WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Tel: (212) 819-8200
J. Christopher Shore (JS-3061)
Gerard Uzzi (GU-2297)

Wachovia Financial Center
Suite 4900
200 South Biscayne Blvd.
Miami, Florida 33131
Tel: (305) 371-2700
Thomas E Lauria (*pro hac vice*)
Richard S. Kebrdle (*pro hac vice*)

Attorneys for Appaloosa Management L.P.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
|   |   |   |
|---|---|---|
| In re | : | Chapter 11 |
|   | : |   |
|   | : | Case No. 06-10354 (BRL) |
| Dana Corporation, *et al.,* | : |   |
|   | : |   |
| Debtors. | : | (Jointly Administered) |
|   | : |   |
-------------------------------------------------------------x

## <u>NOTICE OF APPEAL</u>

PLEASE TAKE NOTICE that Appaloosa Management L.P. ("Appaloosa"), by and

through its undersigned counsel, hereby appeals to the United States District Court for the

Southern District of New York under 28 U.S.C. § 158(a) from each and every part of the Order

Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019,

Approving Settlement Agreements with the United Steelworkers and United Autoworkers, and

Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 and 507, Authorizing the Debtors to Enter

into Plan Support Agreement, Investment Agreement and Related Agreements (Docket No.

5879) (the "Order") entered by United States Bankruptcy Judge Burton R. Lifland on August 1,

2007. A copy of the Order appealed from is attached hereto as Exhibit A.

The names of all parties to the Order appealed from and the names, addresses,

and telephone numbers of their respective attorneys are as follows:

| Appellant: | Attorneys to Appellant: |
|---|---|
| Appaloosa Management L.P. | Gerard Uzzi, Esq. (GU-2297)<br>J. Christopher Shore, Esq. (JS-3061)<br>White & Case LLP<br>1155 Avenue of the Americas<br>New York, New York 10036-2787<br>(212) 819-8200<br><br>Thomas E. Lauria, Esq. (*pro hac vice*)<br>Richard S. Kebrdle (*pro hac vice*)<br>White & Case LLP<br>Wachovia Financial Center<br>200 South Biscayne Blvd., Suite 4900<br>Miami, Florida 33131<br>(305) 371-2700 |
| **Appellees:** | **Attorneys to Appellees:** |
| Dana Corporation, Dakota New York Corp., Brake Systems, Inc., BWDAC, Inc., Coupled Products, Inc., Dana Atlantic LLC f/k/a Glacier Daido America, LLC, Dana Automotive Aftermarket, Inc., Dana Brazil Holdings I LLC f/k/a Wix Filtron LLC, Dana Brazil Holdings LLC f/k/a/ Dana Realty Funding LLC, Dana Information Technology LLC, Dana International Finance, Inc., Dana International Holdings, Inc., Dana Risk Management Services, Inc., Dana Technology Inc., Dana World Trade Corporation, Dandorr L.L.C., Dorr Leasing Corporation, DTF Trucking, Inc., Echlin−Ponce, Inc., EFMG LLC, EPE, Inc., ERS LLC, Flight Operations, Inc., Friction Inc., Friction Materials, Inc., Glacier Vandervell Inc., Hose & Tubing Products, Inc., Lipe Corporation, Long Automotive LLC, Long Cooling LLC, Long USA LLC, Midland Brake, Inc., Prattville | Corinne Ball, Esq.<br>Richard H. Engman, Esq.<br>Jones Day<br>222 East 41st Street<br>New York, NY 10017-6702<br>(212) 326-3939<br><br>Heather Lennox, Esq.<br>Carl E. Black, Esq.<br>Jones Day<br>North Point<br>901 Lakeside Avenue<br>Cleveland, OH 44114-1190<br>(216) 586-3939<br><br>Jeffrey B. Ellman, Esq.<br>Jones Day<br>1420 Peachtree Street, N.E., Suite 800<br>Atlanta, GA 30309-3053<br>(404) 521-3939 |

| | |
|---|---|
| Mfg., Inc., Reinz Wisconsin Gasket LLC, Spicer Heavy Axle & Brake, Inc., Spicer Heavy Axle Holdings, Inc., Spicer Outdoor Power Equipment Components LLC, Torque-Traction Integration Technologies, LLC, Torque-Traction Manufacturing Technologies, LLC, Torque-Traction Technologies, LLC, and United Brake Systems Inc. | Marc S. Levin, Esq. Deputy General Counsel Dana Corporation 4500 Dorr Street Toledo, OH 43615 (419) 535-4500 |
| **Other Parties to the Order:** | **Other Parties' Attorneys:** |
| Centerbridge Capital Partners | Matthew A. Feldman, Esq. Willkie Farr & Gallagher, LLP 787 Seventh Avenue New York, NY 10019-6099 (212) 728-8000 |
| International Union, United Automobile, Aerospace & Agricultural Implement Workers of America | Niraj R. Ganatra, Esq. UAW International 8000 East Jefferson Avenue Detroit, MI 48214 (313) 926-5000<br><br>Babette A. Ceccotti, Esq. Cohen, Weiss and Simon LLP 330 West 42nd Street New York, NY 10036 (212) 563-4100<br><br>Lowell Peterson, Esq. Meyer, Suozzi, English & Klein PC 1350 Broadway, Suite 501 New York, NY 10018 (212) 239-4999 |

| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union | David R. Jury, Esq. Counsel to United Steelworkers Five Gateway Center, Room 807 Pittsburgh, PA 15222 (412) 562-2545 |
|---|---|
| | David M. Fusco Schwarzwald & McNair LLP 616 Pento Media Building 1300 East Ninth Street Cleveland, OH 44114-1503 (216) 566-1600 |
| | Babette A. Ceccotti, Esq. Cohen, Weiss and Simon LLP 330 West 42nd Street New York, NY 10036 (212) 563-4100 |
| The Official Committee of Unsecured Creditors | Kenneth H. Eckstein, Esq. Thomas M. Mayer, Esq. Matthew J. Williams, Esq. Stephen D. Zide, Esq. Kramer Levin Naftalis & Frankel LLP 1177 Avenue of the Americas New York, NY 10036 (212) 715-9100 |
| Ad Hoc Committee of Dana Noteholders | Lewis Kruger Kristopher M. Hansen Kenneth Pasquale Stroock & Stroock & Lavan LLP 180 Maiden Lane New York, NY 10038 (212) 806-5400 |
| United States Trustee | Greg M. Zipes, Esq. Office of The United States Trustee 33 Whitehall Street, Suite 2100 New York, NY 10004 (212) 510-0500, ext. 227 |

Dated:   August 13, 2007
          New York, New York

                            /s/ Gerard Uzzi
                         WHITE & CASE LLP
                         1155 Avenue of the Americas
                         New York, New York 10036-2787
                         Tel:  (212) 819-8200
                         J. Christopher Shore (JS-3061)
                         Gerard Uzzi (GU-2297)

                         Wachovia Financial Center
                         Suite 4900
                         200 South Biscayne Blvd.
                         Miami, Florida 33131
                         Tel:  (305) 371-2700
                         Thomas E Lauria (*pro hac vice*)
                         Richard S. Kebrdle (*pro hac vice*)

                         Attorneys for Appaloosa Management L.P.

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                              :
In re                                         :     Chapter 11
                                              :
Dana Corporation, *et al.,*                   :     Case No. 06-10354 (BRL)
                                              :
                        Debtors.              :     (Jointly Administered)
                                              :
---------------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 1113**
**AND 1114(e) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019,**
**APPROVING SETTLEMENT AGREEMENTS WITH THE UNITED**
**STEELWORKERS AND UNITED AUTOWORKERS,**
**AND PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 AND 507,**
**AUTHORIZING THE DEBTORS TO ENTER INTO PLAN SUPPORT**
**AGREEMENT, INVESTMENT AGREEMENT AND RELATED AGREEMENTS**

        This matter came before the Court on the motion of Dana Corporation ("Dana") and 40

of its domestic direct and indirect subsidiaries (collectively, the "Debtors") dated July 5, 2007

(the "Motion"),[1] for entry of an order (a) pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal

Rule of Bankruptcy Procedure 9019, approving and authorizing the debtors to enter into

settlement agreements, as amended (collectively, as amended, the "Union Settlement

Agreement") with the United Steelworkers ("USW") and the International Union, UAW

("UAW," and together with the USW, the "Unions"), and (b) pursuant to 11 U.S.C. §§ 105(a),

363(b), 364(c), 503 and 507 approving and authorizing the Debtors to enter into:  (i) the Union

Settlement Agreement, (ii) a Plan Support Agreement, as amended, by and among Dana, the

Unions, Centerbridge Capital Partners, L.P. ("Centerbridge") and the creditors set forth on

Exhibit A thereto (the "Plan Support Agreement"), and (iii) an Investment Agreement, dated July

25, 2007, by and among Dana, Centerbridge and CBP Acquisition Co. LLC (as same may be

---

[1]        Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such
terms in the Motion or in the Summary of Changes to the Global Settlement, filed with the Court on July 25, 2007.

amended, the "Investment Agreement"), and related agreements; the Court having reviewed the

Motion, the Union Settlement Agreement, the Plan Support Agreement, the Investment

Agreement, the statements in support of the Motion filed by the UAW and the Ad Hoc

Committee of Noteholders (the "Ad Hoc Noteholders Committee"), the objections of the Official

Committee of Unsecured Creditors (the "Committee"), Appaloosa Management, L.P., Brandes

Investment Partners, L.P., and the joinders to the Committee's objection filed by Wilmington

Trust Company, Timken Company and GK Capital, LLC (collectively, the "Objections"); the

Court having heard the objection (the "Other Creditor Objection") of an ad hoc committee of

certain unsecured creditors (the "Creditor Ad Hoc Committee") and the statements of counsel

and the evidence presented regarding the relief requested in the Motion at a hearing before the

Court on July 26, 2007 (the "Hearing"), at which time, based upon modifications made to the

relief sought in the Motion as further set forth in the record at the Hearing, the Committee

withdrew its objection, Timken Company withdrew its joinder to the Committee's objection and

Wilmington Trust Company modified its objection, and all interested parties were offered an

opportunity to be heard with respect to the Motion, as modified; and it further appearing that the

relief requested in the Motion is in the best interests of the Debtors, their estates and creditors

and other parties in interest; and upon the record of the Hearing and these chapter 11 cases; and

after due deliberation thereon; and good and sufficient cause appearing therefore, as explained in

an oral opinion at the conclusion of the hearing on the Motion (which is incorporated herein fully

by reference), IT IS HEREBY FOUND AND DETERMINED THAT:

Jurisdiction, Notice and Statutory Predicates

        A.      This Court has jurisdiction over the Motion, the transactions contemplated

under the Global Settlement and any other ancillary documents and agreements related thereto

pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a core proceeding pursuant to

28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of the Debtors' chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The notice given by the Debtors of the Motion, the Hearing, and the Notices of Filing regarding the Investment Agreement and the Summary of Changes to the Global Settlement, both of which were filed with the Court on July 25, 2007, constitutes proper, timely, adequate and sufficient notice thereof and complies with the Bankruptcy Code, the Bankruptcy Rules and all applicable local rules, and no further or other notice is necessary.

