**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| DANA CORPORATION, et al., | Case No. 06-10353 (BRL) |
| Debtors. | Jointly Administered |
| APPALOOSA MANAGEMENT L.P., | |
| Appellant. | 07 Civ. 07942 (LAK) |
| v. | |
| DANA CORPORATION, et al., | |
| Appellees. | |

**OPENING BRIEF OF APPELLANT**


WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:  (212) 819-8200
Facsimile:   (212) 354-8113
J. Christopher Shore (JCS-6031)
Gerard Uzzi (GU-2297)

Wachovia Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone:  (305) 371-2700
Facsimile:   (305) 358-5744
Thomas E Lauria (*pro hac vice* application pending)

Attorneys for Appaloosa Management L.P.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, Local Rule 7.1.1 of the Rules for the Southern District of New York, Rule 7007.1 of the Federal Rules of Bankruptcy Procedure, and Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Appaloosa Management L.P. ("Appaloosa"), a Delaware limited partnership provides, for the purpose of enabling Judges of this Court to evaluate possible disqualification or recusal, the statement below identifying, if any, (i) the parent corporation and/or (ii) any publicly held corporation that owns 10% or more of the stock of Appaloosa:

Appaloosa Partners Inc. ("API"), a Delaware corporation, is the general partner of Appaloosa.  Neither the stock of API nor the interests in Appaloosa are publicly traded.

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................. I

TABLE OF AUTHORITIES ........................................................................................... III

STATEMENT OF BASIS FOR APPELLATE JURISDICTION ...............................................4

STATEMENT OF ISSUES PRESENTED ON APPEAL.........................................................4

STANDARD OF APPELLATE REVIEW .............................................................................6

STATEMENT OF THE CASE..........................................................................................6

      A.    Dana's Motion to Reject the Collective Bargaining Agreements and Negotiations With the Unions.......................................................7

      B.    The Proposed Settlement. ...................................................................9

      C.    Discovery Process and Objections to the Settlement Motion............................13

      D.    Rejection of All Counteroffers.............................................................14

      E.    The Settlement Order and the Appeal....................................................15

ARGUMENT.............................................................................................................16

I.    THE SETTLEMENT ORDER SHOULD BE VACATED BECAUSE THE BANKRUPTCY COURT EXCEEDED ITS AUTHORITY UNDER SECTION 9019 OF THE BANKRUPTCY CODE......................................................16

      A.    The Settlement Order Grants Relief That Is Unnecessary to Resolve the Issues Framed by the Underlying Litigation......................16

      B.    The Settlement Order Inappropriately Approves a *Sub Rosa* Chapter 11 Plan for the Debtors.............................................................18

      C.    The Court Inappropriately Considered Preservation of the Debtors' Exclusivity in Entering the Settlement Order. .......................22

II.    EVEN ASSUMING THAT THE BANKRUPTCY COURT HAD THE AUTHORITY TO APPROVE THE SETTLEMENT AGREEMENT, THE BANKRUPTCY COURT FAILED TO APPLY HEIGHTENED SCRUTINY TO THE TRANSACTION AND FAILED TO MAKE THE REQUIRED FINDINGS ON THE RECORD TO SUPPORT ENTRY OF THE SETTLEMENT ORDER ................................................25

A.    The Bankruptcy Court Should Have Applied a Heightened
Scrutiny Standard When Considering Whether to Authorize the
Centerbridge Transaction and the Union Consent Rights.....................25

1.    The Bankruptcy Court Should Have Applied Heightened
Scrutiny Because of the Benefit to Insiders..............................26
2.    The Structure of the Settlement Agreements and the Plan
Support Agreement Brought into Question the Arms' Length
Nature of the Transaction.........................................................28

B.    The Bankruptcy Court Erred by Failing to Make All Findings Necessary
to Support the Conclusion of a "Net Benefit" of the Settlement to the
Debtors' Estates. ...............................................................................................31

CONCLUSION...................................................................................................................35

MIAMI 742360 (2K)

# TABLE OF AUTHORITIES

Page

In re Arkoosh Produce, Inc.,
      No. 00-41817, 2003 WL 2523746
      (Bankr. D. Idaho July 1, 2003). ................................................................. 31

In re Ashford Hotels, Ltd.,
      235 B.R. 734 (S.D.N.Y. 1999)................................................................... 25

BFP v. Resolution Trust Corp.,
      511 U.S. 531 (1994).................................................................................. 24

In re Cajun Elec. Power Co-op, Inc.,
      119 F.3d 349 (5th Cir. 1997). .............................................................. 28, 29

Citibank, N.A. v. Vebeliunas (In re Vebeliunas),
      332 F. 3d 85 (2d Cir. 2003)........................................................................ 6

Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp.
      (In re Foster Mortgage Corp.),
      68 F.3d 914 (5th Cir. 1995). ............................................................... 26, 29

In re Copy Crafters Quickprint, Inc.,
      92 B.R. 973 (Bankr. N.D.N.Y. 1998) . .................................................. 20, 22

In re Crowthers McCall Pattern, Inc.,
      114 B.R. 877 (Bankr. S.D.N.Y. 1990).................................................. 21, 23

In re Curry Corp.,
      148 B.R. 754 (Bankr. S.D.N.Y. 1992).......................................................24

Denton v. Hyman (In re Hyman),
      No. 05-7026-BK, 2007 WL 2492789 (2d Cir. Sept. 6, 2007). ...................... 6

In re Drexel Burnham Lambert Group, Inc.,
      134 B.R. 482 (Bankr. S.D.N.Y. 1991)........................................................ 26

In re Eagle-Pitcher Indus., Inc.,
      176 B.R. 143 (Bankr. S.D. Ohio 1994)....................................................... 24

Matter of Egolf,
      102 B.R. 706 (Bankr. N.D. Ind. 1989)....................................................... 16

In re Global Crossing Ltd.,
      295 B.R. 726 (Bankr. S.D.N.Y. 2003)........................................................ 24

MIAMI 742360 (2K)

In re Hibbard Brown & Co., Inc.,
       217 B.R. 41 (Bankr. S.D.N.Y. 1998). ............................................................ 28

LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.),
       841 F.2d 159 (7th Cir. 1987)……………………………………………………17

In re Louise's, Inc.,
       211 B.R. 798 (D. Del. 1997). ................................................................. 17, 18

In re Matco Elecs. Group, Inc.,
       287 B.R. 68 (Bankr. N.D.N.Y. 2002) . ......................................................... 28

In re MCorp Fin. Inc.,
       160 B.R. 941 (S.D. Tex. 1993). .................................................................... 28

Myers v. Martin (In re Martin),
       91 F.3d 389 (3d Cir. 1996)............................................................................ 31

In re Nat'l Health & Safety Corp.,
       No. 99-18339DWS, 2000 WL 968778
       (Bankr. E.D. Pa. July 5, 2005). .................................................................... 31

In re Nationwide Sports Distribs., Inc.,
       227 B.R. 455 (Bankr. E.D. Pa. 1998). .......................................................... 17

Nellis v. Shugrue,
       165 B.R. 115 (S.D.N.Y. 1994)........................................................... 16, 19, 28

In re NW Investors II, LLC,
       2007 WL 2228151 (E.D.N.Y. July 30, 2007)……………………………………17, 19

Official Comm. of Unsecured Creditors of Tower Auto.
       v. Debtors (In re Tower Auto., Inc.),
       241 F.R.D. 162 (S.D.N.Y. 2006) . ................................................................ 18

Pension Benefit Guar. Corp. v. Braniff Airways, Inc.
       (In re Braniff Airways, Inc.),
       700 F.2d 935 (5th Cir. 1983). ................................................... 18, 19, 21, 22

In re Planned Protective Servs., Inc.,
       130 B.R. 94 (Bankr. C.D. Cal. 1991) ........................................................... 31

Protective Comm. for Indep. Stockholders of
       TMT Trailer Ferry, Inc. v. Anderson,
       390 U.S. 414 (1968)................................................................... 23, 25, 33, 34

iv

In re Public Serv. Co.,
    90 B.R. 575 (Bankr. D.N.H. 1988) ................................................. 20

In re Remsen Partners, Ltd.,
    294 B.R. 557 (Bankr. S.D.N.Y. 2003). ................................... 28, 31

In re The Present Co.,
    141 B.R. 18 (Bankr. W.D.N.Y. 1992). .................................... 26, 29

Thomas v. Fallon (In re Chi. Rapid Transit Co.),
    196 F.2d 484 (7th Cir. 1952). ................................................ 16

In re Tower Auto., Inc.,
    342 B.R. 158 (Bankr. S.D.N.Y. 2006). ....................................... 21

United States v. Air Line Pilots Ass'n Int'l
    (In re Trans World Airlines, Inc.),
    No. 92-678-SLR, 1993 WL 559245
    (Bankr. D. Del. June 22, 1993). ............................................ 32

## FEDERAL STATUES

11 U.S.C. § 101 (31)(B)(i) & (ii). .......................................... 26

11 U.S.C. § 1121. .......................................................... 23, 24

11 U.S.C. § 1125. .......................................................... 18, 21

11 U.S.C. § 1126. .......................................................... 19, 22

11 U.S.C. § 1129(a)(7). .................................................... 19, 22

11 U.S.C. § 1129(b)(2)(B). ................................................. 19, 22

28 U.S.C. § 158(a)(1). ...................................................... 4

## RULES AND REGULATIONS

Fed. R. Bankr. P. 8013. ..................................................... 6

## MISCELLANEOUS

H.R. REP. NO. 595, 95th Cong., 1st Sess. 406 (1977). ....................... 24

S. REP. NO. 989, 95th Cong., 2d Sess. 118 (1978), *as reprinted in*
    1978 U.S.C.C.A.N. 5787, 5963, 6362, 5904. .............................. 24

Appellant, Appaloosa Management L.P. ("Appaloosa"), the largest single holder of common stock in Dana Corporation ("Dana") as well as a substantial holder of Dana's prepetition debt securities, by and through its undersigned attorneys, hereby files this Opening Brief in support of its appeal herein.

