**EXHIBIT A**

# DANA CORP

## FORM 8-K
### (Current report filing)

## Filed 6/29/2007 For Period Ending 6/29/2007

| | |
|---|---|
| Address | 4500 DORR ST |
| | TOLEDO, Ohio 43615 |
| Telephone | 419-535-4500 |
| CIK | 0000026780 |
| Industry | Auto & Truck Parts |
| Sector | Consumer Cyclical |
| Fiscal Year | 12/31 |



http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Onlines Terms of Use.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D. C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): <u>June 29, 2007</u>**

# Dana Corporation

(Exact name of registrant as specified in its charter)

| Virginia | 1-1063 | 34-4361040 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

| 4500 Dorr Street, Toledo, Ohio | 43615 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: <u>(419) 535-4500</u>

<u>Not Applicable</u>
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 7.01. Regulation FD Disclosure.**

On June 29, 2007, Dana Corporation (Dana) filed its unaudited Monthly Operating Report for the month ended May 31, 2007 with the United States Bankruptcy Court for the Southern District of New York (the Bankruptcy Court) ( *In re Dana Corporation, et al.,* Case No. 06-10354 (BRL)). A copy of this report is contained in the attached Exhibit 99.1.

The Monthly Operating Report was prepared solely for the purpose of complying with the monthly reporting requirements of, and is in a format acceptable to, the Office of the United States Trustee, Southern District of New York, and it should not be relied upon for investment purposes. The Monthly Operating Report is limited in scope and covers a limited time period. The financial information that it contains is unaudited.

The financial statements in the Monthly Operating Report are not prepared in accordance with accounting principles generally accepted in the United States of America (GAAP). The Monthly Operating Report presents condensed financial information of Dana and its debtor and non-debtor subsidiaries, with Dana Credit Corporation (DCC) accounted for on an equity basis, rather than on a consolidated basis as required by GAAP.

Readers should not place undue reliance upon the financial information in the Monthly Operating Report, as there can be no assurance that such information is complete. The Monthly Operating Report may be subject to revision. The information in the Monthly Operating Report should not be viewed as indicative of future results.

Additional information about Dana's filing under the Bankruptcy Code, including access to court documents and other general information about the Chapter 11 cases, is available online at http://www.dana.com/reorganization.

The Monthly Operating Report is being furnished for informational purposes only and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, except as otherwise expressly stated in such filing. The filing of this Form 8-K shall not be deemed an admission as to the materiality of any information herein that is required to be disclosed solely by Regulation FD.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Dana Corporation's Monthly Operating Report for the Month of May, 2007 (furnished but not filed) |

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dana Corporation
(Registrant)

Date: June 29, 2007                               By: /s/ Kenneth A. Hiltz
                                                       Kenneth A. Hiltz
                                                       Chief Financial Officer

3

**Exhibit Index**

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Dana Corporation's Monthly Operating Report for the Month of May, 2007 (furnished but not filed) |

Exhibit 99.1

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox (HL 3046)
Carl E. Black (CB 4803)
Ryan T. Routh (RR 1994)

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-3053
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
Jeffrey B. Ellman (JE 5638)

Attorneys for Debtors
  and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Dana Corporation, *et al.,* | : | Case No. 06-10354 (BRL) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

**MONTHLY OPERATING REPORT FOR DANA CORPORATION**
**AND ITS AFFILIATED DEBTORS FOR THE MONTH OF MAY 2007**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**JUDGE:**  Burton R. Lifland

**CASE NO: 06-10354 (BRL)**
**CHAPTER 11**

**DANA CORPORATION, ET AL. (1)**
**MONTHLY OPERATING REPORT**
**PERIOD COVERED: May 1, 2007 — May 31, 2007**

| | |
|---|---|
| **DEBTORS' ADDRESS:** | **MONTHLY DISBURSEMENTS:** |
| **4500 Dorr Street** | $442 million |
| **Toledo, OH 43615** | |
| | |
| **DEBTORS' ATTORNEY:** | **MONTHLY NET PROFIT:** |
| **Jones Day** | $5 million |
| **222 East 41st Street** | |
| **New York, NY 10017** | |

**REPORT PREPARER:**

| | |
|---|---|
| /s/ Kenneth A. Hiltz | CHIEF FINANCIAL OFFICER |
| SIGNATURE OF REPORT PREPARER | TITLE |
| | |
| KENNETH A. HILTZ | June 29, 2007 |
| PRINTED NAME OF REPORT PREPARER | DATE |

The report preparer, having reviewed the attached report and being familiar with the Debtors' financial affairs, verified under the penalty of perjury that the information contained therein is complete, accurate and truthful to the best of his knowledge. (2)

(1)   See next page for a listing of Debtors by case number.
(2)   All amounts herein are unaudited and subject to revision.

-1-

**In re Dana Corporation, et al.**
**Case No. 06-10354 (BRL) (Jointly Administered)**
**Reporting Period: May 1, 2007 — May 31, 2007**

| Debtors: | Case Number: |
|---|---|
| Dana Corporation | 06-10354 |
| Dakota New York Corp | 06-10351 |
| Brake Systems, Inc. | 06-10355 |
| BWDAC, Inc. | 06-10357 |
| Coupled Products, Inc. | 06-10359 |
| Dana Atlantic, LLC | 06-10360 |
| Dana Automotive Aftermarket, Inc. | 06-10362 |
| Dana Brazil Holdings I, LLC | 06-10363 |
| Dana Brazil Holdings, LLC | 06-10364 |
| Dana Information Technology, LLC | 06-10365 |
| Dana International Finance, Inc. | 06-10366 |
| Dana International Holdings, LLC | 06-10367 |
| Dana Risk Management Services, Inc. | 06-10368 |
| Dana Technology, Inc. | 06-10369 |
| Dana World Trade Corporation | 06-10370 |
| Dandorr L.L.C. | 06-10371 |
| Dorr Leasing Corporation | 06-10372 |
| DTF Trucking, Inc. | 06-10373 |
| Echlin-Ponce, Inc. | 06-10374 |
| EFMG, LLC | 06-10375 |
| EPE, Inc. | 06-10376 |
| ERS, LLC | 06-10377 |
| Flight Operations, Inc. | 06-10378 |
| Friction, Inc. | 06-10379 |
| Friction Materials, Inc. | 06-10380 |
| Glacier Vandervell, Inc. | 06-10381 |
| Hose & Tubing Products, Inc. | 06-10382 |
| Lipe Corporation | 06-10383 |
| Long Automotive, LLC | 06-10384 |
| Long Cooling, LLC | 06-10385 |
| Long USA, LLC | 06-10386 |
| Midland Brake, Inc. | 06-10387 |
| Prattville Mfg, Inc. | 06-10388 |
| Reinz Wisconsin Gasket, LLC | 06-10390 |
| Spicer Heavy Axle & Brake, Inc. | 06-10391 |
| Spicer Heavy Axle Holdings, Inc. | 06-10392 |
| Spicer Outdoor Power Equipment Components | 06-10393 |
| Torque-Traction Integration Technologies, LLC | 06-10394 |
| Torque-Traction Manufacturing Technologies, LLC | 06-10395 |
| Torque-Traction Technologies, LLC | 06-10396 |
| United Brake Systems, Inc. | 06-10397 |

**DANA CORPORATION, ET AL.**
**MONTHLY OPERATING REPORT**
**May 2007**

**Index**

Page

**Financial Statements**

Condensed Statement of Operations with Dana Credit Corporation (DCC) on an Equity Basis (Unaudited) —
Month of May 2007 and for the Five Months Ended May 31, 2007                                           4
Condensed Balance Sheet with DCC on an Equity Basis (Unaudited) — May 31, 2007                        5
Condensed Statement of Cash Flows with DCC on an Equity Basis (Unaudited) — Month of May 2007 and for
the Five Months Ended May 31, 2007                                                                     6

**Notes to Monthly Operating Report**

Note 1. Basis of Presentation                                                                          7
Note 2. Reorganization Proceedings                                                                     9
Note 3. Financing                                                                                     10
Note 4. Liabilities Subject to Compromise                                                             12
Note 5. Reorganization Items                                                                          13
Note 6. Post-petition Accounts Payable                                                                13

**Schedules**

Schedule 1. Cash Disbursements by Debtors                                                             14
Schedule 2. Payroll Taxes Paid                                                                        15
Schedule 3. Post-petition Sales, Use and Property Taxes Paid                                          16

**Other Information**

While Dana Corporation (Dana) continues its reorganization under Chapter 11 of the United States Bankruptcy Code (the Bankruptcy Code), investments in Dana securities are highly speculative. Although shares of Dana common stock continue to trade on the OTC Bulletin Board under the symbol "DCNAQ," the trading prices of the shares may have little or no relationship to the actual recovery, if any, by the holders under any eventual court-approved reorganization plan. The opportunity for any recovery by holders of Dana's common stock under such reorganization plan is uncertain, and Dana's shares may be cancelled without any compensation pursuant to such plan.

Case Number: 06-10354 (BRL) (Jointly Administered)

**DANA CORPORATION**
**DEBTOR IN POSSESSION**
**CONDENSED STATEMENT OF OPERATIONS**
**WITH DCC ON AN EQUITY BASIS (UNAUDITED)**

| | Month Ended May 31, 2007 | Year to Date May 31, 2007 |
|---|---|---|
| | (in millions) | |
| **Net sales** | $ 806 | $ 3,641 |
| Costs and expenses | | |
|    Cost of sales | 751 | 3,454 |
|    Selling, general and administrative expenses | 32 | 153 |
|    Realignment charges | 6 | 167 |
|    Other income, net | 8 | 67 |
| Income (loss) from operations | 25 | (66) |
| Interest expense (contractual interest of $17 in May and $78 year to date) | 8 | 33 |
| Reorganization items, net | 10 | 59 |
| Income (loss) before income taxes | 7 | (158) |
| Income tax expense | 10 | 43 |
| Minority interest expense | 1 | 5 |
| Equity in earnings of affiliates | 10 | 19 |
| **Income (loss) from continuing operations** | 6 | (187) |
| **Loss from discontinued operations** | (1) | (70) |
| **Net income (loss)** | $ 5 | $ (257) |

The accompanying notes are an integral part of the financial statements.

Case Number: 06-10354 (BRL) (Jointly Administered)

-4-

**DANA CORPORATION**
**DEBTOR IN POSSESSION**
**CONDENSED BALANCE SHEET**
**WITH DCC ON AN EQUITY BASIS (UNAUDITED)**

|  | May 31, 2007 |
|---|---:|
|  | (in millions) |
| **Assets** | |
| Current assets | |
| Cash and cash equivalents | $    1,060 |
| Accounts receivable | |
| Trade | 1,371 |
| Other | 286 |
| Inventories | 768 |
| Assets of discontinued operations | 192 |
| Other current assets | 141 |
| Total current assets | 3,818 |
| Investments and other assets | 999 |
| Investments in equity affiliates | 420 |
| Property, plant and equipment, net | 1,736 |
| **Total assets** | $    6,973 |
| | |
| **Liabilities and Shareholders' Deficit** | |
| Current liabilities | |
| Debtor-in-posession financing | $      900 |
| Notes payable, including current portion of long-term debt | 48 |
| Accounts payable | 1,117 |
| Liabilities of discontinued operations | 122 |
| Other accrued liabilities | 773 |
| Total current liabilities | 2,960 |
| | |
| Liabilities subject to compromise | 4,323 |
| Deferred employee benefits and other noncurrent liabilities | 418 |
| Long-term debt | 13 |
| Minority interest in consolidated subsidiaries | 99 |
| Total liabilities | 7,813 |
| Shareholders' deficit | (840) |
| **Total liabilities and shareholders' deficit** | $    6,973 |

The accompanying notes are an integral part of the financial statements.

Case Number: 06-10354 (BRL) (Jointly Administered)

-5-

**DANA CORPORATION**
**DEBTOR IN POSSESSION**
**CONDENSED STATEMENT OF CASH FLOWS**
**WITH DCC ON AN EQUITY BASIS (UNAUDITED)**

| | Month Ended May 31, 2007 (in millions) | Year to Date May 31, 2007 (in millions) |
|---|---|---|
| **Operating activities** | | |
| Net income (loss) | $ 5 | $ (257) |
| Depreciation and amortization | 23 | 116 |
| Loss on sale of businesses | | 14 |
| Non-cash portion of U.K. pension charge | | 68 |
| Decrease (increase) in working capital | 41 | (42) |
| Unremitted equity in earnings of affiliates | (10) | (19) |
| Other | (12) | 17 |
| **Net cash flows provided by (used for) operating activities** | 47 | (103) |
| | | |
| **Investing activities** | | |
| Purchases of property, plant and equipment | (18) | (68) |
| Proceeds from sale of assets | | 306 |
| Other | 5 | 1 |
| **Net cash flows provided by (used for) investing activities** | (13) | 239 |
| | | |
| **Financing activities** | | |
| Net change in short-term debt | (47) | 19 |
| Proceeds from DIP Credit Agreement | | 200 |
| **Net cash flows provided by (used for) financing activities** | (47) | 219 |
| | | |
| **Net increase (decrease) in cash and cash equivalents** | (13) | 355 |
| **Cash and cash equivalents — beginning of period** | 1,073 | 705 |
| **Cash and cash equivalents — end of period** | $ 1,060 | $ 1,060 |

The accompanying notes are an integral part of the financial statements.

Case Number: 06-10354 (BRL) (Jointly Administered)

-6-

**DANA CORPORATION, ET AL.**
**DEBTOR IN POSSESSION**
**NOTES TO MONTHLY OPERATING REPORT**
**(Dollars in millions)**

**Note 1. Basis of Presentation**

**General**

Dana and its consolidated subsidiaries are a leading supplier of axle, driveshaft, engine, structural, sealing and thermal products. Dana designs and manufactures products for every major vehicle producer in the world and is focused on being an essential partner to its automotive, commercial truck and off-highway vehicle customers.

On March 3, 2006 (the Filing Date), Dana and forty of its wholly-owned domestic subsidiaries (collectively, the Debtors) filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code (the Bankruptcy Code) in the United States Bankruptcy Court for the Southern District of New York (the Bankruptcy Court). These Chapter 11 cases are being administered jointly under Case Number 06-10354 (BRL) and are collectively referred to as the "Bankruptcy Cases." A listing of the Debtors and their respective case numbers is set forth at the beginning of this Monthly Operating Report. Neither DCC and its subsidiaries nor any of Dana's non-U.S. subsidiaries are Debtors. See Note 2 for more information about the reorganization proceedings.

This Monthly Operating Report has been prepared solely for the purpose of complying with the monthly reporting requirements applicable in the Bankruptcy Cases and is in a format acceptable to the Office of the United States Trustee for the Southern District of New York (the U.S. Trustee) and to the lenders under the DIP Credit Agreement which is discussed in Note 3. The financial information contained herein is limited in scope and covers a limited time period. Moreover, such information is unaudited and, as discussed below, is not prepared in accordance with accounting principles generally accepted in the United States (GAAP). Accordingly, this Monthly Operating Report should not be used for investment purposes.

Case Number: 06-10354 (BRL) (Jointly Administered)

-7-

## Accounting Requirements

The condensed financial statements herein have been prepared in accordance with the guidance in American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" (SOP 90-7), which is applicable to companies operating under Chapter 11. SOP 90-7 generally does not change the manner in which financial statements are prepared. However, it does require that the financial statements for periods subsequent to the filing of the Chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business.

## Financial Statements Presented

The unaudited condensed financial statements and supplemental information contained herein present the condensed financial information of Dana and its Debtor and non-Debtor subsidiaries with DCC accounted for on an equity basis. Accordingly, intercompany transactions with DCC have not been eliminated in these financial statements and are presented as intercompany loans and payables. This presentation of condensed Dana financial statements with DCC on an equity basis, while consistent in format with the financial information required to be provided to the lenders under the DIP Credit Agreement and acceptable to the U.S. Trustee, does not conform to GAAP, which requires that DCC and its subsidiaries be consolidated along with Dana's other majority-owned subsidiaries.

For consolidated financial statements for Dana and its consolidated subsidiaries prepared in conformity with GAAP and the notes thereto, see Dana's Annual Report on Form 10-K for the year ended December 31, 2006 (the 2006 Form 10-K) and Quarterly Report on Form 10-Q for the quarter ended March 31, 2007, which have been filed with the U.S. Securities and Exchange Commission.

The condensed statement of operations and cash flows presented herein are for the month and the five months ended May 31, 2007. Schedule 1. Cash Disbursements by Debtors contains further information regarding cash disbursements made by each of the Debtors during the post-petition period of May 1, 2007 to May 31, 2007.

The condensed financial statements presented herein with DCC accounted for on an equity basis have been derived from Dana's internal books and records. They include normal recurring adjustments and adjustments that are consistent with those made for financial statements prepared in accordance with GAAP. Certain information and footnote disclosures normally included in financial statements prepared in accordance with GAAP have been condensed or omitted.

The financial information used in the preparation of this report was not subjected to the procedures customarily applied in the preparation of Dana's quarterly or annual financial information prepared in accordance with GAAP. Accordingly, the financial information herein is subject to change and any such change could be material. The results of operations in this report are not necessarily indicative of results which may be expected for any other period or the full year and may not be representative of Dana's consolidated results of operations, financial position and cash flows in the future.

Case Number: 06-10354 (BRL) (Jointly Administered)

-8-

**Note 2. Reorganization Proceedings**

The Debtors are managing their businesses in the ordinary course as debtors in possession, subject to the supervision of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and the orders of the Bankruptcy Court.

Official committees of the Debtors' unsecured creditors and retirees not represented by unions have been appointed in the Bankruptcy Cases and, in accordance with the provisions of the Bankruptcy Code, have the right to be heard on all matters that come before the Bankruptcy Court. The Debtors are required to bear certain of the committees' costs and expenses, including those of their counsel and other professional advisors. An official committee of Dana's equity security holders was appointed and subsequently disbanded.

