**EXHIBIT D**

**Hearing Date:  March 12, 2007 at 10:00 a.m.**

Babette A. Ceccotti (BC 2690)
Bruce S. Levine (BL 2309)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street, 25th Floor
New York, New York 10036-6976
(212) 563-4100

Attorneys for UAW and USW

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| DANA CORPORATION, et al. | ) | |
| | ) | 06-10354 (BRL) |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## *CORRECTED*

**JOINT UAW AND USW OBJECTION AND MEMORANDUM IN OPPOSITION TO
DEBTORS' MOTION TO REJECT THEIR COLLECTIVE BARGAINING
AGREEMENTS AND TO MODIFY THEIR RETIREE BENEFITS
PURSUANT TO SECTIONS 1113 AND 1114 OF THE BANKRUPTCY CODE**
**[Relates to Document No. 4672]**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

    A.    UAW History and UAW Representation at Dana ................................... 2

    B.    USW History and USW Representation at Dana .................................. 4

ARGUMENT ............................................................................................................. 6

I.    DANA'S ATTACK ON THE COLLECTIVE BARGAINING AGREEMENTS AND RETIREE BENEFITS UNDERMINES THE MOST FUNDAMENTAL PREMISES OF SECTIONS 1113 AND 1114 AND MANDATES DENIAL OF THE MOTION ............ 6

    A.    Sections 1113 and 1114 Were Enacted to Protect Collective Bargaining Agreements and Retiree Health Benefits ................................................. 7

    B.    Dana's Proposals Are Not "Necessary" .................................................. 9

        1.    Dana Has Not Made a Financial Case for the Relief it Seeks .................. 10
        2.    Dana's Rationale for its Proposed Wage Cuts is Methodologically Flawed .......................................................................................... 11
        3.    Dana's Rationale for Eliminating Retiree Health Benefits is Also Flawed .......................................................................................... 13
        4.    Dana's Request is Incompatible With Controlling Law .......................... 14

    C.    Dana Has Failed to Provide the UAW with the Relevant Information Necessary to Evaluate Its Proposals ...................................................... 17

    D.    Dana's Proposals Are Not "Fair and Equitable" .................................... 19

    E.    The Unions Have Not "Rejected the Proposals Without Good Cause" ................ 21

    F.    The Balance of the Equities Does Not Clearly Favor Rejection .......................... 21

        1.    The Impact of a Strike in the Event of Rejection Would Be Devastating for All Constituencies ............................................................. 22
        2.    Dana's Proposal Would Have a Disproportionate Impact on Individual Employees and Retirees ........................................................... 23
        3.    The Unions' Potential Claims for Contract Breach Also Favor Denial of the Motion ................................................................................ 24

II.    DANA IS NOT ENTITLED TO RETROACTIVE RELIEF ........................................... 25

Conclusion .............................................................................................................. 27

# TABLE OF AUTHORITIES

## CASES

Page

*Adventure Resources, Inc. v. Holland*,
    137 F.3d 786 (4th Cir. 1998) ......................................................................7

*Association of Flight Attendants-CWA v. Mesaba Aviation, Inc.*,
    350 B.R. 435 (D. Minn., 2006) ..................................................................20

*Briggs Transport Co. v. International Brotherhood of Teamsters*,
    739 F.2d 341 (8th Cir. 1984) ....................................................................22

*In re Blue Diamond Coal Co.*,
    147 B.R. 720 (Bankr. E.D. Tenn. 1992) ....................................................24

*In re Carey Transport, Inc.*,
    50 B.R. 203 (Bankr. S.D.N.Y. 1985)..........................................................15

*In re Century Brass Products, Inc.*,
    795 F.2d 265 (2d Cir. 1986)................................................................8, 19

*In re Dana Corp.*,
    351 B.R. 96 (Bankr. S.D.N.Y. 2006)..........................................................20

*In re Delta Air Lines, inc.*,
    2006 WL. 3771049 ....................................................................................19

*In re Delta Airlines*,
    342 B.R. 685 (Bankr. S.D.N.Y.)................................................................25

*In re Express Freight Lines, Inc.*,
    119 B.R. 1006 (Bankr. E.D. Wis. 1990) ....................................................21

*In re Garofalo's Finer Foods, Inc.*,
    117 B.R. 363 (Bankr. N.D. Ill. 1990) ........................................................24

*In re Hoffman Brothers Packing Co.*,
    173 B.R. 177 (9th Cir. B.A.P. 1994)..........................................................26

*In re Indiana Grocery Co.*,
    138 B.R. 40 (Bankr. S.D. Ind. 1990) ........................................................24

*In re Ionosphere Clubs, Inc.*,
    134 B.R. 515 (Bankr. S.D.N.Y. 1991)..........................................................9

*In re Ionosphere Clubs, Inc.*,
    922 F.2d 984 (2d Cir. 1990)................................................................8

*In re K & B Mounting, Inc.*,
    50 B.R. 460 (Bankr. N.D. Ind. 1985).............................................22

*In re Maxwell Newspapers, Inc.*,
    981 F.2d 85 (2d Cir. 1992).........................................................8, 17

*In re Mesaba Aviation, Inc.*,
    341 B.R. 693 (Bankr. D. Minn. 2006) ..............................15, 17, 19

*In re Moline Corp.*,
    144 B.R. 75 (Bankr. N.D. Ill. 1992) ...............................................24

*In re Northwest Airlines Corp.*,
    346 B.R. 307 (Bankr. S.D.N.Y. 2006)........................................8, 16

*In re Pesce Baking Co.*,
    43 B.R. 949 (Bankr. N.D. Ohio 1984)............................................22

*In re Pierce Terminal Warehouse, Inc.*,
    133 B.R. 639 (Bankr. N.D. Iowa 1991) ..........................................15

*In re Roth American, Inc.*,
    975 F.2d 949 (3d Cir. 1992)............................................................7

*In re Royal Composing Room, Inc.*
    848 F.2d 349 (2d Cir. 1988) ....................................................16, 17

*In re Royal Composing Room, Inc.*,
    62 B.R. 403 (Bankr. S.D.N.Y. 1986)..............................................15

*In re U.S. Airways*,
    No. 04-13879 (Bankr. E.D. Va. Jan. 6, 2005).................................16

*In re U.S. Truck Co.*,
    89 B.R. 618 (E.D. Mich. 1988).......................................................25

*In re U.S. Truck Co. Holdings, Inc.*,
    165 L.R.R.M. (BNA) 2521 (Bankr. E.D. Mich. 2000)....................25

*In re Unimet Corp.*,
    842 F.2d 879 (6th Cir. 1988) ...........................................................8

*In re World Sales, Inc.*,
   183 B.R. 872 (9th Cir. B.A.P. 1995)................................................................26

*International Brotherhood of Teamsters v. IML Freight, Inc.*,
   789 F.2d 1460 (10th Cir. 1986) .......................................................................22

*Mertens v. Hewitt Associates*,
   508 U.S. 248 (1993)..........................................................................................15

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984)........................................................................................7, 8

*Peters v. Pikes Peak Musicians Association*,
   462 F.3d 1265 (10th Cir. 2006) .......................................................................26

*Truck Drivers Local 807 v. Carey Transport Inc.*,
   816 F.2d 82 (2d Cir. 1987)....................................................................... *passim*

*United Sav. Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*,
   484 U.S. 365 (1988)..........................................................................................15

*Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of America*,
   791 F.2d 1074 (3d Cir. 1986) ...................................................................7, 8, 15

## STATUTES

11 U.S.C. §363 ........................................................................................................25

11 U.S.C. §502(b)(7) ..............................................................................................25

11 U.S.C. §1113(b)(1)(A)................................................................................7, 21, 26

11 U.S.C. §1113(f) ..................................................................................................26

11 U.S.C. §1114(e) ..................................................................................................26

## LEGISLATIVE HISTORY

130 Cong. Rec. H7495..............................................................................................8

130 Cong. Rec. H7496..............................................................................................8

130 Cong. Rec. S8898 ..............................................................................................8

130 Cong. Rec. S8900 ..........................................................................................8, 9

134 Cong. Rec. S6823 ...........................................................................................................9

134 Cong. Rec. S6940 ...........................................................................................................9

## MISCELLANEOUS

Michael St. Patrick Baxter, *Is There a Claim for Damages from the Rejection of a*
*Collective Bargaining Agreement Under Section 1113 of the Bankruptcy Code?*,
12 Bankr. Dev. J. 703 (1996) ...........................................................................................24

Rosenberg, *Bankruptcy and the Collective Bargaining Agreement - A Brief Lesson in the*
*Use of the Constitutional System of Checks and Balances,* 58 Am. Bankr. L.J.
293, 306-308 (Fall 1984) ...................................................................................................7

The International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America (the "UAW"), and the United Steel, Paper and Forestry, Rubber,

Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW")

(collectively, the "Unions"), by their undersigned counsel, submit this Joint UAW and USW

Objection and Memorandum in Opposition to Debtors' Motion to Reject Their Collective

Bargaining Agreements and to Modify Their Retiree Benefits Pursuant to Sections 1113 and

1114 of the Bankruptcy Code (the "Motion").

## PRELIMINARY STATEMENT

Dana's deeply flawed Motion is but one element of a bankruptcy case premised

on the near elimination of U.S.-based unionized jobs and other restructuring initiatives aimed

squarely at the Debtors' workforce and retirees. By targeting labor cost savings of $60-90

million, in addition to a footprint "optimization" plan that moves production out of the U.S., and

by seeking the *complete elimination* of its retiree health obligations -- far beyond the cash

savings Dana says it needs for the next five years -- Dana is conducting its restructuring

overwhelmingly at the expense of its employees and retirees. The details of Dana's Section 1113

and 1114 proposals reveal a broad effort to depress wage rates, cut virtually all forms of benefits

and, ultimately, force employees and retirees to fund Dana's slow but steady migration to

Mexico and other low cost economies.

Moreover, Dana's drive to reduce labor costs and eliminate retiree benefits

demonstrates that Dana expects to achieve its goal through litigation, without the serious effort to

reach a negotiated solution that is required by Sections 1113 and 1114. While Dana commenced

its bankruptcy case nearly a year ago, it did not announce the restructuring initiatives aimed at its

workforce until last fall. Proposals were not given to the Unions until late November and early

December, 2006. At the same time, chronic problems with information flow have hindered the

Unions' ability to conduct the necessary due diligence. Dana has thus thwarted the most basic

protections that Congress designed in Sections 1113 and 1114 in order to avoid precisely the

result that Dana's Motion seeks to achieve. Dana's Motion should be denied.

## STATEMENT OF FACTS

A.    UAW History and UAW Representation at Dana[1]

Founded in 1935, the UAW and its members have achieved many of the contract

benefits that Dana has targeted with its Motion through a long history of strikes, lockouts and

collective bargaining in the auto industry and elsewhere. Gains from negotiations and strikes led

to guarantees of the same minimum wage for both men and women, the first employer-paid

pension plan for industrial workers, the first cost-of-living allowances, landmark job and income

security provisions, comprehensive training and educational programs, and supplemental

unemployment benefit programs. The UAW has been active in key civil rights battles for over

50 years, including the enactment of the Civil Rights Act of 1964, the Voting Rights Act of

1965, the Fair Housing Act, the Civil Rights Restoration Act of 1988 and legislation banning

discrimination against women, the elderly and people with disabilities. The UAW was also

instrumental in passing Medicare and Medicaid, the Occupational Safety and Health Act, the

Employee Retirement Income Security Act of 1974 and the Family and Medical Leave Act.

The UAW is the exclusive collective bargaining representative of approximately

5,200 employees of Dana, over one-third of Dana's total hourly U.S. workforce. These

employees work in 13 different Dana facilities located in six states (Indiana, Kentucky,

Michigan, Missouri, Ohio and Texas). In addition, the UAW serves as the authorized

representative of over 6,800 retirees, including retirees of Dana's Lima, Ohio, and Pottstown,

---

[1] *See* Declaration of Miguel Foster in Support of the Joint UAW and USW Objection and Memorandum in Opposition to Debtors' Motion to Reject Their Collective Bargaining Agreements and to Modify Their Retiree Benefits Pursuant to Sections 1113 and 1114 of the Bankruptcy Code ("Foster Decl."), filed herewith, at ¶¶3-6.

Pennsylvania facilities, and over two dozen facilities Dana has closed or idled as part of its drive to move its work to lower cost economies in Mexico and elsewhere.

Over the past several years, the UAW has spent considerable time and effort trying to enhance Dana's competitive position. The Union undertook such initiatives and engaged the Company on these issues in an attempt to secure, on a long-term basis, jobs at particular facilities and provide some measure of employment security to our members. Such efforts have commonly taken the form of collectively bargained modifications to existing wage, benefit and job classification provisions in our labor agreements. By way of example, during collective bargaining for the parties' current Upper Sandusky, Ohio labor agreement, the UAW ultimately agreed to numerous economic concessions, including: wage freezes in 2005 and 2006; closing off participation in the defined benefit pension plan to new hires and instead placing such individuals in a less costly defined contribution/401(k) plan; and the consolidation of various job classifications. The UAW similarly agreed to close the defined benefit pension plan to new hires and instead place such employees in the defined contribution savings plan during negotiations in 2005 in connection with the Archbold, Ohio labor agreement (in addition to changes in vacation entitlements for new hires).

Similarly, the UAW has demonstrated its willingness to engage the Company on methods of addressing direct labor costs. In 2004, the Union agreed to implementation of a two-tier wage schedule at the Auburn Hills, Michigan, facility with workers hired after August 2004 being placed in a lower tier wage category. Concessions agreed to by UAW-represented Lima, Ohio and Pottstown, Pennsylvania employees during the parties' 2003 labor negotiations were more pronounced, including: no general wage increases for the duration of the agreement; increases in health care co-pays and deductibles and introduction of health care premium costs

on employees; implementation of two-tier wage structure for newly hired employees with lower

wage rates; lower pension benefits; reduced health care benefits; and no eligibility for post-

retirement health care benefits.

     B.     <u>USW History and USW Representation at Dana</u>[2]

     The USW is the largest industrial union in North America, with approximately

850,000 members in nearly every sector of the economy, including steel, aluminum, mining,

paper and forestry, rubber, energy, auto parts, glass, general manufacturing, and health care.  The

USW's predecessor organization, the Steelworkers Organizing Committee ("SWOC") was

formed in 1936.  From its inception, the USW has grown both by organizing throughout its

original jurisdictions and as a result of mergers with other industrial unions.  Most recently, in

April 2005, the USW merged with the Paper, Allied Industrial, Chemical and Energy

International Union ("PACE"), a merger which brought approximately 250,000 new members to

the USW, including several bargaining units of Dana employees.

     At Dana, the USW represents approximately 2,500 bargaining unit employees

employed at Dana facilities in Indiana, Kentucky, and Ohio.  In addition, the USW is the

authorized representative for purposes of Section 1114 of the Bankruptcy Code of those persons

receiving retiree benefits pursuant to the collective bargaining agreements between Dana and the

USW.  Included among the retirees that the USW represents are people who worked at facilities

since closed by Dana, including a large complement of retirees from a facility in Reading,

Pennsylvania.

     Throughout its history in its many industries, the USW and its members have

struggled and sacrificed to gain the very benefits that Dana seeks to diminish or wholly eliminate

---

[2] *See* Declaration of James Robinson in Support of the Joint UAW and USW Objection and Memorandum in Opposition to Debtors' Motion to Reject Their Collective Bargaining Agreements and to Modify Their Retiree Benefits Pursuant to Sections 1113 and 1114 of the Bankruptcy Code ("Robinson Decl.".), filed herewith, at ¶¶3-10.

through its Motion, including defined benefit pension plans, retiree insurance programs, supplemental unemployment benefits, and wage and benefit programs that, like those gains achieved by the UAW, have enabled hourly industrial workers to participate in a prosperous economy as members of the middle class.[3]

The USW has also been a leader in gaining passage of such key legislation as the Occupational Health and Safety Act of 1970 ("OSHA"), 29 U.S.C. §651 *et seq.*, the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §801 *et seq.*, and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §301 *et seq.*, as well as Sections 1113 and 1114 of the Bankruptcy Code.

During the past two decades, and particularly since 2000, the USW and its members in several industries, including the steel, aluminum, and mining industries, have faced enormous challenges occasioned by international trade policies, escalating health care costs, and other factors that have harmed America's industrial sector.  The USW has responded to current conditions with progressive and innovative contract initiatives that have facilitated more rational and equitable corporate reorganizations and which, at the same time, have protected the economic security of its affected members and retirees.  These contract initiatives (which have been incorporated into myriad existing collective bargaining agreements) include protections associated with the sale of operations to successor employers, mandated investment in plants and equipment, restrictions on corporate expenditures unrelated to plant investment, restrictions on the contracting out of bargaining unit work to outside contractors, a limitation placed on excessive executive compensation, and profit sharing programs that allow employees and retirees

---

[3] The USW has also been a leader in gaining passage of such key legislation as the Occupational Health and Safety Act of 1970 ("OSHA"), 29 U.S.C.§651 *et seq.*, the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §801 *et seq.*, and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §301 *et seq.*, as well as Sections 1113 and 1114 of the Bankruptcy Code, which were enacted to protect collective bargaining agreements and retiree health benefits.

to share in future gains.  The USW has offered similar terms to Dana, but unlike many other industrial employers, Dana has refused to adopt such initiatives.

The USW is organized into 13 districts, each of which covers a geographical area. At Dana, the USW represents approximately 2,500 bargaining unit employees employed at Dana facilities in Indiana, Kentucky and Ohio.  The USW is the bargaining agent of the hourly employees employed at Dana's facilities at Fort Wayne and Marion, Indiana, Caldwell, Ohio, and Henderson, Kentucky and is a party to separate collective bargaining agreements at each facility.  The USW is also the bargaining agent of employees at Dana's Andrews and Mitchell, Indiana facilities, each of which is in the process of being closed.

In addition, the USW is the authorized representative in this proceeding of the bargaining unit retirees of Dana's facility at Reading, Pennsylvania, which was shut down in the 1990s.

A number of local unions from the USW have joined the Dana Unions Council ("D.U.C.").  The D.U.C. is an affiliation of USW and UAW local unions that have agreed on a set of principles to protect Dana workers and retirees during the bankruptcy process and negotiations.

## **ARGUMENT**

## I.    **DANA'S ATTACK ON THE COLLECTIVE BARGAINING AGREEMENTS AND RETIREE BENEFITS UNDERMINES THE MOST FUNDAMENTAL PREMISES OF SECTIONS 1113 AND 1114 AND MANDATES DENIAL OF THE MOTION**

As set forth below, Dana's Motion flouts the basic principles underlying Sections 1113 and 1114.  Dana's Motion should be denied because it has failed to present facts that would satisfy the strongest requirements deliberately imposed by Congress for obtaining the relief it seeks.

A.     Sections 1113 and 1114 Were Enacted to Protect
       <u>Collective Bargaining Agreements and Retiree Health Benefits</u>

Although the history of Sections 1113 and 1114 and their purposes are well-known to this Court, it is apparent that Dana has ignored the most basic elements of these provisions. Sections 1113 and 1114 were enacted during a time when labor agreements and federal policies promoting collective bargaining were threatened by a series of strategic bankruptcy filings aimed at organized labor and collective bargaining agreements.[4]

In enacting Section 1113 after the 1984 Supreme Court decision in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513 (1984), Congress intended to halt the use of the "bankruptcy law as an offensive weapon in labor relations." *Adventure Res., Inc. v. Holland*, 137 F.3d 786, 797-98 (4th Cir. 1998) (quoting *In re Roth American*, *Inc.*, 975 F.2d 949, 956 (3d Cir. 1992)); *see generally Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am.*, 791 F.2d 1074, 1081-83, 1089 (3d Cir. 1986) (detailing legislative history).

Congress accomplished its objective of restoring the balance in collective bargaining in bankruptcy by: (1) providing that collective bargaining agreements are enforceable and cannot be modified absent court approval, (2) requiring that the parties engage in bargaining before the debtor may seek rejection, and (3) creating a substantive test for rejection that prohibits the debtor from overreaching in its demands and disproportionately burdening the affected employees. *See* 11 U.S.C. §§1113(b)(1)(A), (c), (f).

Giving effect to labor policies (and in stark contrast to the manner in which Dana has handled this process), the statute is designed to promote collective bargaining with litigation

---

[4] Continental Airlines filed its first Chapter 11 petition in 1983, immediately affecting its labor agreements. Continental laid off all 12,000 employees and started operations with a reduced workforce at half of their regular pay rates. Eastern Air Lines openly threatened its workers with bankruptcy as leverage in collective bargaining negotiations. *See* Rosenberg, *Bankruptcy and the Collective Bargaining Agreement – A Brief Lesson in the Use of the Constitutional System of Checks and Balances*, 58 Am. Bankr. L.J. 293, 306-308 (Fall 1984).

used only as a last resort.  *E.g.*, *In re Century Brass Prods., Inc.*, 795 F.2d 265, 273 (2d Cir. 1986) (Section 1113 "encourages the collective bargaining process as a means of solving a debtor's financial problems insofar as they affect its union employees").  *See also In re Northwest Airlines Corp.*, 346 B.R. 307, 320 (Bankr. S.D.N.Y. 2006) (Section 1113 is "aimed at facilitating consensual modifications to collective bargaining agreements"); 130 Cong. Rec. S8898 (daily ed. June 29, 1984), Collier App. p. 6-183-84 (statement of Sen. Packwood: §1113 was enacted to "stimulate collective bargaining and limit the number of cases when a judge will have to authorize the rejection of a labor contract"; requirements of §1113 "place[ ] the primary focus on the private collective bargaining process and not in the courts").[5]  As summarized by the Second Circuit, the statute's "entire thrust" is to "ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process."  *In re Maxwell Newspapers, Inc.,* 981 F.2d 85, 90 (2d Cir. 1992).[6]

The statute was also designed to ensure that "covered employees do not bear either the entire financial burden of making the reorganization work or a disproportionate share of that burden, but only their fair and equitable share of the necessary sacrifices."  130 Cong. Rec. H7496 (daily ed. June 29, 1984), Collier App. p. 6-141 (statement of Rep. Morrison); *see*

---

[5] Because there were no committee reports associated with Section 1113, courts look to other legislative history, including legislators' statements, for congressional intent.  *See In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 990 (2d Cir. 1990); *In re Unimet Corp.*, 842 F.2d 879, 883 n.3 (6th Cir. 1988); *Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am.*, 791 F.2d 1074, 1083 (3d Cir. 1986) (examining legislative history).  The legislative history of Section 1113 is reprinted in E-1 Lawrence P. King, *et al., Collier on Bankruptcy* App. Pt. 6(c) (15th ed. 2005) (hereafter, "Collier App. p ___").

[6] *See also* 130 Cong. Rec. S8898 (daily ed. June 29, 1984), Collier App. p. 6-190 (comments of Senator Packwood) (Section 1113 "encourages the collective bargaining process, so basic to federal labor policy"); 130 Cong. Rec. S8900 (daily ed. June 29, 1984), Collier App. p. 6-190 (comments of Sen. Moynihan) ("This [good faith] provision . . . embodies the basic principles of collective bargaining established by Congress in the National Labor Relations Act"); 130 Cong. Rec. S8898 (daily ed. June 29, 1984), Collier App. p. 6-185 (comments of Sen. Kennedy) (the intent of the law is "to overturn the *Bildisco* decision . . .and to substitute a rule of law that encourages the parties to solve their mutual problems through the collective bargaining process").  *See also* 130 Cong. Rec. H7495 (daily ed. June 29, 1984), Collier App. p. 6-140 (statement of Rep. Morrison) (Section 1113 was enacted to "move[] us in the direction of a negotiation process rather than a litigation process to save companies that are in trouble without permitting any abuse of chapter 11").

*also* 130 Cong. Rec. S8900 (daily ed. June 29, 1984), Collier App. p. 6-190 (comments of Sen.

Moynihan) (provision for "necessary" modifications "is a most important one . . . for it ensures

that a company's workers will not have to bear an undue burden to keep the company solvent.

The union would have to make the necessary concessions.  Nothing more.  Nothing less.").

        In addition, Section 1114 reflects Congress' intent to safeguard retiree health

benefits so that "the burden of turning a company around should not rest on the backs of

retirees."  *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 522 (Bankr. S.D.N.Y. 1991) (quoting 134

Cong. Rec. S6823, S6825 (daily ed. May 26, 1988) (statement of Sen. Metzenbaum)).  Congress

acted to protect retirees because of the devastating effects of the loss of health insurance:

> [c]ancellation of health insurance is a serious matter for anyone.
> It is especially serious for a retiree who is too young for Medicare
> but too old to buy affordable health coverage.  While healthy
> retirees may find a replacement policy for a hefty monthly
> premium, sick retirees may be unable to find one at any price.  The
> thought that a company could enter bankruptcy and renege on the
> promise of health and life insurance without a moment's hesitation
> or so much as a word to the retirees was troubling to the Congress.

134 Cong. Rec. S6940, 1988 WL 1091280 (daily ed. May 27, 1988) (statement of Sen. Heinz).

The statute gives effect to this policy through features that mirror those of Section 1113.  *See

Ionosphere,* 134 B.R. at 519-20 ("[C]ompliance with §1114 is substantively and procedurally the

same as compliance with §1113").[7]

    B.    <u>Dana's Proposals Are Not "Necessary"</u>

        Dana bases its "necessity" argument on its goal of achieving a pre-tax operational

profit margin of at least 4-6%.  Motion, ¶78.  But Dana has asked the Court (and the Unions) to

make a significant leap by suggesting that Dana needs its Section 1113/1114 proposals to

achieve these margins.

---

[7] As discussed below, the Second Circuit's interpretation of Section 1113 adhered to these basic principles.

1.    <u>Dana Has Not Made a Financial Case for the Relief it Seeks</u>

First, as the Unions' financial advisor has observed, the measure of operating margin is not meaningful without taking into account protected capitalization and cash flows over a long projection period, as would be the case with a five-year business plan. Such projections would ordinarily be used to evaluate whether the Company will achieve such margins over the long-term. *See* Declaration of Leon Potok in Support of the Joint UAW and USW Objection and Memorandum in Opposition to Debtors' Motion to Reject Their Collective Bargaining Agreements and to Modify Their Retiree Benefits Pursuant to Sections 1113 and 1114 of the Bankruptcy Code ("Potok Decl.") at ¶20. The Unions' financial advisor cites a number of factors suggesting that Dana's performance in 2008 and beyond will improve and perhaps reach the Company's target in the absence of the Section 1113/1114 proposals. *See* Potok Decl. ¶20 (citing four factors that would be included in long-term projections). The Unions' financial advisor has concluded that, absent a long-term view of the Company's business and operations, "it is not possible to conclude that Dana *needs* the proposed concessions." *Id.* ¶22.

The Unions' financial advisor also observes Dana has made concessionary proposals for plants that, in all likelihood, are slated for closure over time, given management's "bias" in favor of low cost production overseas. Potok Decl. ¶¶15-17. Thus, rejection of collection bargaining agreements "will have little, if any, impact on long-term performance of the Debtors. In essence . . . the Company is asking for relief not to bolster long-term performance and to allow for its emergence from bankruptcy but rather it is asking that the employees of these facilities fund the costs of implementing the Company's plan to cut loose the same employees and facilities." Potok Decl. ¶18.

2.    Dana's Rationale for its Proposed Wage Cuts is Methodologically Flawed

Dana seeks deep cuts in the wages of current production and support employees at five plants -- Auburn Hills, Fort Wayne, Lima, Marion and Pottstown -- and also seeks to cut the pay of the skilled workers at those plants. *See* Bueter Decl. ¶¶17, 20-21. In addition, it proposes paying new hires a starting wage of $11.05 per hour, pay that would increase to $13 only after three full years of employment. Bueter Decl. ¶22 & Exh. B. The Company claims it needs these new low wage rates to "bring Dana's hourly wage costs into alignment with the costs of its competitors." Motion at 23; *see also* Bueter Decl. ¶17 (claiming Dana needs to reduce pay "to bring the average hourly wage cost in line with that being paid by other companies in the same industry").

Dana, however, provides *no* evidence that the reduced wages it proposes would be in line with those of its competitors in the auto parts industry. The Company identifies by name the principal competitors of each of the five plants, *see* Wachter Decl. ¶¶55, 72, 87, 102, 114, yet provides no indication of the wages paid by these competitors. Instead, to support its claim that it currently pays above-market wages, Dana relies on the conclusion of its expert, Dr. Michael Wachter, that the pay of the workers at these five plants "is far above the compensation for comparably skilled workers across the private sector." Bueter Decl. ¶19. But Dana does not compete for business with firms "across the private sector"; it competes with other firms in the auto parts industry.

The expert report of Dr. Paula Voos shows that, when compared to plants of comparable size in the motor vehicle parts industry, the wages Dana pays at each of the five plants are *currently* below market. *See* Voos Decl., Table 4. For example, union workers at Auburn Hills now earn an average wage of $17.72 per hour, compared to the estimated $20.60 per hour paid on average in similarly sized motor vehicle parts factories. *See id*.

Cutting Dana's current wages to the level the Company proposes would immediately drive the pay of union employees at these five plants to approximately *25%* below market levels. *See id*. at Table 5. At the Marion, Ohio facility, for example, the average hourly wage would be $16.24, compared to an estimated average wage of $22.38 for similarly sized auto parts plants. *See id*. With turnover and the hiring of new workers at the Tier II rate of $11.05 an hour, the average wage at Marion would fall still further below market levels. *See id*. at ¶32. By seeking to drive its wages so far below market, Dana is making opportunistic use of the bankruptcy laws, hoping to achieve by court decree a sizeable competitive wage advantage over its competitors.

Even the analysis of Dana's expert -- which compares the wages of Dana's employees to those of workers across the private sector economy who allegedly have similar skills -- shows that Dana's proposed wages would be below market. *See* Voos Decl. ¶9 (listing groups of employees whose pay Dana admits would be below market). In particular, the proposed $11.05 wage for new hires is below the average private sector wage for *every* occupational category at *each* of the five plants. *See* Wachter Decl., Tables IV.5, V.5, VI.5, VII.5. Dana's expert in fact understates how far below market levels the proposed wages would be because he looks only at national averages and ignores the fact that the five plants at issue are located in areas where wages exceed the national average. *See* Voos Decl. at 7 (Table 1); *see also* Helper Decl. ¶20.

Far from being necessary for Dana's reorganization, the below-market wages that the Company proposes would be a recipe for failure. A firm like Dana that competes against others in complex manufacturing cannot expect to succeed without being able to attract and retain a highly skilled and motivated workforce. Workers at the Ft. Wayne plant, for example,

must produce axles that have tolerances measured in the thousandth of an inch; such work requires the operators to have ample experience with the machines they set up and run and the processes they oversee. *See* Helper Decl. ¶23. Having workers who can get the job done right is critical since defects in parts can have enormous financial implications for the Company, including by hurting its ability to win new business. *See id.* ¶¶12-13.

Cutting the pay of incumbent workers to below market levels will inevitably cause Dana's quit rates to spiral even higher than they have in the last two years, *see, e.g.*, Wachter Decl., Table IV.4 (annual quit rate at Auburn Hills jumped from 7.5% in 2004 to 38% in 2006), resulting in a hemorrhaging of experienced employees with valuable knowledge of Dana's operations. And by offering starting pay well below market levels, Dana will only be able to fill the vacancies with individuals who, due to a lack of competence, skill or motivation, are unable to get better paying jobs elsewhere. *See* Voos Decl. ¶11. What Dana needs to compete is to pay a wage that attracts competent and committed employees. Paying below-market wages will be counterproductive.[8]

### 3.    Dana's Rationale for Eliminating Retiree Health Benefits is Also Flawed

Dana's purported rationale for the total elimination of retiree health benefits is equally deficient. First and foremost, while Dana has stated an annual cash savings goal for retiree health benefits, $100 million per year, it has overbroadly proposed the total elimination of its retiree health obligations forever. *See* Declaration of Suzanne Taranto ("Taranto Decl."), ¶20. Dana's rationale for the permanent cessation of its retiree health obligations goes far beyond any

---

[8] Dana's preoccupation with global competitiveness does not extend to its Chief Executive Officer ("CEO"). According to a April 1, 2000 report by Towers Perrin, American CEOs at 365 of the largest publicly traded U.S. companies were paid 531 times what the typical hourly employee was paid, whereas in Brazil, which had the next highest paid CEOS, CEOs were paid 57 times what the typical hourly employee was paid. CEOs in Europe were paid even less. In Germany, for example, CEOs were paid only 11 times what the typical hourly employee was paid. Michael Hennigan, *Executive Pay and Inequality in the Winner-take-all Society*, Aug. 7, 2005, http://www.finfacts.com/irelandbusinessnews/publish/article_10002825.shtml (last visited Feb. 22, 2007).

short-term cash relief.  Dana relies on its observation that "[m]any companies have terminated, or are in the process of terminating, their continuing obligation to provide healthcare benefits to existing retirees."  Motion, ¶57.  In other words, like some other large employers, Dana would rather not provide retiree health care.  But in enacting Section 1114, Congress has foreclosed mere preference as rationale for eliminating retiree health benefits.

Moreover, a large number of employers *do* provide retiree health coverage, and studies show relatively few employers eliminating health benefits for current retirees.  Taranto Decl., ¶¶9, 11.[9]  And while Dana complains that its retiree health care obligations will be disproportionate to its shrinking active workforce (reductions which are part of Dana's strategy), the Unions' actuarial consultant points out that Dana has already achieved significant caps in its retiree health obligation through programs such as the VEBAs (which take retiree health obligations off of Dana's balance sheet), and through other programs that cap Dana's response to medical inflation.  Indeed, a large percentage of Dana's UAW and USW-related liability is protected against medical inflation since Dana's liability is capped at a fixed dollar level.  Moreover, the percentage of its capped liability will increase over time, compared to its uncapped liability, because the latter is associated with an aging population that is declining in both size and attendant liability.  Taranto Decl., ¶7.  In addition, Dana's annual "cost" under FAS 106 currently is less than its cash outlay.  *Id.* at 13.

4.    Dana's Request is Incompatible With Controlling Law

Dana's reliance on the Second Circuit courts' interpretation of the "necessary" standard does not support its contention that its proposals are "necessary."  In *Truck Drivers Local 807 v. Carey Transp. Inc.*, 816 F.2d 82, 89 (2d Cir. 1987), the Second Circuit rejected the

_____

[9] Private employers are now encouraged to continue to provide retiree health care through significant government subsidies.  Taranto Decl., ¶13.

equation of "necessary" with "essential" or "bare minimum" with respect to the debtor's "initial" proposal in light of the statute's requirement that the debtor negotiate *beyond* its initial proposal. The *Carey* court viewed the legislative history as inconsistent with "language suggesting that a debtor must prove that its *initial* post-petition proposal contained only bare-minimum changes" and further noted that since a debtor must negotiate in good faith over its Section 1113 proposal, the *initial* proposal could not be limited to minimal changes. *Id.*

Moreover, *Carey* rejected a stricter construction of the term "necessary" for a small company needing more than "break even" finances in a reorganization far less complex than Dana's.[10]  Thus, *Carey* does not support Dana's view that its proposed modifications would meet the "necessary" requirement if they only demonstrate that the proposals increase the likelihood of a successful reorganization.  (Motion, ¶37).[11]  Indeed, interpreting "necessary" as Dana has done would render the standard no more stringent than that used to evaluate any other

---

[10] The debtor in *Carey* was a privately held company that provided bus service between New York City and two area airports.  The collective bargaining agreements sought to be rejected in *Carey* covered 115 workers represented by one local union.  *In re Carey Transp., Inc.*, 50 B.R. 203, 204-05 (Bankr. S.D.N.Y. 1985).  As Dana concedes, "determination of whether a proposal is necessary to the debtor's reorganization is made on a case-by-case basis." Motion, ¶76, citing *Carey*, 50 B.R. at 209.  Thus, the differences between Dana and a small local company like *Carey* must be taken into account when those cases are cited by Dana.  *See, e.g., In re Royal Composing Room, Inc.*, 62 B.R. 403, 412 (Bankr. S.D.N.Y. 1986) (specifically noting that debtor was "not a Fortune 500 company" in applying the requirements of Section 1113 to that facts of that case).  *Royal Composing*, also relied upon by Dana, involved a collective bargaining agreement between a single union local and one advertising typography shop that employed 71 workers, 31 of whom were covered by the labor contract sought to be rejected.  *Id.* at 405.  *See also In re Mesaba Aviation, Inc.,* 341 B.R. 693, 714 n.20 (Bankr. D. Minn. 2006) (noting "universe of difference between Mesaba's bankruptcy and *Royal* and finding debtor's insistence on applying *de minimis* information standard "puzzling – not to mention increasingly tiresome.")

[11] In a more complex case where there are many more factors to consider in gauging the prospects for reorganization, a standard closer to the *Wheeling-Pittsburgh* standard is plainly more consistent with Section 1113's language, structure and legislative history.  *See In re Pierce Terminal Warehouse, Inc.*, 133 B.R. 639, 646-47 (Bankr. N.D. Iowa 1991) (accepting Third Circuit's strict interpretation of the "necessary" standard and pointing out flaws in Second Circuit's position).  In addition, Dana's construction of "necessary" is contrary to the Supreme Court's construction of parallel language in Section 362(d) of the Bankruptcy Code.  *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988).  There the Court construed a "necessary to an effective reorganization" standard to require that the debtor show (in the context of relief from the automatic stay) "not merely . . . that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is *essential* for an effective reorganization that is in prospect."  *Id.* (emphasis added).  The same language "in one portion of a statute . . . should be deemed to have the same meaning as the same language used elsewhere."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260 (1993).  As noted above, the issue in *Carey* was the degree of room left to bargain in a small company with a limited budget.

transaction promoted by the debtor.  Sections 1113 and 1114 were designed to avoid precisely that result.

Dana also relies heavily on *In re Northwest Airlines Corp.*, 346 B.R. 307 (Bankr. S.D.N.Y. 2006).  In *Northwest*, the Professional Flight Attendants Association ("PFAA") conceded the debtor's total dollar "ask" at trial.  *Id.* at 323.  Moreover, the union in that case "failed to challenge either the assumptions or the conclusions of the Debtors' business plan."  *Id.* at 324.  Here, the Unions have contested Dana's total "ask" and there is no business plan.  *See* Potok Decl. ¶20.  Further, in *Northwest*, the PFAA had reached a tentative agreement with Northwest over proposed modifications, yet withdrew from the agreement after its members failed to ratify it.  *Id*. at 318.  In short, *Northwest* is inapposite.  *In re U.S. Airways*, No. 04-13879 (Bankr. E.D. Va. Jan. 6, 2005), is similarly distinguishable from this case.  There, the debtor had presented a proposal with a series of line items with corresponding values, but was open to any proposal that reached the overall amount of the "ask."  (U.S. Airways Tr. of Record at 26 [attached as App. A to Motion].)  There is no such bottom-line flexibility in Dana's rigid insistence on each of its line-by-line proposals.

Further, Dana incorrectly contends that it need not demonstrate that each proposed modification is "necessary."  (Dana Br. at 38 [citing *In re Royal Composing Room, Inc.*, 848 F.2d 345, 349 (2d Cir. 1988)].)  In *Royal Composing*, the court held only that a debtor may not need to demonstrate the necessity of an element of a proposal where the union does not bargain over changing that proposal.  *See Royal Composing*, 848 F.2d at 348-51 (noting that, at least where the union has refused to bargain over particular elements of the proposal, the union cannot attack any specific element in seeking to show the proposal is not necessary).  *Royal Composing* does not excuse Dana from having to prove the necessity of each item in its proposal.

The Unions here are not, as in *Royal Composing*, belatedly attempting to raise a "necessity" argument over elements of the proposal the union never bargained about.[12]

      Dana must therefore demonstrate that each of its proposed changes is "necessary." *See Maxwell Newspapers*, 981 F.2d at 90 ("the employer has the burden of proving its proposals are necessary"). In order to be "necessary," the proposal must "contain[] *only* those modifications essential for the debtor's reorganization." *Id.* at 91 (emphasis in original). Given the flawed methodology underlying Dana's wage proposals and the weak rationale for its many other line items, Dana cannot meet the "necessity" requirement of Section 1113(b)(1)(A).

    C.    Dana Has Failed to Provide the UAW with the <u>Relevant Information Necessary to Evaluate Its Proposals</u>

      The information requirements of Section 1113(b)(1)(A) and Section 1114(f)(1) are another means by which Congress intended to promote bargaining rather than litigation as the forum for resolution of the debtor's financial needs. *See In re Mesaba Aviation, Inc.,* 341 B.R. at 713-14. The many information-flow difficulties plaguing the Unions' due diligence demonstrate that Dana is simply not serious about its bargaining obligations and has turned the process in to one of litigation gamesmanship.

      There have been repeated and systemic problems with information flow, notwithstanding (and even as a result of) Dana's effort to set-up the Virtual Data Room and the volumes of data posted to the Virtual Data Room. As the Unions discovered only recently, Dana, inexplicably, provided some of the same documents produced in the Unions' data room to the Creditors' Committee's in a format that was more usable and more detailed. For example,

---

[12] Indeed, it is difficult to see how Dana can justify many of its proposals. Some, such as the proposal to "streamline" its wage rates suggest that Dana merely seeks to eliminate advantages the union has negotiated through its agreements with Dana over the years. *See e.g.,* Motion ¶47, *see also id.* at ¶48 (noting proposals to modify certain work rules such as imposing standardized vacation schedules and attendance bonus programs, eliminating tuition reimbursement, that Dana determined "were above the norm" and "represented a material economic cost").

the Committee's data room received an Excel spreadsheet on employment data in which the data can be analyzed quantitatively, and can be manipulated to test alternative scenarios. The version on the Unions' data room was in PDF format, where data would have to be manually entered on a spreadsheet, and was not susceptible to the type of analysis attendant to Excel spreadsheets. Moreover, while the Committee's version contained source employment data by facility, the level of aggregation made it far less valuable to the Unions' due diligence. Although the shortcomings of the data room have been made known to Dana's counsel, the Unions were still directed to data room postings where only limited information was provided in response to specific requests, resulting in time wasted with follow-up inquiries. Potok Decl. at ¶¶25-33.

The Unions have had continued problems obtaining meaningful data responsive to their requests. For example, the UAW requested census data files on benefit plan participants. Such basic information is necessary for actuaries to calculate estimates of benefit plan funding obligations and requirements, yet the data that Dana provided to the Union in late December 2006 prohibited the actuaries from conducting a thorough analysis. Declaration of Miguel Foster ("Foster Decl.") at ¶8. Again, because most of the items contained in the Virtual Data Room were PDF files, they could not be used to test alternative scenarios. The UAW's actuaries, for example, could not perform the tasks necessary to carry out their analysis. *Id.* When, after several weeks delay, the requested data did arrive, it was incomplete, lacked necessary participant data, and contained undefined codes (such as dependent status, participant location, etc.). This required more time-wasting follow-up requests for the necessary participant information and code definitions. *Id.* Milliman, the Unions' outside actuarial consultants, also found the Virtual Data Room difficult to gather information due to the organization of the

material and the labeling of information, and difficult to use, given the data's non-machine readable format. Declaration of Suzanne Taranto ("Taranto Decl.") at ¶4.

Dana cannot credibly justify its decision to post usable data on the Creditors' Committee's website and provide less complete, less usable data to the Unions. Dana's persistent failure to supply information in usable form violates Section 1113(b)(1)(A). *See Mesaba,* 341 B.R. at 715-17, 755, 763 (denying Section 1113 motion because Debtor failed to provide its unions with a "live" copy of its financial modeling tool). As the Court in *Mesaba* noted, "large, complex" cases require "far more information" in order to satisfy the statutory requirements. *Id.* at 714. The court went on to note that, if Section 1113 is to operate as intended, a "vital" purpose of the information requirement "is to enable a union's representatives and members to subjectively attach some bedrock legitimacy to a debtor's proposal -- to convince them that the process of formulating the proposal was not arbitrary, not 'loaded' toward a particular result, not manipulated to produce an unfair allocation of burdens among the constituencies to the bankruptcy case." *Id.* at 716.

D.    Dana's Proposals Are Not "Fair and Equitable"

The Second Circuit has made clear that a Section 1113 motion may only be granted upon a showing by the debtor that all constituencies have "sacrifice[d] to a similar degree." *Century Brass*, 795 F.2d at 273. *See also, id.* ("the purpose [of the "fairly and equitably" requirement] is to spread the burdens of saving the company to every constituency while ensuring that all sacrifice to a similar degree."); *In re Delta Air Lines, inc.,* 2006 WL 3771049, at *15 (noting "requirement of the governing case law that all constituencies, great and small, bear their *fair share* of the cost of reorganization."). As demonstrated above, Dana has made plain its intent to reorganize at the expense of its unionized workforce and its retiree population.

Dana's restructuring plan, while divided into separate "initiatives," targets USW and UAW plants in its footprint programs, and divestiture, in addition to labor cost cuts that would reduce pay and a wide range of benefit programs and retiree health costs cuts thus overwhelmingly burdening the hourly workforce and retirees. While Dana contends that salaried and management personnel are contributing their fair share, a very different picture has emerged over the course of this case.

Dana spent months in litigation over its effort to secure modified contracts for its senior executives. *See In re Dana Corp.*, 351 B.R. 96 (Bankr. S.D.N.Y. 2006). Indeed, the Court on its own initiative, cut back the annual compensation cap proposed for the CEO's salary, an indication that Dana is simply unwilling to seek to attain true savings from its management team.[13] Moreover, in contrast to Dana's repeated efforts to pay incentives to management, among the many items Dana seeks to eliminate or reduce for its hourly employees are, ironically, incentive programs, such as Dana's attendance incentive bonus. The contrast could not be more stark. Nor can the fact that Dana seeks an across-the-board elimination of its retiree health obligations save Dana's Section 1114 proposal. And, as shown above, while Dana attempts to diversify its restructuring efforts with initiatives aimed at customers, SGA and other costs, there is no mistaking that this case is about the loss of U.S. jobs, the reduction of already below market wages, a comprehensive assault on a panoply of benefits providing crucial financial security for working families, such as life, disability and AD&D benefits, and its near obsession with the concept of eliminating retiree health obligations. *See* Stenger Decl., ¶44. Dana's argument that its proposals meet the statutory "fair and equitable" test can just not be taken seriously.

---

[13] Chapter 11 has become a virtual safe haven for executive pay. See Gretchen Morgenson, *Gee, Bankruptcy Never Looked So Good*, The New York Times, January 15, 2006, Sunday Business, p. 1. But it has been "disastrous" for workers *See Ass'n of Flight Attendants-CWA v. Mesaba Aviation, Inc.* 350 B.R. 435, 443 (D. Minn., 2006) ("Bankruptcy law is draconian  [and] . . . disastrous for labor").

E.      The Unions Have Not "Rejected the Proposals Without Good Cause"

Dana contends that "the burden lies with the Unions and the Retiree Committee, as the authorized representatives, to articulate in detail their reasons for declining to accept Dana's proposals.  Motion, ¶87.[14]  Dana's half-hearted contention that the Unions have not accepted their proposals recognizes that matters between the parties simply have not progressed to the point where this statutory issue is relevant.  Each of the Union declarants notes that discussions and due diligence continue.  *See* Foster Decl. ¶10; Robinson Decl. ¶19[15]; *see also* Potok Decl. ¶¶31, 33 (describing upcoming meetings with Dana).  The current status is not at all surprising given the timing of the Debtors' proposals, in late November and early December, 2006, and Dana's revised Section 1114 proposal delivered by Dana just days before it filed its Motion.  As the Unions' financial advisor has noted, the difficulties in information flow from Dana have necessitated specific meetings at which all open information items will be reviewed. Potok Decl., ¶32.

F.      The Balance of the Equities Does Not Clearly Favor Rejection

Dana cannot show that the "balance of the equities clearly favors rejection" of the Unions' collective bargaining agreements.  The Second Circuit has "glean(ed) at least six permissible [relevant] equitable considerations:

> (1) the likelihood and consequences of liquidation if rejection is not permitted; (2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force; (3) the likelihood and consequences of a strike if the bargaining agreement is voided; (4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved;

---

[14] A court may approve a Section 1113 motion "only if" the court finds that the union "refused to accept [the debtor's Section 1113] proposal without good cause."  11 U.S.C. §1113(c)(2).  A Union would have good cause to reject a debtor's proposals because, for example, they are neither necessary nor fair and equitable.  *See In re Express Freight Lines, Inc.,* 119 B.R. 1006, 1017 (Bankr. E.D. Wis. 1990) (when "debtor's proposal is not necessary to its reorganization and is not fair to all concerned, it follows that the union rejected the proposal with good cause").

[15] *See also id.*, ¶18 (regarding proposal tendered at January 17-19 meetings).

> (5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and (6) the good or bad faith of the parties in dealing with the debtor's financial dilemma.

*Carey*, 816 F.2d at 93.

Dana's burden of proof on the balance of the equities test is heavier than a preponderance of the evidence. *See In re K & B Mounting, Inc.*, 50 B.R. 460, 467 (Bankr. N.D. Ind. 1985).

1.    The Impact of a Strike in the Event of Rejection
      Would Be Devastating for All Constituencies

Dana concedes that the prospect of a strike must be addressed as part of its burden to demonstrate that a balance of the equities clearly favors rejection.[16]  Motion, ¶92.  In *Int'l Bhd. of Teamsters v. IML Freight, Inc.*, 789 F.2d 1460, 1463 (10th Cir. 1986), the court reversed a bankruptcy court's decision granting rejection because the court failed to consider the impact of rejection of the labor agreement on the employees, in particular the likelihood of a damaging strike.  *Id.* at 1463; *see also In re Pesce Baking Co.*, 43 B.R. 949, 961, 962 (Bankr. N.D. Ohio 1984) (denying rejection motion because "[c]onsidering the risk of a strike or decreased productivity, [the debtor's] projected savings [are] highly speculative").  As in any case where an employer obtains the rejection of a collective bargaining agreement, there is a high risk here that there will be work stoppages if this Court were to grant the relief that the Company seeks.  Both the UAW and USW have long histories of engaging in work stoppages in their core jurisdictions to protect the livelihoods of their members and to protest employer overreaching.

---

[16] The unions would have the right to strike in the event the court grants the Motion.  *See Briggs Transp. Co. v. Int'l Bhd. of Teamsters*, 739 F.2d 341, 344 (8th Cir. 1984).

2.    Dana's Proposal Would Have a Disproportionate
Impact on Individual Employees and Retirees

The Court must also consider the respective cost-spreading abilities of the parties. *See Carey*, 816 F.2d at 93.  The impact of the Debtor's proposals on individual employees and retirees are especially harsh.  Dana's proposals to cut wages, eliminate disability insurance, and reduce health care protection erode financial security and force workers to stretch fewer dollars with less available for overprotected, catastrophic occurrences.[17]

The impact of Dana's proposed cuts on its retirees is particularly disproportionate to the sacrifice demanded of non-labor constituencies, as the declarations of Henry Gibson and Craig Zucker, filed herewith, attest.  Both Mr. Gibson and Mr. Zucker will lose the retiree health insurance that was repeatedly promised to them when they worked at Dana.  The declarations of Mr. Gibson and Mr. Zucker spell out the cost of Dana's proposals in human terms.

Mr. Zucker, who went to work at Dana right after high school, worked for the company for thirty years, and then retired due to work-induced back problems. *See* Declaration of Craig Zucker In Opposition To The Debtors' Motion To Reject Their Collective Bargaining Agreements And To Modify Their Retiree Benefits Pursuant To Sections 1113 And 1114 of the Bankruptcy Code at ¶¶1-3. Mr. Zucker is in constant pain and, still, in order to survive, is forced to work part-time as a bus driver just to make ends meet. *Id*. at ¶¶8-9.  Mr. Zucker and his wife, who is disabled and who cannot work, are too young to receive Medicare and they depend on Dana's retiree health benefits to pay for their substantial medical needs. *Id.* at ¶¶11-12.  The loss of these benefits will lead to financial devastation for Mr. Zucker, notwithstanding his thirty years of loyal and dedicated service to Dana.

---

[17] Dana's proposal even extends to programs such as tuition reimbursement, which would be eliminated.

Mr. Gibson is eighty-five years old.  He worked at Dana and helped build the company from the time he left the Army immediately after WWII until his retirement in 1980. Declaration Of Henry Gibson In Opposition To The Debtors' Motion To Reject Their Collective Bargaining Agreements And To Modify Their Retiree Benefits Pursuant To Sections 1113 And 1114 Of The Bankruptcy Code at ¶1.  He and his wife live on Social Security and a small pension.  *Id*. at ¶¶3-4  Mr. Gibson and his wife have substantial medical expenses that are not covered by Medicare, and they depend on the Dana retiree coverage to supplement their needs. *Id*.  The retiree medical cuts proposed by Dana will do nothing less than deny Mr. Gibson and his wife the ability to live in peace and security in their final years.

These are among the real and human costs of Dana's proposals, and negate any argument by Dana that its proposed modifications are "clearly favored" by a balance of the equities.

> 3.    The Unions' Potential Claims for Contract
>        Breach Also Favor Denial of the Motion

The Court must also consider the possibility and likely effect of any employee claims for breach of contract if rejection is approved.[18]  Rejection will indeed permit the Unions to file damage claims for substantial sums.  *See In re Moline Corp.*, 144 B.R. 75, 78 (Bankr. N.D. Ill. 1992) (as labor agreements are executory contracts, "§365 must apply to fill in the gap left by §1113"); *In re Indiana Grocery Co.*, 138 B.R. 40, 50 (Bankr. S.D. Ind. 1990); *In re Garofalo's Finer Foods, Inc.*, 117 B.R. 363, 371 (Bankr. N.D. Ill. 1990); Michael St. Patrick Baxter, *Is There a Claim for Damages from the Rejection of a Collective Bargaining Agreement Under Section 1113 of the Bankruptcy Code?*, 12 Bankr. Dev. J. 703 (1996).  *See also Carey*,

---

[18] Dana's "split of authority" on the Unions' entitlement to damages amounts to one case.  Motion, at 46, n. 59 citing *In re Blue Diamond Coal Co.*, 147 B.R. 720, 728-32 (Bankr. E.D. Tenn. 1992), *aff'd*, *Southern Labor Union, Local 188 v. Blue Diamond Coal Co.*, 160 B.R. 574 (E.D. Tenn. 1993).  The clear weight of authority recognizes that rejection gives rise to a damages claim.

816 F.2d at 93 (a bankruptcy court must consider "the possibility and likely effect of any employee claims for breach of contract if rejection is approved").[19]  Termination of Dana's retiree health and life insurance obligations, based on Dana's calculation of its OPEB liability, would yield claims of approximately $1 billion.  Although the Unions have not yet estimated the potential damages associated with Dana's rejection of their labor agreements, such damages will be considerable as well.  The potential creation of substantial claims against the estate militates strongly against rejection.[20]

In sum, Dana cannot meet any of the requirements of Sections 1113 or 1114 and the Motion must be denied.  *E.g., In re Delta Airlines*, 342 B.R. 685 (Bankr. S.D.N.Y.) (denying motion where none of the requirements of Section 1113(c) were met); *In re U.S. Truck Co. Holdings, Inc.*, 165 L.R.R.M. (BNA) 2521, 2530 (Bankr. E.D. Mich. 2000) (rejection denied where debtor's proposal failed the "necessary" and "fair and equitable" requirements and where the debtor failed to meet and confer in good faith).

## II.    DANA IS NOT ENTITLED TO RETROACTIVE RELIEF

Dana's Section 1113 proposals purport to seek implementation dates of January 1, 2007 for many wage and benefit-related items.  Although the Motion clearly must be denied for failure to meet any of the statute's requirements, even if compliance had been perfect, retroactive relief cannot be granted under Sections 1113 and 1114.  Both statutes require that the debtor

---

[19] Moreover, there is no basis for limiting the Union's claims for future lost compensation to one year under Section 502(b)(7) of the Code.  That provision limits claims of "an employee for damages resulting from the termination of an employment contract."  11 U.S.C. §502(b)(7).  A rejected collective bargaining agreement is not an employment contract within the meaning of this provision.  *See In re U.S. Truck Co.*, 89 B.R. 618, 627-28 (E.D. Mich. 1988).

[20] Since the filing of the Motion, Dana has filed its Motion Pursuant to 11 U.S.C. §363, Authorizing Debtors to Terminate Unvested Non-Pension Benefits of (i) Non-Union Retirees and (ii) Non-Union Active Employees.  Dana's notion that there is "little prospect of large damage claims arising from its proposals" where the Debtors had a pre-petition "unilateral legal right to termination" has no application to the hourly retired benefits, all of which have been collectively bargained.

adhere to all provisions of a labor agreement, and in the case of Section 1114, to timely pay retiree health benefits without modification, following the filing of a Chapter 11 case and prohibit the unilateral change in any such provision until the Debtor has complied with the provisions of the statutes.  *See* 11 U.S.C. §1113(f), 11 U.S.C §1114(e).[21]  A debtor, therefore, may not obtain relief on a retroactive basis.  As the court in *In re Hoffman Bros. Packing Co.*, 173 B.R. 177 (9th Cir. B.A.P. 1994) explained in the context of a motion filed under Section 1113(e),[22] the plain language of Section 1113(f) prohibiting the unilateral modifications in the absence of statutory compliance compels the conclusion that no retroactive relief can be granted. *Hoffman Bros.*, 173 B.R. at 186.  Rejection, if granted under either Section 1113 or Section 1114, must be prospective only.  *See Peters v. Pikes Peak Musicians Ass'n*, 462 F.3d 1265, 1274 (10th Cir. 2006) (deeming labor agreement rejected when the court approved the rejection, not when the employer filed a motion seeking rejection, for purposes of calculating §507 claim); *see also In re World Sales, Inc.*, 183 B.R. 872, 878 (9th Cir. B.A.P. 1995) (stating that "a CBA may not be rejected retroactively").

---

[21] Section 1113(f) provides: "No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section."  11 U.S.C. §1113(f).

[22] That section permits a debtor to obtain interim modifications to a CBA where the debtor demonstrates that such changes are "essential to the continuation of the debtor's business" or "to avoid irreparable damage to the estate."  11 U.S.C. §1113(e).

## CONCLUSION

For the foregoing reasons, the Debtors' Motion must be denied.


Dated: February 23, 2007
       New York, NY

                                        Respectfully submitted,


                                         /s/ Babette A. Ceccotti
                                        Babette A. Ceccotti (BC 2690)
                                        Peter D. DeChiara (PD 0719)
                                        Bruce S. Levine (BL 2309)
                                        David R. Hock (DH 8599)
                                        Claire K. Tuck*
                                        COHEN, WEISS AND SIMON LLP
                                        330 West 42nd Street, 25th Floor
                                        New York, New York 10036-6976
                                        (212) 563-4100

                                        Attorneys for UAW and USW

                                        and

                                        Niraj R. Ganatra
                                        Associate General Counsel
                                        International Union, UAW
                                        8000 East Jefferson Avenue
                                        Detroit, MI 48214

                                        Attorney for UAW

                                        and

                                        David R. Jury
                                        Associate General Counsel
                                        USW
                                        Five Gateway Center
                                        Pittsburgh, PA 15222

                                        Attorney for USW

---

*Admitted in New Jersey only.

**EXHIBIT E**

1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   --------------------------------x

4        In the Matter

5             of                        Index No.

                                        06-10354

6        DANA CORPORATION,

7                      Debtors.

8   --------------------------------x

9                         March 26, 2007

10                        United States Custom House

                          One Bowling Green

11                        New York, New York 10004

12

13

14             EVIDENTIARY HEARING

15

16

17  B E F O R E:

18             HON. BURTON R. LIFLAND,

19                      U.S. Bankruptcy Judge

20

21

22

23

24

25

2

```
 1    A P P E A R A N C E S:
 2
 3
              JONES DAY
 4
        Attorneys for the Debtors
 5              222 East 41st Street
                New York, New York 10017
 6
           BY:  JAYANT W. TAMBE, ESQ.,
 7                STEVEN BENNETT, ESQ.,
                  PEDRO A. JIMENEZ, ESQ.,
 8
                  HEATHER LENNOX, ESQ.,
 9                ROBERT HAMILTON, ESQ.
                    901 Lakeside Avenue
10                  Cleveland, Ohio 44114
11
12
           KRAMER LEVIN NAFTALIS & FRANKEL LLP
13
                Attorneys for the Committee of Unsecured
14                Creditors
                  1177 Avenue of the Americas
15                New York, New York 10036
16         BY:    THOMAS MOERS MAYER, ESQ.,
                  THOMAS H. MORELAND, ESQ.,
17                STEPHEN D. ZIDE, ESQ.
18
19
           STROOCK & STROOCK & LAVAN LLP
20
                Attorneys for Ad Hoc Committee of Note
21                Holders
                  180 Maiden Lane
22                New York, New York 10038
23         BY:    SHANNON LOWRY NAGLE, ESQ.
24
25
```

3

1    A P P E A R A N C E S (Continued):

2

3

         COHEN, WEISS AND SIMON LLP

4

            Counsel for UAW and USW

5               330 West 42nd Street

                New York, New York 10036

6

      BY:    BRUCE SIMON, ESQ.,

7             BABETTE CECCOTTI, ESQ.,

              PETER DiCHIARA, ESQ.,

8             BRUCE LEVINE, ESQ.,

              DAVID R. HOCK, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1   P R O C E E D I N G S:

2                THE COURT:   Good morning.

3                MR. TAMBE:   Good morning, your Honor.   Jay

4   Tambe from Jones Day.

5                Before we get started with the hearing, the

6   continuation of the hearing this morning on Dana's 1113,

7   1114 motion, Dana has a discovery motion that was discussed

8   briefly with the parties and counsel, and we wish to

9   present it on the record.   My partner, Steven Bennett, will

10  be presenting that motion.

11               MR. BENNETT:   Good morning, your Honor.   We

12  had a hoped to address this as the court had indicated in

13  chambers through some negotiation we had offered to resolve

14  the matter in part by having attorney's eyes limitation on

15  the use of the materials at issues.   Apparently that's been

16  rejected so we do have to go forward and address it on the

17  record, with counsel for the unions actually wants this on

18  the record.

19               The substance of it, for the record, is we

20  have a couple of experts for the unions, one Dr. Helper and

21  the other Dr. Voos.   Both these experts are testifying on

22  matters that are, according to theirs depositions, exactly

23  the same issue as they addressed in the Delfi case.   In

24  fact their testimony and their depositions here was the

25  very first thing they did was load up a copy of their prior

5

1    report in the Delfi case; make that the basis for the

2    expert reports here, and then they made some changes.  And

3    therein lies the nub of the question here.

4              The substance of our request is we'd like

5    to see the depositions from Delfi.  We're entitled the to

6    know the basis for their opinions in this case.  Their

7    testimony immediately links the opinions in this case to

8    their opinions in the prior Delfi case.  And the

9    depositions, we believe, will demonstrate the basis for the

10   opinions in Delfi and also highlight for the court

11   ultimately whether there are inconsistencies between what

12   they said was the basis for their opinion in Delfi and what

13   they say in this case.

14              It's apparent on just looking at the expert

15   reports, it's all we've got, that there's at least one

16   glaring inconsistency between what Professor Voos said in

17   the Delfi case and what she now says in this case.  We

18   think there's probably more.  We think we are entitled to

19   explore that.  We think we can do that subject to the

20   limitations of confidentiality.  We understand that the

21   union now is taking sort of the opposite is of the view of

22   confidentiality.

23              In general for these proceedings their

24   opinion is that everything should be on record, yet somehow

25   with regard to this issue they are interested in preserving

6

1    the confidentiality of a third party, Delfi.  We think that

2    the request can be handled by simply making this as an

3    attorney's eyes only matter.  That's the first point.

4                    The second point is a smaller matter

5    related to one specific expert, Dr. Voos.  Her testimony in

6    her deposition was that about half the work in her expert

7    report is was done by another fellow, Professor Belmen.

8    And we asked for the reliance materials by Professor

9    Belmen.  In fact, Professor Voos said in her deposition

10   that she couldn't really tell what part she did and what

11   Professor Belmen did.  That to us is a strong indication of

12   what does she actually know of her own expertise and what

13   she is relying on from this fellow Professor Belmen.

14                    We think we are entitled to the

15   information.  Her testimony was she didn't even ask

16   Professor Belmen to see if he had a set of reliance

17   materials and, of course, nothing has been produced.

18   That's our position.

19                    MR. DiCHIARA:  Good morning, your Honor.

20   Peter DiChiara from the law firm of Cohen, Weiss and Simon,

21   attorneys for the UAW and the USW.

22                    First, your Honor, let me address the

23   deposition transcript of Dr. Helper that was taken in the

24   Delfi case.  Counsel for the company says somehow we're

25   interested in confidentiality in this instance.  Now he

7

1    seems puzzled as to why that may be.  Well, the reason we

2    are interested in confidentiality regarding Professor

3    Helper's deposition is that this court issued an order.

4    It's an order that was issued in the Delfi case by Judge

5    Drain on June 12th, 2006.  It's docket number 4157 in in re

6    Delfi 05-44481, and it's entitled stipulation and agreed

7    protective order governing production and use of

8    confidential and highly confidential information in

9    connection with motion for an order under Section 1113.

10                   Your Honor, if I may hand a copy of the

11   statement.

12                   THE COURT:  I'll accept your statement.

13                   MR. DiCHIARA:  Your Honor, what this

14   confidentiality order does is it provides each party to the

15   Delfi case, particularly to the 1113 proceeding in the

16   Delfi case, had the opportunity to designate as

17   confidential or highly confidential material that would be

18   used or produced in connection with that 1113 proceeding.

19                   Delfi designated Dr. Helper's deposition

20   transcript as highly confidential.  And I have here the

21   cover pages of those -- there are actually two separate

22   days of deposition.  I have the cover pages indicating that

23   they have been stamped highly confidential.  I can provide

24   those to the court if the court wishes to see those, but I

25   do represent to the court that they are designated as

8

1    highly confidential.

2              In the deposition Dr. Helper is an

3    empirical economist who is expert in the auto parts

4    industry.  She has visit the many plants, she has visited

5    the Delfi plants, she talked to the Delfi workers about

6    their pay, about the machines they used.  She was asked

7    about much of this in her deposition by Delfi's lawyers and

8    she testified under oath that about these.  Delfi

9    designated that transcript as highly confidential, and I

10    submit it did so precisely because it did not want that

11    information about its internal processes being disclosed to

12    a competitor like Dana.

13              This matter, in terms of complying with the

14    court's confidentiality order, cannot be resolved by an

15    attorney's eyes only agreement with Dana; we do not have

16    that liberty.  There's no provision in the order that this

17    court issued in the Delfi case that permits us to disclose

18    this document designated as highly confidential outside of

19    the scope of the Delfi 1113.

20              We are not at liberty to make a deal with

21    Dana to say we will give it to you under such and such

22    circumstances, so we are precluded from disclosing it.  And

23    I would submit even if this court were inclined to require

24    us to submit the it to the company, that Delfi Corporation

25    be given the opportunity to come before this court and be

9

1    heard and raise an objection, if they have an objection to

2    their document, a document that they deem to be highly

3    confidential, being disclosed to a competitor.

4               Separate and apart from the court order,

5    now moving beyond just the order which pertains to the Dr.

6    Helper transcript, there's no basis for requiring the union

7    to disclose the Professor Helper deposition transcript or

8    the Dr. Voos deposition transcript of their depositions in

9    the Delfi case.

10              When the company first indicated --

11   it did not initially, by the way your Honor, indicate it

12   wanted those deposition transcripts.  We first heard about

13   it a few days ago.  When I heard about it I sent an e-mail

14   and got on the phone with both Dr. Voos and Dr. Helper.

15   And I said point blank to them when you prepared your

16   report in this case did you go back and look at your

17   deposition transcripts from the Delfi case.  And both of

18   them told me unequivocally that they did not.

19              What they said, and they testified to this

20   in their depositions in this case, was they went back and

21   looked at their expert reports in the Delfi case.  We have

22   disclosed those expert reports.

23              The scope of expert discovery is set forth

24   by Federal Rules of Civil Procedure --

25              THE COURT:  Does the testimony in this case

1    involve the same sort of investigative activities that they

2    engaged in in Delfi?  In other words, interviewing, going

3    to its plant?

4                    MR. DiCHIARA:  Well, there are -- counsel

5    said they are the exact same issues.

6                    THE COURT:  I just asked you a question.

7    Yes, no.

8                    MR. DiCHIARA:  The answer is that Dr.

9    Helper did not go into Delfi's plants in this case.

10                    MR. LEVINE:  Dana.

11                    MR. TAMBE:  Dana's plants in this case,

12    sorry.  She did speak to individuals who have worked in

13    Dana's plants.  Dr. Voos is not an empirical economist.

14    She does all her work using, for example, Bureau of Labor

15    statistics data.  She does not do the sort of empirical

16    work that Dr. Helper does.

17                    Counsel said that the issues in the two

18    cases are exactly the same.  There are very similar issues,

19    no doubt about it, but they are clearly not the same.  They

20    are different companies, they pay different wages, their

21    1113 proposals are different, the way they structured their

22    comparisons is different, they are not identical cases.

23                    Rule 26(a)(2)(b) defines the scope of

24    expert discovery.  What it says in relevant part is that

25    the other party is entitled to discovery of material or

11

1    information that the other party considered.  That's the

2    key word considered.  Both Professor Voos and Professor

3    Helper did not, or neither of them considered their

4    deposition transcripts from the Delfi case.

5            Let me put this in some context.  As I

6    said, we have given the company Professor Helper's and

7    Professor Voos' expert reports from the Delfi case.  In

8    addition, the company propounded a document request upon

9    all of our experts, including Dr. Voos and Dr. Helper,

10    which arguably went beyond what we were required to produce

11    under Rule 26(a)(2)(b).  For example, they asked for

12    e-mails between the expert and others.

13            I think a good argument could be made that

14    we were not required to disclose that.  But in the spirit

15    of full disclosure, we provided the company we everything

16    they sought in their document request.  We have produced,

17    from Dr. Helper and Dr. Voos, hundreds of pages of

18    documents, articles, drafts, e-mails, notes.  We have given

19    them everything that they have asked for, that the experts

20    considered.

21            And not only that, your Honor, the

22    company's have taken depositions of all of our experts,

23    including Dr. Voos and Dr. Helper's.  These were all day

24    affairs; these were seven or eight hour depositions.

25            The company had every opportunity to ask

12

1    these experts anything about their reports, in this case,

2    about the report in the Delfi case, about their thinking in

3    the Delfi case, about their theories in the Delfi case; the

4    company had full opportunity for all of that.  But now they

5    want more.  What they want essentially is they want the

6    work product, the thinking of Delfi's own attorneys to

7    figure out what questions Delfi's attorneys asked and what

8    answers those elicited.  They are not entitled to that

9    because it's not something that our experts considered in

10   making their reports.  And I would note, your Honor, to

11   even broaden the context here --

12                THE COURT:  Counsel, you are yourself privy

13   to that thinking, because you you've examined those

14   transcripts.

15                MR. DiCHIARA:  I have, your Honor.

16                THE COURT:  So you do have an edge with

17   respect to the kinds of questions that have been asked of

18   your expert witnesses.

19                MR. DiCHIARA:  Not only have I read their

20   Delfi deposition transcripts, but I've met with and spoken

21   to these experts; of course we have.  They are experts

22   retained by the union, of course we have full access to

23   their thinking, that's why we have retained them to support

24   our case.

25                THE COURT:  No, I'm not talking about their

13

1    thinking, I'm talking about the thinking as you just

2    pointed out of counsel for Delfi in the kinds of questions

3    that were being propounded to your expert.

4                    MR. DiCHIARA:  Yes, your Honor, that is

5    correct.

6                    THE COURT:  So you've been exposed to the

7    blemishes, rewards and the good kinds of questions that

8    have been used in the legal strategy of Delfi competitive

9    to Dana.

10                   MR. DiCHIARA:  Your Honor, that's true, but

11   whenever there is an expert there may be any number of

12   times that that expert may have been --

13                   THE COURT:  I'm just looking at the effort

14   here to maintain a shield and to breach the shield and

15   whether it's legitimate or not.

16                   MR. DiCHIARA:  Your Honor, there's no

17   shield.  What we're trying to do is maintain -- we have

18   given the company everything these experts relied on.

19   We've pushed the envelope in terms of what we think they

20   were entitled to under the rule.

21                   THE COURT:  Do you have anything else,

22   because I'm prepared to rule.

23                   MR. DiCHIARA:  Yes, I do, your Honor.

24                   THE COURT:  Go ahead.

25                   MR. DiCHIARA:  Your Honor, let me also note

14

1    that we have received no reliance materials from, for

2    example, the company's expert witness, Dr. Wachter.  We

3    have received none of his notes, none of his drafts, none

4    of his e-mails, none of the transcripts of any depositions,

5    and he's testified in many, many Section 1113 cases.

6                    THE COURT:  Well, the issue here is Delfi

7    vis a vis Dana.

8                    MR. LEVINE:  He testified in both.

9                    MR. DiCHIARA:  Your Honor, Professor

10   Wachter testified in the Delfi case, he put in a report

11   that was very similar to what was in the Delfi case.  His

12   report in this case is very similar to what he put in in

13   the Delfi case.

14                    We, properly so, are relying on his expert

15   report in that case because that's what he considered.  So

16   we have not sought any similar advantage that the company

17   is seeking here.

18                    Let me move to Professor Belmen.  Professor

19   Belmen is someone who assisted Professor Voos in writing

20   her report.  He was not retained by the unions and he will

21   not testify in this case.  We have already produced to the

22   company everything that Dr. Voos relied on from Dr. Belmen.

23   He sent her drafts.  To a certain extent she incorporated

24   those drafts.  We have produced those drafts.  He sent her

25   e-mails, we have produced those e-mails.  He sent her

15

1    articles, we have produced those articles.

2                    Dr. Belmen testified that it was Dr. Voos

3    who made the final decision based on her expertise about

4    what to incorporate in her report, and she will be on the

5    witness stand, and she will be testifying, and she will be

6    subject to cross examination.

7                    What the company wants now is not just

8    everything that Dr. Voos relied on from Dr. Belmen, they

9    want stuff that Dr. Belmen created that he may not have

10   even shared with Dr. Voos.  Hypothetically, Dr. Belmen had

11   an idea and put it down on a piece of paper and never

12   showed it to Dr. Voos.  You are never going to hear about

13   that, because it's Dr. Voos who is our expert.

14                   The company wants to see everything.  Well,

15   your Honor, there's no provision in the Rules of Civil

16   Procedure for the direct discovery of an expert who is

17   neither retained by the party nor will testify, in fact I

18   looked to see if there's anything.  The closest thing I

19   could find is a provision it's Rule 26(b)(4)(b).  And what

20   it says is that when you have an expert that is retained

21   but will not testify, the other party can only get

22   discovery, in relevant part, under exceptional

23   circumstances, when there's no practical way for the party

24   to get at information about the subject matter that this

25   expert has.

16

1          Here the company, as I said, has gotten all

2  the materials from Dr. Voos had she relied on, has taken an

3  eight hour deposition of Dr. Voos, and has its own expert

4  on the exact same subject matter, Dr. Wachter.  So there

5  are no exceptional circumstances.  So even if Rule

6  26(b)(4)(B) were applied, there would be no direct basis

7  for the direct discovery of Dr. Belmen.  But it does not

8  apply because Dr. Belmen was not retained and is not going

9  to testify.

10          Finally, my last point, I would note that

11  Dr. Walkner, in his report, indicated that he was assisted

12  by two other economists, a Dr. Bueter and Dr. Crawford, so

13  just as Dr. Bellman assisted Dr. Voos, Dr. Walkner was

14  assisted by two other economists.  So to the extent we

15  should be required to provide all the materials Dr. Belmen

16  has, even if he didn't share them with Dr. Voos, the

17  company should be required to share all of the company's

18  work product, and all of the thinking, and all of the

19  notes, and all of the e-mails for those two economists that

20  helped Dr. Walkner.

21          Thank you, your Honor.

22          MR. BENNETT:  I know the court indicated

23  you were prepared to rule and I don't want to belabor this.

24  But the one thing about Dr. Wachter's testimony in Delfi,

25  it is not the same thing, they did not take Dr. Wachter's

17

1    deposition in Delfi.  It is not the same thing.  Not to

2    mention in Delfi the very same counsel were involved in

3    that case.  So if they had taken the deposition they would

4    have it from the Delfi case.

5                    That's all that needs to be said on that

6    sort.

7                    THE COURT:  Thank you, gentleman.

8                    What is clear is the relationship of Delfi

9    and Dana in the context of the expert reports.  To some

10   extent it does appear that the Delfi reports form a

11   foundation for expert opinions in this case.

12                   The purpose of expert witnesses is to give

13   the court information so the court can make a determination

14   based upon expertise that the court doesn't have that the

15   experts do that have.  Those experts are tested by cross

16   examination and by prior discovery.  In this case, both

17   sides indicate that some of the discovery is wanting, that

18   there's a preclusion to some extent.

19                   What is the bottom line with respect to the

20   utilization of expert testimony is the weight to be given.

21   And if it turns out, for example, that these experts are

22   not fully exposed with respect to what they relied upon to

23   the other side, cross examination cannot necessarily be

24   completely probative.

25                   I can't tell at this point who is correct

18

1    with respect to the basis for the expert witnesses, and

2    what is usually done is to go through a voir dire.  I

3    imagine there was some kind of voir dire that was exercised

4    at the time the depositions were taken.  There will be a

5    voir dire before each expert is admitted before this court

6    as an expert, and I'll await that voir dire to make a

7    determination as to the eligibility of the witness to

8    testify as to certain features based upon what the expert

9    has relied upon.

10             This is not Rashomon, although to listen to

11    counsel in chambers it may very well be.  And I'm sure

12    everybody here knows the story of Rashomon.  It is the

13    perception of an event from the eyes of one particular

14    party and the impartial, impersonal viewer sees all kinds

15    of extremes.  The event in Rashomon was either a criminal

16    act or a loving act, depending on whose looking at the

17    incident in question.

18             So we'll not have a Rashomon, we will have

19    a voir dire at the time the experts intend to appear before

20    the court.

21             MR. DiCHIARA:  Thank you, your Honor.

22             THE COURT:  You may proceed.

23             MR. TAMBE:  Your Honor, the debtors are pro

24    prepared by with the 1113, 1114 hearing.

25             As we mentioned to the parties and your

19

1    Honor, we will be calling a witness who testified on the

2    12th, and that's Christopher Bueter, and his testimony will

3    be very brief just to update the court on some developments

4    that have has occurred since the last hearing.

5              Mr. Jimenez will be examining Mr. Bueter.

6    C H R I S T O P H E R    B U E T E R,    called as a

7              witness, having been first duly sworn by the

8              Notary Public, Denise Nowak, was examined and

9              testified as follows:

10             MR. JIMENEZ:  We are ready to proceed.

11             THE COURT:  All right.

12   DIRECT EXAMINATION BY MR. JIMENEZ:

13        Q.    Mr. Bueter, when you testified on March the

14   12th, you stated you had received a letter form both the

15   UAW and USW on March the 9th asking to meet again on March

16   the 19th.  Did you meet with the two unions on March the

17   19th?

18        A.    We did meet with the two unions in on March

19   19th in Detroit.

20        Q.    Who you present at the meeting?

21        A.    The primary participants were Wendy Fields

22   Jacobs and Miguel Foster for the UAW, and Jim Robinson and

23   his administrative assistants for the USW.  There was also

24   present servicing reps from the steel worker locations at

25   Marion, Fort Wayne and Henderson, and our UAW master

20

1    bargaining representative.

2         Q.    During the meeting did the two unions

3    respond to the 1113 proposals that you had previously

4    delivered to them?

5         A.    They did, yes.

6         Q.    What was their response?

7         A.    They submitted a proposal for our review

8    that was identical to the proposal that the steel workers

9    issued on January 17th to us when we bargained in Toledo.

10   The only difference was that they inserted USW/UAW and

11   inserted their locations into that agreement and inserted a

12   paragraph on the partnership.

13            We had a side bar afterwards that we just

14   discussed, Mr. Foster, myself, Wendy Fields Jacobs, Jim

15   Robison, Rick Shaw and Bob Arket the vice president of

16   services where we were going once the initial proposal was

17   made.  And at that time -- I'm sorry, Naraj Guanatra was

18   present as well for the USW counsel.  And we talked about

19   bargaining and how bargaining was to be to proceed because

20   receiving the same proposal caused us a great deal of

21   grief.  And the communication with Mr. Robinson, after a

22   lot of discussion back and forth, was that based on the

23   information they had today they were inclined to give the

24   company absolutely nothing relative to negotiations at this

25   point in time.  His words, financial concessions, we are

21

1    not prepared to give the company any relative financial

2    concessions at this time.

3                Q.    Did the proposal they delivered to you at

4    this meeting respond to any of the terms that were

5    contained in the 1113 proposal?

6                A.    They did not have any responsive terms to

7    our proposal.

8                Q.    What about with respect to the Section 1114

9    proposals that you had previously delivered to them, did

10   they provide any response to those proposals?

11               A.    Not specifically.  In general, though, Mr.

12   Robinson acknowledged that the liabilities that the company

13   had on the books for post retirement healthcare was an

14   issue that absolutely he believed unfortunately needed to

15   be addressed, and he was prepared to set up further

16   conversations on that.  We are in the process of examining

17   some e-mails and setting up for some further dates for

18   discussion on that issue.

19               Q.    Mr. Bueter, I've handed to you Exhibit 72?

20               A.    Yes, sir.

21               Q.    Do you recognize this document, sir?

22               A.    This was the initial table that we

23   presented March 12th relative to the cost savings

24   associated with our proposals on 1113; and we we've added

25   one additional column for estimated savings for the five

22

1    plants subject to 1113.

2         Q.    If you recall, during cross examination on

3    the 12th had you were asked by the unsecured creditors'

4    committee if you knew the amount of savings that were

5    associated with respect to the five plants that are still

6    part of the 1113 motion.  Do you recall that line of

7    questioning, sir?

8         A.    I do recall that.

9         Q.    And does the total that's listed on the

10   chart here of 28 million 418 thousand 970 dollars represent

11   your estimate of the savings the company could realize with

12   respect to the five plants that are still part of the 1113

13   motion?

14             MR. LEVINE:  Objection, your Honor.

15   There's no foundation for this witness to answer that

16   question.

17             MR. JIMENEZ:  Your Honor, I'm glad to

18   produce a foundation for the question; that's fine.

19        Q.    Mr. Bueter, the savings listed next to the

20   items the last column on the right that says estimated

21   savings for the revised plan subject to the 1113 motion?

22        A.    Yes, sir.

23        Q.    Did you arrive at the figures listed on

24   this chart?

25        A.    I did.

23

1    Q.    And have these figures been provided to the

2    counsel or financial advisor to the unions?

3    A.    I believe they are have, but I don't have

4    any firsthand knowledge of that.

5    Q.    And the 28 million 418 thousand dollars

6    number at the bottom, that's a number that you arrived at?

7    A.    Yes.

8    MR. JIMENEZ:  Your Honor, at this time at

9    this time I will move for the admission of Debtor's Exhibit

10   72.

11   MR. LEVINE:  May I conduct voir dire, your

12   Honor?

13   THE COURT:  Sure.

14   VOIR DIRE EXAMINATION BY MR. LEVINE:

15   Q.    Mr. Bueter, when you say that you arrived

16   at the estimate of 28 million for the five plants, do you

17   mean that you did the mathematical calculations to come up

18   with that number, you personally?

19   A.    Yes.  We actually --

20   Q.    Mr. Bueter, did you personally arrive at

21   that estimate?  That is my question, sir.

22   A.    Yes.

23   Q.    And how did you do that?

24   A.    We went to the cost sheets that we

25   presented to Mr. Potok on March 7th and picked the

24

1     applicable categories relative to these locations.

2            Q.     When you say we, you did this with somebody

3     else?

4            A.     No, actually we being Dana, when we

5     presented the cost sheets to Mr. Potok.

6            Q.     Did you personally, not Dana, did you

7     personally --

8                   MR. JIMENEZ:  Your Honor --

9                   THE COURT:  Did you do this?  Was this

10    arrived at by a work product under your supervision?

11                  THE WITNESS:  Yes, it was.

12                  THE COURT:  I'll allow it.

13                  (Whereupon, Debtor's Exhibit 72 was

14    received in evidence as of this date)

15                  MR. JIMENEZ:  Your Honor, I have nothing

16    further for Mr. Bueter.

17                  THE COURT:  It's received.

18                  MR. MAYER:  Your Honor, Tom Mayer for the

19    creditors committee.  This document --

20                  THE COURT:  You asked the original

21    question.

22                  MR. MAYER:  Yes.

23                  THE COURT:  Go ahead.

24                  MR. MAYER:  Thank you, your Honor.

25                  Your Honor, we just this got this exhibit.

25

1    May we have five minutes, we may not need to cross, but I

2    need five minutes to talk to somebody before we do.

3                    MR. LEVINE:  Well, I do have cross

4    examination.

5                    MR. MAYER:  Do you --

6                    THE COURT:  He was asking for a five minute

7    recess.

8                    MR. LEVINE:  All right.

9                    THE COURT:  Yes.

10                   MR. MAYER:  Thank you, your Honor.

11                   (Recess taken.)

12                   MR. MORELAND:  Your Honor, if I might, I

13   have a few questions on behalf of the committee.

14                   THE COURT:  Yes.

15   EXAMINATION BY MR. MORELAND:

16        Q.    Tom Moreland with the creditors committee.

17   Good morning.

18        A.    Good morning.

19        Q.    With respect to Debtor's Exhibit 72, the

20   first savings are estimated at 28,481,970 million; is that

21   correct?

22        A.    Yes, sir.

23        Q.    Does that number represent anything

24   contributable to the Marion plant?

25        A.    It does.

26

1          Q.      How much of that is related to the Marion

2    facility?

3          A.      Approximately 10 million dollars.

4          Q.      Am I correct that the debtors have an

5    intention to close either the Marion or the Lima plants,

6    one of the two?

7          A.      Yes, sir.  We haven't made the decision

8    yes, but yes, one of those two.

9          Q.      And am I correct that if the Marion plant

10   is closed, that closer would realize the savings that are

11   include in this 28 million?

12         A.      Yes.  Those savings would be captured in

13   our manufacturing footprint bucket.

14         Q.      So in that event the savings attributable

15   to the 1113 relief would be 18 million?

16         A.      That's correct, if Marion were selected.

17         Q.      Now these members numbers relate to the

18   first year's savings?

19         A.      That's correct.

20         Q.      Do you have an estimate of whatever savings

21   would result from the 1113 relief after the first year?

22         A.      I do not, with me.

23         Q.      Is there some reason why you've been

24   unable to calculate that figure?

25         A.      No.  There is a pick up in subsequent

27

1    years, but at a descending rate based on our second tier

2    levels and some fethering in of cost of living adjustments

3    that we've proposed for the elimination, but the numbers

4    were are available I don't have them here.

5            Q.    Am I correct that with the exception of the

6    Marion plant all the collective bargaining agreements for

7    the plants affected by the 1113 motion will be expiring by

8    their own terms in the year 2008?

9            A.    I believe that's correct, except Marion, as

10   you indicated, yes.

11           MR. MORELAND:  Thank you.  No further

12   questions.

13   EXAMINATION BY MR. LEVINE:

14           Q.    Mr. Bueter, I do want to walk through this

15   exhibit a little bit with you.

16           A.    Okay.

17           Q.    But I do also want to ask you a few

18   questions about how it was prepared.

19           A.    Okay.

20           Q.    You said that it was prepared at your

21   direction?

22           A.    That's correct.

23           Q.    Is that correct?

24           A.    In response to the unsecured creditors

25   question last time we were here, which I couldn't answer.

28

1          Q.      And the question that you couldn't answer

2    last time was how much the company was seeking from the

3    unions in connection with the 1113 proposals; is that

4    correct?

5          A.      That's correct, they wanted a break out

6    from the 61.9 of the facilities that were specifically

7    subject to the 1113.

8          Q.      And that's an answer that you couldn't give

9    until this weekend; is that correct?

10         A.      That's correct.

11         Q.      So that to the extent that there have been

12   any discussions with the unions dating back to, say,

13   October of 2006 -- November of 2006, this basic

14   information, which we call an ask in negotiations, has not

15   been a part of negotiations; is that correct?

16         A.      I guess I'm not following your question.

17         Q.      Have you advised the unions until this

18   weekend the amount of money that you seek from the unions

19   in connection with your 1113 proposals?

20         A.      Yes.

21         Q.      But you said that document -- Debtor's

22   Exhibit 72 which has been received in evidence, was not

23   prepared until this weekend; is that correct?

24         A.      That's correct.

25         Q.      So this information was just made available

29

1    this weekend and not before, correct?

2           A.    No.  It was provided to Mr. Potok on March

3    7th when we provided the cost sheets for each individual

4    location.

5           Q.    And it is your sworn testimony that the

6    information that you provided to Mr. Potok on March 7th

7    replicates the information that is now found on Debtor's

8    Exhibit Number 72.  Is that your sworn testimony, Mr.

9    Bueter?

10          A.    Yes.  I think the only thing that wasn't

11   available to Mr. Potok or wasn't there, was the long term

12   disability savings because that's an overall corporate

13   savings and wasn't specifically assigned to each of the

14   facilities.

15          Q.    Now on the first row going horizontal, and

16   in the third column there is a figure for wage reductions

17   of 6 million 644 thousand 661 dollars is that correct?

18          A.    Yes, sir.

19          Q.    Now there was another document summarizing

20   the wage reductions produced earlier in the week that had a

21   different number; is that correct?  Are you aware of that?

22          A.    No.

23          Q.    You are not aware of it?

24          A.    No, I am not.

25          Q.    Now in preparing the estimates that are

30

1    contained in the third column, what, if anything, did you

2    do, including what direction you might have given to anyone

3    at Dana to prepare this?

4        A.    I went to the cost sheets for Henderson,

5    Elizabethtown, Auburn Hills, Fort Wayne and Marion, which

6    were the five plants under 1113 and pulled off, to the best

7    of my ability, those items that are identified in this

8    proposal for the line items.

9        Q.    And you did that yourself?

10       A.    Yes.

11       Q.    Did you do that with the assistance of

12   anyone else?

13       A.    Member of my department, but primarily by

14   myself.

15       Q.    People who directly report to you?

16       A.    That's correct.

17       Q.    And were you asked to produce this document

18   in connection with the litigation, or was it for the

19   purposes of negotiation?

20       A.    No, it was actually for the purposes of

21   litigation to respond to the unsecured creditors' question.

22       Q.    Now, looking at the estimated savings for

23   the five plants with respect to wage reduction, we have

24   about 6 and a half million dollars and change; correct?

25       A.    Yes, that's correct.

31

1          Q.      How did you compute that number?

2          A.      I simply calculated the costs per hour that

3    we were requesting from each of the locations.

4          Q.      When you say costs per hour, are you

5    talking about the hourly wage rate?

6          A.      Right, the dollars per hour that we were

7    requesting in reductions from Auburn Hills, Fort Wayne and

8    Marion; multiplied that by 19 hundred hours times the

9    number of employees and came up with that number.

10         Q.      Now, when you say the number of employees,

11   what are you referring to?

12         A.      The head count of the facility at a given

13   time, specifically at the end of year '06.

14         Q.      So you are basing your estimates with

15   respect to first year savings on the head count that

16   existed at the five 1113 facilities, we'll call it that.

17         A.      Yes.

18         Q.      As of December of 2006?

19         A.      As of December 31st or 1/1/07, yes.

20         Q.      Fair enough.  Now is that number the same

21   now as it was on December 31 or January 1?

22         A.      I don't know the answer to that.

23         Q.      Let me ask you this; isn't it fair to say

24   that at many of the facilities including 1113 and non 1113

25   facilities, that Dana has in the United States, isn't it

32

1    fair to say that the head count on average has been reduced

2    over the last several years?

3           A.    It has been reduced.

4           Q.    Let's talk about Fort Wayne.

5           A.    Okay.

6           Q.    How many employees worked at Fort Wayne in

7    say 2000?

8           A.    Oh, probably close to 2000 employees.

9           Q.    And how many employees are there now?

10          A.    405, if I recall correctly.

11          Q.    And how many employees did the company

12   expect, if you know, to have at Fort Wayne a year from now?

13          A.    I do not know that.

14          Q.    In fact, isn't it correct that the number

15   could very well be much less?

16          A.    I think that's true, yes.

17          Q.    And so, taking a head count snapshot as of

18   December 31 or January 1, doesn't tell us much unless we

19   assume that the head count during the first year, which is

20   the only year you can make an estimate at the five 1113

21   facilities, will remain constant; is that fair to say?

22               MR. JIMENEZ:  Your Honor, objection.  I'm

23   not sure how this relates to the scope of the two matters

24   which we put up for Mr. Bueter.

25               THE COURT:  I'll allow it.

33

1          A.      No, I guess I wouldn't say it.  And the

2    reason I wouldn't say that is I've presented to the Fort

3    Wayne union the opportunity to limit or eliminate the loss

4    of further head counts with concession bargaining, so that

5    being a possibility.  So I think it's very fair to say that

6    we could very well remain at that head count.

7          Q.      Is it your testimony to this court then

8    that the head count at the 1113 facilities is a matter for

9    negotiation?

10         A.      Certainly that's an issue for negotiations.

11         Q.      And that is not part of any of the 1113

12   proposals; isn't that correct?

13         A.      No, sir, it is not.

14         Q.      But that's something that you've discussed

15   with the Fort Wayne union, the local union I assume you are

16   talking about?

17         A.      Yes, sir, I've discussed that with Fort

18   Wayne as well as Lima and Pottstown during master

19   bargaining.

20         Q.      And those discussions that you

21   had with those local unions aren't included in your

22   declaration presented to this court relating to the kinds

23   of negotiations, the number of meetings that have been held

24   prior to coming to this court for the requested relief.  Is

25   that fair to say?

34

1          A.     That is fair to say.

2          Q.     In fact, there's been a number of

3    conversations --

4                 MR. JIMENEZ:  Your Honor, objection.  This

5    is argument.

6                 THE COURT:  Overruled.

7          Q.     In fact, there have been any number of

8    conversations that you have had with UAW and/or USW

9    officials at the local and/or international level since

10   November or so that aren't included in your declaration

11   which purports to set forth the meetings that you have had

12   or the negotiations that you have had with the unions;

13   isn't that correct?

14         A.     Well, there's a difference between

15   discussions and negotiations.  I've had plenty of

16   discussions with my colleagues in the USW and UAW.

17   Negotiations are an entirely different matter.

18         Q.     Explain to me -- sorry, are you through?

19         A.     Yes.

20         Q.     Explain that to me, sir, there is a

21   difference between negotiations and discussions with the

22   parties with whom you are negotiating?

23         A.     Yes.  Oftentimes we have discussions on a

24   daily basis about day to day issues; can you clarify this,

25   can you work through that.  Negotiations are of a more

35

1     formal proposals, discussions trying to correct a labor

2     agreement, fix a labor agreement, change something in the

3     context of the labor agreement.

4          Q.    Is it your sworn testimony that that

5     distinction --

6          THE COURT:  Counsel, you could eliminate

7     the prefix.  We know that he's on the stand and he's been

8     sworn.  I'm aware of that and everybody else is?

9          MR. LEVINE:  I understand that, your Honor.

10    I will know longer remind the witness that he's under oath,

11    and I apologize to the court for cluttering the record.

12         Q.    Mr. Bueter, is it your testimony that your

13    declaration reflects all of those negotiations you've have

14    had with the UAW and/or the USW, but does not include daily

15    discussions?

16         A.    I think the context of my declaration

17    discusses the communications we had on information

18    exchanges, and that is, to the best of my recollection, the

19    true and accurate record.

20         Q.    Let's go back to March 19 which you did

21    testify in that.

22         A.    Yes, sir.

23         Q.    You talked about two different sessions.

24    You talked about a session, I believe, tell me if I'm

25    wrong, that involved a larger group?

36

1          A.      Yes.

2          Q.      And at that session there was a counter

3    proposal tendered by the USW/UAW coalition bargaining

4    group; is that fair to say?

5          A.      Actually it was e-mailed to me the Friday

6    before, but yes, we were there to discuss that proposal.

7          Q.      That was the purpose of the proposal?

8          A.      Yes, that's correct.

9          Q.      Now, were you there to discuss it or to

10   negotiate?

11         A.      Well, that depends on how you looked at it.

12   Once we received the proposal we were there to discuss the

13   differences and to consider whether there were some common

14   grounds for agreement.

15         Q.      Mr. Bueter, you made the distinction

16   between the negotiations and discussions for a bargainer, I

17   did not make that distinction.

18         A.      That's correct.

19         Q.      So I am asking you, sir, was that first

20   session a negotiating session or a discussion, as you

21   described the distinction between those two terms?

22         A.      We were there to negotiate the next labor,

23   or attempt to the next labor agreement.

24         Q.      And after that there was a smaller meeting;

25   is that correct?

37

1          A.      That is correct.

2          Q.      Now was that a negotiation session or

3     discussion session?

4          A.      That was both.  The line does not clearly

5     get drawn between discussion and negotiation.  We were

6     attempting, both parties, to try to find some common ground

7     away from our constituencies so we could work through these

8     issues and try to find a labor agreement.

9          Q.      Was that an off the record

10    discussion/negotiation with the people with whom you sit

11    across the table for the purpose of coming to an agreement?

12         A.      I do not come to any forum, sir, and

13    discuss off the record meetings.  If it is off the record,

14    it is off the record.  That meeting was not conducted off

15    the record.

16         Q.      Mr. Bueter, are the unions in this case to

17    assume that any discussions that they have with you for the

18    duration of this proceeding on the record discusses?

19         A.      No, sir.  With we clearly have identified a

20    number of meetings before this period, and I'm sure that

21    I'll conduct afterwards that I'm sure will be off the

22    record.

23         Q.      And it is your testimony as you sit here

24    today that that second session, discussions/negotiating

25    session that you said you had, was not an off the record

38

1    discussion?

2           A.      That's correct.

3           Q.      And none of the negotiating sessions in

4    your declaration include any of those off the record

5    negotiations/discussions you may have had with UAW and/or

6    USW officials since October of 2006; is that correct?

7           A.      As I indicated, I don't discuss or share

8    off the record meetings in a public forum.

9           Q.      And you wouldn't expect your colleagues who

10   sit across the table from you to do that either, would you?

11          A.      Absolutely not.  If we are off the record,

12   I would not expect that.

13                  MR. LEVINE:  I have no further questions,

14   your Honor.

15                  THE COURT:  Any redirect?

16                  MR. JIMENEZ:  None, your Honor.

17                  THE COURT:  Thank you.

18                  (Witness excused)

19                  THE WITNESS:  Thank you, your Honor.

20                  MR. TAMBE:  Your Honor, the debtors would

21   next call Mr. Ted Stenger.

22                  If I may approach with a binder?

23                  THE COURT:  Yes.

24   T E D    S T E N G E R,    called as a witness, having

25                         been first duly sworn by the Notary

1    Public, Denise  Nowak, was examined and testified as

2    follows:

3    EXAMINATION BY MR. TAMBE:

4           Q.    Good morning, Mr. Stenger.

5           A.    Good morning, Mr. Tambe.  How are you?

6           Q.    Would you please introduce yourself to the

7    court?

8           A.    My name is Ted Stenger I'm the chief

9    restructuring officer of the Dana companies.

10          Q.    Could describe briefly, Mr. Stenger, what

11    it is that you have done as the chief restructuring officer

12    of the Dana companies the last year or so?

13          A.    Certainly.  I report directly to the CEO

14    Michael Burns.  I'm one of the senior executives in his

15    team, and I have been charged with leading and

16    coordinating, to different degrees, the restructuring

17    initiatives that the company has in place, including

18    customers, facilities, labor and employee related, as well

19    as our restructuring in the United Kingdom, some of our

20    divestiture and acquisition activities.

21          Q.    If you could give the court the benefit of

22    your experience.  You had identified your prior

23    restructuring advisory retentions, please?

24          A.    Yes.  I've been most recently as a

25    restructuring advisor, kind of in reverse order.  I was the

40

1    restructuring advisor on Oxford Automotive, which was an

2    automotive related Chapter 11.  I was the chief

3    restructuring officer of the Flemming Companies, which was

4    a retail and wholesale distribution company.  Prior to that

5    I was a member, as the treasurer of the senior management

6    team at the K-Mart companies.  Prior to that I was advisor

7    restructuring advisor to the management of Fruit of the

8    Loom, also to the Leslie Faye companies and served as a

9    interim COO for American Rice Co., which is a food products

10   company.

11           Q.    Approximately, for how many years have you

12   been engaged as a restructuring advisory professional?

13           A.    I guess my initial assignment was in the

14   early 80s working for the loan guarantee board of the bail

15   out of Chrysler.  So it has been a better part of about 25

16   years now.

17           Q.    There's a witness binder before you, Mr.

18   Stenger.  If you could turn to Tab 1 which is debtors'

19   Exhibit 300.  And towards the end of that exhibit there's

20   an Exhibit A, the last two pages.

21           A.    Give me one second, please.

22           Q.    Sure.

23           A.    Yes, I'm on Exhibit 300 Exhibit A in the

24   back.

25           Q.    Yes.  Is that a copy of your current

41

1    resume, sir?

2            A.      Yes, it is.

3            Q.      Does that accurately describe the range of

4    your professional experience?

5            A.      Yes, it does.

6            Q.      And does it identify your professional and

7    business affiliation, sir?

8            A.      Yes, it does.

9            Q.      And down at the bottom of page 1 over to

10   page 2 and page 3, does it list some of the articles and

11   speeches that you've offered?

12           A.      Yes, it does.

13           Q.      Now, Exhibit 1, at Tab 1, Exhibit 300.

14   Could you describe for the court what that document is; the

15   entire document behind it?

16           A.      The entire document is a declaration that I

17   prepared as chief restructuring officer, and as a

18   restructuring advisor from Alix Partners, related to the

19   1113 and 1114 motions.

20           Q.      And if I could turn your attention in

21   Exhibit 300 to paragraph 15?

22           A.      Yes, I have paragraph 15.

23           Q.      And I'll read that paragraph.  "As detailed

24   below, the debtors will not be able to achieve the level of

25   improvement in their operating profit margin that is

42

1    necessary for them to emerge from Chapter 11 as a viable

2    and sustainable enterprise unless this court authorizes

3    them to reject their collective bargaining agreement and

4    modify their retirement and benefit obligations as set

5    forth in the debtor's proposals with the unions and retiree

6    committee."

7                    Is that a summary of the opinion that you

8    reached in this case Mr. Stenger?

9          A.    Yes, paragraph 15 is a summary with the

10   summary being that it would be necessary for the company to

11   have a viable and sustainable entity to reorganize to get

12   the labor related savings and retiree related savings that

13   we've put forth in our restructuring initiatives, which

14   include the union related.

15         Q.    And, Mr. Stenger, the recent developments

16   that have taken place, the settlements that have been

17   reached between the debtors and retiree committee and the

18   machinists union, would those alter the summary of your

19   opinion in any way?

20         A.    No, they did not.  My opinion assumed that

21   we would be successful in both aspects, both with the IAM

22   and with the nonunion retirees of obtaining those benefits.

23                    MR. TAMBE:  At this time, your Honor, the

24   debtors would offer Mr. Stenger as an expert in structuring

25   advisory services and would tender his Exhibit 300 hundred,

43

1    his declaration.

2                    MR. SIMON:  No objection to his

3    designation.

4                    THE COURT:  So designated.

5                    THE WITNESS:  Thank you, your Honor.

6                    MR. TAMBE:  And the exhibit is admitted as

7    well, your Honor, Exhibit 300.

8                    THE COURT:  Received.

9                    (Whereupon, Debtor's Exhibit 300 was

10   received in evidence as of this date)

11   BY MR. TAMBE:

12           Q.    If we could talk for a while and describe

13   the nature of Dana's business, broadly speaking?

14           A.    Yes.  Dana is a worldwide tier one

15   automotive supplier.  The business predominantly falls into

16   two groups, one that's very focused on our automotive

17   systems and automotive vehicles, which would be passenger

18   cars basically through heavy pickup trucks and SUVs, that

19   accounts for about 65 percent of companies revenues which

20   approximate for this year about 8.5 billion dollars in

21   total.  The other part of the business is our heavy

22   vehicles group which is about 35 percent and really service

23   the, if you will, truck and off highway market, so

24   construction equipment mining equipment ago consult which

25   you are equipment.  Those were would be the two main areas

44

1   that we operator in on a business in a world wide basis.

2          Q.     Just to get an idea of what it is Dana

3   manufactures if you can turn to Tab 2 in your binder?

4          A.     Yes.

5          Q.     There are a number of exhibits behind Tab

6   2; if we could start with what's been marked as Debtor's

7   Exhibit 37, if you could describe for the court what that

8   is?

9          A.     One of the segments which is in the

10  automotive systems group, it is our structured solutions

11  group which basically makes frames for pickup trucks and

12  SUV.  Here's a picture of a Ford F150 series pickup truck

13  which is a major platform for us not only in our structured

14  products group but in our other business unit.  And you can

15  see there the metal frame that we built in our

16  Elizabethtown facility as well as our Saint Mary's Ontario

17  facility.

18                 MR. TAMBE:  Your Honor, we would offer

19  Exhibit 37 into evidence.

20                 MR. SIMON:  No objection.

21                 THE COURT:  Received.

22                 (Whereupon, Debtor's Exhibit 37 was

23  received in evidence as of this date)

24  BY MR. TAMBE:

25          Q.     If you could turn to Exhibit 38?

45

1          A.      Yes.

2          Q.      And can you describe what's shown in

3     Exhibit 38?

4          A.      Yes.  38 shows our torque products which

5     are basically crank shafts which are designed to take power

6     from the engine to the drive wheels effectively.  And

7     you'll see we serve both the light duty vehicles, crossover

8     vehicles, pickup trucks like the Tacoma, all the way

9     through industrial products which might be -- which is that

10    you can actually see there's a person there, so this is

11    like 10 times taller than a person.  And those would be in

12    like power plants and printing presses, large manufacturing

13    installations, and in-between is heavy duty and off highway

14    products.

15               MR. TAMBE:  We would offer Exhibit 38 into

16    evidence.

17               MR. SIMON:  No objection.

18               THE COURT:  Received.

19               (Whereupon, Debtor's Exhibit 38 was

20    received in evidence as of this date)

21          Q.      And moving on to Exhibit 39, Mr. Stenger,

22    if you could describe what is shown in Exhibit 39?

23          A.      Yes.  One of our other major product

24    offerings both in automotive systems as well as for

25    commercial and heavy vehicles are traction products, axles

46

1    and chaises.  And we would make, in the first picture on

2    the upper left we would make almost that whole entire

3    product offering in terms of the gears and it's form parts.

4    Then it goes around and shows chaises where request made

5    provide not only some of the units there but would by

6    brakes and other components from other vendors fit them up.

7    This is basically ready to put into the frame and

8    effectively attach wheels to.

9             The other part would be power transfer

10   units down at the left hand bottom that we manufacture.

11             MR. TAMBE:  We would offer Exhibit 39 into

12   evidence.

13             MR. SIMON:  No objection.

14             THE COURT:  Received.

15             (Whereupon, Debtor's Exhibit 39 was

16   received in evidence as of this date).

17        Q.    If you could describe briefly, Mr. Stenger,

18   what has been the nature of the challenges facing the

19   automotive industry, especially in North America?

20        A.    The automobile industry in North America,

21   as well as the tier one supplier industry, has been under

22   constant competitive pressure for the last four or five

23   years.  You can see that as you look at the landscape of

24   major companies that have filed bankruptcy, you can look at

25   that when you see the kind of loss performance and market

47

1    shared deterioration of many of what we refer to as the OEM

2    companies here in the US.  As they have lost market share,

3    pressures that's put on the supply chain have been

4    enormous.

5                    At the same time, because of world markets,

6    the commodity prices for things like steel, aluminum

7    nickle, and other commodities has continued to rise, and

8    we've had an inability to pass that on to our customers,

9    who have been similarly unable to pass that on to their

10   consumers.  So it is has been very competitive, and there's

11   been a lot of restructuring in Chapter 11 as well as

12   outside Chapter 11 with plant closers, facilities

13   rationalizations, and more orientation towards a global

14   supply chain as opposed to a north American supply chain.

15          Q.     Now whether you work as the chief

16   restructuring officer of Dana and preparing your

17   declaration did you rely on any reports that were prepared

18   by third parties?

19          A.     Yes, I did.

20          Q.     And Global Insights, is that a company

21   whose information and data that you incorporated into your

22   analyses?

23          A.     Yes.  Global Insights is something that the

24   company uses regularly for assessing not only historic but

25   future perspectives as to industry projected volumes.

48

1          Q.      And are you familiar with an industry

2   called The Center for Automotive Research?

3          A.      Yes, I am.   It's a research organization, a

4   not for profit in Ann Arbor, Michigan.

5          Q.      And have you reviewed the work that had

6   been done by the CAR?

7          A.      Yes, I've been several reports that have

8   been prepared by The Center for Automotive Research.

9          Q.      And did you find information in those

10  reports to be relevant in your analyses?

11         A.      Yes I did.

12         Q.      If you could turn in the binder before you

13  in Tab 3?

14         A.      Yes.

15         Q.      And identify before you what that document

16  is which is Debtor's Exhibit 216?

17         A.      Yes.   This is a presentation that was made

18  in September of 2006 by the center for automotive research

19  that was given I think to I understand January in an

20  economic authority but it basically goes through trends in

21  automotive industry it also discusses some things similar

22  to forward G M amount and Chrysler.

23         Q.      And did you rely on some of the information

24  contained in Debtors' Exhibit 216 in forming your opinions

25  in this case?

49

```
 1              A.      Yes, I did.

 2                      MR. TAMBE:  Your Honor, we would offer

 3   Debtor's Exhibit 216 into evidence.

 4                      MR. SIMON:  Object to it as hearsay, your

 5   Honor.

 6                      THE COURT:  Overruled.

 7                      MR. SIMON:  Is your Honor accepting it for

 8   the truth of the matters contained?

 9                      THE COURT:  You didn't ask me if I had

10   any --

11                      MR. SIMON:  I objected on hearsay, I'm

12   asking --

13                      MR. TAMBE:  Your Honor, my response --

14                      MR. SIMON:  I would object more

15   specifically, your Honor, to relying on the truth of the

16   matters asserted in the document.

17                      MR. TAMBE:  My response would be two fold,

18   your Honor, both under Rule 703 and Rule 803, this is

19   admissible as reliance material relied upon by the expert.

20                      THE COURT:  It's received.  Overruled.

21                      (Whereupon, Debtor's Exhibit 216 was

22   received in evidence as of this date)

23                      MR. TAMBE:  Thank you, your Honor.

24   BY MR. TAMBE:

25              Q.      If I could turn your attention, Mr.
```

50

1    Stenger, to slide 17, page 17 in Debtor's Exhibit 216?

2         A.    Yes.

3         Q.    Is there information on that slide that was

4    relevant to your analysis sir?

5         A.    Yes.  In effect it's one of the things I

6    mention the in my declarations is that one of the things in

7    North American America is the automotive light vehicle

8    market is expected to remain basically on a -- it has been

9    flat, bouncing around in 17 million units, it is expected

10   basic to have relatively weak growth going forward, not

11   here but it's in the global insight projections so what

12   this says is the market here in northbound America will

13   continue to be basically stable, low growth and that to

14   basically build market share you are going to have to take

15   market share so that growth is Boeing going to be based on

16   market share changes.

17        Q.    In terms of the mix of product, what are

18   have the trends been with respect to the change in the mix

19   of product?

20        A.    Yes.  This also there's a yellow band there

21   your Honor which is basically related to cross over sport

22   utility vehicles and cross over utility vehicles which are

23   effectively vehicles that are now configured based on

24   passenger car platforms and given the attributes of utility

25   vehicles or sport utility vehicles.  That's becoming a

51

1    bigger category.  It's important for Dana because we do not

2    participate as much in the crossover vehicles as we do in

3    the what would be more traditional sport utility vehicles

4    and utility vehicles.

5              For example, the frame for the Ford F150

6    that we looked at earlier is something that crossover

7    vehicles do not use since they have unibody, they do not

8    have big frames like that, so we are not able to

9    participate in that.  That's become a bigger part of the

10   marketplace, taking both from passenger car volumes as well

11   as from the truck volumes.  And again, we're very much more

12   heavily weighted in automotive toward truck volumes.

13        Q.     If you could turn the page, Mr. Stenger, to

14   page 18?

15        A.     Yes.

16        Q.     Is there information to that on that page

17   relevant to your analysis?

18        A.     Yes.  As I said in the previous exhibit

19   which really went to sales, this really looks at what have

20   the trends been of actual production of vehicles in the US.

21   And you can see here that it is has been relatively flat in

22   the neighborhood of 12 million units and is expected to

23   remain so going forward.

24        Q.     If you could move forward in Exhibit 216 to

25   page 59, it's the one that's got supplier table of pain?

52

1          A.      Yes, sir.

2          Q.      And was there information on this page

3    relevant to your analysis?

4          A.      Yes, actually this I think is a very good

5    summary of a couple things I've alluded to.  If you look

6    first at the new car and truck consumer price index for the

7    98 to 2 thousand period.  The actual price to consumers the

8    by off the lot has gone down 3.8 percent.  At the same time

9    those vehicles have better safety, better features and a

10   better value equation so that the vehicle has become better

11   and more technologically advanced at the same time it has

12   been reduced in price.

13              At the same time if you drop down, you can

14   see, your Honor would have a -- I should have pointed out,

15   but it's notable in almost all of our products we have very

16   high content of commodities like steel and specialty bar

17   products steel, alloids mixed.  You can see that on cold

18   world steel during this same period of, time we've had

19   almost a 50 percent price increase, hot rolled steel again

20   almost 50 percent aluminum which is an alloy used in a

21   number of our products as well as straight up in our

22   thermal and ceiling products has gone up 67 percent.

23              You can see that for the parts industry

24   supplying to the automotive that the commodity prices of

25   which Dana ends up with almost 60 percent of its cost being

53

1    materials and services that are purchased from third

2    parties having up substantially in this period, which

3    indicatates that while our costs stream has gone up we have

4    not been able to, as noted in my declaration, have not been

5    able to pass those onto the OEM customers because they have

6    been unable to pass those onto the consumers.

7         Q.    And if you could turn to page 64 in Exhibit

8    216?

9         A.    Yes.

10        Q.    And is there information on that page that

11   was relevant to your analysis?

12        A.    Yes this is an interesting graph.  It shows

13   the friends from 97 to 2005.  I draw your attention to

14   really the yellow.  In the yellow bar here is basically

15   parts that are purchased in the US market but are purchased

16   by no one US companies which would be companies like

17   Toyota, Nissan, BMW, Mercedes Benz who have located what I

18   refer to as transplant facilities here.  That's what's

19   happened as since '97 to 2005 the amount of the US parts

20   market being directed by transplant customers, the non

21   traditional big three in the North America American market

22   has moved from 12 to 30 percent.

23             Now why is that important?  That's

24   important because they have bought relationships with them.

25   As they have come to North America to bring suppliers from

54

1    their global supply chain to be here to compete with the

2    North American suppliers like Dana.  Similarly, in the way

3    that Dana has moved into a global footprint so that we can

4    serve our global customers like International, Harvester,

5    Packard, Ford, Renault, Toyota and Nissan.  Again, a trend

6    that has made the competitive environment here in North

7    America that much sharper.

8                     For example, many of the competitors who

9    have come in a similar way that which the transplant

10   manufacturers have come and established facilities, new

11   facilities that do not have, for example, legacy costs,

12   many of them do not have -- almost all of them do not have

13   global do not have define benefit retiree programs.  So

14   they are coming with a competitive advantage as they set up

15   the shop here in this North American market that

16   established players are not able to replicate, other than

17   through negotiation and structuring change that is dramatic

18   which is dramatic, which is what we have talked about here

19   in our proposals.

20              Q.    Would that information as a backdrop, if

21   you could tough briefly about what has the effect be on

22   Dana's financial performance in the hat past five years

23   overall the these changes in the industry?

24              A.    Dana's financial performance in North

25   America for the past five years has continued to

55

1    deteriorate in the five year period the losses from US

2    activities have been approximately 2 billion dollars.  This

3    year the losses will approximate I think it's 443 million

4    dollars.  If you back out from that this year being in

5    bankruptcy there's a lot of restructuring and other costs

6    related to that.  That run rate goes from 443 to a negative

7    325.

8                So on a business, a global business, where

9    our income EBITDAR in total is going to be about 270 this

10   year for 2006, that is in spite of an operation US losing

11   basically 450 million dollars in that period.

12        Q.    Mr. Stenger, you said this year a couple of

13   times.  I just want the record to be clear.  The US losses

14   that you were referring to, the 450 million dollar number,

15   that is for full year 2006 performance?

16        A.    Yes, that would be for calendar year 2006.

17        Q.    And that's a number that has been made

18   public in the most recent SEC filings?

19        A.    Yes, that's in the most recently filed

20   10-K.

21        Q.    You mentioned a couple of times the impact

22   of the US operations and the loss it's of the US

23   operations.  Does Dana need to be competitive in the US?

24        A.    Yes, I believe that for long term viability

25   Dana needs to be competitive in the US.  We are a global

1    company.  We have little over half of our sales here.

2    We're heavily invested in technology, in assets, in people

3    in North America.  We have the our three -- three of our

4    largest customers are based in North America.  Out of the

5    top eight customers or nine customers that the company has

6    consolidated I think accounts for 70 percent of the sales

7    all of those customers has significant sales in North

8    America whether they are US or Toyota or Nissan all have

9    significant operations.  To be a global supplier to these

10   customers we need to have global capability and that

11   includes North America.  I think typically when people are

12   talking about global we need to be in Asia we need to be in

13   China we need to be in India, we also need to be in North

14   America.  We need to serve this market.  The North American

15   automotive market is the largest volume market in the

16   world.  It's hard to be a global world player and not

17   participate in the biggest market in the world.

18        Q.    Can Dana in your opinion compete in the US

19   market with its present cost structure?

20        A.    No, it did not.

21        Q.    Can Dana compete the in the US market by

22   funding its US operations with profits from overseas?

23        A.    Funding the US losses on a short term basis

24   during the restructuring is our strategy now.  We have

25   taken on more debt, we've sold Katrog, we are repatriating

57

1    cash from Europe back to the US to fund a significant

2    turnaround of these US operations.  Long term it is not

3    going to be possible to take the earnings made off shore

4    and redirect those to the US if the US is not fixed.  Our

5    competitors are not doing that.  Our competitors are in a

6    position where in each of the marketplaces they are looking

7    to reinvest and make competitive capabilities in each of

8    those markets to the extents Dana were to continue to

9    compete globally and continue to have to fund ongoing

10   losses in North America of 3 or 4 hundred million dollars

11   we would be at a distinct competitive disadvantage to the

12   other global players who did not have that kind of negative

13   drag in North America or their other operations for that

14   matter.

15        Q.    Now, Mr. Stenger, you were one of the

16   principal architects of identifying and presenting the

17   restructuring initiatives that Dana has identified,

18   correct?

19        A.    That's correct.

20        Q.    If you could describe for the court briefly

21   the principal steps that went into that analysis into

22   identifying restructuring initiatives, if you could?

23        A.    Certainly willing.  It was basically a four

24   step process.  The first step was looking at competitors

25   and what kind of operating financial metrics did they V

58

1      what did we need to be competitive.  That was basically the

2      first step.

3                    The second step was then to say having

4      developed a competitive set and what metrics we looked at

5      we selected one to drive our restructuring around which was

6      EBIT.  We said with that range of EBIT that we would need

7      to be competitive where are we today.  What's our base

8      business, and how much do we need to improve that basis

9      business through either pricing or could the restructuring

10     to get to a point where we have competitive performs?

11          Q.     You said it was a four step process what

12     was the next step?

13          A.     The next step was basically looking at

14     saying what areas in the company's cost structure

15     predominantly focused on North America where we have

16     uncompetitive performs where can we go to look for these

17     improvements.  Those improvements at that point were a

18     range of, I believe it was about 390 to 50 will 550 million

19     of cost improvement, profit improvement that we needed to

20     find.  That was in step 3 and that really then looked at

21     the areas where ultimately we have formed the restructuring

22     initiatives around customers, S SG&A facilities operate mal

23     /SAEUGS rationalization customer profitability and the

24     labor initiatives.

25          Q.     And I believe you said that was the third

59

1       step what was the last stop step in the process?

2              A.     The fourth step has been execution and we

3       have been actively involved in that that the different

4       initiatives really beginning as early as July of 2006 with

5       initiating it's first portions of our customer pricing

6       initiatives.

7              Q.     If we could just step back in a little bit

8       for detail in some of these steps.  First I would ask you

9       to turn to Tab 4 in your binder?

10             A.     Yes.

11             Q.     That's debts Exhibit 50, is the first page

12      mind behind Tab 4?

13             A.     Yes, sir.

14             Q.     Would you describe for the court what

15      Debtor's Exhibit 50 is?

16             A.     Debtor's Exhibit 50 is basically a the

17      result of our first step, which was going through and pry

18      pairing a view of comparable companies and what their

19      performance metrics are.  This was a summary of it which

20      really goes through and shows that on a five year average

21      or a six year average, which would be the far right hand

22      two columns, that over that period this competitive set had

23      average EBIT performance of 5.6 in the case of the five

24      year average, and 5.3 in the six year average.  We also

25      included their EBITDA margins, which is basically about 400

60

1   basis points above those.  So that's the competitive set

2   that we ultimately focused on to look at.

3            I would focus your Honor to look at one

4   other thing.  This is the simple average of those four

5   competitors without Dana.  What you can also clearly see

6   though, also at the bottom under each year column, you can

7   see the average without Dana, and immediately above that is

8   Dana's performance.  Dana has under performed this average

9   from 2001 right through 2006.  So we have had a cost

10  structures that has disadvantaged us relative to our

11  competitors for this entire period.

12           So that says that we need to raise the bar

13  right quite a bit we need structural change, we need

14  dramatic change if we are going to get our performance into

15  the average of the competitive set; which is where we have

16  to be almost by definition to be a viable sustainable

17  competitor had on a long term days.

18           MR. TAMBE:  The debtors offer Debtor's

19  Exhibit 50 into evidence.

20           MR. SIMON:  Same objection, your Honor.

21           THE COURT:  Received overruled.

22           (Whereupon, Debtor's Exhibit 50 was

23  received in evidence as of this date)

24  BY MR. TAMBE:

25       Q.   Now, you focused on four particular

61

1    competitors in Exhibit 50?

2         A.    Correct.

3         Q.    I believe on the briefing of this motion

4    the financial be advisor to the retiree committee suggested

5    a different set of comparables to use?

6         A.    Yes, that's correct.

7         Q.    And you examined the comparables he

8    suggested to us use?

9         A.    Yes, that's correct.

10        Q.    And if you turn to the next page behind Tab

11   4 of Debtors' Exhibit 51?

12        A.    Yes.

13        Q.    Could you describe for the court what

14   Debtor's Exhibit 51 yes is?

15        A.    Yes, it's the declaration of Mr. O'Malley,

16   the expert from DSI working with the retiree committee.  He

17   basically did a comparable analyses similarly in looking at

18   EBITDAR margins.  He pulled that from the competitors that

19   had been mentioned in the SEC filings of Dana and then

20   created averages from that.  It's effectively the same set

21   that Dana used on the preceding with the addition of a few

22   and the deletion of the TRW.

23             He then did calculations, also using public

24   data as we had done, of what those averages would be, and

25   that's presented here.  The same results effectively, which

62

1    is that the Dana performance has been substantially below

2    its competitive set for the last six year.  And his

3    averages are I think about 3 hundred basis points lower on

4    this schedule than mine was.

5              That is predominately due to the fact, in

6    fact, it's exclusively due to the fact that Mr. O'Malley

7    included Visteon.  We did not include Visteon, and we did

8    not include it because Visteon is a poor performer.  It is

9    a spin out from Ford Motor Company five or six years ago, I

10   believe.  Their financial performance since the spin out

11   has been poor and it has included a large amount of support

12   from the Ford Motor Company.  Similarly somewhat to the

13   Delfi spin out where Ford Motor Company retained

14   obligations to the spun out Visteon relative to labor and a

15   number of other costs.

16             So it is basically not a true competitor

17   and it clearly is a week competitor.  The last thing the

18   company wants to do is model itself after a weak performer.

19   The purpose of looking at comparables is to gather what

20   will the comparables who will be who sustainable

21   competitors be.  If you take that out, these numbers

22   actually go out to be I think about one percentage point or

23   1.2 percentage points higher than the numbers that the Dana

24   count set had, if you exclude Visteon.  So that the five

25   year average goes away from being 5.3 to being, I think,

63

1    6.5, which is almost a full percent less than the Dana

2    averages of 5.6.

3              Q.    I just want to clarify a couple of things.

4    You've used 300 basis points, I just want to be clear that

5    what you are talking about is .3 percent; is that what you

6    mean?

7              A.    Three hundred basis points to be would be 3

8    percent.

9              Q.    Let me correct the record.  The difference

10   between Mr. O'Malley's number, including Visteon, and your

11   numbers, is .3 percent or 3 percent?

12             A.    Sorry, it's 30 basis points.  Thank you.

13             MR. TAMBE:  And we would offer Exhibit 51

14   in evidence your Honor.

15             MR. SIMON:  Same objection, your Honor.

16             THE COURT:  Same ruling.

17             MR. SIMON:  May I have a continuing

18   objection, your Honor?

19             THE COURT:  Yes, you certainly may, and a

20   continuing ruling.

21             (Whereupon, Debtor's Exhibit 51 was

22   received in evidence as of this date)

23             Q.    And finally, Exhibit 52, which is the last

24   page behind Tab 4.  If you could briefly describe what that

25   is.

64

1        A.      Yes.   This is a schedule that I had

2   prepared that basically compares the two schedules we've

3   just talked about, your Honor, in showing that the

4   comparable set referred to here as the Stenger comparable

5   set, but it's the Dana set versus Mr. O'Malley's, shows

6   that for the EBIT and the EBITDARs we are basically very

7   similar while having taken specifically different

8   comparable sets as kinds of a point of reference.   For the

9   six year period I just had run through one of the public

10  information sources called Capital IQ that's commonly used

11  by people in doing research, basically it gives me almost

12  the top hundred international tier ones that are publicly

13  traded.

14              And the five year average from '06 to '01

15  is 6 percent EBIT for that group of almost a hundred as

16  opposed to the much smaller counts.   So one of the points

17  here being to be successful in the tier one space, you need

18  to have EBIT ranges in this 5 to 6 level to be competitive

19  to the average within that group.

20              MR. SIMON:   Move to strike the testimony

21  without foundation.

22              THE COURT:   Overruled.

23              MR. TAMBE:   We offer Debtors' Exhibit 52

24  into evidence, your Honor.

25              THE COURT:   Received.

65

1              (Whereupon, Debtor's Exhibit 52 was

2      received in evidence as of this date).

3              Q.    There's been some discussion in some of the

4      opposition papers about your use of the EBIT metric as

5      opposed to the EBITDAR metric.  Does it make a difference,

6      Mr. Stenger?

7              A.    Well, effectively the EBIT and EBITDAR

8      measurements, while they are defined obviously differently,

9      they are highly correlated and in our analysis EBITDAR is

10     basically EBIT and add 400 basis points, 4 percent, and the

11     numbers are almost the same year in and year out.  So we

12     used EBIT was because to drive that through the Dana

13     organization in terms of where were are we going, what are

14     our targets, it's easier to work by with EBIT numbers than

15     EBITDAR, which is not as easy a construct inside the

16     corporation as EBIT.

17             Q.    Let me turn your attention to Tab 5 in your

18     trial binder, it's Debtor's Exhibit 49.

19             What is Exhibit 49, Mr. Stenger?

20             A.    This is a graph that I had prepared which

21     basically shows graphically what I just testified to, your

22     Honor, which is the EBIT percentages in the black, the

23     EBITDA percentages in the red, basically move in lock step

24     and that gap between the two is almost 4 percent year in

25     and year out.

66

1      Q.      After you had identified the target range

2   of EBIT, what was your next step of restructuring

3   initiatives.

4      A.      The next step was to turn that, if you

5   will, turn it into a targeted amount that we needed to

6   find.

7      Q.      And I believe you testified earlier that

8   that was a targeted range initial of 390 to 550 million?

9      A.      Right.  And I think for ease of testifying,

10  was basically 400 to 550 million dollars, which is where we

11  were in June and July.

12     Q.      Of 2006?

13     A.      Of 2006, yes, sir.

14     Q.      The next step you described was a process

15  that resulted in identifying particular areas for savings;

16  is that correct?

17     A.      That's correct.

18     Q.      If I could take you to Tab 6 in the trial

19  binder?

20     A.      Yes.

21     Q.      That's Debtor's Exhibit 35?

22     A.      Yes, sir.

23     Q.      Do you have that there.

24     A.      I do.

25     Q.      Do you have that Tab 6?

67

1          A.     Yes.

2          Q.     If you could briefly describe what is the

3    information contained on Tab 6?  First tell me what Tab 6

4    is?

5          A.     Debtors' Exhibit 35, which we titled

6    restructuring components is basically what we refer to

7    often times as a bubble chart.  But it's a graphic

8    presentation of the major areas there the company moved

9    through in step three of developing where can we go for the

10   kind of significant cost savings that we're looking for to

11   drive through effectively our North American operations.

12              This presents those, if you will, often

13   referred to, your Honor, as buckets.  It says a high and

14   low range that we targeted.  This is the same information

15   that was released in our third quarter SEC filings for the

16   third quarter.  It was developed in a highly iterative

17   process really beginning in July of 2006 and finishing up

18   in October of 2006 with these range of estimates.

19         Q.     And the total range of estimate, if you

20   went around this chart and totaled up the numbers, what is

21   the total range on this chart?

22         A.     If we went around and added up the bubble

23   chart.  The low end would add up to 405 million and the

24   high end would add up to 540 million.

25         Q.     I'd like you to explain, step by step with

68

1   respect to some of these components, what the thinking has

2   been in developing the ranges.  Let's start with customers,

3   which is a range of 175 to 225 billion dollars, if you

4   could describe how he was that was arrived at?

5         A.    Yes.  The range because arrived at by

6   looking at our on a part by part basis the North American

7   products and predominantly focused on the US market.  Our

8   parts, the profitability of those within each of our

9   product groups, and then arrayed that by customer to look

10   at, in effect, customer profitability by part and by

11   platform.  For example, a platform may be the Ford F150

12   pickup truck what was our profitability in our structures

13   business with that particular group.

14         We did that from a very detailed cost

15   analysis that began in May which we completed in August.

16   And based on that, then looked at the overall profitability

17   of customers and developed a range of pricing asks that we

18   would make.  So that was based on the actual profitability

19   of the product, and we looked at only, effectively looked

20   at only under performing ones, which was over 2 billion

21   dollars of the North American business.

22         We then developed based on the customer,

23   the product, and the strategy relative to both of those

24   what would we ask the customer for.  We did that by

25   customer, by product group, and then within product group

69

1    by specific part and program.  And that's where we came up

2    with an estimate of 175 to 225 that we thought we could

3    ultimately realize as a result of what has been a very

4    involved and detailed negotiation process with our

5    customers that began with some customers in July and

6    continues through today.

7         Q.    If you could give us just a flavor of the

8    execution of this part of the restructuring initiatives in

9    terms of dealing with the customers, again without specific

10   customer names, if you could describe generally what that

11   dynamic has been?

12        A.    Sure.  Most of our customers have put this

13   into their product purchasing groups where they have

14   purchasing and cost experts as you can imagine.  We have

15   provided them in most cases with complete transparency as

16   to our information so they can -- they have been provided

17   with the cost of the components.  They are provided with

18   for the facilities that manufactured their products, what

19   is the profitability, what are fixed and variable costs,

20   what are our labor costs, what are our material costs,

21   material costs by vender and components part.

22             Most of our customers have also retained

23   advisers that they use in working with troubled companies

24   for looking at not only the overall restructuring but also

25   doing cost analysis; so that is involved, both customers

70

1    and at advisers making numerous trips into the field with

2    our personnel to go through a build up of what's the

3    processes and plant inspections.

4                    That has then resulted in a process of,

5    depending on the customer, a very detailed bid and ask

6    process where all of the asks were made to customers, I the

7    last one I think was provided in the end of October.

8                    Since that point in time these negotiations

9    have moved back and forth.  Some are concluded, subject to

10   final documentation of which your Honor will see some of

11   that as it is finalized.  But as noted in our 10-K, as of

12   the end of February of our range of 175 to 225, we had

13   concluded discussions on achieving about 75 million of that

14   goal of 175 to 225.

15            Q.     Going back --

16                   THE COURT:  Were these results in a

17   particular period of time of a lock up?

18                   THE WITNESS:  In some instances we have

19   been negotiating for, and in some instances have achieved,

20   commitments for keeping the product for a defined number of

21   years going forward during which period of time, by way of

22   example I'll just use a three year period of time, where we

23   have pricing production through that three year period of

24   time.

25                   THE COURT:  All right.

71

1         Q.      Moving on Debtor's Exhibit 35 to the next

2    item, venders.  There's no range of numbers associated with

3    that.  Could you briefly describe why that's the case?

4         A.      Correct.  As I mentioned before, we have

5    almost I think a 60 percent, a little shy of that of our

6    cost structures for purchased products as well as services.

7              In the past several years the company has

8    centralized and really globalized its supply chain and

9    purchasing management functions.  As a result of that,

10   annually and as consistent with the industry, we set

11   targets year in and year out for reduction of our purchases

12   through cost reductions through material and product

13   substitution and through working on a more partnership

14   basis with vendors.

15              So specifically we target that every year

16   in our budgets, and in most instances, for example in 2007,

17   the annual operating budget which is built up from a plant

18   by plant, we have savings target the and articulated in

19   detailed steps of about 120 million dollars from our vendor

20   base.  Those savings in our plan are serving to offset for

21   planning insurances, what we expect to be approximately 140

22   million dollars of cost increases that will also move

23   through that same vendor base so that net the good work of

24   getting 120 of cost reductions is necessary to offset

25   ongoing cost increases, net for '07 will be behind about 20

72

1    million dollars on that process.

2                So that as a standard business practice we

3    are continually optimizing and looking to the vendor base.

4    It is not something that's a dramatic restructuring

5    initiative for us which the other items on this chart are.

6         Q.    If I to could turn your attention to the

7    next item labeled footprint and has a range of 60 to 85

8    million dollars; what does that purport?

9         A.    Yes.  Footprint is we have looked at and

10   predominately focused on North America, Canada and Mexico.

11   What are the company's manufacturing, assembly and

12   distribution facilities, as well as administrative

13   facilities, and looking at how do we maximize our capacity

14   utilization, consolidate facilities and drive a lower cost

15   manufacturing footprint.  What that means is a

16   consolidation of facilities, closure of facilities of which

17   we've announced we are or will announce, the closure of, I

18   believe nine facilities, downsizing of several other

19   facilities, with the majority of that downsizing moving

20   into a lower cost platform, which for us is our Mexico

21   operations, and to a much lesser extent some of that work

22   is being transferred and consolidated into Spicer, India.

23                Your Honor may recall I think we were here

24   in May or early June to have the approval of the company's

25   acquisition of its joint venture interest in Spicer, which

73

1    is a joint venture we had in Mexico.  Much of this work on

2    facilities optimization is predicated on having that

3    footprint that we now have in Mexico, through Spicer as

4    well as through the Mexican operations that the company had

5    prior to that transaction.

6              So the footprint optimization is basically

7    consolidating and lowering our cost of our supply chains

8    from North America and Dan today through Mexico.  And that

9    is expected which completed in note of those activities

10   would be completed by the year 2010 that would have annual

11   savings of that from of 60 to 85 million dollars.

12        Q.     So the savings shown here, the footprint

13   savings of 60 to 85 million dollars?

14        A.     Yes.

15        Q.     It gives a time period, again, of what

16   period of time those are expected to be achieved?

17        A.     The full run rate should be achieved by

18   2010.  Some of those, as we mentioned earlier, execution of

19   activities has already been initiated, and in some cases in

20   the facilities the footprint optimization that has occurred

21   with, for example, Charlotte and Renton, two of the

22   facilities have been consolidated into our facility in

23   Louisville, and we've initiated and started some of the

24   other closures and rationalizations as well.

25        Q.     And maybe you already testified to this,

74

1    but the savings ground pin over time, is that what your

2    analysis shows with respect to this item?

3            A.    Yes, I'm sorry.  What happens is initially

4    that we will have a lot of actually low capital, but also a

5    lot of costs involved in transitioning facilities, closing

6    facilities, to the extent the facilities are closed, there

7    will be severance obligations that will be paid, there will

8    be other obligations that we have to our employees that we

9    are going to meet.

10           There are also then just in the cost of

11   bringing up new facilities transferring lines to other

12   facilities; all of which are period costs that are

13   negative.  So that ultimately over time, as you get through

14   those, the savings will build initially it's I think less

15   than five million dollars in '07, and by 2010 we expect

16   that to be around 80 million dollars, and it ramps in

17   between SG&A items.

18           Q.    And if you could continue with Debtor's 35,

19   the next item is the SG&A items.

20           A.    Yes.

21           Q.    Could you describe the initiative that went

22   into that components?

23           A.    Yes.  Basically since July what we did was

24   we benchmarked our SG&A spend against competitors.

25           Our SG&A spend has actually compared fairly

75

1    well, but we identified 40 to 50 million dollars as our

2    target that we needed to achieve.  And that is not as much

3    focused strictly on our North American operations, but is

4    one of the initiatives that's more focused on the worldwide

5    footprint of our SG&A, because in fact our SG&A is more

6    global in nature.

7                    So those are savings we developed.  About

8    half of those are articulated.  A number of them have been

9    implemented already.

10          Q.      Moving to the next item on Debtors' 35,

11    retirees?

12          A.      Yes.

13          Q.      Could you describe that component of the

14    restructuring?

15          A.      Yes.  The retiree estimate was developed

16    based by our basically our labor team.  Inside of Dana that

17    consisted of Dana experts, Towers Perrin, Jones Day, and

18    counsel by others, I believe.  And what they looked at, I

19    believe, was a number of different alternatives as to how

20    we could take our retiree costs, predominately the retiree

21    costs related to our medical benefits program and how those

22    could be reduced and changed.

23                    This ultimately came up with an estimate of

24    70 to 90 million which is effectively, at that point in

25    time based on estimates, is basically getting out of the

76

1    retiree healthcare business.  At least as it would reflects

2    as to what's hitting the income statement of the

3    reorganized and restructures Dana.

4              I think as your Honor is aware, we have a

5    settlement with the retiree committee so that while Dana

6    itself will not be showing retiree expenses going forward

7    relative to those benefits, Dana is funding a VIVA with 78

8    million dollars which will be used by the retiree committee

9    to provide some level of benefits to our current retirees.

10        Q.    As we move around then to the last two

11   components on this chart, Debtor's Exhibit 35.

12        A.    Yes.

13        Q.    Could you describe those components?

14        A.    Yes we have hut two bubbles there.

15   Initially though we had effectively a process that looked

16   at all of our employees and was not quite as focused on the

17   difference between union and nonunion.  But across our US

18   employees we are looking for between changes to benefits,

19   and changes to wages, as well as changes to our pension

20   plan, had targeted a range of 60 to 90 million dollars of

21   annual savings from labor benefits and the pension

22   programs.  And that was also developed by our labor team.

23              MR. TAMBE:  We'd offer Debtor's Exhibit 35

24   in evidence, your Honor.

25              MR. SIMON:  No objection.

77

1              THE COURT:  Received.

2              (Whereupon, Debtor's Exhibit 35 was

3    received in evidence as of this date)

4              MR. TAMBE:  And if I haven't previously

5    moved Debtor's Exhibit 49 into evidence, I do so now.

6              THE COURT:  That too is received.

7              (Whereupon, Debtor's Exhibit 49 was

8    received in evidence as of this date)

9    BY MR. TAMBE:

10        Q.    Now, taking this analysis that yields this

11   range of 405 to 540 million dollars that we were just

12   discussing in Debtors' Exhibit 35, did you do any analysis

13   to see if Dana were able to achieve these types of price

14   improvements on savings, what the effect would be moving

15   forward?

16        A.    Yes, we did, a number of times.

17        Q.    I'm going to ask you to turn to Tab 7 in

18   your trial binder, which is Debtor's Exhibit 54, and it is

19   a confidential exhibit.  So some of the information has

20   been publically released from this exhibit, other

21   information has not.  But can you describe for the court

22   what Debtor's Exhibit 54 is?

23              THE COURT:  Before we do that, can we go

24   backwards to 35 for a minute?

25              THE WITNESS:  Yes.

78

```
 1              THE COURT:  All of your bubbles have a
 2    number that go into the entire mix with the exception of
 3    vendors.
 4              THE WITNESS:  Yes, sir.
 5              THE COURT:  There's a bubble above, you
 6    testified that your customers have a lot of input into this
 7    savings that come along, they analyze all of your costs and
 8    so forth.
 9              Do I assume that you do the same thing with
10    respect to your vendors?
11              THE WITNESS:  Yes, we do, your Honor.
12              THE COURT:  In other words, you go into
13    your own vendors and you analyze what they are charging
14    you, what their cost structures are?
15              THE WITNESS:  Yes.  Not with the same
16    intensity.  This is a very unusual level of intensity.
17              THE COURT:  I know your OEMs do it, but
18    from your vender's point of view, you are an OEM.  And you
19    go through the same routine?
20              THE WITNESS:  Yes.  We have a supplier
21    systems used we do field visits, we work with our vendors,
22    in fact I mentioned we are looking at cost savings about of
23    120 --
24              THE COURT:  This doesn't say.  You have no
25    number attached to this.
```

79

1          THE WITNESS:  If I were to attach a number

2     of what we will achieve in 2007, it would be about negative

3     20 million dollars.  We expect to, through our programs,

4     generate savings through our vendor base of about 120

5     million.

6          At the same time we are looking at cost

7     increases either contractual or driven by changes in volume

8     or commodities of about 140 against that.

9          One of the things he I had been trying to,

10    which obviously I wasn't successful in communicating, was

11    that on an ongoing basis in this industry, it is mandatory

12    that you have aggressive programs with your vendor

13    management.  We have those.  We have those on a world wide

14    basis, and we articulate and task out through each of our

15    business units purchasing and vendor savings that they need

16    to garner, so that that is a standard ongoing part of our

17    business.

18          We don't, versus where we are looking at

19    here, are basically on the bubble chart what I would say is

20    more things that are restructuring oriented and dramatic

21    changes that we need to implement now.  If you will, the

22    vender process is already implemented and in place.

23          THE COURT:  A large part of the vendor

24    process deals with commodity purchases; is that right?

25          THE WITNESS:  A large part.

80

1          THE COURT:  And in one of your exhibits

2    your chart shows that commodity prices over a six year

3    period have gone through the roof.

4          THE WITNESS:  Yes.

5          THE COURT:  Do you have any control over

6    negotiating those?

7          THE WITNESS:  We do.  And in certain

8    instances we have longer term contracts with vendors that

9    provide for, if you will, a fixed rate on commodities.  On

10   others, and it is the standard practice in the industry, is

11   surcharges where we have a contract price that is based on,

12   if you will, a set price for hot rolled bar steel for

13   example, or an alloyed steel.

14               As that moves up, our vendors surcharge us

15   and we have to pay that additional charge.  And since we

16   have been successful in negotiating out of those and in

17   others, we have not been successful.

18          THE COURT:  Do you engage in a hedging

19   process with respect to some of these commodities?

20          THE WITNESS:  We do not engage in formal

21   hedging of our purchases or our vendors purchases for

22   commodities.  We try to do that through longer terms

23   contracts with the vendor which, in effect, hush pushes the

24   hedging risk to the venders.  We have been successful, in

25   particular relative to our structures products group which

81

1    was that big frame we see the saw the picture of.  That

2    uses a large amount of flat rolled steel.

3                    We are on steel purchase programs now with

4    a majority, I think in almost all of our North American

5    structured products we are on steel purchase agreements

6    with the OEMs.  Networks where the OEM will provide the

7    steel effectively at a set price so we don't bear the risk

8    of the flat rolled steel price increases.  We also don't

9    bear obviously the opportunity on the down side.  But since

10   we don't have the capability to do the hedging we are very

11   happy to have our OEM customers take that risk.

12                    THE COURT:  All right.

13   BY MR. TAMBE:

14            Q.     Moving on to Exhibit 54, Tab 7 of the

15   binder.

16            A.     Yes.

17            Q.     If you could describe briefly what that

18   analysis shows?

19            A.     Yes this is an analysis that was prepared

20   by us based on two things.  One is the first part of this

21   analysis, your Honor, and I'll just show is pro forma, it

22   shows high and low.  The high and low referring to, in the

23   bubble chart that we went through we had different ranges

24   for each of those bubble charts on a high low.  This

25   incorporates those.  But it starts with what do we think

82

1    our, kind of our base run rate for EBITDAR will be.

2                    We built that up off of the detailed

3    budgets that we did on a facility by facility basis for

4    '07, and that came up with what you'll see as, I believe

5    it's the fifth number down under the second sub total in

6    both of low and the high which is tabled the 2007 based

7    EBITDA.

8                    We then took that which is our expectation

9    of what the base line this business will be able to do.  We

10   then put defense against that we what we discussed earlier

11   as the high and low ranges with one exception.  You'll

12   note, your Honor, that about two thirds of the way down

13   there's a negative number called pension and other.  That

14   was to make an adjustment for some pension matters that we

15   didn't cover in developing the '07 EBITDA base, as well as

16   to recognize that the company has incentive plans that

17   cover management, personnel, the annual incentive plan that

18   would be an expense over time as we achieve those

19   prospective, pro forma operating results; so it would be a

20   reduction.

21                    So that then takes and sub totals to

22   improvement initiatives that really add up, if you will, to

23   recognizing the one negative number and still add up to 405

24   to 540 million consistent with the bubble chart.

25                    What that then shows is on the very bottom

83

1    of the schedule, it shows EBIT percentages based on

2    revenues as through the pro forma base case that are at

3    levels that in the low range are well below the average

4    competitive set which was 5.6, and in the high case of

5    achieving a home run, getting the high end on each one of

6    our estimates and your Honor presuming that it an all

7    happens at once so that the facility savings is 85 million

8    out the chute so to speak.  Then we are within that range

9    of competitive performance metrics that we spoke about

10   earlier in various charts.

11              What that would say is that we need to

12   achieve both towards the high end on everything and we need

13   everyone to, each one of the initiatives to be successful

14   and contribute to this overall solution and turn around of

15   the company.

16              MR. TAMBE:  We offer Exhibit 54 in evidence

17   if we haven't already.

18              MR. SIMON:  No objection.

19              THE COURT:  Received.

20              (Whereupon, Debtor's Exhibit 54 was

21   received in evidence as of this date).

22         Q.    If I could turn your attention to Tab 8,

23   and that's Debtor's Exhibit 36?

24         A.    Yes.

25         Q.    Could you describe for the court what is

84

1    described, what is set forth on Debtor's Exhibit 36, which

2    is a confidential document?

3            A.    Yes, I can.

4                  Your Honor, the other exhibit we covered

5    Exhibit 35, the bubble chart, was basically as I said,

6    prepared on based where we were at the time we put the

7    third quarter Q together.  So this is basically where we

8    are towards the end of October.

9                  This chart, Exhibit 36 is now rolled

10   forward to do two things; one, it incorporates where we

11   thought we would be on the ranges based on where we were in

12   early December of 2006, and it does two things.  At that

13   point in time we were putting together our 2007 budget for

14   what was ultimately the DIP budget supplement which was the

15   budget we put together, your Honor recall, we went for an

16   additional 200 million dollars of term loan, we reduced our

17   revolver by a hundred million and got amended covenants in

18   January of this year.

19                 In putting together for that process, we

20   put together a new budget for '07 which looked at, and I'll

21   use if you will the upper left for our customers, as we

22   spoke before he we had a range of 175 to 225.  What you

23   will see off to the left of that is an amount that we've

24   assumed we would be successful in getting during the

25   calendar year of 2007, that those will be a level of price

85

1    increases we are successful in negotiating and actually

2    received did during the year for shipment, so an increase

3    of pricing and revenue of that amount.

4                At that point, in December, we looked at

5    that and said if we achieve that, given that it will come

6    at different parts during the year of '07, that would

7    translate into a run rate of about -- it would transfer

8    into a run rate as noted beneath of '07 impact here, which

9    is within our range of 175 to 225.

10               Similarly, for each of the other bubbles,

11   with the exception of the union and retiree bubbles, we

12   made estimates based on where we were in December of what

13   would we really achieve as profit improvement in calendar

14   year '07 and we included it in the DIP budget supplement.

15   So as you'll see on footprint, as I noted before, it's a

16   fairly di minimis positive impact to the company in '07,

17   but by the time you get to 2010 a fairly significant and

18   dramatic increase in cost effectiveness.

19               For SG&A where we had an a range of 40 to

20   50.  You'll note we have the 2007 impact.  We now have a

21   view of where that run rate will be, again, it's in the

22   range of 40 to 50.

23               As of the beginning of December we had no

24   firm view on the other two boxes or buckets as you move

25   counterclockwise, and that was our retirees and our union

86

1    employees.  So we made no assumptions as to cost savings

2    relative to either one of those in plea pairing our 2007

3    budget that we gave to our lenders.

4              We did in the last bucket which is the

5    nonunion employees, as I think Mr. Bueter may have

6    testified to already, a number of initiatives that the

7    company identified which have been implemented late in the

8    fourth quarter or in the first quarter.  In some cases they

9    will be implemented during the year of '07.  But we believe

10   those will have an impact that substantially realizes in

11   '07, the full year of benefits that we would expect from

12   the wages, fringes, and pension areas related to the our

13   nonunion employees.

14             MR. TAMBE:  We offer Exhibit 36 in

15   evidence, your Honor.

16             MR. SIMON:  No objection.

17             THE COURT:  Received.

18             (Whereupon, Debtor's Exhibit 36 was

19   received in evidence as of this date).

20   Q.    Did you conduct an analysis based on

21   Exhibit 36 of what Dana's expected financial analysis would

22   be if it simply achieved the 2007 impact numbers that are

23   described in Exhibit 36?

24   A.     Absolutely.  In fact the DIP budget

25   supplement for '07 is in fact that document.

87

1          Q.      And did that analysis reveal Dana achieving

2     it's EBIT target based on the 2007 impact savings?

3          A.      It showed substantial improvement, but we

4     are substantially below where we need to be for to be in

5     that competitive set at that average of 5.6 --

6          Q.      If I could --

7          A.      -- for EBIT.

8          Q.      If I could turn your attention to Tab 9,

9     Debtors' Exhibit 70?

10         A.      Yes.

11         Q.      Could you describe what this document is?

12         A.      This is a document that I had prepared in,

13    and I'll apologize in advance, there's a lot of stuff on

14    this at and it's pretty busy, but I think it's a pretty

15    important kind of perspective where we have been and where

16    we need to go.

17              But basically what this does, your Honor,

18    if you start on the left hand column, which is labeled the

19    2007 DIP budget supplement; you'll recognize the fifth line

20    down there we have the same 2007 based EBITDA.  Again that

21    came up through our detailed budget facility by facility in

22    our budgeting process which was concluded in November.

23              We have then taken from basically the

24    Exhibit 36 bubble chart where we discussed, or I discussed

25    the amounts that we expect to get from each of the

88

1    respective initiatives to actually impact our P&L during

2    2007.  I've lined all those up.  At the end it says that

3    we'll have substantial improvement in our EBITDAR

4    performance over 2006 2006 EBITDAR performances is

5    approximately 267 million, and that's in our -- actually

6    I'm not sure it's in our recent K, but that's the correct

7    number.

8            At the bottom though it shows where our

9    EBIT performance is.  And again, a substantial improvement

10   since EBIT this year is negative, but not even close to

11   where we need to be to be a truly competitive company,

12   therefore able to be viable and sustainable once we emerge

13   from bankruptcy.

14           Q.    Now, did you update that analysis with the

15   other numbers that we saw in Exhibit 36, the run rates that

16   you would analyze or get in the longer run rates?

17           A.    Yes.  What we did was, your Honor, is in

18   the second column from the left is basically take our

19   annual run rates, match those back up with the, again,

20   doing a couple assumptions.  One, that we hit those run

21   rates, two, we have not assumed that we have any

22   participation from the unions or from the salary retirees

23   in this, and it also presumes really what I think is a

24   third and very, very critical assumption, which is if we

25   don't get everything we need and we come out at the bottom

89

1    of this with basically still non competitive performance,

2    will our customers still be willing to participate with us

3    and provide us with that kind of pricing improvement?

4                My answer is no, they will not, because

5    that is -- their contribution is not going to be, if you

6    will, matched by contributions from the company, its

7    employees, and long term it will not be sustainable to

8    assume that our customers are going to bail us out while we

9    don't get the level of self help that they view us as

10   needing to get and that we have committed as an

11   organization to get.  So it becomes very, very hypothetical

12   from that perspective.

13               Probably the third hypothetical here is

14   again this shows in the facilities operate ma signals if I

15   accelerated and brought forward the 210 level sale savings

16   and brought it here.  Again, considering all those we are

17   still below, and well below the average of competitor

18   performers.

19               I then moved to the third column from the

20   left, which is since we had prepared our DIP budget

21   supplement, and actually quite recently, and we've

22   continued to progress forward with negotiations with our

23   customers and we have recently reached settlements with the

24   IAM on the Robinson facility, and we have also reached a

25   settlement with the nonunion retirees.

1      What we've done here is, again, same 2007

2   based EBITDAR.  I have updated the customer pricing but for

3   where we now expect to be, which is a slightly different

4   estimate than you'll see in the column preceding it.  We

5   have then also included, under the union labor you'll see a

6   2 million dollar number.  And we have also included under,

7   put a new category there of which we've now filled in of

8   retiree benefits from terminated or settled, and that

9   really relates to the settlement.  And that's the impact of

10  that settlement on our annual run rate.  So those are the

11  cost savings.

12      So now we've update the for our best

13  estimates at this point.  We still have not put in any

14  estimates for union labor, unless it's settled, which is

15  the IAM, and retiree benefits related to our union

16  employees.  Again at the bottom we're improved, we are

17  incrementally improved over the prior column.  We are still

18  well below the competitive metric that we need to have.

19      The final column, which I've labeled

20  required, takes the updated column and puts into that what

21  we have estimated as the upper end of our union request as

22  well as the upper end of the OPED request from our union

23  employees.  That, when you take that through with all of

24  the other changes carried forward takes us to EBIT that is

25  now at levels that are within the range, not at the simple

1    average et, you have the five year or six year average, but

2    clearly within the range of where that competitive set is

3    moving over the five year period.  That works.

4            The last column works.  And what it means

5    is we need to get the participation of our unions in this

6    process or we won't have the EBIT type of capabilities that

7    we need going forward to be truly competitive and have a

8    sustainable reorganize able business that you won't have to

9    see again.

10            MR. TAMBE:  Thank you, Mr. Stenger.

11            And that concludes our direct examination.

12            MR. SIMON:  I'm sorry, what did you say?

13            MR. TAMBE:  That concludes or direct

14    examination.

15            MR. SIMON:  Did you offer the exhibit?

16            MR. TAMBE:  Oh, yes, I will offer Exhibit

17    36.

18            MR. SIMON:  I would like a voir dire.

19            THE COURT:  Sure.

20            MR. SIMON:  Thank you.

21    VOIR DIRE EXAMINATION BY MR. SIMON:

22            Q.    Mr. Stenger, you said that you thought this

23    was an important document?

24            A.    Yes, sir.

25            Q.    Do you think of all the important documents

92

1    in the booklet you have before you it is the most important

2    document?

3            A.    I don't know if it's the most important,

4    but I think it's a good kind of summary that concludes, so

5    from that perspective it's probably one of the more

6    important ones, yes.

7            Q.    Do you know when this document was provided

8    to the union?

9            A.    My -- it was probably provided --

10           Q.    How about Saturday?

11           A.    I was actually going to say Sunday because

12    we worked on it all through --

13           THE COURT:  About midnight, so you're both

14    right.

15           A.    It probably get it there a minute or two

16    before, but yes, I'm aware that we were working on it on

17    Thursday, Friday and Saturday.

18           MR. SIMON:  Your Honor, giving the

19    statutory requirement that at the time of the Section 1113

20    proceeding the union be provided with the best information

21    available.  Given witness' testimony regarding this

22    exhibit, we object to this exhibit and we object to the

23    testimony.

24           MR. TAMBE:  May I respond, your Honor?

25           THE COURT:  Sure.

93

1            MR. TAMBE:  Sufficient information was

2    provided to the unions to evaluate the proposals.  What

3    this does is update information since we made those

4    proposals.  The world hasn't stood still the last three

5    months, things have been happening.  And arguments are

6    going to be made well, now that X has happened you don't

7    need the relief any more, now that Y has happened we don't

8    need the relief any more.  In fact, Mr. Potok says you

9    don't need any help from the unions because you are going

10   to get there on your own.

11           We are simply responding to developments

12   that have occurred since the proposal was initially made.

13           MR. SIMON:  Your Honor, one additional

14   matter.  March 9th was the deadline under the scheduling

15   order for exhibits to be submitted.

16           THE COURT:  Thank you.

17           This is a fluid operation that's taking

18   place with respect to exchange of documents and the like.

19   The summaries I see here don't create any great surprises.

20   I'm going to allow the documents in, subject, of course, to

21   cross examination.

22           We'll take a lunch break and resume at 2

23   o'clock.

24           MR. TAMBE:  Thank you, your Honor.

25           THE WITNESS:  Thank you, your Honor.

94

1          (Whereupon, a recess was taken for the

2    purpose of luncheon at 12:55 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

95

1          A F T E R N O O N    S E S S I O N

2              (Time noted:  2:00 p.m.)

3              THE COURT:  Are you on first?

4              MR. MAYER:  Yes, your Honor.  We have, I

5    think, a very few questions.  And by arrangements with the

6    other parties I thought we would take a shot.

7              THE COURT:  A few is two.

8              MR. MAYER:  Not much more than that, your

9    Honor.  My colleague this morning, Mr. Moreland.

10   EXAMINATION BY MR. MORELAND:

11        Q.     Mr. Stenger, can you put Debtor's Exhibit

12   70 in front of you, please?  I think it's Tab 9.

13        A.     Thank you.  Yes, I'm on Debtors' 70.

14        Q.     Just a point of clarification, if you look

15   at the fourth column under heading required.  And you see

16   union labor, the savings projected there are 60 million.

17   Do you see that number?

18        A.     Yes, I do.

19        Q.     Could you relate that for us to Mr.

20   Bueter's testimony, that with respect to the 1113 motion

21   the projected savings for the five plants included in the

22   motion is 28 million, or 18 million if you exclude Marion?

23        A.     Right.  This savings is really not intended

24   to be looking specifically at the what I call the narrow

25   definition of where we are going to get savings which is

1    the facilities that are related to the unions that have a

2    formal 1113.

3                    We have other union facilities that are not

4    included in 1113.  For example, Lima and Pottstown, where

5    we have an expired agreement, so we don't have an 1113, as

6    well as, for example, Longview, where it is a union

7    facility but we haven't entered into our first contract

8    yet.

9                    The 60 is really related to Mr. Bueter had,

10   I believe, two columns on his exhibit.  One had the 28, one

11   had 61 million dollars.  The footnote on the 61 that says

12   if you back out, I believe it was Lima at 10 million

13   dollars, that would become 51.  So this 60 would correlate

14   to the 51, and on a annual run rate basis, after the first

15   year, we would anticipate that that 51, 52 would go up to

16   around 60.  So that's this 60 here.

17           Q.    And does that run rate basis take into

18   account the fact that you have expected closings of a

19   number of plants?

20           A.    Yes.  The facilities that are closing are

21   excluded from labor relate the savings.  Those savings show

22   up in our facilities optimization savings numbers.

23                    MR. MORELAND:  Thank you.

24                    THE WITNESS:  You're welcome.

25                    THE COURT:  Any further inquiry?

97

1   EXAMINATION BY MR. SIMON:

2        Q.      Good afternoon Mr. Stenger?

3        A.      Good afternoon, Mr. Simon.

4        Q.      Let me make sure I understand your very

5   last answer.  Which is that savings attributable to the

6   closing ever plants is not included in labor cost savings

7   that you have outlined as part of your restructuring

8   initiatives?

9        A.      That's correct.

10       Q.      So that the savings you will achieve from

11   laying off terminating the employment of thousands of

12   employees and closing plants and transferring the work down

13   to Mexico and China and India, you do not consider to be

14   labor savings.

15       A.      We've accounted for that as being savings

16   related to the closure of facilities and the consolidation,

17   which is 80 million dollar number that I testified to

18   earlier.

19       Q.      We'll get along a lot better if you answer

20   my questions rather than saying what you want to say.  So

21   you do not consider those savings to be labor savings?

22       A.      Specifically answering your question, in

23   the preparation of the analytics behind the facilities

24   optimization, one of the key areas that's looked at and

25   one, in fact the driver on a net basis of savings is an

98

1    evaluation of labor savings not only from wage rate but

2    benefits as well as productivity between facilities that

3    are closing and facilities that the work will be

4    transferred to.  So specifically we have been very focused

5    on labor savings in calculating what the facilities savings

6    are.

7             Q.    How many employees are employed in plants

8    today from whom you expect to achieve the labor savings

9    that are the subject of this motion?

10            A.    As I sit here, I don't know the answer to

11   that question.

12            Q.    You don't know -- we're talking about five

13   plants?

14            A.    The five plants that Mr. --

15            Q.    What plans are we talking about?

16            A.    We're talking about Henderson, Fort Wayne,

17   Auburn Hills, Elizabethtown, Kentucky.

18            Q.    And you have no idea how many employees are

19   employed at those five plants that are the subject of this

20   1113?

21            A.    As with we sit here, I don't know what the

22   number of total employees is.

23            Q.    Do you have an order of magnitude?  Are we

24   talking about a hundred, a thousand, five hundred, five

25   thousand?

99

1          A.      Order of magnitude would be somewhere in

2    the neighborhood of 15 hundred to 2500 employees.

3          Q.      Let's see if this refreshes your

4    recollection.  Marion, 328, does that help?

5          A.      I'm not sure where you are getting those

6    numbers from, but that's helpful to me if you are going to

7    represent that's the correct number.

8          Q.      And that's a plant that may be closed?

9          A.      That was Marion?  Yes, Marion or Lima.

10         Q.      Henderson 471.  Does that sound about

11   right?

12         A.      I'll take that from you, yes.

13         Q.      Auburn Hills, 194.  Does that sound about

14   right?

15         A.      Yes.

16         Q.      Fort Wayne, 405.  Does that sound about

17   right?

18         A.      That's what Mr. Bueter actually testified

19   to, yes.

20         Q.      Elizabethtown, 578.  Does that sound about

21   right?

22         A.      That sounds about right.

23         Q.      Do you want to total those up for me?  I

24   went to law school because I couldn't add and subtract, but

25   I got about 1,076.  Did that sound about right?

100

1        A.      1,076?

2        Q.      1,076.

3        A.      It's got to be more than 1,076.

4        Q.      I said I went to law school because I

5   couldn't add.

6        A.      It's 600, 1,000, 12 hundred, 15 hundred;

7   you've got almost 2 thousand.  I think I said I thought it

8   ranged from 15 hundred to 25 hundred.  I didn't write down

9   all your numbers actually, so I'm rounding.

10               THE COURT:  I have a calculator if you

11   want, Mr. Simon.  I take it back.  I can't find it.

12               MR. SIMON:  We have someone here who claims

13   to be able to add.

14               MR. TAMBE:  Objection, your Honor.  That's

15   a gratuitous comment.

16               THE COURT:  Gentleman, come on.

17   BY MR. SIMON:

18        Q.      So could we round that to about 2 thousand,

19   is that good?

20        A.      That's what I did; that would work for me

21   in.

22        Q.      And from those 2 thousand actively employed

23   now, how many do you expect will be employed at those five

24   facilities, or whatever number of facilities continue to

25   exist, by the end of the year?

101

1          A.      Well.

2          Q.      Your best judgment as you sit here today.

3          A.      My best judgment as I sit here today I I'm

4     not aware of any plans in calendar year of 2007 for head

5     count reductions at those facilities.

6          Q.      And if Marion is closed when would that

7     occur?

8          A.      The decision on Marion or Lima would,

9     depending on when that decision is, we would like to begin

10    to implement that process immediately.  It's probably got a

11    couple, three to four month planning horizon, so there

12    wouldn't be a whole lot of activity in the first four

13    months.

14         Q.      And looking on the out 2007, can you give

15    us the best just judgment of the number of actively

16    employed employees 450 are now the subject of this 1113 who

17    would be continued to be employed by the company?

18         A.      I think it would be using the 2 thousand

19    number.  I think we had 404 in Fort Wayne.  Fort Wayne, in

20    the facilities optimization program, is the one facility

21    out of the five that is expected to have active employee

22    reductions, and I think that goes to in the year about

23    2010, that would be about 200 employees.  So a reduction of

24    approximately 200 from the current rate of 404.

25         Q.      And so if you put together, if you decide

102

1    to close Marion and Fort Wayne is reduced by 200 in your

2    running rate lexicon, we would be talking about what, 14,

3    15 hundred active employees?

4            A.    Yes, I think for Marion we had about 320,

5    so that would be correct, yes.

6            Q.    And from those run rate 15 hundred active

7    employees, do I understand from your latest version of

8    Debtor's Exhibit 72 -- do you have that in front of you?

9            A.    I don't think I do.  Was that Mr. --

10           Q.    That's the one we got this morning.

11           A.    Bueter?

12           Q.    That's from Mr. Bueter.

13                 MR. SIMON:  Does anyone have that?

14                 THE WITNESS:  Thank you very much, your

15    Honor.

16           A.    Yes, I have Debtor's Exhibit 72 in front of

17    me right now.

18           Q.    So that's the one that shows savings that

19    you seek from those five plants of 28 million dollars?

20           A.    Yes, sir.

21           Q.    Which may be 18 million dollars?

22           A.    Correct.

23           Q.    For 15 hundred employees that's what?  How

24    much per employee?

25           A.    On 28?

103

1          Q.      Well?

2          A.      Around 18 did you say?

3          Q.      18?

4          A.      Yes, the 18 would be 18 million on our 15,

5    plus, that's without Marion, so it would be almost a

6    hundred thousand.

7          Q.      And for, if you took it on 28?

8          A.      On 28 I would have to use the 2000, so that

9    would be 140.

10         Q.      Thank you.  Did you participate in the

11   creation of Debtor's Exhibit 72?

12         A.      No, I did not.

13         Q.      Did you see it before this morning?

14         A.      Yes, I believe I thought I saw it

15   yesterday.

16         Q.      Do you know when you first saw it?

17         A.      Yes, I saw it yesterday.

18         Q.      Was it created under your direction?

19         A.      No it was not.

20         Q.      Did you participate in the discussions

21   leading to the creation of this document?

22         A.      Excuse me, Mr. Simon, I'm going to back up.

23   I think I may have misspoken.  Are we speaking about

24   Debtor's Exhibit 72?

25         Q.      Yes, we are.

104

1        A.      Okay.

2        Q.      So --

3        A.      I'm answering correctly, this was not

4    produced under my supervision.

5        Q.      Are you aware that Saturday night we

6    received a version of this document which had estimated

7    savings of 33 million 774 thousand 309 dollars?

8        A.      No, I was not aware of that.

9        Q.      And it was last night for the first time we

10   received a document showing savings of some five million

11   dollars less.  You are not aware of that?

12       A.      No, I was not.

13       Q.      This was not discussed in any way in your

14   capacity as chief restructuring officer?

15       A.      No, it was not.

16       Q.      Does it occur to you as passing strange

17   that on the weekend before an 1113 hearing, a union

18   receives for the first time on Saturday night a document

19   describing, for the first time on a five plant basis,

20   projected savings of 33 million 774 thousand 309 dollars,

21   and then 24 hours later, 12 hours before this trial

22   resumes, it receives one showing savings of 5 million

23   dollars less.  Is does that strike you as passing strange

24   in your capacity as chief restructuring officer?

25       A.      No, it strikes me as an error that someone

105

1    must have made and corrected after subsequently looking at

2    it.

3            Q.    But it doesn't occur to you that providing

4    essential numbers describing the savings to be achieved by

5    this proceeding aren't given to the union until the weekend

6    before the hearing resumes?

7            A.    My understanding is that the cost sheets,

8    as Mr. Bueter testified earlier this morning, had been

9    given to representatives of the union and that he took

10   those same sheets, I think is what he testified to, and

11   compiled those, and those were sheets that had been

12   provided to the union, I think, in the earlier part of

13   March.

14           Q.    We'll have some testimony on that subject.

15           A.    Oh, okay.

16           Q.    In your declaration which I think you have

17   before you, it's Tab 1?

18           A.    Yes, I do.

19           Q.    I direct your attention to paragraph 50.

20           A.    50?

21           Q.    Yes.

22           A.    Yes.

23           Q.    The first bullet point.  "First is

24   discussed below Dana's customers are focused on Dana's

25   operating profitability and its prospects for the emergence

106

1    from bankruptcy as a truly viable long term.  Unlikely to

2    grant new business, the suppliers have not proven

3    themselves to be viable and competitive.  The reason for

4    this is simple, the customers look for stability and

5    reliability in its supplier."

6              A.    Yes, sir.

7              Q.    That's pretty clear, is it not?

8              A.    Yes.

9              Q.    Have you discussed with your customers the

10   possibility of a strike at Dana?

11             A.    Yes, we have.

12             Q.    And have they exhibited some concern about

13   the stability and reliability of the company in connection

14   with the risk of a strike?

15             A.    Yes, they have.

16             Q.    And has Dana made strike contingency plans?

17             A.    It has made strike contingency plans, yes.

18             Q.    And does it plan to hire replacement

19   workers if there is a strike?

20             A.    It is my understanding that plans have been

21   made to hire replacement workers if that's required.

22             Q.    And have those arrangements been made, do

23   you know?

24             A.    I do not know.

25             Q.    Have security plans been made by the

107

1    company in its plan to run a strike with scabs?

2            A.      I am not aware of what level security

3    arrangements have or have not been made.

4            Q.      Do you know if housing arrangements have

5    been made with for the scabs?

6            A.      I don't know if housing arrangements have

7    been made relative to the --

8            Q.      Is it the company's plans to use local scab

9    labor or import the scab labor?

10           A.      I'm not familiar with the details of the

11   strike contingency plans, so I don't know the answer to

12   that.

13           Q.      What have your customers setter to you

14   about the possibility of a strike, if anything?

15           A.      The customers have expressed concerns as to

16   how a strike may impact their product supply chain so they

17   are very focused on their own individual facilities as well

18   as things like what preparedness does the company have,

19   what is the status of perspective of the negotiations, and

20   then issues practical issues like inventory banks, which is

21   a way that we could and they could protect the supply chain

22   in the event a strike did occur.

23           Q.      Mr. Stenger, earlier you said you had

24   assumed that you could reach agreement with the retiree

25   committee with the nonunion employees implementation and

108

1    with the IN.  Do you remember that testimony?

2        A.      Yes, I do.

3        Q.      Did you make an assumption as to whether or

4    not you were going to reach an agreement with the steel

5    workers union?

6        A.      In the --

7        Q.      You can answer that question yes or no.

8        A.      Umm.

9        Q.      Did you make an assumption?

10       A.      Yes, I did.

11       Q.      And what was there assumption?

12       A.      There were two different scenarios, one was

13   that we did not have a settlement that resulted in the cost

14   savings and the other, which was labeled the needed case

15   assumed that we had a negotiated settlement that provided

16   the 60 million dollars in both OPED and with union wage and

17   benefit related savings.

18       Q.      Let's deal for a moment with the assumption

19   that you did not reach an agreement.

20       A.      Yes.

21       Q.      What plans has the company made with

22   respect to that assumed result in negotiations?  That is to

23   say a non consensual agreement, a non consensual

24   arrangement?

25       A.      I'm sorry, do you mean relative -- plans

109

1    relative to what, I'm sorry?

2          Q.    Have you made an assumption as to whether

3    or not in the absence of a negotiated agreement this court

4    is more or less likely to issue an order of rejection

5    pursuant to Section 1113?

6          A.    I've made no assumptions about what the

7    court is going to do.

8          Q.    And that holds true with regard to the auto

9    workers as well?

10          A.    Yes, sir.

11          Q.    And does that hold true with regard to the

12    nonunion retirees covered by the Section 1114 motion?  That

13    is to say have you made an assumption regarding the outcome

14    of the 1114 portion of your motion with respect to the

15    unionized employees?

16          A.    The only assumptions are the ones that I

17    articulated a minute ago, which is I showed two scenarios

18    one where we get nothing and one where we get what we've

19    asked for.  So those are the two scenarios that have been

20    looked at, assumption sets.

21          Q.    Have you made plans regarding

22    implementation of your Section 1114 motion in the event

23    this court grants your motion?

24          A.    Yes, plans are already underway with the

25    active employees that are not covered by the union

110

1    bargaining agreement, we've implemented changes with to

2    retiree benefits there.

3              We are effectuating the settlement with the

4    retiree committee, and I think that the benefits group is

5    prepared for an outcome where we are terminating the

6    retirement benefits for the employees covered by the union

7    bargaining agreements.

8        Q.    Have you made plans for what you are going

9    to do with regard to terms and conditions of employment of

10   your unionized employees if this court grants your motion

11   for rejection?

12       A.    I'm not aware of that what the specific

13   plans are for the labor negotiations.

14       Q.    I'm not talking now about negotiations.  Do

15   you plan to implement your 1113 proposal in the event this

16   court grants your motion?

17       A.    I believe that the company's intention, if

18   the court grants this motion, is to continue a process of

19   trying to negotiate a resolution with the unions and each

20   of the unionized facilities so that we can have a void

21   avoid a strike.

22              If that is not possible, it will be a

23   decision that the management and board will is to make as

24   to how to implement a decision by this court that the

25   company can reject the contracts.

111

1      Q.      Do I understand you to say it's your

2  understanding that this company has not made a management

3  decision to implement its 1113 proposal if this court

4  grants its motion?

5                  MR. TAMBE:  Objection.  Asked and answered

6  your Honor; he just answered that question.

7                  THE COURT:  Sustained.

8      Q.      As chief restructuring officer, do you have

9  a judgment as to whether or not the company should

10  implement its 113 proposal if this court grants the

11  company's proposal?

12                  MR. TAMBE:  Objection.  He's asking the

13  same question again.

14                  MR. SIMON:  It is most certainly not.

15                  THE COURT:  Well, I heard an answer, but

16  I'll let him repeat it.

17      A.      The question is?

18      Q.      The question is whether you have a judgment

19  as the chief restructuring officer as to whether this

20  company should implement its Section 1113 proposal if this

21  company grants the company's motion?

22      A.      Yes.  It is my opinion that it is necessary

23  to implement whatever it takes to get the cost savings that

24  we've articulated.  And if the bargaining and negotiations

25  are not successful, then the company would need to avail

112

1    itself of the ability to reject the union agreements.

2         Q.    And have you articulated that judgment to

3    either Mr. Burns, or the board, or anyone else to whom you

4    report as chief restructuring officer?

5         A.    I have articulated that opinion to Mr.

6    Burns.

7         Q.    And has he responded?

8         A.    He has not responded.  He has taken that

9    advice and will make a decision with that and other advice.

10        Q.    And what period of time would you, in your

11   judgment, give for negotiations after this quart, if this

12   court issues an order of rejection, to see whether those

13   negotiations produce a consensual agreement before you in

14   your judgment would have the company implement its 1113

15   proposal?

16        A.    I don't think it's possible to answer that

17   question without having the benefit of what in fact

18   transpires in this hypothetical situation after the judge

19   issues a ruling.

20        Q.    Have you begun discussions with financial

21   institutions regarding your exit financing?

22        A.    We've had only passing discussion with our

23   existing DIP lender about their desire to be part of the

24   exit financing.

25        Q.    And would you tell us about those passings

113

1    discussions?  What does that mean?

2            A.      Basically it's just been that agent for our

3    current DIP facility which is Citibank has expressed an

4    interest in being kept current of the restructuring process

5    because of their interest in financing the exit facilities

6    for the company.

7            Q.      And have you discussed with Citibank as

8    agent the process that you are currently undergoing under

9    Section 1113 and 1114 before this court?

10           A.      Yes as the agent for our current credit

11   facility we have discussed that.

12           Q.      And have you discussed with the agent the

13   post argument of a strike in the event this court issues an

14   order of rejection?

15           A.      I am not aware of at least in my

16   discussions I have not had a specific discussion regarding

17   that.

18           Q.      And in your experience as a seasoned

19   restructuring officer, is it your judgment that potential

20   exit lenders will have an interest in whether or not a

21   strike is likely or not likely in the event of a 1113

22   rejection?

23           A.      In my estimation, until we have that issue

24   resolved we won't be approaching lenders about exit

25   financing.

114

1        Q.       Was, you know, to a virtual certainty that

2   no exit lending facility is available to a company facing a

3   strike; isn't that right?

4        A.       No, I would say its because we would be

5   wasting our time because we're not going to be ready to

6   reargue organize if we are in the middle of negotiations

7   and a strike is eminent.  So until I have a vehicle and

8   plan to effectuate to reorganize, I don't need to talk to

9   exit lenders and they are not going to talk to us.

10       Q.       Tell us a little bit about your exit plan.

11  You are still planning to exit by the close of '07?

12       A.       That is still our intention, yes.

13       Q.       Would you walk me through the steps and

14  time line that you as chief restructuring officer have in

15  mind from getting from here until December 31 of '07?

16       A.       Yes.  I mean broadly --

17       Q.       Yes.

18       A.       -- the activities are going to be the major

19  milestones will be filing a plan and disclosure statement.

20       Q.       And when do you think -- what's the last

21  time you could do that looking for a fourth quarter '07

22  exit?

23       A.       We're really pushed to being there in

24  August, an August or September to have that filed.

25       Q.       And before getting that filed, would you

115

1    agree with me that one of the critical steps that you have

2    to go through is developing is credible long term probably

3    five year business plan?

4            A.    Yes we'll have a five year business plan

5    developed at that point in time, correct.

6            Q.    In fact you had planned to have one by the

7    end of this month, had you not?

8            A.    Yes.

9            Q.    And do you still intend to fulfill that

10   plan?

11           A.    Well, we expect to have a preliminary first

12   pass of our first five year plan yet this March.

13           Q.    Have you shared your preliminary views on

14   your five year plan with the creditors' committee?

15           A.    No, we have not.  We're still developing

16   it.  We haven't as yet even shared it with our Board of

17   Directors.

18           Q.    So you haven't shared it with any of the

19   professionals of the creditors' committee?

20           A.    That is correct yes, sir.

21           Q.    And you haven't shared it with your agent

22   bank?

23           A.    Correct.

24           Q.    And when do you -- what's today?  March

25   26th.  I guess we have what five business days for the rest

116

1    of the month, including today.  Do you think you'll have

2    your five year business plan in a preliminary form by

3    Friday?

4            A.      Yes, by the end of the week we're scheduled

5    to have basically the first pass with basically an income

6    statement view of what the different product groups, a

7    range of outcomes for them on a five year basis.

8            Q.      And when do you plan to present that

9    iteration of your business plan to your various

10   constituencies?

11           A.      It would be in the month of April sometime,

12   probably in the latter part of April.

13           Q.      The latter part of April?

14           A.      Yes.

15           Q.      And following the presentation of your five

16   year business plan in the latter part of April, and looking

17   forward to an August presentation of a plan of

18   reorganization and disclosure statement, what do you see

19   occurring next?

20           A.      Well, there is an a lot of work that needs

21   to be done on a number of fronts, but probably the drafting

22   of the documents is important, and also reaching out and

23   getting a consensus view we would hope to have with our

24   creditors' committee as well as other constituencies as to

25   what plan will look like, what recoveries are and what the

117

1    distributions would be under such a plan.

2            Q.    Have you begun an evaluation a valuation of

3    the company process?

4            A.    We have not begun valuation of the company,

5    no.

6            Q.    Have you begun a serious assessment of the

7    likely amount of approved claims?

8            A.    We have been working very diligently on the

9    claims process, yes.

10           Q.    And do you have a judgment as we sit here

11   today about the range of allowed claims that will result

12   from your claims analysis process?

13           A.    I think we are basically sticking with

14   estimates that we've made in the K, which I think is about

15   4 billion dollars worth of claims.

16           Q.    4 billion.  Are you aware of the current

17   market for the purchase and sale of claims in Dana?

18           A.    I'm generally aware, yes.

19           Q.    And, again, what's the range of market

20   results regarding the sale as we speak?

21           A.    I think the notes are trading in the

22   probably high 60s to low 70s.

23           Q.    And with a claims pool of approximately 4

24   billion, what assumption is the market making with regard

25   to the valuation going forward?

118

1          A.      That would suggest a valuation, just on the

2    arithmetic on 2.8 billion perhaps in that range of

3    distributable value to creditors, unsecured creditors I

4    should say.

5          Q.      Has the company made a judgment as to

6    whether it is it intense to proceed to exit using debt

7    financing only or whether it contemplates an equity?

8          A.      I think really the numbers in the

9    financial, the EBITDAR's suggest that a significant portion

10   of the recovery for unsecured creditors will be in the form

11   of equity securities.

12         Q.      And do you assume the current equity will

13   be wiped out?

14         A.      I've we've made no assumptions on that.

15   It's been our view that it is very unlikely that there will

16   be a recovery for the current equity holders of the

17   corporation.

18         Q.      My earlier question which I think either I

19   misstated or you misunderstood was whether you also

20   anticipate the issuance of equity into the open market in I

21   addition to the issuance of we can equity and liquidation

22   of existing claims?

23         A.      We've made -- there's been no assumption

24   yet.  I think you are referring to basically a rights

25   offering to sell new stock.

119

1          Q.     Yes?

2          A.     There has been no assumption on that nor

3     detailed analytics on that.

4          Q.     Have you begun to explore that possibility.

5     Have you had any conversations with any of the financial

6     houses regarding that possibility?

7          A.     I have not, no.

8          Q.     Do you know whether anyone else in the

9     company's management or board has?

10         A.     I do not know that for sure.

11         Q.     Would you not expect, as the chief

12    restructuring officer, that that's something you would know

13    if it's going on?

14         A.     Yes, I would.

15         Q.     Just a matter I think of clarification I

16    think.  Would you please turn to paragraph 64 of the

17    declaration?

18         A.     Yes, sir.

19         Q.     There you are talking about SG&A cost

20    reductions?

21         A.     Yes, sir.

22         Q.     The first bullet point talks about reducing

23    US head count by approximately 14 percent in the past 18

24    months as a result of general hiring freeze and attrition

25    during the bankruptcy filing.

120

1          A.      Right.

2          Q.      Is that SG&A head count or is that company

3    head count?

4          A.      That's a good question.  I'm not positive

5    of that.

6          Q.      Clarification?

7          A.      No no, I actually think it may be total

8    head count.  I'm trying to envision the data that I was

9    using when I did this in January, but it may be total head

10   count in January in the US.

11         Q.      Would you, or would counsel, if it's not

12   the correct head count, simply inform us of that at the

13   next hearing?

14                 Thank you.

15                 Could you walk us through the development

16   of the various plans and budgets that the company has

17   undertaken since your retention in, when, March of 06?

18         A.      Actually we were retained by the court of

19   March of '06 but started working with the company in

20   January.

21         Q.      And you began working on the preparation of

22   a two year budget referred to as the DIP plan?

23         A.      Yes.  In February and March we were started

24   working with the company on the development of the DIP

25   budget that we based our initial financing off of in March

1    of 2006.

2         Q.    Now, the DIP budget was being prepared at a

3    time when the company had not made a determination to file

4    Chapter 11; isn't that correct?

5         A.    Well the actual DIP budget was prepared

6    when we did in fact know that the company was going to file

7    for bankruptcy.  We based it off of a annual operating plan

8    that the company had developed in the four third and fourth

9    quarter of calendar year 2005 and we worked with the

10   company to update that beginning in February of 06 to use

11   it as the basis for going out and getting the DIP

12   financing.

13        Q.    So you obviously shared it with your DIP

14   finance partners?

15        A.    Yes, that's correct.

16        Q.    Was it ever presented to the creditors

17   committee?  I realize the creditors' committee was formed

18   subsequently but was that plan submitted to the creditors

19   committee?

20        A.    Yes, it was submitted to the committee once

21   it was formed and had advisors.

22        Q.    Do you recall when that was?

23        A.    I don't specifically, I would think it was

24   in the month of April though.

25        Q.    Do you recall whether that DIP financing

122

1   plan was submitted to either the steel workers or the auto

2   workers?

3          A.    I do not.  I it would not have been

4   submitted I believe contemporaneous of April of '06, but it

5   may have been provided in the context of some of the due

6   diligence that's been going on for, I guess the past couple

7   of months.

8          Q.    Tell us, there then came a 2007 DIP plan,

9   correct?

10          A.    Yes, sir.

11          Q.    Would you tell us about that?

12          A.    That is a plan which we refer to as the DIP

13   budget supplement, which we prepared and issued in the

14   midpoint of December of this year, was based on a detailed

15   facility budget for the calendar year of '07, which we then

16   overlaid on to that the results which I spoke of earlier of

17   the various initiatives with the exclusion of union and

18   retiree related initiatives, and any savings from those

19   were not included.

20                That was then also adjusted to reflect

21   additional borrowings under our term facility which we were

22   proposing to the DIP lenders and use that as its basis to

23   negotiate with our DIP lenders for a larger facility as

24   well as financial recoverance.

25          Q.    And that resulted in the 2007 pro forma

123

1    plan?

2           A.      Well, perhaps you could help me, which 2007

3    pro forma plan is has been used in a bunch of different --

4           Q.      You may want to refer to paragraph 52.

5    There's no mystery about this.

6           A.      Good.

7           Q.      Yes?

8           A.      Could you repeat the question?  I'm sorry.

9           Q.      Yes.  I'm trying to get the relationship

10   between the 2007 pro forma plan and its 2007 DIP plan?

11          A.      Oh, I'm sorry.  The 2007 pro forma plan was

12   basically developed in its summer.  It was ultimately used

13   as a starting point for where we were looking at pro forma

14   operating results against the initiatives and where we set

15   our base line was expected to be and then we then

16   determined what we would need to actually achieve to get to

17   the operating metrics that would get us to our competitive

18   averages so that was in the summer and late summer.

19                  That was then replaced when we did the

20   actual budgeting process which started in late August and

21   concluded in late act which we then called the 2007 base

22   EBITDAR plan.

23          Q.      Was the either the 2007 pro forma or the

24   2007 DIP plan provided to the creditor committee?

25          A.      The 2007 pro forma estimates were provided

124

1    to its committee I think in September.  And then the 2007

2    DIP budget supplement was, as well as the 2007 base plan

3    which was the annual operating budget before layering in

4    the initiatives, those were both provided to the committees

5    in December, December 8th, I believe, for the first one,

6    and December 18th for the DIP budget supplement.

7         Q.    And were they also presented to your

8    lenders?

9         A.    The lenders were presented with the budget

10   supplement in December 18th.  They were not provided with

11   its 2007 base plan.

12        Q.    And were either of them presented to either

13   a committee or an independent note holders?

14        A.    No, neither of those has been presented to

15   them.  I assume you mean the ad hoc bondholders.

16        Q.    Or any antecedent?

17        A.    No it is not shared it is still a

18   confidential document only provided to people whom have

19   executed confidentiality agreements.

20        Q.    And have they been shared why with the

21   unions?

22        A.    They have been shared with the advisors to

23   the unions.

24        Q.    Do you know whether?

25        A.    Specifically no, but I would say

125

1    concurrently for example, I believe that the manufacture

2    Mr. Potok's firm will had already been retained by the

3    committee's when we had a meeting to for the base plan of

4    2007 and that was a December 8th also during that period

5    since it was presented to the full creditors committee the

6    USW has representatives on the creditors' committee so they

7    would have seen it at that time as well.

8           Q.     Do you recall testifying at your deposition

9    Mr. Stenger ger that commodity prices are trending down?

10                 MR. TAMBE:  Can I have a reference please.

11                 MR. SIMON:  Strike that.

12          Q.     Do you believe that commodity prices are

13   trending down?

14          A.     I testified at my deposition that I thought

15   some of the commodity prices had been trending down, yes.

16          Q.     At page 86 of your deposition, if you

17   gentleman have a copy of it to give the witness?

18                 THE COURT:  The question directed at you.

19                 MR. SIMON:  Do you have a copy of the

20   witness' deposition.  Would you provide it to him?  Page

21   86.

22                 MR. TAMBE:  You want me to provide it to

23   him?

24                 MR. SIMON:  Yes.

25                 MR. TAMBE:  My copy is marked, so give us a

126

1    second to get a clean copy.

2                    MR. MAYER:  We have a clean copy.

3                    MR. SIMON:  May I approach?

4                    THE WITNESS:  Thank you.

5    BY MR. SIMON:

6         Q.    Do you know at line 14.

7               "Question.  Mr. Stenger, when you refer to

8    targeted industry benchmarks, is that the 4 percent EBIT

9    number.

10              "Answer.  It is, yeah, operating, profit

11   margins and other metrics, but yes."

12              Is that a correct reading of your

13   testimony?

14        A.    Yes, of lines 14 through 16.

15        Q.    Thank you.

16        A.    Or 18, excuse me.

17        Q.    Would you please turn to page 92?

18        A.    Yes.

19        Q.    Line 21?

20        A.    Yes.

21        Q.    You will see when I get to -- when these

22   numbers get to '09, we are very close to that 4 percent

23   EBIT margin that we talked about earlier it is 36 on the

24   schedule specifically which I said before is kind of where

25   we were, and you jumped ahead.

127

1          MR. TAMBE:  Is there a question?

2          MR. SIMON:  I'm getting to it.

3     Q.     Jump to page 94.  I will say it, on line

4     14.

5     A.     Okay, yes, I'm there.

6     Q.     I will say it again, the target range we

7     are looking at is the minimum of 4 on EBIT.  Is that your

8     testimony?

9     A.     Yes, that was in response to whether it was

10    7.5 EBITDAR.

11    Q.     And in today's notebook?

12    A.     Yes.

13    Q.     If you would turn to Tab 6, the bubble

14    chart?

15    A.     Yes.

16    Q.     Debtor's Exhibit 35?

17    A.     Yes, I have that in front of me.

18    Q.     Calling your attention to the retiree

19    bucket 70 to 90 million dollars?

20    A.     Yes, sir.

21    Q.     Can you break out for us how much of that

22    was attributable to steel workers, auto workers, IAM, and

23    nonunion?

24    A.     As I sit here today, I cannot break it into

25    those four categories, no.

128

1          Q.      Have they been broken out by the company?

2     Are there break out numbers?

3          A.      I believe there are, yes, yes there's been

4     because it's by plan and by facility and by agreement.

5          Q.      Do I understand your testimony to be that

6     with regard to the IAM and nonunion portion of that bucket,

7     you have achieved 30 million of the 70 to 90 million dollar

8     bucket?

9          A.      That is -- actually I don't think I

10    testified to that.  It's part of my deposition exhibit, I

11    didn't actually, specifically say that but --

12               MR. TAMBE:  And, your Honor, that's an item

13    that --

14               THE WITNESS:  -- if you read the document.

15               MR. TAMBE:  -- that's a number that has not

16    been publicized, that breakout and that allocation; it's

17    not public information, it's certainly available in the

18    exhibits that we used today so counsel knows what the

19    number is and your Honor knows what the number is, but that

20    has not been publically disclosed.

21               MR. SIMON:  And I believe it should be,

22    your Honor, if we are talking about equity and balancing

23    the equities and good cause I believe that the achievement

24    by the company of some level of savings attributable to

25    those with whom it is settled is critical information.

1              MR. TAMBE:  Maybe, if I could respond your

2    Honor, maybe that may be counsel's view, but before the

3    confidential information, we believe is confidential is put

4    on the public record, if we could just have an opportunity

5    to let your Honor know why we believe it's confidential and

6    why the confidentiality should be protected.  And once he's

7    asked the question and put the number out there it's on the

8    public record, and I ask for that number to be stricken

9    from the public record.

10             It doesn't help the process, whether it's

11   this number or some other numbers that we might get on

12   later on in this cross examination, to have some of these

13   numbers in the public record even as the company is making

14   efforts to negotiate with various constituencies not just

15   with the union, but also with its customers to reach the

16   results it's trying to reach.

17             MR. SIMON:  Notice, your Honor, there was

18   no claim that it's commercially sensitive information that

19   would put them at a competitive disadvantage, vis a vis the

20   dealings with either the suppliers or their customers.

21             MR. TAMBE:  It's included, it's a

22   competitive advantage as well.

23             MR. MAYER:  Could you suggest a five minute

24   recess to discuss this, your Honor?

25             THE COURT:  Sure.  Five minute recess.

130

1          (Recess taken.)

2          MR. TAMBE:  Your Honor, with respect to the

3   item we were discussing rights before the break our

4   concerns are really two fold.  And with respect to that

5   item, and I'm envisioning some other items coming up that

6   would fall into similar categories.

7          One is information that has not been made

8   public by the company and that can affect our negotiation

9   with our customers or affect us from a competitive

10  standpoint.

11         And the other is non public information,

12  that if broadcast by the issuant here, would permit someone

13  to trade on material non public information not generally

14  made available to investors by the issuer.  I think we have

15  both kinds of problems with the number that was put on the

16  record.

17         Now ultimately that particular number that

18  was discussed on the record by Mr. Simon is a number that

19  maybe can be reverse engineered by people out there and, in

20  fact, be made public by the company in the very near

21  future.  So with respect to that number I'm not going to

22  try to have that stricken off the record.

23         But the concern that that raises I think is

24  going to apply to a number of other issues that may or may

25  not come up in cross examination.  And I don't want a

131

1   situation to come up where the number is put on the record

2   or confidential information is put on the record where we

3   have to then appropriately object to that.

4            If there is information that counsel

5   believes has to be made part of a question and it's

6   confidential information, then I think there should be an

7   advanced ruling sought with respect to that information, or

8   at lease discussion between counsel so that we can avoid a

9   situation where information that we believe is confidential

10  and can effect us with respect to competitiveness and can

11  effect us with respect to release of non public material

12  information can be dealt with and addressed before it goes

13  out on the public record.

14           Certainly when we did the direct

15  examination we were able to examine the witness with

16  respect to a lot of could confidential information without

17  putting that information on this public record.  It remains

18  within the confidential exhibits that are in the trial

19  binder.  And if it's possible for counsel to follow that

20  same approach, I think that will address the question;

21  however, I don't want to suggest how the cross examination

22  should be conducted no do I want to impede the cross

23  examination by my adversary.

24           If he feels he wants to have a free flowing

25  cross examination where he's free to examine this witness

132

1    to about information the debtors feel is confidential, than

2    the only other solution is to seal the courtroom or limit

3    the courtroom attendees to those who have signed

4    confidentiality agreements.  And in that regard what we

5    would suggest is we proceed that way, and within 72 hours

6    of the proceeding being completed, this aspect of the

7    proceeding being completed, we will review the transcript

8    and release publicly those aspects that do not implicate

9    confidential, non public confidential information.

10                   MR. MAYER:  Your Honor, the creditors'

11   committee has a limited perspective on this, but it may be

12   relevant.

13                   There's a different between information

14   that is to forward looking and is a projection, and I can

15   understand the company's sensitivity with respect to that

16   information.

17                   What we are dealing with here is an

18   actuarial determination that has been very recently made

19   about an event that has already happened.  It is my

20   personal view that this is an AK disclosable item and that

21   the company is under obligation to disclose this as soon as

22   possible.

23                   And with that I'll sit down.  I would have

24   to late a to have a fetish made of keeping it confidential,

25   only to have the company's securities lawyers determine

133

1    that they have to put it out on AK anyway.

2                MR. TAMBE:  If I can respond to that.

3                Hence my comment in the very beginning.

4    With this particular number, it may be a number that's made

5    public by the company.

6                THE COURT:  Very frankly, gentleman, when I

7    heard the question and heard the argument I was a little

8    surprised that this was the opener with respect to this

9    kind of problem because of the numbers that I saw and the

10   issue were rather benign.  I see where you're concerned

11   that it might lead to something that is not so benign.

12               I was prepared to allow Mr. Simon to go

13   forward on the fact that I didn't see where it was

14   necessarily harmful, but I do see prospectively the problem

15   and I will ask that the two of you can get together to

16   decide how the gate keeping is to take place with respect

17   to this particular question and this particular issue, I

18   agree, I don't see there's any problem with Mr. Simon

19   extracting the information that he seeks in connection with

20   this question.

21               But Mr. Simon, going forward, if this leads

22   to a more expansive extrication of matters that are truly

23   confidential that ought to be precluded, rather than have

24   the court faced with the problem of sealing and then

25   reviewing on a 72 hour basis later, I think that there

134

1    should be some communication among of two of you as to what

2    your plans are with respect to that kind of confidential

3    information that you may be seeking for a particular

4    advantage or disadvantage to put out on the public record,

5    perhaps properly, perhaps improperly.

6              So if you folks want another five minutes

7    to talk to each other and explore where you are going,

8    that's fine, otherwise I might be more restrictive when an

9    objection is made and I see grounds that make the objection

10   sustainable.  As of right now I don't see a sustainable

11   objection.

12             MR. SIMON:  Your Honor, if I may make a

13   suggestion.

14             THE COURT:  Yes.

15             MR. SIMON:  I think we only have another

16   couple of questions at most on this precise question.

17             I then intend to move into another area

18   that I believe my friend across the aisle will consider to

19   be objectionable.  I have no intention voluntarily of not

20   pursuing those questions.  I will disclose the area that I

21   seek to inquire with counsel, provided I have an assurance

22   that that discussion will not be conveyed to the witness.

23   I do not want the witness pre-prepared to deal with those

24   questions as a consequence.

25             THE COURT:  You have a valid point.  I just

135

1    want that you will consult with each other before you

2    embark on that area.

3                    MR. SIMON:  And then my suggestion would

4    be, because then I foresee not reaching agreement on the

5    next one, that if the court would choose to have argument

6    here or in chambers in chambers I'm perfectly delighted to

7    do it.

8                    The unions have a very strong interest in

9    having this being a free, open and public court.  We

10   believe the Supreme Court, we believe the Second Circuit,

11   we believe this court and the Bankruptcy Rules all so

12   provide except in exceedingly narrow circumstances where

13   the burden is on the debtor.  And we can argue those point

14   by point, and perhaps we should.  And maybe after we've

15   dealt with a couple we will have a footprint for the

16   future.  But make no mistake that we believe that this is

17   information which should be open and available to the

18   public.

19                   THE COURT:  But I do understand that before

20   we get into this area, we'll take a break.

21                   MR. SIMON:  Yes.

22                   THE COURT:  Go ahead, Mr. Simon.

23                   MR. SIMON:  Is it possible to resurrect the

24   last question?

25                   THE WITNESS:  I certainly hope so.

136

1          THE COURT:  There is a bubble, it's the

2     third one down, retirees 70 to 90 million.

3     BY MR. SIMON:

4          Q.    And the we question was whether the

5     relationship, the 30 million dollar number attributable to

6     the savings from the agreement on retiree benefits with the

7     retiree committee had to the target amount for that group?

8          A.    The answer to that is that would be a

9     dollar for dollar reduction of the 70 to 90, so it would be

10    70 minus the 30 to 40, and the 90 minus the 30 to 60, so it

11    would take that to being low to high, 40 to 60.

12         Q.    So I guess what I'm asking is you had some

13    targeted result in mind for that unit of savings?

14         A.    Yes.

15         Q.    There were retiree benefits for nonunion as

16    to which you've achieved on a 30 million dollar savings?

17         A.    Correct.

18         Q.    And my question to you is what relationship

19    does that bear to what you had planned to achieve to that

20    group?  I would suggest to you, and see if this rings a

21    bell, that it represents approximately 30 percent of your

22    ask.  Does that ring a bell?  If not, help us.

23         A.    No.  30 percent of the ask to the salary?

24         Q.    Yes, to the nonunion.

25         A.    The entirety of their projected benefit is

137

1    now expected to be a 30 million dollar deference and

2    reduction in what our expenses will be going forward.

3         Q.    Correct so it's a question of 30 million

4    dollar reduction from what?

5         A.    Our goal had been to get the expense

6    related to the nonunion retirees taken to zero so it we got

7    a hundred percent of the 30 million that we were looking

8    for.  The 30 million is in updated number that was just run

9    I believe by Towers Perrin in the last week since the

10   settlement occurred.

11        Q.    Do you have Debtor's Exhibit 64 in front of

12   you Debtor's Exhibit marked for identification number 64?

13   It's the letter from Towers Perrin dated March 21.

14        A.    I believe I do.

15        Q.    Yes, I do.  We just got it.

16              Directing your attention to the second

17   bullet point on page 1?

18        A.    Yes.

19        Q.    I'm going to try to avoid discussion now of

20   the disputes over what is and whatnot is not public.  You

21   see the notation of periodic costs improvement?

22        A.    Yes.

23        Q.    And does that work out to something like a

24   30 percent reduction in periodic costs?

25        A.    It's probably close do that number.

138

1          Q.        Okay, thank you.

2          A.        Just so I can be clear, 30 percent of what

3    30 percent.

4                    MR. SIMON:  Your counsel will be able to

5    ask you any questions you like I appreciate it if you limit

6    your questions just answers just to questions I ask.  Thank

7    you.

8                    THE WITNESS:  You're welcome.

9                    MR. SIMON:  I think we're now at that

10   point, Judge, where a two minute conversation among counsel

11   would probably be useful, and then if unsuccessful we will

12   have to present you with the question.

13                   THE COURT:  Do you want to do it outside or

14   clear the courtroom?

15                   MR. SIMON:  I think we can do it in the

16   corner.

17                   (Recess taken.)

18                   MR. SIMON:  Your Honor, I think we worked

19   out a modus operandi.

20                   We have two additional bubble items, bubble

21   buckets I guess they are called, which I will address in

22   open court.  I think with minimum intrusion from my friends

23   across the aisle and there is one area that I would like to

24   pursue, but I agree with regard to this particular area the

25   company may have a will get miss basis for asking it to

139

1      remain sealed, so for that limited portion it will only be

2      a couple of questions.  And probably the only way to do

3      that would be with a sealed courtroom.

4                      THE COURT:  Okay.

5      BY MR. SIMON:

6            Q.      With respect to the SG&A bubble which is 40

7      to 50 million dollars?

8            A.      Yes, sir.  Are we still on exhibit --

9            Q.      I'm sorry?

10           A.      Are we still on Debtor's 35?

11           Q.      Yes.

12           A.      Thank you.

13           Q.      I believe you testified that one half of

14     that had been implemented.  Do you recall testifying to

15     that?

16           A.      Yes we have about one half of that we that

17     we expect to be implemented and create those savings in

18     calendar year 2007.

19           Q.      Now with respect to that half, could you

20     describe to us what that half is?  Not in delay terms in

21     substance terms?

22           A.      Yes.

23           Q.      What areas of reduction are producing the

24     savings that you you've described?

25           A.      Okay.  Generally it falls in a couple of

140

1    categories.  One is we have service centers where we do

2    accounting and sales management and back office type

3    functions both in the US in South America, and in Europe.

4    We've implemented head count reductions and further

5    consolidations in some of those service center areas?

6              Q.    Okay, pause.

7              A.    Yes.

8              Q.    On that subject, if I may, because I think

9    it will aid our ability to do this the way we would like to

10   do it.

11              With respect to the service center area

12   you've just identified, had the company targeted an amount

13   of savings to be achieved by that prior to the creation of

14   and as part of the creation of the bubble chart?

15              A.    Well --

16              Q.    Did you say at that point from

17   consolidating service center operations we're going to save

18   X millions of dollars?

19              A.    Not specifically.  What we did have though

20   was a list of articulated areas, including service centers

21   where we expected and were going to drive safe.  We had a

22   bigger estimate relative to that because we hadn't done as

23   much finite work there.

24              Q.    To what extent had the various elements of

25   your SG&A bucket been assigned various target savings

141

1    amounts?  In other words, you have 40 -- I'm sorry 40 to 50

2    million dollars of which 10 million dollars is customer

3    service, 10 million dollars is X, 10 million dollars is Y,

4    10 million dollars is Z.  Did you do anything like that

5    kind of discrete assignment of discrete amounts of savings

6    to discrete areas in SG&A?

7            A.    Yes, we have done that.

8            Q.    Now with respect to the half you have you

9    have accomplished, what percentage of your assigned

10   discrete I saving amounts have you actually achieved?

11           A.    I don't think that we actually had specific

12   target individually for the areas like we've made changed

13   to as part of the F and A finance and account area, we had

14   fact targeted finance and accounting for X amount we have

15   done three or four things in finance accounting.  We're

16   close to X but we're going to have to do more to get to the

17   target that we had set for finance and accounting.

18           Q.    I guess what I'm asking is the level of

19   success you have had in achieving what you will targeted to

20   achieve for specific areas for which you had targeted

21   savings?

22           A.    On balance I think we've been fairly close.

23   Some have in some areas we've under achieved in those areas

24   we have now raised the bar in other areas.  So for example,

25   finance and accounting we expect to achieve what they were

142

1    target the with.  We may be a little light in one or two

2    other areas and we're going to go to the larger cost pools

3    which at Dana are purchase services and engineering and

4    look closer at those areas.  Can we get more than we had

5    targeted those areas with.

6              Q.    Moving to the footprint.  There you had

7    targeted in the bubble chart 60 to 85 million dollars of

8    targeted savings.  E correct?

9              A.    Correct.

10             Q.    And on direct testimony I believe you

11   stated that some of that had been complete and you made a

12   specific reference to Charlotte.  Do you recall that?

13             A.    Yes, I think I mentioned that.

14             Q.    And you made a specific reference to

15   something else but my notes --

16             A.    Renton.

17             Q.    Excuse me?

18             A.    Charlotte and Renton, which are --

19             Q.    Renton?

20             A.    Renton, R-E-N-T-O-N, which are two assembly

21   and sequencing facilities that we have in our torque

22   products group.  I mentioned in Charlotte we announced and

23   finished the closure in the fourth quarter, and in Renton I

24   believe we announced the closure in December at the end of

25   December, early January, and that's completed now as well.

143

1    Q.    And can you tell us how much of the 60 to

2    85 million dollars is attributable to those two Charlotte

3    and Renton and pause for a moment is that consistent with

4    our understanding?

5                   MR. TAMBE:  I wasn't quite sure that that

6    was the question you were going to ask, but I will defer to

7    the witness I know that break out is not public.  And if it

8    raises specific concerns from the company's perspective in

9    terms of what's public and what might put us at a

10   competitive disadvantage I will defer to the witness on

11   that, but that question is fine by me.

12                  A.    I with relative to the two facilities they

13   are both assembly we consolidated them into Louisville I

14   don't have exact numbers but I think each of them range

15   from almost a million to somewhere north of a million so we

16   probably picked up about two, maybe probably a little bit

17   more in run rate savings.

18                  Q.    And in addition to those, is that the order

19   of magnitude on what the you you've accomplished on the 60

20   to 85 million footprint items, so there's really only a

21   small portion.

22                  A.    Yes.  For the year calendar year 2006 our

23   expectation is we'll realize about five million of net

24   savings.

25                  MR. SIMON:  Your Honor, I think we're at

144

1  the point where I the next question I would ask falls into

2  the category -- whoops (handing).

3              The question is whether in the footprint

4  you are counting in the 60 to 85, you're counting savings

5  from Bristol and Buena Vista.

6         A.    No, we are not.  Those are two facilities

7  that we announced the closures of in '05 and have proceeded

8  to complete those.  Actually the BV is, or Buena Vista is

9  done and Bristol is almost done.

10             MR. TAMBE:  I think counsel is about to

11  move to the area I think we agreed on that the courtroom

12  should be closed for because it's going into an area that

13  directly affects ongoing discussions, and it's sensitive

14  information.

15             MR. SIMON:  I think it will be about five

16  minutes.

17             THE COURT:  Will the people sitting beyond

18  the bar please vacate for five minutes?

19             (Whereupon the courtroom was cleared.)

20             THE COURT:  Mr. Simon, do you have any idea

21  how much you have on voir dire?

22             MR. SIMON:  Not much longer, 15 minutes at

23  most, and maybe, depending on the outcome of this, even

24  less.

25             THE COURT:  I want you to cater to my jet

145

1    lag.

2                    MR. SIMON:  Okay.  How about catering to

3    mine I got back from Charleston, South Carolina late last

4    night.

5                    THE COURT:  I got back from Africa after

6    midnight.

7                    MR. TAMBE:  I think he wins.

8                    MR. SIMON:  Yes.

9                    THE WITNESS:  He wins.

10                    THE COURT:  26 hours.

11                    MR. SIMON:  Just so that I don't get hoist

12    on my on own petard subsequently, I think maybe a word of

13    explanation as to why I yielded on this one issue.

14                    This is one that deals directly with

15    negotiations between the company and its customers.  And

16    even I can understand that there may be might be some

17    sensitivity concerning the utilization of answers by

18    customers in subsequent affairs.  It is only in those in

19    that restricted area that I would be prepared to yield on

20    this issue.

21                    MR. TAMBE:  And I assume this part of the

22    proceeding will be in a sealed or separate transcript.

23                    THE COURT:  The reporter is so instructed.

24                    MR. TAMBE:  Thank you, your Honor.

25

146

1                    MR. SIMON:  And it is much ado about

2    nothing.

3                    THE COURT:  Well, much that goes on in this

4    courtroom is much ado about nothing.

5                    All right.

6                    (Confidential Portion of Testimony

7          Extracted)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

148

1   EXAMINATION CONTINUED BY MR. SIMON:

2         Q.    Mr. Stenger, in paragraph 44 --

3         A.    Yes, I'm at paragraph 44.

4         Q.    -- the company states in the 1113 proposal

5   the debtors have proposed modifications to hour of wage

6   rates to be paid for collectively bargaining employees

7   working at facilities where the average wage exceeds 17

8   dollars a however.  And the modification is necessary to

9   standard dies the hourly wage paid across all Dana's

10   manufacturing facilities and to bring Dana's hourly wage

11   costs into alignment with the costs of its competitors."

12   Which competitors does did Dana look at for the wage cost

13   comparisons regarding that paragraph?

14         A.    Specifically, I'm not aware of which

15   specific competitors we did babe labor rate comparisons on.

16         Q.    Do you know whether at the comparison plant

17   the employees who you mentioned as competitors had

18   comparable skills to the employees of Dana?

19         A.    I do not.

20         Q.    Which of Dana's manufacturing facilities

21   were looked at to use as a basis line for the effort "to

22   standard dies the hourly wage paid across all of Dana's

23   manufacturing facility" I believe?

24         A.    I believe based on discussions I've had

25   with members of the labor team, predominately, Mr. Bueter,

149

1    he may have testified to this already, but it was based on

2    looking at a cross section of the benefits and looking at

3    all the benefits in the North America US.

4            Q.    North America, not global, because it says

5    all facilities, it doesn't distinguish.

6            A.    I think it was looked at on a reach mat and

7    North America US were compared to each other.

8            Q.    Do you know whether it included nonunion as

9    well as union facilities of Dana in North America or was it

10   union to union?

11           A.    No, I believe it was cross all the

12   facilities to so it would be union nonunion facilities.

13           Q.    And do you know whether the comparison was

14   played of similarly skilled employees in Dana's union and

15   nonunion facilities in North America?

16           A.    I don't know that firsthand, I'm sorry.

17           Q.    Now is it still part of Dana's Section 1113

18   motion to impose a two tier wage structure at all of Dana's

19   plants, or is that limited to the five plants and the other

20   plants relegated to what you've called normal collective

21   bargaining?

22           A.    Well, I mean as I understand it 1113 motion

23   is just going to those five facilities.  The tier two

24   structure a two tier wage structure is either already

25   implemented or is being implemented at all of the

150

1    facilities that Dana has in the US.  It's those five under

2    the 1113 and several others that have union representation

3    that didn't get a 1113 proposal that we have not

4    implemented yet.

5              Q.    And with regard to those plants, other than

6    the five, where you're seeking to negotiate a two tier says

7    systems but are not seeking to use this proceeding to

8    achieve that result; is that a fair statement?

9              A.    It's a fair statement as with respect to

10   facilities that have union agreements or union

11   representation.

12             Q.    Yes, I meant to limit to union.

13             A.    Yes, because for the other ones we've

14   already implement it and we are already negotiating in the

15   other ones that didn't get the 1113, that's correct.

16             Q.    And do you know before the savings had you

17   attributed to the realization of a two tier structure where

18   it now doesn't exist, includes the plants which are not

19   subject to the 1113 proceeding.

20             A.    In the schedule it does include those that

21   are not subject to the 1113, except for that the one column

22   where Mr. Bueter tried to just articulate 1113.

23             Q.    But just to make it clear if the court

24   grants it's Section 1113, the company would not treat that

25   as authorization to impose a two tier solution at the

151

1    plants not covered by the 113, it might be your goal but

2    it's not something you would implement?

3        A.    It may be a little over my head now in

4    terms of what legally is happening here.  I my

5    understanding is we are implemented or have implemented for

6    non bore gained for facilities two tier wage structures in

7    the nonunion knifed no one represented plants in the US.

8    For those US plants, for example, Lima and Pottstown where

9    we have an expired master agreement it is my understanding

10   that we are negotiating or attempting to negotiate two tier

11   wage structure if in those facilities, but that's not part

12   of the 1113.

13       Q.    That's right and either you will succeed or

14   not succeed in those negotiations, but this proceeding will

15   not produce that report?

16       A.    That's my understanding.

17       Q.    Have you include in your projected labor

18   cost savings any result with respect to let's say 9 master

19   contract negotiations or the negotiations with respect to

20   plants that are not covered by the 1113?

21       A.    Yes, we have.

22       Q.    With respect to the termination of retiree

23   health benefits, was it the company's assessment that its

24   legal right or its right to terminate those benefits

25   unilaterally without regard to 1114 was substantially

152

1    stronger with regard to nonunion employees than it was with

2    regard to union employees?

3                    MR. TAMBE:  Your Honor, I would object to

4    the extent it calls for this witness to divulge information

5    from any communications he had with counsel, it really

6    calls for a legal conclusion.

7                    THE COURT:  Well the question started out

8    by asking for a legal conclusion so your question is

9    sustained.

10                   MR. SIMON:  I think the point is made.

11                   Nothing further, your Honor.

12                   MR. TAMBE:  Tom, do you have questions?

13                   MR. MAYER:  Your Honor, I don't have a

14   question but the record contains an arithmetical inaccuracy

15   I believe the witness testified if you take 28 million and

16   you divide it by I think it was 2 thousand employees I

17   think heed added a zero to the final number and I.

18                   THE WITNESS:  Thank you I was hoping.

19                   MR. MAYER:  I have not spoken to the

20   witness during the break.

21                   MR. SIMON:  The record will speak for

22   itself your Honor.

23                   MR. TAMBE:  If we can have.

24                   THE COURT:  Well, it was using your law

25   school math as I recall.

153

1          MR. TAMBE:  If we could just that have two

2    minutes your Honor we play have some brief questions a

3    redirect.

4          THE COURT:  Very well.

5          (Recess taken.)

6    REDIRECT EXAMINATION BY MR. TAMBE:

7          Q.    Mr. Stenger, you were asked some questions

8    you were asked about a particular EBIT percentage and there

9    was some EBIT and there was some testimony on that what I'm

10   going to do is take you to your declaration and in your

11   declaration?

12         A.    Can I get a copy of the declaration?

13         Q.    It's in the binder.  Tab one in the

14   declaration if I could draw your attention to paragraph 48,

15   49 and 50 and ask you whether your opinions as to minimum

16   ranges of EBIT and more achievable or sustainable levels of

17   EBIT are sustained able in paragraphs 48, 49 and 50 of your

18   deposition?

19         A.    Yes.  In those three paragraphs I walked

20   through, if you will the competitor analysis that we did,

21   said that the five year average was five and six that we

22   needed to be able to achieve in a near term basis

23   performance in the five to six approaching that average if

24   we are to be competitive.  And my near term that was

25   basically a three year window.

154

1          I then further testified that as an

2    absolute kind of bare minimum threshold we the had to be

3    able to demonstrate and articulate and convince not only

4    customers but other constituents like exit lenders that we

5    could get to an at least a 4 percent level by '08, '09.

6          Q.    In your opinion Mr. Stenger, is that

7    minimum percentage a sustained able viable percentage of

8    which the company can succeed longer?

9          A.    No, it is not.

10         Q.    You were asked about some questions about

11   the updated numbers from Towers Perrin that's shown in

12   Exhibit 64.  Do you still have a copy of that?

13         A.    Yes, I do have it.

14         Q.    There was some discussion about what

15   percentage of expense is attributable to nonunion retirees

16   and others with which whom the company has settled.  What

17   percentage of that have been achieved?

18         A.    Yes.

19         Q.    Can you answer that question what

20   percentage of the savings?

21         A.    The percentage achieved based on these

22   would be 30 percent of the expense rate as being reduced

23   based on the settlements with the IAM and the nonunion

24   retirees.

25         Q.    And the 30 percent number that you referred

155

1    to is 30 percent of the entire amount, correct?

2             A.      That is correct.

3             Q.      So what remains is attributable to the

4    unions, correct?

5             A.      It would be attributable to the unions both

6    retired and active because some of the expenses is relative

7    to active participants as well.

8             Q.      And you were asked some questions about

9    labor savings do you recall those questions?

10            A.      I was.

11            Q.      And as an expert providing restructuring

12   advisory services, did you rely on information and

13   calculation as provided to you by the Dana labor team?

14            A.      Yes absolute absolutely.

15            Q.      And with respect to specific labor items

16   did you rely on the Dana labor team for data and

17   information?

18            A.      Yes, I did.

19            MR. TAMBE:   Those are all the questions I

20   have.  Thank you, your Honor.

21   RECROSS EXAMINATION BY MR. SIMON:

22            Q.      Having adopted them, do you adopt those as

23   your own?

24            A.      I adopt them for use as chief restructuring

25   officer for among running the program and taking the

156

1  responsibilities, yes, sir.

2                    MR. TAMBE:  Nothing further, your Honor.

3                    THE COURT:  All right.

4                    We'll resume at 10 o'clock tomorrow

5  morning.

6                    MR. TAMBE:  Thank you, your Honor.

7                    (Time noted:  4:15 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

157

1    March 26, 2007.

2

3                          I N D E X

4

5    WITNESS                  DIRECT  CROSS   REDIR  RECROSS  V. DIRE

6    CHRISTOPHER BUETER    19    25, 27                    23

7    TED STENGER           39,   95, 97   153    159       92

8

9

10                       E X H I B I T S

11           DEBTOR'S                received IN EVIDENCE

12             72                          24

13            300                          43

14             37                          44

15             38                          45

16             39                          46

17            216                          49

18             51                          63

19             52                          65

20             35                          77

21             49                          77

22             54                          83

23             36                          86

24

25

158

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK        }

                             }    ss.:

4    COUNTY OF WESTCHESTER    }

5

6              I, Denise Nowak, a Shorthand Reporter and

7         Notary Public within and for the State of New

8         York, do hereby certify:

9              That I reported the proceedings in the

10        within entitled matter, and that the within

11        transcript is a true record of such proceedings.

12             I further certify that I am not related,

13        by blood or marriage, to any of the parties in

14        this matter and that I am in no way interested in

15        the outcome of this matter.

16             IN WITNESS WHEREOF, I have hereunto set my

17        hand this _____ day of _____, 2007.

18

19             _____

                         DENISE NOWAK

20

21

22

23

24

25

## A

**ability** 30:7 112:1
140:9
**able** 41:24 51:8 53:4
53:5 54:16 77:13
82:9 88:12 91:8
100:13 131:15
138:4 153:17,22
154:3,7
**absence** 109:3
**absolute** 154:2
155:14
**absolutely** 20:24
21:14 38:11 86:24
155:14
**accelerated** 89:15
**accept** 7:12
**accepting** 49:7
**access** 12:22
**accomplished** 141:9
143:19
**account** 96:18
141:13
**accounted** 97:15
**accounting** 140:2
141:14,15,17,25
**accounts** 43:19 56:6
**accurate** 35:19
**accurately** 41:3
**achievable** 153:16
**achieve** 41:24 75:2
77:13 79:2 82:18
83:12 85:5,13
97:10 98:8 123:16
136:19 141:20,25
150:8 153:22
**achieved** 70:19
73:16,17 86:22
105:4 128:7
136:16 140:13
141:10,23 154:17
154:21
**achievement** 128:23
**achieving** 70:13
83:5 87:1 141:19
**acknowledged** 21:12

**acquisition** 39:20
72:25
**act** 18:16,16 123:21
**active** 101:21 102:3
102:6 109:25
155:6,7
**actively** 59:3 100:22
101:15
**activities** 10:1 39:20
55:2 73:9,19
114:18
**activity** 101:12
**actual** 51:20 52:7
68:18 121:5
123:20
**actuarial** 132:18
**ad** 2:20 124:15
**add** 65:10 67:23,24
82:22,23 99:24
100:5,13
**added** 21:24 67:22
152:17
**addition** 11:8 61:21
118:21 143:18
**additional** 21:25
80:15 84:16 93:13
122:21 138:20
**address** 4:12,16 6:22
131:20 138:21
**addressed** 4:23
21:15 131:12
**adjusted** 122:20
**adjustment** 82:14
**adjustments** 27:2
**administrative**
19:23 72:12
**admissible** 49:19
**admission** 23:9
**admitted** 18:5 43:6
**ado** 146:1,4
**adopt** 155:22,24
**adopted** 155:22
**advance** 87:13
**advanced** 52:11
131:7
**advantage** 14:16

54:14 129:22
134:4
**adversary** 131:23
**advice** 112:9,9
**advised** 28:17
**advisers** 69:23 70:1
**advisor** 23:2 39:25
40:1,6,7 41:18
61:4
**advisors** 121:21
124:22
**advisory** 39:23
40:12 42:25
155:12
**affairs** 11:24 145:18
**affect** 130:8,9
**affiliation** 41:7
**Africa** 145:5
**afternoon** 97:2,3
**agent** 113:2,8,10,12
115:21
**aggressive** 79:12
**ago** 9:13 43:24 62:9
109:17
**agree** 115:1 133:18
138:24
**agreed** 7:6 144:11
**agreement** 8:15
20:11 35:2,2,3
36:14,23 37:8,11
42:3 96:5 107:24
108:4,19,23 109:3
110:1 112:13
128:4 135:4 136:6
151:9
**agreements** 27:6
81:5 110:7 112:1
124:19 132:4
150:10
**ahead** 13:24 24:23
126:25 135:22
**aid** 140:9
**aisle** 134:18 138:23
**AK** 132:20 133:1
**alignment** 148:11
**Alix** 41:18

**allocation** 128:16
**alloids** 52:17
**allow** 24:12 32:25
93:20 133:12
**allowed** 117:11
**alloy** 52:20
**alloyed** 80:13
**alluded** 52:5
**alter** 42:18
**alternatives** 75:19
**aluminum** 47:6
52:20
**amended** 84:17
**America** 46:19,20
50:7,12 53:21,25
54:7,25 56:3,4,8
56:11,14 57:10,13
58:15 72:10 73:8
140:3 149:3,4,7,9
149:15
**American** 40:9
47:14 50:7 53:21
54:2,15 56:14
67:11 68:6,21 75:3
81:4
**Americas** 2:14
**amount** 22:4 28:18
48:22 53:19 62:11
66:5 81:2 84:23
85:3 117:7 136:7
140:12 141:14
155:1
**amounts** 87:25
141:1,5,10
**analyses** 47:22
48:10 61:17
**analysis** 50:4 51:17
52:3 53:11 57:21
65:9 68:15 69:25
74:2 77:10,12
81:18,19,21 86:20
86:21 87:1 88:14
117:12 153:20
**analytics** 97:23
119:3
**analyze** 78:7,13

88:16
**and/or** 34:8,9 35:14
  38:5
**Ann** 48:4
**announce** 72:17
**announced** 72:17
  142:22,24 144:7
**annual** 71:17 73:10
  76:21 82:17 88:19
  90:10 96:14 121:7
  124:3
**annually** 71:10
**answer** 10:8 22:15
  27:25 28:1,8 31:22
  89:4 97:5,19 98:10
  107:11 108:7
  111:15 112:16
  126:10 136:8
  154:19
**answered** 111:5,6
**answering** 97:22
  104:3
**answers** 12:8 138:6
  145:17
**antecedent** 124:16
**anticipate** 96:15
  118:20
**anyway** 133:1
**apart** 9:4
**apologize** 35:11
  87:13
**apparent** 5:14
**Apparently** 4:15
**appear** 17:10 18:19
**applicable** 24:1
**applied** 16:6
**apply** 16:8 130:24
**appreciate** 138:5
**approach** 38:22
  126:3 131:20
**approaching** 113:24
  153:23
**appropriately** 131:3
**approval** 72:24
**approved** 117:7
**approximate** 43:20

55:3
**approximately** 26:3
  40:11 55:2 71:21
  88:5 101:24
  117:23 119:23
  136:21
**April** 116:11,12,13
  116:16 121:24
  122:4
**Arbor** 48:4
**architects** 57:16
**area** 134:17,20
  135:2,20 138:23
  138:24 140:11
  141:13 144:11,12
  145:19
**areas** 43:25 58:14,21
  66:15 67:8 86:12
  97:24 139:23
  140:5,20 141:6,12
  141:20,23,23,24
  142:2,4,5
**arguably** 11:10
**argue** 135:13
**argument** 11:13
  34:5 113:13 133:7
  135:5
**arguments** 93:5
**arithmetic** 118:2
**arithmetical** 152:14
**Arket** 20:15
**arrangement** 108:24
**arrangements** 95:5
  106:22 107:3,4,6
**arrayed** 68:9
**arrive** 22:23 23:20
**arrived** 23:6,15
  24:10 68:4,5
**articles** 11:18 15:1,1
  41:10
**articulate** 79:14
  150:22 154:3
**articulated** 71:18
  75:8 109:17
  111:24 112:2,5
  140:20

**Asia** 56:12
**asked** 6:8 8:6 10:6
  11:11,19 12:7,17
  22:3 24:20 30:17
  109:19 111:5
  129:7 153:7,8
  154:10 155:8
**asking** 19:15 25:6
  36:19 49:12
  111:12 136:12
  138:25 141:18
  152:8
**asks** 68:17 70:6
**aspect** 132:6
**aspects** 42:21 132:8
**assembly** 72:11
  142:20 143:13
**asserted** 49:16
**assessing** 47:24
**assessment** 117:6
  151:23
**assets** 56:2
**assigned** 29:13
  140:25 141:9
**assignment** 40:13
  141:5
**assistance** 30:11
**assistants** 19:23
**assisted** 14:19 16:11
  16:13,14
**associated** 21:24
  22:5 71:2
**assume** 32:19 33:15
  37:17 78:9 89:8
  118:12 124:15
  145:21
**assumed** 42:20
  84:24 88:21
  107:24 108:15,22
**assumption** 88:24
  108:3,9,11,18
  109:2,13,20
  117:24 118:23
  119:2
**assumptions** 86:1
  88:20 109:6,16

118:14
**assurance** 134:21
**attach** 46:8 79:1
**attached** 78:25
**attempt** 36:23
**attempting** 37:6
  151:10
**attendees** 132:3
**attention** 41:20
  49:25 53:13 65:17
  72:6 83:22 87:8
  105:19 127:18
  137:16 153:14
**attorneys** 2:4,13,20
  6:21 12:6,7
**attorney's** 4:14 6:3
  8:15
**attributable** 26:14
  97:5 127:22
  128:24 136:5
  143:2 154:15
  155:3,5
**attributed** 150:17
**attributes** 50:24
**attrition** 119:24
**Auburn** 30:5 31:7
  98:17 99:13
**August** 68:15
  114:24,24 116:17
  123:20
**authority** 48:20
**authorization**
  150:25
**authorizes** 42:2
**auto** 8:3 109:8 122:1
  127:22
**automobile** 46:20
**automotive** 40:1,2
  43:15,16,17 44:10
  45:24 46:19 48:2,8
  48:18,21 50:7
  51:12 52:24 56:15
**avail** 111:25
**available** 27:4 28:25
  29:11 92:21 114:2
  128:17 130:14

135:17
**Avenue** 2:9,14
**average** 32:1 59:20
59:21,23,24,24
60:4,7,8,15 62:25
64:14,19 83:3 87:5
89:17 91:1,1 148:7
153:21,23
**averages** 61:20,24
62:3 63:2 123:18
**avoid** 110:21 131:8
137:19
**await** 18:6
**aware** 29:21,23 35:8
76:4 92:16 101:4
104:5,8,11 107:2
110:12 113:15
117:16,18 148:14
**axles** 45:25

**B**

**B** 1:17 19:6 157:10
**babe** 148:15
**BABETTE** 3:7
**back** 9:16,20 20:22
28:12 35:20 40:24
55:4 57:1 59:7
70:9,15 88:19
96:12 100:11
103:22 140:2
145:3,5
**backdrop** 54:20
**backwards** 77:24
**bail** 40:14 89:8
**balance** 141:22
**balancing** 128:22
**band** 50:20
**bank** 115:22
**bankruptcy** 1:1,19
46:24 55:5 88:13
106:1 119:25
121:7 135:11
**banks** 107:20
**bar** 20:13 52:16
53:14 60:12 80:12
141:24 144:18

**bare** 154:2
**bargained** 20:9
**bargainer** 36:16
**bargaining** 20:1,19
20:19 27:6 33:4,19
36:3 42:3 110:1,7
111:24 148:6
149:21
**base** 58:7 71:20,23
72:3 79:4 82:1,9
82:15 83:2 123:15
123:21 124:2,11
125:3
**based** 15:3 17:14
18:8 20:22 27:1
50:15,23 56:4
68:16,18,22 75:16
75:25 80:11 81:20
82:6 83:1 84:6,11
85:12 86:20 87:2
87:20 90:2 120:25
121:7 122:14
148:24 149:1
154:21,23
**basic** 28:13 50:10
**basically** 43:18
44:11 45:5 46:7
48:20 50:8,13,14
50:21 53:14 55:11
57:23 58:1,13
59:16,25 61:17
62:16 64:2,6,11
65:10,21,23 66:10
67:6 73:6 74:23
75:16,25 79:19
84:5,7 87:17,23
88:18 89:1 113:2
116:5,5 117:13
118:24 123:12
153:25
**basing** 31:14
**basis** 5:1,6,9,12 9:6
16:6 18:1 34:24
44:1 56:23 58:8
60:1 62:3 63:4,7
63:12 65:10 68:6

71:14 79:11,14
82:3 96:14,17
97:25 104:19
116:7 121:11
122:22 133:25
138:25 148:21
153:22
**bear** 81:7,9 136:19
**becoming** 50:25
**began** 68:15 69:5
120:21
**beginning** 59:4
67:17 85:23
121:10 133:3
**begun** 112:20 117:2
117:4,6 119:4
**behalf** 25:13
**belabor** 16:23
**believe** 5:9 23:3 27:9
35:24 55:24 58:18
58:25 61:3 62:10
66:7 72:18 75:18
75:19 82:4 86:9
96:10,12 103:14
110:17 122:4
124:5 125:1,12
128:3,21,23 129:3
129:5 131:9
134:18 135:10,10
135:11,16 137:9
137:14 139:13
142:10,24 148:23
148:24 149:11
152:15
**believed** 21:14
**believes** 131:5
**bell** 136:21,22
**Bellman** 16:13
**Belmen** 6:7,9,11,13
6:16 14:18,19,22
15:2,8,9,10 16:7,8
16:15
**benchmarked** 74:24
**benchmarks** 126:8
**beneath** 85:8
**benefit** 39:21 42:4

54:13 108:17
112:17 136:25
**benefits** 42:22 75:21
76:7,9,18,21 86:11
90:8,15 98:2 110:2
110:4,6 136:6,15
149:2,3 151:23,24
**benign** 133:10,11
**Bennett** 2:7 4:9,11
16:22
**Benz** 53:17
**best** 30:6 35:18
90:12 92:20 101:2
101:3,15
**better** 40:15 52:9,9
52:10,10 97:19
**beyond** 9:5 11:10
144:17
**bid** 70:5
**big** 51:8 53:21 81:1
**bigger** 51:1,9 140:22
**biggest** 56:17
**billion** 43:20 55:2
68:3,20 117:15,16
117:24 118:2
**binder** 38:22 40:17
44:3 48:12 59:9
65:18 66:19 77:18
81:15 131:19
153:13
**bit** 27:15 59:7 60:13
114:10 143:16
**black** 65:22
**blank** 9:15
**blemishes** 13:7
**blood** 158:13
**BMW** 53:17
**board** 40:14 110:23
112:3 115:16
119:9
**Bob** 20:15
**Boeing** 50:15
**bondholders** 124:15
**booklet** 92:1
**books** 21:13
**bore** 151:6

**borrowings** 122:21
**bottom** 17:19 23:6
    41:9 46:10 60:6
    82:25 88:8,25
    90:16
**bought** 53:24
**bouncing** 50:9
**Bowling** 1:10
**boxes** 85:24
**brakes** 46:6
**breach** 13:14
**break** 28:5 93:22
    127:21,24 128:2
    130:3 135:20
    143:7 152:20
**breakout** 128:16
**brief** 19:3 153:2
**briefing** 61:3
**briefly** 4:8 39:10
    46:17 54:21 57:20
    63:24 67:2 71:3
    81:17
**bring** 53:25 148:10
**bringing** 74:11
**Bristol** 144:5,9
**broadcast** 130:12
**broaden** 12:11
**broadly** 43:13
    114:16
**broken** 128:1
**brought** 89:15,16
**BRUCE** 3:6,8
**bubble** 67:7,22 78:5
    79:19 81:23,24
    82:24 84:5 87:24
    127:13 136:1
    138:20,20 139:6
    140:14 142:7
**bubbles** 76:14 78:1
    85:10,11
**bucket** 26:13 86:4
    127:19 128:6,8
    140:25
**buckets** 67:13 85:24
    138:21
**budget** 71:17 84:13

84:14,15,20 85:14
86:3,24 87:19,21
89:20 120:22,25
121:2,5 122:13,15
124:2,3,6,9
**budgeting** 87:22
123:20
**budgets** 71:16 82:3
120:16
**Buena** 144:5,8
**Bueter** 16:12 19:2,5
    19:13 21:19 22:19
    23:15,20 24:16
    27:14 29:9 32:24
    35:12 36:15 37:16
    86:5 96:9 99:18
    102:11,12 105:8
    148:25 150:22
    157:6
**Bueter's** 95:20
**build** 50:14 70:2
    74:14
**built** 44:15 71:17
    82:2
**bullet** 105:23 119:22
    137:17
**bunch** 123:3
**burden** 135:13
**Bureau** 10:14
**Burns** 39:14 112:3,6
**BURTON** 1:18
**business** 41:7 43:13
    43:15,21 44:1,14
    55:8,8 58:8,9
    68:13,21 72:2 76:1
    79:15,17 82:9 91:8
    106:2 115:3,4,25
    116:2,9,16
**busy** 87:14
**BV** 144:8

───────────
**C**
───────────
**C** 2:1 3:1 4:1 19:6
    158:1,1
**calculate** 26:24
**calculated** 31:2

**calculating** 98:5
**calculation** 155:13
**calculations** 23:17
    61:23
**calculator** 100:10
**calendar** 55:16
    84:25 85:13 101:4
    121:9 122:15
    139:18 143:22
**call** 28:14 31:16
    38:21 95:24
**called** 19:6 38:24
    48:2 64:10 82:13
    123:21 138:21
    149:20
**calling** 19:1 127:18
**calls** 152:4,6
**Canada** 72:10
**capabilities** 57:7
    91:6
**capability** 56:10
    81:10
**capacity** 72:13
    104:14,24
**capital** 64:10 74:4
**captured** 26:12
**car** 48:6 50:24 51:10
    52:6
**Carolina** 145:3
**carried** 90:24
**cars** 43:18
**case** 4:23 5:1,6,7,8
    5:13,17,17 6:24
    7:4,15,16 8:17 9:9
    9:16,17,20,21,25
    10:9,11 11:4,7
    12:1,2,3,3,24
    14:10,11,12,13,15
    14:21 17:3,4,11,16
    37:16 42:8 48:25
    59:23 71:3 83:2,4
    108:14
**cases** 10:18,22 14:5
    69:15 73:19 86:8
**cash** 57:1
**categories** 24:1

127:25 130:6
    140:1
**category** 51:1 90:7
    144:2
**cater** 144:25
**catering** 145:2
**cause** 128:23
**caused** 20:20
**CECCOTTI** 3:7
**ceiling** 52:22
**center** 48:2,8,18
    140:5,11,17
**centers** 140:1,20
**centralized** 71:8
**CEO** 39:13
**certain** 14:23 18:8
    80:7
**certainly** 33:10
    39:13 57:23 63:19
    111:14 128:17
    131:14 135:25
**certainty** 114:1
**certify** 158:8,12
**chain** 47:3,14,14
    54:1 71:8 107:16
    107:21
**chains** 73:7
**chaises** 46:1,4
**challenges** 46:18
**chambers** 4:13
    18:11 135:6,6
**change** 30:24 35:2
    50:18 54:17 60:13
    60:14
**changed** 75:22
    141:12
**changes** 5:2 50:16
    54:23 76:18,19,19
    79:7,21 90:24
    110:1
**Chapter** 40:2 42:1
    47:11,12 121:4
**charge** 80:15
**charged** 39:15
**charging** 78:13
**Charleston** 145:3

**Charlotte** 73:21
142:12,18,22
143:2
**chart** 22:10,24 67:7
67:20,21,23 72:5
76:11 79:19 80:2
81:23 82:24 84:5,9
87:24 127:14
140:14 142:7
**charts** 81:24 83:10
**chief** 39:8,11 40:2
41:17 47:15
104:14,24 111:8
111:19 112:4
114:14 119:11
155:24
**China** 56:13 97:13
**choose** 135:5
**Christopher** 19:2
157:6
**Chrysler** 40:15
48:22
**chute** 83:8
**Circuit** 135:10
**circumstances** 8:22
15:23 16:5 135:12
**Citibank** 113:3,7
**Civil** 9:24 15:15
**claim** 129:18
**claims** 100:12 117:7
117:9,11,12,15,17
117:23 118:22
**clarification** 95:14
119:15 120:6
**clarify** 34:24 63:3
**clean** 126:1,2
**clear** 17:8 55:13
63:4 106:7 138:2
138:14 150:23
**cleared** 144:19
**clearly** 10:19 37:4
37:19 60:5 62:17
91:2
**Cleveland** 2:10
**close** 26:5 32:8
88:10 102:1

114:11 126:22
137:25 141:16,22
**closed** 26:10 74:6
99:8 101:6 144:12
**closer** 26:10 142:4
**closers** 47:12
**closest** 15:18
**closing** 74:5 96:20
97:6,12 98:3
**closings** 96:18
**closure** 72:16,17
97:16 142:23,24
**closures** 73:24 144:7
**cluttering** 35:11
**coalition** 36:3
**Cohen** 3:3 6:20
**cold** 52:17
**colleague** 95:9
**colleagues** 34:16
38:9
**collective** 27:6 42:3
149:20
**collectively** 148:6
**column** 21:25 22:20
29:16 30:1 60:6
87:18 88:18 89:19
90:4,17,19,20 91:4
95:15 150:21
**columns** 59:22
96:10
**come** 8:25 23:17
37:12 53:25 54:9
54:10 78:7 85:5
88:25 100:16
130:25 131:1
**coming** 33:24 37:11
54:14 130:5
**comment** 100:15
133:3
**commercial** 45:25
**commercially**
129:18
**commitments** 70:20
**committed** 89:10
**committee** 2:13,20
22:4 24:19 25:13

25:16 42:6,17 61:4
61:16 76:5,8
107:25 110:4
115:14,19 116:24
121:17,17,19,20
123:24 124:1,13
125:5,6 132:11
136:7
**committees** 124:4
**committee's** 125:3
**commodities** 47:7
52:16 79:8 80:9,19
80:22
**commodity** 47:6
52:24 79:24 80:2
125:9,12,15
**common** 36:13 37:6
**commonly** 64:10
**communicating**
79:10
**communication**
20:21 134:1
**communications**
35:17 152:5
**companies** 10:20
39:9,12 40:3,6,8
43:19 46:24 47:2
53:16,16 59:18
69:23
**company** 6:24 8:24
9:10 11:6,8,15,25
12:4 13:18 14:16
14:22 15:7,14 16:1
16:17 20:24 21:1
21:12 22:11 28:2
32:11 39:17 40:4
40:10 42:10 47:20
47:24 56:1,5 62:9
62:12,13,18 67:8
71:7 73:4 82:16
83:15 85:16 86:7
88:11 89:6 101:17
106:13 107:1,18
108:21 110:25
111:2,9,20,21,25
112:14 113:6

114:2 117:3,4
118:5 120:2,16,19
120:24 121:3,6,8
121:10 128:1,24
129:13 130:8,20
132:21 133:5
138:25 140:12
145:15 148:4
150:24 154:8,16
**company's** 11:22
14:2 16:17 58:14
72:11,24 107:8
110:17 111:11,21
119:9 132:15,25
143:8 151:23
**comparable** 59:18
61:17 64:4,4,8
148:18
**comparables** 61:5,7
62:19,20
**compared** 74:25
149:7
**compares** 64:2
**comparison** 148:16
149:13
**comparisons** 10:22
148:13,15
**compete** 54:1 56:18
56:21 57:9
**competitive** 13:8
46:22 47:10 54:6
54:14 55:23,25
57:7,11 58:1,4,7
58:10 59:22 60:1
60:15 62:2 64:18
83:4,9 87:5 88:11
89:1 90:18 91:2,7
106:3 123:17
129:19,22 130:9
143:10 153:24
**competitiveness**
131:10
**competitor** 8:12 9:3
60:17 62:16,17
89:17 153:20
**competitors** 54:8

57:5,5,24 60:5,11
61:1,18 62:21
74:24 148:11,12
148:15,17
**compiled** 105:11
**complete** 69:15
142:11 144:8
**completed** 68:15
73:9,10 132:6,7
142:25
**completely** 17:24
**complying** 8:13
**component** 75:13
**components** 46:6
67:6 68:1 69:17,21
74:22 76:11,13
**compute** 31:1
**concern** 106:12
130:23
**concerned** 133:10
**concerning** 145:17
**concerns** 107:15
130:4 143:8
**concession** 33:4
**concessions** 20:25
21:2
**concluded** 70:9,13
87:22 123:21
**concludes** 91:11,13
92:4
**conclusion** 152:6,8
**concurrently** 125:1
**conditions** 110:9
**conduct** 23:11 37:21
86:20
**conducted** 37:14
131:22
**confidential** 7:8,8
7:17,17,20,23 8:1
8:9,18 9:3 77:19
84:2 124:18 129:3
129:3,5 131:2,6,9
131:16,18 132:1,9
132:9,24 133:23
134:2 146:6
**confidentiality** 5:20

5:22 6:1,25 7:2,14
8:14 124:19 129:6
132:4
**configured** 50:23
**connection** 7:9,18
28:3,19 30:18
106:13 133:19
**consensual** 108:23
108:23 112:13
**consensus** 116:23
**consequence** 134:24
**consider** 36:13
97:13,21 134:18
**considered** 11:1,2,3
11:20 12:9 14:15
**considering** 89:16
**consisted** 75:17
**consistent** 71:10
82:24 143:3
**consolidate** 72:14
**consolidated** 56:6
72:22 73:22
143:13
**consolidating** 73:7
140:17
**consolidation** 72:16
97:16
**consolidations**
140:5
**constant** 32:21
46:22
**constituencies** 37:7
116:10,24 129:14
**constituents** 154:4
**construct** 65:15
**construction** 43:24
**consult** 43:24 135:1
**consumer** 52:6
**consumers** 47:10
52:7 53:6
**contained** 21:5 30:1
48:24 49:8 67:3
**contains** 152:14
**contemplates** 118:7
**contemporaneous**
122:4

**content** 52:16
**context** 11:5 12:11
17:9 35:3,16 122:5
**contingency** 106:16
106:17 107:11
**continually** 72:3
**continuation** 4:6
**continue** 50:13 57:8
57:9 74:18 100:24
110:18
**continued** 3:1 47:7
54:25 89:22
101:17 148:1
**continues** 69:6
**continuing** 63:17,20
**contract** 80:11 96:7
151:19
**contracts** 80:8,23
110:25
**contractual** 79:7
**contributable** 25:24
**contribute** 83:14
**contribution** 89:5
**contributions** 89:6
**control** 80:5
**conversation** 138:10
**conversations** 21:16
34:3,8 119:5
**conveyed** 134:22
**convince** 154:3
**COO** 40:9
**coordinating** 39:16
**copy** 4:25 7:10 40:25
125:17,19,25
126:1,2 153:12
154:12
**corner** 138:16
**corporate** 29:12
**corporation** 1:6
8:24 65:16 118:17
**correct** 13:5 17:25
25:21 26:4,9,16,19
27:5,9,22,23 28:4
28:5,9,10,15,23,24
29:1,17,21 30:16
30:24,25 32:14

33:12 34:13 35:1
36:8,18,25 37:1
38:2,6 57:18,19
61:2,6,9 63:9
66:16,17 71:4 88:6
97:9 99:7 102:5,22
115:5,20,23
120:12 121:4,15
122:9 126:12
136:17 137:3
142:8,9 150:15
155:1,2,4
**corrected** 105:1
**correctly** 32:10
104:3
**correlate** 96:13
**correlated** 65:9
**cost** 21:23 23:24
24:5 27:2 29:3
30:4 52:25 56:19
58:14,19 60:9
67:10 68:14 69:14
69:17,25 71:6,12
71:22,24,25 72:14
72:20 73:7 74:10
78:14,22 79:6
85:18 86:1 90:11
97:6 105:7 108:13
111:23 119:19
142:2 148:12
151:18
**costs** 31:2,4 53:3
54:11 55:5 62:15
69:19,20,20,21
74:5,12 75:20,21
78:7 137:21,24
148:11,11
**counsel** 3:4 4:8,17
6:24 10:4,17 12:12
13:2 17:2 18:11
20:18 23:2 35:6
75:18 120:11
128:18 131:4,8,19
134:21 138:4,10
144:10 152:5
**counsel's** 129:2

**count** 31:12,15 32:1
  32:17,19 33:6,8
  62:24 101:5
  119:23 120:2,3,8
  120:10,12 140:4
**counter** 36:2
**counterclockwise**
  85:25
**counting** 144:4,4
**counts** 33:4 64:16
**COUNTY** 158:4
**couple** 4:20 52:5
  55:12,21 63:3
  88:20 101:11
  122:6 134:16
  135:15 139:2,25
**course** 6:17 12:21,22
  93:20
**court** 1:1 4:2,12
  5:10 7:3,12,24,24
  7:25 8:17,23,25
  9:4,25 10:6 12:12
  12:16,25 13:6,13
  13:21,24 14:6
  16:22 17:7,13,13
  17:14 18:5,20,22
  19:3,11 23:13 24:9
  24:12,17,20,23
  25:6,9,14 32:25
  33:7,22,24 34:6
  35:6,11 38:15,17
  38:23 39:7,21
  41:14 42:3 43:4,8
  44:7,21 45:18
  46:14 49:6,9,20
  57:20 59:14 60:21
  61:13 63:16,19
  64:22,25 70:16,25
  77:1,6,21,23 78:1
  78:5,12,17,24
  79:23 80:1,5,18
  81:12 83:19,25
  86:17 91:19 92:13
  92:25 93:16 95:3,7
  96:25 100:10,16
  109:3,7,23 110:10

110:16,18,24
  111:3,7,10,15
  112:12 113:9,13
  120:18 125:18
  129:25 133:6,24
  134:14,25 135:5,9
  135:10,11,19,22
  136:1 138:13,22
  139:4 144:17,20
  144:25 145:5,10
  145:23 146:3
  150:23 152:7,24
  153:4 156:3
**courtroom** 132:2,3
  138:14 139:3
  144:11,19 146:4
**court's** 8:14
**covenants** 84:17
**cover** 7:21,22 82:15
  82:17
**covered** 84:4 109:12
  109:25 110:6
  151:1,20
**crank** 45:5
**Crawford** 16:12
**create** 93:19 139:17
**created** 15:9 61:20
  103:18
**creation** 103:11,21
  140:13,14
**credible** 115:2
**credit** 113:10
**creditor** 123:24
**creditors** 2:14 22:3
  24:19 25:16 27:24
  30:21 115:14,19
  116:24 118:3,3,10
  121:16,17,18
  125:5,6 132:10
**criminal** 18:15
**critical** 88:24 115:1
  128:25
**cross** 15:6 17:15,23
  22:2 25:1,3 50:21
  50:22 93:21
  129:12 130:25

131:21,22,25
  149:2,11 157:5
**crossover** 45:7 51:2
  51:6
**current** 40:25 76:9
  101:24 113:3,4,10
  117:16 118:12,16
**currently** 113:8
**Custom** 1:10
**customer** 58:23 59:5
  68:9,10,22,24,25
  69:10 70:5 90:2
  141:2
**customers** 39:18
  47:8 53:5,20 54:4
  56:4,5,5,7,10
  58:22 68:2,17 69:5
  69:5,9,12,22,25
  70:6 78:6 81:11
  84:21 89:2,8,23
  105:24 106:4,9
  107:13,15 129:15
  129:20 130:9
  145:15,18 154:4

---

## D

**D** 2:17 4:1 38:24
  157:3
**daily** 34:24 35:14
**Dan** 73:8
**Dana** 1:6 4:7 8:12
  8:15,21 10:10 13:9
  14:7 17:9 24:4,6
  30:3 31:25 39:9,12
  43:14 44:2 47:16
  51:1 52:25 54:2,3
  55:23,25 56:18,21
  57:8,17 60:5,7,8
  61:19,21 62:1,23
  63:1 64:5 65:12
  75:16,17 76:3,5,7
  77:13 87:1 106:10
  106:16 117:17
  142:3 148:12,18
  149:9 150:1
  155:13,16

**Dana's** 4:6 10:11,13
  43:13 54:22,24
  60:8 86:21 105:24
  105:24 148:9,10
  148:20,22 149:14
  149:17,18
**data** 10:15 47:21
  61:24 120:8
  155:16
**date** 24:14 43:10
  44:23 45:20 46:16
  49:22 60:23 63:22
  65:2 77:3,8 83:21
  86:19
**dated** 137:13
**dates** 21:17
**dating** 28:12
**DAVID** 3:8
**day** 2:3 4:4 11:23
  34:24,24 75:17
  158:17
**days** 7:22 9:13 60:17
  115:25
**deadline** 93:14
**deal** 8:20 20:20
  108:18 134:23
**dealing** 69:9 132:17
**dealings** 129:20
**deals** 79:24 145:14
**dealt** 131:12 135:15
**debt** 56:25 118:6
**debtor** 135:13
**debtors** 1:7 2:4
  18:23 26:4 38:20
  40:18 41:24 42:17
  42:24 48:24 60:18
  61:11 64:23 67:5
  75:10 77:12 87:9
  95:13 132:1 148:5
**debtor's** 23:9 24:13
  25:19 28:21 29:7
  42:5 43:9 44:6,22
  45:19 46:15 48:16
  49:3,21 50:1 59:15
  59:16 60:18,22
  61:14 63:21 65:1

65:18 66:21 71:1
74:18 76:11,23
77:2,5,7,18,22
83:20,23 84:1
86:18 95:11 102:8
102:16 103:11,24
127:16 137:11,12
139:10 157:11
**debts** 59:11
**December** 31:18,19
31:21 32:18 84:12
85:4,12,23 114:15
122:14 124:5,5,6
124:10 125:4
142:24,25
**decide** 101:25
133:16
**decision** 15:3 26:7
101:8,9 110:23,24
111:3 112:9
**declaration** 33:22
34:10 35:13,16
38:4 41:16 43:1
47:17 53:4 61:15
105:16 119:17
153:10,11,12,14
**declarations** 50:6
**deem** 9:2
**defense** 82:10
**defer** 143:6,10
**deference** 137:1
**define** 54:13
**defined** 65:8 70:20
**defines** 10:23
**definition** 60:16
95:25
**degrees** 39:16
**delay** 139:20
**deletion** 61:22
**Delfi** 4:23 5:1,5,8,10
5:12,17 6:1,24 7:4
7:6,15,16,19 8:5,5
8:8,17,19,24 9:9
9:17,21 10:2 11:4
11:7 12:2,3,3,20
13:2,8 14:6,10,11

14:13 16:24 17:1,2
17:4,8,10 62:13
**Delfi's** 8:7 10:9 12:6
12:7
**delighted** 135:6
**delivered** 20:4 21:3
21:9
**demonstrate** 5:9
154:3
**Denise** 19:8 39:1
158:6,19
**department** 30:13
**depending** 18:16
70:5 101:9 144:23
**depends** 36:11
**deposition** 6:6,9,23
7:3,19,22 8:2,7 9:7
9:8,12,17 11:4
12:20 16:3 17:1,3
125:8,14,16,20
128:10 153:18
**depositions** 4:22,24
5:5,9 9:8,20 11:22
11:24 14:4 18:4
**descending** 27:1
**describe** 39:10 41:3
41:14 43:12 44:7
45:2,22 46:17
57:20 59:14 61:13
63:24 67:2 68:4
69:10 71:3 74:21
75:13 76:13 77:21
81:17 83:25 87:11
139:20
**described** 36:21
66:14 84:1 86:23
139:24
**describing** 104:19
105:4
**designate** 7:16
**designated** 7:19,25
8:9,18 43:4
**designation** 43:3
**designed** 45:5
**desire** 112:23
**detail** 59:8

**detailed** 41:23 68:14
69:4 70:5 71:19
82:2 87:21 119:3
122:14
**details** 107:10
**deteriorate** 55:1
**deterioration** 47:1
**determination**
17:13 18:7 121:3
132:18
**determine** 132:25
**determined** 123:16
**Detroit** 19:19
**developed** 58:4
67:16 68:17,22
75:7,15 76:22
115:5 121:8
123:12
**developing** 67:9
68:2 82:15 115:2
115:15
**development** 120:15
120:24
**developments** 19:3
42:15 93:11
**di** 85:16
**DiCHIARA** 3:7
6:19,20 7:13 10:4
10:8 12:15,19 13:4
13:10,16,23,25
14:9 18:21
**dies** 148:9,22
**difference** 20:10
34:14,21 63:9 65:5
76:17
**differences** 36:13
**different** 10:20,20
10:21,22 29:21
34:17 35:23 39:16
59:3 61:5 64:7
75:19 81:23 85:6
90:3 108:12 116:6
123:3 132:13
**differently** 65:8
**diligence** 122:6
**diligently** 117:8

**DIP** 84:14 85:14
86:24 87:19 89:20
112:23 113:3
120:22,24 121:2,5
121:11,13,25
122:8,12,22,23
123:10,24 124:2,6
**dire** 18:2,3,5,6,19
23:11,14 91:18,21
144:21 157:5
**direct** 15:16 16:6,7
19:12 91:11,13
105:19 131:14
142:10 157:5
**directed** 53:20
125:18
**Directing** 137:16
**direction** 27:21 30:2
103:18
**directly** 30:15 39:13
144:13 145:14
**Directors** 115:17
**disability** 29:12
**disadvantage** 57:11
129:19 134:4
143:10
**disadvantaged**
60:10
**disclosable** 132:20
**disclose** 8:17 9:7
11:14 132:21
134:20
**disclosed** 8:11 9:3
9:22 128:20
**disclosing** 8:22
**disclosure** 11:15
114:19 116:18
**discovery** 4:7 9:23
10:24,25 15:16,22
16:7 17:16,17
**discrete** 141:5,5,6
141:10
**discuss** 36:6,9,12
37:13 38:7 129:24
**discussed** 4:7 20:14
33:14,17 82:10

87:24,24 104:13
105:24 106:9
113:7,11,12
130:18
**discusses** 35:17
37:18 48:21
**discussing** 77:12
130:3
**discussion** 20:22
21:18 36:20 37:3,5
38:1 65:3 112:22
113:16 131:8
134:22 137:19
154:14
**discussions** 28:12
33:20 34:15,16,21
34:23 35:1,15
36:16 37:17 70:13
103:20 112:20
113:1,16 144:13
148:24
**discussions/negoti...**
37:24
**discussion/negotia...**
37:10
**disputes** 137:20
**distinct** 57:11
**distinction** 35:5
36:15,17,21
**distinguish** 149:5
**distributable** 118:3
**distribution** 40:4
72:12
**distributions** 117:1
**DISTRICT** 1:2
**divestiture** 39:20
**divide** 152:16
**divulge** 152:4
**docket** 7:5
**document** 8:18 9:2,2
11:8,16 21:21
24:19 28:21 29:19
30:17 41:14,15,16
48:15 49:16 84:2
86:25 87:11,12
91:23 92:2,7

103:21 104:6,10
104:18 124:18
128:14
**documentation**
70:10
**documents** 11:18
91:25 93:18,20
116:22
**doing** 57:5 64:11
69:25 88:20
**dollar** 55:14 90:6
97:17 128:7 136:5
136:9,9,16 137:1,4
**dollars** 22:10 23:5
26:3 29:17 30:24
31:6 43:20 55:2,4
55:11 57:10 66:10
68:3,21 71:19,22
72:1,8 73:11,13
74:15,16 75:1 76:8
76:20 77:11 79:3
84:16 96:11,13
102:19,21 104:7
104:11,20,23
108:16 117:15
127:19 139:7
140:18 141:2,2,3,3
141:4 142:7 143:2
148:8
**doubt** 10:19
**downsizing** 72:18,19
**Dr** 4:20,21 6:5,23
7:19 8:2 9:5,8,14
9:14 10:8,13,16
11:9,9,17,17,23,23
14:2,22,22 15:2,2
15:8,8,9,10,10,12
15:13 16:2,3,4,7,8
16:11,12,12,13,13
16:13,15,16,20,24
16:25
**drafting** 116:21
**drafts** 11:18 14:3,23
14:24,24
**drag** 57:13
**Drain** 7:5

**dramatic** 54:17,18
60:14 72:4 79:20
85:18
**draw** 53:13 153:14
**drawn** 37:5
**drive** 45:6 58:5
65:12 67:11 72:14
140:21
**driven** 79:7
**driver** 97:25
**drop** 52:13
**DSI** 61:16
**due** 62:5,6 122:5
**duly** 19:7 38:25
**duration** 37:18
**duty** 45:7,13
**dynamic** 69:11

---

### E

**E** 1:17,17 2:1,1 3:1,1
4:1,1 19:6,6,6
38:24,24,24 95:1,1
142:8 157:3,10
158:1,1
**earlier** 29:20 51:6
66:7 73:18 82:10
83:10 97:18 105:8
105:12 107:23
118:18 122:16
126:23
**early** 40:14 59:4
72:24 84:12
142:25
**earnings** 57:3
**ease** 66:9
**easier** 65:14
**East** 2:5
**easy** 65:15
**EBIT** 58:6,6 59:23
64:6,15,18 65:4,7
65:10,12,14,16,22
66:2 83:1 87:2,7
88:9,10 90:24 91:6
126:8,23 127:7
153:8,9,16,17
**EBITDA** 59:25

65:23 82:7,15
87:20
**EBITDAR** 55:9
61:18 65:5,7,9,15
82:1 88:3,4 90:2
123:22 127:10
**EBITDARs** 64:6
**EBITDAR's** 118:9
**economic** 48:20
**economist** 8:3 10:13
**economists** 16:12,14
16:19
**edge** 12:16
**effect** 50:5 54:21
68:10 77:14 80:23
131:10,11
**effectively** 45:6 46:8
50:23 61:20,25
65:7 67:11 68:19
75:24 76:15 81:7
**effectiveness** 85:18
**effectuate** 114:8
**effectuating** 110:3
**effort** 13:13 148:21
**efforts** 129:14
**eight** 11:24 16:3
56:5
**either** 18:15 26:5
38:10 58:9 79:7
86:2 112:3 118:18
122:1 123:23
124:12,12 129:20
149:24 151:13
**elements** 140:24
**elicited** 12:8
**eligibility** 18:7
**eliminate** 33:3 35:6
**elimination** 27:3
**Elizabethtown** 30:5
44:16 98:17 99:20
**embark** 135:2
**emerge** 42:1 88:12
**emergence** 105:25
**eminent** 114:7
**empirical** 8:3 10:13
10:15

employed 98:7,19
  100:22,23 101:16
  101:17
employee 39:18
  101:21 102:24
employees 31:9,10
  32:6,8,9,11 74:8
  76:16,18 86:1,5,13
  89:7 90:16,23
  97:12 98:7,18,22
  99:2 101:16,23
  102:3,7,23 107:25
  109:15,25 110:6
  110:10 148:6,17
  148:18 149:14
  152:1,2,16
employment 97:11
  110:9
ends 52:25
engage 80:18,20
engaged 10:2 40:12
engine 45:6
engineered 130:19
engineering 142:3
enormous 47:4
entered 96:7
enterprise 42:2
entire 41:15,16 46:2
  60:11 78:2 155:1
entirely 34:17
entirety 136:25
entitled 5:5,18 6:14
  7:6 10:25 12:8
  13:20 158:10
entity 42:11
envelope 13:19
environment 54:6
envision 120:8
envisioning 130:5
equation 52:10
equipment 43:24,24
  43:25
equities 128:23
equity 118:7,11,12
  118:16,20,21
  128:22

error 104:25
especially 46:19
ESQ 2:6,7,7,8,9,16
  2:16,17,23 3:6,7,7
  3:8,8
essential 105:4
essentially 12:5
established 54:10,16
estimate 22:11
  23:16,21 26:20
  32:20 67:19 69:2
  75:15,23 90:4
  140:22
estimated 21:25
  22:20 25:20 30:22
  90:21 104:6
estimates 29:25
  31:14 67:18 75:25
  83:6 85:12 90:13
  90:14 117:14
  123:25
estimation 113:23
et 91:1
Europe 57:1 140:3
evaluate 93:2
evaluation 98:1
  117:2
event 18:13,15 26:14
  107:22 109:22
  110:15 113:13,21
  132:19
everybody 18:12
  35:8
evidence 24:14
  28:22 43:10 44:19
  44:23 45:16,20
  46:12,16 49:3,22
  60:19,23 63:14,22
  64:24 65:2 76:24
  77:3,5,8 83:16,21
  86:15,19 157:11
EVIDENTIARY
  1:14
exact 10:5 16:4
  143:14
exactly 4:22 10:18

examination 15:6
  17:16,23 19:12
  22:2 23:14 25:4,15
  27:13 39:3 91:11
  91:14,21 93:21
  95:10 97:1 129:12
  130:25 131:15,21
  131:23,25 148:1
  153:6 155:21
examine 131:15,25
examined 12:13
  19:8 39:1 61:7
examining 19:5
  21:16
example 10:14
  11:11 14:2 17:21
  51:5 54:8,11 68:11
  70:22 71:16 73:21
  80:13 96:4,6 125:1
  141:24 151:8
exceedingly 135:12
exceeds 148:7
exception 27:5 78:2
  82:11 85:11
exceptional 15:22
  16:5
exchange 93:18
exchanges 35:18
exclude 62:24 95:22
excluded 96:21
exclusion 122:17
exclusively 62:6
excuse 103:22
  126:16 142:17
excused 38:18
executed 124:19
execution 59:2 69:8
  73:18
executives 39:14
exercised 18:3
exhibit 21:19 23:9
  24:13,25 25:19
  27:15 28:22 29:8
  40:19,19,20,23,23
  41:13,13,21 42:25
  43:6,7,9 44:7,19

44:22,25 45:3,15
  45:19,21,22 46:11
  46:15 48:16,24
  49:3,21 50:1 51:18
  51:24 53:7 59:11
  59:15,16 60:19,22
  61:1,11,14 63:13
  63:21,23 64:23
  65:1,18,19 66:21
  67:5 71:1 76:11,23
  77:2,5,7,12,18,19
  77:20,22 81:14
  83:16,20,23 84:1,4
  84:5,9 86:14,18,21
  86:23 87:9,24
  88:15 91:15,16
  92:22,22 95:11
  96:10 102:8,16
  103:11,24 127:16
  128:10 137:11,12
  139:8 154:12
exhibited 106:12
exhibits 44:5 80:1
  93:15 128:18
  131:18
exist 100:25 150:18
existed 31:16
existing 112:23
  118:22
exit 112:21,24 113:5
  113:20,24 114:2,9
  114:10,11,22
  118:6 154:4
expansive 133:22
expect 32:12 38:9,12
  71:21 74:15 79:3
  86:11 87:25 90:3
  98:8 100:23
  115:11 119:11
  139:17 141:25
expectation 82:8
  143:23
expected 50:8,9
  51:22 73:9,16
  86:21 96:18
  101:21 123:15

137:1 140:21
**expense** 82:18 137:5
  154:15,22
**expenses** 76:6 137:2
  155:6
**experience** 39:22
  41:4 113:18
**expert** 5:2,14 6:5,6
  8:3 9:21,22,23
  10:24 11:7,12
  12:18 13:3,11,12
  14:2,14 15:13,16
  15:20,25 16:3 17:9
  17:11,12,20 18:1,5
  18:6,8 42:24 49:19
  61:16 155:11
**expertise** 6:12 15:3
  17:14
**experts** 4:20,21 11:9
  11:19,22 12:1,9,21
  12:21 13:18 17:15
  17:15,21 18:19
  69:14 75:17
**expired** 96:5 151:9
**expiring** 27:7
**explain** 34:18,20
  67:25
**explanation** 145:13
**explore** 5:19 119:4
  134:7
**exposed** 13:6 17:22
**expressed** 107:15
  113:3
**extent** 14:23 16:14
  17:10,18 28:11
  72:21 74:6 140:24
  152:4
**extents** 57:8
**Extracted** 146:7
**extracting** 133:19
**extremes** 18:15
**extrication** 133:22
**eyes** 4:14 6:3 8:15
  18:13
**e-mail** 9:13
**e-mailed** 36:5

**e-mails** 11:12,18
  14:4,25,25 16:19
  21:17

---

**F**

**F** 1:17 95:1 141:13
  158:1
**faced** 133:24
**facilities** 28:6 29:14
  31:16,24,25 32:21
  33:8 39:18 47:12
  53:18 54:10,11
  58:22 69:18 72:12
  72:13,14,16,16,18
  72:19 73:2,20,22
  74:5,6,6,11,12
  89:14 96:1,3,20,22
  97:16,23 98:2,3,5
  100:24,24 101:5
  101:20 107:17
  110:20 113:5
  142:21 143:12
  144:6 148:7,10,20
  149:5,9,12,12,15
  149:23 150:1,10
  151:6,11
**facility** 26:2 31:12
  44:16,17 73:22
  82:3,3 83:7 87:21
  87:21 89:24 96:7
  101:20 113:3,11
  114:2 122:15,21
  122:23 128:4
  148:23
**facing** 46:18 114:2
**fact** 4:24 6:9 15:17
  32:14 34:2,7 62:5
  62:6,6 75:5 78:22
  86:24,25 93:8
  96:18 97:25
  112:17 115:6
  121:6 130:20
  133:13 141:14
**fair** 31:20,23 32:1
  32:21 33:5,25 34:1
  36:4 150:8,9

**fairly** 74:25 85:16
  85:17 141:22
**fall** 130:6
**falls** 43:15 139:25
  144:1
**familiar** 48:1 107:10
**far** 59:21
**Faye** 40:8
**features** 18:8 52:9
**February** 70:12
  120:23 121:10
**Federal** 9:24
**feel** 132:1
**feels** 131:24
**fellow** 6:7,13
**fethering** 27:2
**fetish** 132:24
**field** 70:1 78:21
**Fields** 19:21 20:14
**fifth** 82:5 87:19
**figure** 12:7 26:24
  29:16
**figures** 22:23 23:1
**file** 121:3,6
**filed** 46:24 55:19
  114:24,25
**filing** 114:19 119:25
**filings** 55:18 61:19
  67:15
**filled** 90:7
**final** 15:3 70:10
  90:19 152:17
**finalized** 70:11
**finally** 16:10 63:23
**finance** 121:14
  141:13,14,15,17
  141:25
**financial** 20:25 21:1
  23:2 54:22,24
  57:25 61:4 62:10
  86:21 112:20
  118:9 119:5
  122:24
**financing** 112:21,24
  113:5,25 118:7
  120:25 121:12,25

**find** 15:19 37:6,8
  48:9 58:20 66:6
  100:11
**fine** 22:18 134:8
  143:11
**finished** 142:23
**finishing** 67:17
**finite** 140:23
**firm** 6:20 85:24
  125:2
**first** 4:25 6:3,22
  9:10,12 19:7 25:20
  26:18,21 29:15
  31:15 32:19 36:19
  38:25 46:1 52:6
  57:24 58:2 59:5,8
  59:11,17 67:3
  81:20 86:8 95:3
  96:7,14 101:12
  103:16 104:9,18
  104:19 105:23,23
  115:11,12 116:5
  119:22 124:5
**firsthand** 23:4
  149:16
**fit** 46:6
**five** 21:25 22:5,12
  23:16 25:1,2,6
  30:6,23 31:16
  32:20 46:22 54:22
  54:25 55:1 59:20
  59:23 62:9,24
  64:14 74:15 91:1,3
  95:21 98:12,14,19
  98:24,24 100:23
  101:21 102:19
  104:10,19 115:3,4
  115:12,14,25
  116:2,7,15 129:23
  129:25 134:6
  143:23 144:15,18
  149:19,23 150:1,6
  153:21,21,23
**fix** 35:2
**fixed** 57:4 69:19
  80:9

**flat** 50:9 51:21 81:2
  81:8
**flavor** 69:7
**Flemming** 40:3
**flowing** 131:24
**fluid** 93:17
**focus** 60:3
**focused** 43:16 58:15
  60:2,25 68:7 72:10
  75:3,4 76:16 98:4
  105:24 107:17
**fold** 49:17 130:4
**folks** 134:6
**follow** 131:19
**following** 28:16
  116:15
**follows** 19:9 39:2
**food** 40:9
**footnote** 96:11
**footprint** 26:13 54:3
  72:7,9,15 73:3,6
  73:12,20 75:5
  85:15 135:15
  142:6 143:20
  144:3
**Ford** 44:12 51:5
  54:5 62:9,12,13
  68:11
**foresee** 135:4
**form** 17:10 19:14
  46:3 116:2 118:10
**forma** 81:21 82:19
  83:2 122:25 123:3
  123:10,11,13,23
  123:25
**formal** 35:1 80:20
  96:2
**formed** 58:21
  121:17,21
**forming** 48:24
**Fort** 19:25 30:5 31:7
  32:4,6,12 33:2,15
  33:17 98:16 99:16
  101:19,19 102:1
**forth** 9:23 20:22
  34:11 42:5,13 70:9

**78**:8 84:1
**forum** 37:12 38:8
**forward** 4:16 48:22
  50:10 51:23,24
  70:21 76:6 77:15
  84:10 89:15,22
  90:24 91:7 116:17
  117:25 132:14
  133:13,21 137:2
**Foster** 19:22 20:14
**found** 29:7
**foundation** 17:11
  22:15,18 64:21
**four** 46:22 57:23
  58:11 60:4,25
  101:11,12 121:8
  127:25 141:15
**fourth** 59:2 86:8
  95:15 114:21
  121:8 142:23
**frame** 44:15 46:7
  51:5 81:1
**frames** 44:11 51:8
**FRANKEL** 2:12
**frankly** 133:6
**free** 131:24,25 135:9
**freeze** 119:24
**Friday** 36:5 92:17
  116:3
**friend** 134:18
**friends** 53:13 138:22
**fringes** 86:12
**front** 95:12 102:8,16
  127:17 137:11
**fronts** 116:21
**Fruit** 40:7
**fulfill** 115:9
**full** 11:15 12:4,22
  55:15 63:1 73:17
  86:11 125:5
**fully** 17:22
**functions** 71:9 140:3
**fund** 57:1,9
**funding** 56:22,23
  76:7
**further** 21:15,17

**24**:16 27:11 33:4
  38:13 96:25 140:4
  152:11 154:1
  156:2 158:12
**future** 47:25 130:21
  135:16
**F150** 44:12 51:5
  68:11

_____

## G

**G** 4:1 38:24 48:22
**gained** 151:6
**gap** 65:24
**garner** 79:16
**gate** 133:16
**gather** 62:19
**gears** 46:3
**general** 5:23 21:11
  119:24
**generally** 69:10
  117:18 130:13
  139:25
**generate** 79:4
**gentleman** 17:7
  100:16 125:17
  133:6
**ger** 125:9
**getting** 71:24 75:25
  83:5 84:24 99:5
  114:15,25 116:23
  121:11 127:2
**give** 8:21 17:12
  20:23 21:1 28:8
  39:21 40:21 69:7
  101:14 112:11
  125:17,25
**given** 8:25 11:6,18
  13:18 17:20 30:2
  31:12 48:19 50:24
  85:5 92:21 105:5,9
**gives** 64:11 73:15
**giving** 92:18
**glad** 22:17
**glaring** 5:16
**global** 47:13,20,23
  50:11 54:1,3,4,13

**55**:8,25 56:9,10,12
  56:16 57:12 75:6
  149:4
**globalized** 71:8
**globally** 57:9
**go** 4:16 9:16 10:9
  13:24 18:2 24:23
  35:20 58:16 62:22
  67:9 70:2 77:23
  78:2,12,19 87:16
  96:15 115:2
  133:12 135:22
  142:2
**goal** 70:14 137:5
  151:1
**goes** 46:4 48:20 55:6
  59:20 62:25
  101:22 131:12
  146:3
**going** 10:2 15:12
  16:8 20:16 29:15
  50:10,14,15 51:23
  55:9 57:3 59:17
  60:14 65:13 70:15
  70:21 74:9 76:6
  77:17 89:5,8 91:7
  92:11 93:6,9,20
  95:25 99:6 103:22
  108:4 109:7 110:8
  114:5,9,18 117:25
  119:13 121:6,11
  122:6 130:21,24
  133:21 134:7
  137:2,19 140:17
  140:21 141:16
  142:2 143:6
  144:12 149:23
  153:10
**good** 4:2,3,11 6:19
  11:13 13:7 25:17
  25:18 39:4,5 52:4
  71:23 92:4 97:2,3
  100:19 120:4
  123:6 128:23
**gotten** 16:1
**governing** 7:7

**grant** 106:2
**grants** 109:23
   110:10,16,18
   111:4,10,21
   150:24
**graph** 53:12 65:20
**graphic** 67:7
**graphically** 65:21
**gratuitous** 100:15
**great** 20:20 93:19
**Green** 1:10
**grief** 20:21
**ground** 37:6 74:1
**grounds** 36:14 134:9
**group** 35:25 36:4
   43:22 44:10,11,14
   64:15,19 68:13,25
   68:25 80:25 110:4
   136:7,20 142:22
**groups** 43:16 68:9
   69:13 116:6
**growth** 50:10,13,15
**Guanatra** 20:17
**guarantee** 40:14
**guess** 28:16 33:1
   40:13 115:25
   122:6 136:12
   138:21 141:18

### H

**H** 2:16 19:6,6
   157:10
**half** 6:6 30:24 56:1
   75:8 139:13,16,19
   139:20 141:8
**HAMILTON** 2:9
**hand** 7:10 46:10
   59:21 87:18
   158:17
**handed** 21:19
**handing** 144:2
**handled** 6:2
**happened** 53:19
   93:6,7 132:19
**happening** 93:5
   151:4

**happens** 74:3 83:7
**happy** 81:11
**hard** 56:16
**harmful** 133:14
**Harvester** 54:4
**hat** 54:22
**head** 31:12,15 32:1
   32:17,19 33:4,6,8
   101:4 119:23
   120:2,3,8,9,12
   140:4 151:3
**heading** 95:15
**health** 151:23
**healthcare** 21:13
   76:1
**hear** 15:12
**heard** 9:1,12,13
   111:15 133:7,7
**hearing** 1:14 4:5,6
   18:24 19:4 104:17
   105:6 120:13
**hearsay** 49:4,11
**HEATHER** 2:8
**heavily** 51:12 56:2
**heavy** 43:18,21
   45:13,25
**hedging** 80:18,21,24
   81:10
**heed** 152:17
**held** 33:23
**help** 89:9 93:9 99:4
   123:2 129:10
   136:22
**helped** 16:20
**Helper** 4:20 6:23 8:2
   9:6,7,14 10:9,16
   11:3,9,17
**Helper's** 7:3,19 11:6
   11:23
**helpful** 99:6
**Henderson** 19:25
   30:4 98:16 99:10
**hereunto** 158:16
**high** 52:16 67:13,24
   81:22,22,24 82:6
   82:11 83:4,5,12

   117:22 136:11
**higher** 62:23
**highlight** 5:10
**highly** 7:8,17,20,23
   8:1,9,18 9:2 65:9
   67:16
**highway** 43:23
   45:13
**Hills** 30:5 31:7
   98:17 99:13
**hire** 106:18,21
**hiring** 119:24
**historic** 47:24
**hit** 88:20
**hitting** 76:2
**hoc** 2:20 124:15
**HOCK** 3:8
**hoist** 145:11
**hold** 109:11
**holders** 2:21 118:16
   124:13
**holds** 109:8
**home** 83:5
**HON** 1:18
**Honor** 4:3,11 6:19
   6:22 7:10,13 9:11
   11:21 12:10,15
   13:4,10,16,23,25
   14:9 15:15 16:21
   18:21,23 19:1
   22:14,17 23:8,12
   24:8,15,18,24,25
   25:10,12 32:22
   34:4 35:9 38:14,16
   38:19,20 42:23
   43:5,7 44:18 49:2
   49:5,7,13,15,18,23
   50:21 52:14 60:3
   60:20 63:14,15,18
   64:3,24 65:22
   67:13 70:10 72:23
   76:4,24 78:11
   81:21 82:12 83:6
   84:4,15 86:15
   87:17 88:17 92:18
   92:24 93:13,24,25

   95:4,9 100:14
   102:15 111:6
   128:12,19,22
   129:2,5,17,24
   130:2 132:10
   134:12 138:18
   143:25 145:24
   152:3,11,13,22
   153:2 155:20
   156:2,6
**hope** 116:23 135:25
**hoped** 4:12
**hoping** 152:18
**horizon** 101:11
**horizontal** 29:15
**hot** 52:19 80:12
**hour** 11:24 16:3
   31:2,4,6 133:25
   148:5
**hourly** 31:5 148:9
   148:10,22
**hours** 31:8 104:21
   104:21 132:5
   145:10
**House** 1:10
**houses** 119:6
**housing** 107:4,6
**hundred** 31:8 42:25
   57:10 62:3 63:7
   64:12,15 84:17
   98:24,24 99:2
   100:6,6,8,8 102:3
   102:6,23 103:6
   137:7
**hundreds** 11:17
**hush** 80:23
**hut** 76:14
**hypothetical** 89:11
   89:13 112:18
**Hypothetically**
   15:10

### I

**IAM** 42:21 89:24
   90:15 127:22
   128:6 154:23

**idea** 15:11 44:2
98:18 144:20
**identical** 10:22 20:8
**identification**
137:12
**identified** 30:7
37:19 39:22 57:17
66:1 75:1 86:7
140:12
**identify** 41:6 48:15
**identifying** 57:16,22
66:15
**imagine** 18:3 69:14
**immediately** 5:7
60:7 101:10
**impact** 55:21 85:8
85:16,20 86:10,22
87:2 88:1 90:9
107:16
**impartial** 18:14
**impede** 131:22
**impersonal** 18:14
**implement** 79:21
101:10 110:15,24
111:3,10,20,23
112:14 150:14
151:2
**implementation**
107:25 109:22
**implemented** 75:9
79:22 86:7,9 110:1
139:14,17 140:4
149:25,25 150:4
151:5,5
**implicate** 132:8
**import** 107:9
**important** 51:1
53:23,24 87:15
91:23,25 92:1,3,6
116:22
**impose** 149:18
150:25
**improperly** 134:5
**improve** 58:8
**improved** 90:16,17
**improvement** 41:25

58:19,19 82:22
85:13 87:3 88:3,9
89:3 137:21
**improvements**
58:17,17 77:14
**inability** 47:8
**inaccuracy** 152:14
**incentive** 82:16,17
**incident** 18:17
**inclined** 8:23 20:23
**include** 26:11 35:14
38:4 42:14 62:7,8
150:20 151:17
**included** 33:21
34:10 59:25 62:7
62:11 85:14 90:5,6
95:21 96:4 97:6
122:19 129:21
149:8
**includes** 56:11
150:18
**including** 11:9,23
30:2 31:24 39:17
63:10 116:1
140:20
**income** 55:9 76:2
116:5
**inconsistencies** 5:11
**inconsistency** 5:16
**incorporate** 15:4
**incorporated** 14:23
47:21
**incorporates** 81:25
84:10
**increase** 52:19 85:2
85:18
**increases** 71:22,25
79:7 81:8 85:1
**incrementally** 90:17
**independent** 124:13
**index** 1:5 52:6
**India** 56:13 72:22
97:13
**indicatates** 53:3
**indicate** 9:11 17:17
**indicated** 4:12 9:10

16:11,22 27:10
38:7
**indicating** 7:22
**indication** 6:11
**individual** 29:3
107:17
**individually** 141:12
**individuals** 10:12
**industrial** 45:9
**industry** 8:4 46:19
46:20,21 47:25
48:1,21 52:23
54:23 71:10 79:11
80:10 126:8
**inform** 120:12
**information** 6:15
7:8 8:11 11:1
15:24 17:13 20:23
28:14,25 29:6,7
35:17 47:21 48:9
48:23 50:3 51:16
52:2 53:10 54:20
64:10 67:3,14
69:16 77:19,21
92:20 93:1,3
128:17,25 129:3
129:18 130:7,11
130:13 131:2,4,6,7
131:9,12,16,17
132:1,9,13,16
133:19 134:3
135:17 144:14
152:4 155:12,17
**initial** 20:16 21:22
40:13 66:8 120:25
**initially** 9:11 74:3
74:14 76:15 93:12
**initiated** 73:19,23
**initiating** 59:5
**initiative** 72:5 74:21
**initiatives** 39:17
42:13 57:17,22
58:22,24 59:4,6
66:3 69:8 75:4
82:22 83:13 86:6
88:1 97:8 122:17

122:18 123:14
124:4
**input** 78:6
**inquire** 134:21
**inquiry** 96:25
**inserted** 20:10,11,11
**inside** 65:15 75:16
**insight** 50:11
**Insights** 47:20,23
**inspections** 70:3
**installations** 45:13
**instance** 6:25
**instances** 70:18,19
71:16 80:8
**institutions** 112:21
**instructed** 145:23
**insurances** 71:21
**intend** 18:19 115:9
134:17
**intended** 95:23
**intense** 118:6
**intensity** 78:16,16
**intention** 26:5
110:17 114:12
134:19
**interest** 72:25 113:4
113:5,20 135:8
**interested** 5:25 6:25
7:2 158:14
**interesting** 53:12
**interim** 40:9
**internal** 8:11
**international** 34:9
54:4 64:12
**interviewing** 10:2
**introduce** 39:6
**intrusion** 138:22
**inventory** 107:20
**invested** 56:2
**investigative** 10:1
**investors** 130:14
**involve** 10:1
**involved** 17:2 35:25
59:3 69:4,25 74:5
**in-between** 45:13
**IQ** 64:10

**issuance** 118:20,21
**issuant** 130:12
**issue** 4:23 5:25 14:6
    21:14,18 33:10
    109:4 113:23
    133:10,17 145:13
    145:20
**issued** 7:3,4 8:17
    20:9 122:13
**issuer** 130:14
**issues** 4:15 10:5,17
    10:18 34:24 37:8
    107:20,20 112:12
    112:19 113:13
    130:24
**item** 71:2 72:7 74:2
    74:19 75:10
    128:12 130:3,5
    132:20
**items** 22:20 30:7,8
    72:5 74:17,19
    130:5 138:20
    143:20 155:15
**iteration** 116:9
**iterative** 67:16

**J**

**Jacobs** 19:22 20:14
**January** 20:9 31:21
    32:18 48:19 84:18
    120:9,10,20
    142:25
**Jay** 4:3
**JAYANT** 2:6
**jet** 144:25
**Jim** 19:22 20:14
**Jimenez** 2:7 19:5,10
    19:12 22:17 23:8
    24:8,15 32:22 34:4
    38:16
**joint** 72:25 73:1
**Jones** 2:3 4:4 75:17
**judge** 1:19 7:4
    112:18 138:10
**judgment** 101:2,3
    101:15 111:9,18

112:2,11,14
    113:19 117:10
    118:5
**July** 59:4 66:11
    67:17 69:5 74:23
**Jump** 127:3
**jumped** 126:25
**June** 7:5 66:11
    72:24

**K**

**K** 88:6 117:14
**Katrog** 56:25
**keeping** 70:20
    132:24 133:16
**Kentucky** 98:17
**kept** 113:4
**key** 11:2 97:24
**kind** 18:3 39:25
    46:25 57:12,25
    67:10 82:1 87:15
    89:3 92:4 126:24
    133:9 134:2 141:5
    154:2
**kinds** 12:17 13:2,7
    18:14 33:22 64:8
    130:15
**Kingdom** 39:19
**knew** 22:4
**knifed** 151:7
**know** 5:6 6:12 16:22
    31:22 32:12,13
    35:7,10 78:17 92:3
    92:7 98:10,12,21
    103:16 106:23,24
    107:4,6,11 114:1
    119:8,10,12 121:6
    124:24 126:6
    129:5 143:7
    148:16 149:8,13
    149:16 150:16
**knowledge** 23:4
**knows** 18:12 128:18
    128:19
**KRAMER** 2:12
**K-Mart** 40:6

**L**

**labeled** 72:7 87:18
    90:19 108:14
**labor** 10:14 35:1,2,3
    36:22,23 37:8
    39:18 42:12 58:24
    62:14 69:20 75:16
    76:21,22 90:5,14
    95:16 96:21 97:6
    97:14,21 98:1,5,8
    107:9,9 110:13
    148:15,25 151:17
    155:9,13,15,16
**lag** 145:1
**Lakeside** 2:9
**landscape** 46:23
**Lane** 2:21
**large** 45:12 62:11
    79:23,25 81:2
**larger** 35:25 122:23
    142:2
**largest** 56:4,15
**late** 86:7 123:18,20
    123:21 132:24
    145:3
**latest** 102:7
**LAVAN** 2:19
**law** 6:20 99:24 100:4
    152:24
**lawyers** 8:7 132:25
**layering** 124:3
**laying** 97:11
**lead** 133:11
**leading** 39:15
    103:21
**leads** 133:21
**lease** 131:8
**left** 46:2,10 84:21,23
    87:18 88:18 89:20
**legacy** 54:11
**legal** 13:8 151:24
    152:6,8
**legally** 151:4
**legitimate** 13:15
**lender** 112:23
**lenders** 86:3 113:20

113:24 114:9
    122:22,23 124:8,9
    154:4
**lending** 114:2
**LENNOX** 2:8
**Leslie** 40:8
**lesser** 72:21
**letter** 19:14 137:13
**let's** 32:4 35:20 68:2
    99:3 108:18
    151:18
**level** 34:9 41:24
    64:18 76:9 78:16
    84:25 89:9,15
    107:2 128:24
    141:18 154:5
**levels** 27:2 83:3
    90:25 153:16
**LEVIN** 2:12
**LEVINE** 3:8 10:10
    14:8 22:14 23:11
    23:14 25:3,8 27:13
    35:9 38:13
**lexicon** 102:2
**liabilities** 21:12
**liberty** 8:16,20
**lies** 5:3
**LIFLAND** 1:18
**light** 45:7 50:7 142:1
**Lima** 26:5 33:18
    96:4,12 99:9 101:8
    151:8
**limit** 33:3 132:2
    138:5 150:12
**limitation** 4:14
**limitations** 5:20
**limited** 132:11 139:1
    149:19
**line** 17:19 22:6 30:8
    37:4 82:9 87:19
    114:14 123:15
    126:6,19 127:3
    148:21
**lined** 88:2
**lines** 74:11 126:14
**links** 5:7

**liquidation** 118:21
**list** 41:10 140:20
**listed** 22:9,19,23
**listen** 18:10
**litigation** 30:18,21
**little** 27:15 56:1 59:7
  71:5 114:10 133:7
  142:1 143:16
  151:3
**living** 27:2
**LLP** 2:12,19 3:3
**load** 4:25
**loan** 40:14 84:16
**local** 33:15,21 34:9
  107:8
**located** 53:17
**location** 29:4
**locations** 19:24
  20:11 24:1 31:3
**lock** 65:23 70:17
**long** 29:11 55:24
  57:2 60:17 89:7
  106:1 115:2
**longer** 35:10 80:8,22
  88:16 144:22
  154:8
**Longview** 96:6
**look** 9:16 46:23,24
  52:5 58:16 60:2,3
  68:9 95:14 106:4
  116:25 142:4
  148:12
**looked** 9:21 15:18
  36:11 51:6 58:4,20
  68:16,19,19 72:9
  75:18 76:15 84:20
  85:4 97:24 109:20
  148:21 149:6
**looking** 5:14 13:13
  18:16 30:22 57:6
  57:24 58:13 61:17
  62:19 67:10 68:6
  69:24 72:3,13
  76:18 78:22 79:6
  79:18 95:24
  101:14 105:1

114:21 116:16
123:13 127:7
132:14 137:7
149:2,2
**looks** 51:19
**Loom** 40:8
**losing** 55:10
**loss** 33:3 46:25
  55:22
**losses** 55:1,3,13
  56:23 57:10
**lost** 47:2
**lot** 20:22 47:11 52:8
  55:5 74:4,5 78:6
  87:13 97:19
  101:12 116:20
  131:16
**Louisville** 73:23
  143:13
**loving** 18:16
**low** 50:13 67:14,23
  74:4 81:22,22,24
  82:6,11 83:3
  117:22 136:11
**lower** 62:3 72:14,20
**lowering** 73:7
**LOWRY** 2:23
**lunch** 93:22
**luncheon** 94:2

---

## M

**M** 48:22
**ma** 89:14
**machines** 8:6
**machinists** 42:18
**magnitude** 98:23
  99:1 143:19
**Maiden** 2:21
**main** 43:25
**maintain** 13:14,17
**major** 44:13 45:23
  46:24 67:8 114:18
**majority** 72:19 81:4
**making** 6:2 12:10
  70:1 117:24
  129:13

**mal** 58:22
**management** 40:5,7
  71:9 79:13 82:17
  110:23 111:2
  119:9 140:2
**mandatory** 79:11
**manufacture** 46:10
  125:1
**manufactured** 69:18
**manufacturers**
  54:10
**manufactures** 44:3
**manufacturing**
  26:13 45:12 72:11
  72:15 148:10,20
  148:23
**March** 1:9 19:13,15
  19:15,16,18 21:23
  23:25 29:2,6 35:20
  93:14 105:13
  115:12,24 120:17
  120:19,23,25
  137:13 157:1
**margin** 41:25
  126:23
**margins** 59:25 61:18
  126:11
**Marion** 19:25 25:24
  26:1,5,9,16 27:6,9
  30:5 31:8 95:22
  99:4,9,9 101:6,8
  102:1,4 103:5
**marked** 44:6 125:25
  137:12
**market** 43:23 46:25
  47:2 50:8,12,14,15
  50:16 53:15,20,21
  54:15 56:14,15,15
  56:17,19,21 68:7
  117:17,19,24
  118:20
**marketplace** 51:10
**marketplaces** 57:6
**markets** 47:5 57:8
**marriage** 158:13
**Mary's** 44:16

**master** 19:25 33:18
  151:9,18
**mat** 149:6
**match** 88:19
**matched** 89:6
**material** 7:17 10:25
  49:19 69:20,21
  71:12 130:13
  131:11
**materials** 4:15 6:8
  6:17 14:1 16:2,15
  53:1
**math** 152:25
**mathematical** 23:17
**matter** 1:4 4:14 6:3
  6:4 8:13 15:24
  16:4 33:8 34:17
  57:14 93:14
  119:15 158:10,14
  158:15
**matters** 4:22 32:23
  49:8,16 82:14
  133:22
**maximize** 72:13
**Mayer** 2:16 24:18
  24:18,22,24 25:5
  25:10 95:4,8 126:2
  129:23 132:10
  152:13,19
**mean** 23:17 63:6
  108:25 113:1
  114:16 124:15
  149:22
**means** 72:15 91:4
**meant** 150:12
**measurements** 65:8
**medical** 75:21
**meet** 19:15,16,18
  74:9
**meeting** 19:20 20:2
  21:4 36:24 37:14
  125:3
**meetings** 33:23
  34:11 37:13,20
  38:8
**member** 30:13 40:5

**members** 26:17
 148:25
**mention** 17:2 50:6
**mentioned** 18:25
 55:21 61:19 71:4
 73:18 78:22
 142:13,22 148:17
**Mercedes** 53:17
**met** 12:20
**metal** 44:15
**metric** 65:4,5 90:18
**metrics** 57:25 58:4
 59:19 83:9 123:17
 126:11
**Mexican** 73:4
**Mexico** 72:10,20
 73:1,3,8 97:13
**Michael** 39:14
**Michigan** 48:4
**middle** 114:6
**midnight** 92:13
 145:6
**midpoint** 122:14
**Miguel** 19:22
**milestones** 114:19
**million** 22:10 23:5
 23:16 25:20 26:3
 26:11,15 29:17
 30:24 50:9 51:22
 55:3,11,14 57:10
 58:18 66:8,10
 67:23,24 70:13
 71:19,22 72:1,8
 73:11,13 74:15,16
 75:1,24 76:8,20
 77:11 79:3,5 82:24
 83:7 84:16,17 88:5
 90:6 95:16,22,22
 96:11,12 97:17
 102:19,21 103:4
 104:7,10,20,22
 108:16 127:19
 128:7,7 136:2,5,16
 137:1,3,7,8 139:7
 141:2,2,3,3,4
 142:7 143:2,15,15

143:20,23 152:15
**millions** 140:18
**mind** 59:12 114:15
 136:13
**mine** 62:4 145:3
**minimis** 85:16
**minimum** 127:7
 138:22 153:15
 154:2,7
**mining** 43:24
**minus** 136:10,10
**minute** 25:6 77:24
 92:15 109:17
 129:23,25 138:10
**minutes** 25:1,2
 134:6 144:16,18
 144:22 153:2
**misspoken** 103:23
**misstated** 118:19
**mistake** 135:16
**misunderstood**
 118:19
**mix** 50:17,18 78:2
**mixed** 52:17
**model** 62:18
**modification** 148:8
**modifications** 148:5
**modify** 42:4
**modus** 138:19
**MOERS** 2:16
**moment** 108:18
 143:3
**money** 28:18
**month** 101:11 115:7
 116:1,11 121:24
**months** 93:5 101:13
 119:24 122:7
**Moreland** 2:16
 25:12,15,16 27:11
 95:9,10 96:23
**morning** 4:2,3,6,11
 6:19 25:17,18 39:4
 39:5 95:9 102:10
 103:13 105:8
 156:5
**motion** 4:7,7,10 7:9

22:6,13,21 27:7
 61:3 95:20,22 98:9
 109:12,14,22,23
 110:10,16,18
 111:4,21 149:18
 149:22
**motions** 41:19
**Motor** 62:9,12,13
**move** 14:18 23:9
 51:24 64:20 65:23
 71:22 76:10 85:24
 134:17 144:11
**moved** 53:22 54:3
 67:8 70:9 77:5
 89:19
**moves** 80:14
**moving** 9:5 45:21
 71:1 72:19 75:10
 77:14 81:14 91:3
 142:6
**multiplied** 31:8
**mystery** 123:5

_____
**N**

**N** 2:1 3:1 4:1 38:24
 95:1,1,1 157:3
**NAFTALIS** 2:12
**NAGLE** 2:23
**name** 39:8
**names** 69:10
**Naraj** 20:17
**narrow** 95:24
 135:12
**nature** 43:13 46:18
 75:6
**near** 130:20 153:22
 153:24
**necessarily** 17:23
 133:14
**necessary** 42:1,10
 71:24 111:22
 148:8
**need** 25:1,2 55:23
 56:10,12,12,13,13
 56:14 58:1,6,8
 60:12,13,13 64:17

79:15,21 83:11,12
 87:4,16 88:11,25
 90:18 91:5,7 93:7
 93:8,9 111:25
 114:8 123:16
**needed** 21:14 58:19
 66:5 75:2 108:14
 153:22
**needing** 89:10
**needs** 17:5 55:25
 116:20
**negative** 55:6 57:12
 74:13 79:2 82:13
 82:23 88:10
**negotiate** 36:10,22
 110:19 122:23
 129:14 150:6
 151:10
**negotiated** 108:15
 109:3
**negotiating** 34:22
 36:20 38:3 70:19
 80:6,16 85:1
 150:14 151:10
**negotiation** 4:13
 30:19 33:9 37:2,5
 54:17 69:4 130:8
**negotiations** 20:24
 28:14,15 33:10,23
 34:12,15,17,21,25
 35:13 36:16 70:8
 89:22 107:19
 108:22 110:13,14
 111:24 112:11,13
 114:6 145:15
 151:14,19,19
**negotiations/discu...**
 38:5
**neighborhood** 51:22
 99:2
**neither** 11:3 15:17
 124:14
**net** 71:23,25 97:25
 143:23
**Networks** 81:6
**never** 15:11,12

new 1:2,11,11 2:5,5
2:15,15,22,22 3:5
3:5 52:6 54:10
74:11 84:20 90:7
106:2 118:25
158:3,7
nickle 47:7
night 104:5,9,18
145:4
nine 56:5 72:18
Nissan 53:17 54:5
56:8
non 31:24 53:20
89:1 108:23,23
130:11,13 131:11
132:9 151:6
nonunion 42:22
76:17 86:5,13
89:25 107:25
109:12 127:23
128:6 136:15,24
137:6 149:8,12,15
151:7 152:1
154:15,23
normal 149:20
north 46:19,20
47:14 50:7 53:21
53:25 54:2,6,15,24
56:3,4,7,11,13,14
57:10,13 58:15
67:11 68:6,21
72:10 73:8 75:3
81:4 143:15 149:3
149:4,7,9,15
northbound 50:12
notable 52:15
Notary 19:8 38:25
158:7
notation 137:21
note 2:20 12:10
13:25 16:10 73:9
82:12 85:20
124:13
notebook 127:11
noted 53:4 70:11
85:8,15 95:2 156:7

notes 11:18 14:3
16:19 117:21
142:15
Notice 129:17
November 28:13
34:10 87:22
Nowak 19:8 39:1
158:6,19
nub 5:3
number 7:5 13:11
23:6,6,18 25:23
29:8,21 31:1,9,9
31:10,20 32:14
33:23 34:2,7 37:20
44:5 52:21 55:14
55:17 62:15 63:10
70:20 75:8,19
77:16 78:2,25 79:1
82:5,13,23 86:6
88:7 90:6 95:17
96:19 97:17 98:22
99:7 100:24
101:15,19 116:21
126:9 128:15,19
128:19 129:7,8,11
130:15,17,18,21
130:24 131:1
133:4,4 136:5
137:8,12,25
152:17 154:25
numbers 26:17 27:3
62:21,23 63:11
65:11,14 67:20
71:2 86:22 88:15
96:22 99:6 100:9
105:4 118:8
126:22 128:2
129:11,13 133:9
143:14 154:11
numerous 70:1

## O

O 1:17 4:1 19:6 95:1
95:1,1
oath 8:8 35:10
object 49:4,14 92:22

92:22 131:3 152:3
objected 49:11
objection 9:1,1
22:14 32:22 34:4
43:2 44:20 45:17
46:13 60:20 63:15
63:18 76:25 83:18
86:16 100:14
111:5,12 134:9,9
134:11
objectionable
134:19
obligation 132:21
obligations 42:4
62:14 74:7,8
obtaining 42:22
obviously 65:8
79:10 81:9 121:13
occur 101:7 104:16
105:3 107:22
occurred 19:4 73:20
93:12 137:10
occurring 116:19
October 28:13 38:6
67:18 70:7 84:8
OEM 47:1 53:5
78:18 81:6,11
OEMs 78:17 81:6
offer 42:24 44:18
45:15 46:11 49:2
60:18 63:13 64:23
76:23 83:16 86:14
91:15,16
offered 4:13 41:11
offering 46:3 118:25
offerings 45:24
office 140:2
officer 39:9,11 40:3
41:17 47:16
104:14,24 111:8
111:19 112:4
113:19 114:14
119:12 155:25
officials 34:9 38:6
offset 71:20,24
Oftentimes 34:23

Oh 32:8 91:16
105:15 123:11
Ohio 2:10
okay 27:16,19 32:5
104:1 105:15
127:5 138:1 139:4
139:25 140:6
145:2
once 20:16 36:12
83:7 88:12 121:20
129:6
ones 64:12 68:20
92:6 109:16
150:13,15
ongoing 57:9 71:25
79:11,16 144:13
Ontario 44:16
OPED 90:22 108:16
open 118:20 135:9
135:17 138:22
opener 133:8
operandi 138:19
operate 58:22 89:14
operating 41:25
57:25 71:17 82:19
105:25 121:7
123:14,17 124:3
126:10
operation 55:10
93:17
operations 55:22,23
56:9,22 57:2,13
67:11 72:21 73:4
75:3 140:17
operator 44:1
opinion 5:12,24 42:7
42:19,20 56:18
111:22 112:5
154:6
opinions 5:6,7,8,10
17:11 48:24
153:15
opportunity 7:16
8:25 11:25 12:4
33:3 81:9 129:4
opposed 47:14 64:16

65:5
**opposite** 5:21
**opposition** 65:4
**optimization** 73:2,6
  73:20 96:22 97:24
  101:20
**optimizing** 72:3
**order** 7:3,4,7,9,14
  8:14,16 9:4,5
  39:25 93:15 98:23
  99:1 109:4 112:12
  113:14 143:18
**organization** 48:3
  65:13 89:11
**organize** 114:6
**orientation** 47:13
**oriented** 79:20
**original** 24:20
**ought** 133:23
**outcome** 109:13
  110:5 144:23
  158:15
**outcomes** 116:7
**outlined** 97:7
**outside** 8:18 47:12
  138:13
**overall** 29:12 54:23
  68:16 69:24 83:14
**overlaid** 122:16
**overruled** 34:6 49:6
  49:20 60:21 64:22
**overseas** 56:22
**Oxford** 40:1
**o'clock** 93:23 156:4
**O'Malley** 61:15 62:6
**O'Malley's** 63:10
  64:5

———————————
**P**
**P** 2:1,1 3:1,1 4:1
  19:6
**Packard** 54:5
**page** 41:9,10,10 50:1
  51:13,14,16,25
  52:2 53:7,10 59:11
  61:10 63:24

125:16,20 126:17
  127:3 137:17
**pages** 7:21,22 11:17
  40:20
**paid** 74:7 148:6,9,22
**pain** 51:25
**pairing** 59:18 86:2
**paper** 15:11
**papers** 65:4
**paragraph** 20:12
  41:21,22,23 42:9
  105:19 119:16
  123:4 148:2,3,13
  153:14
**paragraphs** 153:17
  153:19
**part** 4:14 6:10 10:24
  15:22 22:6,12
  28:15 33:11 40:15
  43:21 46:9 51:9
  68:6,6,10 69:1,8
  69:21 79:16,23,25
  81:20 97:7 105:12
  112:23 116:12,13
  116:16 128:10
  131:5 140:14
  141:13 145:21
  149:17 151:11
**participants** 19:21
  155:7
**participate** 51:2,9
  56:17 89:2 103:10
  103:20
**participation** 88:22
  91:5
**particular** 18:13
  60:25 66:15 68:13
  70:17 80:25
  130:17 133:4,17
  133:17 134:3
  138:24 153:8
**particularly** 7:15
**parties** 4:8 18:25
  34:22 37:6 47:18
  53:2 95:6 158:13
**partner** 4:9

**partners** 41:18
  121:14
**partnership** 20:12
  71:13
**parts** 8:3 46:3 52:23
  53:15,19 68:8 85:6
**party** 6:1 7:14 10:25
  11:1 15:17,21,23
  18:14
**pass** 47:8,9 53:5,6
  115:12 116:5
**passenger** 43:17
  50:24 51:10
**passing** 104:16,23
  112:22
**passings** 112:25
**pause** 140:6 143:3
**pay** 8:6 10:20 80:15
**PEDRO** 2:7
**pension** 76:19,21
  82:13,14 86:12
**people** 30:15 37:10
  56:2,11 64:11
  124:18 130:19
  144:17
**percent** 43:19,22
  52:8,19,20,22,25
  53:22 56:6 63:1,5
  63:8,11,11 64:15
  65:10,24 71:5
  119:23 126:8,22
  136:21,23 137:7
  137:24 138:2,3
  154:5,22,25 155:1
**percentage** 62:22,23
  141:9 153:8 154:7
  154:7,15,17,20,21
**percentages** 65:22
  65:23 83:1
**perception** 18:13
**perfectly** 135:6
**performance** 46:25
  54:22,24 55:15
  59:19,23 60:8,14
  62:1,10 83:9 88:4
  88:9 89:1 153:23

**performances** 88:4
**performed** 60:8
**performer** 62:8,18
**performers** 89:18
**performing** 68:20
**performs** 58:10,16
**period** 37:20 52:7,18
  53:2 55:1,11 59:22
  60:11 64:9 70:17
  70:21,22,23 73:15
  73:16 74:12 80:3
  91:3 112:10 125:4
**periodic** 137:21,24
**permit** 130:12
**permits** 8:17
**Perrin** 75:17 137:9
  137:13 154:11
**person** 45:10,11
**personal** 132:20
**personally** 23:18,20
  24:6,7
**personnel** 70:2
  82:17
**perspective** 87:15
  89:12 92:5 107:19
  132:11 143:8
**perspectives** 47:25
**pertains** 9:5
**petard** 145:12
**Peter** 3:7 6:20
**phone** 9:14
**pick** 26:25
**picked** 23:25 143:16
**pickup** 43:18 44:11
  44:12 45:8 68:12
**picture** 44:12 46:1
  81:1
**piece** 15:11
**pin** 74:1
**place** 39:17 42:16
  79:22 93:18
  133:16
**plan** 22:21 71:20
  76:20 82:17
  106:18 107:1
  110:15 114:8,10

114:19 115:3,4,10
115:12,14 116:2,8
116:9,16,17,25
117:1 120:22
121:7,18 122:1,8
122:12 123:1,3,10
123:10,11,22,24
124:2,11 125:3
128:4
**planned** 115:6
136:19
**planning** 71:21
101:11 114:11
**plans** 82:16 98:15
101:4 106:16,17
106:20,25 107:8
107:11 108:21,25
109:21,24 110:8
110:13 120:16
134:2
**plant** 10:3 25:24
26:9 27:6 47:12
70:3 71:17,18 99:8
104:19 148:16
**plants** 8:4,5 10:9,11
10:13 22:1,5,12
23:16 26:5 27:7
30:6,23 45:12
95:21 96:19 97:6
97:12 98:7,13,14
98:19 102:19
149:19,19,20
150:5,18 151:1,7,8
151:20
**platform** 44:13
68:11,11 72:20
**platforms** 50:24
**play** 153:2
**played** 149:14
**player** 56:16
**players** 54:16 57:12
**plea** 86:2
**please** 39:6,23 40:21
95:12 119:16
125:10 126:17
144:18

**plenty** 34:15
**plus** 103:5
**point** 6:3,4 9:15
16:10 17:25 20:25
58:10,17 62:22
64:8 70:8 75:24
78:18 84:13 85:4
90:13 95:14
105:23 115:5
119:22 123:13
134:25 135:13,14
137:17 138:10
140:16 144:1
152:10
**pointed** 13:2 52:14
**points** 60:1 62:3,23
63:4,7,12 64:16
65:10
**pool** 117:23
**pools** 142:2
**poor** 62:8,11
**portion** 109:14
118:9 128:6 139:1
143:21 146:6
**portions** 59:5
**position** 6:18 57:6
**positive** 85:16 120:4
**possibility** 33:5
106:10 107:14
119:4,6
**possible** 57:3 110:22
112:16 131:19
132:22 135:23
**post** 21:13 113:13
**potential** 113:19
**Potok** 23:25 24:5
29:2,6,11 93:8
**Potok's** 125:2
**Pottstown** 33:18
96:4 151:8
**power** 45:5,12 46:9
**practical** 15:23
107:20
**practice** 72:2 80:10
**preceding** 61:21
90:4

**precise** 134:16
**precisely** 8:10
**precluded** 8:22
133:23
**preclusion** 17:18
**predicated** 73:2
**predominantly**
43:15 58:15 68:7
**predominately** 62:5
72:10 75:20
148:25
**prefix** 35:7
**preliminary** 115:11
115:13 116:2
**preparation** 97:23
120:21
**prepare** 30:3
**prepared** 9:15 13:22
16:23 18:24 21:1
21:15 27:18,20
28:23 41:17 47:17
48:8 64:2 65:20
81:19 84:6 87:12
89:20 110:5 121:2
121:5 122:13
133:12 145:19
**preparedness**
107:18
**preparing** 29:25
47:16
**present** 4:9 19:20,24
20:18 56:19 116:8
138:12
**presentation** 48:17
67:8 116:15,17
**presented** 21:23
23:25 24:5 33:2,22
61:25 121:16
124:7,9,12,14
125:5
**presenting** 4:10
57:16
**presents** 67:12
**preserving** 5:25
**president** 20:15
**presses** 45:12

**pressure** 46:22
**pressures** 47:3
**presumes** 88:23
**presuming** 83:6
**pretty** 87:14,14
106:7
**previous** 51:18
**previously** 20:3 21:9
77:4
**pre-prepared**
134:23
**price** 52:6,7,12,19
77:13 80:11,12
81:7,8 84:25
**prices** 47:6 52:24
80:2 125:9,12,15
**pricing** 58:9 59:5
68:17 70:23 85:3
89:3 90:2
**primarily** 30:13
**primary** 19:21
**principal** 57:16,21
**printing** 45:12
**prior** 4:25 5:8 17:16
33:24 39:22 40:4,6
73:5 90:17 140:13
**privy** 12:12
**pro** 18:23 81:21
82:19 83:2 122:25
123:3,10,11,13,23
123:25
**probably** 5:18 32:8
89:13 92:5,9,15
101:10 115:2
116:12,21 117:22
137:25 138:11
139:2 143:16,16
**probative** 17:24
**problem** 133:9,14
133:18,24
**problems** 130:15
**Procedure** 9:24
15:16
**proceed** 18:22 19:10
20:19 118:6 132:5
**proceeded** 144:7

**proceeding** 7:15,18
  37:18 92:20 105:5
  132:6,7 145:22
  150:7,19 151:14
**proceedings** 5:23
  158:9,11
**process** 21:16 57:24
  58:11 59:1 66:14
  67:17 69:4 70:4,6
  72:1 76:15 79:22
  79:24 80:19 84:19
  87:22 91:6 101:10
  110:18 113:4,8
  117:3,9,12 123:20
  129:10
**processes** 8:11 70:3
**produce** 11:10 22:18
  30:17 112:13
  151:15
**produced** 6:17 7:18
  11:16 14:21,24,25
  15:1 29:20 104:4
**producing** 139:23
**product** 12:6 16:18
  24:10 45:23 46:3
  50:17,19 68:9,19
  68:23,25,25 69:13
  70:20 71:12
  107:16 116:6
**production** 7:7
  51:20 70:23
**productivity** 98:2
**products** 40:9 44:14
  45:4,9,14,25 52:15
  52:17,21,22 68:7
  69:18 71:6 80:25
  81:5 142:22
**professional** 40:12
  41:4,6
**professionals**
  115:19
**Professor** 5:16 6:7,8
  6:9,11,13,16 7:2
  9:7 11:2,2,6,7 14:9
  14:18,18,19
**profit** 41:25 48:4

58:19 85:13
  126:10
**profitability** 58:23
  68:8,10,12,16,18
  69:19 105:25
**profits** 56:22
**program** 69:1 75:21
  101:20 155:25
**programs** 54:13
  76:22 79:3,12 81:3
**progress** 89:22
**projected** 47:25
  95:16,21 104:20
  136:25 151:17
**projection** 132:14
**projections** 50:11
**properly** 14:14
  134:5
**proposal** 20:7,8,16
  20:20 21:3,5,7
  30:8 36:3,6,7,12
  93:12 110:15
  111:3,10,11,20
  112:15 148:4
  150:3
**proposals** 10:21
  20:3 21:9,10,24
  28:3,19 33:12 35:1
  42:5 54:19 93:2,4
**proposed** 27:3 148:5
**proposing** 122:22
**propounded** 11:8
  13:3
**prospective** 82:19
**prospectively**
  133:14
**prospects** 105:25
**protect** 107:21
**protected** 129:6
**protective** 7:7
**proven** 106:2
**provide** 7:23 16:15
  21:10 46:5 76:9
  80:9 81:6 89:3
  125:20,22 135:12
**provided** 11:15 23:1

29:2,3,6 69:15,16
  69:17 70:7 92:7,9
  92:20 93:2 105:12
  108:15 122:5
  123:24,25 124:4
  124:10,18 134:21
  155:13
**provides** 7:14
**providing** 105:3
  155:11
**provision** 8:16 15:15
  15:19
**pry** 59:17
**public** 19:8 38:8
  39:1 55:18 61:23
  64:9 128:17 129:4
  129:8,9,13 130:8
  130:11,13,20
  131:11,13,17
  132:9 133:5 134:4
  135:9,18 137:20
  143:7,9 158:7
**publically** 77:20
  128:20
**publicized** 128:16
**publicly** 64:12 132:8
**pulled** 30:6 61:18
**purchase** 81:3,5
  117:17 142:3
**purchased** 53:1,15
  53:15 71:6
**purchases** 71:11
  79:24 80:21,21
**purchasing** 69:13,14
  71:9 79:15
**purport** 72:8
**purports** 34:11
**purpose** 17:12 36:7
  37:11 62:19 94:2
**purposes** 30:19,20
**pursuant** 109:5
**pursue** 138:24
**pursuing** 134:20
**pushed** 13:19
  114:23
**pushes** 80:23

**put** 11:5 14:10,12
  15:11 32:24 42:13
  46:7 47:3 69:12
  82:10 84:6,15,20
  90:7,13 95:11
  101:25 129:3,7,19
  130:15 131:1,2
  133:1 134:4 143:9
**puts** 90:20
**putting** 84:13,19
  131:17
**puzzled** 7:1
**P&L** 88:1
**p.m** 94:2 95:2 156:7

**Q**

**quart** 112:11
**quarter** 67:15,16
  84:7 86:8,8 114:21
  121:9 142:23
**question** 5:3 10:6
  18:17 22:16,18
  23:21 24:21 27:25
  28:1,16 30:21
  97:22 98:11 108:7
  111:6,13,17,18
  112:17 118:18
  120:4 123:8
  125:18 126:7
  127:1 129:7 131:5
  131:20 133:7,17
  133:20 134:16
  135:24 136:4,18
  137:3 138:12
  143:6,11 144:1,3
  152:7,8,14 154:19
**questioning** 22:7
**questions** 12:7,17
  13:2,7 25:13 27:12
  27:18 38:13 95:5
  97:20 134:16,20
  134:24 138:5,6,6
  139:2 152:12
  153:2,7 154:10
  155:8,9,19
**quite** 60:13 76:16

89:21 143:5

**R**

**R** 1:17,18 2:1 3:1,8 4:1 19:6,6,6 38:24 95:1 158:1
**raise** 9:1 60:12
**raised** 141:24
**raises** 130:23 143:8
**ramps** 74:16
**range** 41:3 58:6,18 66:1,8 67:14,18,19 67:21 68:3,5,17 70:12 71:2 72:7 76:20 77:11 83:3,8 84:22 85:9,19,22 90:25 91:2 116:7 117:11,19 118:2 127:6 143:14
**ranged** 100:8
**ranges** 64:18 68:2 81:23 82:11 84:11 153:16
**Rashomon** 18:10,12 18:15,18
**rate** 27:1 31:5 55:6 73:17 80:9 82:1 85:7,8,21 90:10 96:14,17 98:1 101:24 102:2,6 143:17 148:15 154:22
**rates** 88:15,16,19,21 148:6
**rationalization** 58:23
**rationalizations** 47:13 73:24
**reach** 107:24 108:4 108:19 129:15,16 149:6
**reached** 42:8,17 89:23,24
**reaching** 116:22 135:4
**read** 12:19 41:23 128:14
**reading** 126:12
**ready** 19:10 46:7 114:5
**realization** 150:17
**realize** 22:11 26:10 69:3 121:17 143:23
**realizes** 86:10
**really** 6:10 43:22 51:19,19 53:14 58:20 59:4,20 67:17 71:8 82:22 85:13 88:23 90:9 95:23 96:9 114:23 118:8 130:4 143:20 152:5
**reargue** 114:6
**reason** 7:1 26:23 33:2 106:3
**recall** 22:2,6,8 32:10 72:23 84:15 121:22,25 125:8 139:14 142:12 152:25 155:9
**received** 14:1,3 19:14 24:14,17 28:22 36:12 43:8 43:10 44:21,23 45:18,20 46:14,16 49:20,22 60:21,23 63:22 64:25 65:2 77:1,3,6,8 83:19 83:21 85:2 86:17 86:19 104:6,10 157:11
**receives** 104:18,22
**receiving** 20:20
**recess** 25:7,11 94:1 129:24,25 130:1 138:17 153:5
**recognize** 21:21 82:16 87:19
**recognizing** 82:23
**recollection** 35:18 99:4
**record** 4:9,17,18,19 5:24 35:11,19 37:9 37:13,13,14,15,18 37:22,25 38:4,8,11 55:13 63:9 129:4,8 129:9,13 130:16 130:18,22 131:1,2 131:13,17 134:4 152:14,21 158:11
**recoverance** 122:24
**recoveries** 116:25
**recovery** 118:10,16
**RECROSS** 155:21 157:5
**red** 65:23
**REDIR** 157:5
**redirect** 38:15 57:4 153:3,6
**reduced** 32:1,3 52:12 75:22 84:16 102:1 154:22
**reducing** 119:22
**reduction** 30:23 71:11 82:20 101:23 136:9 137:2,4,24 139:23
**reductions** 29:16,20 31:7 71:12,24 101:5,22 119:20 140:4
**refer** 47:1 53:18 67:6 122:12 123:4 126:7
**reference** 64:8 125:10 142:12,14
**referred** 64:4 67:13 120:22 154:25
**referring** 31:11 55:14 81:22 118:24
**reflect** 122:20
**reflects** 35:13 76:1
**refreshes** 99:3
**regard** 5:25 109:8 109:11 110:9 117:24 128:6 132:4 138:24 150:5 151:25 152:1,2
**regarding** 7:2 92:21 109:13,21 112:21 113:16 117:20 119:6 148:13
**regularly** 47:24
**reinvest** 57:7
**reject** 42:3 110:25 112:1
**rejected** 4:16
**rejection** 109:4 110:11 112:12 113:14,22
**relate** 26:17 95:19 96:21
**related** 6:5 26:1 39:18 40:2 41:18 42:12,12,14 50:21 55:6 75:21 86:12 90:15 96:1,9 97:16 108:17 122:18 137:6 158:12
**relates** 32:23 90:9
**relating** 33:22
**relationship** 17:8 123:9 136:5,18
**relationships** 53:24
**relative** 20:24 21:1 21:23 24:1 60:10 62:14 68:23 76:7 80:25 86:2 107:7 108:25 109:1 140:22 143:12 155:6
**relatively** 50:10 51:21
**release** 131:11 132:8
**released** 67:15 77:20
**relegated** 149:20
**relevant** 10:24 15:22 48:10 50:4 51:17 52:3 53:11 132:12
**reliability** 106:5,13
**reliance** 6:8,16 14:1

49:19
**relied** 13:18 14:22
15:8 16:2 17:22
18:9 49:19
**relief** 26:15,21 33:24
93:7,8
**rely** 47:17 48:23
155:12,16
**relying** 6:13 14:14
49:15
**remain** 32:21 33:6
50:8 51:23 139:1
**remains** 131:17
155:3
**remember** 108:1
**remind** 35:10
**Renault** 54:5
**Renton** 73:21
142:16,18,19,20
142:23 143:3
**reorganization**
116:18
**reorganize** 42:11
91:8 114:8
**reorganized** 76:3
**repatriating** 56:25
**repeat** 111:16 123:8
**replaced** 123:19
**replacement** 106:18
106:21
**replicate** 54:16
**replicates** 29:7
**report** 5:1 6:7 9:16
12:2 14:10,12,15
14:20 15:4 16:11
30:15 39:13 112:4
151:15
**reported** 158:9
**reporter** 145:23
158:6
**reports** 5:2,15 9:21
9:22 11:7 12:1,10
17:9,10 47:17 48:7
48:10
**represent** 7:25
22:10 25:23 99:7

**representation**
150:2,11
**representative** 20:1
**representatives**
105:9 125:6
**represented** 151:7
**represents** 136:21
**reps** 19:24
**request** 5:4 6:2 11:8
11:16 46:4 90:21
90:22
**requested** 33:24
**requesting** 31:3,7
**require** 8:23
**required** 11:10,14
16:15,17 90:20
95:15 106:21
**requirement** 92:19
**requiring** 9:6
**research** 48:2,3,8,18
64:11
**resolution** 110:19
**resolve** 4:13
**resolved** 8:14
113:24
**respect** 12:17 17:19
17:22 18:1 21:8
22:5,12 25:19
30:23 31:15 50:18
68:1 74:2 78:10
80:19 93:18 95:20
108:22 109:14
130:2,4,21 131:7
131:10,11,16
132:15 133:8,16
134:2 139:6,19
140:11 141:8
150:9 151:18,19
151:22 155:15
**respective** 88:1
**respond** 20:3 21:4
30:21 92:24 129:1
133:2
**responded** 112:7,8
**responding** 93:11
**response** 20:6 21:10

27:24 49:13,17
127:9
**responsibilities**
156:1
**responsive** 21:6
**rest** 115:25
**restricted** 145:19
**restrictive** 134:8
**restructures** 76:3
**restructuring** 39:9
39:11,16,19,23,25
40:1,3,7,12 41:17
41:18 42:13 47:11
47:16 55:5 56:24
57:17,22 58:5,9,21
66:2 67:6 69:8,24
72:4 75:14 79:20
97:7 104:14,24
111:8,19 112:4
113:4,19 114:14
119:12 155:11,24
**result** 26:21 59:17
69:3 71:9 108:22
117:11 119:24
136:13 150:8
151:18
**resulted** 66:15 70:4
108:13 122:25
**results** 61:25 70:16
82:19 117:20
122:16 123:14
129:16
**resume** 41:1 93:22
156:4
**resumes** 104:22
105:6
**resurrect** 135:23
**retail** 40:4
**retained** 12:22,23
14:20 15:17,20
16:8 62:13 69:22
120:18 125:2
**retention** 120:17
**retentions** 39:23
**retired** 155:6
**retiree** 42:5,12,17

54:13 61:4,16
75:15,20,20 76:1,5
76:6,8 85:11 90:8
90:15 107:24
110:2,4 122:18
127:18 136:6,7,15
151:22
**retirees** 42:22 75:11
76:9 85:25 88:22
89:25 109:12
136:2 137:6
154:15,24
**retirement** 21:13
42:4 110:6
**reveal** 87:1
**revenue** 85:3
**revenues** 43:19 83:2
**reverse** 39:25
130:19
**review** 20:7 132:7
**reviewed** 48:5
**reviewing** 133:25
**revised** 22:21
**revolver** 84:17
**rewards** 13:7
**Rice** 40:9
**Rick** 20:15
**right** 19:11 22:20
25:8 31:6 59:21
60:9,13 66:9 70:25
79:24 81:12 92:14
95:23 99:11,14,17
99:21,22,25
102:17 114:3
120:1 134:10
146:5 151:13,24
151:24 156:3
**rights** 118:24 130:3
**ring** 136:22
**rings** 136:20
**rise** 47:7
**risk** 80:24 81:7,11
106:14
**ROBERT** 2:9
**Robinson** 19:22
20:21 21:12 89:24

**Robison** 20:15
**rolled** 52:19 80:12
   81:2,8 84:9
**roof** 80:3
**round** 100:18
**rounding** 100:9
**routine** 78:19
**row** 29:15
**rule** 10:23 11:11
   13:20,22 15:19
   16:5,23 49:18,18
**Rules** 9:24 15:15
   135:11
**ruling** 63:16,20
   112:19 131:7
**run** 55:6 64:9 73:17
   82:1 83:5 85:7,8
   85:21 88:15,16,19
   88:20 90:10 96:14
   96:17 102:6 107:1
   137:8 143:17
**running** 102:2
   155:25
**R-E-N-T-O-N**
   142:20

_____

**S**

**S** 2:1 3:1 4:1 19:6
   38:24 58:22 95:1,1
   95:1 157:10
**SAEUGS** 58:23
**safe** 140:21
**safety** 52:9
**Saint** 44:16
**salary** 88:22 136:23
**sale** 89:15 117:17,20
**sales** 51:19 56:1,6,7
   140:2
**Saturday** 92:10,17
   104:5,18
**save** 140:17
**saving** 141:10
**savings** 21:23,25
   22:4,11,19,21
   25:20 26:10,12,14
   26:18,20 29:12,13

30:22 31:15 42:12
   42:12 66:15 67:10
   71:18,20 73:11,12
   73:13 74:1,14 75:7
   76:21 77:14 78:7
   78:22 79:4,15 83:7
   86:1 87:2 89:15
   90:11 95:16,21,23
   95:25 96:21,21,22
   97:5,6,10,14,15,21
   97:21,25 98:1,5,5
   98:8 102:18 104:7
   104:10,20,22
   105:4 108:14,17
   111:23 122:18
   128:24 136:6,13
   136:16 139:17,24
   140:13,25 141:5
   141:21 142:8
   143:17,24 144:4
   150:16 151:18
   154:20 155:9
**saw** 81:1 88:15
   103:14,16,17
   133:9
**saying** 58:14 97:20
**says** 5:17 6:24 10:24
   15:20 22:20 50:12
   60:12 67:13 88:2
   93:8 96:11 149:4
   150:6
**scab** 107:8,9
**scabs** 107:1,5
**scenarios** 108:12
   109:17,19
**schedule** 62:4 64:1
   83:1 126:24
   150:20
**scheduled** 116:4
**schedules** 64:2
**scheduling** 93:14
**school** 99:24 100:4
   152:25
**scope** 8:19 9:23
   10:23 32:23
**seal** 132:2

**sealed** 139:1,3
   145:22
**sealing** 133:24
**seasoned** 113:18
**SEC** 55:18 61:19
   67:15
**second** 6:4 27:1
   37:24 40:21 58:3
   82:5 88:18 126:1
   135:10 137:16
**section** 7:9 14:5 21:8
   92:19 109:5,12,22
   111:20 113:9
   149:2,17 150:24
**securities** 118:11
   132:25
**security** 106:25
   107:2
**see** 5:5 6:16 7:24
   15:14,18 44:15
   45:7,10 46:23,25
   51:21 52:14,17,23
   60:5,7 70:10 77:13
   81:1 82:4 84:23
   85:15 90:4,5 91:9
   93:19 95:15,17
   99:3 103:13
   112:12 116:18
   126:21 133:10,13
   133:14,18 134:9
   134:10 136:20
   137:21
**seek** 28:18 102:19
   134:21
**seeking** 14:17 28:2
   134:3 150:6,7
**seeks** 133:19
**seen** 125:7
**sees** 18:14
**segments** 44:9
**selected** 26:16 58:5
**self** 89:9
**sell** 118:25
**senior** 39:14 40:5
**sensitive** 129:18
   144:13

**sensitivity** 132:15
   145:17
**sent** 9:13 14:23,24
   14:25
**separate** 7:21 9:4
   145:22
**September** 48:18
   114:24 124:1
**sequencing** 142:21
**series** 44:12
**serious** 117:6
**serve** 45:7 54:4
   56:14
**served** 40:8
**service** 43:22 140:1
   140:5,11,17,20
   141:3
**services** 20:16 42:25
   53:1 71:6 142:3
   155:12
**servicing** 19:24
**serving** 71:20
**session** 35:24 36:2
   36:20,20 37:2,3,24
   37:25
**sessions** 35:23 38:3
**set** 6:16 9:23 21:15
   34:11 42:4 54:14
   58:4 59:22 60:1,15
   61:5,20 62:2,24
   64:4,5,5 71:10
   80:12 81:7 83:4
   84:1 87:5 91:2
   123:14 141:17
   158:16
**sets** 64:8 109:20
**setter** 107:13
**setting** 21:17
**settled** 90:8,14
   128:25 154:16
**settlement** 76:5
   89:25 90:9,10
   108:13,15 110:3
   137:10
**settlements** 42:16
   89:23 154:23

**seven** 11:24
**severance** 74:7
**SG&A** 58:22 74:17
  74:19,24,25 75:5,5
  85:19 119:19
  120:2 139:6
  140:25 141:6
**shafts** 45:5
**SHANNON** 2:23
**share** 16:16,17 38:7
  47:2 50:14,15,16
**shared** 15:10 47:1
  115:13,16,18,21
  121:13 124:17,20
  124:22
**sharper** 54:7
**Shaw** 20:15
**sheets** 23:24 24:5
  29:3 30:4 105:7,10
  105:11
**shield** 13:14,14,17
**shipment** 85:2
**shop** 54:15
**shore** 57:3
**short** 56:23
**Shorthand** 158:6
**shot** 95:6
**show** 81:21 96:21
**showed** 15:12 87:3
  109:17
**showing** 64:3 76:6
  104:10,22
**shown** 45:2,22 73:12
  154:11
**shows** 45:4 46:4
  53:12 59:20 64:5
  65:21 74:2 80:2
  81:18,22 82:25
  83:1 88:8 89:14
  102:18
**shy** 71:5
**side** 17:23 20:13
  81:9
**sides** 17:17
**signals** 89:14
**signed** 132:3

**significant** 56:7,9
  57:1 67:10 85:17
  118:9
**similar** 10:18 14:11
  14:12,16 48:21
  54:9 64:7 130:6
**similarly** 47:9 54:2
  61:17 62:12 85:10
  149:14
**Simon** 3:3,6 6:20
  43:2 44:20 45:17
  46:13 49:4,7,11,14
  60:20 63:15,17
  64:20 76:25 83:18
  86:16 91:12,15,18
  91:20,21 92:18
  93:13 97:1,3
  100:11,12,17
  102:13 103:22
  111:14 125:11,19
  125:24 126:3,5
  127:2 128:21
  129:17 130:18
  133:12,18,21
  134:12,15 135:3
  135:21,22,23
  136:3 138:4,9,15
  138:18 139:5
  143:25 144:15,20
  144:22 145:2,8,11
  146:1 148:1
  152:10,21 155:21
**simple** 60:4 90:25
  106:4
**simply** 6:2 31:2
  86:22 93:11
  120:12
**sir** 21:20,21 22:7,22
  23:21 25:22 26:7
  29:18 33:13,17
  34:20 35:22 36:19
  37:12,19 41:1,7
  50:4 52:1 59:13
  66:13,22 78:4
  91:24 102:20
  106:6 109:10

**115:20 119:18,21
  122:10 127:20
  139:8 156:1
**sit** 37:10,23 38:10
  98:10,21 101:2,3
  117:10 127:24
  132:23
**sitting** 144:17
**situation** 112:18
  131:1,9
**six** 59:21,24 62:2,9
  64:9 80:2 91:1
  153:21,23
**skilled** 149:14
**skills** 148:18
**slide** 50:1,3
**slightly** 90:3
**small** 143:21
**smaller** 6:4 36:24
  64:16
**snapshot** 32:17
**sold** 56:25
**solution** 83:14 132:2
  150:25
**solutions** 44:10
**somebody** 24:2 25:2
**somewhat** 62:12
**soon** 132:21
**sorry** 10:12 20:17
  34:18 63:12 74:3
  91:12 108:25
  109:1 123:8,11
  139:9 141:1
  149:16
**sort** 5:21 10:1,15
  17:6
**sought** 11:16 14:16
  131:7
**sound** 99:10,13,16
  99:20,25
**sounds** 99:22
**sources** 64:10
**South** 140:3 145:3
**SOUTHERN** 1:2
**space** 64:17
**speak** 10:12 83:8

**117:20 152:21
**speaking** 43:13
  103:23
**specialty** 52:16
**specific** 6:5 69:1,9
  110:12 113:16
  141:11,20 142:12
  142:14 143:8
  148:15 155:15
**specifically** 21:11
  28:6 29:13 31:13
  49:15 64:7 71:15
  95:24 97:22 98:4
  121:23 124:25
  126:24 128:11
  140:19 148:14
**speeches** 41:11
**spend** 74:24,25
**Spicer** 72:22,25 73:3
**spin** 62:9,10,13
**spirit** 11:14
**spite** 55:10
**spoke** 83:9 84:22
  122:16
**spoken** 12:20 152:19
**sport** 50:21,25 51:3
**spun** 62:14
**ss** 158:3
**stability** 106:4,13
**stable** 50:13
**stamped** 7:23
**stand** 15:5 35:7
**standard** 72:2 79:16
  80:10 148:9,22
**standpoint** 130:10
**start** 44:6 68:2
  87:18
**started** 4:5 73:23
  120:19,23 123:20
  152:7
**starting** 123:13
**starts** 81:25
**State** 158:3,7
**stated** 19:14 142:11
**statement** 7:11,12
  76:2 114:19 116:6

116:18 150:8,9
**states** 1:1,10 31:25
148:4
**statistics** 10:15
**status** 107:19
**statutory** 92:19
**steel** 19:24 20:8 47:6
52:16,17,18,19
80:12,13 81:2,3,5
81:7,8 108:4 122:1
127:22
**Stenger** 38:21 39:4,8
39:10 40:18 42:8
42:15,24 45:21
46:17 50:1 51:13
55:12 57:15 64:4
65:6,19 91:10,22
95:11 97:2 107:23
125:9 126:7 148:2
153:7 154:6 157:7
**step** 57:24,24 58:2,3
58:11,12,13,20
59:1,1,2,7,17
65:23 66:2,4,14
67:9,25,25
**STEPHEN** 2:17
**steps** 57:21 59:8
71:19 114:13
115:1
**Steven** 2:7 4:9
**sticking** 117:13
**stipulation** 7:6
**stock** 118:25
**stood** 93:4
**stop** 59:1
**story** 18:12
**straight** 52:21
**strange** 104:16,23
**strategy** 13:8 56:24
68:23
**stream** 53:3
**Street** 2:5 3:5
**stricken** 129:8
130:22
**strictly** 75:3
**strike** 64:20 104:23

106:10,14,16,17
106:19 107:1,11
107:14,16,22
110:21 113:13,21
114:3,7 125:11
**strikes** 104:25
**strong** 6:11 135:8
**stronger** 152:1
**STROOCK** 2:19,19
**structural** 60:13
**structure** 56:19
58:14 149:18,24
149:24 150:17
151:11
**structured** 10:21
44:10,13 81:5
**structures** 60:10
68:12 71:6 78:14
80:25 151:6
**structuring** 42:24
54:17
**stuff** 15:9 87:13
**sub** 82:5,21
**subject** 5:19 15:6,24
16:4 22:1,21 28:7
70:9 93:20 98:9,19
101:16 105:14
140:8 150:19,21
**submit** 8:10,23,24
**submitted** 20:7
93:15 121:18,20
122:1,4
**subsequent** 26:25
145:18
**subsequently** 105:1
121:18 145:12
**substance** 4:19 5:4
139:21
**substantial** 87:3
88:3,9
**substantially** 53:2
62:1 86:10 87:4
151:25
**substitution** 71:13
**subtract** 99:24
**succeed** 151:13,14

154:8
**success** 141:19
**successful** 42:21
64:17 79:10 80:16
80:17,24 83:13
84:24 85:1 111:25
**Sufficient** 93:1
**suggest** 118:1,9
129:23 131:21
132:5 136:20
**suggested** 61:4,8
**suggestion** 134:13
135:3
**summaries** 93:19
**summarizing** 29:19
**summary** 42:7,9,10
42:18 52:5 59:19
92:4
**summer** 123:12,18
123:18
**Sunday** 92:11
**supervision** 24:10
104:4
**supplement** 84:14
85:14 86:25 87:19
89:21 122:13
124:2,6,10
**supplier** 43:15 46:21
51:25 56:9 78:20
106:5
**suppliers** 53:25 54:2
106:2 129:20
**supply** 47:3,14,14
54:1 71:8 73:7
107:16,21
**supplying** 52:24
**support** 12:23 62:11
**Supreme** 135:10
**surcharge** 80:14
**surcharges** 80:11
**sure** 18:11 23:13
32:23 37:20,21
40:22 69:12 88:6
91:19 92:25 97:4
99:5 119:10
129:25 143:5

**surprised** 133:8
**surprises** 93:19
**sustainable** 42:2,11
60:16 62:20 88:12
89:7 91:8 134:10
134:10 153:16
**sustained** 111:7
152:9 153:17
154:7
**SUV** 44:12
**SUVs** 43:18
**sworn** 19:7 29:5,8
35:4,8 38:25
**systems** 43:17 44:10
45:24 78:21 150:7

---

**T**

**T** 19:6,6 38:24,24
95:1 157:10 158:1
158:1
**Tab** 40:18 41:13
44:3,5 48:13 59:9
59:12 61:10 63:24
65:17 66:18,25
67:3,3 77:17 81:14
83:22 87:8 95:12
105:17 127:13
153:13
**table** 21:22 37:11
38:10 51:25
**tabled** 82:6
**Tacoma** 45:8
**take** 16:25 45:5
50:14 57:3 62:21
66:18 75:20 81:11
88:18 90:23 93:22
95:6 96:17 99:12
100:11 133:16
135:20 136:11
152:15 153:10
**taken** 6:23 11:22
16:2 17:3 18:4
25:11 42:16 56:25
64:7 87:23 94:1
112:8 130:1 137:6
138:17 153:5

**takes** 82:21 90:20,24
  111:23
**talk** 25:2 32:4 43:12
  114:8,9 134:7
**talked** 8:5 20:18
  35:23,24 54:18
  64:3 126:23
**talking** 12:25 13:1
  31:5 33:16 56:12
  63:5 98:12,15,16
  98:24 102:2
  110:14 119:19
  128:22
**talks** 119:22
**taller** 45:11
**Tambe** 2:6 4:3,4
  10:11 18:23 38:20
  39:3,5 42:23 43:6
  43:11 44:18,24
  45:15 46:11 49:2
  49:13,17,23,24
  60:18,24 63:13
  64:23 76:23 77:4,9
  81:13 83:16 86:14
  91:10,13,16 92:24
  93:1,24 100:14
  111:5,12 125:10
  125:22,25 127:1
  128:12,15 129:1
  129:21 130:2
  133:2 143:5
  144:10 145:7,21
  145:24 152:3,12
  152:23 153:1,6
  155:19 156:2,6
**target** 66:1 71:15,18
  75:2 87:2 127:6
  136:7 140:25
  141:12,17 142:1
**targeted** 66:5,8
  67:14 76:20 126:8
  136:13 140:12
  141:14,19,20
  142:5,7,8
**targets** 65:14 71:11
**task** 79:14

**team** 39:15 40:6
  75:16 76:22
  148:25 155:13,16
**technologically**
  52:11
**technology** 56:2
**Ted** 38:21 39:8
  157:7
**tell** 6:10 17:25 32:18
  35:24 67:3 112:25
  114:10 122:8,11
  143:1
**tender** 42:25
**tendered** 36:3
**term** 29:11 55:24
  56:23 57:2 60:17
  80:8 84:16 89:7
  106:1 115:2
  122:21 153:22,24
**terminate** 151:24
**terminated** 90:8
**terminating** 97:11
  110:5
**termination** 151:22
**terms** 8:13 13:19
  21:4,6 27:8 36:21
  46:3 50:17 65:13
  69:9 80:22 110:9
  139:20,21 143:9
  151:4
**tested** 17:15
**testified** 8:8 9:19
  14:5,8,10 15:2
  19:1,9,13 39:1
  65:21 66:7 73:25
  78:6 86:6 97:17
  99:18 105:8,10
  125:14 128:10
  139:13 149:1
  152:15 154:1
**testify** 14:21 15:17
  15:21 16:9 18:8
  35:21
**testifying** 4:21 15:5
  66:9 125:8 139:14
**testimony** 4:24 5:7

6:5,15 9:25 16:24
  17:20 19:2 29:5,8
  33:7 35:4,12 37:23
  64:20 92:21,23
  95:20 105:14
  108:1 126:13
  127:8 128:5
  142:10 146:6
  153:9
**thank** 16:21 17:7
  18:21 24:24 25:10
  27:11 38:17,19
  43:5 49:23 63:12
  91:10,20 93:16,24
  93:25 95:13 96:23
  102:14 103:10
  120:14 126:4,15
  138:1,6 139:12
  145:24 152:18
  155:20 156:6
**theirs** 4:22
**theories** 12:3
**thermal** 52:22
**thing** 4:25 15:18
  16:24,25 17:1
  29:10 60:4 62:17
  78:9
**things** 47:6 48:21
  50:5,6 52:5 63:3
  79:9,20 81:20
  84:10,12 93:5
  107:18 141:15
**think** 5:18,18,19 6:1
  6:14 11:13 13:19
  29:10 32:16 33:5
  35:16 48:19 52:4
  55:3 56:6,11 62:3
  62:22,25 66:9 70:7
  71:5 72:23 74:14
  76:4 81:4,25 86:5
  87:14 88:23 91:25
  92:4 95:5,12 100:7
  101:18,19,22
  102:4,9 103:23
  105:10,12,16
  110:4 112:16

114:20 116:1
  117:13,14,21
  118:8,18,24
  119:15,16 120:7
  121:23 124:1
  128:9 130:14,23
  131:6,20 133:25
  134:15 138:9,15
  138:18,22 140:8
  141:11,22 142:13
  143:14,25 144:10
  144:11,15 145:7
  145:12 149:6
  152:10,16,17
**thinking** 12:2,6,13
  12:23 13:1,1 16:18
  68:1
**third** 6:1 29:16 30:1
  47:18 53:1 58:25
  67:15,16 84:7
  88:24 89:13,19
  121:8 136:2
**thirds** 82:12
**THOMAS** 2:16,16
**thought** 69:2 84:11
  91:22 95:6 100:7
  103:14 125:14
**thousand** 22:10 23:5
  29:17 52:7 98:24
  98:25 100:7,18,22
  101:18 103:6
  104:7,20 152:16
**thousands** 97:11
**three** 53:21 56:3,3
  63:7 67:9 70:22,23
  93:4 101:11
  141:15 153:19,25
**threshold** 154:2
**Thursday** 92:17
**tier** 27:1 43:14
  46:21 64:12,17
  149:18,23,24
  150:6,17,25 151:6
  151:10
**time** 18:4,19 20:17
  20:25 21:2 23:8,9

27:25 28:2 31:13
42:23 47:5 52:8,11
52:13,18 70:8,17
70:21,22,24 73:15
73:16 74:1,13
75:25 79:6 82:18
84:6,13 85:17
92:19 95:2 104:9
104:18,19 112:10
114:5,14,21 115:5
121:3 125:7 156:7
**times** 13:12 31:8
45:11 55:13,21
67:7 77:16
**titled** 67:5
**today** 20:23 37:24
58:7 69:6 73:8
98:8 101:2,3
115:24 116:1
117:11 127:24
128:18
**today's** 127:11
**told** 9:18
**Toledo** 20:9
**Tom** 24:18 25:16
152:12
**tomorrow** 156:4
**top** 56:5 64:12
**torque** 45:4 142:21
**total** 22:9 43:21 55:9
67:19,21 82:5
98:22 99:23 120:7
120:9
**totaled** 67:20
**totals** 82:21
**tough** 54:21
**Towers** 75:17 137:9
137:13 154:11
**Toyota** 53:17 54:5
56:8
**traction** 45:25
**trade** 130:13
**traded** 64:13
**trading** 117:21
**traditional** 51:3
53:21

**transaction** 73:5
**transcript** 6:23 7:20
8:9 9:6,7,8 132:7
145:22 158:11
**transcripts** 9:12,17
11:4 12:14,20 14:4
**transfer** 46:9 85:7
**transferred** 72:22
98:4
**transferring** 74:11
97:12
**transitioning** 74:5
**translate** 85:7
**transparency** 69:15
**transpires** 112:18
**transplant** 53:18,20
54:9
**treasurer** 40:5
**treat** 150:24
**trend** 54:5
**trending** 125:9,13
125:15
**trends** 48:20 50:18
51:20
**trial** 65:18 66:18
77:18 104:21
131:18
**tried** 150:22
**trips** 70:1
**troubled** 69:23
**truck** 43:23 44:12
51:11,12 52:6
68:12
**trucks** 43:18 44:11
45:8
**true** 13:10 32:16
35:19 62:16 109:8
109:11 158:11
**truly** 88:11 91:7
106:1 133:22
**truth** 49:8,15
**TRW** 61:22
**try** 37:6,8 80:22
130:22 137:19
**trying** 13:17 35:1
79:9 110:19 120:8

123:9 129:16
**turn** 40:18 41:20
44:3,25 48:12
49:25 51:13 53:7
59:9 61:10 65:17
66:4,5 72:6 77:17
83:14,22 87:8
119:16 126:17
127:13
**turnaround** 57:2
**turns** 17:21
**two** 7:21 10:17
16:12,14,19 19:16
19:18 20:2 26:6,8
32:23 35:23 36:21
40:20 43:16,25
49:17 59:22 64:2
65:24 73:21 76:10
76:14 81:20 82:12
84:10,12 85:24
88:21 92:15 95:7
96:10 108:12
109:17,19 120:22
130:4 133:15
134:1 138:10,20
142:1,20 143:2,12
143:16 144:6
149:18,23,24
150:6,17,25 151:6
151:10 153:1
**type** 91:6 140:2
**types** 77:13
**typically** 56:11

---

**U**

**U** 19:6
**UAW** 3:4 6:21 19:15
19:22,25 34:8,16
35:14 38:5
**ultimately** 5:11
58:21 60:2 69:3
74:13 75:23 84:14
123:12 130:17
**Umm** 108:8
**unable** 26:24 47:9
53:6

**uncompetitive**
58:16
**undergoing** 113:8
**understand** 5:20
35:9 48:19 97:4
102:7 111:1 128:5
132:15 135:19
145:16 149:22
**understanding**
105:7 106:20
111:2 143:4 151:5
151:9,16
**undertaken** 120:17
**underway** 109:24
**unequivocally** 9:18
**unfortunately** 21:14
**unibody** 51:7
**unilaterally** 151:25
**union** 5:21 9:6 12:22
33:3,15,15 42:14
42:18 76:17 85:11
85:25 90:5,14,15
90:21,22 92:8,20
95:16 96:3,6
104:17 105:5,9,12
108:5,16 109:25
110:6 112:1
122:17 129:15
149:9,10,10,12,14
150:2,10,10,12
152:2
**unionized** 109:15
110:10,20
**unions** 4:17,20
14:20 19:16,18
20:2 23:2 28:3,12
28:17,18 33:21
34:12 37:16 42:5
88:22 91:5 93:2,9
96:1 110:19
124:21,23 135:8
155:4,5
**unit** 44:14 136:13
**United** 1:1,10 31:25
39:19
**units** 46:5,10 50:9

51:22 79:15
**unsecured** 2:13 22:3
  27:24 30:21 118:3
  118:10
**unsuccessful** 138:11
**unusual** 78:16
**update** 19:3 88:14
  90:12 93:3 121:10
**updated** 90:2,20
  137:8 154:11
**upper** 46:2 84:21
  90:21,22
**use** 4:15 7:7 51:7
  61:5,8 65:4 69:23
  70:22 84:21 103:8
  107:8 121:10
  122:22 148:21
  150:7 155:24
**useful** 138:11
**uses** 47:24 81:2
**usually** 18:2
**USW** 3:4 6:21 19:15
  19:23 20:18 34:8
  34:16 35:14 38:6
  125:6
**USW/UAW** 20:10
  36:3
**utility** 50:22,22,24
  50:25 51:3,4
**utilization** 17:20
  72:14 145:17
**U.S** 1:19

— **V** —

**V** 57:25 157:5
**vacate** 144:18
**valid** 134:25
**valuation** 117:2,4,25
  118:1
**value** 52:10 118:3
**variable** 69:19
**various** 83:10 116:9
  120:16 122:17
  129:14 140:24,25
**vehicle** 50:7 52:10
  114:7

**vehicles** 43:17,22
  45:7,8,25 50:22,22
  50:23,25,25 51:2,3
  51:4,7,20 52:9
**vender** 69:21 79:22
**venders** 71:2 80:24
**vender's** 78:18
**vendor** 71:19,23
  72:3 79:4,12,15,23
  80:23
**vendors** 46:6 71:14
  78:3,10,13,21 80:8
  80:14,21
**venture** 72:25 73:1
**version** 102:7 104:6
**versus** 64:5 79:18
**viability** 55:24
**viable** 42:1,11 60:16
  88:12 106:1,3
  154:7
**vice** 20:15
**view** 5:21 59:18
  78:18 85:21,24
  89:9 116:6,23
  118:15 129:2
  132:20
**viewer** 18:14
**views** 115:13
**virtual** 114:1
**vis** 14:7,7 129:19,19
**visit** 8:4
**visited** 8:4
**visits** 78:21
**Vista** 144:5,8
**Visteon** 62:7,7,8,14
  62:24 63:10
**VIVA** 76:7
**void** 110:20
**voir** 18:2,3,5,6,19
  23:11,14 91:18,21
  144:21
**volume** 56:15 79:7
**volumes** 47:25 51:10
  51:11,12
**voluntarily** 134:19
**Voos** 4:21 5:16 6:5,9

9:8,14 10:13 11:2
  11:7,9,17,23 14:19
  14:22 15:2,8,10,12
  15:13 16:2,3,13,16

— **W** —

**W** 2:6
**Wachter** 14:2,10
  16:4
**Wachter's** 16:24,25
**wage** 29:16,20 30:23
  31:5 98:1 108:16
  148:5,7,9,10,12,22
  149:18,24 151:6
  151:11
**wages** 10:20 76:19
  86:12
**walk** 27:14 114:13
  120:15
**walked** 153:19
**Walkner** 16:11,13
  16:20
**want** 8:10 12:5,5,5
  15:9 16:23 27:14
  27:17 55:13 63:3,4
  97:20 99:23
  100:11 123:4
  125:22 130:25
  131:21,22 134:6
  134:23 135:1
  138:13 144:25
**wanted** 9:12 28:5
**wanting** 17:17
**wants** 4:17 15:7,14
  62:18 131:24
**wasn't** 29:10,11,13
  79:10 143:5
**wasting** 114:5
**way** 9:11 10:21
  15:23 42:19 45:8
  54:2,9 70:21 82:12
  104:13 107:21
  132:5 139:2 140:9
  158:14
**Wayne** 19:25 30:5
  31:7 32:4,6,12

33:3,15,18 98:16
  99:16 101:19,19
  102:1
**weak** 50:10 62:18
**week** 29:20 62:17
  116:4 137:9
**weekend** 28:9,18,23
  29:1 104:17 105:5
**weight** 17:20
**weighted** 51:12
**Weiss** 3:3 6:20
**welcome** 96:24
  138:8
**Wendy** 19:21 20:14
**went** 9:20 11:10
  23:24 30:4 51:19
  57:21 67:20,22
  74:21 81:23 84:15
  99:24 100:4
**West** 3:5
**WESTCHESTER**
  158:4
**we'll** 18:18 31:16
  88:3 93:22 97:19
  105:14 115:4
  135:20 143:23
  156:4
**we're** 5:5 6:24 13:17
  51:11 56:2 67:10
  90:16 98:12,16
  114:5,23 115:15
  116:4 138:9
  140:17 141:15,16
  142:2 143:25
**we've** 5:15 13:19
  21:24 27:3 42:13
  47:8 52:18 56:25
  64:2 72:17 73:23
  84:23 89:21 90:1,7
  90:12 97:15
  109:18 110:1
  111:24 112:22
  117:14 118:14,23
  135:14 140:4
  141:12,22,23
  150:13

**whatnot** 137:20
**wheels** 45:6 46:8
**WHEREOF** 158:16
**wholesale** 40:4
**whoops** 144:2
**wide** 44:1 79:13
**willing** 57:23 89:2
**window** 153:25
**wins** 145:7,9
**wiped** 118:13
**wish** 4:8
**wishes** 7:24
**witness** 14:2 15:5
18:7 19:1,7 22:15
24:11 35:10 38:18
38:19,24 40:17
43:5 70:18 77:25
78:4,11,15,20 79:1
79:25 80:4,7,20
92:21 93:25 96:24
102:14 125:17,20
126:4 128:14
131:15,25 134:22
134:23 135:25
138:8 143:7,10
145:9 152:4,15,18
152:20 157:5
158:16
**witnesses** 12:18
17:12 18:1
**word** 11:2 145:12
**words** 10:2 20:25
78:12 141:1
**work** 6:6 10:14,16
12:6 16:18 24:10
34:25 37:7 47:15
48:5 65:14 71:23
72:21 73:1 78:21
97:12 98:3 100:20
116:20 137:23
140:23
**worked** 10:12 32:6
92:12 121:9
138:18
**worker** 19:24
**workers** 8:5 20:8

106:19,21 108:5
109:9 122:1,2
127:22,22
**working** 40:14
61:16 69:23 71:13
92:16 117:8
120:19,21,24
148:7
**works** 91:3,4
**world** 44:1 47:5
52:18 56:16,16,17
79:13 93:4
**worldwide** 43:14
75:4
**worth** 117:15
**wouldn't** 33:1,2 38:9
101:12
**write** 100:8
**writing** 14:19
**wrong** 35:25

### X

**x** 1:3,8 93:6 140:18
141:3,14,16 157:3
157:10

### Y

**Y** 93:7 141:3
**yeah** 126:10
**year** 26:21 27:8
31:13,15 32:12,19
32:20 39:12 43:20
55:1,3,4,10,12,15
55:16 59:20,21,24
59:24 60:6 62:2,25
64:9,14 65:11,11
65:24,25 70:22,23
71:11,11,15 73:10
80:2 84:18,25 85:2
85:6,14 86:9,11
88:10 91:1,1,3
96:15 100:25
101:4,22 115:3,4
115:12,14 116:2,7
116:16 120:22
121:9 122:14,15
139:18 143:22,22

153:21,25
**years** 27:1 32:2
40:11,16 46:23
54:22,25 62:9
70:21 71:7
**year's** 26:18
**yellow** 50:20 53:14
53:14
**yesterday** 103:15,17
**yield** 145:19
**yielded** 145:13
**yields** 77:10
**York** 1:2,11,11 2:5,5
2:15,15,22,22 3:5
3:5 158:3,8

### Z

**Z** 141:4
**zero** 137:6 152:17
**ZIDE** 2:17

### 0

**01** 64:14
**05** 144:7
**05-44481** 7:6
**06** 31:13 64:14
120:17,19 121:10
122:4
**06-10354** 1:5
**07** 71:25 74:15 82:4
82:15 84:20 85:6,8
85:14,16 86:9,11
86:25 114:11,15
114:21 122:15
**08** 154:5
**09** 126:22 154:5

### 1

**1** 31:21 32:18 40:18
41:9,13,13 105:17
137:17
**1,000** 100:6
**1,076** 99:25 100:1,2
100:3
**1.2** 62:23
**1/1/07** 31:19
**10** 26:3 45:11 96:12

141:2,3,3,4 156:4
**10-K** 55:20 70:11
**10004** 1:11
**10017** 2:5
**10036** 2:15 3:5
**10038** 2:22
**11** 40:2 42:1 47:11
47:12 121:4
**1113** 4:6 7:9,15,18
8:19 10:21 14:5
18:24 20:3 21:5,24
22:1,6,12,21 26:15
26:21 27:7 28:3,7
28:19 30:6 31:16
31:24,24 32:20
33:8,11 41:19
92:19 95:20 96:2,4
96:5 98:20 101:16
104:17 109:5
110:15 111:3,20
112:14 113:9,21
148:4 149:17,22
150:2,3,15,19,21
150:22,24 151:12
151:20
**1114** 4:7 18:24 21:8
41:19 109:12,14
109:22 113:9
151:25
**113** 111:10 151:1
**1177** 2:14
**12** 51:22 53:22 100:6
104:21
**12th** 7:5 19:2,14
21:23 22:3
**12:55** 94:2
**120** 71:19,24 78:23
79:4
**14** 102:2 119:23
126:6,14 127:4
**140** 71:21 79:8 103:9
**15** 41:21,22 42:9
99:2 100:6,8 102:3
102:6,23 103:4
144:22
**153** 157:7

**159** 157:7
**16** 126:14
**17** 50:1,1,9 148:7
**17th** 20:9
**175** 68:3 69:2 70:12
  70:14 84:22 85:9
**18** 26:15 51:14 95:22
  102:21 103:2,3,4,4
  119:23 126:16
**18th** 124:6,10
**180** 2:21
**19** 31:8 35:20 157:6
**19th** 19:16,17,19
**194** 99:13

      **2**

**2** 41:10 44:3,6 52:7
  55:2 68:20 90:6
  93:22 100:7,18,22
  101:18 152:16
**2.8** 118:2
**2:00** 95:2
**20** 71:25 79:3
**200** 84:16 101:23,24
  102:1
**2000** 32:7,8 103:8
**2001** 60:9
**2005** 53:13,19 121:9
**2006** 7:5 28:13,13
  31:18 38:6 48:18
  55:10,15,16 59:4
  60:9 66:12,13
  67:17,18 84:12
  88:4,4 121:1
  143:22
**2007** 1:9 71:16 79:2
  82:6 84:13,25
  85:20 86:2,22 87:2
  87:19,20 88:2 90:1
  101:4,14 122:8,25
  123:2,10,10,11,21
  123:23,24,25
  124:1,2,11 125:4
  139:18 157:1
  158:17
**2008** 27:8

**2010** 73:10,18 74:15
  85:17 101:23
**21** 126:19 137:13
**210** 89:15
**216** 48:16,24 49:3,21
  50:1 51:24 53:8
  157:17
**222** 2:5
**225** 68:3 69:2 70:12
  70:14 84:22 85:9
**23** 157:6
**24** 104:21 157:12
**25** 40:15 100:8 157:6
**2500** 99:2
**26** 1:9 145:10 157:1
**26th** 115:25
**26(a)(2)(b)** 10:23
  11:11
**26(b)(4)(b)** 15:19
  16:6
**267** 88:5
**27** 157:6
**270** 55:9
**28** 22:10 23:5,16
  26:11 95:22 96:10
  102:19,25 103:7,8
  152:15
**28,481,970** 25:20

      **3**

**3** 41:10 48:13 57:10
  58:20 62:3 63:5,7
  63:11,11
**3.8** 52:8
**30** 53:22 63:12 128:7
  136:5,10,10,16,21
  136:23 137:1,3,7,8
  137:24 138:2,3
  154:22,25 155:1
**300** 40:19,23 41:13
  41:21 42:25 43:7,9
  63:4 157:13
**309** 104:7,20
**31** 31:21 32:18
  114:15
**31st** 31:19

**320** 102:4
**325** 55:7
**328** 99:4
**33** 104:7,20
**330** 3:5
**35** 43:22 66:21 67:5
  71:1 74:18 75:10
  76:11,23 77:2,12
  77:24 84:5 127:16
  139:10 157:20
**36** 83:23 84:1,9
  86:14,18,21,23
  87:24 88:15 91:17
  126:23 157:23
**37** 44:7,19,22 157:14
**38** 44:25 45:3,4,15
  45:19 157:15
**39** 45:21,22 46:11,15
  157:7,16
**390** 58:18 66:8

      **4**

**4** 57:10 59:9,12
  61:11 63:24 65:10
  65:24 117:15,16
  117:23 126:8,22
  127:7 154:5
**4:15** 156:7
**40** 75:1 85:19,22
  136:10,11 139:6
  141:1,1
**400** 59:25 65:10
  66:10
**404** 101:19,24
**405** 32:10 67:23
  77:11 82:23 99:16
**41st** 2:5
**4157** 7:5
**418** 22:10 23:5
**42nd** 3:5
**43** 157:13
**44** 148:2,3 157:14
**44114** 2:10
**443** 55:3,6
**45** 157:15
**450** 55:11,14 101:16

**46** 157:16
**471** 99:10
**48** 153:14,17
**49** 65:18,19 77:5,7
  153:15,17 157:17
  157:21

      **5**

**5** 64:18 65:17 104:22
**5.3** 59:24 62:25
**5.6** 59:23 63:2 83:4
  87:5
**50** 52:19,20 58:18
  59:11,15,16 60:19
  60:22 61:1 75:1
  85:20,22 105:19
  105:20 139:7
  141:1 153:15,17
**51** 61:11,14 63:13,21
  96:13,14,15
  157:18
**52** 63:23 64:23 65:1
  96:15 123:4
  157:19
**54** 77:18,22 81:14
  83:16,20 157:22
**540** 67:24 77:11
  82:24
**550** 58:18 66:8,10
**578** 99:20
**59** 51:25

      **6**

**6** 29:17 30:24 64:15
  64:18 66:18,25
  67:3,3 127:13
**6.5** 63:1
**60** 52:25 71:5 72:7
  73:11,13 76:20
  95:16 96:9,13,16
  96:16 108:16
  136:10,11 142:7
  143:1,19 144:4
**60s** 117:22
**600** 100:6
**61** 96:11,11
**61.9** 28:6

**63** 157:18
**64** 53:7 119:16
  137:11,12 154:12
**644** 29:17
**65** 43:19 157:19
**661** 29:17
**67** 52:22

---

**7**

**7** 77:17 81:14
**7th** 23:25 29:3,6
**7.5** 127:10
**70** 56:6 75:24 87:9
  95:12,13 127:19
  128:7 136:2,9,10
**70s** 117:22
**703** 49:18
**72** 21:19 23:10 24:13
  25:19 28:22 29:8
  102:8,16 103:11
  103:24 132:5
  133:25 157:12
**75** 70:13
**77** 157:20,21
**774** 104:7,20
**78** 76:7

---

**8**

**8** 83:22
**8th** 124:5 125:4
**8.5** 43:20
**80** 74:16 97:17
**80s** 40:14
**803** 49:18
**83** 157:22
**85** 72:7 73:11,13
  83:7 142:7 143:2
  143:20 144:4
**86** 125:16,21 157:23

---

**9**

**9** 87:8 95:12 151:18
**9th** 19:15 93:14
**90** 75:24 76:20
  127:19 128:7
  136:2,9,10
**901** 2:9

**92** 126:17 157:7
**94** 127:3
**95** 157:7
**97** 53:13,19 157:7
**970** 22:10
**98** 52:7

**EXHIBIT F**

1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   -------------------------------------x

4   In the Matter of

5           DANA CORPORATION,            06-10354

6                           Debtor.

7   -------------------------------------x

8                           United States Bankruptcy Court

9                           One Bowling Green

10                          New York, New York

11                          March 27, 2007

12                          10:02 a.m.

13

14  B E F O R E:

15          HON. BURTON R. LIFLAND,

16                          United States Bankruptcy Judge

17

18

19

20

21

22

23

24

25

2

1   A P P E A R A N C E S:

2

3           JONES DAY

4           Attorneys for Debtors

5                222 East 41st Street

6                New York, New York 10017

7           BY:  JAYANT W. TAMBE, ESQ.,

8                STEVEN BENNETT, ESQ.,

9                PEDRO A. JIMENEZ, ESQ.

10                   -and-

11          JONES DAY

12               901 Lakeside Avenue

13               Cleveland, Ohio 44114-1190

14          BY:  HEATHER LENNOX, ESQ.,

15               ROBERT HAMILTON, ESQ.

16               CORINNE BALL,ESQ.

17               RICHARD F. SHAW, ESQ.

18

19          KRAMER LEVIN NAFTALIS & FRANKEL LLP

20          Attorneys for Committee of Unsecured Creditors

21               1177 Avenue of the Americas

22               New York, New York 10036

23          BY:  THOMAS MOERS MAYER, ESQ.

24               THOMAS H. MORELAND, ESQ.

25               STEPHEN D. ZIDE, ESQ.

3

```
 1   A P P E A R A N C E S (Cont'd.):

 2

 3          STROOCK & STROOCK & LAVAN LLP

 4          Attorneys for Ad Hoc Committee of Note Holders

 5              180 Maiden Lane

 6              New York, New York 10038

 7          BY:  SHANNON LOWRY NAGLE, ESQ.

 8

 9          COHEN, WEISS & SIMON, LLP

10          Attorneys for UAW and USW

11              330 West 42nd Street

12              New York, New York 10038

13          BY:  BRUCE SIMON, ESQ.

14              BABETTE CECCOTTI, ESQ.

15              PETER DeCHIARA, ESQ.

16              BRUCE LEVINE, ESQ.

17              DAVID R. HOCK, ESQ.

18

19

20

21

22

23

24

25
```

4

1              P R O C E E D I N G S

2                    THE COURT:  Be seated, please.

3                    MR. TAMBE:  Good morning, your Honor, Jay Tambe

4      from Jones Day on behalf of debtors.

5                    THE COURT:  Good morning.

6                    MR. TAMBE:  We're ready to proceed with our next

7      witness on the 1113 and 1114 hearing.  The next witness will

8      be Mr. Miller.  My colleague, Mr. Bennett, will do the

9      examination.

10                    MR. BENNETT:  Good morning, your Honor.  May I

11     proceed?

12                    THE COURT:  Yes.

13                    MR. BENNETT:  You have binders for everybody, I

14     think, including the court.  Go ahead.

15     J E F F R E Y    M I L L E R , having been duly sworn, was

16                    examined and testified as follows:

17                    MR. BENNETT:  May I proceed, your Honor?

18                    THE COURT:  Yes.

19     DIRECT EXAMINATION BY MR. BENNETT:

20          Q.   Mr. Miller, could you tell the court your

21     current position of employment, please.

22          A.   I am a senior manager at BMC Group.

23          Q.   You need to keep your voice up, and you may want

24     to bring the microphone just a bit closer to you.

25          A.   Senior manager at BMC Group.

5

1              MR. BENNETT:  We're having technical

2    difficulties.

3              (A pause in the proceedings.)

4              THE COURT:  We can take a five-minute recess or

5    you can talk loudly.

6              THE WITNESS:  I can talk louder.

7              MR. BENNETT:  I'll keep my voice up and you keep

8    your voice up and we'll see what we can do.

9         Q.   Could you just again repeat for the court what

10   your current position of employment is.

11        A.   I'm a senior manager at BMC Group.

12        Q.   And could you tell us what your education

13   background is.

14             THE COURT:  Can you hear in the back?

15        A.   I received my business degree from USC and my

16   MBA from Pepperdine.  Shortly thereafter, I started at BMC

17   after my MBA degree.

18             THE COURT:  We'll take a five-minute recess and

19   we'll get this solved.

20             MR. BENNETT:  Okay.

21             (Recess taken.)

22             THE COURT:  Take two.

23             MR. BENNETT:  Yes.

24             THE COURT:  From the top.

25   BY MR. BENNETT:

6

1          Q.    I think we got up through your education

2    background.  And could you tell the court how long you've been

3    employed at BMC?

4          A.    I have been with BMC for six years.

5          Q.    What kind of firm is BMC?

6          A.    BMC is an information management and

7    distribution services firm.  We were founded in 1998.  We

8    offer services in restructuring, litigation support, M&A and

9    other areas.  We currently have 140 employees in ten offices

10   worldwide.

11         Q.    Could you take a look at the binder that's in

12   front of you, please, and go to, I guess, tab 2, Debtor's

13   Exhibit 67.

14               Could you tell the court what that is, please.

15         A.    Yes.  This is a page from the our website, which

16   offers a summary of our services and what we do.

17         Q.    And the second page there, if you flip over,

18   where it talks about restructuring services, what is that?

19         A.    This is a listing of some of the services we

20   offer to our restructuring clients.

21         Q.    And if you flip over to the next page, and

22   there's a list that goes on for a while about clients, could

23   you tell the court what that is.

24         A.    Yes, this is a list of our restructuring clients

25   we've had over the course of the time frame since the company

7

1    has been founded.

2         Q.    Okay.

3              MR. BENNETT:  We'll offer Debtor's Exhibit 67,

4    your Honor.

5              MR. LEVINE:  Your Honor, we object only because

6    it is a document that was offered to the unions outside the

7    scope of the scheduling order, the second amended scheduling

8    order which required that documents, exhibits to be marked be

9    done so by March 9.  This document was just recently received.

10   It's one of dozens and dozens of documents that we would have

11   a similar objection to.

12             It's something also that I will represent to the

13   court that I've spoken with Mr. Tambe about and we will try

14   and work out some kind of an amicable resolution outside of

15   court with respect to documents we believe that were in droves

16   provided to us outside the scope of that order.

17             But I do want to, for the record, object to this

18   particular document because it is an example of one of many

19   documents that were just recently served on the union and

20   which could have been served on the unions prior to March 9 in

21   accordance with the scheduling order.

22             THE COURT:  This appears to be the most benign

23   of documents.  But if you want to stand on your objection,

24   I'll make counsel just walk the witness through the whole

25   thing and we'll be here for weeks.

8

1          MR. LEVINE:  Your Honor --

2          THE COURT:  It's okay.

3          MR. LEVINE:  No, no, your Honor --

4          THE COURT:  Go ahead, examine the witness --

5          MR. LEVINE:  No, no, for the record, your

6    Honor --

7          THE COURT:  You picked the most benign of

8    documents to make a principle and a point.  And if the point

9    is to delay and challenge everybody --

10          MR. LEVINE:  Your Honor, I withdraw my

11    objection.  That was not my point.

12          THE COURT:  I can't think of anything more

13    benign than this two-page document.

14          MR. LEVINE:  I am not arguing that it is not

15    benign, your Honor.

16          THE COURT:  All right.

17          MR. BENNETT:  Assuming that Debtor's 67 is

18    received, without objection, we'll move on.

19          THE COURT:  It's received.

20          (Debtor's Exhibit 67, received in evidence, as

21    of this date.)

22          MR. BENNETT:  Thank you, your Honor.

23          Q.  Could you tell the court in broad terms what you

24    understand of the concept of a virtual data room.

25          A.  A virtual data room, VDR, is a secure on-line

9

1    website where documents are posted and authorized users are

2    able to do their due diligence.  We find this to be a very

3    cost-effective and useful means of sharing information to

4    multiple parties when there's multiple documents being

5    engaged.

6              Q.   Why would you want to use a virtual data room

7    versus paper exchange of information?

8              A.   First and foremost is just ease of use of

9    getting the information.  With a paper data room you're forced

10   to bring people to one location with a virtual data room

11   allows you to share information with all parties 24/7.

12             Q.   Does BMC have any experience in uisng data rooms

13   in restructuring and other cases?

14             A.   Yes, we've engaged several companies; one would

15   be AT Holdings Corporation, as well as Musicland Holdings

16   Corporation, two recent cases which we've used virtual data

17   rooms.

18             Q.   And what about your own experience with virtual

19   data rooms?

20             A.   I've set up several as well, most recently being

21   American Commercial Lines in Indiana, Archway Concern, Wells

22   Leaseway Motor Corp., motor car transport company based in

23   Michigan, an auto transport company.

24             Q.   What about with regard for the Dana case, could

25   you tell the court what your role has been with regard to

10

1    virtual data rooms here?

2           A.   Yes.  My team and I, two full-time parties and a

3    trainer as well as the support groups, began setting up the

4    data, virtual data rooms after we were engaged on the case.

5    BMC initially was hired as a claims noticing and balloting

6    agents, and then we were approached by Jones, Day to set up a

7    virtual data room for them.

8                This was in the spring of 2006.  We started

9    setting up a committee site and other sites for them.

10   Subsequently --

11          Q.   Okay, go ahead.

12          A.   Subsequently, we set up, it was in the summer of

13   2006, we were approached again by Jones, Day to set up a

14   virtual data room in anticipation of this 1113/1114 filing.

15   We proceeded to work with Jones, Day to get documents uploaded

16   very soon thereafter, probably in June of 2006.

17          Q.   Was the setup of that virtual data room prior to

18   the formation of the retiree committee?

19          A.   I believe that is the case.

20          Q.   Okay.  Could you tell the court just in summary

21   terms what was involved in populating the data room related to

22   this 1113/1114 proceeding?

23          A.   We set up several planning meetings with Jones,

24   Day to go over what they expected, what type of documents they

25   expected to put up there, the types of users they were going

11

1    to be engaging, and the types of categories and the setting up

2    of what we called the index.  It was the folder structure of

3    the virtual data room.

4              Q.   Could you tell the court how that index was set

5    up.

6              A.   We asked Jones, Day to provide us a document

7    that would outline what their folder structure they looked to

8    see on the site, and once we got it, we started to put that on

9    to the site.

10             Q.   Okay.  And was there some logic to the groupings

11   of the documents?

12             A.   Yes.  I mean, there is a very -- structured very

13   much like an outline, A, B, C, there's, each step allows you

14   to set up the index and then, you know have subfolders and

15   whatnot.

16             Q.   Okay.  Could you tell the court whether there

17   were any confidentiality concerns associated with setting up a

18   data room?

19             A.   Absolutely.  In every case, confidentiality is

20   very important.  That's the reason why data rooms are set up

21   in this manner.  Each person invited to the site is given a

22   user name and a password.  In this particular case, Jones, Day

23   shared with us that confidentiality was very important and

24   they wanted to ensure that each and every party was given the

25   rights to specific categories and user rights as well.

12

1    Q.    Did you have an understanding of the existence

2    of a confidentiality order in the case?

3    A.    Jones, Day did mention that there's a

4    confidentiality order.

5    Q.    And the use of this password system, how does

6    that affect confidentiality?

7    A.    Well, our system generates a user name and

8    password which is then sent directly to that person's e-mail

9    address.  From there, they can use that to log into the

10   system, and only that person can log in.

11   Q.    And if you don't have a password --

12   A.    If you do not have a password, you cannot access

13   the site.

14   Q.    Okay.  You mentioned the services of a trainer.

15   Could you tell the court why you had the services of a

16   trainer?

17   A.    Yes.  Even though the site is very easy to use,

18   as is any new system or software you get, there's a little bit

19   of a training that might be needed.  We offer that service to

20   any parties that were -- that wanted it or needed it.  We find

21   that once you have that training, it becomes very much easier

22   to use the site.

23   Q.    Did any of the parties involved in the 1113/1114

24   proceedings take advantage of the training?

25   A.    I'm aware that the retiree committee very soon

13

1    after they received their invitations to the site requested

2    the training and went through the training.  I believe there

3    also was a special session with Mr. Potok.

4           Q.    Who is Mr. Potok?

5           A.    I believe he's part of the union advisers.

6           Q.    Do you know of any representatives of the unions

7    other than Mr. Potok who asked for training?

8           A.    I am not aware of any other union

9    representatives that asked for training.

10          Q.    Okay.  Is there a hotline system associated with

11   this data room?

12          A.    Yes.  In addition to the training, we offer a

13   24/7 (800) number which any caller or e-mail we get, this

14   group handles it.  If there's any issues, typical issues might

15   be, "I've locked myself out of the site."  If you attempt to

16   enter a password more than three times, and it's incorrect,

17   you'll be locked.  A call -- a phone call will get you

18   unlocked.

19          Q.    Is there any mention of this hotline on the

20   access to the data site?

21          A.    Yes, the (800) number is listed on the bottom of

22   the site on every page, as well as there's a link to a help.

23   If you click on help they will show you the number.

24          Q.    Okay.  You mentioned the process in the summer

25   of 2006, before the retiree committee was set up, of

14

1    populating this data room for the 1113/1114 proceedings.

2                    Could you give the court an idea of how many

3    documents were on the site at that point?

4            A.    Initially, there were several hundred documents

5    on the site at that time.

6            Q.    And could you give the court some idea how many

7    documents have been added to the site thereafter?

8            A.    We're up to probably 2,700 documents now, most

9    recently.

10           Q.    Okay.  Was BMC directly involved in responding

11   to specific information requests from the parties involved in

12   the 1113/1114 proceedings?

13           A.    No.  At no time was BMC involved in any exchange

14   with any parties asking for specific documents or information

15   from the site.

16           Q.    What was BMC's role?

17           A.    BMC's role was to take information and documents

18   and instructions from Jones Day as to what to populate on the

19   site, and we did that fully.

20           Q.    Okay.  Do you have any understanding as to

21   whether the documents that were placed on the site were all in

22   one format, .pdf service, some other format?

23           A.    I'm aware that most documents on the site are in

24   the .pdf format.

25           Q.    What is .pdf?

15

1    A.   It is a portable document format that allows

2    essentially, locks in the data that's on, that's within that

3    document.  So --

4    Q.   Is it possible to print out a copy of a .pdf

5    document?

6    A.   Yes, you can print out a document.

7    Q.   Is it possible to mark a .pdf document with some

8    confidentiality designation?

9    A.   Yes, you can.

10   Q.   And is that important in any way to

11   confidentiality protection?

12   A.   Very much so.  One -- that's, one aspect of a

13   virtual data room is that you've lost a sense of control with

14   your documents, and so users -- I mean, our clients would like

15   to at least ensure that when a document is printed, that

16   there's some sort of understanding as to the confidential

17   nature.  So we would, we were asked in this particular case to

18   use the -- a watermarking feature of our site that you can use

19   to mark documents as confidential or otherwise.

20   Q.   What do you mean by a watermark?

21   A.   Well, our system allows it, you know, Jones Day

22   offered to our -- to the users the ability to print their

23   documents.  And so much so that, if you -- if you print a

24   document, we wanted to ensure that the document had impressed

25   on it a, the confidential or professional use concepts that

16

1    Jones Day said was very important.

2              So we feature that, for those documents in .pdf

3    format, we were able to impress upon the document itself a,

4    the name of the user, the time as well as the confidential

5    markings.

6              Q.   Were there any requests to produce documents in

7    formats other than .pdf?

8              A.   I'm aware that there are less than ten documents

9    that are currently posted through the site that are in other

10   formats, other than .pdf.

11             Q.   Could you get to tab 3 in your binder, there,

12   please.  And can you tell the court just in summary form what

13   that is.

14             A.   This is a usage report that was requested by

15   Jones Day to show the particular users listed here, what their

16   activity was in the site since, from the date that they were

17   given an invitation to the site.

18             Q.   Was that put together at your direction?

19             A.   Yes.

20             Q.   Okay.

21             MR. BENNETT:  We'll offer Debtor's 66, please

22   surgeon.

23             MR. LEVINE:  Voir dire, please?

24   VOIR DIRE EXAMINATION BY MR. LEVINE:

25             Q.   Was this a document that could have been

17

1    generated before March 9th?

2            A.    If requested, I believe, yes, I would.

3                  MR. LEVINE:  No objection, your Honor.

4                  THE COURT:  Received.

5                  (Debtor's Exhibit 66, received in evidence, as

6    of this date.)

7    DIRECT EXAMINATION BY MR. BENNETT (Cont'd.):

8            Q.    And just in terms of the volume of usage that's

9    referenced there, could you let the court know, what are the

10   significant categories here in terms of usage?

11           A.    If you look at, there's a, one listing here

12   titled, "Number of documents viewed" through the particular

13   date, it's the middle column there.  That's -- shows the count

14   of how many documents were viewed by that particular person

15   through that date from the date that they first logged into

16   the site.

17                 In addition, right next to it is the number of

18   documents printed, just, the same concept, the count of

19   documents that were printed.

20           Q.    Okay.  And just remind the court, what do you

21   think the estimated total volume of documents on the site is

22   at this point?

23           A.    Over 2,700.

24           Q.    Okay.  Were there some users who requested

25   passwords and then never actually viewed any documents?

18

1      A.   Yes.  If you look at, I think it's Mr. Doko or

2  Ms. Doyle, in both requests, were sent invitations in

3  November, if you look at the date access granted, invitation

4  sent, and then you'll see that there's no activity for either

5  of those parties, for example.

6      Q.   Okay.  And then the last part on Debtor's 66 to

7  the right there, you'll see, "Issue description and status."

8           Can you tell the court what that represents?

9      A.   Yes.  We maintain a log of all parties that

10  either call or send an e-mail to our support group.  And part

11  of that is for our own use to make sure that, you know, all

12  issues are taken care of and resolved.

13           Looking at these right here, though, are the

14  issues and descriptions that occurred with these particular

15  parties on this report, and in each case, it was simple issues

16  about, accounts were locked and the issues were resolved.

17      Q.   Okay.  Last one, now, if you go to tab 1 there,

18  Debtor's Exhibit 4, could you tell the court what that is,

19  please.

20      A.   Yes.  This is my declaration.

21      Q.   And when was that signed?

22      A.   I believe it was January 31st.

23      Q.   And was that accurate as of January 31st?

24      A.   Yes.

25      Q.   And the information that you've given today in

19

```
 1   terms of usage and status of the total volume of materials on

 2   the site, is that an update of your declaration?

 3            A.   Yes.

 4                 MR. BENNETT:  We'll offer Debtor's Exhibit 4 in

 5   evidence, your Honor.

 6                 MR. LEVINE:  No objection.

 7                 THE COURT:  Received.

 8                 (Debtor's Exhibit 4, received in evidence, as

 9   of this date.)

10                 MR. BENNETT:  We have nothing further.  Thank

11   you, your Honor.

12   CROSS-EXAMINATION BY MR. LEVINE:

13            Q.   Mr. Miller, my name is Bruce Levine from Cohen,

14   Weiss & Simon.  We represent UAW and USW.  Just a few

15   questions, sir.

16                 How many times prior to this occasion, this

17   lawsuit, have you been involved in creating a data room in a

18   situation involving a labor dispute between an employer and a

19   union?

20            A.   This particular occasion, this is the first time

21   I've been involved in this setting of data.

22            Q.   Have you ever created a data site for a labor

23   union's usage in the past?

24            A.   I have not.

25            Q.   And when was the last time did you that, to your
```

20

1    knowledge?

2            A.    Set up a data room for?

3            Q.    For the use by a labor union and/or its

4    professionals.

5            A.    We have not set up.

6            Q.    Mr. Miller, are the data site that was set up

7    for the union and the data site set up for the retirees

8    committee the only data sites that you set up for Dana in this

9    case?

10           A.    Are you saying the labor site, are you asking if

11   that's the only one we set up?

12           Q.    Correct.

13           A.    No, we set up other sites for data.

14           Q.    And what other sites have you set up, sir?

15           A.    I'm aware that we have set up three other sites.

16           Q.    And what sites are those?

17           A.    There is a committee site.

18           Q.    What is the committee site?

19           A.    It's a creditors' committee site.

20           Q.    So that is for use by the UCC, correct?

21           A.    Yes.

22           Q.    And there are two other sites in addition to

23   that?

24           A.    Yes, there was a professional-use-only site.

25           Q.    And for whose benefit was that site created?

21

1          A.    For professional advisers to parties.

2          Q.    To all parties?

3          A.    I'm not at liberty -- I don't know which parties

4    were invited to the site and who they represented.  I just

5    know what the use of the site was for.

6          Q.    Do you know who was invited to the site?

7          A.    Not offhand.

8          Q.    Were you advised who would be invited to that

9    site when you created it?

10         A.    I was not advised.  I was told the way it works

11   is, they send us -- they send us e-mail, they say, "Please

12   invite this person to the site and establish this particular

13   user category."  That's the extent of our understanding of

14   these parties.

15         Q.    And there was a third site that you created in

16   addition to the labor site, correct?

17         A.    Yes.

18         Q.    And what site was that?

19         A.    I'm not sure if I'm at liberty to say.

20         Q.    I'm asking you.

21         A.    There's -- not every site is available for

22   public disclosure.

23               MR. LEVINE:  Your Honor, I would ask that the

24   witness just answer the question.

25               THE COURT:  I direct you to answer the question.

22

1            THE WITNESS:  Okay.

2        A.    There was a -- it was an OEM site.

3        Q.    And that was a site created for OEMs?

4        A.    Correct.

5        Q.    Without telling me which OEMs or divulging

6    something that you might be -- I'll trust you -- that you

7    might be concerned with and confidential, when was this site

8    created?

9        A.    I don't recall.

10       Q.    Was it created at the beginning of your

11   retention?

12       A.    No, it was after our initial retention in the

13   case.

14       Q.    Was it in the spring of 2006?

15       A.    I don't recall without checking.

16       Q.    Was it created before the so-called labor site?

17       A.    Like I said, I do not recall the specific date

18   of when it was created.

19       Q.    You don't know whether it was created before or

20   after the union site?

21            MR. BENNETT:  Asked and answered, your Honor.

22       Q.    Is that your testimony?

23       A.    Please repeat your question?

24       Q.    Do you know whether the OEM site was created

25   before or after the labor site was created?

23

1          A.   I do not recall.

2          Q.   When was the committee site created?

3          A.   I do not recall.

4          Q.   When was the professional site created?

5          A.   I had said that the professional site, or the --

6    sorry, the labor site was created in -- I'm sorry, your

7    question was professional site?

8          Q.   I'm sorry, my question dealt with the

9    professional site.  When was that created?

10         A.   I do not recall.

11         Q.   Do you know whether the professional site was

12   created before or after the labor site?

13         A.   I believe the professional site was created

14   before the labor site.

15         Q.   And -- I forgot whether I asked you, so I'm

16   going to ask you whether you know whether the committee site

17   was created before or after the labor site.

18         A.   I believe the committee site was created before

19   the labor site.

20         Q.   And do you know why there was a need for the

21   creation of a separate labor site?

22         A.   I do not know.

23         Q.   You just followed instructions to create an

24   additional site for customers, is that correct?

25         A.   That's correct.

24

```
1          Q.    Do you know if the documents originally put on

2     each of the four sites were identical to each other?

3          A.    No.

4          Q.    Do you know if there are more .xl documents on

5     the committee site than exist on the labor site?

6          A.    I do not know.

7          Q.    Do you know if the professional-eyes-only site

8     contains more .xl data than the union site contained?

9          A.    I do not know.

10         Q.    Do you know if the OEM site contains more .xl

11    data than the union site contained?

12         A.    I do not know.

13         Q.    Do you know what .xl data is?

14         A.    I assume you're referring to .xls documents, .xl

15    documents.

16         Q.    I assume that's what I'm referring to.  I only

17    know it as .xl.

18         A.    Yes, I'm aware of an .xl document.

19         Q.    And briefly, tell the court, please, the

20    difference between an .xl, et cetera, document, and a .pdf

21    document.

22         A.    An .xl document is a spreadsheet document

23    offered by Microsoft --

24         Q.    I didn't hear --

25         A.    -- a Microsoft document.
```

25

1        Q.   And what can you do, if anything, with an .xl

2  document that you cannot do with a .pdf document?

3        A.   I believe you can type on an .xl document.

4        Q.   Isn't it correct that you can manipulate data on

5  an .xl document whereas, with respect to a .pdf document,

6  you're just looking at a piece of paper that is not subject to

7  electronic manipulation?

8        A.   Yes, that is correct.

9        Q.   Thank you.  Would you please turn to Debtor's

10  Exhibit number 66.

11        MR. LEVINE:  This has been received in evidence

12  by this court.

13        Q.   And it refers to information, I believe, that

14  you prepared at the request of Jones Day for the purposes of

15  this lawsuit; is that correct?  Are you at -- I'm sorry.

16        A.   I'm trying to find the document.

17        Q.   I'm sorry, it's in --

18        THE COURT:  It's the last page.

19        THE WITNESS:  Last page, thank you.  Oh, yes.

20        A.   Yes.

21        Q.   Yes, it was created at the request of Jones Day?

22        A.   Correct.

23        Q.   For this litigation?  And when was that request

24  made?

25        A.   I believe it was early last week.

26

1          Q.   Now, the individuals who appear to be tracked

2     include two people who I will represent to you are my

3     partners, Babette Ceccotti and Elizabeth O'Leary.

4               Have you been tracking at the request of Jones

5     Day the use of this data site by anybody with access to the

6     site?

7          A.   No request for tracking was made by Jones Day.

8     Our system, as a function of its use, the system tracks this

9     information.

10         Q.   And was there any discussion at the time that

11    the system was being created about whether the system should

12    be adjusted such that attorneys and perhaps union officials

13    using the site would not be tracked?

14         A.   I'm not aware of any discussions.

15         Q.   There was certainly no discussion with you,

16    correct?

17         A.   Correct.

18         Q.   And you are responsible, principally

19    responsible, for creating the site on behalf of Jones Day, is

20    that correct?

21         A.   Yes.

22         Q.   Now, I just want to go through the columns

23    briefly.  "Last name," "First name," "User name," I assume

24    that's the e-mail address of the individual using the site,

25    correct?

27

1          A.    That is correct.

2          Q.    The company with -- the company from where the

3    individuals work?

4          A.    Yes.

5          Q.    "Category, union."  I assume that means that the

6    people who are being tracked here are all somehow related to

7    one union or another union in this case?

8          A.    That was the category given to us by Jones Day.

9          Q.    And Jones Day asked you specifically for the

10   folks using the site from the unions?

11         A.    Jones Day specifically gave us this list of

12   users.

13         Q.    "Date access granted" and "invitation sent,"

14   that's just when each individual was granted access to the

15   site?

16         A.    That is correct.

17         Q.    Then there's a column that says, "Date document

18   first viewed."

19              What is that?

20         A.    That would be the date that the -- that

21   particular user viewed their first document.

22         Q.    And am I to assume therefore that you are able

23   to tell when any individual first touched the site; is that

24   correct?

25         A.    That is correct.

28

1          Q.    And you were also able to tell the number of

2    documents each individual reviewed, as I see in the next

3    column; is that correct?

4          A.    Yes.

5          Q.    And you can even tell the number of documents

6    that each individual printed, is that correct?

7          A.    Yes.

8          Q.    Are you able to tell -- I don't see it on this

9    sheet -- what specific documents are reviewed by specific

10   individuals?

11         A.    We know what documents have been viewed and were

12   printed.

13         Q.    Does your recordkeeping include data which would

14   allow you, for example, to determine what documents my

15   partner, Ms. Ceccotti, reviewed?  What specific documents?

16         A.    Yes, our system tracks usage of that nature.

17         Q.    And I assume that was information that you never

18   provided to anybody; correct?

19         A.    We never provide it unless requested by the

20   parties.

21         Q.    So it had been requested.

22         A.    I didn't say that.  I said that the system

23   tracks that information.

24         Q.    What is the call identification number?

25         A.    That is our internal ID for that particular log.

29

1          Q.    And "dates of calls" refer to any call from a

2     user with a problem or for any other reason?

3          A.    Yes, that's correct.

4          Q.    If you'd turn to your declaration, please, which

5     is, I believe, tab 1 in your binder, paragraph 4; would you

6     let me know when you get there, please?

7          A.    Yes, I'm here.

8          Q.    Looking at the second sentence, sir, which

9     reads, "At the time in anticipation of their negotiations with

10    the retiree committee and the unions, the debtors had already

11    posted hundreds of responsive documents to the 1113/1114 data

12    room."

13               Do you see that?

14         A.    Yes.

15         Q.    What do you mean by "responsive documents"?

16         A.    Jones Day gave us documents to post to the site

17    and we did so.

18         Q.    But they were not responsive to any requests by

19    the union or the retiree committee at the initial setting-up

20    stage, is that correct?

21         A.    My understanding is that the documents were

22    responsive to information requests that I was not party to.

23         Q.    When was the data site set up, the labor site?

24         A.    It was the summer of 2006.

25         Q.    And when were the unions first, if you know,

30

1    advised about the existence of this site?

2            A.   I do not know when they were advised.

3            Q.   Paragraph 8, please.  Bottom of page 5.  Last

4    full sentence on that page.  Tell me when you're there,

5    please.

6            A.   Yes.

7            Q.   The November 10th, 2006, do you see that?

8            A.   Yes.

9            Q.   The November 10th training session was attended

10   by Leon Potok and representatives of Jones Day and BMC, do you

11   see that?

12           A.   Yes.

13           Q.   And who was there from Jones Day?

14           A.   If I recall correctly, I believe it was Josh

15   Weisser.

16           Q.   And did you, Mr. Weisser or anyone else who was

17   present at that meeting tell Mr. Potok at that time that he

18   was being watched when he used the data room, or he would be

19   watched?

20           A.   I don't recall any conversation of that nature.

21                MR. LEVINE:  I have no further questions, thank

22   you.

23                (A pause in the proceedings.)

24                MR. LEVINE:  Excuse me, one second.  Sorry, your

25   Honor.

31

1          (Counsel confer.)

2          MR. LEVINE:  One more question, please.  I'm

3     sorry, Mr. Bennett.  I'm sorry, your Honor.

4          Q.   If you posted an .xl document, how were you able

5     to maintain security, if at all?

6          A.   With an .xl document on our sites, you cannot

7     maintain as the same level of security as you can with a .pdf

8     because the document can be taken off the site and

9     manipulated.

10         Q.   To your knowledge, were the same security

11    concerns expressed about the union's usage of documents as was

12    expressed about the UCC's usage of documents?

13         A.   I was not party to any conversation about that.

14         MR. LEVINE:  Thank you very much.  I am

15    definitely finished.

16    REDIRECT EXAMINATION BY MR. BENNETT:

17         Q.   Just starting with some of the last things that

18    Mr. Levine asked you about in terms of tracking of requests,

19    is there a privacy policy associated with the data site?

20         A.   Yes.

21         Q.   Is there a site access agreement associated with

22    the data site?

23         A.   Yes.

24         Q.   Is that mentioned on the website in the log-in

25    portion of the website?

32

1      A.    It is not only mentioned on the log-in site, it

2    is also mentioned, it is there on every page of the site.

3      Q.    For someone to get on to the site and make use

4    of it, do they have to go past the opportunity to view the

5    privacy and security policies?

6      A.    Yes.

7      Q.    And do you know whether the privacy and security

8    policies mention anything about collection of information by

9    BMC?

10     A.    Yes, it does.

11     Q.    And does the privacy policy say in part that the

12   BM data room will collect non-public information and that that

13   information may include without limitation contact

14   information, name, e-mail address, zip code, unique

15   identifiers, et cetera?

16     A.    Yes, it does.

17     Q.    And does the site access agreement say that, as

18   a condition of the user's access to the BMC data room, the

19   user consents to the collection and reporting to the deal

20   owner of all actions taken and all messages sent by user on

21   the deal owner's deal area?

22     A.    Yes, it does.

23     Q.    And to your knowledge, was there ever a request

24   from any representative of the unions for some exemption from

25   the security policy, privacy and security policy and the site

33

1    access agreement?

2            A.    I'm not aware of any requests.

3            Q.    Mr. Levine mentioned access to sites like the

4    creditors' committee site.

5            Do you have any knowledge as to whether the

6    unions have representatives on the creditors' committee?

7            A.    I'm not aware.

8            Q.    Mr. Levine also mentioned access to the

9    professional-eyes-only site.  Do you have any knowledge as to

10   whether Mr. Potok, one of the professionals for the unions,

11   had access to that site?

12           A.    No, I can't recall right now whether they do or

13   not.

14           Q.    The setup of the site in the summer of 2006, the

15   populating of that site with information, did you have any

16   discussion about the desire to provide information on the site

17   that might be useful to the parties in interest in the

18   1113/1114 proceeding?

19           A.    No, I was not party to any of those discussions.

20           Q.    Okay.  I think the only last point here about

21   .xl, do you have any knowledge of specific requests by union

22   representatives for production of any particular documents in

23   .xl format?

24           A.    I'm not aware of any particular requests of that

25   nature.

34

```
 1              MR. BENNETT:  Nothing further.

 2              MR. LEVINE:  Just one quick question.

 3   RECROSS-EXAMINATION BY MR. LEVINE:

 4         Q.   Just to clarify, if someone from the unions had

 5   a request for information, the system wasn't set up for anyone

 6   to -- for the unions to come to you, isn't that correct?

 7         A.   That is correct.

 8              MR. LEVINE:  No further questions.

 9              THE COURT:  Thank you, sir.

10              (The witness is excused.)

11              MR. TAMBE:  The debtors will call the next

12   witness, Ms. Pilar Tarry.  Mr. Jimenez will be examining this

13   area.

14              MR. JIMENEZ:  Your Honor, I have a binder for

15   the court and for the witness.  May I approach?

16   P I L A R      T A R R Y , having been duly sworn, was examined

17              and testified as follows:

18   DIRECT EXAMINATION BY MR. JIMENEZ:

19         Q.   Ms. Tarry, where are you currently employed?

20         A.   At Alex Partners.

21         Q.   And what is your position with Alex Partners?

22         A.   I'm a director in the turnaround restructuring

23   services practice.

24         Q.   How long have you been with Alex Partners?

25         A.   I have been with Alex Partners for
```

35

1    seven-and-a-half years.

2            Q.    In your employment with Alex Partners, are you

3    currently involved in Dana's Chapter 11 cases?

4            A.    Yes.

5            Q.    And other than your work on these Chapter 11

6    cases, during your time with Alex Partners, have you had an

7    opportunity to work at --

8            A.    Yes.  I was the chief restructuring officer at

9    both Atkins Nutritionals, and at Cable and Wireless.  And

10   prior to that, I was involved in the cases, most notably Fruit

11   of the Loom, Hayes Lemmerz.

12           Q.    Have you had a role in connection with the

13   Debtor's process of Sections 1113 and 1114?

14           A.    Yes.

15           Q.    What has been that role?

16           A.    My role has been the primary point of contact

17   for, to receive information requests from outside parties and

18   to coordinate responses to those information requests.

19           Q.    Ms. Tarry, if you could please take a look at

20   tab A in your binder.

21           A.    Okay.

22           Q.    Do you recognize that document?

23           A.    I do.

24           Q.    What is it?

25           A.    It's the declaration I submitted in support of

36

1    the 1113/1114 motion.

2            Q.    To the best of your knowledge, was the

3    information contained in that declaration correct when you

4    signed it?

5            A.    Yes, it was.

6            Q.    Could you please briefly describe the process

7    employed to respond to the various information requests that

8    the debtors have received in connection with their 1113/1114

9    process.

10           A.    Sure.  When Jones Day or Alex Partners would

11   receive an information request, say, from the UAW or the USW,

12   we would first check the virtual data sites that Mr. Miller

13   talked about to ascertain whether those documents already

14   existed on those sites, and if they did, we would coordinate a

15   response through Jones Day, alerting the requesting party to

16   the location of the document.

17                 If the documents were not already available on

18   the site, we would work within the -- I would work with the

19   debtors and our Alex Partners team and Jones Day to ascertain

20   whether any responsive documents did exist, and if they did

21   exist, we would provide them to the requesting party and go

22   ahead and post them to the sites as we assumed other people

23   would also want similar information.

24           Q.    When you say "the site," which site in

25   particular were those documents posted to?

37

1          A.    I think we're calling it the labor site.

2          Q.    With respect to the two unions, the UAW and the

3    USW, approximately how many information requests did debtors

4    receive from these unions?

5          A.    Seven as of Friday.

6          Q.    Ms. Tarry, if you could take a look at

7    Exhibits B through H in the binder in front of you.  And let

8    me know once you've finished looking at those documents.

9                (A pause in the proceedings.)

10         A.    Okay.

11         Q.    Do you recognize these documents?

12         A.    Yes.

13         Q.    What are they?

14         A.    They are the information requests we received

15   from the USW, the UAW and/or their advisers.

16         Q.    Was the same process you just described for

17   responding to information requests used with respect to these

18   requests received from the unions?

19         A.    To the best of my knowledge, yes, it was.

20         Q.    How many documents would you estimate have been

21   provided to the two unions directly or made available on the

22   data site?

23         A.    Currently, there are 4,100 documents on the data

24   site for the unsecured creditors committee.  There are also

25   2,700 documents, I think that's right, on the labor site, the

38

1    virtual data site created for these 1113/1114 process, and the

2    unions, both unions and their advisers have access to both of

3    those sites.

4            Q.    So the two unions and their advisers have access

5    to the creditors' committee site?

6            A.    That's my understanding, yes.

7            Q.    Do you have any understanding whether the two

8    unions have access to the, what's called the

9    professionals-only site?

10           A.    I do not believe they have access to the

11   professional-eyes-only site.

12           Q.    Do you have any understanding why the two unions

13   do not have any access to that site?

14           A.    My understanding of why they don't have access

15   to that site -- well, my understanding why the unions don't

16   have access to that site is, it's for the professionals of the

17   committee to designate documents that we may not want

18   committee members to see for various reasons but we're willing

19   to share with their professionals.

20               The reason that the union's advisers do not have

21   access to that site is, in my understanding, because the terms

22   of the confidentiality agreement with the union advisers does

23   not match the terms of the confidentiality agreement with the

24   unsecured creditor committee advisers.

25           Q.    Could you briefly describe the types of

39

1    information that have been made available to the two unions.

2             A.    Sure.    Briefly.    Um -- we have -- the debtors

3    have provided a substantial amount of information, just in

4    some general categories.    They have provided information about

5    the employee benefit plans, and summary plan descriptions.

6    They have provided actuarial information provided to us by

7    Towers Perrin and supporting detailed schedules regarding

8    those -- those valuations.    They have provided head count

9    information, organization charts, 2005 hourly and salaried

10   wage and fringe information by location.    We've now just

11   provided the 2006 hourly wage and fringe information by

12   location.

13             They have provided historical financial

14   information, including, for example, consolidating P&L and

15   balance sheets, going back as far as 2004.    They have provided

16   the DIP information about our loan credit facilities, cash

17   flow forecasts, variance reports to the cash forecast,

18   discussions of budget to actual plans for the 2006 months;

19   they have provided forecast information for 2007, including

20   the base, what we call the base case, the plus plan, and the

21   DIP budget supplement, which -- I could say what those are if

22   I needed to.    But -- and also, supporting detail and

23   assumptions regarding those plans.

24             They have provided detailed information

25   regarding the restructuring initiatives, including the

40

1    footprint optimization initiative.  We've provided detail in

2    our intercompany transactions, information about our

3    non-debtor subsidiaries operations, market share information,

4    competitor information, information on a repatriation plans on

5    our non-U.S. financings -- I could keep going, I guess.

6              But is that --

7        Q.   Well, there were some questions yesterday

8    regarding specific documents and whether or not these

9    documents have been produced to the unions.  I'd just like to

10   ask you your understanding on whether or not these documents

11   have been provided.

12       A.   Okay.

13       Q.   The 2007 base plan?

14       A.   The 2007 base case, which is the 2007 plan

15   without the restructuring initiatives was provided on December

16   8th, and -- in a call with the unions and others.  It was also

17   provided, more information was provided on that plan on

18   December 14.

19       Q.   The 2007 DIP budget supplement, do you know if

20   that document was provided to the unions?

21       A.   Yes, the DIP budget supplement was provided to

22   the unions on January 3rd.

23       Q.   The 2006 pro forma, do you know if that was

24   provided to the unions?

25       A.   The 2006-2007 pro forma, well, I can't tell you

1    how early they got it.  They had it by no later than November

2    29th.  I was present at a meeting where we handed out that

3    detailed analysis supporting that.

4         Q.   There were also some questions yesterday,

5    Ms. Tarry, regarding whether the backup information related to

6    the labor savings associated with the five plans that are

7    still part of the 1113 motion, whether the unions have been

8    provided any backup information with respect to those savings.

9    Are you aware whether the debtors have made such information

10   available?

11        A.   Yes.  I believe you're referring to the

12   Exhibit 72 that was discussed, that totaled to the 28 million,

13   is that --

14        Q.   Correct.

15        A.   -- what you're thinking of?  Okay.  Yes, I think

16   the cost sheets that I think Mr. Bueter explained were the

17   basis for that 28 million dollar roll-up, the USW cost sheets

18   were provided to Jim Robinson by Chris Bueter's group in late

19   January.  That would be for Fort Wayne, Marion and Henderson.

20            The slightly updated terms sheets or cost sheets

21   for those three plants and for Elizabethtown, Auburn Hills

22   and -- well, Robinson and -- were all provided on March 7th.

23   I was copied on that distribution.

24        Q.   To the best of your knowledge, have the debtors

25   been able to respond to each of the information requests

42

1    received from the two unions?

2           A.    For the most part.  We have a three, I believe

3    three items that are, we have not been able to respond to yet

4    from the March 8th request.  I think everything before that

5    has been satisfied.  Which, the March 8th request and the

6    March 23rd were the last two.  The March 23rd we received

7    Friday.

8                 That request we're now working on.  It included

9    some follow-up questions for the things we provided from the

10   March 8th request and it adds some new requested items.

11               I believe the things that were not responded to

12   are some information about assets of specific facilities, some

13   information on process savings, and some information on our

14   non-globally-managed production purchasing spend, which they

15   would like some detail on.  We are in the process of providing

16   that.

17          Q.    What other efforts have the debtors engaged in

18   to provide information to the two unions?

19          A.    We have participated in conference calls with

20   Mr. Potok and his team related to the information requests.

21   We have invited the unions and their -- well, they are

22   invited, and their advisers, to participate in the periodic

23   calls and updates.  We've had meetings that we have with the

24   committees, the official committees.  We've also met with

25   Mr. Potok and his team individually to respond to certain of

43

1    their requests.

2              Q.    Just so the record is clear, who is Mr. Potok?

3              A.    Leon Potok from -- I apologize.  Potok &

4    Company?

5              Q.    And what is --

6              A.    They are the financial advisers to the UAW and

7    the USW.  That's my understanding.

8              Q.    Any other detail you can provide on the various

9    calls you've had with Mr. Potok or members of his staff?

10              A.    The individual calls we've -- that we've had

11   with Mr. Potok at his staff, sure.  We -- we did a two-day due

12   diligence meeting in Toledo.  Mr. Potok and his team visited

13   Toledo.  During that two-day period, they met with the

14   management group of our heavy-vehicle traction, torque and

15   structures product groups to get an overview of their product

16   groups and their operations and their sort of view of 2007.

17              They also met with, at their request, other

18   individuals from the debtors to answer their questions about

19   repatriation and their questions about the financial statement

20   consolidation.

21              They met with Mike Burns for a time, who shared

22   with them, I think, his outlook for the company and sort of

23   his vision and thoughts on the company and the plan.  They did

24   a follow-up call on the 28th with Paul Miller, the head of our

25   supply chain at his request, at Leon's request, to answer

44

1    their questions about supply chain and purchasing and vendor

2    relationships.

3                We also, Alex Partners also spent some time with

4    Leon and we, took, I think mapped out a process for getting

5    them due diligence information on our footprint initiatives.

6    And in connection with that process, we did a conference call

7    with his team on the 23rd of February, where we took him

8    through a detailed analysis of the traction footprint

9    optimization plan.

10                We did a follow-up call with them on March 12th

11   to take them through a similar analysis for torque, and also

12   to answer his questions on the assumptions in traction and to

13   review with him some additional scenarios that he had asked us

14   to run related to the traction plans.

15                That's substantially the meetings.

16        Q.    A few minutes ago, Mr. Levine asked Jeff Miller

17   some questions regarding .xl documents and whether or not

18   there are any .xl documents available on the, what they call

19   the labor site.

20                Are you aware whether any documents in .xl

21   format have been produced to the unions or their advisers?

22        A.    Yes.  In the March 8th request, Mr. Potok asked

23   for certain documents in .xl form and we did provide those

24   documents in .xl form.  Those would include the DIP budget

25   supplement, which is essentially 2007 plus plan, that also

45

1    includes some of the detail analysis about our fixed and

2    variable cost projections.

3                We've also provided the 2007 base case P&Ls in

4    consolidating form in .xl to Mr. Potok, as well as the 2004

5    through 2006 consolidating financial statements.  Those are

6    all in .xl.

7                MR. JIMENEZ:  Your Honor, at this time I'd move

8    Debtor's Exhibit 7, the declaration of Pilar Tarry into

9    evidence.

10               MR. LEVINE:  No objection.

11               THE COURT:  Received.

12               (Debtor's Exhibit 7, received in evidence, as

13   of this date.)

14               MR. JIMENEZ:  No further questions, your Honor.

15               MR. LEVINE:  May I have one minute, your Honor?

16   Thank you, your Honor.

17               (A pause in the proceedings.)

18   CROSS-EXAMINATION BY MR. LEVINE:

19        Q.   Ms. Tarry, I promise to keep to the lawyer's

20   pledge that is often not kept and that is that I'll be brief.

21               I would like to look at your declaration which I

22   believe is tab A.  Are you there?

23        A.   Yes.

24        Q.   Just looking at your background, this is not

25   your first 1113/1114 proceeding that you've worked on, is that

46

1    correct?

2             A.   No, this is the first time I've worked on

3    1113/1114 proceedings specifically.

4             Q.   But it's not the first time that you've worked

5    on behalf of a company that had some kind of a labor dispute

6    with a labor union, is that correct?

7             A.   No, this is the first one that's had union labor

8    dispute.

9             Q.   Oh, it is.   Okay.   And what experience, if any,

10   have you had with respect to labor relations matters?

11            A.   Labor relations specifically?

12            Q.   Yes.

13            A.   None.

14            Q.   Would you turn, please, to page 9 of your

15   declaration and specifically, paragraph 20, and I am at the

16   second sentence there, do you see that?

17            A.   Um-hum.

18            Q.   It reads, "In conjunction with those

19   negotiations, the UAW has requested copious information which,

20   while technically outside of the 1113 process, demonstrates

21   that the UAW is well informed as to the nature of Dana's

22   financial situation."

23                 Now, do you stand by that statement?

24            A.   Yes.

25            Q.   And what is the basis upon which you have opined

47

1   here that the UAW has requested copious information which is

2   technically outside of the 1113 process?

3          A.   Conversations with Mr. Bueter and a little bit

4   of the 11/30 request.

5          Q.   1113 request?

6          A.   The request dated 11/30 that they submitted.

7   It's under tab B.

8          Q.   So you were advised by others that the

9   information was outside of 1113.  That is not your own

10  judgement, is that correct?

11         A.   No, advised by Jones Day that it was outside of

12  1113.

13         Q.   So that was a legal conclusion that had been

14  conveyed to you; correct?

15         A.   Correct.

16         Q.   Thank you.  Now, you said that a number of .xl

17  documents have been provided to the unions.

18         A.   That's correct.

19         Q.   And I believe you mentioned the DIP budget

20  supplement.

21         A.   That's correct.

22         Q.   And when was that provided?

23         A.   In .xl?

24         Q.   .xl, correct.

25         A.   On March 19.

48

1          Q.    And when was that provided to the UCC in .xl

2     format?

3          A.    I wouldn't know that.

4          Q.    It was provided to the UCC, was it not?

5          A.    It was provided to the UCC.  I don't know if it

6     was provided in .xl at any point.

7          Q.    Do you know when the union was provided with

8     detailed information, I believe you described in terms of

9     fixed and variable costs of the debtor, do you know when that

10    information was provided in .xl format?

11         A.    The information I'm speaking of has not been

12    provided to the UCC in .xl format.

13         Q.    I'm asking when it was provided to the unions.

14         A.    Oh, I'm sorry, the unions.  On March 19th.

15         Q.    And the 2007 base case, when was that provided

16    in .xl format to the unions?

17         A.    I don't believe I said that that was provided in

18    .xl.  I'm not sure that it actually was.

19         Q.    I'm sorry, I had that written down that way, as

20    one of the items.  I may have misheard you.

21         A.    Oh, no, no, no.  I didn't say that.  I don't

22    think I said that.

23         Q.    I --

24         A.    It may have been, but I don't know that it has

25    been.

49

1          Q.    And the consolidated financials for 2004 and

2    2006, when were they provided in .xl format?

3          A.    I cannot tell you exactly when they were

4    provided, but they were provided by February 26th and 27th,

5    when Mr. Potok's team was in Toledo.

6          Q.    And do you know when the motion was filed in

7    this case?

8          A.    January 31st, I believe.

9          Q.    You testified about information that was

10   provided to, I guess, Mr. Potok on or about March 7th.  Could

11   you tell the court, again, or for my benefit, what information

12   specifically that you're talking about?

13         A.    I'm talking about the cost, what we call the

14   cost sheets which show and support the asks at the various

15   union facilities over the first three years in detail.  Those

16   cost sheets were provided to him on the 7th for Marion,

17   Auburn -- I'm sorry, Auburn Hills, Marion, Pottstown,

18   Henderson, Elizabethtown, Robinson.

19         Q.    And is that information that you're talking

20   about, would you turn, please, to, I think it's tab, or it is

21   tab D in your document looseleaf binder.  Are you there?

22         A.    Um-hum.  I am.

23         Q.    Is that information responsive to item number 10

24   in that information request from Potok & Company dated

25   November 20th, 2006?

50

1          A.    I'm sorry, repeat the question?

2          Q.    Is the information that was provided on March,

3    or on or about March 7, responsive to the request set forth in

4    paragraph number 10 of Mr. Potok's information request dated

5    November 20th, 2006?

6          A.    It is.

7          Q.    Okay.  And that was before the motion in this

8    case was filed, is that correct?  The 1113/1114 motion?

9          A.    I'm sorry, say your question again?

10          Q.    Withdrawn.  I just want to go through summarily

11    with you the process through which one requests information.

12          Does the request go to you or has the request

13    gone to you specifically from Mr. Potok or another

14    representative of the union?

15          A.    Certain requests have come directly to me.  But

16    most of the time, they go from Mr. Potok to Jones Day or to

17    Mr. Bueter, who then pass them to me.

18          Q.    If a request comes to you specifically at the

19    threshold, what, if anything, is your role?

20          A.    If the request comes to me, I distribute the

21    request to Jones Day and to the appropriate people inside Dana

22    who may have responsive documents for that request.  Then --

23          Q.    What happens next?

24          A.    Well, at that point, we would, as I said, look

25    at the data site that's -- and see if that document already

51

1    existed and if it did, I would work with Jones Day to prepare

2    a letter notifying the requesting party of the location of the

3    document.

4          If the document is not already on the site, I

5    would then work with the company to determine if the document

6    existed that was responsive, and if it did, we would then

7    provide that document to the requesting party and have it

8    posted on the site.

9          Q.   Is that essentially the same procedure used for

10   requests made by representatives of the UCC?

11         A.   My role is to provide information to all the

12   parties, including the UCC, related to 1113/1114.  So if it

13   related to 1113/1114, yes, that's the process.

14         Q.   And if it did not relate to 1113/1114, what is

15   the process?

16         A.   I don't handle those requests.

17         Q.   Who handles those requests?

18         A.   Others from the Alex Partners team.

19         Q.   Were you involved in the original determinations

20   as to what documents should be placed on the various sites

21   that had been discussed this morning, that is, the site for

22   the UCC, the professional-only site, and the labor site?

23         A.   Not the UCC and the professional-only site.

24         Q.   You testified previously that the union's

25   adviser was not entitled to have access to the

52

1   professional-only site, is that correct?

2        A.   I don't think I said he wasn't entitled to it.

3        Q.   Is it correct that he is not entitled to review

4   documents in the professional-only site?

5        A.   I'm not sure I know what "entitled" means.

6        Q.   Has Mr. Potok, to your knowledge, asked for

7   permission to have access to that site?

8        A.   Yes.

9        Q.   And has that access been granted?

10       A.   No.

11       Q.   And why is that?

12       A.   It's my understanding, again, that the

13  confidentiality agreement with Mr. Potok contains different

14  language regarding professional-eyes-only designations than

15  does the confidentiality agreement with the unsecured

16  creditors' committee advisers.

17       Q.   And who, if anyone, to your knowledge was

18  responsible for communicating that reason to Mr. Potok for

19  denying his access to the professional-eyes-only site?

20       A.   I told him that directly but then referred him

21  for additional conversations to Jones Day.

22       Q.   Was that your decision or was that a decision

23  made by Jones Day?

24       A.   I'm not sure who decided.

25       Q.   When you told Mr. Potok he couldn't look at the

53

1   site, was that a decision that you, yourself, made or did you

2   have to check with anybody?

3          A.   I checked with Jones Day.

4          Q.   And it was on that basis that you communicated

5   to Mr. Potok that he, on behalf of the union, would not be

6   able to look at that site, is that correct?

7          A.   That's correct.

8          Q.   Now, to your knowledge, the unions, as you said,

9   are participants on the unsecured creditors' committee, right,

10  members of that committee?

11         A.   That's correct.

12         Q.   And Mr. Potok does not represent the creditors

13  committee, is that correct?

14         A.   That's correct.

15         Q.   And the labor site was created for a purpose, to

16  your understanding, isn't that correct?

17         A.   That's correct.

18         Q.   As distinguished from the UCC site, isn't that

19  correct?

20         A.   Yup.

21         Q.   And the UCC has its own professional

22  representatives; isn't that correct?

23         A.   Yes.

24         Q.   Including Mr. Talarico over there, isn't that

25  correct?

54

1          A.   I've never actually seen Mr. Talarico, but I've

2    heard the name, so if that's indeed him, yes.

3          Q.   As a professional, you would expect to look at

4    that site on behalf of the UCC, correct?

5          A.   To look at the --

6          Q.   The UCC site?

7          A.   We would look at the UCC site, yes.

8          Q.   And was Mr. Potok told, to your knowledge, at

9    any time that, in addition to the labor site that we're

10   creating especially for this 1113/1114 proceeding, you might

11   also go over to another site that is created, that has

12   different information?

13          Do you know if he was ever told that?

14          A.   Not by me.  I don't know if he was ever told

15   that.

16          MR. LEVINE:  I have no further questions.

17          MR. TAMBE:  May we just have a minute?

18          (Counsel confer.)

19          MR. JIMENEZ:  Your Honor, just a couple of quick

20   questions.

21   REDIRECT EXAMINATION BY MR. JIMENEZ:

22          Q.   Ms. Tarry, you testified a few minutes ago

23   regarding providing the 2007 DIP budget supplement and fixed

24   and variable costs, both in .xl format on March 19th, do you

25   remember that?

55

1         A.   Yes.

2         Q.   Was that information previously provided to the

3    union or its advisers in some other format before March the

4    19th?

5         A.   Yes, it was provided in -- the DIP budget

6    supplement was provided on January 3rd in .pdf format.

7         Q.   And why did you provide the 2007 DIP budget

8    supplement in .xl format on March the 19th?

9         A.   Because he asked for it.

10        Q.   And with respect to the fixed and variable

11   costs, do you recall when that was first provided?

12        A.   It was first provided on March 19th, after he

13   asked for it on March 8th.

14        Q.   And that was provided in .xl format as well?

15        A.   Yes.

16             MR. JIMENEZ:  Nothing further, your Honor.

17   RECROSS-EXAMINATION BY MR. LEVINE:

18        Q.   Do you know why Mr. Potok made those requests in

19   March and not earlier?

20        A.   No.

21             MR. LEVINE:  No further questions.

22             THE COURT:  Thank you.

23             (The witness was excused. )

24             MR. TAMBE:  Your Honor, Mr. Hamilton will be

25   calling the next witness.

56

1          MR. HAMILTON:  Your Honor, my name is Robert

2    Hamilton.  I'm from the Columbus, Ohio office of Jones Day and

3    I'd like to call our next witness, who is Dr. Janemarie

4    Mulvey.

5          I have witness notebooks that I can bring to the

6    witness stand and to your Honor.

7          THE COURT:  Please.

8    J A N E M A R I E     M U L V E Y , having been duly sworn, was

9          examined and testified as follows:

10   DIRECT EXAMINATION BY MR. HAMILTON:

11        Q.   Dr. Mulvey, where are you currently employed?

12        A.   I'm currently employed at the College of

13   American Pathologists.

14        Q.   If I could ask you to open your witness notebook

15   to tab A, which has Debtor's Exhibit 5 behind the tab, are you

16   there?

17        A.   I'm there.

18        Q.   Can you tell the court what this document is?

19        A.   This is my declaration and my resume.

20        Q.   If I can ask you, in your declaration, which is

21   Debtor's Exhibit 5, to turn to the end, appendix 1, which is

22   right after page 28 of the declaration, are you there?

23        A.   Yes, I'm there.

24        Q.   Can you tell the court what appendix 1 is?

25        A.   That's my resume.

57

1          Q.   Does it accurately describe your background?

2          A.   Yes, it does.

3          Q.   If I can, I'd like to bring to the court's

4     attention just a few of the items in there that may be

5     relevant to consideration of your testimony today.

6               After you received your masters in economics

7     from the University of Maryland in '85, did there come a time

8     when you started working at the American Association of

9     Retired Persons in Washington, D.C.?

10         A.   Yes, I worked with the American Association of

11    Retired Persons beginning in 1989.

12         Q.   About how many years were you there?

13         A.   About four-and-a-half.

14         Q.   During those four-and-a-half years at the AARP,

15    what did do you there?

16         A.   Well, it was during the era of the Clinton

17    administration and healthcare reform was a very important

18    topic.  So I played an integral role in the development of

19    AARP's healthcare reform proposal, which included expanding

20    Medicare to the pre-65 population.  I also represented AARP on

21    certain federal advisory commissions with respect to health

22    and retirement issues.

23               I wrote testimony for retirees for when they

24    testified before Congress.  One of those included looking at

25    pension coverage of women.  And I also provided

58

1    recommendations and analysis to the Social Security

2    Administration on tax burdens of the elderly.

3         Q.   After you were at the AARP, did there come a

4    time when you then went to the Urban Institute?

5         A.   Yes.

6         Q.   How long were you at the Urban Institute?

7         A.   Approximately two years.

8         Q.   And what is the Urban Institute?

9         A.   The Urban Institute is a nonprofit research

10   organization.  People call it a think tank.

11        Q.   What did you do there?

12        A.   One of my main roles was to develop economic

13   models to look at state healthcare reform proposals and the

14   cost of those proposals.  And then that information was used

15   to advise state legislators and state governments on their

16   respective reform proposals.

17        Q.   Who was asking the Urban Institute to provide

18   that information?

19        A.   The state governments or the state legislatures.

20        Q.   Did you have occasion at the Urban Institute to

21   do research into out-of-pocket spending by the elderly on

22   healthcare?

23        A.   Yes.  Also, while I was there, I did an

24   extensive study on the out-of-pocket spending among the

25   elderly for AARP.  I also coauthored a book on the future

59

1    viability of the Medicare program.

2            Q.    When you say on behalf of AARP, was AARP a

3    client of the Urban Institute at that time?

4            A.    They contributed funding.

5            Q.    So while you were at the Urban Institute you

6    were doing research for the AARP?

7            A.    Yes.

8            Q.    All right.  And then, as I understand it from

9    August of '95 through the early part of 2000, you were at the

10   Center For Health Policy Studies and American Council of Life

11   Insurers, is that right?

12           A.    Correct.

13           Q.    What were you doing there?

14           A.    At the Center For Health Policy Studies, I

15   helped large employers look at ways to contain their

16   healthcare costs, largely through negotiating premiums and

17   bundling payments.  At the American Council of Life Insurers,

18   I worked on pension and long-term care issues, and my research

19   on long-term care focused on future needs of the baby boomers

20   and it led to an invitation to testify before the Senate aging

21   committee and ultimately led to the enactment of a long-term

22   care insurance program for federal employees.

23           Q.    So at these two places, were you working at the

24   request of or for the benefit of retirees and the elderly or

25   for the large employers at that time?

60

1          A.   For the federal health policy studies, it was

2    employers.  And the American Council of Life Insurers, it was

3    for life insurers.

4          Q.   All right.  And then, in early 2000, as I

5    understand it, you went to a company called Watson Wyatt

6    Worldwide, is that correct?

7          A.   That's correct.

8          Q.   What is Watson Wyatt?

9          A.   Watson Wyatt is an actuarial consulting firm.  I

10   was in the research department.

11         Q.   What good did you do there?

12         A.   I basically conducted surveys of employee

13   benefit issues.  And I used that information from the surveys

14   to educate large employers regarding the changing nature of

15   the pension benefits and retiree health benefits.  That

16   education included both written reports and I also presented

17   the findings at numerous industry symposiums where VPs of HR

18   would attend, similar to Bob Arquette from Dana Corporation.

19         Q.   These symposia, who was attending these

20   symposia?

21         A.   VPs of HR.

22         Q.   For --

23         A.   Large employers.

24         Q.   And then, did you also have occasion to publish

25   your research?

61

| | | |
|---|---|---|
| 1 | A. | Yes.  I published a lot of my research in |

peer-reviewed journals, I also published it in reports for

Watson Wyatt.

        Q.    When did you leave Watson Wyatt?

        A.    I left Watson Wyatt in, I'm sorry, January 2005.

        Q.    Okay.  And you started at the Employment Policy

Foundation?

        A.    Correct.

        Q.    What was your title there?

        A.    I was president and chief economist.

        Q.    What did you do there?

        A.    The Employment Policy Foundation provided

research to large employers.  We had about 75 contributors,

and basically, that research focused on the nature of their

retirement and healthcare benefits.

        Q.    Did you have occasion to write a book while you

were there?

        A.    Actually, yes.  I wrote a book on the changing

nature of the employer-provided benefits.  I also testified

before both the House and the Senate committees.  On the House

side, I focused on President Bush's pension administration

reform proposals; and on the Senate side, I had done some

research on family medical leave and testified about that

research.

        Q.    And then I guess, later in 2005, you joined the

62

1    College of American Pathologists, is that correct?

2         A.    Correct.

3         Q.    What is that College of American Pathologists?

4         A.    The College of American Pathologists is a

5    membership organization of pathologists and we basically

6    provide advocacy support.  We lobby the Federal Government and

7    federal regulators to make sure that physicians are paid

8    adequately.

9         Q.    What are pathologists?

10        A.    Pathologists are doctors that are in the labs

11   that diagnose disease, they diagnose cancer, they also do

12   autopsies.

13        Q.    And what was the kind of work you did, you're

14   doing at the College of American Pathologists?

15        A.    I conduct surveys of pathologists regarding

16   their compensation and benefits.

17        Q.    Why do you do that?

18        A.    Those surveys are used to help pathologists

19   negotiate their reimbursement rates with hospitals.

20        Q.    What else do you research?

21        A.    I also look at workforce issues and most

22   recently, I've been looking, working with, doing an analysis

23   of how physicians are paid under Medicare and providing

24   recommendations to the Medicare agency that we administer, CMS

25   it's called, and how physicians should be paid and alternative

63

1     formulas for paying under Medicare.

2          Q.   So for the past 18 years, then, you've worked on

3     employee and retiree healthcare benefits from a number of

4     different perspectives, is that correct?

5          A.   Yes.  I've actually had a very unique

6     perspective on health care.  At AARP and Urban Institute, I

7     followed healthcare at the retiree perspective.  At Watson

8     Wyatt, the Employment Policy Foundation and that Center for

9     Health Policies, I looked at the employer perspective, and now

10    I'm actually working on the provider side.

11              MR. HAMILTON:  Your Honor, I would tender as an

12    expert on -- for employees and retirees, Dr. Janemarie Mulvey.

13              MS. CECCOTTI:  No objection, your Honor.

14              THE COURT:  So qualified.

15              MR. HAMILTON:  Thank you, your Honor.

16         Q.   Dr. Mulvey, over the past 18 years that you've

17    been studying, publishing research and testifying before

18    Congress on the subject of employer provided healthcare

19    benefits, have you observed a trend among large employers in

20    this country with respect to retiree health care benefits?

21         A.   Yes, I have.

22         Q.   What is that trend?

23         A.   Over time, more and more large employers are

24    either significantly reducing or completely eliminating the

25    provision of healthcare to retirees.

64

1      Q.   And if you could speak a little bit closer to

2  the microphone so everybody in the back can hear you.  What

3  are the factors that are contributing to this trend?

4      A.   There's a number of factors.  One of the key

5  factors is, in 1993, the government instituted new accounting

6  rules, and what these accounting rules did was to require

7  employers to not only report their current retiree healthcare

8  liabilities, but to project forward their future retiree

9  healthcare liabilities and record those on their balance

10  sheet.

11      What this did was essentially expose these

12  liabilities to stockholders and potential investors.  And

13  these liabilities were quite large.

14      Q.   Okay.  In addition to the accounting rule

15  change, what other factors are contributing to the trend of

16  employers getting out of the business of retiree health care?

17      A.   Another key factor is, the economy has become

18  increasingly globalized, and our health care costs in the

19  United States have risen far faster than our foreign

20  competitors.  And this is especially important for employers

21  because in the United States, the nature of employer-sponsored

22  coverage means that employers disproportionately bear those

23  costs where, among many of our foreign competitors, it's a

24  national healthcare program and therefore, those costs are

25  borne across all taxpayers.

65

1          Related to that is the issue that the aging baby

2    boomers in the United States is unique to the United States

3    and our European counterparts, but our lower-cost competitors

4    like India and China are not facing the same aging population

5    that we are; in fact, they have a relatively young population.

6          Q.    What is the effect of Asia and India having a

7    younger population on retiree healthcare costs?

8          A.    What all this means is that to compete

9    effectively with our, against foreign firms, our labor costs

10   are much higher than them and we're not able to --

11   disadvantage us with respect to how we compete with them.  But

12   the bottom line is that firms have realized that they have to

13   start shedding their retiree healthcare liabilities in order

14   to compete effectively.

15         Q.    How are large employers going about the business

16   of shedding their retiree healthcare costs in the United

17   States?

18         A.    They are following three key steps.

19         Q.    What's the first step?

20         A.    Well, actually, they are following three key

21   steps in this process and where they are in the process really

22   depends on their financial viability.

23         Q.    What's the first step?

24         A.    The first step is that they are eliminating

25   coverage for new hires.

66

1          Q.   When you say "coverage," what do you mean?

2          A.   The provision of retiree health benefits for

3     employees who are newly hired.

4          Q.   And when they eliminate that, what does that

5     mean to the new hire?

6          A.   That basically means the new hire would be

7     employed without coverage, and it would reduce the number of

8     future retirees that have coverage.

9          Q.   Can you give the court an approximate ballpark

10    of what the percentage is of large employers in this country

11    that have eliminated the provision of retiree benefits to new

12    employees?

13         A.   Well, the data show that the vast majority of

14    employers, about 80 percent, do not now cover new hires, do

15    not now provide coverage for retiree health for new hires.

16         Q.   What would be the second step that some large

17    employers are taking to get out of the business of retiree

18    healthcare?

19         A.   The second step is, employers are eliminating

20    coverage for active workers.

21         Q.   Okay.   If I could ask you to open your witness

22    binder again, and turn to tab B, which is Debtor's Exhibit 31.

23         A.   Okay.

24         Q.   Can you tell the court what this document is.

25         A.   This is the Kaiser Family Foundation annual

67

1    employer healthcare benefit survey and this is the 2006

2    report.

3            Q.    What is the Kaiser Family Foundation?

4            A.    The Kaiser Family Foundation is a nonprofit

5    organization.  It is not a consulting firm.  And its mission

6    is to provide information on healthcare costs and trends to

7    the media, legislators and the public.

8            Q.    How long has the Kaiser Family Foundation been

9    doing this annual survey?

10           A.    It's been doing the survey for quite a while,

11   about twenty years.

12           Q.    Is this considered an authoritative source for

13   documenting trends in employer health benefits in this

14   country?

15           A.    Yes, it is.

16           Q.    Is this the entire survey or just portions of

17   it?

18           A.    What you see here is the executive summary of

19   the survey and the chapter on retiree healthcare benefits.

20           Q.    So if you turn to the page halfway, or to the

21   page halfway to the middle of the exhibit that has all the

22   black on it, so section 11, what is that section?

23           A.    This is the section on retiree healthcare

24   benefits.

25           Q.    The rest of the document deals with other

1    healthcare benefits, not retirees?

2        A.   Correct.

3        Q.   If we go to that Section 11, if I could ask you

4    to turn to page 133 of section 11, which has a big bar graph

5    on --

6        A.   Yes, I'm there.

7        Q.   Would you tell the court what that bar graph

8    represents.

9        A.   Well, as I was saying earlier, step 2 of the

10   process was to eliminate retiree health benefits for active

11   workers.  And what this graph shows is that in 1988, 66

12   percent of large employers had retiree health benefits for

13   active workers; today, only 35 percent of large employers, so

14   it shows the trend away from retiree healthcare benefits.

15       Q.   And let's make sure because it's easy to get

16   confused here when you start making distinctions between

17   active employees and current retirees.  Does this chart

18   reflect who is providing retirement benefits to current

19   retirees and who is not?

20       A.   Its does include some of the those firms who may

21   be providing benefits to current retirees but it's largely

22   focused on active workers.

23       Q.   So when it says at the top, it's among firms

24   that are offering health benefits to active workers, it's

25   referring to the active employees who will be entitled to

69

1    retiree benefits when they retire in the future; is that

2    right?

3              A.    Correct.

4              Q.    And the 66 percent figure in 1988 reflects what

5    in 1988?

6              A.    This means that in 1988, 66 percent of large

7    employers offered retiree health benefits to their active work

8    force.

9              Q.    And in 2006, that numbers is?

10             A.    Thirty-five percent.

11             Q.    A little over a third.

12             A.    A little over a third.

13             Q.    Are you familiar with the expert declaration

14   that was filed by Suzanne Taranto for the unions in this case?

15             A.    I am.

16             Q.    If I could ask you to turn to tab E in your

17   witness notebook.

18             A.    Okay.

19             Q.    Is this the expert report that Suzanne Taranto

20   filed?

21             A.    Yes.

22             Q.    I'd ask you to turn to page 4, paragraph 9 of

23   Ms. Taranto's expert report.

24             A.    Yes.

25             Q.    And in you'll see there in the second sentence

70

1    of paragraph 9, can you read that sentence, please, out loud,

2    slowly?

3         A.   It says, "A Kaiser Family Foundation 2005 survey

4    indicated that 60 percent of employers with more than five

5    thousand employees offered post-retirement medical coverage."

6         Q.   All right.  That sentence appears to be

7    inconsistent with what you just told the court.  Is it?

8         A.   No, it's not.

9         Q.   All right.  Now, it's referring to the Kaiser

10   Family Foundation 2005 survey, is that correct?

11        A.   Correct.

12        Q.   And the one that's in your notebook is the 2006

13   survey, is that correct?

14        A.   Correct.

15        Q.   Why is her statement here not inconsistent with

16   what you just told the court about, two-thirds of large

17   employers are not providing retiree benefits to active

18   employees?

19        A.   What this data reflects is skewed upward because

20   it includes large state and local governments.  And if you go

21   back to the Kaiser study, I can show you her data.

22        Q.   All right, let's flip back, then, to tab B,

23   Debtor's Exhibit 31, and go to Section 11, page 134.  That's

24   the next page to the one we just looked at?

25        A.   Correct.

71

1        Q.    What is on page 134?  Just tell the court

2   generally, what is the table?

3        A.    This data shows the percent of firms that

4   provide retiree coverage to active workers by firm size,

5   region and industry.

6        Q.    All right.  And in paragraph 9 of Ms. Taranto's

7   declaration, she was making a reference to employers with five

8   thousand or more workers, jumbo employers, is that correct?

9        A.    Correct.

10       Q.    And if we look on this table here, on page 134

11  of the 2006 Kaiser survey, where is that represented?

12       A.    It is in the first section under, "Firm size,"

13  there's a number that's 54 percent in the second column.

14       Q.    What does that 54 percent figure mean?

15       A.    That says that 54 percent of all large firms,

16  those with five thousand or more workers, provide retiree

17  health coverage to their active workers.

18       Q.    Any idea what the reason is for the difference

19  between 54 percent in this survey, and the 60 percent in

20  Ms. Taranto's declaration?

21       A.    Well, I did go back and look at the 2005 survey

22  and, in the 2005 survey, the number was 55 percent.  So I'm

23  assuming she meant to say nearly 60 percent.

24       Q.    Okay.  So at least in 2006, it indicates the

25  number is 54 percent for jumbo employers, five thousand or

72

1    more; is that correct?

2         A.    Correct.

3         Q.    Now, I believe you said that does or doesn't

4    include state and local governments?

5         A.    That does include state and local governments,

6    and if you look down below under "Industry," you can see that

7    state and local governments have a high prevalence, or high

8    percentage of providing retiree healthcare benefits to their

9    active workers.

10        Q.    What's their percentage?

11        A.    It's 82 percent.  And what's interesting to note

12   about this is, state and local government at the time of the

13   survey were not subject to the accounting rules that private

14   sector firms were and they will be subject to those rules

15   starting this year.

16        Q.    So you expect that 82 percent figure to go down

17   some?

18        A.    I do.

19        Q.    Okay.  Now, do state and local governments

20   compete with, like, China and India and stuff like that?

21        A.    No.

22        Q.    So if we were to look at just the manufacturing

23   industry and large employers in the manufacturing industry

24   that do compete with lower cost countries, what is the

25   percentage of large employers in the manufacturing industry

73

1   that offer retiree benefits to active employees?

2           A.   According to this study, it's 31 percent.

3           Q.   Less than a third.

4           A.   Less than a third.

5           Q.   Well, the first step was eliminating retiree

6   benefits to new hires.  The second step was eliminating

7   benefits to active employees.  What's the third step that

8   large employers in this country are taking to get out of the

9   business of retiree benefits?

10          A.   The third step some employers are doing, a

11  smaller number of large employers are eliminating coverage

12  altogether for current retirees.  This is particularly evident

13  among financially distressed companies.  But within that

14  category of eliminating coverage for current retirees, there

15  is a larger number of employers who are moving to something

16  called a retiree pay-all plan, where they are essentially

17  offering access to coverage but they are requiring the retiree

18  to pay the entire premium.

19               And the Kaiser study shows that among current

20  retirees, 21 percent --

21          Q.   Well, we'll get to that, because let's make sure

22  we don't get lost here.

23          A.   Okay.

24          Q.   What is the percentage of employers, large

25  employers in this country, who are requiring their current

74

1    retirees to pay all, to pay for all of their retiree let care

2    benefits?

3        A.    It's 21 percent for their pre-65 retirees, and

4    approximately 19 percent for their post-65 retirees, on

5    Medicare.

6        Q.    Now, if I can ask you to flip again to Suzanne

7    Taranto's declaration which is in tab E of your notebook, this

8    time I want to refer to a different paragraph, paragraph 11 of

9    her declaration which is on page 5.  And you'll see at the end

10   of paragraph 11, there's a reference to a Watson Wyatt study.

11   Can you read that sentence please, loudly and slowly.

12       A.    Sure.  "A 2005 Watson Wyatt study of 164

13   companies indicates that, while 14 percent planned to

14   eliminate the benefit in the future, only 6 percent planned to

15   eliminate benefits for current retirees."

16       Q.    Now, Watson Wyatt, that's where you worked for

17   five years, right?

18       A.    Yes.

19       Q.    Do you have any comments for the court about

20   this sentence in Susan Taranto's declaration?

21       A.    Well, the six percent does not include

22   financially distressed companies.

23       Q.    All right.

24       A.    And so it's an underestimate.

25       Q.    What do you mean it doesn't include financially

75

1    distressed companies?  How do you know that?

2            A.   Well, in my years of experience of conducting

3    surveys --

4            Q.   Where were you conducting these surveys when you

5    had that experience?

6            A.   At Watson Wyatt.

7            Q.   And during those five years conducting thee

8    surveys at Watson Wyatt, what was your experience?

9            A.   One of the things we find about surveys, first

10   of all, it's very hard to get employers to respond at all to

11   the surveys.  But financially distressed employers are very

12   busy and they don't have an interest in filling these out.

13   And the reason is that when employers fill these surveys out,

14   the main motivation is to benchmark what they are doing to

15   other employers.  And financially distressed companies realize

16   that their strategy is going to be much different than

17   financially healthy employers of which the survey dominantly

18   covers.

19           Q.   And so it's your experience, then, that

20   financially distressed companies are less likely to respond to

21   the survey?

22           A.   Correct.

23           Q.   Are those financially distressed companies that

24   are less likely to respond to the survey, are they more or

25   less likely to be planning to eliminate retiree benefits for

76

1    current retirees in the future?

2            A.    They are more likely.

3            Q.    So the six percent figure understates or

4    overstates the true number of large companies that are

5    planning to terminate?

6            A.    It understates.

7            Q.    Now, also, does this figure say anything about

8    large employers who have already terminated retiree benefits

9    for current retirees?

10           A.    No.  Because the survey only goes out to those

11   employers who are already providing benefits over the past

12   year.  It doesn't indicate those who have terminated the

13   benefits in the past.

14           Q.    Now, are you familiar with the Section 1114

15   proposals that Dana has made in this case that eliminate

16   retiree benefits for current retirees and set up VEBAs for

17   them?

18           A.    Yes.

19           Q.    Are Dana's Section 1114 proposals consistent

20   with the actions of other distressed companies who have taken

21   this third step of eliminating retiree benefits for current

22   retirees?

23           A.    Yes.

24           Q.    Now, you are aware that Dana is proposing to set

25   up VEBAs, voluntary employee benefit associations, to -- and

77

1    fund those VEBAs with some amount of funding to provide a

2    limited amount of replacement coverage for the retiree

3    benefits they are eliminating, is that correct?

4           A.   Yes, I'm aware of that.

5           Q.   Have you analyzed at all or considered what the

6    amount of the proposed funding for those VEBAs is?

7           A.   No.

8           Q.   Why haven't you?

9           A.   I wasn't asked to.

10          Q.   Now, you just told the court it's your opinion

11   that Dana's Section 1114 proposals are consistent with the

12   actions of other distressed companies that are taking this

13   step, correct?

14          A.   Correct.

15          Q.   Is your opinion affected in any way by how much

16   Dana is proposing to put into the VEBAs that it's offering to

17   establish?

18          A.   No.

19          Q.   Why not?

20          A.   My opinion states that Dana's actions, proposed

21   actions to eliminate the retiree healthcare benefits are

22   consistent with other large employers, particularly distressed

23   employers, and it is my understanding that the amount Dana may

24   be required to contribute to the VEBA is really a matter of

25   negotiations and potentially litigation.  And I am not here to

78

1    offer an opinion about what that amount that they are required

2    to contribute should be.

3        Q.   All right.  Now, I want to switch the focus of

4    your testimony to the proposed changes that Dana is proposing

5    for the healthcare benefits for its active employees in the

6    HealthWorks plan that is the subject of your declaration.

7            Can you explain to the court what your opinion

8    is on the trends in the present economy regarding the type and

9    nature of healthcare insurance that employers are providing to

10   their active employees.

11       A.   Yes.  What has happened is, there's been a new

12   type of healthcare insurance out called consumer-directed

13   plans.  And these plans have been prompted by concerns over

14   the past 15 years by economists and others that, because of

15   private health insurance, consumers are really shielded from

16   the true cost of care.  They go to the doctors and they pay a

17   ten dollar co-pay, but they are really not paying the full

18   cost of the care even though the insurance is very valuable to

19   them.  So there's an overconsumption of healthcare services.

20           And this was actually proven in a 2001 Institute

21   of Medicine study where they went out, very respected

22   physicians, and looked at what care people were receiving and

23   they found that there was an overuse and a misuse of

24   healthcare services.  So the consumer-directed plans are

25   structured so that the consumer is responsible for more of

79

1    healthcare dollars at the front end, but the employer also

2    contributes to a savings account for them.

3        Q.    How does it make the consumer more responsible

4    for the healthcare spending at the front end in your view?

5        A.    Well, because right now, consumers pay a premium

6    and then when they go to the doctor, they only pay ten

7    dollars.  But they feel that they paid that premium and they

8    really want to get their money's worth, so if they have to get

9    expensive tests, and the doctor recommends it, they will go

10   and get all the care the doctor recommends.  But these plans

11   have a higher deductible, so that first seven hundred to a

12   thousand dollars of care, they will think closely about what

13   they are doing and may not spend it on an expensive test,

14   maybe they will ask their doctor for a cheaper test.

15       Q.    Have you evaluated the healthcare plan that Dana

16   is proposing to migrate its active employees to?

17       A.    I have.

18       Q.    Okay.  Could you describe that plan.

19       A.    Yes.  The plan is a consumer-directed healthcare

20   plan that has a health reimbursement account which is

21   essentially, Dana will contribute a thousand dollars into a

22   health reimbursement account and that thousand dollars is used

23   to pay for the first thousand dollars of care for the

24   consumer -- of healthcare for the consumer.

25              The key thing about the account is, if they

80

1     don't spend a thousand dollars in care, that money is rolled

2     over to the next year and can be used for health expenditures

3     in the next year.

4            Q.   Is this healthcare plan already in place for

5     some of Dana's work force?

6            A.   Yes, the salaried work force already has a

7     similar plan.

8            Q.   How does this plan compare to what the typical

9     indemnity type plan is in the market today?

10           A.   Well, I look at that analysis, and it basically

11    is more favorable for the majority of workers than the

12    traditional indemnity plan.

13           Q.   All right.  If I could ask you to turn to tab C

14    of your witness notebook, which is Debtor's Exhibit 32.  Are

15    you there?

16           A.   I'm there.

17           Q.   Can you tell the court, what is this document?

18           A.   This is a table that I prepared that compares

19    Dana's HealthWorks 2007 plan to the national average consumer

20    directed plan reported in the Kaiser survey.

21           Q.   And what does it show?

22           A.   And it shows, the first row shows what Dana

23    contributes to the health reimbursement accounts, and Dana

24    contributes a thousand dollars a year.

25                And in the second column, it shows that on

81

1    average, other employers contribute about eight hundred

2    dollars a year.  So Dana is more generous in terms what have

3    they are contributing to the health reimbursement accounts.

4                    MR. HAMILTON:  Your Honor, I would offer into

5    evidence Debtor's Exhibit number 32.

6                    MS. CECCOTTI:  This exhibit reflects the

7    correction to Dr. Mulvey's, the table in her declaration?

8                    MR. HAMILTON:  Yes, we're going to get to that

9    in the end.

10                    MS. CECCOTTI:  No objection.

11                    THE COURT:  Received.

12                    (Debtor's Exhibit 32, received in evidence, as

13    of this date.)

14           Q.    All right.  Let's flip to tab D, the next tab.

15    Which is Debtor's Exhibit 34.

16                    Would you tell the court what this document is.

17           A.    Yes.  This document basically compares Dana's

18    health care -- HealthWorks plan to the traditional

19    fee-for-service plan out there, which is probably the most

20    popular plan among Dana's active workers today.

21           Q.    What conclusions do you draw from this document?

22           A.    I guess the best way to show is that, actually,

23    can I go through the table?  It might be easier.

24           Q.    Yes, go ahead.

25           A.    And I apologize for all the numbers here.  But

82

1    the first column of this table shows that Dana's HealthWorks

2    plan provision, and these are what you saw in the earlier

3    table, the thousand dollars to the reimbursement account, the

4    $750 deductible, and at this point, it's important to note

5    that the deductible does not get applied to preventive

6    services.  And that is very important because studies show

7    that chronic disease that progresses over time and is not

8    identified early is a leading cause of rising healthcare

9    costs.

10              And then there's a coinsurance.  But this first

11   column doesn't tell us much.  What we need to know is, what

12   are the healthcare expenditures, how much are people spending

13   on healthcare.

14              So the second column shows median healthcare

15   expenditures for insured workers under 65, and I projected

16   that number to 2006.  It's $1,130.  So if the median worker

17   had 1,130, the first thousand would be paid by the health

18   reimbursement account.  As I move down that second column, you

19   see the parentheses around one thousand.  That leaves $130.

20   So the median employee would only may $130 or less for

21   healthcare.

22              You add that to the premiums at the bottom of

23   the second column, that's their employee contribution, 624,

24   that means the 50 percent of Dana employees will pay $754 or

25   less.

83

1        But when we compare that to the traditional

2   fee-for-service plan, the third column shows the plan

3   provisions.  When you take that same median employee through

4   those plan provisions, they don't have the thousand dollars to

5   pay to them.  So they have to pay the deductible of 327, and

6   20 percent coinsurance of 161.  So they are actually going to

7   pay more out-of-pocket, $488, than the Dana employee, and then

8   with their premium contributions overall, they will pay

9   $1,115, which is not -- almost not twice the amount of Dana,

10  but close to it.

11        Q.   Are there, in addition to salaried employees of

12  Dana, are there other employees of Dana, including some union

13  employees, that are already in the HealthWorks program?

14        A.   I believe so.

15             MR. HAMILTON:  Your Honor, I would offer into

16  evidence Debtor's Exhibit number 34.

17             MS. CECCOTTI:  Your Honor, I have -- first of

18  all, let me just ask, is this a copy of table 2 that's already

19  contained in Dr. Mulvey's declaration or are there any changes

20  on this chart?

21             MR. HAMILTON:  No, there are no changes.  It's a

22  copy.

23             MS. CECCOTTI:  I have a number of questions

24  regarding this chart, your Honor, which are probably more

25  appropriate for cross-examination.  So I suppose, considering

84

1    the fact that it's simply a copy of what is in her declaration

2    already, I can go ahead and not object to its introduction as

3    a separate exhibit.  But -- and we'll just get into the

4    questions that I have about it.

5                    THE COURT:  It's admitted.

6                    MR. HAMILTON:  Thank you.

7                    (Debtor's Exhibit 34, received in evidence, as

8    of this date.)

9                    MR. HAMILTON:  We would also offer into

10   evidence, your Honor, the 2006 Kaiser Family Foundation survey

11   that's Debtor's Exhibit 31, which is tab B of her witness

12   notebook.  Tab B, 2006 Kaiser.

13                   MS. CECCOTTI:  No objection.

14                   THE COURT:  Received.

15                   (Debtor's Exhibit 31, received in evidence, as

16   of this date.)

17         Q.   And then, Dr. Mulvey, if I could turn your

18   attention back to your declaration, which is Debtor's

19   Exhibit 5, which is tab A of your notebook, and I'd like to

20   draw your attention to page 13, paragraph 32, table 1.

21                   Now, is table 1 essentially, except one minor

22   exception, the same thing that is Debtor's Exhibit 32 in your

23   notebook?

24         A.   Correct.

25         Q.   Now, on this table, when it's reproduced in your

85

1      declaration, is there a typo on this particular table?

2              A.   Yes, there is.

3              Q.   Could you show the court where that typo is.

4              A.   Sure.  In the very first column, third row where

5      it says, "Monthly employee contributions to premiums," that

6      should say, "Annual employee contribution to premiums."

7              Q.   And did you make that correction on Debtor's

8      Exhibit 32?

9              A.   I did.

10             Q.   Now, other than that typographical error in your

11     declaration, is everything else in your declaration that

12     you're aware of, is it true and accurate to the best of your

13     belief and understanding?

14             A.   Yes.

15             MR. HAMILTON:  Your Honor, we would offer into

16     evidence Dr. Mulvey's declaration, which is Debtor's

17     Exhibit 5.

18             MS. CECCOTTI:  Your Honor, I'm hesitating only

19     because I think that in Dr. Mulvey's deposition, she

20     highlighted a couple of other typos, and I wondered when we

21     were going to handle those.  I have no general objection, I

22     just wondered if she could just take the time now to just

23     point them out so that I don't have to go through them.

24             MR. HAMILTON:  I'm not familiar with what they

25     are.  If you think they are substantive, I'm sure you can get

86

1    to it in cross-examination.  But we offer it into evidence.

2                    THE COURT:  It's received.

3                    MR. HAMILTON:  Thank you, your Honor.

4                    (Debtor's Exhibit 5, received in evidence, as

5    of this date.)

6                    MR. HAMILTON:  I have no further questions and

7    eagerly anticipate the cross-examination on these typos.

8                    MS. CECCOTTI:  Your Honor, I will need a few

9    moments to collect --

10                    THE COURT:  Sure.  We'll take a five-minute

11    recess.

12                    (Recess taken.)

13    CROSS-EXAMINATION BY MS. CECCOTTI:

14            Q.    Ms. Mulvey, I'm Babette Ceccotti from Cohen,

15    Weiss & Simon, representing the unions.  Good afternoon.

16            A.    Good afternoon.

17            Q.    Now, I'm correct that you're trained as an

18    economist, correct?

19            A.    Correct.

20            Q.    Not as an actuary.

21            A.    Correct.

22            Q.    Are you a restructuring professional?

23            A.    No.

24            Q.    Have you ever advised companies going through

25    Chapter 11?

87

1          A.   No.

2          Q.   You used the term, "Distressed" several times

3     during your direct testimony to describe distressed companies

4     or distressed employers.  How are you defining "distressed"?

5          A.   Distressed employers are generally firms where

6     they have continual declines in profit, you know, negative

7     profit over a number of years, and in the extreme case,

8     distress means bankruptcy.

9          Q.   And in your testimony, you were using that term

10    to describe companies in bankruptcy as well as non-bankrupt

11    companies.

12         A.   Yes.

13         Q.   In terms of the Watson Wyatt study that was

14    referenced at paragraph 9 of Ms. Taranto's declaration, were

15    you at Watson Wyatt at the time that study was conducted?

16         A.   No, I wasn't.

17         Q.   Do you have any personal knowledge of what the

18    response rate was for that particular study?

19         A.   Well, actually I did call the author of the

20    study and asked him whether there were any financially

21    distressed companies in there, and he said no.

22         Q.   And what definition of "distressed companies"

23    did you use with that individual?

24         A.   I had just said "financially distressed."  When

25    I worked at Watson Wyatt with him, we kind of knew generally

88

1    what we meant by "financially distressed."

2            Q.    So you used the same shorthand with him, in

3    other words.   Okay.   Let's turn to your declaration, which is

4    behind tab A.   And in paragraph 4, you state here that you

5    submitted testimony in a legal proceeding which is cited there

6    as UAW versus General Motors Corporation.

7            A.    Correct.

8            Q.    Is that correct?   And that testimony concerned

9    the settlement agreement between UAW and GM regarding, I

10   believe what's referred to as the modified GM health plan for

11   retirees, do you remember?

12           A.    Yes.

13           Q.    Okay.   And your conclusion in that -- well, what

14   was your conclusion in that?

15           A.    My conclusion as I recall was that the proposals

16   that GM were making were reasonable.

17           Q.    By the time you testified, there was already a

18   settlement agreement, correct?

19           A.    Yes, I did not testify in that case.   I

20   submitted the declaration.

21           Q.    When it says "testimony" here, you're referring

22   to the declaration that was filed with the court in that

23   matter.   You didn't actually testify.

24           A.    Correct.

25           Q.    Okay.   Do you remember stating in your

89

1   declaration, "Overall, in my opinion, the GM modified plan is

2   fair and reasonable"?

3          A.   That sounds correct.

4          Q.   What about the GM modified plan would have

5   caused you to conclude that it is fair and reasonable?

6          A.   They made relatively modest changes to, I

7   believe, prescription drug co-payments, and they made some

8   small changes to the coinsurance rate.  Again, I don't recall

9   exactly.  But they were basically modest changes in

10  out-of-pocket spending.

11         Q.   Okay.  GM was not eliminating its obligation to

12  provide retiree healthcare in the modified plan, was it?

13         A.   No.

14         Q.   Okay.  Moving to -- let's talk about the

15  HealthWorks plan starting with paragraph 22 of your

16  declaration.

17              You say that, in about the middle of paragraph

18  22, "Consumer-directed health plans are relatively new and in

19  2006, only seven percent of large employers reported they had

20  implemented them."

21              Is that --

22         A.   That's correct.

23         Q.   Okay.  And you are referring to the Kaiser 2006

24  study.  Would that be the exhibit that we talked about or that

25  you spoke about in your direct examination, Debtor's 31?

90

1          A.   Yes.  The actual chapter for that is not

2   included there, but I think I submitted it when I submitted my

3   materials.

4          Q.   I believe --

5          A.   Or it might be in the summary.

6          Q.   I was just going to say, yes.  If we can take a

7   moment --

8          A.   I believe it's on the first page, first

9   paragraph, "Key findings."

10         Q.   This is tiny type.  I'm sorry.  You said --

11   what's the page number at the bottom?  I'm sorry.

12         A.   It says number 1 of the executive summary of

13   Kaiser.

14         Q.   Oh, okay.  Give me a second.  I'm there.

15         A.   And the very first paragraph.

16         Q.   Yes, there it is.  Okay.  And that 7.7 percent

17   figure includes essentially two types of consumer-directed

18   plans.  I don't think you talked about the two types in your

19   direct testimony, did you, this morning?

20         A.   Correct.

21         Q.   Okay.

22         A.   I can explain --

23         Q.   Why don't you take a moment.

24         A.   There's two types of plans.  There's a health

25   reimbursement account, which is largely funded by the

91

1    employer, and then there's a health savings account, which is

2    largely funded by the employee through funds that are not

3    taxed.

4         Q.   And which type is HealthWorks?

5         A.   HealthWorks is the health reimbursement account

6    funded by the employer.

7         Q.   Okay.  So in that same paragraph that we're

8    looking at here, under tab B, let's see, the 7.7 percent

9    figure, and if we go down -- I apologize -- of that 7.7

10   figure, do you know how much is the structure that is

11   represented by the HealthWorks model?

12        A.   I don't.  I would have to look at that detailed

13   table where I got that information.

14        Q.   And that's not part of Exhibit B, is it?

15        A.   No.

16        Q.   I see.  Okay.

17        A.   Actually, can I correct that?  In some cases,

18   they did break out how much was HRA and how much was HSA.  I

19   cannot recall directly without looking at that data.

20             MS. CECCOTTI:  Give me a moment.

21             (A pause in the proceedings.)

22        Q.   Can you turn to page 5.

23        A.   Yes.

24        Q.   And directing your attention to the first column

25   on the left, the second block of type about halfway down, it

92

1    says, "Firms with one thousand or more workers are more likely

2    than smaller firms to offer the HSA qualified HDHP"; do you

3    see that?

4              A.   I'm sorry?

5              Q.   I'm sorry.  Let me withdraw that.  If you look

6    at the paragraph that starts, "Seven percent of firms offering

7    health benefits offer an HDHP/SO in 2006," and the next

8    sentence says, "This is statistically unchanged from the four

9    percent, etc., and then the next sentence says, "Among the

10   firms offering health benefits, one percent offer the

11   HDHP/HRA."

12             Is that consistent with your recollection of the

13   data?

14             A.   Yes.

15             Q.   Can you tell us what percentage of employers who

16   offer high deductible health plans offer them as the only

17   health plan that the employer offers as opposed to one of an

18   option of health plans?

19             A.   I don't have that readily available.  I mean, I

20   think the 7 percent refers to those who are offering it

21   primarily as the main plan.  When these first came out,

22   employers were offering them as an option and it caused a

23   great deal of something called adverse selection where certain

24   employees would go into the other plan.  So they moved to

25   primarily offering one plan.

93

1          Q.    Looking, again, at paragraph 22 of your

2     declaration, you state that, "Nearly 31 percent of large

3     employers, however, plan to offer consumer-directed health

4     plans in the near future," again citing the Kaiser 2006 study.

5                Where would I find that number?

6          A.    That, I think is in, there's a whole detailed

7     chapter that I submit -- that was submitted with my

8     declaration as part of my reference materials on the whole

9     nature of health reimbursement accounts and consumer-directed

10    plan.

11         Q.    Can you turn to page 7 behind tab B.  And

12    Exhibit A at the bottom is entitled, "Among firms offering

13    health benefits, distribution of firms reporting the

14    likelihood of making the following changes in the next year,

15    2006."  Do you see that?

16         A.    I do.

17         Q.    And the second-to-last entry, "Offer HDHP/HRA,"

18    we see that the "very likely" column says six percent.  Right?

19         A.    Uh-huh.

20         Q.    The "somewhat likely" column says 18.  The "not

21    too likely" column says 31.  And the "not likely at all"

22    column says 44 percent.  Correct?

23         A.    Correct.

24         Q.    Do you think that there's other information in

25    the more detailed section that might --

94

1          A.    Yes.

2          Q.    -- more closely correspond to the number that's

3    in your declaration?

4          A.    Yes.  The detailed section breaks it out by firm

5    size and the number I believe I cite in my declaration are

6    larger firms.  And that number is much larger than what you

7    see here.

8               MS. CECCOTTI:  We could ask perhaps counsel, to

9    make this go more efficiently, for counsel, and if it's in the

10   courtroom today, that would be fine, if we could get the

11   detailed information there, I would like to look at that in

12   comparison to the exhibit we were provided.

13              MR. HAMILTON:  Your Honor, we gave it to them.

14   They have it.  It's not my job to prepare their

15   cross-examination exhibits.

16              THE COURT:  Take five minutes and see if you can

17   highlight it.

18              MS. CECCOTTI:  I'm prepared to proceed while

19   they do.  I have no intention of stopping.

20              MR. HAMILTON:  I have no idea if we have it,

21   your Honor.

22              MS. CECCOTTI:  If not, we can always take it

23   later.  I'm prepared to proceed.

24         Q.    And moving now to paragraph 4 of your

25   declaration, you describe HealthWorks 2007 as a

95

1    consumer-directed health plan and I believe in your testimony,

2    you described your understanding of what that means.

3             First of all, do you know how it got the name?

4         A.   Consumer-directed?

5         Q.   Yes.

6         A.   No, I guess the idea is that a consumer would

7    direct those funds, the first, you know, whatever thousand

8    dollars or two thousand dollars.  So --

9         Q.   Is this something that consumer groups have been

10   clamoring for, something called a consumer-driven health plan

11   with the attributes that you described?

12        A.   No, not -- I mean, I think, again, it's

13   consumer-directed because the idea is to empower the consumer

14   to spend their healthcare dollar wisely and to direct it

15   efficiently, and that's why it's called consumer-directed.

16        Q.   It's the employer that's looking to substitute

17   consumer-driven plans for indemnity plans, right?

18        A.   Yes.

19        Q.   It's not something that unions have been

20   clamoring for, to your knowledge.

21        A.   That's correct.

22             THE COURT:  That includes state and federal

23   governments, doesn't it?

24             THE WITNESS:  Yes.

25        Q.   Now, in paragraph 24 you state that a

96

1    consumer-driven health plan is one that provides incentives

2    for the individuals who are covered to become more involved

3    and proactive in their healthcare decisions; is that generally

4    correct?

5            A.    Correct.

6            Q.    Is it a fair summary to say that the idea is to

7    incentivize cost-effective behavior?

8            A.    Yes.

9            Q.    Not to overuse services or pay too much for

10   services.  I think the example that you gave exactly in your

11   direct testimony had to do with someone in another type of a

12   plan who had paid a particular premium and then paid ten

13   dollars for a doctor's visit; okay?  And I believe your

14   testimony was that because the individual was paying ten

15   dollars but had already paid a premium, the individual might

16   feel a need to seek out other services to make it,

17   quote-unquote, "Worthwhile."  Is that a fair summary?

18           A.    Yes.

19           Q.    The ten-dollar scenario, though, that wouldn't

20   be a traditional indemnity plan, would it?  Wouldn't that be a

21   plan that we typically think of as a network plan where you go

22   to a network doctor and you're incentivized to go to an

23   in-network doctor because you're only going to pay ten or 15

24   bucks out of pocked?

25           A.    The preferred provider network.

97

1         Q.   The preferred provider network.  Okay.  Now,

2    actually while we're on that topic, HealthWorks 2007, I

3    suppose we should take a moment and talk about what that

4    means.  The actual HealthWorks 2007 applies to more than just

5    health benefits, as you understand it.

6         A.   Yes, I believe it does.

7         Q.   But in your declaration, you were only talking

8    about the health benefits portion; is that correct?

9         A.   Yes.

10         Q.   Okay.  Now, I don't see here a description of

11    HealthWorks or the plan documents, but did you review the

12    HealthWorks 2007 plan document?

13         A.   I did.

14         Q.   Okay.

15              (A pause in the proceedings.)

16              MS. CECCOTTI:  We're just taking a moment to

17    provide a copy of 2007, it says "Draft SPD," but it's entitled

18    "HealthWorks," it's offered behind the declaration of

19    Mr. Arquette, who has not yet testified.

20         Q.   But for this purpose, I just want to have you

21    take a look at it and ask you if that's the document you

22    referred to.

23              (Document distributed.)

24              THE COURT:  We're marching toward a lunch break

25    in about ten minutes.

98

1          MS. CECCOTTI:  That's fine, your Honor.  If I

2    lose track of time you'll give me a signal, I'm sure.

3          THE COURT:  I have a red light.  This is it

4    (indicating).

5          Q.   Do you have that document?

6          A.   I do.

7          Q.   It's a little hard to find.  I suggest you start

8    from the back and get to it, I think it's Exhibit C.  But

9    you're never going to find it that way.

10         A.   Yes, it's about a third of the way -- wait a

11   minute --

12         Q.   And I'll just take you right to page 10 which I

13   think starts the medical portion.

14         A.   Okay.  Yes.

15         Q.   Are you there?  Okay.  So the HealthWorks

16   appears to provide different, I'll call them types of

17   coverage.  There's single coverage, single plus one and

18   family; do you see that on page -- first of all, this is the

19   document you looked at?

20         A.   Yes.

21         Q.   Okay, good.  And if you look at page 11, we see

22   that there's an in-network and out-of-network option.

23         A.   Yes.

24         Q.   Correct.  Okay.  So would it be fair to say that

25   incentivizing behavior could also exist in a health plan that

99

1    did not have a high deductible but simply had an in-network

2    and out-of-network option?

3         A.   No, because the traditional or the other plans

4    would not have the health reimbursement account, which is very

5    important, and the larger deductible to kind of incentivize

6    the first, early dollars of coverage.

7         Q.   You see here that, in the -- go ahead.

8         A.   I think what you're saying is, certainly,

9    between the in-network and out-network in the HealthWorks,

10   there's a greater incentive to stay in network.

11        Q.   Okay.  Wouldn't necessarily have to involve the

12   high deductible.  I understand that that's a particular design

13   feature, but there are lots of plans out there that don't

14   have -- in fact, your testimony or your declaration cites that

15   we have very few employers right now even providing the high

16   deductible health plans at this point; right?

17        A.   Because there are new products.

18        Q.   Because there are new products, exactly.  But

19   there are other types of plans that provide incentivizing

20   behavior as well, just through products that were, you know,

21   once new and are now used, you know, by large employers such

22   as this in-network, out-of-network incentivizing plan,

23   correct?

24        A.   Yes, but I think in the industry there was a

25   feeling that those weren't going far enough in controlling

100

1    healthcare costs.

2          Q.   I guess my question is that the consumer-driven,

3    the high deductible health plan is not uniquely a plan

4    designed, it's not the only market, the only product in the

5    marketplace that is designed to covered individuals to seek

6    cost-effective coverage, cost-effective use of the health plan

7    services, correct?

8          A.   Well, actually, they were developed with health

9    savings accounts to exactly provide a more effective means

10   of --

11         Q.   I didn't ask if it was more effective.  I'm

12   asking you if incentivizing behavior is uniquely a feature of

13   a high deductible health plan.

14         A.   No.

15         Q.   Okay.  Also in paragraph 24, I realize we're

16   flipping of lot of these books here, but let's go back to

17   paragraph 24 of your declaration.  And I'm on page 10,

18   actually, you say, "A 2006 study by the Employee Benefits

19   Research Institute found that individuals covered by consumer

20   directed health plans exhibit more efficient and

21   cost-conscious behavior in their healthcare decisionmaking

22   than individuals covered by more traditional healthcare

23   insurance," do you see that?

24         A.   I do.

25         Q.   And would you be referring to -- look on the

101

1    list of materials appended to your declaration.  Would you

2    referring to the December 2006 --

3              MS. CECCOTTI:  -- may I approach the witness?

4         Q.   I'm just going to have you see if that refreshes

5    your recollection.

6         A.   Yes.

7         Q.   That's the survey you're referring to?

8              MR. HAMILTON:  Could we get a copy?

9              MS. CECCOTTI:  Yes, absolutely.

10        Q.   And I believe the bullet point that sets forth

11   what we just read is the second from the bottom, "More

12   cost-conscious behavior."

13        A.   Correct.

14        Q.   There's a second sentence in that bullet point,

15   is there not?  "However, in many questions that address this

16   issue, those in more comprehensive plans were just as likely

17   to report such behavior as adults in consumer-driven or

18   high-deductible health plans," do you see that?

19        A.   I do.

20              (Continued on following page.)

21

22

23

24

25

102

1          Q.    This is -- well, it says that it's a healthcare

2     survey.  Are you familiar with these surveys?

3          A.    I am.

4          Q.    Okay.  You don't have any reason to doubt the

5     statement in that second sentence in that bullet point, do

6     you?

7          A.    No.

8                MS. CECCOTTI:  Your Honor, I would suggest since

9     I'm now going to get into the tables, that this might be a

10    good place to stop.  Otherwise, we'll just be --

11               THE COURT:  We'll have a Ceccotti lunch hour.

12    See you at 2 o'clock.

13               MS. CECCOTTI:  Thank you, your Honor.

14               (Luncheon recess:   12:30 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N

2                    (2:02 p.m.)

3  J A N E M A R I E    M U L V E Y ,   having been previously

4                sworn, resumed the stand and testified further as

5                follows:

6                MS. CECCOTTI:  Your Honor, during the break, the

7  detailed section of the Kaiser survey document that we

8  discussed before the break has been provided, so I'd just like

9  to take a few moments to go back to that, and I will, if I

10 may, approach the witness with what I hope she will identify

11 as a copy.  And if I may approach, Judge.

12                (Document distributed.)

13 CROSS-EXAMINATION BY MS. CECCOTTI (Cont'd.):

14       Q.   And I believe if we go to -- I have to confess

15 that I'm going to use the color one -- if we go to page 113,

16 first of all, Dr. Mulvey, is this in fact the section you were

17 referring to?

18       A.   Yes, it is.

19       Q.   Then why don't we go to page 113 and make sure

20 I've correctly identified the page.  At the top, among firms

21 not currently offering an HDHP/HRA, that's the model we're

22 dealing with here, percentages who say they are very likely or

23 somewhat likely to offer this type of program in the next

24 year.  And your testimony, I believe, is that the figure in

25 paragraph 22 of your declaration came from the five thousand

104

1    or more workers --

2         A.   Correct.

3         Q.   -- category.  What counsel described as the

4    jumbo employers, right?

5         A.   Yes.

6         Q.   Okay.  So --

7              THE COURT:  Which included state and federal

8    governments.

9              THE WITNESS:  Yes.

10             MS. CECCOTTI:  I'm sorry, your Honor?  I didn't

11   hear you.

12             THE COURT:  I said which also included state and

13   federal governments.

14             MS. CECCOTTI:  Thank you, your Honor.

15        Q.   And if we look at the 2006 bar, the darker bar

16   is the "very likely" bar, and that's ten percent, correct?

17        A.   Correct.

18        Q.   It's a little hard to read probably on the Xerox

19   copies.  And the lighter bar is 21 percent, and that

20   represents the "somewhat likely" category.

21        A.   Correct.

22        Q.   Okay.  So you used the 21 percent plus the ten

23   percent in both those categories to come up with the -- to --

24   you interpreted those to say that 31 percent of large

25   employers, however, plan to offer.

105

1          A.    Correct.

2          Q.    Okay, thank you.  Let's go back very -- among

3    the very first things that you testified to in your direct was

4    what you called the trend that you have observed, which I

5    believe I have accurately summarized here as, more and more

6    employers are either significantly reducing or completely

7    eliminating healthcare to retirees; is that correct?

8          A.    Correct.

9          Q.    And then you went through the three steps.  And

10   the third step you discussed what I believe you characterized

11   as a smaller number of employers, and here you need to help

12   me.

13               Is that smaller category the "eliminate and

14   significantly reduce," or one or the other?

15         A.    I meant to say a smaller number eliminating.

16         Q.    Eliminating.  Okay.  Where in the continuum

17   would you put employers who are significantly reducing, as

18   opposed to eliminating?

19         A.    Well, they -- in addition to eliminating for new

20   hires, active workers and current retirees, there were also

21   those who didn't eliminate are significantly reducing the

22   value of that benefit by pushing the cost on to retirees.

23         Q.    Cost shifting?

24         A.    Cost shifting to go back to workers and current

25   retirees.

106

1          Q.   In various ways, correct.

2          A.   Right.

3          Q.   Paying more premiums, sharing deductibles, all

4    of that.  Okay.  As between the eliminating and the

5    significantly reducing, order of magnitude as to the employers

6    that are eliminating versus significantly reducing?

7          A.   I believe I said the --

8               MR. HAMILTON:  Your Honor, I'm just going to

9    object to the form of the question.  It's very significant if

10   she's talking about eliminating for active employees versus

11   current retirees, two different --

12              MS. CECCOTTI:  I'd be happy to break the

13   question down.  You can answer them.

14         Q.   Why don't we go with -- I'm either talking about

15   eliminating or significantly reducing for current retirees.

16         A.   Okay.  As far as -- I'm sorry, say the first

17   part of the question that related to that?

18         Q.   As between, we're talking about current

19   retirees, not the future group, just the current retirees.

20   The employers that are eliminating versus significantly

21   reducing, which is the bigger group.

22         A.   The bigger group is significantly reduced.

23         Q.   Okay.  I think now we can go back to where we

24   were before the lunch break, and I was going to go next to

25   table 1.  I guess it's best at this point to use the tab D

107

1      version -- no, that's not the tab D version, it's the other

2      one.  It's the Debtor's 32 behind tab C.

3                  Okay.  So we have in the Dana HealthWorks 2007,

4      you have noted the features of -- would it be fair to say that

5      you've noted the features of the plan design applicable to

6      single employees, single coverage?

7            A.   Yes, it says that in the title.

8            Q.   Right.  Okay.  And HealthWorks offers more than

9      single coverage.  I think we talked about this beforehand.  Is

10     there any reason why you limited this to single coverage?

11           A.   Well, generally, when you look at the numbers, I

12     could have done family coverage and compared them, but I think

13     the comparison would have been similar.

14           Q.   Okay.  Do you have any idea of, for Dana

15     employees, what the breakdown is between single coverage and

16     family coverage?

17           A.   I don't.

18           Q.   You don't.  Okay.  In addition, you have, table

19     1 provides the plan design for the in-network benefit; is that

20     correct?

21           A.   Correct.

22           Q.   And going back to the other big book here,

23     Mr. Arquette's declaration, exhibit, the HealthWorks document

24     as page 11, we see there that there are a couple of plan

25     design attributes that are different for in-network and

1    out-of-network; is that correct?

2        A.   Correct.

3        Q.   Okay.  For example, there is no annual

4    out-of-pocket maximum in the out-of-network, for

5    out-of-network coverage, is that correct?

6        A.   Correct.

7        Q.   Okay.  And are you aware of of what the

8    coinsurance is for out-of-network coverage under the

9    HealthWorks 2007?

10       A.   I am not offhand.  I'd have to look here.

11       Q.   It was here.  Yes.  If you go to page 12,

12    there's a small chart -- no, I'm sorry.

13                (A pause in the proceedings.)

14       Q.   Ah, page 13 at the top.  Coinsurance percentage

15    for out of network coverage is 40 percent; correct?

16       A.   Correct.

17       Q.   Meaning, the individual pays 40 percent and Dana

18    pays 60 percent or however they work that out.  Okay.

19                So the conclusions that you state in paragraph

20    32 then would be applicable only to the in-network comparison,

21    the comparison with the in-network coverage?

22       A.   I did the comparison for in-network coverage but

23    I glanced at the data for the family and I think the

24    relationship would be similar.  I didn't do that analysis but

25    I think it would be similar with respect to the co -- with

109

1    respect to some of the categories.

2              Q.    If I said family, I misspoke.  I meant out of

3    network.  Your conclusions in paragraph 32 do not apply to the

4    out-of-network coverage.

5              A.    Correct.

6              Q.    Okay.  Actually, let's just go back to paragraph

7    26 for a moment.  You are -- you state here that, in the

8    middle of the paragraph, "While Dana believes that it will

9    take time and education of employees to realize the savings

10   under HealthWorks 2007, these savings can be substantial," and

11   then you cite Dana estimates that it can save 5.75 million per

12   year with the transition of current union employees not

13   already covered by HealthWorks to HealthWorks 2007, and you're

14   citing Mr. Arquette's declaration.

15             A.    Correct.

16             Q.    So that is his figure?

17             A.    That is his figure.

18             Q.    You didn't look behind that figure or do your

19   own analysis on that.

20             A.    No.

21             Q.    You're just reporting his figure.  What about

22   the sentence, "While Dana believes it will take time and

23   education of employees to realize the savings," what about

24   that observation?  Why would it take time and education to

25   realize the savings?

1      A.    I actually believe that is a statement in

2  Mr. Arquette's thing, but the issue is that, in the first few

3  years, while you will save marginally, you will have to kind

4  of -- people will have to learn how to become good healthcare

5  consumers.  So they may at first pay for that expensive test

6  because they don't know anything else.

7           But what's happening, and there's a big effort

8  underway on the Internet for people to get on and rate their

9  doctors, and find maybe a cheaper alternative to certain test.

10          So there's ways that people are going to be

11 learning to be better healthcare consumers over time.  That's

12 what I interpreted.  But I think that exact statement was in

13 Mr. Arquette's, and you could probably ask him.

14      Q.    Okay.  But is a statement like that consistent

15 with your understanding of the experience that employers who

16 implement these programs have in terms of needing time and

17 education to realize whatever savings they are anticipating?

18      A.    Well, I think the programs are very new so we're

19 still learning what's going to happen.  I think that's an

20 assumption that we're going to make, that it will take a

21 little time to educate them.

22      Q.    Are you aware, you mentioned the Internet-based

23 products list.  Do you know what products HealthWorks has that

24 they might be offering to employees to help them with this

25 education process?

111

1          A.    I don't.

2          Q.    Okay.  How about for Dana, whether Dana is

3    offering any?

4          A.    No.

5          Q.    Have you seen any of these in operation?

6          A.    I haven't.  I've actually been involved with

7    kind of the provider side where they are trying to, the

8    Federal Government wants providers to provide on-line to

9    everybody key indicators of their quality of care so people

10   can look at different physicians and understand better their

11   quality.  So I am familiar with the general idea and the

12   data --

13         Q.    In the federal government sector --

14         A.    Well, the Federal Government is going to require

15   everybody to provide it to everyone in terms of on the

16   Internet.

17         Q.    The Federal Government in its own health program

18   for its own employees?

19         A.    No, it's -- for Medicare --

20         Q.    Sorry, for Medicare?

21         A.    They are going to require and it's being pushed

22   to the private sector.

23         Q.    For Medicare eligibles.

24         A.    Yes.

25         Q.    Okay.  Let's go now to paragraph 34, table 2,

112

1    and we can either, again, referring to the larger version

2    behind tab D, first of all, with this first column that you

3    walked us through during your direct testimony, this, again,

4    as it states in the heading, is single coverage in-network

5    plan design provisions.

6         A.    Correct.

7         Q.    Okay.  Where did the information come from for

8    what you have termed the median employee expenditure under

9    Dana's HealthWorks 2007?

10        A.    That information is from a national dataset

11   called the Medicare Expenditure Panel Survey that is a

12   representative sample of the U.S. population with respect to

13   their Medicare -- Medicaid -- medical expenditures.  It

14   actually -- it should -- I'm sorry, this says Medicare

15   Expenditure Panel.  It should say Medical Expenditure Panel.

16   That was a typo that I did not see.

17        Q.    That's why I couldn't find it.  Medical

18   expenditures.  Who publishes that?

19        A.    The -- AHPR, the agency for healthcare policy

20   and research.  A Federal Government agency.  It's been a

21   survey that's been out for quite a while.  They have refined

22   it considerably over the years.

23        Q.    And how do they collect the data?

24        A.    They go out to individuals -- I don't -- I

25   think -- I think it's a phone survey, if I recall.  And they

113

```
 1    actually call people.  And they also go and follow up and
 2    actually sit down with them and look at their medical bills to
 3    see how much they spend.  Because a lot of people don't even
 4    actually realize how much they've spent.  So it's very
 5    detailed in how they capture the different areas of
 6    expenditures.
 7              Q.   I'm sorry, they are gathering information from
 8    the --
 9              A.   Individuals.
10              Q.   -- from the individuals.  And this is without
11    regard to what health coverage they might have?
12              A.   No, they actually capture health coverage in
13    terms of what kind of insurance they have as well.
14              Q.   Okay.  So this could capture people in
15    provider-type arrangements?
16              A.   Correct.  The category of private insurance.
17              Q.   Private insurance of all ways, shapes, ways,
18    manners and forms, in all of its varieties.  Okay.  And what's
19    the -- how big is the database?
20              A.   It's very large.  As I said, it's considered a
21    representative sample of U.S. population, so statistically,
22    the information in that is generalizable to the whole
23    population.  I don't exactly remember how many recip -- people
24    are in the survey, but it's very large.
25              Q.   And -- okay.  So this information is not based
```

114

1    on Dana claims information.

2            A.    No.    This information is based on the population

3    that is insured that's under 65.    I did not have access to the

4    Dana --

5            Q.    You didn't have access to -- I'm sorry, I'm

6    violating the reporter's rule here.    You didn't have access to

7    Dana's claims information?    Did you ask for it?

8            A.    No.

9            Q.    You didn't ask for it.

10           A.    I -- the scope of this project was pretty quick.

11   I mean, I was asked to enter this in December.    So it would

12   have taken much longer to actually analyze the individual

13   claims data in such a short period of time.

14           Q.    Well, okay.    In paragraph 34 of your

15   declaration, you're, in essence, describing table 2 and the

16   exhibit we just looked at, correct?

17           A.    Correct.

18           Q.    Okay.    But then, in paragraph 35, you state, "As

19   table 2 shows, if their experience mirrors the MPPS data as

20   adjusted for 2006, over half of Dana's union employees will

21   spend $361 less per year on healthcare under HealthWorks 2007

22   than they would if they were covered by an average traditional

23   fee for service health insurance plan."

24                That's your statement; correct?

25           A.    Yes.

115

1      Q.   So doesn't that strike you as a pretty big "if,"

2  though?

3      A.   Well, in my experience in dealing with this

4  data, this national dataset does closely align with others.  I

5  mean, there might be a difference in terms of the type of

6  insurance coverage, but I don't think, I mean, without seeing

7  the data it's going to be significantly different.

8      Q.   But again, you don't know because you haven't

9  seen the Dana claims data.

10     A.   Right.

11     Q.   Correct?  Let's talk about this adjusted for

12 2006.  What you did is, you explain in paragraph 34 is, again,

13 taking this other database material for prior year, correct?

14     A.   Yes, the only data that was available was the

15 2004 data.  That's the most recent data year, and I projected

16 it using a seven percent growth rate.

17     Q.   And when you say seven percent growth rate,

18 just, medical inflation?

19     A.   Yes.

20     Q.   Okay.  But you only looked at one year's worth

21 of this data.

22     A.   Yes.

23     Q.   But nevertheless, you projected it forward two

24 years using simply the growth rate, correct?

25     A.   Correct.

116

1          Q.    No other adjustment.

2          A.    Right.

3          Q.    Would it necessarily be the case that somebody

4    who spent -- let's just take the number in here -- somebody

5    who spent $754 in one year would necessarily spend that or

6    less two years later?

7          A.    Well, what the statistic says is, fifty percent

8    of the sample is spending that money.  So --

9          Q.    In that year.

10         A.    In that year.

11         Q.    In 2004?

12         A.    Right.  It is true that some people are sicker

13   in one year than another, and that healthcare expenditures are

14   highly skewed to high-cost users.  But what the data actually

15   show is that only ten percent of the population accounts for

16   about 40 percent of healthcare expenditures.

17         Q.    I'm sorry, could you repeat that?  I apologize.

18         A.    Sure.  What the actual, when you look at

19   healthcare expenditures across the population, a very small

20   share, say ten -- and I don't have exact numbers, but I can

21   get close -- ten percent of the individuals, high cost

22   individuals, the very sick individuals, consume almost 40

23   percent of the healthcare expenditure bucket.  So when you

24   look at healthcare expenditures, they are very skewed to the

25   high cost user, and that this media number is a much better

117

1      estimate of what the fifty percent of the population is

2      spending.  That's --

3              Q.   Okay.  But again, you don't, since --

4                   THE COURT:  So the hypochondriacs are taking all

5      the money.

6              Q.   But again, since you haven't looked at the Dana

7      claims, you really don't know if that pattern holds, correct?

8              A.   Well, I know the high cost issue holds across

9      everything.  I mean --

10             Q.   And do you have any idea how many employees who

11     are covered by Dana's current health programs would be

12     considered high-cost users?

13             A.   I don't.

14             Q.   You don't.  Okay.  And again, looking at

15     paragraph 35, in the middle, let's see, you say, "Table 2 does

16     not account for the fact that twelve percent of insured

17     individuals will not incur any health care expenditures in a

18     given year beyond their premiums or monthly contributions,"

19     again citing this database, correct?  But here again, you

20     wouldn't know if that would be true of Dana's employees,

21     correct?

22             A.   Correct.

23             Q.   You said you had looked at the claims data.  But

24     have you looked at demographic data of the Dana employees who

25     are covered under the health plans?

118

1          A.    Demographic in terms of age?

2          Q.    Age, male/female split.

3          A.    The only age I've seen is the pre-65, post-65

4    retiree data in terms of a number.  I haven't seen the age

5    distribution.

6          Q.    You've not seen the age distribution.  In other

7    words, how many are pre-65 and post-65.  Okay.  Let's go to

8    paragraph 38.  Now, we're switching over to the retiree health

9    section of your declaration.

10               And here, you've cited that January 1, 2006

11   retiree healthcare obligation of 1.4 billion, which is set

12   forth in Mr. Hoffman's declaration, correct?

13         A.    Correct.

14         Q.    And do you know that to be the APBO number?

15         A.    I believe that is.

16         Q.    And as you understand it, the APBO number is in

17   effect a present value calculation.  Would it be fair to say

18   that the APBO number is a present value calculation of a

19   stream of payments expected to be made over time?

20         A.    Correct.

21         Q.    Okay.  But you're comparing that number to

22   projected company revenues in 2007.

23         A.    In -- yes.

24         Q.    In that particular paragraph.

25         A.    Yes.  And I can explain why.

119

1          Q.   No, I just wanted to make sure I had that

2     correct.  Moving on to paragraph 50 here, we're talking about

3     retirement healthcare for active employees.  And you say, "In

4     addition, a few large automotive suppliers have eliminated

5     their company-subsidized retiree medical for new," here you're

6     talking about non-union hires.  And you say, "Many others,"

7     and you list some, "Have imposed caps for implemented

8     individual account plans."

9               Are you aware that Dana has also implemented

10    caps in its retiree healthcare obligation?

11         A.   I am.

12         Q.   Do you know for about how long Dana has had caps

13    in place?

14         A.   I believe -- I think I was told during my

15    deposition, mid '90s, perhaps, I think I recall.

16         Q.   That was information that you got in the

17    give-and-take of your deposition.

18         A.   Yes.

19         Q.   Not information that you had at the time that

20    you prepared the declaration.

21         A.   Correct.

22         Q.   Okay.  So would you know, then, in connection

23    with the ABPO number that Mr. Hoffman cites at paragraph 38,

24    would you know how much of that is attributable to the capped

25    obligations?

120

1          A.    I don't.

2          Q.    Paragraph 51, you have noted some which have

3    eliminated retiree medical benefits for future retirees in

4    bankruptcy.  And you list four companies there.  Let's just

5    take the Continental Airlines example.  Do you have any

6    details about how that occurred, or -- first of all,

7    Continental went through two bankruptcies, are you aware of

8    that?

9          A.    Yes.

10          Q.    Do you know whether this was during the first or

11    the second?

12          A.    I think this was during the first.

13          Q.    During the first.  Okay.

14          A.    I don't recall.

15          Q.    Georgetown Steel -- was that a court -- was that

16    imposed through the bankruptcy process, do you know, or was

17    that some sort of negotiated solution?

18          A.    I don't recall.

19          Q.    Do you recall if it was -- okay.  Georgetown

20    Steel, again a company that was unfortunate enough to go

21    through two bankruptcy cases.

22                Does this reference refer to the first or

23    second, if you know?

24          A.    I think it's the first.

25          Q.    You think it's the first?

121

```
1            A.    But I'm not totally sure.

2            Q.    You're not totally sure.  And again, do you know

3     if this was something that was imposed by virtue of a court

4     process like the one we have here today, or through some

5     negotiation?

6            A.    I don't -- don't know.

7            Q.    Outboard Marine Corporation, any details there

8     as to how the elimination came about?

9            A.    No.

10           Q.    Other than during the course of its bankruptcy.

11    Are you aware that Outboard Marine Corporation liquidated?

12           A.    I don't know.

13           Q.    That's not information you have.  Okay.

14    Wheeling Pittsburgh, again, another company that went through

15    two bankruptcy cases.  Do you know which one?

16           A.    I don't.

17           Q.    And do you know if it was by virtue of a

18    negotiation or through a court-imposed process like what we

19    have here?

20           A.    I don't.

21           Q.    Okay.  Dr. Mulvey, are you generally familiar

22    with Section 1114 of the Federal Bankruptcy Code?

23           A.    Generally.

24           Q.    You're not trained as a lawyer?

25           A.    No.
```

122

1          Q.    Okay.  Are you familiar enough to know that it

2     allows a company to, through a couple of different processes,

3     modify or terminate its retiree health obligations in

4     bankruptcy?

5          A.    Yes.

6          Q.    Are you familiar with the processes?

7          A.    Not totally, no.

8          Q.    So if I told you that there could be a

9     negotiated way to do it, are you familiar with that?  Without

10    coming to court, are you familiar?

11         A.    Yeah.

12         Q.    You understand that to be true?

13         A.    Yes.

14         Q.    Okay.  In paragraph 56, we're in now the section

15    that talks about retiree healthcare benefits to current

16    retirees.  In paragraph 56, you say there were numerous

17    examples of other large employers that have eliminated or are

18    in the process of eliminating retiree health benefits for some

19    or all of their existing retirees outside of bankruptcy.  And

20    then you list some here.

21              Do you know whether, in any of the cases here,

22    the obligations were assumed by -- perhaps the company didn't

23    have them anymore, but the obligation was picked up either by

24    a purchaser or a joint venture or some other party?

25         A.    Are you talking about the Ford/General Motors

123

1    reference?

2         Q.   No, I'm in 56 right now.

3         A.   Oh, I'm sorry.  Yes, I just know that they have

4    eliminated or proposed to eliminate in this in this case, and

5    I don't know about who took over an obligation, whether there

6    was a VEBA.

7         Q.   Or any --

8         A.   Or any other.

9         Q.   Anything else, cash payments or -- and, okay.

10   And then in the next paragraph, 57, we're back to some

11   bankruptcy examples and you include Bethlehem Steel.  Again,

12   are you familiar with any of the details?

13        A.   No.

14        Q.   And Georgetown Steel we covered.  What about

15   LTV?

16        A.   No.

17        Q.   No details.  Okay.  Tower Automotive?

18        A.   I am familiar that there was a VEBA in that

19   case.

20        Q.   Do you know whether that was a negotiated

21   resolution?

22        A.   I am not for sure.  I think it might have been

23   negotiated but I don't recall.

24        Q.   And again, just with respect to Bethlehem, we

25   covered Georgetown, do you know whether that was a negotiated

124

1    resolution or court imposed?

2           A.   I don't know.

3           Q.   You don't know.  Okay.  What about National

4    Steel?

5           A.   I don't know.

6           Q.   Wheeling Pittsburgh we covered.  How about

7    Weirton?

8           A.   I don't know.

9           Q.   Kaiser?

10          A.   Again, I know there was a VEBA in that case but

11   I don't know how it came to be.

12          Q.   Don't know if it was negotiated?

13          A.   -- negotiated.

14          Q.   Sorry.  United Air Lines, any details?

15          A.   No.

16          Q.   Negotiated or not?

17          A.   No.

18          Q.   No as to both United and USAirways, just so the

19   record is clear.

20               So I gather your point in, I guess, paragraph 57

21   and then the corresponding paragraph 51 where you name the

22   companies that eliminated their retiree medical while they

23   were in the bankruptcy process, your point here is that these

24   are employers who, during the course of the bankruptcy,

25   eliminated the obligation.  That's it.

125

1          A.    Correct.

2          Q.    That's your only point.

3          A.    Correct.

4          Q.    Has nothing to do with what happened to the

5    obligations, whether they were negotiated or not negotiated.

6          A.    Correct.

7          Q.    Okay.  Whether the retirees received a claim or

8    other consideration for the -- in consideration of the

9    elimination?

10          A.    Correct.

11                MS. CECCOTTI:  Your Honor, I just need a couple

12    of moments to see if I have anything else.

13                (A pause in the proceedings.)

14                MS. CECCOTTI:  Ah, yes, just a couple of other

15    questions.

16          Q.    I think you discussed a VEBA proposal with

17    counsel in your direct examination.  Your understanding of

18    the -- tell us your understanding of the company's proposal to

19    implement a VEBA.

20          A.    Well, I know that there is a VEBA, has been a

21    VEBA discussed and I know that it, under the, I guess, one of

22    the proposals, it was about thirty percent.  That's all I

23    know.

24          Q.    Do you know thirty percent of what?

25          A.    I think of claims.

126

1          Q.   Well, let's, actually, it's in -- let's not

2     guess.  You have something about it in your declaration.  I

3     think it's paragraph 61.  Yes, paragraph 61, where you relate

4     that Dana has proposed to contribute to the respective VEBAs a

5     monthly cash advance in 2007 which shall represent 30 percent

6     of the average monthly cost of providing retiree benefits to

7     eligible participants.

8               Do you know why it's a monthly cash advance?

9          A.   I have no idea.

10         Q.   You don't have any idea, advance against what?

11         A.   No.

12              MS. CECCOTTI:  I have no further questions, your

13    Honor.

14              MR. HAMILTON:  Just very quickly.

15    REDIRECT EXAMINATION BY MR. HAMILTON:

16         Q.   On Debtor's Exhibit number 34, tab B, second

17    column, you said you got that information from the MMPS survey

18    of a general population, correct?

19         A.   Correct.

20         Q.   And counsel for the unions asked you whether or

21    not you knew personally whether or not the personal claims

22    experience of Dana employees was any different.  You said you

23    didn't know, is that right?

24         A.   Correct.

25         Q.   Are you aware of any facts that would lead you

127

1    to believe that the health of Dana employees is different than

2    the health of the general population?

3            A.    No.

4            Q.    If you wanted to confirm that Dana's experience

5    was comparable to the general population, who was the guy at

6    Dana you would ask that?

7            A.    Bob Arquette, probably.

8                  MR. HAMILTON:  No further questions, your Honor.

9                  MS. CECCOTTI:  Your Honor, one piece of

10   housekeeping.  We did have the detailed section from the

11   Kaiser study that we --

12                 THE COURT:  Section 8?

13                 MS. CECCOTTI:  -- yes, discussed right after the

14   lunch break.  I gather this is not already a Debtor's exhibit,

15   because we don't have it in her book, and the unions would

16   like to mark that and offer it as our next exhibit number.

17                 MR. HAMILTON:  No objection, your Honor, all for

18   it.

19                 THE COURT:  Received.

20                 MS. CECCOTTI:  We'll mark it during an

21   appropriate break.  Your Honor, in addition, because it was in

22   Dr. Mulvey's reliance materials, I would like to also mark the

23   December 2006 employee benefit research institute survey that

24   I questioned her about as well.

25                 MR. HAMILTON:  No objection, your Honor.

128

```
 1                    MS. CECCOTTI:  Okay, we'll --

 2                    THE COURT:  It was in, but restricted to the

 3      cover page, right?

 4                    MS. CECCOTTI:  Your Honor, frankly, the reliance

 5      materials -- you relied on the entire document or just the

 6      cover page?

 7                    THE WITNESS:  I read --

 8                    MS. CECCOTTI:  She read the whole thing.

 9                    THE COURT:  Received.

10                    MS. CECCOTTI:  Thank you.

11                    (The witness is excused.)

12                    MR. TAMBE:  Your Honor, the debtors would next

13      call Mr. Bob Arquette.  Mr. Jimenez will be examining

14      Mr. Arquette.

15                    MR. JIMENEZ:  Your Honor, if I may approach, I

16      have a binder for your Honor and for the witness.

17      R O B E R T    A R Q U E T T E , having been duly sworn, was

18                    examined and testified as follows:

19      DIRECT EXAMINATION BY MR. JIMENEZ:

20           Q.   Mr. Arquette --

21                    MR. JIMENEZ:  -- your Honor, may I proceed?  I'm

22      sorry?

23                    THE COURT:  Yes.

24                    MS. CECCOTTI:  Give us a second just to get

25      ourselves reorganized.
```

129

1              (A pause in the proceedings.)

2         Q.    Mr. Arquette, where are you currently employed?

3         A.    I work for the Dana Corporation.

4         Q.    And when did you begin working for the Dana

5    Corporation?

6         A.    In 1968.

7         Q.    Could you please describe your employment

8    history during your 39 years with Dana Corporation.

9         A.    Yes, I began work in 1968 as the mail boy for

10   the Spicer Transmission division Toledo plant located on

11   Bennett Road, which was also the home for the corporate

12   offices and several divisions at the time.

13              From there, I worked my way up to a job in the

14   factory where I was a machine operator, that was a union job,

15   and I briefly was a union steward, as a matter of fact.  After

16   that, I was promoted to excluded employment where I became the

17   office employment coordinator at the same location.

18              I worked in that, what was then called the

19   personnel department, now called the human resources

20   department.  Thereafter, I was promoted to the industrial

21   relations department at the corporate offices.  Following

22   that, in 1974, I was promoted to what was then called

23   personnel manager, now called human resources manager, at the

24   Pottstown plant, where I worked as a human resources manager.

25              In 1978, I was returned to the corporate office

130

1    industrial relations department as the manager of industrial

2    relations, we also call that labor relations.  I was then

3    promoted to the position of director of labor relations where

4    I was chief spokesman for the company in labor matters.

5              Then, in approximately 1990, I was asked to take

6    a position in what is called the Dana Benefits and Payroll

7    Services Group.  In 19 -- I was appointed director.  And in

8    1999, I was made vice president of the Dana Corporation

9    Benefits and Payroll Services Group.  That position I've held

10   ever since.

11             Q.   What are your current responsibilities as the

12   vice president, benefits and payroll services?

13             A.   I oversee all workings of the department which

14   governs our group employee benefits, principally the tax

15   qualified benefit plans, healthcare plans, hospital medical

16   surge plans, dental, life insurance, pension plans, savings

17   plans, and other similar plans in place for groups of

18   employees.

19             I do not oversee pension investments or

20   investment management of assets, and I do not oversee what's

21   commonly referred to as compensation management and executive

22   compensation.  Those things do not fall in my purview.

23             Q.   How many employees currently report to you?

24             A.   Nine.

25             Q.   And has that number changed during the last few

131

1    years?

2            A.    Yes, changed dramatically.  Dana Corporation

3    began outsourcing certain of its services groups and in about

4    2004, the Dana Corporation outsourced certain human resource

5    management functions.  Included in that outsourcing was many

6    of the functions that were performed in my department.  At

7    that time, my authorized strength was 52 people, and we now

8    have ten of us, including myself.

9            Q.    Have your responsibilities increased because of

10   the bankruptcy filing by Dana?

11           A.    Oh, yes, very definitely.  Work on these

12   proceedings takes up almost all my time now.  In addition to

13   which, we have added the responsibility for Sarbanes-Oxley

14   compliance, which is a rigorous auditing exercise.  We've also

15   had to take on the responsibilities for HIPPA privacy

16   requirements, as well as all the other things that we have to

17   do on a daily basis, in addition to which we've had to be the

18   overseers and supervisors of the outsourced company that's

19   IBM, and that's been sort of a difficult challenge since it's

20   begun.

21           So we're responsible to make sure that those

22   services are in line and it's -- it's a constant addition to

23   our workload.

24           Q.    Have you had a role in connection with the

25   Debtor's process under Sections 1113 and 1114,?

132

```
1              A.   A role, yes.

2              Q.   Could you briefly describe your role in that

3   process, sir.

4              A.   I've been asked to assist in providing

5   information and data.  I've also been asked to assist in the

6   preparation of certain documents and cost and quantify the

7   items that the Dana Corporation proposes to reduce to achieve

8   cost savings.

9              Q.   Mr. Arquette, if you could please take a look at

10  tab A in the binder I handed to you --

11             A.   I see it.

12             Q.   -- do you recognize this document?

13             A.   Yes, it is.  This is my declaration that I filed

14  in regard to these proceedings in the court.

15             Q.   Did you help prepare your declaration?

16             A.   Yes, I did.

17             Q.   Was the information contained in the declaration

18  correct when you signed it?

19             A.   Well, I need to make a couple of corrections.

20  In paragraph 1 of my declaration, it's mistakenly attributed

21  my time in the benefits and payroll services department in

22  1993.  It actually began in 1990, as I had previously said.

23                  Paragraphs 13 and 15, mistakenly attributed

24  what's called AD&D, or accidental death and dismemberment

25  insurance along with life insurance as something we provide
```

133

```
1    for retirees.  In fact, we do not.  We only provide retirees

2    with life insurance.

3              And then in paragraph 23, I believe it is,

4    mistakenly included the number of 5.75 million as the amount

5    of savings that could be attributed to migration of certain

6    union locations to HealthWorks, and I believe that number is

7    more correctly stated at 7.5 million.

8              THE COURT:  What paragraph are you talking

9    about?

10             THE WITNESS:  Twenty-three, sir.

11        Q.   Other than the three items you've just

12   mentioned, is the information contained in the declaration

13   accurate?

14        A.   Yes, it is.

15             MR. JIMENEZ:  Your Honor, at this time I'd move

16   into evidence Debtor's Exhibit 1 which is the declaration of

17   Robert Arquette.

18             MS. CECCOTTI:  No objection, your Honor.

19             THE COURT:  Received.

20             (Debtor's Exhibit 1, received in evidence, as

21   of this date.)

22        Q.   Mr. Arquette, with respect to the proposals

23   delivered to the UAW and USW, were active union employees, did

24   you play a role in that?

25        A.   Yes, I did.
```

134

1      Q.    What was that role?

2      A.    Toward the middle or later summer.  I assisted

3  Mr. Chris Bueter, our vice president of labor relations, in

4  assigning values to certain of the proposals that were being

5  prepared.

6      Q.    If you could please take a look at tab B in the

7  binder, do you recognize that --

8      A.    Tab B?

9      Q.    Tab B, yes, this is Debtor's Exhibit 9.

10      A.    I see it.  Yes, that's a chart that demonstrates

11  estimated savings from modifications to union wage and

12  benefits.

13      Q.    Looking at the chart, are there any items listed

14  there which you helped Mr. Bueter prepare?

15      A.    Yes, there are.  I helped prepare the estimates

16  for migration to HealthWorks 2007.  The estimate for medical

17  inflation cost sharing, the estimate for modified life AD&D

18  benefits, the estimate for elimination of long-term

19  disability, the estimate for modification of short-term

20  disability, the estimate for modification to pension benefits,

21  and the estimate for Robinson 401(k) matching/other matching.

22      Q.    Do you the amounts listed next to each of these

23  items represent your estimate of the annual savings debtors

24  could realize from these changes?

25      A.    Yes, they do.

135

1          Q.    Now, Mr. Arquette, which of the five facilities

2     that are still part of the Debtor's 1113 motion currently do

3     not offer HealthWorks to the union employees of those

4     facilities?

5          A.    Only two.  Henderson, Kentucky, and Marion,

6     Indiana.  Otherwise, the union employees at the other

7     locations are already covered by HealthWorks.  A certain

8     version of HealthWorks.

9          Q.    Are there other facilities that are not part of

10    the 1113 motion that currently do not offer HealthWorks to its

11    union employees?

12         A.    Yes.  For instance, Lima and Pottstown.

13         Q.    And have the debtors proposed to offer

14    HealthWorks at those facilities?

15         A.    Yes, we have.

16         Q.    With respect to Dana's U.S. non-union employees,

17    are these employees covered today under HealthWorks?

18         A.    Dana's U.S. non-union employees are covered by

19    HealthWorks, yes.

20         Q.    Now, a few moments ago, Dr. Mulvey testified and

21    gave a description of the Debtor's HealthWorks 2007 medical

22    plan.

23              Were you here to hear her testimony?

24         A.    Yes, I was.

25         Q.    Do you agree with her description of the

136

1    HealthWorks program?

2            A.    Yes, she did a very good job of giving a general

3    description of the way Dana's HealthWorks program operates.

4            Q.    Could you contrast the HealthWorks program with

5    the medical plan that's currently offered today to union

6    employees at Henderson and Marion?

7            A.    Well, following up with what she said, the

8    HealthWorks program is a program that's called, generally

9    referred to as a consumer-directed program, meaning that we --

10   we're trying to establish a program that empowers the consumer

11   to play a much greater role in their health, as opposed to the

12   plans, the traditional plans that we have in place, for the

13   plans that you mentioned, which are basically sick plans.

14   They pay for benefits which employees are sick.  We refer to

15   these as indemnity type plans, meaning they indemnify people

16   from loss which occurs when they incur hospital, doctor,

17   medical bills.

18            Typically, they include a deductible, a co-pay,

19   an out-of-pocket maximum and some portion of premium sharing.

20   Those are more traditional indemnity-type plans.

21            The plan that HealthWorks has constructed with a

22   health reimbursement account which grants people an amount of

23   money into an account each year, if they don't use it, it

24   rolls over to the subsequent years.  We provide them with a

25   source of information so that they can determine their medical

137

1  procedures, they can check up on their physicians, they can

2  consult about hospitals and quality of care, and we teach

3  people to use these facilities and we encourage them to do

4  that.

5           We also provide flexible spending accounts both

6  for healthcare and dependent care, and we have a wellness

7  component in the HealthWorks plan that pays a hundred percent

8  of certain preventive and diagnostic procedures.  So we

9  encourage people not to stay away from doctors and hospitals,

10 but to -- but for early discovery and detection and thereby

11 hopefully saving us money and contributing to their good

12 health.

13          Q.   Is HealthWorks offered today at any of Dana's

14 unionized facilities?

15          A.   It's offered to virtually all the union

16 facilities except the ones that I mentioned.  We have a number

17 of union facilities, especially what we call the partnership

18 plants, that were established with HealthWorks and they

19 continue to have HealthWorks, even now that they are

20 represented by the union.

21          Q.   Mr. Arquette, if you could please take a look at

22 tab C in the binder.

23          A.   I see it.

24          Q.   This is what's been marked as Debtor's

25 Exhibit 23.  Do you recognize the document, sir?

138

1      A.   Yes, this is a chart that's included in my

2   declaration.  It's an estimate of annual savings arising from

3   changes and modifications that we have made prior to the

4   filing for Chapter 11, and the estimated annual savings for

5   each.

6      Q.   Did these changes affect all Dana's U.S.

7   non-union employees?

8      A.   Yes, they did.

9      Q.   Including senior management of Dana?

10      A.   Including senior management, yes.

11      Q.   Do the numbers listed to the right of each

12   modification represent your estimate of the estimated annual

13   savings from these modifications?

14      A.   Yes, except for three categories.  Except for

15   the effective elimination of tuition reimbursement, except for

16   the category of head count reductions, and except for

17   eliminate gain sharing plan.  Those estimates were supplied to

18   me by our HR group.

19      Q.   Now, when were these changes implemented, sir?

20      A.   These changes were implemented late in 2005 and

21   effective 1/1, 2006.

22      Q.   Now, given the fact that they were implemented

23   in January 2006, do you know what these, these savings have

24   been factored into the Debtor's 2007 financial plan?

25      A.   I believe they have, yes.

139

1          MR. JIMENEZ:  At this time, your Honor, I'd move

2     into evidence Debtor's Exhibit 23.

3          MS. CECCOTTI:  No objection.

4          THE COURT:  Received.

5          (Debtor's Exhibit 23, received in evidence, as

6     of this date.)

7          Q.   Mr. Arquette, if I could have you look at tab D

8     in the binder.

9          A.   I see it.

10          Q.   Do you recognize the document?

11          A.   Yes.  This is another chart that was included in

12     my declaration.  And it is a -- an attempt at a brief

13     description of modifications and changes that we are making or

14     have announced to make and the estimated cost savings for

15     each.

16          Q.   With respect to the modification of life

17     insurance benefits, which is the first item on the chart, has

18     this change already been implemented?

19          A.   That change has been implemented 1/1/07.

20          Q.   And what modifications were made to the life

21     insurance benefits?

22          A.   The life insurance benefits referred to here

23     contained essentially in the HealthWorks plan, which prior to

24     1/1/07, issued an amount of life insurance to all employees

25     covered by HealthWorks in the amount of one and one half times

140

1    their base salary.

2              That was reduced to one times base salary.

3         Q.   Is this change consistent with what's been

4    proposed for Dana's union employees?

5         A.   Yes.  It is.

6         Q.   Did you calculate the estimated savings figure

7    for the right of this change?

8         A.   Yes, I did.

9         Q.   With respect to the next item on the chart,

10   short-term disability, has that change already been

11   implemented for non-union employees?

12        A.   That change was implemented again on the 1st of

13   January 2007.

14        Q.   And what modifications were made to the

15   short-term disability benefits of non-union employees?

16        A.   Prior to 1/1, 2007, the short-term disability

17   plan had a seven-day waiting period and provided a benefit

18   which was graduated, beginning at one hundred percent of pay,

19   dropping down to 70 percent of pay on a schedule denominated

20   by service, ending with 22 weeks.

21             The changes that were made is that the seven-day

22   waiting period was lengthened to 14 days, and the benefit was

23   reduced to 50 percent for all weeks up to 22 weeks.

24        Q.   Are these changes consistent with what's been

25   proposed to Dana's union employees?

141

1          A.    They are consistent with what we are proposing,

2     yes.

3          Q.    Did you calculate the estimated savings figure

4     to the right of this change?

5          A.    Yes, I did.

6          Q.    With regard to the next item on the chart,

7     "Elimination of long-term disability," has that change already

8     been implemented for non-union employees?

9          A.    No, it hasn't.  We have announced to our

10    non-union employees that we intend to eliminate the long-term,

11    the self-insured long-term disability plan that is contained

12    and explained the in the HealthWorks program, and replace it

13    instead with the, with an employee purchase of an insured

14    benefit which will be -- which will take effect on July 1st,

15    2007.

16         Q.    And is this consistent with what's been proposed

17    for Dana's union employees?

18         A.    Yes, it has.

19         Q.    Did you calculate the savings figure to the

20    right?

21         A.    Yes, I did.

22         Q.    How did you arrive at the savings for the

23    elimination of long-term disability?

24         A.    We took the entire group of claims that are

25    currently being paid which is approximately 540 persons, and

142

1    we valued the entire group of claimants, both by examining the

2    amounts that we're paying to claimants as income, and also

3    consulting our actuaries, Towers Perrin, on an appropriate

4    amount of cost that's allocated to this group for medical.

5                   And that entire group, which is made up

6    predominantly of collectively bargained employees, about 95

7    percent, in excess of 95 percent of collectively bargaining

8    employees, we allocated a portion of that cost to the

9    non-union employees who have -- are still open to claim, and

10   those are persons who opened a claim since we filed for

11   Chapter 11.

12                  So a small portion of the current claimants are

13   non-union employees.  The rest are union employees and the

14   amount of savings that's estimated here is a portion of the

15   savings that we estimated for elimination of the program for

16   all employees, union and non-union.

17            Q.    Approximately what percent of the total

18   employees that are out on long term disability are non-union

19   employees?

20            A.    A little less than five percent.

21            Q.    And do you know why there's such a large

22   disparity between the number of union employees and non-union

23   employees out on long term disability?

24            A.    Yes.  When we filed for Chapter 11, we

25   discontinued the benefits for all of the then-current

143

1    non-union employees who were receiving long-term disability

2    benefits, which was approximately 500 cases at the time.

3         Q.    With respect to the next item on the chart,

4    "Modifications to pension plan," have those changes already

5    been implemented for non-union employees?

6         A.    No, they have not.  We have announced to our

7    non-union work force several times of our intention to freeze

8    the accumulation of future credited service effective July 1,

9    2007.

10         Q.    Did you calculate the estimated savings listed

11    to the right of this change?

12         A.    Yes, I did.

13         Q.    Could you briefly describe the proposed changes

14    to the pension plan for non-union employees?

15         A.    There are principally two pension plans, two

16    defined benefit pension plans in effect that cover non-union

17    U.S. employees.  The principal and largest one is Cash Plus.

18    Cash Plus is a career average cash balance pension plan which

19    expresses the benefit in terms of a lump sum which was given

20    to employees on an annual statement.  A notional account is

21    kept for every employee, and their lump sum is added to every

22    year by taking their service, their seniority or their service

23    times a level of contribution in a chart in the summary plan

24    description, we call that chart A, or the service credit

25    chart.

144

1          Service credits are then added to an account

2     every year and employees are given a copy of that statement

3     once a year at about this time of year.

4          In addition to which, employees like myself who

5     were employed at the time this plan was converted from its

6     former form to the current form, there's what's called a

7     transitional benefit.  It's a small additional amount that's a

8     carryover from the old plan.  Those two things are added to

9     employees' account balances every year, and that's stated as

10    their benefit.

11         The other pension plan, the other defined

12    benefit pension plan is the Dana Automotive Aftermarket Group,

13    or what we call D-A-A-G, DAAG plan, and that plan is more of a

14    final average pay plan which states a benefit in terms of

15    years of service times a formulation of the employee's base

16    pay; for instance, the highest three of the last five years of

17    pay.  That benefit, then, is expressed as an accrued benefit

18    under that plan.

19         Q.   The debtors have also proposed to modify the

20    pension benefits of union employees, is that correct?

21         A.   That's correct.  We've given the unions

22    proposals on freezing of future credited service under various

23    pension plans.

24         Q.   And how do the changes you just described for

25    the non-union plans compare to the changes that have been

145

1    proposed for the union plans?

2          A.    Well, actually, it would affect non-union

3    employees more severely.  It's a difficult comparison to make,

4    but if you make an apples-to-apples comparison, if you take an

5    employee with the same service, earning the same wage,

6    retiring at the same time, employees covered under the union

7    plans, the typical union plans like the UAW master, would be

8    entitled to a greater basic benefit than would be generated

9    under the Cash Plus plan.

10          Q.    Could you give me an example of how the changes

11    would impact the same type of employee?

12          A.    Certainly.  If you take the UAW master pension

13    plan, defined benefit pension plan, it's what we refer to as a

14    rate plan.  In other words, the benefit is expressed as a rate

15    times years of service.

16                The rate in the current, or the current rate in

17    the UAW master plan is $32.50.  So for an employee who is

18    retiring at age 62, with thirty years of service earning,

19    let's say, is $16 an hour, which makes little difference in

20    the union plan, would generate ha basic benefit of $975 a

21    month.  Under the Cash Plus plan, that same employee aged 62

22    with thirty years service earning $16 an hour, would have

23    accumulated an account balance roughly three times their

24    annual salary.  So in this case, at $16 annual salary would

25    amount to 32,000, amount in their account would equal roughly

146

1    $96,000.  The $96,000 is available to the employees as a lump

2    sum payment, but to weigh that up, to make it match the value

3    of the employee who is retiring under the UAW master, you'd

4    have to convert it to an annuity, using a 6 percentage

5    inflation factor, which is generous, and consulting the

6    mortality tables, which the actuary would do, the RP 2000

7    table that is implicit in our pension valuations, you'd divide

8    the $96,000 by twelve to reach an annual annuity, divide it by

9    twelve again to reach a monthly annuity, and that amount would

10   be approximately $667, considerably less than that basic

11   benefit available to an employee under the UAW master plan in

12   similar circumstances.

13            Q.    Now, you're entitled to receive a benefit under

14   Dana's pension plan, are you not?

15            A.    I'm covered by the Cash Plus pension plan, yes.

16            Q.    How would the freezing of future credited

17   service for non-union employees affect you personally?

18            A.    Well, since I've got more than thirty years

19   service, I've reached the top level of credits, accumulation

20   by the chart.  Which is roughly 19.2 percent of my base

21   salary, would be added to my notional account every year.

22            In addition to which, since I was employed when

23   the plan was converted, I'm also entitled to a transition

24   benefit, which by this time is small, but roughly I would be

25   entitled to absolutely in excess of 20 percent of my base pay,

147

1    pension earnings, added to my account on an annual basis.

2    When the company freezes the future accumulation of credited

3    service under this pension plan, that 20 percent will no

4    longer be added to my account.  Instead, I will be given a

5    three-percent contribution, a three-percent contribution times

6    my base salary to a defined contribution plan in replacement.

7         Q.   So the net result being, you would lose a

8    contribution of approximately 17 percent of your pay?

9         A.   That's correct.

10         Q.   With respect to the next item on the chart,

11    elimination of company paid physicals for executives, has this

12    modification already been implemented?

13         A.   Yes, it has.

14         Q.   Did you calculate the estimated savings

15    associated with this change?

16         A.   Yes, I did.

17         Q.   What about with respect to the next item,

18    conversion of life insurance benefits for executives, has that

19    already been implemented?

20         A.   That has been implemented to the best of my

21    understanding.  Certain high ranking executives are entitled

22    to an additional amount of life insurance which has taken the

23    form of what's called universal life.  What is going on here

24    is, the company has ceased making annual premium payments to

25    those universal life policies in the amount of $1.9 million,

148

1    thereby reducing the value of those life policies to the

2    executives who held them.

3         Q.   Did you calculate the estimated savings

4    associated with this change?

5         A.   No, I did not.  That was supplied to me by the

6    compensation group.

7         Q.   With respect to the next item on the chart,

8    Mr. Arquette, the implementation of a two-tier wage structure,

9    has this change already been implemented for non-union

10   employees?

11        A.   Yes, it has.

12        Q.   Would you briefly describe the two-tier wage

13   structure for non-union employees?

14        A.   This is identical to the proposal that we've

15   given to the unions on two-tier.  What this means is that for

16   non-bargained hourly employees, non-bargained hourly non-union

17   employees, we have put in place a lower starting wage, a lower

18   total wage so that persons who are hired to take the place of

19   persons who are left or who have left the organization, will

20   be hired at a lesser rate.

21        Q.   Did you calculate the savings associated with

22   this change?

23        A.   No, I did not.  That was also -- no, that was

24   supplied to me by the HR group.

25        Q.   With respect to the last item on the chart, work

149

1    rule modifications, have these changes already been

2    implemented?

3         A.    Yes, they have.

4         Q.    Could you briefly describe the work rule

5    modifications that have been implemented?

6         A.    These are modifications to terms and conditions

7    of employment for non-union workers at all levels.  It

8    includes reductions of holiday, vacation, but generally is

9    largely made up of changes and reductions in overtime premium

10   pay for non-union employees.

11        Q.    Are these modifications consistent with what's

12   been proposed for union employees?

13        A.    It's my understanding that they are, yes.

14        Q.    Did you calculate the estimated savings

15   associated with these changes?

16        A.    No, that number was also supplied to me by the

17   HR group.

18             MR. JIMENEZ:  Your Honor, at this time, I'd

19   introduce Debtor's Exhibit 25 into evidence.

20             MS. CECCOTTI:  No objection.

21             THE COURT:  Received.

22             (Debtor's Exhibit 25, received in evidence, as

23   of this date.)

24        Q.    Mr. Arquette, what is the status of retiree

25   medical benefits for non-union active employees?

1          A.    We have informed our non-union active employees

2    in the U.S. who are otherwise covered by post-retirement

3    benefit programs, and not all employees are.  We have ceased

4    offering these benefits to persons hired after January of '04,

5    I believe.  But for those persons who are covered, like

6    myself, we've announced that effective April 1st, the program

7    will be eliminated.

8          Q.    And what is the impact of this elimination on

9    you personally?

10          A.    Well, the benefit is expressed as an account or,

11    again, a notional account balance.  Years of service are

12    multiplied times a factor of 1,700, which was arrived at by

13    our actuaries years ago when we invented the plan, and that

14    is, that gives you an account balance which is then annuitized

15    into a flow of monies which would allow a participant, an

16    employee like me, to use to offset future retirement medical

17    costs.

18          In my case, with my years of service, I'm going

19    to round up to 40.  The amount in my account is $68,000, and

20    that will be eliminated April 1st.

21          MR. JIMENEZ:  Your Honor, nothing further.

22          MS. CECCOTTI:  Your Honor, I think in order to

23    proceed most efficiently, I have a few questions and

24    Mr. Levine has some questions.  Would it be best for us to

25    proceed rather than take a lengthy break and try to

151

1    consolidate it?

2              THE COURT:  Is this in lieu of a lengthy break?

3              MS. CECCOTTI:  Yes.

4    CROSS-EXAMINATION BY MR. LEVINE:

5         Q.   Mr. Arquette --

6              THE COURT:  That was the seductive offer.

7              MR. LEVINE:  I'm sorry, your Honor, I cannot

8    hear you.

9              MR. HAMILTON:  Seductive offer.

10         Q.   Mr. Arquette, you just talked about your

11   personal circumstances.  And I just want to make sure I

12   understand what those are.  What was your compensation in

13   2006?

14         A.   In 2006, I forget what my total compensation

15   was, but my base pay is now $200,000.

16         Q.   $200,000.  Do you know if that's more or less

17   than the average union hourly employee receives at Dana?

18         A.   Oh, I would guess it's more.

19         Q.   And that's your base salary, is that correct?

20         A.   That's correct.

21         Q.   And what other compensation components, not

22   related to fringe benefits, are part of your total

23   compensation package?

24         A.   I receive a car allowance in lieu of a company

25   car, which is a program we also eliminated a couple of years

152

1    ago.

2                And I'm eligible for a annual improvement

3    program which is a bonus program, and that maximum eligible

4    earning, I believe, is 45 percent.

5          Q.   45 percent of what?

6          A.   Of base pay.

7          Q.   So if your base pay was $200,000 last year,

8    you're eligible for up to -- you were eligible for up to an

9    additional $90,000?

10         A.   That would be correct if that math works out,

11   yes.

12         Q.   Under that bonus program?

13         A.   Under that bonus program, yes.

14         Q.   Do you know at this point how much, if anything,

15   you've received from that bonus program in 2006?

16         A.   In 2006, we received approximately half of a

17   year's bonus payment.

18         Q.   So in addition to your base compensation of

19   approximately two hundred thousand dollars, you also received

20   an additional approximate amount of $45,000 from this bonus

21   program?

22         A.   No, at that time I was in a bonus category of

23   eligible earnings of 25 percent, I believe, and we received

24   half of that payment at twelve-and-a-half percent.

25         Q.   Now, is that bonus program available to

153

1    unionized hourly employees, that payment?

2             A.    The bonus program that I'm in is not.

3             Q.    And do unionized hourly employees have a car

4    allowance?

5             A.    Not that I know of.

6             Q.    What other components of your compensation

7    package are there, other than what you've already described

8    for calendar year 2006?

9             A.    I'm not sure that I know of any others.

10            Q.    Is it fair to say that an hourly employee making

11   less money without a bonus plan and without -- some of the

12   them without bonus plans, certainly not the kind of bonus plan

13   you have, and without a car allowance, will be impacted

14   differently by the proposed changes in the 1113 plan than

15   someone making the kind of money you made last year, is that

16   fair to say?

17            A.    I would suppose that's a fair statement.

18            Q.    Now, you have involved in human resources and/or

19   industrial relations with Dana for quite some time; is that

20   fair to say?

21            A.    Yes.

22            Q.    And you have been involved in collective

23   bargaining in that capacity, that fair to say?

24            A.    Yes, when I was in the industrial relations

25   department, I became chief spokesman for the company, so, yes,

154

1    that would put me at the bargaining table, yes.

2         Q.   You've been in the trenches, is it fair to say?

3         A.   I think I was one of the people that dug the

4    trenches.

5         Q.   So noted.  And the retiree health benefits that

6    the company seeks to eliminate, are those the product of

7    collective bargaining agreements with the UAW and the USW over

8    time?

9         A.   Certainly.

10        Q.   And I noticed that in your declaration, you

11   refer to the fact that some retirees continue to receive

12   health insurance even though their plants have already closed;

13   do you recall making that representation in your declaration?

14        A.   I don't recall in my declaration, but that's

15   certainly true.

16        Q.   But you would agree with that statement.

17        A.   I certainly agree with that, yes.

18        Q.   And do you know why you would have included that

19   kind of a representation in your declaration?  Why is that

20   significant, if at all?

21        A.   Certainly, it's a point of interest.  The Dana

22   Corporation continues to carry a significant burden, financial

23   burden to supply healthcare benefits and other benefits for

24   persons who no longer have a home plant.  There's no

25   operation.  We either sold the product, discontinued to

155

1    product, closed the operation, years ago.

2            Q.    But they were also the product, those benefits,

3    the product of negotiated agreements that covered those

4    employees when their plants were in operation, isn't that

5    correct?

6            A.    I would say that's correct.

7            Q.    And when some of their plants closed, was there

8    effects bargaining leading to agreements which provided for

9    continued retiree health payments for some of those employees?

10           A.    I think in the vast majority of plant closings,

11    there were effects bargaining, yes.  Not all, but in the vast

12    majority.

13           Q.    And that effects bargaining, at least on

14    occasion, is it fair to say resulted in agreements by the

15    company to uphold prior obligations to provide retiree health

16    insurance to its workers?

17           A.    I think in general terms, or back in specific

18    terms, the effects bargaining would have concluded in

19    continuing the healthcare supplements, which contained the

20    provisions for certain retiree coverages, yes.

21           Q.    Those were promises made when those plants were

22    closed, isn't that fair to say?

23           A.    That's a fair statement.

24           Q.    Now, also, you talk about how plants closed and

25    those employees in the United States who are now retirees,

156

1    continue to receive health benefits.

2              And some of the work that those employees have

3    done is now being done overseas, correct?

4         A.   I'm not sure I can -- I know which work is being

5    done overseas.  But I know that we have, we're a worldwide

6    company and we have operations in other countries.

7         Q.   Is it fair -- I'm sorry?

8         A.   -- produce products in South America and in

9    Mexico and in Germany and in the United Kingdom and in Canada

10   and a number of places, some places of which are not

11   necessarily cheaper.

12        Q.   Is it fair to say that more work is done

13   overseas today, for Dana, than was done at any other time in

14   Dana's history?

15        A.   I don't know that I'm qualified to make that

16   characterization.

17        Q.   You don't know?

18        A.   I don't know that, no.  I know that we're still,

19   the bulk of our sales are domestic.

20        Q.   Now, could you please turn to paragraph 7 of

21   your declaration.  Let me know when you're there, sir.

22        A.   I see it.

23        Q.   Looking at the last sentence, and it says,

24   "While the total expense for 2006 for providing healthcare

25   coverage to active union employees slightly decreased as

157

1    compared to 2005, the total spent per active union employee

2    increased to eleven thousand and change, reflecting a 15.1

3    percent per employee increase; do you see that?

4         A.   Yes.

5         Q.   Now, the reason total expenditures went down but

6    employee expense at the same time went up is because there are

7    now less employees at Dana; isn't that correct?

8         A.   Yes.

9         Q.   And the head count data is, remains in flux,

10   isn't that fair to say?

11        A.   That's fair to say, yes.

12        Q.   So that in trying to negotiate an agreement, and

13   you've been involved in labor relations and collective

14   bargaining, isn't it fair to say that negotiations are

15   complicated by the fact that we don't know how many employees

16   will be covered by collective bargaining agreements ten months

17   from now, or 24 months from now; isn't it fair to say that?

18        A.   In my entire career of bargaining, I've never

19   known it any other way.

20        Q.   Right.  In your entire career at collective

21   bargaining, have you ever been in an 1113 proceeding?

22        A.   No, I have not.

23        Q.   Do you now think that makes it easier or more

24   difficult to negotiate an agreement?

25        A.   Oh, I think the collective bargaining agreements

158

```
1    are difficult enough to negotiate without these circumstances.

2    But I think if the parties put their mind to it, we can get

3    something done.

4              Q.   But you would agree that it's more complicated

5    by the pendency of this proceeding, isn't it fair to say, as a

6    bargainer?

7              A.   Certainly.

8              Q.   Now, let's look at paragraph 8.  Is the same

9    point to be made there, that is to say that the numbers that

10   you cite in terms of per-employee cost or disability benefits,

11   isn't the fact that the numbers have increased related to the

12   fact that the force has declined?

13             A.   That's not exactly the way to look at that.  But

14   the work force declining certainly has some major effect only

15   because the way we pay for these benefits is, we're

16   self-insured.  In other words, we pay cash money for the

17   claimants who are receiving the benefit.  We don't buy an

18   insurance policy from an insurer to insure these.

19                  So the population would have an indirect effect.

20   Not a direct effect.

21             Q.   Okay.  Mr. Arquette, could you please turn to

22   Debtor's Exhibit 9, please.  I'm sorry --

23                  MR. LEVINE:  -- and, your Honor, that is after

24   tab D in this looseleaf binder.

25             Q.   Are you there, sir?
```

159

```
 1              A.   I see it.

 2              Q.   I believe you identify four items that you

 3   played a role in estimating costs for:  Migration of

 4   HealthWorks 2007, medical inflation cost sharing, modification

 5   of life, AD&D benefits, and modification of short-term

 6   disability, is that correct?  Are those items that you were

 7   involved in making cost savings estimates for?

 8              A.   Well, there are more.

 9              Q.   Okay.  You were personally involved in doing

10   more estimates on these items?

11              A.   Yes.  As I said in my testimony, migration to

12   HealthWorks all the way down to Robinson 401(k) and matching

13   in others.

14              Q.   So it would include elimination of LTD,

15   modification of pension benefits, and the Robinson 401(k)

16   match?

17              A.   That's correct.

18              Q.   I'm sorry.  I misunderstood your testimony.  And

19   how did you calculate those various savings in terms of head

20   count?

21              A.   Is there anyone in particular you want to ask

22   about?

23              Q.   Well, did you do it differently for different

24   items?

25              A.   Yes, it certainly makes a difference as to which
```

160

1    item we're talking about.

2         Q.    Okay.  Well, let's go to migration to

3    HealthWorks 2007.  You come up with estimated first year

4    savings of seven-and-a-half million dollars, is that correct?

5         A.    Yes.

6         Q.    And that's just for moving unionized workers

7    into HealthWorks 2007?

8         A.    Yes.  Moving the unionized workers that are not

9    already on HealthWorks to HealthWorks 2007, yes.

10        Q.    And that includes Lima and Pottstown, correct?

11        A.    I'm not sure whether this particular -- I think

12   the number does include Lima and Pottstown.

13        Q.    But Lima and Pottstown aren't part of the 1113,

14   isn't that correct?

15        A.    I think that's correct, yes.

16        Q.    So that debtors' Exhibit 9 doesn't break out

17   what the company seeks in savings from its 1113 proposal; is

18   that correct?

19        A.    Only in that regard, I would say.

20        Q.    Only in regard to the estimated first-year

21   savings for all of these items?

22        A.    In the regard that it may include Lima and

23   Pottstown.  Otherwise, it would be accurate.

24        Q.    And how many employees were at Lima and

25   Pottstown as of December 31, 2006?

161

1          A.    I don't remember the exact number.

2          Q.    Order of magnitude?

3          A.    I think between both of them, possibly six

4    hundred, thereabouts, five, six hundred.

5          Q.    Were you present at court yesterday?  I believe

6    you were.

7          A.    Yes.

8          Q.    Do you recall some of the law school math that

9    was going on?

10         A.    I recall it, yes.

11         Q.    By my partner, Mr. Simon, who made me add up

12   those numbers rather quickly without a calculator?

13         A.    I remember that exercise.

14         Q.    I believe we came up with approximately two

15   thousand employees at the five facilities where the 1113

16   proposal still applied; do you recall that?

17         A.    I recall that.

18         Q.    I think the number was about 1976, and we

19   rounded it off to 2,000.  So you're talking about 2,600

20   employees approximately, 600 of whom that you used in this

21   calculation aren't even part of the Section 1113; correct?

22         A.    That's correct.

23         Q.    Law school math.  That's about thirty percent,

24   correct?  In other words, the Lima/Pottstown complement is

25   about thirty percent of the workers who are included in these

162

1    calculations?

2            A.    Those numbers work out, I think, generally, yes.

3                  MR. JIMENEZ:  Your Honor, if I understand the

4    math correctly, the 2,000 related to the five plants that are

5    part of the 1113, not plants that are not part of the 1113.

6    So I'm not sure that the exhibit is correct.

7                  THE COURT:  He's going along with his testimony.

8    It's being broken out.  I'll allow it.

9            Q.    Now, a couple of questions, and again,

10    Ms. Ceccotti's proposal to split this examination might not be

11    the cleanest way to do that, but I will try and not step on

12    her turf so that you won't be asked the same question.

13                  But turning to Debtor's Exhibit 23 which is

14    after tab C, in your binder, do you see that?

15            A.    Yes.

16            Q.    "Estimated annual savings arising from

17    pre-Chapter 11 sacrifices by the non-union active salaried and

18    hourly personnel."

19            A.    Yes.

20            Q.    As I understand it, for at least some of these

21    items, you are counting savings from actions taken in the past

22    as to these employees; is that fair to say?

23            A.    I think all of them.

24            Q.    And --

25                  THE COURT:  Defining past as pre-Chapter 11.

163

1        MR. LEVINE:  Correct, your Honor.

2        Q.   Do you know if Dana, in any of its motion papers

3   or in any of its negotiations, has gone to the unions and

4   taken the position, or taken the position with this court,

5   that sacrifices already made by the unions involved in the

6   1113 or otherwise, prior to 2006, should be taken into

7   account?

8        A.   I have no knowledge of that.

9        MR. LEVINE:  I have no further questions.  And I

10   defer to Ms. Ceccotti, and I hope I haven't rained on your

11   parade.  Thank you for your patience.

12   CROSS-EXAMINATION BY MS. CECCOTTI:

13        Q.   Just a couple of more questions, going back to

14   tab B in Debtor's 9 and the calculation of the 7.5 dollar

15   figure related to the migration to HealthWorks, and I guess we

16   would then go back to paragraph 23 of your declaration.  First

17   of all, just help me out a little bit here.

18        At the time that you're -- was the number always

19   7.5 and this is some sort of transcription error, or did the

20   number actually change between the time you penned your

21   declaration and the time Exhibit 9 was prepared?

22        A.   I can't answer that.  I don't remember.

23        Q.   You don't remember.

24        A.   No.

25        Q.   Okay.  How did you calculate what is now the

164

1    $7.5 million figure?

2          A.   By looking at the paid claims for persons

3    covered under plans other than HealthWorks, compared to paid

4    claims for hospital, medical, surgical, dental and drug

5    coverage for persons covered under HealthWorks, average to

6    average.

7          Q.   How did you -- first of all, what year claims

8    did you look at?

9          A.   The most recent twelve months ending at about

10   June of 2006, I believe, would have been -- that's the period

11   of time where we do an annual rating process, so we collect

12   data on claims paid in the twelve-month cycles.

13          That would have been a time where we would have

14   had ready data available on paid claims for a year.

15          Q.   Okay.  So in other words, that would be the paid

16   claims for employees at Henderson and Marion, correct?

17          A.   Yes.

18          Q.   And Lima and Pottstown?

19          A.   I believe so.  I think I'm right about that.  I

20   don't remember exactly but I believe so, yes.

21          Q.   Okay.  By the way, you gave a brief description,

22   I guess, of the plan in effect at Henderson and Marion but not

23   Lima and Pottstown, which I recognize are not part of the

24   proceedings, but since the savings figure may include those,

25   I'd like to just ask you if you could describe briefly the

165

1    health plan in effect at Lima and Pottstown.

2         A.   With the difference of the numbers, it's

3    virtually the same type of indemnity plan.

4              There is a deductible in place, there's a co-pay

5    in place up to an out-of-pocket maximum.  The employees pay a

6    premium share out of their paychecks.  And it's very similar

7    to the plan I described generally before.

8         Q.   Are there in- and out-of-network options at

9    either location?

10        A.   No, I don't believe there are under the plans I

11   just described.

12        Q.   Not at Lima/Pottstown?

13        A.   No.  For the salaried workers who are covered by

14   HealthWorks, yes.  But for the hourly workers, no.

15        Q.   Okay.  So you took the claims data for that

16   twelve-month period that you described, and I guess I just

17   need you to walk me through what you did.  You took that data

18   which obviously were paid out under the current plans, and

19   tell me how you came up with the figure that represents the

20   potential savings.

21        A.   Well, the difference in paid claims under both

22   plans, multiplied by what we knew about the number of persons

23   covered in the work force.  One times the other.

24        Q.   In other words, you took the number of -- okay.

25   So within the claims-paid data, you have some claims incurred

166

1    by single covered people, some incurred by family covered

2    people, correct?  Do you break them down that way?

3           A.   Yes, we do.

4           Q.   Okay.  And did you use the same breakdown when

5    you --

6           A.   We would have used actual paid claims.

7           Q.   Actual paid claims for the -- oh, I see.  So you

8    just -- you took the HealthWorks design and you applied it to

9    the paid claims; is that in essence what you did?

10          A.   No, we took actual paid claims under

11   HealthWorks, and since HealthWorks is our largest plan, the

12   sample population is what's called statistically significant.

13   It means, it stands on its own.  If you try to replicate the

14   data you come up with almost the same identical data.  The

15   population in the sample is large enough so that taking a

16   sample doesn't make any difference.

17               You take the entire paid claims for the entire

18   group and that's the average of the group.  Adding or

19   subtracting lives to it doesn't change the averages all that

20   much.  So we compared the paid claims averages under

21   HealthWorks, to the paid claims per capita under the -- under

22   the various population groups I have spoken of.

23          Q.   And HealthWorks had been in effect for how long,

24   for the HealthWorks actual claims sample that you used?

25          A.   It's in its third year.

167

1          Q.    It's in its third year?

2          A.    Third year, yes.

3          Q.    So that sample we have included claims paid

4    under the in-network and out-of-network options.  However the

5    claims came in is what you took, right?

6          A.    Yes.  By and large, the vast majority of our

7    claims paid under HealthWorks are paid as in-network claims.

8          Q.    So people are getting whatever the advantage is

9    of provider discounts and the like, correct?  In terms of the

10   claims.

11         A.    Both our participants and the company is getting

12   advantage of network pricing, yes.

13         Q.    Correct.  Okay.  And this is the plan, putting

14   aside the actual details because we won't bother shifting the

15   books around again, but in an in-network arrangement, somebody

16   is going to a doctor and will just shell out ten or fifteen

17   bucks, correct?

18         A.    That's got nothing to do with in network or

19   out-of-network.  In-network means that we contract for

20   specific prices with various doctors and hospitals who will

21   give us preferred pricing.  Out-of-network physicians charge

22   whatever they please.

23         Q.    Okay.  But stick with me for a second.  So in

24   the HealthWorks in effect in this table that you used,

25   somebody going to a doctor is submitting a claim or however it

168

1    gets done, simply for whatever the preferred, whatever the

2    negotiated rate is, correct?

3         A.    That's right.

4         Q.    They are not making a co-pay, nominal co-pay?

5         A.    Well, again, the HealthWorks plan has a health

6    reimbursement account that would pay first.

7         Q.    I see.

8         A.    And those dollars are applied first and when

9    those dollars are expended, then the employee experiences a

10   deductible, and that's limited up to an out-of-pocket maximum

11   if they stay within network.

12             If the employee experiences a catastrophic

13   medical event, the company pays for all of it.

14        Q.    Okay.  Let me go back to the sentence that I

15   asked Dr. Mulvey about in paragraph 23 of your declaration,

16   which starts at the bottom of 12.

17             "These savings, although the debtors believe it

18   will take time and education of employees to achieve, can be

19   substantial."

20             Tell me what you meant when you stated that the

21   debtors will -- believe it will take time and education for

22   employees to achieve the savings?

23        A.    Well, one of the key factors in HealthWorks is

24   the availability of medical information which we make

25   available to employees via the Internet, either through their

169

1    own homes, their own computers, or through company computers.

2    We contract with WebMD, a notable national source of medical

3    information, and gives them the ability to look up virtually

4    any medical malady that they may be dealing with, and also

5    have described for them medical procedures and included in

6    that is medical prices, what to expect should they go to the

7    doctor or hospital for a certain procedure.

8            And so what we were trying to do is get people

9    used to first investigating and looking into the sources for

10   information, taking that with them when they go to their

11   doctor or the hospital, so they are armed with enough

12   information so that they know about their own healthcare.

13           In addition to which, by paying the wellness

14   benefits, we're encouraging people to go to the doctors for

15   early detection.  And so we provide a hundred percent paid

16   benefit for these wellness features.

17           Q.   And for the locations where you had HealthWorks

18   in place for a while, how long has it taken for the company to

19   realize the savings?

20           A.   It seemed as though when we put this in it was

21   very well received.  It still has been well received, and from

22   our examination of paid claims data, it took less than a year.

23           Q.   Looking at the location pre-HealthWorks and the

24   same location post-HealthWorks.

25           A.   That's correct.

170

1    Q.   And give me an example of your first-year

2    savings.

3        A.   In our first year savings, we were virtually

4    able to eliminate the effects of medical inflation on a group

5    that was already included in HealthWorks.  And at that time,

6    that was about 12, 13 percent medical annual inflation for the

7    country as a whole.  Our medical inflation for the second year

8    following the first year was zero.  We were able to keep our

9    paid claims level in the second year, identical for the first

10   year.

11       Q.   The HealthWorks network, is that something that

12   HealthWorks itself runs or does Dana contract separately for

13   that?

14       A.   It's a combination of many things.  Dana has

15   built and administers several of its own networks.  We have

16   contracted for the services of American Health Group, which is

17   a group of physicians who run a company that both are third

18   party administrator and contractor for networks, plus, in

19   addition, we contract with various national networks like, for

20   instance, the Beach Street Network.  So where we can't build

21   one of our own, we find one and rent space on it, that's what

22   it's called in the trade, and we'll take advantage of local

23   networks already in place.

24            (Counsel confer.)

25       Q.   You mentioned that HealthWorks is already in

171

1    place at a number of the facilities, unionized facilities, is

2    that correct?

3            A.   That's correct.

4            Q.   Where is it in place?

5            A.   It's in place for the union workers at Fort

6    Wayne, Indiana.  It's in place for the union workers at

7    Elizabethtown, Kentucky, it's in place for the union workers

8    at Auburn Hills.  It's also in place for a number of other

9    union locations which you've already established

10           Q.   By virtue of the collective bargaining agreement

11   with the applicable union?

12           A.   Yes.

13           Q.   And, so these were negotiated prior to the

14   bankruptcy, right?

15           A.   Yes.

16           Q.   When or for how long did they been in effect,

17   I'm sorry?

18           A.   The Fort Wayne -- HealthWorks went into effect

19   for the Fort Wayne union workers I think a year ago.  And many

20   of the other plants have been in effect since either the

21   plants has been opened or as long as HealthWorks has been in

22   effect, which is now -- that's now three years ago.

23           Q.   Is, at those locations, the unionized locations

24   you just mentioned, is it the only plan in effect?

25           A.   I'm sorry, I --

172

1          Q.    Is it the only health plan in effect at those

2      locations?

3          A.    Yes.  HealthWorks is in effect at those

4      locations for salaried employees in what we call the 2007

5      version, and for the union employees, there are slight

6      differences in their insured benefits like life insurance,

7      AD&D, and disability.  Otherwise, it's the same HealthWorks.

8          Q.    Again, and those differences were the product of

9      negotiations?

10         A.    Yes, they were.

11              MS. CECCOTTI:  No further questions.  Thank you.

12              MR. JIMENEZ:  Your Honor, could I ask for a

13      two-minute recess before redirect?

14              THE COURT:  Two minutes.  We'll take a recess.

15              (Recess taken.)

16              THE COURT:  Are you ready?

17              MR. JIMENEZ:  I am, your Honor.

18              THE COURT:  Gentlemen, we're proceeding.

19              MR. MAYER:  I'm sorry, your Honor, I apologize

20      for the delay.  We have two small questions which we think

21      it's appropriate to ask prior to redirect.  We've been

22      conferring with the debtor over the appropriateness of asking

23      one of them, given it's potential sensitivity.  I just need

24      thirty seconds to confer with my partner.  Could I beg the

25      court's indulgence for an additional thirty seconds?

173

1              THE COURT:  Go.

2              (A pause in the proceedings.)

3   CROSS-EXAMINATION BY MR. MORELAND:

4         Q.   Mr. Arquette, Thomas Moreland for the unions.

5   Were you present in court for the examination of Mr. Bueter

6   yesterday?

7         A.   Yes, I was.

8         Q.   And do you recall his testimony that with

9   respect to the 1113 motion, the potential cost savings to Dana

10  if the motion is granted is 28 million?

11        A.   I remember that line of questioning, yes.

12        Q.   And is that figure in agreement with your own

13  understanding that 28 million is the savings that would be

14  realized if the 1113 motion is granted with respect to the

15  five plants that are included in the motion?

16        A.   I don't have any reason to disagree with

17  Mr. Bueter's testimony, no.

18              MR. MORELAND:  Thank you.

19              MR. JIMENEZ:  Very quick.

20  REDIRECT EXAMINATION BY MR. JIMENEZ:

21        Q.   Mr. Arquette, as you sit here today, you do not

22  know if the unions would be entitled to any claim at all if

23  the retiree medical benefits were terminated, do you?

24        A.   I have -- I don't have knowledge of that, no.

25              MR. JIMENEZ:  No further questions, your Honor.

174

1          THE COURT:  Thank you, sir.

2          (The witness is excused.)

3          THE COURT:  We'll take a ten-minute recess.

4          (Recess taken.)

5          MR. BENNETT:  Debtors will call Professor

6    Michael Wachter.

7          May I approach, your Honor?  We have a binder.

8    M I C H A E L    W A C H T E R , having been duly sworn, was

9          examined and testified as follows:

10   DIRECT EXAMINATION BY MR. BENNETT:

11         Q.   Professor Wachter, could you begin by telling

12   the court about your current professional position, please.

13         A.   Yes.  My current position is, I'm the professor

14   of law and economics, the William B. Johnson Professor of Law

15   and economics at University of Pennsylvania Law School.  I'm

16   also the co-director of the Institute For Law and Economics.

17         Q.   Could you tell the court what your educational

18   background is, please.

19         A.   My undergraduate degree is from Cornell in

20   industrial and labor relations.  I received that degree in

21   1964.  I then have a masters in economics and a Ph.D. in

22   economics from Harvard University in 1970.

23         Q.   Could you give the court an idea of your

24   academic experience.

25         A.   I came to Penn before I finished my Ph.D. by a

175

```
 1    few months.  So I came as a lecturer, then became an assistant

 2    professor, became a associate professor with tenure in 1973.

 3    Make sure I don't forget the decades.  Became a full professor

 4    in 1976.

 5                    In 1984, I became the director of the Institute

 6    For Law and Economics, and then in 1997, left the teaching and

 7    research for a bit and went to the provost's office where I

 8    was the deputy provost for Judy Rodin when she was first

 9    coming to Penn.  I was deputy provost for two years and

10    interim provost for the university for the year after that.

11                    Penn is a $2 million a year operation and my job

12    in that capacity was working with the twelve deans in their

13    academic planning and budgeting.  After I was through with

14    that in 1999, I decided for my last career move, I would start

15    teaching corporate law, and although I've continued to do a

16    lot of my research in economics and labor law, I now teach

17    corporate law and corporate finance.  The corporate finance is

18    really the MBA type economics course, rather than a law

19    course.

20           Q.    Could you give the court some idea --

21                 THE COURT:  Have you had courses in bankruptcy?

22                 THE WITNESS:  Excuse me?

23                 THE COURT:  Have you had courses in bankruptcy?

24                 THE WITNESS:  I have not, but I talk to the

25    bankruptcy experts all the time.
```

1        Q.    Could you give the court an idea of what part of

2    your scholarship has concerned labor economics?

3        A.    Over the years, certainly, about 75 percent of

4    my work, maybe even 80 percent, has been in labor economics.

5        Q.    Could you give the court an idea of your

6    involvement as a government consultant?

7        A.    Over the years, I consulted for a number of

8    government agencies in the 1970s.  I was fairly active

9    consulting for the Department of Labor, occasionally the Board

10    of Governors, the Council of Economic Advisers.  I stopped

11    doing that when I switched over to doing law and economics

12    because my interest base had switched a bit.

13            However, I became a consultant to the Postal

14    Service in 1980, involving their collective bargaining.  They

15    had asked me to do a wage study in 1980.  I did that study for

16    them and they then decided to use that in collective

17    bargaining.  They did use it in collective bargaining, and

18    then I began to appear as their expert witness in all the

19    major interest arbitrations that have taken place between 1981

20    and basically the current year.

21        Q.    You mentioned interest arbitrations.  What are

22    those?

23        A.    Well, basically, the difference from grievance

24    arbitrations, the interest arbitrations in setting wages and

25    benefits rather than -- for the entire unit rather than a

177

1    grievance that an individual worker might have.

2         Q.   Other than these Postal Service interest

3    arbitrations, have you had any other involvement as a labor

4    economics expert in litigation matters?

5         A.   I have over the years.  Most recently, I

6    participated as an expert witness in a number of major

7    bankruptcy cases involving United Air Lines, Delta Airlines,

8    and Delphi and Tower Automotive.  I also did studies for

9    USAir, but did not testify in that case.

10        Q.   Okay.  Do you have some familiarity with the

11   norms and standards for conducting a wage and benefit

12   comparability study?

13        A.   Yes, I do.  And some of my work really related

14   to the original postal contract was to help develop some of

15   those norms that are now used in comparability, and a number

16   of my articles in 1980 -- in the 1980s sort of developed how,

17   when to do a comparability analysis study.

18        Q.   Have you used those norms and standards in

19   connection with in case?

20        A.   Yes, I have.

21        MR. BENNETT:  Your Honor, at this point, we

22   would tender Professor Wachter in as an expert in the field of

23   labor economics and specifically with regard to wage and

24   benefit comparable studies.

25        MR. DeCHIARA:  Your Honor, we have no objection

178

1    to the witness being qualified as an expert in labor

2    economics.  I just want to make clear for the record, we're

3    not agreeing that he's an expert in the United States auto

4    parts industry.

5              MR. BENNETT:  Okay.  I don't think that's a

6    limitation --

7              THE COURT:  I don't see that that's a

8    limitation.  He's recognized as an expert.

9              MR. BENNETT:  Okay.  Assuming he's qualified to

10   testify, we'll proceed.

11             THE COURT:  He's qualified.

12        Q.   Could you turn to tab A in your binder, which is

13   Debtor's Exhibit 8.

14        A.   Yes.

15        Q.   And tell the court just in very brief terms what

16   that is.

17        A.   This is a study that I prepared for Dana on

18   doing a wage and benefit comparability study.

19        Q.   And have you received any additional information

20   since this study was completed at the end of January 2007?

21        A.   Yes.

22        Q.   Could you tell the court what else you've gotten

23   since then.

24        A.   We did not have completed at the time we had to

25   file the report the cost savings the company expected from

179

1    their benefits proposals.  We also obviously did not have the

2    Voos and Helper reports and discovery depositions and the

3    discovery material that resulted from those reports and

4    depositions.

5              MR. BENNETT:  At this point, your Honor, we

6    would offer Debtor's Exhibit 8.

7              MR. DeCHIARA:  No objection.

8              THE COURT:  Received.

9              (Debtor's Exhibit 8, received in evidence, as

10   of this date.)

11        Q.   Just as a background question, here, step back

12   for a second, would you tell the court in broad terms, what is

13   a wage and benefits comparability study?

14        A.   Wage and benefits comparability study is a very

15   core concept.  What it does is, it takes, let's say, using

16   Dana as the obvious example, a look at Dana's employees, look

17   at their skill levels, look at the wages and benefits they are

18   paid, and compare them to private sector workers who are

19   comparably skilled and look at what wages and benefits are

20   paid across the private sector of the economy.

21              And then we calculate from that whether Dana

22   pays the market wage, which is the economy-wide wage, or pays

23   a wage premium, which would be a wage and benefits, a

24   compensation premium, a wage and benefits premium compared to

25   the market, or whether they have a deficit, that is, their

180

1      wages and benefits are below market levels.

2              Q.    And why in general terms do you want to do such

3      a study?

4              A.    The main reason besides an academic one that one

5      might want to just publish the articles, and I've done a fair

6      amount of that, is that for a firm that's in a competitive

7      labor market, whether or not it pays comparable compensation

8      is an extremely important part of their competitiveness.

9      Labor costs tend to be a very important and variable component

10     for different firms.  Most firms, let's say in the auto parts

11     industry can buy the same capital equipment.  Where they may

12     differ is in terms of their labor costs.  That can be very

13     variable.

14              If a firm pays a wage premium and a benefits

15     premium, it will find itself in a less competitive position

16     because, by definition of what the market --

17              (Telephone interruption.)

18              THE COURT:  You'll have to speak up.

19              Q.    You'll have to speak up as well.  The microphone

20     is not on.

21              A.    Okay.

22              Q.    We were talking about the need for a

23     comparability study and I think you had started to say that

24     that had something to do with the competitiveness of the firm.

25              Could you complete that thought, please?

181

1          A.   Yes, I was saying it's a very important part of

2     competitiveness.  Taking Dana as an example, if it pays a

3     premium compensation package, then a competitor can open up,

4     let's say, in the south, hire American workers, it's an

5     American plant, and underprice Dana with respect to the price

6     of the product because their labor costs can be considerably

7     lower than Dana, given, as I will show, the size of the

8     premium that they pay at least in some of their plants.

9          Q.   And have you done a wage-and-benefits

10    comparability study in this case?

11         A.   Yes, I have.

12         Q.   And how long did that process take, in rough

13    terms?

14         A.   The report itself, which had the initial study,

15    took roughly a month-and-a-half.

16         Q.   Okay.  And can you give us an idea, taking a

17    look first at Debtor's Exhibit 46, tab B, can you tell us

18    whether that's a chart that was put together at your

19    direction?

20         A.   Correct, yes.  This is my chart.

21         Q.   And looking at that, you've got several

22    categories.  One is wages and salaries, one is total benefits,

23    and one is total compensation.

24              Could you tell the court what that refers to?

25         A.   Certainly.  The wages and salaries are what one

182

1    gets paid in the check form after taxes.  The total benefits

2    refer mostly to insurance.  The big component there is medical

3    insurance.  It also includes retirement plans.

4            If you add wages and salaries to benefits, with

5    benefits, you get total compensation.

6            So total compensation is sometimes referred to

7    as the all-in number, and then it has all the benefits and the

8    wage costs in it.

9        Q.   Compensation is the big picture number?

10       A.   Compensation is the big picture number.  And the

11   key number for competitiveness because, as far as a firm's

12   ability to price products, what matters is its labor costs,

13   and that includes benefits as much as wages.

14       Q.   Okay.  And the category here that says, "Dana,"

15   on Debtor's Exhibit 46, where does that information come from?

16       A.   That information I obtained from Dana itself

17   from their payroll files.

18       Q.   And there are five particular plants that are

19   listed here.  Auburn Hills, Fort Wayne, Lima, Marion and

20   Pottstown.  Could you tell the court why there was a focus on

21   those particular five plants?

22       A.   These were the five plants that --

23            (Brief interruption.)

24            THE COURT:  Go ahead.

25       Q.   You might, Professor, want to pull the

183

1    microphone just a tad closer to you.

2         A.   It's working now?

3         Q.   I think it is.  Okay.  We were looking at

4    Debtor's 46, the five different plants there, and I had asked

5    you, I think, why you had focused on those five particular

6    plants.

7         A.   These were the five plants that have wage

8    reductions.  We didn't have that much time to do the study.

9    We had to complete it for the deadline of the filing of the

10   report.  And we decided to limit the study to the five plants

11   that had planned wage reductions.

12        Q.   And do you know whether Lima and Pottstown in

13   particular are plants that are subject to the 1113 motion?

14        A.   It's my understanding that they have a

15   collective bargaining agreement that has expired and is being

16   renegotiated.

17        Q.   Did you visit any of these plants yourself,

18   Professor?

19        A.    I did.  I visited Pottstown, which is not that

20   far from my home in Auburn Hills during the last of the ice

21   storms that hit the Midwest and east.

22        Q.   Could you tell the court just in brief terms

23   what you observed during the course of those plant visits.

24        A.    Very generally, when I arrived, I spent some

25   time talking to the plant manager, perhaps for an hour or so,

184

1    maybe more.  We then did a tour of the plant, visiting

2    essentially each of the workstations.  Then we went back to

3    the plant manager's office and they gave me opportunities to

4    ask a whole set of questions, which I did, about the operation

5    of the plant, their ability to recruit workers.  At Auburn

6    Hills, where there's a second tier, how that was working, and

7    all of the questions that were relevant to my study.

8         Q.    Okay.  Still looking at Debtor's Exhibit 46, the

9    next column there, next to the Dana information, the next

10   column there says, "Comparable private sector workers."

11              Could you tell the court what the source of that

12   information is.

13        A.    The source of that is from the Bureau of Labor

14   Statistics of the Department of Labor.

15        Q.    Why did you choose that source?

16        A.    It's the authoritative source on wages.  Also on

17   benefits, the employer costs of employee compensation are the

18   two components, the wage and benefit studies that I use in

19   most of my labor economics research.

20        Q.    Now, did you have any involvement in the

21   selection of comparable worker positions for purposes of this

22   comparability study?

23        A.    I determined them.

24        Q.    And how did you do that?

25        A.    Well, I worked with Chris Bueter, who is a, who

1    I believe has testified before the court.  Chris in a sense

2    owns their classification system, and what I asked Chris to do

3    under my direction was to match the -- his job categorizations

4    into those of the national compensation survey.

5              We went back and forth on this a fair amount.  I

6    closely validated all of the matches he did.  A few of them we

7    talked about at some length.  Two of them were changed.  One

8    resulted in an upgrading of the skill, the other in a

9    downgrading of the skill.

10             THE COURT:  Were they matched geographically?

11             THE WITNESS:  No, they were matched -- my

12   concept is that we have a national labor market and they were

13   matched to the average compensation of comparable workers

14   across the economy.

15             Q.   Okay.  Just in terms of the categories of

16   workers, can you give the court an idea, a general description

17   of the categories of workers that are involved in this

18   comparability analysis?

19             A.   Yes.  Most of the workers at these plants are

20   production workers.  And I forget exactly what the number, but

21   it's something like 70 percent of the workers at these plants

22   are production workers.

23             Of that 70, over 80 percent fit into the

24   category known as lathe operators.

25             Q.   Okay.  And --

186

1          A.   Maybe I should mention the other 14 are

2    assemblers, mostly assemblers and balance technicians.  There

3    are other few other of the semiskilled trades.

4          Q.   Okay.  We now get to the last part on the chart.

5    We've got the Dana information, we've got the comparable

6    private sector workers information.  And then you've got a

7    category called, "Dana difference."

8               Could you explain to the court what that

9    represents.

10         A.   Yes.  That's -- that is the premium, and these,

11   the numbers are all positive so they are all premiums rather

12   than deficits, and they are calculated simply as a percentage

13   difference between the Dana wage and the comparable private

14   sector wage.

15         Q.   Okay.

16              MR. BENNETT:  We'll offer Debtor's Exhibit 46,

17   your Honor.

18              MR. DeCHIARA:  No objection.

19              MR. MORELAND:  Your Honor, on behalf of the

20   creditors' committee, we've had testimony that the Lima and

21   the Pottstown plants are not part of the 1113 motion.  In

22   light of that, we would move to strike the portions of this

23   exhibit and Debtor's -- well, it's tabs B, C and D, Debtor's

24   Exhibits 46, 55 and 56, which deal with Lima or Pottstown as

25   irrelevant to this motion.

187

1          MR. BENNETT:  Your Honor, it gives you actually

2     more information, it actually helps the court more.

3          THE COURT:  We'll see where it's all subject to

4     connection, absolutely.  The objection is overruled.

5          MR. BENNETT:  Thank you, your Honor.

6          THE COURT:  The document is received.

7          (Debtor's Exhibit 46, received in evidence, as

8     of this date.)

9          Q.   Professor, could you tell the court whether you

10    have a familiarity with a concept called "quit rates"?

11         A.   Yes, I do.

12         Q.   And could you tell the court in substance what

13    you think of when you think of quit rates.

14         A.   Quit rate analysis is something that I always

15    do, at least when the data are available, to validate what I

16    have found in terms of the existence of a wage premium.

17              A quit is a voluntary termination when a worker

18    leaves a firm, essentially to find another job.  It's a

19    voluntary quit because the worker is going to another job.  It

20    excludes workers who leave the firm to retire.  It excludes

21    layoffs, and it excludes terminations.

22              So what we're looking at, then, are those people

23    who are essentially looking for what you might call better

24    jobs.  And so it really provides them --

25              (Telephone interruption.)

188

1          MR. BENNETT:  Shall I go ahead?

2          THE COURT:  Go ahead.

3      Q.   In broad terms, why do you want to do a quit

4  rate review?

5      A.   As I stated, what's in the quit rate is the

6  people who were leaving essentially because they think they

7  can get a better job or one that they'd prefer.

8          What has been validated in an extensive number

9  of studies is that firms that pay high wages and benefits are

10  likely to have a very low quit rate because there isn't an

11  opportunity to get a better job.  Where firms that pay more or

12  less market wages will have an average quit rate and firms

13  that may be in a deficit position will have a very high quit

14  rate.

15          So it's a way of testing the basic core results

16  from the wage and benefits comparability analysis.

17      Q.   Have you done a quit rate study in this case?

18      A.   Yes, I did.

19      Q.   Okay.  I'll have you turn to Debtor's

20  Exhibit 56, which is tab D in your binder.  Could you tell the

21  court whether that was put together at your direction?

22      A.   Yes, it was.

23      Q.   And does this chart contain any revised

24  information as compared to your original report?

25      A.   As it shows, Auburn Hills, we had some real

189

1    questions about the quit rate information that had been given

2    to us.  We asked them to go back and validate it, looking at

3    each of the individual records of workers who had left the

4    plant and these numbers are then revised from the original

5    report.

6          Q.    Okay.  Now, this one at the top, looking at

7    Debtor's 56, gives you information from the private sector in

8    general, and the manufacturing industry; do you see that?

9          A.    Yes, I do.

10          Q.    And what is the source of data for those

11    categories?

12          A.    This comes from the government.  It's called the

13    JOLTS survey.  It's a fairly recent data source that the

14    government has begun collecting.  They used to collect it in

15    the 1980s, then they stopped collecting it, but it resumed

16    fairly recently.

17          Q.    Now, you have information here from three

18    different years, Debtor's Exhibit 56 has 2004, 2005 and 2006.

19    Do you have a view as to whether any of those years are more

20    important in terms of your opinion on the significance of quit

21    rates?

22          A.    We focus our attention on 2004, largely because

23    by 2005, the wave of bankruptcies in this industry had really

24    begun to bloom, and there was much more concern among the

25    employees, and logically so, you could imagine, that a worker

190

1    would be wondering, "Is my job going to continue, and maybe I

2    would take a worse job that I could count on rather than the

3    current job where I think I might be terminated."

4              So one would expect in those circumstances where

5    you fear that you may be terminated in your job, that you will

6    take another job, even if it's less attractive.  So one would

7    expect the quit rates to go up the more talk there was of,

8    beginning with the Tower's bankruptcy, Delphi's bankruptcy,

9    Collins and Aikman's bankruptcy and knowing that Dana wasn't

10   making money.

11        Q.   What about in terms of the situation of Dana in

12   particular, what would you expect over that period of time?

13        A.   I would expect the quit rates to increase.

14        Q.   And why is that?

15        A.   Essentially because the workers that had other

16   opportunities would take them rather than face the risk of

17   losing their job.

18        Q.   Now, looking at the information that you've

19   gathered here, the comparison between private sector

20   manufacturing and -- private sector and manufacturing quit

21   rates in that period, and then the quit rates at the Dana

22   facilities, can you tell the court whether you came to some

23   overall conclusion about the significance of that data?

24        A.   Yes.  The quit rates at these five plants is

25   considerably below that for the private sector, considerably

1    below that for the manufacturing industry.  It's worth noting

2    in addition, since there are different categories of

3    employees, Dana has three categories of employees; the skilled

4    workers, the production workers, and the service workers.  And

5    most of the quits are in the skilled category, which happens

6    to not pay a wage premium.  The wage premium is in the support

7    workers, which I called service workers, and the production

8    workers.

9                So the quits we're observing are largely among

10   the skilled workers.  In some of these plants, literally no

11   production workers quit, or maybe one a year.

12               Q.   Okay.  And does any of your analysis take into

13   account the inclusion of, in part-time workers, in the general

14   set of information from the private sector for the

15   manufacturing industry?

16               A.   Dana does not have part-time workers.

17   Unfortunately for the comparison purposes, the JOLTS data does

18   have, it's a plant-wide measure.  The private sector does have

19   in private, obviously, some part-time workers, and so we

20   downplayed that comparison.  The manufacturing industry had

21   very, very few part-time workers.  So it provides a closer

22   match.

23               Even in the private sector, there simply aren't

24   enough part-time workers to create that large of a difference

25   as exists between the private sector and the data plants.

192

1          Q.   But if you focus just on the manufacturing

2     industry, where there are fewer part-time workers, what

3     conclusion do you reach?

4          A.   If one looks down the chart for 2004, you see

5     the quits at Pottstown is 1.6 quits compared to manufacturing,

6     14.9.  In Auburn Hills, which is a newer plant, the quit rate

7     was 7.5 percent, which is still half the quit rate for the

8     manufacturing industry.

9               MR. BENNETT:  Your Honor, we'll offer Debtor's

10    Exhibit 56.

11              MR. DeCHIARA:  Your Honor, if I may have some

12    voir dire on this document?

13    VOIR DIRE EXAMINATION BY MR. DeCHIARA:

14         Q.   Professor Wachter, if I could ask you to turn to

15    page 24 of your report, and in particular, I'm referring to

16    table IV.4, to you see that?

17         A.   Yes, I do.

18         Q.   And it indicates that the 2006, or the 2005 quit

19    rate at the Auburn Hills facility is 20 percent, do you see

20    that?

21         A.   Yes.

22         Q.   And on Debtor's Exhibit 56, the 2005 quit rate

23    is 4.5 percent, about -- a fraction of that, correct?

24         A.   Yes.

25         Q.   And going back to page 24, the table in your

193

1   report indicates the 2006 quit rate is 38 percent; do you see

2   that?

3        A.   Yes.

4        Q.   And on Debtor's Exhibit 5, the 2006 quit rate

5   for Auburn Hills is 9.4 percent, do you see that?

6        A.   Yes.

7        Q.   Again, a small fraction of what it was in your

8   original report.

9        A.   Yes.

10       Q.   And who provided you these new percentages?

11       A.   When I saw the percentages, I was curious about

12  them, and I asked Chris Bueter to check all the records in

13  that plant.  The quit rate is not a number that most firms are

14  even familiar with in terms of differentiating between people

15  who are retiring and people who are leaving to find another

16  job.

17            And at the plant level, what I found in a lot of

18  the studies that I've done with a lot of the companies is that

19  you have to go back to whoever is collecting the quit rate

20  data and ask them, you know, questions as to whether they have

21  done it properly, and in Auburn Hills, they had simply

22  included too many workers who either had retired or had been

23  terminated, and had counted them as quits, because they had

24  done it as a quick request for our benefit.

25            We then had the other numbers checked as well.

194

1    Q.    I'm sorry?

2    A.    We had the other numbers checked as well.

3    Q.    Did you ask Chris Bueter go back to the other

4    four plants and do the same analysis?

5    A.    Yes, we did.

6    Q.    Were you provided a breakdown at Auburn Hills of

7    how many of the original -- when you say in your original

8    report that there was a 38 percent quit rate, are you saying

9    there was a 38 percent attrition rate, in other words, there

10    was a 38 percent separation from employment rate, but only

11    some of that was made up of voluntary quits, was that your

12    understanding?

13    A.    No, that's not my understanding.  I think at

14    Auburn Hills, they had just muffed the job.

15    Q.    And they muffed it by a magnitude of 4 or 5

16    times what it was.

17    A.    If you don't know what you're doing, and that's

18    not surprising, 'cause it's a different concept, you can muff

19    it big.

20    Q.    And they muffed it big.

21    A.    They muffed it big.

22    Q.    And when did they tell you that they had muffed

23    it big?  When did you get this information?

24    A.    I forget exactly.  Obviously after this report

25    was filed.

195

1      Q.   Your original report was filed, well, it's dated

2   January 31st, 2007.  Does that help you place in time when you

3   got the updated report on the Auburn Hills quit rates?

4      A.   Clearly after that date.

5      Q.   But can you tell me with any precision more than

6   that when you received it?  Was it in February?

7      A.   I really do not know.

8      Q.   Was it since the beginning of March?

9      A.   If -- this is guessing, and I -- my guess is

10   that you don't want me to guess, but if I were guessing I

11   would guess that I got it in late February.

12      Q.   Was that your best estimate, late February?

13      A.   And that's a guess.

14      Q.   Okay.  And was there any, other than going back

15   and finding out they had been mistaken, there was no event or

16   development that had changed the facts as to the quit rate,

17   correct?

18      A.   I'm not -- I don't understand the question.

19      Q.   The quit rate at --

20      THE COURT:  Your voir dire is degenerating into

21   a cross-examination.

22      MR. DeCHIARA:  Let me get to the point, your

23   Honor.

24      THE COURT:  Please.

25      MR. DeCHIARA:  We have a detailed scheduling

196

1    order in this case that was ordered by the court, I think it

2    was actually drafted by debtor, provides quite clearly that

3    all exhibits need to be marked by March 9th, 2007.  It has one

4    exception.  That's for matters arising out of depositions that

5    were taken after that date.  I think also, a common sense

6    exception that's not expressed would be for events that

7    occurred after that date.

8           This would fall into neither category.  This is

9    information that the company could have gotten to this expert

10   at any time the before March 9th, and in fact, the witness'

11   best guess is that they did in fact get it to him before March

12   9th.  Yet we got this exhibit over this weekend.  We got this

13   on Saturday.  And therefore, it's untimely under the Debtor's

14   own draft and this court's own schedule order and on that

15   basis, we object for its admission.

16           MR. BENNETT:  If I may, on that score, this is a

17   no-harm-no-foul sort of situation.  They decided they didn't

18   even want to take Professor Wachter's deposition.  So -- and

19   they have had information on the backup for this for some

20   period of time.  This is also, as far as it goes, something

21   that did come out over the weekend.  This is the first time

22   they are telling us they think there's something inadequate

23   about the time frame associated.

24           MR. DeCHIARA:  Your Honor, if I may, first of

25   all over the weekend, we provided as we were required to under

197

1   the scheduling order a written communication to the debtor

2   specifically preserving the objection as to the untimeliness

3   of all the post-March 9th exhibits, and I would include this

4   exhibit.  So they have been on notice.  The reason we're

5   raising the objection now is because this is when it's being

6   moved into evidence and whether or not we took Mr. Wachter's

7   deposition is entirely irrelevant.

8                THE COURT:  Okay, he's given you a best guess.

9   And I don't see any great harm in allowing it.  It's admitted.

10               (Debtor's Exhibit 56, received in evidence, as

11  of this date.)

12               MR. BENNETT:  If we have Debtor's 56 in

13  evidence, I'll move on, your Honor.

14  DIRECT EXAMINATION BY MR. BENNETT (Cont'd.):

15       Q.   Professor Wachter, did you have any involvement

16  in the formulation of the Debtor's proposals to the unions in

17  this case?

18       A.   No, I did not.

19       Q.   Have you had any involvement in the negotiations

20  involved in the case?

21       A.   I had no involvement nor do I know what

22  particularly is going on.

23       Q.   Have you had an opportunity to review the

24  proposals that were put forward to you?

25       A.   Yes.

198

1          Q.    And have you had an opportunity to analyze those

2     proposals with regard to a comparison to general market

3     information?

4          A.    Yes.  I had the information on the proposed wage

5     reductions in time for the filing of the original declaration.

6     So the evaluation of the wage reductions is there.

7                I did not have the cost savings they were

8     estimating for the benefits.  And that came in after the

9     filing of the report and that is now contained in this report.

10         Q.    Okay.  Well, let me get you, then, to tab C in

11    your binder, Debtor's Exhibit 55.  Could you take a look at

12    that and tell us whether that was put together at your

13    direction.

14         A.    Yes, it was.

15         Q.    And is any part of what we see here on Debtor's

16    Exhibit 55 equivalent to what we saw on the prior Exhibit, 46?

17         A.    The match with the private sector is the same.

18    So the column, "Comparable private sector workers," those

19    numbers are the same between the two tables.

20         Q.    Okay.  And the data on the left side under Dana

21    matched up with the various plants, where does that

22    information come from?

23         A.    This is the new data that subtracts from debtor

24    Exhibit 46, which is the current wages and benefits, it

25    deducts from the column 1 in that exhibit the cost of the

199

1    benefit savings per hour.

2          Q.    Okay.  And now, with that revision to the

3    information so that we're looking at the effect of the

4    proposals, what does the Dana difference on the right-hand

5    side, what does that represent?

6          A.    With respect to wages, the proposal essentially

7    brings Dana's wages into rough comparability with the private

8    sector.  There's one small positive number.  There are a

9    couple of small negative numbers.  And then there's a zero for

10   Fort Wayne.

11         Q.    And with regard to overall compensation, what's

12   the effect?

13         A.    The benefits, the cost of benefits is

14   significantly reduced from the current levels but not enough

15   to bring it into alignment with the private sector.  The

16   result is a continuing substantial benefits premium that

17   results in a total compensation premium that varies from four

18   percent at Marion to fifteen percent at Pottstown.

19         Q.    And based on that comparison, do you have an

20   opinion as to whether, if these proposals were implemented,

21   Dana would have an ability to retain a satisfactory workforce?

22         A.    I don't think there's any question that they

23   would be able to attract and maintain a quality workforce.

24               MR. BENNETT:  Your Honor, we'll offer Debtor's

25   Exhibit 55.

200

1              MR. DeCHIARA:  Same objection, your Honor.  We

2    received this over the weekend.  The information in the first

3    column, there's no -- deals with the company's proposals.

4    There's no reason this information could not have been

5    provided to us, the unions, before the March 9th deadline.

6    And the second column deals with 2006 information that was

7    included in Professor Wachter's original report, so again,

8    it's untimely under the scheduling award.

9              MR. BENNETT:  Well, half of what's there is in

10   his original report, the whole thing about private sector

11   workers.  The other hand on the left-hand side, the wages part

12   was in his original report.  The addition I believe is the

13   benefits part.  That's it.

14              THE COURT:  It's admitted.

15              (Debtor's Exhibit 55, received in evidence, as

16   of this date.)

17        Q.   Do you have some knowledge, Professor Wachter,

18   of a two-tier wage system at any of the plants?

19        A.   Yes, I do.

20        Q.   What is the basis for your understanding about

21   the two-tier wage system?

22        A.   First, what I learned from Chris Bueter in terms

23   of original discussions with him, what plants had an incentive

24   system, and then, from my -- I'm sorry, I misspoke there --

25   what firms had a two-tier, and then for my visit to Auburn

201

1    Hills, Auburn Hills is the one plant that's had a two-tier in

2    operation for some time, and some real experience in terms of

3    how that has worked out.

4        Q.   Okay.  I think you said what firms.  Did you

5    mean what plants?

6        A.   Yes, I'm sorry, what plants.

7        Q.   That's fine.  Just in broad strokes for the

8    court, to remind the judge, what is the nature of this

9    two-tier system?

10       A.   The nature of the two-tier system enables Dana,

11   and specifically at two of the plants, to hire workers at a

12   lower wage than is paid to the incumbent workers.  This is a

13   voluntary agreement that was worked out with the UAW.  And in

14   my visit to Auburn Hills, which again has one of the two

15   tears, and one that's been in operation for some time, the

16   plant manager talked, I have to say even eloquently, about

17   what his partnership with the UAW, and how this second tier

18   enabled him to expand production, expand employment, and has

19   made the firm, made the plant less unprofitable than it had

20   been before.

21           MR. DeCHIARA:  Objection, hearsay.

22           MR. BENNETT:  Okay.

23       Q.   Well, do you have some understanding as to

24   whether the two-tier system has been successfully implemented

25   at the plants where it is in effect?

202

1          A.    A lot of their production workers are two-tier

2    workers, and it's my understanding that the -- they've had a

3    very low quit rate from the two-tier workers.

4          Q.    And what, if anything, is the significance of

5    that for your opinion?

6          A.    I might mention just that Auburn Hills is the

7    one assembly plant in these five.  The others are machining

8    plants.  So what we have for Auburn Hills is clearly the

9    ability to hire assemblers who are very well qualified.  The

10   plant manager said these people are every bit as good and

11   productive as the incumbent workers, they were a great

12   addition to the plant, and what it says is that, in a sense,

13   my estimate of the market wage may even be too high in the

14   sense that on the second tier, you can hire workers and

15   maintain them at a lower wage level.

16          MR. DeCHIARA:  Your Honor, objection to the

17   statements of the plant manager going to the truth of the

18   matter.  It's hearsay.

19          THE COURT:  Well, it forms part of his opinion

20   and hearsay is admissible for an expert to testify to.  It's

21   the basis for his opinion, and I agree with you, it doesn't go

22   to the truth of the statements.

23          MR. BENNETT:  It goes to weight, actually.  You

24   can cross on the subject.

25          MR. DeCHIARA:  Your Honor, if I may refer the

203

1    court to Federal Rule of Evidence 73 which concerns the bases

2    of opinion testimony by experts, what it says is that hearsay

3    evidence can come in as a basis of an expert's opinion if it's

4    of a type reasonably relied upon by experts in the particular

5    field in forming opinions or inferences.  There's been no

6    foundational testimony suggesting that Dr. Wachter, in his

7    experience as a labor economist, has ever done any sort of

8    research where he has interviewed plant managers to make

9    opinions regarding the productivity of the workers there.

10              MR. BENNETT:  That can't possibly be the

11   standard.  That you have to have written a study in order to

12   rely on it.

13              THE COURT:  The objection is overruled.

14              MR. BENNETT:  Thank you.  I would note just for

15   the record when we get to it, their experts have used

16   information from union officials as the basis for their

17   opinions.

18              MR. DeCHIARA:  And your Honor, I will note for

19   the record, as you will hear tomorrow, our expert has made her

20   career of interviewing workers about their work life.

21              MR. BENNETT:  Okay.

22        Q.   The charts that we've looked at so far, do any

23   of those charts include retiree insurance costs?

24        A.   They do not.

25        Q.   Do you have any information about retiree

204

1    insurance costs with regard to Dana's situation?

2              A.    We do and they are in the body of the report, at

3    the plant level for these five plants.

4              Q.    Do you have general industry information about

5    retiree insurance costs for purposes of doing a comparability

6    study?

7              A.    Retiree insurance is unusual in the private

8    sector.  Not many firms have it.  The result is that the

9    government in its collection of data on private sector

10   benefits actually doesn't collect that as part of that data.

11   Therefore, we can't make a direct comparison with the numbers

12   published by the, in the ECEC report.

13             Q.    Based on the information that you do have with

14   regard to Dana, does that affect your opinion in any way?

15             A.    It has very little effect at Auburn Hills, which

16   has a relatively new plant and fewer -- relatively few

17   retirees.  It has a substantial effect on the benefit costs at

18   the other four plants that have an older workforce.  And many

19   retirees.

20             Q.    Okay.  We started talking about the experts for

21   the other side.  Are you familiar with Professor Paula Voos

22   from Rutgers?

23             A.    Yes.

24             Q.    And are you familiar with Professor Susan Helper

25   from Case Western?

205

1          A.   Yes, I should say I'm familiar with them

2    professionally in regard to some of these cases.

3          Q.   Yes.  Do you have some understanding of what

4    their role is in this case?

5          A.   They are the union's experts.

6          Q.   And were they also involved in the Delphi case?

7          A.   Yes, they were in union's experts in the Delphi

8    case as well.

9          Q.   And did you give some testimony in the Delphi

10   case?

11         A.   Yes, I did.

12         Q.   And did you conclude that there was a

13   compensation premium at Delphi?

14         A.   Yes.  I concluded there was a considerable

15   compensation premium at Delphi.

16         Q.   Did you use methods that are similar to the

17   methods that you used here?

18         A.   Yes.  The same.

19         Q.   And did Professors Voos and Helper disagree with

20   you?

21         A.   They disagreed with me there, as they disagree

22   with me here, saying in various different ways that the

23   workers here do not have a wage and benefits premium and that

24   was their conclusion in that report as well.

25         Q.   Did the court in Delphi ultimately render some

206

1    opinion resolving this dispute between the experts?

2         A.   It's my understanding, I haven't followed this

3    very closely, but it's my understanding that in none of the

4    cases that I have testified in was there ultimately a court

5    ruling.  Instead, what has normally happened is, whether in

6    the middle of the trial or at the end of the trial, the

7    parties have a settlement.  That I do not believe has been

8    completed yet at Delphi, although there's been progress

9    towards that.

10        Q.   Have you learned any additional information

11   about the Delphi situation that is significant for your

12   opinion?

13        A.   Yes.  First of all, it was a buyout of some of

14   the workers at Delphi.  And second of all, Delphi has become,

15   being pursued by two private equity firms who are --

16             MR. DeCHIARA:  Your Honor, I'm going to object

17   to this line of testimony.  There's no foundation for this

18   testimony.

19             THE COURT:  I'll hear an explanation but I'm

20   inclined to sustain your objection.

21        Q.   What do you know about that situation at Delphi,

22   is that from the financial press and other sources describing

23   develop ments related to Delphi?

24        A.   That and the fact that, through the Institute

25   for Law and Economics, I have a fair number of private equity

207

1    people who are on the board and I talked to some of them about

2    it.

3                MR. DeCHIARA:  Your Honor, in light of this

4    testimony, I'll change my objection to one of hearsay.

5         Q.   Well, do you consider that information to be

6    reliable?

7                MR. DeCHIARA:  Your Honor, I have an objection.

8                THE COURT:  I'll allow it subject to connection.

9         Q.   Do you consider that information to be reliable?

10        A.   Yes.  Some of it's been very much in the public

11   press a number of times.  Certainly --

12               THE COURT:  That doesn't make it reliable.

13               THE WITNESS:  Excuse me?

14               THE COURT:  Being in the public press doesn't

15   make it reliable.

16               THE WITNESS:  Well, there have been reports of

17   negotiations where the private equity firms have been

18   interested in buying Delphi if they get wage and benefits

19   concessions.  It's my understanding --

20               THE COURT:  I'll sustain your objection.

21               MR. DeCHIARA:  Thank you, your Honor.

22        Q.   Okay.  Have you read the Voos and Helper expert

23   reports in this case?

24        A.   Yes, I have.

25        Q.   And have you seen their depositions in this

208

1  case?

2          A.    I've read their depositions, yes.

3          Q.    And has anything in those expert reports and

4  depositions changed your opinion in this case?

5          A.    Actually much of what they say is supportive of

6  my conclusions.

7          Q.    Okay.  Have you heard of something called the

8  "efficiency wage theory"?

9          A.    Yes, I have.

10         Q.    And do you have any idea of whether Professor

11  Helper is referring to the efficiency wage theory in her

12  expert opinion in this case?

13         A.    Yes, she is.

14         Q.    And could you give the court just a quick

15  summary of your understanding of that theory.

16         A.    The efficiency wage theory very briefly is that

17  a firm may pay higher wages than the market, attract either

18  workers who are more qualified or workers who will work harder

19  and smarter, because they want to keep this job because it's

20  an above-market job.

21                Critical to the efficiency wage model to work

22  is, there has to be ease of termination.  Because that's what

23  enables the firm to weed out the workers who really are

24  working harder and smarter from those who are not.

25         Q.    And that concept of the ability to terminate

209

1    unproductive workers has an essential element of efficiency

2    wage theory, has that been validated at all in the literature?

3         A.    Well, there are certainly theoretical models of

4    it.  I'm not familiar with any theoretical models that don't

5    assume as a critical part of the functions of the efficiency

6    wage model and ease of discharge.

7         Q.    Okay.  Do you have a view as to whether the

8    efficiency wage theory can be applied to Dana?

9         A.    It really can't be because Dana is a unionized

10   plant with a collective bargaining agreement and the discharge

11   mechanism is very different from the employment-at-will

12   mechanism, which you might think is good or bad, but is the

13   mechanism that is used in the efficiency wage model as the

14   mechanism of making sure that the firm gets these workers

15   within incentivized to work harder and smarter.

16        Q.    You had mentioned before this two-tier

17   experience at Dana.

18        A.    Yes.

19        Q.    Does that relate in any way to your opinions

20   about the applicability of the efficiency wage theory?

21        A.    Well, it goes to some of the comments of, I

22   believe both Voos and Helper that, if you were to reduce

23   wages, the workers would become less efficient.  And what we

24   have in the two-tier experience are workers who are being

25   hired at really a substantial discount to current wages and

210

1   it's my understanding that they are every bit as productive as

2   the workers on the tier 1.

3                   MR. DeCHIARA:  Objection, lack of foundation,

4   hearsay.

5                   MR. BENNETT:  What's the lack of foundation?

6                   THE COURT:  Overruled.

7                   MR. BENNETT:  He has a firm understanding of

8   Voos and Helper.

9           Q.   Separate issue regarding modeling of the

10  industry for purposes of the comparability study.  Do you have

11  some understanding that Professors Voos and Helper have some

12  critique of your study in that regard?

13          A.   Well, they have a number of different critiques.

14  Professor Voos in particular comes closest to doing a study

15  that looks like a comparability study even if she doesn't call

16  it that.  And has a number of very specific comments about my

17  methodology.

18          Q.   Now, does the market segment that Professor Voos

19  wants to focus on, how does that compare to the market segment

20  that you've looked at?

21          A.   Well, Professor Voos' analysis is actually of

22  the beginning of all production workers, and she's doing

23  analysis of all production worker wages and in a match with

24  Dana.

25                  My comparison is with the very specific workers

211

1    at Dana; namely, the lathe operators and the assemblers, who

2    I'm comparing much more narrowly to assemblers and lathe

3    operators in the private sector.  So she has a much broader

4    comparison than I do.  But then she moves from that to

5    suggesting that the right comparison from her perspective is

6    to focus entirely on the auto parts industry and the workers

7    and pay in the auto parts industry.

8            Q.   Do you have a view as to whether focusing on

9    just that segment is appropriate?

10           A.   I think it's a very bad idea.  It's a bit like

11   holding up a mirror to yourself.  Dana is a unionized plant, a

12   very large player in the field.  There are other unionized

13   plants that in some ways are like Dana in having very high

14   wage premiums.

15               We know, and substantiated by some of the

16   reports of Voos and Helper, that there are lots of layoffs in

17   the industry, that employment is declining, that essentially,

18   the auto parts industry, particularly the unionized part of

19   it, is in a crisis mode.  And I think comparing Dana largely

20   to the auto parts industry is just looking to continue the

21   problems that the firm is already in.

22               MR. DeCHIARA:  Your Honor, I have an objection

23   to that last piece of testimony.  The witness was not

24   qualified as an expert in the auto parts industry, and the

25   opinion he just rendered was an opinion on the state of the

212

1    auto parts industry.  He's not qualified to render that

2    opinion.

3                    THE COURT:  You'll have cross-examination.  I

4    know how to weigh testimony.  Overruled.

5                    MR. BENNETT:  Okay.

6            Q.    I'll ask you, Professor Wachter, to turn to tab

7    E in your binder.  And you'll see there Debtor's Exhibit 57.

8            A.    Yes.

9            Q.    Have you read the various UAW statements that

10   are excerpted there?

11           A.    Yes, I have.

12           Q.    And what, if anything, is the significance of

13   those statements for your opinion?

14           A.    It is clear that the union leadership recognizes

15   that there is a crisis in the automotive job market.  All of

16   these go to a significant loss of jobs, thousands of job

17   losses.  I think it's useful as a summary to read the last

18   statement from July 18, 2006, which is, I guess, roughly nine

19   months ago, where the union president said, "The brutal truth,

20   however, is that the U.S. has lost 240,100 automotive jobs

21   since February 2000.  Most of these job losses have occurred

22   in the auto parts sector," which is where Dana is, "As

23   companies have increasingly outsourced their production to

24   Mexico, China and other low wage nations.

25           Q.    Why is a --

213

1          MR. DeCHIARA:  Objection.  Your Honor, if that's

2   meant to come into the truth of the matter, I would object to

3   that statement as hearsay.  It's not part of an expert opinion

4   of a labor economist.  It's also, I would note, maybe I'm

5   jumping the gun here, your Honor, we have an objection to this

6   entire exhibit.  I can save it until there's the moving it

7   into evidence or I can raise it now.

8          THE COURT:  Raise it now.

9          MR. DeCHIARA:  Okay.  I have actually four

10  different objections to Debtor's Exhibit 57.  First of all,

11  it's hearsay.  It's a statement by a declarant who is not in

12  the courtroom, and he is not -- so it's hearsay.  There's --

13  it contradicts the best evidence rule.  The Federal Rules of

14  Evidence, and in particular, Federal Rule of Evidence 1006

15  says that you can have a summary of written texts when they

16  are so voluminous that it would be impractical to put the

17  entire text into the record.  There's no indication that that

18  is a problem here.

19          And the danger, the reason we have that rule, is

20  that these statements could well be taken out of context.  We

21  don't know what -- well, first of all, we don't know if these

22  statements are accurate, but even if they are, we don't know

23  what the UAW president said just before or just after that.

24  There's no context here.  They are just lifted out of,

25  purportedly lifted out of text.  So they are not best

214

1   evidence.

2            And lastly, again, they are hearsay and they don't

3   fall within the exception of the Federal Rules of Evidence

4   which allow an expert to rely on information that they

5   reasonably rely on in the course of their work.  There's no

6   foundational testimony that Professor Wachter relies on the

7   statements of the UAW president about the state of the auto

8   parts industry in doing a comparability study.  In fact, if I

9   could have just a second of voir dire is to ask Mr. Wachter

10  that question, your Honor.

11           THE COURT:  Are you finished?

12           MR. DeCHIARA:  I am with the statement.  I would

13  like to have the question of voir dire.

14           THE COURT:  I don't see the purpose of a voir

15  dire, because I'm going to rule on all your other arguments.

16  Let me hear the response.

17           MR. BENNETT:  First, in terms of context, I

18  don't think Mr. DeChiara managed to look at the remainder of

19  tab because the backup for all these statements is immediately

20  behind it.  This is a point of assistance for the court.  If

21  Mr. DeChiara thinks we misquoted something or he wants to give

22  context, it's all there.

23           THE COURT:  He has cross-examination.

24           MR. BENNETT:  It's all there for the court.  It

25  is an admission by the union and it does describe the state of

215

1    the auto parts industry.  If Mr. DeChiara is going to insist

2    that somehow there's a narrow limit on information, here's a

3    source of information that this expert can rely on and give

4    the court some information about.

5              MR. DeCHIARA:  Your Honor, I failed and my

6    colleagues have reminded me of yet another basis for objection

7    to this document.  This was provided to us over this past

8    weekend, this document.  You'll see the dates that are

9    provided to these quotes are from December 2005, January 2006,

10   July 2006, July 2006.  There's absolutely no reason in the

11   world, when this company was gearing up to do its 1113, and

12   there's been testimony in this court that it spent months

13   gearing up for this process --

14             THE COURT:  Counselor, this isn't Alice in

15   Wonderland.  I think everybody here in the courtroom

16   recognizes that there are severe problems in the auto parts

17   industry.

18             MR. DeCHIARA:  Your Honor, I'm not suggesting

19   that --

20             THE COURT:  The documents are admitted.  The

21   objection is overruled.

22             (Debtor's Exhibit 57, received in evidence, as

23   of this date.)

24             MR. BENNETT:  Thank you, your Honor.  At risk of

25   making a further statement after the court's ruled, all of

216

1    these things were shown to their experts in their depositions,

2    just for the record.  Okay.

3         Q.   Okay, let's go to tab F, please.  And you'll

4    note that this one again has the backup of Debtor's

5    Exhibit 201.

6         A.   Yes.

7         Q.   And have you read the statement from Susan

8    Helper that is excerpted in Debtor's Exhibit 58?

9         A.   Yes, I have.

10        Q.   And could you tell the court whether that

11   statement has any significance for your opinion?

12        A.   It certainly confirms what the union president

13   has said and as the judge has said, what really everybody

14   knows, that this is an industry in considerable trouble.  Just

15   read -- to read her last comment, because of its relevance to

16   my testimony in support of my testimony, "However, given

17   stagnant demand for cars and continuing productivity

18   improvements, it is true that employment in the industry would

19   probably shrink even the absence of global competition."

20        Q.   And why is that significant for your opinion?

21        A.   What it goes to is the idea that it is relevant

22   to look exclusively or mostly at the auto parts industry.  One

23   of the key concepts in economics is the opportunity wage or

24   what is the compensation that you can get if you were to leave

25   Dana and go elsewhere.

217

1          What Professor Voos is essentially saying is

2     that the wage you can get if you leave Dana is a wage

3     elsewhere in the auto parts industry.  And I think what this

4     evidence indicates is that there really aren't jobs there.

5     That jobs are shrinking rather than increasing, so that the

6     ability to, if you're displaced from Dana, to land another job

7     in the auto parts industry certainly in this area of the

8     country, is very small.

9          Q.    Okay.

10          MR. BENNETT:  We'll offer Debtor's 58, your

11     Honor.

12          MR. DeCHIARA:  Your Honor, I have the same

13     objections.  If this, if there is the backup, there's no

14     reason to put in Debtor's Exhibit 58.  Statements are taken

15     out of context.  It's also hearsay, and I also note that this

16     is a statement from July 17th, 2006, many months before this

17     proceeding.  There's no reason this could not have been

18     provided to the union by March 9th debt line as opposed to

19     over this past weekend.

20          THE COURT:  It's admitted.  I'll give it the

21     appropriate weight.

22          (Debtor's Exhibit 58, received in evidence, as

23     of this date.)

24          MR. BENNETT:  Okay.

25          Q.    Debtor's Exhibit 59 at tab G, please.

218

1          A.   Yes.

2          Q.   Have you read the presentation from Professor

3     Helper that is excerpted in this exhibit?

4          A.   Yes, and I -- it is an excellent presentation.

5          Q.   Okay.  And what, if anything, is the

6     significance of that information for your opinion?

7          A.   What this does is focus on another aspect of the

8     job losses in this industry.  The earlier remarks had a lot to

9     do with losses to international competitors.  Much of what is

10    going on in the industry is actually a shift from what is

11    sometimes called the rust belt to the southern plants that are

12    certainly U.S. plants but tend to be non-union.

13         Q.   Okay.  And do you have a view as to whether that

14    trend toward locating in southern areas is continuing in the

15    auto parts sector?

16         A.   I think it's useful to actually look at some of

17    the specific pages from her report.

18         Q.   You're going to Debtor's Exhibit 205, is that

19    right?  The backup?

20         A.   Yes.

21         Q.   Same tab.

22         A.   If you go to the page after Allied Automotive,

23    you begin to see some maps.

24         Q.   Okay.  And what's significant about that?

25         A.   What it shows is that in 1980, virtually all of

219

1    the employment in this industry was located in Michigan, Ohio

2    and Indiana, with literally no plants at all in the southern

3    or western parts of the country.  So it was right around

4    Detroit.

5              1980 by my counting is not so long ago.  And

6    clearly, as shown in her other, as you go one by one, what you

7    see is the evolution of a nationwide auto parts market.  So if

8    you get to 1996, while there still is considerable

9    concentration in Michigan, Indiana and Ohio, you now have

10   plants in the Carolinas, in Mississippi, in Tennessee, in

11   Oklahoma, in Missouri, in Texas, in Arizona, and California.

12             Q.   Do you have a view, Professor Wachter, as to

13   whether there is a national market for labor related to the

14   auto parts industry?

15             A.   As someone who has been a labor economist since

16   1969, when I began teaching at Penn, I've long been a firm

17   believer that the U.S. labor market is a national labor

18   market, and this is further confirmation of that.  Jobs move

19   very readily in the American economy, and in a relatively

20   short period of time, this industry has restructured so that

21   much of, many of the jobs are outside of the traditional rust

22   belt states.

23             Q.   Okay.

24             MR. BENNETT:  We will offer Debtor's Exhibit 59

25   as an aid to the court, but we'll also offer Debtor's 205,

220

1    your Honor.

2              MR. DeCHIARA:  Your Honor, the same objections

3    as before.

4              THE COURT:  Received.

5              MR. BENNETT:  Thank you, your Honor.

6              (Debtor's Exhibit 59, received in evidence, as

7    of this date.)

8              (Debtor's Exhibit 205, received in evidence, as

9    of this date.)

10         Q.   Going down to tab H, Debtor's Exhibit 60.  Have

11   you read the article from which this quote from Professor

12   Helper is taken?

13         A.   Yes.

14         Q.   And the information from Professor Helper

15   reflected there, does that affect your opinion in this case in

16   any way?

17         A.   Well, it certainly doesn't change it.  It's

18   further confirmation that the opportunity wage or for a Dana

19   worker, if this -- if Dana is not able to come out of

20   bankruptcy and restructure and there are significant job

21   losses, what Susan Helper is saying is that very few laid-off

22   workers will instantly find something equal to their skills

23   and former wages.

24              And as an academic like Susan Helper, we use the

25   term "instantly" when often we mean, you know, for many years.

221

1          Q.    And why is that significant for your opinion?

2          A.    Again, it goes to the question of whether it's

3    useful for Dana to hold a mirror up to its face and to do a

4    comparison of what looks like other Dana plants.

5          Q.    Why do you say that's significant?

6          A.    That's significant because, if workers lose

7    their job, they are not going to be able to find jobs in the

8    auto parts industry.  They will have to find jobs elsewhere

9    and I provide an estimate of what I believe to be the wage and

10   benefits they at best will receive in their next best job.

11              MR. BENNETT:  Your Honor, we'll offer Debtor's

12   Exhibit 60.

13              MR. DeCHIARA:  Your Honor, this is a quote taken

14   out of a newspaper article.  I would object on the basis of

15   hearsay.  I would also object to the testimony to the extent

16   the article says nothing as far as I can see about the auto

17   parts industry.

18              MR. BENNETT:  Your Honor, if you want to take

19   this subject to connection --

20              MR. DeCHIARA:  And it's also from October 11,

21   2004.

22              MR. BENNETT:  This is another one I actually

23   showed to Professor Helper, she said she had given the quote,

24   so obviously it's not hearsay in that regard since it's their

25   own expert, and if you need some connection for that, I'll

222

```
1    cross her on that subject.

2                THE COURT:  I'll allow it subject to connection.

3                (Debtor's Exhibit 60, received in evidence, as

4    of this date.)

5           A.   Perhaps I should add that it's clear that the

6    trend that she's talking about, both in this exhibit and the

7    prior one, has continued to the current time.  As someone who

8    does follow this industry and the unionized sectors of the

9    American economy in general, it is certainly the case that

10   this trend has continued.

11          Q.   Okay.  Do you have some familiarity with a

12   critique from Professor Voos on the subject of size of firms

13   and size of plants in your study?

14          A.   Yes.

15          Q.   And have you done any comparison that controls

16   for that in your analysis?

17          A.   Well, I don't think it's an appropriate control

18   variable, but my comparison group is, for production workers,

19   which are the bulk of the workers, are lathe operators and

20   assemblers.  Virtually -- well, I shouldn't say virtually all.

21   The great bulk of those employees work in manufacturing.

22   That's where that kind of work is done.

23                So that my comparison is largely with

24   manufacturing operations and, in addition, most manufacturing

25   plants tend to be either mid size or large.  And it turns out
```

223

1    that Dana's plants are the average establishment size for the

2    American economy.  The result is, since I'm using average Dana

3    wages compared to average economy-wide wages for these

4    particular skill categories, I essentially have in it, sort of

5    baked in it, a, essentially a midsized firm comparison,

6    because the Dana plants -- I'm sorry, midsized establishment

7    comparisons because that's what the Dana plants are.

8              So her argument that I don't control for it,

9    although I disagree with the need to control for it, is

10   already in the data because of the nature of the comparison

11   group.

12        Q.   Okay.  With regard to another critique about

13   matching specific skill levels, are you familiar with that

14   critique from Professor Voos?

15        A.   Yes, I am.

16        Q.   And did you go back and direct that there be

17   some further analysis to respond to that after you got the

18   Voos report?

19        A.    I did, although let me say it at the outset,

20   that I was surprised by the comment that I was not doing a

21   narrow enough comparison since my comparison is job to job,

22   lathe operators to lathe operators, assemblers to assemblers,

23   and her comparison is all production workers.  So her

24   comparison group will control for skill and occupation, is

25   much broader than is mine.  So one element of it is that she

224

1    really, in her study, and in her data and results, has a wider

2    comparison group than I do.

3              There is also a question raised about, even

4    within the narrow occupational categories that I have, namely

5    the lathe operators and the assemblers, whether the Dana

6    workers in these plants are more skilled than lathe operators

7    or assemblers in general.

8              I'm certainly familiar and have been with the

9    way these calculations are done by the Department of Labor,

10   and by firms that want to use their system.  I had Chris

11   Bueter essentially do this for the lathe operators, and he

12   confirmed that the lathe operators, and I did not give him any

13   of the wage data, I simply gave him the sheets to fill out, he

14   filled out the sheets and what came out of that was the lathe

15   operators at Dana, not surprisingly, are like, on average,

16   lathe operators throughout the economy.  Having been through

17   one of the plants where this is going on, this is the kind of

18   machinery you would expect to find in general in other plants.

19   These are what lathes look like and how they operate.

20        Q.   Okay.  You mentioned, I think, the comparability

21   analysis done by Professor Voos.  Do you know whether

22   Professor Helper did any kind of comparability study?

23        A.   If I could just interrupt for a second, I hadn't

24   actually finished on the last quote.

25        Q.   Go ahead.

225

1          A.    I also asked him about assemblers, and although

2    I did not have him do the matching, he said that assemblers at

3    Auburn Hills are less skilled than machining operators in the

4    other plants.  When we think of assembly --

5                MR. DeCHIARA:  Objection, your Honor, hearsay.

6    Your Honor, it's hearsay.  This witness is saying what Chris

7    Bueter said.  Chris Bueter was here to testify.  He did not

8    testify to this.  If the company wanted him to testify to

9    this, Chris Bueter should have been the one to testify so I

10   could have cross-examined him.

11               THE COURT:  I'll allow it.  He's here.  If you

12   want to call Mr. Bueter again, you may.

13          Q.    Go on.

14          A.    I visited the assembly plant at Auburn Hills.

15   When we think of assembly plants and the movies that have been

16   made of assembly plants going back to the original Ford Motor

17   Company assembly plant, you have the idea of the piece moving

18   along an assembly line, and one worker doing one job under the

19   time pressure that it then goes to another worker who does

20   something else.  None of of it gets tested as each worker does

21   his or her part.  And it goes through a whole series of

22   workers and if one worker messes up, it could have a

23   significant impact.

24               At Auburn Hills, the assembly is very different.

25   One worker does the entire assembly of the drive shaft.  It's

226

1    not a big piece of equipment.  It is assembled there from

2    components, and is a very different kind of operation.  It's

3    one person, essentially, doing it.  It's not an assembly line.

4                In addition, in terms of testing, the machines

5    themselves provide instant tests.  This is actually done by

6    the balance technician, of whether the drive shaft meets their

7    standards.  And essentially, then, instructs the balance

8    technician in how to fix the problem.  The more automated

9    equipment actually fixes it itself.

10               Q.   Okay.  On to comparability analysis done by

11   Professor Helper, do you know whether she did at actual study

12   on that subject?

13               A.   Certainly, Professor Helpers did not.  She

14   talked around it but she didn't do an actual study.

15               Q.   Okay.  What about Professor Voos?

16               A.   Professor Voos did not call it a comparability

17   study.  But you can call it that.  I mean, it had all the

18   ingredients of a comparability study.

19               Q.   Okay.  Just for information purposes, would you

20   turn to tab I.

21               A.   Yes.

22               Q.   And have you read this report from Professor

23   Voos?

24               A.   Yes, I have.

25               Q.   Okay.  And could you get inside, please, to page

227

1    17?  This is Union Exhibit 1, page 17, I think.  Paragraph 36.

2    Do you see that?

3          A.   Yes, I do.

4          Q.   And now, you see a couple of numbers there.  One

5    is $26.11, and the other one is actually a range between

6    $29.14 to $31.41.

7               Could you tell the court your understanding of

8    the difference between those two calculations as performed by

9    Professor Voos.

10         A.   Yes.  First of all, let me say that I certainly

11   prefer my method for doing the comparability study --

12              THE COURT:  You're not referring to the table.

13   You're referring to the text in paragraph 36?

14              MR. BENNETT:  Yes, sir.

15         A.   I think the way the assumptions are layered to

16   do the calculations, have some real flaws to it.  But

17   accepting her number as, her first number of 26.11, she says,

18   this is the average for the goods-producing sector, average

19   total compensation of production workers.

20              So it's the all-in number in the sense that it's

21   total compensation, and her calculation is $26.11.

22         Q.   Okay.  And then what's the comparison to the 29

23   to 31 number?

24         A.   The 29 to 31 number is then, again, taking the

25   mirror to the face and saying, the only comparison group

228

1    should be the motor vehicle parts industry, and largely

2    because that industry is a heavily unionized industry, the UAW

3    is clearly one of the strongest unions and has been able to

4    bargain for some of the largest wage premiums.

5              A lot of what you're getting in the move from

6    26.11 to 29.14 to 31.41, which is her range for the second

7    number, is something like the union wage premium that you get

8    in the motor vehicles parts.

9         Q.   Recognizing that you have some disagreement with

10   her overall methodology, if you had to choose between the 26

11   number and the 29 to 31 number, which of those do you think is

12   more appropriate?

13        A.   For the reasons I've testified, I think the

14   comparison to the auto parts industry is a very bad comparison

15   given the state of the industry and the fact that workers are

16   not going to be able to easily find other jobs in that

17   industry.

18        Q.   Okay.  Now, could you please go back to tab B as

19   in boy.

20        A.   Debtor's Exhibit 46?

21        Q.   Yes, sir.

22        A.   Yes.

23        Q.   Could you take a look at that chart and, just in

24   rough terms, give us a comparison between Professor Voos'

25   numbers and the numbers that you found in your survey.

229

1      A.    Her 26.11 again is a compensation number.  It is

2  a kind of comparability study.  I want to compare to it the

3  number that I actually reached for the private sector.  And

4  what I, what you find, then, if you look at Debtor's

5  Exhibit 46, is a total compensation premium at Auburn Hills,

6  which is about $24, but three of the other plants are actually

7  in the $26 range.  So that effectively, and I'm above her

8  number, so that even in a way her number is rougher than mine,

9  she has essentially reproduced my estimate of the compensation

10 of comparable skilled workers.

11     Q.    And now, do the same comparison with the Dana

12 numbers, please.

13     A.    Excuse me, can you ask that --

14     Q.    Yes.  It's pretty simple, just matching them up.

15 What is the comparison between her numbers and the numbers

16 that you derive for Dana?

17     A.    Well, the obvious implication is that, what I

18 call the Dana difference, although the numbers would be

19 different, would lead to substantially the same conclusion.

20 So using her numbers, you would produce from that, that Dana's

21 current compensation has a sizeable premium compared to in her

22 categorization production workers.

23     Q.    Okay.

24     A.    In the goods-producing industries.

25     Q.    Now could you go to tab C, Debtor's Exhibit 55.

230

1          A.    Yes.

2                THE COURT:  What you're saying, Professor, is

3    that, in Exhibit 46, taking your figures and her figures, you

4    come down to the same Dana difference?

5                THE WITNESS:  Pretty much so, yes.  I mean, my

6    numbers, my numbers vary from plant to plant.  Because the

7    skill mix in each of the plants is different.  And this is the

8    total compensation average is an average across different

9    skilled workers.  So there's a different number for the

10   different plants.  But they range from around $24 to $26.72,

11   and her number is $26.11.  So on our comparability study of

12   the private sector, using a much rougher methodology, she has

13   essentially replicated my results.

14               THE COURT:  The premium percentages you say are

15   about the same?

16               THE WITNESS:  Yes, that's correct.

17               MR. BENNETT:  Okay.  May I move to the next one,

18   your Honor?

19         Q.    Just quickly, then, on Debtor's 55, this is

20   another one that shows a comparison to the numbers with the

21   11.13 proposals calculated, in terms of the effect on

22   compensation.  How does that match up with Professor Voos'

23   numbers?

24         A.    With the $26.11 are you saying?

25         Q.    Yes, sir.

231

1        A.   With the $26.11, you compare it to Dana's total

2   compensation and the first number for Auburn Hills would be

3   $26.54, Fort Wayne would be $29.03 if the proposals were

4   implemented, and what this shows is that her comparison group

5   says that Dana is essentially, would still be above market

6   even with the implementation of the proposals.

7        Q.   Okay.

8        A.   Because their total compensation will remain

9   above the $26.11 figure.

10       Q.   Okay.  Last question.  Having reviewed all of

11  this information from Professor Voos and Professor Helper, how

12  do those calculations affect your overall opinion in the case?

13       A.   I view them as in general supportive.  Not

14  surprisingly, we're studying the same industry.  It's clear to

15  everybody that this industry is in crisis, that it's having

16  substantial job losses.  This is unfortunately the third time

17  I've testified in a bankruptcy involving an auto parts

18  manufacturer.  And what the result shows is that this is an

19  industry that's deeply troubled.  If it cannot restructure

20  successfully, you have a great number of workers, many of them

21  at these plants are older workers in their fifties, in their

22  late forties.  Except at Auburn Hills, it is an older

23  workforce.  These people would find it very difficult to get

24  jobs elsewhere, certainly not in the auto parts industry,

25  perhaps not even as lathe operators or assemblers.  They would

232

```
 1    have to go elsewhere.  Perhaps some of them wouldn't be able
 2    to find jobs at all.  But it would be a real hardship for
 3    these workers if the restructuring is not successful.
 4                Dana has got to be competitive in order to
 5    survive in a highly competitive product market.
 6                MR. BENNETT:  Nothing further, your Honor.
 7                MR. DeCHIARA:  Your Honor, if I may have just
 8    one minute to get my notes?
 9                (A pause in the proceedings.)
10    CROSS-EXAMINATION BY MR. DeCHIARA:
11          Q.   Good afternoon, Professor Wachter.
12          A.   Good afternoon.
13          Q.   My name is Tom DeChiara from the firm of Cohen,
14    Weiss & Simon.  I represent the united Auto Workers and United
15    Steelworkers in this case.  Have you had the opportunity to
16    review the declaration of Chris Bueter?
17          A.   Excuse me?
18          Q.   Have you had the opportunity to review the
19    declaration of Chris Bueter?
20          A.   Yes, I did.
21          Q.   Okay.  I'd like to refer you to Mr. Bueter's
22    declaration.
23                MR. DeCHIARA:  Your Honor, if I may approach the
24    witness.  Your Honor, do you have a copy of the declaration
25    handy?  I can provide --
```

233

1          THE COURT:  If you could provide it, would it be

2    helpful.

3              (A pause in the proceedings.)

4          Q.   Professor Wachter, if you could turn to

5    paragraph 17 of Mr. Bueter's declaration, it's on page 10, and

6    in that paragraph, Mr. Bueter says that one of the purposes of

7    the proposed wage cuts that Dana is proposing is, and I'm

8    reading the last line-and-a-half of the paragraph, "So to

9    bring the average hourly wage costs in line with" -- and

10   that's Dana -- "to bring the average hourly wage cost in line

11   with that being paid by other companies in the same industry."

12             Do you see that?

13         A.   Yes.

14         Q.   And what is that industry that he's referring to

15   as far as you know?

16         A.   I presume it's the auto parts industry.

17         Q.   So Mr. Bueter there is saying that one of the

18   goals of what the company is trying to achieve in this

19   proceeding is to bring Dana's wages in line with the average

20   wage costs being paid by other companies in the motor vehicle

21   parts industry.

22         A.   That --

23         Q.   So that, am I correct in my interpretation of

24   Mr. Bueter's declaration as far as you understand it?

25         A.   No, it is not.

234

1          Q.    And why is it not?

2          A.    Chris Bueter is quite familiar with the fact

3    that his plant is losing business to other plants, including

4    plants in the south, and he is largely referring there to his

5    competitor costs of his actual competitors.  Not being a labor

6    economist, when he talks about the average hourly earnings

7    being paid by other companies in the industry, he's talking

8    about his competitors, he's not talking about the average

9    wage.

10         Q.    He's talking about his competitors in the motor

11   vehicle parts industry, correct?

12         A.    He is doing that.  But that --

13         Q.    Is that correct?

14         A.    That is correct.

15         Q.    You answered my question, thank you.  And did

16   you tell Mr. Bueter after you read this that comparing Dana's

17   wages to other competitors in the motor vehicle parts industry

18   was, what were your words just a minute ago, a very bad

19   comparison?

20         A.    It's a very good comparison if you restrict the

21   comparison to the competitive firms.  This is a comparison

22   that I did in the Delphi report as well.  It's perfectly

23   legitimate, if you're looking at the market wage, what you

24   want to look at is the wages of your competitors who are

25   essentially maintaining market share and who seem to have

235

1   competitive wages and prices.  You do not want to look at the

2   average of the entire industry that would include a lot of

3   your compatriot firms that are going out of business.

4           Q.   So you're saying it does make sense to compare

5   Dana's wages to successful competitors in the motor vehicle

6   parts industry.  Is that what you're saying?

7           A.   Yes.

8           Q.   You served as an expert in the United Air Lines

9   Section 1113 case, did you not?

10          A.   Yes.

11          Q.   And you prepared an expert report in that case?

12          A.   Yes, I did.

13          Q.   And you did a comparability study in that case?

14          A.   Yes, I did.

15          Q.   And in your comparability study in the United

16  Air Lines case, you compared various classes of United Air

17  Lines employees to other employees in the airline industry for

18  purposes of comparability, correct?

19          A.   The comparison that we did in each of my

20  studies, the critical thing is identifying the market, the

21  relevant market where these firms are competing in terms of

22  the wage they need to pay to attract a qualified workforce.

23              The comparison that I did in the United report

24  for the -- to obtain the market wage was to look at the wages

25  paid by the regional airlines where the workers are doing

236

1    essentially the same work.  A lot of the pilots that

2    eventually served at United Air Lines were hired out of the

3    regionals, and the regionals then provided an estimate of the

4    market wage of the successful, at that point, the growing

5    regional airlines that were taking market share from some of

6    the majors, what their labor costs were.

7                And in that sense, it's exactly the same as I

8    did in Delphi, and I would have done here if I had estimates

9    of the market wages of the low-cost competitors that Delphi

10   is -- that Dana is losing market share to.

11           Q.   Just to be clear, your expert report in this

12   case has no comparison of Dana's wages to the wages paid by

13   other firms in the motor vehicle parts industry, be it

14   successful firms or less successful firms, correct?

15           A.   That data was not available to me through Dana.

16           Q.   So the answer is no, your report does not have

17   that information.

18           A.   Yes.

19           Q.   Yes, it does not.

20           A.   Yes, it does not.

21           Q.   Thank you.  Let me show you what's been marked

22   as Union Exhibit 32.

23                (Document distributed.)

24                THE COURT:  Are you going to refer to this

25   again?

237

1          MR. DeCHIARA:  I may, your Honor, I'm not a

2    hundred percent certain.

3          Q.   Is this your expert report in the United Air

4    Lines case?

5          A.   Yes, it is.

6          Q.   You testified a moment ago that when you did

7    your comparability study in that case, you compared the wages

8    of United Air Lines employees to the regional airlines in the

9    airline industry.  Is that what you just said?

10         A.   I have to check to make sure --

11         Q.   I'm just asking what you just testified.

12         A.   Yes.

13         Q.   Well, let's turn to page 11 of your report in

14   the United Air Lines case, paragraph 37.  Let me read the

15   first line.  It says, "In performing comparability analysis,

16   we begin by comparing each United Air Lines employee group

17   with the same employee group of other major and National

18   Airlines."

19         Do you see that?

20         A.   Yes.

21         Q.   That's not the regional airlines, correct?

22         A.   That's correct.

23         Q.   Okay.  And at that time, when you prepared this

24   report in United, the major airlines were going through very

25   difficult economic times, were they not?

238

1          A.    And I refer to that --

2          Q.    Please answer the question.  Were they not?

3          A.    Yes, and I refer to that in the paragraphs that

4     follow the one you quoted from.

5          Q.    Okay.  And there were many airline bankruptcies

6     in this period of time that you --

7          A.    Yes, there were.

8          Q.    But nevertheless, part of your comparability

9     study, there are other parts, but part of it was comparing it

10    to the other major airlines that were also going through

11    economic hard times, correct?

12         A.    Um --

13         Q.    Correct?  Yes or no.

14         A.    Yes, it was there but it was not used in the

15    same way.

16         Q.    In your report in the Dana case, in this case,

17    you refer to the principal competitors of each of the

18    facilities, each of the five facilities that you address in

19    your report, correct?

20         A.    Yes.

21         Q.    And let's just take an example.  Let me refer

22    you to paragraph 72 of your report.  And there, the last

23    portion of the last sentence of the paragraph says that the --

24         A.    Excuse me, I'm moving stuff to get to --

25         Q.    I'm sorry.

239

1              A.    Where do you want me?

2              Q.    Your report in this case, page 26, paragraph 72.

3    Are you there?

4              A.    I am indeed.

5              Q.    The latter part of the last sentence of that

6    paragraph identifies the principal competitors of the Fort

7    Wayne, Indiana facility as AAM, Detroit Axle, Visteon and

8    another company with a long German name that's abbreviated as

9    ZF.

10             A.    Yes.

11             Q.    First, AAM, is that American Axle?

12             A.    Yes.

13             Q.    And how do you know that these are the principal

14   competitors of the Fort Wayne facility?

15             A.    I was told that by Chris Bueter.

16             Q.    Now, is this the same American Axle that

17   Mr. Stenger identified that has a benchmark financial

18   performance that Dana would like to achieve?

19             A.    I'm not familiar with what Mr. Stenger testified

20   to.

21             Q.    What do you mean by saying that companies are

22   the principal competitors of the facilities?

23             A.    Simply that as, when I asked Chris Bueter who

24   were the other major firms in the industry, he identified

25   these.

240

1          Q.    In the industry that the Fort Wayne plant

2    competes with.

3          A.    That's correct, in the subsector where they --

4    where they compete.

5          Q.    And they, so the Fort Wayne facility competes in

6    the same product market as these other firms, would that --

7          A.    Yes, in terms of what Fort Wayne produces.

8          Q.    Was that a yes?

9          A.    Yes.

10         Q.    Do you have any information about what the wages

11   paid by American Axle are to its production workers?

12         A.    I know American Axle has just been successful in

13   getting a third tier, and is, part of its success is based

14   first on having a second tier and now having a third tier that

15   makes them highly competitive.

16         Q.    Do you know what the average wage paid to the

17   entire body of the production workers at American Axle is?

18         A.    I do not.

19         Q.    Do you know the average wage paid by production

20   workers of any of these listed competitors on paragraph 72?

21         A.    No, I do not.

22         Q.    And rather than taking the time and going

23   through each of the five plants, you have a similar paragraph

24   for the four other plants where you identify the principal

25   competitors, do you not?

241

1          A.    Yes.

2          Q.    And if I asked you the same question about

3     whether you know the wages of the production workers at those

4     competitors, your answer would be you do not know, is that

5     correct?

6          A.    That's correct.

7          Q.    And if I asked you what the total compensation

8     was for the principal competitors, your answer would also be

9     that you do not know?

10         A.    I do not know.

11         Q.    That would, however, for purposes of doing a

12    comparability study, be particularly valuable information to

13    know, would it not?

14         A.    I certainly wish I had had it.  I wish I had had

15    it for all the competitors in the industry.

16         Q.    By the way, do you know whether these

17    competitors, these principal competitors for the five plants,

18    are all economically successful firms or are some of them also

19    suffering hard times?

20         A.    Certainly, Visteon is suffering hard times.

21    American Axle seems to be successfully restructuring.  It is

22    the case that I have not looked into the details of these

23    other firms.

24         Q.    So it's fair to say that, as far as you know,

25    some may be successful and others may be struggling; would

242

1    that be fair?

2           A.    That would be fair.

3           Q.    But nonetheless, it would be particularly

4    valuable in your view to have information on the wages and on

5    the total compensation as to all these competitors, correct?

6           A.    All the competitors of Dana would be very

7    valuable to have that information.

8           Q.    And in fact, in your report in the Delphi case,

9    you did provide as part of your comparability study

10   information about the total compensation paid by the

11   competitors of Delphi, did you not?

12          A.    I did, and if I could just explain --

13          Q.    It's just a yes or no question.  You'll have a

14   chance to complain all you'd like on redirect --

15          A.    I think my explanation might be helpful to

16   understanding --

17          Q.    It may well be, but the way this works is, I ask

18   you the questions, and if you could answer them.

19               MR. BENNETT:  Objection, your Honor.

20               THE COURT:  I'll sustain your objection.

21   However, the professor is an attorney.  I think --

22          Q.    Just to clarify, you said you teach in the law

23   school of University of Pennsylvania.  You do not have a law

24   degree, do you?

25          A.    I do not have a law degree.

243

1          Q.    You are not a lawyer?

2          A.    I am not a lawyer and I never took civil

3    procedure or bankruptcy.

4          Q.    Okay.  Just wanted to clarify that.  Now, in

5    your comparability --

6          A.    Or Federal Courts, either.

7          Q.    -- we'll stipulate there's a whole slew of the

8    law school curriculum that you did not take.

9          A.    That's correct.

10         Q.    Your position in this case is that the market

11   wage for Dana's union workers are the wages paid to comparably

12   skilled workers throughout the private sector of the entire

13   United States economy.

14         A.    Yes.

15         Q.    Is it not a fact, however, that Dana does not

16   compete in the same product market as the vast majority of the

17   firms in that private sector economy; is that not a fact?

18         A.    They do not compete but they are part of the

19   relevant labor market.

20         Q.    But they do not compete in the same product

21   market.

22         A.    They do not compete in the same product market

23   but in terms of estimating --

24         Q.    That was my question.  You've answered my

25   question.

244

1      THE COURT:  I'll allow him to finish the answer.

2      A.   What is relevant for a comparability study is,

3   what is the best alternative wage that a lathe operator or

4   assembler can get.  A lathe operator or assembler can work

5   throughout manufacturing plants, occasionally in other

6   industries as well, so what is relevant is the opportunity

7   wage that the worker has and that may not be with the

8   competitors.  It may be with other growing firms that are

9   offering jobs that are being successful that are in different

10  parts of the country.

11     Q.   Let me now refer you to table Roman numeral V.5

12  on page 33 of your report.

13          In this chart you're comparing what the average

14  wages of the workers at the Fort Wayne plant, how they would

15  compare to the private sector average after implementation of

16  the company's proposed changes, correct?

17     A.   Yes.

18     Q.   And the second column that says, "Private sector

19  wage," that's the average wage for the employees in the same

20  BLS, Bureau of Labor Statistics occupational category for

21  employees across the private sector economy, correct?

22     A.   Yes.

23     Q.   If you control -- now, I'm not asking you

24  whether you would want to do this or not, you've already made

25  your views quite clear on this; I'm just asking you, if you

245

1    did control that second column and limited it to employees in

2    the auto part industry, in other words the firms with which

3    Dana competes in the same product market, that number would be

4    significantly higher?

5         A.   Perhaps.  I mean, I don't know that for certain,

6    but given the numbers that have been reported by Professor

7    Voos, I would suppose so.

8         Q.   And therefore, the last column, "Dana proposed

9    percentage difference," just as a matter of mathematics, if

10   the second column went up, the amount by which the proposed

11   Dana wages, the gap would increase, so for example, on your

12   analysis, under the company's proposal, the skilled trades

13   after implementation of the Section 1113 proposal would be 11

14   percent below the market wage; is that your analysis?

15        A.   Yes.

16        Q.   And if you controlled for the auto parts

17   industry, in other words increasing the number in that second

18   column, there would be more than eleven percent below the

19   market wage, correct?

20        A.   Um-hum.

21        Q.   I understand your view that you --

22        A.   I was going to raise a different point, just --

23        Q.   No, I'd like to you answer my question.

24        A.   I was going to ask you to clarify what you meant

25   by "controlled" since the word "controlled" does not fit into

246

1    the kind of study that's being done here.

2            Q.   You'll have to bear with me.  I'm not an

3    economist, so I might not be using your sort of term of art,

4    terms of art that you use in your profession.  But what I mean

5    is, if you limited it, if you took the entire set of employees

6    in that occupational group, but instead of going across the

7    entire private sector, you just limited it to those in the

8    auto parts industry, that's what I mean.

9            Now, can you answer my question?

10           A.   As pure arithmetic, that would increase the gap.

11           Q.   So it would be more than eleven percent below

12   inaccurate?

13           A.   It would be more than eleven percent below

14   market.

15           Q.   Now, Dana is a large firm, correct?

16           A.   It is a large firm.

17           Q.   Did you hear testimony earlier this afternoon by

18   another of the company's experts who described it as a jumbo

19   size firm?

20           A.   I did not.  I was back at the law offices.

21           Q.   But it has, as far as you know, multiple tens of

22   thousands of employees?

23           A.   Yes.

24           Q.   And the BLS considers anything above a thousand

25   employees firmwide to be a big firm, correct?

247

1        A.    That's correct.

2        Q.    Or to say more precisely, to be a firm that's in

3    the biggest category that BLS tracks, correct?

4        A.    Thank you for the clarification, that's

5    important.

6        Q.    And I'm correct?

7        A.    You are correct.

8        Q.    Now, again, and as an empirical matter, is it

9    not true that large firms pay more in general than small

10   firms?

11       A.    Well, we know that large establishments pay

12   more.  That if you actually have both --

13            THE COURT:  Does that apply to Wal-Mart?

14            MR. DeCHIARA:  I'm sorry?

15            THE COURT:  Does that apply to Wal-Mart?

16            MR. DeCHIARA:  Your Honor, I don't know whether

17   it applies to Wal-Mart.  I'm just asking the questions, your

18   Honor.  I can ask the witness.

19       Q.    Is it not an im --

20       A.    It does apply to Wal-Mart.

21       Q.    Let's try to get this in a question-and-answer

22   format.  Is it not a fact, as an empirical matter, that

23   generally large firms, even controlling for establishment

24   size, pay more?

25            A.    It has very little effect if you control for

248

1    establishment size.

2              Q.    In the Delphi case, you submitted both an

3    initial report and a supplemental report, did you not?

4              A.    I believe so.  I don't recall exactly.

5              Q.    Let me show you what's been marked as Union

6    Exhibit 30.

7                    (Handing document to witness.)

8              Q.    Does this refresh your recollection about

9    whether you did a supplemental declaration in the Delphi case?

10             A.    Yes, the supplemental was to address the reports

11   of Drs. Voos and Helper.

12             Q.    And let me refer you to paragraph 31 of this

13   document.  It's on page 12.  And in particular, the first part

14   of the second sentence, it says -- well, I'll read the whole

15   sentence.  It says, "Large firms on average pay more than

16   small firms."

17                   MR. BENNETT:  Objection, your Honor.

18                   THE COURT:  I don't know where he's reading

19   from.

20                   MR. DeCHIARA:  I'm sorry, page 12, your Honor,

21   paragraph 31 of Professor Wachter's supplemental declaration

22   in the Delphi case.  It's Union Exhibit 30.  I'm reading the

23   second sentence.

24                   MR. BENNETT:  If you read it, read all the

25   words, please.

249

1          MR. DeCHIARA:  I will do my best to that that.

2     It says, "Large firms, on average, may pay more than smaller

3     firms but there's no agreement or understanding as to the

4     precise reasons why that regularity occurs."

5          Q.   Is it not true that, as a regular -- there's a

6     regular pattern that large firms on average pay more than

7     small firms?

8          A.   Yes, but that's mostly captured by the

9     establishment size effect.  So once you -- once you take into

10    account the establishment size, the plant size, the firm size

11    actually doesn't matter.

12         Q.   By the way, in the Delphi case, the union's

13    experts made the argument that one should look at firm size or

14    control for firm size when determining market wage, correct?

15         A.   Yes.

16         Q.   And your paragraph 31 is in dispute of that

17    point, correct?

18         A.   Again, your use of the term "control" doesn't

19    fit this case because there's no regression analysis.  So the

20    control variable fits into the context of a regression

21    analysis.

22         Q.   I'll use the word "limit," does that help?

23         A.   Depends on how you use it.

24         Q.   Let me ask the question again.  The union

25    experts in the Delphi case made the argument that one should,

250

1    in determining the market wage, limit the set of firms one

2    looks at to large firms; correct?

3         A.    I don't recall that exactly, but I certainly

4    could understand from what they have argued in general that

5    they would have said that.

6         Q.    Okay.  And in paragraph 31, are you not refuting

7    that point or attempting to refute that point?

8         A.    I'm saying that once you have establishment

9    size, firm size doesn't matter.  And that in general, we don't

10   know what causes the higher pay.  The higher pay in larger

11   establishments may be due to a union wage premium.  Larger

12   establishments tend to have a higher unionization rate than

13   smaller establishments.  Critically also, all of this data on

14   firm size has no control at all for the skill mix in the

15   plant.  And in -- or in the firm.  And in general, the larger

16   the plant, you may have more skilled workers than you would

17   have in a tiny plant.

18        Q.    In --

19        A.    So there's no -- Dr. Voos argues persuasively

20   for the need to control for things like skill.  There is no

21   such controls in this data, which is one of the reasons that

22   most economists think that they are not terribly useful in

23   comparability analysis.

24        Q.    In paragraph 31, you do not make the point that

25   you're trying to make here, which is that, if you control for

251

```
 1    establishment size, firm size doesn't matter, do you?

 2              A.   I have to read the rest of the paragraph --

 3              THE COURT:  Which I've been doing.  I'm a little

 4    bit surprised.  You gave him one simple sentence, left the

 5    rest of the paragraph out.  And paragraph 32 is also probative

 6    on the issue.  Let's play a little square, counselor.

 7              Q.   Please, Dr. --

 8              THE COURT:  I know we can wait until his

 9    attorney gets up to rehabilitate, but when you're asking the

10    questions, and I'm the trier of the facts, I expect to have a

11    more candid presentation.

12              MR. DeCHIARA:  Your Honor --

13              THE COURT:  Don't give me that one single

14    sentence when you know darn well there's going to be rebuttal

15    with the entire two paragraphs.

16              Q.   Professor Wachter, feel free to peruse the

17    entire document.

18              A.   The entire document or just 31?

19              Q.   As much as you feel is appropriate.  I do not

20    want at all to limit what you look at in answering my

21    question.

22              A.   I don't want to start --

23              THE COURT:  Well, don't give him one single

24    little line out of a whole page.

25              MR. DeCHIARA:  Well, I was quoting --
```

252

1          THE COURT:  And then tell him to look at the

2     whole document again, counselor.

3          MR. DeCHIARA:  Your Honor, if I may explain --

4          THE COURT:  Change the subject.  Go on to

5     another subject.  You're off base on this one.

6          MR. DeCHIARA:  I'll move on.

7          THE COURT:  Your tactic is improper.

8          MR. DeCHIARA:  Your Honor, I --

9          THE COURT:  This is not a game of gotcha.

10          MR. DeCHIARA:  Your Honor, I'm not playing

11     gotcha.  I --

12          THE COURT:  Well then, fine, you've covered this

13     subject.  Take another one now.

14          Q.   Professor Wachter, let me go back to your table

15     5.  If you could look at table 5, point 5, on page 33 of your

16     report.

17          A.   Yes.

18          Q.   Again, going back to the private sector

19     column --

20          A.   Yes.

21          Q.   -- whether or not you think it's a good idea to

22     do it, if you limited the set of firms that you looked at that

23     rendered that private sector wage document to firms that had

24     more than a thousand employees, that number would go up, would

25     it not?

253

1          A.    Once I controlled for establishment size as

2     well, it would not go up.

3          Q.    Okay, that's not my question, however.  If you

4     limited it to firm size, the number would go up, would it not?

5          A.    If you improperly limited it to firm size, which

6     is generally recognized in the academic literature as not the

7     way you should do it, you have to do establishment size and

8     firm size, there would be no difference because the

9     establishment size at Dana is fairly large and it mirrors the

10    overall economy.  So there would be no effect on these

11    numbers.  I appropriately -- if you wanted to control for

12    establishment size, there would be no effect on these numbers.

13         Q.    Let me just try to clarify your answer without

14    the editorial comment.  If, as a matter of looking at the

15    data, you limited the set to firms that had over a thousand

16    employees, that number in the second column on table 5.5 would

17    go up, would it not?

18         A.    I'm sorry, would you repeat the question?

19               MR. DeCHIARA:  Could the court reporter please

20    read back the question.

21               (Record read.)

22         A.    Perhaps.

23         Q.    You served as an expert witness for the United

24    States Postal Service in connection with the Postal Service's

25    interest arbitration in 1999 with the National Association of

254

1    Letter Carriers, did you not?

2         A.   And all prior ones going back to 1981.

3         Q.   Including one in '99?

4         A.   Yes, that's correct.

5         Q.   I think you testified earlier what an interest

6    arbitration is.  Is it accurate to say an interest arbitration

7    is a legal proceeding to determine the terms and conditions of

8    a collective bargaining agreement where an arbitrator

9    determines those?

10        A.   I don't want to get into legal definitions.

11   Certainly, as part of the proceeding, the arbitration panel

12   determines the terms of the collective bargaining agreement

13   that the parties themselves could not agree to.

14        Q.   Right.  And that's typical in public sector

15   labor relations?

16        A.   No, it's not.

17        Q.   But nonetheless, there was such an interest

18   arbitration that you participated in on behalf of the United

19   States Postal Service in 1999, correct?

20        A.   Correct.

21        Q.   And in that case, you presented a comparability

22   analysis.

23        A.   Yes.

24        Q.   And you argued that the letter carriers enjoy a

25   pay premium because their wages are above the average wage of

255

1   comparably skilled workers throughout the private sector

2   economy, correct?

3        A.   Yes.

4        Q.   And you also argue that the low quit rate of

5   letter carriers was further evidence of pay premium, correct?

6        A.   Yes.

7        Q.   In other words, very much the argument you're

8   making here.

9        A.   Yes.  The analysis that I've done here is the

10  analysis I've done all of my prior studies.

11       Q.   And the experts for the letter carriers' union

12  argue that one should look at the wages paid by the Postal

13  Service's competitors like Fed Ex or UPS, correct?

14       A.   Those are only two of the competitors that the

15  Postal Service faces.

16       Q.   Nonetheless, the union's experts made the

17  argument that those were among the comparables that one should

18  look to, correct?

19       A.   They picked out two very high pay -- high wage

20  firms and said, "Let's restrict it to those two high wage

21  firms."

22       Q.   And comparability of pay for letter carriers is

23  mandated by federal law, correct?

24       A.   Say that again?  I'm sorry.

25       Q.   Comparability of pay for letter carriers is

256

1     mandated by federal law.

2            A.    Yes.

3            Q.    So if your approach to comparability were

4     correct, the pay of letter carriers should have been reduced

5     as a matter of law to the average pay of comparably skilled

6     workers across the private sector, correct?

7                  MR. BENNETT:  Objection.  Calls for a legal

8     conclusion.

9                  THE COURT:  I'll allow it.

10           A.    I'm sorry, could you repeat the question?

11                 MR. DeCHIARA:  Could the court reporter plead

12    read back the question.

13                 (Record read.)

14           A.    No.

15           Q.    Why do you say that?

16           A.    That arbitration was almost entirely about

17    internal comparability between clerks and carriers.  The

18    arbitration panel did not address the overall premium of

19    letter carriers.  There was no refutation by the panel of the

20    existence of the premium.  The panel only agreed to an

21    internal adjustment of the wages of clerks versus carriers.

22    In all prior NALC arbitrations that I participated in, where

23    the issue was wage comparability, there, beginning in 1981,

24    has been a pattern of what's called moderate restraint that

25    was acknowledged in 1981 that there is a wage premium and

257

1    subsequent arbitrations have been attempting to lower that.

2            Q.    You argued in that 1999 arbitration, did you

3    not, that the letter carriers enjoy a pay premium over the

4    private sector average worker in the U.S. economy, correct?

5            A.    Correct.

6            Q.    To this day is it not true that the letter

7    carriers' pay has not been reduced to the private sector

8    average?

9            A.    No, it has not yet been reduced to the private

10   sector average.  It may get there but it hasn't gotten there

11   yet.

12           Q.    It is currently above the private sector

13   average, correct?

14           A.    Yes, it is above private sector average.

15           Q.    In your --

16               THE COURT:  And they get a uniform, too.

17               MR. SIMON:  They pay for it.

18               THE COURT:  They do?

19               MR. SIMON:  There is a uniform allowance but the

20   uniform allowance does not cover the full cost of the uniform.

21           Q.    In your comparability analysis in this case, you

22   say, you looked at comparably skilled workers throughout the

23   private sector economy, correct?

24           A.    In this case, yes.

25           Q.    And your study matches the job categories of the

258

1   various Dana plants to various BLS occupational groups,

2   correct?

3           A.    Yes.

4           Q.    For example, let's look at one of your charts,

5   if you would turn to page 20, there you matched, or -- I

6   wouldn't say you, but for purposes of your study, assembly

7   operator was matched to the assembler BLS occupation?

8           A.    Yes.

9           Q.    As were the balance technician and assembly line

10  leader positions?

11          A.    Yes.

12          Q.    And that matching was performed by Chris Bueter?

13          A.    Under my direction, it was.

14          Q.    And the BLS divides within a given occupational

15  category like assembler, there are work levels, are there not?

16          A.    You can do that as a separate exercise if you

17  want to, yes.

18          Q.    So in other words, you could further refine your

19  matching, correct?

20          A.    Yes.

21          Q.    And isn't it true that the BLS advises or

22  instructs employers who are trying to find a market wage to

23  utilize work levels?

24          A.    I don't know that.

25          Q.    Let me refer you to Union Exhibit 36.  And let

259

1    me represent to you two things about Union Exhibit 36.  One

2    is, it's an excerpt from a document that I printed off of the

3    United States Department of Labor website within the last

4    couple of weeks.  And also, let me represent to you that it is

5    the same document but only an excerpt of Company Exhibit 185.

6              Can you identify what Union Exhibit 36 is?

7        A.   It's an excerpt from the National Compensation

8    Survey report.

9        Q.   Let me refer you to page 6, the last page of the

10   excerpt.  The third paragraph on the left column, let me read

11   it.  It says, "Within the blue collar group, earnings data are

12   presented for ten work levels.  An average hourly earnings

13   range from nine dollars for level one workers to $37.43 for

14   level ten."

15       A.   I'm sorry, where are you reading from?

16       Q.   I'm reading --

17            THE COURT:  Middle of the page.

18            THE WITNESS:  Okay.

19       Q.   Do you see where I am?

20       A.   Read it again?

21       Q.   Yes, I'm reading from the third paragraph in the

22   left column.

23       A.   Third paragraph -- okay.

24       Q.   It begins with the word "within."

25       A.   Yes.

260

1          Q.   It says, "Within the blue collar group, earnings

2     data are presented for ten work levels and average hourly

3     earnings range from nine dollars for level 1 workers to $27.43

4     for level ten."

5               Do you see that?

6          A.   Yes.

7          Q.   Is it fair to say, based on that statement from

8     the Bureau of Labor Statistics, that there is a sizeable pay

9     range within a given BLS occupational group based on work

10    level?

11         A.   No.

12         Q.   And why do you say that?

13         A.   The point system that's being used by the BLS is

14    used for all workers for all different categories of workers.

15    So it would include a millwright, it would include a skilled

16    carpenter, an electrician.  It would also include a laborer.

17    The idea is to have a single point system that can be applied

18    to all of these different trades.

19               The most skilled workers tend to come up at the

20    very high range of the scale that they are talking about.  The

21    unskilled workers tend to be at the bottom, and the machine

22    operators and assemblers are somewhere in the middle.  But the

23    kind of range --

24               THE COURT:  Which is what's stated in the next

25    paragraph.

261

1          THE WITNESS:  Excuse me?

2          THE COURT:  Which is what is stated in the next

3    paragraph.

4          Q.   Let me refer you to paragraph 20 of Professor

5    Voos' declaration.  And let me point to you to --

6          A.   Could you remind me of what tab are we --

7          Q.   It's in, your booklet, it's tab I.  And I'm

8    referring you to page 9.  And let me refer you to the fifth

9    sentence.  The one that begins, "For example."  It's in the

10   middle of the page.

11         A.   Yes.

12         Q.   It says, "For example, although the average

13   earnings of an assembler in June 2005 was 14.95, the earnings

14   of an assembler at work level 7 was $21.76, while that of an

15   assembler at work level 1 was less than half that, $9.50."

16              Do you see that?

17         A.   Yes.

18         Q.   So is it not true that within a given

19   occupational category such as assembler, there's a wide

20   disparity in average pay based on what work level the worker

21   fits within; correct?

22         A.   No.

23         Q.   And why do you say that?

24         A.   Because if you look at the average across all

25   assemblers, they tend to fall into just a few of the

262

1   categories.  There are a couple of outliers.  My guess is that

2   the outliers are probably misclassified.  But if you look at

3   any of these categories, you tend to find a much narrower

4   range where the bulk of the assemblers are classified.

5           Q.   Are you disagreeing that the BLS has a category

6   for assembler work level 1?

7           A.   It has these categories for all occupations.

8           Q.   It has work levels for all -- within each

9   occupation, correct?

10          A.   For every occupation from the millwright down to

11  the janitor.

12          Q.   And is it not true that the average pay within

13  each work level, within each of those occupational groups,

14  varies substantially?

15          A.   Not -- certainly the -- if you look at the

16  average and then you look at the dispersion around the average

17  you get a fairly tight distribution.

18          Q.   Do you challenge or dispute that those are

19  accurate, that that sentence in Professor Voos' declaration is

20  accurate?

21          A.   Which sentence are you referring to?

22          Q.   The one I read.

23          A.   Could you read it again?  I'm sorry.

24          Q.   I'll just point to you.  It's the one that says

25  "for example."

263

1          A.   Yes.  I presume it's accurate.  I have no reason

2     to suppose it's not.

3          Q.   Did you, when you were directing Chris Bueter to

4     determine, to match the Dana workers to BLS categories, did

5     you mention anything to him about the existence of these work

6     levels within an occupational category?

7          A.   I did not.

8          Q.   And did he provide you with any information

9     about the work levels within which the Dana workers in a given

10    occupational category, like assemblers, fell?

11         A.   Not when we were doing the original analysis.

12    We talked about it subsequently a great deal.

13         Q.   And did you talk about it after your report was

14    done?

15         A.   Yes.  We also talked about it while the report

16    was being prepared.  We acknowledged, we talked about the

17    different assembler jobs and, you know, lathe operator jobs

18    and that there would be some differences across them.

19         Q.   Did you use, did either of you use the word

20    "work level" in your conversation?  Did you refer -- well,

21    I'll leave that as my first question.

22         A.   To be more precise, we did not discuss this

23    aspect of the ranking system.

24         Q.   Thank you.  Let me refer you to page 21 of your

25    report.

264

1          A.    Of my report.  I'm sorry.

2                (A pause in the proceedings.)

3          Q.    And in particular, let me refer you to table

4     IV.2.

5          A.    Yes.

6          Q.    And this table compares the current wages of the

7     Auburn Hills workers to what you deem to be the comparable

8     workers throughout the private sector, correct?

9          A.    Yes.

10         Q.    And the dollar figure for the average wages of

11    the current Dana workers at the Auburn facility includes only

12    the tier 1 workers, correct?

13         A.    Excuse me?

14         Q.    It only includes the tier 1 workers, correct?

15         A.    Oh, I'm sorry.  The -- the Dana's tier 1

16    workers.  That's correct.  Yes.

17         Q.    And in fact, we know that one third of the

18    workers at Auburn Hills are tier 2 workers; correct?

19         A.    Yes, and that's why the plant has been doing

20    well and has been able to expand employment.

21         Q.    And if we -- and we know that the tier 2 workers

22    earn substantially below the average private sector wage,

23    correct?

24         A.    Yes.

25         Q.    And in fact, they earn on average 15 percent

265

1    below the private sector wage, correct?

2         A.   I'm sorry, say that again?

3         Q.   They earn 15 percent below the private sector

4    average.

5         A.   Yes.

6         Q.   So if table 4.2, instead of excluding the one

7    third of the workforce, had included all the workers, that

8    first column for Dana current wage would be substantially

9    lower, would it not?

10        A.   Certainly, there's no misrepresentation here.

11   I'm presenting the analysis for tier 1 workers and then I'm

12   giving the analysis for two tier workers.

13        Q.   I'm not accusing you of misrepresentation.  I'm

14   just asking you a simple question.  If you had included in the

15   calculation the tier 2 workers, the numbers in this first

16   column on the left would be substantially lower, would it not?

17        A.   Certainly, if we had added and produced another

18   table that had both of them combined, the average Dana wage

19   would be lower for production workers.

20        Q.   And did you do that calculation in preparing

21   your report or at any time subsequent to that?

22        A.   My guess is that we did.  It's a very simple

23   calculation.

24        Q.   Well, I'm asking you, do you know if you did?

25        A.   I think I did.

266

1    Q.   And do you remember what the number was?

2    A.   No.

3    Q.   And you decided not to include that anywhere in

4    your report?

5    A.   I think it's quite clear why I didn't, and the

6    report is clear in terms of, we were looking at the impact of

7    the wage reduction for the tier 1 workers and we wanted to

8    isolate their wage so we could do the comparability study.

9    Q.   Let me refer you to page 26.  And in particular,

10   table IV.5 at the top of page 26, do you see that?

11   A.   Yes, I do.

12   Q.   Now, this shows what, according to Dana, the

13   proposed average wages at the Auburn plant would look like

14   after implementation of the Section 1113 proposal, correct?

15   A.   Yes.

16   Q.   Now, would it be fair to say that this average

17   wage would be the average wage immediately following the

18   implementation of the Section 1113 proposal before there was

19   any change in the composition of the workforce?

20   A.   I'm sorry, I didn't receive the question -- if

21   you could restate that?  I didn't hear the question.

22   Q.   Is it not true that this first column --

23   A.   Yes.

24   Q.   -- the proposed Dana wage, shows what the

25   average wage at the plant would look like immediately after

267

1    implementation of the Section 1113 proposal?

2              A.    Yes.

3              Q.    Okay.  Now, is it not also true that, as a

4    matter of course, after implementation of the Section 1113

5    proposal, there would be some incumbent workers who would

6    retire or quit or die or leave the firm for any number of

7    reasons, correct?

8              A.    That's kind of a broad statement.  I mean,

9    things happen to people, if that's what your point is, and

10   life goes on.  Yes, life goes on.

11             Q.    Well, we know that there's a turnover on a

12   voluntary quit rate according to the most recent data from the

13   company of about 9.4 percent at the Auburn plant, so we would

14   expect over the course of a year there would be, in that

15   ballpark, 9.4 percent of people who would voluntarily quit,

16   correct?

17             A.    Yeah, there certainly would be people -- if you

18   use the word "quit," it has a specific meaning.  It doesn't --

19   are you talking about people who are going to go look for

20   other jobs?

21             Q.    I'm talking about people who voluntarily quit.

22             A.    Not retiring.

23             Q.    I don't know what they do after they quit, but

24   there's going to be a certain number who voluntarily quit,

25   right?

268

1          A.   Yes.

2          Q.   And there are going to be a certain number

3    perhaps who also will retire.

4          A.   Yes.  Let me just comment that we do know from

5    Auburn Hills that --

6          Q.   Professor Wachter, you could answer my question.

7    And there will be a certain number who perhaps will get fired?

8          A.   Presumably.

9          Q.   Okay.  And new workers will be hired to replace

10   them; is that not true?

11         A.   Yes.

12         Q.   And the new workers --

13         A.   Well, hopefully.

14         Q.   Hopefully.  And if they are, they will be hired

15   at $11.05 an hour, correct?

16         A.   That wage will grow to $13.

17         Q.   Within three years.

18         A.   Yes.

19         Q.   But they will be hired at 11.05.

20         A.   Yes.

21         Q.   As a certain number of incumbent employees

22   leave, and as new employees are hired at that $11.05 rate, the

23   average wage at the plant will fall from the average wage

24   that's indicated here on table 4.5, correct?

25         A.   Yes.  And the firm may become much more

269

1    competitive as a result.

2           Q.   I was just asking whether it would fall.  And

3    your answer is yes?

4           A.   Yes.

5           Q.   Let me turn your attention to page 33, table

6    V.5.  This is a similar table, similar analysis to the one we

7    just looked at but for the Fort Wayne plant?

8           A.   Yes.

9           Q.   And without going through the whole series of

10   questions again, this -- let me just see if I can summarize

11   it, this shows the proposed average wage at the plant that

12   would exist immediately after 1113 proposal were implemented,

13   correct?

14          A.   Yes.

15          Q.   But over time, with attrition and new hiring,

16   that number, the first column number would go down.  Correct?

17          A.   I'm sorry?  Say again?

18          Q.   I'm asking you the same questions I asked for

19   Auburn, I'm just asking for you --

20          A.   The first column is the Dana proposed wage.

21          Q.   Right.  And that shows the average wage as it

22   would exist immediately after implementation -- let me just

23   finish for the clarity of the record -- immediately after

24   implementation of the 11 proposal, correct?

25          A.   If you were including those who come in in the

270

1    new tier, and you added that in, that would be the case.

2          Q.   If you -- if as time went on an some incumbents

3    left and some new employees were hired, that number in the

4    left column would go down, correct?

5          A.   In the left column, yes.

6          Q.   So for example, where it says, "Support workers

7    under your analysis would be paid ten percent below market,

8    under Dana's proposal, as time went on, the average wage of

9    the plant would become further, even more below ten percent,

10   correct?  Below market.

11         A.   You're obviously assuming that there would be no

12   wage increases over this period.

13         Q.   I am assuming that.  Let's assume that.

14         A.   All right, if you assume there would be no wage

15   increases and you had new workers coming in at a lower salary,

16   then the average would go down.

17         Q.   By the way, are you aware of any proposals the

18   company has to increase the pay of the workers at the Fort

19   Wayne plant?

20         A.   I do not.  I would assume, like any competitor,

21   that if they had trouble attracting and retaining workers,

22   they would adjust their wages accordingly.  The main problem

23   that this company faces at this point is getting out of

24   bankruptcy.

25         Q.   Now, a comparability study should look not just

271

1    at the skills of comparison workers, but also their working

2    conditions, correct?

3         A.   Yes.

4         Q.   To what extent in your study did you take into

5    account in determining the market wage how the working

6    conditions of Dana's workers may or may not differ from the

7    average -- the working conditions of the average worker in the

8    U.S. private sector economy in a given BLS occupational

9    category?

10        A.   I took it into account because I -- not looking

11   at the average wage across the economy, I'm looking at other

12   assemblers and other lathe operators, so the working

13   conditions are, in my comparison, for the production workers,

14   are for lathe workers at Dana compared to the lathe workers at

15   other facilities by other employers.  So the working

16   conditions would be roughly similar.

17        Q.   You're saying that the working conditions of the

18   Dana, let's say, assemblers, are the average, they have the

19   average working conditions of assemblers in the U.S. private

20   sector, is that your testimony?

21        A.   I didn't say that.  I said they would be

22   similar.

23        Q.   Okay.  Now, under the theory of compensating

24   differentials, adverse working conditions will lead to a

25   higher market wage, correct?

272

1          A.   Yes, but we also know what those adverse working

2     conditions are that lead to a higher wage.

3          Q.   And those would include things like having to

4     wear protective equipment?

5          A.   What it would -- there might be a small effect

6     to that.  I don't know if there actually would be.  Where it

7     really kicks in are people who are wearing gear that is from

8     the head to the foot.  They are essentially in a, encased in

9     an outfit.  It includes people who are exposed to extreme

10    temperature.  It includes people who are working in hazardous

11    jobs.

12          Generally, the kinds of conditions you would

13    find in a Dana assembly plant or machining plant would not fit

14    into those characteristics that are -- that lead to higher

15    wages.  Those are not the kind of working conditions that lead

16    to higher wages.  It's also the case --

17          Q.   But protective equipment, wearing protective

18    equipment or being exposed to extreme temperatures does lead

19    to a compensating differential?

20          A.   Yes.  But again, when I said protective

21    equipment, I'm talking about somebody who is essentially

22    encased in an outfit from head to toe.

23          Q.   You didn't visit the Fort Wayne plant, did you?

24          A.   I did not.

25          Q.   Did you speak to any of the plant managers

273

1    there?

2              A.    I did not.

3              Q.    Did you speak to anyone at the Fort Wayne

4    facility?

5              A.    No.

6              Q.    Let me refer you to Professor Helper's

7    declaration and report, and in particular, page 9, paragraph

8    28.

9                    THE COURT:  Where is that, counselor?

10                   MR. DeCHIARA:  It's tab J of the looseleaf

11   binder.

12                   THE COURT:  What paragraph?

13                   MR. DeCHIARA:  Paragraph 28, page 9.

14             Q.    Let me read the first couple of sentences of

15   that paragraph from Dr. Helper's report.  It says, "For

16   example, at Fort Wayne, workers on the gear carrier line look

17   like they are going off to do battle.  They are wearing

18   goggles, rubber aprons, shoe spats up to their knees, rubber

19   gloves, wrist and elbow braces.  They are wet, sweating and

20   covered in little black beads and dust from cutting malleable

21   iron castings."

22                   And I'll stop the quote there.

23                   Do you have any reason to dispute the accuracy

24   of this description?

25             A.    I have reason to dispute that they look like

274

1    they are going off to battle.

2        Q.   Well, making license for that sort of language,

3    but in terms of the factual representation?

4        A.   I believe that they wear that kind of protective

5    equipment.

6        Q.   Let me now turn you to paragraph 30 of the same

7    declaration by Dr. Helper.  And in that paragraph, Dr. Helper

8    is talking about workers in what's called the heat treat, and

9    let me just read the last sentence of that paragraph.  It

10   says, "Ambient temperatures in this area are near one hundred

11   degrees in the winter and often 120 to 130 degrees in the

12   summer.  The facility is not air conditioned."

13               Do you have any reason to dispute the accuracy

14   of that statement?

15       A.   No, but it's also true that we know that workers

16   aren't quitting those jobs.

17       Q.   Is it not true that as a matter of empirical,

18   general empirical fact that wages rise with respect to work

19   experience?

20       A.   Yes.

21       Q.   And is it not also true that the five plants

22   that you discuss in your report have in recent years

23   experienced substantial reductions in head count?

24       A.   Yes.

25       Q.   And is it not true that in a union plant like

275

1    these five plants that head count reductions are pursuant to

2    reverse seniority order?

3         A.    Yes.

4         Q.    Isn't it fair to say that the workers who remain

5    after these substantial head count reductions have a

6    relatively high degree of work experience?

7         A.    Yes.

8         Q.    Let me refer you now back to --

9              THE COURT:  How much more do you have,

10   counselor?

11             MR. DeCHIARA:  I'm more than halfway through.

12             THE COURT:  Give me an estimate of time.

13             MR. DeCHIARA:  Excuse me, your Honor?

14             THE COURT:  Give me an estimate of time.

15             MR. DeCHIARA:  I'm not sure how long I've been

16   going.  I haven't been paying attention to the clock, but I'd

17   say maybe 45 minutes or 40 minutes, something --

18             THE COURT:  We'll take a five-minute break.

19             (Recess taken.)

20   CROSS-EXAMINATION BY MR. DeCHIARA (Cont'd):

21         Q.    Professor Wachter, let me refer you back to

22   Mr. Bueter's declaration, and in particular, page, paragraph 5

23   on page 6.

24         A.    Where do you want me?

25         Q.    Mr. Bueter's declaration, page 6, paragraph 5.

276

1    Are you there?

2         A.   Yes.

3         Q.   Let me read the first couple of sentences.  It

4    says, "Until recently, the Debtor's businesses were operated

5    in a decentralized fashion and run on a division-by-division

6    basis.  As a result, wages paid and benefits offered to

7    employees varied widely, depending on the labor in this

8    specific area where a manufacturing facility was located, in

9    order to account for variances in wage and benefit rates in

10   the various markets in which the debtors maintain their

11   manufacturing and production facilities."

12        Do you see that?

13        A.   Yes.

14        Q.   And there, Mr. Bueter is referring to, when he

15   says "various markets," he's talking about various labor

16   markets, correct?

17        A.   Yes.

18        Q.   Within the United States, correct?

19        A.   Yes.

20        Q.   And you believe Mr. Bueter is wrong in his

21   belief that there are various labor markets, local labor

22   markets within the United States?

23        A.   Our positions are entirely consistent.

24        Q.   Well, you believe there's one national market in

25   the United States, correct?

277

1          A.   I believe one needs to look primarily at the

2    national market.  If you are facing a wage deficit, and you

3    need to hire workers immediately, obviously, the local labor

4    market conditions are important.  If you're taking a

5    longer-term look at survival of the company, you really have

6    to look at the national labor market 'cause that's where the

7    competitors are.

8               One thing is pricing your product so you can

9    actually sell it.  And that's the product market component of

10   a labor market.  The other part is the labor supply.  And in

11   some cases, where they pay skilled workers perhaps less than

12   in the local market, they might hire their skilled worker who

13   does not have a union wage premium from the local market and

14   we think about and worry about the conditions and rates in the

15   local labor markets.

16          Q.   You believe that there are some situations in

17   which it makes sense for an employer to look at the lower

18   labor market conditions?

19          A.   Where you're paying a wage deficit and where

20   you're hiring workers, you're obviously going to hire workers

21   from the local market.  Again, keep in mind that the labor

22   market has two components, the labor supply and the labor

23   demand.  Labor demand is very much a national market.  You're

24   hiring people when you have a wage deficit, you've got to be

25   attuned to the local labor market conditions.

278

1      Q.   Is it your understanding in the past, when Dana

2    was taking into account variances in wages and benefit rates

3    in the various markets, it was paying a wage deficit?

4          A.   It is certainly the case that, because of the

5    extraordinarily compressed wage structure that Dana has, they

6    do not pay the skilled workers a premium.  The skilled workers

7    get very little out of this deal, the production workers get a

8    fair amount.  The less skilled workers get the most.

9            The result of that in terms of my results is to

10   show that, for skilled workers, the firm is very close to the

11   market and, indeed, may be below in some categories.

12         Q.   I don't think Mr. Bueter in those first two

13   sentences that I quoted was talking about only skilled

14   workers.  He was talking about hourly workers at large, isn't

15   that your understanding as well?

16         A.   I don't think you can infer anything from that

17   in terms of exactly who he was talking about.

18         Q.   Well, there's clearly no indication in the

19   language there that he's referring only to skilled workers, is

20   there?

21         A.   There isn't.  I'm just saying in the original

22   question, that I believe the two of us are in complete

23   agreement in terms of the importance of local labor market

24   conditions in certain situations.

25         Q.   Well, I don't know whether we're in agreement.

279

1    I just want to make sure I understand what you're saying.

2            A.    I'm not saying the two of us are in agreement.

3    I'm saying I'm in agreement with Chris Bueter.

4            Q.    Okay.  Let's just focus on what you're saying.

5    You're saying in certain situations, it makes sense for an

6    employer to take account of conditions in the lower labor

7    market, and the situation where it makes sense, you're saying,

8    is when you're paying a wage deficit; correct?

9            A.    And you need to hire workers and you obviously

10   hired workers from the local labor market.

11           Q.    Okay.  In the past, and I'm saying in the

12   relatively recent past, in the last few years, is it your view

13   that Dana across the board for its hourly workers has been

14   paying a wage deficit?

15           A.    Certainly not.

16           Q.    Certainly not.  So is it in correct for the

17   company in your view to the extent it was not paying a wage

18   deficit to take into account local labor market conditions?

19           A.    I believe that that statement refers to times

20   when they need to hire workers and when they would need to

21   hire workers, if they are paying a wage deficit, they would

22   need to adjust to local labor market conditions.

23           Q.    And where in that language does it say that it

24   refers to when they were hiring workers?

25           A.    I'm just saying that what is there is not at all

280

1    inconsistent with my position.

2        Q.   Let me refer you again to Union Exhibit 36.

3    It's the excerpt from the Department of Labor website.

4        A.   Hold it.  I have to get there.

5        Q.   And if you look at page 2, not the little Roman

6    ii, but the Arabic 2 --

7        A.   On page?

8        Q.   Two.  Do you see at the bottom of the table

9    there, there in bold print on the left side it says,

10   "Geographic areas"?

11       A.   Actually, I don't.  I'm sorry.

12       Q.   It's page 2 on Union Exhibit --

13       A.   I see it.  On the bottom.

14       Q.   You see it?

15       A.   Yes.

16       Q.   And under there it lists various regions of the

17   United States of America, correct?

18       A.   Yes.

19       Q.   And then it has numbers, in particular the

20   fourth column, it has hourly wages in private industry for

21   those various regions, correct?

22       A.   Yes.

23       Q.   And those numbers differ, one from the other?

24       A.   Yes.

25       Q.   Now, one could do a comparability study that,

281

1    instead of looking at the average wages across the U.S.

2    private sector economy, one looked at local labor markets.

3    Correct?

4            A.    You could, but it would be a very bad idea.

5            Q.    Okay.  Let's look at your expert report in the

6    Tower case, which is Union Exhibit 31.

7            THE COURT:  I'm holding you to your time

8    estimate, counselor.

9            MR. DeCHIARA:  Your Honor, I'm not sure I'm

10   going to complete it within the 45 minutes.

11           THE COURT:  Be more direct with your questioning

12   and get right to the point.

13           MR. DeCHIARA:  Your Honor, there's a lot of

14   material to cover.  I'm doing my best.

15           THE COURT:  Be more focused.  There's been a lot

16   of redundancy and I haven't called you down on it.  It's only

17   now.  Be more focused.

18           MR. DeCHIARA:  Your Honor, I will do my best

19   to --

20           THE COURT:  I can't ask for more.  Go ahead.

21           MR. DeCHIARA:  Thank you.

22           Q.    You prepared a report in the Tower case on

23   behalf of the company in support of its 1113 motion, did you

24   not?

25           A.    I did.

282

1          Q.    And you did a comparability study?

2          A.    I did.

3          Q.    And in part, in your comparability study, you

4    looked at local labor markets?

5          A.    The point of our comparability --

6          Q.    Just answer, it's a yes or no question.  We're

7    trying not to take up more of the court's time --

8          A.    I think this answer will answer a whole series

9    of questions.

10         Q.    It will help move it along if you answer yes or

11   no, if that's possible.  Did you do a comparability study that

12   included in part limiting your look at local labor markets?

13         A.    No.

14         Q.    Okay.

15         A.    If you let me explain, I think --

16         Q.    No, I think it's just going to take too much

17   time if you start explaining, so if you can answer yes or no,

18   I would appreciate if you could limit your answer to that.

19              MR. BENNETT:  I object.  Does counsel actually

20   not want the expert to explain what's necessary for the court

21   to understand in this line of questioning?

22              MR. DeCHIARA:  Counsel wants the witness to

23   answer the questions, and he answered the questions.

24              THE COURT:  Go ahead.

25         Q.    If you can turn to page 14 of Union Exhibit

283

1    31 --

2            A.    I'm sorry, yes.

3            Q.    -- there's an Exhibit 3.3, do you see that at

4    the bottom of page 14 in your Tower report?

5            A.    Yes.

6            Q.    And it says, "Average wages," I'm reading the

7    title of the chart, it says, "Average wages of Tower's hourly

8    workers at twelve unionized plants and comparable occupations

9    in their local labor markets as measured by Department of

10   Labor data, October 2005."

11            Is it not true that in this part of your report,

12   in Tower, that you took into account local labor market

13   conditions?

14            A.    What I was doing in taking account of local

15   labor market conditions was criticizing Tower's approach,

16   which used local labor market conditions.  And the point of my

17   report was to say that their comparability study had looked at

18   local labor market conditions and I was making a national

19   comparison and criticizing their study for the use of, or

20   relying on, exclusively, local labor market data.

21            Q.    Looking at local labor market data has the

22   advantage of accounting for any conditions of labor demand or

23   supply that are specific to that location, correct?

24            A.    Labor supply.  Labor demand is another factor.

25            Q.    If you could turn to paragraph 19 of your

284

1    report --

2             A.    This is not Tower, or --

3             Q.    Tower, I'm sorry, your Tower report.  Page 8,

4    paragraph 19.  The third sentence, feel free to read as much

5    of the paragraph as you like, being mindful of the time.  I'm

6    going to refer you to the third sentence.  Tell me when you've

7    read it.

8             (Witness perusing document.)

9             Q.    It says, "Such a control group has the

10   advantage --" well, let me start from the beginning.  The

11   beginning of paragraph 19, it says, "The Tower wage analysis

12   examines wages in the same occupation or type of job, i.e.,

13   similar skills and working conditions, in the same or nearby

14   location.  This approach has several advantages.  Such a

15   control group has the advantage of accounting for any

16   conditions of labor demand or supply that are specific to that

17   location."

18             Did you write those words?

19             A.    Yes.

20             Q.    Do you stand by them?

21             A.    Certainly, but you're taking it out of context

22   in my overall report.  The whole report was an analysis of

23   Tower's own study.  Tower's study relied exclusively on local

24   labor market conditions.  My study relied on national labor

25   market conditions, is entirely consistent with what I'm doing

285

1    here.  Simply evaluating the company's study that had relied

2    on local labor market conditions, and I was pointing out some

3    of the advantages as well as the disadvantages that come up

4    with later paragraphs of their approach.

5            Q.   What are the other advantages of taking into

6    account local labor supply and demand?

7            A.   I think I've explained them all as best I can.

8            Q.   Well, if you could briefly summarize that,

9    because I'm not sure you did.

10           A.   Well, as I said before, if you have --

11           Q.   No, in terms of doing a comparability study.

12   What are the advantages of taking into account local issues?

13           A.   An overall comparability study, I wouldn't look

14   at local labor market conditions.

15           Q.   When you say -- who prepared -- going back to

16   that Exhibit 3.3 on page 14, who prepared that?

17                (Witness perusing document.)

18           Q.   That's part of your report, is it not?

19           A.   It is, but it's all Tower's data.

20           Q.   Okay.  But you incorporate Tower's data and you

21   presented this table, correct?

22           A.   To criticize it.

23           Q.   You presented this table, correct, in your

24   report?

25           A.   Yes.

286

1          Q.   And this was part of your report submitted to

2     the court in the Tower case.

3          A.   Certainly.

4          Q.   And in fact, when you did look at local labor

5     market conditions, you found that the market wage was higher

6     than when you looked at a national wage, correct?

7          A.   I did not look at the local labor market

8     conditions.  They did the local labor market study.  I was

9     critiquing their study.  I did not look at local labor market

10    conditions.  I was reporting on their conclusions.

11         Q.   Ultimately, the document will speak for itself.

12    I don't have the time to take you through it sentence by

13    sentence.  But let me refer you to paragraph 37.  It's on the

14    next page.  It's page 15.  It says, "Comparison of exhibits

15    3.2 and 3.3 thus isolates the effect of the use of local

16    rather than national wages.  Use of local market comparison

17    data leads to a market wage estimate of 14.23 versus an

18    estimate of 13.25 based on national wage data.  This

19    difference reflects the fact that the twelve Tower plants tend

20    to be located in areas that have average wages for the ten

21    benchmark occupations that are higher than the national

22    average compiled across all labor markets."

23              Did you write those words?

24         A.   Could you read the last sentence of that

25    paragraph?  Because that will point out what I was doing.

287

1          Q.   Well, and they are there in front of you, the

2     words I just read.  Did you write them?  That's my question --

3          A.   The sentence that follows, "The movement from

4     the use of local to the use of national OES wage increases our

5     estimated Tower wage premium from 24 to 33 percent."  As I've

6     said now a number of times, what I was trying -- what I was

7     doing in their study, what I was doing in this report --

8               MR. DeCHIARA:  Your Honor, this is why --

9               THE COURT:  No, counselor, as a matter of fact,

10    I was go to comment but the witness did.  You didn't read the

11    very last sentence.

12              MR. DeCHIARA:  Your Honor, I can't read the

13    entire report.

14              THE COURT:  It was only one sentence.  Just a

15    few words, counselor, you stopped a little bit too short.

16    It's only ten words.

17         Q.   Professor Wachter, if I refer you to any part of

18    any text in --

19              THE COURT:  Please let the witness finish the

20    answer.  I'm allowing him to finish.

21         A.   Tower did a study before we were -- before I was

22    employed and what they asked me to do was to do an analysis of

23    the Tower study.

24              One of my major conclusions was that they had

25    understated the premium they were paying because they relied

288

1    on local labor market conditions.  And the correct approach

2    was to use a national labor market analysis.

3              So if you read the entire document, it does

4    stand for itself, and what it says is, you should do a

5    national labor market analysis.

6              Q.   Tower is an auto parts manufacturer, correct?

7              A.   Yes.

8              Q.   And of course, like Dana, it was in Chapter 11

9    bankruptcy, correct?

10             A.   Yes.

11             Q.   And you found that the wage proposals that Tower

12   made in its 1113 proposal were highly reasonable, correct?

13             A.   I'm sorry, say that again?

14             Q.   You found Tower's Section 1113 proposals to be

15   highly reasonable, correct?

16             A.   You'd have to point me to -- I don't recall

17   exactly --

18             Q.   Okay.  I'm going to point you to one sentence

19   but feel free to read any sentence and all sentences in the

20   document because I don't want to restrict you, but let me

21   point you to the following sentence.

22             It's paragraph ten on page 4, the first

23   sentence.  It says, "Based on our review of the Tower

24   analysis, combined with our analysis, we conclude that the

25   current pay proposals from Tower are highly reasonable."

289

1          Does that refresh your recollection about

2     whether you concluded that Tower's pay proposals were highly

3     reasonable?

4          A.    Yes.

5          Q.    And you did so conclude, did you not?

6          A.    I did so conclude.

7          Q.    And you did a comparability study in this

8     report, did you not?

9          A.    Yes.

10          Q.    Could you turn to page 21 of this report.  And

11     in particular, Exhibit 4.2.  Do you see that?

12          A.    Yes.

13          Q.    And in that exhibit, you conclude that the Tower

14     market wage differentials after implementation of the proposed

15     wage changes at the plants at issue in that case, all

16     employees at issue would enjoy a pay premium, according to

17     you, of 7 to 19 percent; correct?

18          A.    Yes.  And the reason --

19          Q.    And in fact, for non-skilled employees, and by

20     that I assume you mean what would be the production or support

21     workers here, is that a correct assumption?  When you use

22     "non-skilled," in Tower 4.2, does that equate to what would be

23     called the production and support workers here?

24          A.    Some of the support workers, yes.

25          Q.    And you concluded, for the non-skilled

290

1     employees, that they would enjoy a 22 percent to 33 percent

2     wage premium, correct?

3           A.   Yes.

4           Q.   Now, let's look at what you say would be the

5     resulting market wages of the Dana employees in this case

6     after -- well, strike that --

7           A.   If I could give you a short explanatory sentence

8     on why I concluded the way I did --

9           Q.   You have the whole report that supports it.  I'd

10    like to try to get within my time.  So if you could just

11    answer my questions.

12          THE COURT:  Maybe we can save a little time if

13    we get a short explanation.

14          MR. DeCHIARA:  As you wish, your Honor.

15          A.   My short explanation is, all that I was

16    concluding in this report is that the wage proposals were

17    moving Tower in the right direction.  It's not in my capacity

18    to instruct firms to hit exact comparability.  I was simply

19    applauding the fact that they were narrowing the differential.

20          Q.   But nonetheless, in your expert opinion, you

21    concluded that wages that remained after 1113 and limitation,

22    22 to 33 percent above market, were highly reasonable,

23    correct?

24          A.   As a first step, I assumed that they would be

25    lowered later.

291

1      Q.   Was there any representation to you to that

2  effect?

3      A.   If Tower does not get its --

4      Q.   Please answer the question.  Was there a

5  representation to you by Tower management that, after

6  implementing the 1113 proposal, they were going to reduce

7  wages even further?  That's a factual question.  You can

8  answer it yes or no.

9      A.   No, I can't answer it yes or no.  The answer is

10  that they -- their proposals were contingent on what happened

11  to the success of the firm and their ability to get out of

12  bankruptcy and survive.  It was clear that they intended to

13  make further adjustments if they needed to.

14      Q.   When you say it was clear, did they tell you

15  they were going to do that?

16      A.   I had discussions with them and there were

17  discussions that they had to get themselves out of bankruptcy.

18  They had to meet national labor market conditions, and might

19  make other adjustments to do so.

20      Q.   In addition to their 1113 proposals?

21      A.   As I said, this was a general discussion of,

22  that if this did not prove to be enough, they would do more.

23      Q.   Do you say that in your report?

24      A.   I didn't say it in my report.

25      Q.   Did you testify in Tower?

292

1          A.    Yes, I did.

2          Q.    Did you testify to what you just testified to

3    just now?

4          A.    That question didn't come up to I didn't testify

5    to it.

6          Q.    Well, you have a basic understanding of Section

7    1113, do you not?

8          A.    Yes.

9          Q.    And that an employer has to prove that --

10         A.    Actually, perhaps I should go back.  My

11   understanding --

12         Q.    I'm asking another question, excuse me -- excuse

13   me, let me finish my question.  The employer has to prove that

14   the proposals it seeks are necessary to enable it to achieve

15   long-term viability; are you familiar with that?

16         A.    That is --

17         Q.    Are you familiar with that?

18         A.    Can I utter a few words?

19               THE COURT:  You should just answer yes or no to

20   that.

21         A.    I'm familiar with that component.  Not much

22   more.

23         Q.    Okay.  So Tower believed that it could

24   successfully, achieve successful long-term viability and still

25   pay market wages to this group of employees that were, under

1    your view, 22 to 33 percent above market average, is that

2    correct?

3           A.    In the context of the proceeding, what Tower was

4    obviously trying to do was reach an accommodation with the

5    labor union so the court would not have to impose a

6    settlement, and that often requires the firm to settle on

7    wages that are above market levels.

8           Q.    Well, certainly, employers typically try to

9    reach settlements with their unions and not go to a decision.

10   But nonetheless, Tower put on a case in a court of law, and

11   you supported that case, that the Section 1113 proposals were

12   what was necessary for its long-term viability, correct?

13          A.    All I did was conclude that they were lowering

14   the differentials, and that was the right thing to do.

15          Q.    Let's move on.  Let's look at what Dana's

16   proposals would achieve here compared to what Tower would

17   achieve there.  If you could turn to page 33 of your Dana

18   expert report, it's table 5.5.

19          A.    You're back to my report?

20          Q.    Yes.  Are you there?

21          A.    Yes.

22          Q.    And Tower's proposals would put the skilled

23   trades workers at Fort Wayne 11 percent below market?

24          A.    Yes.

25          Q.    And it would put support workers ten percent

294

1    below market?

2         A.   Yes.

3         Q.   Turn to page 47, if you would.  Table 7.5, do

4    you see that?

5         A.   Yes.

6         Q.   Dana's proposal would put the skilled trade

7    workers at Marion at six percent below market?

8         A.   Yes.

9         Q.   And it would put the production workers at seven

10   percent below market?

11        A.   Yes.

12        Q.   That relates to Pottstown, so I won't ask you

13   about Pottstown because it's not part of the Section 1113.

14   Under the principle of comparability, workers with comparable

15   skills and comparable working conditions should receive

16   comparable compensation, correct?

17        A.   Yes.

18        Q.   So under your analysis, let's look back at page

19   33.  Are you at page 33?

20        A.   Yes.

21        Q.   Let's just talk about all the support workers in

22   general.

23             Workers in your view who have similar skills and

24   similar working conditions earn 13.62 an hour, correct?

25        A.   Yes.

295

1    Q.   So the workers at that plant should receive

2    13.62 an hour, correct?

3        A.   If there were going to be, you know,

4    comparability.

5        Q.   But Dana is proposing to pay them less, correct?

6    I didn't hear what you said.

7        A.   I haven't said.  We were talking about the

8    support workers.  Yes, they would be paying them less.

9        Q.   Now, you say in your report that the principle

10   of comparability is supported by a "norm of basic fairness."

11           What's a norm of basic fairness?

12       A.   As I say in the next sentence, the norm of basic

13   fairness is that workers who were doing similar work should

14   receive similar wages.  If I could also point out that --

15       Q.   Please, I would just -- answer my questions,

16   we'll get through this quicker.  Now, you say in your report

17   that market wages are those "required to attract and retain

18   well qualified employees," correct?

19       A.   Where are you reading from?

20       Q.   Paragraph 39 of your report.  And feel free to

21   read any part of your report and any part of paragraph 39, but

22   in particular I'm focusing on the middle paragraph.

23       A.   Paragraph 39.

24       Q.   That's correct.  You say there, "From the

25   perspective of employers, comparability has the feature of

296

1    requiring that compensation be set at the level required to

2    attract and retain well qualified employees."

3                   Did you say that?

4          A.    Yes.

5          Q.    If an employer pays below market level, it would

6    not be able to, or would at least have a hard time attracting

7    and retaining well qualified employees, correct?

8          A.    That's a very incomplete statement and it's

9    wrong because of its incompleteness.

10                  What I did as you know is a quit rate analysis,

11   which is critical.  If a firm, the way a firm knows it's

12   paying below market is if it has trouble attracting and

13   retaining workers.  That shows up in the quit rate.  So the

14   firm doesn't have to pay exactly the wages I'm suggesting.

15   What it has to do is look at the quit rate, which will provide

16   confirmation.

17                  In addition, what I did not analyze in the Tower

18   report was their benefits, which were much above market.  My

19   analysis in Tower was entirely about their wages.

20         Q.    To attract and retain well qualified workers, a

21   firm needs to both pay competitive wages and competitive wages

22   plus benefits, in other words, total compensation, correct?

23         A.    Yes.

24         Q.    Okay.  You say in the last sentence of paragraph

25   39, "A firm that provides a competitive wage and benefits

297

1      package is by definition not at a competitive disadvantage."

2                  Do you see that?

3            A.   By definition.

4            Q.   Okay.  Is it by definition true that a firm that

5      pays a below-market wage and benefits package, is at a

6      competitive advantage?

7            A.   I'm sorry, say that again?

8            Q.   Is it true, and I'm just trying to follow

9      logically from what you wrote, is it true by definition that a

10     firm that pays below a competitive wage and benefit package

11     enjoys a competitive advantage?

12           A.   No, it doesn't.  Because it will have trouble

13     attracting and retaining a qualified workforce.

14           Q.   Okay.  So if you pay below-market wages and

15     benefits, you'll have trouble attracting well qualified

16     workers, correct?

17           A.   Yes.  That's what I just said.

18           Q.   Okay.  So far, we've been talking only about

19     wages.  Let's now talk about total compensation, if you can

20     turn to page 7 of your report, paragraph 21.

21           A.   Just a small comment if I can say, we've been

22     talking a lot about total compensation.

23           Q.   You're right.  I strike my -- I'm just trying to

24     segue into the next subject.  You say in paragraph 21, and I'm

25     going to point you to certain language, but feel free to read

298

1    any part of paragraph 21 or indeed your whole report.

2            You say in paragraph 21, in the second sentence,

3    "We calculate a plant-wide compensation premium reflecting the

4    fact that non-wage benefits data are only available at the

5    plant level"; do you see that?

6        A.   Yes.

7        Q.   So I just want to understand, when you have

8    charts in your report, and I'll give you an example, the chart

9    on page 23, regarding total compensation at the Auburn Hills

10   plant, the figure you give there for total current

11   compensation for the plant, is that all --

12       A.   I'm sorry, which table are you referring to?

13       Q.   Page 23.

14           THE COURT:  Table 4.3.

15       A.   Yes.

16       Q.   Is that for all the workers in the plant?  Any

17   of the numbers in the first column where it says Dana, are

18   those for all the workers in the plant?

19       A.   Can I read these?

20       Q.   Yes, please.  Feel free to read whatever you

21   like.

22           (A pause in the proceedings.)

23       A.   Yes.

24       Q.   So it includes supervisors?

25       A.   Yes, it is a plant-wide compensation -- it is a

299

1    plant-wide benefit level.

2           Q.    So it would include supervisors?

3           A.    Yes.

4           Q.    Plant manager?

5           A.    I believe so, sure.

6           Q.    Clerical workers?

7           A.    I believe so.

8                 THE COURT:  He said it encompasses all of them.

9    Get on.

10          Q.    And would that, that would be true not only in

11   your charts where you set forth what the current total

12   compensation is, but also in your charts where you say what

13   the total compensation will be after implementation of the

14   proposed changes.

15          A.    Yes.

16          Q.    Such as Debtor's Exhibit 55, correct?

17          A.    Yes.  And I have no reason to suppose the

18   inclusion of these extra workers changes the premium

19   particularly in one direction or another.

20          Q.    Did you make any effort to determine whether

21   that was true?

22          A.    I couldn't, 'cause I don't have statewide data,

23   but we do know that with issues like medical insurance, that

24   they are pretty much the same regardless of the worker

25   category, and therefore, benefit rates actually tend to be

300

1    higher for lower-skilled workers than for higher-skilled

2    workers with respect to that important component.

3           Q.   But the wages of, say, the plant manager, are

4    above those of the assembly line workers correct?

5           A.   Plant manager does get paid more than assembly

6    line workers.

7           Q.   And in determining the comparable private sector

8    number in your total compensation charts, both the ones that

9    show current total compensation and those that show, well, I

10   guess the numbers are the same, right?  The comparable column

11   is the same, both, for example, in table 4.3, which shows

12   current benefits, and Debtor's Exhibit 55, which behind tab C.

13              That was confusing.  Let me try to clarify it.

14          A.   It surely was.

15          Q.   You have, in your original report, you have

16   charts that show current total compensation at the five

17   plants.

18          A.   Yes.

19          Q.   And then you have another column right next to

20   it that shows what in your view is the market total

21   compensation.

22          A.   Yes.

23          Q.   And then in your new Exhibit 55, you look at

24   what the total compensation at the plants will be after

25   implementation of the Section 1113 proposal.

301

1          A.    When you say Exhibit 55 --

2          Q.    It's Debtor's Exhibit 55, behind tab C of the

3    looseleaf binder that was handed out by counsel during your

4    direct testimony.

5          A.    Yes.

6          Q.    And the numbers in the comparable private sector

7    column, the second column, is identical throughout.  That

8    doesn't change, correct?

9          A.    It changes by plant, because it's a different

10   skill mix.

11         Q.    But it doesn't change from the charts that show

12   the current Dana compensation to Debtor's Exhibit 55; correct?

13         A.    Yes.

14         Q.    And in coming up with that comparable number,

15   the comparable private sector numbers, did you look at -- did

16   you do what you did with wages and try to match specific

17   occupational categories at Dana to specific BLS occupational

18   categories?

19         A.    You're talking about benefits?

20         Q.    Yes.

21         A.    The benefits match is done with blue collar

22   workers, which is as close as you can come with the ECEC data.

23         Q.    And when you say blue collar workers, that's not

24   a BLS term.  What's -- correct?

25         A.    Well, it would include the workers that are

302

1    encompassed in this report.

2            Q.    Right, but what's the BLS category that you

3    looked at to obtain the comparable total compensation number?

4            A.    The benefits number is for blue collar workers

5    out of the ECEC report.

6            Q.    There's not a line in the ECEC that says "blue

7    collar workers," is there?

8            A.    I'm not sure if it says blue collar workers, but

9    it may.  It may say production workers.  I'm not sure exactly

10   what they have as the title.

11           Q.    And did you look at any particular industry to

12   get that comparable, such as the auto parts industry?

13           A.    I would not do so based on my methodology.

14           Q.    I'm not asking for the editorial comment.  I

15   just want to know factually, did you do that?

16           A.    I answered that question.

17           Q.    No, you did not?

18           A.    I did not.

19           Q.    So it's your understanding that there's a

20   category in BLS that says "blue collar workers" and that's the

21   wage you took?

22           A.    Yes.  That's the benefits --

23           Q.    Benefits?

24           A.    Yes.

25           Q.    Thank you.  And how did you break down the

303

```
1    comparable number by plants?  How did you end up with

2    different numbers for the different plants?

3          A.    That is much too vague to answer.  I have no

4    idea what you're asking.

5          Q.    Okay.  Look at Debtor's Exhibit 55.  Do you see

6    the column that says, "Comparable private sector workers?

7          A.    Yes.

8          Q.    And the numbers differ for the five different

9    plants, correct?

10         A.    Yes.

11         Q.    Why do they differ?

12         A.    Because the skill mix in each of the plants is

13   different.

14         Q.    But these numbers come from the BLS, correct?

15         A.    Yes.

16         Q.    So what did you look at that was different in

17   the BLS data that produced different numbers for these plants?

18         A.    As I've explained a number of times, the skill

19   mix differs from plant to plant.  What we did in the

20   comparison was compare each of the groups to their individual

21   groups in the private sector.  If a plant had more skilled

22   workers than another plant, the skilled worker category would

23   get a higher rating and therefore, its comparable wage would

24   be higher, reflecting the skill mix.

25         Q.    But to reflect the skill mix, you need to look
```

304

1  at particular occupational categories, right?

2          A.    That's the way I did the report.  I gave the

3  categories and matched it to private sector -- matched it to

4  private sector comparators and then we added it up.

5          Q.    Okay.  I asked you earlier --

6              THE COURT:  Counselor --

7          Q.    Maybe I'm misunderstanding --

8              THE COURT:  -- counselor, your time is just

9  about up.  We'll quit for the evening and you'll get a short

10 period of time in the morning to continue, but a short period

11 of time.

12             MR. DeCHIARA:  Thank you, your Honor.

13             THE COURT:  Because I think you're kind of --

14             MR. DeCHIARA:  I'm pretty much in the end,

15 towards the end.

16             (Continued on following page.)

17

18

19

20

21

22

23

24

25

305

1              THE COURT:  Well --

2              MR. BENNETT:  If he's able to finish --

3              MR. DeCHIARA:  I'm not suggesting I'll finish

4    today.  I'll be happy to break for the evening --

5              THE COURT:  Can you do this in another 15

6    minutes?  We'll accommodate you.

7              MR. DeCHIARA:  I can't represent that to the

8    court, your Honor.

9              THE COURT:  Well you can't expect much more time

10   tomorrow.  Very well.  Tomorrow, 10 o'clock.

11             (Time noted:  7:25 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

306

1                    C E R T I F I C A T E

2   STATE OF NEW YORK   )

3                              : ss.

4   COUNTY OF NEW YORK )

5

6           I, DAVID LEVY, CSR, a Shorthand

7       Reporter and Notary Public within and for

8       the State of New York, do hereby certify

9       that the foregoing proceedings were taken

10      before me on March 27, 2007;

11          That the within transcript is a true

12      record of said proceedings;

13          That I am not connected by blood or

14      marriage with any of the parties herein nor

15      interested directly or indirectly in the matter in

16      controversy, nor am I in the employ of any of the

17      counsel.

18          IN WITNESS WHEREOF, I have hereunto

19      set my hand this 29th of March, 2007.

20

21                      _____

22                          DAVID LEVY, CSR

23

24

25

307

1    ---------------------- I N D E X ----------------------

2    WITNESS                  EXAMINATION              PAGE

3    JEFFREY MILLER  DIRECT - BENNETT                   4

4                    VOIR DIRE - LEVINE                16

5                    CROSS - LEVINE                    19

6                    REDIRECT - BENNETT                31

7                    RECROSS - LEVINE                  34

8    PILAR TARRY     DIRECT - JIMENEZ                   34

9                    CROSS - LEVINE                    45

10                   REDIRECT - JIMENEZ                54

11                   RECROSS - MR. LEVINE              55

12   JANEMARIE MULVEY DIRECT - HAMILTON                56

13                   CROSS - CECCOTTI                  86

14                   REDIRECT - HAMILTON              126

15   ROBERT ARQUETTE DIRECT - JIMENEZ                 128

16                   CROSS - LEVINE                   151

17                   CROSS - CECCOTTI                 163

18                   CROSS - MORELAND                 173

19                   REDIRECT - JIMENEZ               173

20   MICHAEL WACHTER DIRECT - BENNETT                 174

21                   VOIR DIRE - DeCHIARA             192

22                   DIRECT - BENNETT (Cont'd.)       197

23                   CROSS - DeCHIARA                 232

24

25

308

| | DEBTOR'S EXHIBITS | RECEIVED IN EVID. |
|---|---|---|
| 1 | | |
| 2 | 67 | 8 |
| 3 | 66 | 17 |
| 4 | 4 | 19 |
| 5 | 7 | 45 |
| 6 | 32 | 81 |
| 7 | 34 | 84 |
| 8 | 31 | 84 |
| 9 | 5 | 86 |
| 10 | 1 | 133 |
| 11 | 23 | 139 |
| 12 | 25 | 149 |
| 13 | 8 | 179 |
| 14 | 46 | 187 |
| 15 | 56 | 197 |
| 16 | 55 | 200 |
| 17 | 57 | 215 |
| 18 | 58 | 217 |
| 19 | 59 | 220 |
| 20 | 205 | 220 |
| 21 | 60 | 222 |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**A**

**AAM** 239:7,11
**AARP** 57:14,20 58:3
58:25 59:2,2,6
63:6
**AARP's** 57:19
**abbreviated** 239:8
**ability** 15:22 169:3
182:12 184:5
199:21 202:9
208:25 217:6
291:11
**able** 9:2 16:3 27:22
28:1,8 31:4 41:25
42:3 53:6 65:10
170:4,8 199:23
220:19 221:7
228:3,16 232:1
264:20 296:6
305:2
**above-market**
208:20
**ABPO** 119:23
**absence** 216:19
**absolutely** 11:19
101:9 146:25
187:4 215:10
**academic** 174:24
175:13 180:4
220:24 253:6
**accepting** 227:17
**access** 12:12 13:20
18:3 26:5 27:13,14
31:21 32:17,18
33:1,3,8,11 38:2,4
38:8,10,13,14,16
38:21 51:25 52:7,9
52:19 73:17 114:3
114:5,6
**accidental** 132:24
**accommodate** 305:6
**accommodation**
293:4
**account** 79:2,20,22
79:25 82:3,18
90:25 91:1,5 99:4

117:16 119:8
136:22,23 143:20
144:1,9 145:23,25
146:21 147:1,4
150:10,11,14,19
163:7 168:6
191:13 249:10
271:5,10 276:9
278:2 279:6,18
283:12,14 285:6
285:12
**accounting** 64:5,6
64:14 72:13
283:22 284:15
**accounts** 18:16
80:23 81:3 93:9
100:9 116:15
137:5
**accrued** 144:17
**accumulated** 145:23
**accumulation** 143:8
146:19 147:2
**accuracy** 273:23
274:13
**accurate** 18:23
85:12 133:13
160:23 213:22
254:6 262:19,20
263:1
**accurately** 57:1
105:5
**accusing** 265:13
**achieve** 132:7
168:18,22 233:18
239:18 292:14,24
293:16,17
**acknowledged**
256:25 263:16
**actions** 32:20 76:20
77:12,20,21
162:21
**active** 66:20 68:10
68:13,17,22,24,25
69:7 70:17 71:4,17
72:9 73:1,7 78:5
78:10 79:16 81:20

105:20 106:10
119:3 133:23
149:25 150:1
156:25 157:1
162:17 176:8
**activity** 16:16 18:4
**actual** 39:18 90:1
97:4 116:18 166:6
166:7,10,24
167:14 226:11,14
234:5
**actuarial** 39:6 60:9
**actuaries** 142:3
150:13
**actuary** 86:20 146:6
**Ad** 3:4
**add** 82:22 161:11
182:4 222:5
**added** 14:7 131:13
143:21 144:1,8
146:21 147:1,4
265:17 270:1
304:4
**Adding** 166:18
**addition** 13:12
17:17 20:22 21:16
54:9 64:14 83:11
105:19 107:18
119:4 127:21
131:12,17,22
144:4 146:22
152:18 169:13
170:19 191:2
200:12 202:12
222:24 226:4
291:20 296:17
**additional** 23:24
44:13 52:21 144:7
147:22 152:9,20
172:25 178:19
206:10
**address** 12:9 26:24
32:14 101:15
238:18 248:10
256:18
**adds** 42:10

**adequately** 62:8
**adjust** 270:22
279:22
**adjusted** 26:12
114:20 115:11
**adjustment** 116:1
256:21
**adjustments** 291:13
291:19
**administer** 62:24
**administers** 170:15
**administration**
57:17 58:2 61:21
**administrator**
170:18
**admissible** 202:20
**admission** 196:15
214:25
**admitted** 84:5 197:9
200:14 215:20
217:20
**adults** 101:17
**advance** 126:5,8,10
**advantage** 12:24
167:8,12 170:22
283:22 284:10,15
297:6,11
**advantages** 284:14
285:3,5,12
**adverse** 92:23
271:24 272:1
**advise** 58:15
**advised** 21:8,10 30:1
30:2 47:8,11 86:24
**adviser** 51:25
**advisers** 13:5 21:1
37:15 38:2,4,20,22
38:24 42:22 43:6
44:21 52:16 55:3
176:10
**advises** 258:21
**advisory** 57:21
**advocacy** 62:6
**AD&D** 132:24
134:17 159:5
172:7

**affect** 12:6 138:6
145:2 146:17
204:14 220:15
231:12
**Aftermarket** 144:12
**afternoon** 86:15,16
232:11,12 246:17
**age** 118:1,2,3,4,6
145:18
**aged** 145:21
**agencies** 176:8
**agency** 62:24 112:19
112:20
**agents** 10:6
**aging** 59:20 65:1,4
**ago** 44:16 54:22
135:20 150:13
152:1 155:1
171:19,22 212:19
219:5 234:18
237:6
**agree** 135:25 154:16
154:17 158:4
202:21 254:13
**agreed** 256:20
**agreeing** 178:3
**agreement** 31:21
32:17 33:1 38:22
38:23 52:13,15
88:9,18 157:12,24
171:10 173:12
183:15 201:13
209:10 249:3
254:8,12 278:23
278:25 279:2,3
**agreements** 154:7
155:3,8,14 157:16
157:25
**Ah** 108:14 125:14
**ahead** 4:14 8:4
10:11 36:22 81:24
84:2 99:7 182:24
188:1,2 224:25
281:20 282:24
**AHPR** 112:19
**aid** 219:25

**Aikman's** 190:9
**air** 124:14 177:7
235:8,16,16 236:2
237:3,8,14,16
274:12
**airline** 235:17 237:9
238:5
**airlines** 120:5 177:7
235:25 236:5
237:8,18,21,24
238:10
**alerting** 36:15
**Alex** 34:20,21,24,25
35:2,6 36:10,19
44:3 51:18
**Alice** 215:14
**align** 115:4
**alignment** 199:15
**Allied** 218:22
**allocated** 142:4,8
**allow** 28:14 150:15
162:8 207:8 214:4
222:2 225:11
244:1 256:9
**allowance** 151:24
153:4,13 257:19
257:20
**allowing** 197:9
287:20
**allows** 9:11 11:13
15:1,21 122:2
**all-in** 182:7 227:20
**alternative** 62:25
110:9 244:3
**altogether** 73:12
**Ambient** 274:10
**amended** 7:7
**America** 156:8
280:17
**American** 9:21
56:13 57:8,10
59:10,17 60:2 62:1
62:3,4,14 170:16
181:4,5 219:19
222:9 223:2
239:11,16 240:11

240:12,17 241:21
**Americas** 2:21
**amicable** 7:14
**amount** 39:3 77:1,2
77:6,23 78:1 83:9
133:4 136:22
139:24,25 142:4
142:14 144:7
145:25,25 146:9
147:22,25 150:19
152:20 180:6
185:5 245:10
278:8
**amounts** 134:22
142:2
**analysis** 41:3 44:8
44:11 45:1 58:1
62:22 80:10
108:24 109:19
177:17 185:18
187:14 188:16
191:12 194:4
210:21,23 222:16
223:17 224:21
226:10 237:15
245:12,14 249:19
249:21 250:23
254:22 255:9,10
257:21 263:11
265:11,12 269:6
270:7 284:11,22
287:22 288:2,5,24
288:24 294:18
296:10,19
**analyze** 114:12
198:1 296:17
**analyzed** 77:5
**and/or** 20:3 37:15
153:18
**announced** 139:14
141:9 143:6 150:6
**annual** 66:25 67:9
85:6 108:3 134:23
138:2,4,12 143:20
145:24,24 146:8
147:1,24 152:2

162:16 164:11
170:6
**annuitized** 150:14
**annuity** 146:4,8,9
**answer** 21:24,25
43:18,25 44:12
106:13 163:22
236:16 238:2
241:4,8 242:18
244:1 245:23
246:9 253:13
268:6 269:3 282:6
282:8,8,10,17,18
282:23 287:20
290:11 291:4,8,9,9
292:19 295:15
303:3
**answered** 22:21
234:15 243:24
282:23 302:16
**answering** 251:20
**anticipate** 86:7
**anticipating** 110:17
**anticipation** 10:14
29:9
**anybody** 26:5 28:18
53:2
**anymore** 122:23
**APBO** 118:14,16,18
**apologize** 43:3 81:25
91:9 116:17
172:19
**appear** 26:1 176:18
**appears** 7:22 70:6
98:16
**appended** 101:1
**appendix** 56:21,24
**applauding** 290:19
**apples-to-apples**
145:4
**applicability** 209:20
**applicable** 107:5
108:20 171:11
**applied** 82:5 161:16
166:8 168:8 209:8
260:17

**applies** 97:4 247:17
**apply** 109:3 247:13
   247:15,20
**appointed** 130:7
**appreciate** 282:18
**approach** 34:15
   101:3 103:10,11
   128:15 174:7
   232:23 256:3
   283:15 284:14
   285:4 288:1
**approached** 10:6,13
**appropriate** 50:21
   83:25 127:21
   142:3 172:21
   211:9 217:21
   222:17 228:12
   251:19
**appropriately**
   253:11
**appropriateness**
   172:22
**approximate** 66:9
   152:20
**approximately** 37:3
   58:7 74:4 130:5
   141:25 142:17
   143:2 146:10
   147:8 152:16,19
   161:14,20
**April** 150:6,20
**aprons** 273:18
**Arabic** 280:6
**arbitration** 253:25
   254:6,6,11,18
   256:16,18 257:2
**arbitrations** 176:19
   176:21,24,24
   177:3 256:22
   257:1
**arbitrator** 254:8
**Archway** 9:21
**area** 32:21 34:13
   217:7 274:10
   276:8
**areas** 6:9 113:5

218:14 280:10
   286:20
**argue** 255:4,12
**argued** 250:4 254:24
   257:2
**argues** 250:19
**arguing** 8:14
**argument** 223:8
   249:13,25 255:7
   255:17
**arguments** 214:15
**arising** 138:2 162:16
   196:4
**arithmetic** 246:10
**Arizona** 219:11
**armed** 169:11
**Arquette** 60:18
   97:19 127:7
   128:13,14,20
   129:2 132:9
   133:17,22 135:1
   137:21 139:7
   148:8 149:24
   151:5,10 158:21
   173:4,21 307:15
**Arquette's** 107:23
   109:14 110:2,13
**arrangement** 167:15
**arrangements**
   113:15
**arrive** 141:22
**arrived** 150:12
   183:24
**art** 246:3,4
**article** 220:11
   221:14,16
**articles** 177:16
   180:5
**ascertain** 36:13,19
**Asia** 65:6
**aside** 167:14
**asked** 11:6 13:7,9
   15:17 22:21 23:15
   27:9 31:18 44:13
   44:16,22 52:6 55:9
   55:13 77:9 87:20

114:11 126:20
   130:5 132:4,5
   162:12 168:15
   176:15 183:4
   185:2 189:2
   193:12 225:1
   239:23 241:2,7
   269:18 287:22
   304:5
**asking** 14:14 20:10
   21:20 48:13 58:17
   100:12 172:22
   237:11 244:23,25
   247:17 251:9
   265:14,24 269:2
   269:18,19 292:12
   302:14 303:4
**asks** 49:14
**aspect** 15:12 218:7
   263:23
**assembled** 226:1
**assembler** 244:4,4
   258:7,15 261:13
   261:14,15,19
   262:6 263:17
**assemblers** 186:2,2
   202:9 211:1,2
   222:20 223:22,22
   224:5,7 225:1,2
   231:25 260:22
   261:25 262:4
   263:10 271:12,18
   271:19
**assembly** 202:7
   225:4,14,15,16,17
   225:18,24,25
   226:3 258:6,9
   272:13 300:5
**assemply** 300:4
**assets** 42:12 130:20
**assigning** 134:4
**assist** 132:4,5
**assistance** 214:20
**assistant** 175:1
**assisted** 134:2
**associate** 175:2

**associated** 11:17
   13:10 31:19,21
   41:6 147:15 148:4
   148:21 149:15
   196:23
**Association** 57:8,10
   253:25
**associations** 76:25
**assume** 24:14,16
   26:23 27:5,22
   28:17 209:5
   270:13,14,20
   289:20
**assumed** 36:22
   122:22 290:24
**assuming** 8:17 71:23
   178:9 270:11,13
**assumption** 110:20
   289:21
**assumptions** 39:23
   44:12 227:15
**Atkins** 35:9
**attempt** 13:15
   139:12
**attempting** 250:7
   257:1
**attend** 60:18
**attended** 30:9
**attending** 60:19
**attention** 57:4 84:18
   84:20 91:24
   189:22 269:5
   275:16
**attorney** 242:21
   251:9
**attorneys** 2:4,20 3:4
   3:10 26:12
**attract** 199:23
   208:17 235:22
   295:17 296:2,20
**attracting** 270:21
   296:6,12 297:13
   297:15
**attractive** 190:6
**attributable** 119:24
**attributed** 132:20

132:23 133:5
**attributes** 95:11
    107:25
**attrition** 194:9
    269:15
**attuned** 277:25
**Auburn** 41:21 49:17
    49:17 171:8
    182:19 183:20
    184:5 188:25
    192:6,19 193:5,21
    194:6,14 195:3
    200:25 201:1,14
    202:6,8 204:15
    225:3,14,24 229:5
    231:2,22 264:7,11
    264:18 266:13
    267:13 268:5
    269:19 298:9
**auditing** 131:14
**August** 59:9
**author** 87:19
**authoritative** 67:12
    184:16
**authorized** 9:1
    131:7
**auto** 9:23 178:3
    180:10 211:6,7,18
    211:20,24 212:1
    212:22 214:7
    215:1,16 216:22
    217:3,7 218:15
    219:7,14 221:8,16
    228:14 231:17,24
    232:14 233:16
    245:2,16 246:8
    288:6 302:12
**automated** 226:8
**automotive** 119:4
    123:17 144:12
    177:8 212:15,20
    218:22
**autopsies** 62:12
**availability** 168:24
**available** 21:21
    36:17 37:21 39:1

41:10 44:18 92:19
115:14 146:1,11
152:25 164:14
168:25 187:15
236:15 298:4
**Avenue** 2:12,21
**average** 80:19 81:1
    114:22 126:6
    143:18 144:14
    151:17 164:5,6
    166:18 185:13
    188:12 223:1,2,3
    224:15 227:18,18
    230:8,8 233:9,10
    233:19 234:6,8
    235:2 240:16,19
    244:13,15,19
    248:15 249:2,6
    254:25 256:5
    257:4,8,10,13,14
    259:12 260:2
    261:12,20,24
    262:12,16,16
    264:10,22,25
    265:4,18 266:13
    266:16,17,25
    268:23,23 269:11
    269:21 270:8,16
    271:7,7,11,18,19
    281:1 283:6,7
    286:20,22 293:1
**averages** 166:19,20
**award** 200:8
**aware** 12:25 13:8
    14:23 16:8 20:15
    24:18 26:14 33:2,7
    33:24 41:9 44:20
    76:24 77:4 85:12
    108:7 110:22
    119:9 120:7
    121:11 126:25
    270:17
**Axle** 239:7,11,16
    240:11,12,17
    241:21
**a.m** 1:12

**B**

**B** 1:14 11:13 37:7
    47:7 66:22 70:22
    84:11,12 91:8,14
    93:11 126:16
    128:17 134:6,8,9
    163:14 174:14
    181:17 186:23
    228:18
**Babette** 3:14 26:3
    86:14
**baby** 59:19 65:1
**back** 5:14 39:15
    64:2 70:21,22
    71:21 84:18 98:8
    100:16 103:9
    105:2,24 106:23
    107:22 109:6
    123:10 155:17
    163:13,16 168:14
    179:11 184:2
    185:5 189:2
    192:25 193:19
    194:3 195:14
    223:16 225:16
    228:18 246:20
    252:14,18 253:20
    254:2 256:12
    275:8,21 285:15
    292:10 293:19
    294:18
**background** 5:13
    6:2 45:24 57:1
    174:18 179:11
**backup** 41:5,8
    196:19 214:19
    216:4 217:13
    218:19
**bad** 209:12 211:10
    228:14 234:18
    281:4
**baked** 223:5
**balance** 39:15 64:9
    143:18 145:23
    150:11,14 186:2
    226:6,7 258:9

**balances** 144:9
**balloting** 10:5
**ballpark** 66:9
    267:15
**BALL,ESQ** 2:16
**bankruptcies** 120:7
    189:23 238:5
**bankruptcy** 1:1,8,16
    87:8,10 120:4,16
    120:21 121:10,15
    121:22 122:4,19
    123:11 124:23,24
    131:10 171:14
    175:21,23,25
    177:7 190:8,8,9
    220:20 231:17
    243:3 270:24
    288:9 291:12,17
**bar** 68:4,7 104:15,15
    104:16,19
**bargain** 228:4
**bargained** 142:6
**bargainer** 158:6
**bargaining** 142:7
    153:23 154:1,7
    155:8,11,13,18
    157:14,16,18,21
    157:25 171:10
    176:14,17,17
    183:15 209:10
    254:8,12
**base** 39:20,20 40:13
    40:14 45:3 48:15
    140:1,2 144:15
    146:20,25 147:6
    151:15,19 152:6,7
    152:18 176:12
    252:5
**based** 9:22 113:25
    114:2 199:19
    204:13 240:13
    260:7,9 261:20
    286:18 288:23
    302:13
**bases** 203:1
**basic** 145:8,20

146:10 188:15
292:6 295:10,11
295:12
**basically** 60:12
61:14 62:5 66:6
80:10 81:17 89:9
136:13 176:20,23
**basis** 41:17 46:25
53:4 131:17 147:1
196:15 200:20
202:21 203:3,16
215:6 221:14
276:6
**battle** 273:17 274:1
**Beach** 170:20
**beads** 273:20
**bear** 64:22 246:2
**beg** 172:24
**began** 10:3 129:9
131:3 132:22
176:18 219:16
**beginning** 22:10
57:11 140:18
190:8 195:8
210:22 256:23
284:10,11
**begins** 259:24 261:9
**begun** 131:20
189:14,24
**behalf** 4:4 26:19
46:5 53:5 54:4
59:2 186:19
254:18 281:23
**behavior** 96:7 98:25
99:20 100:12,21
101:12,17
**belief** 85:13 276:21
**believe** 7:15 10:19
13:2,5 17:2 18:22
23:13,18 25:3,13
25:25 29:5 30:14
38:10 41:11 42:2
42:11 45:22 47:19
48:8,17 49:8 72:3
83:14 88:10 89:7
90:4,8 94:5 95:1

96:13 97:6 101:10
103:14,24 105:5
105:10 106:7
110:1 118:15
119:14 127:1
133:3,6 138:25
150:5 152:4,23
159:2 161:5,14
164:10,19,20
165:10 168:17,21
185:1 200:12
206:7 209:22
221:9 248:4 274:4
276:20,24 277:1
277:16 278:22
279:19 299:5,7
**believed** 292:23
**believer** 219:17
**believes** 109:8,22
**below-market** 297:5
297:14
**belt** 218:11 219:22
**benchmark** 75:14
239:17 286:21
**benefit** 20:25 39:5
49:11 59:24 60:13
67:1 74:14 76:25
105:22 107:19
127:23 130:15
140:17,22 141:14
143:16,19 144:7
144:10,12,14,17
144:17 145:8,13
145:14,20 146:11
146:13,24 150:3
150:10 158:17
169:16 177:11,24
178:18 184:18
193:24 199:1
204:17 276:9
278:2 297:10
299:1,25
**benefits** 60:15,15
61:15,19 62:16
63:3,19,20 66:2,11
67:13,19,24 68:1

68:10,12,14,18,21
68:24 69:1,7 70:17
72:8 73:1,6,7,9
74:2,15 75:25 76:8
76:11,13,16,21
77:3,21 78:5 92:7
92:10 93:13 97:5,8
100:18 120:3
122:15,18 126:6
130:6,9,12,14
132:21 134:12,18
134:20 136:14
139:17,21,22
140:15 142:25
143:2 144:20
147:18 149:25
150:4 151:22
154:5,23,23 155:2
156:1 158:10,15
159:5,15 169:14
172:6 173:23
176:25 179:1,13
179:14,17,19,23
179:24 180:1,14
181:22 182:1,4,5,7
182:13 184:17
188:9,16 198:8,24
199:13,13,16
200:13 204:10
205:23 207:18
221:10 276:6
296:18,22,25
297:5,15 298:4
300:12 301:19,21
302:4,22,23
**benign** 7:22 8:7,13
8:15
**Bennett** 2:8 4:8,10
4:13,17,19 5:1,7
5:20,23,25 7:3
8:17,22 16:21 17:7
19:4,10 22:21 31:3
31:16 34:1 129:11
174:5,10 177:21
178:5,9 179:5
186:16 187:1,5

188:1 192:9
196:16 197:12,14
199:24 200:9
201:22 202:23
203:10,14,21
210:5,7 212:5
214:17,24 215:24
217:10,24 219:24
220:5 221:11,18
221:22 227:14
230:17 232:6
242:19 248:17,24
256:7 282:19
305:2 307:3,6,20
307:22
**best** 36:2 37:19
41:24 81:22 85:12
106:25 147:20
150:24 195:12
196:11 197:8
213:13,25 221:10
221:10 244:3
249:1 281:14,18
285:7
**Bethlehem** 123:11
123:24
**better** 110:11
111:10 116:25
187:23 188:7,11
**beyond** 117:18
**big** 68:4 107:22
110:7 113:19
115:1 182:2,9,10
194:19,20,21,23
226:1 246:25
**bigger** 106:21,22
**biggest** 247:3
**billion** 118:11
**bills** 113:2 136:17
**binder** 6:11 16:11
29:5 34:14 35:20
37:7 49:21 66:22
128:16 132:10
134:7 137:22
139:8 158:24
162:14 174:7

178:12 188:20
198:11 212:7
273:11 301:3
**binders** 4:13
**bit** 4:24 12:18 47:3
64:1 163:17 175:7
176:12 202:10
210:1 211:10
251:4 287:15
**black** 67:22 273:20
**block** 91:25
**blood** 306:13
**bloom** 189:24
**BLS** 244:20 246:24
247:3 258:1,7,14
258:21 260:9,13
262:5 263:4 271:8
301:17,24 302:2
302:20 303:14,17
**blue** 259:11 260:1
301:21,23 302:4,6
302:8,20
**BM** 32:12
**BMC** 4:22,25 5:11
5:16 6:3,4,5,6 9:12
10:5 14:10,13
30:10 32:9,18
**BMC's** 14:16,17
**board** 176:9 207:1
279:13
**Bob** 60:18 127:7
128:13
**body** 204:2 240:17
**bold** 280:9
**bonus** 152:3,12,13
152:15,17,20,22
152:25 153:2,11
153:12,12
**book** 58:25 61:16,18
107:22 127:15
**booklet** 261:7
**books** 100:16 167:15
**boomers** 59:19 65:2
**borne** 64:25
**bother** 167:14
**bottom** 13:21 30:3

65:12 82:22 90:11
93:12 101:11
168:16 260:21
280:8,13 283:4
**Bowling** 1:9
**boy** 129:9 228:19
**braces** 273:19
**break** 91:18 97:24
103:6,8 106:12,24
127:14,21 150:25
151:2 160:16
166:2 275:18
302:25 305:4
**breakdown** 107:15
166:4 194:6
**breaks** 94:4
**brief** 45:20 139:12
164:21 178:15
182:23 183:22
**briefly** 24:19 26:23
36:6 38:25 39:2
129:15 132:2
143:13 148:12
149:4 164:25
208:16 285:8
**bring** 4:24 9:10 56:5
57:3 199:15 233:9
233:10,19
**brings** 199:7
**broad** 8:23 179:12
188:3 201:7 267:8
**broader** 211:3
223:25
**broken** 162:8
**Bruce** 3:13,16 19:13
**brutal** 212:19
**bucket** 116:23
**bucks** 96:24 167:17
**budget** 39:18,21
40:19,21 44:24
47:19 54:23 55:5,7
**budgeting** 175:13
**Bueter** 41:16 47:3
50:17 134:3,14
173:5 184:25
193:12 194:3

200:22 224:11
225:7,7,9,12
232:16,19 233:6
233:17 234:2,16
239:15,23 258:12
263:3 276:14,20
278:12 279:3
**Bueter's** 41:18
173:17 232:21
233:5,24 275:22
275:25
**build** 170:20
**built** 170:15
**bulk** 156:19 222:19
222:21 262:4
**bullet** 101:10,14
102:5
**bundling** 59:17
**burden** 154:22,23
**burdens** 58:2
**Bureau** 184:13
244:20 260:8
**Burns** 43:21
**BURTON** 1:15
**Bush's** 61:21
**business** 5:15 64:16
65:15 66:17 73:9
234:3 235:3
**businesses** 276:4
**busy** 75:12
**buy** 158:17 180:11
**buying** 207:18
**buyout** 206:13

**C**

**C** 2:1 3:1 4:1 11:13
80:13 98:8 107:2
137:22 162:14
174:8,8 186:23
198:10 229:25
300:12 301:2
306:1,1
**Cable** 35:9
**calculate** 140:6
141:3,19 143:10
147:14 148:3,21

149:14 159:19
163:25 179:21
298:3
**calculated** 186:12
230:21
**calculation** 118:17
118:18 161:21
163:14 227:21
265:15,20,23
**calculations** 162:1
224:9 227:8,16
231:12
**calculator** 161:12
**calendar** 153:8
**California** 219:11
**call** 13:17,17 18:10
28:24 29:1 34:11
39:20 40:16 43:24
44:6,10,18 49:13
56:3 58:10 87:19
98:16 113:1
128:13 130:2
137:17 143:24
144:13 172:4
174:5 187:23
210:15 225:12
226:16,17 229:18
**called** 11:2 38:8
60:5 62:25 73:16
78:12 92:23 95:10
95:15 105:4
112:11 129:18,19
129:22,23 130:6
132:24 136:8
144:6 147:23
166:12 170:22
186:7 187:10
189:12 191:7
208:7 218:11
256:24 274:8
281:16 289:23
**caller** 13:13
**calling** 37:1 55:25
**calls** 29:1 42:19,23
43:9,10 256:7
**Canada** 156:9

**cancer** 62:11
**candid** 251:11
**capacity** 153:23
  175:12 290:17
**capita** 166:21
**capital** 180:11
**capped** 119:24
**caps** 119:7,10,12
**capture** 113:5,12,14
**captured** 249:8
**car** 9:22 151:24,25
  153:3,13
**care** 18:12 59:18,19
  59:22 63:6,20
  64:16,18 74:1
  78:16,18,22 79:10
  79:12,23 80:1
  81:18 111:9
  117:17 137:2,6
**career** 143:18
  157:18,20 175:14
  203:20
**Carolinas** 219:10
**carpenter** 260:16
**carrier** 273:16
**carriers** 254:1,24
  255:5,11,22,25
  256:4,17,19,21
  257:3,7
**carry** 154:22
**carryover** 144:8
**cars** 216:17
**case** 9:24 10:4,19
  11:19,22 12:2
  15:17 18:15 20:9
  22:13 27:7 39:20
  40:14 45:3 48:15
  49:7 50:8 69:14
  76:15 87:7 88:19
  116:3 123:4,19
  124:10 145:24
  150:18 177:9,19
  181:10 188:17
  196:1 197:17,20
  204:25 205:4,6,8
  205:10 207:23

208:1,4,12 220:15
  222:9 231:12
  232:15 235:9,11
  235:13,16 236:12
  237:4,7,14 238:16
  238:16 239:2
  241:22 242:8
  243:10 248:2,9,22
  249:12,19,25
  254:21 257:21,24
  270:1 272:16
  278:4 281:6,22
  286:2 289:15
  290:5 293:10,11
**cases** 9:13,16 35:3,6
  35:10 91:17
  120:21 121:15
  122:21 143:2
  177:7 205:2 206:4
  277:11
**cash** 39:16,17 123:9
  126:5,8 143:17,18
  143:18 145:9,21
  146:15 158:16
**castings** 273:21
**catastrophic** 168:12
**categories** 11:1,25
  17:10 39:4 104:23
  109:1 138:14
  181:22 185:15,17
  189:11 191:2,3
  223:4 224:4
  257:25 260:14
  262:1,3,7 263:4
  278:11 301:17,18
  304:1,3
**categorization**
  229:22
**categorizations**
  185:3
**category** 21:13 27:5
  27:8 73:14 104:3
  104:20 105:13
  113:16 138:16
  152:22 182:14
  185:24 186:7

191:5 196:8
  244:20 247:3
  258:15 261:19
  262:5 263:6,10
  271:9 299:25
  302:2,20 303:22
**cause** 82:8 194:18
  277:6 299:22
**caused** 89:5 92:22
**causes** 250:10
**ceased** 147:24 150:3
**Ceccotti** 3:14 26:3
  28:15 63:13 81:6
  81:10 83:17,23
  84:13 85:18 86:8
  86:13,14 91:20
  94:8,18,22 97:16
  98:1 101:3,9 102:8
  102:11,13 103:6
  103:13 104:10,14
  106:12 125:11,14
  126:12 127:9,13
  127:20 128:1,4,8
  128:10,24 133:18
  139:3 149:20
  150:22 151:3
  163:10,12 172:11
  307:13,17
**Ceccotti's** 162:10
**Center** 59:10,14
  63:8
**certain** 42:25 44:23
  50:15 57:21 92:23
  110:9 131:3,4
  132:6 133:5 134:4
  135:7 137:8
  147:21 155:20
  169:7 237:2 245:5
  267:24 268:2,7,21
  278:24 279:5
  297:25
**certainly** 26:15 99:8
  145:12 153:12
  154:9,15,17,21
  158:7,14 159:25
  176:3 181:25

207:11 209:3
  216:12 217:7
  218:12 220:17
  222:9 224:8
  226:13 227:10
  231:24 241:14,20
  250:3 254:11
  262:15 265:10,17
  267:17 278:4
  279:15,16 284:21
  286:3 293:8
**certify** 306:8
**cetera** 24:20 32:15
**chain** 43:25 44:1
**challenge** 8:9 131:19
  262:18
**chance** 242:14
**change** 64:15 139:18
  139:19 140:3,7,10
  140:12 141:4,7
  143:11 147:15
  148:4,9,22 157:2
  163:20 166:19
  207:4 220:17
  252:4 266:19
  301:8,11
**changed** 130:25
  131:2 185:7
  195:16 208:4
**changes** 78:4 83:19
  83:21 89:6,8,9
  93:14 134:24
  138:3,6,19,20
  139:13 140:21,24
  143:4,13 144:24
  144:25 145:10
  149:1,9,15 153:14
  244:16 289:15
  299:14,18 301:9
**changing** 60:14
  61:18
**chapter** 35:3,5 67:19
  86:25 90:1 93:7
  138:4 142:11,24
  288:8
**characteristics**

272:14
**characterization**
156:16
**characterized**
105:10
**charge** 167:21
**chart** 68:17 83:20,24
108:12 134:10,13
138:1 139:11,17
140:9 141:6 143:3
143:23,24,25
146:20 147:10
148:7,25 181:18
181:20 186:4
188:23 192:4
228:23 244:13
283:7 298:8
**charts** 39:9 203:22
203:23 258:4
298:8 299:11,12
300:8,16 301:11
**cheaper** 79:14 110:9
156:11
**check** 36:12 53:2
137:1 182:1
193:12 237:10
**checked** 53:3 193:25
194:2
**checking** 22:15
**chief** 35:8 61:10
130:4 153:25
**China** 65:4 72:20
212:24
**choose** 184:15
228:10
**Chris** 41:18 134:3
184:25 185:1,2
193:12 194:3
200:22 224:10
225:6,7,9 232:16
232:19 234:2
239:15,23 258:12
263:3 279:3
**chronic** 82:7
**circumstances**
146:12 151:11

158:1 190:4
**cite** 94:5 109:11
158:10
**cited** 88:5 118:10
**cites** 99:14 119:23
**citing** 93:4 109:14
117:19
**civil** 243:2
**claim** 125:7 142:9
142:10 167:25
173:22
**claimants** 142:1,2
142:12 158:17
**claims** 10:5 114:1,7
114:13 115:9
117:7,23 125:25
126:21 141:24
164:2,4,7,12,14,16
165:15,21,25
166:6,7,9,10,17,20
166:21,24 167:3,5
167:7,7,10 169:22
170:9
**claims-paid** 165:25
**clamoring** 95:10,20
**clarification** 247:4
**clarify** 34:4 242:22
243:4 245:24
253:13 300:13
**clarity** 269:23
**classes** 235:16
**classification** 185:2
**classified** 262:4
**cleanest** 162:11
**clear** 43:2 124:19
178:2 212:14
222:5 231:14
236:11 244:25
266:5,6 291:12,14
**clearly** 195:4 196:2
202:8 219:6 228:3
278:18
**Clerical** 299:6
**clerks** 256:17,21
**Cleveland** 2:13
**click** 13:23

**client** 59:3
**clients** 6:20,22,24
15:14
**Clinton** 57:16
**clock** 275:16
**close** 83:10 116:21
278:10 301:22
**closed** 154:12 155:1
155:7,22,24
**closely** 79:12 94:2
115:4 185:6 206:3
**closer** 4:24 64:1
183:1 191:21
**closest** 210:14
**closings** 155:10
**CMS** 62:24
**coauthored** 58:25
**code** 32:14 121:22
**Cohen** 3:9 19:13
86:14 232:13
**coinsurance** 82:10
83:6 89:8 108:8,14
**collar** 259:11 260:1
301:21,23 302:4,7
302:8,20
**colleague** 4:8
**colleagues** 215:6
**collect** 32:12 86:9
112:23 164:11
189:14 204:10
**collecting** 189:14,15
193:19
**collection** 32:8,19
204:9
**collective** 153:22
154:7 157:13,16
157:20,25 171:10
176:14,16,17
183:15 209:10
254:8,12
**collectively** 142:6,7
**College** 56:12 62:1,3
62:4,14
**Collins** 190:9
**color** 103:15
**Columbus** 56:2

**column** 17:13 27:17
28:3 71:13 80:25
82:1,11,14,18,23
83:2 85:4 91:24
93:18,20,21,22
112:2 126:17
184:9,10 198:18
198:25 200:3,6
244:18 245:1,8,10
245:18 252:19
253:16 259:10,22
265:8,16 266:22
269:16,20 270:4,5
280:20 298:17
300:10,19 301:7,7
303:6
**columns** 26:22
**combination** 170:14
**combined** 265:18
288:24
**come** 34:6 50:15
57:7 58:3 104:23
112:7 160:3
166:14 182:15
196:21 198:22
203:3 213:2
220:19 230:4
260:19 269:25
285:3 292:4
301:22 303:14
**comes** 50:18,20
189:12 210:14
**coming** 122:10
175:9 270:15
301:14
**comment** 216:15
223:20 253:14
268:4 287:10
297:21 302:14
**comments** 74:19
209:21 210:16
**Commercial** 9:21
**commissions** 57:21
**committee** 2:20 3:4
10:9,18 12:25
13:25 20:8,17,18

24:5 29:10,19 33:4
33:6 37:24 38:5,17
38:18,24 52:16
53:9,10,13 59:21
186:20
**committees** 42:24
42:24 61:20
**common** 196:5
**commonly** 130:21
**communicated** 53:4
**communicating**
52:18
**communication**
197:1
**companies** 9:14
73:13 74:13,22
75:1,15,20,23 76:4
76:20 77:12 86:24
87:3,10,11,21,22
120:4 124:22
193:18 212:23
233:11,20 234:7
239:21
**company** 6:25 9:22
9:23 27:2,2 43:4
43:22,23 46:5
49:24 51:5 60:5
118:22 120:20
121:14 122:2,22
130:4 131:18
147:2,11,24
151:24 153:25
154:6 155:15
156:6 160:17
167:11 168:13
169:1,18 170:17
178:25 196:9
215:11 225:8,17
233:18 239:8
259:5 267:13
270:18,23 277:5
279:17 281:23
**company's** 125:18
200:3 244:16
245:12 246:18
285:1

**company-subsidiz...**
119:5
**comparability**
177:12,15,17
178:18 179:13,14
180:23 181:10
184:22 185:18
188:16 199:7
204:5 210:10,15
214:8 224:20,22
226:10,16,18
227:11 229:2
230:11 235:13,15
235:18 237:7,15
238:8 241:12
242:9 243:5 244:2
250:23 254:21
255:22,25 256:3
256:17,23 257:21
266:8 270:25
280:25 282:1,3,5
282:11 283:17
285:11,13 289:7
290:18 294:14
295:4,10,25
**comparable** 127:5
177:24 180:7
184:10,21 185:13
186:5,13 198:18
229:10 264:7
283:8 294:14,15
294:16 300:7,10
301:6,14,15 302:3
302:12 303:1,6,23
**comparables** 255:17
**comparably** 179:19
243:11 255:1
256:5 257:22
**comparators** 304:4
**compare** 80:8 83:1
144:25 179:18
210:19 229:2
231:1 235:4
244:15 303:20
**compared** 107:12
157:1 164:3

166:20 179:24
188:24 192:5
223:3 229:21
235:16 237:7
271:14 293:16
**compares** 80:18
81:17 264:6
**comparing** 118:21
211:2,19 234:16
237:16 238:9
244:13
**comparison** 94:12
107:13 108:20,21
108:22 145:3,4
190:19 191:17,20
198:2 199:19
204:11 210:25
211:4,5 221:4
222:15,18,23
223:5,10,21,21,23
223:24 224:2
227:22,25 228:14
228:14,24 229:11
229:15 230:20
231:4 234:19,20
234:21,21 235:19
235:23 236:12
271:1,13 283:19
286:14,16 303:20
**comparisons** 223:7
**compatriot** 235:3
**compensating**
271:23 272:19
**compensation** 62:16
130:21,22 148:6
151:12,14,21,23
152:18 153:6
179:24 180:7
181:3,23 182:5,6,9
182:10 184:17
185:4,13 199:11
199:17 205:13,15
216:24 227:19,21
229:1,5,9,21 230:8
230:22 231:2,8
241:7 242:5,10

259:7 294:16
296:1,22 297:19
297:22 298:3,9,11
298:25 299:12,13
300:8,9,16,21,24
301:12 302:3
**compete** 65:8,11,14
72:20,24 240:4
243:16,18,20,22
**competes** 240:2,5
245:3
**competing** 235:21
**competition** 216:19
**competitive** 180:6
180:15 232:4,5
234:21 235:1
240:15 269:1
296:21,21,25
297:1,6,10,11
**competitiveness**
180:8,24 181:2
182:11
**competitor** 40:4
181:3 234:5
270:20
**competitors** 64:20
64:23 65:3 218:9
234:5,8,10,17,24
235:5 236:9
238:17 239:6,14
239:22 240:20,25
241:4,8,15,17,17
242:5,6,11 244:8
255:13,14 277:7
**compiled** 286:22
**complain** 242:14
**complement** 161:24
**complete** 180:25
183:9 278:22
281:10
**completed** 178:20
178:24 206:8
**completely** 63:24
105:6
**compliance** 131:14
**complicated** 157:15

158:4
**component** 137:7
180:9 182:2 277:9
292:21 300:2
**components** 151:21
153:6 184:18
226:2 277:22
**composition** 266:19
**comprehensive**
101:16
**compressed** 278:5
**computers** 169:1,1
**concentration** 219:9
**concept** 8:24 17:18
179:15 185:12
187:10 194:18
208:25
**concepts** 15:25
216:23
**concern** 9:21 189:24
**concerned** 22:7 88:8
176:2
**concerns** 11:17
31:11 78:13 203:1
**concessions** 207:19
**conclude** 89:5
205:12 288:24
289:5,6,13 293:13
**concluded** 155:18
205:14 289:2,25
290:8,21
**concluding** 290:16
**conclusion** 47:13
88:13,14,15
190:23 192:3
205:24 229:19
256:8
**conclusions** 81:21
108:19 109:3
208:6 286:10
287:24
**condition** 32:18
**conditioned** 274:12
**conditions** 149:6
254:7 271:2,6,7,13
271:16,17,19,24

272:2,12,15 277:4
277:14,18,25
278:24 279:6,18
279:22 283:13,15
283:16,18,22
284:13,16,24,25
285:2,14 286:5,8
286:10 288:1
291:18 294:15,24
**conduct** 62:15
**conducted** 60:12
87:15
**conducting** 75:2,4,7
177:11
**confer** 31:1 54:18
170:24 172:24
**conference** 42:19
44:6
**conferring** 172:22
**confess** 103:14
**confidential** 15:16
15:19,25 16:4 22:7
**confidentiality**
11:17,19,23 12:2,4
12:6 15:8,11 38:22
38:23 52:13,15
**confirm** 127:4
**confirmation**
219:18 220:18
296:16
**confirmed** 224:12
**confirms** 216:12
**confused** 68:16
**confusing** 300:13
**Congress** 57:24
63:18
**conjunction** 46:18
**connected** 306:13
**connection** 35:12
36:8 44:6 119:22
131:24 177:19
187:4 207:8
221:19,25 222:2
253:24
**consents** 32:19
**consider** 207:5,9

**considerable** 205:14
216:14 219:8
**considerably** 112:22
146:10 181:6
190:25,25
**consideration** 57:5
125:8,8
**considered** 67:12
77:5 113:20
117:12
**considering** 83:25
**considers** 246:24
**consistent** 76:19
77:11,22 92:12
110:14 140:3,24
141:1,16 149:11
276:23 284:25
**consolidate** 151:1
**consolidated** 49:1
**consolidating** 39:14
45:4,5
**consolidation** 43:20
**constant** 131:22
**constructed** 136:21
**consult** 137:2
**consultant** 176:6,13
**consulted** 176:7
**consulting** 60:9 67:5
142:3 146:5 176:9
**consume** 116:22
**consumer** 78:25
79:3,24,24 80:19
95:6,9,13 100:19
136:10
**consumers** 78:15
79:5 110:5,11
**consumer-directed**
78:12,24 79:19
89:18 90:17 93:3,9
95:1,4,13,15 136:9
**consumer-driven**
95:10,17 96:1
100:2 101:17
**contact** 32:13 35:16
**contain** 59:15
188:23

**contained** 24:8,11
36:3 83:19 132:17
133:12 139:23
141:11 155:19
198:9
**contains** 24:8,10
52:13
**context** 213:20,24
214:17,22 217:15
249:20 284:21
293:3
**Continental** 120:5,7
**contingent** 291:10
**continual** 87:6
**continue** 137:19
154:11 156:1
190:1 211:20
304:10
**continued** 101:20
155:9 175:15
222:7,10 304:16
**continues** 154:22
**continuing** 155:19
199:16 216:17
218:14
**continuum** 105:16
**contract** 167:19
169:2 170:12,19
177:14
**contracted** 170:16
**contractor** 170:18
**contradicts** 213:13
**contrast** 136:4
**contribute** 77:24
78:2 79:21 81:1
126:4
**contributed** 59:4
**contributes** 79:2
80:23,24
**contributing** 64:3
64:15 81:3 137:11
**contribution** 82:23
85:6 143:23 147:5
147:5,6,8
**contributions** 83:8
85:5 117:18

**contributors** 61:13
**control** 15:13
  222:17 223:8,9,24
  244:23 245:1
  247:25 249:14,18
  249:20 250:14,20
  250:25 253:11
  284:9,15
**controlled** 245:16
  245:25,25 253:1
**controlling** 99:25
  247:23
**controls** 222:15
  250:21
**controversy** 306:16
**Cont'd** 3:1 17:7
  103:13 197:14
  275:20 307:22
**conversation** 30:20
  31:13 263:20
**conversations** 47:3
  52:21
**conversion** 147:18
**convert** 146:4
**converted** 144:5
  146:23
**conveyed** 47:14
**coordinate** 35:18
  36:14
**coordinator** 129:17
**copied** 41:23
**copies** 104:19
**copious** 46:19 47:1
**copy** 15:4 83:18,22
  84:1 97:17 101:8
  103:11 144:2
  232:24
**core** 179:15 188:15
**CORINNE** 2:16
**Cornell** 174:19
**Corp** 9:22
**corporate** 129:11,21
  129:25 175:15,17
  175:17,17
**Corporation** 1:5
  9:15,16 60:18 88:6

121:7,11 129:3,5,8
130:8 131:2,4
132:7 154:22
**correct** 20:12,20
  21:16 22:4 23:24
  23:25 25:4,8,15,22
  26:16,17,20,25
  27:1,16,24,25 28:3
  28:6,18 29:3,20
  34:6,7 36:3 41:14
  46:1,6 47:10,14,15
  47:18,21,24 50:8
  52:1,3 53:6,7,11
  53:13,14,16,17,19
  53:22,25 54:4
  59:12 60:6,7 61:8
  62:1,2 63:4 68:2
  69:3 70:10,11,13
  70:14,25 71:8,9
  72:1,2 75:22 77:3
  77:13,14 84:24
  86:17,18,19,21
  88:7,8,18,24 89:3
  89:22 90:20 91:17
  93:22,23 95:21
  96:4,5 97:8 98:24
  99:23 100:7
  101:13 104:2,16
  104:17,21 105:1,7
  105:8 106:1
  107:20,21 108:1,2
  108:5,6,15,16
  109:5,15 112:6
  113:16 114:16,17
  114:24 115:11,13
  115:24,25 117:7
  117:19,21,22
  118:12,13,20
  119:2,21 125:1,3,6
  125:10 126:18,19
  126:24 132:18
  144:20,21 147:9
  151:19,20 152:10
  155:5,6 156:3
  157:7 159:6,17
  160:4,10,14,15,18

161:21,22,24
162:6 163:1
164:16 166:2
167:9,13,17 168:2
169:25 171:2,3
181:20 192:23
195:17 230:16
233:23 234:11,13
234:14 235:18
236:14 237:21,22
238:11,13,19
240:3 241:5,6
242:5 243:9
244:16,21 245:19
246:15,25 247:1,3
247:6,7 249:14,17
250:2 254:4,19,20
255:2,5,13,18,23
256:4,6 257:4,5,13
257:23 258:2,19
261:21 262:9
264:8,12,14,16,18
264:23 265:1
266:14 267:7,16
268:15,24 269:13
269:16,24 270:4
270:10 271:2,25
276:16,18,25
279:8,16 280:17
280:21 281:3
283:23 285:21,23
286:6 288:1,6,9,12
288:15 289:17,21
290:2,23 293:2,12
294:16,24 295:2,5
295:18,24 296:7
296:22 297:16
299:16 300:4
301:8,12,24 303:9
303:14
**correction** 81:7 85:7
**corrections** 132:19
**correctly** 30:14
  103:20 133:7
  162:4
**correspond** 94:2

**corresponding**
  124:21
**cost** 41:16,17,20
  45:2 49:13,14,16
  58:14 72:24 78:16
  78:18 105:22,23
  105:24 116:21,25
  117:8 126:6 132:6
  132:8 134:17
  139:14 142:4,8
  158:10 159:4,7
  173:9 178:25
  198:7,25 199:13
  233:10 257:20
**costs** 48:9 54:24
  55:11 59:16 64:18
  64:23,24 65:7,9,16
  67:6 82:9 100:1
  150:17 159:3
  180:9,12 181:6
  182:8,12 184:17
  203:23 204:1,5,17
  233:9,20 234:5
  236:6
**cost-conscious**
  100:21 101:12
**cost-effective** 9:3
  96:7 100:6,6
**Council** 59:10,17
  60:2 176:10
**counsel** 7:24 31:1
  54:18 94:8,9 104:3
  125:17 126:20
  170:24 282:19,22
  301:3 306:17
**counselor** 215:14
  251:6 252:2 273:9
  275:10 281:8
  287:9,15 304:6,8
**count** 17:13,18 39:8
  138:16 157:9
  159:20 190:2
  274:23 275:1,5
**counted** 193:23
**counterparts** 65:3
**counting** 162:21

219:5
**countries** 72:24
156:6
**country** 63:20 66:10
67:14 73:8,25
170:7 217:8 219:3
244:10
**COUNTY** 306:4
**couple** 54:19 85:20
107:24 122:2
125:11,14 132:19
151:25 162:9
163:13 199:9
227:4 259:4 262:1
273:14 276:3
**course** 6:25 121:10
124:24 175:18,19
183:23 214:5
267:4,14 288:8
**courses** 175:21,23
**court** 1:1,8 4:2,5,12
4:14,18,20 5:4,9
5:14,18,22,24 6:2
6:14,23 7:13,15,22
8:2,4,7,12,16,19
8:23 9:25 10:20
11:4,16 12:15 14:2
14:6 16:12 17:4,9
17:20 18:8,18 19:7
21:25 24:19 25:12
25:18 34:9,15
45:11 49:11 55:22
56:7,18,24 63:14
66:9,24 68:7 70:7
70:16 71:1 74:19
77:10 78:7 80:17
81:11,16 84:5,14
85:3 86:2,10 88:22
94:16 95:22 97:24
98:3 102:11 104:7
104:12 117:4
120:15 121:3
122:10 124:1
127:12,19 128:2,9
128:23 132:14
133:8,19 139:4

149:21 151:2,6
161:5 162:7,25
163:4 172:14,16
172:18 173:1,5
174:1,3,12,17,23
175:20,21,23
176:1,5 178:7,11
178:15,22 179:8
179:12 180:18
181:24 182:20,24
183:22 184:11
185:1,10,16 186:8
187:2,3,6,9,12
188:2,21 190:22
195:20,24 196:1
197:8 200:14
201:8 202:19
203:1,13 205:25
206:4,19 207:8,12
207:14,20 208:14
210:6 212:3 213:8
214:11,14,20,23
214:24 215:4,12
215:14,20 216:10
217:20 219:25
220:4 222:2
225:11 227:7,12
230:2,14 233:1
236:24 242:20
244:1 247:13,15
248:18 251:3,8,13
251:23 252:1,4,7,9
252:12 253:19
256:9,11 257:16
257:18 259:17
260:24 261:2
273:9,12 275:9,12
275:14,18 281:7
281:11,15,20
282:20,24 286:2
287:9,14,19
290:12 292:19
293:5,10 298:14
299:8 304:6,8,13
305:1,5,8,9
**courtroom** 94:10

213:12 215:15
**Courts** 243:6
**court's** 57:3 172:25
196:14 215:25
282:7
**court-imposed**
121:18
**cover** 66:14 128:3,6
143:16 257:20
281:14
**coverage** 57:25
64:22 65:25 66:1,7
66:8,15,20 70:5
71:4,17 73:11,14
73:17 77:2 98:17
98:17 99:6 100:6
107:6,9,10,12,15
107:16 108:5,8,15
108:21,22 109:4
112:4 113:11,12
115:6 156:25
164:5
**coverages** 155:20
**covered** 96:2 100:5
100:19,22 109:13
114:22 117:11,25
123:14,25 124:6
135:7,17,18
139:25 145:6
146:15 150:2,5
155:3 157:16
164:3,5 165:13,23
166:1,1 252:12
273:20
**covers** 75:18
**co-director** 174:16
**co-pay** 78:17 136:18
165:4 168:4,4
**co-payments** 89:7
**create** 23:23 191:24
**created** 19:22 20:25
21:9,15 22:3,8,10
22:16,18,19,24,25
23:2,4,6,9,12,13
23:17,18 25:21
26:11 38:1 53:15

54:11
**creating** 19:17 26:19
54:10
**creation** 23:21
**credit** 39:16 143:24
**credited** 143:8
144:22 146:16
147:2
**creditor** 38:24
**creditors** 2:20 20:19
33:4,6 37:24 38:5
52:16 53:9,12
186:20
**credits** 144:1 146:19
**crisis** 211:19 212:15
231:15
**critical** 208:21 209:5
235:20 296:11
**Critically** 250:13
**criticize** 285:22
**criticizing** 283:15,19
**critique** 210:12
222:12 223:12,14
**critiques** 210:13
**critiquing** 286:9
**cross** 202:24 222:1
307:5,9,13,16,17
307:18,23
**cross-examination**
19:12 45:18 83:25
86:1,7,13 94:15
103:13 151:4
163:12 173:3
195:21 212:3
214:23 232:10
275:20
**cross-examined**
225:10
**CSR** 306:6,22
**curious** 193:11
**current** 4:21 5:10
64:7 68:17,18,21
73:12,14,19,25
74:15 76:1,9,16,21
105:20,24 106:11
106:15,18,19

109:12 117:11
122:15 130:11
142:12 144:6
145:16,16 165:18
174:12,13 176:20
190:3 198:24
199:14 209:25
222:7 229:21
264:6,11 265:8
288:25 298:10
299:11 300:9,12
300:16 301:12
**currently** 6:9 16:9
34:19 35:3 37:23
56:11,12 103:21
129:2 130:23
135:2,10 136:5
141:25 257:12
**curriculum** 243:8
**customers** 23:24
**cuts** 233:7
**cutting** 273:20
**cycles** 164:12

---

**D**

**D** 2:25 4:1 49:21
81:14 106:25
107:1 112:2 139:7
158:24 186:23
188:20 307:1
**DAAG** 144:13
**daily** 131:17
**Dana** 1:5 9:24 20:8
50:21 60:18 76:15
76:24 77:16,23
78:4 79:15,21
80:22,23 81:2
82:24 83:7,9,12,12
107:3,14 108:17
109:8,11,22 111:2
111:2 114:1,4
115:9 117:6,24
119:9,12 126:4,22
127:1,6 129:3,4,8
130:6,8 131:2,4,10
132:7 138:9

144:12 151:17
153:19 154:21
156:13 157:7
163:2 170:12,14
173:9 178:17
179:16,21 181:2,5
181:7 182:14,16
184:9 186:5,7,13
190:9,11,21 191:3
191:16 198:20
199:4,21 201:10
204:14 209:8,9,17
210:24 211:1,11
211:13,19 212:22
216:25 217:2,6
220:18,19 221:3,4
223:2,6,7 224:5,15
229:11,16,18
230:4 231:5 232:4
233:7,10 236:10
236:15 238:16
239:18 242:6
243:15 245:3,8,11
246:15 253:9
258:1 263:4,9
264:11 265:8,18
266:12,24 269:20
271:14,18 272:13
278:1,5 279:13
288:8 290:5
293:17 295:5
298:17 301:12,17
**Dana's** 35:3 46:21
76:19 77:11,20
80:5,19 81:17,20
82:1 112:9 114:7
114:20 117:11,20
127:4 135:16,18
136:3 137:13
138:6 140:4,25
141:17 146:14
156:14 179:16
199:7 204:1 223:1
229:20 231:1
233:19 234:16
235:5 236:12

243:11 264:15
270:8 271:6
293:15 294:6
**danger** 213:19
**darker** 104:15
**darn** 251:14
**data** 8:24,25 9:6,9
9:10,12,16,19 10:1
10:4,4,7,14,17,21
11:3,18,20 13:11
13:20 14:1 15:2,13
19:17,21,22 20:2,6
20:7,8,13 24:8,11
24:13 25:4 26:5
28:13 29:11,23
30:18 31:19,22
32:12,18 36:12
37:22,23 38:1
50:25 66:13 70:19
70:21 71:3 91:19
92:13 108:23
111:12 112:23
114:13,19 115:4,7
115:9,14,15,15,21
116:14 117:23,24
118:4 132:5 157:9
164:12,14 165:15
165:17,25 166:14
166:14 169:22
187:15 189:10,13
190:23 191:17,25
193:20 198:20,23
204:9,10 223:10
224:1,13 236:15
250:13,21 253:15
259:11 260:2
267:12 283:10,20
283:21 285:19,20
286:17,18 298:4
299:22 301:22
303:17
**database** 113:19
115:13 117:19
**dataset** 112:10
115:4
**date** 8:21 16:16 17:6

17:13,15,15 18:3
19:9 22:17 27:13
27:17,20 45:13
81:13 84:8,16 86:5
133:21 139:6
149:23 179:10
187:8 195:4 196:5
196:7 197:11
200:16 215:23
217:23 220:7,9
222:4
**dated** 47:6 49:24
50:4 195:1
**dates** 29:1 215:8
**DAVID** 3:17 306:6
306:22
**day** 2:3,11 4:4 10:6
10:13,15,24 11:6
11:22 12:3 14:18
15:21 16:1,15
25:14,21 26:5,7,19
27:8,9,11 29:16
30:10,13 36:10,15
36:19 47:11 50:16
50:21 51:1 52:21
52:23 53:3 56:2
257:6
**days** 140:22
**deadline** 183:9
200:5
**deal** 32:19,21,21
92:23 186:24
263:12 278:7
**dealing** 103:22
115:3 169:4
**deals** 67:25 200:3,6
**dealt** 23:8
**deans** 175:12
**death** 132:24
**debt** 217:18
**debtor** 1:6 48:9
172:22 196:2
197:1 198:23
**debtors** 2:4 4:4
29:10 34:11 36:8
36:19 37:3 39:2

41:9,24 42:17
43:18 128:12
134:23 135:13
144:19 160:16
168:17,21 174:5
276:10
**Debtor's** 6:12 7:3
8:17,20 16:21 17:5
18:6,18 19:4,8
25:9 35:13 45:8,12
56:15,21 66:22
70:23 80:14 81:5
81:12,15 83:16
84:7,11,15,18,22
85:7,16 86:4 89:25
107:2 126:16
127:14 131:25
133:16,20 134:9
135:2,21 137:24
138:24 139:2,5
149:19,22 158:22
162:13 163:14
178:13 179:6,9
181:17 182:15
183:4 184:8
186:16,23,23
187:7 188:19
189:7,18 192:9,22
193:4 196:13
197:10,12,16
198:11,15 199:24
200:15 212:7
213:10 215:22
216:4,8 217:10,14
217:22,25 218:18
219:24,25 220:6,8
220:10 221:11
222:3 228:20
229:4,25 230:19
276:4 299:16
300:12 301:2,12
303:5 308:1
**decades** 175:3
**December** 40:15,18
101:2 114:11
127:23 160:25

215:9
**decentralized** 276:5
**DeCHIARA** 3:15
177:25 179:7
186:18 192:11,13
195:22,25 196:24
200:1 201:21
202:16,25 203:18
206:16 207:3,7,21
210:3 211:22
213:1,9 214:12,18
214:21 215:1,5,18
217:12 220:2
221:13,20 225:5
232:7,10,13,23
237:1 247:14,16
248:20 249:1
251:12,25 252:3,6
252:8,10 253:19
256:11 273:10,13
275:11,13,15,20
281:9,13,18,21
282:22 287:8,12
290:14 304:12,14
305:3,7 307:21,23
**decided** 52:24
175:14 176:16
183:10 196:17
266:3
**decision** 52:22,22
53:1 293:9
**decisionmaking**
100:21
**decisions** 96:3
**declarant** 213:11
**declaration** 18:20
19:2 29:4 35:25
36:3 45:8,21 46:15
56:19,20,22 69:13
71:7,20 74:7,9,20
78:6 81:7 83:19
84:1,18 85:1,11,11
85:16 87:14 88:3
88:20,22 89:1,16
93:2,8 94:3,5,25
97:7,18 99:14

100:17 101:1
103:25 107:23
109:14 114:15
118:9,12 119:20
126:2 132:13,15
132:17,20 133:12
133:16 138:2
139:12 154:10,13
154:14,19 156:21
163:16,21 168:15
198:5 232:16,19
232:22,24 233:5
233:24 248:9,21
261:5 262:19
273:7 274:7
275:22,25
**declined** 158:12
**declines** 87:6
**declining** 158:14
211:17
**decreased** 156:25
**deductible** 79:11
82:4,5 83:5 92:16
99:1,5,12,16 100:3
100:13 136:18
165:4 168:10
**deductibles** 106:3
**deducts** 198:25
**deem** 264:7
**deeply** 231:19
**defer** 163:10
**deficit** 179:25
188:13 277:2,19
277:24 278:3
279:8,14,18,21
**deficits** 186:12
**defined** 143:16
144:11 145:13
147:6
**defining** 87:4 162:25
**definitely** 31:15
131:11
**definition** 87:22
180:16 297:1,3,4,9
**definitions** 254:10
**degenerating** 195:20

**degree** 5:15,17
174:19,20 242:24
242:25 275:6
**degrees** 274:11,11
**delay** 8:9 172:20
**delivered** 133:23
**Delphi** 177:8 205:6
205:7,9,13,15,25
206:8,11,14,14,21
206:23 207:18
234:22 236:8,9
242:8,11 248:2,9
248:22 249:12,25
**Delphi's** 190:8
**Delta** 177:7
**demand** 216:17
277:23,23 283:22
283:24 284:16
285:6
**demographic**
117:24 118:1
**demonstrates** 46:20
134:10
**denominated** 140:19
**dental** 130:16 164:4
**denying** 52:19
**department** 60:10
129:19,20,21
130:1,13 131:6
132:21 153:25
176:9 184:14
224:9 259:3 280:3
283:9
**dependent** 137:6
**depending** 276:7
**depends** 65:22
249:23
**deposition** 85:19
119:15,17 196:18
197:7
**depositions** 179:2,4
196:4 207:25
208:2,4 216:1
**deputy** 175:8,9
**derive** 229:16
**describe** 36:6 38:25

57:1 79:18 87:3,10
94:25 129:7 132:2
143:13 148:12
149:4 164:25
214:23
**described** 37:16
48:8 95:2,11 104:3
144:24 153:7
165:7,11,16 169:5
246:18
**describing** 114:15
206:22
**description** 18:7
97:10 135:21,25
136:3 139:13
143:24 164:21
185:16 273:24
**descriptions** 18:14
39:5
**design** 99:12 107:5
107:19,25 112:5
166:8
**designate** 38:17
**designation** 15:8
**designations** 52:14
**designed** 100:4,5
**desire** 33:16
**detail** 39:22 40:1
42:15 43:8 45:1
49:15
**detailed** 39:7,24
41:3 44:8 48:8
91:12 93:6,25 94:4
94:11 103:7 113:5
127:10 195:25
**details** 120:6 121:7
123:12,17 124:14
167:14 241:22
**detection** 137:10
169:15
**determinations**
51:19
**determine** 28:14
51:5 136:25 254:7
263:4 299:20
**determined** 184:23

**determines** 254:9,12
**determining** 249:14
250:1 271:5 300:7
**Detroit** 219:4 239:7
**develop** 58:12
177:14 206:23
**developed** 100:8
177:16
**development** 57:18
195:16
**diagnose** 62:11,11
**diagnostic** 137:8
**die** 267:6
**differ** 180:12 271:6
280:23 303:8,11
**difference** 24:20
71:18 115:5
145:19 159:25
165:2,21 166:16
176:23 186:7,13
191:24 199:4
227:8 229:18
230:4 245:9 253:8
286:19
**differences** 172:6,8
263:18
**different** 52:13
54:12 63:4 74:8
75:16 98:16
106:11 107:25
111:10 113:5
115:7 122:2
126:22 127:1
159:23 180:10
183:4 189:18
191:2 194:18
205:22 209:11
210:13 213:10
225:24 226:2
229:19 230:7,8,9
230:10 244:9
245:22 260:14,18
263:17 301:9
303:2,2,8,13,16,17
**differential** 272:19
290:19

**differentials** 271:24
289:14 293:14
**differentiating**
193:14
**differently** 153:14
159:23
**differs** 303:19
**difficult** 131:19
145:3 157:24
158:1 231:23
237:25
**difficulties** 5:2
**diligence** 9:2 43:12
44:5
**DIP** 39:16,21 40:19
40:21 44:24 47:19
54:23 55:5,7
**dire** 16:23,24 192:12
192:13 195:20
214:9,13,15 307:4
307:21
**direct** 4:19 17:7
21:25 34:18 56:10
87:3 89:25 90:19
95:7,14 96:11
105:3 112:3
125:17 128:19
158:20 174:10
197:14 204:11
223:16 281:11
301:4 307:3,8,12
307:15,20,22
**directed** 80:20
100:20
**directing** 91:24
263:3
**direction** 16:18
181:19 185:3
188:21 198:13
258:13 290:17
299:19
**directly** 12:8 14:10
37:21 50:15 52:20
91:19 306:15
**director** 34:22 130:3
130:7 175:5

**disability** 134:19,20
140:10,15,16
141:7,11,23
142:18,23 143:1
158:10 159:6
172:7
**disadvantage** 65:11
297:1
**disadvantages** 285:3
**disagree** 173:16
205:19,21 223:9
**disagreed** 205:21
**disagreeing** 262:5
**disagreement** 228:9
**discharge** 209:6,10
**disclosure** 21:22
**discontinued** 142:25
154:25
**discount** 209:25
**discounts** 167:9
**discovery** 137:10
179:2,3
**discuss** 263:22
274:22
**discussed** 41:12
51:21 103:8
105:10 125:16,21
127:13
**discussion** 26:10,15
33:16 291:21
**discussions** 26:14
33:19 39:18
200:23 291:16,17
**disease** 62:11 82:7
**dismemberment**
132:24
**disparity** 142:22
261:20
**dispersion** 262:16
**displaced** 217:6
**disproportionately**
64:22
**dispute** 19:18 46:5,8
206:1 249:16
262:18 273:23,25
274:13

**distinctions** 68:16
**distinguished** 53:18
**distress** 87:8
**distressed** 73:13
  74:22 75:1,11,15
  75:20,23 76:20
  77:12,22 87:2,3,4
  87:4,5,21,22,24
  88:1
**distribute** 50:20
**distributed** 97:23
  103:12 236:23
**distribution** 6:7
  41:23 93:13 118:5
  118:6 262:17
**DISTRICT** 1:2
**divide** 146:7,8
**divides** 258:14
**division** 129:10
**divisions** 129:12
**division-by-division**
  276:5
**divulging** 22:5
**doctor** 79:6,9,10,14
  96:22,23 136:16
  167:16,25 169:7
  169:11
**doctors** 62:10 78:16
  110:9 137:9
  167:20 169:14
**doctor's** 96:13
**document** 7:6,9,18
  8:13 11:6 15:1,3,5
  15:6,7,15,24,24
  16:3,25 24:18,20
  24:21,22,22,25
  25:2,2,3,5,5,16
  27:17,21 31:4,6,8
  35:22 36:16 40:20
  49:21 50:25 51:3,4
  51:5,7 56:18 66:24
  67:25 80:17 81:16
  81:17,21 97:12,21
  97:23 98:5,19
  103:7,12 107:23
  128:5 132:12

137:25 139:10
187:6 192:12
215:7,8 236:23
248:7,13 251:17
251:18 252:2,23
259:2,5 284:8
285:17 286:11
288:3,20
**documenting** 67:13
**documents** 7:8,10
  7:15,19,23 8:8 9:1
  9:4 10:15,24 11:11
  14:3,4,7,8,14,17
  14:21,23 15:14,19
  15:23 16:2,6,8
  17:12,14,18,19,21
  17:25 24:1,4,14,15
  28:2,5,9,11,14,15
  29:11,15,16,21
  31:11,12 33:22
  36:13,17,20,25
  37:8,11,20,23,25
  38:17 40:8,9,10
  44:17,18,20,23,24
  47:17 50:22 51:20
  52:4 97:11 132:6
  215:20
**doing** 59:6,13 62:14
  62:22 67:9,10
  73:10 75:14 79:13
  159:9 176:11,11
  178:18 194:17
  204:5 210:14,22
  214:8 223:20
  225:18 226:3
  227:11 234:12
  235:25 241:11
  251:3 263:11
  264:19 281:14
  283:14 284:25
  285:11 286:25
  287:7,7 295:13
**Doko** 18:1
**dollar** 41:17 78:17
  95:14 163:14
  264:10

**dollars** 79:1,7,12,21
  79:22,23 80:1,24
  81:2 82:3 83:4
  95:8,8 96:13,15
  99:6 152:19 160:4
  168:8,9 259:13
  260:3
**domestic** 156:19
**dominantly** 75:17
**doubt** 102:4
**downgrading** 185:9
**downplayed** 191:20
**Doyle** 18:2
**dozens** 7:10,10
**Dr** 56:3,11 63:12,16
  81:7 83:19 84:17
  85:16,19 103:16
  121:21 127:22
  135:20 168:15
  203:6 250:19
  251:7 273:15
  274:7,7
**draft** 97:17 196:14
**drafted** 196:2
**dramatically** 131:2
**draw** 81:21 84:20
**drive** 225:25 226:6
**dropping** 140:19
**droves** 7:15
**Drs** 248:11
**drug** 89:7 164:4
**due** 9:2 43:11 44:5
  250:11
**dug** 154:3
**duly** 4:15 34:16 56:8
  128:17 174:8
**dust** 273:20
**D-A-A-G** 144:13
**D.C** 57:9

—————————————
**E**
**E** 1:14,14 2:1,1 3:1,1
  4:1,1,15,15,15
  56:8,8,8 69:16
  74:7 103:1,1,3,3,3
  128:17,17,17

**174:8,8 212:7
  306:1,1 307:1
**eagerly** 86:7
**earlier** 55:19 68:9
  82:2 218:8 246:17
  254:5 304:5
**early** 25:25 41:1
  59:9 60:4 82:8
  99:6 137:10
  169:15
**earn** 264:22,25
  265:3 294:24
**earning** 145:5,18,22
  152:4
**earnings** 147:1
  152:23 234:6
  259:11,12 260:1,3
  261:13,13
**ease** 9:8 208:22
  209:6
**easier** 12:21 81:23
  157:23
**easily** 228:16
**east** 2:5 183:21
**easy** 12:17 68:15
**ECEC** 204:12
  301:22 302:5,6
**economic** 58:12
  176:10 237:25
  238:11
**economically**
  241:18
**economics** 57:6
  174:14,15,16,21
  174:22 175:6,16
  175:18 176:2,4,11
  177:4,23 178:2
  184:19 206:25
  216:23
**economist** 61:10
  86:18 203:7 213:4
  219:15 234:6
  246:3
**economists** 78:14
  250:22
**economy** 64:17 78:8

179:20 185:14
219:19 222:9
223:2 224:16
243:13,17 244:21
253:10 255:2
257:4,23 271:8,11
281:2
**economy-wide**
179:22 223:3
**editorial** 253:14
302:14
**educate** 60:14
110:21
**education** 5:12 6:1
60:16 109:9,23,24
110:17,25 168:18
168:21
**educational** 174:17
**effect** 65:6 118:17
141:14 143:16
158:14,19,20
164:22 165:1
166:23 167:24
171:16,18,20,22
171:24 172:1,3
199:3,12 201:25
204:15,17 230:21
247:25 249:9
253:10,12 272:5
286:15 291:2
**effective** 100:9,11
138:15,21 143:8
150:6
**effectively** 65:9,14
229:7
**effects** 155:8,11,13
155:18 170:4
**efficiency** 208:8,11
208:16,21 209:1,5
209:8,13,20
**efficient** 100:20
209:23
**efficiently** 94:9
95:15 150:23
**effort** 110:7 299:20
**efforts** 42:17

**eight** 81:1
**either** 18:4,10 63:24
105:6 106:14
112:1 122:23
154:25 165:9
168:25 171:20
193:22 208:17
222:25 243:6
263:19
**elbow** 273:19
**elderly** 58:2,21,25
59:24
**electrician** 260:16
**electronic** 25:7
**element** 209:1
223:25
**eleven** 157:2 245:18
246:11,13
**eligible** 126:7 152:2
152:3,8,8,23
**eligibles** 111:23
**eliminate** 66:4 68:10
74:14,15 75:25
76:15 77:21
105:13,21 123:4
138:17 141:10
154:6 170:4
**eliminated** 66:11
119:4 120:3
122:17 123:4
124:22,25 150:7
150:20 151:25
**eliminating** 63:24
65:24 66:19 73:5,6
73:11,14 76:21
77:3 89:11 105:7
105:15,16,18,19
106:4,6,10,15,20
122:18
**elimination** 121:8
125:9 134:18
138:15 141:7,23
142:15 147:11
150:8 159:14
**Elizabeth** 26:3
**Elizabethtown**

41:21 49:18 171:7
**eloquently** 201:16
**empirical** 247:8,22
274:17,18
**employ** 306:16
**employed** 6:3 34:19
36:7 56:11,12 66:7
129:2 144:5
146:22 287:22
**employee** 39:5 60:12
63:3 76:25 82:20
82:23 83:3,7 85:5
85:6 91:2 100:18
112:8 127:23
130:14 141:13
143:21 145:5,11
145:17,21 146:3
146:11 150:16
151:17 153:10
157:1,3,6 168:9,12
184:17 237:16,17
**employees** 6:9 59:22
63:12 66:3,12
68:17,25 70:5,18
73:1,7 78:5,10
79:16 82:24 83:11
83:12,13 92:24
106:10 107:6,15
109:9,12,23
110:24 111:18
114:20 117:10,20
117:24 119:3
126:22 127:1
130:18,23 133:23
135:3,6,11,16,17
135:18 136:6,14
138:7 139:24
140:4,11,15,25
141:8,10,17 142:6
142:8,9,13,13,16
142:18,19,22,23
143:1,5,14,17,20
144:2,4,9,20 145:3
145:6 146:1,17
148:10,13,16,17
149:10,12,25

150:1,3 153:1,3
155:4,9,25 156:2
156:25 157:7,15
160:24 161:15,20
162:22 164:16
165:5 168:18,22
168:25 172:4,5
179:16 189:25
191:3,3 222:21
235:17,17 237:8
244:19,21 245:1
246:5,22,25
252:24 253:16
268:21,22 270:3
276:7 289:16,19
290:1,5 292:25
295:18 296:2,7
**employee's** 144:15
**employer** 19:18 63:9
63:18 67:1,13 79:1
91:1,6 92:17 95:16
184:17 277:17
279:6 292:9,13
296:5
**employers** 59:15,25
60:2,14,23 61:13
63:19,23 64:7,16
64:20,22 65:15
66:10,14,17,19
68:12,13 69:7 70:4
70:17 71:7,8,25
72:23,25 73:8,10
73:11,15,24,25
75:10,11,13,15,17
76:8,11 77:22,23
78:9 81:1 87:4,5
89:19 92:15,22
93:3 99:15,21
104:4,25 105:6,11
105:17 106:5,20
110:15 122:17
124:24 258:22
271:15 293:8
295:25
**employer-provided**
61:19

**employer-sponsor...**
64:21
**employment** 4:21
5:10 35:2 61:6,12
63:8 129:7,16,17
149:7 194:10
201:18 211:17
216:18 219:1
264:20
**employment-at-will**
209:11
**empower** 95:13
**empowers** 136:10
**enable** 292:14
**enabled** 201:18
**enables** 201:10
208:23
**enactment** 59:21
**encased** 272:8,22
**encompassed** 302:1
**encompasses** 299:8
**encourage** 137:3,9
**encouraging** 169:14
**engaged** 9:5,14 10:4
42:17
**engaging** 11:1
**enjoy** 254:24 257:3
289:16 290:1
**enjoys** 297:11
**ensure** 11:24 15:15
15:24
**enter** 13:16 114:11
**entire** 67:16 73:18
128:5 141:24
142:1,5 157:18,20
166:17,17 176:25
213:6,17 225:25
235:2 240:17
243:12 246:5,7
251:15,17,18
287:13 288:3
**entirely** 197:7 211:6
256:16 276:23
284:25 296:19
**entitled** 51:25 52:2,3
52:5 68:25 93:12

97:17 145:8
146:13,23,25
147:21 173:22
**entry** 93:17
**equal** 145:25 220:22
**equate** 289:22
**equipment** 180:11
226:1,9 272:4,17
272:18,21 274:5
**equity** 206:15,25
207:17
**equivalent** 198:16
**era** 57:16
**error** 85:10 163:19
**especially** 54:10
64:20 137:17
**ESQ** 2:7,8,9,14,15
2:17,23,24,25 3:7
3:13,14,15,16,17
**essence** 114:15
166:9
**essential** 209:1
**essentially** 15:2
44:25 51:9 64:11
73:16 79:21 84:21
90:17 139:23
184:2 187:18,23
188:6 190:15
199:6 211:17
217:1 223:4,5
224:11 226:3,7
229:9 230:13
231:5 234:25
236:1 272:8,21
**establish** 21:12
77:17 136:10
**established** 137:18
171:9
**establishment** 223:1
223:6 247:23
248:1 249:9,10
250:8 251:1 253:1
253:7,9,12
**establishments**
247:11 250:11,12
250:13

**estimate** 37:20
117:1 134:16,17
134:18,19,20,21
134:23 138:2,12
195:12 202:13
221:9 229:9 236:3
275:12,14 281:8
286:17,18
**estimated** 17:21
134:11 138:4,12
139:14 140:6
141:3 142:14,15
143:10 147:14
148:3 149:14
160:3,20 162:16
287:5
**estimates** 109:11
134:15 138:17
159:7,10 236:8
**estimating** 159:3
198:8 243:23
**et** 24:20 32:15
**European** 65:3
**evaluated** 79:15
**evaluating** 285:1
**evaluation** 198:6
**evening** 304:9 305:4
**event** 168:13 195:15
**events** 196:6
**eventually** 236:2
**everybody** 4:13 8:9
64:2 111:9,15
215:15 216:13
231:15
**EVID** 308:1
**evidence** 8:20 17:5
19:5,8 25:11 45:9
45:12 81:5,12
83:16 84:7,10,15
85:16 86:1,4
133:16,20 139:2,5
149:19,22 179:9
187:7 197:6,10,13
200:15 203:1,3
213:7,13,14,14
214:1,3 215:22

217:4,22 220:6,8
222:3 255:5
**evident** 73:12
**evolution** 219:7
**Ex** 255:13
**exact** 110:12 116:20
161:1 290:18
**exactly** 49:3 89:9
96:10 99:18 100:9
113:23 158:13
164:20 185:20
194:24 236:7
248:4 250:3
278:17 288:17
296:14 302:9
**examination** 4:9,19
16:24 17:7 31:16
34:18 54:21 56:10
89:25 125:17
126:15 128:19
162:10 169:22
173:5,20 174:10
192:13 197:14
307:2
**examine** 8:4
**examined** 4:16
34:16 56:9 128:18
174:9
**examines** 284:12
**examining** 34:12
128:13 142:1
**example** 7:18 18:5
28:14 39:14 96:10
108:3 120:5
145:10 170:1
179:16 181:2
238:21 245:11
258:4 261:9,12
262:25 270:6
273:16 298:8
300:11
**examples** 122:17
123:11
**excellent** 218:4
**exception** 84:22
196:4,6 214:3

**excerpt** 259:2,5,7,10
   280:3
**excerpted** 212:10
   216:8 218:3
**excess** 142:7 146:25
**exchange** 9:7 14:13
**excluded** 129:16
**excludes** 187:20,20
   187:21
**excluding** 265:6
**exclusively** 216:22
   283:20 284:23
**excuse** 30:24 175:22
   207:13 229:13
   232:17 238:24
   261:1 264:13
   275:13 292:12,12
**excused** 34:10 55:23
   128:11 174:2
**executive** 67:18
   90:12 130:21
**executives** 147:11
   147:18,21 148:2
**exemption** 32:24
**exercise** 131:14
   161:13 258:16
**exhibit** 6:13 7:3 8:20
   17:5 18:18 19:4,8
   25:10 41:12 45:8
   45:12 56:15,21
   66:22 67:21 70:23
   80:14 81:5,6,12,15
   83:16 84:3,7,11,15
   84:19,22 85:8,17
   86:4 89:24 91:14
   93:12 94:12 98:8
   100:20 107:23
   114:16 126:16
   127:14,16 133:16
   133:20 134:9
   137:25 139:2,5
   149:19,22 158:22
   160:16 162:6,13
   163:21 178:13
   179:6,9 181:17
   182:15 184:8

186:16,23 187:7
   188:20 189:18
   192:10,22 193:4
   196:12 197:4,10
   198:11,16,16,24
   198:25 199:25
   200:15 212:7
   213:6,10 215:22
   216:5,8 217:14,22
   217:25 218:3,18
   219:24 220:6,8,10
   221:12 222:3,6
   227:1 228:20
   229:5,25 230:3
   236:22 248:6,22
   258:25 259:1,5,6
   280:2,12 281:6
   282:25 283:3
   285:16 289:11,13
   299:16 300:12,23
   301:1,2,12 303:5
**exhibits** 7:8 37:7
   94:15 186:24
   196:3 197:3
   286:14 308:1
**exist** 24:5 36:20,21
   98:25 269:12,22
**existed** 36:14 51:1,6
**existence** 12:1 30:1
   187:16 256:20
   263:5
**existing** 122:19
**exists** 191:25
**expand** 201:18,18
   264:20
**expanding** 57:19
**expect** 54:3 72:16
   169:6 190:4,7,12
   190:13 224:18
   251:10 267:14
   305:9
**expected** 10:24,25
   118:19 178:25
**expended** 168:9
**expenditure** 112:8
   112:11,15,15

116:23
**expenditures** 80:2
   82:12,15 112:13
   112:18 113:6
   116:13,16,19,24
   117:17 157:5
**expense** 156:24
   157:6
**expensive** 79:9,13
   110:5
**experience** 9:12,18
   46:9 75:2,5,8,19
   110:15 114:19
   115:3 126:22
   127:4 174:24
   201:2 203:7
   209:17,24 274:19
   275:6
**experienced** 274:23
**experiences** 168:9
   168:12
**expert** 63:12 69:13
   69:19,23 176:18
   177:4,6,22 178:1,3
   178:8 196:9
   202:20 203:19
   207:22 208:3,12
   211:24 213:3
   214:4 215:3
   221:25 235:8,11
   236:11 237:3
   253:23 281:5
   282:20 290:20
   293:18
**experts** 175:25
   203:2,4,15 204:20
   205:5,7 206:1
   216:1 246:18
   249:13,25 255:11
   255:16
**expert's** 203:3
**expired** 183:15
**explain** 78:7 90:22
   115:12 118:25
   186:8 242:12
   252:3 282:15,20

**explained** 41:16
   141:12 285:7
   303:18
**explaining** 282:17
**explanation** 206:19
   242:15 290:13,15
**explanatory** 290:7
**expose** 64:11
**exposed** 272:9,18
**expressed** 31:11,12
   144:17 145:14
   150:10 196:6
**expresses** 143:19
**extensive** 58:24
   188:8
**extent** 21:13 221:15
   271:4 279:17
**extra** 299:18
**extraordinarily**
   278:5
**extreme** 87:7 272:9
   272:18
**extremely** 180:8
**e-mail** 12:8 13:13
   18:10 21:11 26:24
   32:14

**F**

**F** 1:14 2:17 4:15,15
   103:1 216:3 306:1
**face** 190:16 221:3
   227:25
**faces** 255:15 270:23
**facilities** 39:16
   42:12 49:15 135:1
   135:4,9,14 137:3
   137:14,16,17
   161:15 171:1,1
   190:22 238:18,18
   239:22 271:15
   276:11
**facility** 192:19 239:7
   239:14 240:5
   264:11 273:4
   274:12 276:8
**facing** 65:4 277:2

**fact** 65:5 84:1 99:14
103:16 117:16
129:15 133:1
138:22 154:11
157:15 158:11,12
196:10,11 206:24
214:8 228:15
234:2 242:8
243:15,17 247:22
264:17,25 274:18
286:4,19 287:9
289:19 290:19
298:4
**factor** 64:17 146:5
150:12 283:24
**factored** 138:24
**factors** 64:3,4,5,15
168:23
**factory** 129:14
**facts** 126:25 195:16
251:10
**factual** 274:3 291:7
**factually** 302:15
**failed** 215:5
**fair** 89:2,5 96:6,17
98:24 107:4
118:17 153:10,16
153:17,20,23
154:2 155:14,22
155:23 156:7,12
157:10,11,14,17
158:5 162:22
180:5 185:5
206:25 241:24
242:1,2 260:7
266:16 275:4
278:8
**fairly** 176:8 189:13
189:16 253:9
262:17
**fairness** 295:10,11
295:13
**fall** 130:22 196:8
214:3 261:25
268:23 269:2
**familiar** 69:13 76:14

85:24 102:2
111:11 121:21
122:1,6,9,10
123:12,18 193:14
204:21,24 205:1
209:4 223:13
224:8 234:2
239:19 292:15,17
292:21
**familiarity** 177:10
187:10 222:11
**family** 61:23 66:25
67:3,4,8 70:3,10
84:10 98:18
107:12,16 108:23
109:2 166:1
**far** 39:15 64:19
99:25 106:16
182:11 183:20
196:20 203:22
221:16 233:15,24
241:24 246:21
297:18
**fashion** 276:5
**faster** 64:19
**favorable** 80:11
**fear** 190:5
**feature** 15:18 16:2
99:13 100:12
295:25
**features** 107:4,5
169:16
**February** 44:7 49:4
195:6,11,12
212:21
**Fed** 255:13
**federal** 57:21 59:22
60:1 62:6,7 95:22
104:7,13 111:8,13
111:14,17 112:20
121:22 203:1
213:13,14 214:3
243:6 255:23
256:1
**fee** 114:23
**feel** 79:7 96:16

251:16,19 284:4
288:19 295:20
297:25 298:20
**feeling** 99:25
**fee-for-service**
81:19 83:2
**fell** 263:10
**fewer** 192:2 204:16
**field** 177:22 203:5
211:12
**fifteen** 167:16
199:18
**fifth** 261:8
**fifties** 231:21
**fifty** 116:7 117:1
**figure** 69:4 71:14
72:16 76:3,7 90:17
91:9,10 103:24
109:16,17,18,21
140:6 141:3,19
163:15 164:1,24
165:19 173:12
231:9 264:10
298:10
**figures** 230:3,3
**file** 178:25
**filed** 49:6 50:8 69:14
69:20 88:22
132:13 142:10,24
194:25 195:1
**files** 182:17
**filing** 10:14 131:10
138:4 183:9 198:5
198:9
**fill** 75:13 224:13
**filled** 224:14
**filling** 75:12
**final** 144:14
**finance** 175:17,17
**financial** 39:13 43:6
43:19 45:5 46:22
65:22 138:24
154:22 206:22
239:17
**financially** 73:13
74:22,25 75:11,15

75:17,20,23 87:20
87:24 88:1
**financials** 49:1
**financings** 40:5
**find** 9:2 12:20 25:16
75:9 93:5 98:7,9
110:9 112:17
170:21 180:15
187:18 193:15
220:22 221:7,8
224:18 228:16
229:4 231:23
232:2 258:22
262:3 272:13
**finding** 195:15
**findings** 60:17 90:9
**fine** 94:10 98:1
201:7 252:12
**finish** 244:1 269:23
287:19,20 292:13
305:2,3
**finished** 31:15 37:8
174:25 214:11
224:24
**fired** 268:7
**firm** 6:5,7 60:9 67:5
71:4,12 94:4 180:6
180:14,24 187:18
187:20 201:19
208:17,23 209:14
210:7 211:21
219:16 223:5
232:13 246:15,16
246:19,25 247:2
249:10,13,14
250:9,14,15 251:1
253:4,5,8 267:6
268:25 278:10
291:11 293:6
296:11,11,14,21
296:25 297:4,10
**firms** 65:9,12 68:20
68:23 71:3,15
72:14 87:5 92:1,2
92:6,10 93:12,13
94:6 103:20

180:10,10 188:9
188:11,12 193:13
200:25 201:4
204:8 206:15
207:17 222:12
224:10 234:21
235:3,21 236:13
236:14,14 239:24
240:6 241:18,23
243:17 244:8
245:2 247:9,10,23
248:15,16 249:2,3
249:6,7 250:1,2
252:22,23 253:15
255:20,21 290:18
**firmwide** 246:25
**firm's** 182:11
**first** 9:8 17:15 19:20
26:23 27:18,21,23
29:25 36:12 45:25
46:2,4,7 49:15
55:11,12 65:19,23
65:24 71:12 73:5
75:9 79:11,23
80:22 82:1,10,17
83:17 85:4 90:8,8
90:15 91:24 92:21
95:3,7 98:18 99:6
103:16 105:3
106:16 110:2,5
112:2,2 120:6,10
120:12,13,22,24
120:25 139:17
160:3 163:16
164:7 168:6,8
169:9 170:3,8,9
175:8 181:17
196:21,24 200:2
200:22 206:13
213:10,21 214:17
227:10,17 231:2
237:15 239:11
240:14 248:13
263:21 265:8,15
266:22 269:16,20
273:14 276:3

278:12 288:22
290:24 298:17
**first-year** 160:20
170:1
**fit** 185:23 245:25
249:19 272:13
**fits** 249:20 261:21
**five** 41:6 70:4 71:7
71:16,25 74:17
75:7 94:16 103:25
135:1 142:20
144:16 161:4,15
162:4 173:15
182:18,21,22
183:4,5,7,10
190:24 202:7
204:3 238:18
240:23 241:17
274:21 275:1
300:16 303:8
**five-minute** 5:4,18
86:10 275:18
**fix** 226:8
**fixed** 45:1 48:9
54:23 55:10
**fixes** 226:9
**flaws** 227:16
**flexible** 137:5
**flip** 6:17,21 70:22
74:6 81:14
**flipping** 100:16
**flow** 39:17 150:15
**flux** 157:9
**focus** 78:3 182:20
189:22 192:1
210:19 211:6
218:7 279:4
**focused** 59:19 61:14
61:21 68:22 183:5
281:15,17
**focusing** 211:8
295:22
**folder** 11:2,7
**folks** 27:10
**follow** 113:1 222:8
238:4 297:8

**followed** 23:23 63:7
206:2
**following** 65:18,20
93:14 101:20
129:21 136:7
170:8 266:17
288:21 304:16
**follows** 4:16 34:17
56:9 103:5 128:18
174:9 287:3
**follow-up** 42:9
43:24 44:10
**foot** 272:8
**footprint** 40:1 44:5
44:8
**force** 69:8 80:5,6
143:7 158:12,14
165:23
**forced** 9:9
**Ford** 225:16
**Ford/General**
122:25
**forecast** 39:17,19
**forecasts** 39:17
**foregoing** 306:9
**foreign** 64:19,23
65:9
**foremost** 9:8
**forget** 151:14 175:3
185:20 194:24
**forgot** 23:15
**form** 16:12 44:23,24
45:4 106:9 144:6,6
147:23 182:1
**forma** 40:23,25
**format** 14:22,22,24
15:1 16:3 33:23
44:21 48:2,10,12
48:16 49:2 54:24
55:3,6,8,14 247:22
**formation** 10:18
**formats** 16:7,10
**former** 144:6 220:23
**forming** 203:5
**forms** 113:18 202:19
**formulas** 63:1

**formulation** 144:15
197:16
**Fort** 41:19 171:5,18
171:19 182:19
199:10 231:3
239:6,14 240:1,5,7
244:14 269:7
270:18 272:23
273:3,16 293:23
**forth** 50:3 101:10
118:12 185:5
299:11
**forties** 231:22
**forward** 64:8 115:23
197:24
**found** 78:23 100:19
187:16 193:17
228:25 286:5
288:11,14
**foundation** 61:7,12
63:8 66:25 67:3,4
67:8 70:3,10 84:10
206:17 210:3,5
**foundational** 203:6
214:6
**founded** 6:7 7:1
**four** 24:2 92:8 120:4
159:2 194:4
199:17 204:18
213:9 240:24
**fourth** 280:20
**four-and-a-half**
57:13,14
**fraction** 192:23
193:7
**frame** 6:25 196:23
**FRANKEL** 2:19
**frankly** 128:4
**free** 251:16 284:4
288:19 295:20
297:25 298:20
**freeze** 143:7
**freezes** 147:2
**freezing** 144:22
146:16
**Friday** 37:5 42:7

**fringe** 39:10,11
  151:22
**front** 6:12 37:7 79:1
  79:4 287:1
**Fruit** 35:10
**full** 30:4 78:17 175:3
  257:20
**fully** 14:19
**full-time** 10:2
**function** 26:8
**functions** 131:5,6
  209:5
**fund** 77:1
**funded** 90:25 91:2,6
**funding** 59:4 77:1,6
**funds** 91:2 95:7
**further** 19:10 30:21
  34:1,8 45:14 54:16
  55:16,21 86:6
  103:4 126:12
  127:8 150:21
  163:9 172:11
  173:25 215:25
  219:18 220:18
  223:17 232:6
  255:5 258:18
  270:9 291:7,13
**future** 58:25 59:19
  64:8 66:8 69:1
  74:14 76:1 93:4
  106:19 120:3
  143:8 144:22
  146:16 147:2
  150:16

**G**

**G** 4:1 217:25
**gain** 138:17
**game** 252:9
**gap** 245:11 246:10
**gather** 124:20
  127:14
**gathered** 190:19
**gathering** 113:7
**gear** 272:7 273:16
**gearing** 215:11,13

**general** 39:4 85:21
  88:6 111:11
  126:18 127:2,5
  136:2 155:17
  180:2 185:16
  189:8 191:13
  198:2 204:4 222:9
  224:7,18 231:13
  247:9 250:4,9,15
  274:18 291:21
  294:22
**generalizable**
  113:22
**generally** 71:2 87:5
  87:25 96:3 107:11
  121:21,23 136:8
  149:8 162:2 165:7
  183:24 247:23
  253:6 272:12
**generate** 145:20
**generated** 17:1
  145:8
**generates** 12:7
**generous** 81:2 146:5
**Gentlemen** 172:18
**Geographic** 280:10
**geographically**
  185:10
**Georgetown** 120:15
  120:19 123:14,25
**German** 239:8
**Germany** 156:9
**getting** 9:9 44:4
  64:16 167:8,11
  228:5 240:13
  270:23
**give** 14:2,6 66:9
  90:14 91:20 98:2
  128:24 145:10
  167:21 170:1
  174:23 175:20
  176:1,5 181:16
  185:16 205:9
  208:14 214:21
  215:3 217:20
  224:12 228:24

  251:13,23 275:12
  275:14 290:7
  298:8,10
**given** 11:21,24 16:17
  18:25 27:8 117:18
  138:22 143:19
  144:2,21 147:4
  148:15 172:23
  181:7 189:1 197:8
  216:16 221:23
  228:15 245:6
  258:14 260:9
  261:18 263:9
  271:8
**gives** 150:14 169:3
  187:1 189:7
**give-and-take**
  119:17
**giving** 136:2 265:12
**glanced** 108:23
**global** 216:19
**globalized** 64:18
**gloves** 273:19
**GM** 88:9,10,16 89:1
  89:4,11
**go** 4:14 6:12 8:4
  10:11,24 18:17
  26:22 32:4 36:21
  50:10,12,16 54:11
  68:3 70:20,23
  71:21 72:16 78:16
  79:6,9 81:23,24
  84:2 85:23 91:9
  92:24 94:9 96:21
  96:22 99:7 100:16
  103:9,14,15,19
  105:2,24 106:14
  106:23,24 108:11
  109:6 111:25
  112:24 113:1
  118:7 120:20
  160:2 163:16
  168:14 169:6,10
  169:14 173:1
  182:24 188:1,2
  189:2 190:7

  193:19 194:3
  202:21 212:16
  216:3,25 218:22
  219:6 223:16
  224:25 225:13
  228:18 229:25
  232:1 252:4,14,24
  253:2,4,17 267:19
  269:16 270:4,16
  281:20 282:24
  287:10 292:10
  293:9
**goals** 233:18
**goes** 6:22 76:10
  196:20 202:23
  209:21 216:21
  221:2 225:19,21
  267:10,10
**goggles** 273:18
**going** 10:25 23:16
  39:15 40:5 65:15
  75:16 81:8 83:6
  85:21 86:24 90:6
  96:23 98:9 99:25
  101:4 102:9
  103:15 106:8,24
  107:22 110:10,19
  110:20 111:14,21
  115:7 147:23
  150:18 161:9
  162:7 163:13
  167:16,25 187:19
  190:1 192:25
  195:14 197:22
  202:17 206:16
  214:15 215:1
  218:10,18 220:10
  221:7 224:17
  225:16 228:16
  235:3 236:24
  237:24 238:10
  240:22 245:22,24
  246:6 251:14
  252:18 254:2
  267:19,24 268:2
  269:9 273:17

274:1 275:16
277:20 281:10
282:16 284:6
285:15 288:18
291:6,15 295:3
297:25
**good** 4:3,5,10 60:11
86:15,16 98:21
102:10 110:4
136:2 137:11
202:10 209:12
232:11,12 234:20
252:21
**goods-producing**
227:18 229:24
**gotcha** 252:9,11
**gotten** 178:22 196:9
257:10
**government** 62:6
64:5 72:12 111:8
111:13,14,17
112:20 176:6,8
189:12,14 204:9
**governments** 58:15
58:19 70:20 72:4,5
72:7,19 95:23
104:8,13
**Governors** 176:10
**governs** 130:14
**graduated** 140:18
**granted** 18:3 27:13
27:14 52:9 173:10
173:14
**grants** 136:22
**graph** 68:4,7,11
**great** 92:23 197:9
202:11 222:21
231:20 263:12
**greater** 99:10
136:11 145:8
**Green** 1:9
**grievance** 176:23
177:1
**group** 4:22,25 5:11
13:14 18:10 41:18
43:14 106:19,21

106:22 130:7,9,14
138:18 141:24
142:1,4,5 144:12
148:6,24 149:17
166:18,18 170:4
170:16,17 222:18
223:11,24 224:2
227:25 231:4
237:16,17 246:6
259:11 260:1,9
284:9,15 292:25
**groupings** 11:10
**groups** 10:3 43:15
43:16 95:9 130:17
131:3 166:22
258:1 262:13
303:20,21
**grow** 268:16
**growing** 236:4 244:8
**growth** 115:16,17,24
**guess** 6:12 40:5
49:10 61:25 81:22
95:6 100:2 106:25
124:20 125:21
126:2 151:18
163:15 164:22
165:16 195:9,10
195:11,13 196:11
197:8 212:18
262:1 265:22
300:10
**guessing** 195:9,10
**gun** 213:5
**guy** 127:5

---

**H**

**H** 2:24 37:7 174:8,8
220:10
**ha** 145:20
**half** 114:20 139:25
152:16,24 192:7
200:9 261:15
**halfway** 67:20,21
91:25 275:11
**Hamilton** 2:15
55:24 56:1,2,10

63:11,15 81:4,8
83:15,21 84:6,9
85:15,24 86:3,6
94:13,20 101:8
106:8 126:14,15
127:8,17,25 151:9
307:12,14
**hand** 200:11 306:19
**handed** 41:2 132:10
301:3
**Handing** 248:7
**handle** 51:16 85:21
**handles** 13:14 51:17
**handy** 232:25
**happen** 110:19
267:9
**happened** 78:11
125:4 206:5
291:10
**happening** 110:7
**happens** 50:23
191:5
**happy** 106:12 305:4
**hard** 75:10 98:7
104:18 238:11
241:19,20 296:6
**harder** 208:18,24
209:15
**hardship** 232:2
**harm** 197:9
**Harvard** 174:22
**Hayes** 35:11
**hazardous** 272:10
**HDHP** 92:2
**HDHP/HRA** 92:11
93:17 103:21
**HDHP/SO** 92:7
**head** 39:8 43:24
138:16 157:9
159:19 272:8,22
274:23 275:1,5
**heading** 112:4
**health** 57:21 59:10
59:14 60:1,15 63:6
63:9,20 64:16,18
66:2,15 67:13

68:10,12,24 69:7
71:17 78:15 79:20
79:22 80:2,23 81:3
81:18 82:17 88:10
89:18 90:24 91:1,5
92:7,10,16,17,18
93:3,9,13 95:1,10
96:1 97:5,8 98:25
99:4,16 100:3,6,8
100:13,20 101:18
111:17 113:11,12
114:23 117:11,17
117:25 118:8
122:3,18 127:1,2
136:11,22 137:12
154:5,12 155:9,15
156:1 165:1 168:5
170:16 172:1
**healthcare** 57:17,19
58:13,22 59:16
61:15 63:3,7,18,25
64:7,9,24 65:7,13
65:16 66:18 67:1,6
67:19,23 68:1,14
72:8 77:21 78:5,9
78:12,19,24 79:1,4
79:15,19,24 80:4
82:8,12,13,14,21
89:12 95:14 96:3
100:1,21,22 102:1
105:7 110:4,11
112:19 114:21
116:13,16,19,23
116:24 118:11
119:3,10 122:15
130:15 137:6
154:23 155:19
156:24 169:12
**HealthWorks** 78:6
80:19 81:18 82:1
83:13 89:15 91:4,5
91:11 94:25 97:2,4
97:11,12,18 98:15
99:9 107:3,8,23
108:9 109:10,13
109:13 110:23

112:9 114:21
133:6 134:16
135:3,7,8,10,14,17
135:19,21 136:1,3
136:4,8,21 137:7
137:13,18,19
139:23,25 141:12
159:4,12 160:3,7,9
160:9 163:15
164:3,5 165:14
166:8,11,11,21,23
166:24 167:7,24
168:5,23 169:17
170:5,11,12,25
171:18,21 172:3,7
**healthy** 75:17
**hear** 5:14 24:24 64:2
104:11 135:23
151:8 203:19
206:19 214:16
246:17 266:21
295:6
**heard** 54:2 208:7
**hearing** 4:7
**hearsay** 201:21
202:18,20 203:2
207:4 210:4 213:3
213:11,12 214:2
217:15 221:15,24
225:5,6
**heat** 274:8
**HEATHER** 2:14
**heavily** 228:2
**heavy-vehicle** 43:14
**held** 130:9 148:2
**help** 13:22,23 62:18
105:11 110:24
132:15 163:17
177:14 195:2
249:22 282:10
**helped** 59:15 134:14
134:15
**Helper** 179:2 204:24
205:19 207:22
208:11 209:22
210:8,11 211:16

216:8 218:3
220:12,14,21,24
221:23 224:22
226:11 231:11
248:11 274:7,7
**Helpers** 226:13
**Helper's** 273:6,15
**helpful** 233:2 242:15
**helps** 187:2
**Henderson** 41:19
49:18 135:5 136:6
164:16,22
**hereunto** 306:16
**hesitating** 85:18
**high** 72:7,7 92:16
99:1,12,15 100:3
100:13 116:21,25
117:8 147:21
188:9,13 202:13
211:13 255:19,19
255:20 260:20
275:6
**higher** 65:10 79:11
208:17 245:4
250:10,10,12
271:25 272:2,14
272:16 286:5,21
300:1 303:23,24
**higher-skilled** 300:1
**highest** 144:16
**highlight** 94:17
**highlighted** 85:20
**highly** 116:14 232:5
240:15 288:12,15
288:25 289:2
290:22
**high-cost** 116:14
117:12
**high-deductible**
101:18
**Hills** 41:21 49:17
171:8 182:19
183:20 184:6
188:25 192:6,19
193:5,21 194:6,14
195:3 201:1,1,14

202:6,8 204:15
225:3,14,24 229:5
231:2,22 264:7,18
268:5 298:9
**HIPPA** 131:15
**hire** 66:5,6 181:4
201:11 202:9,14
277:3,12,20 279:9
279:20,21
**hired** 10:5 66:3
148:18,20 150:4
209:25 236:2
268:9,14,19,22
270:3 279:10
**hires** 65:25 66:14,15
73:6 105:20 119:6
**hiring** 269:15
277:20,24 279:24
**historical** 39:13
**history** 129:8 156:14
**hit** 183:21 290:18
**Hoc** 3:4
**HOCK** 3:17
**Hoffman** 119:23
**Hoffman's** 118:12
**hold** 221:3 280:4
**Holders** 3:4
**holding** 211:11
281:7
**Holdings** 9:15,15
**holds** 117:7,8
**holiday** 149:8
**home** 129:11 154:24
183:20
**homes** 169:1
**HON** 1:15
**Honor** 4:3,10,17 7:4
7:5 8:1,3,6,10,15
8:22 17:3 19:5,11
21:23 22:21 30:25
31:3 34:14 45:7,14
45:15,16 54:19
55:16,24 56:1,6
63:11,13,15 81:4
83:15,17,24 84:10
85:15,18 86:3,8

94:13,21 98:1
102:8,13 103:6
104:10,14 106:8
125:11 126:13
127:8,9,17,21,25
128:4,12,15,16,21
133:15,18 139:1
149:18 150:21,22
151:7 158:23
162:3 163:1
172:12,17,19
173:25 174:7
177:21,25 179:5
186:17,19 187:1,5
192:9,11 195:23
196:24 197:13
199:24 200:1
202:16,25 203:18
206:16 207:3,7,21
211:22 213:1,5
214:10 215:5,18
215:24 217:11,12
220:1,2,5 221:11
221:13,18 225:5,6
230:18 232:6,7,23
232:24 237:1
242:19 247:16,18
248:17,20 251:12
252:3,8,10 275:13
281:9,13,18 287:8
287:12 290:14
304:12 305:8
**hope** 103:10 163:10
**hopefully** 137:11
268:13,14
**hospital** 130:15
136:16 164:4
169:7,11
**hospitals** 62:19
137:2,9 167:20
**hotline** 13:10,19
**hour** 102:11 145:19
145:22 183:25
199:1 268:15
294:24 295:2
**hourly** 39:9,11

148:16,16 151:17
153:1,3,10 162:18
165:14 233:9,10
234:6 259:12
260:2 278:14
279:13 280:20
283:7
**House** 61:20,20
**housekeeping**
127:10
**HR** 60:17,21 138:18
148:24 149:17
**HRA** 91:18
**HSA** 91:18 92:2
**human** 129:19,23,24
131:4 153:18
**hundred** 14:4 79:11
81:1 137:7 140:18
152:19 161:4,4
169:15 237:2
274:10
**hundreds** 29:11
**hypochondriacs**
117:4

**I**

**IBM** 131:19
**ice** 183:20
**ID** 28:25
**idea** 14:2,6 71:18
94:20 95:6,13 96:6
107:14 111:11
117:10 126:9,10
174:23 175:20
176:1,5 181:16
185:16 208:10
211:10 216:21
225:17 252:21
260:17 281:4
303:4
**identical** 24:2
148:14 166:14
170:9 301:7
**identification** 28:24
**identified** 82:8
103:20 239:17,24

**identifiers** 32:15
**identifies** 239:6
**identify** 103:10
159:2 240:24
259:6
**identifying** 235:20
**ii** 280:6
**im** 247:19
**imagine** 189:25
**immediately** 214:19
266:17,25 269:12
269:22,23 277:3
**impact** 145:11 150:8
225:23 266:6
**impacted** 153:13
**implement** 110:16
125:19
**implementation**
148:8 231:6
244:15 245:13
266:14,18 267:1,4
269:22,24 289:14
299:13 300:25
**implemented** 89:20
119:7,9 138:19,20
138:22 139:18,19
140:11,12 141:8
143:5 147:12,19
147:20 148:9
149:2,5 199:20
201:24 231:4
269:12
**implementing** 291:6
**implication** 229:17
**implicit** 146:7
**importance** 278:23
**important** 11:20,23
15:10 16:1 57:17
64:20 82:4,6 99:5
180:8,9 181:1
189:20 247:5
277:4 300:2
**impose** 293:5
**imposed** 119:7
120:16 121:3
124:1

**impractical** 213:16
**impress** 16:3
**impressed** 15:24
**improper** 252:7
**improperly** 253:5
**improvement** 152:2
**improvements**
216:18
**inaccurate** 246:12
**inadequate** 196:22
**incentive** 99:10
200:23
**incentives** 96:1
**incentivize** 96:7
99:5
**incentivized** 96:22
209:15
**incentivizing** 98:25
99:19,22 100:12
**inclined** 206:20
**include** 26:2 28:13
32:13 44:24 68:20
72:4,5 74:21,25
123:11 136:18
159:14 160:12,22
164:24 197:3
203:23 235:2
260:15,15,16
266:3 272:3 299:2
301:25
**included** 42:8 57:19
57:24 60:16 90:2
104:7,12 131:5
133:4 138:1
139:11 154:18
161:25 167:3
169:5 170:5
173:15 193:22
200:7 265:7,14
282:12
**includes** 45:1 70:20
90:17 95:22 149:8
160:10 182:3,13
264:11,14 272:9
272:10 298:24
**including** 4:14 39:14

39:19,25 51:12
53:24 83:12 131:8
138:9,10 234:3
254:3 269:25
**inclusion** 191:13
299:18
**income** 142:2
**incomplete** 296:8
**incompleteness**
296:9
**inconsistent** 70:7,15
280:1
**incorporate** 285:20
**incorrect** 13:16
**increase** 157:3
190:13 245:11
246:10 270:18
**increased** 131:9
157:2 158:11
**increases** 270:12,15
287:4
**increasing** 217:5
245:17
**increasingly** 64:18
212:23
**incumbent** 201:12
202:11 267:5
268:21
**incumbents** 270:2
**incur** 117:17 136:16
**incurred** 165:25
166:1
**indemnify** 136:15
**indemnity** 80:9,12
95:17 96:20
136:15 165:3
**indemnity-type**
136:20
**index** 11:2,4,14
**India** 65:4,6 72:20
**Indiana** 9:21 135:6
171:6 219:2,9
239:7
**indicate** 76:12
**indicated** 70:4
268:24

**indicates** 71:24
74:13 192:18
193:1 217:4
**indicating** 98:4
**indication** 213:17
278:18
**indicators** 111:9
**indirect** 158:19
**indirectly** 306:15
**individual** 26:24
27:14,23 28:2,6
43:10 87:23 96:14
96:15 108:17
114:12 119:8
177:1 189:3
303:20
**individually** 42:25
**individuals** 26:1
27:3 28:10 43:18
96:2 100:5,19,22
112:24 113:9,10
116:21,22,22
117:17
**indulgence** 172:25
**industrial** 129:20
130:1,1 153:19,24
174:20
**industries** 229:24
244:6
**industry** 60:17 71:5
72:6,23,23,25
99:24 178:4
180:11 189:8,23
191:1,15,20 192:2
192:8 204:4
210:10 211:6,7,17
211:18,20,24
212:1 214:8 215:1
215:17 216:14,18
216:22 217:3,7
218:8,10 219:1,14
219:20 221:8,17
222:8 228:1,2,2,14
228:15,17 231:14
231:15,19,24
233:11,14,16,21

234:7,11,17 235:2
235:6,17 236:13
237:9 239:24
240:1 241:15
245:2,17 246:8
280:20 302:11,12
**infer** 278:16
**inferences** 203:5
**inflation** 115:18
134:17 146:5
159:4 170:4,6,7
**information** 6:6 9:3
9:7,9,11 14:11,14
14:17 18:25 25:13
26:9 28:17,23
29:22 32:8,12,13
32:14 33:15,16
34:5 35:17,18 36:3
36:7,11,23 37:3,14
37:17 39:1,3,4,6,9
39:10,11,14,16,19
39:24 40:2,3,4,4
40:17 41:5,8,9,25
42:12,13,13,18,20
44:5 46:19 47:1,9
48:8,10,11 49:9,11
49:19,23,24 50:2,4
50:11 51:11 54:12
55:2 58:14,18
60:13 67:6 91:13
93:24 94:11 112:7
112:10 113:7,22
113:25 114:1,2,7
119:16,19 121:13
126:17 132:5,17
133:12 136:25
168:24 169:3,10
169:12 178:19
182:15,16 184:9
184:12 186:5,6
187:2 188:24
189:1,7,17 190:18
191:14 194:23
196:9,19 198:3,4
198:22 199:3
200:2,4,6 203:16

203:25 204:4,13
206:10 207:5,9
214:4 215:2,3,4
218:6 220:14
226:19 231:11
236:17 240:10
241:12 242:4,7,10
263:8
**informed** 46:21
150:1
**ingredients** 226:18
**initial** 22:12 29:19
181:14 248:3
**initially** 10:5 14:4
**initiative** 40:1
**initiatives** 39:25
40:15 44:5
**inside** 50:21 226:25
**insist** 215:1
**instance** 135:12
144:16 170:20
**instant** 226:5
**instantly** 220:22,25
**institute** 58:4,6,8,9
58:17,20 59:3,5
63:6 78:20 100:19
127:23 174:16
175:5 206:24
**instituted** 64:5
**instruct** 290:18
**instructions** 14:18
23:23
**instructs** 226:7
258:22
**insurance** 59:22
78:9,12,15,18
100:23 113:13,16
113:17 114:23
115:6 130:16
132:25,25 133:2
139:17,21,22,24
147:18,22 154:12
155:16 158:18
172:6 182:2,3
203:23 204:1,5,7
299:23

**insure** 158:18
**insured** 82:15 114:3
117:16 141:13
172:6
**insurer** 158:18
**insurers** 59:11,17
60:2,3
**integral** 57:18
**intend** 141:10
**intended** 291:12
**intention** 94:19
143:7
**intercompany** 40:2
**interest** 33:17 75:12
154:21 176:12,19
176:21,24 177:2
253:25 254:5,6,17
**interested** 207:18
306:15
**interesting** 72:11
**interim** 175:10
**internal** 28:25
256:17,21
**international** 218:9
**Internet** 110:8
111:16 168:25
**Internet-based**
110:22
**interpretation**
233:23
**interpreted** 104:24
110:12
**interrupt** 224:23
**interruption** 180:17
182:23 187:25
**interviewed** 203:8
**interviewing** 203:20
**introduce** 149:19
**introduction** 84:2
**invented** 150:13
**investigating** 169:9
**investment** 130:20
**investments** 130:19
**investors** 64:12
**invitation** 16:17
18:3 27:13 59:20

**invitations** 13:1 18:2
**invite** 21:12
**invited** 11:21 21:4,6
  21:8 42:21,22
**involve** 99:11
**involved** 10:21
  12:23 14:10,11,13
  19:17,21 35:3,10
  51:19 96:2 111:6
  153:18,22 157:13
  159:7,9 163:5
  185:17 197:20
  205:6
**involvement** 176:6
  177:3 184:20
  197:15,19,21
**involving** 19:18
  176:14 177:7
  231:17
**in-network** 96:23
  98:22 99:1,9,22
  107:19,25 108:20
  108:21,22 112:4
  167:4,7,15,19
**iron** 273:21
**irrelevant** 186:25
  197:7
**isolate** 266:8
**isolates** 286:15
**issue** 18:7 65:1
  101:16 110:2
  117:8 210:9 251:6
  256:23 289:15,16
**issued** 139:24
**issues** 13:14,14
  18:12,14,15,16
  57:22 59:18 60:13
  62:21 285:12
  299:23
**item** 49:23 139:17
  140:9 141:6 143:3
  147:10,17 148:7
  148:25 160:1
**items** 42:3,10 48:20
  57:4 132:7 133:11
  134:13,23 159:2,6

159:10,24 160:21
  162:21
**IV.2** 264:4
**IV.4** 192:16
**IV.5** 266:10
**i.e** 284:12

**J**

**J** 4:15 56:8 103:3
  273:10
**Janemarie** 56:3
  63:12 307:12
**janitor** 262:11
**January** 18:22,23
  40:22 41:19 49:8
  55:6 61:5 118:10
  138:23 140:13
  150:4 178:20
  195:2 215:9
**Jay** 4:3
**JAYANT** 2:7
**Jeff** 44:16
**JEFFREY** 307:3
**Jim** 41:18
**Jimenez** 2:9 34:12
  34:14,18 45:7,14
  54:19,21 55:16
  128:13,15,19,21
  133:15 139:1
  149:18 150:21
  162:3 172:12,17
  173:19,20,25
  307:8,10,15,19
**job** 94:14 129:13,14
  136:2 175:11
  185:3 187:18,19
  188:7,11 190:1,2,3
  190:5,6,17 193:16
  194:14 208:19,20
  212:15,16,21
  217:6 218:8
  220:20 221:7,10
  223:21,21 225:18
  231:16 257:25
  284:12
**jobs** 187:24 212:16

212:20 217:4,5
  219:18,21 221:7,8
  228:16 231:24
  232:2 244:9
  263:17,17 267:20
  272:11 274:16
**Johnson** 174:14
**joined** 61:25
**joint** 122:24
**JOLTS** 189:13
  191:17
**Jones** 2:3,11 4:4
  10:6,13,15,23 11:6
  11:22 12:3 14:18
  15:21 16:1,15
  25:14,21 26:4,7,19
  27:8,9,11 29:16
  30:10,13 36:10,15
  36:19 47:11 50:16
  50:21 51:1 52:21
  52:23 53:3 56:2
**Josh** 30:14
**journals** 61:2
**judge** 1:16 103:11
  201:8 216:13
**judgement** 47:10
**Judy** 175:8
**July** 141:14 143:8
  212:18 215:10,10
  217:16
**jumbo** 71:8,25 104:4
  246:18
**jumping** 213:5
**June** 10:16 164:10
  261:13

**K**

**Kaiser** 66:25 67:3,4
  67:8 70:3,9,21
  71:11 73:19 80:20
  84:10,12 89:23
  90:13 93:4 103:7
  124:9 127:11
**keep** 4:23 5:7,7 40:5
  45:19 170:8
  208:19 277:21

**Kentucky** 135:5
  171:7
**kept** 45:20 143:21
**key** 64:4,17 65:18,20
  79:25 90:9 111:9
  168:23 182:11
  216:23
**kicks** 272:7
**kind** 6:5 7:14 46:5
  62:13 87:25 99:5
  110:3 111:7
  113:13 153:12,15
  154:19 222:22
  224:17,22 226:2
  229:2 246:1
  260:23 267:8
  272:15 274:4
  304:13
**kinds** 272:12
**Kingdom** 156:9
**knees** 273:18
**knew** 87:25 126:21
  165:22
**know** 11:14 13:6
  15:21 17:9 18:11
  21:3,5,6 22:19,24
  23:11,16,20,22
  24:1,4,6,7,9,10,12
  24:13,17 28:11
  29:6,25 30:2 32:7
  37:8 40:19,23 48:3
  48:5,7,9,24 49:6
  52:5 54:13,14
  55:18 75:1 82:11
  87:6 91:10 95:3,7
  99:20,21 110:6,23
  115:8 117:7,8,20
  118:14 119:12,22
  119:24 120:10,16
  120:23 121:2,6,12
  121:15,17 122:1
  122:21 123:3,5,20
  123:25 124:2,3,5,8
  124:10,11,12
  125:20,21,23,24
  126:8,23 138:23

142:21 151:16
152:14 153:5,9
154:18 156:4,5,15
156:17,18,18,21
157:15 163:2
169:12 173:22
183:12 193:20
194:17 195:7
197:21 206:21
211:15 212:4
213:21,21,22
220:25 224:21
226:11 233:15
239:13 240:12,16
240:19 241:3,4,9
241:10,13,16,24
245:5 246:21
247:11,16 248:18
250:10 251:8,14
258:24 263:17
264:17,21 265:24
267:11,23 268:4
272:1,6 274:15
278:25 295:3
296:10 299:23
302:15
**knowing** 190:9
**knowledge** 20:1
31:10 32:23 33:5,9
33:21 36:2 37:19
41:24 52:6,17 53:8
54:8 87:17 95:20
163:8 173:24
200:17
**known** 157:19
185:24
**knows** 216:14
296:11
**KRAMER** 2:19

### L
**L** 4:15,15 34:16 56:8
103:3 174:8
**labor** 19:18,22 20:3
20:10 21:16 22:16
22:25 23:6,12,14

23:17,19,21 24:5
29:23 37:1,25 41:6
44:19 46:5,6,7,10
46:11 51:22 53:15
54:9 65:9 130:2,3
130:4 134:3
157:13 174:20
175:16 176:2,4,9
177:3,23 178:1
180:7,9,12 181:6
182:12 184:13,14
184:19 185:12
203:7 213:4
219:13,15,17,17
224:9 234:5 236:6
243:19 244:20
254:15 259:3
260:8 276:7,15,21
276:21 277:3,6,10
277:10,15,18,21
277:22,22,23,25
278:23 279:6,10
279:18,22 280:3
281:2 282:4,12
283:9,10,12,15,16
283:18,20,21,22
283:24,24 284:16
284:24,24 285:2,6
285:14 286:4,7,8,9
286:22 288:1,2,5
291:18 293:5
**laborer** 260:16
**labs** 62:10
**lack** 210:3,5
**laid-off** 220:21
**Lakeside** 2:12
**land** 217:6
**Lane** 3:5
**language** 52:14
274:2 278:19
279:23 297:25
**large** 59:15,25 60:14
60:23 61:13 63:19
63:23 64:13 65:15
66:10,16 68:12,13
69:6 70:16,20

71:15 72:23,25
73:8,11,24 76:4,8
77:22 89:19 93:2
99:21 104:24
113:20,24 119:4
122:17 142:21
166:15 167:6
191:24 211:12
222:25 246:15,16
247:9,11,23
248:15 249:2,6
250:2 253:9
278:14
**largely** 59:16 68:21
90:25 91:2 149:9
189:22 191:9
211:19 222:23
228:1 234:4
**larger** 73:15 94:6,6
99:5 112:1 250:10
250:11,15
**largest** 143:17
166:11 228:4
**lastly** 214:2
**late** 41:18 138:20
195:11,12 231:22
**lathe** 185:24 211:1,2
222:19 223:22,22
224:5,6,11,12,14
224:16 231:25
244:3,4 263:17
271:12,14,14
**lathes** 224:19
**LAVAN** 3:3
**law** 161:8,23 174:14
174:14,15,16
175:6,15,16,17,18
176:11 206:25
242:22,23,25
243:8 246:20
255:23 256:1,5
293:10
**lawsuit** 19:17 25:15
**lawyer** 121:24 243:1
243:2
**lawyer's** 45:19

**layered** 227:15
**layoffs** 187:21
211:16
**lead** 126:25 229:19
271:24 272:2,14
272:15,18
**leader** 258:10
**leadership** 212:14
**leading** 82:8 155:8
**leads** 286:17
**learn** 110:4
**learned** 200:22
206:10
**learning** 110:11,19
**Leaseway** 9:22
**leave** 61:4,23 187:20
216:24 217:2
263:21 267:6
268:22
**leaves** 82:19 187:18
**leaving** 188:6
193:15
**lecturer** 175:1
**led** 59:20,21
**left** 61:5 91:25
148:19,19 175:6
189:3 198:20
251:4 259:10,22
265:16 270:3,4,5
280:9
**left-hand** 200:11
**legal** 47:13 88:5
254:7,10 256:7
**legislators** 58:15
67:7
**legislatures** 58:19
**legitimate** 234:23
**Lemmerz** 35:11
**length** 185:7
**lengthened** 140:22
**lengthy** 150:25
151:2
**LENNOX** 2:14
**Leon** 30:10 43:3
44:4
**Leon's** 43:25

**lesser** 148:20
**letter** 51:2 254:1,24
 255:5,11,22,25
 256:4,19 257:3,6
**let's** 68:15 70:22
 73:21 81:14 88:3
 89:14 91:8 100:16
 105:2 109:6
 111:25 115:11
 116:4 117:15
 118:7 120:4 126:1
 126:1 145:19
 158:8 160:2
 179:15 180:10
 181:4 216:3
 237:13 238:21
 247:21 251:6
 255:20 258:4
 270:13 271:18
 279:4 281:5 290:4
 293:15,15 294:18
 294:21 297:19
**level** 31:7 143:23
 146:19 170:9
 193:17 202:15
 204:3 259:13,14
 260:3,4,10 261:14
 261:15,20 262:6
 262:13 263:20
 296:1,5 298:5
 299:1
**levels** 149:7 179:17
 180:1 199:14
 223:13 258:15,23
 259:12 260:2
 262:8 263:6,9
 293:7
**LEVIN** 2:19
**Levine** 3:16 7:5 8:1
 8:3,5,10,14 16:23
 16:24 17:3 19:6,12
 19:13 21:23 25:11
 30:21,24 31:2,14
 31:18 33:3,8 34:2
 34:3,8 44:16 45:10
 45:15,18 54:16

 55:17,21 150:24
 151:4,7 158:23
 163:1,9 307:4,5,7
 307:9,11,16
**LEVY** 306:6,22
**liabilities** 64:8,9,12
 64:13 65:13
**liberty** 21:3,19
**license** 274:2
**lieu** 151:2,24
**life** 59:10,17 60:2,3
 130:16 132:25
 133:2 134:17
 139:16,20,22,24
 147:18,22,23,25
 148:1 159:5 172:6
 203:20 267:10,10
**LIFLAND** 1:15
**lifted** 213:24,25
**light** 98:3 186:22
 207:3
**lighter** 104:19
**likelihood** 93:14
**Lima** 135:12 160:10
 160:12,13,22,24
 164:18,23 165:1
 182:19 183:12
 186:20,24
**Lima/Pottstown**
 161:24 165:12
**limit** 183:10 215:2
 249:22 250:1
 251:20 282:18
**limitation** 32:13
 178:6,8 290:21
**limited** 77:2 107:10
 168:10 245:1
 246:5,7 252:22
 253:4,5,15
**limiting** 282:12
**line** 65:12 131:22
 173:11 206:17
 217:18 225:18
 226:3 233:9,10,19
 237:15 251:24
 258:9 273:16

 282:21 300:4,6
 302:6
**Lines** 9:21 124:14
 177:7 235:8,16,17
 236:2 237:4,8,14
 237:16
**line-and-a-half**
 233:8
**link** 13:22
**liquidated** 121:11
**list** 6:22,24 27:11
 101:1 110:23
 119:7 120:4
 122:20
**listed** 13:21 16:15
 134:13,22 138:11
 143:10 182:19
 240:20
**listing** 6:19 17:11
**lists** 280:16
**literally** 191:10
 219:2
**literature** 209:2
 253:6
**litigation** 6:8 25:23
 77:25 177:4
**little** 12:18 47:3 64:1
 69:11,12 98:7
 104:18 110:21
 142:20 145:19
 163:17 204:15
 247:25 251:3,6,24
 273:20 278:7
 280:5 287:15
 290:12
**lives** 166:19
**LLP** 2:19 3:3,9
**loan** 39:16
**lobby** 62:6
**local** 70:20 72:4,5,7
 72:12,19 170:22
 276:21 277:3,12
 277:13,15,21,25
 278:23 279:10,18
 279:22 281:2
 282:4,12 283:9,12

 283:14,16,18,20
 283:21 284:23
 285:2,6,12,14
 286:4,7,8,9,15,16
 287:4 288:1
**located** 129:10
 219:1 276:8
 286:20
**locating** 218:14
**location** 9:10 36:16
 39:10,12 51:2
 129:17 165:9
 169:23,24 283:23
 284:14,17
**locations** 133:6
 135:7 169:17
 171:9,23,23 172:2
 172:4
**locked** 13:15,17
 18:16
**locks** 15:2
**log** 12:9,10 18:9
 28:25
**logged** 17:15
**logic** 11:10
**logically** 189:25
 297:9
**log-in** 31:24 32:1
**long** 6:2 34:24 58:6
 67:8 119:12
 142:18,23 166:23
 169:18 171:16,21
 181:12 219:5,16
 239:8 275:15
**longer** 114:12 147:4
 154:24
**longer-term** 277:5
**long-term** 59:18,19
 59:21 134:18
 141:7,10,11,23
 143:1 292:15,24
 293:12
**look** 6:11 17:11 18:1
 18:3 35:19 37:6
 45:21 50:24 52:25
 53:6 54:3,5,7

58:13 59:15 62:21
71:10,21 72:6,22
80:10 91:12 92:5
94:11 97:21 98:21
100:25 104:15
107:11 108:10
109:18 111:10
113:2 116:18,24
132:9 134:6
137:21 139:7
158:8,13 164:8
169:3 179:16,16
179:17,19 181:17
198:11 214:18
216:22 218:16
224:19 228:23
229:4 234:24
235:1,24 249:13
251:20 252:1,15
255:12,18 258:4
261:24 262:2,15
262:16 266:13,25
267:19 270:25
273:16,25 277:1,5
277:6,17 280:5
281:5 282:12
285:13 286:4,7,9
290:4 293:15
294:18 296:15
300:23 301:15
302:11 303:5,16
303:25
**looked** 11:7 63:9
70:24 78:22 98:19
114:16 115:20
117:6,23,24
203:22 210:20
241:22 252:22
257:22 269:7
281:2 282:4
283:17 286:6
302:3
**looking** 18:13 25:6
29:8 37:8 45:24
57:24 62:22 91:8
91:19 93:1 95:16

117:14 134:13
156:23 164:2
169:9,23 181:21
183:3 184:8
187:22,23 189:2,6
190:18 199:3
211:20 234:23
253:14 266:6
271:10,11 281:1
283:21
**looks** 192:4 210:15
221:4 250:2
**Loom** 35:11
**looseleaf** 49:21
158:24 273:10
301:3
**lose** 98:2 147:7
221:6
**losing** 190:17 234:3
236:10
**loss** 136:16 212:16
**losses** 212:17,21
218:8,9 220:21
231:16
**lost** 15:13 73:22
212:20
**lot** 61:1 100:16
113:3 175:16
193:17,18 202:1
218:8 228:5 235:2
236:1 281:13,15
297:22
**lots** 99:13 211:16
**loud** 70:1
**louder** 5:6
**loudly** 5:5 74:11
**low** 188:10 202:3
212:24 255:4
**lower** 72:24 148:17
148:17 181:7
201:12 202:15
257:1 265:9,16,19
270:15 277:17
279:6
**lowered** 290:25
**lowering** 293:13

**lower-cost** 65:3
**lower-skilled** 300:1
**LOWRY** 3:7
**low-cost** 236:9
**LTV** 123:15
**lump** 143:19,21
146:1
**lunch** 97:24 102:11
106:24 127:14
**Luncheon** 102:14

**M**

**M** 4:15 56:8,8 103:3
103:3 174:8
**machine** 129:14
260:21
**machinery** 224:18
**machines** 226:4
**machining** 202:7
225:3 272:13
**magnitude** 106:5
161:2 194:15
**Maiden** 3:5
**mail** 129:9
**main** 58:12 75:14
92:21 180:4
270:22
**maintain** 18:9 31:5
31:7 199:23
202:15 276:10
**maintaining** 234:25
**major** 158:14
176:19 177:6
237:17,24 238:10
239:24 287:24
**majority** 66:13
80:11 155:10,12
167:6 243:16
**majors** 236:6
**making** 68:16 71:7
88:16 93:14
139:13 147:24
153:10,15 154:13
159:7 168:4
190:10 209:14
215:25 255:8

274:2 283:18
**malady** 169:4
**male/female** 118:2
**malleable** 273:20
**managed** 214:18
**management** 6:6
43:14 130:20,21
131:5 138:9,10
291:5
**manager** 4:22,25
5:11 129:23,23,24
130:1 183:25
201:16 202:10,17
299:4 300:3,5
**managers** 203:8
272:25
**manager's** 184:3
**mandated** 255:23
256:1
**manipulate** 25:4
**manipulated** 31:9
**manipulation** 25:7
**manner** 11:21
**manners** 113:18
**manufacturer**
231:18 288:6
**manufacturing**
72:22,23,25 189:8
190:20,20 191:1
191:15,20 192:1,5
192:8 222:21,24
222:24 244:5
276:8,11
**mapped** 44:4
**maps** 218:23
**March** 1:11 7:9,20
17:1 41:22 42:4,5
42:6,6,10 44:10,22
47:25 48:14 49:10
50:2,3 54:24 55:3
55:8,12,13,19
195:8 196:3,10,11
200:5 217:18
306:10,19
**marching** 97:24
**marginally** 110:3

**Marine** 121:7,11
**Marion** 41:19 49:16
  49:17 135:5 136:6
  164:16,22 182:19
  199:18 294:7
**mark** 15:7,19
  127:16,20,22
**marked** 7:8 137:24
  196:3 236:21
  248:5
**market** 40:3 80:9
  100:4 179:22,25
  180:1,7,16 185:12
  188:12 198:2
  202:13 208:17
  210:18,19 212:15
  219:7,13,17,18
  231:5 232:5
  234:23,25 235:20
  235:21,24 236:4,5
  236:9,10 240:6
  243:10,16,19,21
  243:22 245:3,14
  245:19 246:14
  249:14 250:1
  258:22 270:7,10
  271:5,25 276:24
  277:2,4,6,9,10,12
  277:13,18,21,22
  277:23,25 278:11
  278:23 279:7,10
  279:18,22 283:12
  283:15,16,18,20
  283:21 284:24,25
  285:2,14 286:5,5,7
  286:8,9,16,17
  288:1,2,5 289:14
  290:5,22 291:18
  292:25 293:1,7,23
  294:1,7,10 295:17
  296:5,12,18
  300:20
**marketplace** 100:5
**markets** 276:10,15
  276:16,21,22
  277:15 278:3

281:2 282:4,12
  283:9 286:22
**markings** 16:5
**marriage** 306:14
**Maryland** 57:7
**master** 145:7,12,17
  146:3,11
**masters** 57:6 174:21
**match** 38:23 146:2
  159:16 185:3
  191:22 198:17
  210:23 230:22
  263:4 301:16,21
**matched** 185:10,11
  185:13 198:21
  258:5,7 304:3,3
**matches** 185:6
  257:25
**matching** 134:21
  159:12 223:13
  225:2 229:14
  258:12,19
**matching/other**
  134:21
**material** 115:13
  179:3 281:14
**materials** 19:1 90:3
  93:8 101:1 127:22
  128:5
**math** 152:10 161:8
  161:23 162:4
**mathematics** 245:9
**matter** 1:4 77:24
  88:23 129:15
  202:18 213:2
  245:9 247:8,22
  249:11 250:9
  251:1 253:14
  256:5 267:4
  274:17 287:9
  306:15
**matters** 46:10 130:4
  177:4 182:12
  196:4
**maximum** 108:4
  136:19 152:3

165:5 168:10
**MAYER** 2:23
  172:19
**MBA** 5:16,17
  175:18
**mean** 11:12 15:14
  15:20 29:15 66:1,5
  71:14 74:25 92:19
  95:12 114:11
  115:5,6 117:9
  201:5 220:25
  226:17 230:5
  239:21 245:5
  246:4,8 267:8
  289:20
**meaning** 108:17
  136:9,15 267:18
**means** 9:3 27:5 52:5
  64:22 65:8 66:6
  69:6 82:24 87:8
  95:2 97:4 100:9
  148:15 166:13
  167:19
**meant** 71:23 88:1
  105:15 109:2
  168:20 213:2
  245:24
**measure** 191:18
**measured** 283:9
**mechanism** 209:11
  209:12,13,14
**media** 67:7 116:25
**median** 82:14,16,20
  83:3 112:8
**Medicaid** 112:13
**medical** 61:23 70:5
  98:13 112:13,15
  112:17 113:2
  115:18 119:5
  120:3 124:22
  130:15 134:16
  135:21 136:5,17
  136:25 142:4
  149:25 150:16
  159:4 164:4
  168:13,24 169:2,4

169:5,6 170:4,6,7
  173:23 182:2
  299:23
**Medicare** 57:20
  59:1 62:23,24 63:1
  74:5 111:19,20,23
  112:11,13,14
**Medicine** 78:21
**meet** 291:18
**meeting** 30:17 41:2
  43:12
**meetings** 10:23
  42:23 44:15
**meets** 226:6
**members** 38:18 43:9
  53:10
**membership** 62:5
**mention** 12:3 13:19
  32:8 186:1 202:6
  263:5
**mentioned** 12:14
  13:24 31:24 32:1,2
  33:3,8 47:19
  110:22 133:12
  136:13 137:16
  170:25 171:24
  176:21 209:16
  224:20
**ments** 206:23
**messages** 32:20
**messes** 225:22
**met** 42:24 43:13,17
  43:21
**method** 227:11
**methodology** 210:17
  228:10 230:12
  302:13
**methods** 205:16,17
**Mexico** 156:9
  212:24
**Michael** 174:6
  307:20
**Michigan** 9:23
  219:1,9
**microphone** 4:24
  64:2 180:19 183:1

**Microsoft** 24:23,25
**mid** 119:15 222:25
**middle** 17:13 67:21
  89:17 109:8
  117:15 134:2
  206:6 259:17
  260:22 261:10
  295:22
**midsized** 223:5,6
**Midwest** 183:21
**migrate** 79:16
**migration** 133:5
  134:16 159:3,11
  160:2 163:15
**Mike** 43:21
**Miller** 4:8,20 19:13
  20:6 36:12 43:24
  44:16 307:3
**million** 41:12,17
  109:11 133:4,7
  147:25 160:4
  164:1 173:10,13
  175:11
**millwright** 260:15
  262:10
**mind** 158:2 277:21
**mindful** 284:5
**mine** 223:25 229:8
**minor** 84:21
**minute** 45:15 54:17
  98:11 232:8
  234:18
**minutes** 44:16 54:22
  94:16 97:25
  172:14 275:17,17
  281:10 305:6
**mirror** 211:11 221:3
  227:25
**mirrors** 114:19
  253:9
**misclassified** 262:2
**misheard** 48:20
**misquoted** 214:21
**misrepresentation**
  265:10,13
**mission** 67:5

**Mississippi** 219:10
**Missouri** 219:11
**misspoke** 109:2
  200:24
**mistaken** 195:15
**mistakenly** 132:20
  132:23 133:4
**misunderstanding**
  304:7
**misunderstood**
  159:18
**misuse** 78:23
**mix** 230:7 250:14
  301:10 303:12,19
  303:24,25
**MMPS** 126:17
**mode** 211:19
**model** 91:11 103:21
  208:21 209:6,13
**modeling** 210:9
**models** 58:13 209:3
  209:4
**moderate** 256:24
**modest** 89:6,9
**modification** 134:19
  134:20 138:12
  139:16 147:12
  159:4,5,15
**modifications**
  134:11 138:3,13
  139:13,20 140:14
  143:4 149:1,5,6,11
**modified** 88:10 89:1
  89:4,12 134:17
**modify** 122:3 144:19
**MOERS** 2:23
**moment** 90:7,23
  91:20 97:3,16
  109:7 237:6
**moments** 86:9 103:9
  125:12 135:20
**money** 80:1 116:8
  117:5 136:23
  137:11 153:11,15
  158:16 190:10
**money's** 79:8

**monies** 150:15
**month** 145:21
**monthly** 85:5
  117:18 126:5,6,8
  146:9
**months** 39:18
  157:16,17 164:9
  175:1 212:19
  215:12 217:16
**month-and-a-half**
  181:15
**Moreland** 2:24
  173:3,4,18 186:19
  307:18
**morning** 4:3,5,10
  51:21 90:19
  304:10
**mortality** 146:6
**motion** 36:1 41:7
  49:6 50:7,8 135:2
  135:10 163:2
  173:9,10,14,15
  183:13 186:21,25
  281:23
**motivation** 75:14
**motor** 9:22,22
  225:16 228:1,8
  233:20 234:10,17
  235:5 236:13
**Motors** 88:6 122:25
**move** 8:18 45:7
  82:18 133:15
  139:1 175:14
  186:22 197:13
  219:18 228:5
  230:17 252:6
  282:10 293:15
**moved** 92:24 197:6
**movement** 287:3
**moves** 211:4
**movies** 225:15
**moving** 73:15 89:14
  94:24 119:2 160:6
  160:8 213:6
  225:17 238:24
  290:17

**MPPS** 114:19
**muff** 194:18
**muffed** 194:14,15,20
  194:21,22
**multiple** 9:4,4
  246:21
**multiplied** 150:12
  165:22
**Mulvey** 56:4,11
  63:12,16 84:17
  86:14 103:16
  121:21 135:20
  168:15 307:12
**Mulvey's** 81:7 83:19
  85:16,19 127:22
**Musicland** 9:15
**M&A** 6:8

---

**N**

**N** 2:1 3:1 4:1 56:8
  103:1,1,1,3 307:1
**NAFTALIS** 2:19
**NAGLE** 3:7
**NALC** 256:22
**name** 11:22 12:7
  16:4 19:13 26:23
  26:23,23 32:14
  54:2 56:1 95:3
  124:21 232:13
  239:8
**narrow** 215:2
  223:21 224:4
**narrower** 262:3
**narrowing** 290:19
**narrowly** 211:2
**national** 64:24 80:19
  112:10 115:4
  124:3 169:2
  170:19 185:4,12
  219:13,17 237:17
  253:25 259:7
  276:24 277:2,6,23
  283:18 284:24
  286:6,16,18,21
  287:4 288:2,5
  291:18

**nations** 212:24
**nationwide** 219:7
**nature** 15:17 28:16
  30:20 33:25 46:21
  60:14 61:14,19
  64:21 78:9 93:9
  201:8,10 223:10
**near** 93:4 274:10
**nearby** 284:13
**nearly** 71:23 93:2
**necessarily** 99:11
  116:3,5 156:11
**necessary** 282:20
  292:14 293:12
**need** 4:23 23:20
  82:11 86:8 96:16
  105:11 125:11
  132:19 165:17
  172:23 180:22
  196:3 221:25
  223:9 235:22
  250:20 277:3
  279:9,20,20,22
  303:25
**needed** 12:19,20
  39:22 291:13
**needing** 110:16
**needs** 59:19 277:1
  296:21
**negative** 87:6 199:9
**negotiate** 62:19
  157:12,24 158:1
**negotiated** 120:17
  122:9 123:20,23
  123:25 124:12,13
  124:16 125:5,5
  155:3 168:2
  171:13
**negotiating** 59:16
**negotiation** 121:5,18
**negotiations** 29:9
  46:19 77:25
  157:14 163:3
  172:9 197:19
  207:17
**neither** 196:8

**net** 147:7
**network** 96:21,22,25
  97:1 99:10 108:15
  109:3 167:12,18
  168:11 170:11,20
**networks** 170:15,18
  170:19,23
**never** 17:25 28:17
  28:19 54:1 98:9
  157:18 243:2
**nevertheless** 115:23
  238:8
**new** 1:2,10,10 2:6,6
  2:22,22 3:6,6,12
  3:12 12:18 42:10
  64:5 65:25 66:5,6
  66:11,14,15 73:6
  78:11 89:18 99:17
  99:18,21 105:19
  110:18 119:5
  193:10 198:23
  204:16 268:9,12
  268:22 269:15
  270:1,3,15 300:23
  306:2,4,8
**newer** 192:6
**newly** 66:3
**newspaper** 221:14
**nine** 130:24 212:18
  259:13 260:3
**nominal** 168:4
**nonprofit** 58:9 67:4
**non-bankrupt** 87:10
**non-bargained**
  148:16,16
**non-debtor** 40:3
**non-globally-man...**
  42:14
**non-public** 32:12
**non-skilled** 289:19
  289:22,25
**non-union** 119:6
  135:16,18 138:7
  140:11,15 141:8
  141:10 142:9,13
  142:16,18,22

143:1,5,7,14,16
144:25 145:2
146:17 148:9,13
148:16 149:7,10
149:25 150:1
162:17 218:12
**non-U.S** 40:5
**non-wage** 298:4
**norm** 295:10,11,12
**normally** 206:5
**norms** 177:11,15,18
**notable** 169:2
**notably** 35:10
**Notary** 306:7
**note** 3:4 72:11 82:4
  203:14,18 213:4
  216:4 217:15
**notebook** 56:14
  69:17 70:12 74:7
  80:14 84:12,19,23
**notebooks** 56:5
**noted** 107:4,5 120:2
  154:5 305:11
**notes** 232:8
**notice** 197:4
**noticed** 154:10
**noticing** 10:5
**notifying** 51:2
**noting** 191:1
**notional** 143:20
  146:21 150:11
**November** 18:3 30:7
  30:9 41:1 49:25
  50:5
**no-harm-no-foul**
  196:17
**number** 13:13,21,23
  17:12,17 25:10
  28:1,5,24 47:16
  49:23 50:4 63:3
  64:4 66:7 71:13,22
  71:25 73:11,15
  76:4 81:5 82:16
  83:16,23 87:7
  90:11,12 93:5 94:2
  94:5,6 105:11,15

116:4,25 118:4,14
118:16,18,21
119:23 126:16
127:16 130:25
133:4,6 137:16
142:22 149:16
156:10 160:12
161:1,18 163:18
163:20 165:22,24
171:1,8 176:7
177:6,15 182:7,9
182:10,11 185:20
188:8 193:13
199:8 206:25
207:11 210:13,16
227:17,17,20,23
227:24 228:7,11
228:11 229:1,3,8,8
230:9,11 231:2,20
245:3,17 252:24
253:4,16 266:1
267:6,24 268:2,7
268:21 269:16,16
270:3 287:6 300:8
301:14 302:3,4
303:1,18
**numbers** 69:9 81:25
  107:11 116:20
  138:11 158:9,11
  161:12 162:2
  165:2 186:11
  189:4 193:25
  194:2 198:19
  199:9 204:11
  227:4 228:25,25
  229:12,15,15,18
  229:20 230:6,6,20
  230:23 245:6
  253:11,12 265:15
  280:19,23 298:17
  300:10 301:6,15
  303:2,8,14,17
**numeral** 244:11
**numerous** 60:17
  122:16
**Nutritionals** 35:9

| O | | | |
|---|---|---|---|
| **O** 1:14 4:1 103:1,1,1 128:17 | 58:20 60:24 61:16 155:14 | **offers** 6:16 92:17 107:8 | 120:13,19 121:13 121:21 122:1,14 |
| **object** 7:5,17 84:2 106:9 196:15 206:16 213:2 221:14,15 282:19 | **occasionally** 176:9 244:5 | **offhand** 21:7 108:10 | 123:9,17 124:3 125:7 128:1 |
| | **occupation** 223:24 258:7 262:9,10 284:12 | **office** 56:2 129:17 129:25 175:7 184:3 | 158:21 159:9 160:2 163:25 164:15,21 165:15 |
| **objection** 7:11,23 8:11,18 17:3 19:6 45:10 63:13 81:10 84:13 85:21 127:17,25 133:18 139:3 149:20 177:25 179:7 186:18 187:4 197:2,5 200:1 201:21 202:16 203:13 206:20 207:4,7,20 210:3 211:22 213:1,5 215:6,21 225:5 242:19,20 248:17 256:7 | **occupational** 224:4 244:20 246:6 258:1,14 260:9 261:19 262:13 263:6,10 271:8 301:17,17 304:1 | **officer** 35:8 | 165:24 166:4 |
| | | **offices** 6:9 129:12,21 246:20 | 167:13,23 168:14 177:10 178:5,9 |
| | | **official** 42:24 | 180:21 181:16 |
| | **occupations** 262:7 283:8 286:21 | **officials** 26:12 203:16 | 182:14 183:3 184:8 185:15,25 |
| | **occurred** 18:14 120:6 196:7 212:21 | **offset** 150:16 | 186:4,15 188:19 189:6 191:12 |
| | | **oh** 25:19 46:9 48:14 48:21 90:14 123:3 131:11 151:18 157:25 166:7 264:15 | 195:14 197:8 198:10,20 199:2 201:4,22 203:21 204:20 207:22 |
| | **occurs** 136:16 249:4 | | 208:7 209:7 212:5 213:9 216:2,3 |
| | **October** 221:20 283:10 | **Ohio** 2:13 56:2 219:1,9 | 217:9,24 218:5,13 218:24 219:23 |
| | **OEM** 22:2,24 24:10 | **okay** 5:20 7:2 8:2 10:11,20 11:10,16 12:14 13:10,24 14:10,20 16:20 17:20,24 18:6,17 22:1 33:20 35:21 37:10 40:12 41:15 46:9 50:7 61:6 64:14 66:21,23 69:18 71:24 72:19 73:23 79:18 88:3 88:13,25 89:11,14 89:23 90:14,16,21 91:7,16 96:13 97:1 97:10,14 98:14,15 98:21,24 99:11 100:15 102:4 104:6,22 105:2,16 106:4,16,23 107:3 107:8,14,18 108:3 108:7,18 109:6 110:14 111:2,25 112:7 113:14,18 113:25 114:14,18 115:20 117:3,14 118:7,21 119:22 | 222:11 223:12 |
| **objections** 213:10 217:13 220:2 | **OEMs** 22:3,5 | | 224:20 226:10,15 226:19,25 227:22 |
| **obligation** 89:11 118:11 119:10 122:23 123:5 124:25 | **OES** 287:4 | | 228:18 229:23 |
| | **offer** 6:8,20 7:3 12:19 13:12 16:21 19:4 73:1 78:1 81:4 83:15 84:9 85:15 86:1 92:2,7 92:10,16,16 93:3 93:17 103:23 104:25 127:16 135:3,10,13 151:6 151:9 179:6 186:16 192:9 199:24 217:10 219:24,25 221:11 | | 230:17 231:7,10 |
| | | | 232:21 237:23 |
| **obligations** 119:25 122:3,22 125:5 155:15 | | | 238:5 243:4 250:6 253:3 259:18,23 |
| | | | 267:3 268:9 |
| **observation** 109:24 | | | 271:23 279:4,11 |
| **observed** 63:19 105:4 183:23 | | | 281:5 282:14 |
| | | | 285:20 288:18 |
| **observing** 191:9 | | | 292:23 296:24 |
| **obtain** 235:24 302:3 | | | 297:4,14,18 303:5 304:5 |
| **obtained** 182:16 | **offered** 7:6 15:22 24:23 69:7 70:5 97:18 136:5 137:13,15 276:6 | | **Oklahoma** 219:11 |
| **obvious** 179:16 229:17 | | | **old** 144:8 |
| **obviously** 165:18 179:1 191:19 194:24 221:24 270:11 277:3,20 279:9 293:4 | **offering** 68:24 73:17 77:16 92:6,10,20 92:22,25 93:12 103:21 110:24 111:3 150:4 244:9 | | **older** 204:18 231:21 231:22 |
| | | | **once** 11:8 12:21 37:8 99:21 144:3 249:9 249:9 250:8 253:1 |
| **occasion** 19:16,20 | | | **ones** 137:16 254:2 |

300:8
**on-line** 8:25 111:8
**open** 56:14 66:21
  142:9 181:3
**opened** 142:10
  171:21
**operate** 224:19
**operated** 276:4
**operates** 136:3
**operation** 111:5
  154:25 155:1,4
  175:11 184:4
  201:2,15 226:2
**operations** 40:3
  43:16 156:6
  222:24
**operator** 129:14
  244:3,4 258:7
  263:17
**operators** 185:24
  211:1,3 222:19
  223:22,22 224:5,6
  224:11,12,15,16
  225:3 231:25
  260:22 271:12
**opined** 46:25
**opinion** 77:10,15,20
  78:1,7 89:1 189:20
  199:20 202:5,19
  202:21 203:2,3
  204:14 206:1,12
  208:4,12 211:25
  211:25 212:2,13
  213:3 216:11,20
  218:6 220:15
  221:1 231:12
  290:20
**opinions** 203:5,9,17
  209:19
**opportunities** 184:3
  190:16
**opportunity** 32:4
  35:7 188:11
  197:23 198:1
  216:23 220:18
  232:15,18 244:6

**opposed** 92:17
  105:18 136:11
  217:18
**optimization** 40:1
  44:9
**option** 92:18,22
  98:22 99:2
**options** 165:8 167:4
**order** 7:7,8,16,21
  12:2,4 65:13 106:5
  150:22 161:2
  196:1,14 197:1
  203:11 232:4
  275:2 276:9
**ordered** 196:1
**organization** 39:9
  58:10 62:5 67:5
  148:19
**original** 51:19
  177:14 188:24
  189:4 193:8 194:7
  194:7 195:1 198:5
  200:7,10,12,23
  225:16 263:11
  278:21 300:15
**originally** 24:1
**Outboard** 121:7,11
**outfit** 272:9,22
**outliers** 262:1,2
**outline** 11:7,13
**outlook** 43:22
**outset** 223:19
**outside** 7:6,14,16
  35:17 46:20 47:2,9
  47:11 122:19
  219:21
**outsourced** 131:4,18
  212:23
**outsourcing** 131:3,5
**out-network** 99:9
**out-of-network**
  98:22 99:2,22
  108:1,4,5,8 109:4
  165:8 167:4,19,21
**out-of-pocket** 58:21
  58:24 83:7 89:10

108:4 136:19
  165:5 168:10
**overall** 83:8 89:1
  190:23 199:11
  228:10 231:12
  253:10 256:18
  284:22 285:13
**overconsumption**
  78:19
**overruled** 187:4
  203:13 210:6
  212:4 215:21
**overseas** 156:3,5,13
**oversee** 130:13,19
  130:20
**overseers** 131:18
**overstates** 76:4
**overtime** 149:9
**overuse** 78:23 96:9
**overview** 43:15
**owner** 32:20
**owner's** 32:21
**owns** 185:2
**o'clock** 102:12
  305:10
**O'Leary** 26:3

_____

**P**

**P** 2:1,1 3:1,1 4:1
  34:16
**package** 151:23
  153:7 181:3 297:1
  297:5,10
**page** 6:15,17,21
  13:22 25:18,19
  30:3,4 32:2 46:14
  56:22 67:20,21
  68:4 69:22 70:23
  70:24 71:1,10 74:9
  84:20 90:8,11
  91:22 93:11 98:12
  98:18,21 100:17
  101:20 103:15,19
  103:20 107:24
  108:11,14 128:3,6
  192:15,25 218:22

226:25 227:1
  233:5 237:13
  239:2 244:12
  248:13,20 251:24
  252:15 258:5
  259:9,9,17 261:8
  261:10 263:24
  266:9,10 269:5
  273:7,13 275:22
  275:23,25 280:5,7
  280:12 282:25
  283:4 284:3
  285:16 286:14,14
  288:22 289:10
  293:17 294:3,18
  294:19 297:20
  298:9,13 304:16
  307:2
**pages** 218:17
**paid** 62:7,23,25 79:7
  82:17 96:12,12,15
  141:25 147:11
  164:2,3,12,14,15
  165:18,21 166:6,7
  166:9,10,17,20,21
  167:3,7,7 169:15
  169:22 170:9
  179:18,20 182:1
  201:12 233:11,20
  234:7 235:25
  236:12 240:11,16
  240:19 242:10
  243:11 255:12
  270:7 276:6 300:5
**panel** 112:11,15,15
  254:11 256:18,19
  256:20
**paper** 9:7,9 25:6
**papers** 163:2
**parade** 163:11
**paragraph** 29:5
  30:3 46:15 50:4
  69:22 70:1 71:6
  74:8,8,10 84:20
  87:14 88:4 89:15
  89:17 90:9,15 91:7

92:6 93:1 94:24
95:25 100:15,17
103:25 108:19
109:3,6,8 111:25
114:14,18 115:12
117:15 118:8,24
119:2,23 120:2
122:14,16 123:10
124:20,21 126:3,3
132:20 133:3,8
156:20 158:8
163:16 168:15
227:1,13 233:5,6,8
237:14 238:22,23
239:2,6 240:20,23
248:12,21 249:16
250:6,24 251:2,5,5
259:10,21,23
260:25 261:3,4
273:7,12,13,15
274:6,7,9 275:22
275:25 283:25
284:4,5,11 286:13
286:25 288:22
295:20,21,22,23
296:24 297:20,24
298:1,2
**paragraphs** 132:23
238:3 251:15
285:4
**parentheses** 82:19
**part** 13:5 18:6,10
32:11 41:7 42:2
59:9 91:14 93:8
106:17 135:2,9
151:22 160:13
161:21 162:5,5
164:23 176:1
180:8 181:1 186:4
186:21 198:15
200:11,13 202:19
204:10 209:5
211:18 213:3
225:21 238:8,9
239:5 240:13
242:9 243:18

245:2 248:13
254:11 277:10
282:3,12 283:11
285:18 286:1
287:17 294:13
295:21,21 298:1
**participant** 150:15
**participants** 53:9
126:7 167:11
**participate** 42:22
**participated** 42:19
177:6 254:18
256:22
**particular** 7:18
11:22 15:17 16:15
17:12,14 18:14
19:20 21:12 27:21
28:25 33:22,24
36:25 85:1 87:18
96:12 99:12
118:24 159:21
160:11 182:18,21
183:5,13 190:12
192:15 203:4
210:14 213:14
223:4 248:13
264:3 266:9 273:7
275:22 280:19
289:11 295:22
302:11 304:1
**particularly** 73:12
77:22 197:22
211:18 241:12
242:3 299:19
**parties** 9:4,11 10:2
12:20,23 14:11,14
18:5,9,15 21:1,2,3
21:14 28:20 33:17
35:17 51:12 158:2
206:7 254:13
306:14
**partner** 28:15
161:11 172:24
**partners** 26:3 34:20
34:21,24,25 35:2,6
36:10,19 44:3

51:18
**partnership** 137:17
201:17
**parts** 178:4 180:10
211:6,7,18,20,24
212:1,22 214:8
215:1,16 216:22
217:3,7 218:15
219:3,7,14 221:8
221:17 228:1,8,14
231:17,24 233:16
233:21 234:11,17
235:6 236:13
238:9 244:10
245:16 246:8
288:6 302:12
**party** 11:24 29:22
31:13 33:19 36:15
36:21 51:2,7
122:24 170:18
**part-time** 191:13,16
191:19,21,24
192:2
**pass** 50:17
**password** 11:22
12:5,8,11,12 13:16
**passwords** 17:25
**pathologists** 56:13
62:1,3,4,5,9,10,14
62:15,18
**patience** 163:11
**pattern** 117:7 249:6
256:24
**Paul** 43:24
**Paula** 204:21
**pause** 5:3 30:23 37:9
45:17 91:21 97:15
108:13 125:13
129:1 173:2 232:9
233:3 264:2
298:22
**pay** 73:18 74:1,1
78:16 79:5,6,23
82:24 83:5,5,7,8
96:9,23 110:5
136:14 140:18,19

144:14,16,17
146:25 147:8
149:10 151:15
152:6,7 158:15,16
165:5 168:6 181:8
188:9,11 191:6
208:17 211:7
235:22 247:9,11
247:24 248:15
249:2,6 250:10,10
254:25 255:5,19
255:22,25 256:4,5
257:3,7,17 260:8
261:20 262:12
270:18 277:11
278:6 288:25
289:2,16 292:25
295:5 296:14,21
297:14
**paychecks** 165:6
**paying** 63:1 78:17
96:14 106:3 142:2
169:13 275:16
277:19 278:3
279:8,14,17,21
287:25 295:8
296:12
**payment** 146:2
152:17,24 153:1
**payments** 59:17
118:19 123:9
147:24 155:9
**payroll** 130:6,9,12
132:21 182:17
**pays** 108:17,18
137:7 168:13
179:22,22 180:7
180:14 181:2
296:5 297:5,10
**pay-all** 73:16
**pdf** 14:22,24,25 15:4
15:7 16:2,7,10
24:20 25:2,5 31:7
55:6
**PEDRO** 2:9
**peer-reviewed** 61:2

pendency 158:5
**Penn** 174:25 175:9
175:11 219:16
**penned** 163:20
**Pennsylvania**
174:15 242:23
**pension** 57:25 59:18
60:15 61:21
130:16,19 134:20
143:4,14,15,16,18
144:11,12,20,23
145:12,13 146:7
146:14,15 147:1,3
159:15
**people** 9:10 26:2
27:6 36:22 50:21
58:10 78:22 82:12
110:4,8,10 111:9
113:1,3,14,23
116:12 131:7
136:15,22 137:3,9
154:3 166:1,2
167:8 169:8,14
187:22 188:6
193:14,15 202:10
207:1 231:23
267:9,15,17,19,21
272:7,9,10 277:24
**Pepperdine** 5:16
**percent** 66:14 68:12
68:13 69:4,6,10
70:4 71:3,13,14,15
71:19,19,22,23,25
72:11,16 73:2,20
74:3,4,13,14,21
76:3 82:24 83:6
89:19 90:16 91:8
92:6,9,10,20 93:2
93:18,22 104:16
104:19,22,23,24
108:15,17,18
115:16,17 116:7
116:15,16,21,23
117:1,16 125:22
125:24 126:5
137:7 140:18,19

140:23 142:7,7,17
142:20 146:20,25
147:3,8 152:4,5,23
152:24 157:3
161:23,25 169:15
170:6 176:3,4
185:21,23 192:7
192:19,23 193:1,5
194:8,9,10 199:18
199:18 237:2
245:14,18 246:11
246:13 264:25
265:3 267:13,15
270:7,9 287:5
289:17 290:1,1,22
293:1,23,25 294:7
294:10
**percentage** 66:10
72:8,10,25 73:24
92:15 108:14
146:4 186:12
245:9
**percentages** 103:22
193:10,11 230:14
**perfectly** 234:22
**performance** 239:18
**performed** 131:6
227:8 258:12
**performing** 237:15
**period** 43:13 114:13
140:17,22 164:10
165:16 190:12,21
196:20 219:20
238:6 270:12
304:10,10
**periodic** 42:22
**permission** 52:7
**Perrin** 39:7 142:3
**person** 11:21 12:10
17:14 21:12 226:3
**personal** 87:17
126:21 151:11
**personally** 126:21
146:17 150:9
159:9
**personnel** 129:19,23

162:18
**persons** 57:9,11
141:25 142:10
148:18,19 150:4,5
154:24 164:2,5
165:22
**person's** 12:8
**perspective** 63:6,7,9
211:5 295:25
**perspectives** 63:4
**persuasively** 250:19
**peruse** 251:16
**perusing** 284:8
285:17
**per-employee**
158:10
**PETER** 3:15
**phone** 13:17 112:25
**physicals** 147:11
**physicians** 62:7,23
62:25 78:22
111:10 137:1
167:21 170:17
**Ph.D** 174:21,25
**picked** 8:7 122:23
255:19
**picture** 182:9,10
**piece** 25:6 127:9
211:23 225:17
226:1
**Pilar** 34:12 45:8
307:8
**pilots** 236:1
**Pittsburgh** 121:14
124:6
**place** 80:4 102:10
119:13 130:17
136:12 148:17,18
165:4,5 169:18
170:23 171:1,4,5,6
171:7,8 176:19
195:2
**placed** 14:21 51:20
**places** 59:23 156:10
156:10
**plan** 39:5,20 40:13

40:14,17 43:23
44:9,25 73:16 78:6
79:15,18,19,20
80:4,7,8,9,12,19
80:20 81:18,19,20
82:2 83:2,2,4
88:10 89:1,4,12,15
92:17,21,24,25
93:3,10 95:1,10
96:1,12,20,21,21
97:11,12 98:25
99:22 100:3,3,6,13
104:25 107:5,19
107:24 112:5
114:23 135:22
136:5,21 137:7
138:17,24 139:23
140:17 141:11
143:4,14,18,23
144:5,8,11,12,13
144:13,14,18
145:9,13,13,14,17
145:20,21 146:11
146:14,15,23
147:3,6 150:13
153:11,12,14
164:22 165:1,3,7
166:11 167:13
168:5 171:24
172:1
**planned** 74:13,14
183:11
**planning** 10:23
75:25 76:5 175:13
**plans** 39:5,18,23
40:4 41:6 44:14
78:13,13,24 79:10
89:18 90:18,24
92:16,18 93:4
95:17,17 99:3,13
99:16,19 100:20
101:16,18 117:25
119:8 130:15,15
130:16,16,17,17
136:12,12,13,13
136:15,20 143:15

143:16 144:23,25
145:1,7,7 153:12
164:3 165:10,18
165:22 182:3
**plant** 129:10,24
154:24 155:10
181:5 183:23,25
184:1,3,5 189:4
192:6 193:13,17
201:1,16,19 202:7
202:10,12,17
203:8 204:3,16
209:10 211:11
225:14,17 230:6,6
234:3 240:1
244:14 249:10
250:15,16,17
264:19 266:13,25
267:13 268:23
269:7,11 270:9,19
272:13,13,23,25
274:25 295:1
298:5,10,11,16,18
299:4 300:3,5
301:9 303:19,19
303:21,22
**plants** 41:21 137:18
154:12 155:4,7,21
155:24 162:4,5
171:20,21 173:15
181:8 182:18,21
182:22 183:4,6,7
183:10,13,17
185:19,21 186:21
190:24 191:10,25
194:4 198:21
200:18,23 201:5,6
201:11,25 202:8
204:3,18 211:13
218:11,12 219:2
219:10 221:4
222:13,25 223:1,6
223:7 224:6,17,18
225:4,15,16 229:6
230:7,10 231:21
234:3,4 240:23,24

241:17 244:5
258:1 274:21
275:1 283:8
286:19 289:15
300:17,24 303:1,2
303:9,12,17
**plant-wide** 191:18
298:3,25 299:1
**play** 133:24 136:11
251:6
**played** 57:18 159:3
**player** 211:12
**playing** 252:10
**plead** 256:11
**please** 4:2,21 6:12
6:14 16:12,21,23
18:19 21:11 22:23
24:19 25:9 29:4,6
30:3,5 31:2 35:19
36:6 46:14 49:20
56:7 70:1 74:11
129:7 132:9 134:6
137:21 156:20
158:21,22 167:22
174:12,18 180:25
195:24 216:3
217:25 226:25
228:18 229:12
238:2 248:25
251:7 253:19
287:19 291:4
295:15 298:20
**pledge** 45:20
**plus** 39:20 44:25
98:17 104:22
143:17,18 145:9
145:21 146:15
170:18 296:22
**pocked** 96:24
**point** 8:8,8,11 14:3
17:22 33:20 35:16
48:6 50:24 82:4
85:23 99:16
101:10,14 102:5
106:25 124:20,23
125:2 152:14

154:21 158:9
177:21 179:5
195:22 214:20
236:4 245:22
249:17 250:7,7,24
252:15 260:13,17
261:5 262:24
267:9 270:23
281:12 282:5
283:16 286:25
288:16,18,21
295:14 297:25
**pointing** 285:2
**policies** 32:5,8 63:9
147:25 148:1
**policy** 31:19 32:11
32:25,25 59:10,14
60:1 61:6,12 63:8
112:19 158:18
**popular** 81:20
**populate** 14:18
**populating** 10:21
14:1 33:15
**population** 57:20
65:4,5,7 112:12
113:21,23 114:2
116:15,19 117:1
126:18 127:2,5
158:19 166:12,15
166:22
**portable** 15:1
**portion** 31:25 97:8
98:13 136:19
142:8,12,14
238:23
**portions** 67:16
186:22
**position** 4:21 5:10
34:21 130:3,6,9
163:4,4 174:12,13
180:15 188:13
243:10 280:1
**positions** 184:21
258:10 276:23
**positive** 186:11
199:8

**possible** 15:4,7
282:11
**possibly** 161:3
203:10
**post** 29:16 36:22
**postal** 176:13 177:2
177:14 253:24,24
254:19 255:12,15
**posted** 9:1 16:9
29:11 31:4 36:25
51:8
**post-HealthWorks**
169:24
**post-March** 197:3
**post-retirement**
70:5 150:2
**post-65** 74:4 118:3,7
**potential** 64:12
165:20 172:23
173:9
**potentially** 77:25
**Potok** 13:3,4,7 30:10
30:17 33:10 42:20
42:25 43:2,3,3,9
43:11,12 44:22
45:4 49:10,24
50:13,16 52:6,13
52:18,25 53:5,12
54:8 55:18
**Potok's** 49:5 50:4
**Pottstown** 49:17
129:24 135:12
160:10,12,13,23
160:25 164:18,23
165:1 182:20
183:12,19 186:21
186:24 192:5
199:18 294:12,13
**practice** 34:23
**precise** 249:4 263:22
**precisely** 247:2
**precision** 195:5
**predominantly**
142:6
**prefer** 188:7 227:11
**preferred** 96:25

97:1 167:21 168:1
**premium** 73:18 79:5
79:7 83:8 96:12,15
136:19 147:24
149:9 165:6
179:23,24,24
180:14,15 181:3,8
186:10 187:16
191:6,6 199:16,17
205:13,15,23
228:7 229:5,21
230:14 250:11
254:25 255:5
256:18,20,25
257:3 277:13
278:6 287:5,25
289:16 290:2
298:3 299:18
**premiums** 59:16
82:22 85:5,6 106:3
117:18 186:11
211:14 228:4
**preparation** 132:6
**prepare** 51:1 94:14
132:15 134:14,15
**prepared** 25:14
80:18 94:18,23
119:20 134:5
163:21 178:17
235:11 237:23
263:16 281:22
285:15,16
**preparing** 265:20
**prescription** 89:7
**present** 30:17 41:2
78:8 118:17,18
161:5 173:5
**presentation** 218:2
218:4 251:11
**presented** 60:16
254:21 259:12
260:2 285:21,23
**presenting** 265:11
**preserving** 197:2
**president** 61:10,21
130:8,12 134:3

212:19 213:23
214:7 216:12
**press** 206:22 207:11
207:14
**pressure** 225:19
**Presumably** 268:8
**presume** 233:16
263:1
**pretty** 114:10 115:1
229:14 230:5
299:24 304:14
**prevalence** 72:7
**preventive** 82:5
137:8
**previously** 51:24
55:2 103:3 132:22
**pre-Chapter** 162:17
162:25
**pre-HealthWorks**
169:23
**pre-65** 57:20 74:3
118:3,7
**price** 181:5 182:12
**prices** 167:20 169:6
235:1
**pricing** 167:12,21
277:8
**primarily** 92:21,25
277:1
**primary** 35:16
**principal** 143:17
238:17 239:6,13
239:22 240:24
241:8,17
**principally** 26:18
130:14 143:15
**principle** 8:8 294:14
295:9
**print** 15:4,6,22,23
280:9
**printed** 15:15 17:18
17:19 28:6,12
259:2
**prior** 7:20 10:17
19:16 35:10
115:13 138:3

139:23 140:16
155:15 163:6
171:13 172:21
198:16 222:7
254:2 255:10
256:22
**privacy** 31:19 32:5,7
32:11,25 131:15
**private** 72:13 78:15
111:22 113:16,17
179:18,20 184:10
186:6,13 189:7
190:19,20,25
191:14,18,19,23
191:25 198:17,18
199:7,15 200:10
204:7,9 206:15,25
207:17 211:3
229:3 230:12
243:12,17 244:15
244:18,21 246:7
252:18,23 255:1
256:6 257:4,7,9,12
257:14,23 264:8
264:22 265:1,3
271:8,19 280:20
281:2 300:7 301:6
301:15 303:6,21
304:3,4
**pro** 40:23,25
**proactive** 96:3
**probably** 10:16 14:8
81:19 83:24
104:18 110:13
127:7 216:19
262:2
**probative** 251:5
**problem** 29:2
213:18 226:8
270:22
**problems** 211:21
215:16
**procedure** 51:9
169:7 243:3
**procedures** 137:1,8
169:5

**proceed** 4:6,11,17
94:18,23 128:21
150:23,25 178:10
**proceeded** 10:15
**proceeding** 10:22
33:18 45:25 54:10
88:5 157:21 158:5
172:18 217:17
233:19 254:7,11
293:3
**proceedings** 5:3
12:24 14:1,12
30:23 37:9 45:17
46:3 91:21 97:15
108:13 125:13
129:1 131:12
132:14 164:24
173:2 232:9 233:3
264:2 298:22
306:9,12
**process** 13:24 35:13
36:6,9 37:16 38:1
42:13,15 44:4,6
46:20 47:2 50:11
51:13,15 65:21,21
68:10 110:25
120:16 121:4,18
122:18 124:23
131:25 132:3
164:11 181:12
215:13
**processes** 122:2,6
**produce** 16:6 156:8
229:20
**produced** 40:9
44:21 265:17
303:17
**produces** 240:7
**product** 43:15,15
100:4 154:6,25
155:1,2,3 172:8
181:6 232:5 240:6
243:16,20,22
245:3 277:8,9
**production** 33:22
42:14 185:20,22

191:4,7,11 201:18
202:1 210:22,23
212:23 222:18
223:23 227:19
229:22 240:11,17
240:19 241:3
265:19 271:13
276:11 278:7
289:20,23 294:9
302:9
**productive** 202:11
210:1
**productivity** 203:9
216:17
**products** 99:17,18
99:20 110:23,23
156:8 182:12
**profession** 246:4
**professional** 15:25
21:1 23:4,5,7,9,11
23:13 53:21 54:3
86:22 174:12
**professionally** 205:2
**professionals** 20:4
33:10 38:16,19
**professionals-only**
38:9
**professional-eyes-...**
24:7 33:9 38:11
52:14,19
**professional-only**
51:22,23 52:1,4
**professional-use-o...**
20:24
**professor** 174:5,11
174:13,14 175:2,2
175:3 177:22
182:25 183:18
187:9 192:14
196:18 197:15
200:7,17 204:21
204:24 208:10
210:14,18,21
212:6 214:6 217:1
218:2 219:12
220:11,14 221:23

222:12 223:14
224:21,22 226:11
226:13,15,16,22
227:9 228:24
230:2,22 231:11
231:11 232:11
233:4 242:21
245:6 248:21
251:16 252:14
261:4 262:19
268:6 273:6
275:21 287:17
**Professors** 205:19
210:11
**profit** 87:6,7
**program** 59:1,22
64:24 83:13
103:23 111:17
136:1,3,4,8,8,9,10
141:12 142:15
150:6 151:25
152:3,3,12,13,15
152:21,25 153:2
**programs** 110:16,18
117:11 150:3
**progress** 206:8
**progresses** 82:7
**project** 64:8 114:10
115:15,23 118:22
**projected** 82:15
115:15,23 118:22
**projections** 45:2
**promise** 45:19
**promises** 155:21
**promoted** 129:16,20
129:22 130:3
**prompted** 78:13
**properly** 193:21
**proposal** 57:19
125:16,18 148:14
160:17 161:16
162:10 199:6
245:12,13 266:14
266:18 267:1,5
269:12,24 270:8
288:12 291:6
294:6 300:25

**proposals** 58:13,14
58:16 61:22 76:15
76:19 77:11 88:15
125:22 133:22
134:4 144:22
179:1 197:16,24
198:2 199:4,20
200:3 230:21
231:3,6 270:17
288:11,14,25
289:2 290:16
291:10,20 292:14
293:11,16,22
**proposed** 77:6,20
78:4 123:4 126:4
135:13 140:4,25
141:16 143:13
144:19 145:1
149:12 153:14
198:4 233:7
244:16 245:8,10
266:13,24 269:11
269:20 289:14
299:14
**proposes** 132:7
**proposing** 76:24
77:16 78:4 79:16
141:1 233:7 295:5
**protection** 15:11
**protective** 272:4,17
272:17,20 274:4
**prove** 291:22 292:9
292:13
**proven** 78:20
**provide** 11:6 28:19
33:16 36:21 42:18
43:8 44:23 51:7,11
55:7 58:17 62:6
66:15 67:6 71:4,16
77:1 89:12 97:17
98:16 99:19 100:9
111:8,15 132:25
133:1 136:24
137:5 155:15
169:15 221:9
226:5 232:25

233:1 242:9 263:8
296:15
**provided** 7:16 28:18
37:21 39:3,4,6,6,8
39:11,13,15,19,24
40:1,11,15,17,17
40:20,21,24 41:8
41:18,22 42:9 45:3
47:17,22 48:1,4,5
48:6,7,10,12,13,15
48:17 49:2,4,4,10
49:16 50:2 55:2,5
55:6,11,12,14
57:25 61:12 63:18
94:12 103:8
140:17 155:8
193:10 194:6
196:25 200:5
215:7,9 217:18
236:3
**provider** 63:10
96:25 97:1 111:7
167:9
**providers** 111:8
**provider-type**
113:15
**provides** 96:1
107:19 187:24
191:21 196:2
296:25
**providing** 42:15
54:23 62:23 68:18
68:21 70:17 72:8
76:11 78:9 99:15
126:6 132:4
156:24
**provision** 63:25 66:2
66:11 82:2
**provisions** 83:3,4
112:5 155:20
**provost** 175:8,9,10
**provost's** 175:7
**public** 21:22 67:7
207:10,14 254:14
306:7
**publish** 60:24 180:5

published 61:1,2
    204:12
publishes 112:18
publishing 63:17
pull 182:25
purchase 141:13
purchaser 122:24
purchasing 42:14
    44:1
pure 246:10
purportedly 213:25
purpose 53:15 97:20
    214:14
purposes 25:14
    184:21 191:17
    204:5 210:10
    226:19 233:6
    235:18 241:11
    258:6
pursuant 275:1
pursued 206:15
purview 130:22
pushed 111:21
pushing 105:22
put 10:25 11:8 16:18
    24:1 77:16 105:17
    148:17 154:1
    158:2 169:20
    181:18 188:21
    197:24 198:12
    213:16 217:14
    293:10,22,25
    294:6,9
putting 167:13
P&L 39:14
P&Ls 45:3
p.m 102:14 103:2
    305:11

Q

qualified 63:14 92:2
    130:15 156:15
    178:1,9,11 202:9
    208:18 211:24
    212:1 235:22
    295:18 296:2,7,20

297:13,15
quality 111:9,11
    137:2 199:23
quantify 132:6
question 21:24,25
    22:23 23:7,8 31:2
    34:2 50:1,9 100:2
    106:9,13,17
    162:12 179:11
    195:18 199:22
    214:10,13 221:2
    224:3 231:10
    234:15 238:2
    241:2 242:13
    243:24,25 245:23
    246:9 249:24
    251:21 253:3,18
    253:20 256:10,12
    263:21 265:14
    266:20,21 268:6
    278:22 282:6
    287:2 291:4,7
    292:4,12,13
    302:16
questioned 127:24
questioning 173:11
    281:11 282:21
questions 19:15
    30:21 34:8 40:7
    41:4 42:9 43:18,19
    44:1,12,17 45:14
    54:16,20 55:21
    83:23 84:4 86:6
    101:15 125:15
    126:12 127:8
    150:23,24 162:9
    163:9,13 172:11
    172:20 173:25
    184:4,7 189:1
    193:20 242:18
    247:17 251:10
    269:10,18 282:9
    282:23,23 290:11
    295:15
question-and-ans...
    247:21

quick 34:2 54:19
    114:10 173:19
    193:24 208:14
quicker 295:16
quickly 126:14
    161:12 230:19
quit 187:10,13,14,17
    187:19 188:3,5,10
    188:12,13,17
    189:1,20 190:7,13
    190:20,21,24
    191:11 192:6,7,18
    192:22 193:1,4,13
    193:19 194:8
    195:3,16,19 202:3
    255:4 267:6,12,15
    267:18,21,23,24
    296:10,13,15
    304:9
quite 64:13 67:10
    112:21 153:19
    196:2 234:2
    244:25 266:5
quits 191:5,9 192:5
    192:5 193:23
    194:11
quitting 274:16
quote 220:11 221:13
    221:23 224:24
    273:22
quoted 238:4 278:13
quotes 215:9
quote-unquote
    96:17
quoting 251:25

R

R 1:14,15 2:1 3:1,17
    4:1,15,15 34:16,16
    34:16 56:8 103:1,3
    128:17,17,17
    174:8 306:1
rained 163:10
raise 213:7,8 245:22
raised 224:3
raising 197:5

range 227:5 228:6
    229:7 230:10
    259:13 260:3,9,20
    260:23 262:4
ranking 147:21
    263:23
rate 87:18 89:8
    110:8 115:16,17
    115:24 145:14,14
    145:16,16 148:20
    168:2 187:14
    188:4,5,10,12,14
    188:17 189:1
    192:6,7,19,22
    193:1,4,13,19
    194:8,9,10 195:16
    195:19 202:3
    250:12 255:4
    267:12 268:22
    296:10,13,15
rates 62:19 187:10
    187:13 189:21
    190:7,13,21,21,24
    195:3 276:9
    277:14 278:2
    299:25
rating 164:11
    303:23
reach 146:8,9 192:3
    293:4,9
reached 146:19
    229:3
read 70:1 74:11
    101:11 104:18
    128:7,8 207:22
    208:2 212:9,17
    216:7,15,15 218:2
    220:11 226:22
    234:16 237:14
    248:14,24,24
    251:2 253:20,21
    256:12,13 259:10
    259:20 262:22,23
    273:14 274:9
    276:3 284:4,7
    286:24 287:2,10

287:12 288:3,19
295:21 297:25
298:19,20
**readily** 92:19 219:19
**reading** 233:8
248:18,22 259:15
259:16,21 283:6
295:19
**reads** 29:9 46:18
**ready** 4:6 164:14
172:16
**real** 188:25 201:2
227:16 232:2
**realize** 75:15 100:15
109:9,23,25
110:17 113:4
134:24 169:19
**realized** 65:12
173:14
**really** 65:21 77:24
78:15,17 79:8
117:7 175:18
177:13 187:24
189:23 195:7
208:23 209:9,25
216:13 217:4
224:1 272:7 277:5
**reason** 11:20 29:2
38:20 52:18 71:18
75:13 102:4
107:10 157:5
173:16 180:4
197:4 200:4
213:19 215:10
217:14,17 263:1
273:23,25 274:13
289:18 299:17
**reasonable** 88:16
89:2,5 288:12,15
288:25 289:3
290:22
**reasonably** 203:4
214:5
**reasons** 38:18
228:13 249:4
250:21 267:7

**rebuttal** 251:14
**recall** 22:9,15,17
23:1,3,10 30:14,20
33:12 55:11 88:15
89:8 91:19 112:25
119:15 120:14,18
120:19 123:23
154:13,14 161:8
161:10,16,17
173:8 248:4 250:3
288:16
**receive** 35:17 36:11
37:4 146:13
151:24 154:11
156:1 221:10
266:20 294:15
295:1,14
**received** 5:15 7:9
8:18,19,20 13:1
17:4,5 19:7,8
25:11 36:8 37:14
37:18 42:1,6 45:11
45:12 57:6 81:11
81:12 84:7,14,15
86:2,4 125:7
127:19 128:9
133:19,20 139:4,5
149:21,22 152:15
152:16,19,23
169:21,21 174:20
178:19 179:8,9
187:6,7 195:6
197:10 200:2,15
215:22 217:22
220:4,6,8 222:3
308:1
**receives** 151:17
**receiving** 78:22
143:1 158:17
**recess** 5:4,18,21
86:11,12 102:14
172:13,14,15
174:3,4 275:19
**recip** 113:23
**recognize** 35:22
37:11 132:12

134:7 137:25
139:10 164:23
**recognized** 178:8
253:6
**recognizes** 212:14
215:16
**Recognizing** 228:9
**recollection** 92:12
101:5 248:8 289:1
**recommendations**
58:1 62:24
**recommends** 79:9
79:10
**record** 7:17 8:5 43:2
64:9 124:19 178:2
203:15,19 213:17
216:2 253:21
256:13 269:23
306:12
**recordkeeping**
28:13
**records** 189:3
193:12
**RECROSS** 307:7,11
**RECROSS-EXA...**
34:3 55:17
**recruit** 184:5
**red** 98:3
**redirect** 31:16 54:21
126:15 172:13,21
173:20 242:14
307:6,10,14,19
**reduce** 66:7 105:14
132:7 209:22
291:6
**reduced** 106:22
140:2,23 199:14
256:4 257:7,9
**reducing** 63:24
105:6,17,21 106:5
106:6,15,21 148:1
**reduction** 266:7
**reductions** 138:16
149:8,9 183:8,11
198:5,6 274:23
275:1,5

**redundancy** 281:16
**refer** 29:1 74:8
120:22 136:14
145:13 154:11
182:2 202:25
232:21 236:24
238:1,3,17,21
244:11 248:12
258:25 259:9
261:4,8 263:20,24
264:3 266:9 273:6
275:8,21 280:2
284:6 286:13
287:17
**reference** 71:7 74:10
93:8 120:22 123:1
**referenced** 17:9
87:14
**referred** 52:20
88:10 97:22
130:21 136:9
139:22 182:6
**referring** 24:14,16
41:11 68:25 70:9
88:21 89:23
100:25 101:2,7
103:17 112:1
192:15 208:11
227:12,13 233:14
234:4 261:8
262:21 276:14
278:19 298:12
**refers** 25:13 92:20
181:24 279:19,24
**refine** 258:18
**refined** 112:21
**reflect** 68:18 303:25
**reflected** 220:15
**reflecting** 157:2
298:3 303:24
**reflects** 69:4 70:19
81:6 286:19
**reform** 57:17,19
58:13,16 61:22
**refresh** 248:8 289:1
**refreshes** 101:4

**refutation** 256:19
**refute** 250:7
**refuting** 250:6
**regard** 9:24,25
 113:11 132:14
 141:6 160:19,20
 160:22 177:23
 198:2 199:11
 204:1,14 205:2
 210:12 221:24
 223:12
**regarding** 39:7,23
 39:25 40:8 41:5
 44:17 52:14 54:23
 60:14 62:15 78:8
 83:24 88:9 203:9
 210:9 298:9
**regardless** 299:24
**region** 71:5
**regional** 235:25
 236:5 237:8,21
**regionals** 236:3,3
**regions** 280:16,21
**regression** 249:19
 249:20
**regular** 249:5,6
**regularity** 249:4
**regulators** 62:7
**rehabilitate** 251:9
**reimbursement**
 62:19 79:20,23
 80:23 81:3 82:3,18
 90:25 91:5 93:9
 99:4 136:22
 138:15 168:6
**relate** 51:14 126:3
 209:19
**related** 10:21 27:6
 41:5 42:20 44:14
 51:12,13 65:1
 106:17 151:22
 158:11 162:4
 163:15 177:13
 206:23 219:13
**relates** 294:12
**relations** 46:10,11

129:21 130:1,2,2,3
 134:3 153:19,24
 157:13 174:20
 254:15
**relationship** 108:24
**relationships** 44:2
**relatively** 65:5 89:6
 89:18 204:16,16
 219:19 275:6
 279:12
**relevance** 216:15
**relevant** 57:5 184:7
 216:21 235:21
 243:19 244:2,6
**reliable** 207:6,9,12
 207:15
**reliance** 127:22
 128:4
**relied** 128:5 203:4
 284:23,24 285:1
 287:25
**relies** 214:6
**rely** 203:12 214:4,5
 215:3
**relying** 283:20
**remain** 231:8 275:4
**remainder** 214:18
**remained** 290:21
**remains** 157:9
**remarks** 218:8
**remember** 54:25
 88:11,25 113:23
 161:1,13 163:22
 163:23 164:20
 173:11 266:1
**remind** 17:20 201:8
 261:6
**reminded** 215:6
**render** 205:25 212:1
**rendered** 211:25
 252:23
**renegotiated** 183:16
**rent** 170:21
**reorganized** 128:25
**repatriation** 40:4
 43:19

**repeat** 5:9 22:23
 50:1 116:17
 253:18 256:10
**replace** 141:12
 268:9
**replacement** 77:2
 147:6
**replicate** 166:13
**replicated** 230:13
**report** 16:14 18:15
 64:7 67:2 69:19,23
 101:17 130:23
 178:25 181:14
 183:10 188:24
 189:5 192:15
 193:1,8 194:8,24
 195:1,3 198:9,9
 200:7,10,12 204:2
 204:12 205:24
 218:17 223:18
 226:22 234:22
 235:11,23 236:11
 236:16 237:3,13
 237:24 238:16,19
 238:22 239:2
 242:8 244:12
 248:3,3 252:16
 259:8 263:13,15
 263:25 264:1
 265:21 266:4,6
 273:7,15 274:22
 281:5,22 283:4,11
 283:17 284:1,3,22
 284:22 285:18,24
 286:1 287:7,13
 289:8,10 290:9,16
 291:23,24 293:18
 293:19 295:9,16
 295:20,21 296:18
 297:20 298:1,8
 300:15 302:1,5
 304:2
**reported** 80:20
 89:19 245:6
**reporter** 253:19
 256:11 306:7

**reporter's** 114:6
**reporting** 32:19
 93:13 109:21
 286:10
**reports** 39:17 60:16
 61:2 179:2,3
 207:16,23 208:3
 211:16 248:10
**represent** 7:12
 19:14 26:2 53:12
 126:5 134:23
 138:12 199:5
 232:14 259:1,4
 305:7
**representation**
 154:13,19 274:3
 291:1,5
**representative**
 32:24 50:14
 112:12 113:21
**representatives** 13:6
 13:9 30:10 33:6,22
 51:10 53:22
**represented** 21:4
 57:20 71:11 91:11
 137:20
**representing** 86:15
**represents** 18:8 68:8
 104:20 165:19
 186:9
**reproduced** 84:25
 229:9
**request** 25:14,21,23
 26:4,7 32:23 34:5
 36:11 42:4,5,8,10
 43:17,25,25 44:22
 47:4,5,6 49:24
 50:3,4,12,18,20
 50:21,22 59:24
 193:24
**requested** 13:1
 16:14 17:2,24
 28:19,21 42:10
 46:19 47:1
**requesting** 36:15,21
 51:2,7

**requests** 14:11 16:6
18:2 29:18,22
31:18 33:2,21,24
35:17,18 36:7 37:3
37:14,17,18 41:25
42:20 43:1 50:11
50:15 51:10,16,17
55:18
**require** 64:6 111:14
111:21
**required** 7:8 77:24
78:1 196:25
295:17 296:1
**requirements**
131:16
**requires** 293:6
**requiring** 73:17,25
296:1
**research** 58:9,21
59:6,18 60:10,25
61:1,13,14,23,24
62:20 63:17
100:19 112:20
127:23 175:7,16
184:19 203:8
**resolution** 7:14
123:21 124:1
**resolved** 18:12,16
**resolving** 206:1
**resource** 131:4
**resources** 129:19,23
129:24 153:18
**respect** 7:15 25:5
37:2,17 41:8 46:10
55:10 57:21 63:20
65:11 108:25
109:1 112:12
123:24 133:22
135:16 139:16
140:9 143:3
147:10,17 148:7
148:25 173:9,14
181:5 199:6
274:18 300:2
**respected** 78:21
**respective** 58:16

126:4
**respond** 36:7 41:25
42:3,25 75:10,20
75:24 223:17
**responded** 42:11
**responding** 14:10
37:17
**response** 36:15
87:18 214:16
**responses** 35:18
**responsibilities**
130:11 131:9,15
**responsibility**
131:13
**responsible** 26:18
26:19 52:18 78:25
79:3 131:21
**responsive** 29:11,15
29:18,22 36:20
49:23 50:3,22 51:6
**rest** 67:25 142:13
251:2,5
**restate** 266:21
**restraint** 256:24
**restrict** 234:20
255:20 288:20
**restricted** 128:2
**restructure** 220:20
231:19
**restructured** 219:20
**restructuring** 6:8,18
6:20,24 9:13 34:22
35:8 39:25 40:15
86:22 232:3
241:21
**result** 147:7 199:16
204:8 223:2
231:18 269:1
276:6 278:9
**resulted** 155:14
179:3 185:8
**resulting** 290:5
**results** 188:15
199:17 224:1
230:13 278:9
**resume** 56:19,25

**resumed** 103:4
189:15
**retain** 199:21
295:17 296:2,20
**retaining** 270:21
296:7,13 297:13
**retention** 22:11,12
**retire** 69:1 187:20
267:6 268:3
**retired** 57:9,11
193:22
**retiree** 10:18 12:25
13:25 29:10,19
60:15 63:3,7,20
64:7,8,16 65:7,13
65:16 66:2,11,15
66:17 67:19,23
68:10,12,14 69:1,7
70:17 71:4,16 72:8
73:1,5,9,16,17
74:1 75:25 76:8,16
76:21 77:2,21
89:12 118:4,8,11
119:5,10 120:3
122:3,15,18
124:22 126:6
149:24 154:5
155:9,15,20
173:23 203:23,25
204:5,7
**retirees** 20:7 57:23
59:24 63:12,25
66:8 68:1,17,19,21
73:12,14,20 74:1,3
74:4,15 76:1,9,16
76:22 88:11 105:7
105:20,22,25
106:11,15,19,19
120:3 122:16,19
125:7 133:1,1
154:11 155:25
204:17,19
**retirement** 57:22
61:15 68:18 119:3
150:16 182:3
**retiring** 145:6,18

146:3 193:15
267:22
**returned** 129:25
**revenues** 118:22
**reverse** 275:2
**review** 44:13 52:3
97:11 188:4
197:23 232:16,18
288:23
**reviewed** 28:2,9,15
231:10
**revised** 188:23
189:4
**revision** 199:2
**RICHARD** 2:17
**right** 8:16 17:17
18:7,13 33:12
37:25 53:9 56:22
59:8,11 60:4 69:2
70:6,9,22 71:6
74:17,23 78:3 79:5
80:13 81:14 93:18
95:17 98:12 99:15
99:16 104:4 106:2
107:8 115:10
116:2,12 123:2
126:23 127:13
128:3 138:11
140:7 141:4,20
143:11 157:20
164:19 167:5
168:3 171:14
211:5 218:19
219:3 254:14
267:25 269:21
270:14 281:12
290:17 293:14
297:23 300:10,19
302:2 304:1
**rights** 11:25,25
**right-hand** 199:4
**rigorous** 131:14
**rise** 274:18
**risen** 64:19
**rising** 82:8
**risk** 190:16 215:24

**Road** 129:11
**Robert** 2:15 56:1
  133:17 307:15
**Robinson** 41:18,22
  49:18 134:21
  159:12,15
**Rodin** 175:8
**role** 9:25 14:16,17
  35:12,15,16 50:19
  51:11 57:18
  131:24 132:1,2
  133:24 134:1
  136:11 159:3
  205:4
**roles** 58:12
**rolled** 80:1
**rolls** 136:24
**roll-up** 41:17
**Roman** 244:11
  280:5
**room** 8:24,25 9:6,9
  9:10 10:7,14,17,21
  11:3,18 13:11 14:1
  15:13 19:17 20:2
  29:12 30:18 32:12
  32:18
**rooms** 9:12,17,19
  10:1,4 11:20
**rough** 181:12 199:7
  228:24
**rougher** 229:8
  230:12
**roughly** 145:23,25
  146:20,24 181:15
  212:18 271:16
**round** 150:19
**rounded** 161:19
**row** 80:22 85:4
**RP** 146:6
**rubber** 273:18,18
**rule** 64:14 114:6
  149:1,4 203:1
  213:13,14,19
  214:15
**ruled** 215:25
**rules** 64:6,6 72:13

72:14 213:13
  214:3
**ruling** 206:5
**run** 44:14 170:17
  276:5
**runs** 170:12
**rust** 218:11 219:21
**Rutgers** 204:22

———————
**S**
**S** 2:1 3:1 4:1 103:1,1
  103:1
**sacrifices** 162:17
  163:5
**salaried** 39:9 80:6
  83:11 162:17
  165:13 172:4
**salaries** 181:22,25
  182:4
**salary** 140:1,2
  145:24,24 146:21
  147:6 151:19
  270:15
**sales** 156:19
**sample** 112:12
  113:21 116:8
  166:12,15,16,24
  167:3
**Sarbanes-Oxley**
  131:13
**satisfactory** 199:21
**satisfied** 42:5
**Saturday** 196:13
**save** 109:11 110:3
  213:6 290:12
**saving** 137:11
**savings** 41:6,8 42:13
  79:2 91:1 100:9
  109:9,10,23,25
  110:17 130:16
  132:8 133:5
  134:11,23 138:2,4
  138:13,23 139:14
  140:6 141:3,19,22
  142:14,15 143:10
  147:14 148:3,21

149:14 159:7,19
  160:4,17,21
  162:16,21 164:24
  165:20 168:17,22
  169:19 170:2,3
  173:9,13 178:25
  198:7 199:1
**saw** 82:2 193:11
  198:16
**saying** 20:10 68:9
  99:8 181:1 194:8
  205:22 217:1
  220:21 225:6
  227:25 230:2,24
  233:17 235:4,6
  239:21 250:8
  271:17 278:21
  279:1,2,3,4,5,7,11
  279:25
**says** 27:17 68:23
  70:3 71:15 85:5
  88:21 90:12 92:1,8
  92:9 93:18,20,21
  93:22 97:17 102:1
  107:7 112:14
  116:7 156:23
  182:14 184:10
  202:12 203:2
  213:15 221:16
  227:17 231:5
  233:6 237:15
  238:23 244:18
  248:14,15 249:2
  259:11 260:1
  261:12 262:24
  270:6 273:15
  274:10 276:4,15
  280:9 283:6,7
  284:9,11 286:14
  288:4,23 298:17
  302:6,8,20 303:6
**scale** 260:20
**scenario** 96:19
**scenarios** 44:13
**schedule** 140:19
  196:14

**schedules** 39:7
**scheduling** 7:7,7,21
  195:25 197:1
  200:8
**scholarship** 176:2
**school** 161:8,23
  174:15 242:23
  243:8
**scope** 7:7,16 114:10
**score** 196:16
**seated** 4:2
**second** 6:17 7:7 29:8
  30:24 46:16 66:16
  66:19 69:25 71:13
  73:6 80:25 82:14
  82:18,23 90:14
  91:25 101:11,14
  102:5 120:11,23
  126:16 128:24
  167:23 170:7,9
  179:12 184:6
  200:6 201:17
  202:14 206:14
  214:9 224:23
  228:6 240:14
  244:18 245:1,10
  245:17 248:14,23
  253:16 298:2
  301:7
**seconds** 172:24,25
**second-to-last** 93:17
**section** 67:22,22,23
  68:3,4 70:23 71:12
  76:14,19 77:11
  93:25 94:4 103:7
  103:16 118:9
  121:22 122:14
  127:10,12 161:21
  235:9 245:13
  266:14,18 267:1,4
  288:14 292:6
  293:11 294:13
  300:25
**Sections** 35:13
  131:25
**sector** 72:14 111:13

111:22 179:18,20
184:10 186:6,14
189:7 190:19,20
190:25 191:14,18
191:23,25 198:17
198:18 199:8,15
200:10 204:8,9
211:3 212:22
218:15 227:18
229:3 230:12
243:12,17 244:15
244:18,21 246:7
252:18,23 254:14
255:1 256:6 257:4
257:7,10,12,14,23
264:8,22 265:1,3
271:8,20 281:2
300:7 301:6,15
303:6,21 304:3,4
**sectors** 222:8
**secure** 8:25
**security** 31:5,7,10
32:5,7,25,25 58:1
**seductive** 151:6,9
**see** 5:8 11:8 18:4,7
28:2,8 29:13 30:7
30:11 38:18 46:16
50:25 67:18 69:25
72:6 74:9 82:19
91:8,16 92:3 93:15
93:18 94:7,16
97:10 98:18,21
99:7 100:23 101:4
101:18 102:12
107:24 112:16
113:3 117:15
125:12 132:11
134:10 137:23
139:9 156:22
157:3 159:1
162:14 166:7
168:7 178:7 187:3
189:8 192:4,16,19
193:1,5 197:9
198:15 212:7
214:14 215:8

218:23 219:7
221:16 227:2,4
233:12 237:19
259:19 260:5
261:16 266:10
269:10 276:12
280:8,13,14 283:3
289:11 294:4
297:2 298:5 303:5
**seeing** 115:6
**seek** 96:16 100:5
**seeks** 154:6 160:17
292:14
**seen** 54:1 111:5
115:9 118:3,4,6
207:25
**segment** 210:18,19
211:9
**segue** 297:24
**selection** 92:23
184:21
**self-insured** 141:11
158:16
**sell** 277:9
**semiskilled** 186:3
**Senate** 59:20 61:20
61:22
**send** 18:10 21:11,11
**senior** 4:22,25 5:11
138:9,10
**seniority** 143:22
275:2
**sense** 15:13 185:1
196:5 202:12,14
227:20 235:4
236:7 277:17
279:5,7
**sensitivity** 172:23
**sent** 12:8 18:2,4
27:13 32:20
**sentence** 29:8 30:4
46:16 69:25 70:1,6
74:11,20 92:8,9
101:14 102:5
109:22 156:23
168:14 238:23

239:5 248:14,15
248:23 251:4,14
261:9 262:19,21
274:9 284:4,6
286:12,13,24
287:3,11,14
288:18,19,21,23
290:7 295:12
296:24 298:2
**sentences** 273:14
276:3 278:13
288:19
**separate** 23:21 84:3
210:9 258:16
**separately** 170:12
**separation** 194:10
**series** 225:21 269:9
282:8
**served** 7:19,20 235:8
236:2 253:23
**service** 12:19 14:22
114:23 140:20
143:8,22,22,24
144:1,15,22 145:5
145:15,18,22
146:17,19 147:3
150:11,18 176:14
177:2 191:4,7
253:24 254:19
255:15
**services** 6:7,8,16,18
6:19 12:14,15
34:23 78:19,24
82:6 96:9,10,16
100:7 130:7,9,12
131:3,22 132:21
170:16
**Service's** 253:24
255:13
**session** 13:3 30:9
**set** 9:20 10:6,12,13
10:23 11:4,14,20
13:25 20:2,5,6,7,8
20:11,13,14,15
29:23 34:5 50:3
76:16,24 118:11

184:4 191:14
246:5 250:1
252:22 253:15
296:1 299:11
306:19
**sets** 101:10
**setting** 10:3,9 11:1
11:17 19:21
176:24
**setting-up** 29:19
**settle** 293:6
**settlement** 88:9,18
206:7 293:6
**settlements** 293:9
**setup** 10:17 33:14
**seven** 37:5 79:11
89:19 92:6 115:16
115:17 294:9
**seven-and-a-half**
35:1 160:4
**seven-day** 140:17,21
**severe** 215:16
**severely** 145:3
**shaft** 225:25 226:6
**SHANNON** 3:7
**shapes** 113:17
**share** 9:11 38:19
40:3 116:20 165:6
234:25 236:5,10
**shared** 11:23 43:21
**sharing** 9:3 106:3
134:17 136:19
138:17 159:4
**SHAW** 2:17
**shedding** 65:13,16
**sheet** 28:9 64:10
**sheets** 39:15 41:16
41:17,20,20 49:14
49:16 224:13,14
**shell** 167:16
**shielded** 78:15
**shift** 218:10
**shifting** 105:23,24
167:14
**shoe** 273:18
**short** 114:13 219:20

287:15 290:7,13
290:15 304:9,10
**shorthand** 88:2
306:6
**Shortly** 5:16
**short-term** 134:19
140:10,15,16
159:5
**show** 13:23 16:15
49:14 66:13 70:21
80:21 81:22 82:6
85:3 116:15 181:7
236:21 248:5
278:10 300:9,9,16
301:11
**showed** 221:23
**shown** 216:1 219:6
**shows** 17:13 68:11
68:14 71:3 73:19
80:22,22,25 82:1
82:14 83:2 114:19
188:25 218:25
230:20 231:4,18
266:12,24 269:11
269:21 296:13
300:11,20
**shrink** 216:19
**shrinking** 217:5
**sick** 116:22 136:13
136:14
**sicker** 116:12
**side** 61:21,22 63:10
111:7 198:20
199:5 200:11
204:21 280:9
**signal** 98:2
**signed** 18:21 36:4
132:18
**significance** 189:20
190:23 202:4
212:12 216:11
218:6
**significant** 17:10
106:9 154:20,22
166:12 206:11
212:16 216:20

218:24 220:20
221:1,5,6 225:23
**significantly** 63:24
105:6,14,17,21
106:5,6,15,20,22
115:7 199:14
245:4
**similar** 7:11 36:23
44:11 60:18 80:7
107:13 108:24,25
130:17 146:12
165:6 205:16
240:23 269:6,6
271:16,22 284:13
294:23,24 295:13
295:14
**Simon** 3:9,13 19:14
86:15 161:11
232:14 257:17,19
**simple** 18:15 229:14
251:4 265:14,22
**simply** 84:1 99:1
115:24 168:1
186:12 191:23
193:21 224:13
239:23 285:1
290:18
**single** 98:17,17
107:6,6,9,10,15
112:4 166:1
251:13,23 260:17
**sir** 19:15 20:14 29:8
34:9 132:3 133:10
137:25 138:19
156:21 158:25
174:1 227:14
228:21 230:25
**sit** 113:2 173:21
**site** 10:9 11:8,9,21
12:13,17,22 13:1
13:15,20,22 14:3,5
14:7,15,19,21,23
15:18 16:9,16,17
17:16,21 19:2,22
20:6,7,10,17,18,19
20:24,25 21:4,5,6

21:9,12,15,16,18
21:21 22:2,3,7,16
22:20,24,25 23:2,4
23:5,6,7,9,11,12
23:13,14,16,17,18
23:19,21,24 24:5,5
24:7,8,10,11 26:5
26:6,13,19,24
27:10,15,23 29:16
29:23,23 30:1 31:8
31:19,21,22 32:1,2
32:3,17,25 33:4,9
33:11,14,15,16
36:18,24,24 37:1
37:22,24,25 38:1,5
38:9,11,13,15,16
38:21 44:19 50:25
51:4,8,21,22,22,23
52:1,4,7,19 53:1,6
53:15,18 54:4,6,7
54:9,11
**sites** 10:9 20:8,13,14
20:15,16,22 24:2
31:6 33:3 36:12,14
36:22 38:3 51:20
**situation** 19:18
46:22 190:11
196:17 204:1
206:11,21 279:7
**situations** 277:16
278:24 279:5
**six** 6:4 74:21 76:3
93:18 161:3,4
294:7
**size** 71:4,12 94:5
181:7 222:12,13
222:25 223:1
246:19 247:24
248:1 249:9,10,10
249:10,13,14
250:9,9,14 251:1,1
253:1,4,5,7,8,9,12
**sizeable** 229:21
260:8
**skewed** 70:19
116:14,24

**skill** 179:17 185:8,9
223:4,13,24 230:7
250:14,20 301:10
303:12,18,24,25
**skilled** 179:19 191:3
191:5,10 224:6
225:3 229:10
230:9 243:12
245:12 250:16
255:1 256:5
257:22 260:15,19
277:11,12 278:6,6
278:8,10,13,19
293:22 294:6
303:21,22
**skills** 220:22 271:1
284:13 294:15,23
**slew** 243:7
**slight** 172:5
**slightly** 41:20
156:25
**slowly** 70:2 74:11
**small** 89:8 108:12
116:19 142:12
144:7 146:24
172:20 193:7
199:8,9 217:8
247:9 248:16
249:7 272:5
297:21
**smaller** 73:11 92:2
105:11,13,15
249:2 250:13
**smarter** 208:19,24
209:15
**Social** 58:1
**software** 12:18
**sold** 154:25
**solution** 120:17
**solved** 5:19
**somebody** 116:3,4
167:15,25 272:21
**somewhat** 93:20
103:23 104:20
**soon** 10:16 12:25
**sorry** 23:6,6,8 25:15

25:17 30:24 31:3,3
48:14,19 49:17
50:1,9 61:5 90:10
90:11 92:4,5
104:10 106:16
108:12 111:20
112:14 113:7
114:5 116:17
123:3 124:14
128:22 151:7
156:7 158:22
159:18 171:17,25
172:19 194:1
200:24 201:6
223:6 238:25
247:14 248:20
253:18 255:24
256:10 259:15
262:23 264:1,15
265:2 266:20
269:17 280:11
283:2 284:3
288:13 297:7
298:12
**sort** 15:16 43:16,22
120:17 131:19
163:19 177:16
196:17 203:7
223:4 246:3 274:2
**sounds** 89:3
**source** 67:12 136:25
169:2 184:11,13
184:15,16 189:10
189:13 215:3
**sources** 169:9
206:22
**south** 156:8 181:4
234:4
**southern** 1:2 218:11
218:14 219:2
**so-called** 22:16
**space** 170:21
**spats** 273:18
**SPD** 97:17
**speak** 64:1 180:18
180:19 272:25

273:3 286:11
**speaking** 48:11
**special** 13:3
**specific** 11:25 14:11
14:14 22:17 28:9,9
28:15 33:21 40:8
42:12 155:17
167:20 210:16,25
218:17 223:13
267:18 276:8
283:23 284:16
301:16,17
**specifically** 27:9,11
46:3,11,15 49:12
50:13,18 177:23
197:2 201:11
**spend** 42:14 79:11
80:1 95:14 113:3
114:21 116:5
**spending** 58:21,24
79:4 82:12 89:10
116:8 117:2 137:5
**spent** 44:3 113:4
116:4,5 157:1
183:24 215:12
**Spicer** 129:10
**split** 118:2 162:10
**spoke** 89:25
**spoken** 7:13 166:22
**spokesman** 130:4
153:25
**spreadsheet** 24:22
**spring** 10:8 22:14
**square** 251:6
**ss** 306:3
**staff** 43:9,11
**stage** 29:20
**stagnant** 216:17
**stand** 7:23 46:23
56:6 103:4 284:20
288:4
**standard** 203:11
**standards** 177:11,18
226:7
**stands** 166:13
**start** 65:13 68:16

98:7 175:14
251:22 282:17
284:10
**started** 5:16 10:8
11:8 57:8 61:6
180:23 204:20
**starting** 31:17 72:15
89:15 148:17
**starts** 92:6 98:13
168:16
**state** 58:13,15,15,19
58:19 70:20 72:4,5
72:7,12,19 88:4
93:2 95:22,25
104:7,12 108:19
109:7 114:18
211:25 214:7,25
228:15 306:2,8
**stated** 133:7 144:9
168:20 188:5
260:24 261:2
**statement** 43:19
46:23 70:15 102:5
110:1,12,14
114:24 143:20
144:2 153:17
154:16 155:23
212:18 213:3,11
214:12 215:25
216:7,11 217:16
260:7 267:8
274:14 279:19
296:8
**statements** 45:5
202:17,22 212:9
212:13 213:20,22
214:7,19 217:14
**states** 1:1,8,16 64:19
64:21 65:2,2,17
77:20 112:4
144:14 155:25
178:3 219:22
243:13 253:24
254:19 259:3
276:18,22,25
280:17

**statewide** 299:22
**stating** 88:25
**statistic** 116:7
**statistically** 92:8
113:21 166:12
**Statistics** 184:14
244:20 260:8
**status** 18:7 19:1
149:24
**stay** 99:10 137:9
168:11
**Steel** 120:15,20
123:11,14 124:4
**Steelworkers** 232:15
**Stenger** 239:17,19
**step** 11:13 65:19,23
65:24 66:16,19
68:9 73:5,6,7,10
76:21 77:13
105:10 162:11
179:11 290:24
**STEPHEN** 2:25
**steps** 65:18,21 105:9
**STEVEN** 2:8
**steward** 129:15
**stick** 167:23
**stipulate** 243:7
**stockholders** 64:12
**stop** 102:10 273:22
**stopped** 176:10
189:15 287:15
**stopping** 94:19
**storms** 183:21
**strategy** 75:16
**stream** 118:19
**Street** 2:5 3:11
170:20
**strength** 131:7
**strike** 115:1 186:22
290:6 297:23
**strokes** 201:7
**strongest** 228:3
**STROOCK** 3:3,3
**structure** 11:2,7
91:10 148:8,13
278:5

structured 11:12
  78:25
structures 43:15
struggling 241:25
studies 59:10,14
  60:1 82:6 177:8,24
  184:18 188:9
  193:18 235:20
  255:10
study 58:24 70:21
  73:2,19 74:10,12
  78:21 87:13,15,18
  87:20 89:24 93:4
  100:18 127:11
  176:15,15 177:12
  177:17 178:17,18
  178:20 179:13,14
  180:3,23 181:10
  181:14 183:8,10
  184:7,22 188:17
  203:11 204:6
  210:10,12,14,15
  214:8 222:13
  224:1,22 226:11
  226:14,17,18
  227:11 229:2
  230:11 235:13,15
  237:7 238:9
  241:12 242:9
  244:2 246:1
  257:25 258:6
  266:8 270:25
  271:4 280:25
  282:1,3,11 283:17
  283:19 284:23,23
  284:24 285:1,11
  285:13 286:8,9
  287:7,21,23 289:7
studying 63:17
  231:14
stuff 72:20 238:24
subfolders 11:14
subject 25:6 63:18
  72:13,14 78:6
  183:13 187:3
  202:24 207:8

221:19 222:1,2,12
  226:12 252:4,5,13
  297:24
submit 93:7
submitted 35:25
  47:6 88:5,20 90:2
  90:2 93:7 248:2
  286:1
submitting 167:25
subsector 240:3
subsequent 136:24
  257:1 265:21
subsequently 10:10
  10:12 263:12
subsidiaries 40:3
substance 187:12
substantial 39:3
  109:10 168:19
  199:16 204:17
  209:25 231:16
  274:23 275:5
substantially 44:15
  229:19 262:14
  264:22 265:8,16
substantiated
  211:15
substantive 85:25
substitute 95:16
subtracting 166:19
subtracts 198:23
success 240:13
  291:11
successful 232:3
  235:5 236:4,14,14
  240:12 241:18,25
  244:9 292:24
successfully 201:24
  231:20 241:21
  292:24
suffering 241:19,20
suggest 98:7 102:8
suggesting 203:6
  211:5 215:18
  296:14 305:3
sum 143:19,21 146:2
summarily 50:10

summarize 269:10
  285:8
summarized 105:5
summary 6:16
  10:20 16:12 39:5
  67:18 90:5,12 96:6
  96:17 143:23
  208:15 212:17
  213:15
summer 10:12 13:24
  29:24 33:14 134:2
  274:12
supervisors 131:18
  298:24 299:2
supplement 39:21
  40:19,21 44:25
  47:20 54:23 55:6,8
supplemental 248:3
  248:9,10,21
supplements 155:19
supplied 138:17
  148:5,24 149:16
suppliers 119:4
supply 43:25 44:1
  154:23 277:10,22
  283:23,24 284:16
  285:6
support 6:8 10:3
  18:10 35:25 49:14
  62:6 191:6 216:16
  270:6 281:23
  289:20,23,24
  293:25 294:21
  295:8
supported 293:11
  295:10
supporting 39:7,22
  41:3
supportive 208:5
  231:13
supports 290:9
suppose 83:25 97:3
  153:17 245:7
  263:2 299:17
sure 18:11 21:19
  36:10 39:2 43:11

48:18 52:5,24 62:7
  68:15 73:21 74:12
  85:4,25 86:10 98:2
  103:19 116:18
  119:1 121:1,2
  123:22 131:21
  151:11 153:9
  156:4 160:11
  162:6 175:3
  209:14 237:10
  275:15 279:1
  281:9 285:9 299:5
  302:8,9
surely 300:14
surge 130:16
surgeon 16:22
surgical 164:4
surprised 223:20
  251:4
surprising 194:18
surprisingly 224:15
  231:14
survey 67:1,9,10,16
  67:19 70:3,10,13
  71:11,19,21,22
  72:13 75:17,21,24
  76:10 80:20 84:10
  101:7 102:2 103:7
  112:11,21,25
  113:24 126:17
  127:23 185:4
  189:13 228:25
  259:8
surveys 60:12,13
  62:15,18 75:3,4,8
  75:9,11,13 102:2
survival 277:5
survive 232:5
  291:12
Susan 74:20 204:24
  216:7 220:21,24
sustain 206:20
  207:20 242:20
Suzanne 69:14,19
  74:6
sweating 273:19

switch 78:3
switched 176:11,12
switching 118:8
sworn 4:15 34:16
    56:8 103:4 128:17
    174:8
symposia 60:19,20
symposiums 60:17
system 12:5,7,10,18
    13:10 15:21 26:8,8
    26:11,11 28:16,22
    34:5 185:2 200:18
    200:21,24 201:9
    201:10,24 224:10
    260:13,17 263:23

---

**T**

T 34:16 103:1
    128:17,17,17
    174:8 306:1,1
tab 6:12 16:11 18:17
    29:5 35:20 45:22
    47:7 49:20,21
    56:15,15 66:22
    69:16 70:22 74:7
    80:13 81:14,14
    84:11,12,19 88:4
    91:8 93:11 106:25
    107:1,2 112:2
    126:16 132:10
    134:6,8,9 137:22
    139:7 158:24
    162:14 163:14
    178:12 181:17
    188:20 198:10
    212:6 214:19
    216:3 217:25
    218:21 220:10
    226:20 228:18
    229:25 261:6,7
    273:10 300:12
    301:2
table 71:2,10 80:18
    81:7,23 82:1,3
    83:18 84:20,21,25
    85:1 91:13 106:25

107:18 111:25
114:15,19 117:15
146:7 154:1
167:24 192:16,25
227:12 244:11
252:14,15 253:16
264:3,6 265:6,18
266:10 268:24
269:5,6 280:8
285:21,23 293:18
294:3 298:12,14
300:11
tables 102:9 146:6
    198:19
tabs 186:23
tactic 252:7
tad 183:1
take 5:4,18,22 6:11
    12:24 14:17 35:19
    37:6 44:11 83:3
    85:22 86:10 90:6
    90:23 94:16,22
    97:3,21 98:12
    103:9 109:9,22,24
    110:20 116:4
    120:5 130:5
    131:15 132:9
    134:6 137:21
    141:14 145:4,12
    148:18 150:25
    166:17 168:18,21
    170:22 172:14
    174:3 181:12
    190:2,6,16 191:12
    196:18 198:11
    221:18 228:23
    238:21 243:8
    249:9 252:13
    271:4 275:18
    279:6,18 282:7,16
    286:12
taken 5:21 18:12
    31:8 32:20 76:20
    86:12 114:12
    147:22 162:21
    163:4,4,6 169:18

172:15 174:4
176:19 196:5
213:20 217:14
220:12 221:13
275:19 306:9
takes 131:12 179:15
Talarico 53:24 54:1
talk 5:5,6 89:14 97:3
    115:11 155:24
    175:24 190:7
    263:13 294:21
    297:19
talked 36:13 89:24
    90:18 107:9
    151:10 185:7
    201:16 207:1
    226:14 263:12,15
    263:16
talking 49:12,13,19
    97:7 106:10,14,18
    119:2,6 122:25
    133:8 160:1
    161:19 180:22
    183:25 204:20
    222:6 234:7,8,10
    260:20 267:19,21
    272:21 274:8
    276:15 278:13,14
    278:17 295:7
    297:18,22 301:19
talks 6:18 122:15
    234:6
Tambe 2:7 4:3,3,6
    7:13 34:11 54:17
    55:24 128:12
tank 58:10
Taranto 69:14,19
Taranto's 69:23
    71:6,20 74:7,20
    87:14
Tarry 34:12,19
    35:19 37:6 41:5
    45:8,19 54:22
    307:8
tax 58:2 130:14
taxed 91:3

taxes 182:1
taxpayers 64:25
teach 137:2 175:16
    242:22
teaching 175:6,15
    219:16
team 10:2 36:19
    42:20,25 43:12
    44:7 49:5 51:18
tears 201:15
technical 5:1
technically 46:20
    47:2
technician 226:6,8
    258:9
technicians 186:2
Telephone 180:17
    187:25
tell 4:20 5:12 6:2,14
    6:23 8:23 9:25
    10:20 11:4,16
    12:15 16:12 18:8
    18:18 24:19 27:23
    28:1,5,8 30:4,17
    40:25 49:3,11
    56:18,24 66:24
    68:7 71:1 80:17
    81:16 82:11 92:15
    125:18 165:19
    168:20 174:17
    178:15,22 179:12
    181:17,24 182:20
    183:22 184:11
    187:9,12 188:20
    190:22 194:22
    195:5 198:12
    216:10 227:7
    234:16 252:1
    284:6 291:14
telling 22:5 174:11
    196:22
temperature 272:10
temperatures
    272:18 274:10
ten 6:9 16:8 78:17
    79:6 96:12,14,23

97:25 104:16,22
116:15,20,21
131:8 157:16
167:16 259:12,14
260:2,4 270:7,9
286:20 287:16
288:22 293:25
**tend** 180:9 218:12
222:25 250:12
260:19,21 261:25
262:3 286:19
299:25
**tender** 63:11 177:22
**Tennessee** 219:10
**tens** 246:21
**tenure** 175:2
**ten-dollar** 96:19
**ten-minute** 174:3
**term** 87:2,9 142:18
142:23 220:25
246:3 249:18
301:24
**termed** 112:8
**terminate** 76:5
122:3 208:25
**terminated** 76:8,12
173:23 190:3,5
193:23
**termination** 187:17
208:22
**terminations** 187:21
**terms** 8:23 10:21
17:8,10 19:1 31:18
38:21,23 41:20
48:8 81:2 87:13
110:16 111:15
113:13 115:5
118:1,4 143:19
144:14 149:6
155:17,18 158:10
159:19 167:9
178:15 179:12
180:2,12 181:13
183:22 185:15
187:16 188:3
189:20 190:11

193:14 200:22
201:2 214:17
226:4 228:24
230:21 235:21
240:7 243:23
246:4 254:7,12
266:6 274:3 278:9
278:17,23 285:11
**terribly** 250:22
**test** 79:13,14 110:5,9
**tested** 225:20
**testified** 4:16 34:17
49:9 51:24 54:22
56:9 57:24 61:19
61:23 88:17 97:19
103:4 105:3
128:18 135:20
174:9 185:1 206:4
228:13 231:17
237:6,11 239:19
254:5 292:2
**testify** 59:20 88:19
88:23 177:9
178:10 202:20
225:7,8,8,9 291:25
292:2,4
**testifying** 63:17
**testimony** 22:22
57:5,23 78:4 87:3
87:9 88:5,8,21
90:19 95:1 96:11
96:14 99:14
103:24 112:3
135:23 159:11,18
162:7 173:8,17
186:20 203:2,6
205:9 206:17,18
207:4 211:23
212:4 214:6
215:12 216:16,16
221:15 246:17
271:20 301:4
**testing** 188:15 226:4
**tests** 79:9 226:5
**Texas** 219:11
**text** 213:17,25

227:13 287:18
**texts** 213:15
**thank** 8:22 19:10
25:9,19 30:21
31:14 34:9 45:16
47:16 55:22 63:15
84:6 86:3 102:13
104:14 105:2
128:10 163:11
172:11 173:18
174:1 187:5
203:14 207:21
215:24 220:5
234:15 236:21
247:4 263:24
281:21 302:25
304:12
**thee** 75:7
**then-current** 142:25
**theoretical** 209:3,4
**theory** 208:8,11,15
208:16 209:2,8,20
271:23
**thereabouts** 161:4
**they'd** 188:7
**thing** 7:25 79:25
84:22 110:2 128:8
200:10 235:20
277:8 293:14
**things** 31:17 42:9,11
75:9 105:3 130:22
131:16 144:8
170:14 216:1
250:20 259:1
267:9 272:3
**think** 4:14 6:1 8:12
17:21 18:1 33:20
37:1,25 41:15,16
42:4 43:22 44:4
48:22 49:20 52:2
58:10 79:12 85:19
85:25 90:2,18
92:20 93:6,24
95:12 96:10,21
98:8,13 99:8,24
106:23 107:9,12

108:23,25 110:12
110:18,19 112:25
112:25 115:6
119:14,15 120:12
120:24,25 123:22
125:16,25 126:3
150:22 154:3
155:10,17 157:23
157:25 158:2
160:11,15 161:3
161:18 162:2,23
164:19 171:19
172:20 178:5
180:23 183:3,5
187:13,13 188:6
190:3 194:13
196:1,5,22 199:22
201:4 209:12
211:10,19 212:17
214:18 215:15
217:3 218:16
222:17 224:20
225:4,15 227:1,15
228:11,13 242:15
242:21 250:22
252:21 254:5
265:25 266:5
277:14 278:12,16
282:8,15,16 285:7
304:13
**thinking** 41:15
**thinks** 214:21
**third** 21:15 69:11,12
73:3,4,7,10 76:21
83:2 85:4 98:10
105:10 166:25
167:1,2 170:17
231:16 240:13,14
259:10,21,23
264:17 265:7
284:4,6
**thirty** 125:22,24
145:18,22 146:18
161:23,25 172:24
172:25
**Thirty-five** 69:10

**Thomas** 2:23,24
  173:4
**thought** 180:25
**thoughts** 43:23
**thousand** 70:5 71:8
  71:16,25 79:12,21
  79:22,23 80:1,24
  82:3,17,19 83:4
  92:1 95:7,8 103:25
  152:19 157:2
  161:15 246:24
  252:24 253:15
**thousands** 212:16
  246:22
**three** 13:16 20:15
  41:21 42:2,3 49:15
  65:18,20 105:9
  133:11 138:14
  144:16 145:23
  171:22 189:17
  191:3 229:6
  268:17
**three-percent** 147:5
  147:5
**threshold** 50:19
**tier** 184:6 201:17
  202:14 210:2
  240:13,14,14
  264:12,14,15,18
  264:21 265:11,12
  265:15 266:7
  270:1
**tight** 262:17
**time** 6:25 14:5,13
  16:4 19:20,25
  26:10 29:9 30:17
  35:6 43:21 44:3
  45:7 46:2,4 50:16
  54:9 57:7 58:4
  59:3,25 63:23
  72:12 74:8 82:7
  85:22 87:15 88:17
  98:2 109:9,22,24
  110:11,16,21
  114:13 118:19
  119:19 129:12

131:7,12 132:21
133:15 139:1
143:2 144:3,5
145:6 146:24
149:18 152:22
153:19 154:8
156:13 157:6
163:18,20,21
164:11,13 168:18
168:21 170:5
175:25 178:24
183:8,25 190:12
195:2 196:10,20
196:21,23 198:5
201:2,15 219:20
222:7 225:19
231:16 237:23
238:6 240:22
265:21 269:15
270:2,8 275:12,14
281:7 282:7,17
284:5 286:12
290:10,12 296:6
304:8,10,11 305:9
305:11
**times** 13:16 19:16
  87:2 139:25 140:2
  143:7,23 144:15
  145:15,23 147:5
  150:12 165:23
  194:16 207:11
  237:25 238:11
  241:19,20 279:19
  287:6 303:18
**tiny** 90:10 250:17
**title** 61:9 107:7
  283:7 302:10
**titled** 17:12
**today** 18:25 57:5
  68:13 80:9 81:20
  94:10 121:4
  135:17 136:5
  137:13 156:13
  173:21 305:4
**toe** 272:22
**told** 21:10 52:20,25

54:8,13,14 70:7,16
77:10 119:14
122:8 239:15
**Toledo** 43:12,13
  49:5 129:10
**Tom** 232:13
**tomorrow** 203:19
  305:10,10
**top** 5:24 68:23
  103:20 108:14
  146:19 189:6
  266:10
**topic** 57:18 97:2
**torque** 43:14 44:11
**total** 17:21 19:1
  142:17 148:18
  151:14,22 156:24
  157:1,5 181:22,23
  182:1,5,6 199:17
  227:19,21 229:5
  230:8 231:1,8
  241:7 242:5,10
  296:22 297:19,22
  298:9,10 299:11
  299:13 300:8,9,16
  300:20,24 302:3
**totaled** 41:12
**totally** 121:1,2 122:7
**touched** 27:23
**tour** 184:1
**Tower** 123:17 177:8
  281:6,22 283:4,12
  284:2,3,3,11 286:2
  286:19 287:5,21
  287:23 288:6,11
  288:23,25 289:13
  289:22 290:17
  291:3,5,25 292:23
  293:3,10,16
  296:17,19
**Towers** 39:7 142:3
**Tower's** 190:8 283:7
  283:15 284:23,23
  285:19,20 288:14
  289:2 293:22
**track** 98:2

**tracked** 26:1,13
  27:6
**tracking** 26:4,7
  31:18
**tracks** 26:8 28:16,23
  247:3
**traction** 43:14 44:8
  44:12,14
**trade** 170:22 294:6
**trades** 186:3 245:12
  260:18 293:23
**traditional** 80:12
  81:18 83:1 96:20
  99:3 100:22
  114:22 136:12,20
  219:21
**trained** 86:17
  121:24
**trainer** 10:3 12:14
  12:16
**training** 12:19,21,24
  13:2,2,7,9,12 30:9
**transactions** 40:2
**transcript** 306:11
**transcription**
  163:19
**transition** 109:12
  146:23
**transitional** 144:7
**Transmission**
  129:10
**transport** 9:22,23
**treat** 274:8
**trenches** 154:2,4
**trend** 63:19,22 64:3
  64:15 68:14 105:4
  218:14 222:6,10
**trends** 67:6,13 78:8
**trial** 206:6,6
**trier** 251:10
**trouble** 216:14
  270:21 296:12
  297:12,15
**troubled** 231:19
**true** 76:4 78:16
  85:12 116:12

117:20 122:12
154:15 216:18
247:9 249:5 257:6
258:21 261:18
262:12 266:22
267:3 268:10
274:15,17,21,25
283:11 297:4,8,9
299:10,21 306:11
**trust** 22:6
**truth** 202:17,22
212:19 213:2
**try** 7:13 150:25
162:11 166:13
247:21 253:13
290:10 293:8
300:13 301:16
**trying** 25:16 111:7
136:10 157:12
169:8 233:18
250:25 258:22
282:7 287:6 293:4
297:8,23
**tuition** 138:15
**turf** 162:12
**turn** 25:9 29:4 46:14
49:20 56:21 66:22
67:20 68:4 69:16
69:22 80:13 84:17
88:3 91:22 93:11
156:20 158:21
178:12 188:19
192:14 212:6
226:20 233:4
237:13 258:5
269:5 274:6
282:25 283:25
289:10 293:17
294:3 297:20
**turnaround** 34:22
**turning** 162:13
**turnover** 267:11
**turns** 222:25
**twelve** 117:16 146:8
146:9 164:9
175:12 283:8

286:19
**twelve-and-a-half**
152:24
**twelve-month**
164:12 165:16
**twenty** 67:11
**Twenty-three**
133:10
**twice** 83:9
**two** 5:22 9:16 10:2
20:22 26:2 37:2,21
38:4,7,12 39:1
42:1,6,18 58:7
59:23 90:17,18,24
95:8 106:11
115:23 116:6
120:7,21 121:15
135:5 143:15,15
144:8 152:19
161:14 172:14,20
175:9 184:18
185:7 198:19
201:11,14 206:15
227:8 251:15
255:14,19,20
259:1 265:12
277:22 278:12,22
279:2 280:8
**two-day** 43:11,13
**two-minute** 172:13
**two-page** 8:13
**two-thirds** 70:16
**two-tier** 148:8,12,15
200:18,21,25
201:1,9,10,24
202:1,3 209:16,24
**type** 10:24 25:3 78:8
78:12 80:9 90:10
91:4,25 96:11
103:23 115:5
136:15 145:11
165:3 175:18
203:4 284:12
**types** 10:25 11:1
38:25 90:17,18,24
98:16 99:19

**typical** 13:14 80:8
145:7 254:14
**typically** 96:21
136:18 293:8
**typo** 85:1,3 112:16
**typographical** 85:10
**typos** 85:20 86:7

---

**U**

**U** 56:8 103:3 128:17
**UAW** 3:10 19:14
36:11 37:2,15 43:6
46:19,21 47:1 88:6
88:9 133:23 145:7
145:12,17 146:3
146:11 154:7
201:13,17 212:9
213:23 214:7
228:2
**UCC** 20:20 48:1,4,5
48:12 51:10,12,22
51:23 53:18,21
54:4,6,7
**UCC's** 31:12
**Uh-huh** 93:19
**uisng** 9:12
**ultimately** 59:21
205:25 206:4
286:11
**Um** 39:2 238:12
**Um-hum** 46:17
49:22 245:20
**unchanged** 92:8
**underestimate**
74:24
**undergraduate**
174:19
**underprice** 181:5
**understand** 8:24
59:8 60:5 97:5
99:12 111:10
118:16 122:12
151:12 162:3,20
195:18 233:24
245:21 250:4
279:1 282:21

298:7
**understanding** 12:1
14:20 15:16 21:13
29:21 38:6,7,12,14
38:15,21 40:10
43:7 52:12 53:16
77:23 85:13 95:2
110:15 125:17,18
147:21 149:13
173:13 183:14
194:12,13 200:20
201:23 202:2
205:3 206:2,3
207:19 208:15
210:1,7,11 227:7
242:16 249:3
278:1,15 292:6,11
302:19
**understated** 287:25
**understates** 76:3,6
**underway** 110:8
**unfortunate** 120:20
**unfortunately**
191:17 231:16
**uniform** 257:16,19
257:20,20
**union** 7:19 13:5,8
19:19 20:3,7 22:20
24:8,11 26:12 27:5
27:7,7 29:19 33:21
38:22 46:6,7 48:7
49:15 50:14 53:5
55:3 83:12 109:12
114:20 129:14,15
133:6,23 134:11
135:3,6,11 136:5
137:15,17,20
140:4,25 141:17
142:13,16,22
144:20 145:1,6,7
145:20 149:12
151:17 156:25
157:1 171:5,6,7,9
171:11,19 172:5
203:16 212:14,19
214:25 216:12

217:18 227:1
228:7 236:22
243:11 248:5,22
249:24 250:11
255:11 258:25
259:1,6 274:25
277:13 280:2,12
281:6 282:25
293:5
**unionization** 250:12
**unionized** 137:14
153:1,3 160:6,8
171:1,23 209:9
211:11,12,18
222:8 228:2 283:8
**unions** 7:6,20 13:6
27:10 29:10,25
32:24 33:6,10 34:4
34:6 37:2,4,18,21
38:2,2,4,8,12,15
39:1 40:9,16,20,22
40:24 41:7 42:1,18
42:21 44:21 47:17
48:13,14,16 53:8
69:14 86:15 95:19
126:20 127:15
144:21 148:15
163:3,5 173:4,22
197:16 200:5
228:3 293:9
**union's** 19:23 31:11
38:20 51:24 205:5
205:7 249:12
255:16
**unique** 32:14 63:5
65:2
**uniquely** 100:3,12
**unit** 176:25
**united** 1:1,8,16
64:19,21 65:2,2,16
124:14,18 155:25
156:9 177:7 178:3
232:14,14 235:8
235:15,16,23
236:2 237:3,8,14
237:16,24 243:13

253:23 254:18
259:3 276:18,22
276:25 280:17
**universal** 147:23,25
**university** 57:7
174:15,22 175:10
242:23
**unlocked** 13:18
**unproductive** 209:1
**unprofitable** 201:19
**unsecured** 2:20
37:24 38:24 52:15
53:9
**unskilled** 260:21
**untimeliness** 197:2
**untimely** 196:13
200:8
**unusual** 204:7
**update** 19:2
**updated** 41:20 195:3
**updates** 42:23
**upgrading** 185:8
**uphold** 155:15
**uploaded** 10:15
**UPS** 255:13
**upward** 70:19
**Urban** 58:4,6,8,9,17
58:20 59:3,5 63:6
**usage** 16:14 17:8,10
19:1,23 28:16
31:11,12
**USAir** 177:9
**USAirways** 124:18
**USC** 5:15
**use** 9:6,8 12:5,9,17
12:22 15:18,18,25
18:11 20:3,20 21:5
26:5,8 32:3 87:23
100:6 103:15
106:25 136:23
137:3 150:16
166:4 176:16,17
184:18 205:16
220:24 224:10
246:4 249:18,22
249:23 263:19,19

267:18 283:19
286:15,16 287:4,4
288:2 289:21
**useful** 9:3 33:17
212:17 218:16
221:3 250:22
**user** 11:22,25 12:7
16:4 21:13 26:23
27:21 29:2 32:19
32:20 116:25
**users** 9:1 10:25
15:14,22 16:15
17:24 27:12
116:14 117:12
**user's** 32:18
**USW** 3:10 19:14
36:11 37:3,15
41:17 43:7 133:23
154:7
**utilize** 258:23
**utter** 292:18
**U.S** 112:12 113:21
135:16,18 138:6
143:17 150:2
212:20 218:12
219:17 257:4
271:8,19 281:1

———————
**V**

**V** 56:8 103:3
**vacation** 149:8
**vague** 303:3
**validate** 187:15
189:2
**validated** 185:6
188:8 209:2
**valuable** 78:18
241:12 242:4,7
**valuations** 39:8
146:7
**value** 105:22 118:17
118:18 146:2
148:1
**valued** 142:1
**values** 134:4
**variable** 45:2 48:9

54:24 55:10 180:9
180:13 222:18
249:20
**variance** 39:17
**variances** 276:9
278:2
**varied** 276:7
**varies** 199:17
262:14
**varieties** 113:18
**various** 36:7 38:18
43:8 49:14 51:20
106:1 144:22
159:19 166:22
167:20 170:19
198:21 205:22
212:9 235:16
258:1,1 276:10,15
276:15,21 278:3
280:16,21
**vary** 230:6
**vast** 66:13 155:10,11
167:6 243:16
**VDR** 8:25
**VEBA** 77:24 123:6
123:18 124:10
125:16,19,20,21
**VEBAs** 76:16,25
77:1,6,16 126:4
**vehicle** 228:1 233:20
234:11,17 235:5
236:13
**vehicles** 228:8
**vendor** 44:1
**venture** 122:24
**version** 107:1,1
112:1 135:8 172:5
**versus** 9:7 88:6
106:6,10,20
256:21 286:17
**viability** 59:1 65:22
292:15,24 293:12
**vice** 130:8,12 134:3
**view** 32:4 43:16 79:4
189:19 209:7
211:8 218:13

219:12 231:13
242:4 245:21
279:12,17 293:1
294:23 300:20
**viewed** 17:12,14,25
27:18,21 28:11
**views** 244:25
**violating** 114:6
**virtual** 8:24,25 9:6
9:10,16,18 10:1,4
10:7,14,17 11:3
15:13 36:12 38:1
**virtually** 137:15
165:3 169:3 170:3
218:25 222:20,20
**virtue** 121:3,17
171:10
**vision** 43:23
**visit** 96:13 183:17
200:25 201:14
272:23
**visited** 43:12 183:19
225:14
**visiting** 184:1
**visits** 183:23
**Visteon** 239:7
241:20
**voice** 4:23 5:7,8
**voir** 16:23,24 192:12
192:13 195:20
214:9,13,14 307:4
307:21
**volume** 17:8,21 19:1
**voluminous** 213:16
**voluntarily** 267:15
267:21,24
**voluntary** 76:25
187:17,19 194:11
201:13 267:12
**Voos** 179:2 204:21
205:19 207:22
209:22 210:8,11
210:14,18,21
211:16 217:1
222:12 223:14,18
224:21 226:15,16

226:23 227:9
228:24 230:22
231:11 245:7
248:11 250:19
261:5 262:19
**VPs** 60:17,21
**V.5** 244:11 269:6

---

## W

**W** 2:7 174:8
**Wachter** 174:6,11
177:22 192:14
197:15 200:17
203:6 212:6 214:6
214:9 219:12
232:11 233:4
251:16 252:14
268:6 275:21
287:17 307:20
**Wachter's** 196:18
197:6 200:7
248:21
**wage** 39:10,11
134:11 145:5
148:8,12,17,18
176:15 177:11,23
178:18 179:13,14
179:22,22,23,23
179:24 180:14
182:8 183:7,11
184:18 186:13,14
187:16 188:16
191:6,6 198:4,6
200:18,21 201:12
202:13,15 205:23
207:18 208:8,11
208:16,21 209:2,6
209:8,13,20
211:14 212:24
216:23 217:2,2
220:18 221:9
224:13 228:4,7
233:7,9,10,20
234:9,23 235:22
235:24 236:4
240:16,19 243:11

244:3,7,19,19
245:14,19 249:14
250:1,11 252:23
254:25 255:19,20
256:23,25 258:22
264:22 265:1,8,18
266:7,8,17,17,24
266:25 268:16,23
268:23 269:11,20
269:21 270:8,12
270:14 271:5,11
271:25 272:2
276:9 277:2,13,19
277:24 278:3,5
279:8,14,17,21
284:11 286:5,6,17
286:18 287:4,5
288:11 289:14,15
290:2,16 296:25
297:5,10 302:21
303:23
**wages** 176:24
179:17,19 180:1
181:22,25 182:4
182:13 184:16
188:9,12 198:24
199:6,7 200:11
208:17 209:23,25
210:23 220:23
223:3,3 233:19
234:17,24 235:1,5
235:24 236:9,12
236:12 237:7
240:10 241:3
242:4 243:11
244:14 245:11
254:25 255:12
256:21 264:6,10
266:13 270:22
272:15,16 274:18
276:6 278:2
280:20 281:1
283:6,7 284:12
286:16,20 290:5
290:21 291:7
292:25 293:7

295:14,17 296:14
296:19,21,21
297:14,19 300:3
301:16
**wage-and-benefits**
181:9
**wait** 98:10 251:8
**waiting** 140:17,22
**walk** 7:24 165:17
**walked** 112:3
**Wal-Mart** 247:13
247:15,17,20
**want** 4:23 7:17,23
9:6 26:22 36:23
38:17 50:10 74:8
78:3 79:8 97:20
151:11 159:21
178:2 180:2,5
182:25 188:3
195:10 196:18
208:19 221:18
224:10 225:12
229:2 234:24
235:1 239:1
244:24 251:20,22
254:10 258:17
275:24 279:1
282:20 288:20
298:7 302:15
**wanted** 11:24 12:20
15:24 119:1 127:4
225:8 243:4
253:11 266:7
**wants** 111:8 210:19
214:21 282:22
**Washington** 57:9
**wasn't** 34:5 52:2
77:9 87:16 190:9
**watched** 30:18,19
**watermark** 15:20
**watermarking**
15:18
**Watson** 60:5,8,9
61:3,4,5 63:7
74:10,12,16 75:6,8
87:13,15,25

wave 189:23
way 15:10 21:10
  48:19 77:15 81:22
  98:9,10 122:9
  129:13 136:3
  157:19 158:13,15
  159:12 162:11
  164:21 166:2
  188:15 204:14
  209:19 220:16
  224:9 227:15
  229:8 238:15
  241:16 242:17
  249:12 253:7
  270:17 290:8
  296:11 304:2
Wayne 41:19 171:6
  171:18,19 182:19
  199:10 231:3
  239:7,14 240:1,5,7
  244:14 269:7
  270:19 272:23
  273:3,16 293:23
ways 59:15 106:1
  110:10 113:17,17
  205:22 211:13
wear 272:4 274:4
wearing 272:7,17
  273:17
WebMD 169:2
website 6:15 9:1
  31:24,25 259:3
  280:3
weed 208:23
week 25:25
weekend 196:12,21
  196:25 200:2
  215:8 217:19
weeks 7:25 140:20
  140:23,23 259:4
weigh 146:2 212:4
weight 202:23
  217:21
Weirton 124:7
Weiss 3:9 19:14
  86:15 232:14

Weisser 30:15,16
wellness 137:6
  169:13,16
Wells 9:21
went 13:2 58:4 60:5
  78:21 105:9 120:7
  121:14 157:5,6
  171:18 175:7
  184:2 185:5
  245:10 270:2,8
weren't 99:25
West 3:11
western 204:25
  219:3
wet 273:19
we'll 5:8,18,19 7:3
  7:25 8:18 16:21
  19:4 73:21 84:3
  86:10 102:10,11
  127:20 128:1
  170:22 172:14
  174:3 178:10
  186:16 187:3
  192:9 199:24
  217:10 219:25
  221:11 243:7
  275:18 295:16
  304:9 305:6
we're 4:6 5:1 14:8
  37:1 38:18 42:8
  54:9 65:10 81:8
  91:7 97:2,16,24
  100:15 103:21
  106:18 110:18,20
  118:8 119:2
  122:14 123:10
  131:21 136:10
  142:2 156:5,18
  158:15 160:1
  169:14 172:18
  178:2 187:22
  191:9 197:4 199:3
  231:14 278:25
  282:6
we've 6:25 9:14,16
  39:10 40:1 42:23

42:24 43:10,10
  45:3 131:14,17
  144:21 148:14
  150:6 172:21
  186:5,5,20 203:22
  297:18,21
whatnot 11:15
Wheeling 121:14
  124:6
WHEREOF 306:18
wide 261:19
widely 276:7
wider 224:1
William 174:14
willing 38:18
winter 274:11
Wireless 35:9
wisely 95:14
wish 241:14,14
  290:14
withdraw 8:10 92:5
Withdrawn 50:10
witness 4:7,7 5:6
  7:24 8:4 21:24
  22:1 25:19 34:10
  34:12,15 55:23,25
  56:3,5,6,14 66:21
  69:17 80:14 84:11
  95:24 101:3
  103:10 104:9
  128:7,11,16
  133:10 174:2
  175:22,24 176:18
  177:6 178:1
  185:11 196:10
  207:13,16 211:23
  225:6 230:5,16
  232:24 247:18
  248:7 253:23
  259:18 261:1
  282:22 284:8
  285:17 287:10,19
  306:18 307:2
women 57:25
wondered 85:20,22
wondering 190:1

Wonderland 215:15
word 245:25 249:22
  259:24 263:19
  267:18
words 88:3 118:7
  145:14 158:16
  161:24 164:15
  165:24 194:9
  234:18 245:2,17
  248:25 255:7
  258:18 284:18
  286:23 287:2,15
  287:16 292:18
  296:22
work 7:14 10:15
  27:3 35:5,7 36:18
  36:18 51:1,5 62:13
  69:7 80:5,6 108:18
  129:3,9 131:11
  143:7 148:25
  149:4 156:2,4,12
  158:14 162:2
  165:23 176:4
  177:13 203:20
  208:18,21 209:15
  214:5 222:21,22
  236:1 244:4
  258:15,23 259:12
  260:2,9 261:14,15
  261:20 262:6,8,13
  263:5,9,20 274:18
  275:6 295:13
worked 45:25 46:2,4
  57:10 59:18 63:2
  74:16 87:25
  129:13,18,24
  184:25 201:3,13
worker 82:16 177:1
  184:21 187:17,19
  189:25 210:23
  220:19 225:18,19
  225:20,22,25
  244:7 257:4
  261:20 271:7
  277:12 299:24
  303:22

**workers** 66:20 68:11
68:13,22,24 71:4,8
71:16,17 72:9
80:11 81:20 82:15
92:1 104:1 105:20
105:24 149:7
155:16 160:6,8
161:25 165:13,14
171:5,6,7,19
179:18 181:4
184:5,10 185:13
185:16,17,19,20
185:21,22 186:6
187:20 189:3
190:15 191:4,4,4,7
191:7,8,10,11,13
191:16,19,21,24
192:2 193:22
198:18 200:11
201:11,12 202:1,2
202:3,11,14 203:9
203:20 205:23
206:14 208:18,18
208:23 209:1,14
209:23,24 210:2
210:22,25 211:6
220:22 221:6
222:18,19 223:23
224:6 225:22
227:19 228:15
229:10,22 230:9
231:20,21 232:3
232:14 235:25
240:11,17,20
241:3 243:11,12
244:14 250:16
255:1 256:6
257:22 259:13
260:3,14,14,19,21
263:4,9 264:7,8,11
264:12,14,16,18
264:18,21 265:7
265:11,12,15,19
266:7 267:5 268:9
268:12 270:6,15
270:18,21 271:1,6

271:13,14,14
273:16 274:8,15
275:4 277:3,11,20
277:20 278:6,6,7,8
278:10,14,14,19
279:9,10,13,20,21
279:24 283:8
289:21,23,24
293:23,25 294:7,9
294:14,21,23
295:1,8,13 296:13
296:20 297:16
298:16,18 299:6
299:18 300:1,2,4,6
301:22,23,25
302:4,7,8,9,20
303:6,22
**workforce** 62:21
199:21,23 204:18
231:23 235:22
265:7 266:19
297:13
**working** 42:8 57:8
59:23 62:22 63:10
129:4 175:12
183:2 184:6
208:24 271:1,5,7
271:12,15,17,19
271:24 272:1,10
272:15 284:13
294:15,24
**workings** 130:13
**workload** 131:23
**works** 21:10 152:10
242:17
**workstations** 184:2
**world** 215:11
**worldwide** 6:10 60:6
156:5
**worry** 277:14
**worse** 190:2
**worth** 79:8 115:20
191:1
**Worthwhile** 96:17
**wouldn't** 48:3 96:19
96:20 99:11

117:20 232:1
258:6 285:13
**wrist** 273:19
**write** 61:16 284:18
286:23 287:2
**written** 48:19 60:16
197:1 203:11
213:15
**wrong** 276:20 296:9
**wrote** 57:23 61:18
297:9
**Wyatt** 60:5,8,9 61:3
61:4,5 63:8 74:10
74:12,16 75:6,8
87:13,15,25

---

## X

**x** 1:3,7 307:1
**Xerox** 104:18
**xl** 24:4,8,10,13,14,17
24:18,20,22 25:1,3
25:5 31:4,6 33:21
33:23 44:17,18,20
44:23,24 45:4,6
47:16,23,24 48:1,6
48:10,12,16,18
49:2 54:24 55:8,14
**xls** 24:14

---

## Y

**Y** 4:15 34:16 56:8
103:3
**Yeah** 122:11 267:17
**year** 72:15 76:12
80:2,3,24 81:2
93:14 103:24
109:12 114:21
115:13,15 116:5,9
116:10,13 117:18
136:23 143:22
144:2,3,3,9 146:21
152:7 153:8,15
160:3 164:7,14
166:25 167:1,2
169:22 170:3,7,8,9
170:10 171:19
175:10,11 176:20

191:11 267:14
**years** 6:4 35:1 49:15
57:12,14 58:7 63:2
63:16 67:11 74:17
75:2,7 78:14 87:7
110:3 112:22
115:24 116:6
129:8 131:1
136:24 144:15,16
145:15,18,22
146:18 150:11,13
150:18 151:25
155:1 171:22
175:9 176:3,7
177:5 189:18,19
220:25 268:17
274:22 279:12
**year's** 115:20
152:17
**yesterday** 40:7 41:4
161:5 173:6
**York** 1:2,10,10 2:6,6
2:22,22 3:6,6,12
3:12 306:2,4,8
**young** 65:5
**younger** 65:7
**Yup** 53:20

---

## Z

**zero** 170:8 199:9
**ZF** 239:9
**ZIDE** 2:25
**zip** 32:14

---

## $

**$1,115** 83:9
**$1,130** 82:16
**$1.9** 147:25
**$11.05** 268:15,22
**$13** 268:16
**$130** 82:19,20
**$16** 145:19,22,24
**$2** 175:11
**$200,000** 151:15,16
152:7
**$21.76** 261:14
**$24** 229:6 230:10

**$26** 229:7
**$26.11** 227:5,21
  230:11,24 231:1,9
**$26.54** 231:3
**$26.72** 230:10
**$27.43** 260:3
**$29.03** 231:3
**$29.14** 227:6
**$31.41** 227:6
**$32.50** 145:17
**$361** 114:21
**$37.43** 259:13
**$45,000** 152:20
**$488** 83:7
**$667** 146:10
**$68,000** 150:19
**$7.5** 164:1
**$750** 82:4
**$754** 82:24 116:5
**$9.50** 261:15
**$90,000** 152:9
**$96,000** 146:1,1,8
**$975** 145:20

---
**0**
**04** 150:4
**06-10354** 1:5

---
**1**
**1** 18:17 29:5 56:21
  56:24 84:20,21
  90:12 106:25
  107:19 118:10
  132:20 133:16,20
  143:8 198:25
  210:2 227:1 260:3
  261:15 262:6
  264:12,14,15
  265:11 266:7
  308:10
**1st** 140:12 141:14
  150:6,20
**1,130** 82:17
**1,700** 150:12
**1.4** 118:11
**1.6** 192:5
**1/1** 138:21 140:16

**1/1/07** 139:19,24
**10** 49:23 50:4 98:12
  100:17 233:5
  305:10
**10th** 30:7,9
**10:02** 1:12
**10017** 2:6
**10036** 2:22
**10038** 3:6,12
**1006** 213:14
**11** 35:3,5 67:22 68:3
  68:4 70:23 74:8,10
  86:25 98:21
  107:24 138:4
  142:11,24 162:17
  162:25 221:20
  237:13 245:13
  269:24 288:8
  293:23
**11.05** 268:19
**11.13** 230:21
**11/30** 47:4,6
**1113** 4:7 35:13 41:7
  46:20 47:2,5,9,12
  131:25 135:2,10
  153:14 157:21
  160:13,17 161:15
  161:21 162:5,5
  163:6 173:9,14
  183:13 186:21
  215:11 235:9
  245:13 266:14,18
  267:1,4 269:12
  281:23 288:12,14
  290:21 291:6,20
  292:7 293:11
  294:13 300:25
**1113/1114** 10:14,22
  12:23 14:1,12
  29:11 33:18 36:1,8
  38:1 45:25 46:3
  50:8 51:12,13,14
  54:10
**1114** 4:7 35:13 76:14
  76:19 77:11
  121:22 131:25

**113** 103:15,19
**1177** 2:21
**12** 108:11 168:16
  170:6 248:13,20
**12th** 44:10
**12:30** 102:14
**120** 274:11
**126** 307:14
**128** 307:15
**13** 84:20 108:14
  132:23 170:6
**13.25** 286:18
**13.62** 294:24 295:2
**130** 274:11
**133** 68:4 308:10
**134** 70:23 71:1,10
**139** 308:11
**14** 40:18 74:13
  140:22 186:1
  282:25 283:4
  285:16
**14.23** 286:17
**14.9** 192:6
**14.95** 261:13
**140** 6:9
**149** 308:12
**15** 78:14 96:23
  132:23 264:25
  265:3 286:14
  305:5
**15.1** 157:2
**151** 307:16
**16** 307:4
**161** 83:6
**163** 307:17
**164** 74:12
**17** 147:8 227:1,1
  233:5 308:3
**17th** 217:16
**173** 307:18,19
**174** 307:20
**179** 308:13
**18** 63:2,16 93:20
  212:18
**180** 3:5
**185** 259:5

**187** 308:14
**19** 47:25 74:4 130:7
  283:25 284:4,11
  289:17 307:5
  308:4
**19th** 48:14 54:24
  55:4,8,12
**19.2** 146:20
**192** 307:21
**1964** 174:21
**1968** 129:6,9
**1969** 219:16
**197** 307:22 308:15
**1970** 174:22
**1970s** 176:8
**1973** 175:2
**1974** 129:22
**1976** 161:18 175:4
**1978** 129:25
**1980** 176:14,15
  177:16 218:25
  219:5
**1980s** 177:16 189:15
**1981** 176:19 254:2
  256:23,25
**1984** 175:5
**1988** 68:11 69:4,5,6
**1989** 57:11
**1990** 130:5 132:22
**1993** 64:5 132:22
**1996** 219:8
**1997** 175:6
**1998** 6:7
**1999** 130:8 175:14
  253:25 254:19
  257:2

---
**2**
**2** 6:12 68:9 83:18
  102:12 111:25
  114:15,19 117:15
  264:18,21 265:15
  280:5,6,12
**2,000** 161:19 162:4
**2,600** 161:19
**2,700** 14:8 17:23

37:25
**2:02** 103:2
**20** 46:15 83:6 146:25
   147:3 192:19
   258:5 261:4
**20th** 49:25 50:5
**200** 308:16
**2000** 59:9 60:4 146:6
   212:21
**2001** 78:20
**2004** 39:15 45:4 49:1
   115:15 116:11
   131:4 189:18,22
   192:4 221:21
**2005** 39:9 61:5,25
   70:3,10 71:21,22
   74:12 138:20
   157:1 189:18,23
   192:18,22 215:9
   261:13 283:10
**2006** 10:8,13,16
   13:25 22:14 29:24
   30:7 33:14 39:11
   39:18 40:23 45:5
   49:2,25 50:5 67:1
   69:9 70:12 71:11
   71:24 82:16 84:10
   84:12 89:19,23
   92:7 93:4,15
   100:18 101:2
   104:15 114:20
   115:12 118:10
   127:23 138:21,23
   151:13,14 152:15
   152:16 153:8
   156:24 160:25
   163:6 164:10
   189:18 192:18
   193:1,4 200:6
   212:18 215:9,10
   215:10 217:16
**2006-2007** 40:25
**2007** 1:11 39:19
   40:13,14,14,19
   43:16 44:25 45:3
   48:15 54:23 55:7

80:19 94:25 97:2,4
97:12,17 107:3
108:9 109:10,13
112:9 114:21
118:22 126:5
134:16 135:21
138:24 140:13,16
141:15 143:9
159:4 160:3,7,9
172:4 178:20
195:2 196:3
306:10,19
**201** 216:5
**205** 218:18 219:25
   220:8 308:20
**21** 73:20 74:3 104:19
   104:22 263:24
   289:10 297:20,24
   298:1,2
**215** 308:17
**217** 308:18
**22** 89:15,18 93:1
   103:25 140:20,23
   290:1,22 293:1
**220** 308:19,20
**222** 2:5 308:21
**23** 133:3 137:25
   139:2,5 162:13
   163:16 168:15
   298:9,13 308:11
**23rd** 42:6,6 44:7
**232** 307:23
**24** 95:25 100:15,17
   157:17 192:15,25
   287:5
**24/7** 9:11 13:13
**240,100** 212:20
**25** 149:19,22 152:23
   308:12
**26** 109:7 228:10
   239:2 266:9,10
**26th** 49:4
**26.11** 227:17 228:6
   229:1
**27** 1:11 306:10
**27th** 49:4

**28** 41:12,17 56:22
   173:10,13 273:8
   273:13
**28th** 43:24
**29** 227:22,24 228:11
**29th** 41:2 306:19
**29.14** 228:6

---

**3**

**3** 16:11
**3rd** 40:22 55:6
**3.2** 286:15
**3.3** 283:3 285:16
   286:15
**30** 126:5 248:6,22
   274:6
**31** 66:22 70:23 73:2
   84:11,15 89:25
   93:2,21 104:24
   160:25 227:23,24
   228:11 248:12,21
   249:16 250:6,24
   251:18 281:6
   283:1 307:6 308:8
**31st** 18:22,23 49:8
   195:2
**31.41** 228:6
**32** 80:14 81:5,12
   84:20,22 85:8
   107:2 108:20
   109:3 236:22
   251:5 308:6
**32,000** 145:25
**327** 83:5
**33** 244:12 252:15
   269:5 287:5 290:1
   290:22 293:1,17
   294:19,19
**330** 3:11
**34** 81:15 83:16 84:7
   111:25 114:14
   115:12 126:16
   307:7,8 308:7
**35** 68:13 114:18
   117:15
**36** 227:1,13 258:25

259:1,6 280:2
**37** 237:14 286:13
**38** 118:8 119:23
   193:1 194:8,9,10
**39** 129:8 295:20,21
   295:23 296:25

---

**4**

**4** 18:18 19:4,8 29:5
   69:22 88:4 94:24
   194:15 288:22
   307:3 308:4
**4,100** 37:23
**4.2** 265:6 289:11,22
**4.3** 298:14 300:11
**4.5** 192:23 268:24
**40** 108:15,17 116:16
   116:22 150:19
   275:17
**401(k)** 134:21
   159:12,15
**41st** 2:5
**42nd** 3:11
**44** 93:22
**44114-1190** 2:13
**45** 152:4,5 275:17
   281:10 307:9
   308:5
**46** 181:17 182:15
   183:4 184:8
   186:16,24 187:7
   198:16,24 228:20
   229:5 230:3
   308:14
**47** 294:3

---

**5**

**5** 30:3 56:15,21 74:9
   84:19 85:17 86:4
   91:22 193:4
   194:15 252:15,15
   252:15 275:22,25
   308:9
**5.5** 253:16 293:18
**5.75** 109:11 133:4
**50** 82:24 119:2
   140:23

**500** 143:2
**51** 120:2 124:21
**52** 131:7
**54** 71:13,14,15,19,25
   307:10
**540** 141:25
**55** 71:22 186:24
   198:11,16 199:25
   200:15 229:25
   230:19 299:16
   300:12,23 301:1,2
   301:12 303:5
   307:11 308:16
**56** 122:14,16 123:2
   186:24 188:20
   189:7,18 192:10
   192:22 197:10,12
   307:12 308:15
**57** 123:10 124:20
   212:7 213:10
   215:22 308:17
**58** 216:8 217:10,14
   217:22 308:18
**59** 217:25 219:24
   220:6 308:19

────── **6** ──────
**6** 74:14 146:4 259:9
   275:23,25
**60** 70:4 71:19,23
   108:18 220:10
   221:12 222:3
   308:21
**600** 161:20
**61** 126:3,3
**62** 145:18,21
**624** 82:23
**65** 82:15 114:3
**66** 16:21 17:5 18:6
   25:10 68:11 69:4,6
   308:3
**67** 6:13 7:3 8:17,20
   308:2

────── **7** ──────
**7** 45:8,12 50:3 92:20
   93:11 156:20

   261:14 289:17
   297:20 308:5
**7th** 41:22 49:10,16
**7.5** 133:7 163:14,19
   192:7 294:3
**7.7** 90:16 91:8,9
**7:25** 305:11
**70** 140:19 185:21,23
**72** 41:12 238:22
   239:2 240:20
**73** 203:1
**75** 61:13 176:3

────── **8** ──────
**8** 30:3 127:12 158:8
   178:13 179:6,9
   284:3 308:2,13
**8th** 40:16 42:4,5,10
   44:22 55:13
**80** 66:14 176:4
   185:23
**800** 13:13,21
**81** 308:6
**82** 72:11,16
**84** 308:7,8
**85** 57:7
**86** 307:13 308:9

────── **9** ──────
**9** 7:9,20 46:14 69:22
   70:1 71:6 87:14
   134:9 158:22
   160:16 163:14,21
   261:8 273:7,13
**9th** 17:1 196:3,10,12
   197:3 200:5
   217:18
**9.4** 193:5 267:13,15
**90s** 119:15
**901** 2:12
**95** 59:9 142:6,7
**99** 254:3

**EXHIBIT G**

1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   ------------------------------------x

4   In the Matter of

5          DANA CORPORATION,           06-10354

6                         Debtor.

7   ------------------------------------x

8                         United States Bankruptcy Court

9                         One Bowling Green

10                        New York, New York

11                        March 28, 2007

12                        10:10 a.m.

13

14  B E F O R E:

15         HON. BURTON R. LIFLAND,

16                        United States Bankruptcy Judge

17

18

19

20

21

22

23

24

25

2

```
 1   A P P E A R A N C E S:

 2

 3           JONES DAY

 4           Attorneys for Debtors

 5                222 East 41st Street

 6                New York, New York 10017

 7           BY:  JAYANT W. TAMBE, ESQ.,

 8                STEVEN BENNETT, ESQ.,

 9                PEDRO A. JIMENEZ, ESQ.

10                     -and-

11           JONES DAY

12                901 Lakeside Avenue

13                Cleveland, Ohio 44114-1190

14           BY:  HEATHER LENNOX, ESQ.,

15                ROBERT HAMILTON, ESQ.

16                CORINNE BALL,ESQ.

17                RICHARD F. SHAW, ESQ.

18

19           KRAMER LEVIN NAFTALIS & FRANKEL LLP

20           Attorneys for Committee of Unsecured Creditors

21                1177 Avenue of the Americas

22                New York, New York 10036

23           BY:  THOMAS MOERS MAYER, ESQ.

24                THOMAS H. MORELAND, ESQ.

25                STEPHEN D. ZIDE, ESQ.
```

3

```
 1   A P P E A R A N C E S (Cont'd.):

 2

 3           STROOCK & STROOCK & LAVAN LLP

 4           Attorneys for Ad Hoc Committee of Note Holders

 5               180 Maiden Lane

 6               New York, New York 10038

 7           BY:  SHANNON LOWRY NAGLE, ESQ.

 8

 9           COHEN, WEISS & SIMON, LLP

10           Attorneys for UAW and USW

11               330 West 42nd Street

12               New York, New York 10038

13           BY:  BRUCE SIMON, ESQ.

14               BABETTE CECCOTTI, ESQ.

15               PETER DeCHIARA, ESQ.

16               BRUCE LEVINE, ESQ.

17               DAVID R. HOCK, ESQ.

18

19

20

21

22

23

24

25
```

4

1            P R O C E E D I N G S

2            THE COURT:  Be seated, please.

3            MR. DeCHIARA:  Good morning, your Honor.  I'd

4    like to complete the cross-examination of Dr. Wachter.

5            MR. TAMBE:  There's one other matter, your

6    Honor, that's on the calendar.  It should take roughly five

7    minutes.  Mr. Jimenez will present it.

8            MR. JIMIENEZ:  Good morning, your Honor, Pedro

9    Jimenez of Jones Day on behalf of the debtors.  Your Honor, on

10   March 14th, the debtors filed a motion to assume a lease

11   related to a Rochester Hills facility.  We served the a copy

12   of the motion on the same day, on March 14, and to date have

13   not received any objections.  I conferred with counsel for the

14   creditors committee prior to the hearing and was advised that

15   the creditors committee had no objection, and actually

16   supported the motion.  I've brought a copy of the order with

17   me.  I'm also prepared to give the court an explanation and a

18   summary of the new lease terms if your Honor wishes.

19            THE COURT:  Go ahead, very brief.

20            MR. JIMIENEZ:  Your Honor, currently, the lease

21   has a life of approximately 14-and-a-half years and the

22   debtors are paying approximately $121,046 per month on the

23   lease.  Pursuant to the amendment that was entered into with

24   the lessor, the rent has been reduced by approximately 45

25   percent to $67,183.33, and the term has been reduced from 15

5

1    years to three years and the amount of the claim that the

2    lessor would get has been reduced from approximately $4.5

3    million to $2.75 million.  And finally, the debtor would pay a

4    cure payment of approximately $59,569.40 based on the amended

5    terms of the lease.  The debtors concluded in their business

6    judgement that the amended lease was beneficial to the estate

7    and made the decision to assume the lease.

8                    THE COURT:  Does anyone want to be heard?

9    There's no response.  Your application is granted.  I'll

10   entertain the order.

11                   MR. JIMIENEZ:  Your Honor, I've got a copy of

12   the order both on paper and disc, if I could approach.

13                   THE COURT:  Yes.  I have approved the order.

14                   MR. JIMIENEZ:  Thank you, your Honor.

15                   MR. DeCHIARA:  Your Honor, if we could call

16   Dr. Wachter back to the stand to complete his

17   cross-examination?

18                   THE COURT:  Doctor?

19   M I C H A E L    W A C H T E R ,    having been previously

20                   sworn, resumed the stand and testified further as

21                   follows:

22                   MR. DeCHIARA:  For the record, I'm Pete DeChiara

23   from the law firm of Cohen, Weiss & Simon for the UAW and USW.

24   CROSS-EXAMINATION BY MR. DeCHIARA (Cont'd):

25                   Q.   Good morning, Dr. Wachter.

6

1              A.    Good morning.

2              Q.    Do you know the quit rates of Dana's competitors

3      in the auto parts industry?

4              A.    No, I do not.

5              Q.    And the quit rate data that you provided in

6      Debtor's Exhibit 56, which appears behind tab D of the

7      looseleaf binder, the -- are you there?

8              A.    Debtor Exhibit?

9              Q.    It's 56, behind tab D.

10             A.    Yes.

11             Q.    You have data on the private sector quit rate

12     and the manufacturing industry quit rate.  Do you see that?

13             A.    Yes, I do.

14             Q.    Neither of those sets of data are limited to

15     firms that have over one thousand employees; is that correct?

16             A.    Yes.

17             Q.    That is correct?

18             A.    Yes.

19             Q.    You testified about obtaining certain

20     information about the incumbent tier 2 employees at Auburn

21     Hills, do you recall that testimony?

22             A.    Yes, I do.

23             Q.    And do you have specific data on what the quit

24     rate is among the incumbent tier 2 workers at Auburn hills?

25             A.    The encumbered --

7

1          Q.    Incumbent tier 2 workers at Auburn Hills.  Do

2    you have specific data?

3          A.    No, I do not.

4          Q.    But you were told by the plant manager certain

5    things about that --

6          A.    That they were, when they originally posted the

7    openings, they had a flood of applicants.  They were able to

8    choose freely among them, and they -- they have been able to

9    retain the ones they hired, they wanted to keep, and those

10   workers are as good as the incumbent workers.

11         Q.    Do you have any data on how many of those have

12   quit over any period of time?  Do you have any data?

13         A.    I do not believe I do.

14         Q.    By the way, was that the same Auburn Hills

15   management that made that enormous error initially that you

16   needed to correct, as, in your -- in Exhibit 56?

17         A.    It certainly wouldn't be the same person.

18         Q.    But it was the Auburn Hills management that made

19   that error?

20         A.    I would believe that the error was made

21   clerically by somebody in an office collecting data.  It was

22   certainly not the plant manager's error.

23         Q.    Is that speculation on your part or do you have

24   firsthand knowledge as to that?

25         A.    I guess it's speculation based on --

8

1          Q.    Okay.

2          A.    -- what a plant manager normally does and what

3    clerical support normally do.

4          Q.    The cost of Dana providing life and health

5    insurance to its current retirees is a fixed, not a marginal

6    cost, correct?

7          A.    I'm sorry, say that again?

8          Q.    The cost of Dana providing life and health

9    insurance to its current retirees is a fixed, and not a

10   marginal cost, correct?

11         A.    You stated it differently the second time than

12   the first time.

13         Q.    Well, why don't you answer the second time I

14   stated it.

15         A.    There's a technical question.  Let me give you a

16   full answer to it, if I can.

17              "Fixed" and "variable" are economic terms,

18   meaning does it vary with output.  It is certainly the case

19   that retiree costs do not vary with output.  However, they are

20   continuing costs of the firm.  And they are not paid once and

21   then not paid again.  There are continuing annual obligations

22   resulting from the collective bargaining agreement and

23   therefore, properly viewed as labor costs.

24         Q.    But they are a fixed cost.

25         A.    They do not vary with output.  They have to be

9

1    paid each year.

2          Q.    In determining its labor costs, for purposes of

3    bidding for new business, it's correct, is it not, that Dana

4    should not include those costs of providing retiree health and

5    life insurance to its current retirees?

6          A.    Not on bidding, but it would certainly show up

7    in the P&L.

8          Q.    The questions was -- excuse me, let's just get

9    the record clear.  The answer to my question was yes, I am

10   correct?

11         A.    You asked a theoretical question and I answered.

12   I do not know how they do the bidding.

13         Q.    No, it's not a theoretical question.  Would it

14   be proper, forgetting about how they actually do or don't do,

15   my question is, and let me just to make the record clear, it

16   would be proper, would it not, in determining its labor costs

17   for purposes of bidding for new business, for Dana not to

18   include the costs of providing retiree and health insurance to

19   its current retirees?

20         A.    That would be entirely a management decision.

21         Q.    Professor Wachter, did you testify in the Delphi

22   case?

23         A.    Yes.

24         Q.    I'd like to show you a document that the been

25   marked as Union Exhibit 34.  Which I will represent to you is

1    a copy of the transcript from May 10th, 1996 in the Delphi

2    Section 1113 hearing.  And I would ask to you turn to page

3    170.  And I'm going to refer you to a certain sentence, but

4    feel free to look at the entire document in answering my

5    question.

6              It's the -- are you on page 170?

7         A.   Yes.

8         Q.   It's the third answer, the third text after the

9    third letter A.  It says there, "There was a -- in bidding for

10   new business, you would not include legacy costs because they

11   are fixed costs and not marginal costs."

12             Was that your testimony?

13        A.   That was, and that was the way I tried to answer

14   your question until you restated it in a way that forced me to

15   give a different answer.

16        Q.   Okay.  But you would stand by the testimony I

17   just read from the Delphi case?

18        A.   If you're doing marginal cost bidding, which was

19   the setting in which I was answering the question, if you're

20   going marginal cost bidding, you would not -- it's clearly a

21   management decision as to whether or not they want to do

22   marginal cost bidding.

23        Q.   When the Bureau of Labor Statistics provides

24   data on employee costs, it does not include the costs that

25   firms pay retiree life insurance to its -- to their retirees,

11

1  correct?

2          A.   It's correct, and it's my understanding the

3  reason for that is that it's so unusual in the private sector.

4          Q.   In Delphi, in preparing your comparability study

5  in Delphi, you looked at data on the total compensation of

6  Delphi's competitors in the auto parts industry, correct?

7          A.   Yes.

8          Q.   Now, you did not only look at data concerning

9  compensation paid by financially successful competitors,

10 correct?  You did not limit it to that subset.

11         A.   I included all the data that was given to me.

12         Q.   And as far as you know, that data was not

13 limited to financially successful competitors; is that

14 correct?

15         A.   Certainly not.  Much of the data was collected

16 by GM and would be the data provided by companies that had

17 succeeded in winning GM's business away from Delphi.

18         Q.   And that was one of three sets of competitor

19 data that you relied on?

20         A.   Yes, that's correct.

21         Q.   And overall, that data as far as you know is not

22 limited to only the financially successful firms, correct?

23         A.   Correct.

24         MR. DeCHIARA:  I have no more questions.  I

25 would like to move into evidence Union Exhibit 36, which is

12

1    the excerpt from the Bureau of Labor Statistics document that

2    I questioned the witness about yesterday.

3             MR. BENNETT:  Is there a complete version of

4    this?

5             MR. DeCHIARA:  It is, it's actually Company

6    Exhibit 185.

7             MR. BENNETT:  Does that go in at the same time?

8             MR. DeCHIARA:  I happily stipulate to that.

9             MR. BENNETT:  No objection, your Honor.

10            THE COURT:  Received.

11            (Union Exhibit 36, received in evidence, as of

12    this date.)

13    REDIRECT EXAMINATION BY MR. BENNETT:

14        Q.  Professor Wachter, I think you had been asked

15    yesterday about benefits data at the plants and the question

16    had to do with whether the benefits data at the plants

17    included benefits applicable to non-hourly employees such as

18    plant managers, et cetera.

19            Are you sure the data that you included had such

20    non-hourly employees in there?

21        A.  It was pretty clear to me after I said it that

22    it was wrong because that data only did include the unionized

23    work force.

24            MR. BENNETT:  Nothing further, your Honor.

25            MR. DeCHIARA:  Nothing further, your Honor.

13

1          THE COURT:  Thank you, sir.

2          (The witness is excused.)

3          MR. TAMBE:  Your Honor, subject to the recall of

4     witnesses, rebuttal witnesses on the presentation of the

5     union's case, debtors have no further witnesses on the

6     1113/1114 hearing.

7          MR. SIMON:  Your Honor, the Steelworkers and

8     Auto Workers Union move for a dismissal pursuant to Rule

9     56(d).  Even in this court, chosen by this debtor through a

10    paper corporation for jurisdictional purposes because of its

11    decisional track with regard to Section 1113, I say even in

12    this court, to argue that it is necessary to impose $20

13    million worth of labor cuts in an eight-billion-dollar

14    company, one quarter of one percent in effect of the costs of

15    the company, is absurd and cannot possibly meet any reading,

16    however expansive, of the word "necessary."

17               Even in this court, the argument that the

18    relevant labor market is not employees in the industry in

19    which the applicant is a participant, is not something that

20    this court has looked to in the past.  This court has been

21    solicitous of competitors in the industry, and the ability of

22    the debtor to compete with competitors in the industry and in

23    the relevant market with respect to labor.  I am aware of no

24    case in which a court has, even this court, has issued an

25    order of rejection based upon an academic notion of a national

14

1    labor market in the total American economy as opposed to

2    focusing on the competitive set of competitors in the same

3    industry and typically, in the local labor market.

4                Even in this case, even in this court, the

5    argument that the total elimination of retiree health benefits

6    is necessary for reorganization is something I am aware of no

7    court granting.  Modification, yes.  That's been proposed.

8    Reduction, yes, if that's been proposed.  Total elimination?

9    Nay.

10               In addition to the "necessary" argument, in

11   terms of "fair and equitable," we have a settlement with the

12   retiree committee with a payment of $78 million against a

13   liability perhaps of $400 million of OPEB, where you have a

14   billion dollars of OPEB liability here, with no liability

15   whatsoever made with respect to the amelioration of that

16   extent of the claim.

17               Even in this court, the notion of "fair and

18   equitable" should have some bearing upon the manner in which

19   1114 is applied to those circumstances, particularly where, as

20   your Honor is aware, the case for the non-union retirees with

21   respect to retiree medical was a far lesser, far less

22   well-based-in-law argument than with respect to union

23   retirees.  And this court indicated at the conclusion of the

24   presentation of the settlement the other day that this court

25   had been prepared to issue that order, and debtors' papers are

15

1    replete with statements of the level of their confidence in

2    their ability to terminate such benefits for non-union

3    employees without the necessity for an 1114 order.  So on a

4    "fair and equitable basis, as well as a "necessary" basis,

5    there is no basis for issuance of the 1113 or the 1114 relief

6    sought.

7                Further, as we indicated earlier, we believe

8    that dismissal is necessary because the debtor is seeking from

9    this court a remedy which the statute does not provide.  It

10   seeks not an order of rejection, which is what Section 1113

11   provides your Honor may do; it seeks authority to implement

12   upon the issuance of an order authorizing them to implement.

13                That, in effect, your Honor, is a bald-faced

14   effort to achieve leverage in what they have testified are

15   their plans to do in the event your Honor issues an order.

16   And that is not to implement but rather, to bargain.  All they

17   are seeking is leverage in their post-order bargaining.  That

18   is to say, after you issue an order, they want to then use the

19   leverage that order gives them for bargaining purposes.

20   That's not what 1113 is all about.  That's not what 1113 says.

21   That's not what this court is authorized to do.  That's what

22   they have asked for.  It's beyond the power of this court, and

23   as a consequence, the motion to dismiss should be granted for

24   that and the other reasons indicated.  Tank you.

25                MR. TAMBE:  The motion, your Honor, should be

16

1  denied.  What you have seen in the last three days of

2  hearings, start --

3               THE COURT:  Mr. Simon's motion?

4               MR. TAMBE:  Mr. Simon's motion.

5               THE COURT:  Not yours.

6               MR. TAMBE:  No, we certainly hope you grant our

7  motion.  The only motion you're being asked to rule on right

8  now is the one that Mr. Simon just raised.  Your Honor, what

9  we have demonstrated through our papers and through the

10  testimony that was put on through several witnesses, including

11  the chief restructuring officer of Dana, is first of all, the

12  competitive nature of the industry in which Dana finds itself

13  and the nature of Dana's finances when compared to what's

14  going on with our competitors.

15               There's conclusive testimony presented by

16  Mr. Stenger that he discussed at length on Monday about what

17  the competition looks like, and what the competition is likely

18  to look like in the coming years, and how Dana needs to

19  fundamentally change its cost structure in order to compete.

20  It needs to fundamentally restructure its U.S. operations in

21  order to compete effectively.

22               That is the benchmark, that is the target that

23  we have set, is to compete against that set of competitors.

24  There's been no evidence submitted by the unions in any of

25  their declarations, and we submit there will be none submitted

17

1    on the stand that challenges Mr. Stenger and the company's

2    evidence on that ground.  This is an issue about making Dana

3    competitive so that it not just barely comes out of

4    bankruptcy, but that it comes out of bankruptcy as a viable

5    company, as a company that will not reenter bankruptcy.  And

6    that is the proper test.

7           Now, in terms of the dollar savings, what we're

8    seeing here is a theme that is repeated in many 1113 and 1114

9    motions where what you see is the opponents of the motion

10    trying to cherry-pick off little bits and pieces of the

11    overall restructuring strategy that is put forth by the

12    company.  What you saw and what you heard from Mr. Stenger on

13    the stand was the comprehensive step-by-step analysis by which

14    Dana first set its targets, identified where it could achieve

15    savings, and then very methodically, very deliberately and in

16    a very fair and equitable way, went to each of the

17    constituencies to try to obtain the savings and the profit

18    enhancements that were necessary for this company to emerge

19    from bankruptcy.

20           There's an argument made with respect to the

21    settlement with the non-union retirees.  There was a

22    calculation of a settlement of $78 million.  This is an OPEB

23    liability of $400 million, and the claim that somehow the

24    debtors have taken the position in this court that our case is

25    stronger with respect to non-union retirees than the union

18

1    retirees, no such statement has been made by the debtors.

2                We moved with respect to non-union retirees.  We

3    have made no application with respect to the union retirees.

4    Nor have we said anywhere that our case with respect -- we

5    haven't compared our cases with respect to non-union retirees

6    and the union retirees.  So it's just flatly wrong to say that

7    we have somehow conceded that we have a different or an

8    inferior case with respect to our rights determined

9    unilaterally.  That is an issue that will be discussed.  That

10   will be an issue that will be discussed not just in this

11   courtroom, but it will be discussed in negotiations.

12               Mr. Simon believes that it's negotiations that

13   lead to results.  That's what they seek.  We are ready to

14   negotiate.  We have been ready to negotiate.  When Mr. Bueter

15   took the stand when he was recalled on Monday, he told you

16   what happened the last time we went in for negotiations.

17   That's what he said on the stand.  We got a big zero from the

18   union, zero concessions, and if you read today's newspaper,

19   what Mr. Gettelfinger said very publicly at the meeting

20   yesterday in Detroit was, "No more concessions."  That's the

21   line in the sand that the unions have drawn.

22               In terms of "fair and equitable," what you have

23   heard time and again and with respect to the level of cost

24   savings we are seeking on 1113, what we are seeking to

25   implement with respect to the union active employees, are

19

1    cost-saving measures, cost reductions that have already been

2    put in place with respect to our nonunionized work force.

3    It's only fair that the unions bear their fair share of the

4    cost-cutting measures that the company has enacted across the

5    board.

6                An argument was made in opening and as well

7    right now on this motion for dismissal of the motion, or

8    rejection of the motion, that somehow, Section 1113 does not

9    permit your Honor to issue the order we have requested, which

10   is an order authorizing the debtors to reject the collective

11   bargaining agreements.  Curiously, that was an argument not

12   stated ever in the formal papers by the unions.  It was raised

13   for the first time in the openings.  And we do have response

14   to that.  I think their reading of 1113 is flawed and we will

15   address as part of our post-trial briefing as a matter of law

16   why they are wrong and why the case law and the legislative

17   history permits us to seek the relief we are seeking, which is

18   an order authorizing us to reject the collective bargaining

19   agreement.

20               They talk about leverage.  The argument they

21   make that, as soon as this court decides 1113 motion, somehow

22   the CBAs are automatically rejected and they can walk out on

23   strike.  Talk about seeking leverage, talk about using this

24   forum as what way of putting pressure, that's what they are

25   seeking to do with that argument.  It's an unfounded argument.

20

1    It's not supported by the law and we will demonstrate that in

2    a briefing to your Honor.

3         Your Honor, the debtors stand ready to

4    negotiate.  We stand ready to negotiate in good faith with the

5    proposals we've made under 1113 and 1114.  We've said that to

6    the unions many times.  Failing good faith bargaining and

7    negotiations with the union, we do have rights under the

8    Bankruptcy Code.  We have made the necessary showing.  Each of

9    the elements of 1113 and 1114 have been more than satisfied by

10   the evidence that we have submitted.  We would ask that

11   Mr. Simon's application be denied and the motion for 1113 and

12   1114 relief as requested by the debtors be granted.  Thank

13   you.

14        MR. MAYER:  Your Honor, we would reserve our

15   right to provide a short statement at the end of this hearing.

16   We take no motion on the motion.  We have some concerns.  --

17        THE COURT:  Mr. Simon --

18        MR. MAYER:  -- if the court wishes to hear from

19   us, I'll --

20        THE COURT:  No I'll hear from Mr. Simon.

21        MR. SIMON:  Just very briefly in rejoinder, your

22   Honor, with respect to the fact that they hadn't heard of the

23   argument respecting this court's jurisdiction, it was only

24   because it was in testimony and in their clarification of

25   their papers that the issue became apparent.  At one point in

21

1    their papers, they do say they are seeking a motion to reject.

2    In other places in their paper, they say they are seeking

3    authority to reject.  The witness made it clear that it was

4    authority and therefore, our failure to do so in our formal

5    papers is a red herring and should be ignored by this court.

6    My friend's reference to comments by Mr. Gettelfinger.  I

7    refer your Honor to today's New York Times for the full

8    article, but let me read just a piece of it since my --

9            THE COURT:  What was in The New York Post?

10   Because you know that the building you're in was named after

11   Alexander Hamilton, the founder of the New York Post, and

12   there's a proprietary interest in that newspaper above others.

13   So I don't think it's appropriate, Mr. Simon, for you to exalt

14   one newspaper or another.

15           MR. SIMON:  Your Honor, it is not for me to

16   determine the relative merits of the New York Times and The

17   New York Post.  I leave that to others, including your

18   Honor --

19           THE COURT:  Aaron Burr took care of

20   Mr. Hamilton --

21           MR. SIMON:  I think it's one of the few cases in

22   which one can say res ipsa loquitur, and I believe there's an

23   awful long distance, and you can measure it with the arrows

24   pointing in whichever direction you please, between Alexander

25   Hamilton and Rupert Murdoch.

22

1            The New York Times story today says, quoting

2    Mr. Gettelfinger, "Our union does not want to strike.  But

3    when employers act as if collective bargaining is a one-way

4    street and not a two-way street, then we will do what we have

5    to do, make no mistake about it.  Collective bargaining is not

6    collective begging.  And where we have demonstrated

7    cooperation, it would be a grave mistake to equate our actions

8    to capitulation."

9            The UAW, and the Steelworkers, and I know I can

10   speak for them and witnesses can and will, are very much in

11   accord with my friend's proper citation to you of the New York

12   Times.

13           Your Honor, 1113, unlike my friend's commentary,

14   is in fact a cherry-picking institution.  The employer is

15   obligated to select and propose only those modifications that

16   are necessary to reorganization.  And the argument on a pure

17   quantitative basis, Judge -- asking you to look at the Second

18   Circuit case law only; you don't have to go to the Third

19   Circuit, you don't have to go elsewhere -- is that a $20

20   million labor cost reduction in an eight-billion-dollar

21   company under any stretch of the imagination cannot be said to

22   be necessary.

23           The company is trying to make uniform its wage

24   rates among its various North American plants.  The company,

25   according to its testimony, would like to get out of the

23

```
1    business of retiree insurance.  No doubt they would like to

2    achieve both such objectives.  But it's not for this court to

3    engage in social engineering.  It's not this court's job to

4    tidy up the fact that in the past they negotiated many

5    different labor contracts around the country.  Neatness

6    doesn't count.  Necessity counts.  They might like to have

7    uniformity.  They might like to get out of the retiree

8    insurance business.  That's not your job.

9                  THE COURT:  Thank you.  Anyone else want to be

10   heard?

11                 The motion to dismiss is denied.  Call your

12   witness.

13                 MR. LEVINE:  Your Honor, at this point, the

14   unions are prepared to present their case in opposition to the

15   motion with their witnesses, and I would ask for two to three

16   minutes, just to set up the appropriate binders, if that's

17   okay.  Maybe a five-minute recess, your Honor --

18                 THE COURT:  You've got it.

19                 MR. LEVINE:  Thank you.

20                 (Recess taken.)

21                 MR. LEVINE:  Your Honor, the unions are pleased

22   to present Mr. James Robinson as their first witness.

23   J A M E S     R O B I N S O N , having been duly sworn, was

24                 examined and testified as follows:

25   DIRECT EXAMINATION BY MR. LEVINE:
```

24

1          Q.   Mr. Robinson, by whom are you employed, sir?

2          A.   United Steelworkers.

3          Q.   And what is your position?

4          A.   I'm district director for District 7, which is

5    the States of Illinois and Indiana.

6          Q.   And for how long have you served in that

7    capacity, sir?

8          A.   I was elected in November of 2001 and took

9    office the following month.

10         Q.   And when you say you were elected, you were

11   elected by whom?

12         A.   The members in District 7.

13         Q.   The members of the USW?

14         A.   Yes.  We have referendum elections for our

15   executive board members.

16         Q.   And prior to serving as district director, did

17   you have the occasion to be employed by the USW?

18         A.   I was -- I was appointed to the U.S. -- at that

19   time USWA staff in 1994, and served as staff representative,

20   subdistrict director, assistant to the director and then I was

21   elected director.

22         Q.   And in addition to your experience working for

23   the Steelworkers at the international level, have you had any

24   additional experience working with any affiliates of the

25   United Steelworkers?

25

1          A.   I was hired at Inland Steel in East Chicago,

2   Indiana in 1977, joining Local 1010 of the United

3   Steelworkers.  I was elected to the safety committee in 1973,

4   to the grievance committee in 1976.  I served four terms as

5   grievance committeeman at the number 4 basic oxygen furnace.

6   I was appointed -- and working full time in the mill during

7   those -- those years.

8               I was appointed arbitration coordinator doing

9   arbitrations for the local union in 1988, working primarily

10  full time at the local union hall.  1991, I was elected

11  chairman of the grievance committee.

12          Q.   Now, you testified that you began, or at one

13  point, you began working for Inland Steel; is that correct?

14          A.   Yes.

15          Q.   And flesh that out a little, if you would.  Was

16  that after college or high school?

17          A.   I attended college briefly and unsuccessfully,

18  and dropped -- in short, I dropped out and went to work in the

19  mill, like everybody else, intending to work there for a while

20  and make a little money and then go do something else like go

21  to California.  It was the '70s.  And I got active in the

22  union and got married and the next thing I knew, it was thirty

23  years later.

24               THE COURT:  Did you get to California?

25               THE WITNESS:  Um -- not until recently.  And

26

1    under different circumstances.

2         A.    I was a mechanic, and --

3         Q.    I'm sorry, just -- you were a mechanic in the

4    beginning?

5         A.    No, I went through an apprenticeship, became a

6    mill mechanic, and got active in the union and as a mill

7    mechanic, I was a good union representative, is the best way

8    to put it in terms of my skills.

9              I did go back to school.  I received a

10   Bachelor's degree in labor studies from Antioch University of

11   Ohio through the George Meany Center For Labor Studies in

12   Silver Spring, Maryland.  Following that, I attended law

13   school at Loyola University School of Law in Chicago and took

14   the bar exam for Illinois and Indiana, for both states, in

15   1997 and was admitted in both states and I maintain those

16   licenses.

17        Q.    You are in a room, sir, where being a lawyer

18   will not be helpful.

19              But I --

20        A.    Also, it won't make me very outstanding, either.

21   There sure are a lot of them.

22        Q.    The judge is the trier of the fact, you'll see.

23   But let me ask you something else.  We know what lawyers do

24   here.  But a lot of us don't know what a mill mechanic does.

25   And could you tell us a little bit about what you did as a

1    mill mechanic?

2          A.   Well, at Inland Steel, a mill mechanic is a

3    combination craft job.  Something that historically, we had

4    millwrights and boilermakers and pipefitters and a variety of

5    specialized crafts.  Over the years, in the steel industry,

6    the union negotiated those -- those crafts into where we are

7    now, which is a single mechanical craft and a single

8    electrical craft.  That process was underway when I hired in

9    the mill.

10          I hired into a department where the mill

11   mechanic craft existed, and that job essentially required all

12   the mechanics -- consisted of all mechanical work in the mill

13   with the exception of welding.  At that time, welder was still

14   a separate job.

15          So we did everything from working on pumps to

16   changing out large hood sections on the furnace.

17          Q.   And for how many years did you serve as a mill

18   mechanic?

19          A.   I worked essentially full time in the mill for

20   17 years.  Obviously, I was off on union business now and

21   again, but essentially working full time in the mill for 17

22   years.  Starting in 1988, I worked most of the time for the

23   local union as our arbitration coordinator, I still went back

24   occasionally and worked on the job in the mill.  Same thing

25   was true as when I was chairman of the grievance committee.

28

1     Starting in 1994, when I went to work on the international

2     staff, I no longer went back to work in the plant.

3          Q.    Understood, sir.  Did ever break a sweat working

4     as a mill mechanic?

5          A.    The basic oxygen furnace and caster department

6     is steel production.  Molten steel is really hot, so, yes,

7     breaking a sweat is part of the job.

8          Q.    I'd like to refer you, sir, Mr. Robinson, to tab

9     104 in front of you --

10               MR. LEVINE:  -- which is Union Exhibit 7, your

11    Honor, behind tab 104.

12         A.    Yes.

13         Q.    Mr. Robinson, is that a declaration that you

14    prepare in connection with this 1113/1114 proceeding?

15         A.    Yes.

16         Q.    Other than the typographical errors that might

17    exist in this document, are there any corrections that you'd

18    like to make to what you declared on February 22nd?

19         A.    Yes, there is one statement in here that is

20    inaccurate.

21         Q.    Do you know the paragraph or --

22         A.    I'm looking.

23         Q.    Well, let me give you a hint, at the risk of

24    being accused of leading you.  Would you turn, please, to

25    paragraph 16, and read that paragraph.

29

1          A.    Want me to read it out loud?

2          Q.    No, read it to yourself and tell us if there is

3    anything that you'd like to correct --

4          A.    Yes, the last sentence is incorrect.

5          Q.    Would you explain the, what is incorrect and

6    what is correct?

7          A.    We had a tiff with Dana over the company setting

8    up meetings to provide proposals at the local unions in Fort

9    Wayne and Marion.  The staff representatives assigned to those

10   locals were not notified of those meetings.  I learned,

11   actually at my deposition, that a representative of the

12   company had called Danny Wirges, who at that time was an

13   assistant to the director in District 7, and notified him of

14   the meetings and offered him the opportunity to be there.

15               He said it wasn't necessary.

16         Q.    And do you know of any reason as to why you

17   wouldn't have heard about this from Mr. Wirges?  He was your

18   assistant, was he not?

19         A.    Danny retired the 1st of the year.  Most of us

20   are hopefully familiar with people getting ready to retire.

21   They mentally leave before of they physically leave.

22               MR. HAMILTON:  Your Honor, at this point, these

23   are facts that we disputed and he's now being asked to testify

24   on behalf of why somebody else did something without any

25   foundation.  I object.

30

1          THE COURT:  I'll allow him to clarify this.

2     Q.    Just clarify what you know about paragraph 16,

3  that's all I'm getting to.  Don't mean to --

4     A.    All I'm saying is that I know that the reason

5  that Danny didn't call me, was --

6          THE COURT:  You know where the anomalies are.

7  Could you very quickly get to them?

8          MR. LEVINE:  I did think that it should be

9  clarified, and I believe it has been.  Thank you.  I'll move

10  on, your Honor.

11     Q.    Have you ever been involved in collective

12  bargaining?

13     A.    Yes.

14     Q.    Now, for how long have you been involved in

15  collective bargaining presumably on behalf of the Steelworkers

16  at either the local or international levels?

17     A.    Collective bargaining, as I understand it, which

18  is a very broad term, it includes the day-to-day contract

19  enforcement and problem-solving activities in the plant.  I,

20  my involvement in collective bargaining began in 1973 with my

21  activities as a representative of my fellow employees on the

22  safety committee.

23     Q.    Now, does collective bargaining involve, at

24  least on occasion, sitting across the table from the company

25  and exchanging paper with proposals and counterproposals?

31

1      A.   That's a part of it.  In my experience and in my

2   opinion, a relatively small part.

3      Q.   Okay.  Well, without getting into what your

4   opinion is, based on your experience, what else has collective

5   bargaining involved from your experience over the past thirty

6   years?

7      A.   Well, most collective bargaining involves

8   talking, discussing issues, making arguments, assessing

9   positions between representatives of the two sides, and that

10   occurs, especially in larger contract negotiations, that

11   occurs at many levels.

12         It also involves a great deal of internal

13   negotiations, trying to make sure that everybody on our side

14   is -- we reach a position that everybody can agree to and then

15   sign on to as our position.

16         I've been told by management lawyers that the

17   same thing occurs on the other side.  That's in some respects

18   more difficult and more time-consuming than the negotiation

19   across the table.

20      Q.   Why is that, sir, from your understanding?

21      A.   Because in my experience, the internal

22   negotiations often involve things that people care very deeply

23   and personally about, because we're talking about the jobs of

24   the people involved.  And across the table, it's much -- the

25   things that people care about tend to be at a higher level,

32

1    and less personal.

2         Q.   Understood.  Now, as district director, do you

3    have jurisdiction over any facilities with USW members who are

4    employed by the debtors, in this case, Dana?

5         A.   Yes.  We have two local unions representing Dana

6    employees at the Fort Wayne plant and at the Marion plant.

7         Q.   And what role, if any, do you play as district

8    director with respect to those employees at those facilities?

9         A.   Well, the -- I guess the best place to begin is,

10   the constitutional definition of the district director's role

11   is to oversee the -- oversee the actions, the responsibilities

12   of the international union within the district, as well as to

13   carry out assignments given by the international president.

14        Q.   Now, were the Steelworkers at those facilities

15   formally represented by another international union?

16        A.   Yes.  The Fort Wayne and Marion locations were

17   originally organized by the Allied Industrial Workers.  That

18   union merged into what became PACE, which the Paperworkers,

19   the Allied Industrial Workers and the Oil, Chemical and Atomic

20   Workers.  PACE last year, PACE merged into the Steelworkers

21   and last year, about last March, the PACE districts and the

22   steel worker districts were merged and those locals became a

23   part of District 7.

24        Q.   And were there formerly other Dana facilities in

25   the geographical jurisdiction of District 7?

33

1          A.   Yes.  There was a plant in Andrews, Indiana, and

2    a plant in Mitchell, Indiana, both of which either have closed

3    or are in the final stages of closing.

4          Q.   And were the Steelworkers involved in any way

5    with discussions or negotiations with Dana in connection with

6    those shutdowns?

7          A.   Yes.  Danny Wirges negotiated the closure

8    agreement for Andrews and Chris Bolte, a staff representative

9    for the Steelworkers in District 7, negotiated the closure

10   agreement in Mitchell.

11         Q.   Would you turn, please, to paragraph 6 of your

12   declaration.

13              MR. LEVINE:  It's on page 2, your Honor.  And if

14   I may, I would like to read the first couple of sentences of

15   that paragraph into the record.

16              THE COURT:  Do you have another binder?  This

17   one has an opening and when I turn the pages, it kicks them

18   out.

19              MR. LEVINE:  Your Honor, that is fine.  In fact,

20   mine has little tabs on it.

21              THE COURT:  You'll have a problem if you take

22   mine.

23              MR. LEVINE:  I don't want to take the creditors'

24   committee.  They've been working the whole case to get their

25   own binder.  But it's the judge.

34

```
1              DEPUTY CLERK:  It's okay.  I gave him mine.

2              (A pause in the proceedings.)

3              MR. LEVINE:  May I proceed, your Honor?

4              THE COURT:  Sure.

5         Q.   I'd like to read paragraph 6, at least the first

6    part of it and then ask you some questions, Mr. Robinson.

7              In paragraph 6, you declare that, "During the

8    past two decades and particularly since 2000, the USW and its

9    members in several industries, including the steel, aluminum

10   and mining industries, have faced enormous challenges

11   occasioned by international trade policies, escalating

12   healthcare costs, and other factors that have challenged

13   America's industrial sector."

14             Now, do you stand by that statement?

15        A.   Yes.

16        Q.   You then state that, "The USW has responded to

17   current conditions with progressive and innovative contract

18   initiatives that have facilitated more rational and equitable

19   corporate reorganizations and which, at the same time, have

20   protected the economic security of its affected members and

21   retirees."

22             Could you, I assume you stand by that statement

23   as well.

24        A.   Absolutely.

25        Q.   And could you shed a little light about what
```

35

1    your experience has been with respect to the Steelworkers and

2    its working with companies that are challenged by issues such

3    as so-called globalization and the flattening of the world.

4            A.   Well, let me mention first of all two industries

5    or two situations in which I was not personally involved, but

6    were major issues within the union.  The Sarco negotiations in

7    Arizona and Texas, Sarco is a very old mining company in the

8    copper industry, primarily, in bankruptcy after a long and

9    difficult strike and a lot of difficult negotiations.

10           A new contract was recently approved in the

11   Bankruptcy Court in Texas.  Ormetluminum -- and that's a part

12   of a larger restructuring plan that is moving forward --

13   Ormetaluminum, we had similar problems with bankruptcy and a

14   long strike and plants being shut down.  And the aluminum

15   smelter part of that operation just restarted after a lot of

16   hard work and negotiations and working with -- with a buyer to

17   secure a power contract in Ohio and permit it to run.

18           More personally, I can talk about the steel

19   industry, because I was directly and personally involved in

20   that.  Since -- really, we've been in a sort of constant

21   crisis in the steel industry since the early 1980s.  In 1986,

22   we developed innovative approaches that involved major

23   restructuring of our contracting-out protections.  Those were

24   secured in LTV negotiations, just prior to them showing up in

25   your courtroom.

36

1        We also negotiated a partnership agreement that

2   gave us a much greater participation in the business

3   operations and also board seats nominated by the union, all of

4   which created over the years, and I can say this with some

5   amazement because I was very skeptical at the time,

6   Steelworkers in the basic steel industry today have a much

7   deeper knowledge of the business and the realities and what's

8   necessary to make those plants profitable and competitive than

9   anybody would have dreamed of when I started.

10       We ultimately, with the latest round of steel

11  crises in 2003, we negotiated -- let me back up.  LTV

12  ultimately shut the plants down.  We worked with a buyer,

13  Wilbur Ross, to -- with the firm ISG to buy those shutdown

14  plants and restart them.  I was secretary of -- or my

15  predecessor was secretary of the ISG negotiations.  I sat in

16  for him with Dave McCall, who was the chairman, and we worked

17  through that process.  The plants were back up and running.

18       We then negotiated a quite innovative labor

19  agreement, streamlined the contract, reduced the number of job

20  classifications, and expanded duties to enhance productivity.

21  That worked exceptionally well and ISG expanded and acquired

22  Bethlehem and a piece of the old Acme.

23       We then went into negotiations with U.S. Steel.

24  They were attempting to buy National out of bankruptcy, the

25  National plants.  And AK Steel came in as a -- as another

37

1    potential buyer.  We negotiated with both.  We reached the

2    same type of innovative agreement with U.S. Steel.  AK was not

3    interested in that, and wanted a more traditional approach,

4    for a variety of reasons, not the least of which was, we

5    believed, and we think we have been proven right, that our

6    innovative approaches to contract negotiation in the steel

7    industry produced efficient, productive, profitable

8    operations, and we reached that agreement with U.S. Steel.  We

9    did not reach agreement with AK steel.  We supported U.S.

10   Steel's purchase of the National plants in the Bankruptcy

11   Court.  That was approved.

12            Today those National plants, as well as the U.S.

13   Steel plants, are running, are employing our members, and U.S.

14   Steel is enjoying significant profitability in District 7.

15   One of the most successful U.S. Steel plants is Granite City,

16   Illinois, an old National plant, which has surprised everybody

17   for becoming a real shining star to productivity,

18   profitability within U.S. Steel.  And I think it's a fair

19   statement to say that both sides would credit the labor

20   agreement that we negotiated for a significant amount of that

21   success.

22            Q.   Thank you.  You were not directly involved in

23   the Tower Automotive proceeding, am I correct?

24            A.   No.

25            Q.   You do understand that Tower --

38

1       A.   Yes, you are correct.  No, I wasn't involved.

2       Q.   Would you please turn to tab 121.

3            MR. LEVINE:  Same problem, your Honor, as you

4  had with my binder.  It's Union Exhibit 38, which is tab 121.

5       Q.   Mr. Robinson, do you have Union Exhibit 38 in

6  front of you?

7       A.   Yes.

8       Q.   Have you seen this document before?

9       A.   Yes, I was the primary author of it.

10      Q.   Okay.  And when did you participate in the

11 authoring of this document?

12      A.   Directly after the meeting that's discussed in

13 the document and of all the -- well, the union representatives

14 that are in the picture.  The date escapes me, but --

15      Q.   Was it sometime last fall, perhaps?

16      A.   No, it was more recent.

17      Q.   Could you --

18      A.   This was the meeting where we came together and

19 formed the Dana Unions Council.

20      Q.   Well, explain what the Dana Unions Council is.

21      A.   We met with -- the UAW had an existing Dana

22 council of the local unions representing Dana employees.  And

23 what we did was, we brought the Fort Wayne, Marion and

24 Henderson, Kentucky Steelworker locals together with the UAW

25 locals and agreed that we would form a broader council, the

39

1    Dana Unions Council, which would -- be -- consist of all of

2    the union members from both unions working for Dana.

3              Q.   And what was the purpose of this leaflet?

4              A.   Well, the purpose of the leaflet, one of the

5    things we did at the meeting was to develop this set of

6    principles that would guide our negotiations.  And we wanted

7    to make sure that the -- that we informed the members of those

8    principles that we would be working from.  And we also wanted

9    to obviously tell the members that we had formed this Dana

10   Unions Council, where we would be working in a united way to

11   work our way through the problems of the bankruptcy.

12              MR. LEVINE:  At this time, I would ask for

13   Exhibit 38 to be received, your Honor.

14              MR. HAMILTON:  No objection, your Honor.

15              THE COURT:  Received.

16              MR. LEVINE:  I would also ask for Mr. -- I

17   forgot to ask for Mr. Robinson's declaration to be received

18   into evidence.

19              MR. HAMILTON:  On the declaration, your Honor,

20   paragraphs 12 through 16 appear to be hearsay.  If counsel

21   wants to establish some foundation for the witness to report

22   on it, I probably won't object, but --

23              MR. LEVINE:  I -- I'm sorry?

24              MR. HAMILTON:  On their face, they're hearsay.

25              MR. LEVINE:  I don't want to delve into

40

1    negotiations any more than is necessary.  If Mr. Hamilton

2    believes that that is hearsay, we would respectfully disagree.

3    I could establish further Mr. Robinson's authority over

4    District 7 and how he is familiar with the various meetings,

5    negotiating sessions that he describes if the court deems it

6    necessary.

7                    We really don't think it's necessary, your

8    Honor.

9                    THE COURT:  I'll allow it.  It doesn't appear to

10   be anything that the court can't evaluate properly.

11                   MR. LEVINE:  It's Exhibit 7.

12                   (Union Exhibit 7, received in evidence, as of

13   this date.)

14           Q.    Have you participated in negotiations with Dana

15   in connection with the 1113 and 1114 proceeding?

16           A.    Yes.

17           Q.    And otherwise?

18           A.    Yes.

19           Q.    And subsequent to your, the preparation of your

20   declaration, did you have the occasion of participating in a

21   negotiating session on March 19th?

22           A.    I will have to confess to being terrible at

23   dates.  The dates in my declaration were -- were asserted

24   based on checking my calendar to make sure that they were

25   accurate.  If that's what -- if March 19th is the date in the

41

1    declaration, it's one that I confirmed before we put it in.

2        Q.    Do you recall meeting with Mr. Bueter and other

3    representatives from Dana within the past two weeks or so?

4        A.    Oh, yes.

5        Q.    That's what I'm talking about.

6        A.    That's fine.  Yes.

7        Q.    And was an agreement reached at that time?

8        A.    No.

9        Q.    Without getting into anything about your

10   strategy or anything, could you tell us whether the parties

11   agreed to meet in the future?

12       A.    Yes.

13       Q.    And do you know if that's the intention of the

14   Steelworkers and the Auto Workers United Coalition?

15       A.    We are -- we have put a proposal on the table

16   that we believe creates a framework for a successful outcome,

17   and it's our intention to pursue that to a successful

18   conclusion.

19       Q.    Has that been communicated to the company?

20       A.    Yes.

21       Q.    I'd like to turn to you Union Exhibit 37 --

22             MR. LEVINE:  -- which is behind tab 121, your

23   Honor -- I'm sorry, 120.  It's Union Exhibit 37.

24             Are you there, your Honor?

25       Q.    Do you have that in front of you, Mr. Robinson,

42

1    Union Exhibit 37?

2          A.    Yes.

3          Q.    Have you seen this document in the past?

4          A.    Yes.

5          Q.    Could you describe what it is, please.

6          A.    Well, when I refer to a proposal that we believe

7    establishes a framework for a successful outcome, this was our

8    original -- this was the Steelworkers' proposal to Dana that

9    led to a joint proposal.  But this is the, essentially the

10   framework that I was referring to.

11         Q.    And do you know what, if any, significance is

12   attached to the date of January 17 on the front of the

13   document?

14         A.    We -- I believe -- again, I apologize for my --

15         Q.    What's your understanding?

16         A.    -- yes, we met with the company, I believe, and

17   gave them this proposal on the 17th.  But I can tell you the

18   sequence, but I can't remember the date.

19         Q.    Tell us the sequence.

20         A.    Well, we've met with the company at Toledo prior

21   to, at the end of last year, sort of in between the holidays.

22   And we had another meeting with the company in January.  And

23   we have been attempting to engage the company in bargaining

24   around this framework, and that's been our, the purpose of

25   providing this document to, it turns out to have been

43

1    repeatedly.

2        Q.   Now, this document as I read it doesn't contain

3    any proposals for a wage concession.

4        A.   It does not.

5        Q.   And in fact, I don't see any monetary

6    concessions proposed in this document.

7        A.   Correct.

8        Q.   Are you still calling this a proposal in

9    connection with negotiations?

10       A.   Yes.

11       Q.   How could that be?

12       A.   Well, this proposal on its face assumes no

13   change in the economics.  But it is a framework for a

14   successful outcome.  The company has repeatedly put proposals

15   for economic reductions on the table.  We have not accepted

16   those.  But everything's a matter for negotiations.  We think

17   this is the proper framework in which those negotiations can

18   proceed, and conclude, for -- and conclude in a manner in

19   which our members will have an opportunity as they have in the

20   steel industry to have good jobs and profitable plants.

21       Q.   And let me ask you is this, then:  You keep

22   referring to the term "framework."

23       A.   Yes.

24       Q.   Could you just elaborate on what you mean by the

25   concept of "framework" in connection with these negotiations.

44

1          A.    One of the things that we have learned from

2    dealing with distressed manufacturing companies, which is

3    unfortunately including an increasing number of manufacturing

4    companies in the global -- globalized environment we exist in,

5    is that merely rearranging the furniture in the collective

6    bargaining agreement doesn't get at the underlying problems;

7    and over the years, we have seen situations where we don't

8    work to address the problems, and simply agree to lower labor

9    costs, that the problems don't get addressed and the company

10   returns and asks for lower labor costs again, and eventually,

11   we reach the point where we're not going to agree to lower

12   labor costs.

13          And a very good example was a company called

14   Spectralight Consortium in Madison, Illinois.  After two or

15   three rounds of wage cuts, the membership said, "Enough's

16   enough, we're not working for less than that," and there was a

17   very difficult strike, and the end result was, the company

18   went out of business.

19          That's not a good way -- a good way to operate.

20          MR. LEVINE:  I would ask for Union Exhibit 37 to

21   be received into evidence, your Honor.

22          THE COURT:  Are you with us, counselor?

23          MR. HAMILTON:  Yes.  No objection, your Honor.

24          THE COURT:  Received.

25          (Union Exhibit 37, received in evidence, as of

45

1    this date.)

2                    MR. LEVINE:  Thank you, your Honor.

3            Q.    Would you turn, please, to Union Exhibit 5 --

4                    MR. LEVINE:  -- which is behind tab 131 in our

5    binder, your Honor.  Union Exhibit 55.  Five-five.  Are you

6    there, your Honor?

7            Q.    Mr. Robinson, are you familiar with Union

8    Exhibit 55?  Have you seen it before?

9            A.    Yes.

10           Q.    And what is it?

11           A.    This proposal was given to the company jointly

12   by the Steelworkers and the auto workers following our

13   formation of the Dana Unions Council, and our agreement to

14   work jointly.

15           Q.    Okay.  And how, if at all, is it different from

16   Union Exhibit 37, which we were talking about earlier?

17           A.    There are changes.  Primarily, those changes are

18   related to including the UAW.

19           Q.    Does --

20           A.    The underlying framework that I've been talking

21   about remains the same.

22           Q.    I was going to ask you that.  Does this continue

23   to be the framework for negotiations that have been tendered

24   by the joint UAW/USW bargaining coalition to the company?

25           A.    Yes.

46

1          MR. LEVINE:  I would ask that Union Exhibit 55

2  be received into evidence, your Honor.

3          MR. HAMILTON:  No objection.

4          THE COURT:  It's received.

5          (Union Exhibit 55, received in evidence, as of

6  this date.)

7          THE COURT:  Do I understand this is the same

8  proposal essentially as the one in January?

9          THE WITNESS:  There are changes --

10          THE COURT:  With additional parties --

11          THE WITNESS:  Conceptually, it's the same.

12     Q.   Are you involved specifically in compiling

13  information that the union has asked for in connection with

14  negotiations with the company?

15     A.   No.

16     Q.   And who is the individual, to your knowledge,

17  who is principally responsible for that role?

18     A.   Leon Potok.

19     Q.   Now, let me ask you this, Mr. Robinson:

20          To your knowledge, has the USW communicated its

21  willingness to negotiate in good faith with Dana?

22     A.   I believe we have.

23     Q.   Has the USW communicated its willingness to

24  strike if necessary under appropriate circumstances to the

25  company?

47

1          A.   I have said that to the company, and we have

2     made that point in a couple of our leaflets that we distribute

3     to our members.

4          Q.   Mr. Robinson, have you in your thirty years of

5     experience, thereabouts, with the Steelworkers participated in

6     any strikes?

7          A.   Yes.

8          Q.   Have you been involved in organizing and/or

9     directing such strike activity?

10         A.   Yes.

11         Q.   And is that a process that you are familiar with

12    that you would be able to apply with respect to Dana, if

13    necessary?

14         A.   Yes.

15         Q.   And that has been communicated to the company?

16         A.   As I said, we have made clear in the leaflets

17    that we have produced for our members, which everybody knows

18    that the company will read as well, and I've said that across

19    the bargaining table.

20              MR. LEVINE:  Mr. Robinson, I have no further

21    questions for you.  Thank you very much.

22              MR. HAMILTON:  Your Honor, I have witness

23    notebooks for the cross.  May I approach?

24              THE COURT:  Sure.

25              (A pause in the proceedings.)

48

1    CROSS-EXAMINATION BY MR. HAMILTON:

2         Q.    Mr. Robinson, my name is Robert Hamilton of

3    Jones, Day.  We met briefly here this morning.  I'm

4    representing the debtors.  I'll be cross-examining you.

5              As I understand it, you are a licensed

6    practicing lawyer, is that correct?

7         A.    Yes.

8         Q.    And are you familiar with the requirements of

9    Section 1113 of the Bankruptcy Code?

10        A.    Generally.

11        Q.    And are you familiar with the sections that

12   relate to whether or not a union has good cause or not to

13   reject a Section 1113 proposal proposed by a debtor?

14        A.    Probably not.

15        Q.    You said you had some twenty, thirty years'

16   experience negotiating collective bargaining agreements.

17   During that period of time, have you been negotiating

18   collective bargaining agreements during Chapter 11

19   proceedings?

20        A.    Been involved in them.

21        Q.    In those ones that you were involved in, were

22   you involved in negotiating collective bargaining agreements

23   when there was a pending Section 1113 proposal made by the

24   debtor?

25        A.    Probably not as directly as in this case, no.

49

1          Q.   This is --

2          A.   We had an 1113/14 issue at Spectralight

3    Consortium, the strike that I referred to, but the

4    circumstances were much different.

5          Q.   Well, in that case, had the debtor made a

6    Section 1113/1114 proposal to the union?

7          A.   Yes.

8          Q.   And were you representing the union in those

9    negotiations?

10         A.   No, I was working with the subdirector in

11   southern Illinois, who works for me, and he was actually at

12   the table.

13         Q.   And do you know, did the unions make a formal

14   written counterproposal in that case to the debtors, Section

15   1113/1114 proposals?

16         A.   We effectively told them where they could get

17   off.

18         Q.   So you did not make a written counterproposal.

19         A.   No.

20         Q.   And the result was the strike and the eventual

21   liquidation of the company.

22         A.   Yes.

23         Q.   Let's talk about the PACE merger, which happened

24   just last year, is that right?

25         A.   The merger happened two years ago.  The merger

50

1   of the PACE regions with the Steelworker districts happened

2   last year.

3           Q.   Okay.  So the -- the merger between PACE and the

4   Steelworkers district happened last year, is that right?

5           A.   Yes.  That's an administrative result of the

6   formal merger of the two unions.

7           Q.   Now, prior to the administrative merger that

8   happened last year, was Mr. Sturgis the head of the PACE

9   district?

10          A.   Wirges?

11          Q.   Yes.

12          A.   No.

13          Q.   Who was the head?

14          A.   Bill Gibbons.

15          Q.   What was Mr. Wirges' position?

16          A.   Assistant to Bill.

17          Q.   And then after the administrative merger, who

18   did Mr. Wirges report to?

19          A.   Me.

20          Q.   You made a reference to paragraph 6 of your

21   declaration, which in the cross-examination binder is the

22   first tab, tab A.  It's Union Exhibit number 7.

23          A.   Yes.

24          Q.   And you made a reference to the progressive and

25   innovative contract initiatives that the USW has responded to

51

```
1    with respect to healthcare, rising costs and global

2    competition; is that right?

3              A.    Yes.

4              Q.    All right.  What are the progressive and

5    innovative contract initiatives that you have formally

6    proposed to the debtor in this case?

7              A.    We believe that the framework that we have

8    proposed to the debtor is progressive and innovate if I have.

9              Q.    And that's to increase job security for the

10   union employees, right?

11             A.    That's part of it.

12             Q.    If we can go to the paragraph 11 of your

13   declaration, this is the November 1st meeting.

14             A.    Yes.

15             Q.    You didn't attend that meeting, is that correct?

16             A.    That's correct.

17             Q.    You were only told what happened at that meeting

18   by somebody?

19             A.    Yes.

20             Q.    Who told you?

21             A.    Ron Bloom.

22             Q.    In paragraph 12, you say that at that November

23   1st meeting, Dana made no proposal and, "It did not provide

24   any financial data as part of it summary of intentions."

25                   Do you see that?
```

52

1          A.   Yes.

2          Q.   How do you know that?

3          A.   That's what I was told.

4          Q.   And if you look at tab B of your binder,

5   section -- Debtor's Exhibit number 274, dated November 1st,

6   2006 --

7          A.   Yes.

8          Q.   -- isn't it true that that information was

9   provided to the unions at the November --

10         A.   I wasn't there.  I cannot answer the question.

11         Q.   You don't know?

12         A.   I put what I believed to be true in my

13  declaration.

14              MR. HAMILTON:  Your Honor, we would offer

15  Debtor's Exhibit number 274, tab B, into evidence?

16              MR. LEVINE:  With this witness, we object, your

17  Honor.

18              THE COURT:  Do you want voir dire?  Because the

19  witness indicates he has knowledge as to what transpired at

20  that meeting, and I find it a little difficult to conceive

21  that he's not aware that there was this document discussed

22  there.

23              MR. HAMILTON:  Let me ask, your Honor.

24         Q.   Mr. Robinson, you've seen Exhibit 274 before,

25  right?

53

1          A.    Yes.

2          Q.    It has been provided to you, correct?

3          A.    Yes.

4          Q.    You just don't know if it was provided at the

5    November 1st meeting which is the same date as this document,

6    right?

7          A.    Correct.

8                MR. LEVINE:  No objection, your Honor.

9                THE COURT:  Received.

10               (Debtor's Exhibit 274, received in evidence, as

11   of this date.)

12         Q.    Now, your next paragraph in your declaration

13   talks about the meeting on November 29th in Ypsilanti, is that

14   right?

15         A.    That's right.

16         Q.    You weren't at that meeting, either; right?

17         A.    No.

18         Q.    And then paragraph 14, you're again discussing

19   the November 29th meeting, right?

20         A.    Yes.

21         Q.    And you say there that, "The sole purpose of the

22   meeting was for Dana to present its Section 1114 proposals to

23   the USW and UAW."  Is that correct?

24         A.    That's what -- that was my information and I

25   believed that to be true.

54

```
1              Q.   Who told you that?

2              A.   Ron Bloom -- or David Jury, I don't know which.

3              Q.   Isn't it true, sir, if you take a look at tab

4    D --

5              A.   Did you say B or D?

6              Q.   D as in "dog," Debtor's Exhibit 176.  It's a

7    PowerPoint dated November 29th.

8              A.   Yes.

9              Q.   Isn't it true that that PowerPoint was presented

10   at that meeting?

11             A.   I can't say.  I wasn't there.

12             Q.   Did you ever ask anybody if it was?

13             A.   No.

14             Q.   Have you seen this document before?

15             A.   I'm sure I have.  I've seen about 28

16   PowerPoints.

17             Q.   And if you look at the next tab, tab E, Debtor's

18   Exhibit 277, it contains a substantial amount of financial

19   information about the plants, correct?

20             A.   It would appear that way.

21             Q.   Have you seen that document before?

22             A.   I have absolutely no idea.

23             Q.   Do you know if that document was provided at the

24   November 29th meeting?

25             A.   I have absolutely no idea.
```

55

1          Q.    Isn't it true, sir --

2          A.    I don't look at the numbers.  That's what Leon

3     does.

4                THE COURT:  Have you seen the document?

5                THE WITNESS:  I don't know.  I've seen documents

6     with numbers but we have an expert who looks -- we have an

7     expert who reviews the financial information.  I -- I rely on

8     him to explain it to me.  I don't read the numbers because I'm

9     not capable of making the evaluation.

10         Q.    I understand that, sir --

11               THE WITNESS:  So I don't know if I've seen this

12    set of numbers or not.

13         Q.    I understand that, sir.  What I'm focusing on is

14    your first sentence in paragraph 14 where you say the sole

15    purpose of the November 29th meeting was to make a proposal.

16               Isn't it true, sir, that exhibits behind tabs D

17    and E were also presented at that meeting for the purposes of

18    the debtor's demonstrating the economic case for why they

19    needed Section 1113 relief?

20         A.    Once again, I can't answer that question.  I

21    wasn't at the meeting.  I put in my declaration my

22    understanding based on our internal discussions of what took

23    place.

24         Q.    Which is based totally on what somebody else

25    told you who is not here today to be cross-examined, right?

56

1          A.   Of course.

2          Q.   Paragraph 16.  Now, this is the paragraph that

3   you purported to correct on the record at the beginning of

4   your direct examination, correct?

5          A.   I didn't purport.  I did.

6          Q.   Okay.  Well, let's talk about it.  You say,

7   "During the week of December 4, 2006, Dana also conducted a

8   short meeting with the local bargaining -- union bargaining

9   committees at each of the plants that are the subject of

10  Dana's requests for contract modifications," correct?

11         A.   Yes.

12         Q.   Now, you're referring to meetings that occurred

13  at the Henderson, Caldwell, Fort Wayne and Marion plants;

14  right?

15         A.   No.

16         Q.   You're not?

17         A.   No.

18         Q.   What are you referring to?

19         A.   Fort Wayne and Marion.

20         Q.   You're not referring to the meetings in this

21  particular sentence that occurred at Henderson and Caldwell?

22         A.   No.

23         Q.   Okay.  Did meetings occur with the local

24  representatives at Henderson and Caldwell?

25         A.    I have had no involvement with Caldwell.  I have

57

1    no idea what's happened at Caldwell.  Caldwell has not been a

2    part, from my perspective, of the negotiation process that

3    I've been involved in because Caldwell when we began this

4    process was for sale, and we did not propose to bargain at

5    Caldwell with Dana.  We proposed to bargain with the buyer.  I

6    believe the sale's been completed, but I don't know.

7    Henderson has been a part of this process because they are not

8    for sale.  And I do -- I am told by the local union

9    representatives at Henderson that there were meetings that

10   took place at Henderson as well.

11           Q.    That there was a meeting that took place?

12           A.    Yes.

13           Q.    Isn't it true, sir, that meetings took place at

14   both Henderson and Caldwell at which staff representatives of

15   the national USW were invited and did attend?

16           A.    As I just told you, I don't know anything about

17   Caldwell.

18           Q.    Well, let's talk about Marion and Fort Wayne.  I

19   believe you said that you learned at your deposition that

20   Mr. Wirges had been invited to attend those meetings, is that

21   correct?

22           A.    That's what I was told, yes.

23           Q.    And then you told the judge that he didn't

24   bother to attend, is that correct?

25           A.    I told the judge that he -- that my

58

1    understanding is, he informed the company it was not necessary

2    for him to attend.  I didn't say he didn't bother.

3         Q.   Okay.  Isn't it true that Mr. Wirges did attend

4    the meeting at Fort Wayne and then decided based on -- could I

5    finish the question, sir?

6         A.   Certainly.

7         Q.   Isn't it true that Mr. Wirges was invited and

8    did attend the meeting at Fort Wayne and based on what

9    happened at the meeting at Fort Wayne, decided not to attend

10   the meeting at Marion?

11        A.   Well, the Jones, Day attorney who took my

12   deposition represented to me that Danny Wirges was contacted

13   and informed the company his presence was not necessary at

14   either location, and I took his word for it, and at this

15   point, don't really care what happened.  Because I don't think

16   it's relevant to anything we're doing today.

17        Q.   Okay.

18             THE COURT:  You do know that I'm the one that

19   makes rulings on relevance.

20             THE WITNESS:  I've heard that, yes, your Honor.

21        Q.   Did you ever ask Mr. Wirges around this time

22   period whether he was attending meetings with Dana without

23   your knowledge?

24        A.   No.

25        Q.   Any idea why he would do that without telling

59

1    you?

2            A.    I was explaining that earlier when you objected.

3    Would you like me to go back to my explanation?

4            Q.    You indicated he was planning to retire in the

5    near future?

6            A.    He did retire and at that point was in

7    retirement mode, and it comes as no surprise to me that he

8    wasn't paying the strictest attention to reporting everything

9    that happened.  I hope one day to be in that same position.

10            Q.    Isn't it true, sir, there was a bit of a riff or

11    conflict between you and Mr. Wirges, who basically got

12    squeezed out when there was a merger between you and PACE?

13            A.    That's a hundred percent not true.  He

14    maintained exactly the same position that he had in PACE with

15    the USW.

16            Q.    But then he went to meetings, didn't tell you

17    about them and then retired.

18            A.    He was planning to retire.  He has a bad back.

19    He was in a lot of pain.

20            Q.    Sir, in your description of your experience in

21    dealing with the, proposing the progressive and innovative

22    contract initiatives, you made a reference to your extensive

23    work in the steel industry, and in particular, LTV, is that

24    correct?

25            A.    Yes.

60

```
1              Q.   Now --
2              A.   LTV and ISG.
3              Q.   Right.  Right.  Now, in LTV, the company, LTV,
4    made Section 1113 and 1114 proposals to the unions in that
5    case, is that correct?
6              A.   During the bankruptcy case?
7              Q.   Yes.
8              A.   Yes, that is correct.  I was not involved in
9    that.
10             Q.   But the counsel, Bruce Simon, was; right?
11                  MR. SIMON:  He sure was.
12             A.   You can ask him.
13             Q.   You don't know?
14             A.   Well, I do know, why are you asking me when he's
15   right there --
16             Q.   Because you are on the stand, sir.
17             A.   To -- that is hearsay, but I'll tell you the
18   hearsay.  I was told he was there.
19                  THE COURT:  Please sit down, Mr. Simon.
20             Q.   You gave a pretty long explanation on what
21   happened in LTV.  Now I'm going to ask you about it, okay?
22   Your counsel was involved in that one, right?
23             A.   Yes.
24             Q.   And you were, right?
25             A.   No.
```

61

1          Q.    You just know about it.

2          A.    Yes.

3          Q.    Isn't it true, sir, that on the eve of the

4     Section 1113/1114 hearing in that case, the creditors'

5     committee and the USW began to attempt to negotiate a modified

6     labor agreement?

7          A.    I've heard the story.  I wasn't there.

8          Q.    Isn't it true, sir, that's your understanding?

9          A.    I've heard the story.  I have no reason to

10    believe it isn't true.

11         Q.    Okay.  And that story that you've heard, isn't

12    it true that the USW and the creditors' committee, not the

13    debtor, but the creditors' committee in LTV came to an

14    agreement on the modified labor agreement, is that correct?

15         A.    That's my understanding, yes.

16         Q.    And isn't it true that that modified labor

17    agreement that the creditors' committee and the unions agreed

18    upon did not provide the level of savings that LTV was seeking

19    in the 1113 and 1114 proposals, correct?

20         A.    Knowing the USW's bargaining strategy, I would

21    believe that to be true, but I have no knowledge of that.

22         Q.    And then LTV did not successfully reorganize as

23    a result.  They instead sold their assets, correct?

24         A.    Oh, that's correct.

25         Q.    All right.  And they were bought by ISG?

62

1          A.    Yes.  The plants were bought.

2          Q.    And ISG took the plants and the assets without

3    the retirement benefit liabilities, correct?

4          A.    Correct.

5          Q.    Those were left with LTV to satisfy with its

6    pre-petition assets, right?

7          A.    I don't think that's an accurate statement of

8    the situation.  The obligation was left with LTV.  In the

9    negotiations with ISG, we created a trust funded by ISG

10   profits to provide healthcare to retirees from, ultimately,

11   Acme, LTV and Bethlehem.

12         Q.    Sir, on paragraph 17 of your declaration in tab

13   A of the cross-examination binder, you make a reference to the

14   meeting that occurred in Pittsburgh on December 14th; is that

15   right?

16         A.    Yes.

17         Q.    Now, at that meeting, the only thing that really

18   happened is, the parties made a date to meet again a month

19   later to engage in formal negotiations; is that correct?

20         A.    No, that's not correct.

21         Q.    What else happened?

22         A.    That did happen.  The original purpose as I

23   understood it of the meeting was to share information; and

24   there was a long discussion of financial and operating

25   information.  That part of the meeting was primarily a

63

1    teleconference.  At the end, Rick Shaw, counsel for Dana, and

2    myself, began the process of making arrangements for a

3    meeting.

4        Q.   At that December 14th meeting, the unions did

5    not take the opportunity to engage in any negotiation of the

6    debtor's Section 1113 proposals or 1114 proposals at that

7    time.

8        A.   That was not the purpose of the meeting.  No.

9        Q.   January 17th was the date set for that, right?

10       A.   We met in Toledo, and --

11       Q.   On January 17th?

12       A.   Yes.

13       Q.   Okay.  Now, that meeting that was scheduled for

14   January 167th, that was the meeting that was originally

15   scheduled for five days, correct?

16       A.   It was -- it was scheduled for, yes, at least

17   five days.

18       Q.   You had --

19       A.   We set aside time, is a better way to put it

20   than "schedule."

21       Q.   You had hotel reservations for five days,

22   correct?

23       A.   Yes.

24       Q.   It ended up only lasting two-and-a-half, three

25   days, correct?

64

1          A.    That's correct.

2          Q.    And at that meeting, that's when you made your

3    first proposal, which is tab H of your cross-examination

4    binder, Debtor's 280, is that correct?

5          A.    It appears that way.

6          Q.    Why did the meeting only last three days instead

7    of the anticipated five?

8          A.    Because there wasn't any point meeting after the

9    point at which we broke up.

10          Q.    Why not?

11          A.    I don't think it's appropriate to discuss

12    bargaining strategy on the witness stand.

13          Q.    Well, we've been talking --

14          THE COURT:    You can answer that question without

15    discussing the strategy.

16          A.    Well, we broke up for strategic reasons based on

17    our assessment of the bargaining situation.  I don't think

18    it's appropriate for me to go into detail under oath about our

19    strategic thinking about the long-term bargaining.

20          Q.    Well, you did testify under oath that it was

21    originally planned for five days, right?

22          A.    Yes.

23          Q.    And then --

24          A.    I -- I actually, that's not right.  I testified

25    that we set aside the time.  I didn't say planned.  I said we

65

1    set aside the time.  I corrected your word, "Planned."

2         Q.   So, I'm not going to ask you what your strategy

3    was, but it was terminated because of your strategy, is that

4    right?

5         A.   It was terminated because we concluded that at

6    that point, we should terminate it.

7         Q.   All right.  Then, sir, if I could ask you to

8    turn to tab I, this is a Debtor's Exhibit 281.

9         A.   Yes, sir.

10        Q.   Is this the counterproposal that Dana submitted

11   to the unions with respect to 1114 whereby they proposed

12   creation of a VEBA?

13        A.   Appears to be.

14        Q.   Do you recall seeing this?

15        A.   Yes, I received it.

16        Q.   And you received this on or about January 26,

17   2007?

18        A.   That sounds right.

19        Q.   And the unions did not respond to this

20   counterproposal with a formal response?

21        A.   A fair answer to that question is that we have

22   been engaged in negotiations with Dana over all subjects.  We

23   have not given them a written formal counterproposal that we

24   could then introduce into evidence in this proceeding.  But to

25   say that we have not responded to it is not fair.

66

1        Q.    Have you submitted anything in writing to

2   Dana --

3        A.    I just said we didn't --

4        Q.    -- with respect to this proposal?

5        A.    Well, again, we were not provided a formal

6   counterproposal that could be introduced in evidence.

7             Have we had discussions with the company over

8   the subject?  Yes.

9        Q.    Did you, I take it you rejected this proposal,

10  is that correct?

11       A.    Well, we certainly haven't accepted it.

12       Q.    Have you rejected it?

13       A.    I don't know what that means.  We haven't got an

14  agreement that we're going to do this.

15       Q.    Have you told Dana that you're unwilling to

16  accept this proposal?

17       A.    In a formal sense, probably.  That's really not

18  how negotiations work.  So -- we haven't been bargaining to

19  create a record for this proceeding.  We've been bargaining to

20  try to reach an acceptable agreement.  So I don't bargain in

21  terms like, "Reject," and keep that kind of --

22       Q.    I'm going to ask you to turn to tab K.  This is

23  Debtor's Exhibit 283.

24       A.    Yes.

25       Q.    Is this a letter that you sent to Mr. Bueter on

67

1    or about March 9th?

2            A.    Yes.

3            Q.    And this proposes -- March 9th, that was the

4    Friday before in Section 1113 hearing was scheduled to begin

5    on Monday, the following Monday, is that correct?

6            A.    It sound right.

7            Q.    So it's one business day before the trial was

8    supposed to start, right?

9            A.    Sounds right.

10           Q.    And in this letter, you're proposing to meet to

11   talk about something during the week of March 19th, March

12   20th, is that right?

13           A.    That's correct.

14           Q.    And then, if we turn to tab 11, this is the --

15           A.    Tab?

16           Q.    I'm sorry, tab L.  Debtor's Exhibit 284, this is

17   the revised proposal that you gave to Dana on March 19th,

18   correct?

19           A.    Yes.

20           Q.    And the only difference, the only material

21   difference between this proposal and the one that you did on

22   January 17th is that it added the UAW?

23           A.    In substance, that's correct.

24           Q.    All right.  So this proposal, and I know you

25   gave a little bit of preview of this to Mr. Levine's

68

1      questions, but the proposal that the unions made to Dana

2      doesn't address any wage reductions whatsoever with respect to

3      the unions at the plants, correct?

4              A.   Well --

5              Q.   You said yes to Mr. Levine.  Are you going to

6      give me a long answer?

7              A.   No, you used the word "address."  And I'm not

8      going to -- I'm not going to ratify that word.  Because we

9      think it provides a framework for a successful conclusion to

10     negotiations --

11             Q.   I know you said that.

12             A.   -- issues, so I'm not going to say yes to your

13     issue, it doesn't address.  I will acknowledge the obvious

14     that it doesn't propose on its face wage concessions.

15             Q.   Doesn't even discuss any wage concessions,

16     right?

17             A.   It doesn't on its face propose wage concessions.

18             Q.   All right.  And it doesn't discuss on its face

19     anything with respect to pension plan modifications, correct?

20             A.   Correct.

21             Q.   And it doesn't discuss on its face anything with

22     respect to healthcare plan modifications, correct?

23             A.   Correct.

24             Q.   And it doesn't discuss on its face any changes

25     in workplace rules or labor rules, correct?

69

1          A.    I -- I would probably quarrel with you, but it's

2    not directly, no.

3          Q.    And I may not be using the correct terms.  But

4    it doesn't address on its face any changes or proposed

5    modifications to retirement healthcare benefits, correct?

6          A.    I already said correct.

7          Q.    What it does do is, it asks to give additional

8    security to union workers to make it more difficult for Dana

9    to fire union workers, correct?

10          A.    Well, I don't think -- you're using the word

11    "fire" --

12          Q.    Terminate.

13          A.    -- I think that's incorrect.  I think

14    "terminate" is incorrect.  It addresses, I think what you're

15    getting at is, it addresses job security issues, as well as

16    other things.

17          Q.    Does the job security proposals in your

18    counterproposal, do they make it, if they were implemented,

19    more difficult for Dana to terminate union workers at these

20    plants?

21          A.    Well, you're using terms of art and I don't want

22    to sit around and argue about how those terms are used in

23    collective bargaining agreements, because I don't think that's

24    what you're doing.  It addresses the issue of job security,

25    which obviously means ongoing opportunity to work, for Dana

70

1    union-represented employees.

2         Q.   Okay.  You were sitting here yesterday during

3    the trial, is that correct?

4         A.   No.

5         Q.   Oh, you weren't here?  So you didn't hear

6    Professor Wachter's testimony about something called an

7    efficiency wage theory that might be proposed by one of your

8    experts, Susan Helper?

9         A.   I didn't hear it and it sounds like I'm glad I

10   didn't.

11        Q.   You have no knowledge as to whether or not

12   increasing job security for union workers might be

13   inconsistent with the efficiency wage theory proposed by your

14   expert?

15        A.   As I -- as I said, I've got no idea what the

16   efficiency wage theory is, so I can't answer the question.

17        Q.   Neither do I.  I can't wait to hear about the

18   cross-examination on that one today.  We'll find out.

19             Now, isn't it true, sir, that at this March 19th

20   meeting, you told representatives of Dana, including Chris

21   Bueter and Mr. Shaw of Jones, Day, that it was your belief

22   that both sides' proposals being discussed at that meeting

23   were "ridiculous"?

24        A.   My understanding of the -- we had a -- had two

25   discussions on the 19th.  The first was a full discussion with

71

1    both full committees in the room.  We proposed our proposal.

2    There was no proposal from the company, meaning that their

3    original 1113 proposal was still on the table from them.  They

4    didn't counterpropose their own proposal.

5              We had a meeting following that consisting of

6    the top leadership from each side.  And my understanding was

7    that that was an off-the-record discussion, and I prefer not

8    to discuss off-the-record discussions.

9         Q.   Sir, isn't it true that Mr. Bueter testified

10   that you told him at that meeting that you had called both

11   proposals ridiculous?

12        A.   I don't know what Mr. Bueter testified.

13        Q.   You weren't here?

14        A.   The only time I've been the in this courtroom is

15   this morning.

16        Q.   Okay, fair enough.  Then I was misinformed.  I

17   apologize.  You don't have any reason to dispute that what

18   Mr. Bueter testified is accurate, do you?

19        A.   I didn't hear him testify, so I'm not going to

20   comment on his testimony.

21        Q.   Well, he was commenting about what you said at

22   the March 19th meeting.  You're the person that would refute

23   him if anybody's going to.  Are you going to do it now?

24        A.   And I'm going to say, I don't recall making a

25   serious statement that our proposal was ridiculous, and if

72

1    Mr. Bueter said that, he can say whatever he wants.  I don't

2    discuss off-the-record conversations on the record.  I will

3    say in response to your question, I don't remember ever saying

4    that, and I'm sure I never said it in a serious way, "This is

5    a ridiculous proposal."

6                    Now, may I have had a joking comment with

7    somebody off the record?  Of course that's possible.

8              Q.   Now, the original Section 1113 proposals, with

9    all the wage reductions and pension plan modifications and

10   healthcare plan changes and work rule changes and retirement

11   benefit changes proposed by Dana, those were all made back in

12   early December to the union, right?

13             A.   Sound right.

14             Q.   All right.  And those changes are seeking cost

15   savings for the debtor that will result in somewhere between

16   30 and 60 million bucks, right?  Well, actually, 28 for these

17   five --

18             A.   Well, 30 to 60 is the number that's being thrown

19   around.

20             Q.   But for these five plants it's in the

21   neighborhood of thirty million or a little under, right?

22             A.    Thirty to sixty is the number I've had heard

23   thrown around.  You'd have to ask Leon --

24             Q.   I'm sure Mr. Bennett will do that at some point.

25   My question is, that was early December.  To this date, the

73

1    unions have not made any written counterproposal or formal

2    counterproposal to the debtors that results in cost savings to

3    the debtors that comes anywhere close to $28 million or $30

4    million, right?

5            A.    I have no idea about the costing.  I will tell

6    you, if what you're asking is, again, that we have not made a

7    written proposal for wage reductions, the answer is, that's

8    correct.

9            Q.    At this point, the unions haven't made any

10   counterproposal to the debtors that would save the debtors

11   even a nickel on their labor costs to this point, correct?

12           A.    Well, I am not going to concede that the

13   proposal we had will not result in labor cost savings.

14           Q.    You haven't proposed any reductions in wages,

15   right?

16           A.    That's correct.

17           Q.    No reduction in benefits, right?

18           A.    That's correct.

19           Q.    No reduction in total compensation.

20           A.    That's correct.

21           Q.    Okay.  So you haven't made any formal written

22   proposal that reduces Dana's total compensation for labor cost

23   by a nickel, right?

24           A.    On a per-capita basis, that's correct.  Now in

25   the steel industry --

74

1      Q.   Sir --

2      A.   -- you're asking me to characterize our proposal

3  and you're not giving me a fair chance to answer it --

4           THE COURT:  Your attorney is going to have you

5  on redirect.  Just answer the question.

6      Q.   All right.  It's now almost four months since

7  early December.  Do the unions have any plans to make a formal

8  proposal to the debtors that will reduce the debtors's total

9  compensation costs for their union labor prior to the court's

10  ruling on this 1113/1114 motion?

11      A.   As I explained to you earlier, I'm not going to

12  discuss a bargaining strategy on the witness stand.

13      Q.   Well, you haven't done it today, right?

14      A.   Once again, we have not proposed wage

15  reductions.  I conceded that pretty early.  We can say it a

16  lot of times.  I'll keep agreeing with you.

17           MR. HAMILTON:  I have no further questions, your

18  Honor.

19           MR. LEVINE:  No questions, your Honor.

20           Thank you, Mr. Robinson.

21           (The witness is excused.)

22           MR. LEVINE:  Your Honor, at this point, I'm

23  deferring to my partner, Mr. DeChiara.

24           MR. DeCHIARA:  Your Honor, if we could have a

25  very short break, a few minutes before the next witness?

75

 1    Thank you.

 2                    THE COURT:  Five minutes.

 3                    (Recess taken.)

 4                    THE COURT:  Okay.

 5                    MR. DeCHIARA:  Thank you, your Honor, Peter

 6    DeChiara, again, for the unions.  Our next witness is

 7    Dr. Paula Voos.

 8    P A U L A     V O O S , having been duly sworn, was examined

 9                    and testified as follows:

10    DIRECT EXAMINATION BY MR. DeCHIARA:

11             Q.    Good afternoon, Dr. Voos.

12             A.    Good afternoon.

13             Q.    Can you tell us where you are currently

14    employed?

15             A.    I'm a professor at Rutgers, the State University

16    of New Jersey.

17             Q.    And what is your academic specialty?

18             A.    I'm a labor economist who also specializes in

19    industrial relations.

20             Q.    And for how many years have you been a labor

21    economist?

22             A.    I graduated with my Ph.D. in economics from

23    Harvard University in 1982, whereupon I became an assistant

24    professor at the University of Wisconsin.  I stayed there for

25    many years, eventually became a full professor of economics

76

1    and industrial relations.  And then in 1998, I moved to New

2    Jersey and joined Rutgers.

3            Q.   And what is your position in the department at

4    Rutgers?

5            A.   I'm the elected chairperson of the department.

6            Q.   Have you published in the field of labor

7    economics?

8            A.   I have published extensively, both scholarly

9    reports and articles, and I have edited some books.

10           Q.   I'd like to refer you to your expert report in

11   this case.  It is marked as Union Exhibit 1.

12               MR. DeCHIARA:  Your Honor, if I may approach the

13   witness and hand her a copy, and if I may hand you a copy as

14   well.

15               THE COURT:  Don't I have it?

16               MR. DeCHIARA:  You probably do.  I just thought

17   for convenience I'll give you another.

18               THE COURT:  Well, if convenience means you're

19   burying me behind a mountain of paper --

20               MR. DeCHIARA:  Your Honor --

21           Q.   -- Dr. Voos, attached to your report is what

22   appears to be your CV, do you see that?

23           A.   Yes, I do.

24           Q.   And is that a complete and accurate and

25   up-to-date version of your CV?

77

1          A.   Yes, it is.

2          Q.   And looking on your CV, pages 2 through, I guess

3     it's 2 through 9, there are a list of many publications.  Is

4     that a listing of your publications in the field of labor

5     economics?

6          A.   Yes, that is.

7          Q.   Do any of those publications deal with the

8     subject of wage and benefit comparability?

9          A.   Yes.  Some do.  And others use the same

10    methodology that we would use in addressing wage

11    comparability, even though that's not the primary subject of

12    the article.

13              THE COURT:  Dr. Voos, what's the space after the

14    names of articles and chapters in books?  Is that --

15              THE WITNESS:  I'm glad you asked --

16              THE COURT:  -- is that a substitute for your

17    name?

18              THE WITNESS:  That's my name.  That's an

19    academic style.

20              THE COURT:  You give yourself a blank?

21              THE WITNESS:  Right, to put a blank in.  You

22    just put your name in the first one.  It's just a style.

23         Q.   Have you ever served as an expert in connection

24    with a legal proceeding?

25         A.   Yes, I have.

78

1          Q.    Can you tell us what those occasions were?

2          A.    They are all listed on my CV.  Most importantly,

3    and most recently, I was an expert in the Delphi bankruptcy

4    case for the UAW.  I've also been an expert in several

5    arbitrations, including two for the National Association of

6    Letter Carriers in 1999 and 1995, earlier for a couple for

7    Madison Teachers, Inc., in Madison, Wisconsin.

8          MR. DeCHIARA:  At this point, your Honor, I'd

9    like to move the qualification of Dr. Voos as an expert in the

10   field of labor economics.

11         MR. BENNETT:  Two things, your Honor.  One, as

12   with the limitations on Professor Wachter, I don't think this

13   expert is being proposed as an expert on the auto industry in

14   general, or the auto supply industry.

15         And the other one has to do with a discovery

16   point that we had raised earlier.  I could voir dire on that

17   subject or simply cross on the subject to make a record and

18   the court can rule.  My preference would be to do it as cross,

19   so that it's continuous.

20         THE COURT:  We'll await the event.

21         MR. BENNETT:  Thank you, your Honor.

22         THE COURT:  She's accepted as an expert in labor

23   economics.

24         Q.    Professor Voos, did you write your expert report

25   that's Union Exhibit 1?

79

1        A.   Yes, I did.

2        Q.   And I'm going to ask you if everything in it is

3   true and accurate, but before I do that, are there any

4   corrections you'd like to make in it?

5        A.   I would like to make one important correction

6   that is, involves a rounding error.  That correction is in

7   table 3 on, I believe, page 13 -- yes.  If you look at the

8   right column of that table, and you go down three rows, you

9   will see a a figure of $20.04 per hour.  That should read

10  $20.05 per hour.  The number was 20.046, and it should be

11  rounded up to five.

12       Q.   So it's a penny difference?

13       A.   Correct.

14       Q.   Apart from that correction, as far as you know,

15  is everything set forth in your expert report true and

16  correct?

17       A.   To the best of my knowledge and belief.

18            MR. DeCHIARA:  Your Honor, we would move the

19  admission of Union Exhibit 1.

20            MR. BENNETT:  No objection.

21            THE COURT:  Received.

22            (Union Exhibit 1, received in evidence, as of

23  this date.)

24       Q.   Dr. Voos, in his declaration, Mr. Bueter states

25  that among the goals that Dana is seeking to achieve in the

80

1    pay cuts it's seeking in the five facilities that have been

2    discussed in this case, one of the goals is, "To bring the

3    average hourly wage cost in line with that being paid by other

4    companies in the same industry."

5              That's paragraph 17 of Mr. Bueter's declaration.

6    First let me ask you, what industry does Dana operate in?

7         A.    The Bureau of Labor Statistics places it in the

8    motor vehicle parts industry.  That's North American

9    industrial classification code -- let me be sure I have the

10   right number -- 3363.

11        Q.    That's the BLS code for the auto parts industry?

12        A.    That is correct.

13        Q.    In preparation for your testimony here today,

14   did you do any analysis of Dana's wages in the five plants

15   that have been discussed, and I'm referring to Auburn Hills,

16   Fort Wayne, Lima, Marion and Pottstown, did you do any

17   analysis of Dana's wages at those plants in comparison to

18   wages paid generally in the auto parts industry?

19        A.    Yes, I did, and I did that because those wages

20   in that industry are the important benchmark or reference

21   point for Dana's competitors who are also in that industry.

22        Q.    And based on your analysis, do you have an

23   opinion about how Dana's current wages at these five

24   facilities compare to other companies in the motor vehicle

25   parts industry?

81

1        A.    Yes --

2             MR. MORELAND:  Your Honor, excuse me.  Could I

3    object on behalf of the committee to testimony in relation to

4    the Lima and Pottstown plants on the grounds that it's

5    irrelevant to the motion before the court?

6             MR. DeCHIARA:  Your Honor, I don't substantively

7    disagree that since the company has said that its Section 1113

8    proposal does not apply to the Pottstown and Lima plants, that

9    they may not be relevant.  However, for purposes of this

10   examination, since this witness did prepare an analysis of

11   those five plants in response to, largely in response to what

12   Dr. Wachter did, and Dr. Wachter looked at those five plants,

13   I think it would just be more complete to allow her to present

14   her analysis and the court can obviously take note of the fact

15   that the Section 1113 proposal does not apply to those five

16   plants.

17             THE COURT:  I understand that.  It's taking

18   those, all five plants in juxtaposition each to the other that

19   forms a backdrop for the preparation of the report.  I will

20   allow it.  The objection is overruled.

21        Q.    Let me ask the question again.  Based on your

22   analysis, do you have an opinion about how Dana's current

23   wages at these five facilities compare to other companies in

24   the motor vehicle parts industry?

25        A.    Yes, I do.  And I look at these plants on an

82

1    individual basis as well as on a collective basis, so it is

2    easy to see the Lima and Pottstown plants and see the other

3    three plants.

4            Q.   Okay.  And what is, if you could just tell us

5    what your conclusion is, and then I'll ask you to walk us

6    through how to get there, what is your conclusion about how

7    the current wages at those five plants compare to the auto

8    parts industry?

9            A.   Yes.  Wages at these five plants, I have

10   concluded, currently are somewhat below the industry standard.

11           Q.   Okay.  And now that you've given us your

12   conclusion, if you could turn to your report and walk us

13   through how you reached that conclusion.

14           A.   Yes, please.  I would like to say that I started

15   by looking at the industry and its wages, and I used two

16   different publicly-available datasets from the Bureau of Labor

17   Statistics to do that.

18               If you turn to page 11, at the bottom you will

19   see table 2-A, and then at the top of page 12, you will see

20   table 2-B.  Each table refers to a different dataset.  My data

21   was taken from the website of the Bureau of Labor Statistics.

22   It is the most recent data available, and these are two

23   sources of data on this industry and on other industries in

24   the American economy.

25               The first set of data is from the quarterly

83

1    census of wages.  It is for the second quarter of 2006.  That

2    is a dataset that covers about 98 percent of all the employees

3    in the economy.  It includes white collar workers as well as

4    blue collar workers, managers as well as production workers.

5    It's a very inclusive dataset.  And it has data, of course,

6    also on government employees.  But I looked only at the

7    private sector, and then the two parts of the private sector

8    is either the goods producing sector or the service sector,

9    and clearly Dana is in the goods-producing sector.  And then

10   within the goods-producing sector it's in the motor vehicle

11   parts industry.  So this data table is set up to show the

12   average weekly wages in these various industry groups of which

13   Dana is a part.

14            So the industry groups are going in the first

15   column down from most aggregate, the total product sector, to

16   quite an aggregate, intermediate category, the goods-producing

17   sector, and then the motor vehicle parts industry, Dana's

18   industry, at the bottom.  And the first column shows the

19   average weekly wages in those three sectors and then you'll

20   notice that in motor vehicle parts at $1,001 per week --

21            THE COURT:  Rounded off.

22            THE WITNESS:  Yes, that's rounded up to the

23   nearest dollar, correct --

24        A.   -- that wage in that industry is above the

25   average in the goods-producing sector or in the total private

84

1    sector.  And those comparisons are in the next two columns.

2    It's just for the convenience of everyone to see the degree to

3    which they are above.

4              And probably the most important number on the

5    table is the comparison to the goods-producing sector and

6    that's important because sometimes, one has to use data from

7    the goods-producing sector.  One would always prefer to use

8    the most close match as possible in doing a kind of

9    benchmarking or comparability.  One would like to use

10   industry, motor vehicle parts industry data, but when we can't

11   get it, we have to look at the closest thing possible.  And

12   that's sometimes the goods-producing sector.

13             And so you see in the first right column at the

14   bottom of the table, that on average, weekly wages in the

15   motor vehicle parts industry are 11.6 percent above that in

16   the total goods producing sector.

17             Table 2-B is from a different dataset.  It is

18   also from the Bureau of Labor Statistics.  It's for December

19   2006.  And it is, in some ways, really quite relevant because

20   it pertains only to production and non-supervisory workers,

21   and that is, you know, one might say in a vernacular way, blue

22   collar, the people who are paid on an hourly basis, and

23   clearly, all the union workers in the Dana facilities in

24   question would be in this category of production and

25   non-supervisory workers.  That would include skilled

85

1    employees, it would include production employees, it would

2    include support employees.

3              And again, we have the three industry groups and

4    then the first column shows the average hourly earnings in the

5    total product, the goods-producing and the motor vehicle parts

6    industry, and you'll notice in motor vehicle parts, the

7    average as of last December is $22.11 per hour, and you might

8    want to kind of mentally circle that number in your mind,

9    because it is a particularly relevant number for the five

10   facilities in question, and is a number that is a really clear

11   industry benchmark.

12             The next two columns, again, show the percentage

13   differential with the total private sector or the

14   goods-producing sector and the number on the far right bottom

15   row shows that, you know, looking at this dataset, at the

16   production and non-supervisory workers only, on average, their

17   pay, their average hourly earnings is 20.3 percent above that,

18   in the goods producing sector.

19             So clearly, motor vehicle parts is not a

20   low-wage industry.  That is one factor, but only one factor

21   that we would look at in comparability analysis.  Typically

22   we'd look at a variety of factors.  And table 3 on page 13

23   introduces a second consideration, and one that has been found

24   to be very, very important in terms of wages.  And that is the

25   issue of employer size.

86

1     Q.    Establishment size?

2     A.    Well, actually, this table is about

3    establishment size, but I'd like to note at this point that

4    there really are two dimensions to employer size.  One is the

5    size of the total corporation, and Dana is a substantial

6    corporation in terms of its, you know, entire work force.  And

7    that factor will be dealt with later in the paper.

8              This is about establishment size, the size of an

9    individual facility or plant or location.  And so we have data

10    on establishment size.  Both have been found to be important

11    dimensions in wage comparisons.  And establishment size,

12    you'll notice again, BLS data from the quarterly census of

13    wages, this is, the first quarter of 2006 was the latest

14    available, you see some establishment size categories created

15    by the bureau.  And they go down from 50 to 99, that's a small

16    size category, up to, at the bottom of the table, one thousand

17    or more employees in an individual plant or facility.

18              The second column shows weekly earnings in all

19    the goods-producing sector in these different size

20    establishments.  And you'll notice just looking down the

21    columns what a marked impact establishment size has on

22    earnings.  And small facilities at the top there, we have 881.

23    By the time you're down to really large facilities, one

24    thousand or more, you're at $1,544 per week.  So establishment

25    size is clearly very important.

87

1        Dana's facilities that we're looking at, these

2   five facilities, are all actually kind of in the middle of

3   this table.  They are moderately large.  They are not huge.

4   Four of the five facilities are most likely now in the 250 to

5   499 category.  I judged the size category by looking at the

6   number of union employees mentioned in Professor Wachter's

7   report.  I did not know the number of non-union employees.  So

8   if I erred, I erred on the side of choosing too small a

9   category.  I was conservative.

10        In one facility, Auburn Hills, the number of

11   union employees is only 194, so that facility may be in the

12   one hundred to 249 category.  And again, that's being

13   conservative.

14        So the numbers that are most important here in

15   the table are the ones that are in those rows and those are

16   the ones that matter.  And we'll -- let me explain the other

17   columns and what one needs to do to use these numbers in a way

18   that gives us a good benchmark for the Dana employees in

19   question.

20        The next column takes the weekly earnings

21   figures and changes them to hourly earnings figures, hourly

22   wage figures, by dividing by the standard work week of 40

23   hours.  So that's just simply the numbers in the first column

24   divided by forty.  The final column adjusts for the fact that

25   this is data on all employees, and not just on production and

88

1    non-supervisory employees, the work group in question.  And to

2    make it more applicable to the blue collar employees, I used

3    the economy-wide average of the ratio between pay to the

4    production and non-supervisory category, to all employees.

5    And the production and non-supervisory category has a little

6    lower earnings on average because they don't include

7    high-level managers, supervisors and so on.  And that ratio is

8    about 78 percent.

9            So the final column is an estimated average for

10   hourly wages for production workers in the goods-producing

11   sector for different size establishments.  And you will see,

12   now that it's been corrected, that in the one hundred to 249

13   category, that is $18.46 per hour, and in the 250 to 499,

14   $20.04 per hour.

15           Table 4 does two things.  It allows us to look

16   at industry wages in comparison to the average wage for all

17   union-represented employees in these plants, and it also

18   allows us to look at the benchmark wage for similarly-sized

19   facilities in the same industry, as it takes into account two

20   factors.  And to do it, it's a little bit complicated, so let

21   me try to walk you through it.  If there are any questions,

22   please let me know.

23           We have the five facilities in question on the

24   left column, and then I took information from Professor

25   Wachter's report on the current wages for various categories

1     of union-represented employees.  And those categories are the

2     average for all skilled trades in each facility, first column;

3     second column, for the current tier 1 production and support

4     employees.  And tier 2 is the next column, for those two

5     facilities where there currently is a tier 2 agreement.  All

6     right?

7                    So those are the wages for each group at

8     present.  And then, in order to find out the current average

9     wage for all union-represented employees at each facility, I

10    did a weighted average using information on the number of

11    workers in each category, and that's the same type of average

12    Professor Wachter uses.  It's an accurate type of average used

13    by economists to arrive at the current average wage for all

14    union-represented workers in each facility.

15                    And that column, even though it's the fourth

16    column over and kind of of buried in the table, is a very

17    important column, and let me just pause for a minute and

18    explain why it's important.

19                    In much of Professor Wachter's analysis, he

20    focuses on only on tier 1 production and support employees and

21    ignores all the other employees.  And this is the actual

22    average wage at each and every one of these facilities, and

23    one thing you can do in your mind is simply go back and

24    compare that wage to the wage that I suggested we all mentally

25    circle in table 2-B.

90

1          So go back to table 2-B, if you can --

2      Q.    It's on page 12?

3      A.    -- page 12.  And you know, on page 2-B, in the

4  motor vehicle parts industry, the average hourly earnings is

5  22.11.  Compare that to this wage, the average wage for all

6  union workers in each and every one of these five facilities

7  and you will notice that Fort Wayne Indiana, at 22.12, is one

8  penny more than the current average wage in the industry.

9  Just about at average.  And all other facilities, all of these

10 other four facilities are below the current average industry

11 wage.  So that's why I would say that current Dana wages are

12 somewhat below average.

13          That is just looking at industry.  But we need

14 to combine that with information on establishment size,

15 because establishment size is also important.  And that's what

16 is done in the next two columns.

17          The next column, "Comparison wage for the

18 goods-producing sector," is a column that is simply taken from

19 table 3.  It's for your convenience to have it on the same

20 page.  And for each one of the facilities I looked at, the

21 wage in the goods-producing sector for blue collar or

22 production non-supervisory employees as calculated in table 3,

23 and you'll notice that's $20.05 for four of the five

24 facilities, and 18.46 for the one that's smallest.  Okay.

25          So then just comparing those two columns gives

91

1    us some information, but obviously, that's for the

2    goods-producing sector, not for the motor vehicle industry.

3    So what's really important is to have some idea of how the

4    wages for Dana employees compare to employees in the motor

5    vehicle industry.  And that's what we do in the final column.

6              How do I derive the figures in that column?

7    Well, being a conservative person, I wanted to be

8    conservative, so I went back to table 2-A and said, "Well, the

9    differential between motor vehicles and the goods-producing

10   sector is at least 111.6 percent."  It might be 120.3.  That's

11   2.3.  But I just used 111.6, the smaller of the two measures

12   of the differential, and the motor vehicle parts sector

13   benchmarks or comparison wages are just 111.6 percent of my

14   estimates of the motor -- of the goods-producing sector.  So

15   that's the final column.

16             As a double-check, I'd like you to notice one

17   thing.  I understand we've been through several steps in

18   getting to that estimate.  Remember that the direct measure by

19   the BLS, table 2-B, of wages in the motor vehicle parts

20   industry was $22.11.  If you look at the figures in my final

21   column that come through a series of estimating steps, a

22   different data source, you'll notice 22.38, you know, just a

23   little above 22.11.  Or 20.60, just a little below 22.11,

24   okay?

25             So I think that these estimates are quite

92

1    reasonable.  They take into account both establishment size

2    and industry, but they correspond to a wholly different

3    dataset that has direct measures of motor vehicle parts wages.

4    So they are pretty reasonable and they do show the impact of

5    both industry and establishment size.

6              Q.   And if you could just point out to us which

7    column should we look at to compare the current average wage

8    for the union workers at the five plants to your estimate of

9    what the benchmark wage is?

10             A.   Well, that would be the third column from the

11   right, "Current average wage for all union workers."  Let's go

12   ahead and do a --

13             Q.   All union workers at the five facilities.

14             A.   At each of the five facilities.  It's facility

15   by facility, to the comparison wage which is the column on the

16   right.  So you will see for Pottstown, the current average for

17   the union-represented employees is $20.91 per hour, and the

18   comparison wage for a motor vehicle parts facility of

19   approximately the same size as Pottstown is 22.38.  So you can

20   compare those two columns.  I'm sorry they are not next to one

21   another.  That would have made it a little more convenient,

22   but it's pretty clear that for each and every comparison, in

23   all five facilities, the current wage is below this benchmark.

24             Q.   Did you do an analysis of what the wages at the

25   five plants would look like compared to the benchmark after

93

1    implementation of the Section 1113 facility?

2              A.    Yes, I did.

3              Q.    Can you show us where that is in your report.

4              A.    Please turn to the next table.  That's table 5.

5    And let me explain what this shows before I try to go through

6    all the detailed calculations.

7                    Dana's proposal includes immediate wage

8    reductions for current skilled workers, current tier 1

9    workers, and it also includes a much lower starting rate for

10   new tier 2 workers at $11.05 an hour.

11                   So any, you know, estimation of the impact has

12   to make some assumptions about how many of these new people,

13   new tier 2 people are hired.  And so this is a snapshot.  This

14   is the morning after those pay reductions go into effect, and

15   I'm assuming that no new tier 2 employees have been hired at

16   11.05 an hour for the purposes of this table.  This is just

17   the immediate effect on the current employees.

18                   I also assumed that there were the same number

19   of employees in each of the categories so that the weighted

20   average wasn't any different, right?  So it just is the effect

21   of the pay changes alone and no change in mix.  And the

22   figures in the first three columns for each of the facilities

23   were again taken from Professor Wachter's report on what Dana

24   is proposing to pay to these current employees.

25                   And again, I have, in column 4, the column 4,

94

1    the numerical column 4 is, headed, "Proposed average wage for

2    all union workers," facility by facility in each of these five

3    plants.

4                    The next column, "Comparison wage, motor vehicle

5    parts sector," is the number that is from table 4, right-hand

6    column.  It is a number that includes, remember, both

7    industry, motor vehicle parts, and establishment size.  And

8    you can just compare the proposed wage with the benchmark.

9    The final column shows the percent difference.  And it seems

10   clear to me that Dana is proposing to lower pay substantially

11   below the industry average in a similar facility; anywhere

12   from 22 percent below in Fort Wayne, Indiana, to 27 percent

13   below in Marion, Ohio.  Their proposals, even ignoring the new

14   tier 2, are really ones that would make it quite a low-wage

15   competitor within the industry.

16                   Q.   You said that table 5 gives us a snapshot of the

17   morning after the 1113 proposals are implemented.  How would

18   this last column, the percentage differences, those double

19   digit negative numbers, how would those change with the

20   passage of time as new tier 2 employees were brought in at

21   11.05 an hour and as perhaps incumbent employees left?

22                   A.   The percent differences would get larger and

23   more negative.  Because the new employees would have an

24   average wage that is substantially below these figures.

25                   Q.   In your opinion, what effect would paying below

1 market wages have on the work force that Dana can attract or

2 retain at these five facilities?

3   A. Labor economists find that there is some range

4 of wages in a labor market for particular types of workers,

5 and presumably that range of wages exists because there are

6 some differences in the qualification and skills of employees

7 that, you know, were not able to take into account in our

8 standard dataset.

9   But when employers are hiring, clearly, the

10 employers who are paying the best wages have their pick of

11 many, many employees and good, high quality employees can take

12 those jobs.  And the employers who are trying to compete in

13 that labor market and are paying substantially below the

14 average have to take what's left.  They have to take less

15 qualified, less skilled employees, employees with, you know,

16 interrupted work careers or employees that have had problems

17 getting better jobs.

18   Q. And what effect would that have on the

19 productivity of Dana's plants?

20   A. Typically, labor economists believe that pay is

21 strongly related to skill, and less skilled, less dedicated,

22 less motivated employees, employees who don't have the ability

23 to solve problems or to remain error-free in doing their work,

24 are less productive.  They have a higher defect rate, higher

25 problems all around.

96

1        Q.   In your opinion, if some of the incumbent

2   workers left these plants as a result of or after the

3   implementation of the Section 1113 proposals, which types of

4   workers are most likely to leave?

5        A.   Again, workers who have better opportunities

6   with other employers are most likely to leave, and those tend

7   to be the best quality employees who are able to get better

8   jobs.  They also tend to be younger employees.  Older

9   employees may stick with it a few more years in order to

10   retire at the same place.  It's harder for them and their

11   families to be mobile.  But that's one of the problems

12   employers find when they reduce wages, is that they often lose

13   the people they don't want to lose.

14        Q.   And what effect, in your view, would there be on

15   the incumbent employees who stayed?

16        (Continued on following page.)

17

18

19

20

21

22

23

24

25

97

1        A.   My experience and knowledge as a labor economist

2   is that academic studies have demonstrated that there are

3   consequences to pay cuts, especially substantial pay cuts that

4   lead to reduced morale, reduced efficiency, and often some

5   unwanted consequences to the employer.  It's hard to predict

6   precisely how serious those will be.  Hard to put a number on

7   it.  But, yes, there are certainly many stores abound.

8        Q.   Professor Wachter on --

9             THE COURT:  If you're going to go into another

10  subject area, we'll break for lunch.

11            MR. DeCHIARA:  That's fine, your Honor.

12            THE COURT:  We'll break for lunch.

13            MR. DeCHIARA:  2 o'clock?

14            THE COURT:  Yes.

15            (Luncheon recess:   12:55 p.m.)

16

17

18

19

20

21

22

23

24

25

98

1          A F T E R N O O N    S E S S I O N

2                    (2:04 p.m.)

3   P A U L A     V O O S ,    having been previously sworn,

4                    resumed the stand and testified further as

5                    follows:

6   DIRECT EXAMINATION BY MR. DeCHIARA (Cont'd.)

7          Q.   Mr. Voos, before we broke for lunch, we were

8   discussing primarily your analysis of wages.

9          A.   Correct.

10         Q.   As opposed to wages and total compensation.  Let

11  me begin by asking you, in terms of the ability to attract and

12  retain a skilled and motivated work force, can a company look

13  solely at total compensation or does it also need to look

14  separately at wages?

15         A.   An employer needs to look both at wages and at

16  total compensation, and the reason is that employees look at

17  both.  All of us need to, you know, buy gasoline, go to the

18  grocery store, pay rent, pay the mortgage.  So we're concerned

19  with wages, and we're also concerned with total compensation.

20  We're concerned with our health insurance, pensions and so on.

21              But they are not entirely separatable, and

22  clearly employees care about both.  So employers have to

23  analyze both.

24         Q.   Do you have an estimate of the total

25  compensation, wages plus benefits, of production workers in

99

1    the motor vehicle parts industry?

2         A.    Yes, I do.

3         Q.    Can you refer us to your expert report and

4    explain to us how you arrived at that estimate.

5         A.    Yes.  And let me say first of all, the reason I

6    do create an estimate of total compensation in motor vehicle

7    parts is that the Bureau of Labor Statistics does not simply

8    present that data.  I wish they had.  They have data for the

9    entire goods-producing sector, so I have to use that data, and

10   then use a reasonable information on differentials between two

11   industry aggregations to get to a more precise estimate

12   applicable to motor vehicle parts.

13              To do that, why don't we look at table 6.

14        Q.    It's on page 16?

15        A.    On page 16, yes.  This is the dataset, the

16   employer cost of employee compensation that is also used by

17   Professor Wachter, from the Bureau of Labor Statistics.  This

18   was the latest data that was available.  It's for the third

19   quarter of 2006, and this table is set up a little

20   differently.  The number of employees in establishments of

21   different size categories in the goods-producing sector,

22   you'll notice that's across the top, and these are categories

23   created by the BLS.  So one to 49 is the smallest size

24   establishment in their categorization scheme, and five

25   hundred-plus is the largest size for this particular type of

100

1  data.

2          Clearly, in all the five facilities that we're

3  talking about at the present time, not perhaps in the past

4  when they were larger but at the present time, the Dana

5  facilities would be in this one hundred to 499 category.

6  That's obviously an agglomeration of two categories that we

7  were looking at earlier, but that's the way this total

8  compensation data is released to the public.

9          Total compensation is in the first line, and

10  that, of course, includes the cost of various fringe benefits,

11  both legally required and not legally required, and wages and

12  salaries.  And you'll see the total compensation on average in

13  the goods-producing industry in the one hundred to 499

14  category is $29.34, and you can also see the breakdown between

15  the wages and benefits.

16          To arrive at an estimate of the total

17  compensation in motor vehicle parts, I do the same steps that

18  I did before, though they are not separate tables.  That is, I

19  recognize first of all that this applies to all employees.  It

20  does not apply specifically to production and non-supervisory

21  employees, the group of employees that the union represents at

22  Dana.  And so we have to recognize the difference between

23  that, and to do that, I have information on the relationship,

24  economy-wide, between the production occupations and all

25  occupations.  And that information is in table 7.  And it is

1    also from the employer cost of employee compensation.

2                And you'll notice economy-wide production

3    occupations, 22.62; all occupations, economy-wide, total

4    compensation, I'm reading across the first line, 25.52, and so

5    the first number is 89 percent of the other number.

6    Production occupations come in somewhat lower as before, 89

7    percent.

8                So in order to get at the compensation benchmark

9    in the goods-producing industries for the employees

10   occupational group in question, the blue collar workers, I

11   just take 89 percent of the figure in table 6 in that second

12   column to the right, that 29.34 figure, 89 percent of that is

13   $22.62, and that number is in paragraph 35 that is below the

14   table.

15               Again, that is for the goods-producing sector,

16   and we need to recognize in fact that the motor vehicle parts

17   industry is a more highly compensated sector, and so I refer

18   again to table 2-A and 2-B.  Those were the estimates of how

19   different motor vehicles was in comparison to goods-producing,

20   and we saw in those tables that total compensation in motor

21   vehicles was something like 111.6, 2-A; or 123.3 percent, 2-B,

22   of the figures for the goods-producing industry as a whole.

23   And when I do that, I conclude that a reasonable estimate of

24   total compensation in the motor vehicle parts industry for

25   establishments that are the size of the establishments we're

102

1    talking about are between $29.14 an hour, and $31.41 an hour,

2    and that conclusion is at the end of paragraph 36 on page 17.

3           Q.   And how does that estimate compare to the total

4    current compensation of Dana employees?

5           A.   Mr. Chris Bueter said in his declaration on page

6    12 that the average wage and fringe costs for Dana employees,

7    corporation-wide, was $30.46 an hour in 2005.  A value that's

8    in that range, it's in the middle of that estimated range.

9           Q.   So that the current total compensation of the

10   Dana employees is within the range of what you say is the

11   benchmark for the industry.

12          A.   Corporation-wide, yes.  So I would conclude that

13   their total compensation at the present time is just about

14   average for the industry.

15          Q.   Let me now direct your attention to Union

16   Exhibit 58.  Do you have a copy of that?

17          A.   I'm not sure where that's located, can you --

18          Q.   Let me --

19               MR. DeCHIARA:  -- your Honor, this is a new

20   exhibit.  I gave your clerk two copies.  You should have one.

21   And the company, I believe, has...

22               (Handing document to witness.)

23          Q.   And I'm also going to be referring to Exhibit 59

24   in a minute, as well.  But let's first talk about Exhibit 58.

25   It says, table 8.  If you could first tell us, who created

103

1    this document?

2              A.    I created it.

3              Q.    And when did you create it?

4              A.    I created it this past weekend after looking at

5    Debtor's Exhibit 55.

6              Q.    And can you tell us what table 8 shows us?

7              A.    Table 8, again, lists the five facilities and it

8    shows us how the proposed value of total compensation,

9    according to Dana, compares to this benchmark that I have

10   created for the total compensation in the motor vehicle parts

11   industry for similarly-sized establishments.

12              I took, in Professor Wachter's original report,

13   there was no estimate of the total cost of the proposed

14   compensation.  He submitted that later.  And I --

15              Q.    You mean after the implementation of 1113?

16              A.    Yes, after the implementation of 1113.  In his

17   original report he did not analyze this.  But then Debtor's

18   Exhibit 55 listed the five facilities, what they proposed for

19   each one in terms of pay and in terms of benefits and hence,

20   total compensation.  And I took their figures.  Those figures

21   are in the first column of this table.  I can't really vouch

22   for their accuracy and indeed, I'm not sure if they -- I heard

23   this morning Professor Wachter say that they only pertained to

24   union-represented employees.  I did not know, for example, if

25   they include current tier 2 employees or if they are just tier

104

1    1.  But in any event, these are the companies's figures on

2    total compensation and for comparison, I just took the

3    midpoint of that estimated rage for the industry.  The

4    midpoint of that estimated range is $30.27, and you will see

5    in the third column how their proposed total compensation

6    compares and, in Pottstown, it's just about the same, just,

7    you know, and in Auburn Hills, it's 12.3 percent below and so

8    on.

9              Q.   Well, let's just for a moment look at the three

10   of those plants where the 1113 is supposed to, or would apply,

11   Auburn Hills, Marion and Fort Wayne.  Just, what's the

12   percentage difference between the proposed total compensation

13   and the market?

14             A.   In each of those cases, the proposed

15   compensation is lower than the benchmark for a similarly-sized

16   facility in the motor vehicle parts industry.  In Auburn

17   Hills, it's 12.3 percent below.  In Marion, it's 9.5 percent

18   below, and in Fort Wayne, it's 4.1 percent below.

19             Q.   Okay.  Let me draw your attention back to the

20   proposed total compensation column; do you see that?

21             A.   Yes, I do.

22             Q.   Now, when we were talking about your table

23   regarding the proposed wages after implementation of the 1113,

24   you had indicated that that was a snapshot, sort of a morning

25   after the implementation.  Does that same concept apply here?

105

1          A.   Yes, it does.  This table does not assume that

2     the company has hired any new tier 2 employees yet.  This is

3     just for the current employees immediately after

4     implementation.

5          Q.   And how would those numbers in the last column

6     change after certain incumbent employees leave and no hires

7     are hired?

8          A.   As new employees are hired at a lower level of

9     total compensation, those numbers would get larger and more

10    negative.

11         Q.   Let me now refer you to Exhibit 59, which is the

12    one that says, "Table 9."  And -- I'm sorry.

13              (Handing document to witness.)

14         Q.   Did you create this document?

15         A.   Yes, I did.

16         Q.   And did you also create this in the last couple

17    of days?

18         A.   Yes, I did.

19         Q.   And can you tell us what this shows us.

20         A.   Well, as I said, Debtor's Exhibit --

21              THE COURT:  Could you show us exactly what you

22    just testified to, the increase in the percentage numbers?

23              THE WITNESS:  That is correct.  And again, it

24    was taken from the Debtor's Exhibit 55, and I just took the

25    value of benefits for each facility and added that to 11.05 an

106

```
1    hour to arrive at the numbers the first column, proposed tier

2    2 numbers, and then as you said, shows the conclusion.

3              Q.   This is the conclusion of what the tier 2, the

4    new tier 2 employees' total compensation would be.

5              A.   That is correct.  And you'll see that in all

6    three of those facilities, they are very substantially below

7    the total compensation that is a reasonable benchmark for the

8    industry.

9              MR. DeCHIARA:  Your Honor, we move the admission

10   of Union Exhibits 58 and 59.

11             MR. BENNETT:  Your Honor, just for the record,

12   these were given to us this morning, just before the hearing

13   started.  I'm well aware that the court's ruling is that this

14   is a fluid situation.  The fact, however, is that Professor

15   Wachter could have had an opportunity to look at this since

16   they were created over the weekend.  He could have had an

17   opportunity to look at this.  He could have had an opportunity

18   to respond to it.  He's now on a train back to Philadelphia.

19             I'm not going to object to it.  She's already

20   testified about it.  But you should certainly understand that

21   it hasn't been vetted in that way.

22             THE COURT:  It's received.

23             MR. DeCHIARA:  Thank you, your Honor.

24             THE COURT:  Or they are received.

25             MR. DeCHIARA:  Thank you, your Honor.
```

107

1              (Union Exhibit 58, received in evidence, as of

2    this date.)

3              (Union Exhibit 59, received in evidence, as of

4    this date.)

5         Q.   As long as we're talking about Professor

6    Wachter, let me move to the next topic.  Professor Wachter

7    measures -- have you read Dr. Wachter's expert report?

8         A.   Yes, I have.

9         Q.   And he measures the market level of Dana's

10   current wages by looking at the average pay for certain BLS

11   occupational categories across the entire U.S. private sector

12   economy, is that your understanding?

13        A.   That is correct.

14        Q.   Do you believe that is the proper way to

15   determine the market wage of Dana's employees?

16        A.   No, I do not.

17        Q.   Can you explain why?

18        A.   It has various problems.  For one thing, it is

19   nationwide.  For another thing, it is focused solely on

20   occupation.  It ignores other elements that determine wages

21   besides occupation, including, industry and employer size are

22   things I've focused on here, but there are other things as

23   well that determine compensation.  And it is not even a very

24   careful or precise analysis of occupation.

25        Q.   Okay.  And we'll discuss each of those in turn.

108

1    But let me first ask you if you can give us an example of a

2    comparability situation that you've been involved in and

3    explain how comparability was performed.

4          A.    Comparability has been used in interest

5    arbitration; that is, arbitration that sets the terms and

6    conditions of new contracts in parts of the public sector.

7                And for example, in Wisconsin, where I worked

8    for many years, when there is an impasse in the public sector,

9    public sector employees are not allowed to strike.  Instead,

10   they may take their claims to interest arbitration.  Or in the

11   State of New Jersey, police and fire, other public safety

12   employees may take their claims to interest arbitration.

13               It is rarely, very rarely used in the private

14   sector.  In the public sector, of course, we have public

15   information about wages and benefits that are paid to

16   employees.  We're not concerned with keeping that secret from

17   the competition.  So typically the standard, the gold standard

18   that would be used in arbitration is to make as exact a match

19   as possible, that is, to take into account all the different

20   pay-setting elements that have been identified by labor

21   economists in research to effect a pay, and to choose a

22   comparison group that is as close as possible.

23               So an example would be that, when I consulted

24   with Madison Teachers in the 1880s, 1890s, in --

25          Q.    1880s?

1        A.    I'm sorry, 19 -- yeah, I'm older than I look.

2    The 1980s and 1990s, on pay, the standard that had evolved in

3    Wisconsin arbitration, and there were a number of things by

4    the way in the statute or the law that arbitrators were

5    directed to look at but one of them was comparable pay.  The

6    standard that had had evolved was to look at pay in the -- for

7    teachers in the same athletic conference.  And athletic

8    conferences are set up in Wisconsin, as in many states, to

9    recognize the size of the school district.  And school

10   districts that are larger in fact have higher pay.  And they

11   are also set up to be in approximately the same part of the

12   state.  And in Wisconsin, pay is higher in the southern and

13   more urban parts of the state than it is in the north.

14        So both the school district and Madison Teachers

15   stipulated the pay rates in the various districts in that same

16   athletic conference, and of course that's the same industry,

17   that public education, not private schools, it's the same

18   occupation, teachers, you know, not principals, and it's in

19   the same location and the same size of the employer.

20        Q.    In doing a comparability analysis, why would one

21   want to limit the comparison group by those various types of

22   factors that you mentioned?

23        A.    Because economists have found that various

24   factors affect pay.  And once one limits those factors, one

25   has a group that is -- is -- should have similar pay.

110

1      Q.    In doing a comparability study, if one is

2 looking at other firms in the same industry, to what extent

3 would one want to only look at firms that are financially

4 successful?

5      A.    Typically, one would look at all firms, and I

6 notice Professor Wachter looked at all firms when he looked at

7 occupation.  He didn't look at just financially successful

8 firms.

9      Q.    Let's now talk about factors that might be

10 relevant to determining the market wage for Dana's employees.

11 We've already discussed industry and establishment size.  Tell

12 us a little bit about the relevance of firm size.

13      A.    Firm size is also important.  It has been the

14 subject of numerous studies by economists, sometimes carefully

15 separating it out from establishment size, sometimes

16 confounding the two, but of course the best studies have both.

17 And they have typically adopted regression methodology that

18 controls for many factors at once.

19           The studies were reviewed by the person who

20 assisted me in this report, Professor Dale Belman, and Erica

21 Groshen of the New York Federal Reserve, and we refer to their

22 paper, which is a study of studies in the relevant footnote,

23 and they found --

24      Q.    What do you mean "a study of studies"?

25      A.    I mean that it is a survey of other studies, and

1    they list the various studies and what was found in each study

2    in their report.  So it is an overview, and they find that

3    virtually all studies show that employer size and employer

4    corporate size as a whole, holding constant for establishment

5    size, has been an important influence both on wages and on

6    total compensation.

7           Q.    And your correlation is in what direction?

8           A.    Larger firms pay more.

9           Q.    And is Dana a large firm?

10          A.    Well, obviously yes, because the cutoff that has

11   been used in most of the published research is one thousand or

12   more.  Some studies have used five thousand or more, and under

13   either of those categories, Dana would clearly be a large

14   employer.

15          Q.    Okay.  Let's now talk about the relevance of

16   geographical location.  What is the relevance, if any?

17          A.    We all know that pay differs in different

18   locations of the United States.  We're sitting here in

19   Manhattan now.  All you have to think about is the comparison

20   to south Jersey.  Pay differs even for the same occupation,

21   occupation of being a lawyer or the occupation of being a

22   lathe operator.  There are well-established metropolitan and

23   regional differences in pay.  They change slowly over time.

24   But they are a fact of life.

25          Q.    And if I can refer you to table 1 on page 7 of

112

1    your report, if you can tell us what that shows us and what

2    the relevance of that is.

3         A.    Table 1 on page 7 was the first thing that I

4    did.  And I did it in response to a statement by Mr. Chris

5    Bueter.  He pointed out in his declaration that Dana had

6    historically had a wage policy in which it set pay in

7    different facilities by looking at the local labor market, and

8    had separate negotiations with separate unions and union

9    plants, or had separate pay setting in the non-union plants,

10   and now was trying to move to change that historic pattern by

11   reducing pay in these five facilities that were relatively

12   high in his estimation.

13        So they were moving from a local pay-setting

14   procedure to a more national procedure.  So my first thought

15   was, is that correct, is it true that these five facilities

16   are located in areas of relatively high pay for blue collar

17   workers?  And so I just looked at the BLS website, again, this

18   is the quarterly census of wages.  This was the most recent

19   data.  It was for 2005.  I really don't know why they only had

20   2005 in this data, but it was data county by county.  It was

21   for the goods-producing sector, not motor vehicle parts, but

22   clearly, for that larger industry group that motor vehicle

23   parts is contained in.  And these are the five counties in

24   each of these -- for each of these facilities and also we see

25   the U.S. average down at the bottom of the table.  And I note

113

1    that each and every one of these five plants was located in an

2    area in which wages were at least average for the United

3    States, and in some cases, substantially above average.

4              So Oakland, Michigan, where the Auburn Hills

5    plant is located, has average weekly pay of $1,154 per week.

6         Q.    If you had factored in location in determining

7    your estimate of the work wage for the Dana employees, how

8    would the market wage have been affected, directionally?

9         A.    It would have been higher than my figures that

10   just include establishment size and industry.

11        Q.    Let me now ask you, within a given BLS

12   occupational category, such as the ones Dr. Wachter used, like

13   assembler, are there differences within a given BLS

14   occupational category of pay?

15        A.    There are very substantial differences, and

16   they, because this data is often used by employers for

17   pay-setting purposes, the BLS carefully collects and releases

18   data on what it calls the work level within particular

19   occupations.  And work levels are determined by the skill

20   requirements of jobs.

21              So for example, for an assembler, which is a

22   very large industrial classification, at the lowest work

23   level, the least skilled assemblers in the United States, I'm

24   referring to my paragraph 20 on page 9, are 9.50 an hour and

25   at the very highest level of skill in the assembler category,

114

1    folks earn $21.76 an hour.

2              These work levels have descriptions with a --

3    attached to them by the BLS that indicates the amount of skill

4    that is required.  And an employer's human resource management

5    department should take its own knowledge of the work that is

6    being done by its assemblers and find the work level in the

7    BLS data and then use that as the benchmark or the comparison.

8         Q.   If Dana's employees that are subject to the

9    Section 1113 proposal had an above-average work level within

10   whatever BLS occupational group they would fall, how would

11   that directionally change your estimate of their market wage?

12        A.   I'm not sure that I can answer that question.  I

13   think --

14        Q.   Assuming that they had an above-average work

15   level.

16        A.   Let me see if I can explain and perhaps --

17   Professor Wachter assumed they were average.  I made no

18   assumptions about whether they were above average or whether

19   they were average or whether they were the below average.  If

20   in fact they are above average, then Professor Wachter's

21   estimates are too low.  If in fact they are below average,

22   then they are too high.

23        Q.   What about work experience?

24        A.   Work experience has been found in numerous

25   economic studies to influence employee pay.

115

1        Q.    If the Dana employees that are at issue here had

2   an above-average level of work experience, how would that

3   affect their market wage?

4        A.    Work experience, even for blue collar workers,

5   rises for 15, 20 years at a minimum, and then levels off

6   according to numerous studies, and so if they have more than

7   an average level of work experience, they would receive higher

8   pay on average.

9        Q.    Do you know whether the employees at the Dana

10  plants that we've been discussing here have a relatively high

11  level of work experience?

12       A.    I have no direct data on that matter.  But I do

13  know that there have been expensive layoffs at some of these

14  facilities, and that under the contract, those layoffs have

15  been influenced by seniority, so that the remaining work force

16  is older and more experienced than one would otherwise found.

17       Q.    If the quit rate at a particular facility is

18  below the private sector average, does that necessarily mean

19  that the workers there receive above-market pay?

20       A.    No, it does not.

21       Q.    Can you explain?

22       A.    Quit rates are influenced by a variety of

23  factors.  As I mentioned earlier, young workers are much more

24  likely to quit than older employees.  Economists have found

25  that employees in large corporations are much less likely to

116

1    quit than employees in -- for small employers.  There are a

2    variety of things that have influenced quit rates, and pay is

3    one of those things, but it is by no means the only factor.

4         Q.   Let me now turn you to page 3 of your report and

5    in particular, paragraph 6.  In that paragraph, you refer to

6    two concepts.  One is compensation and the other is labor cost

7    per unit of output.

8              If you could tell us what those two concepts are

9    and what the relationship is between them.

10        A.   Compensation, as I've stated before, is the

11   hourly cost of benefits plus the hourly pay.  So that's what

12   we have been talking about to date.  But what really matters

13   in terms of an employer's competitiveness is a combination of

14   what it costs to an employer, an individual in terms of their

15   compensation, and what that individual actually produces.

16   That is, it's influenced both by pay and by employee

17   productivity.

18             Labor costs per unit of output takes into

19   account productivity by the -- by dividing compensation by the

20   number of units of output or by the value of sales.  So that

21   you get a cost in terms that matters in the market.

22        Q.   Is it true that, for each dollar reduction in

23   compensation that Dana implements, it will reduce its labor

24   cost per unit of output by a dollar?

25        A.   No, it is not correct.

117

1          Q.   Do you have a view as to what the relationship

2    will be?

3          A.   I don't know the precise numeric relationship,

4    but I can explain the direction.

5               When an employer reduces compensation, it is

6    very often the case that its best employees leave.  There's

7    new hires who are not up to speed, remaining employees are

8    less careful, less conscientious, they have low morale, they

9    may be making more mistakes, and so typically, productivity

10   suffers after an employer has a cut in compensation.

11              And conversely, it's also true that when an

12   employer increases hourly compensation, costs don't rise in a

13   one-for-one direction as well.  Improved morale, improved

14   retention of employees, many other kinds of things can come

15   into play.

16              MR. DeCHIARA:  Thank you.  Nothing further.

17              MR. BENNETT:  May I, your Honor?

18   CROSS-EXAMINATION BY MR. BENNETT:

19         Q.   Dr. Voos, we have in front of you a binder of

20   some materials that I hope you'll be able to refer to for

21   purposes of your cross-examination.

22              Let's just start with your background and

23   experience.  You mentioned, you testified or provided a

24   declaration in the Delphi case, correct?

25         A.   I provided a declaration.  I did not testify.

118

1          Q.    That was on behalf of the UAW, correct?

2          A.    Correct.

3          Q.    And I think you mentioned that you've done some

4     work for the Madison Teachers, is that right?

5          A.    That is correct.

6          Q.    You've done that a couple of times?

7          A.    Yes.

8          Q.    You've done some work on behalf of National

9     Association of Letter Carriers?

10         A.    That is correct.

11         Q.    Done that a couple of times?

12         A.    Correct.

13         Q.    Union group called Unite you worked for, is that

14    correct?

15         A.    I worked for them once, yes.

16         Q.    A union called AFSCME, for American Federation

17    of State, County and Municipal Employees --

18         A.    That's correct.

19         Q.    -- you worked for them, is that right?

20         A.    That's correct.

21         Q.    And you worked for the United Food Union, is

22    that right?

23         A.    United Food and Commercial Workers, yes.

24         Q.    You've never provided expert services on behalf

25    of an employer, have you?

119

1          A.    I have not.

2          Q.    Okay.  You're not an expert in human resource

3    management, are you?

4          A.    No, I'm not.

5          Q.    And you couldn't, for example, advise the court

6    on how best to improve the productivity of Dana's workers

7    while modifying their compensation system; correct?

8          A.    Labor economists have examined that.  So

9    although I'm not an HR expert, and my knowledge of HR is more

10   casual, I have some information on what economists have found

11   about productivity.

12         Q.    Well, you did give a deposition in this case,

13   correct?

14         A.    That is correct.

15         Q.    And in that deposition, were you asked whether

16   you could advise management at Dana as to how to counter any

17   mechanisms that might affect productivity?

18              MR. DeCHIARA:  Your Honor, I would just ask if

19   the witness is going to be asked about questions and answers

20   from her deposition, that she be allowed to look at a copy of

21   her transcript.

22              MR. BENNETT:  Sure, it's right in front of her.

23              THE COURT:  I thought she has it.  I have it.

24         Q.    Page 32.

25         A.    I am not in the business of consulting with

120

1    managers or corporations about how to improve productivity.

2    And I said that in the deposition.  On the other hand,

3    economists have also studied the relationship between

4    compensation and productivity, and I can testify about that.

5            Q.   Well, in fact, in your deposition, you were put

6    this series of questions and gave these, correct?

7            A.   That's correct.

8            Q.   (Reading):

9            "Question:   If you were advising management at

10   Dana as to the means to counter that mechanism, what would you

11   advise?

12           "Answer:  That really isn't my area of

13   expertise.

14           "Question:  No idea?

15           "Answer:  I would ask them to seek a different

16   expert, yes.

17           "Question:  Is that just because you haven't

18   done any work on the employer side?

19           "Answer:  No, that's because I am an expert on

20   compensation.  And this is a -- the questions you are asking

21   fall into other professors's field of study or work."

22           Is that the testimony you gave under oath?

23           A.   Yes, it is.  And again, I would make the

24   distinction between consulting about a practical human

25   resource management problem, and the question of expertise on

121

1    what economists have using typically quantitative data across

2    a variety of corporations, but sometimes study of the

3    individual ones have found about influences op productivity.

4         Q.   You have not done any research specifically

5    about the motor vehicle parts industry, correct?

6         A.   That is correct.

7         Q.   And none of your published papers are concerned

8    specifically with the motor vehicle industry, correct?

9         A.   That is correct.

10        Q.   And there is a body of labor economics research

11   that focuses on the automotive supply industry, correct?

12        A.   There has been some work by economists, yes.

13        Q.   And you have not reviewed any of that literature

14   for purposes of your opinion; correct?

15        A.   I did not review that.

16        Q.   And you haven't spoken to anyone at Dana at any

17   time, correct?

18        A.   I have not spoken to anyone at Dana.

19        Q.   You have not visited any of the Dana plants,

20   correct?

21        A.   I have not visited any plants.

22        Q.   Okay.  Now, you mentioned the Delphi case.

23   That's the only other case in which, in a bankruptcy context,

24   you have provided expert labor economics testimony, correct?

25        A.   That is correct.

122

1          Q.    And in that case, you were an expert on the

2    exact same matter as in this case, wage and benefits

3    comparability, correct?

4          A.    Correct.

5          Q.    And in that case, Professor Michael Wachter was

6    an expert for the debtor, correct?

7          A.    Correct.

8          Q.    And in that case, your expert report responded

9    to Professor Wachter's analysis, correct?

10         A.    Correct.

11         Q.    And based on your experience with Professor

12   Wachter, you've concluded that he's a person with very high

13   esteem in the economics profession, isn't that true?

14         A.    Yes, he is.

15         Q.    And your assignment in this case was to review

16   and respond to Professor Wachter's report, is that right?

17         A.    Yes, it was.

18         Q.    And the very first thing that you did in this

19   case was to put the report that you had prepared in Delphi

20   back onto your word processor system so that you could create

21   a report in this case based on that prior report; correct?

22         A.    Let me explain.  I had verbally heard from the

23   attorneys that Professor Wachter had provided essentially a

24   similar analysis.  So before I saw his report, I knew it was

25   the same industry, motor vehicle parts, but I knew that the

123

1    data in the older report was somewhat dated.  And so the first

2    thing I did before I even saw Professor Wachter's report was

3    simply to update the tables in that report.

4              Then I read Professor Wachter's report and saw

5    that it had some similarities and some differences, and I

6    modified my analysis accordingly.

7         Q.   Isn't it true, Dr. Voos, that you started your

8    work in this case by putting the report that you prepared for

9    Delphi into your word processor, that's the first thing you

10   did?

11        A.   Yes, it's true.

12        Q.   Okay.  And isn't it true that the report in this

13   case contain some of the same sentences from the earlier

14   report in the Delphi case?

15        A.   There are some sentences that are the same.  In

16   fact, I think the paragraph on my qualifications is identical.

17        Q.   Okay.

18        A.   They haven't changed markedly.

19        Q.   But there were some things you decided to take

20   out from the expert opinion in this case, isn't that true?

21        A.   Yes, there were some things.  This case was a

22   little different.  This case was specific to five facilities

23   and Professor Wachter's analysis was a little different.

24        Q.   Well, let's look at one particular thing.  Could

25   you go to tab A, please?

124

1          A.    Sure.

2          Q.    That's Debtor's Exhibit 177.

3          A.    Yes.

4          Q.    And that is the declaration that you gave in the

5    Delphi case, correct?

6          A.    Yes, it is.

7          Q.    And if you could go to page 3 there --

8          A.    Yes.

9          Q.    -- paragraph 5?

10         A.    Yes.

11         Q.    This concerns comparability, do you see that?

12         A.    Yes, I do.

13         Q.    And you say in that paragraph, "Comparability is

14   a standard commonly used in arbitration in comparing the total

15   compensation of different groups of employees where

16   compensation includes both direct pay and the cost of various

17   employer-provided benefits.  Such arbitration is common in the

18   public sector where it provides a means of settling the terms

19   of collective bargaining agreements when the parties cannot

20   agree but strikes are prohibited by law.  Interest arbitration

21   is not common in the private sector where direct negotiation

22   of contracts and compromise of difference is encouraged by the

23   freedom to take direct economic action when the parties cannot

24   agree to new contract terms.  For this reason, it is not clear

25   to me that the court should deem comparability of total

125

1    compensation between Delphi employees and other employees to

2    be particularly relevant to this case.  Doing so might

3    short-circuit the collective bargaining process."

4                   Do you see all of that?

5         A.    I do.

6         Q.    And you decided not to put that into your expert

7    report in this case, correct?

8         A.    I did not put it in this report.

9         Q.    But you still hold that view.  Isn't that true?

10        A.    Let me explain my view.  One of the reasons we

11   can do comparability in the public sector is that in the

12   public sector, as I said before, wages and the cost of

13   benefits are public information.  We can find good matches in

14   the situation at hand.

15                  In the private sector, employers have been very

16   careful not to make this public information, and the BLS

17   often, you know, why doesn't it publish information on the

18   motor vehicle parts industry that we could look at really

19   directly to get this comparison?  Well, because they are

20   concerned about the confidentiality of data.

21                  The only data on direct competitors is assembled

22   by employers or by employer associations, and it's not

23   neutral, it's not publicly available, it's not vetted through

24   the economists of the BLS, and it just is not of the same

25   nature.  It's not of the same quality.  It's always something

126

1    that's harder to look at, and less useful.

2            So I do think this is a matter as a professor,

3    rather than as an attorney, that I was kind of straying into

4    one of my opinions but I think my opinion is that, you know,

5    it stands as to whether or not Bankruptcy Court should be

6    doing it.  But whether or not they do it is really a matter of

7    law, and it's probably, you know, I'm not a legal expert.  So

8    that's not my expert opinion, that's kind of more of a

9    personal opinion.

10           Q.   Okay.  This statement in paragraph 5 of your

11   Delphi declaration, even though you decided not to put it into

12   your declaration in this case, you think it applies to this

13   case as well, correct?

14           A.   I don't disavow this statement.

15           Q.   Okay.  Now, you did give a deposition in the

16   Delphi case; even though you didn't testify; correct?

17           A.   That is correct.

18           Q.   And that deposition explored the bases for your

19   opinion in that case, correct?

20           A.   That is correct.

21           Q.   And if we read that deposition, we'd find out

22   whether there's any inconsistency between the bases of your

23   opinion in that case, and the bases of your opinion in this

24   case, isn't that true?

25           A.   That is correct.

127

1    Q.   And you have a copy of the deposition, don't

2    you?

3    A.   I actually, I threw it out after the case.  I

4    have a small office, and I just clear it out periodically.

5    There was -- I read it through once, threw it out.  It may be

6    on my computer somewhere.  I don't know if I could find it.

7    It's just not something I looked at.

8    Q.   You're pretty sure your counsel has a copy of

9    it, aren't you?

10    A.   I suspect they have a much better filing system

11    than I do.

12    Q.   There's no physical reason why it couldn't have

13    been produced in this case, is there?

14    A.   I can't answer that.  That you'd have to ask

15    them.

16    Q.   Okay.  You do know that there is something

17    called a virtual data site associated with this case?

18    A.   I learned about that at the deposition.  I had

19    not received permission to access that site before the

20    deposition.

21    Q.   I take it you didn't ask what was on that site

22    that might be relevant to your analysis, is that right?

23    A.   I did not know of its existence or that I had

24    access to it.  I had Professor Wachter's declaration, I had

25    Mr. Chris Bueter's declaration and I was asked to base my

1    report on them.

2        Q.    Okay.  Now, you mentioned this fellow Professor

3    Belman.  Could you tell the court who that is?

4        A.    Daily Belman is a professor at Michigan State

5    University.  He has a Ph.D. in economics.  He worked with me

6    and helped me prepare this report by gathering data and

7    providing an initial draft of some sections.  We worked

8    together on other cases.  In his vitae, and his publications,

9    his work as expert are detailed in his vitae.

10        Q.    That fact, Professor Belman did a draft of a

11    section on firm size in your report, correct?

12        A.    He definitely did that draft, and as with that

13    section and other sections, everything he drafted I went over

14    sentence by sentence, was -- often changed it to some extent,

15    and made sure that I was fully informed of and fully in

16    agreement with every word.

17        Q.    Okay.  He did a draft of the section on quit

18    rates.  He did the first draft?

19        A.    He did a draft on that section, yes.

20        Q.    He did the first draft of the section on work

21    levels within occupations, correct?

22        A.    That is correct.

23        Q.    And your view is, he actually knows more about

24    that than you do.  Correct?

25        A.    That is correct.  That's why I asked him to

129

1    draft that section.

2           Q.    And at least as of the time of your deposition,

3    Professor Belman had put in about 13 hours on the project and

4    you'd put in about 18 hours, is that correct?

5           A.    At the time of the deposition, that was my

6    estimate and I had not actually added up my hours, so...

7           Q.    Okay.  You're actually not precisely sure when

8    you look at your report who did what on the various tables in

9    your report, correct?

10          A.    I would like to say that I checked and rechecked

11   and double-checked every number ultimately that was in my

12   report and every sentence in my report.  And while Professor

13   Belman helped me, and in fact, looked it over and did some

14   work, ultimately, I am fully responsible for everything in

15   that report.

16          Q.    Well, were you asked this question in your

17   deposition and did you give this answer:

18              "Question:  And you're saying those were

19   prepared initially by Professor Belman?"  This is on page 13.

20              "Answer:  No.  I'm not saying that.  I prepared

21   table 1.  I think Professor Belman may have checked it.  We

22   both worked on different tables.  I can't even -- I'm not even

23   sure I can recall at this point who did precisely what on each

24   table.  But we both checked the figures to be sure we were

25   right."

130

1                MR. DeCHIARA:  I'm sorry, what line are you

2  reading from?

3                MR. BENNETT:  That would be page 13, line 20.

4       Q.  Was that the testimony?

5       A.  That was the testimony, and I don't see how it

6  contradicts what I just said.  We both worked on it.  He

7  checked me, I checked him.  I'm really concerned that the

8  final product is correct.

9       Q.  Okay.  Let's move to a different subject.  You

10  mentioned the part about unit labor costs in response to

11  Mr. DeChiara's questions.  Remember that?

12       A.  Yes.

13       Q.  Okay.  And your view is, reducing compensation

14  does not necessarily produce a one-for-one reduction in union

15  labor costs, is that right?

16       A.  Correct.

17       Q.  And as you sit here today, you don't have any

18  way to predict the ultimate outcome here in terms of whether a

19  reduction in compensation will or will not lead to specific

20  reduced unit labor costs, isn't that true?

21       A.  I cannot quote a precise figure on it.

22       Q.  You don't have any way to evaluate what other

23  relevant factors that could affect union labor costs here,

24  correct?

25       A.  I was not attempting to do that.  I...

131

1          Q.    But --

2          A.    -- I don't know what you're talking about, but

3     certainly, there are many factors that could affect unit labor

4     costs, but most specifically there are many factors that could

5     affect productivity.

6          Q.    Okay.  In talking about unit labor costs, you

7     don't have any human resources expertise to determine whether

8     there are ways to improve the effects on unit labor costs from

9     reduced compensation, correct?  We already established that.

10              MR. DeCHIARA:  I would just object to the form

11    of the question.

12         A.    I'm not sure what you're saying.

13              MR. DeCHIARA:  I was just going to object to the

14    form of the question.  I think it was a little compound.  I

15    think it was unclear.  I'd ask that it be restated.

16              MR. BENNETT:  We'll do it again if we have to.

17              THE COURT:  Go ahead.

18         Q.    Let me start on a different approach to this.

19    When you're telling the judge that you think unit labor costs

20    might not go down as well they should, as much as they should

21    as a result of reduced compensation, one of the things that

22    you're suggesting is that workers at Dana with reduced

23    compensation may willfully try to reduce their production

24    levels, isn't that true?

25         A.    That may occur, but they may -- there may be

132

1    reduced productivity from things that are not willful.  As I

2    stated, it may be that less-qualified employees are the ones

3    that stay on the job rather than take other work.  New hires

4    are there.  They are less good at problem solving, they have

5    lower morale.  Yes, wait may be willful or it may not be

6    willful.  There are various things that lead to changes in

7    productivity.

8         Q.   Just in that vein, willful or non-willful

9    actions by workers that might affect unit labor costs, you

10   can't tell the judge whether or not there are ways from a

11   human resources perspective to ameliorate those, to address

12   those, correct?  Because you're just not a human resources

13   expert.

14        A.   I work in a school of management and labor

15   relations and my knowledge of human resource management is

16   casual rather than expert, yes.

17        Q.   And you mentioned before the problem about

18   attracting skilled workers.  Correct?  That's one of the

19   things that might affect unit labor costs, correct?

20        A.   Correct.

21        Q.   And that assumes that Dana needs to hire a bunch

22   of new people, correct?

23        A.   I don't know if it assumes it needs to hire a

24   bunch of new people.  It assumes that there will continue to

25   be turnover and employees will continue to retire and, if in

133

1    fact wages are reduced substantially below what they can earn

2    in the area in similar types of work, that -- yes, more will

3    quit.

4            Q.    Okay.  And the problem about attracting skilled

5    workers, that is not based on any actual experience at Dana in

6    terms of Dana having difficulty attracting skilled workers.

7            A.    I have no actual experience at Dana.

8            Q.    You know that Dana has a two-tiered system,

9    correct?  At some of the plants.

10           A.    At two of the five plants, there are currently

11   tier 2 employees, yes.

12           Q.    And you would agree that looking at the

13   experience with the tier 2 in terms of how successful Dana has

14   been in attracting and retaining workers, that could be a

15   useful source of information, correct?

16           A.    I haven't seen that information and I don't know

17   if you've presented it or not.

18           Q.    It would be useful to see it, isn't that true?

19           A.    It might be relevant information.  It certainly,

20   $13 an hour is certainly different than 11.05.

21           Q.    Okay.  But you haven't seen it.

22           A.    No, I have not.

23           Q.    And you haven't looked at any other corporations

24   in Dana's industry that have modified compensation to

25   determine whether they had any problems in attracting and

134

1    retaining workers, correct?

2          A.   You know, just this morning, I was looking at an

3    article that someone suggested I read.  It's an article that

4    was about Henry Ford and his experience with wages.  It was

5    written partly by Larry Summers, recently president of Harvard

6    University, Secretary of the Treasury before that, and it was

7    about Henry Ford's experience when he decided in 1914 to raise

8    wages to $5 a day.

9                Before he did that, and wages were only $2.34 an

10   hour, there were large numbers of job seekers.  He had no

11   trouble at all attracting workers at the lower wage, but they

12   were not workers that ended up being nearly as productive as

13   the workers that he was able to hire and retain at the higher

14   wage rate.

15               Productivity went up substantially and that's

16   obviously not something I have firsthand knowledge of.  It's

17   something I read by an economist about the effect of wages on

18   productivity, and how higher wages can increase productivity

19   or how simply having job applicants at a lower wage rate

20   doesn't necessarily mean that that is the right wage rate or

21   the most profit-maximizing wage rate.

22          Q.   Henry Ford notwithstanding, you don't have any

23   information, and you can't share it with the Court, about the

24   actual experience of other employers in Dana's industry in

25   terms of modifying their compensation, whether that's had any

135

1    effect on attracting and retaining skilled workers, isn't that

2    true?

3            A.   I have not studied that on a systematic basis.

4            Q.   You would agree with me that, in the automotive

5    supply industry today, there is a reduced level of demand for

6    labor, correct?

7            A.   Um -- I have to speak, as you've pointed out,

8    not as an industry expert but as just someone who reads the

9    newspaper, has relatively -- well, casual interest in these

10   things, and I would agree with that statement on that basis.

11           Q.   Okay.  And that's as a result of a reduced level

12   of sales for, particularly, American automobiles, correct?

13           A.   That is as I said, my non-expert judgement.

14           Q.   And that's in part due to international

15   competition in the automotive supply industry, correct?

16           A.   It's presumably due to a variety of factors,

17   among them being global competition, product quality, all

18   kinds of things.

19           Q.   And would you agree that the degree of product

20   demand and the degree of competition in an industry can

21   influence pay levels in the industry, isn't that true?

22           A.   I would agree that that is a general truth.

23           Q.   And you'd agree that areas with high

24   unemployment and less demand for labor typically have lower

25   wage rates, correct?

136

1     A.    There is an extensive literature on that

2   subject, and controlling for a large number of other factors,

3   there is some influence of area unemployment on pay, though it

4   is not immediate, and it is relatively small.

5     Q.    You would agree that decreasing demand for labor

6   in the auto supply industry will tend to have some downward

7   influence on wage rates, correct?

8     A.    It will tend to retard wage increases, other

9   things equal.  It may or may not result in actual pay

10   reductions, but it is not a passive factor for wages, let's

11   put it that way.

12     Q.    Okay.  And you would agree in the other

13   direction that the degree of competitiveness in a market may

14   determine the employer's ability to raise prices for goods,

15   correct?

16     A.    Can you restate that?

17     Q.    Yes.  We're talking about the product, now,

18   rather than the labor.  If you've got a highly competitive

19   product market, more entrants into the market, highly

20   competitive, that tends to retard the ability of an employer

21   to raise prices, correct?

22     A.    Correct.

23     Q.    And in highly competitive product markets where

24   the employer has difficulty raising prices, that may have a

25   negative effect on wage rates; isn't that true?

137

1          A.   The economic theory of wages assumes that all

2    product markets are highly competitive, and it assumes also

3    that employers are wage-takers, which is the theory behind

4    Professor Wachter's paper.  But as a matter of fact, in our

5    imperfect world, I would actually agree with your statement.

6          Q.   Okay.  And it is fair to say that U.S. auto

7    suppliers are in the process generally of negotiating

8    different pay levels with their employees and for those

9    employees who are not union-represented, they have

10   unilaterally in some instances changed pay for their

11   employees; isn't that true?

12         A.   Yes, and I also read, and I think this is

13   important, that there, Ford Motor in particular is

14   negotiating, plant by plant, different work rules, different

15   productivity.  So this is a case where, yeah, they are worried

16   about wages but they are also worried about productivity

17   because what really matters is unit labor costs.

18         Q.   Okay.  In setting pay levels, you'd agree that

19   since pay and compensation levels indirectly affect operating

20   costs, they must be set with an eye on both the competitors'

21   cost and what the organization can afford to pay; isn't that

22   true?

23         A.   That is correct.

24         Q.   And you'd agree that product market conditions

25   set the maximum beyond which the organization will be unable

138

1    to competitively price its goods and services?

2              A.    I believe you're reading from -- are you reading

3    from a textbook?

4              Q.    I'm reading from a textbook that you actually

5    told me at your deposition was credible.

6              A.    I've actually forgotten the source.  Can you

7    remind me?

8              Q.    Sure.  Go to page 170 in your deposition.

9    Starts in the previous one.  It's the Newman text, which I

10   think was cited in your report.  Starts at the bottom of page

11   169, "Hence the product market conditions set the maximum

12   beyond which the organization will be unable to competitively

13   price its goods and services," you agree with that, do you

14   not?

15             A.    I would not disagree with that.

16             Q.    And then the next page goes on and says, "Labor

17   market conditions set the minimum pay level to attract and

18   retain a pool of qualified workers.  Set the pay level too low

19   and managers will have trouble attracting and holding

20   employees.  Set the pay level too high and the employer's

21   ability to sell products will be affected."

22                   You agree with that, correct?

23             A.    That's a very general textbook statement that

24   would be hard to disagree with.

25             Q.    Okay.  The analysis that you did here in this

139

1    case, would you call that a comparability study?

2              A.   My analysis was not a full comparability study,

3    really, any more than Professor Wachter's was.  He looked at

4    one factor, occupation.  I looked at two factors which I think

5    are as important in blue collar pay or more, which is industry

6    and establishment size.  And I don't claim that my analysis is

7    a full analysis.  However, when I think about the other things

8    that one would have to include to make it a full analysis,

9    things like location, the corporation size, that would do

10   nothing but raise these numbers that I created.

11             And then of course there's the question of

12   occupation.  My analysis assumes that the occupational

13   distribution of Dana's employees are just average for the

14   motor vehicle parts industry.  I don't know that's the case,

15   but I have seen no evidence from Dana Corporation that it's

16   not the case, either.  In fact, Professor Wachter often

17   assumes averages and clearly, if the occupational distribution

18   is above average, then my numbers are too low, and if they are

19   below average, then my numbers are too high.

20             Q.   You mentioned I think in response to

21   Mr. DeChiara's questions the idea of a comparability gold

22   standard, right?

23             A.   Yes, I did.

24             Q.   And the comparability gold standard from your

25   perspective is to try to control as many different factors as

140

1    possible in order to focus on the most, the closest

2    comparison, isn't that right?

3         A.    That has been what has been done in settings in

4    which this type of pay analysis is employed, yes.

5         Q.    Okay.  You didn't meet the gold standard with

6    your study, correct?

7         A.    No, I did not.

8         Q.    And in particular, you didn't run any comparison

9    of wages and benefits of Dana's competitors, correct?

10        A.    As I explained to you when I discussed why

11   comparability is used less in the private sector, I was not

12   able to do that.  That data is not publicly available.  And

13   that is in fact the precise reason why I have to use these

14   estimates, you know, based on this factor and that factor from

15   the BLS.  We can't do the gold standard.

16        Q.    Okay.  You didn't make any effort to survey

17   whatever available literature is out there as to whether

18   Dana's competitors are attempting to restructure their wage

19   and benefits at their high-wage plants, correct?

20        A.    Well, I was not asked to survey that literature.

21        Q.    And you didn't make any effort to survey

22   information about whether Dana's competitors are moving some

23   of their operations to low-wage southern areas, correct?

24        A.    I was not asked to do that.

25        Q.    And you didn't do any analysis of the effects of

141

1    high wage and benefits on Dana's competitors that have gone

2    into bankruptcy, correct?

3         A.   I was not asked to do that.

4         Q.   Okay.  You would agree, would you not, that

5    there are circumstances in which some of the factors that

6    you've talked about that can affect pay are correlated one to

7    the other, correct?

8         A.   That is correct.

9         Q.   There may for example, I think you mentioned

10   this, be some relationship between firm size and establishment

11   size, correct?

12        A.   I am not sure of the degree of correlation.  One

13   would need data on that.  But I believe there's a small

14   positive correlation between employer establishment size and

15   employer firm size, although I really, absent any data, I

16   can't say how big the correlation is.

17        Q.   Well, big employers like GM have big plants,

18   correct?

19        A.   Sometimes they do, and sometimes they do not.

20   And there are studies that have data and show the

21   correlations.  But if we don't have the data, we, you know,

22   have to assume zero.

23        Q.   Okay.  It would be fair to say that unionization

24   is a factor that can affect wage and benefit rates, correct?

25        A.   That is correct.

142

1          Q.    And it is fair to say that unionization is

2     correlated to geographic location; for example, workers in the

3     north are more likely to be unionized, correct?

4          A.    That is correct.

5          Q.    And unionization is correlated, for example,

6     with big cities versus small towns, correct?

7          A.    That is correct.

8          Q.    And unionization is correlated with large firms

9     versus small firms, correct?

10         A.    That is correct.

11         Q.    And unionization is correlated with the

12    manufacturing sector versus other sectors?

13         A.    Actually, at the present time, the manufacturing

14    sector is no longer above average in terms of unionization.

15    You're correct historically.

16         Q.    Okay.  You would agree that the aim of unions is

17    to raise, in general, the wages and benefits for workers,

18    correct?

19         A.    That is one of several union aims.  It's not

20    their only aim.  But yes.

21         Q.    And you would agree that one of the aims of

22    unions is to attempt to increase total compensation for

23    workers above what the market level would otherwise be,

24    correct?

25         A.    That is one of their several purposes, yes.

143

1      Q.    And would you agree that unions usually succeed

2   in increasing total compensation above market levels, correct?

3      A.    I would say that usually but not always, unions

4   are successful in that effort.  They are more successful in

5   some contexts than others.

6      Q.    Okay.  You would agree that even the threat of

7   unionization may cause compensation levels to rise at a firm?

8      A.    Sometimes private sector employers pay higher

9   pay than they would otherwise have to or want to in order to

10  keep their employees from choosing to unionize, yes.

11     Q.    In this case, you have not determined whether

12  any unions at Dana have succeeded in raising compensation

13  above market level, correct?

14     A.    Actually I would think the unions that are

15  paying me in this case would be rather abashed to learn that

16  their pay levels for their represented employees are below the

17  benchmark for the industry.

18     Q.    You assume they have been successful, correct?

19     A.    No, I have to say as a result of my analysis

20  that I would say they have not been successful.

21     Q.    You think the unions have been working at this

22  for years and not succeeded at all?

23     A.    I have to say, just based on the data that I

24  looked at, that the pay at these facilities is not high, and

25  total compensation is about average.

144

1        Q.    Okay.  Let's talk about work levels.  You

2   mentioned that that's something that you think should have

3   been refined in Professor Wachter's analysis, correct?

4        A.    I think that since he focused on occupation

5   alone, he might have done it in a more precise way.  Instead,

6   he chose to assume the average and that's not how the BLS

7   suggests this data should be used.

8        Q.    You weren't here when Professor Wachter

9   testified, were you?

10       A.    I was not here yesterday.  I did hear the

11  remnants of his cross-examination this morning.

12       Q.    Okay.  Did you hear the part about how he went

13  back and looked at work levels?  Did you hear that part?

14       A.    I did not.  And because it was yesterday, I did

15  not have a chance to review the transcript.

16       Q.    Okay.  So you don't know whether that reanalysis

17  confirmed that the work levels were in fact consistent with

18  industry average?

19              MR. DeCHIARA:  Your Honor, I would just raise an

20  objection.  I'm not sure --

21              THE COURT:  Sustained.

22              MR. BENNETT:  Okay.

23       Q.    You don't know one way or the other what his

24  reanalysis --

25       A.    I based my work on his initial report.

145

1          Q.    At the end of the day, I think you already said

2     this, you can't tell from what you looked at whether Professor

3     Wachter actually may have underestimated the market level,

4     correct?

5          A.    That is what I wrote in my report.

6          Q.    Okay.  Let's talk about regional variations.

7     What you showed us in your report, I think it's tab B, that's

8     your declaration, UAW 1, are you there with the table?

9          A.    Table 1?

10         Q.    Right.

11         A.    Yes, I am.

12         Q.    That's not the automotive sector?

13         A.    No, that is the goods-producing sector.  The BLS

14    does not release data for the motor vehicle parts industry for

15    these counties.  As I said, are they are concerned with

16    confidentiality.

17         Q.    Okay.  And that is not some trend data, is it?

18         A.    No, this is at a point in time.

19         Q.    Okay.  And you in fact haven't looked at any

20    trend data to determine whether those regional variations may

21    be changing.

22         A.    I have not systematically reviewed studies, but

23    I know from my training and experience as a labor economist

24    that those regional -- excuse me, let me start again --

25    regional differences in wages do change, albeit slowly over

146

1    time.

2              For example, the south has always been a

3    low-wage part of the United States.  Its wages are less low in

4    comparison to the northern part of the United States than it

5    used to be, but I do know that these differences persist over

6    a long period of time.

7              I have not recently reviewed studies of how

8    regional or area wages are changing.

9         Q.   Okay.  And you certainly haven't looked at how

10   regional differences in the auto supply industry have changed,

11   correct?

12        A.   No, I have not.

13        Q.   Do you know that in the '40s and '50s, at least,

14   the auto supply industry changed in terms of regional

15   concentration as workers came from the south and moved toward

16   the north to get into that industry?  Do you know about that?

17        A.   That's really not something that I can testify

18   on.

19        Q.   Not really a student of labor history?

20        A.   I'm not a student of labor history of the auto

21   supply industry, no.

22        Q.   You would agree that Dana operates in a market

23   where it competes with suppliers from other locations,

24   correct?

25        A.   Yes.  The entire, you know, motor vehicle

147

1    industry in the United States has -- competes.

2            Q.   And you would agree that domestic motor vehicle

3    producers are outsourcing greater amounts of automotive

4    supplies overseas, especially the lower-wage countries such as

5    Brazil, South Korea and Mexico, correct?

6            A.   As I said, that's any non-expert impression, but

7    I can't give you any expert testimony on the size and precise

8    level of that trend.

9            Q.   And you would agree that for Dana to be

10   competitive, it has to be able to provide products that are

11   equivalent to what other suppliers could produce at other

12   locations, correct?

13           A.   It has -- hopefully, it will produce better

14   quality components, if not equally good components.  And

15   obviously, also, in comparing different locations, let me say

16   the following:

17               One of the things that affects cost is location.

18   So when a supplier is closer to a manufacturer, that gives it

19   a competitive advantage in terms of having lower

20   transportation costs, and being able to respond to

21   just-in-time inventory, pressures from the original equipment

22   manufacturers or other manufacturers.

23               So it is true that obviously, it's competing

24   with manufacturers at more distance or other locations.  But

25   sometimes, location itself is part of the competitive

148

1    equation.

2            Q.    You would agree that Dana, to be competitive,

3    must consider what prices its competitors are charging,

4    correct?

5            A.    Of course.

6            Q.    And you do know that, at least in the auto

7    industry, original equipment manufacturers have, in many

8    instances, successfully demanded reductions in product costs

9    from year to year.  You know about that, correct?

10           A.    I know about that.  I was really interested to

11   read in The Wall Street Journal just, I don't know, last

12   couple of weeks, that it appears that the OEMs are no longer

13   being able to reduce prices for the suppliers in the same way

14   that they have in the past.  It was a front-page article.  I

15   don't remember precisely the day.  So, you know, my knowledge

16   of this is entirely based on things like newspaper stories,

17   and --

18                 THE COURT:  Mr. Simon may be able to help you

19   with the news media.

20                 MR. BENNETT:  He's got The Post.

21                 THE COURT:  I did read that Wall Street Journal

22   article.  There are other Wall Street Journal articles which

23   anecdotally the contradict the expert testimony obviously of

24   yesterday and today.  So much for the media.  If we want to

25   use the media for expertise, you can, but we won't try this

149

1    case based on media representations.

2            Q.    Let's move on to efficiency wages.  Do you know

3    about that term?

4            A.    I do.

5            Q.    And would you agree that research on efficiency

6    wages is not very advanced?

7            A.    I believe it has been inconclusive.  However, it

8    is not a theory that is something that has been disproven,

9    either.  I was really interested to find out that Professor

10   Summers, for example, had done a number of articles supporting

11   the concept of efficiency wage theory.  On the other hand, I

12   would not state that it is something that is either generally

13   validated or generally invalidated by the profession.  It's

14   just one theory.

15           MR. DeCHIARA:  Your Honor, if I can be heard, I

16   don't want to be overly technical here, but right following

17   this witness, you're going to hear from Dr. Helper, who does

18   discuss efficiency wage.  She is the expert.  Dr. Voos has

19   something in her report about efficiency wage.  I just think

20   in terms of the efficiency, if I can use that word of this

21   proceeding, it might be better to save the efficiency wage

22   questions for the expert on that matter.

23           MR. BENNETT:  Let's at least try this small

24   part.

25           Q.    You would agree that Dr. Belman, your

150

```
1    colleague's views on efficiency wages, are authoritative?

2          A.   I respect his views.  I'm not sure I, you know,

3    have one hundred percent agreement with them, but I definitely

4    respect his views.

5          Q.   Would you go to tab D in your binder, please.

6    And that is a study or set of information from Dr. Belman and

7    some of his colleagues, correct?

8          A.   That is correct.  That is the report that I

9    referred to earlier, the study of studies.  The study of the

10   effect of large employer size on employee compensation.

11         Q.   This is something you actually relied on for

12   your report, correct?

13         A.   Correct.

14         Q.   Okay.

15              MR. BENNETT:  We'll offer Debtor's Exhibit 184,

16   your Honor.

17              MR. DeCHIARA:  We have no objection.

18              THE COURT:  Received.

19              MR. BENNETT:  Okay.

20              (Debtor's Exhibit 184, received in evidence, as

21   of this date.)

22         Q.   Could you get to page, it's 22 at the bottom.

23   It says, "Voos 163" in there.

24         A.   Yes.

25         Q.   And under efficiency wages, there's a long
```

151

1    paragraph --

2                    THE COURT:  What page is that?

3                    MR. BENNETT:  It's page 22.  Voos 163 in the

4    middle.  It's actually marked as reliance material in the

5    case.

6                    THE COURT:  Go ahead.

7          Q.    Okay.  You see the segment that talks about

8    efficiency wages?

9          A.    I do.

10          Q.    You've read this whole article --

11          A.    I have.  I haven't memorized it but yes, I've

12    read it several times.

13          Q.    The part in there that says, "Research on

14    efficiency wages is not very advanced, but there is little

15    indication that the employer size premium is explained by

16    factors associated with efficiency wage schemes," do you agree

17    with that?

18          A.    Yes, and let me explain what he's talking about.

19    He's not talking about efficiency wage theory in general.

20    He's talking about the question of why it is that large

21    employers pay higher wages.  Efficiency wage theory is about

22    this, but it's about many other things as well.  And he's, in

23    this article he and Erica Groshen go through various theories

24    of why it is and what research demonstrates about the validity

25    or invalidity of those particular theories for an -- a good

152

1    explanation of this fact that we observed, that large

2    employers pay more.

3              And he's saying that, with regard to this

4    matter, with regard to the effect of employer size on pay, you

5    know, efficiency wage theory has not been demonstrated to be a

6    conclusive reason, and I would agree with that.

7              I said in my report that I am agnostic about why

8    it is that large employers pay more, why large establishments

9    have higher wages.  There are a variety of theories.  Probably

10   several theories are simultaneously true.  And proponents of

11   any one of these theories have not convinced economists that

12   their individual theory is the reason.

13        Q.   You have read Dr. Helper's declaration in this

14   case?

15        A.   I read it once.

16        Q.   Okay.  Could you go to tab E; Union Exhibit 8.

17        A.   Yes.

18        Q.   And could you go to page 15, paragraph 45.  Are

19   you there?

20        A.   Yes, I am.

21        Q.   In the first sentence there in the conclusion,

22   Dr. Helper writes, "Dana has had for many years a high wage

23   policy."

24              Do you agree with that?

25        A.   I do not have knowledge of what their intended

153

1    policy is.  And I did not look at what their wages were in

2    prior years.  So I cannot say for many years.  I would say at

3    the present time, their wages are no longer high wages.  But

4    of course, I was just looking at these five plants.  Maybe

5    they have a high wage policy in other plants.

6         Q.    Okay.  Mr. DeChiara mentioned quit rates.  No

7    part of your analysis has concerned quit rates, correct?

8         A.    I did not look at quit rates.

9         Q.    And separate question.  You don't have any

10   analysis of retiree insurance costs, correct?

11        A.    No, I do not.

12        Q.    You can't tell the court what burden that might

13   have on Dana's profitability, correct?

14        A.    I have not looked at that.

15        Q.    Okay.  Now, the analysis that you did do, I

16   hesitate to call it a comparability study, because -- how do

17   you call it, your wage build-up, what do you call it?  The

18   thing that you did in your report, it's not a comparability

19   study.  What is it?

20        A.    I was asked to analyze the adequacy of Professor

21   Wachter's study, and I did it by demonstrating a different

22   approach, a really, I think standard approach based on

23   industry.

24        Q.    So what do you call it, a critique?

25        A.    I don't have a title.

154

1      Q.    Okay.  Your thing that you did.

2      A.    My declaration, yes.

3      Q.    Okay.  The thing that you did that's not a

4    direct comparison to competitors for Dana, correct?

5      A.    Correct.

6      Q.    It's based on a number of estimates, correct?

7      A.    It is based on publicly-available data from the

8    Bureau of Labor Statistics, just as Professor Wachter's study

9    is based on BLS data.  His is also not a look at competitors.

10      Q.    Basically, what do you is build up from the

11   goods-producing sector, correct?  That's where you start.

12      A.    I have direct evidence, as I said, in table 2-B,

13   about wages in the motor vehicle parts industry.  And I show

14   that very direct data where it's available.

15            Where direct data is not available, I use the

16   best data that is available to create a reasonable estimate,

17   and ones that I, as my testimony indicated, come in pretty

18   close to the direct data.

19      Q.    Okay.  So you've got information from the

20   goods-producing sector, you've got an estimate for motor

21   vehicles, correct?

22      A.    Correct.

23      Q.    And you've got an estimate for large firms,

24   correct?

25      A.    There is data on large establishments.  I refer

155

1    to studies of large firms.  I don't have data on large firms.

2         Q.    And then you've got an estimate for removal of

3    supervisory personnel, correct?

4         A.    Correct.

5         Q.    Okay.  And that gets you to your total

6    compensation thing, whatever it is, your estimate.

7         A.    Which is, by the way, remarkably close to

8    actual.

9         Q.    Okay.  And that in summary is at page 36 -- or

10   page 17.  Is that right?

11        A.    Where are you, please?  At which tab?

12        Q.    It's tab B, your report.

13        A.    Yes.

14        Q.    And there you've got actually two different sets

15   of numbers.  One has to do with production numbers.  That's

16   this $26.11 figure, right?

17        A.    I'm sorry, I'm on page 17.  Where are you

18   looking?

19        Q.    Page 17, paragraph 36.

20        A.    Yes.

21        Q.    You've got total compensation of production

22   workers is approximately $26.11, right?

23        A.    For the goods-producing sector, correct.

24        Q.    And you haven't taken that number and compared

25   it to any of Dana's numbers, correct?

156

1        A.    That's not the most precise industry.  One could

2   do that.  But I have not done that.

3        Q.    Okay.  What you do is, you go to the second

4   numbers and get your 29 to $31 figure, correct?

5        A.    That is correct.

6        Q.    And that's the comparison that shows up on these

7   two, Union 58 and 59, is that right?

8        A.    That is correct.

9        Q.    And that's the numbers that you use for the

10  remainder of your testimony, is that right?

11       A.    That is correct.

12       Q.    Okay.  The compensation level at 29 to 31, have

13  you compared that?  Go back to tab G, Debtor's 46, I believe,

14  in evidence.  Have you done any analysis to compare your 29 to

15  31 figure with the numbers in the Dana column on debtor's 46?

16       A.    I have not.

17       Q.    Okay.

18       A.    And I would like to add, one reason I have not

19  is that Professor Wachter and debtors, to my knowledge, were

20  not very clear on how these numbers were derived.

21             I don't know, for example, to what extent they

22  are elevated because there have been extensive layoffs at

23  these facilities and hence, there's an older work force, and

24  under most types of pension plans, that means that that will

25  temporarily elevate the per-employee cost of the pension.

1        So this is really, this kind of plant-by-plant

2   analysis is difficult.  I really don't know how Dana is

3   allocating these costs across plants.  I would suspect that

4   these figures reflect things like downsizing at these plants.

5        MR. BENNETT:  Move to strike, your Honor, as

6   totally speculative.

7        MR. DeCHIARA:  Objection, your Honor, it's based

8   on her expert view --

9        THE COURT:  It's pure guesswork.  Sustained.

10       Q.   Just in terms of the analysis you did where you

11  blend tier 1 and tier 2 information --

12       A.   I do that to derive -- and also the wages paid

13  to skilled workers, to derive an average wage rate for the

14  plant, yes.

15       Q.   You do that, for example, in Union 59, the last

16  thing that Mr. DeChiara showed you, this one (indicating) --

17       MR. BENNETT:  -- if I may approach.

18       A.   No, Union 59 does not blend categories.  Union

19  59 looks only at the new tier 2 employees and in constructing

20  this, I took the proposed wage for tier 2 employees, $11.05 an

21  hour, and added it to the amount that Dana said it was going

22  to provide in terms of benefits per employee.  So I used

23  Debtor's 55 as to the value of benefits that they were

24  proposing and added pay, 11.05, to that number for benefits,

25  under the assumption that the benefits would be the same for

158

1    tier 2 employees.  I'm not a hundred percent sure that's the

2    case, but that's the most generous type of assumption, to

3    arrive at those proposed total compensation figures for tier 2

4    employees.  So it does not mix different types of employees.

5    It's just new tier 2 employees.

6             Q.   You do know that the tier 2 level of employees,

7    that's not part of the 1113 motion, correct?

8             A.   I was not aware of that.

9             Q.   Okay.

10            MR. BENNETT:  Nothing further.

11            MR. DeCHIARA:  Your Honor, I have no questions,

12   and just I can't remember whether I moved the admission of

13   Dr. Voos' declaration, and if I did not do that, I will do

14   that now.

15            THE COURT:  Received.  Any further inquiry?

16   Thank you.

17            (The witness is excused.)

18            THE COURT:  Off the record.

19            (Discussion off the record.)

20            (Recess taken.)

21            MR. DeCHIARA:  Your Honor, as our next witness,

22   the unions call Dr. Susan Helper.

23   S U S A N    H E L P E R , having been duly sworn, was

24            examined and testified as follows:

25            (Continued on following page.)

159

1    DIRECT EXAMINATION BY MR. DeCHIARA:

2            Q.    Good afternoon, Dr. Helper.

3            A.    Good afternoon.

4            Q.    Where are you employed?

5            A.    I'm employed at the Weatherhead School of

6    Management at Case Western Reserve University.

7                  THE COURT:    Slower.

8                  THE REPORTER:    Slower, please.

9            A.    I'm the SBC Professor of Regional Economic

10   Development and I'm the acting chair of the economics

11   department.

12                 THE COURT:    Not that slow.

13           Q.    What is your area of academic specialty?

14           A.    I'm an organizational economist and I focus on

15   the motor vehicle parts industry.

16           Q.    What is an organizational economist?

17           A.    We study the constellation of policies that a

18   firm might adopt and how, taken together, those policies

19   affect a firm's performance.

20           Q.    And are, do the policies you look at include

21   compensation policies?

22           A.    Yes, they do.

23           Q.    Where and when did you receive your Ph.D.?

24           A.    I received a Ph.D. in economics from Harvard in

25   1987.

160

1      Q.   And what was the subject of your Ph.D.

2  dissertation?

3      A.   The motor vehicle parts industry.

4      Q.   And have you continued to study the auto parts

5  industry since then?

6      A.   Yes, I have.  I've written about 40 papers that

7  primary concern the motor vehicle parts industry, and I've

8  visited about 60 plants in different parts of the world.

9      Q.   Including in your capacity as an economist?

10      A.   Yes.

11      Q.   I'd like to show you what's been marked as Union

12  Exhibit 8.

13           MR. DeCHIARA:  Your Honor, do you need a copy?

14  It's Professor Helper's report.  I have an extra if you like.

15           THE COURT:  I thought I had it.

16           (A pause in the proceedings.)

17           THE COURT:  I have it.  Okay.

18      Q.   Professor Helper, attached to the back of Union

19  Exhibit 8 is what appears to be your CV.  Do you see that?

20      A.   Yes, I do.

21      Q.   And is that a correct and accurate account of

22  your professional and academic positions and activity and

23  publications?

24      A.   Yes.

25      Q.   And on pages 19 through 23 of the CV, there's a

161

1    list of publications.  Is that a listing of your scholarly

2    publications?

3            A.    Yes, it is.

4            Q.    To what extent do those scholarly publications

5    concern the auto parts industry?

6            A.    Almost all of them have something to do with the

7    automotive parts industry.

8            Q.    On paragraph 2 of your report, you say you are a

9    research associate of the MIT International Motor Vehicle

10   Program.  Can you tell us what that is?

11           A.    Yes, it's a group of researchers around the

12   world that does research on issues of interest to the

13   international motor vehicle industry, and we are funded in

14   large part by motor vehicle companies from around the world.

15           Q.    You also say you're a research associate of the

16   National Bureau of Economic Research.  Can you tell us what

17   that is?

18           A.    Yes, it's a group of empirical economists.  It's

19   headed by Dr. Martin Feldstein, who was an adviser to

20   President Reagan and other presidents, and you have to be

21   invited to join.  They hold a number of conferences every

22   year.

23           Q.    And you're a member of that?

24           A.    Yes, I am.

25           Q.    Have you ever before served as an expert witness

 1    in any type of proceeding?

 2              A.    Yes.  In two cases.  One, most recently was

 3    Delphi on behalf of UAW.  Before that, I served as an expert

 4    on behalf of management in a case where a salesperson alleged

 5    that he had won a contract with GM and then was dismissed by

 6    the company so that they wouldn't have to pay him a promised

 7    bonus; and then my testimony was to look at the overall

 8    organization of the company, to two of the plants, to talk to

 9    management and workers there, and to make the point or, what I

10    found was that in fact, the entire company, the performance of

11    the entire company was responsible for winning that contract

12    with GM.  It wasn't an individual person.

13              MR. DeCHIARA:  Your Honor, I would move to have

14    Professor Helper qualified as an expert in organizational

15    economics and in the U.S. auto parts industry.

16              MR. BENNETT:  No objection, your Honor.

17              THE COURT:  Received.  I mean, qualified.

18              Q.    Professor Helper, did you, looking back to Union

19    Exhibit 8, did you write this report?

20              A.    Yes.

21              Q.    And as far as you know, are all the statements

22    in the report true and accurate to the best of your belief?

23              A.    Yes.

24              Q.    And do you adopt them here as if they were your

25    sworn testimony?

163

1          A.   Yes.

2               MR. DeCHIARA:  Move the admission of Union

3     Exhibit 8.

4               MR. BENNETT:  Your Honor, there is a great deal

5     of hearsay in Union 8.  We'll cross on it.  I think the court

6     can certainly weigh the ultimate value of the report on that

7     basis.

8               THE COURT:  I'll keep my scale here.

9               MR. DeCHIARA:  Your Honor, is it admitted?

10              THE COURT:  It's admitted.

11              MR. DeCHIARA:  Thank you.

12              (Union Exhibit 8, received in evidence, as of

13    this date.)

14         Q.   Professor Helper, in your opinion, would it ever

15    make business sense for a firm in the auto parts industry like

16    Dana to pay its workers wages above the market level?

17         A.   Yes, for three reasons.  One is the, in the

18    motor vehicle parts industry, there's sort of three

19    characteristics that are important here.  One is the capital

20    intensity of production; a second is the importance of

21    quality, and the third is the importance of just-in-time

22    production.

23         Q.   Why don't you explain what those three concepts

24    are, beginning with capital intensity.

25         A.   So, in a company like Dana, downtime is very

164

1    expensive.  So we have expensive capital equipment that's not

2    being used.  We also have the services of a lot of engineers

3    and managers who, there's not being revenue generated to pay

4    their salaries if equipment is down.  So that it becomes very

5    important to have skilled and motivated workers to keep that

6    equipment up and running.

7              And so what that means is, it can be sort of

8    penny-wise and pound-foolish to pay a slightly lower wage but,

9    as a consequence, get lower skilled workers who are unable or

10   unwilling to prevent downtime in the first place, or to

11   improvise and use their deep base of knowledge to get that

12   equipment back up and running very quickly.

13        Q.    Would you describe Dana as a capital-intensive

14   operation?

15        A.    Yes, I would.

16        Q.    And why do you say that?

17        A.    Based on my understanding of the nature of

18   production in that plant, based on my reading of the trade

19   press, discussions with experts in the industry.

20        Q.    And what is just-in-time production?

21        A.    So, just-in-time production is a method of

22   production that was perfected by the Japanese, actually

23   invented by Henry Ford.  But the idea is that you use very

24   little inventory.  And this has a lot of of benefits.  You

25   save on working capital, you can identify quality problems

1    more quickly because you're using the parts right after they

2    were made.  And it's been a policy that's been adopted by most

3    auto companies, particularly the most successful ones.

4              And again, this requires to be successful,

5    skilled and motivated workers, because you don't have a big

6    bank of parts that you can work off of if equipment goes down.

7         Q.   And does Dana use just-in-time production?

8         A.   They do.  In a number of their plants, they make

9    multiple deliveries to their customers every day.  And they

10   are trying to, as part of their improvement plan, trying to

11   increase their ability to both reduce inventory and to

12   increase their percentage of on-time deliveries.

13        Q.   And how does a firm's use of just-in in-time

14   production relate to its compensation policy or how should it

15   relate to its compensation policy?

16        A.   Well, so, just-in-time again places a great

17   premium on worker skill to avoid downtime in the first place,

18   and second, to respond quickly and creatively if there is

19   downtime.

20             And again, you're more likely to find workers

21   who are willing and able to do that if you pay a higher wage.

22        Q.   To what extent do firms in the auto parts

23   industry compete with each other based on the quality of their

24   products?

25        A.   It's very, very important.  And a firm whose

```
 1    quality is too low will not even be invited to bid on a

 2    product.

 3           Q.   How demanding are the automakers regarding the

 4    quality of their suppliers' products?

 5           A.   Incredibly demanding.  In a couple of examples,

 6    one is that, I guess the best one is that in many cases, if a

 7    company, a supplier ships one bad part, the automaker will

 8    reject that entire part.  So at that point the supplier will

 9    be required at his own expense to send workers to that plant,

10    sort through the parts, figure out which ones are good and

11    which ones are bad.  The company then will get a black mark

12    against it, make it more difficult to win future business.

13           Q.   Can you tell us how demanding the Japanese

14    automakers are in terms of qualities, the quality of their

15    suppliers' products and the American automakers?

16           A.   In the past, the Japanese have been much more

17    demanding.  This gap, the quality gap, at least as measured,

18    say, by the JD power surveys, has narrowed.  So the Americans

19    are approaching the Toyota and Honda requirements, but both of

20    them are quite stringent.

21           Q.   Why have the American automakers become more

22    demanding of quality over time?

23           A.   Customers, final consumers like us, demand it.

24    We're much more likely to pay, to buy a car that has a good

25    reputation for reliability.
```

167

1      Q.   Let's talk about the consequences that could

2  result if a supplier supplies defective parts to an automaker.

3           Could there be financial penalties or warranty

4  costs?

5      A.   Yes.  And this actually has been an issue for

6  Dana, that there has been a charge-back.  If a part failure

7  that a consumer finds in the field can be shown to be the

8  result of a faulty part supplied to -- by a supplier, that

9  supplier will be charged for that warranty cost, which can be

10  many times the original cost of the part.

11      Q.   How could making a defective delivery affect an

12  auto supply company's ability to win new business?

13      A.   It could dramatically hurt it.  It might not

14  even be invited to bid in the first place.

15      Q.   How does the importance of quality in the

16  industry relate, if it does, to a firm's compensation policy?

17      A.   Again, it's important that workers have the

18  skill and the motivation to produce the correct parts.

19  Workers who are paid more have more skill, have more ability

20  to identify failure modes.  Workers who are paid more stay

21  around longer, and thus are often exposed to more jobs and so

22  they can understand what it means if a bad part, say, comes to

23  them and they were previously employed in that supplying

24  department, they can identify, perhaps, early, the causes that

25  there's a problem, make it known, get that problem solved

168

1  quickly.  So --

2        Q.  What -- I'm sorry.

3        A.  -- so it's very important.

4        Q.  To what extent is there improvement of the

5  production processes in the auto supply industry?

6        A.  It's very important.  There's lots of

7  competitors in the industry, and keeping ahead is a very

8  important thing, so always changing, always introducing new

9  products, introducing what look like minor improvements can

10  have a huge impact on quality of -- and profitability of a

11  company.

12        Q.  Have you ever seen the phrase, "Flawless

13  launch"?

14        A.  Yes.  It's in, it appears a number of times in

15  the Dana turnaround documents as something that Dana must do

16  to successfully emerge from bankruptcy.

17        Q.  What is your understanding of what a flawless

18  launch is?

19        A.  Well, one of the best ways to make profits in

20  this industry is to have a new product, a product that other

21  companies can't supply.  So if an automaker wants to get it,

22  they have to get it from you, so that gives you a lot more

23  bargaining room on price.

24            In order to get that product out of prototype

25  and into mass production is quite a severe challenge.  What

1    you need to do is move from small batches to large batches.

2    It places a premium, again, on worker skill and motivation.

3    Workers -- we don't have -- there's not a script, there's a

4    lot of problems that are going to evolve, perhaps unexpected,

5    that parts don't fit in the way that was designed, workers

6    need to improvise, to understand problems, to make linkages

7    perhaps across departments.

8            And the quicker this can happen, the quicker

9    that a company can move from the prototype stage to the mass

10   production stage, the faster that they can, or the longer

11   period of exclusivity they are going to have before they are

12   imitated by other competitors.

13       Q.   What effect is there on the quality of a

14   company's work force if it pays above the market wage?

15       A.   They are going to be able to draw from a, the

16   top part of the skill distribution.  And they are also going

17   to be able to keep workers who become experienced.  They also

18   will achieve higher motivation by workers, either due to

19   loyalty, a kind of passive, a carrot reason, or on the other

20   hand, workers will not want to lose a job that pays so well,

21   and so they will work hard for that reason as well.

22       Q.   And what impact would there be on Dana's current

23   work force if it cuts pay to well below market levels?

24       A.   Well, I think we might see some of the best

25   workers quit because they will be able to find better jobs.

170

1    Some of the existing workers, I think it's a problem, you

2    know, we can all imagine if we had to take a significant pay

3    cut, that we have car payments and house payments that are

4    predicated on a certain level of income.  If all of a sudden,

5    there's a lower level of income to make that, there's, people

6    are going to be preoccupied with financial worries, and

7    perhaps less focused on thinking of new ideas in the shower or

8    whatever that will improve the company.

9         Q.   Do you have any view or information about

10   whether Dana will be able to attract skilled and committed

11   workers at the starting rate of $11.05 an hour?

12        A.   I think it would be unlikely.  And maybe here's

13   a good time for me to kind of give a picture of what it is

14   these workers do.

15             We may think sitting here that what a blue

16   collar worker does is, you know, push a button on a machine

17   and the same button every twenty seconds, year after year, for

18   twenty years.  That's very much not what these workers do.  So

19   just to give an example of, say, an assembler, this is an

20   assembler at Fort Wayne doing the center section axle

21   assembly, each one of these assemblies is slightly different,

22   that they need, the finished part needs to meet tolerances of

23   one one thousandth of an inch.  If it doesn't meet such

24   tolerances, it's going to suffer in terms of noise, vibration,

25   harshness, durability, and could even cause safety problems.

171

1    And as a result, the worker has to insert shims into this

2    assembly that are different for each one, because the

3    tolerances are so sight.  So there's a lot of judgement that's

4    involved.  There's also new products that come along and new

5    products that would be made in a rotation, so they are not

6    doing the same job every day, day after day.  That's just one

7    example.

8            Q.   Did you have your deposition taken by Dana in

9    this case?

10           A.   I did.

11           Q.   Do you recall being asked in your deposition

12   what auto parts company you believed was most closely

13   comparable to Dana?

14           A.   Yes.  I said American Axle.

15           Q.   Why did you say that?

16           A.   For a variety of reasons, include that Professor

17   Wachter lists them as a competitor to a number of the plants,

18   also, it's a company that Dana benchmarks in its goals for

19   profits.

20           Q.   Have you made any effort to determine what wages

21   are paid by American Axle to its production employees?

22           A.   I did.  I spoke to someone in the UAW research

23   department.  The UAW represents the workers at American Axle.

24           Q.   And what did you learn?

25           A.   I --

1          MR. BENNETT:  Objection, your Honor, it's pure

2   hearsay.  If they want to put it in through somebody in the

3   UAW, if they want to give us some documents that actually

4   relate to us, it wasn't in the report, it's pure hearsay.

5          THE COURT:  I'll allow it.

6          MR. DeCHIARA:  Thank you.

7     Q.    What did you learn?

8     A.    I learned that 85 percent of the workers at

9   American Axle are under the master agreement with the UAW and

10  they make a wage of $27 an hour, plus benefits.  So the wage

11  alone is $27 per hour.

12    Q.    How can American Axle compete and succeed paying

13  that kind of wage?

14    A.    Well, they have very high operational

15  effectiveness.  So their defect rate has declined dramatically

16  in recent years to the point where -- this is according to a

17  presentation made by Mr. Dauch, the chairman and CEO, to

18  stockholders or to stock analysts.

19          What he shows is that currently, American Axle's

20  defect rates are about 25 parts per million, so that means for

21  every million parts that American Axle is supplying to its

22  customer, less than 25 have a problem.  So it's a remarkable

23  achievement.  And Dana's defect rates are seven to ten times

24  what American Axle's are.  So one example of how, with better

25  operations, you can offset the cost of high wages.

173

1          Q.    To what extent does your academic work include

2     interviewing workers about their work?

3          A.    Quite frequently, as I mentioned, I've been to

4     about 60 plants.  Typically in those plants visits, I will

5     talk to workers, ask them what they do, ask them the training

6     that they've received, ask them what happens if there's a

7     quality problem, et cetera.

8          Q.    In preparing your report in this case, did you

9     interview any individuals with experience working at any of

10    Dana's plants?

11         A.    I did.

12         Q.    And did these individuals have experience

13    working in the plants themselves?

14         A.    Yes, they did.

15         Q.    Who were these individuals?

16         A.    So I talked to union officials at Auburn Hills,

17    Lima, Henderson, Kentucky, and Fort Wayne, Indiana.

18         Q.    And apart from having personal experience as

19    workers in the plants, were there any other way in which they

20    would have been familiar with the work processes in the plant?

21         A.    Well, in many cases, they have been there for a

22    long time, so twelve years in the case of the Lima shop chair

23    and over 20 in the case of the Fort Wayne shop chair.  It's

24    also, besides their personal experience working in these

25    plants, it's their responsibility to represent workers in a

174

1   variety of areas of the plant.

2          Q.    What sorts of questions did you ask them?

3          A.    Well, I asked them a variety of objective

4   questions.  So, what are the duties of workers in this plant,

5   give me some examples.  Tell me what the conditions are like.

6   Walk me through, now, okay, so the part arrives at their

7   station, what do they do next?  Is there heavy lifting?  Do

8   they need to wear protective equipment?  How long of a

9   training process does it take to do this job?  Do they do

10  setup with the machines as well as operation, et cetera.

11         Q.    How do these types of questions compare to the

12  types of questions you would ask a worker if you were doing an

13  academic study?

14         A.    They are the same.

15         Q.    In your view, is it appropriate to look at broad

16  BLS occupational categories like assembler to determine the

17  market wage for Dana's production workers?

18         A.    No, it's not.

19         Q.    Why do you say that?

20         A.    There's a broad variation in this category or in

21  all of these categories.  And in my report, I have an example

22  of a non-automotive plant that I visited that assembled

23  plastic panels for office equipment.

24               And in this plant, the workers just kind of --

25         Q.    Was this a plant in the auto industry?

175

1      A.    This was not a plant in the auto industry.  It

2  was assembly for office equipment.  And so they just sort of

3  snapped some panels together.  There was no pressure to

4  produce just in time, the workers could learn just by

5  observing each other, there wasn't particularly dangerous

6  machinery, so it's very different, say, from the job of the

7  assembler that I just described where the worker's exercising

8  judgement and each assembly is slightly different.

9      Q.    In your view, how did Dana's production workers

10 who are in the assembly occupational category compare to, in

11 terms of skill, to other workers throughout the economy who

12 were in the same occupational category?

13     A.    They'd be at the upper end.

14     Q.    What about Dana workers who are in the machine

15 operator category, can you tell us anything about that and how

16 they might compare to other workers in that category

17 throughout the economy?

18     A.    Yes.  Professor Wachter used a category out of

19 the BLS data for workers who operate machines.  In fact,

20 workers at Dana don't just operate machines.  With the

21 exception of tier 2 workers, all the incumbent workers both

22 operate and set up their machines.  And setup is a much more

23 skilled operation for a variety of reasons.

24          First of all, if the machine is set up wrong, no

25 good parts can result, so it's sort of garbage in, garbage

176

1    out.  So it's very crucial.  There's a lot of tight

2    tolerances, a lot of adjustments that need to be made, and

3    this is also something that varies quite substantially from

4    product to product.  So there's a lot of variation and a lot

5    of skill and judgement required to do the setup.

6            Q.    Do Dana's production workers review quality

7    control charts or read blueprints?

8            A.    Yes, they do.  They also prepare quality charts,

9    so they are responsible for taking measurements of parts, and

10   noting whether or not those parts are trending out of the

11   specification, and if so, to take action to stop that.

12           Q.    Do they do inspections?

13           A.    Yes, they do.

14           Q.    How up to date is the equipment at Dana's

15   facilities?

16           A.    It varies.  Some of it is quite new, some of it

17   is quite old.  Some of it's forty to fifty years old.

18           Q.    And what significance, if any, does that have in

19   your mind?

20           A.    So, the 40- to 50-year-old equipment tends to

21   require a lot of judgement and so, for example, the shop chair

22   at Lima was telling me about how, you know, maybe machine 1,

23   you can get to know your machine, you know, sort of day in and

24   day out.  You know, maybe many of us here think, engineers can

25   know everything.  But that's actually not true.  You really --

1    there's a great deal of knowledge to be gained by having a

2    worker who lives with this machine day in and day out, knows

3    how it sounds when it's running right, knows how it sounds

4    when it's not running right, operate that.

5                With these older machines, again, giving this

6    example of, so maybe there's machine 1, and machine 1 is --

7    runs good for half an hour but then, you've got to dial it

8    back because it heats up and it's going to make parts that are

9    too big; whereas machine 8, it's finicky at the beginning so

10   you've got to get it running, but once you get it running, you

11   never want it to stop.  You want to find somebody to cover for

12   you on your breaks, et cetera.  So that's the kind of

13   knowledge that it takes to really keep these machines up and

14   running.

15               Q.   Does Dana need workers who have the skills to do

16   more than one job in the plant?

17               A.   It's quite beneficial.  Dana, particularly in

18   their heavy truck area, runs a wide variety of parts.  And if

19   you have a worker who only knows one job, and that part's not

20   running that day, that worker will be idle.  So if you have

21   workers that are cross-trained, can do a variety of jobs,

22   you're going to have better utilization of your workers.

23   You're also going to have better and quicker diagnosis of

24   quality problems because they are going to have seen, perhaps,

25   will know what generated that failure mode.

178

1      Q.    What about working conditions?  How in your

2  judgement do Dana's workers compare in terms of working

3  conditions to others in the broad assembly or machine operator

4  BLS occupational categories?

5      A.    In many cases they are worse.  So the BLS

6  language for describing the machine operator category talks

7  about, that typically, the jobs are done in well-ventilated

8  clean climate controlled areas.  And that is not true for many

9  of the jobs at Dana, so -- and also involve only moderate

10  lifting.

11             So for example, the gear carrier line at Fort

12  Wayne, you have workers who are, as the shop chair put it,

13  dressed to do battle.  They've got aprons, rubber gloves,

14  spats up to their knees, helmets, goggles, they are bathed in

15  this cutting fluid that's continually operating to keep the

16  parts cool and lubricated.

17             These parts weigh about 80 pounds each.  They

18  make 280 parts a shift, and lift each part four times.

19  Meanwhile, they are doing precise measurements on each part.

20  So it's a very, very tough job with -- done in very difficult

21  conditions.

22      Q.    Tell us about the heat treat.

23      A.    So heat treat -- so this is in the category of,

24  I think, such workers, so these workers don't just inspect.

25  They also do heat treating where they are lifting, again,

179

1    parts weighing from ten to twelve pounds, up to 40 pounds.  So

2    they may lift several tons over the course of their shift.

3                And meanwhile, they are making precise

4    measurements and, because they are near these very hot ovens,

5    the temperature can be over a hundred degrees.

6         Q.    What is a compensating differential?

7         A.    This is a term from economics that just makes

8    the point that if you're going to ask workers to work in worse

9    working conditions than another employer, you're going to have

10   to pay them more to attract them to your job.

11        Q.    So the market wage of those individuals would be

12   higher?

13        A.    Yes.

14        Q.    In your view, in determining what compensation

15   it should pay to its current employees, should Dana take into

16   account the cost of the retiree life and health benefits it

17   pays to its current retirees?

18        A.    No, it should not.

19        Q.    Why do you say that?

20        A.    Well, one of the main lessons that we teach or

21   that I teach when I teach business economics is that the

22   profit-maximizing rule is marginal revenue equals marginal

23   cost.  And if you include costs that are not marginal costs in

24   your pricing, you're going to be leaving money on the table

25   that you could, by lowering your price to the marginal cost,

180

1    you -- or excuse me, lowering your estimate of costs to your

2    marginal cost, you're going to pick up new business that's

3    going to make, enable you to make a contribution toward

4    reducing that sum cost to the retiree benefits.

5                So I think this -- it's just a very standard

6    economic principle that, you know, set marginal revenue equals

7    marginal cost.  In decisionmaking about future pricing, future

8    work, you do not take into account sum costs.

9                Q.    And are the cost of life and health insurance

10   for retirees what you call a sum cost?

11               A.    Yes, those are costs that were agreed to in the

12   past.  So regardless of how many future workers Dana hires,

13   those costs aren't going to change.  I mean, just to kind of

14   see what this might look like, suppose Dana laid off all but a

15   few of its workers, it would look like that burden, that fixed

16   burden divided by a small number of workers, look like those

17   workers cost you millions of dollars.  That's obviously not

18   true.

19               Q.    In your view, are the pay cuts that Dana is

20   proposing in its Section 1113 proposal necessary for its

21   successful reorganization?

22               A.    No.

23               MR. BENNETT:  Objection, your Honor.  Objection

24   if she's going to give a legal definition on this subject.

25   She's certainly not qualified to do that.

181

1          MR. DeCHIARA:  Your Honor, I wasn't seeking a

2   legal definition.

3          Q.   In your view, are the pay costs that Dana is

4   proposing necessary for it to be a successful company in the

5   future?

6          A.   No.  I mean, as an economist, I worry that they

7   may actually be counterproductive.  We're talked about a

8   variety of reasons why that might be so, that pay cuts would

9   lead qualified and highly skilled workers perhaps to quit,

10  because they can now find better employment somewhere else,

11  make it difficult to employ new workers, meaning that perhaps

12  there will be more downtime as a result, lower quality, less

13  just-in-time production.

14          One thing I didn't actually say was, the

15  importance of downtime, that if you shut down an assembly

16  plant in the auto industry, it can cost ten thousand dollars a

17  minute to that customer in terms of the ability to -- you've

18  lost the ability to sell a highly profitable car.  And it's a

19  big deal.  And so actually at Auburn Hills, about four or five

20  months ago, in fact, the Toledo plant was in fact shut down

21  and this was a reason to call out both the president of Dana,

22  high officials of Chrysler.  So it's an extremely important

23  issue.  And I worry that these pay cuts could be penny-wise

24  and pound-foolish.

25          MR. DeCHIARA:  Thank you.  I have no further

182

1    questions.

2    CROSS-EXAMINATION BY MR. BENNETT:

3         Q.    That little part at the end before call of the

4    president, that's from the newspapers someplace?

5         A.    This is from the shop chair at Auburn Hills.

6         Q.    Okay.  Just to start with, you were here for

7    Professor Voos' testimony?

8         A.    Yes, I was.

9         Q.    And you heard her testify about Dana's

10   compensation levels are below market at present?

11        A.    Yes.

12        Q.    Let's just go to your declaration.  It's the

13   Union Exhibit 8.  You have it in front of you in your existing

14   binder.  I have a little more information including your

15   deposition here.

16              (Handing document to witness.)

17        A.    Okay.

18        Q.    It's either tab A in the cross-examination

19   binder, which may already be in front of you.  Are you there?

20        A.    Yes.

21        Q.    Paragraph 45 in the conclusion?

22        A.    Yes.

23        Q.    You say, "Dana has had for many years a

24   high-wage policy."  Do you see that?

25        A.    Yes.

183

1          Q.    Do you believe that's true today?

2          A.    What I meant there was, they paid a higher wage

3    than average for the U.S. economy.

4          Q.    Okay.  Do you think that that's a condition that

5    exists today?

6          A.    Yes.

7          Q.    Okay.  Now --

8          A.    Excuse me, higher wage to production workers

9    than in the U.S. economy.

10          Q.    Okay.

11          A.    Yes.

12          Q.    Fair enough.  You provided a declaration in

13    Delphi?

14          A.    I did.

15          Q.    And you used that declaration to prepare your

16    report in this case, is that right?

17          A.    Um, when there were similar facts that needed to

18    be responded to, Professor Wachter's declaration, I used my

19    Delphi declaration, yes.  When the facts were different, I

20    modified, or I used different words.

21          Q.    Okay.  You have that Delphi declaration on your

22    word processor?

23          A.    Yes, I do.

24          Q.    And you used some of the same phrasing from that

25    original Delphi report for this report, correct?

184

```
 1              A.   Yes.

 2              Q.   And you had some notes from the Delphi case that

 3   you reviewed as part of your preparation of the opinion in

 4   this case; is that right?

 5              A.   Um -- I'm not sure that I did.

 6              Q.   Well, you did have your deposition taken in this

 7   case, correct?

 8              A.   Yes.

 9              Q.   You have that in front of you.  It's in the very

10   front of your book.

11              At page 25, line 6 there, you refer to your

12   notes on Delphi.  You say you reviewed those notes on Delphi

13   in connection with this case, is that correct?

14              A.   Oh, just to look at American Axle, yes.

15              Q.   Okay.  So you did have some notes on Delphi.

16   You looked at those for purposes of this case, correct?

17              A.   Actually, this was in my expert report.  I

18   wasn't as precise as I might have been, but in my expert

19   report, there is a mention of Delphi.

20              Q.   Okay.  You did give a deposition in the Delphi

21   case, is that right?

22              A.   Yes, I did.

23              Q.   And that did explore the bases for your opinion

24   in that case, is that right?

25              A.   Yes.
```

185

1      Q.   And you didn't ignore the bases for your opinion

2   in that case when you put together your opinion in this case,

3   did you?

4      A.   Didn't -- that's com -- are you allowed to ask

5   your question that way?

6      Q.   Let me put it to you this way:  Your experience

7   is cumulative, isn't it?  You compartmentalize the projects

8   that you work on, put them on the shelf and forget about them

9   after you have that experience, do you?

10     A.   That's true.

11     Q.   Okay.  And it is fair to say that your

12  experience in Delphi, the information that you gathered in

13  Delphi to some extent is relevant to your opinion in this

14  case, is that right?

15     A.   Yes.

16     Q.   And the background of your opinion in Delphi,

17  that was the subject of examination in your deposition in that

18  case; is that correct?

19     A.   I believe so, yes.

20     Q.   And you don't know of any reason physically

21  why -- that transcript hasn't been burned, has it?

22     A.   I believe not.

23     Q.   It exists someplace, correct?

24     A.   I believe so.

25     Q.   You don't know any physical reason why it

186

1    couldn't have been given to us, do you?

2         A.    I do not.

3         Q.    Okay.  Now, let's talk about the information

4    that you have about the plants, okay?

5              In the Delphi case, you did conduct visits of

6    some of the plants, is that right?

7         A.    I did.

8         Q.    And your view is, it's always best to see things

9    with your own eyes to reach conclusions as a scholar, correct?

10        A.    Where are you quoting from?

11        Q.    I'm asking you right now, right here, is that

12   your view?

13        A.    I believe that you're quoting from something,

14   isn't that true?

15        Q.    Is it your view, Dr. Helper, that if you want to

16   reach conclusions as a scholar, the best thing is to see

17   things with your own eyes?  Yes or no?  Please.

18              MR. DeCHIARA:  Your Honor --

19              THE COURT:  If you're making some kind of

20   objection to the examination, it's overruled.  I direct you to

21   sit down.

22              MR. DeCHIARA:  I was just going to make a

23   suggestion, but --

24              THE COURT:  No, the questions are being asked

25   very, very cautiously and correctly.  And the witness, if she

187

1    doesn't understand, can say so.  And if she wants to dally

2    back and forth with the examiner, I'll let that happen.

3              Just listen to the question.

4         A.   I would agree with that, yes.

5         Q.   Okay.  If you want to understand something in

6    your view, you go to the source, correct?

7         A.   Yes.

8         Q.   In this case, unlike Delphi, you didn't do any

9    tour of the plants, correct?

10        A.   Let me explain.  I did speak for about seven

11   hours with a number of different plant officials on the phone.

12   I've also visited plants that use similar processes.  I've

13   seen machining plants.  I've seen various types of assembly,

14   I've seen heat treat.  So I'm familiar with a variety of these

15   processes.

16        Q.   Dr. Helper, did you go to plants in this case?

17        A.   I did not.

18        Q.   Thank you.  The people that you talked to about

19   the conditions of the plants were union officials, correct?

20        A.   Yes.

21        Q.   There were two union officers from Fort Wayne,

22   correct?

23        A.   Yes.

24        Q.   There was one union officer from Lima, correct?

25        A.   Lima, yes.

188

1      Q.   You did not talk even to union people

2  representing any of the other facilities, correct?

3      A.   No -- well, I talked with someone from

4  Henderson, Kentucky, and from Auburn Hills.

5      Q.   You don't mention that in your report, do you?

6      A.   Those happened after I finished my report.

7      Q.   The seven hours that you spent, that was with

8  the people at those two facilities, correct?

9      A.   I believe so, yes.

10      Q.   Okay.  You certainly didn't talk to any

11  management representatives, correct?

12      A.   That's true.

13      Q.   You are not a human lie detector, are you?

14          MR. DeCHIARA:  Objection.

15      A.   No, but I believe, when I ask objective

16  questions, I mean, you know, it seems to me that the workers

17  say that the part weighs 80 pound, it weighs 80 pounds.  If

18  they say they make 280 parts per shift, they make 280 parts

19  per shift.

20      Q.   Do you have some unique ability to discern when

21  people are lying to you that the rest of the world doesn't

22  have?

23      A.   I have my experience from visiting sixty parts

24  plants, from doing these sorts of interviews many times in the

25  past, and knowing how to ask questions so that I get objective

189

1    answers.

2          Q.    You do recognize that the union representatives

3    who spoke to you had an agenda in the case, correct?

4          A.    I did.  And I couched my questions very

5    carefully to make sure that, to the best I could, I avoided

6    that agenda.

7          Q.    You do know that the union representatives who

8    spoke to you were trying to make a case that they should be

9    paid high wages and benefits, correct?

10         A.    Does that mean that they --

11               THE COURT:  Answer the question.  Answer the

12   question.

13         A.    I believe that's so, but I don't believe that

14   that influences their answers about how many parts per shift

15   they do, what the temperature is in the plant, et cetera.

16         Q.    Another source of information that you used was

17   a union website called Unionsrule.com, correct?

18         A.    I consulted that in the performance of my

19   research.

20         Q.    You thought that union website was a good source

21   of data, correct?

22         A.    No.  I merely, the way that came up in my

23   deposition was that you found it in my notes.  This was a

24   unions website that I was informed about in the course of my

25   telephone conversation.  I wrote it down in my notes, which

190

1    you had, and then you asked me about it.

2            Q.   Okay.  This "going off to battle" thing, that's

3    from some description from a union officer, is that right?

4            A.   Yes, it is.

5            Q.   You don't have any pictures that you actually

6    looked at, do you?

7            A.   No, I do not.  But I have seen workers dressed

8    to do similar types of jobs, so this struck me as a reasonable

9    description.

10           Q.   Okay.  You didn't do some comprehensive

11   questionnaire of the workers across all the different plants,

12   did you?

13           A.   Asking each worker individually?  No, I did not.

14           Q.   Okay.  In terms of comparability studies, you

15   would agree with me that, in setting a wage rate, a

16   comparability study is a useful piece of information?

17           A.   It's a useful piece of information if it's done

18   correctly and supplemented with other pieces of information,

19   yes.

20           Q.   It gives a sense of what other employers are

21   paying, correct?

22           A.   Yes.

23           Q.   It gives a sense of what alternative

24   opportunities are available to workers, correct?

25           A.   Again, if it is done carefully, and actually

191

1   does look at the skills of the workers who are involved in

2   that.  And so, for example, I think you'd want to take into

3   account exactly what kind of assembly we're talking about.

4   You want to take into account industry -- industry in this

5   case, motor vehicle parts -- matters because it's subject

6   to -- work in this industry is subject to a variety of

7   additional stresses.  So that just-in-time production creates

8   stress.  The pressure for quality --

9          Q.    Doctor, could you try to focus on my question?

10         A.    I am explaining my answer about why it's

11  important to have a correct comparability analysis.

12         Q.    Let me try it this way:

13                In your deposition, were you asked this question

14  and did you give this answer at page 61:

15                "Question:  Why do you want to know that?

16                "Answer:  It gives a sense of what the available

17  opportunities, alternative opportunities available to workers

18  might be."

19                You'd say that's correct?

20         A.    Page 61?

21                (Witness perusing transcript.)

22         A.    Yes.  So there I'm -- yes.

23         Q.    And you'd agree that sooner or later in setting

24  a compensation scheme, you're going to have to do some form of

25  comparability analysis, correct?

192

1       A.   I'd say that would be a useful piece of input.

2    I would want to supplement it with a variety of other pieces

3    of input.  Employers adopt different production recipes.  So

4    for example, not all employers in the motor vehicle parts

5    industry have workers both operate and set up their machines.

6    So it would be important to make be sure that, if you're going

7    to do that, that you didn't compare them incorrectly to

8    workers who only operated.

9       Q.   Let me try it again from your deposition in a

10   simpler form.  Page 66.  Were you asked this question and did

11   you give this answer:

12            "Question:   Sooner or later you're going to do

13   a comparability analysis, correct?

14            "Answer:  Yes.

15            Did you give that testimony?

16       A.   Yes.

17       Q.   Okay.  In this case, you haven't done any

18   analysis that amounts to a comparability study, correct?

19       A.   I've done a number -- I have actually

20   investigated as to the wages of direct competitors of Dana.

21   As I testified, I learned that the wages at American Axle are

22   $27 per hour.

23       Q.   Oh, let's talk about American Axle just for a

24   second.  That's not in your report; is it?

25       A.   No, it came out as a result of your question at

193

1    my deposition.

2              Q.   And you haven't produced any notes from whatever

3    you got from the United Auto Workers on that subject, correct?

4              MR. DeCHIARA:  Your Honor, I would represent we

5    did provide reliance materials to the company on that last

6    Friday.

7              MR. BENNETT:  This is Dauch material?  This is

8    some statement from American Axle that actually shows

9    something different from what she testified about.

10             MR. DeCHIARA:  It was an e-mail that contained

11   about three or four documents that were sent to the company.

12   I don't have the e-mail.

13             THE COURT:  Is there a motion before me?

14             MR. BENNETT:  There is a motion actually to

15   preclude or strike the prior testimony.

16             THE COURT:  I'm granting it.

17             MR. BENNETT:  Thank you, your Honor.

18             THE WITNESS:  I believe there's an Excel

19   spreadsheet --

20             MR. BENNETT:  There's no question pending, your

21   Honor.

22             Q.   Your method in this case was to critique

23   Dr. Wachter's comparability study, isn't that correct?

24             A.   Yes.  And I did obtain an Excel spreadsheet from

25   the UAW research department which I believe that you have.

194

1          MR. BENNETT:  Move to strike if that's

2     reference, again, to American Axle.

3          THE COURT:  I don't know if it's a reference,

4     but it's certainly not responsive to your question.  Your

5     motion is granted.

6          MR. BENNETT:  Okay.

7          Q.   At least in setting up your expert report, no

8     part of your analysis involved direct review of comparator

9     companies, correct?

10          A.   That's correct.

11          Q.   You would agree, would you not, that generally

12     low quit rates are associated with high compensation?  Isn't

13     that true?

14          A.   High compensation can be one cause of low quit

15     rates.  It's not the only cause.  One cannot infer if one sees

16     a low quit rate that therefore, compensation is high.

17          Q.   Were you asked this question in your deposition

18     and did you give this answer, page 90:

19               "Question:  Would you agree that generally,

20     relatively low voluntary quit rates are associated with high

21     compensation?

22               "Answer:  Other things held equal, yes."

23               Was that your testimony?

24          A.   Yes, I believe it's the same as what I just said

25     because of the "other things held equal" qualifier.

195

1      Q.   Okay.  You would agree, would you not, that the

2 auto supply industry is not healthy financially?

3      A.   I would agree that many firms in the auto parts

4 industry are in trouble.

5      Q.   You would agree that, since 1999, at least 36

6 auto parts makers and a couple of vehicle haulers have sought

7 bankruptcy protection, correct?

8      A.   I don't have reason to doubt that.

9      Q.   And you have no reason to doubt that there will

10 be additional bankruptcy filings related to the auto parts

11 industry, correct?

12      A.   I don't have a crystal ball regarding that.

13      Q.   Professor, I'm asking --

14      A.   I don't know.

15      Q.   -- you whether you have a reason to tell the

16 Court, "I think it's over, no more bankruptcies in this area."

17 Is that your testimony?

18      A.   I'm saying I am not sure one way or the other.

19      Q.   You've been studying the industry for twenty

20 years and you can't tell the Court whether you think the

21 bankruptcy wave is over in the auto supply industry, is that

22 your testimony?

23           MR. DeCHIARA:  Objection, asked and answered.

24           THE COURT:  Overruled.  It's asked in a

25 different way.

196

1          He's asking you about trends, do you see any

2    trends?

3          THE WITNESS:  I believe that there's going to be

4    difficult times in the auto industry for a while, for American

5    producers, yes.

6          Q.    Okay.  Move to a different subject.  Talking

7    about national wages, in doing a comparability study, you'd

8    agree that you can't just pick an employer that is physically

9    closest to the employer in question, correct?

10          A.    I'm not sure what you mean by "pick."

11          Q.    Well, if you're going to do a comparability

12    study, you're going to say, what do other employers pay in the

13    way of compensation as compared to the employer in question,

14    you don't just walk down the road and go to the next employer,

15    "Hey, how much are you paying your workers?"  That's not a

16    good comparability study, is it?

17          A.    Well, I think a comparability study should

18    include a variety of elements; and one of those elements

19    should be, what are nearby employers paying, because those are

20    the employers that are going to be competing for workers in

21    that area.  So that is one factor that should be considered.

22          Q.    Well, you would agree that to do a proper

23    comparability study, you need to understand something about

24    the overall supply and demand for labor, correct?

25          A.    Overall supply and demand for labor in -- well,

197

1    it would need to be appropriately qualified.  You'd need to

2    understand where you're getting the workers from that you want

3    to hire.  The auto parts industry, the blue collar workers in

4    the auto parts industry, that's not a national market.

5            Q.   Dr. Helper, let me ask you whether you were

6    asked this question in your deposition, did you give this

7    answer?  Page 67:

8                 "Question:  Why would you want to do that?

9                 "Answer:  Well, let's say that the plant is a

10   large employer compared to the work force in the town.  You

11   might want to, need to, understand something about what the

12   overall supply and demand for labor situation looks like."

13               Did you give that testimony?

14           A.   I'm sorry, where are you?

15           Q.   Page 67.  If you look on the left side, there

16   are little lines there.  Starts at question at line 8.

17           A.   Yes, so again, I'm saying that you need to take

18   into account multiple factors.

19           Q.   Okay.  Now, you have not studied trends in

20   equalization of compensation at the national level in the

21   manufacturing sector, correct?

22           A.   No.  I do know that there are remaining

23   differences in compensation by region in manufacturing.  So

24   the levels of compensation remain different.

25           Q.   Well, were you asked this question in your

198

1    deposition and did you give this answer, page 68, line 23:

2            "Question:  Do you see some trends towards

3    equalization in manufacturing sectors where plants are being

4    relocated?

5            "Answer:  I haven't looked specifically at

6    that."

7            Wasn't that your testimony?

8        A.   Yes, and above, I said, "The fact that when you

9    look at the data, even quite recent data, you still see large

10   differentials, that suggests that equalization has not

11   occurred."

12       Q.   Okay.  And you haven't looked at longitudinal

13   data trends in terms of nationalization of compensation, isn't

14   that true?

15       A.   I have not.  I think that the major point that's

16   important here is that the differential remains.

17       Q.   Okay.  Your observation, however, is that wages

18   in industrial states have not grown in recent years, isn't

19   that true?

20       A.   Yes.

21       Q.   And you would agree that there's been downward

22   pressure on wages in industrial states, correct?

23       A.   Yes.

24       Q.   And that was caused in part by loss of

25   manufacturing jobs in those areas, correct?

199

1          A.    Yes.

2          Q.    That was caused by plants closing?

3          A.    Yes.

4          Q.    And that was caused by plants closing in one

5     location and then opening in other locations, correct?

6          A.    Yes.  Despite that, the differential remains.

7          Q.    Not quite my question, Doctor.  I would like to

8     try to maintain some order in asking you questions, and trying

9     to get answers to my questions.

10                You could agree --

11                MR. SIMON:  Your Honor, given Dr. Wachter's

12    tendency yesterday continually to cast his answers as he chose

13    to cast them to deliver the message he chose to deliver, it

14    comes with ill grace for that exchange to have occurred.

15                MR. BENNETT:  Well, I appreciate the tag team

16    approach to this.  I thought Mr. DeChiara was my --

17                MR. SIMON:  I made a general observation and not

18    an objection.

19                MR. DeCHIARA:  I defer to my senior partner for

20    his apt remarks.

21                THE COURT:  The remarks can be stricken from the

22    record.  They are inappropriate.

23                MR. BENNETT:  Okay.

24          Q.    You have seen a movement of employment in the

25    auto parts industry to the south, correct?

200

1          A.   Yes.

2          Q.   And that has had an effect on unionization rates

3   in the auto parts industry, correct?

4          A.   Yes.

5          Q.   And the unionization rates have fallen as a

6   result, correct?

7          A.   Yes.

8          Q.   And the result in part of that is compensation

9   rates in the auto parts industry have fallen, correct?

10          A.   I'm not sure that they've fallen.  The rate of

11   increase has certainly slowed.

12          Q.   Did you give this testimony in response to these

13   questions at page 161:

14               "Question:   One of the bullet points there

15   says, 'Massive shift to the south.'  What were you referring

16   to there?"

17               MR. DeCHIARA:  I'm sorry, what line are you on?

18               MR. BENNETT:  Page 161 --

19               THE COURT:  Line twelve -- line 13.

20          Q.   Line 13, the actual question is:

21               "Question:   One of the bullet points there

22   says, 'Massive shift to the south.'  What were you referring

23   to there?

24               "Answer:  There's a movement of employment in

25   the auto parts industry to the south.

201

1              "Question:  Has that had any effect on

2     unionization rates in the auto parts industry?

3              "Answer:  Yes, they have fallen.

4              "Question:  Has that had any effect on

5     compensation rates in the auto parts industry?

6              "Answer:  I believe so, yes.

7              "Question:  Those have also fallen?

8              "Answer:  Yes.  Well, relative to other -- I'm

9     not sure.  I don't think there's been an absolute shift, an

10    absolute fall, but there has been a decline in growth."

11             Was that your testimony?

12        A.   Yes, I believe that's the same as what I just

13    said.

14        Q.   Now, outsourcing, you know something about that,

15    correct?

16        A.   Could you define "outsourcing"?  There's a

17    variety of definitions out there.  I'm not sure which one

18    you're using.

19        Q.   Doctor, please.  You've worked in this area.

20        A.   Now, and there's two different terms --

21             THE COURT:  Well then, why don't you give us

22    your definition --

23             THE WITNESS:  Okay.  So "outsourcing" can mean

24    the process of a firm using suppliers that are not financially

25    dependent on that company, so using financially independent

202

1    companies as their suppliers.  They can also be used as a

2    synonym for offshoring, which is sending work to companies

3    that are located in other parts of the world.  So I can

4    actually testify to both.  I was just unclear as to what you

5    were referring to.

6         Q.   Okay.  You'd agree that the dollar value of

7    imports from outside the United States of auto parts has

8    steadily increased over the past 15 years, correct?

9         A.   Yes, I would agree with that.  But there's also

10   a substantial amount of auto parts production in -- that

11   remains in the U.S.

12        Q.   That is a trend that you do see continuing,

13   correct?

14        A.   Yes.  It's -- yes.

15        Q.   And you would agree that competitive pressure

16   from China, India and other low-wage regions is applicable to

17   tier 1 auto supply firms, correct?

18        A.   Um -- I'm not sure what you mean by

19   "applicable."  I'm sorry, I'm not trying to be difficult, but

20   I'm having trouble understanding the -- there's a variety of

21   ways --

22        Q.   Is it your view, Doctor, are you telling the

23   Court the auto supply industry has been affected by this

24   increase of auto parts being imported into the United States

25   but it has had no effect on tier 1 suppliers?  Is that what

203

1    you're telling this court?

2            A.    I'm saying that there has been some effect.

3    That effect is mitigated by the fact that tier 1 suppliers, or

4    particularly Dana, supply parts that are quite heavy and bulky

5    and they are expensive to ship long distances and thus, it

6    remains a reason to locate parts plants near assembly plants.

7            Q.    And you would agree, would you not, that

8    purchasing policies by the U.S. big three automakers have led

9    to a great deal of cost pressure on suppliers, correct?

10           A.    Yes, that's true.

11           Q.    And you would agree that suppliers increasingly

12   feel that the only way to meet the pressures is to source from

13   China themselves, correct?

14           A.    That's a trend that many suppliers have felt in

15   the thing that -- the document you're referring to, that was a

16   quote from suppliers.  That's not -- I don't feel that that is

17   the only strategy that suppliers can use to respond.  And

18   there are many other such strategies that suppliers can use.

19   You don't have to fight low wages with low wages.  You can

20   fight low wages with high operational effectiveness, high

21   productivity.

22           Q.    Your point is, they feel the pressure to move to

23   places like China for sourcing, but you think there's a better

24   way to do it, right?

25           A.    Yes.

204

1      Q.   Okay.  You would agree that, given stagnant

2   demand for cars and continuing productivity improvements, it

3   is true that employment in the industry would probably shrink,

4   we're talking about the auto parts industry, even in the

5   absence of global competition, isn't that true?

6      A.   Yes.

7      Q.   And that's a trend you see continuing, correct?

8      A.   Yes.

9      Q.   And your research suggests that the trend to

10   offshoring, that's not likely to stop in the future, correct?

11      A.   Um -- it's not likely to stop.  It's not clear

12   how much -- we're seeing some push-back from that, a number of

13   companies that have gone, rushed over there, have found that

14   it didn't work quite as well as they thought it would.  So

15   we're seeing some companies move back.

16      Q.   Dr. Helper, were you asked this question in your

17   deposition and did you give this answer at page 145:

18           "Question:  Does your research suggest that the

19   trend to offshoring has stopped?

20           "Answer:  It does not, no."

21           Did you give that answer?

22      A.   Yes, I believe that's consistent with what I

23   just said.  I said that it, the trend has not stopped but it

24   may -- it may be slowing.

25      Q.   You agree that there have been large layoffs at

205

1    a number of auto supply firms, correct?

2         A.   Yes.

3         Q.   And you haven't done a study on the degree of

4    labor oversupply in the auto supply industry, correct?

5         A.   I have not.  I believe that framing a study in

6    such a way would not be a good idea.  As I've testified, I

7    believe that there's a variety of measures that one needs to

8    use; that the auto supply industry is not one industry, it

9    does not draw on a single labor market.  When we're talking

10   about Dana, we're talking about machinists that require a year

11   of training, talking about people who do combination heat

12   treat, inspection, so it would need to, if we're going to do a

13   study that would be useful, it would need to consider not just

14   industry but skill levels within occupation, location, et

15   cetera.

16        Q.   Dr. Helper, let's both try to help the Court

17   figure out the limits of your knowledge, okay?  All right?

18        A.   Yes.

19        Q.   I'm asking you now to tell the judge whether you

20   have research that you can share with the judge as to whether

21   there is an oversupply of labor in the auto parts industry.

22   Yes or no, can you help the judge on that?

23        A.   Yes, I believe that I can help the judge by

24   pointing out that there are a variety of different labor

25   markets that are involved, a variety of different skills that

206

1    are required to do, put together parts in a car.  There are

2    plastic parts in a car, there are forged parts, there are

3    parts that require extremely complicated assembly.  Knowing

4    that there are lots of people who are unemployed just

5    generally doesn't tell you about the --

6                     THE COURT:  The question is, do you have

7    research on this?

8                     THE WITNESS:  I don't have research.  I have a

9    framework.

10            Q.    Thank you very much.  You would agree,

11   Dr. Helper, that original equipment manufacturers in making

12   sourcing decisions do look at the direct labor costs of their

13   suppliers, correct?

14            A.    That's a small part of what they look at, but on

15   occasion, that is something they do look at, yes.

16            Q.    Okay.  Just in terms of productive capacity,

17   production capacity, you do see overcapacity for production in

18   the auto supply industry today, correct?

19            A.    Yes.

20            Q.    That's a situation that you expect to continue

21   into the future, correct?

22            A.    Yes.

23            Q.    You'd expect that to continue for five years or

24   more, correct?

25            A.    Yes.

207

1        Q.   And you would agree, would you not, Dr. Helper,

2   that employees, workers who are working in high-paid

3   manufacturing jobs in the rust belt, when they are laid off,

4   find it difficult to find equivalent jobs with similar wages,

5   correct?

6        A.   Yes, many of them do.

7        Q.   And that's also true in the automotive --

8             MR. DeCHIARA:  Your Honor, I think the witness

9   had not completed her answer.

10            THE COURT:  Let her finish.

11       Q.   Go ahead.

12       A.   Yeah, I think that again, you'd need to look at

13  exactly what skills we're talking about and what parts of the

14  country, and -- yeah, there's a differential there.  Some

15  workers are going to have a very hard time, some are going to

16  have a less hard time.

17       Q.   That's a condition that you also think applies

18  to the automotive industry, correct?  Workers with these

19  high-paid manufacturing jobs, they get laid off, they have

20  trouble getting equivalent jobs.

21       A.   Yes.  It's going to be less true for workers at

22  a company like Dana who have skills in blueprint reading,

23  quality control, inspection, et cetera, than for some worker

24  that is just a kind of run-of-the-mill assembler.

25       Q.   Now, let's talk about the efficiency wage

208

1    theory.  That is a central part of what you are attempting to

2    share with the Court, correct?

3            A.   My, the point I want to make with that is that

4    wages can affect the level of productivity.  And so therefore,

5    when wages are cut by X percent, we're not going to see a fall

6    in costs by that equivalent X percent.  There's a variety of

7    theories that lead to that result.  Efficiency wage is one

8    such theory.

9            MR. BENNETT:  I'm going to move to strike that

10   as totally not responsive.

11           THE COURT:  Granted.

12           Q.   Doctor, a central part of your report is the

13   efficiency wage theory, true?

14           A.   Yes.

15           Q.   Thank you.  The efficiency wage theory, you will

16   agree, is a phenomenon that does not necessarily apply to all

17   employment relationships, correct?

18           A.   The efficiency wage theory states that a higher

19   wage may lead to cause higher productivity.  In some

20   circumstances, that effect may be smaller.

21           Q.   Doctor, at page 33 of your deposition, were you

22   asked this question and did you give this answer:

23           "Question:  Does the efficiency wage phenomenon

24   apply to all employment relationships?

25           "Answer:  Not necessarily."

209

1          Was that your testimony, Doctor?

2          A.   Yes, I gave a more careful answer just now.

3          Q.   Okay.  You would agree also that there is

4   research that suggests that the efficiency wage theory may not

5   apply to employment relationships, correct?

6          A.   Um -- I believe you're referring to the -- maybe

7   you could refer me to what you're, the basis of your question.

8          THE COURT:  He just asked you a question.  You

9   can answer it.  If you don't --

10          THE WITNESS:  Yes, I believe there's some

11   research that argues that, for example, piece rates.

12          Q.   It's not all one-sided, is it?  It isn't that

13   every theorist and everyone who has ever studied this says,

14   "Oh, yeah, you're right, efficiency wages, that's it," right?

15          A.   The Nobel Prize committee gave the Nobel Prizes

16   in this, for this theory.  Every labor economics textbook is

17   going to have --

18          THE COURT:  I think the question is, is there

19   unanimity in it?

20          THE WITNESS:  There is not unanimity, the --

21          THE COURT:  Thank you.

22          Q.   Thank you.  Now, the effectiveness theory, as

23   applied to Dana, you talk about in your expert report,

24   correct?

25          A.   Yes.

210

1           Q.   Okay, let's get that out.  Tab A in the cross

2      binder, Exhibit 8, that's your expert report, right?

3           A.   Yes.

4           Q.   Let's go back to the end there, the conclusion.

5      Are you there, paragraph 45?

6           A.   Yes.

7           Q.   Starts, "Dana has had for many years a high wage

8      policy."  We talked about that.  Correct?

9           A.   Yes.

10           Q.   And the rest of it says, "Like successful

11      high-wage employers, Dana should adopt policies that are

12      complementary to this strategy, such as adding up-to-date

13      equipment, cutting supervisors, implementing employee

14      involvement programs to take advantage of the highly senior

15      work force that have attracted.  One could argue that Dana has

16      done the high-wage strategy without the complementary policies

17      and that they need to add the complementary policies and then

18      cut wages less."

19                That is part of your efficiency wage theory as

20      applied to Dana; correct?

21           A.   Yes.

22           Q.   And that's what you're recommending the judge

23      should consider in making a decision in the case, correct?

24           A.   Yes.

25           Q.   And those three things that you talk about, at

1  least, adding up-to-date equipment, cutting supervisors, and

2  implementing employee involvement programs, you refer to those

3  as essentially a transformation of Dana; correct?

4          A.   Yes, that would be a first best policy for Dana

5  to adopt, yes.

6          Q.   And it is fair to say that your suggestion of

7  adopting this transformation, you don't have any way to tell

8  the Court how long that's going to take?

9          A.   There are other companies that have adopted such

10  transformation and those companies would be a good guide, I

11  think, to estimate what might be the experience of Dana.

12          Q.   Could you answer the question as to whether you

13  can tell the Court if Dana does what you suggest, add

14  equipment, get rid of supervisors, add some employee

15  involvement program, how long is that going to take to achieve

16  some net benefit to the company?

17              You can't tell the Court that, can you?

18          A.   Well, I think in companies that have done

19  similar things, a couple of years is a reasonable estimate.

20  It's not clear, I mean, Dana is also proposing a

21  transformation of a different type, with moving a lot of

22  equipment and workers overseas, which is also a

23  time-consuming, expensive proposition.

24              As I said, this is a first best policy.  Even if

25  Dana doesn't adopt these, my argument remains that cutting

212

1    wages as Dana proposes is a counterproductive policy.

2          Q.   Okay.  You do know, and you can tell the Court

3    that to do what you suggest, to adopt this transformation,

4    don't cut wages and benefits, but do this transformation

5    thing, that's going to cost some money, correct?

6          A.   Yes.

7          Q.   And that's for new equipment, new technology and

8    computers, that's going to cost some money, right?

9          A.   Yes, there will be some savings from not having.

10   But offsetting savings.

11         Q.   And it's going to take some additional training

12   of workers to do this transformation thing that you suggest,

13   correct?  And that's going to cost money.

14         A.   Yes, there would be some savings from fewer

15   supervisors, from fewer errors, fewer -- less scrap, less

16   requirement of setting up supply chains in new plants

17   overseas.

18         Q.   And this transformation thing also involves

19   changing work routines.  And those sorts of changes cost some

20   money, too; correct?

21         A.   They may or may not.  Some companies find that

22   when they listen to their workers, that often great savings

23   result.  I think you can point to the Nummi plant, when it was

24   a General Motors plant, it was a plant that belonged to

25   General Motors, had the highest grievance rate in General

213

1    Motors, deeply problematic quality and productivity, was taken

2    over by Toyota and quickly became, with almost exactly the

3    same work force, became one of the highest quality plants in

4    the Toyota system, and certainly the highest quality plant in

5    the General Motors system.

6         Q.   Doctor, are you suggesting to the Court, having

7    never visited any of the plants and having talked to union

8    officials from two of the plants, that you can compare Dana's

9    situation to something that happened at a GM facility where it

10   was taken over by the Japanese and there was some great

11   transformation, and tell the Court that means that we can get

12   the transformation that you're talking about?  Is that your

13   testimony?

14        MR. DeCHIARA:  Your Honor, I believe her

15   testimony, she spoke to individuals from more than two plants.

16        MR. BENNETT:  Well, given that --

17        THE COURT:  I -- I'm waiting for a motion to

18   strike because her whole response was totally unresponsive to

19   the question.  But nevertheless, it's in the record, no motion

20   was made, and the explanation and the follow-on questions were

21   appropriate.

22        Q.   Okay.  Are you telling the Court you can give

23   some actual comparison between Dana plants and this

24   GM/Japanese automaker situation and say, "I know that means we

25   can do whatever happened in their transformation," is that

214

1   what you're saying?

2          A.   I'd remind you that I've worked on the auto

3   parts industry for twenty years.  I have visited plants around

4   the world.  I've seen this happen.  There's a variety of

5   literature that discusses this.  So it's not just my work but

6   I'd refer you to books such as The Machine that Changed the

7   World by Womack, Jones and Roos, books by Tom Kolkin, so I'm

8   suggesting, I think that this is not an unusual proposal.

9          Q.   Doctor, isn't it basically a guess from your

10  perspective, since you haven't done any study sufficient to do

11  that kind of comparison, isn't that true?

12         A.   Yes.

13         Q.   And you would agree that it is generally quite

14  difficult to get manufacturing firms to change their

15  industrial processes, isn't that true?

16         A.   The general barrier is management.  And so I

17  believe that if management commits itself to such a

18  transformation, the unions would go on board.

19         Q.   Doctor, could you answer my question?  Is it

20  difficult to get manufacturing firms to change their

21  industrial processes?

22         A.   Yes, but I'm suggesting that the reason is

23  something that's under the control --

24              THE COURT:  That wasn't the question.

25         Q.   Is it hard?

215

1      A.   Yes.

2      Q.   To get industrial --

3           THE COURT:  She's already answered the question.

4  Go on.

5           MR. BENNETT:  Great.

6      Q.   Let's just look at this year, 2007, what's

7  coming up here.  You'd agree, would you not, that 2007 is

8  going to be another challenging year for the automotive

9  industry, isn't that true?

10     A.   Yes.

11     Q.   You would agree that the auto industry in the

12  United States is in trouble, correct?

13     A.   The U.S. automakers, yes, are.

14     Q.   They are in financial trouble, correct?

15     A.   Yes.

16     Q.   And you would expect them to be mired in

17  trouble, financial trouble for the foreseeable future,

18  correct?

19     A.   Yes, for GM, Daimler-Chrysler, yes.

20     Q.   And that's going to cause serious trouble for

21  auto suppliers in the United States for the foreseeable

22  future, isn't that through?

23     A.   Yes.

24          MR. BENNETT:  Nothing further, your Honor.

25          (Continued on following page.)

216

1  REDIRECT EXAMINATION BY MR. DeCHIARA:

2        Q.   Dr. Helper, is the efficiency wage or -- to what

3  extent is the efficiency wage theory a widely accepted theory

4  in the economics world?

5        A.   I believe it is a widely accepted theory as a

6  theory, that this narrow theory of the efficiency wages is

7  quite widely accepted, so any labor economics textbook is

8  going to have it in it.  The general idea of causal

9  relationship between wages and productivity is even more

10 widely accepted.

11       Q.   You said something, and I didn't catch it,

12 because I don't think you finished your statement, about the

13 Nobel Prize when you were talking about efficiency wage.  What

14 were you saying?

15       A.   The Nobel Prize for the year, I believe it was

16 2001, was awarded to George Akerlof and Joseph Stiglitz in

17 large part for their work on efficiency wages.

18       Q.   Do you agree with Professor Wachter that

19 efficiency wage theory does not apply to unionized work

20 settings?

21       A.   I do not agree with that statement.

22       Q.   Can you explain why you don't agree with that?

23       A.   The key idea behind efficiency wage theory is

24 that the wage is lifted to above market -- above-market

25 levels.  A union is one way that that can happen.  And so when

1    those wages are higher, you're likely to see the mechanisms

2    that I've discussed at work, so you're likely to see greater

3    loyalty and dedication to the job and you're likely to see the

4    ability to hire from the higher parts of the skill

5    distribution.

6                  I can actually provide some evidence on that

7    from the tier 2 workers that Dana has in fact already hired

8    that, according to the shop chair at Lima --

9                  MR. BENNETT:  Objection, your Honor, hearsay.

10                  THE COURT:  I'll allow it.

11        A.    The 75 --

12                  THE COURT:  The weight, based upon the

13   cross-examination with respect to the source of this hearsay,

14   is somewhat unweighted with respect to this testimony.

15                  MR. DeCHIARA:  Your Honor, can the witness

16   continue?

17                  THE COURT:  She may continue.

18        A.    So they hired 75 workers, 75 tier 2 workers in

19   of January.  Less than half of those workers remained on the

20   job.  In Auburn Hills, the shop chair reported that there was

21   greater absenteeism among those workers, and just sort of a

22   general reduced commitment to the job.  So I think we can

23   already see at the tier 2 wages, which aren't as low as the

24   ones Dana proposes to pay, a diminution or some evidence of

25   diminution in the quality of the workers they are able to

218

1    attract.

2         Q.   You testified on cross that a small part of what

3    U.S. automakers look at in choosing suppliers are the direct

4    labor costs of their suppliers.  To what extent do they look,

5    do the automakers look at the quality and reliability of their

6    suppliers?

7         A.   That's far more important.  Another thing that

8    they look at is, is there a unique product?  Is there

9    something we can get from this company that we can't get from

10   anywhere else?

11            So one reason that Auburn Hills is growing is

12   that they have a product that no one else can make.  And

13   that's -- that gets back to the flawless launch way of

14   achieving profitability with new products made reliably and

15   with high quality as a way of competing.

16        Q.   We've heard some discussion, including in your

17   testimony, about increased competition in the auto parts

18   industry.  What significance, if any, does that have on your

19   view that Dana needs a skilled and motivated work force to be

20   successful?

21        A.   I'm sorry, could you repeat the question?

22        Q.   Sure.  To the extent there's increased

23   competition in the auto parts industry, what significance, if

24   any, does that have on your view that Dana needs a skilled and

25   motivated work force to be successful?

219

1          A.   I think it's even more important.  The

2    competition in the auto industry is based not just on price

3    but significantly on quality and delivery, as I outlined

4    before.  And in order to get that high quality, that reliable

5    delivery, paying a bit extra for workers is a very sound

6    investment.

7               MR. DeCHIARA:  Thank you.

8               Did you have further questions?  Because I have

9    one statement I want to make for the record.

10              MR. BENNETT:  Actually, I have one tiny

11   foundation thing I that I should have done at the very end.

12   RECROSS EXAMINATION BY MR. BENNETT:

13         Q.   Dr. Helper, could you get to tab E of your

14   binder.  Are you there?

15         A.   Yes.

16         Q.   This is an October 11, 2004 news story?

17         A.   Yes.

18         Q.   And if you go to the very bottom there, there's

19   a quote from you.

20         A.   Yes.

21         Q.   You did give that quote to a reporter, isn't

22   that true?

23         A.   Yes, regarding employment in manufacturing in

24   general.  Yes.

25              MR. BENNETT:  Your Honor, we'll offer Debtor's

220

1    212 and I believe the Court had taken a parallel excerpt of a

2    quote subject to connection.  Here's the connection.

3    Obviously, she's here, and is confirming that she gave that

4    statement.

5                    MR. DeCHIARA:  Your Honor, we don't have any

6    objection to Dr. Helper's statement in the article.  We would

7    object to the rest of the article coming in for the truth of

8    the matters asserted.

9                    MR. BENNETT:  I'm fine with that, your Honor.

10                   THE COURT:  Very well, it's received.

11                   (Debtor's Exhibit 212, received in evidence, as

12   of this date.)

13                   MR. DeCHIARA:  Your Honor, the statement I

14   wanted to make for the record, you struck from the record

15   Dr. Helper's testimony about the wages paid at American Axle.

16   I'm not sure I had a chance to object on the record.  I just

17   want to make the record clear that we do object to the

18   striking of that -- we do object to that ruling.

19                   THE COURT:  You have an exception.  The ruling

20   stands.

21                   MR. DeCHIARA:  Your Honor, just for the record,

22   I was making clear that we object to that.

23                   MR. BENNETT:  We would ask in that connection,

24   if there is a basis, some actual documents related to American

25   Axle, we'd like to see that.  It has not been produced.

221

1              MR. DeCHIARA:  Your Honor, all I can say is that

2    on Friday, I received from Dr. Helper three or four documents

3    and they were -- there might have been an Excel spreadsheet,

4    there might have been an article.  I can't tell you exactly

5    what they were, but there were three or four documents that I

6    received from Dr. Helper which I understood to be her reliance

7    materials on that subject.  And I put them -- I forwarded the

8    e-mail with the attachments to Mr. Bennett.

9              MR. BENNETT:  I think we're done, your Honor.

10             THE COURT:  I think we are.  Have another

11   witness?  Thank you, Ma'am.

12             (The witness is excused.)

13             MR. SIMON:  We've agreed, your Honor, to

14   terminate at the end of these two witnesses.

15             THE COURT:  You have?  Okay.

16             MR. BENNETT:  I think we're done for today.

17   Unless the Court wants to --

18             MR. DeCHIARA:  We don't have any witnesses

19   prepared to go forward today.

20             THE COURT:  Are you prepared tomorrow morning?

21             MR. DeCHIARA:  We are, your Honor.

22             THE COURT:  10 o'clock tomorrow.

23             (Time noted:  5:10 p.m. )

24

25

222

1                    C E R T I F I C A T E

2    STATE OF NEW YORK   )

3                        : ss.

4    COUNTY OF NEW YORK )

5

6            I, DAVID LEVY, CSR, a Shorthand

7         Reporter and Notary Public within and for

8         the State of New York, do hereby certify

9         that the foregoing proceedings were taken

10        before me on March 28, 2007;

11            That the within transcript is a true

12        record of said proceedings;

13            That I am not connected by blood or

14        marriage with any of the parties herein nor

15        interested directly or indirectly in the matter in

16        controversy, nor am I in the employ of any of the

17        counsel.

18            IN WITNESS WHEREOF, I have hereunto

19        set my hand this 2nd of April, 2007.

20

21                        _____

22                        DAVID LEVY, CSR

23

24

25

223

```
1   ----------------------- I N D E X ----------------------
2   WITNESS                  EXAMINATION               PAGE
3    MICHAEL WACHTER     CROSS - DeCHIARA (Cont'd)     5
4                        REDIRECT - BENNETT            12
5    JAMES ROBINSON      DIRECT - LEVINE               23
6                        CROSS - HAMILTON              48
7    PAUL VOOS           DIRECT - DeCHIARA             75
8                        CROSS - BENNETT              117
9    SUSAN HELPER        DIRECT - DeCHIARA            159
10                       CROSS - BENNETT              182
11                       REDIRECT - DeCHIARA          216
12                       RECROSS - BENNETT            219
13
14   DEBTOR'S EXHIBITS                    RECEIVED IN EVID.
15        274                                          53
16        184                                         150
17        212                                         220
18
19   UNION EXHIBITS                       RECEIVED IN EVID.
20        36                                           12
21        7                                            40
22        37                                           44
23        55                                           46
24        1                                            79
25        58                                          107
```

223

1        59                                    107

2        8                                    163

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

**Aaron** 21:19
**abashed** 143:15
**ability** 13:21 15:2
95:22 98:11
136:14,20 138:21
165:11 167:12,19
181:17,18 188:20
217:4
**able** 7:7,8 47:12
95:7 96:7 117:20
134:13 140:12
147:10,20 148:13
148:18 165:21
169:15,17,25
170:10 217:25
**abound** 97:7
**above-average**
114:9,14 115:2
**above-market**
115:19 216:24
**absence** 204:5
**absent** 141:15
**absenteeism** 217:21
**absolute** 201:9,10
**absolutely** 34:24
54:22,25
**absurd** 13:15
**academic** 13:25
75:17 77:19 97:2
159:13 160:22
173:1 174:13
**accept** 66:16
**acceptable** 66:20
**accepted** 43:15
66:11 78:22 216:3
216:5,7,10
**access** 127:19,24
**accord** 22:11
**account** 88:19 92:1
95:7 108:19
116:19 160:21
179:16 180:8
191:3,4 197:18
**accuracy** 103:22
**accurate** 40:25 62:7

71:18 76:24 79:3
89:12 160:21
162:22
**accused** 28:24
**achieve** 15:14 17:14
23:2 79:25 169:18
211:15
**achievement** 172:23
**achieving** 218:14
**acknowledge** 68:13
**Acme** 36:22 62:11
**acquired** 36:21
**act** 22:3
**acting** 159:10
**action** 124:23
176:11
**actions** 22:7 32:11
132:9
**active** 18:25 25:21
26:6
**activities** 30:19,21
**activity** 47:9 160:22
**actual** 89:21 133:5,7
134:24 136:9
155:8 200:20
213:23 220:24
**Ad** 3:4
**add** 156:18 210:17
211:13,14
**added** 67:22 105:25
129:6 157:21,24
**adding** 210:12 211:1
**addition** 14:10
24:22
**additional** 24:24
46:10 69:7 191:7
195:10 212:11
**address** 19:15 44:8
68:2,7,13 69:4
132:11
**addressed** 44:9
**addresses** 69:14,15
69:24
**addressing** 77:10
**adequacy** 153:20
**adjustments** 176:2

**adjusts** 87:24
**administrative** 50:5
50:7,17
**admission** 79:19
106:9 158:12
163:2
**admitted** 26:15
163:9,10
**adopt** 159:18 162:24
192:3 210:11
211:5,25 212:3
**adopted** 110:17
165:2 211:9
**adopting** 211:7
**advanced** 149:6
151:14
**advantage** 147:19
210:14
**advise** 119:5,16
120:11
**advised** 4:14
**adviser** 161:19
**advising** 120:9
**affect** 109:24 115:3
119:17 130:23
131:3,5 132:9,19
137:19 141:6,24
159:19 167:11
208:4
**affiliates** 24:24
**afford** 137:21
**AFSCME** 118:16
**afternoon** 75:11,12
159:2,3
**agenda** 189:3,6
**agglomeration**
100:6
**aggregate** 83:15,16
**aggregations** 99:11
**agnostic** 152:7
**ago** 49:25 181:20
**agree** 31:14 44:8,11
124:20,24 133:12
135:4,10,19,22,23
136:5,12 137:5,18
137:24 138:13,22

141:4 142:16,21
143:1,6 146:22
147:2,9 148:2
149:5,25 151:16
152:6,24 187:4
190:15 191:23
194:11,19 195:1,3
195:5 196:8,22
198:21 199:10
202:6,9,15 203:7
203:11 204:1,25
206:10 207:1
208:16 209:3
214:13 215:7,11
216:18,21,22
**agreed** 38:25 41:11
61:17 180:11
221:13
**agreeing** 74:16
**agreement** 8:22
19:19 33:8,10 36:1
36:19 37:2,8,9,20
41:7 44:6 45:13
61:6,14,14,17
66:14,20 89:5
128:16 150:3
172:9
**agreements** 19:11
48:16,18,22 69:23
124:19
**ahead** 4:19 92:12
131:17 151:6
168:7 207:11
**aim** 142:16,20
**aims** 142:19,21
**AK** 36:25 37:2,9
**Akerlof** 216:16
**albeit** 145:25
**Alexander** 21:11,24
**alleged** 162:4
**Allied** 32:17,19
**allocating** 157:3
**allow** 30:1 40:9
81:13,20 172:5
217:10
**allowed** 108:9

119:20 185:4
**allows** 88:15,18
**alternative** 190:23
  191:17
**aluminum** 34:9
  35:14
**amazement** 36:5
**ameliorate** 132:11
**amelioration** 14:15
**amended** 5:4,6
**amendment** 4:23
**American** 14:1
  22:24 80:8 82:24
  118:16 135:12
  166:15,21 171:14
  171:21,23 172:9
  172:12,19,21,24
  184:14 192:21,23
  193:8 194:2 196:4
  220:15,24
**Americans** 166:18
**Americas** 2:21
**America's** 34:13
**amount** 5:1 37:20
  54:18 114:3
  157:21 202:10
**amounts** 147:3
  192:18
**analysis** 17:13 80:14
  80:17,22 81:10,14
  81:22 85:21 89:19
  92:24 98:8 107:24
  109:20 122:9,24
  123:6,23 127:22
  138:25 139:2,6,7,8
  139:12 140:4,25
  143:19 144:3
  153:7,10,15
  156:14 157:2,10
  191:11,25 192:13
  192:18 194:8
**analysts** 172:18
**analyze** 98:23
  103:17 153:20
**Andrews** 33:1,8
**and/or** 47:8

**anecdotally** 148:23
**annual** 8:21
**anomalies** 30:6
**answer** 8:13,16 9:9
  10:8,13,15 52:10
  55:20 64:14 65:21
  68:6 70:16 73:7
  74:3,5 114:12
  120:12,15,19
  127:14 129:17,20
  189:11,11 191:10
  191:14,16 192:11
  192:14 194:18,22
  197:7,9 198:1,5
  200:24 201:3,6,8
  204:17,20,21
  207:9 208:22,25
  209:2,9 211:12
  214:19
**answered** 9:11
  195:23 215:3
**answering** 10:4,19
**answers** 119:19
  189:1,14 199:9,12
**anticipated** 64:7
**Antioch** 26:10
**anybody** 36:9 54:12
**anybody's** 71:23
**apart** 79:14 173:18
**apologize** 42:14
  71:17
**apparent** 20:25
**appear** 39:20 40:9
  54:20
**appears** 6:6 64:5
  65:13 76:22
  148:12 160:19
  168:14
**applicable** 12:17
  88:2 99:12 202:16
  202:19
**applicant** 13:19
**applicants** 7:7
  134:19
**application** 5:9 18:3
  20:11

**applied** 14:19
  209:23 210:20
**applies** 100:19
  126:12 207:17
**apply** 47:12 81:8,15
  100:20 104:10,25
  208:16,24 209:5
  216:19
**appointed** 24:18
  25:6,8
**appreciate** 199:15
**apprenticeship** 26:5
**approach** 5:12 37:3
  47:23 76:12
  131:18 153:22,22
  157:17 199:16
**approaches** 35:22
  37:6
**approaching** 166:19
**appropriate** 21:13
  23:16 46:24 64:11
  64:18 174:15
  213:21
**appropriately** 197:1
**approved** 5:13
  35:10 37:11
**approximately** 4:21
  4:22,24 5:2,4
  92:19 109:11
  155:22
**April** 222:19
**aprons** 178:13
**apt** 199:20
**arbitration** 25:8
  27:23 108:5,5,10
  108:12,18 109:3
  124:14,17,20
**arbitrations** 25:9
  78:5
**arbitrators** 109:4
**area** 97:10 113:2
  120:12 133:2
  136:3 146:8
  159:13 177:18
  195:16 196:21
  201:19

**areas** 112:16 135:23
  140:23 174:1
  178:8 198:25
**argue** 13:12 69:22
  210:15
**argues** 209:11
**argument** 13:17
  14:5,10,22 17:20
  19:6,11,20,25,25
  20:23 22:16
  211:25
**arguments** 31:8
**Arizona** 35:7
**arrangements** 63:2
**arrive** 89:13 100:16
  106:1 158:3
**arrived** 99:4
**arrives** 174:6
**arrows** 21:23
**art** 69:21
**article** 21:8 77:12
  134:3,3 148:14,22
  151:10,23 220:6,7
  221:4
**articles** 76:9 77:14
  148:22 149:10
**aside** 63:19 64:25
  65:1
**asked** 9:11 12:14
  15:22 16:7 29:23
  46:13 77:15
  119:15,19 127:25
  128:25 129:16
  140:20,24 141:3
  153:20 171:11
  174:3 186:24
  190:1 191:13
  192:10 194:17
  195:23,24 197:6
  197:25 204:16
  208:22 209:8
**asking** 22:17 60:14
  73:6 74:2 98:11
  120:20 186:11
  190:13 195:13
  196:1 199:8

205:19
**asks** 44:10 69:7
**assembled** 125:21
    174:22
**assembler** 113:13,21
    113:25 170:19,20
    174:16 175:7
    207:24
**assemblers** 113:23
    114:6
**assemblies** 170:21
**assembly** 170:21
    171:2 175:2,8,10
    178:3 181:15
    187:13 191:3
    203:6 206:3
**asserted** 40:23 220:8
**assessing** 31:8
**assessment** 64:17
**assets** 61:23 62:2,6
**assigned** 29:9
**assignment** 122:15
**assignments** 32:13
**assistant** 24:20
    29:13,18 50:16
    75:23
**assisted** 110:20
**associate** 161:9,15
**associated** 127:17
    151:16 194:12,20
**Association** 78:5
    118:9
**associations** 125:22
**assume** 4:10 5:7
    34:22 105:1
    141:22 143:18
    144:6
**assumed** 93:18
    114:17
**assumes** 43:12
    132:21,23,24
    137:1,2 139:12,17
**assuming** 93:15
    114:14
**assumption** 157:25
    158:2

**assumptions** 93:12
    114:18
**athletic** 109:7,7,16
**Atomic** 32:19
**attached** 42:12
    76:21 114:3
    160:18
**attachments** 221:8
**attempt** 61:5 142:22
**attempting** 36:24
    42:23 130:25
    140:18 208:1
**attend** 51:15 57:15
    57:20,24 58:2,3,8
    58:9
**attended** 25:17
    26:12
**attending** 58:22
**attention** 59:8
    102:15 104:19
**attorney** 58:11 74:4
    126:3
**attorneys** 2:4,20 3:4
    3:10 122:23
**attract** 95:1 98:11
    138:17 170:10
    179:10 218:1
**attracted** 210:15
**attracting** 132:18
    133:4,6,14,25
    134:11 135:1
    138:19
**Auburn** 6:20,24 7:1
    7:14,18 80:15
    87:10 104:7,11,16
    113:4 173:16
    181:19 182:5
    188:4 217:20
    218:11
**author** 38:9
**authoring** 38:11
**authoritative** 150:1
**authority** 15:11 21:3
    21:4 40:3
**authorized** 15:21
**authorizing** 15:12

19:10,18
**auto** 6:3 11:6 13:8
    41:14 45:12 78:13
    78:14 80:11,18
    82:7 136:6 137:6
    146:10,14,20
    148:6 160:4 161:5
    162:15 163:15
    165:3,22 167:12
    168:5 171:12
    174:25 175:1
    181:16 193:3
    195:2,3,6,10,21
    196:4 197:3,4
    199:25 200:3,9,25
    201:2,5 202:7,10
    202:17,23,24
    204:4 205:1,4,8,21
    206:18 214:2
    215:11,21 218:17
    218:23 219:2
**automaker** 166:7
    167:2 168:21
    213:24
**automakers** 166:3
    166:14,15,21
    203:8 215:13
    218:3,5
**automatically** 19:22
**automobiles** 135:12
**automotive** 37:23
    121:11 135:4,15
    145:12 147:3
    161:7 207:7,18
    215:8
**available** 82:22
    86:14 99:18
    125:23 140:12,17
    154:14,15,16
    190:24 191:16,17
**Avenue** 2:12,21
**average** 80:3 83:12
    83:19,25 84:14
    85:4,7,16,17 88:3
    88:6,9,16 89:2,8
    89:10,11,12,13,22

90:4,5,8,9,10,12
    92:7,11,16 93:20
    94:1,11,24 95:14
    100:12 102:6,14
    107:10 112:25
    113:2,3,5 114:17
    114:18,19,19,20
    114:21 115:7,8,18
    139:13,18,19
    142:14 143:25
    144:6,18 157:13
    183:3
**averages** 139:17
**avoid** 165:17
**avoided** 189:5
**await** 78:20
**awarded** 216:16
**aware** 13:23 14:6,20
    52:21 106:13
    158:8
**awful** 21:23
**axle** 170:20 171:14
    171:21,23 172:9
    172:12,21 184:14
    192:21,23 193:8
    194:2 220:15,25
**Axle's** 172:19,24
**a.m** 1:12

---

**B**

**B** 1:14 23:23 52:4,15
    54:5 145:7 155:12
**BABETTE** 3:14
**Bachelor's** 26:10
**back** 5:16 26:9
    27:23 28:2 36:11
    36:17 59:3,18
    72:11 89:23 90:1
    91:8 104:19
    106:18 122:20
    144:13 156:13
    160:18 162:18
    164:12 177:8
    187:2 204:15
    210:4 218:13
**backdrop** 81:19

**background** 117:22
185:16
**bad** 59:18 166:7,11
167:22
**bald-faced** 15:13
**ball** 195:12
**BALL,ESQ** 2:16
**bank** 165:6
**bankruptcies**
195:16
**bankruptcy** 1:1,8,16
17:4,4,5,19 20:8
35:8,11,13 36:24
37:10 39:11 48:9
60:6 78:3 121:23
126:5 141:2
168:16 195:7,10
195:21
**bar** 26:14
**barely** 17:3
**bargain** 15:16 57:4
57:5 66:20
**bargaining** 8:22
15:17,19 19:11,18
20:6 22:3,5 30:12
30:15,17,20,23
31:5,7 42:23 44:6
45:24 47:19 48:16
48:18,22 56:8,8
61:20 64:12,17,19
66:18,19 69:23
74:12 124:19
125:3 168:23
**barrier** 214:16
**base** 127:25 164:11
**based** 5:4 7:25 13:25
31:4 40:24 55:22
55:24 58:4,8 64:16
80:22 81:21
122:11,21 133:5
140:14 143:23
144:25 148:16
149:1 153:22
154:6,7,9 157:7
164:17,18 165:23
217:12 219:2

**bases** 126:18,22,23
184:23 185:1
**basic** 25:5 28:5 36:6
**basically** 59:11
154:10 214:9
**basis** 15:4,4,5 22:17
73:24 82:1,1 84:22
135:3,10 163:7
209:7 220:24
**batches** 169:1,1
**bathed** 178:14
**battle** 178:13 190:2
**bear** 19:3
**bearing** 14:18
**becoming** 37:17
**began** 25:12,13
30:20 57:3 61:5
63:2
**begging** 22:6
**beginning** 26:4 56:3
163:24 177:9
**behalf** 4:9 29:24
30:15 81:3 118:1,8
118:24 162:3,4
**belief** 70:21 79:17
162:22
**believe** 7:13,20 15:7
21:22 30:9 41:16
42:6,14,16 46:22
51:7 57:6,19 61:10
61:21 79:7 95:20
102:21 107:14
138:2 141:13
149:7 156:13
183:1 185:19,22
185:24 186:13
188:9,15 189:13
189:13 193:18,25
194:24 196:3
201:6,12 204:22
205:5,7,23 209:6
209:10 213:14
214:17 216:5,15
220:1
**believed** 37:5 52:12
53:25 171:12

**believes** 18:12 40:2
**Belman** 110:20
128:3,4,10 129:3
129:13,19,21
149:25 150:6
**belonged** 212:24
**belt** 207:3
**benchmark** 16:22
80:20 85:11 87:18
88:18 92:9,23,25
94:8 101:8 102:11
103:9 104:15
106:7 114:7
143:17
**benchmarking** 84:9
**benchmarks** 91:13
171:18
**beneficial** 5:6
177:17
**benefit** 62:3 72:11
77:8 141:24
211:16
**benefits** 12:15,16,17
14:5 15:2 69:5
73:17 98:25
100:10,15 103:19
105:25 108:15
116:11 122:2
124:17 125:13
140:9,19 141:1
142:17 157:22,23
157:24,25 164:24
172:10 179:16
180:4 189:9 212:4
**Bennett** 2:8 12:3,7,9
12:13,24 72:24
78:11,21 79:20
106:11 117:17,18
119:22 130:3
131:16 144:22
148:20 149:23
150:15,19 151:3
157:5,17 158:10
162:16 163:4
172:1 180:23
182:2 193:7,14,17

193:20 194:1,6
199:15,23 200:18
208:9 213:16
215:5,24 217:9
219:10,12,25
220:9,23 221:8,9
221:16 223:4,8,10
223:12
**best** 26:7 32:9 79:17
95:10 96:7 110:16
117:6 119:6
154:16 162:22
166:6 168:19
169:24 186:8,16
189:5 211:4,24
**Bethlehem** 36:22
62:11
**better** 63:19 95:17
96:5,7 127:10
147:13 149:21
169:25 172:24
177:22,23 181:10
203:23
**beyond** 15:22
137:25 138:12
**bid** 166:1 167:14
**bidding** 9:3,6,12,17
10:9,18,20,22
**big** 18:17 141:16,17
141:17 142:6
165:5 177:9
181:19 203:8
**Bill** 50:14,16
**billion** 14:14
**binder** 6:7 33:16,25
38:4 45:5 50:21
52:4 62:13 64:4
117:19 150:5
182:14,19 210:2
219:14
**binders** 23:16
**bit** 26:25 59:10
67:25 88:20
110:12 219:5
**bits** 17:10
**black** 166:11

**blank** 77:20,21
**blend** 157:11,18
**blood** 222:13
**Bloom** 51:21 54:2
**BLS** 80:11 86:12
  91:19 99:23
  107:10 112:17
  113:11,13,17
  114:3,7,10 125:16
  125:24 140:15
  144:6 145:13
  154:9 174:16
  175:19 178:4,5
**blue** 83:4 84:21 88:2
  90:21 101:10
  112:16 115:4
  139:5 170:15
  197:3
**blueprint** 207:22
**blueprints** 176:7
**board** 19:5 24:15
  36:3 214:18
**body** 121:10
**boilermakers** 27:4
**Bolte** 33:8
**bonus** 162:7
**book** 184:10
**books** 76:9 77:14
  214:6,7
**bother** 57:24 58:2
**bottom** 82:18 83:18
  84:14 85:14 86:16
  112:25 138:10
  150:22 219:18
**bought** 61:25 62:1
**Bowling** 1:9
**Brazil** 147:5
**break** 28:3 74:25
  97:10,12
**breakdown** 100:14
**breaking** 28:7
**breaks** 177:12
**brief** 4:19
**briefing** 19:15 20:2
**briefly** 20:21 25:17
  48:3

**bring** 80:2
**broad** 30:18 174:15
  174:20 178:3
**broader** 38:25
**broke** 64:9,16 98:7
**brought** 4:16 38:23
  94:20
**Bruce** 3:13,16 60:10
**bucks** 72:16
**Bueter** 18:14 41:2
  66:25 70:21 71:9
  71:12,18 72:1
  79:24 102:5 112:5
**Bueter's** 80:5
  127:25
**build** 154:10
**building** 21:10
**build-up** 153:17
**bulky** 203:4
**bullet** 200:14,21
**bunch** 132:21,24
**burden** 153:12
  180:15,16
**bureau** 10:23 12:1
  80:7 82:16,21
  84:18 86:15 99:7
  99:17 154:8
  161:16
**buried** 89:16
**burned** 185:21
**Burr** 21:19
**BURTON** 1:15
**burying** 76:19
**business** 5:5 9:3,17
  10:10 11:17 23:1,8
  27:20 36:2,7 44:18
  67:7 119:25
  163:15 166:12
  167:12 179:21
  180:2
**button** 170:16,17
**buy** 36:13,24 98:17
  166:24
**buyer** 35:16 36:12
  37:1 57:5

## C

**C** 2:1 3:1 4:1 5:19,19
  222:1,1
**calculated** 90:22
**calculation** 17:22
**calculations** 93:6
**Caldwell** 56:13,21
  56:24,25 57:1,1,3
  57:5,14,17
**calendar** 4:6 40:24
**California** 25:21,24
**call** 5:15 23:11 30:5
  139:1 153:16,17
  153:17,24 158:22
  180:10 181:21
  182:3
**called** 29:12 44:13
  70:6 71:10 118:13
  118:16 127:17
  189:17
**calling** 43:8
**calls** 113:18
**capable** 55:9
**capacity** 24:7 160:9
  206:16,17
**capital** 163:19,24
  164:1,25
**capital-intensive**
  164:13
**capitulation** 22:8
**car** 166:24 170:3
  181:18 206:1,2
**care** 21:19 31:22,25
  58:15 98:22
**careers** 95:16
**careful** 107:24 117:8
  125:16 209:2
**carefully** 110:14
  113:17 189:5
  190:25
**carrier** 178:11
**Carriers** 78:6 118:9
**carrot** 169:19
**carry** 32:13
**cars** 204:2
**case** 8:18 9:22 10:17

13:5,24 14:4,20
  17:24 18:4,8 19:16
  22:18 23:14 32:4
  33:24 48:25 49:5
  49:14 51:6 55:18
  60:5,6 61:4 76:11
  78:4 80:2 117:6,24
  119:12 121:22,23
  122:1,2,5,8,15,19
  122:21 123:8,13
  123:14,20,21,22
  124:5 125:2,7
  126:12,13,16,19
  126:23,24 127:3
  127:13,17 137:15
  139:1,14,16
  143:11,15 149:1
  151:5 152:14
  158:2 159:6 162:4
  171:9 173:8,22,23
  183:16 184:2,4,7
  184:13,16,21,24
  185:2,2,14,18
  186:5 187:8,16
  189:3,8 191:5
  192:17 193:22
  210:23
**cases** 18:5 21:21
  104:14 113:3
  128:8 162:2 166:6
  173:21 178:5
**cast** 199:12,13
**caster** 28:5
**casual** 119:10
  132:16 135:9
**catch** 216:11
**categories** 86:14
  88:25 89:1 93:19
  99:21,22 100:6
  107:11 111:13
  157:18 174:16,21
  178:4
**categorization** 99:24
**category** 83:16
  84:24 86:16 87:5,5
  87:9,12 88:4,5,13

89:11 100:5,14
113:12,14,25
174:20 175:10,12
175:15,16,18
178:6,23
**causal** 216:8
**cause** 48:12 143:7
170:25 194:14,15
208:19 215:20
**caused** 198:24 199:2
199:4
**causes** 167:24
**cautiously** 186:25
**CBAs** 19:22
**CECCOTTI** 3:14
**census** 83:1 86:12
112:18
**center** 26:11 170:20
**central** 208:1,12
**CEO** 172:17
**certain** 6:19 7:4
10:3 105:6 107:10
170:4
**certainly** 7:17,22
8:18 9:6 11:15
16:6 58:6 66:11
97:7 106:20 131:3
133:19,20 146:9
163:6 180:25
188:10 194:4
200:11 213:4
**certify** 222:8
**cetera** 12:18 173:7
174:10 177:12
189:15 205:15
207:23
**chains** 212:16
**chair** 159:10 173:22
173:23 176:21
178:12 182:5
217:8,20
**chairman** 25:11
27:25 36:16
172:17
**chairperson** 76:5
**challenge** 168:25

**challenged** 34:12
35:2
**challenges** 17:1
34:10
**challenging** 215:8
**chance** 74:3 144:15
220:16
**change** 16:19 43:13
93:21 94:19 105:6
111:23 112:10
114:11 145:25
180:13 214:14,20
**changed** 123:18
128:14 137:10
146:10,14 214:6
**changes** 45:17,17
46:9 68:24 69:4
72:10,10,11,14
87:21 93:21 132:6
212:19
**changing** 27:16
145:21 146:8
168:8 212:19
**Chapter** 48:18
**chapters** 77:14
**characteristics**
163:19
**characterize** 74:2
**charged** 167:9
**charge-back** 167:6
**charging** 148:3
**charts** 176:7,8
**checked** 129:10,21
129:24 130:7,7
**checking** 40:24
**Chemical** 32:19
**cherry-pick** 17:10
**cherry-picking**
22:14
**Chicago** 25:1 26:13
**chief** 16:11
**China** 202:16
203:13,23
**choose** 7:8 108:21
**choosing** 87:8
143:10 218:3

**chose** 144:6 199:12
199:13
**chosen** 13:9
**Chris** 33:8 70:20
102:5 112:4
127:25
**Chrysler** 181:22
**circle** 85:8 89:25
**Circuit** 22:18,19
**circumstances**
14:19 26:1 46:24
49:4 141:5 208:20
**citation** 22:11
**cited** 138:10
**cities** 142:6
**City** 37:15
**claim** 5:1 14:16
17:23 139:6
**claims** 108:10,12
**clarification** 20:24
**clarified** 30:9
**clarify** 30:1,2
**classification** 80:9
113:22
**classifications** 36:20
**clean** 178:8
**clear** 9:9,15 12:21
21:3 47:16 85:10
92:22 94:10
124:24 127:4
156:20 204:11
211:20 220:17,22
**clearly** 10:20 83:9
84:23 85:19 86:25
95:9 98:22 100:2
111:13 112:22
139:17
**clerical** 8:3
**clerically** 7:21
**clerk** 34:1 102:20
**Cleveland** 2:13
**climate** 178:8
**close** 73:3 84:8
108:22 154:18
155:7
**closed** 33:2

**closely** 171:12
**closer** 147:18
**closest** 84:11 140:1
196:9
**closing** 33:3 199:2,4
**closure** 33:7,9
**coalition** 41:14
45:24
**code** 20:8 48:9 80:9
80:11
**Cohen** 3:9 5:23
**collar** 83:3,4 84:22
88:2 90:21 101:10
112:16 115:4
139:5 170:16
197:3
**colleagues** 150:7
**colleague's** 150:1
**collected** 11:15
**collecting** 7:21
**collective** 8:22 19:10
19:18 22:3,5,6
30:11,15,17,20,23
31:4,7 44:5 48:16
48:18,22 69:23
82:1 124:19 125:3
**collects** 113:17
**college** 25:16,17
**column** 79:8 83:15
83:18 84:13 85:4
86:18 87:20,23,24
88:9,24 89:2,3,4
89:15,16,17 90:17
90:18 91:5,6,15,21
92:7,10,15 93:25
93:25 94:1,4,6,9
94:18 101:12
103:21 104:5,20
105:5 106:1
156:15
**columns** 84:1 85:12
86:21 87:17 90:16
90:25 92:20 93:22
**com** 185:4
**combination** 27:3
116:13 205:11

combine 90:14
come 91:21 101:6
   117:14 154:17
   171:4
comes 17:3,4 59:7
   73:3 167:22
   199:14
coming 16:18 215:7
   220:7
comment 71:20 72:6
commentary 22:13
commenting 71:21
comments 21:6
Commercial 118:23
commitment 217:22
commits 214:17
committed 170:10
committee 2:20 3:4
   4:14,15 14:12 25:3
   25:4,11 27:25
   30:22 33:24 61:5
   61:12,13,17 81:3
   209:15
committeeman 25:5
committees 56:9
   71:1
common 124:17,21
commonly 124:14
communicated
   41:19 46:20,23
   47:15
companies 11:16
   35:2 44:2,4 80:4
   80:24 81:23
   161:14 165:3
   168:21 194:9
   202:1,2 204:13,15
   211:9,10,18
   212:21
companies's 104:1
company 12:5 13:14
   13:15 17:5,5,12,18
   19:4 22:21,23,24
   29:7,12 30:24 35:7
   41:19 42:16,20,22
   42:23 43:14 44:9

44:13,17 45:11,24
46:14,25 47:1,15
47:18 49:21 58:1
58:13 60:3 66:7
71:2 81:7 98:12
102:21 105:2
162:6,8,10,11
163:25 166:7,11
168:11 169:9
170:8 171:12,18
181:4 193:5,11
201:25 207:22
211:16 218:9
company's 17:1
167:12 169:14
comparability 11:4
77:8,11 84:9 85:21
108:2,3,4 109:20
110:1 122:3
124:11,13,25
125:11 139:1,2,21
139:24 140:11
153:16,18 190:14
190:16 191:11,25
192:13,18 193:23
196:7,11,16,17,23
comparable 109:5
171:13
comparator 194:8
compare 80:24
81:23 82:7 89:24
90:5 91:4 92:7,20
94:8 102:3 156:14
174:11 175:10,16
178:2 192:7 213:8
compared 16:13
18:5 92:25 155:24
156:13 196:13
197:10
compares 103:9
104:6
comparing 90:25
124:14 147:15
comparison 80:17
84:5 88:16 90:17
91:13 92:15,18,22

94:4 101:19 104:2
108:22 109:21
111:19 114:7
125:19 140:2,8
146:4 154:4 156:6
213:23 214:11
comparisons 84:1
86:11
compartmentalize
185:7
compensated 101:17
compensating 179:6
compensation 11:5
11:9 73:19,22 74:9
98:10,13,16,19,25
99:6,16 100:8,9,12
100:17 101:1,4,8
101:20,24 102:4,9
102:13 103:8,10
103:14,20 104:2,5
104:12,15,20
105:9 106:4,7
107:23 111:6
116:6,10,15,19,23
117:5,10,12 119:7
120:4,20 124:15
124:16 125:1
130:13,19 131:9
131:21,23 133:24
134:25 137:19
142:22 143:2,7,12
143:25 150:10
155:6,21 156:12
158:3 159:21
165:14,15 167:16
179:14 182:10
191:24 194:12,14
194:16,21 196:13
197:20,23,24
198:13 200:8
201:5
compete 13:22
16:19,21,23 95:12
165:23 172:12
competes 146:23
147:1

competing 147:23
196:20 218:15
competition 16:17
16:17 51:2 108:17
135:15,17,20
204:5 218:17,23
219:2
competitive 14:2
16:12 17:3 36:8
136:18,20,23
137:2 147:10,19
147:25 148:2
202:15
competitively 138:1
138:12
competitiveness
116:13 136:13
competitor 11:18
94:15 171:17
competitors 6:2
11:6,9,13 13:21,22
14:2 16:14,23
80:21 125:21
137:20 140:9,18
140:22 141:1
148:3 154:4,9
168:7 169:12
192:20
compiling 46:12
complementary
210:12,16,17
complete 4:4 5:16
12:3 76:24 81:13
completed 57:6
207:9
complicated 88:20
206:3
components 147:14
147:14
compound 131:14
comprehensive
17:13 190:10
compromise 124:22
computer 127:6
computers 212:8
concede 73:12

conceded 18:7 74:15
conceive 52:20
concentration
  146:15
concept 43:25
  104:25 149:11
concepts 116:6,8
  163:23
Conceptually 46:11
concern 160:7 161:5
concerned 98:18,19
  98:20 108:16
  121:7 125:20
  130:7 145:15
  153:7
concerning 11:8
concerns 20:16
  124:11
concession 43:3
concessions 18:18
  18:20 43:6 68:14
  68:15,17
conclude 43:18,18
  101:23 102:12
concluded 5:5 65:5
  82:10 122:12
conclusion 14:23
  41:18 68:9 82:5,6
  82:12,13 102:2
  106:2,3 152:21
  182:21 210:4
conclusions 186:9
  186:16
conclusive 16:15
  152:6
condition 183:4
  207:17
conditions 34:17
  108:6 137:24
  138:11,17 174:5
  178:1,3,21 179:9
  187:19
conduct 186:5
conducted 56:7
conference 109:7,16
conferences 109:8

161:21
conferred 4:13
confess 40:22
confidence 15:1
confidentiality
  125:20 145:16
confirmed 41:1
  144:17
confirming 220:3
conflict 59:11
confounding 110:16
connected 222:13
connection 28:14
  33:5 40:15 43:9,25
  46:13 77:23
  184:13 220:2,2,23
conscientious 117:8
consequence 15:23
  164:9
consequences 97:3,5
  167:1
conservative 87:9
  87:13 91:7,8
consider 148:3
  205:13 210:23
consideration 85:23
considered 196:21
consist 39:1
consisted 27:12
consistent 144:17
  204:22
consisting 71:5
Consortium 44:14
  49:3
constant 35:20
  111:4
constellation 159:17
constituencies 17:17
constitutional 32:10
constructing 157:19
consulted 108:23
  189:18
consulting 119:25
  120:24
consumer 167:7
consumers 166:23

contacted 58:12
contain 43:2 123:13
contained 112:23
  193:10
contains 54:18
context 121:23
contexts 143:5
continually 178:15
  199:12
continue 45:22
  132:24,25 206:20
  206:23 217:16,17
continued 96:16
  158:25 160:4
  215:25
continuing 8:20,21
  202:12 204:2,7
continuous 78:19
contract 30:18
  31:10 34:17 35:10
  35:17 36:19 37:6
  50:25 51:5 56:10
  59:22 115:14
  124:24 162:5,11
contracting-out
  35:23
contracts 23:5 108:6
  124:22
contradict 148:23
contradicts 130:6
contribution 180:3
control 139:25
  176:7 207:23
  214:23
controlled 178:8
controlling 136:2
controls 110:18
controversy 222:16
Cont'd 3:1 5:24 98:6
  223:3
convenience 76:17
  76:18 84:2 90:19
convenient 92:21
conversation 189:25
conversations 72:2
conversely 117:11

convinced 152:11
cool 178:16
cooperation 22:7
coordinator 25:8
  27:23
copies 102:20
copper 35:8
copy 4:11,16 5:11
  10:1 76:13,13
  102:16 119:20
  127:1,8 160:13
CORINNE 2:16
corporate 34:19
  111:4
corporation 1:5
  13:10 86:5,6 139:9
  139:15
corporations 115:25
  120:1 121:2
  133:23
corporation-wide
  102:7,12
correct 6:15,17 7:16
  8:6,10 9:3,10 11:1
  11:2,6,10,14,20,22
  11:23 25:13 29:3,6
  37:23 38:1 43:7
  48:6 51:15,16 53:2
  53:7,23 54:19 56:3
  56:4,10 57:21,24
  59:24 60:5,8 61:14
  61:19,23,24 62:3,4
  62:19,20 63:15,22
  63:25 64:1,4 66:10
  67:5,13,18,23 68:3
  68:19,20,22,23,25
  69:3,5,6,9 70:3
  73:8,11,16,18,20
  73:24 79:13,16
  80:12 83:23 98:9
  105:23 106:5
  107:13 112:15
  116:25 117:24
  118:1,2,5,10,12,14
  118:18,20 119:7
  119:13,14 120:6,7

121:5,6,8,9,11,14
121:17,20,24,25
122:3,4,6,7,9,10
122:21 124:5
125:7 126:13,16
126:17,19,20,25
128:11,21,22,24
128:25 129:4,9
130:8,16,24 131:9
132:12,18,19,20
132:22 133:9,15
134:1 135:6,12,15
135:25 136:7,15
136:21,22 137:23
138:22 140:6,9,19
140:23 141:2,7,8
141:11,18,24,25
142:3,4,6,7,9,10
142:15,18,24
143:2,13,18 144:3
145:4 146:11,24
147:5,12 148:4,9
150:7,8,12,13
153:7,10,13 154:4
154:5,6,11,21,22
154:24 155:3,4,23
155:25 156:4,5,8
156:11 158:7
160:21 167:18
183:25 184:7,13
184:16 185:18,23
186:9 187:6,9,19
187:22,24 188:2,8
188:11 189:3,9,17
189:21 190:21,24
191:11,19,25
192:13,18 193:3
193:23 194:9,10
195:7,11 196:9,24
197:21 198:22,25
199:5,25 200:3,6,9
201:15 202:8,13
202:17 203:9,13
204:7,10 205:1,4
206:13,18,21,24
207:5,18 208:2,17

209:5,24 210:8,20
210:23 211:3
212:5,13,20
215:12,14,18
**corrected** 65:1
88:12
**correction** 79:5,6,14
**corrections** 28:17
79:4
**correctly** 186:25
190:18
**correlated** 141:6
142:2,5,8,11
**correlation** 111:7
141:12,14,16
**correlations** 141:21
**correspond** 92:2
**cost** 8:4,6,8,10,24
10:18,20,22 16:19
18:23 19:1 22:20
72:14 73:2,13,22
80:3 99:16 100:10
101:1 103:13
116:6,11,21,24
124:16 125:12
137:21 147:17
156:25 167:9,10
172:25 179:16,23
179:25 180:2,4,7,9
180:10,17 181:16
203:9 212:5,8,13
212:19
**costing** 73:5
**costs** 8:19,20,23 9:2
9:4,16,18 10:10,11
10:11,24,24 13:14
34:12 44:9,10,12
51:1 73:11 74:9
102:6 116:14,18
117:12 130:10,15
130:20,23 131:4,6
131:8,19 132:9,19
137:17,20 147:20
148:8 153:10
157:3 167:4
179:23,23 180:1,8

180:11,13 181:3
206:12 208:6
218:4
**cost-cutting** 19:4
**cost-saving** 19:1
**couched** 189:4
**council** 38:19,20,22
38:25 39:1,10
45:13
**counsel** 4:13 39:20
60:10,22 63:1
127:8 222:17
**counselor** 44:22
**count** 23:6
**counter** 119:16
120:10
**counterproductive**
181:7 212:1
**counterproposal**
49:14,18 65:10,20
65:23 66:6 69:18
73:1,2,10
**counterproposals**
30:25
**counterpropose**
71:4
**counties** 112:23
145:15
**countries** 147:4
**country** 23:5 207:14
**counts** 23:6
**county** 112:20,20
118:17 222:4
**couple** 33:14 47:2
78:6 105:16 118:6
118:11 148:12
166:5 195:6
211:19
**course** 56:1 72:7
83:5 100:10
108:14 109:16
110:16 139:11
148:5 153:4 179:2
189:24
**court** 1:1,8 4:2,17,19
5:8,13,18 12:10

13:1,9,12,17,20,20
13:24,24 14:4,7,17
14:23,24 15:9,21
15:22 16:3,5 17:24
19:21 20:17,18,20
21:5,9,19 23:2,9
23:18 25:24 30:1,6
33:16,21 34:4
35:11 37:11 39:15
40:5,9,10 44:22,24
46:4,7,10 47:24
52:18 53:9 55:4
58:18 60:19 64:14
74:4 75:2,4 76:15
76:18 77:13,16,20
78:18,20,22 79:21
81:5,14,17 83:21
97:9,12,14 105:21
106:22,24 119:5
119:23 124:25
126:5 128:3
131:17 134:23
144:21 148:18,21
150:18 151:2,6
153:12 157:9
158:15,18 159:7
159:12 160:15,17
162:17 163:5,8,10
172:5 186:19,24
189:11 193:13,16
194:3 195:16,20
195:24 199:21
200:19 201:21
202:23 203:1
205:16 206:6
207:10 208:2,11
209:8,18,21 211:8
211:13,17 212:2
213:6,11,17,22
214:24 215:3
217:10,12,17
220:1,10,19
221:10,15,17,20
221:22
**courtroom** 18:11
35:25 71:14

court's 20:23 23:3
  74:9 106:13
cover 177:11
covers 83:2
craft 27:3,7,8,11
crafts 27:5,6
create 66:19 99:6
  103:3 105:14,16
  122:20 154:16
created 36:4 62:9
  86:14 99:23
  102:25 103:2,4,10
  106:16 139:10
creates 41:16 191:7
creation 65:12
creatively 165:18
credible 138:5
credit 37:19
creditors 2:20 4:14
  4:15 33:23 61:4,12
  61:13,17
crises 36:11
crisis 35:21
critique 153:24
  193:22
cross 47:23 78:17,18
  163:5 210:1 218:2
  223:3,6,8,10
cross-examination
  4:4 5:17,24 48:1
  50:21 62:13 64:3
  70:18 117:18,21
  144:11 182:2,18
  217:13
cross-examined
  55:25
cross-examining
  48:4
cross-trained
  177:21
crucial 176:1
crystal 195:12
CSR 222:6,22
cumulative 185:7
cure 5:4
Curiously 19:11

current 8:5,9 9:5,19
  34:17 80:23 81:22
  82:7 88:25 89:3,8
  89:13 90:8,10,11
  92:7,11,16,23 93:8
  93:8,17,24 102:4,9
  103:25 105:3
  107:10 169:22
  179:15,17
currently 4:20 75:13
  82:10 89:5 133:10
  172:19
customer 172:22
  181:17
customers 165:9
  166:23
cut 117:10 170:3
  208:5 210:18
  212:4
cutoff 111:10
cuts 13:13 44:15
  80:1 97:3,3 169:23
  180:19 181:8,23
cutting 178:15
  210:13 211:1,25
CV 76:22,25 77:2
  78:2 160:19,25

**D**

D 2:25 4:1 6:6,9 54:4
  54:5,6 55:16 150:5
  223:1
Daily 128:4
Daimler-Chrysler
  215:19
Dale 110:20
dally 187:1
Dana 1:5 8:4,8 9:3
  9:17 16:11,12,18
  17:2,14 29:7 32:4
  32:5,24 33:5 38:19
  38:20,21,22 39:1,2
  39:9 40:14 41:3
  42:8 45:13 46:21
  47:12 51:23 53:22
  56:7 57:5 58:22

63:1 65:10,22 66:2
  66:15 67:17 68:1
  69:8,19,25 70:20
  72:11 79:25 80:6
  83:9,13 84:23 86:5
  87:18 90:11 91:4
  93:23 94:10 95:1
  100:4,22 102:4,6
  102:10 103:9
  111:9,13 112:5
  113:7 115:1,9
  116:23 119:16
  120:10 121:16,18
  121:19 131:22
  132:21 133:5,6,7,8
  133:13 139:15
  143:12 146:22
  147:9 148:2
  152:22 154:4
  156:15 157:2,21
  163:16,25 164:13
  165:7 167:6
  168:15,15 170:10
  171:8,13,18
  175:14,20 177:15
  177:17 178:9
  179:15 180:12,14
  180:19 181:3,21
  182:23 192:20
  203:4 205:10
  207:22 209:23
  210:7,11,15,20
  211:3,4,11,13,20
  211:25 212:1
  213:23 217:7,24
  218:19,24
Dana's 6:2 16:13
  56:10 73:22 80:14
  80:17,21,23 81:22
  83:17 87:1 93:7
  95:19 107:9,15
  110:10 114:8
  119:6 133:24
  134:24 139:13
  140:9,18,22 141:1
  153:13 155:25

169:22 172:23
  173:10 174:17
  175:9 176:6,14
  178:2 182:9 213:8
dangerous 175:5
Danny 29:12,19
  30:5 33:7 58:12
data 6:5,11,14,23
  7:2,11,12,21 10:24
  11:5,8,11,12,15,16
  11:19,21 12:15,16
  12:19,22 51:24
  82:20,22,23,25
  83:5,11 84:6,10
  86:9,12 87:25
  91:22 99:8,8,9,18
  100:1,8 112:19,20
  112:20 113:16,18
  114:7 115:12
  121:1 123:1
  125:20,21 127:17
  128:6 140:12
  141:13,15,20,21
  143:23 144:7
  145:14,17,20
  154:7,9,14,15,16
  154:18,25 155:1
  175:19 189:21
  198:9,9,13
dataset 82:20 83:2,5
  84:17 85:15 92:3
  95:8 99:15
datasets 82:16
date 4:12 12:12
  38:14 40:13,25
  42:12,18 45:1 46:6
  53:5,11 62:18 63:9
  72:25 79:23 107:2
  107:4 116:12
  150:21 163:13
  176:14 220:12
dated 52:5 54:7
  123:1
dates 40:23,23
Dauch 172:17 193:7
Dave 36:16

**David** 3:17 54:2
  222:6,22
**day** 2:3,11 4:9,12
  14:24 48:3 58:11
  59:9 67:7 70:21
  134:8 145:1
  148:15 165:9
  171:6,6,6 176:23
  176:24 177:2,2,20
**days** 16:1 63:15,17
  63:21,25 64:6,21
  105:17
**day-to-day** 30:18
**deal** 31:12 77:7
  163:4 177:1
  181:19 203:9
**dealing** 44:2 59:21
**dealt** 86:7
**debtor** 1:6 5:3 6:8
  13:9,22 15:8 48:13
  48:24 49:5 51:6,8
  61:13 72:15 122:6
**debtors** 2:4 4:9,10
  4:22 5:5 13:5
  14:25 17:24 18:1
  19:10 20:3,12 32:4
  48:4 49:14 73:2,3
  73:10,10 74:8
  156:19
**debtors's** 74:8
**debtor's** 6:6 52:5,15
  53:10 54:6,17
  55:18 63:6 64:4
  65:8 66:23 67:16
  103:5,17 105:20
  105:24 124:2
  150:15,20 156:13
  156:15 157:23
  219:25 220:11
  223:14
**decades** 34:8
**December** 56:7
  62:14 63:4 72:12
  72:25 74:7 84:18
  85:7
**DeCHIARA** 3:15

4:3 5:15,22,22,24
  11:24 12:5,8,25
  74:23,24 75:5,6,10
  76:12,16,20 78:8
  79:18 81:6 97:11
  97:13 98:6 102:19
  106:9,23,25
  117:16 119:18
  130:1 131:10,13
  144:19 149:15
  150:17 153:6
  157:7,16 158:11
  158:21 159:1
  160:13 162:13
  163:2,9,11 172:6
  181:1,25 186:18
  186:22 188:14
  193:4,10 195:23
  199:16,19 200:17
  207:8 213:14
  216:1 217:15
  219:7 220:5,13,21
  221:1,18,21 223:3
  223:7,9,11
**DeChiara's** 130:11
  139:21
**decided** 58:4,9
  123:19 125:6
  126:11 134:7
**decides** 19:21
**decision** 5:7 9:20
  10:21 210:23
**decisional** 13:11
**decisionmaking**
  180:7
**decisions** 206:12
**declaration** 28:13
  33:12 39:17,19
  40:20,23 41:1
  50:21 51:13 52:13
  53:12 55:21 62:12
  79:24 80:5 102:5
  112:5 117:24,25
  124:4 126:11,12
  127:24,25 145:8
  152:13 154:2

158:13 182:12
  183:12,15,18,19
  183:21
**declarations** 16:25
**declare** 34:7
**declared** 28:18
**decline** 201:10
**declined** 172:15
**decreasing** 136:5
**dedicated** 95:21
**dedication** 217:3
**deem** 124:25
**deems** 40:5
**deep** 164:11
**deeper** 36:7
**deeply** 31:22 213:1
**defect** 95:24 172:15
  172:20,23
**defective** 167:2,11
**defer** 199:19
**deferring** 74:23
**define** 201:16
**definitely** 128:12
  150:3
**definition** 32:10
  180:24 181:2
  201:22
**definitions** 201:17
**degree** 26:10 84:2
  135:19,20 136:13
  141:12 205:3
**degrees** 179:5
**deliberately** 17:15
**deliver** 199:13,13
**deliveries** 165:9,12
**delivery** 167:11
  219:3,5
**Delphi** 9:21 10:1,17
  11:4,5,17 78:3
  117:24 121:22
  122:19 123:9,14
  124:5 125:1
  126:11,16 162:3
  183:13,19,21,25
  184:2,12,12,15,19
  184:20 185:12,13

185:16 186:5
  187:8
**Delphi's** 11:6
**delve** 39:25
**demand** 135:5,20,24
  136:5 166:23
  196:24,25 197:12
  204:2
**demanded** 148:8
**demanding** 166:3,5
  166:13,17,22
**demonstrate** 20:1
**demonstrated** 16:9
  22:6 97:2 152:5
**demonstrates**
  151:24
**demonstrating**
  55:18 153:21
**denied** 16:1 20:11
  23:11
**department** 27:10
  28:5 76:3,5 114:5
  159:11 167:24
  171:23 193:25
**departments** 169:7
**dependent** 201:25
**deposition** 29:11
  57:19 58:12
  119:12,15,20
  120:2,5 126:15,18
  126:21 127:1,18
  127:20 129:2,5,17
  138:5,8 171:8,11
  182:15 184:6,20
  185:17 189:23
  191:13 192:9
  193:1 194:17
  197:6 198:1
  204:17 208:21
**DEPUTY** 34:1
**derive** 91:6 157:12
  157:13
**derived** 156:20
**describe** 42:5
  164:13
**described** 175:7

**describes** 40:5
**describing** 178:6
**description** 59:20
190:3,9
**descriptions** 114:2
**designed** 169:5
**Despite** 199:6
**detail** 64:18
**detailed** 93:6 128:9
**detector** 188:13
**determine** 21:16
107:15,20,23
131:7 133:25
136:14 145:20
171:20 174:16
**determined** 18:8
113:19 143:11
**determining** 9:2,16
110:10 113:6
179:14
**Detroit** 18:20
**develop** 39:5
**developed** 35:22
**Development**
159:10
**diagnosis** 177:23
**dial** 177:7
**difference** 67:20,21
79:12 94:9 100:22
104:12 124:22
**differences** 94:18,22
95:6 111:23
113:13,15 123:5
145:25 146:5,10
197:23
**different** 10:15 18:7
23:5 26:1 45:15
49:4 82:16,20
84:17 86:19 88:11
91:22 92:2 93:20
99:21 101:19
108:19 111:17
112:7 120:15
123:22,23 124:15
129:22 130:9
131:18 133:20

137:8,14,14
139:25 147:15
153:21 155:14
158:4 160:8
170:21 171:2
175:6,8 183:19,20
187:11 190:11
192:3 193:9
195:25 196:6
197:24 201:20
205:24,25 211:21
**differential** 85:13
91:9,12 179:6
198:16 199:6
207:14
**differentials** 99:10
198:10
**differently** 8:11
99:20
**differs** 111:17,20
**difficult** 31:18 35:9
35:9 44:17 52:20
69:8,19 157:2
166:12 178:20
181:11 196:4
202:19 207:4
214:14,20
**difficulty** 133:6
136:24
**digit** 94:19
**dimensions** 86:4,11
**diminution** 217:24
217:25
**dire** 52:18 78:16
**direct** 23:25 56:4
75:10 91:18 92:3
98:6 102:15
115:12 124:16,21
124:23 125:21
154:4,12,14,15,18
159:1 186:20
192:20 194:8
206:12 218:3
223:5,7,9
**directed** 109:5
**directing** 47:9

**direction** 21:24
111:7 117:4,13
136:13
**directionally** 113:8
114:11
**directly** 35:19 37:22
38:12 48:25 69:2
125:19 222:15
**director** 24:4,16,20
24:20,21 29:13
32:2,8
**director's** 32:10
**disagree** 40:2 81:7
138:15,24
**disavow** 126:14
**disc** 5:12
**discern** 188:20
**discovery** 78:15
**discuss** 64:11 68:15
68:18,21,24 71:8
72:2 74:12 107:25
149:18
**discussed** 16:16 18:9
18:10,11 38:12
52:21 70:22 80:2
80:15 110:11
140:10 217:2
**discusses** 214:5
**discussing** 31:8
53:18 64:15 98:8
115:10
**discussion** 62:24
70:25 71:7 158:19
218:16
**discussions** 33:5
55:22 66:7 70:25
71:8 164:19
**dismiss** 15:23 23:11
**dismissal** 13:8 15:8
19:7
**dismissed** 162:5
**disproven** 149:8
**dispute** 71:17
**disputed** 29:23
**dissertation** 160:2
**distance** 21:23

147:24
**distances** 203:5
**distinction** 120:24
**distressed** 44:2
**distribute** 47:2
**distribution** 139:13
139:17 169:16
217:5
**district** 1:2 24:4,4
24:12,16 29:13
32:2,7,10,12,23,25
33:9 37:14 40:4
50:4,9 109:9,14
**districts** 32:21,22
50:1 109:10,15
**divided** 87:24
180:16
**dividing** 87:22
116:19
**Doctor** 5:18 191:9
199:7 201:19
202:22 208:12,21
209:1 213:6 214:9
214:19
**document** 9:24 10:4
12:1 28:17 38:8,11
38:13 42:3,13,25
43:2,6 52:21 53:5
54:14,21,23 55:4
102:22 103:1
105:13,14 182:16
203:15
**documents** 55:5
168:15 172:3
193:11 220:24
221:2,5
**dog** 54:6
**doing** 10:18 25:8
58:16 69:24 84:8
95:23 109:20
110:1 125:2 126:6
170:20 171:6
174:12 178:19
188:24 196:7
**dollar** 17:7 83:23
116:22,24 202:6

**dollars** 14:14 180:17
181:16
**domestic** 147:2
**double** 94:18
**double-check** 91:16
**double-checked**
129:11
**doubt** 23:1 195:8,9
**downsizing** 157:4
**downtime** 163:25
164:10 165:17,19
181:12,15
**downward** 136:6
198:21
**Dr** 4:4 5:16,25 75:7
75:11 76:21 77:13
78:9 79:24 81:12
81:12 107:7
113:12 117:19
123:7 149:17,18
149:25 150:6
152:13,22 158:13
158:22 159:2
161:19 186:15
187:16 193:23
197:5 199:11
204:16 205:16
206:11 207:1
216:2 219:13
220:6,15 221:2,6
**draft** 128:7,10,12,17
128:18,19,20
129:1
**drafted** 128:13
**dramatically** 167:13
172:15
**draw** 104:19 169:15
205:9
**drawn** 18:21
**dreamed** 36:9
**dressed** 178:13
190:7
**dropped** 25:18,18
**due** 135:14,16
169:18
**duly** 23:23 75:8

158:23
**durability** 170:25
**duties** 36:20 174:4

———————
**E**
**E** 1:14,14 2:1,1 3:1,1
4:1,1 5:19,19
23:23 54:17 55:17
98:1,1 152:16
158:23,23 219:13
222:1,1 223:1
**earlier** 15:7 45:16
59:2 74:11 78:6,16
100:7 115:23
123:13 150:9
**early** 35:21 72:12,25
74:7,15 167:24
**earn** 114:1 133:1
**earnings** 85:4,17
86:18,22 87:20,21
88:6 90:4
**East** 2:5 25:1
**easy** 82:2
**economic** 8:17 34:20
43:15 55:18
114:25 124:23
137:1 159:9
161:16 180:6
**economics** 43:13
75:22,25 76:7 77:5
78:10,23 121:10
121:24 122:13
128:5 159:10,24
162:15 179:7,21
209:16 216:4,7
**economist** 75:18,21
97:1 134:17
145:23 159:14,16
160:9 181:6
**economists** 89:13
95:3,20 108:21
109:23 110:14
115:24 119:8,10
120:3 121:1,12
125:24 152:11
161:18

**economy** 14:1 82:24
83:3 107:12
175:11,17 183:3,9
**economy-wide** 88:3
100:24 101:2,3
**edited** 76:9
**education** 109:17
**effect** 13:14 15:13
93:14,17,20 94:25
95:18 96:14
108:21 134:17
135:1 136:25
150:10 152:4
169:13 200:2
201:1,4 202:25
203:2,3 208:20
**effectively** 16:21
49:16
**effectiveness** 172:15
203:20 209:22
**effects** 131:8 140:25
**efficiency** 70:7,13
70:16 97:4 149:2,5
149:11,18,19,20
149:21 150:1,25
151:8,14,16,19,21
152:5 207:25
208:7,13,15,18,23
209:4,14 210:19
216:2,3,6,13,17,19
216:23
**efficient** 37:7
**effort** 15:14 140:16
140:21 143:4
171:20
**eight-billion-dollar**
13:13 22:20
**either** 26:20 30:16
33:2 53:16 58:14
83:8 111:13
139:16 149:9,12
169:18 182:18
**elaborate** 43:24
**elected** 24:8,10,11
24:21 25:3,10 76:5
**elections** 24:14

**electrical** 27:8
**elements** 20:9
107:20 108:20
196:18,18
**elevate** 156:25
**elevated** 156:22
**elimination** 14:5,8
**emerge** 17:18
168:16
**empirical** 161:18
**employ** 181:11
222:16
**employed** 24:1,17
32:4 75:14 140:4
159:4,5 167:23
**employee** 10:24
99:16 101:1
114:25 116:16
150:10 157:22
210:13 211:2,14
**employees** 6:15,20
12:17,20 13:18
15:3 18:25 30:21
32:6,8 38:22 51:10
70:1 83:2,6 85:1,1
85:2 86:17 87:6,7
87:11,18,25 88:1,2
88:4,17 89:1,4,9
89:20,21 90:22
91:4,4 92:17 93:15
93:17,19,24 94:20
94:21,23 95:6,11
95:11,15,15,16,22
95:22 96:7,8,9,15
98:16,22 99:20
100:19,21,21
101:9 102:4,6,10
103:24,25 105:2,3
105:6,8 106:4
107:15 108:9,12
108:16 110:10
113:7 114:8 115:1
115:9,24,25 116:1
117:6,7,14 118:17
124:15 125:1,1
132:2,25 133:11

137:8,9,11 138:20
139:13 143:10,16
157:19,20 158:1,4
158:4,5,6 171:21
179:15 207:2
**employer** 22:14
85:25 86:4 97:5
98:15 99:16 101:1
107:21 109:19
111:3,3,14 116:14
117:5,10,12
118:25 120:18
125:22 136:20,24
141:14,15 150:10
151:15 152:4
179:9 196:8,9,13
196:14 197:10
**employers** 22:3 95:9
95:10,12 96:6,12
98:22 113:16
116:1 125:15,22
134:24 137:3
141:17 143:8
151:21 152:2,8
190:20 192:3,4
196:12,19,20
210:11
**employer's** 114:4
116:13 136:14
138:20
**employer-provided**
124:17
**employing** 37:13
**employment** 181:10
199:24 200:24
204:3 208:17,24
209:5 219:23
**enable** 180:3
**enacted** 19:4
**encouraged** 124:22
**encumbered** 6:25
**ended** 63:24 134:12
**enforcement** 30:19
**engage** 23:3 42:23
62:19 63:5
**engaged** 65:22

**engineering** 23:3
**engineers** 164:2
176:24
**enhance** 36:20
**enhancements** 17:18
**enjoying** 37:14
**enormous** 7:15
34:10
**Enough's** 44:15
**entered** 4:23
**entertain** 5:10
**entire** 10:4 86:6
99:9 107:11
146:25 162:10,11
166:8
**entirely** 9:20 98:21
148:16
**entrants** 136:19
**environment** 44:4
**equal** 136:9 194:22
194:25
**equalization** 197:20
198:3,10
**equally** 147:14
**equals** 179:22 180:6
**equate** 22:7
**equation** 148:1
**equipment** 147:21
148:7 164:1,4,6,12
165:6 174:8,23
175:2 176:14,20
206:11 210:13
211:1,14,22 212:7
**equitable** 14:11,18
15:4 17:16 18:22
34:18
**equivalent** 147:11
207:4,20 208:6
**Erica** 110:20 151:23
**erred** 87:8,8
**error** 7:15,19,20,22
79:6
**errors** 28:16 212:15
**error-free** 95:23
**escalating** 34:11
**escapes** 38:14

**especially** 31:10
97:3 147:4
**ESQ** 2:7,8,9,14,15
2:17,23,24,25 3:7
3:13,14,15,16,17
**essentially** 27:11,19
27:21 42:9 46:8
122:23 211:3
**establish** 39:21 40:3
**established** 131:9
**establishes** 42:7
**establishment** 86:1
86:3,8,10,11,14,21
86:24 90:14,15
92:1,5 94:7 99:24
110:11,15 111:4
113:10 139:6
141:10,14
**establishments**
86:20 88:11 99:20
101:25,25 103:11
152:8 154:25
**estate** 5:6
**esteem** 122:13
**estimate** 91:18 92:8
98:24 99:4,6,11
100:16 101:23
102:3 103:13
113:7 114:11
129:6 154:16,20
154:23 155:2,6
180:1 211:11,19
**estimated** 88:9
102:8 104:3,4
**estimates** 91:14,25
101:18 114:21
140:14 154:6
**estimating** 91:21
**estimation** 93:11
112:12
**et** 12:18 173:7
174:10 177:12
189:15 205:14
207:23
**evaluate** 40:10
130:22

**evaluation** 55:9
**eve** 61:3
**event** 15:15 78:20
104:1
**eventual** 49:20
**eventually** 44:10
75:25
**everybody** 25:19
31:13,14 37:16
47:17
**everything's** 43:16
**EVID** 223:14,19
**evidence** 11:25
12:11 16:24 17:2
20:10 39:18 40:12
44:21,25 46:2,5
52:15 53:10 65:24
66:6 79:22 107:1,3
139:15 150:20
154:12 156:14
163:12 217:6,24
220:11
**evolve** 169:4
**evolved** 109:2,6
**exact** 108:18 122:2
**exactly** 59:14 105:21
191:3 207:13
213:2 221:4
**exalt** 21:13
**exam** 26:14
**examination** 12:13
23:25 56:4 75:10
81:10 98:6 159:1
185:17 186:20
216:1 219:12
223:2
**examined** 23:24
75:8 119:8 158:24
**examiner** 187:2
**example** 44:13
103:24 108:1,7,23
113:21 119:5
141:9 142:2,5
146:2 149:10
156:21 157:15
170:19 171:7

172:24 174:21
176:21 177:6
178:11 191:2
192:4 209:11
**examples** 166:5
174:5
**Excel** 193:18,24
221:3
**exception** 27:13
175:21 220:19
**exceptionally** 36:21
**excerpt** 12:1 220:1
**exchange** 199:14
**exchanging** 30:25
**exclusivity** 169:11
**excuse** 9:8 81:2
145:24 180:1
183:8
**excused** 13:2 74:21
158:17 221:12
**executive** 24:15
**exercising** 175:7
**exhibit** 6:6,8 7:16
9:25 11:25 12:6,11
28:10 38:4,5 39:13
40:11,12 41:21,23
42:1 44:20,25 45:3
45:5,8,16 46:1,5
50:22 52:5,15,24
53:10 54:6,18 65:8
66:23 67:16 76:11
78:25 79:19,22
102:16,20,23,24
103:5,18 105:11
105:20,24 107:1,3
124:2 150:15,20
152:16 160:12,19
162:19 163:3,12
182:13 210:2
220:11
**exhibits** 55:16
106:10 223:14,19
**exist** 28:17 44:4
**existed** 27:11
**existence** 127:23
**existing** 38:21 170:1

182:13
**exists** 95:5 183:5
185:23
**expanded** 36:20,21
**expansive** 13:16
**expect** 206:20,23
215:16
**expense** 166:9
**expensive** 115:13
164:1,1 203:5
211:23
**experience** 24:22,24
31:1,4,5,21 35:1
47:5 48:16 59:20
97:1 114:23,24
115:2,4,7,11
117:23 122:11
133:5,7,13 134:4,7
134:24 145:23
173:9,12,18,24
185:6,9,12 188:23
211:11
**experienced** 115:16
169:17
**expert** 55:6,7 70:14
76:10 77:23 78:3,4
78:9,13,13,22,24
79:15 99:3 107:7
118:24 119:2,9
120:16,19 121:24
122:1,6,8 123:20
125:6 126:7,8
128:9 132:13,16
135:8 147:7
148:23 149:18,22
157:8 161:25
162:3,14 184:17
184:18 194:7
209:23 210:2
**expertise** 120:13,25
131:7 148:25
**experts** 70:8 164:19
**explain** 29:5 38:20
55:8 87:16 89:18
93:5 99:4 107:17
108:3 114:16

115:21 117:4
122:22 125:10
151:18 163:23
187:10 216:22
**explained** 74:11
140:10 151:15
**explaining** 59:2
191:10
**explanation** 4:17
59:3 60:20 152:1
213:20
**explore** 184:23
**explored** 126:18
**exposed** 167:21
**extensive** 59:22
136:1 156:22
**extensively** 76:8
**extent** 14:16 110:2
128:14 156:21
161:4 165:22
168:4 173:1
185:13 216:3
218:4,22
**extra** 160:14 219:5
**extremely** 181:22
206:3
**eye** 137:20
**eyes** 186:9,17
**e-mail** 193:10,12
221:8

**F**

**F** 1:14 2:17 98:1
222:1
**face** 39:24 43:12
68:14,17,18,21,24
69:4
**faced** 34:10
**facilitated** 34:18
**facilities** 32:3,8,14
32:24 80:1,24
81:23 84:23 85:10
86:22,23 87:1,2,4
88:19,23 89:5,22
90:6,9,10,20,24
92:13,14,23 93:22

95:2 100:2,5 103:7
103:18 106:6
112:7,11,15,24
115:14 123:22
143:24 156:23
176:15 188:2,8
**facility** 4:11 86:9,17
87:10,11 89:2,9,14
92:14,15,18 93:1
94:2,2,11 104:16
105:25 115:17
213:9
**fact** 20:22 22:14
23:4 26:22 33:19
43:5 81:14 87:24
101:16 106:14
109:10 111:24
114:20,21 120:5
123:16 128:10
129:13 133:1
137:4 139:16
140:13 144:17
145:19 152:1
162:10 175:19
181:20,20 198:8
203:3 217:7
**factor** 85:20,20 86:7
116:3 136:10
139:4 140:14,14
141:24 196:21
**factored** 113:6
**factors** 34:12 85:22
88:20 109:22,24
109:24 110:9,18
115:23 130:23
131:3,4 135:16
136:2 139:4,25
141:5 151:16
197:18
**facts** 29:23 183:17
183:19
**Failing** 20:6
**failure** 21:4 167:6
167:20 177:25
**fair** 14:11,17 15:4
17:16 18:22 19:3,3

37:18 65:21,25
71:16 74:3 137:6
141:23 142:1
183:12 185:11
211:6
**faith** 20:4,6 46:21
**fall** 38:15 114:10
120:21 201:10
208:5
**fallen** 200:5,9,10
201:3,7
**familiar** 29:20 40:4
45:7 47:11 48:8,11
173:20 187:14
**families** 96:11
**far** 11:12,21 14:21
14:21 79:14 85:14
162:21 218:7
**faster** 169:10
**faulty** 167:8
**February** 28:18
**Federal** 110:21
**Federation** 118:16
**feel** 10:4 203:12,16
203:22
**Feldstein** 161:19
**fellow** 30:21 128:2
**felt** 203:14
**fewer** 212:14,15,15
**field** 76:6 77:4 78:10
120:21 167:7
**fifty** 176:17
**fight** 203:19,20
**figure** 79:9 101:11
101:12 130:21
155:16 156:4,15
166:10 205:17
**figures** 87:21,21,22
91:6,20 93:22
94:24 101:22
103:20,20 104:1
113:9 129:24
157:4 158:3
**filed** 4:10
**filing** 127:10
**filings** 195:10

**final** 33:3 87:24 88:9
91:5,15,20 94:9
130:8 166:23
**finally** 5:3
**finances** 16:13
**financial** 51:24
54:18 55:7 62:24
167:3 170:6
215:14,17
**financially** 11:9,13
11:22 110:3,7
195:2 201:24,25
**find** 52:20 70:18
89:8 95:3 96:12
111:2 114:6
125:13 126:21
127:6 149:9
165:20 169:25
177:11 181:10
207:4,4 212:21
**finds** 16:12 167:7
**fine** 33:19 41:6
97:11 220:9
**finicky** 177:9
**finish** 58:5 207:10
**finished** 170:22
188:6 216:12
**fire** 69:9,11 108:11
**firm** 5:23 8:20 36:13
110:12,13 111:9
128:11 141:10,15
143:7 159:18
163:15 165:25
201:24
**firms** 6:15 10:25
11:22 110:2,3,5,6
110:8 111:8 142:8
142:9 154:23
155:1,1 165:22
195:3 202:17
205:1 214:14,20
**firm's** 159:19
165:13 167:16
**first** 8:12 16:11
17:14 19:13 23:22
33:14 34:5 35:4

50:22 55:14 64:3
70:25 77:22 80:6
82:25 83:14,18
84:13 85:4 86:13
87:23 89:2 93:22
99:5 100:9,19
101:4,5 102:24,25
103:21 106:1
108:1 112:3,14
122:18 123:1,9
128:18,20 152:21
164:10 165:17
167:14 175:24
211:4,24
**firsthand** 7:24
134:16
**fit** 169:5
**five** 4:6 63:15,17,21
64:7,21 72:17,20
75:2 79:11 80:1,14
80:23 81:11,12,15
81:18,23 82:7,9
85:9 87:2,4 88:23
90:6,23 92:8,13,14
92:23,25 94:2 95:2
99:24 100:2 103:7
103:18 111:12
112:11,15,23
113:1 123:22
133:10 153:4
181:19 206:23
**Five-five** 45:5
**five-minute** 23:17
**fixed** 8:5,9,17,24
10:11 180:15
**flatly** 18:6
**flattening** 35:3
**flawed** 19:14
**flawless** 168:12,17
218:13
**flesh** 25:15
**flood** 7:7
**fluid** 106:14 178:15
**focus** 140:1 159:14
191:9
**focused** 107:19,22

144:7 170:7
**focuses** 89:20
121:11
**focusing** 14:2 55:13
**folks** 114:1
**following** 24:9 26:12
45:12 67:5 71:5
96:16 147:16
149:16 158:25
215:25
**follows** 5:21 23:24
75:9 98:5 158:24
**follow-on** 213:20
**Food** 118:21,23
**footnote** 110:22
**force** 12:23 19:2
86:6 95:1 98:12
115:15 156:23
169:14,23 197:10
210:15 213:3
218:19,25
**forced** 10:14
**Ford** 134:4,22
137:13 164:23
**Ford's** 134:7
**foregoing** 222:9
**foreseeable** 215:17
215:21
**forged** 206:2
**forget** 185:8
**forgetting** 9:14
**forgot** 39:17
**forgotten** 138:6
**form** 38:25 131:10
131:14 191:24
192:10
**formal** 19:12 21:4
49:13 50:6 62:19
65:20,23 66:5,17
73:1,21 74:7
**formally** 32:15 51:5
**formation** 45:13
**formed** 38:19 39:9
**formerly** 32:24
**forms** 81:19
**Fort** 29:8 32:6,16

38:23 56:13,19
57:18 58:4,8,9
80:16 90:7 94:12
104:11,18 170:20
173:17,23 178:11
187:21
**forth** 17:11 79:15
187:2
**forty** 87:24 176:17
**forum** 19:24
**forward** 35:12
221:19
**forwarded** 221:7
**found** 85:23 86:10
109:23 110:23
111:1 114:24
115:16,24 119:10
121:3 162:10
189:23 204:13
**foundation** 29:25
39:21 219:11
**founder** 21:11
**four** 25:4 74:6 87:4
90:10,23 178:18
181:19 193:11
221:2,5
**fourth** 89:15
**framework** 41:16
42:7,10,24 43:13
43:17,22,25 45:20
45:23 51:7 68:9
206:9
**framing** 205:5
**FRANKEL** 2:19
**free** 10:4
**freedom** 124:23
**freely** 7:8
**frequently** 173:3
**Friday** 67:4 193:6
221:2
**friend's** 21:6 22:11
22:13
**fringe** 100:10 102:6
**front** 28:9 38:6
41:25 42:12
117:19 119:22

182:13,19 184:9
184:10
**front-page** 148:14
**full** 8:16 21:7 25:6
25:10 27:19,21
70:25 71:1 75:25
139:2,7,8
**fully** 128:15,15
129:14
**fundamentally**
16:19,20
**funded** 62:9 161:13
**furnace** 25:5 27:16
28:5
**furniture** 44:5
**further** 5:20 12:24
12:25 13:15 15:7
40:3 47:20 74:17
98:4 117:16
158:10,15 181:25
215:24 219:8
**future** 41:11 59:5
166:12 180:7,7,12
181:5 204:10
206:21 215:17,22

---

### G

**G** 4:1 156:13
**gained** 177:1
**gap** 166:17,17
**garbage** 175:25,25
**gasoline** 98:17
**gathered** 185:12
**gathering** 128:6
**gear** 178:11
**general** 78:14
135:22 138:23
142:17 151:19
199:17 212:24,25
212:25 213:5
214:16 216:8
217:22 219:24
**generally** 48:10
80:18 137:7
149:12,13 194:11
194:19 206:5

214:13
**generated** 164:3
177:25
**generous** 158:2
**geographic** 142:2
**geographical** 32:25
111:16
**George** 26:11
216:16
**Gettelfinger** 18:19
21:6 22:2
**getting** 29:20 30:3
31:3 41:9 69:15
91:18 95:17 197:2
207:20
**Gibbons** 50:14
**give** 4:17 8:15 10:15
28:23 68:6 69:7
76:17 77:20 108:1
119:12 126:15
129:17 147:7
170:13,19 172:3
174:5 180:24
184:20 191:14
192:11,15 194:18
197:6,13 198:1
200:12 201:21
204:17,21 208:22
213:22 219:21
**given** 11:11 32:13
45:11 65:23 82:11
106:12 113:11,13
186:1 199:11
204:1 213:16
**gives** 15:19 87:18
90:25 94:16
147:18 168:22
190:20,23 191:16
**giving** 74:3 177:5
**glad** 70:9 77:15
**global** 44:4 51:1
135:17 204:5
**globalization** 35:3
**globalized** 44:4
**gloves** 178:13
**GM** 11:16 141:17

162:5,12 213:9
215:19
**GM's** 11:17
**GM/Japanese**
213:24
**go** 4:19 12:7 22:18
22:19 25:20,20
26:9 51:12 59:3
64:18 79:8 86:15
89:23 90:1 92:11
93:5,14 97:9 98:17
123:25 124:7
131:17,20 138:8
150:5 151:6,23
152:16,18 156:3
156:13 182:12
187:6,16 196:14
207:11 210:4
214:18 215:4
219:18 221:19
**goals** 79:25 80:2
171:18
**goes** 138:16 165:6
**goggles** 178:14
**going** 10:3,20 16:14
44:11 45:22 60:21
65:2 66:14,22 68:5
68:8,8,12 71:19,23
71:23,24 73:12
74:4,11 79:2 83:14
97:9 102:23
106:19 119:19
131:13 149:17
157:21 169:4,11
169:15,16 170:6
170:24 177:8,22
177:23,24 179:8,9
179:24 180:2,3,13
180:24 186:22
190:2 191:24
192:6,12 196:3,11
196:12,20 205:12
207:15,15,21
208:5,9 209:17
211:8,15 212:5,8
212:11,13 215:8

215:20 216:8
**gold** 108:17 139:21
139:24 140:5,15
**good** 4:3,8 5:25 6:1
7:10 20:4,6 26:7
43:20 44:13,19,19
46:21 48:12 75:11
75:12 87:18 95:11
125:13 132:4
147:14 151:25
159:2,3 166:10,24
170:13 175:25
177:7 189:20
196:16 205:6
211:10
**goods** 83:8 84:16
85:18 136:14
138:1,13
**goods-producing**
83:9,10,16,25 84:5
84:7,12 85:5,14
86:19 88:10 90:18
90:21 91:2,9,14
99:9,21 100:13
101:9,15,19,22
112:21 145:13
154:11,20 155:23
**government** 83:6
**grace** 199:14
**graduated** 75:22
**Granite** 37:15
**grant** 16:6
**granted** 5:9 15:23
20:12 194:5
208:11
**granting** 14:7
193:16
**grave** 22:7
**great** 31:12 163:4
165:16 177:1
203:9 212:22
213:10 215:5
**greater** 36:2 147:3
217:2,21
**Green** 1:9
**grievance** 25:4,5,11

27:25 212:25
**grocery** 98:18
**Groshen** 110:21
151:23
**ground** 17:2
**grounds** 81:4
**group** 88:1 89:7
100:21 101:10
108:22 109:21,25
112:22 114:10
118:13 161:11,18
**groups** 83:12,14
85:3 124:15
**growing** 218:11
**grown** 198:18
**growth** 201:10
**guess** 7:25 32:9 77:2
166:6 214:9
**guesswork** 157:9
**guide** 39:6 211:10

---

**H**

**H** 2:24 5:19,19 64:3
158:23
**half** 177:7 217:19
**hall** 25:10
**Hamilton** 2:15
21:11,20,25 29:22
39:14,19,24 40:1
44:23 46:3 47:22
48:1,2 52:14,23
74:17 223:6
**hand** 76:13,13 120:2
125:14 149:11
169:20 222:19
**Handing** 102:22
105:13 182:16
**happen** 62:22 169:8
187:2 214:4
216:25
**happened** 18:16
49:23,25 50:1,4,8
51:17 57:1 58:9,15
59:9 60:21 62:18
62:21 188:6 213:9
213:25

**happens** 173:6
**happily** 12:8
**hard** 35:16 97:5,6
138:24 169:21
207:15,16 214:25
**harder** 96:10 126:1
**harshness** 170:25
**Harvard** 75:23
134:5 159:24
**haulers** 195:6
**head** 50:8,13
**headed** 94:1 161:19
**health** 8:4,8 9:4,18
14:5 98:20 179:16
180:9
**healthcare** 34:12
51:1 62:10 68:22
69:5 72:10
**healthy** 195:2
**hear** 20:18,20 70:5,9
70:17 71:19
144:10,12,13
149:17
**heard** 5:8 17:12
18:23 20:22 23:10
29:17 58:20 61:7,9
61:11 72:22
103:22 122:22
149:15 182:9
218:16
**hearing** 4:14 10:2
13:6 20:15 61:4
67:4 106:12
**hearings** 16:2
**hearsay** 39:20,24
40:2 60:17,18
163:5 172:2,4
217:9,13
**heat** 178:22,23,25
187:14 205:11
**HEATHER** 2:14
**heats** 177:8
**heavy** 174:7 177:18
203:4
**held** 194:22,25
**helmets** 178:14

**help** 148:18 205:16
205:22,23
**helped** 128:6 129:13
**Helper** 70:8 149:17
152:22 158:22
159:2 160:18
162:14,18 163:14
186:15 187:16
197:5 204:16
205:16 206:11
207:1 216:2
219:13 221:2,6
223:9
**Helper's** 152:13
160:14 220:6,15
**helpful** 26:18
**Henderson** 38:24
56:13,21,24 57:7,9
57:10,14 173:17
188:4
**Henry** 134:4,7,22
164:23
**hereunto** 222:18
**herring** 21:5
**hesitate** 153:16
**Hey** 196:15
**high** 25:16 95:11
112:12,16 114:22
115:10 122:12
135:23 138:20
139:19 141:1
143:24 152:22
153:3,5 172:14,25
181:22 189:9
194:12,14,16,20
203:20,20 210:7
218:15 219:4
**higher** 31:25 95:24
95:24 109:10,12
113:9 115:7
134:13,18 143:8
151:21 152:9
165:21 169:18
179:12 183:2,8
208:18,19 217:1,4
**highest** 113:25

212:25 213:3,4
**highly** 101:17
136:18,19,23
137:2 181:9,18
210:14
**high-level** 88:7
**high-paid** 207:2,19
**high-wage** 140:19
182:24 210:11,16
**hills** 4:11 6:21,24
7:1,14,18 80:15
87:10 104:7,11,17
113:4 173:16
181:19 182:5
188:4 217:20
218:11
**hint** 28:23
**hire** 132:21,23
134:13 197:3
217:4
**hired** 7:9 25:1 27:8
27:10 93:13,15
105:2,7,8 217:7,18
**hires** 105:6 117:7
132:3 180:12
**hiring** 95:9
**historic** 112:10
**historically** 27:3
112:6 142:15
**history** 19:17 146:19
146:20
**Hoc** 3:4
**HOCK** 3:17
**hold** 125:9 161:21
**Holders** 3:4
**holding** 111:4
138:19
**holidays** 42:21
**HON** 1:15
**Honda** 166:19
**Honor** 4:3,6,8,9,18
4:20 5:11,14,15
12:9,24,25 13:3,7
14:20 15:11,13,15
15:25 16:8 19:9
20:2,3,14,22 21:7

21:15,18 22:13
23:13,17,21 28:11
29:22 30:10 33:13
33:19 34:3 38:3
39:13,14,19 40:8
41:23,24 44:21,23
45:2,5,6 46:2
47:22 52:14,17,23
53:8 58:20 74:18
74:19,22,24 75:5
76:12,20 78:8,11
78:21 79:18 81:2,6
97:11 102:19
106:9,11,23,25
117:17 119:18
144:19 149:15
150:16 157:5,7
158:11,21 160:13
162:13,16 163:4,9
172:1 180:23
181:1 186:18
193:4,17,21
199:11 207:8
213:14 215:24
217:9,15 219:25
220:5,9,13,21
221:1,9,13,21
**hood** 27:16
**hope** 16:6 59:9
117:20
**hopefully** 29:20
147:13
**hot** 28:6 179:4
**hotel** 63:21
**hour** 79:9,10 85:7
88:13,14 92:17
93:10,16 94:21
102:1,1,7 106:1
113:24 114:1
133:20 134:10
157:21 170:11
172:10,11 177:7
192:22
**hourly** 80:3 84:22
85:4,17 87:21,21
88:10 90:4 116:11

116:11 117:12
**hours** 87:23 129:3,4
129:6 187:11
188:7
**house** 170:3
**HR** 119:9,9
**huge** 87:3 168:10
**human** 114:4 119:2
120:24 131:7
132:11,12,15
188:13
**hundred** 59:13
87:12 88:12 100:5
100:13 150:3
158:1 179:5
**hundred-plus** 99:25
**hurt** 167:13

———————

**I**

**idea** 54:22,25 57:1
58:25 70:15 73:5
91:3 120:14
139:21 164:23
205:6 216:8,23
**ideas** 170:7
**identical** 123:16
**identified** 17:14
108:20
**identify** 164:25
167:20,24
**idle** 177:20
**ignore** 185:1
**ignored** 21:5
**ignores** 89:21
107:20
**ignoring** 94:13
**ill** 199:14
**Illinois** 24:5 26:14
37:16 44:14 49:11
**imagination** 22:21
**imagine** 170:2
**imitated** 169:12
**immediate** 93:7,17
136:4
**immediately** 105:3
**impact** 86:21 92:4

93:11 168:10
169:22
**impasse** 108:8
**imperfect** 137:5
**implement** 15:11,12
15:16 18:25
**implementation**
93:1 96:3 103:15
103:16 104:23,25
105:4
**implemented** 69:18
94:17
**implementing**
210:13 211:2
**implements** 116:23
**importance** 163:20
163:21 167:15
181:15
**important** 79:5
80:20 84:4,6 85:24
86:10,25 87:14
89:17,18 90:15
91:3 110:13 111:5
137:13 139:5
163:19 164:5
165:25 167:17
168:3,6,8 181:22
191:11 192:6
198:16 218:7
219:1
**importantly** 78:2
**imported** 202:24
**imports** 202:7
**impose** 13:12
**impression** 147:6
**improve** 119:6
120:1 131:8 170:8
**improved** 117:13,13
**improvement**
165:10 168:4
**improvements**
168:9 204:2
**improvise** 164:11
169:6
**inaccurate** 28:20
**inappropriate**

199:22
inch 170:23
include 9:4,18 10:10
  10:24 12:22 84:25
  85:1,2 88:6 103:25
  113:10 139:8
  159:20 171:16
  173:1 179:23
  196:18
included 11:11
  12:17,19
includes 30:18 83:3
  93:7,9 94:6 100:10
  124:16
including 16:10
  21:17 34:9 44:3
  45:18 70:20 78:5
  107:21 160:9
  182:14 218:16
inclusive 83:5
income 170:4,5
inconclusive 149:7
inconsistency
  126:22
inconsistent 70:13
incorrect 29:4,5
  69:13,14
incorrectly 192:7
increase 51:9 105:22
  134:18 142:22
  165:11,12 200:11
  202:24
increased 202:8
  218:17,22
increases 117:12
  136:8
increasing 44:3
  70:12 143:2
increasingly 203:11
Incredibly 166:5
incumbent 6:20,24
  7:1,10 94:21 96:1
  96:15 105:6
  175:21
independent 201:25
India 202:16

Indiana 24:5 25:2
  26:14 33:1,2 90:7
  94:12 173:17
indicated 14:23 15:7
  15:24 59:4 104:24
  154:17
indicates 52:19
  114:3
indicating 157:16
indication 151:15
indirectly 137:19
  222:15
individual 46:16
  82:1 86:9,17
  116:14,15 121:3
  152:12 162:12
individually 190:13
individuals 173:9,12
  173:15 179:11
  213:15
industrial 32:17,19
  34:13 75:19 76:1
  80:9 113:22
  198:18,22 214:15
  214:21 215:2
industries 34:9,10
  35:4 82:23 101:9
industry 6:3,12 11:6
  13:18,21,22 14:3
  16:12 27:5 35:8,19
  35:21 36:6 37:7
  43:20 59:23 73:25
  78:13,14 80:4,6,8
  80:11,18,20,21,25
  81:24 82:8,10,15
  82:23 83:11,12,14
  83:17,18,24 84:10
  84:10,15 85:3,6,11
  85:20 88:16,19
  90:4,8,10,13 91:2
  91:5,20 92:2,5
  94:7,11,15 99:1,11
  100:13 101:17,22
  101:24 102:11,14
  103:11 104:3,16
  106:8 107:21

109:16 110:2,11
  112:22 113:10
  121:5,8,11 122:25
  125:18 133:24
  134:24 135:5,8,15
  135:20,21 136:6
  139:5,14 143:17
  144:18 145:14
  146:10,14,16,21
  147:1 148:7
  153:23 154:13
  156:1 159:15
  160:3,5,7 161:5,7
  161:13 162:15
  163:15,18 164:19
  165:23 167:16
  168:5,7,20 174:25
  175:1 181:16
  191:4,4,6 192:5
  195:2,4,11,19,21
  196:4 197:3,4
  199:25 200:3,9,25
  201:2,5 202:23
  204:3,4 205:4,8,8
  205:14,21 206:18
  207:18 214:3
  215:9,11 218:18
  218:23 219:2
infer 194:15
inferior 18:8
influence 111:5
  114:25 135:21
  136:3,7
influenced 115:15
  115:22 116:2,16
influences 121:3
  189:14
information 6:20
  46:13 52:8 53:24
  54:19 55:7 62:23
  62:25 88:24 89:10
  90:14 91:1 99:10
  100:23,25 108:15
  119:10 125:13,16
  125:17 133:15,16
  133:19 134:23

140:22 150:6
  154:19 157:11
  170:9 182:14
  185:12 186:3
  189:16 190:16,17
  190:18
informed 39:7 58:1
  58:13 128:15
  189:24
initial 128:7 144:25
initially 7:15 129:19
initiatives 34:18
  50:25 51:5 59:22
Inland 25:1,13 27:2
innovate 51:8
innovative 34:17
  35:22 36:18 37:2,6
  50:25 51:5 59:21
input 192:1,3
inquiry 158:15
insert 171:1
inspect 178:24
inspection 205:12
  207:23
inspections 176:12
instances 137:10
  148:8
institution 22:14
insurance 8:5,9 9:5
  9:18 10:25 23:1,8
  98:20 153:10
  180:9
intended 152:25
intending 25:19
intensity 163:20,24
intention 41:13,17
intentions 51:24
interest 21:12 108:4
  108:10,12 124:20
  135:9 161:12
interested 37:3
  148:10 149:9
  222:15
intermediate 83:16
internal 31:12,21
  55:22

international 24:23
28:1 30:16 32:12
32:13,15 34:11
135:14 161:9,13
interrupted 95:16
interview 173:9
interviewing 173:2
interviews 188:24
introduce 65:24
introduced 66:6
introduces 85:23
introducing 168:8,9
invalidated 149:13
invalidity 151:25
invented 164:23
inventory 147:21
164:24 165:11
investigated 192:20
investment 219:6
invited 57:15,20
58:7 161:21 166:1
167:14
involve 30:23 31:22
178:9
involved 30:11,14
31:5,24 33:4 35:5
35:19,22 37:22
38:1 46:12 47:8
48:20,21,22 57:3
60:8,22 108:2
171:4 191:1 194:8
205:25
involvement 30:20
56:25 210:14
211:2,15
involves 31:7,12
79:6 212:18
in-time 165:13
ipsa 21:22
irrelevant 81:5
ISG 36:13,15,21
60:2 61:25 62:2,9
62:9
issuance 15:5,12
issue 14:25 15:18
17:2 18:9,10 19:9

20:25 49:2 68:13
69:24 85:25 115:1
167:5 181:23
issued 13:24
issues 15:15 31:8
35:2,6 68:12 69:15
161:12

---

**J**

J 23:23
James 23:22 223:5
January 42:12,22
46:8 63:9,11,14
65:16 67:22
217:19
Japanese 164:22
166:13,16 213:10
JAYANT 2:7
JD 166:18
Jersey 75:16 76:2
108:11 111:20
Jimenez 2:9 4:7,9
JIMIENEZ 4:8,20
5:11,14
job 23:3,8 27:3,11
27:14,24 28:7
36:19 51:9 69:15
69:17,24 70:12
132:3 134:10,19
169:20 171:6
174:9 175:6
177:16,19 178:20
179:10 217:3,20
217:22
jobs 31:23 43:20
95:12,17 96:8
113:20 167:21
169:25 177:21
178:7,9 190:8
198:25 207:3,4,19
207:20
join 161:21
joined 76:2
joining 25:2
joint 42:9 45:24
jointly 45:11,14

joking 72:6
Jones 2:3,11 4:9
48:3 58:11 70:21
214:7
Joseph 216:16
Journal 148:11,21
148:22
judge 1:16 22:17
26:22 33:25 57:23
57:25 131:19
132:10 205:19,20
205:22,23 210:22
judged 87:5
judgement 5:6
135:13 171:3
175:8 176:5,21
178:2
jurisdiction 20:23
32:3,25
jurisdictional 13:10
Jury 54:2
just-in 165:13
just-in-time 147:21
163:21 164:20,21
165:7,16 181:13
191:7
juxtaposition 81:18

---

**K**

K 66:22
keep 7:9 43:21
66:21 74:16
143:10 163:8
164:5 169:17
177:13 178:15
keeping 108:16
168:7
Kentucky 38:24
173:17 188:4
key 216:23
kicks 33:17
kind 66:21 84:8 85:8
87:2 89:16 126:3,8
157:1 169:19
170:13 172:13
174:24 177:12

180:13 186:19
191:3 207:24
214:11
kinds 117:14 135:18
knees 178:14
knew 25:22 122:24
122:25
know 6:2 9:12 11:12
11:21 21:10 22:9
26:23,24 28:21
29:16 30:2,4,6
41:13 42:11 49:13
52:2,11 53:4 54:2
54:23 55:5,11 57:6
57:16 58:18 60:13
60:14 61:1 66:13
67:24 68:11 71:12
79:14 84:21 85:15
86:6 87:7 88:22
90:3 91:22 93:11
95:7,15 98:17
103:24 104:7
109:18 111:17
112:19 115:9,13
117:3 125:17
126:4,7 127:6,16
127:23 131:2
132:23 133:8,16
134:2 139:14
140:14 141:21
144:16,23 145:23
146:5,13,16,25
148:6,9,10,11,15
149:2 150:2 152:5
156:21 157:2
158:6 162:21
170:2,16 176:22
176:23,23,24,25
177:25 180:6
185:20,25 188:16
189:7 191:15
194:3 195:14
197:22 201:14
212:2 213:24
knowing 61:20
188:25 206:3

**knowledge** 7:24
36:7 46:16,20
52:19 58:23 61:21
70:11 79:17 97:1
114:7 119:9
132:15 134:16
148:15 152:25
156:19 164:11
177:1,13 205:17
**known** 167:25
**knows** 47:17 128:23
177:2,3,19
**Kolkin** 214:7
**Korea** 147:5
**KRAMER** 2:19

**L**

**L** 5:19 67:16 75:8
98:3 158:23
**labor** 8:23 9:2,16
10:23 12:1 13:13
13:18,23 14:1,3
22:20 23:5 26:10
26:11 36:18 37:19
44:8,10,12 61:6,14
61:16 68:25 73:11
73:13,22 74:9
75:18,20 76:6 77:4
78:10,22 80:7
82:16,21 84:18
95:3,4,13,20 97:1
99:7,17 108:20
112:7 116:6,18,23
119:8 121:10,24
130:10,15,20,23
131:3,6,8,19 132:9
132:14,19 135:6
135:24 136:5,18
137:17 138:16
145:23 146:19,20
154:8 196:24,25
197:12 205:4,9,21
205:24 206:12
209:16 216:7
218:4
**laid** 180:14 207:3,19

**Lakeside** 2:12
**Lane** 3:5
**language** 178:6
**large** 27:16 86:23
87:3 111:9,13
113:22 115:25
134:10 136:2
142:8 150:10
151:20 152:1,8,8
154:23,25 155:1,1
161:14 169:1
197:10 198:9
204:25 216:17
**largely** 81:11
**larger** 31:10 35:12
94:22 100:4 105:9
109:10 111:8
112:22
**largest** 99:25
**Larry** 134:5
**lasting** 63:24
**latest** 36:10 86:13
99:18
**lathe** 111:22
**launch** 168:13,18
218:13
**LAVAN** 3:3
**law** 5:23 19:15,16
20:1 22:18 26:12
26:13 109:4
124:20 126:7
**lawyer** 26:17 48:6
111:21
**lawyers** 26:23 31:16
**layoffs** 115:13,14
156:22 204:25
**lead** 18:13 97:4
130:19 132:6
181:9 208:7,19
**leadership** 71:6
**leading** 28:24
**leaflet** 39:3,4
**leaflets** 47:2,16
**learn** 143:15 171:24
172:7 175:4
**learned** 29:10 44:1

57:19 127:18
172:8 192:21
**lease** 4:10,18,20,23
5:5,6,7
**leave** 21:17 29:21,21
96:4,6 105:6 117:6
**leaving** 179:24
**led** 42:9 203:8
**left** 62:5,8 88:24
94:21 95:14 96:2
197:15
**legacy** 10:10
**legal** 77:24 126:7
180:24 181:2
**legally** 100:11,11
**legislative** 19:16
**length** 16:16
**LENNOX** 2:14
**Leon** 46:18 55:2
72:23
**lesser** 14:21
**lessons** 179:20
**lessor** 4:24 5:2
**less-qualified** 132:2
**letter** 10:9 66:25
67:10 78:6 118:9
**let's** 9:8 49:23 56:6
57:18 92:11
102:24 104:9
110:9 111:15
117:22 123:24
130:9 136:10
144:1 145:6 149:2
149:23 167:1
182:12 186:3
192:23 197:9
205:16 207:25
210:1,4 215:6
**level** 15:1 18:23
24:23 31:25 61:18
105:8 107:9
113:18,23,25
114:6,9,15 115:2,7
115:11 135:5,11
138:17,18,20
142:23 143:13

145:3 147:8
156:12 158:6
163:16 170:4,5
197:20 208:4
**levels** 30:16 31:11
113:19 114:2
115:5 128:21
131:24 135:21
137:8,18,19 143:2
143:7,16 144:1,13
144:17 169:23
182:10 197:24
205:14 216:25
**leverage** 15:14,17,19
19:20,23
**LEVIN** 2:19
**Levine** 3:16 23:13
23:19,21,25 28:10
30:8 33:13,19,23
34:3 38:3 39:12,16
39:23,25 40:11
41:22 44:20 45:2,4
46:1 47:20 52:16
53:8 68:5 74:19,22
223:5
**Levine's** 67:25
**LEVY** 222:6,22
**liabilities** 62:3
**liability** 14:13,14,14
17:23
**licensed** 48:5
**licenses** 26:16
**lie** 188:13
**life** 4:21 8:4,8 9:5
10:25 111:24
179:16 180:9
**LIFLAND** 1:15
**lift** 178:18 179:2
**lifted** 216:24
**lifting** 174:7 178:10
178:25
**light** 34:25
**Lima** 80:16 81:4,8
82:2 173:17,22
176:22 187:24,25
217:8

limit 11:10 109:21
limitations 78:12
limited 6:14 11:13
11:22
limits 109:24 205:17
line 18:21 80:3
100:9 101:4 130:1
130:3 178:11
184:11 197:16
198:1 200:17,19
200:19,20
lines 197:16
linkages 169:6
liquidation 49:21
list 77:3 111:1 161:1
listed 78:2 103:18
listen 187:3 212:22
listing 77:4 161:1
lists 103:7 171:17
literature 121:13
136:1 140:17,20
214:5
little 17:10 25:15,20
26:25 33:20 34:25
52:20 67:25 72:21
88:5,20 91:23,23
92:21 99:19
110:12 123:22,23
131:14 151:14
164:24 182:3,14
197:16
lives 177:2
LLP 2:19 3:3,9
local 14:3 25:2,9,10
27:23 29:8 30:16
32:5 38:22 56:8,23
57:8 112:7,13
locals 29:10 32:22
38:24,25
locate 203:6
located 102:17
112:16 113:1,5
202:3
location 58:14 86:9
109:19 111:16
113:6 139:9 142:2

147:17,25 199:5
205:14
locations 32:16
111:18 146:23
147:12,15,24
199:5
long 21:23 24:6
30:14 35:8,14
60:20 62:24 68:6
107:5 146:6
150:25 173:22
174:8 203:5 211:8
211:15
longer 28:2 142:14
148:12 153:3
167:21 169:10
longitudinal 198:12
long-term 64:19
look 10:4 11:8 16:18
22:17 52:4 54:3,17
55:2 79:7 81:25
84:11 85:21,22
88:15,18 91:20
92:7,25 98:12,13
98:15,16 99:13
104:9 106:15,17
109:1,5,6 110:3,5
110:7 119:20
123:24 125:18
126:1 129:8 153:1
153:8 154:9
159:20 162:7
168:9 174:15
180:14,15,16
184:14 191:1
197:15 198:9
206:12,14,15
207:12 215:6
218:3,4,5,8
looked 11:5 13:20
81:12 83:6 90:20
110:6,6 112:17
127:7 129:13
133:23 139:3,4
143:24 144:13
145:2,19 146:9

153:14 184:16
190:6 198:5,12
looking 28:22 77:2
82:15 85:15 86:20
87:1,5 90:13 100:7
103:4 107:10
110:2 112:7
133:12 134:2
153:4 155:18
162:18
looks 16:17 55:6
157:19 197:12
looseleaf 6:7
loquitur 21:22
lose 96:12,13 169:20
loss 198:24
lost 181:18
lot 26:21,24 35:9,15
59:19 74:16 164:2
164:24 168:22
169:4 171:3 176:1
176:2,4,4,21
211:21
lots 168:6 206:4
loud 29:1
low 114:21 117:8
138:18 139:18
146:3 166:1
194:12,14,16,20
203:19,19,20
217:23
lower 44:8,10,11
88:6 93:9 94:10
101:6 104:15
105:8 132:5
134:11,19 135:24
147:19 164:8,9
170:5 181:12
lowering 179:25
180:1
lower-wage 147:4
lowest 113:22
LOWRY 3:7
low-wage 85:20
94:14 140:23
146:3 202:16

loyalty 169:19 217:3
Loyola 26:13
LTV 35:24 36:11
59:23 60:2,3,3,21
61:13,18,22 62:5,8
62:11
lubricated 178:16
lunch 97:10,12 98:7
Luncheon 97:15
lying 188:21

_____

M

M 5:19 23:23
machine 170:16
175:14,24 176:22
176:23 177:2,6,6,9
178:3,6 214:6
machinery 175:6
machines 174:10
175:19,20,22
177:5,13 192:5
machining 187:13
machinists 205:10
Madison 44:14 78:7
78:7 108:24
109:14 118:4
Maiden 3:5
main 179:20
maintain 26:15
199:8
maintained 59:14
major 35:6,22
198:15
makers 195:6
making 17:2 31:8
55:9 63:2 71:24
117:9 167:11
179:3 186:19
206:11 210:23
220:22
management 7:15
7:18 9:20 10:21
31:16 114:4 119:3
119:16 120:9,25
132:14,15 159:6
162:4,9 188:11

214:16,17
**manager** 7:4 8:2
**managers** 12:18
83:4 88:7 120:1
138:19 164:3
**manager's** 7:22
**Manhattan** 111:19
**manner** 14:18 43:18
**manufacturer**
147:18
**manufacturers**
147:22,22,24
148:7 206:11
**manufacturing** 6:12
44:2,3 142:12,13
197:21,23 198:3
198:25 207:3,19
214:14,20 219:23
**March** 1:11 4:10,12
32:21 40:21,25
67:1,3,11,11,17
70:19 71:22
222:10
**marginal** 8:5,10
10:11,18,20,22
179:22,22,23,25
180:2,6,7
**Marion** 29:9 32:6,16
38:23 56:13,19
57:18 58:10 80:16
94:13 104:11,17
**mark** 166:11
**marked** 9:25 76:11
86:21 151:4
160:11
**markedly** 123:18
**market** 13:18,23
14:1,3 95:1,4,13
104:13 107:9,15
110:10 112:7
113:8 114:11
115:3 116:21
136:13,19,19
137:24 138:11,17
142:23 143:2,13
145:3 146:22

163:16 169:14,23
174:17 179:11
182:10 197:4
205:9 216:24
**markets** 136:23
137:2 205:25
**marriage** 222:14
**married** 25:22
**Martin** 161:19
**Maryland** 26:12
**mass** 168:25 169:9
**Massive** 200:15,22
**master** 172:9
**match** 84:8 108:18
**matches** 125:13
**material** 67:20
151:4 193:7
**materials** 117:20
193:5 221:7
**matter** 1:4 4:5 19:15
43:16 87:16
115:12 122:2
126:2,6 137:4
149:22 152:4
222:15
**matters** 116:12,21
137:17 191:5
220:8
**maximum** 137:25
138:11
**MAYER** 2:23 20:14
20:18
**Ma'am** 221:11
**McCall** 36:16
**mean** 30:3 43:24
103:15 110:24,25
115:18 134:20
162:17 180:13
181:6 188:16
189:10 196:10
201:23 202:18
211:20
**meaning** 8:18 71:2
181:11
**means** 66:13 69:25
76:18 116:3

120:10 124:18
156:24 164:7
167:22 172:20
213:11,24
**meant** 183:2
**Meany** 26:11
**measure** 21:23
91:18
**measured** 166:17
**measurements**
176:9 178:19
179:4
**measures** 19:1,4
91:11 92:3 107:7,9
205:7
**mechanic** 26:2,3,6,7
26:24 27:1,2,11,18
28:4
**mechanical** 27:7,12
**mechanics** 27:12
**mechanism** 120:10
**mechanisms** 119:17
217:1
**media** 148:19,24,25
149:1
**medical** 14:21
**meet** 13:15 41:11
62:18 67:10 140:5
170:22,23 203:12
**meeting** 18:19 38:12
38:18 39:5 41:2
42:22 51:13,15,17
51:23 52:20 53:5
53:13,16,19,22
54:10,24 55:15,17
55:21 56:8 57:11
58:4,8,9,10 62:14
62:17,23,25 63:3,4
63:8,13,14 64:2,6
64:8 70:20,22 71:5
71:10,22
**meetings** 29:8,10,14
40:4 56:12,20,23
57:9,13,20 58:22
59:16
**member** 161:23

**members** 24:12,13
24:15 32:3 34:9,20
37:13 39:2,7,9
43:19 47:3,17
**membership** 44:15
**memorized** 151:11
**mentally** 29:21 85:8
89:24
**mention** 35:4 184:19
188:5
**mentioned** 87:6
109:22 115:23
117:23 118:3
121:22 128:2
130:10 132:17
139:20 141:9
144:2 153:6 173:3
**merely** 44:5 189:22
**merged** 32:18,20,22
**merger** 49:23,25,25
50:3,6,7,17 59:12
**merits** 21:16
**message** 199:13
**met** 38:21 42:16,20
48:3 63:10
**method** 164:21
193:22
**methodically** 17:15
**methodology** 77:10
110:17
**metropolitan**
111:22
**Mexico** 147:5
**Michael** 122:5 223:3
**Michigan** 113:4
128:4
**middle** 87:2 102:8
151:4
**midpoint** 104:3,4
**mill** 25:6,19 26:6,6
26:24 27:1,2,9,10
27:12,17,19,21,24
28:4
**million** 5:3,3 13:13
14:12,13 17:22,23
22:20 72:16,21

73:3,4 172:20,21
**millions** 180:17
**millwrights** 27:4
**mind** 85:8 89:23
176:19
**mine** 33:20,22 34:1
**minimum** 115:5
138:17
**mining** 34:10 35:7
**minor** 168:9
**minute** 89:17 102:24
181:17
**minutes** 4:7 23:16
74:25 75:2
**mired** 215:16
**misinformed** 71:16
**mistake** 22:5,7
**mistakes** 117:9
**MIT** 161:9
**Mitchell** 33:2,10
**mitigated** 203:3
**mix** 93:21 158:4
**mobile** 96:11
**mode** 59:7 177:25
**moderate** 178:9
**moderately** 87:3
**modes** 167:20
**Modification** 14:7
**modifications** 22:15
56:10 68:19,22
69:5 72:9
**modified** 61:5,14,16
123:6 133:24
183:20
**modifying** 119:7
134:25
**MOERS** 2:23
**Molten** 28:6
**moment** 104:9
**Monday** 16:16
18:15 67:5,5
**monetary** 43:5
**money** 25:20 179:24
212:5,8,13,20
**month** 4:22 24:9
62:18

**months** 74:6 181:20
**morale** 97:4 117:8
117:13 132:5
**MORELAND** 2:24
81:2
**morning** 4:3,8 5:25
6:1 48:3 71:15
93:14 94:17
103:23 104:24
106:12 134:2
144:11 221:20
**mortgage** 98:18
**motion** 4:10,12,16
15:23,25 16:3,4,7
16:7 17:9 19:7,7,8
19:21 20:11,16,16
21:1 23:11,15
74:10 81:5 158:7
193:13,14 194:5
213:17,19
**motions** 17:9
**motivated** 95:22
98:12 164:5 165:5
218:19,25
**motivation** 167:18
169:2,18
**motor** 80:8,24 81:24
83:10,17,20 84:10
84:15 85:5,6,19
90:4 91:2,4,9,12
91:14,19 92:3,18
94:4,7 99:1,6,12
100:17 101:16,19
101:20,24 103:10
104:16 112:21,22
121:5,8 122:25
125:18 137:13
139:14 145:14
146:25 147:2
154:13,20 159:15
160:3,7 161:9,13
161:14 163:18
191:5 192:4
**Motors** 212:24,25
213:1,5
**mountain** 76:19

**move** 11:25 13:8
30:9 78:9 79:18
106:9 107:6
112:10 130:9
149:2 157:5
162:13 163:2
169:1,9 194:1
196:6 203:22
204:15 208:9
**moved** 18:2 76:1
146:15 158:12
**movement** 199:24
200:24
**moving** 35:12
112:13 140:22
211:21
**multiple** 165:9
197:18
**Municipal** 118:17
**Murdoch** 21:25

<hr>

## N

**N** 2:1 3:1 4:1 23:23
23:23 98:1,1,1
158:23 223:1
**NAFTALIS** 2:19
**NAGLE** 3:7
**name** 48:2 77:17,18
77:22
**named** 21:10
**names** 77:14
**narrow** 216:6
**narrowed** 166:18
**national** 13:25 36:24
36:25 37:10,12,16
57:15 78:5 112:14
118:8 161:16
196:7 197:4,20
**nationalization**
198:13
**nationwide** 107:19
**nature** 16:12,13
125:25 164:17
**Nay** 14:9
**near** 59:5 179:4
203:6

**nearby** 196:19
**nearest** 83:23
**nearly** 134:12
**Neatness** 23:5
**necessarily** 115:18
130:14 134:20
208:16,25
**necessary** 13:12,16
14:6,10 15:4,8
17:18 20:8 22:16
22:22 29:15 36:8
40:1,6,7 46:24
47:13 58:1,13
180:20 181:4
**necessity** 15:3 23:6
**need** 90:13 98:13,17
101:16 141:13
160:13 169:1,6
170:22 174:8
176:2 177:15
196:23 197:1,1,11
197:17 205:12,13
207:12 210:17
**needed** 7:16 55:19
183:17
**needs** 16:18,20
87:17 98:15
132:21,23 170:22
205:7 218:19,24
**negative** 94:19,23
105:10 136:25
**negotiate** 18:14,14
20:4,4 46:21 61:5
**negotiated** 23:4 27:5
33:7,9 36:1,11,18
37:1,20
**negotiating** 40:5,21
48:16,17,22 137:7
137:14
**negotiation** 31:18
37:6 57:2 63:5
124:21
**negotiations** 18:11
18:12,16 20:7
31:10,13,22 33:5
35:6,9,16,24 36:15

36:23 39:6 40:1,14
43:9,16,17,25
45:23 46:14 49:9
62:9,19 65:22
66:18 68:10 112:8
**neighborhood** 72:21
**Neither** 6:14 70:17
**net** 211:16
**neutral** 125:23
**never** 72:4 118:24
177:11 213:7
**nevertheless** 213:19
**new** 1:2,10,10 2:6,6
2:22,22 3:6,6,12
3:12 4:18 9:3,17
10:10 21:7,9,11,16
21:17 22:1,11
35:10 75:16 76:1
93:10,12,13,15
94:13,20,23
102:19 105:2,8
106:4 108:6,11
110:21 117:7
124:24 132:3,22
132:24 157:19
158:5 167:12
168:8,20 170:7
171:4,4 176:16
180:2 181:11
212:7,7,16 218:14
222:2,4,8
**Newman** 138:9
**news** 148:19 219:16
**newspaper** 18:18
21:12,14 135:9
148:16
**newspapers** 182:4
**nickel** 73:11,23
**Nobel** 209:15,15
216:13,15
**noise** 170:24
**nominated** 36:3
**nonunionized** 19:2
**non-automotive**
174:22
**non-expert** 135:13

147:6
**non-hourly** 12:17,20
**non-supervisory**
84:20,25 85:16
88:1,4,5 90:22
100:20
**non-union** 14:20
15:2 17:21,25 18:2
18:5 87:7 112:9
**non-willful** 132:8
**normally** 8:2,3
**north** 22:24 80:8
109:13 142:3
146:16
**northern** 146:4
**Notary** 222:7
**note** 3:4 81:14 86:3
112:25
**notebooks** 47:23
**noted** 221:23
**notes** 184:2,12,12,15
189:23,25 193:2
**notice** 83:20 85:6
86:12,20 90:7,23
91:16,22 99:22
101:2 110:6
**notified** 29:10,13
**noting** 176:10
**notion** 13:25 14:17
**notwithstanding**
134:22
**November** 24:8
51:13,22 52:5,9
53:5,13,19 54:7,24
55:15
**number** 25:5 36:19
44:3 50:22 52:5,15
72:18,22 79:10
80:10 84:4 85:8,9
85:10,14 87:6,7,10
89:10 93:18 94:5,6
97:6 99:20 101:5,5
101:13 109:3
116:20 129:11
136:2 149:10
154:6 155:24

157:24 161:21
165:8 168:14
171:17 180:16
187:11 192:19
204:12 205:1
**numbers** 55:2,6,8,12
87:14,17,23 94:19
105:5,9,22 106:1,2
134:10 139:10,18
139:19 155:15,15
155:25 156:4,9,15
156:20
**numeric** 117:3
**numerical** 94:1
**numerous** 110:14
114:24 115:6
**Nummi** 212:23

---

**O**

**O** 1:14 4:1 23:23,23
75:8,8 98:1,1,1,3,3
**Oakland** 113:4
**oath** 64:18,20
120:22
**object** 29:25 39:22
52:16 81:3 106:19
131:10,13 220:7
220:16,17,18,22
**objected** 59:2
**objection** 4:15 12:9
39:14 44:23 46:3
53:8 79:20 81:20
144:20 150:17
157:7 162:16
172:1 180:23,23
186:20 188:14
195:23 199:18
217:9 220:6
**objections** 4:13
**objective** 174:3
188:15,25
**objectives** 23:2
**obligated** 22:15
**obligation** 62:8
**obligations** 8:21
**observation** 198:17

199:17
**observed** 152:1
**observing** 175:5
**obtain** 17:17 193:24
**obtaining** 6:19
**obvious** 68:13
**obviously** 27:20
39:9 69:25 81:14
91:1 100:6 111:10
134:16 147:15,23
148:23 180:17
220:3
**occasion** 24:17
30:24 40:20
206:15
**occasionally** 27:24
**occasioned** 34:11
**occasions** 78:1
**occupation** 107:20
107:21,24 109:18
110:7 111:20,21
111:21 139:4,12
144:4 205:14
**occupational** 101:10
107:11 113:12,14
114:10 139:12,17
174:16 175:10,12
178:4
**occupations** 100:24
100:25 101:3,3,6
113:19 128:21
**occur** 56:23 131:25
**occurred** 56:12,21
62:14 198:11
199:14
**occurs** 31:10,11,17
**October** 219:16
**OEMs** 148:12
**offer** 52:14 150:15
219:25
**offered** 29:14
**office** 7:21 24:9
127:4 174:23
175:2
**officer** 16:11 187:24
190:3

**officers** 187:21
**officials** 173:16
  181:22 187:11,19
  213:8
**offset** 172:25
**offsetting** 212:10
**offshoring** 202:2
  204:10,19
**off-the-record** 71:7
  71:8 72:2
**Oh** 41:4 61:24 70:5
  184:14 192:23
  209:14
**Ohio** 2:13 26:11
  35:17 94:13
**Oil** 32:19
**okay** 8:1 10:16
  23:17 31:3 34:1
  38:10 45:15 50:3
  56:6,23 58:3,17
  60:21 61:11 63:13
  70:2 71:16 73:21
  75:4 82:4,11 90:24
  91:24 104:19
  107:25 111:15
  119:2 121:22
  123:12,17 126:10
  126:15 127:16
  128:2,17 129:7
  130:9,13 131:6
  133:4,21 135:11
  136:12 137:6,18
  138:25 140:5,16
  141:4,23 142:16
  143:6 144:1,12,16
  144:22 145:6,17
  145:19 146:9
  150:14,19 151:7
  152:16 153:6,15
  154:1,3,19 155:5,9
  156:3,12,17 158:9
  160:17 174:6
  182:6,17 183:4,7
  183:10,21 184:15
  184:20 185:11
  186:3,4 187:5

188:10 190:2,10
  190:14 192:17
  194:6 195:1 196:6
  197:19 198:12,17
  199:23 201:23
  202:6 204:1
  205:17 206:16
  209:3 210:1 212:2
  213:22 221:15
**old** 35:7 36:22 37:16
  176:17,17
**older** 96:8 109:1
  115:16,24 123:1
  156:23 177:5
**once** 8:20 55:20
  74:14 109:24
  110:18 118:15
  127:5 152:15
  177:10
**ones** 7:9 48:21 87:15
  87:16 94:14
  113:12 121:3
  132:2 154:17
  165:3 166:10,11
  217:24
**one-for-one** 117:13
  130:14
**one-sided** 209:12
**one-way** 22:3
**ongoing** 69:25
**on-time** 165:12
**op** 121:3
**OPEB** 14:13,14
  17:22
**opening** 19:6 33:17
  199:5
**openings** 7:7 19:13
**operate** 44:19 80:6
  175:19,20,22
  177:4 192:5
**operated** 192:8
**operates** 146:22
**operating** 62:24
  137:19 178:15
**operation** 35:15
  164:14 174:10

175:23
**operational** 172:14
  203:20
**operations** 16:20
  36:3 37:8 140:23
  172:25
**operator** 111:22
  175:15 178:3,6
**opinion** 31:2,4 80:23
  81:22 94:25 96:1
  121:14 123:20
  126:4,8,9,19,23,23
  163:14 184:3,23
  185:1,2,13,16
**opinions** 126:4
**opponents** 17:9
**opportunities** 96:5
  190:24 191:17,17
**opportunity** 29:14
  43:19 63:5 69:25
  106:15,17,17
**opposed** 14:1 98:10
**opposition** 23:14
**order** 4:16 5:10,12
  5:13 13:25 14:25
  15:3,10,12,15,18
  15:19 16:19,21
  19:9,10,18 89:8
  96:9 101:18 140:1
  143:9 168:24
  199:8 219:4
**organization** 137:21
  137:25 138:12
  162:8
**organizational**
  159:14,16 162:14
**organized** 32:17
**organizing** 47:8
**original** 42:8 62:22
  71:3 72:8 103:12
  103:17 147:21
  148:7 167:10
  183:25 206:11
**originally** 7:6 32:17
  63:14 64:21
**Ormetaluminum**

35:13
**Ormetluminum**
  35:11
**outcome** 41:16 42:7
  43:14 130:18
**outlined** 219:3
**output** 8:18,19,25
  116:7,18,20,24
**outside** 202:7
**outsourcing** 147:3
  201:14,16,23
**outstanding** 26:20
**ovens** 179:4
**overall** 11:21 17:11
  162:7 196:24,25
  197:12
**overcapacity** 206:17
**overly** 149:16
**overruled** 81:20
  186:20 195:24
**overseas** 147:4
  211:22 212:17
**oversee** 32:11,11
**oversupply** 205:4,21
**overview** 111:2
**oxygen** 25:5 28:5
**o'clock** 97:13 221:22

**P**

**P** 2:1,1 3:1,1 4:1
  75:8 98:3 158:23
**PACE** 32:18,20,20
  32:21 49:23 50:1,3
  50:8 59:12,14
**page** 10:2,6 33:13
  79:7 82:18,19
  85:22 90:2,3,3,20
  96:16 99:14,15
  102:2,5 111:25
  112:3 113:24
  116:4 119:24
  124:7 129:19
  130:3 138:8,10,16
  150:22 151:2,3
  152:18 155:9,10
  155:17,19 158:25

184:11 191:14,20
192:10 194:18
197:7,15 198:1
200:13,18 204:17
208:21 215:25
223:2
**pages** 33:17 77:2
160:25
**paid** 8:20,21 9:1
11:9 80:3,18 84:22
108:15 157:12
167:19,20 171:21
183:2 189:9
220:15
**pain** 59:19
**panels** 174:23 175:3
**paper** 5:12 13:10
21:2 30:25 76:19
86:7 110:22 137:4
**papers** 14:25 16:9
19:12 20:25 21:1,5
121:7 160:6
**Paperworkers** 32:18
**paragraph** 28:21,25
28:25 30:2 33:11
33:15 34:5,7 50:20
51:12,22 53:12,18
55:14 56:2,2 62:12
80:5 101:13 102:2
113:24 116:5,5
123:16 124:9,13
126:10 151:1
152:18 155:19
161:8 182:21
210:5
**paragraphs** 39:20
**parallel** 220:1
**part** 7:23 19:15 28:7
31:1,2 32:23 34:6
35:11,15 51:11,24
57:2,7 62:25 83:13
109:11 130:10
135:14 144:12,13
146:3,4 147:25
149:24 151:13
153:7 158:7

161:14 165:10
166:7,8 167:6,8,10
167:22 169:16
170:22 174:6
178:18,19 182:3
184:3 188:17
194:8 198:24
200:8 206:14
208:11,12 210:19
216:17 218:2
**participant** 13:19
**participate** 38:10
**participated** 40:14
47:5
**participating** 40:20
**participation** 36:2
**particular** 56:21
59:23 95:4 99:25
113:18 115:17
116:5 123:24
137:13 140:8
151:25
**particularly** 14:19
34:8 85:9 125:2
135:12 165:3
175:5 177:17
203:4
**parties** 41:10 46:10
62:18 124:19,23
222:14
**partly** 134:5
**partner** 74:23
199:19
**partnership** 36:1
**parts** 6:3 11:6 80:8
80:11,18,25 81:24
82:8 83:7,11,17,20
84:10,15 85:5,6,19
90:4 91:12,19 92:3
92:18 94:5,7 99:1
99:7,12 100:17
101:16,24 103:10
104:16 108:6
109:13 112:21,23
121:5 122:25
125:18 139:14

145:14 154:13
159:15 160:3,4,7,8
161:5,7 162:15
163:15,18 165:1,6
165:22 166:10
167:2,18 169:5
171:12 172:20,21
175:25 176:9,10
177:8,18 178:16
178:17,18 179:1
188:18,18,23
189:14 191:5
192:4 195:3,6,10
197:3,4 199:25
200:3,9,25 201:2,5
202:3,7,10,24
203:4,6 204:4
205:21 206:1,2,2,3
207:13 214:3
217:4 218:17,23
**part's** 177:19
**passage** 94:20
**passive** 136:10
169:19
**pattern** 112:10
**PAUL** 223:7
**Paula** 75:7
**pause** 34:2 47:25
89:17 160:16
**pay** 5:3 10:25 80:1
85:17 88:3 93:14
93:21,24 94:10
95:20 97:3,3 98:18
98:18 103:19
107:10 108:21
109:2,5,6,10,12,15
109:24,25 111:8
111:17,20,23
112:6,9,11,16
113:5,14 114:25
115:8,19 116:2,11
116:16 124:16
135:21 136:3,9
137:8,10,18,19,21
138:17,18,20
139:5 140:4 141:6

143:8,9,16,24
151:21 152:2,4,8
157:24 162:6
163:16 164:3,8
165:21 166:24
169:23 170:2
179:10,15 180:19
181:3,8,23 196:12
217:24
**paying** 4:22 59:8
94:25 95:10,13
143:15 172:12
190:21 196:15,19
219:5
**payment** 5:4 14:12
**payments** 170:3,3
**pays** 169:14,20
179:17
**pay-setting** 108:20
112:13 113:17
**Pedro** 2:9 4:8
**penalties** 167:3
**pending** 48:23
193:20
**penny** 79:12 90:8
**penny-wise** 164:8
181:23
**pension** 68:19 72:9
156:24,25
**pensions** 98:20
**people** 29:20 31:22
31:24,25 84:22
93:12,13 96:13
132:22,24 170:5
187:18 188:1,8,21
205:11 206:4
**percent** 4:25 13:14
59:13 83:2 84:15
85:17 88:8 91:10
91:13 94:9,12,12
94:22 101:5,7,11
101:12,21 104:7
104:17,17,18
150:3 158:1 172:8
208:5,6
**percentage** 85:12

94:18 104:12
105:22 165:12
**perfected** 164:22
**performance** 159:19
162:10 189:18
**performed** 108:3
**period** 7:12 48:17
58:22 146:6
169:11
**periodically** 127:4
**permission** 127:19
**permit** 19:9 35:17
**permits** 19:17
**persist** 146:5
**person** 7:17 71:22
91:7 110:19
122:12 162:12
**personal** 32:1 126:9
173:18,24
**personally** 31:23
35:5,18,19
**personnel** 155:3
**perspective** 57:2
132:11 139:25
214:10
**pertained** 103:23
**pertains** 84:20
**perusing** 191:21
**per-capita** 73:24
**per-employee**
156:25
**Pete** 5:22
**Peter** 3:15 75:5
**phenomenon** 208:16
208:23
**Philadelphia** 106:18
**phone** 187:11
**phrase** 168:12
**phrasing** 183:24
**physical** 127:12
185:25
**physically** 29:21
185:20 196:8
**Ph.D** 75:22 128:5
159:23,24 160:1
**pick** 95:10 180:2

196:8,10
**picture** 38:14
170:13
**pictures** 190:5
**piece** 21:8 36:22
190:16,17 192:1
209:11
**pieces** 17:10 190:18
192:2
**pipefitters** 27:4
**Pittsburgh** 62:14
**place** 19:2 32:9
55:23 57:10,11,13
96:10 164:10
165:17 167:14
**places** 21:2 80:7
165:16 169:2
203:23
**plan** 35:12 68:19,22
72:9,10 165:10
**planned** 64:21,25
65:1
**planning** 59:4,18
**plans** 15:15 74:7
156:24
**plant** 7:4,22 8:2
12:18 28:2 30:19
32:6,6 33:1,2
37:16 86:9,17
113:5 137:14,14
157:14 164:18
166:9 173:20
174:1,4,22,24,25
175:1 177:16
181:16,20 187:11
189:15 197:9
212:23,24,24
213:4
**plants** 12:15,16
22:24 35:14 36:8
36:12,14,17,25
37:10,12,13,15
43:20 54:19 56:9
56:13 62:1,2 68:3
69:20 72:20 80:14
80:17 81:4,8,11,12

81:16,18,25 82:2,3
82:7,9 88:17 92:8
92:25 94:3 95:19
96:2 104:10 112:9
112:9 113:1
115:10 121:19,21
133:9,10 140:19
141:17 153:4,5
157:3,4 160:8
162:8 165:8
171:17 173:4,4,10
173:13,19,25
186:4,6 187:9,12
187:13,16,19
188:24 190:11
198:3 199:2,4
203:6,6 212:16
213:3,7,8,15,23
214:3
**plant-by-plant**
157:1
**plastic** 174:23 206:2
**play** 32:7 117:15
**please** 4:2 21:24
28:24 33:11 38:2
42:5 45:3 60:19
82:14 88:22 93:4
123:25 150:5
155:11 159:8
186:17 201:19
**pleased** 23:21
**plus** 98:25 116:11
172:10
**point** 20:25 23:13
25:13 29:22 44:11
47:2 58:15 59:6
64:8,9 65:6 72:24
73:9,11 74:22 78:8
78:16 80:21 86:3
92:6 129:23
145:18 162:9
166:8 172:16
179:8 198:15
203:22 208:3
212:23
**pointed** 112:5 135:7

**pointing** 21:24
205:24
**points** 200:14,21
**police** 108:11
**policies** 34:11
159:17,18,20,21
203:8 210:11,16
210:17
**policy** 112:6 152:23
153:1,5 165:2,14
165:15 167:16
182:24 210:8
211:4,24 212:1
**pool** 138:18
**position** 17:24 24:3
31:14,15 50:15
59:9,14 76:3
**positions** 31:9
160:22
**positive** 141:14
**possible** 72:7 84:8
84:11 108:19,22
140:1
**possibly** 13:15
**Post** 21:9,11,17
148:20
**posted** 7:6
**post-order** 15:17
**post-trial** 19:15
**potential** 37:1
**Potok** 46:18
**Pottstown** 80:16
81:4,8 82:2 92:16
92:19 104:6
**pound** 188:17
**pounds** 178:17
179:1,1 188:17
**pound-foolish** 164:8
181:24
**power** 15:22 35:17
166:18
**PowerPoint** 54:7,9
**PowerPoints** 54:16
**practical** 120:24
**practicing** 48:6
**precise** 99:11 107:24

117:3 130:21
140:13 144:5
147:7 156:1
178:19 179:3
184:18
**precisely** 97:6 129:7
129:23 148:15
**preclude** 193:15
**predecessor** 36:15
**predicated** 170:4
**predict** 97:5 130:18
**prefer** 71:7 84:7
**preference** 78:18
**premium** 151:15
165:17 169:2
**preoccupied** 170:6
**preparation** 40:19
80:13 81:19 184:3
**prepare** 28:14 81:10
128:6 176:8
183:15
**prepared** 4:17 14:25
23:14 122:19
123:8 129:19,20
221:19,20
**preparing** 11:4
173:8
**presence** 58:13
**present** 4:7 23:14,22
53:22 81:13 89:8
99:8 100:3,4
102:13 142:13
153:3 182:10
**presentation** 13:4
14:24 172:17
**presented** 16:15
54:9 55:17 133:17
**president** 32:13
134:5 161:20
181:21 182:4
**presidents** 161:20
**press** 164:19
**pressure** 19:24
175:3 191:8
198:22 202:15
203:9,22

**pressures** 147:21
203:12
**presumably** 30:15
95:5 135:16
**pretty** 12:21 60:20
74:15 92:4,22
127:8 154:17
**prevent** 164:10
**preview** 67:25
**previous** 138:9
**previously** 5:19 98:3
167:23
**pre-petition** 62:6
**price** 138:1,13
168:23 179:25
219:2
**prices** 136:14,21,24
148:3,13
**pricing** 179:24
180:7
**primarily** 25:9 35:8
45:17 62:25 98:8
**primary** 38:9 77:11
160:7
**principally** 46:17
**principals** 109:18
**principle** 180:6
**principles** 39:6,8
**prior** 4:14 24:16
35:24 42:20 50:7
74:9 122:21 153:2
193:15
**private** 6:11 11:3
83:7,7,25 85:13
107:11 108:13
109:17 115:18
124:21 125:15
140:11 143:8
**Prize** 209:15 216:13
216:15
**Prizes** 209:15
**probably** 39:22
48:14,25 66:17
69:1 76:16 84:4
126:7 152:9 204:3
**problem** 33:21 38:3

120:25 132:4,17
133:4 167:25,25
170:1 172:22
173:7
**problematic** 213:1
**problems** 35:13
39:11 44:6,8,9
95:16,23,25 96:11
107:18 133:25
164:25 169:4,6
170:25 177:24
**problem-solving**
30:19
**procedure** 112:14
112:14
**proceed** 34:3 43:18
**proceeding** 28:14
37:23 40:15 65:24
66:19 77:24
149:21 162:1
**proceedings** 34:2
47:25 48:19
160:16 222:9,12
**process** 27:8 36:17
47:11 57:2,4,7
63:2 125:3 137:7
174:9 201:24
**processes** 168:5
173:20 187:12,15
214:15,21
**processor** 122:20
123:9 183:22
**produce** 130:14
147:11,13 167:18
175:4
**produced** 37:7
47:17 127:13
193:2 220:25
**producers** 147:3
196:5
**produces** 116:15
**producing** 83:8
84:16 85:18
**product** 83:15 85:5
130:8 135:17,19
136:17,19,23

137:2,24 138:11
148:8 166:2
168:20,20,24
176:4,4 218:8,12
**production** 28:6
83:4 84:20,24 85:1
85:16 87:25 88:4,5
88:10 89:3,20
90:22 98:25
100:20,24 101:2,6
131:23 155:15,21
163:20,22 164:18
164:20,21,22
165:7,14 168:5,25
169:10 171:21
174:17 175:9
176:6 181:13
183:8 191:7 192:3
202:10 206:17,17
**productive** 37:7
95:24 134:12
206:16
**productivity** 36:20
37:17 95:19
116:17,19 117:9
119:6,11,17 120:1
120:4 121:3 131:5
132:1,7 134:15,18
134:18 137:15,16
203:21 204:2
208:4,19 213:1
216:9
**products** 138:21
147:10 165:24
166:4,15 168:9
171:4,5 218:14
**profession** 122:13
149:13
**professional** 160:22
**professor** 9:21 12:14
70:6 75:15,24,25
78:12,24 87:6
88:24 89:12,19
93:23 97:8 99:17
103:12,23 106:14
107:5,6 110:6,20

114:17,20 122:5,9
122:11,16,23
123:2,4,23 126:2
127:24 128:2,4,10
129:3,12,19,21
137:4 139:3,16
144:3,8 145:2
149:9 153:20
154:8 156:19
159:9 160:14,18
162:14,18 163:14
171:16 175:18
182:7 183:18
195:13 216:18
**professors's** 120:21
**profit** 17:17
**profitability** 37:14
37:18 153:13
168:10 218:14
**profitable** 36:8 37:7
43:20 181:18
**profits** 62:10 168:19
171:19
**profit-maximizing**
134:21 179:22
**program** 161:10
211:15
**programs** 210:14
211:2
**progressive** 34:17
50:24 51:4,8 59:21
**prohibited** 124:20
**project** 129:3
**projects** 185:7
**promised** 162:6
**proper** 9:14,16 17:6
22:11 43:17
107:14 196:22
**properly** 8:23 40:10
**proponents** 152:10
**proposal** 41:15 42:6
42:8,9,17 43:8,12
45:11 46:8 48:13
48:23 49:6 51:23
55:15 64:3 66:4,9
66:16 67:17,21,24

68:1 71:1,2,3,4,25
72:5 73:7,13,22
74:2,8 81:8,15
93:7 114:9 180:20
214:8
**proposals** 20:5 29:8
30:25 43:3,14
49:15 53:22 60:4
61:19 63:6,6 69:17
70:22 71:11 72:8
94:13,17 96:3
**propose** 22:15 57:4
68:14,17
**proposed** 14:7,8
43:6 48:13 51:6,8
57:5 65:11 69:4
70:7,13 71:1 72:11
73:14 74:14 78:13
94:1,8 103:8,13,18
104:5,12,14,20,23
106:1 157:20
158:3
**proposes** 67:3 212:1
217:24
**proposing** 59:21
67:10 93:24 94:10
157:24 180:20
181:4 211:20
**proposition** 211:23
**proprietary** 21:12
**protected** 34:20
**protection** 195:7
**protections** 35:23
**protective** 174:8
**prototype** 168:24
169:9
**proven** 37:5
**provide** 15:9 20:15
29:8 51:23 61:18
62:10 147:10
157:22 193:5
217:6
**provided** 6:5 11:16
52:9 53:2,4 54:23
66:5 117:23,25
118:24 121:24

122:23 183:12
**provides** 10:23
15:11 68:9 124:18
**providing** 8:4,8 9:4
9:18 42:25 128:7
**public** 100:8 108:6,8
108:9,11,14,14
109:17 124:18
125:11,12,13,16
222:7
**publications** 77:3,4
77:7 128:8 160:23
161:1,2,4
**publicly** 18:19
125:23 140:12
**publicly-available**
82:16 154:7
**publish** 125:17
**published** 76:6,8
111:11 121:7
**pumps** 27:15
**purchase** 37:10
**purchasing** 203:8
**pure** 22:16 157:9
172:1,4
**purport** 56:5
**purported** 56:3
**purpose** 39:3,4
42:24 53:21 55:15
62:22 63:8
**purposes** 9:2,17
13:10 15:19 55:17
81:9 93:16 113:17
117:21 121:14
142:25 184:16
**pursuant** 4:23 13:8
**pursue** 41:17
**push** 170:16
**push-back** 204:12
**put** 16:10 17:11 19:2
26:8 41:1,15 43:14
52:12 55:21 63:19
77:21,22 97:6
120:5 122:19
125:6,8 126:11
129:3,4 136:11

172:2 178:12
185:2,6,8 206:1
221:7
**putting** 19:24 123:8
**P&L** 9:7
**p.m** 97:15 98:2
221:23

## Q

**qualification** 78:9
95:6
**qualifications**
123:16
**qualified** 95:15
138:18 162:14,17
180:25 181:9
197:1
**qualifier** 194:25
**qualities** 166:14
**quality** 95:11 96:7
125:25 135:17
147:14 163:21
164:25 165:23
166:1,4,14,17,22
167:15 168:10
169:13 173:7
176:6,8 177:24
181:12 191:8
207:23 213:1,3,4
217:25 218:5,15
219:3,4
**quantitative** 22:17
121:1
**quarrel** 69:1
**quarter** 13:14 83:1
86:13 99:19
**quarterly** 82:25
86:12 112:18
**question** 8:15 9:9,11
9:13,15 10:5,14,19
12:15 52:10 55:20
58:5 64:14 65:21
70:16 72:3,25 74:5
81:21 84:24 85:10
87:19 88:1,23
101:10 114:12

120:9,14,17,25
129:16,18 131:11
131:14 139:11
151:20 153:9
185:5 187:3
189:11,12 191:9
191:13,15 192:10
192:12,25 193:20
194:4,17,19 196:9
196:13 197:6,8,16
197:25 198:2
199:7 200:14,20
200:21 201:1,4,7
204:16,18 206:6
208:22,23 209:7,8
209:18 211:12
213:19 214:19,24
215:3 218:21
**questioned** 12:2
**questionnaire**
190:11
**questions** 9:8 11:24
34:6 47:21 68:1
74:17,19 88:21
119:19 120:6,20
130:11 139:21
149:22 158:11
174:2,4,11,12
182:1 186:24
188:16,25 189:4
199:8,9 200:13
213:20 219:8
**quicker** 169:8,8
177:23
**quickly** 30:7 164:12
165:1,18 168:1
213:2
**quit** 6:2,5,11,12,23
7:12 115:17,22,24
116:1,2 128:17
133:3 153:6,7,8
169:25 181:9
194:12,14,16,20
**quite** 36:18 83:16
84:19 91:25 94:14
166:20 168:25

173:3 176:3,16,17
177:17 198:9
199:7 203:4
204:14 214:13
216:7
**quote** 130:21 203:16
219:19,21 220:2
**quoting** 22:1 186:10
186:13

**R**

**R** 1:14,15 2:1 3:1,17
4:1 5:19 23:23
98:1 158:23 222:1
**rage** 104:3
**raise** 134:7 136:14
136:21 139:10
142:17 144:19
**raised** 16:8 19:12
78:16
**raising** 136:24
143:12
**range** 95:3,5 102:8,8
102:10 104:4
**rarely** 108:13,13
**rate** 6:5,11,12,24
93:9 95:24 115:17
134:14,19,20,21
157:13 170:11
172:15 190:15
194:16 200:10
212:25
**rates** 6:2 22:24
109:15 115:22
116:2 128:18
135:25 136:7,25
141:24 153:6,7,8
172:20,23 194:12
194:15,20 200:2,5
200:9 201:2,5
209:11
**ratify** 68:8
**ratio** 88:3,7
**rational** 34:18
**reach** 31:14 37:9
44:11 66:20 186:9

186:16
**reached** 37:1,8 41:7
82:13
**read** 10:17 18:18
21:8 28:25 29:1,2
33:14 34:5 43:2
47:18 55:8 79:9
107:7 123:4
126:21 127:5
134:3,17 137:12
148:11,21 151:10
151:12 152:13,15
176:7
**reading** 13:15 19:14
101:4 120:8 130:2
138:2,2,4 164:18
207:22
**reads** 135:8
**ready** 18:13,14 20:3
20:4 29:20
**Reagan** 161:20
**real** 37:17
**realities** 36:7
**really** 28:6 35:20
40:7 58:15 62:17
66:17 84:19 85:10
86:4,23 91:3 94:14
103:21 112:19
116:12 120:12
125:18 126:6
130:7 137:17
139:3 141:15
146:17,19 148:10
149:9 153:22
157:1,2 176:25
177:13
**reanalysis** 144:16,24
**rearranging** 44:5
**reason** 11:3 29:16
30:4 61:9 71:17
98:16 99:5 124:24
127:12 140:13
152:6,12 156:18
169:19,21 181:21
185:20,25 195:8,9
195:15 203:6

214:22 218:11
**reasonable** 92:1,4
99:10 101:23
106:7 154:16
190:8 211:19
**reasons** 15:24 37:4
64:16 125:10
163:17 171:16
175:23 181:8
**rebuttal** 13:4
**recall** 6:21 13:3 41:2
65:14 71:24
129:23 171:11
**recalled** 18:15
**receive** 115:7,19
159:23
**received** 4:13 12:10
12:11 26:9 39:13
39:15,17 40:12
44:21,24,25 46:2,4
46:5 53:9,10 65:15
65:16 79:21,22
106:22,24 107:1,3
127:19 150:18,20
158:15 159:24
162:17 163:12
173:6 220:10,11
221:2,6 223:14,19
**recess** 23:17,20 75:3
97:15 158:20
**rechecked** 129:10
**recipes** 192:3
**recognize** 100:19,22
101:16 109:9
189:2
**recommending**
210:22
**record** 5:22 9:9,15
33:15 56:3 66:19
72:2,7 78:17
106:11 158:18,19
199:22 213:19
219:9 220:14,14
220:16,17,21
222:12
**RECROSS** 219:12

223:12
**red** 21:5
**redirect** 12:13 74:5
   216:1 223:4,11
**reduce** 74:8 96:12
   116:23 131:23
   148:13 165:11
**reduced** 4:24,25 5:2
   36:19 97:4,4
   130:20 131:9,21
   131:22 132:1
   133:1 135:5,11
   217:22
**reduces** 73:22 117:5
**reducing** 112:11
   130:13 180:4
**reduction** 14:8
   22:20 73:17,19
   116:22 130:14,19
**reductions** 19:1
   43:15 68:2 72:9
   73:7,14 74:15 93:8
   93:14 136:10
   148:8
**reenter** 17:5
**refer** 10:3 21:7 28:8
   42:6 76:10 99:3
   101:17 105:11
   110:21 111:25
   116:5 117:20
   154:25 184:11
   209:7 211:2 214:6
**reference** 21:6 50:20
   50:24 59:22 62:13
   80:20 194:2,3
**referendum** 24:14
**referred** 49:3 150:9
**referring** 42:10
   43:22 56:12,18,20
   80:15 102:23
   113:24 200:15,22
   202:5 203:15
   209:6
**refers** 82:20
**refined** 144:3
**reflect** 157:4

**refute** 71:22
**regard** 13:11 152:3
   152:4
**regarding** 104:23
   166:3 195:12
   219:23
**regardless** 180:12
**region** 197:23
**regional** 111:23
   145:6,20,24,25
   146:8,10,14 159:9
**regions** 50:1 202:16
**regression** 110:17
**reject** 19:10,18 21:1
   21:3 48:13 66:21
   166:8
**rejected** 19:22 66:9
   66:12
**rejection** 13:25
   15:10 19:8
**rejoinder** 20:21
**relate** 48:12 165:14
   165:15 167:16
   172:4
**related** 4:11 45:18
   95:21 195:10
   220:24
**relation** 81:3
**relations** 75:19 76:1
   132:15
**relationship** 100:23
   116:9 117:1,3
   120:3 141:10
   216:9
**relationships** 208:17
   208:24 209:5
**relative** 21:16 201:8
**relatively** 31:2
   112:11,16 115:10
   135:9 136:4
   194:20
**release** 145:14
**released** 100:8
**releases** 113:17
**relevance** 58:19
   110:12 111:15,16

112:2
**relevant** 13:18,23
   58:16 81:9 84:19
   85:9 110:10,22
   125:2 127:22
   130:23 133:19
   185:13
**reliability** 166:25
   218:5
**reliable** 219:4
**reliably** 218:14
**reliance** 151:4 193:5
   221:6
**relied** 11:19 150:11
**relief** 15:5 19:17
   20:12 55:19
**relocated** 198:4
**rely** 55:7
**remain** 95:23
   197:24
**remainder** 156:10
**remained** 217:19
**remaining** 115:15
   117:7 197:22
**remains** 45:21
   198:16 199:6
   202:11 203:6
   211:25
**remarkable** 172:22
**remarkably** 155:7
**remarks** 199:20,21
**remedy** 15:9
**remember** 42:18
   72:3 91:18 94:6
   130:11 148:15
   158:12
**remind** 138:7 214:2
**remnants** 144:11
**removal** 155:2
**rent** 4:24 98:18
**reorganization** 14:6
   22:16 180:21
**reorganizations**
   34:19
**reorganize** 61:22
**repeat** 218:21

**repeated** 17:8
**repeatedly** 43:1,14
**replete** 15:1
**report** 39:21 50:18
   76:10,21 78:24
   79:15 81:19 82:12
   87:7 88:25 93:3,23
   99:3 103:12,17
   107:7 110:20
   111:2 112:1 116:4
   122:8,16,19,21,21
   122:24 123:1,2,3,4
   123:8,12,14 125:7
   125:8 128:1,6,11
   129:8,9,12,12,15
   138:10 144:25
   145:5,7 149:19
   150:8,12 152:7
   153:18 155:12
   160:14 161:8
   162:19,22 163:6
   172:4 173:8
   174:21 183:16,25
   183:25 184:17,19
   188:5,6 192:24
   194:7 208:12
   209:23 210:2
**reported** 217:20
**reporter** 159:8
   219:21 222:7
**reporting** 59:8
**reports** 76:9
**represent** 9:25
   173:25 193:4
**representations**
   149:1
**representative**
   24:19 26:7 29:11
   30:21 33:8
**representatives** 29:9
   31:9 38:13 41:3
   56:24 57:9,14
   70:20 188:11
   189:2,7
**represented** 32:15
   58:12 143:16

representing 32:5
  38:22 48:4 49:8
  188:2
represents 100:21
  171:23
reputation 166:25
requested 19:9
  20:12
requests 56:10
require 176:21
  205:10 206:3
required 27:11
  100:11,11 114:4
  166:9 176:5 206:1
requirement 212:16
requirements 48:8
  113:20 166:19
requires 165:4
res 21:22
research 108:21
  111:11 121:4,10
  149:5 151:13,24
  161:9,12,15,16
  171:22 189:19
  193:25 204:9,18
  205:20 206:7,8
  209:4,11
researchers 161:11
reservations 63:21
reserve 20:14
  110:21 159:6
resource 114:4
  119:2 120:25
  132:15
resources 131:7
  132:11,12
respect 13:23 14:15
  14:21,22 17:20,25
  18:2,3,4,5,8,23,25
  19:2 20:22 32:8
  35:1 47:12 51:1
  65:11 66:4 68:2,19
  68:22 150:2,4
  217:13,14
respectfully 40:2
respecting 20:23

respects 31:17
respond 65:19
  106:18 122:16
  147:20 165:18
  203:17
responded 34:16
  50:25 65:25 122:8
  183:18
response 5:9 19:13
  65:20 72:3 81:11
  81:11 112:4
  130:10 139:20
  200:12 213:18
responsibilities
  32:11
responsibility
  173:25
responsible 46:17
  129:14 162:11
  176:9
responsive 194:4
  208:10
rest 188:21 210:10
  220:7
restart 36:14
restarted 35:15
restate 136:16
restated 10:14
  131:15
restructure 16:20
  140:18
restructuring 16:11
  17:11 35:12,23
result 44:17 49:20
  50:5 61:23 72:15
  73:13 96:2 131:21
  135:11 136:9
  143:19 167:2,8
  171:1 175:25
  181:12 192:25
  200:6,8 208:7
  212:23
resulting 8:22
results 18:13 73:2
resumed 5:20 98:4
retain 7:9 95:2

98:12 134:13
  138:18
retaining 133:14
  134:1 135:1
retard 136:8,20
retention 117:14
retire 29:20 59:4,6
  59:18 96:10
  132:25
retired 29:19 59:17
retiree 8:19 9:4,18
  10:25 14:5,12,21
  23:1,7 153:10
  179:16 180:4
retirees 8:5,9 9:5,19
  10:25 14:20,23
  17:21,25 18:1,2,3
  18:5,6 34:21 62:10
  179:17 180:10
retirement 59:7
  62:3 69:5 72:10
returns 44:10
revenue 164:3
  179:22 180:6
review 121:15
  122:15 144:15
  176:6 194:8
reviewed 110:19
  121:13 145:22
  146:7 184:3,12
reviews 55:7
revised 67:17
RICHARD 2:17
Rick 63:1
rid 211:14
ridiculous 70:23
  71:11,25 72:5
riff 59:10
right 16:7 19:7
  20:15 37:5 49:24
  50:4 51:2,4,10
  52:25 53:6,14,15
  53:16,19 55:25
  56:14 60:3,3,10,15
  60:22,24 61:25
  62:6,15 63:9 64:21

64:24 65:4,7,18
  67:6,8,9,12,24
  68:16,18 72:12,13
  72:14,16,21 73:4
  73:15,17,23 74:6
  74:13 77:21 79:8
  80:10 84:13 85:14
  89:6 92:11,16
  93:20 101:12
  118:4,19,22
  119:22 122:16
  127:22 129:25
  130:15 134:20
  139:22 140:2
  145:10 149:16
  155:10,16,22
  156:7,10 165:1
  177:3,4 183:16
  184:4,21,24
  185:14 186:6,11
  186:11 190:3
  203:24 205:17
  209:14,14 210:2
  212:8
rights 18:8 20:7
right-hand 94:5
rise 117:12 143:7
rises 115:5
rising 51:1
risk 28:23
road 196:14
Robert 2:15 48:2
Robinson 23:22
  24:1 28:8,13 34:6
  38:5 41:25 45:7
  46:19 47:4,20 48:2
  52:24 74:20 223:5
Robinson's 39:17
  40:3
Rochester 4:11
role 32:7,10 46:17
Ron 51:21 54:2
room 26:17 71:1
  168:23
Roos 214:7
Ross 36:13

**rotation** 171:5
**roughly** 4:6
**round** 36:10
**rounded** 79:11
  83:21,22
**rounding** 79:6
**rounds** 44:15
**routines** 212:19
**row** 85:15
**rows** 79:8 87:15
**rubber** 178:13
**rule** 13:8 16:7 72:10
  78:18 179:22
**rules** 68:25,25
  137:14
**ruling** 74:10 106:13
  220:18,19
**rulings** 58:19
**run** 35:17 140:8
**running** 36:17 37:13
  164:6,12 177:3,4
  177:10,10,14,20
**runs** 177:7,18
**run-of-the-mill**
  207:24
**Rupert** 21:25
**rushed** 204:13
**rust** 207:3
**Rutgers** 75:15 76:2
  76:4

—————————
          **S**
—————————
**S** 2:1 3:1 4:1 23:23
  23:23 75:8 98:1,1
  98:1,3 158:23,23
**safety** 25:3 30:22
  108:11 170:25
**salaries** 100:12
  164:4
**sale** 57:4,8
**sales** 116:20 135:12
**salesperson** 162:4
**sale's** 57:6
**sand** 18:21
**Sarco** 35:6,7
**sat** 36:15

**satisfied** 20:9
**satisfy** 62:5
**save** 73:10 149:21
  164:25
**savings** 17:7,15,17
  18:24 61:18 72:15
  73:2,13 212:9,10
  212:14,22
**saw** 17:12 101:20
  122:24 123:2,4
**saying** 30:4 72:3
  129:18,20 131:12
  152:3 195:18
  197:17 203:2
  214:1 216:14
**says** 10:9 15:20 22:1
  102:25 105:12
  138:16 150:23
  151:13 200:15,22
  209:13 210:10
**SBC** 159:9
**scale** 163:8
**schedule** 63:20
**scheduled** 63:13,15
  63:16 67:4
**scheme** 99:24
  191:24
**schemes** 151:16
**scholar** 186:9,16
**scholarly** 76:8 161:1
  161:4
**school** 25:16 26:9,13
  26:13 109:9,9,14
  132:14 159:5
**schools** 109:17
**scrap** 212:15
**script** 169:3
**seated** 4:2
**seats** 36:3
**second** 8:11,13
  22:17 83:1 85:23
  86:18 89:3 101:11
  156:3 163:20
  165:18 192:24
**seconds** 170:17
**secret** 108:16

**secretary** 36:14,15
  134:6
**section** 10:2 13:11
  15:10 19:8 48:9,13
  48:23 49:6,14 52:5
  53:22 55:19 60:4
  61:4 63:6 67:4
  72:8 81:7,15 93:1
  96:3 114:9 128:11
  128:13,17,19,20
  129:1 170:20
  180:20
**sections** 27:16 48:11
  128:7,13
**sector** 6:11 11:3
  34:13 83:7,7,8,9
  83:10,15,17,25
  84:1,5,7,12,16
  85:13,14,18 86:19
  88:11 90:18,21
  91:2,10,12,14 94:5
  99:9,21 101:15,17
  107:11 108:6,8,9
  108:14,14 112:21
  115:18 124:18,21
  125:11,12,15
  140:11 142:12,14
  143:8 145:12,13
  154:11,20 155:23
  197:21
**sectors** 83:19 142:12
  198:3
**secure** 35:17
**secured** 35:24
**security** 34:20 51:9
  69:8,15,17,24
  70:12
**see** 6:12 17:9 26:22
  43:5 51:25 76:22
  79:9 82:2,2,19,19
  84:2,13 86:14
  88:11 92:16
  100:12,14 104:4
  104:20 106:5
  112:24 114:16
  124:11 125:4

130:5 133:18
  151:7 160:19
  169:24 180:14
  182:24 186:8,16
  196:1 198:2,9
  202:12 204:7
  206:17 208:5
  217:1,2,3,23
  220:25
**seeing** 17:8 65:14
  204:12,15
**seek** 18:13 19:17
  120:15
**seekers** 134:10
**seeking** 15:8,17
  18:24,24 19:17,23
  19:25 21:1,2 61:18
  72:14 79:25 80:1
  181:1
**seeks** 15:10,11
**seen** 16:1 38:8 42:3
  44:7 45:8 52:24
  54:14,15,21 55:4,5
  55:11 133:16,21
  139:15 168:12
  177:24 187:13,13
  187:14 190:7
  199:24 214:4
**sees** 194:15
**segment** 151:7
**select** 22:15
**sell** 138:21 181:18
**send** 166:9
**sending** 202:2
**senior** 199:19
  210:14
**seniority** 115:15
**sense** 66:17 163:15
  190:20,23 191:16
**sent** 66:25 193:11
**sentence** 10:3 29:4
  55:14 56:21
  128:14,14 129:12
  152:21
**sentences** 33:14
  123:13,15

**separatable** 98:21
**separate** 27:14
  100:18 112:8,8,9
  153:9
**separately** 98:14
**separating** 110:15
**sequence** 42:18,19
**series** 91:21 120:6
**serious** 71:25 72:4
  97:6 215:20
**serve** 27:17
**served** 4:11 24:6,19
  25:4 77:23 161:25
  162:3
**service** 83:8
**services** 118:24
  138:1,13 164:2
**serving** 24:16
**session** 40:21
**sessions** 40:5
**set** 14:2 16:23,23
  17:14 23:16 39:5
  55:12 63:9,19
  64:25 65:1 79:15
  82:25 83:11 99:19
  109:8,11 112:6
  137:20,25 138:11
  138:17,18,20
  150:6 175:22,24
  180:6 192:5
  222:19
**sets** 6:14 11:18
  108:5 155:14
**setting** 10:19 29:7
  112:9 137:18
  190:15 191:23
  194:7 212:16
**settings** 140:3
  216:20
**settlement** 14:11,24
  17:21,22
**settling** 124:18
**setup** 174:10 175:22
  176:5
**seven** 172:23 187:10
  188:7

**severe** 168:25
**SHANNON** 3:7
**share** 19:3 62:23
  134:23 205:20
  208:2
**Shaw** 2:17 63:1
  70:21
**shed** 34:25
**shelf** 185:8
**shift** 178:18 179:2
  188:18,19 189:14
  200:15,22 201:9
**shims** 171:1
**shining** 37:17
**ship** 203:5
**ships** 166:7
**shop** 173:22,23
  176:21 178:12
  182:5 217:8,20
**short** 20:15 25:18
  56:8 74:25
**Shorthand** 222:6
**short-circuit** 125:3
**show** 9:6,24 83:11
  85:12 92:4 93:3
  105:21 111:3
  141:20 154:13
  160:11
**showed** 145:7
  157:16
**shower** 170:7
**showing** 20:8 35:24
**shown** 167:7
**shows** 83:18 85:4,15
  86:18 93:5 94:9
  103:6,8 105:19
  106:2 112:1 156:6
  172:19 193:8
**shrink** 204:3
**shut** 35:14 36:12
  181:15,20
**shutdown** 36:13
**shutdowns** 33:6
**side** 31:13,17 71:6
  87:8 120:18
  197:15

**sides** 31:9 37:19
  70:22
**sight** 171:3
**sign** 31:15
**significance** 42:11
  176:18 218:18,23
**significant** 37:14,20
  170:2
**significantly** 219:3
**Silver** 26:12
**similar** 35:13 94:11
  109:25 122:24
  133:2 183:17
  187:12 190:8
  207:4 211:19
**similarities** 123:5
**similarly-sized**
  88:18 103:11
  104:15
**Simon** 3:9,13 5:23
  13:7 16:8 18:12
  20:17,20,21 21:13
  21:15,21 60:10,11
  60:19 148:18
  199:11,17 221:13
**Simon's** 16:3,4
  20:11
**simpler** 192:10
**simply** 44:8 78:17
  87:23 89:23 90:18
  99:7 123:3 134:19
**simultaneously**
  152:10
**single** 27:7,7 205:9
**sir** 13:1 24:1,7 26:17
  28:3,8 31:20 54:3
  55:1,10,13,16
  57:13 58:5 59:10
  59:20 60:16 61:3,8
  62:12 65:7,9 70:19
  71:9 74:1
**sit** 60:19 69:22
  130:17 186:21
**site** 127:17,19,21
**sitting** 30:24 70:2
  111:18 170:15

**situation** 62:8 64:17
  106:14 108:2
  125:14 197:12
  206:20 213:9,24
**situations** 35:5 44:7
**sixty** 72:22 188:23
**size** 85:25 86:1,3,4,5
  86:8,8,10,11,14,16
  86:19,21,25 87:5
  88:11 90:14,15
  92:1,5,19 94:7
  99:21,23,25
  101:25 107:21
  109:9,19 110:11
  110:12,13,15
  111:3,4,5 113:10
  128:11 139:6,9
  141:10,11,14,15
  147:7 150:10
  151:15 152:4
**skeptical** 36:5
**skill** 95:21 113:19
  113:25 114:3
  165:17 167:18,19
  169:2,16 175:11
  176:5 205:14
  217:4
**skilled** 84:25 89:2
  93:8 95:15,21
  98:12 113:23
  132:18 133:4,6
  135:1 157:13
  164:5,9 165:5
  170:10 175:23
  181:9 218:19,24
**skills** 26:8 95:6
  177:15 191:1
  205:25 207:13,22
**slightly** 164:8
  170:21 175:8
**slow** 159:12
**slowed** 200:11
**Slower** 159:7,8
**slowing** 204:24
**slowly** 111:23
  145:25

**small** 31:2 86:15,22
  87:8 116:1 127:4
  136:4 141:13
  142:6,9 149:23
  169:1 180:16
  206:14 218:2
**smaller** 91:11
  208:20
**smallest** 90:24 99:23
**smelter** 35:15
**snapped** 175:3
**snapshot** 93:13
  94:16 104:24
**social** 23:3
**sold** 61:23
**sole** 53:21 55:14
**solely** 98:13 107:19
**solicitous** 13:21
**solve** 95:23
**solved** 167:25
**solving** 132:4
**somebody** 7:21
  29:24 51:18 55:24
  72:7 172:2 177:11
**someplace** 182:4
  185:23
**somewhat** 82:10
  90:12 101:6 123:1
  217:14
**soon** 19:21
**sooner** 191:23
  192:12
**sorry** 8:7 26:3 39:23
  41:23 67:16 92:20
  105:12 109:1
  130:1 155:17
  168:2 197:14
  200:17 202:19
  218:21
**sort** 35:20 42:21
  104:24 163:18
  164:7 166:10
  175:2,25 176:23
  217:21
**sorts** 174:2 188:24
  212:19

**sought** 15:6 195:6
**sound** 67:6 72:13
  219:5
**sounds** 65:18 67:9
  70:9 177:3,3
**source** 91:22 133:15
  138:6 187:6
  189:16,20 203:12
  217:13
**sources** 82:23
**sourcing** 203:23
  206:12
**south** 111:20 146:2
  146:15 147:5
  199:25 200:15,22
  200:25
**southern** 1:2 49:11
  109:12 140:23
**so-called** 35:3
**space** 77:13
**spats** 178:14
**speak** 22:10 135:7
  187:10
**specialized** 27:5
**specializes** 75:18
**specialty** 75:17
  159:13
**specific** 6:23 7:2
  123:22 130:19
**specifically** 46:12
  100:20 121:4,8
  131:4 198:5
**specification** 176:11
**Spectralight** 44:14
  49:2
**speculation** 7:23,25
**speculative** 157:6
**speed** 117:7
**spent** 188:7
**spoke** 171:22 189:3
  189:8 213:15
**spoken** 121:16,18
**spreadsheet** 193:19
  193:24 221:3
**Spring** 26:12
**squeezed** 59:12

**ss** 222:3
**staff** 24:19,19 28:2
  29:9 33:8 57:14
**stage** 169:9,10
**stages** 33:3
**stagnant** 204:1
**stand** 5:16,20 10:16
  17:1,13 18:15,17
  20:3,4 34:14,22
  60:16 64:12 74:12
  98:4
**standard** 82:10
  87:22 95:8 108:17
  108:17 109:2,6
  124:14 139:22,24
  140:5,15 153:22
  180:5
**stands** 126:5 220:20
**star** 37:17
**start** 16:2 67:8
  117:22 131:18
  145:24 154:11
  182:6
**started** 36:9 82:14
  106:13 123:7
**starting** 27:22 28:1
  93:9 170:11
**Starts** 138:9,10
  197:16 210:7
**state** 34:16 75:15
  108:11 109:12,13
  118:17 128:4
  149:12 222:2,8
**stated** 8:11,14 19:12
  116:10 132:2
**statement** 18:1
  20:15 28:19 34:14
  34:22 37:19 62:7
  71:25 112:4
  126:10,14 135:10
  137:5 138:23
  193:8 216:12,21
  219:9 220:4,6,13
**statements** 15:1
  162:21
**states** 1:1,8,16 24:5

**26**:14,15 79:24
  109:8 111:18
  113:3,23 146:3,4
  147:1 198:18,22
  202:7,24 208:18
  215:12,21
**station** 174:7
**Statistics** 10:23 12:1
  80:7 82:17,21
  84:18 99:7,17
  154:8
**statute** 15:9 109:4
**stay** 132:3 167:20
**stayed** 75:24 96:15
**steadily** 202:8
**steel** 25:1,13 27:2,5
  28:6,6 32:22 34:9
  35:18,21 36:6,10
  36:23,25 37:2,6,8
  37:9,13,14,15,18
  43:20 59:23 73:25
**Steelworker** 38:24
  50:1
**Steelworkers** 13:7
  22:9 24:2,23,25
  25:3 30:15 32:14
  32:20 33:4,9 35:1
  36:6 41:14 42:8
  45:12 47:5 50:4
**Steel's** 37:10
**Stenger** 16:16 17:1
  17:12
**STEPHEN** 2:25
**steps** 91:17,21
  100:17
**step-by-step** 17:13
**STEVEN** 2:8
**stick** 96:9
**Stiglitz** 216:16
**stipulate** 12:8
**stipulated** 109:15
**stock** 172:18
**stockholders** 172:18
**stop** 176:11 177:11
  204:10,11
**stopped** 204:19,23

store 98:18
stores 97:7
stories 148:16
story 22:1 61:7,9,11
  219:16
strategic 64:16,19
strategies 203:18
strategy 17:11 41:10
  61:20 64:12,15
  65:2,3 74:12
  203:17 210:12,16
straying 126:3
streamlined 36:19
street 2:5 3:11 22:4
  22:4 148:11,21,22
stress 191:8
stresses 191:7
stretch 22:21
stricken 199:21
strictest 59:8
strike 19:23 22:2
  35:9,14 44:17
  46:24 47:9 49:3,20
  108:9 157:5
  193:15 194:1
  208:9 213:18
strikes 47:6 124:20
striking 220:18
stringent 166:20
stronger 17:25
strongly 95:21
STROOCK 3:3,3
struck 190:8 220:14
structure 16:19
student 146:19,20
studied 120:3 135:3
  197:19 209:13
studies 26:10,11
  97:2 110:14,16,19
  110:22,24,25
  111:1,3,12 114:25
  115:6 141:20
  145:22 146:7
  150:9 155:1
  190:14
study 11:4 110:1,22

110:24 111:1
120:21 121:2
139:1,2 140:6
150:6,9,9 153:16
153:19,21 154:8
159:17 160:4
174:13 190:16
192:18 193:23
196:7,12,16,17,23
205:3,5,13 214:10
studying 195:19
Sturgis 50:8
style 77:19,22
subdirector 49:10
subdistrict 24:20
subject 13:3 56:9
  66:8 77:8,11 78:17
  78:17 97:10
  110:14 114:8
  130:9 136:2 160:1
  180:24 185:17
  191:5,6 193:3
  196:6 220:2 221:7
subjects 65:22
submit 16:25
submitted 16:24,25
  20:10 65:10 66:1
  103:14
subsequent 40:19
subset 11:10
substance 67:23
substantial 54:18
  86:5 97:3 113:15
  202:10
substantially 94:10
  94:24 95:13 106:6
  113:3 133:1
  134:15 176:3
substantively 81:6
substitute 77:16
succeed 143:1
  172:12
succeeded 11:17
  143:12,22
success 37:21
successful 11:9,13

11:22 37:15 41:16
41:17 42:7 43:14
68:9 110:4,7
133:13 143:4,4,18
143:20 165:3,4
180:21 181:4
210:10 218:20,25
successfully 61:22
  148:8 168:16
sudden 170:4
suffer 170:24
suffers 117:10
sufficient 214:10
suggest 204:18
  211:13 212:3,12
suggested 89:24
  134:3
suggesting 131:22
  213:6 214:8,22
suggestion 186:23
  211:6
suggests 144:7
  198:10 204:9
  209:4
sum 180:4,8,10
summary 4:18
  51:24 155:9
Summers 134:5
  149:10
supervisors 88:7
  210:13 211:1,14
  212:15
supervisory 155:3
supplement 192:2
supplemented
  190:18
supplied 167:8
supplier 147:18
  166:7,8 167:2,8,9
suppliers 137:7
  146:23 147:11
  148:13 166:4,15
  201:24 202:1,25
  203:3,9,11,14,16
  203:17,18 206:13
  215:21 218:3,4,6

supplies 147:4 167:2
supply 78:14 121:11
  135:5,15 136:6
  146:10,14,21
  167:12 168:5,21
  195:2,21 196:24
  196:25 197:12
  202:17,23 203:4
  205:1,4,8 206:18
  212:16
supplying 167:23
  172:21
support 8:3 85:2
  89:3,20
supported 4:16 20:1
  37:9
supporting 149:10
suppose 180:14
supposed 67:8
  104:10
sure 12:19 26:21
  31:13 34:4 39:7
  40:24 47:24 54:15
  60:11 72:4,24 80:9
  102:17 103:22
  114:12 119:22
  124:1 127:8
  128:15 129:7,23
  129:24 131:12
  138:8 141:12
  144:20 150:2
  158:1 184:5 189:5
  192:6 195:18
  196:10 200:10
  201:9,17 202:18
  218:22 220:16
surprise 59:7
surprised 37:16
survey 110:25
  140:16,20,21
surveys 166:18
Susan 70:8 158:22
  223:9
suspect 127:10
  157:3
Sustained 144:21

157:9
sweat 28:3,7
sworn 5:20 23:23
  75:8 98:3 158:23
  162:25
synonym 202:2
system 119:7 122:20
  127:10 133:8
  213:4,5
systematic 135:3
systematically
  145:22

**T**

T 5:19 98:1 222:1,1
tab 6:6,9 28:8,11
  38:2,4 41:22 45:4
  50:22,22 52:4,15
  54:3,17,17 62:12
  64:3 65:8 66:22
  67:14,15,16
  123:25 145:7
  150:5 152:16
  155:11,12 156:13
  182:18 210:1
  219:13
table 30:24 31:19,24
  41:15 43:15 47:19
  49:12 71:3 79:7,8
  82:19,20,20 83:11
  84:5,14,17 85:22
  86:2,16 87:3,15
  88:15 89:16,25
  90:1,19,22 91:8,19
  93:4,4,16 94:5,16
  99:13,19 100:25
  101:11,14,18
  102:25 103:6,7,21
  104:22 105:1,12
  111:25 112:3,25
  129:21,24 145:8,9
  154:12 179:24
tables 100:18 101:20
  123:3 129:8,22
tabs 33:20 55:16
tag 199:15

take 4:6 20:16 33:21
  33:23 54:3 63:5
  66:9 81:14 92:1
  95:7,11,14,14
  101:11 108:10,12
  108:19 114:5
  123:19 124:23
  127:21 132:3
  170:2 174:9
  176:11 179:15
  180:8 191:2,4
  197:17 210:14
  211:8,15 212:11
taken 17:24 23:20
  75:3 82:21 90:18
  93:23 105:24
  155:24 158:20
  159:18 171:8
  184:6 213:1,10
  220:1 222:9
takes 87:20 88:19
  116:18 177:13
talk 19:20,23,23
  35:18 49:23 56:6
  57:18 67:11
  102:24 110:9
  111:15 144:1
  145:6 162:8 167:1
  173:5 186:3 188:1
  188:10 192:23
  207:25 209:23
  210:25
talked 141:6 173:16
  181:7 187:18
  188:3 210:8 213:7
talking 31:8,23 41:5
  45:16,20 64:13
  100:3 102:1
  104:22 107:5
  116:12 131:2,6
  136:17 151:18,19
  151:20 191:3
  196:6 204:4 205:9
  205:10,11 207:13
  213:12 216:13
talks 53:13 151:7

178:6
TAMBE 2:7 4:5
  13:3 15:25 16:4,6
Tank 15:24
target 16:22
targets 17:14
teach 179:20,21,21
teachers 78:7
  108:24 109:7,14
  109:18 118:4
team 199:15
technical 8:15
  149:16
technology 212:7
teleconference 63:1
telephone 189:25
tell 26:25 29:2 39:9
  41:10 42:17,19
  59:16 60:17 73:5
  75:13 78:1 82:4
  102:25 103:6
  105:19 110:11
  112:1 116:8 128:3
  132:10 145:2
  153:12 161:10,16
  166:13 174:5
  175:15 178:22
  195:15,20 205:19
  206:5 211:7,13,17
  212:2 213:11
  221:4
telling 58:25 131:19
  176:22 202:22
  203:1 213:22
temperature 179:5
  189:15
temporarily 156:25
ten 172:23 179:1
  181:16
tend 31:25 96:6,8
  136:6,8
tendency 199:12
tendered 45:23
tends 136:20 176:20
term 4:25 30:18
  43:22 149:3 179:7

terminate 15:2 65:6
  69:12,14,19
  221:14
terminated 65:3,5
terms 4:18 5:5 8:17
  14:11 17:7 18:22
  25:4 26:8 66:21
  69:3,21,22 85:24
  86:6 98:11 103:19
  103:19 108:5
  116:13,14,21
  124:18,24 130:18
  133:6,13 134:25
  142:14 146:14
  147:19 149:20
  157:10,22 166:14
  170:24 175:11
  178:2 181:17
  190:14 198:13
  201:20 206:16
terrible 40:22
test 17:6
testified 5:20 6:19
  15:14 23:24 25:12
  64:24 71:9,12,18
  75:9 98:4 105:22
  106:20 117:23
  144:9 158:24
  192:21 193:9
  205:6 218:2
testify 9:21 29:23
  64:20 71:19
  117:25 120:4
  126:16 146:17
  182:9 202:4
testimony 6:21
  10:12,16 16:10,15
  20:24 22:25 70:6
  71:20 80:13 81:3
  120:22 121:24
  130:4,5 147:7
  148:23 154:17
  156:10 162:7,25
  182:7 192:15
  193:15 194:23
  195:17,22 197:13

198:7 200:12
201:11 209:1
213:13,15 217:14
218:17 220:15
**Texas** 35:7,11
**text** 10:8 138:9
**textbook** 138:3,4,23
209:16 216:7
**Thank** 5:14 13:1
20:12 23:9,19 30:9
37:22 45:2 47:21
74:20 75:1,5 78:21
106:23,25 117:16
158:16 163:11
172:6 181:25
187:18 193:17
206:10 208:15
209:21,22 219:7
221:11
**theme** 17:8
**theoretical** 9:11,13
**theories** 151:23,25
152:9,10,11 208:7
**theorist** 209:13
**theory** 70:7,13,16
137:1,3 149:8,11
149:14 151:19,21
152:5,12 208:1,8
208:13,15,18
209:4,16,22
210:19 216:3,3,5,6
216:6,19,23
**thereabouts** 47:5
**They'd** 175:13
**thing** 25:22 27:24
31:17 62:17 84:11
89:23 91:17
107:18,19 112:3
122:18 123:2,9,24
153:18 154:1,3
155:6 157:16
168:8 181:14
186:16 190:2
203:15 212:5,12
212:18 218:7
219:11

**things** 7:5 31:22,25
39:5 44:1 69:16
78:11 88:15
107:22,22 109:3
116:2,3 117:14
123:19,21 131:21
132:1,6,19 135:10
135:18 136:9
139:7,9 147:17
148:16 151:22
157:4 186:8,17
194:22,25 210:25
211:19
**think** 12:14 19:14
21:13,21 30:8 37:5
37:18 40:7 43:16
58:15 62:7 64:11
64:17 68:9 69:10
69:13,13,14,23
78:12 81:13 91:25
111:19 114:13
118:3 123:16
126:2,4,12 129:21
131:14,15,19
137:12 138:10
139:4,7,20 141:9
143:14,21 144:2,4
145:1,7 149:19
153:22 163:5
169:24 170:1,12
170:15 176:24
178:24 180:5
183:4 191:2
195:16,20 196:17
198:15 201:9
203:23 207:8,12
207:17 209:18
211:11,18 212:23
214:8 216:12
217:22 219:1
221:9,10,16
**thinking** 64:19
170:7
**third** 10:8,8,9 22:18
92:10 99:18 104:5
163:21

**thirty** 25:22 31:5
47:4 48:15 72:21
72:22
**THOMAS** 2:23,24
**thought** 76:16
112:14 119:23
160:15 189:20
199:16 204:14
**thousand** 6:15 86:16
86:24 111:11,12
181:16
**thousandth** 170:23
**threat** 143:6
**three** 5:1 11:18 16:1
23:15 44:15 63:24
64:6 79:8 82:3
83:19 85:3 93:22
104:9 106:6
163:17,18,23
193:11 203:8
210:25 221:2,5
**threw** 127:3,5
**thrown** 72:18,23
**tidy** 23:4
**tier** 6:20,24 7:1 89:3
89:4,5,20 93:8,10
93:13,15 94:14,20
103:25,25 105:2
106:1,3,4 133:11
133:13 157:11,11
157:19,20 158:1,3
158:5,6 175:21
202:17,25 203:3
217:7,18,23
**tiff** 29:7
**tight** 176:1
**time** 7:12 8:11,12,13
12:7 18:16,23
19:13 24:19 25:6
25:10 27:13,19,21
27:22 29:12 34:19
36:5 39:12 41:7
48:17 58:21 63:7
63:19 64:25 65:1
71:14 86:23 94:20
100:3,4 102:13

111:23 121:17
129:2,5 142:13
145:18 146:1,6
153:3 166:22
170:13 173:22
175:4 207:15,16
221:23
**times** 20:6 21:7,16
22:1,12 74:16
118:6,11 151:12
167:10 168:14
172:23 178:18
188:24 196:4
**time-consuming**
31:18 211:23
**tiny** 219:10
**title** 153:25
**today** 22:1 36:6
37:12 55:25 58:16
70:18 74:13 80:13
130:17 135:5
148:24 183:1,5
206:18 221:16,19
**today's** 18:18 21:7
**told** 7:4 18:15 31:16
49:16 51:17,20
52:3 54:1 55:25
57:8,16,22,23,25
60:18 66:15 70:20
71:10 138:5
**Toledo** 42:20 63:10
181:20
**tolerances** 170:22
170:24 171:3
176:2
**Tom** 214:7
**tomorrow** 221:20,22
**tons** 179:2
**top** 71:6 82:19 86:22
99:22 169:16
**topic** 107:6
**total** 11:5 14:1,5,8
73:19,22 74:8
83:15,25 84:16
85:5,13 86:5 98:10
98:13,16,19,24

99:6 100:7,9,12,16
101:3,20,24 102:3
102:9,13 103:8,10
103:13,20 104:2,5
104:12,20 105:9
106:4,7 111:6
124:14,25 142:22
143:2,25 155:5,21
158:3
**totally** 55:24 157:6
208:10 213:18
**tough** 178:20
**tour** 187:9
**Tower** 37:23,25
**town** 197:10
**towns** 142:6
**Toyota** 166:19 213:2
213:4
**track** 13:11
**trade** 34:11 164:18
**trades** 89:2
**traditional** 37:3
**train** 106:18
**training** 145:23
173:5 174:9
205:11 212:11
**transcript** 10:1
119:21 144:15
185:21 191:21
222:11
**transformation**
211:3,7,10,21
212:3,4,12,18
213:11,12,25
214:18
**transpired** 52:19
**transportation**
147:20
**Treasury** 134:6
**treat** 178:22,23
187:14 205:12
**treating** 178:25
**trend** 145:17,20
147:8 202:12
203:14 204:7,9,19
204:23

**trending** 176:10
**trends** 196:1,2
197:19 198:2,13
**trial** 67:7 70:3
**tried** 10:13
**trier** 26:22
**trouble** 134:11
138:19 195:4
202:20 207:20
215:12,14,17,21
215:20
**truck** 177:18
**true** 27:25 52:8,12
53:25 54:3,9 55:1
55:16 57:13 58:3,7
59:10,13 61:3,8,10
61:12,16,21 70:19
71:9 79:3,15
112:15 116:22
117:11 122:13
123:7,11,12,20
125:9 126:24
130:20 131:24
133:18 135:2,21
136:25 137:11,22
147:23 152:10
162:22 176:25
178:8 180:18
183:1 185:10
186:14 188:12
194:13 198:14,19
203:10 204:3,5
207:7,21 208:13
214:11,15 215:9
219:22 222:11
**trust** 62:9
**truth** 135:22 220:7
**try** 17:17 66:20
88:21 93:5 131:23
139:25 148:25
149:23 191:9,12
192:9 199:8
205:16
**trying** 17:10 22:23
31:13 95:12
112:10 165:10,10

189:8 199:8
202:19
**turn** 10:2 28:24
33:11,17 38:2
41:21 45:3 65:8
66:22 67:14 82:12
82:18 93:4 107:25
116:4
**turnaround** 168:15
**turnover** 132:25
**turns** 42:25
**twelve** 173:22 179:1
200:19
**twenty** 48:15 170:17
170:18 195:19
214:3
**two** 23:15 31:9 32:5
34:8 35:4,5 41:3
44:14 49:25 50:6
70:24 78:5,11
82:15,22 83:7 84:1
85:12 86:4 88:15
88:19 89:4 90:16
90:25 91:11 92:20
99:10 100:6
102:20 110:16
116:6,8 133:10
139:4 155:14
156:7 162:2,8
187:21 188:8
201:20 213:8,15
221:14
**two-and-a-half**
63:24
**two-tiered** 133:8
**two-way** 22:4
**type** 37:2 89:11,12
99:25 140:4 158:2
162:1 211:21
**types** 95:4 96:3
109:21 133:2
156:24 158:4
174:11,12 187:13
190:8
**typically** 14:3 85:21
95:20 108:17

110:5,17 117:9
121:1 135:24
173:4 178:7
**typographical** 28:16

_____

**U**

**U** 75:8 98:3 158:23
**UAW** 3:10 5:23 22:9
38:21,24 45:18
53:23 67:22 78:4
118:1 145:8 162:3
171:22,23 172:3,9
193:25
**UAW/USW** 45:24
**ultimate** 130:18
163:6
**ultimately** 36:10,12
62:10 129:11,14
**Um** 25:25 135:7
183:17 184:5
202:18 204:11
209:6
**unable** 137:25
138:12 164:9
**unanimity** 209:19
209:20
**unclear** 131:15
202:4
**underestimated**
145:3
**underlying** 44:6
45:20
**understand** 30:17
37:25 46:7 48:5
55:10,13 81:17
91:17 106:20
167:22 169:6
187:1,5 196:23
197:2,11
**understanding** 11:2
31:20 42:15 55:22
58:1 61:8,15 70:24
71:6 107:12
164:17 168:17
202:20
**understood** 28:3

32:2 62:23 221:6
**underway** 27:8
**unemployed** 206:4
**unemployment**
135:24 136:3
**unexpected** 169:4
**unfortunately** 44:3
**unfounded** 19:25
**uniform** 22:23
**uniformity** 23:7
**unilaterally** 18:9
137:10
**union** 9:25 11:25
12:11 13:8 14:22
17:25 18:3,6,18,25
20:7 22:2 25:9,10
25:22 26:6,7 27:6
27:20,23 28:10
32:12,15,18 35:6
36:3 38:4,5,13
39:2 40:12 41:21
41:23 42:1 44:20
44:25 45:3,5,7,16
46:1,5,13 48:12
49:6,8 50:22 51:10
56:8 57:8 69:8,9
69:19 70:12 72:12
74:9 76:11 78:25
79:19,22 84:23
87:6,11 90:6 92:8
92:11,13 94:2
100:21 102:15
106:10 107:1,3
112:8 118:13,16
118:21 130:14,23
142:19 152:16
156:7 157:15,18
157:18 160:11,18
162:18 163:2,5,12
173:16 182:13
187:19,21,24
188:1 189:2,7,17
189:20 190:3
213:7 216:25
223:19
**unionization** 141:23

142:1,5,8,11,14
143:7 200:2,5
201:2
**unionize** 143:10
**unionized** 12:22
142:3 216:19
**unions** 16:24 18:21
19:3,12 20:6 23:14
23:21 29:8 32:5
38:19,20,22 39:1,2
39:10 45:13 49:13
50:6 52:9 60:4
61:17 63:4 65:11
65:19 68:1,3 73:1
73:9 74:7 75:6
112:8 142:16,22
143:1,3,12,14,21
158:22 189:24
214:18
**Unionsrule.com**
189:17
**union's** 13:5
**union-represented**
70:1 88:17 89:1,9
89:14 92:17
103:24 137:9
**unique** 188:20 218:8
**unit** 116:7,18,24
130:10,20 131:3,6
131:8,19 132:9,19
137:17
**Unite** 118:13
**united** 1:1,8,16 24:2
24:25 25:2 39:10
41:14 111:18
113:2,23 118:21
118:23 146:3,4
147:1 193:3 202:7
202:24 215:12,21
**units** 116:20
**University** 26:10,13
75:15,23,24 128:5
134:6 159:6
**unresponsive**
213:18
**Unsecured** 2:20

**unsuccessfully**
25:17
**unusual** 11:3 214:8
**unwanted** 97:5
**unweighted** 217:14
**unwilling** 66:15
164:10
**update** 123:3
**upper** 175:13
**up-to-date** 76:25
210:12 211:1
**urban** 109:13
**use** 15:18 77:9,10
84:6,7,9 87:17
99:9,10 114:7
140:13 148:25
149:20 154:15
156:9 164:11,23
165:7,13 187:12
203:17,18 205:8
**useful** 126:1 133:15
133:18 190:16,17
192:1 205:13
**uses** 89:12
**usually** 143:1,3
**USW** 3:10 5:23
24:13,17 32:3 34:8
34:16 46:20,23
50:25 53:23 57:15
59:15 61:5,12
**USWA** 24:19
**USW's** 61:20
**utilization** 177:22
**U.S** 16:20 24:18
36:23 37:2,8,9,12
37:13,15,18
107:11 112:25
137:6 162:15
183:3,9 202:11
203:8 215:13
218:3

_____

**V**

**V** 75:8 98:3
**validated** 149:13
**validity** 151:24

**value** 102:7 103:8
105:25 116:20
157:23 163:6
202:6
**variable** 8:17
**variation** 174:20
176:4
**variations** 145:6,20
**varies** 176:3,16
**variety** 27:4 37:4
85:22 115:22
116:2 121:2
135:16 152:9
171:16 174:1,3
175:23 177:18,21
181:8 187:14
191:6 192:2
196:18 201:17
202:20 205:7,24
205:25 208:6
214:4
**various** 22:24 40:4
83:12 88:25
100:10 107:18
109:15,21,23
111:1 124:16
129:8 132:6
151:23 187:13
**vary** 8:18,19,25
**VEBA** 65:12
**vehicle** 80:8,24
81:24 83:10,17,20
84:10,15 85:5,6,19
90:4 91:2,5,12,19
92:3,18 94:4,7
99:1,6,12 100:17
101:16,24 103:10
104:16 112:21,22
121:5,8 122:25
125:18 139:14
145:14 146:25
147:2 154:13
159:15 160:3,7
161:9,13,14
163:18 191:5
192:4 195:6

**vehicles** 91:9 101:19
  101:21 154:21
**vein** 132:8
**verbally** 122:22
**vernacular** 84:21
**version** 12:3 76:25
**versus** 142:6,9,12
**vetted** 106:21
  125:23
**viable** 17:4
**vibration** 170:24
**view** 96:14 117:1
  125:9,10 128:23
  130:13 157:8
  170:9 174:15
  175:9 179:14
  180:19 181:3
  186:8,12,15 187:6
  202:22 218:19,24
**viewed** 8:23
**views** 150:1,2,4
**virtual** 127:17
**virtually** 111:3
**visited** 121:19,21
  160:8 174:22
  187:12 213:7
  214:3
**visiting** 188:23
**visits** 173:4 186:5
**vitae** 128:8,9
**voir** 52:18 78:16
**voluntary** 194:20
**Voos** 75:7,11 76:21
  77:13 78:9,24
  79:24 98:7 117:19
  123:7 149:18
  150:23 151:3
  158:13 182:7
  223:7
**vouch** 103:21

————————

**W**

**W** 2:7 5:19
**Wachter** 4:4 5:16,25
  9:21 12:14 78:12
  81:12,12 89:12

97:8 99:17 103:23
106:15 107:6,6
110:6 113:12
114:17 122:5,12
122:23 139:16
144:8 145:3
156:19 171:17
175:18 216:18
223:3
**Wachter's** 70:6 87:6
88:25 89:19 93:23
103:12 107:7
114:20 122:9,16
123:2,4,23 127:24
137:4 139:3 144:3
153:21 154:8
183:18 193:23
199:11
**wage** 22:23 43:3
44:15 68:2,14,15
68:17 70:7,13,16
72:9 73:7 74:14
77:8,10 80:3 83:24
86:11 87:22 88:16
88:18 89:9,13,22
89:24,24 90:5,5,8
90:11,17,21 92:7,9
92:11,15,18,23
93:7 94:1,4,8,24
102:6 107:15
110:10 112:6
113:7,8 114:11
115:3 122:2
134:11,14,19,20
134:21 135:25
136:7,8,25 140:18
141:1,24 149:11
149:18,19,21
151:16,19,21
152:5,22 153:5,17
157:13,20 164:8
165:21 169:14
172:10,10,13
174:17 179:11
183:2,8 190:15
207:25 208:7,13

208:15,18,19,23
209:4 210:7,19
216:2,3,13,19,23
216:24
**wages** 73:14 80:14
80:17,18,19,23
81:23 82:7,9,15
83:1,12,19 84:14
85:24 86:13 88:10
88:16,25 89:7
90:11 91:4,13,19
92:3,24 95:1,4,5
95:10 96:12 98:8
98:10,14,15,19,25
100:11,15 104:23
107:10,20 108:15
111:5 112:18
113:2 125:12
133:1 134:4,8,9,17
134:18 136:10
137:1,16 140:19
142:17 145:25
146:3,8 149:2,6
150:1,25 151:8,14
151:21 152:9
153:1,3,3 154:13
157:12 163:16
171:20 172:25
189:9 192:20,21
196:7 198:17,22
203:19,19,20
207:4 208:4,5
209:14 210:18
212:1,4 216:6,9,17
217:1,23 220:15
**wage-takers** 137:3
**wait** 70:17 132:5
**waiting** 213:17
**walk** 19:22 82:5,12
88:21 174:6
196:14
**Wall** 148:11,21,22
**want** 5:8 10:21
15:18 22:2 23:9
29:1 33:23 39:25
52:18 69:21 85:8

96:13 109:21
110:3 143:9
148:24 149:16
169:20 172:2,3
177:11,11 186:15
187:5 191:2,4,15
192:2 197:2,8,11
208:3 219:9
220:17
**wanted** 7:9 37:3
39:6,8 91:7 220:14
**wants** 39:21 72:1
168:21 187:1
221:17
**warranty** 167:3,9
**wasn't** 29:15 38:1
52:10 54:11 55:21
59:8 61:7 64:8
93:20 162:12
172:4 175:5 181:1
184:18 198:7
214:24
**wave** 195:21
**way** 7:14 10:13,14
17:16 19:24 26:7
33:4 39:10,11
44:19,19 54:20
63:19 64:5 72:4
84:21 87:17 100:7
106:21 107:14
109:4 130:18,22
136:11 144:5,23
148:13 155:7
169:5 173:19
185:5,6 189:22
191:12 195:18,25
196:13 203:12,24
205:6 211:7
216:25 218:13,15
**Wayne** 29:9 32:6,16
38:23 56:13,19
57:18 58:4,8,9
80:16 90:7 94:12
104:11,18 170:20
173:17,23 178:12
187:21

**ways** 84:19 131:8
  132:10 168:19
  202:21
**wear** 174:8
**Weatherhead** 159:5
**website** 82:21
  112:17 189:17,20
  189:24
**week** 56:7 67:11
  83:20 86:24 87:22
  113:5
**weekend** 103:4
  106:16
**weekly** 83:12,19
  84:14 86:18 87:20
  113:5
**weeks** 41:3 148:12
**weigh** 163:6 178:17
**weighing** 179:1
**weighs** 188:17,17
**weight** 217:12
**weighted** 89:10
  93:19
**Weiss** 3:9 5:23
**welder** 27:13
**welding** 27:13
**well-based-in-law**
  14:22
**well-established**
  111:22
**well-ventilated**
  178:7
**went** 17:16 18:16
  25:18 26:5 27:23
  28:1,2 36:23 44:18
  59:16 91:8 128:13
  134:15 144:12
**weren't** 53:16 70:5
  71:13 144:8
**West** 3:11
**Western** 159:6
**we'll** 70:18 78:20
  87:16 97:10,12
  107:25 131:16
  150:15 163:5
  219:25

**we're** 17:7 31:23
  44:11,16 58:16
  66:14 87:1 98:18
  98:19,20 100:2
  101:25 107:5
  108:16 111:18
  136:17 166:24
  181:7 191:3 204:4
  204:12,15 205:9
  205:10,12 207:13
  208:5 221:9,16
**we've** 20:5,5 35:20
  42:20 64:13 66:19
  91:17 110:11
  115:10 218:16
  221:13
**whatsoever** 14:15
  68:2
**WHEREOF** 222:18
**whichever** 21:24
**white** 83:3
**wholly** 92:2
**wide** 177:18
**widely** 216:3,5,7,10
**Wilbur** 36:13
**willful** 132:1,5,6,8
**willfully** 131:23
**willing** 165:21
**willingness** 46:21,23
**win** 166:12 167:12
**winning** 11:17
  162:11
**Wirges** 29:12,17
  33:7 50:10,15,18
  57:20 58:3,7,12,21
  59:11
**Wisconsin** 75:24
  78:7 108:7 109:3,8
  109:12
**wish** 99:8
**wishes** 4:18 20:18
**witness** 12:2 13:2
  21:3 23:12,22
  25:25 39:21 46:9
  46:11 47:22 52:16
  52:19 55:5,11

58:20 64:12 74:12
  74:21,25 75:6
  76:13 77:15,18,21
  81:10 83:22
  102:22 105:13,23
  119:19 149:17
  158:17,21 161:25
  182:16 186:25
  191:21 193:18
  196:3 201:23
  206:8 207:8
  209:10,20 217:15
  221:11,12 222:18
  223:2
**witnesses** 13:4,4,5
  16:10 22:10 23:15
  221:14,18
**Womack** 214:7
**won** 162:5
**word** 13:16 58:14
  65:1 68:7,8 69:10
  122:20 123:9
  128:16 149:20
  183:22
**words** 183:20
**work** 12:23 19:2
  25:18,19 27:12
  28:1,2 35:16 39:11
  44:8 45:14 59:23
  66:18 69:25 72:10
  86:6 87:22 88:1
  95:1,16,23 98:12
  113:7,18,19,22
  114:2,5,6,9,14,23
  114:24 115:2,4,7
  115:11,15 118:4,8
  120:18,21 121:12
  123:8 128:9,20
  129:14 132:3,14
  133:2 137:14
  144:1,13,17,25
  156:23 165:6
  169:14,21,23
  173:1,2,20 179:8
  180:8 185:8 191:6
  197:10 202:2

204:14 210:15
  212:19 213:3
  214:5 216:17,19
  217:2 218:19,25
**worked** 27:19,22,24
  36:12,16,21 108:7
  118:13,15,19,21
  128:5,7 129:22
  130:6 201:19
  214:2
**worker** 32:22
  165:17 169:2
  170:16 171:1
  174:12 177:2,19
  177:20 190:13
  207:23
**workers** 6:24 7:1,10
  7:10 13:8 32:17,19
  32:20 41:14 45:12
  69:8,9,19 70:12
  83:3,4,4 84:20,23
  84:25 85:16 88:10
  89:11,14 90:6 92:8
  92:11,13 93:8,9,10
  94:2 95:4 96:2,4,5
  98:25 101:10
  112:17 115:4,19
  115:23 118:23
  119:6 131:22
  132:9,18 133:5,6
  133:14 134:1,11
  134:12,13 135:1
  138:18 142:2,17
  142:23 146:15
  155:22 157:13
  162:9 163:16
  164:5,9 165:5,20
  166:9 167:17,19
  167:20 169:3,5,17
  169:18,20,25
  170:1,11,14,18
  171:23 172:8
  173:2,5,19,25
  174:4,17,24 175:4
  175:9,11,14,16,19
  175:20,21,21

176:6 177:15,21
177:22 178:2,12
178:24,24 179:8
180:12,15,16,17
181:9,11 183:8
188:16 190:7,11
190:24 191:1,17
192:5,8 193:3
196:15,20 197:2,3
207:2,15,18,21
211:22 212:12,22
217:7,18,18,19,21
217:25 219:5
**worker's** 175:7
**working** 24:22,24
25:6,9,13 27:15,21
28:3 33:24 35:2,16
39:2,8,10 44:16
49:10 143:21
164:25 173:9,13
173:24 178:1,2
179:9 207:2
**workplace** 68:25
**works** 49:11
**world** 35:3 137:5
160:8 161:12,14
188:21 202:3
214:4,7 216:4
**worried** 137:15,16
**worries** 170:6
**worry** 181:6,23
**worse** 178:5 179:8
**worth** 13:13
**wouldn't** 7:17 29:17
162:6
**write** 78:24 162:19
**writes** 152:22
**writing** 66:1
**written** 49:14,18
65:23 73:1,7,21
134:5 160:6
**wrong** 12:22 18:6
19:16 175:24
**wrote** 145:5 189:25

————————
**X**
————————

**x** 1:3,7 208:5,6 223:1

————————
**Y**
————————

**yeah** 109:1 137:15
207:12,14 209:14
**year** 9:1 29:19 32:20
32:21 42:21 49:24
50:2,4,8 148:9,9
161:22 170:17,17
205:10 215:6,8
216:15
**years** 4:21 5:1,1
16:18 25:7,23 27:5
27:17,20,22 31:6
36:4 44:7 47:4
48:15 49:25 75:20
75:25 96:9 108:8
115:5 143:22
152:22 153:2,2
170:18 172:16
173:22 176:17
182:23 195:20
198:18 202:8
206:23 210:7
211:19 214:3
**yesterday** 12:2,15
18:20 70:2 144:10
144:14 148:24
199:12
**York** 1:2,10,10 2:6,6
2:22,22 3:6,6,12
3:12 21:7,9,11,16
21:17 22:1,11
110:21 222:2,4,8
**young** 115:23
**younger** 96:8
**Ypsilanti** 53:13

————————
**Z**
————————

**zero** 18:17,18
141:22
**ZIDE** 2:25

————————
**$**
————————

**$1,001** 83:20
**$1,154** 113:5
**$1,544** 86:24

**$11.05** 93:10 157:20
170:11
**$121,046** 4:22
**$13** 133:20
**$18.46** 88:13
**$2.34** 134:9
**$2.75** 5:3
**$20** 13:12 22:19
**$20.04** 79:9 88:14
**$20.05** 79:10 90:23
**$20.91** 92:17
**$21.76** 114:1
**$22.11** 85:7 91:20
**$22.62** 101:13
**$26.11** 155:16,22
**$27** 172:10,11
192:22
**$28** 73:3
**$29.14** 102:1
**$29.34** 100:14
**$30** 73:3
**$30.27** 104:4
**$30.46** 102:7
**$31** 156:4
**$31.41** 102:1
**$4.5** 5:2
**$400** 14:13 17:23
**$5** 134:8
**$59,569.40** 5:4
**$67,183.33** 4:25
**$78** 14:12 17:22

————————
**0**
————————

**06-10354** 1:5

————————
**1**
————————

**1** 76:11 78:25 79:19
79:22 89:3,20 93:8
104:1 111:25
112:3 129:21
145:8,9 157:11
176:22 177:6,6
202:17,25 203:3
223:24
**1st** 29:19 51:13,23
52:5 53:5
**10** 221:22

**10th** 10:1
**10:10** 1:12
**10017** 2:6
**10036** 2:22
**10038** 3:6,12
**1010** 25:2
**104** 28:9,11
**107** 223:25 223:1
**11** 48:18 51:12 67:14
82:18 219:16
**11.05** 93:16 94:21
105:25 133:20
157:24
**11.6** 84:15
**111.6** 91:10,11,13
101:21
**1113** 10:2 13:11 15:5
15:10,20,20 17:8
18:24 19:8,14,21
20:5,9,11 22:13
40:15 48:9,13,23
55:19 60:4 61:19
63:6 67:4 71:3
72:8 81:7,15 93:1
94:17 96:3 103:15
103:16 104:10,23
114:9 158:7
180:20
**1113/1114** 13:6
28:14 49:6,15 61:4
74:10
**1113/14** 49:2
**1114** 14:19 15:3,5
17:8 20:5,9,12
40:15 53:22 60:4
61:19 63:6 65:11
**117** 223:8
**1177** 2:21
**12** 39:20 51:22 82:19
90:2,3 102:6 223:4
223:20
**12.3** 104:7,17
**12:55** 97:15
**120** 41:23
**120.3** 91:10
**121** 38:2,4 41:22

**123.3** 101:21
**13** 79:7 85:22 129:3
  129:19 130:3
  200:19,20
**131** 45:4
**14** 4:12 53:18 55:14
**14th** 4:10 62:14 63:4
**14-and-a-half** 4:21
**145** 204:17
**15** 4:25 115:5 152:18
  202:8
**150** 223:16
**159** 223:9
**16** 28:25 30:2 39:20
  56:2 99:14,15
**161** 200:13,18
**163** 150:23 151:3
  223:2
**167th** 63:14
**169** 138:11
**17** 27:20,21 42:12
  62:12 80:5 102:2
  155:10,17,19
**17th** 42:17 63:9,11
  67:22
**170** 10:3,6 138:8
**176** 54:6
**177** 124:2
**18** 129:4
**18.46** 90:24
**180** 3:5
**182** 223:10
**184** 150:15,20
  223:16
**185** 12:6
**1880s** 108:24,25
**1890s** 108:24
**19** 109:1 160:25
**19th** 40:21,25 67:11
  67:17 70:19,25
  71:22
**1914** 134:7
**194** 87:11
**1973** 25:3 30:20
**1976** 25:4
**1977** 25:2

**1980s** 35:21 109:2
**1982** 75:23
**1986** 35:21
**1987** 159:25
**1988** 25:9 27:22
**1990s** 109:2
**1991** 25:10
**1994** 24:19 28:1
**1995** 78:6
**1996** 10:1
**1997** 26:15
**1998** 76:1
**1999** 78:6 195:5

**2**

**2** 6:20,24 7:1 33:13
  77:2,3 89:4,5
  93:10,13,15 94:14
  94:20 97:13
  103:25 105:2
  106:2,3,4 133:11
  133:13 157:11,19
  157:20 158:1,3,5,6
  161:8 175:21
  217:7,18,23
**2nd** 222:19
**2-A** 82:19 91:8
  101:18,21
**2-B** 82:20 84:17
  89:25 90:1,3 91:19
  101:18,21 154:12
**2.3** 91:11
**2:04** 98:2
**20** 113:24 115:5
  130:3 173:23
**20th** 67:12
**20.046** 79:10
**20.3** 85:17
**20.60** 91:23
**2000** 34:8
**2001** 24:8 216:16
**2003** 36:11
**2004** 219:16
**2005** 102:7 112:19
  112:20
**2006** 52:6 56:7 83:1

  84:19 86:13 99:19
**2007** 1:11 65:17
  215:6,7 222:10,19
**212** 220:1,11 223:17
**216** 223:11
**219** 223:12
**22** 94:12 150:22
  151:3
**22nd** 28:18
**22.11** 90:5 91:23,23
**22.12** 90:7
**22.38** 91:22 92:19
**22.62** 101:3
**220** 223:17
**222** 2:5
**23** 160:25 198:1
  223:5
**249** 87:12 88:12
**25** 172:20,22 184:11
**25.52** 101:4
**250** 87:4 88:13
**26** 65:16
**27** 94:12
**274** 52:5,15,24 53:10
  223:15
**277** 54:18
**28** 1:11 54:15 72:16
  222:10
**280** 64:4 178:18
  188:18,18
**281** 65:8
**283** 66:23
**284** 67:16
**29** 156:4,12,14
**29th** 53:13,19 54:7
  54:24 55:15
**29.34** 101:12

**3**

**3** 79:7 85:22 90:19
  90:22 116:4 124:7
**30** 72:16,18
**31** 156:12,15
**32** 119:24
**33** 208:21
**330** 3:11

**3363** 80:10
**34** 9:25
**35** 101:13
**36** 11:25 12:11 102:2
  155:9,19 195:5
  223:20
**37** 41:21,23 42:1
  44:20,25 45:16
  223:22
**38** 38:4,5 39:13

**4**

**4** 25:5 56:7 88:15
  93:25,25 94:1,5
**4.1** 104:18
**40** 87:22 160:6
  176:20 179:1
  223:21
**40s** 146:13
**41st** 2:5
**42nd** 3:11
**44** 223:22
**44114-1190** 2:13
**45** 4:24 152:18
  182:21 210:5
**46** 156:13,15 223:23
**48** 223:6
**49** 99:23
**499** 87:5 88:13 100:5
  100:13

**5**

**5** 45:3 93:4 94:16
  124:9 126:10
  223:3
**5:10** 221:23
**50** 86:15
**50s** 146:13
**50-year-old** 176:20
**53** 223:15
**55** 45:5,8 46:1,5
  103:5,18 105:24
  157:23 223:23
**56** 6:6,9 7:16
**56(d)** 13:9
**58** 102:16,24 106:10
  107:1 156:7

223:25
**59** 102:23 105:11
106:10 107:3
156:7 157:15,18
157:19 223:1

**90** 194:18
**901** 2:12
**98** 83:2
**99** 86:15

---
**6**

**6** 33:11 34:5,7 50:20
99:13 101:11
116:5 184:11
**60** 72:16,18 160:8
173:4
**61** 191:14,20
**66** 192:10
**67** 197:7,15
**68** 198:1

---
**7**

**7** 24:4,12 28:10
29:13 32:23,25
33:9 37:14 40:4,11
40:12 50:22
100:25 111:25
112:3 223:21
**70s** 25:21
**75** 217:11,18,18
223:7
**78** 88:8
**79** 223:24

---
**8**

**8** 102:25 103:6,7
152:16 160:12,19
162:19 163:3,5,12
177:9 182:13
197:16 210:2
223:2
**80** 178:17 188:17,17
**85** 172:8
**881** 86:22
**89** 101:5,6,11,12

---
**9**

**9** 77:3 105:12 113:24
**9th** 67:1,3
**9.5** 104:17
**9.50** 113:24

**EXHIBIT H**

1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   ----------------------------------x

4        In the Matter

5            of                        Index No.

                                      06-10354

6        DANA CORPORATION,

7                          Debtors.

8   ----------------------------------x

9                              March 29, 2007

10                             United States Custom House

                              One Bowling Green

11                             New York, New York 10004

12

13

14                   EVIDENTIARY HEARING

15

16

17  B E F O R E:

18                   HON. BURTON R. LIFLAND,

19                            U.S. Bankruptcy Judge

20

21

22

23

24

25

2

```
1   A P P E A R A N C E S:
2
3
          JONES DAY
4
     Attorneys for the Debtors
5              222 East 41st Street
               New York, New York 10017
6
          BY:  JAYANT W. TAMBE, ESQ.,
7              STEVEN BENNETT, ESQ.,
               PEDRO A. JIMENEZ, ESQ.,
8              RICHARD F. SHAW, ESQ.,
               CORINNE BALL, ESQ.,
9
               ROBERT HAMILTON, ESQ.
10             901 Lakeside Avenue
               Cleveland, Ohio 44114
11
12
13        KRAMER LEVIN NAFTALIS & FRANKEL LLP
14             Attorneys for the Committee of Unsecured
               Creditors
15             1177 Avenue of the Americas
               New York, New York 10036
16
          BY:  THOMAS MOERS MAYER, ESQ.,
17             CHRISTINE LUTGENS, ESQ.,
               STEPHEN D. ZIDE, ESQ.
18
19
20        STROOCK & STROOCK & LAVAN LLP
21             Attorneys for Ad Hoc Committee of Note
               Holders
22             180 Maiden Lane
               New York, New York 10038
23
          BY:   SHANNON LOWRY NAGLE, ESQ.
24
25
```

3

1    A P P E A R A N C E S (Continued):

2

3

         COHEN, WEISS AND SIMON LLP

4

             Counsel for UAW and USW
5               330 West 42nd Street
                New York, New York 10036

6

     BY:    BRUCE SIMON, ESQ.,
7           BABETTE CECCOTTI, ESQ.,
            PETER DiCHIARA, ESQ.,
8           BRUCE LEVINE, ESQ.,
            DAVID R. HOCK, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1   P R O C E E D I N G S:

2                MR. TAMBE:  Good morning, your Honor.

3                THE COURT:  Good morning.

4                MS. CECCOTTI:  Good morning.

5                THE COURT:  Good morning, Mrs. Ceccotti.

6                MS. CECCOTTI:  The unions call Suzanne

7   Taranto.

8                S U Z A N N E    T A R A N T O,   called

9   as a witness, having been first duly sworn by the Notary

10  Public, Denise Nowak, was examined and testified as

11  follows:

12               MS. CECCOTTI:  Your Honor I have your for

13  the witnesses convenience prepared a binder with Ms.

14  Taranto's Exhibit 3 and her supplemental deposition

15  declaration which is 43, and they are behind Tabs 3 and 20

16  behind the union's binder.  This binder also contains one

17  other exhibit, Exhibit 44 behind Tab 21.  And for the

18  witnesses convenience I wonder if I may approach and use

19  these while she is testifying as opposed to big binders; is

20  that okay with you?

21               MR. HAMILTON:  I just need a copy of the

22  exhibit, not the declaration but whatever 44 is.

23               MS. CECCOTTI:  All right.

24               MR. HAMILTON:  Just tell me what 44 is.

25               MS. CECCOTTI:  It's the Towers Perrin

5

1    memorandum.

2                    MR. HAMILTON:  Are you moving VEBA caps?

3                    MS. CECCOTTI:  Yes.

4                    MR. HAMILTON:  All right, let's go.

5    DIRECT EXAMINATION BY MS. CECCOTTI:

6            Q.      By whom are you employed?

7            A.      Milliman, Inc.

8            Q.      And can you identify Milliman, Inc.?

9            A.      Milliman is a large actuarial consulting

10   firm.

11           Q.      What is your title?

12           A.      I'm a consulting actuary.

13           Q.      And what does a consulting actuary mean at

14   Milliman?

15           A.      An individual who is identified as a

16   actuary, a member of the American Academy of Actuaries, and

17   also an individual who is certified to sign, that is to

18   deliver actuarial work product to clients with the approval

19   of Milliman.

20           Q.      And what is your area of professional

21   expertise?

22           A.      Employee benefits specifically pensions and

23   retiree health plans.

24           Q.      And for how long have you been an actuary?

25           A.      I've been an actuary since 1989.  I have

6

1  worked in the field for 23 years.

2          Q.      And you mentioned an organization called

3  the American Academy of Actuaries?

4          A.      Yes.

5          Q.      And you are a member of that organization?

6          A.      The American Academy of Actuaries, yes.

7          Q.      And as an actuary, are you subject to any

8  professional standards?

9          A.      Yes.  There are actuarial standards of

10  practice a code of conduct as well as a requirement by

11  Milliman my employer as the way I practice.

12          Q.      And do you those use those standards day to

13  day at your work at Milliman?

14          A.      Yes.

15          Q.      Have you applied those to this case?

16          A.      Yes, I have.

17          Q.      Could you please turn to Union Exhibit 3

18  behind Tab 3 in your binder there and tell us what that

19  document is?

20          A.      It's a declaration and expert report that I

21  filed with respect to the 1113, 114 motion.

22          Q.      And in paragraph 1, you refer to 2 court

23  proceedings in which you have submitted testimony in the

24  past two years.  Do you see that?

25          A.      Yes.

7

1      Q.     Can you just briefly describe those

2   proceedings?

3      A.     Yes, I submitted testimony on behalf of the

4   UAW in the UAW and GM retiree medical litigation and

5   settlement.  I submitted expert witness report as well in

6   the Ford matter with the UAW regarding retiree health.

7           MS. CECCOTTI:  Your Honor, we would offer

8   Ms. Taranto as an expert in actuary science.

9           MR. HAMILTON:  No objection, your Honor.

10           THE COURT:  She is so qualified.

11           MS. CECCOTTI:  Thank you, your Honor.

12   BY MS. CECCOTTI:

13      Q.     Ms. Taranto, you described Milliman -- I'm

14   sorry, can you just give us a sense of the scope of

15   Milliman's practice?

16      A.     Milliman has a number of practices.  The

17   employees benefits practice health life and casualty

18   practices.

19      Q.     And just order of magnitude in order of

20   size relative to the similar firms?

21      A.     It's one of the largest actuarial

22   consulting firms in the US.

23      Q.     And you've been retained by the UAW and the

24   USW in this case, have you not?

25      A.     Yes, I have.

8

1      Q.      In addition to the unions can you give us

2  an idea for of the types of clients for whom you provide

3  actuarial services at Milliman?

4      A.      Yes, at this provide consulting

5  Taft-Hartley trust funds as well as a number of corporate

6  clients.

7      Q.      And with respect to the actuarial services

8  concerning specifically concerning post retirement health

9  benefits, can you tell us more specifically what kinds of

10  services you pro perform for your corporate clients?

11      A.      Yes.  Primarily we are involved with the

12  measurement of liability for purposes of reporting those

13  liabilities on financial statements.  We also provide

14  consulting services around benefits as well.

15      Q.      Okay.  Are your corporate clients asking

16  you to help them address their post retirement health care

17  obligations?

18      A.      Yes, they are.

19      Q.      In what way?

20      A.      Well, many of them have asked us to assist

21  in managing those liabilities in understanding the reasons

22  why they are the size that they are.  Others ask us to help

23  keep those liabilities in check or manage them going

24  forward.  Many of them ask us to do that in such a way that

25  we do not impact the benefits, that is, to make the

9

1    liability smaller with minimal impact to the benefits.

2         Q.    And have you had clients ask you to help

3    them eliminate their post retirement benefits for current

4    retirees?

5         A.    Very few.

6         Q.    So order of magnitude then in your work for

7    your corporate clients, can you break it down just again in

8    a relative since, among those who are asking you to range

9    the liabilities.

10        A.    Most are asking us to help them manage the

11   liabilities.

12        Q.    For the corporate clients that you may not

13   work on directly as Milliman, are you aware of to what

14   extent employers are asking for help in the same area from

15   Milliman?

16        A.    In my experience most employers ask for

17   health and management.

18              MR. HAMILTON:  Your Honor the question at

19   this point I question think the question was your Honor she

20   is asking her what she knows about other clients at

21   Milliman.

22              THE COURT:  Is your objection as to form?

23              MR. HAMILTON:  Yes, foundation.

24              THE COURT:  Sustained.

25        Q.    Do you know to what extent employers, other

10

1  than those for whom you are working directly are asking for

2  help managing their post requirements healthcare

3  liabilities?

4       A.    Yes one of my responsibilities in Milliman

5  is to peer review the work of other actuaries although

6  those clients are not my clients I do have occasion to look

7  at their work and those clients do on occasion ask for help

8  in managing liabilities.

9       Q.    So let's go back to some of the requests

10  that you get for your clients to help manage retiree

11  healthcare liabilities.  And here I am asking specifically

12  about those clients who are providing retiree healthcare to

13  current retirees.  Can you be a little more specific about

14  the nature of those requests; what are they asking you to

15  do specifically?

16       A.    Yes.  In many instances they are go asking

17  us to manage the liability by first reducing the overall

18  cost of health benefits.  That is shrinking the size of the

19  by.  And in other instances by looking at design changes or

20  other methods to manage or reduce the liability.  We are

21  also asked to look at imposing cops on caps on that

22  liability; that is limiting the rate of growth of those

23  benefits.

24       Q.    Let's talk about the caps concept.  In fact

25  Dana has implemented -- or do you know whether Dana has

11

1   implemented caps with regard to its retiree post retirement

2   healthcare obligations?

3          A.    Yes, it has.

4          Q.    Could you please turn to Exhibit 43, which

5   should be behind the tab is labeled 20 because it

6   corresponds to our overall exhibits.  And first of all can

7   you ask you to identify that document, please?

8          A.    Yes, it's a.

9                MR. HAMILTON:  Since I haven't been

10  provided a list of these, it takes us a few minutes to get

11  to sheets.

12               THE COURT:  There's a larger binder that is

13  very easy to follow.

14               Do you have it?

15               MR. HAMILTON:  What is 43?

16               THE COURT:  43 is the supplemental

17  declaration.

18               MR. HAMILTON:  I have that, your Honor.  He

19  have it, Mrs. Ceccotti.

20               MS. CECCOTTI:  Thank you.

21  BY MS. CECCOTTI:

22          Q.    Can you identify that document, Ms.

23  Taranto?

24          A.    It's my supplemental declaration.

25          Q.    And actually I'm going to ask you to turn

12

1    to turn to paragraph 3 of that document?

2              A.    Yes.

3              Q.    Which is on page 2.  And I'm going to ask

4    you to go to the chart that's labeled summary of liability

5    by capped uncapped status.  Do you see that?

6              A.    Yes.

7              Q.    Tell us what that chart represents these

8    please?

9              A.    This chart outlines the liability

10   associated with union post retirement medical benefits.

11   The top of the chart labeled 2007 estimated APBO refers to

12   the present value of benefits or the financial statement

13   liability Dana records on behalf of UAW and USW retiree

14   health benefits.  There are two categories of liabilities

15   portrayed.  Grandfathered and non grandfathered.

16              This exhibit splits the liabilities between

17   those that are grandfathered or not subject to capping or

18   other limits and benefits; and those benefits that are

19   capped are non grandfathered that is subject to some

20   limitation in respect to growth.  The total liability that

21   is capped is 66 percent for the UAW and 57 percent for the

22   USW.

23              Q.    And by UAW and USW, just so we're clear, we

24   are talking about the retiree groups?

25              A.    Correct, the benefits payable to retirees.

13

1       Q.      And then at the next, the 2006 head count

2   section, can you just walk us through that, please?

3       A.      Yes.  The 2006 head count outlines the

4   number of employees so, so the number of retirees both

5   current and future that are either not subject to a cap,

6   that is grandfathered or subject to a cap or non

7   grandfathered, and the percentage of current and future

8   retirees there are subject to a cap or a limit is 512

9   percent for the auto workers and 46 percent for the steel

10  workers.

11      Q.      Can you tell us with respect to the

12  relationship between what you've described as the

13  grandfathered or uncapped group and the non grandfathered

14  or capped group, can you say how the relationship between

15  those two groups would behave over time?

16      A.      Yes, it's grandfathered group typically are

17  retirees who require prior to the mid 1990.  They are an

18  older group of retirees and generally a closed group of

19  retirees; that is there will be no more retirees going into

20  this group.  Over time we would expect that that liability

21  would decrease as benefits were paid out and participants

22  in that group died.

23              THE COURT:  The subject matter here is it

24  all of Dana or is it only the 1113, 1114 motion.

25              THE WITNESS:  This liability is both

14

1    current retirees and future retirees.

2                    THE COURT:  Is it for all of Dana or is it

3    only for the 1113, 1114 motion that's before the court.

4                    THE WITNESS:  It is.

5                    THE COURT:  Your numbers.

6                    THE WITNESS:  They are just the union.  I'm

7    sorry.

8                    MS. CECCOTTI:  Just the UAW and USW portion

9    of the total.

10                    THE COURT:  Of the total of all Dana

11    employees are or of those that are subject to the 1113,

12    1114 collective bargaining motion?

13                    MS. CECCOTTI:  I think I understand your

14    question.

15                    THE COURT:  It's either a larger number or

16    a smaller number.  I'm trying to find out whether you've

17    embraced everything or we are talking about the specific

18    subject matter before the court.

19                    MS. CECCOTTI:  Let me see if I can try to

20    ask the witness the question this way.

21           Q.     Are the percentages here a percentage of

22    the total APBO number meaning for all of the retiree

23    healthcare obligations?

24           A.     No, just the union.

25           Q.     Just the total APBO attributable to the

15

1    unions?

2              A.    Yes.

3              Q.    Okay.  So do you recall -- actually let's

4    go back actually to clarify that a little further for the

5    record.  Let me take you back to paragraph 2 of Exhibit 43.

6                    Ms. Taranto, let me go back.  The 66

7    percent and the 57 percent, do they represent all of the

8    union represented retirees at all locations?

9              A.    Yes.

10             MS. CECCOTTI:  Does that help your Honor?

11             THE COURT:  Yes, it does.

12             MS. CECCOTTI:  I'm sorry, I didn't

13   understand your question myself.

14   BY MS. CECCOTTI:

15             Q.    Ms. Taranto, do we know what the caps that

16   are described on page 2 here, do we know what the caps have

17   been worth to Dana?

18             A.    Yes.  It's been measured.

19             Q.    And where have you shown that, if at all in

20   Exhibit 43?

21             A.    Paragraph 4.

22             Q.    Can we go there, please?

23             A.    Yes.

24             Q.    First of all, before we go there, the

25   figures that you have utilized here, can you tell us what

16

1    the source is?  Let's just go back to 3 for a moment.  The

2    course of your number here.

3              A.     This is the calculated by Towers Perrin and

4    given to us in the data room.

5              Q.     I'm sorry would you please proceed with

6    paragraph 34?

7              A.     One of the analysis that we are we were

8    provided with through the data room was a calculation that

9    was made by Towers Perrin in 2005 as to the impact of

10   removing the caps on the liabilities associated with UAW

11   and USW facilities.  Specifically, of the liability

12   calculated for all UAW and USW facilities, which was

13   determined by Towers to be just over one billion dollars,

14   the increase in the liability, were the caps not

15   implemented, would increase that liability to 1.65 billion

16   dollars or by 40 percent.

17             Q.     And again, just so the record is clear

18   about your source for this particular analysis, can I ask

19   you to turn to the -- what's behind Tab 21?

20             A.     Yes.

21             Q.     And can you just identify for us that

22   document?

23             A.     Yes, this is the October 12th, 2005 letter

24   from Towers Parrin turn titled removing VEBA caps.

25             Q.     And the presentation that you described in

17

1  paragraph 4, how does that affect, how would it present

2  itself on Dana's financial statements?

3       A.    The financial statements of Dana require us

4  to calculate liabilities, assuming medical inflation by

5  Dana capping their rate of growth of the benefits or

6  capping the amount that it pays towards retiree healthcare,

7  it limits the impact of future medical inflation on these

8  benefits, therefore the caps would decrease the liability

9  Dana records on its financial statements associated with

10  retiree medical benefits.

11       Q.    And I think you mentioned this in your

12  direct testimony but I don't how direct it was, do you know

13  for how long Dana had caps with respect thereto?

14       A.    They varied.  There have been caps

15  negotiated as early as the mid 1990s and as recently as

16  within the past year depending on the location and the type

17  of benefit.

18       Q.    Okay.  Can we, sticking with the exhibit of

19  the caps can we turn to paragraph project five of your

20  declaration, and this is again Exhibit 43?

21       A.    Yes.

22       Q.    Have you had an opportunity to review the

23  testimony that Mr. Hoffmann gave regarding at least one

24  sentence in paragraph 5 of your declaration?

25       A.    Yes.

18

1          Q.      And if we look down the paragraph there,

2     there is a sentence that starts "Although the caps on

3     Dana's share" and I'm reading from the paragraph "although

4     the caps to on Dana's share of the post retirement

5     healthcare varied in amount by location, Dana has limited

6     its exposure to future medical inflation in all current

7     active employees many of its recent since the mid 90s

8     retirees." With respect to that sentence and Mr. Hoffman's

9     comments could you respond to his comments?

10         A.      Yes.

11         Q.      Go ahead, please?

12         A.      Mr. Hoffman makes three points around the

13    caps.  First that dental benefits are not subject to an

14    overall dollar limit.  And although they are not subject to

15    an overall dollar limit, the annual benefits payable under

16    the plan are subject to a per participant limit.  So

17    although technically not capped in terms of an absolute

18    dollar, benefits are capped by virtue of the fact that only

19    a certain amount of care and dollars can be spent by the

20    retirees.

21              The second point that Mr. Hoffman makes is

22    that there are some benefits have that are not capped.  We

23    are aware that there's one location where the pre- 65

24    prescription drug plan are not subject to a cap although

25    the post 65 benefits are.  And we believe there may be one

19

1    other location that is subject to -- where the prescription

2    drug benefits, but the rest of the drug benefits are

3    subject to a cap.

4                The third point Mr. Hoffmann makes is that

5    Dana, subject to the collective bargaining agreement,

6    determines the amount of money to charge its retirees in

7    places where there is a cap; specifically, Dana uses two

8    year old experience to determine the cost of the plan from

9    which it subtracts its limit that it will pay and

10   determines its retiree contribution.

11               The challenge with two your old data is

12   that to the extent there has been medical inflation, there

13   may be a higher true cost of the plan or a higher cost of

14   the plan that would, for example, be used in the actuarial

15   actuation.  So that the column dollar amount of the cap

16   that Dana pays may not be the actual cost that Dana incurs

17   for the plan.  Would an example help?

18        Q.    I think an example would help.  Could you

19   give us an example?

20        A.    Sure.  Let's say that the cost of a health

21   plan is a hull dollars and that Dana's cap is 50 dollars.

22   Were Dana in a to determine the retirees contribution as

23   the plan cost less the cap, Dana would be charging a

24   retiree 50 dollars.  However Dana uses older claims data,

25   so for example, two years ago the plan play have cost 90.

20

1    Dana uses 90 less 50 dollars cap to calculate a retirees

2    contribution.  And therefore essentially collects 40

3    dollars from the retiree or spends 60.  The 60 dollars is

4    still a cap.  It's a limit, it is just not the precise

5    dollar amount because of this methodology that Dana is

6    stating it collects.

7            Q.    Okay, thank you.

8                  Let's go now to Exhibit 3, your initial

9    declaration, and I'm going to ask you to take a look at

10   paragraph 9; and just ask you to summarize the conclusions

11   that you've reported in paragraph 9?

12           A.    Yes, in paragraph 9 with we cite two

13   sources that demonstrate that although employers have made

14   changes to their post retirement medical benefits, there

15   are still a number of employers that maintain benefits and

16   have not eliminated them.  Specifically a Kaiser study in

17   2005 indicated that about 60 percent of the employers with

18   more than 5 thousand employees still maintain retiree

19   medical coverage.  And in a review of the S&P retiree

20   companies about 64 percent of them retain a million retiree

21   medical liability.

22           Q.    Before we get to that, I'm going to ask you

23   a little about the S&P study that you've referenced there.

24   Could you describe that a little more for us?

25           A.    Yes.  Milliman internal research monitors

21

1    the financial statement of the S&P 500 with respect to its

2    benefits disclosures both pension and post retirement

3    medical, and makes that information available to its

4    consultants as an indication of trend and what's going on

5    with the market and with the business.

6             Q.    And do you know in the review that you've

7    referenced here, do you know whether that was conducted?

8             A.    It was conducted based on end of 2005

9    financial statements.  So during the middle of 2006.

10            Q.    Okay.  With respect to the reference to

11   Kaiser, I have marked as Exhibit 61, a document I'll ask

12   you to identify.  Could you identify that document?

13            A.    These are excerpts from the Kaiser 2005

14   study.

15            Q.    And let's just take a moment.  I think we

16   had some of this with Dr. Mulvey, but could you describe

17   this Kaiser study for us?

18            A.    The Kaiser is study is a large study of

19   employer health benefits that's conducted by the Kaiser

20   Health Foundation.

21            Q.    And do you know how often that they do this

22   study?

23            A.    It's an annual study.

24            Q.    Can you tell us show us where in this

25   document we would find the source for the figure that you

22

1  present in paragraph 9?

2          A.      It is on page 116, the exhibit is totaled

3  11.2.  It's the third from the back in what you handed me.

4          Q.      Okay.  And that is a page entitled

5  percentage of firms offering retiree health benefits by

6  firm size reach and industry.

7          A.      Yes.

8          Q.      And you were referring to the 55 percent?

9          A.      Correct.

10         Q.      Now, you were not present in court for Dr.

11 Mulvey's testimony, were you?

12         A.      Correct.

13         Q.      Did you have occasion to review her

14 testimony with regard to -- withdrawn.  Did you have an

15 opportunity to review a treatment of Dr. Mulvey's testimony

16 with regard to some comments she made concerning the state

17 and local government component of the firms that were

18 survived by Kaiser?

19         A.      Yes, I did.

20         Q.      Can you tell can you just the summarize the

21 point that she was making there?

22         A.      The point that she made because that since

23 prevalence of retiree medical benefits plants among state

24 and local government's was high and they were included in

25 the survey that potentially impacted the valid 69 survey

23

1    with respect to employee prevalence of retiree health

2    plans.

3           Q.      And do you recall her saying something

4    about the fact that the state and local government's do not

5    have to report post retirement health obligations?

6           A.      Yes.

7           Q.      Can you again just give us a flavor of her

8    observation there?

9           A.      Her observation because was that the

10   prevalence was directly correlated to the fact that state

11   and local government employers had not yet had to measure

12   and report on an accrual accounting base or on a FASB 106

13   type basis, the liability of their retiree health benefits.

14          Q.      Is he let's stop start with the composition

15   portion of her comments did can I ask you to go to the

16   front of Exhibit 61 and tell us what that section

17   represents entitled design survey and methods could you

18   tell us what information we would finds in that portion of

19   Exhibit 61?

20          A.      This exhibit provides the background

21   information including the composition of the group of

22   employers included in the survey.

23          Q.      So, if you can, please, using the seconds,

24   can you tell us how we would turn interpret the composition

25   information of the firms?

24

1          A.       Yes.  If we were to look at page 13, page

2      13 describes the characteristics of firms included in this

3      survey, it describes how many employers were in each

4      category and the relative weighting of that category in

5      determining the averages.

6          Q.       So how would we take the information from

7      page 13 and relate that to the information that we were

8      looking at on page 116 with respect to the composition of

9      state and local governments?

10         A.       Sure.  If one was trying to determine how

11     much influence state and local governments had on the

12     results as a whole, one would look at the percentage

13     weighting given to each of those industries, which is the

14     third category described on page 13.

15              So, for example, in determining the

16     averages of the come posits and the 55 percent, its

17     relative weighting of industries for -- or the relative

18     weighting of state and local government in the industry mix

19     is 1.5 percent, which would contrast to say manufacturing

20     or retail, which is 6.7 or 6.5 percent respectively.

21         Q.       Okay.  Referring to the comment that you

22     described about the requirement or the lack of requirement

23     that state and local government's have to in some way

24     account for these obligations, do you agree with her

25     observation?

25

1        A.      Yes.

2        Q.      I'm sorry, that they don't have to

3   currently account for it?

4        A.      Yes they are in the process of beginning to

5   have to account for them as a -- it's a faced approach for

6   recognition.

7        Q.      Do you remember Dr. Mulvey stating that she

8   expected once that requirement is applicable that she would

9   expect the number of statement and local governments over

10  go retiree health benefits to decrease?

11       A.      Yes.

12       Q.      Do you agree with that statement?

13       A.      Yes.

14       Q.      You do?

15       A.      Yes, I do.

16       Q.      Sticking with Exhibit 61 for a moment, let

17  me ask you to go to page 115; it's entitled Exhibit 11.1

18  percentage of all firms offering retiree health plans 1988

19  to 2005.  Could you describe for us what's going on in this

20  page, please?

21       A.      Sure.  The bars on the page represent the

22  large firms large firms being defined as 200 or more

23  workers there offer retiree health benefits, and the graph

24  tracks that percentage from 1988 through 2005.

25       Q.      Okay.  So it looks like there's a drop

26

1    between 66 -- well, let me not characterize it in 1988 the

2    percentage that we see her is 66 percent, and then in 1991

3    we see that the percentage is 46 percent.  Do you have a

4    view as to why, and then again we see in 1993 let me

5    complete the thought, the percentage further drops to 36.

6    Do you have a view concerning those relative percentages?

7            A.    Yes, I do.

8            Q.    Why don't you tell us what that is?

9            A.    Sure.  1988 was prior to the advent of the

10   accounting standards that are currently in use today for

11   reflecting retiree medical benefits on company's balance

12   sheets and books.  Specifically, prior to the requirement

13   by FASB, employers accounted for these benefits on a pay as

14   you go basis, simply recording the cash that they paid each

15   year for benefits for retirees.

16            The accounting standard required a change

17   in the methodology, from a cash basis to an accrual basis;

18   that is, employers needed to put the value of the benefits

19   on their books, and through their profit and loss

20   statements, as employees earned these benefits rather than

21   as they received them.

22            The general impact of FAS 106, which is

23   what this accounting requirement was called, was to

24   increase liabilities and to highlight the cost of the

25   benefits.

27

1            1991 was the next step in this measurement

2    period between not having done the analysis and

3    understanding the size of the liabilities, and

4    understanding the size of the liabilities, and many

5    employees appeared to eliminated those benefits prior to

6    the point in time where they had to recognize them on their

7    balance sheets.  Most employers had to recognize these

8    liabilities between 1993 and 1994.

9            So in 1993 you see the impact of the what

10   the accounting standard on the employer decision to

11   continue the benefits.

12       Q.    Okay.  And what's actually you've discussed

13   this phenomenon, am I right, in your report as well?

14       A.    Yes.

15       Q.    And where have you included some opinion

16   about that?

17       A.    That's paragraph 9 -- no, I'm sorry.

18       Q.    I'm going to direct you to paragraph 13?

19       A.    13.

20       Q.    And why don't you again, with reference to

21   page 115, which you relate the chart on this page on to the

22   opinion that you've expressed in that paragraph?

23       A.    Yes.  The opinion I expressed in the

24   paragraph is that the company's have following initially

25   putting these liabilities on their books have not had any

28

1   ongoing reaction from the financial community and have

2   essentially not recorded current challenges with respect to

3   these liabilities.  Some have made changes, but the

4   accounting liabilities have been a that's right part of the

5   financial report reporting now foreclose to 15 years.

6           Q.    So that what we see on page 115 after this

7   1988 to 1993 period that you described beginning with 1995

8   we see the liability going from 40 percent to, I guess to

9   33 percent in that range, correct?

10          A.    Correct.

11          Q.    Switching topics a little bit for the

12  moment, can you I ask you to -- take a look at paragraph 12

13  of your report.  And can you summarize the opinions that

14  you've expressed there, please?

15          A.    Yes.  In implementing Medicare prescription

16  drug benefits, clear the government provided a subsidy to

17  employers who maintained their plan, specifically the

18  design of the program was facilitated employers maintaining

19  retiree health benefits and receiving government funding to

20  do so.  And based on the Kaiser study we referenced

21  earlier, about 30 percent of large employers maintained

22  their health benefits and elected to take the subsidy from

23  the government towards those benefits.

24          Q.    Does the first sentence of your paragraph

25  1, again, is that the opinion you are standing by here on

29

1    that?

2         A.    Yes.  The fact that a subsidy was available

3    to employers rather than the design of the current Medicare

4    program, was suggests the government's interest in

5    employers maintaining these plans.

6         Q.    Now in your report you also talk about

7    something I call the concept of afford ability; is that

8    correct?

9         A.    Yes.

10        Q.    And we can see that in your report at

11   paragraph 14?

12        A.    Yes.

13        Q.    Could you please, again, summarize your

14   views on that?

15        A.    Yes, in the work that I do generally

16   employers are cognizant of the affordability of changes

17   that they make in retiree health programs when they make

18   these programs.  And in particular, design considerations

19   to recognize the impact, particularly to older retirees,

20   are included in many of the plan design changes we have

21   implemented and worked with employers on.

22        Q.    Can you tell us some of the ways that

23   companies build in this feature or ask you to build this

24   feature into their design?

25        A.    Yes.  All else being equal, it is generally

1    my experience that the companies I work with would prefer

2    to change benefits that have not yet begun rather than

3    change benefits in effect today.  For example, it is much

4    simpler to eliminate retiree health benefits for someone

5    who is not each employed yet and have them understand as a

6    condition of employment that those benefits would not be

7    available than is to eliminate benefits for someone who is

8    in receipt.  Companies will choose to impact or limit these

9    benefits prospectively more frequently or preferably over

10   changing things in for current retirees.

11             Another way employers impact their

12   obligations is to cap their obligation.  We talked about

13   this earlier.  But to limit the rate of growth of these

14   benefits has significant financial impact beneficial to the

15   company because of the way we are required to project

16   liabilities and inflation less of a direct impact on the

17   employees in the short term.

18             Q.    Is affordable only relate to affordable to

19   the company?

20             A.    Afford ability to retirees is often

21   considered as well.  Particularly in recognition that

22   planning for an additional expense is harder if you do not

23   have an income with which to save.  Many of our employers

24   have facilitated savings vehicles in connection with

25   conjunction with a change in retiree healthcare to help an

1    employee accumulate pension funding in order to pay for

2    those benefits.

3           Q.    Did the GM matter that you participated in

4    was the affordable concept evidence in the modified plan in

5    that case?

6           A.    Yes, it was.

7           Q.    Can you just describe that?

8           A.    Yes.  The GM settlement specifically

9    codified for its existing retirees a level of pension

10   income that marked an individual as able to afford the

11   changes that they were proposing and precluded individuals

12   below that level of pension income from having to be

13   subject to those changes.

14          Q.    Are you familiar with Dana's Section 1114

15   proposal?

16          A.    Yes.

17          Q.    And why don't I describe your understanding

18   of the proposal?

19          A.    For the most part the elimination of

20   retiree coverage for future and something retirees.

21   There's something some discussion of VEBA funding but it's

22   unclear as to exactly what that means.

23          Q.    And how does that proposal, as you

24   understand it, fit into your experience with what employers

25   have been asking you to do in terms of helping them manage

32

1    their retiree obligations?

2            A.      It is not a typical proposal.

3            Q.      Why don't we go back to Exhibit 43,

4    supplemental declaration, and I'm going do ask you to look

5    at paragraph 7.

6                    And can you describe what you are showing

7    in that paragraph?

8            A.      Yes.  Paragraph 7 compares the value on a

9    present practical value basis of the pension benefits

10   provided by Dana as various union locations to the value

11   provided by Dana of post retirement medical coverage to

12   those retirees at those locations.

13           Q.      Why don't you walk us through what your

14   exhibit shows, please.

15           A.      Yes.  The exhibit compares, on an average

16   basis, the monthly pension amount at four selective

17   locations, and the value expressed as a present value of

18   those benefits to the retirees.  So, for example, in the

19   UAW master plan, plan 3 at left most, the average retiree

20   receives a pension benefits of 42.72 a month that has a

21   present value of 48 thousand 500 dollars.

22                   The next value present value of post

23   retirement medical is a value expressed on a financial

24   statement perspective on a per retiree basis.  So the

25   liability that Dana records for those benefits divided by

33

1    the number of retirees.  In the instance of the UAW master

2    plan, the value of the benefit is 78 thousand 600.

3              Q.     And for each of the examples that you have

4    shown here, which are three other examples, correct but

5    that you haven't walked through but they are there.  These

6    represent averages, correct?

7              A.     Averages.

8              Q.     I need to actually take you back to the

9    paragraph we talked about in your initial declaration.

10   Lets go to 11 in Exhibit 3?

11             A.     Yes.

12             Q.     And you reference here the S&P 500 review

13   is that the same review that the described earlier in your

14   testimony?

15             A.     Yes it is.

16             Q.     What about the 2005 Watson Wyatt study?

17             A.     Watson Wyatt published a study in 2005 of

18   164 companies and their findings suggested that 14 percent

19   of the company's VEBA plan to eliminate the benefit for

20   future retirees or in the future, 6 percent plan to

21   eliminate for current retirees.

22             Q.     Can you just describe what that study

23   showed, just versus what we were looking at when we were

24   looking at the Kaiser studies?

25             A.     This study.

34

1      Q.      As to what -- I'm sorry as to what it's

2   attempting to show there?

3      A.      This study focused on intended design

4   changes for post retirement health plans.  And although

5   there are there were a significant number of employers who

6   reported anticipating making changes and potentially cost

7   sharing type changes, there were few 6 percent employers

8   who were planning on simply eliminate go the benefits for

9   existing retirees.

10      Q.      And can you just identify the Watson Wyatt

11   form firm for us, please?

12      A.      Excuse me.

13      Q.      Can you identify the what's at and white

14   firm for us, please?  Can you describe them?

15      A.      Watson Wyatt worldwide actuarial firm one

16   of the largest.

17      Q.      And you worked there for a while?

18      A.      Yes.

19      Q.      How long did you work there?

20      A.      16 years.

21      Q.      I would actually like to -- I have marked

22   as Exhibit 60, the document that I will show you and ask

23   you to identify can you identify Exhibit 60?

24      A.      It's the executive summary of the Watson

25   Wyatt study.

35

1          Q.     Is this the study that's referred to in the
2     paragraph we were just discussing?
3          A.     Yes.
4          Q.     Can you tell us again where the numbers you
5     just testified to are?
6          A.     Hang on a second.  The figure for?
7          Q.     Figure 4?
8          A.     Figure 4 describes the for both current and
9     future employees the expectations of employers with respect
10    to changing retiree medical benefits.
11         Q.     And just again, show us where we can fine
12    the figures you were talking about?
13         A.     Towards the middle of the exhibit in the
14    eliminate the benefit for post 65, 16 and 4, and eliminate
15    pre- 65.
16         Q.     Okay.
17                MS. CECCOTTI:  Can I have just a moment,
18    your Honor?
19                Your Honor, to the extent they were not
20    otherwise in the record, I would like to move for the
21    admission of Exhibits 3 and 43 at this time, which are the
22    two supplemental -- the declaration and the supplemental.
23                We have not received, as part of this the
24    scheduling order, we haven't received any indication that
25    there's an objection.  But I just want to make sure the

36

1    record is clear that they are in evidence.

2                    MR. HAMILTON:  We have no objection.

3                    MS. CECCOTTI:  Okay, that's fine.

4                    THE COURT:  Received.

5                    MS. CECCOTTI:  Thank you.

6                    (Whereupon, Union Exhibits 3 and 43 were

7            received in evidence as of this date).

8                    MS. CECCOTTI:  And then, as to the two

9    exhibits I've marked I would like to move those in as well.

10                   MR. HAMILTON:  Which ones?

11                   MS. CECCOTTI:  60 and 61.

12                   MR. HAMILTON:  Yes, there's no objection.

13                   THE COURT:  Received.

14                   (Whereupon, Union Exhibits 60 and 61 were

15           received in evidence as of this date)

16                   MS. CECCOTTI:  No further questions.

17                   MR. HAMILTON:  Your Honor, I have cross

18   examination binders.  May I approach?

19                   THE COURT:  Sure.

20                   (Handing)

21   CROSS EXAMINATION BY MR. HAMILTON:

22           Q.    Ms. Taranto, my name is Robert Hamilton.

23   I'm with Jones Day representing the debtors in this case.

24                   As I understand it, you've been at

25   Millennium for a short poured; about how long?

37

1          A.       Two years.

2          Q.       Before that you were at a private company,

3    right?

4          A.       Yes.

5          Q.       Which one?

6          A.       I was at equitable.

7          Q.       For how long?

8          A.       About three years.

9          Q.       Pardon?

10         A.       About three years.

11         Q.       And before that you were you at another

12   private company?

13         A.       I was at Ingersoll Rand.

14         Q.       For how long?

15         A.       Two years.

16         Q.       And before that where were you?

17         A.       Watson Wyatt.

18         Q.       Milliman, you have multi employer plans,

19   trusts and corporate clients; is that correct?

20         A.       Yes.

21         Q.       You personally?

22         A.       Yes.

23         Q.       Approximately how many clients have you

24   provided services to at Milliman for the past two years?

25         A.       About 30.

38

1      Q.    30 clients.  And in about those 30, how

2    many were large corporations more than 200 employees?

3      A.    About 15 or so.

4      Q.    And you gave some description in your

5    opening direct about the advice that you've given on

6    managing OPED liabilities for these corporations.  Of those

7    corporations there you are giving this advisor to, how many

8    of them have been in bankruptcy?

9      A.    None.

10      Q.    Have you provided any advice to any company

11    in bankruptcy?

12      A.    No.

13      Q.    And you have provided advice in connection

14    with the Delfi bankruptcy?

15      A.    Yes.

16      Q.    But you refuse to tell us what that advice

17    was at your deposition because of confidentiality concerns?

18      A.    Yes.

19      Q.    So we can't ask you today to advise the

20    court what your experience has been in dealing with the

21    Delfi bankruptcy and how they were managing their OPED

22    liabilities, right?

23      A.    Yes.

24      Q.    Now the Academy of Actuaries, American

25    Academy of Actuaries, you are certified as a member of

39

1    that, correct?

2            A.      Yes.

3            Q.      There's also something called the society

4    of actuaries; is that correct?

5            A.      Yes.

6            Q.      And have you to pass a series of tests and

7    exams in order to become a fellow of the Society of

8    Actuaries; is that correct?

9            A.      Yes.

10           Q.      And while the number has varied over the

11   years, it was somewhere around ten tests; is that right?

12           A.      Yes.

13           Q.      You took one of them and passed it, right?

14           A.      Yes.

15           Q.      And you didn't take the other nine?

16           MS. CECCOTTI:  Objection, your Honor.  I

17   don't understand what the purpose of this is.

18           MR. HAMILTON:  I'm going into her

19   qualifications, your Honor.

20           THE COURT:  Sure.

21           MS. CECCOTTI:  She's already been qualified

22   as an expert.

23           THE COURT:  Well, I have to weight her

24   testimony.  Overruled.

25   BY MR. HAMILTON:

40

1          Q.      You didn't take the other nine?

2          A.      That's correct.

3          Q.      What was the subject matter of the one test

4    you did take?

5          A.      The test among the society sill business

6    was a calculus festa.

7          Q.      Now did you have to take any type of test

8    or exams to get what qualified for the American Academy of

9    Actuaries?

10         A.      Yes, I did.

11         Q.      And in that context did you have to take

12   any courses or take any type of training courses in order

13   to take the test?

14         A.      Yes.

15         Q.      Have you received training in how you or

16   what the effect of Chapter 11 is in the calculation of APBO

17   liabilities?

18         A.      No.

19         Q.      Your engagement started in January of '07;

20   is that right?

21         A.      Yes.

22         Q.      And your the very first thing you did when

23   you started your engagement was to define the scope of the

24   engagement; is that correct?

25         A.      Correct.

41

1    Q.    And the information you asked for you asked

2  from both the debtors and other people in your research

3  department at Milliman; correct?

4    A.    Yes.

5    Q.    Now in addition to the analysis and data

6  you provided in your declarations you row provided here

7  today for the court you also provided other data and

8  declarations with respect to the unions in this case with

9  respect to their negotiations; is that correct?

10    A.    Yes.

11    Q.    And you haven't told us what that advice

12  and information because was because you were instructed by

13  your counsel, correct?

14          MS. CECCOTTI:  Objection I don't understand

15  the scope of witness's testimony here.  She is here as an

16  expert to discuss her expert testimony.

17          THE COURT:  Overruled.

18    Q.    You haven't told us what that additional

19  data analysis, advise, and recommendations that you've

20  given to unions in this case was because you were

21  instructed to buy your counsel, right?

22    A.    Correct.  I was told to focus on matters

23  record regarding the declaration and not to discuss party.

24    Q.    Let's go to your declaration, if I could

25  ask you to take the cross examination binder and go to Tab

42

1    3, which is just another copy of the declaration that you

2    were already discussing on your direct?

3          A.    Yes.

4          Q.    And I want to refer your attention, Ms.

5    Taranto, to paragraph 3 to page 2?

6          A.    Yes.

7          Q.    And after you indicate the documents that

8    you were initially provided by Dana, there's a sentence

9    that starts with "we were not provided."

10               Do you see that sentence?

11         A.    Yes.

12         Q.    That sentence says, "We were not provided

13   with sufficient information to replicate the actuarial

14   valuation work performed by Towers Perrin."

15               Do you see that?

16         A.    Yes.

17         Q.    Since the time you prepared that this

18   declaration you have provided that information, correct?

19         A.    Yes.

20         Q.    Now your next sentence right after that

21   says, "Since we were not provided with adequate participant

22   data or detailed actuarial assumptions, we have been

23   required to rely, without audit, on the work completed by

24   Towers and presented by Dana in our analysis."

25               That is correct, right?

43

```
 1              A.     Yes.

 2              Q.     Now that's not an entirely true statement,

 3     is it?

 4              A.     It was true at the time.

 5              Q.     Well, at the time it was outside of the

 6     scope of your engagement by the unions to perform an audit

 7     on the work completed by Towers, correct?

 8              A.     No.

 9              Q.     When you were provided the information that

10     you needed to do such an audit, you didn't do that audit,

11     correct?

12              A.     An audit?  Yes.

13              Q.     I'm sorry, I need to --

14              THE COURT:  I don't understand the answer.

15              MR. HAMILTON:  There was a double negative

16     in that question?

17              Q.     Since you prepared this declaration you

18     have been provided with sufficient information to replicate

19     the actuarial valuation performed by Towers Perrin,

20     correct?

21              A.     Yes.

22              Q.     Even though you have the information, you

23     haven't done it, you haven't replicated the actuarial

24     valuation performed by Towers Perrin; correct?

25              A.     Yes, that is correct.
```

44

1        Q.    And the reason you haven't done it is

2  because it was outside of the scope that you were engaged

3  to do by the unions, correct?

4        A.    What I was asked to do was to audit the

5  work, not replicate the valuation, auditing the work gave

6  me sufficient comfort with of what Towers did, that in

7  conjunction with the fact that they were a large actuarial

8  firm gave us comfort that we could rely on their analysis.

9        Q.    All right.  So in any event, the bottom

10  line is that you've now audited the work and you believe

11  the work they did was based on reasonable assumption and

12  you have no reason to doubt any of their numbers, correct?

13        A.    Correct.

14        Q.    Let's go to paragraph 7 of your

15  declaration.

16        A.    Yes.

17        Q.    And you will a pretty fairly lengthy

18  discussion of this concept of caps in connection with this

19  paragraph, the caps that have been imposed.  An as I

20  understand it there have been caps applied not only to the

21  union employees of Dana but also the nonunion employees and

22  the salaried workers as well; is that right?

23        A.    I did not focus on them, but yes I believe

24  there were limit.

25        Q.    So it's not like the union employees were

45

1    singled out to have their retiree benefits capped?

2              A.    No.

3              Q.    And as a matter of fact the non union

4    hourly employees and salaried employees, their benefits

5    have been capped at a higher level and for a much longer

6    time than its union employees, correct?

7              A.    I don't know that for a fact.

8              Q.    Do you have any reason to doubt it?

9              A.    My understanding of the these retiree

10   health plan for salaried employees is in its a different

11   type of cap I don't know when what under the circumstances.

12             Q.    Now these caps, I think that you were kind

13   of hinting in your direct they are not air tight, Dana

14   still has some exposure to increased cost as a result of

15   the inflation of medical costs, correct?

16             A.    On a very limited basis there is one

17   location with 365 prescription drugs that are subject to a

18   cap.  But for medical costs, the caps preclude Dana from

19   being exposed to future inflation.

20             Q.    But what about the lock back that you were

21   describing.  Let's talk about that, all right?

22             A.    Sure.

23             Q.    Used for an example, I tried to follow it

24   but you used a hundred dollars figure and the Dana's cap,

25   you called it Dana's cap is 50?

46

1           A.      Um hum.

2           Q.      But of the actual cost incurred are only 90

3    the employees has to pay 40, right?

4           A.      Yes.

5           Q.      And so Dana actually instead of having to

6    pay 50, pays 60, right?

7           A.      Correct.

8           Q.      And that additional 10 dollars, in your

9    example is the result of medical inflation that occurred

10   during the two year look back period, correct?

11          A.      Correct.

12          Q.      So there is some exposure to Dana of they

13   have to pay the increased medical inflation cost during

14   that two year look back?

15          A.      That's not quite correct.  The exposure to

16   inflation with respect to whatever the redefined cap is,

17   the 50 dollars stated plus the 10 dollar two year

18   deferential is not subject to additional future inflation.

19   So the question is the point of the line 59 which you

20   define the cap relative to inflation over a one or two year

21   period which you would expect to be fairly consistent.

22          Q.      When you are doing your APBO calculations,

23   if you are an actuary, you take into account the fact that

24   there are caps, right?

25          A.      Correct.

47

1          Q.      So the economic impact of the caps is

2     already included in Dana's APBO figures, correct?

3          A.      Correct.

4          Q.      Now, at the end of your paragraph in

5     talking about the caps, this is paragraph 7 you say, "The

6     decrease over time in the FAS 106 expense and liability is

7     consistent with the information reported in Jeffrey

8     Hoffman's declaration which indicates a 23 percent decrease

9     in annual expense from 2006 to 2012 and a 17 percent

10    decrease in liabilities."

11              I read that correctly, right?

12         A.      Yes.

13         Q.      So I'm trying to understand what your

14    argument is here, but let me see if I can get it correctly.

15    Is it fair to say that what you are saying is that in the

16    future over time as current retirees who don't have a cap

17    die, and therefore drop out of the APBO and new retirees

18    who did do have a cap replace them, Dana's APBO and FAS 106

19    expense numbers are going to decline, is that right?

20         A.      That's correct.

21         Q.      So you cite this figure of 23 percent over

22    the next five or six years as somehow supporting that

23    argument, correct?

24         A.      Yes.

25         Q.      So to give the judge an idea of how

48

1   significant this argument is you are making?

2          A.    Yes.   I'm reporting the numbers that Towers

3   is reporting.

4          Q.    So you are suggesting that this 23 percent

5   decrease in the FAS 106 number over the next six years is

6   as a result of people who aren't capped dying being

7   replaced by people who are capped; is that right?

8          A.    Generally yes.

9          Q.    Are you familiar with something called

10  fresh start accounting?

11         A.    Yes.

12         Q.    This wasn't part of any of the training you

13  received in becoming the American Academy of Actuaries, you

14  don't have any bankruptcy expertise, right?

15         A.    Fresh start accounting is a concept that is

16  broader than just bankruptcy.

17         Q.    Do you understand that whether a company

18  come out of Chapter 11 it has an impact on how the APBO

19  number is calculated, correct?

20         A.    The APBO number?

21         Q.    Yes?

22         A.    That's not my understanding liabilities.

23         Q.    Does it have an impact on the FAS 106

24  number?

25         A.    It has an impact on the expense and it has

49

1    an impact on the balance sheet, but the liability

2    calculation is unimpacted by the emergency bankruptcy -- by

3    a fresh start.

4              Q.    Let's turn to Tab 5 of your binder, please?

5              A.    Yes.

6              Q.    This is Debtor's Exhibit 62.

7                    Now does this documentary reflect the

8    original base line numbers that you use to make your

9    assertion of the end of behalf 7, the declaration of the 23

10   decline?

11             A.    No.  This is dated 3/21/07, so --

12             Q.    I know it's not the same document, this has

13   updated numbers, but it includes the numbers that you used

14   to calculate your 23 percent, right?

15             A.    Yes.  It includes the cash, the periodic

16   cost and the liability.

17             Q.    Right.  And if we go to the middle row

18   there are periodic costs, that is what you are referring to

19   when you're talking about in the FAS 106 expense liability,

20   correct?

21             A.    Yes.

22             Q.    And your testimony is from 2006 to 2012

23   there is a 23 percent decline?

24             A.    Based on Towers numbers, yes.

25             Q.    And the Towers number you make that

50

1    argument is the line that says original base line, right?

2           A.      I believe so.

3           Q.      It starts out at 106 and then decline?

4           A.      Yes, I believe so.

5           Q.      And in that decline, by the time you get to

6    2012, is approximately 23 percent, correct?

7           A.      Correct.

8           Q.      And then Mr. Hoffmann updated those numbers

9    for purposes that of of this trial and you have an updated

10   base line do you see that?

11          A.      Yes.

12          Q.      And as part of that update if you look at

13   footnote one it indicates that it was updated to reflect a

14   number of factors, one of which was to reflect the fact,

15   item number E, that it was expected that Dana would emerge

16   from bankruptcy at the end of December 31, 2007, correct?

17          A.      Um hum.

18          Q.      You have to say yes or no for the record.

19          A.      Yes, I'm sorry.

20          Q.      So what we notice is that there is a huge

21   drop off in the annual expense, the FAS 106 expense from

22   2007, when Dana is still in bankruptcy, and 2008 when it's

23   not, right?

24          A.      Correct.

25          Q.      Now that huge drop has nothing to do with

51

1    employees who are not capped dying and being replaced by

2    capped employees, that is entirely a result of fresh start

3    accounting, is it not?

4         A.    No.

5         Q.    Isn't that what Mr. Hoffman testified to on

6    direct?

7         A.    I did not read that part of it.  I would

8    observe that the APBO.

9         Q.    I'm not talking about the APBO, ma'am, I'm

10   talking about --

11             MS. CECCOTTI:  Can the witness please

12   finish her answer.

13             MR. HAMILTON:  She is not answering the

14   question I asked.

15             THE COURT:  I'll allow her to explain it,

16   and you can cross examine it.

17        A.    Fresh start accounting is one component,

18   however, the fact that the liability which drives other

19   components of the expense which is decreasing because of

20   this replacement of uncapped liability and capped

21   liability, is another contributing factor, and a large

22   factor, that would lead to the decrease and expense over

23   time.

24             One of the components of expense is the

25   interest on the liability; a large components of expense.

52

1    So where fresh start may impact other amortization elements

2    that may drive the expense, the liability itself and the

3    decrease in that liability over time drives a good measure

4    of expense and the decrease over time.

5         Q.    Okay.  If you look at the numbers, ma'am,

6    from 2008 to 2009, the FAS 106 expense number decline by

7    less than a million bucks, right?

8         A.    Yes.

9         Q.    And from 2009 to 2010 it decline by less

10   than a million bucks, right?

11        A.    I think that's a little more, but yeah.

12        Q.    Well 92 --

13        A.    Of which one?

14        Q.    The revised one.

15        A.    Updated base line 1?

16        Q.    Yes.

17        A.    Yes.

18        Q.    And then from 2010 to 2011 it declines by a

19   million bucks, right?

20        A.    Yes.

21        Q.    And between 2011 and 2012 it decline by a

22   million bucks, right?

23        A.    Yes.

24        Q.    But from 2007 to 2008 it declines by almost

25   22 million dollars, right?

53

1            A.      Right.

2            Q.      So it's a million dollars in every other

3    year except the year that Dana comes out of bankruptcy,

4    right?

5            A.      Correct.

6            Q.      Okay.  So isn't it fair to say that of the

7    that 22 million dollar decrease from the year they came out

8    of bankruptcy a million dollars or less might be due to

9    something other than the result of fresh start accounting?

10           A.      That's fair.

11           Q.      All right.  So this citing 23 percent

12   figure in your paragraph 7 is somewhat deceptive, right,

13   it's really about a million bucks a year?

14           A.      Give or take.

15           Q.      So if Dana does anything your testimony is

16   that this hundred million dollar a year expense they have

17   will decline about a million dollars a year?

18           A.      Over this particular period of time under

19   these assumptions.

20           Q.      Okay.  That's about one percent a year, not

21   23 percent over five years, right?

22           A.      Yes.

23           Q.      Do you provide any actuarial advice or

24   benefit plan advice at Milliman to companies that have

25   global operations?

54

1          A.      Yes.

2          Q.      And, in fact, if we take a look at tab one

3  of the cross examination binder, this is a brochure

4  prepared by Milliman, correct?

5          A.      Yes.

6          Q.      And if we open up to the first page which

7  actually, if we look behind the cover page where it says

8  Milliman employee benefits, do you see that?

9          A.      Yes.

10         Q.      If you look at the second column, the first

11 full sentence starts with offices do you see that?

12         A.      Yes.

13         Q.      "With offices and principal cities

14 worldwide, Milliman combines global experience with local

15 knowledge.  We can help you be prepared to operate in new

16 markets, expanded beyond your boundaries, and understand

17 how your industry is affected by the developments around

18 the world."  Is that right?

19         A.      Yes.

20         Q.      Have you had occasion to advise your

21 clients regarding the impacts on their benefit programs

22 that they face when they have to compete with employers in

23 other countries like China and India and Mexico that have

24 different healthcare costs experience?

25         A.      Can you elaborate?

55

1          Q.     Well, isn't it fair to say that some of

2    your clients come to you, your clients with global

3    operations, and say one of the reasons that we believe we

4    have to reduce our retiree benefit obligations is because

5    we are competing with overseas operations that don't have

6    the same comparable level of retiree benefit obligations

7    that they have to account for when they produce their

8    competing products, right?

9          A.     Not necessarily.

10         Q.     You haven't had that experience?

11         A.     Not in those specific words.

12         Q.     Do you have any understanding of are what

13   the relative retiree healthcare burdens are on automotive

14   parts suppliers in China or India or Mexico?

15         A.     Yes.

16         Q.     Is it less than the burdens that auto parts

17   suppliers in its United States have?

18         A.     Yes.

19         Q.     And you would agree that one of the reasons

20   an employer would want to reduce the retiree health

21   benefits here in the United States is because of

22   competitive pressures because from get competitors that

23   have lower retiree health costs, right?

24         A.     That could be.

25         Q.     Well, based on your experience of 20 years

56

1    or eighteen years, is it?

2          A.      Yes.

3          Q.      Would you say that therefore with respect

4    to companies in the United States, companies in the United

5    States that are competing globally with competitors in

6    lower cost countries are more likely to want to reduce or

7    eliminate their retiree benefits than companies in the

8    United States that are not completing on a global market?

9          A.      No.

10         Q.      Not likely?

11         A.      No, I have no basis to say that.

12         Q.      And conversely then you have no basis to

13   agree with me that employers that don't compete on a global

14   level on are less interested or less likely to want to on

15   reduce or eliminate their retiree benefits?

16         A.      Employees depends on their financial

17   circumstances whether it's competing or not.

18         Q.      Would you agree with me that for instance

19   transportation companies here in the United States are

20   generally trucking companies, they are not competing with

21   competitors in Asia, right?

22         A.      I don't know.

23         Q.      But communications companies here, the

24   utilities here in the United States they weren't competing

25   with competitors and India?

57

```
1          A.      Communication, yes.

2          Q.      Some communication maybe.

3          A.      (No response)

4          Q.      Is it possible, based on your experience

5   and qualifications as an expert, that one of the reasons

6   that there is a much higher prevalence among large

7   employers in the transportation, communications and

8   utilities industry, there is a much higher percentage of

9   retiree benefits than those employers in the manufacturing

10  segments, and that one of the reasons the employers in the

11  transportation and utilities do not compete with lower cost

12  countries in United States and Mexico.  Is that possible?

13         A.      I have no basis to confirm or deny.

14         Q.      Isn't it true that you and others at

15  Milliman have been assisting at least some clients to

16  terminate and eliminate their retiree benefits for

17  retirees?

18         A.      Yes.

19         Q.      And in fact if you look at tab 12, of your

20  binder, this is Debtor's Exhibit 246, this is a power point

21  presentation presented by one of your colleagues at

22  Milliman; is that correct?

23         A.      Yes.

24         Q.      Do you know do you have any idea where that

25  presentation was made?
```

58

1      A.      No.

2      Q.      If you flip to page 24?

3      A.      Yes.

4      Q.      Is this a picture of what some of your

5  clients like look like whether they come to you?

6                  MS. CECCOTTI:  Your Honor, objection.

7                  MR. HAMILTON:  Is this supposed to --

8                  MS. CECCOTTI:  Objection.

9                  MR. HAMILTON:  This is their penalty.  This

10  is supposed to represent why your clients come to you.

11      A.      This specific exhibit is about Gasby 45

12  accounting rules.  I think I would be holding my head going

13  through some of these accounting rules for the first time.

14                  THE COURT:  I can also replicate that

15  picture when listening to some of the testimony.

16                  MR. HAMILTON:  She is obviously geered to

17  go to battle or win the war, war, your Honor.

18                  THE COURT:  Those are attached to the

19  exhibit.

20      Q.      Summing up the exhibit, let's go to page

21  35.  35 has four bullet points, right?

22      A.      Yes.

23      Q.      And these are actions that Milliman advises

24  their clients they should consider whether they are trying

25  to figure out you how they are going to reduce or eliminate

59

1    their retirees burdens, right?

2           A.     Yes.

3           Q.     And you've advised your clients to consider

4    all four of these, correct?

5           A.     Yes.

6           Q.     Do you have any experience in conducting

7    large surveys of employers in the United States regarding

8    the healthcare benefits they provide to retirees?

9           A.     No.

10          Q.     Have you published any research on how such

11   surveys are conduct the?

12          A.     No.

13          Q.     Have you published any research on how and

14   to what extent you can extrapolate such surveys across the

15   entire United States population?

16          A.     No.

17          Q.     Do you have any personal experience as to

18   what type of companies are likely to respond to such

19   surveys?

20          A.     No.

21          Q.     Do you have any personal experience that

22   tells you what considerations cause some companies to

23   respond to the surveys and cause other companies not to

24   respond to the surveys?

25          A.     Can you ask that question again?

1    Q.  Sure do you have any experience that gives

2 you some understanding as to why some companies decide to

3 respond to the surveys and other companies don't?

4    A.  Yes.

5    Q.  Based on whatever that information and

6 experience is, would you say its fair that companies that

7 are in financial distress are less likely to respond to

8 such surveys than companies that are not?

9    A.  No.

10    Q.  You don't think that's a fair

11 characterization?

12    A.  Have I no reason to say that that's a

13 differentiator.

14    Q.  But you've never conducted such surveys?

15    A.  I have.

16    Q.  But and you your counsel said you reviewed

17 Ms. Mull vase testimony?

18    A.  Yes.

19    Q.  And she told you the court based on her

20 five years at Watson Wyatt conducting such surveys, it was

21 her experience that companies in financial distress were

22 less likely to respond to the surveys because they didn't

23 need to benchmark their programs against financially

24 healthy companies, right?  That's what she said?

25    A.  I read that testimony, yes.

61

```
 1              Q.      You disagree with that?

 2              A.      I have no basis to basis to agree or

 3      disagree.

 4              Q.      So you don't agree?

 5              MS. CECCOTTI:  Your Honor, I think the

 6      witness has answered the question clearly.

 7              MR. HAMILTON:  I'll move on.  I guess

 8      disagree that she answered it clearly, but I'll move on.

 9      BY MR. HAMILTON:

10              Q.      Let's go to your declaration again in

11      paragraph 9?

12              A.      Yes.

13              Q.      All right.  The second sentence says "A

14      Kaiser family foundation 2005 survey indicated that 60

15      percent of employers with more than 5 thousand employees

16      offered post retirement medical coverage."  Did I read that

17      correctly?

18              A.      Yes.

19              Q.      Did I read that correctly?

20              A.      Yes.

21              Q.      How did that sentence get in your report?

22              A.      I read the Kaiser survey and put it in.

23              Q.      You've read the Kaiser 2005 survey?

24              A.      Yes.

25              Q.      Why wasn't it included in your relies
```

62

1    materials that you produced to Dana in this case?

2            A.      I didn't realize it wasn't, sorry.

3            Q.      Okay.  Well on direct -- let's go to Tab 8,

4    Debtor's Exhibit 73?

5            A.      Yes.

6            Q.      Right?

7            A.      Yes.

8            Q.      This is the survey that you say you read,

9    correct?

10           A.      This is the summary of the findings.

11           Q.      And if you look at page 8 you have section

12   11 on retiree health benefits, right?

13           A.      Yes.

14           Q.      This is what you are saying you read,

15   correct?

16           A.      Yes.

17           Q.      Now if we look back at your declaration,

18   the very last page, you have sources?

19           A.      Yes.

20           Q.      This is Tab 3 very last page you put

21   sources?

22           A.      Yes.

23           Q.      That 2005 survey isn't listed as one of

24   your sources, correct?

25           A.      No, it's not.

63

1          Q.      And if we look at tab 7, of your cross

2    examination binder?

3          A.      Yup.

4          Q.      You have an e-mail in clear tuck one of the

5    union lawyers to you indicating that she wanted to ask you

6    to if you wanted us to submit the following reports as

7    exhibits which you lift as sources in your report it lists

8    those two sources?

9          A.      Yes.

10         Q.      There's no reference to the Kaiser 2005

11   exhibits, correct?

12         A.      Yes.

13         Q.      There's not a reference?

14         A.      Correct.

15         Q.      Well, if we go to Tab 8, which is the 2005

16   survey, which you said you read and then put in the report,

17   the figure on page 116 for jumbo employers with 5 thousand

18   or more workers is 55 percent, right?

19         A.      Correct.

20         Q.      Not 60, correct?

21         A.      Yup.

22         Q.      How did you turn 55 into 60?

23         A.      I screwed up.  I made a mistake.

24         Q.      How did a mistake occur?  How does 55

25   become 60?

64

1          MS. CECCOTTI:  Your Honor, again, I think

2     she is answered the question.

3          THE COURT:  Sustained.

4          Q.     Going back to your declaration paragraph 9,

5     the third sentence talks about a review of financial

6     statement who did that review of the S&P companies?

7          A.     Milliman's research department.

8          Q.     At your direction?

9          A.     They do it at as part of the service they

10    provide to consultants.

11         Q.     Did they -- thousand do you find out about

12    the research?

13         A.     The research an available to Milliman

14    consultants.  I asked for a specific extract and to whole

15    specific figures among a large data base there Milliman

16    maintains for various purposes.

17         Q.     Okay.  And of the 64 percent of the 500

18    employers that were reviewed, that still offer retiree

19    healthcare to all or part of their work force, how many of

20    that 64 percent are in financial distress?

21         A.     I don't know those numbers off the top of

22    my head.

23         Q.     How many of that 64 percent are in the

24    manufacturing industry as opposed to transportation

25    communications or utilities?

65

1          A.     I don't know that number off the top of my

2    head.

3          Q.     What does part of the work force mean in

4    that sentence?

5          A.     It means that they have an OPED liabilities

6    and we did not determine whether the OPED liability applies

7    to the entire work force or part of the work force.

8          Q.     All right.  Let's go to paragraph 11 of

9    your declaration where you cite the 2005 Watson Wyatt study

10   of 164 companies.

11              Now, if I could ask you to turn very

12   quickly to Tab 11?

13         A.     Yes.

14         Q.     This is the executive summary of that

15   survey correct?

16         A.     Yes.

17         Q.     It's not the full survey?

18         A.     Correct.

19         Q.     Did you produce the full survey in the

20   reliance materials?

21         A.     No the executive summary.

22         Q.     Did you review the full survey?

23         A.     No, the executive summary.

24         Q.     So all you looked at was the executive

25   summary?

66

1           A.      Yes.

2           Q.      Do you know what the response because how

3    they got the 164 companies?

4           A.      I don't know the response rate.

5           Q.      Do you know whether or not what percentage

6    of the 164 companies that responded to the survey are in

7    financial distress?

8           A.      No, I do not.

9           Q.      Do you have any idea of what percentage of

10   the company's that did not responds to the survey are in

11   financial distress?

12          A.      I don't know the left of the survey initial

13   send.

14          Q.      Would you agree that a company is in severe

15   financial distress would be March likely to eliminate

16   benefits for rear rise than a company that's not in

17   financial distress?

18          A.      It's possible.

19          Q.      I know it's possible.  Why my question is

20   would you agree with it?

21          A.      Yes.

22          Q.      If I could ask you to turn again to Tab 11

23   which is the executive summary.  The second paragraph says

24   "The results of our 2006 survey on retiree medical benefits

25   show that while most employers, most employers are

67

1    disengaging from or reducing retiree medical benefits they

2    have not yet settled on a strategy for doing so yet."

3    Would you agree with that?

4         A.    Not necessarily.

5         Q.    So while you want to use the statistics

6    from the survey you don't agree with its conclusions from

7    the people that made the surveys; is that correct?

8         A.    It's the employers have certainly provided

9    various strategies, at least in the short term, for

10   changing or what they intend to do with respect to the

11   benefits.

12        Q.    If we can go to page 34 of the executive

13   summary under future planning?

14        A.    Yes.

15        Q.    The second paragraph says "Strategies

16   differ for current and future retirees, although an

17   increased level of employee responsibility and cost cutting

18   is apparent throughout.  In fact very few employers

19   anticipate placing no further restrictions on benefit

20   offerings to both their future and current retirees (5 and

21   7 percent respectively) and changing in the employees

22   contributions and overall plan design are planned for many

23   pre- and post 65 retirees."  Did I read that correctly?

24        A.    Yes.

25        Q.    Do you agree with those findings?

68

1          A.     Based on the statistics shown in this

2     exhibit, yes.

3          Q.     And if we look at the last page, page 4 the

4     executive summary under conclusion, the very last paragraph

5     says, "In sum, employers will continue to shift more plan

6     responsibility to their current and future retirees."  Do

7     you agree with that sentence I just read?

8          A.     Yes.

9          Q.     All right.  Let's go to paragraph 12 of

10    your declaration again Tab 3 of the binder?

11         A.     Yes.

12         Q.     Very last sentence says, "Based on various

13    reports including a 2005 Kaiser study, almost 80 percent of

14    large employers kept their retiree prescription drug

15    programs and took the subsidy in 2006, 2007."  Did I read

16    that correctly?

17         A.     Yes.

18         Q.     This particular Kaiser, study this wasn't a

19    normal annual study, this was an on line study conducted

20    during a six month period in 2005, correct?

21         A.     I believe so.

22         Q.     This study expressly excluded from its

23    survey employers that had already eliminated retiree health

24    benefit coverage, correct?

25         A.     Yes.

1        Q.      In fact if we turn to Tab 6 in your binder,

2   this is the study that you are referring to there, right?

3        A.      Yes.

4        Q.      This is the study that you cite as one of

5   your sources?

6        A.      Yes.

7        Q.      Right.

8        A.      Yes.

9        Q.      And if you look at the very first page of

10  the executive summary --

11       A.      Yes.

12       Q.      -- which has a little -- what do you call

13  that?  A little Roman 5 there?

14       A.      V, yes.

15       Q.      The v.

16       A.      Yes.

17       Q.      Third paragraph there is a reference there

18  to the big study, the last sentence says, "Between 1988 and

19  2005 the share of employers with 200 or more employees

20  offering retiree health benefits declined from 66 percent

21  to 33 percent, which likely to increase such retirees

22  without such benefit.  Do you see that?

23       A.      Yes.

24       Q.      Did I read that correctly?

25       A.      Yes.

70

1          Q.      And it's citing the big study, correct?

2          A.      Yes.

3          Q.      If we go to the very back, page 47 of this

4    survey, this is the appendix that described the method of

5    survey approach, correct?

6          A.      Yes.

7          Q.      The second paragraph says, "By design, the

8    Kaiser Hewlett survey focused exclusively on large private

9    employers that currently provide retiree health coverage

10   rather than surveying employers who do not offer coverage?

11   Did I read that right correctly?

12         A.      Yes.

13         Q.      The next sentence says that it's based on a

14   non probability sample because there was no database from

15   which a random sample could be drawn, correct?

16         A.      Yes.

17         Q.      And if we go to the bottom of page 47,

18   under the heading characteristic of participating

19   employers, it says, "Overall, 335 employers responded to

20   the survey.  Employers not providing coverage, those with

21   fewer than 1,000 employees, and government employers were

22   excluded, living a total of 300 large and private employers

23   whose responses are included in the survey analysis."

24   Correct?

25         A.      Yes.

71

1      Q.      So if we go back to your declaration Tab 3

2  paragraph 12, the last sentence, really to make this

3  sentence the truth, the whole truth, and nothing by but the

4  truth, you have to modify it so that it reads based on

5  various reports, including a 2005 Kaiser study, almost 80

6  percent of large employers who still provided the benefit

7  in 2005, kept their retiree prescription drug programs and

8  took the subsidy in 2006, 2007, correct?

9      A.      That's correct.  You need to provide a

10  program to be eligible for the subsidy.

11      Q.      Right.  It's not fair to say that 80

12  percent of large employers took the subsidy because that

13  number excludes all of the large employers who had already

14  eliminated the benefit before 2005, correct?

15      A.      Yes.

16      Q.      All right, let's go back to that study

17  because there's some other statistics in there that are

18  kind of interesting.  This is Tab 6.  Again on the

19  executive survey, this time the page that has the little

20  vi, there's a reference to the survey methods.  The second

21  paragraph gives you some indication of what the response

22  rate was, right?

23      A.      Yes.

24      Q.      And it indicates that it's a response rate

25  of between 19 to 36 percent, depending on the size of the

72

1    employers, correct?

2         A.    Yes.

3         Q.    Which indicates that most of the company's

4    which were sent the survey chose not to respond, correct?

5         A.    Yes.

6         Q.    If we flip then to two pages to the viii.

7    The second bullet under premiums starts with 19 percent.

8    Do you see that?

9         A.    Yes.

10         Q.    It says "19 percent of surveyed firms

11    require newly retiree age 65 plus retirees in the largest

12    plan to pay one hundred percent of the total premium for

13    their health insurance coverage, correct?

14         A.    Yes.

15         Q.    Now, the next sentence -- I mean the next

16    paragraph starts with changes between 2004 and 2005.  And

17    the first bullet says, "Nearly 3 and 4 employers, 75

18    percent in parenthesis increased retiree contributions in

19    premiums between 2004 and 2005."  Is that correct?

20         A.    (No response).

21         Q.    Did I read that correctly?

22         A.    You read it correctly.

23         Q.    Do you agree with their figure?

24         A.    I have no reason to believe it's incorrect

25    for the surveyed group.

73

1        Q.        And that's referring to increasing

2    contributions for current retirees, correct?

3        A.        Yes.

4        Q.        From the perspective of a current retiree

5    of Dana, if, as a result of this proceeding and

6    negotiations that may occur that may obviate the need for

7    the judge to have to make a ruling or whatever the judge

8    rules, a VEBA is created a money is put into the VEBA, from

9    the perspective of the Dana retiree, the result is that

10   retiree is going to have to pay a higher percentage of the

11   premium for his healthcare coverage, right, whatever the

12   VEBA didn't doesn't cover, right?

13       A.        Yes.

14       Q.        So from the perspective of a Dana retiree,

15   what we are proposing is the same as what nearly 3 and 4

16   employers are doing according to this survey, right?  We

17   are increasing their current retiree contribution to their

18   premiums.

19                 MS. CECCOTTI:  I'm going to object to

20   counsel's characterization of the proposals.  I don't know

21   that he has described the proposal for the unions.

22                 MR. HAMILTON:  You did it on direct.

23       Q.        It's a VEBA with money in it, correct?

24                 MS. CECCOTTI:  That's not the company's

25   proposal.

74

1           MR. HAMILTON:  Let me start over, Judge, I

2    would rather not argue with her, I would rather ask the

3    witness a question.

4           THE COURT:  So her objections as to form is

5    sustained.

6           MR. HAMILTON:  Okay.

7    BY MR. HAMILTON:

8        Q.     You understand the that the proposal by the

9    debtors to create a VEBA for Dana's current retirees, and

10    there's a proposal to put money in the VEBA, right?

11       A.     Yes, to eliminate benefits, put money in

12    the VEBA.

13       Q.     And the money in the VEBA will be used to

14    subsidize whatever health insurance coverage the current

15    retirees get, right?

16           MS. CECCOTTI:  Your Honor, once again I'm

17    going to object because I think the witnesses testimony

18    is --

19           MR. HAMILTON:  I don't want her to testify.

20           THE COURT:  The witness is now asked a

21    specific question.  She can either answer it or not.

22           MS. CECCOTTI:  Based on an incorrect

23    description of a proposal, or an incomplete description of

24    a proposal.

25           THE COURT:  You'll have an opportunity to

75

1    redirect.

2                    MR. HAMILTON:  Thank you, your Honor.

3         Q.     The money in the VEBA will be used -- your

4    understanding is that the money in the VEBA will be used to

5    subsidize the retiree health insurance that the current

6    retirees get, right?

7         A.     I'm not clear on the details, but I do

8    understand that there was a proposal of some funding.  It's

9    unclear as to whether that will be used or already spent

10   with respect to previous claims.

11        Q.     Obviously it depends on how much money is

12   put in the VEBA, right?

13        A.     Yes.

14        Q.     And we know that with respect to the

15   nonunion retirees, there's going to be 78 million dollars

16   put in the VEBA, right?

17        A.     I don't know the details of that so I don't

18   know.

19        Q.     If a significant amount of money is put

20   into the VEBA as a result of negotiation as a result of a

21   recovery on a claim or however it happens, the result from

22   a the perspective of the Dana retiree is they are going to

23   have to pay a require percentage of their premiums than

24   they did before the 1113, 1114 proposal, right?

25                    MR. LEVINE:  I'm going to object to form

76

1    again.

2                    THE COURT:  Overruled.

3                    Do you understand the question?

4                    THE WITNESS:  Yes.

5          A.     To the extent that coverage is continued to

6    be offered, yes, they would have to pay much more for it.

7          Q.     And that's consistent with what 3 out of 4

8    large employees are doing for current retirees are doing

9    according to the 2005 Kaiser survey that you cited in your

10   report, right?

11         A.     Yes.

12         Q.     If we flip to the executive summary with

13   the x, page 10 of the executive summary, that says, "9

14   percent of surveyed employers, leaving out the hyphened

15   phrase, 9 percent of the surveyed employers report that

16   they are likely to discontinue drug and/or medical coverage

17   for the plan with the largest group of age 65 plus

18   retirees."  Correct?  Did I read that right?

19         A.     You read it right.

20         Q.     And that's referring to current retirees,

21   correct?

22         A.     I believe so.

23         Q.     Okay.  Now just to keep in mind let's go

24   back to how we got on this let's go back to your

25   declaration Tab 3, paragraph 12 last sentence based on this

77

1    study that we've been looking at you conclude there 80

2    percent of large employers, who are still provided the

3    benefits in 2005, kept their retiree prescription drug

4    programs and took the subsidy in 2006, 2007, correct?

5              A.    Yes.

6              Q.    Now, there was a larger percentage than

7    what's indicated here that indicate they weren't sure what

8    they were going to do in years after 2007, right?

9              A.    This question is specific to 2006.

10             Q.    Yes, 2006, 2007.  Let's go back to the

11   survey again Tab 6, xi page 11 of the executive summary.

12                   In the middle of the page there's a heading

13   that says Medicare strategies beyond 2006.  Do you see

14   that?

15             A.    Yes.

16             Q.    The first bullet has your eight out of ten,

17   your 80 percent figure, right?

18             A.    Right.

19             Q.    The second bullet says, "The share of

20   employers reporting they 'don't know' what their firm will

21   do increases from 11 percent for 2007 to 28 percent for

22   2010."

23             A.    Yes.

24             Q.    Did I read with that correctly?

25             A.    Yes.

78

1          Q.      Do you agree with that?

2          A.      Yes.  I think it's hard to have employers

3     predict the future.

4          Q.      Let's go to Tab 10 of your cross

5     examination binder.  These are materials that you relied on

6     in your preparing your report?

7          A.      Yes.

8          Q.      That's what the ST is at the bottom?

9          A.      Yes.

10         Q.      Ms. Taranto, I'm going to skip the

11    interesting quotes on the first page because you've already

12    covered that.  Let's go to the third page.

13         A.      132?

14         Q.      Yes.

15         A.      Okay.

16         Q.      These are quotes from an article by Jerry

17    Geisel in some publication called Business Insurance at the

18    end of 2005, correct?

19         A.      Yes.

20         Q.      And on the third page there about halfway

21    down there's a paragraph that starts with the word but, but

22    Kaiser.  Do you see that?

23         A.      Yes.

24         Q.      It says, "But Kaiser and Hewlett experts

25    say that for many employers the decision to take the

79

1    subsidy is a short term strategy and one made to give

2    employers more time to analyze and decide on a longer term

3    approach.  'Employers no doubt will revisit those

4    decisions' said Trishia Newman, a Kaiser VP in Washington."

5    Did I read that correctly?

6           A.    Yes.

7           Q.    Did you do agree with that?

8           A.    Yes.

9           Q.    Let's go down to the next paragraph, and

10   the next paragraph starts with the word indeed.  Do you see

11   that?

12          A.    Yes.

13          Q.    It says, "Indeed, when employers were

14   making their retiree health care plan decisions in 2006, it

15   wasn't known, for example, how many health insurers

16   prescription benefit managers and others would enter the

17   Medicare prescription drug market.  That no longer is a

18   concern with retirees in many parts of the country able to

19   choose from a plethora of Medicare prescription drug plans

20   or PDPs from insurers and others."  Did I read that

21   correctly?

22          A.    Yes.

23          Q.    Do you agree with it?

24          A.    Yes.

25          Q.    Let's go on.  "With more certainty in the

80

1    prescription drug market, the percentage of employers

2    retaining plans that qualify for the 28 percent subsidy is

3    likely to drop according to the survey.  For example, while

4    about eight and ten surveyed employers said they are taking

5    the subsidy next year and expect to do the same in 2007,

6    only about 50 percent of employers say they expect to do so

7    in 2010."  Do I read that correctly?

8         A.    Yes.

9         Q.    Is there a reason why you didn't include

10   that 50 percent figure in your report?

11        A.    Because the survey itself suggested that

12   employers didn't know what they were going to do.

13        Q.    But there was an indication that 50 percent

14   say they expect to not take the subsidy in 2010?

15        A.    50 percent said they expect to take the

16   subsidy, 50 percent said they did not know what they are

17   going to do.

18        Q.    Fair enough.  Last paragraph, on the bottom

19   of the page, it carries over.  It starts with word

20   ultimately.  Do you see that?

21        A.    Yes.

22        Q.    It says, "Ultimately, whether employers

23   will maintain drug coverage for Medicare retirees, or for

24   that matter any retiree healthcare coverage over the long

25   term, will depend on several factors.  One key factor is

81

1    how great the financial burden to provide coverage will

2    prove to be over time the survey notes."  Do you agree with

3    that?

4              A.      Yes.

5              Q.      Back to your declaration, Tab 3?

6              A.      Yes.

7              Q.      Paragraph 14, page 6.  The second sentence

8    starts with the phrase in our experience.  Do you see that?

9              A.      Yes.

10             Q.      Now the experience that you are referring

11   to there is your experience in two years at Milliman and a

12   couple companies before and that, and then I guess at

13   Watson Wyatt, and the experience of two other gentleman at

14   Milliman that you've talked to about this case; is that

15   correct?

16             A.      Yes.  And the experience of the employers

17   that I have not only worked on personally but have peer

18   reviewed for other consultants at Milliman.

19             Q.      Okay, but it's the experience that you

20   collected --

21             A.      That's right.  As well as the experience

22   that I collected from participating in various seminars and

23   other educational and information sharing as part of being

24   a consulting actuary in a large firm.

25             Q.      And how much of that experience have you

82

1    collected in all those different capacity related to

2    companies in severe financial distress or bankruptcy?

3          A.    Certainly there are companies in severe

4    financial distress that I had personally worked on.  The

5    work related to General Motors and Ford relates to

6    companies in financial distress.

7          Q.    Right and GM created a VEBA, right?

8          A.    Yes.

9          Q.    And GM isn't in bankruptcy, their creditors

10   are getting paid one hundred cents on the dollar, correct?

11         A.    Yes.

12         Q.    Unlike Dana's creditors?

13         A.    Yes.

14         Q.    Do you think that should have any effect of

15   how much goes in the VEBA?

16         A.    (No response).

17         Q.    You don't know?

18         A.    That's a subject of negotiation.

19         Q.    Good, I agree.  The last sentence of that

20   paragraph, "Because of this leverage and the here leverage

21   you are talking about here is like imposing caps I believe,

22   or -- no; increase in the contributions of the deductibles

23   over time -- I'm sorry.

24               Paragraph 14, the last sentence, what is

25   the leverage you are referring to there?

83

1          A.      The capping.

2          Q.      "Because of this leverage limiting the

3    future growth of benefits achieves significant cost savings

4    while more gradually impacting the living standard of the

5    retiree."

6          A.      Yes.

7          Q.      And the significant cost savings that you

8    are referring to there are the one percent or one million

9    bucks a year for Dana it does nothing, right?

10         A.      No.   The significant cost savings are the

11   650 million dollar differential in liability that it

12   already has taken into account and the relating impact.

13   The numbers are already there.

14         Q.      They have already done that?

15         A.      Yes.

16         Q.      And after having done that they are losing

17   a couple hundred million dollars a year, right?

18         A.      (No response).

19         Q.      Dana is in bankruptcy, right?

20         A.      Right.

21         Q.      Let's talk about the availability of

22   healthcare insurance for current retirees if the Dana

23   program is eliminated.   In paragraphs 16 through 17 of your

24   declaration.   Paragraph 16 talks about what might be

25   available for pre- 65 current retirees and the problem that

84

1    Cobra might be expensive, correct?

2          A.    Yes.

3          Q.    And you have a sentence in there that says,

4    second to last one says, "Some retirees might not be

5    insurable at all outside of the Dana Cobra coverage because

6    of their medical status."  Right?

7          A.    Right.

8          Q.    Just so the court knows, you've provided

9    some data analysis and advise to the union with respect to

10   negotiation and strategy with respect to our proposals that

11   you haven't shared with us, right?

12         A.    Yes.

13         Q.    And you have looked into issues regarding

14   availability of insurance with respect to their negotiating

15   strategy, but have not allowed us to inquire into that,

16   correct?

17         A.    No.

18         Q.    You don't recall your counsel instructing

19   you not to answer the question at your deposition regarding

20   insurance to retirees to the effect it might implicate

21   their negotiating strategy; you don't recall that?

22               MR. LEVINE:  Your Honor, not to double

23   team, but for the record I was counsel at Ms. Taranto's

24   deposition, and I don't believe that it was appropriate to

25   ask the witness the fact that the expert what counsels

85

1    objection were.  I would be happy to advise the court

2    precisely what the nature of my objections were and I'd be

3    happy to advise the court that what the nature of my

4    agreements were with counsel at the time of the deposition

5    with respect to these kinds of matters.

6              I really think that it's inappropriate and

7    I will represent to this court that we expressed -- I

8    expressed concern about privilege and confidential act with

9    the hope that we would be able to work it without out

10   before your Honor and not in cross examination.

11             And I find for the record your Honor that

12   it's very disappointing that we find now for the first time

13   that there were problems with confidentiality and privilege

14   which were supposed to have been addressed between counsel.

15   Thank you your Honor.

16             THE COURT:  Well, I'm listening to the

17   exchange.  And I don't think counsel has gone into the

18   depth to raise the concerns that you are now expressed

19   which I think are legitimate.  But so far, at this point,

20   he's not achieved that depth, but I will tell him he's just

21   about there.

22             MR. HAMILTON:  And I wasn't trying to

23   inquire into the privilege or anything.

24             THE COURT:  I would have stopped you.

25             MR. HAMILTON:  And I understand that, your

1    Honor.  But believe me, having represented the retiree

2    committee in Tower, I'm very much aware of this issue.  And

3    I want to ask her about this sentence in her declaration

4    where she is swearing under own oath and giving you advise

5    and telling you to do doing something based on what she

6    says here.  And she says...

7            Q.    Is it not correct, paragraph 16.  "Some

8    retirees may not be insurable at all outside of the Dana

9    Cobra coverage because of their medical status."  You do

10   say that, correct?

11           A.    Yes.

12           Q.    Is it possible that the VEBA could be

13   structured in a way that it could provide subsidy payments

14   to individuals, current retirees, that are unable to get

15   medical insurance outside of Cobra, right?  In other words,

16   you could take money from the VEBA and subsidize the Cobra

17   payments for the current retirees that can't get insurance

18   anywhere else.  Right?

19           A.    Right.

20           Q.    That would be up to the trustees of the

21   VEBA of how they wanted to structure it.  But if they

22   wanted to, they could take more of the money in the VEBA

23   and give it to the people who can't get insurance elsewhere

24   than to other people who don't need it, right?  They could

25   structure it that way?

87

1         A.      Yes.

2         Q.      Is isn't it possible that pre- 65 retirees

3    of Dana may have other insurance from other employers?

4    They may have got he been a job somewhere else?

5         A.      It is possibility.

6         Q.      It's possible that their spouse has

7    insurance from another employer; cetera isn't that right?

8         A.      It is possible.

9         Q.      And you didn't do any analyses to determine

10   whether or not pre- 65 retirees have insurance from some

11   other employer, correct?

12        A.      Correct.

13        Q.      Let's look at paragraph 17, the comparison

14   of the Medicare costs for retirees and their pension

15   benefits.

16                Paragraph 17 on your calculation of the

17   average pension benefit, did you include in that

18   calculation individuals who are called terminated vested?

19   They had there rights to pension vested, they left the

20   company but they don't yet have the right to receive

21   payments?

22        A.      Yes.

23        Q.      You included that in there?

24        A.      Yes.  Terminated vested participants who

25   have subsequently retired.

88

1          Q.      Yes.

2          A.      Not terminated vested participants who have

3     not yet retired.

4          Q.      That's right.  But they are not yet

5     receiving benefits, right?

6          A.      Anybody who is not receiving a benefit is

7     not included in this calculation.

8          Q.      Okay.  Are surviving spouses included in

9     this calculation?

10         A.      Surviving spouses to the extent that they

11    are receiving benefits from the company's pension plan are

12    included in this calculation.  Surviving spouses with zero

13    benefits are not included in this average on the pension.

14         Q.      When performing this comparison, isn't it

15    true that Dana's current retirees, many of them, are

16    already paying a portion of their Medicare premiums and

17    deductibles right now without being covered by Dana,

18    correct?

19         A.      Yes.

20         Q.      They have to pay some of it?

21         A.      Yes.

22         Q.      So they are already having to use, by your

23    comparison in your analysis, they are already is a clunk of

24    that pension that's going to this Medicare cost already,

25    right?

89

1          A.     Yes.

2          Q.     And as a result of the VEBA, a bigger chunk

3     of that pension is going to go, right?

4                 MS. CECCOTTI:  Again, object to the form.

5                 THE COURT:  Sustained.

6          Q.     If the pension, the average pension that

7     you say is in the neighborhood of five thousand or

8     whatever, just as a matter of question, because I don't

9     want to you scare these people or make them thing we are

10    cutting more than we are, in your declaration you say the

11    average monthly pension is 4 thousand bucks, that's a typo,

12    right?  It's average annual pension?  They are not getting

13    4 thousand dollars a month, are they?  Look at your

14    supplemental declaration.

15         A.     Oh, yes, I said it per year, you're right.

16         Q.     Page 7?

17         A.     Yes, you're right.

18         Q.     If they were getting 50 thousand dollars a

19    year in pension they really wouldn't have any problems,

20    would they?

21         A.     (No response).

22         Q.     That's annual, right?

23         A.     Yes.

24         Q.     If now, if that's their only source of

25    income, if all they are getting is 5 thousand bucks a year

1    or 7 bucks a year, or whatever it is, there are safety

2    nets, right, they would be eligible for Medicaid, correct?

3            A.    I'm not sure with that income they would.

4            Q.    Isn't it true that if your income is less

5    than 10 thousand as a single person you would be entitled

6    to Medicaid?

7            A.    The interplay with Social Security and

8    others I don't profess to know the details of the Medicaid

9    rules.

10           Q.    You are not an expert on that?

11           A.    Not on Medicaid, no.

12           Q.    Well, you are offering expert testimony

13   here on what portion of their pension income is going to

14   have to pay for Medicaid, and you can't tell the court

15   whether or not they are entitled to Medicaid if that's all

16   they've got?

17           A.    I'm offering a present value of benefits as

18   a data point in terms of the value of Dana's pension

19   benefit.

20           Q.    I understand that.  So you don't know that

21   if their income is between 10 and 13 thousand they are

22   eligible for the Medicaid supplementation for their

23   premiums.  You don't know that?

24               MS. CECCOTTI:  Your Honor, I think the

25   witness has already answered with respect to her knowledge

91

1    with respect to the intricate Medicaid rules.

2                    THE COURT:  And I would also sustain an

3    objection as to form, because Medicaid is regulated, to

4    some extent, by individual state law.

5                    MS. CECCOTTI:  And I would make that

6    objection as well.

7                    THE COURT:  Pardon?

8                    MS. CECCOTTI:  I would make that objection

9    as well.

10   BY MR. HAMILTON:

11        Q.    Isn't it fair to say that most people in

12   this country that receive Medicare, over 75 percent, do not

13   receive supplementation or premium subsidies from a

14   previous employer?

15        A.    I believe that's correct, based on, for

16   example, the Kaiser survey.

17        Q.    So somehow most of the people in this

18   country seem to get by in paying their Medicare insurance

19   premiums, right, without any supplementation?

20        A.    In terms of employers sponsored health

21   plan, yes.

22        Q.    Okay.  And with respect to this group, I

23   asked you before about the pre- 65 group...

24                    MR. HAMILTON:  And I'm getting to the end,

25   Judge ...

92

1          Q.      But with respect to this group, this is the

2     Medicare eligible group, you didn't consider in your

3     analyses whether or not they had any other sources of

4     insurance, correct, from a spouse or other employer?

5          A.      No.

6          Q.      You didn't consider whether they had any

7     other source of income or savings like a 401K or a new job

8     or business they are running?

9          A.      No.

10         Q.      I would ask you to turn to Tab 13?

11         A.      Yes.

12         Q.      This is a Milliman publication from the

13    summer of 2005; is that correct?

14         A.      Yes.

15         Q.      This is where you are working, right?

16         A.      Yes.

17         Q.      We turn to page it's titled providing

18    retiree benefits for an active older population.  And I

19    know it's judge is going to be interested in this.  I want

20    to look on page 7, the first paragraph under the heading a

21    change in work ethic.  "Boomers clearly intend to work

22    longer over.  The course of their careers, most will work

23    for a far longer total number of employers than any

24    previous generation.  Many boomers will wind up their

25    employment days working for themselves.  Recent surveys of

93

1    AARP and others confirms that up to 80 percent of

2    respondents intend to work well into their 70s.

3                Do you see that?

4        A.      Yes.

5        Q.      Do you agree with that?

6        A.      That's news to me.

7        Q.      It would be fair to say that at least some

8    portion of Dana's current retirees that are Medicaid

9    eligible are now currently working and have other sources

10   of income from working, correct?

11       A.      I have no basis to opine.

12       Q.      If I could ask you to turn to Tab 14.

13              MR. HAMILTON:  I have some final cleanup,

14   Judge, and I'm done.

15       Q.      This is Debtor's Exhibit 254.  This is an

16   article from a publication that was produced by Milliman;

17   is that correct, Ms. Taranto?

18       A.      Yes.

19       Q.      Gerold Cole who works at Milliman?

20       A.      Yes.

21       Q.      He's with their employees benefits research

22   group, right?

23       A.      Yes.

24       Q.      First paragraph of the article under

25   employees and health savings account says, "In an effort to

94

1    dope for every escalating cost of healthcare, employers are

2    turning more and more to the concept of consumer driven

3    health plans.  The idea behind such plans is that if the

4    employees have a direct monetary interest of healthcare,

5    they will by healthcare just as a rationale consumer buys

6    anything else, that means the employees will try to get the

7    most bang for their healthcare buck."  Do you agree with

8    that?

9            A.    That's the idea behind closed plans, yes.

10           Q.    Last page of the article under other

11   considerations, first paragraph there is a reference to

12   something that Mr. Arkett was talking about earlier about

13   adverse selection.  The last sentence says, "To avoid this

14   'adverse selection' an employer could offer only HDHP's."

15   Do you see that?

16           A.    Yes.

17           Q.    Is that something your company advises its

18   clients as an option they should consider to avoid adverse

19   selection?

20           A.    It is one of the options.

21           Q.    That your company advises its clients

22   about?

23           A.    Informs it's clients, yes.

24           Q.    Last paragraph, last sentence "Given the

25   trend to use consumer driven health plans as a key

95

1    component to controlling escalating health care costs,

2    HSA's will be with us for the foreseeable future."  Do you

3    see that?

4              A.    Yes.

5              Q.    Tab 15?

6              A.    Yes.

7              Q.    There's this is other Milliman publication

8    from your company?

9              A.    Yes.

10             Q.    From last fall, life after work the future

11   of retirement security; that's the title?

12             A.    Yes.

13             Q.    If you could turn to the first page, the

14   next page under the heading consumer driven healthcare

15   taking the long view, an article written by Michael Stern;

16   is that correct?

17             A.    Yes.

18             Q.    He's with your Milwaukee office

19   specializing in healthcare?

20             A.    Yes.

21             Q.    The second paragraph there says there's a

22   clear road map.  Do you see that?

23             A.    Yes.

24             Q.    It says, "There is a clear road map to

25   understanding than you might imagine in response to

96

1    disconcerting spikes in medical costs, ill considered

2    spending uninsured consumers and a general kaleidoscope

3    changes rolling our healthcare system the health insurance

4    industry is realigning toward a consumer based model."  Do

5    you agree with that?

6            A.      Perhaps directionally, yes.

7            Q.      Next tab, Tab 16.  This is an employee

8    benefit advisor article from September of of 2006; is that

9    correct?

10           A.      Yes.

11           Q.      You saw this at your deposition, didn't

12   you?

13           A.      Right.

14           Q.      Debtor's Exhibit 257.  The second paragraph

15   by Ms. Silva "Milliman's 2006 group health insurance survey

16   does indicate a continuing shift to CDH products.  A trend

17   advisors believe is an important factor in tightening the

18   belt on health and medical costs."  Do you agree with that?

19           A.      Certainly the number of consumer driven

20   health plans offered by insurer increase, they are still a

21   very small percent of the total product and offering.

22           Q.      And the next paragraph, it's a quote from

23   somebody, it says, "I'm convinced that health savings

24   accounts and health reimbursement arrangements are the

25   future of the healthcare financing in this country because

1    we just can't continue to support what we are doing right

2    now says Rod Rigatta president and COO of the Denver based

3    Gemini Group."  Do you see that?

4          A.    Yes.

5          Q.    Did you agree with his analysis?

6          A.    I don't agree or disagree.

7          Q.    Okay.  Tab 17 an article from the Albany

8    Times Union that you saw at your deposition?

9          A.    Right.

10         Q.    The fifth paragraph down starts with the

11   word expect more.  Do you see that?

12         A.    Yes.

13         Q.    It says, "Expect more pension plans to be

14   frozen or benefits no longer accrued for the employee or

15   where the employer ends up with insurance annuity to cover

16   wherever was owed to him at the plant's termination.  Do

17   you see that?

18         A.    Yes.

19               MS. CECCOTTI:  Your Honor, objection.  This

20   is, despite the fact they we lived through many hours of

21   this at Ms. Taranto's deposition, I think that this is

22   really just cross examination by ambush where she is

23   expected to look at an article that she may have only seen

24   once before and pluck one paragraph out, and counsel is

25   simply trying to read into the record as if offered for its

98

1    truth, some statement in a newspaper article.

2              MR. HAMILTON:  Well, we're going to

3    subsequent quotes in this article by her firm, Milliman,

4    regarding pension plan increases.

5              THE COURT:  I've noticed that.  And Mrs.

6    Ceccotti, I also note that in the scheme of things, he's at

7    the very last exhibit.

8              MS. CECCOTTI:  I understand.

9              THE COURT:  So it appears we are only going

10   to tolerate this for one last question.

11             MS. CECCOTTI:  I understand that, Judge.

12   But I would I would also like to say that I don't believe

13   that Ms. Taranto has opined in her declaration on pension

14   issues.

15             MR. HAMILTON:  No, but her firm has, Judge.

16             MS. CECCOTTI:  She is here for her report

17   which doesn't discuss pension issues.

18             MR. HAMILTON:  On your direct.  On my cross

19   she is.

20             MS. CECCOTTI:  No.  On your cross she is

21   here beyond the scope of her direct, even broadly defined.

22             THE COURT:  Well, we are getting into areas

23   where Milliman, her employer, her organization, with which

24   she should be very, very familiar and which apparently she

25   is familiar, I don't see that she is being tasked with

99

1    looking at something strange, she is being directed to

2    individual areas where Milliman is has taken a position.

3                Your objection is overruled, and confine

4    yourself to this last exhibit.

5                MR. HAMILTON:  All right.  I had two more

6    exhibits, but I'll just end on this one.

7    BY MR. BENNETT:

8         Q.     The second page of this article, Ms.

9    Taranto, middle of the page we identified who we were

10   talking about, a guy named Rosco Haines.  It starts with

11   the words posting such shortfalls on the balance sheet.  Do

12   you see that paragraph?

13        A.     Yes.

14        Q.     And then it identifies Rosco Haines, a

15   consulting actuary and principal at the Albany office of

16   benefits consultants Milliman.  That's your company, is

17   that correct?

18        A.     Yes.

19        Q.     And going to the next page, page 3 at the

20   very bottom we are quoting Mr. Haines.  And the paragraph

21   says, "Still the perception of pension plans as 'dinosaurs'

22   and 401(k) plans as 'the way of the future' is an attitude

23   that's pervasive, Haines said, and it's one that's likely

24   to speed the demise of the traditional pensions, shifting

25   the responsibility savings for retirement to employees from

1  employers."  Do you agree with your colleague's statement

2  there?

3                    MS. CECCOTTI:  Your Honor, I'm going to

4  object again, because again we are given this quote, if it

5  is indeed an accurate quote, by someone who is not here to

6  tell us if it is or not, in the context of an article that

7  has been prepared by someone at the Albany Times who is

8  interested in making a point and either quoting correctly

9  or incorrectly a subject.

10                    MR. HAMILTON:  All I asked her is whether

11  she agreed with it or not, Judge.

12                    MS. CECCOTTI:  Again, I have no reason, we

13  have no basis here today to say that that is, A, an

14  accurate quote, B, part of a larger thought that the author

15  left on the cutting room floor.  I don't even know what

16  word to describe except appropriate.

17                    MR. HAMILTON:  I'll withdraw it, Judge.

18                    THE COURT:  Very well.

19  BY MR. BENNETT:

20        Q.    Final question, let's go to your

21  supplemental declaration, paragraph 4.  This is Tab 4 in

22  your cross examination binder, Tab 4, paragraph 4, third

23  sentence you say, "Simply put, the union has already

24  provided concessions to Dana that decrease Dana's liability

25  by close to 40 percent."  That's a reference to the caps

101

1    that Dana's unions and employees have agreed to, correct?

2         A.    Yes.

3         Q.    Isn't it also true that Dana's salaried

4    employees and nonunion hourly's have also made similar

5    prepetition concessions regarding their retiree benefit,

6    right?

7         A.    I've not seen the calculation of the

8    valuation of such.

9         Q.    Do you have any reason to believe that the

10   value of their concession on caps is less than the 40

11   percent figure that you swear in your declaration here?

12        A.    I have not been provided with data as to

13   what that's worth.

14             MR. HAMILTON:  No further questions, your

15   Honor.

16             MS. CECCOTTI:  Your Honor, may we have a

17   few moments to decide whether we want to do any redirect?

18             THE COURT:  Sure.

19             Let's take a five minute recess.

20             (Recess taken)

21             MS. CECCOTTI:  I just have a few questions.

22   REDIRECT EXAMINATION BY MS. CECCOTTI:

23        Q.    Ms. Taranto, do you know whether Watson

24   Wyatt releases its full studies?

25        A.    Yes.

102

```
 1            Q.      Do they release it?

 2            A.      Yes, they do.

 3            Q.      How do they release it?

 4            A.      You can purchase it.

 5            Q.      Can Milliman purchase it?

 6            A.      They do not like to release their results

 7   comparisons to their competitors.

 8            Q.      Now, GM, counsel referred to the fact that

 9   GM as has a VEBA, and that's the case that you participated

10   in?

11            A.      Correct.

12            Q.      Do you know how much money GM is obligated

13   to fund the VEBA with ?

14            A.      I believe 3 billion dollars.

15            Q.      Three billion dollars?

16            A.      Billion dollars.

17            Q.      Thank you.  And is that the only feature of

18   the GM modified plan?

19            A.      No.

20            Q.      GM hasn't eliminated its obligation to

21   provide for post retirement healthcare, has it?

22            A.      No.

23            Q.      Under the GM modified setup?  Sorry.

24            A.      No.

25            Q.      Now Dana's proposal in this case at the
```

103

1    time that you prepared your declaration were you given any

2    information from anybody regarding the likely amount to be

3    funded while under Dana's proposal?

4          A.    No, I was not.

5          Q.    Are you aware that the proposal called for

6    a percentage of monthly average costs as an advance against

7    something called an allowed claim?

8          A.    I recall that.  I believe it was 30 percent

9    of the allowed cost against the claim.

10         Q.    Okay.  And were you aware that the allowed

11   claim amount under Dana's proposal is an amount which would

12   be determined through litigation in the Bankruptcy Court?

13         A.    Yes.

14               MS. CECCOTTI:  That's it.  Thank you.

15               MR. HAMILTON:  No cross, your Honor.

16               THE COURT:  Thank you ma'am.

17               (Witness excused)

18               MR. LEVINE:  Your Honor, the unions at this

19   time would like to call Miguel Foster as their next

20   witness.  And I'll be switching with Mrs. Ceccotti.

21               THE COURT:  Fine.

22   M I G U E L     F O S T E R,    called as a witness,

23               having been first duly sworn by the Notary

24               Public, Denise Nowak, was examined and testified

25               as follows:

104

1                    MR. LEVINE:  May I proceed, your Honor?

2                    THE COURT:  Yes, please.

3     DIRECT EXAMINATION BY MR. LEVINE:

4              Q.      Good afternoon, Mr. Foster.

5              A.      Good afternoon.

6              Q.      By whom are you employed, sir?

7              A.      It's international union UAW.

8              Q.      And in what capacity are you employed by

9     the UAW?

10             A.      My title is international representative.

11             Q.      Do you work in any particular department of

12    the UAW?

13             A.      Yes, I work in what's called the

14    competitive shop IPS department.

15             Q.      What is that department, briefly?

16             A.      That department deals with auto part

17    suppliers.

18             Q.      And is Dana considered an auto parts

19    supplier, such that it would be encompassed by the division

20    in which you work by the UAW for purposes of representing

21    employees of that company?

22             A.      That's correct.

23             Q.      What are your responsibilities generally as

24    an international representative in that department?

25             A.      My responsibilities include bargaining

105

1    contracts, attending grievance hearings, advocate

2    arbitration hearings as it relates to Dana.  I also

3    coordinate what's called the Dana union counsel, the UAW

4    Dana union counsel, excuse me, which consists of all the

5    Dana local union plants where we meet pretty much semi

6    annually and share information, build bargaining strategies

7    and so forth.

8           Q.    And how long have you worked on with that

9    UAW Dana counsel?

10          A.    I was assigned to it in October of 2006.

11          Q.    How long have you served as an

12   international representative?

13          A.    A full time international representative

14   since October 2004.

15          Q.    And let me just take you back and ask you

16   to briefly summarize what you've done since high school?

17          A.    After high school I went to on to Michigan

18   State University where I earned a bachelor of science

19   degree.  After that I was employed by had you had sons

20   department store as a shoe salesperson.  I then went on to

21   work for a real estate development company called EL

22   Associates where I was a property analyst.  After that I

23   was employed by Perfection Steel Treaty as a furnace

24   operator.

25          Q.    When was that, sir?

106

1      A.    1994.

2      Q.    Were you working in a shop that was

3   represented by auto workers?

4      A.    Yes.

5      Q.    And was that your first exposure to the

6   auto workers as a member of the union?

7      A.    Yes.

8      Q.    What was your position there?

9      A.    I was hired in as a furnace operator, I was

10  then elected chair person of the bargaining committee.

11     Q.    And by whom were you elected?

12     A.    By my coworkers, the UAW members.

13     Q.    When was that approximately?

14     A.    That was late 1994.

15     Q.    How many union members were in that shop?

16     A.    Approximately 150.

17     Q.    Members of the bargaining unit?

18     A.    Yes members of the bargaining unit.

19     Q.    I was supposed on to say that and not union

20  members, right?

21     A.    You're right.

22     Q.    What were your responsibilities your non

23  UAW responsibilities at that time?

24     A.    At that time, as I said I was a furnace

25  operator and my duties included running a heat treat

107

1    furnace loading unloading doing inspections.  Also I did

2    some maintenance on the furnaces, loaded, unloaded trucks,

3    so I have a had a variety of responsibilities.

4            Q.    How long did you work in that capacity?

5            A.    As a furnace operator about a year and a

6    half.

7            Q.    Did there come a time when your

8    responsibilities changed for the company?

9            A.    I then came became what was termed as a

10   team leader.

11           Q.    How, if at all, did your responsibilities

12   change when you became a team leader?

13           A.    As a team leader we were kind of unique at

14   Perfection Steel where we had teams that ran operations and

15   we were a self directed workforce, and as a team leader I

16   directed the work force, in a nutshell.

17           Q.    How long did you serve in that capacity?

18           A.    Until 2000.

19           Q.    What if anything happened in 2000?

20           A.    In 2000 I was assigned to be a temporary

21   organizer by the UAW.

22           Q.    And did you cease being employed by the

23   company at that point?

24           A.    I did not.  I was officially on a union

25   leave of absence.

108

```
1         Q.      What does that mean?

2         A.      That means at the time being elected or

3    appointed to a position in the union, I still retained by

4    seniority rights at my home plant.

5         Q.      And did you ever go back to your home

6    plant?

7         A.      I have not.

8         Q.      Is it fair to say since 2000 you have

9    worked for the auto workers in one capacity or another?

10        A.      Yes.

11        Q.      Could you describe the various union

12   positions have you held since 1994?  You understand the

13   distinction as opposed to your work responsibility for the

14   company?

15        A.      Yes.  In 1994 I was elected chair person of

16   my bargaining unit.  I was reelected two more terms.  I was

17   then, as I statement the earlier assigned temporarily

18   assigned as an organizer for its UAW in 2000.  I was also

19   assigned as what we call the cap committee chair person

20   which deals with the political action committee we in my

21   local union.  Then approximately in -- I'm sorry in 2003 I

22   was assigned servicing repetitive at my local union.  And

23   then in October of 2004 I was assigned permanent

24   international rep under the direction of vice president Bob

25   King.
```

109

```
1              Q.      And do you report to Mr. King?

2              A.      I do.

3              Q.      Do you report to anybody else?

4              A.      I do.

5              Q.      Who else do you report to?

6              A.      I also report to Wendy Fields-Jacobs Bob

7    King's top administrative assistant.  I also report to Roy

8    King who is assistant director, I also report to Rick

9    Isaacson who is also an administrative assistant in the

10   competitive shop IPS department.

11             Q.      As an international representative in the

12   auto parts division, we'll call it that for the sake of

13   understanding, were are you given a specific geographical

14   division in the United States of America?

15             A.      No.

16             Q.      Responsibilities are national and focused

17   on the auto parts industry?

18             A.      That's correct.

19             Q.      What, if any, experience have you had with

20   the company involved in this proceeding, that is Dana

21   Corporation?

22             A.      I've been involved with Dana, as I said,

23   since my assignment in October of 2006.  I've been involved

24   in bargaining of the UAW master agreement, I've also been

25   involved in coordinating the Dana counsel, I've been
```

110

1    involved with various meetings dealing with those issues.

2    I've been involved with taking phone calls from retirees

3    from Dana I've been involved in grievance hearings with

4    Dana Corporation.

5            Q.    And when you say that you've been involved

6    in taking phone calls from Dana retirees, could you

7    elaborate on what you mean?

8            A.    Yes.  On a daily basis when I'm in the

9    office I receive phone calls from retirees asking questions

10   about their benefits and so forth.  And it has escalated

11   since the bankruptcy proceedings began.  I'm sorry since

12   Dana filed for bankruptcy.  The number of calls from

13   retirees have increased dramatically.  So I try to give the

14   retirees advice.

15           Q.    And have you been involved at all in

16   negotiations with Dana corporation since October of 2006,

17   or before that for that matter?

18           A.    Beginning in late November I was involved

19   with bargaining with Dana, but not prior to that.

20           Q.    And by the way when you are talking about

21   the master agreement you referred to a master agreement

22   where what agreement are you referring to?

23           A.    The UAW master agreement includes two

24   active plants, the Lima Ohio plant and the Pottstown

25   Pennsylvania plant, and it also covers retirees from

1    previously closed plants.

2            Q.    Now, as part of your responsibilities,

3    what, if anything, are you required to do in terms of

4    becoming knowledgeable about collective bargaining

5    agreements applicable to Dana employees represented by the

6    UAW?

7            A.    Some of the things I did to become

8    knowledgeable about Dana was of course I read and

9    researched current agreements and previous agreements, I've

10   had discussions with previous international reps that were

11   involved with Dana; things of that nature.

12           Q.    Have you, in the course of your

13   responsibilities with respect to Dana become familiar with

14   any of the history of the lip relationship between the

15   united auto workers and Dana Corporation?

16           A.    I have.

17           Q.    And could you describe the type of history

18   historical inquiries you have made in that respect?

19           A.    I've learned that over the years Dana used

20   to have in excess of 20 plants in the master agreement, and

21   now we are in the down to two plants that the UAW

22   represents.  I've learned about the struggles that the

23   union and the company have went through together, and the

24   members have sacrificed over the years by giving

25   concessions or wage freezes at the various plants in order

112

1    to help enhance Dana's competitive position in the

2    industry.

3            Q.    I'd like you to refer, please, to what's

4    been marked as the Union Exhibit 4, which your Honor is

5    behind Tab 101?

6                  MR. LEVINE:  Which, your Honor, is behind

7    Tab 101.  Yes, behind to be 101, yes, that is correct.  I'm

8    sorry, your Honor.

9            Q.    Is that a document that you are familiar

10   with, Mr. Foster?

11           A.    Yes.

12           Q.    And what is Union Exhibit 4?

13           A.    This was my declaration.

14           Q.    And have you reviewed the declaration and

15   can you testify as to its accuracy or lack thereof at this

16   point?

17           A.    Yes, I reviewed it.  I just had one

18   addition, paragraph 4 on page 3, the first line where it

19   says these employees works in 13 different facilities

20   located in six states.  I omitted Pennsylvania, so it

21   should be seven states.

22           Q.    And did you indicate that Pennsylvania was

23   part of this at another point in your declaration?

24           A.    Yes, further down.  The third sentence

25   where I talked about Pottstown, Pennsylvania.

113

1      Q.    And there is an Exhibit A to your

2  declaration, is there not?

3      A.    There is.

4      Q.    And are there any corrections that you

5  might want to make with respect to documents included in

6  Exhibit A?

7      A.    Yes.  In Exhibit A, there is a letter to

8  Mr. Bueter dated February 16th 2007 from Mr. Potok, and I

9  had not seen this letter prior to my declaration.

10     Q.    Your Honor?

11          MR. LEVINE:  Your Honor, with those

12  caveats, we nonetheless would ask that Union Exhibit 4 be

13  received into evidence.

14          MR. HAMILTON:  This is a declaration?

15          MR. LEVINE:  Right.

16          MR. HAMILTON:  Your Honor, I have an

17  objection to just two sentences in the declaration that I

18  believe are inadmissible hearsay.  He's not an expert.

19          Paragraph 8 talks about PDF files being

20  provided but not the Microsoft Excel sheets.  And at the

21  top of page 9 there are two sentences in that paragraph

22  that say, "On the other hand, with the PDF versions of

23  those files as opposed to the actual Excel files, the

24  union's actuaries, not Mr. Foster, but the union's actuary

25  were only able to read the files as is, hence the actuaries

114

1    were prevented from performing tasks necessary.

2              He's not the union's actuaries, I don't

3    believe that statement is correct, I can't cross examine

4    him because it's not his, it's the actuary's.  The actuary

5    was just on the stand and said she got all the information

6    and didn't replicate the actuarial figures because it was

7    out of the scope of her engagement.

8              MS. CECCOTTI:  That's not what she said.

9              MR. LEVINE:  All right.

10             MR. HAMILTON:  That may be.  My only point

11   is that those two sentences are hearsay, and I object to

12   those going in the record.  The rest of the declaration I

13   have no objection.

14             MR. LEVINE:  Your Honor, I would be

15   happy to elaborate the foundation to which the witness is

16   able to represent that as part of the ordinary scope of his

17   responsibilities, and I will represent to the court right

18   now that the actuary to whom Mr. Foster refers is not the

19   prior witness.

20             MR. HAMILTON:  It's still hearsay and I

21   object.  No matter who it is, it's hearsay.

22             MR. LEVINE:  I'm sorry, I apologize, Mr.

23   Hamilton.

24             MR. HAMILTON:  He's not the actuary, and

25   he's purporting to testifying under oath what they were or

115

1    not able to do, and I can't cross examine him on that

2    because he's not the actuary; it's hearsay.

3                    MR. LEVINE:  I hate to inject reality into

4    this proceeding, but Mr. Foster was deposed and was deposed

5    at length about the basis of his knowledge of everything in

6    his declaration.

7                    And again, your Honor, I am happy to talk

8    to Mr. Foster before the document is admitted with respect

9    to the basis for his knowledge of that statement.  And, of

10   course, that's not necessarily true, but this is his

11   understanding, and I can explore that.

12                   MR. HAMILTON:  It's not a foundation

13   objection, your Honor, it's a hearsay objection.  It

14   doesn't matter what --

15                   THE COURT:  I'm going to sustain the

16   objection.  He cannot possibly be cross examined about the

17   abilities or inabilities of the a third party who is not

18   here.  And actually, I don't see it as being very harmful

19   in any event, but this is a example, gentlemen, of much ado

20   about nothing.

21                   MR. LEVINE:  I didn't raise the issue.  We

22   will proceed without those two sentences involving the

23   unions actuaries.  It is my understanding that subject to

24   the --

25                   THE COURT:  The document is received

116

1    subject to that excisement.

2                    (Whereupon, Union Exhibit 4 was received in

3            evidence as of this date)

4                    MR. LEVINE:  Thank you, your Honor.

5    BY MR. LEVINE:

6            Q.    Now, Mr. Foster, in paragraphs 5 and 6, you

7    discuss various initiatives taken by the united auto

8    workers in connection with efforts to assist Dana

9    economically and competitively.  Do you see that?

10           A.    Yes.

11           Q.    How did you acquire familiarity with those

12   events?

13           A.    Through discussions with other

14   representatives who worked on the Dana assignment, and

15   through viewing some of the agreements that I mentioned.

16           Q.    You testified that you have participated in

17   negotiations with Dana since the fall of 2006; is that your

18   testimony?

19           A.    Yes.

20           Q.    Now have you participated in every session,

21   every negotiating session where both the company officials

22   and the union officials have met?

23           A.    Have I not.

24           Q.    Could you tell the court about the

25   parameters within which you have participated personally in

117

1  negotiations?

2          A.      I have mainly participated in negotiations

3  when the bargaining committees were also present.  There

4  were at times where there were high level meetings with

5  persons like vice president Bob King and Wendy

6  Fields-Jacobs that I was not a part of.

7          Q.      Did you participate in negotiations on

8  March 19th?

9          A.      I did.

10         Q.      To your knowledge, what, if anything, have

11 the parties agreed to do across the table with respect to

12 continued negotiations?

13         A.      The parties agreed to continue bargaining.

14         Q.      And what, if anything, are you familiar

15 with across the table?  Do you know what I mean by across

16 the table?

17         A.      I do.

18         Q.      With respect to statements made by

19 representatives of the united auto workers or the steel

20 workers and their respective preparedness to strike?

21         A.      It has been indicated from the UAW and the

22 united steel workers that the members of our Dana

23 facilities are prepared to strike to protect our standard

24 of living if the parties are unable to reach a conclusion.

25         Q.      Have you been involved in any strikes, Mr.

118

1    Foster, as an employee of the united auto workers?

2        A.    I have participated in strikes.

3        Q.    Could you just briefly describe which

4    strikes you've participated in and what you've done in

5    connection with those strikes?

6        A.    I was involved in a strike with Johnson

7    Controls Incorporated at the Plymouth, Michigan facility, I

8    was also involved in a strike with Johnson Controls in

9    Ohio, I can't remember the city.  And I was involved in a

10   strike with a company called Skyway Precision in, I

11   believe, it's Livonia, Michigan, and I believe I was just a

12   participant; I didn't coordinate the strike, I just

13   participated and walked the strike line with my fellow

14   union members.

15       Q.    And what, if any, roll do the union members

16   themselves have with respect to decisions to strike or not

17   to strike?

18       A.    In the UAW, the members vote to ratify a

19   strike.

20       Q.    Has such a vote been taken at this point?

21       A.    Yes.  There were votes taken at the two

22   master facilities Lima, Ohio and Pottstown, Pennsylvania

23   prior to us engaging in master negotiations.

24       Q.    And could you describe the relationship if

25   any between the master negotiations and the so-called 1113

119

1    negotiations?

2          A.    We began, as I said, we began negotiations

3    in November, late 2006 with the master agreement, which

4    again dealt with Lima, Ohio and Pottstown, Pennsylvania,

5    and retirees from plants which closed.  Obviously we

6    discussed issues dealing with those plants and those

7    retirees.

8          We also continued the negotiations and the

9    lines kind of cross into the 1113, 1114 negotiations where

10   we've had a lot of discussion about those issues also.

11         Q.    Do you have an understanding as to what

12   happens to the terms and conditions of employment with

13   respect to the Lima and Pottstown employees in the event

14   the court grants the debtors their requested relief and the

15   contracts are rejected?

16         MR. HAMILTON:  Well, I thing I'm going to

17   object.  I don't believe we requested relief to reject

18   contracts at Lima and Pottstown.

19         MR. LEVINE:  Then I'll rephrase the

20   question, because that's precisely what I did not intend to

21   ask.

22         MR. HAMILTON:  Okay.

23         MR. LEVINE:  I withdraw my question and

24   respect your objection and duly note that I apologize.

25         Let me try again.

120

1   BY MR. LEVINE:

2        Q.      Do you have an understanding as to what

3   happens to the master agreement that pertains to the Lima

4   and Pottstown facilities in the event that the court grants

5   the debtors the relief that they are requesting?

6        A.      Nothing happens to the Lima or Pottstown

7   agreements in 1113.

8        Q.      And how many employees order of magnitude

9   are, or if you know, are employed at who Lima and

10  Pottstown?

11       A.      Approximately 600.

12       Q.      Were you present at negotiations between

13  Dana and the auto and/or steel workers on or about January

14  19th, 2007?

15       A.      I don't recall that date.  It's possible.

16       Q.      Are you aware that a counter proposal or a

17  written proposal was tendered by Dana at or about that time

18  to the united auto workers?

19       A.      I did do not know a written proposal was

20  submitted to the union at that time.

21       Q.      Did there come a time that you did become

22  aware of that?

23       A.      I did become aware of that during my

24  deposition.  I knew that around that time there was a high

25  level meeting and there was discussions about the OPEB and

121

1    how to resolve the OPED and I wasn't involved in those

2    decisions.

3               I was always under the assumption that it

4    was an off the record discussion, which is common in

5    collective bargaining, and I didn't realize that a written

6    proposal had been submitted until the day of my deposition.

7         Q.    Do you have any responsibilities for

8    employees represented by the auto workers who are employed

9    by a company called Tower Automotive?

10        A.    I do.

11        Q.    Was Tower Automotive involved in a 1113

12   before this court at some point?

13        A.    Yes.

14        Q.    When was that?

15        A.    That was in 2006, I believe, February.

16        Q.    And what role if any did you have with

17   respect to negotiations between Tower and the united auto

18   workers coincident with the 1113 proceeding?

19        A.    Very similar as I do with Dana.  I was

20   involved in bargaining at Tower Automotive, I also

21   coordinated our UAW Tower Automotive counsel, day to day

22   communications with the locals and so forth.

23        Q.    Now, are you aware of whether there was a

24   hearing in this court in Tower?

25        A.    Yes, there was.

122

1          Q.     Are you aware of when that hearing was

2     completed?

3          A.     Yes.

4                 MR. HAMILTON:  Your Honor, at this point I

5     don't know where he's going with this.

6                 MR. LEVINE:  A couple more questions.

7                 MR. HAMILTON:  We're trying this case, not

8     Tower.

9                 THE COURT:  If that's a relevance

10    objection, I'll allow it subject to connection.

11                One or two more questions.

12                MR. LEVINE:  Thank you, your Honor.

13    BY MR. LEVINE:

14         Q.     Were the united auto workers and Tower able

15    to obtain a settlement?

16         A.     Yes.

17         Q.     Was there a decision rendered by the Judge?

18                MR. HAMILTON:  Your Honor, at this point

19    I'm going to object again on relevance.

20                THE COURT:  I'm going on sustain the

21    objection.

22                MR. LEVINE:  That's all I have.

23                MR. HAMILTON:  No cross.

24                THE COURT:  Thank you, sir.

25                (Witness excused)

123

1                    THE WITNESS:  Thank you.

2                    MR. LEVINE:  Your Honor, Mr. Potok is our

3    next witness.  Is it possible that we could either take a

4    lunch break or have a brief recess?

5                    THE COURT:  If we take a lunch break it

6    will be a half hour lunch break.

7                    MR. LEVINE:  That's fine.

8                    THE COURT:  A half hour, that means five

9    after 1.

10                   (Whereupon, a recess was taken for the

11   purpose of luncheon.)

12                   Time noted:  12:35 p.m.

13

14

15

16

17

18

19

20

21

22

23

24

25

124

1              A F T E R N O O N    S E S S I O N

2                  (Time noted:  1:10 p.m.)

3  L E O N    P O T O K,    called as a witness, having been

4        first duly sworn by the Notary Public, Denise

5        Nowak, was examined and testified as follows:

6                      MR. LEVINE:  May I proceed, your Honor?

7                      THE COURT:  Go ahead.

8  DIRECT EXAMINATION BY MR. LEVINE

9          Q.    Will you state your name for the record?

10         A.    Leon Potok.

11         Q.    Mr. Potok, by whom are you employed?

12         A.    Potok and Co., Inc.

13         Q.    And what do you do at Potok and Co.?

14         A.    Essentially we are financial advisors to

15  labor unions and provide advisory services largely in

16  connection with bankruptcies.

17                     THE COURT:  Could you speak louder, sir, or

18  move closer to the microphone?

19                     MR. LEVINE:  Yes, pull it closer.

20         Q.    Okay.  Could you tell us what Potok and Co.

21  does?

22         A.    We serve as financial advisers essentially

23  to labor unions, and largely in connection with

24  negotiations, especially in corporate restructuring and

25  bankruptcies.

125

1        Q.     Have you ever testified in the capacity as

2    expert witness in a bankruptcy proceeding before?

3        A.     Yes.

4        Q.     And when and what was that?

5        A.     That was Tower Automotive in March of 2006.

6        Q.     Is that a case that was in this court?

7        A.     Yes.

8        Q.     Could you please describe your educational

9    background?

10       A.     I have a BA in economics from City College

11   of New York, an MA in economics from the University of

12   Massachusetts at Amherst, and an MBA in finance from the

13   school of business at Columbia University.

14       Q.     And would you describe your work history

15   generally, similarly and chronologically that you can?

16       A.     My career I started working for the UAW in

17   Detroit from 1977 to 1984.  I was an economist -- my title

18   was research associate, and much of my work was related to

19   providing financial advice in connection with negotiations

20   and organizing, largely negotiations and heavily in

21   situations where companies were requested modification in

22   collective bargaining agreements or in negotiations in

23   connection with financial problems.

24          I then attended business school and worked

25   for three and a half years for an insurance company, New

126

1    York Life Insurance Company, and my job there was lending

2    monitoring investments in what was called risk capital,

3    which covered leverage buyouts, venture capital in oil and

4    gas both directly and indirectly through partnerships.

5                    I then went to work for a firm called

6    Keilin and Bloom in 1990, which was financial advisor to

7    labor unions.

8            Q.      By the way, who is the Bloom in the Keilin

9    and Bloom?

10           A.      That would be Ron Bloom, who subsequently

11   and became special assistant to the president at the united

12   steel workers.

13           Q.      Is that his current position?

14           A.      That is his current position.

15           Q.      Do you know if he's one of the negotiators

16   in this case?

17           A.      Yes.

18           Q.      I'm sorry, proceed.

19           A.      I subsequently left Keilin and Bloom for a

20   six month, seven month period where I worked for a firm

21   called American Capital Strategies, which is a closed end

22   fund publically held that makes investments.

23                   Apart of from that I was a partner in a

24   couple of entities, all of which served in the same role as

25   advisor to labor unions.

127

1          Q.      And is that --

2          A.      And that's the work I do now.

3          Q.      All right, thank you.  In connection with

4    the work that you do now as what you've done in the past,

5    do you advise in connection with collective bargaining?

6          A.      Yes.

7          Q.      And do you ever participate in actual

8    collective bargaining on behalf of the unions whom you

9    represent?

10         A.      Yes.

11         Q.      Have you advised these unions in corporate

12   restructuring context?

13         A.      Yes.

14         Q.      Do you have experience in advising unions

15   in the bankruptcy context when collective bargaining is

16   taking place?

17         A.      Yes.

18         Q.      Do you have experience in identifying and

19   working with potential equity sources in your capacity as

20   advisor to unions and otherwise?

21         A.      Yes.

22         Q.      I'd like you to turn, please, to Exhibit A

23   of your declaration and expert report which has been

24   marked, it's in the binder there, Mr. Potok, it's behind

25   Tab 2.

128

1          A.      Yes.

2          Q.      I was asking you to refer to Exhibit A, Mr.

3    Potok.  Do you have that?

4                  MR LEVINE:  May I approach the witness?

5                  THE COURT:  Go ahead.

6                  MR. TAMBE:  I note there's a binder with

7    some sticky's sticking out in front of the witness, and if

8    it's a marked binder, I would object to it being in front

9    of the witness.

10                 MR. LEVINE:  I apologize, your Honor.

11                 THE COURT:  There's an entry with respect

12   to the other binder that's been marked?

13                 You are not referring to that binder, are

14   you, counselor?

15                 MR. LEVINE:  No, I am not.

16                 MR. TAMBE:  It was up there in the witness

17   chair.

18                 MR. LEVINE:  He might have to refer to it

19   later.

20                 MR. TAMBE:  If he's going to refer it to

21   it, I would like the sticky's to be taken out of it.  Plus

22   if there are any other markings in it.

23                 MR. LEVINE:  Would you like to check?  I

24   didn't put any markings there.

25   I'll represent to the court that I did not put any markings

129

1    in this binder and I am handing it to the witness.

2    BY MR. LEVINE:

3        Q.    Mr. Potok, would you look at Exhibit A,

4    please, of Union Exhibit 2?

5        A.    Yes.

6        Q.    And could you give a couple of

7    representative examples of cases where you have represented

8    unions as financial advisor based on the list that is

9    contained in Exhibit A?

10        A.    Sure.  Let me start with very first 1113

11    proceedings I was involved in, it was involved in this

12    building LTV Steel in 1993.  It was LTV 1.

13        Q.    What did you do?

14        A.    We -- Keilin and Bloom served at financial

15    advisers to the steel workers in connection with the 1113

16    1114 hearings in that case.

17              Others I can point to would be Tower

18    Automotive, about a year ago, also an 1113, 1114, where I

19    served as an expert witness.  Others, Kaiser Aluminum,

20    Special Metals, those are -- and Ormet Aluminum as the

21    other 1113, 1114 cases that I've been involved in as

22    advisor to, in all cases, for the united steel workers.

23              MR. LEVINE:  Your Honor, I move to qualify

24    Mr. Potok as an expert with on matters pertaining to

25    corporate restructuring and corporate financing in the

1    collective bargaining context.

2                    MR. TAMBE:  Your Honor, we have a few

3    objections to him to be provided in that capacity.

4                    First of all, we have been precluded from

5    examining Mr. Potok on any topic related to his other role,

6    the other hat he wears in this proceeding, which is as an

7    advisor in negotiations in the collective bargaining

8    process.  So I trust there will be no opinions or

9    statements offered by Mr. Potok concerning his other role,

10    if he can separate those roles.

11                    Secondarily, there are the two other issues

12    that I trust he will not be offering any opinions on.  One

13    is that we were precluded from asking any questions at his

14    deposition into an analyses that he has conducted into the

15    savings that the company would realize under the 1113

16    proposals at the five plants that are at issue.  He has

17    conducted such an analyses, we were not provided with that

18    analysis, and we were not allowed to ask any questions at

19    his deposition about that analyses.

20                    And finally, I trust he will not be

21    offering any opinion or any statement on any quantitative

22    analyses he may have done comparing Dana's performance to

23    its peer companies.  Again, he has --

24                    THE COURT:  Comparing Dana?

25                    MR. TAMBE:  To its peer companies, the

131

```
1    other automotive parts suppliers.  Again, he has conducted

2    such an analyses he has not provided that analyses to us,

3    and at his deposition we were not aloud to ask any

4    questions about what that analysis shows.

5              I can draw your Honor's attention to the

6    relevant pages of the deposition.  It's only an issue if

7    they are going to offer opinions and statements on those

8    topics.  I trust they are not.

9              MR. LEVINE:  And you trust correctly.

10             Perhaps we could have saved some time,

11   again, if you asked me before.  But the report is before

12   the debtors, has been before the debtors, and that is what

13   we intend to examine this witness on.  And I don't believe

14   any of those three matters are on before the court based on

15   that report.

16             THE COURT:  Well, subject to appropriate

17   objection at the appropriate time.

18             MR. TAMBE:  Thank you, your Honor.

19             MR. LEVINE:  With reservations of our

20   rights.

21             THE COURT:  Yes.  I do have a problem with

22   the designation of his expertise in the general field of

23   instruction.  I don't know that I've heard any such

24   qualification.  If you want to narrow that, I think it

25   might lessen the problem.
```

132

1         MR. LEVINE:  I believe that I did, your

2    Honor.  I could go through more of his experience.

3              THE COURT:  Restructuring is a very general

4    term.

5              MR. LEVINE:  Well, I talked about

6    restructuring in the collective bargaining context, your

7    Honor.

8              THE COURT:  I didn't hear that it was

9    related to that specific context.

10             MR. LEVINE:  Yes, your Honor, that's what

11   we are offering him on.

12             THE COURT:  Very well.  I will admit him as

13   qualified in that area.

14             MR. LEVINE:  Would you like me to repeat

15   what, so that there's no confession in the record, or is

16   that not necessary?

17             THE COURT:  No.  I just thought I heard you

18   qualify him very broadly in the reconstruction field.

19             MR. LEVINE:  Understood.  Thank you, your

20   Honor.

21   BY MR. LEVINE:

22        Q.    Now, did there come a time when you were

23   asked to represent the auto workers and the steel workers

24   in this proceeding?

25        A.    Yes.

133

1          Q.      And when, with respect to both unions, were

2    you asked to get involved in this proceeding in any way?

3          A.      In the 1113 proceeding, sometime in

4    January, early February.

5          Q.      And were you asked to prepare an expert

6    report at that time?

7          A.      Yes.

8          Q.      What were you asked to report on with

9    respect to that expert report?

10         A.      As to the adequacy of information provided

11   to the unions to be able to negotiate, and to the necessity

12   of the company's proposals in order to reorganize, in

13   general terms.

14         Q.      And what, if anything, did you conclude in

15   your report?

16         A.      Based on the information provided to us up

17   to that point I concluded, A, that the unions had not been

18   provided sufficient information, B, that their plans seemed

19   to be, or were, and have been, to substantially eliminate

20   substantial numbers of jobs in the union plants.

21                 And thirdly, that the necessity for the

22   proposal may or may not be the case, based on additional

23   information to be provided, may or may not be required

24   based on additional information.

25         Q.      Anything else?

134

1       A.      No.

2       Q.      Mr. Potok, would you please turn to your

3   expert report beginning on page 4?

4       A.      Yes.

5       Q.      Now, beginning on that page you discuss

6   Dana's domestic footprint as you believe it will be in the

7   relatively near future.  Could you take us through what

8   your findings and observations were with respect to Dana's

9   domestic footprint?

10       A.      The company's 1113 proposals covered 13

11   plants.  Of those 13, six were facilities that were to be

12   sold in fairly short order, and therefore I didn't see the

13   necessity of 1113 proceedings on that -- for those

14   facilities.

15               Of the remaining seven, I concluded that,

16   based on information provided by the company, that two of

17   those facilities would shut in share fairly short order, a

18   third one would be downsized substantially over time, and

19   eventually would be downsized to the point of being

20   completely nonviable and that too would be shut at some

21   point.  And the fourth one was likely to be downsized at

22   some point as well.

23       Q.      And how many plants, if any, in your

24   estimation would that leave?  And could you identify what

25   those which plants you are referring to?

135

1    A.    Going down the list on page 5, I believe

2  Fort Wayne under the company's plan would be substantially

3  downsized, hourly employment would decline from 420 or

4  thereabouts, 405, to down to fewer than 200.  The target

5  was 175 by the year 2000.  And for a plant that only five

6  years ago had 2000 hourly employees, I concluded that it

7  was very unlikely that come 2010, 2011, the company would

8  look at Fort Wayne and determine that it was viable long

9  term.  The cost structure I would expect would be such that

10  it would be -- that the plant would not be viable not be

11  competitive at that point.

12         Auburn Hills will stay, Lima, Ohio and

13  Marion, Indiana, those two plants the company has said that

14  one or the other will be shut in short order.  And planning

15  documents provided to us indicate that the second will be

16  shut subsequently within couple of years.

17         Pottstown would remain, Elizabethtown would

18  remain, and Henderson, Kentucky would likely be downsized.

19    Q.    Turning back to Fort Wayne, why is it, in

20  your opinion, that Fort Wayne will survive as a viable

21  plant after the continuing reduction that you anticipate?

22    A.    It would be -- I haven't been there, but a

23  plan that houses 2000 hourly employees, even, and I

24  understand that one or two of the buildings have been taken

25  down, of the remaining facilities, I don't think it would

136

1    be viable in such a large facility with equipment spread

2    out and handling requirements and heating requirements and

3    lighting requirements, it's simply -- you don't see those

4    kinds of facilities lasting for very long.

5            Q.    And turning to page six paragraph 19, is it

6    fair to say that that reflects your understanding and your

7    belief as to what will remain of Dana's unionized

8    facilities within the next few years?

9            A.    The three facilities mentioned, Auburn

10   Hills, Elizabethtown and Pottstown, would remain under the

11   company's current plan in substantially the form and size

12   they are now.  Henderson would still be around, but long

13   term there are plans to move some assemblies out of

14   Henderson, it's unclear how much employment will remain

15   there.

16           Q.    What is the basis of your understanding

17   with respect to what you believe will happen at Henderson?

18           A.    Again, internal company documents, planning

19   documents.

20           Q.    How, if at all, does that footprint that

21   you anticipate which -- how, if at all, did that footprint

22   that you anticipate influence your opinion as to the

23   necessity of the company's requested relief under Sections

24   1113 and 1114?

25                 MR. TAMBE:  Objection, your Honor.  This is

137

1    outside the scope of his both his expert report, his

2    testimony, and the information that we've been provided.

3                    We have been provided no analyses by this

4    witness on that topic, non whatsoever, no information on

5    that analysis.  You'll find none in his expert report.

6                    MR. LEVINE:  I could go through the expert

7    report, your Honor.  Maybe I should do that, and I'll

8    withdraw the question.

9                    THE COURT:  Withdraw the question.

10                   MR. LEVINE:  I will withdraw the question

11   and go through the expert testimony.

12   BY MR. LEVINE:

13          Q.     Let me ask you this, let's just turn to

14   another subject for the moment.

15                   In paragraph 20, you have a discussion

16   about the company's assertions with respect to operating

17   margins.  Could you elaborate on what your views are with

18   respect to the company's arguments about its operating

19   margins?

20          A.     The company argues that it needs, at this

21   time needs an operating profit margin of between 4 and 6

22   percent to be viable.  And they get there by looking at

23   their peers and concluding that that's what it takes.

24   Based on peer performance they need 4 to 6 percent

25   operating profit.

138

1              I believe that operating profit, which is

2    earnings before interest and taxes, is not the right

3    metrics to use for valuating financial performance or

4    target performance or threshold performance.  I would

5    suggest that the better metric would be EBITDA before

6    legacy expenses, which is earnings before interest taxes,

7    depreciation and amortization and before the portion of

8    retiree pension and medical expenses which is tied to the

9    obligation for those commitments.

10              Q.     And why do you believe that's the more

11   appropriate metric?

12              A.     That metric measures cash flow that's

13   available.

14              MR. TAMBE:  Objection, your Honor.  Again,

15   this goes beyond the scope of the expert report and we were

16   not allowed to conduct any examination of this witness.

17   When he said he had prepared a spreadsheet analyzing our

18   performance to peer companies and provided that to the

19   unions, we asked what that did that analyses show and we

20   were cutoff.

21              We were not permitted any inquiry into that

22   matter, and that analysis has not been produced here.  It

23   is improper for this man now to be opining from the witness

24   stand to this court to about his opinions in that area.

25              MR. LEVINE:  I'm not asking --

139

1          MR. TAMBE:  Fundamentally unfair, your

2    Honor.

3          MR. LEVINE:  I disagree respectfully, your

4    Honor.  I'm not asking him to compare -- to make any

5    comparison with competitors.  I asked him why he believes

6    that the EBITDAR is a better metric, which he specifically

7    stated in his expert report.

8          THE COURT:  I'll allow that question.

9          A.    The targets drawn by the -- were drawn by

10   the company.  I discussed the metric being used.  And the

11   reason EBITDAR, and R does not stand for restructuring it

12   stands for retiree related expenses or legacy related

13   expenses, is that's the amount of cash the company

14   generates that is then available to fund capital spending

15   and fund interest, interest on debt obligations as

16   traditionally understood and defined, and debt as not so

17   traditionally defined in terms of the obligation to

18   retirees either for retiree medical benefits which were

19   promised in the past and not funded, and pension expenses,

20   to the extent that they are tied to under funded plans.

21          So the cost of normal service for pensions

22   and retiree medical, I would put into a deduction from

23   EBITDA, but the interest element of that expense I would

24   take out, because that is then available to fund

25   obligations, be they the debt obligations of banks and

140

1    other credit and other interest bearing securities, or the

2    legacy obligations that have been promised and booked on

3    the company's balance sheet.

4              Q.    Turning to page 7 also on the same

5    paragraph there is a series of bullet points.  Do you see

6    that?

7              A.    Yes.

8              Q.    The sentence above that reads, "There are a

9    number of factors that suggest that Dana's performance in

10   2008 will improve as discussed below and perhaps reach the

11   company's own targets in the absence of the union

12   concession sought under its 1113 and 1114 proposals."

13             What, if any, relationship does that

14   statement have with the bullet points have you directly

15   underneath?

16             A.    The point I was trying to make is that the

17   company presented to the unions a 2007 plan, and not a five

18   year plan that would incorporate years after 2007.  And the

19   issue is long term viability, not the performance in a

20   single year.

21             So I was trying to point out that there are

22   other things going on, other initiatives and other factors

23   that need to be taken into account in order to assess long

24   term viability, and that would be reflected in a longer

25   term business plan, in a real business plan, a five year

141

1    business plan, a traditional period of time that people

2    look at.

3              And I was just highlighting all the

4    initiatives that the company had identified and whose

5    benefit would not be fully realized in 2007.

6         Q.    Without getting any into any specific

7    pricing initiatives that you might be aware of, would you

8    briefly describe how the company's pricing initiatives

9    might be better understood with a longer term picture of

10   the company's projections?

11             MR. TAMBE:  Your Honor, I have spoken to

12   Mr. Levine about it, and I just would like to caution the

13   witness that some of the numbers that have been shared with

14   the witness, they have not been publicly disclosed in terms

15   of targets versus achievements, and if he could be cautious

16   about not disclosing specific numbers, I think the witness

17   can answer the question without mentioning specific

18   numbers; the numbers are before your Honor.

19             MR. LEVINE:  And I believe my question was

20   designed to do that.

21        Q.    And I think, Mr. Potok, do you understand

22   that I said without getting any into any specifics?

23        A.    Yes.

24             MR. TAMBE:  Thank you.

25        Q.    Go ahead.

142

1          A.      The company's target for price increases

2     from customers is larger than the amount budgeted in the

3     2007 plan.  The difference are price increases that will be

4     realized in 2008 essentially.

5          Q.      And what, if any, observations do you have

6     with respect to the relationship on MFO manufacturing

7     footprint optimization and the lack of forward projections?

8          A.      Again, in the case of manufacturing

9     footprint optimization plan, the company's plan would

10    generate more savings over time than is projected for 2007.

11         Q.      And on what basis do you make that

12    observation?

13         A.      Again, the company's own documents.

14         Q.      And with respect to process savings, what

15    are you withdrawn -- how do you believe that process

16    savings should be accounted for with respect to the

17    company's performance over the next few years?

18         A.      I note that the company has consistently

19    generated a so-called process savings and any plan for 2008

20    would need to take into account additional savings to be

21    realized that year.

22         Q.      And, for the record, what is a process

23    saving?

24         A.      It is really a big bucket in which they

25    throw in a lot of stuff, Six, Sigma, Kizon, various

143

1    programs that the company has undertaken in order to

2    realize savings from operations.

3         Q.    You have another bullet point with respect

4    to commercial vehicles.  Could you elaborate on that?

5         A.    Yes.  The commercial vehicles, the company

6    rightly notes, that the 2007 heavy truck industry will

7    suffer substantial decline in 2007, relative to 2006, due

8    to timing of environmental regulations that take effect at

9    the end of 2006, I believe.

10             Looking forward, that too will come back,

11   and the impact on profitability and cash flow needs to be

12   taken into account.

13        Q.    Now, in paragraph 21, you draw some

14   conclusions based upon the observations that you've just

15   described, and could you elaborate on those?

16        A.    The company is asking the unions to

17   negotiate on the basis of one year's set of projections,

18   not on a longer term basis.  The contract is not a one year

19   contract, it is a three to five year contract, and in all

20   likelihood is where the contracts will turn out to be.

21             And just as other constituents in the

22   bankruptcy expect and demand and require longer term

23   projections of the company's performance and will have the

24   time to analyze and digest those projections before they

25   agree to any settlement of their claims.  So the union

144

1    should be in a comparable position in terms of negotiating

2    for the livelihoods of its active members and retirees.

3         Q.    Now in paragraph 23 you quote directly from

4    the debtor's motion with respect to customer willingness.

5    Why did you include that in your report?  Customer

6    willingness to provide pricing reductions.

7         A.    Essentially, again, the company's customers

8    are engaged in a similar exercise, similar due diligence

9    exercise, as we are and as other constituents are involved

10   in, which is to evaluate the long term viability.  And they

11   too, you know, will require longer term business plans,

12   will require, you know, a comfort level with viability,

13   just as the union will.  And in order for the union to

14   assess viability and what will be required to attain

15   viability, the unions will need a long term plan.

16        Q.    I'd like to turn to the next section of

17   your report which relates to information flow, and I'd like

18   to ask you if part of your retention in this proceeding by

19   the two unions included a responsibility on your part to

20   conduct an analysis of the company's books and records?

21        A.    Yes.

22        Q.    And you do address information flow in your

23   report, so to speak?

24        A.    Yes.

25        Q.    Information flow?

145

1      A.      Yes.

2      Q.      And could you describe in general terms

3   what the relationship is between the exchange of

4   information and collective bargaining?

5      A.      In my experience, where parties seek to

6   solve problems, financial problems or any other kinds of

7   problems, they are best able to do that with an

8   understanding of the facts and -- a common understanding of

9   the facts, and a common understanding of where they

10  disagree about the facts, as opposed to one party

11  negotiating based on the facts that it possesses and the

12  other party negotiating based on assertions that are not --

13  it is not in a position to prove or disprove; assertions

14  from the other party.

15     Q.      Now, have you read the declaration of --

16  withdrawn.  Are you familiar with the company's overall

17  assertion in this case that it has provided adequate

18  information to the unions in connection with collective

19  bargaining?

20     A.      I'm aware that the company has made that

21  assertion consistently.

22     Q.      Were you in the courtroom on any other day

23  except for today in this proceeding?

24     A.      No.

25     Q.      So you didn't hear Ms. Tarry testify?

146

1      A.    No.

2      Q.    Do you know who Ms. Tarry is?

3      A.    Yes.

4      Q.    I'll represent to you that Ms. Tarry has

5  advised the court that the unions were provided, in

6  December, with the so-called 2007 base plan.

7            Do you agree with Ms. Tarry?

8      A.    Yes.

9      Q.    And did that provide any meaningful

10  information to the unions in connection with collective

11  bargaining?

12     A.    It's meaningful but not sufficient.

13     Q.    Why is that?

14     A.    It's an incomplete picture of the company's

15  situation.

16     Q.    In what sense?

17     A.    Well, the base case is -- that was provided

18  early December to all constituents, provides projections

19  for 2007 before any initiatives are taken into account.

20  And it doesn't -- there's a whole slew of information that

21  we asked for that is not -- that is other than the one year

22  plan.

23     Q.    I do intend to ask you about information

24  you requested, but focusing on the 2000 base plan that the

25  unions and other constituents were provided in December,

147

1   you believe that the base plan didn't adequately provide

2   the unions with information with respect to the

3   relationship -- withdrawn.

4                Does the base plan, or did the base plan

5   allow the unions to see how the company would perform in

6   2007, assuming that the 1113 proposals in existence at that

7   time were effective?

8        A.    No, it is before any initiatives.

9        Q.    So it's an all things equal sort of

10  analysis?

11       A.    It is taking 2006 and projecting forward

12  the from 2006.

13       Q.    No changes?

14       A.    No changes.

15       Q.    Ms. Tarry also pointed out that the unions,

16  and perhaps other constituents, received the 2007 DIP

17  budget plan; is that correct?

18       A.    Correct.

19       Q.    And how, if at all, was that helpful?  And

20  how, if at all, was it not helpful for the unions in

21  connection with their role in collective bargaining?

22       A.    One of the missing elements -- we still

23  we're not provided with, for example, what the 1113, 1114

24  initiative or effort would yield under the company's

25  proposal and where it would produce those savings such that

148

1   we could at least verify what the relationship is between

2   the proposals on paper and financial projections of the

3   savings.

4          Q.    So you weren't provided with that

5   information, vis a vis the 2007 DIP budget plan, and you

6   still haven't been provided with such information?

7          A.    Well, the company's breakdown of labor cost

8   savings under its 1113, 1114 proposals for the 1113 plants,

9   the active plants, were -- the breakdown was not provided

10  by plant until March 7th or 8th, and that was provided in

11  an Excel document that did not have any of the supporting

12  calculations behind it.

13              It was taking -- it provided the numbers,

14  it didn't provide the assumptions and calculations behind

15  it, and did not include all the savings that the company is

16  seeking.  The total of that, of those plans that were

17  provided in March 7th or 8th, was about 45 million dollars

18  under the company's projections, whereas its ask was 63

19  million dollars.  So there was no tie-in between what was

20  provided in March by the plant with the total number that's

21  been asserted in various other documents.

22         Q.    You were also -- withdrawn.  Ms. Tarry also

23  testified that she received the 2006 pro forma.  Do you

24  agree with that?

25         A.    I don't remember.

149

1    Q.    And how about the DIP bridge supplemental.

2  Did you receive that?

3    A.    I'm sure we did.

4    Q.    Did you ever get any information about the

5  company's fixed and variable costs?

6    A.    It was on a business basis.  We asked for

7  it on a plant by plant basis.

8    Q.    And why did you ask for it on a plant by

9  plant basis as opposed to an overall business basis?

10    A.    We wanted to see what the impact -- it

11  takes us into the MFO analyses, the manufacturing footprint

12  optimization plan.  And as part of our mandate we have been

13  looking at alternatives to the company's plans for shutting

14  unionized facilities in the US.

15          And so in order to assess the economics of

16  closing plants and moving work elsewhere, we wanted to see

17  what the economics would begin to -- having margin.

18  Variable cost and fixed cost it's a very useful tool for

19  that sort of analyses, it's a useful set of information.

20    Q.    I would like to turn to the information

21  flow process itself in this case.  Are you familiar with

22  what's been called the virtual data room?

23    A.    Yes.

24    Q.    And is there a virtual data room to, your

25  knowledge, with respect to the labor constituencies?

150

1          A.    Yes, there is.

2          Q.    And were you given access to that site?

3          A.    Yes, I was.

4          Q.    And when was that?

5          A.    I believe sometime in November.

6          Q.    And from whom were you given access?

7          A.    It was -- I believe the user word and

8    password came from someone at Jones Day, and the contact

9    was with the operator of the data site, BMC.

10         Q.    Was that Mr. Miller?

11         A.    I don't remember.

12         Q.    But somebody at BMC to your knowledge?

13         A.    Perhaps, perhaps Mr. Miller.  And from BMC

14   we received from some overview of how to access the

15   information on the data sight and how to use the data site.

16         Q.    At that time, were you advised of the

17   existence of any other data sites?

18         A.    No.

19         Q.    And, by the way, have the unions retained

20   you in connection with their participation on the unsecured

21   creditors' committee in this proceeding?

22         A.    I was brought in as a financial advisor in

23   connection with the negotiations.  And part of that -- and

24   the restructuring of Dana and the emergence of Dana.  So

25   part of that includes working with the union

151

1    representatives on a committee, to the extent they need

2    financial advisory guidance.

3         Q.    And were you advised at any point by anyone

4    from Jones Day or from BMC or Alix Partners about the

5    existence of a UCC site?

6         A.    No.  Well, at some point I was, but not

7    without making inquiries about it.

8         Q.    And were you, at some point, made aware of

9    the existence of a site for professional eyes only?

10        A.    Yes.

11        Q.    And did you ever attempt to obtain access

12   to documents included in the professional eyes only

13   website?

14        A.    Yes.

15        Q.    And to whom did you make such a request for

16   access?

17        A.    Initially to Chris Bueter, head of HR I

18   believe is his title.

19        Q.    And what, if anything, did Mr. Bueter say

20   to you in response or write to you in response?

21        A.    At no point did the company ever respond in

22   writing to my requests for access to the data sight for the

23   UCC professionals.

24        Q.    Did there come a time when you had a

25   conversation with Ms. Tarry about your desire to have

152

1     access to that site?

2           A.    Yes.  I reminded her that that request was

3     outstanding.

4           Q.    And what, if anything, did she say to you

5     in response?

6           A.    I don't recall, but I think she said there

7     was a confidentiality issue.

8           Q.    Are you bound by any confidentiality

9     agreements in this case?

10          A.    Yes, I am.

11          Q.    And by virtue of being bound by that

12    confidentiality agreement, do you have access to the labor

13    site?

14          A.    Yes, I do.

15          Q.    And were you told anything about the

16    inapplicability or the insufficiency of that

17    confidentiality obligation on your part which precluded you

18    from having access to the professional eyes only site?

19          A.    No.  And I didn't -- I assume that Ms.

20    Tarry didn't know either what any possible legal issues

21    that the company's lawyers could have.

22                MR. TAMBE:  Objection.  Move to strike.  No

23    foundation, your Honor.

24          Q.    Well, focus on was Ms. Tarry said to you

25    and what you said to her?

153

1          A.       She said to me there was an issue of

2    confidentiality agreement.  I reminded her that I was

3    covered by one.  She just repeated her statement as to

4    which I said why don't you proceed and have it taken care

5    of so I can get access says to whatever that issue might

6    be.

7          Q.       And when was that approximately?

8          A.       End of February, beginning of March

9    perhaps; I don't remember exactly.

10         Q.       Were you aware of the existence of the site

11   before then?

12         A.       I became aware of it around February 22nd,

13   20th time frame.

14         Q.       Now, it has been said by some that there

15   are substantial number of documents on the labor site.  Do

16   you agree with that?

17         A.       Yes.

18         Q.       And is quantity important?

19         A.       It's not sufficient.

20         Q.       Necessary perhaps but not sufficient?

21         A.       Well, the quantity didn't say anything to

22   the quality and whether it's complete.  There are a lot of

23   documents that are one page excerpts from larger documents

24   or larger documents that are split up into many documents

25   all in one page.  So quantitatively there are a lot of

154

1     files, and put together they are a lot of pages.  A lot of

2     those pages are collective bargaining agreements which

3     would run 200, 300, 400 pages, but the shear quantity of

4     pages or files is not sufficient to know whether or not

5     sufficient information has been shared with the unions.

6               Q.    I'd like to return to your declaration and

7     expert report, paragraph 27, which begins on the bottom of

8     page 9?

9               A.    Yes.

10              Q.    And there you discuss your observations

11    based upon a comparison of documents on the UCC data site

12    and documents of a like kind on the labor site.

13              Could you elaborate on your findings in

14    that respect that are reflected specifically in paragraph

15    27?

16              A.    Yes.

17              Q.    Please do.

18              A.    On the UCC data site there is a file with

19    an Excel file.  It's in Excel format, which breaks down

20    employment direct, indirect, union employees and salaried

21    employees by plant, and it's for two months.  There are

22    three sheets, one sheet is for the current month, another

23    sheet is for the prior month, and the third sheet is the

24    variance showing the change from one month to the next.  It

25    is organized by business unit, and within business unit by

155

1    geography, and then on a plant by plant basis.

2                    In Excel format one can open up the file to

3    see the employment numbers, as I said, direct, indirect,

4    salary, for two months that are covered at any plant

5    worldwide that's operated by Dana.  In Excel there is a

6    function called data group which you can group by rows or

7    columns, such that it combines you that you only see one

8    row rather than 47 rows or whatever you are trying to

9    group.  So the Excel file is organized that it is grouped

10   by business so you can see the total employees by business,

11   or you could also do it by geography, and you can then open

12   it up to see the detailed information behind it.  That was

13   on the UCC site.

14                   On the labor site for the unions, someone

15   took the trouble to file print to PDF, namely to take this

16   Excel file and create a PDF file with the summary numbers

17   on it.

18                   The difference between the files is one is

19   an absolute number that's on a piece of paper, it's like

20   getting a printout, the other is an Excel where one can

21   manipulate the data and work with it to try to engage

22   trends, and one could get to the level of detail that's

23   simply impossible behind the one page summary because you

24   can't go behind a PDF file, you can't see the underlying

25   data behind it.  What you see is what you get.

1        Q.      So that the PDF file is a snapshot of the

2    Excel file with the same information?

3        A.      Well, the Excel file could have been opened

4    up and printed to a PDF with all the information behind it,

5    but it wasn't; rather all that was provided was the overall

6    summary data.  So the difference is, A, the detail wasn't

7    there.  And secondly it was in a format that in order to be

8    able to do any analysis on it one would need to enter all

9    the data into an Excel file and then do all the analysis,

10   something that would take, in this case, a long period of

11   time.

12       Q.      Now, can you use a PDF file -- you may have

13   answered this, but just so I'm clear.  How do you take a

14   PDF file and make it an Excel file?

15       A.      You can't.

16       Q.      What do you have to do?

17       A.      I mean you can, but you would have to put

18   it into a grinder to read, an OCR grinder, let's call it

19   that, which would take the information and read it and

20   convert it into digital format.  And then you would have

21   to, if it was a good enough digital reader, do quality

22   checks to make sure it does did it properly, and then you

23   would convert it into an Excel format, but you would never

24   be able to get any of the underlying detail that's behind

25   it.

157

1          Or in the case of, for example, the wage

2     costing sheets that were provided to us, they were provided

3     in Excel, but within Excel, all the calculations were taken

4     out.  Someone went through the trouble of taking the data

5     and doing what's called a copy paste value exercise, such

6     that you've turned formulas into just dead data, dead

7     numbers, without seeing the underlying detail behind it of

8     what numbers are being calculated.

9          So someone went through the trouble of

10    doing that rather than providing us the original Excel with

11    all of the calculations built in.

12          Q.    Was that information something that was

13    requested by the union, by you?

14          A.    Well, yes.  We consistently ask for backup

15    information for the analyses.  That means you want to see

16    how its calculated; what are the numbers used for A and B

17    to get to C.  So sometimes we just get C and were told

18    there it is.  Well, we are looking for the backup to

19    understand what the foundation is.

20          Q.    And the backup would be reflected in Excel

21    format and not PDF?

22          A.    Correct.  I mean one would could write out

23    in PDF to see exactly how that number came about, but

24    that's not the same.

25          Q.    Now, I would like to review some documents

158

```
 1    pertaining to your role with respect to requesting

 2    information.  And before I do that, do you know who Mr.

 3    Shaw is?

 4            A.      Rick Shaw, yes.

 5            Q.      Who is Mr. Shaw?

 6            A.      He's an attorney for Jones Day.

 7            Q.      And did you work with Mr. Shaw in

 8    connection with information requests in this case?

 9            A.      I've dealt with Rick Shaw, I've dealt with

10    Chris Bueter, and I've dealt with Polar Tarry on

11    information, so he was one of the people who I've dealt

12    with that that on that question.

13            Q.      Would you turn please to Tab 105, which is

14    Union Exhibit 22?  I think it's the other binder.

15            A.      Yes.

16                    MR. LEVINE:  Behind Tab 105, your Honor.

17                    THE COURT:  Got it.

18            Q.      Mr. Potok, what is this document, if you

19    know?

20            A.      It's the initial information request that I

21    forwarded to the company sometime in December actually.

22            Q.      And it is dated November 20th, 2006?

23            A.      The document reads November 20th at the

24    bottom right hand corner, but in fact it was forwarded in

25    December, I believe, sometime early, mid in December
```

159

1    thereabouts.

2         Q.    Is there any reason you didn't send it on

3    November 20th when it was prepared?

4         A.    On November 20th had I submitted an

5    information request, it would be long and voluminous would

6    be asking for everything.  What I thought would make more

7    sense and to expedite the process and to save the company

8    effort and time would be to first review what was on the

9    data site, because I was told the data site would contain

10   information that would be needed to conduct the due

11   diligence on the company.

12             After spending time on the site we had a

13   better sense of what the issues are that we wanted to

14   pursue, and that was a product that we put together here.

15        Q.    And did there come a time that you sent

16   what's been marked as Union Exhibit 22 to some -- one or

17   more representatives of the company?

18        A.    Yes.

19        Q.    And would you turn to Tab 106 of Union

20   Exhibit 23, and could you identify that for the record,

21   please, if you can?

22        A.    Yes.  That's the cover page of an e-mail

23   from me to Rick Shaw that was -- with it came an

24   attachment, an electronic attachment which was the

25   information request we just look at in the prior exhibit.

160

1      Q.      I see that there's two e-mails on Exhibit

2  23.  Could you explain that?

3      A.      Yes.  I sent --

4      Q.      E-mail transmissions, I'm sorry.

5      A.      Right.  I sent an e-mail indicating that

6  this was a preliminary information request and would be

7  supplemented, and that our -- we were especially interested

8  in getting certain items.  And after sending it I realized

9  that there was something I wanted to modify, I don't

10  remember what it was, so I the made the modification and

11  two minutes later I sent him the more final product.

12      Q.      Based on this it look like you sent one

13  12:30 on December 17th and -- actually it is two minutes

14  12:28?

15      A.      Right.

16      Q.      Okay.  Turning back to Exhibit 22, the

17  specific request that you made.

18      A.      Yes.

19      Q.      Let me just review some of these, and not

20  the whole document, but tell us what you requested with

21  respect to paragraphs 5 and 6 and why you requested that

22  information?

23      A.      Paragraphs 5 and 6 -- well, paragraph 5

24  refers to an analysis that had been done in businesses and

25  paragraph 6 refers to the manufacturing footprint

161

1    optimization.  It was clear that the company had plans to

2    change the footprint, to put it euphemistically, or more

3    precisely, shut the union plants and move the work to

4    Mexico and other non US non Canadian locations.

5                We wanted to understand the analysis behind

6    those decisions to see whether or not the union, in its

7    negotiations, could propose an alternative and work through

8    with the company whether or not there were any such

9    alternative.

10               Q.    And I see in paragraph 8 you're requesting

11   that the base case, something called the AOP and the five

12   year business model with some explanatory information

13   below, presumably to tailor your request; is that correct?

14               A.    Correct.

15               Q.    And why were you requesting such

16   information inclusive of the five year business model?

17               A.    We have learned, our experience is, my

18   experience is that one needs a five year business plan, and

19   companies generally work one year time frame in terms of

20   the budget and the business plan for a longer term time

21   horizon.  And we expected that we would want to know what

22   the company's long term plan was for the business to see

23   how profitable the business would be based on what

24   projections, what assumptions and what might or might not

25   be required in the way of modifications and collective

162

1    bargaining agreements.

2        Q.    And did there come a time when you received

3    a copy of the company's five year business plan?

4        A.    No, it has not been produced.  The timing

5    for receipt has been delayed several times.  So at this

6    point I believe it's sometime some April that we are

7    projected, we and other constituents are projected to

8    receive a five year business plan.

9        Q.    In your experience in advising unions in

10   regard to financial matters connected to collective

11   bargaining have you worked with five year business models

12   for the purposes of negotiating agreements?

13       A.    In my experience, whether it be negotiating

14   collective bargaining agreement or providing equity capital

15   or lending money, one does it on the basis of longer term

16   plans, the five year plan being the typical projection

17   period.

18       Q.    So in your opinion was the request for the

19   five year business model connected to a collective

20   bargaining agreement in any way unique?

21       A.    We believe that it is essential as a

22   foundation for getting some facts and getting some analyses

23   of those facts so as to be able to in a negotiate.

24       Q.    Can you negotiate effectively without such

25   a plan in this kind of a situation where the company is in

163

1    a fairly radical restructuring posture?

2            A.      I think both in terms of negotiating an

3    agreement and in terms of getting that agreement ratified

4    by the people who vote on those agreements, it is essential

5    to have a complete set of four information, and a five year

6    business plan goes a long way towards that.

7            Q.      And who are the people who vote on the

8    agreement, who ratify the agreement that you are talking

9    about?

10           A.      The union's leadership, be it at the

11   international level or the local level, negotiate

12   agreements, those agreements then have to be approved by

13   the members affected by those agreement, and those are the

14   active employees, and some in some cases the people on

15   layoff as well who get to vote as to whether or not to

16   ratify those agreements and their attitude about ratifying

17   and the company and the union.

18                   MR. TAMBE:  Objection, I move to strike,

19   your Honor, the testimony.  I think the witness is sneaking

20   from behind the privilege curtain.

21                   MR. LEVINE:  I don't understand the

22   objection.

23                   MR. TAMBE:  Well, the objection is we were

24   not allowed to ask this gentleman anything that even

25   remotely touched on what you called the so-called

164

1    negotiations privilege.

2                   Now he's giving a rationale of how the

3    unions negotiate and what their understanding is as to what

4    their considerations are.  He's not been qualified as an

5    expert on that and I think it's highly improper.

6                   THE COURT:  I allow the answer to stand and

7    restrict --

8                   MR. LEVINE:  I will note for the record, I

9    wasn't talking about negotiations.  I'm sorry, I'm a labor

10   lawyer.  There is a distinction between ratification of

11   labor agreements and --

12                  THE COURT:  I've ruled, counselor.  Let's

13   not have a debate.  The answer stands.  Go no further.

14   BY MR. LEVINE:

15        Q.       Turn to paragraph 10, please?

16        A.       Yes.

17        Q.       Now, there you ask for information

18   pertaining to the 1113 and 1114 proposals, specifically you

19   ask for detailed analyses of book and cash savings

20   requested from each facility by component and labor group,

21   i.e. wage rate cuts, healthcare changes, overtime policy

22   changes, vacation changes, et cetera.  Why did you request

23   that information?

24        A.       Fundamentally, the company's asking for

25   cost relief, and so one needs to know how much it is asking

165

1     for, one also needs to know what it is asking for.  And

2     negotiations are about, A, first figuring out how big a

3     basket it needs to be, and then one needs to figure out

4     what the elements of the basket are going to be.

5                    So without the cost elements in the

6     company's proposal, how do we weigh how the various

7     elements of the proposal relate to one another in terms of

8     the cost benefits to the company?  And in that cost

9     benefits -- whether or not the calculation of 46 million

10    dollars that the company asserts it is asking for is a

11    number that consists of the first year, the second, year,

12    the third year, the average of the three years, do those

13    numbers change over time, which direction do they go in?

14    That all goes into seeing the underlying detail of how the

15    company costs its proposal.

16         Q.    And turning to finally paragraph 12, you

17    asked for information about cash repatriation.  Why would

18    you ask for that in the context of collective bargaining?

19         A.    In one of the meetings with the company

20    there was an assertion that relief was necessary very soon

21    because the company might run out of cash, the debtor might

22    run out of cash without it in the time frame of

23    March/April.  And we asked for what the projections were to

24    understand how much cash the company would have, the debtor

25    would have, A, on its own based on the resources it had and

166

1   the resources that it would use, and to what extent cash

2   outside that's sitting with subsidiaries that are not

3   covered by the bankruptcy protection, to what extent there

4   are resources there that are available to be brought back

5   to support the debtor.

6          Q.    By the way, when, if at all, did you

7   receive a response to the information requested in

8   paragraph 10, that is information directly related to the

9   company's proposals in this case in any way responsive?

10         A.    It wasn't until -- well, around March 8th,

11  9th time frame.  We got documents that show what the

12  savings are for each of the plants.  We then asked for a

13  reconciliation of what those numbers add up to for the

14  plants with assertions in Mr. Bueter's declaration and Mr.

15  Stenger's declaration to see how it fit into the larger

16  picture of numbers being banged about.

17              And we didn't get a response to that until

18  the last week, which include -- what we did receive

19  suggests that there were some errors made along the way,

20  that perhaps no one had bothered to do that calculation in

21  the first place, or if they had, they made some errors as

22  well.  Some things were counted or mistakenly counted and

23  some things weren't counted, and that's what we have.

24         Q.    When did you receive the information about

25  cash repatriation if ever?

167

1          A.      Within the last month, but I don't remember

2      exactly when.

3                  MR. LEVINE:  Your Honor, at this point I

4      would ask for Union Exhibits 22 and 23 to be received as

5      evidence.

6                  MR. TAMBE:  No objection, your Honor.

7                  THE COURT:  Received.

8                  (Whereupon, Union's Exhibits 22 and 23 were

9          received in evidence as of this date)

10     BY MR. LEVINE:

11         Q.      Turn, please, to Union Exhibit 24 which I

12     believe is behind Tab 107, Mr. Potok?

13         A.      Yes.

14         Q.      I note for the record that that is a two

15     page exhibit.  And beginning from the second page, could

16     you tell the court what this is, if you know?

17         A.      This is an e-mail trail, so the oldest

18     e-mail that it's trailing was my December 17th e-mail to

19     Rick Shaw on 12/28.

20         Q.      Which for the record was reflected in

21     Exhibit 23?

22         A.      Correct.

23         Q.      Okay.

24         A.      And that's on page 2.  On page 1 we see the

25     copy of the e-mail that was sent two minutes later, so that

168

1    takes us to December 17th at 12:30 a.m. and this e-mail was

2    sent on December 29th.

3            Q.      When you say this e-mail, I hate to

4    interrupt you --

5            A.      The very top.

6            Q.      -- just for the record are you talk about?

7            A.      Same exhibit.

8            Q.      First page?

9            A.      Yes.  It is an e-mail dated December 29th

10   to Rick Shaw.

11           Q.      And what was the purpose of sending this

12   e-mail to approximately 12 days after the information

13   request was transmitted on the 17th?

14           A.      To inform Mr. Shaw that since sending the

15   request there had been absolutely no response from the

16   company, its lawyers, or its restructuring experts

17   indicating that it was received, not received, viewed or

18   not reviewed, whether or not there are questions or issues,

19   absolutely no response.

20                   MR. LEVINE:  I would ask that Union Exhibit

21   24 be received into evidence, your Honor.

22                   MR. TAMBE:  No objection your Honor.

23                   THE COURT:  Received.

24                   (Whereupon, Debtor's Exhibit 24 was

25   received in evidence as of this date)

169

1    BY MR. LEVINE:

2           Q.      Turn, please, to Union Exhibit 25 behind

3    Tab 108?

4           A.      Yes.

5           Q.      Are you there, Mr. Potok?

6           A.      Yes.

7           Q.      Could you describe to the court what is

8    reflected in Exhibit 25?

9           A.      It is a letter dated January 8th from Rick

10   Shaw, and it was sent to me electronically, by fax, and by

11   U.S. Mail.

12          Q.      Now is this the first response that you

13   received from the company to your information request sent

14   on December 17th, 2006?

15          A.      Yes.

16          Q.      And let me ask you to focus on a couple of

17   responses by the company.

18                  Could you turn please to page 3, on the

19   bottom with respect to paragraph 6 dealing with

20   manufacturing footprint optimization?

21          A.      Yes.

22          Q.      Does that indicate that the company was

23   responding to your request for information about MFO

24   adequately?

25          A.      Well, item 6 was a request for detailed

170

1    analyses of the MFO analysis done by the company.  For each

2    instance what was provided to us were power point

3    presentations to the creditors from November 10th, October

4    17th, and December 18th.

5            Q.    And why was that or was that not adequate

6    from your perspective?

7            A.    We were trying to understand the underlying

8    analyses, what the numbers were, what the detail was behind

9    the conclusions.

10            The conclusions were not ones we were

11    pleased to see, but we wanted to understand the analysis

12    behind those conclusions to see, A, whether or not we could

13    understand them and see whether or not we could come up

14    with alternatives, and to see what was done by the company.

15            Q.    And that information wasn't contained in

16    these power point presentations?

17            A.    No, it's simply conclusions.  It presents,

18    you know, it does not provide the underlying analysis

19    behind the conclusions.  The numbers used to reach the

20    conclusions.

21            Q.    I would like you please now to refer to the

22    response to item 10 of your original information request,

23    which again, for the record, requested basically

24    fundamental information about the 1113 and 1114 proposals.

25            I'll read it onto the record, "You asked on

1    December 17th for detailed analyses of book and cash

2    savings requested from each facility by component and labor

3    group, i.e. wage rate cuts, healthcare changes, overtime,

4    policy changes, vacation changes, et cetera."  And on page

5    7 of the company's response, what is reflected as

6    responsive, if at all, to those that fundamental requests

7    by the union on December 17th?

8          A.    The response on January 8th, in the January

9    8th letter on page eight was, "We are still considering

10   your request."

11         Q.    And that was on January 8th, approximately

12   three weeks after the request was initially made?

13         A.    Correct.  Now this is the fires first time

14   the company communicated that it was considering the

15   request.  This is apparently it's suggesting that they had

16   been considering it for some period of time.

17         Q.    And that was two and a half weeks before

18   the company filed its motion in this case?

19         A.    I believe that's the case.

20               MR. LEVINE:  Your Honor I would ask that

21   Union Exhibit 25 be received in evidence.

22               MR. TAMBE:  No objection, your Honor.

23               THE COURT:  Received.

24               (Whereupon, Union Exhibit 25 was received

25          in evidence as of this date)

172

1    BY MR. LEVINE:

2         Q.     One other item on Union Exhibit 25 please

3    turn to paragraph 12.  With respect to your request made on

4    December 17th for information relating to cash

5    repatriation, what, if anything, was responsive to that

6    request in this letter?

7         A.     The request was to understand whether or

8    not there was any cash available in the non bankrupt

9    subsidiaries that might be able to support the debtor.  And

10   the response it is not nonresponsive.

11        Q.     Well, it is responsive.

12        A.     It does not provide -- well, on the first

13   element, which is A, as to whether or not there are

14   redirections on moving the cash.  And the response was that

15   we are considering your request.

16             On the second which is to quantify cash

17   required for operations of non US businesses.  And the

18   response was see the plus plan, and when you look at the

19   plus plan it doesn't answer that question, so it is non

20   responsive.

21        Q.     Now turn, please, to Tab 109 which is Union

22   Exhibit 26?

23        A.     Yes.

24        Q.     It appears to be a letter to Mr. Shaw from

25   you dated January 12th, which would have been four days

173

1    after the company's initial response to your December 17th

2    request for information in connection with the company's

3    1113 proposals.  Are you there, Mr. Potok?

4        A.    Yes.

5        Q.    I just want to go over a couple of -- well,

6    why did you send this letter?

7        A.    Because the January 8th response was

8    substantially incomplete to our initial request from

9    December.

10        Q.    And how does this letter relate to what you

11    consider to be --

12        A.    It identifies all the areas where it is

13    incomplete.

14        Q.    And I'd like to focus first on paragraph B,

15    and is that your explanation relating to what you were

16    still waiting for with respect to the company's MFO

17    analyses and projections?

18        A.    Yes.

19        Q.    What about item G?

20        A.    Again, indicating the gap between the

21    question and the answer provided.

22        Q.    And what, for the record, do you indicate

23    with respect to your request for information pertaining to

24    the 1113 and 1114 proposals, what do you say?

25        A.    My response is, "You respond that we are

174

```
 1   still considering your request.  Please note this
 2   information is critical to our analysis."
 3           Q.     Finally, Mr. Potok, with respect to this
 4   document, you have paragraph H relating to cash
 5   repatriation.  And does that reflect their continuing
 6   effort to receive information about cash repatriation?
 7           A.     Yes.
 8                  MR. LEVINE:  Your Honor, I would ask that
 9   Union Exhibit 26 be received into evidence.
10                  MR. TAMBE:  No objection.
11                  THE COURT:  Received.
12                  (Whereupon, Debtor's Exhibit 26 was
13           received in evidence as of this date).
14   BY MR. LEVINE:
15           Q.     Please turn to the document behind Tab 110,
16   Mr. Potok, which has previously been marked as Union
17   Exhibit 27?
18           A.     Yes.
19           Q.     What is Union Exhibit 27?
20           A.     It is a letter from Rick Shaw, which is
21   meant to supplement his prior letter of January 12th.
22           Q.     So this is a letter --
23           A.     January 8th, I'm sorry.
24           Q.     So this is a letter of approximately a week
25   later which is responsive in part I guess to your January
```

175

1    12th letter; is it fair to say that?

2        A.    No, it is not.  It simply supplements the

3    earlier letter that he sent in response to December 17th.

4    As I recall, there's nothing in here that's in any way

5    responsive to the January 12 letter we just reviewed.

6        Q.    Is it at all, looking through this

7    documents then to the best of your recollection, was this

8    letter dated January 16th, 2007 which is now one month

9    after the union's initial information request, in any way

10   responsive to your request for basic information pertaining

11   to the company's 1113 and 1114 proposals?

12       A.    Well, on January 16th, in this letter, Mr.

13   Shaw doesn't indicate that they are still considering the

14   request, he's just silent on the question as to whether or

15   not they are considering it or decided not to share that

16   analysis with us or anything, it's just silence.

17       Q.    And this is two weeks before the motion in

18   this case is filed, correct?

19       A.    Correct.

20       Q.    Does Mr. Shaw, and for the record, your

21   Honor, I don't mean to refer to Mr. Shaw personally, but

22   does the company's response that's reflected in Union

23   Exhibit 27 refer at all to cash repatriation?

24       A.    It supplements the earlier non response in

25   the 12 A previously, the letter from Jones Day said that

176

1    the company was considering that request, as I recall.  In

2    this letter there's a file that's referred to that is meant

3    presumably to be responsive to that question, but in fact

4    it is not.

5            Q.    Now, Mr. Potok, I would like to move up a

6    little to the period immediately preceding our coincident

7    with the hearing in this matter.

8                 Would you look, please, at Union Exhibit

9    53, which finds itself behind Tab number 129?

10           A.    Yes.

11                MR. LEVINE:  By the way, your Honor, I

12   would ask that Union Exhibit 27 be received as evidence?

13                MR. TAMBE:  No objection.

14                THE COURT:  It's received.

15                (Whereupon, Union Exhibit 27 was

16   received in evidence as of this date).

17                MR. LEVINE:  And if I didn't ask for Union

18   Exhibit 26 to be received, I would do so now.

19                MR. TAMBE:  No objection.

20                THE COURT:  Received again.

21   BY MR. LEVINE:

22           Q.    Are you at Union Exhibit 53, Mr. Potok

23           A.    Yes.

24           Q.    Does that appear to be a chain of e-mails

25   between you and representatives of the company?

177

1       A.      Yes.

2       Q.      Could you go through that chain and tell us

3  what, if anything, is material to with respect to your

4  request for basic information about the company's 1113 and

5  1114 proposals?

6       A.      Okay.

7       Q.      It's easier to go chronologically; I think

8  you have to start from the back.

9       A.      Yes.  The first one is dated February 23rd,

10  and it's an e-mail from me to the company.  It's to Chris

11  Bueter, and it's copied to other company officials or

12  company lawyers or advisers.  And it notes that the union's

13  chief negotiator forwarded the company's calculations of

14  the 1113 savings that were provided by the company to the

15  negotiator in negotiations, and requests that the same

16  analysis be provided for the UAW plants.

17       Q.      When you say chief negotiator, are you

18  talking about Mr. Robinson and the USW, the steel workers?

19       A.      Yes.  Jim Robinson and the united steel

20  workers.

21       Q.      And you were asking for similar information

22  for the united auto workers?

23       A.      Yes, correct.

24       Q.      And that was information, that was part of

25  item 10 in your original information request?

178

1          A.      Correct.  And it requests that such

2    information be provided in Excel format.

3          Q.      In Excel?

4          A.      In Excel.  I believe what was provided --

5    I'm fairly certain was provide to Mr. Robinson was a PDF

6    file.

7          Q.      And did you get -- is there a response to

8    your e-mail reflected in this chain of e-mail

9    transmissions?

10          A.      Yes, there is.

11          Q.      And your e-mail was sent on 2/23.  When do

12    you get a response to this e-mail?

13          A.      On March 7th.

14          Q.      And that's an e-mail transmission from Mr.

15    Bueter to you, Mr. Potok?

16          A.      Yes.

17          Q.      And that begins with the sentence, "I am

18    sorry I am late with these"?

19          A.      Yes.

20          Q.      And that is five days before the first day

21    of hearing in this matter?

22          A.      Yes.

23          Q.      And was Mr. Bueter's response fully

24    responsive to the request that you had made back in

25    December of 2006 for basic and fundamental information

179

1    connected to the company's 1113 and 1114 proposals?

2         A.    No, it was not.

3         Q.    Why not?

4         A.    Well, on March 8th I sent a followup to Mr.

5    Bueter.

6         Q.    Is that the e-mail transmission directly

7    above that?

8         A.    Correct.  That comes right above it.  And

9    some of the questions in that e-mail I note for him, are

10   directed at him, and others are for Alix Partners.

11        Q.    And now is the followup that you refer to

12   reflected in Exhibit 54, which is found behind Tab 130?

13        A.    Yes.

14             MR. LEVINE:  Your Honor, I would move to

15   have Union Exhibit 53 received in evidence.

16             MR. TAMBE:  No objection.

17             THE COURT:  Received.

18             (Whereupon, Union Exhibit 53 was received

19        in evidence as of this date)

20   BY MR. LEVINE:

21        Q.    I would like to focus now on a couple of

22   items in Exhibit 54, which as I understand it from Exhibit

23   53, was transmitted along with your March 8th e-mail to Mr.

24   Bueter; is that correct?

25        A.    Correct.

180

1          Q.     And I see here that you have a question

2     number 1 relating to Section 1113 cost savings.  What were

3     you looking for as reflected in paragraph 1?  Could you

4     explain that?

5          A.     There were three numbers that were

6     available that were referring to 1113 savings, and I was

7     asking the company to reconcile it since there was never

8     any schedule tied to any of these.

9               So the first one is in Mr. Bueter's

10    original declaration he estimated the 1113 savings would

11    amount to 48 million 6 dollars -- 695 thousand dollars.

12               In Mr. Stenger's declaration, the annual

13    cost savings with respect to union employee benefits and

14    wages I read at a range of 60 to 90 million dollars.  And

15    then the cost sheets provided on March 6th for the UAW and

16    the USW, when we added those up, they added up to 40.8

17    million dollars in the first year, and 44 million dollars

18    in the second year, and 45.6 million dollars in the third

19    year.

20          Q.     And so paragraph item 1 you were requesting

21    basically a reconciliation of those numbers?

22          A.     Correct.

23          Q.     And this was as of March 8th?

24          A.     March 8th.  We had received the cost sheets

25    for each of the plants on March 7th or 8th, March 6th, I

1    guess.  And when we added them up they didn't fit with

2    other data to the company was using?

3            Q.    Item 2 includes a number of requests for

4    followup information, information about certain assumption;

5    one of them is a request for information about calculated

6    savings from elimination of LTD, which I take it is long

7    term disability.

8            A.    Correct.

9            Q.    Tell us about what you were looking for on

10   March 8th with respect to the company's projected savings

11   resulting from the elimination of the long term disability

12   in full?

13           A.    I needed to understand how that calculation

14   was derived, how much it was, broken out whatever ways the

15   company could share with me that would explain how they

16   arrived at the number that was in their savings

17   projections.

18           Q.    And what, if any, response did you get from

19   your request for some kind of an explanation for the

20   conclusory estimate of savings in the millions of dollars

21   with respect to long term disabilities elimination?

22           A.    The savings on long term disability come

23   from two places; one is the active plants, and that amounts

24   to, in cost sheets, to about 2.4 million dollars.  Then as

25   we saw in the reconciliations that subsequently came,

182

```
 1    there's an another 11 million dollars in savings for closed

 2    plants.

 3                   And what we were directed to, for purposes

 4    of understanding how those numbers were calculated, as I

 5    recall, were in a subsequent communication we were referred

 6    to Mr. Arkett's declaration, certain paragraphs in Mr.

 7    Arkett's declaration that would explain how the company

 8    arrived at these numbers.

 9            Q.      Let me understand this.  You asked

10    questions about company estimates of the savings they

11    expect to achieve from eliminating in full long term

12    disability, and you were referred to litigation documents?

13            A.      That was the response, yes.

14            Q.      Did you look at those litigation documents?

15            A.      Yes, I did.

16            Q.      Were they responsive to your fairly basic

17    request?

18            A.      No.

19                   MR. LEVINE:  Your Honor, I would ask that

20    Exhibit 54 be received as evidence.

21                   MR. TAMBE:  No objection.

22                   THE COURT:  Received.

23                   (Whereupon, Debtor's Exhibit 54 was

24           received in evidence as of this date)

25    BY MR. LEVINE:
```

183

1          Q.      Turn, please, to Union Exhibit 57 which

2    finds itself behind Tab 133, Mr. Potok?

3          A.      Yes.

4                  THE COURT:  After that I have no more tabs.

5    Is that an indicator?

6                  MR. LEVINE:  No, your Honor.

7                  THE COURT:  It's not an indicator?

8                  MR. LEVINE:  Are you smiling for any

9    particular reason?

10   BY MR. LEVINE:

11         Q.      Mr. Potok, could you identify Union Exhibit

12   57?

13         A.      It is a letter from me to the lawyer at

14   Jones Day dated --

15         Q.      Mr. Welsser?

16         A.      Mr. Welsser is the recipient.  The letter

17   itself is not dated so I can't tell you when it was sent

18   just by looking at the letter, but it was sent by e-mail,

19   so I'm sure we can track it.

20         Q.      Do you know approximately when it was sent?

21         A.      It was sent within a day or two of my

22   receiving an e-mail from Mr. Welsser on March 19th.

23         Q.      And for what purpose did you send Union

24   Exhibit 57?

25         A.      Because the letter from Mr. Welsser was

184

1  seeking to respond to my earlier letter of March 8th.  And

2  to the extent there were still gaps, I wanted to identify

3  them for the company and its advisers so that they could

4  respond back and complete the information request.

5      Q.    I'd like you to turn your attention,

6  please, to the bottom of page 1 which deals with the issue

7  of long term disability.  Is that what you sent to the

8  company with respect to its recommendation that you read

9  the litigation file in order to obtain information

10  pertinent to the negotiations?

11      A.    I could have said in the reference to Mr.

12  Arkett's declaration was nonresponsive; instead I chose to

13  be more specific in this followup request by pointing to

14  discrepancies in numbers on long term disability, hoping

15  that that would perhaps generate the underlying data that

16  would be responsive to my request, so I refer to specific

17  data points that were provided to us by that point.

18      Q.    And there did there come a time when you

19  received a response to Union Exhibit 57?

20      A.    No, not yet.

21          MR. LEVINE:  Your Honor I would ask that

22  Union Exhibit 57 be received as evidence.

23          MR. TAMBE:  No objection.

24          THE WITNESS:  Actually let me just, I

25  believe one item here.  There was a followup e-mail from

185

1    Ms. Tarry on 2006 -- one of the items here's was asking for

2    the 2006 wage survey of labor costs at each of the plants,

3    and within a day or two of this e-mail I received that from

4    Ms. Tarry.

5                    MR. LEVINE:  Your Honor, I would also ask

6    that Mr. Potok's declaration and expert report, Union

7    Exhibit 2, be received as evidence.

8                    And then my direct examination is complete.

9                    MR. TAMBE:  No objection, subject to the

10   limitations we that we had made at the beginning of the

11   direct examination.

12                   THE COURT:  Yes.  Both are received, the

13   former and latter request.

14                   (Whereupon, Union Exhibits 2 and 57 were

15        received in evidence as of this date).

16                   MR. TAMBE:  Could we have just five

17   minutes?

18                   THE COURT:  Yes.

19                   (Recess taken.)

20   CROSS EXAMINATION BY MR. TAMBE:

21        Q.    Good afternoon, Mr. Potok.

22        A.    Good afternoon.

23        Q.    My name is Jay Tambe.  I'm one of lawyers

24   for the debtors.

25                   Let's start with where we ended.  If you

186

1    could turn to Exhibit 57?

2          A.    Yes.

3          Q.    Do you have it before you?

4          A.    Yes.

5          Q.    Yes that's the undated letter we were

6    talking about when we ended?

7          A.    Correct.

8          Q.    And you said it was a couple of days before

9    you got Mr. Welsser's letter, correct?

10         A.    Yes, yes, within days; the same week.

11         Q.    Would it surprise you if it was actually?

12               THE COURT:  Can I catch up with the

13   exhibit?  Which one?

14               MR. TAMBE:  Exhibit 57.

15               THE COURT:  Which tab?

16               MR. LEVINE:  It's Tab 13, your Honor.

17         Q.    That's the undated letter, right?  And

18   that's responding to Mr. Welsser's March 19th letter to

19   you, right?

20         A.    Yes.

21         Q.    You said on direct, I believe that it was a

22   day or two after you got Mr. Welsser's letter that you sent

23   off this undated letter, correct?

24         A.    I think I said I expected it was sent

25   within a day or two.

187

1    Q.    But it was for days wasn't it?

2    A.    Yes.

3    Q.    It was actually just Friday before we

4    started the hearing?

5    A.    That is correct.

6    Q.    It was Friday afternoon when you sent it,

7    correct?

8    A.    That is correct.

9    Q.    And we didn't discuss Mr. Welsser's letter

10   to you, correct?  You didn't talk about that?

11   A.    No.  But in terms of the letter itself,

12   what I did in this letter was -- I initially submitted a

13   letter, he then responded, including all the text in my

14   letter to be able to respond point by point.  I then took

15   his letter and added my followup to his response.  So all

16   three letters are in fact included in this one letter.

17   Q.    And Mr. Welsser, in his letter to you of

18   March 19th, provided additional materials, including

19   spreadsheets, correct?

20   A.    Yes, he did.

21   Q.    And that was the information you've been

22   looking for, correct?

23   A.    You have to be more specific.

24   Q.    Some of the information you were looking

25   for, correct?  His letter wasn't nonresponsive was it, Mr.

188

1    Potok?

2            A.    It was not nonresponsive, it was responsive

3    in part.

4            Q.    He gave you substantial information, did he

5    not?

6            A.    He gave me information --

7            MR. LEVINE:  Let me just ask --

8            A.    And to the extent to which it fell short of

9    my request, my followup indicated it was short and how it

10   was short.

11           MR. LEVINE:  Your Honor, I would just ask

12   that the witness be allowed to answer the question.

13           THE COURT:  He's doing fine on his own; I

14   don't think he needs your help.

15           MR. LEVINE:  Just trying to keep the record

16   clear, your Honor.

17   BY MR. TAMBE:

18           Q.    In terms of Exhibit 53, that was another

19   exhibit you talked about, can you turn to that?  That was

20   the chain of e-mails.

21           A.    Yes.

22           Q.    Do you have it?

23           A.    Yes.

24           MR. LEVINE:  It's Tab 129, your Honor.

25           THE COURT:  Got it.

189

1   Q.   And you started talking about your February

2   23rd e-mail, which is at the end of that exhibit?

3   A.   Correct.

4   Q.   And then you had a conversation with Mr.

5   Matthew about how it took more than a week to get to you?

6   A.   It looks like about two weeks.

7   Q.   And in fact you commented I'm sorry I'm

8   late with these, and you commented on the phrase that Mr.

9   Bueter used, correct?

10   A.   That was the comment; I don't know what my

11   comment was.

12   Q.   Well, that was noted in your direct, was it

13   not?

14   A.   It was noted in my direct either by me or

15   by my attorney.

16   Q.   Could you tell the court where you were on

17   February 26th and 27th?

18   A.   Where I was?

19   Q.   Yes, where were you?

20   A.   Well, I was in Toledo.

21   Q.   At Dana?

22   A.   At Dana.

23   Q.   Getting an in person visit with the highest

24   levels of management, correct?

25   A.   Yes.

1          Q.      Mr. Burns, correct?

2          A.      Correct.

3          Q.      The CEO, right?

4          A.      We had about 30 minutes with Mr. Burns,

5     yes.

6          Q.      And you had two days with heads of products

7     groups, correct?

8          A.      Not all heads of product groups.  The case

9     of -- our very first meeting was at the beginning of the

10    day, we had a full complement of management for the

11    traction business.  By the time we got to structures, we

12    get the controller of the business the sole representative

13    I think, of that business.  So it depended which business

14    we were talking about.

15         Q.      And you had the opportunity to ask

16    questions, did you not?

17         A.      I had an opportunity to ask questions, yes.

18         Q.      And you spent some time with Mr. Stenger

19    during those two days, correct?

20         A.      Yes.

21         Q.      The chief restructuring officer of the

22    company, correct?

23         A.      Yes.

24         Q.      And he answered your questions, correct?

25         A.      I assume to best of his ability.

191

1        Q.    Well, there was no question that you asked

2    that he did not answer, was there, sir?

3        A.    There were questions for which there was

4    followup.  For example, one of the statements that he made

5    was it was the company's view that productivity in US and

6    Mexico for the labor work were equilivant.  And he

7    indicated the that the company's analysis was that Fort

8    Wayne and Mexican facility were about equal, and Cape

9    Gerardo, which is a UAW facility, was lower productivity.

10   And I asked for the backup to you.

11              And I subsequently received a two page

12   power point presentation that was non responsive.  So there

13   was questions asked, and there was followup.  And we

14   reviewed the followup which in some cases was on point and

15   in some cases was not.

16       Q.    You are not saying that your two days at

17   Dana was a waste of time?

18       A.    Certainly not.

19       Q.    You got a lot of useful information out of

20   those two days, did you not?

21       A.    Absolutely.  It was about time.

22       Q.    Now let's go back to your December 17th

23   request.  You said that there was absolutely no response to

24   your December 17th request until January; is that right?

25       A.    There was no response to me, there was no

192

1    response to any member of my firm.  There were, I assume,

2    some documents that might have been posted to the website

3    during that timeframe, I would have expected there would

4    be, but there was no response recognizing that a request

5    had been submitted, nor when a response to that a request

6    would be provided.

7              Q.    Is that it?  Is there anything else you can

8    think of that happened between December 17th and January

9    8th, anything?

10             A.    I guess I must be missing something.

11   Please remind me.

12             Q.    Yes.  I think you are, and you failed to

13   tell the court.  On December 20th and 21st what happened on

14   those days?

15             A.    On the 20th and 21st the company held

16   informational meetings for professionals and the key

17   constituents during which time it made presentations.

18   And we were provided one or two day's notice for a meeting

19   that was set up presumably well in advance of that,

20   coordinating many people from constituents such as the

21   bondholders' committee, the UCC, at which time there were

22   presentations essentially about the plus plan.  Because

23   earlier in the month there was a presentation in New York

24   of the base plan, the 2007 base plan.  And then there was a

25   presentation in New York of the plus plan to, I believe, to

193

1    the unsecured creditors.  And this was a follow up to that

2    to provide for the various constituents to get the report

3    at one time.

4                    But that was not responsive to our request.

5    That was part of the normal course and process of sharing

6    information and projections with the key constituents.

7           Q.    So you you exclude from your information

8    flow anything that's held for consumption of people other

9    than yourself.  Is that the answer, sir?

10          A.    I submitted a request, a request which was

11   organized into different subjects.  There was no indication

12   that that request was received.  There was no indication

13   that that request would be responded to.  There was a

14   normal course information flow which would have taken place

15   with or without my request.  And obviously it was new

16   information.  I mean -- well.  Okay.

17          Q.    It was information you were provided,

18   correct?  It was information you were provided in New York.

19   It was information you were provided in Toledo, correct?

20          A.    Yes.  It was provided to all key

21   constituents, including us.

22          Q.    And you had people from your office attend

23   in person the meeting in Toledo, correct?

24          A.    Yes.

25          Q.    And they were given an opportunity to ask

194

1    questions at the meeting, correct?

2           A.    I take it there was some period of

3    questions.

4           Q.    Well, sir, there were no restrictions on

5    asking questions at those meetings, were there, Mr. Potok?

6           A.    Only to the extent there were time

7    constraints assigned.

8           Q.    Did you know, Mr. Potok, there was time

9    left over each day, plenty of free time?

10          A.    Well --

11          Q.    Are you suggesting to this court that

12   people were cut off from asking questions?

13                THE COURT:  Let him finish the answer.

14          Q.    Are you suggesting that people were cut off

15   from asking questions?

16          A.    I do not know whether people were cut off.

17   I do not know to what extent questions were asked.  I do

18   not know to what extent questions were fully answered and

19   completely answered.

20          Q.    And therefore you have no reason to believe

21   that any questions that were asked were not answered,

22   correct?

23          A.    Correct.

24          Q.    Now you had access to the data site as of

25   sometime in November of 2005, correct?

195

1        A.      Correct.

2        Q.      And you mentioned on direct, I believe,

3   that you were retained as an expert sometime in January; is

4   that correct?

5        A.      I was retained to be advisor to the unions.

6   At some point I was told there might be a need for me to

7   prepare an expert report.  And at some subsequent point I

8   was asked to prepare such a report.

9        Q.      But you had been looking --

10       A.      The purpose of my retainer was not to

11  generate an expert report.  The purpose of my engagement by

12  the unions was to help them in the bankruptcy, to provide

13  my expertise in the bankruptcy to the extent they needed

14  it.

15       Q.      You had access to information since

16  November of 2006, correct?

17       A.      I had access to the data room since

18  September, November, yes.

19       Q.      And there was extended discussion about

20  Excel and PDF files during your direct examination,

21  correct?

22       A.      Yes.

23       Q.      This wasn't the first time you've seen an

24  Excel file, correct?

25       A.      Correct.

196

1        Q.      You are fully familiar with Excel files?

2        A.      Yes.  Well, I could be a better expert at

3   it, but I'm familiar with it.

4        Q.      Well, you mentioned a number of terms of

5   art about Excel files that you are familiar with, correct?

6        A.      Yes.

7        Q.      Data grouping, and various other things,

8   and hidden formulas, and all the like, right?

9        A.      Yes.

10        Q.      You know all about that stuff?

11        A.      Correct.

12        Q.      And this wasn't the first time you were

13   exposed to it, correct?

14        A.      Correct.

15        Q.      And you knew that when you went on the

16   labor site in November of 2006 when you were looking at a

17   PDF file, you knew it was a PDF file, correct?

18        A.      Correct.

19        Q.      And between November of 2006 and sometime

20   in February of 2007, did you ever specifically request any

21   of the files that were in PDF to be provided to you in

22   Excel, sir?

23        A.      I don't remember.

24        Q.      You didn't do so, did you?

25        A.      I don't remember.

197

1    Q.    Every time you asked for an Excel file you

2    were provided an Excel file, correct?

3    A.    I wouldn't say every time.  And, as I

4    indicated, sometimes I was provided with an Excel file, but

5    where the functions of the Excel were -- the values of

6    having the information in Excel were taken out by simply

7    pasting it as -- by taking out the calculations behind it.

8    Q.    And then did you ask for someone to give

9    you the more detailed information in the Excel files?

10    A.    Every time I asked for backup, that's what

11    I asked for.  That's what it means to ask for detailed

12    backup.  It means to allow someone to audit the trail that

13    gets to the final number that's presented.  That's what it

14    means to ask for detailed backup.

15    Q.    And every time you asked for detailed

16    backup specifically, you were given the detailed backup,

17    were you not?

18    A.    No, I was not.  Absolutely not.

19    Q.    Let's talk about a little bit more about

20    the Excel files.

21    You said sometime in February you

22    discovered that there were files on the labor site in PDF

23    that were in Excel on the UCC site; is that correct?

24    A.    At the point where I learned there was an

25    UCC data site I went on it and I found information that I

198

1    thought was useful that was not on the labor site, or was

2    provided in a way that was more useful than what was

3    provided on the labor site.

4                And I picked the example of the employment

5    data to show that rather than the company making an effort

6    to fully disclose and disclose in a way that would be

7    helpful and useful for us, it seemed, and I can just say it

8    seemed, that someone was going out of their way to take

9    what was a useful format of information, namely in Excel,

10   and convert it to something which was much less useful.

11               I observed that.  I shared that observation

12   in my declaration.

13        Q.    Now, if someone really wanted to keep

14   information from being useful, do you have any explanation

15   as to why that same information on the Excel file was being

16   posted on the UCC site?

17        A.    Well --

18        Q.    You don't have an explanation, do you, sir?

19        A.    Well, one might be skeptical as to whether

20   or not there was an effort to provide the unions with

21   information that would be provided in its useful format as

22   provided to the UCC members.  And we don't know what was

23   provided -- in what format information has been provided to

24   UCC professionals, because we still have not gained access

25   to that site.

199

1          Q.       Now, the unions have representatives in the

2      UCC, correct?

3          A.       Correct.

4          Q.       Mr. Narag Guanatra, he's on the UCC,

5      correct?

6          A.       He's a lawyer for the UAW, and he's been on

7      the creditors' committee pretty much all along.

8          Q.       And Mr. Jury from the USW is also a member

9      of the UCC, correct?

10         A.       He gained membership to the UCC later on in

11     the process.

12         Q.       Now, you've described this very convoluted

13     process by which you could take PDF files and put them

14     through an OCR grinder and convert them into Excel files.

15     Do you remember that?

16         A.       Yes.  I wanted to be very precise.  I was

17     asked whether one could turn a PDF into an Excel file.  And

18     in fact there is, but no one would do that.

19         Q.       You could have called Narag and he would

20     give you the information in Excel, correct, sir?  He a had

21     access to the UCC site, did he not?

22         A.       My understanding is the user IDs and the

23     passwords for the UCC site and the labor site were

24     provided -- one was provided to Naraj --

25         Q.       Answer the question, please?

200

1         A.      I'm trying to answer the question.

2         Q.      You could have gotten the information from

3    Mr. Narag Guanatra, could you not, correct?

4         A.      Absolutely not, and I'm trying to explain

5    to you why I couldn't.

6                 Mr. Naraj Guanatra had access to a site, it

7    turns out to have been the labor site.  When he was given a

8    user ID and password, that's what he was given.  He never

9    ventured onto the UCC site.  He never had -- according to

10   e-mails I received from Mr. Guanatra, he did not know there

11   was a separate site available.

12        Q.      You are not suggesting that that site

13   existence was kept from Mr. Guanatra in any way, are you,

14   sir?

15        A.      No, I'm not suggesting that, just that he

16   was never made aware that it was available to him.  And he

17   assumed that what he was viewing on the labor site was

18   identical to what was being provided to the other

19   constituents on the UCC site.

20                That's an assumption he made.  It turns out

21   to have been incorrect.

22        Q.      And at any time, if you had simply asked

23   the company for Excel files, you would have gotten Excel

24   files, correct?

25        A.      I could have submitted very long, detailed

201

1    information requests.  I was trying to tailor the request

2    to get key information that was essential.  And, you

3    know -- and, yes, I could have said give me everything

4    you've given me to date in Excel.

5            Q.    That's one sentence, right?  Just one

6    sentence your request would have made you receive Excel

7    files as opposed to any other format, correct?

8                    MR. LEVINE:  Objection, that's --

9            A.    That one sentence --

10                   THE COURT:  That objection is overruled.  I

11   was going to interject and ask the same question.

12           A.    That could have been a request I would have

13   made, and I believe it would have been a leap of faith.

14           Q.    You didn't make the request, did you, sir?

15           A.    It would be a leap of faith for me to

16   assume that by asking I would get it.  Yes, I could have

17   asked it.

18                   THE COURT:  You didn't hesitate to ask for

19   a lot of information.  Why would you be reticent there?

20                   THE WITNESS:  I was focused on the bigger

21   picture.

22           Q.    Or perhaps a different picture, right, Mr.

23   Potok?

24           A.    No.

25           Q.    Let's talk about your role.  Let's go to

202

1    your declaration, Exhibit 2?

2              A.    (Witness complies.)

3                    MR. TAMBE:  I'm trying not to put another

4    binder up there so I'm trying to work off the union's

5    binder, but it may be easier for me to just go with the one

6    we have.

7              A.    Which one?  The declaration.

8              Q.    The declaration, yes.

9                    MR. LEVINE:  It's 10, your Honor.

10             Q.    It's your Exhibit Number 2.  You have it

11   under a different Tab?

12                   MR. LEVINE:  I have --

13                   THE COURT:  It's 2 in your smaller binder.

14                   THE WITNESS:  Okay.

15                   MR. LEVINE:  It's two in the smaller

16   binder.

17             Q.    Are you there?

18             A.    Yes.

19             Q.    That's your declaration, correct?

20             A.    Correct.

21             Q.    And in paragraph 2 of your declaration you

22   state I've been asked for the USW and UAW to provide

23   financial advisory services in these matters, correct?

24             A.    Yes.

25             Q.    And you don't describe in that paragraph

203

1   anywhere, do you, sir, that you have a duel role as both

2   expert witness and as a negotiation assistant?  Is it's not

3   there is it, sir?

4          A.    No.

5          Q.    And in the very next sentence you say,

6   "Under the terms of my firm's retention as the union's

7   financial advisor, my firm is paid 50 thousand dollars per

8   month for this engagement."  Correct?

9          A.    Yes.

10          Q.    And that's not all, is it Mr. Potok?

11   There's more, isn't there?

12          A.    More what?

13          Q.    Well, you have a success fee, don't you,

14   sir?

15          A.    Yes, potentially.

16          Q.    Yes, you do?

17          A.    The potential for a success fee, correct.

18          Q.    And that's not written down anywhere?

19          A.    Correct.

20          Q.    That's your side agreement with the unions,

21   is that right?

22          A.    It's a potential for a success fee.

23          Q.    What's your definition of success in this

24   matter, sir?  Have the unions told you?

25          A.    It will be assessed when the case is

204

1  completed.

2       Q.    So it remains to be determined what success

3  means?

4       A.    Success means that a company that is

5  reorganized with the unions maximizing employment and labor

6  costs with a viable company.

7       Q.    Well, the unions are going to define for

8  you, are they not, sir, what success means?

9       A.    Will they define it?  They will have to

10  agree.  We will have to agree on what success is.

11      Q.    And their objectives in this are to

12  maximize employment, correct?

13      A.    Maximize employment, maximize retiree

14  benefit recoveries, maximize wages and benefits, maximize

15  job security, and there is no job security without a viable

16  entity.  So that's a foundation for all else.

17      Q.    You haven't expressed any opinion in your

18  report, and you've offered none on direct, about what it

19  will take for Dana to be a successful, viable company,

20  correct?  Yes or no?

21      A.    No.

22      Q.    You have not offered any opinion about

23  whether Dana has failed to make any necessary capital

24  investments in the past few years, have you, sir?

25      A.    No, I have not.

205

1          Q.      No opinion as to that?

2          A.      No.

3          Q.      You've used no opinion as to whether Dana

4     needs to modernize it's facilities relative to its

5     competitors?

6          A.      No, I have not.

7          Q.      And you have not opined on what Dana needs

8     to do to be in the correct financial condition to obtain

9     exiting financing, correct?

10         A.      I have not done that.

11         Q.      And when you have done your analysis in

12    paragraph 20 of your declaration about Dana's so-called

13    ability to reach its targets without any contribution from

14    the unions, you haven't included any new sources of revenue

15    that the company hadn't already told you about, did you?

16         A.      No, I have not.

17         Q.      And nor have you shared with us your views

18    about your analysis about the company's labor savings under

19    the 1113 proposals at the five plants, correct?

20         A.      No, have I not.

21         Q.      Now, you've said a few times in your

22    declaration and on your direct that you need a five year

23    plan in order to negotiate, is that right?  Got to have it?

24         A.      It's pretty standard in these negotiations

25    to have a five year business plan.

206

1          Q.      And how many of the prior CVA negotiations

2     have the unions been provided with a five year plan by

3     Dana, any?

4          A.      You mean out of bankruptcy?

5          Q.      Out of bankruptcy, yes.

6          A.      Generally they are not shared.

7          Q.      Generally you negotiate without the benefit

8     of a five year plan, correct?

9          A.      Outside of bankruptcy, yes, but it depends

10    on the circumstances.  It depends on --

11         Q.      You've answered the question, Mr. Potok.

12    Let's talk about the five year plan a little bit more.

13                 You assume in your report that Dana is

14    going to achieve a certain level of price improvements with

15    its customers, do you not?

16         A.      I simply repeat what management is seeking.

17         Q.      And you have no reason to doubt management

18    that management has obtained some price improvements from

19    some customers to date, correct?

20         A.      It has reported that it has, yes.

21         Q.      And Dana's customers are major OEM

22    companies, are they not?

23         A.      Yes.

24         Q.      And they have managed to give price

25    concessions to Dana without the benefit of a five year

1   plan, correct?

2        A.    I haven't seen the agreements.  I don't

3   know the conditions attached to those.

4        Q.    In fact, you know very little about Dana's

5   communications with its customers as part of its price

6   improvement initiative, correct?

7        A.    Right.  The company has insisted on not

8   sharing the granularity of those discussions, and I haven't

9   insisted on getting those because I can get a general sense

10  and I have not pushed on that.

11       Q.    But you have assumed for purposes of your

12  analyses, in paragraph 20 of your analyses, that somehow

13  Dana is going to somehow achieve the full benefits of its

14  customer price improvements, correct?

15       A.    I have not assumed that it will achieve it,

16  I simply note that under its target, the target is higher

17  than what's being built into in the 2007 base plan plus.

18       Q.    Staying with the information sharing in the

19  five year plan, sir, in your meetings with the company in

20  February 26, on February 26th and 27th, you had a detailed

21  discussion about the MFO alternative, correct?

22       A.    Actually, there was very little time spent

23  on the MFO on February 26th and 27th, those were Monday and

24  Tuesday of the week.  The prior Friday I believe it was, we

25  had a detailed one hour discussion with an Alix Partners

208

1    professional who walked us through three spreadsheets that

2    we had received a half hour earlier.

3           Q.      So you had a detailed discussion on or

4    about February 26th and February 27th about the MFO

5    analyses, right?

6           A.      No, it wasn't a detailed discussion.  It

7    was a the analyst walking us through the analysis so that

8    we could understand how the spreadsheets that were being

9    shared with us were structured and how to understand what

10   analyses was being done.

11          Q.      And you asked for an explanation and you

12   received it, correct?

13          A.      We were allotted an hour and a half for

14   someone to walk us through three huge spreadsheets.  And

15   for the first time we had a half hour to review before we

16   got on the call.  The Alix Partners professionals had

17   another call that same morning and he had got a late, and

18   he had another call afterwards.  So we had all of an hour

19   for someone to walk us through that.  That's not a detailed

20   discussion, that's someone walking us though the

21   spreadsheets so that we could analyze it.

22          Q.      And Alix Partners and Dana did more for you

23   with respect to the MFO analyses, did they not, sir?

24          A.      They did.

25          Q.      You asked for a specific scenario to be run

209

1    and they modeled and ran the scenario for you, correct?

2              A.    I don't think they ran it.  I think they

3    pointed to a version of the one of the scenarios that they

4    had previously run as one to refer to.

5              Q.    And that was done for you at your request,

6    correct?

7              A.    The spreadsheet that was previously

8    prepared was sent to us, yes.  But I would not overstate

9    how much was done for us in the what way of any real de

10   nouveau analysis.

11             Q.    Is it the case here that you believe that

12   Dana has a special obligation to provide you with

13   information that it doesn't generate in the ordinary course

14   of business, sir?  Is that what you are saying?

15             A.    No.  I'm not saying --

16             Q.    You've answered the question.  And yet Dana

17   has, from time to time, conducted analysis at your request

18   and provided you with information, correct?

19             A.    They have responded to my request.  I don't

20   know how much of it was new on my behalf, I don't know.

21   None of it was labeled as new in response to your request

22   as opposed to here is something we previously did.

23             Q.    By the way, the meetings on the 26th and

24   the 27th where you meet Mr. Burns and Mr. Stenger, you were

25   the only folks there, correct, you and your investment

210

1    partners, correct?

2         A.    There were representatives from my firm,

3    from the UAW from, and from a firm called Center Ridge

4    Partners LP, which is also advisor.

5         Q.    To the unions?

6         A.    Correct.

7         Q.    So that was the special two day session

8    just for the unions, correct?

9         A.    Yes.

10        Q.    Switching gears a little bit, back to your

11   declaration, Exhibit 2?

12        A.    Yes.

13        Q.    Just confirm for me that you hadn't broken

14   out a separate 1113 analysis from a 1114 necessity analysis

15   anywhere in this declaration, correct?

16        A.    Correct.

17        Q.    Every time you refer to 1113, you also

18   refer to 1114, correct?

19        A.    Correct.

20        Q.    That's the way you looked at it 1113 and

21   1114 proposals, correct?

22        A.    My clients are negotiating on both motions.

23        Q.    Were you in the courtroom when Mr. Miguel

24   Foster testified this morning?

25        A.    No, I wasn't.

211

1          Q.       So would you agree or disagree with the

2    statement that the negotiations that are going on with

3    respect to Lima and Pottstown, the plans with the expired

4    agreement, those also touch upon what's going on in the

5    1113 and 1114 process?

6          A.       What do you mean by touch upon?

7          Q.       Well, would you agree that there is a

8    connection between the 1113 and 1114 proposals and what's

9    being negotiated between the company and the unions with

10   respect to the non 1113 plans?

11         A.       Both sets of negotiations are with the same

12   employer.  That employer is seeking financial relief.

13         Q.       And the unions are looking at that as a

14   connected set of issues, correct?

15         A.       They are looking to negotiate a

16   comprehensive labor agreement covering all plants and all

17   issues at one time.

18         Q.       But that only makes sense, doesn't it?

19         A.       Correct.

20         Q.       And that would be the proper way of looking

21   at these issues, correct?

22         A.       I believe so.

23         Q.       Now let's talk about the plant closers a

24   little bit.

25                  Have you been advised, by the way, that in

212

1      the course of this proceeding the debtors have made quite

2      clear that the active 1113 proposals relate to the plants

3      that have not been sold and not about to be sold off and

4      not the plants that are subject to active collective

5      bargaining discussions for an expired agreement?

6               A.      I'm sorry, can you say that again?

7               Q.      I'm sorry, I should say that again.  That

8      was a horrible question.

9                       Are you aware that in the course of this

10     proceeding, that the debtors have made clear that really

11     what we are talking about are the five remaining proposals

12     with respect to the five remaining plants?  That's been a

13     subject of a lot of testimony.

14              A.      I'll take your word for it.

15              Q.      And you have a list of seven plants in your

16     declaration, paragraph 13 of your declaration, correct?

17              A.      Correct.

18              Q.      In paragraph 15 you discuss Lima and

19     Marion, correct?

20              A.      Correct.

21              Q.      And you state that debtors have indicated

22     that in a subsequent phase of the manufacturing footprint

23     restructuring, the remaining facility is likely to be shut

24     as well.  Do you see that?

25              A.      Yes, I do.

213

1          Q.       And you cite a document for that?

2          A.       Correct.

3          Q.       Do you know what the date of that document

4     was, sir?

5          A.       No I do not.  I mean I don't remember what

6     it is.

7          Q.       Would it surprise you that it was a July

8     2006 document that you were quoting from?

9          A.       No.

10         Q.       And are you aware that the manufacturing

11    footprint plan has evolved since July 2006?

12         A.       I wasn't there in July of 2006 for the

13    company to present to me what the plan was.  I know what

14    the plan is right now concretely, the immediate plan.

15         Q.       And the concrete plan that's here and

16    immediate does not support your statement, does it, sir?

17         A.       The immediate plan is to shut Marion or

18    Lima, that's what the company has asserted.  And, if and

19    when asked by members of the two facilities what's the

20    future of our plant if the other one shuts, I would have to

21    be truthful and say it's my judgment, based on what I've

22    reviewed from the company, the other shoe will fall here

23    too.

24         Q.       So you are guessing that the other shoe is

25    going to fall?

214

1    A.    I'm not guessing.  The July documents refer

2  to phases MFO phases, and the first phase is either Lima or

3  Marion.  The company clearly has a view about what it needs

4  to do, which is move work from "high cost North American

5  facilities to Mexico and other low cost countries".

6    When I've made these assertions to the

7  company or Alix Partners, no one has said to me, oh, no,

8  you're wrong.  We've changed our minds about the other

9  plant.  We are going to keep it.  Don't worry about that

10  one.

11    Q.    Has the company said in its most recent up

12  to date MFO plan that it intends to shut the other

13  facility.  Does it say the say it anywhere in that

14  document, sir?

15    A.    The immediate MFO plan is an immediate

16  plan, it is not an intermediate plan.

17    Q.    Come now, Mr. Potok.  The plan that's in

18  effect right now goes out to 2010, 2011, 2012, doesn't it,

19  sir?

20    A.    No.

21    Q.    You haven't seen the hockey stick figure

22  showing how the savings from the MFO analyses are going to

23  come on line?  You haven't seen that?

24    A.    I have seen it.  Those are projections for

25  phase one savings.  Those aren't projections for phase one,

215

1    phase two, phase three savings.

2              Q.    And does the current plan say anything

3    about closing the other facility down?

4              A.    Phase one does not call for shutdown of the

5    other facility.

6              Q.    Thank you.  Let's go to the next paragraph.

7              A.    Yes.

8              Q.    Now, here --

9              MR. SIMON:  Your Honor, it might make the

10   proceeding somewhat more expeditious if the company would

11   give us firm assurances that the other plant will, in fact,

12   not be shut down rather than playing cat and mouse.

13             I think there are probably folks out in the

14   country who would appreciate knowledge as to --

15             THE COURT:  I'm interested in hearing from

16   the witness on the basis of his testimony and how his

17   testimony and his declaration support each other.

18   BY MR. TAMBE:

19             Q.    Let's talk about Fort Wayne, Mr. Potok, and

20   only Mr. Potok.  You say that it's likely that the wind

21   down at Fort Wayne?

22             THE COURT:  And by the way, I think Mr.

23   Levine is doing a fine job of not interrupting.

24             MR. SIMON:  So do I, your Honor, but as you

25   know --

216

1          THE COURT:  Sit down, Mr. Simon.

2          MR. SIMON:  -- various negotiations are

3   going on, people are listening, questions are being asked,

4   facts are known, they should be put forth.  The company

5   knows the facts.  Mr. Stenger is in the courtroom, all he

6   has to do is get up equally and appropriately and say don't

7   worry, Mr. Simon --

8          THE COURT:  Mr. Simon, this is not a

9   theater.  This is question and answer with a witness, and

10  your witnesses have received the same courtesy.

11         MR. LEVINE:  I was going to offer, your

12  Honor, a proposed stipulation that one of the two plants

13  would stay open.  Perhaps that would be more in accord with

14  the flow.

15         THE COURT:  I wouldn't want you to

16  contradict Mr. Simon in any way.

17         MR. LEVINE:  They were talking about the

18  closing of one.  I'm talking about the second.

19  BY MR. TAMBE:

20     Q.     All right.  Moving to Fort Wayne, there you

21  say in your second sentence, "It is likely that this wind

22  down is nothing more than a prelude to a complete facility

23  closure."  Do you see that?

24     A.     Yes.

25     Q.     And that's not what the current MFO plan

217

1       says about Fort Wayne, that it's going to be a shut down or

2       closer of a facility, correct?

3               A.      The MFO plan says it's a wind down.

4               Q.      To a lower number of employees?

5               A.      Well, the projection period it says wind

6       down of 15 percent to 2010 or 2011, which gets us to,

7       according to company documents, to 175 active employees.

8       It does not project beyond that.

9               Q.      And in the very next sentence you say, "In

10      fact, the debtor's planning documents indicate that Fort

11      Wayne would have been shut down, would have been shut in

12      the next few years," and it goes on.  Do you see that?

13              A.      Yes.

14              Q.      And so that was something that may have

15      been planned or contemplated earlier in the MFO process,

16      but clearly was not in the plan at the end of the MFO

17      process or where the MFO process currently stands, correct?

18              A.      The MFO process shows what the costs and

19      savings would be under the scenario where Fort Wayne would

20      be shut, and the comment in the document say we would shut

21      it but it's too much more us to handle at one time.

22              Q.      Therefore we are not it have shutting it?

23              A.      Therefore we are not shutting it, at the

24      same time we are shutting the other two plants.  So three

25      years the other two plants will have been shut for three

218

1   years, it won't be a implementation problem to shut Fort

2   Wayne at that point as well, which is what the statement of

3   the planning document says why they didn't shut it down

4   immediately, one reason for not shutting it down

5   immediately.

6          Q.      But you think it's likely that it will be

7   shut down?

8          A.      Yes, I do.

9          Q.      Looking out three years you say under oath

10  that it's likely to be shut down?

11         A.      Yes.

12         Q.      Next paragraph, 17.

13         A.      Yes.

14         Q.      Now there you can see that there's no

15  specific plan to shut Henderson down, correct?

16         A.      There are planning documents that state

17  that some assumably work will be taken out of Henderson and

18  it will be downsized.

19         Q.      So you want to speculate that the company

20  might sometime in the future choose to shut down Henderson,

21  correct?

22         A.      It's speculation.

23         Q.      So let me get this clear.  For purposes of

24  a five year plan, you are not going to make any projections

25  about the future.  For purposes of plant closer you want to

219

1    look three, four, five years down the road and speculate

2    about what the company is going to do.  Is that right?

3          A.    It's not --

4          Q.    Is that right?

5          A.    It's not idle speculation, it's based on

6    the company's documents.

7          Q.    And then you talk in paragraph 19 about the

8    three remaining facilities that you have not discussed in

9    the prior paragraphs.  And there are you said debtors have

10   not provided sufficient information to substantiate their

11   position.  Do you see that?

12         A.    Correct.

13         Q.    You have received, since the date of this

14   declaration, more information about the those three plants,

15   correct?

16         A.    Yes.

17         Q.    And in fact you ran an analysis of the

18   information you received from Mr. Bueter, correct?

19         A.    What do you mean I ran an analysis?

20         Q.    You conducted a spreadsheet to check Mr.

21   Bueter's calculations, correct?

22         A.    Of the cost savings at the various plants,

23   correct.

24         Q.    And you've shared that with the unions,

25   correct?

220

1          A.      Not yet.

2          Q.      You haven't shared that with us?

3          A.      I just ran it this morning in the last

4    couple days.

5          Q.      Do you have your deposition before you?  If

6    you don't I can hand it to you.

7                  MR. TAMBE:  May I approach, your Honor?

8                  THE COURT:  Yes.

9          Q.      Tab B in this binder.

10         A.      Yes.

11         Q.      Now you gave your deposition on March 9th

12   of this year, correct?

13         A.      Correct.  I take your word that that's what

14   it was, I don't remember.

15         Q.      I want to draw your attention to page 29 of

16   your deposition.

17         A.      Yes.

18         Q.      And I'm reading from line eight.

19                 "Answer.  Well, for example, we received

20   two days ago a set of spreadsheets from the company from

21   Chris Bueter purporting to quantify the labor costs, the

22   savings the company would realize in each of the three

23   years under its 1113 proposals.  We have taken that

24   information and tried to relate it to other information.

25   We have to see whether or not it makes sense, whether or

221

1    not, when you add it up it adds up to the cost savings

2    asserted by the company's witnesses, and try to figure out

3    whether or not the arithmetic was correct, to the extent

4    shown, and whether or not the information provided was

5    consistent."

6                    Did I read that correctly, sir?

7         A.    I believe you did.

8         Q.    And then you were asked a question by my

9    partner, Mr. Bennett.  And you said there's some

10   spreadsheet that references all of that.  Answer yes.

11                    Did I read all that correctly?

12        A.    Yes.

13        Q.    And then you were asked on page 30 what

14   does your analysis show in that regard, on lines 8 and 9.

15                    Did I read that correctly?

16        A.    That's what the word said.

17        Q.    And you didn't answer that question, did

18   you, sir?

19        A.    I was instructed not to, I believe.

20        Q.    And you followed that instructions,

21   correct?

22        A.    Certainly.

23                    MR. LEVINE:  Your Honor, I would ask that

24   the entire instruction and what I said with respect to the

25   privilege on that day be read into the record.

222

1          MR. TAMBE:  There's no purpose for that,

2     your Honor.

3          THE COURT:  I think there's no purpose.

4     He's just stated he was instructed not to answer the

5     question by his counsel.

6          MR. LEVINE:  But there was also a

7     discussion about trying to resolve this amicably without

8     the need of court and without springing --

9          THE COURT:  No further questions are from

10    him --

11         MR. LEVINE:  -- springing the preservation

12    of the a sacred privilege that the union holds during cross

13    examination.

14         THE COURT:  I haven't heard a question that

15    would breach that.

16         MR. LEVINE:  I respectfully disagree.

17         MR. TAMBE:  May I continue, your Honor?

18         THE COURT:  Yes.

19    BY MR. TAMBE:

20         Q.    Now let's talk about pages 30 and 31.  You

21    were asked about another spreadsheet, correct, that you had

22    created, correct?

23               Are you having trouble finding it?

24         A.    No, I found it.  I was waiting for you to

25    read it.

223

1      Q.      Page 31, line 9.

2              "Q.     Other than that spreadsheet

3      analyzing this labor cost information, can you describe any

4      other spreadsheets that Potok and Co. has created?

5              "A.     We have been updating analyses and

6      performance for Dana's compared to some peers based on four

7      year results that Dana has reported to date and has been

8      reported by public peers."

9              Did I read that correctly?

10     A.      Well, it should say for Dana as compared to

11     some peers.

12     Q.      Well, it was a typo in the document.  Other

13     than that I read it correct?

14     A.      I believe so.

15     Q.      And then you were asked the next question.

16             "Q.     What does that analysis show?

17             And there was an objection.  Do you see

18     that?

19     A.      Yes, I do.

20     Q.      And then you answer that, and you say it

21     provides a context in which to look at the company's

22     performance relative to its peers as a basis to be able to

23     look at the company's projected performance for '07 and

24     future years, when we get that information, if and when we

25     get that information.

224

1          Did I read that answer correctly?

2          A.    Yes, you did.

3          Q.    And the next question you were asked, can

4    you summarize what that contextual information shows?  And

5    you didn't answer that question, did you, sir?

6          A.    Correct.

7          Q.    You do have such a spreadsheet, correct?

8          A.    Yes.

9                MR. LEVINE:  Your Honor, respectfully, the

10   unions, and I want this on the record, the union, through

11   its counsel --

12               THE COURT:  How can it not be on the

13   record?

14               MR. LEVINE:  I don't know.  I want it to

15   the record.

16               THE COURT:  I haven't instructed the

17   reporter not to take anything down.

18               MR. LEVINE:  Thank you, your Honor.  I

19   appreciate the record being kept open for this because I

20   consider it an important consideration by the court.

21               What we tried to do here, as reflected on

22   these pages is to protect something that fundamental to

23   collective bargaining.  Now all of us labor lawyers, all of

24   use us union lawyers to whom come into the court to deal

25   with 1113 and 1114 try as hard as we can to balance core

225

1    principals underlying the nature labor relations act,

2    principles that have been part of the Federal scheme of

3    labor relations for 75 years now, and we try to balance

4    those principles with the --

5              THE COURT:  Mr. Levine, let me just tell

6    you you are overstating the problem.  No question has been

7    asked that would breach the confidentiality and the

8    privilege that you are seeking to assert.

9              MR. LEVINE:  But what --

10             THE COURT:  The only issue is whether these

11   documents exist, whether they were created by the --

12             MR. LEVINE:  No, your Honor.  What is going

13   on here --

14             THE COURT:  Please.  I'm listening to the

15   examination and questions, and I'm the guardian of that.

16   And I will not allow him to get any further than he's going

17   just as to the existence.

18             MR. LEVINE:  Respectfully, your Honor, the

19   problem is that inferences are being sought to be drawn by

20   counsel to suggest that the union was engaged in hiding

21   information to pollute these proceedings, when all we were

22   doing your Honor when all we were doing is protecting the

23   integrity of the bargaining process.  And I am really sorry

24   take respectfully exception to the notion that our efforts

25   to protect that privilege should somehow been used to

226

 1    impeach Mr. Potok, when especially I made it clear right

 2    here in the pages that are now being used to impact on the

 3    credibility of this witness that I would endeavor to work

 4    with Mr. Bennet, to work with Mr. Tambe's partners to

 5    ensure that, A, they get the information they needed, and,

 6    B, the collective bargaining process was protected.  I got

 7    nothing between March 9th now except for these my effort to

 8    protect that privilege to be used to impeach Mr. Potok and

 9    I respectfully suggest to your Honor that it is highly

10    inappropriate.

11                    MR. TAMBE:  If I may respond your Honor.

12                    THE COURT:  Sure.

13                    MR. TAMBE:  This is an issue we flagged

14    your for your Honor yesterday we said the issue is coming

15    up they we have witnesses and this is not a problem of our

16    creation it's their creation.  They have taken someone that

17    they want to cloak in privilege but also put him out there

18    as an expert.  Now Mr. Potok quite properly said in his

19    deposition I don't have a Chinese wall in my head.  I can't

20    separate the two pieces of information.  I'm getting a lot

21    of information and using it for two different purposes.

22    And that then leaves us in a quandary because we can't

23    examine the person who is going opine on issues in this

24    case about certain areas when there is a complete mix of

25    information in his head.

227

1          THE COURT:  Mr. Tambe, the only thing going

2    forward in this line of questioning, is that you've asked

3    information as to whether information exists whether this

4    witness has prepared it and the answer is yes.  I'm not

5    giving you any opportunity to get into that information, to

6    receive it is or demand it.

7          MR. TAMBE:  And I'm not doing so, your

8    Honor.

9          THE COURT:  So the arguments in rebuttal

10   are highly overstated, and they go far beyond the issues

11   that are here before me.  The integrity of the bargaining

12   process is not an issue at all.

13          This is not theater, Mr. Levine.  Please

14   sit down and don't pound the table, because the record

15   should indicate, since it is open, that you have been

16   pounding the table.

17          MR. LEVINE:  For the record --

18          THE COURT:  Please sit down.

19    BY MR. TAMBE:

20        Q.    Let's move on to an area where I think we

21   are going to be in agreement, Mr. Potok.  The state of the

22   auto industry.

23          You would admit that it is a very troubled

24   industry as a whole, correct, the entire auto industry?

25        A.    The domestic always are in trouble in their

228

1    key suppliers, many of them are in trouble as well.

2            Q.      And there is intense pricing pressure on

3    the domestic OEs correct?

4            A.      There is pressure.

5            Q.      And they are passing the pressure onto

6    their suppliers like Dana, correct?

7            A.      They're trying to, yes.

8            Q.      And there's growing competition from

9    overseas companies with respect to the OEs facing

10   competition, correct?

11           A.      There is, yes.

12           Q.      And there's overseas competition from parts

13   suppliers, correct?

14           A.      There is a lots of competition, yes.

15           Q.      And you would agree with me, would you not,

16   that the competition from overseas is in two forms, there's

17   parts produced overseas and have come into the US, and then

18   there are transplant companies, non US companies, setting

19   up operations in the US, correct?

20           A.      One can't generalize as you'd like.  It's

21   parts specific, it's beyond these kinds of broad

22   rationalizations.  If you look at axles, for example, the

23   traction business, the key business is still domestic, it's

24   still North American, it's still heavily internal.  So the

25   due diligence we've conducted is on a business by business

229

1    basis for purposes of informing the negotiators about each

2    business about each plant, not with broad generalizations

3    that don't get the negotiators anywhere for purposes of

4    actually negotiating what makes sense for the specific

5    circumstances.

6              Q.    And Dana as a whole faces competition from

7    these transplant companies, correct?

8              A.    In some markets it has very substantial

9    market shares.

10             Q.    Are you saying there's no competition from

11   transplant for Dana, sir?

12             A.    Of course there is competition.

13             Q.    And it's been growing in the last few

14   years, correct?

15             A.    It's been growing for the last 25 years.

16             Q.    And you don't see any material change in

17   that over the next few years, do you sir?

18             A.    I don't see competition abating any time

19   soon.

20             Q.    And you don't see the US auto productions

21   changing very much any time soon, do you, sir.

22             A.    What do you mean by that?

23             Q.    Let me hand you another binder, sir.

24             MR. TAMBE:  Your Honor?

25             THE COURT:  I'm going to auction off

230

1    binders at the end of this hearing.

2                    MR. TAMBE:  I might be able to take that

3    one back from you, because it's one you've seen before.

4    Just for ease of use, it's the Stenger trial binder.

5    BY MR. TAMBE:

6            Q.    In that binder that I just handed you, the

7    Stenger trial binder, if you could turn to Tab 3 of

8    Debtor's Exhibit 216?

9            A.    Yes.

10           Q.    That's a document prepared by something

11   called the Center for Automotive Research, right, sir?

12           A.    Yes.

13           Q.    And you believe that to be a reliable

14   source of information, do you not, sir?

15           A.    I can't comment, they haven't passed my

16   expertise yet.  And I don't know, quite frankly -- they

17   seemed to be a credible organization or you wouldn't pick

18   them, so I'll take your word for it right now.

19           Q.    Well, I don't want you to take my word for

20   it, I want the judge to take your word for it.  Did you not

21   say in your deposition, page 208, do you have that there?

22                    Let me read to you from page 208.  Are you

23   there?

24           A.    Yes.

25           Q.    Starting at the bottoms of page 207 on the

231

1    same sheet of paper.

2            A.    Okay.

3            Q.    Again my partner Mr. Bennett is asking a

4    question.  Let me show you what we've previously marked as

5    Debtor's Exhibit 216, the one that we've just been talking

6    about.

7                    "Q.    This one appears to be from

8    something called Center for Automotive Research.  Have you

9    heard of that organization?

10                   "A.    Yes.

11                   "Q.    Do you consider that to be a

12   reliable source of information about the auto industry.

13                   "A.      They are viewed as a reliable

14   source."

15                   Did I read that correctly?

16           A.    Yes.

17           Q.    And you have produced no data or analysis

18   in this case that contradicts the information in Exhibit

19   216, have you, sir?

20           A.    Correct.

21           Q.    So you would agree, would you not, sir,

22   with the data that's provided on page 17 of this exhibit,

23   Exhibit 216?

24           A.    Okay.

25           Q.    No reason to doubt that that's accurate,

232

1    correct?

2              A.      No.

3              Q.      And that shows, "stuck in a plateau" is

4    what it says, new light vehicle sales 92 to 2007, and it

5    shows is roughly horizontal for the past six years.  Do you

6    see that?

7              A.      Correct.

8              Q.      And turn the page to 18, and you have no

9    basis to disagree with the information that's contained on

10   page 18, do you, sir?

11             A.      No.

12             Q.      And that is production remains steady is

13   what that says, right?

14             A.      Correct.

15             Q.      And that's talking about US motor vehicle

16   production, correct?

17             A.      Correct.

18             Q.      And that shows US motor vehicle production

19   stable over a number of years, correct?

20             A.      Correct.

21             Q.      Going back to 1994?

22             A.      Correct.

23             Q.      And you don't see any change in that in the

24   near future, do you, sir?

25             A.      No.  I have no reason to see any

233

1    difference.

2         Q.    If I can turn your attention to page 59 in

3    exhibit 216, this one's entitled supplier table of pain.

4    You see no reason to disagree with the information on that

5    piece of paper, do you, sir?

6              MR. LEVINE:  I'm going to object, your

7    Honor, to relevance at this point.  What is the issue here,

8    whether there's trouble in the auto industry?  Is that what

9    we are trying?

10             MR. TAMBE:  What we're talking about is

11   what it's going to take for Dana to get out of this

12   bankruptcy.  And this question opined that they the can do

13   it without any savings from labor for the unions.

14             MR. LEVINE:  He did not say that.

15             THE COURT:  I'll allow it.

16   BY MR. TAMBE:

17        Q.    Is IT not your opinion that Dana can get a

18   viable restructuring without any contribution from the

19   unions?

20        A.    I don't know yet.

21        Q.    You don't know yet, you have no opinion on

22   that topic?

23        A.    I would want to see the five year plan, I

24   would want to run due diligence on it to understand what

25   the projections are.  I reviewed exhibits there were

234

1    submitted as part of Mr. Stenger's testimony where he

2    argues that the company must have union concession so as to

3    achieve an EBITDA of 668 million dollars a year, I would

4    question that, whether or not that's a must have number.

5         Q.    At this point you are not prepared to offer

6    this court any opinion as to whether or not that's a must

7    have number; is that right?

8         A.    I'm not -- I've not -- it would require

9    projections from the company in order to, offhand I do not

10   believe that 668 is a must have number that's been served.

11        Q.    You don't have any other number in mind, do

12   you.  What's your must have number?

13             THE COURT:  Why don't you let him answer

14   the question first.

15        A.    I would say the must have, you know, is in

16   the range of a minimum of 450, call it 500.  That's without

17   seeing the business plan, without seeing cash flow

18   projections, without seeing a lot of what I would need in

19   order to be able to say yes, you know, confirm that,

20   offhand that seems to be about the right number.

21        Q.    And when you say 450 to 500, what are you

22   talking about, the savings that Dana must achieve?

23        A.    I'm sorry, I wasn't clear.  450 to 500

24   million dollars of EBITDA earnings.

25        Q.    And what kind of a percentage would that

235

1    translate to, sir, in terms of EBIT percentages?

2         A.    No, that's EBITDA.

3         Q.    EBITDA percentages, what EBITDA percentages

4    do thing that translates to?

5         A.    On a base of 8 billion dollars, that's

6    about 6.2 percent of EBITDA, not EBIT.

7         Q.    So in your opinion, well, I'm not sure if

8    you're offering an opinion or not, but the view that you've

9    expressed right now.

10        A.    Right.  You asked for my view, I shared it

11   with you.

12        Q.    So your view is that Dana can successfully

13   reorganize around an EBITDA percentage of 6.2; is that

14   right?

15        A.    In the absence of a business plan in the

16   absence of cash flow projections, in the absence of seeing

17   how claims are resolved as between equity and debt and

18   ongoing obligations for things like asbestos and

19   environmental I don't know.

20        Q.    I'm not sure how to consider what you've

21   told me so I can plan the rest of my cross examination.  Is

22   the 6.2 sort of a target in your mind that Dana should be

23   shooting for in EBITDA?

24        A.    It's fact specific.  6.2 in this case would

25   generate 500 million dollars.  The company needs about 300

236

1    million dollars for cap X, that's roughly the run rate.

2    Leave 200 million dollars for overseas taxes that have to

3    be paid, it leaves money for interest on interest expense

4    on debt of foreign subsidiaries, and it leaves the rest for

5    taxes, interest and repayment of debt domestically, so it

6    depends on what level of obligations and what commitments

7    the company makes going forward to see whether or that that

8    will be sufficient.  I could see how the 500 gets you

9    there.

10            Q.    And you can see how the 500 gets you there

11   because of the analysis you just went through on the stand,

12   or you have a spreadsheet back at home somewhere that

13   you've gone through this analyses?

14            A.    I'm running analyses on it, but it would be

15   a lot more meaningful the have it in the context of a five

16   year business plan.

17            Q.    The analyses that you've been running, you

18   did present those to the unions, didn't you?

19            A.    No, not yet.

20            Q.    You made a presentation to the unions on

21   the 1113, 1114 process in which you ran some spreadsheets

22   on that, didn't you?

23            A.    What I did is really the equivalent or

24   parallel of what Mr. Stenger did in his exhibit that was

25   just a submitted earlier this week, which is what if -- I

1   took the 2007 plan and I said what if the company gets all

2   the savings it projects past 2007 in 2007, and what happens

3   if it gets all that it has asked for on labor savings, and

4   the number that I came up with was 637 million dollars as

5   compared to 688, but I excluded some things that Mr.

6   Stenger has on his more up to date; but, yes, I ran that.

7   That's not the same as saying this is sufficient or not

8   sufficient.

9         Q.    I maybe went off track a little bit here

10  you haven't provided us with a copy of that analysis,

11  right, the union analysis?

12        A.    Correct.

13        Q.    And I take it if I asked for it I would,

14  get it, correct?

15              MR. LEVINE:  I'm not on the witness stand.

16        Q.    Sir, would you provide that analysis to me?

17        A.    If I'm advised to do so, if I'm asked to do

18  so by counsel I would -- and by my client, I would do so.

19        Q.    But short of getting that analysis, with

20  respect to the question that's before the court right now,

21  you can express no opinion about whether Dana needs the

22  1113, 1114 relief it's requesting its motion, correct?

23        A.    Well, remember, we still haven't resolved

24  the union's interest in discussing the MFO analysis.  Which

25  plants are open?  Which ones are shut?  What about the

238

```
 1    union's alternatives that it will present to the company

 2    when the company is ready to receive it, and to discuss it

 3    and analyze it to see whether or not there are alternatives

 4    to what's proposed?  Are we talking about three plants,

 5    five plants?  The 1113, 1114 comes in the context of an

 6    overall plan.  The unions have significant interest in

 7    talking about the MFO analysis as a starting point before

 8    you get to who will contribute what?

 9            Q.    I'm sorry, could you read the question

10    back, because I'm not sure if it was answered.

11                 (Record read.)

12                 MR. TAMBE:  Let me ask you again.

13            Q.    You can't offer the court today any opinion

14    on whether Dana needs the 1113 and 1114 relief that it's

15    requesting in its motion, can you, sir?  Yes or no?

16            A.    I would not be able to give you expert

17    opinion about it, I will give you impressions --

18            Q.    The question before the court is can you

19    give the court --

20                 MR. LEVINE:  Let him answer the question,

21    please.

22            A.    No, I will not be able to provide it, will

23    I will need for more information to do so, but I have my

24    impressions.

25            Q.    Let's -- before we move further, the
```

1    percentage that you calculated and shared with the unions,

2    that was an EBITDA percentage of what?  The one you talked

3    about?

4           A.    I actually didn't do a calculation of the

5    percentage of what's meaningful as the absolute number.  I

6    said if we take the company's plan and we assume A, B, C,

7    this is the number we need to get, and it's the number it

8    takes to get there.

9           Q.    And what was the number?

10          A.    I believe it was 637 million dollars.

11          Q.    And that's an EBITDA percentage of what

12   kind of --

13          A.    That's a revenue absolute number.

14          Q.    And what kind of sales base that you would

15   assume for that?

16          A.    Eight billion dollars is a good round

17   number to use.

18          Q.    Let someone with a calculator tell me what

19   that is?

20          A.    It's 7 and a half percent.

21          Q.    Is 7 and a half percent a good target?

22          A.    Slightly north of 7 and a half.

23          Q.    Is that what Dana should be shooting for to

24   be a viable company on reemergence?

25          A.    It should be shooting for a sustainable

240

1    number to that allows it to invest in plants and meet its

2    obligations over time.

3          Q.    And can you give an opinion as to whether

4    or not 7 and a half EBITDA percent is that number, or can

5    you not be give that opinion today?

6          A.    It's much more meaningful to look at it in

7    the context of a set of projections about the business than

8    simply pick a number, a percentage, you know, 7 and a half,

9    you know, 637 million dollars in EBITDA would certainly

10   allow the company to invest -- make investments of 300

11   million dollars in cap "X", it would certainly be

12   sufficient to pay taxes overseas of 50 to 75 million

13   dollars, and then you would have the rest of it leftover to

14   fund retiree medical, to fund interest expense and to fund

15   dividends and interest expense and taxes that might be

16   owed.

17         Q.    Someone just handed me a slip of paper from

18   a calculator, so it's 7.9 percent is what your number comes

19   out to?

20         A.    I was being conservative.

21         Q.    If Dana shot for that, you think that's not

22   a bad place to come out of bankruptcy, right?

23         A.    As an equity investor I would be very

24   delighted with that number coming out of bankruptcy.  But

25   that's on the backs of all these changes, which may not be

241

1    pleasant for the people being asked to make the

2    contributions.

3        Q.    And your view, at least your preliminary

4    view is you need all these changes in order to get to the

5    637 million dollar number, right?

6        A.    I was simply doing the arithmetic of what

7    the company's initiatives are and simply adding it.  I did

8    not take into account what happens if you assume that, for

9    example, 2007 commercial vehicles are not at a, you know,

10   significantly lower than they have been in recent years,

11   but in fact it covers.  It doesn't assume any incremental

12   investments the company makes, it's simply doing the

13   arithmetic to show people what the impact of the company's

14   proposals are.

15       Q.    And as a math proposition, getting to 637,

16   in your view, gets this company to a viable reemergence,

17   viable restructure; is that right?

18       A.    It was a simple arithmetic exercise, it's

19   not a math exercise, and it guess us to a number which we

20   divide by other number to say what the EBITDA margin would

21   be under this set of assumptions, it doesn't tell us

22   whether it's too little or to much.

23       Q.    But whatever the analysis is, that's the

24   one that you presented to the unions, correct?

25       A.    I simply showed them what would happen if

242

1    we took the company's plan and assumed it out, you know,

2    the initiatives are fully implemented, and what the

3    magnitude of savings were that were being asked of the

4    union and its retirees -- the union's active employees,

5    it's members and retired members.

6            Q.      You would agree, would you not, sir, that

7    in setting a target EBITDAR percentage or EBIT percentage,

8    you would look to see how the peer companies of Dana were

9    faring, correct?

10           A.      That's a useful analysis, you certainly

11   would want to look at it.  And if a peer is earning 8

12   percent and paying 3 percent in dividends one would say,

13   well you know, what this company could make five percent

14   and not pay dividends and still be competitive.

15           Q.      So peers are relevant or are they not

16   relevant?

17           A.      To an extent, it's not the end point, it's

18   a starting point.

19           Q.      And you've done such an analysis with peer

20   companies, correct?

21           A.      We've reviewed the peers and we've done

22   some that analysis of it, yes.

23           Q.      You've identified the peers, correct?

24           A.      Some peers, yes.

25           Q.      Well, in your deposition you mentioned four

243

1    peers, actually three peers; American Axel, right, that was

2    one of them?

3             A.      Yes.

4             Q.      Magna was the other one?

5             A.      Yes.

6             Q.      And of them and Arbin Meritor was the

7    third, correct?

8             A.      Yes.

9             Q.      Those were the three peers that you

10   identified in your deposition, correct?

11            A.      Yes.

12            Q.      Let's turn to tab four in the Stenger trial

13   binder.

14            A.      Yes.

15            Q.      Mr. Potok, had you spoken to Mr. Stenger

16   before you chose the three peer companies?

17            A.      No.

18            Q.      Let's go to Tab 4.

19            A.      Well, I reviewed what the company submitted

20   in its declarations and analysis.

21                    All right, I'm on four.

22            Q.      Okay.  That's debtor's 50?

23            A.      Correct.

24            Q.      And you'll see that that's exact Dana

25   comparables companies analyses, correct?

244

```
 1              A.      That's what it's titled.

 2              Q.      And it's got American Axel in there,

 3      correct?

 4              A.      Correct.

 5              Q.      And its got Arbin Meritor in there,

 6      correct?

 7              A.      Correct.

 8              Q.      And it's got Magna in there, correct?

 9              A.      Yes.

10              Q.      And it's got TRW in there, correct?

11              A.      Correct.

12              Q.      And adding TRW to the mix lowers the

13      average, it doesn't it, correct?

14              A.      No.

15              Q.      Look at the averages, sir.

16              A.      Which averages?

17              Q.      Isn't the EBIT margin percentage for TRW if

18      you look at the five year average 2001 to 2005, it's a 4.5

19      number; do you see that?

20              A.      Four point what?

21              Q.      Five percent.

22              A.      The EBIT margin for TRW is 4.5, yes.

23              Q.      And that's lower than the average at the

24      bottom for the four company's EBIT margin of 5.6, correct?

25              A.      Correct.  But the EBITDA margin is higher
```

245

1    than the average excluding data.

2         Q.    It's higher by .5 percent?

3         A.    It's higher by .5 percent.  Well, the 10.2

4    is TRWs, the 9.7 includes TRW, and as compared to the

5    others, as compared to the other three, TRWs EBITDA margin

6    is second to highest behind American Axel.

7         Q.    And in your opinion should Dana on

8    emergence be shooting for EBIT margins higher than those of

9    TRW or lower than those of TRW?  Do you have a view?

10        A.    For what period of time?

11        Q.    On emergence; three four upon emergence,

12   what should we be shooting for?

13        A.    Again, it depends on what your cash needs

14   are going forward.

15        Q.    And you have no opinion then to express

16   that on that subject?

17        A.    It would be better informed with a five

18   year business plan.  Should it reach for the top?  Why

19   shouldn't it reach for Arbin Meritor's.

20        Q.    So it should reach for the lowest

21   denominator?

22        A.    Well, what I'm saying is there's a range,

23   and one always wants to be best or highest or biggest or

24   whatever, but tell me why the retirees should agree to give

25   up their retiree medical benefits that they worked for 30,

246

1    35 years so that you could have another point 5 percent

2    margin that might be used to pay dividends?  How is that an

3    argument that would be sustainable in a retiree hall?

4          Q.    Let me ask you, how about shooting just for

5    the average, for the average of these competitors?  What's

6    wrong with that?  There's nothing wrong with that, is

7    there, sir?

8          A.    Well, why are you including American Axel

9    at 12.32 I would ask?  American Axel at 12.3 is based on

10   some very favorable pricing arrangements for the earlier

11   years.

12         Q.    Sir, I'm using American Axel for the same

13   reason you use American Axel, that's one of the peer

14   companies, correct?

15         A.    That's why I said it's the first step not

16   the last step.  You have to look at those margins and see

17   what they mean and what accounts for it.

18         Q.    Have you done analysis of the top one

19   hundred tier one auto parts companies and see what kind of

20   average you would get over a five year period for the EBIT

21   margins with those companies?

22         A.    Say it again?

23         Q.    Top one hundred, tier one auto parts

24   companies?

25         A.    No, I have not.

247

1        Q.      Do you know if Mr. Stenger has done that

2   analyses?

3        A.      Yes.

4        Q.      And that comes out to about 5.6 percent.

5   You don't disagree with that, do you, sir?

6        A.      And that's what, EBIT or EBITDA?

7        Q.      That's EBIT margin?

8        A.      That's what he's testified.

9        Q.      And you have no reason to disagree with

10  that, do you, sir?

11       A.      No.

12       Q.      You do make a point of distinguishing

13  between EBIT margins and EBITDA margins.  Let's turn to the

14  next tab in Mr. Stenger's trial binder Tab 5 of debtor's

15  49?

16       A.      Debtor's 49?

17       Q.      It's Tab 5.  It's the next one from the one

18  you are on.

19       A.      All right.

20       Q.      And you have no reason -- are you there?

21       A.      I'm there, yes.

22       Q.      And you have no reason to disagree with Mr.

23  Stenger's analysis showing EBIT and EBITDA for the Dana

24  comparables marching in look step, do you, sir?

25       A.      There is a relationship, yes.

248

1          Q.      Thank you.  Now, you would agree that the

2    present condition of Dana's US operations is not

3    sustainable, right?

4          A.      Currently, no.

5          Q.      Losing hundreds of millions of dollars,

6    correct?

7          A.      For what period?  Let's just agree it's not

8    sustainable without initiatives.

9          Q.      Major initiatives?

10         A.      Significant initiatives.

11         Q.      Not little changes here and there, major

12   comprehensive cost restructuring, correct?

13         A.      Major initiatives, yes.

14         Q.      And in order to overcome those losses, Dana

15   has to reduce costs, correct?  That's one components?

16         A.      That's generally one area that's available,

17   yes.

18         Q.      And the other area that could be available

19   increase prices, correct?

20         A.      That is a secondary, yes.

21         Q.      Increased productivity, would that be a

22   third area?

23         A.      That would be a third.

24         Q.      Any other areas that you can think of that

25   Dana should be tackling to overcome its losses and get on

249

1    to cap its profitability?

2           A.    Well --

3           Q.    If you can't think of any, that's fine,

4    we'll move on.

5                 MR. LEVINE:  Please let him try to answer

6    the question without the cheap shots.

7           A.    It could improve on its information

8    systems, for example, it could improve on how it organizes

9    its engineering, it could improve on its relationship with

10   customers, it could improve on its -- well, let's just stop

11   there.

12          Q.    Well, improving relationships with the

13   customers means getting more money from the customers?

14          A.    No, it means working closely with the

15   customers and communicating with the customers.

16          Q.    But just holding hands with the customers

17   isn't going to improve the bottom line, is it, sir?  You

18   have to get something from the customers, right?

19          A.    Well, you start by gaining their confidence

20   in your ability to do the engineering, in your ability to

21   ramp up production, in your ability to price product

22   components.

23          Q.    And where --

24                MR. LEVINE:  Your Honor --

25                THE COURT:  Let him finish the answer.

250

1    Q.    Are you done?

2    A.    And it has to do with, you know, the

3    confidence of customers that you are running a well managed

4    well organized entity without constant shifts in management

5    and constant shifts in direction, and your ability to price

6    product competently.

7    Q.    Are you done?

8    A.    For now.

9    Q.    And can't bank confidence, can you, sir?

10    A.    You can bank it.

11    Q.    But where does it go on the balance sheet?

12    A.    It goes either equity or debt.

13    Q.    So you want investment from customers,

14    that's one way to get there?

15    A.    No.  It shows up with commitments by

16    customers that translates into confidence by investors, it

17    translates into confidence by employees, it translates into

18    confidence by lenders.

19    Q.    So when you talk about the confidence of

20    customers, you are talking about orders from customers for

21    business, right?

22    A.    Confidence means customers will come to you

23    to solve their problems, they will look to you to solve

24    their problems, and that translates into orders, and that

25    translates into a level of perceptions in the marketplace

251

1    of how you are perceived in the market by your customers.

2         Q.    Perceptions don't pay the bills, you need

3    orders, you need money flowing in the door?

4         A.    And that comes from orders, and orders come

5    from perceptions of your ability to deliver.

6         Q.    And it would really help the perception of

7    customers if Dana were able to reorganize and exit Chapter

8    11 expeditiously, correct?

9         A.    With a plan that worked, yes.

10        Q.    And customers, to your knowledge, have been

11   willing to negotiate with Dana and offer price improvements

12   to Dana, correct?

13        A.    There have been some pricing concessions by

14   customers, but we are not there in terms of contracts and

15   written documents to get us to the company's targets and

16   long term commitments for orders.  Pricing concessions in

17   the short term are helpful, but that's not the same as long

18   term contracts, long term commitments, long term confidence

19   in the supplier being there.

20        Q.    Not having spoken to Dana's customers, but

21   you wouldn't disagree with the proposition that Dana's

22   customers, all things being equal, would like to see Dana

23   manage its costs better, correct?

24        A.    They would like to see Dana managed better.

25        Q.    Any reason to believe that they are not

252

1    interested in Dana's costs, sir?

2         A.    They certainly are interested, that's one

3    component of managing a company well.

4         Q.    They would be interested in seeing Dana

5    manage its costs better?

6         A.    Yes.

7         Q.    Have you read Mr. Stenger's testimony?

8         A.    You mean the testimony on Monday?

9         Q.    Yes.

10        A.    I read a transcript of much of it.

11        Q.    Are you aware that Mr. Stenger expresses a

12   view that without significant union concessions Dana is

13   unlikely to get the confidence of its customers for repeat

14   orders, and long term orders?

15        A.    Concessions of what kind?

16        Q.    Wage cuts, health benefits cuts, other cuts

17   and savings?

18        A.    I don't know on what basis he makes that, I

19   don't think -- it's his judgment, and I wouldn't readily

20   agree with it.

21        Q.    As far as you know he has been dealing with

22   customers, correct?

23        A.    I don't know whether or not he's been

24   dealing directly with customers.

25        Q.    But we know you haven't.

253

1          A.     I believe I said that I haven't.

2          Q.     So you have no basis to disagree with what

3    Mr. Stenger may have told you?

4                 THE COURT:  Do you have much more?

5                 MR. TAMBE:  No, your Honor, we've moving

6    on.

7                 MR. LEVINE:  Is that an invitation for Mr.

8    Potok to meet with the company's customers?

9          Q.     At the end of this whole process you would

10   agree that it's important for Dana to be profitable,

11   correct?

12         A.     Yes, and for its customers to have

13   confidence in the company.

14         Q.     Are you done?

15         A.     I'm done.

16         Q.     And not just barely profitable, correct?

17         A.     Profitable, sustainable for the long term.

18         Q.     You had mentioned a case earlier LTV 1.

19   There was an LTD 2, I assume, correct?

20         A.     Yes, there was.

21         Q.     We don't want a Dana 2, do we, sir?

22         A.     No.

23         Q.     We would like to avoid that if possible?

24         A.     Yes.  And the LTV 2 was not a rare

25   occurrence either, it was an industry which suffered

254

1   dramatic setbacks, and the company that managed to develop

2   the --

3           Q.      I think you've answered the question, Mr.

4   Potok?

5           A.      Well, you're drawing the comparison, sir.

6           Q.      There's no question pending, Mr. Potok.

7           A.      Well, I'm trying to give you a more

8   complete answer than simply yes or no.

9           Q.      It was a complete answer.  Thank you for

10  that.

11          Let's move on to what the company has

12  proposed as a way to returning the profit on Tab 6?

13          A.      Yes.

14          Q.      And you've seen that document before,

15  haven't you, Debtor's 35?

16          A.      Yes.

17          Q.      At that's an outline of the company's

18  restructuring components, correct?

19          A.      Correct.

20          Q.      And that's the company going around various

21  areas and seeking savings or price improvements, correct?

22          A.      Correct.

23          Q.      And you would agree that the company should

24  be looking for all of these options to increase its

25  profitability, correct?

255

1      A.      It should be considering all options to

2  generate improved profitability and cash flow.

3      Q.      And as far as you know, the customers have

4  given some concessions, correct?

5      A.      Correct.

6      Q.      And in terms of the footprint optimization,

7  there are some savings expected this year, and more in

8  future years; is that correct?

9      A.      That's what the company projects.

10      Q.      And there have been savings in SG&A

11  expenses, correct?

12      A.      My understanding is yes.

13      Q.      And the nonunion employees have had their

14  wages and benefits cut, correct?

15      A.      The company has indicated that there have

16  been changes in compensation for nonunion actives.

17      Q.      And the retirees, the nonunion retirees

18  have agreed to elimination of the company's obligation to

19  pay their retiree benefits, correct?

20      A.      Correct.

21      Q.      And the IM, one of the unions, has agreed

22  to eliminate it's OPED liabilities, correct?

23      A.      Correct.

24      Q.      And those are all important to the

25  company's reorganization?

256

1          A.      They are all elements, true.

2          Q.      And would you would agree with me, would

3     you not, sir, that it's also necessary and important for

4     the company to get concessions from its unions, correct?

5          A.      Not yet, I'm not there yet.

6          Q.      You are not ruling it out, you are just not

7     prepared to say.  Yes or no.

8          A.      Correct.  Not in the absence of judicial

9     information and judicial exploration and discussions about

10    footprints.

11              MR. TAMBE:  No further questions.  Thank

12    you, Mr. Potok.

13              MR. LEVINE:  A few minutes your Honor

14    please.

15              THE COURT:  Sure.

16              (Brief recess taken)

17              MR. LEVINE:  Your Honor, I just have a few

18    questions.  Maybe not even a few.

19    REDIRECT EXAMINATION BY MR. LEVINE:

20         Q.      Mr. Potok, Mr. Tambe asked you to make a

21    couple of comments about your knowledge of what happened

22    with a company called LTV.  I would like you to tell you

23    what you know about LTV and compare it to what's going on

24    here?

25         A.      Okay.  LTV 1 is was a bankruptcy that

257

1   started in 1986, it was completed in 1993.  The tail end of

2   that bankruptcy there was 1113, 1114 hearings held in this

3   courthouse.  I was part of that process.  And unlike the

4   case here, those hearings were held at the end of a long

5   process, a process in which the unions received

6   information, digested information, had the opportunity to

7   review and meet with management and negotiate.

8                    The parties negotiated for a period of time

9   until they get got to an impasse, the impasse was

10  essentially whether or not the OPED liability was a labor

11  cost or whether it should be treated as a liability, just

12  as any debt would be treated as a liability.  The company

13  insisted on making comparisons of labor costs of LTV versus

14  its competitors, including the legacy cost for OPED and

15  pension.  We insisted that those liabilities should be

16  treated as historical obligations and be viewed as debt

17  load rather than as a labor cost.

18                    The 1113, 1114 hearing didn't begin until

19  we reached that impasse, until we had a long process

20  involving information sharing and analysis and negotiations

21  such that when the 1113, 1114 hearings were conducted here

22  in New York.  At the same time while those negotiations --

23  those hearings were taking place the parties could

24  negotiation to resolve their differences.

25                    The case here is a case where there was

258

1    completely lack of information sufficient for the parties

2    to negotiate, instead the process was highjacked by the

3    professionals for the company with management's consent.

4    Lot's of expenses have been borne by the company pursuing

5    an 1113 prematurely --

6                        MR. TAMBE:  Objection.  It's not

7    responsive.

8               A.       The company and the union are really not in

9    a position to negotiate simultaneously --

10                       THE COURT:  Mr. Potok, I think you should

11   be aware that I'm the presiding judge over LTV 1.  And some

12   of what you are relating has no relationship to what was

13   actually going to in that case, which was far more complex

14   than you are what you are describing, had far more

15   involvement with the PBGC, with the defense department, and

16   with other areas that have those complexities spilled all

17   over.

18                       I do not see the comparison, and as far as

19   relevance is concerned, I'm going to strike his testimony.

20                       MR. SIMON:  With all due respect, your

21   Honor, and Mr. Levine --

22                       THE COURT:  I've made my ruling.  You do

23   recall that I was the presiding judge.  I have full

24   familiarity with what was going on in the LTV 1.

25                       MR. SIMON:  I do indeed, your Honor.  And

259

1    if I may, with as much familiarity as you had in that case,

2    as in this case, you are familiar with what went on in the

3    courtroom, you were not fully familiar with what went on in

4    the negotiating process.  That is true here.  It is true

5    there.  Mr. Potok's description of what went on, I would

6    respectfully suggest to you was with respect to aspects of

7    the case that did not come before you because there was

8    there, as here, a litigation tract as well as a negotiation

9    tract.

10              So that while the court is obviously fully

11   aware of what it is aware of, it is not fully aware of what

12   it is not aware of.

13              THE COURT:  Exactly so.  And you are not

14   fully aware of what the court was aware of, because the

15   court was involved in many other areas.

16              Now what I'm hearing from this witness is

17   pure anecdotal testimony, it's not relevant, and I'm

18   striking.

19              MR. SIMON:  It was only --

20              THE COURT:  Please sit down.

21              Is there anything else, Mr. Levine?

22              MR. LEVINE:  Apparently not, your Honor.

23              No further questions.

24              THE COURT:  Thank you, sir.

25              (Witness excused)

260

1           MR. LEVINE:  Your Honor, at this point I

2    would like to defer to my colleagues Mr. David Hock who sat

3    through these proceedings patiently, and he has just asked

4    for about ten minutes to allow for certain electronic

5    equipment to be set up.

6           THE COURT:  Sure.

7           MR. LEVINE:  Thank you, your Honor.

8           (Recess taken.)

9           THE COURT:  Be seated.

10          MR. HOCK:  Good afternoon, your Honor.

11   David Hock of Cohen, Weiss and Simon on behalf of the

12   United Auto Workers and steel workers.

13          Can your Honor see the video screen?

14          THE COURT:  Yes.  Will the reporter swear

15   in Mr. Gibson?

16   H E N R Y   G I B S O N,   called as a witness, having

17          been first duly sworn by the Notary Public,

18          Denise Nowak, was examined and testified as

19          follows:

20   DIRECT EXAMINATION BY MR. HOCK:

21      Q.    Would you please state your name for the

22   record?

23      A.    My name is Henry Gibson.

24      Q.    And can you give us a little bit of

25   background of when and where you were born?

261

1          A.     I was born in South Carolina, Columbia.

2          Q.     And where were you born?

3          A.     I was born March 26, 1921.  What else you

4    want to know?

5          Q.     Did you grow up in South Carolina?

6          A.     In South Carolina?

7          Q.     Yes.

8          A.     Yes.

9          Q.     And did you leave South Carolina and when

10   was that?

11         A.     Beg pardon?

12         Q.     When did you leave South Carolina?

13         A.     I left '47 I believe it was, 1947.

14         Q.     And why did you leave?

15         A.     I came I moved to Detroit to make a living.

16   I wasn't making no money there.

17         Q.     And what did you do when you got to

18   Detroit?

19         A.     I worked for Dana I was hired at Dana.

20         Q.     What year did you start at Dana?

21         A.     47.

22         Q.     And what was your first job at Dana?

23         A.     Working in the press room.

24         Q.     And how long did you work at Dana?

25         A.     I worked at Dana somewhere near 35 years.

262

1      Q.      And how many types of positions or jobs did

2  you have at Dana?

3      A.      I'm a certified welder, I'm a journey

4  mechanic, I'm a pressure operate, you know, large presses

5  small presses.  I did many things.

6      Q.      Could you tell the court a little bit about

7  the things you did at Dana?

8      A.      Yes.  At times when there was no jobs I

9  worked as a janitor helping to clean the floors, from that

10  to working behind the press, taking steel out of the press

11  and stacking it.  And they said I did one of the best jobs

12  of any man that they had ever had to stack steel from a

13  press.

14              And the next job I started operating the

15  press and the other guy that were back there was stacking

16  steel.  Then from there I hung railing, you know, frames

17  for the Ford chaises.  You know what it is?  I did that.

18      Q.      When did you do that?

19      A.      The rail weighed 200 pounds, each one.  And

20  I worked there for about four years, and after that I put

21  in for a job of welding on the line, the assembly line

22  where they were putting the frames together and making

23  chaises together for the cars, then I did that.

24              After that, what else did I do?  They

25  opened up a welding job, we would frames right on the line.

263

1    That's where I began to weld, but I was a certified welder

2    before I came to -- Murray Bodies then.  And then Dana

3    bought Murray Bodies out.  Do you read me clear?

4            Q.    Yes, we can hear you.

5            A.    And after that I worked out on the dock,

6    taking the rails out, you know, when the job would come to

7    an end and the plant was laying off people we had to switch

8    around and do other odd jobs that we were not hired to do,

9    but I could do all the jobs that they assigned to me to do.

10           And then an opening came in the garage.  I

11   was a journeyman mechanic before I came to Detroit, I was a

12   mechanic for the army, U.S. government for large vehicles,

13   small vehicles, motorcycles and you name it, and I was a

14   welder there.  And I taught men in the army how to operate

15   machinery, I didn't look like it, but black as I am, I can

16   operate a locomotive, any type of machine mechanically I

17   can operate it except for an airplane, and I don't want

18   that.

19           Q.    Mr. Gibson, are you retired now?

20           A.    I can't work, both hips is worn out from

21   doing the heavy work at Dana.  I had the right hip

22   replaced, the left hip now is on the verge of needing

23   replacement.  And while I was working there on the line I

24   developed some type of COPD disease of asthma.  And I have

25   to have three vials of medicine to sustain my health, which

264

1   is Advil, Convet and Unafil, those are the three that I use

2   night and morning.  And my eyes, they have gone bad, I have

3   an irreversible glaucoma in the eye.  But I was working as

4   a mechanic a battery explode, acid, you know, got in my

5   face and I had many treatments for that at Ford Hospital

6   and someplace out there in Bloomfield Hills, I can't

7   remember it's been so long I forgot where the place were,

8   and they put these lens in there, but my eyes were so dry

9   it wouldn't stay, so they give me some drops.  They worked

10  on it and I can see a little bit now.  I have 20 glaucoma

11  in my eyes.

12          Q.    Mr. Gibson, can you tell us a little bit

13  about what type of retirement benefits you are getting

14  right now in terms of pension and healthcare?

15          A.    I tell you lone thing, as far as I can see,

16  and as far as I know, I get somewhere between 600 and maybe

17  a few pennies more.  That's all I get from Dana.  And see

18  these bills here for my eyes, Dana don't pay anything for

19  office visits.  And the prices of these things is

20  tremendous for my eyes, one bottle of medicine about that

21  tall costs 150 dollars a month to put in an eye.

22               Now what else you want to know?

23          Q.    Are you on Medicare right now?

24          A.    Are you?

25          Q.    Are you receiving Medicare right now, Mr.

265

1   Gibson?

2          A.      Yes.   That's the only thing paying for

3   that.

4          Q.      Is that covered by?

5          A.      Dana.

6          Q.      I'm sorry, go ahead.

7          A.      It's not covering all of it, Dana does not

8   pay office visits and we need -- I don't know why they want

9   to not help us who have poured out our lives for Dana.   I

10  have worked 24/7, seven days a week without going home to

11  keep the plants running while my blue eyed white brothers

12  were riding around on their boats on the river with their

13  wife's and I'm out there working like a stupid fool.  Do I

14  make myself clear?

15               I did that on account of this man here, Mr.

16  Gerold B. Mitchell, I had had a conversation with him.

17  That was the director of Dana, of Murray Bodies, then Dana

18  took over.  Do you know him?  You know of him?  He retired,

19  and he's the cause of me having the job which I love.

20         Q.      Mr. Gibson?

21         A.      Yes, sir.

22         Q.      Essentially, right now, are you and your

23  wife living on Social Security and your pension?

24         A.      Yes, yes, yes.

25         Q.      And do you have any extra income that you

266

1    could use?

2              A.      No.  Where I going to get it from?

3              Q.      I'm just asking you whether you have it?

4              A.      What did he say?

5              A VOICE:  He said he was asking whether you

6    had it.

7              THE WITNESS:  Hum.

8              A VOICE:  He was asking whether you had any

9    extra income or not.

10   BY MR. HOCK

11             Q.      Just one more question.  Do you think it's

12   fair and equitable that Dana should eliminate their retiree

13   benefits?

14             A.      I don't think they should.  What in the

15   word are people going to live of?  We can't hardly pay to

16   get food, more or less paying our healthcare, and they want

17   us to pay extra money to maintain Blue Cross, not Blue

18   Cross, Medicare they going up on that so they tell me, I

19   don't know.

20             MR. HOCK:  Thank you, Mr. Gibson.  I have

21   no further questions.

22             THE WITNESS:  Beg your pardon?

23             MR. HOCK:  Thank you, Mr. Gibson.  I have

24   no further questions at this time.

25             THE WITNESS:  Thank you.  I hope I helped

267

```
 1   you, and I hope you helped me.

 2                  Thank you.  Are we ready to go?

 3                  A VOICE:  No.

 4                  MR. TAMBE:  No cross.

 5                  MR. SIMON:  Oh, come on.

 6                  THE COURT:  Thank you, sir.

 7                  MR. LEVINE:  We're finished, thank you.

 8                  MR. HOCK:  We're finished with the video.

 9                  Would you like us to turn this off at this

10   point?

11                  THE COURT:  Yes, I think it might be a

12   distraction for everybody else.

13                  MR. HOCK:  All right.

14                  I'd like to call our next witness.

15                  Craig Zuber, could you please come up to

16   the witness stand?

17   C R A I G    Z U B E R,   called as a witness, having

18               been first duly sworn by the Notary Public,

19               Denise Nowak, was examined and testified as

20               follows:

21                  THE HOCK:  May I proceed?

22                  THE COURT:  Sure.

23   DIRECT EXAMINATION BY MR. HOCK:

24          Q.    Could you please state your name for the

25   record?
```

268

1          A.      Craig Zuber.

2          Q.      And where do you live?

3          A.      Centerport, PA.

4          Q.      Is that near Reading, Pennsylvania?

5          A.      Yes.

6          Q.      How long have you lived in the Reading,

7    Pennsylvania area?

8          A.      I lived there all my life.

9          Q.      And would when did you take your first job

10   at Dana?

11         A.      I think it was when I was 19.

12         Q.      What year was that?

13         A.      In 1965.

14         Q.      Could you please tell us were about your

15   first job at Dana?

16         A.      Well, we were trained to be welders on the

17   line on the Chevy line, basically what that guy said there

18   assembling of frames, welding, I did that for like ten

19   years.  And then the layoffs came, you know, we were laid

20   off a long time.  But you were back and forth on the

21   presses or you were cleaning or doing something there, you

22   did all kind of jobs.

23               They ended up with heavy truck and I

24   finally got a steady job over there, and as my seniority

25   going up I kept working steady.  So the heavy truck was

269

1    where I stayed and retired.

2         Q.    Could you describe the exact type of work

3    you were doing in the heavy truck department?

4         A.    It depends which department you were in at

5    the time.  Sometimes you were welding, grinding them,

6    straightening them, turning them with turning bars; they

7    weighed anywhere from 3 to 15 hundred pounds, cement trucks

8    were pretty heavy.  Sometimes you stacked them by hand,

9    maybe when I had 25 years, then they started getting

10   automation in the shop where it would be a magnet to pick

11   them up instead of you handling them manually.  It was a

12   combination of everything there.

13        Q.    Was this a 9 to 5 job?

14        A.    7 to 3 for me; it was usually 3 to 3 we

15   usually worked.

16        Q.    So you were working 12 hour days?

17        A.    Or seven days when the company needed us.

18        Q.    And when did you require?

19        A.    1995.

20        Q.    And how old were you at that point?

21        A.    49, I just turned 49.

22        Q.    Why did you decide to require at that

23   point?

24        A.    In '88 I had two back operations.  I still

25   have problems with my back.  Took a job in department 22

270

1  welding, grinding, which didn't do much lifting.  The next

2  operation, even though I was having problems, they told me

3  they were going to fuse me, so I didn't want to take the

4  chance of being fused and they had the 30 and out and I

5  left.

6          Q.    Are you eligible for Medicare?

7          A.    No.

8          Q.    Are you married?

9          A.    Yes.

10         Q.    And does your wife have any medical

11  conditions?

12         A.    16 months ago she fell at work and can't

13  get her hand back, probably they will never get it back or

14  her arm.  They just sent her back doing a one handed job.

15  I got the last 16 month driving a school van, which I did

16  for the last couple of years to supplement my income.

17  Between taking care of her and driving the school van I was

18  driving 250 miles a day.  It just got too much and I could

19  feel my leg going numb again.  I drove autistic children.

20  I'm responsible for them, and before I had seen any of them

21  kids get hurt I had to give up the job.

22         Q.    You said your wife is back at work now?

23         A.    Yes.

24         Q.    Does she get benefits?

25         A.    They are paying her 20, 25 hours a week.

271

```
 1   It was only part time for the schools, it's like a Berks
 2   County intermediate unit, but it's part time, okay, it's
 3   the school year.  The school year consists of 180 days a
 4   year even though you work ten months out of the year maybe,
 5   but you have all that time off in-between Christmas
 6   holiday, and you don't get paid for none of that; in
 7   service days, Thanksgiving, Easter, just all the days you
 8   don't get paid for, it's just a part time job.
 9           Q.    What other income do you have?
10           A.    None.
11           Q.    Do you have a pension?
12           A.    Have I a pension from Dana.
13           Q.    How much is that?
14           A.    Total?
15           Q.    Yes, total.
16           A.    14 hundred 63, I think, clear.
17           Q.    So between that and your wife's salary is
18   all that you have to live on?
19           A.    Yeah.
20           Q.    And have you looked into whether or not you
21   could buy health insurance if Dana were to cut your
22   benefits?
23           A.    We've been looking for -- me and my wife
24   are probably looking at 12 hundred dollars a month or more,
25   I can't afford that.
```

272

1    Q.    While you were working at Dana were you

2    able to build up enough savings to be able to pay for

3    insurance until you turn 65 and become eligible for

4    Medicare?

5    A.    I saved some money, okay.  I know since

6    this startled, the bankruptcy, I haven't touched my house I

7    haven't done anything, you know, I need a lot of repairs

8    and now I'm afraid to do anything, I don't know what's

9    going to happen here, you know.  So, if I got to pay that

10   insurance, I don't even know if I can make it until we're

11   on Medicare, both of us.  I'm 60 years old.

12   Q.    While you were working at Dana and when you

13   retired did the company promise that you would have retiree

14   health benefits?

15   A.    Yes, they did.

16   Q.    And how do you feel about Dana's proposal

17   to eliminate retiree benefits?  Do you think it's fair?

18   A.    We had a lot of hard workers in Dana in the

19   Reading plants, good people built that plant.  I just can't

20   see why even thinking of taking it away from us.  You know,

21   not the way we -- where am I going to get a job?  Two back

22   operations I'm 60 years old.  I quit school, I can't run a

23   computer, you know.  What am I going to do?  Even now I'm

24   looking for a job, you know, trying to supplement my income

25   or whatever, but it's got to be something that they want to

273

1    hire me and then am I able to do it.  That's the things

2    that I face.  But let me tell you, when you go for a job at

3    60 they don't want you.

4                    MR. HOCK:  Thank you very much.  I have no

5    further questions.

6                    MR. TAMBE:  Thank no cross, your Honor.

7                    THE COURT:  Thank you.

8                    THE WITNESS:  Thank you, your Honor.

9                    MR. HOCK:  That was our last witness.

10                   THE COURT:  I thank you all.  I'll see you

11   on Tuesday morning.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

274

1  March 29, 2007

2

3                    I N D E X

4

5  WITNESS            DIRECT   CROSS   REDIRECT   RECROSS

6

7  SUZANNE TARANTO       5      36       101

8  MIGUEL FOSTER       104

9  LEON A. POTOK       125     185       256

10 HENRY GIBSON        261

   (video conference)

11

   CRAIG ZUBER         268

12

13

14                  E X H I B I T S

15

16        UNION'S              RECEIVED IN EVIDENCE

17          3                         36

18          43                        36

19          60                        36

20          61                        36

21          4                        115

22          22                       167

23          23                       167

24          24                       168

25          25                       171

275

1              E X H I B I T S (continued)

2

3            UNION'S              RECEIVED IN EVIDENCE

4            26                        174

5            27                        176

6            53                        179

7            54                        182

8             2                        185

9            57                        185

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

276

1                        C E R T I F I C A T E

2

3    STATE OF NEW YORK        }

                             }    ss.:

4    COUNTY OF WESTCHESTER    }

5

6              I, Denise Nowak, a Shorthand Reporter and

7         Notary Public within and for the State of New

8         York, do hereby certify:

9              That I reported the proceedings in the

10        within entitled matter, and that the within

11        transcript is a true record of such proceedings.

12             I further certify that I am not related,

13        by blood or marriage, to any of the parties in

14        this matter and that I am in no way interested in

15        the outcome of this matter.

16             IN WITNESS WHEREOF, I have hereunto set my

17        hand this _____ day of _____, 2007.

18

19                            _____

                                   DENISE NOWAK

20

21

22

23

24

25

## A

**AARP** 93:1
**abating** 229:18
**abilities** 115:17
**ability** 29:7 30:20
190:25 205:13
249:20,20,21
250:5 251:5
**able** 31:10 79:18
85:9 113:25
114:16 115:1
122:14 133:11
145:7 156:8,24
162:23 172:9
187:14 223:22
230:2 234:19
238:16,22 251:7
272:2,2 273:1
**absence** 107:25
140:11 235:15,16
235:16 256:8
**absolute** 18:17
155:19 239:5,13
**absolutely** 168:15
168:19 191:21,23
197:18 200:4
**Academy** 5:16 6:3,6
38:24,25 40:8
48:13
**access** 150:2,6,14
151:11,16,22
152:1,12,18 153:5
194:24 195:15,17
198:24 199:21
200:6
**accord** 216:13
**account** 24:24 25:3
25:5 46:23 55:7
83:12 93:25
140:23 142:20
143:12 146:19
241:8 265:15
**accounted** 26:13
142:16
**accounting** 23:12
26:10,16,23 27:10

28:4 48:10,15 51:3
51:17 53:9 58:12
58:13
**accounts** 96:24
246:17
**accrual** 23:12 26:17
**accrued** 97:14
**accumulate** 31:1
**accuracy** 112:15
**accurate** 100:5,14
231:25
**achieve** 182:11
206:14 207:13,15
234:3,22
**achieved** 85:20
**achievements**
141:15
**achieves** 83:3
**acid** 264:4
**acquire** 116:11
**act** 85:8 225:1
**action** 108:20
**actions** 58:23
**active** 18:7 92:18
110:24 144:2
148:9 163:14
181:23 212:2,4
217:7 242:4
**actives** 255:16
**actual** 19:16 46:2
113:23 127:7
**actuarial** 5:9,18 6:9
7:21 8:3,7 19:14
34:15 42:13,22
43:19,23 44:7
53:23 114:6
**actuaries** 5:16 6:3,6
10:5 38:24,25 39:4
39:8 40:9 48:13
113:24,25 114:2
115:23
**actuary** 5:12,13,16
5:24,25 6:7 7:8
46:23 81:24 99:15
113:24 114:4,18
114:24 115:2

**actuary's** 114:4
**actuation** 19:15
**Ad** 2:21
**add** 166:13 221:1
**added** 180:16,16
181:1 187:15
**adding** 241:7 244:12
**addition** 8:1 41:5
112:18
**additional** 30:22
41:18 46:8,18
133:22,24 142:20
187:18
**address** 8:16 144:22
**addressed** 85:14
**adds** 221:1
**adequacy** 133:10
**adequate** 42:21
145:17 170:5
**adequately** 147:1
169:24
**administrative**
109:7,9
**admission** 35:21
**admit** 132:12 227:23
**admitted** 115:8
**ado** 115:19
**advance** 103:6
192:19
**advent** 26:9
**adverse** 94:13,14,18
**advice** 38:5,10,13,16
41:11 53:23,24
110:14 125:19
**Advil** 264:1
**advise** 38:19 41:19
54:20 84:9 85:1,3
86:4 127:5
**advised** 59:3 127:11
146:5 150:16
151:3 211:25
237:17
**advisers** 124:22
129:15 177:12
184:3
**advises** 58:23 94:17

94:21
**advising** 127:14
162:9
**advisor** 38:7 96:8
126:6,25 127:20
129:8,22 130:7
150:22 195:5
203:7 210:4
**advisors** 96:17
124:14
**advisory** 124:15
151:2 202:23
**advocate** 105:1
**affect** 17:1
**afford** 29:7 30:20
31:10 271:25
**affordability** 29:16
**affordable** 30:18,18
31:4
**afraid** 272:8
**afternoon** 104:4,5
185:21,22 187:6
260:10
**age** 72:11 76:17
**ago** 19:25 129:18
135:6 220:20
270:12
**agree** 24:24 25:12
55:19 56:13,18
61:2,4 66:14,20
67:3,6,25 68:7
72:23 78:1 79:7,23
81:2 82:19 93:5
94:7 96:5,18 97:5
97:6 100:1 143:25
146:7 148:24
153:16 204:10,10
211:1,7 228:15
231:21 242:6
245:24 248:1,7
252:20 253:10
254:23 256:2
**agreed** 100:11 101:1
117:11,13 255:18
255:21
**agreement** 19:5

109:24 110:21,21
110:22,23 111:20
119:3 120:3
152:12 153:2
162:14,20 163:3,3
163:8,8,13 203:20
211:4,16 212:5
227:21
**agreements** 85:4
111:5,9,9 116:15
120:7 125:22
152:9 154:2 162:1
162:12 163:4,12
163:12,16 164:11
207:2
**ahead** 18:11 124:7
128:5 141:25
265:6
**air** 45:13
**airplane** 263:17
**Albany** 97:7 99:15
100:7
**Alix** 151:4 179:10
207:25 208:16,22
214:7
**allotted** 208:13
**allow** 51:15 122:10
139:8 147:5 164:6
197:12 225:16
233:15 240:10
260:4
**allowed** 84:15 103:7
103:9,10 130:18
138:16 163:24
188:12
**allows** 240:1
**aloud** 131:3
**alternative** 161:7,9
207:21
**alternatives** 149:13
170:14 238:1,3
**Aluminum** 129:19
129:20
**ambush** 97:22
**America** 109:14
**American** 5:16 6:3,6

38:24 40:8 48:13
126:21 214:4
228:24 243:1
244:2 245:6 246:8
246:9,12,13
**Americas** 2:15
**Amherst** 125:12
**amicably** 222:7
**amortization** 52:1
138:7
**amount** 17:6 18:5,19
19:6,15 20:5 32:16
75:19 103:2,11,11
139:13 142:2
180:11
**amounts** 181:23
**analyses** 87:9 92:3
130:14,17,19,22
131:2,2 137:3
138:19 149:11,19
157:15 162:22
164:19 170:1,8
171:1 173:17
207:12,12 208:5
208:10,23 214:22
223:5 236:13,14
236:17 243:25
247:2
**analysis** 16:7,18
27:2 41:5,19 42:24
44:8 70:23 84:9
88:23 97:5 130:18
131:4 137:5
138:22 144:20
147:10 156:8,9
160:24 161:5
170:1,11,18 174:2
175:16 177:16
191:7 205:11,18
208:7 209:10,17
210:14,14 219:17
219:19 221:14
223:16 231:17
236:11 237:10,11
237:16,19,24
238:7 241:23

242:10,19,22
243:20 246:18
247:23 257:20
**analyst** 105:22
208:7
**analyze** 79:2 143:24
208:21 238:3
**analyzing** 138:17
223:3
**and/or** 76:16 120:13
**anecdotal** 259:17
**annual** 18:15 21:23
47:9 50:21 68:19
89:12,22 180:12
**annually** 105:6
**annuity** 97:15
**answer** 43:14 51:12
74:21 84:19
141:17 164:6,13
172:19 173:21
188:12 191:2
193:9 194:13
199:25 200:1
216:9 220:19
221:10,17 222:4
223:20 224:1,5
227:4 234:13
238:20 249:5,25
254:8,9
**answered** 61:6,8
64:2 90:25 156:13
190:24 194:18,19
194:21 206:11
209:16 238:10
254:3
**answering** 51:13
**anticipate** 67:19
135:21 136:21,22
**anticipating** 34:6
**anybody** 88:6 103:2
109:3
**AOP** 161:11
**Apart** 126:23
**APBO** 12:11 14:22
14:25 40:16 46:22
47:2,17,18 48:18

48:20 51:8,9
**apologize** 114:22
119:24 128:10
**apparent** 67:18
**apparently** 98:24
171:15 259:22
**appear** 176:24
**appeared** 27:5
**appears** 98:9 172:24
231:7
**appendix** 70:4
**applicable** 25:8
111:5
**applied** 6:15 44:20
**applies** 65:6
**appointed** 108:3
**appreciate** 215:14
224:19
**approach** 4:18 25:5
36:18 70:5 79:3
128:4 220:7
**appropriate** 84:24
100:16 131:16,17
138:11
**appropriately** 216:6
**approval** 5:18
**approved** 163:12
**approximately**
37:23 50:6 106:13
106:16 108:21
120:11 153:7
168:12 171:11
174:24 183:20
**April** 162:6
**Arbin** 243:6 244:5
245:19
**arbitration** 105:2
**area** 5:20 9:14
132:13 138:24
227:20 248:16,18
248:22 268:7
**areas** 98:22 99:2
173:12 226:24
248:24 254:21
258:16 259:15
**argue** 74:2

**argues** 137:20 234:2
**argument** 47:14,23
  48:1 50:1 246:3
**arguments** 137:18
  227:9
**arithmetic** 221:3
  241:6,13,18
**Arkett** 94:12
**Arkett's** 182:6,7
  184:12
**arm** 270:14
**army** 263:12,14
**arrangements** 96:24
  246:10
**arrived** 181:16
  182:8
**art** 196:5
**article** 78:16 93:16
  93:24 94:10 95:15
  96:8 97:7,23 98:1
  98:3 99:8 100:6
**asbestos** 235:18
**Asia** 56:21
**asked** 8:20 10:21
  41:1,1 44:4 51:14
  64:14 74:20 91:23
  100:10 131:11
  132:23 133:2,5,8
  138:19 139:5
  146:21 149:6
  165:17,23 166:12
  170:25 182:9
  191:1,10,13
  194:17,21 195:8
  197:1,10,11,15
  199:17 200:22
  201:17 202:22
  208:11,25 213:19
  216:3 221:8,13
  222:21 223:15
  224:3 225:7 227:2
  235:10 237:3,13
  237:17 241:1
  242:3 256:20
  260:3
**asking** 8:15 9:8,10

9:14,20 10:1,11,14
  10:16 31:25 110:9
  128:2 130:13
  138:25 139:4
  143:16 159:6
  164:24,25 165:1
  165:10 177:21
  180:7 185:1 194:5
  194:12,15 201:16
  231:3 266:3,5,8
**aspects** 259:6
**assemblies** 136:13
**assembling** 268:18
**assembly** 262:21
**assert** 225:8
**asserted** 148:21
  213:18 221:2
**assertion** 49:9
  145:17,21 165:20
**assertions** 137:16
  145:12,13 166:14
  214:6
**asserts** 165:10
**assess** 140:23 144:14
  149:15
**assessed** 203:25
**assigned** 105:10
  107:20 108:17,18
  108:19,22,23
  194:7 263:9
**assignment** 109:23
  116:14
**assist** 8:20 116:8
**assistant** 109:7,8,9
  126:11 203:2
**assisting** 57:15
**associate** 125:18
**associated** 12:10
  16:10 17:9
**Associates** 105:22
**assumably** 218:17
**assume** 152:19
  190:25 192:1
  201:16 206:13
  239:6,15 241:8,11
  253:19

**assumed** 200:17
  207:11,15 242:1
**assuming** 17:4 147:6
**assumption** 44:11
  121:3 181:4
  200:20
**assumptions** 42:22
  53:19 148:14
  161:24 241:21
**assurances** 215:11
**asthma** 263:24
**attached** 58:18
  207:3
**attachment** 159:24
  159:24
**attain** 144:14
**attempt** 151:11
**attempting** 34:2
**attend** 193:22
**attended** 125:24
**attending** 105:1
**attention** 42:4 131:5
  184:5 220:15
  233:2
**attitude** 99:22
  163:16
**attorney** 158:6
  189:15
**Attorneys** 2:4,14,21
**attributable** 14:25
**Auburn** 135:12
  136:9
**auction** 229:25
**audit** 42:23 43:6,10
  43:10,12 44:4
  197:12
**audited** 44:10
**auditing** 44:5
**author** 100:14
**autistic** 270:19
**auto** 13:9 55:16
  104:16,18 106:3,6
  108:9 109:12,17
  111:15 116:7
  117:19 118:1
  120:13,18 121:8

121:17 122:14
  132:23 177:22
  227:22,24 229:20
  231:12 233:8
  246:19,23 260:12
**automation** 269:10
**automotive** 55:13
  121:9,11,20,21
  125:5 129:18
  131:1 230:11
  231:8
**availability** 83:21
  84:14
**available** 21:3 29:2
  30:7 64:13 83:25
  138:13 139:14,24
  166:4 172:8 180:6
  200:11,16 248:16
  248:18
**Avenue** 2:10,15
**average** 32:15,19
  87:17 88:13 89:6
  89:11,12 103:6
  165:12 244:13,18
  244:23 245:1
  246:5,5,20
**averages** 24:5,16
  33:6,7 244:15,16
**avoid** 94:13,18
  253:23
**aware** 9:13 18:23
  86:2 103:5,10
  120:16,22,23
  121:23 122:1
  141:7 145:20
  151:8 153:10,12
  200:16 212:9
  213:10 252:11
  258:11 259:11,11
  259:11,12,14,14
**Axel** 243:1 244:2
  245:6 246:8,9,12
  246:13
**axles** 228:22
**a.m** 168:1

| | | | |
|---|---|---|---|
| **B** | 124:16,25 | 154:11 160:12 | 103:8 113:18 |
| **B** 1:17 100:14 | **bankruptcy** 1:1,19 | 161:23 165:25 | 114:3 118:11,11 |
| 133:18 157:16 | 38:8,11,14,21 | 213:21 219:5 | 119:17 121:15 |
| 173:14 220:9 | 48:14,16 49:2 | 223:6 246:9 | 131:13 132:1 |
| 226:6 239:6 | 50:16,22 53:3,8 | **basic** 175:10 177:4 | 134:6 135:1 |
| 260:16 265:16 | 82:2,9 83:19 | 178:25 182:16 | 136:17 138:1,10 |
| 267:17 274:14 | 103:12 110:11,12 | **basically** 170:23 | 141:19 142:15 |
| 275:1 | 125:2 127:15 | 180:21 268:17 | 143:9 147:1 150:5 |
| **BA** 125:10 | 143:22 166:3 | **basis** 23:13 26:14,17 | 150:7 151:18 |
| **BABETTE** 3:7 | 195:12,13 206:4,5 | 26:17 32:9,16,24 | 158:25 162:6,21 |
| **bachelor** 105:18 | 206:9 233:12 | 45:16 56:11,12 | 167:12 171:19 |
| **back** 10:9 15:4,5,6 | 240:22,24 256:25 | 57:13 61:2,2 93:11 | 178:4 184:25 |
| 16:1 22:3 32:3 | 257:2 272:6 | 100:13 110:8 | 186:21 192:25 |
| 33:8 45:20 46:10 | **banks** 139:25 | 115:5,9 136:16 | 194:20 195:2 |
| 46:14 62:17 64:4 | **barely** 253:16 | 142:11 143:17,18 | 201:13 207:24 |
| 70:3 71:1,16 76:24 | **bargaining** 14:12 | 149:6,7,9,9 155:1 | 209:11 211:22 |
| 76:24 77:10 81:5 | 19:5 104:25 105:6 | 162:15 215:16 | 221:7,19 223:14 |
| 105:15 108:5 | 106:10,17,18 | 223:22 229:1 | 230:13 234:10 |
| 135:19 143:10 | 108:16 109:24 | 232:9 252:18 | 239:10 251:25 |
| 160:16 166:4 | 110:19 111:4 | 253:2 | 253:1 261:13 |
| 177:8 178:24 | 117:3,13 121:5,20 | **basket** 165:3,4 | **believes** 139:5 |
| 184:4 191:22 | 125:22 127:5,8,15 | **battery** 264:4 | **belt** 96:18 |
| 210:10 230:3 | 130:1,7 132:6 | **battle** 58:17 | **benchmark** 60:23 |
| 232:21 236:12 | 145:4,19 146:11 | **bearing** 140:1 | **beneficial** 30:14 |
| 238:10 262:15 | 147:21 154:2 | **becoming** 48:13 | **benefit** 17:17 33:2 |
| 268:20 269:24,25 | 162:1,11,14,20 | 111:4 | 33:19 35:14 53:24 |
| 270:13,13,14,22 | 165:18 212:5 | **Beg** 261:11 266:22 | 54:21 55:4,6 67:19 |
| 272:21 | 224:23 225:23 | **began** 110:11 119:2 | 68:24 69:22 71:6 |
| **background** 23:20 | 226:6 227:11 | 119:2 263:1 | 71:14 79:16 87:17 |
| 125:9 260:25 | **bars** 25:21 269:6 | **beginning** 25:4 28:7 | 88:6 90:19 96:8 |
| **backs** 240:25 | **base** 23:12 49:8 50:1 | 110:18 134:3,5 | 101:5 141:5 |
| **backup** 157:14,18 | 50:10 52:15 64:15 | 153:8 167:15 | 204:14 206:7,25 |
| 157:20 191:10 | 146:6,17,24 147:1 | 185:10 190:9 | **benefits** 5:22 7:17 |
| 197:10,12,14,16 | 147:4,4 161:11 | **begins** 154:7 178:17 | 8:9,14,25 9:1,3 |
| 197:16 | 192:24,24 207:17 | **begun** 30:2 | 10:18,23 12:10,12 |
| **bad** 240:22 264:2 | 235:5 239:14 | **behalf** 7:3 12:13 | 12:14,18,18,25 |
| **balance** 26:11 27:7 | **based** 21:8 28:20 | 49:9 127:8 209:20 | 13:21 17:5,8,10 |
| 49:1 99:11 140:3 | 44:11 49:24 55:25 | 260:11 | 18:13,15,18,22,25 |
| 224:25 225:3 | 57:4 60:5,19 68:1 | **behave** 13:15 | 19:2,2 20:14,15 |
| 250:11 | 68:12 70:13 71:4 | **belief** 136:7 | 21:2,19 22:5,23 |
| **BALL** 2:8 | 74:22 76:25 86:5 | **believe** 18:25 44:10 | 23:13 25:10,23 |
| **bang** 94:7 | 91:15 96:4 97:2 | 44:23 50:2,4 55:3 | 26:11,13,15,18,20 |
| **banged** 166:16 | 129:8 131:14 | 68:21 72:24 76:22 | 26:25 27:5,11 |
| **bank** 250:9,10 | 133:16,22,24 | 82:21 84:24 86:1 | 28:16,19,22,23 |
| **bankrupt** 172:8 | 134:16 137:24 | 91:15 96:17 98:12 | 30:2,3,4,6,7,9,14 |
| **bankruptcies** | 143:14 145:11,12 | 101:9 102:14 | 31:2 32:9,18,20,25 |

34:8 35:10 45:1,4
54:8 55:21 56:7,15
57:9,16 59:8 62:12
66:16,24 67:1,11
69:20 74:11 77:3
83:3 87:15 88:5,11
88:13 90:17 92:18
93:21 97:14 99:16
110:10 139:18
165:8,9 180:13
204:14 207:13
245:25 252:16
255:14,19 264:13
266:13 270:24
271:22 272:14,17
**Bennet** 226:4
**Bennett** 2:7 99:7
100:19 221:9
231:3
**Berks** 271:1
**best** 145:7 175:7
190:25 245:23
262:11
**better** 138:5 139:6
141:9 159:13
196:2 245:17
251:23,24 252:5
**beyond** 54:16 77:13
98:21 138:15
217:8 227:10
228:21
**big** 4:19 69:18 70:1
142:24 165:2
**bigger** 89:2 201:20
**biggest** 245:23
**billion** 16:13,15
102:14,15,16
235:5 239:16
**bills** 251:2 264:18
**binder** 4:13,16,16
6:18 11:12 41:25
49:4 54:3 57:20
63:2 68:10 69:1
78:5 100:22
127:24 128:6,8,12
128:13 129:1

158:14 202:4,5,13
202:16 220:9
229:23 230:4,6,7
243:13 247:14
**binders** 4:19 36:18
230:1
**bit** 28:11 197:19
206:12 210:10
211:24 237:9
260:24 262:6
264:10,12
**black** 263:15
**blood** 276:13
**Bloom** 126:6,8,9,10
126:19 129:14
**Bloomfield** 264:6
**blue** 265:11 266:17
266:17
**BMC** 150:9,12,13
151:4
**boats** 265:12
**Bob** 108:24 109:6
117:5
**Bodies** 263:2,3
265:17
**bondholders** 192:21
**book** 164:19 171:1
**booked** 140:2
**books** 26:12,19
27:25 144:20
**boomers** 92:21,24
**born** 260:25 261:1,2
261:3
**borne** 258:4
**bothered** 166:20
**bottle** 264:20
**bottom** 44:9 70:17
78:8 80:18 99:20
154:7 158:24
169:19 184:6
244:24 249:17
**bottoms** 230:25
**bought** 263:3
**bound** 152:8,11
**boundaries** 54:16
**Bowling** 1:10

**breach** 222:15 225:7
**break** 9:7 123:4,5,6
**breakdown** 148:7,9
**breaks** 154:19
**bridge** 149:1
**brief** 123:4 256:16
105:16 118:3
141:8
**broad** 228:21 229:2
**broader** 48:16
**broadly** 98:21
132:18
**brochure** 54:3
**broken** 181:14
210:13
**brothers** 265:11
**brought** 150:22
166:4
**BRUCE** 3:6,8
**buck** 94:7
**bucket** 142:24
**bucks** 52:7,10,19,22
53:13 83:9 89:11
89:25 90:1
**budget** 147:17 148:5
161:20
**budgeted** 142:2
**Bueter** 113:8 151:17
151:19 158:10
177:11 178:15
179:5,24 189:9
219:18 220:21
**Bueter's** 166:14
178:23 180:9
219:21
**build** 29:23,23 105:6
272:2
**building** 129:12
**buildings** 135:24
**built** 157:11 207:17
272:19
**bullet** 58:21 72:7,17
77:16,19 140:5,14
143:3
**burden** 81:1

**burdens** 55:13,16
59:1
**Burns** 190:1,4
209:24
**BURTON** 1:18
**business** 21:5 40:5
78:17 92:8 125:13
125:24 140:25,25
141:1 144:11
149:6,9 154:25,25
155:10,10 161:12
161:16,18,20,22
161:23 162:3,8,11
162:19 163:6
190:11,12,13,13
205:25 209:14
228:23,23,25,25
229:2 234:17
235:15 236:16
240:7 245:18
250:21
**businesses** 160:24
172:17
**buy** 41:21 271:21
**buyouts** 126:3
**buys** 94:5

---

**C**

**C** 2:1 3:1 4:1 157:17
157:17 239:6
267:17 276:1,1
**calculate** 17:4 20:1
49:14
**calculated** 16:3,12
48:19 157:8,16
181:5 182:4 239:1
**calculation** 16:8
40:16 49:2 87:16
87:18 88:7,9,12
101:7 165:9
166:20 181:13
239:4
**calculations** 46:22
148:12,14 157:3
157:11 177:13
197:7 219:21

**calculator** 239:18 240:18
**calculus** 40:6
**call** 4:6 29:7 69:12 103:19 108:19 109:12 156:18 208:16,17,18 215:4 234:16 267:14
**called** 4:8 6:2 26:23 39:3 45:25 48:9 78:17 87:18 103:5 103:7,22 104:13 105:3,21 118:10 121:9 124:3 126:2 126:5,21 149:22 155:6 157:5 161:11 163:25 199:19 210:3 230:11 231:8 256:22 260:16 267:17
**calls** 110:2,6,9,12
**Canadian** 161:4
**cap** 13:5,6,8 18:24 19:3,7,15,21,23 20:1,4 30:12 45:11 45:18,24,25 46:16 46:20 47:16,18 108:19 236:1 240:11 249:1
**capacity** 82:1 104:8 107:4,17 108:9 125:1 127:19 130:3
**Cape** 191:8
**capital** 126:2,3,21 139:14 162:14 204:23
**capped** 12:5,19,21 13:14 18:17,18,22 45:1,5 48:6,7 51:1 51:2,20
**capping** 12:17 17:5 17:6 83:1
**caps** 5:2 10:21,24

11:1 15:15,16 16:10,14,24 17:8 17:13,14,19 18:2,4 18:13 44:18,19,20 45:12,18 46:24 47:1,5 82:21 100:25 101:10
**care** 8:16 18:19 79:14 95:1 153:4 270:17
**career** 125:16
**careers** 92:22
**Carolina** 261:1,5,6,9 261:12
**carries** 80:19
**cars** 262:23
**case** 6:15 7:24 31:5 36:23 41:8,20 62:1 81:14 102:9,25 122:7 125:6 126:16 129:16 133:22 142:8 145:17 146:17 149:21 152:9 156:10 157:1 158:8 161:11 166:9 171:18,19 175:18 190:8 203:25 209:11 226:24 231:18 235:24 253:18 257:4,25,25 258:13 259:1,2,7
**cases** 129:7,21,22 163:14 191:14,15
**cash** 26:14,17 49:15 138:12 139:13 143:11 164:19 165:17,21,22,24 166:1,25 171:1 172:4,8,14,16 174:4,6 175:23 234:17 235:16 245:13 255:2
**casualty** 7:17
**cat** 215:12

**catch** 186:12
**categories** 12:14
**category** 24:4,4,14
**cause** 59:22,23 265:19
**caution** 141:12
**cautious** 141:15
**caveats** 113:12
**CDH** 96:16
**cease** 107:22
**Ceccotti** 3:7 4:4,5,6 4:12,23,25 5:3,5 7:7,11,12 11:19,20 11:21 14:8,13,19 15:10,12,14 35:17 36:3,5,8,11,16 39:16,21 41:14 51:11 58:6,8 61:5 64:1 73:19,24 74:16,22 89:4 90:24 91:5,8 97:19 98:6,8,11,16,20 100:3,12 101:16 101:21,22 103:14 103:20 114:8
**cement** 269:7
**Center** 210:3 230:11 231:8
**Centerport** 268:3
**cents** 82:10
**CEO** 190:3
**certain** 18:19 160:8 178:5 181:4 182:6 206:14 226:24 260:4
**certainly** 67:8 82:3 96:19 191:18 221:22 240:9,11 242:10 252:2
**certainty** 79:25
**certified** 5:17 38:25 262:3 263:1
**certify** 276:8,12
**cetera** 87:7 164:22 171:4
**chain** 176:24 177:2

178:8 188:20
**chair** 106:10 108:15 108:19 128:17
**chaises** 262:17,23
**challenge** 19:11
**challenges** 28:2
**chance** 270:4
**change** 26:16 30:2,3 30:25 92:21 107:12 154:24 161:2 165:13 229:16 232:23
**changed** 107:8 214:8
**changes** 10:19 20:14 28:3 29:16,20 31:11,13 34:4,6,7 72:16 96:3 147:13 147:14 164:21,22 164:22 171:3,4,4 240:25 241:4 248:11 255:16
**changing** 30:10 35:10 67:10,21 229:21
**Chapter** 40:16 48:18 251:7
**characteristic** 70:18
**characteristics** 24:2
**characterization** 60:11 73:20
**characterize** 26:1
**charge** 19:6
**charging** 19:23
**chart** 12:4,7,9,11 27:21
**cheap** 249:6
**check** 8:23 128:23 219:20
**checks** 156:22
**Chevy** 268:17
**chief** 177:13,17 190:21
**children** 270:19
**China** 54:23 55:14
**Chinese** 226:19

**choose** 30:8 79:19 218:20
**chose** 72:4 184:12 243:16
**Chris** 151:17 158:10 177:10 220:21
**CHRISTINE** 2:17
**Christmas** 271:5
**chronologically** 125:15 177:7
**chunk** 89:2
**circumstances** 45:11 56:17 206:10 229:5
**cite** 20:12 47:21 65:9 69:4 213:1
**cited** 76:9
**cities** 54:13
**citing** 53:11 70:1
**city** 118:9 125:10
**claim** 75:21 103:7,9 103:11
**claims** 19:24 75:10 143:25 235:17
**clarify** 15:4
**clean** 262:9
**cleaning** 268:21
**cleanup** 93:13
**clear** 12:23 16:17 28:16 36:1 63:4 75:7 95:22,24 156:13 161:1 188:16 212:2,10 218:23 226:1 234:23 263:3 265:14 271:16
**clearly** 61:6,8 92:21 214:3 217:16
**Cleveland** 2:10
**client** 237:18
**clients** 5:18 8:2,6,10 8:15 9:2,7,12,20 10:6,6,7,10,12 37:19,23 38:1 54:21 55:2,2 57:15 58:5,10,24 59:3

94:18,21,23 210:22
**cloak** 226:17
**close** 100:25
**closed** 13:18 94:9 111:1 119:5 126:21 182:1
**closely** 249:14
**closer** 124:18,19 217:2 218:25
**closers** 211:23
**closing** 149:16 215:3 216:18
**closure** 216:23
**clunk** 88:23
**Cobra** 84:1,5 86:9 86:15,16
**code** 6:10
**codified** 31:9
**cognizant** 29:16
**Cohen** 3:3 260:11
**coincident** 121:18 176:6
**Cole** 93:19
**colleagues** 57:1 260:2
**colleague's** 100:1
**collected** 81:20,22 82:1
**collective** 14:12 19:5 111:4 121:5 125:22 127:5,8,15 130:1,7 132:6 145:4,18 146:10 147:21 154:2 161:25 162:10,14 162:19 165:18 212:4 224:23 226:6
**collects** 20:2,6
**College** 125:10
**Columbia** 125:13 261:1
**column** 19:15 54:10
**columns** 155:7
**combination** 269:12

**combines** 54:14 155:7
**come** 24:16 48:18 55:2 58:5,10 107:7 120:21 132:22 135:7 143:10 151:24 159:15 162:2 170:13 181:22 184:18 214:17,23 224:24 228:17 240:22 250:22 251:4 259:7 263:6 267:5 267:15
**comes** 53:3 179:8 238:5 240:18 247:4 251:4
**comfort** 44:6,8 144:12
**coming** 226:14 240:24
**comment** 24:21 189:10,11 217:20 230:15
**commented** 189:7,8
**comments** 18:9,9 22:16 23:15 256:21
**commercial** 143:4,5 241:9
**commitments** 138:9 236:6 250:15 251:16,18
**committee** 2:14,21 86:2 106:10 108:19,20 150:21 151:1 192:21 199:7
**committees** 117:3
**common** 121:4 145:8,9
**communicated** 171:14
**communicating** 249:15
**communication**

57:1,2 182:5
**communications** 56:23 57:7 64:25 121:22 207:5
**community** 28:1
**companies** 20:20 29:23 30:1,8 33:18 53:24 56:4,4,7,19 56:20,23 59:18,22 59:23 60:2,3,6,8 60:21,24 64:6 65:10 66:3,6 81:12 82:2,3,6 125:21 130:23,25 138:18 161:19 206:22 228:9,18,18 229:7 242:8,20 243:16 243:25 246:14,19 246:21,24
**company** 30:15,19 37:2,12 38:10 48:17 66:14,16 87:20 94:17,21 95:8 99:16 104:21 105:21 107:8,23 108:14 109:20 111:23 116:21 118:10 121:9 125:25 126:1 130:15 134:16 135:7,13 136:18 137:20 139:10,13 140:17 141:4 142:18 143:1,5,16 145:20 147:5 148:15 151:21 158:21 159:7,11 159:17 161:1,8 162:25 163:17 165:8,10,15,19,21 165:24 168:16 169:13,17,22 170:1,14 171:14 171:18 176:1,25 177:10,11,12,14 180:7 181:2,15

182:7,10 184:3,8
190:22 192:15
198:5 200:23
204:4,6,19 205:15
207:7,19 211:9
213:13,18,22
214:3,7,11 215:10
216:4 217:7
218:19 219:2
220:20,22 234:2,9
235:25 236:7
237:1 238:1,2
239:24 240:10
241:12,16 242:13
243:19 252:3
253:13 254:1,11
254:20,23 255:9
255:15 256:4,22
257:12 258:3,4,8
269:17 272:13
**company's** 26:11
27:24 33:19 66:10
72:3 73:24 88:11
133:12 134:10
135:2 136:11,23
137:16,18 140:3
140:11 141:8,10
142:1,9,13,17
143:23 144:7,20
145:16 146:14
147:24 148:7,18
149:5,13 152:21
161:22 162:3
164:24 165:6
166:9 171:5 173:1
173:2,16 175:11
175:22 177:4,13
179:1 181:10
191:5,7 205:18
219:6 221:2
223:21,23 239:6
241:7,13 242:1
244:24 251:15
253:8 254:17
255:18,25
**comparable** 55:6

144:1
**comparables** 243:25
247:24
**compare** 139:4
256:23
**compared** 223:6,10
237:5 245:4,5
**compares** 32:8,15
**comparing** 130:22
130:24
**comparison** 87:13
88:14,23 139:5
154:11 254:5
258:18
**comparisons** 102:7
257:13
**compensation**
255:16
**compete** 54:22
56:13 57:11
**competently** 250:6
**competing** 55:5,8
56:5,17,20,24
**competition** 228:8
228:10,12,14,16
229:6,10,12,18
**competitive** 55:22
104:14 109:10
112:1 135:11
242:14
**competitively** 116:9
**competitors** 55:22
56:5,21,25 102:7
139:5 205:5 246:5
257:14
**complement** 190:10
**complete** 26:5
153:22 163:5
184:4 185:8
216:22 226:24
254:8,9
**completed** 42:23
43:7 122:2 204:1
257:1
**completely** 134:20
194:19 258:1

**completing** 56:8
**complex** 258:13
**complexities** 258:16
**complies** 202:2
**component** 22:17
51:17 95:1 164:20
171:2 252:3
**components** 51:19
51:24,25 248:15
249:22 254:18
**composition** 23:14
23:21,24 24:8
**comprehensive**
211:16 248:12
**computer** 272:23
**concept** 10:24 29:7
31:4 44:18 48:15
94:2
**concern** 79:18 85:8
**concerned** 258:19
**concerning** 8:8,8
22:16 26:6 130:9
**concerns** 38:17
85:18
**concession** 101:10
140:12 234:2
**concessions** 100:24
101:5 111:25
206:25 251:13,16
252:12,15 255:4
256:4
**conclude** 77:1
133:14
**concluded** 133:17
134:15 135:6
**concluding** 137:23
**conclusion** 68:4
117:24
**conclusions** 20:10
67:6 143:14 170:9
170:10,12,17,19
170:20
**conclusory** 181:20
**concrete** 213:15
**concretely** 213:14
**condition** 30:6 205:8

248:2
**conditions** 119:12
207:3 270:11
**conduct** 6:10 59:11
138:16 144:20
159:10
**conducted** 21:7,8,19
60:14 68:19
130:14,17 131:1
209:17 219:20
228:25 257:21
**conducting** 59:6
60:20
**conference** 274:10
**confession** 132:15
**confidence** 249:19
250:3,9,16,17,18
250:19,22 251:18
252:13 253:13
**confidential** 85:8
**confidentiality**
38:17 85:13 152:7
152:8,12,17 153:2
225:7
**confine** 99:3
**confirm** 57:13
210:13 234:19
**confirms** 93:1
**conjunction** 30:25
44:7
**connected** 162:10,19
179:1 211:14
**connection** 30:24
38:13 44:18 116:8
118:5 122:10
124:16,23 125:19
125:23 127:3,5
129:15 145:18
146:10 147:21
150:20,23 158:8
173:2 211:8
**consent** 258:3
**conservative** 240:20
**consider** 58:24 59:3
92:2,6 94:18
173:11 224:20

231:11 235:20
**consideration**
224:20
**considerations**
29:18 59:22 94:11
164:4
**considered** 30:21
96:1 104:18
**considering** 171:9
171:14,16 172:15
174:1 175:13,15
176:1 255:1
**consistent** 46:21
47:7 76:7 221:5
**consistently** 142:18
145:21 157:14
**consists** 105:4
165:11 271:3
**constant** 250:4,5
**constituencies**
149:25
**constituents** 143:21
144:9 146:18,25
147:16 162:7
192:17,20 193:2,6
193:21 200:19
**constraints** 194:7
**consultants** 21:4
64:10,14 81:18
99:16
**consulting** 5:9,12,13
7:22 8:4,14 81:24
99:15
**consumer** 94:2,5,25
95:14 96:4,19
**consumers** 96:2
**consumption** 193:8
**contact** 150:8
**contain** 159:9
**contained** 129:9
170:15 232:9
**contains** 4:16
**contemplated**
217:15
**context** 40:11 100:6
127:12,15 130:1

132:6,9 165:18
223:21 236:15
238:5 240:7
**contextual** 224:4
**continue** 27:11 68:5
97:1 117:13
222:17
**continued** 3:1 76:5
117:12 119:8
275:1
**continuing** 96:16
135:21 174:5
**contract** 143:18,19
143:19
**contracts** 105:1
119:15,18 143:20
251:14,18
**contradict** 216:16
**contradicts** 231:18
**contrast** 24:19
**contribute** 238:8
**contributing** 51:21
**contribution** 19:10
19:22 20:2 73:17
205:13 233:18
**contributions** 67:22
72:18 73:2 82:22
241:2
**controller** 190:12
**controlling** 95:1
**Controls** 118:7,8
**convenience** 4:13,18
**conversation** 151:25
189:4 265:16
**conversely** 56:12
**convert** 156:20,23
198:10 199:14
**Convet** 264:1
**convinced** 96:23
**convoluted** 199:12
**COO** 97:2
**coordinate** 105:3
118:12
**coordinated** 121:21
**coordinating** 109:25
192:20

**COPD** 263:24
**copied** 177:11
**cops** 10:21
**copy** 4:21 42:1 157:5
162:3 167:25
237:10
**core** 224:25
**CORINNE** 2:8
**corner** 158:24
**corporate** 8:5,10,15
9:7,12 37:19
124:24 127:11
129:25,25
**corporation** 1:6
109:21 110:4,16
111:15
**corporations** 38:2,6
38:7
**correct** 12:25 22:9
22:12 28:9,10 29:8
33:4,6 37:19 39:1
39:4,8 40:2,24,25
41:3,9,13,22 42:18
42:25 43:7,11,20
43:24,25 44:3,12
44:13 45:6,15 46:7
46:10,11,15,25
47:2,3,20,23 48:19
49:20 50:6,7,16,24
53:5 54:4 57:22
59:4 62:9,15,24
63:11,14,19,20
65:15,18 67:7
68:20,24 70:1,5,15
70:24 71:8,9,14
72:1,4,13,19 73:2
73:23 76:18,21
77:4 78:18 81:15
82:10 84:1,16 86:7
86:10 87:11,12
88:18 90:2 91:15
92:4,13 93:10,17
95:16 96:9 99:17
101:1 102:11
104:22 109:18
112:7 114:3

147:17,18 157:22
161:13,14 167:22
171:13 175:18,19
177:23 178:1
179:8,24,25
180:22 181:8
186:7,9,23 187:5,7
187:8,10,19,22,25
189:3,9,24 190:1,2
190:7,19,22,24
193:18,19,23
194:1,22,23,25
195:1,4,16,21,24
195:25 196:5,11
196:13,14,17,18
197:2,23 199:2,3,5
199:9,20 200:3,24
201:7 202:19,20
202:23 203:8,17
203:19 204:12,20
205:8,9,19 206:8
206:19 207:1,6,14
207:21 208:12
209:1,6,18,25
210:1,6,8,15,16,18
210:19,21 211:14
211:19,21 212:16
212:17,19,20
213:2 217:2,17
218:15,21 219:12
219:15,18,21,23
219:25 220:12,13
221:3,21 222:21
222:22 223:13
224:6,7 227:24
228:3,6,10,13,19
229:7,14 231:20
232:1,7,14,16,17
232:19,20,22
237:12,14,22
241:24 242:9,20
242:23 243:7,10
243:23,25 244:3,4
244:6,7,8,10,11,13
244:24,25 246:14
248:6,12,15,19

251:8,12,23
252:22 253:11,16
253:19 254:18,19
254:21,22,25
255:4,5,8,11,14,19
255:20,22,23
256:4,8
**corrections** 113:4
**correctly** 47:11,14
61:17,19 67:23
68:16 69:24 70:11
72:21,22 77:24
79:5,21 80:7 100:8
131:9 221:6,11,15
223:9 224:1
231:15
**correlated** 23:10
**corresponds** 11:6
**cost** 10:18 19:8,13
19:13,16,20,23,25
26:24 34:6 45:14
46:2,13 49:16 56:6
57:11 67:17 83:3,7
83:10 88:24 94:1
103:9 135:9
139:21 148:7
149:18,18 164:25
165:5,8,8 180:2,13
180:15,24 181:24
214:4,5 219:22
221:1 223:3
248:12 257:11,14
257:17
**costing** 157:2
**costs** 45:15,18 49:18
54:24 55:23 87:14
95:1 96:1,18 103:6
149:5 165:15
185:2 204:6
217:18 220:21
248:15 251:23
252:1,5 257:13
264:21
**counsel** 3:4 41:13,21
60:16 84:18,23
85:4,14,17 97:24

102:8 105:3,4,9
109:25 121:21
222:5 224:11
225:20 237:18
**counselor** 128:14
164:12
**counsels** 84:25
**counsel's** 73:20
**count** 13:1,3
**counted** 166:22,22
166:23
**counter** 120:16
**countries** 54:23 56:6
57:12 214:5
**country** 79:18 91:12
91:18 96:25
215:14
**County** 271:2 276:4
**couple** 81:12 83:17
122:6 126:24
129:6 135:16
169:16 173:5
179:21 186:8
220:4 256:21
270:16
**course** 16:2 92:22
111:8,12 115:10
193:5,14 209:13
212:1,9 229:12
**courses** 40:12,12
**court** 1:1 4:3,5 6:22
7:10 9:22,24 11:12
11:16 13:23 14:2,3
14:5,10,15,18
15:11 22:10 36:4
36:13,19 38:20
39:20,23 41:7,17
43:14 51:15 58:14
58:18 60:19 64:3
74:4,20,25 76:2
84:8 85:1,3,7,16
85:24 89:5 90:14
91:2,7 98:5,9,22
100:18 101:18
103:12,16,21
104:2 114:17

115:15,25 116:24
119:14 120:4
121:12,24 122:9
122:20,24 123:5,8
124:7,17 125:6
128:5,11,25
130:24 131:14,16
131:21 132:3,8,12
132:17 137:9
138:24 139:8
146:5 158:17
164:6,12 167:7,16
168:23 169:7
171:23 174:11
176:14,20 179:17
182:22 183:4,7
185:12,18 186:12
186:15 188:13,25
189:16 192:13
194:11,13 201:10
201:18 202:13
215:15,22 216:1,8
216:15 220:8
222:3,8,9,14,18
224:12,16,20,24
225:5,10,14
226:12 227:1,9,18
229:25 233:15
234:6,13 237:20
238:13,18,19
249:25 253:4
256:15 258:10,22
259:10,13,14,15
259:20,24 260:6,9
260:14 262:6
267:6,11,22 273:7
273:10
**courtesy** 216:10
**courthouse** 257:3
**courtroom** 145:22
210:23 216:5
259:3
**cover** 54:7 73:12
97:15 159:22
**coverage** 20:19
31:20 32:11 61:16

68:24 70:9,10,20
72:13 73:11 74:14
76:5,16 80:23,24
81:1 84:5 86:9
**covered** 78:12 88:17
126:3 134:10
153:3 155:4 166:3
265:4
**covering** 211:16
265:7
**covers** 110:25
241:11
**coworkers** 106:12
**Craig** 267:15 268:1
274:11
**create** 74:9 155:16
**created** 73:8 82:7
222:22 223:4
225:11
**creation** 226:16,16
**credibility** 226:3
**credible** 230:17
**credit** 140:1
**creditors** 2:14 82:9
82:12 150:21
170:3 193:1 199:7
**critical** 174:2
**cross** 36:17,21 41:25
51:16 54:3 63:1
78:4 85:10 97:22
98:18,20 100:22
103:15 114:3
115:1,16 119:9
122:23 185:20
222:12 235:21
266:17,18 267:4
273:6 274:5
**current** 9:3 10:13
13:5,7 14:1 18:6
28:2 29:3 30:10
33:21 35:8 47:16
67:16,20 68:6 73:2
73:4,17 74:9,14
75:5 76:8,20 83:22
83:25 86:14,17
88:15 93:8 111:9

126:13,14 136:11
154:22 215:2
216:25
**currently** 25:3 26:10
70:9 93:9 217:17
248:4
**curtain** 163:20
**Custom** 1:10
**customer** 144:4,5
207:14
**customers** 142:2
144:7 206:15,19
206:21 207:5
249:10,13,13,15
249:15,16,18
250:3,13,16,20,20
250:22 251:1,7,10
251:14,20,22
252:13,22,24
253:8,12 255:3
**cut** 194:12,14,16
255:14 271:21
**cutoff** 138:20
**cuts** 164:21 171:3
252:16,16,16
**cutting** 67:17 89:10
100:15
**CVA** 206:1

---

**D**

**D** 2:17 4:1 274:3
**daily** 110:8
**Dana** 1:6 10:25,25
12:13 13:24 14:2
14:10 15:17 17:3,5
17:9,13 18:5 19:5
19:7,16,16,22,23
19:24 20:1,5 32:10
32:11,25 42:8,24
44:21 45:13,18
46:5,12 50:15,22
53:3,15 62:1 73:5
73:9,14 75:22 83:9
83:19,22 84:5 86:8
87:3 88:17 100:24
104:18 105:2,3,4,5

105:9 109:20,22
109:25 110:3,4,6
110:12,16,19
111:5,8,11,13,15
111:19 116:8,14
116:17 117:22
120:13,17 121:19
130:24 150:24,24
155:5 189:21,22
191:17 204:19,23
205:3,7 206:3,13
206:25 207:13
208:22 209:12,16
223:7,10 228:6
229:6,11 233:11
233:17 234:22
235:12,22 237:21
238:14 239:23
240:21 242:8
243:24 245:7
247:23 248:14,25
251:7,11,12,22,24
252:4,12 253:10
253:21 261:19,19
261:20,22,24,25
262:2,7 263:2,21
264:17,18 265:5,7
265:9,17,17
266:12 268:10,15
271:12,21 272:1
272:12,18
**Dana's** 17:2 18:3,4
19:21 31:14 45:24
45:25 47:2,18 74:9
82:12 88:15 90:8
93:8 100:24 101:1
101:3 102:25
103:3,11 112:1
130:22 134:6,8
136:7 140:9
205:12 206:21
207:4 223:6 248:2
251:20,21 252:1
272:16
**data** 16:4,8 19:11,24
41:5,7,19 42:22

64:15 84:9 90:18
101:12 149:22,24
150:9,15,15,17
151:22 154:11,18
155:6,21,25 156:6
156:9 157:4,6
159:9,9 181:2
184:15,17 194:24
195:17 196:7
197:25 198:5
231:17,22 245:1
**database** 70:14
**date** 36:7,15 116:3
120:15 167:9
168:25 171:25
174:13 176:16
179:19 182:24
185:15 201:4
206:19 213:3
214:12 219:13
223:7 237:6
**dated** 49:11 113:8
158:22 168:9
169:9 172:25
175:8 177:9
183:14,17
**David** 3:8 260:2,11
**day** 2:3 6:12,13
36:23 121:6,21,21
145:22 150:8
151:4 158:6
175:25 178:20
183:14,21 185:3
186:22,25 190:10
194:9 210:7
221:25 270:18
276:17
**days** 92:25 168:12
172:25 178:20
186:8,10 187:1
190:6,19 191:16
191:20 192:14
220:4,20 265:10
269:16,17 271:3,7
271:7
**day's** 192:18

**de** 209:9
**dead** 157:6,6
**deal** 224:24
**dealing** 38:20 110:1
119:6 169:19
252:21,24
**deals** 104:16 108:20
184:6
**dealt** 119:4 158:9,9
158:10,11
**debate** 164:13
**debt** 139:15,16,25
235:17 236:4,5
250:12 257:12,16
**debtor** 165:21,24
166:5 172:9
**debtors** 1:7 2:4
36:23 41:2 74:9
119:14 120:5
131:12,12 185:24
212:1,10,21 219:9
**debtor's** 49:6 57:20
62:4 93:15 96:14
144:4 168:24
174:12 182:23
217:10 230:8
231:5 243:22
247:14,16 254:15
**December** 50:16
146:6,18,25
158:21,25,25
160:13 167:18
168:1,2,9 169:14
170:4 171:1,7
172:4 173:1,9
175:3 178:25
191:22,24 192:8
192:13
**deceptive** 53:12
**decide** 60:2 79:2
101:17 269:22
**decided** 175:15
**decision** 27:10 78:25
122:17
**decisions** 79:4,14
118:16 121:2

161:6
**declaration** 4:15,22
6:20 11:17,24
17:20,24 20:9 32:4
33:9 35:22 41:23
41:24 42:1,18
43:17 44:15 47:8
49:9 61:10 62:17
64:4 65:9 68:10
71:1 76:25 81:5
83:24 86:3 89:10
89:14 98:13
100:21 101:11
103:1 112:13,14
112:23 113:2,9,14
113:17 114:12
115:6 127:23
145:15 154:6
166:14,15 180:10
180:12 182:6,7
184:12 185:6
198:12 202:1,7,8
202:19,21 205:12
205:22 210:11,15
212:16,16 215:17
219:14
**declarations** 41:6,8
243:20
**decline** 47:19 49:10
49:23 50:3,5 52:6
52:9,21 53:17
135:3 143:7
**declined** 69:20
**declines** 52:18,24
**decrease** 13:21 17:8
25:10 47:6,8,10
48:5 51:22 52:3,4
53:7 100:24
**decreasing** 51:19
**deductibles** 82:22
88:17
**deduction** 139:22
**defense** 258:15
**defer** 260:2
**deferential** 46:18
**define** 40:23 46:20

204:7,9
**defined** 25:22 98:21
139:16,17
**definition** 203:23
**degree** 105:19
**delayed** 162:5
**Delfi** 38:14,21
**delighted** 240:24
**deliver** 5:18 251:5
**demand** 143:22
227:6
**demise** 99:24
**demonstrate** 20:13
**Denise** 4:10 103:24
124:4 260:18
267:19 276:6,19
**denominator** 245:21
**dental** 18:13
**Denver** 97:2
**deny** 57:13
**department** 41:3
64:7 104:11,14,15
104:16,24 105:20
109:10 258:15
269:3,4,25
**depend** 80:25
**depended** 190:13
**depending** 17:16
71:25
**depends** 56:16 75:11
206:9,10 236:6
245:13 269:4
**deposed** 115:4,4
**deposition** 4:14
38:17 84:19,24
85:4 96:11 97:8,21
120:24 121:6
130:14,19 131:3,6
220:5,11,16
226:19 230:21
242:25 243:10
**depreciation** 138:7
**depth** 85:18,20
**derived** 181:14
**describe** 7:1 20:24
21:16 25:19 31:7

31:17 32:6 33:22
34:14 100:16
108:11 111:17
118:3,24 125:8,14
141:8 145:2 169:7
202:25 223:3
269:2
**described** 7:13
13:12 15:16 16:25
24:14,22 28:7
33:13 70:4 73:21
143:15 199:12
**describes** 24:2,3
35:8
**describing** 45:21
258:14
**description** 38:4
74:23,23 259:5
**design** 10:19 23:17
28:18 29:3,18,20
29:24 34:3 67:22
70:7
**designation** 131:22
**designed** 141:20
**desire** 151:25
**despite** 97:20
**detail** 155:22 156:6
156:24 157:7
165:14 170:8
**detailed** 42:22
155:12 164:19
169:25 171:1
197:9,11,14,15,16
200:25 207:20,25
208:3,6,19
**details** 75:7,17 90:8
**determine** 19:8,22
24:10 65:6 87:9
135:8
**determined** 16:13
103:12 204:2
**determines** 19:6,10
**determining** 24:5,15
**Detroit** 125:17
261:15,18 263:11
**develop** 254:1

**developed** 263:24
**development** 105:21
**developments** 54:17
**DiCHIARA** 3:7
**die** 47:17
**died** 13:22
**differ** 67:16
**difference** 142:3
155:18 156:6
233:1
**differences** 257:24
**different** 45:10
54:24 82:1 112:19
193:11 201:22
202:11 226:21
**differential** 83:11
**differentiator** 60:13
**digest** 143:24
**digested** 257:6
**digital** 156:20,21
**diligence** 144:8
159:11 228:25
233:24
**dinosaurs** 99:21
**DIP** 147:16 148:5
149:1
**direct** 5:5 17:12,12
27:18 30:16 38:5
42:2 45:13 51:6
62:3 73:22 94:4
98:18,21 104:3
124:8 154:20
155:3 185:8,11
186:21 189:12,14
195:2,20 204:18
205:22 260:20
267:23 274:5
**directed** 99:1 107:15
107:16 179:10
182:3
**direction** 64:8
108:24 165:13
250:5
**directionally** 96:6
**directly** 9:13 10:1
23:10 126:4

140:14 144:3
166:8 179:6
252:24
**director** 109:8
265:17
**disabilities** 181:21
**disability** 181:7,11
181:22 182:12
184:7,14
**disagree** 61:1,3,8
97:6 139:3 145:10
211:1 222:16
232:9 233:4 247:5
247:9,22 251:21
253:2
**disappointing** 85:12
**disclose** 198:6,6
**disclosed** 141:14
**disclosing** 141:16
**disclosures** 21:2
**disconcerting** 96:1
**discontinue** 76:16
**discovered** 197:22
**discrepancies**
184:14
**discuss** 41:16,23
98:17 116:7 134:5
154:10 187:9
212:18 238:2
**discussed** 27:12
119:6 139:10
140:10 219:8
**discussing** 35:2 42:2
237:24
**discussion** 31:21
44:18 119:10
121:4 137:15
195:19 207:21,25
208:3,6,20 222:7
**discussions** 111:10
116:13 120:25
207:8 212:5 256:9
**disease** 263:24
**disengaging** 67:1
**disprove** 145:13
**distinction** 108:13

164:10
**distinguishing**
247:12
**distraction** 267:12
**distress** 60:7,21
64:20 66:7,11,15
66:17 82:2,4,6
**DISTRICT** 1:2
**divide** 241:20
**divided** 32:25
**dividends** 240:15
242:12,14 246:2
**division** 104:19
109:12,14
**dock** 263:5
**document** 6:19 11:7
11:22 12:1 16:22
21:11,12,25 34:22
49:12 112:9 115:8
115:25 148:11
158:18,23 160:20
174:4,15 213:1,3,8
214:14 217:20
218:3 223:12
230:10 254:14
**documentary** 49:7
**documents** 42:7
113:5 135:15
136:18,19 142:13
148:21 151:12
153:15,23,23,24
153:24 154:11,12
157:25 166:11
175:7 182:12,14
192:2 214:1 217:7
217:10 218:16
219:6 225:11
251:15
**doing** 46:22 67:2
73:16 76:8,8 86:5
97:1 107:1 157:5
157:10 188:13
215:23 225:22,22
227:7 241:6,12
263:21 268:21
269:3 270:14

**dollar** 18:14,15,18
19:15 20:5 46:17
53:7,16 82:10
83:11 241:5
**dollars** 16:13,16
18:19 19:21,21,24
20:1,3,3 32:21
45:24 46:8,17
52:25 53:2,8,17
75:15 83:17 89:13
89:18 102:14,15
102:16 148:17,19
165:10 180:11,11
180:14,17,17,18
181:20,24 182:1
203:7 234:3,24
235:5,25 236:1,2
237:4 239:10,16
240:9,11,13 248:5
264:21 271:24
**domestic** 134:6,9
227:25 228:3,23
**domestically** 236:5
**door** 251:3
**dope** 94:1
**double** 43:15 84:22
**doubt** 44:12 45:8
79:3 206:17
231:25
**downsized** 134:18
134:19,21 135:3
135:18 218:18
**Dr** 21:16 22:10,15
25:7
**dramatic** 254:1
**dramatically** 110:13
**draw** 131:5 143:13
220:15
**drawing** 254:5
**drawn** 70:15 139:9,9
225:19
**drive** 52:2
**driven** 94:2,25 95:14
96:19
**drives** 51:18 52:3
**driving** 270:15,17

270:18
**drop** 25:25 47:17
50:21,25 80:3
**drops** 26:5 264:9
**drove** 270:19
**drug** 18:24 19:2,2
28:16 68:14 71:7
76:16 77:3 79:17
79:19 80:1,23
**drugs** 45:17
**dry** 264:8
**due** 53:8 143:7
144:8 159:10
228:25 233:24
258:20
**duel** 203:1
**duly** 4:9 103:23
119:24 124:4
260:17 267:18
**duties** 106:25
**dying** 48:6 51:1

---

**E**

**E** 1:17,17 2:1,1 3:1,1
4:1,1,8 50:15
103:22,22 124:1,1
124:3 260:16
267:17 274:3,14
275:1 276:1,1
**earlier** 28:21 30:13
33:13 94:12
108:17 175:3,24
184:1 192:23
208:2 217:15
236:25 246:10
253:18
**early** 17:15 133:4
146:18 158:25
**earned** 26:20 105:18
**earning** 242:11
**earnings** 138:2,6
234:24
**ease** 230:4
**easier** 177:7 202:5
**East** 2:5
**Easter** 271:7

easy 11:13
EBIT 235:1,6 242:7
  244:17,22,24
  245:8 246:20
  247:6,7,13,23
EBITDA 138:5
  139:23 234:3,24
  235:2,3,3,6,13,23
  239:2,11 240:4,9
  241:20 244:25
  245:5 247:6,13,23
EBITDAR 139:6,11
  242:7
economic 47:1
economically 116:9
economics 125:10
  125:11 149:15,17
economist 125:17
educational 81:23
  125:8
effect 30:3 40:16
  82:14 84:20 143:8
  214:18
effective 147:7
effectively 162:24
effort 93:25 147:24
  159:8 174:6 198:5
  198:20 226:7
efforts 116:8 225:24
eight 77:16 80:4
  171:9 220:18
  239:16
eighteen 56:1
either 13:5 14:15
  74:21 100:8 123:3
  139:18 152:20
  189:14 214:2
  250:12 253:25
EL 105:21
elaborate 54:25
  110:7 114:15
  137:17 143:4,15
  154:13
elected 28:22 106:10
  106:11 108:2,15
electronic 159:24

260:4
electronically
  169:10
element 139:23
  172:13
elements 52:1
  147:22 165:4,5,7
  256:1
eligible 71:10 90:2
  90:22 92:2 93:9
  270:6 272:3
eliminate 9:3 30:4,7
  33:19,21 34:8
  35:14,14 56:7,15
  57:16 58:25 66:15
  74:11 133:19
  255:22 266:12
  272:17
eliminated 20:16
  27:5 68:23 71:14
  83:23 102:20
eliminating 182:11
elimination 31:19
  181:6,11,21
  255:18
Elizabethtown
  135:17 136:10
embraced 14:17
emerge 50:15
emergence 150:24
  245:8,11,11
emergency 49:2
employed 5:6 30:5
  104:6,8 105:19,23
  107:22 120:9
  121:8 124:11
employee 5:22 23:1
  31:1 54:8 67:17
  96:7 97:14 118:1
  180:13
employees 7:17 13:4
  14:11 18:7 20:18
  26:20 27:5 30:17
  35:9 38:2 44:21,21
  44:25 45:4,4,6,10
  46:3 51:1,2 56:16

61:15 67:21 69:19
  70:21 76:8 93:21
  93:25 94:4,6 99:25
  101:1,4 104:21
  111:5 112:19
  119:13 120:8
  121:8 135:6,23
  154:20,21 155:10
  163:14 217:4,7
  242:4 250:17
  255:13
employer 6:11 21:19
  27:10 37:18 55:20
  87:7,11 91:14 92:4
  94:14 97:15 98:23
  211:12,12
employers 9:14,16
  9:25 20:13,15,17
  23:11,22 24:3
  26:13,18 27:7
  28:17,18,21 29:3,5
  29:16,21 30:11,23
  31:24 34:5,7 35:9
  54:22 56:13 57:7,9
  57:10 59:7 61:15
  63:17 64:18 66:25
  66:25 67:8,18 68:5
  68:14,23 69:19
  70:9,10,19,19,20
  70:21,22 71:6,12
  71:13 72:1,17
  73:16 76:14,15
  77:2,20 78:2,25
  79:2,3,13 80:1,4,6
  80:12,22 81:16
  87:3 91:20 92:23
  94:1 100:1
employment 30:6
  92:25 119:12
  135:3 136:14
  154:20 155:3
  198:4 204:5,12,13
encompassed
  104:19
endeavor 226:3
ended 185:25 186:6

268:23
ends 97:15
engage 155:21
engaged 44:2 144:8
  225:20
engagement 40:19
  40:23,24 43:6
  114:7 195:11
  203:8
engaging 118:23
engineering 249:9
  249:20
enhance 112:1
ensure 226:5
enter 79:16 156:8
entire 59:15 65:7
  221:24 227:24
entirely 43:2 51:2
entities 126:24
entitled 22:4 23:17
  25:17 90:5,15
  233:3 276:10
entity 204:16 250:4
entry 128:11
environmental
  143:8 235:19
equal 29:25 147:9
  191:8 251:22
equally 216:6
equilivant 191:6
equipment 136:1
  260:5
equitable 37:6
  266:12
equity 127:19
  162:14 235:17
  240:23 250:12
equivalent 236:23
errors 166:19,21
escalated 110:10
escalating 94:1 95:1
especially 124:24
  160:7 226:1
ESQ 2:6,7,7,8,8,9,16
  2:17,17,23 3:6,7,7
  3:8,8

essential 162:21
  163:4 201:2
essentially 20:2 28:2
  124:14,22 142:4
  144:7 192:22
  257:10 265:22
estate 105:21
estimate 181:20
estimated 12:11
  180:10
estimates 182:10
estimation 134:24
et 164:22 171:4
ethic 92:21
euphemistically
  161:2
evaluate 144:10
event 44:9 115:19
  119:13 120:4
events 116:12
eventually 134:19
everybody 267:12
evidence 31:4 36:1,7
  36:15 113:13
  116:3 167:5,9
  168:21,25 171:21
  171:25 174:9,13
  176:12,16 179:15
  179:19 182:20,24
  184:22 185:7,15
  274:16 275:3
EVIDENTIARY
  1:14
evolved 213:11
exact 243:24 269:2
exactly 31:22 153:9
  157:23 167:2
  259:13
examination 5:5
  36:18,21 41:25
  54:3 63:2 78:5
  85:10 97:22
  100:22 101:22
  104:3 124:8
  138:16 185:8,11
  185:20 195:20

222:13 225:15
  235:21 256:19
  260:20 267:23
examine 51:16
  114:3 115:1
  131:13 226:23
examined 4:10
  103:24 115:16
  124:5 260:18
  267:19
examining 130:5
example 19:14,17,18
  19:19,25 24:15
  30:3 32:18 45:23
  46:9 79:15 80:3
  91:16 115:19
  147:23 157:1
  191:4 198:4
  220:19 228:22
  241:9 249:8
examples 33:3,4
  129:7
exams 39:7 40:8
Excel 113:20,23
  148:11 154:19,19
  155:2,5,9,16,20
  156:2,3,9,14,23
  157:3,3,10,20
  178:2,3,4 195:20
  195:24 196:1,5,22
  197:1,2,4,5,6,9,20
  197:23 198:9,15
  199:14,17,20
  200:23,23 201:4,6
exception 225:24
excerpts 21:13
  153:23
excess 111:20
exchange 85:17
  145:3
excisement 116:1
exclude 193:7
excluded 68:22
  70:22 237:5
excludes 71:13
excluding 245:1

exclusively 70:8
excuse 34:12 105:4
excused 103:17
  122:25 259:25
executive 34:24
  65:14,21,23,24
  66:23 67:12 68:4
  69:10 71:19 76:12
  76:13 77:11
exercise 144:8,9
  157:5 241:18,19
exhibit 4:14,17,17
  4:22 6:17 11:4
  12:16 15:5,20
  17:18,20 20:8
  21:11 22:2 23:16
  23:19,20 25:16,17
  32:3,14,15 33:10
  34:22,23 35:13
  49:6 57:20 58:11
  58:19,20 62:4 68:2
  93:15 96:14 98:7
  99:4 112:4,12
  113:1,6,7,12 116:2
  127:22 128:2
  129:3,4,9 158:14
  159:16,20,25
  160:1,16 167:11
  167:15,21 168:7
  168:20,24 169:2,8
  171:21,24 172:2
  172:22 174:9,12
  174:17,19 175:23
  176:8,12,15,18,22
  179:12,15,18,22
  179:22 182:20,23
  183:1,11,24
  184:19,22 185:7
  186:1,13,14
  188:18,19 189:2
  202:1,10 210:11
  230:8 231:5,18,22
  231:23 233:3
  236:24
exhibits 11:6 35:21
  36:6,9,14 63:7,11

99:6 167:4,8
  185:14 233:25
exist 225:11
existence 147:6
  150:17 151:5,9
  153:10 200:13
  225:17
existing 31:9 34:9
exists 227:3
exit 251:7
exiting 205:9
expanded 54:16
expect 13:20 25:9
  46:21 80:5,6,14,15
  97:11,13 135:9
  143:22 182:11
expectations 35:9
expected 25:8 50:15
  97:23 161:21
  186:24 192:3
  255:7
expedite 159:7
expeditious 215:10
expeditiously 251:8
expense 30:22 47:6
  47:9,19 48:25
  49:19 50:21,21
  51:19,22,24,25
  52:2,4,6 53:16
  139:23 236:3
  240:14,15
expenses 138:6,8
  139:12,13,19
  255:11 258:4
expensive 84:1
experience 9:16
  19:8 30:1 31:24
  38:20 54:14,24
  55:10,25 57:4 59:6
  59:17,21 60:1,6,21
  81:8,10,11,13,16
  81:19,21,25
  109:19 127:14,18
  132:2 145:5
  161:17,18 162:9
  162:13

**expert** 6:20 7:5,8
39:22 41:16,16
57:5 84:25 90:10
90:12 113:18
125:2 127:23
129:19,24 133:5,9
134:3 137:1,5,6,11
138:15 139:7
154:7 164:5 185:6
195:3,7,11 196:2
203:2 226:18
238:16
**expertise** 5:21 48:14
131:22 195:13
230:16
**experts** 78:24
168:16
**expired** 211:3 212:5
**explain** 51:15 160:2
180:4 181:15
182:7 200:4
**explanation** 173:15
181:19 198:14,18
208:11
**explanatory** 161:12
**explode** 264:4
**exploration** 256:9
**explore** 115:11
**exposed** 45:19
196:13
**exposure** 18:6 45:14
46:12,15 106:5
**express** 237:21
245:15
**expressed** 27:22,23
28:14 32:17,23
85:7,8,18 204:17
235:9
**expresses** 252:11
**expressly** 68:22
**extended** 195:19
**extent** 9:14,25 19:12
35:19 59:14 76:5
88:10 91:4 139:20
151:1 166:1,3
184:2 188:8 194:6

194:17,18 195:13
221:3 242:17
**extra** 265:25 266:9
266:17
**extract** 64:14
**extrapolate** 59:14
**eye** 264:3,21
**eyed** 265:11
**eyes** 151:9,12 152:18
264:2,8,11,18,20
**e-mail** 63:4 159:22
160:4,5 167:17,18
167:18,25 168:1,3
168:9,12 177:10
178:8,8,11,12,14
179:6,9,23 183:18
183:22 184:25
185:3 189:2
**e-mails** 160:1
176:24 188:20
200:10

---

### F

**F** 1:17 2:8 103:22
124:1 276:1
**face** 54:22 264:5
273:2
**faced** 25:5
**faces** 229:6
**facilitated** 28:18
30:24
**facilities** 16:11,12
112:19 117:23
118:22 120:4
134:11,14,17
135:25 136:4,8,9
149:14 205:4
213:19 214:5
219:8
**facility** 118:7 136:1
164:20 171:2
191:8,9 212:23
214:13 215:3,5
216:22 217:2
**facing** 228:9
**fact** 10:24 18:18

23:4,10 29:2 44:7
45:3,7 46:23 50:14
51:18 54:2 57:19
67:18 69:1 84:25
97:20 102:8
158:24 176:3
187:16 189:7
199:18 207:4
215:11 217:10
219:17 235:24
241:11
**factor** 51:21,22
80:25 96:17
**factors** 50:14 80:25
140:9,22
**facts** 145:8,9,10,11
162:22,23 216:4,5
**failed** 192:12 204:23
**fair** 47:15 53:6,10
55:1 60:6,10 71:11
80:18 91:11 93:7
108:8 136:6 175:1
266:12 272:17
**fairly** 44:17 46:21
134:12,17 163:1
178:5 182:16
**faith** 201:13,15
**fall** 95:10 116:17
213:22,25
**familiar** 31:14 48:9
98:24,25 111:13
112:9 117:14
145:16 149:21
196:1,3,5 259:2,3
**familiarity** 116:11
258:24 259:1
**family** 61:14
**far** 85:19 92:23
227:10 252:21
255:3 258:13,14
258:18 264:15,16
**faring** 242:9
**FAS** 26:22 47:6,18
48:5,23 49:19
50:21 52:6
**FASB** 23:12 26:13

**favorable** 246:10
**fax** 169:10
**feature** 29:23,24
102:17
**February** 113:8
121:15 133:4
153:8,12 177:9
189:1,17 196:20
197:21 207:20,20
207:23 208:4,4
**Federal** 225:2
**fee** 203:13,17,22
**feel** 270:19 272:16
**fell** 188:8 270:12
**fellow** 39:7 118:13
**festa** 40:6
**fewer** 70:21 135:4
**field** 6:1 131:22
132:18
**Fields-Jacobs** 109:6
117:6
**fifth** 97:10
**figure** 21:25 35:6,7
35:8 45:24 47:21
53:12 58:25 63:17
72:23 77:17 80:10
101:11 165:3
214:21 221:2
**figures** 15:25 35:12
47:2 64:15 114:6
**figuring** 165:2
**file** 154:18,19 155:2
155:9,15,16,16,24
156:1,2,3,9,12,14
156:14 176:2
178:6 184:9
195:24 196:17,17
197:1,2,4 198:15
199:17
**filed** 6:21 110:12
171:18 175:18
**files** 113:19,23,23,25
154:1,4 155:18
195:20 196:1,5,21
197:9,20,22
199:13,14 200:23

200:24 201:7
**final** 93:13 100:20
160:11 197:13
**finally** 130:20
165:16 174:3
268:24
**finance** 125:12
**financial** 8:13 12:12
17:2,3,9 21:1,9
28:1,5 30:14 32:23
56:16 60:7,21 64:5
64:20 66:7,11,15
66:17 81:1 82:2,4
82:6 124:14,22
125:19,23 126:6
129:8,14 138:3
145:6 148:2
150:22 151:2
162:10 202:23
203:7 205:8
211:12
**financially** 60:23
**financing** 96:25
129:25 205:9
**find** 14:16 21:25
64:11 85:11,12
137:5
**finding** 222:23
**findings** 33:18 62:10
67:25 134:8
154:13
**finds** 23:18 176:9
183:2
**fine** 35:11 36:3
103:21 123:7
188:13 215:23
249:3
**finish** 51:12 194:13
249:25
**finished** 267:7,8
**fires** 171:13
**firm** 5:10 22:6 34:11
34:14,15 44:8
77:20 81:24 98:3
98:15 126:5,20
192:1 203:7 210:2

210:3 215:11
**firms** 7:20,22 22:5
22:17 23:25 24:2
25:18,22,22 72:10
**firm's** 203:6
**first** 4:9 10:17 11:6
15:24 18:13 28:24
40:22 54:6,10
58:13 69:9 72:17
77:16 78:11 85:12
92:20 93:24 94:11
95:13 103:23
106:5 112:18
124:4 129:10
130:4 159:8 165:2
165:11 166:21
168:8 169:12
171:13 172:12
173:14 177:9
178:20 180:9,17
190:9 195:23
196:12 208:15
214:2 234:14
246:15 260:17
261:22 267:18
268:9,15
**fit** 31:24 166:15
181:1
**five** 17:19 47:22
53:21 60:20 89:7
101:19 123:8
130:16 135:5
140:17,25 143:19
161:11,16,18
162:3,8,11,16,19
163:5 178:20
185:16 205:19,22
205:25 206:2,8,12
206:25 207:19
212:11,12 218:24
219:1 233:23
236:15 238:5
242:13 244:18,21
245:17 246:20
**fixed** 149:5,18
**flagged** 226:13

**flavor** 23:7
**flip** 58:2 72:6 76:12
**floor** 100:15
**floors** 262:9
**flow** 138:12 143:11
144:17,22,25
149:21 193:8,14
216:14 234:17
235:16 255:2
**flowing** 251:3
**focus** 41:22 44:23
152:24 169:16
173:14 179:21
**focused** 34:3 70:8
109:16 201:20
**focusing** 146:24
**folks** 209:25 215:13
**follow** 11:13 45:23
193:1
**followed** 221:20
**following** 27:24 63:6
**follows** 4:11 103:25
124:5 260:19
267:20
**followup** 179:4,11
181:4 184:13,25
187:15 188:9
191:4,13,14
**food** 266:16
**fool** 265:13
**footnote** 50:13
**footprint** 134:6,9
136:20,21 142:7,9
149:11 160:25
161:2 169:20
212:22 213:11
255:6
**footprints** 256:10
**force** 64:19 65:3,7,7
107:16
**Ford** 7:6 82:5
262:17 264:5
**foreclose** 28:5
**foreign** 236:4
**foreseeable** 95:2
**forgot** 264:7

**form** 9:22 34:11
74:4 75:25 89:4
91:3 136:11
**forma** 148:23
**format** 154:19 155:2
156:7,20,23
157:21 178:2
198:9,21,23 201:7
**former** 185:13
**forms** 228:16
**formulas** 157:6
196:8
**Fort** 135:2,8,19,20
191:7 215:19,21
216:20 217:1,10
217:19 218:1
**forth** 105:7 110:10
121:22 216:4
268:20
**forward** 8:24 142:7
143:10 147:11
227:2 236:7
245:14
**forwarded** 158:21
158:24 177:13
**Foster** 103:19 104:4
112:10 113:24
114:18 115:4,8
116:6 118:1
210:24 274:8
**found** 179:12 197:25
222:24
**foundation** 9:23
21:20 61:14
114:15 115:12
152:23 157:19
162:22 204:16
**four** 32:16 58:21
59:4 163:5 172:25
219:1 223:6
242:25 243:12,21
244:20,24 245:11
262:20
**fourth** 134:21
**frame** 153:13
161:19 165:22

166:11
**frames** 262:16,22,25
    268:18
**FRANKEL** 2:13
**frankly** 230:16
**free** 194:9
**freezes** 111:25
**frequently** 30:9
**fresh** 48:10,15 49:3
    51:2,17 52:1 53:9
**Friday** 187:3,6
    207:24
**front** 23:16 128:7,8
**frozen** 97:14
**full** 54:11 65:17,19
    65:22 101:24
    105:13 181:12
    182:11 190:10
    207:13 258:23
**fully** 141:5 178:23
    194:18 196:1
    198:6 242:2 259:3
    259:10,11,14
**function** 155:6
**functions** 197:5
**fund** 102:13 126:22
    139:14,15,24
    240:14,14,14
**fundamental** 170:24
    171:6 178:25
    224:22
**Fundamentally**
    139:1 164:24
**funded** 103:3 139:19
    139:20
**funding** 28:19 31:1
    31:21 75:8
**funds** 8:5
**furnace** 105:23
    106:9,24 107:1,5
**furnaces** 107:2
**further** 15:4 26:5
    36:16 67:19
    101:14 112:24
    164:13 222:9
    225:16 238:25

256:11 259:23
266:21,24 273:5
    276:12
**fuse** 270:3
**fused** 270:4
**future** 13:5,7 14:1
    17:7 18:6 31:20
    33:20,20 35:9
    45:19 46:18 47:16
    67:13,16,20 68:6
    78:3 83:3 95:2,10
    96:25 99:22 134:7
    213:20 218:20,25
    223:24 232:24
    255:8

### G

**G** 4:1 103:22 173:19
    260:16 267:17
**gained** 198:24
    199:10
**gaining** 249:19
**gap** 173:20
**gaps** 184:2
**garage** 263:10
**gas** 126:4
**Gasby** 58:11
**gears** 210:10
**geered** 58:16
**Geisel** 78:17
**Gemini** 97:3
**general** 26:22 82:5
    96:2 131:22 132:3
    133:13 145:2
    207:9
**generalizations**
    229:2
**generalize** 228:20
**generally** 13:18
    29:15,25 48:8
    56:20 104:23
    125:15 161:19
    206:6,7 248:16
**generate** 142:10
    184:15 195:11
    209:13 235:25

255:2
**generated** 142:19
**generates** 139:14
**generation** 92:24
**gentleman** 81:13
    163:24
**gentlemen** 115:19
**geographical** 109:13
**geography** 155:1,11
**Gerardo** 191:9
**Gerold** 93:19 265:16
**getting** 82:10 89:12
    89:18,25 91:24
    98:22 141:6,22
    155:20 160:8
    162:22,22 163:3
    189:23 207:9
    226:20 237:19
    241:15 249:13
    264:13 269:9
**Gibson** 260:15,23
    263:19 264:12
    265:1,20 266:20
    266:23 274:10
**give** 7:14 8:1 19:19
    23:7 47:25 53:14
    79:1 86:23 110:13
    129:6 197:8
    199:20 201:3
    206:24 215:11
    238:16,17,19
    240:3,5 245:24
    254:7 260:24
    264:9 270:21
**given** 16:4 24:13
    38:5 41:20 94:24
    100:4 103:1
    109:13 150:2,6
    193:25 197:16
    200:7,8 201:4
    255:4
**gives** 60:1 71:21
**giving** 38:7 86:4
    111:24 164:2
    227:5
**glaucoma** 264:3,10

**global** 53:25 54:14
    55:2 56:8,13
**globally** 56:5
**GM** 7:4 31:3,8 82:7
    82:9 102:8,9,12,18
    102:20,23
**go** 5:4 10:9,16 12:4
    15:4,6,22,24 16:1
    18:11 20:8 23:15
    25:10,17 26:14
    32:3 33:10 34:8
    41:24,25 44:14
    49:17 58:17,20
    61:10 62:3 63:15
    65:8 67:12 68:9
    70:3,17 71:1,16
    76:23,24 77:10
    78:4,12 79:9,25
    89:3 100:20 108:5
    124:7 128:5 132:2
    137:6,11 141:25
    155:24 164:13
    165:13 173:5
    177:2,7 191:22
    201:25 202:5
    215:6 227:10
    243:18 250:11
    265:6 267:2 273:2
**goes** 82:15 138:15
    163:6 165:14
    214:18 217:12
    250:12
**going** 8:23 11:25
    12:3 13:19 20:9,22
    21:4 25:19 27:18
    28:8 32:4 39:18
    47:19 58:12,25
    64:4 73:10,19
    74:17 75:15,22,25
    77:8 78:10 80:12
    80:17 88:24 89:3
    90:13 92:19 98:2,9
    99:19 100:3
    114:12 115:15
    119:16 122:5,19
    122:20 128:20

131:7 135:1
140:22 165:4
198:8 201:11
204:7 206:14
207:13 211:2,4
213:25 214:9,22
216:3,11 217:1
218:24 219:2
225:12,16 226:23
227:1,21 229:25
232:21 233:6,11
236:7 245:14
249:17 254:20
256:23 258:13,19
258:24 265:10
266:2,15,18
268:25 270:3,19
272:9,21,23
**good** 4:2,3,4,5 52:3
82:19 104:4,5
156:21 185:21,22
239:16,21 260:10
272:19
**gotten** 200:2,23
**government** 22:17
23:11 24:18 28:16
28:19,23 70:21
263:12
**governments** 24:9
24:11 25:9
**government's** 22:24
23:4 24:23 29:4
**gradually** 83:4
**grandfathered**
12:15,15,17,19
13:6,7,13,13,16
**grants** 119:14 120:4
**granularity** 207:8
**graph** 25:23
**great** 81:1
**Green** 1:10
**grievance** 105:1
110:3
**grinder** 156:18,18
199:14
**grinding** 269:5

270:1
**group** 13:13,14,16
13:18,18,20,22
23:21 72:25 76:17
91:22,23 92:1,2
93:22 96:15 97:3
155:6,6,9 164:20
171:3
**grouped** 155:9
**grouping** 196:7
**groups** 12:24 13:15
190:7,8
**grow** 261:5
**growing** 228:8
229:13,15
**growth** 10:22 12:20
17:5 30:13 83:3
**Guanatra** 199:4
200:3,6,10,13
**guardian** 225:15
**guess** 28:8 61:7
81:12 174:25
181:1 192:10
241:19
**guessing** 213:24
214:1
**guidance** 151:2
**guy** 99:10 262:15
268:17

---

**H**

**H** 174:4 260:16
274:14 275:1
**Haines** 99:10,14,20
99:23
**half** 107:6 123:6,8
125:25 171:17
208:2,13,15
239:20,21,22
240:4,8
**halfway** 78:20
**hall** 246:3
**Hamilton** 2:9 4:21
4:24 5:2,4 7:9 9:18
9:23 11:9,15,18
36:2,10,12,17,21

36:22 39:18,25
43:15 51:13 58:7,9
58:16 61:7,9 73:22
74:1,6,7,19 75:2
85:22,25 91:10,24
93:13 98:2,15,18
99:5 100:10,17
101:14 103:15
113:14,16 114:10
114:20,23,24
115:12 119:16,22
122:4,7,18,23
**hand** 113:22 158:24
220:6 229:23
269:8 270:13
276:17
**handed** 22:3 230:6
240:17 270:14
**handing** 36:20 129:1
**handle** 217:21
**handling** 136:2
269:11
**hands** 249:16
**Hang** 35:6
**happen** 136:17
241:25 272:9
**happened** 107:19
192:8,13 256:21
**happens** 75:21
119:12 120:3,6
237:2 241:8
**happy** 85:1,3 114:15
115:7
**hard** 78:2 224:25
272:18
**harder** 30:22
**harmful** 115:18
**hat** 130:6
**hate** 115:3 168:3
**HDHP's** 94:14
**head** 13:1,3 58:12
64:22 65:2 151:17
226:19,25
**heading** 70:18 77:12
92:20 95:14
**heads** 190:6,8

**health** 5:23 7:6,17
8:8,16 9:17 10:18
12:14 19:20 21:19
21:20 22:5 23:1,5
23:13 25:10,18,23
28:19,22 29:17
30:4 34:4 45:10
55:20,23 62:12
68:23 69:20 70:9
72:13 74:14 75:5
79:14,15 91:20
93:25 94:3,25 95:1
96:3,15,18,20,23
96:24 252:16
263:25 271:21
272:14
**healthcare** 10:2,11
10:12 11:2 14:23
17:6 18:5 30:25
54:24 55:13 59:8
64:19 73:11 80:24
83:22 94:1,4,5,7
95:14,19 96:3,25
102:21 164:21
171:3 264:14
266:16
**healthy** 60:24
**hear** 132:8 145:25
263:4
**heard** 131:23 132:17
222:14 231:9
**hearing** 1:14 121:24
122:1 176:7
178:21 187:4
215:15 230:1
257:18 259:16
**hearings** 105:1,2
110:3 129:16
257:2,4,21,23
**hearsay** 113:18
114:11,20,21
115:2,13
**heat** 106:25
**heating** 136:2
**heavily** 125:20
228:24

**heavy** 143:6 263:21
268:23,25 269:3,8
**held** 108:12 126:22
192:15 193:8
257:2,4
**help** 8:16,22 9:2,10
9:14 10:2,7,10
15:10 19:17,18
30:25 54:15 112:1
188:14 195:12
251:6 265:9
**helped** 266:25 267:1
**helpful** 147:19,20
198:7 251:17
**helping** 31:25 262:9
**Henderson** 135:18
136:12,14,17
218:15,17,20
**Henry** 260:23
274:10
**hereunto** 276:16
**hesitate** 201:18
**Hewlett** 70:8 78:24
**hidden** 196:8
**hiding** 225:20
**high** 22:24 105:16
105:17 117:4
120:24 214:4
**higher** 19:13,13 45:5
57:6,8 73:10
207:16 244:25
245:2,3,8
**highest** 189:23
245:6,23
**highjacked** 258:2
**highlight** 26:24
**highlighting** 141:3
**highly** 164:5 226:9
227:10
**Hills** 135:12 136:10
264:6
**hinting** 45:13
**hip** 263:21,22
**hips** 263:20
**hire** 273:1
**hired** 106:9 261:19

263:8
**historical** 111:18
257:16
**history** 111:14,17
125:14
**Hoc** 2:21
**Hock** 3:8 260:2,10
260:11,20 266:10
266:20,23 267:8
267:13,21,23
273:4,9
**hockey** 214:21
**Hoffman** 18:12,21
51:5
**Hoffmann** 17:23
19:4 50:8
**Hoffman's** 18:8 47:8
**Holders** 2:21
**holding** 58:12
249:16
**holds** 222:12
**holiday** 271:6
**home** 108:4,5
236:12 265:10
**HON** 1:18
**Honor** 4:2,12 7:7,9
7:11 9:18,19 11:18
15:10 35:18,19
36:17 39:16,19
58:6,17 61:5 64:1
74:16 75:2 84:22
85:10,11,15 86:1
90:24 97:19 100:3
101:15,16 103:15
103:18 104:1
112:4,6,8 113:10
113:11,16 114:14
115:7,13 116:4
122:4,12,18 123:2
124:6 128:10
129:23 130:2
131:18 132:2,7,10
132:20 136:25
137:7 138:14
139:2,4 141:11,18
152:23 158:16

163:19 167:3,6
168:21,22 171:20
171:22 174:8
175:21 176:11
179:14 182:19
183:6 184:21
185:5 186:16
188:11,16,24
202:9 215:9,24
216:12 220:7
221:23 222:2,17
224:9,18 225:12
225:18,22 226:9
226:11,14 227:8
229:24 233:7
249:24 253:5
256:13,17 258:21
258:25 259:22
260:1,7,10,13
273:6,8
**Honor's** 131:5
**hope** 85:9 266:25
267:1
**hoping** 184:14
**horizon** 161:21
**horizontal** 232:5
**horrible** 212:8
**Hospital** 264:5
**hour** 123:6,8 207:25
208:2,13,15,18
269:16
**hourly** 45:4 135:3,6
135:23
**hourly's** 101:4
**hours** 97:20 270:25
**house** 1:10 272:6
**houses** 135:23
**HR** 151:17
**HSA's** 95:2
**huge** 50:20,25
208:14
**hull** 19:21
**hum** 46:1 50:17
266:7
**hundred** 45:24
53:16 72:12 82:10

83:17 246:19,23
269:7 271:16,24
**hundreds** 248:5
**hung** 262:16
**hurt** 270:21
**hyphened** 76:14

---

## I

**ID** 200:8
**idea** 8:2 47:25 57:24
66:9 94:3,9
**identical** 200:18
**identified** 5:15 99:9
141:4 242:23
243:10
**identifies** 99:14
173:12
**identify** 5:8 11:7,22
16:21 21:12,12
34:10,13,23,23
134:24 159:20
183:11 184:2
**identifying** 127:18
**idle** 219:5
**IDs** 199:22
**ill** 96:1
**IM** 255:21
**imagine** 95:25
**immediate** 213:14
213:16,17 214:15
214:15
**immediately** 176:6
218:4,5
**impact** 8:25 9:1 16:9
17:7 26:22 27:9
29:19 30:8,11,14
30:16 47:1 48:18
48:23,25 49:1 52:1
83:12 143:11
149:10 226:2
241:13
**impacted** 22:25
**impacting** 83:4
**impacts** 54:21
**impasse** 257:9,9,19
**impeach** 226:1,8

implementation 218:1
implemented 10:25 11:1 16:15 29:21 242:2
implementing 28:15
implicate 84:20
important 96:17 153:18 224:20 253:10 255:24 256:3
imposed 44:19
imposing 10:21 82:21
impossible 155:23
impressions 238:17 238:24
improper 138:23 164:5
improve 140:10 249:7,8,9,10,17
improved 255:2
improvement 207:6
improvements 206:14,18 207:14 251:11 254:21
improving 249:12
inabilities 115:17
inadmissible 113:18
inapplicability 152:16
inappropriate 85:6 226:10
include 80:9 87:17 104:25 144:5 148:15 166:18
included 22:24 23:22 24:2 27:15 29:20 47:2 61:25 70:23 87:23 88:7,8 88:12,13 106:25 113:5 144:19 151:12 187:16 205:14
includes 49:13,15 110:23 150:25

181:3 245:4
including 23:21 68:13 71:5 187:13 187:18 193:21 246:8 257:14
inclusive 161:16
income 30:23 31:10 31:12 89:25 90:3,4 90:13,21 92:7 93:10 265:25 266:9 270:16 271:9 272:24
incomplete 74:23 146:14 173:8,13
incorporate 140:18
Incorporated 118:7
incorrect 72:24 74:22 200:21
incorrectly 100:9
increase 16:14,15 26:24 69:21 82:22 96:20 248:19 254:24
increased 45:14 46:13 67:17 72:18 110:13 248:21
increases 77:21 98:4 142:1,3
increasing 73:1,17
incremental 241:11
incurred 46:2
incurs 19:16
Index 1:5
India 54:23 55:14 56:25
Indiana 135:13
indicate 42:7 77:7 96:16 112:22 135:15 169:22 173:22 175:13 217:10 227:15
indicated 20:17 61:14 77:7 117:21 188:9 191:7 197:4 212:21 255:15
indicates 47:8 50:13

71:24 72:3
indicating 63:5 160:5 168:17 173:20
indication 21:4 35:24 71:21 80:13 193:11,12
indicator 183:5,7
indirect 154:20 155:3
indirectly 126:4
individual 5:15,17 31:10 91:4 99:2
individuals 31:11 86:14 87:18
industries 24:13,17
industry 22:6 24:18 54:17 57:8 64:24 96:4 109:17 112:2 143:6 227:22,24 227:24 231:12 233:8 253:25
inferences 225:19
inflation 17:4,7 18:6 19:12 30:16 45:15 45:19 46:9,13,16 46:18,20
influence 24:11 136:22
inform 168:14
information 21:3 23:18,21,25 24:6,7 41:1,12 42:13,18 43:9,18,22 47:7 60:5 81:23 103:2 105:6 114:5 133:10,16,18,23 133:24 134:16 137:2,4 144:17,22 144:25 145:4,18 146:10,20,23 147:2 148:5,6 149:4,19,20 150:15 154:5 155:12 156:2,4,19 157:12,15 158:2,8

158:11,20 159:5 159:10,25 160:6 160:22 161:12,16 163:5 164:17,23 165:17 166:7,8,24 168:12 169:13,23 170:15,22,24 172:4 173:2,23 174:2,6 175:9,10 177:4,21,24,25 178:2,25 181:4,4,5 184:4,9 187:21,24 188:4,6 191:19 193:6,7,14,16,17 193:18,19 195:15 197:6,9,25 198:9 198:14,15,21,23 199:20 200:2 201:1,2,19 207:18 209:13,18 219:10 219:14,18 220:24 220:24 221:4 223:3,24,25 224:4 225:21 226:5,20 226:21,25 227:3,3 227:5 230:14 231:12,18 232:9 233:4 238:23 249:7 256:9 257:6 257:6,20 258:1
informational 192:16
informed 245:17
informing 229:1
Informs 94:23
Ingersoll 37:13
initial 20:8 33:9 66:12 158:20 173:1,8 175:9
initially 27:24 42:8 151:17 171:12 187:12
initiative 147:24 207:6
initiatives 116:7 140:22 141:4,7,8

146:19 147:8
241:7 242:2 248:8
248:9,10,13
**inject** 115:3
**inquire** 84:15 85:23
**inquiries** 111:18
151:7
**inquiry** 138:21
**insisted** 207:7,9
257:13,15
**inspections** 107:1
**instance** 33:1 56:18
170:2
**instances** 10:16,19
**instructed** 41:12,21
221:19 222:4
224:16
**instructing** 84:18
**instruction** 131:23
221:24
**instructions** 221:20
**insufficiency** 152:16
**insurable** 84:5 86:8
**insurance** 72:13
74:14 75:5 78:17
83:22 84:14,20
86:15,17,23 87:3,7
87:10 91:18 92:4
96:3,15 97:15
125:25 126:1
271:21 272:3,10
**insurer** 96:20
**insurers** 79:15,20
**integrity** 225:23
227:11
**intend** 67:10 92:21
93:2 119:20
131:13 146:23
**intended** 34:3
**intends** 214:12
**intense** 228:2
**interest** 29:4 51:25
94:4 138:2,6
139:15,15,23
140:1 236:3,3,5
237:24 238:6

240:14,15
**interested** 56:14
92:19 100:8 160:7
215:15 252:1,2,4
276:14
**interesting** 71:18
78:11
**interject** 201:11
**intermediate** 214:16
271:2
**internal** 20:25
136:18 228:24
**international** 104:7
104:10,24 105:12
105:13 108:24
109:11 111:10
163:11
**interplay** 90:7
**interpret** 23:24
**interrupt** 168:4
**interrupting** 215:23
**intricate** 91:1
**invest** 240:1,10
**investment** 209:25
250:13
**investments** 126:2
126:22 204:24
240:10 241:12
**investor** 240:23
**investors** 250:16
**invitation** 253:7
**involved** 8:11
109:20,22,23,25
110:1,2,3,5,15,18
111:11 117:25
118:6,8,9 121:1,11
121:20 129:11,11
129:21 133:2
144:9 259:15
**involvement** 258:15
**involving** 115:22
257:20
**in-between** 271:5
**IPS** 104:14 109:10
**irreversible** 264:3
**Isaacson** 109:9

**issue** 86:2 115:21
130:16 131:6
140:19 152:7
153:1,5 184:6
225:10 226:13,14
227:12 233:7
**issues** 84:13 98:14
98:17 110:1 119:6
119:10 130:11
152:20 159:13
168:18 211:14,17
211:21 226:23
227:10
**item** 50:15 169:25
170:22 172:2
173:19 177:25
180:20 181:3
184:25
**items** 160:8 179:22
185:1
**i.e** 164:21 171:3

___

**J**

**janitor** 262:9
**January** 40:19
120:13 133:4
169:9 171:8,8,11
172:25 173:7
174:21,23,25
175:5,8,12 191:24
192:8 195:3
**Jay** 185:23
**JAYANT** 2:6
**Jeffrey** 47:7
**Jerry** 78:16
**Jim** 177:19
**JIMENEZ** 2:7
**job** 87:4 92:7 126:1
204:15,15 215:23
261:22 262:14,21
262:25 263:6
265:19 268:9,15
268:24 269:13,25
270:14,21 271:8
272:21,24 273:2
**jobs** 133:20 262:1,8

262:11 263:8,9
268:22
**Johnson** 118:6,8
**Jones** 2:3 36:23
150:8 151:4 158:6
175:25 183:14
**journey** 262:3
**journeyman** 263:11
**judge** 1:19 47:25
73:7,7 74:1 91:25
92:19 93:14 98:11
98:15 100:11,17
122:17 230:20
258:11,23
**judgment** 213:21
252:19
**judicial** 256:8,9
**July** 213:7,11,12
214:1
**jumbo** 63:17
**Jury** 199:8

___

**K**

**K** 124:3
**Kaiser** 20:16 21:11
21:13,17,18,19
22:18 28:20 33:24
61:14,22,23 63:10
68:13,18 70:8 71:5
76:9 78:22,24 79:4
91:16 129:19
**kaleidoscope** 96:2
**keep** 8:23 76:23
188:15 198:13
214:9 265:11
**Keilin** 126:6,8,19
129:14
**Kentucky** 135:18
**kept** 68:14 71:7 77:3
200:13 224:19
268:25
**key** 80:25 94:25
192:16 193:6,20
201:2 228:1,23
**kids** 270:21
**kind** 45:12 71:18

107:13 119:9
154:12 162:25
181:19 234:25
239:12,14 246:19
252:15 268:22
**kinds** 8:9 85:5 136:4
145:6 228:21
**King** 108:25 109:1,8
117:5
**King's** 109:7
**Kizon** 142:25
**knew** 120:24 196:15
196:17
**know** 9:25 10:25
15:15,16 17:12
21:6,7,21 45:7,11
49:12 56:22 57:24
64:21 65:1 66:2,4
66:5,12,19 73:20
75:14,17,18 77:20
80:12,16 82:17
90:8,20,23 92:19
100:15 101:23
102:12 117:15
120:9,19 122:5
126:15 131:23
144:11,12 146:2
152:20 154:4
158:2,19 161:21
164:25 165:1
167:16 170:18
183:20 189:10
194:8,16,17,18
196:10 198:22
200:10 201:3
207:3,4 209:20,20
213:3,13 215:25
224:14 230:16
233:20,21 234:15
234:19 235:19
240:8,9 241:9
242:1,13 247:1
250:2 252:18,21
252:23,25 255:3
256:23 261:4
262:4,16,17 263:6

264:4,16,22 265:8
265:18,18 266:19
268:19 272:5,7,8,9
272:10,20,23,24
**knowledge** 54:15
90:25 115:5,9
117:10 149:25
150:12 215:14
251:10 256:21
**knowledgeable**
111:4,8
**known** 79:15 216:4
**knows** 9:20 84:8
216:5
**KRAMER** 2:13

---

## L

**L** 103:22 124:3
**labeled** 11:5 12:4,11
209:21
**labor** 124:15,23
126:7,25 148:7
149:25 152:12
153:15 154:12
155:14 164:9,11
164:20 171:2
185:2 191:6
196:16 197:22
198:1,3 199:23
200:7,17 204:5
205:18 211:16
220:21 223:3
224:23 225:1,3
233:13 237:3
257:10,13,17
**lack** 24:22 112:15
142:7 258:1
**laid** 268:19
**Lakeside** 2:10
**Lane** 2:22
**large** 5:9 21:18
25:22,22 28:21
38:2 44:7 51:21,25
57:6 59:7 64:15
68:14 70:8,22 71:6
71:12,13 76:8 77:2

81:24 136:1 262:4
263:12
**largely** 124:15,23
125:20
**larger** 11:12 14:15
77:6 100:14 142:2
153:23,24 166:15
**largest** 7:21 34:16
72:11 76:17
**lasting** 136:4
**late** 106:14 110:18
119:3 178:18
189:8 208:17
**LAVAN** 2:20
**law** 91:4
**lawyer** 164:10
183:13 199:6
**lawyers** 63:5 152:21
168:16 177:12
185:23 224:23,24
**laying** 263:7
**layoff** 163:15
**layoffs** 268:19
**lead** 51:22
**leader** 107:10,12,13
107:15
**leadership** 163:10
**leap** 201:13,15
**learned** 111:19,22
161:17 197:24
**leave** 107:25 134:24
236:2 261:9,12,14
**leaves** 226:22 236:3
236:4
**leaving** 76:14
**left** 32:19 66:12
87:19 100:15
126:19 194:9
261:13 263:22
270:5
**leftover** 240:13
**leg** 270:19
**legacy** 138:6 139:12
140:2 257:14
**legal** 152:20
**legitimate** 85:19

**lenders** 250:18
**lending** 126:1
162:15
**length** 115:5
**lengthy** 44:17
**lens** 264:8
**Leon** 124:10 274:9
**lessen** 131:25
**letter** 16:23 113:7,9
169:9 171:9 172:6
172:24 173:6,10
174:20,21,22,24
175:1,3,5,8,12,25
176:2 183:13,16
183:18,25 184:1
186:5,9,17,18,22
186:23 187:9,11
187:12,13,14,15
187:16,17,25
**letters** 187:16
**let's** 5:4 10:9,24 15:3
16:1 19:20 20:8
21:15 23:14 41:24
44:14 45:21 49:4
58:20 61:10 62:3
65:8 68:9 71:16
76:23,24 77:10
78:4,12 79:9,25
83:21 87:13
100:20 101:19
137:13 156:18
164:12 185:25
191:22 197:19
201:25,25 206:12
211:23 215:6,19
222:20 227:20
238:25 243:12,18
247:13 248:7
249:10 254:11
**level** 31:9,12 45:5
55:6 56:14 67:17
117:4 120:25
144:12 155:22
163:11,11 206:14
236:6 250:25
**levels** 189:24

**leverage** 82:20,20,25
  83:2 126:3
**LEVIN** 2:13
**Levine** 3:8 75:25
  84:22 103:18
  104:1,3 112:6
  113:11,15 114:9
  114:14,22 115:3
  115:21 116:4,5
  119:19,23 120:1
  122:6,12,13,22
  123:2,7 124:6,8,19
  128:4,10,15,18,23
  129:2,23 131:9,19
  132:1,5,10,14,19
  132:21 137:6,10
  137:12 138:25
  139:3 141:12,19
  158:16 163:21
  164:8,14 167:3,10
  168:20 169:1
  171:20 172:1
  174:8,14 176:11
  176:17,21 179:14
  179:20 182:19,25
  183:6,8,10 184:21
  185:5 186:16
  188:7,11,15,24
  201:8 202:9,12,15
  215:23 216:11,17
  221:23 222:6,11
  222:16 224:9,14
  224:18 225:5,9,12
  225:18 227:13,17
  233:6,14 237:15
  238:20 249:5,24
  253:7 256:13,17
  256:19 258:21
  259:21,22 260:1,7
  267:7
**liabilities** 8:13,21,23
  9:9,11 10:3,8,11
  12:14,16 16:10
  17:4 26:24 27:3,4
  27:8,25 28:3,4
  30:16 38:6,22

40:17 47:10 48:22
  65:5 255:22
  257:15
**liability** 8:12 9:1
  10:17,20,22 12:4,9
  12:13,20 13:20,25
  16:11,14,15 17:8
  20:21 23:13 28:8
  32:25 47:6 49:1,16
  49:19 51:18,20,21
  51:25 52:2,3 65:6
  83:11 100:24
  257:10,11,12
**life** 7:17 95:10 126:1
  268:8
**LIFLAND** 1:18
**lift** 63:7
**lifting** 270:1
**light** 232:4
**lighting** 136:3
**likelihood** 143:20
**Lima** 110:24 118:22
  119:4,13,18 120:3
  120:6,9 135:12
  211:3 212:18
  213:18 214:2
**limit** 13:8 18:14,15
  18:16 19:9 20:4
  30:8,13 44:24
**limitation** 12:20
**limitations** 185:10
**limited** 18:5 45:16
**limiting** 10:22 83:2
**limits** 12:18 17:7
**line** 44:10 46:19
  49:8 50:1,1,10
  52:15 68:19
  112:18 118:13
  214:23 220:18
  223:1 227:2
  249:17 262:21,21
  262:25 263:23
  268:17,17
**lines** 119:9 221:14
**lip** 111:14
**list** 11:10 129:8

135:1 212:15
**listed** 62:23
**listening** 58:15
  85:16 216:3
  225:14
**lists** 63:7
**litigation** 7:4 103:12
  182:12,14 184:9
  259:8
**little** 10:13 15:4
  20:23,24 28:11
  52:11 69:12,13
  71:19 176:6
  197:19 206:12
  207:4,22 210:10
  211:24 237:9
  241:22 248:11
  260:24 262:6
  264:10,12
**live** 266:15 268:2
  271:18
**lived** 97:20 268:6,8
**livelihoods** 144:2
**lives** 265:9
**living** 70:22 83:4
  117:24 261:15
  265:23
**Livonia** 118:11
**LLP** 2:13,20 3:3
**load** 257:17
**loaded** 107:2
**loading** 107:1
**local** 22:17,24 23:4
  23:11 24:9,11,18
  24:23 25:9 54:14
  105:5 108:21,22
  163:11
**locals** 121:22
**located** 112:20
**location** 17:16 18:5
  18:23 19:1 45:17
**locations** 15:8 32:10
  32:12,17 161:4
**lock** 45:20
**locomotive** 263:16
**lone** 264:15

**long** 5:24 17:13
  34:19 36:25 37:7
  37:14 80:24 95:15
  105:8,11 107:4,17
  135:8 136:4,12
  140:19,23 144:10
  144:15 156:10
  159:5 161:22
  163:6 181:6,11,21
  181:22 182:11
  184:7,14 200:25
  251:16,17,18,18
  252:14 253:17
  257:4,19 261:24
  264:7 268:6,20
**longer** 45:5 79:2,17
  92:22,23 97:14
  140:24 141:9
  143:18,22 144:11
  161:20 162:15
**look** 10:6,21 18:1
  20:9 24:1,12 28:12
  32:4 46:10,14
  50:12 52:5 54:2,7
  54:10 57:19 58:5
  62:11,17 63:1 68:3
  69:9 87:13 89:13
  92:20 97:23 129:3
  135:8 141:2
  159:25 160:12
  172:18 176:8
  182:14 219:1
  223:21,23 228:22
  240:6 242:8,11
  244:15,18 246:16
  247:24 250:23
  263:15
**looked** 65:24 84:13
  210:20 271:20
**looking** 10:19 24:8
  33:23,24 77:1 99:1
  137:22 143:10
  149:13 157:18
  175:6 180:3 181:9
  183:18 187:22,24
  195:9 196:16

211:13,15,20
218:9 254:24
271:23,24 272:24
**looks** 25:25 189:6
**losing** 83:16 248:5
**loss** 26:19
**losses** 248:14,25
**lot** 119:10 142:25
153:22,25 154:1,1
191:19 201:19
212:13 226:20
234:18 236:15
272:7,18
**lots** 228:14
**Lot's** 258:4
**louder** 124:17
**love** 265:19
**low** 214:5
**lower** 55:23 56:6
57:11 191:9 217:4
241:10 244:23
245:9
**lowers** 244:12
**lowest** 245:20
**LOWRY** 2:23
**LP** 210:4
**LTV** 129:12,12
253:18,24 256:22
256:23,25 257:13
258:11,24
**lunch** 123:4,5,6
**luncheon** 123:11
**LUTGENS** 2:17

**M**

**M** 103:22
**MA** 125:11
**machine** 263:16
**machinery** 263:15
**Magna** 243:4 244:8
**magnet** 269:10
**magnitude** 7:19 9:6
120:8 242:3
**Maiden** 2:22
**Mail** 169:11
**maintain** 20:15,18

80:23 266:17
**maintained** 28:17
28:21
**maintaining** 28:18
29:5
**maintains** 64:16
**maintenance** 107:2
**major** 206:21 248:9
248:11,13
**making** 22:21 34:6
48:1 79:14 100:8
151:7 198:5
257:13 261:16
262:22
**man** 138:23 262:12
265:15
**manage** 8:23 9:10
10:10,17,20 31:25
251:23 252:5
**managed** 206:24
250:3 251:24
254:1
**management** 9:17
189:24 190:10
206:16,17,18
250:4 257:7
**management's**
258:3
**managers** 79:16
**managing** 8:21 10:2
10:8 38:6,21 252:3
**mandate** 149:12
**manipulate** 155:21
**manually** 269:11
**manufacturing**
24:19 57:9 64:24
142:6,8 149:11
160:25 169:20
212:22 213:10
**map** 95:22,24
**March** 1:9 66:15
117:8 125:5
148:10,17,20
153:8 166:10
178:13 179:4,23
180:15,23,24,25

180:25 181:10
183:22 184:1
186:18 187:18
220:11 226:7
261:3 274:1
**marching** 247:24
**March/April** 165:23
**margin** 137:21
149:17 241:20
244:17,22,24,25
245:5 246:2 247:7
**margins** 137:17,19
245:8 246:16,21
247:13,13
**Marion** 135:13
212:19 213:17
214:3
**marked** 21:11 31:10
34:21 36:9 112:4
127:24 128:8,12
159:16 174:16
231:4
**market** 21:5 56:8
79:17 80:1 229:9
251:1
**marketplace** 250:25
**markets** 54:16 229:8
**markings** 128:22,24
128:25
**marriage** 276:13
**married** 270:8
**Massachusetts**
125:12
**master** 32:19 33:1
109:24 110:21,21
110:23 111:20
118:22,23,25
119:3 120:3
**material** 177:3
229:16
**materials** 62:1 65:20
78:5 187:18
**math** 241:15,19
**matter** 1:4 7:6 13:23
14:18 31:3 40:3
45:3 80:24 89:8

110:17 114:21
115:14 138:22
176:7 178:21
203:24 276:10,14
276:15
**matters** 41:22 85:5
129:24 131:14
162:10 202:23
**Matthew** 189:5
**maximize** 204:12,13
204:13,14,14
**maximizing** 204:5
**MAYER** 2:16
**ma'am** 51:9 52:5
103:16
**MBA** 125:12
**mean** 5:13 65:3
72:15 108:1 110:7
117:15 156:17
157:22 175:21
193:16 206:4
211:6 213:5
219:19 229:22
246:17 252:8
**meaning** 14:22
**meaningful** 146:9
146:12 236:15
239:5 240:6
**means** 31:22 65:5
94:6 108:2 123:8
157:15 197:11,12
197:14 204:3,4,8
249:13,14 250:22
**meant** 174:21 176:2
**measure** 23:11 52:3
**measured** 15:18
**measurement** 8:12
27:1
**measures** 138:12
**mechanic** 262:4
263:11,12 264:4
**mechanically**
263:16
**Medicaid** 90:2,6,8
90:11,14,15,22
91:1,3 93:8

medical 7:4 12:10
  17:4,7,10 18:6
  19:12 20:14,19,21
  21:3 22:23 26:11
  32:11,23 35:10
  45:15,18 46:9,13
  61:16 66:24 67:1
  76:16 84:6 86:9,15
  96:1,18 138:8
  139:18,22 240:14
  245:25 270:10
Medicare 28:15
  29:3 77:13 79:17
  79:19 80:23 87:14
  88:16,24 91:12,18
  92:2 264:23,25
  266:18 270:6
  272:4,11
medicine 263:25
  264:20
meet 105:5 209:24
  240:1 253:8 257:7
meeting 120:25
  190:9 192:18
  193:23 194:1
meetings 110:1
  117:4 165:19
  192:16 194:5
  207:19 209:23
member 5:16 6:5
  38:25 106:6 192:1
  199:8
members 106:12,15
  106:17,18,20
  111:24 117:22
  118:14,15,18
  144:2 163:13
  198:22 213:19
  242:5,5
membership 199:10
memorandum 5:1
men 263:14
mentioned 6:2 17:11
  116:15 136:9
  195:2 196:4
  242:25 253:18

mentioning 141:17
Meritor 243:6 244:5
Meritor's 245:19
met 116:22
Metals 129:20
method 70:4
methodology 20:5
  26:17
methods 10:20
  23:17 71:20
metric 138:5,11,12
  139:6,10
metrics 138:3
Mexican 191:8
Mexico 54:23 55:14
  57:12 161:4 191:6
  214:5
MFO 142:6 149:11
  169:23 170:1
  173:16 207:21,23
  208:4,23 214:2,12
  214:15,22 216:25
  217:3,15,16,17,18
  237:24 238:7
Michael 95:15
Michigan 105:17
  118:7,11
microphone 124:18
Microsoft 113:20
mid 13:17 17:15
  18:7 158:25
middle 21:9 35:13
  49:17 77:12 99:9
Miguel 103:19
  210:23 274:8
miles 270:18
Millennium 36:25
Miller 150:10,13
Milliman 5:7,8,9,14
  5:19 6:11,13 7:13
  7:16 8:3 9:13,15
  9:21 10:4 20:25
  37:18,24 41:3
  53:24 54:4,8,14
  57:15,22 58:23
  64:13,15 81:11,14

  81:18 92:12 93:16
  93:19 95:7 98:3,23
  99:2,16 102:5
Milliman's 7:15
  64:7 96:15
million 20:20 52:7
  52:10,19,22,25
  53:2,7,8,13,16,17
  75:15 83:8,11,17
  148:17,19 165:9
  180:11,14,17,17
  180:18 181:24
  182:1 234:3,24
  235:25 236:1,2
  237:4 239:10
  240:9,11,12 241:5
millions 181:20
  248:5
Milwaukee 95:18
mind 76:23 234:11
  235:22
minds 214:8
minimal 9:1
minimum 234:16
minute 101:19
minutes 11:10
  160:11,13 167:25
  185:17 190:4
  256:13 260:4
missing 147:22
  192:10
mistake 63:23,24
mistakenly 166:22
Mitchell 265:16
mix 24:18 226:24
  244:12
model 96:4 161:12
  161:16 162:19
modeled 209:1
models 162:11
modernize 205:4
modification 125:21
  160:10
modifications
  161:25
modified 31:4

  102:18,23
modify 71:4 160:9
MOERS 2:16
moment 16:1 21:15
  25:16 28:12 35:17
  137:14
moments 101:17
Monday 207:23
  252:8
monetary 94:4
money 19:6 73:8,23
  74:10,11,13 75:3,4
  75:11,19 86:16,22
  102:12 162:15
  236:3 249:13
  251:3 261:16
  266:17 272:5
monitoring 126:2
monitors 20:25
month 32:20 68:20
  89:13 126:20,20
  154:22,23,24
  167:1 175:8
  192:23 203:8
  264:21 270:15
  271:24
monthly 32:16
  89:11 103:6
months 154:21
  155:4 270:12
  271:4
morning 4:2,3,4,5
  208:17 210:24
  220:3 264:2
  273:11
motion 6:21 13:24
  14:3,12 144:4
  171:18 175:17
  237:22 238:15
motions 210:22
motor 232:15,18
motorcycles 263:13
Motors 82:5
mouse 215:12
move 35:20 36:9
  61:7,8 124:18

129:23 136:13
152:22 161:3
163:18 176:5
179:14 214:4
227:20 238:25
249:4 254:11
**moved** 261:15
**moving** 5:2 149:16
172:14 216:20
253:5
**Mull** 60:17
**multi** 37:18
**Mulvey** 21:16 25:7
**Mulvey's** 22:11,15
**Murray** 263:2,3
265:17

**N**

**N** 2:1 3:1 4:1,8,8,8
124:1,1,1,3 260:16
260:16 274:3
**NAFTALIS** 2:13
**NAGLE** 2:23
**name** 36:22 124:9
185:23 260:21,23
263:13 267:24
**named** 99:10
**Narag** 199:4,19
200:3
**Naraj** 199:24 200:6
**narrow** 131:24
**national** 109:16
**nature** 10:14 85:2,3
111:11 225:1
**near** 134:7 232:24
261:25 268:4
**nearly** 72:17 73:15
**necessarily** 55:9
67:4 115:10
**necessary** 114:1
132:16 153:20
165:20 204:23
256:3
**necessity** 133:11,21
134:13 136:23
210:14

**need** 4:21 33:8 43:13
60:23 71:9 73:6
86:24 137:24
140:23 142:20
144:15 151:1
156:8 195:6
205:22 222:8
234:18 238:23
239:7 241:4 251:2
251:3 265:8 272:7
**needed** 26:18 43:10
159:10 181:13
195:13 226:5
269:17
**needing** 263:22
**needs** 137:20,21
143:11 161:18
164:25 165:1,3,3
188:14 205:4,7
214:3 235:25
237:21 238:14
245:13
**negative** 43:15
**negotiate** 133:11
143:17 162:23,24
163:11 164:3
205:23 206:7
211:15 251:11
257:7 258:2,9
**negotiated** 17:15
211:9 257:8
**negotiating** 84:14,21
116:21 144:1
145:11,12 162:12
162:13 163:2
210:22 229:4
259:4
**negotiation** 75:20
82:18 84:10 203:2
257:24 259:8
**negotiations** 41:9
73:6 110:16
116:17 117:1,2,7
117:12 118:23,25
119:1,2,8,9 120:12
121:17 124:24

125:19,20,22
130:7 150:23
161:7 164:1,9
165:2 177:15
184:10 205:24
206:1 211:2,11
216:2 257:20,22
**negotiator** 177:13
177:15,17
**negotiators** 126:15
229:1,3
**neighborhood** 89:7
**nets** 90:2
**never** 60:14 156:23
180:7 200:8,9,16
270:13
**new** 1:2,11,11 2:5,5
2:15,15,22,22 3:5
3:5 47:17 54:15
92:7 125:11,25
192:23,25 193:15
193:18 205:14
209:20,21 232:4
257:22 276:3,7
**newly** 72:11
**Newman** 79:4
**news** 93:6
**newspaper** 98:1
**night** 264:2
**nine** 39:15 40:1
**non** 12:15,19 13:6
13:13 45:3 70:14
106:22 137:4
161:4,4 172:8,17
172:19 175:24
191:12 211:10
228:18
**nonresponsive**
172:10 184:12
187:25 188:2
**nonunion** 44:21
75:15 101:4
255:13,16,17
**nonviable** 134:20
**normal** 68:19
139:21 193:5,14

**north** 214:4 228:24
239:22
**Notary** 4:9 103:23
124:4 260:17
267:18 276:7
**note** 2:21 98:6
119:24 128:6
142:18 164:8
167:14 174:1
179:9 207:16
**noted** 123:12 124:2
189:12,14
**notes** 81:2 143:6
177:12
**notice** 50:20 192:18
**noticed** 98:5
**notion** 225:24
**nouveau** 209:10
**November** 110:18
119:3 150:5
158:22,23 159:3,4
170:3 194:25
195:16,18 196:16
196:19
**Nowak** 4:10 103:24
124:5 260:18
267:19 276:6,19
**numb** 270:19
**number** 7:16 8:5
13:4,4 14:15,16,22
16:2 20:15 25:9
33:1 34:5 39:10
48:5,19,20,24
49:25 50:14,15
52:6 65:1 71:13
92:23 96:19
110:12 140:9
148:20 153:15
155:19 157:23
165:11 176:9
180:2 181:3,16
196:4 197:13
202:10 217:4
232:19 234:4,7,10
234:11,12,20
237:4 239:5,7,7,9

239:13,17 240:1,4
240:8,18,24 241:5
241:19,20 244:19
**numbers** 14:5 35:4
44:12 47:19 48:2
49:8,13,13,24 50:8
52:5 64:21 83:13
133:20 141:13,16
141:18,18 148:13
155:3,16 157:7,8
157:16 165:13
166:13,16 170:8
170:19 180:5,21
182:4,8 184:14
**nutshell** 107:16

### O

**O** 1:17 4:1,8 103:22
124:1,1,1,3,3,3
260:16
**oath** 86:4 114:25
218:9
**object** 73:19 74:17
75:25 89:4 100:4
114:11,21 119:17
122:19 128:8
233:6
**objection** 7:9 9:22
35:25 36:2,12
39:16 41:14 58:6,8
85:1 91:3,6,8
97:19 99:3 113:17
114:13 115:13,13
115:16 119:24
122:10,21 131:17
136:25 138:14
152:22 163:18,22
163:23 167:6
168:22 171:22
174:10 176:13,19
179:16 182:21
184:23 185:9
201:8,10 223:17
258:6
**objections** 74:4 85:2
130:3

**objectives** 204:11
**obligated** 102:12
**obligation** 30:12
102:20 138:9
139:17 152:17
209:12 255:18
**obligations** 8:17
11:2 14:23 23:5
24:24 30:12 32:1
55:4,6 139:15,25
139:25 140:2
235:18 236:6
240:2 257:16
**observation** 23:8,9
24:25 142:12
198:11
**observations** 134:8
142:5 143:14
154:10
**observe** 51:8
**observed** 198:11
**obtain** 122:15
151:11 184:9
205:8
**obtained** 206:18
**obviate** 73:6
**obviously** 58:16
75:11 119:5
193:15 259:10
**occasion** 10:6,7
22:13 54:20
**occur** 63:24 73:6
**occurred** 46:9
**occurrence** 253:25
**OCR** 156:18 199:14
**October** 16:23
105:10,14 108:23
109:23 110:16
170:3
**odd** 263:8
**OEM** 206:21
**OEs** 228:3,9
**offer** 7:7 25:23
64:18 70:10 94:14
131:7 216:11
234:5 238:13

251:11
**offered** 61:16 76:6
96:20 97:25 130:9
204:18,22
**offering** 22:5 25:18
69:20 90:12,17
96:21 130:12,21
132:11 235:8
**offerings** 67:20
**offhand** 234:9,20
**office** 95:18 99:15
110:9 193:22
264:19 265:8
**officer** 190:21
**offices** 54:11,13
**officially** 107:24
**officials** 116:21,22
177:11
**oh** 89:15 214:7
267:5
**Ohio** 2:10 110:24
118:9,22 119:4
135:12
**oil** 126:3
**okay** 4:20 8:15 15:3
17:18 20:7 21:10
22:4 24:21 25:25
27:12 35:16 36:3
52:5 53:6,20 62:3
64:17 74:6 76:23
78:15 81:19 88:8
91:22 97:7 103:10
119:22 124:20
160:16 167:23
177:6 193:16
202:14 231:2,24
243:22 256:25
271:2 272:5
**old** 19:8,11 269:20
272:11,22
**older** 13:18 19:24
29:19 92:18
**oldest** 167:17
**omitted** 112:20
**once** 25:8 74:16
97:24

**ones** 36:10 170:10
237:25
**one's** 233:3
**ongoing** 28:1 235:18
**OPEB** 120:25
**OPED** 38:6,21 65:5
65:6 121:1 255:22
257:10,14
**open** 54:6 155:2,11
216:13 224:19
227:15 237:25
**opened** 156:3
262:25
**opening** 38:5 263:10
**operate** 54:15 262:4
263:14,16,17
**operated** 155:5
**operating** 137:16,18
137:21,25 138:1
262:14
**operation** 270:2
**operations** 53:25
55:3,5 107:14
143:2 172:17
228:19 248:2
269:24 272:22
**operator** 105:24
106:9,25 107:5
150:9
**opine** 93:11 226:23
**opined** 98:13 205:7
233:12
**opining** 138:23
**opinion** 27:15,22,23
28:25 130:21
135:20 136:22
162:18 204:17,22
205:1,3 233:17,21
234:6 235:7,8
237:21 238:13,17
240:3,5 245:7,15
**opinions** 28:13
130:8,12 131:7
138:24
**opportunity** 17:22
22:15 74:25

190:15,17 193:25
227:5 257:6
**opposed** 4:19 64:24
108:13 113:23
145:10 149:9
201:7 209:22
**optimization** 142:7
142:9 149:12
161:1 169:20
255:6
**option** 94:18
**options** 94:20
254:24 255:1
**order** 7:19,19 9:6
31:1 35:24 39:7
40:12 111:25
120:8 133:12
134:12,17 135:14
140:23 143:1
144:13 149:15
156:7 184:9
205:23 234:9,19
241:4 248:14
**orders** 250:20,24
251:3,4,4,16
252:14,14
**ordinary** 114:16
209:13
**organization** 6:2,5
98:23 230:17
231:9
**organized** 154:25
155:9 193:11
250:4
**organizer** 107:21
108:18
**organizes** 249:8
**organizing** 125:20
**original** 49:8 50:1
157:10 170:22
177:25 180:10
**Ormet** 129:20
**outcome** 276:15
**outline** 254:17
**outlines** 12:9 13:3
**outside** 43:5 44:2

84:5 86:8,15 137:1
166:2 206:9
**outstanding** 152:3
**overall** 10:17 11:6
18:14,15 67:22
70:19 145:16
149:9 156:5 238:6
**overcome** 248:14,25
**overruled** 39:24
41:17 76:2 99:3
201:10
**overseas** 55:5 228:9
228:12,16,17
236:2 240:12
**overstate** 209:8
**overstated** 227:10
**overstating** 225:6
**overtime** 164:21
171:3
**overview** 150:14
**owed** 97:16 240:16

---
**P**
**P** 2:1,1 3:1,1 4:1
124:3
**PA** 268:3
**page** 12:3 15:16 22:2
22:4 24:1,1,7,8,14
25:17,20,21 27:21
27:21 28:6 42:5
54:6,7 58:2,20
62:11,18,20 63:17
67:12 68:3,3 69:9
70:3,17 71:19
76:13 77:11,12
78:11,12,20 80:19
81:7 89:16 92:17
92:20 94:10 95:13
95:14 99:8,9,19,19
112:18 113:21
134:3,5 135:1
136:5 140:4
153:23,25 154:8
155:23 159:22
167:15,15,24,24
168:8 169:18

171:4,9 184:6
191:11 220:15
221:13 223:1
230:21,22,25
231:22 232:8,10
233:2
**pages** 72:6 131:6
154:1,2,3,4 222:20
224:22 226:2
**paid** 13:21 26:14
82:10 203:7 236:3
271:6,8
**pain** 233:3
**paper** 148:2 155:19
231:1 233:5
240:17
**paragraph** 6:22
12:1 15:5,21 16:6
17:1,19,24 18:1,3
20:10,11,12 22:1
27:17,18,22,24
28:12,24 29:11
32:5,7,8 33:9 35:2
42:5 44:14,19 47:4
47:5 53:12 61:11
64:4 65:8 66:23
67:15 68:4,9 69:17
70:7 71:2,21 72:16
76:25 78:21 79:9
79:10 80:18 81:7
82:20,24 83:24
86:7 87:13,16
92:20 93:24 94:11
94:24 95:21 96:14
96:22 97:10,24
99:12,20 100:21
100:22 112:18
113:19,21 136:5
137:15 140:5
143:13 144:3
154:7,14 160:23
160:25 161:10
164:15 165:16
166:8 169:19
172:3 173:14
174:4 180:3,20

202:21,25 205:12
207:12 212:16,18
215:6 218:12
219:7
**paragraphs** 83:23
116:6 160:21,23
182:6 219:9
**parallel** 236:24
**parameters** 116:25
**pardon** 37:9 91:7
261:11 266:22
**parenthesis** 72:18
**Parrin** 16:24
**part** 28:4 31:19
35:23 48:12 50:12
51:7 64:9,19 65:3
65:7 81:23 100:14
104:16 111:2
112:23 114:16
117:6 144:18,19
149:12 150:23,25
152:17 174:25
177:24 188:3
193:5 207:5 225:2
234:1 257:3 271:1
271:2,8
**participant** 18:16
42:21 118:12
**participants** 13:21
87:24 88:2
**participate** 117:7
127:7
**participated** 31:3
102:9 116:16,20
116:25 117:2
118:2,4,13
**participating** 70:18
81:22
**participation**
150:20
**particular** 16:18
29:18 53:18 68:18
104:11 183:9
**particularly** 29:19
30:21
**parties** 117:11,13,24

145:5 257:8,23
258:1 276:13
**partner** 126:23
221:9 231:3
**partners** 151:4
179:10 207:25
208:16,22 210:1,4
214:7 226:4
**partnerships** 126:4
**parts** 55:14,16 79:18
104:18 109:12,17
131:1 228:12,17
228:21 246:19,23
**party** 41:23 115:17
145:10,12,14
**pass** 39:6
**passed** 39:13 230:15
**passing** 228:5
**password** 150:8
200:8
**passwords** 199:23
**paste** 157:5
**pasting** 197:7
**patiently** 260:3
**pay** 19:9 26:13 31:1
46:3,6,13 72:12
73:10 75:23 76:6
88:20 90:14
240:12 242:14
246:2 251:2
255:19 264:18
265:8 266:15,17
272:2,9
**payable** 12:25 18:15
**paying** 88:16 91:18
242:12 265:2
266:16 270:25
**payments** 86:13,17
87:21
**pays** 17:6 19:16 46:6
**PBGC** 258:15
**PDF** 113:19,22
155:15,16,24
156:1,4,12,14
157:21,23 178:5
195:20 196:17,17

196:21 197:22
199:13,17
**PDPs** 79:20
**PEDRO** 2:7
**peer** 10:5 81:17
130:23,25 137:24
138:18 242:8,11
242:19 243:16
246:13
**peers** 137:23 223:6,8
223:11,22 242:15
242:21,23,24
243:1,1,9
**penalty** 58:9
**pending** 254:6
**pennies** 264:17
**Pennsylvania**
110:25 112:20,22
112:25 118:22
119:4 268:4,7
**pension** 21:2 31:1,9
31:12 32:9,16,20
87:14,17,19 88:11
88:13,24 89:3,6,6
89:11,12,19 90:13
90:18 97:13 98:4
98:13,17 99:21
138:8 139:19
257:15 264:14
265:23 271:11,12
**pensions** 5:22 99:24
139:21
**people** 41:2 48:6,7
67:7 86:23,24 89:9
91:11,17 141:1
158:11 163:4,7,14
192:20 193:8,22
194:12,14,16
216:3 241:1,13
263:7 266:15
272:19
**perceived** 251:1
**percent** 12:21,21
13:9,9 15:7,7
16:16 20:17,20
22:8 24:16,19,20

26:2,3 28:8,9,21
33:18,20 34:7 47:8
47:9,21 48:4 49:14
49:23 50:6 53:11
53:20,21 61:15
63:18 64:17,20,23
67:21 68:13 69:20
69:21 71:6,12,25
72:7,10,12,18
76:14,15 77:2,17
77:21,21 80:2,6,10
80:13,15,16 83:8
91:12 93:1 96:21
100:25 101:11
103:8 137:22,24
217:6 235:6
239:20,21 240:4
240:18 242:12,12
242:13 244:21
245:2,3 246:1
247:4
**percentage** 13:7
14:21 22:5 24:12
25:18,24 26:2,3,5
57:8 66:5,9 73:10
75:23 77:6 80:1
103:6 234:25
235:13 239:1,2,5
239:11 240:8
242:7,7 244:17
**percentages** 14:21
26:6 235:1,3,3
**perception** 99:21
251:6
**perceptions** 250:25
251:2,5
**Perfection** 105:23
107:14
**perform** 8:10 43:6
147:5
**performance** 130:22
137:24 138:3,4,4
138:18 140:9,19
142:17 143:23
223:6,22,23
**performed** 42:14

43:19,24
**performing** 88:14
114:1
**period** 27:2 28:7
46:10,21 53:18
68:20 126:20
141:1 156:10
162:17 171:16
176:6 194:2 217:5
245:10 246:20
248:7 257:8
**periodic** 49:15,18
**permanent** 108:23
**permitted** 138:21
**Perrin** 4:25 16:3,9
42:14 43:19,24
**person** 90:5 106:10
108:15,19 189:23
193:23 226:23
**personal** 59:17,21
**personally** 37:21
81:17 82:4 116:25
175:21
**persons** 117:5
**perspective** 32:24
73:4,9,14 75:22
170:6
**pertaining** 129:24
158:1 164:18
173:23 175:10
**pertains** 120:3
**pertinent** 184:10
**pervasive** 99:23
**PETER** 3:7
**phase** 212:22 214:2
214:25,25 215:1,1
215:4
**phases** 214:2,2
**phenomenon** 27:13
**phone** 110:2,6,9
**phrase** 76:15 81:8
189:8
**pick** 230:17 240:8
269:10
**picked** 198:4
**picture** 58:4,15

141:9 146:14
166:16 201:21,22
**piece** 155:19 233:5
**pieces** 226:20
**place** 127:16 166:21
193:14 240:22
257:23 264:7
**places** 19:7 181:23
**placing** 67:19
**plan** 18:16,24 19:8
19:13,14,17,21,23
19:25 28:17 29:20
31:4 32:19,19 33:2
33:19,20 45:10
53:24 67:22 68:5
72:12 76:17 79:14
88:11 91:21 98:4
102:18 135:2,23
136:11 140:17,18
140:25,25 141:1
142:3,9,9,19
144:15 146:6,22
146:24 147:1,4,4
147:17 148:5
149:12 161:18,20
161:22 162:3,8,16
162:25 163:6
172:18,19 192:22
192:24,24,25
205:23,25 206:2,8
206:12 207:1,17
207:19 213:11,13
213:14,14,15,17
214:12,15,16,16
214:17 215:2
216:25 217:3,16
218:15,24 233:23
234:17 235:15,21
236:16 237:1
238:6 239:6 242:1
245:18 251:9
**planned** 67:22
217:15
**planning** 30:22 34:8
67:13 135:14
136:18 217:10

218:3,16
**plans** 5:23 23:2
25:18 29:5 34:4
37:18 79:19 80:2
94:3,3,9,25 96:20
97:13 99:21,22
133:18 136:13
139:20 144:11
148:16 149:13
161:1 162:16
211:3,10
**plant** 108:4,6 110:24
110:25 135:5,10
135:21 148:10,20
149:7,7,8,9 154:21
155:1,1,4 211:23
213:20 214:9
215:11 218:25
229:2 263:7
272:19
**plants** 22:23 105:5
110:24 111:1,20
111:21,25 119:5,6
130:16 133:20
134:11,23,25
135:13 148:8,9
149:16 161:3
166:12,14 177:16
180:25 181:23
182:2 185:2
205:19 211:16
212:2,4,12,15
216:12 217:24,25
219:14,22 237:25
238:4,5 240:1
265:11 272:19
**plant's** 97:16
**plateau** 232:3
**play** 19:25
**playing** 215:12
**pleasant** 241:1
**please** 6:17 11:4,7
12:8 13:2 15:22
16:5 18:11 23:23
25:20 28:14 29:13
32:14 34:11,14

49:4 51:11 104:2
112:3 125:8
127:22 129:4
134:2 154:17
158:13 159:21
164:15 167:11
169:2,18 170:21
172:2,21 174:1,15
176:8 183:1 184:6
192:11 199:25
225:14 227:13,18
238:21 249:5
256:14 259:20
260:21 267:15,24
268:14
**pleased** 170:11
**plenty** 194:9
**plethora** 79:19
**pluck** 97:24
**plus** 46:17 72:11
76:17 128:21
172:18,19 192:22
192:25 207:17
**Plymouth** 118:7
**point** 9:19 18:21
19:4 22:21,22 27:6
46:19 57:20 85:19
90:18 100:8
107:23 112:16,23
114:10 118:20
121:12 122:4,18
129:17 133:17
134:19,21,22
135:11 140:16,21
143:3 151:3,6,8,21
162:6 167:3 170:2
170:16 184:17
187:14,14 191:12
191:14 195:6,7
197:24 218:2
233:7 234:5 238:7
242:17,18 244:20
246:1 247:12
260:1 267:10
269:20,23
**pointed** 147:15

209:3
**pointing** 184:13
**points** 18:12 58:21
140:5,14 184:17
**Polar** 158:10
**policy** 164:21 171:4
**political** 108:20
**pollute** 225:21
**population** 59:15
92:18
**portion** 14:8 23:15
23:18 88:16 90:13
93:8 138:7
**portrayed** 12:15
**position** 99:2 106:8
108:3 112:1
126:13,14 144:1
145:13 219:11
258:9
**positions** 108:12
262:1
**posits** 24:16
**possesses** 145:11
**possibility** 87:5
**possible** 57:4,12
66:18,19 86:12
87:2,6,8 120:15
123:3 152:20
253:23
**possibly** 115:16
**post** 8:8,16 9:3 10:2
11:1 12:10 18:4,25
20:14 21:2 23:5
32:11,22 34:4
35:14 61:16 67:23
102:21
**posted** 192:2 198:16
**posting** 99:11
**posture** 163:1
**potential** 127:19
203:17,22
**potentially** 22:25
34:6 203:15
**Potok** 113:8 123:2
124:10,11,12,13
124:20 127:24

128:3 129:3,24
130:5,9 134:2
141:21 158:18
167:12 169:5
173:3 174:3,16
176:5,22 178:15
183:2,11 185:21
188:1 194:5,8
201:23 203:10
206:11 214:17
215:19,20 223:4
226:1,8,18 227:21
243:15 253:8
254:4,6 256:12,20
258:10 274:9
**Potok's** 185:6 259:5
**Pottstown** 110:24
112:25 118:22
119:4,13,18 120:4
120:6,10 135:17
136:10 211:3
**pound** 227:14
**pounding** 227:16
**pounds** 262:19
269:7
**poured** 36:25 265:9
**power** 57:20 170:2
170:16 191:12
**practical** 32:9
**practice** 6:10,11
7:15,17
**practices** 7:16,18
**pre** 18:23 35:15
67:23 83:25 87:2
87:10 91:23
**preceding** 176:6
**precise** 20:4 199:16
**precisely** 85:2
119:20 161:3
**Precision** 118:10
**preclude** 45:18
**precluded** 31:11
130:4,13 152:17
**predict** 78:3
**prefer** 30:1
**preferably** 30:9

**preliminary** 160:6
241:3
**prelude** 216:22
**prematurely** 258:5
**premium** 72:12
73:11 91:13
**premiums** 72:7,19
73:18 75:23 88:16
90:23 91:19
**prepare** 133:5 195:7
195:8
**prepared** 4:13 42:17
43:17 54:4,15
100:7 103:1
117:23 138:17
159:3 209:8 227:4
230:10 234:5
256:7
**preparedness**
117:20
**preparing** 78:6
**prepetition** 101:5
**prescription** 18:24
19:1 28:15 45:17
68:14 71:7 77:3
79:16,17,19 80:1
**present** 12:12 17:1
22:1,10 32:9,17,21
32:22 90:17 117:3
120:12 213:13
236:18 238:1
248:2
**presentation** 16:25
57:21,25 191:12
192:23,25 236:20
**presentations** 170:3
170:16 192:17,22
**presented** 42:24
57:21 140:17
197:13 241:24
**presents** 170:17
**preservation** 222:11
**president** 97:2
108:24 117:5
126:11
**presiding** 258:11,23

**press** 261:23 262:10
262:10,13,15
**presses** 262:4,5
268:21
**pressure** 228:2,4,5
262:4
**pressures** 55:22
**presumably** 161:13
176:3 192:19
**pretty** 44:17 105:5
199:7 205:24
269:8
**prevalence** 22:23
23:1,10 57:6
**prevented** 114:1
**previous** 75:10
91:14 92:24 111:9
111:10
**previously** 111:1
174:16 175:25
209:4,7,22 231:4
**price** 142:1,3 206:14
206:18,24 207:5
207:14 249:21
250:5 251:11
254:21
**prices** 248:19
264:19
**pricing** 141:7,8
144:6 228:2
246:10 251:13,16
**Primarily** 8:11
**principal** 54:13
99:15
**principals** 225:1
**principles** 225:2,4
**print** 155:15
**printed** 156:4
**printout** 155:20
**prior** 13:17 26:9,12
27:5 110:19 113:9
114:19 118:23
154:23 159:25
174:21 206:1
207:24 219:9
**private** 37:2,12 70:8

70:22
**privilege** 85:8,13,23
163:20 164:1
221:25 222:12
225:8,25 226:8,17
**pro** 8:10 148:23
**probability** 70:14
**probably** 215:13
270:13 271:24
**problem** 83:25
131:21,25 218:1
225:6,19 226:15
**problems** 85:13
89:19 125:23
145:6,6,7 250:23
250:24 269:25
270:2
**proceed** 16:5 104:1
115:22 124:6
126:18 153:4
267:21
**proceeding** 73:5
109:20 115:4
121:18 125:2
130:6 132:24
133:2,3 144:18
145:23 150:21
212:1,10 215:10
**proceedings** 6:23
7:2 110:11 129:11
134:13 225:21
260:3 276:9,11
**process** 25:4 130:8
142:14,15,19,22
149:21 159:7
193:5 199:11,13
211:5 217:15,17
217:17,18 225:23
226:6 227:12
236:21 253:9
257:3,5,5,19 258:2
259:4
**produce** 55:7 65:19
147:25
**produced** 62:1
93:16 138:22

162:4 228:17
231:17
**product** 5:18 96:21
159:14 160:11
190:8 249:21
250:6
**production** 232:12
232:16,18 249:21
**productions** 229:20
**productivity** 191:5,9
248:21
**products** 55:8 96:16
190:6
**profess** 90:8
**professional** 5:20
6:8 151:9,12
152:18 208:1
**professionals**
151:23 192:16
198:24 208:16
258:3
**profit** 26:19 137:21
137:25 138:1
254:12
**profitability** 143:11
249:1 254:25
255:2
**profitable** 161:23
253:10,16,17
**program** 28:18 29:4
71:10 83:23
**programs** 29:17,18
54:21 60:23 68:15
71:7 77:4 143:1
**project** 17:19 30:15
217:8
**projected** 142:10
162:7,7 181:10
223:23
**projecting** 147:11
**projection** 162:16
217:5
**projections** 141:10
142:7 143:17,23
143:24 146:18
148:2,18 161:24

165:23 173:17
181:17 193:6
214:24,25 218:24
233:25 234:9,18
235:16 240:7
**projects** 237:2 255:9
**promise** 272:13
**promised** 139:19
140:2
**proper** 211:20
**properly** 156:22
226:18
**property** 105:22
**proposal** 31:15,18
31:23 32:2 73:21
73:25 74:8,10,23
74:24 75:8,24
102:25 103:3,5,11
120:16,17,19
121:6 133:22
147:25 165:6,7,15
272:16
**proposals** 73:20
84:10 130:16
133:12 134:10
140:12 147:6
148:2,8 164:18
166:9 170:24
173:3,24 175:11
177:5 179:1
205:19 210:21
211:8 212:2,11
220:23 241:14
**propose** 161:7
**proposed** 216:12
238:4 254:12
**proposing** 31:11
73:15
**proposition** 241:15
251:21
**prospectively** 30:9
**protect** 117:23
224:22 225:25
226:8
**protected** 226:6
**protecting** 225:22

**protection** 166:3
**prove** 81:2 145:13
**provide** 8:2,4,13
53:23 59:8 64:10
70:9 71:9 81:1
86:13 102:21
124:15 144:6
146:9 147:1
148:14 170:18
172:12 178:5
193:2 195:12
198:20 202:22
209:12 237:16
238:22
**provided** 11:10 16:8
28:16 32:10,11
37:24 38:10,13
41:6,6,7 42:8,9,12
42:18,21 43:9,18
67:8 71:6 77:2
84:8 100:24
101:12 113:20
130:3,17 131:2
133:10,16,18,23
134:16 135:15
137:2,3 138:18
145:17 146:5,17
146:25 147:23
148:4,6,9,10,13,17
148:20 156:5
157:2,2 170:2
173:21 177:14,16
178:2,4 180:15
184:17 187:18
192:6,18 193:17
193:18,19,20
196:21 197:2,4
198:2,3,21,22,23
198:23 199:24,24
200:18 206:2
209:18 219:10
221:4 231:22
237:10
**provides** 23:20
146:18 223:21
**providing** 10:12

70:20 92:17
125:19 157:10
162:14
**public** 4:10 103:24
124:4 223:8
260:17 267:18
276:7
**publically** 126:22
**publication** 78:17
92:12 93:16 95:7
**publicly** 141:14
**published** 33:17
59:10,13
**pull** 124:19
**purchase** 102:4,5
**pure** 259:17
**purporting** 114:25
220:21
**purpose** 39:17
123:11 168:11
183:23 195:10,11
222:1,3
**purposes** 8:12 50:9
64:16 104:20
162:12 182:3
207:11 218:23,25
226:21 229:1,3
**pursue** 159:14
**pursuing** 258:4
**pushed** 207:10
**put** 26:18 61:22
62:20 63:16 73:8
74:10,11 75:12,16
75:19 100:23
128:24,25 139:22
154:1 156:17
159:14 161:2
199:13 202:3
216:4 226:17
262:20 264:8,21
**putting** 27:25
262:22
**p.m** 123:12 124:2

----

**Q**

----

**qualification** 131:24

**qualifications** 39:19
  57:5
**qualified** 7:10 39:21
  40:8 132:13 164:4
**qualify** 80:2 129:23
  132:18
**quality** 153:22
  156:21
**quandary** 226:22
**quantify** 172:16
  220:21
**quantitative** 130:21
**quantitatively**
  153:25
**quantity** 153:18,21
  154:3
**question** 9:18,19,19
  14:14,20 15:13
  43:16 46:19 51:14
  59:25 61:6 64:2
  66:19 74:3,21 76:3
  77:9 84:19 89:8
  98:10 100:20
  119:20,23 137:8,9
  137:10 139:8
  141:17,19 158:12
  172:19 173:21
  175:14 176:3
  180:1 188:12
  191:1 199:25
  200:1 201:11
  206:11 209:16
  212:8 216:9 221:8
  221:17 222:5,14
  223:15 224:3,5
  225:6 231:4
  233:12 234:4,14
  237:20 238:9,18
  238:20 249:6
  254:3,6 266:11
**questioning** 227:2
**questions** 36:16
  101:14,21 110:9
  122:6,11 130:13
  130:18 131:4
  168:18 179:9

182:10 190:16,17
  190:24 191:3,13
  194:1,3,5,12,15,17
  194:18,21 216:3
  222:9 225:15
  256:11,18 259:23
  266:21,24 273:5
**quickly** 65:12
**quit** 272:22
**quite** 46:15 212:1
  226:18 230:16
**quote** 96:22 100:4,5
  100:14 144:3
**quotes** 78:11,16 98:3
**quoting** 99:20 100:8
  213:8

---

## R

**R** 1:17,18 2:1 3:1,8
  4:1,8 103:22 124:1
  139:11 260:16
  267:17,17 276:1
**radical** 163:1
**rail** 262:19
**railing** 262:16
**rails** 263:6
**raise** 85:18 115:21
**ramp** 249:21
**ran** 107:14 209:1,2
  219:17,19 220:3
  236:21 237:6
**Rand** 37:13
**random** 70:15
**range** 9:8 28:9
  180:14 234:16
  245:22
**rare** 253:24
**rate** 10:22 17:5
  30:13 66:4 71:22
  71:24 164:21
  171:3 236:1
**ratification** 164:10
**ratified** 163:3
**ratify** 118:18 163:8
  163:16
**ratifying** 163:16

**rationale** 94:5 164:2
**rationalizations**
  228:22
**reach** 22:6 117:24
  140:10 170:19
  205:13 245:18,19
  245:20
**reached** 257:19
**reaction** 28:1
**read** 47:11 51:7
  60:25 61:16,19,22
  61:23 62:8,14
  63:16 67:23 68:7
  68:15 69:24 70:11
  72:21,22 76:18,19
  77:24 79:5,20 80:7
  97:25 111:8
  113:25 145:15
  156:18,19 170:25
  180:14 184:8
  221:6,11,15,25
  222:25 223:9,13
  224:1 230:22
  231:15 238:9,11
  252:7,10 263:3
**reader** 156:21
**readily** 252:19
**reading** 18:3 220:18
  268:4,6 272:19
**reads** 71:4 140:8
  158:23
**ready** 238:2 267:2
**real** 105:21 140:25
  209:9
**realigning** 96:4
**reality** 115:3
**realize** 62:2 121:5
  130:15 143:2
  220:22
**realized** 141:5 142:4
  142:21 160:8
**really** 53:13 71:2
  85:6 89:19 97:22
  142:24 198:13
  212:10 225:23
  236:23 251:6

258:8
**rear** 66:16
**reason** 44:1,12 45:8
  60:12 72:24 80:9
  100:12 101:9
  139:11 159:2
  183:9 194:20
  206:17 218:4
  231:25 232:25
  233:4 246:13
  247:9,20,22
  251:25
**reasonable** 44:11
**reasons** 8:21 55:3,19
  57:5,10
**rebuttal** 227:9
**recall** 15:3 23:3
  84:18,21 103:8
  120:15 152:6
  175:4 176:1 182:5
  258:23
**receipt** 30:8 162:5
**receive** 87:20 91:12
  91:13 110:9 149:2
  162:8 166:7,18,24
  174:6 201:6 227:6
  238:2
**received** 26:21
  35:23,24 36:4,7,13
  36:15 40:15 48:13
  113:13 115:25
  116:2 147:16
  148:23 150:14
  162:2 167:4,7,9
  168:17,17,21,23
  168:25 169:13
  171:21,23,24
  174:9,11,13
  176:12,14,16,18
  176:20 179:15,17
  179:18 180:24
  182:20,22,24
  184:19,22 185:3,7
  185:12,15 191:11
  193:12 200:10
  208:2,12 216:10

219:13,18 220:19
257:5 274:16
275:3
**receives** 32:20
**receiving** 28:19 88:5
88:6,11 183:22
264:25
**recess** 101:19,20
123:4,10 185:19
256:16 260:8
**recipient** 183:16
**recognition** 25:6
30:21
**recognize** 27:6,7
29:19
**recognizing** 192:4
**recollection** 175:7
**recommendation**
184:8
**recommendations**
41:19
**reconcile** 180:7
**reconciliation**
166:13 180:21
**reconciliations**
181:25
**reconstruction**
132:18
**record** 15:5 16:17
35:20 36:1 41:23
50:18 84:23 85:11
97:25 114:12
121:4 124:9
132:15 142:22
159:20 164:8
167:14,20 168:6
170:23,25 173:22
175:20 188:15
221:25 224:10,13
224:15,19 227:14
227:17 238:11
260:22 267:25
276:11
**recorded** 28:2
**recording** 26:14
**records** 12:13 17:9

32:25 144:20
**recoveries** 204:14
**recovery** 75:21
**RECROSS** 274:5
**redefined** 46:16
**redirect** 75:1 101:17
101:22 256:19
274:5
**redirections** 172:14
**reduce** 10:20 55:4
55:20 56:6,15
58:25 248:15
**reducing** 10:17 67:1
**reduction** 135:21
**reductions** 144:6
**reelected** 108:16
**reemergence** 239:24
241:16
**refer** 6:22 42:4
112:3 128:2,18,20
170:21 175:21,23
179:11 184:16
209:4 210:17,18
214:1
**reference** 21:10
27:20 33:12 63:10
63:13 69:17 71:20
94:11 100:25
184:11
**referenced** 20:23
21:7 28:20
**references** 221:10
**referred** 35:1 102:8
110:21 176:2
182:5,12
**referring** 22:8 24:21
49:18 69:2 73:1
76:20 81:10 82:25
83:8 110:22
128:13 134:25
180:6
**refers** 12:11 114:18
160:24,25
**reflect** 49:7 50:13,14
174:5
**reflected** 140:24

154:14 157:20
167:20 169:8
171:5 175:22
178:8 179:12
180:3 224:21
**reflecting** 26:11
**reflects** 136:6
**refuse** 38:16
**regard** 11:1 22:14
22:16 162:10
221:14
**regarding** 7:6 17:23
41:23 54:21 59:7
84:13,19 98:4
101:5 103:2
**regulated** 91:3
**regulations** 143:8
**reimbursement**
96:24
**reject** 119:17
**rejected** 119:15
**relate** 24:7 27:21
30:18 165:7
173:10 212:2
220:24
**related** 82:1,5
125:18 130:5
132:9 139:12,12
166:8 276:12
**relates** 82:5 105:2
144:17
**relating** 83:12 172:4
173:15 174:4
180:2 258:12
**relations** 225:1,3
**relationship** 13:12
13:14 111:14
118:24 140:13
142:6 145:3 147:3
148:1 247:25
249:9 258:12
**relationships** 249:12
**relative** 7:20 9:8
24:4,17,17 26:6
46:20 55:13 143:7
205:4 223:22

**relatively** 134:7
**release** 102:1,3,6
**releases** 101:24
**relevance** 122:9,19
233:7 258:19
**relevant** 131:6
242:15,16 259:17
**reliable** 230:13
231:12,13
**reliance** 65:20
**relied** 78:5
**relief** 119:14,17
120:5 136:23
164:25 165:20
211:12 237:22
238:14
**relies** 61:25
**rely** 42:23 44:8
**remain** 135:17,18
136:7,10,14
**remaining** 134:15
135:25 212:11,12
212:23 219:8
**remains** 204:2
232:12
**remember** 25:7
118:9 148:25
150:11 153:9
160:10 167:1
196:23,25 199:15
213:5 220:14
237:23 264:7
**remind** 192:11
**reminded** 152:2
153:2
**remotely** 163:25
**removing** 16:10,24
**rendered** 122:17
**reorganization**
255:25
**reorganize** 133:12
235:13 251:7
**reorganized** 204:5
**rep** 108:24
**repairs** 272:7
**repatriation** 165:17

166:25 172:5
174:5,6 175:23
**repayment** 236:5
**repeat** 132:14
206:16 252:13
**repeated** 153:3
**repetitive** 108:22
**rephrase** 119:19
**replace** 47:18
**replaced** 48:7 51:1
263:22
**replacement** 51:20
263:23
**replicate** 42:13
43:18 44:5 58:14
114:6
**replicated** 43:23
**report** 6:20 7:5 23:5
23:12 27:13 28:5
28:13 29:6,10
61:21 63:7,16
76:10,15 78:6
80:10 98:16 109:1
109:3,5,6,7,8
127:23 131:11,15
133:6,8,9,15 134:3
137:1,5,7 138:15
139:7 144:5,17,23
154:7 185:6 193:2
195:7,8,11 204:18
206:13
**reported** 20:11 34:6
47:7 206:20 223:7
223:8 276:9
**reporter** 224:17
260:14 276:6
**reporting** 8:12 28:5
48:2,3 77:20
**reports** 63:6 68:13
71:5
**represent** 15:7
25:21 33:6 58:10
85:7 114:16,17
127:9 128:25
132:23 146:4
**representative**

104:10,24 105:12
105:13 109:11
129:7 190:12
**representatives**
116:14 117:19
151:1 159:17
176:25 199:1
210:2
**represented** 15:8
86:1 106:3 111:5
121:8 129:7
**representing** 36:23
104:20
**represents** 12:7
23:17 111:22
**reps** 111:10
**request** 151:15
152:2 158:20
159:5,25 160:6,17
161:13 162:18
164:22 168:13,15
169:13,23,25
170:22 171:10,12
171:15 172:3,6,7
172:15 173:2,8,23
174:1 175:9,10,14
176:1 177:4,25
178:24 181:5,19
182:17 184:4,13
184:16 185:13
188:9 191:23,24
192:4,5 193:4,10
193:10,12,13,15
196:20 201:1,6,12
201:14 209:5,17
209:19,21
**requested** 119:14,17
125:21 136:23
146:24 157:13
160:20,21 164:20
166:7 170:23
171:2
**requesting** 120:5
158:1 161:10,15
180:20 237:22
238:15

**requests** 10:9,14
151:22 158:8
171:6 177:15
178:1 181:3 201:1
**require** 13:17 17:3
72:11 75:23
143:22 144:11,12
234:8 269:18,22
**required** 26:16
30:15 42:23 111:3
133:23 144:14
161:25 172:17
**requirement** 6:10
24:22,22 25:8
26:12,23
**requirements** 10:2
136:2,2,3
**research** 20:25 41:2
59:10,13 64:7,12
64:13 93:21
125:18 230:11
231:8
**researched** 111:9
**reservations** 131:19
**resolve** 121:1 222:7
257:24
**resolved** 235:17
237:23
**resources** 165:25
166:1,4
**respect** 6:21 8:7
12:20 13:11 17:13
18:8 21:1,10 23:1
24:8 28:2 35:9
41:8,9 46:16 56:3
67:10 75:10,14
84:9,10,14 85:5
90:25 91:1,22 92:1
111:13,18 113:5
115:8 117:11,18
118:16 119:13,24
121:17 128:11
133:1,9 134:8
136:17 137:16,18
142:6,14,16 143:3
144:4 147:2

149:25 154:14
158:1 160:21
169:19 172:3
173:16,23 174:3
177:3 180:13
181:10,21 184:8
208:23 211:3,10
212:12 221:24
228:9 237:20
258:20 259:6
**respectfully** 139:3
222:16 224:9
225:18,24 226:9
259:6
**respective** 117:20
**respectively** 24:20
67:21
**respond** 18:9 59:18
59:23,24 60:3,7,22
72:4 151:21
173:25 184:1,4
187:14 226:11
**responded** 66:6
70:19 187:13
193:13 209:19
**respondents** 93:2
**responding** 169:23
186:18
**responds** 66:10
**response** 57:3 66:2,4
71:21,24 72:20
82:16 83:18 89:21
95:25 151:20,20
152:5 166:7,17
168:15,19 169:12
170:22 171:5,8
172:10,14,18
173:1,7,25 175:3
175:22,24 178:7
178:12,23 181:18
182:13 184:19
187:15 191:23,25
192:1,4,5 209:21
**responses** 70:23
169:17
**responsibilities** 10:4

104:23,25 106:22
106:23 107:3,8,11
109:16 111:2,13
114:17 121:7
**responsibility** 67:17
68:9 99:25 108:13
144:19
**responsible** 270:20
**responsive** 166:9
171:6 172:5,11,20
174:25 175:5,10
176:3 178:24
182:16 184:16
188:2 191:12
193:4 258:7
**rest** 19:2 114:12
235:21 236:4
240:13
**restrict** 164:7
**restrictions** 67:19
194:4
**restructure** 241:17
**restructuring**
124:24 127:12
129:25 132:3,6
139:11 150:24
163:1 168:16
190:21 212:23
233:18 248:12
254:18
**result** 45:14 46:9
48:6 51:2 53:9
73:5,9 75:20,20,21
89:2
**resulting** 181:11
**results** 24:12 66:24
102:6 223:7
**retail** 24:20
**retain** 20:20
**retained** 7:23 108:3
150:19 195:3,5
**retainer** 195:10
**retaining** 80:2
**retention** 144:18
203:6
**reticent** 201:19

**retired** 87:25 88:3
242:5 263:19
265:18 269:1
272:13
**retiree** 5:23 7:4,6
10:10,12 11:1
12:13,24 14:22
17:6,10 19:10,24
20:3,18,19,20 22:5
22:23 23:1,13
25:10,18,23 26:11
28:19 29:17 30:4
30:25 31:20 32:1
32:19,24 35:10
45:1,9 55:4,6,13
55:20,23 56:7,15
57:9,16 62:12
64:18 66:24 67:1
68:14,23 69:20
70:9 71:7 72:11,18
73:4,9,10,14,17
75:5,22 77:3 79:14
80:24 83:5 86:1
92:18 101:5 138:8
139:12,18,22
204:13 240:14
245:25 246:3
255:19 266:12
272:13,17
**retirees** 9:4 10:13
12:25 13:4,8,17,18
13:19,19 14:1,1
15:8 18:8,20 19:6
19:22 20:1 26:15
29:19 30:10,20
31:9,20 32:12,18
33:1,20,21 34:9
47:16,17 57:17
59:1,8 67:16,20,23
68:6 69:21 72:11
73:2 74:9,15 75:6
75:15 76:8,18,20
79:18 80:23 83:22
83:25 84:4,20 86:8
86:14,17 87:2,10
87:14 88:15 93:8

110:2,6,9,13,14,25
119:5,7 139:18
144:2 242:4
245:24 255:17,17
**retirement** 8:8,16
9:3 11:1 12:10
18:4 20:14 21:2
23:5 32:11,23 34:4
61:16 95:11 99:25
102:21 264:13
**return** 154:6
**returning** 254:12
**revenue** 205:14
239:13
**review** 10:5 17:22
20:19 21:6 22:13
22:15 33:12,13
64:5,6 65:22
157:25 159:8
160:19 208:15
257:7
**reviewed** 60:16
64:18 81:18
112:14,17 168:18
175:5 191:14
213:22 233:25
242:21 243:19
**revised** 52:14
**revisit** 79:3
**RICHARD** 2:8
**Rick** 109:8 158:4,9
159:23 167:19
168:10 169:9
174:20
**Ridge** 210:3
**riding** 265:12
**Rigatta** 97:2
**right** 4:23 5:4 27:13
28:4 37:3 38:22
39:11,13 40:20
41:21 42:20,25
44:9,22 45:21 46:3
46:6,24 47:11,19
48:7,14 49:14,17
50:1,23 52:7,10,19
52:22,25 53:1,4,11

53:12,21 54:18
55:8,23 56:21
58:21 59:1 60:24
61:13 62:6,12
63:18 65:8 68:9
69:2,7 70:11 71:11
71:16,22 73:11,12
73:16 74:10,15
75:6,12,16,24
76:10,18,19 77:8
77:17,18 81:21
82:7,7 83:9,17,19
83:20 84:6,7,11
86:15,18,19,24
87:7,20 88:4,5,17
88:25 89:3,12,15
89:17,22 90:2
91:19 92:15 93:22
96:13 97:1,9 99:5
101:6 106:20,21
113:15 114:9,17
127:3 138:2
158:24 160:5,15
179:8 186:17,19
190:3 191:24
196:8 201:5,22
203:21 205:23
207:7 208:5
213:14 214:18
216:20 219:2,4
226:1 230:11,18
232:13 234:7,20
235:9,10,14
237:11,20 240:22
241:5,17 243:1,21
247:19 248:3
249:18 250:21
262:25 263:21
264:14,23,25
265:22 267:13
**rightly** 143:6
**rights** 87:19 108:4
131:20
**rise** 66:16
**risk** 126:2
**river** 265:12

road 95:22,24 219:1
Robert 2:9 36:22
Robinson 177:18,19
   178:5
Rod 97:2
role 121:16 126:24
   130:5,9 147:21
   158:1 201:25
   203:1
roles 130:10
roll 118:15
rolling 96:3
Roman 69:13
Ron 126:10
room 16:4,8 100:15
   149:22,24 195:17
   261:23
Rosco 99:10,14
roughly 232:5 236:1
round 239:16
row 41:6 49:17
   155:8
rows 155:6,8
Roy 109:7
ruled 164:12
rules 58:12,13 73:8
   90:9 91:1
ruling 73:7 256:6
   258:22
run 154:3 165:21,22
   208:25 209:4
   233:24 236:1
   272:22
running 92:8 106:25
   236:14,17 250:3
   265:11

                 S
S 2:1 3:1 4:1,8
   103:22 124:1,1,1
   260:16 274:14
   275:1
sacred 222:12
sacrificed 111:24
safety 90:1
sake 109:12

salaried 44:22 45:4
   45:10 101:3
   154:20
salary 155:4 271:17
sales 232:4 239:14
salesperson 105:20
sample 70:14,15
sat 260:2
save 30:23 159:7
saved 131:10 272:5
saving 142:23
savings 30:24 83:3,7
   83:10 92:7 93:25
   96:23 99:25
   130:15 142:10,14
   142:16,19,20
   143:2 147:25
   148:3,8,15 164:19
   166:12 171:2
   177:14 180:2,6,10
   180:13 181:6,10
   181:16,20,22
   182:1,10 205:18
   214:22,25 215:1
   217:19 219:22
   220:22 221:1
   233:13 234:22
   237:2,3 242:3
   252:17 254:21
   255:7,10 272:2
saw 96:11 97:8
   181:25
saying 23:3 47:15
   62:14 191:16
   209:14,15 229:10
   237:7 245:22
says 42:12,21 50:1
   54:7 61:13 66:23
   67:15 68:5,12
   69:18 70:7,13,19
   72:10,17 76:13
   77:13,19 78:24
   79:13 80:22 84:3,4
   86:6,6 93:25 94:13
   95:21,24 96:23
   97:2,13 99:21

112:19 153:5
   217:1,3,5 218:3
   232:4,13
scare 89:9
scenario 208:25
   209:1 217:19
scenarios 209:3
schedule 180:8
scheduling 35:24
scheme 98:6 225:2
school 105:16,17
   125:13,24 270:15
   270:17 271:3,3
   272:22
schools 271:1
science 7:8 105:18
scope 7:14 40:23
   41:15 43:6 44:2
   98:21 114:7,16
   137:1 138:15
screen 260:13
screwed 63:23
seated 260:9
second 18:21 35:6
   54:10 61:13 66:23
   67:15 70:7 71:20
   72:7 77:19 81:7
   84:4 95:21 96:14
   99:8 135:15
   165:11 167:15
   172:16 180:18
   216:18,21 245:6
Secondarily 130:11
secondary 248:20
secondly 156:7
seconds 23:23
section 13:2 23:16
   31:14 62:11
   144:16 180:2
Sections 136:23
securities 140:1
security 90:7 95:11
   204:15,15 265:23
see 6:24 12:5 14:19
   26:2,3,4 27:9 28:6
   28:8 29:10 42:10

42:15 47:14 50:10
   54:8,11 69:22 72:8
   77:13 78:22 79:10
   80:20 81:8 93:3
   94:15 95:3,22 97:3
   97:11,17 98:25
   99:12 115:18
   116:9 134:12
   136:3 140:5 147:5
   149:10,16 155:3,7
   155:10,12,24,25
   157:15,23 160:1
   161:6,10,22
   166:15 167:24
   170:11,12,13,14
   172:18 180:1
   212:24 216:23
   217:12 218:14
   219:11 220:25
   223:17 229:16,18
   229:20 232:6,23
   232:25 233:4,23
   236:7,8,10 238:3
   242:8 243:24
   244:19 246:16,19
   251:22,24 258:18
   260:13 264:10,15
   264:17 272:20
   273:10
seeing 157:7 165:14
   234:17,17,18
   235:16 252:4
seek 145:5
seeking 148:16
   184:1 206:16
   211:12 225:8
   254:21
seen 97:23 101:7
   113:9 195:23
   207:2 214:21,23
   214:24 230:3
   254:14 270:20
segments 57:10
selection 94:13,14
   94:19
selective 32:16

self 107:15
semi 105:5
seminars 81:22
send 66:13 159:2
　173:6 183:23
sending 160:8
　168:11,14
seniority 108:4
　268:24
sense 7:14 146:16
　159:7,13 207:9
　211:18 220:25
　229:4
sent 72:4 159:15
　160:3,5,11,12
　167:25 168:2
　169:10,13 175:3
　178:11 179:4
　183:17,18,20,21
　184:7 186:22,24
　187:6 209:8
　270:14
sentence 17:24 18:2
　18:8 28:24 42:8,10
　42:12,20 54:11
　61:13,21 64:5 65:4
　68:7,12 69:18
　70:13 71:2,3 72:15
　76:25 81:7 82:19
　82:24 84:3 86:3
　94:13,24 100:23
　112:24 140:8
　178:17 201:5,6,9
　203:5 216:21
　217:9
sentences 113:17,21
　114:11 115:22
separate 130:10
　200:11 210:14
　226:20
September 96:8
　195:18
series 39:6 140:5
serve 107:17 124:22
served 105:11
　126:24 129:14,19

234:10
service 64:9 139:21
　271:7
services 8:3,7,10,14
　37:24 124:15
　202:23
servicing 108:22
session 116:20,21
　210:7
set 143:17 149:19
　163:5 192:19
　211:14 220:20
　240:7 241:21
　260:5 276:16
setbacks 254:1
sets 211:11
setting 228:18 242:7
settled 67:2
settlement 7:5 31:8
　122:15 143:25
setup 102:23
seven 112:21 126:20
　134:15 212:15
　265:10 269:17
severe 66:14 82:2,3
SG&A 255:10
SHANNON 2:23
share 18:3,4 69:19
　77:19 105:6
　134:17 175:15
　181:15
shared 84:11 141:13
　154:5 198:11
　205:17 206:6
　208:9 219:24
　220:2 235:10
　239:1
shares 229:9
sharing 34:7 81:23
　193:5 207:8,18
　257:20
Shaw 2:8 158:3,4,5
　158:7,9 159:23
　167:19 168:10,14
　169:10 172:24
　174:20 175:13,20

175:21
shear 154:3
sheet 49:1 99:11
　140:3 154:22,23
　154:23 231:1
　250:11
sheets 11:11 26:12
　27:7 113:20
　154:22 157:2
　180:15,24 181:24
shift 68:5 96:16
shifting 99:24
shifts 250:4,5
shoe 105:20 213:22
　213:24
shooting 235:23
　239:23,25 245:8
　245:12 246:4
shop 104:14 106:2
　106:15 109:10
　269:10
short 30:17 36:25
　67:9 79:1 134:12
　134:17 135:14
　188:8,9,10 237:19
　251:17
shortfalls 99:11
Shorthand 276:6
shot 240:21
shots 249:6
show 21:24 34:2,22
　35:11 66:25
　138:19 166:11
　198:5 221:14
　223:16 231:4
　241:13
showed 33:23
　241:25
showing 32:6 154:24
　214:22 247:23
shown 15:19 33:4
　68:1 221:4
shows 32:14 131:4
　217:18 224:4
　232:3,5,18 250:15
shrinking 10:18

shut 134:17,20
　135:14,16 161:3
　212:23 213:17
　214:12 215:12
　217:1,11,11,20,20
　217:25 218:1,3,7
　218:10,15,20
　237:25
shutdown 215:4
shuts 213:20
shutting 149:13
　217:22,23,24
　218:4
side 203:20
sight 150:15 151:22
Sigma 142:25
sign 5:17
significant 30:14
　34:5 48:1 75:19
　83:3,7,10 238:6
　248:10 252:12
significantly 241:10
silence 175:16
silent 175:14
sill 40:5
Silva 96:15
similar 7:20 101:4
　121:19 144:8,8
　177:21
similarly 125:15
Simon 3:3,6 215:9
　215:24 216:1,2,7,8
　216:16 258:20,25
　259:19 260:11
　267:5
simple 241:18
simpler 30:4
simply 26:14 34:8
　97:25 100:23
　136:3 155:23
　170:17 175:2
　197:6 200:22
　206:16 207:16
　240:8 241:6,7,12
　241:25 254:8
simultaneously

258:9
**single** 90:5 140:20
**singled** 45:1
**sir** 104:6 105:25
  122:24 124:17
  191:2 193:9 194:4
  196:22 198:18
  199:20 200:14
  201:14 203:1,3,14
  203:24 204:8,24
  207:19 208:23
  209:14 213:4,16
  214:14,19 221:6
  221:18 224:5
  229:11,17,21,23
  230:11,14 231:19
  231:21 232:10,24
  233:5 235:1
  237:16 238:15
  242:6 244:15
  246:7,12 247:5,10
  247:24 249:17
  250:9 252:1
  253:21 254:5
  256:3 259:24
  265:21 267:6
**sit** 216:1 227:14,18
  259:20
**site** 150:2,9,15 151:5
  151:9 152:1,13,18
  153:10,15 154:11
  154:12,18 155:13
  155:14 159:9,9,12
  194:24 196:16
  197:22,23,25
  198:1,3,16,25
  199:21,23,23
  200:6,7,9,11,12,17
  200:19
**sites** 150:17
**sitting** 166:2
**situation** 146:15
  162:25
**situations** 125:21
**six** 47:22 48:5 68:20
  112:20 126:20

134:11 136:5
  142:25 232:5
**size** 7:20 8:22 10:18
  22:6 27:3,4 71:25
  136:11
**skeptical** 198:19
**skip** 78:10
**Skyway** 118:10
**slew** 146:20
**Slightly** 239:22
**slip** 240:17
**small** 96:21 262:5
  263:13
**smaller** 9:1 14:16
  202:13,15
**smiling** 183:8
**snapshot** 156:1
**sneaking** 163:19
**Social** 90:7 265:23
**society** 39:3,7 40:5
**sold** 134:12 212:3,3
**sole** 190:12
**solve** 145:6 250:23
  250:23
**somebody** 96:23
  150:12
**someplace** 264:6
**somewhat** 53:12
  215:10
**sons** 105:19
**soon** 165:20 229:19
  229:21
**sorry** 7:14 14:7
  15:12 16:5 25:2
  27:17 34:1 43:13
  50:19 62:2 82:23
  102:23 108:21
  110:11 112:8
  114:22 126:18
  160:4 164:9
  174:23 178:18
  189:7 212:6,7
  225:23 234:23
  238:9 265:6
**sort** 147:9 149:19
  235:22

**sought** 140:12
  225:19
**source** 16:1,18 21:25
  89:24 92:7 230:14
  231:12,14
**sources** 20:13 62:18
  62:21,24 63:7,8
  69:5 92:3 93:9
  127:19 205:14
**South** 261:1,5,6,9,12
**SOUTHERN** 1:2
**so-called** 118:25
  142:19 146:6
  163:25 205:12
**speak** 124:17 144:23
**special** 126:11
  129:20 209:12
  210:7
**specializing** 95:19
**specific** 10:13 14:17
  55:11 58:11 64:14
  64:15 74:21 77:9
  109:13 132:9
  141:6,16,17
  160:17 184:13,16
  187:23 208:25
  218:15 228:21
  229:4 235:24
**specifically** 5:22 8:8
  8:9 10:11,15 16:11
  19:7 20:16 26:12
  28:17 31:8 139:6
  154:14 164:18
  196:20 197:16
**specifics** 141:22
**speculate** 218:19
  219:1
**speculation** 218:22
  219:5
**speed** 99:24
**spending** 96:2
  139:14 159:12
**spends** 20:3
**spent** 18:19 75:9
  190:18 207:22
**spikes** 96:1

**spilled** 258:16
**split** 153:24
**splits** 12:16
**spoken** 141:11
  243:15 251:20
**sponsored** 91:20
**spouse** 87:6 92:4
**spouses** 88:8,10,12
**spread** 136:1
**spreadsheet** 138:17
  209:7 219:20
  221:10 222:21
  223:2 224:7
  236:12
**spreadsheets** 187:19
  208:1,8,14,21
  220:20 223:4
  236:21
**springing** 222:8,11
**ss** 276:3
**ST** 78:8
**stable** 232:19
**stack** 262:12
**stacked** 269:8
**stacking** 262:11,15
**stand** 114:5 138:24
  139:11 164:6
  236:11 237:15
  267:16
**standard** 26:16
  27:10 83:4 117:23
  205:24
**standards** 6:8,9,12
  26:10
**standing** 28:25
**stands** 139:12
  164:13 217:17
**start** 23:14 48:10,15
  49:3 51:2,17 52:1
  53:9 74:1 129:10
  177:8 185:25
  249:19 261:20
**started** 40:19,23
  125:16 187:4
  189:1 257:1
  262:14 269:9

**starting** 230:25
238:7 242:18
**startled** 272:6
**starts** 18:2 42:9 50:3
54:11 72:7,16
78:21 79:10 80:19
81:8 97:10 99:10
**state** 22:16,23 23:4
23:10 24:9,11,18
24:23 91:4 105:18
124:9 202:22
212:21 218:16
227:21 260:21
267:24 276:3,7
**stated** 46:17 139:7
222:4
**statement** 12:12
21:1 25:9,12 32:24
43:2 64:6 98:1
100:1 108:17
114:3 115:9
130:21 140:14
153:3 211:2
213:16 218:2
**statements** 8:13
17:2,3,9 21:9
26:20 117:18
130:9 131:7 191:4
**states** 1:1,10 55:17
55:21 56:4,5,8,19
56:24 57:12 59:7
59:15 109:14
112:20,21
**stating** 20:6 25:7
**statistics** 67:5 68:1
71:17
**status** 12:5 84:6
86:9
**stay** 135:12 216:13
264:9
**stayed** 269:1
**Staying** 207:18
**steady** 232:12
268:24,25
**steel** 13:9 105:23
107:14 117:19,22

120:13 126:12
129:12,15,22
132:23 177:18,19
260:12 262:10,12
262:16
**Stenger** 190:18
209:24 216:5
230:4,7 236:24
237:6 243:12,15
247:1 252:11
253:3
**Stenger's** 166:15
180:12 234:1
247:14,23 252:7
**step** 27:1 246:15,16
247:24
**STEPHEN** 2:17
**Stern** 95:15
**STEVEN** 2:7
**stick** 214:21
**sticking** 17:18 25:16
128:7
**sticky's** 128:7,21
**stipulation** 216:12
**stop** 23:14 249:10
**stopped** 85:24
**store** 105:20
**straightening** 269:6
**strange** 99:1
**strategies** 67:9,15
77:13 105:6
126:21
**strategy** 67:2 79:1
84:10,15,21
**Street** 2:5 3:5
**strike** 117:20,23
118:6,8,10,12,13
118:16,17,19
152:22 163:18
258:19
**strikes** 117:25 118:2
118:4,5
**striking** 259:18
**STROOCK** 2:20,20
**structure** 86:21,25
135:9

**structured** 86:13
208:9
**structures** 190:11
**struggles** 111:22
**stuck** 232:3
**studies** 33:24 101:24
**study** 20:16,23
21:14,17,18,18,22
21:23 28:20 33:16
33:17,22,25 34:3
34:25 35:1 65:9
68:13,18,19,19,22
69:2,4,18 70:1
71:5,16 77:1
**stuff** 142:25 196:10
**stupid** 265:13
**subject** 6:7 12:17,19
13:5,6,8,23 14:11
14:18 18:13,14,16
18:24 19:1,3,5
31:13 40:3 45:17
46:18 82:18 100:9
115:23 116:1
122:10 131:16
137:14 185:9
212:4,13 245:16
**subjects** 193:11
**submit** 63:6
**submitted** 6:23 7:3
7:5 120:20 121:6
159:4 187:12
192:5 193:10
200:25 234:1
236:25 243:19
**subsequent** 98:3
182:5 195:7
212:22
**subsequently** 87:25
126:10,19 135:16
181:25 191:11
**subsidiaries** 166:2
172:9 236:4
**subsidies** 91:13
**subsidize** 74:14 75:5
86:16
**subsidy** 28:16,22

29:2 68:15 71:8,10
71:12 77:4 79:1
80:2,5,14,16 86:13
**substantial** 133:20
143:7 153:15
188:4 229:8
**substantially** 133:19
134:18 135:2
136:11 173:8
**substantiate** 219:10
**subtracts** 19:9
**success** 203:13,17,22
203:23 204:2,4,8
204:10
**successful** 204:19
**successfully** 235:12
**suffer** 143:7
**suffered** 253:25
**sufficient** 42:13
43:18 44:6 133:18
146:12 153:19,20
154:4,5 219:10
236:8 237:7,8
240:12 258:1
**suggest** 138:5 140:9
225:20 226:9
259:6
**suggested** 33:18
80:11
**suggesting** 48:4
171:15 194:11,14
200:12,15
**suggests** 29:4 166:19
**sum** 68:5
**summarize** 20:10
22:20 28:13 29:13
105:16 224:4
**summary** 12:4
34:24 62:10 65:14
65:21,23,25 66:23
67:13 68:4 69:10
76:12,13 77:11
155:16,23 156:6
**summer** 92:13
**Summing** 58:20
**supplement** 174:21

270:16 272:24
**supplemental** 4:14
  11:16,24 32:4
  35:22,22 89:14
  100:21 149:1
**supplementation**
  90:22 91:13,19
**supplemented** 160:7
**supplements** 175:2
  175:24
**supplier** 104:19
  233:3 251:19
**suppliers** 55:14,17
  104:17 131:1
  228:1,6,13
**support** 97:1 166:5
  172:9 213:16
  215:17
**supporting** 47:22
  148:11
**supposed** 58:7,10
  85:14 106:19
**sure** 19:20 24:10
  25:21 26:9 35:25
  36:19 39:20 45:22
  60:1 77:7 90:3
  101:18 129:10
  149:3 156:22
  183:19 226:12
  235:7,20 238:10
  256:15 260:6
  267:22
**surprise** 186:11
  213:7
**survey** 22:25,25
  23:17,22 24:3
  61:14,22,23 62:8
  62:23 63:16 65:15
  65:17,19,22 66:6
  66:10,12,24 67:6
  68:23 70:4,5,8,20
  70:23 71:19,20
  72:4 73:16 76:9
  77:11 80:3,11 81:2
  91:16 96:15 185:2
**surveyed** 72:10,25

76:14,15 80:4
**surveying** 70:10
**surveys** 59:7,11,14
  59:19,23,24 60:3,8
  60:14,20,22 67:7
  92:25
**survive** 135:20
**survived** 22:18
**surviving** 88:8,10,12
**sustain** 91:2 115:15
  122:20 263:25
**sustainable** 239:25
  246:3 248:3,8
  253:17
**sustained** 9:24 64:3
  74:5 89:5
**Suzanne** 4:6 274:7
**swear** 101:11 260:14
**swearing** 86:4
**switch** 263:7
**switching** 28:11
  103:20 210:10
**sworn** 4:9 103:23
  124:4 260:17
  267:18
**system** 96:3
**systems** 249:8
**S&P** 20:19,23 21:1
  33:12 64:6

---

**T**

**T** 4:8,8 103:22 124:1
  124:3 274:14
  275:1 276:1,1
**tab** 4:17 6:18 11:5
  16:19 41:25 49:4
  54:2 57:19 62:3,20
  63:1,15 65:12
  66:22 68:10 69:1
  71:1,18 76:25
  77:11 78:4 81:5
  92:10 93:12 95:5
  96:7,7 97:7 100:21
  100:22 112:5,7
  127:25 158:13,16
  159:19 167:12

169:3 172:21
  174:15 176:9
  179:12 183:2
  186:15,16 188:24
  202:11 220:9
  230:7 243:12,18
  247:14,14,17
  254:12
**table** 117:11,15,16
  227:14,16 233:3
**tabs** 4:15 183:4
**tackling** 248:25
**Taft-Hartley** 8:5
**tail** 257:1
**tailor** 161:13 201:1
**take** 15:5 20:9 21:15
  24:6 28:12,22 33:8
  39:15 40:1,4,7,11
  40:12,13 41:25
  46:23 53:14 54:2
  78:25 80:14,15
  86:16,22 101:19
  105:15 123:3,5
  134:7 139:24
  142:20 143:8
  155:15 156:10,13
  156:19 181:6
  194:2 198:8
  199:13 204:19
  212:14 220:13
  224:17 225:24
  230:2,18,19,20
  233:11 237:13
  239:6 241:8 268:9
  270:3
**taken** 83:12 99:2
  101:20 116:7
  118:20,21 123:10
  128:21 135:24
  140:23 143:12
  146:19 153:4
  157:3 185:19
  193:14 197:6
  218:17 220:23
  226:16 256:16
  260:8

**takes** 11:10 137:23
  149:11 168:1
  239:8
**talk** 10:24 29:6
  45:21 83:21 115:7
  168:6 187:10
  197:19 201:25
  206:12 211:23
  215:19 219:7
  222:20 250:19
**talked** 30:12 33:9
  81:14 112:25
  132:5 188:19
  239:2
**talking** 12:24 14:17
  35:12 47:5 49:19
  51:9,10 82:21
  94:12 99:10
  110:20 163:8
  164:9 177:18
  186:6 189:1
  190:14 212:11
  216:17,18 231:5
  232:15 233:10
  234:22 238:4,7
  250:20
**talks** 64:5 83:24
  113:19
**tall** 264:21
**Tambe** 2:6 4:2 128:6
  128:16,20 130:2
  130:25 131:18
  136:25 138:14
  139:1 141:11,24
  152:22 163:18,23
  167:6 168:22
  171:22 174:10
  176:13,19 179:16
  182:21 184:23
  185:9,16,20,23
  186:14 188:17
  202:3 215:18
  216:19 220:7
  222:1,17,19
  226:11,13 227:1,7
  227:19 229:24

230:2,5 233:10,16
238:12 253:5
256:11,20 258:6
267:4 273:6
**Tambe's** 226:4
**Taranto** 4:7 7:8,13
11:23 15:6,15
36:22 42:5 78:10
93:17 98:13 99:9
101:23 274:7
**Taranto's** 4:14
84:23 97:21
**target** 135:4 138:4
142:1 207:16,16
235:22 239:21
242:7
**targets** 139:9 140:11
141:15 205:13
251:15
**Tarry** 145:25 146:2
146:4,7 147:15
148:22 151:25
152:20,24 158:10
185:1,4
**tasked** 98:25
**tasks** 114:1
**taught** 263:14
**taxes** 138:2,6 236:2
236:5 240:12,15
**team** 84:23 107:10
107:12,13,15
**teams** 107:14
**technically** 18:17
**tell** 4:24 6:18 8:9
12:7 13:11 15:25
21:24 22:20 23:16
23:18,24 26:8
29:22 35:4 38:16
85:20 90:14 100:6
116:24 124:20
160:20 167:16
177:2 181:9
183:17 189:16
192:13 225:5
239:18 241:21
245:24 256:22

262:6 264:12,15
266:18 268:14
273:2
**telling** 86:5
**tells** 59:22
**temporarily** 108:17
**temporary** 107:20
**ten** 39:11 77:16 80:4
260:4 268:18
271:4
**tendered** 120:17
**term** 30:17 67:9
79:1,2 80:25 132:4
135:9 136:13
140:19,24,25
141:9 143:18,22
144:10,11,15
161:20,22 162:15
181:7,11,21,22
182:11 184:7,14
251:16,17,18,18
251:18 252:14
253:17
**termed** 107:9
**terminate** 57:16
**terminated** 87:18,24
88:2
**termination** 97:16
**terms** 18:17 31:25
90:18 91:20
108:16 111:3
119:12 133:13
139:17 141:14
144:1 145:2
161:19 163:2,3
165:7 187:11
188:18 196:4
203:6 235:1
251:14 255:6
264:14
**test** 40:3,5,7,13
**testified** 4:10 35:5
51:5 103:24
116:16 124:5
125:1 148:23
210:24 247:8

260:18 267:19
**testify** 74:19 112:15
145:25
**testifying** 4:19
114:25
**testimony** 6:23 7:3
17:12,23 22:11,14
22:15 33:14 39:24
41:15,16 49:22
53:15 58:15 60:17
60:25 74:17 90:12
116:18 137:2,11
163:19 212:13
215:16,17 234:1
252:7,8 258:19
259:17
**tests** 39:6,11
**text** 187:13
**thank** 7:11 11:20
20:7 36:5 75:2
85:15 102:17
103:14,16 116:4
122:12,24 123:1
127:3 131:18
132:19 141:24
215:6 224:18
248:1 254:9
256:11 259:24
260:7 266:20,23
266:25 267:2,6,7
273:4,6,7,8,10
**Thanksgiving** 271:7
**theater** 216:9
227:13
**thereabouts** 135:4
159:1
**thereof** 112:15
**thereto** 17:13
**thing** 40:22 89:9
119:16 227:1
235:4 264:15
265:2
**things** 30:10 98:6
111:7,11 140:22
147:9 166:22,23
196:7 235:18

237:5 251:22
262:5,7 264:19
273:1
**think** 9:19 14:13
17:11 19:18 21:15
45:12 52:11 58:12
60:10 61:5 64:1
74:17 78:2 82:14
85:6,17,19 90:24
97:21 131:24
135:25 141:16,21
152:6 158:14
163:2,19 164:5
177:7 186:24
188:14 190:13
192:8,12 209:2,2
215:13,22 218:6
222:3 227:20
240:21 248:24
249:3 252:19
254:3 258:10
266:11,14 267:11
268:11 271:16
272:17
**thinking** 272:20
**third** 19:4 22:3
24:14 64:5 69:17
78:12,20 100:22
112:24 115:17
134:18 154:23
165:12 180:18
243:7 248:22,23
**thirdly** 133:21
**THOMAS** 2:16
**thought** 26:5 100:14
132:17 159:6
198:1
**thousand** 20:18
32:21 33:2 61:15
63:17 64:11 89:7
89:11,13,18,25
90:5,21 180:11
203:7
**three** 18:12 33:4
37:8,10 102:15
125:25 131:14

136:9 143:19
154:22 165:12
171:12 180:5
187:16 208:1,14
215:1 217:24,25
218:9 219:1,8,14
220:22 238:4
243:1,9,16 245:5
245:11 263:25
264:1
**threshold** 138:4
**throw** 142:25
**tied** 138:8 139:20
180:8
**tier** 246:19,23
**tie-in** 148:19
**tight** 45:13
**tightening** 96:17
**time** 13:15,20 27:6
35:21 42:17 43:4,5
45:6 47:6,16 50:5
51:23 52:3,4 53:18
58:13 71:19 79:2
81:2 82:23 85:4,12
103:1,19 105:13
106:23,24 107:7
108:2 120:17,20
120:21,24 123:12
124:2 131:10,17
132:22 133:6
134:18 137:21
141:1 142:10
143:24 147:7
150:16 151:24
153:13 156:11
159:8,12,15
161:19,20 162:2
165:13,22 166:11
171:13,16 184:18
190:11,18 191:17
191:21 192:17,21
193:3 194:6,8,9
195:23 196:12
197:1,3,10,15
200:22 207:22
208:15 209:17,17

210:17 211:17
217:21,24 229:18
229:21 240:2
245:10 257:8,22
266:24 268:20
269:5 271:1,2,5,8
**timeframe** 192:3
**times** 97:8 100:7
117:4 162:5
205:21 262:8
**timing** 143:8 162:4
**title** 5:11 95:11
104:10 125:17
151:18
**titled** 16:24 92:17
244:1
**today** 26:10 30:3
38:19 41:7 100:13
145:23 238:13
240:5
**told** 41:11,18,22
60:19 152:15
157:17 159:9
195:6 203:24
205:15 235:21
253:3 270:2
**Toledo** 189:20
193:19,23
**tolerate** 98:10
**tool** 149:18
**top** 12:11 64:21 65:1
109:7 113:21
168:5 245:18
246:18,23
**topic** 130:5 137:4
233:22
**topics** 28:11 131:8
**total** 12:20 14:9,10
14:22,25 70:22
72:12 92:23 96:21
148:16,20 155:10
271:14,15
**totaled** 22:2
**touch** 211:4,6
**touched** 163:25
272:6

**Tower** 86:2 121:9,11
121:17,20,21,24
122:8,14 125:5
129:17
**Towers** 4:25 16:3,9
16:13,24 42:14,24
43:7,19,24 44:6
48:2 49:24,25
**track** 183:19 237:9
**tracks** 25:24
**tract** 259:8,9
**traction** 190:11
228:23
**traditional** 99:24
141:1
**traditionally** 139:16
139:17
**trail** 167:17 197:12
**trailing** 167:18
**trained** 268:16
**training** 40:12,15
48:12
**transcript** 252:10
276:11
**translate** 235:1
**translates** 235:4
250:16,17,17,24
250:25
**transmission** 178:14
179:6
**transmissions** 160:4
178:9
**transmitted** 168:13
179:23
**transplant** 228:18
229:7,11
**transportation**
56:19 57:7,11
64:24
**treat** 106:25
**treated** 257:11,12,16
**treatment** 22:15
**treatments** 264:5
**Treaty** 105:23
**tremendous** 264:20
**trend** 21:4 94:25

96:16
**trends** 155:22
**trial** 50:9 230:4,7
243:12 247:14
**tried** 45:23 220:24
224:21
**Trishia** 79:4
**trouble** 155:15
157:4,9 222:23
227:25 228:1
233:8
**troubled** 227:23
**truck** 143:6 268:23
268:25 269:3
**trucking** 56:20
**trucks** 107:2 269:7
**true** 19:13 43:2,4
57:14 88:15 90:4
101:3 115:10
256:1 259:4,4
276:11
**trust** 8:5 130:8,12
130:20 131:8,9
**trustees** 86:20
**trusts** 37:19
**truth** 71:3,3,4 98:1
**truthful** 213:21
**TRW** 244:10,12,17
244:22 245:4,9,9
**TRWs** 245:4,5
**try** 14:19 94:6
110:13 119:25
155:21 221:2
224:25 225:3
249:5
**trying** 14:16 24:10
47:13 58:24 85:22
97:25 122:7
140:16,21 155:8
170:7 188:15
200:1,4 201:1
202:3,4 222:7
228:7 233:9 254:7
272:24
**tuck** 63:4
**Tuesday** 207:24

273:11
**turn** 6:17 11:4,25
12:1 16:19,24
17:19 23:24 49:4
63:22 65:11 66:22
69:1 92:10,17
93:12 95:13
127:22 134:2
137:13 143:20
144:16 149:20
158:13 159:19
164:15 167:11
169:2,18 172:3,21
174:15 183:1
184:5 186:1
188:19 199:17
230:7 232:8 233:2
243:12 247:13
267:9 272:3
**turned** 157:6 269:21
**turning** 94:2 135:19
136:5 140:4
160:16 165:16
269:6,6
**turns** 200:7,20
**two** 6:24 12:14
13:15 19:7,11,25
20:12 35:22 36:8
37:1,15,24 46:10
46:14,17,20 63:8
72:6 81:11,13 99:5
108:16 110:23
111:21 113:17,21
114:11 115:22
118:21 122:11
130:11 134:16
135:13,24 144:19
154:21 155:4
160:1,11,13
167:14,25 171:17
175:17 181:23
183:21 185:3
186:22,25 189:6
190:6,19 191:11
191:16,20 192:18
202:15 210:7

213:19 215:1
216:12 217:24,25
220:20 226:20,21
228:16 269:24
272:21
**type** 17:16 23:13
34:7 40:7,12 45:11
59:18 111:17
263:16,24 264:13
269:2
**types** 8:2 262:1
**typical** 32:2 162:16
**typically** 13:16
**typo** 89:11 223:12

_____

**U**

**U** 4:8 103:22 267:17
**UAW** 3:4 7:4,4,6,23
12:13,21,23 14:8
16:10,12 32:19
33:1 104:7,9,12,20
105:3,9 106:12,23
107:21 108:18
109:24 110:23
111:6,21 117:21
118:18 121:21
125:16 177:16
180:15 191:9
199:6 202:22
210:3
**UCC** 151:5,23
154:11,18 155:13
192:21 197:23,25
198:16,22,24
199:2,4,9,10,21,23
200:9,19
**ultimately** 80:20,22
**Um** 46:1 50:17
**unable** 86:14 117:24
**Unafil** 264:1
**uncapped** 12:5
13:13 51:20
**unclear** 31:22 75:9
136:14
**undated** 186:5,17,23
**underlying** 155:24

156:24 157:7
165:14 170:7,18
184:15 225:1
**underneath** 140:15
**understand** 14:13
15:13 30:5 31:24
36:24 39:17 41:14
43:14 44:20 47:13
48:17 54:16 74:8
75:8 76:3 85:25
90:20 98:8,11
108:12 135:24
141:21 157:19
161:5 163:21
165:24 170:7,11
170:13 172:7
179:22 181:13
182:9 208:8,9
233:24
**understanding** 8:21
27:3,4 31:17 45:9
48:22 55:12 60:2
75:4 95:25 109:13
115:11,23 119:11
120:2 136:6,16
145:8,8,9 164:3
182:4 199:22
255:12
**understood** 132:19
139:16 141:9
**undertaken** 143:1
**unfair** 139:1
**unimpacted** 49:2
**uninsured** 96:2
**union** 6:17 12:10
14:6,24 15:8 32:10
36:6,14 44:21,25
45:3,6 63:5 84:9
97:8 100:23 104:7
105:3,4,5 106:6,15
106:19 107:24
108:3,11,21,22
111:23 112:4,12
113:12 116:2,22
118:14,15 120:20
129:4 133:20

140:11 143:25
144:13,13 150:25
154:20 157:13
158:14 159:16,19
161:3,6 163:17
167:4,11 168:20
169:2 171:7,21,24
172:2,21 174:9,16
174:19 175:22
176:8,12,15,17,22
179:15,18 180:13
183:1,11,23
184:19,22 185:6
185:14 222:12
224:10,24 225:20
234:2 237:11
242:4 252:12
258:8
**unionized** 136:7
149:14
**unions** 4:6 8:1 15:1
41:8,20 43:6 44:3
73:21 101:1
103:18 115:23
124:15,23 126:7
126:25 127:8,11
127:14,20 129:8
133:1,11,17
138:19 140:17
143:16 144:15,19
145:18 146:5,10
146:25 147:2,5,15
147:20 150:19
154:5 155:14
162:9 164:3 195:5
195:12 198:20
199:1 203:20,24
204:5,7 205:14
206:2 210:5,8
211:9,13 219:24
224:10 233:13,19
236:18,20 238:6
239:1 241:24
255:21 256:4
257:5
**union's** 4:16 113:24

113:24 114:2
163:10 167:8
175:9 177:12
202:4 203:6
237:24 238:1
242:4 274:16
275:3
**unique** 107:13
162:20
**unit** 106:17,18
108:16 154:25,25
271:2
**united** 1:1,10 55:17
55:21 56:4,4,8,19
56:24 57:12 59:7
59:15 109:14
111:15 116:7
117:19,22 118:1
120:18 121:17
122:14 126:11
129:22 177:19,22
260:12
**University** 105:18
125:11,13
**unloaded** 107:2
**unloading** 107:1
**unsecured** 2:14
150:20 193:1
**update** 50:12
**updated** 49:13 50:8
50:9,13 52:15
**updating** 223:5
**use** 4:18 6:12 26:10
49:8 67:5 88:22
94:25 138:3
150:15 156:12
166:1 224:24
230:4 239:17
246:13 264:1
266:1
**useful** 149:18,19
191:19 198:1,2,7,9
198:10,14,21
242:10
**user** 150:7 199:22
200:8

**uses** 19:7,24 20:1
**usually** 269:14,15
**USW** 3:4 7:24 12:13
12:22,23 14:8
16:11,12 177:18
180:16 199:8
202:22
**utilities** 56:24 57:8
57:11 64:25
**utilized** 15:25
**U.S** 1:19 169:11
263:12

――――――

**V**

**v** 69:14,15
**vacation** 164:22
171:4
**valid** 22:25
**valuating** 138:3
**valuation** 42:14
43:19,24 44:5
101:8
**value** 12:12 26:18
32:8,9,10,17,17,21
32:22,22,23 33:2
90:17,18 101:10
157:5
**values** 197:5
**van** 270:15,17
**variable** 149:5,18
**variance** 154:24
**varied** 17:14 18:5
39:10
**variety** 107:3
**various** 32:10 64:16
67:9 68:12 71:5
81:22 108:11
110:1 111:25
116:7 142:25
148:21 165:6
193:2 196:7 216:2
219:22 254:20
**vase** 60:17
**VEBA** 5:2 16:24
31:21 33:19 73:8,8
73:12,23 74:9,10

74:12,13 75:3,4,12
75:16,20 82:7,15
86:12,16,21,22
89:2 102:9,13
**vehicle** 232:4,15,18
**vehicles** 30:24 143:4
143:5 241:9
263:12,13
**venture** 126:3
**ventured** 200:9
**verge** 263:22
**verify** 148:1
**version** 209:3
**versions** 113:22
**versus** 33:23 141:15
257:13
**vested** 87:18,19,24
88:2
**vi** 71:20
**viability** 140:19,24
144:10,12,14,15
**viable** 135:8,10,20
136:1 137:22
204:6,15,19
233:18 239:24
241:16,17
**vials** 263:25
**vice** 108:24 117:5
**video** 260:13 267:8
274:10
**view** 26:4,6 95:15
191:5 214:3 235:8
235:10,12 241:3,4
241:16 245:9
252:12
**viewed** 168:17
231:13 257:16
**viewing** 116:15
200:17
**views** 29:14 137:17
205:17
**viii** 72:6
**virtual** 149:22,24
**virtue** 18:18 152:11
**vis** 148:5,5
**visit** 189:23

**visits** 264:19 265:8
**VOICE** 266:5,8
267:3
**voluminous** 159:5
**vote** 118:18,20 163:4
163:7,15
**votes** 118:21
**VP** 79:4

――――――

**W**

**W** 2:6
**wage** 111:25 157:1
164:21 171:3
185:2 252:16
**wages** 180:14
204:14 255:14
**waiting** 173:16
222:24
**walk** 13:2 32:13
208:14,19
**walked** 33:5 118:13
208:1
**walking** 208:7,20
**wall** 226:19
**want** 35:25 42:4
55:20 56:6,14 67:5
74:19 86:3 89:9
92:19 101:17
113:5 131:24
157:15 161:21
173:5 216:15
218:19,25 220:15
224:10,14 226:17
230:19,20 233:23
233:24 242:11
250:13 253:21
261:4 263:17
264:22 265:8
266:16 270:3
272:25 273:3
**wanted** 63:5,6 86:21
86:22 149:10,16
159:13 160:9
161:5 170:11
184:2 198:13
199:16

**wants** 245:23
**war** 58:17,17
**Washington** 79:4
**wasn't** 48:12 61:25
  62:2 68:18 79:15
  85:22 121:1 156:5
  156:6 164:9
  166:10 170:15
  187:1,25 195:23
  196:12 208:6
  210:25 213:12
  234:23 261:16
**waste** 191:17
**Watson** 33:16,17
  34:10,15,24 37:17
  60:20 65:9 81:13
  101:23
**way** 6:11 8:19,24
  14:20 24:23 30:11
  30:15 86:13,25
  99:22 110:20
  126:8 133:2
  150:19 161:25
  162:20 163:6
  166:6,9,19 175:4,9
  176:11 198:2,6,8
  200:13 209:9,23
  210:20 211:20,25
  215:22 216:16
  250:14 254:12
  272:21 276:14
**Wayne** 135:2,8,19
  135:20 191:8
  215:19,21 216:20
  217:1,11,19 218:2
**ways** 29:22 181:14
**wears** 130:6
**website** 151:13
  192:2
**week** 166:18 174:24
  186:10 189:5
  207:24 236:25
  265:10 270:25
**weeks** 171:12,17
  175:17 189:6
**weigh** 165:6

**weighed** 262:19
  269:7
**weight** 39:23
**weighting** 24:4,13
  24:17,18
**Weiss** 3:3 260:11
**weld** 263:1
**welder** 262:3 263:1
  263:14
**welders** 268:16
**welding** 262:21,25
  268:18 269:5
  270:1
**Welsser** 183:15,16
  183:22,25 187:17
**Welsser's** 186:9,18
  186:22 187:9
**Wendy** 109:6 117:5
**went** 105:17,20
  111:23 126:5
  157:4,9 196:15
  197:25 236:11
  237:9 259:2,3,5
**weren't** 56:24 77:7
  148:4 166:23
**West** 3:5
**WESTCHESTER**
  276:4
**we'll** 109:12 249:4
**we're** 12:23 98:2
  122:7 147:23
  233:10 267:7,8
  272:10
**we've** 77:1 119:10
  137:2 214:8
  228:25 231:4,5
  242:21,21 253:5
  271:23
**whatsoever** 137:4
**WHEREOF** 276:16
**white** 34:13 265:11
**wife** 265:23 270:10
  270:22 271:23
**wife's** 265:13 271:17
**willing** 251:11
**willingness** 144:4,6

**win** 58:17
**wind** 92:24 215:20
  216:21 217:3,5
**withdraw** 100:17
  119:23 137:8,9,10
**withdrawn** 22:14
  142:15 145:16
  147:3 148:22
**witness** 4:9 7:5
  13:25 14:4,6,20
  51:11 61:6 74:3,20
  76:4 84:25 90:25
  103:17,20,22
  114:15,19 122:25
  123:1,3 124:3
  125:2 128:4,7,9,16
  129:1,19 131:13
  137:4 138:16,23
  141:13,14,16
  163:19 184:24
  188:12 201:20
  202:2,14 203:2
  215:16 216:9
  226:3 227:4
  237:15 259:16,25
  260:16 266:7,22
  266:25 267:14,16
  267:17 273:8,9
  274:5 276:16
**witnesses** 4:13,18
  74:17 216:10
  221:2 226:15
**witness's** 41:15
**wonder** 4:18
**word** 78:21 79:10
  80:19 97:11
  100:16 150:7
  212:14 220:13
  221:16 230:18,19
  230:20 266:15
**words** 55:11 86:15
  99:11
**work** 5:18 6:13 9:6
  9:13 10:5,7 29:15
  30:1 34:19 42:14
  42:23 43:7 44:5,5

  44:10,11 64:19
  65:3,7,7 82:5 85:9
  92:21,21,22 93:2
  95:10 104:11,13
  104:20 105:21
  107:4,16 108:13
  125:14,18 126:5
  127:2,4 149:16
  155:21 158:7
  161:3,7,19 191:6
  202:4 214:4
  218:17 226:3,4
  261:24 263:20,21
  269:2 270:12,22
  271:4
**worked** 6:1 29:21
  34:17 81:17 82:4
  105:8 108:9
  116:14 125:24
  126:20 162:11
  245:25 251:9
  261:19,25 262:9
  262:20 263:5
  264:9 265:10
  269:15
**workers** 13:9,10
  25:23 44:22 63:18
  106:3,6 108:9
  111:15 116:8
  117:19,20,22
  118:1 120:13,18
  121:8,18 122:14
  126:12 129:15,22
  132:23,23 177:18
  177:20,22 260:12
  260:12 272:18
**workforce** 107:15
**working** 10:1 92:15
  92:25 93:9,10
  106:2 125:16
  127:19 150:25
  249:14 261:23
  262:10 263:23
  264:3 265:13
  268:25 269:16
  272:1,12

**works** 93:19 112:19
**world** 54:18
**worldwide** 34:15
  54:14 155:5
**worn** 263:20
**worry** 214:9 216:7
**worth** 15:17 101:13
**wouldn't** 89:19
  197:3 216:15
  230:17 251:21
  252:19 264:9
**write** 151:20 157:22
**writing** 151:22
**written** 95:15
  120:17,19 121:5
  203:18 251:15
**wrong** 214:8 246:6,6
**Wyatt** 33:16,17
  34:10,15,25 37:17
  60:20 65:9 81:13
  101:24

**X**

**x** 1:3,8 76:13 236:1
  240:11 274:3,14
  275:1
**xi** 77:11

**Y**

**Y** 260:16
**yeah** 52:11 271:19
**year** 17:16 19:8
  26:15 46:10,14,17
  46:20 53:3,3,7,13
  53:16,17,20 80:5
  83:9,17 89:15,19
  89:25 90:1 107:5
  129:18 135:5
  140:18,20,25
  142:21 143:18,19
  146:21 161:12,16
  161:18,19 162:3,8
  162:11,16,19
  163:5 165:11,11
  165:12 180:17,18
  180:19 205:22,25
  206:2,8,12,25

207:19 218:24
220:12 223:7
233:23 234:3
236:16 244:18
245:18 246:20
255:7 261:20
268:12 271:3,3,4,4
**years** 6:1,24 19:25
  28:5 34:20 37:1,8
  37:10,15,24 39:11
  47:22 48:5 53:21
  55:25 56:1 60:20
  77:8 81:11 111:19
  111:24 125:25
  135:6,16 136:8
  140:18 142:17
  165:12 204:24
  217:12,25 218:1,9
  219:1 220:23
  223:24 225:3
  229:14,15,17
  232:5,19 241:10
  246:1,11 255:8
  261:25 262:20
  268:19 269:9
  270:16 272:11,22
**year's** 143:17
**yesterday** 226:14
**yield** 147:24
**York** 1:2,11,11 2:5,5
  2:15,15,22,22 3:5
  3:5 125:11 126:1
  192:23,25 193:18
  257:22 276:3,8
**Yup** 63:3,21

**Z**

**Z** 4:8 267:17
**zero** 88:12
**ZIDE** 2:17
**Zuber** 267:15 268:1
  274:11

**0**

**06-10354** 1:5
**07** 40:19 223:23

**1**

**1** 6:22 28:25 52:15
  123:9 129:12
  167:24 180:2,3,20
  184:6 253:18
  256:25 258:11,24
**1,000** 70:21
**1.5** 24:19
**1.65** 16:15
**1:10** 124:2
**10** 46:8,17 76:13
  78:4 90:5,21
  164:15 166:8
  170:22 177:25
  202:9
**10th** 170:3
**10.2** 245:3
**10004** 1:11
**10017** 2:5
**10036** 2:15 3:5
**10038** 2:22
**101** 112:5,7,7 274:7
**104** 274:8
**105** 158:13,16
**106** 23:12 26:22 47:6
  47:18 48:5,23
  49:19 50:3,21 52:6
  159:19
**107** 167:12
**108** 169:3
**109** 172:21
**11** 33:10 40:16 48:18
  62:12 65:8,12
  66:22 77:11,21
  182:1 251:8
**11.1** 25:17
**11.2** 22:3
**110** 174:15
**1113** 6:21 13:24 14:3
  14:11 75:24
  118:25 119:9
  120:7 121:11,18
  129:10,15,18,21
  130:15 133:3
  134:10,13 136:24
  140:12 147:6,23

148:8,8 164:18
170:24 173:3,24
175:11 177:4,14
179:1 180:2,6,10
205:19 210:14,17
210:20 211:5,8,10
212:2 220:23
224:25 236:21
237:22 238:5,14
257:2,18,21 258:5
**1114** 13:24 14:3,12
  31:14 75:24 119:9
  129:16,18,21
  136:24 140:12
  147:23 148:8
  164:18 170:24
  173:24 175:11
  177:5 179:1
  210:14,18,21
  211:5,8 224:25
  236:21 237:22
  238:5,14 257:2,18
  257:21
**114** 6:21
**115** 25:17 27:21 28:6
  274:21
**116** 22:2 24:8 63:17
**1177** 2:15
**12** 28:12 57:19 68:9
  71:2 76:25 165:16
  168:12 172:3
  175:5,25 269:16
  271:24
**12th** 16:23 172:25
  174:21 175:1
**12.3** 246:9
**12.32** 246:9
**12/28** 167:19
**12:28** 160:14
**12:30** 160:13 168:1
**12:35** 123:12
**125** 274:9
**129** 176:9 188:24
**13** 24:1,2,7,14 27:18
  27:19 90:21 92:10
  112:19 134:10,11

186:16 212:16
**130** 179:12
**132** 78:13
**133** 183:2
**14** 29:11 33:18 81:7
    82:24 93:12
    271:16
**15** 28:5 38:3 95:5
    212:18 217:6
    269:7
**150** 106:16 264:21
**16** 34:20 35:14 83:23
    83:24 86:7 96:7
    270:12,15
**16th** 113:8 175:8,12
**164** 33:18 65:10 66:3
    66:6
**167** 274:22,23
**168** 274:24
**17** 47:9 83:23 87:13
    87:16 97:7 218:12
    231:22
**17th** 160:13 167:18
    168:1,13 169:14
    170:4 171:1,7
    172:4 173:1 175:3
    191:22,24 192:8
**171** 274:25
**174** 275:4
**175** 135:5 217:7
**176** 275:5
**179** 275:6
**18** 232:8,10
**18th** 170:4
**180** 2:22 271:3
**182** 275:7
**185** 274:9 275:8,9
**19** 71:25 72:7,10
    136:5 219:7
    268:11
**19th** 117:8 120:14
    183:22 186:18
    187:18
**1921** 261:3
**1947** 261:13
**1965** 268:13

**1977** 125:17
**1984** 125:17
**1986** 257:1
**1988** 25:18,24 26:1,9
    28:7 69:18
**1989** 5:25
**1990** 13:17 126:6
**1990s** 17:15
**1991** 26:2 27:1
**1993** 26:4 27:8,9
    28:7 129:12 257:1
**1994** 27:8 106:1,14
    108:12,15 232:21
**1995** 28:7 269:19

——————————
**2**

**2** 6:22 12:3 15:5,16
    42:5 127:25 129:4
    167:24 181:3
    185:7,14 202:1,10
    202:13,21 210:11
    253:19,21,24
    275:8
**2.4** 181:24
**2/23** 178:11
**20** 4:15 11:5 55:25
    111:20 137:15
    205:12 207:12
    264:10 270:25
**20th** 153:13 158:22
    158:23 159:3,4
    192:13,15
**200** 25:22 38:2 69:19
    135:4 154:3 236:2
    262:19
**2000** 107:18,19,20
    108:8,18 135:5,6
    135:23 146:24
**2001** 244:18
**2003** 108:21
**2004** 72:16,19
    105:14 108:23
**2005** 16:9,23 20:17
    21:8,13 25:19,24
    33:16,17 61:14,23
    62:23 63:10,15

65:9 68:13,20
69:19 71:5,7,14
72:16,19 76:9 77:3
78:18 92:13
194:25 244:18
**2006** 13:1,3 21:9
    47:9 49:22 66:24
    68:15 71:8 77:4,9
    77:10,13 79:14
    96:8,15 105:10
    109:23 110:16
    116:17 119:3
    121:15 125:5
    143:7,9 147:11,12
    148:23 158:22
    169:14 178:25
    185:1,2 195:16
    196:16,19 213:8
    213:11,12
**2007** 1:9 12:11 50:16
    50:22 52:24 68:15
    71:8 77:4,8,10,21
    80:5 113:8 120:14
    140:17,18 141:5
    142:3,10 143:6,7
    146:6,19 147:6,16
    148:5 175:8
    192:24 196:20
    207:17 232:4
    237:1,2,2 241:9
    274:1 276:17
**2008** 50:22 52:6,24
    140:10 142:4,19
**2009** 52:6,9
**2010** 52:9,18 77:22
    80:7,14 135:7
    214:18 217:6
**2011** 52:18,21 135:7
    214:18 217:6
**2012** 47:9 49:22 50:6
    52:21 214:18
**207** 230:25
**208** 230:21,22
**21** 4:17 16:19 143:13
**21st** 192:13,15
**216** 230:8 231:5,19

231:23 233:3
**22** 52:25 53:7 158:14
    159:16 160:16
    167:4,8 269:25
    274:22
**22nd** 153:12
**222** 2:5
**23** 6:1 47:8,21 48:4
    49:9,14,23 50:6
    53:11,21 144:3
    159:20 160:2
    167:4,8,21 274:23
**23rd** 177:9 189:2
**24** 58:2 167:11
    168:21,24 274:24
**24/7** 265:10
**246** 57:20
**25** 169:2,8 171:21,24
    172:2 229:15
    269:9 270:25
    274:25
**250** 270:18
**254** 93:15
**256** 274:9
**257** 96:14
**26** 172:22 174:9,12
    176:18 207:20
    261:3 275:4
**26th** 189:17 207:20
    207:23 208:4
    209:23
**261** 274:10
**268** 274:11
**27** 154:7,15 174:17
    174:19 175:23
    176:12,15 275:5
**27th** 189:17 207:20
    207:23 208:4
    209:24
**28** 77:21 80:2
**29** 1:9 220:15 274:1
**29th** 168:2,9

——————————
**3**

**3** 4:14,15 6:17,18
    12:1 16:1 20:8

32:19 33:10 35:21
36:6 42:1,5 62:20
68:10 71:1 72:17
73:15 76:7,25 81:5
99:19 102:14
112:18 169:18
230:7 242:12
269:7,14,14,14
274:17
**3/21/07** 49:11
**30** 28:21 37:25 38:1
38:1 103:8 190:4
221:13 222:20
245:25 270:4
**300** 70:22 154:3
235:25 240:10
**31** 50:16 222:20
223:1
**33** 28:9 69:21
**330** 3:5
**335** 70:19
**34** 16:6 67:12
**35** 58:21,21 246:1
254:15 261:25
**36** 26:5 71:25 274:7
274:17,18,19,20
**365** 45:17

---

**4**

**4** 15:21 17:1 35:7,8
35:14 68:3 72:17
73:15 76:7 89:11
89:13 100:21,21
100:22,22 112:4
112:12,18 113:12
116:2 134:3
137:21,24 243:18
274:21
**4.5** 244:18,22
**40** 16:16 20:2 28:8
46:3 100:25
101:10
**40.8** 180:16
**400** 154:3
**401K** 92:7
**401(k)** 99:22

**405** 135:4
**41st** 2:5
**42nd** 3:5
**42.72** 32:20
**420** 135:3
**43** 4:15 11:4,15,16
15:5,20 17:20 32:3
35:21 36:6 274:18
**44** 4:17,22,24 180:17
**44114** 2:10
**45** 58:11 148:17
**45.6** 180:18
**450** 234:16,21,23
**46** 13:9 26:3 165:9
**47** 70:3,17 155:8
261:13,21
**48** 32:21 180:11
**49** 247:15,16 269:21
269:21

---

**5**

**5** 17:24 20:18 49:4
61:15 63:17 67:20
69:13 89:25 116:6
135:1 160:21,23
160:23 245:2,3
246:1 247:14,17
269:13 274:7
**5.6** 244:24 247:4
**50** 19:21,24 20:1
45:25 46:6,17 80:6
80:10,13,15,16
89:18 203:7
240:12 243:22
**500** 21:1 32:21 33:12
64:17 234:16,21
234:23 235:25
236:8,10
**512** 13:8
**53** 176:9,22 179:15
179:18,23 188:18
275:6
**54** 179:12,22 182:20
182:23 275:7
**55** 22:8 24:16 63:18
63:22,24

**57** 12:21 15:7 183:1
183:12,24 184:19
184:22 185:14
186:1,14 275:9
**59** 46:19 233:2

---

**6**

**6** 33:20 34:7 69:1
71:18 77:11 81:7
116:6 137:21,24
160:21,23,25
169:19,25 180:11
254:12
**6th** 180:15,25
**6.2** 235:6,13,22,24
**6.5** 24:20
**6.7** 24:20
**60** 20:3,3,17 34:22
34:23 36:11,14
46:6 61:14 63:20
63:22,25 180:14
272:11,22 273:3
274:19
**600** 33:2 120:11
264:16
**61** 21:11 23:16,19
25:16 36:11,14
274:20
**62** 49:6
**63** 148:18 271:16
**637** 237:4 239:10
240:9 241:5,15
**64** 20:20 64:17,20,23
**65** 18:23,25 35:14,15
67:23 72:11 76:17
83:25 87:2,10
91:23 272:3
**650** 83:11
**66** 12:21 15:6 26:1,2
69:20
**668** 234:3,10
**688** 237:5
**69** 22:25
**695** 180:11

---

**7**

**7** 32:5,8 44:14 47:5

**49**:9 53:12 63:1
67:21 89:16 90:1
92:20 140:4 171:5
239:20,21,22
240:4,8 269:14
**7th** 148:10,17
178:13 180:25
**7.9** 240:18
**70s** 93:2
**73** 62:4
**75** 72:17 91:12 225:3
240:12
**78** 33:2 75:15

---

**8**

**8** 62:3,11 63:15
113:19 161:10
221:14 235:5
242:11
**8th** 148:10,17
166:10 169:9
171:8,9,11 173:7
174:23 179:4,23
180:23,24,25
181:10 184:1
192:9
**80** 68:13 71:5,11
77:1,17 93:1
**88** 269:24

---

**9**

**9** 20:10,11,12 22:1
27:17 61:11 64:4
76:13,15 113:21
154:8 221:14
223:1 269:13
**9th** 166:11 220:11
226:7
**9.7** 245:4
**90** 19:25 20:1 46:2
180:14
**90s** 18:7
**901** 2:10
**92** 52:12 232:4