**EXHIBIT I**

1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------------x

4         In the Matter

5              of                        Index No.

                                         06-10354

6         DANA CORPORATION,

7                        Debtors.

8    ---------------------------------x

9                           April 3, 2007

10                          United States Custom House

                            One Bowling Green

11                          New York, New York 10004

12

13

14              EVIDENTIARY HEARING

15

16

17   B E F O R E:

18

                    HON. BURTON R. LIFLAND,

19

                              U.S. Bankruptcy Judge

20

21

22

23

24

25

2

```
 1   A P P E A R A N C E S:
 2
 3
            JONES DAY
 4
        Attorneys for the Debtors
 5               222 East 41st Street
                 New York, New York 10017
 6
            BY:  JAYANT W. TAMBE, ESQ.,
 7               PEDRO A. JIMENEZ, ESQ.,
                 MICHAEL D. SILBERFARB, ESQ.,
 8
                 ROBERT HAMILTON, ESQ.
 9                  901 Lakeside Avenue
                    Cleveland, Ohio 44114
10
11
12        KRAMER LEVIN NAFTALIS & FRANKEL LLP
13             Attorneys for the Committee of Unsecured
                 Creditors
14               1177 Avenue of the Americas
                 New York, New York 10036
15
            BY:   THOMAS MOERS MAYER, ESQ.,
16                THOMAS H. MORELAND, ESQ.
17
18
          STROOCK & STROOCK & LAVAN LLP
19
                 Attorneys for Ad Hoc Committee of Note
20                 Holders
                   180 Maiden Lane
21                 New York, New York 10038
22        BY:    SHANNON LOWRY NAGLE, ESQ.
23
24
25
```

3

1    A P P E A R A N C E S (Continued):

2

3

              COHEN, WEISS AND SIMON LLP

4

                   Counsel for UAW and USW

5                     330 West 42nd Street

                      New York, New York 10036

6

         BY:    BRUCE SIMON, ESQ.,

7                BABETTE CECCOTTI, ESQ.,

                 PETER DiCHIARA, ESQ.,

8                BRUCE LEVINE, ESQ.,

                 DAVID R. HOCK, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    P R O C E E D I N G S:

2                    THE COURT:  Good morning.

3                    MR. TAMBE:  Good morning, your Honor.  Jay

4    Tambe from Jones Day on behalf of the debtors.

5                    We are here this morning to present closing

6    arguments on the motion for relief pursuant to Sections

7    1113, 1114 at the conclusion of the five days of

8    evidentiary hearing.  I have a very thin binder of exhibits

9    that I might refer to during my closing statements, if I

10   may approach.

11                   THE COURT:  Yes.

12                   (Handing)

13                   MR. TAMBE:  Your Honor, we've marched

14   through a lot of evidence over the last five days of

15   hearings, and the case for the relief that's being

16   requested by the debtors I would submit is clear, and

17   essentially unrebutted.  What's remarkable when one goes

18   over the evidence and the testimony we heard are the

19   admissions, the series of admissions that we obtained from

20   the union's own witnesses as to essential elements of the

21   debtor's burden.

22                   With we've a lot of heated rhetoric, we've

23   heard a lot of innuendo, a lot of threats, and a lot of

24   theater.  But when you look at the evidence, the evidence

25   that came from the witness stand and the evidence that came

5

1    from the documents that were admitted into evidence, the

2    case for the relief requested is overwhelming.

3

4              Let's discuss the evidence.  We start with

5    the basics, your Honor, the case for necessity.  Have the

6    debtors made the case that the proposals that they have

7    made to these unions are necessary for the reorganization

8    of the company?  The standard is one that your Honor laid

9    down, it was adopted by the Second Circuit in Carrie

10   Transport, and it's a standard that clearly rejects time

11   and again in the Second Circuit the standards that being

12   proposed by the unions; that's the Wheeling Pittsburgh

13   Standard.

14             The debtors are not required to come here

15   and demonstrate the bare minimum savings or the bare

16   minimum proposals that would just barely get them out of

17   bankruptcy, the standard is are the proposals made by the

18   debtors necessary for reorganization.  And is the view

19   that's term taken is a longer term view of the debtor's

20   business standard and the industry in which the debtors

21   conduct their business.

22             The case for necessity, the debtor's case

23   for necessity was stated, and again, essentially

24   uncontradicted by any witness from the unions, and it came

25   from the mouth of Mr. Stenger and it came from his

6

1    declaration and the exhibits that he explained to the

2    court.  And many of those exhibits are included in the

3    closing binder that I've handed up to your Honor.  And

4    briefly, if I can go through the case of necessity and then

5    discuss some of the points that have been made in response,

6    some of the themes that we have heard on cross examination

7    from the unions.

8              Mr. Stenger began, as it properly should,

9    by examining the context in which Dana operates.  The facts

10   about Dana's financial performance are irrefutable; it's a

11   company that's had billions of dollars of losses in the

12   past five years.  It continues to lose money, and if

13   compared its financial performance with its peer companies,

14   you'll see that it lacks behind considerably.  And even Mr.

15   Potok, the financial expert for the unions, had to admit

16   what Dana needs are major initiatives, not little tweaks,

17   not little changes here and there around the edges, but

18   major initiatives.  There's no dispute on that, your Honor.

19             Tab one of the binder, your Honor, is, in

20   effect, where Mr. Stenger and the company began.  They

21   began by benchmarking the performance of Dana against its

22   competitors.  Why was benchmarking necessary?  Why is it

23   even relevant?  Well, again, it's unrebutted what's going

24   on in the industry, that is growing competition,

25   essentially a stagnant US production, essentially stagnant

7

1    US sales; the result being the only way you are going to

2    turn this around is by making yourself more attractive,

3    more profitable than your competitors.

4                    The market is essentially a fixed market.

5    There are more and more people trying to grab a piece of

6    that pie.  And companies, both domestic companies as well

7    as increasingly, and this was made clear in Debtor's

8    Exhibit 216, there's an increasing prevalence of

9    transplants; these are non US companies that are setting up

10   operations in the USA in the parts sector and competing

11   against Dana and other parts companies for business, and

12   they are successful at it.  And why are they successful?

13   They are successful because they enjoy lower costs among

14   other things, they have a total absence of legacy, medical

15   and retiree costs that are significant for companies like

16   Dana, and that operate to a large part outside of areas

17   where there is a strong union presence.  That's the

18   competition.  That's the reality.

19                   It is, to that extent, this is a case about

20   globalization, the effects of globalization on Dana.  We

21   can't ignore that reality, Mr. Stenger didn't ignore that

22   reality, and I would suggest neither does Mr. Potok.

23   Debtors Exhibit 51, behind Tab 1, what that shows very

24   dramatically is how far behind the peer group performance

25   Dana has lacked.  If you look at the five year averages,

8

1    that's the second column from the right, your Honor, 2001

2    through 2005, the five year average, you can see Dana's

3    EBIT margins and EBITDAR margins and compared those to the

4    margins enjoyed by the comparable companies.

5              There was some discussion and there was

6    evidence presented to your Honor about, well, is this the

7    right set of comparatives.  And while Mr. Potok claims to

8    have looked at this issue, he could offer this court no

9    opinion on that issue, and while he's conducted alalysis,

10   he didn't submit it for review by os or by your Honor.

11             Mr. O'Malley, financial expert for the

12   retiree committee, the retiree committee that has settled

13   with Dana, he did submit an alternate comparable analysis.

14   And if you look behind Tab 2, you can see the results of

15   Mr. O'Malley's analysis compared to that conducted by Mr.

16   Stenger on behalf of the debtors.  And even with a

17   different set of comparables, the results that Mr. O'Malley

18   obtained were not appreciably different than the results

19   obtained by Mr. Stenger.

20             So we have the target.  We know what this

21   company should be shooting for in terms of successful

22   emergence from bankruptcy.  If it can't operate roughly in

23   these profitability margins, it is not going to be able to

24   obtain and secure and maintain market share and grow its

25   business, and do all the sorts of things that it must do in

9

1     order to emerge from bankruptcy, not just barely but as a

2     viable entity.

3                    I would note again, with respect to the

4     comparables, Mr. Potok admitted on the stand that the

5     comparables that he picked when he did his analysis, that

6     the analysis that he has not shared with us, he picked the

7     same companies; American Axel, Magna and Arbin Meritor.

8                    There was discussion and there was some

9     quibbling with respect to the use of EBIT as opposed to

10    EBITDAR, and there, too, Mr. Potok admitted that the

11    evidence is irrefutable.  Look at Tab 3, that's Mr.

12    Stenger's analyses, Debtor's Exhibit 49.  That shows that

13    EBIT and EBITDAR margins for this comparable set

14    effectively march in tandem.  So whether you pick EBIT as

15    your target or you conduct your analysis around EBITDAR,

16    the analysis leads you to the same conclusion, it leads you

17    to the same target range, it leads to the same range of

18    savings, significant, major initiatives, as Mr. Potok

19    testified and admitted that this company needs.

20                    Now, we discussed with Mr. Potok the

21    restructuring initiatives, and that's Tab 4 in your binder,

22    your Honor.  Those were the components that were identified

23    by the debtors, part of this comprehensive restructuring

24    initiative, where the debtors didn't focus just on labor or

25    just on union labor or just on the retirees, the debtors

10

1   looked comprehensively at all aspects of their business and

2   they identified where the savings could be obtained.  And

3   again, these will major savings that need to be obtained

4   from a number of different quarters.

5             And when shown this chart, Mr. Potok

6   admitted, well, customers need to be part of the solution,

7   the footprint optimization needs to be part of the

8   solution, SG&A savings need to be part of the solution,

9   nonunion labor needs to be part of the collusion solution

10  nonunion retirees needs to be part of the solution,

11  nonunion retirees need to be part of the solution, but when

12  it came to what contributions the unions should make to the

13  solution, Mr. Potok had no opinion, at least none that he

14  was prepared to share with this court.

15            The savings identified in Debtor's Exhibit

16  35, the restructuring components that were identified and

17  discussed in detail by Mr. Stenger.  The effect of

18  achieving those savings was explained and set out by Mr.

19  Stenger in Debtor's Exhibit 54, and that's behind Tab 5.

20  And again, that's on a pro forma basis before the debtors

21  had gone out to effectuate the restructuring components.

22  If they were able to get the low end, if they were able to

23  achieve the high end, what would this company look like.

24  And that's a confidential document, but I will turn your

25  Honor's attention to the bottom line, the EBIT percentages.

11

1    And if you compare the EBIT percentage on that exhibit as

2    to those identified in the comparable analysis, you will

3    see that coming in at the low end of the range may not be

4    enough.  What Dana needs to do is come in at the middle to

5    high end of the range of savings, otherwise you are leaving

6    Dana arguably in a position where it will not be able to

7    weather the kinds of shocks, the kinds of ups and downs

8    that this industry regularly faces, more downs than ups

9    recently, and more down than ups for the foreseeable future

10   as witness after witness admitted, they don't see any

11   dramatic turn around in Dana's position in this industry

12   absent major initiatives by Dana.

13                And Mr. Stenger ended his analysis with

14   Debtor's Exhibit 70 in a discussion of what that shows, and

15   that's Tab 6 in your binder, your Honor.  And really the

16   focus here is the third column over, the updated column.

17   And this was in direct response to an argument that has

18   been raised by these unions and by Mr. Potok which goes

19   something like this:  Well, if you do everything else in

20   your restructuring components if you achieve everything

21   else at the full at the maximum levels, well then you won't

22   need any relief from the unions so go get the savings from

23   somewhere else.  That's not fair, that's not equitable, and

24   it's not right.  And it's not right as a matter of

25   economics, and it's not right as a matter of logic.  That's

12

1    what the third column shows.

2              What the third column shows as a matter of

3    economics, if Dana maximized all of its savings, assuming

4    it could maximize all of the savings without any

5    contributions from any of the unions, it would still fall

6    short off the competitive profitability rate.  It would be,

7    in effect, setting it up itself up for Dana 2.  We've been

8    through LTV 1, we've been through LTV 2, your Honor.  I

9    don't think anyone here wants a Dana 2.  We want to fix

10   this company the right way, in a way that it will be able

11   to compete for the longer term, not just for the immediate

12   term.

13             So what are the union's argument?  In

14   response to 1113, what we have heard in cross examination

15   and in argument from counsel is, well, you may be seeking a

16   certain level of savings with respect to union active

17   employees, but with respect to the 1113 proposals that are

18   really at issue, it's a much smaller number.  And it's a

19   number between 18 and 28 million dollars.  And in the

20   context of a 8 billion dollar company, how could that be

21   necessary?  Well let's talk about it.

22             First of all, that's an argument that has

23   been made in various guises by unions time and again in

24   cases, and has been almost uniformly rejected, if not

25   uniformly rejected.  It has a name, it's called the last

13

1    man standing argument.  And here's how one court described

2    it.  This is Judge Hardin in Delta Airlines.  "The last man

3    standing argument," I'm reading from page 11 of the April

4    2006 slip opinion, and we can get you a citation, your

5    Honor, after closing argument.  Page 11 of the slip

6    opinion, April 2006.  "This last man standing argument, if

7    acceptable as a matter of principle, might always succeed

8    as a matter economics in the case where the single

9    bargaining unit that had not reached a negotiated

10   settlement with a debtor represented a very small

11   percentage of the debtor's budget."

12              And moving on to page 12, what Judge Hardin

13   said was, "Thus I reject the IBT's contentions that the

14   flight attendants cannot or should not be called upon to

15   accept a proposal merely because their requested sacrifice

16   will not make or break the reorganization.  The last man

17   standing argument, that one relatively minor holdout cost

18   constituency is not economically necessary to the

19   reorganization cannot be sustained in the face of the

20   requirement that all affected parties be treated fairly and

21   equitably, and the corallin of the requirement of the

22   governing case law that all constituencies great and small

23   bear their fair share of the cost of reorganization.  The

24   statute does not contemplate that any single group of

25   employees, such as the flight attendants, will be

14

1    subsidized by the sacrifices of others."

2                    And although in that particular decision

3    Judge Hardin did not grant the airlines request for relief

4    requested, he did subsequently.  And in no way did he step

5    away from his views of this argument, the last man standing

6    argument.  And his rejection of that argument is right.  It

7    makes sense here.  And it makes sense beyond the economics

8    here, it makes sense as a matter of both the economics, but

9    also the logic.

10                    Let's go back to Exhibit 70, which is Tab

11   6, and explore a little bit deeper what this last man

12   standing argument by the unions really means.  Is it their

13   contention that the debtors should obtain all of the other

14   savings except for the 18 to 28 million dollars

15   attributable to the 1113 proposals?  And if the debtors

16   were to do that, well then they would be only 18 to 28

17   million dollars shy of the target they are seeking.  Is

18   that what they are arguing, your Honor?

19                    Because if that is what they are arguing,

20   there's something else unsaid in that argument.  That means

21   we get from the union retiree brethren the full measure of

22   the retiree concessions we are seeking.  That means that we

23   are getting from their union brethren the full measure of

24   the savings we are seeking from the CBAs that are currently

25   being negotiated and are not the subject of the 1113

15

1    proposal.  Is that what they are saying, that we go out and

2    get the savings from the rest of their union brethren?

3                    Also left unsaid in that argument is they

4    clearly are assuming that we obtain the savings from the

5    nonunion actives and the nonunion retirees.  And, in fact,

6    those constituencies have already agreed with the debtors

7    in terms of the savings that the debtors can hope to

8    realize from the cutbacks from the savings related to those

9    constituencies.  In fact, the retiree committee

10   representing the nonunion retirees reached a settlement

11   with Dana.  We got one hundred percent of the relief we

12   were requesting with respect to the retirement committee,

13   and they, in turn, got a VEBA which will provide at least

14   some level of funding for continued healthcare benefit for

15   their members.

16                    Similarly the IAM reached a settlement with

17   Dana on both 1113 and 1114, again, avoiding the type of

18   brinksmanship that we are seeing these unions exercise

19   before your Honor.

20                    I talked about what was left unsaid.

21   What's left unsaid is do they expect us to go and get the

22   savings from their other union brethren, because that's the

23   only way the math would work, if all that was left was 18

24   to 28 million, then they must be saying that we get

25   everything else from the other union folks.  If that's not

16

1    what they're saying, then the real number is not 18 to 28,

2    the real number is 18 through 28 plus whatever else we seek

3    to obtain on 1114 from these same union's retirees.  It

4    also includes the amount we seek to obtain from, again,

5    members of these same unions who are active employees.  So

6    the real relief that we are requesting is in the range of

7    80 to 120 million dollars, not the 18 to 28 million dollars

8    they suggest.

9            And on the math by any stretch of the

10   imagination, requesting relief in the range of 120 to 180

11   million dollars is a significant part, a significant part

12   of Dana's restructuring initiatives.  I may have misspoken,

13   I think the range is 80 to 120 million dollars.  If I

14   misspoke I apologize, your Honor.

15           So as a matter of math, is it the 28, and

16   we get everything from the other union members, or is it

17   really, is it in effect, 80 to 120?  And the argument about

18   the 18 to 28 million dollars being di minimis falls apart?

19           The additional problem with the argument is

20   one of logic.  Now there is an implicit assumption that

21   Dana can obtain the full measure of all of its other

22   initiatives without obtaining significant relief from these

23   unions.  The only testimony that you've heard, your Honor,

24   that is competent on this topic is the testimony from Mr.

25   Stenger who sat across from customers time and again and

17

1    negotiated the significant concessions, the significant

2    contributions that Dana is seeking from its customers.

3                    And one thing was very clear in Mr.

4    Stenger's testimony, Dana needs to achieve all of its cost

5    savings.  The customers expecting to achieve all of its

6    cost savings.  And the thought that the customers will

7    continue, the customers, by the way, who are the major OEMs

8    who themselves are in dire financial conditions.  The

9    thought that those customers would continue to provide

10   price improvement and continue to provide contributions to

11   Dana while Dana's unionized work force did not contribute

12   savings as well, that's not a credible position to take.

13                   And, in fact, on that issue, the unrebutted

14   testimony from Mr. Stenger is it will make a difference.

15   As a matter of logic, we are not just talking about the 18

16   to 28, we are talking about the connection between the

17   labor savings attributable to the unions and the what

18   savings Dana had hoped to achieve from its customers.

19   There is a connection.  And it's not just Mr. Stenger

20   talking about connections like that, it's the union's own

21   witnesses.

22                   When Mr. Potok wrote his expert report, he

23   didn't separate out the 1113, 1114, every time he mentioned

24   1113 he also mentioned 1114, he sees that as a package of

25   relief that the debtors are seeking.  When Mr. Foster, one

18

1    of the negotiators took the stand, he said, oh yeah,

2    there's a connection, there's a connection between what's

3    going on in the 1113, 1114 process and when we sit across

4    the table from the Dana negotiators on those CBAs that are

5    not the subject of 1113 proposals, yes, there is a

6    connection, that makes sense.  In fact Mr. Potok said what

7    the unions are looking for is to negotiate a comp -- "to

8    negotiate a comprehensive labor agreement covering all

9    plants and all issues at one time."  Page 210 of the March

10   29th transcript.  And he agreed, that makes sense, that

11   only makes sense.

12                   So as a matter of logic to carve out the

13   1113 proposals and say well ignore everything else or

14   assume everything else is automatically going to fall in

15   place ignores reality.  And no matter what else 1113 might

16   require of this court, it does not require this court to

17   suspend its belief in reality.

18                   With respect to the union retirees.  There

19   the dispute is not about the level of savings that Dana

20   hopes to achieve, there's really, again, no dispute as to

21   the calculations that have been done by Towers Perrin and

22   by Mr. Jeff Hoffmann who testified on March 12th.  There is

23   an enormous liability for retiree medical benefits that

24   remains on Dana's books even after the substantial

25   settlement with the nonunion retirees.  And it's not just

19

1    an expense number, it's an annual cash flow number as well.

2    And it's a cash flow number that is in excess of 75 million

3    dollars attributable to the unions alone.  And that's a

4    cash flow expense that Dana cannot afford.  It cannot

5    afford that.

6              And as part of its restructuring

7    initiatives, it has proposed an a solution to that, it has

8    proposed a VEBA structure with some level of funding.  Dana

9    is happy to negotiate the level of that funding, but what

10   Dana needs as a restructuring matter, as a restructuring

11   initiative, is to reach the same result with the union

12   retirees that it so successfully reached with the nonunion

13   retirees, and that is to eliminate that obligation from

14   Dana's books to set up a VEBA structure that provides some

15   level of healthcare funding.

16             At this point, your Honor, I would draw

17   your attention to Ms. Taranto's admissions, and there were

18   many admissions.  Not only did she admit that the

19   calculations done by Mr. Hoffmann and Towers Perrin were

20   accurate, she also conceded, after some to and fro, that

21   once you set aside the effects of fresh start accounting,

22   the liability, the size of the liability that Dana faces

23   with respect to union retirees is going to shrink by at

24   most 1 percent a year, so it's going to remain on Dana's

25   books for a significant, significant period of time.  And

20

1    that needs to be addressed.

2                 If one looks at the elimination from Dana's

3    books of the liability for union OPED liabilities and

4    compares that number to the analysis set forth by Mr.

5    Stenger in Debtor's Exhibit 70, it's clear that without

6    that savings Dana simply is not going to hit the range of

7    EBIT margins and EBITDAR margins that it needs to in order

8    to emerge from bankruptcy as successful and viable company.

9                 The casement necessity therefore, the case

10   for these savings at this level of savings, both on 1113

11   and 1114, your Honor, has been made conclusively and is

12   essentially unrebutted.  The case for necessity was also

13   made, and the proposals were made on the basis of the most

14   complete and reliable information available at the time

15   that the proposals were made.

16                Now, the proposals were made in December,

17   there were revised proposals that Dana offered in January,

18   and throughout this time period Dana has been engaged in an

19   intensive effort to provide detailed financial information

20   to the unions and, before the settlement of the retirees,

21   to the retiree committee as well.

22                The evidence of what Dana has provided and

23   when it has provided it is set forth both clearly in Ms.

24   Pilar Tarry's testimony on the stand, as well as her

25   declaration which cites chapter and verse in terms of face

21

1  to face meetings, in terms of the details financial

2  information, the types of financial information, and when

3  it was provided.  And in addition to providing financial

4  information, Dana has held meeting after meeting, in

5  personal meetings with the financial advisors for the

6  unions and the financial advisors other constituencies as

7  well.  The unions have not been excluded from that give and

8  take of information, they have been free to ask for

9  information, although to hear Mr. Potok say it there has

10  been a deficiency in the provision of information, delays.

11          I would submit, your Honor, that Mr. Potok

12  was less than candid in describing to this court the flow

13  of information, and that is something your Honor should

14  take into account when considering his complaints about the

15  flow of information, his lack of candor with this tribunal.

16          Mr. Potok had access to the data site for

17  almost one month before he requested information from Dana.

18  He had a list of documents prepared in November of 2006,

19  but didn't send it for another month.  He claimed there was

20  a delay in responding to the November request for

21  information, but he neglected to tell the court that two

22  days after the request there were in person meetings in

23  where there were "deep dives" into various aspects of the

24  debtor's operations and into the debtor's financial plan

25  for 2007.

22

1              Mr. Potok claimed a delay in responding to

2    his February 23rd request for information, but neglected to

3    tell the court that just three days after that e-mail went

4    out he was in Toledo meeting with heads of groups, with the

5    chief restructuring officer, with the chief executive

6    officer of Data, at meetings that were set up specifically

7    for the unions on for their benefit to answer their

8    questions to provide them in information.

9              Mr. Potok claims that there were delays in

10   obtaining Excel files, although he first requested an Excel

11   almost three months after he gained access to the data

12   site.  One sentence would have cured this complaint:

13   Please provide all information in Excel.

14              Now Mr. Potok admitted why, although he

15   suggested a nefarious purpose, he admitted why the debtors

16   may wish to post information in PDF as opposed to Excel,

17   the word he used was manipulation.  Not that he meant it in

18   a good way, he could analyze the information and move it

19   around, but manipulation of Excel files is a very important

20   reason why, if you are putting financial information out on

21   a website, even with restricted access, you would rather

22   not have people manipulate that information.  But when he

23   asked for Excel, files he got them.

24              And finally, Mr. Potok claimed that he

25   could not conduct an analysis, could not offer opinions on

23

1    key issues before this court because he did not have a five

2    year plan.  Well, he's conducted a lot of analyses that he

3    hasn't shared with us or with you, your Honor.  He's done a

4    comparables analysis, he's done an analysis, that he's

5    vetted, on Dana's calculations of labor savings.  He's

6    shared that with some folks, but not with us and not with

7    you.  And he admitted on the stand that the unions have

8    negotiated multi year collective bargaining agreements

9    without benefit of such five year plans or three year plans

10   in the past; indeed I would say the retiree committee and

11   the IAM in this case were able to settle the issued raised

12   by the 1113, 1114 motion without the benefit of a five year

13   plan.

14                   And at the end of the day, what is that

15   plan?  What is that mysterious five year plan that is going

16   to change Mr. Potok's analysis?  Could it change Mr.

17   Potok's analysis in any material way?  He admitted the

18   nature of the industry.  He admitted the nature of the

19   competition.  There is no miracle around the corner.  We

20   know how Dana has been performing compared to its

21   competitors over the last several years, not just the last

22   year or two, we know what it's going to take, and he knows

23   what it's going to take, major initiatives by Dana to

24   restructure its business.

25                   So I would submit, your Honor, in terms of

24

1    making proposals on the basis of most complete and reliable

2    information, and making information available on a

3    continuous, updated basis to the unions, the debtors have

4    more than satisfied that requirement in the statutes, both

5    1113 and 1114.

6                    There is a requirement, an important

7    requirement that the proposals treat all parties fairly and

8    equitably, and we would submit, again, your Honor, that is

9    what the evidence demonstrates conclusively.

10                   With respect to the savings that we are

11   seeking from active unions employees, Mr. Bueter and Mr.

12   Arquette both testified that the types of initiatives, the

13   types of proposals that are being made, the specific

14   modifications that are being requested from active union

15   employees, are similar, if not identical, to the types of

16   initiatives that have been requested and put in place with

17   respect to non union employees.  We are not singling the

18   unions out for additional burdens.  We are asking them to

19   make their fair contribution to the overall restructuring

20   initiatives.

21                   By way of comparison, your Honor, in

22   Northwest Airlines there was a business plan, there was an

23   aggregate of 2.2 billion dollars in savings that were being

24   salt by the debtor.  Over 50 percent of those savings were

25   attributable to labor.  In this case, your Honor, of an

25

1    aggregate of 405 to 540 million dollars in savings, about

2    25 percent are attributable to labor.  We are not asking

3    labor to shoulder an undue proportion of the savings.  And

4    I would add, with respect to the savings already offered,

5    the sacrifices already made by the nonunion hourly and

6    salaried workers and by the nonunion retirees, all we're

7    asking now is for the unions to make the same

8    contributions, the same sacrifices, that their nonunion

9    brethren have made.

10                There's no serious dispute, your Honor,

11   that Dana has made itself available for meetings, has acted

12   in good faith in reaching mutually satisfactory

13   modifications.  The best evidence of that, your Honor, is

14   the fact that we were able to negotiate the settlements

15   with the IAM and the retiree committee.  Initially they

16   opposed the request for 1113, 1114 relief.  We were able to

17   bridge the gap, we were able to make modifications and

18   agree on terms that both allowed the retiree committee, for

19   example, to continue to provide its members with some level

20   of retiree medical benefits, while at the same time

21   achieving one hundred percent of the cost savings that Dana

22   needed to achieve with respect to that constituency.

23                And, your Honor, we have continued to work

24   even with these unions to avoid friction wherever possible

25   with respect to those contracts that are under active

26

1    negotiation.

2                    Now what have we heard from the unions in

3    response?  Mr. Bueter talked about the meetings that were

4    held on March 19th, and you've seen the proposals, your

5    Honor, that were submitted by the USW on January 17 and

6    then with very minor modifications two months later on

7    March 19th.  And those proposals from the unions do not

8    offer any cost savings to Dana, they do not seriously

9    address Dana's need for substantial, major cost saving

10   initiatives, as their own financial expert has admitted.

11   Instead, what we have heard from the June's both in January

12   and then again in March is zero concessions.  That's not

13   fair your Honor, that's not equitable.

14                   Given the strong case for necessity, given

15   the sacrifices already made by nonunion labor by other

16   constituencies, given the contributions that are that being

17   made by Dana's customers, there is a clear case to be made

18   here that the equities favor a rejection of the collective

19   bargaining agreements, the equities favor a modification of

20   the retiree healthcare benefits

21                   There are a number of the factors that the

22   court can consider in determining a balance of the equities

23   and whether they clearly favor the relief requested.  But

24   at the end of the day, that analysis is not a free wheeling

25   analyses, as some courts have said.  In Northwest Airlines,

27

1    for example, the court said, "The Bankruptcy Code does not

2    authorize free wheeling consideration of every conceivable

3    equity, but rather only how the equities relate to the

4    success of the reorganization."

5              So in considering the various equitable

6    issues that have been outlined by the court, at the end of

7    the day the focus has got to be on relating those equities

8    to the success of the reorganization.

9              Now Kerri set out a number of factors, six

10   factors in all, that the court could consider as part of a

11   balancing of equity, and the first two relate to the

12   likelihood and consequence of liquidation if rejection is

13   not permitted and the likely reduction in creditor's claims

14   if the bargaining agreement or retiree benefits remain in

15   force.

16             On these two factors, your Honor, relating

17   to the risks of liquidation and the impact on creditor's

18   claims, the facts show, and again, this is part of a

19   necessity case, that without the relief we are requesting

20   Dana is simply not going to be able to reorganize.  Dana

21   will be forced to consume the available cash, it's already

22   consuming available cash, it's selling assets, it's

23   borrowing money, it's doing whatever it can to provide

24   liquidity, but it's going to burn through that cash in very

25   short order if it's not granted the relief it is

28

```
1    requesting.

2                On the Section 1114 motion, the unions

3    contend that the modification of retiree benefits will

4    result in a large unsecured claim.  The committee of

5    unsecured creditors, I would add, has itself indicated some

6    support for that motion, thus the constituency that is most

7    directly affected by the creation of unsecured claims that

8    could result from the modification of retiree health

9    benefits has voiced its confidence in the debtor's

10   proposals.

11               The third factor regarding the possibility

12   of the strike, and that's a theme; if there is a theme we

13   have heard consistently from the unions, it is that.  If

14   the requested relief is granted there will be a strike.

15   Again, in Northwest Airlines, the judge observes as

16   follows:  "A strike is inherent risk in every Section 1113

17   motion.  And in the end it makes little difference if the

18   debtors are forced out of business because of a union

19   strike of a continuing obligation to pay union benefits to

20   avoid one.  The unions may have the legal right to strike,

21   but that does not mean that they must exercise that right."

22               In slightly more colorful language used,

23   your Honor, in another case, in re Mesaba Aviation.  And

24   I'm reading from page 747 of 341 Bankruptcy Reporter 693.

25   And again, there's a similar argument made about the risk
```

1    of strike, and here's what the court had to say:  "The

2    underpinnings of this argument are quite austere.  In a way

3    it is almost embarrassing to see it presented in a forum

4    that is to receive principal discourse structured by the

5    dictates of reason.  In contrast, this seems to be a matter

6    of posturing only, and posturing in height.  One message to

7    be gleaned from is jarringly out of place in a legal

8    proceeding, 'if you don't watch out, I'm really going to

9    hurt myself and you too.'  An image comes to mind of

10   standing under a high bridge and hearing a voice coming

11   from above, 'if you don't give me what I want, I'm going to

12   grab you and take us both over the edge."

13                Yet another factor, yet another

14   consideration in the balancing of the equities, your Honor,

15   is the possibility and likely effect of any employees

16   claims for breach of contract if rejection is approved.  I

17   would submit, your Honor, the possibility of a damage

18   claim, the possibility of unsecured claims, does not change

19   the balance here.  Where the impact of possible damage

20   claims on creditor recoveries is dwarfed by the impact on

21   such recoveries if Dana cannot successfully reorganize and

22   cannot emerge as a viable, ongoing enterprise.

23                The fifth equitable consideration, your

24   Honor, asked the court to take into account the number of

25   effected employees and how their wage levels compared to

30

1    those of the other companies in the industry.  And there

2    was evidence submitted on the stand both from Professor

3    Wachter and Ms. Mulvey about two different aspects of this

4    factor.  One is the wages at Dana's plants, the wages that

5    are sought to be modified, and from Ms. Mulvey on the

6    nature of the modifications that Dana seeks with respect to

7    retiree health benefits.

8                  Professor Wachter, your Honor, provided

9    compelling evidence on wage comparability and demonstrating

10   how even after the modifications to both wages and

11   benefits, the wage differential at the plants at issue

12   would remain positive in most instances, and if it were

13   negative it would be minimally negative.

14                 Professor Voos, on behalf the of the

15   unions, offered contrary testimony, she offered a different

16   set of comparables that should be looked at.  And I believe

17   Professor Wachter's response to that argument was, well,

18   that's a little bit like holding a mirror to your face and

19   saying I want to model myself after other troubled

20   manufacturing auto industry companies that are struggling

21   with high labor costs, that are struggling with legacy

22   retirement benefits; that's what I want to model myself

23   after.  And that doesn't make sense for Dana.  Dana is in

24   bankruptcy.  Dana needs to dramatically change its cost

25   structure.  It needs to dramatically change its wage

1    structure.  And Professor Wachter's analyses on this point

2    is compelling and conclusive.

3                    And moreover, Professor Wachter analyzed

4    quick rates at the plants at issue, and one of the

5    conclusions he drew of the opinions he offered to your

6    Honor was, given the low quit rates, he was of the opinion

7    that there was in fact a wage premium by Dana.  And when he

8    spoke with the company about the effect of those plants

9    where the two tier wage structure had already gone into

10   effect, the company has not experienced any difficulty in

11   hiring and retaining qualified workers.

12                   This is a situation where the modifications

13   being sought, even if one were to accept Professor Voos'

14   comparable set, even if those modifications result in

15   Dana's overall compensation being slightly lower, and

16   that's all her analysis shows at best, slightly lower than

17   her comparable set, well, that is not a reason why the

18   equities tip in favor of the unions on this point.  The

19   modifications sought remain necessary.  The modifications

20   sought are fair and equitable.  They are similar to the

21   modifications we have obtained with respect to the non

22   unionized work force.

23                   With respect to retiree benefits, there was

24   a lot of discussion about whether the initiatives that Dana

25   is proposing.  Well, how do they match up with what's going

32

1     on in the industry?  And although Ms. Taranto started out

2     in her declaration purporting to take a view contrary to

3     that expressed by Ms. Mulvey, I think at the end she

4     conceded on virtually every point made by the debtors on

5     this issue.

6                    For example, she agreed that very few

7     employers anticipate placing no further restrictions on

8     benefit offerings to both their future and current

9     retirees, and changes in employee contributions and overall

10    plant design are planned for many pre- and post 65

11    retirees.  3/29 transcript at 67 to 68.  She acknowledged

12    that the same surveys that she relies on show that the

13    number of large firms in this country offering retiree

14    benefits have declined from 66 percent in 1988 to 33

15    percent in 2005.

