**EXHIBIT Q**

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball (CB 8203)
Steven C. Bennett (SB 2746)
Pedro A. Jimenez (PJ 1026)

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Heather Lennox (HL 3046)
Robert W. Hamilton (RH 3130)

Attorneys for Debtors
 and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                              :
In re                                         :   Chapter 11
                                              :
Dana Corporation, et al.,                     :   Case No. 06-10354 (BRL)
                                              :
                     Debtors.                 :   (Jointly Administered)
                                              :
------------------------------------------------------------x
```

**NOTICE OF FILING OF EXECUTED INVESTMENT AGREEMENT**
**IN CONNECTION WITH MOTION OF DEBTORS AND DEBTORS IN**
**POSSESSION FOR ENTRY OF AN ORDER (A) APPROVING SETTLEMENT**
**AGREEMENTS WITH THE UNITED STEELWORKERS  AND UNITED**
**AUTOWORKERS, PURSUANT TO 11 U.S.C. §§ 1113 AND 1114(E) AND**
**FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019, AND**
**(B) AUTHORIZING THE DEBTORS TO ENTER INTO PLAN SUPPORT**
**AGREEMENT, INVESTMENT AGREEMENT AND RELATED**
**AGREEMENTS, PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), 364(C)(1), 503 AND 507**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     On July 6, 2007, the undersigned filed with this Court the Motion of Debtors and Debtors in Possession for Entry of an Order (A) Approving Settlement Agreements with the United Steelworkers and United Autoworkers, Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, and (b) Authorizing the Debtors to Enter into Plan Support Agreement, Investment Agreement and Related Agreements, Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c)(1), 503 and 507 (Docket No. 5645) (the "Motion").

2.     The undersigned are hereby filing the executed Investment Agreement, annexed hereto (the "Investment Agreement"), in connection with the Motion.

3.     Copies of the Motion, and the Investment Agreement may be obtained on from the Court's website http://www.ecf.nysb.uscourts.gov or, without charge, at the website of the Debtors' claims and noticing agent at http://www.dana.bmcgroup.com

Dated:  July 25, 2007       Respectfully submitted,
   New York, New York

           /s/ Corinne Ball
           Corinne Ball (CB 8203)
           Steven C. Bennett (SB 2746)
           Pedro A. Jimenez (PJ 1026)
           JONES DAY
           222 East 41st Street
           New York, New York  10017
           Telephone:  (212) 326-3939
           Facsimile:  (212) 755-7306

           Heather Lennox (HL 3046)
           Robert W. Hamilton (RH 3130)
           JONES DAY
           North Point
           901 Lakeside Avenue
           Cleveland, Ohio  44114
           Telephone:  (216) 586-3939
           Facsimile:  (216) 579-0212

           ATTORNEYS FOR DEBTORS AND
           DEBTORS IN POSSESSION

# INVESTMENT AGREEMENT

INVESTMENT AGREEMENT (this "Agreement"), dated as of July 25, 2007, between Centerbridge Capital Partners, L.P., a Delaware limited partnership ("Centerbridge"), CBP Parts Acquisition Co. LLC, a newly formed Delaware limited liability company (the "Purchaser"), and Dana Corporation, a Virginia corporation (the "Company") and debtor-in-possession under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in case No. 06-10354 (BRL) (the "Chapter 11 Case"), pending in the Bankruptcy Court.

WHEREAS, the Company, together with its debtor Subsidiaries that commenced jointly administered cases under chapter 11 of the Bankruptcy Code (such Subsidiaries and Affiliates and the Company collectively, the "Debtor"), intends to file with the Bankruptcy Court a chapter 11 plan of reorganization containing, among others, the terms set forth in the PSA Term Sheet, the effectiveness of which will be conditioned on the Closing having occurred (the "Chapter 11 Plan"); and

WHEREAS, the Company, the Unions and Centerbridge have entered into an Amended Plan Support Agreement (the "Support Agreement"), including the Plan Term Sheet attached as to the Support Agreement as it may be amended (in accordance with the terms of the Support Agreement (the "PSA Term Sheet"), pursuant to which the parties to the Support Agreement have agreed to various transactions in furtherance of the Chapter 11 Plan; and

WHEREAS, the Chapter 11 Plan contemplates (i) a new investment (the "Series A Investment") in the corporation that will be the successor to the Company under the Chapter 11 Plan for purposes of Section 1145 of the Bankruptcy Code ("New Dana") by Purchaser, a newly formed investment company that is a Subsidiary of Centerbridge, in 4.0% Series A Convertible Preferred Stock, par value $0.01 per share, of New Dana (the "Series A Preferred") having the terms set forth in the Certificate of Designation attached hereto as Exhibit B and (ii) new investments (such investments, together with the Series A Investment, the "Investments") by Purchaser and certain institutional investors in 4.0% Series B Convertible Preferred Stock, par value $0.01 per share, of New Dana and by certain institutional investors in 4.0% Series B Convertible Preferred Stock, par value $0.01 per share, of New Dana, in each case having the terms set forth in the Certificate of Designation attached hereto as Exhibit B and to be made in connection with the transactions contemplated by the Chapter 11 Plan, including without limitation the transactions contemplated by the Support Agreement; and

WHEREAS, subject to the entry of a Confirmation Order on the effective date of the Chapter 11 Plan (the "Effective Date"), New Dana will be authorized to issue new shares of Series A Preferred to Purchaser and Series B Preferred to the Series B Investors.

ACCORDINGLY, the parties agree as follows:

I.    SHARE PURCHASE

1.1    <u>Series A Preferred Share Purchase</u>.  On the terms and subject to the conditions herein, at the Closing, New Dana will issue and sell to Purchaser, and Purchaser will purchase from New Dana, for an aggregate price of $250,000,000 in cash (the "<u>Series A Purchase Price</u>"), 2,500,000 newly issued shares of Series A Preferred representing 100% of the Series A Preferred issued and outstanding as of immediately after the Effective Date.

1.2    <u>Series B Preferred Share Purchase</u>.  On the terms and subject to the conditions herein, at the Closing, New Dana will issue and sell to Purchaser and Purchaser will purchase from New Dana, for an aggregate price of $250,000,000 in cash (the "<u>Series B-1 Purchase Price</u>"), 2,500,000 newly issued shares of Series B Preferred ("<u>Series B-1 Shares</u>" and, together with the Series A Preferred, the "<u>Shares</u>"); <u>provided</u>, <u>however</u>, that Purchaser's obligation and right to purchase Series B-1 Preferred will be reduced to the extent that Qualified Investors purchase and pay for Series B-1 Preferred at the Closing pursuant to a duly executed Subscription Agreement in the form of <u>Exhibit C</u> (such Qualified Investors, together with Purchaser, the "<u>Series B Investors</u>").  In addition, on the terms and subject to the conditions herein, New Dana will issue and sell an additional up to 2,500,000 shares of Series B Preferred ("<u>Series B-2 Shares</u>") for an aggregate purchase price of $250,000,000, or $100 per share, in cash (the "<u>Series B-2 Purchase Price</u>" and together with the Series B-1 Purchase Price, the "<u>Series B Purchase Price</u>") to Series B Investors who have delivered to Centerbridge and the Company a duly executed Subscription Agreement in the form of Exhibit C prior to five business days after the Trade Claim Record Date with respect to Trade Claims and the entry of an order by the Bankruptcy Court approving the disclosure statement in connection with the Chapter 11 Plan for Bondholder Claims and have paid for such Series B-2 Shares prior to the Closing.  Purchaser will use its reasonable efforts to identify Qualified Investors eligible to purchase such Series B-2 Shares; <u>provided</u>, <u>however</u>, that in no event will Purchaser be required or entitled to purchase any portion of Series B-2 Shares.  Each Qualified Investor will be entitled to purchase its *pro rata* allocation of Series B-1 and B-2 Shares, calculated based on the proportion that Qualified Claims held by it bear to the total amount of Qualified Claims ("<u>Pro Rata Share</u>"); <u>provided</u>, <u>however</u>, that in no event will any Qualified Investor and its Affiliates be entitled to acquire beneficial ownership of more than $200 million in aggregate liquidation preference of Series B Preferred.  Notwithstanding the foregoing, in the event a Qualified Investor does not purchase its Pro Rata Share of the Series B-2 Shares (the "<u>Unsubscribed Shares</u>"), each other Qualified Investor subscribing for Series B-2 Shares will be entitled to purchase its *pro rata* share of such Unsubscribed Shares, calculated based on the proportion that the allowed liquidated, noncontingent, unsecured Claims held by it bear to the total amount of such Claims held by Qualified Investors subscribing for Series B-2 Shares as of the Record Date; <u>provided</u>, <u>however</u>, that in no event will any Qualified Investor and its Affiliates be entitled to acquire beneficial ownership of more than $200 million in aggregate liquidation preference of Series B Preferred after taking into account subscriptions for Unsubscribed Shares.

1.3    Purchase Price.  The Series A Purchase Price and the Series B Purchase Price will be payable on the Closing Date in cash by bank wire transfer of immediately available funds to an account of New Dana designated by the Company by written notice to Centerbridge and each Series B Investor delivered at least two business days prior to the Closing Date.

1.4    Closing Timing.  The closing of the purchase and sale of the Shares (the "Closing") will take place at the offices of Jones Day, 222 E. 41st Street, New York, New York at 10:00 a.m. local time on the date on which all of the conditions (other than the conditions to be satisfied concurrently with the Closing) set forth in Article V have been satisfied or waived (or such other date, time and place to which the parties may agree in writing).  The date on which the Closing occurs is the "Closing Date."

1.5    Closing Deliveries.  (a)  At or prior to the Closing, Centerbridge, Purchaser or the Series B Investors, as applicable, will deliver to New Dana:

(i)    the Series A Purchase Price and the Series B Purchase Price payable in accordance with Section 1.3;

(ii)    a counterpart to the Shareholders Agreement in the form attached hereto as Exhibit D (the "Shareholders Agreement"), duly executed by Centerbridge and Purchaser;

(iii)    a counterpart to the Registration Rights Agreement in the form attached hereto as Exhibit E (the "Series A Registration Rights Agreement"), duly executed by Purchaser; and

(iv)    a counterpart to the Registration Rights Agreement in the form attached hereto as Exhibit F (the "Series B Registration Rights Agreement" and, together with the Series A Registration Rights Agreements, the "Registration Rights Agreements"), duly executed by the Qualified Investors;

(v)    a counterpart to the Subscription Agreement in the form attached hereto as Exhibit C (the "Subscription Agreement"), duly executed by each of the Qualified Investors; and

(vi)    a certificate from each Qualified Investor to New Dana and dated the Closing Date, signed by an executive of such Qualified Investor, confirming the matters set forth in Exhibit G (the "Series B Subscription Agreement Rep Bringdown").

(b)    At or prior to the Closing, New Dana will deliver to Purchaser or the Series B Investors, as applicable:

(i)    Subject to clause (c) below, validly issued stock certificates evidencing the Shares;

(ii)            a counterpart to the Shareholders Agreement duly executed by New Dana;

(iii)           a counterpart to the Registration Rights Agreements duly executed by New Dana; and

(iv)           a copy of the New Dana charter containing the Certificate of Designations, certified by the Secretary of State of the state in which it is incorporated.

(c)    Certificates for Series B Shares purchased by Qualified Investors will be delivered as promptly as practicable after the Closing, following confirmation of Qualified Investor status and calculation of Pro Rata Shares.

II.    <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>

The Company hereby represents and warrants to Purchaser, except as disclosed (i) in, and reasonably apparent from, any report, schedule, form or other document filed with, or furnished to, the SEC by the Company and publicly available prior to the date of this Agreement and only as and to the extent disclosed therein (other than any forward-looking disclosures set forth in any risk factor section, any disclosures in any section relating to forward-looking statements and any other similar disclosures included therein to the extent they are primarily cautionary in nature), or (ii) in the letter, dated the date hereof, from the Company to Purchaser specifically referencing this Agreement and delivered prior to the execution of this Agreement and initialed by the parties hereto (the "<u>Company Disclosure Letter</u>"), as follows:

2.1    <u>Existence; Authorization, Validity and Effect of Agreement</u>.  Each of the Company and its Significant Subsidiaries (i) is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization (to the extent the legal concept of good standing exists in such jurisdiction), (ii) has all requisite corporate or equivalent power and authority to own, operate or lease the properties that it purports to own, operate or lease and to conduct its business as currently conducted and (iii) is duly qualified or licensed as a foreign entity to do business, and is in good standing (to the extent the legal concept of good standing exists in such jurisdiction), in each jurisdiction where the character of its properties owned, operated or leased or the nature of its activities makes such qualification or licensing necessary, except in the case of clauses (i) through (iii) to the extent that the failure to be so qualified or in good standing or to possess requisite power and authority would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  As of the Effective Date, New Dana will be a corporation duly incorporated, validly existing and in good standing under the laws of the state in which it is incorporated.  Subject to the entry of the Approval Order, Confirmation Order and the occurrence of the Effective Date, (a) the Company has and New Dana will have the requisite corporate power and authority to execute and deliver this Agreement and all agreements and documents contemplated hereby to be executed and delivered by it, (b) this Agreement and the consummation by the Company and New Dana of the transactions contemplated hereby have been (or, in the case of New Dana, will be on or

prior to the Effective Date) duly authorized by all requisite corporate action and, (c) this Agreement has been duly and validly executed and delivered by the Company and constitutes, and the Shareholders Agreement and the Registration Rights Agreements (together with this Agreement, referred to collectively as the "Transaction Documents") contemplated hereby to be executed and delivered by New Dana (when executed and delivered pursuant hereto) will constitute, the valid and binding obligations of the Company or New Dana, as applicable, enforceable against the Company or New Dana, as applicable, in accordance with their respective terms.

2.2    Capitalization.  Immediately following the Effective Date and upon issuance of the Shares, the Series A Preferred, Series B Preferred and New Common Stock will be the only issued and outstanding equity securities of New Dana, including management incentive equity issued in accordance with the Chapter 11 Plan.  Except as provided in the Registration Rights Agreements, the Company is not, and New Dana will not be, under any third party contractual obligation to register any of its equity securities under the Securities Act.

2.3    Validity of Shares, Etc.  Each of the Shares when issued to Purchaser in accordance with the Chapter 11 Plan and this Agreement will be duly authorized, validly issued, fully paid, non-assessable and free of preemptive rights of third parties, except for the preemptive rights included in Exhibit B.  At the Closing, Purchaser will acquire good and valid title to the Shares, free and clear of any and all liens, Claims, security interests, encumbrances, restrictions on voting or alienation or otherwise, or adverse interests, except as may be created by Purchaser, the Transaction Documents, Exhibit B or by applicable Securities Laws.  All issued and outstanding shares of capital stock, if any, of each Significant Subsidiary of the Company have been duly authorized and validly issued, and are fully paid, non-assessable and free of preemptive rights of third parties.

2.4    No Conflict; Required Filings and Consents.  (a)  The execution, delivery and performance of this Agreement and the other Transaction Documents by the Company or New Dana, as applicable, do not, and the consummation by the Company and New Dana of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the articles of incorporation or bylaws or equivalent organizational documents of the Company or any of its Subsidiaries or New Dana, as applicable (as they may be amended or adopted pursuant to the Chapter 11 Plan, as applicable), (ii) subject to the entry of the Confirmation Order and the occurrence of the Effective Date, conflict with or violate any domestic or foreign statute, rule, regulation or other legal requirement ("Law") or order, judgment, injunction or decree ("Order") applicable to the Company or any of its Subsidiaries or New Dana or by which any property or asset of the Company or any of its Subsidiaries is (or New Dana will be) bound or affected or (iii) subject to the entry of the Confirmation Order and the occurrence of the Effective Date and the implementation of the transactions contemplated by the Chapter 11 Plan and the application of bankruptcy Law, conflict with or violate or result in a breach or default under any contract, agreement or instrument binding upon the Company or any of its Subsidiaries or New Dana, or result, except to the extent specified in the Chapter 11 Plan, in the acceleration of, or the

creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is (or New Dana will be) a party or by which the Company or any of its Subsidiaries is (or New Dana will be) bound or to which any of the property or assets of the Company or any of its Subsidiaries is (or New Dana will be) subject, except, in the case of clauses (i) (as to Subsidiaries only), (ii) and (iii), for any such conflicts, violations, breaches or defaults that, individually or in the aggregate, would not have a Company Material Adverse Effect.

(b)    The execution and delivery of this Agreement and the other Transaction Documents by the Company or New Dana, as applicable, does not, and the performance of this Agreement and the other Transaction Documents and the consummation by the Company and New Dana of the transactions contemplated hereby and thereby will not, require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, domestic or foreign, including without limitation any quasi-governmental, supranational, statutory, environmental entity and any stock exchange, court or arbitral body (each a "Governmental Entity"), except (i) for (A) the applicable notification requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if any, and the rules and regulations thereunder (the "HSR Act"), and any other comparable laws or regulations in any foreign jurisdiction relating to the sale or issuance of the Shares, (B) filings contemplated by the Registration Rights Agreements and (C) the entry of the Approval Order and the Confirmation Order and any other Bankruptcy Court Orders that may be required in connection with the Chapter 11 Plan, and (ii) where the failure to obtain any such consent, approval, authorization or permit, or to make any such filing or notification, would not, individually or in the aggregate, have a Company Material Adverse Effect.

2.5    No Undisclosed Liabilities.  As of the date hereof, neither the Company nor any of its Subsidiaries has any liabilities or obligations (absolute or accrued, contingent or otherwise, and whether due or to become due and whether the amount thereof is readily ascertainable or not) that are material to the business or operations of the Company and its Subsidiaries, taken as a whole, other than: (a) liabilities or obligations disclosed in the financial statements of the Company included in the Company Reports filed with the SEC prior to the date hereof; (b) liabilities or obligations under contracts to which the Company or any of its Subsidiaries is a party; (c) liabilities of a nature not required by GAAP to be set forth on a consolidated balance sheet of the Company and its Subsidiaries or in the notes thereto; (d) liabilities or obligations incurred in the ordinary course of business consistent with past practices since December 31, 2006, or (e) liabilities or obligations expressly included within the scope of another representation or warranty in this Article II or as expressly excluded from any representation or warranty in this Article II as a result of the scope of any materiality or similar qualification applicable to such representation or warranty.

2.6    No Violation or Default; Compliance with Laws. Neither the Company nor any of its Significant Subsidiaries is in violation of its charter or by-laws or similar organizational documents.  Neither the Company nor any of its Subsidiaries is,

except as a result of the Chapter 11 Case, in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, except for any such default that has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  Neither the Company nor any of its Subsidiaries is, or has been, in violation of any Law, except for any such violation that has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

      2.7   <u>Litigation</u>.  There are no legal, governmental or regulatory actions, suits, proceedings or, to the Knowledge of the Company, investigations pending to which the Company or any of its Subsidiaries is or may be a party or to which any property of the Company or any of its Subsidiaries is or may be the subject that, individually or in the aggregate, if determined adversely to the Company or any of its Subsidiaries, would reasonably be expected to have a Company Material Adverse Effect, and no such actions, suits or proceedings or investigations are pending or, to the Knowledge of the Company, threatened or contemplated, by any governmental or regulatory authority or by others.

      2.8   <u>Labor Relations</u>.  (a) The Company is not a party to, and has no obligations under, any collective bargaining agreement or other agreement, unexpired, or expired in circumstances where the Company has a continuing statutory obligation to maintain the existing terms and conditions of employment as specified in the expired contract, with any labor organization governing wages, hours or other terms and conditions of employment of any current employees of the Company at any facility currently operated by the Company in the United States and Canada, that is, individually or in the aggregate, material to the Company and its Subsidiaries, taken as a whole; (b) there are no current organizational activities, demands for recognition or petitions for representation by a labor organization seeking to represent employees of the Company or any Subsidiary that would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect; (c) no grievance, arbitration, litigation, complaint or charge, or, to the Knowledge of the Company, investigations relating to labor or employment matters is pending or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries which, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect; (d) the Company and each of its Subsidiaries has complied and is in compliance in all respects with all applicable laws (domestic and foreign), agreements, contracts, and policies relating to employment, employment practices, wages, hours, and terms and conditions of employment and is not engaged in any unfair labor practice as defined by the National Labor Relations Board (or any foreign equivalent), in each case except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Company

Material Adverse Effect; and (e) the Company has complied and is in compliance in all material respects with its obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 ("WARN Act") (and any similar state or local law) to the extent applicable, and all material other employee notification and bargaining obligations arising under any collective bargaining agreement or statute, in each case except to the extent the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

        2.9    <u>Title to Intellectual Property</u>. The Company and its Subsidiaries own all right, title and interest in and to, or possess valid and enforceable rights to use, all material patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, copyrights, licenses, software and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) and other intellectual property rights (collectively, "<u>Intellectual Property</u>") used in the conduct of their respective businesses, the failure to own or possess which would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. All registrations and with applications to governmental or regulatory authorities in respect of such Intellectual Property are (i) to the Knowledge of the Company, valid and (ii) in full force and effect, (iii) have not lapsed, expired or been abandoned, and (iv) are not the subject of any opposition filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry other than in the ordinary course of business and, in each case in clauses (i) through (iv), except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. The consummation of the transaction contemplated hereby and by the Chapter 11 Plan will not result in the loss or impairment of any rights to use such Intellectual Property or obligate Purchaser to pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by the Company and its Subsidiaries absent the consummation of the Investments, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. The Company and its Subsidiaries have taken reasonable security measures to protect the confidentiality and value of its and their material trade secrets (or other Intellectual Property for which the value is dependent upon its confidentiality), and no such material trade secrets have been misappropriated, except to the extent that such misappropriation would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. The Company and its Subsidiaries are not in default (and no event has occurred so that, with the giving of notice or lapse of time or both, they will be in default) under any contract relating to such Intellectual Property except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. To the Knowledge of the Company, no Intellectual Property rights of the Company or its Subsidiaries are being infringed by any other Person, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. To the Knowledge of the Company, the conduct of the businesses of the Company and its Subsidiaries does not and will not conflict in any respect with any intellectual property rights of others, and the Company and its Subsidiaries have not received any notice of any claim of infringement

or conflict with any such rights of others, in each case, which would be reasonably expected to have, individually or in the aggregate, a Company Material Adverse Effect.

2.10    <u>Title to Real and Personal Property</u>. The Company and its Subsidiaries have good and marketable fee simple, leasehold or subleasehold title to all real property owned, leased or subleased by the Company and its Subsidiaries, and for all real property currently used, and good title to all other tangible and intangible properties (other than Intellectual Property covered by Section 2.9) owned by them, in each case, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind ("<u>Liens</u>"), except for such Liens or failure to have title as, individually and in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect. All of the leases and subleases for real property to which the Company or its Subsidiaries are a party are in full force and effect and enforceable by the Company or such Subsidiary in accordance with their terms, and, to the Knowledge of the Company, neither the Company nor any Subsidiary has received any notice of any claim of any sort that has been asserted by anyone adverse to the rights of the Company or any Subsidiary under any of the leases or subleases mentioned above or under any documents affecting any fee owned property, or affecting or questioning the rights of the Company or such Subsidiary to the continued possession of any owned, leased or subleased property by under any such lease or sublease or under any documents affecting any fee owned property, or for the continued operations of the Company's business as currently operated in any material respect on any owned, leased or subleased property, except for any such matter as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

2.11    <u>No Undisclosed Relationships</u>. As of the date hereof, no relationship, direct or indirect, exists between or among the Company or any of its Subsidiaries, on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company or any of its Subsidiaries, on the other, that is required by the Exchange Act to be described in the Company Reports and that are not so described, except for the transactions pursuant to this Agreement and pursuant to Company Plans.

2.12    <u>Licenses and Permits</u>.   The Company and its Subsidiaries have and are in compliance with all licenses, certificates, permits, approvals, franchises or other authorizations required to be obtained from a Governmental Authority necessary for the ownership or lease of their respective properties or for the conduct of their respective businesses as now conducted, which if violated or not obtained would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.   Neither the Company nor any Subsidiary has finally been denied any application for any such license, permit, franchise or other governmental authorization.

2.13    <u>Compliance with Environmental Laws</u>.   (a) Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, the Company and its Subsidiaries have complied and are in compliance with any and all applicable federal, state, local and foreign laws, rules, regulations, decisions and orders, including all civil and common law, relating to the

protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants (collectively, "Environmental Laws"); (b) during the three years prior to the date of this Agreement, to the Knowledge of the Company, the Company and its Subsidiaries have not received notice from any governmental authority or other Person of any actual or potential liability for the investigation or remediation of any disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants, or for any violation of Environmental Laws that would in any such case reasonably be expected to result in, individually or in the aggregate, a material liability of the Company and its Subsidiaries, taken as a whole; (c) except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, to the Knowledge of the Company, there are no facts, circumstances or conditions relating to the past or present business or operations of the Company, its Subsidiaries or any of their predecessors (including the disposal of any hazardous or toxic substances or wastes, pollutants or contaminants), or to any real property currently or formerly owned or operated by the Company, its Subsidiaries or any of their predecessors, that would reasonably be expected to give rise to any claim, proceeding or action, or to any liability, under any Environmental Law; (d) to the Knowledge of the Company, neither the Company nor any of its Subsidiaries is required or reasonably expected to incur material capital expenditures during the current and the subsequent five fiscal years to reach or maintain compliance with existing or reasonably anticipated Environmental Laws except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect; and (e) the disclosure in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007, as reproduced in Section 2.13 of the Company Disclosure Letter, was, to the Knowledge of the Company, true and correct in all material respects based on the assumptions set forth therein and as of May 10, 2007.  To the Knowledge of the Company, no changes in the facts underlying these asbestos-related disclosures (as opposed to the assumptions made) have occurred since May 10, 2007, that would, individually or in the aggregate, reasonably be expected to result in a liability that is material to the Company and its Subsidiaries, taken as a whole.

2.14  Tax Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect:  (a) the Company has timely filed or caused to be timely filed (taking into account any applicable extension of time within which to file) with the appropriate taxing authorities all material tax returns, statements, forms and reports (including elections, declarations, disclosures, schedules, estimates and information Tax Returns) for Taxes ("Tax Returns") that are required to be filed by, or with respect to, the Company and its Subsidiaries; (b) the Tax Returns accurately reflect all liability for Taxes of the Company and its Subsidiaries for the periods covered thereby; (c) all material Taxes and Tax liabilities due by or with respect to the income, assets or operations of the Company and its Subsidiaries have been timely paid in full or accrued and fully provided for in accordance with GAAP on the financial statements of the Company included in the Company Reports; (d) neither the Company nor any of its Subsidiaries has received any written notices from any Taxing authority relating to any issue that has not been adequately provided for in accordance with GAAP in the financial statements of the Company

included in the Company Reports; (e) all material Taxes which the Company and each or any of its Subsidiaries is (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable; (f) neither the Company nor any of its Subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under the law of the United States, any foreign jurisdiction or any state or locality with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its Subsidiaries are the only members); and (g) the Company is not a party to any agreement other than certain Change In Control Agreements described in the Company Reports filed prior to the date hereof that would require the Company or any affiliate thereof to make any material payment that would constitute an "excess parachute payment" for purposes of Sections 280G and 4999 of the Code.

2.15   Compliance With ERISA.

(a)     Correct and complete copies of the following documents, with respect to all U.S. domestic benefit and compensation plans, programs, contracts, commitments, practices, policies and arrangements, whether written or oral, that are maintained or contributed to (or with respect to which an obligation to contribute has been undertaken) or with respect to which any potential liability is borne by the Company or any of its Subsidiaries, including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and deferred compensation, stock option, stock purchase, restricted stock, stock appreciation rights, stock based, incentive and bonus plans, but excluding any employee benefit plans within the meaning of Section 3(3) of ERISA which Mahle GmbH or its subsidiaries or affiliates have agreed to assume (the "Company Plans"), have been delivered or made available to Centerbridge and Purchaser by the Company, to the extent applicable: (i) all material Company Plan documents, together with all amendments and attachments thereto (including, in the case of any Company Plan not set forth in writing, a written description thereof); (ii) all material trust documents, declarations of trust and other documents establishing other funding arrangements, and all amendments thereto and the latest financial statements thereof; (iii) the most recent annual report on Internal Revenue Service ("IRS") Form 5500 for the past year and all schedules thereto; (iv) the most recent IRS determination letter; (v) summary plan descriptions and summaries of material modifications; and (vi) the most recently prepared actuarial valuation report.

(b)     Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect (i) each Company Plan, other than any "multiemployer plans" within the meaning of Section 3(37) of ERISA ("Multiemployer Plans"), is in compliance with ERISA, the Internal Revenue Code of 1986, as amended (the "Code") and other applicable laws; (ii) each Company Plan that is intended to be a qualified plan under Section 401(a) of the Code is so qualified and has received a favorable determination letter from the IRS covering

all Tax law changes prior to the Economic Growth and Tax Relief Reconciliation Act of 2001 or has applied to the IRS for such favorable determination within the applicable remedial amendment period under Section 401(b) of the Code, and the Company is not aware of any circumstances likely to result in the loss of the qualification of such Company Plan under Section 401(a) of the Code; (iii) no liability under Subtitle C or D of Title IV of ERISA has been incurred during the previous three years by the Company or any of its Subsidiaries with respect to any ongoing, frozen or terminated "single-employer plan," within the meaning of Section 4001(a)(15) of ERISA ("Single-Employer Plan") currently or previously maintained or contributed to (or with respect to which an obligation to contribute has been undertaken) by the Company or any of its Subsidiaries, or the Single-Employer Plan of any entity which is considered one employer with the Company under Section 4001 of ERISA or Section 414 of the Code (a "Company ERISA Affiliate"); (iv) the Company and its Subsidiaries have not incurred any withdrawal liability (including any contingent or secondary withdrawal liability) with respect to a Multiemployer Plan under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of a Company ERISA Affiliate) that has not been satisfied in full and no condition or circumstance has existed that presents a risk of the occurrence of any withdrawal from or the partition, termination, reorganization or insolvency of any such Multiemployer Plan; (v) no notice of a "reportable event," within the meaning of Section 4043 of ERISA has occurred after January 1, 2005 for any Company Plan or by any Single Employer Plan of a Company ERISA Affiliate; (vi) all contributions required to be made under the terms of any tax qualified Company Plan have been timely made or have been reflected in the financial statements of the Company included in the Company Reports filed prior to the date hereof; and (vii) there has been no amendment to, announcement by the Company or any of its Subsidiaries relating to, or change in employee participation or coverage under, any Company Plan which would increase the expense of maintaining such plan above the level of the expense incurred therefor for the most recent fiscal year.

(c)    (i) Neither any Company Plan nor any Single-Employer Plan of a Company ERISA Affiliate has an "accumulated funding deficiency" (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA and neither the Company nor any of its Subsidiaries nor any Company ERISA Affiliate has applied for or obtained a funding waiver; and (ii) neither the Company nor any of its Subsidiaries has provided, or is required to provide, security to any Company Plan or to any Single-Employer Plan of a Company ERISA Affiliate pursuant to Section 401(a)(29) of the Code.

(d)    Except as has not and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) no claim, lawsuit, arbitration or other action has been instituted against the Company Plans (other than routine claims for benefits, and appeals of such claims), the Company, any Subsidiary, any director, officer, or employee thereof, any of the assets of any trust of the Company Plans, or, to the Company's knowledge, any fiduciary of a Company Plan with respect to a Company Plan, and (ii) no "prohibited transaction," within the meaning of Section 4975 of the Code or Section 406 of ERISA, for which no exemption is available, has occurred with respect to any Company Plan or its related trust.

(e)    Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, (i)(A) all material company benefit plans maintained primarily for the benefit of employees principally employed in jurisdictions listed in Schedule 2.15(e) (the "Non-U.S. Benefit Plans") have been maintained in all material respects in accordance with their terms and all applicable legal requirements, (B) if any Non-U.S. Benefit Plan is intended to qualify for special tax treatment, such Non-U.S. Benefit Plan meets all requirements to the extent necessary to obtain such treatment, and (C) the fair market value of the assets of each Non-U.S. Benefit Plan required to be funded, the liability of each insurer for any Non-U.S. Benefit Plan required to be funded, and the book reserve established for any Non-U.S. Benefit Plan, together with any accrued contributions, is sufficient to provide for the accrued benefit obligations under each Non-U.S. Benefit Plan and (ii) neither the Company nor any Company subsidiary is or has (x) a debt that is or has become due under Section 75 of the Pensions Act 1995; (y) been a party to an act or deliberate failure to act (or knowingly assisted) to prevent the recovery of any amount of debt due under Section 75 of the Pensions Act of 1995; or (z) is or has been an associate of or connected with (as set out in Sections 38 and 51 of the Pensions Act 2004) any person who is an employer in relation to any occupational pension scheme other than the company's pension schemes disclosed on Schedule 2.15(e).

2.16    SEC Filings; Financial Statements.  The Company has timely filed, all Company Reports required to be filed by it with the Securities and Exchange Commission (the "SEC") since January 1, 2006.  All Company Reports, as of their respective dates (a) complied in all material respects with the applicable requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations thereunder and (b) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading.  The representation in the preceding sentence does not apply to (a) any statement or omission in (i) any Company Report filed prior to the date of this Agreement that was superseded by a subsequent Company Report filed prior to the date of this Agreement or (ii) any Company Report filed after the date of this Agreement that is superseded by a subsequent Company Report filed prior to the Closing Date or (b) any projections, forecasts, estimates and forward-looking information included in the Company Reports.  The consolidated financial statements of the Company included in any Company Reports were prepared in accordance with accounting principles generally accepted in the United States ("GAAP") applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly presented the consolidated financial position of the Company and its Subsidiaries, as of the dates thereof (subject, in the case of any unaudited statements, to the absence of footnotes and to normal year-end audit adjustments).  No Subsidiary of the Company is currently required to file any periodic reports with the SEC under the Exchange Act.

Each Company Report containing financial statements that has been filed with the SEC by the Company was accompanied by the certifications required to be filed or furnished by the Company's principal executive officer and principal financial

officer pursuant to the Sarbanes-Oxley Act and, at the time of filing or submission of each such certification, such certification was true and accurate in all material respects.

2.17    <u>Insurance.</u> The Company and its Subsidiaries have insurance covering their respective properties, operations, personnel and businesses, including business interruption insurance, which insurance is in amounts and insures against such losses and risks as are customary for companies whose businesses are similar to the Company and its Subsidiaries, except where such failure would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  Neither the Company nor any of its Subsidiaries has received notice of any termination or threatened termination of any of such policies and such policies are in full force and effect.

2.18    <u>No Brokers</u>.  The Company has not entered into any contract, arrangement or understanding with any Person or firm that may result in the obligation of the Company or Purchaser to pay any investment banker's or finder's fees, brokerage or agent's commissions or other like payments in connection with the negotiations leading to this Agreement or the consummation of the Investments, except that the Company has retained Miller, Buckfire & Co., LLC as its financial advisor.  The Company, New Dana or one of their Subsidiaries will pay all amounts owed pursuant to the foregoing arrangements.

2.19    <u>State Takeover Statutes</u>.  The Company Board has approved this Agreement and the transactions described herein and such approval is sufficient to render inapplicable to this Agreement and such transactions the restrictions of Article 14 of the Virginia Stock Corporation Act (the "<u>VSCL</u>"), and, accordingly such Article 14 does not apply to any such transactions.  The Company has opted out of Article 14.1 of the VSCL in Section 10.1 of its bylaws.  There is no other provision of the VSCL or the Company's bylaws or charter under which special voting or waiting period requirements would become applicable to this Agreement and the transactions described herein, or under which Centerbridge, Purchaser or the Qualified Investors would not have rights possessed by other stockholders of the Company.

2.20    <u>Rights Plan Amendment</u>.  The Company has taken all action, if any, necessary or appropriate so that the execution of this Agreement and the consummation of the purchase of Series A Shares and Series B Shares pursuant to this Agreement do not and will not result in the ability of any Person to exercise any Rights (as defined in the Rights Agreement) under the Rights Agreement or enable or require any Rights to separate from the Shares to which they are attached or to be triggered or to become exercisable.

2.21    <u>No Additional Representations</u>.  Except as and to the extent expressly set forth in this Agreement (together with the schedules hereto and the agreements and certificates contemplated hereby), the Company makes no representations or warranties whatsoever, and disclaims all liability and responsibility for any representation, warranty, statement made or information communicated (orally or in writing) to Centerbridge or Purchaser (including, but not limited to, the information

memorandum furnished to Centerbridge or Purchaser in connection with their consideration of an investment in the Company and any opinion, information or advice which may have been provided to Centerbridge or Purchaser or any of their respective Affiliates, by any officer, stockholder, director, employee, engineering or accounting firm, legal counsel or any other agent, consultant or representative of such party, as applicable).

III.    REPRESENTATIONS AND WARRANTIES OF CENTERBRIDGE AND PURCHASER

Centerbridge and Purchaser represent and warrant to the Company as follows:

3.1    Existence; Authorization, Validity and Effect of Agreement. Centerbridge is a limited partnership and Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware. Purchaser is a Subsidiary of Centerbridge.  Centerbridge and Purchaser have all requisite power and authority to execute and deliver this Agreement and all agreements and documents contemplated hereby and thereby to be executed by it.  This Agreement and the consummation by Centerbridge and Purchaser of the transactions contemplated hereby have been duly and validly authorized by all requisite action.  This Agreement constitutes, and all Transaction Documents contemplated hereby to be executed and delivered by Centerbridge or Purchaser (when executed and delivered pursuant hereto) will constitute, the valid and binding obligations of Centerbridge or Purchaser, as the case may be, enforceable against each of them in accordance with their respective terms.

3.2    No Conflict; Required Filings and Consents.  (a)  The execution, delivery and performance of this Agreement and the other Transaction Documents by Centerbridge and Purchaser do not, and the consummation by Centerbridge and Purchaser of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the organizational documents of Centerbridge or Purchaser, (ii) conflict with or violate any Law or Order applicable to Centerbridge or Purchaser or by which any property or asset of Centerbridge or Purchaser is bound or affected or (iii) conflict with or violate or result in a breach or default under any contract, agreement or instrument binding upon Centerbridge or Purchaser, except, in the case of clauses (ii) and (iii), for any such conflicts, violations, breaches or defaults that, individually or in the aggregate, would not reasonably be expected to have a Purchaser Material Adverse Effect.

(b)    The execution and delivery of this Agreement and the other Transaction Documents by Centerbridge and Purchaser does not, and the performance of this Agreement and the consummation of the transactions contemplated hereby and thereby by them will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Entity, except (i) for (A) applicable requirements, if any, of the Exchange Act, and (B) the applicable notification requirements of the HSR Act, and (ii) where failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would not, individually

or in the aggregate, reasonably be expected to have a Purchaser Material Adverse Effect.

3.3     No Undisclosed Agreements.  Centerbridge and Purchaser have disclosed to the Company the terms of all agreements, arrangements and understandings, whether oral or written, between Centerbridge and any of its Affiliates or their respective officers, directors or employees, on the one hand, and any other Person that involve or relate to the Company, any of its Subsidiaries, the Unions, or the Company's creditors or their respective officers, directors, employees or representatives, on the other hand.  Centerbridge and Purchaser have provided to the Company true and correct copies of all such agreements, arrangements and understandings that are in written form.

3.4     No Brokers.  Centerbridge and Purchaser have not entered into any contract, arrangement or understanding with any Person or firm that may result in the obligation of the Company, New Dana or any of their Subsidiaries to pay any investment banker's or finder's fees, brokerage or agent's commissions or other like payments in connection with the negotiations leading to this Agreement or the consummation of the transactions contemplated hereby, any such amounts to be the sole liability of Centerbridge or Purchaser.

3.5     Sufficient Funds.  Centerbridge and Purchaser will have sufficient funds available to pay the Series A Purchase Price and the Series B Purchase Price in cash at the Closing.

3.6     Investment Intent.  Other than the Series B Preferred that will be purchased by Qualified Investors pursuant to Section 1.2, Centerbridge and Purchaser are purchasing the Shares to be purchased by them for their own account and for investment purposes, and neither of them intends to redistribute the Shares (except in a transaction or transactions exempt from registration under the federal and state securities laws or pursuant to an effective registration statement under such laws). Centerbridge and Purchaser acknowledge that the Shares have not been and will not, when issued, be registered under the Securities Act of 1933, as amended (the "Securities Act"), or any state blue sky or Securities Laws and that the transfer of the Shares may be subject to compliance with such Laws unless an exemption is available pursuant to section 1145 of the Bankruptcy Code (in addition to the restrictions set forth in the Shareholders Agreement).

3.7     Investor Sophistication.  Centerbridge and Purchaser are sophisticated investors and each has such knowledge and experience in financial, business and investment matters as to be capable of evaluating the merits and risks of an investment in the Shares.  Centerbridge was not organized for the specific purpose of acquiring the Shares.  Centerbridge and Purchaser are not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

3.8     Ownership of Company Securities/ Related Businesses.  As of the date of this Agreement, none of Centerbridge, Purchaser or any of their Subsidiaries,

Affiliates or affiliated funds (a) beneficially own any Claims, indebtedness or equity securities of the Company or any direct or indirect options, warrants or other rights to acquire, or any security convertible into or exchangeable for, any indebtedness or equity securities of the Company, or (b) have an equity interest greater than 10% in any Person that owns, Controls or operates a business engaged in any of the following: (i) the supply of components for automobiles or trucks, including but not limited to drivetrain products (including front and rear axles, transfer cases and gearboxes, differential and torque couplings, driveshafts, propshafts and drivetrain systems), chassis products (including front and rear suspension systems and modules, chassis systems, steering components and suspension components), structural products (including cradles, frames, sub-frames and side-rails), or engine components (including sealing systems and thermal management products); (ii) the supply of components for off-highway vehicles (including single-reduction drive and non-drive axles, steering and rigid planetary axles, transaxles, driveshafts, transfer cases and gearboxes, powershaft transmissions, torque converters, brakes, and electronic controls); or (iii) replacement components for sale in the independent aftermarket or for original equipment service (including replacement parts of any of the components listed above, transmissions, universal joints, brakes and gaskets).

3.9    No Additional Representations.  Centerbridge and Purchaser acknowledge that they and their representatives have received or been afforded the opportunity to review prior to the date hereof all written materials that the Company was requested to deliver or make available, as the case may be, to Centerbridge pursuant to this Agreement on or prior to the date hereof.  Centerbridge and Purchaser acknowledge that they and their representatives have been permitted access to the books and records, Tax Returns, contracts, insurance policies (or summaries thereof) and other properties and assets of the Company and its Subsidiaries that they and their representatives have desired or requested to see or review, and that they and their representatives have had a full opportunity to meet with the officers and employees of the Company.  Neither Centerbridge nor Purchaser has Knowledge of any facts or circumstances that could reasonably be expected to constitute a breach of the representations and warranties of the Company in Article II of this Agreement.

IV.    COVENANTS

4.1    Approval Motion; Approval Order.  The Company shall use its reasonable best efforts to cause the Bankruptcy Court to enter a final order of the Bankruptcy Court (the "Approval Order") approving and authorizing the Company to enter into this Agreement and authorizing the various fees contained herein and approving and authorizing the Support Agreement and that, subject to Section 4.9, to issue such Approval Order and to cause such Approval Order to contain a process specified therein that is reasonably acceptable to the Creditors' Committee, the Company and Centerbridge, whereby Persons who have submitted a bona fide proposal for an Alternative Investment, Alternative Majority Investment, Alternative Transaction or Alternative Stand-Alone Plan (each, an "Alternative Proposal") would be granted access to Company information after signing a confidentiality agreement having terms no less favorable to the Company or more favorable to the recipient thereunder

than the respective terms of the Confidentiality Agreement (an "<u>Acceptable Confidentiality Agreement</u>"), would be required to submit a definitive Alternative Proposal to the Company on or before the deadlines specified in the Approval Order. Nothing in this Section 4.1 or the Approval Order will be deemed to limit Section 4.10 or the Company's right to terminate this Agreement pursuant to any of Sections 6.2(f), (g), (h) or (i) or the exercise of its fiduciary duties with respect to the Plan Support Agreement.

4.2     <u>Plan and Disclosure Statement</u>.  Subject to Section 4.9, the Company shall authorize, execute, file with the Bankruptcy Court and seek confirmation of, a Chapter 11 Plan (and a related disclosure statement (the "<u>Disclosure Statement</u>")) the terms of which are consistent with this Agreement, the Support Agreement, the PSA Term Sheet and with such other terms that, to the extent they have a material impact on Purchaser's proposed investment in the Company, are reasonably satisfactory to Centerbridge and Purchaser.  The Company shall (a) provide to Centerbridge and Purchaser and their counsel a copy of the Chapter 11 Plan and Disclosure Statement, and any amendments thereto, and a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court, and (b) duly consider in good faith any comments consistent with this Agreement, the Support Agreement and the PSA Term Sheet, and any other reasonable comments of Centerbridge and Purchaser and their counsel.  In addition, the Company shall (y) provide to Centerbridge and Purchaser and their counsel a copy of the Confirmation Order and a reasonable opportunity to review and comment on such order prior to such order being filed with the Bankruptcy Court and (z) duly consider in good faith any comments consistent with this Agreement, the Support Agreement and the PSA Term Sheet, and any other reasonable comments of Centerbridge and Purchaser and their counsel.

4.3     <u>Rights Agreement</u>.  Subject to compliance by Purchaser and Centerbridge with Section 2.1 and 2.2 of the Shareholders Agreement, the Company shall take all action to ensure that the purchase of Series A Shares and Series B Shares pursuant to this Agreement will not result in the ability of any Person to exercise any Rights (as defined in the Rights Agreement) under the Rights Agreement or enable or require any Rights to separate from the Shares to which they are attached or to be triggered or to become exercisable.

4.4     <u>Employment Agreements</u>.  The Company and Centerbridge will use reasonable best efforts to ensure that the individuals negotiating the employment agreements for the persons listed on Schedule 4.4, as contemplated by the Chapter 11 Plan, will consult with Centerbridge during that negotiation and that such employment agreements shall be on market terms and in form and substance reasonably acceptable to Centerbridge, all subject to approval by the Board of Directors of New Dana on the Effective Date.

4.5     <u>Conduct of Business by Company Pending the Closing</u>.  The Company covenants and agrees that, during the period from the date of this Agreement to the Closing Date, (i) except as expressly required or permitted by this Agreement, the

Support Agreement or the Chapter 11 Plan, as required by Law or order of the Bankruptcy Court or as set forth in Section 4.5 of the Company Disclosure Letter or otherwise with the prior written consent of Purchaser (which will not be unreasonably withheld or delayed), the business of the Company and its Subsidiaries shall be conducted in the usual and ordinary course of business consistent in all material respects with past practices, and the Company shall use its commercially reasonable efforts to (a) preserve substantially intact its current business organization and (b) preserve in all material respects its present relationships with suppliers, lessors, employees, customers, and other Persons with which it has significant business relations, and (ii) it will promptly give written notice to Centerbridge with particularity upon having Knowledge of any matter that may constitute a breach of any of the Company's representations, warranties, agreements or covenants contained in this Agreement that would reasonably be expected to result in a failure of a condition in Section 5.3(b) or 5.3(c).  Without limiting the generality of the foregoing, the Company shall not, and it shall cause its Subsidiaries not to, between the date of this Agreement and the Closing Date, except as expressly required or permitted by this Agreement, the Support Agreement or the Chapter 11 Plan, as required by Law or order of the Bankruptcy Court or as set forth in Section 4.5 of the Company Disclosure Letter, directly or indirectly, do, or irrevocably commit to do, any of the following without the prior written consent of Centerbridge or Purchaser, which will not be unreasonably withheld or delayed:

(a)    amend or otherwise change the Company's charter or bylaws or, unless the Company Board determines in good faith, after consultation with its outside counsel, that its fiduciary duties require it, amend or grant any waiver under the Rights Agreement;

(b)    except for intercompany transactions, issue, deliver, grant, sell or dispose of any of the Company's or its Subsidiaries capital stock or any securities convertible into, or any rights, warrants or options to acquire, any such capital stock at less than fair market value;

(c)    declare, set aside, make or pay any dividend or other distribution, whether payable in cash, stock, property or otherwise, with respect to any of its capital stock (other than dividends or distributions by any wholly owned Subsidiary to its parent);

(d)    reclassify, combine, split, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any shares of capital stock of the Company or any Subsidiary or any securities convertible into or exercisable for any such shares of its capital stock or securities;

(e)    acquire any shares or equity interests in any corporation, partnership, Person or other business organization or division thereof, or a substantial portion of the assets thereof, except (i) immaterial acquisitions in the ordinary course of business consistent with past practice and (ii) other acquisitions involving not in excess of $50 million in any transaction;

(f)     (i) incur, create or assume any indebtedness for borrowed money (including by issuance of debt securities) other than borrowings in the ordinary course of business consistent with past practices under the Company's or any Subsidiary's existing or any amended or replacement credit facilities or (ii) other than in the ordinary course of business consistent with past practices or for guarantees of Subsidiary obligations to the extent permitted under the Company's applicable credit agreements, issue any debt securities or warrants or other rights to acquire any debt securities of the Company or any Subsidiary, or assume, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations or indebtedness for borrowed money of any Person, or make any loans or advances or, except in connection with an acquisition permitted under clause (e) above, make any capital contributions to, or investments in, any other Person;

(g)     except as may be required as a result of a change in law or in GAAP or audit practices, make any material change to any of the financial accounting methods, practices or principles used by it;

(h)     adopt or authorize a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of the Company or any of its Significant Subsidiaries (other than as provided for under the Chapter 11 Plan or as otherwise expressly permitted under this Agreement);

(i)     sell, lease, license, mortgage, pledge, grant a lien, mortgage, pledge, security interest, charge, claim or other encumbrance of any kind or nature on or otherwise encumber or dispose of any of its properties or assets, except (i) in the ordinary course of business consistent with past practice and (ii) other transactions involving not in excess of $50 million in any 12-month period;

(j)     settle or dismiss any Litigation threatened against, relating to or involving the Company and any Subsidiary in connection with any business, asset or property of the Company and any Subsidiary, other than in the ordinary course of business consistent with past practices but not, in any individual case, in excess of $50 million or in a manner that would prohibit or materially restrict the Company from operating as it has historically (including as of the date of this Agreement);

(k)     (A) make any material Tax election, (B) enter into any settlement or compromise of any material Tax liability, (C) file any amended Tax Return with respect to any material Tax, (D) change any annual Tax accounting period, (E) enter into any closing agreement relating to any material Tax, or (F) surrender any right to claim a material Tax refund other than in the ordinary course of business consistent with past practices; or

(l)     enter into any new, or amend or supplement any existing, collective bargaining agreement, which is inconsistent with the Chapter 11 Plan, this Agreement or the Support Agreement.

4.6    Access.  From the date hereof to the Closing Date, the Company will (i) allow all designated officers, attorneys, accountants and other representatives of Centerbridge and Purchaser reasonable access at reasonable times during normal business hours to the officers, key employees, accountants and other representatives of the Company and its Subsidiaries and the books and records of the Company and its Subsidiaries and (ii) furnish to Centerbridge and Purchaser and their counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information as such Persons may reasonably request.  All information provided pursuant to this Section 4.6 will be subject to the Confidentiality Agreement.

4.7    Publicity.  The initial press release relating to this Agreement will be in the form of a joint press release previously agreed between Centerbridge and Purchaser and the Company.  Thereafter, the Company (or New Dana, as applicable), Centerbridge and Purchaser will, subject to their respective legal obligations (including requirements of stock exchanges and other similar regulatory bodies), consult with each other, and use reasonable efforts to agree upon the text of any press release, before issuing any such press release or otherwise making public statements with respect to the transactions contemplated hereby and in making any filings with any Governmental Entity or with any national securities exchange with respect thereto.

4.8    HSR Act; Other Regulatory Filings.  The Company and Centerbridge will or will cause the Person within which the Company and Purchaser are included, pursuant to the HSR Act and rules and regulations promulgated thereunder, to (i) promptly, but in no event later than twenty business days after the date of the Approval Order, file any and all Notification and Report Forms required under the HSR Act with the Federal Trade Commission (the "FTC") and the Antitrust Division of the Department of Justice (the "Antitrust Division") and use their respective reasonable efforts to respond as promptly as practicable to all reasonable inquiries received from the FTC or the Antitrust Division for additional information or documentation, (ii) use reasonable best efforts to cause the expiration or termination of any applicable waiting periods under the HSR Act, (iii) use reasonable best efforts to cooperate with each other in (x) determining whether any filings are required to be made with, or consents, permits, authorizations, waivers, clearances, approvals, and expirations or terminations of waiting periods are required to be obtained from any Governmental Entities in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and (y) timely making all such filings and timely obtaining all such consents, permits, authorizations or approvals, (iii) supply to any Governmental Entity as promptly as reasonably practicable any additional information or documentary material that may reasonably be requested pursuant to any Antitrust Law or by such Governmental Entity, and (iv) use reasonable best efforts to take, or cause to be taken, all other actions and do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective the Investments, including using reasonable best efforts to (A) take such further action as may be necessary to resolve such objections, if any, as the FTC, Antitrust Division, state antitrust enforcement authorities or competition authorities of any other nation or other jurisdiction or any other Person may assert under any Antitrust Law with respect to the Investments, and (B) avoid or eliminate each and every impediment under any Law that may be asserted by

any Governmental Entity with respect to the Investments so as to enable the Closing to occur no later than May 1, 2008; *provided* that, neither the Company nor any of its Subsidiaries will, nor will Centerbridge or any of its Subsidiaries or Affiliates, be obligated to, become subject to, or consent or agree to or otherwise take any action with respect to, any requirement, condition, understanding, agreement or order of a Governmental Entity to sell, to hold separate or otherwise dispose of, or to conduct, restrict, operate, invest or otherwise change the assets or business of the Company or any of its Subsidiaries or Centerbridge or any of its Subsidiaries or Affiliates, as the case may be, unless such requirement, condition, understanding, agreement or order is binding on the Company or Centerbridge, its Subsidiaries or Affiliates, respectively, only in the event that the Closing occurs. For purposes hereof, "Affiliates" shall in no event include or be deemed to include any portfolio companies (whether Controlled by Centerbridge or otherwise) of Centerbridge or any of its affiliated funds.

4.9    <u>Reasonable Efforts to Close</u>. The parties agree to use their reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including without limitation using reasonable efforts to cause the conditions to Closing to be satisfied as promptly as practicable. Each of Purchaser and the Company agrees that it will consult with the other with respect to the obtaining of all approvals of any and all third parties and Governmental Entities necessary or advisable to consummate the transactions contemplated by this Agreement, and each party will keep the other reasonably apprised of the status of any material matters relating to completion of the transactions contemplated herein. Centerbridge will cause Purchaser to perform its obligations in this Agreement.

4.10    <u>Notification of Alternative Investment</u>. Nothing in this Agreement will be deemed to preclude the Company from furnishing information with respect to the Company and its Subsidiaries to any Person making an Alternative Proposal or participating in discussions or negotiations with the Person making an Alternative Proposal; *provided*, that the Company will not disclose any material non-public information to such Person without entering into an Acceptable Confidentiality Agreement. If the Company Board determines in good faith (after consultation with its outside legal counsel and its independent financial advisor or advisors) that the terms of an Alternative Investment proposal are superior to the terms of this Agreement and the Investments, taking into account all legal, financial, regulatory and other aspects of such Alternative Investment, the likely time to consummation of the Alternative Investment and the termination rights of the Unions set forth in the Union Settlement Agreement, then the Company must promptly, but in no event more than one business day, after such Company Board determination provide written notice to Centerbridge (the "<u>Notice of Alternative Investment</u>") advising it that it has received a proposal for an Alternative Investment, specifying the material terms and conditions of such proposal and indicating that the Company Board intends to consider whether to terminate this Agreement pursuant to Section 6.2(f). Centerbridge will have five business days from its receipt of

the Notice of Alternative Investment (the "Match Period") to make an offer to amend the terms of this Agreement and the Investments in response thereto.

4.11    Takeover Statutes and Charter.  The Company and the Company Board have taken, or with respect to New Dana, will prior to Closing take, all action necessary (a) to ensure that no state takeover statute or similar statute or regulation is or becomes applicable to this Agreement or any transaction contemplated hereby or by the Chapter 11 Plan, the Support Agreement or the PSA Term Sheet, (b) if any state takeover statute is or may become applicable to the transactions contemplated by this Agreement, the Chapter 11 Plan, the Support Agreement or the PSA Term Sheet, to grant such approvals and take such actions as are necessary so that such transactions may be consummated as promptly as practicable on the terms contemplated by this Agreement, the Chapter 11 Plan, the Support Agreement or the PSA Term Sheet and otherwise to act to eliminate or minimize the effects of such statute or regulation on such transactions and (iii) to ensure that this Agreement or any transaction contemplated hereby or by the Chapter 11 Plan, the Support Agreement or the PSA Term Sheet are approved for purposes of Article 14 of the VSCA.

## V.    CONDITIONS TO CLOSING

5.1    Conditions to Each Party's Obligations. The respective obligations of Centerbridge and Purchaser, on the one hand, and Dana and New Dana, on the other hand, to consummate the transactions contemplated by this Agreement are subject to the fulfillment (or waiver by all parties to the extent permitted by Law) at or prior to the Closing Date of the following conditions:

(a)    All conditions precedent to the effectiveness of the Chapter 11 Plan shall have been satisfied or waived pursuant to the provisions therein.

(b)    The waiting period (and any extension thereof) if any, applicable to the issuance and sale of the Shares under all applicable Antitrust Laws shall have been terminated or expired.

(c)    No Order or Law enacted, entered, promulgated, enforced or issued by any court of competent jurisdiction or other Governmental Entity or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement shall be in effect.

(d)    The Bankruptcy Court shall have issued the Approval Order.

(e)    The Union Settlement Agreement shall not have been terminated and shall have been approved by the Bankruptcy Court.

5.2    Conditions to Obligations of the Company.  The obligations of the Company to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing of the following conditions:

(a)    That all closing deliveries set forth in Section 1.5(a) hereof shall have been delivered to New Dana.

(b)    All representations and warranties of Centerbridge and Purchaser in Article III must be true and correct in all respects on the Closing Date, except as would not have or reasonably be expected to have a Purchaser Material Adverse Effect.

(c)    All covenants in Article IV required to be performed by Centerbridge or Purchaser herein must have been complied with in all material respects.

(d)    A confirmation order (the "Confirmation Order") approving the Chapter 11 Plan in a form reasonably acceptable to the Company consistent with the PSA Term Sheet in all respects shall have been entered by the Bankruptcy Court.

(e)    The Chapter 11 Plan, including the plan documents attached thereto, shall be in a form reasonably acceptable to the Company consistent with the PSA Term Sheet and shall have been implemented in all material respects in a manner acceptable to the Company.

(f)    The Company or New Dana, as the case may be, must have received from Centerbridge a certificate of an executive officer of Centerbridge (without personal liability) certifying to the satisfaction of the conditions set forth in Sections 5.2(b) and 5.2(c) above.

5.3    Conditions to Obligations of Purchaser.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing of the following conditions:

(a)    All closing deliveries set forth in Section 1.5(b) hereof must have been delivered to Purchaser.

(b)    All representations and warranties of the Company and New Dana in Article II must be true and correct in all respects on the Closing Date, except as would not have or reasonably be expected to have a Company Material Adverse Effect.

(c)    All covenants in Article IV required to be performed by the Company or New Dana, as the case may be, must have been complied with in all material respects.

(d)    No Company Material Adverse Effect shall have occurred between the date hereof and the Closing.

(e)    The Confirmation Order approving the Chapter 11 Plan in a form reasonably acceptable to Centerbridge consistent with the PSA Term Sheet in all respects shall have been entered by the Bankruptcy Court on or before February 28, 2008.

(f)     The Company shall have obtained exit financing with parties and on market terms that are reasonably acceptable to Centerbridge and shall have consulted with Centerbridge regarding such parties and terms.

(g)     The Chapter 11 Plan and the related disclosure statement shall have been filed with the Bankruptcy Court no later than September 3, 2007.

(h)     The Chapter 11 Plan, including the plan documents attached thereto, shall be in a form acceptable to Centerbridge and shall have been implemented in all material respects in a manner acceptable to Centerbridge consistent with this Agreement and the PSA Term Sheet.

(i)     Centerbridge must have received from the Company or New Dana, as the case may be, a certificate of an executive officer of the Company or New Dana, as the case may be, (without personal liability) certifying to such executive's Knowledge the satisfaction of the conditions set forth in Sections 5.3(b), (c) and (d) above.

(j)     New Dana's charter or amendments to the Company's charter, as applicable, shall have been filed with the Secretary of State of the state in which it is incorporated, which charter or amendments, and the bylaws of New Dana in effect as of the Closing Date, shall be in form and substance reasonably acceptable to Purchaser and Centerbridge and consistent with this Agreement and the Exhibits hereto, necessary to implement the transactions contemplated by this Agreement, the Chapter 11 Plan, the Support Agreement and the PSA Term Sheet; provided, however, that the terms of the Series A Preferred and Series B Preferred included in the New Dana charter shall in any event be in the form of Exhibit B, and Centerbridge shall have received from the Company or New Dana, as the case may be, a certificate of the Secretary of the Company or New Dana, as the case may be, certifying as to such charter and bylaws.

(k)     Effective upon the Closing, the New Dana Board shall consist of seven directors, (i) three of whom shall be designated by Centerbridge, one of whom shall be an Independent Director, (ii) two of whom shall be designated by representatives of the unsecured creditor's committee (the "Creditors' Committee") appointed in the Chapter 11 Case, each of whom shall be an Independent Director, (iii) one of whom shall be selected by the Creditors' Committee from a list of three Independent Directors proffered to the Creditors' Committee by Centerbridge, provided, however, if none of the Independent Directors on the list are reasonably satisfactory to the Creditors' Committee, then Centerbridge shall proffer the names of additional Independent Directors until the name of an Independent Director reasonably satisfactory to the Creditors' Committee is put forth, and (iv) one of whom shall be the Chief Executive Officer of the Company.

5.4     Frustration of Closing Conditions.  No party hereto may rely, either as a basis for not consummating the Investments or terminating this Agreement and abandoning the Investments, on the failure of any condition set forth in Section 5.1, 5.2 or 5.3, as the case may be, to be satisfied if such failure was caused by such party's

breach in any material respect of any provision of this Agreement or failure to use all reasonable best efforts to consummate the Investments and the other transactions contemplated hereby.

VI.    <u>TERMINATION AND WAIVER</u>

6.1    <u>Termination by Mutual Consent</u>.  This Agreement may be terminated at any time prior to the Closing Date by the mutual consent of Centerbridge and the Company.

6.2    <u>Other Termination Rights</u>.  This Agreement may also be terminated:

(a)    by either Centerbridge or the Company, if the Effective Date has not occurred on or before May 1, 2008; <u>provided</u>, <u>however</u>, that no party may terminate this Agreement pursuant to this Section 6.2(a) if such party has failed in any material respect to fulfill any of its obligations under this Agreement;

(b)    by either Centerbridge or the Company, if any Governmental Entity has issued an order, decree or ruling or taken any other action permanently enjoining, restraining or otherwise prohibiting the consummation of the purchase of Shares by Purchaser or any of the other transactions contemplated by this Agreement and such order, decree or ruling or other action has become final and nonappealable;

(c)    by either Centerbridge or the Company, if the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or a Chapter 11 trustee is appointed;

(d)    by Centerbridge, if there has been a default or breach by the Company of its representations and warranties, covenants or agreements set forth in this Agreement, or in connection with the transactions contemplated hereby, which default or breach is incapable of being cured or, if capable of being cured has not been cured within 60 days following receipt by the Company from Centerbridge of written notice of such default or breach (specifying in reasonable detail the claimed default or breach and demand of its cure or satisfaction) and which default or breach would result in a failure of the condition set forth in Section 5.3(f) or (g), as applicable or if, pursuant to an order of the Bankruptcy Court, the Debtor no longer has the exclusive right to file a plan of reorganization; <u>provided</u>, <u>however</u>, that Centerbridge will not have the right to terminate this Agreement pursuant to this Section 6.2(d) if it or Purchaser is in material breach of any representations, warranties, covenants or agreements hereunder;

(e)    by the Company, if there has been a default or breach by Centerbridge or Purchaser of its representations and warranties, covenants or agreements set forth in this Agreement, or in connection with the transactions contemplated hereby, which default or breach is incapable of being cured or, if capable of being cured has not been cured within 60 days following receipt by Centerbridge from the Company of written notice of such default or breach (specifying in reasonable detail the claimed default or breach and demand of its cure or satisfaction) and which default

or breach would result in a failure of the condition set forth in Section 5.2(d) or (e), as applicable; provided, however, that the Company will not have the right to terminate this Agreement pursuant to this Section 6.2(e) if it is in material breach of any representations, warranties, covenants or agreements hereunder;

(f)      by the Company, in the event that the Company Board approves an Alternative Investment (whether pursuant to a binding letter of intent or definitive agreements) after determining in good faith (after consultation with its outside legal counsel and its independent financial advisor or advisors) that the terms of such Alternative Investment are superior to the terms of this Agreement and the Investments, taking into account all legal, financial, regulatory and other aspects of such Alternative Investment, the likely time to consummation of the Alternative Investment, the termination rights of the Unions set forth in the Union Settlement Agreement and any amendments to this Agreement and the Investments proposed by Centerbridge during the Match Period; provided, however, that in order for the termination of this Agreement pursuant to this Section 6.2(f) to be effected, the Company shall first have complied in all material respects with the provisions of Section 4.10;

(g)      by the Company, in the event that the Company Board approves an Alternative Majority Investment (whether pursuant to a binding letter of intent or definitive agreements) after determining in good faith (after consultation with its outside legal counsel and its independent financial advisor or advisors) that the terms of such Alternative Majority Investment are more favorable to the bankruptcy estate of the Debtor than the Chapter 11 Plan and the Investments, taking into account all legal, financial, regulatory and other aspects of such Alternative Majority Investment, the likely time to consummation of the Alternative Majority Investment and the termination rights of the Unions set forth in the Union Settlement Agreement;

(h)      by the Company, in the event that the Company Board approves an Alternative Transaction (whether pursuant to a binding letter of intent or definitive agreements) after determining in good faith (after consultation with its outside legal counsel and its independent financial advisor or advisors) that the terms of such Alternative Transaction are more favorable to the bankruptcy estate of the Debtor than the Chapter 11 Plan and the Investments, taking into account all legal, financial, regulatory and other aspects of such Alternative Transaction, the likely time to consummation of the Alternative Transaction and the termination rights of the Unions set forth in the Union Settlement Agreement; and

(i)      by the Company, in the event that the Company Board approves an Alternative Stand-Alone Plan after determining in good faith (after consultation with its outside legal counsel and its independent financial advisor or advisors) that the terms of an Alternative Stand-Alone Plan are more favorable to the bankruptcy estate of the Debtor than the Chapter 11 Plan and the Investments, taking into account all legal, financial, regulatory and other aspects of such Alternative Stand-Alone Plan, the likely time to consummation of the Alternative Stand-Alone Plan and the termination rights of the Unions set forth in the Union Settlement Agreement.

6.3    Effect of Termination.  (a)  Any termination of this Agreement by Centerbridge pursuant to this Article VI will be deemed to be a termination on behalf of itself and Purchaser.

(b)    A termination under Section 6.1 will be effective upon the date of the mutual agreement to terminate this Agreement pursuant thereto.

(c)    In order to terminate this Agreement pursuant to Section 6.2 hereof by Centerbridge or the Company, written notice thereof must promptly be given to the other party specifying the provision hereof pursuant to which such termination is made, and the effective date of such termination will be as follows (with respect to each applicable paragraph of Section 6.2, the "Termination Effective Date" thereof):

(i)    with respect to a termination under Section 6.2(a), (b), (c), (d) or (e), such termination will become effective upon notice of the exercise of such termination right, in accordance with Section 8.1;

(ii)    with respect to a termination under Section 6.2(f), (g) or (h), notwithstanding the prior delivery of a notice of the Company's exercise of such termination right, such termination will become effective only upon the earlier to occur of (A) the approval by the Bankruptcy Court of the Alternative Investment, the Alternative Majority Investment or the Alternative Transaction, respectively, (B) the 30th day after the applicable Company Board approval giving rise to such termination right, as described in Section 6.2(f), (g) or (h), and (C) the Company's written notice to Centerbridge that it wishes the termination to be effective at a specified earlier date, respectively; provided, however, that in the event the Bankruptcy Court enters an order denying the Company's motion to approve such Alternative Investment, Alternative Majority Investment or Alternative Transaction, as applicable, prior to such 30th day (or, if earlier, the date of such Company notice), the Company's termination notice relating thereto will automatically and without further action be deemed to have been withdrawn and such termination will not become effective for any purposes under this Agreement; and

(iii)    with respect to a termination under Section 6.2(i), notwithstanding the prior delivery of a notice of the Company's exercise of such termination right, such termination will become effective only upon the entry of an order by the Bankruptcy Court approving the disclosure statement relating to such Alternative Stand-Alone Plan or such earlier date on which the Company give written notice to Centerbridge that it wishes the termination to be effective at a specified earlier date.

(d)    Upon the effectiveness of the termination of this Agreement pursuant to Section 6.3(c), this Agreement will become void and have no effect, and there will be no liability hereunder on the part of Centerbridge, Purchaser or the Company or New Dana; provided, however, that Section 4.7 and Article VIII and all obligations to pay any fees pursuant to Article VII, if any, will survive any such

effectiveness or termination as set forth therein; provided further, however, that nothing in this Section 6.3 will relieve Centerbridge or Purchaser of liability for any breach of this Agreement.  The Confidentiality Agreement will, except as provided herein, remain in effect during the term of this Agreement and following its termination pursuant to its terms; provided, however, that such agreement will automatically terminate as of the Closing.  Notwithstanding that a termination of this Agreement pursuant to Section 6.2(f), (g), (h) or (i) is not yet effective, upon delivery by the Company of notice of termination pursuant to one of those Sections, the Company's obligations to pursue the Chapter 11 Plan and to otherwise use reasonable efforts to consummate, and take actions in furtherance of, the transaction contemplated by this Agreement and the Chapter 11 Plan will be suspended until such termination either becomes effective or is withdrawn pursuant to the applicable provision of Section 6.2; provided, however, that during such suspension period, the Company will not voluntarily take any action, directly or indirectly, that would preclude continued compliance with its obligations hereunder should the termination be so withdrawn.

## VII.    FEES AND EXPENSES

7.1    Liquidated Damages.    (a)  Subject to Section 7.3, in the event that this Agreement is terminated by the Company in accordance with Section 6.2(f), and at the time of such termination Centerbridge and Purchaser have not breached any of their representations, warranties, covenants or agreements under this Agreement in any material respect, then the Company will pay Purchaser, as liquidated damages, a payment of $15.0 million, plus an additional amount equal to the reasonable out-of-pocket costs and expenses incurred by Purchaser and Centerbridge in connection with this Agreement and the transactions contemplated hereby in an amount not to exceed $4.0 million (the "Purchaser Expenses").  Any such payments pursuant to this Section 7.1(a) will be earned and payable by the Company to Purchaser immediately upon the Termination Effective Date.

(b)    Subject to Section 7.3, in the event that this Agreement is terminated by the Company pursuant to Section 6.2(g), (h) or (i), and at the time of such termination Centerbridge and Purchaser have not breached any of their respective representations, warranties, covenants or agreements under this Agreement in any material respect, then the Company will pay Purchaser, as liquidated damages, a payment of $22.5 million, plus an additional amount equal to the Purchaser Expenses. Any such payments pursuant to this Section 7.1(b) will be earned and payable by the Company to Purchaser immediately upon the Termination Effective Date of the applicable termination.

(c)    Subject to Section 7.3, in the event that this Agreement is terminated pursuant to Section 6.2(c) or (d), then the Company will be obligated to pay Purchaser, as liquidated damages, a payment of $3.5 million (the "Termination Fee") plus an additional amount equal to the Purchaser Expenses.  Any such payments pursuant to this Section 7.1(c) will be earned and payable by the Company to Purchaser immediately upon the Termination Effective Date of the applicable termination.

(d)    Subject to Section 7.3, in the event that this Agreement is terminated pursuant to Section 6.2(a), then the Company will be obligated to pay Purchaser, as liquidated damages, a payment of $2.5 million (the "Commitment Fee") plus an additional amount equal to the Purchaser Expenses.  Any such payments pursuant to this Section 7.1(d) will be earned and payable by the Company to Purchaser immediately upon the Termination Effective Date of the applicable termination.

7.2    Commitment Fee.  Subject to Section 7.3, in consideration of Centerbridge's and Purchaser's commitment to purchase the Series B-1 Preferred pursuant to the terms of this Agreement, on the Effective Date, the Company will pay to Purchaser the Commitment Fee, plus an additional amount equal to the Purchaser Expenses.

7.3    No Duplication of Payments.  Notwithstanding any other provision hereof, Purchaser shall be entitled to only one payment of each of the following fees and expenses:  (a) Purchaser Expenses, (b) a Termination Fee, (c) a Commitment Fee and (c) the $15.0 million or $22.5 million, as applicable, fee payable pursuant to Section 7.1(a) or (b).

7.4    Superpriority Administration Expense Claims.  The liquidated damages payments payable pursuant to Section 7.1 and 7.2 will be superpriority allowed administrative expense claims having priority over all other administrative claims other than any such claims of the Debtors' post-petition lenders in their capacity as such.

7.5    Liquidated Damages.  Centerbridge and Purchaser agree that it would be impractical and extremely difficult to determine the extent of any damages to Centerbridge and Purchaser that might result from a breach by the Company of any representation, warranty, covenant or agreement of this Agreement or the Support Agreement.  Therefore, the parties acknowledge and agree that any payment to Purchaser made pursuant this Article VII will be paid as liquidated damages and the parties' good faith estimate of the actual potential damages to Purchaser and Centerbridge for any such breach.  Purchaser and Centerbridge agree to accept such amounts as satisfaction in full of any claim or demand that Purchaser or Centerbridge may have against the Company, its Affiliates, employees, officers, directors, agents, successors and assigns because of such breach.


VIII.    GENERAL PROVISIONS

8.1    Notices.  Any notice or other communication required to be given hereunder will be in writing, and sent by reputable courier service (with proof of service), by hand delivery, or by email or facsimile (followed on the same day by delivery by courier service (with proof of delivery) or by hand delivery), addressed as follows:

<u>If to Centerbridge or Purchaser</u>:

    Centerbridge Capital Partners, L.P.
    375 Park Avenue, 12th Floor
    New York, NY 10152
    Attention:    Jeffrey Aronson
    Email:        jaronson@centerbridge.com
    Fax:          (212) 672-6501

    and

    Attention:    David Trucano
    Email:        dtrucano@centerbridge.com
    Fax:          (212) 672-6501

<u>With copies to</u>:

    Willkie Farr & Gallagher LLP
    787 Seventh Avenue
    New York, New York 10019
    Attention:    Matthew A. Feldman
    Email:        mfeldman@willkie.com
    Fax:          (212) 728-9651

    and

    Attention:    Jeffrey R. Poss
    Email:        jposs@willkie.com
    Fax:          (212) 728-9536

<u>If to the Company or New Dana</u>:

    Dana Corporation (or the name of New Dana)
    4500 Dorr Street
    Toledo, OH  43615
    Attention:    General Counsel and Secretary
    Email:
    Fax:          (419) 535-4544

<u>With copies to</u>:

    Jones Day
    222 East 41st Street
    New York, New York  10017
    Attention:    Corinne Ball
    Email:        cball@jonesday.com
    Fax:          (212) 755-7306

and

Attention:     Marilyn W. Sonnie
Email:         mwsonnie@jonesday.com
Fax:           (212) 755-7306

or to such other address as any party will specify by written notice so given, and such notice will be deemed to have been delivered as of the date so telecommunicated or personally delivered.

8.2     Assignment; Binding Effect.  Neither this Agreement nor any of the rights, interests or obligations hereunder will be assigned by any party hereto (whether by operation of Law or otherwise) without the prior written consent of the other party, except that (a) Centerbridge will have the right to assign any of the rights and obligations of Centerbridge hereunder to any Qualified Purchaser Transferee, who executes and delivers to the Company an Assumption Agreement, provided, that any such assignment will not relieve Centerbridge from any of its obligations hereunder and (b) the Company will, effective as of the Effective Date, assign all of its rights and obligations under this Agreement to New Dana.  Any assignment not granted in accordance with the foregoing will be null and void.  Subject to the first and last sentence of this Section 8.2, this Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and assigns. Notwithstanding anything contained in this Agreement to the contrary, (A) the Company's and New Dana's obligations hereunder are subject to approval by the Bankruptcy Court of the transactions contemplated hereby and under the other Transaction Documents and (B) nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto or their respective heirs, successors, executors, administrators and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

8.3     Entire Agreement.  This Agreement, the Company Disclosure Letter, and any documents delivered by the parties in connection herewith or therewith, including the Transaction Documents, the Support Agreement (except for the Investment Term Sheet as defined therein) and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto.  The Confidentiality Agreement and Support Agreement remain in full force and effect except that the Investment Term Sheet is replaced in its entirety with this Agreement.

8.4     Amendment.  Subject to applicable law, including but not limited to the requirements of the Bankruptcy Code and the orders of the Bankruptcy Court, this Agreement may only be amended by an instrument in writing signed on behalf of each of the parties hereto.

8.5    <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles.

8.6    <u>Counterparts</u>.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered will be an original, but all such counterparts will together constitute one and the same instrument.  Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto.  A facsimile copy of a signature page will be deemed to be an original signature page.

8.7    <u>Headings</u>.  Headings of the Articles and Sections of this Agreement are for the convenience of the parties only, and will be given no substantive or interpretive effect whatsoever.

8.8    <u>Certain Definitions/Interpretations</u>.  (a)  For purposes of this Agreement:

(i)    "<u>Assumption Agreement</u>" means an agreement in writing in substantially the form of <u>Exhibit A</u> to the Shareholders Agreement pursuant to which the party thereto agrees to be bound by the terms and provisions of this Agreement;

(ii)    An "<u>Affiliate</u>" of any Person means another Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under Common Control with, such first Person; provided that as such term is used in this Agreement, Centerbridge and Purchaser will not be considered to be Affiliates of the Company;

(iii)    "<u>Alternative Investment</u>" means an investment proposed by any Person or group of Persons (other than a party to this Agreement or its Affiliates) (a "<u>Third Party Investor</u>") that would result in any direct or indirect acquisition or purchase by such Third Party Investor of beneficial ownership of less than 50% of the equity securities of New Dana entitled to vote generally in the election of directors calculated on a fully-diluted basis, taking into account any securities convertible into, exchangeable for or exercisable for any such securities (whether immediately or otherwise) on an as-converted, exchanged or exercised basis, that would be an alternative to the Investments;

(iv)    "<u>Alternative Majority Investment</u>" means an investment proposed by any Third Party Investor, other than an Alternative Investment, that would result in any direct or indirect acquisition or purchase by such Third Party Investor of beneficial ownership of at least 50% of the equity securities of New Dana entitled to vote generally in the election of directors calculated on a fully-diluted basis, taking into account any securities convertible into, exchangeable for or exercisable for any such securities (whether immediately or otherwise) on an as-

converted, exchanged or exercised basis, that would be an alternative to the Investments; ;

(v)      "<u>Alternative Transaction</u>" means a proposed transaction, other than an Alternative Investment or Alternative Majority Investment, between the Company and a Third Party Investor, involving the sale of all or substantially all of the assets of Debtor as a going concern and not as a liquidation;

(vi)     "<u>Alternative Stand-Alone Plan</u>" means any plan of reorganization for the Company, not involving any Alternative Investment, Alternative Majority Investment or Alternative Transaction, proposed by the Debtor without any party providing equity financing;

(vii)    "<u>Antitrust Laws</u>" means the Sherman Antitrust Act, as amended, the Clayton Act of 1914, as amended, the HSR Act, the Federal Trade Commission Act of 1914, as amended, Council Regulation (EC) No. 139/2004 of 20 January 2004 on the control of concentrations between undertakings, as amended, and all other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade, whether foreign or domestic;

(viii)   "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York;

(ix)     "<u>Certificate of Designation</u>" means the Articles of Serial Designation of 4.0% Series A Convertible Preferred Stock and 4.0% Series B Convertible Preferred Stock in the form of <u>Exhibit B</u>;

(x)      "<u>Claims</u>" means claims (as such term is defined under section 101 of the Bankruptcy Code) against the Company or any rights to acquire such claims;

(xi)     "<u>Company Board</u>" means the board of directors of the Company;

(xii)    "<u>Company Material Adverse Effect</u>" means any change, effect, event or condition that has had or could reasonably be expected to have a material adverse effect (a) on the business, results of operations or financial condition of the Company, New Dana and their Subsidiaries, taken as a whole, or (b) that would prevent the Company from timely consummating the transactions contemplated hereby in all material respects; <u>provided</u>, <u>however</u>, that the definition of Company Material Adverse Effect will not include facts, circumstances, events, changes, effects or occurrences (i) generally affecting the industry in which the Company and its Subsidiaries or their customers operate, or the economy or the financial, credit or securities markets, in the United States or other countries in which the Company or its Subsidiaries operate, including effects on such industries, economy or markets resulting from any regulatory and political conditions or developments in general, or any outbreak or escalation of hostilities, declared or undeclared acts of war or terrorism (other than any of the

foregoing that causes any damage or destruction to or renders physically unusable or inaccessible any facility or property of the Company or any of its Subsidiaries); (ii) reflecting or resulting from changes in law or GAAP (or authoritative interpretations thereof); (iii) resulting from actions of the Company or any of its Subsidiaries that Centerbridge has expressly requested in writing or to which Centerbridge has expressly consented to in writing; (iv) to the extent resulting from the announcement of the Investments and the transactions contemplated thereby, including any lawsuit related thereto or any loss or threatened loss of or adverse change or threatened adverse change, in each case resulting therefrom, in the relationship of the Company or its Subsidiaries with its customers, suppliers, employees or others; (v) resulting from changes in the market price or trading volume of the Company's securities, *provided* that the exceptions in this clause (v) are strictly limited to any such change or failure in and of itself and will not prevent or otherwise affect a determination that any fact, circumstance, event, change, effect or occurrence underlying such change or such failure has resulted in, or contributed to a Company Material Adverse Change; (vi) resulting from the suspension of trading in securities generally on any U.S. national securities exchange; or (vii) resulting from changes in the pool of claims (as such term is defined in Section 1.01(5) of the Bankruptcy Code); except to the extent that, with respect to clauses (i) and (ii), the impact of such fact, circumstance, event, change, effect or occurrence is disproportionately adverse to the Company and its Subsidiaries, taken as a whole, as compared to other Persons engaged in the industries in which the Company and its Subsidiaries compete;

(xiii)    "Company Reports" means all forms and reports filed by the Company with the SEC after January 1, 2006, and any such forms or reports filed by the Company with the SEC after the date of this Agreement and until the Closing Date, in each case under Sections 12(b) or 12(g) of the Exchange Act and the rules and regulations promulgated thereunder;

(xiv)    "Confidentiality Agreement" means that agreement by and between Centerbridge and the Company, dated as of June 1, 2007, as amended on June 19, 2007 and at any time thereafter;

(xv)    "Control" (including the terms "Controlling", "Controlled by" and under "Common Control with") means possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise;

(xvi)    "Independent Director" has the meaning given such term in Exhibit B;

(xvii)    "Investment Term Sheet" means the term sheet summarizing certain terms of this Agreement, dated July 5, 2007;

(xviii)  "Knowledge" means the actual knowledge after reasonable inquiry of any of the Company's executive officers in the case of the Company and, in the case of Purchaser, means the actual knowledge of Centerbridge's executive officers after reasonable inquiry;

(xix)  "Litigation" means any complaint, action, suit, proceeding, arbitration or other alternate dispute resolution procedure, demand, investigation or inquiry, whether civil, criminal or administrative;

(xx)  "New Common Stock" means the common stock of New Dana issued pursuant to the Plan;

(xxi)  "New Dana Board" means the board of directors of New Dana;

(xxii)  "Person" means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity;

(xxiii)  "Purchaser Material Adverse Effect" means any change, effect, event or condition that has prevented or materially delayed or could reasonably be expected to prevent or materially delay Centerbridge's or Purchaser's ability to consummate the transactions contemplated hereby;

(xxiv)  "Qualified Claims" means the net long position (after subtracting all short or other hedge positions form the long position) of Bondholder Claims beneficially owned by a Qualified Investor as of the Bondholder Record Date and Trade Claims beneficially owned by a Qualified Investor as of the Trade Claim Record Date, including any such Claims that are aggregated for determining eligibility pursuant to clause (A) of the definition of Qualified Investor;

(xxv)  "Qualified Investor" means a Person, other than the Unions, who (A) beneficially owns a net long position (calculated as aforesaid) of at least $25 million in the aggregate of Bondholder Claims and Trade Claims as of the Bondholder Record Date or at least $25 million in the aggregate of Trade Claims and Bondholder Claims (subject to the proviso) as of the Trade Claim Record Date, provided, however, that purchase of Trade Claims after the Bondholder Record Date may be aggregated with Bondholder Claims held as of the Bondholder Record Date for purposes of determining eligibility under this clause (A), but Bondholder Claims purchased after the Bondholder Record Date will not be aggregated with Trade Claims for such purpose, (B) is a "qualified institutional buyer," as such term is defined in Rule 144A promulgated under the Securities Act, (C) executes and delivers a signature page to the Support Agreement as a Supporting Creditor on or before the applicable Record Date, (D) either retains all of the Qualified Claims as of the Effective Date or transfers such Qualified Claims to a transferee that (1) qualifies as a Qualified Investor and (2) assumes all of the obligations of the transferor under the Support Agreement, provided, such transfer does not result in the transferor being entitled to purchase more than

36

$200 million of Series B Preferred, (E) is qualified to make the representations and warranties in, and who delivers to the Company a duly executed copy of, a Series B Subscription Agreement in the form of Exhibit C; and (F) has not at any time during the period from the Record Date through and including the Effective Date, engaged in any short sales of New Common Stock or Claims, any transactions involving options (including exchange-traded options), puts, calls or other derivatives involving securities of New Dana or any other transactions of any type that would have the effect of providing such holder with any other economic gain in the event of a decrease in the current or future market price of New Common Stock or Claims, or otherwise breached any covenants or agreements in the Subscription Agreement;

(xxvi)  "Qualified Purchaser Transferee" means an Affiliate of Purchaser that executes an Assumption Agreement, but only to the extent that such Qualified Purchaser Transferee is a corporation or other organization, whether incorporated or unincorporated, of which either Purchaser or Centerbridge directly or indirectly owns or Controls 100% of the securities or other interests having by their terms ordinary voting power to elect the board of directors (or others performing similar functions) of such corporation or other organization;

(xxvii) "Rights Agreement" means the Rights Agreement, dated as of April 25, 1996, as amended, between the Company and The Bank of New York, successor to Mellon Investor Services LLC (formerly Chemical Mellon Shareholder Services, L.L.C.), as Rights Agent;

(xxviii) "Record Date" means a date between August 9, 2007 and August 13, 2007, as agreed among Centerbridge, the Company and the Ad Hoc Committee of Bondholders, for all allowed liquidated, noncontingent, unsecured Claims of Bondholders (as defined in the PSA Term Sheet) (such Claims, "Bondholder Claims" and such date, the "Bondholder Record Date") and for all other allowed liquidated, noncontingent, unsecured Claims, the date that the Confirmation Order is entered (such claims, "Trade Claims" and such date, the "Trade Claims Record Date");

(xxix)  "Securities Laws" means, collectively, the Securities Act, the Exchange Act, and any state securities and "blue sky" laws;

(xxx)  "Significant Subsidiary" has the meaning set forth in Rule 1-02(w) of Regulation S-X promulgated by the SEC;

(xxxi)  "Subsidiary" when used with respect to any Person, means any corporation or other organization, whether incorporated or unincorporated, of which such Person directly or indirectly owns or Controls more than 50% of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions;

(xxxii)   "Taxes or Tax" means all federal, state, local and foreign taxes arising after the date on which the Debtor filed the Chapter 11 Case, in the case of the Debtor, and arising at anytime in the case of Persons other than the Debtor, (including income or profits taxes, alternative or add-on minimum taxes, profits or excess profits taxes, premium taxes, occupation taxes, excise taxes, sales taxes, use taxes, gross receipts taxes, franchise taxes, ad valorem taxes, severance taxes, capital levy taxes, prohibited transaction taxes, transfer taxes, value added taxes, employment and payroll-related taxes (including employee withholding or employer payroll tax, FICA or FUTA), real or personal property taxes, business license taxes, occupation taxes, stamp taxes or duties, withholding or back up withholding taxes, import duties and other governmental charges and assessments), of any kind whatsoever, including charges, interest, additions to tax and penalties with respect thereto, it being agreed that the foregoing shall include any transferee or secondary liability for a Tax and any liability assumed by agreement or arising as a result of being or ceasing to be a member of any affiliated group or being included or required to be included in any Tax Return;

(xxxiii)   "Unions" means, the United Steelworkers of America and the International Union, UAW; and

(xxxiv) "Union Settlement Agreement" means the Settlement Agreements by and between the Company and the Unions.

(b)      When a reference is made in this Agreement to an Article, Section, Exhibit or Annex, such reference will be to an Article or Section of, or an Annex or Exhibit to, this Agreement unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement.  All terms used herein with initial capital letters have the meanings ascribed to them herein and all terms defined in this Agreement will have such defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.  Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.  As the context requires, all references to the "Company" contained herein shall be references to "New Dana" after the Closing.

8.9    <u>No Survival of Representations and Warranties</u>.  None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Closing.

8.10    <u>Waivers</u>.  Except as provided in this Agreement, no action taken pursuant to this Agreement, including without limitation any investigation by or on behalf of any party, will be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants or agreements contained in this Agreement. The waiver by any party hereto of a breach of any provision hereunder will not operate or be construed as a waiver of any prior or subsequent breach of the same or any other provision hereunder.  At any time prior to the Closing Date, any party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions contained herein.  Any such extension or waiver will be valid only if set forth in an instrument in writing signed by the party or parties to be bound thereby.

8.11    <u>Severability</u>.  Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

8.12    <u>Jurisdiction; Consent to Service of Process</u>.  (a)  Each party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and any appellate court from any such court, in any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, or for recognition or enforcement of any judgment resulting from any such suit, action or proceeding, and each party hereby irrevocably and unconditionally agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in the Bankruptcy Court.

(b)    It will be a condition precedent to each party's right to bring any such suit, action or proceeding that such suit, action or proceeding, in the first instance, be brought in the Bankruptcy Court, and if each such court refuses to accept jurisdiction with respect thereto, such suit, action or proceeding may be brought in any other court with jurisdiction.

(c)    No party may move to (i) transfer any such suit, action or proceeding from the Bankruptcy Court to another jurisdiction, (ii) consolidate any such suit, action or proceeding brought in the Bankruptcy Court with a suit, action or proceeding in another jurisdiction, or (iii) dismiss any such suit, action or proceeding brought in the Bankruptcy Court for the purpose of bringing the same in another jurisdiction.

(d)    Each party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in the Bankruptcy Court, (ii) the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (iii) the right to object, with respect to such suit, action or proceeding, that such court does not have jurisdiction over such party.  Each party irrevocably consents to service of process in any manner permitted by law.

8.13    WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.14    No Strict Construction.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

[*Remainder of page intentionally blank*]

IN WITNESS WHEREOF, the parties have executed this Agreement and caused the same to be duly delivered on their behalf on the day and year first written above.

**DANA CORPORATION**

By: _____
Name: Michael J. Burns
Title: Chairman and Chief Executive Officer

**CENTERBRIDGE CAPITAL PARTNERS, L.P.**
By:    Centerbridge Associates, L.P.,
       its general partner
       By:  Centerbridge GP Investors, LLC,
            its general partner

By: _____
Name: _____
Title: Authorized Person

**CBP PARTS ACQUISITION CO. LLC**
By: Centerbridge Capital Partners, L.P., its member owning a majority of its interests
       By: Centerbridge Associates, L.P.,
           its general partner
           By:  Centerbridge GP Investors, LLC,
                its general partner

By: _____
Name: _____
Title: Authorized Person

IN WITNESS WHEREOF, the parties have executed this Agreement and caused the same to be duly delivered on their behalf on the day and year first written above.

**DANA CORPORATION**

By: _____

Name: _____

Title: _____

**CENTERBRIDGE CAPITAL PARTNERS, L.P.**

By:    Centerbridge Associates, L.P.,
          its general partner
          By:   Centerbridge GP Investors, LLC,
                   its general partner

By: _____

Name: _____ JEFFREY H. ARONSON _____

Title:  Authorized Person

**CBP PARTS ACQUISITION CO. LLC**

By: Centerbridge Capital Partners, L.P., its member owning a majority of its interests
          By: Centerbridge Associates, L.P.,
                 its general partner
                 By:   Centerbridge GP Investors, LLC,
                          its general partner

By: _____

Name: _____ JEFFREY H. ARONSON _____

Title:  Authorized Person

<u>List of Exhibits</u>

<u>Exhibit A</u> - Intentionally Omitted
<u>Exhibit B</u> - Form of Certificate of Designation
<u>Exhibit C</u> - Form of Subscription Agreement
<u>Exhibit D</u> - Form of Shareholders Agreement
<u>Exhibit E</u> - Form of Series A Registration Rights Agreement
<u>Exhibit F</u> - Form of Series B Registration Rights Agreement
<u>Exhibit G</u> - Form of Series B Subscription Agreement Rep Bringdown

## **EXHIBIT A**

Intentionally omitted from the document.

**Exhibit B**

## [NEW DANA CORPORATION]

**ARTICLES OF SERIAL DESIGNATION OF
4.0% SERIES A CONVERTIBLE PREFERRED STOCK AND
4.0% SERIES B CONVERTIBLE PREFERRED STOCK**[1]

The terms of the authorized 4.0% Series A Convertible Preferred Stock, par value $0.01 per share (the "Series A Preferred"), and 4.0% Series B Convertible Preferred Stock, par value $0.01 per share (the "Series B Preferred"), of [New Dana Corporation], a corporation organized and existing under the State of [_____] (the "Corporation"), are as set forth below:

1.    Designation.  There is hereby created out of the authorized and unissued shares of Preferred Stock of the Corporation two new series of Preferred Stock designated as the Series A Preferred and the Series B Preferred.  The number of shares constituting the Series A Preferred will be 2,500,000, and the number of shares constituting the Series B Preferred will be 5,000,000.

2.    Ranking.  The Series A Preferred and Series B Preferred will, with respect to payment of dividends and to distributions in the event of the Corporation's voluntary or involuntary liquidation, winding up or dissolution (a "Liquidation"), rank (i) senior to the Corporation's Series A Junior Participating Preferred Stock and all classes of Common Stock and to each other class of Capital Stock of the Corporation or series of Preferred Stock of the Corporation established hereafter by the Board, the terms of which do not expressly provide that such class or series ranks senior to, or on a parity with, the Series A Preferred and Series B Preferred as to dividend rights and rights on a Liquidation (collectively referred to as "Junior Stock"), (ii) on a parity with each class of Capital Stock of the Corporation or series of Preferred Stock of the Corporation established hereafter by the Board, the terms of which expressly provide that such class or series will rank on a parity with the Series A Preferred and Series B Preferred as to dividend rights and rights on a Liquidation (collectively referred to as "Parity Stock"), and (iii) junior to each class of Capital Stock of the Corporation or series of Preferred Stock of the Corporation established hereafter by the Board, the terms of which expressly provide that such class or series will rank senior to the Series A Preferred or Series B Preferred as to dividend rights and rights on a Liquidation.  For the avoidance of doubt, the Series A Preferred and Series B Preferred will rank on a parity with each other as to dividend rights and rights on a Liquidation.

---

[1]    To be conformed, as necessary, to reflect the name and jurisdiction of the reorganized company.  The Charter and By-Laws will also be amended to reflect changes in par value, to authorize additional preferred stock to permit the issuance of the Series A Preferred and Series B Preferred, to permit preemptive rights, to increase the number of directors and to allow a special meeting of shareholders to be held at the request of shareholders owning not less than 20% of the issued and outstanding voting shares, including taking into account the preferred shares on an as converted basis.

3.    <u>Dividends</u>.  (a)  So long as any shares of Series A Preferred or Series B Preferred are outstanding, the holders of such shares will be entitled to receive out of the Corporation's assets legally available therefor, when, as and if declared by the Board, preferential dividends at a rate per annum equal to 4.0% (the "<u>Dividend Rate</u>") on the then-effective Liquidation Preference per share for such share hereunder, payable in cash.  Subject to <u>Section 5(f)</u>, such dividends with respect to each share of Series A Preferred and Series B Preferred, as applicable, will be fully cumulative and will begin to accrue from the Issue Date of such share, whether or not such dividends are authorized or declared by the Board and whether or not in any Dividend Period or Dividend Periods there are assets of the Corporation legally available for the payment of such dividends.

(b)    Dividends on the shares of Series A Preferred and Series B Preferred will be payable quarterly in equal amounts (subject to <u>Section 3(d)</u> hereunder with respect to shorter periods, including the first such period with respect to newly issued shares of Series A Preferred or Series B Preferred) in arrears on each Dividend Payment Date, in preference to and in priority over dividends on any Junior Stock, commencing on the first Dividend Payment Date after the Issue Date of such share of Series A Preferred or Series B Preferred, as applicable.  Such dividends will be paid to the holders of record of the shares of Series A Preferred and Series B Preferred, as applicable, as they appear at the close of business on the applicable Dividend Record Date.  The amount payable as dividends on such Dividend Payment Date will be payable in cash, unless such payment is prohibited under statutory law.

(c)    All dividends paid with respect to shares of Series A Preferred and Series B Preferred pursuant to <u>Section 3(a)</u> will be paid pro rata to the holders thereof and will first be credited against the dividends accrued with respect to the earliest Dividend Period for which dividends have not been paid.  Dividend payments will be aggregated per holder and will be made to the nearest cent (with $0.005 being rounded upward).

(d)    The amount of dividends payable per share of Series A Preferred and Series B Preferred for each full Dividend Period will be computed by dividing the annual dividend amount for such share by four.  The amount of dividends payable for the initial Dividend Period, or any other period shorter or longer than a full Dividend Period, on a share of Series A Preferred or Series B Preferred, as applicable, will be computed on the basis of twelve 30-day months and a 360-day year.  No interest will accrue or be payable in respect of unpaid dividends.

(e)    Any reference to "distribution" in this <u>Section 3</u> will not be deemed to include any distribution made in connection with any Liquidation.

4.    <u>Liquidation Rights</u>.  (a)  In the event of any Liquidation, the holders of shares of Series A Preferred and Series B Preferred then outstanding will be entitled to be paid out of the assets of the Corporation available for distribution to its shareholders, whether such assets are capital, surplus, earnings or otherwise, before any payment or declaration and setting apart for payment of any amount will be made in respect of any shares of Junior Stock, an amount with respect to each share of Series A Preferred and

NYI-3999718v11

Series B Preferred outstanding equal to the then-effective Liquidation Preference per share for such shares, plus all declared or accrued and unpaid dividends in respect thereof to the date of final distribution.  If upon any Liquidation, the assets to be distributed among the holders of Series A Preferred and Series B Preferred are insufficient to permit the payment to such shareholders of the full preferential amounts thereof, then the entire assets of the Corporation to be distributed will be distributed ratably among the holders of Series A Preferred, Series B Preferred and Parity Stock, based on the full preferential amounts for the number of shares of Series A Preferred, Series B Preferred and Parity Stock held by each holder.

(b)    After payment to the holders of Series A Preferred and Series B Preferred of the amounts set forth in Section 4(a) hereof, such holders will not be entitled to any further participation in any distribution of the Corporation's assets and the entire remaining assets and funds of the Corporation legally available for distribution, if any, will be distributed among the holders of any Capital Stock entitled to a preference over the Common Stock in accordance with the terms thereof and, thereafter, to the holders of Common Stock.

(c)    No funds are required to be set aside to protect the Liquidation Preference of the shares of Series A Preferred and Series B Preferred, although the applicable Liquidation Preference will be substantially in excess of the par value of the shares of Series A Preferred and Series B Preferred.

(d)    For purposes of this Section 4, neither a merger, consolidation, business combination, reorganization or recapitalization of the Corporation with or into any corporation, nor a sale, lease or other disposition of all or substantially all of the assets of the Corporation and its subsidiaries (on a consolidated basis) will be deemed a Liquidation.

5.    Conversion.  The Series A Preferred and Series B Preferred are convertible into shares of Common Stock as follows:

(a)    Conversion Price.  The initial Conversion Price of each share of Series A Preferred and Series B Preferred will be determined as set forth in the definition of "Conversion Price" in Section 13 and the defined terms used therein.  In addition to Common Stock, holders will receive, upon conversion, rights under the Corporation's Rights Agreement, dated as of April 25, 1996, unless, prior to conversion, the rights have expired, terminated or been redeemed or unless the rights have separated from the Common Stock.  The Conversion Price will be subject to adjustment as provided in Section 5(h).

(b)    Optional Conversion Right.  At any time after the six-month anniversary of the Original Issue Date, but subject to Section 8, at the option of the holder thereof, any share of Series A Preferred or Series B Preferred may be converted into such number of fully paid and non-assessable shares of Common Stock that is obtained by dividing the then-effective Liquidation Preference for such share by the Conversion Price (as in effect on the Conversion Date).

(c)     Mandatory Conversion.  If the Closing Sale Price of the Common Stock has exceeded an amount equal to 1.4 multiplied by the Distributable Market Equity Value Per Share (such product, rounded up to the nearest cent, and subject to equitable adjustment in the event of any stock dividends, splits, reverse splits, combinations, reclassifications and similar actions, the "Mandatory Conversion Trigger Price"), for at least 20 consecutive Trading Days commencing from or after the fifth anniversary of the Original Issue Date, then the Corporation may, at its option at any time after any such 20 consecutive Trading Day period, cause all but not less than all of the outstanding shares of Series A Preferred and Series B Preferred to convert into such number of fully paid and non-assessable shares of Common Stock that is obtained by dividing the then-effective Liquidation Preference of such shares by the Conversion Price (as in effect on the Conversion Date).

(d)     Mechanics for Exercise of Conversion Rights.  In order to exercise the optional conversion right provided for in Section 5(b), the holder of each share of Series A Preferred or Series B Preferred to be converted will (i) surrender the certificate representing such share, duly endorsed or assigned to the Corporation or in blank, to the office of the Transfer Agent or (ii) deliver written notice to the Corporation or the Transfer Agent that such certificate has been lost, stolen or destroyed and execute an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates (the actions taken pursuant to clause (i) or (ii), a "Surrender"), accompanied, in either case, by written notice to the Corporation that the holder thereof elects to convert all or a specified whole number of shares of Series A Preferred or Series B Preferred, as applicable.  Unless the shares of Common Stock issuable on conversion are to be issued in the same name as the name in which such shares of Series A Preferred or Series B Preferred, as applicable, are registered, each share Surrendered for conversion must be accompanied by instruments of transfer, in form reasonably satisfactory to the Corporation, duly executed by the holder or such holder's duly authorized attorney and an amount sufficient to pay any transfer or similar tax (or evidence reasonably satisfactory to the Corporation demonstrating that such taxes have been paid).  In the event the Corporation elects to exercise the mandatory conversion right provided for in Section 5(c), the Corporation will provide written notice of such exercise to the Transfer Agent and each holder of Series A Preferred and Series B Preferred specifying the date on which such conversion will be effective (the "Mandatory Conversion Notice"), which date must be no less than 90 days from the date on which such written notice is sent, and thereafter each holder of shares of Series A Preferred and Series B Preferred will Surrender its shares to the Corporation.

(e)     Delivery of Certificates and Conversion Date.  As promptly as practicable, but in any event within five Business Days following the Conversion Date (in the case of a conversion pursuant to Section 5(b)) or within five Business Days following the date on which a holder of shares to be converted Surrenders such shares to the Corporation (in the case of a conversion pursuant to Section 5(c)), the Corporation will issue and deliver to, or upon the written order of, the holder a certificate or certificates for the number of full shares of Common Stock issuable upon the conversion of such holder's applicable shares of Series A Preferred or Series B Preferred in accordance with the

4

provisions of this <u>Section 5</u>, and any fractional interest in respect of a share of Common Stock arising upon such conversion will be settled as provided in <u>Section 5(g)</u> hereof.  In the event of a conversion pursuant to <u>Section 5(b)</u>, upon conversion of only a portion of the number of shares covered by a certificate representing shares of Series A Preferred or Series B Preferred Surrendered for conversion, the Corporation will also issue and deliver to, or upon the written order of, the holder of the certificate so Surrendered for conversion, at the expense of the Corporation, a new certificate covering the number of shares of Series A Preferred or Series B Preferred, as applicable, representing the unconverted portion of the certificate so Surrendered, which new certificate will entitle the holder thereof to the rights of the shares of Series A Preferred or Series B Preferred represented thereby to the same extent as if the certificate theretofore covering such unconverted shares had not been Surrendered for conversion.  Each conversion will be deemed to have been effected as of the close of business on the date on which (i) in the case of an optional conversion pursuant to <u>Section 5(b)</u>, the certificates for Series A Preferred or Series B Preferred are Surrendered and such notice and payment of all required transfer taxes and dividends received by the Corporation as aforesaid, or (ii) in the case of a mandatory conversion pursuant to <u>Section 5(c)</u>, the date specified in the Mandatory Conversion Notice (the "<u>Conversion Date</u>").  On the Conversion Date, all rights with respect to the shares of Series A Preferred or Series B Preferred so converted, including the rights, if any, to receive notices, will terminate except only the rights of holders thereof to receive the physical certificates contemplated by this <u>Section 5(e)</u> and cash in lieu of any fractional share as provided in <u>Section 5(g)</u>, and the Person entitled to receive the shares of Common Stock will be treated for all purposes as having become the record holder of such shares (even if certificates for such shares of Common Stock have not yet been issued).

(f)    If conversion rights are exercised with respect to shares of Series A Preferred or Series B Preferred under <u>Section 5(b)</u> or <u>(c)</u>, such shares will cease to accrue dividends pursuant to <u>Section 3(a)</u> as of the end of day immediately preceding the Conversion Date.  On conversion of such shares, except for conversion during the period beginning after the close of business on any Dividend Record Date corresponding to a Dividend Payment Date until before the opening of business on such Dividend Payment Date (in which case the holder on such Dividend Record Date will receive the dividends payable on such Dividend Payment Date), accumulated and unpaid dividends on the converted portion of Series A Preferred or Series B Preferred will be cancelled and the Conversion Price for such converted shares will not be adjusted for any dividends so cancelled.  Notwithstanding the foregoing, shares of Series A Preferred or Series B Preferred Surrendered for conversion pursuant to <u>Section 5(b)</u> after the close of business on any Dividend Record Date for the payment of dividends declared and prior to the opening of business on the Dividend Payment Date relating thereto must be accompanied by a payment in cash of an amount equal to the dividend declared in respect of such shares.  A holder of shares of Series A Preferred or Series B Preferred who converts such shares into Common Stock on the corresponding Dividend Payment Date will be entitled to receive the dividend payable on such shares on such Dividend Payment Date, and the holder need not include payment to the Corporation of the amount of such dividend upon Surrender of such shares.

(g)    No Fractional Shares.  No fractional shares or scrip representing fractions of shares of Common Stock will be issued upon conversion of shares of Series A Preferred or Series B Preferred.  Instead of any fractional interest in a share of Common Stock that would otherwise be deliverable upon the conversion of such shares, the Corporation will pay to the holder of such shares an amount in cash based upon the Current Market Price of Common Stock on the Trading Day immediately preceding the Conversion Date.  If more than one share is Surrendered for conversion pursuant to this Section 5 at one time by the same holder, the number of full shares of Common Stock issuable upon conversion thereof will be computed on the basis of the aggregate number of shares so Surrendered.

(h)    Conversion Price Adjustments.  The Conversion Price is subject to adjustment from time to time as follows:

(i)    Stock Splits and Combinations.  If, after the Original Issue Date, the Corporation (A) subdivides or splits its outstanding shares of Common Stock into a greater number of shares, (B) combines or reclassifies its outstanding shares of Common Stock into a smaller number of shares, or (C) issues any Capital Stock of the Corporation by reclassification of its Common Stock, then the Conversion Price in effect immediately prior to such event will be adjusted so that the holder of any share of Series A Preferred or Series B Preferred thereafter Surrendered for conversion will be entitled to receive the number of such securities that such holder would have owned or have been entitled to receive after the occurrence of any of the events described above as if such share had been converted immediately prior to the effective date of such subdivision, combination or reclassification or the record date therefor, whichever is earlier.  An adjustment made pursuant to this Section 5(h)(i) will become effective at the close of business on the effective date of such corporate action.  Such adjustment will be made successively wherever any event listed above occurs.

(ii)    Dividends/Distributions of Common Stock.  If, after the Original Issue Date, the Corporation fixes a record date for or pays a dividend or makes a distribution in shares of Common Stock on any class of Capital Stock of the Corporation, other than dividends or distributions of shares of Common Stock or other securities with respect to which adjustments are provided in Section 5(h)(i), then the Conversion Price in effect at the close of business on the record date therefor will be adjusted to equal the price determined by multiplying (A) such Conversion Price by (B) a fraction, the numerator of which will be the number of shares of Common Stock Outstanding at the close of business on the record date and the denominator of which will be the sum of (1) the number of shares of Common Stock Outstanding at the close of business on the record date and (2) the number of shares of Common Stock constituting such dividend or distribution.  An adjustment made pursuant to this Section 5(h)(ii) will become effective immediately after the close of business on such record date (except as provided in Section 5(h)(iv)(F) hereof).  Such adjustment will be made successively wherever any event listed above occurs.

(iii)    Certain Issuances of Common Stock and Common Stock Derivatives.  If, after the Original Issue Date, the Corporation issues or sells shares of

Common Stock or any Common Stock Derivative without consideration or at a consideration per share of Common Stock (or having a conversion, exercise or exchange price per share of Common Stock, in the case of a Common Stock Derivative), calculated by including the aggregate proceeds to the Corporation upon issuance and any additional consideration payable to the Corporation upon and in respect of any such conversion, exchange or exercise, that is less than the Conversion Price in effect at the close of business on the day immediately preceding such issuance, then the maximum number of shares of Common Stock issuable upon conversion, exchange or exercise of such Common Stock Derivatives, as applicable, will be deemed to have been issued as of such issuance and such Conversion Price will be decreased, effective as of the time of such issuance, to equal the price determined by multiplying (A) such Conversion Price by (B) a fraction, the numerator of which will be the sum of (1) the number of shares of Common Stock Outstanding immediately prior to such issuance and (2) the number of shares which the aggregate proceeds to the Corporation from such issuance (including any additional consideration per share of Common Stock payable to the Corporation upon any such conversion, exchange or exercise) would purchase at such Conversion Price, and the denominator of which will be the sum of (1) the number of shares of Common Stock Outstanding immediately prior to such issuance and (2) the number of additional shares of Common Stock issued or subject to issuance upon the conversion, exchange or exercise of such Common Stock Derivatives issued.  In the event that any portion of such consideration is in a form other than cash, the Fair Market Value of such noncash consideration will be used. Notwithstanding any provision hereof to the contrary, this Section 5(h)(iii) will not apply to any issuance of Common Stock in any manner described in Section 5(h)(i) and (ii). Such adjustment will be made successively wherever any event listed above occurs.

(iv)    Additional Conversion Matters.

(A)    Minor Adjustments and Calculations.  No adjustment in the Conversion Price pursuant to any provision of this Section 5(h) will be required unless such adjustment would require a cumulative increase or decrease of at least 1% in such price; provided, however, that any adjustments that by reason of this Section 5(h)(iv)(A) are not required to be made will be carried forward and taken into account in any subsequent adjustments until made.  All calculations under this Section 5(h) will be made to the nearest cent (with $0.005 being rounded upward) or to the nearest whole share (with 0.5 of a share being rounded upward), as the case may be.

(B)    Exceptions to Adjustment Provisions.  The provisions of this Section 5(h) will not be applicable to (1) any issuance for which an adjustment to the Conversion Price is provided under any other subclause of this Section 5(h), (2) any issuance of shares of Common Stock upon actual exercise, exchange or conversion of any Common Stock Derivative if the Conversion Price was fully and properly adjusted at the time such securities were issued or if no such adjustment was required hereunder at the time such securities were issued, (3) the issuance of additional shares of Series A Preferred or Series B Preferred at a per share price equal to or greater than the applicable Liquidation Preference or the issuance of shares of Common Stock upon conversion of outstanding shares of Series A Preferred or Series B Preferred, (4) the

7

issuance of Common Stock Derivatives or shares of Common Stock to employees, directors or consultants of the Corporation or its subsidiaries pursuant to management or director incentive plans or stock compensation plans as in effect on or prior to the Original Issue Date or approved by the affirmative vote of a majority of the Board after the Original Issue Date, including any employment, severance or consulting agreements, or the issuance of shares of Common Stock upon the exercise of such Common Stock Derivative, (5) the issuance of shares of Common Stock as consideration for an arm's-length acquisition of a business or assets from Third Parties that is approved by a majority of the Corporation's shareholders in accordance with the requirements under the Charter and the Corporation's By-Laws and applicable law, or (6) the issuance of shares of Common Stock pursuant to any plan providing for the reinvestment of dividends or interest payable on securities of the Corporation and the investment of additional optional amounts in Common Stock under such plan.

(C)     Board Adjustment to Conversion Price.  Anything in this Section 5(h) to the contrary notwithstanding, the Corporation may, to the extent permitted by law, make such reductions in the Conversion Price, in addition to those required by this Section 5(h), as the Board in its good faith discretion determines to be necessary in order that any subdivision of shares, reclassification or combination of shares, distribution of Common Stock Derivatives, or a distribution of other assets (other than cash dividends) hereafter made by the Corporation to its shareholders will not be taxable.  Whenever the Conversion Price is so decreased, the Corporation will mail to holders of record of shares of Series A Preferred and Series B Preferred a notice of the decrease at least 5 days before the date the decreased Conversion Price takes effect, and such notice will state the decreased Conversion Price and the period it will be in effect.

(D)     Other Capital Stock.  In the event that, at any time as a result of the provisions of this Section 5(h), a holder of shares of Series A Preferred or Series B Preferred becomes entitled to receive any shares of Capital Stock of the Corporation other than Common Stock upon subsequent conversion, the number of such other shares so receivable upon conversion will thereafter be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions contained herein.

(E)     Effect of Adjustment.  In the event that, at any time after the Original Issue Date, any adjustment is made to the Conversion Price pursuant to this Section 5, such adjustment to the Conversion Price will be applicable with respect to all then outstanding shares of Series A Preferred and Series B Preferred and all shares of Series A Preferred or Series B Preferred issued after the date of the event causing such adjustment to the Conversion Price.

(F)     Adjustment Deferral.  In any case in which Section 5(h) provides that an adjustment becomes effective from and after a record date for an event, the Corporation may defer until the occurrence of such event (1) issuing to the holder of any shares of Series A Preferred or Series B Preferred converted after such record date and before the occurrence of such event the additional shares of Common

Stock issuable upon such conversion by reason of the adjustment required by such event over and above the shares of Common Stock issuable upon such conversion before giving effect to such adjustment and (2) paying to such holder any amount of cash in lieu of any fraction pursuant to Section 5(g).

(G)    Other Limits on Adjustment.  There will be no adjustment of the Conversion Price in the event of the issuance of any shares of the Corporation in a reorganization, acquisition or other similar transaction, except as specifically set forth in this Section 5.

(H)    Abandoned Events and Expired Common Stock Derivatives. If the Corporation takes a record of the holders of its Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter and before the distribution to shareholders legally abandons its plan to pay or deliver such dividend or distribution, then thereafter any adjustment in the Conversion Price granted by this Section 5(h) will, as and if necessary, be readjusted at the time of such abandonment to the Conversion Price that would have been in effect if no adjustment had been made (taking proper account of all other conversion adjustments under this Section 5(h)); provided, however, that such readjustment will not affect the Conversion Price of any shares of Series A Preferred or Series B Preferred that have been converted prior to such abandonment.  If any Common Stock Derivatives referred to in this Section 5(h) in respect of which an adjustment has been made expire unexercised in whole or in part after the same have been distributed or issued by the Corporation, the Conversion Price will be readjusted at the time of such expiration to the Conversion Price that would have been in effect if no adjustment had been made on account of the distribution or issuance of such expired Common Stock Derivatives (taking proper account of all other conversion adjustments under this Section 5(h)); provided, however, that such readjustment will not affect the Conversion Price of any shares of Series A Preferred or Series B Preferred that have been converted prior to such expiration.

(I)    Participation in Dividends.  Notwithstanding anything herein to the contrary, no adjustment to the Conversion Price will be made under Section 5(h)(ii) to the extent that the holders of Series A Preferred or Series B Preferred, as applicable, participate in any such distribution on an as-converted basis based on the number of shares of Common Stock into which such shares are then convertible.

(J)    Pre-Conversion Price Determination Time Events.  No adjustment will be made to the Conversion Price for events occurring prior to the determination of the Conversion Price in accordance with Section 5(a) (the "Conversion Price Determination Time"), whether or not they would otherwise result in an adjustment to the Conversion Price pursuant to this Section 5(h); provided, however, that the Corporation will not take any actions that, but for this Section 5(h)(iv)(J), would have resulted in an adjustment of the Conversion Price prior to the Conversion Price Determination Time pursuant to this Section 5(h) without the written consent of the Required Holders.

9

(i)    <u>Fundamental Changes</u>.  In the event that any transaction or event (including, without limitation, any merger, consolidation, sale of assets, tender or exchange offer, reclassification, compulsory share exchange or liquidation) occurs in which all or substantially all of the outstanding Common Stock is converted into or exchanged for stock, other securities, cash or assets (each, a "<u>Fundamental Change</u>"), the holder of each share of Series A Preferred and each share of Series B Preferred outstanding immediately prior to the occurrence of such Fundamental Change will have the right upon any subsequent conversion to receive (but only out of legally available funds, to the extent required by applicable law) the kind and amount of stock, other securities, cash and assets that such holder would have received if such share had been converted immediately prior thereto (assuming such holder failed to exercise his rights of election, if any, as to the kind or amount of securities, cash or other property receivable upon such Fundamental Change).  Such adjustment will be made successively whenever any event listed above occurs.  No adjustment will be made pursuant to <u>Section 5(i)</u> in respect of any Fundamental Event as to which an adjustment to the Conversion Price was made pursuant to <u>Section 5(h)</u>.

(j)    <u>Notice of Certain Events</u>.  If, subject to the limitations set forth in <u>Section 3</u> hereof:

(i)    the Corporation declares (A) any dividend (or any other distribution) on Common Stock, other than a dividend payable in shares of Common Stock, or (B) any extraordinary dividend or distribution on any Junior Stock (excluding any regularly scheduled dividends paid in accordance with the terms thereof);

(ii)    there is any recapitalization or reclassification of the Common Stock (other than an event to which <u>Section 5(h)</u> hereof applies) or any consolidation or merger to which the Corporation is a party and for which approval of any shareholders of the Corporation is required, or a share exchange or self-tender offer by the Corporation for all or substantially all of its outstanding Common Stock or the sale or transfer of all or substantially all of the assets of the Corporation as an entirety or any compulsory share exchange affecting the Common Stock; or

(iii)    there occurs a Liquidation;

then the Corporation will cause to be filed with the Transfer Agent and will cause to be mailed to the holders of the outstanding shares of Series A Preferred and Series B Preferred at the addresses of such holders as shown on the stock books of the Corporation, as promptly as possible, but at least ten Business Days prior to the applicable date hereinafter specified and no later than when notice is first mailed or sent to the holders of Common Stock, a notice stating (A) the date on which a record is to be taken for the purpose of such dividend, distribution or grant, or, if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution or grant are to be determined or (B) the date on which such reclassification, consolidation, merger, share exchange, self-tender offer, sale, transfer or Liquidation is expected to become effective, and the date as of which it is expected that holders of Common Stock of record will be entitled to exchange their shares of

Common Stock for securities or other property, if any, deliverable upon such reclassification, consolidation, merger, share exchange, self-tender offer, sale, transfer or Liquidation.  Failure to give or receive such notice or any defect therein will not affect the legality of validity of the proceedings described in this Section 5.

(k)    Sufficient Shares of Common Stock.  The Corporation covenants that it will at all times reserve and keep available, free from preemptive rights, out of the aggregate of its authorized but unissued shares of Common Stock, solely for the purpose of effecting conversion of the Series A Preferred and Series B Preferred, the full number of shares of Common Stock deliverable upon the conversion of all outstanding shares of Series A Preferred and Series B Preferred not theretofore converted.  For purposes of this Section 5(k), the number of shares of Common Stock that are deliverable upon the conversion of all such outstanding shares will be computed as if at the time of computation all such outstanding shares were held by a single holder.

(l)    Compliance with Laws.  Prior to the delivery of any securities that the Corporation is obligated to deliver upon conversion of shares of Series A Preferred or Series B Preferred, the Corporation will use its best efforts to comply with all federal and state laws and regulations thereunder requiring the registration of such securities with, or any approval of or consent to the delivery thereof by, any governmental authority.

(m)    Officer's Certificate.  As promptly as practicable following the Conversion Price Determination Time, the Corporation will promptly file with the Transfer Agent, and cause to be delivered to each holder of Series A Preferred and each holder of Series B Preferred, a certificate signed by the principal financial or accounting officer of the Corporation, setting forth the determination of the initial Conversion Price, the Distributable Market Equity Value Per Share and the Mandatory Conversion Trigger Price.  Thereafter whenever the applicable Conversion Price is adjusted pursuant to this Section 5, the Corporation will promptly file with the Transfer Agent, and cause to be delivered to each holder of Series A Preferred and each holder of Series B Preferred, a certificate signed by the principal financial or accounting officer of the Corporation, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated (including a description of the basis of the determination of the Current Market Price and/or Fair Market Value, as applicable) and specifying the new applicable Conversion Price.  In the event of a Fundamental Event pursuant to Section 5(i), such a certificate will be issued describing the amount and kind of stock, securities, property or assets or cash receivable upon conversion of the Series A Preferred and Series B Preferred after giving effect to the provisions of such Section 5(i).

(n)    Errors.  The Board will have the power to resolve any ambiguity or correct any error in Section 5, and its action in doing so will be final and binding and conclusive.

(o)    No Increase.  Notwithstanding anything herein to the contrary, the Conversion Price will in no event be increased pursuant to Section 5(h)(iii).

6.    <u>Voting Rights</u>. (a)  <u>General</u>.  Subject to the terms of the Shareholders Agreement, holders of shares of Series A Preferred and Series B Preferred will have one vote for each share of Common Stock into which such share of Series A Preferred or Series B Preferred, as applicable, could be converted at the Conversion Price at the record date for determination of the shareholders entitled to vote, or, if no such record date is established, at the date such vote is taken or any written consent of shareholders is solicited by the Corporation.  Except as required by law, by the terms of any agreement to which the Corporation and holders of Series A Preferred or Series B Preferred, as applicable, are a party or as otherwise set forth in this <u>Section 6</u>, such holders will have full voting rights and powers equal to the voting rights and powers of the holders of Common Stock, and will be entitled to vote, together with holders of Common Stock and not by classes, with respect to any and all matters upon which holders of Common Stock have the right to vote.  Fractional votes by the holders of Series A Preferred and Series B Preferred will not be permitted, and any fractional voting rights (after aggregating all shares into which shares of Series A Preferred or Series B Preferred, as applicable, held by each holder could be converted) will be disregarded.

(b)    Without limiting Article III of the Shareholders Agreement, beginning with the Corporation's first annual meeting of shareholders following the Original Issue Date, for as long as shares of Series A Preferred having an aggregate Series A Liquidation Preference of at least $125 million are owned by the Initial Series A Purchaser, the Board will consist of seven members, elected as follows:

(i)    The holders of shares of the Series A Preferred will be entitled, voting as a separate class, to elect three directors at each meeting of shareholders held for the purpose of electing directors, at least one of whom will be an Independent Director.

(A)    In case of any removal, either with or without cause, of a director elected by the holders of the shares of Series A Preferred, the holders of the shares of Series A Preferred will be entitled, voting as a separate class either by written consent or at a special meeting or next regular meeting, to elect a successor to hold office for the unexpired term of the director who has been removed.

(B)    (1)  In case of such removal, an officer of the Corporation may call, and, upon written request of the Initial Series A Purchaser, addressed to the Secretary of the Corporation, will call a special meeting of the holders of shares of Series A Preferred.  Such meeting will be held at the earliest practicable date upon the notice required for annual meetings of shareholders at the place for holding annual meetings of shareholders of the Corporation, or, if none, at a place designated by the Board.  Notwithstanding the provisions of this <u>Section 6(b)(i)(B)(1)</u>, no such special meeting will be called during a period within the 120 days immediately preceding the date fixed for the next annual meeting of shareholders in which such case, the election of directors pursuant to <u>Section 6(b)(i)</u> will be held at such annual meeting of shareholders.

NYI-3999718v11

(2)  At any meeting held for the purpose of electing directors at which the holders of shares of Series A Preferred voting separately as one class have the right to elect directors as provided herein, the presence in person or by proxy of the holders of more than 50% of the then-outstanding shares of the Series A Preferred will be required and will be sufficient to constitute a quorum of such class for the election of directors by such class.

(ii)     The remaining directors will be elected by holders of shares of Common Stock and any other class of Capital Stock entitled to vote in the election of directors (including the Series A Preferred and Series B Preferred) (together the "Voting Stock"), voting together as a single class at each meeting of shareholders held for the purpose of electing directors.

(A)     In case of any removal, either with or without cause, of a director elected by the holders of the Voting Stock, the holders of the shares of Voting Stock will be entitled, voting together as a class either by written consent or at a special meeting or next regular meeting, to elect a successor to hold office for the unexpired term of the director who has been removed.

(B)     (1)  In case of such removal, an officer of the Corporation may call, and, upon written request of the holders of at least 25% of the outstanding shares of Voting Stock, addressed to the Secretary of the Corporation, will call a special meeting of the holders of Voting Stock.  Such meeting will be held at the earliest practicable date upon the notice required for annual meetings of shareholders at the place for holding annual meetings of shareholders of the Corporation, or, if none, at a place designated by the Board.  Notwithstanding the provisions of this Section 6(b)(ii)(B)(1), no such special meeting will be called during a period within the 120 days immediately preceding the date fixed for the next annual meeting of shareholders in which such case, the election of directors pursuant to Section 6(b)(ii) will be held at such annual meeting of shareholders.

(2)  At any meeting held for the purpose of electing directors at which the holders of Voting Stock voting together as one class have the right to elect directors as provided herein, the presence in person or by proxy of the holders of more than 50% of the then-outstanding shares of Voting Stock will be required and will be sufficient to constitute a quorum of such class for the election of directors by such class.

(C)     In case of any vacancy (other than by removal) in the office of a director elected by the holders of the shares of Common Stock, the vacancy will be filled by the remaining directors of the Board.

(c)     Election of Directors Upon Dividend Default.  If at any time the equivalent of six quarterly dividends payable on the shares of Series A Preferred or Series B Preferred or any other class or series of Parity Stock are accrued and unpaid (whether or not consecutive and whether or not declared), then, immediately prior to the next annual meeting of shareholders or special meeting of shareholders, the total number of directors constituting the entire Board will automatically be increased by two and, in

each case, the holders of all outstanding shares of Series A Preferred, Series B Preferred and any Parity Stock having similar voting rights then exercisable, voting separately as a single class without regard to series, will be entitled to elect at such meeting of the shareholders of the Corporation two directors to serve until all dividends accumulated and unpaid on any such voting shares have been paid.  The term of office of all such directors will terminate immediately upon payment in full of all accrued but unpaid dividends and upon such termination the total number of directors constituting the entire Board will be reduced by two.  In exercising any such vote, each outstanding share of Series A Preferred and Series B Preferred will be entitled to one vote, excluding shares held by the Corporation or any entity controlled by the Corporation, which shares will have no vote.  Notwithstanding the foregoing, the number of directors to be elected pursuant to this Section 6(c) will be reduced to zero in the event that the holders of Series A Preferred are entitled to elect directors pursuant to Section 6(b)(i) at such time; provided, however, that such number will be increased back to two pursuant to this Section 6(c) effective immediately upon the termination of the right of the holders of Series A Preferred to elect directors pursuant to Section 6(b)(i) unless at such time all accumulated and unpaid dividends have been paid.

(d)      No holder of Series A Preferred or Series B Preferred may receive any compensation or remuneration of any kind (from the Corporation or from any other Person) in connection with the exercise or non-exercise of any voting or other rights under any provision of these Articles.

7.      Preemptive Rights.  (a)  If, prior to the Preemptive Rights Disqualifying Date, the Corporation proposes to offer any shares of Capital Stock to any Person or Persons, other than any shares of Capital Stock issued as described in Section 5(h)(iv)(B)(4) or (5), (the "New Securities"), the Corporation will, prior to issuing such New Securities, deliver to the holders of Series A Preferred (the "Qualified Participants") a written offer (the "Preemptive Rights Offer") to issue to such Qualified Participants New Securities to maintain their Pro Rata Amounts.  The Preemptive Rights Offer will state (i) the amount of New Securities to be issued, (ii) the terms of the New Securities, (iii) the purchase price of the New Securities, and (iv) any other material terms of the proposed issuance.  The Preemptive Rights Offer will remain open and irrevocable for a period of 30 days from the date of its delivery (the "Preemptive Rights Period").

(b)      Each Qualified Participant may accept the Preemptive Rights Offer by delivering to the Corporation a written notice (the "Preemptive Rights Notice") within the Preemptive Rights Period.  The Preemptive Rights Notice will state the number (the "Preemptive Rights Number") of New Securities such Qualifying Participant desires to purchase.  If the sum of all Preemptive Rights Numbers exceeds the number of New Securities that the Corporation proposes to issue, then the New Securities will be allocated among the Qualifying Participants that delivered a Preemptive Rights Notice in accordance with their Pro Rata Amounts.

(c)      The issuance of New Securities to the Qualified Participants will be made on a Business Day, as designated by the Corporation, not less than ten nor more than 30 days after expiration of the Preemptive Rights Period on terms and conditions of the

Preemptive Rights Offer consistent with this <u>Section 7</u>.  At the closing of the issuance of the New Securities to such Qualified Participants, the Corporation will deliver certificates or other instruments evidencing such New Securities against payment of the purchase price therefor, and such New Securities will be issued free and clear of all liens, claims and other encumbrances (other than those attributable to actions by the purchasers thereof).  At such closing, all of the parties to the transaction will execute such additional documents as are deemed by the Board to be necessary or appropriate in its sole discretion.

(d)    If the number of New Securities included in the Preemptive Rights Offer exceeds the sum of all Preemptive Rights Numbers, the Corporation may issue such excess or any portion thereof on the terms and conditions of the Preemptive Rights Offer to any Person within 45 days after expiration of the Preemptive Rights Period (or upon the expiration of any regulatory period, if applicable).  If such issuance is not made within such period, the restrictions provided for in this <u>Section 7</u> will again become effective.

Except as otherwise expressly provided in this <u>Section 7</u>, no holder of any shares of Series A Preferred or Series B Preferred will have any preemptive right to acquire any shares of unissued Capital Stock of the Corporation, now or hereafter authorized, or any treasury shares or securities convertible into such shares or carrying a right to subscribe to or acquire such shares of capital stock.

8.    <u>Transferability</u>.  (a) Subject to <u>Section 8(c)</u>, during the six-month period following the Original Issue Date (the "<u>Transfer Prohibition Period</u>"), no holder of shares of Series A Preferred or Series B Preferred may (i) sell, assign, transfer, pledge, hypothecate or otherwise encumber or dispose of in any way all or any part of an interest in ("<u>Transfer</u>") such holder's Series A Preferred or Series B Preferred, as applicable, or (ii) convert any such shares into Common Stock pursuant to <u>Section 5</u>; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 8(a)</u> will prohibit a holder from Transferring Series A Preferred or Series B Preferred to a Permitted Transferee of such holder.

(b)    Subject to <u>Section 8(c)</u>, during the 30-month period commencing immediately upon the end of the Transfer Prohibition Period, the Initial Series A Purchaser may not (i) Transfer shares of Series A Preferred having an aggregate Series A Liquidation Preference of more than $125 million to any Person or (ii) convert shares of Series A Preferred having an aggregate Series A Liquidation Preference of more than $125 million into shares of Common Stock pursuant to <u>Section 5</u>; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 8(b)</u> will prohibit the Initial Series A Purchaser from Transferring Series A Preferred to a Permitted Transferee of such holder (and such a Transfer will not be counted for purposes of clause (i) above).

(c)    The restrictions on transferability set forth in <u>Sections 8(a)</u> and <u>(b)</u> will automatically terminate upon any (i) Bankruptcy Event relating to the Corporation, (ii) Company Sale to a Third Party, or (iii) underwritten public offering of any Common Stock for cash (other than in connection with an acquisition of assets, a company or a

business by the Corporation or one of its subsidiaries in a transaction approved by the Board) pursuant to an effective registration statement (other than a registration statement on Form S-4 or S-8 or any similar form) filed under the Securities Act, unless the holders of Series A Preferred or Series B Preferred, as applicable, are given the opportunity to sell securities in such public offering on the basis of their Pro Rata Amounts.

(d)    Each certificate representing Series A Preferred or Series B Preferred issued to any holder will bear a legend on the face thereof substantially to the following effect (with such additions thereto or changes therein as the Corporation may be advised by counsel are required by law (the "Legend")):

"THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO TRANSFER RESTRICTIONS CONTAINED IN THE ARTICLES OF SERIAL DESIGNATION RELATING TO SUCH SHARES, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH ARTICLES OF SERIAL DESIGNATION."

"THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THEY HAVE BEEN REGISTERED UNDER THAT ACT OR ANY OTHER APPLICABLE LAW OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE."

The Legend will be removed by the Corporation by the delivery of substitute certificates without such Legend in the event of the termination of the restrictions contained in this Section 8 pursuant to the terms of hereof; provided, however, that the second paragraph of such Legend will only be removed if at such time a legal opinion from counsel to the transferee is obtained to the effect that such legend is no longer required for purposes of applicable securities laws.

(e)    In the event of any purported Transfer not made in compliance with this Section 8, such purported Transfer will be void and of no effect and the Corporation will not give effect to such Transfer.  The Corporation will be entitled to treat the prior owner as the holder of any such securities not Transferred in accordance with this Section 8.

(f)    In no event will any holder of Series A Preferred or Series B Preferred engage in any short sales of Common Stock, any transactions involving options (including exchange-traded options), puts, calls or other derivatives involving securities of the Corporation or any other transactions of any type that would have the effect of providing such holder with any economic gain in the event of a decrease in the Current Market Price.

16

9.     <u>Deregistration</u>.  For as long as any shares of Series A Preferred or Series B Preferred are outstanding, the Corporation will not voluntarily take any action to deregister or suspend the registration of its Common Stock under Section 12 or 15 of the Exchange Act.

10.     <u>No Reissuance</u>.  Shares of Series A Preferred or Series B Preferred that have been issued and reacquired in any manner, including shares purchased, redeemed, converted or exchanged, may not be reissued as shares of Series A Preferred or Series B Preferred and will (upon compliance with applicable law) have the status of authorized and unissued shares of Preferred Stock undesignated as to series and may be redesignated and reissued as part of any series of Preferred Stock; <u>provided</u>, <u>however</u>, that so long as any shares of Series A Preferred or Series B Preferred are outstanding, any issuance of such shares must be in compliance with the terms hereof in respect of the applicable series of such shares.  Upon any such reacquisitions, the number of shares of Series A Preferred or Series B Preferred, as applicable, authorized pursuant to the Charter and these Articles will be reduced by the number of shares so acquired.

11.     <u>Transfer Agent</u>.  The duly appointed Transfer Agent for the Series A Preferred and Series B Preferred will be [_____].  The Corporation may, in its sole discretion, remove the Transfer Agent in accordance with the agreement between the Corporation and the Transfer Agent as long as the Corporation will appoint a successor transfer agent who will accept such appointment prior to the effectiveness of such removal.

12.     <u>Currency</u>.  All shares of Series A Preferred and Series B Preferred will be denominated in U.S. currency, and all payments and distributions thereon or with respect thereto will be made in U.S. currency.  All references herein to "$" refer to the U.S. currency.

13.     <u>Definitions</u>.  In additions to terms defined elsewhere in these Articles, the following terms have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, another Person.  For purposes of this definition, the terms "control," "controlling," "controlled by" and "under common control with," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Articles</u>" means these Articles of Serial Designation of 4.0% Series A Convertible Preferred Stock and 4.0% Series B Convertible Preferred Stock.

"<u>Bankruptcy Event</u>" means the voluntary or involuntary commencement of a case or other proceeding against a Person seeking the liquidation, reorganization, debt arrangement, dissolution, winding up or composition or readjustment of debts of such

Person, the appointment of a trustee, receiver, custodian, liquidator, assignee or the like for such Person of all or substantially all of its assets, or any similar action with respect to such Person, whether judicial or non-judicial or under any law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts; provided, however, that in no event will a Bankruptcy Event be deemed to have occurred as a result of any internal corporate or other restructuring or reorganization of such Person.

"Board" means the Board of Directors of the Corporation; where any consent, approval or action is required by the Board hereunder and the authority of the Board with respect to such consent, approval or action has been delegated to a committee of the Board, in accordance with applicable law, the consent, approval or action by such committee will satisfy such requirement for purposes hereof.

"Business Day" means any day other than a Saturday, Sunday or a day on which banking institutions in the State of New York are authorized or obligated by law or executive order to close.

"Capital Stock" means (a) with respect to any Person that is a corporation or company, any and all shares, interests, participations or other equivalents (however designated) of capital or capital stock of such Person and (b) with respect to any Person that is not a corporation or company, any and all partnership or other equity interests of such Person.

"Centerbridge" means Centerbridge Capital Partners, L.P.

"Charter" means the Corporation's Restated Articles of Incorporation, as it may be amended from time to time.

"Closing Sale Price" when used with reference to shares of the Common Stock or other securities on any date, means the last sale price, regular way, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, in either case as reported in the principal consolidated transaction reporting system with respect to securities listed or admitted to trading on the NYSE or, if the shares of Common Stock or other applicable security are not listed or admitted to trading on the NYSE, as reported in the principal consolidated transaction reporting system with respect to securities listed on the principal national securities exchange on which the shares of Common Stock or other security are listed or admitted to trading or, if the shares of Common Stock or other security are not listed or admitted to trading on any national securities exchange, the average of the last quoted high bid and low asked prices in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotations System or such other system then in use, or, if on any such date the shares of Common Stock or other security are not quoted by any such organization, the average of the closing bid and asked prices as furnished by a professional market maker making a market in the Common Stock or other security, as selected by the Board (any such applicable exchange or market referred to above, the "Corporation's Principal Exchange").

"Common Stock" means the common stock, par value $0.01 per share, of the Corporation and any shares or Capital Stock for or into which such common stock hereafter is exchanged, converted, reclassified or recapitalized by the Corporation or pursuant to an agreement to which the Corporation is a party.

"Common Stock Derivative" means any option, right, warrant or security of the Corporation which is convertible into or exercisable or exchangeable for Common Stock of the Corporation.

"Common Stock Outstanding" means all shares of Common Stock issued and outstanding as of the applicable time plus the number of shares issuable upon conversion or exercise of all outstanding Common Stock Derivatives (including the Series A Preferred and the Series B Preferred) as of the applicable time.

"Company Sale" means any merger, consolidation, business combination, reorganization or recapitalization of the Corporation that results in the transfer of 50% or more of the outstanding voting power of the Corporation, any sale, lease or other disposition of all or substantially all of the assets of the Corporation and its subsidiaries (on a consolidated basis), or any other form of corporate reorganization in which 50% or more of the outstanding shares of any class or series of Capital Stock of the Corporation are exchanged for or converted into cash, securities or property of another business organization.

"Conversion Price" means an amount equal to 0.83 (the "Discount Factor") multiplied by the Distributable Market Equity Value Per Share (rounded up to the nearest cent).

"Current Market Price" when used with reference to shares of Common Stock or other securities on any date, means the average of the Closing Sale Price for the 30 consecutive Trading Days immediately prior to such date; provided, however, (a) if on any such date no market maker is making a market in the Common Stock or such other security so that there is no Closing Sale Price, then the Current Market Price of such Common Stock or other security will be valued using clause (a) of the definition of "Fair Market Value" below, as if it were an "asset" thereunder, and (b) that in the event that the Current Market Price is determined during a period following the announcement by the Corporation or other issuer of the applicable securities of (i) a dividend or distribution on such Common Stock or such other securities payable in shares of such Common Stock or securities convertible into shares of such Common Stock or securities, or (ii) any subdivision, combination or reclassification of such Common Stock or other securities, and prior to the expiration of the requisite 30 Trading Day period set forth above, then, and in each such case, the Current Market Price will be properly adjusted to take into account ex-dividend trading.

"Debt/Interest" means an amount equal to the sum of net debt of the Corporation (defined as funded debt plus the average outstanding revolver balance pursuant to the Corporation's five-year business plan net of cash as of the Original Issue Date) and the value of minority interests of the Corporation as of the Original Issue Date.

"Distributable Market Equity Value Per Share" means a per share value equal to the 20-Trading Day volume weighted average sale price (rounded to the nearest 1/10,000) of the Common Stock on the Corporation's Principal Exchange, as reported by Bloomberg Financial Markets (or such other source as the Corporation may reasonably determine) and determined using the 22 Trading Days beginning on and including the first Business Day after the Original Issue Date (disregarding the Trading Days during such period having the highest and lowest volume weighted average sale price (as so determined)); provided, however, that, as of immediately following the Conversion Price Determination Time, the Distributable Market Equity Value Per Share shall result in the holders of the Series A Preferred and the Series B Preferred owning, on an as-converted, fully diluted basis, no less than the Preferred Ownership Floor of the Fully Diluted Shares on account of the Preferred Stock, and no more than Preferred Ownership Ceiling of the Fully Diluted Shares on account of the Preferred Stock.

"Dividend Payment Date" means the first day of March, June, September and December; provided, however, that if any Dividend Payment Date falls on any day other than a Business Day, the dividend payment due on such Dividend Payment Date will be paid on the Business Day immediately following such Dividend Payment Date.

"Dividend Periods" means the quarterly dividend periods commencing on and including the first day of March, June, September and December of each year and ending on and including the date before the next Dividend Payment Date of such year, respectively (other than the initial Dividend Period, which will commence on the Original Issue Date and end on and include the date before the first Dividend Payment Date after the Original Issue Date).

"Dividend Record Date" means, with respect to a Dividend Payment Date, the close of business on the 15th calendar day prior thereto, or such other record date, not more than 60 days and not less than 10 days preceding the applicable Dividend Payment Date, as may be fixed by the Board.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Fair Market Value" means, with respect to any (a) asset, the amount that a willing buyer would pay an unaffiliated willing seller in an arm's-length transaction to acquire ownership of such asset, with neither being under any compulsion to buy or sell, and both having reasonable knowledge of all relevant facts and taking into account all relevant circumstances and information, including market treatment of similar businesses, historical operating results and projections for future periods, as determined in good faith by the Board, or (b) security, the Current Market Price thereof.

"Floor/Ceiling Mechanism" means the Preferred Ownership Floor and the Preferred Ownership Ceiling may be adjusted in accordance with the following chart to the extent the Debt/Interest is an amount other than $625 million[2] in accordance with the following chart:

---

[2]    Subject to possible revision taking into account the Debtors' business plan filed with its Disclosure

| Debt/Interest | Preferred Ownership Ceiling | | Debt/Interest | Preferred Ownership Floor |
|---|---|---|---|---|
| (425) | 33.2% | | (425) | 29.4% |
| (475) | 33.8% | | (475) | 29.9% |
| (525) | 34.4% | | (525) | 30.4% |
| (575) | 35.1% | | (575) | 30.9% |
| (625) | 35.8% | | (625) | 31.4% |
| (675) | 36.5% | | (675) | 32.0% |
| (725) | 37.3% | | (725) | 32.6% |
| (775) | 38.0% | | (775) | 33.2% |
| (825) | 38.9% | | (825) | 33.8% |

To the extent Debt/Interest either is less than $425 million or exceeds $825 million, the Preferred Ownership Ceiling and Preferred Ownership Floor will be adjusted ratably based on the chart above and the calculations therein.

"Fully Diluted Shares" means a number of shares of Common Stock equal to the sum of (a) the number of shares of Common Stock issued and outstanding on the Issue Date plus (b) a number equal to the quotient of (i) the sum of (A) the aggregate Series A Liquidation Preference plus (B) the aggregate Series B Liquidation Preference divided by (ii) the Conversion Price.

"Independent Director" means a director of the Corporation who qualifies as an "independent director" of the Corporation under (a) New York Stock Exchange ("NYSE") Rule 303A(2), as such rule may be amended, supplemented or replaced from time to time ("303A(2)"), or (b) if the Corporation is listed or quoted on another securities exchange or quotation system that has an independence requirement, the comparable rule or regulation of such securities exchange or quotation system on which the Common Stock is listed or quoted (whether by final rule or otherwise).  In addition, in order for a director designated by Centerbridge to be deemed to be an "Independent Director," such director would also have to be considered an "independent director" of Centerbridge and the Initial Series A Purchaser under 303A(2), assuming for this purpose that (i) such director were a director of Centerbridge and the Initial Series A Purchaser (whether or not such director actually is or has been a director of Centerbridge or the Initial Series A Purchaser) and (ii) Centerbridge and the Initial Series A Purchaser are each deemed to be a NYSE listed company.

Statement.

21

"Initial Series A Purchaser" means CBP Parts Acquisition Co. LLC, a Delaware limited liability company, and any Permitted Transferee thereof, but only to the extent that such Permitted Transferee is a corporation or other organization, whether incorporated or unincorporated, of which either the Initial Series A Purchaser or Centerbridge directly or indirectly owns or controls 100% of the securities or other interests having by their terms ordinary voting power to elect the board of directors (or others performing similar functions) of such corporation or other organization.

"Issue Date" means, with respect to a share of Series A Preferred or Series B Preferred, the date on which such share is issued and sold by the Corporation.

"Liquidation Preference" means, as applicable, the Series A Liquidation Preference or the Series B Liquidation Preference.

"Original Issue Date" means effective date of the Plan, which is the date of the original issuance of shares of Series A Preferred and Series B Preferred.

"Permitted Transferee" means, with respect to any holder of Series A Preferred or Series B Preferred, an Affiliate of such holder that acknowledges the transfer restrictions set forth in Section 8 and agrees to be bound by any agreements to which such holder is a party with respect to its ownership of Series A Preferred or Series B Preferred, as applicable, to the same extent it would be bound if it were an original party thereto as evidenced by documentation satisfactory to the Corporation in its sole discretion.

"Person" means any individual, firm, corporation, partnership, limited partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity, and will include a "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act), as well as any successor (by merger or otherwise) of any such Person.

"Plan" means the joint plan of reorganization filed by Dana Corporation and its debtor subsidiaries with the United States Bankruptcy Court for the Southern District of New York on _____ __, 2007, as such joint plan may be amended.

"Preemptive Rights Disqualifying Date" means the date on which the Initial Series A Purchaser no longer beneficially owns shares of Series A Preferred having a Liquidation Preference of at least 50% of the Series A Preferred Liquidation Preference of shares of Series A Preferred that are outstanding at such time.

"Preferred/Common Equity Value" means total enterprise value of the Corporation minus the Debt/Interest.

"Preferred Equity Value" means an amount equal to (a) the sum of (i) the Series A Liquidation Preference multiplied by the number of shares of the Series A Preferred and (ii) the Series B Liquidation Preference multiplied by the number of shares of the Series B Preferred (b) divided by the Discount Factor.

"Preferred Ownership Ceiling" means an amount equal to the Preferred Equity Value divided by the Preferred Common Equity Value, which shall be [35.8]% (assuming Debt/Interest equals $625 million), subject to the Floor/Ceiling Mechanism.

"Preferred Ownership Floor" means an amount equal to the Preferred Equity Value divided by the Preferred Common Equity Value, which shall be [31.4]% (assuming Debt/Interest equals $625 million), subject to the Floor/Ceiling Mechanism.

"Preferred Stock" means the Corporation's authorized Preferred Stock, par value $0.01 per share.

"Pro Rata Amounts" means, on the date of determination, with respect to any Qualified Participant, the quotient obtained by dividing (a) the aggregate number of shares of Series A Preferred (and, in the case of a determination under Section 8(c) only, Series B Preferred) held by such Qualified Participant on such date by (b) the aggregate number of shares of Common Stock Outstanding.

"Required Holders" means holders of shares of Series A Preferred having a Liquidation Preference of at least 50% of the Series A Liquidation Preference of shares of Series A Preferred that are outstanding at such time.

"Securities Act" means the Securities Act of 1933, as amended.

"Series A Liquidation Preference" means $100.00 per share, as adjusted from time to time for Series A Preferred stock splits, stock dividends, recapitalizations and the like.

"Series B Liquidation Preference" means $100.00 per share, as adjusted from time to time for Series B Preferred stock splits, stock dividends, recapitalizations and the like.

"Series A Nominating Committee" means a committee of the Board that consists of three directors, two of whom will be chosen by the Initial Series A Purchaser and one of whom will be chosen by the Board.

"Shareholders Agreement" means the Shareholders Agreement among the Corporation, Centerbridge and the Initial Series A Purchaser, as in effect from time to time.

"set apart for payment" will be deemed to include, without any action by the Corporation other than the following, the recording by the Corporation in its accounting ledgers of any accounting or bookkeeping entry which indicates, pursuant to an authorization of dividends or other distribution by the Board, the allocation of funds or Capital Stock of the Corporation to be so paid on any series or class of Capital Stock of the Corporation.

"Third Party" means a Person that is not (a) the Corporation or any of its subsidiaries or (b) an Affiliate of the Corporation or any of its subsidiaries.

NYI-3999718v11

"Trading Day" means a day on which the principal national securities exchange on which the shares of Common Stock are listed or admitted to trading is open for the transaction of business or, if the shares of the Common Stock are not listed or admitted to trading on any national securities exchange, a Business Day.

"Transfer Agent" means the transfer agent or agents of the Corporation as may be designated by the Board or its designee as the transfer agent for the Series A Preferred and Series B Preferred.

14.    Amendment.  No provision of these Articles may be repealed or amended in any respect unless such repeal or amendment is approved by the affirmative vote of not less than a majority of the total voting power of all Common Stock Outstanding (on an as-converted basis).

24

**Exhibit C**

**[NEW DANA CORPORATION]**

---

**SUBSCRIPTION AGREEMENT**

---

**Copy # _____**

## NOTICES

THIS SUBSCRIPTION AGREEMENT HAS BEEN PREPARED ON A CONFIDENTIAL BASIS SOLELY FOR THE BENEFIT OF SELECTED QUALIFIED INVESTORS IN CONNECTION WITH THE PRIVATE PLACEMENT OF SECURITIES OF THE CORPORATION ("NEW DANA") THAT WILL BE THE SUCCESSOR TO DANA CORPORATION, A VIRGINIA CORPORATION ("DANA"), UNDER THE CHAPTER 11 PLAN OF REORGANIZATION OF DANA AND ITS DEBTOR SUBSIDIARIES AND AFFILIATES THAT COMMENCED JOINTLY ADMINISTERED CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "CHAPTER 11 PLAN").  ANY REPRODUCTION OR DISTRIBUTION OF THIS SUBSCRIPTION AGREEMENT, OR RETRANSMITTAL OF ITS CONTENTS, IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF DANA OR NEW DANA IS PROHIBITED.  THIS SUBSCRIPTION AGREEMENT, INCLUDING ALL COPIES THEREOF, SHALL BE RETURNED TO DANA IF REQUESTED.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE, NOR HAS THE COMMISSION OR ANY SUCH AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS SUBSCRIPTION AGREEMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS SUBSCRIPTION AGREEMENT IS NOT AN OFFER TO SELL TO OR A SOLICITATION OF AN OFFER TO BUY FROM, NOR SHALL ANY SECURITIES BE OFFERED OR SOLD TO, ANY PERSON IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION, PURCHASE OR SALE WOULD BE UNLAWFUL UNDER THE SECURITIES LAWS OF SUCH JURISDICTION.

THERE IS NO PUBLIC MARKET FOR THE SERIES B PREFERRED STOCK OF NEW DANA, AND IT IS NOT EXPECTED THAT THERE WILL BE A MARKET IN THE FORESEEABLE FUTURE FOR THE RESALE OF THE SERIES B PREFERRED STOCK OFFERED HEREBY.

NEITHER DANA NOR NEW DANA MAKES ANY REPRESENTATION TO ANY OFFEREE OR PURCHASER OF THE SECURITIES REGARDING THE LEGALITY OF AN INVESTMENT THEREIN BY SUCH OFFEREE OR PURCHASER UNDER APPLICABLE LEGAL INVESTMENT OR SIMILAR LAWS.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS SUBSCRIPTION AGREEMENT, OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM DANA OR ANY OF ITS AGENTS, OFFICERS, OR REPRESENTATIVES, AS LEGAL OR TAX ADVICE.  EACH OFFEREE SHOULD CONSULT HIS OWN ADVISERS

AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT IN NEW DANA.

AS A PURCHASER OF THE SECURITIES IN A PRIVATE PLACEMENT NOT REGISTERED UNDER THE SECURITIES ACT, EACH INVESTOR SHOULD PROCEED ON THE ASSUMPTION THAT THE ECONOMIC RISK OF THE INVESTMENT MUST BE BORNE FOR AN INDEFINITE PERIOD, SINCE THE SECURITIES MAY NOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK.  IT IS SPECULATIVE AND SUITABLE ONLY FOR PERSONS WHO HAVE SUBSTANTIAL FINANCIAL RESOURCES AND HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT. FURTHER, THIS INVESTMENT SHOULD ONLY BE MADE BY THOSE WHO UNDERSTAND OR HAVE BEEN ADVISED WITH RESPECT TO THE TAX CONSEQUENCES OF AND RISK FACTORS ASSOCIATED WITH THE INVESTMENT AND WHO ARE ABLE TO BEAR THE SUBSTANTIAL ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

NOTICE TO FLORIDA INVESTORS: THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT.  THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA.  IN ADDITION, ALL FLORIDA RESIDENTS SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER, OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.  TO ACCOMPLISH THIS, IT IS SUFFICIENT FOR A FLORIDA PURCHASER TO SEND A LETTER OR TELEGRAM TO THE ISSUER WITHIN SUCH THREE (3) DAY PERIOD, STATING THAT THE PURCHASER IS VOIDING AND RESCINDING THE PURCHASE.  IF A PURCHASER SENDS A LETTER, IT IS PRUDENT TO DO SO BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO INSURE THAT THE LETTER IS RECEIVED AND TO EVIDENCE THE TIME OF MAILING.  HOWEVER, THIS RIGHT IS NOT AVAILABLE TO ANY PURCHASER WHO IS A BANK, TRUST COMPANY, SAVINGS INSTITUTION, INSURANCE COMPANY, SECURITIES DEALER, INVESTMENT COMPANY (AS DEFINED IN THE 1940 ACT), PENSION OR PROFIT-SHARING TRUST OR QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE 1933 ACT).

NOTICE TO NEW HAMPSHIRE INVESTORS: **NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER THIS CHAPTER WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR**

**THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

[NEW DANA CORPORATION]

SUBSCRIPTION AGREEMENT

This Subscription Agreement, dated as of _____, 2007 (the "**Subscription Agreement**"), is made by and between Dana and the undersigned (the "**Subscriber**" or "**Preferred Stockholder**") who is subscribing hereby for shares of 4.0% Series B Convertible Preferred Stock, par value $0.01 per share, of New Dana (the "**Shares**" or the "**Series B Preferred Stock**").

The Subscriber and Dana agree and represent as follows:

1.    UNDERLINE SUBSCRIPTION

(a)    The Subscriber hereby agrees to subscribe for the number of Shares of New Dana at the aggregate purchase price set forth on Schedule I.  The Subscriber will, at the Closing, pay to New Dana the amount set forth on Schedule I, in the form of a wire transfer of immediately available funds payable to New Dana in accordance with the wiring instructions set forth on Schedule II or pursuant to another method of payment approved in advance by Dana. The Subscriber acknowledges that it will then be a Preferred Stockholder of New Dana.

(b)    The closing of the subscription for Shares contemplated by this Subscription Agreement (the "**Closing**") will take place at the offices of Jones Day, 222 E. 41st Street, New York, New York concurrently with the Closing, as defined in that certain Investment Agreement, dated as of July 25, 2007, by and among Centerbridge Capital Partners, L.P., a Delaware limited partnership, CBP Parts Acquisition Co. LLC, a newly formed Delaware limited liability company, and Dana (the "**Investment Agreement**").  The date on which the Closing occurs is the "**Closing Date**."

(c)    The Subscriber understands and acknowledges that:

(i)    The Shares purchased pursuant hereto will be owned only in the name of the Subscriber as indicated on the signature page below.

(ii)    Except to the extent provided in this Subscription Agreement, (A) Dana and New Dana make no representation or warranty in connection with the purchase of the Shares hereunder, (B) Dana has made available to the Subscriber, prior to the Closing Date, the opportunity to ask questions of and receive answers from Dana or persons acting on behalf of Dana concerning the investment contemplated hereby, the terms and conditions of the private placement and the business, operations and prospects of Dana and New Dana, and to obtain any additional information to the extent Dana possesses such information and (C) any materials provided to the Subscriber prior to the date hereof are for presentation purposes only and do not constitute representations or warranties by Dana or New Dana.

(iii)    No federal or state agency has made or will make any finding or determination as to the adequacy or accuracy of any information provided to the Subscriber in

NYI-4007451v5

connection with its consideration of its investment in the Shares or as to the fairness of this private placement for investment, nor any recommendation or endorsement of the Shares.

(iv)     Since neither the Shares nor the shares of common stock of New Dana, par value $0.01 per share, into which the Shares are convertible (the "**Common Shares**" and, together with the Shares, the "**Unregistered Securities**") will be registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or applicable state securities laws, the economic risk of the investment must be held indefinitely by the Subscriber and the Unregistered Securities cannot be sold unless subsequently registered under the Securities Act and such state securities laws or an exemption from such registration is available; New Dana's obligations to file a registration statement under the Securities Act will be limited to those set forth under the Registration Rights Agreement, dated _____, 200_, among the holders of Series B Preferred Stock and Dana ("the "**Registration Rights Agreement**").  It is not anticipated that there will be any market for resale of the Series B Preferred Stock prior to the filing of a registration statement in respect of such securities.

(v)     The Articles of Serial Designation of 4.0% Series A Convertible Preferred Stock and 4.0% Series B Convertible Preferred Stock (the "**Articles of Designation**") will contain restrictions on transfer of the Series B Preferred Stock held by a Preferred Stockholder.

(d)     The Subscriber understands and acknowledges that New Dana will be relying on representations, warranties and agreements made by the Subscriber to Dana and New Dana, and the covenants agreed to by the Subscriber, herein and, thus, shall indemnify, defend and hold harmless Dana, New Dana, and their stockholders, directors, officers, affiliates, agents and employees, against any and all loss, damage, liability or expense, including reasonable attorneys' fees, which they or any of them may suffer, sustain or incur by reason of or in connection with any breach of a covenant made by the Subscriber in this Subscription Agreement, or any misrepresentation or breach of warranty or agreement made by the Subscriber in this Subscription Agreement, or in connection with the sale or distribution by the Subscriber of the Shares purchased by the Subscriber pursuant hereto in violation of the Securities Act or any other applicable law.  The representations, warranties and covenants contained in this Subscription Agreement shall survive the acceptance of this subscription and the admission of the Subscriber as a Preferred Stockholder.

2.     REPRESENTATIONS AND WARRANTIES OF DANA AND NEW DANA.  Dana represents and warrants to the Subscriber as follows:

(a)     Dana is a corporation duly organized and validly existing under the laws of the State of Virginia.

(b)     Subject to the entry of the confirmation order for the Chapter 11 Plan contemplated by the Investment Agreement and occurrence of the Closing, (i) Dana has and New Dana will have the requisite corporate power and authority to execute and deliver this Subscription Agreement, (ii) this Subscription Agreement and the consummation by Dana and New Dana of the transactions contemplated hereby have been (or, in the case of New Dana, will be prior to the Effective Date) duly authorized by all requisite corporate action, and (iii) this

Subscription Agreement has been duly and validly executed and delivered by Dana and constitutes the valid and binding obligation of Dana and New Dana, enforceable against Dana or New Dana, as applicable, in accordance with its terms.

(c)    New Dana will at Closing be a corporation duly organized and validly existing under the laws of the State of _____.

(d)    The Series B Preferred Stock to be issued and sold by New Dana pursuant to this Subscription Agreement when issued in accordance with the provisions hereof will be validly issued by New Dana, and will represent fully paid and nonassessable shares of New Dana.

(d)    Except for the representations and warranties contained in this Section 2, none of Dana, New Dana and any other Person on behalf of Dana or New Dana makes any other express or implied representation or warranty with respect to Dana or New Dana with respect to any other information provided to the Subscriber.  None of Dana, New Dana and any other Person will have or be subject to any liability or indemnification obligation to the Subscriber or any other Person resulting from the distribution to the Subscriber, or use by the Subscriber of, any such information, including any information, documents, projections, forecasts or other material made available to the Subscriber, unless any such information is included in a representation or warranty contained in this Section 2.

3.    <u>REPRESENTATIONS AND WARRANTIES OF THE SUBSCRIBER</u>. The Subscriber represents and warrants to Dana and New Dana as follows:

(a)    <u>Due Authorization</u>.  (i) The Subscriber has the requisite corporate or individual power and authority to execute and deliver this Subscription Agreement, (ii) this Subscription Agreement and the consummation by Subscriber of the transactions contemplated hereby have been duly authorized by all requisite corporate action, and (iii) this Subscription Agreement has been duly and validly executed and delivered by Subscriber and constitutes the valid and binding obligation of Subscriber, enforceable against Subscriber in accordance with its terms.  Except to the extent Subscriber is an individual, Subscriber is a duly organized entity of the type set forth on the signature page hereto and such entity is validly existing under the laws of the jurisdiction of its incorporation or formation.

(b)    <u>Offering Exemption</u>.  The Subscriber understands that the Series B Preferred Stock of New Dana that he or she is purchasing hereunder has not been registered under the Securities Act, nor qualified under any state securities laws, and that it is being offered and sold pursuant to an exemption from such registration and qualification requirements based in part upon the Subscriber's representations contained herein.

(c)    <u>Knowledge of Offer</u>.  The Subscriber has been given the opportunity to obtain from Dana all information that he or she has requested regarding Dana's and New Dana's business plans and prospects.  The Subscriber has read this Subscription Agreement, the Articles of Designation, the Registration Rights Agreement and the Certificate of Incorporation of New Dana and understands the terms and conditions herein and therein.

(d)     Knowledge and Experience; Ability to Bear Economic Risks.  The Subscriber has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of the investment contemplated by this Subscription Agreement, and he or she is able to bear the economic risk of an investment in New Dana.  The Subscriber has sufficient financial resources available to support the loss of all or a portion of his or her investment in New Dana, and has no need for liquidity in his or her investment in New Dana.

(e)     Limitations on Disposition.  The Subscriber recognizes that no public market exists for the Unregistered Securities, and no representation has been made to the Subscriber that such public market will exist in the future.  The Subscriber understands that he or she must bear the economic risk of this investment indefinitely unless his or her Unregistered Securities are registered pursuant to the Securities Act or an exemption from such registration is available, and unless the disposition of such Unregistered Securities is qualified under applicable state securities laws or an exemption from such qualification is available.  The Subscriber further understands that there is no assurance that any exemption from the Securities Act will be available, or, if available, that such exemption will allow the Subscriber to Transfer (as hereinafter defined) all or part of his or her Unregistered Securities, in the amounts or at the times the Subscriber might propose.  The Subscriber further acknowledges and understands that his or her Series B Preferred Stock will be subject to restrictions on transfer contained in the Articles of Designation.

(f)     Investment Purpose.  The Subscriber is acquiring the Series B Preferred Stock solely for his or her own account for investment and not with a view toward the resale, Transfer, or distribution thereof, nor with any present intention of distributing the Series B Preferred Stock.  No other Person (as hereinafter defined) has any right with respect to or interest in the Shares to be purchased by the Subscriber, nor has the Subscriber agreed to give any Person any such interest or right in the future.

(g)     Capacity.  The Subscriber has full power and legal right to execute and deliver this Subscription Agreement and the Stockholders Agreement and to perform his or her obligations hereunder and thereunder.

(h)     No Finder's Fee.  No finder's fee or other similar fee is payable to any third party in connection with the Subscriber's investment in New Dana.  Should such a fee be payable to any third party, such fee is payable in its entirety by the Subscriber and not by Dana, New Dana or any of their affiliates.

(i)     Accredited Investor.  The Subscriber represents and warrants that he or she is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under Section 4(2) of the Securities Act, has completed the accredited investor questionnaire attached hereto as Schedule III, and that such completed questionnaire sets forth a true, correct and complete statement of the Subscriber's accredited investor status.

(j)     Qualified Institutional Buyer.  The Subscriber represents and warrants that it is a "qualified institutional buyer" as such term is defined in Rule 144A promulgated under the Securities Act, has completed the qualified institutional buyer questionnaire attached hereto as

Part III of Schedule III, and that such completed questionnaire sets forth a true, correct and complete statement of the Subscriber's qualified institutional investor status.

(k)     Consents and Approvals.  No third-party consents or approvals are required to be obtained, made or given in order to permit the Subscriber to execute and deliver this Subscription Agreement and to perform his, her or its obligations hereunder.

(l)     No Conflicts or Violations.  Neither the execution and delivery of this Subscription Agreement by the Subscriber nor the consummation of any of the transactions contemplated hereby will violate or conflict with, or result in a breach of, or constitute a default under (whether upon notice or the passage of time or both) any (i) contract to which the Subscriber is a party or (ii) applicable laws, regulations, orders, judgments and decrees.

(m)     Accuracy of Representations and Warranties.  The foregoing representations and warranties will be true on the date hereof and as of the Closing Date and shall survive delivery of this Subscription Agreement.  If any of such representations and warranties shall not be true prior to acceptance of this Subscription Agreement by Dana or prior to the Closing Date, the Subscriber shall give written notice of such fact to Dana, specifying which representations and warranties are not true and accurate and the reasons therefor.

4.     COVENANTS OF THE PARTIES.

(a)     Securities Act Restrictions.  The Subscriber covenants that he or she will not sell or otherwise Transfer all or part of his or her Unregistered Securities except pursuant to an effective registration under the Securities Act or in a transaction which, in the opinion of counsel reasonably satisfactory to New Dana, qualifies as an exempt transaction under the Securities Act and the rules and regulations promulgated thereunder.

(b)     Financial and Business Information.  If requested by the Subscriber, New Dana shall deliver to the Subscriber, so long as it owns any Unregistered Securities, one copy of each financial statement, report, notice or proxy statement sent by New Dana to any stockholders.

(c)     Alternative Investment.  Nothing in this Subscription Agreement will be deemed to preclude the Subscriber from making any proposal for an investment, transaction or plan that would be an alternative to the investment contemplated by the Investment Agreement or the Chapter 11 Plan (as defined in the Investment Agreement), or from financing any such proposal made by a third party.

5.     SUBSCRIBER ACKNOWLEDGMENTS.  The Subscriber further acknowledges the following as of the date hereof and as of the Closing Date:

(a)     Disclosure Statement.  The Subscriber has received, read and understands the risks associated with Dana's and New Dana's business described in the Disclosure Statement.

(b)     Lack of Public Market.  No public market exists for the Unregistered Securities, and no representation has been made to the Subscriber that such public market will exist in the future.  The sale of the Shares offered by this Subscription Agreement is not being

registered under the Securities Act or under state securities laws, and the Unregistered Securities may not be resold or otherwise transferred unless they are subsequently registered or an exemption from applicable registration requirements is available.  Consequently, investors may not be able to liquidate their investments.

(c)     Projections.  The Business Plan of New Dana presented to the Subscriber prior to the Closing Date contains projections.  Projections are hypothetical and based upon present factors influencing the business of New Dana.  Assumptions regarding future changes in sales and revenues are necessarily speculative in nature.  In addition, projections do not and cannot take into account such factors as general economic conditions, unforeseen changes and developments in available technologies and products, the entry into New Dana's market of significant additional competitors, natural disasters, the terms and conditions of future financings of New Dana, and other risks inherent to the business of New Dana.  While management believes that the projections reflect the possible future results of New Dana's operations, such results cannot be guaranteed.  Investors must be prepared for the substantial economic risks involved in the purchase of the Shares, including the total loss of their investment.  Neither Dana nor New Dana will be under any duty to update the projections received by the Subscriber prior to the Closing Date.

6.     CONDITIONS TO CLOSING

(a)     Conditions to Each Party's Obligations.  The respective obligations of the Subscriber and New Dana to consummate the transactions contemplated by this Subscription Agreement are subject to the concurrent occurrence of the Closing, as defined in the Investment Agreement.

(b)     Conditions to Obligations of New Dana.  The obligations of New Dana to consummate the transactions contemplated by this Subscription Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of the following conditions:

(i)     All representations and warranties of the Subscriber in Section 3 of this Subscription Agreement must be true, correct and complete in all respects on the Closing Date.

(ii)    All acknowledgments of the Subscriber in Section 5 of this Subscription Agreement must be true, correct and complete in all respects on the Closing Date.

(c)     Conditions to Obligations of the Subscriber.  The obligations of the Subscriber to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing of the following condition:  all representations and warranties of New Dana and New Dana in Section 2 of this Subscription Agreement must be true and correct in all respects on the Closing Date.

7.     TERMINATION.  This Agreement will terminate automatically upon the termination of the Investment Agreement.

8.     INTERPRETATION OF THIS SUBSCRIPTION AGREEMENT

Terms Defined.  As used in this Subscription Agreement, the following terms have the respective meanings set forth below:

**Bankruptcy Court**:  the United States Bankruptcy Court for the Southern District of New York.

**Debtors**:  Dana, on behalf of itself and its subsidiaries operating as debtors and debtors-in-possession in the Chapter 11 Cases.

**Disclosure Statement**:  a disclosure statement with respect to the Plan filed by the Debtors with the Bankruptcy Court.

**Exchange Act**:  the Securities Exchange Act of 1934, as amended.

**Person**:  an individual, partnership, limited liability company, joint-stock company, corporation, trust or unincorporated organization, and a government or agency or political subdivision thereof.

**Plan**:  the plan of reorganization for the Debtors filed in connection with the Debtors' jointly administered chapter 11 cases ("**Chapter 11 Cases**") filed in the Bankruptcy Court as case No. 06-10354 (BRL).

**Security, Securities**:  as defined in Section 2(l) of the Securities Act.

**Transfer**:  any sale, assignment, pledge, hypothecation, or other disposition or encumbrance.

(a)    Accounting Principles.  Where the character or amount of any asset or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Subscription Agreement, this shall be done in accordance with U.S. generally accepted accounting principles at the time in effect, to the extent applicable, except where such principles are inconsistent with the requirements of this Subscription Agreement.

(b)    Directly or Indirectly.  Where any provision in this Subscription Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

(c)    Governing Law.  This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the choice of law or conflicts of law principles thereof.

(d)    Section Headings.  The headings of the sections and subsections of this Subscription Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof.

9.    MISCELLANEOUS

(a)     Notices.

(i)     All communications under this Subscription Agreement shall be in writing and shall be delivered by hand or facsimile or mailed by overnight courier or by registered or certified mail, postage prepaid:

(A)     if to the Subscriber, at his or her address or facsimile number shown on Schedule I, or at such other address or facsimile number as the Subscriber may have furnished New Dana in writing, with a copy to Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099 (facsimile (212) 728-9536), marked for the attention of Jeffrey R. Poss, Esq.; and

(B)     if to Dana, at Dana Corporation (or the name of New Dana), 4500 Dorr Street, Toledo, OH 43615 (facsimile: (419) 535-4544), marked for the attention of General Counsel and Secretary, or at such other address or facsimile number as it may have furnished in writing to the Subscriber, with a copy to Jones Day, 222 East 41st Street, New York, NY 10017 (facsimile: 212-755-7306), marked for the attention of Marilyn W. Sonnie, Esq.

(ii)     Any notice so addressed shall be deemed to be given: if delivered by hand or facsimile, on the date of such delivery; if mailed by courier, on the first business day following the date of such mailing; and if mailed by registered or certified mail, on the third business day after the date of such mailing.

(b)     Expenses and Taxes.  Dana or New Dana, as applicable, will pay, and save the Subscriber harmless from any and all liabilities (including interest and penalties) with respect to, or resulting from any delay or failure in paying, stamp and other taxes (other than income taxes), if any, which may be payable or determined to be payable on the execution and delivery of this Subscription Agreement or acquisition of the securities pursuant to this Subscription Agreement.

(c)     Reproduction of Documents.  This Subscription Agreement and all documents relating thereto, including, without limitation, (i) consents, waivers and modifications which may hereafter be executed, (ii) documents received by the Subscriber pursuant hereto and (iii) financial statements, certificates and other information previously or hereafter furnished to the Subscriber, may be reproduced by the Subscriber by any photographic, photostatic, microfilm, microcard, miniature photographic or other similar process and the Subscriber may destroy any original document so reproduced.  All parties hereto agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by the Subscriber in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

(d)     Successors and Assigns.  This Subscription Agreement and the rights, powers and duties set forth herein shall inure to the benefit of and be binding upon the successors and assigns of each of the parties.

(e)     <u>Entire Agreement; Amendment and Waiver</u>.  This Subscription Agreement and the Stockholders Agreement constitute the entire understanding of the parties hereto and supersede all prior understandings among such parties with respect to the matters covered herein.  This Subscription Agreement may be amended, and the observance of any term of this Subscription Agreement may be waived, with (and only with) the written consent of Dana (or New Dana, if after the Closing Date) and the Subscriber.

(f)     <u>Severability</u>.  If any provision of this Subscription Agreement or the application of such provision to any person or circumstance shall be held invalid by any court of competent jurisdiction, the remainder of this Subscription Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

(g)     <u>Counterparts</u>.  This Subscription Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same agreement.

Please indicate your acceptance and approval of the foregoing in the space provided below.

DANA CORPORATION

_____
Name:
Title:

ACCEPTED AND APPROVED

as of the _____ day of

_____, 2007

SUBSCRIBER

By: _____
    Company Name:
    Signatory Name:
    Signatory Title:

SCHEDULE I

| **Name and Address** | **Number of Shares** | **Aggregate Purchase Price** |
|---|---|---|
| Name: | | $ |
| Address: | | |

SCHEDULE II

Wiring Instructions

[to come]

SCHEDULE III

**THE QUESTIONS THAT FOLLOW ARE DESIGNED TO ASSIST NEW DANA IN DETERMINING WHETHER THE SUBSCRIBER IS AN ACCREDITED INVESTOR. INITIAL ALL APPROPRIATE SPACES ON THE FOLLOWING PAGES, INDICATING THE BASIS UPON WHICH THE SUBSCRIBER MAY QUALIFY TO PURCHASE SHARES.  FAILING TO INITIAL ALL SPACES APPLICABLE TO THE SUBSCRIBER MAY RESULT IN NEW DANA NOT HAVING ENOUGH INFORMATION TO DETERMINE IF THE SUBSCRIBER IS AN ACCREDITED INVESTOR.**

## I.  GENERAL INFORMATION

A.  <u>INDIVIDUAL INVESTORS</u>.  If the Subscriber is an individual, including individuals who intend to subscribe for Shares with funds held in a pension plan, profit-sharing plan, IRA or similar plan, the information requested in this section should be provided in regard to such individuals.

1.      Subscriber's Name:

(This name, or names, will be used on the Certificates evidencing the Shares.)

2.      Indicate type of ownership in which Shares will be held:

     ___      Individual
     ___      Tenants in Common
     ___      Joint Tenants with rights of survivorship
              (husband and wife only)
     ___      Community Property

3.      Social Security Number(s):

4.      Date(s) of birth:

5.      a.      United States citizen(s):  ___ Yes  ___ No

       b.      If "No," country of citizenship; _____

6.      State in which domiciled:

B.  <u>ENTITY INVESTORS</u>.  If the Subscriber is a partnership, corporation, limited liability company, trust or other entity, the information requested in this section should be provided in regard to such entity.

      1.      Full legal name of entity:

      2.      Indicate type of entity:

         ___    General Partnership
         ___    Limited Partnership
         ___    Corporation
         ___    Limited Liability Company
         ___    Trust
         ___    Other  _____
                         (Specify)

      3.      Taxpayer Identification Number:

      4.      State in which organized or incorporated:

      5.      Date of organization or incorporation:

      6.      Was this partnership, corporation, limited liability company, trust or other entity for the specific purpose of acquiring the Shares?  ___ Yes  ___ No


## II.  ACCREDITED INVESTOR DETERMINATION

      A.  <u>FOR INDIVIDUALS</u>:

_____
Initial

      1.  I certify that I am an accredited investor because I have an individual net worth, or my spouse and I have a combined net worth[1], in excess of $1,000,000.

_____

      2.  I certify that I am an accredited investor because I had individual income (exclusive of any income attributable to my spouse) of more than $200,000 in each of the two most

---

[1]  "Net worth" means the excess of total assets at fair market value, including home, furnishings and automobiles, over total liabilities. For purposes of determining "net worth," the principal residence owned by an individual shall be valued either at (A) cost, including the cost of improvements, net of current encumbrances upon the property, or (B) the appraised value of the property as determined upon a written appraisal used by an institutional lender making a loan to the individual secured by title property, including the cost of subsequent improvements, net of current encumbrances upon the property.  "Institutional lender" means a bank, savings and loan company, industrial loan company, credit union or personal property broker or a company whose principal business is as a lender upon loans secured by real property and which has such loans receivable in the amount of $2,000,000 or more.

2

_____  recent years and I reasonably expect to have an individual income[2] in excess of $200,000
Initial    in the current year.

_____  3.  I certify that I am an accredited investor because my spouse and I had a joint income
Initial    of more than $300,000 in each of the two most recent years and I reasonably expect to
           have a joint income of $300,000 in the current year.

_____  4. I certify that I am an executive officer or director of New Dana.
Initial


B.  FOR ENTITIES:

_____  1.  Subscriber is either (i) a corporation, (ii) a Massachusetts or similar business trust, (iii)
Initial    a partnership, or (iv) a limited liability company, in each case not formed for the specific
           purpose of acquiring the securities offered, and in each case with total assets in excess of
           $5,000,000.

_____  2.  Subscriber is either (i) a bank as defined in Section 3(a)(2) of the Securities Act, or any
Initial    savings and loan association or other institution as defined in Section 3(a)(5)(A) of the
           Securities Act, acting in its individual or fiduciary capacity; (ii) a broker or dealer
           registered pursuant to Section 15 of the Exchange Act; (iii) an insurance company as
           defined in Section 2(13) of the Securities Act; (iv) an investment company or a business
           development company under the Investment Company Act of 1940, as amended (the
           "1940 Act") or a private business development company under the Investment Advisers
           Act of 1940; or (v) a Small Business Investment Company licensed by the U.S.  Small
           Business Administration under Section 301(c) or (d) of the Small Business Investment
           Act of 1958, as amended.

_____  3.  Subscriber is an employee benefit plan under ERISA: (a) whose decision to invest in
Initial    New Dana is made by a plan fiduciary as defined in ERISA §3(21) that is a registered
           investment adviser, bank, savings and loan association, or insurance company; or (b) with
           total assets exceeding $5,000,000, or (c) that is a self-directed plan, and the decision to
           invest in New Dana is made by an accredited investor.

_____  4.  Subscriber is a plan established and maintained by a state, a political subdivision
Initial    thereof, or any agency or instrumentality thereof, for the benefit of its employees and with
           total assets exceeding $5,000,000.

---

[2]    "Individual income" means adjusted gross income, as reported for Federal income tax purposes, less any
       income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but
       not including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any
       tax-exempt interest income under Section 103 of the Internal Revenue Code of 1986, as amended (the
       "Code"), (ii) the amount of losses claimed as a limited partner in a limited partnership as reported on
       Schedule E of Form 1040, (iii) any deduction claimed for depletion under section 611 et seq. of the Code,
       and (iv) any amount by which income from long-term capital gains has been reduced in arriving at adjusted
       gross income pursuant to the provisions of Section 1202 of the Code.

3

_____
Initial

5.  Subscriber is a trust, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000 and whose purchase is directed by a sophisticated person.

_____
Initial

6.  Subscriber is an entity as to which all the equity owners are accredited investors under one or more of the foregoing categories.

## C.  FAILURE TO QUALIFY UNDER ANY CATEGORY

_____
Initial

1.  I do not meet any of the standards set forth in any one of the above categories, or my organization does not meet any of those standards.

_____
Initial

2.  I do not meet any of the standards set forth in any one of the above categories, however, I am capable of evaluating the merits and risks of an investment in the Shares. To the extent necessary, I have retained, at my own expense, and relied upon, appropriate professional advice regarding the investment, tax and legal merits and consequences of this Subscription Agreement and owning the Shares.  In addition, the amount of my investment in the Shares does not exceed ten percent (10%) of my net worth.  I agree to furnish any additional information requested to assure compliance with applicable federal and state securities laws in connection with the purchase and sale of the Shares.

## III.  QUALIFIED INSTITUTIONAL BUYER DETERMINATION

_____
Initial

1.  Subscriber is either (i) an insurance company as defined in Section 2(13) of the Securities Act, (ii) an investment company registered under the 1940 Act, (iii) a business development company as defined in Section 2(a)(48) of the 1940 Act, (iv) a small business development company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Act or (v) a plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, in each case, owning and investing on a discretionary basis at least $100,000,000 in securities of issuers not affiliated with Subscriber.[3]

---

[3]    In determining the aggregate amount of securities owned and invested on a discretionary basis by an entity, the following instruments and interests shall be excluded: bank deposit notes and certificates of deposit, loan participations, repurchase agreements, securities owned, but subject to a repurchase agreement and currency, interest rate and commodity swaps.

The aggregate value of securities owned and invested on a discretionary basis by an entity shall be the cost of such securities, except where the entity reports its securities holdings in its financial statements on the basis of their market value and no current information with respect to the cost of those securities has been published. In the latter event, the securities may be valued at market.

4

_____
Initial
2. Subscriber is either (i) any employee benefit plan within the meaning of Title I of ERISA, (ii) a trust fund whose trustee is a bank or trust company and whose participants are exclusively plans established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees or employee benefit plans within the meaning of Title I of ERISA or (iii) a business development company as defined in Section 202(a)(22) of the 1940 Act, in each case, owning and investing on a discretionary basis at least $100,000,000 in securities of issuers not affiliated with Subscriber.

_____
Initial
3. Subscriber is either (i) an organization described in Section 501(c)(3) of the Internal Revenue Code, (ii) a corporation (other than a bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association or other institution referenced in Section 3(a)(5)(A) of the Securities Act or a foreign bank or savings and loan association or equivalent institution), (iii) a partnership, (iv) a limited liability company, (iv) a Massachusetts or similar business trust or (v) an investment adviser registered under the Advisers Act, in each case, owning and investing on a discretionary basis at least $100,000,000 in securities of issuers not affiliated with Subscriber.

_____
Initial
4. Subscriber is an entity under one or more of the foregoing categories acting on behalf of other qualified institutional buyers under one or more of the categories contained in this Part III.

_____
Initial
5. Subscriber is either (i) a dealer registered pursuant to Section 15 of the Exchange Act, acting for its own account or the accounts of other qualified institutional buyers under one or more of the categories contained in this Part III, that in the aggregate owns and invests on a discretionary basis at least $10 million of securities of issuers that are not affiliated with Subscriber or (ii) a dealer, whether or not otherwise a qualified institutional buyer under one or more of the categories contained in this Part III, registered pursuant to Section 15 of the Exchange Act acting in a riskless principal transaction on behalf of a qualified institutional buyer under one or more of the categories contained in this Part III.[4]

_____
Initial
6. Subscriber is an investment company registered under the 1940 Act, acting for its own account or for the account of other qualified institutional buyers under one or more of the categories contained in this Part III, that is part of a family of investment companies (any

---

In determining the aggregate amount of securities owned by an entity and invested on a discretionary basis, securities owned by subsidiaries of the entity that are consolidated with the entity in its financial statements prepared in accordance with generally accepted accounting principles may be included if the investments of such subsidiaries are managed under the direction of the entity, except that, unless the entity is a reporting company under Section 13 or 15(d) of the Exchange Act, securities owned by such subsidiaries may not be included if the entity itself is a majority-owned subsidiary that would be included in the consolidated financial statements of another enterprise.

[4] "Riskless principal transaction" means a transaction in which a dealer buys a security from any person and makes a simultaneous offsetting sale of such security to a qualified institutional buyer, including another dealer acting as riskless principal for a qualified institutional buyer.

5

two or more investment companies registered under the 1940 Act, except for a unit investment trust whose assets consist solely of shares of one or more registered investment companies, that have the same investment adviser, or, in the case of unit investment trust, the same depositor)[5] which own in the aggregate at least $100 million in securities of issuers other than issuers that are affiliated with the investment company or are part of such family of investment companies.

_____

Initial

7.  Subscriber is (i) a bank as defined in Section 3(a)(2) of the Securities Act, a savings and loan association or other institution as referenced in Section 3(a)(5)(A) of the Securities Act or any foreign savings bank or savings and loan association or equivalent institution, acting for its own account or the accounts of other qualified institutional buyers under one or more of the categories contained in this Part III, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with it and that has an audited net worth of at least $25 million as demonstrated in its latest annual financial statements, as of a date not more than, if a U.S. bank or savings and loan, 16 months preceding the date hereof and, if a foreign bank or savings and loan, 18 months preceding the date hereof.

---

[5]    For purposes of the definition of "family of investment companies", each series of a series company (as defined in the 1940 Act) shall be deemed to be a separate investment company and investment companies shall be deemed to have the same investment adviser (or depositor) if their advisers (or depositors) are majority-owned subsidiaries of the same parent or if one investment company's adviser (or depositor) is a majority-owned subsidiary of the other investment company's adviser (or depositor).

6

## SHAREHOLDERS AGREEMENT

SHAREHOLDERS AGREEMENT (this "<u>Agreement</u>"), dated as of _____ __, 200_, among [New Dana Corporation], a [_____] corporation (the "<u>Company</u>"),[1] Centerbridge Capital Partners, L.P., a Delaware limited partnership ("<u>Centerbridge</u>"), and CBP Parts Acquisition Co. LLC, a Delaware limited liability company (together with any Qualified Purchaser Transferee thereof, "<u>Purchaser</u>").

A.    Dana Corporation, a Virginia corporation and the predecessor to the Company for certain Bankruptcy Code purposes ("<u>Dana</u>"), entered into an Investment Agreement, dated as of July 25, 2007 (the "<u>Investment Agreement</u>"), with Centerbridge, Purchaser and the other parties thereto, pursuant to which, among other things, on the terms and subject to the conditions thereof, Purchaser has agreed to acquire up to 2,500,000 shares of the Company's 4.0% Series A Convertible Preferred Stock, par value $0.01 per share (the "<u>Series A Preferred</u>"), and up to 2,500,000 shares of the Company's 4.0% Series B Convertible Preferred Stock, par value $0.01 per share (the "<u>Series B Preferred</u>").  The Series A Preferred and Series B Preferred are convertible into shares of the Company's common stock, par value $0.01 per share (the "<u>Common Stock</u>"), on the terms set forth in the Articles (defined below).

B.    The Series A Preferred owned by Purchaser constitutes 100% of the shares of Series A Preferred outstanding on the date hereof, and the Series B Preferred owned by Purchaser constitutes ___% of the shares of Series B Preferred outstanding on the date hereof.  Together, the shares of Series A Preferred and Series B Preferred owned by Purchaser constitute ___% of the shares of the Common Stock outstanding on the date hereof, on an as-converted basis.

C.    The Company, Purchaser and Centerbridge desire to make certain provisions in respect of their relationship.

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

I.    DEFINITIONS

1.1    <u>Definitions</u>.  In addition to the terms defined elsewhere herein, the following terms have the following meanings when used herein:

"<u>Affiliate</u>" has the meaning given to such term in the Articles; <u>provided</u>, <u>however</u>, that as such term is used in this Agreement, the members of the Investor Group will not be included as Affiliates of the Company.

"<u>Articles</u>" means the Company's Articles of Serial Designation of 4.0%

---

[1]    Corporate name/jurisdiction of reorganized company to be determined.

Series A Convertible Preferred Stock and 4.0% Series B Convertible Preferred Stock, in the form attached hereto as <u>Exhibit A</u>.

"<u>Assumption Agreement</u>" means an agreement in writing in substantially the form of <u>Exhibit B</u> hereto pursuant to which the party thereto agrees to be bound by the terms and provisions of this Agreement.

"<u>Bankruptcy Code</u>" means chapter 11 of title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York.

A Person will be deemed the "<u>beneficial owner</u>" of, and will be deemed to "<u>beneficially own</u>," and will be deemed to have "<u>beneficial ownership</u>" of:

(i)     any securities that such Person or any of such Person's Affiliates is deemed to "<u>beneficially own</u>" within the meaning of Rule 13d-3 under the Exchange Act, as in effect on the date of this Agreement and any securities deposited into a trust established by the Person the sole beneficiaries of which are the shareholders of the Person; and

(ii)    any securities (the "<u>underlying securities</u>") that such Person or any of such Person's Affiliates has the right to acquire (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding (written or oral), or upon the exercise of conversion rights, exchange rights, rights, warrants or options, or otherwise (it being understood that such Person will also be deemed to be the beneficial owner of the securities convertible into or exchangeable for the underlying securities); and

(iii)   any securities beneficially owned by persons that are part of a "group" (within the meaning of Rule 13d-5(b) under the Exchange Act) with such Person.

"<u>Board</u>" means the Board of Directors of the Company.

"<u>Chapter 11 Plan</u>" means the joint plan of reorganization filed by Dana and its debtor subsidiaries with the Bankruptcy Court.

"<u>Charter</u>" means the Company's Restated Articles of Incorporation, as in effect from time to time, together with the Articles.

"<u>Company Sale</u>" has the meaning given to such term in the Articles.

"<u>Current Market Price</u>" has the meaning given to such term in the Articles.

"<u>Director Designation Termination Date</u>" means the date on which shares

of Series A Preferred having an aggregate Series A Liquidation Preference of at least $125 million are no longer owned by Purchaser.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Fair Market Value" has the meaning given to such term in the Articles.

"Financial Ratio Date" means [to come].

"Indebtedness" means all indebtedness of a Person, including without limitation obligations for borrowed money, lease financing and indebtedness of another Person guaranteed by such Person or secured by the assets of such Person.

"Independent Director" has the meaning given to such term in the Articles.

"Investor Group" means Purchaser and its Affiliates, including Centerbridge.

"Person" has the meaning given to such term in the Articles.

"Purchaser Designees" means the directors of the Company who were designated for nomination pursuant to Article III of this Agreement (including the Series A Nominee).

"Qualified Purchaser Transferee" means an Affiliate of Purchaser that executes an Assumption Agreement, but only to the extent that such Qualified Purchaser Transferee is a corporation or other organization, whether incorporated or unincorporated, of which either Purchaser or Centerbridge directly or indirectly owns or controls 100% of the securities or other interests having by their terms ordinary voting power to elect the board of directors (or others performing similar functions) of such corporation or other organization.

"Representatives" means, with respect to a Person, such Person's directors, officers, employees, agents, counsel, consultants, accountants, experts, auditors, examiners, financial advisors or other representatives, agents or professionals.

"Series A Liquidation Preference" means $100.00 per share, as adjusted from time to time in accordance with the Articles.

"Subsidiary" means, when used with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which such Person directly or indirectly owns or controls more than 50% of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions.

"Voting Securities" means the Common Stock, all other equity securities entitled to vote in the election of directors of the Company and all other securities convertible into, exchangeable for or exercisable for any such securities (whether

immediately or otherwise), including the Series A Preferred and the Series B Preferred.

## II.    STANDSTILL

2.1    <u>Limitation During Standstill Period</u>.  Subject to Section 2.2, during the period commencing on the date of this Agreement and ending on the tenth anniversary thereof, no member of the Investor Group will, and none of its Representatives will on its behalf, publicly propose or publicly announce or otherwise disclose publicly an intent to propose, or enter into an agreement with any Person for, singly or with any other Person or directly or indirectly, (a) any form of business combination, acquisition or other transaction relating to the Company or any of its Subsidiaries, (b) any form of restructuring, recapitalization or similar transaction with respect to the Company or any of its Subsidiaries, or (c) any demand, request or proposal to amend, waive or terminate any provision of this Article II, nor except as aforesaid during such period will any member of the Investor Group or any of its Representatives on its behalf (i) acquire, or offer, propose or agree to acquire, by purchase or otherwise, subject to applicable securities laws, any Voting Securities, (ii) make, or in any way participate in, any solicitation of proxies or votes with respect to any such Voting Securities (including by the execution of action by written consent), become a participant in any election contest with respect to the Company or any of its Subsidiaries, seek to influence any person with respect to any such Voting Securities, make a shareholder proposal with respect to the Company or its Subsidiaries or demand a copy of any the Company's or its Subsidiaries' lists of shareholders or other books and records, (iii) participate in or encourage the formation of any partnership, syndicate or other group which owns or seeks or offers to acquire beneficial ownership of any such Voting Securities or which seeks to affect control of the Company or any of its Subsidiaries or has the purpose of circumventing any provision of this Agreement, (iv) otherwise act, alone or in concert with others (including by providing financing for another person), to seek or to offer to control or influence, in any manner, the Company's and its Subsidiaries' management, board of directors or policies, or (v) make any proposal or other communication designed to, or which could be reasonably expected to, compel the Company to make a public announcement thereof in respect of any matter referred to in this Section 2.1.

2.2    <u>Exceptions.</u>  Notwithstanding anything to the contrary set forth in Section 2.1, nothing in clause (ii) or (iv) of Section 2.1 will limit or affect or be deemed to apply to a Purchaser Designee's actions taken in connection with such Purchaser Designee's service as a director of the Company, and nothing herein will prohibit any member of the Investor Group from:

(a)    acquiring the shares of Series A Preferred and Series B Preferred pursuant to the Investment Agreement and the Chapter 11 Plan, and any Common Stock received upon conversion thereof (or any dividends or distributions received thereon); or

(b)    acquiring beneficial ownership of any Voting Securities, unless following such acquisition the Investor Group would beneficially own more than

30% of the Voting Securities issued and outstanding at such time;

(c)    taking any action with the approval of a majority of the members of the Board who are not Purchaser Designees; or

(d)    in the event a majority of the members of the Board who are not Purchaser Designees approves a transaction described in Section 2.1(a) or (b) above, (i) voting to approve such transaction, subject to the restrictions contained in Section 4.3, and (ii) selling any securities of the Company owned by the Investor Group in connection with, and pursuant to the terms of, such transaction.

III.    BOARD REPRESENTATION

3.1    Series A Preferred Directors.  (a)  The holders of the Series A Preferred have the director election rights set forth in Section 6(c) and (d) of the Articles for the time periods and to the extent set forth therein.

(b)    Beginning with the Company's first annual meeting of shareholders to elect directors following the date hereof (the "Director Designation Commencement Date"), the Company will ensure that Purchaser may designate nominees for each of the three directors to be elected by the Series A Preferred pursuant to Section 6(c)(i) of the Articles, including following the removal of any such director.  In case of any vacancy (other than by removal) in the office of a Purchaser Designee, the vacancy will be filled with a designee of Purchaser by the remaining Purchaser Designees.

(c)    From and after the Director Designation Termination Date, Purchaser will cause any Purchaser Designees to resign promptly after the Company so requests.

3.2    Series A Nominating Committee.  (a)  Without limiting Section 3.1(a), beginning with the Director Designation Commencement Date, at each election of members of the Board, the Company will use its best efforts to cause a nominating committee (the "Series A Nominating Committee") to be constituted.  The Company will use its best efforts to (i) cause the Series A Nominating Committee to consist of three directors and (ii) cause two of the Purchaser Designees designated by Purchaser to so serve to sit on such Series A Nominating Committee.  The Series A Nominating Committee will be constituted solely for the purpose of Section 3.2(b) below and will be a separate committee from the Company's Nominating Committee.

(b)    Beginning with the Director Designation Commencement Date, the Company will use its best efforts to cause the Series A Nominating Committee to be entitled to nominate one director for election by the holders of the Voting Securities pursuant to Section 6(c)(ii) of the Articles (a "Series A Nominee"); provided, however, that, in order for such nomination to be effective, such nomination by the Series A Nominating Committee must be made unanimously.  To the extent the members of the Series A Nominating Committee are unable to unanimously agree on the identity of a Series A Nominee on or before the latest time at which the Company can reasonably meet its obligations with respect to printing and mailing a proxy statement for an annual

meeting of Company shareholders, the Board (by majority vote of all Independent Directors) will select a Person to be nominated for such Board seat. Each Series A Nominee will, at all times during his or her service on the Board, be qualified to serve as a director of the Company under any applicable law, rule or regulation imposing or creating standards or eligibility criteria for individuals serving as directors of organizations such as the Company. If at any time, an individual Series A Nominee is not so qualified, such Series A Nominee will be replaced pursuant to Section 3.2(c).

(c)     Each elected Series A Nominee will serve until his successor is elected and qualified or until his earlier resignation, retirement, disqualification, removal from office or death. If any Series A Nominee ceases to be a director of the Company for any reason, the Company will promptly use its best efforts to cause a person designated by the Series A Nominating Committee to replace such director.

3.3     <u>Effectiveness</u>. This Article III (other than Section 3.1(c)) will terminate without further action on the Director Designation Termination Date.

## IV.   CERTAIN VOTING RIGHTS

4.1     <u>Purchaser Approval Rights</u>. The Company may not, and may not permit its Subsidiaries to, take any of the following actions without Purchaser's prior written consent; <u>provided</u>, <u>however</u>, that if such written consent is withheld by Purchaser, the Company may, notwithstanding the withholding of such written consent, take any such actions that are first approved by the affirmative vote or consent of holders of not less than two-thirds of the Voting Securities that are not held by Centerbridge, Purchaser or any of their respective Affiliates:

(a)     enter into any transaction with any director or officer of the Company, or any holder of 10% or more of the Voting Securities outstanding at such time, except for (i) compensation or incentive arrangements with officers or directors that have been approved by the Board or Compensation Committee thereof and (ii) transactions that are not material to the Company;

(b)     issue any security that ranks senior to or on parity with the Series A Preferred (or the Series B Preferred, if any shares of Series B Preferred are outstanding and owned by Purchaser) as to dividend rights and rights on liquidation, winding up and dissolution of the Company (including without limitation additional shares of Series A Preferred or Series B Preferred), or issue any options, rights, warrants or securities convertible into or exercisable or exchangeable for such shares; <u>provided</u>, <u>however</u>, that the written consent of Purchaser will not be necessary for the Company to authorize or issue any Indebtedness incurred to refinance, extend, renew, refund, repay, prepay, redeem, defease, exchange or replace (collectively, "<u>Refinancings</u>") any Indebtedness of the Company existing at the applicable time, as long as such Refinancings are (i) on prevailing market terms with respect to the economics thereof in all material respects and (ii) are on substantially the same terms (including without limitation with respect to obligors, tenor, security and ranking)

as the Indebtedness to which such Refinancings relate with respect to other terms;

(c)    issue or authorize the issuance of any capital stock of the Company (or rights to acquire any capital stock of the Company) for a price per share that is less than (A) if such issuance is for Common Stock or options, rights, warrants or securities of the Company which are convertible into or exercisable or exchangeable for Common Stock of the Company ("Common Stock Derivatives"), the Current Market Price for the Common Stock at the time of such issuance, or (B) if such issuance is for capital stock of the Company or rights to acquire capital stock of the Company other than Common Stock or Common Stock Derivatives, the Fair Market Value of such capital stock or rights to acquire such capital;

(d)    (i) amend, alter or repeal any amendment to the Company's By-Laws that materially changes the rights of any member of the Investor Group or any Qualified Purchaser Transferee (in such Person's capacity as a holder of Series A Preferred) or the Company's shareholders generally or (ii) authorize, adopt or approve an amendment to, or repeal any provision of, the Charter or the Articles;

(e)    take any action that results in the purchase or redemption by the Company or any subsidiary of the Company of any equity securities of the Company involving aggregate cash payments by the Company in excess of $10 million during any 12-month period after the date hereof; provided, however, that the written consent of Purchaser will not be required for (i) the repurchase of any equity securities from any individual whose employment with the Company is terminated as long as such repurchase is approved by the Board (by majority vote of all members) or (ii) cashless exercise of, or surrender of shares for payment of withholding tax in connection with, any option, right, warrant or other security that is convertible into or exchangeable for Common Stock in accordance with the terms of its issuance;

(f)    effect a Company Sale;

(g)    voluntarily or involuntarily liquidate, wind up or dissolve; or

(h)    except pursuant to Section 3(a) of the Articles, pay or declare any dividend in cash on any shares of capital stock that ranks junior to or on parity with the Series A Preferred, including Series B Preferred.

4.2    Termination of Purchaser Approval Rights.  The provisions of Sections 4.1(a), (c), (d), (e), (f) and (g) will terminate upon the earlier to occur of the (a) third anniversary of the date hereof and (b) the date on which Purchaser no longer owns shares of Series A Preferred having an aggregate Series A Liquidation Preference of at $125 million.  The provisions of Section 4.1(b) and (h) will terminate upon the earliest to occur of (i) the third anniversary of the date hereof, (ii) the date on which Purchaser no longer owns shares of Series A Preferred having an aggregate Series A Liquidation

Preference of at least $125 million, and (iii) the later to occur of (A) the first anniversary of the date hereof and (B) the Financial Ratio Date.

        4.3     <u>Certain Limitations</u>.  Without limiting any other provision hereof, Purchaser will, and will cause each other member of the Investor Group to, at any meeting of holders of Voting Securities, however such meeting is called and regardless of whether such meeting is a special or annual meeting of shareholders of the Company, or at any adjournment thereof, or in connection with any written consent of shareholders of the Company, vote, or cause to be voted, the Investor Group's Voting Securities in excess of 40% of the issued and outstanding Voting Securities (the "<u>Voting Threshold</u>") in the same proportion that the Company's other shareholders vote their Voting Securities with respect to any proposal submitted to the Company's shareholders for a vote, so that, as a result, the percentage of the Investor Group's Voting Securities in excess of the Voting Threshold that are voted in favor of such proposal will equal the percentage of the outstanding Voting Securities held by all other Company shareholders voted in favor of such proposal, and the percentage of the Investor Group's Voting Securities in excess of the Voting Threshold that are voted against such proposal will equal the percentage of the outstanding Voting Securities held by all other Company shareholders voted against such proposal.

        4.4     <u>Certain Transactions</u>.  Except as expressly contemplated by this Agreement, the Investment Agreement or the documents referred to herein or therein, without the approval of a majority of the members of the Board who are not Purchaser Designees, none of Centerbridge, Purchaser or any of their respective Affiliates may enter into any transaction or agreement with the Company or any Subsidiary of the Company or any amendment or waiver of this Agreement.

V.   MISCELLANEOUS

        5.1     <u>Notice of Certain Matters</u>.  Without limiting Section 8 of the Articles, if Purchaser at any time sells, assigns, transfers, pledges, hypothecates or otherwise encumbers or disposes of in any way all or any part of an interest in any shares of Series A Preferred (a "<u>Transfer</u>"), then Purchaser will, as promptly as practicable but in any event within five business days of such Transfer, provide notice to the Company in accordance with Section 5.3 stating (a) the date on which such Transfer occurred and (b) the name and contact information of such Transferee.

        5.2     <u>Specific Performance</u>.  The parties agree that any breach by any of them of any provision of this Agreement would irreparably injure the Company or Purchaser and Centerbridge, as the case may be, and that money damages would be an inadequate remedy therefor.  Accordingly, the parties agree that the other parties will be entitled to one or more injunctions enjoining any such breach and requiring specific performance of this Agreement and consent to the entry thereof, in addition to any other remedy to which such other parties are entitled at law or in equity.

        5.3     <u>Notices</u>.  Any notice or other communication required to be given hereunder will be in writing and sent by reputable courier service (with proof of service),

by hand delivery, or by email or facsimile (followed on the same day by delivery by courier service (with proof of delivery) or by hand delivery), addressed as follows:

<u>If to the Company, to</u>:

[New Dana Corporation]
4500 Dorr Street
Toledo, Ohio 43615
Attention:  General Counsel and Secretary
Fax:  (419) 535-4544

<u>with a copy to</u>:

Jones Day
222 East 41st Street
New York, New York 10017
Attention:  Corinne Ball
Email:  cball@jonesday.com
Fax:  (212) 755-7306

and

Attention:  Marilyn W. Sonnie
Email:  mwsonnie@jonesday.com
Fax:  (212) 755-7306

<u>If to Purchaser or Centerbridge, to</u>:

Centerbridge Capital Partners, L.P.
375 Park Avenue, 12th Floor
New York, New York 10152
Attention:  Jeffrey Aronson
Email:  jaronson@centerbridge.com
Fax:  (212) 672-6501

and

Attention:  David Trucano
Email:  dtrucano@centerbridge.com
Fax:  (212) 672-6501

<u>with a copy to</u>:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:  Matthew A. Feldman

Email:  mfeldman@willkie.com
Fax:  (212) 728-9651

and

Attention:  Jeffrey R. Poss
Email:  jposs@willkie.com
Fax:  (212) 728-9536

or to such other address as any party may specify by written notice so given, and such notice will be deemed to have been delivered as of the date so emailed, telecommunicated or personally delivered.

5.4    Assignment; Binding Effect.  Neither this Agreement nor any of the rights, interests or obligations hereunder will be assigned by any party hereto (whether by operation of law or otherwise) without the prior written consent of the other parties, except that Purchaser may transfer any of its rights under Article III or IV to any Qualified Purchaser Transferee to which it transfers shares of Series A Preferred without violating the restrictions on transfer of the Series A Preferred set forth in Section 8 of the Articles; provided, however, that neither Purchaser nor Centerbridge will dispose of a majority of the voting power of such Qualified Purchaser Transferee in any transaction or series of transactions unless such shares of Series A Preferred have been transferred and the rights under this Agreement have been assigned back, in each case to the original transferor thereof.  Subject to this Section 5.4, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and assign.  Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto or, if applicable, any Qualified Purchaser Transferee or their respective heirs, successors, executors, administrators and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

5.5    Entire Agreement.  This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the parties with respect thereto (including Section 7 of the Confidentiality Agreement, dated June 1, 2007, between Centerbridge Associates, L.P. and the Company, as amended by the Confidentiality Agreement Amendment, dated June 19, 2007, between Centerbridge Associates, L.P. and the Company).

5.6    Amendment.  Subject to applicable law, this Agreement may only be amended by an instrument in writing signed by the Company and Centerbridge (who will have the authority to bind Purchaser and all other members of the Investors Group).

5.7    Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles.

5.8    Counterparts.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered will be an original, but all such counterparts will together constitute one and the same instrument.  Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto.  A facsimile copy of a signature page will be deemed to be an original signature page.

5.9    Headings.  Headings of the Articles and Sections of this Agreement are for convenience of the parties only, and will be given no substantive or interpretive effect whatsoever.

5.10    Waivers.  Except as provided in this Agreement, no action taken pursuant to this Agreement, including without limitation any investigation by or on behalf of any party, will be deemed to constitute a waiver by the party taking such action of compliance with any of the covenants or agreements contained in this Agreement.  The waiver by any party hereto of a breach of any provision hereunder will not operate or be construed as a waiver of any prior or subsequent breach of the same or any other provision hereunder.  Any party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto and (b) waive compliance with any of the agreements or conditions contained herein.  Any such extension or waiver will be valid only if set forth in an instrument in writing signed by the party or parties to be bound thereby.

5.11    Severability.  Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

5.12    Calculation of Beneficial Ownership.  Any provision in this Agreement that refers to a percentage of Common Stock or Voting Securities will be calculated based on the aggregate number of issued and outstanding securities at the time of such calculation (on an as-converted basis, in the case of Voting Securities), but will not include any such securities issuable upon any options or warrants that are exercisable for such securities.

5.13    Jurisdiction; Consent to Service of Process.  (a)  Each party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York located in New York, New York or the United States District for the Southern District of New York (as applicable, a "New York Court"), and any appellate court from any such court, in any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, or for recognition or enforcement of any judgment resulting from any such suit, action or proceeding, and each party hereby irrevocably and unconditionally agrees that all claims in respect of any such suit, action or proceeding may be heard and

determined in the New York Court.

(b)    It will be a condition precedent to each party's right to bring any such suit, action or proceeding that such suit, action or proceeding, in the first instance, be brought in a New York Court, and if each such court refuses to accept jurisdiction with respect thereto, such suit, action or proceeding may be brought in any other court with jurisdiction.

(c)    No party may move to (i) transfer any such suit, action or proceeding from a New York Court to another jurisdiction, (ii) consolidate any such suit, action or proceeding brought in a New York Court with a suit, action or proceeding in another jurisdiction, or (iii) dismiss any such suit, action or proceeding brought in a New York Court for the purpose of bringing the same in another jurisdiction.

(d)    Each party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in a New York Court, (ii) the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (iii) the right to object, with respect to such suit, action or proceeding, that such court does not have jurisdiction over such party.  Each party irrevocably consents to service of process in any manner permitted by law.

5.14    <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.

5.15    <u>No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

5.16    <u>Confidentiality</u>.  (a)  The Investor Group will maintain, and Purchaser will cause each member of the Investor Group and each of its and their respective Representatives to maintain, the confidentiality of all material non-public information obtained by any member of the Investor Group from the Company or any of its Subsidiaries or its or their respective Representatives (a "<u>Company Person</u>"), and not to use such information for any purpose other than (i) the evaluation and protection of the investment by Purchaser in the Company, (ii) the exercise by Purchaser of any of its rights under this Agreement, and (iii) the exercise by the Purchaser Designees of their fiduciary duties as members of the Board.

(b)    Notwithstanding the foregoing, the confidentiality obligations of Section 5.16(a) will not apply to information obtained other than in violation of this Agreement:

(i)  which any member of the Investor Group or any of its Representatives is required to disclose by judicial or administrative process, or by other requirements of applicable law or regulation or any governmental authority; provided, however, that, where and to the extent practicable, such disclosing party (A) gives the Company reasonable notice of any such requirement and, to the extent protective measures consistent with such requirement are available, the opportunity to seek appropriate protective measures and (B) reasonably cooperates with the Company (at the Company's expense) in attempting to obtain such protective measures;

(ii)  which becomes available to the public other than as a result of a breach of Section 5.16(a); or

(iii)  which has been provided to a member of the Investor Group or any of its Representatives by a source other than a Company Person, unless either Purchaser or such member of the Investor Group knows that the source of such information was bound by a confidentiality agreement with, or other contractual, legal or fiduciary objections of confidentiality to, the Company or any other Person with respect to such information.

5.17    Acknowledgment of Securities Laws.  Purchaser hereby acknowledges that it is aware, and that it will advise the other members of the Investor Group and its and their respective Representatives who are informed as to the material non-public information that is the subject of Section 5.16, that the United States securities laws prohibit any Person who has received from an issuer material, non-public information from purchasing or selling securities of such issuer or from communication of such information to any other Person under circumstances in which it is reasonably foreseeable that such Person is likely to purchase or sell such securities.

5.18    Premiums Upon a Change of Control.  None of Centerbridge, Purchaser or any of their respective Affiliates may receive, or be entitled to receive, any premium, payment or fee from any Person (a "Payor") in connection with voting in favor of, or transferring any Voting Securities in connection with, a transaction that results in (either alone or in connection with a series of related transactions) a Company Sale (as defined in the Articles), unless such amount is shared with, or payable by such Payor to, all shareholders of the Company on a *pro rata* basis.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[NEW DANA CORPORATION]

By:_____
      Name
      Title:

CENTERBRIDGE CAPITAL PARTNERS, L.P.

By:  Centerbridge Associates, L.P., its General Partner

By:  Centerbridge GP Investors, LLC, its General Partner

By: _____
      Name
      Title:  Authorized Person

PURCHASER:

CBP PARTS ACQUISITION CO. LLC

By:  Centerbridge Capital Partners, L.P., its member owning a majority of its interests

By:  Centerbridge Associates, L.P., its General Partner

By:  Centerbridge GP Investors, LLC, its General Partner

By: _____
      Name
      Title:  Authorized Person

**EXHIBIT A**

**Articles**

[To be attached]

**EXHIBIT B**

**Form of Assumption Agreement**

The undersigned hereby agrees, effective as of the date hereof, to become a party to, and be bound by the provisions of, the Shareholders Agreement (the "Agreement") dated as of _____ ___, 200_ by and among [New Dana Corporation], Centerbridge Capital Partners, L.P. and CBP Parts Acquisition Co. LLC, and for all purposes of the Agreement, the undersigned will be a "Qualified Purchaser Transferee" (as defined in the Agreement).  Without limiting the foregoing, the undersigned acknowledges that the shares of Series A Preferred (as defined in the Agreement) transferred to the undersigned in connection herewith are subject to the transfer restrictions set forth in the Articles (as defined in the Agreement).  The address and facsimile number to which notices may be sent to the undersigned is as follows:

_____

_____

_____

Facsimile No._____

[Name]

By:_____
    Name:
    Title:

## [NEW DANA CORPORATION]

## REGISTRATION RIGHTS AGREEMENT

REGISTRATION RIGHTS AGREEMENT, dated as of _____, 2007 (the "<u>Agreement</u>"), between Centerbridge Capital Partners, L.P., a Delaware limited partnership ("<u>Centerbridge</u>"), CBP Parts Acquisition Co. LLC, a Delaware limited liability company (the "<u>Investor</u>") and [New Dana Corporation], a _____ corporation (the "<u>Company</u>").

### R E C I T A L S

WHEREAS, the Investor has, pursuant to the terms of the Investment Agreement, dated as of July 25, 2007, by and among the Company, Centerbridge and the Investor (the "<u>Investment Agreement</u>"), agreed to purchase shares of (i) 4.0% Series A Convertible Preferred Stock, par value $0.01 per share, of the Company (the "<u>Series A Preferred Stock</u>") and (ii) 4.0% Series B Convertible Preferred Stock, par value $0.01 per share, of the Company (the "<u>Series B Preferred Stock</u>"); and

WHEREAS, the shares of Series A Preferred Stock are convertible into shares of common stock, par value $0.01 per share, of the Company (the "<u>Common Stock</u>"); and

WHEREAS, the shares of Series B Preferred Stock are convertible into shares of Common Stock; and

WHEREAS, the Company has agreed, as a condition precedent to the Investor's obligations under the Investment Agreement, to grant the Investor certain registration rights; and

WHEREAS, the Company and the Investor desire to define the registration rights of the Investor on the terms and subject to the conditions herein set forth.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the parties hereby agree as follows:

**SECTION 1.  DEFINITIONS**

As used in this Agreement, the following terms have the respective meanings set forth below:

<u>Allocation Priority</u>:  shall have the meaning set forth in Section 2(b)(ii);

Agreement:  shall mean this Agreement among Centerbridge, the Investor and the Company;

Commission:  shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act;

Exchange Act:  shall mean the Securities Exchange Act of 1934, as amended (or any successor act), and the rules and regulations promulgated thereunder;

Holder:  shall mean any holder of Registrable Securities;

Initiating Holder:  shall mean any Holder or Holders who in the aggregate are Holders of more than 50% of the then outstanding Registrable Securities;

Maximum Number of Shares:  shall have the meaning set forth in Section 2(b)(ii);

Person:  shall mean an individual, partnership, joint-stock company, corporation, trust or unincorporated organization, and a government or agency or political subdivision thereof;

Pro Rata:  shall have the meaning set forth in Section 2(b)(ii);

Register, Registered and Registration:  shall mean a registration effected by preparing and filing a registration statement in compliance with the Securities Act (and any post-effective amendments filed or required to be filed) and the declaration or ordering of effectiveness of such registration statement;

Registrable Securities:  shall mean any (A) Series A Preferred Stock held by the Investor, (B) shares of Common Stock issuable upon conversion of the shares of Series A Preferred Stock held by the Investor, (C) Series B Preferred Stock held by the Investor, (D) shares of Common Stock issuable upon conversion of the shares of Series B Preferred Stock held by the Investor, (E) other shares of Common Stock acquired by the Investor after the date hereof unless acquired in breach of any agreement between the Holder and the Company and (F) any additional securities of the Company issued as a dividend or other distribution with respect to, or in exchange for or in replacement of, any securities of the Company held by the Investor, including but not limited to, those listed in clauses (A), (B), (C), (D) and (E);

Registration Expenses:  shall mean all reasonable expenses incurred by the Company in compliance with Section 2(a), (b) and (c) hereof, including, without limitation, all registration and filing fees, printing expenses, fees and disbursements of counsel for the Company, reasonable fees and expenses of one counsel for all the Holders, blue sky fees and expenses and the reasonable expense of any special audits incident to or required by any such registration (but excluding the compensation of regular employees of the Company, which shall be paid in any event by the Company);

security, securities:  shall have the meaning set forth in Section 2(1) of the Securities Act;

Securities Act:  shall mean the Securities Act of 1933, as amended (or any successor act), and the rules and regulations promulgated thereunder; and

Selling Expenses:  shall mean all underwriting discounts and selling commissions applicable to the sale of Registrable Securities and all fees and disbursements of counsel for each of the Holders other than reasonable fees and expenses of one counsel for all the Holders.

## SECTION 2.  REGISTRATION RIGHTS

(a)      Demand Registration.

(i)      Request for Registration.  If the Company shall receive from an Initiating Holder, at any time, a written request that the Company effect any registration with respect to all or a part of the Registrable Securities, the Company will:

(1)      promptly give written notice of the proposed registration, qualification or compliance to all other Holders; and

(2)      as soon as practicable, use its reasonable best efforts to effect such registration (including, without limitation, the execution of an undertaking to file post-effective amendments, appropriate qualification under applicable blue sky or other state securities laws and appropriate compliance with applicable regulations issued under the Securities Act) as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any Holder or Holders joining in such request as are specified in a written request received by the Company within ten (10) business days after written notice from the Company is given under Section 2(a)(i)(1) above; provided, that the Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this Section 2(a):

(A)      In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification or compliance, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act or applicable rules or regulations thereunder;

(B)      After the Company has effected one (1) such registration pursuant to this Section 2(a) and such registration has been declared or ordered effective and the sales of such Registrable Securities shall have closed;

(C)      If the Registrable Securities requested by all Holders to be registered pursuant to such request do not have an anticipated aggregate public offering price (before any underwriting discounts and commissions)

of not less than $**[insert dollar amount to 10% of the sum of (1) the total aggregate Series A Purchase Price (as defined in the Investment Agreement) and (2) the total aggregate Series B-1 Purchase Price that is paid by Centerbridge and the Investor under the Investment Agreement for Shares (as defined in the Investment Agreement)]**;

(D)     During the period starting with the date thirty (30) days prior to the Company's good faith estimate of the date of filing of, and ending on the date three (3) months immediately following the effective date of, any registration statement pertaining to securities of the Company (other than a registration of securities in a Rule 145 transaction under the Securities Act, with respect to an employee benefit plan or with respect to the Company's first registered public offering of its stock); provided, that the Company is actively employing in good faith all reasonable efforts to cause such registration statement to become effective; provided, however, that the Company may only delay an offering pursuant to this Section 2(a)(i)(2)(D) for a period of not more than thirty (30) days, if a filing of any other registration statement is not made within that period and the Company may only exercise this right once in any twelve (12)-month period; or

(E)     If the Company shall furnish to the Initiating Holders a certificate signed by the President of the Company stating that in the good faith judgment of the Board of Directors of the Company it would be seriously detrimental to the Company or its stockholders for a registration statement to be filed in the near future, in which case the Company's obligation to use its best efforts to comply with this Section 2(a) shall be deferred for a period not to exceed ninety (90) days from the date of receipt of written request from the Initiating Holders; provided, however, that the Company shall not exercise such right more than once in any twelve (12)-month period.

The registration statement filed pursuant to the request of the Initiating Holders may, subject to the provisions of Section 2(a)(ii) below, include other securities of the Company that are held by Persons who, by virtue of agreements with the Company, are entitled to include their securities in any such registration ("Other Stockholders").  In the event any Holder requests a registration pursuant to this Section 2(a) in connection with a distribution of Registrable Securities to its partners or members, the registration shall provide for the resale by such partners or members, if requested by such Holder.

The registration rights set forth in this Section 2 may be assigned, in whole or in part, to any transferee of Registrable Securities (who shall be bound by all obligations of this Agreement).

(ii)     Underwriting.  If the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to Section 2(a)(i).

If Other Stockholders request inclusion of their securities in the underwriting, the Holders shall offer to include the securities of such Other Stockholders in the underwriting and may condition such offer on their acceptance of the further applicable provisions of this Section 2. The Holders whose shares are to be included in such registration and the Company shall (together with all Other Stockholders proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for such underwriting by the Initiating Holders and reasonably acceptable to the Company. Notwithstanding any other provision of this Section 2(a), if the representative advises the Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, the representative may limit the number of Registrable Securities to be included in the registration and underwriting in accordance with the Allocation Priority set forth in Section 2(b)(ii). If any Holder or Other Stockholder who has requested inclusion in such registration as provided herein disapproves of the terms of the underwriting, such Person may elect to withdraw therefrom by providing written notice to the Company, the underwriter and the Initiating Holders. The securities so withdrawn shall also be withdrawn from registration.

     (b)    <u>Company Registration</u>.

     (i)    If the Company shall determine to register any of its equity securities either for its own account or for the account of Other Stockholders, other than a registration relating solely to employee benefit plans, or a registration relating solely to a Rule 145 transaction under the Securities Act, or a registration on any registration form which does not permit secondary sales or does not include substantially the same information as would be required to be included in a registration statement covering the sale of Registrable Securities, the Company will:

     (1)    promptly give to each of the Holders a written notice thereof (which shall include a list of the jurisdictions in which the Company intends to attempt to qualify such securities under the applicable blue sky or other state securities laws); and

     (2)    include in such registration (and any related qualification under blue sky laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests, made by the Holders within ten (10) days after receipt of the written notice from the Company described in clause (1) above, except to the extent limited as set forth in Section 2(b)(ii) below. Such written request may specify all or a part of the Holders' Registrable Securities. In the event any Holder requests inclusion in a registration pursuant to this Section 2(b) in connection with a distribution of Registrable Securities to its partners or members, the registration shall provide for the resale by such partners or members, if requested by such Holder.

     (ii)    <u>Underwriting</u>. If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise each of the Holders as a part of the written notice given pursuant to Section 2(b)(i)(1) above. In such event, the right of each of the Holders to registration pursuant to this Section 2(b) shall be conditioned upon such Holders' participation in such underwriting and the

inclusion of such Holders' Registrable Securities in the underwriting to the extent provided herein.  The Holders whose shares are to be included in such registration shall (together with the Company and the Other Stockholders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for underwriting by the Company.  Notwithstanding any other provision of this Section 2(b), if the representative determines that marketing factors require a limitation on the number of shares to be underwritten, the representative may limit the number of Registrable Securities to be included in the registration and underwriting in accordance with the allocation priority set forth below.  The Company shall promptly advise all holders of securities requesting registration of such limitation, and the number of shares of securities that are entitled to be included in the registration and underwriting (the "Maximum Number of Shares") shall be allocated in the following manner: (i) first, the securities that the Company desires to sell, regardless of the number of shares that can be sold without exceeding the Maximum Number of Shares; (ii) second, the Registrable Securities held by the Holders, all pro rata in accordance with the number of shares that each such Holder has requested be included in such registration (such proportion is referred to herein as "Pro Rata"), to the extent that the Maximum Number of Shares has not been exceeded; (iii) third, the securities held by holders of Series B Preferred Stock entitled to registration under the Registration Rights Agreement, dated _____, 200_, among the holders of Series B Preferred Stock and the Company, that can be sold, Pro Rata, without exceeding the Maximum Number of Shares; and (iv) fourth, to the extent that the Maximum Number of Shares has not been reached under the foregoing clauses, the securities for the account of Other Stockholders that the Company is obligated to register pursuant to written contractual arrangements with such persons that can be sold, Pro Rata, without exceeding the Maximum Number of Shares (the foregoing allocation is referred to herein as the "Allocation Priority").  If any of the Holders or any officer, director or Other Stockholder disapproves of the terms of any such underwriting, he she or it may elect to withdraw therefrom by providing written notice to the Company and the underwriter.  Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall be withdrawn from such registration.

(c)     Form S-3.  The Company shall use its reasonable best efforts to qualify for registration on Form S-3 for secondary sales.  After the Company has qualified for the use of Form S-3, the Holders shall have the right to request up to four (4) registrations on Form S-3 (such requests shall be in writing and shall state the number of shares of Registrable Securities to be disposed of and the intended method of disposition of shares by such holders), provided, that the Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this Section 2(c):

(i)     Unless the Holder or Holders requesting registration propose to dispose of shares of Registrable Securities having an aggregate price to the public (before deduction of Selling Expenses) of more than $**[insert dollar amount to 5% of the sum of (1) the total aggregate Series A Purchase Price (as defined in the Investment Agreement) and (2) the total aggregate Series B-1 Purchase Price that is paid by Centerbridge and the Investor under the Investment Agreement for Shares (as defined in the Investment Agreement)]**;

(ii)     Within one hundred eighty (180) days of the effective date of the most recent registration pursuant to this Section 2(c) in which securities held by the requesting Holder could have been included for sale or distribution;

(iii)    In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification or compliance, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act or applicable rules or regulations thereunder;

(iv)    During the period starting with the date thirty (30) days prior to the Company's good faith estimate of the date of filing of, and ending on the date three (3) months immediately following the effective date of, any registration statement pertaining to securities of the Company (other than a registration of securities in a Rule 145 transaction under the Securities Act or with respect to an employee benefit plan); provided, that the Company is actively employing in good faith all reasonable efforts to cause such registration statement to become effective; provided, however, that the Company may only delay an offering pursuant to this Section 2(c)(iv) for a period of not more than thirty (30) days, if a filing of any other registration statement is not made within that period and the Company may only exercise this right once in any twelve (12)-month period; or

(v)     If the Company shall furnish to the Holders a certificate signed by the President of the Company stating that in the good faith judgment of the Board of Directors of the Company it would be seriously detrimental to the Company or its stockholders for a registration statement to be filed in the near future, in which case the Company's obligation to use its best efforts to comply with this Section 2(c) shall be deferred for a period not to exceed ninety (90) days from the date of receipt of written request from the Holders; provided, however, that the Company shall not exercise such right more than once in any twelve (12)-month period.

The Company shall give written notice to all Holders of the receipt of a request for registration pursuant to this Section 2(c)and shall provide a reasonable opportunity for other Holders to participate in the registration; provided, that if the registration is for an underwritten offering, the terms of Section 2(a)(ii) above shall apply to all participants in such offering.  Subject to the foregoing, the Company will use its reasonable best efforts to effect promptly the registration of all shares of Registrable Securities on Form S-3 to the extent requested by the Holder or Holders thereof for purposes of disposition.  In the event any Holder requests a registration pursuant to this Section 2(c) in connection with a distribution of Registrable Securities to its partners or members, the registration shall provide for the resale by such partners or members, if requested by such Holder.

(d)     Expenses of Registration.  All Registration Expenses incurred in connection with any registration, qualification or compliance pursuant to this Section 2 shall be

borne by the Company, and all Selling Expenses shall be borne by the Holders of the securities so registered pro rata on the basis of the number of their shares so registered.

        (e)      Registration Procedures.  In the case of each registration effected by the Company pursuant to this Section 2, the Company will keep the Holders, as applicable, advised in writing as to the initiation of each registration and as to the completion thereof.  At its reasonable expense, the Company will:

        (i)      keep such registration effective for a period of ninety (90) days;

        (ii)      furnish such number of prospectuses and other documents incident thereto as each of the Holders, as applicable, from time to time may reasonably request;

        (iii)      notify each Holder of Registrable Securities covered by such registration at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; and

        (iv)      furnish, on the date that such Registrable Securities are delivered to the underwriters for sale, if such securities are being sold through underwriters or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (1) an opinion, dated as of such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is reasonably and customarily given to underwriters in an underwritten public offering, addressed to the underwriters, if any, and to the Holders participating in such registration and (2) a letter, dated as of such date, from the independent certified public accountants of the Company, in form and substance as is reasonably and customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters, if any, and if permitted by applicable accounting standards, to the Holders participating in such registration.

        (f)      Indemnification.

        (i)      The Company will indemnify each Holder, each of its officers, directors and partners and members, and each Person controlling each Holder, with respect to each registration which has been effected pursuant to this Section 2, and each underwriter, if any, and each person who controls any underwriter, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, issuer free-writing prospectus, offering circular or other document, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not

misleading, and will reimburse each such Holder, each of its officers, directors and partners and members, and each Person controlling each such Holder, each such underwriter and each Person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating and defending any such claim, loss, damage, liability or action; provided, that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement or omission based upon written information furnished to the Company by such Holder or underwriter and stated to be specifically for use therein; provided, however, that the obligations of the Company to each Holder hereunder shall be limited to an amount equal to the net proceeds to such Holder of securities sold in such registration as contemplated herein.

(ii)     Each Holder will, if Registrable Securities held by it are included in the securities as to which such registration, qualification or compliance is being effected, severally and not jointly, indemnify the Company, each of its directors and officers and each underwriter, if any, of the Company's securities covered by such a registration statement, each Person who controls the Company or such underwriter, each Other Stockholder and each of their respective officers, directors, partners and members, and each Person controlling such Other Stockholder against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, issuer free-writing prospectus, offering circular or other document made by such Holder in writing, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements by such Holder therein not misleading, and will reimburse the Company, the underwriters, and such Other Stockholders, and their respective directors, officers, partners, members, Persons or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular or other document in reliance upon and in conformity with written information furnished to the Company by such Holder and stated to be specifically for use therein; provided, however, that the obligations of each Holder hereunder shall be limited to an amount equal to the net proceeds to such Holder of securities sold in such registration as contemplated herein.

(iii)     Each party entitled to indemnification under this Section 2(f) (the "Indemnified Party") shall give notice to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom; provided, that counsel for the Indemnifying Party, who shall conduct the defense of such claim or any litigation resulting therefrom, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld) and the Indemnified Party may participate in such defense at such party's expense (unless the Indemnified Party shall have reasonably concluded that there may be a conflict of interest between the

Indemnifying Party and the Indemnified Party in such action, in which case the fees and expenses of counsel shall be at the expense of the Indemnifying Party), and provided further, that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 2(f) unless the Indemnifying Party is materially prejudiced thereby.  No Indemnifying Party, in the defense of any such claim or litigation shall, except with the prior written consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation.  Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with the defense of such claim and litigation resulting therefrom.

       (iv)     If the indemnification provided for in this Section 2(f) is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage or expense referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage or expense in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions (or alleged statements or omissions) which resulted in such loss, liability, claim, damage or expense, as well as any other relevant equitable considerations.  The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue (or alleged untrue) statement of a material fact or the omission (or alleged omission) to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

       (v)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with any underwritten public offering contemplated by this Agreement are in conflict with the foregoing provisions, the provisions in such underwriting agreement shall be controlling.

       (g)     <u>Information by the Holders</u>.

       (i)     Each Holder including securities in any registration pursuant to the terms of this Agreement shall furnish to the Company such information regarding such Holder and the distribution proposed by such Holder as the Company may reasonably request in writing and as shall be reasonably required in connection with any registration, qualification or compliance referred to in this Section 2.

       (ii)     In the event that, either immediately prior to or subsequent to the effectiveness of any registration statement, any Holder shall distribute Registrable

Securities to its partners or members, such Holder shall so advise the Company and provide such information as shall be necessary to permit an amendment to such registration statement to provide information with respect to such partners or members, as selling security holders. Promptly following receipt of such information, the Company shall file an appropriate amendment to such registration statement reflecting the information so provided. Any incremental expense to the Company resulting from such amendment shall be borne by such Holder.

(h)     <u>Rule 144 Reporting</u>.

With a view to making available the benefits of certain rules and regulations of the Commission which may permit the sale of restricted securities to the public without registration, the Company agrees to:

(i)     at all times make and keep public information available as those terms are understood and defined in Rule 144 under the Securities Act ("<u>Rule 144</u>");

(ii)     use its reasonable best efforts to file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act at any time after it has become subject to such reporting requirements; and

(iii)     so long as a Holder owns any Registrable Securities, furnish to such Holder, upon request, a written statement by the Company as to its compliance with the reporting requirements of Rule 144, and of the Securities Act and the Exchange Act, a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed as such Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing the Holder to sell any such securities without registration.

(i)     <u>Termination</u>.  The registration rights set forth in this Section 2 shall not be available to any Holder if, (i) in the written opinion of counsel to the Company, all of the Registrable Securities then owned by such Holder could be sold in any ninety (90)-day period pursuant to Rule 144(k) or are otherwise freely saleable or (ii) all of the Registrable Securities held by such Holder have been sold in a registration pursuant to the Securities Act or pursuant to Rule 144.

## SECTION 3.  INTERPRETATION OF THIS AGREEMENT

(a)     <u>Directly or Indirectly</u>.  Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

## SECTION 4.  MISCELLANEOUS

(a)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State without regard to conflicts of law principles.

(b)    <u>Section Headings</u>.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof.

(c)    <u>Notices</u>.

(i)    All communications under this Agreement shall be in writing and shall be delivered by hand or facsimile or mailed by overnight courier or by registered or certified mail, postage prepaid:

(1)    if to the Company, to Dana Corporation (or the name of the Company), 4500 Dorr Street, Toledo, OH 43615, Attention: General Counsel and Secretary (facsimile: (419) 535-4544), or at such other address or facsimile number as it may have furnished in writing to the Holders, with a copy to Jones Day, 222 East 41st Street, New York, New York 10017 (facsimile:  (212) 755-7306), Attention:  Marilyn W. Sonnie, Esq.

(2)    if to the Holders, to Centerbridge Capital Partners, L.P., 375 Park Avenue, 12th Floor, New York, NY 10152, Attention: Jeffrey Aronson (facsimile:  (212) 672-6501) and David Trucano (facsimile:  (212) 672-6501) or at such other address or facsimile numbers as may have been furnished the Company in writing, with a copy to Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (facsimile: (212) 728-9536), Attention: Jeffrey R. Poss, Esq.

(ii)    Any notice so addressed shall be deemed to be given: if delivered by hand or facsimile, on the date of such delivery; if mailed by overnight courier, on the first business day following the date of such mailing; and if mailed by registered or certified mail, on the third business day after the date of such mailing.

(d)    <u>Reproduction of Documents</u>.  This Agreement and all documents relating thereto, including, without limitation, any consents, waivers and modifications which may hereafter be executed may be reproduced by the Holders by any photographic, photostatic, microfilm, microcard, miniature photographic or other similar process and the Holders may destroy any original document so reproduced.  The parties hereto agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by the Holders in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

(e)    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the parties.

(f)     <u>Entire Agreement; Amendment and Waiver</u>.  This Agreement constitutes the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all prior understandings among such parties.  This Agreement may be amended, and the observance of any term of this Agreement may be waived, with (and only with) the written consent of the Company and the Holders holding a majority of the then outstanding Registrable Securities.  Any amendment or waiver effected in accordance with this Section 4(f) shall be binding upon each Holder of Registrable Securities then outstanding (whether or not such Holder consented to any such amendment or waiver).

(g)     <u>Severability</u>.  In the event that any part or parts of this Agreement shall be held illegal or unenforceable by any court or administrative body of competent jurisdiction, such determination shall not affect the remaining provisions of this Agreement which shall remain in full force and effect.

(h)     <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts (including by facsimile), each of which shall be deemed an original and all of which together shall be considered one and the same agreement.

**[Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

**[NEW DANA CORPORATION]**

By:_____
   Name:
   Title:

**CENTERBRIDGE CAPITAL PARTNERS, L.P.**

By: _____, its General Partner

By:_____
Name:
Title:

**CBP PARTS ACQUISITION CO. LLC**

By: Centerbridge Capital Partners, L.P.,
    its member owning a majority of its interests

       By: Centerbridge Associates, L.P.,
           its General Partner

         By: Centerbridge GP Investors, LLC,
            its general partner

By:_____
Name:
Title:   Authorized Person

**Exhibit F**

**[NEW DANA CORPORATION]**

**REGISTRATION RIGHTS AGREEMENT**

REGISTRATION RIGHTS AGREEMENT, dated as of _____, 2007 (the "Agreement"), among the purchasers of 4.0% Series B Convertible Preferred Stock listed on Schedule A (the "Investors") and [New Dana Corporation], a _____ corporation (the "Company").

R E C I T A L S

WHEREAS, the Investors have, pursuant to the terms of the Subscription Agreement, dated as of _____, 2007, by and among the Company and the Investors (the "Subscription Agreement"), agreed to purchase shares of 4.0% Series B Convertible Preferred Stock, par value $0.01 per share, of the Company (the "Series B Preferred Stock"); and

WHEREAS, the shares of Series B Preferred Stock are convertible into shares of common stock, par value $0.01 per share, of the Company (the "Common Stock"); and

WHEREAS, the Company has agreed, as a condition precedent to the Investors' obligations under the Subscription Agreement, to grant the Investors certain registration rights; and

WHEREAS, the Company and the Investors desire to define the registration rights of the Investor on the terms and subject to the conditions herein set forth.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the parties hereby agree as follows:

**SECTION 1.  DEFINITIONS**

As used in this Agreement, the following terms have the respective meanings set forth below:

Allocation Priority:  shall have the meaning set forth in Section 2(b)(ii);

Agreement:  shall mean this Agreement among the Investors and the Company;

Commission:  shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act;

Exchange Act:  shall mean the Securities Exchange Act of 1934, as amended (or any successor act), and the rules and regulations promulgated thereunder;

Holder:  shall mean any holder of Registrable Securities;

Initiating Holder:  shall mean any Holder or Holders who in the aggregate are Holders of more than 50% of the then outstanding Registrable Securities;

Maximum Number of Shares:  shall have the meaning set forth in Section 2(b)(ii);

Person:  shall mean an individual, partnership, joint-stock company, corporation, trust or unincorporated organization, and a government or agency or political subdivision thereof;

Pro Rata:  shall have the meaning set forth in Section 2(b)(ii);

Register, Registered and Registration:  shall mean a registration effected by preparing and filing a registration statement in compliance with the Securities Act (and any post-effective amendments filed or required to be filed) and the declaration or ordering of effectiveness of such registration statement;

Registrable Securities:  shall mean any (A) Series B Preferred Stock held by the Investors, (B) shares of Common Stock issuable upon conversion of the shares of Series B Preferred Stock held by the Investors, (C) other shares of Common Stock acquired by the Investors after the date hereof unless acquired in breach of any agreement between the Holder and the Company and (D) additional securities of the Company issued as a dividend or other distribution with respect to, or in exchange for or in replacement of any securities of the Company held by the Investors, including but not limited to, those listed in clauses (A), (B) and (C);

Registration Expenses:  shall mean all reasonable expenses incurred by the Company in compliance with Section 2(a), (b) and (c) hereof, including, without limitation, all registration and filing fees, printing expenses, fees and disbursements of counsel for the Company, reasonable fees and expenses of one counsel for all the Holders, blue sky fees and expenses and the reasonable expense of any special audits incident to or required by any such registration (but excluding the compensation of regular employees of the Company, which shall be paid in any event by the Company);

security, securities:  shall have the meaning set forth in Section 2(1) of the Securities Act;

Securities Act:  shall mean the Securities Act of 1933, as amended (or any successor act), and the rules and regulations promulgated thereunder; and

Selling Expenses:  shall mean all underwriting discounts and selling commissions applicable to the sale of Registrable Securities and all fees and disbursements of counsel for each of the Holders other than reasonable fees and expenses of one counsel for all the Holders.

## SECTION 2.  REGISTRATION RIGHTS

(a)    Demand Registration.

(i)    Request for Registration.  If the Company shall receive from an Initiating Holder, at any time, a written request that the Company effect any registration with respect to all or a part of the Registrable Securities, the Company will:

(1)    promptly give written notice of the proposed registration, qualification or compliance to all other Holders; and

(2)    as soon as practicable, use its reasonable best efforts to effect such registration (including, without limitation, the execution of an undertaking to file post-effective amendments, appropriate qualification under applicable blue sky or other state securities laws and appropriate compliance with applicable regulations issued under the Securities Act) as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any Holder or Holders joining in such request as are specified in a written request received by the Company within ten (10) business days after written notice from the Company is given under Section 2(a)(i)(1) above; provided, that the Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this Section 2(a):

(A)    In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification or compliance, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act or applicable rules or regulations thereunder;

(B)    After the Company has effected one (1) such registration pursuant to this Section 2(a) and such registration has been declared or ordered effective and the sales of such Registrable Securities shall have closed;

(C)    If the Registrable Securities requested by all Holders to be registered pursuant to such request do not have an anticipated aggregate public offering price (before any underwriting discounts and commissions) of not less than $**[insert dollar amount to 10% of the sum of (1) the total aggregate Series B-1 Purchase Price (as defined in the Investment Agreement) that is paid by all of the Investors under the Investment Agreement for Series B-1 Shares (as defined in the Investment Agreement)and (2) the total aggregate Series B-2 Purchase Price that is paid by all of the Investors under the**

**Investment Agreement for Series B-2 Shares (as defined in the Investment Agreement)]**;

(D)    During the period starting with the date thirty (30) days prior to the Company's good faith estimate of the date of filing of, and ending on the date three (3) months immediately following the effective date of, any registration statement pertaining to securities of the Company (other than a registration of securities in a Rule 145 transaction under the Securities Act, with respect to an employee benefit plan or with respect to the Company's first registered public offering of its stock); provided, that the Company is actively employing in good faith all reasonable efforts to cause such registration statement to become effective; provided, however, that the Company may only delay an offering pursuant to this Section 2(a)(i)(2)(D) for a period of not more than thirty (30) days, if a filing of any other registration statement is not made within that period and the Company may only exercise this right once in any twelve (12)-month period; or

(E)    If the Company shall furnish to the Initiating Holders a certificate signed by the President of the Company stating that in the good faith judgment of the Board of Directors of the Company it would be seriously detrimental to the Company or its stockholders for a registration statement to be filed in the near future, in which case the Company's obligation to use its best efforts to comply with this Section 2(a) shall be deferred for a period not to exceed ninety (90) days from the date of receipt of written request from the Initiating Holders; provided, however, that the Company shall not exercise such right more than once in any twelve (12)-month period.

The registration statement filed pursuant to the request of the Initiating Holders may, subject to the provisions of Section 2(a)(ii) below, include other securities of the Company that are held by Persons who, by virtue of agreements with the Company, are entitled to include their securities in any such registration ("Other Stockholders").  In the event any Holder requests a registration pursuant to this Section 2(a) in connection with a distribution of Registrable Securities to its partners or members, the registration shall provide for the resale by such partners or members, if requested by such Holder.

The registration rights set forth in this Section 2 may be assigned, in whole or in part, to any transferee of Registrable Securities (who shall be bound by all obligations of this Agreement).

(ii)    Underwriting.  If the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to Section 2(a)(i).

If Other Stockholders request inclusion of their securities in the underwriting, the Holders shall offer to include the securities of such Other Stockholders in the underwriting and may condition

such offer on their acceptance of the further applicable provisions of this Section 2. The Holders whose shares are to be included in such registration and the Company shall (together with all Other Stockholders proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for such underwriting by the Initiating Holders and reasonably acceptable to the Company. Notwithstanding any other provision of this Section 2(a), if the representative advises the Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, the representative may limit the number of Registrable Securities to be included in the registration and underwriting in accordance with the Allocation Priority set forth in Section 2(b)(ii). If any Holder or Other Stockholder who has requested inclusion in such registration as provided herein disapproves of the terms of the underwriting, such Person may elect to withdraw therefrom by providing written notice to the Company, the underwriter and the Initiating Holders. The securities so withdrawn shall also be withdrawn from registration.

       (b)    <u>Company Registration</u>.

       (i)    If the Company shall determine to register any of its equity securities either for its own account or for the account of Other Stockholders, other than a registration relating solely to employee benefit plans, or a registration relating solely to a Rule 145 transaction under the Securities Act, or a registration on any registration form which does not permit secondary sales or does not include substantially the same information as would be required to be included in a registration statement covering the sale of Registrable Securities, the Company will:

       (1)    promptly give to each of the Holders a written notice thereof (which shall include a list of the jurisdictions in which the Company intends to attempt to qualify such securities under the applicable blue sky or other state securities laws); and

       (2)    include in such registration (and any related qualification under blue sky laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests, made by the Holders within ten (10) days after receipt of the written notice from the Company described in clause (1) above, except to the extent limited as set forth in Section 2(b)(ii) below. Such written request may specify all or a part of the Holders' Registrable Securities. In the event any Holder requests inclusion in a registration pursuant to this Section 2(b) in connection with a distribution of Registrable Securities to its partners or members, the registration shall provide for the resale by such partners or members, if requested by such Holder.

       (ii)    <u>Underwriting</u>. If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise each of the Holders as a part of the written notice given pursuant to Section 2(b)(i)(1) above. In such event, the right of each of the Holders to registration pursuant to this Section 2(b) shall be conditioned upon such Holders' participation in such underwriting and the inclusion of such Holders' Registrable Securities in the underwriting to the extent provided herein. The Holders whose shares are to be included in such registration shall (together with the Company and the Other Stockholders distributing their securities

through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for underwriting by the Company. Notwithstanding any other provision of this Section 2(b), if the representative determines that marketing factors require a limitation on the number of shares to be underwritten, the representative may limit the number of Registrable Securities to be included in the registration and underwriting in accordance with the allocation priority set forth below. The Company shall promptly advise all holders of securities requesting registration of such limitation, and the number of shares of securities that are entitled to be included in the registration and underwriting (the "Maximum Number of Shares") shall be allocated in the following manner: (i) first, the securities that the Company desires to sell, regardless of the number of shares that can be sold without exceeding the Maximum Number of Shares; (ii) second, the securities entitled to registration under the Registration Rights Agreement, dated _____, 200_, between Centerbridge, CBP Parts Acquisition Co. LLC and the Company, all pro rata in accordance with the number of shares that each such Holder has requested be included in such registration (such proportion is referred to herein as "Pro Rata"), to the extent that the Maximum Number of Shares has not been exceeded; (iii) third, the Registrable Securities that can be sold, Pro Rata, without exceeding the Maximum Number of Shares; and (iv) fourth, to the extent that the Maximum Number of Shares has not been reached under the foregoing clauses, the securities for the account of Other Stockholders that the Company is obligated to register pursuant to written contractual arrangements with such persons that can be sold, Pro Rata, without exceeding the Maximum Number of Shares (the foregoing allocation is referred to herein as the "Allocation Priority"). If any of the Holders or any officer, director or Other Stockholder disapproves of the terms of any such underwriting, he she or it may elect to withdraw therefrom by providing written notice to the Company and the underwriter. Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall be withdrawn from such registration.

(c)     Form S-3. The Company shall use its reasonable best efforts to qualify for registration on Form S-3 for secondary sales. After the Company has qualified for the use of Form S-3, the Holders shall have the right to request up to four (4) registrations on Form S-3 (such requests shall be in writing and shall state the number of shares of Registrable Securities to be disposed of and the intended method of disposition of shares by such holders), provided, that the Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this Section 2(c):

(i)     Unless the Holder or Holders requesting registration propose to dispose of shares of Registrable Securities having an aggregate price to the public (before deduction of Selling Expenses) of more than $**[insert dollar amount to 5% of the sum of (1) the total aggregate Series B-1 Purchase Price (as defined in the Investment Agreement) that is paid by all of the Investors under the Investment Agreement for Series B-1 Shares (as defined in the Investment Agreement)and (2) the total aggregate Series B-2 Purchase Price that is paid by all of the Investors under the Investment Agreement for Series B-2 Shares (as defined in the Investment Agreement)]**;

(ii)      Within one hundred eighty (180) days of the effective date of the most recent registration pursuant to this Section 2(c) in which securities held by the requesting Holder could have been included for sale or distribution;

(iii)      In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification or compliance, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act or applicable rules or regulations thereunder;

(iv)      During the period starting with the date thirty (30) days prior to the Company's good faith estimate of the date of filing of, and ending on the date three(3) months immediately following the effective date of, any registration statement pertaining to securities of the Company (other than a registration of securities in a Rule 145 transaction under the Securities Act or with respect to an employee benefit plan); provided, that the Company is actively employing in good faith all reasonable efforts to cause such registration statement to become effective; provided, however, that the Company may only delay an offering pursuant to this Section 2(c)(iv) for a period of not more than thirty (30) days, if a filing of any other registration statement is not made within that period and the Company may only exercise this right once in any twelve (12)-month period; or

(v)      If the Company shall furnish to the Holders a certificate signed by the President of the Company stating that in the good faith judgment of the Board of Directors of the Company it would be seriously detrimental to the Company or its stockholders for a registration statement to be filed in the near future, in which case the Company's obligation to use its best efforts to comply with this Section 2(c) shall be deferred for a period not to exceed ninety (90) days from the date of receipt of written request from the Holders; provided, however, that the Company shall not exercise such right more than once in any twelve (12)-month period.

The Company shall give written notice to all Holders of the receipt of a request for registration pursuant to this Section 2(c)and shall provide a reasonable opportunity for other Holders to participate in the registration; provided, that if the registration is for an underwritten offering, the terms of Section 2(a)(ii) above shall apply to all participants in such offering.  Subject to the foregoing, the Company will use its reasonable best efforts to effect promptly the registration of all shares of Registrable Securities on Form S-3 to the extent requested by the Holder or Holders thereof for purposes of disposition.  In the event any Holder requests a registration pursuant to this Section 2(c) in connection with a distribution of Registrable Securities to its partners or members, the registration shall provide for the resale by such partners or members, if requested by such Holder.

(d)      Expenses of Registration.  All Registration Expenses incurred in connection with any registration, qualification or compliance pursuant to this Section 2 shall be borne by the Company, and all Selling Expenses shall be borne by the Holders of the securities so registered pro rata on the basis of the number of their shares so registered.

(e)    <u>Registration Procedures</u>.  In the case of each registration effected by the Company pursuant to this Section 2, the Company will keep the Holders, as applicable, advised in writing as to the initiation of each registration and as to the completion thereof.  At its reasonable expense, the Company will:

(i)    keep such registration effective for a period of ninety (90) days;

(ii)    furnish such number of prospectuses and other documents incident thereto as each of the Holders, as applicable, from time to time may reasonably request;

(iii)    notify each Holder of Registrable Securities covered by such registration at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; and

(iv)    furnish, on the date that such Registrable Securities are delivered to the underwriters for sale, if such securities are being sold through underwriters or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (1) an opinion, dated as of such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is reasonably and customarily given to underwriters in an underwritten public offering, addressed to the underwriters, if any, and to the Holders participating in such registration and (2) a letter, dated as of such date, from the independent certified public accountants of the Company, in form and substance as is reasonably and customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters, if any, and if permitted by applicable accounting standards, to the Holders participating in such registration.

(f)    <u>Indemnification</u>.

(i)    The Company will indemnify each of the Holders, as applicable, each of its officers, directors and partners and members, and each Person controlling each of the Holders, with respect to each registration which has been effected pursuant to this Section 2, and each underwriter, if any, and each person who controls any underwriter, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, issuer free-writing prospectus, offering circular or other document, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse each of such Holders, each of its officers, directors and partners and members, and each Person controlling each of such Holders,

each such underwriter and each Person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating and defending any such claim, loss, damage, liability or action; provided, that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement or omission based upon written information furnished to the Company by the Holders or underwriter and stated to be specifically for use therein; provided, however, that the obligations of each of the Holders hereunder shall be limited to an amount equal to the net proceeds to such Holder of securities sold in such registration as contemplated herein.

(ii)     Each of the Holders will, if Registrable Securities held by it are included in the securities as to which such registration, qualification or compliance is being effected, severally and not jointly, indemnify the Company, each of its directors and officers and each underwriter, if any, of the Company's securities covered by such a registration statement, each Person who controls the Company or such underwriter, each Other Stockholder and each of their respective officers, directors, partners and members, and each Person controlling such Other Stockholder against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, issuer free-writing prospectus, offering circular or other document made by such Holder in writing, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements by such Holder therein not misleading, and will reimburse the Company, the underwriters, and such Other Stockholders, and their respective directors, officers, partners, members, Persons or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular or other document in reliance upon and in conformity with written information furnished to the Company by such Holder and stated to be specifically for use therein; provided, however, that the obligations of each of the Holders hereunder shall be limited to an amount equal to the net proceeds to such Holder of securities sold in such registration as contemplated herein.

(iii)     Each party entitled to indemnification under this Section 2(f) (the "Indemnified Party") shall give notice to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom; provided, that counsel for the Indemnifying Party, who shall conduct the defense of such claim or any litigation resulting therefrom, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld) and the Indemnified Party may participate in such defense at such party's expense (unless the Indemnified Party shall have reasonably concluded that there may be a conflict of interest between the Indemnifying Party and the Indemnified Party in such action, in which case the fees and expenses of counsel shall be at the expense of the Indemnifying Party), and provided

<u>further</u>, that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 2(f) unless the Indemnifying Party is materially prejudiced thereby.  No Indemnifying Party, in the defense of any such claim or litigation shall, except with the prior written consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation.  Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with the defense of such claim and litigation resulting therefrom.

(iv)    If the indemnification provided for in this Section 2(f) is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage or expense referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage or expense in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions (or alleged statements or omissions) which resulted in such loss, liability, claim, damage or expense, as well as any other relevant equitable considerations.  The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue (or alleged untrue) statement of a material fact or the omission (or alleged omission) to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(v)    Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with any underwritten public offering contemplated by this Agreement are in conflict with the foregoing provisions, the provisions in such underwriting agreement shall be controlling.

(g)    <u>Information by the Holders</u>.

(i)    Each of the Holders including securities in any registration shall furnish to the Company such information regarding such Holder and the distribution proposed by such Holder as the Company may reasonably request in writing and as shall be reasonably required in connection with any registration, qualification or compliance referred to in this Section 2.

(ii)    In the event that, either immediately prior to or subsequent to the effectiveness of any registration statement, any Holder shall distribute Registrable Securities to its partners or members, such Holder shall so advise the Company and provide such information as shall be necessary to permit an amendment to such

registration statement to provide information with respect to such partners or members, as selling security holders.  Promptly following receipt of such information, the Company shall file an appropriate amendment to such registration statement reflecting the information so provided.  Any incremental expense to the Company resulting from such amendment shall be borne by such Holder.

(h)    Rule 144 Reporting.

With a view to making available the benefits of certain rules and regulations of the Commission which may permit the sale of restricted securities to the public without registration, the Company agrees to:

(i)    at all times make and keep public information available as those terms are understood and defined in Rule 144 under the Securities Act ("Rule 144");

(ii)    use its reasonable best efforts to file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act at any time after it has become subject to such reporting requirements; and

(iii)    so long as a Holder owns any Registrable Securities, furnish to such Holder, upon request, a written statement by the Company as to its compliance with the reporting requirements of Rule 144, and of the Securities Act and the Exchange Act, a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed as such Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing the Holder to sell any such securities without registration.

(i)    Termination.  The registration rights set forth in this Section 2 shall not be available to any Holder if, (i) in the written opinion of counsel to the Company, all of the Registrable Securities then owned by such Holder could be sold in any ninety (90)-day period pursuant to Rule 144(k) or are otherwise freely saleable or (ii) all of the Registrable Securities held by such Holder have been sold in a registration pursuant to the Securities Act or pursuant to Rule 144.

## SECTION 3.  INTERPRETATION OF THIS AGREEMENT

(a)    Directly or Indirectly.  Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

## SECTION 4.  MISCELLANEOUS

(a)    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State without regard to conflicts of law principles.

(b)    Section Headings.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof.

(c)    Notices.

(i)    All communications under this Agreement shall be in writing and shall be delivered by hand or facsimile or mailed by overnight courier or by registered or certified mail, postage prepaid:

(1)    if to the Company, to Dana Corporation (or the name of the Company), 4500 Dorr Street, Toledo, OH 43615, Attention: General Counsel and Secretary (facsimile: (419) 535-4544), or at such other address or facsimile numbers as it may have furnished in writing to the Holders, with a copy to Jones Day, 222 East 41st Street, New York, New York 10017 (facsimile:  (212) 755-7306), Attention:  Marilyn W. Sonnie, Esq.

(2)    if to the Holders, to the address or facsimile provided on Schedule A, or at such other address or facsimile number as may have been furnished the Company in writing, with a copy to: [_____]; and a copy to Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (facsimile:  (212) 728-9536), Attention:  Jeffrey R. Poss, Esq.

(ii)    Any notice so addressed shall be deemed to be given: if delivered by hand or facsimile, on the date of such delivery; if mailed by overnight courier, on the first business day following the date of such mailing; and if mailed by registered or certified mail, on the third business day after the date of such mailing.

(d)    Reproduction of Documents.  This Agreement and all documents relating thereto, including, without limitation, any consents, waivers and modifications which may hereafter be executed may be reproduced by the Holders by any photographic, photostatic, microfilm, microcard, miniature photographic or other similar process and the Holders may destroy any original document so reproduced.  The parties hereto agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by the Holders in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

(e)    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the parties.

(f)    Entire Agreement; Amendment and Waiver.  This Agreement constitutes the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all prior understandings among such parties.  This Agreement may be amended, and the observance of any term of this Agreement may be waived, with (and only with) the written consent of the Company and the Holders holding a majority of the then outstanding Registrable

Securities.  Any amendment or waiver effected in accordance with this Section 4(f) shall be binding upon each Holder of Registrable Securities then outstanding (whether or not such Holder consented to any such amendment or waiver).

(g)    <u>Severability</u>.  In the event that any part or parts of this Agreement shall be held illegal or unenforceable by any court or administrative body of competent jurisdiction, such determination shall not affect the remaining provisions of this Agreement which shall remain in full force and effect.

(h)    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts (including by facsimile), each of which shall be deemed an original and all of which together shall be considered one and the same agreement.

**[Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

**[NEW DANA CORPORATION]**


By:_____
   Name:
   Title:

**[HOLDERS]**


By:_____
Name:
Title:

**SCHEDULE A**

**<u>Investors</u>**

NYI-4007438v4

**EXHIBIT R**

# APPENDIX R:  RIGHT TO TERMINATE

The modifications to the collective bargaining agreements and retiree benefits reached in connection with Dana's Chapter 11 reorganization and set forth in this Settlement Agreement were agreed to in furtherance of Dana's reorganization under Chapter 11 of Title 11, United States Code.  The parties acknowledge and agree that  the proposed investment ("Investment") by Centerbridge Partners, L.P. ("Centerbridge") (the "Centerbridge Investment"), which Investment is reflected in Exhibit B of the Plan Support Agreement, Terms of Centerbridge Investment (the "Investment Term Sheet"), and the Reorganization Plan Metrics, as further described in the Settlement Agreement, are fundamental, integral and necessary conditions to the Settlement Agreement.  The parties agree that the Unions shall have termination rights as follows:

1)      Replacement of Centerbridge By Dana:  In the event that Dana determines that it wishes to replace Centerbridge with an Alternative Minority Investment (as such term is defined in the Investment Term Sheet) on better terms  than those set forth in the Investment Term Sheet (the "Alternative Investor"), leaving the Settlement Agreement (including the Reorganization Plan Metrics) intact in all other respects, such Alternative Minority Investment shall be subject to  the consent of the USW/UAW, which consent shall not be unreasonably withheld.  The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Alternative Minority Investment, including discussions, if any, regarding the labor agreements and related restructuring matters. The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks after notification by Dana regarding the Alternative Minority Investment provided that Dana and the proposed investor cooperate fully in such diligence.  In the event that the Unions do not consent to the Alternative Minority Investment, then the following shall apply:

(a)  Mediation and Arbitration:  Disputes regarding the Unions' determination to withhold their consent of an Alternative Minority Investment shall be timely addressed first, at mediation,  and then at arbitration, applying the standards that would apply in labor arbitration proceedings.  The Unsecured Creditors' Committee has the right to participate with Dana in the mediation/arbitration on a co-equal basis.  The mediation/arbitration shall be based on the parties' understanding that the Unions' willingness to enter into the Settlement Agreement is based on the Unions' understanding and belief that they, the Company and Centerbridge have a shared vision which includes, but is not limited to the following:  that the Company is in financial distress and operates in a highly competitive global industry; that improving the Company's performance will require both substantial experience in using private capital to make equity investments in large operating businesses and dedicated personnel devoted to the businesses' long-term success, a patient, long-term investment horizon, considerable management skills and investor resources and capital;  that the Company can and must maintain a significant manufacturing base in North America and provide a growing supply of good jobs for union-represented employees;  that the Company's success in this environment is highly dependant upon its ability to achieve and sustain financial stability, including, among other things maintaining levels of leverage and liquidity that are prudent in light of prevailing industry conditions;  that the Unions are critical stakeholders and partners in the enterprise and that the Settlement Agreement, as a whole, reflects this recognition;

- 2 -

and that the parties are irrevocably committed to mutual respect and cooperation at all levels of the Company.

The mediator-arbitrator shall be George Fleischli. If George Fleischli is not available, then Richard Bloch shall serve as the mediator-arbitrator. If Richard Bloch is not available, then the mediator-arbitrator shall be Martin Scheinman. For purposes of this paragraph, "available" means able to conduct a mediation-arbitration within ten (10) days of the submission of the dispute to mediation-arbitration and, if necessary, render a decision within four (4) days thereafter. If none of the foregoing individuals are available, then the individual available at the earliest time shall be the individual selected.

(i)     If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Alternative Minority Investment, and, notwithstanding such determination, Dana proceeds with the Alternative Minority Investment, the Unions may, in their sole, unreviewable discretion, either: (A) issue a Notice of Termination, which shall constitute notice that each and every USW or UAW collective bargaining agreement shall be terminated on the date set forth therein, and which shall give rise to the Unions' right to strike upon such termination, or (B) elect not to issue a Notice of Termination, in which event the Unions shall have an allowed administrative expense claim in the amount of $764 million, which claim shall not be subject to reconsideration under 11 U.S.C. § 502 or otherwise, and which shall be the $764 million cash payment (with such amount to be allocated as follows:  USW-$298.7 million; and UAW-$465.3 million) to be made to the respective Union Retiree VEBA as described in Appendix K to this Settlement Agreement (and Appendix K to the USW Settlement Agreement), or as otherwise directed to be paid by the Unions in the event their respective VEBA has not been established (but in no event to be duplicative of the Unions' Claim under this Appendix).

(ii)    If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Alternative Minority Investment, the Company shall be authorized to proceed with the Alternative Minority Investment without further consequence so long as the terms of the Settlement Agreement otherwise remain unchanged and unaffected.

(iii)   Review of Arbitral Award:  Any action to enforce or vacate the arbitral award described in paragraph (a) shall be brought in the Bankruptcy Court and be an action under Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185 ("the Section 301 Action") and reviewed under the standards applicable to judicial review of arbitration awards pursuant to Section 301.

- 3 -

    (b) In the event that, following the consideration of an Alternative Minority Investment proposal, Dana rejects such proposal in favor of the Centerbridge Investment (or a new Centerbridge investment), then the Settlement Agreement shall remain in effect.

2)  <u>Centerbridge Terminates The Investment</u>:  In the event that Centerbridge determines to terminate the Investment, other than for a breach by Dana of the Terms of Centerbridge Investment, the following shall apply:

    (a) The  Unions shall have the sole unreviewable discretion within thirty (30) days of notification by Centerbridge of its termination of the Investment to designate an investor to replace Centerbridge on terms substantially similar to the Centerbridge Investment (the "Replacement Investor").  Such Replacement Investor shall be subject to Dana's consent, which consent shall not be unreasonably withheld.  If the 30-day period has not run by September 3, 2007, then Dana may file a plan of reorganization without the Replacement Investor, which plan shall be amended to incorporate the Replacement Investor, subject to the provisions of paragraphs 2(b) and 2(c) below.

    (b) Disputes with respect to whether or not Dana has acted unreasonably in withholding its consent to the Replacement Investor shall be timely addressed and subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in  Paragraph (1)(a)(iii).

            (i)     If the arbitrator finds that Dana has acted unreasonably in rejecting the Replacement Investor, the arbitral award shall require that Dana accept the Replacement Investor.

            (ii)    If the arbitrator finds that Dana has acted reasonably, then Dana shall not be obligated to accept the Replacement Investor.

    (c) In the event that the Unions do not identify a Replacement Investor or an arbitrator, acting pursuant to paragraph (b) above finds that Dana has acted reasonably in rejecting the Replacement Investor, Dana may pursue an alternate plan of reorganization , so long as such plan of reorganization meets the Reorganization Plan Metrics and the terms of this Settlement Agreement and the USW Settlement Agreement otherwise remain unchanged and unaffected.

3)  <u>Other  Events</u>.

      (a)     (i)     Except as provided in paragraphs (1) and (2) of this Appendix (in which case the provisions of those paragraphs shall govern), in the event that Dana pursues a transaction other than the Centerbridge Investment, including a majority investment transaction, a sale of substantially all of the Company's assets and any similar transaction (the "Non-Centerbridge Transaction"), the Unions shall have an allowed general unsecured claim in the amount of $908 million (such claim to be allocated as follows: USW-$354.7 million; and UAW-$553.3 million), which claim shall not be subject to reconsideration under Section 502 of the Bankruptcy Code or otherwise (after the date of approval of this Settlement Agreement and the

USW Settlement Agreement) (the "Unions' Claim"), unless Dana shall have notified the Unions that they and, if applicable, the third party investor to such Non-Centerbridge Transaction have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the reasonable satisfaction of the Unions.

(ii)     Such Non-Centerbridge Transaction shall be subject to the Unions' consent, which consent shall not be unreasonably withheld. The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Non-Centerbridge Transaction, including discussions, if any, regarding the labor agreements and related restructuring matters.  The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks of notification by Dana regarding the Non-Centerbridge Transaction provided that Dana and the third party to such proposed Transaction cooperate fully in such diligence. In the event that the Unions do not consent to the Non-Centerbridge Transaction, then any dispute regarding the Unions' determination to withhold consent shall be subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in Paragraph (1)(a)(iii).

If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Non-Centerbridge Transaction, and, notwithstanding such determination, Dana proceeds with the transaction, the Unions may, in their sole, unreviewable discretion:  (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing such termination and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement remains in effect), the Unions may elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim to be paid to a Union Retiree VEBA or as otherwise directed by the Unions for the payment of retiree health benefits in the event that their respective VEBA has not been established.  The Unions may file with the Bankruptcy Court a notice identifying such election.  If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Non-Centerbridge Transaction, the Company shall be authorized to proceed with the transaction, subject to the terms of the Settlement Agreement, except that the Unions shall have the right to elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount

- 5 -

of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim.  The Unions may file with the Bankruptcy Court a notice identifying such election.

(b) Except as provided in Paragraphs (1), (2) and 3(a) of this Appendix, for any other event of termination under the Investment Term Sheet including the filing by Dana of a standalone reorganization plan, the Unions shall have the Unions' Claim (subject to the allocation described above at (3)(a)(i)), unless Dana, and if applicable, the plan proponent shall have notified the Unions that they have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the satisfaction of the Unions.  The Unions shall also have the right, in their sole unreviewable discretion to (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) of this Appendix (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing the termination of benefits and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement shall remain in effect), the Unions may elect: (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim, to be paid to the respective Union Retiree VEBA or as otherwise directed by the Unions in the event that their respective VEBA has not been established.  The Unions may file with the Bankruptcy Court a notice identifying such election.

(c) In the case of a dismissal of the Debtors' chapter 11 cases, then this Settlement Agreement will terminate, and the parties will return to the status that existed before the Section 1113/1114 Litigation and the execution of this Settlement Agreement.  In the case of a conversion of the Debtors' cases to Chapter 7, the Debtors will seek that any order of conversion shall provide for an allowed administrative claim in the amount of $764 million for the payment of retiree health benefits (subject to the allocation described above at (1)(a)(i)).

4) For purposes of this Appendix, "Reorganization Metrics" shall mean Appendix I of this Settlement Agreement.

**EXHIBIT S**

## APPENDIX R:  RIGHT TO TERMINATE

The modifications to the collective bargaining agreements and retiree benefits reached in connection with Dana's Chapter 11 reorganization and set forth in this Settlement Agreement were agreed to in furtherance of Dana's reorganization under Chapter 11 of Title 11, United States Code.  The parties acknowledge and agree that  the proposed investment ("Investment") by Centerbridge Partners, L.P. ("Centerbridge") (the "Centerbridge Investment"), which Investment is reflected in Exhibit B of the Plan Support Agreement, Terms of Centerbridge Investment (the "Investment Term Sheet"), and the Reorganization Plan Metrics, as further described in the Settlement Agreement, are fundamental, integral and necessary conditions to the Settlement Agreement.  The parties agree that the Unions shall have termination rights as follows:

1)  <u>Replacement of Centerbridge By Dana</u>:  In the event that Dana determines that it wishes to replace Centerbridge with an  Alternative Minority Investment (as such term is defined in the Investment Term Sheet) on better terms  than those set forth in the Investment Term Sheet (the "Alternative Investor"), leaving the Settlement Agreement (including the Reorganization Plan Metrics) intact in all other respects, such Alternative Minority Investment shall be subject to the consent of the USW/UAW, which consent shall not be unreasonably withheld. The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Alternative Minority Investment, including discussions, if any, regarding the labor agreements and related restructuring matters. The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks after notification by Dana regarding the Alternative Minority Investment provided that Dana and the proposed investor cooperate fully in such diligence.  In the event that the Unions do not consent to the Alternative Minority Investment, then the following shall apply:

   (a)  <u>Mediation and Arbitration</u>:  Disputes regarding the Unions' determination to withhold their consent of an Alternative Minority Investment shall be timely addressed first, at mediation, and then at arbitration, applying the standards that would apply in labor arbitration proceedings.  The Unsecured Creditors' Committee has the right to participate with Dana in the mediation/arbitration on a co-equal basis.  The mediation/arbitration shall be based on the parties' understanding that the Unions' willingness to enter into the Settlement Agreement is based on the Unions' understanding and belief that they, the Company and Centerbridge have a shared vision which includes, but is not limited to the following:  that the Company is in financial distress and operates in a highly competitive global industry;  that improving the Company's performance will require both substantial experience in using private capital to make equity investments in large operating businesses and dedicated personnel devoted to the businesses' long-term success, a patient, long-term investment horizon, considerable management skills and investor resources and capital;  that the Company can and must maintain a significant manufacturing base in North America and provide a growing supply of good jobs for union-represented employees;  that the Company's success in this environment is highly dependant upon its ability to achieve and sustain financial stability, including, among other things maintaining levels of leverage and liquidity that are prudent in light of prevailing industry conditions;  that the Unions are critical stakeholders and partners in the enterprise and that the Settlement Agreement, as a whole, reflects this recognition;

and that the parties are irrevocably committed to mutual respect and cooperation at all levels of the Company.

The mediator-arbitrator shall be George Fleischli. If George Fleischli is not available, then Richard Bloch shall serve as the mediator-arbitrator. If Richard Bloch is not available, then the mediator-arbitrator shall be Martin Scheinman. For purposes of this paragraph, "available" means able to conduct a mediation-arbitration within ten (10) days of the submission of the dispute to mediation-arbitration and, if necessary, render a decision within four (4) days thereafter. If none of the foregoing individuals are available, then the individual available at the earliest time shall be the individual selected.

> (i)     If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Alternative Minority Investment, and, notwithstanding such determination, Dana proceeds with the Alternative Minority Investment, the Unions may, in their sole, unreviewable discretion, either: (A) issue a Notice of Termination, which shall constitute notice that each and every USW or UAW collective bargaining agreement shall be terminated on the date set forth therein, and which shall give rise to the Unions' right to strike upon such termination, or (B) elect not to issue a Notice of Termination, in which event the Unions shall have an allowed administrative expense claim in the amount of $764 million, which claim shall not be subject to reconsideration under 11 U.S.C. § 502 or otherwise, and which shall be the $764 million cash payment (with such amount to be allocated as follows:  USW-$298.7 million; and UAW-$465.3 million) to be made to the respective Union Retiree VEBA as described in Appendix K to this Settlement Agreement (and Appendix K to the UAW Settlement Agreement), or as otherwise directed to be paid by the Unions in the event their respective VEBA has not been established (but in no event to be duplicative of the Unions' Claim under this Appendix).

> (ii)    If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Alternative Minority Investment, the Company shall be authorized to proceed with the Alternative Minority Investment without further consequence so long as the terms of the Settlement Agreement otherwise remain unchanged and unaffected.

> (iii)   Review of Arbitral Award:  Any action to enforce or vacate the arbitral award described in paragraph (a) shall be brought in the Bankruptcy Court and be an action under Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185 ("the Section 301 Action") and reviewed under the standards applicable to judicial review of arbitration awards pursuant to Section 301.

(b) In the event that, following the consideration of an Alternative Minority Investment proposal, Dana rejects such proposal in favor of the Centerbridge Investment (or a new Centerbridge investment), then the Settlement Agreement shall remain in effect.

2) <u>Centerbridge Terminates The Investment</u>:  In the event that Centerbridge determines to terminate the Investment, other than for a breach by Dana of the Terms of Centerbridge Investment, the following shall apply:

(a) The  Unions shall have the sole unreviewable discretion within thirty (30) days of notification by Centerbridge of its termination of the Investment to designate an investor to replace Centerbridge on terms substantially similar to the Centerbridge Investment (the "Replacement Investor").  Such Replacement Investor shall be subject to Dana's consent, which consent shall not be unreasonably withheld.  If the 30-day period has not run by September 3, 2007, then Dana may file a plan of reorganization without the Replacement Investor, which plan shall be amended to incorporate the Replacement Investor, subject to the provisions of paragraphs 2(b) and 2(c) below.

(b) Disputes with respect to whether or not Dana has acted unreasonably in withholding its consent to the Replacement Investor shall be timely addressed and subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in  Paragraph (1)(a)(iii).

(i)    If the arbitrator finds that Dana has acted unreasonably in rejecting the Replacement Investor, the arbitral award shall require that Dana accept the Replacement Investor.

(ii)    If the arbitrator finds that Dana has acted reasonably, then Dana shall not be obligated to accept the Replacement Investor.

(c) In the event that the Unions do not identify a Replacement Investor or an arbitrator, acting pursuant to paragraph (b) above finds that Dana has acted reasonably in rejecting the Replacement Investor, Dana may pursue an alternate plan of reorganization , so long as such plan of reorganization meets the Reorganization Plan Metrics and the terms of this Settlement Agreement and the UAW Settlement Agreement otherwise remain unchanged and unaffected.

3) <u>Other  Events</u>.

(a)    (i)    Except as provided in paragraphs (1) and (2) of this Appendix (in which case the provisions of those paragraphs shall govern), in the event that Dana pursues a transaction other than the Centerbridge Investment, including a majority investment transaction, a sale of substantially all of the Company's assets and any similar transaction (the "Non-Centerbridge Transaction"), the Unions shall have an allowed general unsecured claim in the amount of $908 million (such claim to be allocated as follows: USW - $354.7 million; and UAW - $553.3 million), which claim shall not be subject to reconsideration under Section 502 of the Bankruptcy Code or otherwise (after the date of approval of this Settlement Agreement and the

UAW Settlement Agreement) (the "Unions' Claim"), unless Dana shall have notified the Unions that they and, if applicable, the third party investor to such Non-Centerbridge Transaction have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the reasonable satisfaction of the Unions.

(ii)     Such Non-Centerbridge Transaction shall be subject to the Unions' consent, which consent shall not be unreasonably withheld. The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Non-Centerbridge Transaction, including discussions, if any, regarding the labor agreements and related restructuring matters.  The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks of notification by Dana regarding the Non-Centerbridge Transaction provided that Dana and the third party to such proposed Transaction cooperate fully in such diligence. In the event that the Unions do not consent to the Non-Centerbridge Transaction, then any dispute regarding the Unions' determination to withhold consent shall be subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in Paragraph (1)(a)(iii).

If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Non-Centerbridge Transaction, and, notwithstanding such determination, Dana proceeds with the transaction, the Unions may, in their sole, unreviewable discretion:  (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing such termination and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement remains in effect), the Unions may elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim to be paid to a Union Retiree VEBA or as otherwise directed by the Unions for the payment of retiree health benefits in the event that their respective VEBA has not been established.  The Unions may file with the Bankruptcy Court a notice identifying such election.  If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Non-Centerbridge Transaction, the Company shall be authorized to proceed with the transaction, subject to the terms of the Settlement Agreement, except that the Unions shall have the right to elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount

of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim . The Unions may file with the Bankruptcy Court a notice identifying such election.

(b) Except as provided in Paragraphs (1), (2) and 3(a) of this Appendix, for any other event of termination under the Investment Term Sheet including the filing by Dana of a standalone reorganization plan, the Unions shall have the Unions' Claim (subject to the allocation described above at (3)(a)(i)), unless Dana, and if applicable, the plan proponent shall have notified the Unions that they have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the satisfaction of the Unions. The Unions shall also have the right, in their sole unreviewable discretion to (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) of this Appendix (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing the termination of benefits and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement shall remain in effect), the Unions may elect: (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim, to be paid to the respective Union Retiree VEBA or as otherwise directed by the Unions in the event that their respective VEBA has not been established. The Unions may file with the Bankruptcy Court a notice identifying such election.

(c) In the case of a dismissal of the Debtors' chapter 11 cases, then this Settlement Agreement will terminate, and the parties will return to the status that existed before the Section 1113/1114 Litigation and the execution of this Settlement Agreement. In the case of a conversion of the Debtors' cases to Chapter 7, the Debtors will seek that any order of conversion shall provide for an allowed administrative claim in the amount of $764 million for the payment of retiree health benefits (subject to the allocation described above at (1)(a)(i)).

4) For purposes of this Appendix, "Reorganization Metrics" shall mean Appendix I of this Settlement Agreement.

**EXHIBIT T**

1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4
    – – – – – – – – – – – – – – – – – – x
5
                        In the Matter
6
                        of            Case No.
7                                      06-10354-brl
                 DANA CORPORATION,
8
                             Debtor.
9   – – – – – – – – – – –  – – – – – – – x

10                      July 26, 2007

11                      United States Custom House
                        One Bowling Green
12                      New York, New York 10004

13  Debtor's motion for an order approving amended
    agreement for the payment of certain reasonable
14  fees and expenses of advisors to the debtor's
    unions, motion of debtors and debtors in
15  possession for entry of an order (A) approving
    settlement agreements with the United
16  Steelworkers and United Autoworkers pursuant to
    11 U.S.C. Sections 1113 and 1114(e) and Federal
17  Rule of Bankruptcy Procedure 9019, and (B)
    authorizing the debtors to enter into plan
18  support agreement, investment agreement and
    related agreements, pursuant to 11 U.S.C.
19  Sections 105(a), 363(b), 364(c)(1), 503 and
    507.

20

21  B E F O R E:
             HON. BURTON R. LIFLAND,
22                        Bankruptcy Judge.

23

24

25

2

```
 1                    DANA CORPORATION

 2    A P P E A R A N C E S:

 3            JONES DAY, LLP

 4                Attorneys for the debtor Dana

 5                Corporation

 6                222 East 41st Street

 7                New York, New York 10017

 8            BY: CORINNE BALL, ESQ.

 9                   -and-

10                ROBERT W. HAMILTON, ESQ.

11                   -and-

12                HEATHER LENNOX, ESQ.

13                   -and-

14                RICHARD F. SHAW, ESQ.

15                   -and-

16                STEVEN C. BENNETT, ESQ.

17

18            STROOCK & STROOCK & LAVAN, LLP

19                Attorneys for Ad Hoc Committee of

20                Dana Noteholders

21                180 Maiden Lane

22                New York, New York 10038

23            BY: KRISTOPHER M. HANSEN, ESQ.

24                       -and-

25                SAYAN BHATTACHARYYA, ESQ.
```

3

```
 1                  DANA CORPORATION

 2    A P P E A R A N C E S: (Cont'd)

 3

 4         KRAMER LEVIN NAFTALIS & FRANKEL, LLP

 5              Attorneys for Official Creditor's

 6              Committee

 7              1177 Avenue of the Americas

 8              New York, New York 10036

 9         BY: THOMAS MOERS MAYER, ESQ.

10                    -and-

11              P. BRADLEY O'NEILL, ESQ.

12                    -and-

13              STEPHEN D. ZIDE, ESQ.

14                    -and-

15              KENNETH H. ECKSTEIN, ESQ.

16                    -and-

17              DANIEL EGGERMAN, ESQ.

18                    -and-

19              GREGORY HOROWITZ, ESQ.

20                    -and-

21              THOMAS H. MOORLAND, ESQ.

22

23

24

25
```

4

```
 1              DANA CORPORATION

 2   A P P E A R A N C E S: (Cont'd)

 3

 4        WHITE & CASE, LLP

 5             Attorneys for Appaloosa Management

 6             1155 Avenue of the Americas

 7             New York, New York 10036

 8          BY: THOMAS E. LAURIA, ESQ.

 9                  -and-

10           CHRISTOPHER SHORE, ESQ.

11                  -and

12           GERARD UZZI, ESQ.

13

14        MEYER SUOZZI ENGLISH & KLEIN, P.C.

15             Attorneys for Dana UAW

16             1350 Broadway

17             New York, New York 10018

18          BY: LOWELL PETERSON ESQ.

19

20        THELEN REID BROWN RAYSMAN & STEINER, LLP

21             Attorneys for Brandes Investment

22             Partners, L.P.

23             875 Third Avenue

24             New York, New York 10022

25          BY: PATRICK M. BIRNEY, ESQ.
```

5

```
 1                    DANA CORPORATION
 2    A P P E A R A N C E S: (Cont'd)
 3
 4          BROWN RUDNICK LLP
 5               Attorneys for Ad Hoc Consortium of
 6               Unsecured Creditors
 7               Seven Times Square
 8               New York, New York 10036
 9          BY: ROBERT J. STARK ESQ.
10
11          ARENT FOX, LLP
12               Attorneys for Wilmington Trust
13               Company
14               1675 Broadway
15               New York, New York 10019
16          BY: LEAH M. EISENBERG ESQ.
17                    -and-
18              MICHAEL S. CRYAN, ESQ.
19
20          SCHWARZWALD & McNAIR, LLP
21               Attorneys for United Steel Workers
22               1300 East Ninth Street
23               Cleveland, Ohio 44114
24          BY: DAVID M. FUSCO ESQ.
25
```

6

```
 1                  DANA CORPORATION

 2      A P P E A R A N C E S: (Cont'd)

 3

 4            BREDHOFF & KAISER, PLLC

 5               Attorneys for United Steel Workers

 6               805 Fifteenth Street, NW

 7               Washington, D.C. 20005

 8          BY: JOHN M. WEST ESQ.

 9

10          UNITED STEEL WORKERS

11               Five Gateway Center

12               Pittsburg, PA.  15222

13          BY: DAVID R. JURY ESQ.

14

15          INTERNATIONAL UNION, UNITED AUTOMOBILE,

16          AEROSPACE AND AGRICULTURAL IMPLEMENT

17          WORKERS OF AMERICA, UAW

18               8000 East Jefferson

19               Detroit, Michigan 48214

20          BY: NIRAJ R. GANATRA ESQ.

21

22

23

24

25
```

7

```
 1                    DANA CORPORATION

 2   A P P E A R A N C E S: (Cont'd)

 3

 4          McDERMOTT WILL & EMERY, LLP

 5               Attorneys for Timken Company

 6               340 Madison Avenue

 7               New York, New York 10017

 8          BY: JAMES M. SULLIVAN, ESQ.

 9

10          WILKIE FARR & GALLAGHER, LLP

11               Attorneys for Centerbridge Partners

12               787 Seventh Avenue

13               New York, New York 10019

14          BY: MORRIS J. MASSEL, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    DANA CORPORATION

 2                 P R O C E E D I N G S

 3              THE COURT:  We are going to get

 4    started and give your affiliation any time you

 5    rise to speak.

 6              MR. BIRNEY:  Patrick Birney; Thelen,

 7    Reid, Brown, Raysman and Steiner on behalf of

 8    Brandes Investment Partners Limited

 9    Partnership.

10              MR. PETERSON:  Good morning.  Lowell

11    Peterson; Meyer, Suozzi, English and Klein for

12    the UAW.

13              MR. GANATRA:  Good morning, your

14    Honor.  Niraj Ganatra from the UAW on behalf of

15    the UAW.

16              MR. JURY:  Good morning, your

17    Honor.  David Jury, associate general counsel,

18    United States Steel Workers.

19              MR. WEST:  John West, Bredhoff and

20    Kaiser, also on behalf of the steel workers.

21              MR. FUSCO:  Good morning, your

22    Honor.  David Fusco of Schwarzwald and McNair

23    also on behalf of the United Steel Workers.

24              THE COURT:  Go ahead, Miss Ball.

25              MS. BALL:  Good morning, your
```

9

```
 1                 DANA CORPORATION

 2    Honor.  Corinne Ball of Jones Day on behalf of

 3    Dana Corporation, the debtor.

 4                 Herein, your Honor, from the agenda

 5    letter, we have two matters before you this

 6    morning.

 7                 We have a motion which, in effect,

 8    amends a prior order entered by your Honor in

 9    respect of the reasonableness and expenses

10    incurred by the union for payment of their

11    advisors in connection with our reaching, in

12    connection with our prosecution and we hope

13    today the settlement of our labor issues.

14                 Your Honor, that order provides that

15    they would be entitled to their fees on the

16    procedures established in your earlier order,

17    which are noticed to our committees, noticed to

18    the U.S. Trustee, each of whom reserves a right

19    to object if they do not believe they are

20    reasonable and come back to your Honor.  It

21    removes, however, the caps on the fees for the

22    union advisors.

23                 I am not aware of any objection to

24    this motion to date, your Honor, so we would

25    ask that your Honor grant that motion.
```

1                    DANA CORPORATION

2                    THE COURT:  Does anyone want to be

3    heard?

4                    MR. MAYER:  Creditors Committee has

5    no objection.

6                    THE COURT:  The application is

7    ordered.

8                    MS. BALL:  Thank you, your Honor.

9    May I approach.

10                   THE COURT:  I have approved the

11   order.

12                   MS. BALL:  Thank you, your Honor.

13                   The second item own this morning's

14   agenda, your Honor, is the motion to approve

15   the global settlement that has been reached

16   with each of the major unions having members

17   employed at Dana, United Steel Workers and the

18   United Auto Workers.

19                   Your Honor, I want to point out that

20   we are aware that objections have been filed by

21   the unsecured creditor's committee, as I

22   believe your Honor will hear later day.  That

23   objection is going to be withdrawn.

24                   Your Honor, there also has been an

25   objection joinder to the UCC position by

```
 1                 DANA CORPORATION
 2    Timken, which has been withdrawn.
 3             There has been a joinder of the UCC
 4    objection by Wilmington Trust, your Honor.   I
 5    am not aware of the position they will take
 6    this morning.
 7             There has been an objection filed by
 8    Brandes, one of our equity holders and formally
 9    a member of our now defunct equity committee,
10    and, your Honor, there have been a series of
11    filings by Appaloosa, which is a shareholder of
12    Dana and, also, a member of our now defunct
13    equity committee.  As your Honor may recall,
14    they resigned in February.
15             Your Honor, this morning, I also
16    note that late last night, we were the
17    beneficiaries of a statement of support which
18    was filed on behalf of our ad hoc committee of
19    bondholders, which we understand, your Honor,
20    represents the overwhelming amount of our issue
21    and outstanding bonds.
22             Your Honor, I first want to
23    apologize to you.  We have been on this journey
24    for some time.  We certainly have leaned on the
25    Court in all these late pleadings.
```

```
 1                   DANA CORPORATION

 2              Our intent in extending extensions

 3    to respond certainly was not to burden the

 4    Court but it was in an effort to try to see if

 5    we could reach consensus, but we do recognize

 6    that it has caused a burden on the Court and

 7    the we will hope you bear with us as we go

 8    forward today.

 9              Your Honor, I think in the

10    objections you will hear four basic arguments.

11    One, the settlement false outside the range of

12    reasonableness permitted by 9019.

13              Second, the settlement does not

14    represent the sound exercise of business

15    judgment by the board of directors of Dana.

16              The third argument, your Honor, sets

17    of arguments are rather than the global

18    settlement representing an essential building

19    block clearing the way to a plan that it is a

20    Sub rosa plan; and the fourth categories of

21    objection, your Honor, although is no plan

22    treatment defined, there are objections, your

23    Honor, which I categorize as planned related

24    objections, objections based on various

25    provisions of 1123(a) and 1129.
```

```
1                  DANA CORPORATION

2            As your Honor will recall, this

3    journey began last fall.  Our first labor

4    meetings, as your Honor may recall, from the

5    record of our 1113, 1114 trial began in

6    November.

7            About that time, your Honor, the

8    restructuring initiatives were published in our

9    34 act filings with the SEC and, in fact,

10   shared with your Honor.  You may recall the

11   famous balloons, if you will, your Honor, which

12   became the pictorial representation of our

13   restructural plan which had us seeking savings

14   and revenue increases from various constituents

15   in the Dana case, among them, your Honor, our

16   work force and our retirees, which is what

17   brings us here today.

18           Although this Court had a full trial

19   with some 12 witnesses, six trial days running

20   from February through March, I would suggest,

21   your Honor, that you've actually only seen the

22   tip of the iceberg.

23           In addition to those days, as will

24   be shown today later in our presentation, there

25   have been immense energy, resources, executive
```

```
 1                    DANA CORPORATION

 2    and professional time dedicated to the hard

 3    fought negotiations which have led to the

 4    settlement that we have brought to you today.

 5              Those efforts, your Honor, reflect

 6    interaction with our largest constituents, our

 7    committee, our add hocs, as well as labor.

 8              That journey, your Honor, you may

 9    recall Appaloosa was part of it.  They were

10    part of and active in our equity committee

11    member.  They participated in the evolution of

12    our restructuring initiatives and, your Honor,

13    action case executive comp.

14              You may recall they supported the

15    motion before your Honor, at least through the

16    equity committee and they were part of the

17    considerations actually leading to the

18    1113/1114 filing of motion.

19              As your Honor may recall, the

20    scheduling motion was filed in December and

21    then the motion was filed in late January.

22              Your Honor, what I guess their

23    letter, the journey kind of ended with their

24    letter last night, which I would like to return

25    to in a moment; but, first, your Honor,
```

```
 1                    DANA CORPORATION
 2    realizing that their letter last night returns
 3    to our primary position, which is to bring your
 4    Honor, despite the late pleadings, up to where
 5    we are today to inform the Court of intervening
 6    events.
 7                    Your Honor, if I may, I would like
 8    to start sharing with your Honor that this
 9    agreement, the agreements that are part of the
10    union settlement, have been ratified by United
11    Steel Workers and they have been ratified by
12    the United Auto Workers.  That has been
13    accomplished before we come to you today.
14                    In addition, your Honor, you may
15    recall that we did file late last night a
16    summary of changes to the proposed arrangement
17    and, your Honor, I have copies of that chart.
18    I would like to, if I may share it with your
19    Honor, and walk through the significant changes
20    that were made primarily in response to the
21    objections and concerns of our largest
22    constituents and the unsecured creditors
23    committee.
24                    If I may approach, your Honor.
25                    THE COURT:  I think I have it
```

```
 1                    DANA CORPORATION
 2    already.  I've been keeping current with all of
 3    the filings.
 4                    MS. BALL:  Your Honor, this one is
 5    black line through dawn, the latest and
 6    greatest.
 7                    THE COURT:  I'll see if your version
 8    is different from mine, which I started the
 9    yellow line rather than the black line.
10                    MS. BALL:  May I approach, your
11    Honor?
12                    THE COURT:  Sure.
13                    MS. BALL:  Your Honor, mostly of
14    these, as you see, there is very little black
15    lines so your yellow lines may be adequate, but
16    in an abundance of caution, I would like to go
17    through, your Honor, the portions of these
18    agreements that have changed.
19                    The first page is the size of the
20    investment by our lead investor, Centerbridge.
21    It has been reduced from 300 to 250, leaving a
22    greater portion of this new investment security
23    available for our creditor constituents.
24                    Importantly, your Honor, our
25    commitment for 500 million in new investment
```

1                    DANA CORPORATION

2    remains in place, although the components have

3    shifted slightly.  Centerbridge having 250 and

4    being committed, to underwrite an additional

5    250 and used best efforts, your Honor, in the

6    final 250 million of new investment security.

7                    As your Honor will hear later day,

8    we have moved from a market pricing mechanic

9    for the conversion price of the new securities

10   but we have moved only slightly.

11                   We have added a collar, your Honor,

12   which would help us, and in response to the

13   questions we have received in the objections,

14   it's a pricing mechanic, your Honor, for the

15   new securities but what it tells us is that the

16   ownership is on an as converted basis of the

17   stock of the reorganized company were, this

18   settlement, to be approved and then were a plan

19   incorporated this settlement to be confirmed,

20   would give an ownership range of 31 to 36

21   percent of the reorganized equity would be

22   owned by the holders of this new 750 million

23   dollar security.

24                   Two-thirds of that, your Honor, you

25   think that 500 of the 750 is reserved for

```
1                 DANA CORPORATION
2    creditors would be held by creditors in this
3    case.
4             I'm sure, your Honor, we will be
5    hearing more about the collar in our
6    presentation later.
7             Your Honor, originally the criteria
8    for participating in the new investment
9    security were not articulated.  Now, your Honor
10   they are articulated.  It is an objective
11   standard and the investment, the qualified
12   creditors will participate pro rata based on
13   their holdings in the new investment.
14            To be a qualified creditor, as
15   Mr. Stark has indicated, one must have claims
16   of a size of at least 25 million.  One must be
17   equipped, which is beyond my area of expertise,
18   your Honor, but I understand that to mean a
19   qualified investment or institutional buyer and
20   one must hold eligible claims.
21            One must hold eligible claims, which
22   you will hear, your Honor, is a very market
23   driven concept but this case has certainly been
24   one with the impact of the creditors ability to
25   liquefy their holdings on the market and our
```

```
 1                    DANA CORPORATION
 2    constituency views and, lastly, your Honor for
 3    someone to be a qualified creditor they would
 4    have to agree to support the plan that's being
 5    proposed with Centerbridge as our lead
 6    investor; however, your Honor, it does not
 7    provide for voting the plan, nor would signing
 8    on to that to be a qualified creditor bind
 9    anyone in their fiduciary capacity who might
10    have responsibilities wear their fiduciary
11    hat.  They can become a qualified creditor to
12    retain their ability to act under any manner in
13    1102 and responding to creditors if it was a
14    committee to sign.
15              They're are also, your Honor, free
16    to oppose the plan.  As committee members it
17    strictly binds their commercial interest.
18    Those are the four characteristics:  Size,
19    investment status as sophisticated investor,
20    holding an eligible claim, your Honor, which we
21    will hear a lot about.
22              That has to do with a record date
23    and, interestingly, in order to make sure that
24    our trade creditors have the opportunity to, in
25    essence, benefit from the interest in the B
```

1                    DANA CORPORATION

2     securities, the record date, your Honor, for

3     our trade claims will be the confirmation date

4     such that they put in a position where they can

5     sell their claim to one wanting to be a holder

6     and participate in the D series.

7              You remember, I think we will be

8     getting to more of that, but at least I wanted

9     to share with your Honor that concept which is

10    the smaller creditor is doing everything we can

11    to facilitate their ability to sell to

12    investors because it is our belief, as you will

13    hear, I think you will hear again today, that

14    there happens to be a very significant interest

15    on the part of our creditors constituents in

16    investing in the restructured Dana.

17             Moving ahead, your Honor, the other

18    thing, just to make sure our common

19    shareholders and reorganized company would be

20    protected, there is a maximum that any holder

21    could hold of this new bid of $200,000,000, so

22    that, in fact, the controlled premium of the

23    reorganized Dana would be protected.  No one

24    can garner a substantial position.

25             Your Honor, turning to page 3 of the

```
 1                    DANA CORPORATION
 2   chart, in order to facilitate our creditors
 3   interest in the company, the Series A, which is
 4   that portion of the new investment that's been
 5   reserved and committed by Centerbridge, will be
 6   passive with the investment securities made
 7   available to our creditors.
 8            This is another one, your Honor.
 9   Although we could all disagree as to whether or
10   not the arguments based on the consent rights
11   are right or wrong, there have been changes to
12   be responsive and those changes, your Honor,
13   are reflected in the chart on page 4.
14            The approval rights are now personal
15   to the lead investor, Centerbridge.  So if they
16   were to sell their preferred stock as preferred
17   stock, those rights would not be transferable.
18            All approval rights associated with
19   the Series A, which is the only security that
20   holds these preferred, we would view as not
21   unusual consent rights for a preferred,
22   particularly in a company this size; but all
23   approval rights, your Honor, would terminate 36
24   months and, in addition, the approval rights,
25   your Honor, respecting dividends, which would
```

```
1                    DANA CORPORATION
2    affect the common holders and the approval
3    rights reflecting debt incurrence limitations
4    would expire after 12 months.
5              Your Honor, that was clearly in
6    response to our various creditors constituents
7    who are trying to protect the interest of the
8    common to get dividends in the transaction.
9              Let's go on, your Honor.  Some of
10   the other protections are very important as
11   well.
12             All approval rights terminate if
13   Centerbridge owns less than 50 percent of the
14   Series A.  Importantly, your Honor, the
15   shareholders can override, can override a veto
16   by the As by a vote of two-thirds, which I
17   think the chart is missing, but they can
18   override the veto by a vote of two-thirds of
19   the common, your Honor.
20             In addition, your Honor, we have
21   agreed that the holders of 20 percent of the
22   common shares can call an annual meeting, can
23   call a shareholders meeting in order to have
24   that vote.
25             We have also agreed, your Honor, and
```

```
 1                    DANA CORPORATION
 2    I think this is probably the most significant
 3    economic concession on the recent rights, which
 4    is, Centerbridge as the holder of these consent
 5    rights has agreed that it will the not have any
 6    compensation or premium for its consent to any
 7    transaction that requires its consent and that
 8    is a contractual obligation which the board
 9    will not be able to remove from them.
10              We will see that it is put into the
11    certificate and the charter.  That is not a
12    right that they can bury.  So, your Honor, the
13    idea was to preserve the ability of the benefit
14    from such transaction of common stock. .
15              Your Honor, on the board, the
16    initial board composition originally, your
17    Honor, one thought that giving the creditors
18    committee the ability to select the seven
19    director from a list of three was, in essence,
20    sufficient input.
21              The creditors committee has pushed
22    and what they have really said at the end of
23    the day -- Tom, do you have trouble -- at the
24    end of the day this director has to be
25    satisfactory to the committee and Centerbridge
```

```
 1                    DANA CORPORATION

 2    is going to have to keep bringing names in

 3    until it is satisfactory to the committee.

 4              MR. MAYER:  Technically, the seventh

 5    director has to be mutually acceptable.  I

 6    don't think we talked about multiple lists.  We

 7    will get there.  This will be an issue about

 8    it.  I don't want to make a big deal.

 9              MS. BALL:  It is not an issue, your

10    Honor.  We understand it has to be acceptable

11    to the creditors committee.  They are not

12    confined to one list.

13              The subsequent board, your Honor,

14    has not changed.

15              Revised agreements, your Honor, are

16    silent on the issue of whether or not there

17    will be a rights planned.  That again was to be

18    responsive to the requirements of our creditors

19    constituents.

20              The lock-up period, your Honor,

21    since this is a very market responsive

22    reflective proposal, the lock-up period has

23    grown from two months, 60 days to six months to

24    provide stability for the securities and, in

25    essence, I believe, your Honor, to protect the
```

```
 1                    DANA CORPORATION

 2   common, and, your Honor, the chart shows

 3   those.

 4                    These documents have been circulated

 5   at such late hours exactly where they can

 6   confirm that these changes have been made.

 7   It's a citation or a road map, if you will, to

 8   enable constituents to confirm it.

 9                    Significantly, your Honor, our

10   creditors were also successful in negotiating

11   with Centerbridge such that its commitment fee

12   for the 250 million B securities that it has

13   committed to underwrite has been reduced from

14   1.75 percent to 1 percent.

15                    Your Honor, in terms in which it

16   remains payable is largely when we close, or if

17   we were to terminate in accordance with the

18   agreement, the investment agreement.

19                    There was no claims limitation in

20   the original arrangement.  Our creditors have

21   asked us to impose, and this again goes back to

22   making sure that all creditors have the

23   opportunity to participate directly or

24   indirectly through the market in the new

25   investment opportunity, a claims limitation of
```

```
 1                  DANA CORPORATION

 2    3.25 billion and, your Honor, that's the sum,

 3    not the allowed claim, that's the sum on the

 4    effective day of allowed claims and disputed

 5    claims, you Honor, that we would have to

 6    reserve for under the plan.

 7              Your Honor is probably well aware

 8    given the multiple objections we already have

 9    that this was a case in which over 29 million

10    in claims were filed.  We are now down well

11    close to the four billion range and, your

12    Honor, we believe this condition is

13    achievable.

14              I do point out this condition is

15    waiveable by the committee if in the exercise

16    of its fiduciary duty the means to be effective

17    to get this company out of bankruptcy by year

18    end, which, your Honor, is a major goal, is 10

19    million a month.  We want to be out of

20    January.

21              Professional expense I don't really

22    want to talk about but, your Honor, is probably

23    in the same neighborhood.  So that remains a

24    clear objective and that's why we have asked

25    the committee to be very sensitive.
```

1                    DANA CORPORATION

2                On the VEBA list, your Honor, the

3    proposal contemplates that the VEBA would be

4    established to halt cash and stock.

5                Well, your Honor, that has changed.

6    It is no longer 80 million in stock.  In lieu

7    of that, our creditors were successful in

8    working with us, it has been reduced to 60

9    million in cash in lieu of stock.

10               Again, your Honor may recall we were

11   here in the late summer of 2006 regarding NOLs

12   and L5 plans.  That has been resolved.

13               Our creditors have made it clear

14   they do not want an L5 plan and our business

15   plan, in fact, your Honor, is premised on using

16   the tax alternative sometimes known as L6,

17   which, as your Honor knows, is a reference to a

18   different section of the internal code.  So

19   that's amenable.  That's a major change.

20               Clearly, your Honor that has market

21   impact again designed to enhance both the

22   direct and indirect benefit that our creditors

23   can realize from the new secured.

24               Your Honor, if you look at the

25   control premium, I've already mentioned that

```
 1                  DANA CORPORATION

 2   Centerbridge has already agreed that it will

 3   not be the beneficiary of any controlled

 4   premium or payment for the consent of the As.

 5           The preferred, as I said your Honor,

 6   we are very alert to the fact that the board

 7   shouldn't be able to change a future board.

 8   This carefully negotiated became the consent

 9   rights.

10           So, your Honor, all parties have

11   agreed that that will be built into the charter

12   and can only be changed with the consent of the

13   shareholders, and I think, your Honor, that

14   brings us to the well recognized appendix R,

15   which is on page 10 of your chart.

16           And, your Honor, I'd like to bring

17   to your attention something that's not on the

18   Appendix R chart but that we have agreed is

19   that the creditors committee has asked us to

20   consent to the retention of a very well known

21   labor lawyer, a Mr. Joseph O'Leary, of the firm

22   of McDermott Will nunc pro tunc when they

23   needed to consult with him on the proposed

24   resolutions of Appendix R, one of which was

25   key, Mr. O'Leary's input was key, which I will
```

```
 1                    DANA CORPORATION
 2   get to.  We have consented to that.
 3            Obviously, that decision is
 4   ultimately your Honor's, not ours, but with the
 5   advice of Mr. O'Leary, Appendix R now provides
 6   that the creditors committee will be an active
 7   participant in any arbitration.  There is no
 8   intent nor was there ever that the arbitration
 9   be any kind of a secret process.
10            In fact, our unions have volunteered
11   to hold it at Yankee Stadium if that could be
12   arranged.  There is no desire and to underscore
13   that proposition they have given the creditors
14   committee an active role and has, in fact,
15   asked the company to permit the creditors
16   committee to serve as co-counsel, which we are
17   amenable to.
18            Secondly, your Honor, the standard
19   for reasonableness has been amended so that all
20   parties could see what would be acting
21   unreasonably and what would be reasonable.
22            Your Honor, I think that's been
23   amended and in a very brief shorthand I think
24   what we're really talking about
25   unreasonableness are factors or features that
```

```
 1                    DANA CORPORATION
 2    could reasonably be expected to have an adverse
 3    impact on the wages, hours, working conditions
 4    of the union members in the short or the long
 5    run or the long term or short term viability
 6    and health of the company.
 7                Your Honor, we think that standard
 8    is also credo to the common shareholders of the
 9    reorganized Dana, should we succeed in
10    confirming a plan by year end.
11                In addition, Appendix R, there were
12    names in Appendix R as filed, your Honor.  That
13    was lateness of the hours but there is a very
14    clear agreement that the arbitrators selected
15    must be satisfactory to the unsecured creditors
16    committee and, again, this is a matter as to
17    which they sought guidance from Mr. O'Leary.
18                MR. MAYER:  Yes, your.  Honor, with
19    Mr. O'Leary's help I believe we have agreed on
20    names with the union.  This is not a future
21    matter.  We have come to an agreement on the
22    three individuals.
23                MS. BALL:  And they are available in
24    our time frame.
25                MR. JURY:  Yes, your Honor.  We have
```

```
 1                    DANA CORPORATION
 2   agreed to a list of names.  The steel workers
 3   general council, Paul White, late last evening
 4   spoke to a substitute arbitrator that the
 5   committee had agreed to and that arbitrator is
 6   available.  All three are available within the
 7   time frame of the parameters as needed.
 8                    MR. BIRNEY:  We agree to the
 9   arbitrator.
10                    MS. BALL:  In addition, your Honor,
11   there are three very other significant changes,
12   one of which is that we have imposed on our
13   unions and they have agreed to streamline the
14   process.  We are not going to be talking about
15   six to seven years any longer.  They have
16   committed to a four week process so that we can
17   move this forward expeditiously.  Your Honor,
18   this is one side of how we have addressed
19   Appendix R.
20                    There is a second side and,
21   actually, your Honor, I would digress just a
22   moment.  Oh, we will get to it from the chart
23   and, of course, your Honor is the last that the
24   arbitral reward does remain subject to your
25   review.  The parties understand it ends with
```

```
1                     DANA CORPORATION
2    you, your Honor.  It comes back.  That's a
3    clear provision in Appendix R that every party
4    has accepted.
5              Every party that's supporting the
6    arrangement has accepted, should your Honor
7    approve.
8              Your Honor, the details that are in
9    the chart on page 11 relate to working through
10   the relationship with our ad hoc creditors.  I
11   think we will hear from them later today that
12   the firm of Stroock, Stroock and Lavan has been
13   working with a group which represents in access
14   of one billion, in excess of 1.4 billion of our
15   outstanding 1.6 billion of bonds, which, your
16   Honor, has a focal point for that large
17   constituency has clearly been beneficial to
18   this process and, as your Honor is aware,
19   Stroock has been very active in representing
20   that constituency in that support throughout
21   this case.
22             Your Honor, another condition about
23   the deal is, your Honor, to the extent that a
24   qualifying creditor has to sign the plan
25   support agreement, we have now spelled out
```

```
 1                    DANA CORPORATION

 2    exactly what that requires and it really

 3    requires that they not object or proceed with

 4    the competing plan.  But interestingly, your

 5    Honor, I do want to point out it is still

 6    possible, and the documents are quite clear,

 7    that anyone who is a qualified creditors

 8    investor can still submit a competing

 9    proposal.  They need not surrender that

10    ability.  That ability is preserved even if

11    they sign the plan's point agreement which we

12    provide is key since those who already invested

13    in Dana be the most logical source to invest in

14    Dana in the future.

15              Obviously, your Honor, we have yet

16    to propose a plan of disclosure statement and

17    everyone is planning to do that.

18              Your Honor, there is a condition

19    which appears at the bottom of page 13 of the

20    chart which relate to fees which are not yet

21    before your Honor, which were the subject of an

22    earlier order, but we are committed to work

23    through to see if we can reach consensus on the

24    rights of our investment banker who, your

25    Honor, I can just share with your Honor has
```

```
 1                    DANA CORPORATION
 2   been working around the clock and on multiple
 3   matters in this case, issues across the globe
 4   from, your Honor knows, with our success of the
 5   UK restructuring and other items in Germany and
 6   China.  That remains extant.
 7             Your Honor, the supporting
 8   obligations and one of the other futures,
 9   interestingly, the investment agreement is that
10   we are talking about creditors holding a real,
11   I don't know if the word is natural or not,
12   synthetic position in the bond.  We are really
13   talking about creditors who are invested and,
14   in fact, your Honor, to be the holder of B
15   security one has to forfeit ones right to hedge
16   in the future.  We don't want that.  That's
17   here.  It is part of these arrangements, your
18   Honor.  That has been changed.  That was in the
19   original investment.
20             I just wanted to point out the minor
21   change to insist, which is a change that the
22   creditors have real position in bonds, not a
23   synthetic position sufficient to qualify has
24   been really a coda on the consent that this is
25   not to be a hedging exercise.
```

1                    DANA CORPORATION

2          Your Honor, originally, we had

3    timelines that required us to file plaintiff's

4    disclosure statement by September 3rd, a target

5    which is ambitious.  We are still hoping to do

6    that and I will go into that a little bit more

7    and have more to say about that later.

8          We have a second deadline we were to

9    confirm by September 28th and we have to go

10   effective by May 1st.  This company has no

11   intention, no intention of doing anything other

12   than getting out of this case as soon as

13   possible and we are still targeting January 1.

14          In that connection, our supporting

15   creditors, largely our ad hoc bondholder who

16   would invest in the B, have given us added

17   incentive their plan to support.  The agreement

18   will expire September 28th.

19          So everyone does understand that

20   this company needs to get out of 11.  We would

21   still, however, have till May 1, the commitment

22   of Centerbridge, for its 500,000,000 dollar

23   investment were there to be an unforeseen turn

24   in the case.

25          Your Honor, process, this is the

```
 1                    DANA CORPORATION
 2   other side of the Appendix R settlement, and
 3   that's at the top of page 15 and it's very
 4   briefly described, but what we have agreed with
 5   the creditors's committee has, your Honor,
 6   three clear stakes which we have agreed with
 7   them.
 8                One is, your Honor, that there will
 9   be and we have to thank our colleagues at
10   Appaloosa of a form of confidentiality
11   agreement which we have reached with Appaloosa
12   so everyone sees it.  That form of
13   confidentiality which is, depending on your
14   point of view, your Honor, and limits the
15   rights of an investors only to the minimum the
16   company believed is necessary under the
17   circumstance.
18                You may recall at our discovery
19   conference the discussion of exclusivity.
20   That's been resolved.  So, one, that is the
21   covenant.  Two, plead access to diligence.
22   That whole access, getting in the door is one
23   stake.
24                The second stake is that we have
25   agreed to a timeline in which we would look for
```

1                    DANA CORPORATION

2     all parties and be very public and seek, if

3     your Honor were to enter an approval order,

4     that the approval order would seek that we

5     would have competing proposals submitted by a

6     date certain.  We would have consideration by

7     the board by a date certain and we would get

8     information and notice to our unions by a date

9     certain.

10              Beyond that expedition, you Honor,

11    the third stake in the ground, which is

12    critical to our constituents and complex to the

13    company, is that we are committed to amend the

14    plan that may be filed by September 3rd with

15    Centerbridge as the investor to conform with

16    the outcome of that process.

17              And, your Honor, the timeline that

18    the creditors committee has suggested, which we

19    think is reasonable, is that these three stakes

20    should operate to bring us to conclusion before

21    your Honor would ever approve a disclosure

22    statement for solicitation.  So I think we are

23    looking at mid-October is the timeline

24    suggested.

25              We have to machine the words, your

```
 1                    DANA CORPORATION
 2   Honor, but this is the other side of Appendix
 3   R, the union changing their, streamlining their
 4   approach, bring in the arbitrator, transparency
 5   and on the other side, your Honor, this
 6   timeline, the expedited procedure, the form of
 7   confi, very transparent.
 8            Your Honor, that is how I think
 9   there's been a most substantial plan since the
10   motion was filed and brought to you July 5th.
11            In terms of the unsecured creditors,
12   your Honor, that's a plan issue.  We will deal
13   with that later.
14            The claim condition, your Honor, on
15   page 16, I've already mentioned.  The rights
16   plan I've already mentioned.
17            Your Honor, those are the changes to
18   the documents, but part of the reason for
19   filing the chart last evening was to enable the
20   parties of interest to confirm for themselves
21   by tracing through the agreements and the
22   section that these changes have been made and
23   are in the agreements that constitute the
24   exhibits to the documents in the global
25   settlement that is that before you this
```

```
 1                 DANA CORPORATION

 2   morning.

 3             Your Honor, having gone through that

 4   process exchange, which we think was fairly

 5   monumental, I can report, as an intervening

 6   event, as I've already indicated, we have a

 7   confidentiality agreement with Appaloosa.  They

 8   have by our latest count some 35 plus

 9   professionals doing diligence as we speak.

10             There have been meetings with

11   management and the advisors.  We have been, we

12   have asked the unions to meet with Appaloosa.

13   The unions have met with Appaloosa on initial

14   matters in response to our request and, in

15   addition, after last night's letter, your

16   Honor, which came over our door, and I'm not

17   sure when it was filed, but it came to my

18   attention between 8 and 9 o'clock last night.

19             Fortunately for us, through the

20   dedication of Dana's boards and their

21   willingness to be on standby for something as

22   significant as settlement and achieving labor

23   peace, we were able to circulate the letters to

24   the directors as it was sent to 4500 Dorr

25   Street, the corporate headquarters.
```

```
 1                 DANA CORPORATION

 2            We were able to have a telephonic

 3     meeting of a committee of directors that were

 4     responsible for the final issues relating to

 5     the settlement last evening.  We were able to

 6     include the board's special counsel on process

 7     regarding this and settlement and, in

 8     particular, be in a position of an investor.

 9            And, in addition to that meeting,

10     your Honor, and being able to do that last

11     evening so that the business judgment of the

12     board we could have the benefit of that.

13            We were also able to speak with

14     United Auto Workers.  We were able to speak

15     with United Steel Workers representatives and,

16     your Honor, we did that because, as is before

17     you and exhibit to the pleadings, each of those

18     units have previously sent a letter to the

19     board after Appaloosa's first letter with two

20     important messages.

21            The first message was it's really

22     important to get this labor deal that we're out

23     ratifying done and to establish the baseline.

24            The second message that the union

25     had is that they stood by and were prepared to
```

```
 1                    DANA CORPORATION
 2    stand by their obligations to the company under
 3    that agreement to meet and act reasonably in
 4    connection with any competing proposal.  So we
 5    called them last night in light of the new
 6    letter.  We will plan to go forward.  Is there
 7    something you would like us to be aware of?
 8              And the unions joined the board,
 9    both the unions and our board reached the
10    unassailable conclusion that we must go forward
11    this morning to seek your approval; that in the
12    judgment of our board, which I believe our
13    unions concur, it is the best means available
14    to pursue maximizing values of this estate and
15    enhancing the recoveries and, frankly, your
16    Honor, getting competing proposals.
17              It achieves a groundbreaking labor
18    settlement and with that, your Honor, I will
19    turn to the statement of the UAW.
20              The union settlement represents a
21    change and it does, and the debtor's wages,
22    benefits and work rules eliminates well over a
23    billion dollars in open head liability, results
24    in a reduced footprint.  That means plants will
25    close and workers left unemployed and defeats
```

```
 1                   DANA CORPORATION
 2     all the goals set by the debtors and prosecuted
 3     before you, your Honor, in the 1113 and 1114
 4     hearing.
 5               Labor peace, it sets the bar for the
 6     basis of comparison for all of us.  It is
 7     something for people to shoot at.
 8               Thirdly, your Honor, the board says
 9     it establishes the environment of stability
10     which would enhance the process that we have
11     agreed with our creditors committee to pursue
12     should your Honor approve the settlement.  The
13     process will be transparent to our committee
14     and our largest creditors represented by
15     Stroock and, of course, your Honor, it ends
16     with your review.
17               Having said that, your Honor, having
18     brought you up-to-date, at least I hope, there
19     is one item that is different, which our board
20     is aware of and we did specifically review last
21     evening.
22               If your Honor were to approve the
23     global settlement this morning, there is one
24     change, which is unavoidable if you approve it,
25     your Honor, and that is these dates would be
```

43

```
 1                    DANA CORPORATION
 2    obligated for a break-up fee were a competing
 3    proposal to succeed.
 4              Your Honor, in the vernacular of my
 5    corporate colleagues, the arrangement that line
 6    has brought with Centerbridge is known as a
 7    minority investment.  That's not the only kind
 8    of third party transaction that a debtor could
 9    do, as your Honor is well aware.
10              So Appendix R speaks in terms of a
11    different minority investment proposal.  It
12    also speaks in terms of an other
13    nonCenterbridge transaction, contemplates a
14    sale of all the assets, a majority investment.
15              In the case of an alternative
16    minority investment, the break-fee up is
17    $15,000,000, your Honor.  That's $15,000,000
18    for minority investment that would have to be
19    approved over our existing 750 and enable this
20    eight billion dollar revenue company to emerge
21    from bankruptcy.
22              In the event, your Honor, were it to
23    be an other third-party transaction, a majority
24    investment or a sale of the assets of the
25    break-up fee would be $22.95 million but, your
```

```
 1                  DANA CORPORATION

 2    Honor, in addition to the break-fee up, the

 3    estates would be responsible for the commitment

 4    which you've negotiated down to 2.5 million so

 5    that the commitment fee, unpayable in both

 6    instances and the commitment fee, your Honor,

 7    is 2.5 for maximum break-fee up in a

 8    nonCenterBridge transaction of $25 million.

 9              So, your Honor, that would be the

10    difference between today this morning and

11    tomorrow were your Honor to approve the

12    settlement.

13              Our board is aware of that, and in

14    taking that into account, they still directed

15    the debtors to go forward this morning to get

16    this matter approved and to put us on the

17    course to exit by year end.

18              With that, your Honor, I have been

19    asked, and if your Honor would permit the

20    parties that are in support or at least no

21    longer opposing the settlement, I understand

22    would like to address the Court.

23              We have a status statement of

24    support in the unions.  We have a statement of

25    support from the ad hocs and, of course, I know
```

```
 1                    DANA CORPORATION
 2   that Mr. Mayer would like to follow our two
 3   supporters and address the Court and then the
 4   objectors and if your Honor is amenable, we
 5   then move on to the evidentiary presentation
 6   remaining which consists of one witness, as far
 7   as we know.  Would that be acceptable?
 8             THE COURT:  That's acceptable.
 9             MS. BALL:  Thank you, your Honor.  I
10   would yield to the steel workers and the auto
11   workers.
12             MR. WEST:  Good morning.  John West
13   on behalf of the steel workers.
14             Your Honor, the auto workers have
15   filed a brief in support of a motion that's
16   before you.  The steel workers have not and for
17   that reason, I want to emphasize to you our
18   support for this agreement.
19             Notwithstanding that this has been a
20   very painful decision for our union and I'm
21   sure also for the auto workers to agree to the
22   labor agreement that's before you, there have
23   been, as Miss Ball recited from Mr. Peterson's
24   brief, there's been enormous concessions that
25   the unions have made in order to procure the
```

```
 1                    DANA CORPORATION

 2    labor cost savings that the company has

 3    insisted were necessary.

 4              We have agreed to those with a very

 5    heavy heart but we have done so because we are

 6    convinced that with the infusion of new capital

 7    from an investor who is committed to North

 8    American manufacturing, to sufficient liquidity

 9    for the company, the limits on the company's

10    leverage, to stability in the company that this

11    will give a troubled company the real

12    opportunity to go forward successfully and

13    maintain many, even if not all, of the jobs of

14    the members of the bargaining units that we

15    represent.

16              Therefore, we support the

17    agreement.  We hope your Honor will approve it.

18              I would like to add just one thing

19    and that is one of the conditions for our

20    support in the negotiations with the company

21    was the identity of the investor who would be

22    coming in here.

23              The unions preferred an agreement

24    that would give us an unfettered ability to

25    walk away from the agreement if the investor
```

```
 1                    DANA CORPORATION
 2    were changed.
 3              The company resisted that and at the
 4    end of the day we were obliged to give in and
 5    agree to a limit on our ability to tier up the
 6    agreement, to terminate the agreement in case
 7    the investor that we had negotiated with was
 8    replaced, and that is the origin of the
 9    provisions that you have before you in Appendix
10    R providing for arbitration by an independent
11    arbitrator to determine whether or not the
12    union reasonably or unreasonably withheld
13    consent, if, indeed, it does withhold consent
14    to the replacement of the investor.
15              This is, in other words, the reason
16    that we have an arbitration provision in this
17    agreement is as a limit on what would otherwise
18    be the union's unfettered discretion, which we
19    had sought and were unable to obtain, to
20    terminate the agreement if one of the material
21    terms of the agreement, namely, the identity of
22    the investor, were to be changed.
23              We think it is fully within your
24    Honor's discretion to approve an agreement,
25    that post-petition agreement that contains an
```

```
 1                    DANA CORPORATION
 2    arbitration clause.  I think that's set out
 3    pretty clearly in Rule 9019(c) and the question
 4    is, therefore, whether your Honor in this case
 5    should exercise your discretion to approve this
 6    agreement providing for our arbitration.
 7              I want to emphasize that the
 8    arbitration that would be provided under this
 9    agreement is very limited in scope.  It does
10    not go to any issue of interpretation of the
11    Bankruptcy Code, any issue of distribution of
12    the estate's assets.  It goes simply to the
13    limited question of what the union's remedy is
14    in the event that a material term of the
15    settlement agreement that is negotiated were to
16    be changed.
17              It goes simply to the question of
18    whether, if the union acted reasonably, is
19    determined to have acted reasonably in
20    rejecting an alternative investor it has the
21    remedy of terminating the agreement.
22              If it was determined not to have
23    acted reasonably, it is required to accept the
24    alternative investor without any remedy.
25              This is a very limited provision for
```

49

```
 1                    DANA CORPORATION
 2   arbitration of the terms of a contract, federal
 3   law in the case of labor arbitrations even more
 4   so in the case of commercial arbitration
 5   encourages the arbitration of disputes arising
 6   under collective bargaining agreement and,
 7   indeed, in the world of collective bargaining
 8   arbitration is the universal means of resolving
 9   such disputes we think it is fully appropriate
10   here.
11            It does not impinge on any authority
12   of the Court to make decisions affecting the
13   bankruptcy law or the distribution of the
14   assets of the estate and it is a very limited
15   arbitration here and we urge your Honor,
16   therefore, to approve that provision as well as
17   the rest of the agreement.
18            MR. PETERSON:  Good morning.  Lowell
19   Peterson from Meyer, Suozzi and Klein for the
20   UAW.  We did file a statement in support then.
21            I know we have a lot to cover this
22   morning so I don't want to repeat too many of
23   the arguments there.  I do want to agree with
24   what Mr. West said about the origin and effect
25   of the Appendix R provisions.
```

```
 1                DANA CORPORATION

 2           I would also like to underscore what

 3  Miss Ball said with respect to the standards of

 4  reasonableness that the unions had in mind and

 5  are much more clearly set forth now as a result

 6  of some amendments.

 7           The UAW like the steel workers had

 8  certain goals in negotiating the resolution of

 9  the labor issues and the fundamental issues

10  facing this corporation whose employees we have

11  represented for quite sometime and those goals

12  are the same goals that we would keep in mind

13  in reviewing any alternative proposals with

14  respect to how this company obtains additional

15  investment and gets out of Chapter 11.

16           We are concerned about the long term

17  health of the company, as well as the long term

18  prospects of our members to have reasonable

19  jobs and our retirees to have some source of

20  cash to fund albeit reduced levels of medical

21  benefits.

22           This was why Centerbridge was

23  appealing to the UAW and I'm sure the same is

24  true with the steel workers.

25           They demonstrated a knowledge of the
```

```
 1                    DANA CORPORATION

 2   business and an interest in the kind of

 3   intricate factors that are faced by parts

 4   suppliers in the United States, which is not

 5   what you would call a risk free environment in

 6   current days.

 7           We were concerned that in exchange

 8   for the substantial concessions we made that

 9   there would be a business here that had some

10   prospect of succeeding and funding the

11   obligations undertaken under the revised

12   collective bargaining agreements and revised

13   OPEB obligations.

14           We have never, as Miss Ball so

15   indicated, we have never refused to meet with

16   anyone.  We have never refused to meet with

17   Appaloosa.  We would certainly entertain all

18   proposals made to the process which has been

19   more clearly set forth in the revised documents

20   that Miss Ball went through.

21           The union's preference, as Mr. West

22   said, would be to simply be able to say did we

23   care who was on the other side.

24           We don't want anybody looking over

25   our shoulders as to whether we could continue
```

1                    DANA CORPORATION

2    with the settlement or go back to where we

3    would be without settlement, which would be no

4    settlement, and back in the 1113 world of

5    rejected contracts and so forth but we were

6    willing to agree with the debtors in the sense

7    that there be, to rethink this.

8              Under no circumstances do the unions

9    have any power to alternative transaction.  The

10   only thing the unions can decide to do is live

11   with the concessions they've made and the

12   changes they have agreed to.

13             If the deal changes, if the identity

14   of the investor changes and so forth and even

15   there we have to be reasonable and even there

16   that's reviewable by an arbitrator and that

17   decision is reviewable by your Honor and, of

18   course, we would be foolish to turn down

19   alternative proposals that continue to meet our

20   goals and also were an improvement on the

21   Centerbridge deal.

22             And so, as a practical matter, not

23   only do we have no authority to veto but we

24   won't stand in the way of better proposal that

25   continues to meet our goals and for those

1                    DANA CORPORATION

2     reasons we urge your Honor to accept the global

3     settlement through the motion.

4               We have approved a number of

5     amendments is the sense to get the yes on this

6     and we think it is time for this company to

7     move on.  Thank you, your Honor.

8               MR. HANSEN:  Good morning, your

9     Honor.  Chris Hansen with Stroock, Stroock and

10    Lavan on behalf of the Ad Hoc bondholders

11    group.

12              As your Honor is aware, we were

13    involved in this case since the inception.  We

14    currently represent over $1.4 billion of

15    holders of the company's unsecured bonds which

16    is over 80 percent of the total bond issuance

17    that they have and use.  The 24.5 million

18    dollar claim class of document which is in the

19    document which we think is going to go an awful

20    lot lower on the side, we represent four in

21    that class, your Honor.

22              We think that what's in front of you

23    is the best alternative given the circumstances

24    that we're presented with us.  There is a

25    litigation that's been right in front of you

```
 1                  DANA CORPORATION

 2    for a long time.  It's been tried.  You have a

 3    decision written on a number of cases and it's,

 4    therefore, the labor's position with respect to

 5    them choosing Centerbridge as a partner in this

 6    process and bringing them to the table, and the

 7    other potential alternatives, when we looked at

 8    this as an ad hoc committee, we said there

 9    could be three possibilities as far as we saw

10    it.

11          You could have an alternative

12    sponsor, Centerbridge.  You could have a deal

13    led by our group from a perspective of a

14    defense rights offering or anyone within our

15    group that others could join up to or we could

16    work with Centerbridge to improve dollars and

17    cents.

18          When we analyzed those three

19    scenarios, we recognized that an alternative

20    sponsor prior to getting this approved and a

21    process approved, for which we have to commend

22    the creditors committee and Mr. Mayer, probably

23    wouldn't have led to a better result for the

24    unsecured creditors because it would have come

25    at our expense to the benefit of whoever the
```

```
 1                DANA CORPORATION

 2   alternative sponsor was, especially when the

 3   unions have said, look, we have chosen

 4   Centerbridge.  We want to move forward with

 5   this and at this point in time if someone else

 6   is brought in we have to start negotiations all

 7   over again and this case will drag on and on

 8   and on all the while the judge has heard the

 9   entire 1113/1114 litigation.

10                When we looked at our potential

11   sponsorship by our own group, of which we have

12   not precluded in any way shape or form, we said

13   again, at this time, at this posture of the

14   case, where would that lead us?  Where would it

15   take us?

16                Ultimately, it might lead us to a

17   position where we had, in essence, a

18   sponsorless company come out of bankruptcy

19   which needs complete restructuring under the

20   guise that he knows and understands this

21   industry and he has to compete in a broadtail

22   competitive auto supply market.

23                So what we decided to do was to take

24   a stab at Centerbridge and see if we could

25   improve on the terms of the Centerbridge deal
```

```
 1                DANA CORPORATION
 2   to get them to a point where they were
 3   beneficial for pretty much all of the
 4   bondholders; and through a lot of persistence
 5   and lots of negotiation, we wound up getting
 6   pretty much every concession we asked for.
 7                Centerbridge, as in every
 8   negotiation, there is give and take and neither
 9   side is at stake with the key to results, but
10   that's really a symbol of good negotiations.
11                And the things that were critical to
12   us we achieved and what we recognized was if
13   Centerbridge was in their A preferred, with
14   their control mechanisms and had the economic
15   benefits of that A piece, if we could increase
16   the B piece and participate side by side,
17   frankly, double the magnitude of what they were
18   participating in, then we as boldholders and
19   other unsecured creditors, would be able to
20   participate in this process would be able to
21   enjoy the economic benefits that Centerbridge
22   would, the same ones and we would be wed as we
23   went forward in that preferred stock and as a
24   result, net benefit from that updraft of
25   picking up that B preferred would outweigh any
```

```
 1                    DANA CORPORATION
 2   downward adjustment on our debt as it was
 3   converted into common stock by the presence of
 4   the preferred.
 5              A lot of planning went into that.  A
 6   lot of negotiation went into that and where we
 7   stand today we look at a deal that and we say
 8   is it perfect?  No.  Is it acceptable to us?
 9   It is.
10              We are out with all of our
11   constituents who have not been restricted.
12   Only a small member of them have over $56
13   million, just a small group of holders, and we
14   are out with our constituents right now getting
15   consents from them in a written form to this
16   deal, signing on to the plan support
17   agreement.  We are holding those in escrow,
18   your Honor.
19              Right now we have verbal commitments
20   from over $1.1 billion of holders in our group
21   saying they approve of this deal and we said
22   that in our spirit of support.
23              The written commitments are coming
24   in and, again, we are holding those in escrow
25   because we do have an issue with respect to the
```

```
 1                    DANA CORPORATION

 2    plan that might be proposed in this case.

 3                    As Miss Ball pointed out, and as you

 4    can see from the papers we present in front of

 5    you, one of the conditions that we had here was

 6    the resolution of the Miller Buckfire fee in

 7    this case to our satisfaction.

 8                    The plan support agreement says it

 9    has to be to the supporting creditors

10    satisfaction, and we're not prepared to deliver

11    our consent in a written form until we at least

12    have a full negotiation which Mr. Miller and

13    see then if we are going to rely on that or

14    not.

15                    Just to give you a little bit of

16    color, your Honor, and you've heard this at the

17    beginning of the case with Mr. Eckstein

18    negotiated the Miller Buckfire arrangement,

19    under their letter it could possibly, under

20    their interpretation of the letter, be entitled

21    to north of $50 million in a success fee, exit

22    financing fee and a fee in connection with this

23    equity race.

24                    That's completely unacceptable to

25    the ad hoc committee of bondholders and we
```

```
 1                    DANA CORPORATION

 2   intend to litigate on that point, too,

 3   vigorously, your Honor.  And for today, let me

 4   back up for a second, 37-and-a-half million

 5   dollars of that number under Miller Buckfire's

 6   interpretation would be attributable to the

 7   $750,000,000 of the money raised here and our

 8   view here is that Centerbridge and the unions

 9   brought that deal in and under any

10   interpretation of what Mr. Eckstein negotiated

11   and what your Honor approved they are not

12   entitled to it.

13              But, again, that is not before you

14   today, your Honor.  I'm just giving you a

15   preview of where we are, where we stand.

16              This is a 9019 settlement.  This is

17   not approval of a plan.  This is not approval

18   of a disclosure statement.

19              We think under the standards of a

20   9019 settlement that this deal should be

21   approved.  It is in the best interest of this

22   estate, not only because we have bettered the

23   terms of it and it is the ultimate deal that

24   gets done in a plan.  It will deliver to

25   bondholders significant value but it also sets
```

```
 1                    DANA CORPORATION
 2    in motion a process, a process by which
 3    Appaloosa or any other party can come to the
 4    debtor and say, let me do my diligence, let me
 5    go through my diligence and let me give you a
 6    real offer.
 7              We can stop public fights of 39(d)s
 8    with two page term sheets and saying we will
 9    match what they have.  We will better that term
10    of this settlement.
11              By the way, we don't understand it.
12    We need to understand it.  By the way, we will
13    just do that deal on behalf of a little
14    equity.  We will take far more for the
15    investment.  There are no real offers though,
16    so those matter if we receive those in
17    December.
18              What we need to do is have approval
19    of this deal, assess a motion.  Let people come
20    in at a competitive landscape and make real
21    results and that results in a break-up fee
22    being paid for the Centerbridge.
23              Then it means more value is being
24    delivered to the schedule and creditors and we
25    would also like to confirm the amount with
```

```
 1                    DANA CORPORATION
 2   creditors after we finish our negotiation and
 3   got to the point where he got everything we
 4   needed to and the bondholders.
 5            Mr. Mayer came in and negotiated
 6   quite hard and got further concessions that
 7   even bettered this deal.  So where this deal
 8   stands today is a good deal for creditors.
 9            MR. MAYER:  Tom Mayer for the
10   unofficial committee for unsecured creditors
11   and, as Miss Ball indicated, we should
12   negotiate the exact form of the order to be
13   submitted to your Honor.
14            We have every expectation that those
15   negotiations will be successful, and based on
16   those expectations, we are not objecting to the
17   settlement.  I withdraw our objection but I
18   need to be precise exactly where the committee
19   stands because there is no objection.
20            The decision not to object to the
21   settlement does not mean we are endorsing the
22   Centerbridge deal.  We're not.  We think it is
23   too expensive and we certainly hope there are
24   people out there who could go through the
25   process and could make a better deal for the
```

```
 1                  DANA CORPORATION

 2   estate.

 3               In particular, we are prepared to

 4   put on evidence today to show how much value

 5   there was in the Series A and Series B

 6   preferred.  That a big issue as part of this

 7   deal.

 8               We think there was an enormous

 9   amount of value in those securities such that

10   anybody who had before the investment

11   Centerbridge or is a subscriber is going to

12   realize an almost instantaneous increase in

13   value that would be paid for by all the other

14   instant creditors and we didn't think that was

15   right.  It was one of the things that really

16   bothered us.

17               We negotiated for changes that

18   ameliorate, address these concerns so that we

19   can be here today and say we are not objecting.

20               First, with respect to Centerbridge,

21   we agree with Miss Ball that the changes that

22   have been negotiated provide an opportunity to

23   market test the Centerbridge deal.  It's not as

24   much as we would have wanted but that's the

25   nature of settlements and it was enough for us
```

```
 1                    DANA CORPORATION

 2    to say that we don't object.

 3               As Miss Ball has indicated, the

 4    process involving union's consent, the

 5    reasonableness of the consent, the review of

 6    that consent we have negotiated very hard over

 7    that and it came to rest where we would

 8    prepared to withdraw our objection.

 9               One very technical point, my

10    understanding is that the committee would be a

11    co-equal party with the debtors in this process

12    not that committee counsel will be co-counsel.

13    That's a rather odd distinction but I have one

14    client.  Miss Ball has another client.  Both

15    clients will participate.  I don't believe I'm

16    going to be co-counsel to the debtor with Miss

17    Ball.  I just wanted to make that clear.

18               And so if Appaloosa wants to come

19    in, we're not here to trash proposals that

20    Appaloosa is making.  They are welcome to the

21    process.  We look forward -- if they want to

22    participate, it's a free country -- we look

23    forward to having them participate.

24               We think this process has been

25    changed enough such that the debtors have a
```

```
 1              DANA CORPORATION
 2   meaningful ability to look at better deals and
 3   our participation process gives us comfort that
 4   it will work appropriately.
 5              So that dealt with our concerns that
 6   Centerbridge was getting too good a deal on
 7   Series A and that left us with concerns about
 8   Series B.
 9              The Series B preferred is a very
10   dangerous instrument.  It is worth a lot of
11   money to anybody whose business it is of making
12   a large amount of money and the profit comes
13   out of everybody else.
14              It is possible to be so large a
15   creditor and buy so much Series B preferred
16   that you don't want a competing deal because
17   there is nobody who could come in and pay you
18   more than you will receive if you are getting
19   enough of the Series B preferred.
20              The Series B preferred is a very
21   dangerous instrument.  We have addressed this
22   problem by trying to make, as Mr. Hansen
23   indicates, Series B preferred available to as
24   many people as possible.
25              The original Centerbridge deal said
```

1                    DANA CORPORATION

2    you're only eligible for the Series B if you of

3    the record had a date in the past before people

4    knew what Series B preferred was going to do to

5    their recovery.

6              If the new deal is going to be a

7    record date in the future, this is a piece of

8    machining that was going on this morning in the

9    list of changes.

10             You go to page 3, your Honor.  It

11   says record date for eligibility date between

12   August 9th and 13, 2007.  I believe we have an

13   agreement on the date and precision is

14   important.  There is a market out there and

15   people need to know what they need to do by a

16   given time to qualify for the Series B.

17             My understanding based on hallway

18   conversations is that we have come to rest on

19   the 13th if your Honor gives some flavor --

20             THE COURT:  I hope that's not a

21   Friday?

22             MR. MAYER:  It's Monday.  The

23   committee originally had asked 10 days from the

24   entry of the order.  The problem with that is

25   that the order remains to be negotiated.  Most

```
 1                   DANA CORPORATION

 2   of the terms of this deal are being announced

 3   today.

 4               My understanding is that they will

 5   be allegorized and put into an AK Monday.

 6               MS. BALL:  Your Honor, we committed

 7   to do it by Monday.  Another weekend.

 8               MR. MAYER:  So doing an alternative

 9   offer in all, a number of people, a number of

10   cooks have to stir the broth, basically

11   problematic.  So my understanding we came to

12   rest on August 13th.

13               So if you're a bondholder and you

14   want to buy Series B preferred, which is a very

15   valuable instrument, you've got to be there by

16   August 13th schedule, although not everyone was

17   happy with that and they have their own

18   perspective on it.  They have the indentured

19   trustee for all the bondholders, not just the

20   big folks.  This is a matter of considerable

21   concern to the committee.

22               Second, if interpreted loosely as

23   being anybody who isn't a bondholder you have

24   until the confirmation date to qualify, now you

25   have to get your claim allowed and I have an
```

1                    DANA CORPORATION

2    understanding with Miss Ball that the debtors

3    and the committee is going to work to get

4    peoples claims allowed.

5             That doesn't mean I'm going to get

6    anything, but just to take a minor

7    administrative improvement that could be made

8    to the process, the debtors are going to move,

9    they have moved and they will continue to move

10   on an omnibus objection basis to object to

11   people's claims.

12            My understanding is that if you hold

13   a claim that's one percent in dispute and 99

14   percent not in dispute, procedures going

15   forward will be the debtors object to the one

16   percent but the same pleading will ask for an

17   order allowing the other 99 percent.

18            Once that happens, the trade

19   creditors who hold the other 99 percent, too,

20   can participate in the Series B or at least

21   he's got a shot, and that helps reach the goal,

22   as Mr. Hansen said, of broadening the universe

23   of people who can participate in the Series B.

24            Frankly, your Honor, we had wanted

25   the Series B to be available to every pro

68

1                    DANA CORPORATION

2    rata.  Life is not perfect.  This is the best

3    we could do.  We think it's good enough so that

4    we can stand up here and not object.

5            We think there is a good chance

6    given those changes that a very large

7    percentage of the creditors universe will be

8    eligible to participate in the Series B and in

9    an ideal word 100 percent of the creditors is

10   getting Series B and 100 percent of the

11   creditors were paying for the expense of the

12   Series B it would work out and nobody would

13   care.

14           I don't know if anybody cares but we

15   can get a close enough look at the mirror that

16   we protect the people that we needed to protect

17   and that this Series B will be available on a

18   fair basis to the creditors body as a whole.

19           On that score, a few minor

20   comments.  The plan support agreement that Miss

21   Ball referred to, we do understand that if you

22   happen to be on the creditors committee you

23   could sign it but you are not affecting your

24   fiduciary duty.  Nothing in the plan support

25   agreement will deal with your fiduciary duties

```
 1                 DANA CORPORATION

 2    in the plan as a committee member.

 3              Second, we also understand when a

 4    noncreditors committee signs that agreement, as

 5    she pointed out, you can still come up and do

 6    your own proposal to the company.  Nothing

 7    stops you from doing that, and although it says

 8    you can't run into the Court and make trouble

 9    for the plan you agreed to support, my

10    understanding is you can still call your

11    creditors committee and say, look, I signed

12    this agreement.  I support the plan.  Things

13    have changed and I'm not real happy about it.

14    Here are my concerns.

15              Under Section 1102 of the new

16    bankruptcy code every creditor has the right to

17    call the creditors committee and says what's on

18    his or her mind and that right is going to be

19    preserved under the plan support agreement.  I

20    believe there is an understanding.

21              Finally, and this is an exhortation

22    by the parties, it is not a deal in that

23    sense.  It is part of the deal labor.  It is

24    not a precise term.

25              It is still possible that the
```

1                    DANA CORPORATION

2    allocation of the Series B works an injustice

3    on small creditors who just can't, they just

4    can't qualify and, as you know, they're our

5    pleadings.

6              We don't believe that large

7    creditors should get a superior return, cents

8    on the dollar, just because they are large and

9    small creditors should get an inferior return

10   just because they are small, and the debtor in

11   its response to our objection indicated it took

12   these concerns seriously, and in the plan term

13   sheet there is a reference to the debtors and

14   the ad hocs and Centerbridge considering what

15   additional action, if any, needs to be taken to

16   protect small creditors whose recovery is

17   hampered by the fact that they can't

18   participate in the Series B and we are

19   reserving our rights to bring our plan issue to

20   the court at a later time, be it a disclosure

21   statement hearing or the planning of

22   reorganization.

23              But it is our hope that when the

24   dusk settles and people can take a look at what

25   affect this has all had on small creditors, it

```
 1                    DANA CORPORATION
 2    turns out the small creditors really got a raw
 3    deal, there will be an ability to remedy that.
 4    That's not agreed upon today.  That's just
 5    coming attractions.
 6            Speak of coming attractions, on
 7    Miller Buckfire, Mr. Hansen was correct in what
 8    he said about the creditors committee's views.
 9            We differ with them only where we
10    come out today, that is, we believe that with
11    respect to Miller Buckfire's fees in connection
12    with the Series A and B preferred, quite apart
13    from whether they were earned because the A and
14    B preferred came in through the union through
15    Centerbridge, quite apart in that question,
16    under the documents that we negotiated at the
17    beginning of this case, Mr. Eckstein was here.
18    It is his colloquy is on the record.  We can
19    produce it at the relevant time, just not now,
20    but we believe that Miller Buckfire's fees in
21    connection with exit financing, including A and
22    B preferred, are limited to $3,000,000 but it
23    is not a condition to our position today that
24    this dispute be resolved.  We can fight about
25    it later.
```

```
 1                    DANA CORPORATION

 2               And if Mr. Hansen wants to get to a

 3    deal that's good with his people as part of the

 4    next couple of days, that's fine.  We are

 5    reserving our right and we may come back to the

 6    Court at a later time with the agreements that

 7    we negotiated and say, this is what we think

 8    but we don't have to get to that deal today.

 9    That is not part of our position.  I just want

10    to make sure the judge understood.  Unless you

11    have questions, I don't believe --

12               THE COURT:  I have no further

13    questions.

14               Does anyone else want to be heard in

15    support?  Are you prepared to go forward with

16    an evidentiary hearing or did you want to hear

17    the objection?

18               MS. BALL:  Your Honor's pleasure.

19               THE COURT:  I have no particular

20    desire except to get everybody home for

21    dinner.

22               MS. BALL:  I think, your Honor, it

23    would serve a more logical purpose to have us

24    make our record prior to the objector.  I defer

25    to the Court.
```

```
 1                    DANA CORPORATION

 2            MR. LAURIA:  Good morning.  Tom

 3    Lauria of White and Case.  I represent

 4    Appaloosa Management, LP.  We are at this point

 5    maybe not the lone objector but one of a

 6    shrinking crowd.  It is kind of sad to still be

 7    the guy with his clothes on with all this love

 8    going on around the room here.

 9            Your Honor, I would just like to

10    make a couple of brief comments and then

11    reserve to try to pull it altogether after the

12    evidentiary record has been made.

13            A couple of points that I wanted to

14    make sure were clear, though.

15            The debtor's counsel summary of the

16    pending objections captures some but certainly

17    not all of our objections to what's before the

18    Court today and, indeed, really misses --

19            THE COURT:  You can rest assured

20    that I've read with interest all of yours.

21            MR. LAURIA:  What I want to

22    emphasize to the Court what we think is the two

23    most important points for the Court's

24    consideration today, aside from the settlement

25    considerations associated with the union
```

```
 1                    DANA CORPORATION

 2    settlement and aside from approval of break-up

 3    protection for a stalking horse, what we really

 4    think is important for the Court to consider is

 5    whether or not in view of the linkage between

 6    these various parts, the debtor will be in a

 7    position post-order to exercise properly its

 8    fiduciary duty to maximize value in this case.

 9    That's issue number one.

10            And issue number two is whether this

11    arrangement even as modified this morning

12    really fosters a competitive process that will

13    provide a fair market for the proposal that is

14    before the Court.

15            Now, the debtor will tell you, as I

16    think they already have, that the answer to

17    both those questions is yes, and certainly a

18    cursory review would suggest, as a technical

19    matter, that is correct, but a deeper review, a

20    deeper consideration of the facts will show

21    that, as a practical matter, the answer to both

22    questions is no.

23            The deal effectively shifts

24    significant decision making power regarding the

25    assessment and acceptance of a competing bid to
```

```
 1                 DANA CORPORATION
 2   the wrong party under the wrong standard and
 3   subject to review by the wrong form.
 4             In effect, this deal is a private
 5   agreement that seeks to rewrite important
 6   provisions and protections provided by the
 7   Bankruptcy Code.
 8             We as a stakeholder are entitled to
 9   have an estate fiduciary in an unfettered
10   fashion determine and assess higher and better
11   bids.
12             This arrangement limits the ability
13   of the debtor to do that and the debtor's
14   argument to the contrary really elevates form
15   over substance and I just briefly want to
16   explain our understanding of how this mechanism
17   will work as a practical matter.
18             If a higher and better offer is
19   submitted to the union by the company, the
20   union will then make a decision whether they
21   accept or reject this offer.
22             Now, regardless of what the union
23   thinks of the offer, remember, the union has no
24   duty to anybody but its membership and they
25   have already locked in that recovery and
```

```
 1                    DANA CORPORATION

 2    regardless of what they might offer, I might

 3    add they obviously like their current investor

 4    pretty well because as the evidence will show,

 5    the union refused to settle the 1113 and 1114

 6    issues without the insertion of their hand

 7    picked investor but, regardless, they are

 8    incentivized by this structure to reject the

 9    proposal even if it is better for the rest of

10    the estate.  Why?

11                    Because no gets them a new seat at

12    the negotiating table and if they're wrong, if

13    in this standard of reasonableness somebody

14    determines that their no was unreasonable,

15    there is no penalty to the unions for having

16    said no.

17                    So no is the equivalent of a free

18    option, a free look-see by the unions to try to

19    reup their deal, to reopen the negotiation of

20    the later settlement.

21                    Maybe if there's more value being

22    brought to the table the union will say we have

23    to get a high recovery on our OPEB obligation

24    than the ones we have already negotiated.

25                    The unions would be crazy to say yes
```

```
 1                    DANA CORPORATION
 2    because yes gives them nothing and nobody gives
 3    up anything in bankruptcy for nothing.
 4               We think this is totally
 5    objectionable but the irony, your Honor, is
 6    that we'll never get to the exercise of the
 7    union making a decision and determining if
 8    their decision was reasonable, et cetera.
 9    Why?
10               Because the debtor in this now
11    skewed environment given the value the debtor
12    sees in the labor deal would be just as crazy
13    to ever say yes to a higher and better bid
14    because the only thing the debtor would know
15    for sure would flow from that is that the labor
16    negotiation would be subject to being reopened
17    as a consequence of a no answer from the union.
18               Now, the double secret irony of, if
19    you will, of all of this, any potential
20    investor with half a brain will look at this
21    hair on this process and say it's not worth the
22    time and it's not worth the money.
23               So the reality is we believe that it
24    is highly unlikely that you're ever going to
25    have a competing and, by the way, to validate
```

1                    DANA CORPORATION

2    our concerns about this process, your Honor,

3    the order has not yet been signed but we have

4    just been told by counsel this morning that the

5    board last night met with a clearly superior

6    offer in hand and determined to continue to

7    pursue the Centerbridge transaction.

8              That can only be viewed as a

9    precursor of what will come after this order

10   has been entered.

11             Thus in our view, your Honor, the

12   deal doesn't just chill a bidding process.  It

13   largely eliminates it, and we have never seen a

14   situation where there is no meaningful process

15   to produce a stalking horse and no meaningful

16   process to market test the stalking horse bid

17   after the effect.  I will qualify that.

18             There is the classic situation where

19   we have a rotting fish at the end of the pier

20   where we do things quickly without the

21   process.  This is not that case.

22             Your Honor, we will note that the

23   people who are objecting today are equity

24   holders.  Why?  Because we are the ones at

25   risk.  We are, we believe, the fulcrum class.

```
 1                 DANA CORPORATION
 2     There are indicia all over the case in this
 3     case that the equity is in the money.
 4             The debt is trading above par and
 5     has been trading above par for some time.  The
 6     EBITDA information that we have received when
 7     multiplied by a market multiple that is
 8     indicated by other competitors in the industry
 9     and other transactions in the industry suggest
10     a value that does not foreclose equity being in
11     the money.
12             The debtor has made statements in
13     its pleadings that, at this time, it does not
14     foreclose and has not formed a position as to
15     whether or not equity is in or out of the
16     money.
17             And, indeed, there is a fourth
18     indicator, the enthusiasm of the existing
19     creditors to reup their investment, to buy new
20     paper to capture that, to prevent it from going
21     elsewhere is an indicator of the value that
22     exists in this estate.
23             So Appaloosa is here.  We have been
24     making proposals.  Why have we been doing it?
25     Why won't we be doing it later.  What's the
```

1                    DANA CORPORATION

2    problem?

3              We have been here to try to get this

4    process opened up before the Court strikes its

5    gavel to ensure that we will have a straight

6    fiduciary unfettered in its ability to doctor

7    and evaluate.

8              THE COURT:  You've been here before

9    during the long course of these proceedings and

10   then moved away.  Now you are back at the 11th

11   hour, 39th minute.

12             MR. LAURIA:  Well, your Honor, I can

13   say the following, Appaloosa was a member of

14   the equity committee.

15             As this Court is well aware of,

16   there's pros and cons that every stakeholder

17   has to assess.

18             THE COURT:  You want to be free to

19   participate.  You wanted to be able to do a lot

20   of things and make your own assessment as to

21   when to come in or not.  There are litigating

22   tactics and there are economic tactics and it

23   is obvious that both are being practiced.

24             MR. LAURIA:  Your Honor, we are only

25   practical -- we are only acting in our best

```
 1                 DANA CORPORATION
 2    interest.  We are not here as a fiduciary or
 3    trustee or agent for anybody else.
 4                 We thought, at a point in time, we
 5    thought being on the committee would be
 6    finished.  We waived --
 7                 THE COURT:  I didn't make these
 8    remarks in the pejorative sense, Mr. Lauria.  I
 9    am just pointing out facts.
10                 MR. LAURIA:  Your Honor, well, when
11    we saw this proposal come on the table,
12    actually, it may have been beforehand, we were
13    in negotiations with the company to enter into
14    a confidentiality agreement.  Those
15    negotiations dragged on for a month.
16                 Why did they drag on?  Because we
17    were being compelled to sign the same
18    confidentiality agreement that Centerbridge
19    signed.
20                 One problem. Centerbridge is not a
21    stakeholder.  So Centerbridge agreeing that
22    they would not propose a competing plan, for
23    example, meant nothing to Centerbridge.  It
24    meant a lot to us as the largest stockholder in
25    the company and it was only last weekend,
```

```
 1                    DANA CORPORATION
 2    Sunday, when the debtor finally agreed to give
 3    us a confidentiality agreement that did not
 4    impose those restrictions.
 5              But even before we got that
 6    confidentiality agreement, even before we could
 7    get in and get information, we submitted a
 8    proposal to the company on the Thursday, I'm
 9    sorry, the Wednesday, July 18th, sight unseen
10    topping the Centerbridge proposal reducing the
11    discount that Centerbridge imposes on this
12    estate for the securities it's going to buy.
13              Was that proposal settlement
14    accepted?  No.  And the reason it wasn't
15    accepted is because the day afterwards, less
16    than 12 hours after we submitted a topping
17    proposal, the unions wrote to the debtor and
18    said their proposal is completely illusory
19    because it requires our support and we don't
20    support it.
21              We are very concerned, your Honor.
22    We believe it is great value here and we want
23    to make sure that it is distributed in the
24    first instance to the people who are supposed
25    to get it, the stakeholders of the estate,
```

```
 1                    DANA CORPORATION

 2  including shareholders of their sufficient

 3  value, not to a third-party.

 4              Any questions?  I will otherwise

 5  reserve for closing.

 6              THE COURT:  Well, I read through

 7  your papers that you are in full accord with

 8  the union terms with respect to the 1113/1114.

 9              MR. LAURIA:  If you look at the two

10  pieces separate, we really have no objection.

11              THE COURT:  This is essentially a

12  settlement of the 1113/1114 which in order to

13  come to a complete settlement requires a little

14  bit more than just the union labor resolution

15  of issues.

16              MR. LAURIA:  Our problem is the

17  equity language issue.

18              THE COURT:  You're on board with

19  it.

20              MR. LAURIA:  We are on board with

21  the settlement, yes, your Honor.

22              In fact, I think it is important

23  that we want to be on the record that it is not

24  our intention to disturb the OPEB resolution,

25  the work rules, the salary, the wages, all of
```

```
 1               DANA CORPORATION
 2   the issues embodied by the 1113/1114 disputes.
 3   We are on board with the settlement and we do
 4   not object.
 5           THE COURT:  You are now putting on a
 6   good face for the union, which is fine.
 7   Anybody else?
 8           MR. LAURIA:  It has been the same
 9   face.
10           MR. BIRNEY:  Pat Birney from
11   Theland, Reid, Brown, Raysman and Steiner on
12   behalf of Brandes Investment Partners.
13           Just a limited objection that we
14   filed, your Honor, and I would like to echo
15   what Appaloosa said in that we believe that
16   equity is in the money in this case.
17           Implicit in the debtors initial
18   settlement papers was inferred on our part that
19   there was no money for equity.
20           Since then in their July 25, 2007
21   filing they have stated that there will be an
22   ability for equity stakeholders to participate
23   substantively in the plan negotiation process
24   notwithstanding the settlement agreement
25   today.
```

```
 1                DANA CORPORATION

 2             Miss Ball stated this morning that

 3    it would be clearly an opportunity for

 4    creditors to negotiate the plan process

 5    notwithstanding today's settlement agreement

 6    but she did not mention stakeholders, and we

 7    just renew our objection because we do believe

 8    equity is in the money and we reserve our

 9    rights and object to the motion to the extent

10    that it would foreclose our rights to negotiate

11    the plan process.  Thank you, your Honor.

12             MS. EISENBERG:  Good morning.  Leah

13    Eisenberg from Arent Fox for Wilmington Trust.

14             Based on the concessions and the

15    changes to the settlement agreement we were

16    prepared today to withdraw our joinder to the

17    committee's objection and preserve our rights

18    to raise confirmation issues at the

19    confirmation date, which includes disparate

20    treatment among bondholders; however, we do

21    have one modest request that relates to the

22    record date for which bondholders can

23    participate in the Series B is we request that

24    the record date be set 10 business days from

25    the entry of the order if not fixed as an
```

1                 DANA CORPORATION

2    arbitrary date.

3                 This issue might become mute if the

4    order is entered on Monday but for certain we

5    believe that 10 days is market and 10 business

6    days is market and not unreasonable.

7                 MR. STARK:  Robert Stark from Brown

8    Rudnick, appearing again on behalf of ad hoc

9    consortium of the newly formed formed

10   yesterday.  I'm a little late.  I apologize.

11   We didn't get papers in.  I'm learning a lot.

12                We found out yesterday, or a lot of

13   yesterday, found out yesterday bondholders have

14   a 25 million dollar threshold for which same

15   class similarly situated creditors get to

16   participate in what Mr. Mayer says is a really

17   great deal, sweetheart deal and those that fall

18   outside of those buckets don't get the pot.

19                If you look and if you're in the

20   same class, you are supposed to get the same

21   thing.  I haven't heard 100 percent interest so

22   I'm assuming the right to participate in the

23   Series B is a distribution for which we are

24   entitled to participate pro rata with everybody

25   else.

```
  1                  DANA CORPORATION

  2           I applaud Mr. Mayer for getting up

  3     and saying it's tough, your Honor.  There is a

  4     lot going on here.  It is a tough situation.

  5     I've done the best that I can.

  6           The future record date concept, we

  7     have talked about this morning, again, I'm

  8     learning as I'm sitting here, gives me just

  9     viscerally a bit of comfort because we have a

 10     hard time not only with the results of the

 11     negotiation on this particular issue, not the

 12     1113 and 1114, this particular add on, not the

 13     results but the actual process by which it was

 14     negotiated because your Honor can envision you

 15     had a couple of really large holders

 16     represented by Stroock on the steering

 17     directive sitting down with Centerbridge and

 18     saying, okay, let's carve it.  We will carve

 19     full between Centerbridge and the really big,

 20     big guys and leave the little guys.  It is

 21     their ox being gourd.

 22           I applaud him for I have truly

 23     acknowledged this is tough discovery.  He's got

 24     negotiations.  He's fighting large bondholder

 25     on this dispute and he's trying really hard to
```

```
  1                 DANA CORPORATION
  2    get this union done.
  3                 My preference, your Honor, I'm late
  4    to the party and I don't have discovery.  I'm
  5    trying to learn.
  6                 My preference obviously if you can
  7    parcel out that piece and say we will deal with
  8    the unfair discrimination, which seems obvious
  9    to everybody, to the debtors, even in response
 10    papers, you know, and we'll deal with that
 11    later that would be great, but I'm pragmatic.
 12    I know that's not going to happen today.
 13                 I can sort of share Mr. Lauria's
 14    sense of love in the room and I've also heard
 15    what's been proposed as sort of a reservation
 16    of rights on the record and I, your Honor, just
 17    needs to be --
 18                 THE COURT:  Isn't that a plan
 19    issue?
 20                 MR. STARK:  Maybe, your Honor.  What
 21    I believe is full collateral estoppel of the
 22    rules today.
 23                 If we go ahead and have an issue
 24    with this around the plan of arrangement with
 25    respect to the disclosure statement, Miss Ball
```

```
 1                  DANA CORPORATION
 2   will get up and say we have dealt with it.  It
 3   is resolved.
 4            If the answer is, your Honor, it is
 5   going to be make clear in the order that is not
 6   the case that I will have an opportunity for
 7   discovery.  I will have time to propose my
 8   objections in context with what the disclosure
 9   statement states, as well as in confirmation,
10   maybe gear up for battle not on a 90 days,
11   until then it is fine.  We will move forward
12   today and handle it in due course and we will
13   stand down.
14            And, your Honor, for the record and
15   for your Honor's order drafting purposes it has
16   to be clear that this is a plan issue.  That
17   our rights are fully and utterly reserved and,
18   frankly, I think all the parties should sit
19   down and talk with us in the days ahead because
20   it is an obvious issue and I and Mr. Lauria
21   will get up.  We will look.  We will talk with
22   you.  We will try to obviate it because their
23   page 3 statement that the third creditor is not
24   eligible to invest will receive cash or
25   stocks.
```

```
 1                   DANA CORPORATION

 2              On page 3 is a bit ambiguous and I

 3    don't know what these people, who are going to

 4    reasonably be in a warm quiet room cutting the

 5    deal and gore our ox again, what they are

 6    really thinking.  But since ultimately it is

 7    our money, one would think that we have a seat

 8    at that bargaining table and they will sit down

 9    and talk with us and they will reserve our

10    negotiations.

11              At the time --

12              MS. BALL:  Your Honor, it is not

13    intent nor the request of the debtors to

14    foreclose objections appropriate to a plan

15    today.  That's a tomorrow issue.

16              We do not have a plan in front of

17    you today, your Honor, and I believe that

18    Mr. Stark's rights with respect to a plan and

19    the plan process are reserved.  We have no

20    objection to testimony.

21              MR. STARK:  Your Honor, may I ask

22    for the same representation with equity

23    holders?

24              MS. BALL:  Your Honor.  You may.  It

25    is not a plan, your Honor.
```

```
 1                 DANA CORPORATION

 2             MR. HANSEN:  Mr. Stark wants to

 3    raise big time a couple of big issues for the

 4    benefit of himself, I want to be clear, your

 5    Honor, so you understand the mix.

 6             It is true there were holders who

 7    were big.  They chose to get restricted, see

 8    the information that the company really had to

 9    show them and they chose to negotiate a deal.

10             Did they directly benefit just

11    themselves?  No, your Honor.  They chose a 25

12    million dollar -- Mr. Stark, I'm not finished.

13             MR. STARK:  I'm speaking.

14             MR. HANSEN:  They chose $25,000,000

15    as a product of negotiation and what happens is

16    those big holders represent $50 million of what

17    we hold, our claims hold at the time of the ad

18    hoc committee.  At the time, it was 1 billion,

19    one of a billion four that was above the $25

20    million.

21             And yesterday's count, as we went

22    through it with the group, that number had

23    ballooned a bit to be a bill three, okay, of

24    holders that were over $25 million.

25             I don't know how many dollars in
```

1                 DANA CORPORATION

2    amount Mr. Stark represents here today.  It is

3    not really an issue.  It is an issue for the

4    plan time but I want your Honor to have a bit

5    of that backdrop of the holders when they were

6    thinking broader group.

7                 Of course, they were thinking it is

8    an ad hoc committee and they did their

9    consideration and they chose to negotiate their

10   size.  They chose to get restricted and chose

11   to take the burden that goes along with that.

12                In fact, they can't trade right

13   now.  They are stuck with the positions that

14   they have.

15                Mr. Stark can trade price above par

16   or they can grow themselves and get above 25

17   and so I just want to put it in light.

18                MR. STARK:  Not to spar and belabor

19   the record.

20                THE COURT:  I think this is a plan

21   issue and I think you're holding about 150 or

22   250 people hostage to their lunch hour.

23                MR. STARK:  With that your Honor, I

24   will take my seat.

25                THE COURT:  Provided that we break

```
 1                   DANA CORPORATION
 2   for lunch and I'm not sure about that.
 3               MR. HAMILTON:  Robert Hamilton of
 4   Jones Day on behalf of the debtors.
 5               As much as I would like to jump in
 6   in this sparring match and give my advice on
 7   Mr. Lauria's comments on what the settlement
 8   is, the reality is that my views aren't nearly
 9   as important as what the exercise was of Dana's
10   board of directors and the exercise of their
11   judgment on these issues, and in order to give
12   the Court the benefit of that judgment and the
13   extent to which the considerations that
14   proceeded that judgment, I'd like to call our
15   first witness to the stand and are only witness
16   and that is the CEO of the company.  That is
17   Mr. Michael Burns.
18   M I C H A E L   B U R N S,
19           having been first duly sworn according
20           to law, was examined and testified as
21           follows:
22   DIRECT EXAMINATION
23   BY MR. HAMILTON:
24       Q    Good morning, Mr. Burns.
25               Would you tell the Court what your
```

1                    DANA CORPORATION

2    position is with the debtor.

3        A    My position is chairman and CEO of

4    Dana corporation.

5        Q    Just to set the context of the

6    concerns in which the board authorized

7    management to enter into the global settlement

8    that is the subject of today's hearing, can you

9    review for the Court the circumstances that

10   gave rise to the board's determination that the

11   debtor essentially needed to pursue a section

12   1113/1114 motion here with respect to the

13   circumstances surrounding the U.S. operations

14   of Dana.

15       A    Well, I believe everybody knows, we

16   filed for bankruptcy back in March of '06, the

17   40 subsidiaries in the U.S. that were clearly

18   losing significant amounts of money, almost $2

19   billion over a five year preceding period.

20            We filed the Chapter 11 and made it

21   very clear that we were going to have to look

22   at fundamental change across the entire

23   business.

24       Q    And given the fact that your U.S.

25   operations were losing more than $2 billion

```
 1                    DANA CORPORATION
 2    over a five-year period, why didn't Dana just
 3    make a determination to close its U.S.
 4    operation?
 5         A    It is not that simple in this
 6    business for a number of reasons.
 7              First of all, it is a global
 8    business but, more importantly, our customers
 9    are global so our customers are using vehicle
10    architecture across the world.
11              In the U.S. we have some large
12    customers that sell vehicles.  In other parts
13    of the world we have three other divisions, a
14    light duty business, a heavy-duty truck
15    business and an off highway business.
16              All those customers have global
17    integrated operations and it's not possible to
18    exclude yourself from certain of their markets
19    and clearly not a market that's as strong as
20    and as large as the U.S.
21         Q    Do your customers have an
22    expectation or some sort of preference with
23    respect to the suppliers that they choose on
24    their presence and where they're located?
25         A    They do and even more so today than
```

96

1                    DANA CORPORATION

2    in the past.

3              Example, a large customer of ours,

4    Toyota, we supply to their Tacoma platform.

5    That Tacoma is built in a number of different

6    areas in the world and it's built in

7    California, in the U.S.  It's built in

8    Thailand.  It's built in Indonesia.  It's built

9    in South Africa and it is built in South

10   America, so a number of different places.

11             And they don't want to deal with

12   multiple people.  They want to deal with a

13   single supplier, do the engineering once and be

14   able to supply those in all those locations.

15             It's not simple to be able to build

16   parts, especially the parts that we build that

17   sometimes weigh several hundred pounds or are

18   very bulky.  It's not easy to build those, say,

19   in China and ship them all to the U.S.  It is

20   just not practical to logistics.

21        Q    How does that transmit to your

22   customers?

23        A    The customers look for a good

24   competitive cost but they are looking for

25   something that doesn't drive their logistic

1                    DANA CORPORATION

2    cost up.  They are looking for local

3    manufacturing and local management, so what you

4    see is in many cases we are close to the

5    customer with assembly.

6            In some cases we manufacture parts

7    further away from our operation to the small

8    parties that we can ship, that pack easily and

9    ship easily but the large assemblies tend to be

10   narrowly close to the customer.

11       Q    And where is the company, Dana's,

12   where is the primary source of its technical

13   engineering capability and expertise?

14       A    We have technical capability

15   throughout the world, but the nucleus is in the

16   U.S., from the ability, from the ability to

17   engineer products, gear cutting technology.  A

18   lot of different capability that the company

19   has tends to have a nucleus in the U.S.  So it

20   is not easy to bifurcate the business.

21       Q    You're global business, are they

22   able to benefit from the technical capability

23   you have in the U.S.?

24       A    Absolutely, absolutely, and I think

25   in part it is the way the business has grown up

```
 1                 DANA CORPORATION
 2    over time and where the business started, the
 3    kinds of products that we are in.
 4              We tend to be more towards the heavy
 5    end of the business, pick-up trucks and so.  So
 6    it was more of a U.S. phenomena so a lot of
 7    nucleus capability in the origin was there.
 8         Q    Is there any constraint on your
 9    ability if you were to close your U.S.
10    operations to just move that technical
11    capability elsewhere to other parts of the
12    world?
13         A    It is not as easily transportable.
14         Q    Why not?
15         A    Because you are talking about a
16    very, very deep seated capability in people
17    that have families; that live in places that
18    are not able to transport those.  You are not
19    able to pick those people up and move them.
20              So it's a long process and, quite
21    frankly, even if you could do that, the
22    customer will still dictate that they need a
23    U.S. presence.
24         Q    So you have a U.S. presence that's
25    losing $2 billion over five years and you can't
```

```
 1                    DANA CORPORATION
 2   get rid of it.  You have to fix it.
 3            What did you determine you had to do
 4   in order to fix it?
 5        A    We had to have fundamental change in
 6   all aspects of our business and that means that
 7   we had to get price from the customer.
 8            In some cases where we were losing
 9   money, we had to look at all of our costs,
10   including both union, nonunion, salaried
11   labor.  We had to look at our overhead.  We had
12   to look at our footprint and we had to look at
13   all of our post-retirement benefits that were
14   provided in terms of OPEB, long term
15   disability.  We had to look at health care.  We
16   had to look at every aspect of cost and we just
17   couldn't nibble at the edges.  We needed to
18   have significant, fundamental change.
19        Q    Did management settle on a target of
20   some sort of profit margin that they felt the
21   U.S. operations had to achieve in order to be
22   able to compete in the world?
23        A    Yes, we obviously did a lot of
24   competitive benchmark, with companies in our
25   subset.
```

1                    DANA CORPORATION

2              We determined that we needed to

3    ultimately operate in the 5 to 6 percent

4    earnings before interest in tax range, that

5    margin, and then, as a result of that, back up

6    engineered into a number that we felt that we

7    needed to capture in terms of improvement.

8              On the revenue side and on the cost

9    side, that number being from 400 to five to 540

10   million dollars.

11       Q    And that was the target that was

12   announced in the SEC files last fall?

13       A    Last fall.  We determined that

14   after, in the summer period and reviewed it

15   with the creditors committee, reviewed it with

16   the board and announced it in November of last

17   year.

18       Q    And in those announcements, did you

19   identify what the systemic restructure

20   initiatives you determined you needed to pursue

21   in bankruptcy to achieve those improvements?

22       A    Yes, we did and it was referred to

23   earlier as buckets.  It was pictorial, some

24   people referred to them as I believe balloons,

25   but it was the pictorial of, and we can just go

```
 1                    DANA CORPORATION

 2     through them, from a pricing standpoint with

 3     the customer, we needed between 175 and $225

 4     million.

 5                    On overhead, we said we needed to

 6     capture between 40 and $50 million.

 7     Manufacturing footprint, 60 to 80 million.

 8                    In terms of active work force, we

 9     said we needed to capture between 60 and 95

10     million and in the case of post-retirement

11     activities, it was I believe 70 to 90 and it

12     totaled up to this 4 or 5 to 540.

13          Q    And that total is what you have been

14     calling run-rate savings?

15          A    Absolutely.  They have to be

16     run-rate savings.  It has to be real.  They

17     have to stay with us and we, obviously, have

18     intent and are very intent and quite successful

19     in identifying that capability and where we sit

20     today would be solidly written that range,

21     assuming that we have a labor agreement

22     approved.

23          Q    So of those buckets, you have 60 to

24     90 million in labor cost reductions and 70 to

25     90 million in reduction of post-retirement
```

```
 1                DANA CORPORATION

 2   benefit obligations, right?

 3        A     Right.

 4        Q     Why did Dana determine that it

 5   needed to seek relief under Section 1113 and

 6   1114 of the Bankruptcy Code to achieve those

 7   particular buckets?

 8        A     For a couple reasons.

 9              Number one, the customer piece of

10   this, the 175 to 225, the customer had to

11   determine first of all before they wanted to

12   survive, and that really was up to them.  They

13   could have gone a different direction.

14        Q     By customers, who are you talking

15   about?

16        A     I'm talking about major

17   manufacturers:  Ford, Toyota, Nissan, Chrysler,

18   GM.  We virtually sell to everybody in the

19   world.

20              So, first of all, they had to decide

21   whether or not they were going to give us price

22   relief on products where we were not making

23   money but, at the same time, they were also

24   expecting us on the rest of that pictorial or

25   those buckets to be able to capture significant
```

```
 1                    DANA CORPORATION

 2    savings in other parts.  So that's one piece of

 3    it, and we were successful in doing that.

 4              Now, that said, the pricing piece of

 5    it, 175 to 225 million, if you look at the

 6    labor side, meaning union, union, salaried

 7    worker, I believe if you total that up, it is

 8    like 109 to 265 counting the manufacturing

 9    footprint piece, which really is labor because

10    in the manufacturing footprint piece what we're

11    really doing is in some cases consolidating

12    operations, in some cases closing operations

13    and in other cases actually moving those

14    operations to lower cost countries.

15              So it is really tied in to labor and

16    part of it to the collective bargaining

17    agreements that we had.

18      Q    Let's talk about that.

19              Can you give the Court some idea of

20    how significant a portion of your labor

21    structure is, how much of it is union related

22    in the United States?

23      A    About between 50 and 60 percent of

24    our head, about 50 percent of our head count

25    but probably closer to at the time when we
```

```
 1                  DANA CORPORATION
 2   started the 65 to 75 percent of our costs in
 3   terms of labor, in other words, tough labor,
 4   productive labor, union nonunion.
 5        Q     Why did management make a
 6   determination that it needed to file a motion
 7   for relief under Section 1113 to gain the
 8   concessions that you needed from unions to get
 9   the labor costs reductions that were necessary?
10        A     We had at the time 10 plants that
11   had union representation.
12              Two of those plants, Lymon,
13   Pottstown were under an expired, were under an
14   expired contract.  The master expired at the
15   end of last year.  So we didn't really have a
16   contract there, couldn't file for 1113 because
17   we had no contracts.  It was just a question of
18   do we reject that contract.
19              The other five plants in Ft. Wayne,
20   Marion, Henderson, Longview and, excuse me,
21   Elizabethtown and Auburn Hills were the other
22   five plants where we did file for an 1113 and
23   then we had three other plants that had been
24   recently organized where a collective
25   bargaining agreement had not been negotiated,
```

```
 1                DANA CORPORATION
 2   and those fell under a partnership agreement.
 3              We had a no strike, we had a no
 4   strike clause in the partnership agreement.
 5   The partnership agreement expired on June the
 6   8th of 2007.
 7      Q    Why not just go to the unions and
 8   negotiate a deal?  Why did you bother with a
 9   1113 motion?
10      A    Again, it's in part experience, in
11   part reality that the unions, it is very
12   difficult.  We needed fundamental change across
13   all aspects of costs, all aspects of costs with
14   regard to our union agreements, not only wages
15   but health benefits, post-retirement.  We
16   needed everything and so what we needed to do
17   then was to get the, in bankruptcy.
18              The 1113 process it gave us the
19   capability to get, I guess for the lack of a
20   better word, leverage, to get parties to the
21   table to try to come up with a consensual
22   agreement rather than just rejecting outright
23   the contract and in the 1113 process and your
24   Honor's process and the court were successful
25   in getting us together.
```

```
  1                    DANA CORPORATION

  2        Q     Why did Dana not just rely on

  3   getting a ruling from the Court on its 1113

  4   motion to achieve the reduction in labor cost

  5   that you needed?

  6        A     Because it would, once we did that,

  7   it was more than likely we'd end up in some

  8   kind of labor disruption and that labor

  9   disruption would be very costly.

 10             We could handle a couple of plants

 11   and make plans and have strikes contingencies,

 12   but when you get seven plants in the mix, or

 13   ultimately after June, 10 plants in the mix,

 14   the level of complexities just overwhelms you.

 15        Q     What happens after June of this

 16   year?

 17        A     June of this year?

 18        Q     What happened after June of this

 19   year?

 20        A     After June 2007, that was the

 21   neutrality agreement I was talking about; it

 22   expired, and then those three plants would have

 23   had the ability, had we done anything, had the

 24   ability to close Rochester Hills in Michigan,

 25   Toledo, Ohio and Longview, Texas.
```

```
 1                  DANA CORPORATION

 2        Q    You have Lymon, Pottstown you have

 3   the risks of the strike now?

 4        A    Lymon, Pottstown are under an

 5   expired contract and we are going on a month to

 6   month or week to week extension.

 7        Q    If you had obtained -- but if you do

 8   obtain a favorable ruling on your 1113 motion

 9   with respect to the other, with respect to the

10   other five plants, what would then be the risk

11   that the company would face with respect to

12   labor unrest or strike at all these 10 plants?

13        A    Well, as we implement it, it was

14   pretty clear that the unions felt strongly if

15   they were implemented we would have labor

16   disruption.

17             I think it is also important to

18   understand the context in which we operate

19   today right ahead of the national negotiations

20   for the OEMS for GM and Chrysler that have

21   massive, massive numbers of people and a lot of

22   risks for both sides.  We could very easily be

23   held as an example, a warning shot that unions

24   could use.

25             So, in our estimation, the best
```

```
 1              DANA CORPORATION
 2  outcome was to try to find a reasonable, a good
 3  consensual agreement that satisfied our needs
 4  and kept us out of labor strive.
 5      Q    What are the inherent limitations on
 6  management's ability to prepare for a strike at
 7  all of its 10 union plants?
 8      A    I think you have, you need to take
 9  in it layers.  In Lymon, Pottstown where we had
10  the expired contract, we had prepared for the
11  strikes and let me just give you an idea of
12  what we did.
13          The product president that ran that
14  group had trained salaried workers, had taken
15  her salaried workers and trained them to run
16  the equipment, not only the plant people but
17  also engineers from the tech centers to go in
18  and run the equipment.  We also made
19  arrangement for temporary workers we would hire
20  with temporary agencies.  We made, she made
21  arrangements and had plans to house those
22  people inside the plant perimeter so we didn't
23  have a security issue going through and, most
24  importantly, we laid in a lot of inventory.  We
25  built inventory to give ourselves a buffer.
```

```
 1                    DANA CORPORATION

 2               And keep in mind one of these plants

 3     produces 2,000 parts, 2,000 different part

 4     numbers and it is a manufacturing plant.  So it

 5     doesn't, they don't ship to an end-user.  They

 6     ship to another plant that puts that component

 7     in a final assembly.

 8               So if you can kind of look at it, it

 9     is a spaghetti toll bus, all kinds of avenues

10     for potential problems that ultimately get to

11     all your customers.

12               It takes a tremendous amount of

13     effort.  It takes a tremendous amount of cost

14     and there is a big risk and, quite frankly, our

15     experience, my experience when you have labor

16     disruption in this industry typically it costs

17     you business both short and long term.

18          Q    Is there a material difference in

19     terms of Dana's ability to withstand a strike

20     at one or two plants versus a strike at all 10

21     of its unit plants?

22          A    There is.

23          Q    What's the difference?

24          A    There is.  It is the level of

25     complexity.  It just multiplies.  You only have
```

```
 1                    DANA CORPORATION

 2   so many salaried workers to help you run.  You

 3   only have so many technical people, so many

 4   production people and logistics people to move

 5   products in an abnormal way and when you have

 6   so many different customers and those

 7   customers, you have to understand, don't have

 8   the ability, they don't have the ability to

 9   find another part in most of the cases.

10             That part is one of 2,000 that goes

11   into a vehicle and if they don't have that

12   part, they don't build the vehicle.  So the

13   economic consequences here ends up being quite

14   large quite quickly both from a liability

15   standpoint and a practical standpoint where you

16   start losing assembly plants.

17        Q    I want you to tell the Court what

18   management's judgment is regarding the possible

19   immediate loss of revenue on a potentially

20   permanent basis from a strike at its union

21   plants in U.S. operations?

22        A    Your Honor, we have a line of

23   business that is in a cycle, in a bottom of a

24   cycle now.   It is the heavy-duty truck

25   business as a result of emission standards
```

1                    DANA CORPORATION

2   where they are running about 40 percent, the

3   market is about running about 40 percent of its

4   capacity and we will be through 2007 and into

5   2008.

6              The one unique part that we're

7   buying tractor assembly trucks.  You know the

8   big class A trucks.

9              THE COURT:  The ones I don't want to

10  see in my rear-view mirror?

11      A    The ones you don't want to see in

12  your rear-view mirror.  That's exactly right.

13             Those have the ability for the

14  person buying to specify the axle, the drive

15  shaft or the transmission or the frontends or

16  the brakes.  So they are really engineered to

17  take multiple people's products, multiple

18  suppliers products.

19             In the U.S., of the U.S. there are

20  two big suppliers, ourselves and another

21  company if we are --

22             THE COURT:  Who shall remain

23  nameless?

24      A    We can name them, Arvin Meritor.

25  Everybody that's close to this industry knows

1                    DANA CORPORATION

2    that.

3              So what happens them they have extra

4    capacity because of this downturn in the

5    market.  We go on striking.  Their customers

6    then still need the trucks.

7              They put Arvin Meritor's products on

8    it.  We end up not only with a temporary loss

9    but more than likely a permanent loss and

10   that's about a billion dollars of revenue.

11        Q    That's a billion annually?

12        A    A billion annually of revenue of

13   which some portion of that we would not recover

14   from.  We would lose it on a permanent basis.

15        Q    All right.  Given those

16   circumstances, what was the company's end game

17   in pursuing the section 1113/1114 motion?

18        A    Our end game was that we wanted to

19   use that process in the proper way to find

20   consensual agreement with our unions to

21   drastically reduce our costs, to dramatically

22   reduce or costs.

23        Q    Consensual resolution, reach a labor

24   deal?

25        A    Absolutely, absolutely.  If we could

113

```
 1                DANA CORPORATION

 2    do it, but not if it was going to damage the

 3    business long term, then we were prepared to

 4    have to strike to ensure that we could fix the

 5    business and have sustainability.

 6              But the best situation, and I

 7    believe your Honor in your ruling or in your,

 8    when we got done with the 1113/1114 I remember

 9    reading that you said we want to ardently

10    negotiate to try to find a consensual agreement

11    and that's essentially what we did.

12        Q    Okay.  Let's talk about that

13    process.

14              When did you start assembling the

15    company's labor negotiation team to try to

16    reach a deal with you?

17        A    Summer of '06.

18        Q    And who did you pick from within the

19    company?

20        A    I have two very capable people.

21    They both have law degrees or law background,

22    law degrees and they are both capable union and

23    benefits, they have great capability.

24              So Chris Bueter and Bob Arquette and

25    then I supplemented that.  I went to look for
```

1                    DANA CORPORATION

2    outside counsel.

3        Q    I want you to tell the Court how you

4    went about selecting outside counsel to help

5    you in your negotiations with the unions on

6    negotiating a new labor deal?

7        A    My idea was that I needed somebody

8    that had the capability to not only understand

9    our business but the industry but also

10   understand the unions, and, more importantly,

11   that had the ability not to just blow the place

12   up but try to find a way to reach agreement and

13   try to find mutual leverage that would allow us

14   to reach a substantial agreement.

15            I had a few people that used to work

16   at General Motors.  I had a few people that I

17   knew there that helped at times.  Sometimes

18   successfully.  Sometimes not, but I also looked

19   at other law firms, Skadden; Kirkland Ellis,

20   other people that have significant labor law

21   people.  I also looked at an individual from

22   Jones Day, Andy Kramer from Washington D.C.,

23   who had done a lot of work in this business and

24   actually interviewed him.

25            I remember having him come to Toledo

```
 1                  DANA CORPORATION
 2   and talking to him about what my goals were and
 3   the company's goals were and how he saw or how
 4   he thought we might be able to accomplish
 5   that.  I had a plan I thought was good and I
 6   employed Andy Miller at the end of the summer.
 7        Q    What was the name?
 8        A    Andy Kramer.  Excuse me.  Andy
 9   Kramer, not Andy Miller.
10        Q    In the process of selecting
11   Mr. Kramer, did you have an opportunity to
12   become familiar with his reputation in the
13   industry and if he had any experience in the
14   industry in dealing with these unions in this
15   industry?
16        A    It is part of why I chose Andy
17   Kramer because of the background.  He had
18   worked with GM.  He had worked with Ford and
19   Chrysler, Firestone, Good Year.
20             He had a pretty good understanding
21   of just how difficult this industry is and how
22   important it is to have a full grasp of the
23   entire cost structure.  He also had a lot of,
24   he had a lot of health care and benefit
25   understanding both active as well as
```

```
 1                  DANA CORPORATION
 2    post-retirement.
 3         Q    Do you know where Mr. Kramer is
 4    today, Mr. Burns?
 5         A    I believe Mr. Kramer is helping
 6    someone in the big three negotiations.
 7         Q    With who?  The negotiations with
 8    who?
 9         A    I believe the UAW but he's on -- I'm
10    not sure he's on the UAW side.  I think he's on
11    the other side.
12         Q    After you assembled this team with
13    Mr. Kramer, was there a time where there was a
14    presentation made to the board last year about
15    the approach that would be taken in trying to
16    negotiate a new deal with the union?
17         A    Andy Kramer and I went and visited
18    both unions in the same day actually, went to
19    Pittsburgh and dealt with and visited with the
20    United Steel Workers and we actually, this was
21    right after we had talked with the creditors
22    committee about our plan and rolled out our
23    plans to them in terms of the different buckets
24    and what we needed and why it was a business
25    necessity to do this.
```

117

1                    DANA CORPORATION

2            We had a nice and a long

3    discussion.  I wouldn't say it was a pleasant

4    one but I think Ron Bloom understood the

5    situation.  We went from there back to Toledo.

6            Actually, Andy had to go to another

7    meeting and I went back to Toledo with Chris

8    and Bob and we met with Bob King, who is the

9    head of the parts side and the Ford side of the

10   UAW in the U.S. and Wendy Fields-Jacobs who is

11   his first lieutenant and we went through the

12   same presentation.

13        Q    Now, prior to those presentations,

14   did you discuss with the board of directors of

15   Dana what the company's concerns were in

16   negotiating a new deal with the labor agreement

17   with the unions?

18        A    We absolutely did, and that process

19   started actually about the same time we put the

20   labor team together because we were putting

21   together the synthesis of what it took to fix

22   the business, all these different buckets, and

23   had multiple discussion with the board with

24   regard to what we saw as the business need and

25   what we would have to do and as part of that

```
 1                    DANA CORPORATION

 2    labor was identified as a large piece of that.

 3         Q    Now, in those initial discussion

 4    with the board back in the fall of 2006, was

 5    there a discussion about the possibility of a

 6    strike by the unions as a result of your

 7    efforts to negotiate a new contract and the

 8    possibility of a 1113 motion?

 9         A    There was, and the reason, quite

10    frankly, is the size of the magnitude of what

11    we were asking for, the change of what we were

12    asking for and also realizing at the time we

13    were asking for that one right ahead of the

14    huge UAW, GM, Ford and Chrysler negotiations,

15    which are, you know, just in the process of

16    starting now and we will really try to work

17    towards an agreement in September of 2007.

18         Q    I want you to tell the judge what

19    the board discussed last fall about the

20    possibility that the unions might strike at

21    Dana as a way to get leverage in the upcoming

22    negotiations with the big three?

23         A    We had a spirited debate.  We have a

24    board that has quite a bit of labor experience

25    on it, a spirited debate about what might
```

```
 1                  DANA CORPORATION
 2   happen, how far we could push that and still
 3   keep labor peace because I think everybody
 4   recognizes the lack of labor peace is usually
 5   very costly to the estate.
 6              And we ultimately agreed that what
 7   we needed to do was to use 1113/1114 process,
 8   1113 for the collective bargaining piece of
 9   this to actually get leverage and get some
10   emphasis in the system to make the negotiations
11   successful.
12       Q    How did the upcoming negotiations
13   with the big three play into that analysis in
14   the board discussion last fall?
15       A    The board was concerned that we
16   would be used as an example, a rifle shot
17   across the globe to the other people who were
18   asking for significant concessions.
19              Now, they might not be in bankruptcy
20   but the issue was what we were asking for was
21   across the entire gamit with the unions and
22   they would be very reluctant to show weakness
23   right ahead of the national negotiations.
24              So that was the essence of the
25   discussion.
```

```
 1                   DANA CORPORATION

 2        Q    All right.  From the period after

 3   that initial meeting with the unions, from

 4   November through February of this year, did you

 5   have discussions with the unions' program

 6   beyond just the information collection process

 7   with the unions?

 8        A    Once we started in the November time

 9   frame, I would say it was more information

10   sharing for the next couple of months.

11             We tried a couple of different

12   things or a couple of different activities to

13   get the negotiations started, but the reality

14   was that they really started to pick up once we

15   filed the 1113/1114 motion at the end of I

16   believe January.

17        Q    And then getting into the February

18   time period, did there come a time where

19   management and the board of directors of Dana

20   became aware of Centerbridge having a role with

21   the unions?

22        A    Yes.

23        Q    What happened?

24        A    We first became aware of

25   Centerbridge in a news report that Centerbridge
```

```
1                    DANA CORPORATION

2    had been retained to advise.  Not long after

3    that then Steve Girsky, who used to be an auto

4    analyst with Morgan Stanley, who was a member

5    of the Centerbridge team, called me and said

6    they will be engaged to advise the steel

7    workers and then shortly thereafter, not the

8    steel workers, but also the auto workers.

9         Q    And was the fact that the union had

10   retained Centerbridge a subject of discussion

11   at a board meeting at the end of February or

12   March 1st?

13        A    Yes.

14        Q    What was discussed?

15        A    We actually discussed this and said

16   we're not quite sure what Centerbridge's role

17   is.  They are -- an equity house is typically

18   not an advisor.  They don't make money on

19   advising and there were different possibilities

20   that could occur, one being that they could

21   possibly try at an appropriate time to buy the

22   union claim for OPEB.

23        Q    All right.

24             Do you recall when Dana entered into

25   a settlement with the nonunion retiree
```

1                    DANA CORPORATION

2    committee and IAM with respect to the

3    termination of retire benefits?

4         A    The best I could probably get to is

5    the middle of March.

6         Q    At what point were we starting 1113?

7         A    I think you were actually just

8    restarting after a recess I believe or I think

9    you had opening comments and then we had a

10   recess and it was starting.

11              Over a weekend period before that

12   restart, we reached agreement with the salaried

13   retirees and we also reached agreement with the

14   international machinists.

15        Q    Now, with the settlement with the

16   nonunion, the salaried retirees, what was the

17   settlement with respect to Dana's obligation to

18   fund the VEBA?

19        A    We had an obligation, as I recall,

20   of 320 million.  Settlement was about 80

21   million and the settlement was cash of 80

22   million.  So it was about 25 cents on a dollar

23   of the OPEB liability.

24        Q    And was there then a board meeting a

25   few days later in which the board considered

```
 1                  DANA CORPORATION
 2   and authorized management to go ahead, to go
 3   forward with settlement?
 4        A    Yes, there was.  We did the
 5   negotiations with the salaried retirees over
 6   the weekend and then we made it contingent upon
 7   board approval and took it to the board I want
 8   to say the middle of the following week.  Maybe
 9   it have been the first couple days of the
10   following week.
11        Q    It could have been March 16?
12        A    That sounds correct.
13        Q    At the March 16th meeting, did the
14   board also then consider the possibilities of a
15   settlement with the unions with respect to the
16   elimination of retiree benefits for union
17   employees?
18        A    They actually discussed it at the
19   board meeting as I recall and felt like that,
20   you know, from our feelings the people that
21   we're dealing with the negotiations, the
22   1113/1114 process, our advisors, people felt
23   like maybe there might be a chance that the
24   union rather than subject themselves to the
25   trial, might want to try to settle and we asked
```

124

```
 1                  DANA CORPORATION

 2   for authorization and received authorization.

 3        Q    Now, in the course of that

 4   discussion, did the board consider a possible

 5   range or a range of possible outcomes over

 6   litigation over the size of the union claim

 7   that might result from eliminating their

 8   retiree benefits?

 9        A    They did.

10        Q    What was the range that the board

11   considered of possible outcomes?

12        A    Just right at 400 million to

13   essentially a billion.

14        Q    And the billion represents the OPEB

15   number on Dana's books for the union retirees?

16        A    That's correct.

17        Q    And you said the board gave you an

18   authorization to pursue settlement.

19             What was the board settlement to

20   management with respect to pursuing settlement

21   negotiations in the next two weeks with the

22   union?

23        A    We met with the advisors of

24   management.  We made about 40 or 50 cents and

25   we had a board approval.  They discussed it and
```

```
 1                    DANA CORPORATION
 2   approved up to 50 cents on the dollar, so
 3   roughly $500 million would have been roughly
 4   $500 million if they approved 40 to 50 cents.
 5        Q    When the 1113/1114 trial recommenced
 6   a couple of weeks later on March 26th, what
 7   else happened on that day with respect to
 8   negotiation with the union?
 9        A    We actually held our first, for lack
10   of a better word, top table discussion.  In
11   other words, key principals with both the steel
12   workers and the auto workers and key
13   negotiators on our side, Andy Kramer, our
14   advisors, Henry Miller.
15             There were a number of people that
16   were at the meeting to try to begin to put a
17   boundary on what we were considering for, what
18   they might be willing to do and start to get a
19   boundary of ground of the considerations of how
20   we were going to negotiate it.
21        Q    And then was there then a board
22   meeting again on Friday, March 30th in Atlanta?
23        A    There was.  That was in Atlanta and
24   we reviewed the preliminary business plan but
25   we also had a discussion about our first top
```

```
 1                   DANA CORPORATION
 2   level meeting with the unions, our first really
 3   truly top level meeting where there was
 4   something of substance discussed and we
 5   discussed at that meeting where the unions
 6   might come out.
 7        Q    And did you also discuss at that
 8   meeting the indication of a possible strike
 9   that the unions had been making during the
10   course of the 1113/1114 trial?
11        A    The unions had actually taken in,
12   many locations had actually taken strike
13   votes.  So they were prepared, if need be; they
14   were prepared.  They had already prepared at
15   least and had strike votes authorized to take
16   action if they desired.
17        Q    All right.  And then after the
18   closing arguments on April 3rd at the 1113/1114
19   trial where you indicated you read the judge's
20   comment urging the party to argue to negotiate,
21   what happened right after that?
22        A    We had another top level table
23   meeting.
24        Q    Where was it?
25        A    That one was actually in Detroit
```

```
 1                   DANA CORPORATION
 2   also and then we started to, we really started
 3   to get at substantive issues and I would say
 4   probably at that meeting both sides really laid
 5   out what they were after.
 6         Q     You first started to ardently
 7   negotiate these provisions?
 8         A     Exactly.
 9         Q     Had the concept of a plan sponsor
10   been raised bright unions at this time?
11         A     I don't believe.  I think that came
12   out at the next meeting.  There were a total of
13   six to that table meetings and I think that
14   came out at the next meeting.
15         Q     The next meeting was towards the end
16   of April?
17         A     It was about two, two-and-a-half
18   weeks later then.
19         Q     Where was that meeting?
20         A     That meeting was in Cleveland and at
21   that meeting, the unions raised the point that
22   they felt like they wanted and needed a plan
23   sponsor and articulated why.
24         Q     Then after that meeting, did you
25   direct Jones Day to send a letter to his honor
```

```
 1                    DANA CORPORATION
 2   regarding the 1113/1114?
 3        A    We asked for a delay.  That
 4   negotiations were moving and that we wanted to
 5   try to find a way to get this done and to
 6   please hold the 1113/1114 ruling and to see if
 7   we could do it.
 8        Q    Then what was going on then the
 9   first week of May with respect to your
10   negotiations with the union?
11        A    We had another meeting.  At that
12   meeting, I believe Centerbridge came out as the
13   plan sponsor and, again, good discussions, more
14   progress.
15             I think at that meeting we laid out
16   a floor on what we would, we might agree to
17   from an OPEB standpoint.  It was less than
18   $400,000,000 and we had a pretty strident
19   discussion with regard to what the union was
20   expecting.
21        Q    And in addition to these to that
22   table or head table negotiations, were there
23   also other negotiations going on between people
24   that don't sit at the head table in terms of
25   the individual provisions?
```

```
 1                    DANA CORPORATION

 2        A    Well, individual provisions around

 3   the top table discussions is the big discussion

 4   but also we had tried a couple of times to

 5   begin to get local issues started in terms of

 6   the negotiation of local issues.

 7        Q    And did you direct Alex Partners to

 8   assist you in these negotiations of all these

 9   individual provisions?

10        A    Actually before either right at that

11   meeting or right before that meeting or the

12   next one we actually had.

13             I recall we got all of our side

14   together in Detroit after one of these meetings

15   and we talked about what we were doing, what

16   our strategy was and I wanted to ensure that we

17   knew exactly where we stood in terms of

18   run-rate savings for what we were discussing

19   and agreeing as well as what the cash cost

20   was.

21             So we basically put together a

22   ledger sheet that every time we made a move or

23   made a proposal, we knew exactly what the cost

24   would be in terms of run-rate savings but also

25   cash cost so we could keep a track of this
```

1                    DANA CORPORATION

2    because it was so complex my concern was we

3    would lose traffic where we were and lose

4    Stroock on the table.

5         Q    Sometimes called scorecard?

6         A    I think scorecarding is the word

7    that the Alex people used and I asked the Alex

8    people to do it.

9              Interestingly enough, the union had

10   also engaged not only Centerbridge but also a

11   gentleman by the name of Leon Pocock and he had

12   also started a score carding process and at

13   times we were comparing score cards to see if

14   we costed these things the same way.

15        Q    Were there table -- there were

16   negotiations over the proper score-carding as

17   to what we would agree to?

18        A    Fully as all negotiations go, that

19   happens.

20        Q    I think you already indicated to the

21   judge you had another head-table meeting in

22   Pittsburgh around May 8th; is that correct?

23        A    Around May 8th or 6th, in that time

24   frame.

25        Q    And that's the meeting where Dana

```
 1                  DANA CORPORATION
 2   made an initial offer of what they would
 3   contribute to a VEBA in return for eliminating
 4   the union retiree retirement?
 5        A    That's exactly right.
 6        Q    Was there a subsequent meeting head
 7   table negotiation in Detroit shortly after
 8   that?
 9        A    Yes, there was.  Again, I think May
10   13th or 14th or 15th.
11        Q    Did the unions make a counteroffer
12   on one contribution to a VEBA they would demand
13   in exchange for Dana's termination of retire
14   benefits for union employees?
15        A    They did and, as I recall, that was
16   in the area of a billion dollars.  Somewhere
17   between the high nines and a billion dollars.
18        Q    So the opening offers and
19   counteroffers are somewhere between 350 and 400
20   by Dana and somewhere between 900 and a billion
21   by the union?
22        A    That's correct.
23        Q    At this head table negotiation, was
24   there also a discussion of a term sheet for a
25   planned sponsorship by Centerbridge on behalf
```

```
 1                  DANA CORPORATION
 2   of the unions?
 3        A    Yes, for the first time we saw I
 4   guess what really came out was the fact that
 5   the unions had decided that Centerbridge was
 6   the plan sponsor that they wanted to use and it
 7   came out that that was a condition, at least
 8   starting position of theirs, a position on an
 9   overall agreement, an overall labor agreement
10   and we saw a term sheet.  I would say a draft
11   term sheet of what the thought process might
12   be.
13        Q    And I want you to tell the judge
14   what the unions told you at that meeting as to
15   why they were insisting that the you needed a
16   plan sponsor and it had to be Centerbridge?
17        A    The unions told me it really was
18   around the need to ensure that if they were
19   going to give all of the concessions, that it
20   was adequate liquidity, proper leverage in the
21   company and that there was not a short term
22   view but rather a long term view of what the
23   company needed and somebody that would have the
24   capability to, I think the words were apartment
25   guidance.  In other words, to be able to help
```

```
 1                    DANA CORPORATION

 2      look over the company in the term of a planned

 3      sponsor who had financial background and

 4      governance was the other issue, November to

 5      governance.

 6           Q    Was there then a subsequent board

 7      meeting in Detroit where you discussed with the

 8      board this Centerbridge term sheet?

 9           A    Shortly thereafter, I think within a

10      couple days there was a board meeting.  We took

11      the board meeting throughout the draft term

12      sheet, put it up against preliminary numbers

13      that we were looking at and walked the board

14      through what this might look liked.  The board

15      -- it was a spirit discussion.  I won't forget

16      it.

17           Q    Who helped you with that

18      presentation?

19           A    Miller Buckfire and Jones days.  I

20      mean, we were all part of it.

21           Q    And during the course of Miller

22      Buckfire's presentation to the board regarding

23      Centerbridge, did they discuss anything else

24      about Centerbridge in addition to the terms of

25      the term sheet?  Did they go back, for
```

1                DANA CORPORATION

2    instance, in the background, experience of

3    Centerbridge?

4        A    They go into the background or

5    origin of Centerbridge, how they raised money,

6    so on, and then they also raised the issue of,

7    from their own governance standpoint and their

8    own board responsibility, how do we ensure

9    alternative offers and we have to absolutely

10   have alternative offers.  This can't be a sole

11   right of the unions to pick Centerbridge.

12       Q    I want to explore that with you

13   pretty much in the tailend of the settlement.

14            Before we get to that portion of the

15   board meeting, can you tell the judge what the

16   board was told about the experience of the

17   Centerbridge principals in this industry?

18            MR. SHORE:  Objection.  I think

19   there are three hearsays in there.  The debtors

20   have had an opportunity to put Centerbridge

21   forward and they haven't.  I have no problem

22   with what the board was advised but taking it

23   for the truth of who Centerbridge is I think is

24   objectionable.

25            THE COURT:  I will allow it.  I will

1                    DANA CORPORATION

2    give it the appropriate weight recognizing that

3    it may be opinion.

4        Q    And, again, I'm not asking for your

5    opinion, Mr. Burns.  All I want to do is let

6    the judge know what the board considered and

7    the information it considered in reaching its

8    determination in approving the settlement.

9             At this board meeting in May 16th

10   and 17th in Detroit, what did Miller Buckfire

11   tell the board about the experience of the

12   Centerbridge principals in this industry?

13       A    Really talked about two principals

14   and of their lower level advisors.  Two

15   principals, Mark Gogley, talked about Mark put,

16   used to work for Blackstone, put the American

17   Excel agreement together and worked with Dick

18   Graw on that probably it would have been eight,

19   nine years ago, has had a fair amount, I think

20   also the TRW transaction, has had a fair amount

21   of experience in the automotive business.

22            Jeff Aaronsohn came from Angelo

23   Gordan I believe we were told and also had a

24   very good background in distress markets with

25   Angelo Gordan and these two people had come

```
 1                  DANA CORPORATION
 2    together, put a group together in the last 18
 3    months or so and had raised based on their
 4    representation and the team they assembled had
 5    raised substantial money.
 6         Q    You indicated the board at this
 7    meeting in Detroit, May 16th, 17th expressed
 8    concern and had a discussion about a, I think
 9    you called it a fiduciary out; is that right?
10         A    Yes.
11         Q    Tell the board what you recall about
12    that discussion.  Tell the Court --
13         A    Your Honor, the board was very
14    concerned that they handle their fiduciary
15    responsibilities in this process and you need
16    to understand up to this point and since
17    January we have probably had 25 board
18    meetings.  So they are very serious about
19    this.
20              They wanted to make sure they handle
21    their fiduciary responsibility right; that
22    other people had the right and alternative
23    offer.  This wasn't a single process.  Before
24    nobody else had a right to do it.
25              So it was a fairly extensive
```

1                 DANA CORPORATION

2    discussion, quite a bit of direction and, also,

3    and I think, quite frankly, a good agreement

4    among other people then with the board's

5    position that we had to absolutely have a

6    fiduciary out or the ability for alternative

7    offers.

8         Q    Was there a discussion of something

9    like called a two-step process?

10        A    Yes.  It was very clear that we

11   needed to get the labor agreement in place and

12   the labor agreement was going to have to come

13   with a some kind of a plan sponsor.  That was

14   going to be a condition of the unions.  It is a

15   negotiation.

16            It's not likely we are going to get

17   the unions offer of that, so it was probably

18   going to have with it a plan sponsor, but the

19   issue was we needed to get the labor agreement

20   in place.  It is essential for the company to

21   survive and then we will deal with an

22   alternative to the plan sponsor or a different

23   offer to the plan sponsor agreement after we

24   get the labor agreement locked down.

25            So that was the strategy.  That's

```
 1                     DANA CORPORATION

 2    what we were left -- we were left with

 3    management and advisors with two items, which

 4    absolutely must have a fiduciary out and they

 5    must absolutely understand the ability and just

 6    the unions could walk away from the deal that

 7    we were negotiating with them, what was the

 8    union's out and when could they cancel and how

 9    could they cancel and what was the process if

10    they didn't agree to who might replace or who

11    might else come in as an alternative investor.

12         Q    All right.  Put yourself back there,

13    that's May 16, May 17th in Detroit.  The board

14    gives you that direction that you just told the

15    judge.

16              What happens next with respect to

17    your negotiations with the unions?

18         A    The next meeting, actually, it

19    happens with our advisors and Chris Bueter and

20    Bob Arquette almost immediately with the union

21    and with Centerbridge, but the next big meeting

22    is to try to get a labor agreement, to try to

23    get everything around the labor agreement

24    decided, and that I believe is the 24th and

25    25th of May.
```

1                    DANA CORPORATION

2          Q     Now, what is it about that time

3     period May 24th, May 25th head table

4     negotiations where it was felt that this is the

5     time we have to try and resolve everything?

6     What are the dynamics that were making people

7     think you had to do it now?

8          A     In June and July the top table

9     discussion started with the big three, GM, Ford

10    and Chrysler.  In the UAW there is a vacation

11    period that the auto companies take a two week

12    vacation period where they shut down most of

13    their facilities, if not all of fair

14    facilities.

15             So we were coming up against a

16    situation that once those national negotiations

17    started after that two week recess, if we

18    weren't careful, we would be a very small

19    element of a much bigger picture and stood the

20    likelihood of being pushed to the end of

21    negotiations if we didn't get them done ahead

22    of time.

23         Q     When you said end of negotiations,

24    what are you talking about?

25         A     End of going, more than likely there

```
 1                   DANA CORPORATION

 2   will be a settlement, or if they reach

 3   settlement, it will be before the expiration

 4   date, before September and then they have three

 5   of them to do.  They take them in sequential

 6   order.

 7            So this could push this out into the

 8   fall and we were very concerned that if we

 9   didn't get it done in this next, in that next

10   four to six week period and get it ratified

11   that it could get pushed out to the fall.

12        Q    Before you could start again with

13   the negotiation?

14        A    Exactly, exactly, and as we talked

15   about earlier, our goal, it is not just a goal,

16   it is good for the creditors, there is a good

17   reason for the maximization of the estate to

18   get out of bankruptcy this year so that not

19   only can we save the money of the cost of

20   bankruptcy and book the situation savings that

21   we have achieved but also because of our

22   customers.

23            Our customers, there is no way we'd

24   grow the business the way we had like to grow

25   it in bankruptcy because the customers have the
```

```
 1              DANA CORPORATION
 2   uncertainty of whether or not we are going to
 3   emerge.
 4         Q    Now, where did these head-table
 5   negotiations occur in Detroit on May 24th and
 6   25th at this?
 7         A    They occurred at the airport at the
 8   Crown Plaza.
 9         Q    And what was the time period that
10   these negotiations took?
11         A    They started on the 24th, late
12   morning.  I joined them late afternoon.
13         Q    At the Detroit Crown Plaza?
14         A    At the Detroit Crown Plaza.
15         Q    When did you leave the Detroit Crown
16   Plaza?
17         A    I left, all of us left at 6:30.
18         Q    6:30 what?
19         A    In the morning, the following
20   morning.
21         Q    You negotiated all night?
22         A    All night, ran over then to the
23   Winston to do a board meeting at 7 o'clock.
24   There was a telephonic board meeting and then
25   after that board meeting went back to the Crown
```

```
 1                DANA CORPORATION

 2    Plaza into and I believe we ended probably one,

 3    1 o'clock.  So we essentially went 26, 27

 4    hours.

 5         Q    And at that telephonic board meeting

 6    that you had the follow morning on the 27th

 7    when you haven't had any sleep, did you discuss

 8    with the board what management's view was as to

 9    whether the unions would walk away from its

10    demand that there be a plan sponsor acceptable

11    to the union as part of these labor

12    negotiations?

13         A    I think we were more convinced that

14    to get a labor agreement we were going to have

15    to have a plan sponsor.  In other words, to get

16    that labor agreement in place, we were going to

17    have to have some form of a plan sponsor.

18    Obviously, they had Centerbridge.

19              We said there has to be alternatives

20    to that, not only to the plan sponsor but

21    alternatives in terms of other structures that

22    could take place once there was a stalking

23    horse in place.

24         Q    Let's talk about that.

25              During this telephonic board meeting
```

```
 1                DANA CORPORATION

 2    on the 25th, after the all night negotiating

 3    session or during the all night negotiating

 4    session, did Miller Buckfire discuss with the

 5    board the concept of the Centerbridge proposal

 6    as being a stalking horse?

 7         A    It was discussed during that

 8    meeting.  It was also discussed at other

 9    meetings prior to that with the board.

10         Q    And what did Miller Buckfire say to

11    the board in that regard?

12         A    The discussion was around the fact

13    that it was that somewhat the chicken and the

14    egg.  To get labor agreement we had to have, we

15    had to have the Center plan or the Centerbridge

16    support.

17              To get that agreement in place, we

18    were going to have to do that and then we would

19    use that construct as a stalking horse for

20    alternative investments.

21         Q    And did you reach a tentative deal

22    with the unions on most of the terms, the

23    economic terms shortly after that marathon

24    session at the Detroit Crown Plaza?

25         A    We reached an agreement on the
```

144

```
 1                    DANA CORPORATION
 2   majority of the large items and then it went
 3   back to the local negotiations for the work
 4   rule changes and so on, local negotiations for
 5   an intervening couple of weeks, and then we got
 6   into some final top table items in the late
 7   June, early July time frame.
 8       Q    Now, on the big items that you
 9   reached at least economic terms at the end of
10   May, beginning of June, how did the
11   negotiations come out on that VEBA list?  You
12   were at 3, 400 and they were at 900 to a
13   billion.
14            What happened?
15       A    From the time we started 3, 400,
16   there had been some movement during that 24th
17   and 25th meeting.  There was a settlement of,
18   let's see, 600.  It was actually.
19            $660 million and then another,
20   another 40 -- $662 million and then another 42
21   million dollar for long term disability.
22            We had on the books obligation of
23   about I would say 80 million, between 60 and 80
24   million, and we settled that for 40 million,
25   meaning the people that were on long term
```

```
 1                 DANA CORPORATION
 2   disability became the person operating the
 3   VEBA.  It became their responsibility with
 4   regard to their obligations.
 5              So effectively we made an agreement
 6   at $704 million to eliminate OPEB and long term
 7   disability for the UAW and the steel workers.
 8       Q    And that 704 included 650 on the
 9   OPEB liability and then another 650 for
10   whatever and then another 40 million in change
11   for the long term disability portion?
12       A    Yeah, and the way it worked was it
13   was 610 at emergence and we got credit for the
14   amount between the time we made the deal and
15   emergence.  So I think on paper it looked like
16   662 million and then there was a 42 million
17   number for the long term disabilities.
18       Q    So did you then have a meeting with
19   the unsecured creditors committee and the ad
20   hoc committees and the unions to go over the
21   proposed deal with Centerbridge and the deal
22   you'd cut to date with the unions on the labor
23   terms and the VEBA?
24       A    We did.  Again, I think my dates
25   might be a little bit off, June 4th.  It was at
```

146

1                    DANA CORPORATION

2    the Kramer Levin office in the evening where we

3    had the people that were under the large

4    bondholders that are under confis, the

5    creditors committees, both unions and the

6    company and its advisors and we walked through

7    the deal that we had constructed.

8         Q     And was there a reaction by the

9    creditors to the deal as it existed at that

10   time?

11        A     Yes.  In general, you know,

12   actually, in a fairly large way, most people

13   felt like it was a good deal.  There were some

14   questions from certain people but, in general,

15   I think there was reasonable support out of

16   that that then, that the proof is in the

17   details here to get it buttoned up and to take

18   it the rest of the way.

19        Q     Did you then have a meeting with the

20   board on June 8th in which you discovered the

21   creditors reaction to the June 4th meeting?

22        A     We did, and we discussed that at

23   length with the board and I think the board

24   asked a lot of questions, not only of me but

25   also of the advisors for opinion and Andy

1                    DANA CORPORATION

2    Kramer.

3         Q    Let's not get into counsel.

4              What did Henry Miller from Miller

5    Buckfire tell the board about the reaction of

6    the creditors committee professionals to this

7    deal?

8         A    His comments were that they were

9    supportive.

10             (A break from the record was taken.)

11        Q    Mr. Burns, picking up where we left

12   off with the June 8th board meeting in which

13   the board was updated on the creditors reaction

14   to the walk through of the terms of the deal,

15   what happened in terms of the five-year

16   business plan of Dana at this time, middle of

17   June?

18        A    The business plan, up to this point,

19   the business plan was still being worked on and

20   came together second week, finally came

21   together the second week of June or so, and,

22   actually, as a result came out a little bit

23   better than we had been using.

24        Q    Did management make that business

25   plan or show it to Centerbridge?

1                    DANA CORPORATION

2        A    Management at Centerbridge was doing

3    due diligence.  They were under a confi, I

4    wanted to say June 13th.  There were in and

5    actually had a lot of people, a lot of advisors

6    and others in for about a week period I think

7    starting on the 13th and they sought numbers on

8    the 13th.

9        Q    And those numbers, without telling

10   the whole open courtroom what those numbers

11   are, how would you characterize those numbers

12   in terms of the projected EBITDA of the

13   company?  Were they aggressive?  Conservative?

14   What are the words that you use?

15       A    The word I would use is "center."

16   They were centered.  They were numbers that

17   were somewhat down the middle, in other words,

18   not aggressive, not conservative but centered.

19       Q    And how did those projected EBITDA

20   numbers compare to the numbers that the parties

21   had been using during the labor negotiations

22   when you negotiated the proposed contribution

23   it the VEBA?

24       A    They were higher.  They were higher

25   on an annual basis, really starting in '08.

```
 1                    DANA CORPORATION

 2        Q    And did you then have an occasion

 3   later to share these same projected numbers in

 4   the five-year plan with the union's financial

 5   advisor Bob Hillcock?

 6        A    They were part of, they were

 7   obviously under the same confi, so they were

 8   sharing information with Centerbridge and also

 9   we're privy to the same information in the

10   company.

11        Q    And what was the result or what was

12   the reaction of the unions when you shared with

13   them the higher projected EBITDA numbers, the

14   numbers that were higher than what the parties

15   had been using when they were negotiating the

16   $740 million for the union?

17        A    The unions came back and said they

18   needed to go back to the VEBA number again.  In

19   other words, they needed to rediscuss the VEBA

20   number because based, upon the EBITDA numbers

21   from the company, the VEBA needed to be larger.

22        Q    You say they needed to rediscuss?

23   Did they put a number on this rediscussion?

24        A    It started out as a fairly large

25   number.
```

```
 1                 DANA CORPORATION

 2       Q     And what was the demand?

 3       A     Their demand was, their basis was I

 4  believe $130 million is what they started with.

 5       Q     They wanted another?

 6       A     Another 130 million dollar

 7  contribution to the VEBA.

 8       Q     What was your initial offer?

 9       A     Our position was the numbers were

10  higher.  I believe we offered 40 million.

11       Q     Now, during that discussion, was

12  there a discussion of a section of the

13  Bankruptcy Code called 1114(g)?

14       A     Yes, there was.

15       Q     Would you tell the Court the history

16  of that discussion, please.

17       A     The discussion for 1114(g) was that

18  under the new Bankruptcy Code, if the recovery

19  was higher than what something was negotiated

20  at to the ultimate claimants, in other words,

21  if in the end where they would settle the VEBA

22  at a lower number and ultimately the estate was

23  worth more, they had a right to the second

24  bite, in other words, a right to come back and

25  renegotiate a higher number.
```

```
 1                    DANA CORPORATION

 2              We did not want to have that happen,

 3    so as part of our condition for that

 4    negotiation, we said that they would have, if

 5    we were going to negotiate for more VEBA than

 6    what we had agreed to in the May time frame,

 7    then they would have to waive the right on

 8    1114(g) and went back and forth and, finally,

 9    as I believe you know, they ended up waiving

10    that right.

11         Q    What was the number that the parties

12    ended up agreeing on with the additional waiver

13    of the union's right to seek additional

14    increase under Section 1114(g)?

15         A    We went back and forth and

16    ultimately ended up on agreeing on $80 million

17    worth of stock in addition to the 704 million.

18              So it went from 704 to 784 and that

19    included both the OPEB as well as the long term

20    disability liability.  So we were talking

21    about, we were talking about on roughly a

22    billion, under a billion 1 of total liability.

23         Q    Now, that 784 figure, 704 in cash

24    and 80 in stock is what the deal was when we

25    filed the global settlement motion on July 5th,
```

1                    DANA CORPORATION

2    right?

3         A    That's correct.

4         Q    That's changed now.

5              What is your understanding as a

6    result of discussion with the ad hoc committee

7    and creditors committee what is now as of

8    today, the deal on Dana's contribution to the

9    union VEBA?

10        A    The 80 million of additional stock

11   has been reduced to $60 million of cash.  So

12   it's a 20 million dollar reduction and, quite

13   frankly, came out of this entire process of

14   trying, trying to true up the deal.

15        Q    The deal is now 764 million cash to

16   the VEBA; is that right?

17        A    That's correct.

18        Q    And that reflects not only the OPEB

19   number but also the 40 million dollar agreement

20   on the long term disability; is that right?

21        A    42 million.  It is all inclusive.

22        Q    So it puts substantial value on the

23   long term disability if I'm doing my math

24   right, 720 odd on the OPEB?

25             MR. LAURIA:  Objection.  Objection,

```
 1                    DANA CORPORATION

 2   your Honor.  I think we are at our sixth

 3   leading question.

 4                MR. HAMILTON:  It is a mathematical

 5   calculation, your Honor.

 6                THE COURT:  I will allow it.

 7       Q    Go ahead.

 8       A    We went from 784 to 764.  764 less

 9   the long term disability would make it 722.

10                THE COURT:  So you did better

11   without the leading question.

12       Q    What was the range of possible

13   outcomes that the board had considered on the

14   claim of the OPEB number?  Define to the Court

15   what it was.

16       A    As we discussed earlier, we are

17   roughly 400 million to a billion.

18       Q    And the number we settled on is

19   what?

20       A    722.

21       Q    Was there then after you agreed on

22   this number another board meeting in New York

23   to walk the board through the deal?

24       A    The following day.  We settled on

25   the VEBA number on the night of the 25th and
```

```
 1                    DANA CORPORATION

 2   the following day on the 26th.  I believe it

 3   was the 26th there was a board meeting, an

 4   in-person board meeting, to walk the board

 5   through the final business plan and the

 6   preliminary evaluation from Miller Buckfire.

 7       Q    And were the actual agreements, the

 8   draft agreements, the union agreements and the

 9   plan support agreement and the draft investment

10   term sheet, were those all presented to the

11   board as well?

12       A    Yes, they were.  They had been

13   updating at this board meeting with every stat

14   but the documents were shown at the board

15   meeting and that would have been that June 26th

16   or 25th.

17       Q    Who walked them through all those

18   agreements?

19       A    Corinne, Corinne and Marilyn Sonnie.

20       Q    After that board meeting on the 25th

21   in New York, did the board at that time

22   authorize you to enter into these settlement

23   agreements?

24       A    The board authorized us to, to, we

25   had a couple things that had to be negotiated
```

```
 1                    DANA CORPORATION
 2    and we discussed those with the board and the
 3    board then gave us the ability to move forward
 4    with, as I recall, with a, with a proviso that
 5    we went back to a couple of the directors.
 6         Q    Now, is this discussion at the board
 7    meeting in New York or was there a follow-up
 8    telephonic board meeting I would say?
 9         A    It was at the end of the next day,
10    before we thought we were going to file, we had
11    a telephonic board meeting.
12         Q    And what were the outstanding issues
13    -- did you have any outstanding issues at the
14    June 28th board meeting with respect to USW?
15         A    No, I don't believe we had any with
16    USW.  We had two, real two issues with the UAW.
17         Q    What were they?
18         A    One of them was a VEBA trust trustee
19    question.
20              Our position is and our auditor's
21    position is that to keep the liability off our
22    balance sheet, we cannot have anybody
23    associated with the VEBA trust.
24              They obviously felt differently.  We
25    agreed to disagree and we agreed then, at the
```

156

                          DANA CORPORATION

 1

 2   time of that, it wasn't then but over the

 3   subsequent days prior to filing at the fifth,

 4   we agreed to collectively approach the SEC for

 5   essentially an opinion or ruling with regard to

 6   that.

 7        Q    Was there an issue regarding the

 8   local settlement with Longview as well?

 9        A    As I told you earlier, we had three

10   plants that had union representation but did

11   not have collective bargaining agreements.

12             One of those we were having a

13   difficult time getting a local agreement on of

14   the wages, the wage changes at that plant, and

15   that was Longview, Texas.

16        Q    Subject to those two open issues at

17   the June 28th board meeting, did the board

18   authorize the debtors to enter into the

19   agreements that constitute the global

20   settlement?

21        A    Yes, they did.

22        Q    Can you tell the Court then just

23   real briefly what happened then over the next

24   seven days, over the July 4th weekend?

25        A    We continued to negotiate, go back

```
 1                DANA CORPORATION

 2   and forth over these two issues.  We ultimately

 3   got the Longview issue settled and then the

 4   VEBA trust was the last one really to fall, as

 5   I explained, what we agreed to do, and that

 6   actually went up to and I guess it was one

 7   other small issue, but it went up to

 8   essentially late in the night on the 5th and we

 9   filed.

10        Q    And you filed.

11             Tell the Court your understanding of

12   the five basic structural components of the

13   deal that we filed, the global settlement.

14        A    The global settlement obviously had

15   these components to it," the elimination of

16   OPEB and post-retirement health care and also

17   the long term disability.

18             We had major wages, work rules and

19   health care changes that were part of this in

20   the labor agreement.  We had footprint changes,

21   footprint meaning closure of plants,

22   consolidation of plants and other activities

23   and then we had a set up 500 to a 750 million

24   dollar infusion in convertible preferred from

25   plan sponsors and then in return, the fifth one
```

```
 1                    DANA CORPORATION

 2    would have been what we would call an

 3    alternative, fiduciary out and then provisions

 4    around the Appendix R, which were the

 5    provisions under which conditions the union

 6    could reject an alternative sponsor or an

 7    alternative plan.

 8         Q    And what happened at Jones Day on

 9    July 9th in terms of explaining this deal?

10         A    We actually on July 9th had a

11    creditors committee and a large collection of

12    people that were under a confidential

13    agreement, ad hoc bondholders, and we met with

14    them and explained the deal.

15         Q    And then over the course of the next

16    two, two weeks, what occurred?

17         A    A lot of negotiation, a lot of

18    negotiation.

19         Q    Among whom?

20         A    Among the creditors committee, the

21    ad hoc bondholders and it really, really was

22    about certain parts of the agreement, and so

23    there was a fair amount of give and take and

24    actually some pretty positive movement and help

25    by the various constituents, creditors
```

1                 DANA CORPORATION

2    committee and others helping solidify the final

3    details, in some cases those that they were

4    concerned with at the July 9th meeting.

5         Q     Has the board of directors of Dana

6    considered the modifications to the agreements

7    that constitute the global settlement that were

8    agreed to by the parties in connection with the

9    discussion between Centerbridge and the ad hoc

10   committee and UC?

11        A     Yes, they have.

12        Q     When did they consider those

13   modifications?

14        A     They considered those modifications,

15   they considered the status of those

16   modifications in a board meeting about a

17   week-and-a-half ago and another board meeting

18   on the I want to say the 24th, July 24th.

19        Q     Tuesday night?

20        A     Tuesday night.

21        Q     When they considered their changes,

22   what was their ultimate judgment?

23        A     After discussion and questions,

24   their business judgment was that we should move

25   forward with the plan support agreement, the

```
 1                   DANA CORPORATION

 2   labor agreement and the investment agreement as

 3   modified to establish the process under which

 4   alternative investors could be reviewed and,

 5   and, in addition, we also would take the labor

 6   settlement to the court and to his Honor to get

 7   approval for that.

 8        Q    Has the board directed management to

 9   enter into these agreements if the bankruptcy

10   approves them?

11        A    Absolutely.

12        Q    How would you characterize the labor

13   deal that's been negotiated with the unions

14   working for Dana?

15        A    In terms of labor deals, it's pretty

16   exceptional.  I think a better way to say it it

17   is groundbreaking.

18             Typically in Labor Day you got a

19   couple of pieces or a few pieces of your cost

20   structure and you address.  In this case, we

21   have addressed every piece of the cost

22   structure, from active health care wages, work

23   rules, so on.

24        Q    Let's lay it out for the judge

25   here.
```

```
 1                DANA CORPORATION

 2              What are the key benefits, the key

 3     cost areas that Dana has achieved in this Labor

 4     Day?

 5         A    Obviously, a big one is

 6     post-retirement health care and long term

 7     disability.  Elimination of those.

 8              Essentially Dana is out of, with

 9     this agreement confirmed, we are out of the

10     long term health care business for

11     post-retirement as well as long term

12     disability.  So that's a big issue.

13              Wages, work rules, wages,

14     exceptional there from the standpoint of a

15     second tier and what's interesting about this

16     second tier and critical for us it is a second

17     tier wage to a 14 dollar entry with steps in

18     subsequent rules already established what the

19     economics are for the four-year period.

20              So we know what the economics are

21     versus other cases where they have sliding

22     economics as they go through those four years.

23              Another big issue --

24         Q    When you say, I'm sorry, Mr. Burns.

25     When you say other cases, what are you
```

162

```
 1                    DANA CORPORATION

 2   referring to?

 3        A    I'm talking about, when I say other

 4   cases, other negotiations where second tiers

 5   have been established.

 6        Q    In what industry?

 7        A    In this industry.

 8        Q    Competitors?

 9        A    Competitors.  Where it has been

10   established where they have not locked down the

11   wage escalation during the contracts, in other

12   words, if the second tier can escalate across

13   the contract.  In our case $14, $15 the second

14   year.

15              Our 14, 14.50, 15, 15.50 across the

16   four-year period for a new employee, that's

17   important.

18        Q    What does the buy-out provision

19   entail in terms of this two tier section?

20        A    We plan to buy out approximately 600

21   people that are really high cost first year

22   people and replace them with second tiers.

23              So we are buying out somebody that

24   at end has 40, $45 plus wage rate and replacing

25   them with somebody that has a starting wage
```

1                    DANA CORPORATION

2    rate of $14 and some level benefits on top of

3    that.  So it's half, at least half maybe more

4    of what that total wage rate would be, and the

5    buy-out was very economic again compared to

6    industry term.

7            For a buy-out of an employee, it was

8    $45,000 versus what we have seen at Ford, GM,

9    ad others well in excess of $100,000.  So we

10   have got a good negotiation there.

11           In addition, we bought out people

12   that were on layoff in Ft. Wayne.  We had a

13   modest payment to them to take them out of a

14   first tier structure.

15       Q    How many employees are we talking

16   about there?

17       A    200 people.  When they come back,

18   they come back as a second tier employee.

19           All the work rules are good, a lot

20   of improvement there.  About $600 million of

21   additional improvement.  Work rules in the

22   various plants on a local basis.  So that's

23   good.

24           Active health care, critical.  We

25   have got everyone on a consumer driven plan.

1                    DANA CORPORATION

2        Q    What's the company's experience with

3    the consumer driven plan?

4        A    We have had both up to this point.

5    We have consumer driven plans where people

6    share in the cost of the plan in terms of

7    payments and deductible and also share in the

8    inflation of the plan versus the contrast, what

9    I would call closer to first hour coverage

10   where the company pays for everything including

11   all the inflation.  So a big difference in

12   terms of cost to the company.  People get more

13   involved when they have consumer driven plans.

14            We now have the entire company, our

15   salaried, our nonunion as well as our union

16   people on consumer driven plan and they share

17   then going forward.

18            In the case of the unions, they

19   share in the inflation.  All employees share in

20   the inflation of, you know, up to 6 percent.

21            If the inflation goes up 12 percent

22   in a year, the employees pick up 6 percent of

23   that in terms of that inflation rate.

24       Q    What happened to COLA as part of

25   this labor deal?

```
 1                  DANA CORPORATION

 2          A     COLA, Cost of Living Allowances,

 3    traditional in this industry and we had four,

 4    four facilities that had COLA allowances, those

 5    had accumulated up to $3.50 cents an hour.

 6    Those were eliminated and we have no COLA

 7    responsibility going forward.  So, again, a de

 8    facto wage reduction.

 9               This is truly a groundbreaking type

10    of an agreement.

11          Q     And what did you do with pensions?

12          A     We went to a defined contribution

13    plan, so we froze pensions, went to a defined

14    contribution across the board.  People don't

15    lose their pensions they have accumulated.

16    They just get frozen and we move into a defined

17    contribution.

18               That's important because of the new

19    pension rules and you get into a lot of topping

20    up and costs that runs to the income statement

21    there.

22          Q     In addition to the wages and benefit

23    terms of the labor agreement, was there a

24    discussion and agreement reached on footprint?

25          A     Yes, the footprint discussion had to
```

```
 1                    DANA CORPORATION

 2   do with the closure of some facilities and I

 3   think is important a recognition by the parties

 4   that there were certain things that we're

 5   challenging to do, machining of parts, gear

 6   cutting, grinding of and cutting of parts, an

 7   understanding of how difficult it is to be

 8   competitive in the U.S. at the high wage rate

 9   so that was important.

10                    In some cases, we moved some of that

11   work.  In some cases, we closed some plants and

12   consolidated some of that work but I think for

13   the first time a true understanding of what a

14   company in our situation faces with regard to

15   the competitiveness of that versus the rest of

16   the world.

17        Q    So is the union now in agreement

18   with management's plan with respect to

19   optimization of the footprint?

20        A    They are, and they also become a

21   participant in helping us as we get challenges

22   going into the future.

23        Q    Now, let's go back to the 1113/1114

24   case that you described at the beginning of

25   your testimony.
```

```
 1                 DANA CORPORATION

 2            What was the total range of the

 3    three buckets that we just talked about, the

 4    labor cost, the retiree health care cost and of

 5    the MFO, what was the total target that you

 6    were seeking in those three buckets?

 7         A    Counting all employees 190, $265

 8    million.

 9         Q    And if you incorporate the nonunion

10    labor cost of reductions that you were able to

11    get and your settlements with the IAM and the

12    nonunion retiree committee, union settlement

13    agreement, we are asking the Court to approve

14    today results in what amount of annual savings?

15         A    The union agreement alone, the UAW

16    and the steel workers agreement we're talking

17    about well in excess of $100 million and

18    combined more than $225 million.  So you think

19    about that 190 to 367 clearly right in the

20    range that we were targeting for as a necessity

21    to have a viable sustainable going forward.

22         Q    And earlier this morning you

23    indicated how interested your customers were in

24    Dana's ability to restructure its labor and

25    legacy costs during the bankruptcy.
```

```
 1              DANA CORPORATION

 2              Have you received any indication

 3   from your customers as to how they view this

 4   labor deal?

 5        A    As you know, in this process it is

 6   somewhat of an opening book.  So people were

 7   able to look at the filings and look at it and

 8   I've had a number of customers who have called

 9   me and actually been quite encouraged by the

10   progress that was made not only for the company

11   but from the standpoint of reducing labor

12   costs.

13        Q    And what significance does that have

14   with respect to the company's ability to

15   achieve the other portions of the restructuring

16   initiatives that you identified as being

17   necessary to make reorganization successful?

18        A    If you remember, we were looking for

19   275 to 200 million of price improvement from

20   author customers.

21              A lot of them, all of them have

22   stepped forward and given us price increases.

23   Obviously, if we didn't get the rest of it, it

24   looked like the company wasn't going to make it

25   out of bankruptcy.
```

169

```
 1                DANA CORPORATION

 2           Then they made a bad deal and they

 3    would start finding ways to resource and do

 4    things.  So this was encouraging to them to see

 5    that the plan we laid out that we took them

 6    through we are actually implementing it.

 7      Q    Do they have abilities, do they have

 8    ways to take away the price increases in

 9    assessing service you have given if they don't

10    think you have done what you need to do?

11      A    Sure, they have a lot of ways to do

12    it.  They can do it through reorganizing

13    programs before the program is over or at the

14    end of the program.

15           They are a lot of ways for them to

16    redirect programs that are both in process as

17    well as ending a program.  So it really is

18    important for them to have a feel not only in

19    the U.S. for the U.S. manufacturers but also

20    for the manufacturers around the rest of the

21    world because everybody understands how

22    integrated the business is, and if you can't

23    make the U.S. work, then ultimately it gets the

24    rest of the world.  So it is a growth issue for

25    us.  It is a profitable growth issue.
```

```
 1                    DANA CORPORATION

 2        Q     And what's the term of this labor

 3   agreement?

 4        A     Four years.

 5        Q     So you have four years now of labor?

 6        A     Four years of an understanding of

 7   what are costs are, of labor piece and the

 8   ability then to really work on the business to

 9   get the business growing and completely fixed.

10        Q     And what is your expectation of the

11   impact that this four year labor piece will

12   have on your global operations?

13        A     It will cause the global operations

14   to be better.  It will also cause us to grow.

15        Q     Why?

16        A     Because people will have comfort

17   that we're a sustainable business and that, you

18   know, to the Japanese, the Europeans,

19   bankruptcy is a tough concept for them and it's

20   a big, it's a big weight on the company's

21   shoulder from the standpoint of growing

22   business.  So it becomes very important for

23   them to have the confidence that the company

24   has the sustainable and the wherewithal to go

25   forward.
```

```
 1                 DANA CORPORATION

 2        Q    Does management have an expectation

 3   that if this Court approves this global

 4   settlement Dana will be able to achieve a 5 to

 5   6 percent EBITDA operations going forward to be

 6   successful globally when it emerges from

 7   Chapter 11?

 8        A    Yes, that's a key ingredient here.

 9   Let me just clarify though, when we get to full

10   run-rate savings of this, it would just be as

11   emerged when all manufacturing footprint has

12   changed then, yes, you get into a picture in

13   the 5 percent range.

14        Q    So if the Court approves this global

15   settlement, it is management's expectations

16   that Dana will be able to reorganize

17   successfully and compete in the global

18   marketplace?

19        A    That's absolutely true.

20        Q    Now, in addition to those benefits,

21   does the deal that's been struck offer any

22   opportunities for Dana to receive even better

23   offers from other potential investors?

24        A    We talk about the alternatives that

25   exist here and we have not closed any of those
```

172

<pre>
 1                DANA CORPORATION

 2   off, will not close any of these off with the

 3   approval of the plan support agreement, the

 4   investment agreement and the labor agreement.

 5               I take it the other way I would say

 6   we have probably opened up the opportunities

 7   because somebody who is going to invest in the

 8   company knows what kind of labor deal they

 9   have, and that is also, any time you are in a

10   company that has unions and labor negotiations

11   it is always a big unknown in terms of selling

12   a business or buying a business.

13        Q    Until you started working, the

14   creditors committee and the ad hocs were the

15   tentative deal that had been reached with the

16   unions and Centerbridge, had anybody else come

17   to Dana with a concrete proposal to invest

18   money to get this company out of Chapter 11?

19        A    No one.  No one.

20        Q    I want you to explain to the judge

21   how this deal with Centerbridge and the union

22   paves the way for others to now come in and

23   offer better proposals?

24        A    Your Honor, this doesn't preclude

25   anybody from coming forward with another offer
</pre>

```
 1                    DANA CORPORATION
 2     and, as I said, I think that it gives the
 3     opportunity with the labor agreement to really
 4     solidify the cost savings that are necessary
 5     for the businesses to sustain itself so it's
 6     actually I think positive.
 7               The union, we have got an agreement
 8     with the unions with regard to their consent
 9     rights with alternative investments.
10               We have an agreement with
11     Centerbridge with regard to their rights and we
12     have a process that we can go through and
13     manage our way through and nothing prevents
14     people from putting a better offer on the
15     table.
16               And I assure you that the UAW, the
17     steel workers are not, they just didn't get off
18     the truck yesterday.  They've been around a
19     while.  They know value and if somebody puts
20     something better on the table, they are going
21     to have to look hard at that before they ever
22     turn it down.
23          Q    Now, if for some reason this Court
24     were not to approve this global settlement with
25     the unions and were instead to issue a ruling,
```

1                    DANA CORPORATION

2    a favorable ruling to the company on your

3    1113/1114 application, what is management's

4    expectation as to that result, management's

5    expectation as to how that result would affect

6    the prospects of other people coming forward

7    with better proposals?

8         A    I don't think there is any doubt

9    that, you know, you could get it in different

10   forms but there will be some form of labor

11   disruption at some point as a result of that

12   because, to fix the company, we have to take

13   action.  You can't leave everything like it

14   used to be.  So we'd have to take action.

15   There would be some labor disruption as a

16   result of that.

17            I've never been in a case where

18   labor disruption has lead to more value in the

19   company.  It just doesn't.  It usually you

20   destroys value.

21            You don't gain it by going through a

22   labor disturbance and, in the end, it's going

23   to be very difficult to get the kind of deal

24   that we have negotiated.  So it will be very

25   difficult to achieve that if you go through

```
 1                    DANA CORPORATION
 2    labor disruption.
 3         Q    So you talked about how this deal is
 4    groundbreaking.  You talked about how this deal
 5    paves a way for better offers.
 6               What is it about the timing of this
 7    deal that represents an incredible opportunity
 8    for the creditors of this estate?
 9         A    You're going to get the deal, if we
10    approve the deal, you get it done and out at
11    the way prior to the start of the
12    negotiations.  You provide for the ability for
13    the company to have a very good chance of
14    getting out of bankruptcy in calendar year
15    2007.
16         Q    What does that mean to the creditors
17    of the estate?  Why is that so important to
18    preserving all of the estate to get out of the
19    end 2007?
20         A    The process of being in there is a
21    run rate associated with that that people
22    talked about earlier in terms of professional
23    fees.
24               More importantly, if we approve the
25    deal, then you start accruing savings from that
```

1            DANA CORPORATION

2    and, also, the fact that we have approved the

3    deal or the Court approves the deal that then

4    puts us into a situation where we then I think

5    send a strong message to the market, to the

6    competitors, to the customers that we have got

7    a sustainable company.  May get overbid.  May

8    have an alternative investor come in but it is

9    only going to get better from this point.

10        Q    Last question, Mr. Burns.

11             Did the board consider all of the

12   benefits of this global settlement you just

13   outlined for the Court?

14        A    Yes.

15        Q    Did the board make a judgment as to

16   whether or not committing itself to the

17   potential 22-and-a-half or $25 million break

18   up/commitment fee of Centerbridge that it was

19   in the best interest of Dana to go ahead and

20   incur that obligation to get these benefits?

21        A    It absolutely did and, you know, we

22   discussed it.  We have discussed the

23   competitiveness of the break-up fees and the

24   market base situation when we first started and

25   we also discussed them when we got to the final

```
 1                DANA CORPORATION

 2    approval of the three agreements that we're

 3    talking about today.

 4                They absolutely did and in their

 5    view, their view, a break-fee up is

 6    insignificant, especially in an overbid process

 7    to what you would expect to be able to

 8    accomplish with somebody else bidding a high

 9    number for the business.

10                MR. HAMILTON:  Thank you,

11    Mr. Burns.  I have no further questions.

12                THE COURT:  Anyone want to make --

13                MR. SHORE:  I will have a

14    significant cross.  I don't know if you want to

15    break for lunch or whether you me to get

16    started.  I'm happy to do either.

17                THE COURT:  When you say

18    significant?

19                MR. SHORE:  Hour, hour-and-a-half.

20                THE COURT:  Half an hour lunch break

21    it means we will be back 10 after 2.

22                (A lunch break was taken from

23    1:40-2:10 p.m.)

24          A F T E R N O O N   S E S S I O N

25                MR. SHORE:  A couple of issues, your
```

1                    DANA CORPORATION

2    Honor, to start.

3             One, I will just run our exhibits

4    off of four.  We had submitted an exhibit list

5    which I think had three items on it, and so

6    these will be cross-itemed.  Some will be

7    designated for identification purposes like

8    this first one which is an ESE, a debtor's

9    exhibit, and ours will be already into evidence

10   at the end.

11            In addition, some of the materials I

12   will be going through have been designated as

13   confidential by the debtors.  Counsel for the

14   debtors had suggested we take it on a case by

15   case basis with respect to whether or not the

16   cross can continue in open court or not.

17            MR. HAMILTON:  Your Honor, I would

18   just point out that we asked for the objectors

19   to tell us in advance of the hearing what

20   documents they were intending to use as

21   exhibits at this hearing so we could address

22   the situation before the hearing.

23            Appaloosa identified four documents,

24   no one of which are confidential.  They didn't

25   identify any of the documents that he's now

179

1                    DANA CORPORATION

2      referring to.

3              I don't know what he plans on

4      bringing out here in cross-examination, but I

5      do think it is a bit tardy to start bringing in

6      confidential documents as exhibits when they

7      didn't designate them pursuant to their

8      designation.

9              MR. SHORE:  Your Honor, I think it

10     has been pretty clear that nobody was required,

11     as is consistent with normal practice, to

12     reveal the materials which are going to be used

13     for impeachment purposes.

14             I actually think that the only thing

15     in here that is going to be of issues are the

16     deposition transcript, which the debtor himself

17     marked as confidential.  So I don't think that

18     the problem is as big as someone might want to

19     make it.

20             MR. HAMILTON:  If is just for

21     impeachment purposes, I don't anticipate a

22     problem, your Honor, but I thought he said he

23     was going to be introducing a lot of documents

24     in evidence.

25             THE COURT:  As far as impeachment

```
 1              DANA CORPORATION
 2   purposes, I think I'm prepared.
 3              MR. SHORE:  If I may approach, your
 4   Honor and here's Appaloosa Exhibit 4.
 5              (Appaloosa Exhibit 4 marked for
 6   identification.)
 7   CROSS-EXAMINATION
 8   BY MR. SHORE:
 9        Q    Good afternoon, Mr. Burns.  I'm
10   Chris Shore from White and Case.  We spoke at
11   your deposition in Toledo maybe 10 days ago,
12   right?
13        A    About a week ago, yes.
14        Q    And at your deposition I asked you
15   some questions about what's been marked as
16   Appaloosa No. 4, right?
17        A    Yes, sir.
18        Q    And can you turn to paragraph 7 of
19   that agreement and read it into the record,
20   please.
21        A    Paragraph 7.  What page?
22        Q    On my copy it's page 10 but I think
23   you may have a different one.
24        A    You're asking me to read item No.
25   7?  Is that what you're asking?
```

1                    DANA CORPORATION

2        Q    It is two sentences I believe.

3        A    Union's claim.  Is this one?

4        Q    That one.

5        A    It says, this is on page 10 of the

6    document you gave me, it says "Union's claim

7    the parties agree that the amount of

8    classification treatment under the plan of

9    reorganization that incorporates the new

10   investment term sheet of any claim of the union

11   shall be determined in connection with the

12   filing of such plan.  Any such claim shall be

13   voted by the union."

14       Q    And at your deposition do you recall

15   me asking you what claim are we talking about?

16   Do you recall me just asking that question?

17       A    I do.  I do.

18       Q    And you responded that you didn't

19   know, as you state there, what claim was being

20   referred to in paragraph 7, right?

21       A    Well, I think, I believe at the

22   deposition that's what I answered, yes.

23       Q    And that you said though that you

24   would make sure you understand by the time you

25   get to court what paragraph 7 means?

182

1                    DANA CORPORATION

2              MR. HAMILTON:  Your Honor, he's

3    trying to impeach an answer that hasn't been

4    given.  Why can't he ask the witness questions

5    now.

6              THE COURT:  I will let him continue

7    for a short time but he's going to find out

8    that I don't agree with examination that

9    amounts to Three Card Monty.

10        A    I don't recall I said.  By the time

11   I get to the court I will understand.  I think

12   if you want an answer I will give you an answer

13   is the way I recall answering.

14        Q    And what is your understanding what

15   claim is being referred to in paragraph 7 if

16   the settlement agreement is approved by his

17   honor?

18        A    I can only tell you how I would

19   interpret it would be the only thing I could

20   do.  You know, I did not write this language.

21        Q    And what's your interpretation?

22        A    Well, what it says is that with

23   regard to union's claim the parties agree that

24   the amount and the type classification and

25   treatment under the plan of reorganization that

```
 1                  DANA CORPORATION
 2   incorporates the new term sheet, which would be
 3   the term sheet that the new investment term
 4   sheet that we're talking about, shall be
 5   determined in connection with the filing of
 6   such plan.
 7        Q    As a board member, you are the
 8   chairman of the board of Dana, right?
 9        A    Yes, sir, I am.
10        Q    And when you approved this
11   agreement, do you recall asking any questions
12   of the lawyers of what that paragraph meant,
13   not the answer but do you recall asking the
14   question?
15             MR. HAMILTON:  I think that's
16   privileged, your Honor.
17             THE COURT:  Sustained.
18        Q    And after your deposition, do you
19   recall asking anybody, leaving aside lawyers
20   for a moment, what paragraph 7 meant?
21        A    No, sir.
22        Q    Now, you agree that if the
23   settlement is effectuated, Dana is going to be
24   funding directly to the VEBA trust, right?
25        A    That's correct.
```

184

1                    DANA CORPORATION

2         Q    And that you agreed that in lieu of

3    assuming the CBAs and the OPEB liability, you

4    would be funding the trust, right?

5         A    With the agreement, we would be

6    funding a trust, and that agreement being the

7    overall agreement of the collective bargaining

8    agreements and the post-retirement health care

9    and long term disability.  We would fund a

10   trust for the OPEB and long term disability.

11        Q    And that one of the purposes of

12   entering into the settlement was to remove from

13   your books a billion dollars of OPEB liability

14   that was being carried there, right?

15        A    Well, actually, the agreement was to

16   not only remove it from the books but also

17   remove the obligation running through our

18   income statement, we would set up a VEBA that

19   would not only remove it from our books but

20   remove the expense from running through the

21   income statement.

22        Q    Now, you did not obtain a release

23   from the unions of any claims they might assert

24   though under their existing CBAs, did you?

25        A    I'm not sure I'm prepared to answer

1                    DANA CORPORATION

2    that question.

3         Q    Well, do you recall the issue of

4    releasing the unions coming up in any of the

5    board's deliberations?

6         A    Define releasing the unions.

7         Q    Excuse me.  You're right.

8              Do you recall any discussion at the

9    board meetings that the debtors would obtain a

10   release from the unions and the union employees

11   who might make claims in respect of the

12   existing CBAs?

13        A    My understanding was that if we made

14   a payment into a VEBA, there would be no

15   additional claims that would be available from

16   the employees.  That was my understanding.

17        Q    Okay.

18             But you agree that paragraph 7 under

19   your interpretation is that the unions have

20   claims that will be determined in the context

21   of the plan of reorganization?

22        A    Mr. Shore, what I told you is that I

23   gave you my interpretation of it but I did not

24   go back and ask the question about paragraph 7

25   after my deposition.

```
 1               DANA CORPORATION

 2       Q    And, as you sit here today, you

 3   don't have any assurances from the unions, do

 4   you, that they won't file proofs of claim for

 5   amounts they contend are owing under the CBAs

 6   even if the settlement agreement is approved?

 7       A    I'm not aware of any risk that they

 8   could file a claim against the company.

 9       Q    And any nonunion supported bidder

10   that we let negotiate a bid submitted by

11   somebody who the unions do not agree with as a

12   plan sponsor is going to have to deal with

13   paragraph 7, right?

14       A    As part of the settlement agreement

15   between Dana corporation and the UAW, yes.

16       Q    Let's talk about Centerbridge for a

17   bit.  You knew that Centerbridge was in the

18   deal advising the unions prior to their making

19   the plan sponsor bid, right?

20       A    I knew that Centerbridge, as I

21   testified, I knew that Centerbridge as one

22   advisor back in February time frame.

23       Q    And did you understand that

24   Centerbridge was obtaining confidential

25   information of the debtors under the
```

```
 1                    DANA CORPORATION
 2    confidentiality agreement that the unions had
 3    with the company?
 4         A    It was my understanding that
 5    Centerbridge had their own confidentiality
 6    agreement as an advisor to the unions.
 7         Q    And that after they came forward or
 8    at some point after you learned that they were
 9    an advisor but before they submitted their
10    proposal they got a separate confi as an
11    investor, right?
12         A    I can't answer that.  I can't answer
13    that with any specificity.  I know they were
14    under a confidential agreement, a confi with
15    the company and I've got very capable advisors
16    who took care of that for me.
17         Q    Well, one of your advisor is
18    Mr. Stranger, right?
19         A    Yes, he is.
20         Q    He is the chief restructuring
21    officer of the company, right?
22         A    Chief restructuring officer, right.
23         Q    And I'm going to turn to the time at
24    which Centerbridge made its first proposal to
25    the company, okay, and I'm going to read you a
```

```
 1                    DANA CORPORATION
 2   section of his deposition which we have
 3   designated and ask whether you agree with what
 4   he said.
 5            MR. HAMILTON:  Your Honor, he can
 6   submit that as evidence.  In fact, he has.  The
 7   witness has already said that he doesn't know
 8   the answer.  He relies upon his advisors.
 9            The only purpose of this is to
10   introduce a deposition that is already into
11   evidence and introduce it in open court.  He
12   hasn't given us a copy.
13            THE COURT:  It is not for purposes
14   of impeachment.
15            MR. HAMILTON:  Not, it is not.  He
16   has already got it into evidence.  I don't know
17   what the purpose is reading it to Mr. Burns.
18   Mr. Burns had already said he doesn't know the
19   circumstances.  He relies on his advisors.
20            MR. SHORE:  If I may respond, first,
21   to some extent to the particular point for the
22   Court.  If you want to go through the
23   deposition designations, we can refer to them
24   in closing or whatnot.  It may help your Honor,
25   I've got maybe three or four points in here
```

```
 1                    DANA CORPORATION

 2    that will draw your attention to the

 3    depositions.

 4              In addition, I think it is fair game

 5    to ask this witness whether his recollection of

 6    what happened at the meetings comports with

 7    Mr. Stranger.

 8              THE COURT:  I will allow you five

 9    minutes in this area, counselor, and then I'm

10    going to curb you.

11        Q    This is from Mr. Stranger's

12    deposition.  It is marked confidential but I

13    don't think it addresses confidential material.

14              The question was:  "Prior to the

15    time that any proposal was received from

16    Centerbridge, did you have an expectation as to

17    whether Dana would be likely to propose a

18    standalone plan of reorganization?"

19              The witness asked to repeat the

20    question on page 34 and the answer was "Yeah, I

21    had a prospective on that."

22              "QUESTION:  What was your

23    prospective?

24              The prospective was that depending

25    on what the liquidity requirements were going
```

```
 1                   DANA CORPORATION
 2   to be to get out of bankruptcy, you know,
 3   whether we would be able to do a standalone
 4   plan with or without having to do a liquidity,
 5   plans was still up in that air but the
 6   expectation was we would do what I refer to as
 7   a standalone plan."
 8             Is it your recollection as well at
 9   the time Centerbridge came forward it was the
10   expectation of the company that they were going
11   to be doing the standalone plan?
12        A    At the time that Centerbridge came
13   forward as an advisor to the union and even up
14   through the time of their declaration or the
15   union's declaration that they were more than a
16   plan sponsor, I don't think we had at that
17   point what the condition we would come out,
18   whether it be standalone, rights offering,
19   whatever it might be.  All the different
20   possibilities that might exist.
21             From my recollection we had not made
22   a determination.
23        Q    Well, not made a determination but
24   do you agree that there was an expectation that
25   there was going to be a standalone plan?
```

```
 1                 DANA CORPORATION
 2        A    No, I don't agree.
 3        Q    Do you recall that when Centerbridge
 4   made its first proposal that the company
 5   informed Centerbridge that it didn't need the
 6   funding and would do a standalone plan?
 7        A    I recall, I recall discussing, I was
 8   not at the meeting, but I recall a discussion
 9   of playback of the meeting and I believe
10   Mr. Miller from Miller Buckfire had indicated
11   when they raised the plan, in fact, as I recall
12   it they put the possibility of a plan sponsor
13   on the table, and I don't think the company
14   gave a reply one way or the other other than
15   the fact that I think then Henry made a comment
16   that he's not sure the company needed a plan
17   sponsor but this is like, you know, early March
18   type time frame.
19        Q    Now, in your view, as late as your
20   deposition, your view was that there was
21   nothing unique about Centerbridge as a plan
22   sponsor, right?
23        A    My view that there was nothing
24   unique.  Is that a question?
25        Q    Yes.  It wasn't your view that there
```

```
 1                 DANA CORPORATION

 2    was nothing unique about Centerbridge as a

 3    planned sponsor?

 4         A    Unique in what way?

 5         Q    Let me read from you your deposition

 6    and we will see what you meant by your answer

 7    then.  If I could hand out --

 8         A    That would be fine.

 9              MR. SHORE:  If I could hand out

10    depositions.

11         A    If you would, Mr. Shore, read me the

12    question.

13         Q    I'm going to get you a copy.

14         A    Repeat.

15         Q    Would you like me to question you

16    again?

17         A    I would like to see.

18         Q    I'm going to hand you a copy.

19              MR. SHORE:  We will mark this just 5

20    for identification.

21              (Appaloosa Exhibit 5 marked for

22    identification.)

23         Q    Down at the bottom line of 25 is

24    where we're starting, and Mr. Burns we're

25    starting on page 95, line 25.
```

```
 1                 DANA CORPORATION

 2       A    I'm looking for.

 3       Q    "QUESTION:  Mr. Burns, to the best

 4   of your knowledge, is there anything unique

 5   about Centerbridge as a potential plan sponsor

 6   for Dana with respect to its financial

 7   strength?"

 8            Mr. Hamilton objected to the form

 9   and said you can answer.

10            Your answer was "Anything unique, I

11   mean, I suspect -- no, I don't.  I suspect

12   there are a number of firms that have the

13   capability of doing something like this if you

14   are talking about their own personal ability or

15   their ability to raise monies."

16            Do you recall that answer?

17       A    Yes, I do because that's why I asked

18   you to ask that question because what you asked

19   me was with regard to their financial strength,

20   yes, and I do recall the question and I do

21   completely agree with my answer.

22       Q    And you also testified it was hard

23   for you to answer whether Centerbridge had an

24   unique reputation in the industry, right?

25       A    Where are you now?
```

1                    DANA CORPORATION

2          Q     I'm just asking you now, do you

3    recall that being your testimony?

4          A     I think -- again, if you would like

5    to go to the question.  You have to be a little

6    careful here because it depends upon the

7    question you are asking, but, as I recall, I

8    said that principals of Centerbridge had a

9    unique standing, a unique capability in the

10   industry, as I recall.  So why don't you point

11   that question out to me.

12         Q     Sure, sure.

13               Page 96, line 12 and same question:

14   "With respect to the reputation of

15   Centerbridge and its principals, is there

16   anything, to your knowledge, that is unique

17   about their reputation as compared to other

18   companies as potential plan sponsors?"

19               You answered, "Well, obviously the

20   union things, the kinds of thing that are

21   strong there, you have to understand, you know,

22   I work with Centerbridge.  It is that proposal,

23   you know, what, four months, two or three,

24   July, almost three months I guess, you know.

25               I don't, I'm typically not in the

1                    DANA CORPORATION

2    business that of doing this so I don't know.

3    It is hard for me to answer whether there is

4    anything unique about them."

5         A    Sir, what is your question?

6         Q    I just asked, didn't you say at your

7    deposition it was hard to answer whether it

8    was, regarding Centerbridge, anything unique

9    about them?

10        A    I still agree.

11             THE COURT:  That's a gotcha

12   question.  It is really not relevant at all to

13   the issues here before me, counselor, and you

14   may have just used about your five minutes.

15        Q    And, also, Centerbridge is about a

16   year old, right?

17        A    I believe I said over a year old.

18   18 months, I believe.

19        Q    And so we don't know yet, nobody

20   knows yet what Centerbridge's track record is

21   with respect to holding investments longer,

22   does it?

23        A    I think we discussed that at the

24   deposition that with someone with 18 months or

25   whatever, two years, whatever it is, what we

196

```
 1                 DANA CORPORATION
 2  did though, talk though at the deposition was
 3  the capability of the principals of
 4  Centerbridge and the team that they formulated
 5  around them, if you recall.
 6       Q    Now, you know that Centerbridge has
 7  not been paid a fee as an advisor to the
 8  unions, right?
 9       A    I'm not -- I don't think we have
10  paid a fee to them and I don't know what the
11  unions have done.
12       Q    And as far as you know, is
13  Centerbridge still the advisor to the unions?
14       A    I think Centerbridge back in the, in
15  the springtime frame moved from an advisor to
16  plan sponsor.
17            Whether they are still plan
18  advisors, Mr. Shore, you would have to ask the
19  union.
20       Q    As far as you know, has the company
21  ever asked Centerbridge or the unions to
22  terminate CenterBridge's role as an advisor to
23  the unions?
24       A    Not that I'm aware of.
25       Q    Now, let's talk about the
```

```
 1                 DANA CORPORATION
 2   Centerbridge economics for a bit, and not
 3   necessarily with respect to the break-up fee or
 4   the commitment fee but more to the terms of the
 5   A and B preferred that they're buying, okay.
 6                 Now, Centerbridge even under the
 7   revised deal is committing itself to 500
 8   million of A and B?
 9        A     Yes, they are taking, under the
10   agreement, they're taking 250 and agreeing to
11   underwrite an additional 250, I believe.
12        Q     But they can sell of that which they
13   are underwriting.  So their actual commitment
14   -- how much is their actual commitment that
15   they must fund if they can sell the B
16   preferred?
17        A     That they underwrite, is that what
18   you're saying?
19        Q     That they are actually committed to
20   purchase.
21        A     They are committed to purchase 250
22   and I believe they're committed to underwrite
23   an additional 250.  I guess your point is they
24   could sell some of the additional 250.
25        Q     That's right.  So at confirmation
```

198

```
 1                    DANA CORPORATION
 2   they could hold as little as 250 of the Series
 3   A, right?
 4        A    That's my understanding.
 5        Q    And do you recall questions being
 6   asked at your deposition regarding the risk
 7   with respect to the Series A paper?
 8        A    I do recall you asking that
 9   question.  It wasn't quite that simple but I
10   recall you asking that question.
11        Q    The Series A preferred, 150 of it is
12   locked up for 36 months, right?
13        A    150 or 125.  I'm not sure.  I'd have
14   to look at the document.
15        Q    And with respect the other 125,
16   that's locked up now for six months, right?
17        A    180 days, yes.
18        Q    Now, at your deposition, do you
19   recall testifying that, first of all --
20             MR. HAMILTON:  Your Honor, at this
21   point, I do object to the way he's
22   approaching.  What he's said at his deposition
23   on a different deal is not relevant.
24             If he wants to ask a question of the
25   witness now about the deal and he thinks he
```

```
 1                    DANA CORPORATION
 2   said something inconsistent at his deposition
 3   then that's a fair question but I don't
 4   understand why he's asking him now what he said
 5   at his deposition on a different view?
 6             THE COURT:  I'll take a statement
 7   from you as to where you're going and what your
 8   attempting to do, counselor, so we can put it
 9   in the proper perspective and I can allow or
10   disallow you.
11             MR. SHORE:  Yes, your Honor.  At the
12   time of the deposition the Series A lock-up was
13   a two-month lock-up for 250.  That has since
14   changed at the deposition.
15             At the deposition we had questions
16   with respect to whether there was any material
17   risk with respect to Centerbridge's ability to
18   realize on that 150 million at that time
19   lock-up and whether that constituted a real
20   equity risk.
21             It has since changed to be a two to
22   four month lock-up and if you want --
23             MR. HAMILTON:  Six months.
24             MR. SHORE:  We add another four
25   months and, if you like, your Honor, I can cut
```

```
 1                DANA CORPORATION
 2   to the chase on that.
 3             THE COURT:  Go ahead.
 4   BY MR. SHORE:
 5        Q    With respect to the lock-up, was the
 6   board ever presented with any analysis that
 7   showed that a move from a two month lock-up to
 8   a six-month lock-up puts an additional equity
 9   risk on Centerbridge?
10        A    I'm not aware of the board with any
11   type.  You're saying analysis?
12        Q    Yes.
13        A    No, I'm not aware of any type of
14   analysis given to the board with regard to the
15   risk of extending from two to six months.
16        Q    And, in fact, when the deal was
17   first approved by the board, the board wasn't
18   advised with respect to any risk about
19   Centerbridge that Centerbridge was
20   internalizing with respect to this deal?
21             MR. HAMILTON:  I don't know what the
22   question is.
23             Is there a question pending, your
24   Honor?
25        Q    Well, do you remember the board ever
```

201

```
 1                    DANA CORPORATION

 2   being advised up till the time that the deal

 3   was approved by the board of what risks

 4   Centerbridge was taking in entering into its

 5   term plan sheet?

 6        A    Is that a question or a statement?

 7        Q    That's a question.

 8        A    That's a question, and I think if

 9   you go back to my deposition what we talked

10   about I do not recall somebody going through a

11   financial analysis of the risks that

12   Centerbridge faced in the 180 days or the 60

13   days lock-up on that.  That's what I told you

14   at the deposition.  It's still the same thing

15   today.

16        Q    Just so we're clear, that has been

17   extended from the 60 days to the 180 days.  You

18   haven't seen an analysis of that either?

19        A    I told you that.

20        Q    Let's turn to the pricing mechanism

21   for the conversion of the preferred and the

22   common and you're aware of the provisions

23   relating to that, right?

24        A    Yes.

25        Q    And, in particular, with respect to
```

```
 1                DANA CORPORATION
 2   the evaluated average price analysis that gets
 3   done in the first 20 trading days after the
 4   first effective date.
 5        A    Yes.
 6        Q    Now, during the board approval
 7   process, the board was advised that the first
 8   30 days of trading on a company coming out of
 9   bankruptcy there is significant volatility?
10        A    Is that a question?
11        Q    Yes.
12        A    Yes, I think that's what I stated.
13        Q    And you were advised that there is a
14   risk in that period that creditors or other
15   stakeholders who were getting equity
16   distributions will sell equity into the market
17   in those first 30 days?
18        A    I think we talked about that and
19   your line of questioning was is there a
20   possibility of a risk like that.  I said yes.
21   I think there is a possibility of a risk like
22   that.
23        Q    And if the price of the stock goes
24   down, isn't it true at that the effective
25   discount that is being given to Centerbridge
```

1                    DANA CORPORATION

2    goes up?

3        A    Under the collar mechanism, if the

4    price of the stock goes down in that 20 day

5    period, it moves towards the lower end of the

6    collar, then the discount would increase.

7        Q    Up to, what's the top of the collar

8    now?

9        A    Hang on.  I can tell you.  The

10   discount would move from at the top of the

11   dollar at 3.5, I believe I'm correct, from 29

12   percent to the bottom of the tower I believe 42

13   percent.

14       Q    And that would mean that

15   Centerbridge could in exercising its conversion

16   right convert up to 42 percent of the

17   outstanding common?

18            MR. MAYER:  There is a confusion

19   here, if you may.  Centerbridge is buying 250

20   million of RA.  None of the numbers make sense

21   except when applied to all 700 and million

22   preferred.

23       A    That's correct.

24            MR. MAYER:  I think it would help

25   the Court for the questions to be tailored

```
 1                   DANA CORPORATION
 2   narrowly, therefore, if you want to refer to
 3   the 250.  If not, we will refer to the whole
 4   750.  If not we are going to get lost.
 5         Q     Centerbridge is going to own
 6   somewhere between 250 and 500, right?
 7         A     Yes.
 8         Q     And the investment can convert into
 9   as much as 42 percent of the outstanding
10   common?
11         A     That's not what I said.  You asked
12   for a discount.  Did you ask for a discount?
13   Did you ask for ownership?  I answered the
14   discount question.
15         Q     Sorry.  We have got the proposal new
16   one last night.
17              The collar work such that the
18   discount for the shares, for the 750, what's
19   the maximum discount that can occur?
20         A     Mr. Shore, you're asking about the
21   discount now, meaning the discount on the
22   shares that would be converted.
23              My answer, and I believe I'm
24   correct, at three-and-a-half, it's 29 percent.
25   This is for the 750.  Three-and-a-half at the
```

```
 1                    DANA CORPORATION

 2    high end of the collar is 29 percent at the low

 3    end of the chart.  It is 3.95.  I believe it is

 4    42 percent but we could get that answer for you

 5    if you really need that answer right now.

 6              MR. MAYER:  Your Honor, I'm not

 7    following what he means by discount.  I don't

 8    know if the Court does.  I don't know what he

 9    means by discount and I'm afraid the record

10    that is being followed by the public --

11              THE COURT:  Well, I'm not following

12    it either but I also understand that the

13    lock-up and many of these terms have been

14    negotiated with the party, all of the parties,

15    including creditors and the ad hoc committee.

16              MR. MAYER:  That is correct, yes.

17              THE COURT:  So the purpose of some

18    of these questions are somewhat lost on me.  If

19    I'm going to try some facts, I don't know what

20    facts I'm going to be a trier of.

21              If your bottom is this is too good a

22    deal incentively, you've made that clear in

23    your papers.  So, to that extent, I think your

24    questioning is quite redundant.  I understand

25    exactly where you're coming from.
```

```
 1                 DANA CORPORATION

 2      Q    Let's turn to the issue, the board

 3 meeting Miss Ball referred to earlier.

 4           Were you at the board meeting last

 5 night?

 6      A    Yes, I was.

 7      Q    Who else was on that?

 8      A    The two members the board had

 9 designated if we got into a situation late in

10 the day.  Our two directors was Rich Sykes and

11 our chairman of the governance committee chair

12 per se.

13      Q    And during that board meeting did

14 you apprise yourself of the terms of the

15 Appaloosa letter that was sent to the board

16 last night?

17      A    I also sent the board your letter,

18 as I was aware of it.  I was working about 9

19 o'clock, called them, sent it to them, asked

20 them to read it.  And when they were ready and

21 we would get not only myself but my advisors on

22 the phone with them to their additional

23 advisors on the process.

24      Q    So let's turn to the new Appendix

25 R.  Now, the one I have, the one attached to
```

```
 1                 DANA CORPORATION

 2   the reply which was filed at 2 yesterday

 3   morning -- is there a new Appendix R?

 4             MS. BALL:  There will be in Appendix

 5   R is the identity of the arbitrators that have

 6   been agreed with by the creditors committee and

 7   steel workers and auto workers and the

 8   debtors.

 9             MR. SHORE:  Without that I would

10   just like to mark for identification then the

11   debtors omnibus reply which has the latest

12   Appendix R on top.  I have it right now.

13             (Appaloosa Exhibit 6 marked for

14   identification.)

15        Q    Mr. Burns, if you would turn to the

16   back in Appendix R, I'm going do ask you

17   questions with respect to that.

18        A    Okay.

19        Q    Specifically in reference to the

20   letter that was sent to the board last night,

21   you understand that Appaloosa has two offers

22   out, right?

23        A    They have, they have presented two

24   different offers.

25        Q    Right.
```

```
 1                 DANA CORPORATION

 2       A    One earlier and the one last night.

 3       Q    And the one last night has two

 4  components, right?

 5       A    Right, there is two components and a

 6  reference to yet, as I recall, yet another

 7  better offer on its way.  I didn't quite

 8  understand what that meant.

 9       Q    With respect to either of those two

10  offers, if you turn to paragraph 1 of Appendix

11  R, what is Dana's views as to whether either of

12  those offers constitutes an alternative

13  minority investment?

14       A    On my read of the documents last

15  night and, again, I did not, I did not

16  specifically ask this question, but I would

17  consider certainly the, certainly your first

18  offer comparable to this.

19            Of the second one had this minority

20  or this rights offering, Adelphi style rights

21  offering and I cannot, I can't comment on that

22  when I'm not quite sure.  That was hard for me

23  to follow exactly where you were going with

24  that one.

25            It was like everything, just putting
```

1                    DANA CORPORATION

2    every idea you had on a piece of paper.

3         Q    So let's focus on the first one that

4    you think would be considered an alternate

5    minority investment.

6              Walk me through the process.

7    Tomorrow, if this approved today, tomorrow the

8    board will take up the issue of whether or not

9    that offer would be approved?

10        A    The process would be that we would,

11   we already started it last night after the

12   board called.  We contacted the unions and,

13   just so you understand, in case we didn't make

14   it clear earlier, we talked to the board.

15             Those two members were authorized by

16   the board to give, to review and to give

17   direction.  They directed us that we were still

18   to file today the three agreements with the

19   Court or to pursue the approval of the three

20   agreements and certainly we would take the

21   offers of Appaloosa as serious once we

22   understood them.  We needed more

23   clarification.

24             There were questions that couldn't

25   be answered last night but that we would

1                    DANA CORPORATION

2    certainly take those as serious as an

3    alternative bid under the proviso that we go

4    forward with, we go for forward with the

5    approval today.

6              They want us to go forward with

7    that.  We also told them we would get a hold of

8    the union and the union is aware, the head of

9    the UAW, as well as the UAW, that they were

10   aware that a document had been delivered that

11   had and wanted their opinion.  They both

12   answered in the affirmative way that they would

13   take those seriously.

14             They would read them.  They would

15   ask for clarification and if this, if this were

16   approved today, we'd certainly move forward on

17   looking at these in terms of serious bids.

18       Q    Let's walk through your

19   understanding of what happens with an

20   alternative minority investment.  Let's assume

21   that the company says with respect to that

22   first Appaloosa offer we want to proceed with

23   that.

24             It first goes to mediation, right?

25       A    If we want to proceed with that bid,

1                    DANA CORPORATION

2   well, the first thing it would go, you're

3   assuming, you're assuming that unions, they

4   have it the right to consent or not consent,

5   correct?

6        Q    Right.

7        A    I'm assuming they are not going to

8   consent to it.

9        Q    They first have the right to

10  consent.

11            Under what circumstances would they

12  say, yes, let's go ahead with Appaloosa.

13  That's not in your control, is it?

14       A    It is, first of all, I think the

15  board has a right to take a look at the bid and

16  then certainly the unions have a right; and if

17  they consent, then we'd move forward with it.

18            If they didn't consent, and I think

19  that would be after a period of time of due

20  diligence and as we talked about the process

21  was streamlined in terms of that due diligence,

22  then we'd have a situation.

23            If they didn't consent, then it

24  would go to an arbitrator and ultimately it

25  would be reviewed by your Honor.

```
 1                    DANA CORPORATION

 2         Q     And if the arbitrator, well, we will

 3   come back to the issue of review by your Honor,

 4   but if the arbitrator found that the unions

 5   were being reasonable, under that circumstances

 6   that alternative minority investment that the

 7   board wanted to proceed with would give the

 8   unions either the right to strike or give them

 9   an administrative claim for $764 million,

10   right?

11         A     That's correct.

12         Q     And if they found that they were

13   unreasonable, if the arbitrator found they were

14   unreasonable, the company could go ahead with

15   the alternative minority investment, right?

16         A     That's correct.

17         Q     If you look at the definition of an

18   alternative minority investment, you see in the

19   fourth line it requires that you leave the

20   settlement agreement including the

21   reorganization plan metric intact in all other

22   respects.

23               What does that mean?

24         A     My interpretation of what that means

25   is that if there is an alternative minority
```

```
 1                   DANA CORPORATION
 2   investor, then the company, the company would
 3   essentially receive all the benefits from the
 4   labor agreement, primarily the labor agreement.
 5        Q    But what does it mean to leave the
 6   reorganization plan metric intact in all
 7   respects?
 8              Does that mean, as far as you know,
 9   that an alternative minority, the only thing
10   that is an alternative minority investment is
11   one that doesn't change the reorganization
12   metric at all?
13        A    It would be a replacement for a
14   minority replacement for the plan sponsor
15   Centerbridge.
16        Q    Is it fair to say the alternative
17   minority investment then is a situation in
18   which the company strikes out the name
19   Centerbridge and rights in the name of another
20   plan sponsor?
21        A    Mr. Shore, in this document, the
22   right to terminate, there is the ability for
23   every possibility of any type of alternative
24   investment proposal and there is a method under
25   which it would be dealt with, and I would rely
```

1                    DANA CORPORATION

2    on my legal counsel and the people who put this

3    together to decide under which category it

4    would be dealt with.

5         Q    And, in fact, it would also --

6    unions would have an ability to determine what

7    category it fit under too, right?

8         A    It probably would have an input,

9    yes.

10        Q    Let's talk a lit bit about the

11   dynamics of what happens in just this

12   situation.

13             Number one, it is right, isn't it,

14   that there is no adverse consequence if the

15   unions are found to have withheld their consent

16   unreasonably, right?

17        A    Well, you know, it's going, if they

18   do that, it is going to go to arbitration.

19   Could be, that could be adverse to them if the

20   arbitrator came back and said, you know, you

21   withheld it unreasonably.

22        Q    But in that instance they get the

23   deal then that they said no to?

24        A    So what.  I'm not sure I understand

25   your point.

215

```
 1                    DANA CORPORATION

 2         Q    Well, if they had said yes to the

 3    deal, they would have the deal, right?

 4         A    If they said yes to an alternative,

 5    they would have the deal.

 6         Q    Right.  And if they say no to the

 7    alternative the worse thing that happens is

 8    they end up with the deal, right?

 9         A    Yes.

10         Q    And isn't it true that if they go to

11    mediation in that instance, they at least get

12    an opportunity to seek more from the company or

13    the alternative minority investor in order to

14    deliver their consent?

15         A    That's a possibility.

16         Q    And they have shown you that they

17    have already renegotiated once when the

18    business plan came out, right?

19         A    That's a possibility but my point

20    would be that there are a lot of other people

21    that are involved in that, including the

22    creditors committee with regard to the analysis

23    of just how that comes out.

24         Q    But the creditors committee isn't

25    given any consent rights, right?
```

216

```
 1              DANA CORPORATION
 2      A    They are not given consent rights
 3   but they have the ability to oversee that
 4   process and it becomes a point at which an
 5   alternative, alternative investment, you know,
 6   you got to, you got to take, you got to the
 7   take the specifics of it and see how it plays
 8   out.
 9      Q    You told me at your deposition you
10   couldn't be certain that the unions wouldn't
11   try to renegotiate if they got into a situation
12   with the alternative minority is put on the
13   table?
14      A    They are like anybody else in this
15   process.  Anytime anybody has the ability to
16   renegotiate, it seems to occur.
17      Q    Now, let's talk about the situation
18   in which the unions are deemed to have acted
19   reasonably by the arbitrator.
20           We said they get the right to strike
21   at that point, right?
22      A    Yes, sir.
23      Q    And you said today that the strike
24   could cost up to a billion dollars in annual
25   losses of revenue, right?
```

```
 1                    DANA CORPORATION

 2        A     Under certain circumstances, yes.

 3   That's what I said.

 4        Q     And in those circumstances some of

 5   the losses you said would be permanent?

 6        A     Yes.

 7        Q     Now, can you imagine a situation in

 8   which the board of directors of Dana is going

 9   to proceed with an alternative minority

10   investment if the unions actually have the

11   right to strike?

12        A     You have to look at each situation

13   for what it is.

14        Q     Can you concede --

15        A     And the size of it.

16        Q     -- of a situation in which the board

17   is going to take a marginally better minority

18   investment, marginal from the perspective of

19   the creditors if the unions, in fact, have the

20   right to strike?

21        A     Again, Mr. Shore, I think you have

22   to look at it on the basis of what the offer is

23   and what it does to the estate.

24        Q     Now, you reviewed reasonable since

25   and provided more color on what reasonable
```

```
 1              DANA CORPORATION
 2    means since your deposition, right?
 3         A    Yes.
 4         Q    What role, if any, did you play in
 5    that process?
 6         A    In terms of the negotiation of
 7    that?
 8         Q    Yes.
 9         A    Or in terms of the need to continue
10    defining that because I told you at my
11    deposition that we are in the process of
12    defining that.
13         Q    But what role personally did you
14    play in that?
15         A    My role that was actually done by
16    Andy Kramer and others in terms of that
17    negotiation.
18         Q    And what role, if any, did the board
19    play in having input on what reasonable meant?
20         A    The board had asked, the board had
21    asked that that be defined and I believe I
22    indicated that in my deposition to you that
23    they had asked for that to be defined and the
24    board also and the board had a role to play.
25    The creditors committee had a role to play.
```

```
 1              DANA CORPORATION
 2   There were many people that had a role to play
 3   in better defining and tightening up that
 4   process and that's what we reviewed this
 5   morning.
 6        Q    Do you recall at any time the board
 7   insisting that the definition of reasonable
 8   include a requirement that the arbitrator
 9   should take into consideration the fact that
10   the company was under a fiduciary obligation to
11   provide the highest and best value to its
12   creditors and stakeholders?
13              MR. HAMILTON:  Your Honor, I know
14   this is a difficult line to try to walk for
15   everybody in the room but that really is asking
16   for privileged information.  He's asking did
17   the legal body get legal advice on what their
18   fiduciary duties are.
19              THE COURT:  I'm going to sustain
20   your objection.  I'm going to curb the entire
21   line, Mr. Shore.
22              I've allowed you to go on with a
23   whole host of the areas which under Rule 403,
24   among other things, most of the negotiations of
25   many of the things you are questioning the
```

1              DANA CORPORATION

2    witness on came up with a product that were

3    part and parcel of input of the creditors

4    committee, ad hoc bondholders and, frankly,

5    this line right now is, in my judgment, right

6    now a waste of time.

7              You've also made inquiry on the

8    obvious.  I didn't stop you.  You do realize

9    that at some point in time, including this one,

10   the unions have a right to strike if not all

11   the plans, most of the plans, and if there is

12   an adverse ruling from this court on the

13   1113/1114 issue, of which this is a hearing on

14   the settlement of that, then they have an

15   absolute right to the strike in any event.

16             So with all of these things hanging

17   over, I'd appreciate if you would, if you said,

18   cut to the chase and let's get right down to

19   what Appaloosa is looking for.

20        Q    Let's deal with the situation, you

21   recall people saying this morning that the

22   union does not have a veto right over any plan

23   right?

24        A    Over any what?  Excuse me.

25        Q    Over any alternate plan, right?  Did

```
 1                  DANA CORPORATION
 2    you hear that this morning?
 3         A    They don't have a veto right over
 4    any alternative provision in terms of what they
 5    can do of the provision based upon something
 6    that comes forward as an alternative.
 7         Q    Would you turn to the last page of
 8    Exhibit R?
 9         A    I put it away.  Excuse me.
10         Q    Paragraph B.
11         A    Page number.
12         Q    It is page 5.
13         A    Of Exhibit R.  Let me find it.  I
14    put it away.  I don't think it is page 5, is
15    it?
16         Q    It is at the back of the document.
17    Page 5 of Exhibit R or Appendix R?
18         A    Okay.
19         Q    Isn't is it true that under, if the
20    debtors file a standalone plan of
21    reorganization, the unions have the right in
22    their sole and reviewable discretion to issue a
23    notice of termination and strike?
24              MR. HAMILTON:  Your Honor, the
25    document speaks for itself.  You asked him to
```

```
 1                  DANA CORPORATION
 2   cut to the chase.  He isn't cutting to the
 3   chase.  I don't need to protect the witness.
 4   He's doing fine but the document says what he
 5   just said.
 6              THE COURT:  I'm aware of paragraph
 7   5.  I've reviewed the exhibit in all of its
 8   iterations.
 9        A    Paragraph 5.
10              MR. HAMILTON:  Can I ask him to help
11   out the witness?
12              THE COURT:  I'll help him out if
13   counsel doesn't want to.  It is a very simple
14   concept, counselor.  Let's not waste time.  You
15   can even ask a leading question:  "Are you
16   aware?"  Go ahead.
17        A    So not paragraph 5, page 5.
18              THE COURT:  Paragraph B.
19        Q    Paragraph 3(B), isn't it fact that
20   under that paragraph if the debtors plan a
21   standalone plan of reorganization the unions
22   have the absolute right to the strike?
23        A    Yes.
24        Q    And in the alternative majority
25   investment, whether they are reasonable or not,
```

```
 1                 DANA CORPORATION

 2   don't they have a right to a 908 million dollar

 3   generally unsecured claim?

 4         A     Under the majority investment.

 5         Q     908 million dollar generally

 6   unsecured claim?

 7         A     They have an either/or right as I

 8   recall.  I have would have to read this but as

 9   I recall they have an either/or right for the

10   764 or the 908.

11         Q     And do you have an understanding of

12   the total amount of general unsecured claims

13   right now allowed?

14         A     The total amount of what?

15         Q     Allowed generally unsecured claims.

16         A     Did I have an understanding of

17   that?

18         Q     Yes.

19         A     No, sir.

20               MR. MAYER:  Your Honor, this is a

21   question that can't really be answered.  There

22   is, as you know, currently an order being --

23               MR. LAURIA:  It's schedule --

24               MR. MAYER:  -- marked with COD.  The

25   answer the witness gives will be misleading,
```

```
 1                DANA CORPORATION
 2   will be misleading to the public.
 3                MR. HAMILTON:  He said he didn't
 4   know.
 5        Q    Do you recall whether the board was
 6   advised with respect to the possibility that a
 7   908 million dollar allowed secured claim would
 8   give the unions a blocking position in the
 9   general unsecured class?
10        A    I don't recall.  I don't recall
11   that, the board getting that direction.
12        Q    And, as you sit here today, do you
13   have an opinion one way or the other was to
14   whether a 908 million allowed general unsecured
15   claim would provide the unions with a blocking
16   position?
17        A    I don't have a position.
18        Q    Now, just with respect, and this is
19   my last line of questioning, with respect to
20   Appaloosa coming late to the game as people
21   have said, you were aware in the June time
22   frame that Appaloosa was seeking to sign a
23   confidentiality agreement with the company,
24   right?
25        A    I certainly was.
```

```
 1                    DANA CORPORATION

 2        Q    But you didn't play any role in the

 3    drafting of the confis, did you?

 4        A    No, I didn't.  I asked the question

 5    and the answer I received was that the

 6    confidentiality agreement, as you recall at the

 7    time, at the time, in June, Mr. Tepper had

 8    contacted me.  I believe he had also filed a

 9    13(D) and had said he was going from a passive

10    to an aggressive, whatever you call it,

11    investor.  I think it was active he said, not

12    aggressive.

13             And I talked to my, our attorney and

14    the appropriate confidentiality agreement was

15    determined and put in front of Mr. Tepper and I

16    believe, as Miss Ball specified earlier, there

17    was a fair amount of disagreement about whether

18    that was the appropriate confidentiality

19    agreement, but the point of it is from the

20    company's perspective it was.

21        Q    You do understand in the end the

22    company eased the lock-up restrictions it was

23    demanding from Appaloosa when it signed the

24    confidentiality, do you understand that?

25        A    My understanding is that, in
```

```
 1                    DANA CORPORATION
 2   essence, that the confidentiality agreement
 3   that was signed by Appaloosa on I thought it
 4   was Saturday, maybe it was Sunday, was very
 5   much, very much in part the key conditions were
 6   equal to those that have been requested
 7   earlier.
 8       Q    Well, specifically with respect to
 9   the lock-up was my question.  You don't know?
10       A    I specifically don't know.  I mean,
11   you have advisors that do this for a living and
12   do it all the time and I was told that the
13   proper confidentiality agreement was given and
14   I trust that.
15       Q    I mean, I can offer by evidence of
16   the original one that was presented and the one
17   that was signed.  We don't need the witness for
18   that.
19            Once Centerbridge and the debtor
20   sign the plan support agreement, the company
21   made no active attempt to shop that bid, did
22   it?
23       A    No, I gave you that answer before.
24   Our position was that we needed, the company,
25   my position, the board's position, the
```

```
 1                  DANA CORPORATION

 2   company's position was that we needed to

 3   establish a stalking horse and then the rest

 4   would take care of itself.

 5        Q    But didn't you also tell me that the

 6   process that's set up after tomorrow is not

 7   meant to be an aggressive pursuit of new and

 8   better deals with the company; isn't that what

 9   you told me?

10        A    When did I tell you that, Mr. Shore,

11   or will you show me that one?

12        Q    Sure.  It is page 188 of your

13   deposition.

14        A    Again, I would like to look at it in

15   the context of the question you asked me.

16        Q    It actually starts on page 187.

17        A    You asked me the question and, you

18   asked me the question, "So you're understanding

19   is that the plan support agreement would not

20   permit you to affirmatively seek to find

21   alternative sponsors but it would permit you to

22   evaluate proposals that come to you from

23   alternative sponsors; is that correct?"

24             And my response was, "In effect,

25   that is correct.  It provides the ability for
```

```
 1                   DANA CORPORATION
 2   us to entertain offers with regard to the
 3   company.  It is not set up to be an aggressive
 4   pursuit bringing to the people new people and
 5   the implied position was by the company."
 6        Q    Right.  And then you, in fact,
 7   referred to Centerbridge as being the strawman
 8   for us, right?
 9        A    Strawman?
10        Q    Stalking.
11        A    I think you used the term stalking
12   horse.  I think we are talking about the same
13   position.
14             MR. SHORE:  I think that's all I
15   have, your Honor.
16             THE COURT:  Thank you.  Any other?
17             MR. HAMILTON:  Redirect.
18             THE COURT:  Go ahead.
19             MR. HAMILTON:  No redirect.  I
20   believe that concludes all testimony for today.
21             The parties have submitted
22   deposition transcripts designations and
23   counter-designations with objection.  We think
24   you can take it under advisement and I think we
25   are ready to proceed to closings if you want to
```

1                    DANA CORPORATION

2    entertain it.

3                    THE COURT:  I will receive all that

4    has been submitted.  Anybody else want to be

5    heard?

6                    Closing argument then.

7                    MR. HAMILTON:  Your Honor, we don't

8    need to close.  I would like to hear if

9    Mr. Laurie or Mr. Shore wants to say anything

10   more than they already did, that would be

11   fine.  We think it is pretty straightforward.

12                   MR. LAURIA:  Is the debtor waiving

13   closing?  I'm not sure I understand what is

14   going on.

15                   MR. HAMILTON:  If they say something

16   that I want to respond to but as yet they

17   haven't said anything that I think I need to

18   respond to.

19                   MR. LAURIA:  Motion.

20                   THE COURT:  Essentially, they did,

21   Mr. Lauria.  They gave an extensive

22   presentation on who's on board and why.  I

23   heard from all of the supporters. So I've had

24   an argument.

25                   Now, if it is argument time, you did

1                DANA CORPORATION

2    indicate that you had some argument, not

3    complete, and I'm giving you that opportunity.

4                MR. LAURIA:  Thank you very much,

5    your Honor.

6                As one of the lowest people on the

7    totem pole, we are fundamentally and almost

8    desperately concerned about one thing, making

9    sure that the value of this estate is

10   maximized, and our insurance policy in that

11   regard is an open and vibrant market testing of

12   the Centerbridge proposal.

13               Without that our recovery is at risk

14   in the best case of being reduced and may more

15   likely be eliminated.

16               The wipeout of old equity in Chapter

17   11 cases is so common place that it almost

18   happens without even a flinch nine times out of

19   10 --

20               THE COURT:  Well, not in the months

21   of April, May and June of this year and July as

22   well.

23               MR. LAURIA:  I hope that's a trend.

24               THE COURT:  You're coming on the

25   cusp of another hearing this past Tuesday in

1                    DANA CORPORATION

2    which it is demonstratively at odds of your

3    assessment.

4                    MR. LAURIA:  Well, you Honor,

5    nevertheless, we can probably both match names

6    of cases where old equity has been reviewed or

7    viewed, as in the best case, Gadflies and in

8    the worse case as the Money Terrace but we have

9    to be careful, and I think the Court is making

10   the bid for me the viability of old equity in

11   every case has to be assessed on the merits and

12   the facts and circumstance of the particular

13   case.  It can't be just dispensed with as a

14   standard part of the playbook and here --

15                   THE COURT:  Do you have a defined

16   term for old equity because in the years 2006

17   and 2007, old equity can really be yesterday's

18   equity.  That wasn't even in existence before.

19                   MR. LAURIA:  It is the equity that

20   existed on the date of the petition is what I'm

21   referring to as old equity.

22                   And one thing that, of course, has

23   us old equity holders nervous or at least my

24   client as an old equity holder nervous is that

25   in all of the documents filed to this point

1                DANA CORPORATION

2    regarding the plan but new investment and the

3    deal with labor, none of them say a peep about

4    what's supposed to happen to old equity.

5                It doesn't say they get what's left

6    over if there is excess value.  They don't say

7    they get something for sure.  They don't say

8    they get wiped out.  It's silent.

9                Now, as I mentioned at the beginning

10   of the hearing, there are indicia in this

11   particular case that there should be value to

12   old equity.  This is another one of these

13   recent phenomena cases where the debt is all

14   trading above par.

15               Now, assuming that people aren't

16   going to get their recovery for a few months,

17   maybe as late as maybe next year, somebody

18   who's paying more than par for the debt now is

19   expecting to get even more or they were just

20   wasting their time.

21               And as I also alluded to in the

22   opening, although I'm not going to disclose the

23   information on the record here, there is

24   information that's been provided in the way of

25   EBITDA projections that when you apply

```
 1                   DANA CORPORATION

 2   reasonable market multiples suggest that there

 3   is enterprise value here that will not permit

 4   foreclosing equity out of a recovery and, yet,

 5   and yet the plan term sheet and the new

 6   investment agreement contemplate all of the

 7   securities being issued, the As, the Bs and the

 8   common going either to the new investor, going

 9   to creditors who qualify to play in the Bs or

10   going to other creditors who don't qualify

11   under the plan Bs.

12            There seems to be an assumption that

13   there is nothing left over.  The creditors

14   aren't going to get a full recovery, and so, as

15   a shareholder, we're very concerned that we are

16   moving down a path that will be hard to catch

17   up to later and say, hey, I told you so.

18            So we're trying to bring this issue

19   to the Court's attention now when we are at the

20   starting line instead of later when we're close

21   to the finish line in this plan process.

22            The real point though today is that

23   under these circumstances where nobody is

24   prepared to say that old equity is out of the

25   money.  That old equity is entitled to the
```

234

```
 1                    DANA CORPORATION
 2      bedrock protection contemplated by the
 3      Bankruptcy Code and put into place in almost
 4      every case where there is a material
 5      transaction as part of confirmation, whether as
 6      a sale of substantially all the assets or the
 7      purchase of equity or recapitalization of the
 8      debtor and that is a real market test of the
 9      transaction.
10              THE COURT:  Or a labor agreement.
11              MR. LAURIA:  Well, your Honor, I
12      guess a rose by any other name is still a rose,
13      and this set of agreements clearly contemplates
14      a process to a plan of reorganization and an
15      exit for Chapter 11 and it specifies the terms
16      and the timeline on which that's going to
17      happen.
18              Now, if that is under the heading of
19      a labor agreement, so be it, but I don't think
20      we can ignore what the substance is because of
21      what the title on the piece of paper is.
22              This all brings me back home.  We
23      are concerned, your Honor, our fundamental
24      concern with the relief sought under the motion
25      is that viewed in its totality it will secure
```

```
 1                  DANA CORPORATION

 2   the board's prospective exercise of its

 3   fiduciary duties in assessing any competing

 4   proposals that are received, if any are

 5   received, and it establishes obvious cost, bids

 6   rather than fostering them, which taken as a

 7   whole, taken together is going to retard not

 8   enhance estate value.

 9             I want to be clear.  I think the

10   Court asked this question.  I want to be clear

11   on this.

12             At the end of the day we have no

13   problem with the individual components of

14   what's before the Court.

15             To the extent the union settlement

16   addresses the 1113 and 1114 issues, we can't

17   say that it's unfair or unequitable.

18             The proposed new labor deals seems

19   to be reasonable and the resolution of OPEB

20   based on what we know appears to be consistent

21   with the parties expectations.

22             To the extent the approval of the

23   investment agreement simply provides for a

24   break-fee up, commitment fee and expense

25   reimbursement to Centerbridge, we can't really
```

1                    DANA CORPORATION

2    complain to loudly.

3              We do think they are entitled to one

4    on the circumstances and we have already topped

5    their bid and I've never seen the guy who was

6    at the highest bid on the day wouldn't be

7    entitled to the break-fee up.

8              But your Honor, your Honor, at the

9    end of the day, as the witness testified, those

10   amounts are not going to be outcome

11   determinative in this case.  So we're not here

12   to complain about that.

13             What we are here to complain about

14   and what we asked the Court to think about

15   carefully is rather than steamrolling our

16   concerns, look at the impact of the linkage

17   between the labor settlement and the investment

18   agreement and consider that together they

19   purport to lock us in to a particular capital

20   structure.  They purport to dictate the terms

21   of the company's new financing and who will

22   provide it, what the plan currencies will be

23   and when and who will get them all without a

24   market test.

25             Now, we heard this morning that

237

```
 1              DANA CORPORATION
 2  everybody has agreed that there is going to be
 3  a timeline for proposals to be submitted and
 4  all, but the fact of the matter is without some
 5  blue penciling from this Court, there isn't a
 6  real market test.  There is not an auction.
 7           The debtor is not going to go out in
 8  an organized fashion and reach out to
 9  interested parties and solicit bids and bring
10  them together and try to work its way to the
11  highest and the best.
12           What the debtor is going to do is
13  sit back and, if they get proposals, they are
14  going to deal with them and in the process of
15  dealing with them, as they did last night, they
16  hand them over to the union.  That's what
17  happens.  That's step one, hand it over to the
18  union and let them do their diligence.
19           Now, the problem with this is it is
20  inconsistent with Chapter 11.  While
21  exclusivity is in place, the code contemplates
22  that it is the debtor in possession who's in
23  control of these types of decisions and who
24  runs the process as everybody's fiduciary, as
25  the honest broker.
```

238

```
 1              DANA CORPORATION

 2              These are responsibilities, your

 3    Honor, that can't during exclusivity be

 4    abrogated or delegated, particularly to a

 5    stakeholder on the one hand who has no

 6    fiduciary duty to the estate as a whole but at

 7    least, at least presumably, has interests that

 8    are aligned by Pari passu and senior

 9    stakeholders.

10              As value in the estate goes up,

11    everybody in that group and above does better,

12    but it kind of leaves the junior guys on the

13    outs.  It is even worse though, your Honor,

14    when you delegate these fiduciary duties to

15    nonstakeholders.

16              Why is it worse?  It's worse because

17    the nonstakeholder, Centerbridge, the anointed

18    one of the unions, the lower the consideration

19    is, the lower the price is, the more upside

20    they preserve for themselves and the fact of

21    the matter is the preferred securities

22    contemplated by this transaction, in fact,

23    provide substantial premium value to the

24    holders.

25              We don't have evidence in the record
```

1                    DANA CORPORATION

2    about the size of that premium but everybody is

3    licking their chops over it.  I think the Court

4    can acknowledge there must be something there

5    given the line of $1.4 billion of creditors

6    that might get into that.

7              THE COURT:  There must be something

8    that brought you back into the fold after

9    resigning.

10             MR. LAURIA:  Your Honor, while we're

11   here, I want to clarify one fact, we attempted

12   to get a confidentiality agreement from the

13   debtor in June, starting in June before this

14   deal was made public to try to figure out how,

15   if we could participate in a process and how we

16   could make an investment here that would

17   preserve value.

18             It took us until Sunday to get that

19   confidentiality agreement signed.

20             Now, I'd mention that not to place

21   blame for how long it took to get it done but,

22   just to clarify for the Court, we didn't come

23   in at the 11th hour and 59th minute reactive to

24   something that the debtor had done.

25             We were trying to get in before and

```
 1              DANA CORPORATION
 2    we didn't get there until the after the debtor
 3    went public with his proposal.
 4              The problem we have in totality of
 5    this thing is that it involves significant
 6    overreaching by the unions in the first
 7    instance and overreaching by Centerbridge in
 8    the second instance, the consequence of which
 9    is that practical, practical, not technical,
10    but practical control over the plan process has
11    been ceded to a stakeholder or a nonstakeholder
12    third-party, and this is going to restrict the
13    amount of the debtor exercising its fiduciary
14    duty.
15              It is going to chill competitive
16    biding and it is going to undermine the
17    protections that this process ordinarily
18    affords all of us, the debtor, creditors, the
19    shareholders and even this court.
20              Now, it would be one thing if the
21    linkage mechanism just provided for the unions
22    in a rejection to return everybody to the
23    status quo ante.  That might not be great but
24    it would be better than what we have.
25              The parties are asking you to
```

```
 1                    DANA CORPORATION

 2    approve, it goes far beyond that, to provide

 3    for fairly substantive penalties that may be

 4    imposed at the union's discretion if the union

 5    does not approve a proposed alternative

 6    transaction that is otherwise acceptable to the

 7    company.

 8             These penalties range from going on

 9    trying and destroying value to a 700 million

10    dollar administrative plan, 80 of obligation,

11    all of which arises under a prepetition

12    agreement or a 900 million dollar prepetition

13    unsecured claim in each occasion in favor of

14    the unions.

15             In the context of these cases, these

16    claims are, in effect, a super break-fee up.

17    For some to top the Centerbridge deal, they

18    would have to climb that mountain.  They would

19    have to provide that much more consideration

20    for the estate to do better with these claims

21    layered on top.

22             The problem is if you think about

23    these plans as a break-fee up they range

24    between 15 and 50 percent of the total

25    anticipated equity value of the company,
```

1                    DANA CORPORATION

2    depending on your particular spin on things,

3    which is way out of the range of anything that

4    I've ever seen any Court approve as break-up

5    protection.

6                    Now, the fact that these super

7    break-up fees are paid to the stalking horses

8    sponsor and not directly to the stalking horse

9    I think matter not.  The fact is the impact on

10   the estate is the same.

11                   Now, potential enormous union claims

12   are also a problem because of their impact on

13   management compensation.  Although this is

14   apparently the subject of some debate, our

15   method, the CEO's compensation under the key of

16   the next nine years would be reduced by

17   $3,000,000 if claims are increased by 900

18   million.

19                   Even if that's a chance, that's not

20   right, is it incredible that the CEO is not

21   going to think about that when he's looking at

22   an alternative proposal.

23                   Given the power that this

24   arrangement gives the union and potential

25   insulation to provide to the stalking horse

243

1                    DANA CORPORATION

2   from competition, I think we have to go back

3   and just remember what the unions duties are

4   and most motivation are.

5          The union has no fiduciary duty to

6   the estate or any of the stakeholders.  I don't

7   think anybody would argue with that.  Their

8   duty is to their membership, rank and file.

9   They have done a great job of protecting them,

10  thus we have to assume on a going-forward basis

11  the unions are going to do what they think is

12  the best interest to their rank and file, the

13  people they are here to protect, regardless of

14  the impact on the rest of the estate.

15         It turns to motivation, as

16  previously mentioned, your Honor, no, no, that

17  we reject the proposal.  It is a freer option

18  from the union.  It gives them a chance to come

19  back to the table and negotiate.

20         If there is a superior proposal that

21  expects higher than this deal, it let's them

22  reup.  It opens the door.

23         As such it will be fairly said that

24  union is just neutral.  They don't care what

25  happens to the estate.  They are affirmatively

```
 1                DANA CORPORATION

 2   motivated to restrict a higher and better,

 3   higher and better bid so they can say no to get

 4   back to the table.

 5             Now, this negativity may be

 6   strengthened by the possibility that the union

 7   leadership by the fact that cutting a deal set

 8   makes these higher OPEB obligations based on

 9   their view of the claim somewhere around 75

10   cents on the dollar.

11             If a higher and better bid came in

12   on 100 of the dollars, how do they explain?

13             And this is not just conjecture on

14   my part.  It really is speculation, almost rank

15   speculation.

16             THE COURT:  It is not based on

17   anything other than rhetoric.

18             MR. LAURIA:  All right.  Let me try

19   the record here.  Let's try the record and see

20   if the actions of the union are inconsistent

21   with my speculation.

22             On July 18th, Appaloosa made a

23   committed proposal that clearly would enhance

24   recoveries to the estate stakeholders.

25             We reduced the discount in the
```

1                    DANA CORPORATION

2    Centerbridge proposal from 17 percent to 10

3    percent, which has the effect of reducing the

4    confiscatory effect of the Centerbridge

5    securities.

6              I say confiscatory because you have

7    a third-party that's getting value extracted

8    from the estate in the form of premium

9    associated with these creditors when you are

10   not paying creditors in full.

11             Less than 12 hours later, your

12   Honor, without any discussion of dialogue, the

13   UAW sent a letter to the company characterizing

14   our proposal as illusory because it required

15   their approval which they would not give and

16   directed the debtor to disregard it and proceed

17   with the Centerbridge transaction.  That letter

18   is attached to your objection.

19             Now, is that inconsistent with my

20   conjecture.  A 12 hour turnaround is all it

21   took them to say disregard that.  We want to

22   stick with our guy.

23             Now, to address this concern, we

24   have been told that the deal conditions of the

25   union's walk right on its rejection was

```
 1                  DANA CORPORATION
 2    determined to be reasonable.
 3               As I said before, your Honor, I
 4    don't think that's any protection at all.
 5    There are multiple problems with that
 6    mechanism.
 7               First of all, the standard is
 8    inherently differential.  It is like the
 9    arbitrary and capricious standard applied to
10    the appellate review of certain appellate court
11    findings and conclusions and has as much a
12    chance I submit of being reversed on review.
13               If there is any reason that the
14    decision is going to be reasonable.  The
15    arbitrator doesn't have to agree with where the
16    union got it.  The arbitrator just has to
17    determine that reasonable minds can differ,
18    and, your Honor, the unions are always going to
19    have a credible explanation.  They have
20    expressed it in their papers.
21               They worked with their financial
22    advisor, Centerbridge, for a long time.  They
23    got very comfortable with their philosophy and
24    views with how they were going to deal with the
25    managing of that company and the problems they
```

```
 1                 DANA CORPORATION

 2    had going forward and they just couldn't get

 3    there with X, whoever X is in four weeks or two

 4    weeks, however long we get to do our

 5    diligence.  It is going to be for an arbitrator

 6    to find that to be an unreasonable withholding

 7    of consent.

 8              Now, adding insult to injury, the

 9    reasonableness standard is a far cry from the

10    standard we would otherwise enjoy in this case

11    where our fiduciary protecting all the interest

12    of the estate would be exercising its fiduciary

13    duty do maximize value and looking to determine

14    whether or not a new bid was, in fact, higher

15    and better.

16              The decision of matrix in the two

17    stories there is completely different.  The

18    debtor presumably is assessing value in

19    exclusion of risk.

20              The union is thinking about is it

21    good for me and my people?  Does it give me

22    leverage to get some more?

23              The final point is we have changed

24    this Court who we all know and love, maybe more

25    importantly we respect and understand.
```

```
 1                 DANA CORPORATION

 2            THE COURT:  I go for love.

 3            MR. LAURIA:  That's where we

 4   started, your Honor, with an arbitrator.

 5            Your Honor, the Bankruptcy Code

 6   contemplates that this Court has jurisdiction

 7   over the parties and the power to sheppard them

 8   in the right direction and to decide who's

 9   behaving properly and who isn't.

10            That power and protection can't be

11   taken away by a private agreement of some of

12   the parties in the case.

13            Now, counsel told us this morning

14   not to worry.  How many times did we hear the

15   statement.  Ultimately, this Court reviews what

16   the arbitrator does, and I presume that's a

17   reference to the provision on page 2 of the

18   famed Appendix R, Section 103(I) of the whole

19   which says "Any action to enforce or vacate the

20   arbitral award described in paragraph A shall

21   be brought in the bankruptcy court and be an

22   action under Section 301 of the Labor

23   Management Relations Act of 1947 as amended 29

24   U.S.C. Section 185 and reviewed under the

25   standards applicable to judicial review of
```

```
 1              DANA CORPORATION

 2   arbitration awards pursuant to Section 301."

 3              Now, your Honor, I presume you know

 4   exactly what that means but just in case, in

 5   the Second Circuit, in the case of New York

 6   Telephone Co v Communication Workers of

 7   America, Local 1100 AFL-CIO, district number

 8   1256 F 3rd 89 Second Circuit 201, the 2nd

 9   circuit said reversal occurs if there was a

10   manifest disregard of the law, and to establish

11   that you have to have two things, the

12   arbitrator had to have known of a governing

13   legal principle and ignored it and the ignored

14   law had to be clear and well defined.

15              You Honor, we're starting with a

16   reasonable standard that takes a page to say.

17   I don't know where we're going to have this

18   clear defined law that was ignored that was

19   supposedly known to the arbitrator.

20              In short, there is no review.  You

21   have retained under this arrangement no

22   supervisory powers over the decision of the

23   union to accept or reject a proposal.

24              So through this private deal that

25   they're asking you to endorse today, the
```

1                    DANA CORPORATION

2    parties purport to exchange the estate

3    fiduciary for a party with no fiduciary duty

4    and an adverse interest, exchange maximization

5    of value for reasonableness and exchange this

6    court for an arbitrator whose decision, as a

7    practical matter, can't be reviewed as little

8    more than a poorly disguised rewrite of the

9    Bankruptcy Code that disrupts the balance that

10   Congress envisioned for the Chapter 11 process

11   and intently creates barriers for entry for

12   competing bids, which is ultimate the engine

13   for maximizing value in this process.  A fair

14   and open process that fosters competitive

15   bidding.

16             This barrier is made worse by the

17   public record that I've already alluded to, the

18   July 18 enhancement and the implied rejection

19   on July 19th.

20             It's not worse than the public facts

21   that came out in the record today and made

22   perfectly clear in discovery in the depositions

23   of the Mr. Aaronsohn and the deposition of the

24   Mr. Stranger.

25             The union basically told the company

251

```
 1                    DANA CORPORATION

 2    to take the Centerbridge deal.  They said we

 3    will not settle if you do not take

 4    Centerbridge's investment and Centerbridge

 5    heard it.

 6             Let's go walk over the cliff.  Let's

 7    go try.  Let's go destroy everything if you

 8    won't take Centerbridge and Centerbridge is an

 9    investment, an investment that takes millions

10    of dollars out of the estate and doesn't give

11    it to stakeholders and instead puts it in the

12    pocket of a third-party, which may be different

13    if Appaloosa gets the recovery as a shareholder

14    which it is entitled to, which is the way this

15    problem is supposed to be and gets nothing.  At

16    the very least it is going to dilute a

17    potential recovery.

18             Now, having elevated Centerbridge to

19    the level of importance in this last round of

20    negotiations, can we reasonably expect

21    prospectively the unions are going to say never

22    mind.  We don't care about Centerbridge any

23    more.  We will take your guy.

24             THE COURT:  Do you have anything

25    else that you haven't said before that is not
```

```
  1                 DANA CORPORATION

  2    in your papers, Mr. Lauria, because so far the

  3    argument is beginning to turn on itself as

  4    being redundant.

  5              MR. LAURIA:  I'm sorry about that,

  6    your Honor.  I was enjoying a little too much.

  7              THE COURT:  Well, in some senses

  8    this courtroom has seen theatre but I think we

  9    have had a long show so far.

 10              MR. LAURIA:  Let me mention one

 11    other point that I'm not sure is in you are

 12    papers.

 13              The fact the Centerbridge acts as

 14    the union financial advisor for no fees

 15    combined with the richness, shall we say, of

 16    the investment deal the unions have voiced

 17    against this estate suggests that perhaps the

 18    negotiation of that aspect of the deal wasn't

 19    arms length in any common understanding of that

 20    concept and, in fact, is a sweetheart deal to

 21    compensate for services previously provided for

 22    free, at least in part, and suggests we have

 23    got to be very careful here because the premise

 24    of approving a settlement is that all the

 25    pieces where negotiated at arms length.  That
```

```
 1                 DANA CORPORATION
 2   there are some sweetheart deals.
 3                 So at the bottom line we have new
 4   money coming in with no market test before or
 5   after and we recognize the value of the union
 6   settlement and we are willing to look the other
 7   way with respect to the break-up protection but
 8   we really think the Court should limit relief
 9   granted and try to pick up the language between
10   the two pieces so we can have an honest shot of
11   making sure value is maximized in this case. .
12                 MR. HAMILTON:  Counsel's arguments
13   are fallacious for the reasons we set forth in
14   our reply.  You need to go through them.
15                 Your Honor, I would just like to
16   make five points and then turn it over to Miss
17   Ball and I also want to clarify because we are
18   all in the same understanding that we
19   understand that the record from the 1113/1114
20   trial is also part of the record for this
21   settlement motion as well and we intend to
22   incorporate that record as part of our case.
23                 I believe the Court has already
24   indicated it's relying on the record from the
25   trial.
```

```
 1                 DANA CORPORATION

 2           THE COURT:  Absolutely.

 3           MR. HAMILTON:  Point number one, the

 4      assertion that this global settlement globally

 5      somehow locks a debtor into a plan structure is

 6      just 100 percent erroneous and false.

 7                In fact, the exact is contrary to

 8      the case.  The settlement agrees that,

 9      expressly contemplates we have the source to

10      pursue any plan structure we want and there are

11      consequences with respect to the agreement of

12      unions if we do that.

13                And the union has in certain

14      circumstances rights to back out of this

15      settlement agreement if we pursue a different

16      plan than what's contemplated here, but there

17      is nothing in this restructuring that prevents

18      the debtors as fiduciary from pursuing any plan

19      reorganization that we determine is in the best

20      interest of the estate and maximizes value to

21      everybody.

22                And if you look at what they

23      submitted as one of their exhibits, one of

24      their four, their three as part of their

25      papers, they submitted a motion to have a
```

```
1                    DANA CORPORATION
2     private settlement agreement with the UAW and
3     the Adelphi case where Appaloosa was in the
4     same functional position where Centerbridge is
5     here.
6                    And in that motion that they submit,
7     if you took a look at footnote 19 of that
8     motion, you will you see what we are talking
9     about.
10                    THE COURT:  We are talking about 450
11    input from General Motors.  I'm aware of that
12    language.
13                    MR. HAMILTON:  And in footnote 19
14    they expressly say in that language we are not,
15    they say, for certain of the agreements in the
16    UAW settlement agreement to be implemented, the
17    debtors plan of RESO must contain provisions
18    consistent with the UAW settlement agreement
19    and confirmation over such plan shall provide
20    for the assumption of the UAW settlement
21    agreements and it cites various things.
22                    Then it says it is relevant to note
23    that this undertaking by the debtors constitute
24    a condition to the effectiveness of certain
25    provisions rather than a covenant by the
```

```
 1                    DANA CORPORATION
 2    debtors that might impermissibly restrict the
 3    plan of reorganization that could be prosecuted
 4    by them.
 5              In other words, in the Adelphi case
 6    they are suggesting is the proper approach.
 7    They are doing exactly what they are doing
 8    here, which is the UAW settlement agreement
 9    there -- excuse me.  I will do my closing and
10    if you want to respond you can but I would
11    appreciate not to be distracted by you standing
12    up, sir.
13              MR. LAURIA:  I feel that I only
14    should address the Court if we are going to
15    talk about the Adelphi case which I did not
16    come here to do.
17              THE COURT:  You put it in your
18    papers, Mr. Lauria, which I read, which you
19    intended for me to do.  Please sit down.
20              MR. LAURIA:  There is a big
21    difference.
22              THE COURT:  Did you intend for me to
23    read it?
24              MR. LAURIA:  I did, your Honor.
25              THE COURT:  Thank you.
```

```
 1              DANA CORPORATION
 2         MR. HAMILTON:  The point is that in
 3    that case the condition to the effectiveness of
 4    the UAW settlement were conditions that would
 5    be provisions on the plan of reorganization
 6    that accomplished that was in that settlement
 7    agreement and if the plan didn't do what was
 8    contemplated in that settlement agreement, the
 9    settlement agreement was off.
10         Well, that's our situation except
11    we're better because here if we don't do what
12    the UAW settlement contemplates, the UAW is
13    still bound by the labor deal unless their
14    refusal to consent to it is determined to be
15    reasonable by some arbitrator, a restriction on
16    their right to back out of the agreement that
17    didn't exist in Adelphi.
18         The underlying point, nothing in
19    this settlement agreement locks the debtors in
20    to anything on a plan and we are free to pursue
21    whatever plan will maximize the value of the
22    estate to these creditors.
23         Second, their suggestion that
24    somehow this settlement agreement creates
25    barriers to new or better alternative proposals
```

```
 1                    DANA CORPORATION

 2   coming forward is completely and absolutely

 3   backwards and false.

 4              They cite two barriers.  One, gee,

 5   if another proposal comes along in certain

 6   circumstances the unions get the right to

 7   strike.

 8              That's backwards because if we don't

 9   approve this settlement agreement, the unions

10   have the right to strike.

11              If you issue an 1113 rule in our

12   favor, if that happens, if that truly is, if

13   the right to strike is truly a barrier to

14   different or better alternative proposals

15   coming in, next thing in this settlement

16   agreement, next thing this settlement agreement

17   will create that barrier and cause that barrier

18   if we don't get out of bankruptcy.  We won't

19   get at these new proposals by any analysis.

20              Now, the other barrier, your Honor,

21   that they say the global settlement creates is

22   the possibility that if we pursue another

23   alternative proposal the unions will have the

24   opportunity to either take a 794 advent claim

25   or a find 108 million unsecured claim and
```

1                    DANA CORPORATION

2    that's just too much to give.

3            The problem with that argument is

4    that there is a 1.01 billion dollar OPEB claim

5    and there are claims that would arise from

6    other aspects of this deal.

7            Until you resolve those claims, no

8    alternative investor can come in because those

9    claims are so huge and those legacy obligations

10   are so large that you can't construct an

11   alternative proposal until you settle those

12   claims.

13           The uncontroverted evidence on the

14   record before, your Honor, and you're the one

15   in the best position to make this assessment,

16   is that the range of possible outcomes here is

17   somewhere between 450 and $500 million and over

18   a billion dollars on those claims.

19           In that context, you are in the best

20   position to assess the reasonableness of what

21   debtors did.  We reached an agreement with the

22   union to settle it in the mid point range

23   between 700 or if the deal goes away and we

24   pursue something else, they have the option to

25   you puruse an 908 million unsecured claim.

1                    DANA CORPORATION

2              Those are within the range of

3    reasonableness but, more importantly, until we

4    reach a settlement on those claims, you're not

5    going to get anybody else in the door to offer

6    an alternative investment proposal.  The proof

7    is in the pudding.

8              Until we reach those numbers with

9    unions along with Centerbridge, nobody else

10   comes with a proposal.

11             You didn't see Appaloosa at the

12   door.  It is only when we resolve that

13   uncertainty that you create the situation where

14   anybody else can come in, knows what the

15   situation is and makes a better alternative

16   proposal.

17             So the reality is what they say is

18   the barriers that this global settlement

19   creates is, in fact, just the opposite.

20             This global settlement removes the

21   barriers that had previously existed to getting

22   alternative better proposals in the door.  That

23   was the uniform conclusion of everyone involved

24   in this case and that is what the determination

25   was of Dana's board of directors and that's the

```
 1                DANA CORPORATION

 2      determination that governs here.

 3               Third, they talk about these secret

 4      implied EBITDA projections that is subject

 5      under some scenario.  Maybe some money will go

 6      to equity.

 7               Bottom line, those EBITDA projection

 8      assume this labor deal.  If you don't approve

 9      this labor deal, if we don't get those savings,

10      we couldn't eliminate the right to strike and

11      lock things in for four years.  There's not

12      going to be any money for equity and there is

13      going to be a lot less money available for

14      everybody else.

15               The fallacy of their argument was

16      the concept of urging this Court to use a blue

17      pencil.  Your Honor, if you have the right, if

18      you had the legal authority to blue pencil the

19      collective bargaining agreement that the

20      debtors could reach with their unions, the

21      whole world will turn inside out.

22               The whole premise of a collective

23      bargaining agreement is that the Court, your

24      Honor, cannot blue pencil or force the labor

25      unions to agree to all the various provisions
```

1              DANA CORPORATION

2    that are subject under negotiations.  That's

3    why you have such extensive round the clocks

4    negotiations over periods of months precisely

5    because unions cannot be forced to agree to

6    something they don't want to agree to.  You

7    don't have that option.

8              Your option is to say thumbs up or

9    thumbs down on the deal we do cut and it was

10   that reality is what caused all the parties

11   over a very intense three to four months period

12   to get the deal today that we're offering to

13   you.

14             And let me remind you, the deeply

15   uncontroverted evidence establishes that deal

16   will enable this company to emerge from Chapter

17   11 as a successful viable competitor in the

18   global market place with a  5 to 6 percent

19   EBITDA profit margin.

20             Finally, I say, well, the dynamic

21   here is that the union doesn't have any reason

22   to consent to a superior proposal because they

23   have no downside to going to arbitration.

24             If we go to arbitration, we lose.

25   We just get the same thing we would have got if

1                    DANA CORPORATION

2      we had consented in the first place.

3                    You Honor, they're ignoring the

4      realities of the situation.  The union has been

5      asked to give up substantial wage and benefit

6      rates, groundbreaking concessions.  They are

7      giving up over a billion dollars of retiree

8      benefit payments.

9                    They are doing so on the premise of

10     the plan of reorganization and the investment

11     by Centerbridge that's contemplated by these

12     agreements.

13                   If somebody else comes in with a

14     heck of a lot more money or throws at creditors

15     so much more money that equity and Appaloosa

16     recovers money, why shouldn't the unions be

17     able to say, well, wait a minute.  Are we

18     taking away the retiree benefit obligations for

19     our retiree and why are we causing all of our

20     employees to like go in a tier 1 to tier 2 and

21     reduce their wages in half with those who have

22     been on layoffs when this new investor is going

23     to come in and give money to these equity

24     holders?  That's just backwards.

25                   Of course they have the right to say

```
 1                 DANA CORPORATION
 2    if someone is going to come in with a heck of a
 3    lot more money maybe we institute taking a
 4    little more money into the VEBA.
 5                There is nothing unfair about that.
 6    There is nothing wrong with that and there is
 7    nothing sinister on them insisting that right
 8    and it is certainly within the business
 9    decision of Dana to agree to a procedure that
10    would allow for this to occur.
11                But the genius of this settlement is
12    that we have locked them in to this labor deal
13    and as long as the alternative investor can
14    achieve the same protections and commitments to
15    the union as Centerbridge they can't back out
16    of this deal.
17                It is binding law in this district,
18    as it is elsewhere in the country that in the
19    end, when you consider the reasonableness of
20    this settlement, you do not have to also
21    consider all the evidence you've heard today
22    and all the reasons for it but you also have to
23    consider the experience and the qualifications
24    of the professionals who are advocating
25    settlement.  That's what the law is in the
```

```
 1                    DANA CORPORATION

 2   state.

 3            That's what I went through with

 4   Mr. Burns on the standard experience and

 5   qualification of Mr. Kramer because it is

 6   relevant to your consideration about the

 7   reasonableness of this settlement that we have

 8   agreed to achieve with the unions.

 9            It is reasonable to consider the

10   qualifications of the creditors committee

11   counsel and the ad hoc bondholders counsel over

12   there, Mr. Hansen, in reaching this deal so

13   everybody here except the lawyers for Appaloosa

14   recognizes maximizing the opportunities for all

15   interested parties in this estate.

16            In that context, I would turn over

17   for the final comments to Miss Ball on behalf

18   of the debtors.

19            MR. MAYER:  Can I just take one

20   second to confer with Miss Ball, your Honor.

21            THE COURT:  Yes.

22            MR. PETERSON:  Your Honor, briefly.

23   Lowell Peterson for the UAW.  People say mean

24   things about us all the time so I'm not going

25   to respond to a lot of what Mr. Lauria said.  I
```

266

```
 1                 DANA CORPORATION
 2    do want to say a couple of things.
 3                 The July 18th letter is supposedly
 4    proof positive the UAW has a closed mind simply
 5    does not apply.
 6                 Mr. Lauria says it says we need this
 7    problem to have global settlement reviewed and
 8    then we will consider any alternative bids that
 9    make it through the process carefully
10    negotiated by the parties in this and as
11    articulated by both the party and Miss Ball
12    earlier on.
13                 I would also point out that the
14    administrative claim that the union maintains
15    as part of the supposedly no risk saying no is
16    simply an embodiment of provision Appendix K to
17    our settlement deal.
18                 If we elect the option of staying
19    with the settlement agreement in the face of
20    another proposal, we also can elect the
21    possibility of having this administrative
22    claim.  So it's really just the same thing we
23    get under the settlement deal.
24                 That is just a comfortable deal for
25    the union.  It is administrative without us
```

```
 1              DANA CORPORATION
 2   knowing that Centerbridge is there, without us
 3   knowing that the alternative bidder is going to
 4   have its cash in its proposal to make us
 5   whole.
 6              In other words, there is nothing
 7   different in our administrative claim than what
 8   we already have in our settlement agreement and
 9   in order to get that we have to fund our
10   settlement agreement.
11              There is nothing nefarious about
12   it.  There's no additional barrier to entry to
13   that.  It is really the same thing.
14              I think your Honor said it best in
15   these alternatives here.
16              We do have the right to strike.  We
17   don't get any additional rights out of this
18   deal that we don't have under the statute as it
19   stands.
20              In fact, we get fewer rights because
21   there are some restrictions, however
22   characterized, on our ability to simply walk
23   away but the fact is this labor deal is
24   conditioned on having a proposal that we can
25   live with.
```

```
 1                  DANA CORPORATION
 2              And one more final thing I would
 3   like to say about this right to strike.  We do
 4   not simply willy-nilly pull people from plants
 5   for no good reason whatsoever.  There has to be
 6   some reason, some fundamental reason the union
 7   has with some alternative deal in some
 8   fundamental case if it doesn't meet the need of
 9   the retirees and the members.
10              We don't just walk out for the sake
11   of walking out because if anyone is immediately
12   impacted by a walk out is the people who walk
13   out.  Thank you, your Honor.
14              MS. BALL:  Your Honor, I have very
15   little to add to my colleague, Mr. Hamilton's
16   close, but I did want to make just three
17   clarifying points.
18              The good news that was established
19   is that we have an EBA target of 45 percent and
20   certainly higher in EBITDA terms, that's good
21   news.
22              But the thing I wanted to follow up
23   with your Honor is two additional facts.  One,
24   I don't recall seeing anywhere that we asked
25   you to relist 1129(b) for the absolute priority
```

```
1                    DANA CORPORATION

2    rule of the Bankruptcy Code.

3              Returning to what we did tell you,

4    we did tell you that there is just, assuming

5    this deal, addressing the points Mr. Lauria

6    raised as an equity holder that there is, if I

7    did the math right, 69 to 64 percent of the

8    equity, reorganized equities companies

9    available and it is available for these

10   constituents, and everyone is hoping that that

11   will reach as far as into our constituent body

12   as possible but, your Honor, there is nothing.

13             We'd know about the value about

14   that.  There is nothing we said today about the

15   distribution because the plan is not in front

16   of you.

17             Two points we did tell you are, one,

18   we are going to ask Miller Buckfire to go 27

19   steps on an abbreviated timeline to get this

20   process going and we are all going to continue

21   with our nose to the grindstone.

22             What Mr. Peterson indicates the

23   letters from the union it is not a pass a

24   football to the unions and we go close shop.

25   As even Appaloosa knows, it is a parallel track
```

```
 1                  DANA CORPORATION
 2    because we want to keep this timing going
 3    forward.
 4              As Mr. Hamilton indicated but I
 5    think it is really worth the time to go back,
 6    the Bankruptcy Code has special provisions for
 7    unions.  The Bankruptcy Code has very special
 8    provisions for retirees.  We are asking you to
 9    respect those.
10              In fact, this settlement is totally
11    we believe consistent with what Congress asked
12    the bankruptcy judges and lawyers to do is to
13    work with the special routes that they have
14    established to protect workers and retirees and
15    the one rule I want to point to no good deed
16    goes unpunished, part of Mr. Lauria arguments,
17    recognizing that these equity; and, your Honor,
18    I'm going over old ground for you that you're
19    well aware, if we seek any modification of
20    retiree benefits they have to be sure and you
21    have to have been satisfied if you were to rule
22    that the modification sought assures that the
23    creditors and the affected parties are treated
24    fairly and equitable.
25              That is a phrase of art, as
```

1              DANA CORPORATION

2    Mr. Lauria knows in our bankruptcy world, and

3    even if you were to find it, 1114(g) goes on,

4    and I only want to take this time, your Honor,

5    because I do think these take out his ability

6    to do something positive for equity in this

7    concept test, and it was as Mr. Burns testimony

8    indicated it was for that last piece after the

9    business plan looked better.

10            And, your Honor, I would like to

11   refer to 1114(g), in particular, the phrase

12   that in essence says "That at any time after an

13   order is entered providing for modification of

14   retiree benefits or at any time after an

15   agreement modifying such benefits is made

16   between the trustee and approved by your Honor,

17   the authorized representative may apply to the

18   court for an order increasing these benefits,

19   and that order and the word is "shall," not

20   "may," your Honor, shall be granted if the

21   increase in retiree benefits sought is

22   consistent with the standard I just read, fair

23   and equitable.

24            This is a legal underpinning my

25   colleague, Mr. Hamilton, was drawing if we're

```
 1                    DANA CORPORATION

 2   so well off that everyone is doing better they

 3   can come back and ask for more.  That's in the

 4   statutes.

 5            One of the things that we did do

 6   that we think is very relevant for that last, I

 7   hope, last contribution to the union VEBA was a

 8   fully informed waiver of this right.

 9            They got the business plan.  Their

10   expert studied it.  We debated it.  They have

11   gotten that modification again but, your Honor,

12   based on a very well advised, maybe that's

13   where Centerbridge being an advisor helps that

14   informed waiver, they have waived that right

15   and you know who the beneficiary of that waiver

16   is, you Honor.

17            We are hopeful the beneficiary of

18   that waiver are our creditors, and to quote a

19   phrase of Mr. Lauria stakeholders, even those

20   who are at the lowest end of the food chain.

21            Your Honor, with that I do not

22   believe the debtor has anything else to add to

23   the record before you.  Thank you.

24            THE COURT:  Anyone else want to be

25   heard.  Thank you all.  We will take a 15
```

```
 1                    DANA CORPORATION

 2    minute recess and reconvene.

 3                    (A break from record was taken.)

 4                    THE COURT:  I will read the

 5    settlement over which has some text in it.

 6                    This is a 9019 settlement and based

 7    upon the extensive record before me, the

 8    submissions and in full consideration of the

 9    arguments and the interventions heard today, I

10    am prepared to and do approve the proposed

11    settlement.

12                    As the Second Circuit Court of

13    appeals recently noted, "There is little doubt

14    that settlements of disputed claims facilitate

15    the efficient functioning of the judicial

16    system.  In Chapter 11 bankruptcies,

17    settlements also help clear a path for the

18    official administration of the bankruptcy

19    estates, including any eventual plan of

20    reorganization.

21                    Before preplan settlements can take

22    effect, however, they must be approved by the

23    bankruptcy court pursuant to Bankruptcy Rule

24    9019:  Motorola, Incorporated against Official

25    Unsecured Creditors (In re Iridium Operation)
```

1              DANA CORPORATION

2    478 Fed third 452, 455 Second Circuit 2007.

3              Bankruptcy Rule 1990 has a clear

4    purpose to prevent the making of concealed

5    agreements which are unknown to the creditors

6    and unevaluated by the Court.

7              In determining whether to approve a

8    proposed settlement, the Court's responsibility

9    is not to decide the numerous issues of law and

10   fact implicated by the settlement "but rather

11   to canvas the issues and see whether the

12   settlement falls below the lowest point in the

13   range of reasonableness":  Cosoff against

14   Rodman colloquially known as WT Grant, 699 Fed

15   Second, 599, 608, 2d Circuit, 1983.

16             Courts in the second circuit have

17   developed standards to evaluate if the

18   settlement is fair and equitable based on the

19   original framework announced by the United

20   States Supreme court in TMT Trailer Ferry

21   Protective Commission for Independent

22   Stockholder of TMT Ferry against Anderson of

23   390 U.S. 414 1968.

24             Those interrelated factors are, one,

25   the balance between the litigations possibility

```
 1              DANA CORPORATION

 2   of success and the settlements future

 3   benefits.

 4              Two, the likelihood of complex and

 5   protracted litigation with its attendant

 6   expense inconvenience and delay including the

 7   difficulty in collecting on the judgment.

 8              Three, the paramount interest of the

 9   creditors including each affected class'

10   relative benefits and the degree to which

11   creditors either do not object to or

12   affirmatively support the proposed settlement.

13              Four, whether other parties in

14   interest support the settlement.

15              Five, the competency and experience

16   of counsel supporting and supporting the

17   settlement.

18              Six, the nature and breadth of

19   releases to be obtained by officers and

20   directors and, seven, the extent to which the

21   settlement is the product of arms lengths

22   bargaining, in re Iridium Operating, LLC, 478

23   Fed 3d at 461 again quoting TMT Trailer Ferry.

24              With respect to this settlement, on

25   July 5, 2007, Dana Corp. and its affiliates,
```

```
 1                    DANA CORPORATION

 2    the debtors, filed a motion for approval of

 3    their settlement with the unions and the so

 4    accompanying plan support agreement and

 5    investment agreement known as amended the

 6    settlement.

 7              This settlement comes on the heals

 8    of a full six day trial on the complex issues

 9    implicated in the debtors request for relief

10    under Sections 1113 and 1114.

11              The creditors committee, among

12    others, originally filed an objection to the

13    settlement but the debtors continued to work

14    with the committee and other objectors to amend

15    the settlement and the creditors committee

16    along with the ad hoc committee of Dana

17    noteholders that holds $1.4 billion in

18    unsecured notes representing 89 cents, 89

19    percent of the notes outstanding now support

20    the amended global settlement.

21              Several parties originally filed

22    statements merely noting that they joined with

23    the creditors committee objection, including

24    Wilmington Trust Company and Timken Company

25    last named who have also withdrawn their
```

277

```
 1                    DANA CORPORATION
 2    objections.
 3                    Brandes Investment Partners, LLP, an
 4    equity holder and former member of the defunct
 5    equity committee, submitted an objection
 6    complaining that the debtors motion to approve
 7    the settlement fails to contain a discussion
 8    about a distribution to equity under a Chapter
 9    11 plan.
10                    Similar plan objections were raised
11    at the hearing today by certain bondholders.
12    Plan objections are not ripe at this time and
13    will be dealt with during the planned
14    confirmation process and all parties rights to
15    raise those objections have been reserved.
16    Their objections accordingly are overruled.
17                    Appaloosa management, the largest
18    shareholder and also a former member of the
19    defunct equity committee, has filed several
20    objections to the motion and has submitted
21    alternative investment proposals to the debtors
22    board.
23                    The board has determined to reject
24    each of Appaloosa proposal at this time.
25                    If the settlement is approved,
```

278

1               DANA CORPORATION

2    however, Appaloosa and others will have the

3    opportunity to submit a proposal that offers

4    better value for creditors.

5               Approval of this settlement would

6    put a procedure in place to allow parties to

7    receive and consider alternative offers.

8               The debtors have a fiduciary

9    obligation to analyze all proposals and to

10   determine which is in the best interest of

11   their estate and their creditors.  That

12   obligation transcends the debtors obligations

13   under the settlement agreement.

14              In arguing that the union has too

15   much say in the process, Appaloosa infers that

16   any successful investor need not have the

17   support of the unions in order to avoid labor

18   unrest and maintain a viable business.

19              Similarly, Appaloosa implausibly

20   contends the settlement somehow invents a claim

21   now that the union would not otherwise hold.

22              In reality, although the union's

23   claim would not be fixed at this point, it is

24   fairly clear the union would probably have a

25   large claim arising from a rejection of the

```
 1                  DANA CORPORATION
 2    labor agreement, albeit subject to a time
 3    consuming claims objection process.  In fact,
 4    the debtors legacy liabilities needed and need
 5    to be liquidated before any investment
 6    proposals could realistically be made and
 7    considered.
 8              Appaloosa's contentions that the
 9    debtors are unable to fulfill their fiduciary
10    duty and that the proposed process is not
11    competitive are unavailing.
12              The settlement as it has been
13    tweaked satisfies this Court that the 9019
14    process with the participation of the creditors
15    committee and the ad hoc committee has been
16    sound, passes muster and is sufficient.
17              No objections, including
18    Appaloosa's, seriously challenge the
19    significant benefit to the estate resulting
20    from the labor costs improvements and
21    modifications that the debtors were able to
22    negotiate with the unions.
23              The labor agreements, without the
24    dissent, have been characterized as
25    groundbreaking with substantial benefits to
```

1            DANA CORPORATION

2    both the debtors and the union.

3            The main objection is to the terms

4    of the settlement relating to the investment to

5    be made by Centerbridge and the rights the

6    unions receive in the event Centerbridge is

7    replaced by an alternative investor.

8            However, as demonstrated at the

9    hearing, the settlement is an integrated

10   comprehensive resolution of all the issues

11   between the debtors and the union to the

12   benefit of the debtor's estates, their

13   creditors and stakeholders and creates the

14   framework for an investment in the debtors that

15   is required to fund the distributions to the

16   union under the global settlement creating

17   substantial value for creditors and

18   stakeholders.

19           The settlement is an arms length

20   negotiation by highly experienced professionals

21   and advisors and is supported by the major

22   stakeholders in the case other than Appaloosa

23   and Brandes investment.

24           Specifically, the settlement

25   provides costs savings necessary to

```
 1                    DANA CORPORATION
 2    successfully restructure the debtors North
 3    American operation, including among other
 4    things the elimination of approximately one
 5    billion dollar liability from the debtor's
 6    balance sheet on the account of nonpension
 7    retiree benefits provided to union retirees and
 8    active employees.
 9              It extends the maturity of the
10    collective bargaining agreements for another
11    four years, resolves the litigation surrounding
12    the Section 1113/1114 motion and avoids the
13    uncertainty and labor unrest likely to ensue if
14    the 1113/1114 were to be granted, puts the
15    debtor in a position to formulate and prosecute
16    a plan of reorganization within the time frame
17    established by Congress that will permit the
18    debtors to compete meaningfully in a distressed
19    auto industry, identify the funding source to
20    provide the means by which the debtors will be
21    able to fulfill their obligation under the
22    union settlement and while not a Sub rosa plan,
23    provides the building blocks for a plan of
24    reorganization.
25              Accordingly, I find that the
```

282

```
 1              DANA CORPORATION

 2   settlement is a sound exercise of the debtor's

 3   business judgment, is fair and equitable, well

 4   above the lowest rung in the range of

 5   reasonableness, in the best interest of the

 6   debtors, their, creditors and stakeholders.

 7   Accordingly, the motion is granted.  Please

 8   submit a motion.

 9              MR. HAMILTON:  Thank you, your

10   Honor.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

283

```
 1              DANA CORPORATION

 2           C E R T I F I C A T E

 3

 4           I, MICHAEL WILLIAMS, a Certified

 5  Shorthand Reporter and Notary Public of the

 6  State of New Jersey do hereby certify that the

 7  foregoing is a true and accurate transcript of

 8  the within proceedings, to the best of my

 9  ability.

10

11

12

13

14

15

16

17

18

19

20

21

22

23           _____
             MICHAEL WILLIAMS, CSR
24           License No. XIO1991
             Notary Public of the
25           State of New York
```

**EXHIBIT U**

**EXHIBIT A**



# UNITED STEELWORKERS

**UNITY AND STRENGTH FOR WORKERS**

July 19, 2007

Michael J. Burns
Chairman, President and Chief Executive Officer
Dana Corporation
P.O. Box 1000
Toledo, Ohio 43697

Dear Michael:

We learned today of the SEC Schedule 13D filing made by Appaloosa Management L.P. ("Appaloosa"). As you know, Appaloosa attached to its filing a letter sent on July 18 to the Board of Directors of Dana Corporation in which Appaloosa describes its purported willingness to "unconditionally commit . . . to fund Centerbridge's obligations as set forth in the 'Terms of Centerbridge Investment,' attached as Exhibit B to [the] Plan Support Agreement . . . ."

Appaloosa's present offer is far from unconditional. Indeed, "illusory" would be a more apt description. As you know, the "Centerbridge" transaction is conditioned on specific Settlement Agreements between the Company and the Unions, which Agreements are based on Centerbridge being the party making the investment referred to therein. At this time, we are not prepared to enter into Settlement Agreements with Appaloosa as the investor. Therefore, Appaloosa cannot in fact make good on their offer.

We continue to encourage Dana to pursue the court approval of the Settlement Agreements and related understandings. If the court approves our Agreements, and if Appaloosa, or anyone else, proposes thereafter to pursue an investment in Dana, the Unions stand ready to fully fulfill our obligations under our respective Settlement Agreements. As you know, the Settlement Agreements include extensive obligations regarding the Unions' consideration of other potential investors or transactions.

**United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union**

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

Michael J. Burns
July 19, 2007
-2-

At this stage, however, Dana and its Board of Directors should not be diverted from the important work of obtaining court approval of our Agreements.

Very truly yours,

Bob King
Vice President and
Director of CS/ISP Department

Jim Robinson
Director
USW – District 7

CC:  Corinne Ball
Andrew M. Kramer
Thomas Moers Mayer
Henry S. Miller
David Tepper

**EXHIBIT B**

26 Main Street
Chatham, NJ 07928

July 18, 2007

**TO: THE BOARD OF DIRECTORS OF DANA CORPORATION**
4500 Dorr Street
Toledo, Ohio 43615

Ladies and Gentlemen:

The efforts of management and its advisors to pursue a plan sponsored by Centerbridge Capital Partners, L.P. ("Centerbridge") have been fundamentally flawed and, if continued, will yield far less than the maximum recoveries available to stakeholders. It is the fiduciary responsibility of the Board to ensure that management and its advisors pursue strategies designed to maximize the value of the Debtors' estates for the benefit of all stakeholders. The Board has failed in this regard.

As an initial matter, management and its advisors continue to resist our efforts to obtain legitimately from the Company customary access to information needed to support a plan-sponsorship proposal, which proposal we believe may pay creditors in full and provide a return to current shareholders. To date, management has conditioned our access to information upon us agreeing to give up inherent rights of a stakeholder, including our right to make a proposal without management's prior approval, and has ceded to Centerbridge material decision making authority regarding the terms of access to information. The efforts of management and its advisors in concert with Centerbridge to exclude interested investors from the process will inevitably ensure that no alternative competitive proposals ever materialize.

Furthermore, the Company's proposed transaction with Centerbridge and the Unions
(a) shifts significant estate decision-making authority to non-fiduciaries (the unions and their financial advisor), (b) shifts material estate value to a third party, without the benefit of a meaningful competitive bidding process, (c) provides substantial value and benefits to management, and (d) is structured to effectively preclude competing proposals.

To demonstrate the absurd and one-sided nature of the Centerbridge proposal, we are prepared, and do hereby unconditionally commit, despite not being permitted to conduct any due diligence, to fund and perform Centerbridge's obligations as set forth in the "Terms of Centerbridge Investment," attached as Exhibit B to Plan Support Agreement, filed as an exhibit to the Company's Form 8K, dated July 5, 2007, in exchange for the consideration to be provided to Centerbridge thereunder, with the following improvements in favor of the Company: (1) we agree to eliminate and waive any break-up fee; (2) we will enhance the Conversion Price from .83 times Distributable Market Equity Value Per Share to .90 times Distributable Market Equity Value per share (each term as defined in the Terms of Centerbridge Investment); and (3) we will agree to the elimination of barriers to the submission of competing proposals. We can make this commitment with its enhancements over the Centerbridge proposal without the benefit of any

due diligence, because the Centerbridge transaction is essentially risk free to Centerbridge. The Conversion Price, rather than being fixed on the basis of a set enterprise value, which would permit stakeholders to assess the value of their recovery, is instead set after-the-fact at a 17% discount to actual trading value. In other words, given Centerbridge's guaranteed senior position in the capital structure, they are assured of being "in the money" regardless of

(a) the Company's condition when it emerges from chapter 11 protection, or (b) the total amount of allowed claims entitled to distributions under a plan of reorganization. We believe this construct provides Centerbridge and its co-investors with a risk free return of several hundred million dollars on their investment at the expense of your stakeholders.

Notwithstanding our full commitment to pursue an alternative to the Centerbridge transaction as outlined above, we believe that the structure of the Centerbridge transaction, even as improved by us, remains fundamentally unfair to existing stakeholders. As a consequence, based on our understanding of the Company and its finances as set forth in publicly available information, and subject to our and our financial advisors' (The Blackstone Group) satisfaction with confirmatory due diligence (which we believe can be completed promptly with the Company's support and cooperation), and the negotiation and preparation of customary definitive documents, we are prepared to fund the Company's chapter 11 exit on the terms set forth on the attached plan term sheet. This proposal is materially superior to the Centerbridge proposal because, among other things, it:

(1) Aligns our interests as plan investors in the future success of the Company with those of the other stakeholders;

(2) Appropriately values the Company allowing creditors to receive a full recovery on their claims and provides a meaningful return to shareholders;

(3) Properly allocates the role of the Company's stakeholders in the selection of a new board of directors and the Company's post-exit governance; and

(4) Ensures that management will be accountable to stakeholders on a going-forward basis

Furthermore, while our proposal contemplates the full incorporation of the economic terms of the Company's proposed settlement with its Unions, we are also willing to pursue a transaction that does not require the incorporation of the Union settlement, thereby permitting the Company to exercise fully its fiduciary duty to pursue value maximizing transactions.

We implore you to review and reconsider the Company's current restructuring strategy. The consequences of continued pursuit of this strategy will be unfortunate. To protect their legitimate interests (that are being ignored by the Company), stakeholders will be compelled to pursue remedies that are by definition less efficient and more expensive than a proper resolution of this chapter 11 case (but nonetheless more favorable than the outcome put forth by the Company). At a minimum, the plan process will be hotly contested until its conclusion (and perhaps beyond). In addition, parties may determine to pursue other available stakeholder remedies.

2

We believe that the situation requires your immediate attention and consideration. We are available to meet with the Board and its representatives at your earliest convenience to discuss more fully the matters set forth herein and to work toward an amicable, appropriate conclusion to Dana's chapter 11 case.

Sincerely,

**APPALOOSA MANAGEMENT L.P.**

David Tepper
President

3

**FOR DISCUSSION PURPOSES ONLY**

**TERM SHEET FOR
PLAN OF REORGANIZATION FOR DANA CORPORATION**

Set forth below is a summary of indicative terms for a potential investment in Dana Corporation by entities or funds controlled by Appaloosa Management L.P. The investment is being made in connection with a Plan of Reorganization of Dana Corporation under chapter 11 of the Bankruptcy Code. The terms set forth below are intended solely to provide a framework for the parties as they proceed with discussions of the proposed transaction and do not constitute any agreement with respect to the definitive terms for any transaction or any agreement to agree or any solicitation of acceptances or rejections of any plan of reorganization. While the parties expect to negotiate in good faith with respect to the terms for a transaction, any party shall be free to discontinue discussions and negotiations at any time for any reason or no reason. No party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.

| | |
|---|---|
| New Equity Investment | On the Effective Date, subject to participation rights of existing stakeholders as more fully set forth herein, Appaloosa Management LP ("AMLP") will fully commit up to $750 million of equity financing, consisting of (i) $300 million of Series A Preferred Stock, (ii) $100 million of Series B Preferred Stock, (iii) up to $100 million of Series B Preferred Stock not otherwise subscribed to in the Preferred Stock Rights Offering, and (iv) up to $250 million of New Common Stock not otherwise subscribed to in the Common Stock Rights Offering (collectively, the "Investment"). |
| New Debt Financing | On the Effective Date, the Company shall (i) obtain a Senior Secured Facility in the amount of $1.5 billion, and (ii) issue Unsecured Notes in an amount to be determined (together, the "Exit Facility").  The Exit Facility shall be with parties and on market terms reasonably acceptable to AMLP.  Proceeds of the Exit Facility shall be used to, among other things, repay the DIP Facility, fund obligations under the Plan, including partial cash distributions to unsecured creditors, and fund business operations. |
| Treatment of Secured and Priority Claims | Secured and Priority Claims will be reinstated or satisfied in full in cash on the Effective Date. |

4

| | |
|---|---|
| Preferred Stock Terms | tion of the Series A Preferred Stock and the Series B Preferred Stock (collectively, the "Preferred Stock") shall have identical terms except that Series A Preferred Stock shall have certain voting and governance rights.  Subject to additional terms and conditions to be set forth in the Definitive Agreements, (a) holders of Preferred Stock shall be entitled to receive a dividend at the annual rate of 4.0% of the liquidation preference thereof, which if unpaid, shall accrue, and (b) each share of Preferred Stock shall be convertible, without any payment by the holder thereof, into a number of shares of New Common Stock equal to (i) the liquidation preference divided by (ii) .85 times Plan Value. AMLP shall be prohibited from receiving, in exchange for the exercise or non-exercise of voting rights, any compensation or renumeration. |
| Direct Investment | AMLP shall have the option to purchase up to $25 million of New Common Stock at the Exercise Price in addition to any shares of New Common Stock acquired pursuant to the Common Stock Rights Offering or Common Stock Rights Offering Backstop Commitment. |
| Governance | Reorganized Dana Corporation shall have balanced corporate governance pursuant to terms to be agreed upon between AMLP and the Official Committee of Unsecured Creditors. |
| Registration Rights | Registration Rights shall be customary for a transaction of this type. |
| Transaction Fees | AMLP shall be entitled to payment of commitment, backstop and other fees customarily payable in connection with a transaction of this type and magnitude. |
| Break-Up Fees | AMLP shall be entitled to customary break-up fees payable in connection with an at-risk transaction. |

| | |
|---|---|
| Treatment of Unsecured Claims | Unsecured Creditors shall receive, on account of their Allowed Claims, (i) New Common Stock, (ii) Excess Cash, and (iii) the right to purchase their pro rata share of $100 million of Series B Preferred Stock (the "Preferred Stock Rights Offering").  Excess Cash shall mean the (i) sum of the proceeds of the Exit Facility plus cash on hand on the Effective Date, less (ii) (a) amounts necessary to pay, or reserve for payment of, all Allowed Administrative, Secured and Priority Claims, and (b) amounts necessary to fund business operations.  It is anticipated that distributions to Unsecured Creditors will have a value equal to the full amount of their Allowed Claims plus interest accrued from the Petition Date at the applicable non-default rate ("Payment in Full"). |
| Treatment of Equity Holders | Equity Holders shall receive the right to purchase (the "Common Stock Rights Offering") their pro rata share, based upon $250 million of proceeds, of New Common Stock at an exercise price equal to .85 times Plan Value (the "Exercise Price").  Plan Value shall mean the price per share that when combined with Excess Cash results in Payment in Full of Unsecured Creditors. |
| Preferred Stock Right Offering Backstop Commitment | AMLP shall commit to purchase at face value all Series Preferred B Stock offered in but not issued pursuant to the Preferred Stock Rights Offering. |
| Common Stock Rights Offering Backstop Commitment | AMLP shall commit to purchase at the Exercise Price all New Common Stock offered in but not issued pursuant to the Common Stock Rights Offering. |

| | |
|---|---|
| Expense Reimbursement | AMLP shall be reimbursed for reasonable out of pocket costs and expenses incurred in connection with pursuing the Investment. |
| Definitive Agreements | All obligations shall be subject to mutually agreeable definitive agreements with customary conditions, representations and warranties, covenants and defaults. |
| Additional Investors | It is anticipated, but not a condition, that AMLP will arrange for additional investors to participate in the Investment. Such additional investors shall be subject to the consent of the Company, such consent not to be unreasonably withheld. |
| Governing Law | New York |

7

**EXHIBIT C**

**Hearing Date And Time: July 19, 2007 at 10:00 a.m.**
**Objection Deadline: July 12, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      -and-

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

      -and-

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Tom A. Jerman (TJ 1129)
Jessica Kastin (JK 2288)

Attorneys for Delphi Corporation, et al.,
    Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698
Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :
       In re                :      Chapter 11
                           :
DELPHI CORPORATION, et al.,    :      Case No. 05-44481 (RDD)
                           :
                Debtors. :      (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 363, 1113 AND 1114
AND FED. R. BANKR. P. 6004 AND 9019 APPROVING MEMORANDUM OF UNDERSTANDING
AMONG UAW, DELPHI, AND GENERAL MOTORS CORPORATION
INCLUDING MODIFICATION OF UAW COLLECTIVE BARGAINING AGREEMENTS
<u>AND RETIREE WELFARE BENEFITS FOR CERTAIN UAW-REPRESENTED RETIREES</u>

("UAW 1113/1114 SETTLEMENT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion")[1] for an order approving under 11 U.S.C. §§ 363, 1113 and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019, (i) a memorandum of understanding regarding Delphi's restructuring entered into among the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), Delphi, and General Motors Corporation ("GM") (the "UAW Settlement Agreement" or the "Memorandum of Understanding"),[2] a comprehensive agreement that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals (the "UAW CBAs"), and (b) provides that GM and Delphi will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, (ii) withdrawal without prejudice of the Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing  Modification Of Retiree Welfare Benefits (the "1113/1114 Motion") as it solely pertains to the UAW and UAW-represented retirees and approving the parties' settlement of the 1113/1114 Motion as it pertains to the UAW and UAW-represented retirees, and (iii) modification of retiree welfare benefits for certain UAW-represented retirees of the Debtors.

---

[1]     A copy of the informational notice provided to active Delphi hourly employees and hourly retirees represented by the UAW in connection with the Motion is attached hereto as Exhibit 1.

[2]     A copy of the UAW Settlement Agreement is annexed to the Proposed Order which is attached hereto as Exhibit 2.  Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the UAW Settlement Agreement.

<u>Introduction</u>

1.      The UAW, Delphi, and GM have discussed the challenges impacting Delphi and its UAW-represented operations.  As GM's largest supplier and the employer of thousands of UAW-represented employees, indirectly supporting tens of thousands of dependents, retirees, and surviving spouses, these parties have a critical interest in Delphi's successful emergence from bankruptcy with certain UAW-represented operations.  These parties acknowledge that restructuring actions are necessary and commit to take specific actions to protect the needs of these parties and their constituencies, continuing progress already made toward transforming Delphi's labor cost structure and ongoing business operations.

2.      The UAW has already agreed to an attrition program pursuant to which thousands of employees at traditional Big Three wages and benefits took buy outs, flowbacks to GM, or retired, and the UAW waived Delphi obligations to hire thousands of new employees as a result of the departures caused by the attrition program.  The UAW, Delphi, and GM have also agreed to the "Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee"[3] facilitating the freeze of Delphi's pension plan and the assumption of billions of dollars of OPEB liabilities by GM, thereby dramatically reducing Delphi's ongoing benefit costs and liabilities.

3.      In addition to the above, to enable continued transformation to more competitive wage and benefit levels, to address capacity, divestiture, work rules, and staffing level issues, and to better position Delphi to retain existing business and attract new business, the UAW, Delphi, and GM have entered into various agreements in the Memorandum of

---

[3]    This agreement is Attachment B to the Memorandum of Understanding.

Understanding on a two-party or three-party basis, as applicable, which agreements were ratified by the UAW membership on June 28, 2007.

        4.      On March 31, 2006, the Debtors filed the 1113/1114 Motion after they were unable to consummate consensual modifications to the Debtors' collective bargaining agreements and retiree welfare benefits with the UAW and the other unions representing certain of its U.S. employees and retirees (the "Unions")[4] during the first six months of its chapter 11 reorganization cases. The Debtors continued to negotiate with the Unions even after they filed the 1113/1114 Motion, and represented that they would continue to negotiate with the Unions even if Debtors obtained the order requested in the 1113/1114 Motion.[5] The parties were unable to reach a consensus before the scheduled commencement of the hearing on the 1113/1114 Motion on May 9, 2006. This Court conducted hearings on the contested motion on various trial dates in May and June 2006, the record of which constitutes part of the basis for approval of the relief requested in this Motion. Throughout the 1113/1114 proceedings, however, the Debtors and the Unions continued to seek negotiated alternatives to litigation.

        5.      On June 8, 2006, the Debtors and all respondents to the 1113/1114 Motion conducted a "meet and confer" at which the parties agreed to submit a scheduling order to this

---

[4]    These unions include the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America ("IUE-CWA"), the United Steelworkers of America ("USW"), the International Association of Machinists and Aerospace Workers, the International Brotherhood of Electrical Workers, the International Union of Operating Engineers, and their local affiliates.

[5]    The Debtors' proposed modifications to the UAW CBAs upon which their 1113/1114 Motion was based are described in detail in the 1113/1114 Motion and the accompanying Declaration Of Darrell Kidd In Support of the 1113/1114 Motion (Docket No. 3039). In sum, the Debtors' proposed modifications contemplated two possible scenarios: one in which they received no or inadequate financial support from GM (the "Competitive Benchmark Proposals") and the other in which they received financial support from GM adequate to offer less restrictive or severe modifications to their national and local labor agreements (the "GM Consensual Proposals"). The UAW, as well as the Debtors' other U.S. labor unions, rejected the Competitive Benchmark Proposals and took the position that the Competitive Benchmark and GM Consensual Proposals were unacceptable and did not provide a framework for negotiations. The Memorandum of Understanding that is the basis of this Motion is essentially a fully negotiated GM Consensual Proposal on terms acceptable to the UAW, Delphi, and GM.

4

Court which provided for a recess of the hearings until August 11, 2006 (Docket No. 4170). During the next five months, the Debtors' discussions with the Unions, GM, and other stakeholders continued. As a consequence of those negotiations, the parties submitted to this Court further scheduling orders adjourning the 1113/1114 Motion through the balance of 2006 and, on January 31, 2007, this Court suspended further proceedings on the 1113/1114 Motion (Docket No. 6779). Further orders continuing the suspension of the 1113/1114 Motion have been granted by this Court with the intention of allowing the parties additional time to negotiate consensual modifications to Delphi's labor agreements.

6.      The UAW Settlement Agreement applies only to the UAW and does not resolve the 1113/1114 Motion as to the remaining Unions. As of the date of this Motion, however, the Debtors are engaged in active bargaining with their second and third largest Unions and expect to renew formal bargaining with their three remaining Unions prior to the hearing date on this Motion in an effort to reach consensual agreements with all of the remaining Unions that could be considered by this Court as early as the August 16, 2007 omnibus hearing.

7.      The UAW Settlement Agreement, among other subject matters,[6] provides that: [7]

---

[6]  Delphi and the UAW have also agreed that Delphi will pay as soon as reasonably practicable after the Effective Date approximately (but in no event more than) $993,000 in cash severance and vacation payments to former UAW-represented hourly employees of Manufacturers Products Co. ("MPC"), a former distressed supplier to the Debtors. The payments relate to an unfunded budget line for severance and vacation payments in connection with an Accommodation Agreement dated January 24, 2006 among Delphi, MPC, and certain third parties pursuant to which parts (including an inventory bank) were produced in February and March 2006. Delphi had previously disputed any contractual or other basis for these claims. Based on Delphi's participation in the Accommodation Agreement, its pro-rata apportionment of the claims would have been approximately $233,355. When MPC wound down and distributed the proceeds of its liquidation, Delphi received approximately $209,000 in reimbursement of payments made under the Accommodation Agreement; however, none of the severance or vacation payments to UAW-represented employees contemplated under the Accommodation Agreement were previously paid. These MPC-related payments are to be in full satisfaction of all claims against the Debtors arising or related to MPC and the Accommodation Agreement and the Debtors will receive full releases therefor, including from each payment recipient. In addition, all related claims filed in Delphi's chapter 11 cases will be disallowed and expunged, including claim no. 13270.

5

(A)    Effective upon the later of entry of this Court's approval order in respect of the Motion or the first Monday following receipt of written notice of ratification from the UAW: [8]

- The term of the UAW CBAs are extended until September 14, 2011;

- A site plan is implemented with respect to each of 21 UAW-Delphi plants which includes specific revenue, production, and job commitments from Delphi and/or GM and pursuant to which Delphi will retain ownership and operations in four facilities, seven facilities will be sold or transferred to a third party so that Delphi will have no further operational or employment responsibilities after certain specified sunset dates, and ten facilities will be closed;

- A workforce transition program is implemented for traditional UAW-represented employees that provides eligible employees with transformation plan options including  (1) attrition options similar to the previously-approved UAW attrition programs, (2) flowback rights to eligible Delphi employees as of the Petition Date (as defined below) who do not elect the attrition options, including relocation allowances of up to $67,000 in certain circumstances when plants cease production, (3) provision of lump sum "buy-down" payments totaling $105,000 for traditional production employees who do not elect the attrition option or flowback and continue to work for Delphi under the terms of the 2004 UAW-Delphi Supplemental Agreement applicable to employees hired after 2004, transferring those employees to Supplemental Employee Status as of October 1, 2007, (4) conversion of temporary employees in UAW-Delphi plants to permanent employee status, and (5) severance payments up to

---

[7]    The summary of the UAW Settlement Agreement set forth in this Motion is qualified entirely by and is subject to the actual terms and conditions of the UAW Settlement Agreement filed as an exhibit to the Proposed Order which is attached hereto as Exhibit 2.

[8]    Until the effective date of a plan of reorganization, nothing in the UAW Settlement Agreement will constitute an assumption of any agreement described in the UAW Settlement Agreement, including, without limitation, any collective bargaining agreement between the UAW and Delphi (except as provided for in Section K.3) or any commercial agreement between GM and Delphi, nor will anything in the UAW Settlement Agreement be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.  The UAW Settlement Agreement also provides that the UAW, Delphi, and GM agree (and the order approving this Motion must also provide) that the UAW Settlement Agreement is without prejudice to any interested party (including the UAW, Delphi, GM, and the statutory committees) in all other aspects of Delphi's chapter 11 cases and the UAW, Delphi, and GM reserve all rights not expressly waived in the UAW Settlement Agreement.

$40,000 to eligible employees who are permanently laid off prior to September 14, 2011;[9]

- Certain terms of the 2004 UAW-Delphi Supplemental Agreement with respect to wages, individual retirement and savings plans, and post-retirement health care accounts are modified;

- Certain terms of the UAW CBAs are modified with respect to provisions covering hiring requirements, existing CHR/Legal Services, holiday schedule, workers' compensation letter, temporary employees, Appendix L, GIS, AOL, and other matters described in Attachment E to the Memorandum of Understanding;

- Local negotiations subject to mutual agreement regarding work rules and other local agreement issues will be conducted on an expedited basis;

- Delphi's commitment in the Supplemental Agreement to the principle of "equivalence of sacrifice" when establishing compensation and benefit levels for salaried employees and management is reaffirmed;

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and pending ordinary course grievances of employees remaining in the workforce); and

- The UAW will receive an allowed prepetition claim in the amount of $140 million on account of the CHR and Legal Services claims as of April 1, 2007 (to be adjusted by the difference between accruals through October 1, 2007 and expenditures until the effective date of a plan of reorganization) of which $30 million will be paid to the UAW-GM Center for Human Resources and the balance will be paid directly to the DC VEBA established pursuant to a settlement agreement approved by the court in the case of International Union, UAW, et al. v. General Motors Corp., Civil Action No. 05-73991.[10]

---

[9]    GM will receive certain claims in connection with certain of these commitments as specified in Attachment C to the UAW Settlement Agreement.

[10]   The UAW and the Debtors agree that Sections H.3 and J.3 are clarified to provide for the continuance of CHR accruals through October 1, 2007 and that the UAW will receive on the Effective Date an allowed prepetition general unsecured claim against Delphi in the amount of $140 million to be paid pursuant to the plan of reorganization following substantial consummation of a plan of reorganization. The UAW and the Debtors

7

(B)        Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by this Court which incorporates, approves, and is consistent with all of the terms of the UAW Settlement Agreement and Delphi-GM settlement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain UAW-represented employees covered as provided in the Benefit Guarantee Term Sheet;

- A transfer of certain pension assets and liabilities from Delphi's pension plans to GM's pension plans is effectuated pursuant to Internal Revenue Code Section 414(l) in exchange for certain consideration to be paid by Delphi to GM;

- Delphi's existing pension plan is frozen in certain respects effective upon emergence from chapter 11 and GM is obligated to pay certain benefits for certain UAW-represented employees covered as provided in the Benefit Guarantee Term Sheet;

- The amount of $450 million is funded by GM, which the UAW has directed to be paid directly to the DC VEBA established pursuant to a settlement agreement approved by the court in the case of International Union, UAW, et al. v. General Motors Corp., Civil Action No. 05-73991;

- The Memorandum of Understanding (including the UAW CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The UAW released parties are exculpated and released in connection with the Memorandum of Understanding and Delphi's chapter 11 cases; and

- Delphi and GM receive releases from the UAW, all employees and former employees of Delphi represented or formerly represented by the UAW, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly

---

further agree that: (a) Section H.3 is clarified to be subject to and consistent with Section J.3; (b) the first sentence of J.3 is clarified to mean that Delphi will continue to make payments in the ordinary course of business until the effective date of a plan of reorganization; (c) the second sentence of J.3 is clarified to be consistent with this footnote and the Approval Order; and (d) the adjustment calculation referred to in the second sentence of J.3 is clarified to mean adjustment for accruals through October 1, 2007 and adjustment for expenditures by Delphi until the effective date of a plan of reorganization.

or indirectly from or in any way related to any obligations under the collective bargaining agreements or the Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the Memorandum of Understanding).

8.    The Debtors submit that approval of the UAW Settlement Agreement, which resolves Delphi's 1113/1114 Motion as it pertains to the UAW, is in the best interests of the Debtors and their stakeholders.  The Debtors believe that approval of the UAW Settlement Agreement will facilitate the Debtors' ability to reach consensual resolutions of their labor issues with the remaining Unions and GM and permit the Debtors to continue to implement their transformation plan and to promptly develop, prosecute, confirm, and consummate a plan of reorganization.

Background

A.    The Chapter 11 Filings

9.    On October 8 and 14, 2005 (collectively, the "Petition Date"), the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

10.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

11.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

12.     The statutory predicates for the relief requested herein are sections 363, 1113, and 1114 of the Bankruptcy Code and Rule 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.     Business Operations Of The Debtors

13.     Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[11]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from this Court.[12]

14.     The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

---

[11]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[12]    On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  The Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

15.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

16.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[13] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to Special Attrition Programs.

17.     The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

---

[13]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

environment for domestic automakers resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

18.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

19.     On March 31, 2006, the Company outlined five key tenets of its transformation plan.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[14]  Finally, the Debtors must devise a workable solution to their current pension situation.

---

[14]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

D.     The Debtors' Prior Special Attrition Programs

20.     On March 22, 2006, Delphi, GM and the UAW entered into a three-party agreement establishing a special attrition program (the "UAW Special Attrition Program"), pursuant to which certain eligible Delphi U.S. hourly employees represented by the UAW were offered normal and early voluntary retirements with a $35,000 lump sum incentive payment paid by Delphi and reimbursed by GM.  The program also provided a pre-retirement program for employees with at least 27 and fewer than 30 years of credited service.  In addition, employees who elected to participate were eligible to retire as employees of Delphi or to flow back to GM and retire.

21.     On June 5, 2006, Delphi, GM, and the UAW agreed on a supplemental program (the "UAW Supplemental Attrition Agreement") that expanded the UAW Special Attrition Program to include a pre-retirement program for employees with 26 years of credited service and provided buyouts for UAW-represented hourly employees (collectively, the UAW Special Attrition Program and UAW Supplemental Attrition Agreement are referred to herein as the "UAW Attrition Programs").  The buyout payments, depending on the amount of seniority or credited service, ranged from $40,000 to $140,000.  GM has agreed to reimburse Delphi for one-half of these buyout payments and in exchange will receive an allowed prepetition general unsecured claim.

22.     On May 8, 2006 (Docket No. 3648) and May 12, 2006 (Docket No. 3754), this Court entered an order and an amended order, respectively, approving the UAW Special Attrition Program.  The UAW Supplemental Attrition Agreement and the IUE-CWA Special

Attrition Program were approved by this Court on June 29, 2006, and on July 7, 2006, this Court entered the order approving the motion (Docket No. 4461).[15]

23.    Pursuant to the UAW Attrition Programs, approximately 12,400 of Delphi's UAW-represented employees opted to retire by January 1, 2007 and approximately 1,400 additional UAW-represented Delphi employees elected a buyout.  Furthermore, approximately 6,200 IUE-CWA-represented Delphi employees, representing approximately 82% of the eligible IUE-CWA-represented workforce, elected to participate in the IUE-CWA Special Attrition Program.  The Special Attrition Programs provided nearly two-thirds of Delphi's existing UAW and IUE-CWA-represented long-term hourly employees (as of September 26, 2006 and August 18, 2006, respectively) with "soft landings" through a combination of incentivized retirement programs[16] and, as to UAW-represented employees, GM flowback rights.

E.    Settlement Of The 1113/1114 Motion As It Pertains To The UAW Through The UAW Settlement Agreement

24.    On June 22, 2007, the Debtors reached a tentative agreement with GM and the UAW as set forth in the UAW Settlement Agreement that includes significant and necessary modifications to the UAW CBAs.  Delphi's UAW-represented employees ratified the UAW Settlement Agreement on June 28, 2007.  As set forth above, Delphi, GM, and the UAW will implement certain terms of the UAW Settlement Agreement as of the Effective Date (defined in the UAW Settlement Agreement as the later of entry of an order by the Court approving the

---

[15]    On June 16, 2006, Delphi, GM, and the IUE-CWA reached agreement on the terms of a special attrition program (the "IUE-CWA Special Attrition Program," and together with the UAW Attrition Programs, the "Special Attrition Programs") which mirrored in all material respects the UAW Attrition Programs.

[16]    Delphi is negotiating the terms of similar programs with the USW and Delphi's other Unions which, if agreed upon as part of a comprehensive settlement, would provide those hourly employees with retirement programs and incentives.

UAW Settlement Agreement that is satisfactory to the parties (the "Approval Order"), or the first

Monday following receipt by Delphi of written notice of ratification from the UAW).[17]

      25.    The UAW Settlement Agreement settles the 1113/1114 Motion as it

pertains to the UAW, enabling the Debtors to seek authority by this Motion to withdraw, without

prejudice, the 1113/1114 Motion with respect to the UAW.

Relief Requested

      26.    By this Motion, the Debtors seek entry of an order, under 11 U.S.C. §§

363, 1113, and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019, approving (i)

the UAW Settlement Agreement, (ii) withdrawal without prejudice of the 1113/1114 Motion

solely as it pertains to the UAW and approving the parties' settlement of the 1113/1114 Motion

solely as it pertains to the UAW, and (iii) modification of retiree welfare benefits for certain

UAW-represented retirees of the Debtors.

Basis For Relief

      27.    The UAW Settlement Agreement requires a court order approving the

UAW Settlement Agreement, which encompasses a settlement of the 1113/1114 Motion as it

pertains to the UAW.  See UAW Settlement Agreement Section K.  Thus, as noted above and

consistent with the terms and spirit of the UAW Settlement Agreement, this Motion is brought

before this Court under sections 363, 1113, and 1114 of the Bankruptcy Code and Bankruptcy

Rules 6004 and 9019.[18]

---

[17]   As noted above, the effective date of certain provisions of the UAW Settlement Agreement is conditioned upon confirmation of the Debtors' reorganization plan and resolution of certain financial, commercial, and other issues between Delphi and GM.

[18]   The Debtors do not concede through this Motion that the modifications to the UAW CBAs contained in the UAW Settlement Agreement require court approval either because such modifications are outside the ordinary course of business under section 363 or pursuant to sections 1113 or 1114 of the Bankruptcy Code.  Out of an abundance of caution in connection with GM's unique role here and consistent with the terms of the UAW Settlement Agreement, the Debtors are seeking this Court's approval of the UAW Settlement Agreement.  See

15

F.    Approval Of The UAW Settlement Agreement Is Warranted Under Bankruptcy Code Section 363

28.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Whether modifications to a collective bargaining agreement are ordinary course transactions under section 363 of the Bankruptcy Code or whether such modifications are outside the ordinary course requiring approval under the Bankruptcy Code has generally been determined on a case-by-case basis. See In re North American Royalties, Inc., 267 B.R. 587, 593 (Bankr. E.D. Tenn. 2002) (collecting and comparing relevant authority).

29.    Use of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it. See Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D. Del. 1991).

30.    The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming an "arbiter of disputes between creditors and the estate." Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993). The Court's consideration of a debtor's section 363(b) motion is a "summary proceeding," intended merely as a means "to efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It

---

In re The Leslie Fay Cos., 168 B.R. 294, 303 (Bankr. S.D.N.Y. 1994) (debtors can enter into agreement modifying existing collective bargaining agreements postpetition without notice or hearing).

is not the time or place for prolonged discovery or a lengthy trial with disputed issues." <u>Id</u>. at 1098-99.

31.      Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" <u>Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc.</u> (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." <u>Id.</u>  To satisfy its burden, it is not enough for an objector simply to raise and argue an objection.  Rather, an objector "is required to produce some evidence respecting its objections." <u>Lionel Corp.</u>, 722 F.2d at 1071.

32.      As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" <u>In re Aerovox, Inc.</u>, 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting <u>In re Interco, Inc.</u>, 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

33.      The Debtors have demonstrably sound business reasons for entering into the UAW Settlement Agreement at this time.  The UAW Settlement Agreement, which is the result of careful deliberations and extensive negotiations, includes modifications to the UAW CBAs that equitably address many of the Debtors' substantial financial, transformational, and labor relations roadblocks in a manner that will best serve the economic interests of the Debtors' estates and their stakeholders.

34.     First, once implemented, the modifications to the UAW CBAs contemplated by the UAW Settlement Agreement will generate a level of labor cost savings that will significantly improve the Debtors' ability to emerge from chapter 11 successfully.

35.     Second, the UAW Settlement Agreement provides the Debtors with the flexibility necessary to transform their operations to compete as a supplier to nearly every major global automotive original equipment manufacturer while furthering the legitimate interests of Delphi's employees, retirees, and other stakeholders.  As evidenced by the summary provided above, the UAW Settlement Agreement achieves significant cost savings through wage reductions, work rule and operational changes, and buy-out and buy-downs that will enable Delphi to better meet its competitive challenges.  Accordingly, there is a sound business purpose for consummating the transactions contemplated in the UAW Settlement Agreement promptly.

36.     In the exercise of their business judgment, the Debtors believe that the terms of the UAW Settlement Agreement are reasonable based upon the significant benefits that they will receive, as summarized above, as well as the potential harm to the estates if the relief requested herein is not granted.[19]

G.     Approval Of The UAW Settlement Agreement Is Warranted Under
       Bankruptcy Rule 9019

37.     Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019(a).  Settlements and compromises are "a normal part of the process of

---

[19]   For certain of the agreements in the UAW Settlement Agreement to be implemented, the Debtors' plan of reorganization must contain provisions consistent with the UAW Settlement Agreement and the confirmation order for such plan will provide for the assumption of the UAW Settlement Agreement and the agreements referenced in Attachment E thereto under section 365 of the Bankruptcy Code.  Indeed, by its terms, the UAW Settlement Agreement itself does not constitute an assumption of the UAW CBAs.  See UAW Settlement Agreement Section K.  It is relevant to note that this undertaking by the Debtors constitutes a condition to the effectiveness of certain provisions rather than a covenant by the Debtors that might impermissibly restrict the plan of reorganization that could be prosecuted by them.

18

reorganization."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106,

130 (1939)); In re Adelphia Communications Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)

(decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered

to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

        38.     In addition, Rule 9019 applies to settlements such as the UAW Settlement

Agreement that modify (i) the terms of a collective bargaining agreement pursuant to 11 U.S.C. §

1113, and (ii) retiree benefits pursuant to 11 U.S.C. § 1114.  See Nellis v. Shugrue, 165 B.R.

115, 116-17, 121(S.D.N.Y. 1994) (applying Bankruptcy Rule 9019 to the approval of a

settlement under 11 U.S.C. § 1113); In re Tower Automotives, 241 F.R.D. 162, 170 (S.D.N.Y.

2006) (applying Bankruptcy Rule 9019 to the approval of settlements and compromises under

11. U.S.C. § 1114); see also In re GF Corp., 120 B.R. 421, 425 (Bankr. D. Ohio 1990) (applying

Bankruptcy Rule 9019 to settlement pursuant to 11 U.S.C. §§ 1113, 1114).[20]

        39.     Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate

when the compromise is fair and equitable and is in the best interests of the debtor's estate.  See,

e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia, 327 B.R. at 159 ("The settlement need not be

the best that the debtor could have obtained.  Rather, the settlement must fall 'within the

reasonable range of litigation possibilities.'") (citations and internal quotations omitted); Nellis,

165 B.R. at 121 ("The obligation of the bankruptcy court is to determine whether a settlement is

in the best interest of an estate before approving it.")  In general, compromises in the bankruptcy

---

[20]    No retiree committee was formed under section 1114 of the Bankruptcy Code in these cases because under the
Order (I) Appointing Unions As Authorized Representatives For Union Represented Retirees Under 11 U.S.C.
§§ 1114(c) And 1114(d) Or, In The Alternative, (II) Establishing Procedures For Solicitation, Nomination, And
Appointment Of Committee Of Retired Employees granted by this Court on October 13, 2005 (Docket No.
231), the UAW (and the other Unions) elected to serve and have been acting as the authorized representative for
purposes of section 1114 of the Bankruptcy Code throughout these chapter 11 cases of the Delphi retirees who
were previously represented by the Unions as active employees.

context should be approved unless they "'fall below the lowest point in the range of reasonableness.'"  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

40.    The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122.

41.    Courts in this district have further elaborated on the following relevant factors: (a) the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the competency and experience of counsel who support the settlement, (d) the relative benefits to be received by individuals or groups within the class, and (e) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.  Adelphia, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

42.    The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances.  See Adelphia, 327 B.R. at 159-60; Nellis, 165 B.R. at 123.  Instead, the court's proper role is to familiarize itself with all the facts necessary for an intelligent and objective opinion, and determine whether the settlement is fair and equitable.  In re Best Products Co., Inc., 168 B.R. 35, 49-51 (Bankr. S.D.N.Y. 1994).  To

that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'"  Adelphia, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17 F.3d 600 (2d Cir. 1994); In re Best Products Co., Inc., 168 B.R. at 49-51.

43.    Given that the UAW Settlement Agreement is a resolution or settlement of the issues raised in the 1113/1114 Motion as it pertains to the UAW, it should be approved under Bankruptcy Rule 9019(a) because its terms are fair and equitable, fall well within the range of reasonableness, and are in the best interests of the Debtors, their estates, their creditors, and their stakeholders.  Most significantly, the UAW Settlement Agreement clarifies and provides certainty regarding the manner in which Delphi's labor, pension, and OPEB issues with the UAW will be resolved.

44.    Moreover, the Court is not required to find that the terms of the settlement are the most favorable that the Debtors could have obtained in order to approve the UAW Settlement Agreement.  In re W.T. Grant Co., 699 F.2d at 608 (noting that court is only required to "see whether the settlement falls below the lowest point in the range of reasonableness") (citation omitted); Nellis, 165 B.R. at 123; In re Best Products Co., Inc., 168 B.R. at 49-51.

45.    And, as recognized by this Court on various occasions, a consensual resolution to the Debtors' need to reduce labor costs is in the best interests of the Debtors' estates. See, e.g., May 12, 2006 Hearing Transcript at pp. 201-02 (noting that the representatives of the Delphi and the Unions, not the Court, are the most important in an 1113/1114 proceeding, and urging parties to reach good faith agreement).  Consensual agreements are recognized generally as a normal part of the reorganization process and as beneficial to the estate in part because of

21

the inevitable reduction in administrative costs and other burdens associated with protracted litigation. This is especially the case here, given the thousands of employees and retirees who would be affected by the non-consensual modifications proposed in the 1113/1114 Motion, should that motion ultimately be granted by the Court. See, e.g., TMT Trailer Ferry, Inc., 390 U.S. at 424 ("[c]ompromises are a normal part of the process of reorganization."); Nellis, 165 B.R. at 123 (stating "the general rule that settlements are favored and, in fact, encouraged by the bankruptcy approval process").

### Notice Of Motion

46.     Notice of this Motion has been provided in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on October 26, 2006 (Docket No. 5418), and the Supplemental Order Under 11 U.S.C. Sections 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883). The Debtors have also provided the informational notice of this Motion, a copy of which is attached hereto as Exhibit 1, as a courtesy to all of the UAW-represented employees and UAW-represented retirees affected by this Motion. In light of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

47.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

22

WHEREFORE the Debtors respectfully request that the Court enter an order pursuant to 11 U.S.C. §§ 363, 1113, and 1114 of the Bankruptcy Code and Fed. R. Bankr. P. 6004 and 9019 (i) approving the UAW Settlement Agreement, (ii) authorizing the withdrawal without prejudice of the Debtors' 1113/1114 Motion solely as it pertains to the UAW and approving the parties' settlement of the 1113/1114 Motion solely as it pertains to the UAW, (iii) authorizing the Debtors' modification of retiree welfare benefits for certain UAW-represented retirees of the Debtors, and (iv) granting the Debtors such other and further relief as is just.

Dated:      New York, New York
            June 29, 2007

                    SKADDEN, ARPS, SLATE, MEAGHER
                     & FLOM LLP

            By:      /s/ John Wm. Butler, Jr.
                    John Wm. Butler, Jr. (JB 4711)
                    John K. Lyons (JL 4951)
                    Ron E. Meisler (RM 3026)
                     333 West Wacker Drive, Suite 2100
                     Chicago, Illinois 60606
                    (312) 407-0700

                        - and -

            By:      /s/ Kayalyn A. Marafioti
                    Kayalyn A. Marafioti (KM 9632)
                    Thomas J. Matz (TM 5986)
                     Four Times Square
                     New York, New York 10036
                    (212) 735-3000

                        - and-

            O'MELVENY & MYERS LLP

            By:      /s/ Tom A. Jerman
                    Tom A. Jerman (TJ 1129)
                    Jessica Kastin (JK 2288)
                     1625 Eye Street, NW
                     Washington, DC 20006
                    (202) 383-5300

                            23

Attorneys for Delphi Corporation, <u>et al.</u>,
Debtors and Debtors-in-Possession

**EXHIBIT V**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Tel:  (212) 819-8200
J. Christopher Shore (JS-3061)
Gerard Uzzi (GU-2297)

Wachovia Financial Center
Suite 4900
200 South Biscayne Blvd.
Miami, Florida 33131
Tel:  (305) 371-2700
Thomas E Lauria (*pro hac vice*)
Richard S. Kebrdle (*pro hac vice*)

Attorneys for Appaloosa Management L.P.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
|  | : | Case No. 06-10354 (BRL) |
| Dana Corporation, *et al.,* | : |  |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
-------------------------------------------------------------x

<u>**NOTICE OF APPEAL**</u>

PLEASE TAKE NOTICE that Appaloosa Management L.P. ("Appaloosa"), by and

through its undersigned counsel, hereby appeals to the United States District Court for the

Southern District of New York under 28 U.S.C. § 158(a) from each and every part of the Order

Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019,

Approving Settlement Agreements with the United Steelworkers and United Autoworkers, and

Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 and 507, Authorizing the Debtors to Enter

into Plan Support Agreement, Investment Agreement and Related Agreements (Docket No.

5879) (the "Order") entered by United States Bankruptcy Judge Burton R. Lifland on August 1,

2007. A copy of the Order appealed from is attached hereto as Exhibit A.

The names of all parties to the Order appealed from and the names, addresses,

and telephone numbers of their respective attorneys are as follows:

| Appellant: | Attorneys to Appellant: |
|---|---|
| Appaloosa Management L.P. | Gerard Uzzi, Esq. (GU-2297)<br>J. Christopher Shore, Esq. (JS-3061)<br>White & Case LLP<br>1155 Avenue of the Americas<br>New York, New York 10036-2787<br>(212) 819-8200<br><br>Thomas E. Lauria, Esq. (*pro hac vice*)<br>Richard S. Kebrdle (*pro hac vice*)<br>White & Case LLP<br>Wachovia Financial Center<br>200 South Biscayne Blvd., Suite 4900<br>Miami, Florida 33131<br>(305) 371-2700 |
| **Appellees:** | **Attorneys to Appellees:** |
| Dana Corporation, Dakota New York Corp., Brake Systems, Inc., BWDAC, Inc., Coupled Products, Inc., Dana Atlantic LLC f/k/a Glacier Daido America, LLC, Dana Automotive Aftermarket, Inc., Dana Brazil Holdings I LLC f/k/a Wix Filtron LLC, Dana Brazil Holdings LLC f/k/a/ Dana Realty Funding LLC, Dana Information Technology LLC, Dana International Finance, Inc., Dana International Holdings, Inc., Dana Risk Management Services, Inc., Dana Technology Inc., Dana World Trade Corporation, Dandorr L.L.C., Dorr Leasing Corporation, DTF Trucking, Inc., Echlin−Ponce, Inc., EFMG LLC, EPE, Inc., ERS LLC, Flight Operations, Inc., Friction Inc., Friction Materials, Inc., Glacier Vandervell Inc., Hose & Tubing Products, Inc., Lipe Corporation, Long Automotive LLC, Long Cooling LLC, Long USA LLC, Midland Brake, Inc., Prattville | Corinne Ball, Esq.<br>Richard H. Engman, Esq.<br>Jones Day<br>222 East 41st Street<br>New York, NY 10017-6702<br>(212) 326-3939<br><br>Heather Lennox, Esq.<br>Carl E. Black, Esq.<br>Jones Day<br>North Point<br>901 Lakeside Avenue<br>Cleveland, OH 44114-1190<br>(216) 586-3939<br><br>Jeffrey B. Ellman, Esq.<br>Jones Day<br>1420 Peachtree Street, N.E., Suite 800<br>Atlanta, GA 30309-3053<br>(404) 521-3939 |

| | |
|---|---|
| Mfg., Inc., Reinz Wisconsin Gasket LLC, Spicer Heavy Axle & Brake, Inc., Spicer Heavy Axle Holdings, Inc., Spicer Outdoor Power Equipment Components LLC, Torque-Traction Integration Technologies, LLC, Torque-Traction Manufacturing Technologies, LLC, Torque-Traction Technologies, LLC, and United Brake Systems Inc. | Marc S. Levin, Esq.<br>Deputy General Counsel<br>Dana Corporation<br>4500 Dorr Street<br>Toledo, OH 43615<br>(419) 535-4500 |
| **Other Parties to the Order:** | **Other Parties' Attorneys:** |
| Centerbridge Capital Partners | Matthew A. Feldman, Esq.<br>Willkie Farr & Gallagher, LLP<br>787 Seventh Avenue<br>New York, NY 10019-6099<br>(212) 728-8000 |
| International Union, United Automobile, Aerospace & Agricultural Implement Workers of America | Niraj R. Ganatra, Esq.<br>UAW International<br>8000 East Jefferson Avenue<br>Detroit, MI 48214<br>(313) 926-5000<br><br>Babette A. Ceccotti, Esq.<br>Cohen, Weiss and Simon LLP<br>330 West 42nd Street<br>New York, NY 10036<br>(212) 563-4100<br><br>Lowell Peterson, Esq.<br>Meyer, Suozzi, English & Klein PC<br>1350 Broadway, Suite 501<br>New York, NY 10018<br>(212) 239-4999 |

| | |
|---|---|
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union | David R. Jury, Esq.<br>Counsel to United Steelworkers<br>Five Gateway Center, Room 807<br>Pittsburgh, PA 15222<br>(412) 562-2545<br><br>David M. Fusco<br>Schwarzwald & McNair LLP<br>616 Pento Media Building<br>1300 East Ninth Street<br>Cleveland, OH 44114-1503<br>(216) 566-1600<br><br>Babette A. Ceccotti, Esq.<br>Cohen, Weiss and Simon LLP<br>330 West 42nd Street<br>New York, NY 10036<br>(212) 563-4100 |
| The Official Committee of Unsecured Creditors | Kenneth H. Eckstein, Esq.<br>Thomas M. Mayer, Esq.<br>Matthew J. Williams, Esq.<br>Stephen D. Zide, Esq.<br>Kramer Levin Naftalis & Frankel LLP<br>1177 Avenue of the Americas<br>New York, NY 10036<br>(212) 715-9100 |
| Ad Hoc Committee of Dana Noteholders | Lewis Kruger<br>Kristopher M. Hansen<br>Kenneth Pasquale<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, NY 10038<br>(212) 806-5400 |
| United States Trustee | Greg M. Zipes, Esq.<br>Office of The United States Trustee<br>33 Whitehall Street, Suite 2100<br>New York, NY  10004<br>(212) 510-0500, ext. 227 |

Dated:    August 13, 2007
         New York, New York

                                     /s/ Gerard Uzzi
                              WHITE & CASE LLP
                              1155 Avenue of the Americas
                              New York, New York 10036-2787
                              Tel:  (212) 819-8200
                              J. Christopher Shore (JS-3061)
                              Gerard Uzzi (GU-2297)

                              Wachovia Financial Center
                              Suite 4900
                              200 South Biscayne Blvd.
                              Miami, Florida 33131
                              Tel:  (305) 371-2700
                              Thomas E Lauria (*pro hac vice*)
                              Richard S. Kebrdle (*pro hac vice*)

                              Attorneys for Appaloosa Management L.P.

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
In re                                                        :    Chapter 11
                                                             :
Dana Corporation, *et al.,*                                  :    Case No. 06-10354 (BRL)
                                                             :
                        Debtors.                             :    (Jointly Administered)
                                                             :
-------------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 1113**
**AND 1114(e) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019,**
**APPROVING SETTLEMENT AGREEMENTS WITH THE UNITED**
**STEELWORKERS AND UNITED AUTOWORKERS,**
**AND PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 AND 507,**
**AUTHORIZING THE DEBTORS TO ENTER INTO PLAN SUPPORT**
**AGREEMENT, INVESTMENT AGREEMENT AND RELATED AGREEMENTS**

This matter came before the Court on the motion of Dana Corporation ("Dana") and 40

of its domestic direct and indirect subsidiaries (collectively, the "Debtors") dated July 5, 2007

(the "Motion"),[1] for entry of an order (a) pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal

Rule of Bankruptcy Procedure 9019, approving and authorizing the debtors to enter into

settlement agreements, as amended (collectively, as amended, the "Union Settlement

Agreement") with the United Steelworkers ("USW") and the International Union, UAW

("UAW," and together with the USW, the "Unions"), and (b) pursuant to 11 U.S.C. §§ 105(a),

363(b), 364(c), 503 and 507 approving and authorizing the Debtors to enter into:  (i) the Union

Settlement Agreement, (ii) a Plan Support Agreement, as amended, by and among Dana, the

Unions, Centerbridge Capital Partners, L.P. ("Centerbridge") and the creditors set forth on

Exhibit A thereto (the "Plan Support Agreement"), and (iii) an Investment Agreement, dated July

25, 2007, by and among Dana, Centerbridge and CBP Acquisition Co. LLC (as same may be

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such
terms in the Motion or in the Summary of Changes to the Global Settlement, filed with the Court on July 25, 2007.

amended, the "Investment Agreement"), and related agreements; the Court having reviewed the

Motion, the Union Settlement Agreement, the Plan Support Agreement, the Investment

Agreement, the statements in support of the Motion filed by the UAW and the Ad Hoc

Committee of Noteholders (the "Ad Hoc Noteholders Committee"), the objections of the Official

Committee of Unsecured Creditors (the "Committee"), Appaloosa Management, L.P., Brandes

Investment Partners, L.P., and the joinders to the Committee's objection filed by Wilmington

Trust Company, Timken Company and GK Capital, LLC (collectively, the "Objections"); the

Court having heard the objection (the "Other Creditor Objection") of an ad hoc committee of

certain unsecured creditors (the "Creditor Ad Hoc Committee") and the statements of counsel

and the evidence presented regarding the relief requested in the Motion at a hearing before the

Court on July 26, 2007 (the "Hearing"), at which time, based upon modifications made to the

relief sought in the Motion as further set forth in the record at the Hearing, the Committee

withdrew its objection, Timken Company withdrew its joinder to the Committee's objection and

Wilmington Trust Company modified its objection, and all interested parties were offered an

opportunity to be heard with respect to the Motion, as modified; and it further appearing that the

relief requested in the Motion is in the best interests of the Debtors, their estates and creditors

and other parties in interest; and upon the record of the Hearing and these chapter 11 cases; and

after due deliberation thereon; and good and sufficient cause appearing therefore, as explained in

an oral opinion at the conclusion of the hearing on the Motion (which is incorporated herein fully

by reference), IT IS HEREBY FOUND AND DETERMINED THAT:

Jurisdiction, Notice and Statutory Predicates

        A.      This Court has jurisdiction over the Motion, the transactions contemplated

under the Global Settlement and any other ancillary documents and agreements related thereto

pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a core proceeding pursuant to

28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of the Debtors' chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The notice given by the Debtors of the Motion, the Hearing, and the Notices of Filing regarding the Investment Agreement and the Summary of Changes to the Global Settlement, both of which were filed with the Court on July 25, 2007, constitutes proper, timely, adequate and sufficient notice thereof and complies with the Bankruptcy Code, the Bankruptcy Rules and all applicable local rules, and no further or other notice is necessary.

C.      The statutory predicates for the relief granted herein are sections 105(a), 363(b), 364(c), 503, 507, 1113(c) and 1114(e) of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 9019.

Procedural Background

D.      On March 3, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

E.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

F.      Pursuant to an order of this Court, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.

G.      On March 13, 2006, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee, pursuant to section 1102 of the Bankruptcy Code.

H.      On August 31, 2006, the U.S. Trustee appointed an official committee of non-union retired employees (the "Retiree Committee"), pursuant to section 1114(d) of the

Bankruptcy Code, and as directed by an order of the Court entered on August 9, 2006 (Docket No. 2773).

The Section 1113/1114 Litigation

      I.      Pursuant to section 1113 of the Bankruptcy Code, the Debtors may elect to assume or reject the CBAs.

      J.      On January 31, 2007, the Debtors filed their Motion to Reject their Collective Bargaining Agreements and to Modify their Retiree Benefits pursuant to Sections 1113 and 1114 of the Bankruptcy Code (the "Section 1113/1114 Motion").  The Section 1113 part of the Section 1113/1114 Motion sought the rejection of the CBAs with respect to the Debtors facilities at Auburn Hills, Michigan, Henderson, Kentucky, Marion, Indiana, Fort Wayne, Indiana, and Elizabethtown, Kentucky.  The trial on the Section 1113/1114 Motion began on March 12, 2007.

      K.      At the hearing on the Motion, together with the trial on the Section 1113/1114 Motion, which is to be settled by the instant Motion, the Debtors established that:

      a)      The financial performance of the Debtors' U.S. operations has deteriorated dramatically in the recent past, resulting in $2 billion in losses during the past five years.

      b)      A significant portion of the Debtors' U.S. workforce is unionized. As of January 1, 2007, the Debtors had approximately 6,500 union employees.  Except for Union employees located at the Debtors' Lima, Ohio and Pottstown, Pennsylvania facilities, which are covered under a master collective bargaining agreement with the UAW (the "UAW Master Agreement"), and Union employees at the Debtors' Toledo, Ohio, Rochester Hills, Michigan, and Longview, Texas facilities, where first collective bargaining agreements have yet to be negotiated with the UAW, the remainder of the Debtors' Union employees are covered by

separate collective bargaining agreements with respect to each facility (together with the UAW Master Agreement, the "CBAs").

   c)  The Debtors provide non-pension retiree benefits (including hospital, medical, surgical, dental, prescription drug, vision, hearing and life insurance) (collectively, "Non-Pension Retiree Benefits") to all eligible active and retired Union employees and/or their spouses and dependents.  As of January 1, 2006, approximately 16,415 individuals received Non-Pension Retiree Benefits from the Debtors under CBAs (or were active Union employees currently covered under provisions of CBAs that provide a benefit upon retirement).

   d)  As of December 31, 2006, the Debtors' Accumulated Post-Employment Benefit Obligation ("APBO") for Non-Pension Retiree Benefits for Union employees and retirees was approximately $1 billion.  As of December 31, 2006, the Debtors' corresponding periodic cost or expense reflected on their income statement on account of Non-Pension Retiree Benefits for Union employees and retirees was approximately $63.3 million.

   e)  In order to address the mounting losses from their U.S. operations, in October 2006, the Debtors developed a restructuring plan that would allow the Debtors to achieve the necessary level of cost savings in order to emerge from chapter 11 as a viable business.  The Debtors' restructuring plan outlines annual cost savings of approximately $405 to $540 million, which the Debtors believe they could achieve from five separate areas:  (i) restructuring unprofitable or below market contracts with customers; (ii) capitalizing on lower cost manufacturing capabilities by shifting work, where possible, from high-cost operations to low-cost countries through implementation of a manufacturing footprint optimization ("MFO Program"); (iii) reducing overhead costs; (iv) reducing their union and non-union labor costs; and (v) eliminating Non-Pension Retiree Benefits for both union and non-union retirees (as well as any expectation of future coverage for both union and non-union active employees).

f)    During November and December 2006, the Debtors began discussions and negotiations with the Unions for the purpose of obtaining consensual modifications to the CBAs and Non-Pension Retiree Benefits that would allow the Debtors to achieve the level of cost savings outlined in their restructuring plan.  During this time, the Debtors delivered proposals to the Unions under section 1113 of the Bankruptcy Code with respect to each Union facility (each, a "Section 1113 Proposal").  Similarly, during this time and followed up by revised proposals delivered in January 2007, the Debtors delivered proposals to the Unions under section 1114 of the Bankruptcy Code  with respect to Non-Pension Retiree Benefits (each, a "Section 1114 Proposal").

g)    In summary, the Section 1113 Proposals sought (a) wage modifications at five of the 1113 Facilities; (b) implementation of a "Two Tier" wage structure at all facilities; (c) migration to a customer-directed health benefit program; and (d) modifications to certain work rules and benefits.  The revised Section 1114 Proposals delivered to the Unions contemplated the elimination of Non-Pension Retiree Benefits for Union retirees and active employees and, in its place, the establishment of a VEBA from which participating retirees could receive a subsidy towards the cost of their healthcare.

h)    The modifications proposed by the Debtors and contained in the proposals with respect to their Union labor costs and costs associated with Non-Pension Retiree Benefits represent almost a third of the total savings the Debtors need to achieve, and without such savings, the Debtors will not be able to successfully restructure their U.S. operations.

L.    At the trial on the Section 1113/1114 Motion, the Unions established that in the event the Debtors were granted authorization to reject the CBAs, it was the Unions' intent to strike at facilities covered under the CBAs, and at other unionized facilities without existing CBAs.  Evidence at the Hearing confirmed the reality and significance of that strike threat.

M.     If the Debtors' Section 1113/1114 Motion were granted and the Debtors granted authority to reject the CBAs, the CBAs would be rendered unenforceable in their entirety.

The Global Settlement

N.     After the trial on the Section 1113/1114 Motion, the Debtors and the Unions met and conferred on numerous occasions in an attempt to negotiate a consensual resolution to the Debtors' need for concessions from the Unions on labor costs and Non-Pension Retiree Benefit obligations.

O.     At the request of the Unions, the negotiations evolved into three party discussions and negotiations among the Debtors, the Unions and Centerbridge over a potential framework for the resolution of all issues between the Debtors and the Unions, which would also provide the Debtors with a source of funding to allow them to meet their obligations to the Unions under such proposed resolution, as well as emerge from chapter 11 promptly as a sustainable business.

P.     These discussions led to an agreement between the Debtors, the Unions and Centerbridge over the proposed terms of a global resolution that would include, among other things:  (i) the Union Settlement Agreement, which represents a compromise of the litigation between the Debtors and the Unions and that, more importantly, achieves significant cost savings that will allow the Debtors to markedly improve their overall EBITDA and address the "cash burn" of the Debtors' U.S. operations; (ii) the Plan Support Agreement, which sets forth certain key plan terms that the Unions consider essential to the Debtors' successful emergence from bankruptcy; and (iii) the Investment Agreement, which provides for an investment in the reorganized Debtors of up to $750 million, but not less than $500 million, by Centerbridge and certain creditors of the Debtors, which will enable the Debtors to meet their financial obligations under the Union Settlement Agreement.

Q.     Following the filing of the Motion, the Debtors, the Unions, Centerbridge, the Committee and the Ad Hoc Noteholders' Committee entered into discussions concerning amendments or modifications to the Global Settlement for the purpose of resolving the objections of the Committee and obtaining the support of the Ad Hoc Noteholder Committee.

R.     In an effort to resolve the objections raised by the Committee and obtain support from the Ad Hoc Noteholders' Committee, the parties subsequently agreed to certain modifications and changes to the Global Settlement, although the key wage and benefit terms set forth in the Global Settlement remain unchanged.

S.     The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement (and all transactions contemplated thereunder) are all integral components of the Global Settlement, and without each of these agreements, the Unions would not have agreed to a consensual resolution of all issues with the Debtors.

T.     Subject to the terms of the Plan Support Agreement and the exhibits thereto, the parties have also agreed to work together to complete the formulation and negotiation of a plan of reorganization, and to formulate and facilitate confirmation of a plan in order to consummate the transactions contemplated in the Global Settlement.

U.     The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement, and the transactions contemplated thereby, represent a substantial milestone and pave the way towards the Debtors' reorganization by resolving the issues surrounding the Debtors' union labor and legacy costs that threatened to impact the Debtors' ability to emerge successfully from chapter 11.

V.     Absent approval of the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement (and the transactions contemplated thereby), the Debtors' ability to negotiate consensual modifications to the CBAs and Non-Pension Retiree

Benefits is questionable. Substantial risks to the estate (in terms of, among other things, delay and labor unrest) exist in the absence of the Global Settlement.

W.    The Global Settlement allows the Debtors to meaningfully restructure their Union labor costs, eliminate their legacy obligations, implement their MFO Program, which collectively represent a savings of approximately $220 million on an annual basis, and which savings are essential to produce a long-term, viable business.

X.    The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement are fair, reasonable and equitable and in the best interests of the Debtors' estates.

Y.    The Global Settlement has a proper business justification and constitutes an important step towards the Debtors' confirmation of a plan of reorganization. As such, the Global Settlement is neither an evasion of the plan confirmation process, nor does it constitute a *sub rosa* plan of reorganization.

Z.    The Debtors' decision to enter into the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement represents a sound exercise of their business judgment, is consistent with their fiduciary duties and is based on good, sufficient and sound business purposes and justifications.

AA.    The Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement were all negotiated at arms' length and in good faith by all parties, and the parties' entry into or performance under the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement do not violate any law, including the Bankruptcy Code, and do not give rise to any claim or remedy against the parties thereto, except as may be expressly set forth in this Order or in such agreements.

BB.    The entry into, and performance under, the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement by the Debtors do not constitute the solicitation of a vote on a plan of reorganization.

CC.    The provisions in the Investment Agreement for the payment of the Break-Up Fee, Expense Reimbursement, the Termination Fee and the Commitment Fee are integral parts of the transactions contemplated by the Investment Agreement, and without any one of these provisions, Centerbridge would not enter into the Investment Agreement.

DD.    The Debtors have demonstrated a sound business justification for authorizing the payment of the Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee.  The Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee are each fair and reasonable and provide a benefit to the Debtors' estates.

EE.    The Debtors' payment of the Break-Up Fee, the Expense Reimbursement, the Termination Fee and the Commitment Fee on the terms and conditions provided for in the Investment Agreement are (a) actual and necessary costs and expenses of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and (c) reasonable and appropriate in light of, among other things, (i) the size and nature of the Investment, (ii) the substantial efforts that are being expended by Centerbridge and (iii) the benefits that Centerbridge is providing to the Debtors' estates.

FF.    The Break-Up Fee, Expense Reimbursement and the Commitment Fee pursuant to the terms of the Investment Agreement were incurred in good faith, as such term is used in section 363(m) of the Bankruptcy Code, and the priorities extended to Centerbridge pursuant to this Order shall be entitled to all of the protections provided herein or otherwise contemplated hereby.

GG.    The entry of this Order is in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest in these cases.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is GRANTED in its entirety.

2.    Any objection (including the Objections and the Other Creditor Objection), joinder to any objection or reservation of rights related to the Motion not withdrawn or otherwise resolved as set forth in this Order is hereby OVERRULED.

3.    The Debtors are hereby authorized, but not directed, to execute, deliver and implement the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement the terms of such agreements, and such agreements and documents shall be binding and enforceable against the Debtors and their estates and the other parties thereto in accordance with their terms and subject to the conditions therein; provided, however, that notwithstanding its effectiveness or anything to the contrary in the Union Settlement Agreement or this Order, neither the Union Settlement Agreement nor any of the CBAs shall be assumed, or deemed assumed, by the Debtors unless and until a chapter 11 plan or reorganization shall have been confirmed by order of this Court and substantially consummated.

4.    The Union Settlement Agreement constitutes a valid and binding amendment to the CBAs with authorized representatives of all individuals who were or are in a bargaining unit represented by the UAW or USW, as permitted by section 1113 of the Bankruptcy Code or otherwise.

5.    The Union Settlement Agreement constitutes a valid and binding amendment to existing retiree health and welfare benefits, as permitted by section 1114 of the Bankruptcy Code or otherwise.

6.     Unless terminated in accordance with Appendix R thereof, the Union Settlement Agreement shall be binding upon any chapter 11 trustee that may be subsequently appointed in the Debtors' chapter 11 cases.

7.     The Union Settlement Agreement shall be held to resolve all individual claims filed by Union retirees or employees arising from or with respect to the (i) modifications of the CBAs, as provided for in the Union Settlement Agreement, (ii) the termination of Non-Pension Retiree Benefits, and/or (iii) the termination of long-term disability benefits ("LTD Benefits", as that term is used in the Union Settlement Agreement) to the extent that such individual claim asserts a demand for continued benefits.  It is understood that (i) the Debtors may rely upon the Union Settlement Agreement as a basis for objecting to individual claims to the extent that such individual claims are addressed by the Union Settlement Agreement, and, (ii) the Debtors may effect such resolution through filing with the Bankruptcy Court objections to such claims on notice to the individual claimants.

8.     The entry into the Union Settlement Agreement, the Plan Support Agreement and the Investment Agreement by the parties thereto, and the performance and fulfillment of their obligations thereunder, does not constitute the solicitation of a vote on a plan of reorganization, does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the Debtors, the Unions, Centerbridge and/or any creditor of the Debtors that executes the Plan Support Agreement; provided, however, that except as may otherwise be agreed upon (including in the Plan Support Agreement, the Investment Agreement and the Union Settlement Agreement), nothing in this Order shall prejudice any party in interest's right to object to approval of the disclosure statement or confirmation of a plan of reorganization and this Order shall have no preclusive effect (whether by res judicata or otherwise) in connection with any such objection.

9.     Nothing in this Order shall prejudice the right of the Committee to object to the proposed payment of any financing fee to Miller Buckfire.

10.     Pursuant to sections 105(a), 503(b) and 507(a) of the Bankruptcy Code, the Debtors are authorized and directed to pay the Break-Up Fee, Expense Reimbursement, the Termination Fee and the Commitment Fee (each if applicable), in accordance with its terms and as and when required by the Investment Agreement, without further order of the Court.  Each of the Break-Up Fee, Expense Reimbursement, the Termination Fee and Commitment Fee (each if applicable) shall constitute allowed superpriority administrative expenses pursuant to sections 364(c)(1), 503(b)(l)(A) and 507(a)(l) of the Bankruptcy Code having a priority over all other administrative claims other than any such claims of the Debtors' postpetition lenders.

11.     The process for the receipt and consideration of any proposed Alternative Minority Investment, Alternative Majority Investment, Alternative Transaction or Alternative Stand-Alone Plan (each as defined in the Investment Agreement and each, an "Alternative Proposal") (collectively, the "Bid Process"), shall be as follows:

a)     Each party that is designated as a Qualified Potential Investor (as such term is defined in the Alternative Proposal Procedures) shall be provided a confidentiality agreement (each, an "Acceptable Confidentiality Agreement") in the form attached to this Order as Exhibit A.  Each Qualified Potential Investor shall also be provided the Alternative Proposal Procedures, the form of which is attached to this Order as Exhibit B;

b)     Subject to the conditions, qualifications and terms contained in the Alternative Proposal Procedures, each Qualified Potential Investor that executes an Acceptable Confidentiality Agreement shall be granted access to information and a virtual data room consistent with the Alternative Proposal Procedures;

c)      The Debtors shall reasonably cooperate with any Potential Investor that has executed an Acceptable Confidentiality Agreement in connection with assisting such party in formulating an Alternative Proposal;

d)      Qualified Potential Investors (as such term is defined in the Alternative Proposal Procedures) that are interested in submitting an Alternative Proposal shall submit their preliminary indications of interest (each, an "Indication of Interest") so as to be actually **received on or before 5:00 p.m. (EST) on August 17, 2007**, by:  (a) counsel to the Debtors, Jones Day, 222 East 41st Street, New York, NY 10017, Attn:  Corinne Ball, Esq., E-mail: cball@jonesday.com; (b) Miller Buckfire, 250 Park Avenue, 17th Floor, New York, NY 10177, Attn:  Richard Morgner, E-mail: richard.morgner@millerbuckfire.com; and (c) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: Thomas Moers Mayer, Esq., E-mail: tmayer@kramerlevin.com, and Matthew Williams, E-mail: mjwilliams@kramerlevin.com.  The Debtors will provide copies of Indications of Interest to third parties consistent with the Alternative Proposal Procedures.

e)      Only those Continuing Potential Investors (as such term is defined in the Alternative Proposal Procedures) who, on or before August 24, 2007, are invited to submit a Final Proposal Letter (each, a "Final Proposal Letter") shall submit a final, binding proposal to the parties identified in subparagraph (d) above so as to be actually **received by all parties on or before 5:00 p.m. (EST) on September 21, 2007**.  The Debtors will provide copies of Final Proposals to third parties consistent with the Alternative Proposal Procedures.

f)      Dana's board of directors will consider all timely received Final Proposal Letters during the week of September 24, 2007,

g)     On or before September 25, 2007, the Debtors may provide to the Unions the notices contemplated by Sections 1 and 3(a)(ii) of Appendix R to the Union Settlement Agreement, a copy of which is attached to this Order as Exhibit C;

h)     In the event that the Unions have withheld consent requested by the Debtors to an Alternative Proposal, the Debtors, the Unions and the Committee shall move expeditiously through the arbitration process outlined in Appendix R to the Union Settlement Agreement in accordance with the terms of such Appendix R; and

i)     The hearing to consider the Debtors' disclosure statement on any plan of reorganization for the Debtors (as same may be amended as a result of the Bid Process) shall be held on **Tuesday, October 23, 2007, at 10:00 a.m.**, subject to any extension of such hearing date that may be necessary to provide for the five (5) business day time period specified in Section 4.10 of the Investment Agreement.  In the event that the Debtors have decided to proceed with an Alternative Proposal, the Debtors shall advise the Court of their intention to terminate the Investment Agreement at the hearing to consider the Debtors' disclosure statement.

12.     So long as the Debtors adhere to the Bid Process described in paragraph 11 above or amend any plan of reorganization then on file with this Court to incorporate the terms of any Alternative Proposal (an "Amended Plan"), the Committee, the Ad Hoc Noteholders Committee (or its members), Centerbridge or the Unions shall not: (i) challenge directly or indirectly, or support any motion challenging or seeking to terminate, the Debtors' exclusive right to to file a plan of reorganization or solicit acceptances thereto; (ii) allege or construe an Amended Plan to be a new plan of reorganization such that the Debtors would lose their exclusive rights to file or solicit acceptance to such plan, as amended; (iii) take any action or make any other suggestion in any forum to limit or terminate the exclusive rights of the Debtors to file a plan of reorganization or solicit acceptances thereon in the event that the

Debtors amend their plan of reorganization to incorporate the terms of any Alternative Proposal; or (iv) file a competing plan of reorganization on or before December 4, 2007.

13.    Upon the Union Settlement Agreement becoming effective, the Unions shall withdraw with prejudice their appeal in respect of the Debtors' executive compensation, annual incentive plan and long-term incentive plan that is currently pending in the United States District Court for the Southern District of New York.

14.    This Order is a final and non-interlocutory order and is immediately subject to appeal pursuant to 28 U.S.C § 158(a).

15.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

16.    The requirement under Local Rule 9013-l(b) for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

17.    For purposes of determining whether a creditor shall be deemed a "Qualified Investor" (as such term is defined in the Investment Agreement), (i) the Bondholder Record Date shall be August 13, 2007 and (ii) the Trade Claims Record Date shall be the date of the entry of an order confirming the Debtors' plan of reorganization.

18.    Notwithstanding anything to the contrary in the Global Settlement, any signatory to the Plan Support Agreement, who is also a member of the Committee, shall be deemed to execute the Plan Support Agreement in its individual capacity only and not as a member of the Committee, and nothing contained in this Order or the Global Settlement shall be deemed to limit the free and unrestricted performance of such signatory's duties as a member of the Committee, including without limitation, any consideration, formulation or action with respect to any competing plan of reorganization or alternative transaction.

19.     The terms of this Order govern the terms of the Global Settlement.  To the extent the terms of this Order conflict with the terms of the Global Settlement, the terms of this Order shall be deemed to apply.

Dated: New York, New York
       August 1, 2007

/s/Burton R. Lifland
HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A



**DANA CORPORATION**
**4500 Dorr Street**
**Toledo, Ohio  43615**

_____ ___, 200_

**<u>CONFIDENTIAL</u>**

_____
_____
_____
Attention:  _____

Re:  <u>Confidentiality Agreement</u>

Dear Mr./Mrs. _____:

As you know, Dana Corporation ("<u>Dana</u>") and 40 of its domestic direct and indirect subsidiaries (collectively, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), on March 3, 2006.  Dana's chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>") are jointly administered under the caption <u>In re Dana, *et al.*</u>, Case No. 06-10354 (BRL), and are pending before the Honorable Burton R. Lifland in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").  Subject to the terms and conditions of this letter agreement (this "<u>Agreement</u>"), the Debtors are willing to furnish _____ ("<u>Investor</u>") with certain Confidential Information (as defined below) in connection with Investor's consideration of a possible investment in Dana as an alternative to the investment by Centerbridge Capital Partners, L.P. (the "<u>Investment</u>").

The Confidential Information shall be furnished or otherwise disclosed or made known to you subject to the terms and conditions of this Agreement unless otherwise agreed to in writing by the Debtors.  This Agreement and your obligations hereunder shall apply to your use of

2

Confidential Information regardless of whether it is provided or made known to you by the Debtors or their Advisors or Representatives (as such terms are defined below). You will be responsible for any use or disclosure of Confidential Information by your Representatives or Advisors in contravention of this Agreement.

     1.     For purposes of this Agreement, the following terms shall have the following indicated meanings:

     "<u>Advisors</u>" shall include any counsel, consultants, accountants, experts, auditors, examiners, financial advisors or other agents or professionals.

     "<u>Confidential Information</u>" means any non-public information and any information marked or designated by the Debtors and/or their Representatives or Advisors as being "confidential," in each case concerning the Debtors or the Chapter 11 Cases, including, without limitation, information concerning the Debtors' assets, liabilities, business operations, business practices, business plans, financial projections, financial and business analyses, intellectual property, trade secrets and compilations and studies relating to the foregoing, and other documents prepared by the Debtors or their Advisors or Representatives, and information concerning any potential investor in or purchaser or potential purchaser of any of the Debtors' assets, or any confidential information provided as part of or in connection with any proposals or negotiations of a possible investment transaction, which is furnished, disclosed or made known to you or your Representatives or Advisors by the Debtors or their Representatives or Advisors, whether intentionally or unintentionally and in any manner, including in written form, orally or through any electronic, facsimile or computer related means of communication. Confidential Information shall include, without limitation: (a) any notes, summaries, compilations, presentations, memoranda or similar written materials disclosing or discussing Confidential Information; (b) any written Confidential Information that is discussed or presented orally; and (c) any other Confidential Information conveyed to you or your Representatives or Advisors orally that the Debtors or their Representatives or Advisors advise you should be treated as confidential. Notwithstanding anything to the contrary in this Agreement, Confidential Information shall not include any information or portions of information that: (a) is or becomes generally available to the public, (b) is or becomes available to you on a non confidential basis, to the extent that the source of such information was or is not actually known by you to be prohibited from disclosing such information by contractual, legal or fiduciary obligation to the Debtors, or (c) was in the possession of Investor on a non-confidential basis prior to its disclosure by the Debtors.

     "<u>or</u>" shall not be construed as exclusive.

     "<u>person</u>" shall be interpreted broadly to include the media and any corporation, company, limited liability company, group, partnership, joint venture, union, government agency, political subdivision or individual.

     "<u>Representatives</u>" shall include directors, officers, employees, agents and other representatives.

     "<u>you</u>" and "<u>your</u>" refers to Investor.

2.      The Confidential Information shall be used consistent with the following:

(a)      All Confidential Information shall be used by you solely and exclusively in connection with your consideration and evaluation of a possible investment in the Debtors and shall be kept confidential by you, and shall not be disclosed by you or your Representatives or Advisors to any other person or entity without the Debtors' prior written consent.

(b)      If the Debtors determine, in their business judgment, that certain Confidential Information poses a risk of competitive or other harm to the Debtors, the Debtors may designate such information to be for (i) Investor's eyes only or (ii) professional eyes only or (iii) particular professionals' eyes only (collectively, "Restricted Information").  You agree that any Restricted Information designated in this manner (whether by legend, watermark, restricted access in the virtual dataroom or written confirmation) may be reviewed only by employees of Investor or the specific Advisor or Advisors, as the case may be, designated as having access to such Restricted Information and, in the case of an Advisor or Advisors, who agree to this restriction and have acknowledged in a writing in the form attached hereto as Exhibit 1 that they have reviewed this Agreement and agreed to be bound by all of the terms hereof.

(c)      Confidential Information may be disclosed by you to your Representatives and Advisors who are working on the Chapter 11 Cases (subject in all cases to the limitations in paragraph 2(b) above), provided that each such Advisor receiving any Confidential Information pursuant to this paragraph 2(c) has acknowledged in a writing in the form attached hereto as Exhibit 1 that he has reviewed this Agreement and agreed to be bound by all of the terms hereof, including without limitation, the obligations concerning the confidentiality of all such Confidential Information and the proper use thereof.  Investor shall provide promptly to the Debtors a true and correct copy of any acknowledgment executed in accordance with paragraphs 2(b) and 2(c).

(d)      Notwithstanding the foregoing, Investor shall be permitted to disclose Confidential Information to other holders of Dana Securities (as defined below) or other parties in interest in the Chapter 11 Cases so long as such holders or parties in interest have entered into a confidentiality agreement acceptable to Dana.

3.      Without the prior consent of the other party hereto, Investor will not enter into any agreement, arrangement or any other understanding, whether written or oral, with any potential financing source or sources which by its terms seeks to, or is intended to, limit, restrict, restrain, or otherwise impair in any manner, directly or indirectly, the ability of such financing source or sources to provide financing or other assistance to any other party in any other transaction involving the Company.

4.      Confidential Information may be disclosed by you or any of your Representatives or Advisors if you are legally compelled (including, by deposition, interrogatory, request for documents, subpoena, civil investigative demand, court order or similar process) to do so; provided that, if legally permissible, you provide the Debtors with reasonable prior notice of your intention to disclose Confidential Information, which notice must be received by the Debtors' counsel not fewer than 10 days prior to such disclosure (or if the period for your own compliance is fewer than 10 days, then reasonably prompt notice), so that the Debtors may seek

a protective order or other appropriate remedy and/or waive compliance with the terms of this Agreement with respect to the proposed disclosure.  If you timely give such notice and a protective order or other remedy is not obtained by the time you are required to comply with such disclosure requests, you may comply with such requests, provided that you use reasonable efforts to disclose only such limited portion of the Confidential Information as is covered by such request.

5.      Without limiting the generality of any provision of this Agreement, if you determine in your sole discretion that it is necessary to disclose or describe the substance of the Confidential Information in a motion, pleading or other document filed with the Bankruptcy Court, or any other court, administrative body or other tribunal (collectively, a "<u>Filing</u>"), prior to such Filing, you shall move the Bankruptcy Court, or other court of competent jurisdiction, to make such Filing under seal or through some comparable protective mechanism.  Further, if you determine that it is necessary to disclose or describe the substance of Confidential Information through oral disclosure in any court, administrative body or other tribunal (collectively, an "<u>Oral Disclosure</u>"), prior to such Oral Disclosure, you shall:  (a) to the extent reasonably practicable, notify the Debtors thereof promptly upon such determination; and (b) move the court, administrative body or other tribunal for authority to make such disclosure in camera or in some other protective manner.  Except as provided in paragraphs 2, 3, 4 and 5 of this Agreement, Confidential Information shall not be disclosed absent the express written consent of the Debtors.  If you or the Debtors seek a protective order or other remedy in accordance with this Agreement, you agree that, to the extent legally permissible, you will not publicly disclose Confidential Information until the matter has been resolved by a court of competent jurisdiction.

6.      You shall take proper care to assure that all Confidential Information is maintained in a secure location and manner.  Upon termination of any definitive agreement between Dana and Investor providing for the Investment or the earlier termination of discussions between Investor and Dana regarding such investment, and at the written request of the Debtors, all tangible Confidential Information in your possession, custody or control and furnished by the Debtors or their Representatives or Advisors to you or your Representatives or Advisors shall promptly be returned to the Debtors, without retention of any copy thereof.  If the Debtors make such a request, all other Confidential Information that has been furnished by the Debtors or their Representatives or Advisors to the extent incorporated into any analyses, compilations, studies, personal notes, summaries or other documents in your possession, custody or control shall be either destroyed or retained by you and kept subject to the terms of this Agreement.  If requested in writing by the Debtors, you shall provide a certification as to the destruction of any materials in accordance with the foregoing.  Notwithstanding the return, destruction or retention of any Confidential Information, you and your Representatives and Advisors will continue to be bound by the obligations of confidentiality and other obligations hereunder.  Notwithstanding the foregoing, Investor shall be authorized to retain in the office of the General Counsel to Investor one copy of any Confidential Information furnished under this Agreement, along with any notes, compilations, studies or analysis incorporating the Confidential Information; provided that all of the terms of this Agreement shall apply to any Confidential Information or other documents maintained pursuant to this sentence.

7.      As of the date of this Agreement, except as previously disclosed by you to the Debtors in writing, you represent that you do not beneficially own any claims (as such term is

defined under section 101 of chapter 11 of title 11 of the United States Code) with respect to any Debtor or any rights to acquire such claims (collectively, "Claims") or any debt or equity securities of Dana or any of its subsidiaries or any direct or indirect options, warrants or other rights to acquire, or any security convertible into or exchangeable for, any debt or equity securities of Dana or any of its subsidiaries (together with Claims, "Dana Securities").  You agree that for a period (the "Standstill Period") of the earliest to occur of the one year anniversary of the date of this Agreement and the effective date of a chapter 11 plan of reorganization for the Debtors (the "Effective Date"), except within the terms of a specific written request from a majority of the independent directors of the Board of Directors of Dana or its designee, you will not, and none of your Representatives or Advisors on your behalf will, directly or indirectly through another party (a) file with the Bankruptcy Court, or solicit acceptances with respect to, any Plan of Reorganization in the Chapter 11 Cases unless and until such time as the Debtors do not have the exclusive right to propose, or solicit acceptances in respect of, a Plan of Reorganization in the Chapter 11 Cases or (b) sell, acquire, or offer, propose or agree to sell or acquire, by purchase or otherwise, beneficial ownership of any Dana Securities, provided, however, that if no definitive agreement for an Investment has been executed between you and Dana and discussions between you and Dana regarding an Investment have terminated, subject to applicable securities laws and any applicable orders of the Bankruptcy Court, you may sell Dana Securities beneficially owned by you at any time after a disclosure statement is filed by the Debtors in the Chapter 11 Cases.

8.      Except as described in paragraph 6 hereof and except for the Standstill Period described in paragraph 7, all obligations under this Agreement shall terminate and be of no further force or effect on the date that is the later of:  (a) three months after the first to occur of (x) the Effective Date, (y) the dismissal of the Chapter 11 Cases, or (z)  the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (b) twelve months from the date of this Agreement.

9.      It is agreed that no failure or delay by the Debtors in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder.  Nothing contained herein shall restrict the use by the Debtors of Confidential Information or limit or preclude the Debtors from raising objections to the production or disclosure of information or documents.

10.     Each party hereto agrees that unless and until a definitive agreement between Dana and you with respect to the Investment has been executed and delivered, neither you nor any Debtor will be under any legal obligation of any kind whatsoever with respect to such a transaction by virtue of this Agreement or any written or oral expression with respect to such a transaction by any of our respective Representatives or Advisors except, in the case of this Agreement or any other written agreement signed by the parties which purports to be binding, for the matters specifically agreed to herein or therein.  Although you understand that the Debtors have endeavored to include in the Confidential Information those materials and information which they believes to be reliable and relevant for the purpose of your evaluation of Dana and its subsidiaries, you understand and acknowledge that the Debtors are not making any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information.  You agree that neither the Debtors, nor any of their respective

Representatives or Advisors will have any liability to you or any other person resulting from the use of the Confidential Information by you or your Representatives and Advisors or any errors or omissions therein, it being understood that only those particular representations and warranties that are made to you by the Debtors in a definitive purchase agreement, when and if it is executed, and subject to such limitations and restrictions as may be specified in such definitive purchase agreement, will have any legal effect.

11.     Unless agreed to otherwise by Investor in its sole discretion or for the purpose of negotiating the Investment, the Debtors shall not enter into any confidentiality agreement with any third party or creditor that has proposed to Dana to enter into discussions with Dana concerning an investment in Dana and its subsidiaries as an alternative to the Investment unless such confidentiality agreement contains terms that are not materially less favorable to Dana than the terms of this Agreement.

12.     You agree that money damages will not be a sufficient remedy for any breach of this Agreement by you or your Representatives or Advisors.  Accordingly, in addition to any other remedies to which they may be entitled at law or in equity, the Debtors shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any breach of this Agreement (regardless of whether damages may or may not be readily quantifiable and without posting a bond or other security).

13.     This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to the otherwise applicable principles of law as to conflicts or choice of law of such state.

14.     Each party hereto hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall have exclusive jurisdiction with respect to any issues, actions, suits or proceedings arising out of or relating to this Agreement during such time as any of the Debtors shall be subject to the jurisdiction of the Bankruptcy Court.

15.     This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of such counterparts taken together shall be deemed to constitute one and the same instrument.  The parties agree that facsimile signatures shall be accepted as originals for all purposes under this Agreement.

16.     Except as otherwise provided herein, all notices and other communications to the Debtors or you required or permitted under this Agreement shall be in writing and shall become effective when delivered by facsimile (confirmed by mail), overnight courier service, registered or certified mail (postage prepaid) or hand delivery, addressed as follows or to such other addresses as may be thereafter designated in writing by such party to the other parties:

You:                          _____
                             _____
                             _____
                             <u>Attention</u>:      _____
                             Telephone:     _____
                             Facsimile:     _____

With copies to:              _____
                             _____
                             _____
                             <u>Attention</u>:      _____
                             Telephone:     _____
                             Facsimile:     _____

The Debtors:                 Dana Corporation
                             4500 Dorr Street
                             Toledo, Ohio  43615
                             <u>Attention</u>:      Marc S. Levin, Esq.
                             Telephone:     (419) 535-4640
                             Facsimile:     (419) 535-4790

With copies to:              Jones Day
                             222 E. 41st Street
                             New York, New York  10017
                             <u>Attention</u>:      Marilyn W. Sonnie
                             Telephone:     (212) 326-3734
                             Facsimile:     (212) 755-7306

17.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  This Agreement may not be assigned by you without the prior written consent of the Debtors, which consent shall be granted or not according to the Debtors' sole discretion.  There are no third-party beneficiaries of this Agreement.

18.    This Agreement shall apply with respect to all Confidential Information provided or made known to you on, prior to or after the date hereof.

19.    This Agreement represents the entire agreement of the parties hereto with respect to the subject matter hereof, and any amendment, supplement or modification hereto, or any waiver of the rights and obligations hereunder, must be in writing and signed on behalf of the parties hereto.

20.    If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of the Agreement shall not be affected or impaired thereby.

21.    You hereby acknowledge that you and your Representatives and Advisors may receive material non-public information in connection with your evaluation of an investment and

are aware that the federal and state securities laws may prohibit any person who has material, non-public information about a company from purchasing or selling securities of such a company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

Please indicate your acceptance of this Agreement by signing below and returning this Agreement to Marilyn Sonnie at the notice address set forth in paragraph 16 above.

Sincerely,

Dana Corporation, on its own behalf and on behalf of all of the other Debtors

By:     _____
          Name:
          Title:

Authorized Signatory for All of the Debtors

AGREED AND ACKNOWLEDGED:

_____

By:     _____
          Name:
          Title

**EXHIBIT 1**

## ACKNOWLEDGMENT AND AGREEMENT

       Reference is hereby made to the Confidentiality Agreement dated _____ \_\_, 200\_ (the "Confidentiality Agreement"), by and between Dana and 40 of its domestic direct and indirect subsidiaries (collectively, the "Debtors") and _____ ("Investor"). The undersigned acknowledges receipt of a true and correct copy of the Confidentiality Agreement and that it is an Advisor (as such term is defined and used in the Confidentiality Agreement) to Investor. The undersigned further acknowledges and agrees to be bound by all of the terms and conditions of the Confidentiality Agreement as if it were a party thereto, and that the Debtors are express beneficiaries of this Acknowledgment and Agreement and shall be entitled to rely upon and enforce this Acknowledgment and Agreement in accordance with the terms of the Confidentiality Agreement.

       Dated this \_\_\_ day of _____, 200\_.

                       [NAME OF ADVISOR]

                       By: _____
                          Name:
                          Title:

**EXHIBIT B**

## ALTERNATIVE PROPOSAL PROCEDURES

Persons ("Potential Investors") who have an interest in exploring the proposal of an Alternative Minority Investment, Alternative Majority Investment, Alternative Transaction or Alternative Stand-Alone Plan (each an "Alternative Proposal") must follow each of the procedural steps and additional guidelines set forth in these Procedures, or their Alternative Proposals may not be considered.

## The Investment Order

The process respecting the consideration of Alternative Proposals will be governed solely by these procedures and the requirements set forth in the Order Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, Approving Settlement Agreements with the United Steelworkers and United Autoworkers, and Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 and 507, Authorizing the Debtors to Enter Into Plan Support Agreement, Investment Agreement and Related Agreements (the "Investment Order"), which was entered in the chapter 11 cases of Dana Corporation and its debtor affiliates by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Capitalized terms not otherwise defined herein have the meanings given to them in the Investment Order.

The Investment Order approves, among other things, an investment agreement (the "Investment Agreement") and related agreements among Centerbridge Capital Partners, L.P. ("Centerbridge") and Dana setting forth the terms and conditions upon which Centerbridge is willing to make an investment in New Dana (the "Centerbridge Proposal"). The Investment Order contemplates the consideration by Dana of Alternative Proposals to be made by Potential Investors that will be governed by these procedures.

## Step One:  Entry Into Confidentiality Agreement

Each Potential Investor must submit a letter indicating its interest in making an Alternative Proposal, including any information that the Potential Investor believes will assist Dana in evaluating the credentials of the Potential Investor (the "Initial Letter"). If, after consultation with the Official Committee of Unsecured Creditors (the "Committee"), Dana determines the interest to be bona fide and is satisfied with the financial credentials of the Potential Investor (a "Qualified Potential Investor"), such Qualified Potential Investor will be asked to execute and deliver to Dana a confidentiality agreement in the form substantially similar to that attached to the Investment Order as Exhibit A (an "Acceptable Confidentiality Agreement").

Each Qualified Potential Investor that executes an Acceptable Confidentiality Agreement shall be granted access to the information and the virtual data room that was established and is being maintained by the Dana for the purpose of having allowed Centerbridge to conduct its due diligence in connection with the Centerbridge Proposal; provided, however, that the information and data room access relating to commercially sensitive pricing, customer, supply and other information may be limited for certain Qualified Potential Investors to the extent that Dana, in consultation with the Committee, determines that permitting the investor unfettered access to

such information or data room could violate applicable federal law (including antitrust law) or have a potentially negative impact on Dana's business operations or competitive position in the industry.

### Step Two:  Indications of Interest

Each Qualified Potential Investor must submit a bona fide written, preliminary, nonbinding indication of interest (an "Indication of Interest") based its review of the online data room, the pleadings filed in the Bankruptcy Court, other publicly available information and its knowledge of the industry.

In order to be considered, any Indication of Interest must be submitted in accordance with the instructions below no later than 5:00 p.m., Eastern Time, on August 17, 2007.  Potential investors are encouraged to submit Indications of Interest early, so that the Debtors and the Committee can review Indications of Interest and provide comments so that revised Indications of Interest may be submitted prior to the August 17, 2007 deadline.  The Indication of Interest may be a nonbinding proposal but must address, at minimum, the following items (provided that any of the requirements set forth below are waivable by Dana in its discretion after consultation with the Committee, so long as such waiver does not adversely affect the rights of the United Steelworkers of America (the "USW") and the International Union, UAW (the "UAW" and, collectively with the USW, the "Unions")):

- Investment Terms.  The terms of the proposed investment or transaction (the "Proposed Transaction"), including (but not limited to) the structure of the transaction, the types of securities that the Qualified Potential Investor expects to purchase from Dana or reorganized Dana or offer to others to purchase in connection with the Proposed Transaction, a brief summary of the rights associated with such securities, the amounts (in U.S. dollars) that are to be paid for such securities and the other relevant economic terms of such Proposed Transaction or, if the Proposed Transaction does not call for an investment, all relevant terms of such Proposed Transaction.

- Assumptions.  Details of the key assumptions pertaining to the Proposed Transaction that are being made in order to determine relevant underlying metrics (e.g., valuation).

- Financing Requirements.  A detailed description of financing plans, financing structure and the Qualified Potential Investor's plans, if any, to seek other investors as participants in the Proposed Transaction and, if the Indication of Interest contemplates external financing, information regarding appropriate contacts at each external financing source(s), the amounts and terms of the financing contemplated, the commitment process, the anticipated timing involved, the steps required to secure necessary funds, the present status of discussions and any other financing contingencies.

- <u>Information Regarding the Investor.</u>  A detailed description of the identity, exact legal name, state of incorporation (or similar information if not a corporation), capital structure and ownership structure of the Qualified Potential Investor.  In addition, each Qualified Potential Investor should provide a detailed description of the following information:  (a) the Qualified Potential Investor's experience in using private capital to consummate equity investments in large operating businesses and in businesses in the automotive industry and a description of (i) the most recent such transactions and (ii) other such transactions that the Qualified Potential Investor has made in the automotive industry; (b) the Qualified Potential Investor's management skills and resources; (c) the identity of the dedicated personnel that will be assigned by the Qualified Potential Investor to work with the Debtors' management team; and (d) the proposed investment horizon of the Qualified Potential Investor.  If other entities are proposed to participate in the Proposed Transaction, all such information set forth above must be provided for such parties as well.

- <u>Necessary Internal Approvals</u>.  A description of the internal corporate, partnership or shareholder approvals, if any, which will be required for the Qualified Potential Investor to obtain prior to entry into a Proposed Transaction, and the anticipated timing of obtaining such approvals.

- <u>Necessary External Approvals</u>.  A listing and description of all expected required regulatory, governmental or other external approvals (<u>e.g.</u>, Hart-Scott Rodino, Federal Trade Commission, European Commission) expected to be required for a Proposed Transaction, and the anticipated timing of obtaining such approvals.

- <u>Other Material Conditions</u>.  A detailed description of any other material conditions of any nature that must be fulfilled prior to consummating a Proposed Transaction, and the anticipated timing of fulfillment of such conditions.

- <u>Due Diligence</u>.  A list of the material, unanswered business questions or issues that are important for determining the final terms of any Alternative Proposal, and the scope, nature, timing and extent of any additional due diligence that the Qualified Potential Investor or its financing sources would need to complete.

- <u>Appropriate Contact Persons</u>.  The appropriate contact persons for the Qualified Potential Investor and its legal and financial advisors, with their contact information, and appropriate contact persons for any third parties that the Qualified Potential Investor proposes will be involved in the Proposed Transaction.

Indications of Interests submitted in a timely manner will be evaluated as soon as reasonably practicable with the objective of determining whether to invite Potential Investors to participate in the next phase of the evaluation process, such determination to be made no later than August 24, 2007.  If Dana, after considering the views of the Committee, determines that the Indication of Interest is bona fide and, based on the information in the Indication of Interest, has the potential to meet the standards set forth in the Investment Agreement for the exercise of its rights to terminate the Investment Agreement, then:

- The Qualified Potential Investor will be deemed a "Continuing Potential Investor" and invited to make a Final Proposal (as such term is defined below).

- Subject to the terms of the Acceptable Confidentiality Agreement, the Continuing Potential Investor will receive access to the same information and virtual data room that was established and is being maintained by Dana for the purpose of having allowed Centerbridge to conduct its due diligence in connection with the Centerbridge Proposal.

- The Continuing Potential Investor will be invited to visit selected Dana facilities and meet with Dana's advisors and selected members of its senior management team.

- Arrangements will be made so that the Continuing Potential Investor may meet with representatives of the Committee and the Unions.

## Step Three:  Final Proposals

Each Continuing Potential Investor will be required to submit a firm and final written offer constituting its Alternative Proposal (a "Final Proposal") in accordance with the instructions below so as to be received by both parties on or before 5:00 p.m., Eastern Time on September 21, 2007 (the "Final Proposal Deadline").  Continuing Potential Investors are encouraged to submit Final Proposals early, so that the Debtors and the Committee can review Final Proposals and provide comments so that revised Final Proposals may be submitted prior to the Final Proposal Deadline.

Upon review and consideration of Indications of Interest, Dana, in consultation with the Committee, may promulgate additional instructions governing what will be required to be submitted in any Final Proposal.  Any such additional instructions will be provided to Continuing Potential Investors and the Committee reasonably in advance of the Final Proposal Deadline.

In connection with the making of a Final Proposal, each Continuing Potential Investor will be required to, at minimum, provide the following (provided that any of the requirements set forth below will be waivable by Dana in its discretion after consultation with the Committee so long as such waiver does not adversely affect the rights of the Unions):

- <u>Structure and Amounts of Investment or Transaction</u>.  An executive summary of the Proposed Transaction structure setting forth all relevant features of the Proposed Transaction, including (but not limited to) the types of securities that the Continuing Potential Investor expects to purchase from Dana or reorganized Dana or offer to others to purchase in connection with the Proposed Transaction, a brief summary of the rights associated with such securities, the amounts (in U.S. dollars) that are to be paid for such securities and the other relevant economic terms of such Proposed Transaction or, if the Proposed Transaction does not call for an investment, all relevant terms of such Proposed Transaction.

- <u>Modified Investment Agreement</u>.  To the extent that the Final Proposal is similar in a material way to the Centerbridge Proposal, the Final Proposal must include a marked-up version of the Investment Agreement (including the schedules thereto) and a marked-up version of the most recent plan of reorganization that has been filed in the Bankruptcy Court by the Debtors, with a statement that the Continuing Potential Investor is prepared to execute promptly such agreement on such modified terms with no additional due diligence or conditions other than those expressly set forth in the agreement and that the Continuing Potential Investor is prepared to support a plan of reorganization on such modified terms.  Counsel to Dana and counsel to the Committee will be available to discuss any proposed modifications to the terms of the Investment Agreement and the plan of reorganization prior to the Final Proposal Deadline.

- <u>Other Form of Agreement</u>.  To the extent that the Final Proposal is not similar to the Centerbridge Proposal in any material way, the Final Proposal must include a draft agreement or agreements (along with any necessary schedules thereto) that set forth the terms of the Final Proposal, along with a statement that the Continuing Potential Investor is prepared to execute promptly such agreement with no additional due diligence or conditions other than those expressly set forth in the agreement.  To the extent that a Final Proposal includes a new form of agreement, the Continuing Potential Investor must provide counsel to Dana and counsel to the Committee nonbinding draft forms of the proposed agreement at least seven business days prior to the Final Proposal Deadline to provide Dana and the Committee an opportunity to comment on the form and provisions of such agreement.

- <u>Changes From Indication of Interest</u>.  A statement confirming that all information set forth in the Indication of Interest remains accurate and, if not, a detailed description of the information set forth in the Indication of Interest that has changed since the submission thereof.

- <u>Financing Requirements</u>.  A detailed description of relevant financing plans and financing structure.  If the Final Proposal contemplates the

participation of other investors as participants in the Proposed Transaction, any written agreements with such third-party investors or any information regarding the identity or qualifications of such investors. If the Final Proposal contemplates external financing, the Final Proposal must include copies of executed agreements from such external financing sources committing to secure necessary funds. No financing contingencies may be included in any Final Proposal.

- <u>Due Diligence</u>. A statement confirming that all due diligence has been completed as of the date of the Final Proposal and that no additional due diligence will be necessary.

- <u>Necessary Internal Approvals</u>. A statement confirming that all internal corporate or shareholder approvals, if any, have been obtained (or, for large publicly-held corporations, if, when and how such approvals are anticipated to be obtained).

- <u>Necessary External Approvals</u>. A statement confirming that all regulatory, governmental or other external approvals (financing and otherwise), if any, have been obtained. To the extent any governmental approvals remain pending, when they will be satisfied.

- <u>Other Material Conditions</u>. All closing conditions or other contingencies, if any, must be expressly set forth in the form of agreement that is submitted with the Final Proposal.

- <u>Additional Information</u>. A detailed description of (a) the plans of the Continuing Potential Investor with respect to the future of the Debtors' businesses, including the expected manufacturing footprint of the Debtors' business operations in upcoming years, information regarding any proposed or contemplated plant closures; and (b) the levels of financial leverage to be applied to Dana's business as part of the Final Proposal; and (c) the proposed amounts of liquidity that the Continuing Potential Investor projects will be available to the Debtors in the operation of their businesses.

- <u>Disclosure of Connections with Parties In Interest</u>. A detailed disclosure of any material connections that the Continuing Potential Investor has with parties in interest in Dana's bankruptcy case, including any that may need to be disclosed in the Bankruptcy Court in connection with this process.

Dana shall review all Final Proposals and may, by September 25, 2007, provide the required notice to the Unions under section 1 or section 3(a)(ii) of Appendix R to the Union Settlement Agreement, as applicable, to initiate the due diligence period of the Unions.

The Board of Directors of Dana Corporation and the Debtors' attorneys and advisors, in consultation with the Committee and its advisors, will consider all Final Proposals during the week of September 24, 2007 and will contact all parties that have submitted Final Proposals thereafter.

### Communications with Dana and Instructions for Submissions

All communication or inquiries relating to Alternative Proposals should be directed to Jones Day and Miller Buckfire & Co., LLC, attorneys and advisors to Dana, the contact information for which is as follows:

| | |
|---|---|
| Jones Day<br>222 East 41st Street<br>New York, New York  10017<br>Phone:  (212) 326-3939<br>Facsimile:  (212) 755-7306<br>Attn:  Corinne Ball, Esq.<br>(cball@jonesday.com)<br>Attn:  Marilyn W. Sonnie, Esq.<br>(mwsonnie@jonesday.com) | Miller Buckfire & Co., LLC<br>250 Park Avenue, 19th Floor<br>New York, NY  10177<br>Phone:  (212) 895-1818<br>Facsimile:  (212) 895-1853<br>Attn:  Durc Savini<br>(durc.savini@millerbuckfire.com)<br>Attn:  Henry Miller<br>(henry.miller@millerbuckfire.com)<br>Attn:  Richard Morgner<br>(richard.morgner@millerbuckfire.com) |

All Initial Letters, Indications of Interest and Final Proposals must be submitted in writing so as to be received by the applicable deadlines set forth above by the following:  (a) counsel to the Debtors, Jones Day, 222 East 41st Street, New York, NY 10017, Attn:  Corinne Ball, Esq., E-mail: cball@jonesday.com; (b) Miller Buckfire, 250 Park Avenue, 17th Floor, New York, NY 10177, Attn:  Richard Morgner, E-mail: richard.morgner@millerbuckfire.com; (c) counsel to the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: Thomas Moers Mayer, Esq., E-mail: tmayer@kramerlevin.com, and Matthew Williams, E-mail: mjwilliams@kramerlevin.com.

Counsel to the Committee may promptly share copies of any Initial Letters, Indications of Interest and Final Proposals that it receives with UBS Securities LLC ("UBS") and FTI Consulting, Inc. ("FTI"), and the Members of the Official Committee of Unsecured Creditors, who shall keep such information confidential.  For purposes of these procedures, the Debtors shall have fulfilled their requirement to consult with the Committee if the Debtors and/or their professionals have consulted with counsel to the Committee, UBS and/or FTI, as appropriate.

The Debtors will promptly share copies of any Indications of Interest and Final Proposals with counsel to the Unions.  The Debtors will provide counsel to Centerbridge with any Indications of Interest or Final Proposals that Centerbridge is entitled to receive pursuant to the Investment Agreement.  The Debtors will communicate with and provide documents to the Ad Hoc Bondholders' Committee and the Ad Hoc Steering Committee in a manner consistent with the Plan Term Sheet.

## **Additional Terms Governing the Procedures**

The circulation of these procedures to parties that the Debtors believe might have an interest in becoming a Potential Investor will not constitute an invitation or an offer capable of acceptance for the sale or purchase of securities or any of the businesses or assets of Dana.

Each Potential Investor will bear all of its own costs and expenses related to this process and the preparation of an Indication of Interest and Final Proposal. Dana, its affiliates, attorneys and advisors disclaim any and all liability for materials supplied to any Potential Investor, and no representation or warranty, other than those that may be made by Dana in a definitive and binding agreement, is made as to the accuracy or completeness of any information furnished, either written or verbally. By submitting an Indication of Interest or Final Proposal, the Potential Investor is deemed to acknowledge that it is relying solely upon its own independent investigation and evaluation of Dana and its subsidiaries and affiliates.

# EXHIBIT C

# Part 1

**APPENDIX R:  RIGHT TO TERMINATE**

The modifications to the collective bargaining agreements and retiree benefits reached in connection with Dana's Chapter 11 reorganization and set forth in this Settlement Agreement were agreed to in furtherance of Dana's reorganization under Chapter 11 of Title 11, United States Code.  The parties acknowledge and agree that  the proposed investment ("Investment") by Centerbridge Partners, L.P. ("Centerbridge") (the "Centerbridge Investment"), which Investment is reflected in Exhibit B of the Plan Support Agreement, Terms of Centerbridge Investment (the "Investment Term Sheet"), and the Reorganization Plan Metrics, as further described in the Settlement Agreement, are fundamental, integral and necessary conditions to the Settlement Agreement.  The parties agree that the Unions shall have termination rights as follows:

1) <u>Replacement of Centerbridge By Dana</u>:  In the event that Dana determines that it wishes to replace Centerbridge with an  Alternative Minority Investment (as such term is defined in the Investment Term Sheet) on better terms  than those set forth in the Investment Term Sheet (the "Alternative Investor"), leaving the Settlement Agreement (including the Reorganization Plan Metrics) intact in all other respects, such Alternative Minority Investment shall be subject to the consent of the USW/UAW, which consent shall not be unreasonably withheld. The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Alternative Minority Investment, including discussions, if any, regarding the labor agreements and related restructuring matters. The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks after notification by Dana regarding the Alternative Minority Investment provided that Dana and the proposed investor cooperate fully in such diligence.  In the event that the Unions do not consent to the Alternative Minority Investment, then the following shall apply:

   (a) <u>Mediation and Arbitration</u>:  Disputes regarding the Unions' determination to withhold their consent of an Alternative Minority Investment shall be timely addressed first, at mediation, and then at arbitration, applying the standards that would apply in labor arbitration proceedings.  The Unsecured Creditors' Committee has the right to participate with Dana in the mediation/arbitration on a co-equal basis. The mediation/arbitration shall be based on the parties' understanding that the Unions' willingness to enter into the Settlement Agreement is based on the Unions' understanding and belief that they, the Company and Centerbridge have a shared vision which includes, but is not limited to the following:  that the Company is in financial distress and operates in a highly competitive global industry;  that improving the Company's performance will require both substantial experience in using private capital to make equity investments in large operating businesses and dedicated personnel devoted to the businesses' long-term success, a patient, long-term investment horizon, considerable management skills and investor resources and capital;  that the Company can and must maintain a significant manufacturing base in North America and provide a growing supply of good jobs for union-represented employees;  that the Company's success in this environment is highly dependant upon its ability to achieve and sustain financial stability, including, among other things maintaining levels of leverage and liquidity that are prudent in light of prevailing industry conditions;  that the Unions are critical stakeholders and partners in the enterprise and that the Settlement Agreement, as a whole, reflects this recognition;

and that the parties are irrevocably committed to mutual respect and cooperation at all levels of the Company.

The mediator-arbitrator shall be George Fleischli. If George Fleischli is not available, then Richard Bloch shall serve as the mediator-arbitrator. If Richard Bloch is not available, then the mediator-arbitrator shall be Martin Scheinman. For purposes of this paragraph, "available" means able to conduct a mediation-arbitration within ten (10) days of the submission of the dispute to mediation-arbitration and, if necessary, render a decision within four (4) days thereafter. If none of the foregoing individuals are available, then the individual available at the earliest time shall be the individual selected.

> (i)     If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Alternative Minority Investment, and, notwithstanding such determination, Dana proceeds with the Alternative Minority Investment, the Unions may, in their sole, unreviewable discretion, either: (A) issue a Notice of Termination, which shall constitute notice that each and every USW or UAW collective bargaining agreement shall be terminated on the date set forth therein, and which shall give rise to the Unions' right to strike upon such termination, or (B) elect not to issue a Notice of Termination, in which event the Unions shall have an allowed administrative expense claim in the amount of $764 million, which claim shall not be subject to reconsideration under 11 U.S.C. § 502 or otherwise, and which shall be the $764 million cash payment (with such amount to be allocated as follows: USW-$298.7 million; and UAW-$465.3 million) to be made to the respective Union Retiree VEBA as described in Appendix K to this Settlement Agreement (and Appendix K to the UAW Settlement Agreement), or as otherwise directed to be paid by the Unions in the event their respective VEBA has not been established (but in no event to be duplicative of the Unions' Claim under this Appendix).

> (ii)    If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Alternative Minority Investment, the Company shall be authorized to proceed with the Alternative Minority Investment without further consequence so long as the terms of the Settlement Agreement otherwise remain unchanged and unaffected.

> (iii)   <u>Review of Arbitral Award</u>:  Any action to enforce or vacate the arbitral award described in paragraph (a) shall be brought in the Bankruptcy Court and be an action under Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185 ("the Section 301 Action") and reviewed under the standards applicable to judicial review of arbitration awards pursuant to Section 301.

(b) In the event that, following the consideration of an Alternative Minority Investment proposal, Dana rejects such proposal in favor of the Centerbridge Investment (or a new Centerbridge investment), then the Settlement Agreement shall remain in effect.

2) <u>Centerbridge Terminates The Investment</u>:  In the event that Centerbridge determines to terminate the Investment, other than for a breach by Dana of the Terms of Centerbridge Investment, the following shall apply:

(a) The  Unions shall have the sole unreviewable discretion within thirty (30) days of notification by Centerbridge of its termination of the Investment to designate an investor to replace Centerbridge on terms substantially similar to the Centerbridge Investment (the "Replacement Investor").  Such Replacement Investor shall be subject to Dana's consent, which consent shall not be unreasonably withheld.  If the 30-day period has not run by September 3, 2007, then Dana may file a plan of reorganization without the Replacement Investor, which plan shall be amended to incorporate the Replacement Investor, subject to the provisions of paragraphs 2(b) and 2(c) below.

(b) Disputes with respect to whether or not Dana has acted unreasonably in withholding its consent to the Replacement Investor shall be timely addressed and subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in  Paragraph (1)(a)(iii).

      (i)      If the arbitrator finds that Dana has acted unreasonably in rejecting the Replacement Investor, the arbitral award shall require that Dana accept the Replacement Investor.

      (ii)      If the arbitrator finds that Dana has acted reasonably, then Dana shall not be obligated to accept the Replacement Investor.

(c) In the event that the Unions do not identify a Replacement Investor or an arbitrator, acting pursuant to paragraph (b) above finds that Dana has acted reasonably in rejecting the Replacement Investor, Dana may pursue an alternate plan of reorganization , so long as such plan of reorganization meets the Reorganization Plan Metrics and the terms of this Settlement Agreement and the UAW Settlement Agreement otherwise remain unchanged and unaffected.

3) <u>Other  Events</u>.

      (a)      (i)      Except as provided in paragraphs (1) and (2) of this Appendix (in which case the provisions of those paragraphs shall govern), in the event that Dana pursues a transaction other than the Centerbridge Investment, including a majority investment transaction, a sale of substantially all of the Company's assets and any similar transaction (the "Non-Centerbridge Transaction"), the Unions shall have an allowed general unsecured claim in the amount of $908 million (such claim to be allocated as follows: USW - $354.7 million; and UAW - $553.3 million), which claim shall not be subject to reconsideration under Section 502 of the Bankruptcy Code or otherwise (after the date of approval of this Settlement Agreement and the

UAW Settlement Agreement) (the "Unions' Claim"), unless Dana shall have notified the Unions that they and, if applicable, the third party investor to such Non-Centerbridge Transaction have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the reasonable satisfaction of the Unions.

(ii)     Such Non-Centerbridge Transaction shall be subject to the Unions' consent, which consent shall not be unreasonably withheld. The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Non-Centerbridge Transaction, including discussions, if any, regarding the labor agreements and related restructuring matters.  The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks of notification by Dana regarding the Non-Centerbridge Transaction provided that Dana and the third party to such proposed Transaction cooperate fully in such diligence. In the event that the Unions do not consent to the Non-Centerbridge Transaction, then any dispute regarding the Unions' determination to withhold consent shall be subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in Paragraph (1)(a)(iii).

If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Non-Centerbridge Transaction, and, notwithstanding such determination, Dana proceeds with the transaction, the Unions may, in their sole, unreviewable discretion:  (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing such termination and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement remains in effect), the Unions may elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim to be paid to a Union Retiree VEBA or as otherwise directed by the Unions for the payment of retiree health benefits in the event that their respective VEBA has not been established.  The Unions may file with the Bankruptcy Court a notice identifying such election.  If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Non-Centerbridge Transaction, the Company shall be authorized to proceed with the transaction, subject to the terms of the Settlement Agreement, except that the Unions shall have the right to elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount

of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim . The Unions may file with the Bankruptcy Court a notice identifying such election.

(b) Except as provided in Paragraphs (1), (2) and 3(a) of this Appendix, for any other event of termination under the Investment Term Sheet including the filing by Dana of a standalone reorganization plan, the Unions shall have the Unions' Claim (subject to the allocation described above at (3)(a)(i)), unless Dana, and if applicable, the plan proponent shall have notified the Unions that they have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the satisfaction of the Unions. The Unions shall also have the right, in their sole unreviewable discretion to (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) of this Appendix (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing the termination of benefits and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement shall remain in effect), the Unions may elect: (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim, to be paid to the respective Union Retiree VEBA or as otherwise directed by the Unions in the event that their respective VEBA has not been established. The Unions may file with the Bankruptcy Court a notice identifying such election.

(c) In the case of a dismissal of the Debtors' chapter 11 cases, then this Settlement Agreement will terminate, and the parties will return to the status that existed before the Section 1113/1114 Litigation and the execution of this Settlement Agreement. In the case of a conversion of the Debtors' cases to Chapter 7, the Debtors will seek that any order of conversion shall provide for an allowed administrative claim in the amount of $764 million for the payment of retiree health benefits (subject to the allocation described above at (1)(a)(i)).

4) For purposes of this Appendix, "Reorganization Metrics" shall mean Appendix I of this Settlement Agreement.

**EXHIBIT C**

**Part 2**

## APPENDIX R:  RIGHT TO TERMINATE

The modifications to the collective bargaining agreements and retiree benefits reached in connection with Dana's Chapter 11 reorganization and set forth in this Settlement Agreement were agreed to in furtherance of Dana's reorganization under Chapter 11 of Title 11, United States Code.  The parties acknowledge and agree that  the proposed investment ("Investment") by Centerbridge Partners, L.P. ("Centerbridge") (the "Centerbridge Investment"), which Investment is reflected in Exhibit B of the Plan Support Agreement, Terms of Centerbridge Investment (the "Investment Term Sheet"), and the Reorganization Plan Metrics, as further described in the Settlement Agreement, are fundamental, integral and necessary conditions to the Settlement Agreement.  The parties agree that the Unions shall have termination rights as follows:

1)    Replacement of Centerbridge By Dana:  In the event that Dana determines that it wishes to replace Centerbridge with an Alternative Minority Investment (as such term is defined in the Investment Term Sheet) on better terms  than those set forth in the Investment Term Sheet (the "Alternative Investor"), leaving the Settlement Agreement (including the Reorganization Plan Metrics) intact in all other respects, such Alternative Minority Investment shall be subject to  the consent of the USW/UAW, which consent shall not be unreasonably withheld.  The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Alternative Minority Investment, including discussions, if any, regarding the labor agreements and related restructuring matters. The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks after notification by Dana regarding the Alternative Minority Investment provided that Dana and the proposed investor cooperate fully in such diligence.  In the event that the Unions do not consent to the Alternative Minority Investment, then the following shall apply:

(a)    Mediation and Arbitration:  Disputes regarding the Unions' determination to withhold their consent of an Alternative Minority Investment shall be timely addressed first, at mediation,  and then at arbitration, applying the standards that would apply in labor arbitration proceedings.  The Unsecured Creditors' Committee has the right to participate with Dana in the mediation/arbitration on a co-equal basis.  The mediation/arbitration shall be based on the parties' understanding that the Unions' willingness to enter into the Settlement Agreement is based on the Unions' understanding and belief that they, the Company and Centerbridge have a shared vision which includes, but is not limited to the following:  that the Company is in financial distress and operates in a highly competitive global industry; that improving the Company's performance will require both substantial experience in using private capital to make equity investments in large operating businesses and dedicated personnel devoted to the businesses' long-term success, a patient, long-term investment horizon, considerable management skills and investor resources and capital;  that the Company can and must maintain a significant manufacturing base in North America and provide a growing supply of good jobs for union-represented employees;  that the Company's success in this environment is highly dependant upon its ability to achieve and sustain financial stability, including, among other things maintaining levels of leverage and liquidity that are prudent in light of prevailing industry conditions;  that the Unions are critical stakeholders and partners in the enterprise and that the Settlement Agreement, as a whole, reflects this recognition;

- 2 -

and that the parties are irrevocably committed to mutual respect and cooperation at all levels of the Company.

The mediator-arbitrator shall be George Fleischli. If George Fleischli is not available, then Richard Bloch shall serve as the mediator-arbitrator. If Richard Bloch is not available, then the mediator-arbitrator shall be Martin Scheinman. For purposes of this paragraph, "available" means able to conduct a mediation-arbitration within ten (10) days of the submission of the dispute to mediation-arbitration and, if necessary, render a decision within four (4) days thereafter. If none of the foregoing individuals are available, then the individual available at the earliest time shall be the individual selected.

    (i)    If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Alternative Minority Investment, and, notwithstanding such determination, Dana proceeds with the Alternative Minority Investment, the Unions may, in their sole, unreviewable discretion, either: (A) issue a Notice of Termination, which shall constitute notice that each and every USW or UAW collective bargaining agreement shall be terminated on the date set forth therein, and which shall give rise to the Unions' right to strike upon such termination, or (B) elect not to issue a Notice of Termination, in which event the Unions shall have an allowed administrative expense claim in the amount of $764 million, which claim shall not be subject to reconsideration under 11 U.S.C. § 502 or otherwise, and which shall be the $764 million cash payment (with such amount to be allocated as follows: USW-$298.7 million; and UAW-$465.3 million) to be made to the respective Union Retiree VEBA as described in Appendix K to this Settlement Agreement (and Appendix K to the USW Settlement Agreement), or as otherwise directed to be paid by the Unions in the event their respective VEBA has not been established (but in no event to be duplicative of the Unions' Claim under this Appendix).

    (ii)    If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Alternative Minority Investment, the Company shall be authorized to proceed with the Alternative Minority Investment without further consequence so long as the terms of the Settlement Agreement otherwise remain unchanged and unaffected.

    (iii)    <u>Review of Arbitral Award</u>: Any action to enforce or vacate the arbitral award described in paragraph (a) shall be brought in the Bankruptcy Court and be an action under Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185 ("the Section 301 Action") and reviewed under the standards applicable to judicial review of arbitration awards pursuant to Section 301.

- 3 -

(b) In the event that, following the consideration of an Alternative Minority Investment proposal, Dana rejects such proposal in favor of the Centerbridge Investment (or a new Centerbridge investment), then the Settlement Agreement shall remain in effect.

2) <u>Centerbridge Terminates The Investment</u>:  In the event that Centerbridge determines to terminate the Investment, other than for a breach by Dana of the Terms of Centerbridge Investment, the following shall apply:

(a) The  Unions shall have the sole unreviewable discretion within thirty (30) days of notification by Centerbridge of its termination of the Investment to designate an investor to replace Centerbridge on terms substantially similar to the Centerbridge Investment (the "Replacement Investor").  Such Replacement Investor shall be subject to Dana's consent, which consent shall not be unreasonably withheld.  If the 30-day period has not run by September 3, 2007, then Dana may file a plan of reorganization without the Replacement Investor, which plan shall be amended to incorporate the Replacement Investor, subject to the provisions of paragraphs 2(b) and 2(c) below.

(b) Disputes with respect to whether or not Dana has acted unreasonably in withholding its consent to the Replacement Investor shall be timely addressed and subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in  Paragraph (1)(a)(iii).

> (i)      If the arbitrator finds that Dana has acted unreasonably in rejecting the Replacement Investor, the arbitral award shall require that Dana accept the Replacement Investor.

> (ii)     If the arbitrator finds that Dana has acted reasonably, then Dana shall not be obligated to accept the Replacement Investor.

(c) In the event that the Unions do not identify a Replacement Investor or an arbitrator, acting pursuant to paragraph (b) above finds that Dana has acted reasonably in rejecting the Replacement Investor, Dana may pursue an alternate plan of reorganization , so long as such plan of reorganization meets the Reorganization Plan Metrics and the terms of this Settlement Agreement and the USW Settlement Agreement otherwise remain unchanged and unaffected.

3) <u>Other  Events</u>.

> (a)      (i)      Except as provided in paragraphs (1) and (2) of this Appendix (in which case the provisions of those paragraphs shall govern), in the event that Dana pursues a transaction other than the Centerbridge Investment, including a majority investment transaction, a sale of substantially all of the Company's assets and any similar transaction (the "Non-Centerbridge Transaction"), the Unions shall have an allowed general unsecured claim in the amount of $908 million (such claim to be allocated as follows: USW-$354.7 million; and UAW-$553.3 million), which claim shall not be subject to reconsideration under Section 502 of the Bankruptcy Code or otherwise (after the date of approval of this Settlement Agreement and the

USW Settlement Agreement) (the "Unions' Claim"), unless Dana shall have notified the Unions that they and, if applicable, the third party investor to such Non-Centerbridge Transaction have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the reasonable satisfaction of the Unions.

(ii)    Such Non-Centerbridge Transaction shall be subject to the Unions' consent, which consent shall not be unreasonably withheld. The Unions' consent shall be determined once the Unions have conducted due diligence regarding the Non-Centerbridge Transaction, including discussions, if any, regarding the labor agreements and related restructuring matters.  The Unions shall use reasonable best efforts to complete expedited due diligence within two (2) weeks of notification by Dana regarding the Non-Centerbridge Transaction provided that Dana and the third party to such proposed Transaction cooperate fully in such diligence. In the event that the Unions do not consent to the Non-Centerbridge Transaction, then any dispute regarding the Unions' determination to withhold consent shall be subject to the procedures and standards set forth in Paragraph (1)(a) of this Appendix and any review of the arbitral award shall be as set forth in Paragraph (1)(a)(iii).

If the arbitrator finds that the Unions have acted reasonably in their determination to withhold consent of the Non-Centerbridge Transaction, and, notwithstanding such determination, Dana proceeds with the transaction, the Unions may, in their sole, unreviewable discretion:  (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing such termination and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement remains in effect), the Unions may elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim to be paid to a Union Retiree VEBA or as otherwise directed by the Unions for the payment of retiree health benefits in the event that their respective VEBA has not been established.  The Unions may file with the Bankruptcy Court a notice identifying such election.  If the arbitrator finds that the Unions have acted unreasonably in their determination to withhold consent of the Non-Centerbridge Transaction, the Company shall be authorized to proceed with the transaction, subject to the terms of the Settlement Agreement, except that the Unions shall have the right to elect (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount

- 5 -

of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim.  The Unions may file with the Bankruptcy Court a notice identifying such election.

(b) Except as provided in Paragraphs (1), (2) and 3(a) of this Appendix, for any other event of termination under the Investment Term Sheet including the filing by Dana of a standalone reorganization plan, the Unions shall have the Unions' Claim (subject to the allocation described above at (3)(a)(i)), unless Dana, and if applicable, the plan proponent shall have notified the Unions that they have unconditionally and irrevocably waived the right to seek to modify retiree health benefits and have committed to continue all such benefits in force without modification to the satisfaction of the Unions.  The Unions shall also have the right, in their sole unreviewable discretion to (x) issue a Notice of Termination as described in Paragraph (1)(a)(i)(A) of this Appendix (which shall give rise to the right to strike), in which event, retiree health benefits shall remain in force until such time as they are terminated in accordance with a further order of the Court implementing the termination of benefits and setting forth the terms of distribution of the Unions' Claim; or (y) if no such notice is given (in which case this Settlement Agreement shall remain in effect), the Unions may elect: (I) the Unions' Claim (subject to the allocation described above at (3)(a)(i)) or (II) a cash payment of $764 million (subject to the allocation described above at (1)(a)(i) and further subject to the provisions reducing the amount of such payment contained in Appendix K hereto) in full settlement of the Unions' Claim, to be paid to the respective Union Retiree VEBA or as otherwise directed by the Unions in the event that their respective VEBA has not been established.  The Unions may file with the Bankruptcy Court a notice identifying such election.

(c) In the case of a dismissal of the Debtors' chapter 11 cases, then this Settlement Agreement will terminate, and the parties will return to the status that existed before the Section 1113/1114 Litigation and the execution of this Settlement Agreement.  In the case of a conversion of the Debtors' cases to Chapter 7, the Debtors will seek that any order of conversion shall provide for an allowed administrative claim in the amount of $764 million for the payment of retiree health benefits (subject to the allocation described above at (1)(a)(i)).

4) For purposes of this Appendix, "Reorganization Metrics" shall mean Appendix I of this Settlement Agreement.

PII-1161286v3

**EXHIBIT W**

# DANA CORP

FORM
()

Filed 7/19/2007

| Address | 4500 DORR ST |
| | TOLEDO, Ohio 43615 |
| Telephone | 419-535-4500 |
| CIK | 0000026780 |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Onlines Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

---

**SCHEDULE 13D/A**
(Amendment No. 2)

**Under the Securities Exchange Act of 1934**

---

# DANA CORPORATION
(Name of Issuer)

**Common Stock, $1.00 Par Value Per Share**
(Title of Class of Securities)

235811106
(CUSIP Number)

---

with copies to:

Ken Maiman
Appaloosa Management L.P.
26 Main Street
Chatham, NJ 07928
(Name, Address and Telephone Number of Person
Authorized to Receive Notices of Communication)

July 18, 2007
(Date of Event Which Requires Filing of This Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition which is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), 13d-1(f) or 13d-1(g), check the following box. [ ]

---

Page 1 of 9

CUSIP No. 235811106                    13D

```
----- --------------------------------------------------------------------------
 1    NAME OF REPORTING PERSONS
      Appaloosa Investment Limited Partnership I
      S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS
----- --------------------------------------------------------------------------
 2    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP              (a) [ ]
                                                                   (b) [ ]
----- --------------------------------------------------------------------------
 3    SEC USE ONLY
----- --------------------------------------------------------------------------
 4    SOURCE OF FUNDS
      OO
----- --------------------------------------------------------------------------
 5    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT
      TO ITEM 2(d) OR 2(e)                                              [ ]
----- --------------------------------------------------------------------------
 6    CITIZENSHIP OR PLACE OF ORGANIZATION
      Delaware
-------------------- ------- -----------------------------------------------------
NUMBER OF             7       SOLE VOTING POWER
SHARES                       0
BENEFICIALLY         ------- -----------------------------------------------------
OWNED BY             8       SHARED VOTING POWER
EACH REPORTING               11,992,500
PERSON WITH         ------- -----------------------------------------------------
                     9       SOLE DISPOSITIVE POWER
                             0
                    ------- -----------------------------------------------------
                     10      SHARED DISPOSITIVE POWER
                             11,992,500
--------------------------------------------------------------------------------
 11   AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
      11,992,500
----- --------------------------------------------------------------------------
 12   CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES
      CERTAIN SHARES                                                    [ ]
----- --------------------------------------------------------------------------
 13   PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
      7.98%
----- --------------------------------------------------------------------------
 14   TYPE OF REPORTING PERSON
      PN
----- --------------------------------------------------------------------------
```

CUSIP No. 235811106                    13D
-------------------                              -------------------

----- --------------------------------------------------------------------
1     NAME OF REPORTING PERSONS
      Palomino Fund Ltd.
      S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS
----- --------------------------------------------------------------------
2     CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP          (a) [ ]
                                                                (b) [ ]
----- --------------------------------------------------------------------
3     SEC USE ONLY
----- --------------------------------------------------------------------
4     SOURCE OF FUNDS
      OO
----- --------------------------------------------------------------------
5     CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT
      TO ITEM 2(d) OR 2(e)                                          [ ]
----- --------------------------------------------------------------------
6     CITIZENSHIP OR PLACE OF ORGANIZATION
      British Virgin Islands
------------------- ------- ------------------------------------------------
NUMBER OF           7       SOLE VOTING POWER
SHARES                      0
BENEFICIALLY        ------- ------------------------------------------------
OWNED BY            8       SHARED VOTING POWER
EACH REPORTING             10,507,500
PERSON WITH         ------- ------------------------------------------------
                    9       SOLE DISPOSITIVE POWER
                           0
                    ------- ------------------------------------------------
                    10      SHARED DISPOSITIVE POWER
                           10,507,500
----- --------------------------------------------------------------------
11    AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
      10,507,500
----- --------------------------------------------------------------------
12    CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES
      CERTAIN SHARES                                                [ ]
----- --------------------------------------------------------------------
13    PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
      7.00%
----- --------------------------------------------------------------------
14    TYPE OF REPORTING PERSON
      CO
----- --------------------------------------------------------------------

                              Page 3 of 9

```
CUSIP No. 235811106                    13D
-------------------                                    -------------------

----- ------------------------------------------------------------------------
1     NAME OF REPORTING PERSONS
      Appaloosa Management L.P.
      S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS
----- ------------------------------------------------------------------------
2     CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP            (a) [ ]
                                                                  (b) [ ]
----- ------------------------------------------------------------------------
3     SEC USE ONLY
----- ------------------------------------------------------------------------
4     SOURCE OF FUNDS
      AF
----- ------------------------------------------------------------------------
5     CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO
      ITEM 2(d) OR 2(e)                                              [ ]
----- ------------------------------------------------------------------------
6     CITIZENSHIP OR PLACE OF ORGANIZATION
      Delaware
------------------- ------- --------------------------------------------------
NUMBER OF           7       SOLE VOTING POWER
SHARES                      0
BENEFICIALLY        ------- --------------------------------------------------
OWNED BY            8       SHARED VOTING POWER
EACH REPORTING             22,500,000
PERSON WITH         ------- --------------------------------------------------
                    9       SOLE DISPOSITIVE POWER
                           0
                    ------- --------------------------------------------------
                    10      SHARED DISPOSITIVE POWER
                           22,500,000
------------------- ------- --------------------------------------------------
11    AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
      22,500,000
----- ------------------------------------------------------------------------
12    CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES
      CERTAIN SHARES                                               [ ]
----- ------------------------------------------------------------------------
13    PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
      14.98%
----- ------------------------------------------------------------------------
14    TYPE OF REPORTING PERSON
      PN
----- ------------------------------------------------------------------------
```

```
CUSIP No. 235811106                    13D
-------------------                                    -------------------

----- -----------------------------------------------------------------------
1      NAME OF REPORTING PERSONS
       Appaloosa Partners Inc.
       S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS
----- -----------------------------------------------------------------------
2      CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP              (a) [ ]
                                                                    (b) [ ]
----- -----------------------------------------------------------------------
3      SEC USE ONLY
----- -----------------------------------------------------------------------
4      SOURCE OF FUNDS
       AF
----- -----------------------------------------------------------------------
5      CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO
       ITEM 2(d) OR 2(e)                                                [ ]
----- -----------------------------------------------------------------------
6      CITIZENSHIP OR PLACE OF ORGANIZATION
       Delaware
------------------- ------- -------------------------------------------------
NUMBER OF            7      SOLE VOTING POWER
SHARES                     0
BENEFICIALLY        ------- -------------------------------------------------
OWNED BY            8      SHARED VOTING POWER
EACH REPORTING             22,500,000
PERSON WITH         ------- -------------------------------------------------
                    9      SOLE DISPOSITIVE POWER
                           0
                    ------- -------------------------------------------------
                    10     SHARED DISPOSITIVE POWER
                           22,500,000
------------------- ------- -------------------------------------------------
11     AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
       22,500,000
----- -----------------------------------------------------------------------
12     CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES
       CERTAIN SHARES                                                  [ ]
----- -----------------------------------------------------------------------
13     PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
       14.98%
----- -----------------------------------------------------------------------
14     TYPE OF REPORTING PERSON
       CO
----- -----------------------------------------------------------------------
```

```
CUSIP No. 235811106                    13D
-------------------                              -------------------

----- --------------------------------------------------------------------
1     NAME OF REPORTING PERSONS
      David A. Tepper
      S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS
----- --------------------------------------------------------------------
2     CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP            (a) [ ]
                                                                 (b) [ ]
----- --------------------------------------------------------------------
3     SEC USE ONLY
----- --------------------------------------------------------------------
4     SOURCE OF FUNDS
      AF
----- --------------------------------------------------------------------
5     CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO
      ITEM 2(d) OR 2(e)                                              [ ]
----- --------------------------------------------------------------------
6     CITIZENSHIP OR PLACE OF ORGANIZATION
      United States of America
------------------- ------- ------------------------------------------------
NUMBER OF           7       SOLE VOTING POWER
SHARES                      0
BENEFICIALLY        ------- ------------------------------------------------
OWNED BY            8       SHARED VOTING POWER
EACH REPORTING             22,500,000
PERSON WITH         ------- ------------------------------------------------
                    9       SOLE DISPOSITIVE POWER
                           0
                    ------- ------------------------------------------------
                    10      SHARED DISPOSITIVE POWER
                           22,500,000
-------------------------------------------------------------------------
11    AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
      22,500,000
----- --------------------------------------------------------------------
12    CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES
      CERTAIN SHARES                                                 [ ]
----- --------------------------------------------------------------------
13    PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
      14.98%
----- --------------------------------------------------------------------
14    TYPE OF REPORTING PERSON
      IN
----- --------------------------------------------------------------------
```

This Amendment No. 2 (this "Amendment") to the Schedule 13D filed on June 25, 2007 by the Reporting Persons, as amended by Amendment No. 1 thereto filed on June 29, 2007 (as so amended, the "Schedule 13D") relates to the Common Stock of the Issuer and is being filed to amend the Schedule 13D as specifically set forth below.

The information set forth in the Exhibits to this Amendment is hereby expressly incorporated herein by reference, and the responses to each item of this Amendment are qualified in their entirety by the provisions of such Exhibits. Unless otherwise indicated, all capitalized terms shall have the meanings ascribed to them in the Schedule 13D, and unless otherwise amended hereby, all information previously filed remains in effect.

**ITEM 4. IS AMENDED BY ADDING THE FOLLOWING:**

Yesterday evening, AMLP sent a letter to the Board asking that the Board reconsider the Issuer's current restructuring strategy and abandon its pursuit of the proposed transaction with Centerbridge Capital Partners, L.P. ("Centerbridge"), which is described in the Issuer's current report on Form 8-K filed on July 5, 2007 (the "Proposed Centerbridge Transaction"). As described in the letter, AMLP has made a fully committed offer to replace Centerbridge on terms superior to the terms of the Proposed Centerbridge Transaction. Notably, AMLP's offer to replace Centerbridge is not subject to a due diligence condition, despite the fact that the Issuer has not provided AMLP with the opportunity to conduct any due diligence regarding the Issuer. AMLP has also delivered with its letter to the Board a term sheet for an alternative restructuring proposal, which AMLP believes will be materially more favorable to stakeholders than the plan of reorganization proposed under the Proposed Centerbridge Transaction. The foregoing summary of AMLP's July 18th letter to the Board is qualified in its entirety by reference to the July 18th letter, a copy of which is filed with this Amendment No. 2 as Exhibit 3 to the Schedule 13D.

While the Reporting Persons do not have any current plans or proposals, except as otherwise described in this Statement, which relate to or would result in any transaction, event or action enumerated in paragraphs (a) through (j) of Item 4 of the form of Schedule 13D promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), each of the Reporting Persons reserves the right, in light of its or his ongoing evaluation of the Issuer's financial condition, business, operations and prospects, the market price of the Common Stock, conditions in the securities markets generally, general economic and industry conditions, its or his business objectives and other relevant factors, to change its or his plans and intentions at any time, as it or he deems appropriate. In particular, and without limiting the generality of the foregoing, but subject to the terms of applicable court orders, restrictions and agreements and to any limitations imposed by applicable law, including the Exchange Act, each of the Reporting Persons (and their respective affiliates) may (i) purchase additional shares of Common Stock or other securities of or claims against the Issuer, (ii) sell or transfer shares of Common Stock or other securities or claims beneficially owned by it or him from time to time in public or private transactions and (iii) cause any of the Reporting Persons to distribute in kind to their respective stockholders, partners or members, as the case may be, shares of Common Stock or other securities or claims owned by such Reporting Persons. The Reporting Persons may seek the views of, hold discussions with, or respond to inquiries from members of the Issuer's management or Board of Directors or other persons including other stockholders, or holders of

Page 7 of 9

claims in the Issuer's bankruptcy proceedings, regarding the Issuer's affairs, restructuring or other strategic matters.

Case 1:07-cv-07942-LAK    Document 8-6    Filed 11/08/2007    Page 538 of 594

**ITEM 7. MATERIAL TO BE FILED AS EXHIBITS**

**Item 7 of the Schedule 13D is supplemented as follows:**

```
EXHIBIT NO.   DESCRIPTION
-----------   --------------------------------------------------------------
     3        Letter sent by Appaloosa Management L.P. to the Members of the
              Board of Directors of Dana Corporation, dated July 18, 2007,
              together with attachment thereto.
```

Page 8 of 9

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: July 19, 2007

**APPALOOSA INVESTMENT LIMITED
PARTNERSHIP I**

By: APPALOOSA MANAGEMENT L.P.,
Its General Partner

By: APPALOOSA PARTNERS INC.,
Its General Partner

```
By: /s/ David A. Tepper
    --------------------------
Name:  David A. Tepper
Title: President
```

**PALOMINO FUND LTD.**

By: APPALOOSA MANAGEMENT L.P.,
Its Investment Adviser

By: APPALOOSA PARTNERS INC.,
Its General Partner

```
By: /s/ David A. Tepper
    --------------------------
Name:  David A. Tepper
Title: President
```

**APPALOOSA MANAGEMENT L.P.**

By: APPALOOSA PARTNERS INC.,
Its General Partner

```
By: /s/ David A. Tepper
    --------------------------
Name:  David A. Tepper
Title: President
```

**APPALOOSA PARTNERS INC.**

```
By: /s/ David A. Tepper
    --------------------------
Name:  David A. Tepper
Title: President
```

```
/s/ David A. Tepper
------------------------------
David A. Tepper
```

Page 9 of 9

26 Main Street
Chatham, NJ 07928

July 18, 2007

**TO: THE BOARD OF DIRECTORS OF DANA CORPORATION**
4500 Dorr Street
Toledo, Ohio 43615

Ladies and Gentlemen:

The efforts of management and its advisors to pursue a plan sponsored by Centerbridge Capital Partners, L.P. ("Centerbridge") have been fundamentally flawed and, if continued, will yield far less than the maximum recoveries available to stakeholders. It is the fiduciary responsibility of the Board to ensure that management and its advisors pursue strategies designed to maximize the value of the Debtors' estates for the benefit of all stakeholders. The Board has failed in this regard.

As an initial matter, management and its advisors continue to resist our efforts to obtain legitimately from the Company customary access to information needed to support a plan-sponsorship proposal, which proposal we believe may pay creditors in full and provide a return to current shareholders. To date, management has conditioned our access to information upon us agreeing to give up inherent rights of a stakeholder, including our right to make a proposal without management's prior approval, and has ceded to Centerbridge material decision making authority regarding the terms of access to information. The efforts of management and its advisors in concert with Centerbridge to exclude interested investors from the process will inevitably ensure that no alternative competitive proposals ever materialize.

Furthermore, the Company's proposed transaction with Centerbridge and the Unions
(a) shifts significant estate decision-making authority to non-fiduciaries (the unions and their financial advisor), (b) shifts material estate value to a third party, without the benefit of a meaningful competitive bidding process, (c) provides substantial value and benefits to management, and (d) is structured to effectively preclude competing proposals.

To demonstrate the absurd and one-sided nature of the Centerbridge proposal, we are prepared, and do hereby unconditionally commit, despite not being permitted to conduct any due diligence, to fund and perform Centerbridge's obligations as set forth in the "Terms of Centerbridge Investment," attached as Exhibit B to Plan Support Agreement, filed as an exhibit to the Company's Form 8K, dated July 5, 2007, in exchange for the consideration to be provided to Centerbridge thereunder, with the following improvements in favor of the Company: (1) we agree to eliminate and waive any break-up fee; (2) we will enhance the Conversion Price from .83 times Distributable Market Equity Value Per Share to .90 times Distributable Market Equity Value per share (each term as defined in the Terms of Centerbridge Investment); and (3) we will agree to the elimination of barriers to the submission of competing proposals. We can make this commitment with its enhancements over the Centerbridge proposal without the benefit of any

due diligence, because the Centerbridge transaction is essentially risk free to Centerbridge. The conversion price—rather than being fixed on the basis of a set enterprise value, which would permit stakeholders to assess the value of their recovery, is instead set after-the-fact at a 17% discount to actual trading value. In other words, given Centerbridge's guaranteed senior position in the capital structure, they are assured of being "in the money" regardless of

(a) the Company's condition when it emerges from chapter 11 protection, or (b) the total amount of allowed claims entitled to distributions under a plan of reorganization. We believe this construct provides Centerbridge and its co-investors with a risk free return of several hundred million dollars on their investment at the expense of your stakeholders.

Notwithstanding our full commitment to pursue an alternative to the Centerbridge transaction as outlined above, we believe that the structure of the Centerbridge transaction, even as improved by us, remains fundamentally unfair to existing stakeholders. As a consequence, based on our understanding of the Company and its finances as set forth in publicly available information, and subject to our and our financial advisors' (The Blackstone Group) satisfaction with confirmatory due diligence (which we believe can be completed promptly with the Company's support and cooperation), and the negotiation and preparation of customary definitive documents, we are prepared to fund the Company's chapter 11 exit on the terms set forth on the attached plan term sheet. This proposal is materially superior to the Centerbridge proposal because, among other things, it:

(1) Aligns our interests as plan investors in the future success of the Company with those of the other stakeholders;

(2) Appropriately values the Company allowing creditors to receive a full recovery on their claims and provides a meaningful return to shareholders;

(3) Properly allocates the role of the Company's stakeholders in the selection of a new board of directors and the Company's post-exit governance; and

(4) Ensures that management will be accountable to stakeholders on a going-forward basis

Furthermore, while our proposal contemplates the full incorporation of the economic terms of the Company's proposed settlement with its Unions, we are also willing to pursue a transaction that does not require the incorporation of the Union settlement, thereby permitting the Company to exercise fully its fiduciary duty to pursue value maximizing transactions.

We implore you to review and reconsider the Company's current restructuring strategy. The consequences of continued pursuit of this strategy will be unfortunate. To protect their legitimate interests (that are being ignored by the Company), stakeholders will be compelled to pursue remedies that are by definition less efficient and more expensive than a proper resolution of this chapter 11 case (but nonetheless more favorable than the outcome put forth by the Company). At a minimum, the plan process will be hotly contested until its conclusion (and perhaps beyond). In addition, parties may determine to pursue other available stakeholder remedies.

We believe that the situation requires your immediate attention and consideration. We are available to meet with the Board and its representatives at your earliest convenience to discuss more fully the matters set forth herein and to work toward an amicable, appropriate conclusion to Dana's chapter 11 case.

Sincerely,

**APPALOOSA MANAGEMENT L.P.**

_____

David Tepper
President

3

**FOR DISCUSSION PURPOSES ONLY**

**TERM SHEET FOR**
**PLAN OF REORGANIZATION FOR DANA CORPORATION**

Set forth below is a summary of indicative terms for a potential investment in Dana Corporation by entities or funds controlled by Appaloosa Management L.P. The investment is being made in connection with a Plan of Reorganization of Dana Corporation under chapter 11 of the Bankruptcy Code. The terms set forth below are intended solely to provide a framework for the parties as they proceed with discussions of the proposed transaction and do not constitute any agreement with respect to the definitive terms for any transaction or any agreement to agree or any solicitation of acceptances or rejections of any plan of reorganization. While the parties expect to negotiate in good faith with respect to the terms for a transaction, any party shall be free to discontinue discussions and negotiations at any time for any reason or no reason. No party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.

| | |
|---|---|
| New Equity Investment | On the Effective Date, subject to participation rights of existing stakeholders as more fully set forth herein, Appaloosa Management LP ("AMLP") will fully commit up to $750 million of equity financing, consisting of (i) $300 million of Series A Preferred Stock, (ii) $100 million of Series B Preferred Stock, (iii) up to $100 million of Series B Preferred Stock not otherwise subscribed to in the Preferred Stock Rights Offering, and (iv) up to $250 million of New Common Stock not otherwise subscribed to in the Common Stock Rights Offering (collectively, the "Investment"). |
| New Debt Financing | On the Effective Date, the Company shall (i) obtain a Senior Secured Facility in the amount of $1.5 billion, and (ii) issue Unsecured Notes in an amount to be determined (together, the "Exit Facility").  The Exit Facility shall be with parties and on market terms reasonably acceptable to AMLP.  Proceeds of the Exit Facility shall be used to, among other things, repay the DIP Facility, fund obligations under the Plan, including partial cash distributions to unsecured creditors, and fund business operations. |
| Treatment of Secured and Priority Claims | Secured and Priority Claims will be reinstated or satisfied in full in cash on the Effective Date. |

4

| | |
|---|---|
| Treatment of Unsecured Claims | Unsecured Creditors shall receive, on account of their Allowed Claims, (i) New Common Stock, (ii) Excess Cash, and (iii) the right to purchase their pro rata share of $100 million of Series B Preferred Stock (the "Preferred Stock Rights Offering").  Excess Cash shall mean the (i) sum of the proceeds of the Exit Facility plus cash on hand on the Effective Date, less (ii) (a) amounts necessary to pay, or reserve for payment of, all Allowed Administrative, Secured and Priority Claims, and (b) amounts necessary to fund business operations.  It is anticipated that distributions to Unsecured Creditors will have a value equal to the full amount of their Allowed Claims plus interest accrued from the Petition Date at the applicable non-default rate ("Payment in Full"). |
| Treatment of Equity Holders | Equity Holders shall receive the right to purchase (the "Common Stock Rights Offering") their pro rata share, based upon $250 million of proceeds, of New Common Stock at an exercise price equal to .85 times Plan Value (the "Exercise Price").  Plan Value shall mean the price per share that when combined with Excess Cash results in Payment in Full of Unsecured Creditors. |
| Preferred Stock Right Offering Backstop Commitment | AMLP shall commit to purchase at face value all Series Preferred B Stock offered in but not issued pursuant to the Preferred Stock Rights Offering. |
| Common Stock Rights Offering Backstop Commitment | AMLP shall commit to purchase at the Exercise Price all New Common Stock offered in but not issued pursuant to the Common Stock Rights Offering. |

| | |
|---|---|
| Preferred Stock Terms | ment of the Series A Preferred Stock and the Series B Preferred Stock (collectively, the "Preferred Stock") shall have identical terms except that Series A Preferred Stock shall have certain voting and governance rights.  Subject to additional terms and conditions to be set forth in the Definitive Agreements, (a) holders of Preferred Stock shall be entitled to receive a dividend at the annual rate of 4.0% of the liquidation preference thereof, which if unpaid, shall accrue, and (b) each share of Preferred Stock shall be convertible, without any payment by the holder thereof, into a number of shares of New Common Stock equal to (i) the liquidation preference divided by (ii) .85 times Plan Value. AMLP shall be prohibited from receiving, in exchange for the exercise or non-exercise of voting rights, any compensation or renumeration. |
| Direct Investment | AMLP shall have the option to purchase up to $25 million of New Common Stock at the Exercise Price in addition to any shares of New Common Stock acquired pursuant to the Common Stock Rights Offering or Common Stock Rights Offering Backstop Commitment. |
| Governance | Reorganized Dana Corporation shall have balanced corporate governance pursuant to terms to be agreed upon between AMLP and the Official Committee of Unsecured Creditors. |
| Registration Rights | Registration Rights shall be customary for a transaction of this type. |
| Transaction Fees | AMLP shall be entitled to payment of commitment, backstop and other fees customarily payable in connection with a transaction of this type and magnitude. |
| Break-Up Fees | AMLP shall be entitled to customary break-up fees payable in connection with an at-risk transaction. |

| | |
|---|---|
| Expense Reimbursement | AMLP shall be entitled to reimbursement of all reasonably incurred out of pocket costs and expenses incurred in connection with pursuing the Investment. |
| Definitive Agreements | All obligations shall be subject to mutually agreeable definitive agreements with customary conditions, representations and warranties, covenants and defaults. |
| Additional Investors | It is anticipated, but not a condition, that AMLP will arrange for additional investors to participate in the Investment. Such additional investors shall be subject to the consent of the Company, such consent not to be unreasonably withheld. |
| Governing Law | New York |

7

**EXHIBIT X**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Tel:  (212) 819-8200
J. Christopher Shore (JS-3061)
Gerard Uzzi (GU-2297)

Wachovia Financial Center
Suite 4900
200 South Biscayne Blvd.
Miami, Florida 33131
Tel:  (305) 371-2700
Thomas E Lauria (*pro hac vice* pending)
Richard S. Kebrdle (*pro hac vice* pending)

Attorneys for Appaloosa Management L.P.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                    :    Chapter 11
In re                               :
                                    :    Case No. 06-10354 (BRL)
Dana Corporation, et al.,           :
                                    :
                    Debtors.        :    (Jointly Administered)
                                    :
------------------------------------------------------------x
```

**PRELIMINARY OBJECTION OF APPALOOSA MANAGEMENT L.P. TO
MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF AN
ORDER (A) APPROVING SETTLEMENT AGREEMENTS WITH THE UNITED
STEELWORKERS AND UNITED AUTOWORKERS, PURSUANT TO 11 U.S.C. §§ 1113
AND 1114(E) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019,
AND (B) AUTHORIZING THE DEBTORS TO ENTER INTO PLAN SUPPORT
AGREEMENT, INVESTMENT AGREEMENT AND RELATED AGREEMENTS,
<u>PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), 364(C)(1), 503 AND 507</u>**

TO:    THE HONORABLE BURTON R. LIFLAND,
        UNITED STATES BANKRUPTCY JUDGE:

Appaloosa Management L.P. ("Appaloosa") files this objection (the "Objection") to the

motion (the "Motion") of the above-captioned debtors and debtors in possession (the "Debtors")

for entry of an order (A) approving settlement agreements (the "Settlement Agreements") with United Steelworkers and United Autoworkers, pursuant to sections 1113 and 1114(e) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure, and (B) authorizing the Debtors to enter into a plan support agreement, the invest agreement and related agreements (collectively, the "Plan Support Agreement"), pursuant to sections 105(a), 363(b), 364(c)(1), 503 and 507 of the Bankruptcy Code.  In support of the Objection, Appaloosa respectfully represents as follows:

## OBJECTION

1.      Upon information and belief, Appaloosa is the largest single holder of common stock in Dana Corporation ("Dana") as well as a substantial holder of Dana's prepetition debt securities.  As such, and perhaps more than any other stakeholder, Appaloosa possesses a substantial interest in the outcome of the Motion.  The Motion, however, lacks sufficient information to permit any party in interest to form an appropriate view.  Notably, despite being styled as a motion to approve a "Plan Support Agreement," the Motion fails to provide sufficient information regarding the potential distributions to the Debtors' stakeholders under any chapter 11 plan satisfying the Plan Support Agreement.  In particular, the Plan Support Agreement contains no discussion of any potential distributions to the Debtors' equity holders. One (and perhaps the most probable) conclusion that can be drawn from this omission is that the Debtors intend to completely wipe out equity and provide no recovery for equity holders in their chapter 11 plan.

2.      For several weeks, Appaloosa has attempted to obtain consensually from the Debtors information necessary to determine the potential value available to equity holders in these chapter 11 cases.  In response, the Debtors have refused to disclose any confidential

information to Appaloosa unless Appaloosa agrees in advance to waive material rights.  For

example, one of the Debtors' demands is that Appaloosa waive its right to propose an alternative

chapter 11 plan even if Debtors' exclusivity were to terminate.

      3.    Given the above, Appaloosa objects to the Motion and the approval of the

Settlement Agreements and the authorization of the Plan Support Agreement.  Appaloosa

believes that these agreements are the product of a defective process conducted by the Debtors,

designed to be overly exclusive rather than inclusive.  As a consequence, the process has resulted

in the undervaluation of the Debtors' estates to the detriment of all stakeholders.  Indeed,

Appaloosa believes that equity holders are entitled to participate meaningfully in a plan of

reorganization and is considering submitting a proposal to the Debtors that would result in a

recovery for Dana's equity security holders.

      4.    Appaloosa reserves the right to supplement this Objection, including upon

completion of discovery.

MIAMI 730975 v3 (2K)

## <u>CONCLUSION</u>

5.       For the foregoing reasons, the Court should not approve the Settlement

Agreements and should not authorize the Plan Support Agreement, and award such other and

further relief as the Court deems appropriate.


Dated:   New York, New York
         July 9, 2007


                                                   /s/  Gerard Uzzi
                                        WHITE & CASE LLP
                                        1155 Avenue of the Americas
                                        New York, New York 10036-2787
                                        Tel:  (212) 819-8200
                                        J. Christopher Shore (JS-3061)
                                        Gerard Uzzi (GU-2297)

                                        Wachovia Financial Center
                                        Suite 4900
                                        200 South Biscayne Blvd.
                                        Miami, Florida 33131
                                        Tel:  (305) 371-2700
                                        Thomas E Lauria (*pro hac vice* pending)
                                        Richard S. Kebrdle (*pro hac vice* pending)

**EXHIBIT Y**

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ------------------------------X

5  In re:                    Chapter 11

6  DANA CORPORATION, et al.,

7                        Case No. 06-10354(BLR)

8                        (Jointly Administered)

9  ------------------------------X

10

11               CONFIDENTIAL

12       DEPOSITION OF JEFFREY H. ARONSON

13            New York, New York

14            July 20, 2007

15

16

17

18

19

20

21

22  Reported by:

   Bonnie Pruszynski, RMR

23  JOB NO. 12501

24

25

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2                              July 20, 2007

3                              8:10 a.m.

4

5

6              Confidential deposition of JEFFREY H.

7    ARONSON, held at KRAMER LEVIN NAFTALIS &

8    FRANKEL, LLP, 1177 Avenue of the Americas,

9    New York, New York, before Bonnie

10   Pruszynski, a Notary Public of the State of

11   New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1     CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
 2  A P P E A R A N C E S:
 3  KRAMER LEVIN NAFTALIS & FRANKEL, LLP
    Attorneys for Official Committee of Unsecured
 4  Creditors
 5          1177 Avenue of the Americas
            New York, New York 10036
 6  BY:     P. BRADLEY O'NEILL, ESQ.
 7  STROOCK STROOCK & LAVAN
    Attorneys for Ad Hoc Committee of Bondholders
 8          180 Maiden Lane
            New York, New York 10038
 9  BY:     KENNETH PASQUALE, ESQ.
10  JONES DAY
    Attorneys for Debtors and the Witness
11          222 East 41st Street
            New York, New York 10017-6702
12  BY:     STEVEN C. BENNETT, ESQ.
13  WHITE & CASE LLP
    Attorneys for Appaloosa Management
14          1155 Avenue of the Americas
            New York, New York 10036
15  BY:     MEGHAN MC CURDY, ESQ.
            CHRISTOPHER SHORE, ESQ.
16
17  WILLKIE FARR & GALLAGHER, LLP
    Attorneys for Centerbridge Capital Partners, LP
18          787 Seventh Avenue
            New York, New York 10019
19  BY:     MATTHEW FELDMAN, ESQ.
            BRIAN E. O'CONNOR, ESQ.
20  ARENT FOX LLP
    Attorneys for Wilmington Trust
21          1675 Broadway
            New York, New York 10019
22  BY:     MICHAEL S. CRYAN, ESQ.
23  SCHWARZWALD & MC NAIR, LLP
    Attorneys for the United Steelworkers
24          1300 East Ninth Street
            Cleveland, Ohio 44114
25  BY:     DAVID M. FUSCO, ESQ.
```

1      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2  APPEARANCES (Continued)

3  AKIN GUMP STRAUSS HAUER & FELD, LLP
   Attorneys for Avenue Capital management II, LP

4  Contrarian Capital Management, LLC, Deutsche Bank
   Securities, Inc. Hain Capital Group, LLC, JP

5  Morgan Securities Inc., Longacre Fund Management,
   LLC, Madison Capital Management, Siver Point

6  Capital, L.P.
            New York, New York

7           590 Madison Avenue
            New York, New York 10022

8  BY:      BRIAN GELDERT, ESQ. (appearing
            telephonically)

9

10

11 Also Present:  Leon Potok, Potok & Co., Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2       received last night some 11,000 additional

3       documents from the unions and we reserve our

4       right to continue this deposition in the

5       future, depending on what that information

6       shows.

7            MR. O'CONNOR:  I will just say we

8       obviously reserve our rights to oppose that.

9            MR. BENNETT:  Everyone is reserving

10      all right.

11           MR. O'NEILL:  You don't get to.

12      Q       What do you do for a living?

13      A       I am a managing principal of

14  Centerbridge Partners.

15      Q       What is Centerbridge Partners?

16      A       Centerbridge Partners is a private

17  investment firm, focusing on private equity

18  investments and investments in restructuring

19  companies.

20      Q       Does Centerbridge have any business

21  other than making investments?

22      A       That's our principal business.

23      Q       What other businesses do you have?

24      A       That's our business.

25      Q       Approximately how many, or how much

1     CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2 threshold.  So, we don't know how many creditors

3 are out there, we don't know who owns what.

4              So, if you set a claim threshold,

5 it's impossible -- if we went that route of

6 setting a claim threshold that creditors owning

7 north of X amount of claims can participate, in

8 that event we would not have a finite number.  It

9 is all very fluid.  Discussions are continuing

10 probably as we speak.

11     Q     I guess there would be a finite

12 number --

13     A     I just wouldn't know what it is.  We

14 would actually -- if we went that route.  We would

15 cross out you all this language.

16     Q     The definition of qualified creditors

17 also refers to other objective characteristics as

18 reasonably determine would by Centerbridge; is

19 that right?

20     A     Um-hum.

21     Q     I think you testified, that one of --

22 have you -- has Centerbridge established any

23 objective characteristics to be used in defining

24 the term "qualified creditors" under Exhibit 7?

25     A     We are still considering it.  We have

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1   not yet.  But I think that one would be, we would

2   want people who are in favor of the plan, that is

3   supportive of the company, supportive of our

4   efforts, supportive of the labor settlement.

5       Q       And the -- let me see if I -- when

6   you say supportive of the plan, do you mean

7   committed to vote in favor of the plan?

8       A       I don't think we have defined it with

9   any specificity yet.

10      Q       How would you objectively determine

11  whether people are supportive of your efforts?

12      A       I guess one way is asking them.

13      Q       And, so, are you seeking, are you

14  considering seeking representations from potential

15  qualified creditors?

16      A       Or have them sign a plan support

17  agreement, that is probably the best way to do it.

18      Q       Any objective characteristics, other

19  seeking signatures on a plan support agreement?

20      A       No, I think that would be it.

21      Q       What, in your mind, would the plan

22  support agreement that you described provide?

23      A       I know a plan support agreement can't

24  require people to vote or not vote because it's a

Page 137

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1

2 if that is a phrase, of the preferred in terms of

3 whether there are lots of sellers, lots of buyers.

4 I don't know what will happen.  You know, if there

5 are more sellers than buyers, the price is going

6 to go down.

7        Q      Well, let's leave aside the instance

8 in which you have exercised your right.

9             Could you express your views based

10 upon -- well, let me back up.

11             First of all, you agree with me,

12 don't you, that your Series A has a priority in

13 liquidation to the common?

14        A      As presently proposed and that is

15 under discussion now.

16        Q      And in that instance -- well, I am

17 only going to talk about the deal that is in front

18 of the court right now.

19             In that instance, can you explain the

20 circumstances under which Dana, having just

21 emerged from bankruptcy with a limitation on

22 indebtedness of $1.5 billion, does not have

23 sufficient assets to pay the 150 in Series A

24 preferred?  Can you describe the circumstance

25 under which that would happen?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A        At what point in time?

Q        In that first two-month period while you are restricted.

A        That is highly, highly unlikely.

Q        Can you describe any other risks, other than what you said, to that $150 million piece that you can sell within the first two months?

A        Other than valuation and liquidity, no.

Q        Let's talk about that, that 30-day VWAP.

Based upon your experience and trading, can you discern any patterns in what happens in the first 30 days of trading in a company emerging from bankruptcy?

A        I don't have a clue what's going to happen.

Q        And do you have a clue as to what effect the -- the tax election that the debtors make will have on the trading prices of the securities in the first 30 days?

A        That's a good question.  I don't know.

1      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2  whether or not the plan, which is outlined in the

3  plan support agreement, is confirmable?

4        A      Is confirmable?

5        Q      Yes.

6        A      We believe that it is, yes.

7        Q      And what is the basis for your

8  belief?

9        A      Based upon advice of counsel.

10       Q      And what, particularly, about the

11  your ability to obtain an accepting vote of the

12  general and unsecured class.  Do you have any

13  basis other than the two creditors you have talked

14  to who have said that they would support this

15  plan, absent a buy-in?

16              MR. O'CONNOR:  Objection to form.

17       A      You could you rephrase the question?

18  I don't follow it.

19       Q      Sure.  Specifically you said you

20  think this is plan is confirmable or believe so

21  based upon the advice of counsel; right?

22       A      Correct.

23       Q      And independent of the larger issue,

24  let's focus specifically on ability of the debtors

25  to obtain the requisite majorities in order to

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2  confirm the plan.

3       A       Got it.

4       Q       For the unsecured creditors, do you

5  do you have any belief at this point that you will

6  be able get the requisite majority?

7              MR. O'CONNOR:  Objection to form.

8       A       We have not gone out and taken a poll

9  as to who is going to vote yes and who is going to

10  vote no.

11              We have had a lot of phone calls from

12  a lot of creditors, including people on the ad hoc

13  committee, that that have told us they are in

14  favor of this plan, but still subject to more

15  negotiations.

16       Q       Okay.  But I guess my point is:  Is

17  the only two who have done so, who supported this

18  deal, who weren't being offered to buy in, were

19  Deutsche Bank and Mariner?

20              MR. O'CONNOR:  Objection to form.

21       A       You should be clear, because since

22  the plan says the B will be allocated objectively

23  and to a finite number of creditors, the people

24  who are calling -- and there are more than those

25  two people.  Those are the one that come to

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2 modify paragraph 11.

3         Q     Okay.

4         A     We said we are considering it.

5         Q     When was that?

6         A     In the past, past several days, past

7 few days.

8         Q     Who called you?

9         A     I heard this from my counsel.

10        Q     Okay.  What did you hear?

11        A     Just what I said.

12        Q     Did counsel explain who called?

13        A     Appaloosa.

14        Q     Sorry.  First of all, did counsel

15 explain who from the debtors called?

16        A     I think Jones Day, but I am not sure.

17        Q     As best you can recall, tell me that

18 conversation.

19              MR. O'CONNOR:  Which conversation?

20        Q     With your counsel, at least with

21 respect to the information relating to the Jones

22 day call.

23              MR. O'CONNOR:  You can tell him the

24        factual, if there was a factual statement

25        made as to what happened or who did what,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2    you can.

3        A    That the company wants to know if we

4  would modify this in light of Appaloosa's request

5  to sign a confidentiality agreement with the

6  company.

7        Q    Okay.  And how did they ask to you

8  modify it?

9        A    I don't recall the precise request,

10  but it was to the effect that Appaloosa would like

11  to sign a confi.  Appaloosa thinks that this confi

12  is too restrictive, I believe, in terms of their

13  ability to propose a plan.

14            And, consequently, wouldn't we

15  consider modifying it and, if so, under what

16  circumstances.  I think that was earlier this

17  week.

18        Q    Okay.  To be clear, you have not

19  delivered the consent to allow the company to

20  enter into such a confi?

21        A    I have actually given advice to

22  counsel as to my view.  I don't know whether that

23  counts.  That advice has been related to the

24  company, Matt, or no?

25        Q    Then I would ask you to confer with

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2        on it, you are not entitled to inquire what

3        our current view of it is.

4                MR. O'NEILL:  Why not?

5                MR. O'CONNOR:  Because it's not

6        appropriate.

7                MR. O'NEILL:  The privilege doesn't

8        protect your views.

9                MR. O'CONNOR:  You are confusing

10       privilege.

11               MR. O'NEILL:  Are you instructing him

12       not to answer on the basis of privilege?

13               MR. O'CONNOR:  One of the privileges

14       is the business strategy, the white knight

15       privilege and I am going to rely on that.

16               MR. O'NEILL:  The white knight

17       privilege?

18               MR. O'CONNOR:  Yes.  I don't know

19       what you are laughing about.

20   BY MR. SHORE:

21           Q       Just so we are clear here, right now

22   you do not consent to Appaloosa obtaining

23   information from the company to the extent that

24   the restrictions of paragraph seven are eased in

25   any respect?

Page 154

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1

2          MR. O'CONNOR:  Read that back,

3      please.

4              (Record read.)

5          MR. O'NEILL:  You can answer.

6      A      I said we are considering it.

7              My view will be, because I have

8  discussed it with counsel, if we can come up with

9  something that is reasonable and that works for

10  the debtor, we would amend it.

11      Q      And, to be clear, the conversation

12  where this issue was first raised occurred last

13  week?

14      A      This week.

15      Q      This week.

16              And when this week?

17      A      I don't remember the day.

18      Q      With you involved at all in the

19  negotiation of Aronson number 10?

20      A      It was handled by counsel.

21      Q      Were you involved in any respect?

22      A      Not really.  I mean, a

23  confidentiality agreement, I usually let counsel

24  handle it.

25      Q      Do you recall any discussions

**EXHIBIT Z**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


In re                          Chapter 11

Dana Corporation, et al,       Case 06-10354(BRL)

                Debtors,

_____/


PAGE 1 TO 168


    The Deposition of WENDY FIELDS-JACOBS,

    Taken at 2501 Worldgateway Place,

    Romulus, Michigan,

    Commencing at 2:30 p.m.,

    Thursday, July 19, 2007,

    Before Laurel A. Frogner, RMR, CRR, CSR-2495

c212aa02-3d82-4388-8698-087dca27c426

Page 2

1    APPEARANCES:

2    MS. CHRISTINE JENNINGS (Via Phone)

3    Jones Day

4    222 East 41st Street

5    New York, New York  10017

6    212.326.3732

7         Appearing on behalf of the Debtors

8

9    MR. CHRISTOPHER J. BATTAGLIA

10   Halperin Battaglia Raicht, LLP

11   555 Madison Avenue - 9th Floor

12   New York, New York  10022

13   212.765.9100

14        Appearing on behalf of the Creditors Committee

15

16   MR. MELVIN A. BROSTERMAN and

17   MR. SAYAN BHATTACHARYYA

18   Stroock & Stroock & Lavan LLP

19   180 Maiden Lane

20   New York, New York  10038

21   212.806.5400

22        Appearing on behalf of the Ad Hoc Committee

23        of Dana Noteholders

24

25

Page 3

1    APPEARANCES (Continued):

2    MR. LOWELL PETERSON

3    Meyer, Suozzi, English & Klein, P.C.

4    1350 Broadway, Suite 501

5    New York, New York  10018

6    212.239.4999

7         Appearing on behalf of UAW

8

9    MR. NIRAJ R. GANATRA

10   Associate General Counsel

11   8000 East Jefferson

12   Detroit, Michigan  48214

13   313.926.5216

14        Appearing on behalf of UAW

15

16   MR. DOUGLAS L. GREENFIELD

17   Bredhoff & Kaiser, PLLC

18   805 Fifteenth Street, N.W.

19   Washington, D.C.  20005

20   202.842.2600

21        Appearing on behalf of USW

22

23   MR. DAVID JURY (Via Phone)

24   Associate General Counsel

25        Appearing on behalf of USW

c212aa02-3d82-4388-8698-087dca27c426

Page 4

1    APPEARANCES (Continued):

2    MS. CONSTANTINA APRILAKIS (Via Phone)

3    Willkie Farr & Gallagher, LLP

4    787 Seventh Avenue

5    New York, New York  10019

6    212.728.8631

7         Appearing on behalf of Centerbridge Capital

8         Partners

9

10   MR. BRIAN D. GELDERT (Via Phone)

11   Akin Gump Strauss Hauer & Feld LLP

12   590 Madison Avenue

13   New York, New York  10022

14   212.872.8036

15        Appearing on behalf of Avenue Capital, et al

16

17   MR. RUSSELL JOHNSTON (Via Phone)

18   White & Case LLP

19   1155 Avenue of the Americas

20   New York, New York  10036

21   212.819.2565

22        Appearing on behalf of Appaloosa Management

23

24

25

c212aa02-3d82-4388-8698-087dca27c426

Page 5

1    APPEARANCES (Continued):

2    MS. MARY JOANNE DOWD (Via Phone)

3    Arent Fox

4    1050 Connecticut Avenue, N.W.

5    Washington, D.C.  20036

6    202.857.6059

7         Appearing on behalf of Wilmington Trust

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

c212aa02-3d82-4388-8698-087dca27c426

1                    WENDY FIELDS-JACOBS,

2      having first been duly sworn, was examined and

3      testified on her oath as follows:

4      EXAMINATION BY MR. BROSTERMAN:

5           Q.     Good afternoon.

6           A.     Hello.

7           DEPOSITION FIELDS-JACOBS EXHIBIT NUMBER 1, MOTION

8      OF DEBTORS

9           WAS MARKED BY THE REPORTER

10          FOR IDENTIFICATION

11     BY MR. BROSTERMAN:

12          Q.     I've marked as, I guess we marked it as

13     Fields-Jacobs Exhibit Number 1, the Motion of Debtors,

14     and I'll abbreviate, I'll shrink it down, entry of an

15     order approving settlement agreements with the USW and

16     UAW along with the exhibits to that motion.  So if

17     you'll just give that to the witness, please.  Do you

18     have a copy of that for your own use?

19                    MR. PETERSON:  I don't.  Well, if

20     you have an extra one.

21                    MR. BROSTERMAN:  Sure.

22     BY MR. BROSTERMAN:

23          Q.     Miss Fields-Jacobs, with whom are you

24     employed?

25          A.     United Auto Workers International Union.

c212aa02-3d82-4388-8698-087dca27c426

1          Q.     And what do you do for -- can I call them

2     UAW?

3          A.     Yes, you can.

4          Q.     And what do you do at the UAW?

5          A.     I am top administrative assistant for

6     vice-president Bob King.

7                      MS. JENNINGS:  Could I interrupt for

8     a second.  Wendy, you're not close enough to the phone.

9     We're having a hard time hearing.

10                     MR. PETERSON:  All right.  We've

11     moved the UFO.  Hopefully it'll work.

12                     THE WITNESS:  I'm an administrative

13     assistant for vice-president Bob King, and we have

14     responsibility for the independent part sector,

15     competitive shop, and the Ford Department.

16     BY MR. BROSTERMAN:

17          Q.     And did you say the vice-president is

18     Mr. King, Bob King?

19          A.     Yep.

20          Q.     And what does he do at the UAW?

21          A.     Bob is an elected vice-president and the

22     director, so it's his responsibility for negotiations

23     over the independent part sector, which is what -- the

24     supplier sector, which is what Dana falls within, and

25     he has the responsibility for the Ford Department,

c212aa02-3d82-4388-8698-087dca27c426

1  National Ford Department, so that's Ford bargaining and

2  organizing.

3       Q.    Sorry.  And as administrative assistant,

4  your responsibilities include what?

5       A.    Assisting him in those responsibilities, so

6  I, technically I'm -- I guess in your world I would be

7  his assistant.

8       Q.    Okay.

9       A.    So I negotiate agreements, I oversee staff,

10  whatever he needs, I'm responsible for his key

11  assignments.

12       Q.    And for how long have you had that position?

13       A.    With Vice-President King for about eight

14  years, a little over eight years.

15       Q.    And for eight years have you been involved

16  in the negotiation of agreements?

17       A.    That is correct.

18       Q.    Are the types of agreements --

19       A.    Supplier agreements, very similar supplier

20  agreements to Dana, and I am the assigned person over

21  the Dana -- I have lead responsibility for the Dana

22  assignment.

23       Q.    And for how long have you had

24  responsibility -- let me finish, okay.

25       A.    Yeah.

c212aa02-3d82-4388-8698-087dca27c426

1          MR. PETERSON:  You said other than

2     Dana.

3          THE WITNESS:  He did, he said other

4     than Dana, and I said the only thing I know about is

5     Dana.

6     BY MR. BROSTERMAN:

7          Q.    Right, okay.

8          A.    That's all I can speak to.

9          Q.    What's the compensation arrangement that

10    Centerbridge has with UAW in relation to Dana?  And I'm

11    not talking about its role in the Investment Term Sheet

12    or the Plan Support Agreement, I mean the work that it

13    did as an advisor.

14          MR. PETERSON:  Hold it a second,

15    please.

16          THE WITNESS:  There wasn't any.

17    BY MR. BROSTERMAN:

18          Q.    They don't get compensated?

19          A.    No, they don't.

20          Q.    And did Centerbridge ever tell you why

21    it wasn't -- did it ever ask for compensation?

22          A.    No, they did not.

23          Q.    For how long did Centerbridge work for

24    the UAW --

25          A.    They advised us.

c212aa02-3d82-4388-8698-087dca27c426

1    A.    Right, February.

2    Q.    Okay, by the UAW?

3    A.    That is correct.

4    Q.    And so what I'm asking you is when

5    Centerbridge became the UAW's advisor in relation to

6    Dana, did it at roughly the same time become the USW's

7    advisor in relation to Dana, or was it talking to the

8    UAW for a period of time before it started talking to

9    the USW?

10            MR. PETERSON:  If she knows.

11            THE WITNESS:  What I said was we

12    knew, for us, okay, UAW is the only organization I can

13    speak for, had a past history, right, with

14    Centerbridge, with Gurski.

15    BY MR. BROSTERMAN:

16    Q.    Right.

17    A.    We obviously have an interest in the Dana

18    discussion with another union.

19    Q.    Right.

20    A.    Right?  We started talking to Centerbridge

21    folks, we brought them in as our advisor in February.

22    Prior to that I did not have any discussions with

23    anybody about Centerbridge, about Dana.

24    Q.    Okay.  Now, was there any discussion with

25    Centerbridge as to why they were going to work free?

c212aa02-3d82-4388-8698-087dca27c426

1      A.     Again, when you -- first in this process we
2  don't have a lot of -- I don't know that you understand
3  this, but it's not like we -- we have -- we don't have
4  a lot of money to be going out getting advisors, so
5  they knew, they decided to work for us much -- I won't
6  make the analogy because -- I won't do it, but they
7  said they'd advise us.
8      Q.     Did they say -- did anybody ask them words
9  in substance, "What's in it for you guys?  We're not
10 going to pay you."
11     A.     No, I didn't have that conversation.
12     Q.     Well, did you learn from any source why they
13 were doing this without getting paid?
14     A.     Having an analyst, having advisors, it helps
15 them, helping union members have the say in a process
16 that is stacked against them is a good thing.  Is there
17 some conspiracy theory?  No.  No, I wouldn't, and for
18 us, for the union having someone who's not just looking
19 for money but gave a darn about the industry is a good
20 thing.
21     Q.     I understand why it's a good thing for the
22 union.  Why is it a good thing for --
23     A.     Not everybody works for money.
24     Q.     Okay.  Centerbridge is not a charitable
25 organization, right?

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

c212aa02-3d82-4388-8698-087dca27c426

1        A.      Right.

2        Q.      They're a -- really a hedge fund, investment

3    partnership to try to make money for their investors,

4    right?

5        A.      I would assume that's what they do, and some

6    attorneys do -- what do y'all call that, pro bono work.

7    Some charge high and some go down and do some poverty

8    work and do pro bono work, too, so maybe that's what it

9    is.

10        Q.      So saying they were doing this on a pro bono

11    basis?

12        A.      We secured them as our advisors with no

13    money.  We had no -- no money.

14        Q.      Well, did they ever tell you or suggest to

15    you why they were prepared to devote their time and

16    energies to assist you if they weren't going to get

17    paid?

18        A.      There was no conversation with us about, and

19    there was no conversation about why they were doing

20    this.  We said we needed advice, we said we're looking

21    for an advisor to help us move through this process,

22    give us some advice and give us some vision into the

23    industry.  No one knew how much time that was going to

24    be.  We sort of went into this process looking to arm

25    our members, looking to have some information, period.

c212aa02-3d82-4388-8698-087dca27c426

1  agreement based on the fact that we thought this

2  company had a shot with Centerbridge in the game, we

3  should have a say, that we should have a say in that,

4  and that as I testified, as I said before, business

5  decisions, viability is important, and we want -- and

6  we needed -- we were clear we want -- on behalf of our

7  members we needed that said.

8      Q.    How did Centerbridge feel about this

9  provision in your conversations with them?

10      A.    They were okay with it.

11      Q.    Uh-huh.  Did the union have an objection to

12  anybody but Centerbridge serving as an investor, the

13  lead investor?

14      A.    There was no one.

15      Q.    Would the unions have an objection to

16  anybody serving as an investor other than Centerbridge?

17                MR. PETERSON:  Objection as to form,

18  this calls for speculation.

19                THE WITNESS:  There wasn't one.

20  BY MR. BROSTERMAN:

21      Q.    And if Dana could get a deal on better

22  terms, which is what 1 talks about, the first

23  Settlement Agreement would be in place, then what

24  reason would you have to refuse to consent to it?

25      A.    Shuttering all of our factories.

c212aa02-3d82-4388-8698-087dca27c426

1    Q.    Anything else?

2    A.    Sure, I'm sure we would -- if somebody came,

3 I think if you're asking me if another investor came

4 and said we have some other -- we have lots of other

5 things we think we can do better, we'd entertain that,

6 that would be kind of -- we would obviously talk to

7 them.

8    Q.    Does the union settlement agreement prevent

9 Dana from shutting any factories?

10    A.    There's lots of pieces in this agreement

11 that talk about jobs.  I said shuttering all of our

12 factories, I didn't say one or two, I said all.

13    Q.    Right, but whatever you negotiated for you

14 have in your Settlement Agreement, right?

15    A.    Uh-huh.

16    Q.    So to the extent that you tried to negotiate

17 provisions that said that they could shutter whatever,

18 a certain number or not shutter a certain number of

19 factories, that would have appeared in your agreement,

20 correct?

21            MR. PETERSON:  Objection as to form,

22 the agreement speaks for itself.  You can answer.

23            THE WITNESS:  You can read it, I'd

24 say

25 BY MR. BROSTERMAN:

c212aa02-3d82-4388-8698-087dca27c426

1    investors into the company in light of the fact that

2    your agreement was tied to the Centerbridge agreement?

3        A.    Yeah.

4        Q.    What were the nature of those discussions?

5        A.    That we didn't want a stripper and flipper

6    to come in.

7        Q.    Who did you have this conversation with?

8        A.    Internally.

9        Q.    So is it fair to say that what the union

10   wants to do is reserve to itself the ability to

11   exercise judgment over whether another investor fits

12   the mold, as you put it, of a tipper or flipper?

13              MR. PETERSON:    Objection as to form.

14   You can answer.

15              THE WITNESS:    We reserve the right

16   to protect our -- to have an agreement that gives --

17   that protects our retirees and our members and

18   provides, gets a profitable company, that's what we

19   want.

20   BY MR. BROSTERMAN:

21       Q.    And if you concluded that somebody who

22   was -- proposes an investment alternative to

23   Centerbridge, even if the terms were better, was, as

24   you put it, a tipper or flipper, in your view, it would

25   be reasonable to withhold consent?

c212aa02-3d82-4388-8698-087dca27c426

1      A.     We would be reasonable on a whole host of

2 counts.   I wouldn't say it would be solely on that, I

3 didn't say that.   I said you got to have the patience

4 to withstand this business, if you want it to be

5 profitable and, as you say, make some money, you got to

6 stay in it -- I guess it's a tough time and tough

7 environment.   We would -- I'm telling you what we would

8 do, we would look at it on all aspects, it is important

9 to stay on all aspects.   I think I said that at the

10 creditors committee meeting.   As a matter of fact, a

11 guy said to me if I gave you money, I said it's not

12 just about money, I said it there.   I'll say it again.

13 We are not in the business from once on this one going

14 in, taking our members into a forum that gives them a

15 shot at a fact of having jobs at the end of the day.

16      Q.     But you have no, according to you,

17 commitment from Centerbridge to do that?

18                MR. PETERSON:   Objection, that's not

19 what she said.

20                THE WITNESS:   I didn't say that.

21 BY MR. BROSTERMAN:

22      Q.     You had no agreement with Centerbridge that

23 they will not do that?

24      A.     I have a labor agreement that guarantees

25 jobs, and we have a labor agreement, and that's what we

c212aa02-3d82-4388-8698-087dca27c426

1    discussions, we're fully aware which parts of the

2    business are tougher than others, and they have some

3    expertise and have gone in the places they should.

4        Q.    But if somebody else goes through the

5    diligence and is prepared to put in more money, why

6    should you have the right to withhold consent?

7        A.    Again, we have a labor deal that's

8    predicated on protecting our retirees, protecting our

9    members, and giving us factory jobs.  We make

10   concessions.  We're doing a lot.  We've given up a lot,

11   a lot.  So we have the right to condition our

12   agreement, and we did that, and we do that when you

13   don't get all your claim and you do that when you --

14   you know, we have that right, that's what we do.

15       Q.    Was there any discussion -- were you a part

16   of any discussions in which the subject of -- I may

17   have asked this, but I'm not sure I got an answer,

18   maybe I didn't ask it, in which there was a discussion

19   on the impact on other prospective bidders or investors

20   of your tying your deal to the Centerbridge deal?

21           MR. PETERSON:  Yes, you did ask

22   that.  She answered that there were internal

23   discussions.

24   BY MR. BROSTERMAN:

25       Q.    And with whom were those internal

c212aa02-3d82-4388-8698-087dca27c426

1   to go through it.

2        Q.    So you don't know if there are anything

3   specifically that would make the Centerbridge deal

4   better or worse?

5        A.    Right.

6        Q.    What factors or what qualifications does

7   Centerbridge possess that would make them uniquely

8   qualified to be in this position, to be the plan

9   sponsor as opposed to somebody else?

10       A.    Okay, commitment to North America, jobs and

11  not running from the union, growing the business,

12  finding a way to invest, getting with the customers,

13  getting through that and moving through that, tapping

14  the sources that say I understand this core business,

15  I'm willing to be patient and make that commitment to

16  that business and grow that for shareholders alike to

17  get future, the ability to convince stakeholders that

18  future products, future on vehicles, that's what we

19  saw, that's what we talked about, that's what I see,

20  and with along with an infusion of new cash, and

21  they're not afraid of the union --

22       Q.    So in your arrangement or understanding with

23  Centerbridge, it was your support quid pro quo this is

24  how we see the business going down, this is how these

25  are the things that we will do in the future to suture

c212aa02-3d82-4388-8698-087dca27c426

1  those provisions were at the behest of the union or

2  whether it was from Centerbridge, you wouldn't know?

3       A.    (Witness shakes head from side to side.) I

4  wouldn't know.

5       Q.    Thank you.  You spoke a little bit earlier

6  about the union's right to reject certain alternatives.

7  This may fall into the preceding conversation.  Would

8  you know whether what the genesis of that provision

9  was?  Whether that was a union request or a

10  Centerbridge request?

11       A.    That what?

12       Q.    That there would be certain rejection rights

13  or relative to alternative investors?

14            MR. GANATRA:  You're referencing the

15  Appendix R rights.

16            MR. BATTAGLIA:  Yes.

17            THE WITNESS:  Well, I think I

18  testified to this earlier here again I'm the labor

19  person and I would say we were not about to engage in

20  any more concession bargaining with Dana Corporation

21  and let go of our -- and make a deal around our

22  retiree's health care without an ability to protect our

23  settlement and give the company a chance to emerge to a

24  profitable company so our workers could have jobs.

25  How, that is what I bargained and is that what I

c212aa02-3d82-4388-8698-087dca27c426

Page 136

1    dictated.  How people then go about embodying that

2    vision is in a form of an agreement is what happened,

3    and so I would say that we said we needed to not just

4    so not just walk out there and obliterate the company

5    as we had 1113, 1114 pending in front of the judge that

6    there was an alternative, that's what we did, and

7    that's what I bargained, and that's what the very good

8    qualified staff and technicians and advisors did.

9    BY MR. BATTAGLIA:

10       Q.    So are you saying that the provisions

11   relative to the union's right to reject certain

12   alternatives or setting a procedure for that, was that

13   at the union's insistence?  Was that an issue critical

14   to the union?

15       A.    It was an issue very critical to the union.

16       Q.    Was it critical to Centerbridge?

17       A.    I did not engage Centerbridge on that

18   discussion.  We said if you're going to be a plan

19   sponsor, if you're going to be a future person and

20   we're going to support you, you know what our

21   principles are, you know what we've discussed.

22       Q.    About the provisions relative to doing due

23   diligence with regard to any alternative investor, are

24   you familiar with those provisions?

25       A.    Huh-uh, no, I'm not, sorry.

c212aa02-3d82-4388-8698-087dca27c426

1    who -- what was the genesis of the mediation

2    arbitration proceeding.

3                    MR. GANATRA:  You're referencing a

4    specific provision in Appendix R.

5                    MR. BATTAGLIA:  That's true.  Let's

6    pull Appendix R.

7                    MR. BATTAGLIA:  It may be better

8    summed up actually in the motion.

9                    MR. GANATRA:  I think if you look at

10   Page 111 of the Settlement Agreement itself, there's a

11   section entitled Review of Arbitral Award.

12                    MR. BATTAGLIA:  Right. If you look

13   on -- actually it starts on Page 110 when it speaks of

14   mediation and arbitration.

15                    MR. PETERSON:  Culminating in court

16   review on --

17                    MR. BATTAGLIA:  On Page 111,

18   exactly.  This provision, what was the genesis of this

19   provision?  Who wanted this to be heard or resolved in

20   mediation or arbitration?  Was this a union issue?

21                    THE WITNESS:  Well, if you believe

22   we were going to be unreasonable, which we would not

23   be, we agreed to go to arbitration.

24   BY MR. BATTAGLIA:

25        Q.    And all I'm trying get at is who requested

c212aa02-3d82-4388-8698-087dca27c426

Page 139

1    that to be part of, who requested that provision?  Was

2    it the union's desire to do it at arbitration as

3    opposed to any other means?

4        A.    We prefer to go to arbitration.

5        Q.    So you suggested that language?  That's all

6    I'm getting at.

7        A.    Through a process of negotiations we came to

8    a place where we agreed that arbitration was where we

9    were going to go to settle this issue.

10       Q.    What about the provision whereby

11   Centerbridge has the right to match the offers of other

12   alternative investors?

13                 MR. PETERSON:  What provision?

14   BY MR. BATTAGLIA:

15       Q.    Actually if you look on Page 10 of the term

16   of Centerbridge investment which is Exhibit B to

17   Exhibit B of the motion --

18       A.    I don't know that document, sorry, I can't

19   help you.

20       Q.    Are you familiar with the provision that

21   Centerbridge would have a right to match the offers of

22   other alternative investors?

23       A.    No.

24       Q.    Okay.  As part of the, these terms on

25   Exhibit R, the union states that it would not

c212aa02-3d82-4388-8698-087dca27c426

Page 140

1  unreasonably withhold its consent to other competing

2  investors.  How would you -- what would be a -- make it

3  simple, what factors would you refer to or would you

4  believe would render the union's withholding of its

5  consent to be reasonable?

6              MR. PETERSON:  Objection as to form.

7  You can answer.

8              THE WITNESS:  Anybody who was not

9  committed to growing the business, jobs in the U.S.,

10  investing, have the patience to live through doing --

11  coming up at, you know, with manufacturing, investing

12  in our factories, finding a way to get with the

13  customers, thinking ahead, understanding the next cycle

14  of vehicles, building the technology, staying around

15  for a while, you know, hearing our, hearing the

16  members.

17  BY MR. BATTAGLIA:

18      Q.    I don't mean to have you repeat what you've

19  --

20      A.    Fine --

21      Q.    I mean just so it's fair enough to say that

22  those --

23      A.    The same things --

24      Q.    The pledges that were sort of made to you by

25  Centerbridge or that the understanding that you had

c212aa02-3d82-4388-8698-087dca27c426

1    investor?

2         A.    This is one deal.  Centerbridge is the

3    investor, and the language, I think that the lawyers

4    said that the agreement's clear on what happens if

5    other people want to bid.  I'm saying to you that a

6    labor deal and Centerbridge deal, I've said this in the

7    creditors' committee, is one deal.

8         Q.    But here's what I want to know.  I just

9    asked you a second ago, and you really haven't answered

10   my question, okay.  What I want to know is are you

11   saying here right now that if Centerbridge is not in

12   the deal, you don't care who's in the deal, you don't

13   have a consent?

14        A.    I'm saying if Centerbridge is not a part of

15   this settlement, there is no Settlement Agreement.

16        Q.    So if Centerbridge is not part of the deal,

17   it doesn't matter who comes in, how much better the

18   offer is, what they say to the union, okay, you're

19   never consenting?

20        A.    There was a thing in here, language that

21   says about reasonableness, and we will be reasonable if

22   someone offers a deal.  You know, we said we'd look at

23   it.  I said we'd look at it.  I said it 10 times we'd

24   look at it.

25                  MR. PETERSON:  I think counsel was

c212aa02-3d82-4388-8698-087dca27c426

1    Q.    Under the termination agreement you have the

2    right, the unions have the right to consent to a new

3    investor under certain circumstances.

4    A.    Right.

5    Q.    Actually, any new investor has to be

6    consented to by the union, any lead investor?

7    A.    Right.

8    Q.    And if the unions consent, if they withhold

9    that consent but were reasonable in withholding that

10   consent, one thing occurs, right?

11   A.    But why -- okay, and you're asking --

12   Q.    Let me just finish, take it one at a time.

13   Okay, you understand the agreement sufficiently to

14   understand, do you not, that if the unions are

15   reasonable in withholding their consent to a different

16   lead investor, then one set of options occur, including

17   the right of unions to strike, right?

18   A.    Right.

19   Q.    Okay.  And if the unions were unreasonable

20   in withholding their consent to the investor, then they

21   don't have the right to strike?

22   A.    Right.

23   Q.    Right?  Okay.  And I'm asking you --

24   A.    What's unreasonable?

25   Q.    Right.  Under what circumstance would it be

c212aa02-3d82-4388-8698-087dca27c426

1  unreasonable for the unions to withhold their consent

2  to a new investor, assuming the new investor does the

3  very same deal, offers the very same deal as

4  Centerbridge?

5      A.    Okay, well, what I would say is what I said

6  when your colleague here questioned me about the

7  difference between a superior deal and a better deal.

8  And I said superior would be -- he asked me, right,

9  that they would basically accept everything, I guess

10  somebody, the arbitrator would say, the arbitrator

11  would say what would be unreasonable is if we walked

12  away from 100 percent of our claim or 110 percent of

13  our claim or said we will leave -- the factories, that

14  we would open more factories and give you -- I mean I

15  guess it would have to be completely something to that

16  degree, and any arbitrator as having -- which I'm more

17  comfortable in that arena of arbitration, an arbitrator

18  or anybody, for that matter, would -- even as public as

19  this deal is, any public person on the street would

20  probably think that was kind of crazy.

21      Q.    Okay.  So is it your view, then, based upon

22  what you just said, that if a new investor comes in and

23  proposes alternative investment, that one of the things

24  that the union can do in evaluating that alternative,

25  right, and in determining whether you're reasonable or

c212aa02-3d82-4388-8698-087dca27c426