**EXHIBIT AA**

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ------------------------------X

5  In re:                    Chapter 11

6  DANA CORPORATION, et al.,

7                      Case No. 06-10354(BLR)

8                      (Jointly Administered)

9  ------------------------------X

10

11              CONFIDENTIAL

12        DEPOSITION OF HENRY S. MILLER

13            New York, New York

14            July 19, 2007

15

16

17

18

19

20

21

22  Reported by:
    Bonnie Pruszynski, RMR
23  JOB NO. 12493

24

25

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2                        July 19, 2007

3                        10:10 a.m.

4

5

6            Confidential deposition of HENRY S.

7    MILLER, held at JONES DAY, LLP, 222 East

8    41st Street, New York, New York, before

9    Bonnie Pruszynski, a Notary Public of the

10   State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
2  A P P E A R A N C E S:
3  KRAMER LEVIN NAFTALIS & FRANKEL, LLP
   Attorneys for Official Committee of Unsecured
4  Creditors
5          1177 Avenue of the Americas
           New York, New York 10036
6  BY:     GREGORY A. HOROWITZ, ESQ.
7  STROOCK STROOCK & LAVAN
   Attorneys for Ad Hoc Committee of Bondholders
8          180 Maiden Lane
           New York, New York 10038
9  BY:     KENNETH PASQUALE, ESQ.
10 JONES DAY
   Attorneys for Debtors and the Witness
11         222 East 41st Street
           New York, New York 10017-6702
12 BY:     STEVEN C. BENNETT, ESQ.
13 WHITE & CASE LLP
   Attorneys for Appaloosa Management
14         1155 Avenue of the Americas
           New York, New York 10036
15 BY:     MEGHAN MC CURDY, ESQ.
16 WILLKIE FARR & GALLAGHER, LLP
   Attorneys for Centerbridge Capital Partners, LP
17         787 Seventh Avenue
           New York, New York 10019
18 BY:     ELISSA ROSSI, ESQ.
19 ARENT FOX LLP
   Attorneys for Wilmington Trust
20         1675 Broadway
           New York, New York 10019
21 BY:     ANDREW I. SILFEN, ESQ.
22
23 LEVY RATNER, P.C.
   Attorneys for the United Steelworkers
24         80 Eighth Avenue
           New York, New York 10011
25 BY:     SUZANNE HEPNER, ESQ.

1      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2  APPEARANCES (Continued)

3  AKIN GUMP STRAUSS HAUER & FELD, LLP

   Attorneys for Avenue Capital management II, LP

4  Contrarian Capital Management, LLC, Deutsche Bank

   Securities, Inc. Hain Capital Group, LLC, JP

5  Morgan Securities Inc., Longacre Fund Management,

   LLC, Madison Capital Management, Siver Point

6  Capital, L.P.

           New York, New York

7          590 Madison Avenue

           New York, New York 10022

8  BY:     DAVID KAY (appearing telephonically)

9

10  Also Present:  Howard Bocher, Potok & Co., Inc.

                   Leon Potok, Potok & Co., Inc.

11                 Mark Buschmann, Blackstone Group

                   Stefan Feuerabendt, Blackstone

12                 Group

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2              (Miller Exhibit Number 1 marked for

3        identification as of this date.)

4              (Witness sworn.)

5  HENRY S. MILLER,

6            called as a witness, having been first

7            duly sworn, was examined and testified

8            as follows:

9  EXAMINATION

10        Q      Will you state your name for the

11  record?

12        A      Henry, middle initial S as in

13  Stephen, Miller.

14              MR. BENNETT:  Could we just make sure

15        that everybody in this room and everybody on

16        the phone is covered by confidentiality

17        agreements to the effect that this

18        deposition is for purposes of discovery

19        only, not for any other purposes?

20              We are going to designate it to that

21        effect.

22              I want to make sure that everybody in

23        the room is covered by a confidentiality

24        agreement for professionals.

25              MR. HOROWITZ:  Okay.  Well, I'm not

1      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2 dozens of times?

3      A      Probably.

4      Q      So, you understand today we are

5 making a written record of your sworn testimony;

6 correct?

7      A      Correct.

8      Q      And you understand that for that

9 reason, it's extremely important that we make sure

10 that you understand exactly what my question is

11 seeking.

12            You understand that, right?

13      A      Yes.

14      Q      Okay.  So, if at any point in time,

15 and I undoubtedly will, ask a poorly phrased,

16 incoherent or ambiguous question, you will ask me

17 to rephrase it as often as necessary to make sure

18 we are absolutely clear what's being asked.

19            Is that okay?

20      A      That's okay.

21      Q      Great.

22            By whom are you employed?

23      A      A company called Miller Buckfire and

24 Company, LLC.

25      Q      What is your position there?

Page 11

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2        A        I'm the chairman.

3        Q        And without wasting undue time on it,

4    could you just tell me briefly what your

5    postgraduate education is?

6        A        I have an MBA from Columbia

7    University School of Business.

8        Q        Anything else?

9        A        No.

10       Q        In what capacity is Miller Buckfire

11   involved in these proceedings?

12       A        Miller Buckfire is financial adviser,

13   investment banker to Dana Corporation.

14       Q        When was Miller Buckfire first

15   retained?

16       A        In February of '06.

17       Q        Have you been involved as the

18   principal Miller Buckfire person in charge of the

19   assignment since its inception?

20           MR. BENNETT:  Objection to form.

21       A        I was going to ask you to clarify

22   your question, but I understand what you are

23   saying.

24           Yes, I'm called the partner in

25   charge.

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2  long as we want a labor agreement.  But we clearly

3  said, "this is normally something we would expect

4  to do."

5       Q       Did you give any pushback?

6               MR. BENNETT:  Objection to form.

7       A       In what sense pushback?

8       Q       Well, did you try to move Mr. Bloom

9  off of his position that the debtor should have to

10 accept the plan sponsor that the union has

11 selected?

12      A       Yes.

13      Q       And how did you do that?

14      A       Probably in words to that effect;

15 that this was putting the company in an awkward

16 spot, that the board of directors will not be

17 happy at having its prerogatives usurped, and that

18 we would prefer to run a more traditional process,

19 if, in fact, we conclude that outside capital is

20 necessary.

21      Q       But Mr. Bloom insisted that this was

22 a condition to the deal?

23      A       Correct.

24      Q       And going back to what Mr. Bloom told

25 you about the union's views on the need for a plan

Page 27

1      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2  Centerbridge was also reached; correct?

3      A      That's correct.

4      Q      So, during the time that you were

5  negotiating the labor agreement, it was also open

6  to negotiate the identity of the plan sponsor;

7  correct?

8      A      I'm sorry.  I don't understand what

9  you mean.

10      Q      It would also have been possible for

11  you, in your discussions with the union, to seek

12  to negotiate the identity of the plan sponsor;

13  correct?

14              MR. BENNETT:  Objection to form.

15      A      An alternative plan sponsor, is that

16  what you are saying?

17      Q      Yes.

18      A      Possibly.

19      Q      To be clear, you did not, during the

20  course of the negotiation of the labor agreement,

21  talk to any other potential plan sponsors, other

22  than Centerbridge?

23      A      Actually, that is not correct.

24      Q      Okay.  Who else did you talk to?

25      A      We had received calls and we made

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2  certain calls to a variety of people, but we did

3  not expand those initial conversations other than

4  logging the interest, because we were committed by

5  virtue of the negotiations with labor to get that

6  transaction done.

7    Q    Okay.  Now, you said -- I wish I had

8  Live Note at this point.

9          You said you didn't do anything

10 beyond logging the expressions of interest, did I

11 get that right?

12   A    Yes.

13   Q    That is a typical procedure, right?

14 You keep a log of potential interested plan

15 sponsors?

16   A    Not only plan sponsors.  There were

17 people who were interested in particular

18 businesses, people who are interested in the whole

19 thing.  So, yes, we kept a log of all expressions

20 of interest.

21   Q    And is that what you call a call log?

22   A    No.

23   Q    What do you call it, that identifier?

24   A    Just -- I wouldn't call it a call

25 log.  It's a log of potentially interested

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2          As would Appaloosa?

3    Q        And under the terms of your retention

4    agreement, your fee for an equity transaction

5    would be 5 percent of the amount raised, correct?

6    A        That's correct.

7    Q        Thirty-seven and a half million one,

8    did I get that right?

9    A        That's right, you got that math

10   right.

11   Q        Okay.

12            If the Centerbridge deal is

13   consummated, you would intend to collect that fee,

14   correct?

15   A        The agreement says what it says.

16   Q        And have you advised the board of

17   what Miller Buckfire's fee would be in connection

18   with this transaction?

19   A        The board approved our agreement way

20   back when, as did the court.

21   Q        Okay.

22            But since the Centerbridge

23   transaction was put before the court, did you tell

24   the board how much your fee would calculate out

25   to?

1   CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2       A       Did we discuss that specifically with

3   the board?  No.

4       Q       Did anyone on the board ask about

5   what Miller Buckfire's fee would be in connection

6   with this transaction?

7       A       No.

8               MR. HOROWITZ:  Okay.  Let's take a

9       five-minute break.  I want to go through my

10      notes, I am pretty close to done.

11              (Recess taken.)

12  BY MR. HOROWITZ:

13      Q       Mr. Miller, are you planning on

14  attended the hearing on Wednesday?

15      A       Probably.

16              MR. HOROWITZ:  I pass the witness.

17      Thank you.

18  EXAMINATION

19  BY MR. PASQUALE:

20      Q       Mr. Miller, Ken Pasquale from Stroock

21  representing the ad hoc bondholders.

22      A       I know you.

23      Q       You spent a lot of time with

24  Mr. Horowitz talking about the process for

25  soliciting alternative proposals.

Page 211

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2              MR. BENNETT:  Objection to form.

3       A     You are talking about page two of

4    this?

5       Q     I am sorry?

6       A     We did not create something specific

7    along these lines.

8       Q     Okay.  Good to know.

9              Earlier you said about my client that

10   if Appaloosa could commit to an offer without due

11   diligence then cows will fly or pigs, whatever the

12   animal will be.

13             What did you mean by that?

14      A     That the context was how the market

15   would look at certain things, and my

16   characterization is that if there is a major firm

17   such as Appaloosa that is willing to commit

18   $750 million without any due diligence whatsoever,

19   then I have proven my point that this was

20   certainly a frothy market.

21      Q     Anything more than that?

22      A     No, I have a great deal of respect to

23   Appaloosa, Mr. Tepper, and I have actually

24   represented them on occasion, so...

25      Q     You also testified or that you agreed

Page 212

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

that Appaloosa is a sophisticated investor?

A       Yes.

Q       Do you believe that Appaloosa is a
legitimate bidder in this process?

MR. BENNETT:  Objection to form.

A       What did you do -- how do you define
legitimate?

Q       Well, how do you define legitimate?

A       I asked you first.

Q       Do you think that the offer is
credible?

MR. BENNETT:  Objection to form.

A       I haven't, as I said earlier, had an
opportunity to really look through the letter or
to have some analysis done, so I -- at some point
probably over the next 24 hours, if I am released
soon, then that's an obvious thing to do.

Q       Okay.  We also talked earlier about
the term qualified investor.

Is Appaloosa a qualified investor?

MR. BENNETT:  Objection to form.

A       I think that is something that we
need to understand.

Q       So you can't answer that question

1    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2  sitting here today?

3        A       No.

4        Q       I believe you testified earlier that

5  Centerbridge is subject to market risk once the

6  amount of common stock that their preferred

7  converts into is determined?

8        A       Correct.

9        Q       Is that the only risk that

10  Centerbridge has in this deal?

11            MR. BENNETT:  Objection to form.

12        A       No, I mean, they have reputational

13  risk.  They have, I suppose everything at the end

14  of the day works down to will they make a

15  reasonable rate of return on the investment,

16  assuming it were to go forward.  They help guide

17  the company to achieve its projections, can they

18  do, help the company do better?

19            There is a lot of execution risk that

20  ultimately works back to whether they will earn

21  whatever rate of return they assume they should

22  get for the investment they will make.

23        Q       But other than the risk that we

24  talked about, about the amount of common stock, is

25  there any other financial risk involved?

**EXHIBIT BB**

**Hearing Date and Time: July 25, 2007 at 10:00 a.m.**
**Response Deadline: July 20, 2007**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Thomas Moers Mayer (TM-9357)
Matthew J. Williams (MW-4081)
Daniel M. Eggermann (DE-3024)
Stephen D. Zide (SZ-0004)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Counsel for the Official Committee
of Unsecured Creditors of Dana Corporation, *et al.*
www.danacreditorcommittee.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DANA CORPORATION, *et al.*, | ) Case No. 06-10354 (BRL) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE MOTION OF DEBTORS AND DEBTORS IN
POSSESSION FOR ENTRY OF AN ORDER (A) APPROVING SETTLEMENT
AGREEMENTS WITH THE UNITED STEELWORKERS AND THE UNITED
AUTOWORKERS, PURSUANT TO 11 U.S.C. §§ 1113 AND 1114(E)
AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019, AND (B)
AUTHORIZING THE DEBTORS TO ENTER INTO PLAN SUPPORT
AGREEMENT, INVESTMENT AGREEMENT AND RELATED AGREEMENTS,
PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), 364(C)(1), 503 AND 507**

The duly-appointed Official Committee of Unsecured Creditors (the "Creditors'

Committee") of the above-captioned debtors and debtors-in-possession (collectively, the

"Debtors"), by and through its undersigned counsel, hereby submits this objection (the

"Objection") to the Motion of the Debtors for Entry of an Order (A) Approving Settlement Agreements with the United Steelworkers and United Autoworkers, Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, and (b) Authorizing the Debtors to Enter into Plan Support Agreement, Investment Agreement and Related Agreements, Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c)(1), 503 and 507 (the "Motion").  In support of its Objection, the Creditors' Committee respectfully submits as follows:

## PRELIMINARY STATEMENT

1. This Global Settlement is far more than a settlement of litigation under sections 1113 and 1114 of the Bankruptcy Code.  If approved, the Global Settlement would deliver control of the Debtors to a third-party investor - Centerbridge - by dictating the terms of an unconfirmable plan not negotiated with the Creditors' Committee.  It gives the Unions a veto over alternate plans, divests this Court of jurisdiction over whether or not the Unions exercised that veto in a reasonable manner, and delivers over $150 million in premiums and fees to Centerbridge and those creditors it "qualifies" to be its co-investors.

2. The Debtors, at the demand of the Unions, did not subject the proposal to a "market test" before entering into the Global Settlement.  Shielded from market pressure, Centerbridge - whose previous role was a financial advisor to the Unions - was positioned to demand dozens of concessions from the estate that are neither customary nor fair to the estate. When taken together, the various agreements (Plan Support Agreement, Investment Agreement, and Union Settlement Agreement) that make up the Global Settlement result in an investment that is so rich and risk free that - even without access to confidential information or the requirement of any bid protections – another entity has announced a willingness to make the same investment on substantially better terms.