C.      The statutory predicates for the relief granted herein are sections 105(a), 363(b), 364(c), 503, 507, 1113(c) and 1114(e) of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 9019.

Procedural Background

D.      On March 3, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

E.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

F.      Pursuant to an order of this Court, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.

G.      On March 13, 2006, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee, pursuant to section 1102 of the Bankruptcy Code.

H.      On August 31, 2006, the U.S. Trustee appointed an official committee of non-union retired employees (the "Retiree Committee"), pursuant to section 1114(d) of the

Bankruptcy Code, and as directed by an order of the Court entered on August 9, 2006 (Docket No. 2773).

The Section 1113/1114 Litigation

        I.        Pursuant to section 1113 of the Bankruptcy Code, the Debtors may elect to assume or reject the CBAs.

        J.        On January 31, 2007, the Debtors filed their Motion to Reject their Collective Bargaining Agreements and to Modify their Retiree Benefits pursuant to Sections 1113 and 1114 of the Bankruptcy Code (the "Section 1113/1114 Motion").  The Section 1113 part of the Section 1113/1114 Motion sought the rejection of the CBAs with respect to the Debtors facilities at Auburn Hills, Michigan, Henderson, Kentucky, Marion, Indiana, Fort Wayne, Indiana, and Elizabethtown, Kentucky.  The trial on the Section 1113/1114 Motion began on March 12, 2007.

        K.        At the hearing on the Motion, together with the trial on the Section 1113/1114 Motion, which is to be settled by the instant Motion, the Debtors established that:

        a)        The financial performance of the Debtors' U.S. operations has deteriorated dramatically in the recent past, resulting in $2 billion in losses during the past five years.

        b)        A significant portion of the Debtors' U.S. workforce is unionized. As of January 1, 2007, the Debtors had approximately 6,500 union employees.  Except for Union employees located at the Debtors' Lima, Ohio and Pottstown, Pennsylvania facilities, which are covered under a master collective bargaining agreement with the UAW (the "UAW Master Agreement"), and Union employees at the Debtors' Toledo, Ohio, Rochester Hills, Michigan, and Longview, Texas facilities, where first collective bargaining agreements have yet to be negotiated with the UAW, the remainder of the Debtors' Union employees are covered by

separate collective bargaining agreements with respect to each facility (together with the UAW Master Agreement, the "CBAs").

c)      The Debtors provide non-pension retiree benefits (including hospital, medical, surgical, dental, prescription drug, vision, hearing and life insurance) (collectively, "Non-Pension Retiree Benefits") to all eligible active and retired Union employees and/or their spouses and dependents.  As of January 1, 2006, approximately 16,415 individuals received Non-Pension Retiree Benefits from the Debtors under CBAs (or were active Union employees currently covered under provisions of CBAs that provide a benefit upon retirement).

d)      As of December 31, 2006, the Debtors' Accumulated Post-Employment Benefit Obligation ("APBO") for Non-Pension Retiree Benefits for Union employees and retirees was approximately $1 billion.  As of December 31, 2006, the Debtors' corresponding periodic cost or expense reflected on their income statement on account of Non-Pension Retiree Benefits for Union employees and retirees was approximately $63.3 million.

e)      In order to address the mounting losses from their U.S. operations, in October 2006, the Debtors developed a restructuring plan that would allow the Debtors to achieve the necessary level of cost savings in order to emerge from chapter 11 as a viable business.  The Debtors' restructuring plan outlines annual cost savings of approximately $405 to $540 million, which the Debtors believe they could achieve from five separate areas:  (i) restructuring unprofitable or below market contracts with customers; (ii) capitalizing on lower cost manufacturing capabilities by shifting work, where possible, from high-cost operations to low-cost countries through implementation of a manufacturing footprint optimization ("MFO Program"); (iii) reducing overhead costs; (iv) reducing their union and non-union labor costs; and (v) eliminating Non-Pension Retiree Benefits for both union and non-union retirees (as well as any expectation of future coverage for both union and non-union active employees).

f)        During November and December 2006, the Debtors began discussions and negotiations with the Unions for the purpose of obtaining consensual modifications to the CBAs and Non-Pension Retiree Benefits that would allow the Debtors to achieve the level of cost savings outlined in their restructuring plan.  During this time, the Debtors delivered proposals to the Unions under section 1113 of the Bankruptcy Code with respect to each Union facility (each, a "Section 1113 Proposal").  Similarly, during this time and followed up by revised proposals delivered in January 2007, the Debtors delivered proposals to the Unions under section 1114 of the Bankruptcy Code  with respect to Non-Pension Retiree Benefits (each, a "Section 1114 Proposal").

g)        In summary, the Section 1113 Proposals sought (a) wage modifications at five of the 1113 Facilities; (b) implementation of a "Two Tier" wage structure at all facilities; (c) migration to a customer-directed health benefit program; and (d) modifications to certain work rules and benefits.  The revised Section 1114 Proposals delivered to the Unions contemplated the elimination of Non-Pension Retiree Benefits for Union retirees and active employees and, in its place, the establishment of a VEBA from which participating retirees could receive a subsidy towards the cost of their healthcare.

h)        The modifications proposed by the Debtors and contained in the proposals with respect to their Union labor costs and costs associated with Non-Pension Retiree Benefits represent almost a third of the total savings the Debtors need to achieve, and without such savings, the Debtors will not be able to successfully restructure their U.S. operations.

L.        At the trial on the Section 1113/1114 Motion, the Unions established that in the event the Debtors were granted authorization to reject the CBAs, it was the Unions' intent to strike at facilities covered under the CBAs, and at other unionized facilities without existing CBAs.  Evidence at the Hearing confirmed the reality and significance of that strike threat.

M.      If the Debtors' Section 1113/1114 Motion were granted and the Debtors granted authority to reject the CBAs, the CBAs would be rendered unenforceable in their entirety.

The Global Settlement

N.      After the trial on the Section 1113/1114 Motion, the Debtors and the Unions met and conferred on numerous occasions in an attempt to negotiate a consensual resolution to the Debtors' need for concessions from the Unions on labor costs and Non-Pension Retiree Benefit obligations.

O.      At the request of the Unions, the negotiations evolved into three party discussions and negotiations among the Debtors, the Unions and Centerbridge over a potential framework for the resolution of all issues between the Debtors and the Unions, which would also provide the Debtors with a source of funding to allow them to meet their obligations to the Unions under such proposed resolution, as well as emerge from chapter 11 promptly as a sustainable business.

P.      These discussions led to an agreement between the Debtors, the Unions and Centerbridge over the proposed terms of a global resolution that would include, among other things:  (i) the Union Settlement Agreement, which represents a compromise of the litigation between the Debtors and the Unions and that, more importantly, achieves significant cost savings that will allow the Debtors to markedly improve their overall EBITDA and address the "cash burn" of the Debtors' U.S. operations; (ii) the Plan Support Agreement, which sets forth certain key plan terms that the Unions consider essential to the Debtors' successful emergence from bankruptcy; and (iii) the Investment Agreement, which provides for an investment in the reorganized Debtors of up to $750 million, but not less than $500 million, by Centerbridge and certain creditors of the Debtors, which will enable the Debtors to meet their financial obligations under the Union Settlement Agreement.

Q.      Following the filing of the Motion, the Debtors, the Unions, Centerbridge, the Committee and the Ad Hoc Noteholders' Committee entered into discussions concerning amendments or modifications to the Global Settlement for the purpose of resolving the objections of the Committee and obtaining the support of the Ad Hoc Noteholder Committee.

R.      In an effort to resolve the objections raised by the Committee and obtain support from the Ad Hoc Noteholders' Committee, the parties subsequently agreed to certain modifications and changes to the Global Settlement, although the key wage and benefit terms set forth in the Global Settlement remain unchanged.

S.      The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement (and all transactions contemplated thereunder) are all integral components of the Global Settlement, and without each of these agreements, the Unions would not have agreed to a consensual resolution of all issues with the Debtors.

T.      Subject to the terms of the Plan Support Agreement and the exhibits thereto, the parties have also agreed to work together to complete the formulation and negotiation of a plan of reorganization, and to formulate and facilitate confirmation of a plan in order to consummate the transactions contemplated in the Global Settlement.

U.      The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement, and the transactions contemplated thereby, represent a substantial milestone and pave the way towards the Debtors' reorganization by resolving the issues surrounding the Debtors' union labor and legacy costs that threatened to impact the Debtors' ability to emerge successfully from chapter 11.

V.      Absent approval of the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement (and the transactions contemplated thereby), the Debtors' ability to negotiate consensual modifications to the CBAs and Non-Pension Retiree

Benefits is questionable.  Substantial risks to the estate (in terms of, among other things, delay and labor unrest) exist in the absence of the Global Settlement.

       W.     The Global Settlement allows the Debtors to meaningfully restructure their Union labor costs, eliminate their legacy obligations, implement their MFO Program, which collectively represent a savings of approximately $220 million on an annual basis, and which savings are essential to produce a long-term, viable business.

       X.     The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement are fair, reasonable and equitable and in the best interests of the Debtors' estates.

       Y.     The Global Settlement has a proper business justification and constitutes an important step towards the Debtors' confirmation of a plan of reorganization.  As such, the Global Settlement is neither an evasion of the plan confirmation process, nor does it constitute a *sub rosa* plan of reorganization.

       Z.     The Debtors' decision to enter into the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement represents a sound exercise of their business judgment, is consistent with their fiduciary duties and is based on good, sufficient and sound business purposes and justifications.

       AA.     The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement were all negotiated at arms' length and in good faith by all parties, and the parties' entry into or performance under the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement do not violate any law, including the Bankruptcy Code, and do not give rise to any claim or remedy against the parties thereto, except as may be expressly set forth in this Order or in such agreements.

BB.     The entry into, and performance under, the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement by the Debtors do not constitute the solicitation of a vote on a plan of reorganization.

CC.     The provisions in the Investment Agreement for the payment of the Break-Up Fee, Expense Reimbursement, the Termination Fee and the Commitment Fee are integral parts of the transactions contemplated by the Investment Agreement, and without any one of these provisions, Centerbridge would not enter into the Investment Agreement.