## PRELIMINARY STATEMENT

This appeal concerns a Bankruptcy Court order that approved a settlement under Bankruptcy Rule 9019. Because the Bankruptcy Court exceeded its statutory authority in entering the appealed-from order, that order should be vacated and the matter remanded for further proceedings.

The dispute at bar began when Dana, a Debtor below, filed a motion seeking authority to breach its prepetition collective bargaining agreements with certain of its Unions. The union dispute, which was admittedly contentious and difficult, was ultimately settled in a series of agreements that were approved in the appealed-from order. Appaloosa does not dispute herein that the economic aspects of the union settlement, standing alone, provide a benefit to Dana, nor does Appaloosa contend that the Bankruptcy Court lacked authority to approve that aspect of the settlement.

Rather, the defects in the appealed-from order concern relief granted which has little, if anything, to do with a union settlement. As set forth below, the agreements approved by the Court below were tainted by two terms unrelated to the disputes being settled: (1) the requirement that the Debtors enter into a material equity investment agreement with the Unions' financial advisor, Centerbridge Capital Partners, L.P., a distressed investment private equity fund, and (2) the provision that the Unions retain the right to withhold their consent to any other

1

transaction with a different investor, regardless of whether that transaction would be substantially more beneficial to Dana, its creditors or its equity holders such as Appaloosa.

Under almost any set of metrics, the Centerbridge transaction does not make economic sense. The relevant terms require that (1) Centerbridge will provide $250 million in cash to Dana in exchange for all the Series A Preferred stock in the reorganized Dana and (2) Centerbridge will backstop the purchase of up to $250 million more of the Series B Preferred stock in that entity. The undisputed testimony at the settlement hearing below was that, given additional terms that dictate the reorganized Dana's capital structure, there is no material risk that Centerbridge will ever have to purchase any of the Series B Preferred or that its own $250 million investment in the Series A Preferred is at material economic risk. In exchange for these relatively modest commitments, Centerbridge will obtain full control of the board of the reorganized Dana, a publicly-traded corporation with reported annual earnings of almost $300 million as of May 31, 2007.[1]

Under existing Second Circuit precedent, the settlement process under Bankruptcy Rule 9019 may not proceed this way. First and foremost, regardless of the benefits a settlement might provide in resolving a contentious litigation, a bankruptcy court may not approve settlement terms that are not related to the underlying dispute being settled or which otherwise act as a *sub rosa* plan of reorganization. Here, the approval of the Settlement Agreement has in fact dictated all of the material terms of the Debtors' reorganization without ever satisfying the requirements for confirmation imposed by section 1129 of the Bankruptcy Code, including creditors' rights to participate in the negotiation of and to vote on the terms of the agreements that the Bankruptcy

---

[1]        App. Ex. A at 11.

Court has already approved. One simply cannot resolve issues of a debtor's post-emergence structure and plan architecture in a settlement agreement.

Moreover, the Settlement Order contains two other fundamental errors that require reversal. First, the Bankruptcy Court failed to apply the correct legal standard in entering the order. In assessing the merits of the Centerbridge transaction, the Court should have applied a heightened level of scrutiny given that:

(1) Centerbridge was the Unions' financial advisor for the Dana chapter 11 cases and did not charge the Unions for any of its services;

(2) The Settlement was negotiated only between the Debtors, the Unions and Centerbridge without significant input from Dana's Official Creditors' Committee or any other creditor constituency until after the deal was announced;

(3) The Debtors never attempted to market control of the reorganized Dana before agreeing to the Centerbridge transaction;

(4) The Unions' consent rights prevented the Centerbridge transaction from ever being subject to an appropriate market test;

(5) Members of the Debtors' management team received personal benefits from the Settlement; and

(6) The Debtors' haste to enter into the transactions was driven by a conceded desire to preserve its exclusive period to file a plan of reorganization.

Second, the Bankruptcy Court failed to make the necessary factual findings to support the relief granted and, indeed, was not presented with an evidentiary record upon which it could make those findings. Even if it were appropriate for the Debtors to link the Union Settlement with the Centerbridge plan agreement, the Bankruptcy Court neither determined that the

Centerbridge agreement was in the best interests of the Debtors' estates, nor that the Debtors exercised their business judgment when entering into that agreement. In fact, no evidence concerning the value of the equity and control that would be transferred to Centerbridge was presented to the Bankruptcy Court, nor was there any evidence as to how the price to be paid was reached. Consequently, the Bankruptcy Court could never have made the findings necessary to support an order approving the *entire* Settlement as a valid exercise of the Debtors' business judgment and as in the best interests of the estates.

For these reasons, the Settlement Order should be reversed.

## STATEMENT OF BASIS FOR APPELLATE JURISDICTION

This appeal (the "Appeal") is taken from the Order Pursuant to sections 1113 and 1114(e) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules"), Approving Settlement Agreements with the United Steelworkers and United Autoworkers, and Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 and 507, Authorizing the Debtors to Enter into Plan Support Agreement, Investment Agreement, and Related Agreements [Docket No. 5879] (the "Settlement Order"), entered by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Such order constitutes a final appealable order pursuant to 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES PRESENTED ON APPEAL

1.      The Bankruptcy Court erred as a matter of fact and law in approving the Investment Agreement and the Plan Support Agreement under the business judgment test and by not applying a higher standard of scrutiny.[2]

---

[2]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Settlement Order, which is attached hereto as Exhibit "B".

2.      The Bankruptcy Court erred as a matter of fact and law in determining that the Debtors' decision to enter into the Investment Agreement and the Plan Support Agreement represents a sound exercise of their business judgment, is consistent with their fiduciary duties and is based on good, sufficient and sound business purposes and justifications.

3.      The Bankruptcy Court erred as a matter of fact and law in determining that the Investment Agreement and the Plan Support Agreement were negotiated at arms' length and in good faith.

4.      The Bankruptcy Court erred as a matter of fact in determining that Centerbridge would not enter into the Investment Agreement without the Break-up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee.

5.      The Bankruptcy Court erred as a matter of fact and law in determining: that the Debtors have a demonstrated sound business justification for the payment of the Break-up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee; that each of the foregoing are fair, reasonable and provide a benefit to the Debtors' estates; and that each of the foregoing are entitled to protection under section 363(m) of the Bankruptcy Code.

6.      The Bankruptcy Court erred as a matter of fact and law in determining that the relief granted was in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest in the chapter 11 cases.

7.      The Bankruptcy Court erred as a matter of fact and law in determining that the relief ordered is not a *sub rosa* plan.

8.      The Bankruptcy Court erred as a matter of fact and law in determining that the relief ordered did not improperly delegate or restrict the Debtors' statutory duties.

MIAMI 742360 (2K)

9.    The Bankruptcy Court erred as a matter of fact and law in approving the Bid

Process.

10.    The Bankruptcy Court erred as a matter of fact and law in altering the standard for

assessing competing bids.

11.    The Bankruptcy Court erred as a matter of fact and law in restricting its power to

review the parties' conduct in connection with the Bid Process and to oversee the Debtors'

conduct of the chapter 11 cases.

**STANDARD OF APPELLATE REVIEW**

A bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of

law are reviewed <u>de novo</u>.  Fed. R. Bankr. P. 8013; <u>Denton v. Hyman (In re Hyman)</u>, 502 F.3d

61 (2d Cir. 2007).  Mixed questions of law and fact are reviewed <u>de novo</u>.  <u>See</u> <u>Citibank, N.A. v.</u>

<u>Vebeliunas (In re Vebeliunas)</u>, 332 F. 3d 85, 90 (2d Cir. 2003).

**STATEMENT OF THE CASE**

As noted above, the dispute before this Court concerns a global settlement (the

"Settlement") that began as an attempt to resolve issues stemming from the Debtors' motion to

reject their collective bargaining agreements (the "Section 1113 Motion") with the International

Union, United Automobile, Aerospace and Agricultural Implement Workers of America

("UAW") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied

Industrial and Service Workers International Union, AFL-CIO, CLC ("USW" and together with

the UAW, the "Unions").[3]  The Settlement ultimately consisted of four separate agreements: (i) a

labor agreement with the UAW (the "UAW Settlement"), (ii) a labor agreement with the USW

---

[3]    The Section 1113 Motion also attempted to reject the collective bargaining agreement with the
International Association of Machinists and Aerospace Workers (the "IAM"), but the Debtors and the IAM were
able to consensually resolve the issue before the litigation giving rise to this appeal.