The Debtors have received approval from the Bankruptcy Court to pay or otherwise honor certain of their pre-petition obligations, subject to certain restrictions, including employee wages, salaries, certain benefits and other employee obligations; claims of foreign vendors and certain suppliers that are critical to the Debtors' continued operation; and certain customer program and warranty claims.

Under the Bankruptcy Code, the Debtors have the right to assume or reject executory contracts (i.e., contracts that are to be performed by both contract parties after the Filing Date) and unexpired leases, subject to Bankruptcy Court approval and other limitations. In this context, "assuming" executory contracts or unexpired leases generally means that the Debtors will agree to perform their obligations and cure certain existing defaults under the contracts or leases and "rejecting" them means that the Debtors will be relieved of their obligations to perform further under the contracts or leases, which may give rise to an unsecured pre-petition claim for damages for the breach thereof. Since the Filing Date, the Bankruptcy Court has authorized the Debtors to assume or reject certain unexpired leases and executory contracts.

The Debtors filed their initial schedules of assets and liabilities existing on the Filing Date with the Bankruptcy Court in June 2006 and amendments to certain of these schedules in July and November 2006. The Bankruptcy Court set September 21, 2006 as the general bar date (the date by which most entities that wished to assert a pre-petition claim against a Debtor had to file a proof of claim in writing). Asbestos-related personal injury and wrongful death claimants were not required to file proofs of claim by the bar date, and such claims will be addressed as part of the Chapter 11 proceedings. The Debtors are now in the process of evaluating, investigating and reconciling the claims that were submitted. The Debtors have objected to multiple claims and expect to file additional claim objections with the Bankruptcy Court. Pre-petition claims are recorded as liabilities subject to compromise. Amounts and payment terms for these claims, if applicable, will be established in connection with the Bankruptcy Cases. See Note 4 for more information about liabilities subject to compromise.

Case Number: 06-10354 (BRL) (Jointly Administered)

-9-

In August 2006, the Bankruptcy Court entered an order establishing procedures for trading in claims and equity securities which is designed to protect the Debtors' potentially valuable tax attributes (such as net operating loss carryforwards). Under the order, holders or acquirers of 4.75% or more of Dana stock are subject to certain notice and consent procedures prior to acquiring or disposing of Dana common shares. Holders of claims against the Debtors that would entitle them to more than 4.75% of the common shares of reorganized Dana under a confirmed plan of reorganization utilizing the tax benefits provided under Section 382(l)(5) of the Internal Revenue Code may be subject to a requirement to sell down the excess claims if necessary to implement such a plan of reorganization.

The Debtors have the exclusive right to file a plan of reorganization in the Bankruptcy Cases until September 3, 2007.

**Taxes**

Income taxes are accounted for in accordance with Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes." Current and deferred income tax assets and liabilities are recognized based on events which have occurred and are measured by the enacted tax laws. Based on a history of losses in the U.S. and near-term prospects for continued losses, Dana established a 100% valuation allowance against its U.S. federal deferred tax assets in 2005. Deferred tax assets resulting from subsequent U.S. losses have been offset by increases in the valuation allowances, effectively eliminating the benefit of those losses.

The Debtors have received Bankruptcy Court approval to pay pre-petition sales, use and certain other taxes in the ordinary course of their businesses. The Debtors believe that they have paid all pre-petition and post-petition taxes when due from before and after the Filing Date. See Schedule 2. Payroll Taxes Paid and Schedule 3. Post-petition Sales, Use and Property Taxes Paid for information regarding taxes paid. The Debtors believe that all tax returns are being prepared and filed when due, or extended as necessary, and that they are paying all post-petition taxes as they become due or obtaining extensions for the payment thereof.

**Contractual Interest Expense**

Contractual interest expense includes amounts relating to debt subject to compromise which is no longer recognized in the statement of operations in accordance with SOP 90-7. The contractual interest that was not recognized was $9 for the month of May 2007 and $45 for the five months ended May 31, 2007.

**Note 3. Financing**

**DIP Credit Agreement**

Dana, as borrower, and its Debtor U.S. subsidiaries, as guarantors, are parties to a Senior Secured Superpriority Debtor-in-Possession Credit Agreement (the DIP Credit Agreement) with Citicorp North America, Inc., as agent, initial lender and an issuing bank, and with Bank of America, N.A. and JPMorgan Chase Bank, N.A., as initial lenders and issuing banks. The DIP Credit Agreement, as amended, has been approved by the Bankruptcy Court. The aggregate amount of the facility is presently $1,550, including a $650 revolving credit facility (of which $400 is available for the issuance of letters of credit) and a $900 term loan facility. For a discussion of the terms of the DIP Credit Agreement, see Note 10 to the consolidated financial statements in Item 8 of the 2006 Form 10-K.

Case Number: 06-10354 (BRL) (Jointly Administered)

In January 2007, Dana borrowed $200 under the term loan facility bringing the total borrowed under the facility to $900. Based on its borrowing base collateral, Dana had availability under the DIP Credit Agreement at May 31, 2007 of $218 after deducting the $100 minimum availability requirement and $240 for outstanding letters of credit.

The DIP Credit Agreement currently requires Dana and its consolidated subsidiaries to maintain a rolling 12-month cumulative EBITDAR (earnings before interest, taxes, depreciation, amortization, restructuring and reorganization charges and other items, as defined in the agreement) at specified levels as of the last day of each calendar month. The EBITDAR requirement for the period ended May 31, 2007 was $175 and actual EBITDAR for that period was $297, calculated as follows:

**EBITDAR Calculation**

|  | June 1, 2006 to May 31, 2007 (in millions) | Year to Date May 31, 2007 (in millions) |
| --- | ---: | ---: |
| **Net loss** | $ (845) | $ (257) |
| Plus — | | |
| Interest expense | 69 | 33 |
| Income tax expense | 132 | 43 |
| Depreciation and amortization expense | 277 | 116 |
| Asset impairment | 58 | |
| Goodwill impairment | 46 | |
| Realignment charges | 257 | 167 |
| Reorganization items, net | 102 | 59 |
| Loss from discontinued operations | 165 | 70 |
| Minority interest | 11 | 5 |
| Less — | | |
| Equity in earnings of affiliates | (92) | 19 |
| Non-recurring items | 35 | 32 |
| Interest income | 32 | 14 |
| **EBITDAR** | $ 297 | $ 171 |

In April 2007, certain of Dana's U.K. subsidiaries were released from continuing pension plan obligations in return for a cash payment of $93 and the transfer of a 33% equity interest in Dana's remaining U.K. axle and driveshaft operating businesses. As a result of this pension settlement, realignment charges in the above table include $144 for the first five months of 2007 and loss from discontinued operations includes $17 for the same period.

Case Number: 06-10354 (BRL) (Jointly Administered )

-11-

**Canadian Credit Agreement**

In June 2006, Dana Canada Corporation (Dana Canada), as borrower, and certain of its Canadian affiliates, as guarantors, entered into a Credit Agreement (the Canadian Credit Agreement) with Citibank Canada as agent, initial lender and an issuing bank, and with JPMorgan Chase Bank, N.A., Toronto Branch and Bank of America, N.A., Canada Branch, as initial lenders and issuing banks. The Canadian Credit Agreement provides a $100 revolving credit facility, of which $5 is available for the issuance of letters of credit. At May 31, 2007, based on Dana Canada's borrowing base collateral, it had availability of $75 after deducting the $20 minimum availability requirement and $2 for currently outstanding letters of credit. Dana Canada had no borrowings under this agreement at May 31, 2007.

**European Receivables Loan Facility**

In March 2007, certain of Dana's European subsidiaries received a commitment from GE Leveraged Loans Limited for the establishment of a five-year accounts receivable securitization program, providing up to the euro equivalent of $225 in available financing. Under the financing program, certain of Dana's European subsidiaries will sell accounts receivable to Dana Europe Financing (Ireland) Limited, a limited liability company incorporated under the laws of Ireland (an Irish special purpose entity). This entity, as borrower, will pledge those receivables as collateral for short-term loans from GE Leveraged Loans Limited, as administrative agent, and other participating lenders. The accounts receivable purchased by the Irish special purpose entity and the related borrowings will be included in Dana's consolidated financial statements because the Irish special purpose entity does not meet certain accounting requirements for treatment as a "qualifying special purpose entity" under GAAP.

**Note 4. Liabilities Subject to Compromise**

As a result of the Chapter 11 filings, the Debtors' pre-petition indebtedness is subject to compromise or other treatment under a plan of reorganization. SOP 90-7 requires that pre-petition liabilities subject to compromise be reported at the amounts expected to be allowed as claims, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise represent Dana's estimate of known or potential pre-petition claims to be addressed in connection with the Bankruptcy Cases and include the liabilities subject to compromise of discontinued operations. Such claims remain subject to future adjustments resulting from, among other things, negotiations with creditors, rejection of executory contracts and unexpired leases and orders of the Bankruptcy Court. The terms under which any allowed pre-petition claims will be satisfied will be established by order of the Bankruptcy Court, including any order confirming a plan or plans of reorganization in the Bankruptcy Cases.

The amount of liabilities subject to compromise reported herein was $4,323 at May 31, 2007. This amount includes an intercompany payable to DCC of $325 which is not eliminated under this basis of presentation. In addition, substantially all of the Debtors' pre-petition debt is in default due to the bankruptcy filing, and Debtors' pre-petition debt of $1,585 is also included in liabilities subject to compromise. At the Filing Date, in accordance with SOP 90-7, Dana discontinued recording interest expense on debt classified as liabilities subject to compromise. Contractual interest on all debt, including the portion classified as liabilities subject to compromise, amounted to $17 and $78 for the one month and five months ended May 31, 2007.

Case Number: 06-10354 (BRL) (Jointly Administered)

**Note 5. Reorganization Items**

SOP 90-7 requires that reorganization items, such as professional fees directly related to the process of reorganizing under Chapter 11 and provisions and adjustments to adjust the carrying value of certain pre-petition liabilities to their estimated allowable claim amounts, be reported separately. The Debtors' reorganization expense items for the month of May 2007 consisted of professional fees partially offset by interest income.

Pursuant to orders of the Bankruptcy Court, professionals retained by the Debtors and by the official statutory committees appointed in the Bankruptcy Cases are entitled to receive payment for their fees and expenses on a monthly basis, subject to compliance with certain procedures established by the Bankruptcy Code and orders of the Bankruptcy Court. In some cases, the professionals retained by the Debtors in the Bankruptcy Cases are also providing services to the Debtors' non-Debtor subsidiaries and are being paid for such services by the non-Debtor subsidiaries. With respect to the Debtors' foreign non-Debtor subsidiaries, payments for services to these entities in U.S. dollars are being made by the Debtors and reimbursed by the foreign non-Debtor subsidiaries through the ordinary course netting process established under the Debtors' consolidated cash management system. In addition, under the terms of the DIP Credit Agreement, the Debtors are obligated to reimburse the lenders for the fees and expenses of their professionals. The Debtors are making the required payments to such professionals, as described above, and believe they are current with regard to such payments.

**Note 6. Post-petition Accounts Payable**

The Debtors believe that all undisputed post-petition accounts payable have been and are being paid under agreed payment terms and the Debtors intend to continue paying all undisputed post-petition obligations as they become due. See "Schedule 1. Cash Disbursements by Debtors" for post-petition disbursements in May 2007.

Case Number: 06-10354 (BRL) (Jointly Administered)

-13-

**In re Dana Corporation, et al.**
**Case No. 06-10354 (BRL) (Jointly Administered)**                                          **Schedule 1**
**Reporting Period: May 1, 2007 — May 31, 2007**
**Cash Disbursements by Debtors**
*(Dollars in 000s)*

| Petitioning Entities: | Case Number: | May 2007 Disbursements |
|---|---|---:|
| Dana Corporation | 06-10354 | $ 442,021 |
| Dakota New York Corp | 06-10351 | |
| Brake Systems, Inc. | 06-10355 | |
| BWDAC, Inc. | 06-10357 | |
| Coupled Products, Inc. | 06-10359 | |
| Dana Atlantic, LLC | 06-10360 | |
| Dana Automotive Aftermarket, Inc. | 06-10362 | |
| Dana Brazil Holdings I, LLC | 06-10363 | |
| Dana Brazil Holdings, LLC | 06-10364 | |
| Dana Information Technology, LLC | 06-10365 | |
| Dana International Finance, Inc. | 06-10366 | |
| Dana International Holdings, LLC | 06-10367 | |
| Dana Risk Management Services, Inc. | 06-10368 | 148 |
| Dana Technology, Inc. | 06-10369 | |
| Dana World Trade Corporation | 06-10370 | |
| Dandorr L.L.C. | 06-10371 | |
| Dorr Leasing Corporation | 06-10372 | |
| DTF Trucking, Inc. | 06-10373 | |
| Echlin-Ponce, Inc. | 06-10374 | |
| EFMG, LLC | 06-10375 | |
| EPE, Inc. | 06-10376 | |
| ERS, LLC | 06-10377 | |
| Flight Operations, Inc. | 06-10378 | |
| Friction, Inc. | 06-10379 | |
| Friction Materials, Inc. | 06-10380 | |
| Glacier Vandervell, Inc. | 06-10381 | 3 |
| Hose & Tubing Products, Inc. | 06-10382 | |
| Lipe Corporation | 06-10383 | |
| Long Automotive, LLC | 06-10384 | |
| Long Cooling, LLC | 06-10385 | |
| Long USA, LLC | 06-10386 | |
| Midland Brake, Inc. | 06-10387 | |
| Prattville Mfg, Inc. | 06-10388 | |
| Reinz Wisconsin Gasket, LLC | 06-10390 | 2 |
| Spicer Heavy Axle & Brake, Inc. | 06-10391 | |
| Spicer Heavy Axle Holdings, Inc. | 06-10392 | |
| Spicer Outdoor Power Equipment Components | 06-10393 | |
| Torque-Traction Integration Technologies, LLC | 06-10394 | 10 |
| Torque-Traction Manufacturing Technologies, LLC | 06-10395 | 131 |
| Torque-Traction Technologies, LLC | 06-10396 | |
| United Brake Systems, Inc. | 06-10397 | |
| Total Cash Disbursements | | $ 442,315 (a) |

(a)   Total disbursements may include certain payments made by the Debtors on behalf of non-Debtors pursuant to their cash management order. Disbursements are actual cash disbursements incurred for the month.

Schedule 2

**In re Dana Corporation, et al.**
**Case No. 06-10354 (BRL) (Jointly Administered)**
**Reporting Period: May 1, 2007 — May 31, 2007**
**Payroll Taxes Paid**

*(Dollars in 000s)*

| FEDERAL | | | | TOTALS |
|---|---|---|---|---|
| | Liabilities incurred or withheld | | | |
| FIT | FICA-ER | FICA-EE | FUTA | |
| $6,544 | $ 3,950 | $ 3,950 | $ | $ 14,444 |
| | Deposits released and pending | | | |
| FIT | FICA-ER | FICA-EE | FUTA | |
| $(6,544) | $(3,950) | $(3,950) | $ | $(14,444) |

| STATE | | | | TOTALS |
|---|---|---|---|---|
| | Liabilities incurred or withheld | | | |
| SIT | SUI-ER | SUI-EE | SDI-EE | |
| $1,804 | $ | $ | $ 6 | $ 1,810 |
| | Deposits released and pending | | | |
| SIT | SUI-ER | SUI-EE | SDI-EE | |
| $(1,804) | $ | $ | $(6) | $(1,810) |

| LOCAL | | | | TOTALS |
|---|---|---|---|---|
| | Liabilities incurred or withheld | | | |
| CIT | | | | |
| $457 | $ | $ | $ | $ 457 |
| | Deposits released and pending | | | |
| CIT | | | | |
| $(457) | $ | $ | $ | $(457) |

-15-

**In re Dana Corporation, et al.**                                                          **Schedule 3**
**Reporting Period: May 1, 2007 — May 31, 2007**
**Case No. 06-10354 (BRL) (Jointly Administered)**
**Post-petition Sales, Use and Property Taxes Paid**

*(Dollars in 000s)*

| Tax Authority | State | Type of Tax | Taxes Paid |
|---|---|---|---|
| City of Auburn Hills | MI | Property | (A) |
| City of St. Clair | MI | Property | 5 |
| Florida Dept of Revenue | FL | Sales/use | 5 |
| Illinois Dept of Revenue | IL | Sales/use | 1 |
| Indiana Dept of Revenue | IN | Sales/use | 19 |
| Indiana Dept of Workforce Development | IN | Miscellaneous | 15 |
| Kentucky Dept of Revenue | KY | Sales/use | 66 |
| Michigan Dept of Treasury | MI | Annual Report | (A) |
| Michigan Dept of Treasury | MI | Sales/use | 18 |
| Missouri Dept of Revenue | MO | Sales/use | 9 |
| Ohio State Treasurer | OH | Commercial Activity | 171 |
| Ohio State Treasurer | OH | Miscellaneous | (A) |
| Ohio State Treasurer | OH | Sales/use | 76 |
| Pennsylvania Dept of Revenue | PA | Sales/use | 1 |
| South Carolina Dept of Revenue | SC | Sales/use | 1 |
| Tennessee Dept of Revenue | TN | Sales/use | 29 |
| Texas Comptroller | TX | Sales/use | 8 |
| United States Treasury | | Miscellaneous | (A) |
| Virginia Dept of Taxation | VA | Sales/use | (A) |
| Washington State Dept of Revenue | WA | Excise | (A) |
| Wisconsin Dept of Revenue | WI | Sales/use | (A) |
| | | | $  424 |

(A)-payment was less than one thousand dollars

-16-

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                :

In re                        :    Chapter 11
                                :

Dana Corporation, *et al.,*       :    Case No. 06-10354 (BRL)
                                :