16                   She acknowledged that the same surveys that

17    she relies on show that about one out of five, 19 percent

18    of companies that have not yet terminated their retiree

19    benefits as of 2005 require newly retired 65 plus retirees

20    to pay one hundred percent, to pay one hundred percent of

21    the total premium for their health insurance coverage.  She

22    conceded that the VEBA structure that had been proposed by

23    Dana would result in Dana's unionized retirees bearing a

24    higher percentage of their medical costs, and that was

25    consistent with what three out of four large employers in

33

1    this country are doing for current retirees, increasing the

2    amount that current retirees are required to contribute for

3    their health insurance premiums.  And finally she admitted

4    that 75 percent of the people in this country who are on

5    Medicare manage to get by in paying their Medicare premiums

6    without any contributions from an employer sponsored

7    healthcare plan.

8                    There are a series of steps that companies

9    take in dealing with the cost of retiree medical benefits.

10   Ms. Mulvey talked about the various steps.  But the greater

11   the financial distress, and in this case given the fact

12   that Dana is in bankruptcy, it has to consider the types of

13   options that it is not alone in considering.  It has to

14   consider and implement the types of options that it must

15   effect if it is to reorganize effectively, if it is to

16   emerge from bankruptcy as a viable company.

17                   Sixth and final equitable consideration,

18   your Honor, has Dana exhibited good faith in attempting to

19   reach a solution with respect to it's labor and retiree

20   costs.  Again, your Honor, I don't think there can be any

21   genuine dispute on this point, that Dana has strived from

22   very early on in this bankruptcy process to identify what

23   its restructuring issues were, how it intended to achieve

24   them, and to negotiate with all affected constituencies to

25   try and achieve a negotiated solution, and we remain ready

34

1    to do that even today.

2                    An argument that was raised by the unions

3    with respect to Section 1113, was that, well, your Honor

4    can't grant the relief that Dana is requesting under 1113

5    because what Dana is seeking is authority to reject the

6    collective bargaining agreements.  It apparently is the

7    union's view that the court must enter an order rejecting

8    the CBA.

9                    There's no case law that supports that

10   reading, as far as we can tell, your Honor, none's been

11   cited to us, there's nothing in the plain language of

12   Section 1113 that supports the union's position.  In fact,

13   what Section 1113 says is the court can approve an

14   application for rejection if certain conditions are met,

15   not automatically reject, or cause the debtors to reject

16   collective bargaining agreements.

17                    And if you look at the decisions from

18   several other cases, Delta Airlines, Northwest Airlines, US

19   Airways, Mesaba Aviation; in case after case after case,

20   the order that is entered is an order authorizing,

21   permitting the debtor to terminate collective bargaining

22   agreements, to reject collective bargaining agreements.  In

23   some cases it's quite explicit that if the debtor is going

24   to act on the court's order and actually go forth and

25   reject the collective bargaining agreements, and this is

35

1    from Mesaba Aviation, the court required the debtor to

2    provide each union prior notice of the date on which the

3    rejection shall be effective.  So that's clearly contrary

4    to a reading of a statute that, well, it's automatically

5    effective on the entry of an order.

6                    And the reading that the unions suggest,

7    your Honor, I think would also be contrary to the

8    principals underlying Section 1113.  And we've heard a lot

9    about the sanctity of the collective bargaining process,

10   and to some great extent Congress, in enacting 1113, tried

11   to preserve aspects of collective bargaining in the

12   bankruptcy context, and hence the need for negotiations,

13   hence the need for meetings, the provision of information.

14   And yet, what the unions would have this court do is equate

15   the filing of this motion with the loading of a gun and the

16   granting of the motion, handing that gun over to the unions

17   to do with it as they wish to do.

18                   The better reading of Section 1113 is to

19   grant debtors the authority to take the steps that they

20   have demonstrated are necessary for a successful

21   reorganization, but yet allow the parties to negotiate a

22   solution as opposed to precipitating a crisis, which is not

23   in any constituencies' interest, least of all the unions.

24                   In closing, your Honor, I was drawn to a

25   passage that you quoted from Judge Boah in Ionosphere where

36

1    you commented on the results of the relief that is

2    requested in this Section 1114 process.  And in quoting

3    Judge Boah you said the following.  "This court is aware of

4    the harsh circumstances the retirees who face the loss of

5    their insurance coverage.  Indeed this courts witnesses

6    daily hardships imposed on all parties by the misfortunes

7    that result in bankruptcy.  But short of printing money,

8    there is no way to see that all claims are paid in full.

9                   "The Bankruptcy Code recognizes this

10   reality and provides a method for dealing with it.  And the

11   best that this court can do is see that all of the

12   provisions of the Code are given effect.  If in the present

13   case this means that the court has made its best efforts to

14   enforce Section 1114 in accordance with the intent of

15   Congress, while still acting within the traditional context

16   of the Bankruptcy Code and pursuing the greatest benefit

17   for all of the creditors of this estate."

18                   Your Honor, we seek nothing more from the

19   unions than we have sought from the retirees, from the IAM,

20   and our non unionized workforce.  The IAM, the retirees and

21   the non unionized workforce has negotiated with us and

22   given us the savings that we were seeking.

23                   The unions have the power and ability to

24   deliver to their rank and file a negotiated resolution that

25   will avoid the brinkmanship and the potential loss of

37

1    benefits that a litigated resolution might entail.  We urge

2    them to return to the bargaining table and negotiate in

3    good faith so as to permit Dana to pursue a reorganization

4    path that will enure to the greatest benefit of all of the

5    creditors of this estate.

6            Short of a negotiated resolution, your

7    Honor, we respectfully respect that your Honor Dana's

8    motion for 1113 and 1114 relief be granted.

9            Thank you.

10            MR. MAYER:  Your Honor, by agreement with

11    the other parties, the committee would like to say a few

12    words and then the union will conclude.

13            THE COURT:  Go ahead.

14            MR. MAYER:  Your Honor, we deal here with

15    two different statutes.  One is Section 1113.  One is

16    Section 1114.  We deal with two separate sets of demands,

17    there's a separate Section 1113 demand for every collective

18    bargaining agreement.  There's a Section 1114 demand with

19    respect to the retirees.

20            The committee has followed these

21    proceedings very carefully and has done considerable

22    analysis of its own.  And after much thought and internal

23    debate is supportive of the debtor's request for relief

24    under Section 1114.

25            This is not is decision reached easily.  We

38

1    originally conditioned our support to evidence of what the

2    claim would be under 1114, and no evidence has been

3    forthcoming.

4            But that being said, it is our judgment

5    that if retirement and medical benefits are terminated and

6    the claim is granted, there will of course be consideration

7    and respect to that claim, it will go to the retirees, it

8    will ameliorate the loss of the their benefits, but from

9    the perspective of the unsecured creditors' committee it

10   will not be a carried victory, that means that unsecured

11   creditors' recoveries will not be diminished by this

12   outcome.

13           We have looked at the claims.  That is our

14   determination.  Although we have not shared our analysis

15   with the debtors, who don't understand and disagree with

16   our conclusion on this forum, it remains a matter for

17   another day.  That is our position for on Section 1114.

18           Section 1113 the our position is somewhat

19   different.  As you know, we participated in very limited

20   but very targeted ways in this proceeding.  And Section

21   1113 means cuts to payments and benefits to men and women

22   who work for Dana today, create the parts that Dana sells

23   to make money, and who have the right to strike if there is

24   a strike.

25           If this court enters an order granting the

39

1    company's Section 1113 motion, the unions take the position

2    that the entry of that order terminates their contracts and

3    gives them the right to strike.  Whether or not that is the

4    law, it is clearly true that if the company implements all

5    of those benefit cuts, that will give the unions,

6    company-wide, the right to strike, which is not a result

7    that the unsecured creditors' committee wishes to see

8    occur.

9                The savings from Section 1113 are much less

10   than the Section 1114 section.  The record shows that first

11   year savings range between 18 and 28 million dollars, and

12   there's nothing specific in the record as to the

13   reoccurring runway rate of savings from the active

14   employees.  The company takes the position it needs every

15   dollar it can get, and the committee is concerned that

16   there's a much lower level of savings from the actives, who

17   will be the people who strike if there is a strike.

18               And for that reason the committee takes no

19   position on the debtor's request for relief under Section

20   1113, and sincerely hopes that both the debtors and the

21   union can negotiate a resolution to their issues.

22               Thank you.

23               MR. SIMON:  Good morning, your Honor Bruce

24   Simon from Cohen, Weiss and Simon for the auto workers and

25   the steel workers unions.

40

1              Before I turned to my prepared remarks, let

2    me go straight to the question Mr. Tambe asked.  He asked

3    are the unions claiming that debtors must get all the

4    savings they need from others?  Let me answer that straight

5    up.  You bet.  To the extent there are savings achievable

6    from the other areas of available to the debtor, the debtor

7    is required, as a matter of law, to pursue and achieve

8    those savings before it comes to the unions and says it

9    needs a contribution from the union or from the retirees.

10             Mr. Tambe stated that's not fair, that's

11   not right.  This proceeding is not about what's fair or

12   right for the company's suppliers, or its vendors, or its

13   nonunion employees, that was not what Congress sought to

14   achieve with Section 1113.  Section 1113, Congress

15   established to protect the fruits of collective bargaining,

16   a unique structure in our legal systems, not one applicable

17   to vendors, customers, nonunion employees.

18             There is nothing that talks about equal

19   sharing.  Vendors builds into their prices a profit.  They

20   built in an allowance for bad debt.  Customers have the

21   marketplace as the ultimate regulator of their

22   relationships with the company.  Nonunion employees are at

23   the will of the company's disposition.

24             There is no requirement for the court.  I

25   go further, there is no mandate for the court.  There is no

41

1    room for the court to reconcile competing policies involved

2    in the law with regard to customers, suppliers or nonunion

3    employees.  The court's duty, the court's obligation is a

4    much more limited one.

5                    It has to reconcile the otherwise competing

6    policies of the National Labor Relations Act which is

7    designed to provide employees with the right and the fruits

8    of collective bargaining and to reconcile that policy with

9    the policies of the Bankruptcy Code.  And in that regard,

10   what is necessary for the debtor is necessary for the

11   debtor after it has pursued other alternate means of

12   savings available to us.

13                   Let me make, perhaps taking into account

14   Mr. Tambe's accusation that we engaged in theatrics and

15   rhetoric, let me make a radical proposition, which is that

16   we really look at the statute, even in this court,

17   specifically and cynically hand picked by the debtor for

18   its debtor friendly Section 1113 and 1114 juris prudence.

19   Even in this court the words of the statute matter, and we

20   too will match the company's words and actions and case up

21   against the statute.

22                   A couple of preliminary remarks, one

23   triggered by Mr. Mayer's reminder to us that we are really

24   dealing with two separate sections of the Bankruptcy Code.

25   And while they are in many respects similar, they are by no

42

1    means identical.  And those are Sections 1113 and 1114.

2                    Second general observation is that it's the

3    debtor that bears the burden of proof.  And when it comes

4    to the balancing of equities, this court has a particularly

5    heavy burden to impose upon the debtor.  The burden imposed

6    by the statute is not preponderance of the evidence, the

7    burden is that it must clearly establish the balance of

8    equities favors rejections.

9                    Finally, the debtors make an effort to

10   shift some blame for their own failures onto the unions.

11   The unions could have dug out some more information if it

12   pursued the maze of three data rooms more aggressively, and

13   if it somehow dealt with the fact to the debtor cleverly,

14   cutely, inappropriately gave the user friendly program to

15   all of the other constituencies but not to the union, was

16   that accidental, your Honor?  I think the inference is

17   plain, the inference is clear; it was not.

18                   The unions should have made a counter

19   proposal in the form that the debtors would prefer.  Judge,

20   when it comes to information, when it comes to the

21   obligation to make burdens, to make proposals, it's the

22   debtor's burden.  It's not a could have, would have, should

23   have game to measure the union's actions.

24                   Let me deal with the authority to reject

25   issue as opposed to outright rejection.  Let us remember

43

1     that the debtor has to meet a two prong test for providing

2     information to the unions before filing for Section 1113

3     relief.

4               Let me back up for a minute and perhaps

5     summarize what the unions believe are the failures of the

6     company's case.  A, the debtor seeks a remedy not provided

7     by the statute, it seeks authority to reject rather than

8     rejection.  I'll deal with each of these separately.  Two,

9     the debtor has not met the two prong test for providing

10    information to the union.  Provide information to the union

11    before the filing of the Section 1113, 1114 relief.  It had

12    the obligation to provide information relevant to its

13    proposal and information necessary for the unions to

14    evaluate the necessity for the debtor's demands.  And we'll

15    have a look at Mesaba a little later on in that connection.

16              Here the debtor's Section 1113 proposals

17    are not necessary for reorganization, in fact, they amount

18    to a mere rounding error.  One quarter of percent in costs

19    in an 8 billion dollar a year company.  In a case where the

20    debtor's active employees, and we're going to go through

21    this in painstaking detail, the debtor's active employees

22    already in less than its competitor's employees, and would

23    earn far less if this motion were to be granted, and that's

24    both in wages and total compensation.

25              And where astounding total elimination as

44

1    opposed to modification or reduction of retiree health

2    insurance, your Honor, that is both cruel and unusual

3    punishment, and it is virtually unheard of in or out of

4    Chapter 11.

5                    And where the total elimination of retiree

6    health insurance for UAW and steel workers represented

7    employees and retirees on its face is unfair and

8    inequitable as compared with the debtor's treatment of its

9    nonunion and IAM represented employees and retirees.  And

10   the debtor's effort to makeup for that by saying, oh, we'll

11   negotiate with you at some point a VEBA does not address

12   fairness and equity in terms what their current proposal

13   is, which is total elimination of retiree insurance.

14                   Any one of those factors should be a

15   sufficient basis for the denial of the 1113 or 1114 motion.

16   In combination, they are truly a staggering statement.  As

17   to the impropriety of the motions, frankly it's an insult

18   both to the process and to this court.

19                   Let me start with the fact that the motion

20   seeks relief not available under the statute.  Dana asks

21   for an order giving the debtor authority to reject union

22   contracts, but doesn't ask you for an order of rejection.

23   Dana's strategic ploy is clear, it seeks to obtain, through

24   this process, bargaining leverage in pursuit of its

25   strategic vision for negotiations.  But under 1113, the

45

1    application referred by Mr. Tambe is clearly the motion.

2    1113(d) provides that the debtors may apply for rejection

3    of a labor contract.  There is no stretch of that phrase

4    which can be used to produce a result that instead of

5    applying for a motion for rejection, the debtor applies for

6    authority to reject if and when it chooses.

7                   The statute sets forth the circumstances

8    under which you may approve an application for rejection.

9    It does not permit Dana to seek a court order giving it the

10   option to reject its collective bargaining agreement to use

11   at its discretion.  The rationale for 1113 for permitting

12   debtor to seek court relief is that negotiations have

13   failed and the debtor has determined and can prove that

14   rejection is necessary.

15                   At least one other debtor attempted this

16   strategy and had the issue specifically addressed by the

17   court to which it was addressed.  Unlike the instances

18   cited by Mr. Tambe.  In United Airlines the debtor asked

19   for a rejection order to keep in its hip pocket; it sought

20   authority to reject not an order of rejection.  And during

21   oral argument, final argument on the motions, the court

22   flatly rejected the request citing specifically the

23   statutorial language.

24                   "THE COURT:  Well, just to make clear Mr.

25   Demetri, United's lawyer, I believe that the only order

46

1    that 1113 allows the court to enter in this connection is

2    an order granting an application for rejection of a

3    collective bargaining agreement."

4              Mr. Demetri makes an argument that the

5    statute permits authority to reject as opposed to

6    rejection.

7              "THE COURT:  Well, I think one of the

8    important limitations of 1113 is that a debtor, in seeking

9    rejection of a collective bargaining agreement, has to be

10   willing to live with the consequences of a rejection if

11   that rejection is ordered.  And so, if the debtor is not

12   certain about whether it really wants to have a collective

13   bargaining agreement rejected, it ought not to make the

14   application."

15             And so merely giving the debtor an option

16   of rejecting it or not rejecting it does not exist on under

17   1113 as I read it.  The court further on.  "Once the order

18   goes into effect, then there is rejection of the agreement,

19   not an option to reject or not reject."  That's the

20   transcript of the argument on May 20th, 2005 at pages 50

21   and 51.

22             Further, from a policy perspective, Dana's

23   attempt to obtain an order it can impose at its discretion

24   is plainly at odds with the statute, which requires that

25   the debtor first exhaust the prospects for consensual

47

1   modification of agreement and then apply to the court for

2   rejection orders.  As in Centry Grass the court said only

3   if expedited bargaining fails does is 1113 permit the

4   debtor to apply for rejection.

5              If the debtor were permit to short circuit

6   the negotiation process, initiate litigation, and then use

7   a rejection order as leverage in further bargaining, the

8   statutory provisions would be rendered meaningless and the

9   principle statutory purpose to promote collective

10  bargaining would be nullified.

11             Dana's request improperly attempts to

12  enlist this court in its bargaining strategy.  Like United

13  Airlines, Dana should be prepared to live with the

14  consequences of its choice to proceed with this motion or

15  withdraw it.

16             Let me now turn to the statutory

17  requirement regarding debtor's burden to present

18  information adequate and in a timely fashion.

19             1113(b)(1)(a) states specifically prior to

20  filing, and the filing was January 31, prior to filing an

21  application seeking rejections, debtor shall make a

22  proposal based on the most complete and reliable

23  information available at the time of such proposal.

24             It provides for those necessary

25  modifications necessary to permit reorganization, and

48

1    provides such relevant information as is necessary to

2    evaluate the proposal.

3              Your Honor, it is really undisputed that

4    prior to filing, debtors failed to provide the unions with

5    all of the relevant information it could have disclosed to

6    the unions.  It is equally undisputed that the information

7    debtors did provide was both inadequate and untimely.

8              Debtor's responses, to trivialize their

9    statutory disclosure obligations, beginning with their

10   frivolous argument that the number of pieces of paper

11   available in virtual data room should be considered by the

12   court.  The number of pieces of paper available in an

13   electronic data room is not what counts.  As a matter of

14   law, what does count is whether debtors disclosed the

15   relevant information that it had to the unions, and whether

16   that information that was provided was sufficient such that

17   the unions could undertake an adequate evaluation of the

18   necessity for debtor's proposals, and those are not the

19   same thing.  They are separate tests, and each test must be

20   passed, and the burden is on the debtor.  It has passed

21   neither one.

22             It is undisputed that debtors failed to

23   provide the unions with all the relevant information it

24   could have disclosed.  Indeed Alix Particulars partner own

25   Pilar Tarry conceded that Potok's request to review

49

1    documents in the "professional eyes only data site" was

2    rejected because Potok wasn't bound by a confidentiality

3    stipulation.  If a different confidentiality protection was

4    required to view that data room, then one must assume,

5    there can be no explanation, that the professional eyes

6    only room contained information that had not been made

7    available to the unions which was made available to

8    professionals working for other constituents.  Can it

9    seriously be argued that such data was not relevant; that

10   it was not necessary to evaluate the debtors proposals?

11              Moreover, it is equally undisputed that

12   after Potok learned of the existence of yet another data

13   room, this one for the members of the creditors' committee,

14   he also learned that there was data in the more usable

15   Excel format than had been provided to him in the less

16   useful PDF format.  Now even if the court believes Mr.

17   Potok could have been more aggressive in pursuing

18   information in Excel, this case isn't about the degree of

19   Mr. Potok's aggressiveness, this case is about whether or

20   not debtor has fulfilled its obligation under law to

21   provide the unions with the most complete and reliable

22   information that it had.  And this obligation was not

23   dependant upon any particularized request from the unions.

24   And for this, your Honor, we do refer you to the Mesaba

25   decision, the first of I think three Mesaba decisions,

50

1    which turn down the motion for 1113 rejection precisely

2    because the debtor played games with the information and

3    the form of information it provided and found that its

4    failure to make available to the unions information in

5    effect in a user friendly fashion while that information

6    existed and was made available to others was an independent

7    and sufficient basis for denying the motion for relief.

8                    The statutory burden was on the debtors to

9    provide, not on the union to figure out that there were

10   three data sources and two computer programs and to go

11   through an elaborate maze to try and find the nuggets of

12   information at the heart of the maze.

13                   1113 information is not supposed to be a

14   treasurer hunt.  Debtors have not explained, and of course

15   they cannot explain why they made the affirmative decision

16   to provide information in user friendly Excel to the

17   creditors' committee and the same information to the unions

18   in clumsy PDF format.

19                   In addition, the information that was

20   produced to the unions did not permit them to conduct an

21   adequate evaluation of the necessity for the debtor's

22   proposals.  At the threshold is a great bulk of the

23   information that had been produced to the unions has only

24   be provided since the filing of the motions on January 31.

25   You heard Mr. Tambe refer to those wonderful meetings

51

1    wonderful across the board meetings with top people that

2    took place in Toledo at the end of February.  A month after

3    the filing.  Fully not in compliance with the statutory

4    requirement that such information be made available before

5    filing.

6                    It is undisputed, and indeed it is

7    corroborated by Mr. Bueter, that it was not until on or

8    about March 7th, fully five weeks after the 1113, 1114

9    motions were filed, that the unions finally received

10   information they had requested back in December pertaining

11   to the cost savings associated with the debtor's proposals

12   on a plant by plant basis.  And it's only on a plant by

13   plant basis that debtor's proposals can be evaluated by

14   employees at each specific plant.

15                   If the purpose here, and I suggest to you

16   one of the key purposes here is to provide the employees

17   who are working for Dana with the information necessary for

18   them to make the very difficult highly personal decision as

19   to whether or not to vote for the concessions demanded by

20   the company, company wide assessments, company wide numbers

21   are meaningless.  The employees at each specific plant have

22   to know, otherwise it's a fool's game what the impact of

23   the company's proposals are on the employees of that plant.

24   And that doesn't come until March 7th.

25                   Of course the timing issues alone don't

52

1   tell the entire story, their ultimate failure has been in

2   its conceded ability to produce the most relevant

3   information sought by the unions, and by the way by every

4   other constituency and I'll get to that in a moment, and

5   that is the five year plans that the unions have been

6   demanding since the debtors first uttered the words 1113.

7                   Why is there a need for a five year plan?

8   This is not just a labor cost case at all, if in fact it's

9   a labor cost case at all.  This is a transformation case.

10  This is a case about debtor's wholesale restructuring of

11  its business model involving a massive transfer of

12  operations overseas, a transfer that the debtors seek to

13  subsidize, at least in part, on the backs of debtor's

14  unionized work force and retirees.  These loyal members of

15  the Dana family, these American workers and retirees have

16  every right to know that what little may be left on these

17  shores, when the transfers are effected to China and India

18  and other low wage havens, are really the most they can

19  hope for under the circumstances.

20                  The unionized workforce, the incumbents and

21  retirees have every right to know that the sacrifices being

22  asked of them are justified, such that they know that the

23  concessions sought by the company are not just a

24  reshuffling of deck chairs on the Titanic.

25                  Debtors offer a twofold response.  First

53

1    they say that well, we are not going to have a five year

2    plan until the end of March.  Hello?  Where is it?  And

3    while it's obviously true that the debtors cannot provide

4    the unions with information it doesn't have, it's equally

5    true that the unions should be permitted to review such

6    information when it is available and can be shared.

7                    Debtors and debtors alone are responsible

8    for the timing of their motion.  The unions cannot be

9    faulted for the debtor's inability to back up their plans

10   to eliminate retiree medical insurance and slash wages

11   before such long term changes can be evaluated along side

12   of debtor's own long term projections.  Again, this is not

13   a garden variety Section 1113 labor cost cutting case, it's

14   a case about a massive restructuring in which extraordinary

15   concessions are being sought, not the least of which is the

16   effort to completely eliminate retiree health insurance.

17                   Absent a five year plan, the plan that exit

18   financiers are will insist upon before they even think

19   about dealing with exit finance, the five year plan that

20   the creditors' committee will demand before they even think

21   about a plan of reorganization and everything that leads to

22   it; the five year plan that any potential equity investors

23   will demand as a prerequisite for any consideration of the

24   provision of new equity to this company.  Every other

25   constituency, this court knows from its prior experience,

54

1    the direct essential character of a five year business

2    plan.

3                    As we've stated, and as you know, this is

4    not the first recent case in this court involving the

5    automobile parts industry and these very same unions.  In

6    Delfi the parties, while disagreeing on many things,

7    jointly agreed, as did the court, that in order for the

8    unions to be effective partners in negotiations they would

9    have to conduct due diligence.

10                   No such due diligence can be conducted

11   without a five year plan.  Debtors ignore the significance

12   of such projections, try to downplay it, and that mocks the

13   type of candor exhibited by the debtors in Delfi.  In

14   mocking the union's attempt to make informed decision in

15   bargaining, the debtors demonstrate once again their

16   indifference and/or their wholesale lack of understanding

17   of the collective bargaining process and ultimately

18   demonstrate their failure to fulfill their statutory

19   obligations to provide information.

20                   In Mesaba the court went on to note that if

21   Section 1113 is to operate as intended, a vital "purpose of

22   the information requirement" and I quote, "is to enable a

23   union's representatives and members to subjectively attach

24   some bedrock legitimacy to a debtor's proposal, to

25   convenience them, its employees, that the process of

55

1    formulating the proposal was not arbitrary, not loaded

2    toward particular result, not manipulated to produce an

3    unfair allocation of burdens among the constituencies to

4    the bankruptcy case."

5              Now, I'd like to go to what may be

6    considered the heart of the case on the merits, addressed

7    to some extent by Mr. Tambe, about to which I think a full

8    explication will require the court to parse very carefully

9    the proposed findings of fact that you'll receive from each

10   of the parties.  And while I will try and emphasize what I

11   think are clear and unmistakable admissions in the record,

12   I do recognize that this is a difficult process for oral

13   argument.  And I do not mean for my effort this morning, to

14   sidetrack what I think will necessarily be a court close

15   examination of the charts and the testimony and the

16   proposed findings.

17             Is it necessary to permit reorganization

18   for this company to achieve one quarter of one percent of

19   its labor cost savings?  We think not.  Is it appropriate

20   for this court to drive wages which are already below

21   industry comparable wages by competitors of the company

22   even lower?  We think not.  Is it necessary for this court

23   to authorize the total elimination of retiree insurance?

24   We think not.  Let me address those.

25             In paragraph 17 of his declaration, Mr.

56

1    Bueter says that the company seeks, one, and I quote, "to

2    standardize the hourly wage being paid by the debtors

3    across all of their manufacturing facilities, and, two, I'm

4    still quoting, to bring the average hourly wage costs in

5    line with that being paid by other companies in the same

6    industry."  And, your Honor, we do agree that that second

7    issue is indeed relevant.

8                    Let's take them one at a time.  First

9    standardizing wages.  The company cites no case law, and we

10   know of none, that says a debtor is entitled to 1113 relief

11   to make its wages standard from one plant to another.

12   Standardized wages may look neater, they may feel tidier,

13   they may give Mr. Bueter warm, fuzzy feelings, but they are

14   not in fulfillment of a statutory mandate, and it's no

15   reason to throw out labor agreements that have evolved

16   differently at different plants over the course of decades

17   of collective bargaining.

18                    These wage and work rule differences

19   reflect years of give and take between local management and

20   local union officials who know best the operations under

21   which their plants operate.  They also reflect, as Mr.

22   Bueter indeed recognized at paragraph 5 of his declaration,

23   that variances in wage and benefit rates in the various

24   markets in which the plants are located was a fact of life.

25                    Table one on page 7 of Professor Voos'

1    report shows by just by how much the market wages varied by

2    the location of each plant.  The Auburn Hills plant located

3    in a county in Michigan where the average weekly wage in

4    the goods producing sector is nearly 30 percent above the

5    US average.  So standardizing wages at Auburn Hills with

6    that of plants of lower wage areas just means driving

7    Auburn Hills below market level.

8                    And as long as we are discussing below

9    market wages, let's turn to the company's next rationale

10   for its Section 1113 requests.  To bring average hourly

11   wage costs in line with that being paid by other companies

12   in the same industry.  His declaration page 17.  Now this

13   assertion assumes that Dana currently has average hourly

14   costs above those in the competitive auto parts industry,

15   but there is simply no evidence of that.  Mr. Stenger's

16   declaration identifies the competitors whose financial

17   performance Dana wants to match, but the company provide no

18   evidence, none, zero, that Dana pays higher wages than do

19   those benchmark companies identified by the company's chief

20   restructuring officer himself.

21                    I would note parenthetically that Professor

22   Helper tried to testify that she knew at least one of the

23   those benchmark companies, American Axel, pays far higher

24   wages, but that evidence was stricken from the record.  We

25   took an exception, and we think that was an incorrect

58

1    conclusion from the record of a directly relevant fact.

2              Professor Wachter's report identifies what

3    the company considers to be the principal competitors of

4    each of the five plants included in the report.  He

5    admitted that he had no information on the wages or the

6    total compensation paid by any of those principle

7    competitors, nor, for that matter, did he have any

8    information on the competitors quick rates.

9              Does the record provide any source of

10   information that would allow for comparison to Dana's

11   hourly wage costs to those of other companies in the same

12   industry?  In fact, fortunately, it does.

13             We have what Professor Wachter called the

14   authoritative source on wages, data from the Bureau of

15   Labor Statistics of the United States Department of Labor,

16   there the most up to date BLS data tells us precisely what

17   the average hourly earnings were for production and non

18   supervisory workers in the motor vehicle parts industry as

19   recently as December '06.  That number is contained the on

20   table 2B on page 12 of Professor's Voos' report.  That

21   figure, you remember, we asked you to circle it, was 22

22   dollars and 11 cents an hour.  Table 4 on page 14 of

23   Professor Voos' report uses the company's own data to show

24   the weighted average wages currently paid at Dana's plants.

25             And let's look at the three plants subject

59

1    to 1113 proposal.  Fort Wayne, current average hourly wage,

2    22.12, that's one penny within the industry average.

3    Marion, current average wage, 19.62, well below 22.11.

4    Auburn Hills, 17.81, far below the average 22.11.

5                     These figures, which use the company's own

6    data and the authoritative BLS data are undisputed.  There

7    is simply no dispute in this record that Dana's current

8    wages at the plants at issue in this Section 1113 motion

9    are at or below average industry levels.  At market in the

10   case of Fort Wayne, and below market at Marion Auburn

11   Hills.

12                    So, will cutting these wages as the company

13   proposed bring them in line with those of the Dana's

14   competitors?  No.  In fact, undeniably they will drive the

15   wages at the company's facilities well below its

16   competitors in the auto parts industry.

17                    We see in Professor Voos' table on table

18   five at page 15, the table shows what the wages at those

19   plants would look like, she called it, the morning after

20   the wages were cut if this court rejects the contract.  By

21   her conservative estimate, Fort Wayne's workers would be 22

22   percent below the average wage of similarly sized

23   facilities in the auto parts industry.  Auburn Hills, 25

24   percent below.  Marion, 27 percent below.  And that's just

25   the snapshot of the morning after.  With normal turnover

60

1    the average wages at these plants would soon sink even

2    further below market levels as senior one senior employees

3    require or quit and are replaced by new hires paid the

4    proposed 11.05 cents an hour.  And there won't even be been

5    normal turnover, the process will accelerate.

6                   At Auburn Hills and Fort Wayne, the quit

7    rates doubled from 2005 to 2006.  Professor Wachter

8    suggests that's due to uncertainty about the future.  Take

9    that continued uncertainty and whopping pay cut and these

10   plants will hemorrhage the better paid skilled and

11   experienced workers and the average wages at those plants

12   will really plummet below market levels.

13                  And the picture is the same with total

14   compensation.  Professor Voos' table 8, Union Exhibit 58,

15   traces total compensation at those plants and produces the

16   same result subject to the same exacerbation once the

17   morning after morphs into increased quits and increased

18   hires at an 11.05 rate.

19                  Now, does the company seriously dispute any

20   of this?  No.  So what does it do?  It hires Professor

21   Wachter at 600 dollars an hour to tell you why auto workers

22   and steel workers should be paid 11 dollars an hour.  For

23   600 dollars an hour, Professor Wachter tells this court

24   it's a "very bad idea," transcript of March 27th at page

25   211, to compare labor costs of Dana to its competitors in

61

1    the same industry.  That's odd, because the same Professor

2    Wachter's study in Delfi, Union's Exhibit 29 in this case,

3    relied heavily on data about total compensation paid by

4    others in the auto parts industry.  Indeed, Professor

5    Wachter at paragraph 26 of his Delfi report, called the

6    data from the auto parts industry particularly valuable.

7    But here it's a bad idea?

8                    His comparability study in the United case,

9    Union Exhibit 32, compared United's wages to the wages of

10   other airlines.  He explained there, at paragraph 37 of

11   Union Exhibit 32 that, "in performing comparability

12   analysis we begin by comparing each United Airlines

13   employee group with the same employee group at other major

14   and national airlines."  In other words, he used industry

15   pay as a comparison even where the industry, as here, was

16   going through tough times.  Even though it meant, to some

17   extent, holding up the mirror and looking into it.

18                    This court, every court that I'm aware of

19   in a 1113 context, always looks at the wages of comparable

20   employees in the same industry in the same market, same

21   labor market.  And for precisely the reason we do it here,

22   that's where debtors competitors are.  And you really don't

23   need a 600 dollar an hour Ph.D. to tell you what common

24   sense tells you.

25                    Bet let's accept for a moment for the sake

62

1    of argument that Professor Wachter is right, and it's not

2    the wages of competitors that one should look to but the

3    average wage of the applicable BLS job category across the

4    entire private sector economy, just not just manufacturing,

5    not just regional.  Of course to make the this assumption,

6    we have to ignore, as Professor Wachter does, the

7    undisputed fact set out in Voos Table 1, that the Dana

8    facilities at issue are all located in areas where the

9    market wage is above the national average.

10          We also have to ignore obviously relevant

11   factors like firm size and establishment size, and the

12   relatively high work experience of Dana's employees at the

13   union plants.  Factors that all correlate with higher

14   wages.  We also have to ignore Dr. Helper's undisputed

15   testimony that Dana's employees face difficult working

16   conditions which command higher wages as a compensating

17   differential.  Labor economics 101.

18          In the heat part of the operation they work

19   under one hundred degree temperatures while doing heavy

20   lifting.  On the gear carrier line they look like they are

21   going off to battle, wearing goggles, rubber aprons, shoe

22   spats up to their knees, rubber gloves, wrist and ankle

23   braces, they are sweating, they are covered in little black

24   beads and dust from their cutting malleable iron castings,

25   water runs down their legs into their shoes because the

63

1    machines run with a continuous spray of cutting fluid.  You

2    don't get a better example of a compensating differential

3    in labor economics 101 than that.

4              So to accept the doctor's analyses, do they

5    have to ignore the fact that Dana's workers read blue

6    prints, do the own inspections, set up their own machines?

7    We must ignore the fact that they are sometimes working

8    with finicky old equipment to produce axles that have

9    tolerances within a thousandth of an inch.  And we have to

10   ignore the fact that if they don't do the axle job right

11   day in/day out, some diver may go off the road.  And

12   finally we have to ignore the fact that workers must do

13   this, all the while meeting the tight schedules of Dana's

14   just in time production process.

15             So let's, for the moment, ignore all this

16   and accept Dr. Wachter's assumption that Dana's workers are

17   no different than the average worker in the applicable BLS

18   category nationwide.  Where does that assumption leave us?