- 2 -

3.      Based upon the information provided by the Debtors, the Creditors' Committee does not object to the payments to be made and securities to be issued to unionized workers and retirees.  The Creditors' Committee does object to the Unions' insistence (and the Debtors' acquiescence) that the estate pay the Unions' financial advisor a premium of over $150 million simply because it is the only investor that has been pre-approved by the Unions.  The Creditors' Committee does object to a settlement that is not only an impermissible <u>sub rosa</u> plan, but also a <u>sub rosa</u> plan which gives the plan sponsor, as a potential 7.5% shareholder, corporate control in violation of the Bankruptcy Code.  The Creditors' Committee does object to a <u>sub rosa</u> plan which allows the proposed new equity sponsor to influence the votes of a few large pre-petition creditors by offering them distributions greater than other smaller creditors in the same class.  The Creditors' Committee does object to an arbitrator - rather than the Court - determining in secret, and not in a public hearing, whether the Unions have reasonably exercised a veto over an investment superior to the current proposal.  These concerns all relate to the unfair benefits handed to the proposed investor.  None of these issues were even mentioned in the section 1113/1114 proceedings.  None of these issues relate to the sacrifices required of workers or retirees or the Debtors' need for those sacrifices.

## <u>FACTS</u>

<u>Procedural History</u>

4.      On March 3, 2006, the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

5.      On March 13, 2006, the Office of the United States Trustee in the Southern District of New York appointed the Creditors' Committee.[1]

---

[1] The current members of the Creditors' Committee are: (i) Wilmington Trust Company; (ii) P. Schoenfeld Asset Management LLC ("<u>PSAM</u>"); (iii) The Timken Company; (iv) International Union, United Automobile, Aerospace

The Debtors' 1113/1114 Motion

6.     The Debtors are party to collective bargaining agreements (the "CBAs") with the UAW and the USW (collectively, the "Unions"), and provide retiree benefits (as such term is defined in the Bankruptcy Code, "Retiree Benefits") to active and retired union employees.

7.     Centerbridge Capital Partners, L.P. ("Centerbridge") was retained as an advisor by the Unions in connection with this case.  The Motion does not provide any information regarding when Centerbridge was retained, the terms of its retention, or on what issues it was providing advice.

8.     On January 31, 2007, the Debtors filed a motion to reject their CBAs and modify their Retiree Benefits (the "1113/1114 Motion").

9.     Beginning on March 12, 2007, this Court held a multi-day contested hearing on the 1113/1114 Motion, and upon conclusion of the trial, reserved decision. Subsequently, the Unions, the Debtors, and Centerbridge requested that this Court delay issuing a ruling on the 1113/1114 Motion so that the parties could attempt to negotiate a consensual resolution of the labor issues.

The Global Settlement

10.    On July 6, 2007, the Debtors filed the Motion to approve the Global Settlement.  The Global Settlement consists of three key agreements between the Debtors, the

---

and Agricultural Implement Workers of America (the "UAW"); (v) Sypris Solutions, Inc. ("Sypris"); (vi) Julio Gonzalez Jr., as Special Administrator for the estate of Julio Gonzalez; (vii) Dune Capital LLC; and (viii) the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW", and together with the UAW, the "Unions").  The Pension Benefit Guaranty Corporation is an ex officio member of the Creditors' Committee.  PSAM and Sypris are co-chairs of the Creditors' Committee.  At all times, the Unions (as members of the Creditors' Committee) were excluded from Creditors' Committee deliberations surrounding the Motion.

Unions, and Centerbridge: (i) the Union Settlement Agreement;[2] (ii) the Plan Support Agreement; and (iii) the Centerbridge Investment Agreement (each described below).

11.    The Union Settlement Agreement.  In return for the termination of the Retiree Benefits, the Debtors propose to pay $664 million in cash, plus an additional $80 million in stock in the reorganized company, into VEBAs.[3]  See USW & UAW Settlement Agreements, Appendix K § 4(b).  In addition, the parties have agreed to modify the CBAs, alter the Debtors' manufacturing footprint operations, and execute numerous other agreements.

12.    The Union Settlement Agreement is conditioned upon the Debtors' pursuit of a particular plan of reorganization.  The Unions may veto any alternative plan sponsor or any stand-alone plan of reorganization.  See generally, Union Settlement Agreement, Appendix R.  If the Unions are able to exercise their veto, the settlement is terminated and the Unions can strike. In other circumstances, the Unions have a veto right in their "sole and absolute discretion."  Id. at § 3(b).  In some limited circumstances, the Unions are obligated to use the veto right "reasonably" (i.e., if there is a "minority alternative investment" with identical plan terms (id. § 1) or a "majority alternative investment" (id. § 3(a)).  The determination of whether the Unions have exercised their veto "reasonably" is to be decided by an unidentified arbitrator instead of this Court.  Id. § 1(a).

13.    The Plan Support Agreement.  In addition to the Union Settlement Agreement, the Debtors, the Unions, and Centerbridge have also entered (and seek Court

---

[2] The Union Settlement Agreement consists of the UAW Settlement Agreement and the USW Settlement Agreement.

[3] Under the Union Settlement Agreement, the Debtors also propose to pay an additional $40 million in cash into the VEBA on account of the elimination of long-term disability benefits, bringing the total VEBA contribution to $704 million in cash and $80 million in common stock.

approval of) the Plan Support Agreement.  The Plan Support Agreement requires the parties to support and seek confirmation of a plan containing the following terms, among others:

- Unsecured creditors shall receive their pro rata share of common stock (and distributable cash if it is available) (see Plan Term Sheet p. 4);

- A $1.5 billion cap on emergence debt (id. p. 3);

- A "minimum liquidity" covenant agreeable to the Unions and Centerbridge (id.);

- An exit facility acceptable to Centerbridge (id. p. 3-4);

- Management contracts negotiated with Centerbridge (id. p. 4);

- An IRC 382(l)(5) exemption absent Centerbridge's agreement to the contrary (Plan Term Sheet p. 4); and

- The ability to block any sale of the Debtors' core businesses prior to emergence (id.).

14.     The Investment Agreement.  To fund their obligations under the Global Settlement, the Debtors propose to sell $300 million Series A Preferred Shares (only to Centerbridge), $200 million Series B1 Preferred Shares (underwritten by Centerbridge but available to creditors who qualify using criteria to be determined by Centerbridge), and $250 million Series B2 Preferred Shares (also available only to creditors who qualify using Centerbridge's criteria).  All of the Preferred Shares are convertible into common shares, at a conversion price representing a 17% discount to the post-confirmation 20-day trading price of the Debtors' common stock.

15.     In addition, the Investment Agreement provides:

- Centerbridge will receive the Series A Preferred Shares, which will be senior to the reorganized common stock and the Series B Preferred Shares (Investment Term Sheet p. 5);

- Centerbridge will have the right to designate the "objective characteristics" by which creditors are entitled to participate in the purchase of the Preferred Series B1 and B2 Shares (id. p. 4);

- Centerbridge will be entitled to fees of up to $30 million (including a Commitment Fee of $3.5 million, an Expense Reimbursement of up to $4 million, and a potential Break Up Fee of up to $22.5 million) (id. pp. 2-3);

- Centerbridge will have the right to nominate at least four of the seven-member initial board of directors (id. p. 6);

- Centerbridge will have a de facto continuing right to nominate a majority of the subsequent members of the board of directors so long as it holds an investment of at least half of the Series A Preferred Shares (id. p. 6);

- Centerbridge shall have the right to negotiate employment agreements with senior management (id. p. 10);

- Centerbridge shall have veto rights over the terms of a Plan of Reorganization and Exit Facility (id. p. 11); and

- Centerbridge shall have the ability to block numerous significant corporate transactions of the reorganized company, regardless of whether or not such a transaction would be beneficial to the company as a whole or its stockholders, so long as it holds an investment of not less than $150 million in the Series A Preferred (id. p. 7).

16.     As part of the Global Settlement, the Unions have agreed to dismiss their pending appeal of this Court's order approving executive compensation. See Union Settlement Agreements p. 11.[4]   In addition, upon information and belief, Miller Buckfire, the Debtors' financial advisor, intends to assert a fee of $37.5 million in connection with the Global Settlement.[5]

---

[4] In connection with the negotiations surrounding the Debtors' executive compensation plan, the Creditors' Committee insisted (and the Debtors agreed) that management would not obtain the right to an increased bonus based upon cash flow improvements if those cash flow improvements resulted in the creation of dilutive claims. Thus, the agreed-upon executive compensation order provides that if claims exceed $2.85 billion, management bonuses will be reduced.  The Creditors' Committee reserves all rights to challenge the payment of management bonuses on the ground that the VEBA settlement is, in fact, the allowance of a claim and thus should reduce the cap on management incentive bonuses.

[5] The Creditors' Committee believes that the assertion of this fee is without merit, because, among other things, the order approving Miller Buckfire's retention provides that in addition to a $12.5 million Restructuring Transaction Fee to be paid upon confirmation of a plan, any fee earned in connection with exit financing is limited to $3 million.

<u>The Appaloosa Bid</u>

17.     On July 19, 2007, Appaloosa Management L.P. ("<u>Appaloosa</u>") filed a form 13D with the Securities and Exchange Commission.  <u>See</u> Exhibit A.  In that filing, Appaloosa claimed that the Debtors' management and advisors had been and were continuing to resist efforts of Appaloosa to obtain access to information that Appaloosa deemed was necessary to assist it in formulating an alternative investment proposal.  <u>Id</u>.

18.     Among other things, Appaloosa asserted that, if approved, the Global Settlement would shift estate value to third parties without the benefit of a meaningful and competitive bidding process.  <u>Id</u>.  Given the essentially risk-free nature of the proposed investment and substantial premium provided therein, Appaloosa stated that, notwithstanding the fact that it had not been provided <u>any</u> access to due diligence, it was nonetheless prepared to unconditionally invest on terms set forth in the Global Settlement, and that Appaloosa was willing to (1) waive any break up fee; (2) enhance the conversion price; and (3) eliminate barriers for submission of competing proposals.  <u>Id</u>.

19.     That same day, the USW wrote a letter to Dana's board of directors, wherein it stated that, at this time, it was currently not prepared to enter into a settlement agreement with Appaloosa as the investor, and that therefore, the Debtors should continue to push forward with the Motion to approve the Centerbridge deal.  <u>See</u> Exhibit B.

## OBJECTION

### A.     The "True Costs" of the Global Settlement are Excessive

20.     From just reading the Motion, it is impossible to determine the true costs of this deal to the estate and its creditors.  The Motion lacks any valuation of the Preferred Shares or the premium the estate is paying to the purchasers thereof.  At trial, the Creditors' Committee will show that the Series A Preferred shares being transferred to Centerbridge are

- 8 -

structured to provide Centerbridge with an immediate guaranteed profit of more than 20% - on an as-converted basis without taking into account dividend or option value - and without incurring any risk.  In addition, the Creditors' Committee will show that the Series B1 and B2 Preferred Shares being transferred to Centerbridge and its co-investors provide a similar premium, all at the expense of other unsecured creditors.

21.     Thus, putting aside the fees and costs associated with the Centerbridge investment, Centerbridge and its selected co-investors will receive a windfall of well over $150 million - all at the expense of general unsecured creditors - as a cost of doing the current deal. At trial, the Creditors Committee will show that such a premium, in contrast to comparable deals in the market, is excessive and unwarranted.

22.     Perhaps the most striking aspect of this enormous windfall is that, in contrast with other transactions of this type, it will be realized without any risk at all being incurred by the lucky few who are allowed to participate.  This is because of the unusual mechanics by which the conversion price of the Preferred Shares will be established.  Unlike the $80 million in stock being provided to the Unions - which is calculated based upon a firm total enterprise value to be determined in the Disclosure Statement - Centerbridge has refused to lock in a price it is willing to pay.  Instead, its purchase price is based off of the average trading price of the post-consummation common stock.  Thus, the preferred holders are guaranteed that the securities they receive will be worth at least 20% more than what they paid for them regardless of the actual value of the company as established by the market.  Indeed, Appaloosa cited the risk-free nature of this investment as the reason it was able to offer to make the same investment - without access to any due diligence - on substantially better terms.  See Exhibit A.

23.     Given that (i) the Debtors' financial advisor has already formulated a valuation of the company and shared that valuation with the proposed investor and (ii) Centerbridge itself has performed substantial due diligence on the company (and is seeking $4 million in reimbursement for fees and expenses incurred in connection with such due diligence), the Creditors' Committee submits that Centerbridge should tell creditors and this Court what price it is willing to pay for shares of the reorganized company.

**B.     The Break Up Fee and Expense Reimbursement Should Be Denied, Because the Global Settlement Does Not Encourage Bidding - it Precludes Participation**

24.     The Debtors know how to run an auction in bankruptcy.  Prior to selling their Fluids Products Group, the Debtors contacted 113 potential buyers, and provided the 39 potential buyers who executed confidentiality agreements access to confidential information. Twelve potential buyers attended management presentations, and, after "vigorous negotiations" with multiple potential buyers, the Debtors selected the most attractive offer as a stalking horse. Only after this process did the Debtors seek Court approval of a reasonable break up fee, and thereafter the Debtors subjected the stalking horse to higher and better bids pursuant to a carefully crafted bid and auction process.  The procedures followed in connection with the sales of the Engine Products Group (Debtors contacted 50 potential buyers, 29 of whom ultimately signed confidentiality agreements) and the Trailer Axles Business were similar.[6]

25.     Contrast the approach previously taken to the approach taken now.  Here, the Unions demanded that the Debtors designate Centerbridge as the proposed investor. Centerbridge was not chosen because of any unique expertise or synergy in the industry or

---

[6] See, e.g., Motion to Approve Bidding Procedures with Respect to Fluid Products Group [Dkt No. 4985].

because it offered the best terms after an extensive marketing process.  Centerbridge was chosen because the Unions demanded it be anointed the plan sponsor.

26.    In the Creditors' Committee's view, this constitutes a tangible and fundamental breakdown in the process, because the "stalking horse" bid was not subject to any market test prior to the filing of the Motion.  On information and belief, <u>no</u> other potential investors were contacted in connection with providing alternative financing or as acting as a "reasonable" Centerbridge substitute.  Making a bad situation worse, the Motion does not contemplate an auction of the minority investment for the best price or on the least onerous terms.  The Motion is devoid of any auction procedures, dates for submission of higher and better offers, or considerations that potential investors should take into account when determining whether or not to make a competing investment.  It is impossible for any investor to determine whether, after incurring the fees and costs of its due diligence, its bid will be vetoed by the Unions as unacceptable.

27.    By failing to set up a meaningful process, the Debtors have put unsecured creditor recovery at risk.  "Reorganization practice illustrates that the presence of competing bidders for a debtor, whether they are owners or not, tends to increase creditor recoveries."  <u>In re Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434, 457 (1999) (quoting Bruce A. Markell, <u>Owners, Auctions and Absolute Priority in Bankruptcy Reorganizations</u>, 44 Stan. L. Rev. 69, 73 (1991)).  Indeed, as noted by the Supreme Court:

> Under a plan granting an exclusive right, making no provision for competing bids or competing plans, any determination that the price was top dollar would necessarily be made by a judge in bankruptcy court, whereas the best way to determine value is exposure to a market.

<u>Id.</u>

28.     For this reason, break-up fees and expense reimbursement should only be approved when they are designed to compensate and reimburse a disappointed stalking horse bidder when the fees actually <u>encourage</u> bidding.   <u>In re APP Plus, Inc.</u>, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998).  "Breakup fees are sometimes authorized in the bankruptcy auction sale context because they provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders." <u>Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)</u>, 346 F.3d 31, 34 (2d Cir. 2003). Such fees must be closely scrutinized to determine whether (i) the relationship of the parties who negotiated the fees was tainted by self-dealing or manipulation, (ii) open bidding is hampered, rather than encouraged, or (iii) the amount of the fee is unreasonable to the proposed purchase price.   <u>Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)</u>, 147 B.R. 650, 657 (S.D.N.Y. 1992).