DD.     The Debtors have demonstrated a sound business justification for authorizing the payment of the Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee.  The Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee are each fair and reasonable and provide a benefit to the Debtors' estates.

EE.     The Debtors' payment of the Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee on the terms and conditions provided for in the Investment Agreement are (a) actual and necessary costs and expenses of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and (c) reasonable and appropriate in light of, among other things, (i) the size and nature of the Investment, (ii) the substantial efforts that are being expended by Centerbridge and (iii) the benefits that Centerbridge is providing to the Debtors' estates.

FF.     The Break-Up Fee, Expense Reimbursement and the Commitment Fee pursuant to the terms of the Investment Agreement were incurred in good faith, as such term is used in section 363(m) of the Bankruptcy Code, and the priorities extended to Centerbridge pursuant to this Order shall be entitled to all of the protections provided herein or otherwise contemplated hereby.

GG.    The entry of this Order is in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest in these cases.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is GRANTED in its entirety.

2.    Any objection (including the Objections and the Other Creditor Objection), joinder to any objection or reservation of rights related to the Motion not withdrawn or otherwise resolved as set forth in this Order is hereby OVERRULED.

3.    The Debtors are hereby authorized, but not directed, to execute, deliver and implement the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement the terms of such agreements, and such agreements and documents shall be binding and enforceable against the Debtors and their estates and the other parties thereto in accordance with their terms and subject to the conditions therein; provided, however, that notwithstanding its effectiveness or anything to the contrary in the Union Settlement Agreement or this Order, neither the Union Settlement Agreement nor any of the CBAs shall be assumed, or deemed assumed, by the Debtors unless and until a chapter 11 plan or reorganization shall have been confirmed by order of this Court and substantially consummated.

4.    The Union Settlement Agreement constitutes a valid and binding amendment to the CBAs with authorized representatives of all individuals who were or are in a bargaining unit represented by the UAW or USW, as permitted by section 1113 of the Bankruptcy Code or otherwise.

5.    The Union Settlement Agreement constitutes a valid and binding amendment to existing retiree health and welfare benefits, as permitted by section 1114 of the Bankruptcy Code or otherwise.

6.    Unless terminated in accordance with Appendix R thereof, the Union Settlement Agreement shall be binding upon any chapter 11 trustee that may be subsequently appointed in the Debtors' chapter 11 cases.

7.    The Union Settlement Agreement shall be held to resolve all individual claims filed by Union retirees or employees arising from or with respect to the (i) modifications of the CBAs, as provided for in the Union Settlement Agreement, (ii) the termination of Non-Pension Retiree Benefits, and/or (iii) the termination of long-term disability benefits ("LTD Benefits", as that term is used in the Union Settlement Agreement) to the extent that such individual claim asserts a demand for continued benefits.  It is understood that (i) the Debtors may rely upon the Union Settlement Agreement as a basis for objecting to individual claims to the extent that such individual claims are addressed by the Union Settlement Agreement, and, (ii) the Debtors may effect such resolution through filing with the Bankruptcy Court objections to such claims on notice to the individual claimants.

8.    The entry into the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement by the parties thereto, and the performance and fulfillment of their obligations thereunder, does not constitute the solicitation of a vote on a plan of reorganization, does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the Debtors, the Unions, Centerbridge and/or any creditor of the Debtors that executes the Plan Support Agreement; provided, however, that except as may otherwise be agreed upon (including in the Plan Support Agreement, the Investment Agreement and the Union Settlement Agreement), nothing in this Order shall prejudice any party in interest's right to object to approval of the disclosure statement or confirmation of a plan of reorganization and this Order shall have no preclusive effect (whether by res judicata or otherwise) in connection with any such objection.

9.    Nothing in this Order shall prejudice the right of the Committee to object to the proposed payment of any financing fee to Miller Buckfire.

10.    Pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code, the Debtors are authorized and directed to pay the Break-Up Fee, Expense Reimbursement, the Termination Fee and the Commitment Fee (each if applicable), in accordance with its terms and as and when required by the Investment Agreement, without further order of the Court.  Each of the Break-Up Fee, Expense Reimbursement, the Termination Fee and Commitment Fee (each if applicable) shall constitute allowed superpriority administrative expenses pursuant to sections 364(c)(1), 503(b)(l)(A) and 507(a)(l) of the Bankruptcy Code having a priority over all other administrative claims other than any such claims of the Debtors' postpetition lenders.

11.    The process for the receipt and consideration of any proposed Alternative Minority Investment, Alternative Majority Investment, Alternative Transaction or Alternative Stand-Alone Plan (each as defined in the Investment Agreement and each, an "<u>Alternative Proposal</u>") (collectively, the "<u>Bid Process</u>"), shall be as follows:

a)    Each party that is designated as a Qualified Potential Investor (as such term is defined in the Alternative Proposal Procedures) shall be provided a confidentiality agreement (each, an "<u>Acceptable Confidentiality Agreement</u>") in the form attached to this Order as Exhibit A.  Each Qualified Potential Investor shall also be provided the Alternative Proposal Procedures, the form of which is attached to this Order as Exhibit B;

b)    Subject to the conditions, qualifications and terms contained in the Alternative Proposal Procedures, each Qualified Potential Investor that executes an Acceptable Confidentiality Agreement shall be granted access to information and a virtual data room consistent with the Alternative Proposal Procedures;

c)        The Debtors shall reasonably cooperate with any Potential Investor that has executed an Acceptable Confidentiality Agreement in connection with assisting such party in formulating an Alternative Proposal;

d)        Qualified Potential Investors (as such term is defined in the Alternative Proposal Procedures) that are interested in submitting an Alternative Proposal shall submit their preliminary indications of interest (each, an "Indication of Interest") so as to be actually **received on or before 5:00 p.m. (EST) on August 17, 2007**, by:  (a) counsel to the Debtors, Jones Day, 222 East 41st Street, New York, NY 10017, Attn:  Corinne Ball, Esq., E-mail: cball@jonesday.com; (b) Miller Buckfire, 250 Park Avenue, 17th Floor, New York, NY 10177, Attn:  Richard Morgner, E-mail: richard.morgner@millerbuckfire.com; and (c) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: Thomas Moers Mayer, Esq., E-mail: tmayer@kramerlevin.com, and Matthew Williams, E-mail: mjwilliams@kramerlevin.com.  The Debtors will provide copies of Indications of Interest to third parties consistent with the Alternative Proposal Procedures.

e)        Only those Continuing Potential Investors (as such term is defined in the Alternative Proposal Procedures) who, on or before August 24, 2007, are invited to submit a Final Proposal Letter (each, a "Final Proposal Letter") shall submit a final, binding proposal to the parties identified in subparagraph (d) above so as to be actually **received by all parties on or before 5:00 p.m. (EST) on September 21, 2007**.  The Debtors will provide copies of Final Proposals to third parties consistent with the Alternative Proposal Procedures.

f)        Dana's board of directors will consider all timely received Final Proposal Letters during the week of September 24, 2007,

g)      On or before September 25, 2007, the Debtors may provide to the Unions the notices contemplated by Sections 1 and 3(a)(ii) of Appendix R to the Union Settlement Agreement, a copy of which is attached to this Order as Exhibit C;

h)      In the event that the Unions have withheld consent requested by the Debtors to an Alternative Proposal, the Debtors, the Unions and the Committee shall move expeditiously through the arbitration process outlined in Appendix R to the Union Settlement Agreement in accordance with the terms of such Appendix R; and

i)      The hearing to consider the Debtors' disclosure statement on any plan of reorganization for the Debtors (as same may be amended as a result of the Bid Process) shall be held on **Tuesday, October 23, 2007, at 10:00 a.m.**, subject to any extension of such hearing date that may be necessary to provide for the five (5) business day time period specified in Section 4.10 of the Investment Agreement.  In the event that the Debtors have decided to proceed with an Alternative Proposal, the Debtors shall advise the Court of their intention to terminate the Investment Agreement at the hearing to consider the Debtors' disclosure statement.

12.      So long as the Debtors adhere to the Bid Process described in paragraph 11 above or amend any plan of reorganization then on file with this Court to incorporate the terms of any Alternative Proposal (an "Amended Plan"), the Committee, the Ad Hoc Noteholders Committee (or its members), Centerbridge or the Unions shall not: (i) challenge directly or indirectly, or support any motion challenging or seeking to terminate, the Debtors' exclusive right to to file a plan of reorganization or solicit acceptances thereto; (ii) allege or construe an Amended Plan to be a new plan of reorganization such that the Debtors would lose their exclusive rights to file or solicit acceptance to such plan, as amended; (iii) take any action or make any other suggestion in any forum to limit or terminate the exclusive rights of the Debtors to file a plan of reorganization or solicit acceptances thereon in the event that the

Debtors amend their plan of reorganization to incorporate the terms of any Alternative Proposal; or (iv) file a competing plan of reorganization on or before December 4, 2007.

13.     Upon the Union Settlement Agreement becoming effective, the Unions shall withdraw with prejudice their appeal in respect of the Debtors' executive compensation, annual incentive plan and long-term incentive plan that is currently pending in the United States District Court for the Southern District of New York.

14.     This Order is a final and non-interlocutory order and is immediately subject to appeal pursuant to 28 U.S.C § 158(a).

15.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

16.     The requirement under Local Rule 9013-l(b) for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

17.     For purposes of determining whether a creditor shall be deemed a "Qualified Investor" (as such term is defined in the Investment Agreement), (i) the Bondholder Record Date shall be August 13, 2007 and (ii) the Trade Claims Record Date shall be the date of the entry of an order confirming the Debtors' plan of reorganization.

18.     Notwithstanding anything to the contrary in the Global Settlement, any signatory to the Plan Support Agreement, who is also a member of the Committee, shall be deemed to execute the Plan Support Agreement in its individual capacity only and not as a member of the Committee, and nothing contained in this Order or the Global Settlement shall be deemed to limit the free and unrestricted performance of such signatory's duties as a member of the Committee, including without limitation, any consideration, formulation or action with respect to any competing plan of reorganization or alternative transaction.

19.      The terms of this Order govern the terms of the Global Settlement.  To the extent the terms of this Order conflict with the terms of the Global Settlement, the terms of this Order shall be deemed to apply.