6

(the "USW Settlement" and, collectively, with the UAW Settlement, the "Union Settlements"),

(iii) an investment agreement with Centerbridge Capital Partners, L.P. (the "Investment

Agreement"), and (iv) an agreement between all parties to the Union Settlement and the

Investment Agreement to fully support any proposed plan of reorganization ("Plan")

promulgated by the Debtors (the "Plan Support Agreement").  The Debtors stipulated that

success of each of the separate agreements was dependent upon the success of the others,

effectively intertwining the otherwise unrelated business transactions.

    **A.    Dana's Motion to Reject the Collective Bargaining Agreements and Negotiations With the Unions.**

The process leading to the Settlement began on January 31, 2007, when the Debtors filed

in the Bankruptcy Court the Section 1113 Motion to reject certain collective bargaining

agreements (each, a "CBA") with the Unions and to modify certain retiree benefits. App. Ex. C

at 1.  At the time of the Section 1113 Motion, the Debtors estimated their Accumulated

Postretirement Benefit Obligation to be approximately $1.45 billion.  App. Ex. C at 14-15.  The

Debtors contended that absent the requested relief, they could not emerge from chapter 11 as a

viable entity in today's competitive automotive industry.  App. Ex. C at 22.

The Unions immediately objected to the proposed rejection of the CBAs and threatened

to strike.  See, e.g., App. Ex. D at 22.  Unproductive negotiations between the Debtors and the

Unions followed, eventually culminating in a five-day evidentiary hearing on the merits of the

Section 1113 Motion.  See generally App. Ex. E; App. Ex. F; App. Ex. G; App. Ex. H; App. Ex.

I.[4]   Before the Bankruptcy Court could rule on the Section 1113 Motion, however, the parties

submitted a stipulation requesting additional time for negotiation.  App. Ex. K.

---

[4]    The parties submitted their proposed findings of fact and conclusions of law to the Bankruptcy Court on April 13, 2007, but these documents were not docketed.  See App. Ex. J at 13.

Through a series of letter agreements, the Debtors and the Unions repeatedly delayed the date for rendering judgment upon the Section 1113 Motion.  App. Ex. L; App. Ex. M; App. Ex. N.  Thereafter, the parties resumed negotiations regarding a potential resolution of the disputes.  During that process, Centerbridge acted as "financial advisor" to the Unions at no cost.[5]  Those negotiations culminated in a series of agreements, described below, that not only resolved the Section 1113 Motion and related disputes under section 1113 and 1114 of the Bankruptcy Code (collectively, the "Section 1113/1114 Issues"), but also charted the course for the remainder of the Debtors' reorganization.

On July 6, 2007, the Debtors filed their Motion for Entry of an Order (A) Approving Settlement Agreements with the United Steelworkers and United Autoworkers, Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, and (B) Authorizing the Debtors to Enter into Plan Support Agreement, Investment Agreement and Related Agreements, Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c)(1), 503 and 507 [Docket No. 5645] (the "Settlement Motion").  By the Settlement Motion, the Debtors sought approval of the Settlement, including the Investment Agreement.  App. Ex. J at 13-14.  The Debtors concurrently submitted a letter to Judge Lifland, stating that if the Settlement was approved, then the Debtors would withdraw the Section 1113 Motion.  App. Ex. O at 2.

---

[5]    When questioned about Centerbridge's compensation for providing financial advisory services to the Unions, the Unions professed to believe that Centerbridge, an organization that had been chartered for the purpose of investing in distressed companies, was providing them with "pro bono" advice and services:

Q:  [Centerbridge is] a -- really a hedge fund, investment partnership to try to make money for their investors, right?
A:  I would assume that's what they do, and some attorneys do -- what do y'all call that, pro bono work.  Some charge high and some go down and do some poverty work and do pro bono work, too, so maybe that's what it is.
Q:  So saying [sic] they were doing this on a pro bono basis?
A:  We secured them as our advisors with no money.  We had no -- no money.

App. Ex. Z at 42:2-13.

### B.    The Proposed Settlement.

A central aspect of the proposed resolution of the ongoing Union disputes was the concept, and indeed condition, that Centerbridge would become the lead investor in Dana's reorganization and, post-emergence from chapter 11, would have *de facto* control over all Dana's material business operations through the reorganized Dana's board of directors.[6]  Under the executed Investment Agreement as approved by the Settlement Order[7], Centerbridge's cash commitment for 100% of the Series A Preferred stock of reorganized Dana is $250 million, while other "Qualified Investors" are given the right to purchase up to $500 million of the Series B Preferred stock, of which Centerbridge has agreed to backstop up to $250 million of the Series B Preferred.  App. Ex. Q at 2.  Only those creditors of the Debtors who, among other things, sign a Plan Support Agreement and hold $25 million or more in aggregate of unsecured claims have the right to purchase Series B Preferred.  App. Ex. Q at 2.  Notably, the Series A Preferred provides Centerbridge with the right to choose a voting majority of (and effectively control) the reorganized Dana's board of directors.  App. Ex. Q at 2.

The economics of these transactions indisputably provide immense value to Centerbridge.  As counsel to the Creditors' Committee indicated at the Settlement Hearing, the Series B Preferred itself is so valuable that it is unlikely that Centerbridge will ever have to

---

[6]    Under the first version of this Centerbridge transaction, as described in the "Investment Agreement Term Sheet" (Exhibit B to the Plan Support Agreement attached to the Settlement Motion), Centerbridge proposed a cash payment of $300 million in exchange for all Series A Preferred stock (the "Series A Preferred") that would be issued by the reorganized Dana, while an additional $450 million would be contributed by other investors chosen by Centerbridge and the Debtors in exchange for the Series B Preferred stock (the "Series B Preferred") that would be issued by the reorganized Dana.  App. Ex. J.  Of that $450 million, Centerbridge agreed to backstop the purchase of $200 million of the Series B Preferred.  App. Ex. J at 30.

[7]    Since the filing of this Appeal, the parties further modified the Investment Agreement by adding a new backstop commitment.  Under this commitment, Centerbridge and members of the steering committee (the "Steering Committee") for the Ad Hoc Committee of Dana Noteholders (the "Noteholders Committee") will backstop an additional $290 million of the Series B Preferred in exchange for, among other things, a fee of $11.5 million.  The Bankruptcy Court approved these modifications on October 23, 2007 [Docket No. 6666] and, on the same day, approved the Debtors' Third Amended Disclosure Statement [Docket No. 6673].

honor its backstop obligations.  See App. Ex. T at 62:8-15 ("We think there was an enormous amount of value in those securities such that anybody who had before the investment Centerbridge or is a subscriber is going to realize an almost instantaneous increase in value that would be paid for by all the other instant creditors and we didn't think that was right.").  When questioned at the Settlement Hearing, the Debtors' chief executive officer acknowledged that Centerbridge could invest as little as $250 million at confirmation and maintain control of the board under the Investment Agreement.  App. Ex. T at 197:25-198:4 ("Q:  So at confirmation [Centerbridge] could hold as little as 250 of the Series A, right?  A: That's my understanding.").

The extent of Centerbridge's Series A Preferred commitment, however, is somewhat deceptive.  Under the Investment Agreement, Centerbridge must only retain $125 million of the Series A Preferred for six months after the effective date of the Debtors' plan to retain its control of the reorganized Dana's board.  See App. Ex. Q, ex. B at 12.  The Series A Preferred also has a liquidation preference, giving it priority over any shares of common stock in the reorganized Dana.  See App. Ex. Q, ex. B at 15.  When questioned about any risks that Centerbridge may face with respect to the Series A Preferred, Centerbridge's representative stated that it was "highly, highly unlikely" that Dana, having just emerged from bankruptcy with a limitation on indebtedness of $1.5 billion, would not have sufficient assets to pay off the Series A Preferred. App. Ex. Y at 137:11-138:5.  In fact, "[o]ther than valuation and liquidity[,]" Centerbridge could identify no risks to its ability to recoup half of its $250 million equity investment shortly after confirmation.  App. Ex. Y at 138:6-11.  Likewise, the Debtors could identify no perceived financial risks with respect to selling these shares.  See App. Ex. AA at 213:4-22 (Debtors' financial advisors characterizing Centerbridge's only risks outside of conversion market risk as "reputational," rather than financial).

From Appaloosa's perspective and that of many others in the process, the sale of control of a massive public company for as little as $125 million raises significant issues as to whether Dana's directors, who approved the transaction, fulfilled their fiduciary duties to maximize value for stakeholders.  For their part, throughout the process, the Debtors sought to downplay the obvious one-sided nature of the Centerbridge transaction, explaining that the price for control of reorganized Dana would be subject to a "market test" and that other potential investors would be free to propose alternate transactions.