               Debtors.     :    (Jointly Administered)
                                :

-----------------------------------------------------------x

## ORDER PURSUANT TO 11 U.S.C. §§ 1113 AND 1114(e) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019, APPROVING SETTLEMENT AGREEMENTS WITH THE UNITED STEELWORKERS AND UNITED AUTOWORKERS, AND PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 AND 507, AUTHORIZING THE DEBTORS TO ENTER INTO PLAN SUPPORT AGREEMENT, INVESTMENT AGREEMENT AND RELATED AGREEMENTS

This matter came before the Court on the motion of Dana Corporation ("<u>Dana</u>") and 40 of its domestic direct and indirect subsidiaries (collectively, the "<u>Debtors</u>") dated July 5, 2007 (the "<u>Motion</u>"),[1] for entry of an order (a) pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, approving and authorizing the debtors to enter into settlement agreements, as amended (collectively, as amended, the "<u>Union Settlement Agreement</u>") with the United Steelworkers ("<u>USW</u>") and the International Union, UAW ("<u>UAW</u>," and together with the USW, the "<u>Unions</u>"), and (b) pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 and 507 approving and authorizing the Debtors to enter into:  (i) the Union Settlement Agreement, (ii) a Plan Support Agreement, as amended, by and among Dana, the Unions, Centerbridge Capital Partners, L.P. ("<u>Centerbridge</u>") and the creditors set forth on Exhibit A thereto (the "<u>Plan Support Agreement</u>"), and (iii) an Investment Agreement, dated July 25, 2007, by and among Dana, Centerbridge and CBP Acquisition Co. LLC (as same may be

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or in the Summary of Changes to the Global Settlement, filed with the Court on July 25, 2007.

amended, the "Investment Agreement"), and related agreements; the Court having reviewed the

Motion, the Union Settlement Agreement, the Plan Support Agreement, the Investment

Agreement, the statements in support of the Motion filed by the UAW and the Ad Hoc

Committee of Noteholders (the "Ad Hoc Noteholders Committee"), the objections of the Official

Committee of Unsecured Creditors (the "Committee"), Appaloosa Management, L.P., Brandes

Investment Partners, L.P., and the joinders to the Committee's objection filed by Wilmington

Trust Company, Timken Company and GK Capital, LLC (collectively, the "Objections"); the

Court having heard the objection (the "Other Creditor Objection") of an ad hoc committee of

certain unsecured creditors (the "Creditor Ad Hoc Committee") and the statements of counsel

and the evidence presented regarding the relief requested in the Motion at a hearing before the

Court on July 26, 2007 (the "Hearing"), at which time, based upon modifications made to the

relief sought in the Motion as further set forth in the record at the Hearing, the Committee

withdrew its objection, Timken Company withdrew its joinder to the Committee's objection and

Wilmington Trust Company modified its objection, and all interested parties were offered an

opportunity to be heard with respect to the Motion, as modified; and it further appearing that the

relief requested in the Motion is in the best interests of the Debtors, their estates and creditors

and other parties in interest; and upon the record of the Hearing and these chapter 11 cases; and

after due deliberation thereon; and good and sufficient cause appearing therefore, as explained in

an oral opinion at the conclusion of the hearing on the Motion (which is incorporated herein fully

by reference), IT IS HEREBY FOUND AND DETERMINED THAT:

Jurisdiction, Notice and Statutory Predicates

A.      This Court has jurisdiction over the Motion, the transactions contemplated

under the Global Settlement and any other ancillary documents and agreements related thereto

pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a core proceeding pursuant to

28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of the Debtors' chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

        B.      The notice given by the Debtors of the Motion, the Hearing, and the Notices of Filing regarding the Investment Agreement and the Summary of Changes to the Global Settlement, both of which were filed with the Court on July 25, 2007, constitutes proper, timely, adequate and sufficient notice thereof and complies with the Bankruptcy Code, the Bankruptcy Rules and all applicable local rules, and no further or other notice is necessary.

        C.      The statutory predicates for the relief granted herein are sections 105(a), 363(b), 364(c), 503, 507, 1113(c) and 1114(e) of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 9019.

Procedural Background

        D.      On March 3, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

        E.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

        F.      Pursuant to an order of this Court, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.

        G.      On March 13, 2006, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee, pursuant to section 1102 of the Bankruptcy Code.

        H.      On August 31, 2006, the U.S. Trustee appointed an official committee of non-union retired employees (the "Retiree Committee"), pursuant to section 1114(d) of the

Bankruptcy Code, and as directed by an order of the Court entered on August 9, 2006 (Docket No. 2773).

The Section 1113/1114 Litigation

       I.      Pursuant to section 1113 of the Bankruptcy Code, the Debtors may elect to assume or reject the CBAs.

       J.      On January 31, 2007, the Debtors filed their Motion to Reject their Collective Bargaining Agreements and to Modify their Retiree Benefits pursuant to Sections 1113 and 1114 of the Bankruptcy Code (the "Section 1113/1114 Motion"). The Section 1113 part of the Section 1113/1114 Motion sought the rejection of the CBAs with respect to the Debtors facilities at Auburn Hills, Michigan, Henderson, Kentucky, Marion, Indiana, Fort Wayne, Indiana, and Elizabethtown, Kentucky. The trial on the Section 1113/1114 Motion began on March 12, 2007.

       K.      At the hearing on the Motion, together with the trial on the Section 1113/1114 Motion, which is to be settled by the instant Motion, the Debtors established that:

       a)      The financial performance of the Debtors' U.S. operations has deteriorated dramatically in the recent past, resulting in $2 billion in losses during the past five years.

       b)      A significant portion of the Debtors' U.S. workforce is unionized. As of January 1, 2007, the Debtors had approximately 6,500 union employees. Except for Union employees located at the Debtors' Lima, Ohio and Pottstown, Pennsylvania facilities, which are covered under a master collective bargaining agreement with the UAW (the "UAW Master Agreement"), and Union employees at the Debtors' Toledo, Ohio, Rochester Hills, Michigan, and Longview, Texas facilities, where first collective bargaining agreements have yet to be negotiated with the UAW, the remainder of the Debtors' Union employees are covered by

separate collective bargaining agreements with respect to each facility (together with the UAW Master Agreement, the "CBAs").

c)      The Debtors provide non-pension retiree benefits (including hospital, medical, surgical, dental, prescription drug, vision, hearing and life insurance) (collectively, "Non-Pension Retiree Benefits") to all eligible active and retired Union employees and/or their spouses and dependents.  As of January 1, 2006, approximately 16,415 individuals received Non-Pension Retiree Benefits from the Debtors under CBAs (or were active Union employees currently covered under provisions of CBAs that provide a benefit upon retirement).

d)      As of December 31, 2006, the Debtors' Accumulated Post-Employment Benefit Obligation ("APBO") for Non-Pension Retiree Benefits for Union employees and retirees was approximately $1 billion.  As of December 31, 2006, the Debtors' corresponding periodic cost or expense reflected on their income statement on account of Non-Pension Retiree Benefits for Union employees and retirees was approximately $63.3 million.

e)      In order to address the mounting losses from their U.S. operations, in October 2006, the Debtors developed a restructuring plan that would allow the Debtors to achieve the necessary level of cost savings in order to emerge from chapter 11 as a viable business.  The Debtors' restructuring plan outlines annual cost savings of approximately $405 to $540 million, which the Debtors believe they could achieve from five separate areas:  (i) restructuring unprofitable or below market contracts with customers; (ii) capitalizing on lower cost manufacturing capabilities by shifting work, where possible, from high-cost operations to low-cost countries through implementation of a manufacturing footprint optimization ("MFO Program"); (iii) reducing overhead costs; (iv) reducing their union and non-union labor costs; and (v) eliminating Non-Pension Retiree Benefits for both union and non-union retirees (as well as any expectation of future coverage for both union and non-union active employees).

f)      During November and December 2006, the Debtors began discussions and negotiations with the Unions for the purpose of obtaining consensual modifications to the CBAs and Non-Pension Retiree Benefits that would allow the Debtors to achieve the level of cost savings outlined in their restructuring plan.  During this time, the Debtors delivered proposals to the Unions under section 1113 of the Bankruptcy Code with respect to each Union facility (each, a "Section 1113 Proposal").  Similarly, during this time and followed up by revised proposals delivered in January 2007, the Debtors delivered proposals to the Unions under section 1114 of the Bankruptcy Code  with respect to Non-Pension Retiree Benefits (each, a "Section 1114 Proposal").

g)      In summary, the Section 1113 Proposals sought (a) wage modifications at five of the 1113 Facilities; (b) implementation of a "Two Tier" wage structure at all facilities; (c) migration to a customer-directed health benefit program; and (d) modifications to certain work rules and benefits.  The revised Section 1114 Proposals delivered to the Unions contemplated the elimination of Non-Pension Retiree Benefits for Union retirees and active employees and, in its place, the establishment of a VEBA from which participating retirees could receive a subsidy towards the cost of their healthcare.

h)      The modifications proposed by the Debtors and contained in the proposals with respect to their Union labor costs and costs associated with Non-Pension Retiree Benefits represent almost a third of the total savings the Debtors need to achieve, and without such savings, the Debtors will not be able to successfully restructure their U.S. operations.

L.      At the trial on the Section 1113/1114 Motion, the Unions established that in the event the Debtors were granted authorization to reject the CBAs, it was the Unions' intent to strike at facilities covered under the CBAs, and at other unionized facilities without existing CBAs.  Evidence at the Hearing confirmed the reality and significance of that strike threat.

M.      If the Debtors' Section 1113/1114 Motion were granted and the Debtors granted authority to reject the CBAs, the CBAs would be rendered unenforceable in their entirety.

The Global Settlement

N.      After the trial on the Section 1113/1114 Motion, the Debtors and the Unions met and conferred on numerous occasions in an attempt to negotiate a consensual resolution to the Debtors' need for concessions from the Unions on labor costs and Non-Pension Retiree Benefit obligations.

O.      At the request of the Unions, the negotiations evolved into three party discussions and negotiations among the Debtors, the Unions and Centerbridge over a potential framework for the resolution of all issues between the Debtors and the Unions, which would also provide the Debtors with a source of funding to allow them to meet their obligations to the Unions under such proposed resolution, as well as emerge from chapter 11 promptly as a sustainable business.

P.      These discussions led to an agreement between the Debtors, the Unions and Centerbridge over the proposed terms of a global resolution that would include, among other things: (i) the Union Settlement Agreement, which represents a compromise of the litigation between the Debtors and the Unions and that, more importantly, achieves significant cost savings that will allow the Debtors to markedly improve their overall EBITDA and address the "cash burn" of the Debtors' U.S. operations; (ii) the Plan Support Agreement, which sets forth certain key plan terms that the Unions consider essential to the Debtors' successful emergence from bankruptcy; and (iii) the Investment Agreement, which provides for an investment in the reorganized Debtors of up to $750 million, but not less than $500 million, by Centerbridge and certain creditors of the Debtors, which will enable the Debtors to meet their financial obligations under the Union Settlement Agreement.

Q.     Following the filing of the Motion, the Debtors, the Unions, Centerbridge, the Committee and the Ad Hoc Noteholders' Committee entered into discussions concerning amendments or modifications to the Global Settlement for the purpose of resolving the objections of the Committee and obtaining the support of the Ad Hoc Noteholder Committee.

R.     In an effort to resolve the objections raised by the Committee and obtain support from the Ad Hoc Noteholders' Committee, the parties subsequently agreed to certain modifications and changes to the Global Settlement, although the key wage and benefit terms set forth in the Global Settlement remain unchanged.

S.     The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement (and all transactions contemplated thereunder) are all integral components of the Global Settlement, and without each of these agreements, the Unions would not have agreed to a consensual resolution of all issues with the Debtors.

T.     Subject to the terms of the Plan Support Agreement and the exhibits thereto, the parties have also agreed to work together to complete the formulation and negotiation of a plan of reorganization, and to formulate and facilitate confirmation of a plan in order to consummate the transactions contemplated in the Global Settlement.

U.     The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement, and the transactions contemplated thereby, represent a substantial milestone and pave the way towards the Debtors' reorganization by resolving the issues surrounding the Debtors' union labor and legacy costs that threatened to impact the Debtors' ability to emerge successfully from chapter 11.

V.     Absent approval of the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement (and the transactions contemplated thereby), the Debtors' ability to negotiate consensual modifications to the CBAs and Non-Pension Retiree

Benefits is questionable. Substantial risks to the estate (in terms of, among other things, delay and labor unrest) exist in the absence of the Global Settlement.

W.     The Global Settlement allows the Debtors to meaningfully restructure their Union labor costs, eliminate their legacy obligations, implement their MFO Program, which collectively represent a savings of approximately $220 million on an annual basis, and which savings are essential to produce a long-term, viable business.

X.     The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement are fair, reasonable and equitable and in the best interests of the Debtors' estates.

Y.     The Global Settlement has a proper business justification and constitutes an important step towards the Debtors' confirmation of a plan of reorganization. As such, the Global Settlement is neither an evasion of the plan confirmation process, nor does it constitute a *sub rosa* plan of reorganization.

Z.     The Debtors' decision to enter into the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement represents a sound exercise of their business judgment, is consistent with their fiduciary duties and is based on good, sufficient and sound business purposes and justifications.

AA.     The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement were all negotiated at arms' length and in good faith by all parties, and the parties' entry into or performance under the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement do not violate any law, including the Bankruptcy Code, and do not give rise to any claim or remedy against the parties thereto, except as may be expressly set forth in this Order or in such agreements.

BB.    The entry into, and performance under, the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement by the Debtors do not constitute the solicitation of a vote on a plan of reorganization.

CC.    The provisions in the Investment Agreement for the payment of the Break-Up Fee, Expense Reimbursement, the Termination Fee and the Commitment Fee are integral parts of the transactions contemplated by the Investment Agreement, and without any one of these provisions, Centerbridge would not enter into the Investment Agreement.

DD.    The Debtors have demonstrated a sound business justification for authorizing the payment of the Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee.  The Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee are each fair and reasonable and provide a benefit to the Debtors' estates.

EE.    The Debtors' payment of the Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee on the terms and conditions provided for in the Investment Agreement are (a) actual and necessary costs and expenses of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and (c) reasonable and appropriate in light of, among other things, (i) the size and nature of the Investment, (ii) the substantial efforts that are being expended by Centerbridge and (iii) the benefits that Centerbridge is providing to the Debtors' estates.

FF.    The Break-Up Fee, Expense Reimbursement and the Commitment Fee pursuant to the terms of the Investment Agreement were incurred in good faith, as such term is used in section 363(m) of the Bankruptcy Code, and the priorities extended to Centerbridge pursuant to this Order shall be entitled to all of the protections provided herein or otherwise contemplated hereby.

GG.    The entry of this Order is in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest in these cases.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is GRANTED in its entirety.

2.    Any objection (including the Objections and the Other Creditor Objection), joinder to any objection or reservation of rights related to the Motion not withdrawn or otherwise resolved as set forth in this Order is hereby OVERRULED.

3.    The Debtors are hereby authorized, but not directed, to execute, deliver and implement the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement the terms of such agreements, and such agreements and documents shall be binding and enforceable against the Debtors and their estates and the other parties thereto in accordance with their terms and subject to the conditions therein; provided, however, that notwithstanding its effectiveness or anything to the contrary in the Union Settlement Agreement or this Order, neither the Union Settlement Agreement nor any of the CBAs shall be assumed, or deemed assumed, by the Debtors unless and until a chapter 11 plan or reorganization shall have been confirmed by order of this Court and substantially consummated.

4.    The Union Settlement Agreement constitutes a valid and binding amendment to the CBAs with authorized representatives of all individuals who were or are in a bargaining unit represented by the UAW or USW, as permitted by section 1113 of the Bankruptcy Code or otherwise.

5.    The Union Settlement Agreement constitutes a valid and binding amendment to existing retiree health and welfare benefits, as permitted by section 1114 of the Bankruptcy Code or otherwise.

6.    Unless terminated in accordance with Appendix R thereof, the Union Settlement Agreement shall be binding upon any chapter 11 trustee that may be subsequently appointed in the Debtors' chapter 11 cases.

7.    The Union Settlement Agreement shall be held to resolve all individual claims filed by Union retirees or employees arising from or with respect to the (i) modifications of the CBAs, as provided for in the Union Settlement Agreement, (ii) the termination of Non-Pension Retiree Benefits, and/or (iii) the termination of long-term disability benefits ("LTD Benefits", as that term is used in the Union Settlement Agreement) to the extent that such individual claim asserts a demand for continued benefits.  It is understood that (i) the Debtors may rely upon the Union Settlement Agreement as a basis for objecting to individual claims to the extent that such individual claims are addressed by the Union Settlement Agreement, and, (ii) the Debtors may effect such resolution through filing with the Bankruptcy Court objections to such claims on notice to the individual claimants.

8.    The entry into the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement by the parties thereto, and the performance and fulfillment of their obligations thereunder, does not constitute the solicitation of a vote on a plan of reorganization, does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the Debtors, the Unions, Centerbridge and/or any creditor of the Debtors that executes the Plan Support Agreement; provided, however, that except as may otherwise be agreed upon (including in the Plan Support Agreement, the Investment Agreement and the Union Settlement Agreement), nothing in this Order shall prejudice any party in interest's right to object to approval of the disclosure statement or confirmation of a plan of reorganization and this Order shall have no preclusive effect (whether by res judicata or otherwise) in connection with any such objection.

9.      Nothing in this Order shall prejudice the right of the Committee to object to the proposed payment of any financing fee to Miller Buckfire.