19   Under Dr. Wachter's own analysis, after imposition of the

20   1113 proposal, the morning after your Honor's decision to

21   reject goes into effect, skilled workers at Fort Wayne will

22   be 11 percent below that national market average, support

23   workers will be 10 percent below, the skilled workers at

24   Marion will be 6 percent below market, the production

25   workers will be 7 percent below, at Auburn Hills the tier

64

1    one production workers will be 2 per above market the day

2    after implementation, but once you add in the fact that

3    Wachter does not -- that one third of the production

4    workers at Auburn Hills are currently tier 2 employees

5    making below market wages, and add in the fact that new

6    hires will come in at 11.05, even using Professor Wachter's

7    approach, average wages at Auburn Hills will drop below

8    market levels upon Section 1113 implementation.

9              Does any company, even a bankrupt company

10   in a troubled industry, need to pay below market wages to

11   survive?  Let's see what even Dr. Wachter says about that.

12   Tower, another bankrupt auto parts marker familiar to this

13   court, made Section 1113 proposals to its unions that Dr.

14   Wachter concluded would have left the non skilled hourly

15   workers there with wage premiums of 22 to 23 percent above

16   market level, that's after implementation of a contract

17   rejection.  22 to 33 percent.

18              What did Dr. Wachter conclude regarding

19   these proposed premium wages in Tower that would result

20   after contract rejection?  That they were highly

21   reasonable.  So in Tower, Dr. Wachter deemed it highly

22   reasonable for a bankrupt auto parts supplier to pay above

23   market levels.  And this fully comports with Dr. Helper's

24   testimony, that it makes good business sense for a firm to

25   pay above market wages when it has capital intensive

65

1      operations, as Dana does when it uses just to in time

2      production, as Dana does when it competes based on quality.

3              In such circumstances the key to success is

4      not saving a few pennies on labor which makes up a

5      relatively small portion of overall costs, but in having a

6      motivated, skilled workforce that will keep defect free

7      products from rolling off the assembly line.

8              What happens to a firm that cuts pay below

9      market level, especially when the workers have not agreed

10     to accept the cuts?  We have had two Harvard Ph.D.'s

11     explain it to the court, but frankly, again, it's just

12     common sense.  You lose your best, your most talented

13     workers, those who can get a job elsewhere earning market

14     wages, those who can't get market wage stay, but they are

15     angry, unhappy, worried, preoccupied with how to make ends

16     meat on a smaller paycheck.

17             As for the new workers who replace those

18     who quit, you can only hire those who couldn't get a better

19     job elsewhere paying the market rate.  But you don't need

20     to trust our experts or even your own common sense,

21     Professor Wachter himself made it plain that below market

22     wages make it difficult for a company to attract and retain

23     qualified workers, as he explained on page 297 of his March

24     27 trial transcript.

25             "Question.  Is it true by definition that a

66

1    firm that pays below a competitive wage and benefit package

2    enjoys a competitive advantage Professor Wachter?

3                    "Answer.  No, it doesn't, because it will

4    have trouble attracting and retraining a qualified

5    workforce.

6                    "Question.  Okay, so if you pay below

7    market wages and benefits you'll have trouble attracting

8    well qualified workers, correct:

9                    "Answer.  Yes, that's what I just said.

10                   "Question.  Does it matter that Dana's

11   proposed cuts will make it hard for it to attract and

12   obtain a well qualified work force?"

13                   Professor Helper, the only expert in this

14   case who actually spent her career studying the auto parts

15   industry and was qualified as an auto parts expert,

16   explained that firms in the industry compete based on

17   quality.  Her unrebutted testimony was that auto makers,

18   when choosing suppliers care about price, but they care

19   more about quality and reliability.  The Japanese OEMs have

20   set the bar high regarding quality, and American auto

21   makers, to keep market share, have had to follow suit.

22                   Simply put, consumers now demand a better

23   car, and quality standards have respondent risen

24   accordingly.  The supplier who can't match the competition

25   based on quality truly has no future.  That the industry is

1   facing stiffer international competition, as the company

2   has pointed out again and again in this case, and which we

3   have not denied, is just that much more reason why Dana

4   must excel at what it does.

5            Indeed, as Dr. Helper explained, to capture

6   the profits that the industry has to offer, a parts maker

7   must develop new products and roll them out with a flawless

8   launch, companies phrase, before the competition can catch

9   up.  A flawless launch takes not just engineers, not just

10  managers, it takes skilled and motivated workers on the

11  shop room floor, committed to their company, knowledgeable

12  about their jobs, and willing to make the extra effort that

13  it takes to turn a prototype into a mass production product

14  quickly and without defects or delays.

15           There's no question that pay cuts will

16  pretty up the balance sheet.  There's no question that pay

17  cuts will make certain constituencies happy.  But will it

18  increase Dana's prospects for long term survival?  Not if

19  it leads to poorer quality product and less reliable

20  operations.  But, you may ask yourself, the company surely

21  must know what it's doing.  If cutting wages were harmful,

22  why would the company propose it?  After all, this is a

23  large and sophisticated corporation and a rational economic

24  actor, right?  Does this company know what it's doing?

25  Doesn't the fact that we're standing here in the Bankruptcy

68

1    courtroom answer that question?

2                    American Axel, and the other success

3    stories identified by the company as financial benchmarks

4    face the same rising commodity prices, the same

5    international competition, the same challenges in the same

6    industry as Dana.  But they are not before you, they found

7    a different and a better pen.

8                    Mr. Stenger is a professional cost cutter

9    he's doing what reorganization gurus do, they cost cuts

10   wherever they see them.  He has no idea what the impact

11   will be on the quality of this company's unionized

12   workforce, on the quality of this company's operations if

13   the collective bargaining agreements are tossed out the

14   window and below market wages are crammed down the

15   employees.  And here I'm not even talking about a strike,

16   although to fulfill Mr. Tambe's expectations I will.

17                    Mr. Stenger who has been a restructuring

18   officer in a number of industries has the generic simpler

19   view of a turn around profession, a dollar cut is a dollar

20   saved.  Whether it's wages, retiree health, SG&A or

21   commodity prices.  Once Dana emerging from bankruptcy, Mr.

22   Stenger will move on to his next 125 thousand dollar a

23   month engagement for Alix Partners.  But Dana's management

24   and workforce will still be there left to deal with the

25   consequences of Dana's restructuring of its labor costs.

69

1          Wage cuts don't go straight to the bottom

2     line.  Dr. Voos explained, again in unrebutted testimony,

3     that if productivity falls, a dollar wage cut does not

4     translate into a dollar saved in labor cuts.  If cutting

5     pay below market levels drives productivity down, it

6     impairs the company's ability to deliver a quality product

7     just in time for its customers.  If it makes a launch less

8     than flawless, cutting wages would be penny wise but dollar

9     foolish.

10          The company's proposed pay cuts are not a

11     recipe for long term success, but a recipe for long term

12     failure.  By then, by the long term, Mr. Stenger and his

13     team of professionals will have received their tens of

14     millions of dollars of fees and be long gone.

15          Let me switch to Section 1114.  Let's talk

16     about the company's proposal which is, rather literally,

17     breathtakingly simple.  It not only takes our breath away,

18     it will take away the breath from retiree who depends on

19     retiree insurance for their continued breathing.

20          Dana what's to eliminate its obligation to

21     pay all retiree health benefits, and when it says all it,

22     means all.  Their 1114 proposal is not limited to the five

23     plants that are the subject of its 1113 proposal.  The

24     specific proposal dated January 29th, two days before their

25     January 31 filing, includes the establishment of a VEBA,

70

1    but neither in January 29th nor through the period of time

2    until today has there been any money proposed for that

3    VEBA, and it exists only in the litigation team's cross

4    examination by suggesting that a VEBA could "pay subsidized

5    coverage" or other items that would no longer be paid for

6    by Dana.  Dana's litigation teams implies that somehow the

7    company's proposal already offers real money.  It does no

8    such thing.

9              The company's 1114 proposal is that a VEBA

10   would be funded by a general unsecured recovery on whatever

11   this court subsequently decides would be a union's allowed

12   claim for retiree healthcare.  So what Dana calls its

13   proposal, is really just an invitation to engage in yet

14   another round of litigation, this time over the allowed

15   claim.  The only proposal that's before you, and the

16   proposal which you have to determine is either necessary or

17   not, is their proposal to eliminate their obligation to pay

18   retiree healthcare, period, end of paragraph.

19             Dana's argument really boils down to this:

20   The company simply doesn't want to be in the business of

21   providing retiree healthcare.  But that's not what Section

22   1114 was enacted to prevent.  A company in Chapter 11

23   cannot merely decide it no longer wants to be in the

24   business of providing retiree healthcare.  1114 was enacted

25   to protect retiree benefits in the event a company goes

71

1    through Chapter 11.  Instead the exacting compliance with

2    1114's requirements required in order to obtain Section

3    1114 relief, the company's case is nothing more than they

4    would like to get out of the retiree healthcare business,

5    because, one, retiree healthcare is a society wide issues,

6    and, two, the number it has to report on its financial

7    statements as its APBO is a very big number.  And, three,

8    some of the company's in bankruptcy ended up reducing or

9    eliminating their obligation to retiree healthcare.  That's

10   their case.

11              That case fails every element under 1114's

12   tests.  It cannot make a case that it's necessary to

13   eliminate obligation to pay retiree healthcare simply by

14   presenting an APBO number, a periodic cost, and cash

15   expense projection; all of which, by the way, have changed

16   as a result of the settlements with the nonunion retirees

17   and the IAM.  Because Dana's has chosen to proceed this

18   case without presenting its five year business plan, Dana

19   is not in a position to show, or hasn't shown, that it's

20   able to pay for any retiree healthcare.

21              Instead, Dana relies on what it calls long

22   term trends in employer provided retiree healthcare in the

23   rest of the world.  But those trends develop, and there

24   were trends, in 1993 to 1993.

25              MS. CECCOTTI:  '88.

72

1              MR. SIMON:  Dana is relying on what it

2    calls long term trends in its employer provided healthcare.

3    Those trends developed when companies acted in response to

4    the 1993 accounting requirements that they reduce or

5    eliminate APBO so they would not show up on their balance

6    sheets.  Of course, the so-called trend is not really news

7    at all by this time.  The drop in the number of large

8    employers offering retiree healthcare to active employees

9    from 66 percent in 1988 to 31 percent, was explained by Ms.

10   Taranto and demonstrated in the Kaiser survey charts; most

11   employers who were going to get out of the retiree

12   healthcare did so before the new reporting requirements

13   took place in '93.

14              Since that time the figures have stayed in

15   the 30 to 40 percent range for all employers surveyed, and

16   a larger percentage for the largest employees surveyed.

17   The trend that Dana claims justifies it's case may have

18   been news between 1988 and 1993, but it's not news now.

19   The changes have long been incorporated into the financial

20   metrics of US companies.

21              And if one were looking at the trend among

22   employers offering retiree health to active employees,

23   which is what Kaiser surveyed, one would see that for the

24   past ten years the percentage has been rather stable.  Here

25   though, Dana wants to make its case with reference to the

73

1    company's that have either reduced or eliminated their

2    retiree health obligations without differentiating between

3    a result that would leave some retiree of the health

4    benefits intact or completely wipe it out.

5                    Dr. Mulvey testified that employers are

6    looking to either eliminate or reduce their healthcare

7    obligations, and that, as between those two groups, a

8    smaller group is looking to eliminate while a larger group

9    is looking to contain, to modify, to reduce.  This is

10   consistent with the testimony of Ms. Taranto of Milliman,

11   so both experts on this agree.  More employers are looking

12   to cap their costs, to reduce their costs, and fewer are

13   looking to eliminate them in entirely.

14                   And despite Dana's insistence that somehow

15   a survey that included so-called distressed employers have

16   change their results, debtors presents no such survey of

17   distressed employers, so we have no reasonable basis to

18   conclude that such a survey would show anything other than

19   what most other companies are actually doing, and what we

20   know from reading the newspapers they are doing, they are

21   limiting rather than eliminating their obligations.  And

22   let us not forget, once again, the burden here is not on

23   the unions, the burden is on the employer.

24                   In the GM proceeding, over GM's modified

25   health plan, where both witnesses submitted expert

74

1    declarations, GM did not eliminate its obligation to pay

2    retiree health, it negotiated a modified plan which

3    includes but is not limited to a VEBA to which GM will

4    contribute, hold your breath, 3 billion dollars.  Dr.

5    Mulvey stated that her assessment of the GM modified plan

6    as fair and reasonable was based on the fact that GM made

7    minimal changes in cost shifting to retirees.

8                    Regarding companies in Chapter 11, all that

9    Dr. Mulvey's testimony boiled down to on the subject of

10   companies in bankruptcy was that some employers in Chapter

11   11 reduced or eliminated their retiree health obligation.

12   She cited a few examples of employers who went through

13   Chapter 11 and had absolutely no information about the

14   circumstances under which they reduced or eliminated their

15   retiree health benefits.

16                    This court presided over the Bethlehem

17   case, in which the steel workers in Bethlehem entered into

18   a comprehensive agreement resolving a host of labor issues,

19   including retiree health benefits, as a result of the sale

20   of Bethlehem to International Steel Group, a company that

21   at the public record will show bought the assets of

22   Georgetown Steel and LTV, two other cases cited by Dr.

23   Mulvey.

24                    The opinion of Dana's witnesses can be

25   summarized as follows:  Dana's proposal to eliminate

75

1    retiree healthcare for future retirees is consistent "with

2    those of other larger employers," and there are examples of

3    companies in Chapter 11 that reduced or eliminated their

4    retiree health obligations during those cases, but whether

5    a proposal is consistent with the actions of other

6    companies, or whether they are examples of other Chapter 11

7    companies addressing their retiree health obligations, does

8    not tell the court that Dana's proposal in this case is

9    necessary.  It does not tell the court that Dana's proposal

10   in this case is fair and equitable.

11              It does tell the court that if that is the

12   basis of Dana's proposal, the union had good cause to

13   reject it.  If anything, the Chapter 11 company cited by

14   Dr. Mulvey show that large Chapter 11 employers who are not

15   undergoing an asset sale or liquidating, are maintaining

16   their retiree healthcare obligations even if they have

17   reduced that obligation through 1113.

18              Dana cannot make a case necessary based a

19   mere assertions, assertions made without any meaningful

20   comparison, that Dana's proposal is consistent with actions

21   taken by other employers or Chapter 11 companies, the other

22   case references show only that certain companies took

23   advantage of 1114 during their Chapter 11 cases.

24              In the end, Dr. Mulvey's examples were

25   included for the very limited and unremarkable purpose of

76

1    showing that other companies, through 1114, have eliminated

2    their retiree healthcare obligations without regard to

3    whether those instances involved negotiated settlements,

4    assumption by a third party, payment of claims, or other

5    results.

6                    Dana has also failed to meet the necessity

7    standard because while Dana seeks to eliminate its

8    obligations to pay retiree healthcare, Dana has not shown

9    it could not, in fact, do instead what most other employers

10   are doing.  In fact, Dana as already capped a significant

11   portion of its liabilities, as Ms. Taranto's chart shows,

12   and based on Towers Perrin's APBO number.  Dana has capped

13   66 percent of UAW retire liability and 57 percent of its

14   steel worker retiree liability.  Those caps were negotiated

15   through collective bargaining, and Dana has not said why

16   further restraints cannot be negotiated, it has said only

17   that it wants to get out of the business of retiree health

18   care.

19                    It cannot be found to be necessary where

20   Dana has not made a case that it cannot afford any retiree

21   health obligation, where it's relying on a ten year old

22   change in accounting requirements, and where it merely

23   cites to other companies that address retiree benefits in

24   their bankruptcy cases.  It's certainly not fair and

25   equitable, even if Dana asserts it has eliminated its

1    retiree health obligations for its none union retirees and

2    current employees.

3                    First, it has settled its nonunion retiree

4    health benefit obligations, obligations, by the way, it was

5    prepared to abruptly terminate without using the Section

6    1114 process.  And while I will not climb into the court's

7    mind, I think it's fair to say the reasonable expectation

8    is that the court was prepared to say it had the ability to

9    terminate those benefits without pursuing 1114.  But there

10   it terminated them by agreement by funding a VEBA with 78

11   million dollars against an APBO liability of some 350 or

12   400 hundred million dollars.  Here it seeks to terminate

13   one billion dollars worth of liability and hasn't put a red

14   cent on the table.  Under no stretch of the imagination can

15   that be found to be fair and equitable, and certainly not

16   that it establishes that the equities are balanced clearly

17   in a burden of proof exercise.

18                    Dana's single attempt to lessen the blow

19   here by asserting that surely there must be spouses with

20   coverage, Mr. Tambe said a survey shows 75 percent of

21   retirees can meet their costs under Medicare.  Can someone

22   tell we me what about the other 25 percent of the thousands

23   of people we are talking about?  The negative pregnant of

24   that is that 25 percent will not be able to meet their

25   costs.  The company cannot eliminate health benefits based

78

1     upon a hypothetical suggestion with no evidence to support

2     it.  The unions surely have good cause to reject Dana's cut

3     now, litigate later.

4                   Your Honor, in my opening I talked about

5     the difference between pushing the button at 40 thousand

6     feet to release bombs and killing someone in hand to hand

7     combat in the trenches.  We presented real evidence from

8     the trenches.  Some will say it was cheap theatrics,

9     playing to emotion.  Well, it's unfortunate that it's

10    collateral damage.  Let's review our collateral damage.

11                   Your Honor heard from Henry Gibson, born in

12    South Carolina in 1921.  He worked for Dana for nearly 35

13    years doing everything from mopping floors to working as a

14    mechanic to welding.  He wore out both hips doing heavy

15    work at Dana, suffers from incurable glaucoma as a result

16    of a battery accident, and chronic asthma.

17                   At 86 years of age, Mr. Gibson and his wife

18    lives on Social Security and a 600 dollars a month pension

19    from Dana.  Mr. Gibson, when asked about the elimination of

20    his health insurance answered, what in the world are people

21    going to live off?  We can't hardly pay to get food.  Your

22    Honor also heard from Greg Zuber.  Mr. Zuber was a welder

23    for Dana for 30 years, often working 12 hours a day welding

24    parts weighing anywhere from 3 thousand to 15 thousand and

25    pushing them and stacking them by hand, after 25 years Dana

1   finally installed a magnet to move it.  He retired it at 49

2   after two back operations.  He's now 60.  He's not entitled

3   to Medicare, so he can't apply to the 75 percent test.

4   Elimination of his retiree benefits will be devastating.

5   He receives a pension of approximately 1 thousand 463

6   dollars a month.  He said he looked into the cost of

7   purchasing health insurance.  12 hundred dollars a month to

8   replace the retiree benefits if they are terminated under

9   your Honor's order.  That would consume 82 percent of his

10  pension.  He tried to work again.  He quit his job working

11  as a school bus operator before any kids were hurt when his

12  leg started becoming numb.  His wife had an accident at

13  work 16 months ago and has lost the use of one of her

14  hands.  She just started a new part time one handed job for

15  20 to 25 hour a week.  The Zuber's have some savings, but

16  Mr. Zuber doesn't even know if I can make it until we are

17  on Medicare.  Two back operations, I'm 60 years old.  I

18  can't run a computer you know.  What am I going to do?  And

19  Mr. Gibson asked what in the world are people going to live

20  on?

21              If you grant this motion to reject, your

22  Honor, will you tell Mr. Zuber what he's going to do?  Will

23  you tell Mr. Gibson what he's going to live off?  We're not

24  at 40 thousand feet.  What about the literally thousands of

25  others besides Mr. Gibson and Mr. Zuber each with a

80

1    personal history of service to Dana.  Each with a personal

2    history of reliance on the promises made by Dana, each with

3    the prospect of being betrayed and abandoned by Dana, and

4    for what?  For 18 million dollars in wage and benefit

5    reduction at five plants in an 8 billion dollar company,

6    one quarter of one percent, a rounding error?  Compared

7    with the 50 million dollars and counting fees for

8    professionals, chief executive officer Burns 6.5 million

9    dollars in earnings?  Compared to that, 18 million dollars

10   is chicken feed.  To the workers and retirees of Dana, it

11   isn't chicken feed, it's the difference between chicken on

12   the table and no chicken on the table.  Chicken on the

13   table or pay for medical.

14              Mr. Tambe mentioned the voice from above,

15   and you know I said at the start of this statement that our

16   text would be the words of the statute.  I'm going to

17   depart from that now and I'm going to refer to another

18   guiding text, Exodus, chapter 5.  Last night some of us

19   celebrated a Passover Seder, we told the story of Moses

20   leading the Hebrew slaves out of Egypt, the ten plagues,

21   the parting of the Red Sea, and the delivery of the Ten

22   Commandments.  One early part of the story of Exodus is

23   generally not told.  Moses in fact, when you read Exodus

24   chapter 5, was histories first recorded shop steward, and

25   the famed Exodus was, in fact, history's first recorded

81

1    strike.  I said we would talk about strikes.

2                    The Hebrew slaves were engaged in building

3    the Pharaoh's pyramids in the desert.  They were divided

4    into work teams with little tents all around the

5    construction site.  God, the voice from above, instructed

6    Moses to go to the Pharaoh and asked the slaves to be given

7    a weekend off so that they could go into the desert and

8    pray.  This wasn't yet let my people go, this was a three

9    day weekend to go into the desert for a religious

10   celebration.

11                   The Pharaoh not only tossed Moses out on

12   his ear, but he called in his supervisors and said it's

13   clear these folks aren't working hard enough, they had the

14   audacity to come in and ask for a weekend off.  Here are

15   the new instructions, now the new instructions need a

16   little background.  Pyramids not only use huge stones, they

17   use a lot of bricks, the bricks were made by the slaves on

18   the work site; they mixed mud from the Nile River together

19   with straw and baked them.  Mud was no problem, the Nile is

20   a very muddy river, but straw was a problem, not so easily

21   found, but the supervisors and other workers brought the

22   straw to the slaves so that they can make their bricks,

23   until about what I'm about to recount.

24                   So the Pharaoh said, listen, there is a

25   daily quota of bricks that have to be produced.  That quota

82

1    has to be maintained.  But, unlike what you did before, no

2    straw for the slaves, they are going to have to forage and

3    find the straw where they can, making the job infinitely

4    more difficult.

5                You can push workers only so far, find your

6    own straw but keep production up, not very different from

7    what we have here at Dana.  Work harder, pay em less, cut

8    their benefits.  Moses called a strike, they stopped work,

9    and he lead a walkout.  Work stopped and the Exodus began.

10   The Pharaoh's strike breakers pursued the strikers, with

11   some help from Jehovah, the voice above, or maybe a

12   fortunate turn in the tides of the Red Sea, or maybe both,

13   the strike breakers were neutralized.

14               At last night's Seder the youngest present

15   asks why is this night different from all other nights?

16   Let's make that why is this strike different from all other

17   strikes?  And the short answer is that it really isn't that

18   different.  Hash and brutal employers have been with us for

19   35 hundred years or more, workers have responded, when

20   necessary, for 35 hundred years or more.  Mark this well,

21   Dana's workers may not have a Moses to lead them, they may

22   not have a Jehovah to bail them out, the tides, perhaps a

23   metaphor for this court, may not be running in their favor,

24   but if Dana persists in its headlong arrogance in pursuing

25   this course instead of negotiating, and if this court

83

1    rejects the union's contract, we will have run out of

2    plagues and everyone should count on the workers to strike,

3    and strike hard and let the scabs remember the hot sands of

4    yesteryear and the Red Sea.

5                    Thank you.

6                    THE COURT:  Anyone else wants to be heard?

7                    You seem to have strayed a bit far afield

8    from the issues that all parties were considering over the

9    last few weeks.  I just want to observe that 1113 and 1114

10   are built on an underpinning of encouragement of continued

11   negotiation and bargaining during course of this process.

12                   Mr. Simon ended his Biblical illusions to

13   the prospect that what's important here and what I'm

14   emphasizing here is that negotiations and bargaining are

15   not foreclosed by this process; I think the witnesses from

16   the stand indicated that.  And notwithstanding all the

17   rhetoric here, the gate is not closed, we are not at

18   impasse, and both parties, both sides, should ardently

19   avoid brinkmanship and continue to try to negotiate toward

20   a resolution.

21                   Have you some time.  I don't think anybody

22   likes to see everything left in my hands.  You have until

23   April 13th to submit findings and conclusions keyed to the

24   record.  During that course of time, and during the rest of

25   the time where the statute has made a demand on this

84

1    court's issuing a resolution, I urge that you all ardently

2    continue the basis for what Congress understood 1113 and

3    1414 to be all about, and that is to push the parties

4    toward negotiating a resolution.

5                    Let the lawyers back away from the process

6    because they only inhibit it.

7                    Good luck to all of you.  Thank you.

8                    MR. TAMBE:  Thank you, your Honor.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

85

```
1                        C E R T I F I C A T E

2

3    STATE OF NEW YORK        }

                              }      ss.:

4    COUNTY OF WESTCHESTER    }

5

6              I, Denise Nowak, a Shorthand Reporter and

7         Notary Public within and for the State of New

8         York, do hereby certify:

9              That I reported the proceedings in the

10        within entitled matter, and that the within

11        transcript is a true record of such proceedings.

12             I further certify that I am not related,

13        by blood or marriage, to any of the parties in

14        this matter and that I am in no way interested

15        in the outcome of this matter.

16                  IN WITNESS WHEREOF, I have hereunto

17        set my hand this _____ day of

18        _____, 2007.

19

20                       _____

                         DENISE NOWAK

21

22

23

24

25
```

| A | | | |
|---|---|---|---|
| **abandoned** 80:3 | **actives** 15:5 39:16 | 26:19 34:6,16,22 | **apologize** 16:14 |
| **ability** 36:23 52:2 | **actor** 67:24 | 34:22,25 56:15 | **apparently** 34:6 |
| 69:6 77:8 | **Ad** 2:19 | 68:13 | **applicable** 40:16 |
| **able** 8:23 10:22,22 | **add** 25:4 28:5 64:2,5 | **ahead** 37:13 | 62:3 63:17 |
| 11:6 12:10 23:11 | **addition** 21:3 50:19 | **airlines** 13:2 14:3 | **application** 34:14 |
| 25:14,16,17 27:20 | **additional** 16:19 | 24:22 26:25 28:15 | 45:1,8 46:2,14 |
| 71:20 77:24 | 24:18 | 34:18,18 45:18 | 47:21 |
| **abruptly** 77:5 | **address** 26:9 44:11 | 47:13 61:10,12,14 | **applies** 45:5 |
| **absence** 7:14 | 55:24 76:23 | **Airways** 34:19 | **apply** 45:2 47:1,4 |
| **absent** 11:12 53:17 | **addressed** 20:1 | **alalysis** 8:9 | 79:3 |
| **absolutely** 74:13 | 45:16,17 55:6 | **Alix** 48:24 68:23 | **applying** 45:5 |
| **accelerate** 60:5 | **addressing** 75:7 | **allocation** 55:3 | **appreciably** 8:18 |
| **accept** 13:15 31:13 | **adequate** 47:18 | **allow** 35:21 58:10 | **approach** 4:10 64:7 |
| 61:25 63:4,16 | 48:17 50:21 | **allowance** 40:20 | **appropriate** 55:19 |
| 65:10 | **admissions** 4:19,19 | **allowed** 25:18 70:11 | **approve** 34:13 45:8 |
| **acceptable** 13:7 | 19:17,18 55:11 | 70:14 | **approved** 29:16 |
| **access** 21:16 22:11 | **admit** 6:15 19:18 | **allows** 46:1 | **approximately** 79:5 |
| 22:21 | **admitted** 5:1 9:4,10 | **alternate** 8:13 41:11 | **April** 1:9 13:3,6 |
| **accident** 78:16 | 9:19 10:6 11:10 | **ameliorate** 38:8 | 83:23 |
| 79:12 | 22:14,15 23:7,17 | **American** 9:7 52:15 | **aprons** 62:21 |
| **accidental** 42:16 | 23:18 26:10 33:3 | 57:23 66:20 68:2 | **Arbin** 9:7 |
| **account** 21:14 29:24 | 58:5 | **Americas** 2:14 | **arbitrary** 55:1 |
| 41:13 | **adopted** 5:9 | **amount** 16:4 33:2 | **ardently** 83:18 84:1 |
| **accounting** 19:21 | **advantage** 66:2 | 43:17 | **areas** 7:16 40:6 57:6 |
| 72:4 76:22 | 75:23 | **analyses** 9:12 23:2 | 62:8 |
| **accurate** 19:20 | **advisors** 21:5,6 | 26:25 31:1 63:4 | **arguably** 11:6 |
| **accusation** 41:14 | **affirmative** 50:15 | **analysis** 8:13,15 9:5 | **argued** 49:9 |
| **achievable** 40:5 | **afford** 19:4,5 76:20 | 9:6,15,16 11:2,13 | **arguing** 14:18,19 |
| **achieve** 10:23 11:20 | **afield** 83:7 | 20:4 22:25 23:4,4 | **argument** 11:17 |
| 17:4,5,18 18:20 | **age** 78:17 | 23:16,17 26:24 | 12:13,15,22 13:1,3 |
| 25:22 33:23,25 | **aggregate** 24:23 | 31:16 37:22 38:14 | 13:5,6,17 14:5,6,6 |
| 40:7,14 55:18 | 25:1 | 61:12 63:19 | 14:12,20 15:3 |
| **achieving** 10:18 | **aggressive** 49:17 | **analyze** 22:18 | 16:17,19 28:25 |
| 25:21 | **aggressively** 42:12 | **analyzed** 31:3 | 29:2 30:17 34:2 |
| **acknowledged** 32:11 | **aggressiveness** | **and/or** 54:16 | 45:21,21 46:4,20 |
| 32:16 | 49:19 | **angry** 65:15 | 48:10 55:13 62:1 |
| **act** 34:24 41:6 | **ago** 79:13 | **ankle** 62:22 | 70:19 |
| **acted** 25:11 72:3 | **agree** 25:18 56:6 | **annual** 19:1 | **arguments** 4:6 |
| **acting** 36:15 | 73:11 | **answer** 22:7 40:4 | **Arquette** 24:12 |
| **actions** 41:20 42:23 | **agreed** 15:6 18:10 | 66:3,9 68:1 82:17 | **arrogance** 82:24 |
| 75:5,20 | 32:6 54:7 65:9 | **answered** 78:20 | **aside** 19:21 |
| **active** 12:16 16:5 | **agreement** 18:8 | **anticipate** 32:7 | **asked** 22:23 29:24 |
| 24:11,14 25:25 | 27:14 37:10,18 | **anybody** 83:21 | 40:2,2 45:18 52:22 |
| 39:13 43:20,21 | 45:10 46:3,9,13,18 | **apart** 16:18 | 58:21 78:19 79:19 |
| 72:8,22 | 47:1 74:18 77:10 | **APBO** 71:7,14 72:5 | 81:6 |
| | **agreements** 23:8 | 76:12 77:11 | **asking** 24:18 25:2,7 |

**asks** 44:20 82:15
**aspects** 10:1 21:23
  30:3 35:11
**assembly** 65:7
**asserting** 77:19
**assertion** 57:13
**assertions** 75:19,19
**asserts** 76:25
**assessment** 74:5
**assessments** 51:20
**asset** 75:15
**assets** 27:22 74:21
**associated** 51:11
**assume** 18:14 49:4
**assumes** 57:13
**assuming** 12:3 15:4
**assumption** 16:20
  62:5 63:16,18 76:4
**asthma** 78:16
**astounding** 43:25
**attach** 54:23
**attempt** 46:23 54:14
  77:18
**attempted** 45:15
**attempting** 33:18
**attempts** 47:11
**attendants** 13:14,25
**attention** 10:25
  19:17
**Attorneys** 2:4,13,19
**attract** 65:22 66:11
**attracting** 66:4,7
**attractive** 7:2
**attributable** 14:15
  17:17 19:3 24:25
  25:2
**Auburn** 57:2,5,7
  59:4,10,23 60:6
  63:25 64:4,7
**audacity** 81:14
**austere** 29:2
**authoritative** 58:14
  59:6
**authority** 34:5 35:19
  42:24 43:7 44:21
  45:6,20 46:5

**authorize** 27:2
  55:23
**authorizing** 34:20
**auto** 30:20 39:24
  57:14 59:16,23
  60:21 61:4,6 64:12
  64:22 66:14,15,17
  66:20
**automatically** 18:14
  34:15 35:4
**automobile** 54:5
**available** 20:14 24:2
  25:11 27:21,22
  40:6 41:12 44:20
  47:23 48:11,12
  49:7,7 50:4,6 51:4
**Avenue** 2:9,14
**average** 8:2 56:4
  57:3,5,10,13 58:17
  58:24 59:1,2,3,4,9
  59:22 60:1,11 62:3
  62:9 63:17,22 64:7
**averages** 7:25
**Aviation** 28:23
  34:19 35:1
**avoid** 25:24 28:20
  36:25 83:19
**avoiding** 15:17
**aware** 36:3 61:18
**Axel** 9:7 57:23 68:2
**axle** 63:10
**axles** 63:8

---
**B**

**B** 1:17
**BABETTE** 3:7
**back** 14:10 43:4
  51:10 53:9 79:2,17
  84:5
**background** 81:16
**backs** 52:13
**bad** 40:20 60:24
  61:7
**bail** 82:22
**baked** 81:19

**balance** 26:22 29:19
  42:7 67:16 72:5
**balanced** 77:16
**balancing** 27:11
  29:14 42:4
**bankrupt** 64:9,12,22
**bankruptcy** 1:1,19
  5:17 8:22 9:1 20:8
  27:1 28:24 30:24
  33:12,16,22 35:12
  36:7,9,16 41:9,24
  55:4 67:25 68:21
  71:8 74:10 76:24
**bar** 66:20
**bare** 5:15,15
**barely** 5:16 9:1
**bargaining** 13:9
  23:8 26:19 27:14
  34:6,16,21,22,25
  35:9,11 37:2,18
  40:15 41:8 44:24
  45:10 46:3,9,13
  47:3,7,10,12 54:15
  54:17 56:17 68:13
  76:15 83:11,14
**based** 47:22 65:2
  66:16,25 74:6
  75:18 76:12 77:25
**basics** 5:5
**basis** 10:20 20:13
  24:1,3 44:15 50:7
  51:12,13 73:17
  75:12 84:2
**battery** 78:16
**battle** 62:21
**beads** 62:24
**bear** 13:23
**bearing** 32:23
**bears** 42:3
**becoming** 79:12
**bedrock** 54:24
**began** 6:8,20,21
  82:9
**beginning** 48:9
**behalf** 4:4 8:16
  30:14

**belief** 18:17
**believe** 30:16 43:5
  45:25
**believes** 49:16
**benchmark** 57:19
  57:23
**benchmarking** 6:21
  6:22
**benchmarks** 68:3
**benefit** 15:14 22:7
  23:9,12 32:8 36:16
  37:4 39:5 56:23
  66:1 77:4 80:4
**benefits** 18:23 25:20
  26:20 27:14 28:3,9
  28:19 30:7,11,22
  31:23 32:14,19
  33:9 37:1 38:5,8
  38:21 66:7 69:21
  70:25 73:4 74:15
  74:19 76:23 77:9
  77:25 79:4,8 82:8
**best** 25:13 31:16
  36:11,13 56:20
  65:12
**bet** 40:5 61:25
**Bethlehem** 74:16,17
  74:20
**betrayed** 80:3
**better** 35:18 60:10
  63:2 65:18 66:22
  68:7
**beyond** 14:7
**Biblical** 83:12
**big** 71:7
**billion** 12:20 24:23
  43:19 74:4 77:13
  80:5
**billions** 6:11
**binder** 4:8 6:3,19
  9:21 11:15
**bit** 14:11 30:18 83:7
**black** 62:23
**blame** 42:10
**blood** 85:13
**blow** 77:18