29.     The proposed break up fee fails to meet the applicable standards.  First, it was not negotiated at arms-length because Centerbridge was not a stranger to the deal.  As the Unions' advisor, Centerbridge had substantially more leverage than other potential investors.  In addition, because it is the Unions' advisor, Centerbridge was not in a position to demand similar concessions from the Unions as part and parcel of providing financing.

30.     Second, it is manifestly unfair that, prior to the filing of the Motion, the Debtors did not seek out potential investors other than Centerbridge to determine if the Centerbridge deal was on reasonable market terms.  <u>See</u> <u>In re Bidermann Indus. U.S.A., Inc.</u>, 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1997) (noting that breakup fee could be proper where there was "a concerted effort to shop the debtors *before* the debtors selected a purchaser and agreed to a breakup fee and window shop provision").  Although the Debtors purport to retain a "fiduciary

out," there are no meaningful guidelines or delineated auction processes (such as access to diligence, dates by which bids must be submitted, qualifications for determining and process for submitting "competing bids," etc.) to test the investment market or ensure that investors will have a meaningful opportunity to be heard in the short time frame proposed. Id. at 552 (refusing bid protection where "fiduciary out" was just "window-dressing" and the "sale process should have followed an intensive effort to drum up the best price obtainable for creditors.  Instead this process aims to cut off other potential sales.").  This is an important issue.  Pursuant to the terms of the Global Settlement, the parties can consider timing in determining whether or not a bid is a better bid.  But the Unions (through their veto right and subsequent mediation and arbitration) have the ability to delay any decision for at least seven weeks.   Given that the Debtors' exclusivity period expires September 3, 2007, it is all but certain that any offer, under the current procedures, could be rejected on timing grounds.  Even Appaloosa's offer – which came in before the hearing on this Motion - could be rejected as "too late" because it could not be completed in time.

31.    Third, the Unions' rights to terminate and strike in the event of alternative transactions chills the bidding process (see infra), because potential bidders will not be eager to submit higher and better offers only to be faced with a potential labor strike and crippling Union claim.

32.    Fourth, the Investment Term Sheet provides Centerbridge the last right to match - not outbid - any competing offer.  Courts have recognized the chilling effect of such provisions.  See In re Rancourt, 153 B.R. 380, 383-84 (Bankr. D.N.H. 1993) (holding that statutory right of first refusal "certainly has a chilling effect upon [the auction bidding] process" because "[n]obody wants to come into an auction and bid property up as high as they can afford

and then have it taken away from them at the same price"); In re Mr. Grocer, Inc., 77 B.R. 349, 353 (Bankr. D.N.H. 1987) (noting that rights of first refusal "necessarily must have some chilling effect" on competitive bidding).

33.    Fifth, the Debtors have made a bad situation worse by requiring potential bidders to enter into unduly burdensome and overly restrictive confidentiality agreements that preclude them from proposing any competing plan, whether or not it provides greater value to the estate. It appears that, at least to date, potential bidders have been rebuffed, rather than embraced. See Exhibit A.

34.    Finally, there is simply no need for bid protections here. As set forth in Appaloosa's unsolicited and unconditional bid, because the Centerbridge investment is a risk-free investment, Appaloosa is able to commit now - without a break up fee - to a similar (but better) deal. Given that there is already active bidding on this investment, it is difficult if not impossible to see how approval of a break up fee could encourage bidding. By definition, it can only serve as a deterrent.

35.    Because there is no auction contemplated, and because the Global Settlement will chill bidding, the request for the allowance of the break up fee and expense reimbursement should be denied. Integrated Resources, 147 B.R. at 659 ("The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding they are not enforceable.").[7]

---

[7] The break-up fee is potentially payable (i) in the event of a stand-alone plan, at approval of the disclosure statement or (ii) in the event of alternative investment transactions, 30 days after the Dana board approves the terms of any alternative transaction. At a minimum, the break-up fee, commitment fee and expense reimbursement (to the extent they are even appropriate), should be paid out of the proceeds or upon consummation of an alternative deal.

**C.    The Settlement Removes the Ability of this Court to Decide One of the Most Important Issues in this Case - Whether or Not the Unions are Acting "Reasonably" in Exercising Veto Rights Over Alternative Plan Sponsors**

36.    The Debtors claim the Global Settlement enables them to discharge their fiduciary responsibilities by allowing them to pursue alternative investments or plans if - after considering all relevant factors - a superior opportunity emerges.  But this "fiduciary out" is illusory because the Unions can effectively veto any transaction that does not involve Centerbridge as plan sponsor.  As noted above, merely by exercising their veto, the Unions can cause a delay that exists for at least seven weeks. In addition, this Court has no ability to review whether the Unions have been "reasonable" in exercising their veto over an alternative plan sponsor.  Instead, the parties to the Global Settlement have agreed that such a dispute - potentially the most important dispute in this entire bankruptcy case - will be transferred to an unidentified arbitrator who will have sole authority to determine whether the Unions are acting in a reasonable manner.[8]

37.    The Creditors' Committee respectfully submits that the Debtors, the Unions and Centerbridge - by an agreement among themselves to which no creditors are a party - should not be allowed to remove one of the most crucial issues in this bankruptcy case to an arbitration proceeding where creditors will have no voice and where this Court (who is intimately familiar with all of the facts as well as the potential impact the decision will have on the chapter 11 process) will have no role.  Indeed, courts have recognized the public policy of having issues important to the reorganization decided by the bankruptcy court - not an arbitrator - and have refused to enforce pre-petition arbitration clauses when they impinge on the

---

[8] As noted above, there are numerous scenarios (stand-alone plan, minority investment with different plan terms) where the Unions have a <u>unilateral right</u> to terminate their agreement with the Debtors and strike in their "sole unreviewable discretion."  Moreover, even in the limited circumstances where the Unions are obligated to act "reasonably," there are no clear ground rules setting forth the qualifications that the Unions may consider in determining whether an alternative sponsor is reasonably acceptable.

bankruptcy process. Given as much, it is difficult to see why this Court would authorize the parties to enter into a post-petition agreement seeking to divest the Court of jurisdiction of the most important issue in this case. See generally U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. (In re U.S. Lines, Inc.), 197 F.3d 631, 641 (2d Cir. 1999) (affirming the denial of arbitration of insurance claims because claims were integral to bankruptcy court's ability to preserve and equitably distribute assets of the estate); Gandy v. Gandy (In re Gandy), 299 F.3d 489, 498 (5th Cir. 2002) (holding that the bankruptcy court did not abuse its discretion in denying the motion to compel arbitration where the dispute "implicates matters central to the purposes and policies of the Bankruptcy Code"); Pardo v. Pacificare of Texas, Inc., (In re APF Co.), 264 B.R. 344, 364 (Bankr. D. Del. 2001) (denying enforcement of arbitration agreement because bankruptcy court "is the most efficient and effective forum in which to resolve these fundamental Bankruptcy Code issues"); Caldor Corp. v. S Plaza Assocs., L.P. (In re Caldor, Inc.-NY), 217 B.R. 121, 130 (Bankr. S.D.N.Y. 1998) (refusing to order arbitration of debtor's claims against lessor where such claims implicated "important aspects of the Bankruptcy Code and significant estate assets"); In re Spectrum Info. Techs., Inc., 183 B.R. 360, 363 (Bankr. E.D.N.Y. 1995) ("[E]specially with respect to core proceedings ... arbitration should not triumph over the specific jurisdiction bestowed upon the bankruptcy courts under the Bankruptcy Code.").

38.    In essence, the Debtors and the Unions have agreed to eliminate any meaningful review of the Unions' veto power in a process already slanted against other bids. The most important issue in the case is being transferred to an unknown arbitrator, whose decision will not be subject to any meaningful review on the merits. This is a patent disservice

- 16 -

to creditors, and this core, crucial dispute over the Unions' consent should be decided by this Court.[9]

## D. The Global Settlement is a Sub Rosa Plan

39. The Global Settlement dictates resolution of dozens of issues unrelated to the section 1113/1114 dispute including distributions to creditors, minimum liquidity, maximum debt leverage, appointment of the board of directors, and implementing an IRC 382(l)(5) exemption. Such terms are properly imposed on creditors only through the chapter 11 plan, not through a 9019 settlement or a section 363 motion that has the practical effect of dictating the terms of such a plan:

> Indeed, it is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures. Where it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved under that section.

Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.), 333 B.R. 30, 52 (S.D.N.Y. 2005) (holding that order authorizing distributions to creditors and termination of liens was an improper sub rosa plan); see also Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Airlines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986) ("When a proposed transaction specifies terms for adopting a reorganization plan, the parties and the district court must scale the hurdles erected in Chapter 11."); Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the

---

[9] Although the Debtors have reserved the right to seek bankruptcy Court review of the arbitrator's ruling, this "review" is illusory. Under the standard of review set forth in the Global Settlement, any action to vacate the arbitral award is subject to review under the standards made applicable by Section 301 of the Labor-Management Relations Act of 1947. As stated by the Second Circuit, "[u]nder our heightened standard of deference ... [i]f the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract, the award must stand." Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 222 (2d Cir. 2002).

KL2 2514330.14

requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with the sale of assets.").[10]

40.     In <u>Braniff</u>, the debtor (a troubled air carrier) entered into an agreement whereby it would transfer cash, airplanes and other property to a purchaser in exchange for travel scrip, unsecured notes and a participation in purchaser's profits.  700 F.2d at 939.  Specifically, the agreement provided that the debtor would pay $2.5 million for $7.5 million in travel scrip that could be used only in a future Braniff reorganization and only by Braniff employees, shareholders and creditors (in limited amounts) for travel on the purchaser's operations.  <u>Id</u>.  The Fifth Circuit held that these provisions "had the practical effect of dictating some of the terms of any future reorganization plan."  <u>Id</u>. at 940.  As stated by the Court:

> The reorganization plan would have to allocate the scrip according to the terms of the [purchase] agreement or forfeit a valuable asset. The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with the sale of assets.

<u>Id</u>.

41.     Like the transaction at issue in <u>Braniff</u>, the reorganization plan that is confirmed in this case will have to abide by the strict terms of the Global Settlement or else the Debtors will lose a valuable asset – the labor agreement.  For example, if Dana proposes <u>any</u> stand-alone plan of reorganization - regardless of its terms - the Unions can terminate all collective bargaining agreements, strike and have an allowed $908 million claim!  <u>See</u> Union

---

[10] <u>See also</u> <u>In re CGE Shattuck, LLC</u>, 254 B.R. 5, 12 (Bankr. D.N.H. 2000) ("[A] debtor may not use the provisions of § 363 to deny creditors the protections they would receive under Chapter 11 if the transaction were a part of a plan of reorganization."); <u>In re Quality Beverage Co.</u>, 181 B.R. 887, 895 (Bankr. S.D. Tex. 1995) (rejecting settlement agreement that distributed estate assets "without disclosure, claims allowance, and voting safeguards of plan confirmation in Chapter 11"); <u>In re Copy Crafters Quickprint, Inc.</u>, 92 B.R. 973, 983 (Bankr. N.D.N.Y. 1988) (rejecting lease transaction that was part of a sale integral to proposed plan before "hurdles of Chapter 11" were overcome).

Settlement Agreement, Appendix R § 3. If the Debtors propose a cheaper minority investment but with different plan terms (for instance, having the right to appoint only two directors or with different minimum liquidity requirements) the Unions can strike in their sole and absolute discretion. No reasonableness is required in either scenario.

42.     Accordingly, if this Global Settlement is approved, it will be incumbent upon the Debtors to propose a plan containing the dozens of terms and conditions of the Plan Term Sheet - or else risk a strike. Come confirmation, creditors and this Court will be left with no realistic alternative, because any other permutation of plan terms or plan sponsors - no matter how beneficial to creditors or the company - will involve risking the labor deal and a crippling Union claim. In the Creditors' Committee's view, the "settlement" is really no settlement at all - it is a mechanism that attempts to prematurely force creditors and this Court to accept Centerbridge's terms on numerous issues that are more properly dealt with at confirmation. See Braniff, 700 F.2d at 940 (sub rosa plan where settlement "had the practical effect of dictating some of the terms of any future reorganization plan").

E.     **The Global Settlement Obligates the Debtors to Seek Confirmation of a Patently Unconfirmable Plan**

43.     The Plan Support Agreement requires the Debtors to support the Plan containing the "Reorganization Metrics" set forth in the Plan Term Sheet. The metrics violate the Bankruptcy Code.

i)     The Right of a Minority Preferred Shareholder to Elect a Majority of the Board Now and Into the Future Violates Sections 1123(a)(7) and 1129(a)(5) of the Bankruptcy Code.

44.     Under the Global Settlement, Centerbridge - a minority investor who, according to the Motion, will likely hold less than 15% of the reorganized company on a full-diluted basis - has the right to nominate four of the seven members of the board of directors post-

confirmation.  Centerbridge's control of the directors will continue year after year, so long as it keeps an investment of $150 million or more in the company.[11]

45.    Bankruptcy Code sections 1123(a)(7) and 1129(a)(5) govern the identity and appointment mechanisms for post-confirmation officers and directors.[12]  With respect to initial directors, section 1129(a)(5)'s purpose is to "insure that the initial management and board of directors of the reorganized corporation will be sufficiently independent and free from conflicts and the potential of post reorganization litigation so as to serve all creditors and interested parties on an even and loyal basis."  See In re W.E.  Parks Lumber Co., 19 B.R. 285, 287, 292 (Bankr. W.D. La. 1982) (emphasis added).  Similarly, section 1123(a)(7) (governing mechanics for selecting post-confirmation directors) "was intended to make certain ... that provision will be carried in the plan for the selection - at least for the mechanics or means of selecting the managements which will carry forward the reorganization in the interest of the parties."  In re Machne Menachem, Inc., 304 B.R. 140, 142-43 (Bankr. M.D. Pa. 2003). Accordingly, "[i]n analyzing these provisions in plans [i.e., regarding manner of selection of officers and directors], we believe that a court should consider, inter alia, the shareholders' interest in participating in the corporation, the desire to preserve the debtor's reorganization and the overall fairness of the [plan] provisions."  See Acequia, Inc. v. Clinton (In re Acequia), 787 F.2d 1352 (9th Cir. 1986).

---

[11] In the Motion, the Debtors state that a $500 million investment would represent less than 25% of the fully diluted common stock.  Accordingly, a $300 million investment by Centerbridge for the Series A Preferred would represent not more than 15% of the fully diluted common stock of reorganized Dana.

[12] Section 1123(a)(7) provides that a plan must "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7). Similarly, Bankruptcy Code Section 1129(a)(5)(A) provides that the court may only confirm a plan if the plan proponent has disclosed the identity of the post-confirmation officers and "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy."