Dated: New York, New York
          August 1, 2007

/s/Burton R. Lifland
HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**



**DANA CORPORATION**
**4500 Dorr Street**
**Toledo, Ohio  43615**


_____ ___, 200_


<u>**CONFIDENTIAL**</u>

_____
_____
_____
Attention:  _____

Re:  <u>Confidentiality Agreement</u>

Dear Mr./Mrs. _____:


As you know, Dana Corporation ("<u>Dana</u>") and 40 of its domestic direct and indirect subsidiaries (collectively, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), on March 3, 2006.  Dana's chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>") are jointly administered under the caption <u>In re Dana, *et al.*</u>, Case No. 06-10354 (BRL), and are pending before the Honorable Burton R. Lifland in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").  Subject to the terms and conditions of this letter agreement (this "<u>Agreement</u>"), the Debtors are willing to furnish _____ ("<u>Investor</u>") with certain Confidential Information (as defined below) in connection with Investor's consideration of a possible investment in Dana as an alternative to the investment by Centerbridge Capital Partners, L.P. (the "<u>Investment</u>").

The Confidential Information shall be furnished or otherwise disclosed or made known to you subject to the terms and conditions of this Agreement unless otherwise agreed to in writing by the Debtors.  This Agreement and your obligations hereunder shall apply to your use of

2

Confidential Information regardless of whether it is provided or made known to you by the Debtors or their Advisors or Representatives (as such terms are defined below).  You will be responsible for any use or disclosure of Confidential Information by your Representatives or Advisors in contravention of this Agreement.

       1.      For purposes of this Agreement, the following terms shall have the following indicated meanings:

      "Advisors" shall include any counsel, consultants, accountants, experts, auditors, examiners, financial advisors or other agents or professionals.

      "Confidential Information" means any non-public information and any information marked or designated by the Debtors and/or their Representatives or Advisors as being "confidential," in each case concerning the Debtors or the Chapter 11 Cases, including, without limitation, information concerning the Debtors' assets, liabilities, business operations, business practices, business plans, financial projections, financial and business analyses, intellectual property, trade secrets and compilations and studies relating to the foregoing, and other documents prepared by the Debtors or their Advisors or Representatives, and information concerning any potential investor in or purchaser or potential purchaser of any of the Debtors' assets, or any confidential information provided as part of or in connection with any proposals or negotiations of a possible investment transaction, which is furnished, disclosed or made known to you or your Representatives or Advisors by the Debtors or their Representatives or Advisors, whether intentionally or unintentionally and in any manner, including in written form, orally or through any electronic, facsimile or computer related means of communication.  Confidential Information shall include, without limitation:  (a) any notes, summaries, compilations, presentations, memoranda or similar written materials disclosing or discussing Confidential Information; (b) any written Confidential Information that is discussed or presented orally; and (c) any other Confidential Information conveyed to you or your Representatives or Advisors orally that the Debtors or their Representatives or Advisors advise you should be treated as confidential.  Notwithstanding anything to the contrary in this Agreement, Confidential Information shall not include any information or portions of information that:  (a) is or becomes generally available to the public, (b) is or becomes available to you on a non confidential basis, to the extent that the source of such information was or is not actually known by you to be prohibited from disclosing such information by contractual, legal or fiduciary obligation to the Debtors, or (c) was in the possession of Investor on a non-confidential basis prior to its disclosure by the Debtors.

      "or" shall not be construed as exclusive.

      "person" shall be interpreted broadly to include the media and any corporation, company, limited liability company, group, partnership, joint venture, union, government agency, political subdivision or individual.

      "Representatives" shall include directors, officers, employees, agents and other representatives.

      "you" and "your" refers to Investor.

2.    The Confidential Information shall be used consistent with the following:

(a)    All Confidential Information shall be used by you solely and exclusively in connection with your consideration and evaluation of a possible investment in the Debtors and shall be kept confidential by you, and shall not be disclosed by you or your Representatives or Advisors to any other person or entity without the Debtors' prior written consent.

(b)    If the Debtors determine, in their business judgment, that certain Confidential Information poses a risk of competitive or other harm to the Debtors, the Debtors may designate such information to be for (i) Investor's eyes only or (ii) professional eyes only or (iii) particular professionals' eyes only (collectively, "Restricted Information").  You agree that any Restricted Information designated in this manner (whether by legend, watermark, restricted access in the virtual dataroom or written confirmation) may be reviewed only by employees of Investor or the specific Advisor or Advisors, as the case may be, designated as having access to such Restricted Information and, in the case of an Advisor or Advisors, who agree to this restriction and have acknowledged in a writing in the form attached hereto as Exhibit 1 that they have reviewed this Agreement and agreed to be bound by all of the terms hereof.

(c)    Confidential Information may be disclosed by you to your Representatives and Advisors who are working on the Chapter 11 Cases (subject in all cases to the limitations in paragraph 2(b) above), provided that each such Advisor receiving any Confidential Information pursuant to this paragraph 2(c) has acknowledged in a writing in the form attached hereto as Exhibit 1 that he has reviewed this Agreement and agreed to be bound by all of the terms hereof, including without limitation, the obligations concerning the confidentiality of all such Confidential Information and the proper use thereof.  Investor shall provide promptly to the Debtors a true and correct copy of any acknowledgment executed in accordance with paragraphs 2(b) and 2(c).

(d)    Notwithstanding the foregoing, Investor shall be permitted to disclose Confidential Information to other holders of Dana Securities (as defined below) or other parties in interest in the Chapter 11 Cases so long as such holders or parties in interest have entered into a confidentiality agreement acceptable to Dana.

3.    Without the prior consent of the other party hereto, Investor will not enter into any agreement, arrangement or any other understanding, whether written or oral, with any potential financing source or sources which by its terms seeks to, or is intended to, limit, restrict, restrain, or otherwise impair in any manner, directly or indirectly, the ability of such financing source or sources to provide financing or other assistance to any other party in any other transaction involving the Company.

4.    Confidential Information may be disclosed by you or any of your Representatives or Advisors if you are legally compelled (including, by deposition, interrogatory, request for documents, subpoena, civil investigative demand, court order or similar process) to do so; provided that, if legally permissible, you provide the Debtors with reasonable prior notice of your intention to disclose Confidential Information, which notice must be received by the Debtors' counsel not fewer than 10 days prior to such disclosure (or if the period for your own compliance is fewer than 10 days, then reasonably prompt notice), so that the Debtors may seek

a protective order or other appropriate remedy and/or waive compliance with the terms of this Agreement with respect to the proposed disclosure. If you timely give such notice and a protective order or other remedy is not obtained by the time you are required to comply with such disclosure requests, you may comply with such requests, provided that you use reasonable efforts to disclose only such limited portion of the Confidential Information as is covered by such request.

5.      Without limiting the generality of any provision of this Agreement, if you determine in your sole discretion that it is necessary to disclose or describe the substance of the Confidential Information in a motion, pleading or other document filed with the Bankruptcy Court, or any other court, administrative body or other tribunal (collectively, a "Filing"), prior to such Filing, you shall move the Bankruptcy Court, or other court of competent jurisdiction, to make such Filing under seal or through some comparable protective mechanism. Further, if you determine that it is necessary to disclose or describe the substance of Confidential Information through oral disclosure in any court, administrative body or other tribunal (collectively, an "Oral Disclosure"), prior to such Oral Disclosure, you shall: (a) to the extent reasonably practicable, notify the Debtors thereof promptly upon such determination; and (b) move the court, administrative body or other tribunal for authority to make such disclosure in camera or in some other protective manner. Except as provided in paragraphs 2, 3, 4 and 5 of this Agreement, Confidential Information shall not be disclosed absent the express written consent of the Debtors. If you or the Debtors seek a protective order or other remedy in accordance with this Agreement, you agree that, to the extent legally permissible, you will not publicly disclose Confidential Information until the matter has been resolved by a court of competent jurisdiction.

6.      You shall take proper care to assure that all Confidential Information is maintained in a secure location and manner. Upon termination of any definitive agreement between Dana and Investor providing for the Investment or the earlier termination of discussions between Investor and Dana regarding such investment, and at the written request of the Debtors, all tangible Confidential Information in your possession, custody or control and furnished by the Debtors or their Representatives or Advisors to you or your Representatives or Advisors shall promptly be returned to the Debtors, without retention of any copy thereof. If the Debtors make such a request, all other Confidential Information that has been furnished by the Debtors or their Representatives or Advisors to the extent incorporated into any analyses, compilations, studies, personal notes, summaries or other documents in your possession, custody or control shall be either destroyed or retained by you and kept subject to the terms of this Agreement. If requested in writing by the Debtors, you shall provide a certification as to the destruction of any materials in accordance with the foregoing. Notwithstanding the return, destruction or retention of any Confidential Information, you and your Representatives and Advisors will continue to be bound by the obligations of confidentiality and other obligations hereunder. Notwithstanding the foregoing, Investor shall be authorized to retain in the office of the General Counsel to Investor one copy of any Confidential Information furnished under this Agreement, along with any notes, compilations, studies or analysis incorporating the Confidential Information; provided that all of the terms of this Agreement shall apply to any Confidential Information or other documents maintained pursuant to this sentence.

7.      As of the date of this Agreement, except as previously disclosed by you to the Debtors in writing, you represent that you do not beneficially own any claims (as such term is

5

defined under section 101 of chapter 11 of title 11 of the United States Code) with respect to any Debtor or any rights to acquire such claims (collectively, "Claims") or any debt or equity securities of Dana or any of its subsidiaries or any direct or indirect options, warrants or other rights to acquire, or any security convertible into or exchangeable for, any debt or equity securities of Dana or any of its subsidiaries (together with Claims, "Dana Securities"). You agree that for a period (the "Standstill Period") of the earliest to occur of the one year anniversary of the date of this Agreement and the effective date of a chapter 11 plan of reorganization for the Debtors (the "Effective Date"), except within the terms of a specific written request from a majority of the independent directors of the Board of Directors of Dana or its designee, you will not, and none of your Representatives or Advisors on your behalf will, directly or indirectly through another party (a) file with the Bankruptcy Court, or solicit acceptances with respect to, any Plan of Reorganization in the Chapter 11 Cases unless and until such time as the Debtors do not have the exclusive right to propose, or solicit acceptances in respect of, a Plan of Reorganization in the Chapter 11 Cases or (b) sell, acquire, or offer, propose or agree to sell or acquire, by purchase or otherwise, beneficial ownership of any Dana Securities, provided, however, that if no definitive agreement for an Investment has been executed between you and Dana and discussions between you and Dana regarding an Investment have terminated, subject to applicable securities laws and any applicable orders of the Bankruptcy Court, you may sell Dana Securities beneficially owned by you at any time after a disclosure statement is filed by the Debtors in the Chapter 11 Cases.

8.      Except as described in paragraph 6 hereof and except for the Standstill Period described in paragraph 7, all obligations under this Agreement shall terminate and be of no further force or effect on the date that is the later of: (a) three months after the first to occur of (x) the Effective Date, (y) the dismissal of the Chapter 11 Cases, or (z) the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (b) twelve months from the date of this Agreement.