Indeed, as explained below, that "fiduciary out" concept provides a key element of the relief granted.  Notably, however, Dana's board of directors did not attempt to negotiate for any market test until the labor deal was complete.  App. Ex. T at 136:20-137:24.  Accordingly, the form of the "fiduciary out" was ultimately limited to giving other investors the right to propose alternative transactions to Dana's board of directors and the Unions without any affirmative marketing by the Debtors or its professionals.  This limited right to pursue alternative investments that were brought to the Debtors, however, was itself qualified by multiple, material restrictions.  Appendix R to each of the Union Settlements outlines the Unions rights if: (i) the Debtors choose to replace Centerbridge with an "Alternative Minority Investment;" (ii) Centerbridge terminates the Investment Agreement; or (iii) the Debtors pursue a majority transaction with a party other than Centerbridge.[8]  App. Ex. R at 2-6; App. Ex. S at 2-6.

In the event that the Debtors chose to pursue an Alternative Minority Investment, any such investment would have been subject to consent from the Unions.  App. Ex. R at 2; App. Ex. S at 2.  If the Unions had withheld consent, a labor arbitrator (and not the Bankruptcy Court) would have determined if the Unions have acted "reasonably" if they withhold consent.  App.

---

[8]        The Settlement Order provides the final version of Appendix R.

Ex. R at 3; App. Ex. S at 3.  If the arbitrator determined that the Unions acted reasonably in

withholding their consent and the Debtors nevertheless chose to proceed with the proposed

alternative investment, then the Unions would be free to either (1) terminate their CBAs and

strike, or (2) remain bound by their CBAs, in which case the Unions would become entitled to an

allowed administrative expense claim of $764 million, which shall be the $764 million cash

payment to be contributed to the Unions' voluntary employees' benefit associations.  App. Ex. R

at 2-3; App. Ex. S at 2-3.  If the arbitrator had found that the Unions acted unreasonably,

however, the Debtors could have proceeded with the proposed alternative investment and the

Settlement Agreements would remain in place. App. Ex. R at 3; App. Ex. S at 3.  Notably, the

Unions' consent rights under Appendix R would not vest until the Debtors affirmatively

determined that an Alternative Minority Investment is a better and higher offer than the

Investment Agreement with Centerbridge.  See App. Ex. R at 3; App. Ex. S at 3.

Similarly, Appendix R vested the Unions with the authority to designate a replacement

investor in the event that Centerbridge had terminated the Investment Agreement.  App. Ex. R at

4; App. Ex. S at 4.  Although the Debtors had the right to withhold their consent to any such

replacement investor, a labor arbitrator would determine whether that consent was

"unreasonably" withheld.  App. Ex. R at 4; App. Ex. S at 4.  Thus, even if the Debtors objected

to the Unions' selected replacement investor, and their objection was found to be "reasonable,"

Appendix R only allowed the Debtors to pursue an alternative plan of reorganization if such plan

was consistent with the Settlement Agreements and, presumably, the plan terms dictated therein.

App. Ex. R at 4; App. Ex. S at 4.

Finally, Appendix R to the Settlement Agreements further provides that in the event that

the Debtors had chosen to pursue an alternative transaction under different "Reorganization Plan

Metrics," the Unions could have again withheld their consent. App. Ex. R at 4-5; App. Ex. S at 4-5. Under this scenario, however, if a labor arbitrator determined that the Unions "reasonably" withheld their consent, the Unions would have had the right to either (i) terminate the Settlement Agreements, strike, and receive a general unsecured claim in the amount of $908 million (the "Unions' Claim"), or (ii) elect not to terminate the Settlement Agreements and still receive either the Unions' Claim or a cash payment of $764 million. App. Ex. R at 5; App. Ex. S at 5. For <u>any other event of termination</u> under the Investment Term Sheet, including the filing by the Debtors of a standalone reorganization plan, the Unions would have had the Unions' Claim or a cash payment of $764 million, regardless of whether they had acted reasonably or unreasonably. App. Ex. R at 6; App. Ex. S at 6. The Unions would also receive the right to terminate their CBAs, which would have resulted in the right to strike. App. Ex. R at 6; App. Ex. S at 6.

The consequences of the rights provided to the Unions under Appendix R were potentially drastic to any new investor. If the Unions were to strike, the Debtors would stand to lose approximately one billion dollars in annual revenue. App. Ex. T at 112:8-14 (Dana's CEO testifying that this loss would be caused by Dana's customers switching suppliers). App. Ex. T at 111:24-25; App. Ex. T at 112:1-12. Moreover, this annual one-billion-dollar loss of business most likely would have been immediate and permanent. App. Ex. T at 112:14.

### C.    Discovery Process and Objections to the Settlement Motion.

The Official Committee of Unsecured Creditors (the "Creditors' Committee"), Brandes Investment Partners, and Appaloosa all filed timely objections to the Settlement Motion, voicing concerns regarding the highly prejudicial terms of the Investment Agreement, the ties between the Centerbridge and the Unions, and the lack of any meaningful discussion regarding the treatment of equity under the Plan Support Agreement. App. Ex. BB at 2; App. Ex. CC at 2. Other parties in interest filed timely joinder motions adopting the arguments set forth in the

objection filed by the Creditors' Committee (the "Creditors' Committee Objection").  App. Ex. DD at 2; App. Ex. EE at 2.

The various objections stood until the eve of the hearing on the Settlement Motion (the "Settlement Hearing"), with all interested parties protesting the status of Centerbridge as lead investor and/or the dearth of information regarding the treatment of equity under the Plan Support Agreement.  See, e.g., App. Ex. BB at 2.  At the Settlement Hearing, however, the Creditors' Committee announced the last-minute withdrawal of the Creditors' Committee Objection.  App. Ex. T at 61:5-61:19.  Having negotiated for and received favorable investment terms under a slightly modified form of the Investment Agreement, both the Creditors' Committee and the Noteholders Committee opted to quickly reverse position and support the Settlement Motion.  App. Ex. T at 56:7-57:4, 61:9-70:22.  The improved terms as to the Creditors' Committee included (i) increased ability to purchase Series B Preferred under the Investment Agreement, (ii) specificity as to the record date for eligibility to purchase the Series B Preferred, (iii) ability for potentially disallowed claims to participate in the offering for the Series B Preferred, and (iv) co-equal arbitration rights with the Debtors regarding the "reasonableness" of the Unions' determination not to accept a proposed alternative minority investment.  App. Ex. T at 61:9-70:22; App. Ex. R at 2; App. Ex. S at 2.  Similarly, the Noteholders Committee gained the ability to participate "side by side" with Centerbridge and the Creditors' Committee in the purchase of Series B Preferred.  App. Ex. T at 56:11-57:9.  At the same Settlement Hearing, certain smaller creditors, who are unable to purchase Series B Preferred under the Investment Agreement, announced that they had formed a separate ad hoc committee to oppose, *inter alia*, their disparate treatment.  App. Ex. T at 86:7-87:21.

### D.    Rejection of All Counteroffers.

Soon after analyzing the Centerbridge transaction, Appaloosa determined that the

requisite equity investment was so essentially risk free that it submitted a higher and better offer

despite the Debtors' refusal to grant Appaloosa access to any confidential diligence information.[9]

App. Ex. W at 11-12.  The Debtors and the Unions' deliberations over that offer were short-

lived.  In a letter sent to the Debtors shortly thereafter, the USW urged the Debtors to retain

Centerbridge as the lead investor despite the existence of Appaloosa's offer.  App. Ex. U, Ex. A.

The Debtors complied with the Union request and rejected Appaloosa's offer, demonstrating

their commitment to Centerbridge as lead investor in their Corrected Omnibus Reply to

Objections to Motion for Entry of an Order (A) Approving Settlement Agreements with the

United Steelworkers and Untied Autoworkers and (B) Authorizing the Debtors to Enter Into a

Plan Support Agreement, Investment Agreement, and Related Agreements [Docket No. 5792].

On July 26, 2007, Appaloosa submitted another competing offer with even greater

enhancements.  App. Ex. FF, Ex. A.  The Settlement Hearing occurred on the same day.  At the

Settlement Hearing, the Debtors yet again demonstrated their deference to the Unions and

Centerbridge by continuing to seek approval of the Investment Agreement and Plan Support

Agreement as filed with the Bankruptcy Court, albeit slightly modified.  App. Ex. T at 10:13-18.

### E.    The Settlement Order and the Appeal.

Following an evidentiary hearing, the Bankruptcy Court orally approved the Settlement

Motion on July 26, 2007 and issued the Settlement Order on August 1, 2007.  On August 13,

2007, Appaloosa filed its Notice of Appeal. App. Ex. V.

---

[9]      Before the submission of the first Appaloosa offer, the Debtors refused to grant Appaloosa access to
confidential information absent entry into a confidentially agreement that required Appaloosa to yield substantial
stakeholder rights.  After Appaloosa submitted its offer, the Debtors offered a form of confidentiality agreement
acceptable to Appaloosa, which Appaloosa signed.