10.     Pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code, the Debtors are authorized and directed to pay the Break-Up Fee, Expense Reimbursement, the Termination Fee and the Commitment Fee (each if applicable), in accordance with its terms and as and when required by the Investment Agreement, without further order of the Court.  Each of the Break-Up Fee, Expense Reimbursement, the Termination Fee and Commitment Fee (each if applicable) shall constitute allowed superpriority administrative expenses pursuant to sections 364(c)(1), 503(b)(l)(A) and 507(a)(l) of the Bankruptcy Code having a priority over all other administrative claims other than any such claims of the Debtors' postpetition lenders.

11.     The process for the receipt and consideration of any proposed Alternative Minority Investment, Alternative Majority Investment, Alternative Transaction or Alternative Stand-Alone Plan (each as defined in the Investment Agreement and each, an "Alternative Proposal") (collectively, the "Bid Process"), shall be as follows:

a)      Each party that is designated as a Qualified Potential Investor (as such term is defined in the Alternative Proposal Procedures) shall be provided a confidentiality agreement (each, an "Acceptable Confidentiality Agreement") in the form attached to this Order as Exhibit A.  Each Qualified Potential Investor shall also be provided the Alternative Proposal Procedures, the form of which is attached to this Order as Exhibit B;

b)      Subject to the conditions, qualifications and terms contained in the Alternative Proposal Procedures, each Qualified Potential Investor that executes an Acceptable Confidentiality Agreement shall be granted access to information and a virtual data room consistent with the Alternative Proposal Procedures;

c)      The Debtors shall reasonably cooperate with any Potential Investor that has executed an Acceptable Confidentiality Agreement in connection with assisting such party in formulating an Alternative Proposal;

d)      Qualified Potential Investors (as such term is defined in the Alternative Proposal Procedures) that are interested in submitting an Alternative Proposal shall submit their preliminary indications of interest (each, an "Indication of Interest") so as to be actually **received on or before 5:00 p.m. (EST) on August 17, 2007**, by:  (a) counsel to the Debtors, Jones Day, 222 East 41st Street, New York, NY 10017, Attn:  Corinne Ball, Esq., E-mail: cball@jonesday.com; (b) Miller Buckfire, 250 Park Avenue, 17th Floor, New York, NY 10177, Attn:  Richard Morgner, E-mail: richard.morgner@millerbuckfire.com; and (c) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: Thomas Moers Mayer, Esq., E-mail: tmayer@kramerlevin.com, and Matthew Williams, E-mail: mjwilliams@kramerlevin.com.  The Debtors will provide copies of Indications of Interest to third parties consistent with the Alternative Proposal Procedures.

e)      Only those Continuing Potential Investors (as such term is defined in the Alternative Proposal Procedures) who, on or before August 24, 2007, are invited to submit a Final Proposal Letter (each, a "Final Proposal Letter") shall submit a final, binding proposal to the parties identified in subparagraph (d) above so as to be actually **received by all parties on or before 5:00 p.m. (EST) on September 21, 2007**.  The Debtors will provide copies of Final Proposals to third parties consistent with the Alternative Proposal Procedures.

f)      Dana's board of directors will consider all timely received Final Proposal Letters during the week of September 24, 2007,

g)    On or before September 25, 2007, the Debtors may provide to the Unions the notices contemplated by Sections 1 and 3(a)(ii) of Appendix R to the Union Settlement Agreement, a copy of which is attached to this Order as Exhibit C;

h)    In the event that the Unions have withheld consent requested by the Debtors to an Alternative Proposal, the Debtors, the Unions and the Committee shall move expeditiously through the arbitration process outlined in Appendix R to the Union Settlement Agreement in accordance with the terms of such Appendix R; and

i)    The hearing to consider the Debtors' disclosure statement on any plan of reorganization for the Debtors (as same may be amended as a result of the Bid Process) shall be held on **Tuesday, October 23, 2007, at 10:00 a.m.**, subject to any extension of such hearing date that may be necessary to provide for the five (5) business day time period specified in Section 4.10 of the Investment Agreement.  In the event that the Debtors have decided to proceed with an Alternative Proposal, the Debtors shall advise the Court of their intention to terminate the Investment Agreement at the hearing to consider the Debtors' disclosure statement.

12.    So long as the Debtors adhere to the Bid Process described in paragraph 11 above or amend any plan of reorganization then on file with this Court to incorporate the terms of any Alternative Proposal (an "Amended Plan"), the Committee, the Ad Hoc Noteholders Committee (or its members), Centerbridge or the Unions shall not: (i) challenge directly or indirectly, or support any motion challenging or seeking to terminate, the Debtors' exclusive right to to file a plan of reorganization or solicit acceptances thereto; (ii) allege or construe an Amended Plan to be a new plan of reorganization such that the Debtors would lose their exclusive rights to file or solicit acceptance to such plan, as amended; (iii) take any action or make any other suggestion in any forum to limit or terminate the exclusive rights of the Debtors to file a plan of reorganization or solicit acceptances thereon in the event that the

Debtors amend their plan of reorganization to incorporate the terms of any Alternative Proposal; or (iv) file a competing plan of reorganization on or before December 4, 2007.

13.    Upon the Union Settlement Agreement becoming effective, the Unions shall withdraw with prejudice their appeal in respect of the Debtors' executive compensation, annual incentive plan and long-term incentive plan that is currently pending in the United States District Court for the Southern District of New York.

14.    This Order is a final and non-interlocutory order and is immediately subject to appeal pursuant to 28 U.S.C § 158(a).

15.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

16.    The requirement under Local Rule 9013-l(b) for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

17.    For purposes of determining whether a creditor shall be deemed a "Qualified Investor" (as such term is defined in the Investment Agreement), (i) the Bondholder Record Date shall be August 13, 2007 and (ii) the Trade Claims Record Date shall be the date of the entry of an order confirming the Debtors' plan of reorganization.

18.    Notwithstanding anything to the contrary in the Global Settlement, any signatory to the Plan Support Agreement, who is also a member of the Committee, shall be deemed to execute the Plan Support Agreement in its individual capacity only and not as a member of the Committee, and nothing contained in this Order or the Global Settlement shall be deemed to limit the free and unrestricted performance of such signatory's duties as a member of the Committee, including without limitation, any consideration, formulation or action with respect to any competing plan of reorganization or alternative transaction.

19.    The terms of this Order govern the terms of the Global Settlement. To the extent the terms of this Order conflict with the terms of the Global Settlement, the terms of this Order shall be deemed to apply.

Dated: New York, New York
      August 1, 2007

                    /s/Burton R. Lifland_____
                    HONORABLE BURTON R. LIFLAND
                    UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT C**

Hearing Date and Time: March 12, 2007 at 10:00 a.m.
Objection Deadline: February 22, 2007 at 4:00 p.m.

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball (CB 8203)
Steven C. Bennett (SB 2746)
Jayant Tambe (JT 0118)

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox (HL 3046)
Robert W. Hamilton (RH 3130)