**BLS** 58:16 59:6 62:3
  63:17
**blue** 63:5
**Boah** 35:25 36:3
**board** 51:1
**boiled** 74:9
**boils** 70:19
**bombs** 78:6
**books** 18:24 19:14
  19:25 20:3
**born** 78:11
**borrowing** 27:23
**bottom** 10:25 69:1
**bought** 74:21
**bound** 49:2
**Bowling** 1:10
**braces** 62:23
**breach** 29:16
**break** 13:16
**breakers** 82:10,13
**breath** 69:17,18
  74:4
**breathing** 69:19
**breathtakingly**
  69:17
**brethren** 14:21,23
  15:2,22 25:9
**bricks** 81:17,17,22
  81:25
**bridge** 25:17 29:10
**briefly** 6:4
**bring** 56:4 57:10
  59:13
**brinkmanship**
  36:25 83:19
**brinksmanship**
  15:18
**brought** 81:21
**Bruce** 3:6,8 39:23
**brutal** 82:18
**budget** 13:11
**Bueter** 24:11 26:3
  51:7 56:1,13,22
**building** 81:2
**builds** 40:19
**built** 40:20 83:10

**bulk** 50:22
**burden** 4:21 42:3,5
  42:5,7,22 47:17
  48:20 50:8 73:22
  73:23 77:17
**burdens** 24:18 42:21
  55:3
**Bureau** 58:14
**burn** 27:24
**Burns** 80:8
**BURTON** 1:18
**bus** 79:11
**business** 5:20,21
  7:11 8:25 10:1
  23:24 24:22 28:18
  52:11 54:1 64:24
  70:20,24 71:4,18
  76:17
**button** 78:5

**C**

**C** 2:1 3:1 4:1 85:1,1
**calculations** 18:21
  19:19 23:5
**called** 12:25 13:14
  58:13 59:19 61:5
  81:12 82:8
**calls** 70:12 71:21
  72:2
**candid** 21:12
**candor** 21:15 54:13
**cap** 73:12
**capital** 64:25
**capped** 76:10,12
**caps** 76:14
**capture** 67:5
**car** 66:23
**care** 66:18,18 76:18
**career** 66:14
**carefully** 37:21 55:8
**Carolina** 78:12
**Carrie** 5:9
**carried** 38:10
**carrier** 62:20
**carve** 18:12
**case** 4:15 5:2,5,6,22

5:22 6:4 7:19 13:8
  13:22 20:9,12
  23:11 24:25 26:14
  26:17 27:19 28:23
  33:11 34:9,19,19
  34:19 36:13 41:20
  43:6,19 49:18,19
  52:8,9,9,10 53:13
  53:14 54:4 55:4,6
  56:9 59:10 61:2,8
  66:14 67:2 71:3,10
  71:11,12,18 72:17
  72:25 74:17 75:8
  75:10,18,22 76:20
**casement** 20:9
**cases** 12:24 34:18,23
  74:22 75:4,23
  76:24
**cash** 19:1,2,4 27:21
  27:22,24 71:14
**castings** 62:24
**catch** 67:8
**category** 62:3 63:18
**cause** 34:15 75:12
  78:2
**CBA** 34:8
**CBAs** 14:24 18:4
**CECCOTTI** 3:7
  71:25
**celebrated** 80:19
**celebration** 81:10
**cent** 77:14
**Centry** 47:2
**cents** 58:22 60:4
**certain** 12:16 34:14
  46:12 67:17 75:22
**certainly** 76:24
  77:15
**certify** 85:8,12
**chairs** 52:24
**challenges** 68:5
**change** 23:16,16
  29:18 30:24,25
  73:16 76:22
**changed** 71:15
**changes** 6:17 32:9

53:11 72:19 74:7
**chapter** 20:25 44:4
  70:22 71:1 74:8,10
  74:13 75:3,6,13,14
  75:21,23 80:18,24
**character** 54:1
**chart** 10:5 76:11
**charts** 55:15 72:10
**cheap** 78:8
**chicken** 80:10,11,11
  80:12,12
**chief** 22:5,5 57:19
  80:8
**China** 52:17
**choice** 47:14
**chooses** 45:6
**choosing** 66:18
**chosen** 71:17
**chronic** 78:16
**circle** 58:21
**circuit** 5:9,11 47:5
**circumstances** 36:4
  45:7 52:19 65:3
  74:14
**citation** 13:4
**cited** 34:11 45:18
  74:12,22 75:13
**cites** 20:25 56:9
  76:23
**citing** 45:22
**claim** 28:4 29:18
  38:2,6,7 70:12,15
**claimed** 21:19 22:1
  22:24
**claiming** 40:3
**claims** 8:7 22:9
  27:13,18 28:7
  29:16,18,20 36:8
  38:13 72:17 76:4
**clear** 4:16 7:7 17:3
  20:5 26:17 42:17
  44:23 45:24 55:11
  81:13
**clearly** 5:10 15:4
  20:23 26:23 35:3
  39:4 42:7 45:1

77:16
Cleveland 2:9
cleverly 42:13
climb 77:6
close 55:14
closed 83:17
closing 4:5,9 6:3
13:5 35:24
clumsy 50:18
Code 27:1 36:9,12
36:16 41:9,24
Cohen 3:3 39:24
collateral 78:10,10
collective 23:8 26:18
34:6,16,21,22,25
35:9,11 37:17
40:15 41:8 45:10
46:3,9,12 47:9
54:17 56:17 68:13
76:15
collusion 10:9
colorful 28:22
column 8:1 11:16,16
12:1,2
combat 78:7
combination 44:16
come 5:14 11:4
51:24 64:6 81:14
comes 29:9 40:8
42:3,20,20
coming 11:3 29:10
command 62:16
Commandments
80:22
commented 36:1
committed 67:11
committee 2:13,19
8:12,12 15:9,12
20:21 23:10 25:15
25:18 28:4 37:11
37:20 38:9 39:7,15
39:18 49:13 50:17
53:20
commodity 68:4,21
common 61:23
65:12,20

comp 18:7
companies 6:13 7:6
7:6,9,11,15 8:4 9:7
30:1,20 32:18 33:8
56:5 57:11,19,23
58:11 67:8 72:3,20
73:19 74:8,10 75:3
75:6,7,21,22 76:1
76:23
company 5:8 6:11
6:20 8:21 9:19
10:23 12:10,20
20:8 31:8,10 33:16
39:4,14 40:22
43:19 51:20,20,20
52:23 53:24 55:18
55:21 56:1,9 57:17
58:3 59:12 60:19
64:9,9 65:22 67:1
67:11,20,22,24
68:3 70:20,22,25
74:20 75:13 77:25
80:5
company's 39:1
40:12,23 41:20
43:6 51:23 57:9,19
58:23 59:5,15
68:11,12 69:6,10
69:16 70:7,9 71:3
71:8 73:1
company-wide 39:6
comparability 30:9
61:8,11
comparable 8:4,13
9:13 11:2 31:14,17
55:21 61:19
comparables 8:17
9:4,5 23:4 30:16
comparatives 8:7
compare 11:1 60:25
compared 6:13 8:3
8:15 23:20 29:25
44:8 61:9 80:6,9
compares 20:4
comparing 61:12
comparison 24:21

58:10 61:15 75:20
compelling 30:9
31:2
compensating 62:16
63:2
compensation 31:15
43:24 58:6 60:14
60:15 61:3
compete 12:11
66:16
competent 16:24
competes 65:2
competing 7:10 41:1
41:5
competition 6:24
7:18 23:19 66:24
67:1,8 68:5
competitive 12:6
57:14 66:1,2
competitors 6:22
7:3 23:21 55:21
57:16 58:3,7,8
59:14,16 60:25
61:22 62:2
competitor's 43:22
complaint 22:12
complaints 21:14
complete 20:14 24:1
47:22 49:21
completely 53:16
73:4
compliance 51:3
71:1
components 9:22
10:16,21 11:20
comports 64:23
comprehensive 9:23
18:8 74:18
comprehensively
10:1
computer 50:10
79:18
conceded 19:20 32:4
32:22 48:25 52:2
conceivable 27:2
concerned 39:15

concessions 14:22
17:1 26:12 51:19
52:23 53:15
conclude 37:12
64:18 73:18
concluded 64:14
conclusion 4:7 9:16
38:16 58:1
conclusions 31:5
83:23
conclusive 31:2
conclusively 20:11
24:9
conditioned 38:1
conditions 17:8
34:14 62:16
conduct 5:21 9:15
22:25 50:20 54:9
conducted 8:9,15
23:2 54:10
confidence 28:9
confidential 10:24
confidentiality 49:2
49:3
Congress 35:10
36:15 40:13,14
84:2
connection 17:16,19
18:2,2,6 43:15
46:1
connections 17:20
consensual 46:25
consequence 27:12
consequences 46:10
47:14 68:25
conservative 59:21
consider 26:22
27:10 33:12,14
considerable 37:21
considerably 6:14
consideration 27:2
29:14,23 33:17
38:6 53:23
considered 48:11
55:6
considering 21:14

27:5 33:13 83:8
**considers** 58:3
**consistent** 32:25
  73:10 75:1,5,20
**consistently** 28:13
**constituencies** 13:22
  15:6,9 21:6 26:16
  33:24 35:23 42:15
  55:3 67:17
**constituency** 13:18
  25:22 28:6 52:4
  53:25
**constituents** 49:8
**construction** 81:5
**consume** 27:21 79:9
**consumers** 66:22
**consuming** 27:22
**contain** 73:9
**contained** 49:6
  58:19
**contemplate** 13:24
**contend** 28:3
**contention** 14:13
**contentions** 13:13
**context** 6:9 12:20
  35:12 36:15 61:19
**continue** 17:7,9,10
  25:19 83:19 84:2
**continued** 3:1 15:14
  25:23 60:9 69:19
  83:10
**continues** 6:12
**continuing** 28:19
**continuous** 24:3
  63:1
**contract** 29:16 45:3
  59:20 64:16,20
  83:1
**contracts** 25:25 39:2
  44:22
**contrary** 30:15 32:2
  35:3,7
**contrast** 29:5
**contribute** 17:11
  33:2 74:4
**contribution** 24:19

40:9
**contributions** 10:12
  12:5 17:2,10 25:8
  26:16 32:9 33:6
**convenience** 54:25
**corallin** 13:21
**corner** 23:19
**corporation** 1:6
  67:23
**correct** 66:8
**correlate** 62:13
**corroborated** 51:7
**cost** 13:17,23 17:4,6
  25:21 26:8,9 30:24
  33:9 51:11 52:8,9
  53:13 55:19 68:8,9
  71:14 74:7 79:6
**costs** 7:13,15 30:21
  32:24 33:20 43:18
  56:4 57:11,14
  58:11 60:25 65:5
  68:25 73:12,12
  77:21,25
**counsel** 3:4 12:15
**count** 48:14 83:2
**counter** 42:18
**counting** 80:7
**country** 32:13 33:1
  33:4
**counts** 48:13
**county** 57:3 85:4
**couple** 41:22
**course** 38:6 50:14
  51:25 56:16 62:5
  72:6 82:25 83:11
  83:24
**court** 1:1 4:2,11 6:2
  8:8 10:14 13:1
  18:16,16 21:12,21
  22:3 23:1 26:22
  27:1,6,10 29:1,24
  34:7,13 35:1,14
  36:3,11,13 37:13
  38:25 40:24,25
  41:1,16,19 42:4
  44:18 45:9,12,17

45:21,24 46:1,7,17
  47:1,2,12 48:12
  49:16 53:25 54:4,7
  54:20 55:8,14,20
  55:22 59:20 60:23
  61:18,18 64:13
  65:11 70:11 74:16
  75:8,9,11 77:8
  82:23,25 83:6
**courtroom** 68:1
**courts** 26:25 36:5
**court's** 34:24 41:3,3
  77:6 84:1
**coverage** 32:21 36:5
  70:5 77:20
**covered** 62:23
**covering** 18:8
**crammed** 68:14
**create** 38:22
**creation** 28:7
**credible** 17:12
**creditor** 29:20
**creditors** 2:13 28:5
  36:17 37:5 38:9,11
  39:7 49:13 50:17
  53:20
**creditor's** 27:13,17
**crisis** 35:22
**cross** 6:6 12:14 70:3
**cruel** 44:2
**cured** 22:12
**current** 32:8 33:1,2
  44:12 59:1,3,7
  77:2
**currently** 14:24
  57:13 58:24 64:4
**Custom** 1:10
**customers** 10:6
  16:25 17:2,5,6,7,9
  17:18 26:17 40:17
  40:20 41:2 69:7
**cut** 59:20 60:9 68:19
  69:3 78:2 82:7
**cutbacks** 15:8
**cutely** 42:14
**cuts** 38:21 39:5 65:8

65:10 66:11 67:15
  67:17 68:9 69:1,4
  69:10
**cutter** 68:8
**cutting** 53:13 59:12
  62:24 63:1 67:21
  69:4,8
**cynically** 41:17

**D**

**D** 2:7 4:1
**daily** 36:6 81:25
**damage** 29:17,19
  78:10,10
**Dana** 1:6 6:9,16,21
  7:11,16,20,25 8:13
  11:4,6,12 12:3,7,9
  15:11,17 16:21
  17:2,4,11,18 18:4
  18:19 19:4,8,10,22
  20:6,17,18,22 21:4
  21:17 23:20,23
  25:11,21 26:8
  27:20,20 29:21
  30:6,23,23,24 31:7
  31:24 32:23 33:12
  33:18,21 34:4,5
  37:3 38:22,22
  44:20 45:9 47:13
  51:17 52:15 57:13
  57:17,18 60:25
  62:7 65:1,2 67:3
  68:6,21 69:20 70:6
  70:12 71:18,21
  72:1,17,25 75:18
  76:6,7,8,10,12,15
  76:20,25 78:12,15
  78:19,23,25 80:1,2
  80:3,10 82:7,24
**Dana's** 6:10 8:2
  11:11 16:12 17:11
  18:24 19:14,24
  20:2 23:5 26:9,17
  30:4 31:15 32:23
  37:7 44:23 46:22
  47:11 58:10,24

59:7,13 62:12,15
63:5,13,16 66:10
67:18 68:23,25
70:6,19 71:17
73:14 74:24,25
75:8,9,12,20 77:18
78:2 82:21
**data** 21:16 22:6,11
42:12 48:11,13
49:1,4,9,12,14
50:10 58:14,16,23
59:6,6 61:3,6
**date** 35:2 58:16
**dated** 69:24
**DAVID** 3:8
**day** 2:3 4:4 23:14
26:24 27:7 38:17
63:11 64:1 78:23
81:9 85:17
**days** 4:7,14 21:22
22:3 69:24
**deal** 37:14,16 42:24
43:8 68:24
**dealing** 33:9 36:10
41:24 53:19
**dealt** 42:13
**debate** 37:23
**debt** 40:20
**debtor** 13:10 24:24
34:21,23 35:1 40:6
40:6 41:10,11,17
41:18 42:3,5,13
43:1,6,9 44:21
45:5,12,13,15,18
46:8,11,15,25 47:4
47:5,21 48:20
49:20 50:2 56:10
**debtors** 1:7 2:4 4:4
4:16 5:6,14,18,20
7:23 8:16 9:23,24
9:25 10:20 14:13
14:15 15:6,7 17:25
22:15 24:3 28:18
32:4 34:15 35:19
38:15 39:20 40:3
42:9,19 45:2 48:4

48:7,14,22 49:10
50:8,14 52:6,12,25
53:3,7,7 54:11,13
54:15 56:2 61:22
73:16
**debtor's** 4:21 5:19
5:22 7:7 9:12
10:15,19 11:14
13:11 20:5 21:24
21:24 28:9 37:23
39:19 42:22 43:14
43:16,20,21 44:8
44:10 47:17 48:8
48:18 50:21 51:11
51:13 52:10,13
53:9,12 54:24
**decades** 56:16
**December** 20:16
51:10 58:19
**decide** 70:23
**decides** 70:11
**decision** 14:2 37:25
49:25 50:15 51:18
54:14 63:20
**decisions** 34:17
49:25
**deck** 52:24
**declaration** 6:1
20:25 32:2 55:25
56:22 57:12,16
**declarations** 74:1
**declined** 32:14
**deemed** 64:21
**deep** 21:23
**deeper** 14:11
**defect** 65:6
**defects** 67:14
**deficiency** 21:10
**definition** 65:25
**degree** 49:18 62:19
**delay** 21:20 22:1
**delays** 21:10 22:9
67:14
**Delfi** 54:6,13 61:2,5
**deliver** 36:24 69:6
**delivery** 80:21

**Delta** 13:2 34:18
**demand** 37:17,18
53:20,23 66:22
83:25
**demanded** 51:19
**demanding** 52:6
**demands** 37:16
43:14
**Demetri** 45:25 46:4
**demonstrate** 5:15
54:15,18
**demonstrated** 35:20
72:10
**demonstrates** 24:9
**demonstrating** 30:9
**denial** 44:15
**denied** 67:3
**Denise** 85:6,20
**denying** 50:7
**depart** 80:17
**Department** 58:15
**dependant** 49:23
**depends** 69:18
**described** 13:1
**describing** 21:12
**desert** 81:3,7,9
**design** 32:10
**designed** 41:7
**despite** 73:14
**detail** 10:17 43:21
**detailed** 20:19
**details** 21:1
**determination**
38:14
**determine** 70:16
**determined** 45:13
**determining** 26:22
**devastating** 79:4
**develop** 67:7 71:23
**developed** 72:3
**di** 16:18
**DiCHIARA** 3:7
**dictates** 29:5
**difference** 17:14
28:17 78:5 80:11
**differences** 56:18

**different** 8:17,18
10:4 30:3,15 37:15
38:19 49:3 56:16
63:17 68:7 82:6,15
82:16,18
**differential** 30:11
62:17 63:2
**differentiating** 73:2
**differently** 56:16
**difficult** 51:18 55:12
62:15 65:22 82:4
**difficulty** 31:10
**diligence** 54:9,10
**diminished** 38:11
**dire** 17:8
**direct** 11:17 54:1
**directly** 28:7 58:1
**disagree** 38:15
**disagreeing** 54:6
**disclosed** 48:5,14,24
**disclosure** 48:9
**discourse** 29:4
**discretion** 45:11
46:23
**discuss** 5:4 6:5
**discussed** 9:20 10:17
**discussing** 57:8
**discussion** 8:5 9:8
11:14 31:24
**disposition** 40:23
**dispute** 6:18 18:19
18:20 25:10 33:21
59:7 60:19
**distress** 33:11
**distressed** 73:15,17
**DISTRICT** 1:2
**diver** 63:11
**dives** 21:23
**divided** 81:3
**doctor's** 63:4
**document** 10:24
**documents** 5:1
21:18 49:1
**doing** 27:23 33:1
62:19 67:21,24
68:9 73:19,20

76:10 78:13,14
**dollar** 12:20 39:15
  43:19 61:23 68:19
  68:19,22 69:3,4,8
  80:5
**dollars** 6:11 12:19
  14:14,17 16:7,7,11
  16:13,18 19:3
  24:23 25:1 39:11
  58:22 60:21,22,23
  69:14 74:4 77:11
  77:12,13 78:18
  79:6,7 80:4,7,9,9
**domestic** 7:6
**doubled** 60:7
**downplay** 54:12
**downs** 11:7,8
**Dr** 62:14 63:16,19
  64:11,13,18,21,23
  67:5 69:2 73:5
  74:4,9,22 75:14,24
**dramatic** 11:11
**dramatically** 7:24
  30:24,25
**draw** 19:16
**drawn** 35:24
**drew** 31:5
**drive** 55:20 59:14
**drives** 69:5
**driving** 57:6
**drop** 64:7 72:7
**due** 54:9,10 60:8
**dug** 42:11
**dust** 62:24
**duty** 41:3
**dwarfed** 29:20

---

**E**

**E** 1:17,17 2:1,1 3:1,1
  4:1,1 85:1,1
**ear** 81:12
**early** 33:22 80:22
**earn** 43:23
**earning** 65:13
**earnings** 58:17 80:9
**easily** 37:25 81:20

**East** 2:5
**EBIT** 8:3 9:9,13,14
  10:25 11:1 20:7
**EBITDAR** 8:3 9:10
  9:13,15 20:7
**economic** 67:23
**economically** 13:18
**economics** 11:25
  12:3 13:8 14:7,8
  62:17 63:3
**economy** 62:4
**edge** 29:12
**edges** 6:17
**effect** 6:20 10:17
  12:7 16:17 29:15
  31:8,10 33:15
  36:12 46:18 50:5
  63:21
**effected** 29:25 52:17
**effective** 35:3,5 54:8
**effectively** 9:14
  33:15
**effects** 7:20 19:21
**effectuate** 10:21
**effort** 20:19 42:9
  44:10 53:16 55:13
  67:12
**efforts** 36:13
**Egypt** 80:20
**either** 70:16 73:1,6
**elaborate** 50:11
**electronic** 48:13
**element** 71:11
**elements** 4:20
**eliminate** 19:13
  53:10,16 69:20
  70:17 71:13 72:5
  73:6,8,13 74:1,25
  76:7 77:25
**eliminated** 73:1
  74:11,14 75:3 76:1
  76:25
**eliminating** 71:9
  73:21
**elimination** 20:2
  43:25 44:5,13

55:23 78:19 79:4
**em** 82:7
**embarrassing** 29:3
**emerge** 9:1 20:8
  29:22 33:16
**emergence** 8:22
**emerging** 68:21
**emotion** 78:9
**emphasize** 55:10
**emphasizing** 83:14
**employee** 32:9 61:13
  61:13
**employees** 12:17
  13:25 16:5 24:11
  24:15,17 29:15,25
  39:14 40:13,17,22
  41:3,7 43:20,21,22
  44:7,9 51:14,16,21
  51:23 54:25 60:2
  61:20 62:12,15
  64:4 68:15 72:8,16
  72:22 77:2
**employer** 33:6 71:22
  72:2 73:23
**employers** 32:7,25
  72:8,11,15,22 73:5
  73:11,15,17 74:10
  74:12 75:2,14,21
  76:9 82:18
**enable** 54:22
**enacted** 70:22,24
**enacting** 35:10
**encouragement**
  83:10
**ended** 11:13 71:8
  83:12
**ends** 65:15
**enforce** 36:14
**engage** 70:13
**engaged** 20:18 41:14
  81:2
**engagement** 68:23
**engineers** 67:9
**enjoy** 7:13
**enjoyed** 8:4
**enjoys** 66:2

**enlist** 47:12
**enormous** 18:23
**entail** 37:1
**enter** 34:7 46:1
**entered** 34:20 74:17
**enterprise** 29:22
**enters** 38:25
**entire** 52:1 62:4
**entirely** 73:13
**entitled** 56:10 79:2
  85:10
**entity** 9:2
**entry** 35:5 39:2
**enure** 37:4
**equal** 40:18
**equally** 48:6 49:11
  53:4
**equate** 35:14
**equipment** 63:8
**equitable** 11:23
  26:13 27:5 29:23
  31:20 33:17 75:10
  76:25 77:15
**equitably** 13:21 24:8
**equities** 26:18,19,22
  27:3,7 29:14 31:18
  42:4,8 77:16
**equity** 27:3,11 44:12
  53:22,24
**error** 43:18 80:6
**especially** 65:9
**ESQ** 2:6,7,7,8,15,16
  2:22 3:6,7,7,8,8
**essential** 4:20 54:1
**essentially** 4:17 5:23
  6:25,25 7:4 20:12
**establish** 42:7
**established** 40:15
**establishes** 77:16
**establishment** 62:11
  69:25
**estate** 36:17 37:5
**estimate** 59:21
**evaluate** 43:14 48:2
  49:10
**evaluated** 51:13

53:11
**evaluation** 48:17
    50:21
**event** 70:25
**evidence** 4:14,18,24
    4:24,25 5:1,4 8:6
    9:11 20:22 24:9
    25:13 30:2,9 38:1
    38:2 42:6 57:15,18
    57:24 78:1,7
**evidentiary** 1:14 4:8
**evolved** 56:15
**exacerbation** 60:16
**exacting** 71:1
**examination** 6:6
    12:14 55:15 70:4
**examining** 6:9
**example** 25:19 27:1
    32:6 63:2
**examples** 74:12 75:2
    75:6,24
**excel** 22:10,10,13,16
    22:19,23 49:15,18
    50:16 67:4
**exception** 57:25
**excess** 19:2
**excluded** 21:7
**executive** 22:5 80:8
**exercise** 15:18 28:21
    77:17
**exhaust** 46:25
**exhibit** 7:8,23 9:12
    10:15,19 11:1,14
    14:10 20:5 60:14
    61:2,9,11
**exhibited** 33:18
    54:13
**exhibits** 4:8 6:1,2
**exist** 46:16
**existed** 50:6
**existence** 49:12
**exists** 70:3
**exit** 53:17,19
**Exodus** 80:18,22,23
    80:25 82:9
**expect** 15:21

**expectation** 77:7
**expectations** 68:16
**expecting** 17:5
**expedited** 47:3
**expense** 19:1,4
    71:15
**experience** 53:25
    62:12
**experienced** 31:10
    60:11
**expert** 6:15 8:11
    17:22 26:10 66:13
    66:15 73:25
**experts** 65:20 73:11
**explain** 50:15 65:11
**explained** 6:1 10:18
    50:14 61:10 65:23
    66:16 67:5 69:2
    72:9
**explanation** 49:5
**explication** 55:8
**explicit** 34:23
**explore** 14:11
**expressed** 32:3
**extent** 7:19 35:10
    40:5 55:7 61:17
**extra** 67:12
**extraordinary** 53:14
**eyes** 49:1,5
**e-mail** 22:3

─────────

**F**

**F** 1:17 85:1
**face** 13:19 20:25
    21:1 30:18 36:4
    44:7 62:15 68:4
**faces** 11:8 19:22
**facilities** 56:3 59:15
    59:23 62:8
**facing** 67:1
**fact** 15:5,9 17:13
    18:6 25:14 31:7
    33:11 34:12 42:13
    43:17 44:19 52:8
    55:9 56:24 58:1,12
    59:14 62:7 63:5,7

63:10,12 64:2,5
    67:25 74:6 76:9,10
    80:23,25
**factor** 28:11 29:13
    30:4
**factors** 26:21 27:9
    27:10,16 44:14
    62:11,13
**facts** 6:9 27:18
**failed** 45:13 48:4,22
    76:6
**fails** 47:3 71:11
**failure** 50:4 52:1
    54:18 69:12
**failures** 42:10 43:5
**fair** 11:23 13:23
    24:19 26:13 31:20
    40:10,11 74:6
    75:10 76:24 77:7
    77:15
**fairly** 13:20 24:7
**fairness** 44:12
**faith** 25:12 33:18
    37:3
**fall** 12:5 18:14
**falls** 16:18 69:3
**famed** 80:25
**familiar** 64:12
**family** 52:15
**far** 7:24 34:10 43:23
    57:23 59:4 82:5
    83:7
**fashion** 47:18 50:5
**faulted** 53:9
**favor** 26:18,19,23
    31:18 82:23
**favors** 42:8
**February** 22:2 51:2
**feed** 80:10,11
**feel** 56:12
**feelings** 56:13
**fees** 69:14 80:7
**feet** 78:6 79:24
**fewer** 73:12
**fifth** 29:23
**figure** 50:9 58:21

**figures** 59:5 72:14
**file** 36:24
**filed** 51:9
**files** 22:10,19,23
**filing** 35:15 43:2,11
    47:20,20,20 48:4
    50:24 51:3,5 69:25
**final** 33:17 45:21
**finally** 22:24 33:3
    42:9 51:9 63:12
    79:1
**finance** 53:19
**financial** 6:10,13,15
    8:11 17:8 20:19
    21:1,2,3,5,6,24
    22:20 26:10 33:11
    57:16 68:3 71:6
    72:19
**financiers** 53:18
**find** 50:11 82:3,5
**findings** 55:9,16
    83:23
**finicky** 63:8
**firm** 62:11 64:24
    65:8 66:1
**firms** 32:13 66:16
**first** 12:22 22:10
    27:11 39:10 46:25
    49:25 52:6,25 54:4
    56:8 77:3 80:24,25
**five** 4:7,14 6:12 7:25
    8:2 23:1,9,12,15
    32:17 51:8 52:5,7
    53:1,17,19,22 54:1
    54:11 58:4 59:18
    69:22 71:18 80:5
**fix** 12:9
**fixed** 7:4
**flatly** 45:22
**flawless** 67:7,9 69:8
**flight** 13:14,25
**floor** 67:11
**floors** 78:13
**flow** 19:1,2,4 21:12
    21:15
**fluid** 63:1

**focus** 9:24 11:16
  27:7
**folks** 15:25 23:6
  81:13
**follow** 66:21
**followed** 37:20
**following** 36:3
**follows** 28:16 74:25
**food** 78:21
**foolish** 69:9
**fool's** 51:22
**footprint** 10:7
**forage** 82:2
**force** 17:11 27:15
  31:22 52:14 66:12
**forced** 27:21 28:18
**foreclosed** 83:15
**foreseeable** 11:9
**forget** 73:22
**form** 42:19 50:3
**forma** 10:20
**format** 49:15,16
  50:18
**formulating** 55:1
**Fort** 59:1,10,21 60:6
  63:21
**forth** 20:4,23 34:24
  45:7
**forthcoming** 38:3
**fortunate** 82:12
**fortunately** 58:12
**forum** 29:3 38:16
**Foster** 17:25
**found** 50:3 68:6
  76:19 77:15 81:21
**four** 32:25
**FRANKEL** 2:12
**frankly** 44:17 65:11
**free** 21:8 26:24 27:2
  65:6
**fresh** 19:21
**friction** 25:24
**friendly** 41:18 42:14
  50:5,16
**frivolous** 48:10
**fro** 19:20

**fruits** 40:15 41:7
**fulfill** 54:18 68:16
**fulfilled** 49:20
**fulfillment** 56:14
**full** 11:21 14:21,23
  16:21 36:8 55:7
**fully** 51:3,8 64:23
**funded** 70:10
**funding** 15:14 19:8
  19:9,15 77:10
**further** 32:7 40:25
  46:17,22 47:7 60:2
  76:16 85:12
**future** 11:9 32:8
  60:8 66:25 75:1
**fuzzy** 56:13

### G

**G** 4:1
**gained** 22:11
**game** 42:23 51:22
**games** 50:2
**gap** 25:17
**garden** 53:13
**gate** 83:17
**gear** 62:20
**general** 42:2 70:10
**generally** 80:23
**generic** 68:18
**genuine** 33:21
**Georgetown** 74:22
**getting** 14:23
**Gibson** 78:11,17,19
  79:19,23,25
**give** 21:7 29:11 39:5
  56:13,19
**given** 26:14,14,16
  31:6 33:11 36:12
  36:22 81:6
**gives** 39:3
**giving** 44:21 45:9
  46:15
**glaucoma** 78:15
**gleaned** 29:7
**globalization** 7:20
  7:20

**gloves** 62:22
**GM** 73:24 74:1,3,5,6
**GM's** 73:24
**go** 6:4 11:22 14:10
  15:1,21 34:24
  37:13 38:7 40:2,25
  43:20 50:10 55:5
  63:11 69:1 81:6,7
  81:8,9
**God** 81:5
**goes** 4:17 11:18
  46:18 63:21 70:25
**goggles** 62:21
**going** 6:23 7:1 8:23
  18:3,14 19:23,24
  20:6 23:15,22,23
  27:20,24 29:8,11
  31:25 34:23 43:20
  53:1 61:16 62:21
  72:11 78:21 79:18
  79:19,22,23 80:16
  80:17 82:2
**good** 4:2,3 22:18
  25:12 33:18 37:3
  39:23 64:24 75:12
  78:2 84:7
**goods** 57:4
**governing** 13:22
**grab** 7:5 29:12
**grant** 14:3 34:4
  35:19 79:21
**granted** 27:25 28:14
  37:8 38:6 43:23
**granting** 35:16
  38:25 46:2
**Grass** 47:2
**great** 13:22 35:10
  50:22
**greater** 33:10
**greatest** 36:16 37:4
**Green** 1:10
**Greg** 78:22
**group** 7:24 13:24
  61:13,13 73:8,8
  74:20
**groups** 22:4 73:7

**grow** 8:24
**growing** 6:24
**guiding** 80:18
**guises** 12:23
**gun** 35:15,16
**gurus** 68:9

### H

**H** 2:16
**HAMILTON** 2:8
**hand** 41:17 78:6,6
  78:25 85:17
**handed** 6:3 79:14
**handing** 4:12 35:16
**hands** 79:14 83:22
**happens** 65:8
**happy** 19:9 67:17
**hard** 66:11 81:13
  83:3
**harder** 82:7
**Hardin** 13:2,12 14:3
**hardships** 36:6
**harmful** 67:21
**harsh** 36:4
**Harvard** 65:10
**Hash** 82:18
**havens** 52:18
**headlong** 82:24
**heads** 22:4
**health** 28:8 30:7
  32:21 33:3 44:1,6
  53:16 68:20 69:21
  72:22 73:2,3,25
  74:2,11,15,19 75:4
  75:7 76:17,21 77:1
  77:4,25 78:20 79:7
**healthcare** 15:14
  19:15 26:20 33:7
  70:12,18,21,24
  71:4,5,9,13,20,22
  72:2,8,12 73:6
  75:1,16 76:2,8
**hear** 21:9
**heard** 4:18,23 6:6
  12:14 16:23 26:2
  26:11 28:13 35:8

50:25 78:11,22
  83:6
**hearing** 1:14 4:8
  29:10
**hearings** 4:15
**heart** 50:12 55:6
**heat** 62:18
**heated** 4:22
**heavily** 61:3
**heavy** 42:5 62:19
  78:14
**Hebrew** 80:20 81:2
**height** 29:6
**held** 21:4 26:4
**Hello** 53:2
**help** 82:11
**Helper** 57:22 66:13
  67:5
**Helper's** 62:14
  64:23
**hemorrhage** 60:10
**Henry** 78:11
**hereunto** 85:16
**high** 10:23 11:5
  29:10 30:21 62:12
  66:20
**higher** 32:24 57:18
  57:23 62:13,16
**highly** 51:18 64:20
  64:21
**Hills** 57:2,5,7 59:4
  59:11,23 60:6
  63:25 64:4,7
**hip** 45:19
**hips** 78:14
**hire** 65:18
**hires** 60:3,18,20
  64:6
**hiring** 31:11
**histories** 80:24
**history** 80:1,2
**history's** 80:25
**hit** 20:6
**Hoc** 2:19
**HOCK** 3:8
**Hoffmann** 18:22

19:19
**hold** 74:4
**Holders** 2:20
**holding** 30:18 61:17
**holdout** 13:17
**HON** 1:18
**Honor** 4:3,13 5:5,8
  6:3,18,19 8:1,6,10
  9:22 11:15 12:8
  13:5 14:18 15:19
  16:14,23 19:16
  20:11 21:11,13
  23:3,25 24:8,21,25
  25:10,13,23 26:5
  26:13 27:16 28:23
  29:14,17,24 30:8
  31:6 33:18,20 34:3
  34:10 35:7,24
  36:18 37:7,7,10,14
  39:23 42:16 44:2
  48:3 49:24 56:6
  78:4,11,22 79:22
  84:8
**Honor's** 10:25 63:20
  79:9
**hope** 15:7 52:19
**hoped** 17:18
**hopes** 18:20 39:20
**host** 74:18
**hot** 83:3
**hour** 58:22 60:4,21
  60:22,23 61:23
  79:15
**hourly** 25:5 56:2,4
  57:10,13 58:11,17
  59:1 64:14
**hours** 78:23
**House** 1:10
**huge** 81:16
**hundred** 15:11
  25:21 32:20,20
  62:19 77:12 79:7
  82:19,20
**hunt** 50:14
**hurt** 29:9 79:11
**hypothetical** 78:1