46. The Global Settlement violates both sections of the Bankruptcy Code. It makes no sense for Centerbridge - who may hold only 7.5% of the common stock on a fully diluted basis as early as two months after confirmation - to have the right to control four out of seven members of the board. See generally W.E. Parks, 19 B.R. at 292 ("[I]t is obvious that, if the [secured creditor] were allowed to nominate a majority of the board of directors, there would be created a conflict of interest detrimental to other creditors and the public at large."). It is difficult for the Centerbridge directors to adequately represent the interests of all common stockholders because Centerbridge - as holder of the Series A Preferred that are senior to all other stockholders - has different rights and potentially competing interests with the common stockholders. C.f., In re Washington Group Int'l, Inc., No BK-N-01-31627, 2001 Bankr. LEXIS 2150, at *7 (Bankr. D. Nev. December 21, 2001) ("Because the majority of the initial board of directors of [the reorganized debtor] shall be designated by the Steering Committee and the Creditors' Committee, which represent the creditors that receive one hundred percent (100%) of the New Common Shares on the Effective Date, the appointment or continuance of the proposed directors and officers is consistent with the interests of holders of Claims and Interests and public policy.") (emphasis added). Unless and until the Global Settlement provides for more equitable mechanics for selecting the current and continuing board, the Motion should be denied.

ii) The Preferred Series A Shares Being Distributed to Centerbridge Violate Section 1123(a)(6) of the Bankruptcy Code Because they Provide Centerbridge with Inordinate Control of the Company at the Expense of the Common Stockholders.

47. Bankruptcy Code section 1123(a)(6) provides that a plan "must provide for the inclusion in the charter of the debtor... of a provision... providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes ..." Although there is scant caselaw on this statute, its purpose is to ensure that one class

of stockholders is not disenfranchised by the rights of other constituencies in the capital structure. "These provisions [sections 1123(a)(6) and (a)(7)] require that the court scrutinize any plan which alters voting rights... in connection with a plan of reorganization, whether or not the plan provides for the issuance of new securities." In re Acequia, 787 F.2d at 1361. In determining whether a plan meets the requirements of section 1123(a)(6), the court should consider, among other things, shareholders' interests and the overall fairness of the provisions. Id. at 1362; see also In re Quaker City Cold Storage Co., 71 F. Supp. 124, 131-32 (E.D. Pa. 1947) (interpreting Section 216(1) of the Bankruptcy Act - section 1123(a)(6)'s predecessor statute).

48.     Under the Global Settlement, only Centerbridge is authorized to purchase the Series A Preferred. In addition to the right to nominate a majority of the board of directors, the holders of the Series A Preferred are granted numerous other rights that will detrimentally affect the value of the common stock holders who do not have such rights. For example, so long as Centerbridge holds a mere $150 million of the Series A preferred (on a company with a potential enterprise value in the billions), Centerbridge and only Centerbridge will have the right, for at least five years (and potentially into perpetuity), to, among other things: (i) block sales of substantially all of the company's assets or any "change of control;" (ii) prohibit dividends on account of common stock; (iii) preclude any amendment to Dana's charter; (iv) prohibit the issuance of any security that is senior or pari passu to Centerbridge; or (v) block any amendment to the by-laws that adversely affects Centerbridge. Going forward, Centerbridge will be in a position to demand a substantial control premium as a cost to doing any deal to the detriment of common stockholders.

49.    These and other governance rights are intrusive insofar as they will allow Centerbridge to prevent the company from engaging in transactions that are in the best interests of a majority of the owners of the enterprise.  Moreover, in exercising these substantial veto and consent rights in its capacity as a Series A Preferred Holder, Centerbridge will not be bound by any fiduciary duty to the company or common stockholders.  Any and all Centerbridge vetoes will be immune from all legal or market tests, rendering any Centerbridge action as a preferred stockholder impervious to challenge under corporate law and beyond the reach of any proxy fight.  Going forward, Centerbridge will be in a position to demand a substantial control premium as a cost to doing any deal to the detriment of common stockholders.

50.    At trial, the Creditors' Committee will show that these types of veto rights for a minority preferred shareholder are unfair to common stockholders.  In addition, the Creditors' Committee will show that these veto rights decrease the value of the junior securities being distributed to general unsecured creditors, thereby increasing Centerbridge's recovery on account of its fixed investment and reducing value available to pre-petition unsecured creditors.  Because Centerbridge is receiving too much control for too small an investment, the terms of the Series A Preferred *vis-à-vis* the common stock do not provide for an "appropriate distribution of such power among such classes" and do not withstand the scrutiny required under Bankruptcy Code section 1123(a)(6).

iii)    Allowing Some - But Not All - Unsecured Creditors the Right to Purchase Series B Preferred Shares Violates Bankruptcy Code Section 1123(a)(4).

51.    Bankruptcy Code section 1123(a)(4) "prohibits different percentage settlements to members of the same class as well as unequal consideration tendered for equal payment."  See 7 Collier on Bankruptcy, 1123.01[4] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. 2005).  On its face, the Global Settlement proposes to do exactly what the Bankruptcy

Code prohibits.   Only certain unsecured creditors (i.e., those that meet certain as-of-yet undefined "objective criteria") will have the right to purchase the Series B Preferred.   If the Series B Preferred are being issued pursuant to the plan, this is unfair and unequal treatment, because the Series B Preferred are of a substantial value, and should be offered to all unsecured creditors in an equitable manner to comply with section 1123(a)(4).   See In re AOV Indus., Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986) ("Even though neither the [Bankruptcy] Code nor the legislative history precisely defines the standards of equal treatment, the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members."); Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 659-60 (6th Cir. 2002) (finding disparate treatment of claims in a particular class in violation of section 1123(a)(4) where certain claimants were afforded more rights than other claimants in the same class).

52.    Although the Global Settlement is silent on this issue, the Creditors' Committee understands that one of the "objective criteria" used to determine eligibility is that the creditor seeking preferential treatment vote in favor of the Debtors' plan.   The fact that a party has agreed to vote for a plan, however, is not justification to treat that party differently from other creditors in the same class.   See In re Union Meeting Partners, 165 B.R. 553, 566-67 (Bankr. E.D. Pa. 1994) (denying confirmation because plan allowed all unsecured creditors except one "to receive an additional fifteen (15%) percent dividend directly from the General Partners if they vote in favor of the Debtor's Plan and releases [sic] the General Partners of all liability.").   To the contrary, by offering to treat creditors who vote in favor of the plan more favorably than those who vote against the plan (and by making that offer to some, but not all, creditors of a class), the Centerbridge plan unfairly rewards certain large claimholders who agree

to support the Centerbridge plan at the expense of other creditors not allowed to participate. This, calls into question the confirmability of the plan, because a plan cannot be deemed proposed in good faith where it is premised upon a payment to vote yes that is being paid to certain, but not all, creditors on a discriminatory basis. See generally In re Dunes Hotel Assocs., 188 B.R. 174, 188-89 (Bankr. D.S.C. 1995) (stating that debtor's manipulation of claims in attempt to achieve confirmation in face of overwhelming opposition by creditors whose claims were truly impaired would demonstrate lack of "good faith").

**E.     The Terms of the Union Deal Does Not Justify Paying a Premium to Centerbridge**

53.     Notably, the Motion does not provide an estimate of the amount of claim to which the Unions are even entitled, so it is impossible to determine the Unions' recovery on account of the termination of Retiree Benefits. Pursuant to the Global Settlement, the Debtors are transferring $744 million in cash and stock to a VEBA to fund Retiree Benefits being rejected. Assuming that the resulting claim from rejection of the Retiree Benefits was equal to the Debtors' FAS 106 Accumulated Post-Employment Benefit Obligation ("APBO") of approximately $1 billion, the Unions are receiving a guaranteed recovery of at least 74 cents on account of the Retiree Benefits claim. Although the Creditors' Committee does not object to this portion of the settlement, it hardly justifies the payment of the additional premiums to third parties required as part of the Global Settlement, including (i) the $30 million potentially payable to Centerbridge on account of its break up fee and expense reimbursement; (ii) the $37.5 million potentially payable to Miller Buckfire on account of its "Financing Fee"; and (iii) $150 million in premiums payable to Series A and Series B Preferred.

54.     There is another reason why the Unions are getting a good deal here. The 74-cent recovery analysis assumes that the Unions would be entitled to the full FAS 106 amount if the Retiree Benefits are rejected, but applicable law is not so generous. Retiree Benefits exist

solely as a matter of contract, and generally can be terminated without any claim regardless of the FAS 106 APBO.  "Unlike pension plan benefits, the benefits provided by a welfare plan generally are not vested and an employer can amend or terminate a welfare plan at any time." Am. Fed. of Grain Millers v. In'l Multifoods Corp., 116 F.3d 976, 979 (2d Cir. 1997); see also Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995).  Accordingly, termination of Retiree Benefits will only give rise to claim if the applicable documents vest lifetime benefits by their terms.  See LTV Steel Co. v. United Mine Workers of Am. (In re Chateaugay Corp.), 945 F.2d 1205, 1208-9 (2d Cir. 1991); In re Ionosphere Clubs, Inc., 134 B.R. 515, 519 n. 4 (Bankr. S.D.N.Y. 1991) ("[S]ection 1114 does not protect retiree benefits beyond the contractual obligations of the debtor.")

55.    In connection with the underlying 1113/1114 Motion, the Creditors' Committee reviewed and analyzed the Debtors' unionized retiree medical benefit plans at major union locations.  With the help of the Debtors' professionals, the Creditors' Committee allocated a FAS 106 APBO number to each particular agreement.  At trial, the Creditors' Committee will show that a substantial portion of the Debtors' $1 billion FAS 106 APBO liability relates to plans containing language that does not purport to vest retiree welfare benefits, and that many of these plans expressly reserve the unilateral right of the Debtors to modify or terminate the plans at any time.  Accordingly, using the FAS 106 APBO results in too great a denominator (and too low a percentage recovery) when calculating the actual claim recovery for the Unions, the Unions are actually receiving in excess of 100% of their allowable unsecured claim.

**F.    Because the Global Settlement Impermissibly Combines the Union Deal with the Centerbridge Components, it Violates Bankruptcy Rule 9019**

56.    The Debtors seek approval of the Global Settlement pursuant to Bankruptcy Rule 9019(a).  Under Rule 9019, the test is whether the settlement is fair and

equitable and in the "best interests of the estate." In re Purofied Down Prods. Corp., 150 B.R. 519, 523 (S.D.N.Y. 1993).[13]  In addition, a Rule 9019 settlement cannot be used to contravene otherwise applicable provisions of the Bankruptcy Code.  See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 464 (2d Cir. 2007) ("[W]hether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider when determining whether a settlement is 'fair and equitable' under Rule 9019.").

57.    The Creditors' Committee recognizes and is sympathetic to the concessions made by the unionized employees and retirees, and the Creditors' Committee does not object to any of the issues in the Global Settlement related to the sacrifices required of workers or retirees, the Debtors' need for those sacrifices, or the cash and stock being paid to the Unions in respect of those sacrifices.  But other components of the Global Settlement (including the sub rosa plan, the impermissible terms of that plan, and the premium and control being transferred to new investors at creditors' expense) poison the rest of the deal.  Because the parties to the Global Settlement have tied a potentially reasonable Union settlement to an unreasonable (and unconfirmable) plan, the Global Settlement does not meet the Rule 9019 standard.  Nor is it fair to all creditors.  While the settlement could be a good deal for certain unsecured creditors who are lucky enough to be authorized to purchase the Series B Preferred Shares, other creditors in the same class will be unfairly diluted by this transfer of value.  See

---

[13] To determine whether a settlement is in the best interests of the estate, courts consider: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.  Iridium, 478 F.3d at 462 (citing In re WorldCom, Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).

KL2 2514330.14

Nellis v. Shugrue, 165 B.R. 115, 122 (S.D.N.Y. 1994) (stating the "judge must consider the fairness of the settlement to the estate and its creditors").

<div align="center">

### CONCLUSION

</div>

58.    The Creditors' Committee is cognizant of the significance of, and the need to resolve, the issues associated with the 1113/1114 Motion.  While the Creditors' Committee encourages an amicable as opposed to a litigated resolution, the Creditors' Committee submits that any such resolution must be fair and reasonable for all of the Debtors' creditor constituents and must not otherwise violate the provisions of the Bankruptcy Code.  The Global Settlement, in its current form, falls short on both counts.  But, it is not without hope.  Indeed, the Creditors' Committee believes that, with the following modifications, the Global Settlement may strike a fair and reasonable balance while keeping intact the essential chapter 11 plan disclosure, solicitation and confirmation protections:

- <u>Series B Preferred</u> – The opportunity to purchase Series B Preferred should be made available to all unsecured creditors in an equitable and arms-length manner, as opposed to the "objective criteria chosen by Centerbridge."  This will satisfy 11 U.S.C. § 1123(a)(4) and cleanse the Global Settlement of its disparate treatment of creditors.

- <u>Purchase Price</u> – The purchase price of the Series A, B1 and B2 Preferred Shares should be based off a fixed total enterprise value so that creditors can compute the full extent of dilution prior to voting on any plan.

- <u>Corporate Governance</u> – The scope of Centerbridge's control over the nomination of board of directors, as well as Centerbridge's veto rights over major corporate transactions, should be scaled back to comply with the Bankruptcy Code.

- <u>Auction Process</u> – The Debtors should propose and implement reasonable auction and bidding procedures in connection with the proposed minority investment.  This will benefit all creditors by maximizing the value the Debtors receive in exchange for the issuance of its stock.  Eliminating Centerbridge's right to match will minimize the Global Settlement's chilling effect on competitive bidding, while having a public, clear timeline and criteria for bids will assist potential investors in making bids.

KL2 2514330.14

- <u>Union Consent and Termination Rights</u> – If this is a true settlement, the settlement should remain in place so long as the fundamental terms of the union deal remain in place.  In any event, whether or not the Unions are acting "reasonably" in withholding consent should surely be determined by this Court, not an arbitrator.

WHEREFORE, the Creditors' Committee respectfully requests that the Court deny the Motion and grant such further relief as is just and proper.