9.      It is agreed that no failure or delay by the Debtors in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder. Nothing contained herein shall restrict the use by the Debtors of Confidential Information or limit or preclude the Debtors from raising objections to the production or disclosure of information or documents.

10.     Each party hereto agrees that unless and until a definitive agreement between Dana and you with respect to the Investment has been executed and delivered, neither you nor any Debtor will be under any legal obligation of any kind whatsoever with respect to such a transaction by virtue of this Agreement or any written or oral expression with respect to such a transaction by any of our respective Representatives or Advisors except, in the case of this Agreement or any other written agreement signed by the parties which purports to be binding, for the matters specifically agreed to herein or therein. Although you understand that the Debtors have endeavored to include in the Confidential Information those materials and information which they believes to be reliable and relevant for the purpose of your evaluation of Dana and its subsidiaries, you understand and acknowledge that the Debtors are not making any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information. You agree that neither the Debtors, nor any of their respective

6

Representatives or Advisors will have any liability to you or any other person resulting from the use of the Confidential Information by you or your Representatives and Advisors or any errors or omissions therein, it being understood that only those particular representations and warranties that are made to you by the Debtors in a definitive purchase agreement, when and if it is executed, and subject to such limitations and restrictions as may be specified in such definitive purchase agreement, will have any legal effect.

11.     Unless agreed to otherwise by Investor in its sole discretion or for the purpose of negotiating the Investment, the Debtors shall not enter into any confidentiality agreement with any third party or creditor that has proposed to Dana to enter into discussions with Dana concerning an investment in Dana and its subsidiaries as an alternative to the Investment unless such confidentiality agreement contains terms that are not materially less favorable to Dana than the terms of this Agreement.

12.     You agree that money damages will not be a sufficient remedy for any breach of this Agreement by you or your Representatives or Advisors.  Accordingly, in addition to any other remedies to which they may be entitled at law or in equity, the Debtors shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any breach of this Agreement (regardless of whether damages may or may not be readily quantifiable and without posting a bond or other security).

13.     This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to the otherwise applicable principles of law as to conflicts or choice of law of such state.

14.     Each party hereto hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall have exclusive jurisdiction with respect to any issues, actions, suits or proceedings arising out of or relating to this Agreement during such time as any of the Debtors shall be subject to the jurisdiction of the Bankruptcy Court.

15.     This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of such counterparts taken together shall be deemed to constitute one and the same instrument.  The parties agree that facsimile signatures shall be accepted as originals for all purposes under this Agreement.

16.     Except as otherwise provided herein, all notices and other communications to the Debtors or you required or permitted under this Agreement shall be in writing and shall become effective when delivered by facsimile (confirmed by mail), overnight courier service, registered or certified mail (postage prepaid) or hand delivery, addressed as follows or to such other addresses as may be thereafter designated in writing by such party to the other parties:

You:                          _____
                             _____
                             _____
                             <u>Attention:</u>      _____
                             Telephone:      _____
                             Facsimile:      _____

With copies to:              _____
                             _____
                             _____
                             <u>Attention:</u>      _____
                             Telephone:      _____
                             Facsimile:      _____

The Debtors:                 Dana Corporation
                             4500 Dorr Street
                             Toledo, Ohio  43615
                             <u>Attention:</u>      Marc S. Levin, Esq.
                             Telephone:      (419) 535-4640
                             Facsimile:      (419) 535-4790

With copies to:              Jones Day
                             222 E. 41st Street
                             New York, New York  10017
                             <u>Attention:</u>      Marilyn W. Sonnie
                             Telephone:      (212) 326-3734
                             Facsimile:      (212) 755-7306

        17.     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  This Agreement may not be assigned by you without the prior written consent of the Debtors, which consent shall be granted or not according to the Debtors' sole discretion.  There are no third-party beneficiaries of this Agreement.

        18.     This Agreement shall apply with respect to all Confidential Information provided or made known to you on, prior to or after the date hereof.

        19.     This Agreement represents the entire agreement of the parties hereto with respect to the subject matter hereof, and any amendment, supplement or modification hereto, or any waiver of the rights and obligations hereunder, must be in writing and signed on behalf of the parties hereto.

        20.     If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of the Agreement shall not be affected or impaired thereby.

        21.     You hereby acknowledge that you and your Representatives and Advisors may receive material non-public information in connection with your evaluation of an investment and

are aware that the federal and state securities laws may prohibit any person who has material, non-public information about a company from purchasing or selling securities of such a company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

Please indicate your acceptance of this Agreement by signing below and returning this Agreement to Marilyn Sonnie at the notice address set forth in paragraph 16 above.

Sincerely,

Dana Corporation, on its own behalf and on behalf of all of the other Debtors

By:      _____
        Name:
        Title:

Authorized Signatory for All of the Debtors

AGREED AND ACKNOWLEDGED:

_____

By:      _____
        Name:
        Title

**EXHIBIT 1**

## ACKNOWLEDGMENT AND AGREEMENT

Reference is hereby made to the Confidentiality Agreement dated _____ __, 200_ (the "Confidentiality Agreement"), by and between Dana and 40 of its domestic direct and indirect subsidiaries (collectively, the "Debtors") and _____ ("Investor"). The undersigned acknowledges receipt of a true and correct copy of the Confidentiality Agreement and that it is an Advisor (as such term is defined and used in the Confidentiality Agreement) to Investor.  The undersigned further acknowledges and agrees to be bound by all of the terms and conditions of the Confidentiality Agreement as if it were a party thereto, and that the Debtors are express beneficiaries of this Acknowledgment and Agreement and shall be entitled to rely upon and enforce this Acknowledgment and Agreement in accordance with the terms of the Confidentiality Agreement.

Dated this ___ day of _____, 200_.

[NAME OF ADVISOR]


By: _____
        Name:
        Title:

**EXHIBIT B**

## ALTERNATIVE PROPOSAL PROCEDURES

Persons ("Potential Investors") who have an interest in exploring the proposal of an Alternative Minority Investment, Alternative Majority Investment, Alternative Transaction or Alternative Stand-Alone Plan (each an "Alternative Proposal") must follow each of the procedural steps and additional guidelines set forth in these Procedures, or their Alternative Proposals may not be considered.

## The Investment Order

The process respecting the consideration of Alternative Proposals will be governed solely by these procedures and the requirements set forth in the Order Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, Approving Settlement Agreements with the United Steelworkers and United Autoworkers, and Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 and 507, Authorizing the Debtors to Enter Into Plan Support Agreement, Investment Agreement and Related Agreements (the "Investment Order"), which was entered in the chapter 11 cases of Dana Corporation and its debtor affiliates by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Capitalized terms not otherwise defined herein have the meanings given to them in the Investment Order.

The Investment Order approves, among other things, an investment agreement (the "Investment Agreement") and related agreements among Centerbridge Capital Partners, L.P. ("Centerbridge") and Dana setting forth the terms and conditions upon which Centerbridge is willing to make an investment in New Dana (the "Centerbridge Proposal"). The Investment Order contemplates the consideration by Dana of Alternative Proposals to be made by Potential Investors that will be governed by these procedures.

## Step One:  Entry Into Confidentiality Agreement

Each Potential Investor must submit a letter indicating its interest in making an Alternative Proposal, including any information that the Potential Investor believes will assist Dana in evaluating the credentials of the Potential Investor (the "Initial Letter"). If, after consultation with the Official Committee of Unsecured Creditors (the "Committee"), Dana determines the interest to be bona fide and is satisfied with the financial credentials of the Potential Investor (a "Qualified Potential Investor"), such Qualified Potential Investor will be asked to execute and deliver to Dana a confidentiality agreement in the form substantially similar to that attached to the Investment Order as Exhibit A (an "Acceptable Confidentiality Agreement").

Each Qualified Potential Investor that executes an Acceptable Confidentiality Agreement shall be granted access to the information and the virtual data room that was established and is being maintained by the Dana for the purpose of having allowed Centerbridge to conduct its due diligence in connection with the Centerbridge Proposal; provided, however, that the information and data room access relating to commercially sensitive pricing, customer, supply and other information may be limited for certain Qualified Potential Investors to the extent that Dana, in consultation with the Committee, determines that permitting the investor unfettered access to

such information or data room could violate applicable federal law (including antitrust law) or have a potentially negative impact on Dana's business operations or competitive position in the industry.

## Step Two:  Indications of Interest

Each Qualified Potential Investor must submit a bona fide written, preliminary, nonbinding indication of interest (an "Indication of Interest") based its review of the online data room, the pleadings filed in the Bankruptcy Court, other publicly available information and its knowledge of the industry.

In order to be considered, any Indication of Interest must be submitted in accordance with the instructions below no later than 5:00 p.m., Eastern Time, on August 17, 2007.  Potential investors are encouraged to submit Indications of Interest early, so that the Debtors and the Committee can review Indications of Interest and provide comments so that revised Indications of Interest may be submitted prior to the August 17, 2007 deadline.  The Indication of Interest may be a nonbinding proposal but must address, at minimum, the following items (provided that any of the requirements set forth below are waivable by Dana in its discretion after consultation with the Committee, so long as such waiver does not adversely affect the rights of the United Steelworkers of America (the "USW") and the International Union, UAW (the "UAW" and, collectively with the USW, the "Unions")):

- Investment Terms.  The terms of the proposed investment or transaction (the "Proposed Transaction"), including (but not limited to) the structure of the transaction, the types of securities that the Qualified Potential Investor expects to purchase from Dana or reorganized Dana or offer to others to purchase in connection with the Proposed Transaction, a brief summary of the rights associated with such securities, the amounts (in U.S. dollars) that are to be paid for such securities and the other relevant economic terms of such Proposed Transaction or, if the Proposed Transaction does not call for an investment, all relevant terms of such Proposed Transaction.

- Assumptions.  Details of the key assumptions pertaining to the Proposed Transaction that are being made in order to determine relevant underlying metrics (e.g., valuation).

- Financing Requirements.  A detailed description of financing plans, financing structure and the Qualified Potential Investor's plans, if any, to seek other investors as participants in the Proposed Transaction and, if the Indication of Interest contemplates external financing, information regarding appropriate contacts at each external financing source(s), the amounts and terms of the financing contemplated, the commitment process, the anticipated timing involved, the steps required to secure necessary funds, the present status of discussions and any other financing contingencies.