15

## ARGUMENT

## I.

### THE SETTLEMENT ORDER SHOULD BE REVERSED BECAUSE THE BANKRUPTCY COURT EXCEEDED ITS AUTHORITY UNDER SECTION 9019 OF THE BANKRUPTCY CODE

Appaloosa does not dispute that the labor issues presented by the Section 1113 Motion standing alone were properly resolved by the Settlement Motion, nor does it dispute that approval of the Union Settlements with respect to the Section 1113 Motion represented a valid exercise of the Bankruptcy Court's authority.  In approving the Plan Support Agreement as part of the Settlement with the Unions, however, the Bankruptcy Court exceeded its authority, thereby requiring a reversal by this Court.

> **A.**  **The Settlement Order Grants Relief That Is Unnecessary to Resolve the Issues Framed by the Underlying Litigation.**

Unlike compromises between private parties outside of bankruptcy, parties in chapter 11 cases may not settle their controversies simply on any terms that they deem to be mutually satisfactory.  See Matter of Egolf, 102 B.R. 706, 710-11 (Bankr. N.D. Ind. 1989) (rejecting a proposed settlement agreement that did not assure equal treatment of similarly situated creditors) (citing Thomas v. Fallon (In re Chi. Rapid Transit Co.), 196 F.2d 484, 490 (7th Cir. 1952)).  When considering whether to approve a settlement under Bankruptcy Rule 9019 the court must consider if the settlement is: (a) above the lowest point in the range of reasonableness; and (b) in the best interests of the estate.  Nellis v. Shugrue, 165 B.R. 115, 121-22 (S.D.N.Y. 1994).  Where a settlement fails to meet this standard because it contains extraordinary provisions that are harmful to the estate, a bankruptcy court lacks authority under Bankruptcy Rule 9019 to approve the agreement.  See cf. In re Kuhns, 101 B.R. 243, 246-47 (Bankr. D. Mont. 1989).  Further, where a bankruptcy court fails to make sufficient findings on the record to support a well-

reasoned evaluation of a proposed settlement, approval of such settlement should be reversed.

LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.), 841 F.2d 159, 162-63 (7th Cir. 1987)

(reversing approval of settlement where bankruptcy court's findings were insufficient to permit

appellate review of the agreement).

    For example, in In re Louise's, Inc., 211 B.R. 798 (D. Del. 1997), the court held that a

settlement agreement between the debtor and its creditors' committee to extend plan exclusivity

could not be approved under Bankruptcy Rule 9019 because that agreement also purported to

transfer de facto control over the debtor.  Among other things, the settlement in Louise's would

have provided the creditors' committee with the exclusive right to designate new directors upon

the court's approval of the settlement.  Id. at 801-02.  In refusing to anoint the proposed

settlement, the court noted as follows:

> The Settlement Agreement, presented here as a compromise of the
> Exclusivity Motion issue, **is so tainted with provisions unrelated to**
> **exclusivity that it cannot be fairly denoted a Rule 9019**
> **compromise.**  In reality, the Settlement Agreement is a vehicle for
> [the creditor party] to implement a plan of reorganization guaranteed
> to be more favorable to [the creditor] than all other interested parties.
> The "control" provisions of the Settlement Agreement attempt to . . .
> insure that [the creditor] can control the plan approval process.

Id. at 802 (emphasis added).  Stated simply, the court refused to approve a settlement under

Bankruptcy Rule 9019 that included provisions that were unrelated to the dispute.  Id.; see also

In re Nationwide Sports Distribs., Inc., 227 B.R. 455, 460 (Bankr. E.D. Pa. 1998) (noting that

Bankruptcy Rule 9019 may not be applicable where the proposed agreement extended to issues

and parties beyond those involved in the underlying litigation) (citing Louise's, 211 B.R. 798).

    Similarly, the Bankruptcy Court granted substantial relief in excess of what was

necessary to settle a collective bargaining dispute under Bankruptcy Rule 9019 when it

authorized the Debtors to enter into the Plan Support Agreement and Investment Agreement with

Centerbridge.  Not only are both of these agreements wholly unrelated to the resolution of the

section 1113/1114 issues, but they also transfer substantial chapter 11 rights from the Debtors

and their stakeholders to third parties.

As in <u>Louise's</u>, the unrelated terms of the Settlement Agreements provide Centerbridge

and/or the Unions with effective control of the Debtors both post-confirmation, <u>see</u> App. Ex. Q at

6, and before confirmation, <u>see</u> App. Ex. P, Ex. A at 4 (restricting the Debtors from pursuing a

pre-confirmation sale of "any business line within the Automotive Systems Group or the

Commercial Vehicles Group").  Because these unrelated terms were unnecessary to resolve the

underlying dispute with the Unions, the Bankruptcy Court improperly granted that relief

pursuant to Bankruptcy Rule 9019.

### B.    The Settlement Order Inappropriately Approves a *Sub Rosa* Chapter 11 Plan for the Debtors

The Settlement Order should also be reversed on the basis that it impermissibly preempts

the confirmation process and subverts the rights of the Debtors' creditors and stakeholders.  A

court may not approve any settlement under Bankruptcy Rule 9019 that effectively is no more

than a "*sub rosa*" plan in that it dictates terms of the debtors' plan of reorganization prior to the

confirmation process.  <u>Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors (In re</u>

<u>Tower Auto., Inc.)</u>, 241 F.R.D. 162, 168 (S.D.N.Y. 2006) (citing <u>Pension Benefit Guar. Corp. v.</u>

<u>Braniff Airways, Inc. (In re Braniff Airways, Inc.)</u>, 700 F.2d 935, 940 (5th Cir. 1983)).

The reason for this prohibition is simple.  A Bankruptcy Rule 9019 settlement is

evaluated on the lowest end of reasonableness and a finding that such settlement provides some

benefit to the estate.  <u>See</u> <u>Nellis</u>, 165 B.R. at 121-22.  As such, a bankruptcy court relies heavily

on the chapter 11 debtor's business judgment.  <u>See</u> <u>In re NW Investors II, LLC</u>, 2007 WL

2228151, at *4-5 (E.D.N.Y. July 30, 2007).  In contrast, the terms of a plan of reorganization

must satisfy a host of detailed statutory requirements before the bankruptcy court will approve them under chapter 11 of the Bankruptcy Code.  See Braniff, 700 F.2d at 940.

Among other things, creditors are first entitled to vote in favor or against the proposed plan after having adequate time to consider a court-approved disclosure statement describing such plan.  See 11 U.S.C. §§ 1125 (allowing solicitation only after distribution of a disclosure statement containing adequate information); 1126 (outlining vote tabulation); 1129(a)(8) (requiring accepting classes of claims and interests).  The proponent must also demonstrate to the bankruptcy court that proposed chapter 11 plan meets all 16 requirements of section 1129(a) of the Bankruptcy Code, and, in the event a class rejects the plan, section 1129(b) of the Bankruptcy Code.[10]  In short, approval of chapter 11 plan terms requires (i) court-approved disclosure, (ii) creditor participation, and (iii) findings that the proposed plan satisfies the congressionally-mandated tests contained in section 1129, and thus, that such plan terms cannot be approved as part of a Bankruptcy Rule 9019 settlement.

In considering whether a transaction dictates the terms of a future reorganization plan, a court should ask "whether the proposed transaction might improperly and indirectly lock the estate into any particular plan mode prematurely, and without the protection afforded by the procedures surrounding a disclosure statement and confirmation hearing, in a plan of reorganization."  In re Public Serv. Co., 90 B.R. 575, 582 (Bankr. D.N.H. 1988).  Any settlement agreement that would effect a "lock-up" of the terms of a plan of reorganization is per se invalid and cannot be approved.  In re Crowthers McCall Pattern, Inc.,114 B.R. 877, 885 (Bankr.

---

[10]      The requirements for a plan under section 1129 of the Bankruptcy Code are much more difficult to satisfy than a settlement's "lowest possible reasonable result" test.  For example, under the "best interests of creditors" test, the proponent must demonstrate that the plan distributes to each rejecting creditor property of a value that is equal to or greater than such creditor would receive in a chapter 7 liquidation.  11 U.S.C. § 1129(a)(7).  Moreover, if a class of unsecured creditors rejects a plan, the bankruptcy court will refuse to confirm it unless the proponent can show that the rejecting class will receive the full amount of their claims or that no class of junior creditors or interest holders will receive any distribution.  11 U.S.C. § 1129(b)(2) ("fair and equitable test" or "absolute priority rule").

S.D.N.Y. 1990); see also In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 983-84 (Bankr. N.D.N.Y. 1998) (proposed agreement "short-circuit[ed]" chapter 11 and could not be approved).

Here, the Settlement Agreements have the practical effect of dictating substantially all the terms of the Debtors' reorganization plan. Each agreement is specifically conditioned on the confirmation of a chapter 11 plan that is consistent with the Plan Term Sheet and the deal involving Centerbridge. The Plan Term Sheet's "Certain Emergence Covenants and Other Terms" dictate, among other things, (i) the treatment of unsecured creditors, (ii) the provision of exit financing, and (iii) the post-emergence management of the reorganized Debtors. See App. Ex. P, Ex. A at § 4. Notably, the Plan Term Sheet even has a "Leverage Limitation" covenant, which states that "[t]he total amount of funded debt at emergence shall not exceed $1.5 billion" – or roughly the total amount of the Debtors' existing postpetition debtor-in-possession credit facility. App. Ex. P, ex. A at § 4. This restriction effectively locks-in the amount and nature of the plan currency that will be available to stakeholders under any plan proposed by the Debtors.