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
                                         :    Case No. 06-10354 (BRL)
                                         :
Dana Corporation, et al.,                :    (Jointly Administered)
                                         :
                                         :
                  Debtors.               :
                                         :
-----------------------------------------------------------x
```

## MOTION AND MEMORANDUM OF LAW OF DEBTORS
## AND DEBTORS IN POSSESSION TO REJECT THEIR
## COLLECTIVE BARGAINING AGREEMENTS
## AND TO MODIFY THEIR RETIREE BENEFITS PURSUANT TO
## SECTIONS 1113 AND 1114 OF THE BANKRUPTCY CODE

---

**REDACTED**

NYI-3960572v1

## TABLE OF CONTENTS

**Page**

The Debtors' Chapter 11 Cases ................................................................. 1

Jurisdiction .................................................................................................. 3

Relief Requested ......................................................................................... 3

Preliminary Statement ................................................................................ 3

Factual Background .................................................................................... 6

    A.    Dana's Customers ........................................................... 7

    B.    Dana's Active Workforce ................................................ 11

    C.    Dana's Retirees ............................................................... 14

    D.    The Restructuring Initiatives .......................................... 15

        1.    Customers ........................................................... 17

        2.    Manufacturing Footprint Optimization ............... 18

        3.    Divestiture of Non-Core Businesses .................... 19

        4.    SG&A Cost Reductions ....................................... 19

        5.    Workforce ........................................................... 20

        6.    The Retirees ........................................................ 22

    E.    The Debtors' Proposals ................................................... 23

        1.    Summary of Proposed Modifications To The Wages And Benefits Of Active Union Employees ............................................. 23

        2.    Summary of Proposed Modifications to the Benefits of the Retirees ............................................................. 27

    F.    The Negotiation Process ................................................. 29

ARGUMENT ............................................................................................. 33

    I.    THE MOTION SHOULD BE GRANTED BECAUSE DANA HAS SATISFIED THE REQUIREMENTS OF SECTION 1113(c) AND 1114(g) .................................................................. 33

        A.    The Debtors' Proposals Are Based On The Most Complete And Reliable Information Available At This Time ................... 34

        B.    The Proposed Modifications Are Necessary To Permit The Debtors To Reorganize Successfully And Compete In The Marketplace ........... 37

        C.    The Proposals Treat All Parties Fairly And Equitably ............................................. 39

**TABLE OF CONTENTS**
(continued)

**Page**

D.  Dana Has Made Itself Available For Meetings, And Has Acted
    In Good Faith To Reach Mutually Satisfactory Modifications ............... 42

E.  The Unions and the Retiree Committee Have
    Rejected the Proposals Without Good Cause ........................................... 43

F.  The Balance Of The Equities Clearly Favors Implementing The
    Proposals ................................................................................................. 44

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page(s)**

*In re Allied Delivery System Co.*, 49 B.R. 700 (Bankr. N.D. Ohio 1985) ...............................40, 41

*In re America Provision Co.*, 44 B.R. 907 (Bankr. D. Minn. 1984)...................................34, 35, 42

*In re Amherst Sparkle Market, Inc.*, 75 B.R. 847 (Bankr. N.D. Ohio 1987) ................................34

*In re Appletree Markets, Inc.*, 155 B.R. 431 (S.D. Tex. 1993)...................................35, 36, 38, 41

*Baldridge v. Continental Airlines Holdings, Inc.*, 257 B.R. 658 (Bankr. D. Del. 2000) ...............47

*In re Big Sky Transport Co.*, 104 B.R. 333 (Bankr. D. Mont. 1989).............................................36

*In re Blue Diamond Coal Co.*, 131 B.R. 633 (Bankr. E.D. Tenn. 1991).......................................42

*In re Blue Diamond Coal Co.*, 147 B.R. 720 (Bankr. E.D. Tenn. 1992).......................................46

*In re Bowen Enterprises, Inc.*, 196 B.R. 734 (Bankr. W.D. Pa. 1996).........................................36

*In re Carey Transport, Inc.*, 50 B.R. 203 (Bankr. S.D.N.Y. 1985) .............................34, 37, 39, 44

*In re Carey Transport, Inc.*, 816 F.2d 82 (2d Cir. 1987)..........................34, 37, 39, 41, 43, 44, 45

*In re Century Brass Products, Inc.*, 795 F.2d 265 (2d Cir. 1986) .................................................39

*In re Continental Airlines Corp.*, 901 F.2d 1259 (5th Cir. 1990)..................................................47

*Devlin v. Transport Communications International Union*, 173 F.3d 94 (2d Cir. 1999).............29

*In re Doskocil Cos.*, 130 B.R. 870 (Bankr. D. Kan. 1991) ..........................................................29

*In re Electric Contracting Services Co.*, 305 B.R. 22 (Bankr. D. Colo. 2003) ............................43

*In re Horsehead Industries, Inc.*, 300 B.R. 573 (Bankr. S.D.N.Y. 2003)....................34, 38, 43, 46

*In re Indiana Grocery Co.*, 136 B.R. 182 (Bankr. S.D. Ind. 1990) ..............................................37

*In re Indiana Grocery Co.*, 138 B.R. 40 (Bankr. S.D. Ind. 1990) .....................................41, 42, 44

*In re Ionosphere Clubs, Inc.*, 134 B.R. 515 (Bankr. S.D.N.Y. 1991)...........................................34

**Page(s)**

*In re Kentucky Truck Sales, Inc.*, 52 B.R. 797 (Bankr. W.D. Ky. 1985)................................39, 44

*In re Maxwell Newspapers, Inc.*, 146 B.R. 920 (Bankr. S.D.N.Y. 1992)....................................39

*In re Maxwell Newspapers, Inc.*, 981 F.2d 85 (2d Cir. 1992) ........................................44

*In re Mile Hi Metal System, Inc.*, 899 F.2d 887 (10th Cir. 1990)..................................37

*In re New Valley Corp.*, No 92-4884, 1993 WL 818245 (D.N.J. Jan. 28, 1993)..........................29

*NLRB v. Bildisco & Dildisco*, 465 U.S. 513 (1984) .................................................45, 47

*In re North America Royalties, Inc.*, 276 B.R. 860 (Bankr. E.D. Tenn. 2002).............................29

*In re Northwest Airlines Corp.*, 346 B.R. 307
          (Bankr. S.D.N.Y. 2006) .........................................................37, 38, 40, 41, 44, 45, 46, 47

*In re Rayman, Martin & Fader, Inc.*, 170 B.R. 286 (D. Md. 1994) ................................47

*In re Royal Composing Room, Inc.*, 62 B.R. 403 (Bankr. S.D.N.Y. 1986) ............................35, 42

*In re Royal Composing Room, Inc.*, 848 F.2d 345 (2d Cir. 1998)..........................................37, 38

*In re Sol-Sieff Produce Co.*, 82 B.R. 787 (Bankr. W.D. Pa. 1988)................................42

*In re Texas Sheet Metals,. Inc.*, 90 B.R. 260 (Bankr. S.D. Tex. 1988).............................35, 42, 43

*UAW v. Gatke Corp.*, 151 B.R. 211 (N.D. Ind. 1991) ..............................................3, 37

*United Food & Commercial Workers Union, Local 211 v. Family Snacks, Inc.*,
          257 B.R. 884 (B.A.P. 8th Cir. 2001)................................................................34

*In re United States Truck Co.*, 89 B.R. 618 (E.D. Mich. 1988)....................................47

*In re Valley Steel Products Co.*, 142 B.R. 337 (Bankr. E.D. Mo. 1992) ................................35, 36

*In re Walway, Co.*, 69 B.R. 967 (Bankr. E.D. Mich. 1987)..........................................40

## FEDERAL DOCKETED MATERIALS

*In re U.S. Airways, Inc.*, Case No. 04-13819, Transcript of Record
          (Bankr. E.D. Va. Jan. 6, 2005)..................................................................38, 42

## FEDERAL STATUTES

**Page(s)**

11 U.S.C. § 1113 .................................................................23, 24, 30, 33, 34, 35, 36, 40, 43, 45, 46, 47

11 U.S.C. § 1114 .................................................................23, 28, 29, 30, 31, 34, 35, 47

28 U.S.C. § 1334 ...........................................................................................................................3

28 U.S.C. § 1408 ...........................................................................................................................3

28 U.S.C. § 157(b) ........................................................................................................................3

## LEGISLATIVE MATERIALS

130 Cong. Rec. H7495 (daily ed. June 29, 1984) ........................................................................43

130 Cong. Rec. S8888 (daily ed. June 29, 1984) ........................................................................43

## TREATISES

7 Collier, *Bankruptcy* at ¶ 1113.06 .....................................................................................35, 37

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Dana Corporation ("Dana") and 40 of its domestic direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors" or "Dana" or "the Company"), submit this motion (the "Motion") to reject their collective bargaining agreements and to modify their retiree benefits in order to implement proposals that will generate annual cost savings of $100 million to $150 million. These proposals are integral components of the Debtors' recently announced restructuring initiatives, which call for contributions by each of the Debtors' key constituencies that are essential if the Debtors are to survive. If successfully implemented, these restructuring initiatives (taken together) will generate the $405 million to $540 million improvement in Dana's pre-tax operating income that must be achieved for Dana to successfully reorganize and emerge from chapter 11 as a viable enterprise capable of competing in its worldwide markets.

### The Debtors' Chapter 11 Cases

1.      On March 3, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). By an order entered on the Petition Date, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being administered jointly. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On March 10, 2006, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"), pursuant to section 1102 of the Bankruptcy Code. On June 27,

2006, the U.S. Trustee appointed an official committee of equity holders, pursuant to section 1102 of the Bankruptcy Code (the "Equity Committee"). On August 31, 2006, the U.S. Trustee appointed an official committee of non-union retired employees pursuant to section 1114(d) of the Bankruptcy Code, and as directed by an order of the Court entered on August 9, 2006 (Docket No. 2773) (the "Retiree Committee" and, collectively with the Creditors' Committee and Equity Committee, the "Committees").

3.      Debtor Dakota New York Corp. ("Dakota") is a New York corporation. Debtor Dana is the direct or indirect parent of Dakota and each of the other Debtors. Dana maintains its corporate headquarters in Toledo, Ohio. The Debtors and their nondebtor affiliates (collectively, the "Dana Companies") have business locations and operations in approximately 25 states, as well as in Mexico, Canada, 11 countries in Europe and 14 countries elsewhere in the world.

4.      The Dana Companies are leading suppliers of modules, systems and components for original equipment manufacturers ("OEMs") and service customers in the light, commercial and off-highway vehicle markets. The products manufactured and supplied by the Dana Companies are used in cars; vans; sport-utility vehicles; light, medium and heavy trucks; and a wide range of off-highway vehicles.

5.      As disclosed in Dana's Form 10-K, filed on April 27, 2006, for the year ending December 31, 2005 (the "Dana 2005 Form 10-K"), the Dana Companies recorded revenue of more than $8.6 billion and had assets of approximately $7.4 billion and liabilities totaling $6.8 billion. As of the Petition Date, the Dana Companies had approximately 44,000 employees worldwide.

NYI-3960572v1

### Jurisdiction

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

7.      By this Motion, the Debtors seek an order, pursuant to section 1113(c) of the Bankruptcy Code, authorizing them to reject their collective bargaining agreements with the three principal unions representing the Debtors' employees subject to collective bargaining agreements in the United States:  (i) International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"); (ii) United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"); and (iii)  International Association of Machinists and Aerospace Workers ("IAM", and collectively with UAW and USW, the "Unions").  In addition, by this Motion, the Debtors seek an order, pursuant to section 1114(g) of the Bankruptcy Code, authorizing them to terminate or modify certain retiree benefits for their current retirees represented by the Unions and the Retiree Committee (collectively, the "Retirees") as set forth in the Debtors' proposals described herein.

### Preliminary Statement

8.      The Debtors commenced these chapter 11 cases due to the significant and well-publicized pressures in the U.S. auto industry, substantial increases in commodity prices, the Debtors' high wage and benefit costs and enormous legacy obligations, and the liquidity pressures that each of these factors imposed on the Debtors.  As has been described to this Court many times previously, the Debtors' North American operations — in particular, their operations in the United States (the "U.S. Operations") — have been and continue to be extraordinarily

- 3 -

unprofitable. Specifically, the Debtors' U.S. operations have generated losses before income taxes during the past five years aggregating more than $2 billion. During that same time frame, the Debtors have sold 12 major businesses with aggregate revenues of approximately $3.5 billion.

9.      For the first nine months of 2006, Dana suffered consolidated losses before income taxes of $150 million. The U.S. Operations' losses for this same period were $326 million.

10.      The Debtors have identified the following primary causes of the negative performance of its U.S. operations:  (a) customer price reductions; (b) increased raw material costs; (c) competition from low cost suppliers in other countries; and (d) labor and retiree welfare benefit costs (primarily healthcare).[1]  Indeed, in large part as a result of prior divestitures and closed operations, the ratio of active workers to retirees at Dana has fallen below 1.00 (to 0.714) and continues to decline, making it impossible for Dana's active workers to generate enough income for Dana to afford the enormous expense of its retiree benefit obligations, which currently exceeds $100 million annually.

11.      Improving the operating margin of their U.S. Operations is essential for the Debtors to emerge from chapter 11 as a sustainable and viable entity because (a) the U.S. Operations are integrated with worldwide operations in the manufacturing and assembly of products; (b) the Debtors' largest customers are based in the U.S., and (c) losses realized in the U.S. Operations consume cash that could otherwise be deployed in the U.S. and around the world.

---

[1]      The Debtors' performance has also been significantly affected by relatively recent changes in (a) industry volumes by three of Debtors' five major customers, and (b) consumer preferences, which have led to an unprecedented downturn in the production of pick-up trucks and sport utility vehicles, which are the primary market for Debtors' products in the United States.

**REDACTED**

- 4 -

To achieve viability on a sustainable basis, the Debtors must achieve substantially improved operating margins in their U.S. Operations through a combination of price recovery from customers and a more competitive cost structure.

12.     During the past several months, the Debtors have put substantial effort into developing a business plan that achieves these objectives. The Debtors performed an exhaustive analysis of all aspects of their business operations to identify the necessary restructuring initiatives that will form the basis of Debtors' reorganization plan and permit the Debtors to rehabilitate their U.S. Operations and emerge from chapter 11 at the end of this year in a position to compete in the worldwide market.

13.     As stated in Dana's Form 10-Q, filed on November 9, 2006 ( "Dana Form 10-Q"), the Debtors have determined that, to achieve a competitive operating profit margin, they must pursue restructuring initiatives that result in an aggregate **_annual_** pre-tax income improvement of $405 to $540 million.  Accordingly, the Debtors' plan for returning the U.S. Operations to viability on a sustained basis will require the cooperation and support of all of their business constituents, including the Debtors' customers, vendors, workforce and retirees.  To achieve the required improvement in their operating profit margin, the Debtors are addressing the U.S. Operations' current loss and cash burn by pursuing the following interdependent restructuring initiatives (the "Restructuring Initiatives"):

- Achieving a permanent reduction and realignment of overhead costs (projected annual cost savings:  $40-$50 million);

**REDACTED**

- 5 -

- Optimizing the Debtors' manufacturing footprint by rationalizing production, moving certain machining operations to lower cost country production sites where feasible, achieving consolidation and right-sizing of remaining U.S. Operations (projected annual cost savings: $60-$85 million);

- Restructuring wage and benefit programs for the Debtors' active workforce to create an appropriate and industry-competitive labor and benefit cost structure, whether union, non-union hourly or salaried (projected annual cost savings: $60-$90 million);

- Addressing the excessive cash requirements of the legacy postretirement benefit liabilities that the Debtors have accumulated over the years, in large part from prior divestitures and closed operations (projected annual cost savings: $70-$90 million);

- Achieving positive margins for the Debtors' products by addressing prior "pricedowns" and increased material costs to obtain substantial price recovery from customers (projected annual revenue improvements: $175-$225 million); and

- Achieving competitively priced raw materials and components on appropriate terms.

*See* Dana Form 10-Q, at 41-44. (A chart reflecting the Restructuring Initiatives and the revenue enhancements or cost savings that each is designed to achieve is set forth on page 16.)

14.      As detailed below, Dana cannot achieve the improvement in its operating profit margin necessary for it to emerge from chapter 11 as a viable and sustainable company unless this Court authorizes Dana to reject its collective bargaining agreements and modify its retiree benefit obligations as set forth in the Debtors' proposals to the Unions and the Retiree Committee.

## **Factual Background**

15.      While the magnitude of the Debtors' operations is readily established, the complexity of these highly decentralized companies with a century of history cannot be over-emphasized, particularly with respect to the three constituents on which the success of this reorganization is heavily dependent:  the Debtors' customers, their active workforce and their retirees.  The breadth and significance of the Debtors' relationship with these constituencies set

- 6 -

the scope of the restructuring process and, as discussed below, there are links between these three constituents that make the required contribution by each constituency to the Debtors' restructuring interdependent on the contributions of the other two.

### A.    Dana's Customers

16.    With 2005 worldwide sales of almost $9 billion, the Dana Companies together comprise one of the world's largest independent suppliers of modules, systems and components for OEMs of light, commercial and off-highway vehicles and for related aftermarket customers. The products manufactured and supplied by the Dana Companies are used in passenger cars, vans, sport-utility vehicles, light, medium and heavy trucks, recreational vehicles and motor homes and a wide range of off-highway vehicles. The Dana Companies have developed longstanding business relationships with thousands of customers worldwide, including nearly every major global vehicular OEM. Ford Motor Company ("Ford") and General Motors Corporation ("GM") together accounted for approximately 36% of the Dana Companies' consolidated sales in 2004.

17.    The Debtors have two business segments that align with their customer markets. The first is the Automotive Systems Group ("ASG"), which accounts for approximately 65% of Debtors' gross sales revenues. The ASG's primary customers are five global OEMs, with a heavy emphasis on the Detroit-based OEMs for its continuing product lines, including Traction (axles), Torque (driveshafts), Structures (frames), and Thermal and Sealing, all of which are used primarily in pick-up trucks and medium and large sports utility vehicles. The other business segment, the Heavy Vehicles Technology Systems Group ("HVG"), has two primary product lines (commercial vehicles (large trucks) and off-highway vehicles) and a more diversified customer base. The HVG manufactures and sells: (a) axles, brakes, driveshafts, chassis and suspension modules, ride controls and related modules and systems for the commercial and off-highway vehicle markets; and (b) transaxles, transmissions and electronic controls for the off-highway

- 7 -

market.  The largest customers of the HVG business are PACCAR Inc, Volvo Group and International Truck & Engine Corporation.  Each segment operates in the United States and the rest of the world, each serves global customers, each reacts to the industry and its competitors and each has its own distinct restructuring challenges with respect to its customers.[2]

20.    Since 2003, the industry has experienced significant increases in raw material prices.  These increases have been most pronounced in steel and other metals.  Since late 2004,

---

[2]    *See* Declaration and Expert Report of Ted J. Stenger ("Stenger Decl.") at ¶¶ 19-20.

**REDACTED**

- 8 -

almost every automotive raw material has faced strong demand and tight supply. The rapid growth of the China market as an industrial region and its dramatic growth as an OEM and parts manufacturer have been key drivers of these increases. The ability of suppliers like Dana to mitigate commodity price increases of the duration and amounts experienced over the past three years is limited, and the ability to pass such cost increases on to the OEMs has been extremely limited.[5]



21.     During the pendency of these cases, the distress in the automotive industry has deepened as Dana's key ASG customers have experienced financial difficulties of their own. For instance, Ford has announced that it will close 16 plants, eliminate 44,000 jobs by 2009, cut

---

5          *Id.* at ¶ 33.

- 9 -