**I**

**IAM** 15:16 23:11
  25:15 36:19,20
  44:9 71:17
**IBT's** 13:13
**idea** 60:24 61:7
  68:10
**identical** 24:15 42:1
**identified** 9:22 10:2
  10:15,16 11:2
  57:19 68:3
**identifies** 57:16 58:2
**identify** 33:22
**ignore** 7:21,21 18:13
  54:11 62:6,10,14
  63:5,7,10,12,15
**ignores** 18:15
**illusions** 83:12
**image** 29:9
**imagination** 16:10
  77:14
**immediate** 12:11
**impact** 27:17 29:19
  29:20 51:22 68:10
**impairs** 69:6
**impasse** 83:18
**implement** 33:14
**implementation**
  64:2,8,16
**implements** 39:4
**implicit** 16:20
**implies** 70:6
**important** 22:19
  24:6 46:8 83:13
**impose** 42:5 46:23
**imposed** 36:6 42:5
**imposition** 63:19
**improperly** 47:11
**impropriety** 44:17
**improvement** 17:10
**inability** 53:9
**inadequate** 48:7
**inappropriately**
  42:14
**inch** 63:9
**included** 6:2 58:4

73:15 75:25
**includes** 16:4 69:25
  74:3
**including** 74:19
**incorporated** 72:19
**incorrect** 57:25
**increase** 67:18
**increased** 60:17,17
**increasing** 7:8 33:1
**increasingly** 7:7
**incumbents** 52:20
**incurable** 78:15
**independent** 50:6
**Index** 1:5
**India** 52:17
**indicated** 28:5 83:16
**indifference** 54:16
**industries** 68:18
**industry** 5:20 6:24
  11:8,11 23:18 30:1
  30:20 32:1 54:5
  55:21 56:6 57:12
  57:14 58:12,18
  59:2,9,16,23 61:1
  61:4,6,14,15,20
  64:10 66:15,16,25
  67:6 68:6
**inequitable** 44:8
**inference** 42:16,17
**infinitely** 82:3
**information** 20:14
  20:19 21:2,2,4,8,9
  21:10,13,15,17,21
  22:2,8,13,16,18,20
  22:22 24:2,22 35:13
  42:11,20 43:2,10
  43:10,12,13 47:18
  47:23 48:1,5,6,15
  48:16,23 49:6,18
  49:22 50:2,3,4,5
  50:12,13,16,17,19
  50:23 51:4,10,17
  52:3 53:4,6 54:19
  54:22 58:5,8,10
  74:13
**informed** 54:14

**inherent** 28:16
**inhibit** 84:6
**Initially** 25:15
**initiate** 47:6
**initiative** 9:24 19:11
**initiatives** 6:16,18
 9:18,21 11:12
 16:12,22 19:7
 23:23 24:12,16,20
 26:10 31:24
**innuendo** 4:23
**insist** 53:18
**insistence** 73:14
**inspections** 63:6
**installed** 79:1
**instances** 30:12
 45:17 76:3
**instructed** 81:5
**instructions** 81:15
 81:15
**insult** 44:17
**insurance** 32:21
 33:3 36:5 44:2,6
 44:13 53:10,16
 55:23 69:19 78:20
 79:7
**intact** 73:4
**intended** 33:23
 54:21
**intensive** 20:19
 64:25
**intent** 36:14
**interest** 35:23
**interested** 85:14
**internal** 37:22
**international** 67:1
 68:5 74:20
**investors** 53:22
**invitation** 70:13
**involved** 41:1 76:3
**involving** 52:11 54:4
**in/day** 63:11
**Ionosphere** 35:25
**iron** 62:24
**irrefutable** 6:10
 9:11

**issue** 8:8,9 12:18
 17:13 30:11 31:4
 32:5 42:25 45:16
 56:7 59:8 62:8
**issued** 23:11
**issues** 18:9 23:1 27:6
 33:23 39:21 51:25
 71:5 74:18 83:8
**issuing** 84:1
**items** 70:5

___

**J**

**January** 20:17 26:5
 26:11 47:20 50:24
 69:24,25 70:1
**Japanese** 66:19
**jarringly** 29:7
**Jay** 4:3
**JAYANT** 2:6
**Jeff** 18:22
**Jehovah** 82:11,22
**JIMENEZ** 2:7
**job** 62:3 63:10 65:13
 65:19 79:10,14
 82:3
**jobs** 67:12
**jointly** 54:7
**Jones** 2:3 4:4
**judge** 1:19 13:2,12
 14:3 28:15 35:25
 36:3 42:19
**judgment** 38:4
**June's** 26:11
**juris** 41:18
**justified** 52:22
**justifies** 72:17

___

**K**

**Kaiser** 72:10,23
**keep** 45:19 65:6
 66:21 82:6
**Kerri** 27:9
**key** 23:1 51:16 65:3
**keyed** 83:23
**kids** 79:11
**killing** 78:6
**kinds** 11:7,7

**knees** 62:22
**knew** 57:22
**know** 8:20 23:20,22
 38:19 51:22 52:16
 52:21,22 54:3
 56:10,20 67:21,24
 73:20 79:16,18
 80:15
**knowledgeable**
 67:11
**knows** 23:22 53:25
**KRAMER** 2:12

___

**L**

**labor** 9:24,25 10:9
 17:17 18:8 23:5
 24:25 25:2,3 26:15
 30:21 33:19 41:6
 45:3 52:8,9 53:13
 55:19 56:15 58:15
 58:15 60:25 61:21
 62:17 63:3 65:4
 68:25 69:4 74:18
**lack** 21:15 54:16
**lacked** 7:25
**lacks** 6:14
**laid** 5:8
**Lakeside** 2:9
**Lane** 2:20
**language** 28:22
 34:11 45:23
**large** 7:16 28:4
 32:13,25 67:23
 72:7 75:14
**larger** 72:16 73:8
 75:2
**largest** 72:16
**launch** 67:8,9 69:7
**LAVAN** 2:18
**law** 13:22 34:9 39:4
 40:7 41:2 48:14
 49:20 56:9
**lawyer** 45:25
**lawyers** 84:5
**lead** 82:9,21
**leading** 80:20

**leads** 9:16,16,17
 53:21 67:19
**learned** 49:12,14
**leave** 63:18 73:3
**leaving** 11:5
**left** 15:3,20,21,23
 52:16 64:14 68:24
 83:22
**leg** 79:12
**legacy** 7:14 30:21
**legal** 28:20 29:7
 40:16
**legitimacy** 54:24
**legs** 62:25
**lessen** 77:18
**let's** 5:4 12:21 14:10
 56:8 57:9 58:25
 61:25 63:15 64:11
 69:15 78:10 82:16
**level** 12:16 15:14
 18:19 19:8,9,15
 20:10 25:19 39:16
 57:7 64:16 65:9
**levels** 11:21 29:25
 59:9 60:2,12 64:8
 64:23 69:5
**leverage** 44:24 47:7
**LEVIN** 2:12
**LEVINE** 3:8
**liabilities** 20:3 76:11
**liability** 18:23 19:22
 19:22 20:3 76:13
 76:14 77:11,13
**life** 56:24
**LIFLAND** 1:18
**lifting** 62:20
**likelihood** 27:12
**likes** 83:22
**limitations** 46:8
**limited** 38:19 41:4
 69:22 74:3 75:25
**limiting** 73:21
**line** 10:25 56:5
 57:11 59:13 62:20
 65:7 69:2
**liquidating** 75:15

**liquidation** 27:12,17
**liquidity** 27:24
**list** 21:18
**listen** 81:24
**literally** 69:16 79:24
**litigate** 78:3
**litigated** 37:1
**litigation** 47:6 70:3
    70:6,14
**little** 6:16,17 14:11
    28:17 30:18 43:15
    52:16 62:23 81:4
    81:16
**live** 46:10 47:13
    78:21 79:19,23
**lives** 78:18
**LLP** 2:12,18 3:3
**loaded** 55:1
**loading** 35:15
**local** 56:19,20
**located** 56:24 57:2
    62:8
**location** 57:2
**logic** 11:25 14:9
    16:20 17:15 18:12
**long** 53:11,12 57:8
    67:18 69:11,11,12
    69:14 71:21 72:2
    72:19
**longer** 5:19 12:11
    70:5,23
**look** 4:24 7:25 8:14
    9:11 10:23 34:17
    41:16 43:15 56:12
    58:25 59:19 62:2
    62:20
**looked** 8:8 10:1
    30:16 38:13 79:6
**looking** 18:7 61:17
    72:21 73:6,8,9,11
    73:13
**looks** 20:2 61:19
**lose** 6:12 65:12
**loss** 36:4,25 38:8
**losses** 6:11
**lost** 79:13

**lot** 4:14,22,23,23,23
    23:2 31:24 35:8
    81:17
**low** 10:22 11:3 31:6
    52:18
**lower** 7:13 31:15,16
    39:16 55:22 57:6
**LOWRY** 2:22
**loyal** 52:14
**LTV** 12:8,8 74:22
**luck** 84:7

--------

## M

**machines** 63:1,6
**Magna** 9:7
**magnet** 79:1
**Maiden** 2:20
**maintain** 8:24
**maintained** 82:1
**maintaining** 75:15
**major** 6:16,18 9:18
    10:3 11:12 17:7
    23:23 26:9 61:13
**maker** 67:6
**makers** 66:17,21
**makeup** 44:10
**making** 7:2 24:1,2
    64:5 82:3
**malleable** 62:24
**man** 13:1,2,6,16
    14:5,11
**manage** 33:5
**management** 56:19
    68:23
**managers** 67:10
**mandate** 40:25
    56:14
**manipulate** 22:22
**manipulated** 55:2
**manipulation** 22:17
    22:19
**manufacturing**
    30:20 56:3 62:4
**march** 9:14 18:9,22
    26:4,7,12 51:8,24
    53:2 60:24 65:23

**marched** 4:13
**margins** 8:3,3,4,23
    9:13 20:7,7
**Marion** 59:3,10,24
    63:24
**Mark** 82:20
**marker** 64:12
**market** 7:4,4 8:24
    57:1,7,9 59:9,10
    60:2,12 61:20,21
    62:9 63:22,24 64:1
    64:5,8,10,16,23,25
    65:9,13,14,19,21
    66:7,21 68:14 69:5
**marketplace** 40:21
**markets** 56:24
**marriage** 85:13
**mass** 67:13
**massive** 52:11 53:14
**match** 31:25 41:20
    57:17 66:24
**material** 23:17
**math** 15:23 16:9,15
**matter** 1:4 11:24,25
    12:2 13:7,8 14:8
    16:15 17:15 18:12
    18:15 19:10 29:5
    38:16 40:7 41:19
    48:13 58:7 66:10
    85:10,14,15
**maximize** 12:4
**maximized** 12:3
**maximum** 11:21
**MAYER** 2:15 37:10
    37:14
**Mayer's** 41:23
**maze** 42:12 50:11,12
**mean** 28:21 55:13
**meaningful** 75:19
**meaningless** 47:8
    51:21
**means** 14:12,20,22
    36:13 38:10,21
    41:11 42:1 57:6
    69:22
**meant** 22:17 61:16

**measure** 14:21,23
    16:21 42:23
**meat** 65:16
**mechanic** 78:14
**medical** 7:14 18:23
    25:20 32:24 33:9
    38:5 53:10 80:13
**Medicare** 33:5,5
    77:21 79:3,17
**meet** 43:1 76:6
    77:21,24
**meeting** 21:4,4 22:4
    63:13
**meetings** 21:1,5,22
    22:6 25:11 26:3
    35:13 50:25 51:1
**members** 15:15 16:5
    16:16 25:19 49:13
    52:14 54:23
**men** 38:21
**mentioned** 17:23,24
    80:14
**mere** 43:18 75:19
**merely** 13:15 46:15
    70:23 76:22
**Meritor** 9:7
**merits** 55:6
**Mesaba** 28:23 34:19
    35:1 43:15 49:24
    49:25 54:20
**message** 29:6
**met** 34:14 43:9
**metaphor** 82:23
**method** 36:10
**metrics** 72:20
**MICHAEL** 2:7
**Michigan** 57:3
**middle** 11:4
**Milliman** 73:10
**million** 12:19 14:14
    14:17 15:24 16:7,7
    16:11,13,18 19:2
    25:1 39:11 77:11
    77:12 80:4,7,8,9
**millions** 69:14
**mind** 29:9 77:7

minimal 74:7
minimally 30:13
minimis 16:18
minimum 5:15,16
minor 13:17 26:6
minute 43:4
miracle 23:19
mirror 30:18 61:17
misfortunes 36:6
misspoke 16:14
misspoken 16:12
mixed 81:18
mocking 54:14
mocks 54:12
model 30:19,22
  52:11
modification 26:19
  28:3,8 44:1 47:1
modifications 24:14
  25:13,17 26:6 30:6
  30:10 31:12,14,19
  31:19,21 47:25
modified 30:5 73:24
  74:2,5
modify 73:9
MOERS 2:15
moment 52:4 61:25
  63:15
money 6:12 27:23
  36:7 38:23 70:2,7
month 21:17,19 51:2
  68:23 78:18 79:6,7
months 22:11 26:6
  79:13
mopping 78:13
MORELAND 2:16
morning 4:2,3,5
  39:23 55:13 59:19
  59:25 60:17 63:20
morphs 60:17
Moses 80:19,23 81:6
  81:11 82:8,21
motion 4:6 23:12
  28:2,6,17 35:15,16
  37:8 39:1 43:23
  44:15,19 45:1,5

47:14 50:1,7 53:8
  59:8 79:21
motions 44:17 45:21
  50:24 51:9
motivated 65:6
  67:10
motor 58:18
mouth 5:25
move 22:18 68:22
  79:1
moving 13:12
mud 81:18,19
muddy 81:20
multi 23:8
Mulvey 30:3,5 32:3
  33:10 73:5 74:5,23
  75:14
Mulvey's 74:9 75:24
mutually 25:12
mysterious 23:15

_____

**N**

N 2:1 3:1 4:1
NAFTALIS 2:12
NAGLE 2:22
name 12:25
national 41:6 61:14
  62:9 63:22
nationwide 63:18
nature 23:18,18
  30:6
nearly 57:4 78:12
neater 56:12
necessarily 55:14
necessary 5:7,18
  6:22 12:21 13:18
  31:19 35:20 41:10
  41:10 43:13,17
  45:14 47:24,25
  48:1 49:10 51:17
  55:17,22 70:16
  71:12 75:9,18
  76:19 82:20
necessity 5:5,22,23
  6:4 20:9,12 26:14
  27:19 43:14 48:18

50:21 76:6
need 10:3,6,8,11
  11:22 26:9 35:12
  35:13 40:4 52:7
  61:23 64:10 65:19
  81:15
needed 25:22
needs 6:16 9:19 10:7
  10:9,10 11:4 17:4
  19:10 20:1,7 30:24
  30:25 39:14 40:9
nefarious 22:15
negative 30:13,13
  77:23
neglected 21:21 22:2
negotiate 18:7,8
  19:9 25:14 33:24
  35:21 37:2 39:21
  44:11 83:19
negotiated 13:9
  14:25 17:1 23:8
  33:25 36:21,24
  37:6 74:2 76:3,14
  76:16
negotiating 82:25
  84:4
negotiation 26:1
  47:6 83:11
negotiations 35:12
  44:25 45:12 54:8
  83:14
negotiators 18:1,4
neither 7:22 48:21
  70:1
neutralized 82:13
new 1:2,11,11 2:5,5
  2:14,14,21,21 3:5
  3:5 53:24 60:3
  64:5 65:17 67:7
  72:12 79:14 81:15
  81:15 85:3,7
newly 32:19
news 72:6,18,18
newspapers 73:20
night 80:18 82:15
nights 82:15

night's 82:14
Nile 81:18,19
non 7:9 24:17 31:21
  36:20,21 58:17
  64:14
none's 34:10
nonunion 10:9,10,11
  15:5,5,10 18:25
  19:12 25:5,6,8
  26:15 40:13,17,22
  41:2 44:9 71:16
  77:3
normal 59:25 60:5
Northwest 24:22
  26:25 28:15 34:18
Notary 85:7
note 2:19 9:3 54:20
  57:21
notice 35:2
notwithstanding
  83:16
November 21:18,20
Nowak 85:6,20
nuggets 50:11
nullified 47:10
numb 79:12
number 10:4 12:18
  12:19 16:1,2 19:1
  19:1,2 20:4 26:21
  27:9 29:24 32:13
  48:10,12 58:19
  68:18 71:6,7,14
  72:7 76:12
numbers 51:20

_____

**O**

O 1:17 4:1
obligation 19:13
  28:19 41:3 42:21
  43:12 49:20,22
  69:20 70:17 71:9
  71:13 74:1,11
  75:17 76:21
obligations 48:9
  54:19 73:2,7,21
  75:4,7,16 76:2,8

77:1,4,4
**observation** 42:2
**observe** 83:9
**observes** 28:15
**obtain** 8:24 14:13
  15:4 16:3,4,21
  44:23 46:23 66:12
  71:2
**obtained** 4:19 8:18
  8:19 10:2,3 31:21
**obtaining** 16:22
  22:10
**obviously** 53:3
  62:10
**occur** 39:8
**odd** 61:1
**odds** 46:24
**OEMs** 17:7 66:19
**offer** 8:8 22:25 26:8
  52:25 67:6
**offered** 20:17 25:4
  30:15,15 31:5
**offering** 32:13 72:8
  72:22
**offerings** 32:8
**offers** 70:7
**officer** 22:5,6 57:20
  68:18 80:8
**officials** 56:20
**oh** 18:1 44:10
**Ohio** 2:9
**Okay** 66:6
**old** 63:8 76:21 79:17
**once** 19:21 46:17
  54:15 60:16 64:2
  68:21 73:22
**ongoing** 29:22
**OPED** 20:3
**opening** 78:4
**operate** 7:16 8:22
  54:21 56:21
**operates** 6:9
**operation** 62:18
**operations** 7:10
  21:24 52:12 56:20
  65:1 67:20 68:12

79:2,17
**operator** 79:11
**opinion** 8:9 10:13
  13:4,6 31:6 74:24
**opinions** 22:25 31:5
**opposed** 9:9 22:16
  25:16 35:22 42:25
  44:1 46:5
**optimization** 10:7
**option** 45:10 46:15
  46:19
**options** 33:13,14
**oral** 45:21 55:12
**order** 9:1 20:7 27:25
  34:7,20,20,24 35:5
  38:25 39:2 44:21
  44:22 45:9,19,20
  45:25 46:2,17,23
  47:7 54:7 71:2
  79:9
**ordered** 46:11
**orders** 47:2
**originally** 38:1
**os** 8:10
**ought** 46:13
**outcome** 38:12
  85:15
**outlined** 27:6
**outright** 42:25
**outside** 7:16
**overall** 24:19 31:15
  32:9 65:5
**overseas** 52:12
**overwhelming** 5:2
**O'Malley** 8:11,17
**O'Malley's** 8:15

---

**P**

**P** 2:1,1 3:1,1 4:1
**package** 17:24 66:1
**page** 13:3,5,12 18:9
  28:24 56:25 57:12
  58:20,22 59:18
  60:24 65:23
**pages** 46:20
**paid** 36:8 56:2,5

57:11 58:6,24 60:3
  60:10,22 61:3 70:5
**painstaking** 43:21
**paper** 48:10,12
**paragraph** 55:25
  56:22 61:5,10
  70:18
**parenthetically**
  57:21
**parse** 55:8
**part** 7:16 9:23 10:6
  10:7,8,9,10,11
  16:11,11 19:6
  27:10,18 52:13
  62:18 79:14 80:22
**participated** 38:19
**particular** 14:2 55:2
**particularized** 49:23
**particularly** 42:4
  61:6
**Particulars** 48:24
**parties** 13:20 24:7
  35:21 36:6 37:11
  54:6 55:10 83:8,18
  84:3 85:13
**parting** 80:21
**partner** 48:24
**partners** 54:8 68:23
**parts** 7:10,11 38:22
  54:5 57:14 58:18
  59:16,23 61:4,6
  64:12,22 66:14,15
  67:6 78:24
**party** 76:4
**passage** 35:25
**passed** 48:20,20
**Passover** 80:19
**path** 37:4
**pay** 28:19 32:20,20
  60:9 61:15 64:10
  64:22,25 65:8 66:6
  67:15,16 69:5,10
  69:21 70:4,17
  71:13,20 74:1 76:8
  78:21 80:13 82:7
**paycheck** 65:16

**paying** 33:5 65:19
**payment** 76:4
**payments** 38:21
**pays** 57:18,23 66:1
**PDF** 22:16 49:16
  50:18
**PEDRO** 2:7
**peer** 6:13 7:24
**pen** 68:7
**pennies** 65:4
**penny** 59:2 69:8
**pension** 78:18 79:5
  79:10
**people** 7:5 22:22
  33:4 39:17 51:1
  77:23 78:20 79:19
  81:8
**percent** 15:11 19:24
  24:24 25:2,21
  32:14,15,17,20,20
  33:4 43:18 55:18
  57:4 59:22,24,24
  63:22,23,24,25
  64:15,17 72:9,9,15
  76:13,13 77:20,22
  77:24 79:3,9 80:6
**percentage** 11:1
  13:11 32:24 72:16
  72:24
**percentages** 10:25
**performance** 6:10
  6:13,21 7:24 57:17
**performing** 23:20
  61:11
**period** 19:25 20:18
  70:1,18
**periodic** 71:14
**permit** 37:3 45:9
  47:3,5,25 50:20
  55:17
**permits** 46:5
**permitted** 27:13
  53:5
**permitting** 34:21
  45:11
**Perrin** 18:21 19:19

**Perrin's** 76:12
**persists** 82:24
**person** 21:22
**personal** 21:5 51:18
　80:1,1
**perspective** 38:9
　46:22
**pertaining** 51:10
**PETER** 3:7
**Pharaoh** 81:6,11,24
**Pharaoh's** 81:3
　82:10
**phrase** 45:3 67:8
**Ph.D** 61:23 65:10
**pick** 9:14
**picked** 9:5,6 41:17
**picture** 60:13
**pie** 7:6
**piece** 7:5
**pieces** 48:10,12
**Pilar** 20:24 48:25
**Pittsburgh** 5:12
**place** 18:15 24:16
　29:7 51:2 72:13
**placing** 32:7
**plagues** 80:20 83:2
**plain** 34:11 42:17
　65:21
**plainly** 46:24
**plan** 21:24 23:2,13
　23:15,15 24:22
　33:7 52:7 53:2,17
　53:17,19,21,22
　54:2,11 71:18
　73:25 74:2,5
**planned** 32:10
**plans** 23:9,9 52:5
　53:9
**plant** 32:10 51:12,12
　51:12,13,14,21,23
　56:11 57:2,2
**plants** 18:9 30:4,11
　31:4,8 56:16,21,24
　57:6 58:4,24,25
　59:8,19 60:1,10,11
　60:15 62:13 69:23

80:5
**played** 50:2
**playing** 78:9
**Please** 22:13
**ploy** 44:23
**plummet** 60:12
**plus** 16:2 32:19
**pocket** 45:19
**point** 19:16 31:1,18
　32:4 33:21 44:11
**pointed** 67:2
**points** 6:5
**policies** 41:1,6,9
**policy** 41:8 46:22
**poorer** 67:19
**portion** 65:5 76:11
**position** 11:6,11
　17:12 34:12 38:17
　38:18 39:1,14,19
　71:19
**positive** 30:12
**possibility** 28:11
　29:15,17,18
**possible** 25:24 29:19
**post** 22:16 32:10
**posturing** 29:6,6
**potential** 36:25
　53:22
**Potok** 6:15 7:22 8:7
　9:4,10,18,20 10:5
　10:13 11:18 17:22
　18:6 21:9,11,16
　22:1,9,14,24 49:2
　49:12,17
**Potok's** 23:16,17
　48:25 49:19
**power** 36:23
**pray** 81:8
**pre** 32:10
**precipitating** 35:22
**precisely** 50:1 58:16
　61:21
**prefer** 42:19
**pregnant** 77:23
**preliminary** 41:22
**premium** 31:7 32:21

64:19
**premiums** 33:3,5
　64:15
**preoccupied** 65:15
**prepared** 10:14
　21:18 40:1 47:13
　77:5,8
**preponderance** 42:6
**prerequisite** 53:23
**presence** 7:17
**present** 4:5 36:12
　47:17 82:14
**presented** 8:6 29:3
　78:7
**presenting** 71:14,18
**presents** 73:16
**preserve** 35:11
**presided** 74:16
**pretty** 67:16
**prevalence** 7:8
**prevent** 70:22
**price** 17:10 66:18
**prices** 40:19 68:4,21
**principal** 29:4 58:3
**principals** 35:8
**principle** 13:7 47:9
　58:6
**printing** 36:7
**prints** 63:6
**prior** 35:2 47:19,20
　48:4 53:25
**private** 62:4
**pro** 10:20
**problem** 16:19
　81:19,20
**proceed** 47:14 71:17
**proceeding** 29:8
　38:20 40:11 73:24
**proceedings** 37:21
　85:9,11
**process** 18:3 33:22
　35:9 36:2 44:18,24
　47:6 54:17,25
　55:12 60:5 63:14
　77:6 83:11,15 84:5
**produce** 45:4 52:2

55:2 63:8
**produced** 50:20,23
　81:25
**produces** 60:15
**producing** 57:4
**product** 67:13,19
　69:6
**production** 6:25
　58:17 63:14,24
　64:1,3 65:2 67:13
　82:6
**productivity** 69:3,5
**products** 65:7 67:7
**profession** 68:19
**professional** 49:1,5
　68:8
**professionals** 49:8
　69:13 80:8
**Professor** 30:2,8,14
　30:17 31:1,3,13
　56:25 57:21 58:2
　58:13,23 59:17
　60:7,14,20,23 61:1
　61:4 62:1,6 64:6
　65:21 66:2,13
**Professor's** 58:20
**profit** 40:19
**profitability** 8:23
　12:6
**profitable** 7:3
**profits** 67:6
**program** 42:14
**programs** 50:10
**projection** 71:15
**projections** 53:12
　54:12
**promises** 80:2
**promote** 47:9
**prong** 43:1,9
**proof** 42:3 77:17
**properly** 6:8
**proportion** 25:3
**proposal** 13:15 15:1
　42:19 43:13 44:12
　47:22,23 48:2
　54:24 55:1 59:1

63:20 69:16,22,23
69:24 70:7,9,13,15
70:16,17 74:25
75:5,8,9,12,20
**proposals** 5:6,16,17
12:17 14:15 18:5
18:13 20:13,15,16
20:17 24:1,7,13
26:4,7 28:10 42:21
43:16 48:18 49:10
50:22 51:11,13,23
64:13
**propose** 67:22
**proposed** 5:12 19:7
19:8 32:22 55:9,16
59:13 60:4 64:19
66:11 69:10 70:2
**proposing** 31:25
**proposition** 41:15
**prospect** 80:3 83:13
**prospects** 46:25
67:18
**protect** 40:15 70:25
**protection** 49:3
**prototype** 67:13
**prove** 45:13
**provide** 15:13 17:9
17:10 20:19 22:8
22:13 25:19 27:23
35:2 41:7 43:10,12
48:4,7,23 49:21
50:9,16 51:16 53:3
54:19 57:17 58:9
**provided** 20:22,23
21:3 30:8 43:6
48:16 49:15 50:3
50:24 71:22 72:2
**provides** 19:14
36:10 45:2 47:24
48:1
**providing** 21:3 43:1
43:9 70:21,24
**provision** 21:10
35:13 53:24
**provisions** 36:12
47:8

**prudence** 41:18
**public** 74:21 85:7
**punishment** 44:3
**purchasing** 79:7
**purporting** 32:2
**purpose** 22:15 47:9
51:15 54:21 75:25
**purposes** 51:16
**pursuant** 4:6
**pursue** 37:3 40:7
**pursued** 41:11 42:12
82:10
**pursuing** 36:16
49:17 77:9 82:24
**pursuit** 44:24
**push** 82:5 84:3
**pushing** 78:5,25
**put** 24:16 66:22
77:13
**putting** 22:20
**pyramids** 81:3,16

### Q

**qualified** 31:11
65:23 66:4,8,12,15
**quality** 65:2 66:17
66:19,20,23,25
67:19 68:11,12
69:6
**quarter** 43:18 55:18
80:6
**quarters** 10:4
**question** 40:2 65:25
66:6,10 67:15,16
68:1
**questions** 22:8
**quibbling** 9:9
**quick** 31:4 58:8
**quickly** 67:14
**quit** 31:6 60:3,6
65:18 79:10
**quite** 29:2 34:23
**quits** 60:17
**quota** 81:25,25
**quote** 54:22 56:1
**quoted** 35:25

**quoting** 36:2 56:4

### R

**R** 1:17,18 2:1 3:1,8
4:1 85:1
**radical** 41:15
**raised** 11:18 23:11
34:2
**range** 9:17,17 11:3,5
16:6,10,13 20:6
39:11 72:15
**rank** 36:24
**rate** 12:6 39:13
60:18 65:19
**rates** 31:4,6 56:23
58:8 60:7
**rational** 67:23
**rationale** 45:11 57:9
**reach** 19:11 33:19
**reached** 13:9 15:10
15:16 19:12 37:25
**reaching** 25:12
**read** 46:17 63:5
80:23
**reading** 13:3 28:24
34:10 35:4,6,18
73:20
**ready** 33:25
**real** 16:1,2,6 70:7
78:7
**reality** 7:18,21,22
18:15,17 36:10
**realize** 15:8
**really** 11:15 12:18
14:12 16:17 18:20
29:8 41:16,23
46:12 48:3 52:18
60:12 61:22 70:13
70:19 72:6 82:17
**reason** 22:20 29:5
31:17 39:18 56:15
61:21 67:3
**reasonable** 64:21,22
73:17 74:6 77:7
**receive** 29:4 55:9
**received** 51:9 69:13

**receives** 79:5
**recipe** 69:11,11
**recognize** 55:12
**recognized** 56:22
**recognizes** 36:9
**reconcile** 41:1,5,8
**record** 39:10,12
55:11 57:24 58:1,9
59:7 74:21 83:24
85:11
**recorded** 80:24,25
**recount** 81:23
**recoveries** 29:20,21
38:11
**recovery** 70:10
**red** 77:13 80:21
82:12 83:4
**reduce** 72:4 73:6,9
73:12
**reduced** 73:1 74:11
74:14 75:3,17
**reducing** 71:8
**reduction** 27:13
44:1 80:5
**refer** 4:9 49:24
50:25 80:17
**reference** 72:25
**references** 75:22
**referred** 45:1
**reflect** 56:19,21
**regard** 41:2,9 76:2
**regarding** 28:11
47:17 64:18 66:20
74:8
**regional** 62:5
**regularly** 11:8
**regulator** 40:21
**reject** 13:13 34:5,15
34:15,22,25 42:24
43:7 44:21 45:6,10
45:20 46:5,19,19
63:21 75:13 78:2
79:21
**rejected** 12:24,25
45:22 46:13 49:2
**rejecting** 34:7 46:16

46:16
**rejection** 14:6 26:18
27:12 29:16 34:14
35:3 42:25 43:8
44:22 45:2,5,8,14
45:19,20 46:2,6,9
46:10,11,18 47:2,4
47:7 50:1 64:17,20
**rejections** 42:8
47:21
**rejects** 5:10 59:20
83:1
**relate** 27:3,11
**related** 15:8 85:12
**relating** 27:7,16
**Relations** 41:6
**relationships** 40:22
**relatively** 13:17
62:12 65:5
**release** 78:6
**relevant** 6:23 43:12
48:1,5,15,23 49:9
52:2 56:7 58:1
62:10
**reliability** 66:19
**reliable** 20:14 24:1
47:22 49:21 67:19
**reliance** 80:2
**relied** 61:3
**relief** 4:6,15 5:2
11:22 14:3 15:11
16:6,10,22 17:25
25:16 26:23 27:19
27:25 28:14 34:4
36:1 37:8,23 39:19
43:3,11 44:20
45:12 50:7 56:10
71:3
**relies** 32:12,17
71:21
**religious** 81:9
**relying** 72:1 76:21
**remain** 19:24 27:14
30:12 31:19 33:25
**remains** 18:24 38:16
**remarkable** 4:17

**remarks** 40:1 41:22
**remedy** 43:6
**remember** 42:25
58:21 83:3
**reminder** 41:23
**rendered** 47:8
**reoccurring** 39:13
**reorganization** 5:7
5:18 13:16,19,23
27:4,8 35:21 37:3
43:17 47:25 53:21
55:17 68:9
**reorganize** 27:20
29:21 33:15
**replace** 65:17 79:8
**replaced** 60:3
**report** 17:22 57:1
58:2,4,20,23 61:5
71:6
**reported** 85:9
**Reporter** 28:24 85:6
**reporting** 72:12
**representatives**
54:23
**represented** 13:10
44:6,9
**representing** 15:10
**request** 14:3 21:20
21:22 22:2 25:16
37:23 39:19 45:22
47:11 48:25 49:23
**requested** 4:16 5:2
13:15 14:4 21:17
22:10 24:14,16
26:23 28:14 36:2
51:10
**requesting** 15:12
16:6,10 27:19 28:1
34:4
**requests** 57:10
**require** 18:16,16
32:19 55:8 60:3
**required** 5:14 33:2
35:1 40:7 49:4
71:2
**requirement** 13:20

13:21 24:4,6,7
40:24 47:17 51:4
54:22
**requirements** 71:2
72:4,12 76:22
**requires** 46:24
**reshuffling** 52:24
**resolution** 36:24
37:1,6 39:21 83:20
84:1,4
**resolving** 74:18
**respect** 9:3,9 12:16
12:17 15:12 18:18
19:23 24:10,17
25:4,22,25 30:6
31:21,23 33:19
34:3 37:7,19 38:7
**respectfully** 37:7
**respects** 41:25
**responded** 82:19
**respondent** 66:23
**responding** 21:20
22:1
**response** 6:5 11:17
12:14 26:3 30:17
52:25 72:3
**responses** 48:8
**responsible** 53:7
**rest** 15:2 71:23
83:24
**restraints** 76:16
**restricted** 22:21
**restrictions** 32:7
**restructure** 23:24
**restructuring** 9:21
9:23 10:16,21
11:20 16:12 19:6
19:10,10 22:5
24:19 33:23 52:10
53:14 57:20 68:17
68:25
**result** 7:1 19:11 28:4
28:8 31:14 32:23
36:7 39:6 45:4
55:2 60:16 64:19
71:16 73:3 74:19