Dated: July 20, 2007

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

By:  /s/ Thomas Moers Mayer
Thomas Moers Mayer (TM 9357)
Matthew J. Williams (MW 4081)
Daniel M. Eggermann (DE-3024)
Stephen D. Zide (SZ-0004)
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

Counsel for the Official Committee of
Unsecured Creditors of Dana Corporation, *et al.*
www.danacreditorcommittee.com

# **EXHIBIT A**

```
<DOCUMENT>
<TYPE>SC 13D/A
<SEQUENCE>1
<FILENAME>sch13d_a.txt
<DESCRIPTION>AMENDMENT
<TEXT>
```
================================================================================

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

----------

SCHEDULE 13D/A
(Amendment No. 2)
Under the Securities Exchange Act of 1934

----------

DANA CORPORATION
(Name of Issuer)

Common Stock, $1.00 Par Value Per Share
(Title of Class of Securities)

235811106
(CUSIP Number)

----------

with copies to:

Ken Maiman
Appaloosa Management L.P.
26 Main Street
Chatham, NJ 07928
(Name, Address and Telephone Number of Person
Authorized to Receive Notices of Communication)

July 18, 2007
(Date of Event Which Requires Filing of This Statement)

    If the filing person has previously filed a statement on Schedule 13G to
report the acquisition which is the subject of this Schedule 13D, and is filing
this schedule because of Rule 13d-1(e), 13d-1(f) or 13d-1(g), check the
following box. [ ]

================================================================================

Page 1 of 9
```
<PAGE>
```
-------------------                           -------------------
CUSIP No. 235811106                13D
-------------------                           -------------------

-----  -----------------------------------------------------------------------
  1    NAME OF REPORTING PERSONS
       Appaloosa Investment Limited Partnership I
       S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS

```
----- -----------------------------------------------------------------------
 2     CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP              (a) [ ]
                                                                     (b) [ ]
----- -----------------------------------------------------------------------
 3     SEC USE ONLY
----- -----------------------------------------------------------------------
 4     SOURCE OF FUNDS
       OO
----- -----------------------------------------------------------------------
 5     CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT
       TO ITEM 2(d) OR 2(e)                                              [ ]
----- -----------------------------------------------------------------------
 6     CITIZENSHIP OR PLACE OF ORGANIZATION
       Delaware
------------------- ------- -------------------------------------------------
NUMBER OF             7     SOLE VOTING POWER
SHARES                     0
BENEFICIALLY        ------- -------------------------------------------------
OWNED BY             8     SHARED VOTING POWER
EACH REPORTING            11,992,500
PERSON WITH         ------- -------------------------------------------------
                     9     SOLE DISPOSITIVE POWER
                          0
                    ------- -------------------------------------------------
                     10    SHARED DISPOSITIVE POWER
                          11,992,500
----- -----------------------------------------------------------------------
 11    AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
       11,992,500
----- -----------------------------------------------------------------------
 12    CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES
       CERTAIN SHARES                                                   [ ]
----- -----------------------------------------------------------------------
 13    PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
       7.98%
----- -----------------------------------------------------------------------
 14    TYPE OF REPORTING PERSON
       PN
----- -----------------------------------------------------------------------
```

Page 2 of 9

<PAGE>

```
-------------------                         -------------------
CUSIP No. 235811106                13D
-------------------                         -------------------
```

```
----- -----------------------------------------------------------------------
 1     NAME OF REPORTING PERSONS
       Palomino Fund Ltd.
       S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS
----- -----------------------------------------------------------------------
 2     CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP              (a) [ ]
                                                                     (b) [ ]
----- -----------------------------------------------------------------------
 3     SEC USE ONLY
----- -----------------------------------------------------------------------
 4     SOURCE OF FUNDS
       OO
----- -----------------------------------------------------------------------
 5     CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT
```

```
           TO ITEM 2(d) OR 2(e)                                           [ ]
----- ------------------------------------------------------------------------
6      CITIZENSHIP OR PLACE OF ORGANIZATION
       British Virgin Islands
-------------------- ------- --------------------------------------------------
NUMBER OF              7      SOLE VOTING POWER
SHARES                       0
BENEFICIALLY          ------- --------------------------------------------------
OWNED BY              8      SHARED VOTING POWER
EACH REPORTING               10,507,500
PERSON WITH           ------- --------------------------------------------------
                      9      SOLE DISPOSITIVE POWER
                             0
                      ------- --------------------------------------------------
                      10     SHARED DISPOSITIVE POWER
                             10,507,500
------------------------------------------------------------------------------
11     AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
       10,507,500
----- ------------------------------------------------------------------------
12     CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES
       CERTAIN SHARES                                                      [ ]
----- ------------------------------------------------------------------------
13     PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
       7.00%
----- ------------------------------------------------------------------------
14     TYPE OF REPORTING PERSON
       CO
----- ------------------------------------------------------------------------
```

Page 3 of 9

<PAGE>
```
--------------------                             --------------------
CUSIP No. 235811106                13D
--------------------                             --------------------


----- ------------------------------------------------------------------------
1      NAME OF REPORTING PERSONS
       Appaloosa Management L.P.
       S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS
----- ------------------------------------------------------------------------
2      CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP             (a) [ ]
                                                                   (b) [ ]
----- ------------------------------------------------------------------------
3      SEC USE ONLY
----- ------------------------------------------------------------------------
4      SOURCE OF FUNDS
       AF
----- ------------------------------------------------------------------------
5      CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO
       ITEM 2(d) OR 2(e)                                                   [ ]
----- ------------------------------------------------------------------------
6      CITIZENSHIP OR PLACE OF ORGANIZATION
       Delaware
-------------------- ------- --------------------------------------------------
NUMBER OF              7      SOLE VOTING POWER
SHARES                       0
BENEFICIALLY          ------- --------------------------------------------------
OWNED BY              8      SHARED VOTING POWER
EACH REPORTING               22,500,000
```

```
PERSON WITH
                      ------- --------------------------------------------------
                      9       SOLE DISPOSITIVE POWER
                              0
                      ------- --------------------------------------------------
                      10      SHARED DISPOSITIVE POWER
                              22,500,000
--------------------------------------------------------------------------------
11     AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
       22,500,000
-----  -------------------------------------------------------------------------
12     CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES
       CERTAIN SHARES                                                       [ ]
-----  -------------------------------------------------------------------------
13     PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
       14.98%
-----  -------------------------------------------------------------------------
14     TYPE OF REPORTING PERSON
       PN
-----  -------------------------------------------------------------------------
```

                            Page 4 of 9

<PAGE>
```
-------------------                        -------------------
CUSIP No. 235811106                13D
-------------------                        -------------------


-----  -------------------------------------------------------------------------
1      NAME OF REPORTING PERSONS
       Appaloosa Partners Inc.
       S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS
-----  -------------------------------------------------------------------------
2      CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP            (a) [ ]
                                                                  (b) [ ]
-----  -------------------------------------------------------------------------
3      SEC USE ONLY
-----  -------------------------------------------------------------------------
4      SOURCE OF FUNDS
       AF
-----  -------------------------------------------------------------------------
5      CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO
       ITEM 2(d) OR 2(e)                                                    [ ]
-----  -------------------------------------------------------------------------
6      CITIZENSHIP OR PLACE OF ORGANIZATION
       Delaware
-------------------   ------- --------------------------------------------------
NUMBER OF             7       SOLE VOTING POWER
SHARES                        0
BENEFICIALLY          ------- --------------------------------------------------
OWNED BY              8       SHARED VOTING POWER
EACH REPORTING                22,500,000
PERSON WITH           ------- --------------------------------------------------
                      9       SOLE DISPOSITIVE POWER
                              0
                      ------- --------------------------------------------------
                      10      SHARED DISPOSITIVE POWER
                              22,500,000
--------------------------------------------------------------------------------
11     AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
       22,500,000
-----  -------------------------------------------------------------------------
```

```
12    CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES
      CERTAIN SHARES                                                    [ ]
----- --------------------------------------------------------------------
13    PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
      14.98%
----- --------------------------------------------------------------------
14    TYPE OF REPORTING PERSON
      CO
----- --------------------------------------------------------------------
```

                              Page 5 of 9
<PAGE>

```
-------------------                        -------------------
CUSIP No. 235811106              13D
-------------------                        -------------------


----- --------------------------------------------------------------------
1     NAME OF REPORTING PERSONS
      David A. Tepper
      S.S. OR I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS
----- --------------------------------------------------------------------
2     CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP           (a) [ ]
                                                                 (b) [ ]
----- --------------------------------------------------------------------
3     SEC USE ONLY
----- --------------------------------------------------------------------
4     SOURCE OF FUNDS
      AF
----- --------------------------------------------------------------------
5     CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO
      ITEM 2(d) OR 2(e)                                                 [ ]
----- --------------------------------------------------------------------
6     CITIZENSHIP OR PLACE OF ORGANIZATION
      United States of America
------------------- ------- ----------------------------------------------
NUMBER OF           7     SOLE VOTING POWER
SHARES                    0
BENEFICIALLY        ------- --------------------------------------------
OWNED BY            8     SHARED VOTING POWER
EACH REPORTING           22,500,000
PERSON WITH         ------- --------------------------------------------
                    9     SOLE DISPOSITIVE POWER
                         0
                    ------- --------------------------------------------
                    10    SHARED DISPOSITIVE POWER
                         22,500,000
--------------------------------------------------------------------------
11    AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
      22,500,000
----- --------------------------------------------------------------------
12    CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES
      CERTAIN SHARES                                                    [ ]
----- --------------------------------------------------------------------
13    PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
      14.98%
----- --------------------------------------------------------------------
14    TYPE OF REPORTING PERSON
      IN
----- --------------------------------------------------------------------
```

Page 6 of 9

&lt;PAGE&gt;

     This Amendment No. 2 (this "Amendment") to the Schedule 13D filed on June
22, 2007 by the Reporting Persons, as amended by Amendment No. 1 thereto filed
on June 29, 2007 (as so amended, the "Schedule 13D") relates to the Common Stock
of the Issuer and is being filed to amend the Schedule 13D as specifically set
forth below.

     The information set forth in the Exhibits to this Amendment is hereby
expressly incorporated herein by reference, and the responses to each item of
this Amendment are qualified in their entirety by the provisions of such
Exhibits. Unless otherwise indicated, all capitalized terms shall have the
meanings ascribed to them in the Schedule 13D, and unless otherwise amended
hereby, all information previously filed remains in effect.

ITEM 4. IS AMENDED BY ADDING THE FOLLOWING:

     Yesterday evening, AMLP sent a letter to the Board asking that the Board
reconsider the Issuer's current restructuring strategy and abandon its pursuit
of the proposed transaction with Centerbridge Capital Partners, L.P.
("Centerbridge"), which is described in the Issuer's current report on Form 8-K
filed on July 5, 2007 (the "Proposed Centerbridge Transaction"). As described in
the letter, AMLP has made a fully committed offer to replace Centerbridge on
terms superior to the terms of the Proposed Centerbridge Transaction. Notably,
AMLP's offer to replace Centerbridge is not subject to a due diligence
condition, despite the fact that the Issuer has not provided AMLP with the
opportunity to conduct any due diligence regarding the Issuer. AMLP has also
delivered with its letter to the Board a term sheet for an alternative
restructuring proposal, which AMLP believes will be materially more favorable to
stakeholders than the plan of reorganization proposed under the Proposed
Centerbridge Transaction. The foregoing summary of AMLP's July 18th letter to
the Board is qualified in its entirety by reference to the July 18th letter, a
copy of which is filed with this Amendment No. 2 as Exhibit 3 to the Schedule
13D.

     While the Reporting Persons do not have any current plans or proposals,
except as otherwise described in this Statement, which relate to or would result
in any transaction, event or action enumerated in paragraphs (a) through (j) of
Item 4 of the form of Schedule 13D promulgated under the Securities Exchange Act
of 1934, as amended (the "Exchange Act"), each of the Reporting Persons reserves
the right, in light of its or his ongoing evaluation of the Issuer's financial
condition, business, operations and prospects, the market price of the Common
Stock, conditions in the securities markets generally, general economic and
industry conditions, its or his business objectives and other relevant factors,
to change its or his plans and intentions at any time, as it or he deems
appropriate. In particular, and without limiting the generality of the
foregoing, but subject to the terms of applicable court orders, restrictions and
agreements and to any limitations imposed by applicable law, including the
Exchange Act, each of the Reporting Persons (and their respective affiliates)
may (i) purchase additional shares of Common Stock or other securities of or
claims against the Issuer, (ii) sell or transfer shares of Common Stock or other
securities or claims beneficially owned by it or him from time to time in public
or private transactions and (iii) cause any of the Reporting Persons to
distribute in kind to their respective stockholders, partners or members, as the
case may be, shares of Common Stock or other securities or claims owned by such
Reporting Persons. The Reporting Persons may seek the views of, hold discussions
with, or respond to inquiries from members of the Issuer's management or Board
of Directors or other persons including other stockholders, or holders of

Page 7 of 9

```
<PAGE>
```
claims in the Issuer's bankruptcy proceedings, regarding the Issuer's affairs,
restructuring or other strategic matters.

ITEM 7. MATERIAL TO BE FILED AS EXHIBITS

        Item 7 of the Schedule 13D is supplemented as follows:

EXHIBIT NO.   DESCRIPTION
-----------   -------------------------------------------------------------------
     3        Letter sent by Appaloosa Management L.P. to the Members of the
              Board of Directors of Dana Corporation, dated July 18, 2007,
              together with attachment thereto.

                              Page 8 of 9
```
<PAGE>
```
                                SIGNATURE

        After reasonable inquiry and to the best of my knowledge and belief, I
certify that the information set forth in this statement is true, complete and
correct.

Dated: July 19, 2007


                                    APPALOOSA INVESTMENT LIMITED
                                    PARTNERSHIP I

                                    By: APPALOOSA MANAGEMENT L.P.,
                                        Its General Partner

                                    By: APPALOOSA PARTNERS INC.,
                                        Its General Partner


                                    By: /s/ David A. Tepper
                                        --------------------------
                                    Name:  David A. Tepper
                                    Title: President

                                    PALOMINO FUND LTD.

                                    By: APPALOOSA MANAGEMENT L.P.,
                                        Its Investment Adviser

                                    By: APPALOOSA PARTNERS INC.,
                                        Its General Partner


                                    By: /s/ David A. Tepper
                                        --------------------------
                                    Name:  David A. Tepper
                                    Title: President

                                    APPALOOSA MANAGEMENT L.P.

                                    By: APPALOOSA PARTNERS INC.,
                                        Its General Partner

```
                                    By: /s/ David A. Tepper
                                        --------------------------
                                    Name:  David A. Tepper
                                    Title: President


                                    APPALOOSA PARTNERS INC.


                                    By: /s/ David A. Tepper
                                        --------------------------
                                    Name:  David A. Tepper
                                    Title: President



                                    /s/ David A. Tepper
                                    ------------------------------
                                    David A. Tepper
```

Page 9 of 9

```
</TEXT>
</DOCUMENT>
```

```
<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>2
<FILENAME>ex99.txt
<DESCRIPTION>LETTER TO BOARD OF DIRECTORS OF DANA CORPORATION
<TEXT>
```

                    Appaloosa Management L.P.
                        26 Main Street
                      Chatham, NJ 07928


July 18, 2007


TO: THE BOARD OF DIRECTORS OF DANA CORPORATION
4500 Dorr Street
Toledo, Ohio 43615


Ladies and Gentlemen:

The efforts of management and its advisors to pursue a plan sponsored by
Centerbridge Capital Partners, L.P. ("Centerbridge") have been fundamentally
flawed and, if continued, will yield far less than the maximum recoveries
available to stakeholders. It is the fiduciary responsibility of the Board to
ensure that management and its advisors pursue strategies designed to maximize
the value of the Debtors' estates for the benefit of all stakeholders. The Board
has failed in this regard.

As an initial matter, management and its advisors continue to resist our efforts
to obtain legitimately from the Company customary access to information needed
to support a plan-sponsorship proposal, which proposal we believe may pay
creditors in full and provide a return to current shareholders. To date,
management has conditioned our access to information upon us agreeing to give up
inherent rights of a stakeholder, including our right to make a proposal without
management's prior approval, and has ceded to Centerbridge material decision
making authority regarding the terms of access to information. The efforts of
management and its advisors in concert with Centerbridge to exclude interested
investors from the process will inevitably ensure that no alternative
competitive proposals ever materialize.

Furthermore, the Company's proposed transaction with Centerbridge and the Unions
(a) shifts significant estate decision-making authority to non-fiduciaries (the
unions and their financial advisor), (b) shifts material estate value to a third
party, without the benefit of a meaningful competitive bidding process, (c)
provides substantial value and benefits to management, and (d) is structured to
effectively preclude competing proposals.