- <u>Information Regarding the Investor.</u>  A detailed description of the identity, exact legal name, state of incorporation (or similar information if not a corporation), capital structure and ownership structure of the Qualified Potential Investor.  In addition, each Qualified Potential Investor should provide a detailed description of the following information:  (a) the Qualified Potential Investor's experience in using private capital to consummate equity investments in large operating businesses and in businesses in the automotive industry and a description of (i) the most recent such transactions and (ii) other such transactions that the Qualified Potential Investor has made in the automotive industry; (b) the Qualified Potential Investor's management skills and resources; (c) the identity of the dedicated personnel that will be assigned by the Qualified Potential Investor to work with the Debtors' management team; and (d) the proposed investment horizon of the Qualified Potential Investor.  If other entities are proposed to participate in the Proposed Transaction, all such information set forth above must be provided for such parties as well.

- <u>Necessary Internal Approvals</u>.  A description of the internal corporate, partnership or shareholder approvals, if any, which will be required for the Qualified Potential Investor to obtain prior to entry into a Proposed Transaction, and the anticipated timing of obtaining such approvals.

- <u>Necessary External Approvals</u>.  A listing and description of all expected required regulatory, governmental or other external approvals (<u>e.g.</u>, Hart-Scott Rodino, Federal Trade Commission, European Commission) expected to be required for a Proposed Transaction, and the anticipated timing of obtaining such approvals.

- <u>Other Material Conditions</u>.  A detailed description of any other material conditions of any nature that must be fulfilled prior to consummating a Proposed Transaction, and the anticipated timing of fulfillment of such conditions.

- <u>Due Diligence</u>.  A list of the material, unanswered business questions or issues that are important for determining the final terms of any Alternative Proposal, and the scope, nature, timing and extent of any additional due diligence that the Qualified Potential Investor or its financing sources would need to complete.

- <u>Appropriate Contact Persons</u>.  The appropriate contact persons for the Qualified Potential Investor and its legal and financial advisors, with their contact information, and appropriate contact persons for any third parties that the Qualified Potential Investor proposes will be involved in the Proposed Transaction.

Indications of Interests submitted in a timely manner will be evaluated as soon as reasonably practicable with the objective of determining whether to invite Potential Investors to participate in the next phase of the evaluation process, such determination to be made no later than August 24, 2007.  If Dana, after considering the views of the Committee, determines that the Indication of Interest is bona fide and, based on the information in the Indication of Interest, has the potential to meet the standards set forth in the Investment Agreement for the exercise of its rights to terminate the Investment Agreement, then:

- The Qualified Potential Investor will be deemed a "Continuing Potential Investor" and invited to make a Final Proposal (as such term is defined below).

- Subject to the terms of the Acceptable Confidentiality Agreement, the Continuing Potential Investor will receive access to the same information and virtual data room that was established and is being maintained by Dana for the purpose of having allowed Centerbridge to conduct its due diligence in connection with the Centerbridge Proposal.

- The Continuing Potential Investor will be invited to visit selected Dana facilities and meet with Dana's advisors and selected members of its senior management team.

- Arrangements will be made so that the Continuing Potential Investor may meet with representatives of the Committee and the Unions.

### Step Three:  Final Proposals

Each Continuing Potential Investor will be required to submit a firm and final written offer constituting its Alternative Proposal (a "Final Proposal") in accordance with the instructions below so as to be received by both parties on or before 5:00 p.m., Eastern Time on September 21, 2007 (the "Final Proposal Deadline").  Continuing Potential Investors are encouraged to submit Final Proposals early, so that the Debtors and the Committee can review Final Proposals and provide comments so that revised Final Proposals may be submitted prior to the Final Proposal Deadline.

Upon review and consideration of Indications of Interest, Dana, in consultation with the Committee, may promulgate additional instructions governing what will be required to be submitted in any Final Proposal.  Any such additional instructions will be provided to Continuing Potential Investors and the Committee reasonably in advance of the Final Proposal Deadline.

In connection with the making of a Final Proposal, each Continuing Potential Investor will be required to, at minimum, provide the following (provided that any of the requirements set forth below will be waivable by Dana in its discretion after consultation with the Committee so long as such waiver does not adversely affect the rights of the Unions):

- <u>Structure and Amounts of Investment or Transaction</u>.  An executive summary of the Proposed Transaction structure setting forth all relevant features of the Proposed Transaction, including (but not limited to) the types of securities that the Continuing Potential Investor expects to purchase from Dana or reorganized Dana or offer to others to purchase in connection with the Proposed Transaction, a brief summary of the rights associated with such securities, the amounts (in U.S. dollars) that are to be paid for such securities and the other relevant economic terms of such Proposed Transaction or, if the Proposed Transaction does not call for an investment, all relevant terms of such Proposed Transaction.

- <u>Modified Investment Agreement</u>.  To the extent that the Final Proposal is similar in a material way to the Centerbridge Proposal, the Final Proposal must include a marked-up version of the Investment Agreement (including the schedules thereto) and a marked-up version of the most recent plan of reorganization that has been filed in the Bankruptcy Court by the Debtors, with a statement that the Continuing Potential Investor is prepared to execute promptly such agreement on such modified terms with no additional due diligence or conditions other than those expressly set forth in the agreement and that the Continuing Potential Investor is prepared to support a plan of reorganization on such modified terms.  Counsel to Dana and counsel to the Committee will be available to discuss any proposed modifications to the terms of the Investment Agreement and the plan of reorganization prior to the Final Proposal Deadline.

- <u>Other Form of Agreement</u>.  To the extent that the Final Proposal is not similar to the Centerbridge Proposal in any material way, the Final Proposal must include a draft agreement or agreements (along with any necessary schedules thereto) that set forth the terms of the Final Proposal, along with a statement that the Continuing Potential Investor is prepared to execute promptly such agreement with no additional due diligence or conditions other than those expressly set forth in the agreement.  To the extent that a Final Proposal includes a new form of agreement, the Continuing Potential Investor must provide counsel to Dana and counsel to the Committee nonbinding draft forms of the proposed agreement at least seven business days prior to the Final Proposal Deadline to provide Dana and the Committee an opportunity to comment on the form and provisions of such agreement.

- <u>Changes From Indication of Interest</u>.  A statement confirming that all information set forth in the Indication of Interest remains accurate and, if not, a detailed description of the information set forth in the Indication of Interest that has changed since the submission thereof.

- <u>Financing Requirements</u>.  A detailed description of relevant financing plans and financing structure.  If the Final Proposal contemplates the

participation of other investors as participants in the Proposed Transaction,
any written agreements with such third-party investors or any information
regarding the identity or qualifications of such investors.  If the Final
Proposal contemplates external financing, the Final Proposal must include
copies of executed agreements from such external financing sources
committing to secure necessary funds.  No financing contingencies may be
included in any Final Proposal.

- Due Diligence.  A statement confirming that all due diligence has been
  completed as of the date of the Final Proposal and that no additional due
  diligence will be necessary.

- Necessary Internal Approvals.  A statement confirming that all internal
  corporate or shareholder approvals, if any, have been obtained (or, for
  large publicly-held corporations, if, when and how such approvals are
  anticipated to be obtained).

- Necessary External Approvals.  A statement confirming that all regulatory,
  governmental or other external approvals (financing and otherwise), if any,
  have been obtained.  To the extent any governmental approvals remain
  pending, when they will be satisfied.

- Other Material Conditions.  All closing conditions or other contingencies,
  if any, must be expressly set forth in the form of agreement that is
  submitted with the Final Proposal.

- Additional Information.  A detailed description of (a) the plans of the
  Continuing Potential Investor with respect to the future of the Debtors'
  businesses, including the expected manufacturing footprint of the Debtors'
  business operations in upcoming years, information regarding any
  proposed or contemplated plant closures; and (b) the levels of financial
  leverage to be applied to Dana's business as part of the Final Proposal; and
  (c) the proposed amounts of liquidity that the Continuing Potential
  Investor projects will be available to the Debtors in the operation of their
  businesses.

- Disclosure of Connections with Parties In Interest.  A detailed disclosure
  of any material connections that the Continuing Potential Investor has with
  parties in interest in Dana's bankruptcy case, including any that may need
  to be disclosed in the Bankruptcy Court in connection with this process.

Dana shall review all Final Proposals and may, by September 25, 2007, provide the required
notice to the Unions under section 1 or section 3(a)(ii) of Appendix R to the Union Settlement
Agreement, as applicable, to initiate the due diligence period of the Unions.

The Board of Directors of Dana Corporation and the Debtors' attorneys and advisors, in consultation with the Committee and its advisors, will consider all Final Proposals during the week of September 24, 2007 and will contact all parties that have submitted Final Proposals thereafter.

### Communications with Dana and Instructions for Submissions

All communication or inquiries relating to Alternative Proposals should be directed to Jones Day and Miller Buckfire & Co., LLC, attorneys and advisors to Dana, the contact information for which is as follows:

| | |
|---|---|
| Jones Day<br>222 East 41st Street<br>New York, New York  10017<br>Phone:  (212) 326-3939<br>Facsimile:  (212) 755-7306<br>Attn:  Corinne Ball, Esq.<br>(cball@jonesday.com)<br>Attn:  Marilyn W. Sonnie, Esq.<br>(mwsonnie@jonesday.com) | Miller Buckfire & Co., LLC<br>250 Park Avenue, 19th Floor<br>New York, NY  10177<br>Phone:  (212) 895-1818<br>Facsimile:  (212) 895-1853<br>Attn:  Durc Savini<br>(durc.savini@millerbuckfire.com)<br>Attn:  Henry Miller<br>(henry.miller@millerbuckfire.com)<br>Attn:  Richard Morgner<br>(richard.morgner@millerbuckfire.com) |

All Initial Letters, Indications of Interest and Final Proposals must be submitted in writing so as to be received by the applicable deadlines set forth above by the following:  (a) counsel to the Debtors, Jones Day, 222 East 41st Street, New York, NY 10017, Attn:  Corinne Ball, Esq., E-mail: cball@jonesday.com; (b) Miller Buckfire, 250 Park Avenue, 17th Floor, New York, NY 10177, Attn:  Richard Morgner, E-mail: richard.morgner@millerbuckfire.com; (c) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: Thomas Moers Mayer, Esq., E-mail: tmayer@kramerlevin.com, and Matthew Williams, E-mail: mjwilliams@kramerlevin.com.

Counsel to the Committee may promptly share copies of any Initial Letters, Indications of Interest and Final Proposals that it receives with UBS Securities LLC ("UBS") and FTI Consulting, Inc. ("FTI"), and the Members of the Official Committee of Unsecured Creditors, who shall keep such information confidential.  For purposes of these procedures, the Debtors shall have fulfilled their requirement to consult with the Committee if the Debtors and/or their professionals have consulted with counsel to the Committee, UBS and/or FTI, as appropriate.