Notwithstanding the Debtors' assertion that the Settlement Agreements are not *sub rosa* because the Investment Agreement is subject to higher and better offers, the Debtors' "fiduciary out" has little practical effect. As explained above, if the Debtors had pursued any transaction other than the one with Centerbridge, the Unions would have had the right to withhold their consent, the "reasonableness" of which would have been determined by a labor arbitrator, not the Bankruptcy Court. At the end of the day, the obstacles imposed by Appendix R are so significant that the Debtors' ability to accept a better and higher offer has proven to be illusory. In fact, these impediments are so significant that no party other than Appaloosa (who was already attempting to make an offer) has been willing to propose any offer at all – even one

MIAMI 742360 (2K)

slightly better than Centerbridge's offer to buy control of the reorganized Dana for as little as $125 million, risk-free.  App. Ex. A at 11.

Furthermore, the Settlement Agreements constitute a *sub rosa* plan because they deprive the Debtors' stakeholders of the rights and protections afforded to them under chapter 11 of the Bankruptcy Code (as described above).  A settlement agreement that encroaches upon any of these rights cannot be approved.  See In re Tower Auto., Inc., 342 B.R. 158, 163-64 (Bankr. S.D.N.Y. 2006)  (citing In re Crowthers, 114 B.R. at 885).  In coming to the conclusion that an agreement effectuated under section 363 of the Bankruptcy Code was an impermissible *sub rosa* plan, among other things, the Fifth Circuit in Braniff focused on the fact that the transaction had the effect of thwarting "the Code's carefully crafted scheme for creditor enfranchisement."  700 F.2d at 940.[11]  The Braniff Court held that, "[i]n any future attempts to specify the terms whereby a reorganization plan is to be adopted, the parties and the district court must scale the hurdles erected in Chapter 11.  See, e.g., 11 U.S.C. § 1125 (disclosure requirements); § 1126 (voting); § 1129(a)(7) (best interest of creditors test); § 1129(b)(2)(B) (absolute priority rule)."  Id.

As in Braniff, the Settlement Agreements here disenfranchise the vast majority of the Debtors' stakeholders from their rights in the reorganization process and even prevent the Bankruptcy Court from presiding over critical aspects of the Debtors' reorganizations.  Even if the Debtors' stakeholders were to decide to pursue an alternative reorganization plan and/or equity investment agreement (including one that would provide the Debtors' estates with more value), the Unions effectively have the last say as to what the chapter 11 reorganization plan for

---

[11]    The Braniff Court also considered whether the transaction (i) "had the practical effect of dictating some of the terms of any future reorganization plan" and (ii) "provided for the release of claims by all parties against Braniff, its secured creditors and its officers and directors."  Id. at 940.

the Debtors would be, supervised only by an arbitrator over whom the courts have little power.

Stated differently, the Settlement Agreements have "short circuit[ed] the requirements of Chapter

11 for confirmation of a reorganization plan by establishing the terms of the plan"

before stakeholders have an opportunity to vote and before the Bankruptcy Court has considered

the confirmation requirements of section 1129.  Braniff, 700 F.2d at 940; see also Copy Crafters,

92 B.R. at 985 (holding that "[a] debtor cannot seek relief under the Code and then attempt to

circumvent its requirements to the detriment of its creditors.").

> ### C.    The Court Inappropriately Considered Preservation of the Debtors' Exclusivity in Entering the Settlement Order.

One of the fundamental characteristics of these proceedings before the Bankruptcy Court

was the sense of urgency that pervaded the process and dictated its course.  As described above,

the Debtors filed the Settlement Motion on July 5, 2007 and set the Settlement Hearing for July

26, 2007, leaving fewer than 21 days for parties to take discovery and file objections.  Given the

importance of the Settlement to these chapter 11 cases, this timeline imposed by the Debtors and

the Bankruptcy Court was, to say the least, set on extremely expedited basis.  As a result, the

parties in interest were unable to depose key witnesses until well after the objection deadline and

had to travel to multiple jurisdictions only a few days before the Settlement Hearing  to conduct

those depositions.  See App. Ex. Y at 1; App. Ex. Z at 1.

All this urgency was, according to the Debtors themselves, driven by their perceived need

to preserve the exclusive right to propose and solicit a chapter 11 plan under section 1121(d) of

the Bankruptcy Code.[12]  In its decision read on the record at the Settlement Hearing, the

---

[12]    Under section 1121(d)(2) of the Bankruptcy Code, that right will expire in September of 2007 (i.e., 18 months after the Debtors filed their chapter 11 petitions) and, by Congressional mandate, cannot be extended by the Court.

Bankruptcy Court stated, among other reasons, that the impending loss of the Debtors'

exclusivity justified approval of the Settlement Order:

> It extends the maturity of the collective bargaining
> agreements for another four years, resolves the litigation surrounding
> the Section 1113/1114 motion and avoids the uncertainty and labor
> unrest likely to ensue if the 1113/1114 were to be granted, **puts the
> debtor in a position to formulate and prosecute a plan of
> reorganization within the time frame established by Congress** that
> will permit the debtors to compete meaningfully in a distressed auto
> industry, identify the funding source to provide the means by which
> the debtors will be able to fulfill their obligation under the union
> settlement and while not a Sub rosa plan, provides the building
> blocks for a plan of reorganization.

App. Ex. T at 281:9-25 – 282:1-6 (emphasis added).

The preservation of the Debtors' exclusivity, however, does not justify approval of the

Settlement Motion and the Bankruptcy Court's consideration of that factor provides an

independent basis for reversal here.  The Supreme Court has explicitly stated, "[t]he need for

expedition . . . is not a justification for abandoning proper standards [for approving a settlement

agreement]." Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,

390 U.S. 414, 450 (1968).  Thus, although the loss of exclusivity may impart some sense of

urgency, the perceived need for expediency is not a valid reason for approving the Investment

Agreement as a part of the Settlement Order.  Nor does the perceived urgency created by the

impending expiration of the Debtor's exclusivity justify approval of the Plan Support Agreement

with Centerbridge as lead investor when superior offers existed that could have maximized the

Debtors' estates for all stakeholders.

Termination of the Debtors' exclusivity would have only resulted in the Debtor losing a

degree of control over its case by allowing for alternative plans to be proposed.  Unlike

conversion into chapter 7 or a "fire sale" of the estate, the loss of exclusivity is not so

momentous of an event that would justify allowing the Debtors to concede to nearly every whim

MIAMI 742360 (2K)

of the Unions (e.g., entering into the Investment Agreement with Centerbridge) and relinquish substantial rights related to the ultimate reorganization of their chapter 11 cases.[13]

Moreover, exclusivity should be used as a shield and not as a sword, and, thus, should not have not been employed as a tactical device to put pressure on the Debtors to yield to a substandard plan that mainly benefits the Unions and Centerbridge.  See, e.g., In re Eagle-Pitcher Indus., Inc., 176 B.R. 143, 147-48 (Bankr. S.D. Ohio 1994) ("[T]he legislative history accompanying 11 U.S.C. § 1121 indicates that the plan exclusivity provisions should not be employed as a tactical device to put pressure on parties to yield to a plan they consider unsatisfactory" but rather provide the debtors "a shield of exclusivity."); see also In re Global Crossing Ltd., 295 B.R. 726, 747 (Bankr. S.D.N.Y. 2003) (exclusivity will be extended when, inter alia, the debtors "want to preserve exclusivity not to take advantage of creditors, but to preserve the benefits of a consensual [p]lan that their creditors endorsed"); In re Curry Corp., 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) (citing H.R. REP. NO. 595, 95th Cong., 1st Sess. 406 (1977); S. REP. NO. 989, 95th Cong., 2d Sess. 118 (1978), 1978 U.S.C.C.A.N. 5787, 5963, 6362, 5904).  Because the Bankruptcy Court improperly relied on the need to preserve the Debtors' exclusivity in approving the Centerbridge transaction and Union consent rights, its Order Approving the Settlement should be reversed.

---

[13]    This is all the more true where, as here, the proposed transactions are so detrimental to a debtor's stakeholders that they amount to, at best, a "fire sale" of estate property and in no way maximize value.  BFP v. Resolution Trust Corp., 511 U.S. 531, 563-64 (1994) (stating that "obtaining maximum and equitable distribution for creditors" is the policy underlying bankruptcy).

## II.

**EVEN ASSUMING THAT THE BANKRUPTCY COURT HAD THE
AUTHORITY TO APPROVE THE SETTLEMENT AGREEMENT,
THE BANKRUPTCY COURT FAILED TO APPLY HEIGHTENED
SCRUTINY TO THE TRANSACTION AND FAILED TO MAKE
THE REQUIRED FINDINGS ON THE RECORD TO SUPPORT
ENTRY OF THE SETTLEMENT ORDER**

Even if the Bankruptcy Court did not exceed its authority by approving the Centerbridge

transaction and the Union consent rights, it still did not approve these provisions of the

settlement in the proper manner.