production by 21% in the fourth quarter of 2006, and further cut production by 12% for the first half of 2007. Ford has also announced pending reductions in healthcare benefits for active and retired employees. DaimlerChrysler has announced that it will eliminate 6,000 jobs and change its health care benefits. General Motors has announced that it will cut $1 billion in retiree benefits, change retiree benefits for its active workers and close 12 facilities and eliminate 30,000 jobs by 2009. Announced production cutbacks have been predominantly related to pick-up truck and sports utility vehicle segments, segments upon which the Debtors are heavily dependent.[6]



22. The Debtors' competitors and other suppliers are also under constant and increasing OEM pressure for pricedowns, thus making the environment competitively destructive, as reflected by the following companies: (a) Delphi, also in chapter 11, which has announced

---

[6]     *Id.* at ¶ 23.

plans to close or sell 21 U.S. plants and cut 25% salaried and 24,000 UAW jobs; (b) American

Axle, which has announced workforce cuts and attrition programs targeting 6,000 UAW jobs;

(c) Johnson Controls, which has announced plans to eliminate 5,000 jobs and close 16 plants;

(d) Tower and Dura, each of which has entered chapter 11; and (e) Arvin Meritor, Lear and

Visteon, each of which have announced major workforce and cost reductions.[7]



**B.    Dana's Active Workforce**

---

[7]      *Id.* at ¶¶ 24, 28-29.

**REDACTED**

- 11 -

24.     All employees covered under Collective Bargaining Agreements with the Unions receive a comprehensive package of benefits from the Debtors, including:  healthcare insurance (hospital, medical, surgical, dental, prescription drug, vision and hearing); short-term disability (and in some locations, long-term disability); life and accidental death and dismemberment insurance; 401(k) coverage and/or a defined benefit pension plan; workers' compensation; travel accident insurance; tuition reimbursement; vacation and holiday pay; and bereavement and short-term military duty pay.

25.     Dana currently pays at or above market wages at the five U.S. facilities at which wage reductions are proposed, and total compensation — wages plus benefits — at these facilities is significantly higher than total compensation of workers with similar skills industry-wide.

_____

**REDACTED**

- 12 -

26.     Employee benefit costs have far exceeded growth in the overall economy and
wages over the past five years, in large part due to the dramatic and increasingly unsustainable
increase in average healthcare costs per employee. Indeed, since 2000, premiums for employer
provided health insurance for active workers have increased nearly 90%, as compared to a 20%
growth in wages and an 18% increase in general inflation.[11]

27.     The Debtors self-insure their health insurance programs. Coverage is offered to all
full-time employees, and comprehensive coverage is provided to union employees (and their
eligible dependents) with a monthly contribution by employees that varies depending on the plan
and type of coverage selected.

For
2006, the Debtors anticipate that the total spent per employee increased to        representing a
15.1% year-to-year increase.[12]

28.     The Debtors' eligible employees (both union and non-union) are entitled to receive
pension benefits when they retire. Pension benefits vest after five years of service, and the benefit
amount is determined by a basic formula that, although calculated differently for different plans,
primarily depends on the years of service for which the employee is credited at the time of
retirement. The Debtors' pension obligations are 92% funded and the Debtors have fully
complied with all of their contribution obligations. Prior to December 31, 2006, the Debtors had
over 33 different pension plans covering 39,447 inactive and 15,781 active participants, each with
separate funding and administrative requirements.

---

[11]     *See* Declaration and Expert Report of Janemarie Mulvey ("Mulvey Decl.") at ¶¶ 8-9, 14.

[12]     *See* Arquette Decl. at ¶ 7.          **REDACTED**

- 13 -

**C.    Dana's Retirees**

29.    The Debtors provide various "retiree benefits," as such term is defined in section 1114(a) of the Bankruptcy Code (collectively, the "Retiree Benefits"), to active and retired salaried employees and/or their spouses and dependents and also to active and retired hourly employees and/or their spouses and dependents.  The Debtors provide the Retiree Benefits — primarily to pay for or subsidize the cost of healthcare insurance — under at least 35 different Retiree Benefit plans, which have evolved over the past 35 years or more.[14]  As of January 1, 2006, approximately 16,415 individuals currently receive post-retirement healthcare and life insurance benefits from the Debtors under collective bargaining agreements that were negotiated with unions (or are active employees currently covered under provisions to collective bargaining agreements that provide a benefit upon retirement) (the "Union Retirees").  Of these 16,415 Union Retirees, approximately 7,200 are associated with manufacturing facilities that have either been sold or closed.  In addition, approximately 14,004 individuals currently receive post-retirement healthcare and life insurance benefits from the Debtors but not pursuant to active or expired collective bargaining agreements (or are active employees currently covered under programs that provide a benefit upon retirement) (the "Non-Union Retirees").[15]

30.    As of January 1, 2006, the present value of the Debtors' Accumulated Postretirement Benefit Obligation ("APBO") for U.S.-based Retiree Benefits, based on an

---

[14]    *See* Arquette Decl. at ¶¶ 13-18 (providing summary of various healthcare plans for union and non-union retirees); Hoffman Decl. at ¶¶ 17-22 (same).

[15]    *See* Arquette Decl at ¶ 13.

**REDACTED**

- 14 -

actuarial calculation prepared in connection with the Debtors' financial reporting obligations, was approximately $1.45 billion. The Debtors' expense in 2006 for providing Retiree Benefits to its U.S. retirees was calculated at approximately $106 million.[16] These enormous amounts have increased over time. Ordinarily, obligations for Retiree Benefits and their annual expense increase over time due to various factors, including escalating medical costs and increasing life expectancies of the covered individuals.

### D.    The Restructuring Initiatives

31.    Since the summer of 2006, Dana has focused on determining the restructuring it must undertake to become a viable and sustainable enterprise. This effort required an in-depth analysis of Dana's operations and obligations and of the operations and cost structures of Dana's competitors. The analysis revealed that Dana must fundamentally restructure its operations to achieve a pre-tax, operating profit margin (as measured by EBIT as a percentage of gross revenues)                        reorganize successfully and compete in the marketplace upon emergence from chapter 11. Unless the Debtors can restructure their business to achieve this

---

**REDACTED**

- 15 -

level of operating margin, they will likely not have the necessary flexibility to compete in their demanding markets. Nor, absent such restructuring, would Debtors be able to attract the level of support, price concessions and investments from vendors, customers, partners and joint venturers and the capital markets that are necessary to Dana's survival. In 2005, the Dana Companies' operating margin was a *negative* 0.8%. Accordingly, Dana has concluded that,

it needs to implement fundamental changes that will result in an aggregate annual pre-tax income improvement of                    summarized below.[19]



32.    As detailed in Dana's Form 10-Q, to achieve those results, the Restructuring Initiatives announced by the Debtors will require them to obtain substantial annual revenue

---

[19]    *See* Stenger Decl. at ¶¶ 46-59.    **REDACTED**

- 16 -

enhancements from their customers, substantial annual cost savings from Dana's manufacturing footprint optimization plan (the "MFO"), strategic divestitures and overhead reductions, and substantial contributions from the two constituencies at issue herein — Dana's active workforce and Retirees.[20]

### 1. Customers

33.    The Debtors have conducted an extensive review of their many customer contracts, analyzing their profitability by product and by customer, including a review of the "pricedown" history embedded in their underperforming contracts.  Against the backdrop of the tools available under the Bankruptcy Code, through the power to reject contracts and/or avoid past transfers, the Debtors studied their contracts for tens of thousands of products in their various product lines,

. The Debtors assessed material, labor and other costs of these programs, detailed down to the subassembly and component level, and reviewed the developments or differences between the assumptions used at the time of quoting the business, the interim "pricedowns" and the actual current costs.  Given the Debtors' decision to diversify their customer base, the Debtors also undertook an industry review to determine the economic and strategic importance of each particular program and customer to the Debtors and the alternatives available to the customers to obtain the products from others.  The Debtors have completed this work and developed a customer-specific strategy to obtain price and cost recovery.  The Debtors have targeted customer pricing actions that could result in aggregate annual price improvements of $175-$225 million of annual revenue enhancements.

_____

**REDACTED**

NYI-3960572v1

2. **Manufacturing Footprint Optimization**

35.      Consistent with Dana's prepetition long term strategy of shifting high-cost operations to low-cost countries, Dana developed a manufacturing footprint optimization ("MFO") plan.  Dana plans a significant shift in manufacturing capacity from high-cost North American sites to Mexico and other low-cost countries, while also improving productivity of the final parts assembly in the U.S.  Dana has already announced that 13 manufacturing plants have been, or will be, closed, consolidated and/or moved to lower cost countries.  The Debtors studied multiple matrices of production facilities for each of their product lines, accounting for return on investment, payback period and run-rate savings.  Then, they conducted a feasibility assessment to test the potential movement in footprint on the cost impact of the relevant collective bargaining agreements and the impact upon severance, insurance, retiree and pension costs, infrastructure costs and related transition costs.

---

**REDACTED**

- 18 -

Long term, Dana expects the MFO initiatives to reduce annual operating costs by $60 to $85 million.[22]

### 3.    Divestiture of Non-Core Businesses

36.    Dana has analyzed its business in detail and, even before filing its chapter 11 petition, commenced the divestiture of non-core operations, resulting in significant savings and adding cash to its books.  To date, Dana has announced plans to divest its engine hard parts, pump products and fluids products operations.  Dana also has sold its trailer axle operations for $32.5 million.  Dana has signed a "stalking horse" agreement with Mahle GmbH for its engine products group with an aggregate purchase price of $157 million.  The purchase price includes $98 million in cash plus Mahle's assumption of certain liabilities (principally environmental and retiree benefits) related to the business.  Pending Court approval and customary government regulatory approvals, Dana plans to close this transaction in the first quarter of 2007.

### 4.    SG&A Cost Reductions

37.    Due to its historically decentralized operating model and the reduction in the overall size of Dana's business resulting from recent and planned divestitures, Dana has determined that its current overhead costs are unnecessarily high.  In 2005, SG&A was        of net sales.  Dana has already taken several actions to ameliorate this situation by:

---

22    *See* Dana Form 10-Q at 44; Stenger Decl. at ¶¶ 40-45.

**REDACTED**

- 19 -

NYI-3960572v1

These actions have helped reduce SG&A to        of net sales in 2006.  Dana continues to pursue

opportunities to reduce SG&A spending, including consolidating spending at service center level

rather than at plant level, evaluating opportunities to consolidate spending with particular

vendors and identifying opportunities to negotiate better deals with new vendors.  In addition,

Dana has formulated an action plan for purchased services, the largest discretionary SG&A

spend.  Areas in which SG&A is being reviewed and for which savings targets are being

formulated include: Automotive Systems Group, Heavy Vehicle/Off Highway Group, Executive

Committee, Finance, Human Resources, Information Technology, Legal and Risk Management

and Purchasing.  The targeted total profit improvement from these initiatives is annualized

savings of $40 million to $50 million.[24]

### 5.    Workforce

38.    The Debtors have assessed and analyzed their wage and fringe benefit costs by

product and by facility throughout North America and have compiled and compared their

production workforce (union and non-union) cost basis to industry or competitive benchmarks.

The Debtors evaluated the changes that must be made in wages, benefits and terms and conditions

of employment at both union and non-union facilities to achieve labor costs at competitive levels.

---

[24]       *See* Stenger Decl. at ¶¶ 64-66.        **REDACTED**

The Debtors reviewed in-depth the benefits they provide and studied competitive, cost-effective alternatives and their ability to implement these changes for their non-union hourly and salaried workforce as well.

39.     The Debtors have already or are currently implementing wage and benefit changes for their non-union workforce, including headcount reductions, a reduction of severance benefits, healthcare benefit modifications, a suspended 401(k) matching program, a merit increase freeze, changes to long- and short-term disability benefits and life insurance and several other substantial cost-cutting measures.[25]

40.     Based on the modifications to the wages and benefits offered to non-union, salaried employees adopted by Dana in 2005 and 2006 (*i.e.,* prior to the Petition date), Dana anticipates that it has reduced its expenses by approximately                    as follows:[26]

---

[25]        *See* Arquette Decl. at ¶¶ 36-59.

**REDACTED**

NYI-3960572v1

41.    In addition to the foregoing, based on the proposed modifications to the wages and benefits offered to non-union, salaried employees by Dana, which modifications are being effected over the course of 2007 and subsequent years, Dana anticipates an annualized savings of approximately            as follows:[27]

### 6.    The Retirees

42.    The Debtors have also determined that, in order to be able to successfully emerge from chapter 11 as a viable entity, they must be relieved of any future obligation to provide Retiree Benefits to their Union and Non-Union Retirees. The Debtors' APBO for Retiree Benefits was approximately $1.447 billion as of January 1, 2006. While the amount of this obligation is expected to decrease over time and drop to approximately            as of January 1, 2012, the Debtors will incur cash outlays for Retiree Benefits of over $100 million per year, on average, and anticipate that they will spend approximately            for Retiree Benefits during that

--------------------

**REDACTED**

- 22 -

### E.    The Debtors' Proposals

43.    As described more fully below, Dana has proposed certain modifications to the wages and benefits of its active Union employees and to the welfare benefits of its Retirees necessary for successful reorganization.  The proposals delivered to the Unions under section 1113 of the Bankruptcy Code are attached collectively as Exhibit B to the Bueter Declaration (Dana's "Section 1113 Proposals"); the proposals delivered to the Unions and the Retiree Committee under section 1114 of the Bankruptcy Code are attached collectively as Exhibit C to the Bueter Declaration and Exhibit D to the Arquette Declaration, respectively (Dana's "Section 1114 Proposals" and, together with Dana's Section 1113 Proposals, the "Proposals").

#### 1.    Summary of Proposed Modifications To The Wages And Benefits Of Active Union Employees

44.    In the Section 1113 Proposals, the Debtors have proposed modifications to the hourly wage rates being paid to the collectively bargained for employees working at facilities where the average wage exceeds            This modification is necessary: (a) to standardize the hourly wage paid across all of Dana's manufacturing facilities and (b) to bring Dana's hourly wage costs into alignment with the costs of its competitors.  The only unionized facilities that received a wage reduction proposal for current Union employees are Auburn Hills, Ft. Wayne, Lima, Marion and Pottstown.[30]

---

[30]    *See* Bueter Decl. at ¶ 17.        **REDACTED**

- 23 -

45.    The proposed wage reductions at these five unionized facilities would bring the wages of employees at these facilities into alignment with the wages of comparably skilled workers.  If Dana's Section 1113 Proposals were implemented at these five facilities, Dana's compensation to its workers would more than suffice to attract and retain a highly qualified workforce well into the future.[31]

46.    In addition, in the Section 1113 Proposals, Debtors have proposed a two-tier wage rate structure at all of its Union plants.  Under this new structure, current employees would be classified as Tier 1 and paid approximately $16/hour.  Again, as noted above, only five Dana unionized facilities have received a proposed wage reduction for current employees.  New hires would be classified as Tier 2 and earn $13/hour after 3 years of employment with Dana, and during years 1 through 3 would earn:  (a) 85 percent of $13/hour in Year 1; (b) 90% of $13/hour in Year 2; and (c) 95% of $13/hour in Year 3.[32]

47.    Dana has also proposed to (a) modify the overtime wage structure present in many of its Collective Bargaining Agreements, (b) eliminate lump-sum bonuses, wage improvements and COLA payments paid at certain facilities and (c) eliminate wage re-opener provisions contained in the Collective Bargaining Agreements governing several plants.[33]

48.    Finally, Dana has proposed to modify work rules at certain facilities that Dana determined were above industry norm and represented a material economic cost, including: (a) implementing standardized vacation benefits and holiday schedules; (b) eliminating the prior

---

[31]    *See* Wachter Decl. at ¶¶ 32, 34.

[32]    *See* Bueter Decl. at ¶¶ 22-23.

[33]    *See id.* at ¶¶ 24-26.

NYI-3960572v1

policy of providing paid personal time-off; and (c) eliminating the tuition reimbursement, service award and attendance bonus programs.[34]

49.     Dana has also proposed modifications to the benefits of active Union employees. Dana has proposed that, beginning January 1, 2007, active Union employees not previously participating in Dana's HealthWorks health care program will be migrated to HealthWorks 2007.[35]

50.     HealthWorks 2007 is a more generous plan (in terms of benefits) as compared to the average consumer-directed healthcare plan.  Further, under HealthWorks 2007, the majority of Dana's union employees are expected not to incur higher health care costs than average employee health care costs under traditional fee-for-service health insurance plans.[36]

51.     In addition, Dana has proposed to terminate its existing long-term disability insurance program, effective July 1, 2007, and to reduce benefits for short-term disability offered to active Union employees effective January 1, 2007.[37]  The section 1113 proposals include a proposal to reduce life / accidental death and disability insurance benefits and to freeze the accumulation of all future pension credited service under Dana's various pension benefit programs, effective in 2007.[38]

---

[34]     *See id.* at ¶¶ 35-37.

[35]     *See* Arquette Decl. at ¶ 234; Mulvey Decl. at ¶ 25.

[36]     *See* Mulvey Decl. at ¶ 13.

[37]     *See* Arquette Decl. at ¶¶ 25-26.

[38]     *See id.* at ¶¶ 27-28.

NYI-3960572v1

52.     Finally, Dana has proposed to offer in 2007 a defined contribution 401(k) plan for any active Union employees not already covered under Dana's SavingsWorks/SavingsPlus programs.[39]

53.     Based on the proposed modifications to the wages and benefits currently being offered to active Union employees, Dana anticipates an annual savings of approximately as follows:[40]

| **Proposed Modification to Union Wages and Benefits** |
| --- |
| Two-Tier Wage Structure |
| Overtime Wage Structure |
| Lump-Sum Bonuses |
| COLA Payments |
| Migration to HealthWorks 2007 |
| Medical Inflation Cost Sharing |
| Modify Life/AD&D Benefits |
| Elimination of Long-Term Disability |
| Modification of Short-Term Disability |
| Modification to Pension Benefits |
| Robinson 401(k) Matching |
| Vacation/Holiday Benefits |
| Paid Personal Time Off |
| Tuition Reimbursement/Service Award/Attendance Bonus Programs |
| **Total Estimated First-Year Savings** |

---

[39]     *See Id.*. at ¶ 28.

**REDACTED**

- 26 -

2.    **Summary of Proposed Modifications to the Benefits of the Retirees**

54.    Dana has proposed to eliminate any obligation on its part to provide Retiree

Benefits, primarily healthcare coverage (hospital, surgical, medical, dental, prescription drug,

vision and hearing), as well as life/ad&d insurance benefits, to the Retirees, effective as of April 1,

2007.  Dana also proposes to eliminate any obligation to provide retirement benefits to their

current active Union and non-union employees who are currently covered under a collective

bargaining agreement or program that provides retiree benefits.[41]

---

[41]    *See* Arquette Decl. at ¶ 31.

NY1-3960572v1

56.    Dana's proposal to reduce the heavy burden of its retiree healthcare liabilities by discontinuing its retiree health plans for active employees is reasonable and consistent with actions of other large employers.  Due in large part to increases in employer health care costs, as of 2006, 65% of the largest U.S. employers no longer offered retiree health benefits to active employees.[43]

57.    Dana's proposal to discontinue its retiree healthcare plan for current retirees is consistent with the rapidly changing nature of employer-provided retiree healthcare benefits.

Dana's action is a rational alternative in light of the fact that auto-parts suppliers, like Dana, have been especially hard hit in recent years by a combination of higher energy and steel costs, heavy debt and large retiree benefit costs.  Dana is not alone in being forced to recognize the need to shed its retiree healthcare costs by eliminating the heavy financial burden of providing retiree medical benefits.  Many U.S. companies have terminated, or are in the process of terminating, their continuing obligation to provide healthcare benefits to existing retirees.[44]

58.    For purposes of this Motion only, the Debtors have made their Section 1114 Proposals to the Unions and the Retiree Committee to terminate all their existing retiree benefit programs pursuant to section 1114 of the Bankruptcy Code, without regard to whether the Debtors have the absolute right, under the specific terms in any of the various retiree benefit plans at issue, to terminate the plan(s) unilaterally outside the section 1114 process.  Both in this Motion and in their negotiations, however, the Debtors have expressly reserved their rights, if any, to terminate Retiree Benefits pursuant to the contractual terms of the plans under which those benefits are