78:15
**results** 8:14,17,18
36:1 73:16 76:5
**retain** 65:22
**retaining** 31:11
**retire** 76:13
**retired** 32:19 79:1
**retiree** 7:15 8:12,12
14:21,22 15:9
18:23 20:21 23:10
25:15,18,20 26:20
27:14 28:3,8 30:7
31:23 32:13,18
33:9,19 44:1,5,13
53:10,16 55:23
68:20 69:18,19,21
70:12,18,21,24,25
71:4,5,9,13,20,22
72:8,11,22 73:2,3
74:2,11,15,19 75:1
75:4,7,16 76:2,8
76:14,17,20,23
77:1,3 79:4,8
**retirees** 9:25 10:10
10:11 15:5,10 16:3
18:18,25 19:12,13
19:23 20:20 25:6
32:9,11,19,23 33:1
33:2 36:4,19,20
37:19 38:7 40:9
44:7,9 52:14,15,21
71:16 74:7 75:1
77:1,21 80:10
**retirement** 15:12
30:22 38:5
**retraining** 66:4
**return** 37:2
**review** 8:10 48:25
53:5 78:10
**revised** 20:17
**rhetoric** 4:22 41:15
83:17
**right** 8:1,7 11:24,24
11:25 12:10 14:6
28:20,21 38:23
39:3,6 40:11,12

41:7 52:16,21 62:1
63:10 67:24
**risen** 66:23
**rising** 68:4
**risk** 28:16,25
**risks** 27:17
**river** 81:18,20
**road** 63:11
**ROBERT** 2:8
**roll** 67:7
**rolling** 65:7
**room** 41:1 48:11,13
49:4,6,13 67:11
**rooms** 42:12
**roughly** 8:22
**round** 70:14
**rounding** 43:18 80:6
**rubber** 62:21,22
**rule** 56:18
**run** 63:1 79:18 83:1
**running** 82:23
**runs** 62:25
**runway** 39:13

**S**

**s** 2:1 3:1 4:1 65:10
**sacrifice** 13:15
**sacrifices** 14:1 25:5
25:8 26:15 52:21
**sake** 61:25
**salaried** 25:6
**sale** 74:19 75:15
**sales** 7:1
**salt** 24:24
**sanctity** 35:9
**sands** 83:3
**sat** 16:25
**satisfactory** 25:12
**satisfied** 24:4
**saved** 68:20 69:4
**saving** 26:9 65:4
**savings** 5:15 9:18
10:2,3,8,15,18
11:5,22 12:3,4,16
14:14,24 15:2,4,7
15:8,22 17:5,6,12

17:17,18 18:19
20:6,10,10 23:5
24:10,23,24 25:1,3
25:4,21 26:8 36:22
39:9,11,13,16 40:4
40:5,8 41:12 51:11
55:19 79:15
**saying** 15:1,24 16:1
30:19 44:10
**says** 34:13 40:8 56:1
56:10 64:11 69:21
**scabs** 83:3
**schedules** 63:13
**school** 79:11
**Sea** 80:21 82:12 83:4
**second** 5:9,11 8:1
42:2 56:6
**section** 28:2,16 34:3
34:12,13 35:8,18
36:2,14 37:15,16
37:17,18,24 38:17
38:18,20 39:1,9,10
39:10,19 40:14,14
41:18 43:2,11,16
53:13 54:21 57:10
59:8 64:8,13 69:15
70:21 71:2 77:5
**sections** 4:6 41:24
42:1
**sector** 7:10 57:4
62:4
**secure** 8:24
**Security** 78:18
**Seder** 80:19 82:14
**see** 6:14 8:2,14 11:3
11:10 29:3 36:8,11
39:7 59:17 64:11
68:10 72:23 83:22
**seeing** 15:18
**seek** 16:2,4 36:18
45:9,12 52:12
**seeking** 12:15 14:17
14:22,24 17:2,25
24:11 34:5 36:22
46:8 47:21
**seeks** 30:6 43:6,7

44:20,23 56:1 76:7
77:12
**seen** 26:4
**sees** 17:24
**selling** 27:22
**sells** 38:22
**send** 21:19
**senior** 60:2,2
**sense** 14:7,8 18:6
18:10,11 30:23
61:24 64:24 65:12
65:20
**sentence** 22:12
**separate** 17:23
37:16,17 41:24
48:19
**separately** 43:8
**series** 4:19 33:8
**serious** 25:10
**seriously** 26:8 49:9
60:19
**service** 80:1
**set** 8:7,17 9:13 10:18
19:14,21 20:4,23
22:6 27:9 30:16
31:14,17 62:7 63:6
66:20 85:17
**sets** 37:16 45:7
**setting** 7:9 12:7
**settle** 23:11
**settled** 8:12 77:3
**settlement** 13:10
15:10,16 18:25
20:20
**settlements** 25:14
71:16 76:3
**SG&A** 10:8 68:20
**SHANNON** 2:22
**share** 8:24 10:14
13:23 66:21
**shared** 9:6 23:3,6
38:14 53:6
**sharing** 40:19
**sheet** 67:16
**sheets** 72:6
**shift** 42:10

**shifting** 74:7
**shocks** 11:7
**shoe** 62:21
**shoes** 62:25
**shooting** 8:21
**shop** 67:11 80:24
**shores** 52:17
**short** 12:6 27:25
36:7 37:6 47:5
82:17
**Shorthand** 85:6
**shoulder** 25:3
**show** 27:18 32:12,17
58:23 71:19 72:5
73:18 74:21 75:14
75:22
**showing** 76:1
**shown** 10:5 71:19
76:8
**shows** 7:23 9:12
11:14 12:1,2 31:16
39:10 57:1 59:18
76:11 77:20
**shrink** 19:23
**shy** 14:17
**side** 53:11
**sides** 83:18
**sidetrack** 55:14
**significance** 54:11
**significant** 7:15 9:18
16:11,11,22 17:1,1
19:25,25 76:10
**SILBERFARB** 2:7
**similar** 24:15 28:25
31:20 41:25
**similarly** 15:16
59:22
**Simon** 3:3,6 39:23
39:24,24 72:1
83:12
**simple** 69:17
**simpler** 68:18
**simply** 20:6 27:20
57:15 59:7 66:22
70:20 71:13
**sincerely** 39:20

single 13:8,24 77:18
singling 24:17
sink 60:1
sit 18:3
site 21:16 22:12 49:1
   81:5,18
situation 31:12
six 27:9
Sixth 33:17
size 19:22 62:11,11
sized 59:22
skilled 60:10 63:21
   63:23 64:14 65:6
   67:10
slash 53:10
slaves 80:20 81:2,6
   81:17,22 82:2
slightly 28:22 31:15
   31:16
slip 13:4,5
small 13:10,22 65:5
smaller 12:18 65:16
   73:8
snapshot 59:25
Social 78:18
society 71:5
solution 10:6,8,8,9
   10:10,11,13 19:7
   33:19,25 35:22
somewhat 38:18
soon 60:1
sophisticated 67:23
sorts 8:25
sought 30:5 31:13
   31:19,20 36:19
   40:13 45:19 52:3
   52:23 53:15
source 58:9,14
sources 50:10
South 78:12
SOUTHERN 1:2
so-called 72:6 73:15
spats 62:22
specific 24:13 39:12
   51:14,21 69:24
specifically 22:6

41:17 45:16,22
   47:19
spent 66:14
spoke 31:8
sponsored 33:6
spouses 77:19
spray 63:1
ss 85:3
stable 72:24
stacking 78:25
staggering 44:16
stagnant 6:25,25
stand 4:25 9:4 18:1
   20:24 23:7 30:2
   83:16
standard 5:8,10,13
   5:17,20 56:11 76:7
standardize 56:2
Standardized 56:12
standardizing 56:9
   57:5
standards 5:11
   66:23
standing 13:1,3,6,17
   14:5,12 29:10
   67:25
start 5:4 19:21
   44:19 80:15
started 32:1 79:12
   79:14
State 85:3,7
stated 5:23 40:10
   54:3 74:5
statement 44:16
   80:15
statements 4:9 71:7
states 1:1,10 47:19
   58:15
Statistics 58:15
statute 13:24 35:4
   41:16,19,21 42:6
   43:7 44:20 45:7
   46:5,24 80:16
   83:25
statutes 24:4 37:15
statutorial 45:23

statutory 47:8,9,16
   48:9 50:8 51:3
   54:18 56:14
stay 65:14
stayed 72:14
steel 39:25 44:6
   60:22 74:17,20,22
   76:14
Stenger 5:25 6:8,20
   7:21 8:16,19 10:17
   10:19 11:13 16:25
   17:14,19 20:5 68:8
   68:17,22 69:12
Stenger's 9:12 17:4
   57:15
step 14:4
steps 33:8,10 35:19
steward 80:24
stiffer 67:1
stipulation 49:3
stones 81:16
stopped 82:8,9
stories 68:3
story 52:1 80:19,22
straight 40:2,4 69:1
strategic 44:23,25
strategy 45:16 47:12
straw 81:19,20,22
   82:2,3,6
strayed 83:7
Street 2:5 3:5
stretch 16:9 45:3
   77:14
stricken 57:24
strike 28:12,14,16
   28:19,20 29:1
   38:23,24 39:3,6,17
   39:17 68:15 81:1
   82:8,10,13,16 83:2
   83:3
strikers 82:10
strikes 81:1 82:17
strived 33:21
strong 7:17 26:14
STROOCK 2:18,18
structure 19:8,14

30:25 31:1,9 32:22
   40:16
structured 29:4
struggling 30:20,21
study 61:2,8
studying 66:14
subject 14:25 18:5
   58:25 60:16 69:23
   74:9
subjectively 54:23
submit 4:16 8:10,13
   21:11 23:25 24:8
   29:17 83:23
submitted 26:5 30:2
   73:25
subsequently 14:4
   70:11
subsidize 52:13
subsidized 14:1 70:4
substantial 18:24
   26:9
succeed 13:7
success 27:4,8 65:3
   68:2 69:11
successful 7:12,12
   7:13 8:21 20:8
   35:20
successfully 19:12
   29:21
suffers 78:15
sufficient 44:15
   48:16 50:7
suggest 7:22 16:8
   35:6 51:15
suggested 22:15
suggesting 70:4
suggestion 78:1
suggests 60:8
suit 66:21
summarize 43:5
summarized 74:25
supervisors 81:12
   81:21
supervisory 58:18
supplier 64:22 66:24
suppliers 40:12 41:2

66:18
**support** 28:6 38:1
  63:22 78:1
**supportive** 37:23
**supports** 34:9,12
**supposed** 50:13
**surely** 67:20 77:19
  78:2
**survey** 72:10 73:15
  73:16,18 77:20
**surveyed** 72:15,16
  72:23
**surveys** 32:12,16
**survival** 67:18
**survive** 64:11
**suspend** 18:17
**sustained** 13:19
**sweating** 62:23
**switch** 69:15
**systems** 40:16

**T**

**T** 85:1,1
**Tab** 6:19 7:23 8:14
  9:11,21 10:19
  11:15 14:10
**table** 18:4 37:2
  56:25 58:20,22
  59:17,17,18 60:14
  62:7 77:14 80:12
  80:12,13
**take** 17:12 21:8,14
  23:22,23 29:12,24
  32:2 33:9 35:19
  39:1 56:8,19 60:8
  69:18
**taken** 5:19 75:21
**takes** 39:14,18 67:9
  67:10,13 69:17
**talented** 65:12
**talk** 12:21 69:15
  81:1
**talked** 15:20 26:3
  33:10 78:4
**talking** 17:15,16,20
  68:15 77:23

**talks** 40:18
**Tambe** 2:6 4:3,4,13
  40:2,10 45:1,18
  50:25 55:7 77:20
  80:14 84:8
**Tambe's** 41:14
  68:16
**tandem** 9:14
**Taranto** 32:1 72:10
  73:10
**Taranto's** 19:17
  76:11
**target** 8:20 9:15,17
  14:17
**targeted** 38:20
**Tarry** 48:25
**Tarry's** 20:24
**team** 69:13
**teams** 70:6 81:4
**team's** 70:3
**tell** 21:21 22:3 34:10
  52:1 60:21 61:23
  75:8,9,11 77:22
  79:22,23
**tells** 58:16 60:23
  61:24
**temperatures** 62:19
**ten** 72:24 76:21
  80:20,21
**tens** 69:13
**tents** 81:4
**term** 5:19,19 12:11
  12:12 53:11,12
  67:18 69:11,11,12
  71:22 72:2
**terminate** 34:21
  77:5,9,12
**terminated** 32:18
  38:5 77:10 79:8
**terminates** 39:2
**terms** 8:21 15:7
  20:25 21:1 23:25
  25:18 44:12
**test** 43:1,9 48:19
  79:3
**testified** 9:19 18:22

24:12 73:5
**testify** 57:22
**testimony** 4:18
  16:23,24 17:4,14
  20:24 30:15 55:15
  62:15 64:24 66:17
  69:2 73:10 74:9
**tests** 48:19 71:12
**text** 80:16,18
**Thank** 37:9 39:22
  83:5 84:7,8
**theater** 4:24
**theatrics** 41:14 78:8
**theme** 28:12,12
**themes** 6:6
**thin** 4:8
**thing** 17:3 48:19
  70:8
**things** 7:14 8:25
  54:6
**think** 21:21 22:3 34:10
  32:3 33:20 35:7
  42:16 46:7 49:25
  53:18,20 55:7,11
  55:14,19,22,24
  57:25 77:7 83:15
  83:21
**third** 11:16 12:1,2
  28:11 64:3 76:4
**THOMAS** 2:15,16
**thought** 17:6,9
  37:22
**thousand** 68:22 78:5
  78:24,24 79:5,24
**thousands** 77:22
  79:24
**thousandth** 63:9
**threats** 4:23
**three** 22:3,11 23:9
  32:25 42:12 49:25
  50:10 58:25 71:7
  81:8
**threshold** 50:22
**throw** 56:15
**tides** 82:12,22
**tidier** 56:12

**tier** 31:9 63:25 64:4
**tight** 63:13
**time** 5:10 12:23
  16:25 17:23 18:9
  19:25 20:14,18
  25:20 47:23 56:8
  63:14 65:1 69:7
  70:1,14 72:7,14
  79:14 83:21,24,25
**timely** 47:18
**times** 61:16
**timing** 51:25 53:8
**tip** 31:18
**Titanic** 52:24
**today** 34:1 38:22
  70:2
**told** 80:19,23
**Toledo** 22:4 51:2
**tolerances** 63:9
**top** 51:1
**topic** 16:24
**tossed** 68:13 81:11
**total** 7:14 32:21
  43:24,25 44:5,13
  55:23 58:6 60:13
  60:15 61:3
**tough** 61:16
**Tower** 64:12,19,21
**Towers** 18:21 19:19
  76:12
**traces** 60:15
**traditional** 36:15
**transcript** 18:10
  32:11 46:20 60:24
  65:24 85:11
**transfer** 52:11,12
**transfers** 52:17
**transformation** 52:9
**translate** 69:4
**transplants** 7:9
**Transport** 5:10
**treasurer** 50:14
**treat** 24:7
**treated** 13:20
**treatment** 44:8
**trenches** 78:7,8

**trend** 72:6,17,21
**trends** 71:22,23,24
  72:2,3
**trial** 65:24
**tribunal** 21:15
**tried** 35:10 57:22
  79:10
**triggered** 41:23
**trivialize** 48:8
**trouble** 66:4,7
**troubled** 30:19
  64:10
**true** 39:4 53:3,5
  65:25 85:11
**truly** 44:16 66:25
**trust** 65:20
**try** 33:25 50:11
  54:12 55:10 83:19
**trying** 7:5
**turn** 7:2 10:24 11:11
  15:13 47:16 50:1
  57:9 67:13 68:19
  82:12
**turned** 40:1
**turnover** 59:25 60:5
**tweaks** 6:16
**two** 21:21 23:22
  26:6 27:11,16 30:3
  31:9 37:15,16
  41:24 43:1,8,9
  50:10 56:3 65:10
  69:24 71:6 73:7
  74:22 79:2,17
**twofold** 52:25
**type** 15:17 54:13
**types** 21:2 24:12,13
  24:15 33:12,14

**U**

**UAW** 3:4 44:6 76:13
**ultimate** 40:21 52:1
**ultimately** 54:17
**uncertainty** 60:8,9
**uncontradicted** 5:24
**undeniably** 59:14
**undergoing** 75:15

**underlying** 35:8
**underpinning** 83:10
**underpinnings** 29:2
**understand** 38:15
**understanding**
  54:16
**understood** 84:2
**undertake** 48:17
**undisputed** 48:3,6
  48:22 49:11 51:6
  59:6 62:7,14
**undue** 25:3
**unfair** 44:7 55:3
**unfortunate** 78:9
**unhappy** 65:15
**unheard** 44:3
**uniformly** 12:24,25
**union** 7:17 9:25
  12:16 14:21,23
  15:2,22,25 16:16
  18:18 19:11,23
  20:3 24:14,17
  28:18,19 35:2
  37:12 39:21 40:9
  42:15 43:10,10
  44:21 50:9 56:20
  60:14 61:9,11
  62:13 75:12 77:1
**unionized** 17:11
  31:22 32:23 36:20
  36:21 52:14,20
  68:11
**unions** 5:7,12,24 6:7
  6:15 10:12 11:18
  11:22 12:5,23
  14:12 15:18 16:5
  16:23 17:17 18:7
  19:3 20:20 21:6,7
  22:7 23:7 24:3,11
  24:18 25:7,24 26:2
  26:7 28:2,13,20
  30:15 31:18 34:2
  35:6,14,16,23
  36:19,23 39:1,5,25
  40:3,8 42:10,11,18
  43:2,5,13 48:4,6

48:15,17,23 49:7
  49:21,23 50:4,17
  50:20,23 51:9 52:3
  52:5 53:4,5,8 54:5
  54:8 64:13 73:23
  78:2
**union's** 4:20 12:13
  16:3 17:20 34:7,12
  42:23 54:14,23
  61:2 70:11 83:1
**unique** 40:16
**unit** 13:9
**United** 1:1,10 45:18
  47:12 58:15 61:8
  61:12
**United's** 45:25 61:9
**unmistakable** 55:11
**unrebutted** 4:17
  6:23 17:13 20:12
  66:17 69:2
**unremarkable**
  75:25
**unsaid** 14:20 15:3
  15:20,21
**unsecured** 2:13 28:4
  28:5,7 29:18 38:9
  38:10 39:7 70:10
**untimely** 48:7
**unusual** 44:2
**updated** 11:16 24:3
**ups** 11:7,8,9
**urge** 37:1 84:1
**USA** 7:10
**usable** 49:14
**use** 9:9 45:10 47:6
  59:5 79:13 81:16
  81:17
**useful** 49:16
**user** 42:14 50:5,16
**uses** 58:23 65:1
**USW** 3:4 26:5
**uttered** 52:6
**U.S** 1:19

**V**

**valuable** 61:6

**variances** 56:23
**varied** 57:1
**variety** 53:13
**various** 12:23 21:23
  27:5 33:10 56:23
**VEBA** 15:13 19:8,14
  32:22 44:11 69:25
  70:3,4,9 74:3
  77:10
**vehicle** 58:18
**vendors** 40:12,17,19
**verse** 20:25
**vetted** 23:5
**viable** 9:2 20:8
  29:22 33:16
**victory** 38:10
**view** 5:18,19 32:2
  34:7 49:4 68:19
**views** 14:5
**virtual** 48:11
**virtually** 32:4 44:3
**vision** 44:25
**vital** 54:21
**voice** 29:10 80:14
  81:5 82:11
**voiced** 28:9
**Voos** 30:14 31:13
  56:25 58:20,23
  59:17 60:14 62:7
  69:2
**vote** 51:19

**W**

**W** 2:6
**Wachter** 30:3,8 31:3
  58:13 60:7,21,23
  61:5 62:1,6 64:3
  64:11,14,18,21
  65:21 66:2
**Wachter's** 30:17
  31:1 58:2 61:2
  63:16,19 64:6
**wage** 29:25 30:9,11
  30:25 31:7,9 52:18
  56:2,4,18,23 57:3
  57:6,11 58:11 59:1

59:3,22 62:3,9
64:15 65:14 66:1
69:1,3 80:4
**wages** 30:4,4,10
43:24 53:10 55:20
55:21 56:9,11,12
57:1,5,9,18,24
58:5,14,24 59:8,12
59:15,18,20 60:1
60:11 61:9,9,19
62:2,14,16 64:5,7
64:10,19,25 65:14
65:22 66:7 67:21
68:14,20 69:8
**walkout** 82:9
**want** 12:9 29:11
30:19,22 70:20
83:9
**wants** 12:9 46:12
57:17 70:23 72:25
76:17 83:6
**warm** 56:13
**wasn't** 49:2 81:8
**watch** 29:8
**water** 62:25
**way** 7:1 12:10,10
14:4 15:23 17:7
22:18 23:17 24:21
29:2 36:8 52:3
71:15 77:4 85:14
**Wayne** 59:1,10 60:6
63:21
**Wayne's** 59:21
**ways** 38:20
**wearing** 62:21
**weather** 11:7
**website** 22:21
**week** 79:15
**weekend** 81:7,9,14
**weekly** 57:3
**weeks** 51:8 83:9
**weighing** 78:24
**weighted** 58:24
**Weiss** 3:3 39:24
**welder** 78:22
**welding** 78:14,23

**went** 22:3 54:20
74:12
**West** 3:5
**WESTCHESTER**
85:4
**we'll** 43:14 44:10
**we're** 25:6 43:20
67:25 79:23
**we've** 4:13,22,22
12:7,8 35:8 54:3
**wheeling** 5:12 26:24
27:2
**WHEREOF** 85:16
**wholesale** 52:10
54:16
**whopping** 60:9
**wide** 51:20,20 71:5
**wife** 78:17 79:12
**willing** 46:10 67:12
**window** 68:14
**wipe** 73:4
**wise** 69:8
**wish** 22:16 35:17
**wishes** 39:7
**withdraw** 47:15
**witness** 4:25 5:24
11:10,10 85:16
**witnesses** 4:20 17:21
36:5 73:25 74:24
83:15
**women** 38:21
**wonderful** 50:25
51:1
**word** 22:17
**words** 37:12 41:19
41:20 52:6 61:14
80:16
**wore** 78:14
**work** 15:23 17:11
25:23 31:22 38:22
52:14 56:18 62:12
62:18 66:12 78:15
79:10,13 81:4,18
82:7,8,9
**worked** 78:12
**worker** 63:17 76:14

**workers** 25:6 31:11
39:24,25 44:6
52:15 58:18 59:21
60:11,21,22 63:5
63:12,16,21,23,23
63:25 64:1,4,15
65:9,13,17,23 66:8
67:10 74:17 80:10
81:21 82:5,19,21
83:2
**workforce** 36:20,21
52:20 65:6 66:5
68:12,24
**working** 49:8 51:17
62:15 63:7 78:13
78:23 79:10 81:13
**world** 71:23 78:20
79:19
**worried** 65:15
**worth** 77:13
**wrist** 62:22
**wrote** 17:22

**X**

**x** 1:3,8

**Y**

**yeah** 18:1
**year** 7:25 8:2 19:24
23:2,8,9,9,12,15
23:22 39:11 43:19
52:5,7 53:1,17,19
53:22 54:1,11
71:18 76:21
**years** 6:12 23:21
56:19 72:24 78:13
78:17,23,25 79:17
82:19,20
**yesteryear** 83:4
**York** 1:2,11,11 2:5,5
2:14,14,21,21 3:5
3:5 85:3,8
**youngest** 82:14

**Z**

**zero** 26:12 57:18
**Zuber** 78:22,22

79:16,22,25
**Zuber's** 79:15

**0**

**06** 58:19
**06-10354** 1:5

**1**

**1** 7:23 12:8 19:24
62:7 79:5
**10** 63:23
**10004** 1:11
**10017** 2:5
**10036** 2:14 3:5
**10038** 2:21
**101** 62:17 63:3
**11** 13:3,5 44:4 58:22
60:22 63:22 70:22
71:1 74:8,11,13
75:3,6,13,14,21,23
**11.05** 60:4,18 64:6
**1113** 4:7 12:14,17
14:15,25 15:17
17:23,24 18:3,5,13
18:15 20:10 23:12
24:5 25:16 28:16
34:3,4,12,13 35:8
35:10,18 37:8,15
37:17 38:18,21
39:1,9,20 40:14,14
41:18 42:1 43:2,11
43:16 44:15,25
45:11 46:1,8,17
47:3 50:1,13 51:8
52:6 53:13 54:21
56:10 57:10 59:1,8
61:19 63:20 64:8
64:13 69:23 75:17
83:9 84:2
**1113(b)(1)(a)** 47:19
**1113(d)** 45:2
**1114** 4:7 15:17 16:3
17:23,24 18:3
20:11 23:12 24:5
25:16 28:2 36:2,14
37:8,16,18,24 38:2
38:17 39:10 41:18

42:1 43:11 44:15
  51:8 69:15,22 70:9
  70:22,24 71:3
  75:23 76:1 77:6,9
  83:9
**1114's** 71:2,11
**1177** 2:14
**12** 13:12 58:20 78:23
  79:7
**12th** 18:22
**120** 16:7,10,13,17
**125** 68:22
**13th** 83:23
**14** 58:22
**1414** 84:3
**15** 59:18 78:24
**16** 79:13
**17** 26:5 55:25 57:12
**17.81** 59:4
**18** 12:19 14:14,16
  15:23 16:1,2,7,18
  17:15 39:11 80:4,9
**180** 2:20 16:10
**19** 32:17
**19th** 26:4,7
**19.62** 59:3
**1921** 78:12
**1988** 32:14 72:9,18
**1993** 71:24,24 72:4
  72:18

_____
**2**

**2** 8:14 12:7,8,9 64:1
  64:4
**2B** 58:20
**2.2** 24:23
**20** 79:15
**20th** 46:20
**2001** 8:1
**2005** 8:2 32:15,19
  46:20 60:7
**2006** 13:4,6 21:18
  60:7
**2007** 1:9 21:25 85:18
**210** 18:9
**211** 60:25

**216** 7:8
**22** 58:21 59:21 64:15
  64:17
**22.11** 59:3,4
**22.12** 59:2
**222** 2:5
**23** 64:15
**23rd** 22:2
**25** 25:2 59:23 77:22
  77:24 78:25 79:15
**26** 61:5
**27** 59:24 65:24
**27th** 60:24
**28** 12:19 14:14,16
  15:24 16:1,2,7,15
  16:18 17:16 39:11
**29** 61:2
**29th** 18:10 69:24
  70:1
**297** 65:23

_____
**3**

**3** 1:9 9:11 74:4
  78:24
**3/29** 32:11
**30** 57:4 72:15 78:23
**31** 47:20 50:24 69:25
  72:9
**32** 61:9,11
**33** 32:14 64:17
**330** 3:5
**341** 28:24
**35** 10:16 78:12 82:19
  82:20
**350** 77:11
**37** 61:10

_____
**4**

**4** 9:21 58:22
**40** 72:15 78:5 79:24
**400** 77:12
**405** 25:1
**41st** 2:5
**42nd** 3:5
**44114** 2:9
**463** 79:5
**49** 9:12 79:1

_____
**5**

**5** 10:19 56:22 80:18
  80:24
**50** 24:24 46:20 80:7
**51** 7:23 46:21
**54** 10:19
**540** 25:1
**57** 76:13
**58** 60:14

_____
**6**

**6** 11:15 14:11 63:24
**6.5** 80:8
**60** 79:2,17
**600** 60:21,23 61:23
  78:18
**65** 32:10,19
**66** 32:14 72:9 76:13
**67** 32:11
**68** 32:11
**693** 28:24

_____
**7**

**7** 56:25 63:25
**7th** 51:8,24
**70** 11:14 14:10 20:5
**747** 28:24
**75** 19:2 33:4 77:20
  79:3
**78** 77:10

_____
**8**

**8** 12:20 43:19 60:14
  80:5
**80** 16:7,13,17
**82** 79:9
**86** 78:17
**88** 71:25

_____
**9**

**901** 2:9
**93** 72:13

**EXHIBIT J**

Hearing Date and Time:  July 25, 2007 at 10:00 a.m.
Objection Deadline:  July 19, 2007 at 4:00 p.m.

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball (CB 8203)
Steven C. Bennett (SB 2746)
Pedro A. Jimenez (PJ 1026)

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Heather Lennox (HL 3046)
Robert W. Hamilton (RH 3130)

Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
                                            :
In re                                       :   Chapter 11
                                            :
Dana Corporation, et al.,                   :   Case No. 06-10354 (BRL)
                                            :
                                            :   (Jointly Administered)
                    Debtors.                :
                                            :
------------------------------------------------------------x
```

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF AN ORDER (A) APPROVING SETTLEMENT AGREEMENTS WITH THE UNITED STEELWORKERS AND UNITED AUTOWORKERS, PURSUANT TO 11 U.S.C. §§ 1113 AND 1114(E) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019, AND (B) AUTHORIZING THE DEBTORS TO ENTER INTO PLAN SUPPORT AGREEMENT, INVESTMENT AGREEMENT AND RELATED AGREEMENTS, PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), 364(C)(1), 503 AND 507

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................ 2

Jurisdiction ................................................................................................................ 6

Background ................................................................................................................ 6

    Procedural Background .......................................................................................... 6

    The Debtors' Efforts To Restructure Their Labor Costs And Legacy Obligations ..........8

        The Debtors' Unionized Workforce .............................................................. 8

        The Debtors' Non-Pension Retiree Benefits ................................................. 9

        The Debtors' Restructuring Initiatives ......................................................... 10

        The Debtors' Section 1113/1114 Proposals .................................................. 11

        The Section 1113/1114 Litigation ................................................................ 12

    The Global Settlement .......................................................................................... 13

        The Union Settlement Agreement ................................................................ 15

        The Plan Support Agreement ....................................................................... 27

        The Investment Agreement and the Investment Agreement Term Sheet ........... 30

Relief Requested ...................................................................................................... 37

Basis for Relief ........................................................................................................ 38

    The Global Settlement Should Be Approved .......................................................... 38

    The Global Settlement Represents a Sound Exercise of the Debtors' Business Judgment ............................................................................................................. 43

Memorandum of Law ............................................................................................... 48

Notice ...................................................................................................................... 48

No Prior Request ...................................................................................................... 49

Conclusion ............................................................................................................... 49

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*In re Aerovox, Inc.*, 269 B.R. 74 (Bankr. D. Del. 2001) ..................................................44

*Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939) ................................39

*In re Enron Corp.*, No. 02 Civ. 8489, 2003 WL 230838 (S.D.N.Y. Jan. 31, 2003) .....................39

*In re Hibbard Brown & Co., Inc.*, 217 B.R. 41 (Bankr. S.D.N.Y. 1998) ......................................40

*In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y. 1992) .......................................43, 44, 45

*In re Interco, Inc.*, 128 B.R. 229 (Bankr. E.D. Mo. 1991) .............................................................44

*In re Ionosphere Clubs, Inc.*, 100 B.R. 670 (Bankr. S.D.N.Y. 1989) ............................................43

*In re Ionosphere Clubs, Inc.*, 156 B.R. 414 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994) ..................................................................................................39, 40

*Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007) ...........................................................39, 40

*Nellis v. Shugrue*, 165 B.R. 115 (S.D.N.Y. 1994) ................................................................39, 40

*Official Committee of Unsecured Creditors of LTV Aerospace and Defense Co. v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) ................................43

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir. 1993) ..................................................................................................43

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) .....................................................................................39

*Purofied Down Products*, 150 B.R. 519 (S.D.N.Y. 1993) ............................................................40

*United Food & Commercial Workers Union v. Family Snacks, Inc. (In re Family Snacks, Inc.)*, 257 B.R. 884 (8th Cir. BAP 2001) ..............................................................38

*In re W.T. Grant Co.*, 699 F.2d 599 (2d Cir. 1983) .......................................................................40

### DOCKETED CASES

*In re Comdisco, Inc.*, Case No. 01-24795 (RB) ...........................................................................47

*In re Delphi Corp., et al.*, Case No. 05-44481 (RDD) (Jan. 12, 2007) ...................................46, 47

## TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Owens Corning*, Case No. 00-03837 (Bankr. D. Del. June 29, 2006) ..................................46

*In re USG Corp.*, Case No. 01-2094 (Bankr. D. Del. Feb. 23, 2006)............................................46

## FEDERAL STATUTES

11 U.S.C. §105(a) ........................................................................................................44

11 U.S.C. § 363(b) ......................................................................................................43

11 U.S.C. § 503(b)(1)(A) ............................................................................................46

11 U.S.C. § 1114(e) ....................................................................................................38

Fed. R. Bankr. Pr. 9019................................................................................................39

NYI-4003642v4

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Dana Corporation ("Dana") and 40 of its domestic direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for entry of an order pursuant to: (a) sections 1113 and 1114(e) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving and authorizing the Debtors to enter into a settlement agreement (the "USW Settlement Agreement") with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW") and a settlement agreement (the "UAW Settlement Agreement," and together with the USW Settlement Agreement, the "Union Settlement Agreement")[1] with International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW," and together with USW, the "Unions"); and (b) sections 105(a), 363(b), 364(c)(1), 503 and 507 of the Bankruptcy Code, approving and authorizing the Debtors to enter into: (i) a plan support agreement (the "Plan Support Agreement," attached hereto as Exhibit B), which includes as Exhibit A thereto a term sheet for certain key elements of a plan of reorganization (the "Plan Term Sheet") and as Exhibit B thereto a term sheet (the "Investment Agreement Term Sheet") setting forth the terms for a new investment in the reorganized Debtors of no less than $500 million and up to $750 million (the "Investment") by Centerbridge Capital Partners, L.P. ("Centerbridge") and certain additional parties (the "Plan Investors"); and (ii) an investment agreement between Dana and Centerbridge that will incorporate the terms of the Investment Agreement Term Sheet (the "Investment Agreement," and together with the Union Settlement

---

[1]    True and correct copies of the USW Settlement Agreement and the UAW Settlement Agreement are attached hereto collectively as Exhibit A.

Agreement and the Plan Support Agreement, the "Global Settlement").[2]  In support of the

Motion, the Debtors respectfully represent as follows:

<u>**Preliminary Statement**</u>

1.      During the course of the trial on the Debtors' Motion To Reject Their

Collective Bargaining Agreements and To Modify Their Retiree Benefits Pursuant to Sections

1113 and 1114 of the Bankruptcy Code [Docket #4672] (the "Section 1113/1114 Motion"), the

Debtors presented evidence that:  (a) the Debtors' U.S. operations have been hemorrhaging cash

at an alarming rate, which has resulted in over $2 billion in losses over the past 5 years; (b) the

Debtors are constrained to maintain significant business operations in the United States given the

size of the U.S. auto market as compared with the rest of the world and, equally importantly,

given that the overwhelming majority of the Debtors' customers are headquartered, and do the

majority of their business, in the U.S.; and (c) the Debtors cannot successfully restructure their

U.S. operations without addressing and resolving their escalating U.S. union labor and legacy

costs.  The Unions vigorously opposed the Section 1113/1114 Motion for numerous reasons,

including without limitation, the Unions' position that granting the relief requested in the Section

1113/1114 Motion would impose a great toll on Union retirees, whose retiree welfare benefits

would be terminated, as well as on Union active employees, whose wages and benefits would be

reduced.  In their response to, and during the trial on the Section 1113/11114 Motion, the Unions

made clear their intention to strike in the event that the Court granted the relief sought in the

Section 1113/1114 Motion.

---

[2]      The Investment Agreement Term Sheet, which is attached as Exhibit B to the Plan Support
Agreement, sets forth the material terms of the Investment Agreement.  The Debtors intend to file a true and correct
copy of the Investment Agreement prior to the hearing on the Motion.

2.    In the weeks since the conclusion of the trial on the Section 1113/1114 Motion, the Debtors, the Unions and Centerbridge have met and conferred on almost a continuous basis and negotiated tirelessly to address these issues and achieve a consensual resolution of the Union labor and retiree benefit issues that are the subject of the Section 1113/1114 Motion.  Given the certainty favored by the Unions over the source from which the Debtors would satisfy their obligations under the proposed resolution with the Unions, Centerbridge was brought into the negotiations as a potential source of long-term funding and because Centerbridge possesses extensive restructuring and automotive industry experience. Centerbridge is a well known and well respected private equity firm committed to the long-term success of a company in which it invests.

3.    The three party arm's length negotiations between the Debtors, the Unions and Centerbridge have resulted in a finely-balanced consensual resolution of the litigation surrounding the Section 1113/1114 Motion.  Indeed, the involvement and commitment of Centerbridge is and continues to be a condition to the willingness of the Unions to enter into the Global Settlement.  As discussed herein, Centerbridge already has satisfied itself with respect to its due diligence and, as a result, Centerbridge's commitment to make the Investment is firm through May 1, 2008, subject only to a customary "material adverse change" provision.  The Global Settlement benefits the Debtors' estates by (a) allowing the Debtors to achieve the cost savings necessary for them to exit from chapter 11 as a sustainable business capable of meaningfully competing in a distressed auto industry (while simultaneously avoiding labor unrest likely to ensue if the Section 1113/1114 Motion was granted) and (b) providing the Debtors with a source of funding from which to meet their obligations under the Union Settlement Agreement.

4.      Indeed, the Global Settlement addresses and resolves three issues vital to the Debtors' successful emergence from bankruptcy:  As detailed in the Plan Term Sheet, the Debtors have agreed to propose and prosecute a plan of reorganization that will contain certain terms that both the Debtors and the Unions consider essential to the Debtors' emergence from bankruptcy as a viable, going concern capable of sustaining profitable U.S. operations and supporting a unionized workforce.  In addition, as detailed in the Investment Agreement Term Sheet, the Global Settlement includes the issuance of preferred equity of between $500 million and $750 million, of which $500 million is committed by Centerbridge, that provides the means by which the Debtors will be able to fulfill their obligations under the Union Settlement Agreement.  Finally, as detailed in the Union Settlement Agreement, the Global Settlement provides for the compromise of the Section 1113/1114 litigation with the Unions and, more importantly, achieves significant cost savings (through, among other things, the elimination of an approximately $1 billion liability from the Debtors' balance sheet on account of Non-Pension Retiree Benefits (defined below) provided to Union retirees and active employees) that will allow the Debtors to markedly improve their overall EBITDA and mitigate the "cash burn" of the Debtors' U.S. operations.

5.      Under the terms of the Union Settlement Agreement, the Debtors and the Unions have agreed to modifications to the various collective bargaining agreements between the Debtors and the Unions that are expected (together with the consensual agreement related to the closure of two of the Debtors' unionized facilities) to save the Debtors in excess of $100 million per year based upon the modification of wages and benefits for active Union employees, the modification to certain work rules and the termination of Non-Pension Retiree Benefits (defined below) for the Debtors' Union retirees and active employees.  In exchange for these concessions,

the Debtors have agreed to, among other things, certain modifications to their MFO Program (defined below), buyout payments, implementing successorship provisions governing the sale of the stock or assets of any Organized Union Facility (defined below) and provide funding to separate, Union specific VEBAs to be established by each Union to provide long-term disability and retiree welfare benefits to eligible Union employees and retirees.

6.      Another key component of the Global Settlement (and a condition to the Unions' willingness to enter into the Global Settlement) was the Debtors' ability to provide greater certainty that the reorganized Debtors would emerge as a healthy, competitive enterprise and also have the wherewithal to make the payments to the Unions contemplated under the Global Settlement.  The Unions and the Debtors expressed confidence in Centerbridge's industry knowledge, competence and commitment to the Debtors' long-term health, as well as Centerbridge's ability to work constructively with the Unions—both now and in the future. Because of this confidence in Centerbridge and in order to ensure adequate resources to fund the Debtors' obligations under the Union Settlement Agreement, the Unions required, as a condition to their willingness to proceed with the Global Settlement, that Centerbridge serve as the lead investor and funding source.  As a result, the Debtors, the Unions and Centerbridge have spent the last several weeks negotiating the terms of the Global Settlement, as set forth in the constituent documents described more fully below.  The Debtors' agreements with Centerbridge discussed herein are a necessary and integral part of the Global Settlement.

7.      The Global Settlement represents the last hurdle in the Debtors' efforts over the last 15 months to address the issues that led them to seek relief under chapter 11 and, indeed, clears the way for the Debtors to formulate, negotiate, propose and prosecute a plan of reorganization within the timeframe established by the Bankruptcy Code.  At the same time, the

Global Settlement enables the Debtors to discharge their fiduciary responsibilities by allowing

the Debtors to pursue an alternative investment or alternative plan if, after considering all

relevant factors, a superior opportunity emerges (subject to the rights of the Unions described

herein and in Appendix R to the Union Settlement Agreement).  Accordingly, the Debtors

believe that their entry into the Global Settlement represents a sound exercise of their business

judgment and request that the Court approve and authorize the Debtors to enter into the Union

Settlement Agreement, the Plan Support Agreement and the Investment Agreement.

8.     In addition, the Debtors respectfully submit that the Global Settlement,

when viewed in the context of the goals the Debtors sought to achieve through the Section

1113/1114 Motion, satisfies the requirements of Bankruptcy Rule 9019 and, accordingly, should

be approved in all respects.

<u>**Jurisdiction**</u>

9.     This Court has jurisdiction to consider this matter pursuant to

28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The relief requested herein is made pursuant to sections 105(a), 363(b),

364(c)(1), 503, 507, 1113 and 1114(e) of the Bankruptcy Code and Rule 9019 of the Bankruptcy

Rules.

<u>**Background**</u>

<u>**Procedural Background**</u>

11.     On March 3, 2006 (the "<u>Petition Date</u>"), the Debtors filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code.  By an order entered on the Petition

Date, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are

being administered jointly.  The Debtors are authorized to continue to operate their businesses

and manage their properties as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.    On March 10, 2006, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors, pursuant to section 1102 of the Bankruptcy Code.  On June 27, 2006, the U.S. Trustee appointed an official committee of equity security holders, pursuant to section 1102 of the Bankruptcy Code, which committee subsequently was disbanded by the U.S. Trustee on February 9, 2007.  On August 31, 2006, the U.S. Trustee appointed an official committee of non-union retired employees (the "Retiree Committee"), pursuant to section 1114(d) of the Bankruptcy Code and as directed by an order of the Court entered on August 9, 2006 (Docket No. 2773).

13.    Debtor Dakota New York Corp. ("Dakota") is a New York corporation. Debtor Dana is the direct or indirect parent of Dakota and each of the other Debtors.  Dana maintains its corporate headquarters in Toledo, Ohio.  The Debtors and their nondebtor affiliates (collectively, the "Dana Companies") have over 100 leased and owned domestic business locations and have operations in approximately 25 states, as well as in Mexico, Canada, 11 countries in Europe and 14 countries elsewhere in the world.

14.    The Dana Companies are leading suppliers of modules, systems and components for original equipment manufacturers and service customers in the light, commercial and off-highway vehicle markets.  The products manufactured and supplied by the Dana Companies are used in cars; vans; sport utility vehicles; light, medium and heavy trucks; and a wide range of off-highway vehicles.

15.    As disclosed in Dana's Form 10-K filed on March 20, 2007, for the year ended December 31, 2006, the Dana Companies recorded revenue of approximately $8.5 billion and had assets of approximately $6.7 billion and liabilities totaling $7.6 billion.  As of the Petition Date, the Dana Companies had approximately 44,000 employees.

**The Debtors' Efforts To Restructure Their Labor Costs And Legacy Obligations**

The Debtors' Unionized Workforce

16.    As of January 1, 2007, the Debtors' unionized workforce was composed of approximately 6,500 employees working at 25 different U.S. facilities.  Of the 25 U.S. facilities, two—Lima, Ohio and Pottstown, Pennsylvania—were operating under an extension of an otherwise expired collective bargaining agreement with the UAW (the "UAW Master Agreement").  Several other U.S. facilities, including union facilities, were recently sold (or are scheduled to be sold) as part of the sale of the Debtors' engine hard parts and fluids businesses, which leaves five U.S. Union facilities with current and unexpired collective bargaining agreements (other than the UAW Master Agreement):  Auburn Hills, Michigan; Elizabethtown, Kentucky; Fort Wayne, Indiana; Henderson, Kentucky; and Marion, Indiana (these five facilities are referred to as the "1113 Facilities," and together with the Lima and Pottstown facilities, are collectively referred to as the "Organized Union Facilities").  Two other facilities, Rochester Hills, Michigan and Longview, Texas, are organized by the UAW pursuant to a partnership agreement between the Debtors and the UAW, but do not yet have ratified agreements (the "Newly Organized Facilities").[3]

---

[3]    Except for the Fort Wayne, Henderson and Marion facilities, where the USW is the bargaining agent, the UAW is the bargaining agent at the other facilities named herein.

17.    Except for employees covered under the UAW Master Agreement and employees at the Newly Organized Facilities, all Union employees at the 1113 Facilities are covered by separate collective bargaining agreements with respect to each such facility (together with the UAW Master Agreement, the "CBAs").

18.    All employees covered under a CBA currently receive a comprehensive package of benefits from the Debtors, including:  healthcare insurance (hospital, medical, surgical, dental, prescription drug, vision and hearing); short- and long-term disability; life and accidental death and dismemberment insurance; 401(k) coverage and/or a defined benefit pension plan; workers' compensation and other benefits.  For 2006, the total cost for wages paid and benefits provided to the Debtors' unionized workforce was approximately $405 million, or in excess of $60,000 per employee.

The Debtors' Non-Pension Retiree Benefits

19.    The Debtors currently provide non-pension retiree benefits (including hospital, medical, surgical, dental, prescription drug, vision, hearing and life insurance) (collectively, "Non-Pension Retiree Benefits") to all eligible active and retired union employees and/or their spouses and dependents at facilities were such benefits are or were negotiated.  Such Non-Pension Retiree Benefits are "retiree benefits" within the meaning of section 1114(a)(1) of the Bankruptcy Code.  As of January 1, 2006, approximately 16,415 individuals received Non-Pension Retiree Benefits from the Debtors under CBAs (or were active union employees currently covered under provisions of the CBAs that provide a benefit upon retirement).  Of these 16,415, approximately 7,200 are associated with manufacturing facilities that have either

been sold or closed.[4]  As of December 31, 2006, the Debtors' Accumulated Post-Employment

Benefit Obligation ("APBO") for Non-Pension Retiree Benefits for Union employees and

retirees was approximately $1 billion.

20.    As of December 31, 2006, Debtors' 2006 cash cost for providing Non-

Pension Retiree Benefits to their Union employees and retirees was approximately $80 million,

and the Debtors' corresponding periodic cost or expense reflected on their income statement on

account of Non-Pension Retiree Benefits for Union employees and retirees was approximately

$63 million.

The Debtors' Restructuring Initiatives

21.    Based on analyses and diligence that the Debtors (with the assistance of

their advisors) began during the first part of 2006, on October 17, 2006, the Debtors outlined the

key components of what they believed was necessary to emerge from chapter 11 as a viable

business.  Specifically, the Debtors communicated to the Unions, the Creditors Committee and

other key constituencies that the Debtors needed to achieve annual cost savings or revenue

enhancement of approximately $405 to $540 million, which the Debtors believed they could

achieve from five separate areas.  First, the Debtors stated a need to restructure some of their

unprofitable or below market contracts with customers, from which the Debtors anticipated they

could achieve approximately $175 to $225 million in annual revenue improvements.  Second, the

Debtors identified additional savings they believed could be realized by capitalizing on the

Debtors' lower cost manufacturing capabilities by shifting work, where possible, from high-cost

operations to low-cost countries.  In this regard, the Debtors developed a manufacturing footprint

---

[4]    The Unions have served as the "authorized representative," as defined in section 1114 of the
Bankruptcy Code, for those persons receiving Non-Pension Retiree Benefits who were formerly employed at the
Union Facilities, as well as union retirees receiving Non-Pension Retiree Benefits, and who were affiliated with a
facility that has since been closed or sold.

optimization program ("MFO Program"), pursuant to which the Debtors would shift manufacturing capacity from high cost plants in the U.S. to Mexico and other countries, and from which the Debtors estimated they could achieve approximately $60 to $85 million in annual cost savings. Third, the Debtors identified various overhead costs that they believed could reduce or completely eliminate, and which would yield an additional $40 to 50 million in annual cost savings. Fourth, the Debtors developed a plan to reduce their labor costs associated with their union and non-union workforce, which the Debtors believed could result in additional $60 to $90 million in annual cost savings. Finally, the Debtors proposed the elimination of Non-Pension Retiree Benefits for both union and non-union retirees (as well as any anticipated coverage for both union and non-union active employees), which the Debtors estimated would result in an additional annual cost savings of approximately $70 to $90 million.

22.    The $130 to $180 million in savings the Debtors sought to realize from labor and legacy costs was composed of the following: (a) modifications to certain benefits and programs offered to non-union active employees beginning on January 1, 2007; (b) elimination of Non-Pension Retiree Benefits for non-union active employees and retirees; (c) elimination of Non-Pension Retiree Benefits for union retirees and active employees; and (d) modifications to the CBAs (wages, as well as certain benefits and programs offered to union active employees).

The Debtors' Section 1113/1114 Proposals

23.    During November and December 2006, the Debtors made proposals to the Unions under section 1113 of the Bankruptcy Code with respect to each 1113 Facility (each, a "Section 1113 Proposal"). Similarly, during that time and followed up by revised proposals made in January 2007, the Debtors made proposals to the Unions under section 1114 of the Bankruptcy Code with respect to Non-Pension Retiree Benefits provided by the Debtors to

retired Union employees and/or their spouses and dependents and to eligible Union employees

upon retirement (each, a "Section 1114 Proposal").[5]

24.     In summary, the Section 1113 Proposals sought (a) wage modifications at

the 1113 Facilities; (b) implementation of a "Two Tier" wage structure at all facilities;

(c) migration to a consumer-driven health benefit program; and (d) modifications to certain work

rules and benefits.  The revised Section 1114 Proposals delivered to the Unions, like those

delivered to the Retiree Committee and the IAM, contemplated the elimination of Non-Pension

Retiree Benefits for Union retirees and active employees upon retirement and, in its place, the

establishment of a VEBA from which participating retirees can receive a subsidy towards the

cost of their healthcare.

The Section 1113/1114 Litigation

25.     On January 31, 2007, the Debtors filed their Section 1113/1114 Motion.[6]

The trial on the Section 1113/1114 Motion began on March 12, 2007.  Prior to the

commencement of the trial, the Debtors announced that they had reached consensual agreements

with both the IAM (with respect to the issues in the Section 1113/1114 Motion) and the Retiree

Committee (with respect to both the section 1114 portion of the Section 1113/1114 Motion and

the Unilateral Termination Motion).  The settlement with the IAM was approved by an order

entered on April 27, 2007 [Docket # 5180], and the settlement with the Retiree Committee was

approved by an order entered on May 22, 2007 [Docket # 5356].

---

[5]     Both prior to and after delivering the Section 1113 and Section 1114 Proposals to the Unions, the Debtors met with Union representatives and provided information to the Unions for the purpose of their evaluation of the proposals.

[6]     The Debtors also filed a motion under section 363 of the Bankruptcy Code for entry of an order authorizing the Debtors to terminate Non-Pension Retiree Benefits for their non-union active employees and retirees (the "Unilateral Termination Motion").

26.     The trial on the Section 1113/1114 Motion continued on March 26, 27, 28 and 29, 2007 and concluded on April 3, 2007.  On April 13, 2007, both the Debtors and the Unions submitted their proposed findings of fact and conclusions of law to the Court.  The Court was scheduled to render a decision on the Section 1113/1114 Motion on April 30, 2007.  However, by virtue of four extensions requested jointly by the Debtors and the Unions, the Court has deferred rendering a decision on the motion until July 6, 2007.

**The Global Settlement**

27.     After concluding the trial on the Section 1113/1114 Motion, the Debtors, the Unions and Centerbridge have engaged in extensive and exhaustive collective bargaining in connection with negotiating an overall resolution of the Union labor, retiree and operational issues that have plagued the Debtors' U.S. operations and which, if resolved, would enable the Debtors to move forward with a plan of reorganization and satisfy the Unions' desire to protect the interests of their members and retirees to the greatest extent possible given the circumstances.  The Global Settlement is the result of these numerous meetings and conferences and the parties' good faith negotiations and arm's length bargaining.  In structuring the Global Settlement, the Debtors sought to achieve several principal objectives:  (a) the reduction of union labor costs and Non-Pension Retiree Benefits within the range needed for the Debtors to achieve long-term viability; (b) the extension of the terms of the various CBAs; (c) the resolution of the section 1113/1114 litigation between the Debtors and the Unions; (d) the mitigation of the risk of a likely strike or other actions in the event that the Court granted the relief requested under section 1113 of the Bankruptcy Code; and (e) the orderly closure of the Debtors' Syracuse and Cape Girardeau facilities.  The Debtors believe that the Global Settlement achieves each of these stated objectives.

28. The Unions also had several objectives that they sought to achieve as part of the Global Settlement: (a) to maintain as many current and future jobs as possible at the Union facilities; (b) to provide additional job security for both current and future Union employees; (c) to minimize the effect of the restructuring initiatives on retirees; (d) to assure that the Debtors emerge from bankruptcy with limited leverage and adequate liquidity to sustain the business in what likely will continue to be a distressed auto industry; (e) to secure a reputable funding source (with significant restructuring, private equity and automotive expertise) for the various contributions the Debtors are required to make under the Union Settlement Agreement that can work constructively with the Unions and is prepared to provide leadership expertise, intended to insure the long-term success of the business; and (f) establish the groundwork for a new labor relations model between the parties.

29. Because of the magnitude of the Debtors' objectives and the complicated nature of, and conditions to, the consensual resolution of the Section 1113/1114 Motion, the Global Settlement is a complex and finely balanced resolution of the parties' competing interests. It is comprised of three constituent agreements: the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement.

30. The following description is a summary only of certain material aspects of the Global Settlement and does not purport to summarize all of the key terms of the constituent agreements. Moreover, because the following description summarizes complex terms, it is by nature neither as detailed nor as precise as the constituent documents. Accordingly, the following description is qualified in its entirety by reference to the three agreements, which control any interpretation of the Global Settlement, and to which the reader is respectfully directed.

The Union Settlement Agreement

31.    The Union Settlement Agreement provides comprehensive terms for the extension of the CBAs, wage structure modifications, benefit modifications, work and scope rule changes and elimination of Non-Pension Retiree Benefits for both Union employees and retirees that will generate in excess of $100 million in annual expense savings for the Debtors.  Specific terms of the Union Settlement Agreement include:

| New Expiration Date of CBAs and new agreements at Newly Organized Facilities | June 1, 2011 |
|---|---|
| Wage Structure Modifications (Appendix O and Letter No. 4) | Effective on the first Monday following approval of the Union Settlement Agreement, the Debtors will implement a two-tier wage at all Union facilities where the first tier of wages exceeds the Tier 2 rate listed below.  Subject to certain exceptions, existing tiered wage structures at Union facilities will be eliminated and replaced with the new two-tier wage structure listed below.

For Tier 1 employees at the Debtors' Lima, Pottstown, Fort Wayne, Marion and Henderson facilities, the Debtors and the Unions have agreed to the following:

•Effective July 7, 2008, pay each Tier I employee a 2% lump sum of earnings (minimum $1,000), exclusive of shift premium, during the fifty-two (52) pay periods ending Sunday, June 22, 2008;

•Effective July 6, 2009, pay each Tier I employee a 1-1/2% lump sum of earnings (minimum $750), exclusive of shift premium, during the fifty-two (52) pay periods ending Sunday, June 21, 2009; and

•Effective January 4, 2010, each Tier I employee from locations noted above shall be granted a one and one-half percent (1.5%) General Wage Increase.  The method of accomplishing this shall be to add one and one half percent (1.5%) to the base hourly rate of each Tier I employee's job classification |

| | including the minimum and maximum rates for spread rate classifications (if applicable) exclusive of shift premiums. |
| | The Tier 2 rates are as follows: |
| | 0-52 weeks  $14.00/hr.<br>53-104 weeks  $14.50/hr.<br>105-156 weeks  $15.00/hr.<br>157+ weeks  $15.50/hr. |
| | For those Tier 2 employees receiving $15.50/hr. for at least one year as of July 1, 2009, increase of $.50/hr. in lieu of general wage increase for Tier 2 employees, and add a fourth year to the progression. |
| | Tier 2 wages will also apply to all Fort Wayne Union employees currently on layoff. |
| | Tier 2 wages will not apply to skilled trade classifications or to the technical employees in the office unit at Pottstown. |
| Health Insurance for Active Employees (Appendix Q) | Effective January 1, 2008, active Union employees at the Lima, Pottstown, Henderson and Marion facilities will be covered under the Debtors' HealthWorks medical insurance plan, as modified by Appendix Q. |
| | Active Union employees at all other Union Facilities will be covered under the HealthWorks medical insurance plan in substantially the same manner as provided to all other employees at facilities where HealthWorks is already offered to employees. |
| | Premium contributions to be paid by Union employees will be adjusted on January 1 of each year beginning January 1, 2009, provided that the premium increase will not exceed six percent (6%) in any one year. |
| Long-Term Disability Insurance (Appendices K and Q) | Beginning on the later of January 1, 2008, and the effective date of a plan of reorganization for the Debtors, the Debtors will terminate long-term disability benefits for all Union employees who are currently receiving long-term disability benefits as of that date or have begun a period of disability that will result in qualification for long-term disability benefits. Pursuant to the terms of the Union Settlement |

| | |
|---|---|
| | Agreement, the Debtors will make a contribution to separate, Union-specific VEBAs to be established by the Unions in respect of any Union employees whose long-term disability benefits are terminated. |
| | For active Union employees at Lima, Pottstown, Henderson and Marion not covered under the prior paragraph, beginning January 1, 2008, long-term disability benefits shall be equal to that provided to all other employees, except for the following modifications:  (i) waiting period for long-term disability benefits is 26 weeks, (ii) benefit of 50% of average weekly earnings, (iii) Union employee must be wholly prevented from engaging in any regular employment at the facility where he/she is employed and not otherwise engaged in any other regular employment for pay or profit, and (iv) benefit duration is "time-for-time" except for those employees with 10+ years of service with the Debtors who shall receive benefits until such employee reaches early or normal retirement age. |
| | For all other Union employees, effective January 1, 2008, long-term disability benefits are modified as follows:  (i) 24 week waiting period for benefits, (ii) benefit of 50% of annual wages, with a maximum benefit of $5,000/month and minimum benefit of $100/month, (iii) maximum duration of benefits is 2 years, and (iv) Union employee must be unable to perform the material and substantial duties of regular job, have a 20% or more loss in monthly earnings and be under regular care of a physician. |
| Short-Term Disability Insurance (Appendix Q) | Effective January 1, 2008, short-term disability benefits to Union employees shall be the same as that provided to all other employees except for the following modifications:  (i) waiting period for benefits is 1st day for accident or hospitalization and 8th day for illness, (ii) benefit payable is 60% of average weekly earnings for up to 26 weeks, (iii) no lifetime maximum benefit limitation, and (iv) total benefits cannot exceed 70% of weekly earnings |

| | on account of other sources of income. |
|---|---|
| | Union employees already receiving short-term disability benefits that commenced prior to January 1, 2008, and who become eligible for long-term disability, will continue receiving benefits under applicable plan in force until their period of eligibility for short-term disability benefits expires. |
| Life/AD&D Insurance (Appendix Q) | Beginning on January 1, 2008, life insurance will be provided to Union employees in the amount of one and one-half times base annual wages.  Accidental death and dismemberment insurance will be provided in the amount of 75% of the amount of base annual wages. |
| Non-Pension Retiree Benefits and Establishment of VEBAs (Appendix K) | Beginning on the later of January 1, 2008, and the effective date of a plan of reorganization for the Debtors, the Debtors will cease providing Non-Pension Retiree Benefits to Union retirees and active employees. |
| | In connection with the treatment of existing long-term disability benefits (discussed above) and Non-Pension Retiree Benefits for Union retirees and active employees, the Debtors have agreed to contribute an amount not to exceed $704 million plus approximately $80 million of new common stock of reorganized Debtors (subject to the allocation set forth in Appendix K to the Union Settlement Agreement) to separate, Union specific voluntary employer benefit associations ("VEBAs") to be established pursuant to the Union Settlement Agreement by each Union and maintained in the manner set forth in Appendix K. |
| | The amount of the contribution to be made to each VEBA is subject to reduction for the amount of long-term disability claims or Non-Pension Retiree Benefit claims actually paid by the Debtors after July 1, 2007 and before January 1, 2008. |
| Pension Benefits (Appendices L and M) | Effective on the later of January 1, 2008, or the effective date of a plan of reorganization for the Debtors (the "Freeze Date"), all future pension "credited service" and benefit accruals |

| | under Union pension plans will be frozen, except for the pension plan for Syracuse, which is covered under a plant closing agreement. |
| | With respect to pension benefits based on credited service going forward, the Debtors have agreed to contribute on a monthly basis to the Steelworkers Pension Trust a fixed amount per covered employee's "Contributory Hours" (as such term is defined in the relevant plan documents) for Union employees at the Elizabethtown, Auburn Hills, Pottstown, Lima, Fort Wayne, Marion, Henderson, Rochester Hills and Longview facilities.  The amount of the contribution during the first year following the effective date (defined as the later of January 1, 2008, or the date immediately following the effective date of the freeze of the Debtors' pension plans) is $.60 for each covered employee's "Contributory Hours", with the amount of the contribution increasing to $.80 in the second year, and $1.00 beginning in the third year and continuing to the expiration of the CBAs. |
| Local Bargaining | In the negotiation of the individual location agreements, the Unions and their local leadership have agreed to modifications that provide the Debtors with an aggregate net additional $6.2 million in verifiable savings per year. |
| Buyouts (Appendix L) | A one-time payment will be available to: (i) Union employees, neither on long-term disability status at the time they retire nor who, upon retirement, would be commencing a benefit from terminated vested status, at the Debtors' Lima, Pottstown or Marion facilities, who satisfied the eligibility requirements for retirement under the applicable Union pension plan covering such employees and who retire or have retired beginning May 26, 2007 and extending for 90 days past the Freeze Date; (ii) Union employees, neither on long-term disability status at the time they retire nor who, upon retirement, would be commencing a benefit from terminated vested status, covered under the CBA for the Fort Wayne traction |

|  | manufacturing facility who are Tier 1 employees and who satisfied the eligibility requirements for retirement under the applicable Union pension plan for Fort Wayne employees, and who retire or have retired beginning May 26, 2007 and extending for 90 days past the Freeze Date; and (iii) Union employees, neither on long-term disability status at the time they retire nor who, upon retirement, would be commencing a benefit from terminated vested status, at the Debtors' Lima, Pottstown, Marion facilities or at the traction manufacturing facility in Fort Wayne who retired from employment with the Debtors on or after January 1, 2007 and prior to May 26, 2007.  In the case of the Fort Wayne facility, in order to be eligible under subparagraph (ii) above, a Union employee must have, in addition, been at work on January 1, 2007 and must continue to be at work in that location as of May 1, 2007. |
|---|---|
|  | For eligible employees in groups (i) and (ii), the amount of the buy out payment will be $45,000.00.  For eligible employees in group (iii), the amount of the buyout payment will be $22,500.00.  Any such payments will be reduced by any applicable withholdings and deductions required by law. |
|  | A one time payment not to exceed $2.5 million in the aggregate will also be made available to Union employees at the Fort Wayne plant who on the Freeze Date have less than 20 years of pension credited service.  The portion of the $2.5 million payment to be paid to each participant is to be determined by the local Union leadership for the Fort Wayne facility, based on each employee's credited service as a portion of the total pension credited service held by all employees eligible to receive such a payment. |
| Marion Facility Special Voluntary Separation Program (Appendix N) | In connection with the Debtors' relocation of the production of end yokes currently manufactured in the Marion facility, a lump sum payment equal to 52 weeks of pay at the base rate of pay (less any expected |

| | unemployment compensation during that period) will be paid to eligible employees at the Marion facility who agree to participate in the Special Voluntary Separation Program. |
|---|---|

32.    The Debtors believe that the wage and benefit modifications described above result in savings within the range that the Debtors need to achieve a competitive cost structure.

33.    In addition to the cost savings described above, the Union Settlement Agreement memorializes other important agreements between the parties:

| | |
|---|---|
| Successorship (Appendix A) | The Debtors and the Unions have agreed to include a provision in each CBA that requires that certain conditions must be satisfied prior to or in conjunction with the closing of any sale or other type of transfer of any Union plant or facility. |
| Neutrality (Appendix B and Letter No. 1) | The Debtors and the Unions have agreed on a form of agreement that governs the conduct of the parties with respect to any current or future non-Union facilities (except for Owensboro, Kentucky, Gordonsville, Tennessee and Orangeburg, South Carolina) at which one of the Unions undertakes activities to represent employees at those facilities. |
| MFO Program (Appendix C) | The Debtors and the Unions have agreed that the Debtors will continue with their announced MFO Program, with the following modifications:  (i) 138 heavy duty assembly jobs will be moved from the Louisville, Kentucky and Brantford, Ontario facilities to the Lima facility; and (ii) when the production of end yokes is moved from the Marion facility, the Debtors will replace 60 jobs that would otherwise be lost by that move. |
| Employment Security (Appendix D) | The Debtors and the Unions have agreed that, prior to the Debtors implementing any layoffs at Union facilities, the Debtors will discuss with the Unions the need for, and plan related to, any proposed layoffs, and will entertain any |

| | |
|---|---|
| | alternatives identified by the Unions. |
| Future Opportunity/Underutilized Facilities (Appendix E) | The Debtors and the Unions have agreed to a program whereby new work intended to be performed by the Debtors in the United States will be given to a particular Union Facility specializing in such type of work if certain conditions are met. |
| | In addition, with respect to certain Econoline machining work currently performed at the Fort Wayne facility, the Debtors and the Unions have agreed that, in the event the customer decides to perform such work in-house, the Debtors will give the Fort Wayne facility first priority for future traction business machining work that the Debtors intend to perform in North America; provided that the work can be performed at the Fort Wayne plant in a manner that would not be materially detrimental to the financial or competitive viability of the North American traction business. |
| | The Debtors have also agreed that, with respect to any underutilized facility, they will consider sourcing existing or new work that can be performed by an underutilized facility to such facility. |
| Interplant Job Opportunities (Appendix F) | The Debtors and the Unions have agreed that, with respect to any Union employee that has two or more years of service and is on continuous layoff for at least 60 days, such employee shall be given priority over new hires for job vacancies at facilities other than the facility from which he/she is on layoff. |
| Sourcing (Appendix G) | The Debtors and the Unions have agreed that, with respect to work currently sub-contracted or outsourced from the Lima, Pottstown, Fort Wayne, Henderson, Elizabethtown and Auburn Hills facilities, the Debtors will make reasonable attempts to in-source such work when the work can be completed on a cost-competitive basis. The parties have also agreed to establish a process for addressing future sourcing issues. |