To demonstrate the absurd and one-sided nature of the Centerbridge proposal, we
are prepared, and do hereby unconditionally commit, despite not being permitted
to conduct any due diligence, to fund and perform Centerbridge's obligations as
set forth in the "Terms of Centerbridge Investment," attached as Exhibit B to
Plan Support Agreement, filed as an exhibit to the Company's Form 8K, dated July
5, 2007, in exchange for the consideration to be provided to Centerbridge
thereunder, with the following improvements in favor of the Company: (1) we
agree to eliminate and waive any break-up fee; (2) we will enhance the
Conversion Price from .83 times Distributable Market Equity Value Per Share to
.90 times Distributable Market Equity Value per share (each term as defined in
the Terms of Centerbridge Investment); and (3) we will agree to the elimination
of barriers to the submission of competing proposals. We can make this
commitment with its enhancements over the Centerbridge proposal without the
benefit of any
```
<PAGE>
```

due diligence, because the Centerbridge transaction is essentially risk-free to Centerbridge. The Conversion Price, rather than being fixed on the basis of a set enterprise value, which would permit stakeholders to assess the value of their recovery, is instead set after-the-fact at a 17% discount to actual trading value. In other words, given Centerbridge's guaranteed senior position in the capital structure, they are assured of being "in the money" regardless of (a) the Company's condition when it emerges from chapter 11 protection, or (b) the total amount of allowed claims entitled to distributions under a plan of reorganization. We believe this construct provides Centerbridge and its co-investors with a risk free return of several hundred million dollars on their investment at the expense of your stakeholders.

Notwithstanding our full commitment to pursue an alternative to the Centerbridge transaction as outlined above, we believe that the structure of the Centerbridge transaction, even as improved by us, remains fundamentally unfair to existing stakeholders. As a consequence, based on our understanding of the Company and its finances as set forth in publicly available information, and subject to our and our financial advisors' (The Blackstone Group) satisfaction with confirmatory due diligence (which we believe can be completed promptly with the Company's support and cooperation), and the negotiation and preparation of customary definitive documents, we are prepared to fund the Company's chapter 11 exit on the terms set forth on the attached plan term sheet. This proposal is materially superior to the Centerbridge proposal because, among other things, it:

(1)  Aligns our interests as plan investors in the future success of the Company with those of the other stakeholders;

(2)  Appropriately values the Company allowing creditors to receive a full recovery on their claims and provides a meaningful return to shareholders;

(3)  Properly allocates the role of the Company's stakeholders in the selection of a new board of directors and the Company's post-exit governance; and

(4)  Ensures that management will be accountable to stakeholders on a going-forward basis

Furthermore, while our proposal contemplates the full incorporation of the economic terms of the Company's proposed settlement with its Unions, we are also willing to pursue a transaction that does not require the incorporation of the Union settlement, thereby permitting the Company to exercise fully its fiduciary duty to pursue value maximizing transactions.

We implore you to review and reconsider the Company's current restructuring strategy. The consequences of continued pursuit of this strategy will be unfortunate. To protect their legitimate interests (that are being ignored by the Company), stakeholders will be compelled to pursue remedies that are by definition less efficient and more expensive than a proper resolution of this chapter 11 case (but nonetheless more favorable than the outcome put forth by the Company). At a minimum, the plan process will be hotly contested until its conclusion (and perhaps beyond). In addition, parties may determine to pursue other available stakeholder remedies.

2

<PAGE>
We believe that the situation requires your immediate attention and consideration. We are available to meet with the Board and its representatives at your earliest convenience to discuss more fully the matters set forth herein and to work toward an amicable, appropriate conclusion to Dana's chapter 11 case.

Sincerely,

APPALOOSA MANAGEMENT L.P.


-------------------------
David Tepper
President

                                    3

<PAGE>

                                              JULY 18, 2007
                                    FOR DISCUSSION PURPOSES ONLY

                            TERM SHEET FOR
                PLAN OF REORGANIZATION FOR DANA CORPORATION

Set forth below is a summary of indicative terms for a potential investment in
Dana Corporation by entities or funds controlled by Appaloosa Management L.P.
The investment is being made in connection with a Plan of Reorganization of Dana
Corporation under chapter 11 of the Bankruptcy Code. The terms set forth below
are intended solely to provide a framework for the parties as they proceed with
discussions of the proposed transaction and do not constitute any agreement with
respect to the definitive terms for any transaction or any agreement to agree or
any solicitation of acceptances or rejections of any plan of reorganization.
While the parties expect to negotiate in good faith with respect to the terms
for a transaction, any party shall be free to discontinue discussions and
negotiations at any time for any reason or no reason. No party shall be bound by
the terms hereof and only execution and delivery of definitive documentation
relating to the transaction shall result in any binding or enforceable
obligations of any party relating to the transaction.

New Equity Investment            On the Effective Date, subject to participation
                                 rights of existing stakeholders as more fully
                                 set forth herein, Appaloosa Management LP
                                 ("AMLP") will fully commit up to $750 million of
                                 equity financing, consisting of (i) $300 million
                                 of Series A Preferred Stock, (ii) $100 million
                                 of Series B Preferred Stock, (iii) up to $100
                                 million of Series B Preferred Stock not
                                 otherwise subscribed to in the Preferred Stock
                                 Rights Offering, and (iv) up to $250 million of
                                 New Common Stock not otherwise subscribed to in
                                 the Common Stock Rights Offering (collectively,
                                 the "Investment").

New Debt Financing               On the Effective Date, the Company shall (i)
                                 obtain a Senior Secured Facility in the amount
                                 of $1.5 billion, and (ii) issue Unsecured Notes
                                 in an amount to be determined (together, the
                                 "Exit Facility").  The Exit Facility shall be
                                 with parties and on market terms reasonably
                                 acceptable to AMLP.  Proceeds of the Exit
                                 Facility shall be used to, among other things,
                                 repay the DIP Facility, fund obligations under
                                 the Plan, including partial cash distributions
                                 to unsecured creditors, and fund business
                                 operations.

| | |
|---|---|
| Treatment of Secured and Priority Claims | Secured and Priority Claims will be reinstated or satisfied in full in cash on the Effective Date. |

4

<PAGE>

| | |
|---|---|
| Treatment of Unsecured Claims | Unsecured Creditors shall receive, on account of their Allowed Claims, (i) New Common Stock, (ii) Excess Cash, and (iii) the right to purchase their pro rata share of $100 million of Series B Preferred Stock (the "Preferred Stock Rights Offering").  Excess Cash shall mean the (i) sum of the proceeds of the Exit Facility plus cash on hand on the Effective Date, less (ii) (a) amounts necessary to pay, or reserve for payment of, all Allowed Administrative, Secured and Priority Claims, and (b) amounts necessary to fund business operations.  It is anticipated that distributions to Unsecured Creditors will have a value equal to the full amount of their Allowed Claims plus interest accrued from the Petition Date at the applicable non-default rate ("Payment in Full"). |
| Treatment of Equity Holders | Equity Holders shall receive the right to purchase (the "Common Stock Rights Offering") their pro rata share, based upon $250 million of proceeds, of New Common Stock at an exercise price equal to .85 times Plan Value (the "Exercise Price").  Plan Value shall mean the price per share that when combined with Excess Cash results in Payment in Full of Unsecured Creditors. |
| Preferred Stock Right Offering Backstop Commitment | AMLP shall commit to purchase at face value all Series Preferred B Stock offered in but not issued pursuant to the Preferred Stock Rights Offering. |
| Common Stock Rights Offering Backstop Commitment | AMLP shall commit to purchase at the Exercise Price all New Common Stock offered in but not issued pursuant to the Common Stock Rights Offering. |

5

<PAGE>

| | |
|---|---|
| Preferred Stock Terms | Each of the Series A Preferred Stock and the Series B Preferred Stock (collectively, the "Preferred Stock") shall have identical terms except that Series A Preferred Stock shall have certain voting and governance rights.  Subject to additional terms and conditions to be set forth in the Definitive Agreements, (a) holders of Preferred Stock shall be entitled to receive a dividend at the annual rate of 4.0% of the liquidation preference thereof, which if unpaid, shall accrue, and (b) each share of Preferred Stock shall be convertible, without any payment by the holder thereof, into a number of shares of New Common Stock equal to (i) the liquidation |

preference divided by (ii) .85 times Plan Value. AMLP shall be prohibited from receiving, in exchange for the exercise or non-exercise of voting rights, any compensation or renumeration.

Direct Investment

AMLP shall have the option to purchase up to $25 million of New Common Stock at the Exercise Price in addition to any shares of New Common Stock acquired pursuant to the Common Stock Rights Offering or Common Stock Rights Offering Backstop Commitment.

Governance

Reorganized Dana Corporation shall have balanced corporate governance pursuant to terms to be agreed upon between AMLP and the Official Committee of Unsecured Creditors.

Registration Rights

Registration Rights shall be customary for a transaction of this type.

Transaction Fees

AMLP shall be entitled to payment of commitment, backstop and other fees customarily payable in connection with a transaction of this type and magnitude.

Break-Up Fees

AMLP shall be entitled to customary break-up fees payable in connection with an at-risk transaction.

6

<PAGE>

Expense Reimbursement

AMLP shall be entitled to reimbursement of all reasonably incurred out of pocket costs and expenses incurred in connection with pursuing the Investment.

Definitive Agreements

All obligations shall be subject to mutually agreeable definitive agreements with customary conditions, representations and warranties, covenants and defaults.

Additional Investors

It is anticipated, but not a condition, that AMLP will arrange for additional investors to participate in the Investment. Such additional investors shall be subject to the consent of the Company, such consent not to be unreasonably withheld.

Governing Law

New York

7

</TEXT>
</DOCUMENT>

# EXHIBIT B



From: MAIMAN

TO: UZZI/LAURIA      COMPANY:        FAX NUMBER:        PHONE NUMBER:
                                     212·354–8113

NUMBER OF PAGES: 3                   DATE:

RE:

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:



# UNITED STEELWORKERS

**UNITY AND STRENGTH FOR WORKERS**

July 19, 2007

Michael J. Burns
Chairman, President and Chief Executive Officer
Dana Corporation
P.O. Box 1000
Toledo, Ohio 43697

Dear Michael:

We learned today of the SEC Schedule 13D filing made by Appaloosa Management L.P. ("Appaloosa"). As you know, Appaloosa attached to its filing a letter sent on July 18 to the Board of Directors of Dana Corporation in which Appaloosa describes its purported willingness to "unconditionally commit . . . to fund Centerbridge's obligations as set forth in the 'Terms of Centerbridge Investment,' attached as Exhibit B to [the] Plan Support Agreement . . . ."

Appaloosa's present offer is far from unconditional. Indeed, "illusory" would be a more apt description. As you know, the "Centerbridge" transaction is conditioned on specific Settlement Agreements between the Company and the Unions, which Agreements are based on Centerbridge being the party making the investment referred to therein. At this time, we are not prepared to enter into Settlement Agreements with Appaloosa as the investor. Therefore, Appaloosa cannot in fact make good on their offer.

We continue to encourage Dana to pursue the court approval of the Settlement Agreements and related understandings. If the court approves our Agreements, and if Appaloosa, or anyone else, proposes thereafter to pursue an investment in Dana, the Unions stand ready to fully fulfill our obligations under our respective Settlement Agreements. As you know, the Settlement Agreements include extensive obligations regarding the Unions' consideration of other potential investors or transactions.

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

Five Gateway Center, Pittsburgh, PA 15222 • 412-562-2400 • www.usw.org

Michael J. Burns
July 19, 2007
-2-

At this stage, however, Dana and its Board of Directors should not be diverted from the important work of obtaining court approval of our Agreements.

Very truly yours,

Bob King
Vice President and
Director of CS/ISP Department

Jim Robinson
Director
USW – District 7

CC:   Corinne Ball
      Andrew M. Kramer
      Thomas Moers Mayer
      Henry S. Miller
      David Tepper

**EXHIBIT CC**

Hearing Date and Time: July 25, 2007 at 10:00 a.m.
Objection Deadline: July 19, 2007 at 4:00 p.m.

THELEN REID BROWN RAYSMAN
& STEINER LLP
875 Third Avenue
New York, New York  10022
(212) 603-2000
Daniel A. Lowenthal (DL 7971)

Attorneys for Brandes Investment Partners, L.P.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Dana Corporation, *et al.*, | Case No. 06-10354 (BRL) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF BRANDES INVESTMENT PARTNERS, L.P. TO MOTION OF
DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF AN ORDER
(A) APPROVING SETTLEMENT AGREEMENTS WITH THE UNITED STEEL
WORKERS AND UNITED AUTOWORKERS, PURSUANT TO 11 U.S.C. §§ 1113
AND 1114(E) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019,
AND (B) AUTHORIZING THE DEBTORS TO ENTER INTO PLAN SUPPORT
AGREEMENT, INVESTMENT AGREEMENT AND RELATED AGREEMENTS,
PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), 364(C)(1), 503 AND 507**

TO:    THE HONORABLE BURTON R. LIFLAND
       UNITED STATES BANKRUPTCY JUDGE:

Brandes Investment Partners, L.P. ("Brandes") files this objection (the "Objection") to the

motion (the "Motion") of the above-captioned debtors and debtors in possession (the "Debtors") for

entry of any order (A) approving settlement agreements (the "Settlement Agreements") with the

United Steelworkers and United Autoworkers, pursuant to sections 1113 and 1114(e) of title 11 of the

United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy

Procedure, and (B) authorizing the Debtors to enter into a plan support agreement, an investment

agreement and related agreements (collectively, the "Plan Support Agreement"), pursuant to sections

105, 363(b), 364(c)(1), 503 and 507 of the Bankruptcy Code.  In support of its Objection, Brandes respectfully states as follows:

<u>**Objection**</u>

1.      Brandes is an investment advisory firm with 9,989,611 shares of the Debtors' common stock under management as of July 13, 2007.  Brandes was a member of the disbanded Official Committee of Equity Security Holders.

2.      The relief requested in the Motion should be denied.  Among other things, the Motion and the accompanying papers do not provide relevant information concerning anticipated distributions for equity security holders under a chapter 11 plan that would comply with the terms of the Plan Support Agreement.  Brandes' detailed review of publicly available information indicates that equity could receive a meaningful distribution in these cases.  Any plan process should take into account the interests of equity.  But neither the Plan Support Agreement nor its exhibits contain any discussion about a distribution for equity.  This omission suggests that, if the Motion is approved, the Debtors intend to file a chapter 11 plan that would eliminate the interests of old equity.  Brandes submits that the Settlement Agreements and Plan Support Agreement are based upon overly conservative valuations that will result in prejudice to equity security holders and likely other parties in interest as well.

**Conclusion**

For the foregoing reasons, Brandes respectfully requests that the Court not approve the

Settlement Agreements and not authorize the Plan Support Agreement, and grant Brandes such other

and further relief as the Court deems just and proper.

Dated: New York, New York
       July 19, 2007

                                    Respectfully submitted,

                                    THELEN REID BROWN RAYSMAN
                                    & STEINER LLP


                                    By:   /s/ Daniel A. Lowenthal
                                    Daniel A. Lowenthal (DL 7971)
                                    875 Third Avenue
                                    New York, New York  10022
                                    (212) 603-2000

                                    Attorneys for Brandes Investment Partners, L.P.

3                                   NY #1171301 v1

**EXHIBIT DD**

Andrew I. Silfen (AS-1264)                          Hearing Date: July 25, 2007
Michael S. Cryan (MC-4887)                          Hearing Time: 10:00 a.m.
Leah M. Eisenberg (LE-0096)
ARENT FOX LLP
1675 Broadway
New York, New York 10019
(212) 484-3900

Counsel to Wilmington Trust Company, as
Indenture Trustee

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re                                               Chapter 11

DANA CORPORATION, *et al.*,                         Case No. 06-10354 (BRL)

                          Debtors.                  Jointly Administered
---------------------------------------------------------x

**JOINDER OF WILMINGTON TRUST COMPANY AS INDENTURE
TRUSTEE TO OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO MOTION OF DEBTORS IN POSSESSION FOR ENTRY
OF AN ORDER (A) APPROVING SETTLEMENT AGREEMENTS WITH THE
UNITED STEELWORKERS AND UNITED AUTOWORKERS, PURSUANT TO
11 U.S.C. §§ 1113 AND 1114(E) AND FEDERAL RULE OF BANKRUPTCY
PROCEDURE 9019, AND (B) AUTHORIZING THE DEBTORS TO ENTER INTO PLAN
SUPPORT AGREEMENT, INVESTMENT AGREEMENT AND RELATED
<u>AGREEMENTS, PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), 364(C)(1), 503 AND 507</u>**

Wilmington Trust Company ("Wilmington Trust"), in its capacity as successor indenture

trustee (the "Trustee") to Citibank, N.A., under four Indentures dated as of December 15, 1997 (as

supplemented), August 8, 2001, March 11, 2002 and December 10, 2004 (as supplemented),

respectively (collectively, the "Indentures") between Dana Corporation ("Dana" or the "Debtors")

and Citibank, N.A., for a multiple series of fixed-rate unsecured notes in excess of $1.6 billion

principal amount outstanding issued by Dana pursuant to the Indentures, by and through its counsel,

Arent Fox LLP, hereby joins in the Objection of the Official Committee of Unsecured Creditors

(the "Creditors Committee") to the Motion of the Debtors for Entry of an Order (A) Approving

Settlement Agreements with the United Steelworkers and United Autoworkers, Pursuant to 11

NYC/340850.2

U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, and (b) Authorizing the Debtors to Enter into Plan Support Agreement, Investment Agreement and Related Agreements, Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c)(1), 503 and 507 (the "Plan Support, Investment and Global Settlement Motion"), and respectfully represents as follows:

## Joinder

1.      Wilmington Trust agrees with the assertions, contentions and arguments set forth in the Creditors Committee's Objection and hereby joins in such objection.

## Reservation of Rights

2.      Wilmington Trust reserves its rights to further address the Plan Support, Investment and Global Settlement Motion and any proposed form of order and to object to any additional deficiencies or infirmities and all rights to heard before the Court and otherwise participate in this contested matter.

3.      Wilmington Trust reserves its rights to further address any other issue or issues raised in this contested matter with respect to any plan or disclosure statement or at any hearing to consider approval of any disclosure statement or confirmation of any plan.[1]

---

[1] Although a confirmation issue, under the proposed structure, Wilmington Trust believes the disparate treatment among bondholders precludes confirmation of any plan of reorganization.

**<u>Conclusion</u>**

WHEREFORE, Wilmington Trust respectfully requests this Court to deny the Plan Support, Investment and Global Settlement Motion and grant the relief requested in the Creditor Committee's Objection, or in the alternative, deny approval of the Plan Support, Investment and Global Settlement Agreement Motion until the issues raised by the Creditors Committee and Wilmington Trust have been addressed satisfactorily, and grant such other and further relief as this Court deems just and proper.

Dated: New York, New York
       July 23, 2007

ARENT FOX LLP
Counsel to Wilmington Trust Company, as Indenture Trustee

By:     */s/ Andrew I. Silfen*
        Andrew I. Silfen (AS-1264)
        Michael S. Cryan (MC-4887)
        Leah M. Eisenberg (LE-0096)
        1675 Broadway
        New York, NY 10019
        (212) 484-3900

**<u>EXHIBIT EE</u>**

**Hearing Date and Time: July 26, 2007 at 10:00 AM**

James M. Sullivan, Esq. (JS-2189)
340 Madison Avenue
New York, New York 10173-1922
Telephone: 212.547.5400
Fax: 212.547.5444

*Counsel for The Timken Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------ X
In re                                                    : Chapter 11
                                                         :
DANA CORPORATION, et al.,                  : Case No. 06-10354 (RDD)
                                                         :
                        Debtors.                    : (Jointly Administered)
                                                         :
                                                         :
------------------------------------------------ X

**JOINDER OF THE TIMKEN COMPANY**
**TO OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**TO THE MOTION OF DEBTORS IN POSSESSION FOR ENTRY OF AN ORDER (A)**
**APPROVING SETTLEMENT AGREEMENTS WITH THE UNITED STEELWORKERS**
**AND UNITED AUTOWORKERS, PURSUANT TO 11 U.S.C. SECTIONS 1113 AND**
**1114(E) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019, AND (B)**
**AUTHORIZING THE DEBTORS TO ENTER INTO PLAN SUPPORT AGREEMENT,**
**INVESTMENT AGREEMENT AND RELATED AGREEMENTS, PURSUANT TO 11**
**U.S.C. SECTIONS 105(A), 363(B), 364(C)(1), 503 AND 507**

 

        The Timken Company, by and through its undersigned counsel, hereby joins in the

Objection of the Official Committee of Unsecured Creditors (the "Creditors Committee

Objection") to the Motion of the Debtors for Entry of an Order (a) Approving Settlement

Agreements with the United Steelworkers and United Autoworkers, Pursuant to 11 U.S.C. §§

1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, and (b) Authorizing the

Debtors to Enter into Plan Support Agreement, Investment Agreement and Related Agreements,

Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c)(1), 503 and 507 (the "Plan Support, Investment and Global Settlement Motion"). Timken agrees with the assertions, contentions and arguments set forth in the Creditors Committee's Objection and hereby joins in such objection. Timken reserves its rights to further address the Plan Support, Investment and Global Settlement Motion.

Dated: July 24, 2007

Respectfully submitted,

**McDermott Will & Emery LLP**

By: /s/  James M. Sullivan
James M. Sullivan, Esq. (JS-2189)
340 Madison Avenue
New York, New York  10173-1922
Telephone:  212.547.5400
Fax:  212.547.5444

*Counsel for The Timken Company*

NYK 1112538-1.064980.0025

**EXHIBIT FF**

**Hearing Date and Time:  July 26, 2007 at 10:00 a.m.**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Tel:  (212) 819-8200
J. Christopher Shore (JS-3061)
Gerard Uzzi (GU-2297)

Wachovia Financial Center
Suite 4900
200 South Biscayne Blvd.
Miami, Florida 33131
Tel:  (305) 371-2700
Thomas E Lauria (*pro hac vice*)
Richard S. Kebrdle (*pro hac vice*)

Attorneys for Appaloosa Management L.P.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
|  | : | Chapter 11 |
| In re | : |  |
|  | : | Case No. 06-10354 (BRL) |
| Dana Corporation, *et al.,* | : |  |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

-------------------------------------------------------------x

**SECOND SUPPLEMENTAL OBJECTION OF APPALOOSA MANAGEMENT L.P.
TO MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF AN
ORDER (A) APPROVING SETTLEMENT AGREEMENTS WITH THE UNITED
STEELWORKERS AND UNITED AUTOWORKERS, PURSUANT TO 11 U.S.C. §§ 1113
AND 1114(e) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019,
AND (B) AUTHORIZING THE DEBTORS TO ENTER INTO PLAN SUPPORT
AGREEMENT, INVESTMENT AGREEMENT AND RELATED AGREEMENTS,
PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 364(c)(1), 503 AND 507**

TO:     THE HONORABLE BURTON R. LIFLAND,
          UNITED STATES BANKRUPTCY JUDGE:

          Appaloosa Management L.P. ("Appaloosa") files this second supplemental

objection (the "Second Supplemental Objection") to the motion (the "Settlement Motion") of the

above-captioned debtors and debtors in possession (the "Debtors") for entry of an order (A)

approving settlement agreements with the United Steelworkers and United Autoworkers,

pursuant to sections 1113 and 1114(e) of title 11 of the United States Code (the "Bankruptcy

Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure, and (B) authorizing the

Debtors to enter into a plan support agreement, the investment agreement, and related

agreements, pursuant to sections 105(a), 363(b), 364(c)(1), 503 and 507 of the Bankruptcy

Code.[1]  In support of the Second Supplemental Objection, Appaloosa respectfully represents as

follows:

<div align="center">**OBJECTION**</div>

1.      At approximately 2:00 a.m. this morning, July 25, 2007, Appaloosa

received the Debtors' amended omnibus reply in support of the Settlement Motion [Docket No.

5792] (the "Reply").  In the Reply, the Debtors set forth certain modifications to Centerbridge

Capital Partners, L.P.'s originally publicized investment terms (the "Modified Centerbridge

Investment Terms").

2.      Since having an opportunity to review the Reply, Appaloosa has delivered

to the Debtors' board of directors a letter containing a second investment proposal, a copy of

which is attached hereto as Exhibit "A."  Appaloosa submits that this second investment

proposal is superior to the Modified Centerbridge Investment Terms and now, for the same

reasons explained in Appaloosa's Supplemental Objection, the Modified Centerbridge

Investment Terms are also rendered obsolete.

---

[1]      The Second Supplemental Objection supplements the supplemental objection filed and served by
Appaloosa on July 25, 2007 [Docket No. 5766] (the "Supplemental Objection") and the preliminary objection of
Appaloosa, which was filed and served on July 9, 2007 [Docket No. 5656].

## **CONCLUSION**

3.      For the foregoing reasons, the Court should deny approval of the

Settlement Motion, and award such other and further relief as the Court deems appropriate.

Dated:  New York, New York
          July 25, 2007


                                          _/s/ Gerard Uzzi_____
                                          WHITE & CASE LLP
                                          1155 Avenue of the Americas
                                          New York, New York 10036-2787
                                          Tel:  (212) 819-8200
                                          J. Christopher Shore (JS-3061)
                                          Gerard Uzzi (GU-2297)

                                          Wachovia Financial Center
                                          Suite 4900
                                          200 South Biscayne Blvd.
                                          Miami, Florida 33131
                                          Tel:  (305) 371-2700
                                          Thomas E Lauria (*pro hac vice*)
                                          Richard S. Kebrdle (*pro hac vice*)

                                          Attorneys for Appaloosa Management L.P.

MIAMI 733985 (2K)

**<u>Exhibit A</u>**

Appaloosa Management L.P.
26 Main Street
Chatham, NJ 07928

July 25, 2007

TO: THE BOARD OF DIRECTORS OF DANA CORPORATION
4500 Dorr Street
Toledo, Ohio 43615

Ladies and Gentlemen:

Earlier today, the Company filed with the Bankruptcy Court its Omnibus Reply to Objections to its Motion seeking approval of, among other things, the terms under which Centerbridge Capital Partners, L.P. is willing to invest in a plan of reorganization of the Company. In its Reply, the Company sets forth certain modifications to Centerbridge's originally publicized investment terms (the "Modified Centerbridge Investment Terms").

We believe that the Modified Centerbridge Investment Terms continue to fall short of providing a fair and adequate recovery to stakeholders. We believe that such deficiencies are the product of, among other things, a flawed market test being performed by the Company, which lacks sufficient openness and transparency, and that unfair and inadequate recoveries will be the inevitable conclusions of the Company's reorganization efforts. In this regard, it is obvious that the Modified Centerbridge Investment Terms have been submitted largely as a counter to our enhancements over Centerbridge's original proposal that we previously committed to you. We believe the conclusion that stakeholders would benefit substantially from an open and transparent marketing process (which is currently lacking) cannot be reasonably disputed.

Furthermore, we are in receipt of your letter to us, dated July 18, 2007, refusing to take any actions with respect to Dana's "poison pill." We believe such refusal to modify the poison pill as we previously requested in our letter to you, dated June 28, 2007, has a further chilling effect on the ability of stakeholders to formulate competitive alternative proposals for a plan of reorganization with market terms. We hereby reiterate our request, again without conceding that the poison pill was, in fact, properly extended without Bankruptcy Court approval, that you modify Dana's rights plan as set forth in our June 28, 2007 letter, a copy of which is attached hereto.

In light of our conclusion that a plan of reorganization based upon the Modified Centerbridge Investment Terms falls far short of providing a construct for a reorganization that is in the best interest of all stakeholders, we are prepared to further demonstrate the relative ease upon which we are able to offer enhancements to such proposal. Accordingly, in addition to the July 18th Enhancements, Appaloosa now commits and agrees to make the following additional changes to the Modified Centerbridge Investment Terms:

(1)    Appaloosa adopts and agrees to each of the Modified Centerbridge Investment Terms (all as set forth on Schedule 1 annexed hereto), except (a) for the collar mechanism set

forth therein (unless and until Appaloosa receives a satisfactory explanation of how the mechanism operates), and (b) to the extent otherwise inconsistent with the terms set forth herein.

(2)    In lieu of the limited Rule 144A Offering contemplated by the Modified Centerbridge Investment Terms, which Appaloosa contends is discriminatory in its treatment of stakeholders, the right to purchase the Series B Preferred at par will be offered to all holders of allowed unsecured claims on a pro rata basis (the "Series B Rights Offering").  Any shares of Series B Preferred not purchased under the Series B Preferred Rights Offering will be purchased at par by Appaloosa and certain other entities (the "Standby Purchasers") who shall receive a guaranteed minimum of 10% of the Series B Preferred and a commitment fee of $10.0 million (2.0%) as consideration for their agreement to perform the foregoing standby purchaser obligations.

(3)    The Approval Rights (as defined in the Centerbridge Investment Terms) shall be subject to being over-ridden by a 2/3s vote of the common shareholders (not counting any shares held by Appaloosa).  A special shareholder meeting may be called upon the giving of notice by 20% or more of the issued and outstanding shares of common stock.

(4)    The initial Board of Directors shall be selected as follows:

(A)    Appaloosa shall select 3 directors;

(B)    The UCC shall select 3 directors;

(C)    One director shall be the CEO;

(D)    One director shall be the new Executive Chairman (selected as described below); and

(E)    One director shall be selected by the Standby Purchasers other than Appaloosa.

(5)    Not less than 2/3s of the New Board shall be "independent" as defined under the NYSE rules and shall also be independent from Appaloosa.

(6)    The initial Executive Chairman of the Board shall be selected by a selection committee comprised of one Appaloosa representative, one UCC representative and one representative of the Standby Purchasers (other than Appaloosa).  The Executive Chairman shall be approved by a majority vote of the Selection Committee (such majority to include the Appaloosa representative).  Any successor Executive Chairman shall be selected by the Nominating and Governance Committee of the Board, subject (but only for so long as Appaloosa retains the voting rights set forth in paragraph (8) below) to the approval of Appaloosa.

(7)    The Executive Chairman shall be a full-time employee of the Company with his or her principal office in the Company's world headquarters in Toledo, Ohio and shall devote substantially all of his or her business activity to the business affairs of the Company.

The Executive Chairman shall cause the Company to and the Company shall be obligated to meaningfully consult with the representatives of Appaloosa with respect to the annual budget and material modifications thereto prior to the time it is submitted to the Board for approval.

The employment agreements entered into by the Company with the Executive Chairman and the Chief Executive Officer shall provide that (i) upon any termination of employment, the Executive Chairman and/or the Chief Executive Officer shall resign as a director (and the employment agreements shall require delivery at the time such agreements are entered into of an executed irrevocable resignation that becomes effective upon such termination) and (ii) the right to receive any payments or other benefits upon termination of employment shall be conditioned upon such resignation. If for any reason the Executive Chairman or the Chief Executive Officer does not resign or the irrevocable resignation is determined to be ineffective, then the Series A Preferred Stock Holders may remove the Executive Chairman and/or Chief Executive Officer as a director, subject to applicable law.

(8)    For so long as Appaloosa shall beneficially own not less than $150 million of the Series A Preferred or until the fourth anniversary of the Effective Date, whichever comes first, the Series A Preferred shall vote separately as a class to elect the Series A Preferred directors and shall have the right to remove and replace the Series A Directors; thereafter, the Series A Preferred shall vote together with the common on an as converted basis.

Notwithstanding our full commitment to pursue an alternative to the Modified Centerbridge Investment Terms as outlined above, we continue to believe that such transaction, even as improved by us, remains fundamentally unfair to existing stakeholders. Accordingly, we remain prepared to continue to explore with the Company a transaction bases upon the "Term Sheet for Plan of Reorganization for Dana Corporation" attached to our July 18th Letter.

We continue to believe that the situation requires your immediate attention and consideration and await your response. We are available to meet with the Board and its representatives at your earliest convenience to discuss more fully the matters set forth herein and to work toward an amicable, appropriate conclusion to Dana's chapter 11 case.

Sincerely,

APPALOOSA MANAGEMENT L.P.

David Tepper
President

4

## SCHEDULE 1

- Appendix R to the Union Settlement Agreement now: (i) provides that the counsel for the Creditors' Committee will be co-counsel with the Debtors in any mediation/arbitration proceeding; (ii) establishes an objective standard by which the mediator/arbitrator is to determine whether the Unions acted reasonably in withholding their consent to an alternative transaction; (iii) identifies an arbitrator that is acceptable to the Debtors, the Unions and the Creditors' Committee; and (iv) limits the Union's due diligence and the arbitration period to four weeks in the aggregate;

- There will be $250 million (rather than $300 million) of Series A Preferred Shares and $500 million (rather than $450 million) of Series B Preferred Shares;

- The $500 million of Series B Preferred will be offered to qualified investors (holders of at least $25 million in the aggregate of claims and who are "qualified institutional buyers" as defined in Rule 144A promulgated under the Securities Act as of (i) for bonds, 10 days after the date that this Motion is approved and (ii) for trade creditors, at later dates);

- The Debtors are committed to address the concerns raised by the Creditors' Committee on behalf of creditors who are not qualified investors in the plan of reorganization;

- The Series A Preferred is *pari passu* to the Series B Preferred;

- The lock-up period for all of the Series B Preferred and that portion of the Series A Preferred not subject to the three-year lock-up period increases from 2 months to 6 months;

- The market pricing for the Preferred Stock remains the market pricing set forth in the Motion subject to a collar based on a total enterprise value range between $3,150,000,000 and $3,500,000,000;

- The commitment fee payable to Centerbridge on the Series B-1 Preferred Stock would be reduced from 1.75% to 1% (but would remain 1.75% if the Debtors pursue a transaction other than an alternative minority investment);

- The consent rights of Centerbridge are non-transferable and are limited to three years (12 months for dividends and the issuance of senior or *pari* passu securities) or up until it holds less than 50% of the then-outstanding Series A Preferred, whichever comes first;

- The Unions will receive $60 million in cash to their VEBAs in lieu of the $80 million stock contribution;

- The Debtors agree not to oppose, and Centerbridge and the Unions will support, an application of counsel to the Ad Hoc Committee under section 503(b) of the Bankruptcy Code for reasonable fees up to a cap of $5 million;

- Any plan of reorganization will be proposed to take advantage of the tax benefits available under Internal Revenue Code § 382(l)(6) rather than § 382(l)(5);

- Miller Buckfire's fees shall be determined in an amount reasonably satisfactory to Miller Buckfire, the Ad Hoc Committee of Bondholders and the Creditors' Committee; and

- Any order approving the Motion shall provide for a process and schedule that are acceptable to the Debtors and the Creditors' Committee for interested parties to submit competing offers.



26 Main Street, 1st Floor  Chatham, New Jersey 07928

(973) 701-7000
Fax (973) 701-7055

VIA FEDEX AND FAX

June 28, 2007

TO:
THE MEMBERS OF THE BOARD OF DIRECTORS
   OF DANA CORPORATION
c/o Michael J. Burns,
Chairman, President, and Chief Executive Officer
Dana Corporation
4500 Dorr Street
Toledo, Ohio 43615

Ladies and Gentlemen:

As you know, Appaloosa is the largest shareholder of Dana Corporation.  As reflected in our Schedule 13D on file with the SEC, we own almost 15% of Dana's issued and outstanding shares of common stock.

We understand that the Board of Directors, without approval by shareholders or the Bankruptcy Court overseeing Dana's chapter 11 case, purported to extend until July 2016 Dana's Rights Agreement, dated as of April 25, 1996, even though the Rights were to have expired on July 25, 2006, several months after Dana filed its bankruptcy petition.  In the interests of all of Dana's stakeholders, without accepting that the Rights Agreement was properly extended without bankruptcy court approval, we request that either the Board terminate/cancel the Rights Agreement or at least make it inapplicable to shareholders working together to construct or propose an alternative to management's pending Plan of Reorganization.

Under present circumstances, the Rights Agreement presents an impediment to equity holders who wish to organize and otherwise act in a fashion consistent with protecting their interests in the Company's Chapter 11 case.  Moreover, as Appaloosa may wish to sponsor an alternate Plan of Reorganization to management's pending proposal, the Rights Agreement impairs our ability to work with other interested shareholders to construct such an alternative.  As any such proposal, necessarily, would be subject to bankruptcy court oversight and approval, there is no reason the Rights Agreement should prevent such activities.

We trust revoking or amending the Rights Agreement should not be controversial or problematic as doing so would be consistent with the Board's duty to act in the best interests of its stakeholders and otherwise demonstrates sound business judgment designed to enhance Dana's estate value.   Along the same lines, we would ask the Board to ensure that Appaloosa, or any other parties-in-interest, be afforded timely access to a full and complete package of information – which is necessary in order to make a competitive proposal.

Sincerely,

APPALOOSA MANAGEMENT L.P.

David A. Tepper
President

**<u>EXHIBIT GG</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------X
                                        :
In re                                   :    Chapter 11
                                        :
Dana Corporation, et al.,               :    Case No. 06-10354 (BRL)
                                        :
        Debtors.                        :    (Jointly Administered)
                                        :
                                        :
-------------------------------------------------------X
```

**ORDER, PURSUANT TO SECTIONS 105, 363, 365, 502 AND 503 OF THE
BANKRUPTCY CODE (A) AUTHORIZING ASSUMPTION OF
EMPLOYMENT AGREEMENTS, AS MODIFIED, (B) APPROVING
LONG-TERM INCENTIVE PLAN AND (C) GRANTING RELATED RELIEF**

This matter coming before the Court on the Motion of Debtor Dana Corporation,

Pursuant to Sections 105, 363, 365, 502 and 503(c) of the Bankruptcy Code, for an Order

(A) Authorizing Assumption of Employment Agreements, as Modified, (B) Approving Long-

Term Incentive Plan and (C) Granting Related Relief (the "Motion"),[1] filed by Dana Corporation

("Dana"), one of the debtors and debtors in possession in the above-captioned cases; objections

to the Motion having been filed by the U.S. Trustee, the Unions, the Retirees' Committee and

several individuals (collectively, the "Objections"); statements in support of the Motion having

been filed by the Creditors' Committee and the Equity Committee (collectively, the "Statements

in Support"); a reply having been filed by Dana in response to the Objections (the "Reply"); the

Court having reviewed the Motion, the Objections, the Reply and the Statements in Support and

having considered the statements of counsel regarding the relief requested in the Motion and the

evidence adduced at the hearing on the Motion (the "Hearing"); the Court having found that

---

[1]        Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

(a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (c) notice of the Motion and the Hearing was sufficient under the circumstances; (d) in light of the circumstances, the requirements of Local Bankruptcy Rule 9013-1(b) that a separate memorandum of law be filed in support of the Motion is waived; (e) a sound business purpose exists for (i) Dana's assumption of the Employment Agreements, as modified (collectively, the "Executive Agreements"), to curtail the assumption of Mr. Burn's Pension Benefits to 60% of his prepetition accrued amount and all postpetition accruals and to limit remedies thereunder to comply with section 503(c)(2) of the Bankruptcy Code and this Court's prior decision, (ii) the implementation and performance of the LTIP and (iii) the allowance of certain general unsecured claims against Dana's estate under certain circumstances as described in the Motion and the Term Sheet (the "Allowed Executive Claims" and, together with the Executive Agreements and the LTIP, the "Executive Compensation Program"); (f) the Executive Compensation Program is reasonable, appropriate and in the best interests of the Debtors' estates and stakeholders; and is consistent with and does not violate section 503(c) of the Bankruptcy Code; and the Court having determined that the legal and factual bases set forth in the Motion, the Statements in Support, the Reply and at the Hearing establish just cause for the relief granted herein;

<div align="center">IT IS HEREBY ORDERED THAT:</div>

1.    For the reasons set forth in the Memorandum Opinion Approving, In Part, Debtors' Motion for Authorization to Assume Employment Agreements, For Approval of a Long Term Incentive Plan, entered on November 30, 2006 (Docket No. 4193) (the "Memorandum Opinion"), (a) the Motion is GRANTED as modified herein and by the Memorandum Opinion; (b) the Objections are OVERRULED; and (c) the Motion of Debtor Dana Corporation for

Clarification and Reconsideration, Pursuant to Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure, of Order Denying Executive Compensation Motion (Docket No. 3530) is DENIED as moot.

2.    Dana is authorized, pursuant to sections 105, 363 and 503(c) of the Bankruptcy Code, to implement the LTIP and perform its obligations thereunder, as contemplated by and in conformity with the Motion, the Term Sheet and this Order.

3.    Subject to the execution of appropriate documentation reasonably acceptable to the Creditors' Committee, the Equity Committee and the *Ad Hoc* Committee, Dana is authorized, pursuant to sections 105, 365 and 503(c) of the Bankruptcy Code, to assume the Executive Agreements in accordance with the terms of the Motion, the Term Sheet and this Order; it being understood that (a) such Executive Agreements will reflect parity of pensions with the salaried and bargained unit defined benefit pension plans of Dana so that (i) the Senior Executives' Pension Benefits will only be assumed if such plans are not terminated and (ii) in the event of termination of such plans, the Senior Executives shall have only unsecured claims for the accrued prepetition amounts of their Pension Benefits, as set forth herein; and (b) during 2007 and continuing through the pendency of these cases, each of the executives shall have an annual base compensation which shall, unless otherwise approved by this court, be frozen at today's levels[2] and the maximum additional compensation payable annually under the AIP and the LTIP approved herein shall not exceed $5.5 Million for Mr. Burns, representing a decrease in the maximum bonus amounts to which he would have been entitled under the AIP and the LTIP in 2007 pursuant to the relief sought in the Motion if all applicable targets are met under the AIP

---

[2]    The annual base cash compensation for Michael Burns is $1,035,000; and the annual base compensation for each of the other senior executive is as follows: for Paul Miller, $375,000; for Tom Stone, $440,000; for Michael DeBacker, $405,000; for Nick Stanage, $385,000; and for Ralf Goettel, $385,000.

and LTIP, and $7.01 Million, in aggregate, for Messrs. Stone, Stanage, Miller, Debacker and

Goettel, representing a 7% reduction in the aggregate maximum bonus amounts to which they

would have been entitled under the AIP and the LTIP in 2007 pursuant to the relief sought in the

Motion if all applicable targets are met under the AIP and LTIP.

                4.        Pursuant to section 502 of the Bankruptcy Code, the following claims are

hereby allowed as and to the extent and at the times indicated in this paragraph:  (a) in the event

that the salaried and bargained unit defined benefit pension plans are terminated, each Senior

Executive shall have an allowed general unsecured claim equal to the amount of Pension

Benefits accrued through the date that these cases were commenced, with all postpetition

accruals and credits allowed and paid as an administrative expense claim against Dana's estate;

(b) in the event that such plans are not terminated upon the effective date of a plan of

reorganization in these cases, the Pension Benefits of Messrs. Stone, Stanage, Miller shall be

assumed, and 60% of the prepetition Pension Benefits of Mr. Burns shall be assumed, and Mr.

Burns shall have an allowed general unsecured claim against Dana's estate equal to 40% of his

prepetition Pension Benefits; and (c) in the event that Mr. Burns is terminated prior to the

confirmation of a plan of reorganization in these cases, there shall be allowed to Mr. Burns as a

general unsecured claim against Dana's estate the Pre-Emergence Claim.  In all cases, following

any termination of a Senior Executive, any claims allowed hereby shall be freely assignable.

                5.        If any Senior Executive is terminated prior to the effective date of a plan

of reorganization in these cases, Dana shall file a notice with the Court detailing (a) the amount

of severance it intends to pay to such Senior Executive as permitted by section 503(c)(2) of the

Bankruptcy Code and (b) the calculations underlying such determination (the "Severance

Payment Notice").  The Severance Payment Notice will be served on the U.S. Trustee, the

Creditors' Committee, the Equity Committee, the Unions, the Retirees' Committee and the *Ad Hoc* Committee. If no party in interest objects within 10 days from the date of the Severance Payment Notice, the severance shall be paid. If an objection is filed and cannot be resolved consensually, Dana may pay the undisputed amount of severance, if any, but the disputed amount of severance shall not be paid absent a further order of the Court approving such payment.

6.     Dana is authorized to take any other and further actions as may be necessary or appropriate to give effect to the relief granted in this Order.

7.     Nothing in this Order, the Memorandum Opinion, the prior decisions of this Court or the Executive Compensation Program approved hereby shall prevent: (a) Dana from performing under its 2006 AIP; (b) Mr. Goettel from receiving severance from Dana's nondebtor German affiliates as, and only to the extent required by, German law; and (c) the engagement of a Senior Executive following his termination as a consultant, subject to Court approval after notice and a hearing.

8.     Nothing in this Order shall constitute nor shall be construed as a finding or conclusion concerning the appropriateness of the executive compensation packages or the annual compensation ceilings or caps with respect to the CEO or the other Senior Executives for purposes of a proceeding under section 1113 or section 1114 of the Bankruptcy Code and the legal standards thereunder.

9.    This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this Order.

Dated:  New York, New York
        December 18, 2006

                                            /s/Burton R. Lifland_____
                                            UNITED STATES BANKRUPTCY JUDGE

NO OBJECTION:

 s/Gary J. Kaplan_____        s/Thomas Moers Mayer_____
Gary J. Kaplan, Esq.                     Thomas Moers Mayer (TM 9357)
Brian D. Pfeiffer, Esq.                  Matthew J. Williams (MW 4081)
FRIED, FRANK, HARRIS, SHRIVER &          KRAMER LEVIN NAFTALIS & FRANKEL
JACOBSON LLP                             1177 Avenue of the Americas
One New York Plaza                       New York, New York  10036
New York, New York 10004                 Telephone:  (212) 715-9100
Telephone:  (212) 859-8000               Facsimile:  (212) 715-8000
Facsimile:  (212) 859-4000

                                         ATTORNEYS FOR OFFICIAL
ATTORNEYS FOR OFFICIAL                   COMMITTEE OF UNSECURED
COMMITTEE OF EQUITY SECURITY             CREDITORS
CREDITORS