The Debtors will promptly share copies of any Indications of Interest and Final Proposals with counsel to the Unions.  The Debtors will provide counsel to Centerbridge with any Indications of Interest or Final Proposals that Centerbridge is entitled to receive pursuant to the Investment Agreement.  The Debtors will communicate with and provide documents to the Ad Hoc Bondholders' Committee and the Ad Hoc Steering Committee in a manner consistent with the Plan Term Sheet.

## Additional Terms Governing the Procedures

The circulation of these procedures to parties that the Debtors believe might have an interest in becoming a Potential Investor will not constitute an invitation or an offer capable of acceptance for the sale or purchase of securities or any of the businesses or assets of Dana.

Each Potential Investor will bear all of its own costs and expenses related to this process and the preparation of an Indication of Interest and Final Proposal. Dana, its affiliates, attorneys and advisors disclaim any and all liability for materials supplied to any Potential Investor, and no representation or warranty, other than those that may be made by Dana in a definitive and binding agreement, is made as to the accuracy or completeness of any information furnished, either written or verbally. By submitting an Indication of Interest or Final Proposal, the Potential Investor is deemed to acknowledge that it is relying solely upon its own independent investigation and evaluation of Dana and its subsidiaries and affiliates.

**EXHIBIT C**

**Part 1**

**APPENDIX R:  RIGHT TO TERMINATE**

The modifications to the collective bargaining agreements and retiree benefits reached in connection with Dana's Chapter 11 reorganization and set forth in this Settlement Agreement were agreed to in furtherance of Dana's reorganization under Chapter 11 of Title 11, United States Code.  The parties acknowledge and agree that  the proposed investment ("Investment") by Centerbridge Partners, L.P. ("Centerbridge") (the "Centerbridge Investment"), which Investment is reflected in Exhibit B of the Plan Support Agreement, Terms of Centerbridge Investment (the "Investment Term Sheet"), and the Reorganization Plan Metrics, as further described in the Settlement Agreement, are fundamental, integral and necessary conditions to the Settlement Agreement.  The parties agree that the Unions shall have termination rights as follows:

1) Replacement of Centerbridge By Dana:  In the event that Dana determines that it wishes to replace Centerbridge with an  Alternative Minority Investment (as such term is defined in the Investment Term Sheet) on better terms  than those set forth in the Investment Term Sheet (the "Alternative Investor"), leaving the Settlement Agreement (including the Reorganization Plan Metrics) intact in all other respects, such Alternative Minority Investment shall be subject to the consent of the USW/UAW, which consent shall not be unreasonably withheld. The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Alternative Minority Investment, including discussions, if any, regarding the labor agreements and related restructuring matters. The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks after notification by Dana regarding the Alternative Minority Investment provided that Dana and the proposed investor cooperate fully in such diligence.  In the event that the Unions do not consent to the Alternative Minority Investment, then the following shall apply:

   (a) Mediation and Arbitration:  Disputes regarding the Unions' determination to withhold their consent of an Alternative Minority Investment shall be timely addressed first, at mediation, and then at arbitration, applying the standards that would apply in labor arbitration proceedings.  The Unsecured Creditors' Committee has the right to participate with Dana in the mediation/arbitration on a co-equal basis.  The mediation/arbitration shall be based on the parties' understanding that the Unions' willingness to enter into the Settlement Agreement is based on the Unions' understanding and belief that they, the Company and Centerbridge have a shared vision which includes, but is not limited to the following:  that the Company is in financial distress and operates in a highly competitive global industry;  that improving the Company's performance will require both substantial experience in using private capital to make equity investments in large operating businesses and dedicated personnel devoted to the businesses' long-term success, a patient, long-term investment horizon, considerable management skills and investor resources and capital;  that the Company can and must maintain a significant manufacturing base in North America and provide a growing supply of good jobs for union-represented employees;  that the Company's success in this environment is highly dependant upon its ability to achieve and sustain financial stability, including, among other things maintaining levels of leverage and liquidity that are prudent in light of prevailing industry conditions;  that the Unions are critical stakeholders and partners in the enterprise and that the Settlement Agreement, as a whole, reflects this recognition;

and that the parties are irrevocably committed to mutual respect and cooperation at all levels of the Company.

The mediator-arbitrator shall be George Fleischli. If George Fleischli is not available, then Richard Bloch shall serve as the mediator-arbitrator. If Richard Bloch is not available, then the mediator-arbitrator shall be Martin Scheinman. For purposes of this paragraph, "available" means able to conduct a mediation-arbitration within ten (10) days of the submission of the dispute to mediation-arbitration and, if necessary, render a decision within four (4) days thereafter. If none of the foregoing individuals are available, then the individual available at the earliest time shall be the individual selected.

      (i)      If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Alternative Minority Investment, and, notwithstanding such determination, Dana proceeds with the Alternative Minority Investment, the Unions may, in their sole, unreviewable discretion, either: (A) issue a Notice of Termination, which shall constitute notice that each and every USW or UAW collective bargaining agreement shall be terminated on the date set forth therein, and which shall give rise to the Unions' right to strike upon such termination, or (B) elect not to issue a Notice of Termination, in which event the Unions shall have an allowed administrative expense claim in the amount of $764 million, which claim shall not be subject to reconsideration under 11 U.S.C. § 502 or otherwise, and which shall be the $764 million cash payment (with such amount to be allocated as follows: USW-$298.7 million; and UAW-$465.3 million) to be made to the respective Union Retiree VEBA as described in Appendix K to this Settlement Agreement (and Appendix K to the UAW Settlement Agreement), or as otherwise directed to be paid by the Unions in the event their respective VEBA has not been established (but in no event to be duplicative of the Unions' Claim under this Appendix).

      (ii)      If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Alternative Minority Investment, the Company shall be authorized to proceed with the Alternative Minority Investment without further consequence so long as the terms of the Settlement Agreement otherwise remain unchanged and unaffected.

      (iii)      Review of Arbitral Award:  Any action to enforce or vacate the arbitral award described in paragraph (a) shall be brought in the Bankruptcy Court and be an action under Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185 ("the Section 301 Action") and reviewed under the standards applicable to judicial review of arbitration awards pursuant to Section 301.

(b) In the event that, following the consideration of an Alternative Minority Investment proposal, Dana rejects such proposal in favor of the Centerbridge Investment (or a new Centerbridge investment), then the Settlement Agreement shall remain in effect.

2) <u>Centerbridge Terminates The Investment</u>:  In the event that Centerbridge determines to terminate the Investment, other than for a breach by Dana of the Terms of Centerbridge Investment, the following shall apply:

(a) The  Unions shall have the sole unreviewable discretion within thirty (30) days of notification by Centerbridge of its termination of the Investment to designate an investor to replace Centerbridge on terms substantially similar to the Centerbridge Investment (the "Replacement Investor").  Such Replacement Investor shall be subject to Dana's consent, which consent shall not be unreasonably withheld.  If the 30-day period has not run by September 3, 2007, then Dana may file a plan of reorganization without the Replacement Investor, which plan shall be amended to incorporate the Replacement Investor, subject to the provisions of paragraphs 2(b) and 2(c) below.

(b) Disputes with respect to whether or not Dana has acted unreasonably in withholding its consent to the Replacement Investor shall be timely addressed and subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in  Paragraph (1)(a)(iii).

(i)    If the arbitrator finds that Dana has acted unreasonably in rejecting the Replacement Investor, the arbitral award shall require that Dana accept the Replacement Investor.

(ii)    If the arbitrator finds that Dana has acted reasonably, then Dana shall not be obligated to accept the Replacement Investor.

(c) In the event that the Unions do not identify a Replacement Investor or an arbitrator, acting pursuant to paragraph (b) above finds that Dana has acted reasonably in rejecting the Replacement Investor, Dana may pursue an alternate plan of reorganization , so long as such plan of reorganization meets the Reorganization Plan Metrics and the terms of this Settlement Agreement and the UAW Settlement Agreement otherwise remain unchanged and unaffected.

3) <u>Other  Events</u>.

(a)    (i)    Except as provided in paragraphs (1) and (2) of this Appendix (in which case the provisions of those paragraphs shall govern), in the event that Dana pursues a transaction other than the Centerbridge Investment, including a majority investment transaction, a sale of substantially all of the Company's assets and any similar transaction (the "Non-Centerbridge Transaction"), the Unions shall have an allowed general unsecured claim in the amount of $908 million (such claim to be allocated as follows: USW - $354.7 million; and UAW - $553.3 million), which claim shall not be subject to reconsideration under Section 502 of the Bankruptcy Code or otherwise (after the date of approval of this Settlement Agreement and the

UAW Settlement Agreement) (the "Unions' Claim"), unless Dana shall have notified the Unions that they and, if applicable, the third party investor to such Non-Centerbridge Transaction have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the reasonable satisfaction of the Unions.

(ii)     Such Non-Centerbridge Transaction shall be subject to the Unions' consent, which consent shall not be unreasonably withheld. The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Non-Centerbridge Transaction, including discussions, if any, regarding the labor agreements and related restructuring matters.  The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks of notification by Dana regarding the Non-Centerbridge Transaction provided that Dana and the third party to such proposed Transaction cooperate fully in such diligence. In the event that the Unions do not consent to the Non-Centerbridge Transaction, then any dispute regarding the Unions' determination to withhold consent shall be subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in Paragraph (1)(a)(iii).

If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Non-Centerbridge Transaction, and, notwithstanding such determination, Dana proceeds with the transaction, the Unions may, in their sole, unreviewable discretion:  (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing such termination and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement remains in effect), the Unions may elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim to be paid to a Union Retiree VEBA or as otherwise directed by the Unions for the payment of retiree health benefits in the event that their respective VEBA has not been established.  The Unions may file with the Bankruptcy Court a notice identifying such election.  If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Non-Centerbridge Transaction, the Company shall be authorized to proceed with the transaction, subject to the terms of the Settlement Agreement, except that the Unions shall have the right to elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount

of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim . The Unions may file with the Bankruptcy Court a notice identifying such election.

(b) Except as provided in Paragraphs (1), (2) and 3(a) of this Appendix, for any other event of termination under the Investment Term Sheet including the filing by Dana of a standalone reorganization plan, the Unions shall have the Unions' Claim (subject to the allocation described above at (3)(a)(i)), unless Dana, and if applicable, the plan proponent shall have notified the Unions that they have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the satisfaction of the Unions. The Unions shall also have the right, in their sole unreviewable discretion to (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) of this Appendix (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing the termination of benefits and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement shall remain in effect), the Unions may elect: (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim, to be paid to the respective Union Retiree VEBA or as otherwise directed by the Unions in the event that their respective VEBA has not been established. The Unions may file with the Bankruptcy Court a notice identifying such election.

(c) In the case of a dismissal of the Debtors' chapter 11 cases, then this Settlement Agreement will terminate, and the parties will return to the status that existed before the Section 1113/1114 Litigation and the execution of this Settlement Agreement. In the case of a conversion of the Debtors' cases to Chapter 7, the Debtors will seek that any order of conversion shall provide for an allowed administrative claim in the amount of $764 million for the payment of retiree health benefits (subject to the allocation described above at (1)(a)(i)).

4) For purposes of this Appendix, "Reorganization Metrics" shall mean Appendix I of this Settlement Agreement.

**EXHIBIT C**

**Part 2**

## APPENDIX R:  RIGHT TO TERMINATE

The modifications to the collective bargaining agreements and retiree benefits reached in connection with Dana's Chapter 11 reorganization and set forth in this Settlement Agreement were agreed to in furtherance of Dana's reorganization under Chapter 11 of Title 11, United States Code.  The parties acknowledge and agree that  the proposed investment ("Investment") by Centerbridge Partners, L.P. ("Centerbridge") (the "Centerbridge Investment"), which Investment is reflected in Exhibit B of the Plan Support Agreement, Terms of Centerbridge Investment (the "Investment Term Sheet"), and the Reorganization Plan Metrics, as further described in the Settlement Agreement, are fundamental, integral and necessary conditions to the Settlement Agreement.  The parties agree that the Unions shall have termination rights as follows:

1)      Replacement of Centerbridge By Dana:  In the event that Dana determines that it wishes to replace Centerbridge with an Alternative Minority Investment (as such term is defined in the Investment Term Sheet) on better terms  than those set forth in the Investment Term Sheet (the "Alternative Investor"), leaving the Settlement Agreement (including the Reorganization Plan Metrics) intact in all other respects, such Alternative Minority Investment shall be subject to  the consent of the USW/UAW, which consent shall not be unreasonably withheld.  The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Alternative Minority Investment, including discussions, if any, regarding the labor agreements and related restructuring matters. The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks after notification by Dana regarding the Alternative Minority Investment provided that Dana and the proposed investor cooperate fully in such diligence.  In the event that the Unions do not consent to the Alternative Minority Investment, then the following shall apply:

(a)   Mediation and Arbitration:  Disputes regarding the Unions' determination to withhold their consent of an Alternative Minority Investment shall be timely addressed first, at mediation,  and then at arbitration, applying the standards that would apply in labor arbitration proceedings.  The Unsecured Creditors' Committee has the right to participate with Dana in the mediation/arbitration on a co-equal basis.  The mediation/arbitration shall be based on the parties' understanding that the Unions' willingness to enter into the Settlement Agreement is based on the Unions' understanding and belief that they, the Company and Centerbridge have a shared vision which includes, but is not limited to the following:  that the Company is in financial distress and operates in a highly competitive global industry; that improving the Company's performance will require both substantial experience in using private capital to make equity investments in large operating businesses and dedicated personnel devoted to the businesses' long-term success, a patient, long-term investment horizon, considerable management skills and investor resources and capital;  that the Company can and must maintain a significant manufacturing base in North America and provide a growing supply of good jobs for union-represented employees;  that the Company's success in this environment is highly dependant upon its ability to achieve and sustain financial stability, including, among other things maintaining levels of leverage and liquidity that are prudent in light of prevailing industry conditions;  that the Unions are critical stakeholders and partners in the enterprise and that the Settlement Agreement, as a whole, reflects this recognition;

- 2 -

and  that the parties are irrevocably committed to mutual respect and cooperation at all levels of the Company.

The mediator-arbitrator shall be George Fleischli.  If George Fleischli is not available, then Richard Bloch shall serve as the mediator-arbitrator.  If Richard Bloch is not available, then the mediator-arbitrator shall be Martin Scheinman.  For purposes of this paragraph, "available" means able to conduct a mediation-arbitration within ten (10) days of the submission of the dispute to mediation-arbitration and, if necessary, render a decision within four (4) days thereafter.  If none of the foregoing individuals are available, then the individual available at the earliest time shall be the individual selected.

(i)      If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Alternative Minority Investment, and, notwithstanding such determination, Dana proceeds with the Alternative Minority Investment, the Unions may, in their sole, unreviewable discretion, either: (A) issue a Notice of Termination, which shall constitute notice that each and every USW or UAW collective bargaining agreement shall be terminated on the date set forth therein, and which shall give rise to the Unions' right to strike upon such termination, or (B) elect not to issue a Notice of Termination, in which event the Unions shall have an allowed administrative expense claim in the amount of $764 million, which claim shall not be subject to reconsideration under 11 U.S.C. § 502 or otherwise, and which shall be the $764 million cash payment (with such amount to be allocated as follows:  USW-$298.7 million; and UAW-$465.3 million) to be made to the respective Union Retiree VEBA as described in Appendix K to this Settlement Agreement (and Appendix K to the USW Settlement Agreement), or as otherwise directed to be paid by the Unions in the event their respective VEBA has not been established (but in no event to be duplicative of the Unions' Claim under this Appendix).

(ii)      If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Alternative Minority Investment, the Company shall be authorized to proceed with the Alternative Minority Investment without further consequence so long as the terms of the Settlement Agreement otherwise remain unchanged and unaffected.

(iii)      Review of Arbitral Award:  Any action to enforce or vacate the arbitral award described in paragraph (a) shall be brought in the Bankruptcy Court and be an action under Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185 ("the Section 301 Action") and reviewed under the standards applicable to judicial review of arbitration awards pursuant to Section 301.

- 3 -

(b) In the event that, following the consideration of an Alternative Minority Investment proposal, Dana rejects such proposal in favor of the Centerbridge Investment (or a new Centerbridge investment), then the Settlement Agreement shall remain in effect.

2) <u>Centerbridge Terminates The Investment</u>:  In the event that Centerbridge determines to terminate the Investment, other than for a breach by Dana of the Terms of Centerbridge Investment, the following shall apply:

(a) The  Unions shall have the sole unreviewable discretion within thirty (30) days of notification by Centerbridge of its termination of the Investment to designate an investor to replace Centerbridge on terms substantially similar to the Centerbridge Investment (the "Replacement Investor").  Such Replacement Investor shall be subject to Dana's consent, which consent shall not be unreasonably withheld.  If the 30-day period has not run by September 3, 2007, then Dana may file a plan of reorganization without the Replacement Investor, which plan shall be amended to incorporate the Replacement Investor, subject to the provisions of paragraphs 2(b) and 2(c) below.

(b) Disputes with respect to whether or not Dana has acted unreasonably in withholding its consent to the Replacement Investor shall be timely addressed and subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in  Paragraph (1)(a)(iii).

(i)     If the arbitrator finds that Dana has acted unreasonably in rejecting the Replacement Investor, the arbitral award shall require that Dana accept the Replacement Investor.

(ii)    If the arbitrator finds that Dana has acted reasonably, then Dana shall not be obligated to accept the Replacement Investor.

(c) In the event that the Unions do not identify a Replacement Investor or an arbitrator, acting pursuant to paragraph (b) above finds that Dana has acted reasonably in rejecting the Replacement Investor, Dana may pursue an alternate plan of reorganization , so long as such plan of reorganization meets the Reorganization Plan Metrics and the terms of this Settlement Agreement and the USW Settlement Agreement otherwise remain unchanged and unaffected.

3) <u>Other  Events</u>.

(a)     (i)     Except as provided in paragraphs (1) and (2) of this Appendix (in which case the provisions of those paragraphs shall govern), in the event that Dana pursues a transaction other than the Centerbridge Investment, including a majority investment transaction, a sale of substantially all of the Company's assets and any similar transaction (the "Non-Centerbridge Transaction"), the Unions shall have an allowed general unsecured claim in the amount of $908 million (such claim to be allocated as follows: USW-$354.7 million; and UAW-$553.3 million), which claim shall not be subject to reconsideration under Section 502 of the Bankruptcy Code or otherwise (after the date of approval of this Settlement Agreement and the

USW Settlement Agreement) (the "Unions' Claim"), unless Dana shall have notified the Unions that they and, if applicable, the third party investor to such Non-Centerbridge Transaction have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the reasonable satisfaction of the Unions.

(ii)     Such Non-Centerbridge Transaction shall be subject to the Unions' consent, which consent shall not be unreasonably withheld. The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Non-Centerbridge Transaction, including discussions, if any, regarding the labor agreements and related restructuring matters.  The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks of notification by Dana regarding the Non-Centerbridge Transaction provided that Dana and the third party to such proposed Transaction cooperate fully in such diligence. In the event that the Unions do not consent to the Non-Centerbridge Transaction, then any dispute regarding the Unions' determination to withhold consent shall be subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in Paragraph (1)(a)(iii).

If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Non-Centerbridge Transaction, and, notwithstanding such determination, Dana proceeds with the transaction, the Unions may, in their sole, unreviewable discretion:  (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing such termination and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement remains in effect), the Unions may elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim to be paid to a Union Retiree VEBA or as otherwise directed by the Unions for the payment of retiree health benefits in the event that their respective VEBA has not been established.  The Unions may file with the Bankruptcy Court a notice identifying such election.  If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Non-Centerbridge Transaction, the Company shall be authorized to proceed with the transaction, subject to the terms of the Settlement Agreement, except that the Unions shall have the right to elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount

- 5 -

of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim.  The Unions may file with the Bankruptcy Court a notice identifying such election.

(b) Except as provided in Paragraphs (1), (2) and 3(a) of this Appendix, for any other event of termination under the Investment Term Sheet including the filing by Dana of a standalone reorganization plan, the Unions shall have the Unions' Claim (subject to the allocation described above at (3)(a)(i)), unless Dana, and if applicable, the plan proponent shall have notified the Unions that they have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the satisfaction of the Unions.  The Unions shall also have the right, in their sole unreviewable discretion to (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) of this Appendix (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing the termination of benefits and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement shall remain in effect), the Unions may elect: (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim, to be paid to the respective Union Retiree VEBA or as otherwise directed by the Unions in the event that their respective VEBA has not been established.  The Unions may file with the Bankruptcy Court a notice identifying such election.

(c) In the case of a dismissal of the Debtors' chapter 11 cases, then this Settlement Agreement will terminate, and the parties will return to the status that existed before the Section 1113/1114 Litigation and the execution of this Settlement Agreement.  In the case of a conversion of the Debtors' cases to Chapter 7, the Debtors will seek that any order of conversion shall provide for an allowed administrative claim in the amount of $764 million for the payment of retiree health benefits (subject to the allocation described above at (1)(a)(i)).

4) For purposes of this Appendix, "Reorganization Metrics" shall mean Appendix I of this Settlement Agreement.

PII-1161286v3