A.    **The Bankruptcy Court Should Have Applied a Heightened Scrutiny
Standard When Considering Whether to Authorize the Centerbridge
Transaction and the Union Consent Rights.**

In approving the agreement with Centerbridge, the Bankruptcy Court found that the

Investment Agreement was "fair and equitable and in the best interests of the Debtors' estates"

and that the Debtors' decision to pursue this transaction "represents a sound exercise of their

business judgment, is consistent with their fiduciary duties and is based on good, sufficient and

sound business purposes and justifications."  App. Ex. B at 9.  While this is the proper standard

for approving run-of-the-mill settlements under ordinary circumstances pursuant to Bankruptcy

Rule 9019, see In re Ashford Hotels, Ltd., 235 B.R. 734, 740 (S.D.N.Y. 1999); see also TMT

Trailer Ferry, Inc., 390 U.S. at 424-25, the Bankruptcy Court should have applied a higher

standard due to the extraordinary nature of the relief sought in the Settlement, the motivations of

the parties, and the circumstances surrounding the negotiation between the Debtors, the Unions

and Centerbridge.

Specifically, the Bankruptcy Court should have applied a higher degree of scrutiny in this

case because members of the Debtors' management team received personal benefits from the

Settlement; Centerbridge was the Unions' financial advisor for the Dana chapter 11 cases and did

not charge the Unions for any of its services; the Settlement was negotiated only between the

Debtors, the Unions and Centerbridge and without significant input from the Creditors'

Committee or any other creditor constituency; and the Centerbridge transaction was not

subjected to an auction of the estates' assets or any other market test and is insulated from

competing alternatives.

> **1.    The Bankruptcy Court Should Have Applied Heightened Scrutiny Because of the Benefit to Insiders.**

Bankruptcy courts are required to apply a heightened scrutiny when evaluating a

proposed settlement that would benefit an insider.[14]  See In re Drexel Burnham Lambert Group,

Inc., 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (holding "that closer scrutiny of insider

agreements should be added to the cook book list of factors that courts use to determine whether

a settlement is fair and reasonable"); see also Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp.

(In re Foster Mortgage Corp.), 68 F.3d 914, 918 (5th Cir. 1995); In re The Present Co., 141 B.R.

18, 24-25 (Bankr. W.D.N.Y. 1992).  In this case, the Bankruptcy Court failed to apply this

heightened scrutiny test despite the fact that members of the Debtors' management team,

including the Debtors' chief executive officer (the "CEO"), received personal benefits from the

approval of the Settlement Motion.  First, some insiders that were instrumental in the

negotiations, benefited from the condition of the Settlement Agreement requiring the Unions to

withdraw their appeal to the "KEIP Order" [Docket No. 4386] that was currently pending in the

United States District Court for the Southern District of New York.  Now that the Unions have

withdrawn their appeal, these insiders will receive certain additional compensation under the

---

[14]    Section 101(31) provides, in pertinent part, that an "insider" includes,

if the debtor is a corporation — (i) **director** of the debtor; (ii) **officer** of the debtor; (iii) **person in control** of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor . . . .

11 U.S.C. § 101(31)(B) (emphasis added).

KEIP Order.  App. Ex. GG at 3.  Second, because 40% of the CEO's prepetition pension benefits remain an allowed unsecured claim that may only be assumed (and thereby converted into administrative claims) if the defined benefit pension plans of the Debtors' salaried and bargaining unit employees have not been terminated, see App. Ex. GG at 4, the Debtors' CEO had a personal monetary interest in ensuring that salaried and bargaining units of Dana employees kept their pension benefits.

Last, the CEO's compensation is tied to the amount of unsecured claims in the case, which provides the CEO with an additional disincentive to pursuing any alternative transaction. Among the objectionable terms of the Settlement Agreements is a term stating that if the Debtors pursue an alternative transaction under different plan metrics, then the Unions may be entitled to a $908 million unsecured claim.  App. Ex. R at 4; App. Ex. S at 4.  The CEO's ability to attain the performance-based incentive of his long term incentive plan is reduced by every additional dollar of unsecured claims over $2.85 billion.  App. Ex. GG, ex. A.  According to the recent amendments to the Debtors' schedules, [Docket No. 5648], the total aggregate amount of Dana's scheduled unsecured claims is $2.55 billion.  Since every dollar over the $2.85 billion cap affects the CEO's ability to collect a portion of his bonus, the CEO may therefore be personally penalized if an alternative transaction is pursued, even if such alternative transaction satisfies or nearly satisfies all the Debtors claims in full.  Accordingly, the personal disincentive to the CEO to consider alternative transactions warrants close scrutiny of the terms of the Settlement Agreements.  Because the proposed settlement benefited insiders of the Debtors, the Bankruptcy Court erred by not applying a heightened scrutiny when evaluating the settlement.

2.    **The Structure of the Settlement Agreements and the Plan Support Agreement Brought into Question the Arms' Length Nature of the Transaction.**

Given the significance of the Settlement Agreements, the Plan Support Agreement, and the Investment Agreement to the Debtors' reorganization, the Bankruptcy Court should have closely examined these transactions to ensure that they were the product of arms' length negotiations. In considering whether a settlement should be approved, a court must ensure that the settlement was the product of arms' length negotiation rather than collusion and that all interests have been effectively represented. In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); see also In re Cajun Elec. Power Co-op, Inc., 119 F.3d 349, 356 (5th Cir. 1997); In re Matco Elecs. Group, Inc., 287 B.R. 68, 78 (Bankr. N.D.N.Y. 2002) (finding lack of arms' length negotiations a consideration in denying approval of the settlement between insiders because the creditors' committee was not a party to the bargaining that yielded the compromise). If the integrity of the negotiation process is not preserved, then the presumption of fairness will not attach to the settlement. Hibbard Brown, 217 B.R. at 46.

In making the determination that a settlement agreement has been negotiated in good faith, it is the bankruptcy judge's responsibility to make an unbiased and informed assessment of the settlement terms. Nellis, 165 B.R. at 122. Merely "rubber-stamping" a proposed settlement agreement is insufficient; rather, the bankruptcy court must make a full and informed assessment regarding the wisdom of a proposed compromise. Id.; see also In re Remsen Partners, Ltd., 294 B.R. 557, 565 (Bankr. S.D.N.Y. 2003); In re MCorp Fin. Inc., 160 B.R. 941, 950 (S.D. Tex. 1993) ("The most important standard is procedural; the proposed settlement must have been inspected by the court. In reviewing the settlement the court cannot accept the propriety of the settlement on the mere assertion of its value by the proponents.").

28

Such assessment is separate and independent of any evaluation of the proposed reasonableness of the transaction and focuses instead upon the actual negotiations of the proposed settlement. See, e.g., Cajun-Elec., 119 F.3d at 356 (describing the necessity of evaluating all factors bearing upon the wisdom of a compromise, including the extent to which a proposed compromise is the product of arms' length bargaining); Foster Mortgage, 68 F.3d at 918 (same); see generally In re The Present Co., 141 B.R. 18, 23 (Bankr. W.D.N.Y. 1992) (disallowing proposed settlement where negotiations were not clearly the product of arms' length negotiation). Where the bankruptcy court has failed to consider all factors bearing upon the wisdom of the compromise, at least one appellate court has reversed such determination on appeal. Foster Mortgage, 68 F.3d at 919 (reversing bankruptcy court approval of settlement agreement where negotiations were not at arms' length).

In their Settlement Motion, the Debtors sought approval of two sets of proposed transactions at the same time: the Settlement Agreements with the Unions on the one hand, and the Plan Term Sheet and Investment Agreement with Centerbridge on the other. According to the Debtors, all of these agreements were dependent upon one another and negotiated at arms' length between the Unions, Centerbridge and the Debtors. The Bankruptcy Court accepted this assertion, yet ignored a number of facts and circumstances, each of which the Bankruptcy Court should have considered before issuing a determination that the Settlement was negotiated in good faith. See App. Ex. B at 8 (noting that these agreements were "all integral components of the Global Settlement"); App. Ex. B at 9 (noting that these agreements were "all negotiated at arms' length and good faith by all parties").

First, Centerbridge, was an advisor to the Unions in these same chapter 11 cases, see App. Ex. P at Recital B, and provided its services to the Unions free of charge. App. Ex. Z at

34:9-22.  Second, although the Debtors proposed and the Bankruptcy Court's order later incorporated provisions establishing a procedure for accepting alternative bids, the Centerbridge transaction was not subjected to a true auction or any market test.  For instance, the Debtors' financial advisors did not solicit alternative bids or otherwise make any effort to market the estates' assets.  Third, there is nothing in the record valuing the assets that will be transferred to Centerbridge and other investors.  Neither Dana's board of directors nor their advisors made any attempt to market the Series A Preferred and Series B Preferred (or the rights associated with them).[15]  Instead the Debtors relied on the above defective "market test" that never actually subjected these assets to the market.

Fourth, the Unions retain a substantial amount of control over whether the Debtors may pursue any transaction with a party other than Centerbridge, even one that would provide creditors with 100% recoveries.  See App. Ex. R at 2-3; App. Ex. S at 2-3.  The Unions even retain the right to choose Centerbridge's replacement, if Centerbridge terminates the Investment Agreement.  Fifth, the Settlement was negotiated only between the Debtors, the Unions and Centerbridge confidentially and without significant input from the Creditors' Committee or any other creditor constituency.

---

[15]    When asked whether it had solicited investment proposals from other potential investors, the Debtors' financial advisers admitted that they did no more than compile a list of interested entities:

Q  To be clear, you did not, during the course of the negotiation of the labor agreement, talk to any other potential plan sponsors, other than Centerbridge?
A  Actually, that is not correct.
Q  Okay.  Who else did you talk to?
A  We had received calls and we made certain calls to a variety of people, but we did not expand those initial conversations other than logging the interest, because we were committed by virtue of the negotiations with labor to get that transaction done.

App. Ex. AA at 27:15 - 28:6.

The Bankruptcy Court, however, failed to address why none of these facts tainted the Global Settlement and, thus, erred in determining that the negotiations between the Debtors, the Unions and Centerbridge were conducted at arms' length.

**B.    The Bankruptcy Court Erred by Failing to Make All Findings Necessary to Support the Conclusion of a "Net Benefit" of the Settlement to the Debtors' Estates.**

Not only did the Bankruptcy Court fail to apply a higher degree of scrutiny and take a closer look at the Settlement, but the Bankruptcy Court also failed to make the necessary factual findings to support the relief granted. Although the Bankruptcy Court made numerous findings concerning the benefits realized under the Union Settlements, the only finding it made regarding the benefits of the Investment Agreement to the estates was that without such agreement the Union would not enter the Union Settlements.

A bankruptcy court "may not simply rubber stamp the recommendation of a trustee or debtor in possession but, instead, must make an independent, full and fair assessment of the wisdom of the proposed compromise." In re Remsen Partners, Ltd., 294 B.R. 557, 565 (Bankr. S.D.N.Y. 2003) (internal citations omitted); see also In re Planned Protective Servs., Inc., 130 B.R. 94, 96 (Bankr. C.D. Cal. 1991) ("Approval of a compromise under Bankruptcy Rule 9019 requires more than just a 'rubber-stamping' of an agreement . . . ."). Instead, when evaluating the reasonableness of a settlement, a bankruptcy court must balance the benefit achieved for the debtor's estates through the settlement against what is being compromised. Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d. Cir. 1996); see, e.g., Remsen, 294 B.R. at 566 (rejecting settlement where, on a net basis, the estate would likely recover more in continued litigation than under the settlement); In re Nat'l Health & Safety Corp., No. 99-18339DWS, 2000 WL 968778, at *3-5 (Bankr. E.D. Pa. July 5, 2000) (finding that after balancing the various components of the settlement, the settlement did not represent a net benefit to the estate); In re Arkoosh Produce,

Inc., No. 00-41817, 2003 WL 25273746, at *10-12 (Bankr. D. Idaho July 1, 2003) (rejecting a "package deal" settlement where the settlement "gives away too much in exchange for too little"); cf. United States v. Air Line Pilots Ass'n Int'l (In re Trans World Airlines, Inc.), No. 92-678-SLR, 1993 WL 559245, at *9 n.5 (D. Del. June 22, 1993) (evaluating a factual record and expressly finding that the overall transaction under the settlement resulted in a significant net benefit to the debtor and its creditors).

In this case, relying on the evidence provided by the Debtors at the Settlement Hearing, the Bankruptcy Court made findings of fact as to the possible benefit of the Settlement Agreements to the Debtors' estates.  Notably, the Bankruptcy Court found that

> [t]he Global Settlement allows the Debtors to meaningfully restructure their Union labor costs, eliminate their legacy obligations, implement their MFO Program, which collectively represent a savings of approximately $220 million on an annual basis, and which savings are essential to produce a long-term, viable business.[16]

App. Ex. B at 9.  All these cited benefits, however, are derived by the compromise of the section 1113/1114 issues and are solely due to the Debtors' entry into the Union Settlements.  In contrast, the only factual finding[17] supported by evidence in the record as to the benefit that the estates would receive from entry into the Investment Agreement was that the Unions refused to settle otherwise:

> The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement (and all transactions contemplated thereunder) are all integral components of the Global Settlement, and **without each of these agreements, the Unions would not have agreed to a consensual resolution of all issues with the Debtors**.

---

[16]    If the Debtors had prevailed on the Section 1113, the Debtors claimed that the estate would save $100 to $150 million.  See App. Ex. C at 1.

[17]    The Settlement Order, however, does contain conclusory statements:  "The Union Settlement Agreements, the Plan Support Agreement and the Investment Agreement are fair, reasonable and equitable and in the best interests of the Debtors' estates."  App. Ex. B at 9.

App. Ex. B at 8 (emphasis added). In short, the Bankruptcy Court bypassed the issue of the costs of the Centerbridge transaction, instead adopting the view that whatever the costs, peace with the Unions was necessary.

This approach, however, is not sufficient under the Supreme Court's holding with respect to settlements in <u>TMT Trailer</u>. The Bankruptcy Court was required to consider the costs to the chapter 11 estates of transferring the Series A and Series B Preferred, as well as control of its board of directors. Although it is true that the Debtors will receive an equity investment of up to $750 million under the Centerbridge transaction, they also will transfer as many as 500,000,000 shares of the Series Preferred B to investors and Centerbridge, if applicable, as well as all 2,500,000 shares of the Series A Preferred, and control of reorganized Dana's board of directors to Centerbridge. <u>See</u> App. Ex. T at 16:19-18:3; App. Ex. Q at 2. The record is devoid of any evidence as to the value of this transfer of property of the Debtors' estates or even how the parties reached the purchase price to be paid. As such, although one could speculate, there was no way that the Bankruptcy Court could have determined the value of these estate assets. In fact, it is entirely possible that the value of this preferred stock and board control premium exceeds both Centerbridge's cash infusion and the estimated saving from the Union Settlements, resulting in a net detriment to the estates.[18]

Additionally, the absence of this evidence is not ameliorated because the Investment Agreement is purportedly contingent on the market not supplying any higher and better offers for the Series A Preferred and Series B Preferred. As explained above, the negative impacts of

---

[18] The support of the Creditors' Committee and the Ad Hoc Committee is no indication that the Investment Agreement benefits the Debtors' estates. Under the Investment Agreement, significant holders of unsecured trade and bond claims (<u>i.e.</u>, most of the members of these committees) may purchase Series B Preferred alongside Centerbridge. Further, under the Plan Support Agreement and the Debtors' proposed Plan, old equity is essentially eliminated and all common stock in the reorganized Dana is to be transferred to the unsecured trade and bond claims. Thus, support of the Creditors' Committee and the Noteholders' Committee is, at the very least, unreliable given that their members stand to benefit from the Investment Agreement almost as much as Centerbridge.

Appendix R are so substantial that the Centerbridge transaction is all but completely shielded from any higher or better offers from other potential investors. For example, shortly before the Settlement Hearing, an offer made by Appaloosa that was higher than the investment that was then being proposed by Centerbridge was summarily rejected by the Debtors' board of directors because of the Unions' consent rights under Appendix R. App. Ex. W at 11-12. As a result, the Debtors' purported fiduciary out's market test—the cornerstone of their case—was defective because the Investment Agreement never ended up being subjected to the market.

Accordingly, because the Bankruptcy Court failed to determine that the Centerbridge transaction was in the best interests of the Debtors' estates, the Bankruptcy Court did not and could not make the findings necessary to support an order approving the *entire* Settlement. See TMT Trailer, 390 U.S. at 424 (A bankruptcy court must not approve a settlement without first making an "informed and independent judgment as to whether the proposed compromise is fair and equitable . . . Further, the judge should form an educated estimate of . . . all . . . factors relevant to the full and fair assessment of the wisdom of the proposed compromise.").

MIAMI 742360 (2K)

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests entry of an order (i) vacating the Settlement Order to the extent that it authorizes the Debtors to enter into the Investment Agreement and Plan Support Agreement, and (ii) granting such other further relief as is just.

Dated: November 8, 2007
      New York, New York

                      WHITE & CASE LLP
                      1155 Avenue of the Americas
                      New York, New York  10036-2787
                      (212) 819-8200


                      By:   /s/ J. Christopher Shore
                          J. Christopher Shore (JCS-6031)
                          Gerard Uzzi (GU-2297)

                      Wachovia Financial Center
                      200 South Biscayne Boulevard, Suite 4900
                      Miami, Florida 33131
                      (305) 371-2700
                      Thomas E Lauria (*pro hac vice* application pending)


                      ATTORNEYS FOR THE APPALOOSA
                      MANAGEMENT L.P.

MIAMI 742360 (2K)