---

[43]    *See* Mulvey Decl. at ¶ 13.

[44]    *See Id.* at ¶ 13.

**REDACTED**

NYI-3960572v1

provided, should those benefits not be terminated by agreement or by Court order pursuant to section 1114(g).[45]

### F.    The Negotiation Process

59.    With respect to the Union Retirees, section 1114(c)(1) of the Bankruptcy Code provides that: "[a] labor organization shall be, for purposes of this section, the authorized representative of those persons receiving any retiree benefits covered by any collective bargaining agreement to which that labor organization is signatory, unless (A) such labor organization elects not to serve as the authorized representative of such persons, or (B) the court, upon a motion by any party in interest, after notice and hearing, determines that different representation of such persons is appropriate." 11 U.S.C. § 1114(c)(1). The unions that currently represent active Dana employees have agreed to serve as authorized representatives for their respective retiree groups under section 1114(c)(1) of the Bankruptcy Code, including for those retirees for whom no active collective bargaining agreement currently is in place.[46] The Unions have retained counsel and a financial advisor.

---

[45]    While the Debtors and the Creditors' and Equity Committees are continuing to review and analyze the extent of Dana's legal obligation to provide retiree medical benefits, it is now apparent that many, if not most, of the plans under which Retiree Benefits are provided expressly reserve Dana's right to terminate the benefits unilaterally and at any time. *See Devlin v. Transp. Commc'ns Int'l Union*, 173 F.3d 94, 103 (2d Cir. 1999) ("In the face of the unambiguous language in the Plan documents providing for amendment at any time, there can be no question that the benefits in question were not vested."). Thus, with respect to many, if not most, of the Retirees, the Debtors have the right to unilaterally terminate benefits in accordance with the language of the applicable plan and without resorting to the procedure set forth in section 1114 for modifying or terminating vested retiree benefits. *See In re Doskocil Cos.*, 130 B.R. 870, 874-76 (Bankr. D. Kan. 1991) (permitting debtor to modify retiree benefits without section 1114 motion where plan language reserved right to make unilateral changes). *Accord In re North Am. Royalties, Inc.*, 276 B.R. 860, 866-68 (Bankr. E.D. Tenn. 2002) (concluding that "[d]espite § 1114, the debtor can terminate the contract as allowed by its terms"); *In re New Valley Corp.*, No 92-4884, 1993 WL 818245, at *3-5 (D.N.J. Jan. 28, 1993) (noting that "an interpretation of section 1114 that sets aside the modification rights written into benefit agreements would run contrary to . . . provisions of ERISA").

[46]    Between June 12 and 14, 2006, the Debtors wrote to the UAW, USW and IAM (who currently represent active employees of the Debtors), and to the International Brotherhood of Boilermakers (the "Boilermakers") (who previously represented employees at a facility in Marion, Ohio that the Debtors no longer operate); *see* Bueter Decl. at ¶ 2 n.2, to confirm that each of them will agree to represent their respective retiree groups. In such correspondence, the Debtors informed the unions that, if the Debtors did not obtain a response by June 30, 2006, the Debtors would assume that each union had agreed to serve as the authorized representative for its

- 29 -

60.    With respect to Dana's Non-Union Retirees, the Debtors sought and obtained entry of an order pursuant to Section 1114(d) appointing the Retiree Committee to serve as the authorized representative of such individuals.  The Retirees Committee has engaged counsel and financial advisors.

61.    Dana's management has met with the Retiree Committee and the Unions and delivered Dana's Section 1113 and 1114 Proposals.  Since delivery of the Proposals, Dana's management and its advisors have met with the Retiree Committee, the UAW, the USW and their respective advisors on numerous occasions.  As part of the section 1113/1114 process, the Debtors have participated in various negotiation sessions with the Unions, and intend to continue to negotiate with the Unions and the Retiree Committee to achieve a potential consensual resolution of the Debtors' request for relief under sections 1113 and 1114.[47]

62.    With respect to the UAW, negotiations began in November 2006 on the UAW Master Agreement, and have continued since that time, leading most recently to the Debtors' delivery of their comprehensive Section 1113 and 1114 counter-proposal (the "UAW Counter-Proposal") to the UAW, after the UAW informed the Debtors that the initial proposal in respect of the UAW Master Agreement was unacceptable.[48]

63.    With respect to the USW, after delivering their initial proposals to the USW on November 29, 2006 (the Section 1114 Proposal) and December 7, 2006 (the Section 1113

---

(continued...)

respective retiree group.  On June 15, 26 and 30, 2006, the USW, UAW and IAM, respectively, sent letters informing Dana that they agreed to represent their respective retiree groups.  As of the date of this Motion, the Debtors have not received any communication from the Boilermakers and, therefore, the Debtors assume that the Boilermakers will represent the small group of retirees from the Marion, Ohio plant that the Debtors no longer operate.

[47]    See Arquette Decl. at ¶¶ 32-35; see Bueter Decl. at ¶¶ 12, 40-42, 45-46.

[48]    See Bueter Decl. at ¶ 13.

- 30 -

Proposal), the Debtors participated in various negotiation sessions with the USW during January 2007, which resulted in the Debtors' current section 1114 counter-proposal to the USW (the "USW Section 1114 Counter-Proposal"). The Debtors have also submitted a revised Section 1114 Proposal (the "IAM Section 1114 Revised Proposal") to the IAM.[49]

64.    The Debtors have also participated in various negotiation sessions with the Retiree Committee, beginning with the meeting of November 7, 2006, wherein Debtors met with the Retiree Committee and delivered the Debtors' proposal under section 1114 of the Bankruptcy Code. Since that time, the Debtors have participated in numerous discussions and meetings with the Retiree Committee, including receipt of the Retiree Committee's counter-proposal to the Debtors, and culminating in the Debtors' telephonic meeting of January 26, 2007 with the Retiree Committee, during which the Debtors delivered and discussed their current counter-proposal to the Retiree Committee.[50]

65.    In connection with the Proposals, Dana and its advisors have worked to provide the Retiree Committee and the Unions with the information upon which the Debtors' Proposals are based, and with all information necessary for the Unions and Retirees to evaluate the Debtors' Proposals. In anticipation of negotiations with the Retiree Committee and the Unions, Dana created, and has since routinely updated and maintained, a vast electronic data site, operated by The BMC Group, Inc. ("BMC"). The data site has given the Retiree Committee, the Unions and their professionals access to a significant volume of necessary information that has already been

---

[49]    *See* Bueter Decl. at ¶¶ 14-15; 40-42.

[50]    *See* Arquette Decl. at ¶¶ 32-34.

compiled, as well as e-mail alerts to notify the professionals as soon as new information becomes available in the data site. In aggregate, over 2,100 documents have been posted to the data site.[51]

66.     The Retiree Committee and the Unions have collectively generated and delivered to the Debtors eight separate document requests. The Debtors, in turn, have worked to satisfy each request. Throughout the section 1113/1114 negotiation process, the Debtors have delivered responsive material directly to Retiree Committee and Union professionals and/or posted it to the data site. The Debtors' professionals have met and conferred with Union and Retiree Committee counsel and financial advisors approximately fifteen times to focus outstanding information requests as well as to explain, elaborate on and review available information.[52] Finally, as additional responsive information becomes available, the Debtors continue to forward it to these constituencies and to supplement the data site.

67.     The Debtors are hopeful that a consensual resolution of these issues can be reached with the Retiree Committee and the Unions, and will continue to work with both constituencies towards this end. The circumstances, however, clearly warrant the entry of the relief requested by the Debtors, and the Debtors must seek the assistance of the Court on the possibility that their negotiations will not succeed. For Dana to reorganize successfully, it is necessary for Dana to obtain the annual cost savings it seeks in the Proposals.

---

[51]     *See* Declaration of Jeffrey Miller ("Miller Decl.") (detailing creation of the data site and describing its operations and contents).

[52]     *See* Declaration of Pilar Tarry ("Tarry Decl.") at ¶¶ 24-40.

- 32 -

## **ARGUMENT**

### I.    **THE MOTION SHOULD BE GRANTED BECAUSE DANA HAS SATISFIED THE REQUIREMENTS OF SECTIONS 1113(c) AND 1114(g)**

68.    Section 1113(c) of the Bankruptcy Code provides that the court "shall approve an application for rejection of a collective bargaining agreement" if a debtor satisfies certain procedural and substantive prerequisites. 11 U.S.C. § 1113(c).  In addition to bargaining in good faith and sharing relevant and reliable information with its union, a debtor must propose modifications to the existing agreement that are "necessary to permit the reorganization of the debtor" and that ensure "that all creditors, the debtor and all of the affected parties are treated fairly and equitably[.]" 11 U.S.C. § 1113(b)(1)(A).  Rejection of the existing agreement is then appropriate if the union refuses to accept the proposal "without good cause" and "the balance of equities clearly favors rejection."  11 U.S.C. § 1113(c).  In this Circuit, these statutory provisions have been distilled into the following seven requirements:

1.    The debtor in possession must make a proposal to the union to modify the collective bargaining agreement based on the most complete and reliable information available at the time of the proposal. . . .

2.    The proposed modifications must be necessary to permit the debtor's reorganization. . . .

3.    The proposal must assure that all creditors, the debtor, and all of the affected parties are treated fairly and equitably. . . .

4.    The debtor must meet with the Union at reasonable times between the making of its proposal and the time of the hearing on the application to reject the collective bargaining agreement. . . .

5.    The debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement. . . .

6.    The Union must have refused to accept the proposal without good cause. . . .

- 33 -

> 7.    The balance of the equities must clearly favor rejection of the
>        collective bargaining agreement. . . .

*In re Carey Transp., Inc.*, 50 B.R. 203, 207-12 (Bankr. S.D.N.Y. 1985) ("*Carey Transp. I*"),

*aff'd sub nom.*, *Truck Drivers Local 807 v. Carey Transp.*, 816 F.2d 82 (2d Cir. 1987) ("*Carey*

*Transp. II*") (consolidating into seven factors the nine factors originally set forth in *In re Am.*

*Provision Co.*, 44 B.R. 907 (Bankr. D. Minn. 1984)).

69.    Section 1114(g) of the Bankruptcy Code requires a debtor seeking to modify retiree

benefits for current retirees to satisfy requirements that are virtually identical to those of section

1113(c). *See In re Horsehead Indus., Inc.*, 300 B.R. 573, 583 (Bankr. S.D.N.Y. 2003).  Authority

construing section 1113 thus applies equally to motions under section 1114.  *Id.* ("the discussion

relating to the requirements under § 1113 also applies to § 1114").  *See United Food &*

*Commercial Workers Union, Local 211 v. Family Snacks, Inc.* (*In re Family Snacks*), 257 B.R.

884, 896-97 (B.A.P. 8th Cir. 2001) (relying on section 1113 cases in interpreting section 1114);

*In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 520 (Bankr. S.D.N.Y. 1991).

70.    As detailed below, Dana has met the statutory prerequisites for the implementation

of its Proposals under sections 1113 and 1114 of the Bankruptcy Code.

**A.    The Debtors' Proposals Are Based On The Most Complete
       And Reliable Information Available At This Time**

71.    Any proposal under section 1113 or 1114 must be "based on the most complete and

reliable information available at the time of such proposal."  11 U.S.C. §§ 1113(b)(1)(A) and

1114(f)(1)(A). As noted above and explained further in the Declarations, the Debtors' Proposals

are based on the most complete and reliable information available to Dana at this time, including

Dana's most recent revenue and cost projections.  Dana's reliance on its most recent business

plans and financial forecasts satisfies its obligation to base its proposals on "the most complete

and reliable information available."  *In re Amherst Sparkle Mkt., Inc.*, 75 B.R. 847, 850 (Bankr.

- 34 -

N.D. Ohio 1987) (proposal met standard when debtor relied on profit and loss reports, balance sheets for prior fiscal year, cash disbursement data, general ledger and payroll registers, and projections of performance).[53]

72.     Section 1113(b)(l)(B) also requires that a debtor provide the union "with such relevant information as is necessary to evaluate the proposal." 11 U.S.C. § 1113(b)(1)(B); *accord* 11 U.S.C. § 1114(f)(1)(B). The information that must be provided to the union need not have been provided at the same time as the proposal is made if the union has already been supplied with financial materials relevant to its analysis, or if the debtor provides additional information requested by the union. *In re Appletree Mkts., Inc.*, 155 B.R. 431, 438 (S.D. Tex. 1993) (obligation met when debtor provided union with access to financial books and current financial statements); *In re Valley Steel Prods. Co.*, 142 B.R. 337, 338, 341 (Bankr. E.D. Mo. 1992) (debtor properly offered yearly operating statements and monthly bankruptcy operating report); *In re Royal Composing Room, Inc.*, 62 B.R. 403, 412-13 (Bankr. S.D.N.Y. 1986) (a single sheet of paper which listed the union costs was "reliable and relevant information and complete enough to form a basis for reasoned consideration of [the debtor's] proposal"); 7 Collier, *Bankruptcy* at ¶ 1113.06[4]. Once a debtor has provided sufficient information to evaluate its proposal, the burden shifts to the union and the retirees to identify specific information that was not provided and to demonstrate why it is necessary to evaluate the proposal. *See In re Texas Sheet Metals,. Inc.*, 90 B.R. 260, 263 (Bankr. S.D. Tex. 1988); *Am. Provision Co.*, 44 B.R. at 909-10.

---

[53]     In applying the rule that the proposal must be based on the most complete and reliable information available, courts have recognized that proposals under sections 1113 and 1114 often must be made at an early stage in a Chapter 11 case and that available information will, of necessity, be tentative and incomplete. For example, it is unlikely that a debtor will be able to project with complete accuracy the outline of its plan of reorganization, the recovery of all creditors or the effect on other constituencies. Thus, sections 1113 and 1114 require only that the proposals be based on the best information then available. As noted in a leading treatise on bankruptcy law, "Congress must have intended that the court make its finding based on the best, albeit fragmentary, information available at the time of the hearing on rejection." 7 Collier, *Bankruptcy* at ¶ 1113.06[l][b].

73.     As described above and detailed in the Declarations, when Dana delivered its

initial Section 1113 and 1114 Proposals, Dana also provided the Unions and the Retiree

Committee with a formal presentation in which it provided essential financial data and explained

Dana's financial condition, the need for modifications, and the treatment of other constituencies.

Dana has responded to hundreds of information requests from the Unions and the Retiree

Committee, many of which were detailed and exhaustive requests for "due diligence." Dana's

advisors also have met with the advisors to the Unions and the Retiree Committee on at least

fifteen separate occasions to explain and clarify the information provided.[54] Finally, both the

Unions and the Retiree Committee have been provided complete access to the virtual data room

containing comprehensive financial and business information.[55]

74.     Dana's comprehensive sharing of information satisfies its obligations under

sections 1113 and 1114. *See, e.g., In re Bowen Enters., Inc.*, 196 B.R. 734, 741 (Bankr. W.D. Pa.

1996) (information-sharing requirement satisfied where debtor promptly provided union with cost

analysis of proposal and financial information that union requested); *Appletree Mkts.*, 155 B.R. at

438 (debtor fulfilled duty by opening books to union and providing information enabling union to

evaluate debtor's proposal and formulate its own); *In re Big Sky Transp. Co.*, 104 B.R. 333, 335

(Bankr. D. Mont. 1989) (requirement satisfied where "the Debtor supplied its financial data and

business plans to the union [and] met with union representatives and members to discuss and

explain the data"); *see also In re Valley Steel Prods. Co.*, 142 B.R. 337, 338, 341 (Bankr. E.D.

Mo. 1992) (debtor properly offered yearly operating statements, monthly bankruptcy operating

report, and balance sheets).

---

[54]     *See* Tarry Decl. ¶¶ 24-39.

[55]     *See* Miller Decl. at ¶¶ 3-8, 11.

- 36 -

**B.      The Proposed Modifications Are Necessary To Permit The Debtors
         To Reorganize Successfully And Compete In The Marketplace**

75.      Sections 1113(b)(l) and 1114(g)(3) provide that the proposed modifications must

be "necessary to permit the reorganization of the debtor" to permit rejection of the existing

collective bargaining agreement or modification of existing retiree benefits.  As recently noted,

"[t]he most fundamental requirement for rejection of a collective bargaining agreement is that the

rejection must be 'necessary,'" which the Second Circuit has held "'places on the debtor the

burden of proving that its proposal is made in good faith, and that it contains necessary, but not

absolutely minimal, changes that will enable the debtor to complete the reorganization

successfully.'"  *In re Northwest Airlines Corp.*, 346 B.R. 307, 321 (Bankr. S.D.N.Y. 2006)

(quoting *Carey Transp. II*, 816 F.2d at 90).

76.      Determination of whether a proposal is necessary to the debtor's reorganization is

made on a case-by-case basis, with consideration of the debtor's business and industry patterns.

*Carey Transp. I*, 50 B.R. at 209.  As this Court and the Second Circuit have made clear, the debtor

need not prove that the proposed modifications are necessary for "short-term survival" or to

"prevent liquidation;" rather, *"a debtor's proposed modifications are considered 'necessary' if*

*they have a significant impact on the debtor's operations and are required for the debtor to*

*successfully reorganize and compete in the marketplace upon emergence from chapter 11."*

*Northwest Airlines*, 346 B.R. at 321 (emphasis added) (citing *Carey Transp. II*, 816 F.2d at 89).[56]

---

[56]      *Accord In re Royal Composing Room, Inc.*, 848 F.2d 345, 350 (2d Cir. 1998) ("*Royal Composing
Room II*")("[a] debtor's proposal need not be limited to the bare bones relief that will keep it going"); *In re Mile Hi
Metal Sys., Inc.*, 899 F.2d 887, 892-93 (10th Cir. 1990); *In re Indiana Grocery Co.*, 136 B.R. 182, 191-93 (Bankr.
S.D. Ind. 1990) (modifications necessary for debtor to operate profitably); *UAW v. Gatke Corp.*, 151 B.R. 211, 213
(N.D. Ind. 1991) (the "Second Circuit's longer term focus, which encompasses the ultimate success of
reorganization rather than merely the avoidance of immediate liquidation, is more consistent with the statute"); 7
Collier, *Bankruptcy*, at ¶ 1113.06[2][b] ("Congress did not codify a standard that modifications should be authorized
only where it clearly appears that unless the agreement is rejected, the debtor will collapse. . . . [D]ebtor should not
have to show that absent modification, liquidation would occur").

NYI-3960572v1

77.    Moreover, a debtor's proposals "must be viewed as a whole, and not by its specific elements." *In re Horsehead Indus., Inc.*, 300 B.R. 573, 584 (Bankr. S.D.N.Y. 2003); *accord Appletree Mkts.*, 155 B.R. at 441-42. Thus, the Unions and Retiree Committee cannot preclude the relief the Debtors seek by challenging the "necessity" of particular parts of the Proposals if the Proposals, taken as a whole, generate the total quantum of savings necessary for the Debtors to reorganize successfully. *Royal Composing Room II*, 848 F.2d at 349; *see also In re US Airways Group, Inc.*, Case No. 04-139, Trans. of Record at 26 (Banks. E.D. Va. Jan. 6, 2005) (copy of transcript of court's oral decision attached hereto as Exhibit A (the "*US Airways Tr.*")) (proposal for cost savings target that was not necessarily tied to specific line items in proposal "provided for necessary modifications that were necessary to permit the reorganization of the debtor").

78.    Here, the Debtors' Proposals are necessary to their reorganization under the applicable standards. As detailed above, Dana has determined that it must achieve a pre-tax, operational profit margin of                   in order to reorganize successfully and compete in the marketplace upon emergence from chapter 11. Dana cannot achieve that operating profit margin without the annual cost savings and revenue enhancements generated by the Restructuring Initiatives, including the fundamental structural modifications of its labor and legacy costs as defined in the Proposals. The Proposals are thus "necessary" to permit the Debtors to reorganize successfully. *See Northwest Airlines*, 346 B.R. at 322-24 (debtors proved "necessity" under Second Circuit's standard by demonstrating that $195 million "ask" in their section 1113 proposal to union was necessary, along with savings from other unions and from other initiatives, to obtain a 6.5% pre-tax profit margin, which margin was reasonable in the industry and necessary to attract new investors and allow debtors to exit chapter 11).[57]

---

[57]    *See also Royal Composing Room II*, 848 F.2d at 350 (elimination of CBA's priority system, which effectively forced debtor to employ more workers than it needed or could afford because of restrictions on layoffs,

C.      **The Proposals Treat All Parties Fairly And Equitably**

79.     Sections 1113(b)(l)(A) and 1114(g)(3) require that Dana's Proposals ensure that all affected parties "are treated fairly and equitably." The purpose of this requirement "is to spread the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree." *Carey Transp. II*, 816 F.2d at 90, (quoting *In re Century Brass Prods., Inc.*, 795 F.2d 265, 273 (2d Cir. 1986). Because a motion to reject a collective bargaining agreement or modify retiree benefits is frequently made long before a plan of reorganization is proposed, the debtor cannot at the time of the hearing on the motion be expected to guarantee the ultimate treatment of all constituents. *See Carey Transp. I*, 50 B.R. at 210; *In re Kentucky Truck Sales, Inc.*, 52 B.R. 797, 802 (Bankr. W.D. Ky. 1985). "This requirement of equivalent sacrifice does not mean that the debtor must formally propose his plan of reorganization prior to seeking rejection of the collective bargaining agreement." *Id.* Instead, courts look to the changes proposed, as well as concessions already made and likely to be made by creditors, stockholders or owners of the debtor, and other non-union employees. *Id.*

80.     There is not, nor could there be, a formula under sections 1113 and 1114 for determining equivalent sacrifice. Each constituency may sacrifice in a different manner, some through the loss of equity, some through substantial reductions in their prepetition claims and some through job loss or reduction in pay and benefits going forward. "Because it is often

---

(continued...)

was a "necessary modification" under Second Circuit's standard to give debtor "maximum flexibility, including with respect to utilization of its unionized labor, in order to mold and adapt in a changing business environment"); *Horsehead Indus.*, 300 B.R. at 586 (debtors "not required to show either that their proposals are necessary to avoid liquidation, or that the union's less stringent counter-proposals are sufficient to avoid liquidation;" proposed modifications "necessary" where, though they "will not guarantee a successful reorganization, or necessarily make a reorganization likely," they will "make reorganization more likely by permitting the Debtors to operate a little longer while waiting out the market, or attracting someone who will invest in their future"); *In re Maxwell Newspapers, Inc.*, 146 B.R. 920, 931 (Bankr. S.D.N.Y. 1992) (removal of the collective bargaining agreement's lifetime job guarantees necessary to allow debtor to operate viably in future), *aff'd in part and rev'd in part*, 149 B.R. 334 (S.D.N.Y.), *aff'd in part and rev'd in part* 981 F.2d 85 (2d Cir. 1992).

- 39 -

difficult to compare the differing sacrifices of parties in interest, courts apply a flexible approach in determining what constitutes 'fair and equitable treatment.'" *Northwest Airlines*, 346 B.R. at 326. Equity under sections 1113 and 1114 means "fairness under the circumstances, not a comparative dollar-for-dollar concession." *In re Walway, Co.*, 69 B.R. 967, 974 (Bankr. E.D. Mich. 1987) (citing *In re Allied Delivery Sys. Co.*, 49 B.R. 700, 703 (Bankr. N.D. Ohio 1985)). "Thus, a debtor can meet the fair and equitable requirement of § 1113 by showing that its proposal treats the union fairly when compared with the burden imposed on other parties by the debtor's additional cost-cutting measures and chapter 11 process generally." *Northwest Airlines*, 346 B.R. at 326.

81.    The Debtors' Proposals, which collectively seek annual cost savings that run between $100 to $150 million, treat the Unions and the Retirees fairly when compared with the burden imposed on other parties by the Debtors' Restructuring Initiatives, which, if implemented, will generate an aggregate of $405 to $540 million in improvements to pre-tax income. *See generally Northwest Airlines*, 346 B.R. at 326 (debtors' section 1113 proposal treated union fairly where debtors' business plan targeted an aggregate of $2.2 billion in annual cost reductions, including $1.361 billion in labor cost savings and $700 million in non-labor area, unsecured creditors would likely be asked for huge concessions, and position of stockholders was "uncertain, at best").

82.    Even when the constituencies are similarly situated — as the Debtors' union and non-union employees arguably are — the requirement of "fair and equitable" treatment does not require identical treatment. As this Court recently noted, "it is not necessary for all affected parties to receive identical modifications, and concessions asked of various labor groups may reflect differences in the groups' wage and benefit levels." *Northwest Airlines*, 346 B.R. at 325;

*accord Allied Delivery System Co.*, 49 B.R. at 702-03 (reducing higher wages by a greater

percentage is fair and equitable); *In re Indiana Grocery, Co.*, 138 B.R. 40, 48 (Bankr. S.D. Ind.

1990) ("*Indiana Grocery II*") (equalizing wages of two different unions was fair and equitable

even though one union took larger percentage cut). "It is also appropriate for a court to consider a

group's prepetition cost reductions in determining whether that group would 'shoulder a

proportional' share of the debtor's proposed cost reductions." *Northwest Airlines*, 346 B.R. at 325

(quoting *Carey Transp. II*, 816 F.2d at 90-91).

      83.    Here, significant sacrifices have already been made by Dana's salaried and

management employees in the form of a merit pay freeze, termination of 401(k) matching

payments and changes to short and long term disability benefits, among many other measures that

have been described above. Additional sacrifices, previously announced and described above,

will be effected in 2007. In total, more than           in cost-saving measures have been or will

be imposed on this constituency.[58] Moreover, where, as here, management salaries are already at,

or will be reduced to, market levels, it is fair and equitable under section 1113 to reduce union

wages to market levels as well. *See, e.g., Appletree Mkts.*, 155 B.R. at 439 (proposal was fair and

equitable even when not requiring reductions in compensation for management, where union

salaries were above competitive wage levels while management salaries were at or below

prevailing wage levels, management had made other sacrifices in benefits and job cuts, and

company could not reduce management salaries while retaining valued employees); *Carey*

*Transp. II*, 816 F.2d at 90-91 (proposal was fair and equitable when the managerial and non-union

staff took prepetition reductions and only union employees were receiving above-industry

standard pay and benefits); *US Airways Tr.* at 24 (even if management employees had been asked

---

[58]    *See* Arquette Decl. at ¶¶ 36-58.

- 41 -

**REDACTED**

to take a smaller wage cut than union employees, the total dollar amount was not disproportionate

to that being sought from unions); *Indiana Grocery II*, 138 B.R. at 48 (finding management cuts

fair and equitable where "if their salary were much lower," they "would look for other

employment").

       **D.**    **Dana Has Made Itself Available For Meetings, And Has Acted
In Good Faith To Reach Mutually Satisfactory Modifications**

    84.    Sections 1113(b)(2) and 1114(f)(2) require that after delivering its proposal, the

debtor must be available to meet at reasonable times with the union and retiree representatives to

discuss the proposal. As detailed above, the Debtors have met with the Unions and the Retiree

Committee on numerous occasions to provide due diligence information and discuss their

Proposals, and they will continue to do so. When a debtor demonstrates that it has met with the

union retiree to discuss a proposal, it falls to the union representatives to produce evidence that the

debtor did not confer in good faith. *Texas Sheet Metals, Inc.*, 90 B.R. at 263-64; *Am. Provision

Co.*, 44 B.R. at 910. Neither the Unions nor the Retiree Committee can meet this burden.

    85.    In determining whether an employer has satisfied the requirement to confer in good

faith, courts look for "conduct indicating an honest purpose to arrive at an agreement as the result

of the bargaining process." *In re Blue Diamond Coal Co.*, 131 B.R. at 633, 646 (Bankr. E.D.

Tenn. 1991). A debtor's continued willingness to meet with the union and retiree representatives

is itself compelling evidence of the debtor's good faith. *See In re Sol-Sieff Produce Co.*, 82 B.R.

787, 795 (Bankr. W.D. Pa. 1988). When a debtor-employer attempts to meet, but the authorized

representative refuses to discuss the debtor's proposal, the debtor also satisfies the statute's

requirements. *See Royal Composing Room*, 62 B.R. at 418 (granting section 1113(c) relief when

debtor tried to meet with union on several occasions but union stonewalled). In other words, this

good faith requirement "does not apply exclusively to debtors[;] . . . [a] good faith negotiation

- 42 -

cannot take place when only one party acts in good faith." *In re Elec. Contracting Servs. Co.*, 305

B.R. 22, 29 (Bankr. D. Colo. 2003).

> ### E.   The Unions and the Retiree Committee Have
> ### Rejected the Proposals Without Good Cause

86.    To approve rejection of a collective bargaining agreement and modification of

retiree benefits, the debtor must demonstrate that the authorized representatives refused to accept

the debtor's proposals "without good cause." 11 U.S.C. §§ 1113(c)(2) and 1114(g)(2).  Although

the legislative history of these sections provides little guidance, it does indicate that the term

"without good cause" should be narrowly interpreted, in a workable manner.  *See* 130 Cong. Rec.

H7495 (daily ed. June 29, 1984) (remarks of Rep. Lungren) ("The phrase 'good cause' is

undefined, but the conferees clearly believed that it should be interpreted narrowly by a reviewing

court"); 130 Cong. Rec. S8888 (daily ed. June 29, 1984) (remarks of Sen. Thurmond) ("the intent

is for these provisions to be interpreted in a workable manner").

87.    The burden lies with the Unions and the Retiree Committee, as the authorized

representatives, to articulate in detail their reasons for declining to accept Dana's proposals.  *See*

*Carey Transp. II*, 816 F.2d at 92; *Horsehead Indus.*, 300 B.R. at 585 (where the union rejects a

proposal that is necessary, fair and equitable, it must explain the reasons for its opposition); *Texas*

*Sheet Metals*, 90 B.R. at 263-64.  In doing so, the Unions and the Retiree Committee cannot base

their rejection "from the viewpoint of [their] self-interest."  Rather, everyone's focus must instead

be placed on what is necessary to permit reorganization under chapter 11:

> [T]he Union may often have a principled reason for deciding to
> reject the debtor's proposal and which may, when viewed
> subjectively and from the viewpoint of its self-interest, be a
> perfectly good reason.  However, the court must review the
> Union's rejection utilizing an objective standard which narrowly
> construes the phrase "without good cause" in light of the main
> purpose of chapter 11, namely reorganization of financially
> distressed businesses.

NYI-3960572v1

*Carey Transp.*, 50 B.R. at 211 (citing *In re Salt Creek Freightways*, 47 B.R. 835, 840 (Bankr. D. Wyo. 1985)); *see also Kentucky Truck Sales*, 52 B.R. at 805 ( "good cause" requirement must be interpreted narrowly); *Indiana Grocery II*, 138 B.R. at 50 ("Though this stance might indeed benefit [the union] employees more than wage concessions if [the debtor] is indeed doomed to fail, this purely selfish concern cannot be good cause for refusing to cooperate with a debtor's good faith efforts to reorganize.").

88.    When the unions and retirees make demands that are not economically feasible and offer no alternatives that would permit the debtor to reorganize successfully, they do not have "good cause" for rejecting the debtor's proposals. *In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 89-90 (2d Cir. 1992); *Northwest Airlines*, 346 B.R. at 328. Neither the Unions nor the Retiree Committee have proposed any alternatives to the Restructuring Initiatives that will generate the cost savings and revenue enhancements that Dana needs to achieve the operating profit margin to emerge from chapter 11 as a viable entity. Accordingly, the Unions' and Retiree Committee's failure to accept the Proposals is "without good cause." *See In re Maxwell Newspapers*, 981 F.2d at 90; *Carey Transp. II*, 816 F.2d at 92; *Northwest Airlines*, 346 B.R. at 328.

89.    On balance, Dana is not seeking anything more than what is necessary for it to exit bankruptcy, secure exit financing and compete successfully and stay profitable for the long term. Dana is continuing to cut costs everywhere else and now must ask for its unionized employees and retirees to contribute to what the Company needs to reorganize successfully. In short, Dana's proposals treat all parties fairly and equitably, and the Unions and Retiree Committee have no "good cause" to reject them.

F.    **The Balance Of The Equities Clearly Favors Implementing The Proposals**

90.    The final statutory requirement is that the balance of the equities clearly favors rejection of the Collective Bargaining Agreements and modification of the Retiree Benefits.

- 44 -

11 U.S.C. §§ 1113(c)(3) and 1114(g)(3).  The Second Circuit has directed courts to look at six

factors to determine the balance of the equities:

1.  The likelihood and consequence of liquidation if rejection is not permitted;

2.  The likely reduction in the creditors' claims if the bargaining agreement remains in force;

3.  The likelihood and consequences of a strike if the bargaining agreement is voided;

4.  The possibility and likely effect of any employee claims for breach of contract if rejection is approved;

5.  The cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and the manner in which various employees' wages and benefits compare with those of others in the industry; and

6.  The good or bad faith of the parties in dealing with the debtor's financial dilemma.

*See Carey Transp. II*, 816 F.2d at 92-93 (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513,

525-26 (1984)).

91.    As the court recently observed, when considering these factors, "bankruptcy courts

'must focus on the ultimate goal of chapter 11 . . . .  The Bankruptcy Code does not authorize

freewheeling consideration of every conceivable equity, but rather only how the equities relate to

the success of the reorganization.'" *Northwest Airlines*, 346 B.R. at 329 (ellipses by court)

(quoting *Bildisco*, 465 U.S. at 527).  Accordingly, "the primary question in a balancing test is the

effect the rejection of the agreement will have on the debtor's prospects for reorganization."

*Northwest Airlines*, 346 B.R. at 329 (quoting *Kentucky Truck Sales*, 52 B.R. at 806).

92.    Consideration of the six factors identified in *Carey Transportation II*, when viewed

in the context of how they relate to the success of Dana's reorganization, demonstrates that the

balance of equities clearly favors the implementation of Dana's Proposals.

**REDACTED**

- 45 -

As to the third factor, regarding the possibility of a strike, that possibility does not affect the balance of equities here,

As Courts have repeatedly observed, "[a] strike is an inherent risk in every § 1113 motion, and in the end, it makes little difference if the debtors are forced out of business because of a union strike or the continuing obligation to pay union benefits to avoid one. The unions may have the legal right to strike, but that does not mean that they must exercise that right." *Northwest Airlines*, 346 B.R. at 329 (quoting *Horsehead Indus.*, 300 B.R. at 587).

93.    The fourth factor in balancing equities, the possibility and effect of damage claims if a collective bargaining agreement is rejected or retiree benefits modified, does not change the balance here, where the impact of possible damage claims on creditor recoveries is dwarfed by the impact on such recoveries if Dana cannot successfully reorganize and emerge as a viable ongoing enterprise. *See Northwest Airlines*, 346 B.R. at 330; *Horsehead Indus.*, 300 B.R. at 587. Moreover, even if one were to assume that Dana's section 1113 Proposals and 1114 Proposals would give rise to rejection damage or other claims,[59] the amount of those unsecured claims

---

[59]    There is a split of authority on whether such claims would arise at all under section 1113 of the Bankruptcy Code. *Compare In re Blue Diamond Coal Co.*, 147 B.R. 720, 728-32 (Bankr. E.D. Tenn. 1992) *aff'd, Southern Labor Union, Local 188 v. Blue Diamond Coal Co.*, 160 B.R. 574 (E.D. Tenn. 1993) (holding that "the Bankruptcy Code, as presently enacted, does not provide or recognize a remedy for damages resulting from rejection of a collective bargaining agreement under § 1113") *with In re Continental Airlines Corp.*, 901 F.2d 1259,1264-65 (5th Cir. 1990) (holding employees entitled to damage claims for difference between wages and benefits set forth in rejected CBA and those paid after rejection of CBA) and *In re Rayman, Martin & Fader, Inc.*, 170 B.R. 286 (D. Md. 1994).

**REDACTED**

- 46 -

would be limited by the Bankruptcy Code and more than offset by the value to creditors of

restructuring Dana's labor costs to permit Dana to achieve the operating margin it needs to be

viable and competitive. *See In re United States Truck Co.*, 89 B.R. 618, 624 (E.D. Mich. 1988)

(lost future wages stemming from rejection should be considered unsecured debts); *accord*

*Bildisco*, 465 U.S. at 531; *In re Continental Airlines Corp.*, 901 F.2d 1259, 1265 (5th Cir. 1990).

*See also Baldridge v. Continental Airlines Holdings, Inc. (In re Continental Airlines, Inc.),* 257

B.R. 658, 662 (Bankr. D. Del. 2000) (under section 502(b)(7) of the Bankruptcy Code, any

damage claim would be limited to damages accruing in the one-year period following

bankruptcy).[60]

94.    The fifth factor in balancing equities "take[s] into account the number of affected

employees and how their wage levels compare to those of other companies in the industry." *See*

*Northwest Airlines,* 346 B.R. at 330. As detailed above and in the Declarations and Expert

Reports of Michael Wachter and Janemarie Mulvey, Dana's Section 1113 Proposals simply put its

Union employees on par with the Debtors' similarly situated non-union employees, both in terms

of wages and benefits. Finally, as to the sixth factor in balancing equities, Dana's good faith in

attempting to achieve a solution to its unsustainable labor and retiree costs is beyond genuine

dispute. Dana has attempted in good faith to negotiate collective bargaining agreement

modifications with its Unions by (a) repeatedly conveying its willingness to negotiate mutually

acceptable modifications that produce the necessary level of labor and retiree cost reductions, and

---

[60]    Indeed, with respect to the Retiree Benefits, there is little prospect of large damage claims arising
from the Debtors' Section 1114 Proposals, as most if not all of the Retirees receive their benefits pursuant to benefit
plans that the Debtors have a prepetition, unilateral legal right to terminate. *See* note 45, *supra.*

- 47 -

allow Dana to respond to market forces, and (b) responding diligently and exhaustively to the Unions' and Retiree Committee's information requests. The record amply demonstrates Dana's good faith approach to dealing with its financial dilemma.

95.    The Proposals set forth modifications to the Debtors' labor costs and legacy obligations that are both necessary for their reorganization and fair and equitable, and the balance of equities clearly favors them. The Debtors have been candid with the Unions and the Retiree Committee at all times, opened their books and financial records for review, provided the documents and information necessary to evaluate the Proposals and expressed a willingness to bargain at any time. The Debtors stand ready to negotiate a consensual resolution that will best serve the Debtors and all stakeholders. But the time for resolution is upon us; further delay is not an option. Without substantially reduced benefit and legacy costs, the Debtors' efforts to emerge from chapter 11 as a competitive and sustainable enterprise cannot succeed.

### Reservation of Rights

96.    Nothing contained in this Motion shall be deemed an admission or a finding that the Debtors have any obligations to any Retiree. Notwithstanding the relief requested herein, the Debtors hereby reserve their rights to modify any Retiree Benefits unilaterally, in accordance with the documents and agreements governing the provision of such Retiree Benefits, without seeking relief under section 1114 of the Bankruptcy Code.

### Memorandum of Law

97.    This Motion includes citations to applicable authorities and does not raise any novel issues of law. Accordingly, the Debtors respectfully request that the Court waive the requirement contained in Local Bankruptcy Rule 9013 1(b) that a separate memorandum of law be submitted.

- 48 -

## Notice

98.    Notice of this Motion and all supporting Declarations is being provided on the date hereof by electronic mail and/or facsimile to:

(a)    Counsel to the Official Committee of Unsecured Creditors, Kramer Levin Naftalis & Frankel, LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: Thomas Mayer, Facsimile: (212) 715-8000, E-mail:  tmayer@kramerlevin.com;

(b)    Counsel to the Official Committee of Equityholders, Fried, Frank, Harris, Shriver & Jacobson, LLP, One New York Plaza, New York, NY 10004, Attn: Gary Kaplan, Facsimile: (212) 859-4000, E-mail: gary.kaplan@friedfrank.com;

(c)    Counsel to the UAW and USW, Cohen, Weiss and Simon, LLP, 330 West 42nd Street, New York, NY 10036, Attn: Babette Ceccotti, Facsimile: (646) 473-8227, E-mail: bceccotti@cwsny.com;

(d)    Counsel to the IAM, Previant Goldberg Uelmen Gratz Miller & Brueggeman 1555 N. River Center Drive, #202, Milwaukee, WI 53212, Attn: Marianne Goldstein Robbins, Facsimile: (414) 271-6308, E-mail: mgr@previant.com; and

(e)    Counsel to the Retiree Committee, Stahl Cowen Crowley LLC, 55 West Monroe Street, Suite 1200, Chicago, IL 60603, Attn: Jon Cohen, Facsimile: (312) 641-6959, E-mail: jcohen@stahlcowen.com

In addition, pursuant to the Amended Administrative Order, Pursuant to Rule 1015(c) of the Federal Rules of Bankruptcy Procedure, Establishing Case Management and Scheduling Procedures (the "Case Management Order"), entered on March 23, 2006, a Notice of Filing of this Motion and all supporting Declaration has been given to the parties identified on the Special Service List and the General Service List (as such terms are defined in the Case Management Order).  The Debtors submit that no other or further notice need be provided.

- 49 -

NYI-3960572v1

**No Prior Request**

99.    No prior request for the relief sought in this Motion has been made to this or any

other Court.

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order

substantially in the form attached hereto as Exhibit C, granting the relief requested herein; and

(b) grant such other and further relief to the Debtors as the Court may deem proper.


Dated: New York, New York                    Respectfully submitted,
      January 31, 2007

                                              s/Corinne Ball
                                              Corinne Ball (CB 8203)
                                              Steven C. Bennett (SB 2746)
                                              Jayant Tambe (JT 0118)
                                              JONES DAY

                                              222 East 41st Street
                                              New York, New York  10017
                                              Telephone:  (212) 326-3939
                                              Facsimile:  (212) 755-7306

                                              Heather Lennox (HL 3046)
                                              Robert Hamilton (RH 3130)
                                              JONES DAY
                                              North Point
                                              901 Lakeside Avenue
                                              Cleveland, Ohio  44114
                                              Telephone:  (216) 586-3939
                                              Facsimile:  (216) 579-0212

                                              ATTORNEYS FOR DEBTORS AND
                                              DEBTORS IN POSSESSION

NYI-3960572v1