| National Healthcare Network (Appendix Q1) | The Debtors and the Unions have agreed to replace the Debtors' current healthcare networks with a single national network of healthcare providers effective January 1, 2008. The decision of whether to make such change will include consideration of a number of factors set forth in Appendix Q1 to the Union Settlement Agreement. |
|---|---|
| Post-Emergence Bonus (Appendix J) | The Debtors and the Unions have agreed that shares of new common stock of reorganized Dana having a value not to exceed $22.530 million shall be reserved for the purpose of providing a bonus to certain Union employees as soon as practicable following the Debtors' emergence from chapter 11. The amount of shares to be reserved shall be determined based on the value per common share set forth in the disclosure statement for the Debtors as approved by the Court. |
| Section 1114(g)(3) Rights | The Unions have agreed that they will not file or support any subsequent motion or modification of Non-Pension Retiree Benefits pursuant to section 1114(g)(3) of the Bankruptcy Code. |
| Assumption of the CBAs | The CBAs, as modified by the Union Settlement Agreement, shall be assumed by the applicable Debtor on the effective date of a plan of reorganization for the applicable Debtor. |
| Conditions to Effectiveness | The Debtors and the Unions have agreed that the Global Settlement shall not become effective until the occurrence of the following events: (a) approval by the respective Unions in accordance with their designated processes; (b) execution of the Investment Agreement; (c) execution of the Plan Support Agreement; (d) approval by this Court of the Union Settlement Agreement; (e) withdrawal of the Section 1113/1114 Motion, which, so long as the Union Settlement Agreement has not been terminated, will be with prejudice; (f) ratification of the USW's first labor agreement covering employees at Humboldt, Tennessee; and (g) completion of the expedited organizing process at Sterling, Illinois and Milwaukee, |

| | Wisconsin. |
|---|---|
| Termination Events (Appendix R) | The Union Settlement Agreement specifies certain rights that the Unions will have in the event that the Debtors choose to pursue a transaction or other means of a reorganization different than the transaction contemplated with Centerbridge or Centerbridge terminates the Investment, as follows: |
| | If the Debtors choose to pursue an Alternative Minority Investment (defined below), then such investment shall be subject to the Unions' consent, such consent not to be unreasonably withheld.  With respect to such consent, the Unions have the right to conduct expedited due diligence (the Unions will use reasonable best efforts to complete such due diligence within 3 weeks), and the Debtors and the alternative investor are to cooperate fully in such due diligence.  If the Unions do not consent, the matter is to be mediated, and if not resolved, addressed through mandatory labor arbitration.  If the arbitrator finds that the Unions acted reasonably in withholding their consent and the Debtors nonetheless decide to proceed with the proposed alternative investment, then the Unions may choose to either (i) issue a notice of termination, which shall constitute notice that all CBAs have been terminated as of the date set forth in such notice, and which shall give rise to the Unions' right to strike upon such termination; or (ii) not issue a notice of termination, in which case the Unions will have an allowed administrative expense claim of $704 million and a stock distribution of approximately $80 million to be contributed to the respective VEBAs (subject to allocation between the Unions as described in Appendix R to the Union Settlement Agreement), or as otherwise directed to be paid by the Unions in the event that their respective VEBA has not yet been established.  If the arbitrator finds that the Unions acted unreasonably in withholding their consent, the Debtors can proceed with the proposed alternative investment and the Union Settlement Agreement remains in place.  Any |

action to enforce or vacate the arbitral award shall be an action under Section 301 of the Labor-Management Relations Act of 1947. The Debtors reserve the right to commence such action in the Bankruptcy Court.

If Centerbridge terminates the Investment contemplated under the Investment Agreement Term Sheet (other than as a result of a breach by the Debtors), then the Unions may, within 30 days of notice of Centerbridge's termination, designate a replacement investor; provided, however, that if the 30 day period has not run by September 3, 2007, then the Debtors may file a plan of reorganization that will be later amended to incorporate the replacement investor, subject to the provisions below. The Debtors have the right to consent to any such replacement investor, such consent not to be unreasonably withheld. Any disputes over whether the Debtors acted reasonably in withholding their consent shall be decided by mandatory arbitration. If the arbitrator finds that the Debtors acted unreasonably, then the Debtors will be required to accept the replacement investor. If the Unions fail to identify a replacement investor or the arbitrator finds that the Debtors acted reasonably, then the Debtors are authorized to pursue an alternative plan of reorganization so long as such plan is consistent with the Union Settlement Agreement, and the Union Settlement Agreement remains in place.

Except in the case of the events described above, if the Debtors pursue a transaction other than the Investment set forth in the Investment Agreement Term Sheet (including an Alternative Majority Investment (defined below) or the sale of substantially all of the Debtors' assets and any similar transaction), then such alternative transaction shall be subject to the Unions' consent, as well as the arbitration and review procedures set forth above for an Alternative Minority Investment. If the arbitrator determines that the Unions acted reasonably in withholding their consent and Dana nevertheless proceeds with such

alternative transaction, the Unions may either (i) elect to terminate the Union Settlement Agreement, in which case the Unions shall have the right to strike and shall have a general unsecured claim in the amount of $908 million (subject to allocation between the Unions as described in Appendix R to the Union Settlement Agreement) (the "Unions' Claim"), and Non-Pension Retiree Benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing such termination and setting forth the terms of the distribution of the Unions' Claim or (ii) elect not to terminate, in which case the Union Settlement Agreement shall remain in effect and the Unions may elect to have the Unions' Claim or a cash payment of $704 million and a stock distribution of approximately $80 million (the "Unions' Election") to be paid to their respective VEBA (subject to allocation between the Unions as described in Appendix R to the Union Settlement Agreement) or as otherwise directed by the Unions in full satisfaction of the Unions' Claim.  If the arbitrator finds that the Unions acted unreasonably in withholding their consent, then the Debtors may proceed with the alternative transaction and the Unions may make the Unions' Election in full settlement of the Unions' Claim.

For any other event of termination under the Investment Agreement Term Sheet, including the filing of a stand-alone plan of reorganization, the Unions may either (i) elect to terminate the Union Settlement Agreement, in which case the Unions shall have the right to strike, and Non-Pension Retiree Benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing such termination and setting forth the terms of the distribution of the Unions' Claim; or (ii) elect not terminate, in which case the Union Settlement Agreement shall remain in effect and the Unions may make the Unions' Election in full satisfaction of the Unions' Claim.

| | |
|---|---|
| | If the Debtors' chapter 11 cases are dismissed, then the parties will return to the status that existed immediately before the filing of the Section 1113/1114 Motion and execution of the Union Settlement Agreement.<br><br>In the event that the Debtors' chapter 11 cases are converted to cases under chapter 7, then the Debtors will seek that any order of conversion will provide for an allowed administrative claim in the amount of $704 million for the payment of Non-Pension Retiree Benefits. |
| Executive Compensation Appeal | The Unions will withdraw with prejudice their appeal in respect of the Debtors' executive compensation, annual incentive plan, and long term incentive plan that is currently pending in the United States District Court for the Southern District of New York. |
| Dispute Resolution | The parties have agreed that any disputes concerning the interpretation of the Union Settlement Agreement (except for any disputes arising under any individual location Union agreement or other Union agreement) shall be subject to final and binding arbitration. |
| Plan of Reorganization | The Debtors' plan of reorganization will: (i) provide for the assumption by the Debtors of all CBAs and the Union Settlement Agreement; (ii) provide for the funding to the respective VEBAs required under terms of Union Settlement Agreement; (iii) be in a form and substance reasonably acceptable to the Unions; (iv) conform to the Union Settlement Agreement; (v) incorporate the Investment specified in Investment Agreement Term Sheet; and (vi) include the Unions and their representatives in any exculpation and release provisions applicable to, and on same terms as, the Debtors and their officers and directors. |

<u>The Plan Support Agreement</u>

34.     Another fundamental, necessary and inextricable component of the Global Settlement is the Plan Support Agreement.  Both the Plan Term Sheet and the Investment Agreement Term Sheet are exhibits to the Plan Support Agreement.

35.     The Plan Support Agreement, which was entered into by the Debtors, the Unions and Centerbridge, provides that the Debtors will (i) file a motion to obtain approval of the Global Settlement, including the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement; (ii) file a disclosure statement and plan of reorganization consistent in all respects with the Plan Term Sheet and in a form reasonably acceptable to Centerbridge on or before September 3, 2007; (iii) obtain an order confirming such plan of reorganization on or before February 28, 2008; and (iv) consummate such plan of reorganization by May 1, 2008.

36.     The Plan Support Agreement also sets forth the understanding and agreement by the parties that the Unions and Centerbridge:  (a) will support and not oppose a disclosure statement or plan of reorganization that contains the terms in the Plan Term Sheet; (b) will negotiate in good faith with the Debtors to finalize a disclosure statement, plan of reorganization and related definitive documentation consistent with the terms in the Plan Term Sheet; and (c) in the case of Centerbridge, that it will negotiate in good faith and use reasonable best efforts to finalize the Investment Agreement by July 19, 2007.

37.     The Plan Support Agreement identifies various conditions under which it can be terminated:  (i) automatically, if either the Investment Agreement or the Union Settlement Agreement is terminated; or (ii) unless waived, if the plan of reorganization fails to become effective on or before May 1, 2008.

38.    The Plan Term Sheet (Exhibit A to the Plan Support Agreement), in turn, outlines certain key terms for a plan of reorganization consistent with the terms of the Global Settlement.  In particular, the Plan Term Sheet provides for the following:

| | |
|---|---|
| New Investment | Contemplates the investment to be made in the reorganized Debtors on the terms and conditions set forth in the Investment Agreement Term Sheet |
| Exit Facility | The Debtors shall obtain an exit facility with parties and on market terms reasonably acceptable to Centerbridge sufficient to refinance the Debtors' DIP facility and provide sufficient liquidity for working capital and general corporate purposes. |
| Settlement with Unions | The Debtors' plan of reorganization will conform to the Union Settlement Agreement in terms of providing the source and amount of cash required to meet the Debtors' obligations under the Union Settlement Agreement. |
| Treatment of Unsecured Creditors | Unsecured creditors (except for the Unions) will receive their pro rata portion of shares of common stock of reorganized Dana and/or cash in excess of the minimum cash required to operate the Debtors' business.  Distributions to the Unions will be governed by the terms of the Union Settlement Agreement. |
| Initial Management of the Debtors | The reorganized Debtors shall negotiate market employment agreements with senior management, which shall be in form and substance acceptable to Centerbridge. |
| Tax Attributes | Unless otherwise agreed to by the Debtors and Centerbridge, the plan of reorganization and any investments thereunder shall be structured in a manner so as to preserve the Debtors' net operating losses. |
| Restrictions on Sales of Pre-Emergence | The Debtors are permitted to sell core businesses only with consent of the Unions or Centerbridge. |
| Restrictions on Sales Post-Emergence | Restrictions on the reorganized Debtors' ability to sell core businesses (whether through stock or asset sales) are to be addressed in individual CBAs. |
| Outside Effective Date | May 1, 2008 |

| | |
|---|---|
| Union VEBAs | The Debtors' plan of reorganization will provide for payment of cash to be paid into the VEBAs established by the Unions in connection with the Debtors' obligations under the Global Settlement. |
| Pension Benefits | The Debtors' plan of reorganization will not provide for or be conditioned upon the distress or standard termination of any of Debtors' union pension plans.  In addition, the Debtors agree to oppose any involuntary termination of such plans. |
| Assumption of CBAs and Other Agreements | The Debtors' plan of reorganization will provide for the assumption of the CBAs, the Neutrality Agreement and any related agreements necessary to effect the Union Settlement Agreement. |
| Takeover Protections | The reorganized Debtors will have a customary rights plan but will not have a classified board of directors. |
| Post-Emergence Leverage Limitation | Not to exceed $1.5 billion. |
| Minimum Emergence Liquidity | An amount reasonably acceptable to the Unions and Centerbridge. |
| LTD Claims | For Union members receiving long-term disability claims, such claims will be deemed settled under the Union Settlement Agreement and not entitled to vote to accept or reject plan. |

The Investment Agreement and the Investment Agreement Term Sheet

39.    The Investment Agreement Term Sheet sets forth the terms and conditions upon which Centerbridge has committed to purchase $300 million of 4% Series A convertible preferred stock (the "Series A Preferred"), and provide a firm commitment to purchase $200 million in 4% Series B-1 convertible preferred stock that is not purchased by a Qualified Creditor (the "Series B-1 Preferred") and use reasonable best efforts to identify Qualified Creditors[7] eligible to purchase up to $250 million in 4% Series B-2 convertible preferred stock

---

[7]    Qualified Creditors means a finite number, to be agreed upon by the Debtors and Centerbridge, of the largest holders of claims against the Debtors (excluding the Unions), each of whom is (a) a "qualified

(the "Series B-2 Preferred," and together with the Series B-1 Preferred, the "Series B Preferred")

in the reorganized Debtors.  The Series B-1 Preferred will be purchased by either Centerbridge or

Qualified Creditors and the Series B-2 Preferred will be purchased by Qualified Creditors.  Some

of the pertinent terms in the Investment Agreement Term Sheet include:

| | |
|---|---|
| Conversion Rights | Both the Series A Preferred and Series B Preferred are convertible by the holders thereof at any time into New Common Stock of the reorganized Debtors. |
| | The conversion price is 83% of the value (the "Distributable Market Value Per Share") that is determined by calculating the 20-day volume weighted average trading price of the New Common Stock, determined using the closing trading price of the New Common Stock from the first business day after the Effective Date through the twenty-third business day after the Effective Date after disregarding the highest and lowest closing trading price during such period. |
| | The Debtors may force conversion on or after the 5th anniversary of the Effective Date of the Plan if the New Common Stock shall have exceeded 140% of the Distributable Market Value Per Share at the close of trading for at least 20 consecutive trading days occurring on or after the fifth anniversary of the Effective Date. |
| Dividends | Each share of Series A Preferred and Series B Preferred shall be entitled to receive, on a *pari passu* basis, a 4% dividend, payable quarterly in cash.  Unpaid dividends shall accrue and be added to the preferred share's liquidation preference. |
| Ranking | The Series A Preferred shall rank senior to the Series B Preferred for purposes of liquidation, dissolution or winding up of the reorganized |

---

(continued…)

institutional buyer" as such term is defined in Rule 144A promulgated under the Securities Act, and (b) has such
other objective characteristics as reasonably determined by Centerbridge.

| | |
|---|---|
| | Debtors, and each will rank senior to any other class or series of capital stock of the reorganized Debtors with respect to any distributions for liquidation, dissolution or winding up of the reorganized Debtors. |
| Voting Rights | Series A Preferred and the Series B Preferred will have equal voting rights and will vote together as a single class with the New Common Stock of reorganized Dana on an as-converted basis

If the Conversion Price would result in Centerbridge beneficially owning the Series A Preferred, Series B Preferred or New Common Stock of reorganized Dana that in the aggregate has voting power in excess of 40% of the voting power of the fully diluted shares of reorganized Dana, Centerbridge will vote such excess of Series A Preferred, Series B Preferred or New Common Stock of reorganized Dana in the same proportion as the votes cast by the non-Centerbridge affiliated holders of Series A Preferred, Series B Preferred and New Common Stock of reorganized Dana. |
| Preemptive Rights | Series A Preferred is entitled to participate *pro rata* in future equity issuances. |
| Registration Rights | Customary registration rights. |
| Lock-Up | Series A Preferred contain a lockup provision prohibiting a sale or conversion to common shares of more than $150 million for 3 years.

The lockup terminates upon any restructuring, judicial or non-judicial liquidation or reorganization by the reorganized Debtors, any sale of all or substantially all of the assets of the reorganized Debtors taken as a whole, any merger or similar transaction involving a change of control of the reorganized Debtors or any public offering for cash unless, in the case of such public offering, the holders of Series A Preferred or Series B Preferred, as applicable, are given the opportunity to participate in the public offering on a pro rata basis.

Both Series A Preferred and Series B Preferred |

| | holders are also precluded from selling or converting any of their shares for a period of two months after the effective date of the Debtors' plan of reorganization. |
|---|---|
| Reporting Requirements | Dana will not voluntarily deregister or suspend registration of its common stock under the provisions of the comply with all '34 Exchange Act that require the filing of periodic reports (10-Q's and 10-K's, etc.) |
| Standstill | The Investment Agreement will contain a customary 10 year standstill that will limit the ability of Centerbridge to acquire additional stock if it would own more than 30% of the voting power of reorganized Dana's stock after such acquisition and to take other actions to control reorganized Dana after the effective date of the Debtors' plan of reorganization without consent of the new board of directors of Dana. |
| Initial Board of Directors | Composed of 7 members: (i) 2 of whom will be designated by Centerbridge, (ii) 1 of whom will be an independent director chosen by Centerbridge, (iii) 2 of whom will be designated by the Creditors' Committee (both of whom must be independent); (iv) 1 of whom will be chosen by the Creditors' Committee from a list prepared by Centerbridge containing at least 3 independent candidates, and (v) the chief executive officer of reorganized Dana. |
| Subsequent Board of Directors | Beginning at the first annual meeting of shareholders of reorganized Dana following emergence, and as long as Centerbridge owns at least 50% of the Series A Preferred:  Dana's board of directors will be composed of seven members:  (i) 2 of whom will be designated by Centerbridge and elected by holders of the Series A Preferred; (ii) 1 of whom will be an independent director designated by Centerbridge and elected by holders of the Series A Preferred; (iii) 1 of whom will be an independent director nominated by a unanimous vote of a Series A Preferred Nominating Committee (composed of 2 Centerbridge designees and one other board member) and elected by all shareholders; and |

| | |
|---|---|
| | (iv) 3 of whom will be nominated by reorganized Dana's board (including the chief executive officer of reorganized Dana). |
| Definition of "Independent" for Centerbridge Board Designees | Any director designated by Centerbridge, whether on the initial Board or subsequent Board, must be "independent" (as defined in the stock exchange rules) of both reorganized Dana and Centerbridge. |
| Approval Rights | Any proposed action by the reorganized Debtors to (i) sell all or substantially all of their assets; (ii) merge in a change of control transaction; (iii) liquidate; (iv) issue equity below fair market value; (v) pay dividends (other than in additional shares of New Common Stock) on account of common stock of the reorganized Debtors; or (vi) amend reorganized Dana's charter, is subject to veto rights of a majority of the Series A Preferred. The above veto rights terminate if fewer than 50% of the Series A Preferred is outstanding. In addition, Centerbridge consent is required for (i) material transactions with directors, officers or 10% shareholders other than officer and director compensation arrangements; (ii) the issuance of senior or *pari passu* debt or equity securities other than for refinancings on similar terms; (iii) by-law amendments adverse to shareholders generally or to Centerbridge; or (iv) share repurchases in excess of $10 million in any 12 month period. These Centerbridge consent rights terminate if Centerbridge no longer owns at least $150 million of the Series A Preferred shares. |
| Conditions to Investment | Centerbridge's obligation to close the Investment shall be subject to the satisfaction of customary closing conditions, including the following: No material adverse change in Dana Approval of the Union Settlement Agreement on terms reasonably acceptable to Centerbridge Debtors to obtain exit financing with parties on market terms reasonably acceptable to |

| | |
|---|---|
| | Centerbridge, provided that the Debtors shall have the obligation to consult with Centerbridge regarding such terms and parties |
| | Plan/Disclosure Statement filed by September 3, 2007 |
| | Confirmation of plan no later than February 28, 2008 |
| | Confirmation order in form reasonably acceptable to Centerbridge consistent with the Plan Term Sheet in all respects |
| | Effective date of plan no later than May 1, 2008 |
| | Union Settlement Agreement with Unions in form reasonably acceptable to Centerbridge is approved by Court |
| Alternative Transaction Option | Dana has the right to terminate Investment Agreement under the following conditions, subject to the Debtors' obligations to pay the Break-up Fee and Expense Reimbursement (described below): <br><br> • to accept a proposal for an alternative minority investment determined by Dana's board of directors to be superior to the Investment (the "Alternative Minority Investment"). Centerbridge has the right to amend the Investment to match such alternative investment; <br><br> • to accept a proposal for an alternative majority investment determined by Dana's board of directors to be superior to the Investment (the "Alternative Majority Investment"); <br><br> • to accept a proposal for an alternative transaction (*e.g.*, the sale of all or substantially all of the Debtors' assets as a going concern to a third party) that Dana's board determines would be more favorable to the Debtors' bankruptcy estates (the "Alternative Transaction"); and <br><br> • to file a stand alone plan that Dana's board of directors determines would be more favorable to the Debtors' bankruptcy estates |

|  | (the "Alternative Standalone Plan"). |
|---|---|
|  | With respect to each of the four alternatives described above, any determination by Dana's board of directors must be made (i) in good faith; (ii) after consultation with the Debtors' advisors; and (iii) taking into account all legal, financial, regulatory and other aspects of the alternative, the likelihood of completion of the alternative, and the applicable rights of the Unions to terminate the Union Settlement Agreement. |
| Break-Up Fee/Expense Reimbursement | If Dana accepts an Alternative Minority Investment, then Centerbridge is entitled to a $15 million break-up fee plus reasonable expense reimbursement of up to $4 million (the "Expense Reimbursement"). |
|  | If Dana accepts an Alternative Majority Investment or pursues a Sale Alternative or Standalone Plan Alternative, then Centerbridge is entitled to a $22.5 million break-up fee (either the $15 million or the $22.5 million fee, the "Break-Up Fee") plus the Expense Reimbursement. |
|  | The Break-Up Fee and the Expense Reimbursement shall be treated as a superpriority administrative claim in the Debtors' chapter 11 cases. |
| Commitment Fee | If the Debtors' cases are converted to chapter 7 or are dismissed, or Centerbridge decides to terminate the New Investment Term Sheet because of a breach by Dana, or the Centerbridge investment closes, then Centerbridge is entitled to a $3.5 million commitment fee (the "Commitment Fee") plus the Expense Reimbursement. |
|  | The Commitment Fee shall be treated as a superpriority administrative claim in the Debtors' chapter 11 cases. |

40.    The Investment in the Debtors to be provided under the terms of the

Investment Agreement Term Sheet and the Investment Agreement is a critical and necessary

factor in the Debtors' reaching a consensual resolution of their issues with the Unions as part of the Global Settlement.  Without this significant investment in the Debtors, the Debtors' ability to satisfy their obligations under the Union Settlement Agreement may be compromised. Moreover, the requirement for reorganized Dana to keep leverage below $1.5 billion and to maintain significant liquidity are vital elements to assure that Dana has capital to invest in its business and the ability to address uncertainty in a troubled industry.

41.     Because the conversion price for the Series A Preferred and Series B Preferred is set based on market prices, the percentage of the total voting power of reorganized Dana that will be represented by the preferred stock will not be known until after emergence from chapter 11.  Using preliminary forecasts and a preliminary valuation as an estimate of future trading prices for common stock, the Debtors estimate that the $500 million of preferred stock would represent between less than 25 percent of the fully diluted common stock of reorganized Dana.

42.     The Debtors believe that the Break-Up Fee and the Expense Reimbursement are appropriate in light of the amount of capital committed by Centerbridge to the Debtors and the flexibility that it provides to the Debtors in the event that a superior alternative were to present itself, and the Debtors are, by this Motion, requesting that the Break-Up Fee, Expense Reimbursement and Commitment Fee be allowed as superpriority administrative expenses of each of the Debtors' estates under sections 363(b), 364(c) and 503(b) of the Bankruptcy Code.

43.     The Break-Up Fee of $15 million or $22.5 million (depending on the type of alternative transaction the Debtors decide to pursue) represents 3 and 4.5 percent, respectively, of the proposed Investment, and the $22.5 million represents a much lower percentage of the

value of the alternative transactions or plans that would trigger its payment. Similarly, the

Debtors believe that the Commitment Fee described above is appropriate in light of the amount

of capital committed by Centerbridge and the potentially lengthy period of such commitment.

The Commitment Fee of $3.5 million with respect to the Series B-1 Preferred represents just

1.75 percent of the proposed $200 million Series B-1 Preferred commitment by Centerbridge.

However, there is no Commitment Fee payable on Centerbridge's $300 million direct investment

in the Series A Preferred or the Series B-2 Preferred.

## Relief Requested

44.     By this Motion, the Debtors seek entry of an order approving and

authorizing them to enter into the Union Settlement Agreement with the Unions, pursuant to

sections 1113 and 1114(e) of the Bankruptcy Code and Bankruptcy Rule 9019. In addition, the

Debtors seek entry of an order approving and authorizing them to enter into the Plan Support

Agreement and the Investment Agreement (and the related payments, transactions and

agreements), pursuant to sections 105(a), 363(b), 364(c)(1), 503 and 507 of the Bankruptcy

Code.

## Basis for Relief

### The Global Settlement Should Be Approved

45.     The Global Settlement should be approved. After extensive and complex

arm's-length discussions and negotiations with the Unions over the savings the Debtors need to

obtain to emerge as a viable entity (and the means by which such savings are to be achieved), the

Debtors and the Unions reached the Global Settlement, which the Debtors believe represents a

fair and reasonable compromise and, more importantly, is a key development to further the

Debtors' successful reorganization.

46.     Section 1113 of the Bankruptcy Code governs a debtor-in-possession's proposed modifications to a collective bargaining agreement.  See United Food & Commercial Workers Union v. Family Snacks, Inc. (In re Family Snacks, Inc.), 257 B.R. 884, 890-91 (8th Cir. BAP 2001) ("Generally speaking, § 1113 governs the rejection or modification of a CBA by a Chapter 11 trustee or debtor-in-possession. . . . Section 1113(b)(1) . . . sets out the requirements for making a valid proposal to modify [a collective bargaining agreement.]").

47.     Similarly, section 1114(e) of the Bankruptcy Code governs a debtor-in-possession's agreement with an authorized representative over modifications to "retiree benefits".  11 U.S.C. § 1114(e).  That section provides, in relevant part:

> (1) Notwithstanding any other provision of this title, the debtor in possession . . . shall timely pay and shall not modify any retiree benefits, except that –
>
>     (A) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments, after which such benefits as modified shall continue to be paid by the trustee.

11 U.S.C. § 1114(e)(1)(B).

48.     A debtor-in-possession's settlement is governed by Bankruptcy Rule 9019(a), which provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a). Settlements and compromises are "a normal part of the process of reorganization."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939)).

49.     Before a settlement under Bankruptcy Rule 9019 may be approved, a court must determine that the proposed settlement is fair and equitable, reasonable and in the best interests of the debtor's estate.  See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In

re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007) (applying "fair and equitable"

standard to settlements pursuant to Bankruptcy Rule 9019); In re Ionosphere Clubs, Inc., 156

B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994); In re Enron Corp., No. 02 Civ.

8489, 2003 WL 230838, at *2 (S.D.N.Y. Jan. 31, 2003) ("A bankruptcy court may approve a

settlement where the proposed settlement is both fair and equitable and in the best interests of the

estate.") (quotation omitted).

50.    The decision to approve a particular settlement lies within the sound

discretion of the bankruptcy court.  Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994).  In

exercising its discretion, the bankruptcy court must make an independent determination that the

settlement is fair and reasonable.  Id. at 122.  In addition, the bankruptcy court may exercise its

discretion "in light of the general public policy favoring settlements."  In re Hibbard Brown &

Co., Inc., 217 B.R. 41 (Bankr. S.D.N.Y. 1998); see Shugrue, 165 B.R. at 123 ("I am also

cognizant of the general rule that settlements are favored and, in fact, encouraged by the

approval process outlined above.").

51.    In determining whether to approve a proposed settlement, a bankruptcy

court need not definitively rule on all issues of law and fact that may be raised by the settlement,

but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest

point in the range of reasonableness.'"  In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983);

see Purofied Down Prods., 150 B.R. 519, 522 (S.D.N.Y. 1993) ("the court need not conduct a

'mini-trial' to determine the merits of the underlying litigation").

52.    The Second Circuit recently had the opportunity to re-visit the

reasonableness of a settlement under Rule 9019, and set forth the following factors a court

should consider in determining whether a proposed compromise and settlement is fair and equitable:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

Iridium Operating LLC, 478 F.3d at 462 (citing In re WorldCom, Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).  Thus, "[t]he 'reasonableness' of a settlement depends upon all factors, including probability of success, the length and cost of the litigation, and the extent to which the settlement is truly the product of 'arms-length' bargaining, and not of fraud or collusions." Ionosphere Clubs, 156 B.R. at 428.

53.    The Debtors submit that the Global Settlement easily meets these standards for approval.  Indeed, when viewed in the context of these chapter 11 cases and the significant impact the settlement will have on the Debtors' successful emergence from chapter 11, there is little, if any, doubt that the Global Settlement should be approved.  As demonstrated by the Debtors during the trial on the Section 1113/1114 Motion, absent a restructuring of the CBAs and the Debtors' costs associated with providing Non-Pension Retiree Benefits to Union active employees and retirees, the Debtors' likelihood of securing a viable U.S. operations is questionable, at best.

54.    The Debtors are mindful that an alternative to the Global Settlement was simply to wait for the Court to rule on the Section 1113/1114 Motion.  That alternative posed

significant risks for both the Debtors and the Unions. On the one hand, one outcome could have been an unfavorable ruling from the Debtors' point of view. On the other hand, a favorable decision on the Section 1113/1114 Motion, while allowing the Debtors to reject the CBAs (and implement the terms of their last Section 1113 Proposals) and terminate Non-Pension Retiree Benefits for Union active employees and retirees, would potentially yield other risks and uncertainties for the estates, such as labor unrest.

55.    First, the Unions made clear both at the trial on the Section 1113/1114 Motion and in their communications with their members and the public that the Unions would commence a strike in the event that the Court authorized the Debtors to reject their CBAs. Such a result that could seriously delay, if not devastate, the Debtors' prospects for a successful reorganization. Next, a favorable decision under section 1113 does nothing to bring resolution to the UAW Master Agreement (which has otherwise expired by its terms) and, indeed, may have made it more difficult for the Debtors to negotiate a new master agreement with the UAW after rejection of the CBAs related to the 1113 Facilities. Finally, any appeal by the Unions of a favorable decision on the Section 1113/1114 Motion could be protracted and expensive and pose the possibility of further delay in these chapter 11 cases.

56.    In contrast, the Global Settlement allows the Debtors to restructure the CBAs, eliminate their legacy obligations and secure the savings necessary to produce a viable company for the long-term. The Global Settlement produces an aggregate annual cost savings, which, when combined with the cost savings the Debtors have already realized with respect to non-union active employees and retirees (as well as through the settlements with the IAM and the Retiree Committee), is within the range needed by the Debtors to return to long-term viability. Equally importantly, the Global Settlement provides the Debtors' estates with certainty

and labor peace by resolving costly and lengthy litigation with the Unions and placing the Debtors in a position to manage and control their cost structure in the United States more effectively.  Similarly, approval of the Global Settlement allows the Debtors to terminate their present and future obligation to provide Non-Pension Retiree Benefits to the Union retirees and active employees, which eliminates a liability of approximately $1 billion with the VEBA to be established as part of the Union Settlement Agreement responsible prospectively for all Non-Pension Retiree Benefit Obligations.

57.    The Global Settlement allows the Debtors to partner with Centerbridge, a respected, long-term, value investor that will share its extensive restructuring and industry experience with the Debtors.  The Global Settlement also creates the framework for the Debtors to formulate and prosecute a successful plan of reorganization, and further provides the wherewithal for the Debtors to satisfy their obligations under the terms of the Union Settlement Agreement.

58.    For the foregoing reasons, the Debtors believe that the Global Settlement is fair and equitable and should, accordingly, be approved.

**The Global Settlement Represents a Sound Exercise of the Debtors' Business Judgment**

59.    Under section 363(b)(l) of the Bankruptcy Code, the Court may authorize a debtor in possession to "use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(l).  A debtor in possession's decision to use, sell, or lease assets outside the ordinary course of business must be based upon its sound business judgment.  See Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992) (a judge determining a section 363(b) application must find a "good business reason" to grant application); see also In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (same).  The "business

judgment" test is met when the debtor shows that the proposed use of property would be beneficial to the estate. Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

60.    Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)) (the business judgment rule is satisfied where the debtor acts "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Thus, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts generally will not entertain objections to the debtor's conduct"). The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)); Integrated Resources, 147 B.R. at 656 ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence.") (citations omitted).

61.    Pursuant to section 105(a) of the Bankruptcy Code, a bankruptcy court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." See 11 U.S.C. §105(a).

62.     The Debtors submit that the Global Settlement represents a sound exercise of the Debtors' business judgment and should be approved as in the best interests of the Debtors' estates, their creditors and other parties in interest.

63.     Indeed, whether viewed individually or collectively, the constituent agreements making up the Global Settlement satisfy the requirements of section 363 of the Bankruptcy Code.  First and foremost, the Plan Support Agreement and Investment Agreement are a condition to the Unions' agreements memorialized in the Union Settlement Agreement and, thus, in the absence of the agreements contained in the Plan Support Agreement and Investment Agreement, the Debtors risk losing the cost savings necessary to effect a successful restructuring of their U.S. operations.

64.     Similarly, the Global Settlement clears the way for the Debtors to formulate, propose and implement a plan of reorganization, because not only does it resolve the litigation with the Unions, it further secures a firm, long-term investment by which the Debtors will be able to fund their obligations required under the terms of the Union Settlement Agreement.  The Investment Agreement is a firm commitment through May 1, 2008 by Centerbridge, with no due diligence conditions.  The Investment also preserves value for the Debtors' creditors by augmenting, rather than depleting, the estates' cash resources.  Moreover, under the terms and conditions of the Global Settlement, the Debtors may consider and pursue an alternative path to reorganization if they determine that another option superior to that contemplated in the Global Settlement is available (subject to the rights of the Unions described herein and in Appendix R to the Union Settlement Agreement).

65.     Under the standards articulated in <u>Integrated Resources</u>, in considering whether a proposed breakup fee should be approved, a court should consider each of the

following factors: (1) whether the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the proposed fee is unreasonable relative to the proposed purchase price. 147 B.R. at 657. If the answer to each of these questions is no, the break-up fee should be approved. Id.

66.    The Debtors submit that the Break-Up Fee and Expense Reimbursement, which are the product of intense negotiations between the Debtors and Centerbridge, are reasonable in that they represent but a small fraction of the economic value being contributed by Centerbridge in the form of the Investment. The Break-Up Fee, which represents just 3 percent or 4.5 percent of the Investment, is reasonable when measured against the value brought by Centerbridge in helping achieve a consensual resolution with the Unions and the substantial investment that Centerbridge is prepared to make in the Debtors. Bankruptcy courts have approved fees similar in scope and size to the Break-Up Fee and Expense Reimbursement in this same context. See, e.g., In re Delphi Corp., et al., Case No. 05-44481 (RDD) (Jan. 12, 2007) (approving breakup fee of $100 million, which represented approximately 3% of proposed investment, in connection with plan investors' commitment to purchase shares in reorganized debtors and backstop rights offering to existing equity security holders);[8] In re Owens Corning, Case No. 00-03837 (Bankr. D. Del. June 29, 2006) (breakup fee of $130 million (or 6%) approved in connection with backstop of $2.2 billion rights offering); In re USG Corp., Case No. 01-2094 (Bankr. D. Del. Feb. 23, 2006) (breakup fee of up to $120 million (or 6.7%) approved in connection with backstop of $1.8 billion rights offering). The Debtors further submit that the

---

[8]    A true and correct copy of the January 12, 2007 Order entered by Judge Drain in the Delphi chapter 11 cases is attached hereto as Exhibit C.

Break-Up Fee and Expense Reimbursement are reasonable and should be approved because both were instrumental in Centerbridge proposing the Investment, while allowing the Debtors to retain the flexibility to pursue a superior alternative if one becomes available.

67.     Similarly, the Debtors submit that the proposed Commitment Fee of $3.5 million is reasonable in that it represents just 1.75 percent of the total value of the Series B-1 Preferred contemplated to be offered under the Investment Agreement Term Sheet, which Centerbridge has agreed to backstop, and which represents less than 1 percent of the total Investment Centerbridge has agreed to make.  In a similar case, as part of the January 12, 2007, order entered in <u>Delphi Corporation</u> and referenced above, Judge Drain approved a commitment fee of 1.75 percent in connection with the plan investors' agreement to backstop a rights offering to existing equity holders.  <u>See</u> Jan. 12, 2007 Order at p. 9.

68.     The Debtors also submit that granting superpriority administrative expense priority to the Break-Up Fee, Expense Reimbursement and Commitment Fee under sections 364(c)(1), 503(b)(1)(A)[9] and 507(a) of the Bankruptcy Code is warranted under the circumstances here in that awarding fees of this type encourages potential investors to invest the requisite time, money and effort to conduct due diligence and negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.  <u>See</u>, <u>e.g.</u>, <u>In re Comdisco, Inc.</u>, Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a break-up fee as, <u>inter alia</u>, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement).  Indeed, courts within this district have granted

---

[9]     Section 503(b)(1)(A) provides that "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including – the actual, necessary costs and expenses of preserving the estate . . ."  11 U.S.C. § 503(b)(1)(A).

administrative expense priority to breakup fees, expense reimbursement and commitment fees in a context nearly identical to the one present here.  See, e.g., Delphi Corporation, Jan. 12, 2007 Order at p. 10.

69.    Finally, the Debtors respectfully request that the Court find that Debtors' entry into, and performance under, the Union Settlement Agreement, Plan Support Agreement and Investment Agreement does not constitute the solicitation of a vote on a plan of reorganization.  Inasmuch as no vote on any plan of reorganization is being solicited by or in connection with the Plan Support Agreement or the Investment Agreement and that the Debtors intend to solicit their creditors pursuant to a Court-approved disclosure statement, the Debtors submit that the relief requested herein is appropriate and reasonable under the circumstances.

70.    For the foregoing reasons, the Debtors believe that they have exercised sound business judgment in entering into the Global Settlement, and respectfully request that the Court authorize and approve the Debtors' entry into the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement.

## Memorandum of Law

71.    The Motion includes citations to the applicable authorities and does not raise any novel issues of law.  Accordingly, the Debtors respectfully request that the Court waive the requirement contained in Local Bankruptcy Rule 9013-1(b) that a separate memorandum of law be submitted.

## Notice

72.    Pursuant to the Amended Administrative Order, Pursuant to Rule 1015(c) of the Federal Rules of Bankruptcy Procedure, Establishing Case Management and Scheduling Procedures (Docket No. 574) (the "Case Management Order"), entered on March 23, 2006, notice of this Motion has been given to (a) the parties identified on the Special Service List and

the General Service List (as such terms are defined in the Case Management Order), (b) counsel

to the Unions and (c) counsel to Centerbridge.  The Debtors are also providing a separate notice

to all Union retirees summarizing the terms of the Union Settlement Agreement, the date of the

hearing on the Motion and deadline for objections thereto, as well as instructions on how to

obtain copies of the Motion if Union retirees so wish.  The Debtors submit that no other or

further notice need be provided.

### **No Prior Request**

73.     No prior request for the relief sought in this Motion has been made to this

or any other Court.

### **Conclusion**

WHEREFORE, the Debtors respectfully request that the Court enter an order (a)

approving and authorizing the Debtors to enter into the Union Settlement Agreement, pursuant to

sections 1113(c) and 1114(e) of the Bankruptcy Code and Bankruptcy Rule 9019, (b) approving

and authorizing the Debtors to enter into the Plan Support Agreement and the Investment

Agreement, pursuant to sections 105(a), 363(b), 364(c)(1), 503 and 507 of the Bankruptcy Code,

and (c) granting the Debtors such other and further relief as the Court may deem proper.

Dated: July 5, 2007
      New York, New York

Respectfully submitted,

s/Corinne Ball

Corinne Ball (CB 8203)
Steven C. Bennett (SB 2746)
Pedro A. Jimenez (PJ 1026)
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Heather Lennox (HL 3046)
Robert W. Hamilton (RH 3130)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION